IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.                                                    Case Number: 1:12-cv-00257-JB-LFG

LARRY GOLDSTONE,
CLARENCE G. SIMMONS, III
and JANE E. STARRETT,

Defendants.

**PLAINTIFF'S RESPONSE TO THE MOTION TO DISMISS ON BEHALF OF
DEFENDANTS LARRY GOLDSTONE AND CLARENCE G. SIMMONS[1]**

---

[1]      This response is primarily directed to the Motion to Dismiss on Behalf of Defendants
Larry Goldstone and Clarence G. Simmons and Memorandum of Law in Support, Dckt. No. 35,
("G&S Brief"), but to the extent issues in the G&S Brief overlap with issues raised by Defendant
Jane Starrett's Motion to Dismiss and Memorandum of Points and Authorities In Support, Dckt.
No. 36, ("Starrett Brief"), for the sake of efficiency, they may be addressed herein.

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION.................................................................................................1

II.    ARGUMENT ......................................................................................................4

A.    THE MOTIONS TO DISMISS IMPROPERLY REFERENCE
MULTIPLE DOCUMENTS THAT ARE OUTSIDE THE
COMPLAINT AND WHOSE INTERPRETATIONS ARE IN
DISPUTE ............................................................................................................4

B.    LEGAL STANDARD ........................................................................................8

    1.    Federal Rule of Civil Procedure 12(b)(6)...........................................8

    2.    Federal Rule of Civil Procedure 9(b) ..................................................9

C.    DEFENDANTS' REQUEST TO DISMISS THE COMPLAINT
BASED ON PUZZLE PLEADING SHOULD BE DENIED .......................10

D.    THE SEC HAS ALLEGED FRAUD WITH PARTICULARITY ............12

    1.    The Complaint Alleges Material Misstatements and Omissions
in Thornburg's Form 10-K ................................................................15

    2.    Defendants Had a Duty to Disclose the Omitted Information.........19

        a.    The Affirmative Statement that Thornburg Had Not Sold
Any Assets to Meet Margin Calls Created a Duty to Disclose
the I/O Strip Transactions ......................................................20

        b.    Similarly, Proclaiming that Thornburg Had Successfully Met All
Margin Calls Created a Duty to Disclose that the Company Could Not
Timely Meet Margin Calls and Was Not Declared in Default Only
Through Lender Forbearance ..................................................22

    3.    Defendants' Misrepresentations and Omissions Concerned
Past Margin Calls and Income – This is Not "Fraud-by-
Hindsight"............................................................................................24

E.  THE SEC HAS ALLEGED SCIENTER ........................................................28

  1.  Thornburg's "Negative Disclosures" Do Not Negate the
      Scienter Alleged ...........................................................................30

  2.  The Nature of the OTTI Analysis Does Not Undercut Scienter ....................37

  3.  Simmons' "If They Only Knew" Comment to Goldstone Is Strong
      Evidence of Scienter .....................................................................44

  4.  The Desire for Thornburg to Survive the Mortgage Crises
      Evidences Scienter ........................................................................46

F.  GOLDSTONE'S STATEMENTS FOLLOWING THE FILING OF
    THE FORM 10-K ......................................................................................47

G.  THE COMPLAINT ALLEGES THAT DEFENDANTS DECEIVED
    THORNBURG'S AUDITORS.......................................................................50

H.  THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON
    LIABILITY AND AIDING AND ABETTING FOR THORNBURG'S
    VIOLATIONS OF THE SECURITIES LAWS AGAINST GOLDSTONE
    AND SIMMONS ......................................................................................58

III.  CONCLUSION ...............................................................................................60

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Plastic Equipment, Inc. v. Toytrackerz, LLC*, 2008 WL 917635 (D. Kan. 2008) .........40

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................8, 9

*In re BISYS Sec. Litigation*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005) .............................................15

*In re Baan Co. Sec. Litigation*, 103 F. Supp. 2d 1 (D.D.C. 2000) .....................................................1

*Baron v. Smith*, 380 F.3d 49 (1st Cir. 2004) ..........................................................................23, 24

*In re BearingPoint, Inc. Sec. Litigation*, 525 F. Supp. 2d 759 (E.D. Va. 2007) ...........................35

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ...............................................................................8

*In re BellSouth Corp. Sec. Litigation*, 355 F. Supp. 2d 1350 (N.D. Ga. 2005) ..............................3

*In re Boston Technology*, 8 F. Supp. 2d 43 (D. Mass. 1998) ........................................................21

*In re Burlington Coat Factory*, 114 F.3d 1410 (3rd Cir. 1997) ....................................................16

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 1:00-C 2002 U.S. Dist. LEXIS
28072 (N.D. Ga. August 20, 2002) ................................................................................................1

*City of Omaha v. CBS Corp.*, No. 11-2575-cv,
2012 WL 1624022 (2d Cir. 2012)....................................................3, 13, 17, 30, 31, 36, 37

*City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245 (10th Cir. 2001)...........................26, 27

*Connett v. Justus Enters. of Kansas, Inc.*, 68 F.3d 385 (10th Cir. 1995).......................................19

*Cottrell, Ltd. v. Biotrol International, Inc.*, 191 F.3d 1248 (10th Cir. 1999) .................................8

*In re Craftmatic Sec. Litigation*, 890 F.2d 628 (3rd Cir. 1989)....................................................20

*Ferber v. The Travelers Corp.*, 802 F. Supp. 698 (D. Conn. 1992) ...............................................35

*In re First Energy Corp. Sec. Litigation*, 316 F. Supp. 2d 581 (N.D. Ohio 2004) ........................15

*Florida State Board of Admin. v. Green Tree Finance Corp.*, 270 F.3d 645 (8th Cir. 2001) ..................................................................................................................................1, 2, 16

*Fulton Cnty. Emp. Ret. Sys. v. MGIC Investment Corp.*, 675 F.3d 1047 (7th Cir. 2012) .............................................................................17, 25, 26, 28, 35

*Funke v. Life Financial Corp.*, 237 F. Supp. 2d 458 (S.D.N.Y. 2002)...........................................2

*Genesee Cnty. Emp. Retirement  System v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082 (D.N.M. 2011) ........................................................................................7, 8

*German v. SEC*, 334 F.3d 1183 (10th Cir. 2003) .........................................................................19

*Goldstone - Higginbotham v. Baxter International Inc.*, 495 F.3d 753 (7th Cir. 2007)

*Grossman*, v. Novell, 120 F.3d 1112 (10th Cir. 1997) ..................................................................16

*Hackbart v. Holmes*, 675 F.2d 1114 (10th Cir. 1982) ..................................................................28

*In re International Rectifier Corp. Sec. Litigation, Number CV07-02544*, 2008 WL 4555794 (C.D. Cal. May 23, 2008) .............................................................................................41

*Jacobsen v. Deseret Book Co.*, 287 F.3d 936 (10th Cir. 2002) ......................................................5

*Jayhawk Capital Management, LLC v. LSB Industrial, Inc.*, No. 08-2561, 2009 WL 3766371 (D. Kan. Nov. 10, 2009) .......................................................................................5

*Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014 (N.D. Ill. 2010)....................................32

*Ledoux v. Davies*, 961 F.2d 1536 (10th Cir. 1992)................................................................12, 13

*Matrix Capital Management Fund LP v. BearingPoint, Inc.*, 576 F.3d 172 (4th Cir. 2009) (*see* G&S Brief at 40) ..................................................................................................................35

*McDonald v. Kinder -Morgan, Inc.*, 287 F.3d 992 (10th Cir. 2002) ......................................20, 21

*Miller v. Glanz*, 948 F.2d 1562 (10th Cir. 1991) .......................................................................7

*In re MoneyGram International, Inc. Sec. Litigation*, 626 F. Supp. 2d 947 (D. Minn. 2009) .................................................................................................................................47

*In re Network Equipment Technologies, Inc., Litigation*, 762 F. Supp. 1359 (N.D. Cal. 1991) ...................................................................................................................................6

*New Jersey and its Div. of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119 (D. Kan. 2004) ...............19

*Niederquell v. Bank of America*, Civil Action No. 11-cv-03185, 2012 WL 1578060 (D. Colo. May 4, 2012) ...............................................................................................................8

*In re Neopharm, Ind. Sec. Litigation*, No. 02 C 2976, 2003 WL 262369 (N.D. Ill. Feb. 7, 2003) ...................................................................................................................................33

*In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y.) 2000 ..........................55

*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) ...............................................................9

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*, 595 F.3d 86 (2d Cir. 2010)...................................................................................................................19

*Payne v. DeLuca*, 433 F. Supp. 2d 547 (W.D. Pa. 2006) ............................................................18

*In re RAIT Financial Trust Sec. Litigation*, No. 2:07-cv-03148, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)...................................................................................................................2

*Republican Party of North Carolina v. Martin*, 980 F.2d 943 (4th Cir.1992).............................40

*Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008)................................................................8

*SEC v. Arnold*, Civil No. 03-CV-0328, 2007 WL 2786428 (D. Colo. Sept. 24, 2007).............9, 28

*S2 Automation LLC v. Micron Technology, Inc.*, Number CIV 11-0884, __ F.R.D. __,
2012 WL 843706 (D.N.M. Mar. 5, 2012) ..................................................................................4

*SEC v. Autocorp Equities, Inc.*, 292 F. Supp. 2d 1310 (D. Utah 2003) ..........................................19

*SEC v. Autocorp. Equities, Inc.*, No. 2:98-cv-00562, 2004 WL 1771608 ....................................55

*SEC v. BankAtlantic Bancorp, Inc.*, No. 12-60082-Civ., 2012 WL 1936112 (S.D. Fla.
May 29, 2012) ............................................................................................................................33

*SEC v. Curshen*, 372 Fed. Appx. 872, 877 (10th Cir. 2010) ........................................................28

*SEC v. Das*, No. 8:10CV102, 2010 WL 4615336 (D. Neb. Nov. 4, 2010) ...................................10

*SEC v. Dauplaise*, No. 2:98-CV-00562, 2004 WL 17716 (D. Utah Aug. 4, 2004) ......................10

*SEC v. Espuelas*, 579 F. Supp. 2d 461 (S.D.N.Y. 2008) ..........................................................2, 15

*SEC v. First America Bank & Trust Co.*, 481 F.2d 673 (8th Cir. 1973) .......................................20

*SEC v. Fraser*, No. CV-09-00443, 2010 WL 5776401 (D. Ariz. Jan 28, 2010) ...................10, 11

*SEC v. Fraser*, No. CV-09-00443, 2009 WL 2450508 (D. Ariz. Aug. 11, 2009) .......................10

*SEC v. Freiberg*, No. 2:05-CV-00233, 2007 WL 2692041 (D. Utah Sept. 12, 2007).................28

*SEC v. Gabelli*, 653 F.3d 49 (2nd Cir. 2011).......................................................................19, 21

*SEC v. Gordon*, No. 09-CV-0061, 2009 WL 1652464 (N. D. Okla. June 11, 2009) ..............9, 28

*SEC v. Kelly*, 663 F. Supp. 2d 276 (S.D.N.Y. 2009) ..............................................................13, 15

*SEC v. Kovzan*, 807 F. Supp. 2d 1024 (D. Kan. 2011) ................................................................25

*SEC v. Mannion*, 789 F. Supp. 2d 1321 (N.D. Ga. 2011).............................................................29

*SEC v. Mozilo, Number CV 09-3994*, 2009 WL 3807124 (C.D. Cal.
Nov. 3, 2009) ......................................................................................................................31, 35

*SEC v. Nacchio*, 614 F. Supp. 2d 1164 (D. Colo. 2006)..................................................................19

*SEC v. Price Waterhouse*, 797 F. Supp. 1217 (S.D.N.Y. 1992) .......................................................2

*SEC v. Reys*, 712 F. Supp. 2d 1170 (W. D. Wash. 2010) ...............................................................33

*SEC v. Rivelli*, 2010 WL 2775623 (D. Colo. July 14, 2010)..........................................................59

*SEC v. Roanoke Technology Corp.*, No. 6:05CV1880, 2006 WL 3813755 (M.D. Fla.
Dec. 26, 2006) .................................................................................................................................13

*SEC v. System Software Associates, Inc.*, 145 F. Supp. 2d 954 (N.D. Ill. 2001) ..........................11

*Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246 (10th Cir. 1997)...................................9, 11

*Smith v. U.S.*, 561 F.3d 1090 (10th Cir. 2009) .................................................................................5

*Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226 (10th Cir. 1999)......................5, 7

*In re Synchronoss Sec. Litigation*, 705 F. Supp. 2d 367 (D. N.J. 2010) ........................................15

*Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006) ................................................................................5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ..........................................7, 29

*In re Thornburg Mortg. Inc., Sec. Litigation*,
695 F. Supp. 2d 1165 (D.N.M. 2010) ........................................6, 7, 11, 16, 18, 19, 20, 23, 28, 35

*In re Thornburg Mortg., Inc. Sec. Litig. Number CIV 07-0815*, 2009 U.S. Dist. LEXIS
124549 (D. N.M. December 21, 2009) ........................................................................................5, 38

*Unified Container, LLC v. Mazuma Capital Corp.*, No. 2:10CV723DAK, __ F.R.D. __,
2012 WL 918989 (D. Utah Mar. 16, 2012) ......................................................................................9

*United States v. Wolny*, 133 F.3d 758 (10th Cir. 1998) ..................................................................4

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ...................................................12

*In re Williams Sec. Litigation*, 339 F. Supp. 2d 1242 (D. N. Okl. 2003) ......................................10

*Wood v. Wood*, 2010 WL 2813760 (S.D.W.Va., 2010)................................................................40

## FEDERAL STATUTES

15 U.S.C. § 78t................................................................................................................19

17 C.F.R. § 240.12b-20......................................................................................................20

Fed. R. Civ. P. 9(b) ......................................................................................................9, 28

Fed. R. Civ. P. 9(b) ......................................................................................................28

Fed. R. Civ. P. 15(a) ......................................................................................................4

Fed. R. Evid. 201(b)......................................................................................................4

# I.  INTRODUCTION

The Securities and Exchange Commission ("Commission") alleges that defendants Larry

Goldstone ("Goldstone"), Clarence G. Simmons III ("Simmons") and Jane E. Starrett ("Starrett")

(collectively, "Defendants") engaged in an accounting fraud resulting in the overstatement of

Thornburg Mortgage, Inc.'s ("Thornburg's") net income for the fourth quarter of 2007 by $422

million.  (Compl. ¶ 86, at 25).  As a result, Thornburg's Form 10-K for 2007 falsely reported a

fourth quarter net profit of $65 million, when it should have reported a loss of $357 million.  (*Id*.

¶ 87, at 25-26).  Thornburg trumpeted its fourth quarter return to profitability in its Form 10-K,

its going concern analysis, and in messages Thornburg's investor relations group communicated

to investors following the filing of the Form 10-K.  (*Id*. ¶ 72-74, 96, at 21-22, 28).

Thornburg's return to profitability, however, was a fraud designed to allow Thornburg to

raise additional capital and to alleviate its liquidity crisis.  (*Id*. ¶ 4, at 2).  Thornburg itself

acknowledged that its financial statements were materially misleading with regard to its reported

income when it restated those numbers, recognizing a $428 million loss on its ARM Securities,

on March 11, 2008. (*Id*. ¶ 11, at 4).  Thus, Goldstone and Simmons' contention that

"Thornburg's 2007 Form 10-K was simply not misleading" (G&S Brief at 2) is belied by

Thornburg's own restatement days after the Form 10-K was filed.

The Commission alleges that Goldstone and Simmons perpetrated this accounting fraud

by withholding from Thornburg's auditors and the investing public: the true extent of

Thornburg's liquidity crisis in the weeks leading up to the filing of its Form 10-K; the fact that

Thornburg was in breach of three lending agreements and subject to being declared in default

and having its assets seized by its lenders until hours before its filing; the fact that Citigroup had

sent them a letter explicitly stating that Thornburg was in breach; the fact that Thornburg had

engaged in I/O Strip Transactions,[2] which they referred to as asset sales, to meet margin calls;

and the fact they knew that a European hedge fund containing assets similar to their ARM

Securities was collapsing and meant additional margin calls for Thornburg.  (Compl. ¶¶ 3, 8, 59-

65, at 2, 3, 17-19, 25-26).  The withholding of this information made their statements that

Thornburg had "*successfully* continue[d] to meet all margin calls," had the "intent and ability to

hold its ARM Securities until their value recovered in the market," and did not have to sell any

assets to meet margin calls materially misleading.  (*Id.*)  Further, Goldstone's representations on

CNBC Street Signs the afternoon of February 28 that Thornburg had "met all of [its] lending

requirements," and had "liquidity and cash available to continue to support the portfolio" were

false because he knew that Thornburg had been in breach the previous day and had received

margin calls in excess of its cash on hand that morning.  (*Id.* ¶ 98, at 28).  And because Simmons

knew, or was reckless in not knowing, that additional margin calls and price deterioration was on

the way following the collapse of the European hedge fund, his statement to Thornburg's audit

partner that he believed the MBS market had reached its lowest point was materially misleading.

(*Id.* ¶ 77, at 22-23).  Likewise, his statement to KPMG that Thornburg had engaged in the I/O

Strip Transactions not to meet margin calls, but because of "opportune pricing" was materially

misleading  (*Id.* ¶ 65, at 19).

      These allegations are taken as true and all inferences are drawn in favor of plaintiff on a

motion to dismiss.  Despite this tenet of black letter law, Defendants' Motions to Dismiss, in an

---

[2]      Capitalized terms not defined herein have the same meaning as in the Complaint.

attempt to prematurely get to the merits of this case, largely argue their version of the facts.  The

G&S Brief begins with nearly 27 pages of Introduction and a Statement of Facts that flies far

afield from the four corners of the Complaint.  Goldstone and Simmons in large part argue that

the documents and statements alleged in the Complaint, along with dozens of documents not

alleged at all, when interpreted the way they argue they should be, show that they did not make

any misstatements or intend to deceive.  Defendants will certainly be entitled to argue that at

trial, but their arguments of disputed fact are premature at this stage.

Further, Goldstone and Simmons' contention that the SEC is alleging fraud-by-hindsight

and condemning them for failing to predict the future (G&S Brief at 1) is belied by the

allegations set forth in the Complaint.  Those allegations concern what Goldstone and Simmons

knew or recklessly disregarded when they filed Thornburg's Form 10-K, a filing timed to fall

within the narrow window after which Thornburg had managed to meet its outstanding margin

calls – not successfully, but through their lenders' forbearance.  And in Goldstone's case, the

allegations also concern what he knew the next day, prior to speaking on CNBC.  The Complaint

further alleges their intent to mislead in several ways, perhaps most strikingly in their email

acknowledging that they were "purposely" not telling Thornburg's auditor about the lending

agreement breaches in order to avoid being forced to recognize the $428 million loss on their

ARM Securities.  (*Id*. ¶ 53-54, at 16).

Because the Complaint sets forth numerous specific facts that, if proven true at trial, will prove Goldstone and Simmons' violation of the federal securities laws set forth therein, their Motion to Dismiss should be denied.[3]

## II.  ARGUMENT

### A.   THE MOTIONS TO DISMISS IMPROPERLY REFERENCE MULTIPLE DOCUMENTS THAT ARE OUTSIDE THE COMPLAINT AND WHOSE INTERPRETATIONS ARE IN DISPUTE

In a premature effort to tell their version of the facts, the G&S Brief attaches 38 exhibits and the Starrett Brief attaches 15.  Many of those exhibits are not referenced anywhere in the Complaint.  And those that are referenced are often misconstrued by Defendants or cited for a completely different proposition than that alleged in the Complaint.  Defendants request that the Court take judicial notice of these documents under Fed. R. Evid. 201(b).  (*See* Dckt. 39).  Plaintiff objects to judicial notice being taken of any document for the truth of any statements made therein.

Federal Rule of Evidence 201 allows a court to take notice of "adjudicative" facts that are either (1) facts that are "generally known within the trial court's territorial jurisdiction;" or (2) facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  "'Adjudicative facts are simply the facts of the particular case.'"  *United States v. Wolny,* 133 F.3d 758, 764 (10th Cir. 1998) (quoting Advisory

---

[3]   If the Court finds Goldstone and Simmons' arguments persuasive, the Commission requests leave to amend its Complaint pursuant to Fed. R. Civ. P. 15(a), and it is appropriate to permit the Commission that opportunity.  *See S2 Automation LLC v. Micron Tech., Inc.*, No. CIV 11-0884, __ F.R.D. __, 2012 WL 843706 (D.N.M. Mar. 5, 2012) (Browning, J.); Fed. R. Civ. Pro. 15(a) (stating that "[t]he court should freely give leave when justice so requires").

Committee Notes to rule 201).  Judicially noticed documents, however, should not be considered for the truth of any statements therein:

> Exhibits attached to a complaint are properly treated as part of the pleadings for purposes of ruling on a motion to dismiss.  Ordinarily, consideration of material attached to a defendant's answer or motion to dismiss requires the court to convert the motion into one for summary judgment and afford the parties notice and an opportunity to present relevant evidence.   However, facts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment.  This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record.   However, the documents may only be considered to show their contents, not to prove the truth of matters asserted therein.

*In re Thornburg Mortg., Inc. Sec. Litig.*, No. CIV 07-0815, 2009 U.S. Dist. LEXIS 124549 at *9 (December 21, 2009 D. N.M.) (quoting *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006)) (internal citations, quotes and alterations omitted).  In addition, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity.  *Id.* (citing *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941-42 (10th Cir. 2002)).

Documents cited in the complaint are thus appropriately attached to Defendants' Briefs and may be considered to show their contents.  (*See* Exs. 1, 2, 6-11, 13-17, 20-28, C-E, and N).  But they may not be considered for the truth of the statements therein.  *In re Thornburg Mortgage, Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 124549 at *9.  Likewise, accounting standards and public testimony, reports, and statements by government regulators (Exs. 12, 32-35, B, and F-O) may be cited, provided they too are cited for the fact that they were published and say what they say, but no more.  Other documents should not be considered.  Reports by securities analysts, newspaper reporters, and bloggers, as well as compilations prepared by Defendants' counsel (Exs. 3-5, 18, 19, 29-31, 36) do not derive "from sources whose accuracy cannot

5

reasonably be questioned" and are therefore inappropriate for judicial notice under Federal Rule of Evidence 201.  Exhibit 37, Thornburg's April 1, 2008 8-K describing a capital raise on March 31, 2008 is nowhere mentioned in the Complaint.  Further it states that "Thornburg successfully raised $1.35 billion in new capital," a statement relevant not for being made, but only if true.  Thus it should be disregarded.

Numerous times Defendants make references to their Exhibits for the truth of statements made therein.  Those are catalogued in Exhibit A and in each case the reference should be disregarded.  *See* Ex. A to the Declaration of Stephen McKenna.  For instance, the G&S Brief states: "Although the Complaint alleges that Mr. Goldstone and Mr. Simmons received the Citi letter (Compl. ¶ 60, at 17-18), emails referenced in the Complaint show that Mr. Goldstone was traveling by plane, when the letter was sent, and out of town the rest of the week."  (G&S Brief at 12).  The fact that Mr. Goldstone wrote that he had a plane to catch has no relevance to any allegation in the Complaint.  Goldstone and Simmons improperly attempt to use that statement to imply that Goldstone was traveling and may not have even seen the Citibank letter that declared Thornburg in breach of its lending agreement.  This is a disingenuous spin attempt at best given that Mr. Goldstone testified under oath that he "most likely" received the February 21, 2008 Citibank letter that was addressed to him and did not recall bringing it to the attention of Thornburg's auditors.  (*See* Exhibit B to McKenna Declaration, Transcript of Larry Goldstone's March 16, 2010 testimony at 12:13-14:8).

Goldstone and Simmons 'attempted use of this document demonstrates the danger of wading into a disputed factual issue prior to the development of the factual record.  And indeed, courts are admonished not to use judicial notice to generate an evidentiary record and weigh

evidence to dismiss a complaint.  *In re Network Equip. Techs., Inc., Litig.*, 762 F.Supp. 1359,

1363 (N.D. Cal. 1991).  "'The court's function on a Rule 12(b)(6) motion is not to weigh

potential evidence that the parties might present at trial, but to assess whether the plaintiff's

complaint alone is legally sufficient to state a claim for which relief may be granted.'"  *Sutton v.

Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting *Miller v.

Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)).

    Goldstone and Simmons similarly attempt to create an issue of disputed fact when they

argue that Thornburg's going concern analysis contained a "DRAFT" annotation and was "dated

'January 29, 2008' – more than two weeks before the severe dislocation in the markets began on

February 14th."  (G&S Brief at 11).  As alleged in the Complaint, however, the analysis was sent

on February 20th.  (Compl. ¶ 72, at 21).  Whether that analysis reflects Defendants' opinions as

of January 29, February 20, or some other date is a question of fact that is not yet ripe for

resolution.

    Other instances of seeking to infer from documents facts supporting Thornburg's theory

of the case are the multiple references to statements in the Form 10-K regarding the quality of

assets in Thornburg's portfolio and its high lending standards, along with articles and other

company filings describing the financial crisis.  (*See* Exhibit A to McKenna Declaration).  These

references improperly attempt to establish truths about the financial crisis from the documents

cited and should not be considered.

B.    **LEGAL STANDARD**

1.    **Federal Rule of Civil Procedure 12(b)(6)**

"The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Genesee Cnty. Emp. Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1120 (D.N.M.  2011) (Browning, J.) (quoting *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994)).  As this Court has explained, "[A] court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor." *Id.* at 1121.  Indeed, "[t]here is a strong presumption against dismissal for failure to state a claim under Rule 12(b)(6)." *Niederquell v. Bank of America*, Civil Action No. 11-cv-03185-MSK-MJW, 2012 WL 1578060, at *4 (D. Colo. May 4, 2012) (citing *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1251 (10th Cir. 1999)).

As the Supreme Court has clarified, to survive a motion to dismiss, a complaint should contain sufficient factual matter, which, if accepted as true, "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Thus, 'plausible' cannot mean 'likely to be true.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. at 678  Accordingly, the "[f]actual allegations must be enough to raise a right to relief above the speculative level" or,

8

stated otherwise, "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of the misconduct.  *Twombly*, 550 U.S. at 555, 556 (citations omitted).  The Supreme Court explained that what is not permitted is a complaint that does nothing more than make a "the-defendant-unlawfully-harmed-me accusation," that offers "a formulaic recitation of the elements of a cause of action," or that "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (citing and quoting *Twombly*, 550 U.S. at 555, 557).

### 2.    Federal Rule of Civil Procedure 9(b)

Rule 9(b) provides, in part, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Accordingly, scienter may be pled generally.  *See, e.g.*, *SEC v. Arnold*, Civil No. 03-CV-0328-REB-OES, 2007 WL 2786428, at *3 (D. Colo. Sept. 24, 2007) ("under 9(b), scienter 'may be averred generally'"); *SEC v. Gordon*, No. 09-CV-0061, 2009 WL 1652464, at *3 (N. D. Okla. June 11, 2009) (same).

There can be no meaningful claim here that the Plaintiff has failed to adequately satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  Significantly, here there has been no suggestion that the Defendants had any difficulty determining the nature of Plaintiff's claims against them, as they have never suggested that they do not understand the nature of the claims and made initial disclosures.  *See Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) ("The purpose of Rule 9(b) is 'to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based. . . .'" (citation omitted)); *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) ("Rule 9(b) requires the

identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." (citations and quotations omitted)); *Unified Container, LLC v. Mazuma Capital Corp.*, No. 2:10CV723DAK, __ F.R.D. __, 2012 WL 918989, at *7 (D. Utah Mar. 16, 2012) ("[A]t this pleading stage, the alleged conspiracy was apparently detailed enough to allow Republic Bank to answer and provide initial disclosures.").

## C. DEFENDANTS' REQUEST TO DISMISS THE COMPLAINT BASED ON PUZZLE PLEADING SHOULD BE DENIED

Ms. Starrett argues that "the Complaint relies on impermissible 'puzzle pleading' by incorporating by reference the 'Factual Background' of its Complaint into its claims for relief," citing to *SEC v. Fraser*, No. CV-09-00443, 2009 WL 2450508 (D. Ariz. Aug. 11, 2009). (Starrett Brief. at 36-37.) Goldstone and Simmons, similarly cite to *Fraser* in arguing that the deceit of auditors claim should be dismissed for engaging in "shotgun pleading." (G&S Brief at 53). The rationale for disfavoring this pleading style is that it violates Rule 9(b) when it "leaves the Court with the task of untangling which (if any) act(s) engaged in by which (if any) defendant(s) applies to which (if any) claim(s)." *Fraser*, 2009 WL 2450508, at *13. No such untangling is required here.

The Complaint specifically identifies the allegations against each Defendant, including the misstatements being alleged in Thornburg's 2007 Form 10-K, materially misleading communications to Thornburg investors and specific communications made by each Defendant to Thornburg's auditors. *See infra* Section III. D. The Complaint has well put Defendants on notice of the allegations against them. *See SEC v. Das*, No. 8:10CV102, 2010 WL 4615336, at *6 (D. Neb. Nov. 4, 2010) (refusing to dismiss the SEC's complaint based on "shotgun" or "puzzle" style pleading because "[t]he factual allegations are relatively brief and clear, and a

more detailed statement of how those facts apply to each claim is not necessary to enable the

Defendants to respond to the allegations."); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242,

1261 (N.D. Okl. 2003) ("Because the Complaint provides notice to each Defendant regarding the

statements and omissions that Plaintiffs allege are misleading and the reasons why those

statements and omissions are misleading, the Court denies the . . . Defendants' motion to dismiss

based on the argument that the Complaint is a 'puzzle-style' pleading."). The Complaint

adequately balances the need to comply with both Rule 8(a)(2), requiring "a short and plain

statement of the claim showing that the pleader is entitled to relief," and Rule 9(b), requiring a

party to "state with particularity the circumstances constituting fraud or mistake."

Moreover, in *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d at 1253, the 10th Circuit

specifically approved of incorporating paragraphs of a complaint into the claims. There, the

district court had dismissed a claim because "Count II does not 'enumerat[e] which paragraphs in

the Complaint' contain the statements which give rise to the § 10(b) claim." *Id.* The 10th

Circuit found that "[t]his reasoning effectively deprives plaintiff of its Rule 10(c) right to

incorporate by reference," and concluded that "[a] fair reading of the Complaint indicates that by

cross-referencing as allowed by Rule 10(c), it sufficiently particularizes the circumstances

constituting fraud to comply with Rule 9(b)." *Id.*

Defendants contend that Rule 9(b) applies to their Section 13 violations because they

purportedly "sound in fraud." (G&S Brief at 29; Starrett Brief at 6). However, case law is not

clear that Rule 9(b) applies to Defendants' violations of Section 13 and the rules promulgated

thereunder. *See Thornburg Mortg. Inc., Sec. Litig.*, 695 F. Supp. 2d 1165, 1190 (D.N.M. 2010)

(finding that when a plaintiff's 1933 Act claim is based on negligent, rather than fraudulent

conduct, "a court applies the more lenient pleading standards of rule 8(a),") (citing *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d at 1251-52); *see also SEC v. System Software Assocs., Inc.*, 145 F. Supp. 2d 954, 958 (N.D. Ill. 2001) (Rule 9(b) found not to apply to Section 13 claims because scienter is not an element to the violations); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) ("where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)). In any event, the Complaint pleads facts with particularity supporting the SEC's Section 13 claims.

## D.     THE SEC HAS ALLEGED FRAUD WITH PARTICULARITY

The SEC alleges facts that, if proven true, would support the fraud claims against Defendants and entitle the SEC to relief. The Complaint alleges that Thornburg's 2007 Form 10-K:

- Falsely represented that Thornburg had "successfully continue[d] to meet all margin calls" when in fact it had failed to successfully do so, breaching lending agreements and requiring lender forbearance to avoid default and seizure of assets (Compl. ¶¶ 3, 59-64, at 2, 17-19);

- Falsely represented that it had the "intent and ability to hold its ARM Securities until their value recovered in the market," thereby inflating revenue by $427.8 million (*Id.* ¶ 8, at 3) and transforming a $357 million fourth quarter loss into a $65 million gain (*Id.* ¶ 87, at 25-26); and

- Falsely represented that it did not need to sell any assets to meet margin calls when in fact it had entered into the I/O Strip Transactions for that very purpose (*Id.* ¶ 65, at 19).

The Complaint also alleges that Defendants:

- "engaged in a scheme to deceive Thornburg's auditor and the investing public to believe, that Thornburg had successfully met all margin calls and that the company was not required to sell any assets to meet its margin calls;" (*Id.* ¶ 5, at 3);

- "carri[ed] out [a] plan to conceal the true state of Thornburg's margin call situation from its auditor and the investing public, [by each signing] Thornburg's February 27, 2008 management representation letter to Thornburg's auditor in which they falsely represented that:  (1) Thornburg had complied with all aspects of its contractual agreements that would have a material effect on its consolidated financial statements in the event of noncompliance; (2) Thornburg had the intent and ability to hold its impaired securities for a sufficient period of time to allow for their recovery in market value; (3) there had been no subsequent events requiring adjustment to or disclosure in the company's financial statements; and (4) Thornburg's financial statements disclosed all of the matters of which they were aware that were relevant to Thornburg's ability to continue as a going concern"  (*Id.* ¶ 57, at 16-17);

- "Purposely" did not tell Thornburg's outside auditor about their failure to timely meet margin calls.  *Id.* ¶ 53, at 16);

13

- Goldstone and Simmons received a February 21 letter from Citigroup confirming that Thornburg had breached the parties' lending agreement and that Citigroup reserved the right to declare Thornburg in default  (*Id*. ¶ 34, at 10-11), but withheld this letter from Thornburg's auditor, despite an explicit request for all correspondence with lenders.  (*Id*. ¶ 100, at 29);

- Goldstone and Simmons were aware that a large European hedge fund was collapsing on February 27, before filing Thornburg's Form 10-K, and that that collapse would likely result in further margin calls on Thornburg (*Id*. ¶¶ 38-39, at 12), but they withheld this information from Thornburg's auditor.  (*Id*. ¶ 76, at 22);

- Simmons, who had just advised Thornburg's audit partner that he believed the MBS market had reached its lowest point and the prices were not likely to deteriorate further, failed to update this statement when he learned that additional margin calls and price drops were likely.  (*Id*. ¶ 77, at 22-23); and

- Goldstone, on February 28, instructed Thornburg's investor relations group in an early morning email to "try to calm the panic" and to advise investors that day that "[a]ll margin calls met," "[l]enders are fine," and "[w]e still have sufficient operating cash," despite knowing or being reckless in not knowing that message was misleading given Thornburg's recent breaches of lending agreements and I/O Strip Transactions.  (*Id*. ¶¶ 93-97, at 27-28).

- Goldstone, on the afternoon of February 28, appeared on a CNBC Street Signs television interview and represented that he did not believe Thornburg would

have to sell assets, Thornburg had "met all of [its] lending requirements," and "we

have liquidity and cash available to continue to support the portfolio," when he

knew or was reckless in not knowing that Thornburg did not have liquidity and

cash available to meet the margin calls it received earlier that day.  (*Id*. ¶ 98, at

28).

The fact that Thornburg's Form 10-K did not tell the whole story is evident from the 90%

collapse in Thornburg's stock price between the market close on February 28, after the Form 10-

K was filed, and March 11, 2012, during which time Thornburg admitted that it had violated

lending agreements and restated its materially misleading financial statements by, among other

things, recognizing the massive losses associated with its ARM Securities.  (Compl. ¶ 47, at 14).

This price drop dwarfs the "Company's stock price plunge[] [of] 18%" on February 28, the day

the Form 10-K was filed.  (*See* G&S Brief at 21).

Defendants are on notice of the charges against them and can answer and prepare a

defense.  Rules 12(b)(6), 8(a)(2) and 9(b) require nothing more.

### 1.    The Complaint Alleges Material Misstatements and Omissions in Thornburg's Form 10-K

Defendants claim that Thornburg's Form 10-K disclosures "were accurate and not

misleading."  (G&S Brief at 30).  But that claim is belied by the restatement, which by definition

corrects prior inaccurate statements.  *SEC v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009)

("'Although a [financial] restatement is not an admission of wrongdoing, the mere fact that

financial results were restated is a sufficient basis for pleading that those statements were false

and misleading.'") quoting *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005); *In

re First Energy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 594-595 (N.D. Ohio 2004); *SEC v.*

*Espuelas*, 579 F. Supp. 2d 461, 472 (S.D.N.Y. 2008).  "[U]nder Generally Accepted Accounting

Principles ("GAAP"), a restatement issues only when errors are material."  *SEC v. Kelly*, 663 F.

Supp. 2d. at 285.[4]

Thornburg's restatement reflected a previously unrecognized income statement loss of

approximately $428 million for Thornburg's ARM Securities (given that Thornburg did not have

the intent or ability to hold these assets to maturity or recovery), a fourth quarter loss instead of

the previously reported profit, and a qualification that Thornburg might not be able to continue as

a going concern.  (Compl. ¶ 11, at 4).  Goldstone and Simmons, who signed the Form 10-K/A,

should not be heard to now say that the financial statements in the Form 10-K they corrected and

restated were "accurate and not misleading."

A misstatement or omission is material if "a reasonable investor would consider it

important in determining whether to buy or sell stock.  *Grossman v. Novell, Inc.*, 120 F.3d 1112,

1119-120 (10th Cir. 1997).  Statements of income are important.  *Ganino v. Citizens Utilities

Co.*, 228 F.3d 154, 164 (2nd Cir. 2000) ("Misstatements of income could be material because

'earnings reports are among the pieces of data that investors find most relevant to their

investment decisions.'") (quoting *In re Burlington Coat Factory,* 114 F.3d 1410, 1420 n. 9 (3rd

Cir, 1997)).  And whether or not a company is likely to survive is, of course, critically important.

*In re Thornburg Mortg., Inc. Sec. Litig*. 695 F. Supp. 2d at 1214-15 ("The information is

---

[4]      *See also* Thornburg's 2007 Form 10-K/A (Ex. 13 to G&S Brief) stating that "there was
substantial doubt as to our ability to continue as a going concern at December 31, 2001, and that
therefore, losses on our available for sale securities and our Securities Arm Loans . . . were
considered to be other than temporary impairments as of December 31, 2007…"); KPMG's
March 4, 2008 letter to Thornburg stating that its year-end financials contained material
misstatements (Ex. 17 to G&S Brief).

material:  it would inform investors that, at any moment, Thornburg Mortgage, Inc., could be broke, which would tend to influence how one might invest money.").

Defendants attempt to mischaracterize Defendants' accounting fraud as a mere failure to disclose.  They argue that "extensive disclosure about the bottom-line bad news for Thornburg" makes other misstatements in Thornburg's Form 10-K immaterial.  (G&S Brief at 31).  But while Thornburg disclosed it had received $300 million in margin calls and might receive more, it affirmatively represented that it had *successfully* met those calls.  It did not disclose that it had been unable to meet margin calls from three lenders in accordance with the terms of the lending agreements and was subject to having its underlying ARM Securities seized by lenders.  (Compl. ¶ 24, at 8).  And while Thornburg disclosed that its ARM Securities had a "gross unrealized loss," of more than $400 million, it improperly failed to realize that loss, which would have turned its' reported $65 million fourth quarter profit into a $357 million loss.  (Compl. ¶¶ 85, 87, at 25-26).

Defendants claim that *Fulton Cnty. Emp. Ret. Sys. v. MGIC Inv. Corp.,* 675 F.3d 1047 (7th Cir. 2012), involved a nearly identical attempt to impose unnecessary disclosure requirements on a public company.  (G&S Brief at 31).  But there are numerous allegations here that were absent in *Fulton County*.  The *Fulton County* court found that not disclosing $145 million in margin calls received in the prior 18 days was immaterial given accurate disclosures about having $150 million in available liquidity and warnings that such liquidity might not be sufficient to meet future margin calls.  *Id.* at 1049.  *Fulton County* did not involve any allegations that the company falsely stated it had successfully met margin calls when in fact it had been in breach of its lending agreements and thus subject to default and seizure of its assets.  Nor had the

defendant in *Fulton County* misstated its income by over $400 million and reported a fourth quarter profit that was really a loss.

Such allegations were similarly absent in *Payne v. DeLuca*, 433 F. Supp. 2d 547 (W.D. Pa. 2006).  Moreover, whereas the court in *Payne* found that plaintiffs were unable to identify any specific accounting procedure which would require disclose of the company's difficulty in meeting financial obligations, which plaintiffs claimed was the material omission, the SEC has alleged that Thornburg violated accounting standards by improperly failing to recognize an other than temporary impairment on its ARM Securities.  (Compare *Payne*, 433 F. Supp. 2d. at 594 to Compl. ¶¶ 50, 54, 56, at 15-16).

In *In re Thornburg Mortg., Inc. Sec. Litig.*, this Court found that a hypothetical failure to disclose the extent of Thornburg's Alt-A holdings would not have been material in light of extensive disclosures about Thornburg's liquidity problems.  824 F. Supp. 1214, 1266  (D. N.M. 2011).  The alleged misstatements examined in *In re Thornburg*, however, were different than those alleged here and were not subject to restatement.  In that matter, Plaintiffs' allegations of material omissions concerned "failure to disclose that TMI's assets were becoming less liquid, failing to disclose that the RPAs contain cross-default provisions, failing to disclose that the SEC had sent them a letter asking them to confirm an estimate in their September 6, 2007 Form 8-K, failing to disclose the NYSE investigation [and] failing to disclose the Alt-A assets in TMI's portfolio." *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d at 1208.  Here, the SEC alleges that Thornburg made affirmative misrepresentations concerning its intent and ability to hold assets, margin call activity, and its income, as well as various omissions.   Thus, *In re Thornburg* is not dispositive.

### 2.   Defendants Had a Duty to Disclose the Omitted Information

As an initial matter, Defendants' argument that the SEC has not alleged a duty to disclose omitted information ignores the elephant in the room – the SEC alleges that they materially misstated Thornburg's income by over $400 million and reported a profit instead of a loss.  *Cf. New Jersey and its Div. of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1128 (D. Kan. 2004) ("Plaintiffs' claims are based on defendants' nondisclosure of various facts rather than on any affirmative misrepresentations.").  Defendants conveniently overlook that allegation in arguing no duty to disclose.  Even setting that aside, however, Plaintiff's allegations establish a duty to disclose omitted information.

Defendants correctly note that a duty to disclose arises when it is mandated by statute or regulation.  (*See* G&S Brief at 33).  But they incorrectly state that "[a] duty arises only when: (1) it is necessary to correct a previous statement that is false or later turns out to be false, *Connett v. Justus Enters. of Kansas, Inc.*, 68 F.3d 382, 385 (10th Cir. 1995); …."  *Id.  Connett* does not say that.  It states that "[l]iability for failure to disclose only arises when the duty to disclose exists and the withheld information is material."  *Connett*, 68 F.3d at 385.  It does not set forth the standard for a duty to disclose and certainly does not require a previous statement to be false.  Omissions may be actionable even if the statement that requires disclosure of the omission is true.  *See SEC v. Gabelli*, 653 F.3d 49, 57 (2nd Cir. 2011) ("The law is well settled, however, that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud.");  *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than

mislead prospective buyers."); *SEC v. First Am. Bank & Trust Co.*, 481 F.2d 673, 678 (8th Cir.

1973) ("[A] statement which is literally true, if susceptible to quite another interpretation by the

reasonable investor . . . may properly, under § 17(a), be considered a material

misrepresentation.").  The proper standard is that '"when defendants voluntarily disclose

information, they have a duty to disclose additional material facts only to the extent that the

volunteered disclosure was misleading as to a material fact.'"  *In re Thornburg Mortg., Inc. Sec.

Litig.*, 695 F. Supp. 2d at 1209, quoting *In re Craftmatic Sec. Litig.*, 890 F. 2d 628, 641 n. 17

(3rd Cir. 1989).[5]  As noted by Goldstone and Simmons "[a]n omission makes contemporaneous

statements misleading when it makes those statements 'less true.'"  (G&S Brief at 33-34)

(quoting *McDonald v. Kinder -Morgan, Inc.*, 287 F.3d 992, 998-99 (10th Cir. 2002)).

> a.      **The Affirmative Statement that Thornburg Had Not Sold Any Assets to Meet Margin Calls Created a Duty to Disclose the I/O Strip Transactions**

The SEC alleges that Defendants' failure to disclose that they had entered into the I/O

Strip Transactions to meet margin calls was material and made their statement that they had not

sold any assets to meet margin calls misleading.  (Compl. ¶ 65, at 19).  The SEC further alleges

that these transactions depleted Thornburg's liquidity and called into question its intent and

ability to hold other assets to maturity.  (Compl. ¶¶ 36, at 11).  It further identifies specific emails

where Defendants discussed the "sale" of I/O Strips.  (Compl. ¶¶ 66-68, at 19-20,).

---

[5]      The Securities and Exchange Act incorporates this duty in Rule 12b-20, which requires any statement or report to include "such further material or information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading."  17 C.F.R. § 240.12b-20.

By stating that Thornburg did not need to sell assets to meet margin calls, Thornburg implied to investors that its cash and liquidity was sufficient to meet margin calls without dissipating assets.  For a company struggling with liquidity, as Thornburg was and disclosed to investors, this fact was important.  Yet, the SEC alleges that Defendants knew they were "selling" I/O Strips, as Defendants themselves termed it, to meet margin calls.  Simmons even misrepresented the purpose of these sales to Thornburg's auditor, claiming it was done to take advantage of opportune pricing, not to meet margin calls.  (Compl. ¶ 65, at 19).  Taking these allegations in the light most favorable to Plaintiff, the Court should conclude that the I/O Strip Transactions are not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *SEC v. Gabelli*, 653 F.3d at 57-58.

Goldstone and Simmons cite *McDonald v. Kinder-Morgan, Inc.* for the proposition that they had no duty to disclose.  G&S Brief at 35.  That case, however, found that an accurate report of a past success does not give rise to a duty to disclose contingencies that might alter the company's future revenue picture.  *McDonald*, 287 F.3d at 998.  That is because "it would be unreasonable for someone to take a report strictly concerned with the past as a representation about the future, and therefore such a report is per se immaterial to the investment decision."  *Id.* (quoting *In re Boston Tech.*, 8 F. Supp. 2d 43, 53 (D. Mass. 1998).  Thornburg failed to disclose a transaction that it had already been forced to undertake to meet margin calls.  Thus this case is more like *SEC v. Gabelli*, where the defendant failed to disclose something it had done that was inconsistent with the inference to be drawn from its representation to investors.  653 F.3d at *57 (finding that representing that the defendants' actively policed for and banned market timers

from their investment fund, while true, created a materially misleading impression where they

failed to disclose that they allowed one investor to engage in market timing).

      **b.**      **Similarly, Proclaiming That Thornburg Had Successfully Met All Margin Calls Created a Duty to Disclose That the Company Could Not Timely Meet Margin Calls and Was Not Declared in Default Only Through Lender Forbearance**

Thornburg's claim that it had successfully met all margin calls was untrue and actionable

in and of itself because a reasonable investor would consider Thornburg's ability to successfully

meet margin calls important.  The SEC alleges that Thornburg had not been successful in

meeting its margin calls because it had breached its lending agreements with three lenders by not

meeting the calls in the time specified by the lending agreements.  (Compl. ¶ 29, at 9).

Thornburg did not merely disclose that it had met its margin calls in the hours leading up to

filing its Form 10-K, but rather stated that it had done so successfully.  If the word successfully

had any meaning – which it must – it meant that Thornburg had done more than simply meet the

margin calls and avoid default.  Thus the reasonable inference is that Thornburg complied with

the terms of its lending agreements.  Plaintiff alleges that it had not.  The fact that Thornburg's

Form 10-K does not contain the words that it "complied with its lending agreements" (G&S

Brief at 35) is therefore no bar to the SEC's securities fraud claim.

Defendants next claim that Thornburg was not in breach of its lending agreement with

Citibank because the parties agreed to a payment plan, and Citi's reservation of rights letter

declaring Thornburg in breach is "simply incorrect."  (G&S Brief at 36).  The existence of this

letter, considered in a light most favorable to Plaintiff, establishes that Thornburg breached its

agreement.  Goldstone and Simmons' citation to the Citi Repo Agreement and argument as to

how text in that Agreement should be interpreted are improper at this stage; they attempt to use

22

the Citi Repo Agreement to claim that an oral modification to the Agreement was allowed and entered into, something the Agreement itself forbids.  (*See* Ex. 6 to G&S Brief, ¶ 28.3, at 24).

The SEC alleges that Thornburg was in breach of the Citi Repo Agreement, as well as its agreements with two other lenders, and has referred to specific facts to support those allegations – the Citi letter and the late payments to lenders in violation of the agreements.  (Compl. ¶¶ 29-35, at 9-11).  Those breaches, which subjected Thornburg to declarations of default and cross default by its lenders were material because they "would inform investors that, at any moment, Thornburg Mortgage, Inc., could be broke which would tend to influence how one might invest money."  *In re Thornburg Mortg.*, 695 F. Supp. 2d. at 1214-15.  The analysis ends there. Defendants may argue at trial that failing to timely pay margin calls was not a breach and the jury can decide, but the court should not make such a factual finding on a motion to dismiss.

Defendants' contention that they did not need "to disclose precisely how margin call obligations are met," mischaracterizes the SEC's allegations.  (*See* G&S Brief at 36).  The SEC does not allege that Thornburg was required to disclose the details of Thornburg's margin call payments; it alleges that it was false to say Thornburg had successfully met them, and materially misleading to say it met them without also disclosing that it had been in breach of three agreements in the days leading up to the filing of its Form 10-K.  Because of these breaches, Thornburg was subject to having its ARM Securities seized and sold by its lenders and thus did not have the intent and ability to hold those assets to maturity.  This, as well as the need to sell I/O Strips to meet the margin calls, should have been factored into Thornburg's OTTI analysis.

Goldstone and Simmons cite *Baron v. Smith*, 380 F.3d 49 (1st Cir. 2004), for the proposition that Thornburg had no obligation to disclose that it was subject to defaults and had

23

received the Citi reservation of rights letter.  G&S Brief at 36-37.  But that case is readily

distinguishable.  In *Baron*, class plaintiffs alleged that GCX's failure to disclose the effect of its

bankruptcy filing on a loan guarantee to a joint venture, namely that the bankruptcy was an event

of default, was a material omission.  380 F.3d at 57.  The court found that it was not because

plaintiffs admitted that bankruptcy is a standard event of default for most guarantee obligations

in the financial markets.  *Id*.  "It is not a material omission to fail to point out information of

which the market is already aware."  *Id*.  The market was not aware that Thornburg had breached

lending agreements and had relied on its lenders' forbearance to avoid having to sell assets.  Far

from disclosing its default, as GCX did by disclosing its bankruptcy, Thornburg proclaimed that

it had "successfully continu[ed] to meet all margin calls."

### 3.    Defendants' Misrepresentations and Omissions Concerned Past Margin Calls and Income – This is Not "Fraud-by-Hindsight"

The Complaint alleges that Thornburg was late in meeting margin calls leading up to the

filing of its 2007 Form 10-K and could have been declared in default at any time.  (Compl. ¶ 3, at

2).  It further alleges that Defendants failed to disclose to Thornburg's auditor and the investing

public in that Form 10-K: the full extent of Thornburg's liquidity crisis; its exposure to default

and cross-default notices; its receipt of a reservation of rights letter from a lender, Citibank; and

that it had been required to sell portions of its securitized loans to meet margin calls.  (Compl.

¶ 4, at 2).  The Complaint also alleges that Thornburg's Form 10-K falsely claimed that it had

successfully met, and was not required to sell any assets to meet, its margin calls.  (Compl. ¶ 7,

at 3).  Further, in light of the foregoing facts, which were known to the Defendants and

misrepresented to, or concealed from, KPMG, the Complaint alleges that Thornburg's Form 10-

K falsely represented that Thornburg had the intent and ability to hold its ARM securities until

24

their value recovered in the market, and as a result failed to recognize $428 million in losses on those securities on its Income Statement.  (Compl. ¶ 8, at 3-4).  All of these allegations concern facts in existence at the time of the filing of Thornburg's Form 10-K.

Nonetheless, Defendants argue that the SEC alleges "fraud-by hindsight"; that Defendants should have been able to predict the future and should have known that Thornburg would receive additional margin calls following the filing of the Form 10-K, exceed its liquidity, and default.  (G&S Brief at 37-39, Starrett Brief at 23-24).  The case law they cite for this proposition, however, is unhelpful.  For one thing, Defendants cite only cases where the court analyzes the pleading of scienter under the heightened standard of the PSLRA, which is inapplicable here as the SEC need only plead scienter generally.  *SEC v. Kovzan*, 807 F.Supp.2d 1024, 1039 n. 6 (D. Kan. 2011) ("The cases cited by defendant to support his argument that an allegation of insider trading does not sufficiently support scienter were cases under the PSLRA, which involve a higher pleading standard for scienter.") (internal citation omitted).  The SEC is required to plead scienter only generally.  *See infra* § III. E.

Moreover, even if decided under the same standard, the cases cited by Defendants do not involve allegations of material facts that defendants knew or were reckless in not knowing were false and/or misleading at the time of the alleged misstatement.  *Fulton Cnty. Emp. Ret. Sys.*, involved allegedly materially false statements regarding a joint venture called C-BASS. Defendant issued a press release on July 19, 2007 stating that C-BASS "maintains substantial liquidity to cover margin calls in the event of a substantial decline in the value of its mortgages and securities."  675 F.3d at 1048.  Plaintiffs contended this was false because (1) MGIC did not disclose that C- BASS had received $145 million in margin calls in the previous 18 days and (2)

in the following 12 days C-BASS received an additional $470 million in margin calls.  *Id.* at

1049.  The district court found and the 7th Circuit concurred that the statement that C- BASS

maintained substantial liquidity was not misleading; $150 million in cash was "substantial

liquidity", both absolutely and compared to C- BASS' history of margin calls in 2007, including

the $145 million in margin calls received in the prior two and a half weeks.  *Id.*  Thus, Plaintiff's

first contention failed to show that defendants acted with scienter.  The second contention did not

evidence scienter either because at most the complaint alleged that defendants should have seen

the looming problem.  *Id.* at 1050.  This was inactionable where "MGIC's managers did not have

any private information that they could have revealed."  *Id.* at 1050.  Defendants here did have

private information and they purposefully withheld it from KPMG and the investing public.

 In *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245 (10th Cir. 2001), plaintiffs

alleged that defendants committed fraud by failing to disclose a pending litigation that

subsequently led to a substantial judgment against the company.  The court found that given

what defendants knew at the time of the disclosures, it could not "conclude that Plaintiffs have

'state[d] with particularity facts giving rise to a strong inference that [Defendants] acted with the

required state of mind,' as required under the PSLRA."  *Id.* at 1270.  There, plaintiffs had failed

to plead any particular facts by which the court could plausibly infer that two defendants even

knew about the litigation.  *Id.* at 1263.  With regard to the other two defendants, the complaint

failed to allege facts indicating that they knew or were reckless about the potential importance of

the litigation.  Id. at 1264-67.

 In contrast, the SEC alleges that Defendants knew or were reckless in not knowing that

the statements in Thornburg's Form 10-K regarding liquidity, margin calls, and income were

false at the time they were made.  Thus, whether Defendants foresaw the impending margin calls

is irrelevant.  Moreover, unlike defendants in *Fulton County* and *City of Philadelphia*, the SEC

has alleged facts indicating that Goldstone, Simmons, and Starrett did see the margin calls

coming.  The SEC alleges that:

- Goldstone and Simmons exchanged emails about how the blow up of a European hedge fund would lead to "haircuts" (i.e. additional margin calls) on Thornburg's securities, (Compl. ¶ 38, at 12);

- Simmons wrote Starrett that he had given a 6:00 AM deadline to file the "K," because he did "not want there to be any issues based on Thursday activity," (Compl. ¶ 40, at 12); and

- Goldstone wrote Thornburg's board on February 22, 2008, copying Simmons and Starrett, that capital raising efforts should "leave a small cushion to meet other calls, which we expect …." (G&S Brief at 13, citing Ex. 8 and Compl. ¶ 30).

These allegations show that Defendants knew additional margin calls were coming.

Further, the size of the margin calls received on February 28th was not "unprecedented," as

Defendants state.  (*See* G&S Brief at 1, 22; Starrett Brief at 1, 10, 23).  Thornburg received

$157,500,000 in margin calls on February 28 from seven lenders and an additional $64,300,000

on February 29.  (G&S Brief at 22-23).  Defendants misleadingly contrast this to a random two

days prior to the February 28 filing of the Form 10-K to support their "unprecedented"

hyperbole.  *Id.*  But how is over $200,000,000 in margin calls over two days from multiple

lenders unprecedented when a single lender, Citi, had issued a $196,000,000 margin call just a

week before; when the company had received over $300,000,000 in margin calls in the two

weeks leading up to the Form 10-K; and when six months previously it had received $2 billion in

margin calls and had to sell $22 billion in assets to meet them, including $5.5 billion sold by

Thornburg's lenders following defaults?  (Compl. ¶¶ 26, 29, 33, at 8, 9, 10).  In contrast, the

defendant in *Fulton County* received $470 million in margin calls in the 12 days following the statement at issue, over three times the amount it received in the previous 18 days, and it had $150,000,000 in cash compared to Thornburg's $40,000,000.   675 F. 3d at 1049; Compl., ¶ 95, at 28.

**E.    THE SEC HAS ALLEGED SCIENTER**

Initially, as with materiality, whether a defendant acted with the requisite scienter is a fact-specific issue, typically not able to be decided at the 12(b)(6) stage.  *SEC v. Curshen*, 372 Fed. Appx. 872, 877 (10th Cir. 2010) (citations omitted).  Plaintiff must have pleaded that Defendants "acted with an intent to deceive, manipulate, or defraud – in other words, acted with a mental state known as scienter."  *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d at 1187.  "Knowing or reckless conduct meets this scienter requirement.  Recklessness involves 'an extreme departure form the standards of ordinary care' presenting a 'danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  *SEC v. Freiberg*, No. 2:05-CV-00233, 2007 WL 2692041 (D. Utah Sept. 12, 2007) (quoting *Hackbart v. Holmes*, 675 F.2d 1114, 1117 (10th Cir. 1982)).

As noted above, scienter may be pled generally.  *See, e.g.*, *SEC v. Arnold*, Civil No. 03-CV-0328, 2007 WL 2786428, at *3 (D. Colo. Sept. 24, 2007) ("under 9(b), scienter 'may be averred generally'"); *SEC v. Gordon*, No. 09-CV-0061, 2009 WL 1652464, at *3 (same). Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b); *see also Iqbal*, 556 U.S. at 686 ("[A] rigid rule requiring the detailed pleading of a

condition of mind would be undesirable. . . ." (quoting 5A C. Wright & A. Miller, Federal

Practice and Procedure §1301, p. 291 (3d ed. 2004)).

Likewise, in an action brought by the Commission, the Complaint need not allege a

"strong inference" of scienter, as required by the Private Securities Litigation Reform Act and

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) in private securities

actions.  *See SEC v. Mannion*, 789 F. Supp. 2d 1321, 1334 (N.D. Ga. 2011) ("Both *Tellabs* and

the PSLRA provision at issue in *Tellabs* were limited to 'private actions' and have no application

to SEC enforcement actions.").  Indeed, Defendants have not argued that the Commission must

satisfy that PSLRA standard.

Here, the complaint adequately alleges that Defendants possessed the requisite

scienter.  The Complaint leaves no doubt that Defendants were aware that the Form 10-K

contained material misstatements at the time it was filed:

- As to Thornburg's statement in the Form 10-K that it had "successfully" met all

margin calls, the Complaint alleges specific facts making plain that Defendants knew that

statement was false at the time it was made.  (Compl. ¶¶ 60 - 64, at 17-19).  For example, the

Complaint alleges that Mr. Goldstone sent an email on February 21, copying Mr. Simmons and

Ms. Starrett, stating that Thornburg could not timely satisfy the Citi margin call and was

negotiating a payment plan with Citi.  (*Id.* ¶ 61, at 18).

- As to Thornburg's statement in the Form 10-K that it did not sell any assets to

meet margin calls, the Complaint alleges specific facts demonstrating that Defendants were

aware of the I/O Strip Transactions when that statement was made.  (*Id.* ¶¶ 66-71, at 19-21).  For

example, the Complaint alleges that Mr. Goldstone copied Mr. Simmons and Ms. Starrett on

emails dated February 21, 22, and acknowledging that it had to "sell" I/O Strips to try to meet the margin calls, stating that, among the strategies for meeting margin calls, Thornburg had "sold some additional IO securities[.]"  (*Id.* ¶ 68, at 20).

- As to Thornburg's statement in the Form 10-K that it had "the ability and intent to hold the Purchased ARM Assets until recovery," that statement is rendered false by, among other things, Thornburg's violation of its lending agreements (allowing its lenders to seize its assets) and its need to enter into the I/O Strip Transactions to meet margin calls.  (*See Id.* ¶79, at 23).

- As a result, Thornburg's Form 10-K failed to reflect a $428 million impairment charge to its ARM Securities on its Income Statement and improperly reported a fourth quarter profit instead of a loss.  (*Id.* ¶ 11, 46-47, at 4, 14).  As noted above, Defendants were aware of those facts.

Defendants were also aware that Thornburg's year-end going concern analysis, provided to Thornburg's outside auditor on February 20, 2008, was materially misleading in representing that Thornburg successfully continued to meet all margin calls and returned to profitability in the fourth quarter.  (*Id.* ¶¶ 72-74, at 21-22).  Accordingly, and for the reasons described below, Defendants' arguments related to the sufficiency of the scienter allegations should be rejected.

## 1.    Thornburg's "Negative Disclosures" Do Not Negate the Scienter Alleged

Defendants next argue that the negative disclosures that were made by Thornburg "negate any inference of scienter."  (G&S Brief at 40).[6]  The disclosures identified by the Defendants,

---

[6]     The Defendants actually begin by alleging that if a complaint fails to allege that the filing contained any false or misleading statements, then there can be no scienter.  (G&S Brief at 40). For the reasons previously addressed, Thornburg's public filings were materially false and misleading.  *See supra* § III. D.

however, in no way diminish the well-plead allegations that they drafted, reviewed, signed and certified the Form 10-K knowing or recklessly not knowing it contained misstatements and knowingly or recklessly made false statements to KPMG.  (*See supra* § III. D.)[7]  The Defendants' reliance on those disclosures is further misplaced because the Complaint alleges factual misrepresentations and omissions about events that had already transpired, while the disclosures principally warn against future risks.

Defendants identify three categories of disclosures that purportedly diminish the scienter allegations against them.  G&S Brief at 41.  While Thornburg did disclose that it had received margin calls, that there were constraints on its liquidity and that there was a risk of default, it affirmatively – and falsely – represented that they had "successfully" met the margin calls, failed to disclose that it did not meet margin calls per its lending agreements and was forced to rely on lender forbearance to avoid default, that it had entered into the I/O Strip Transactions to meet those margin calls, and falsely represented that it had the intent and ability to hold the ARM Securities until recovery.  (Compl. ¶¶ 5, 7, 32, 38, 53-54, 68-71, 79-80, and 83, at 3, 10, 12, 16, 20-21, 23, and 24).  The Defendants also knowingly or recklessly failed to recognize an income statement loss of approximately $428 million for Thornburg's ARM Securities, and reported a profit rather than a loss for the fourth quarter.  (*Id*. ¶¶ 11, at 4).  As discussed above, Defendants knew or recklessly disregarded that these statements were false and/or materially misleading. Accordingly, the disclosures in no way diminish that Goldstone and Simmons were aware that other false statements were made.  *See SEC v. Mozilo*, No. CV 09-399, 2009 WL 3807124, at *15 (C.D. Cal. Nov. 3, 2009) (despite negative disclosures, finding that "[b]ased on their

---

[7]        Starrett did not sign or certify the Form 10-K.

positions within Countrywide and internal emails, Defendants plausibly had contemporaneous knowledge that their statements were misleading when made, which in turn plausibly supports a finding that Defendants acted with the intent to deceive or defraud").

Moreover, the disclosures do not mean there was no "motive" for the false statements that were, in fact, made with the Defendants' knowledge or reckless disregard for the truth.  The Complaint alleges that the Defendants' scheme was to keep the margin call situation quiet and then quickly raise additional cash.  (Compl. ¶ 32, at 10).  It was neither practical nor necessary to represent that Thornburg was not facing any financial difficulties – in light of the market conditions, any such statement would not have been credible.  *See Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1025 (N.D. Ill. 2010) ("[A]ccording to plaintiff, Corus's fraud consisted largely in concealing the full extent of its financial difficulties.  Thus, the fact that Corus disclosed certain of its difficulties during the class period does not necessarily negate an inference of scienter, for Corus's statements may still have been intended to conceal the fact that its condition was substantially worse than its statements suggested.")

Finally, these disclosures do not remedy the false statements that were made.  Indeed, disclosing that it had successfully met margin calls – even $300 million worth – would not have the same effect on the market as disclosing that Thornburg failed to comply with its lending agreements and, as a result, was subject to default, cross-default and seizure of assets.  The balance of the disclosures identified by the Defendants – regarding the constraints on Thornburg's liquidity and risk of default – generally contain conditional language regarding what may occur under certain circumstances.  (*See* G&S Brief at 17 ("In the event we cannot meet future margin calls . . . ."); G&S Brief at 18 ("[T]here is no assurance that the value of our

mortgage portfolio and derivatives portfolio will not decline further . . .").  As noted above, the

Complaint does not allege that Thornburg failed to disclose some unforeseen potential risk, but

specific material facts currently in its possession.  In other words, these disclosures do not refute

the false statements alleged in the Complaint.  *See In re Neopharm, Ind. Sec. Litig.*, No. 02 C

2976, 2003 WL 262369, at *13 (N.D. Ill. Feb. 7, 2003) (finding allegations regarding certain

misstatements "sufficient" despite public "warn[ings]" where "the full extent of the problems

with [a drug] was known by defendants but [was] not public knowledge").[8]

     *SEC v. BankAtlantic Bancorp, Inc.*, No. 12-60082-Civ., 2012 WL 1936112 (S.D. Fla.

May 29, 2012), a case decided since the Defendants filed their motion, squarely addresses this

issue.  In that case, BankAtlantic Bancorp, Inc. ("Bancorp"), made a series of statements about

the loan portfolio of its subsidiary that are highly analogous to the statements made by

Thornburg.  Like Thornburg representing that margin calls had been successfully met, Bancorp's

Chairman and Chief Executive Officer stated that the "loans were 'proceeding in the normal

course.'" *Id.* at *2.  Like Thornburg stating that it "did not sell any assets to meet margin calls"

while failing to disclose the I/O Strip Transactions, Bancorp's Chairman and CEO stated that

there was only one category of loans that they were concerned about despite knowing that the

loans downgraded were evenly split between both loan categories.  *Id.* at *4.  Also similar to the

present dispute, the Bancorp Chairman and CEO signed a management representation letter

stating that "[m]anagement has the intent and ability to hold loans classified as held-for-

---

[8]     In any event, this is a factual dispute not proper for resolution on a motion to dismiss.
*See SEC v. Reys*, 712 F. Supp. 2d 1170, 1179 (W. D. Wash. 2010).  (despite the presence of
"disclosures/revisions," finding that whether those disclosures are inconsistent with scienter to be
a "factual argument that can be dealt with as the case progresses").

investment for the foreseeable future or until maturity or payoff, despite actively marketing the loans for sale."  *Id.* at *5.

Also, similar to our case, Bancorp made certain negative statements that it argued undermined an inference that it had acted with scienter.  *Id.* at *17.  As here, many of the negative statements relied upon by Bancorp were conditional.  *See id.* at *3 ("'if' the lots were not acquired as anticipated, a borrower 'may not be in a position to service the loan'"); *11 (noting that "the market might become worse").  And, as with Thornburg's statement noting the existence of the margin calls, Bancorp explicitly disclosed then-existing difficult market circumstances.  *Id.* at *11.  In fact, many of the Bancorp disclosures were far harsher than anything contained in the Thornburg Form 10-K:  "Florida's real estate market has slowed significantly, and we are facing the challenges associated with this slowdown"; "Everybody is just looking for extensions, waiting for the market to get better"; and "[W]hat we just have in the marketplace is the music stopped."  *Id.*  The court explicitly rejected Bancorp's argument that those statements undermine any inference of scienter:

> While the Defendants argue that their disclosures as a whole undermine this inference, the Court finds that the above-demonstrated disconnect between the general disclosures as presented and the specific misrepresentations and omissions as alleged does not support a finding of diminished scienter on the face of these allegations and disclosures.

*Id.*  For these same reasons, the Court should reject the Defendants' effort to rely on Thornburg's disclosures to diminish the scienter that has been pled against them.

Defendants' cases all applied the heightened scienter pleading standard of the PSLRA. (*See* G&S Brief at 40-41).  An argument that "fulsome disclosures" undermine a finding of scienter, advanced by a defendant in a Commission enforcement action, has been rejected based

on the defendants' reliance on cases decided under the PSLRA.  *See SEC v. Mozilo*, No. CV 09-3994, 2009 WL 3807124, at *14 ("Not a single case cited by Defendants dismissed a complaint for failure to *plausibly* allege scienter.")  Significantly, Defendants fail to cite any case for this point decided under the appropriate standard.  Moreover, the cases are otherwise distinguishable.  In *Ferber v. The Travelers Corp.*, 802 F. Supp. 698, 706 (D. Conn. 1992) (*see* G&S Brief at 40-41), the defendant publicly disclosed in state court filings the precise thing the plaintiff complained was withheld.[9]  In *In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 777 (E.D. Va. 2007), *aff'd in par, rev'd in part, and remanded*, *Matrix Capital Mgmt. Fund LP v. BearingPoint, Inc.*, 576 F.3d 172 (4th Cir. 2009) (*see* G&S Brief at 40), the court noted numerous problems with the scienter allegations unrelated to "fulsome dislcosures."  Moreover, unlike here, the fact purporting to evidence scienter (overpayment for a foreign company) was explicitly disclaimed in a public warning (risk of overpayment in acquiring businesses).  *Id.*  In *Fulton Cnty, Emp. Ret. Sys.,* 675 F.3d at 1049 (*see* G&S Brief at 41), the court specifically found that the disputed statement was true and not misleading.  Moreover, in that case, the disclosure relied upon by the defendant immediately followed the statement and stated that the entity's liquidity may be insufficient, which specifically addressed the allegedly fraudulent assertion that the entity had "substantial liquidity."  *Id.*  Finally, even the proposition for which Defendants cite *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d at 1210  (*see* G&S Brief at 41), is inapposite.  The Commission's Complaint does not allege that the Defendants were "pessimistic" about Thornburg's future, but knowingly or recklessly fraudulent about events that had already

---

[9]     In fact, the *Mozilo* court specifically identifies *Ferber* as being one of the improperly cited cases.  2009 WL 3807124, at *14.

transpired.

Defendants next argue that the Complaint fails to allege facts demonstrating that Defendants believed the statements in the Form 10-K were false or misleading.  (G&S Brief at 41).  However, as detailed in the Complaint and summarized herein (*see* § III. D. and E.), the Complaint makes plain that, contrary to the representations in the Form 10-K, the Defendants each knew that Thornburg had not "successfully" met its margin calls, entered into the I/O Strip Transactions to meet margin calls, and did not have the ability and intent to hold certain assets until recovery or maturity and consequently falsely reported a fourth quarter profit instead of a loss.  Moreover, the Complaint alleges that Goldstone, Simmons and Starrett schemed to purposely keep the margin call situation from its outside auditors (Compl. ¶ 53, at 16) and that Simmons affirmatively misled them as to why Thornburg sold I/O Strips (*Id.* ¶ 53, at 16).  As a result, Thornburg's financial statements were materially misstated by over $400 million and it improperly reported a fourth quarter profit instead of a loss.  (*Id.* ¶ 11, at 4).

*City of Omaha v. CBS Corp.*, No. 11-2575-cv, 2012 WL 1624022 (2d Cir. 2012), upon which Defendants rely (G&S Brief at 41-42), is readily distinguishable.  Unlike the specific detail provided in the Complaint – references to specific correspondence and statements of the Defendants evidencing their knowledge – in *City of Omaha* the complaint only contained conclusory allegations.  *Id.* at *2.  Moreover, the court concluded that the defendants did not know or have reason to know the facts necessary to establish their scienter.  *Id.*  As has been made clear above, that is abundantly not the case here.[10]

---

[10]     That case, too, is distinguishable as it applies the pleading standards mandated by the PSLRA, a different and more rigid standard than is applicable here.

Defendants next assert that the Complaint demonstrates that the Defendants believed that Thornburg had successfully met all margin calls by the time of the filing, had not violated its lending agreements, and did not sell assets to meet its margin calls.  (G&S Brief at 42).  This is simply not credible.  Among numerous other allegations, the Complaint plainly alleges that Citigroup sent a letter to Goldstone and Simmons advising them that Thornburg had breached the parties' lending agreements and that Citigroup reserved the right to declare default (Compl. ¶ 34, at 10-11); that Thornburg was required to rely on Citigroup's forbearance to avoid default (Compl. ¶ 35, at 11); and that Goldstone and Simmons both drafted and received emails repeatedly referring to the I/O Strip transactions as "sales," including emails acknowledging that "[t]o meet certain of its margin calls, [Thornburg] sold IO strips for a gain" (Compl. ¶ 37, at 11). Those allegations are incompatible with any conclusion other than that Goldstone and Simmons knew that Thornburg violated its lending agreements and effectively sold assets to meet margin calls. [11]

The negative disclosures do not negate the allegations establishing that Goldstone and Simmons possessed the requisite scienter.

### 2.      The Nature of the OTTI Analysis Does Not Undercut Scienter

The SEC alleges, among other things, that Defendants knew or were reckless in not knowing that Thornburg's precarious financial condition, violation of lending agreements and reliance on its lenders' forbearance, notice of breach in the Citi Letter, use of the I/O Strip

---

[11]      Finally, Defendants argue that the Complaint fails to allege scienter because the Complaint fails to allege that the purportedly undisclosed facts were material.  (G&S Brief at 43).  This argument fails for the reasons identified previously.  The misstatements were material. *See supra* § III. D.

Transactions to make late margin call payments, and expectations of future margin calls based on the failure of a European hedge fund were (1) material to a proper OTTI analysis of Thornburg's ARM Securities and (2) would have led KPMG to question and ultimately disagree with Thornburg's conclusion that it had the intent and ability to hold its ARM Securities until recovery or maturity. [12]   (Compl. ¶¶ 51-52, 83, at 15-16, 24).  It further alleges that Goldstone, Simmons, and Starrett failed to properly consider this information in connection with their OTTI analysis and misrepresented and/or failed to disclose this information to KPMG.  (Compl. ¶ 51, at 15.) The SEC alleges that Defendants were aware of the foregoing facts at the time Thornburg's Form 10-K was filed; these are not allegations of fraud-by-hindsight.

Goldstone and Simmons argue that application of an OTTI analysis to Thornburg's situation could not have been clear because the SEC's Office of the Chief Accountant issued a study stating that such an analysis is often complex.  (G&S Brief at 44).  Starrett supports this contention with cites to a Staff Accounting Bulletin, a publication on Current Accounting and Disclosure Issue, and an SEC press release that says GAAP does not provide "bright lines" or "safe harbors" in evaluating OTTI.  (Starrett Brief at 30).  These arguments fail for two reasons.

First, Defendants refer to these extrinsic documents for the truth of the statements therein – that OTTI analysis can be complex and GAAP does not provide bright line rules.  This is improper.  *See In re Thornburg Sec. Litig*., 2009 U.S. Dist. LEXIS 124549 at *9.  Second, the SEC alleges that regardless of the potential complexity of the OTTI analysis, its application

---

[12]    The Complaint does not allege that Starrett knew about the Citi Letter or the European hedge fund.

given the alleged facts was clear.  Starrett wrote Goldstone and Simmons on February 25, 2008

and told them:

> In short, selling some assets is substantially the same as selling all assets because
> the only reason we don't have to recognize the impairments on all assets with
> negative marks in income now is that we represent we have the intent and ability
> to hold the assets to maturity. Selling some assets calls into question our intent
> and having to sell them to meet margin calls or reduce exposure, calls into
> question our ability to hold them.

(Compl. ¶ 54, at 16).  Goldstone responded to Starrett's email by stating:  "Got it.  Understand it.

Thanks."  (Compl. ¶ 55, at 16).  Thus, Defendants understood that if they sold some assets

(voluntarily or because lenders did so following default) they had to recognize the impairment of

all those assets on the company's income statement.  Defendants' awareness of relevant OTTI

criteria is also shown by the going concern analysis, which represented that "[a]s the Company

has the ability and intent to hold its Purchased ARM assets until recovery, losses are not

considered to be other than temporary impairments."  (Compl. ¶ 74, at 22).  Reliance on

Thornburg's auditor cannot protect Defendants because they purposely withhold critical

information from them.

Goldstone and Simmons claim that the SEC "grossly mischaracterizes" the February 25

email and that Starrett was only saying that an issue would "be raised" if they sold assets.  (G&S

Brief at 44).  Raising the issue, however, was a reference to raising the margin calls with KPMG,

whom defendants had "purposely not told [ ] about the margin calls."  (*See* Compl.  ¶ 53, at 16).

Starrett's email says "selling some assets calls into question our intent and … ability to hold."

Regardless, the court should not parse the meaning of Starrett's email at this stage.  "A court's

function in ruling on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties

might present at trial or whether the plaintiff will prevail, but whether the plaintiff is entitled to

offer evidence to support its claims." *American Plastic Equip., Inc. v. Toytrackerz, LLC*, 2008 WL 917635, at *1 (D. Kan. 2008); *Wood v. Wood*, 2010 WL 2813760, at *3 (S.D.W.Va., 2010) (A Rule 12(b)(6) motion tests the sufficiency of the pleading. It does not resolve factual disputes, ….") (citing *Republican Party of North Carolina v. Martin,* 980 F.2d 943, 952 (4th Cir.1992)).

Plaintiff is puzzled by Goldstone and Simmons' next argument. They cite to accounting guidance and suggest that impairment should have been assessed at the individual security level. (G&S Brief at 45). They state that "Plaintiff's contention that Thornburg should have taken a $400 million impairment charge on its entire $2.9 billion portfolio of ARM Securities merely because it might need to sell some portion of that portfolio to meet future margin calls (*see* Compl. ¶¶ 70, 85, at 21-21, 25) has no support in GAAP." (G&S Brief at 45). They seem to be saying that Thornburg did not need to take the $400+ million impairment on its ARM Securities in connection with its restatement. But it is beyond dispute that Thornburg restated its financials on March 11, 2008, and did in fact properly take a $427.8 million impairment on its ARM Securities portfolio. (Compl. ¶ 11, at 4).

Goldstone and Simmons then cite various cases for the uncontroverted proposition that allegations of GAAP violations, standing alone, do not state a securities fraud claim. (G&S Brief at 45). But while "allegations of GAAP violations are not alone sufficient to raise a strong inference of scienter, courts have found them to be 'extremely probative of scienter.'" *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 1:00-CV-2838, 2002 U.S. Dist. LEXIS 28072 *48 (N.D. Ga. August 20, 2002) (quoting *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000)). And more significant violations support a stronger inference. *Id*. In addition, however, the SEC must make some other allegations that support Defendants' scienter. *In re*

*Int'l Rectifier Corp. Sec. Litig.*, No. CV07-02544, 2008 WL 4555794, at *13 (C.D. Cal. May 23, 2008).  And, as set forth above, it has.

Defendants' argument appears to be that whenever accounting guidance is arguably complex there can be no scienter for its violation.  But that is clearly not the case.  In *Florida State Board of Admin. v. Green Tree Fin. Corp.*, the crux of the suit was the "investors' allegation that Green Tree used 'unrealistic and unreasonable' assumptions in its gain-on-sale accounting, thus overvaluing its assets and overstating its earnings."  270 F. 3d 645, 649 (8th Cir. 2001).  The Green Tree investors had pleaded that during the relevant time, defendants, like Defendants here, "had in their possession facts that rendered their financial results materially false when they published them."  *Id*. at 666-67.  Defendants' theory of the case was "that they failed to correct the financials because the accounting was sufficiently complex that they reasonably believed the financials were fairly stated despite the prepayment discrepancy."  *Id*. at 662.  The Eighth Circuit reversed the lower court's dismissal, refusing to "conduct a battle of the experts" regarding accounting issues on a motion to dismiss:

> Undoubtedly, the accounting issues are complex; whether they were handled within the parameters of good faith decision-making or whether the decisions amounted to recklessness will surely be the focus of any trial of this case.  We will not prejudge that issue.  But neither the district court, nor we, can conduct a battle of experts on a motion to dismiss. … The strong-inference pleading standard does not license us to resolve disputed facts at this stage of the case.

*Id*. at 666; *see also In re RAIT Financial Trust Sec. Litig.*, No. 2:07-cv-03148, 2008 WL 5378164, at *7 (E.D. Pa. Dec. 22, 2008) (finding that Plaintiff had adequately alleged that defendant had failed to comply with GAAP based on failure to apply SFAS No. 115).

The SEC's additional factual allegations, coupled with the inference to be drawn from the significant accounting violation, adequately allege Defendants' scienter.

Neither *Funke v. Life Financial Corp.*, 237 F. Supp. 2d 458 (S.D.N.Y. 2002) nor *SEC v. Espuelas*, 579 F. Supp. 2d 461 support dismissal.  In *Funke*, plaintiffs "premise[d] their scienter theory *entirely* on the contention that the defendants' use of the cash-in method for valuing the company's interest in the cash reserves assigned to over-collateralize the securitized loan pools violated GAAP."  237 F. Supp. 2d at 485 (emphasis added).  That was not enough.  *Id*.  *Espuelas* found that allegations that certain defendants improperly accounted for barter transactions, without more, did not allege scienter.  579 F. Supp. 2d at 480-81.  In neither of those cases did plaintiffs allege, let alone support through detailed pleadings, that defendants withheld and misrepresented information to company auditors and the investing public in order to avoid having to take an impairment on assets that would have turned a reported fourth quarter profit to a loss.[13]

Starrett's reliance on accounting cases is similarly misplaced.  In *In re Fannie Mae*, the court found that GAAP "does not require that management write down assets as OTTI, if management considers it probable that all amounts due will be collected and that the security will recover its value during the period management intends to hold it."  742 F. Sup. 2d 382, 410 (S.D.N.Y. 2010).  However, there was no allegation that management knew they had lost the ability to hold assets because their lenders could declare default and seize them, or that they had

---

[13]     *SEC v. Price Waterhouse*, 797 F. Supp. 1217 (S.D.N.Y. 1992), which Goldstone and Simmons also cite in this section, isn't even a motion to dismiss case, it is a decision following a bench trial at which the parties disputed the proper accounting methodology.

deceived their auditors.  *City of Omaha*, 2012 WL 1624022, is also readily distinguishable.  *See supra* § III. E. 1., at 34.  *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350 (N.D. Ga. 2005), similarly did not involve allegations such as these.   In *In re Radian Sec. Litig.*, by Ms. Starrett's own description, plaintiffs claimed that "Radian misled investors by failing to notify shareholders of the margin calls C-BASS received, by downplaying C-BASS' liquidity crisis, and by deceptively stating that C-BASS was *expected* to return to profitability."  (Starrett Brief at 31) (emphasis added).  The SEC alleges that Defendants here falsely represented not an expectation, but a return to profitability that did not exist.

Goldstone and Simmons argue that intent to deceive is not plausible because they hoped to raise additional capital and to meet their expected additional margin calls.  (G&S Brief at 47).  They further claim that because they acknowledged the "need to inform [the auditor about the 'valuation issue' for Thornburg's assets]," if they could not execute their plan to pay off all margin calls right before filing the Form 10-K and before other calls came in, shows their "inten[t] to make accurate, honest disclosures in the Form 10-K and to Thornburg's auditors."  (*Id*.).  But the SEC's Complaint quotes a document where Defendants acknowledge "purposely" not telling their auditors about margin calls.  (Compl. ¶ 53, at 16).  Purposely withholding information while hoping to avoid being forced to disclose it is not consistent with an intent to make accurate and honest disclosures.  If management withholds the fact that they have been playing with matches, only agreeing to acknowledge that they have been doing so if the building burns down, they cannot be said to lack an intent to deceive.

Defendants also place great significance on the fact that they disclosed "gross unrealized losses" of $427.8 million in Thornburg's Form 10-K and claim that disclosure would make no

sense if the goal had been to misrepresent Thornburg's financial condition.  (G&S Brief at 47).

But disclosing an unrealized loss, and stating you have the intent and ability to hold those assets

until they recover, is not the same as disclosing a realized loss.  For one thing, the realized loss

must be taken on the company's income statement.  And if Thornburg did that its fourth quarter

profit would have been a loss; precluding Defendants from touting Thornburg's return to

profitability in the fourth quarter.  (*See* Compl. ¶¶ 72-73, 96, at 21-22, 28).

### 3.   Simmons' "If They Only Knew" Comment to Goldstone Is Strong Evidence of Scienter

The SEC alleges that Simmons implicitly acknowledged to Goldstone, the morning after

filing Thornburg's Form 10-K, that they had misled the investing public when in response to

Goldstone's email about Thornburg's stock drop following the filing of the Form 10-K he wrote:

"'I guess the recent development section did not go over well.  *If they only knew*.' (Emphasis

added)."  (Compl. ¶¶ 10, 92, at 4, 27).  The straight-forward reading of the email, of course, is

that it is an acknowledgment by Simmons that significant information had not been disclosed and

"if they only knew" about that information the market's reaction would have been far worse.

Goldstone and Simmons unabashedly claim that it is not plausible to attribute such a "nefarious

interpretation" to this email.  (G&S Brief at 48).  Rather, they ironically offer that this

"incomplete line of a short, inscrutable email" "was more plausibly an off-hand reference to

Thornburg's still-undisclosed plans to raise cash and capital rather than a fraudulent scheme

mentioned nowhere else in the documents on which the Complaint is based."  (G&S Brief at 48-

49).

First, it is not the court's role at the motion to dismiss stage to weigh potential evidence

that may be submitted at trial.  *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009).  The court

should only "'assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.'"  *Id.* (quoting *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10ᵗʰ Cir. 1999)).  The court should not at this stage attempt to divine meaning from emails, but only assess whether plaintiff has set forth a misleading statement.  *Jayhawk Capital Mgmt., LLC v. LSB Indus., Inc.*, No. 08-2561, 2009 WL 3766371 (D. Kan. Nov. 10, 2009) ( refusing to "rely on one word in an email to determine as a matter of law that Defendant did not make the alleged statement").  Certainly, if the email is viewed in the light most favorable to the Commission – which it must be – it provides evidence of Defendants' scienter.

Second, despite the fact that limited references to a fraudulent scheme in written documents is not surprising, Goldstone and Simmons are wrong that the fraudulent scheme is not mentioned elsewhere in documents cited by the Complaint.  Starrett confirmed  to Goldstone and Simmons in an email their agreement to "purposely" not tell Thornburg's auditors, and by extension investors, about the margin call situation.  (Compl. ¶ 53, at 16).  The February 22, 2008 email from Goldstone that copied Simmons and Starrett stated "[w]e don't want to disclose our current circumstance until it is resolved. … our plan is to say that we had margin calls and all have been met."  (Compl. ¶ 30, at 10).  The Citibank letter offers clear evidence of Thornburg's breach of the Citi Repo Agreement, yet it was not shared with KPMG.  Instead, KPMG was assured both orally and in writing (through the management representation letter) that Thornburg was in compliance with its lending agreements.  (Compl. ¶ 5, 57, 58 at 3, 17).  And a February 21, 2008 email to Goldstone, Simmons, and Starrett noted that "CFSB is willing to withdraw from the underwriting group since ***they realize their attorneys will probably not agree to anything short of disclosing the delay in meeting their margin call earlier this week***."  (Compl.

¶ 64, at 18-19).  Thus Defendants' scheme to withhold the severity of Thornburg's liquidity crisis and its failure to timely meet margin calls is supported by numerous factual allegations, including Simmons' implicit acknowledgement of intent to mislead investors.

**4.      The Desire for Thornburg to Survive the Mortgage Crises Evidences Scienter**

The SEC alleges that Defendants were motivated to commit securities fraud to save Thornburg and that disclosing the truth about the extent of its "liquidity crisis and exposure to default and cross-default notices" would have "undermined the company's imminent plans to raise additional cash."  (Compl. ¶ 4, at 2).  Defendants contend that their desire to save Thornburg cannot evidence scienter, but in citing two cases from New York they ignore this Court's previous finding that it "should not ignore such motives when considering the totality of factual circumstances that might potentially give rise to a strong inference of scienter."  *In re Thornburg Mortg., Inc., Sec. Litig.*, 695 F. Supp. 2d at 1202 (applying higher PSLRA standard for alleging scienter).

> [T]he precarious position of mortgage companies around and during the Class Period is a circumstance that adds to the plausibility of the self-preservation motive.  The Court agrees that the alleged motives, and facts underlying them, standing alone, do not establish a strong inference of scienter.  The allegations nudge the ball, however, further toward the Plaintiffs' goal with respect to Thornburg and Goldstone, the only Defendants referenced in the Plaintiffs' motive allegations.

*Id*.

A lack of insider trading does not always negate or weaken an inference of scienter.  *Id*. at 1194.  And the financial crisis facing the United States in February of 2008 provided Thornburg and "the Defendants with another motive that adequately fills the gap left by a lack of suspicious insider-trading activity: survival."  *Id*.  In *In re Thornburg Mortg., Inc. Sec. Litig*. this

Court found that it was reasonable to infer that the Thornburg Defendants, who were inextricably financially intertwined with the continued viability of the company, had a motive to mislead. *Id.* at 1195; s*ee also In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 981 (D. Minn. 2009) ("However, 'the absence of a motive allegation is not fatal' to a plaintiff's claim.") quoting *Tellabs*, 551 U.S. at 325. The argument is even stronger here where the Company had been in imminent danger of defaults and subsequent cross-defaults in the days leading up to the Form 10-K and where no Defendant was purchasing TMI shares during the relevant period. *See In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d at 1195 (noting that Defendants had purchased $25,000,000 worth of Thornburg Mortgage, Inc. shares during the relevant period and rejecting their argument that this behavior, which could be against Defendant's financial interests, precluded a finding of scienter). The totality of the circumstances alleged clears the SEC's pleading hurdle for scienter.

## F.   GOLDSTONE'S STATEMENTS FOLLOWING THE FILING OF THE FORM 10-K

The SEC claims that Goldstone's statement on CNBC on the afternoon of February 28th that "we have liquidity and cash available to continue to support the portfolio" was a material misstatement because as of that morning (1) Thornburg's available cash was approximately $40 million and (2) Thornburg's lenders were issuing escalating margin calls, including one for more than $60 million (150% of available cash) from UBS AG that exceeded Thornburg's liquidity. (Compl. ¶¶ 95, 98, at 27-28). The statement was also materially misleading because Thornburg had been in violation of its lending agreements the prior week, even as recently as the prior night, meaning that even if Thornburg had been currently supporting its portfolio, which it could not, such support was not "continuing." These alleged facts also made materially misleading

47

Goldstone's instructions to Thornburg's investor relations group to advise investors that "[a]ll margin calls met," "[l]enders are fine," and "[w]e still have sufficient operating cash[.]"  (Compl. ¶ 94, at 27).  The allegations further support the plausible inference that Goldstone knew, or at a minimum was reckless in not knowing, that the statements were false and/or materially misleading.

Further, his statements on CNBC that "he did not believe Thornburg would have to sell assets" and "had 'met all of [its] lending requirements'" (Compl. ¶ 98, at 28) were materially misleading and at a minimum reckless for the reasons stated herein.

Goldstone argues that the SEC has not alleged scienter because he hoped to "generate $25 million in stock sales within two days, another $60 million from a securitization by March 3rd, and $25-$50 million from a preferred stock sale by 'Monday of next week,' for a total of '$150-$175 million of liquidity while [Thornburg] work[ed] on a capital raise' (of between $300 to $500 million) – an expectation of substantial additional liquidity that was expected to supplement Thornburg's $40 million cash position."  (G&S Brief at 50-51).  But Goldstone did not tell investors that he *expected or hoped* to have liquidity and cash available to continue to support the portfolio, he said "we *have* liquidity and cash available to *continue* to support the portfolio."  (Emphasis added).  He said this knowing, at the time he made the statement, that Thornburg was receiving margin calls and did not have sufficient cash to meet them, and that Thornburg's cash and liquidity had not been sufficient to support Thornburg's portfolio in the weeks leading up to the filing of the Form10-K because Thornburg had been in breach of three lending agreements.

Goldstone seeks protection from his statements under the "bespeaks caution" doctrine. (G&S Brief at 51). But as he acknowledges, that doctrine only covers "'forward-looking representations.'" (G&S Brief at 51, n. 52 (quoting *Grossman*, 120 F.3d at 1120-21)). The SEC does not allege, however, that Goldstone's "prediction that Thornburg would have sufficient cash and liquidity" (G&S Brief at 51) was false or misleading; it alleges that saying Thornburg presently had such cash and liquidity was, when he knew that the UBS margin call alone exceeded Thornburg's cash on hand. Similarly, the fact that Goldstone's 5:29 a.m. instructions to his investor relations department preceded his knowledge of the UBS margin call by an hour does not insulate his instructions that investors be told throughout the day that "[a]ll margin calls met," "[l]enders are fine," and "[w]e still have sufficient operating cash[.]" At 5:29 a.m. Goldstone expected additional margin calls and knew Thornburg's liquidity had been severely depleted. And an hour later, he knew its liquidity had been exceeded. Yet, Goldstone did nothing to correct those messages, instead he reinforced them on CNBC. As a result, "Thornburg's investor relations group communicated with numerous investors on February 28th and reported back to Goldstone, Simmons, and Starrett in an email at the end of the day, confirming that the 'top messages [they] reinforced in the market' were:

> We have met all margin calls to date, and we expect to continue to do so.
>
> We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.
>
> We returned to profitability during the fourth quarter despite a tough market."

(Compl. ¶ 96, at 28).

### G.   THE COMPLAINT ALLEGES THAT DEFENDANTS DECEIVED THORNBURG'S AUDITORS

Rule 13b2-2 generally forbids officers and directors of issuing companies from making material misstatements or omissions in communications with accountants in connection with audits or reviews of the issuer's financial records or with the preparation or filing of documents required to be filed with the SEC, and also prevents officers and directors from manipulating, misleading or fraudulently inducing any independent accountant who is performing an audit or review of the issuer's financial statements.

*SEC v. Dauplaise*, No. 2:98-CV-00562, 2004 WL 17716 at *8 (D. Utah Aug. 4, 2004) (internal citations omitted).

Goldstone and Simmons initially claim that the SEC's deceit of auditors, Rule 13b2-2, claim should be dismissed because the SEC allegedly engaged in '"shotgun pleading"' and its "scattershot allegations do not come close to meeting the minimum pleading requirements of Rule 8 and Rule 9(b)."  (G&S Brief at 53, citing to *SEC v. Fraser*, 2010 WL 5776401 at *9). Their very next sentence, however, belies their argument that they cannot readily discern the allegations plaintiff claims underlie this violation when it lists "the alleged fraudulent omissions concerning Thornburg's purported violation of lending agreements, the Citi reservation of rights letter, the I/O Strip Transactions, not selling assets to meet margin calls, and Thornburg's alleged 'precarious' financial condition."  (G&S Brief at 53-54).  Goldstone and Simmons claim that those allegations fail to satisfy Rules 8 and 9(b) for the reasons addressed previously in their Memorandum.  (G&S Brief at 54).  The SEC contends the opposite for the reasons set forth herein.

Second, Goldstone and Simmons argue that "the Complaint does not allege that Thornburg's auditor was in fact unaware of Thornburg's 'precarious' financial condition, the extent of its margin calls, its payment plans for satisfying margin calls and the various

transactions (including the I/O Strip Transactions) that Thornburg undertook to raise cash before the Form 10-K filing." (G&S Brief at 54). They then argue that because the auditor was aware of some facts – difficulties in obtaining financing, $300 million in margin calls since February 14th, $427.8 million in unrealized losses Thornburg considered temporary, and the possibility of more margin calls – it could not have been misled. *Id.*

But the SEC explicitly alleges several facts that, while known to the Defendants, were not known to KPMG. It alleges that KPMG was not aware of the extent of Thornburg's precarious financial condition because Defendants failed to disclose that Thornburg had been in breach of three lending agreements leading up to the Form 10-K filing and subject to defaults and cross-defaults. (*See e.g.* Compl. ¶ 29, at 9). It alleges that the $427 million in disclosed unrealized losses should have been realized, and had KPMG been made aware of all the facts, would have been realized. (*Id.* ¶ 83, at 24). It alleges that Goldstone, Simmons and Starrett each considered the I/O Strip Transactions asset sales, knew they had been done to meet margin calls, but failed to disclose that fact to KPMG – and Simmons advised a KPMG audit partner that it had undertaken the I/O Strip Transactions "to take advantage of opportune pricing rather than to meet margin calls." (*Id.* ¶¶ 65-69, at 19-20). It alleges that Goldstone and Simmons withheld information from KPMG about the impending collapse of a hedge fund and their conclusion that that event would result in further margin calls at Thornburg. (*Id.* ¶¶ 38, 39, 76, 77, at 12, 20). And it alleges that each Defendant was aware or should have been aware that representations made to KPMG in Thornburg's year-end going concern analysis were materially false and misleading. (*Id.* ¶¶ 72, 73, at 21).

Third, Goldstone and Simmons argue that the Rule 13b2-2 claim should be dismissed because the information allegedly withheld from KPMG was not material because the SEC merely makes the "bald assertion that the auditor would have reached a different conclusion had it received 'accurate and complete information about Thornburg's margin call situation during the two-week period leading to the filing of Thornburg's 2007 Form 10-K.'"  (G&S Brief at 55 (quoting Compl. ¶ 83, at 24)).  They also argue that the SEC's complaint contradicts itself on this subject because in paragraph 4 it says disclosing the truth about the margin calls would have led KPMG to "question" Thornburg's OTTI conclusion and later, in paragraph 83, after fleshing out more detail about the fraud, it states that "accurate and complete information about Thornburg's margin call situation" would have led KPMG to "disagree with the company's OTTI conclusion."  (*See* G&S Brief at 55 (quotations are taken from the Complaint)).

Taking the second argument first, the allegation that KPMG would initially question Thornburg's OTTI conclusion and later disagree with it is not inconsistent.  An auditor would be expected to question before reaching a conclusion.  The cases cited by Goldstone and Simmons are inapposite.  First, *Ledoux v. Davies*, 961 F.2d 1536, (10th Cir. 1992) is a summary judgment case, so the allegations of the complaint are not taken to be true.  Second, the prison inmate suing prison officials in *Ledoux* contradicted his claim that he was denied medication "by Plaintiff's own statement of uncontroverted facts that, according to his medical records, he was not denied any medication."  961 F. 2d at 1537.  *SEC v. Roanoke Tech. Corp.*, No. 6:05CV1880, 2006 WL 3813755 at *2 (M.D. Fla. Dec. 26, 2006), merely states, in discussing the standard for a motion to dismiss, that a court need not accept internally inconsistent facts, among other things.  *Id*.  It provides no discussion on the issue from which the parties or court could analogize.

As to the first argument, the SEC has alleged multiple facts that establish the materiality of Defendants misstatements and omissions to auditors as discussed *supra* § III. D.  Moreover, it has alleged that the failure to recognize the $427.8 million loss on Thornburg's ARM Securities resulted in a restatement, which is only done for material misstatements.  *See SEC v. Kelly*, 663 F. Supp. 2d at 285.

Fourth, Goldstone and Simmons argue that they had no duty to disclose the rumored "imminent collapse" of a large European hedge fund and Simmons had no obligation to "update" his statement to KPMG "that he believed that the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  (G&S Brief at 55, citing Compl. ¶¶ 38, 77-78, at 12, 22-23) (quotations are from the Complaint)).  They base this argument on their contention that the hedge fund's collapse was a rumor that was not to be trusted and need not be disclosed.  (G&S Brief at 55-56).

But the allegation is that:

(1)     "Goldstone and Simmons learned on February 27th that a large European hedge fund with substantial MBS holdings similar to Thornburg's ARM Securities was collapsing that afternoon."  (Compl. at ¶ 38, at 12,);

(2)     Goldstone "[a]nticipating that the collapse would negatively impact the price of Thornburg's own ARM Securities," wrote Simmons an email stating:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me. They got hit with 20 point haircuts on Alt-A AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.

(Compl. at ¶ 38, at 12,);

(3)     "Similarly concerned about the negative impact the hedge fund collapse would

have on the value of Thornburg's ARM Securities serving as collateral for its

loans and the prospect of additional margin calls, which, like a 'haircut,' require a

borrower to advance additional collateral or cash to protect a lender's interests,

Simmons sent an email to Goldstone and others on February 27th stating:

> This makes it even more critical to be done with Citi today so we
> can get the K filed."

(Compl. ¶ 39, at 12);

(4)     "[N]either Goldstone nor Simmons informed Thornburg's outside auditor

about the impending collapse of the large European hedge … an event …

they knew, or were reckless in not knowing, would likely further depress

the price of Thornburg's ARM Securities and trigger additional margin

calls."  (Compl. ¶76, at 22); and

(5)     "[A]t or about the time Simmons learned of the hedge fund collapse, he

had just advised the audit partner from Thornburg's outside auditor that he

believed the MBS market had reached its lowest point and MBS prices

were not likely to deteriorate further.  Simmons improperly failed to

update what had become a misleading statement to Thornburg's outside

auditor."  (Compl. ¶77, at 22-23).

Thus, the SEC does not allege that Goldstone and Simmons misled investors by failing to

disclose rumors.  *Cf. In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 420-421 (D. N.J. 2010).

It alleges that they learned that a large hedge fund "was collapsing," believed that the collapse

would further depress the prices of Thornburg's ARM Securities and trigger additional margin calls, and failed to disclose this information to KPMG at a time when they were telling KPMG that Thornburg did not need to realize a $427.8 million loss on those same ARM Securities because it had the intent and ability to hold them until maturity or recovery.   Like *In re Synchronoss Sec. Litig.*, the other cases cited by Simmons and Goldstone – *Higginbotham v. Baxter Int'l. Inc.,* 495 F.3d 753, 760-61 (7th Cir. 2007) and *In re Northern Telecom Ltd. Sec. Litig*., 116 F. Supp. 2d 446, 464 (S.D.N.Y. 2000)[14] – did not involve allegations that defendants deceived their auditors by withholding material information.

Goldstone and Simmons further claim that Simmons had no duty to correct his previous statement to KPMG, that he believed the MBS market had reached its low point and further deterioration in prices was unlikely, because "[t]he Complaint does not allege that Mr. Simmons' opinions on the state of the MBS market and MBS price deterioration were in fact changed by the hedge fund rumor" or "that the European hedge fund rumor was trustworthy, much less material."  (G&S Brief at 56-57).  Rule 13b2-2 "imposes a duty on corporate officers to clarify previous statements that are misleading in the absence of some material fact."  *SEC v. Autocorp. Equities, Inc*., No. 2:98-CV-00562, 2004 WL 1771608 at *6 (D. Utah Aug. 4, 2004).  The SEC has alleged that Simmons told KPMG that MBS prices had reached bottom.  It further alleges that in an email exchange with Goldstone on February 27, 2008, Goldstone wrote Simmons that he thought Thornburg would get additional "haircuts," meaning the price of its ARM Securities

---

[14]     The language Goldstone and Simmons quote from *In re Northern Telecom Ltd. Sec. Litig.* on page 56 on their Memorandum is actually found on page 464 of that case, not page 463 as cited.

would go down.  And it alleges that Simmons, "[s]imilarly concerned about the negative impact

the hedge fund collapse would have on the value of Thornburg's ARM Securities serving as

collateral for its loans and the prospect of additional margin calls, … sent an email to Goldstone

and others on February 27th stating: 'This makes it even more critical to be done with Citi today

so we can get the K filed.'"  (Compl. ¶39, at 12).  Because Simmons and Goldstone expected

additional margin calls and haircuts, they did not believe they were at the bottom of the market

and that further price deterioration was unlikely, thus Simmons' prior statement to the contrary

to the KPMG audit partner was misleading.

Fifth, Goldstone and Simmons argue that their continued concealment of the Citi Letter

from Thornburg's auditors during their restatement work does not support a deceit of auditors

claim because of the SEC "mischaracterization of the record" concerning Thornburg's auditor's

request for correspondence with lenders.  (G&S Brief at 57-58).  Initially, how "the record" is

characterized is an improper inquiry on a motion to dismiss, where a court "cannot resolve a

factual dispute."  *Green Tree Fin. Corp.*, 270 F.3d at 663.  The SEC's allegation that KPMG

requested all correspondence with lenders is to be taken as true at this stage and Defendants'

contention is another improper attempt to argue the merits.  Moreover, if the Court is inclined to

dig into the documents and resolve what they say and mean at this stage, it will see that

Goldstone and Simmons' statement that "the auditor did <u>not</u> 'specifically request[ ] … all'

correspondence with lenders" (G&S Brief at 57) (emphasis in original) is flat wrong – making

their accusation of "mischaracterization" by the SEC ironic, to put it kindly.[15]

---

[15]     Their statement that "they were not even recipients of the Citi letter in the first place" in
footnote 55 is also wrong – the letter was sent to the attention of Goldstone, Simmons, and Nate

The Consent attached to Jennifer Hall's March 3, 2008 email to Goldstone, Starrett, Simmons, and Shawn Buniel said that they needed "Information to address the question" of Thornburg's intent and ability to hold its ARM Securities and its assertion that its default subsequent to the Form 10-K filing was due to "unforeseen catastrophic events." (*See* Ex. 28 to G&S Brief at 2). An example of such information was "correspondence with lenders/attorneys/ shareholders." (*Id*.). Further, on the next page, KPMG requested a timeline of events including:

> b. Day-by-day correspondence with counter parties during the week before filing

> i. Correspondence with counter parties for the two weeks prior to filing, along with supporting evidence."

(*Id*. at 3). We are not sure what to say about Goldstone and Simmons' contention that this is not a request for the Citi Letter, which declared Thornburg in breach of its lending agreement seven days before the filing, other than that it shows chutzpah.

Their further argument that the Citi Letter was immaterial and their breach of the agreement was not required to be disclosed in Thornburg's management representation letter (G&S Brief at 58), is similarly without merit. Arguing that the breach was immaterial because it "would [not] have a material effect on [Thornburg's] financial statements" is circular. Thornburg's breach subjected it to be declared in default and having its assets seized and sold. It is inconceivable that the company's auditors would not want to know this and see the letter declaring the breach.

Sixth, Goldstone and Simmons argue that "the Complaint does not establish that Mr. Simmons' attribution of the February 28th margin call to 'unforeseeable' circumstances was

---

Fellers via overnight courier and facsimile. (*See* Ex. 7 to G&S Brief). Moreover, Goldstone admitted receiving the letter in investigative testimony. (*See* Exhibit B to McKenna Declaration).

in any way false or misleading." (G&S Brief at 58). Again, the Complaint need not "establish" anything at this point other than that what it alleges, if true, states a cause of action. The Complaint alleges that Simmons misled Thornburg's auditors by telling them the margin calls on March 28th were unforeseen, when the day before he and Goldstone had exchanged an email discussing how Thornburg anticipated receiving additional margin calls as the result of the collapse of a large European hedge fund holding similar mortgage backed securities.

In sum, the SEC has alleged numerous misstatements made by Defendants to Thornburg's auditors and numerous omissions from the statements made. Thus the SEC's deceit of auditors claim is properly alleged.

## H. THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY AND AIDING AND ABETTING FOR THORNBURG'S VIOLATIONS OF THE SECURITIES LAWS AGAINST GOLDSTONE AND SIMMONS

Defendants Goldstone and Simmons argue that because there are no primary violations of the securities laws, the claims for control person liability and aiding and abetting must fail. Contrary to Defendants' contentions, dismissal of these claims is not appropriate because the Commission has adequately alleged a primary violation as discussed herein. Goldstone and Simmons do not refute that they are not control persons within the definition of Section 20(a) of the Exchange Act.[16]

With regard to aiding and abetting liability, pursuant to Section 20(e) of the Exchange Act the Commission may impose aiding and abetting liability upon "any person that knowingly or recklessly provides substantial assistance" to another violator of the Exchange Act. 15 U.S.C.

---

[16]    This Court has already found Goldstone and Simmons to be control persons for purposes of Section 20(a) liability. *In re Thornburg Mortg., Inc., Sec. Litig.*, 695 F. Supp. 2d at 1217.

§ 78t; *see also* Dodd-Frank Act § 9290.  Although Defendants' conduct predates the passage of the Dodd-Frank Act, recklessness, contrary to Defendants' contentions, satisfies the scienter requirement for aiding and abetting liability in the Tenth Circuit.  *German v. SEC*, 334 F.3d 1183, 1196 (10th Cir. 2003) ("We think that this is a sufficient factual basis for the conclusion that [defendant] aided and abetted the violations with a state of mind of recklessness, if not willful disregard."); *SEC v. Nacchio*, 614 F. Supp. 2d 1164, 1172 (D. Colo. 2006); *SEC v. Autocorp Equities, Inc.*, 292 F. Supp. 2d 1310, 1331-32 (D. Utah 2003); *but cf. SEC v. Rivelli*, 2010 WL 2775623, at *4 (D. Colo. July 14, 2010).

Goldstone and Simmons contend that "[f]or the reasons set forth above with respect to Defendants' lack of scienter, nothing in the Complaint plausibly demonstrates that Defendants had actual knowledge that they substantially assisted Thornburg (or each other) in the commission of the alleged securities fraud, books and records violations, and internal control violations at issue."  (G&S Brief at 60).  But regardless of the standard, for the reasons set forth herein, the SEC's Complaint does allege that Goldstone and Simmons knowingly (and recklessly) provided substantial assistance to Thornburg's violations of the securities laws.

### III.  CONCLUSION

For the reasons set forth above, the Court should deny Goldstone and Simmons' Motion to Dismiss.

Dated:  June 20, 2012

<div style="margin-left: 50%;">

/s/ Stephen C. McKenna

Stephen C. McKenna

Gregory Kasper

*Attorneys for Plaintiff*

Securities and Exchange Commission

1801 California Street, Suite 1500

Denver, CO  80202

Ph. (303) 844-1000

email:  mckennas@sec.gov

        kasperg@sec.gov

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2012, I filed the foregoing document through the

CM/ECF system, which caused the following parties or counsel to be served by electronic

means, as more fully reflected on the Notice of Electronic Filing:

Michael Hoses
Assistant United States Attorney
P.O. Box 607
Albuquerque, NM 87103
(505) 346-7274
Email: Michael.hoses@usdoj.gov
*Local Counsel for Plaintiff Securities and Exchange Commission*

Alanna G. Buchanan (alanna.buchanan@wilmerhale.com)
Joel Fleming (joel.fleming@wilmerhale.com)
Wilmer Cutler Pickering Hale and Dorr LLP
950 Page Mil Road
Palo Alto, CA 94304
Phone: (650) 858-6000
Fax: 650-858-6100

Randall R. Lee (Randall.lee@wilmerhale.com)
Jessica F. Kurzban (Jessica.kurzban@wilmerhale.com)
Peiyin Patty Li (Patty.li@wilmerhale.com)
Wilmer Cutler Pickering Hale and Dorr LLP
350 S. Grand Avenue, Suite 2100
Los Angeles, CA 90071
Phone: (213) 443-5360
Fax:

John A. Valentine (john.valentine@wilmerhale.com)
Wilmer cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Phone:  (202) 663-6131
Fax:  (202) 663-6363
*Attorneys for defendant Larry Goldstone and Clarance Simmons, III*

Andrew G. Schultz (aschultz@rodey.com)
Bruce D. Hall (bhall@rodey.com)

61

Rodey, Dickason, Sloan, Akin & Robb, P.A.
201 3rd Street NW, Suite 2200
P.O. Box 1888
Albuquerque, NM 87102
*Attorneys for defendants Larry Goldstone, Jane E. Starrett and Clarence Simmons, III*

Jerry L. Marks (jmarks@milbank.com)
Alisa Schlesinger (aschlesinger@milbank.com)
Elena Kilberg (ekilberg@milbank.com)
Paul M. Torres (ptorres@milbank.com)
Robert J. Liubicic (rliubicic@milbank.com)
Milbank, Tweed, Hadley & McCloy LLP
601 S. Figueroa Street, 30th Floor
Los Angeles, CA 90017
Phone (213) 892-4000
Fax:  (213) 892-5063

Thomas Arena (tarena@milbank.com)
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005
Phone: (212) 530-5000
Fax:  (212) 530-5219

*Attorneys for defendant Jane Starrett*

s/ Marla J. Pinkston
Marla J. Pinkston2