# EXHIBIT A

**Listing of Statements Taken from Defendants' Motions to Dismiss**

1. <u>G&S Brief</u> at 6: "Thornburg focused on 'High Quality assets to minimize potential credit losses,' and its investment policy required it to 'invest at least 70% of [its] total assets in High Quality ARM Assets and short term investments.'" <u>Referencing Thornburg's 2007 10-K</u>.

2. <u>G&S Brief</u> at 6: "In general, Thornburg only originated or acquired loans that were 'underwritten to 'A quality standards.'" <u>Referencing Thornburg's 2007 10-K</u>.

3. <u>G&S Brief</u> at 6: "As of December 31, 2007, Thornburg's portfolio consisted of 94.6% AAA-rated assets and only 5.4% below AAA-rated assets." <u>Referencing Thornburg's 2007 10-K</u>.

4. <u>G&S Brief</u> at 6-7: Entirety of "The Mounting Financial Crisis." <u>Referencing New Century Financial Corporation Form 8-K, HomeBanc Corporation Form 8-K, American Home Mortgage Corporation Form 8-K, *Bank of America to Acquire Countrywide for 37% Less*</u>.

5. <u>G&S Brief</u> at 7-9: Entirety of "The Impact of the Financial Crisis on Thornburg." <u>Referencing *Mortgage Fallout Spreads to Thornburg*, Thornburg's 2007 Form 10-Q, TheStreet Analyst Report, Citi Investment Research Analyst Report, RBC Capital Markets Equity Research Report</u>.

6. <u>G&S Brief</u> at 10: "The catalyst of the February 14th downturn was the disclosure of massive write-downs by UBS associated with tens of billions of dollars in exposure to U.S. mortgage securities and finance transactions." <u>Referencing UBS Form 6-K.</u>

7. <u>G&S Brief</u> at 10: "UBS's quarterly loss was, at the time, reported to be the worst in banking history." <u>Referencing *UBS makes biggest quarterly loss in banking history*</u>.

8. <u>G&S Brief</u> at 10: "The press reported that this disclosure 'shocked markets' by 'dramatically raising [UBS's] vulnerability to the credit crisis,' and that UBS's biggest new exposure was to Alt-A mortgages." <u>Referencing *UBS shocks investors with risky debt exposures*</u>.

9. <u>G&S Brief</u> at 11: "What the Complaint conspicuously leaves out is that the analysis was marked 'DRAFT' and dated 'January 29, 2008' – more than two weeks before the severe

dislocation in the markets began on February 14th." <u>Referencing February 21st email from Starrett to Coltharp</u>. '

10. <u>G&S Brief</u> at 12: "Although the Complaint alleges that Mr. Goldstone and Mr. Simmons received the Citi letter (Compl. ¶ 60), emails referenced in the Complaint show that Mr. Goldstone was traveling by plane, when the [Citi Breach] letter was sent, and out of town the rest of the week." <u>Referencing February 21, 2008 email from Goldstone to Board of Directors, February 22, 2008 email from Goldstone to Board of Directors, February 25, 2008 email from Goldstone to Board of Directors</u>.

11. <u>G&S Brief</u> at 26: "Despite the wave of market failures and the market's reaction to its 10-K, on March 31, 2008, Thornburg successfully raised $1.35 billion in new capital, as it had planned to do before the 10-K was filed." <u>Referencing Thornburg's April 2, 2008 8-K</u>.

12. <u>G&S Brief</u> at 44-45: "SFAS 115, the only GAAP literature cited in the Complaint (*id.* ¶ 56), does not say that selling or having to sell *some* securities calls into question a company's intent and ability to hold all of its securities for OTTI analysis purposes." <u>Referencing SFAS 115</u>.

13. <u>G&S Brief</u> at 45: "That guidance acknowledges that when a company intends to sell a specifically identified security before its value has recovered, an OTTI should be recognized. It does not state that an OTTI should extend beyond that individual security." <u>Referencing FSP FAS 115-1, FAS 124-1, and Ex. 13 at F-15 (Thornburg 2007 Form 10-K/A)</u>.

14. <u>G&S Brief</u> at 45: "Thus, Plaintiff's contention that Thornburg should have taken a $400 million impairment charge on its entire $2.9 billion portfolio of ARM Securities merely because it might need to sell some portion of that portfolio to meet future margin calls has no support in GAAP." <u>Referencing Thornburg's 2007 10-K</u>.

15. <u>G&S Brief</u> at 47: "As Ms. Starrett explained in her February 25th email, this meant that '[a]s far as accountants are concerned, this risk is already disclosed.'" <u>Referencing Starrett's February 25, 2008 email (Ex. 22)</u>.

16. <u>G&S Brief</u> at 57: "One topic that Thornburg was asked to discuss in the position paper was a 'Timeline of events,' which included, among other subjects, 'Day-by-day correspondence with counter parties for the two weeks prior to filing.' The auditor did

not 'specifically request[] . . . all' correspondence with lenders." <u>Referencing March 4, 2008 email from outside auditor to Goldstone, Simmons, and Starrett (Ex. 28)</u>.

17. <u>G&S Brief</u> at 57: "On the contrary, the first page of the auditor's request noted that 'correspondence with lenders/attorneys shareholders' was an 'example[]' of evidence that Thornburg 'could include.'" <u>Referencing March 4, 2008 email from outside auditor to Goldstone, Simmons, and Starrett (Ex. 28)</u>.

18. <u>G&S Brief</u> at 58, n.56: "Notably, this reassuring email exchange between Mr. Goldstone and Mr. Simmons took place well *after* the email exchanges involving Mr. Simmons that the Complaint cites as evidence of Mr. Simmons' concern about the hedge fund rumor." <u>Referencing February 27, 2008 email from Goldstone to Simmons to Starrett</u>.

19. <u>Starrett Brief</u> at 11: "The Financial Account Standards Board ("FASB"), which developed this accounting standard, has explained that 'disaster scenarios (such as *a run on a bank* or an insurance company) would not be anticipated by an enterprise in deciding whether it had the positive intent and ability to hold a debt security to maturity.'" <u>Referencing FAS</u>.

20. <u>Starrett Brief</u> at 11-12: "And because lenders had the ability to unilaterally 'initiate margin calls or change margin requirements,' the amount of future margin calls to which TMI would be subject was uncertain and difficult to predict." <u>Referencing Thornburg's 2007 10-K</u>.

21. <u>Starrett Brief</u> at 17-18: "Specifically, TMI gave KPMG schedules used by KPMG to 'tie out' the margin call figures in the 10-K. Those schedules, which are covered with KPMG's tick marks and notes, show margin calls broken out by day, lender name, amount of the call, source of funds, and amount of payment, and made it crystal clear to KPMG that TMI satisfied the margin calls of Citigroup and other lenders over several days." <u>Referencing Thornburg's margin call schedules</u>.

22. <u>Starrett Brief</u> at 29: OTTI analysis is complex and "the SEC's public records show that it is well aware of this fact." <u>Referencing Staff Accounting Bulletin ("SAB") 59</u>.

23. <u>Starrett Brief</u> at 30: "The SEC stated with respect to OTTI guidance issued in November 30, 2006 that '[b]right line or rule of thumb tests are not appropriate for evaluating other-than-temporary impairments.'" <u>Referencing Current Accounting and Disclosure Issues, and SEC/FASB Press Release</u>.

24. <u>Starrett Brief</u> at 32-33: "The resulting report found that '[t]he current global economic crisis has highlighted difficulties in performing OTTI evaluations,' and directed the FASB to 'evaluate the need for modifications (or the elimination) of current OTTI guidance to provide for a more uniform system of impairment testing standards.'" <u>Referencing FAS 115-2 and 124-2</u>.

25. <u>Starrett Brief</u> at 33: "During deliberations in March and April 2009, several FASB Board members criticized the OTTI model and observed that "current market conditions have made the existing impairment model particularly challenging to apply." <u>Referencing March and April 2009 FASB deliberations</u>.

26. <u>Starrett Brief</u> at 33: "On April, 9, 2009, the FASB modified the OTTI guidance and replaced the requirements for assessing intent and ability, with 'more operational' guidance." <u>Referencing FAS 115-2 and 124-2</u>.

27. <u>Starrett Brief</u> at 37-38: "In evaluating the effect of the correction to its 10-K on management's assessment of internal control over financial reporting, TMI's restatement concluded that 'internal control over financial reporting was effective as of December 31, 2007.'" <u>Referencing Thornburg's 2007 10-K/A</u>.

28. <u>Starrett Brief</u> at 38: "KPMG similarly opined in its report on the restated financials that 'Thornburg . . . maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007.'" <u>Referencing Thornburg's 2007 10-K/A</u>.

29. <u>Starrett Brief</u> at 39: "The SEC has stated that 'clarity of authoritative accounting guidance with respect to the misstatement' is one of the factors to be considered 'in assessing whether a misstatement results in a violation of a registrant's obligation to keep books and records that are accurate in reasonable detail.'" <u>Referencing SAB 99</u>.

30. <u>Starrett Brief</u> at 39: "As discussed, the relevant accounting guidance in effect when TMI filed the 10-K was 'flawed and confusing to many users' and 'particularly challenging to apply.'" <u>Referencing March and April 2009 FASB deliberations</u>.