# EXHIBIT 41

Exhibit 41 to the Declaration of Alanna Buchanan in
Further Support of Defendants' Motion to Dismiss

*Support - Comfort*
*12/31/07*



# Master Repurchase Agreement

### September 1996 Version

Dated as of:     September 14, 2007

Between:        Greenwich Capital Markets, Inc.

and:            Thornburg Mortgage, Inc.

1. **Applicability**

   From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

2. **Definitions**

   (a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

   (b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4(a) hereof;

   (c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

*Note: This wp is the rev. repo agreement*
*support the Committed rev. repo line w/*
*Greenwich.*

21-1

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001481

(d)     "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e)     "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f)     "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g)     "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h)     "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i)     "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j)     "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k)     "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360-day-per-year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l)     "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m)     "Prime Rate", the prime rate of U.S. commercial banks as published in *The Wall Street Journal* (or, if more than one such rate is published, the average of such rates);

(n)     "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o)     "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

2 ▪ September 1996 ▪ Master Repurchase Agreement

a1-2

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001482

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

3. **Initiation; Confirmation; Termination**

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001483

Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

4. **Margin Maintenance**

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or a Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the ~~respective rights of Buyer and Seller under~~ subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or a Margin Excess exists with respect to

4 ▪ September 1996 ▪ Master Repurchase Agreement

21-4

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001484

any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

5. **Income Payments**

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

6. **Security Interest**

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

7. **Payment and Transfer**

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

8. **Segregation of Purchased Securities**

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001485

> **Required Disclosure for Transactions in Which the**
> **Seller Retains Custody of the Purchased Securities**
>
> Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.
>
> *Language to be used under 17 C.F.R §403.4(e) if Seller is a government securities broker or dealer other than a financial institution.
> **Language to be used under 17 C.F.R §403.5(d) if Seller is a financial institution.

9.  **Substitution**

    (a)  Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

    (b)  In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

10. **Representations**

    Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

11. **Events of Default**

    In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased

6 ▪ September 1996 ▪ Master Repurchase Agreement

Confidential Treatment Requested by                                    KPMG-THRN-SEC-0001486
Hogan & Hartson LLP on Behalf of KPMG LLP

Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a)  The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b)  In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c)  In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d)  if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

   (i)  as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source,

7 ■ September 1996 ■ Master Repurchase Agreement

21-7

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001487

       against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

(ii)   as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e)   As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f)   For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in subparagraph (a) of this Paragraph.

(g)   The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h)   To the extent permitted by applicable law, the defaulting party shall be liable to the nondefaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights, hereunder. Interest on any sum payable by the defaulting party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

8 ▪ September 1996 ▪ Master Repurchase Agreement

21-8

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001488

(i) The nondefaulting party shall have, in addition to its rights hereunder, any rights otherwise available to it under any other agreement or applicable law.

12. **Single Agreement**

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

13. **Notices and Other Communications**

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereunder may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

14. **Entire Agreement; Severability**

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

15. **Non-assignability; Termination**

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

9 ▪ September 1996 ▪ Master Repurchase Agreement

21-9

Confidential Treatment Requested by                                    KPMG-THRN-SEC-0001489
Hogan & Hartson LLP on Behalf of KPMG LLP

16. **Governing Law**

   This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

17. **No Waivers, Etc.**

   No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

18. **Use of Employee Plan Assets**

   (a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

   (b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

   (c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

19. **Intent**

   (a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

   (b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

10 ▪ September 1996 ▪ Master Repurchase Agreement

21-10

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001490

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

20. **Disclosure Relating to Certain Federal Protections**

The parties acknowledge that they have been advised that:

(a) in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

| Thornburg Mortgage, Inc. | Greenwich Capital Markets, Inc. |
|---|---|
| By: _[signature]_ | By: _[signature]_ |
| PATRICK FELDMAN | |
| Title: VICE PRESIDENT | Title: Managing Director & Treasurer |
| Date: 9/24/07 | Date: 9-26-07 |

11 ▪ September 1996 ▪ Master Repurchase Agreement

21-11

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001491

**Annex I**

**Supplemental Terms and Conditions**

This Annex I forms a part of the Master Repurchase Agreement dated as of   (the "Agreement") between Greenwich Capital Markets, Inc. and Thornburg Mortgage, Inc.. Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1. Overview.

    (a) The Agreement embodies the agreement of the parties to enter into transactions pursuant to which the Seller may sell, and Buyer shall, subject to the terms and conditions set forth in the Agreement (as supplemented by this Annex I), purchase certain Eligible Securities.

    (b) In addition to the requirements set forth elsewhere in the Agreement, Buyer shall have no obligation to enter into any Transaction if (i) a Default or Event of Default shall have occurred at any time during the term of the Agreement or (ii) if, as a result of such Transaction, the aggregate Purchase Price for all Transactions then outstanding under the Agreement would exceed the then applicable Maximum Purchase Price.

    (c) The final Repurchase Date for all Transactions subject to the Agreement shall be March 14, 2008 (the "Final Repurchase Date") or such earlier date as shall be agreed to by the Buyer and the Seller or as otherwise provided for in the Agreement. The Agreement and Buyer's commitment to enter into Transactions thereunder shall terminate on the Final Repurchase Date or as otherwise provided in the Agreement, unless extended in writing by each of the parties hereto.

2. Other Applicable Annexes. In addition to this Annex I and Annex II, the following Annexes and any Schedules thereto shall form a part of the Agreement and shall be applicable thereunder:

    None.

3. Additional Definitions.

The following definitions shall be inserted in Paragraph 2 of the Agreement in the appropriate alphabetical order:

    (a) "Commitment Fee", the meaning specified in paragraph 3(d).

    (b) "Commitment Fee Amount", the product of 0.50% and $750,000,000.

    (c) "Default", any event or condition that with notice or the passage of time (or both) would become an Event of Default.

    (d) "Effective Date", September 14, 2007.

    (e) "Eligible Securities", single family residential mortgage-backed securities which have at least two (2) of the following ratings: (x) at least AAA by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), (y) at least Aaa by

12 ▪ September 1996 ▪ Master Repurchase Agreement

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001492

  Moody's Investors Service, Inc. ("Moody's") and/or (z) at least AAA by Fitch, Inc. ("Fitch"). Notwithstanding anything to the contrary contained herein, in the Agreement or elsewhere, at least 50% of such Eligible Securities subject to a Transaction under the Agreement at any time must have at least one (1) security of the same series that (i) is subordinate to such Eligible Security and (ii) has at least two (2) of the following ratings: (a) at least AAA by S&P, (y) at least Aaa by Moody's and/or (z) at least AAA by Fitch.

(f)  "LIBOR Base Rate", with respect to each day on which a Transaction is outstanding (or if such day is not a Business Day, the next succeeding Business Day), the rate per annum equal to the rate published by Bloomberg or if such rate is not available, the rate appearing at page 3750 of the Telerate Screen, as one-month LIBOR on such date, and if such rate shall not be so quoted, the rate per annum at which Buyer is offered Dollar deposits at or about 11:00 A.M., New York City time, on such date by prime banks in the interbank eurodollar market where the Eurodollar and foreign currency and exchange operations in respect of its Transactions are then being conducted for delivery on such day for a period of one month and in an amount comparable to the amount of the Transactions to be outstanding on such day.

(g)  "LIBOR Rate", with respect to any date of determination, a rate (reset on a monthly basis) per annum determined by Buyer in its sole discretion in accordance with the following formula (rounded upwards to the nearest 1/100th of one percent), which rate as determined by Buyer shall be conclusive absent manifest error by Buyer:

$$\frac{\text{LIBOR Base Rate}}{1.00 - \text{LIBOR Reserve Requirements}}$$

The LIBOR Rate shall be calculated on each Purchase Date and Repurchase Date commencing with the first Purchase Date.

(h)  "LIBOR Reserve Requirements", with respect to any date of determination, the aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements applicable to Buyer in effect on such day (including, without limitation, basic, supplemental, marginal and emergency reserves under any regulations of the Board of Governors of the Federal Reserve System or other governmental authority having jurisdiction with respect thereto), dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) maintained by a member bank of such governmental authority. As of the Effective Date, the LIBOR Reserve Requirements shall be deemed to be zero.

(i)  "Maximum Purchase Price", the excess of $750,000,000 over the aggregate Purchase Price for all Transactions then outstanding under the Master Repurchase Agreement dated as of January 12, 1996 between the Seller and Greenwich Capital Markets, Inc. or any other repurchase agreement for securities between either of the parties or any of their affiliates.

(j)  "Pricing Rate", shall be the LIBOR Rate plus 0.50%; provided, however, during the continuance of an Event of Default, the Pricing Rate shall be increased by 2.00%.

(k)  "Purchase Price", for each Purchased Security shall be 92% of the Market Value thereof.

4.  Modifications to Definitions.

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001493

    (a)    The following shall be added to the end of the definition of "Market Value" in Paragraph 2(j):

"provided, however, that with respect to Purchased Securities for which there exists no generally recognized pricing source, the Market Value shall be determined by Buyer in the exercise of its good-faith reasonable discretion. The Market Value for each Purchased Security that no longer qualifies as an Eligible Security shall be zero."

    (b)    The definition of "Margin Notice Deadline" shall be deleted and replaced in its entirety by the following:

"Margin Notice Deadline", 2:00 p.m. EST.

5.    <u>Modifications to Paragraph 3</u>.

    (a)    The following two sentences shall be inserted in Paragraph 3(a) at the end thereof:

"Upon satisfaction of each condition specified in Paragraph 3(e) hereof, and subject to the terms and conditions of this Agreement, Buyer shall agree to enter into any Transactions initiated by Seller hereunder. In addition to the rights and remedies of the Buyer specified in the Agreement and otherwise available upon an Event of Default by Seller, Buyer's obligation to purchase additional Purchased Securities shall be terminated immediately."

    (b)    The following paragraphs shall be added to the Agreement immediately following Paragraph 3(c) thereof:

"(d) Seller hereby agrees to pay to Buyer a commitment fee equal to the Commitment Fee Amount (the "<u>Commitment Fee</u>"), such payment to be made in Dollars, in immediately available funds, without deduction, set off or counterclaim, to Buyer on the Effective Date. The Commitment Fee shall be deemed to be fully earned by Seller on the Effective Date. Buyer may, in its sole discretion, net such Commitment Fee from the Purchase Price paid to Seller.

(e) The obligation of Buyer to enter into each Transaction pursuant to this Agreement (including the initial Transaction) is subject to the following conditions precedent, both immediately prior to any Transaction and also after giving effect thereto and to the intended use of the proceeds thereof:

    (A)    No Default or Event of Default shall have occurred and be continuing and no default under any other repurchase agreement, loan and security agreement or similar credit facility or agreement for borrowed funds between Seller or any of its affiliates and Buyer or any of its affiliates shall have occurred and be continuing;

    (B)    Both immediately prior to entering into such Transaction and also after giving effect thereto and to the intended use of the proceeds thereof, the representations and warranties made by Seller in this Agreement shall be true and correct on and as of the Purchase Date in all material respects with the same force and effect as if made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date);

14 ▪ September 1996 ▪ Master Repurchase Agreement

21-14

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001494

(a) The following shall be added to the end of the definition of "Market Value" in Paragraph 2(j):

"provided, however, that with respect to Purchased Securities for which there exists no generally recognized pricing source, the Market Value shall be determined by Buyer in the exercise of its good-faith reasonable discretion. The Market Value for each Purchased Security that no longer qualifies as an Eligible Security shall be zero."

(b) The definition of "Margin Notice Deadline" shall be deleted and replaced in its entirety by the following:

"Margin Notice Deadline", 2:00 p.m. EST.

5. Modifications to Paragraph 3.

(a) The following two sentences shall be inserted in Paragraph 3(a) at the end thereof:

"Upon satisfaction of each condition specified in Paragraph 3(e) hereof, and subject to the terms and conditions of this Agreement, Buyer shall agree to enter into any Transactions initiated by Seller hereunder. In addition to the rights and remedies of the Buyer specified in the Agreement and otherwise available upon an Event of Default by Seller, Buyer's obligation to purchase additional Purchased Securities shall be terminated immediately."

(b) The following paragraphs shall be added to the Agreement immediately following Paragraph 3(c) thereof:

"(d) Seller hereby agrees to pay to Buyer a commitment fee equal to the Commitment Fee Amount (the "Commitment Fee"), such payment to be made in Dollars, in immediately available funds, without deduction, set off or counterclaim, to Buyer on the Effective Date. The Commitment Fee shall be deemed to be fully earned by Seller on the Effective Date. Buyer may, in its sole discretion, net such Commitment Fee from the Purchase Price paid to Seller.

(e) The obligation of Buyer to enter into each Transaction pursuant to this Agreement (including the initial Transaction) is subject to the following conditions precedent, both immediately prior to any Transaction and also after giving effect thereto and to the intended use of the proceeds thereof:

(A) No Default or Event of Default shall have occurred and be continuing and no default under any other repurchase agreement, loan and security agreement or similar credit facility or agreement for borrowed funds between Seller or any of its affiliates and Buyer or any of its affiliates shall have occurred and be continuing;

(B) Both immediately prior to entering into such Transaction and also after giving effect thereto and to the intended use of the proceeds thereof, the representations and warranties made by Seller in this Agreement shall be true and correct on and as of the Purchase Date in all material respects with the same force and effect as if made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date);

14 ■ September 1996 ■ Master Repurchase Agreement

21-15

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001495

(C) The then aggregate outstanding Purchase Price for all Purchased Securities, when added to the Purchase Price for the requested Transaction, shall not exceed the then applicable Maximum Purchase Price;

(D) Each Purchased Security for the requested Transaction shall constitute an Eligible Security;

(E) The Final Repurchase Date shall not have occurred; and

(F) Seller shall have paid to Buyer all fees and expenses owed to Buyer in accordance with this Agreement, including without limitation the Commitment Fee."

6. The following paragraph shall be inserted in Paragraph 12 at the end thereof:

12. **Setoff; Cross Default; and Cross Collateral.**

"Each party further agrees that (i) a party's ('X') failure to pay or deliver any amounts as required under any other transaction or agreement with the other party ('Y') (and after giving effect to any defenses or cure periods contained in such transaction or agreement, there occurs a liquidation, an acceleration, or an early termination of all obligations under the master agreement under which multiple transactions may be entered into by the relevant parties (or in the case of any transaction with respect to which no master agreement is in place, such transaction or agreement)) ("Other Obligations") shall constitute an Event of Default hereunder with X as the defaulting party, (ii) upon the occurrence of the event referred to in (i), Y, without prior notice to X, shall have the right to setoff any amounts or obligations owed by X hereunder against any amounts or obligations owed by Y arising under Other Obligations (irrespective of the currency), and (c) as security for the performance by a party of its Other Obligations, it grants to the other party a security interest in all securities and other property (and all proceeds thereof) transferred pursuant to this Agreement, which security interest may be enforced in accordance with the provisions of applicable law or Paragraph 11(d) hereof (applying such Paragraph as if such defaulted Other Obligations were owed hereunder in respect of a Transaction in which X is the Seller)."

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001496

**Annex II**

**Names and Addresses for Communications Between Parties**

Greenwich Capital Markets, Inc.
600 Steamboat Road
Greenwich, Connecticut 06830
Phone: (203) 618-2281
Fax: (203) 618-2132

Attn: Legal Department – Documentation

Thornburg Mortgage, Inc.
150 Washington Avenue, Suite 302
Santa Fe, New Mexico 87501
Phone: (505) 989-1900
Fax: (505) 989-8156

Attention: Larry Goldstone, President



THE BOND MARKET ASSOCIATION
40 Broad Street
New York, NY 10004-2373
Telephone 212.440.9400
Fax 212.440.5260
www.bondmarkets.com

NY1 6329646v.3

Confidential Treatment Requested by
Hogan & Hartson LLP on Behalf of KPMG LLP

KPMG-THRN-SEC-0001497