Rough Transcript

Page 1

1          WOMACK ROUGH DRAFT

2

3

4

5

6  Rough draft of Clyde Womack, 1/22/2013.

7                                                        08:09

8                                                        08:09

9          VIDEOGRAPHER: This tape one in the            09:04

10  video deposition of Clyde Womack. Today is           09:05

11  Tuesday, January 22nd, 2013. We're now on            09:05

12  record at approximately 9:04 a.m. Will the           09:05

13  attorneys please introduce themselves for            09:05

14  the record.                                          09:05

15          MR. LEE: Randall Lee and Jessica             09:05

16  Kurzban from WilmerHale for defendants               09:05

17  Larry Goldstone and Clay Simmons. We're              09:05

18  joined on the phone today by Daniel Crump.           09:05

19          MR. MARKS: Jerry marks from Milbank          09:05

20  Tweed for Jane Starrett.

21          MR. McKENNA: Steve McKenna on                09:05

22  behalf of the plaintiffs, Securities and             09:05

23  Exchange Commission.                                 09:05

24          MR. SALTER: George Salter from               09:05

25  Hogan Lovells. I'm joined by my colleague            09:05

Rough Transcript

Page 254

WOMACK ROUGH DRAFT

1
2  you know we can deal with this if it                05:36
3  becomes a problem, but we're not agreeing           05:36
4  to more than 7 hours.                               05:36
5      MR. McKENNA:                                    05:36
6      Q.  Good afternoon Mr. Womack I know it         05:36
7  has been a long day so will try to keep this as     05:36
8  brief and succinct as can I?                        05:36
9      A.  My name is Steve McKenna I represent        05:36
10 the plaintiff the securitys and exchange            05:36
11 commission in this litigation. And I just want      05:36
12 to start out by asking you a few questions in       05:36
13 general about your audit experience of which        05:36
14 you have had over 40 years; is that correct.        05:36
15     A.  42 years.                                   05:36
16     Q.  And in your experience, who is              05:36
17 responsibility are the familiar statements in       05:36
18 the Form 10-K?                                      05:37
19     A.  The client.                                 05:37
20     Q.  In the case of the company we're            05:37
21 discussing been discussing today who would that     05:37
22 be?                                                 05:37
23     A.  Thornburg.                                  05:37
24     Q.  And how about the, the general              05:37
25 statements in a Form 10-K for instance the          05:37

Page 255

WOMACK ROUGH DRAFT

1
2  management discussion and the analysis who is      05:37
3  responsibility are the statements made there?      05:37
4      A.  The client.                                 05:37
5      Q.  And as far as a decision to issue a        05:37
6  restatement ultimately, whose decision is that?    05:37
7      A.  Well, it would be something that            05:37
8  would just be discussed is between the client      05:37
9  and the auditor and it would normally be the       05:37
10 usually the client if they understood the          05:37
11 situation would agree to the restatement decide    05:38
12 that is what is appropriate, but the auditor       05:38
13 would always have that ability to hold that        05:38
14 over them if they wouldn't if they didn't          05:38
15 restate it they would not issue their opinion.     05:38
16     Q.  So, so the auditor can't actually          05:38
17 force a restatement is that is that correct?       05:38
18     A.  Yes.                                        05:38
19     Q.  All it can do is say that if you           05:38
20 don't restate, I will pull my audit opinion?       05:38
21     A.  That's correct.                             05:38
22     Q.  So ultimately is it the company that      05:38
23 makings the decision of whether to restate or      05:38
24 not?                                                05:38
25     A.  Well, I guess you could say                 05:38

Page 256

WOMACK ROUGH DRAFT

1
2  ultimately it is the auditor that has the power    05:38
3  over this the decision to restate but company      05:38
4  it is it the company, the company's financial      05:38
5  statements so they, they would be, they would     05:38
6  be an agreement that that is what needs to be     05:39
7  done under normal circumstances.                   05:39
8      Q.  Who signs off on a restatement who        05:39
9  signs off on the accuracy of that document?       05:39
10     A.  From the firm stand point or.             05:39
11     Q.  Yes.                                       05:39
12     A.  It would be the engagement team and       05:39
13 then their procedures in place where we would     05:39
14 have to have the appropriate reviews in their     05:39
15 department of professional practice to make       05:39
16 sure that we've done all of the documentation    05:39
17 and approvals that are necessary.                  05:39
18     Q.  And with the restatement is the          05:39
19 management of the company responsible for sign    05:39
20 suggest off on the accuracy of the financial     05:39
21 statements in that restatement?                    05:39
22     A.  No, they're still their financial         05:39
23 statements and yes, they, they have to continue  05:39
24 the ownership of their own financial              05:39
25 statements.                                        05:39

Page 257

WOMACK ROUGH DRAFT

1
2      Q.  And are they required to actually        05:39
3  sign-off on the accuracy of those statements?    05:39
4      A.  Well, they would do so by filing         05:39
5  being filing of the restatement.                  05:40
6      Q.  And I want to ask you to turn to the    05:40
7  margin calls that Thornburg received in the      05:40
8  last 2 weeks of February of 2008. You            05:40
9  testified about those at some 11th today. Is    05:40
10 it your understanding that Thornburg was not     05:40
11 timely meeting those margin calls in the last 2  05:40
12 weeks of February, 2008?                          05:40
13     MR. SALTER:  At what time period are        05:40
14 you asking about his knowledge?                   05:40
15     Q.  As you sit here today?                   05:40
16     A.  As I sit here today with information    05:40
17 I have now.                                       05:40
18     Q.  Yes?                                      05:40
19     A.  Yes that is correct.                      05:40
20     Q.  And if I were to represent to you       05:40
21 that the fact that if you had been able to look  05:40
22 at some of these reverse re purchase agreements  05:40
23 for margin calls that Thornburg was not          05:40
24 meeting, that the failure to meet those margin   05:40
25 calls when made or within 24 hours or shortly    05:40

Page 258

WOMACK ROUGH DRAFT

```
 2  after that time period of when they were made      05:41
 3  gave the lender the right to declare an event      05:41
 4  of default and then immediately without any        05:41
 5  further action sell the collateral that it held    05:41
 6  as security on its loans are you following me?     05:41
 7      A.  Yes.                                       05:41
 8      Q.  Would that have been important for         05:41
 9  Thornburg's engagement's team to know in           05:41
10  connection with its audit?                         05:41
11          MR. LEE:  Objection to form.               05:41
12      A.  Yes.                                       05:41
13      Q.  Why?                                       05:41
14      A.  It would have a bearing on our final       05:41
15  analysis of whether they had the ability to        05:41
16  honor their debt and it would continues as a       05:41
17  going concern and therefore it could trigger       05:41
18  the other than temporary impairment issue.         05:41
19      Q.  So it could be important to your           05:41
20  other than temporary impairment analysis?          05:41
21      A.  Yes.                                       05:41
22      Q.  How about the analysis of whether          05:41
23  the company had the intent and ability to holds    05:41
24  it assets?                                         05:41
25      A.  Yes.                                       05:41
```

Page 259

WOMACK ROUGH DRAFT

```
 2      Q.  And why would it be important to           05:41
 3  that?                                              05:42
 4      A.  Well, it is the basis for issuing of       05:42
 5  a going concern opinion for the company. And       05:42
 6  so this would be knowledge that we would want      05:42
 7  to know.                                           05:42
 8      Q.  And if in fact the company had been        05:42
 9  late in meeting its margin calls and as I          05:42
10  represented that gave the lender the right to      05:42
11  immediately declare an event of default and        05:42
12  there after sell collateral to protect itself,     05:42
13  would you expect Mto tell Thornburg or excuse      05:42
14  me would you expect Thornburg management to        05:42
15  tell KPMG about that circumstance?                 05:42
16          MR. LEE:  Objection to form.               05:42
17      A.  Yes.                                       05:42
18      Q.  And in your experience in your 42          05:42
19  years of experience how would you management to    05:42
20  tell its outside auditor that type of              05:42
21  information?                                       05:42
22      A.  I would expect to get all the              05:42
23  information that they are aware of that they       05:42
24  would share with us especially in an area like     05:43
25  this where it is a critical situation that we      05:43
```

Page 260

WOMACK ROUGH DRAFT

```
 2  would need to know everything that I know in       05:43
 3  order for us to make our final decision as to      05:43
 4  the type of report we would issue.                 05:43
 5      Q.  And are you familiar with the down         05:43
 6  to date meeting?                                   05:43
 7      A.  Yes.                                       05:43
 8      Q.  And can you tell us what that is?          05:43
 9      A.  Well, it is an discussion of               05:43
10  subsequent events down to date of things that      05:43
11  have happened to the company it is normally if     05:43
12  you would have that discussion with the CFO and    05:43
13  the president top people and would be asking       05:43
14  questions about areas that such as you know,       05:43
15  fulfillment of debt obligations or any issues      05:43
16  that come up with asset impairment and             05:44
17  litigation and a whole host of things like         05:44
18  that.                                              05:44
19      Q.  And in f in fact the company had           05:44
20  been in breach of lending agreements leading up    05:44
21  to the filing of the 10-K, is that something       05:44
22  that you as an auditor would expect management     05:44
23  to tell you in a town to date meeting?             05:44
24          MR. LEE:  Objection.                       05:44
25      A.  Absolutely.                                05:44
```

Page 261

WOMACK ROUGH DRAFT

```
 2      Q.  You and spent extensive time               05:44
 3  testifying earlier today about that three-page     05:44
 4  document at pages 52 through 54 of I believe it    05:44
 5  is Exhibit 21 which had some information about    05:44
 6  the total amount of margin calls Thornburg had     05:44
 7  received leading up to the filing of the 10-K     05:44
 8  do you recall that?                                05:44
 9      A.  Yes.                                       05:44
10      Q.  Do you consider that document if          05:44
11  provided to KPMG on February 27th to be            05:44
12  adequate disclosure of the company's failure to   05:44
13  meet margin calls in accordance with the terms    05:44
14  of its repo agreements?                           05:44
15          MR. LEE:  Objection, form.                05:44
16      A.  No.                                       05:44
17      Q.  Why not?                                  05:44
18      A.  Well, that of course I, I didn't see      05:45
19  the document and I don't know exactly what to     05:45
20  do with Inc. was work, with the document but I    05:45
21  would expect that the client when they            05:45
22  presented that document would say explain what    05:45
23  is there and then tell everything they knew       05:45
24  about any breaches in the problems they had       05:45
25  honoring the margin calls and be very             05:45
```