# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.                                No. CIV 12-0257 JB/LFG

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

        Defendants.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) the Motion to Dismiss on Behalf of Defendants Larry Goldstone and Clarence G. Simmons and Memorandum of Law in Support, filed May 21, 2012 (Doc. 35)("Goldstone & Simmons MTD"); (ii) the Defendant Jane Starrett's Motion to Dismiss and Memorandum of Points and Authorities in Support, filed May 21, 2012 (Doc. 36)("Starrett MTD"); and (iii) the Request for Judicial Notice in Support of Defendants' Motions to Dismiss Complaint, filed May 21, 2012 (Doc. 39)("Request for Judicial Notice").[2] The Court held a hearing on July 31, 2012. The primary issues are: (i) whether the Court may or

---

[1] On March 29, 2013, the Court issued an Order in which it granted in part and denied in part the Motion to Dismiss on Behalf of Defendants Larry Goldstone and Clarence G. Simmons and Memorandum of Law in Support, filed May 21, 2012 (Doc. 35) and the Defendant Jane Starrett's Motion to Dismiss and Memorandum of Points and Authorities in Support, filed May 21, 2012 (Doc. 36), stating: "The Court will . . . at a later date issue an opinion more fully detailing its rationale for this decision." Doc. 157 at 1 n.1. This Memorandum Opinion is the promised opinion for those two motions.

[2] The parties' pleadings in this matter often contain two, and sometimes three or more, sets of page numbers. Unless otherwise noted, the Court's citations are to the page numbers attached when a document is filed with the Court, located in the upper-right-hand corner of the documents.

must take judicial notice of certain documents which Defendants Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett have attached to their motions to dismiss; and (ii) whether the Plaintiff Securities and Exchange Commission ("SEC") has stated a plausible claim that the Defendants made, aided and abetted, or are liable as control persons for material misrepresentations and omissions to the investing public and Thornburg Mortgage, Inc.'s outside auditor, Klynveld, Peat, Marwick, Goerdeler ("KPMG"), in connection with the filing of Thornburg Mortgage's 2007 Form 10-K Annual Report.  The Court will grant the Request for Judicial Notice in part, and deny it in part, and will grant the motions to dismiss in part, and deny them in part.

The Court will dismiss the SEC's allegations based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's outside auditor that Thornburg Mortgage successfully met its margin calls without violating its lending agreements, and did not sell assets to meet margin calls.  The Court will also dismiss the SEC's allegations that Starrett engaged in a scheme to defraud the investing public, and that the Defendants schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-K.

On the other hand, the Court has determined that the SEC has sufficiently alleged that the representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was materially false or misleading.  The Court determines that the Defendants' knowledge of objective financial factors -- including that Thornburg Mortgage was late in meeting margin calls in February, 2008, Thornburg had diminished liquidity and cash on hand to meet margin calls on a daily basis, and Goldstone and Simmons' awareness that Thornburg would likely receive additional margin calls -- undermines the statement that Thornburg would be able to continue to

- 2 -

meet margin calls without selling assets at a loss.  The Court will not dismiss the SEC's allegation that Goldstone and Simmons are primarily liable or liable as control persons for that misrepresentation in the 10-K, and the Court will not dismiss the SEC's allegations that the Defendants aided and abetted the misrepresentation, as the Court has determined that the SEC sufficiently alleged that Goldstone and Simmons made, and the Defendants provided substantial assistance to, the misrepresentation with knowledge of or recklessness to its falsity.  Similarly, the Court will not dismiss the SEC's allegations that the Defendants misled Thornburg Mortgage's auditor before the 2007 Form 10-K was filed through the statement that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market.

The Court will also allow certain claims to proceed against Goldstone and Simmons individually.  The SEC has sufficiently alleged that Goldstone and Simmons failed to disclose the material information to KPMG before the 2007 Form 10-K was filed that the collapse of a European hedge fund would negatively impact Thornburg Mortgage's financial condition.  The SEC has sufficiently alleged that Simmons misrepresented to KPMG the purpose of certain transactions Thornburg Mortgage used to satisfy margin calls before the 2007 Form 10-K was filed.  The SEC has also sufficiently alleged that Goldstone materially misrepresented Thornburg Mortgage's financial condition after the 2007 Form 10-K was filed.  The SEC has sufficiently alleged that Goldstone and Simmons materially misled KPMG by not providing correspondence confirming that Thornburg Mortgage experienced an event of default in the two weeks before the 2007 Form 10-K was filed, and that Simmons misrepresented that unforeseen events had an unexpected negative financial impact on Thornburg Mortgage after the 2007 Form 10-K was filed.

## FACTUAL BACKGROUND[3]

The SEC alleges that the Defendants -- Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett -- were involved in fraudulent misrepresentations and omissions made in connection with the Thornburg Mortgage, Inc. 2007 Form 10-K Annual Report, filed May 21, 2012 (Doc. 37-2)("2007 Form 10-K").[4]  Complaint ¶¶ 1-3, at 1-2, filed March 13, 2012 (Doc. 1). Thornburg Mortgage, Inc. ("Thornburg Mortgage") was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico and previously was the second-largest independent mortgage company after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time frame of the allegations in the Complaint, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.

1.      **The Defendants and Thornburg Mortgage.**

_____

[3] Normally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010).  The Defendants, however, have requested the Court to consider a number of documents attached to their motions to dismiss, which, they assert, are either referenced in the Complaint and central to the SEC's allegations, or are documents of which the Court may take judicial notice.  These categories of documents are two exceptions to the rule that the sufficiency of a Complaint is to be judged by its contents alone, and, accordingly, where the Court has found that certain documents fall into these two categories, the Court has incorporated information from those documents into its factual background.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Jacobsen v. Desert Book Co., 287 F.3d 936, 941 (10th Cir. 2002).

[4] A Form 10-K is a

financial report filed annually with the SEC by a registered corporation.  The report typically includes an audited financial statement, a description of the corporation's business and financial condition, and summaries of other financial data.

10-K, Black's Law Dictionary 1607 (9th ed. 2009).

At the time of the allegations set forth in the Complaint, Goldstone, as Thornburg Mortgage's president and chief executive officer ("CEO"), and also one of Thornburg Mortgage's directors, signed and certified Thornburg Mortgage's filings with the SEC, and exercised control over Thornburg Mortgage's management, general operations, and policies. Complaint 17, at 6.  Simmons, as senior executive vice-president, chief financial officer ("CFO"), and one of Thornburg Mortgage's directors, signed and certified Thornburg Mortgage's filings with the SEC, and exercised control over Thornburg Mortgage's management, general operations, and policies.  Complaint ¶ 18, at 6-7.  Starrett was Thornburg Mortgage's chief accounting officer ("CAO"), and as such, was responsible for Thornburg Mortgage's financial reporting and served as Thornburg Mortgage's principal contact with its outside auditor.  Complaint ¶ 19, at 7.  Starrett became a certified public accountant in 1976, but her license has been inactive since 1989.  See Complaint ¶ 19, at 7.

Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo" adjustable-rate mortgage ("ARM") securities, and also purchased ARM securities third parties originated.[5]  Complaint ¶ 21, at 7.  Thornburg Mortgage paid most of its earnings into dividends, and obtained financing for its mortgage and investment business through reverse repurchase

---

[5] An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).  "Super-jumbo" and "jumbo," in reference to ARMs, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  For example, a "super-jumbo" mortgage is a "mortgage or other home-equity secured loan in an amount greater than $650,000," although the definition may vary according to a particular lender's criteria.  Super jumbo mortgage, Wikipedia.

agreements backed by ARM securities.[6]   Complaint ¶ 3, at 2.   Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."   Complaint ¶ 22, at 7-8.   The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.   See Complaint ¶ 22, at 8.[7] A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties otherwise agreed. See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)("Citigroup Global Repo Agreement");   Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, § 11(a), at 7-8, filed July 20, 2012 (Doc. 60-2)("Greenwich Repo Agreement");   Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, § 11(a), at 7, filed July 20, 2012 (Doc. 60-3)("Credit Suisse Repo Agreement");

---

[6] A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.   Often shortened to repo."   Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009).

[7] A "margin call" is a "securities broker's demand that a customer put up money or stock as collateral when the broker finances a purchase of securities.   A margin call usu[ally] occurs when the market prices of the securities are falling."   Margin Call, Black's Law Dictionary 232 (9th Ed. 2009).

Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allows a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8. Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities would often fluctuate.  See Complaint ¶ 25, at 8.

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[8]  Complaint ¶¶ 49-50, at 50-51.  If Thornburg Mortgage had the intent and ability to hold its ARM securities to maturity, any losses associated with those securities would not need to be reflected on Thornburg Mortgage's balance sheet; conversely, if Thornburg Mortgage determined it did not have the intent and ability to hold its ARM securities to maturity, any losses associated with those securities would be deemed "other than temporary," and Thornburg Mortgage would be required to include those losses on its balance sheet. Complaint ¶¶ 49-50, at 14-15 (citing Statement of Financial Accounting Standards No. 115, filed May 21, 2012 (Doc. 37-34)("SFAS 115")).

## 2. **Thornburg Mortgage's Financial Troubles in 2007-2008**.

In August, 2007, disruptions in the housing and financial markets led Thornburg Mortgage to receive approximately two billion dollars in margin calls.  See Complaint ¶¶ 25-26,

---

[8] An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

at 8.  To meet these margin calls, Thornburg Mortgage had to sell twenty-two billion dollars of its mortgage-backed securities ("MBS") at a loss of $1.1 billion and not issue a dividend in the third quarter of 2007.[9]  See Complaint ¶ 26, at 8.  Thornburg Mortgage's Board of Directors expressed concerns in Thornburg Mortgage's Form 10-Q for the third quarter of 2007 regarding the company's "ongoing availability of financing for mortgage assets in the fourth quarter given the substantial likelihood of continued rating agency downgrades of MBS, and the still fragile state of the financial markets."  Complaint ¶ 26, at 8-9.  In the fourth quarter of 2007 -- November and December, specifically -- Thornburg Mortgage paid approximately $360 million in margin calls.  See Complaint ¶ 27, at 9.

Thornburg Mortgage received approximately $650 million in margin calls from January through the middle of February, 2008.  See Complaint ¶ 28, at 9.  Thornburg Mortgage received approximately $300 million in margin calls in the last two weeks of February, 2008, which it could not timely meet.  See Complaint ¶ 3, at 2; id. ¶ 29, at 9.  Thornburg Mortgage was late in meeting margin calls, in violation of its reverse repurchase agreements, with Credit Suisse First Boston ("Credit Suisse"), Greenwich Capital Markets, Inc. ("Greenwich"), and Citigroup Global Markets Limited.  Complaint ¶ 29, at 9.  On February 21, 2008, a senior vice-president with Thornburg Mortgage's structured finance group informed the Defendants that, in connection with Thornburg Mortgage's anticipated capital raise: "'[Credit Suisse] is willing to withdraw

---

[9] A "mortgage-backed security" is a "security (esp[ecially] a pass-through security) backed by mortgages.  The cash flow from these securities depends on principal and interest payments from the pool of mortgages." Mortgage-Backed Security, Black's Law Dictionary 1477 (9th ed. 2009).  A "pass-through" security is a "security that passes through payments from debtors to investors.  Pass-through securities are usu[ally] assembled and sold in packages to investors by private lenders who deduct a service fee before passing the principal and interest payments through to the investors." Pass-Through Security, Black's Law Dictionary 1477 (9th ed. 2009).

from the underwriting group since **they realize their attorneys will probably not agree to anything short of disclosing the delay in meeting their margin call earlier this week**.'" Complaint ¶ 64, at 18-19 (emphasis in original)(quoting Electronic Mail Transmission from Deborah Burns to Larry Goldstone at 2 (February 21, 2008, 2:47 p.m.), filed July 20, 2012 (Doc. 60-1)(" Feb. 21 Burns/Goldstone Email")).  Goldstone discussed Thornburg Mortgage's margin calls in an electronic mail transmission with Simmons and Starrett on February 22, 2008, in which he stated that Thornburg Mortgage had paid approximately $100 million in margin calls and he had "'plans to satisfy the rest over the next week.'"  Complaint ¶ 62, at 18 (quoting Electronic Mail Transmission from Larry Goldstone to Garrett Thornburg, et al. at 2 (Feb. 22, 2008, 8:42 a.m.), filed May 21, 2012 (Doc. 37-8)("Feb. 22 BOD Email")).  Goldstone also stated, regarding Thornburg Mortgage's recent margin calls: "'We had negotiated some additional [borrowing] capacity with Credit Suisse a few weeks ago, but they pulled back on that commitment when we had margin issues with them.'"  Complaint ¶ 63, at 18 (alteration in original)(quoting Feb. 22 BOD Email at 3).

Citigroup Global's margin call on February 21, 2008 was the largest of the three Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, on February 21, 2008, stating that Thornburg Mortgage was in breach of the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default ("the Citigroup Global Letter").  Complaint ¶ 3, at 2; id. ¶ 34, at 10-11.  See Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 between Citigroup Global Markets, Inc. ("CGMI") as

intermediating agent for Citigroup Global Markets Limited ("CGML" and together with CGMI ("CITI") and Thornburg Mortgage, Inc. (the "Fund") (the "Agreement"), sent February 21, 2008, filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter").  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default, or amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an electronic mail transmission from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Electronic Mail Transmission from Clay Simmons to Nyira Gitana, re: FW:TMA update  at 2 (February 21, 2008, 9:30 a.m.), filed May 21, 2012 (Doc. 37-10)("Feb. 21 BOD Email").  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.[10]  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an electronic mail transmission from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans

---

[10] An "interest-only strip" is a "security based solely on the interest payments from a pool of mortgages, Treasury bonds, or other bonds.  Once the principal on the mortgages or bonds has been repaid, interest payments stop, and the value of the [interest-only strip] falls to zero." Interest-Only Strip, The Free Dictionary, http://financial-dictionary.thefreedictionary. com/Interest-only-strip (last visited June 5, 2013).

to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg's] IO securities as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)( Feb. 22 BOD Email at 2).  In an electronic mail transmission sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]" Electronic Email Transmission from Larry Goldstone to the Thornburg Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25 BOD Email")).  See Complaint ¶ 68, at 20 (quoting Feb. 25 BOD Email).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an electronic mail transmission from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22 BOD Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an electronic mail transmission from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> "We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met."

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22 BOD Email at 2).  Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same electronic mail transmission.  Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22 BOD Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10 (quoting Feb. 22 BOD Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.  See Complaint ¶ 38, at 12.   Goldstone anticipated that European hedge fund's collapse would negatively impact Thornburg Mortgage's ARM Securities, and sent an electronic mail transmission to Simmons on February 27, 2008, in which he said:

> "Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got his with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it."[11]

Complaint ¶ 38, at 12 (quoting Electronic Mail Transmission from Larry Goldstone to Clay Simmons at 2 (February 27, 2008, 3:48 p.m.), filed May 21, 2012 (Doc. 37-21)("Feb. 27 Goldstone/Simmons Email")).  Simmons sent an electronic mail transmission to Goldstone, and others, regarding the potential collapse of a European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Electronic Mail Transmission from Clay Simmons to Patrick Feldman and Larry

---

[11] An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered more riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.   "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."   AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5th, 2013).

Goldstone at 2, (February 27, 2008, 8:08 a.m.), filed May 21, 2012 (Doc. 37-20)("Feb. 27 Simmons/Feldman Email")).   Later on February 27, 2008, Simmons sent an electronic mail transmission to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"   Complaint ¶ 40, at 12 (alteration in original)(quoting Electronic Mail Transmission from Clay Simmons to Jane Starrett at 2 (February 27, 2008, 10:35 a.m.), filed May 21, 2012 (Doc. 37-38)("Feb. 27 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required . . . .").   Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[12]  See Complaint ¶ 37,

_____

[12] According to the Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset."  The Financial Accounting Standards Board

at 11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that serve as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  Thornburg Mortgage's financial statements in the 2007 Form 10-K were incorporated into its Form S-3 ASR registration statement, which relates to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which Goldstone and Simmons signed and was filed with the SEC on December 10, 2007.  See Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008.  See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after the 2007 Form 10-K was filed.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Down Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); MarketWatch Feb. 28, 2008, Thornburg, MF Global Send Financial Stocks Lower,

---

("FASB") explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be accounted for as a sale.  SFAS 166 at 3.  The Financial Accounting Standards Board issued SFAS 166 in June, 2009, as an amendment to the  Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  See SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

MarketWatch, filed May 21, 2012 (Doc. 37-30)(" Feb. 28 MarketWatch").   Simmons

commented to Goldstone, in an early-morning electronic mail transmission regarding Thornburg

Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If

they only knew."   Complaint ¶ 10, at 4 (quoting Electronic Mail Transmission from Clay

Simmons to Larry Goldstone at 2 (February 28, 2008, 6:33 a.m.), filed May 21, 2012 (Doc. 37-

24)("Feb. 28 Simmons/Goldstone Email")).   In an electronic mail transmission from Goldstone

to Thornburg Mortgage's investor relations department on February 28, 2008 at 5:29 a.m.,

Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll

margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]"  Complaint ¶

94, at 27 (alterations in original).  <u>See</u> Electronic Mail Transmission from Larry Goldstone to

Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2 (February 28, 2008, 5:29 a.m.), filed

May 21, 2012 (Doc. 37-27)("Feb. 28 IR Email").   At 6:56 a.m., Goldstone informed Thornburg

Mortgage's Board of Directors in an electronic mail transmission that he estimated Thornburg

Mortgage had approximately forty million dollars available in cash at that time.  <u>See</u> Complaint ¶

95, at 28; Electronic Mail Transmission from Larry Goldstone to Thornburg Mortgage Board of

Directors at 2 (February 28, 2008, 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28 BOD

Email").   As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100

million in margin calls.  Complaint ¶ 9, at 4; <u>id.</u> ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on <u>Street Signs</u> on the

Consumer News and Business Channel ("CNBC").   Complaint ¶ 98, at 28.  On <u>Street Signs</u>,

Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii)

Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage

had "'liquidity and cash available to continue to support the portfolio.'"   Complaint ¶ 98, at 28

(alterations in original).   (quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09 (CNBC television broadcast February 28, 2008), filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call J.P. Morgan had issued to Thornburg Mortgage earlier that day.   Complaint ¶ 41, at 13.   At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via electronic mail transmission, that the "'top messages [they] reinforced in the market'" were:   "'We have met all margin calls to date, and we expect to continue to do so.   We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.   We returned to profitability during the fourth quarter despite a tough market.'"   Complaint ¶ 96, at 28 (alterations in original).

By the morning of February 29, 2008, Thornburg Mortgage had received over $200 million in margin calls.   See Complaint ¶ 41, at 13.   Because of the additional margin calls, on March 3, 2008, Thornburg Mortgage filed a Form 8-K announcing that it had received $270 million in margin calls, most of which it could not meet, and that it had received a default notice from a lender.[13]   See Complaint ¶ 9, at 4; id. ¶ 42, at 13.   Thornburg Mortgage's stock price fell by over fifty-percent after filing the Form 8-K.   See Complaint ¶ 43, at 13.   On March 5, 2008, Thornburg Mortgage filed a second Form 8-K, announcing that the lender which had issued a notice of default was exercising its right to seize Thornburg Mortgage's collateral because Thornburg Mortgage could not meet its twenty-eight million dollar margin call.   See Complaint ¶ 44, at 13.   Thornburg Mortgage also stated in the March 5, 2008 Form 8-K that, because of the lender's actions, Thornburg Mortgage was cross-defaulting on all of its reverse repurchase

---

[13] A Form 8-K is a "SEC form that a registered corporation must file if a material event affecting its financial condition occurs between the due dates for regular SEC filings."   8-K, Black's Law Dictionary  593 (9th ed. 2009).

agreements.  See Complaint ¶ 44, at 13.  At this time, Wall Street analysts began to question whether Thornburg Mortgage would go bankrupt.  See Complaint ¶ 45, at 13.

On March 7, 2008, Thornburg Mortgage filed another Form 8-K, and announced that it had received over $1.77 billion in margin calls since December 31, 2007, and that it did not have sufficient cash to cover $610 million of its outstanding margin calls.  See Complaint ¶ 46, at 13-14.  Thornburg Mortgage also announced that it would restate its 2007 Form 10-K.  See Complaint ¶ 11, at 4; id. ¶ 46, at 14.  In the restated 2007 Form 10-K, filed March 11, 2008, Thornburg Mortgage recognized a loss of $427.8 million in ARM securities, a loss in the fourth quarter of 2007, and a qualification that Thornburg Mortgage might not be able to continue as a going concern without restructuring or new capital.  See Complaint ¶ 11, at 4; id. ¶ 46, at 14.  By March 11, 2008, Thornburg Mortgage's stock price had fallen over ninety-percent from what it was on February 28, 2008.  See Complaint ¶ 47, at 14.  Thornburg Mortgage filed for Chapter 11 bankruptcy on May 1, 2009.  See Complaint ¶ 48, at 14.

### 3.    The Defendants' Representations to Thornburg Mortgage's Auditor.

As part of Thornburg Mortgage's 2007 audit, Thornburg Mortgage's auditor, KPMG, assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See Complaint ¶ 49, at 14-15.[14]  The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition; (ii) that Thornburg Mortgage was in violation of its reverse repurchase

---

[14] The Complaint does not identify Thornburg's auditor as KPMG.  The Court, however, has determined that it may take judicial notice of documents referenced in the Complaint and central to the SEC's allegations, and the Court has taken judicial notice of an Electronic Mail Transmission from Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("Marc. 3 Hall Email"), which indicates that Thornburg's auditor was KPMG.  Mar. 3 Hall Email at 2 (representing that the electronic mail transmission was sent from an employee of "KPMG LLP").

agreements and relying on lender forbearance to meet its margin calls; (iii) that Thornburg

Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of

February, 2008; (iv) that Thornburg Mortgage had received the Citigroup Global Letter; and (v)

that the European hedge fund was on the verge of collapsing.  Complaint ¶ 51, at 15; id. ¶ 76, at

22; id. ¶ 99, at 29.

On February 20, 2008, Starrett and Simmons reviewed and approved, and circulated to

Goldstone, KPMG's "year-end going concern analysis," which "repeatedly represented that

Thornburg Mortgage successfully continued to meet all margin calls and returned to profitability

in the fourth quarter."  Complaint ¶ 72, at 21.  The going-concern analysis also stated:

> "As the Company has the ability and intent to hold its Purchased ARM assets
> until recovery, losses are not considered to be other than temporary impairments.
> The basis for the Company's ability to hold these securities is predicated on its
> going profitability, liquidity position and ability to continue to make margin
> calls[.]"

Complaint ¶ 74, at 22 (quoting Going Concern Analysis at 12, filed May 21, 2012 (Doc. 37-

23)[15]).

In an electronic mail transmission from Goldstone to Starrett and Simmons on February

21, 2008, Goldstone stated that Thornburg Mortgage planned to meet the Citigroup Global

margin call by "'[h]aving Citi sell a $100 million Interest Only security that may generate $20 to

$25 million. . . .  We may undertake additional asset sales depending on how market conditions

evolve over the next few weeks[.]'"  Complaint ¶ 66, at 19 (alterations in original)(quoting Feb.

21 BOD Email at 2).  Simmons informed KPMG that it had entered into the I/O Strip

Transactions to take advantage of opportune pricing.  See Complaint ¶ 65, at 19.  On February

_____

[15] The Going Concern Analysis is attached to an Electronic Mail Transmission from Jane
Starrett to Michael Coltharp (February 21, 2008 9:44 a.m.), filed May 21, 2012 (Doc. 37-
23)("Feb. 21 Starrett/Coltharp Email").  See Doc. 37-23.

25, 2008, Starrett stated, in an electronic mail transmission to Goldstone and Simmons, that:

"'**We have purposely** not told [the auditors] about the margin calls so that we don't escalate an issue which we believe will be put to rest by the time they have to issue their opinion.' (Emphasis added)."   Complaint ¶ 53, at 16 (emphasis and alterations in original)(quoting Electronic Mail Transmission from Larry Goldstone to Jane Starrett at 2 (Feb. 25, 2008, 10:09 a.m.), filed May 21, 2012 (Doc. 38-5)("Feb. 25 Starrett/Goldstone Email").   Starrett also informed Goldstone and Simmons of the "essence of an OTTI analysis":

> "In short, selling some assets is substantially the same as selling all assets because the only reason we don't have to recognize the impairments on all assets with negative marks in income now is that we represent we have the intent and ability to hold the assets to maturity.  Selling some assets calls into question our intent and having to sell them to meet margin calls or reduce exposure, calls into question our ability to hold them."

Complaint ¶ 54, at 16 (quoting Feb. 25 Goldstone/Starrett Email at 2-3).  Goldstone responded: "'Got it.  Understand it.  Thanks.'"  Complaint ¶ 55, at 16 (quoting Feb. 25 Goldstone/Starrett Email at 2).

The Defendants each signed Thornburg Mortgage's February 27, 2008 management representation letter to KPMG, in which they stated that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware were relevant regarding Thornburg Mortgage's ability to continue as a going concern.  See Complaint

¶ 57, at 17.  Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, holding ARM securities similar Thornburg Mortgage's.  See Complaint ¶ 76, at 22.  "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further." Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested evidence from the Defendants "that the events subsequent to filing were unforeseeable catastrophic events," such as "correspondence with lenders/attorneys/shareholders, emails."  Electronic Mail Transmission from Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, Shawn Buniel at 2 (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("Mar. 3 Hall Email"); Request for Correspondence at 3-4, filed May 21, 2012 (Doc. 37-28).  See Complaint ¶ 100, at 29.  KPMG also requested a "position paper" which "provide[d] the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . .  Correspondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  See Complaint ¶ 100, at 29 ("Thornburg's outside auditor sent an email . . . requesting, among other items, all correspondence between Thornburg and its lenders during the two-week period leading to the . . . Form 10-K.").  At the time, the auditor was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating the validity of its audit opinion.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of the Citigroup Global Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29. KPMG did not become aware of the Citigroup Global Letter while preparing its restatement.  See Complaint ¶ 101, at 29.  Simmons reviewed and approved an analysis to the auditor that

explained Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market, were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"   Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).   The analysis continued to state: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in mortgage valuations.' (Emphasis added)."   Complaint ¶ 103, at 30 (quoting Position Paper at 2).

## PROCEDURAL BACKGROUND

The SEC contends that the Defendants misrepresented and/or engaged in a scheme to deceive, or aided and abetting material misrepresentations of Thornburg Mortgage's financial condition to, KPMG and the investing public regarding Thornburg Mortgage's financial situation as stated in the 2007 Form 10-K.   See Complaint ¶ 5, at 3; id. ¶ 13, at 5.   The SEC contends that the Defendants "violated, or aided and abetted the violation of, and, unless restrained and enjoined, will continue to violate or aid and abet the violation of" the following statutes and federal rules: (i) 15 U.S.C § 77q(a), also known as § 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77a-77bbb ("the Securities Act"); (ii) 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2), and 78m(b)(5), also known as §§ 10(b), 13(a), 13(b)(2), and 13(b)(5) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78pp ("the Exchange Act"); and (iii) 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13b2-1, and 240.13b2-2.   Complaint ¶ 14, at 5.   The SEC contends that Goldstone and Simmons have violated, and "unless restrained and enjoined, will continue to violate" 17 C.F.R. § 240.13a-14, and rules 13a-14 promulgated under the Exchange Act. Complaint ¶ 14, at 5.   The SEC asserts, in the alternative, that Goldstone and Simmons are liable

as control persons under 15 U.S.C. § 78t, § 20(a) of the Exchange Act, for Thornburg Mortgage's violations of §§ 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) and rules 10b-5, 12b-20, 13a-1 of the Exchange Act.  See Complaint ¶ 14, at 5.  The SEC asserts that the Defendants, either directly or indirectly, used instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or the mail, in connection with the acts, practices, and courses of business alleged in the Complaint.  See Complaint ¶ 15, at 6.

The SEC's first, second, third and fourth claims for relief are related to alleged violations of § 17(a) of the Securities Act and § 10(b) and rule 10b-5 of the Exchange Act.  The SEC's first claim for relief that the Defendants' actions violated, and will continue to violate if not enjoined, Exchange Act Section 10(b) and rule 10b-5.  See Complaint ¶¶ 106-108, at 31.  The SEC's second claim for relief is alleged alternatively against Goldstone and Simmons, and asserts that Goldstone and Simmons are liable as control persons under § 20(a) of the Exchange Act for Thornburg Mortgage's violations of § 10(b) and rule 10b-5 of the Exchange Act.  See Complaint ¶¶ 109-112, at 31-32.  The SEC's fourth claim for relief alleges that the Defendants violated § 17(a) of the Securities Act and committed fraud in the offer or sale of securities, and that the Defendants will continue to violate § 17(a) of the Securities Act if not enjoined.  See Complaint ¶¶ 117-119, at 33-34.  The SEC's third claim for relief is alleged against all Defendants, alternatively, and asserts that the Defendants are liable for aiding and abetting Thornburg Mortgage's violations of § 10(b) and rule 10b-5 of the Exchange Act.  The SEC asserts that the Defendants "each aided and abetted the fraud violations of Thornburg, in that they knowingly or recklessly provided substantial assistance to Thornburg in committing these reporting violations."  Complaint ¶¶ 113-116, at 32-33.

The SEC's eighth and ninth claims for relief allege violations of § 13(a) and rules 12b-20 and 13a-1 of the Exchange Act -- false SEC filings. The SEC asserts that Thornburg Mortgage, "an issuer of securities registered pursuant to Section 12 of the Exchange Act," filed a materially false and misleading annual report with the SEC. Complaint ¶ 129, at 36. The SEC's eighth claim for relief asserts that the Defendants aided and abetted Thornburg Mortgage's violations of § 13(a) and rules 12b-20 and 13a-1 of the Exchange Act, by "knowingly or recklessly provid[ing] substantial assistance to Thornburg in committing these reporting violations." Complaint ¶¶ 130-131, at 36. Alternatively, the SEC also asserts that Goldstone and Simmons are liable as control persons for Thornburg Mortgage's false SEC filings, under § 20(a) of the Exchange Act. See Complaint ¶¶ 132-135, at 37.

The SEC's tenth and eleventh claims for relief relate to alleged false SEC filings. The SEC's tenth claim for relief asserts that the Defendants aided and abetted Thornburg Mortgage's violation of § 13(b)(2) of the Exchange Act, by "knowingly or recklessly provid[ing] substantial assistance to Thornburg['s]" failure to keep "books, records, and accounts which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets," and failure to "devise and maintain a system of internal accounting controls" sufficient to assure reasonable conformity with generally accepted accounting principles.[16] Complaint ¶¶ 137-39, at 37-38. Alternatively, the SEC's eleventh claim for relief alleges that Goldstone and Simmons are liable as control persons, under § 20(a) of the Exchange Act, for Thornburg Mortgage's

---

[16] Generally accepted accounting principles refer to the "conventions, rules, and procedures that define approved accounting practices at a particular time. These principles are issued by the Financial Accounting Standards Board for use by accountants in preparing financial statements. The principles include not only broad guidelines of general application but also detailed practices and procedures." Generally Accepted Accounting Principles, Black's Law Dictionary 753 (9th ed. 2009).

failure to keep accurate books, records and accounts, in violation § 13(b)(2) of the Exchange Act. See Complaint ¶¶ 140-143, at 38-39.

The SEC's fifth claim for relief alleges that the Defendants falsified books, records, or accounts, in violation of § 13(b)(5) and rule 13b2-1 of the Exchange Act.  The SEC asserts that the Defendants "knowingly circumvented or knowingly failed to implement a system of internal accounting controls to assure that Thornburg's financial statements were prepared in conformity with GAAP or knowingly falsified or caused to be falsified books, records, or accounts of Thornburg," in violation of § 13(b)(5) and rule 13b2-1 of the Exchange Act.  Complaint ¶¶ 12-122, at 34.  The SEC's sixth claim for relief asserts that Goldstone and Simmons "each falsely certified in connection with Thornburg's 2007 10-K," in violation of rule 13a-14 promulgated under the Exchange Act, and that they will continue to violate rule 13a-14 if not enjoined. Complaint ¶¶ 123-125, at 34-35.

The SEC's seventh claim for relief asserts that the Defendants deceived auditors, in violation of rule 13b2-2 promulgated under the Exchange Act, and will in the future violate rule 13b2-2 if not enjoined.  See Complaint ¶¶ 126-128, at 35-36.

### 1.    The Defendants' Alleged Misrepresentations and Omissions Concerning the 2007 Form 10-K.

The SEC contends that the Defendants were "scrambling" to meet Thornburg Mortgage's outstanding margin calls before filing the 2007 Form 10-K, "so they could claim in [the 2007 Form 10-k] . . . to have successfully met all margin calls."  Complaint ¶ 38, at 12.  The SEC contends that the Defendants misrepresented in the 2007 Form 10-K that Thornburg Mortgage had successfully met all of its margin calls without selling any assets.  See Complaint ¶¶ 5, 7 at 3; id. ¶ 59, at 17; id. ¶ 65, at 19.  The SEC asserts that the Defendants either knew, or were

reckless in not knowing, that Thornburg Mortgage was late in margin call payments under its reverse repurchase agreements, as Goldstone and Simmons had received the Citigroup Global Letter on or about February 21, 2008, which declared Thornburg Mortgage in default.  See Complaint ¶ 60, at 17.  The SEC asserts that the Defendants' electronic mail transmissions in the final two weeks of February, 2008, demonstrate that Thornburg Mortgage was late in meeting margin calls, was relying on the cooperation and forbearance of its lenders to meet margin calls, and had entered into payment plans with its lenders.  See Complaint ¶ 61, at 18.  The SEC asserts that Simmons has conceded that, if the 2007 Form 10-K contained the "truth relating to Thornburg's financial position," Thornburg Mortgage's stock prices would have fallen much more after the filing of the 2007 Form 10-K.   Complaint ¶ 92, at 27 ("'I guess the recent development section did not go over well.  **If they only knew**'" (emphasis in original)(quoting Feb. 28 Simmons/Goldstone Email at 2).

The SEC also asserts that the Defendants should have recognized the I/O Strip Transactions as sales, rather than as the issuance of secured debt, to avoid misleading investors in the 2007 Form 10-K.  The SEC contends that the Defendants "each knew, or were reckless in not knowing," that Thornburg Mortgage entered into the I/O Strip Transactions to meet margin calls, as the Defendants' electronic mail transmission on February 21, 2008, demonstrates. Complaint ¶ 66, at 19.   The SEC also contends that the Defendants have, in the past, characterized I/O Strip Transactions as sales, and not as the issuance of secured debt, as the Defendants accounted for the Thornburg Mortgage's I/O Strip Transaction in the 2007 Form 10-K.  See Complaint ¶ 37, at 11.   The SEC highlights that, in electronic mail transmissions discussing the I/O Strip Transactions, the Defendants refer to the transactions as "sales" or state that the I/O Strips were "sold" to meet margin calls.  Complaint ¶¶ 67-69, at 19-20.  The SEC

contends that the I/O Strip Transactions were "in form sales and contemporaneously referred to as sales." Complaint ¶ 69, at 20.

The SEC also contends that the Defendants misrepresented in the 2007 Form 10-K that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value was recovered in the market. The SEC asserts that the OTTI analysis was "directly contradicted by Thornburg's severe liquidity crisis and exposure to declarations of default by lenders who then could have seized the company's ARM Securities collateral," and by Thornburg Mortgage's use of I/O Strip Transactions to meet margin calls. Complaint ¶ 8, at 3-4; id. ¶¶ 51-52, at 15. The SEC asserts that the Defendants "knew, or were reckless in not knowing," that the I/O Strip Transactions informed the OTTI analysis. Complaint ¶ 71, at 21. The SEC contends that Starrett provided "clear accounting guidance" to Goldstone and Simmons, which indicates that the Defendants knew that "'selling some assets call[ed] into question [Thornburg's] intent and having to sell them to meet margin calls or reduce exposure, call[ed] into question [the company's] ability to hold them.'" Complaint ¶ 70, at 20 (alterations in original)(quoting Feb. 25 Goldstone/Starrett Email at 2).

Similarly, the SEC asserts that, just as the Defendants' OTTI analysis was fraudulent, the Defendants knew, or were reckless in not knowing, that Thornburg Mortgage was required to recognize a loss of approximately $400 million in its ARM securities in the 2007 Form 10-K, because Thornburg Mortgage could not hold those assets to maturity. See Complaint ¶ 70, at 20-21; id. ¶ 85, at 25.

The SEC asserts that Starrett "accurately" relayed this information to Goldstone and Simmons in an electronic mail transmission on February 25, 2008. Complaint ¶ 56, at 16; id. ¶ 70, at 20-21; id. ¶ 85, at 25. The SEC contends that, if the Defendants had properly accounted

for an impairment of $427.8 million in its ARM securities in the 2007 Form 10-K, Thornburg

Mortgage would have suffered a net loss of approximately $357 million, instead of a net profit of

sixty-five million dollars in the fourth quarter of 2007, an annual net loss of approximately $1.3

billion, instead of $875 million, and losses per share of $10.94, instead of $7.48.  See Complaint

¶¶ 8, 12, at 4, 5; id. ¶¶ 86-88, at 25-26.  The SEC asserts that, because Thornburg Mortgage's

Form S-3 ASR registration, which Goldstone and Simmons signed, incorporated the financial

statements in the 2007 Form 10-K, was, therefore, materially false.[17]  See Complaint ¶ 89, at 26.

The SEC asserts that, because Starrett served as Thornburg Mortgage's CAO and directly

participated in "materially misrepresenting the company's financial condition," she "knew or

reasonably could have anticipated" that Thornburg Mortgage's "false Form 10-K and

accompanying financial statements would be incorporated into Thornburg's pending registration

statements."  Complaint ¶ 90, at 26.

　　　The SEC asserts that Goldstone and Simmons "continued to project a materially false

image of Thornburg's financial condition and to perpetuate the materially false image they had

presented in the Form 10-K" in the days and hours after filing the 2007 Form 10-K.  Complaint ¶

93, at 27.  The SEC asserts that Goldstone "knew, or was reckless in not knowing," that his

---

[17] An "S-3 ASR" registration is an "[a]utomatic shelf registration statement of securities
of well-known seasoned issuers."  SEC filing, Wikipedia (February 17, 2013, 5:40 p.m.),
http://en.wikipedia.org/wiki/SEC_filing.  A "shelf registration" is a

　　　type of public offering where certain issuers are allowed to offer and sell
　　　securities to the public without a separate prospectus for each act of offering.
　　　Instead, there is a single prospectus for multiple, undefined future offerings.  The
　　　prospectus (often as part of a registration statement) may be used to offer
　　　securities for up to several years after its publication.

Shelf    registration,    Wikipedia    (May    18,    2013,    12:59    p.m.),
http://en.wikipedia.org/wiki/Shelf_registration.

electronic mail transmission to the investor relations department on February 28, 2008 was misleading, because Thornburg Mortgage had violated reverse repurchase agreements the previous week.  Complaint ¶ 95, at 27.  The SEC also asserts that Goldstone's electronic mail transmission to the investor relations department became false within "approximately one hour of his instructions," as Thornburg Mortgage received escalating margin calls that exceeded Thornburg Mortgage's liquidity, consisting of approximately forty million dollars in cash at that time.  Complaint ¶ 95, at 27.  The SEC asserts that Goldstone knew, or was reckless in not knowing, that, inconsistent with the "'top messages'" the Defendants "'reinforced in the market,'" on February 28, 2008, Thornburg Mortgage did not have sufficient cash to meet the margin calls it received that day.  Complaint ¶¶ 96- 97, at 28.  The SEC similarly asserts that Goldstone knew, or was reckless in not knowing, that Thornburg Mortgage did not have liquidity and cash sufficient to support its margin calls on February 28, 2008, contrary to his statements on Street Signs.  See Complaint ¶ 98, at 28.

   **2.**  **The Defendants' Alleged Misrepresentations to KPMG.**

   The SEC contends that the Defendants made misrepresentations and omissions to KPMG. The SEC asserts that the Defendants "misrepresented and/or concealed the fact that" Thornburg Mortgage had violated reverse repurchase agreements, and was at risk of having its ARM securities seized as collateral by its lenders, and that Thornburg Mortgage was required to enter into I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008. Complaint ¶ 51, at 15; id. ¶ 79, at 23.  The SEC asserts that the Defendants' misrepresentations and omissions precluded the auditor from having "critical information to evaluate Thornburg's OTTI analysis of its ARM Securities and to determine whether Thornburg had the intent and ability to hold those securities until maturity or their value recovered in the market."  Complaint

¶ 79, at 23.  The SEC asserts that Goldstone and Simmons failed to disclose that a large European hedge fund holding ARM securities similar to Thornburg Mortgage's was close to collapsing, which made Simmons' statements regarding the ARM securities market false and misleading.  See Complaint ¶ 76, at 22.  The SEC also asserts that Goldstone and Simmons perpetuated Thornburg Mortgage's materially false financial statements in the 2007 Form 10-K by not disclosing to the auditor that Thornburg Mortgage had received the Citigroup Global Letter in the days after the 2007 Form 10-K was filed.  See Complaint ¶ 80, at 23; id. ¶ 99, at 29. The SEC asserts that the Defendants' electronic mail transmissions on February 25, 2008, demonstrate a "plan . . . not to disclose the margin call situation until it was resolved" to KPMG. Complaint ¶ 52, at 16.

Regarding Thornburg Mortgage's overall financial situation, the SEC asserts that the Defendants' repeated statements in Thornburg Mortgage's going-concern analysis that Thornburg Mortgage "successfully continued to meet all margin calls" was materially false and misleading, given Thornburg Mortgage's failure to timely meet the Credit Suisse, Citigroup Global, and Greenwich margin calls.  Complaint ¶ 72, at 21.  The SEC also asserts that the Defendants either knew, or were reckless in not knowing, that the statements in the going-concern analysis that Thornburg Mortgage had "returned to profitability in the fourth quarter," were false, because of the Defendants' improper OTTI analysis of the ARM securities. Complaint ¶ 73, at 21-22.  The SEC contends that, had the Defendants disclosed the truth of Thornburg Mortgage's liquidity crisis and exposure to default and cross-defaults, KPMG would have questioned its OTTI analysis in the 2007 Form 10-K, and the Defendants' plan to raise additional cash would have been undermined.  See Complaint ¶ 2, at 2; id. ¶ 52, at 15-16.  The SEC also asserts that the Defendants' February 27, 2008 management representation letter to

KPMG misrepresented that Thornburg Mortgage was not in violation of its reverse repurchase agreements, that Thornburg Mortgage was in compliance with all aspects of its reverse repurchase agreements which would have an effect on its financial statements in the event of noncompliance, that Thornburg Mortgage had the intent and ability to hold its impaired securities until their value recovered in the market, that Thornburg Mortgage had not experienced subsequent events which would require it to adjust its financial statements, and that the financial statements disclosed all matters relevant to Thornburg Mortgage's ability to continue as a going concern. See Complaint ¶¶ 57-58, at 17.

Regarding the I/O Strip Transactions, the SEC contends that the Defendants either "knew, or were reckless in not knowing," that the "circumstances of the I/O Strip Transactions were important information" that KPMG needed to know to properly review Thornburg Mortgage's OTTI analysis regarding its ARM securities. Complaint ¶ 71, at 21. The SEC asserts that Simmons misrepresented to KPMG that Thornburg Mortgage entered into the I/O Strip Transactions to take advantage of opportune pricing. See Complaint ¶ 65, at 19.

The SEC contends that the Defendants' statement in the going-concern analysis that Thornburg Mortgage "'has the ability and intent to hold its Purchased ARM assets until recovery,'" based upon Thornburg Mortgage's "ongoing profitability, liquidity position and ability to continue to make margin calls," was a misrepresentation. Complaint ¶ 12, at 4-5; id. ¶ 74, at 22 (quoting Going Concern Analysis at 12). The SEC also asserts that the statement demonstrates the Defendants knew, or were reckless in not knowing, "the relevant criteria for an OTTI analysis." Complaint ¶ 75, at 22. The SEC asserts that the Defendants "misrepresented or failed to disclose" to the auditor that Thornburg Mortgage's "margin calls events" were a continuation "of a condition that existed as of Thornburg's fiscal year," and that Thornburg

Mortgage's margin calls were "reaching crisis proportions" in the first two months of 2008. Complaint ¶ 81, at 24. The SEC asserts that Thornburg Mortgage's margin calls in the last two weeks of February, 2008, "were a continuation of a condition that existed as of Thornburg's December 31, 2007 balance sheet," and, therefore, were a "Type 1 subsequent event for accounting purposes," and KPMG should have considered the margin calls in its opinion. Complaint ¶ 82, at 24. The SEC asserts that, if the Defendants had provided KPMG with "accurate and complete information about Thornburg's margin call situation during the two-week period leading to the filing of Thornburg's 2007 Form 10-K," KPMG would have disagreed with the Defendants' OTTI analysis. Complaint ¶ 83, at 24.

The SEC also contends that Goldstone and Simmons knew, or were reckless in not knowing, that failing to inform the auditor that the impending collapse of a European hedge fund, of which Goldstone and Simmons became aware on February 27, 2008, would "likely further depress the price of Thornburg's ARM Securities and trigger additional margin calls." Complaint ¶ 76, at 22. The SEC contends that the collapse of the European hedge fund was "material information that" Goldstone and Simmons should have provided to the auditor to allow it to properly review Thornburg Mortgage's OTTI analysis of its ARM securities. Complaint ¶ 78, at 23. The SEC asserts that Simmons "improperly failed to update" his previous statement to KPMG expressing his belief that the MBS market had "reached its lowest point and . . . [would] not likely [] deteriorate further." Complaint ¶ 77, at 22-23.

The SEC asserts that Goldstone and Simmons perpetuated Thornburg Mortgage's false 2007 Form 10-K subsequent to its filing. The SEC contends that Goldstone and Simmons failed to provide the "critical" Citigroup Global Letter in response to the Request for Correspondence. Complaint ¶ 99, at 29. The SEC also contends that the Position Paper, which Simmons

approved, falsely stated that the collapse of the European hedge fund was "'unexpected'" and that Thornburg Mortgage's margin calls after the filing of the 2007 Form 10-K were "'unforeseeable.'"  Complaint ¶ 105, at 30 (quoting Position Paper at 2).  The SEC asserts that Simmons was aware that the hedge fund was collapsing on February 27, 2008, and understood at that time that the collapse would likely "have a negative impact on the price of Thornburg's ARM Securities."  Complaint ¶¶ 38-40, at 12, id. 104, at 30.  The SEC asserts that Simmons "continued to deceive the company's auditor" "in an attempt to defend Thornburg's improper OTTI analysis and failure to recognize the losses associated with its ARM Securities."  Complaint ¶ 105, at 30.

### 3.       Goldstone and Simmons' Motion to Dismiss.

Goldstone and Simmons move to dismiss the SEC's eleven claims against them.  See Goldstone & Simmons MTD at 9.  Goldstone and Simmons assert that the SEC has failed to allege a plausible claim against them in the Complaint, and assert that the SEC's allegations of fraud fail to meet the requirements of rule 9(b) of the Federal Rules of Civil Procedure.  See Goldstone & Simmons  MTD at 8.  Goldstone and Simmons assert that the SEC "uses 20/20 hindsight, the SEC's own sinister characterization of events, and misleading excerpts of internal documents in a belated attempt to hold the defendants liable for, in essence, not having done even more to predict the future."  Goldstone & Simmons MTD at 8.

Goldstone and Simmons assert that the claims against them are "facially invalid in at least five respects:" (i) the Thornburg Mortgage 2007 Form 10-K was not misleading, and that the Defendants had no duty to "disclose incidental details about how Thornburg met its margin calls or to attempt to predict the extent of future margin calls," Goldstone & Simmons MTD at 9-10; (ii) the Complaint "fails to allege facts demonstrating that Defendants prepared the 10-K with

any intent to defraud investors," Goldstone & Simmons MTD at 10; (iii) the Complaint fails to allege plausible facts that Goldstone acted with fraudulent intent to misrepresent Thornburg Mortgage's "ability to support its portfolio with cash and liquidity during an interview on Street Signs and in instructions he gave to the Company's investor relations department on February 28, 2008," Goldstone & Simmons MTD at 11; (iv) the information Goldstone and Simmons withheld regarding the means Thornburg Mortgage used to meet its margin calls and the European hedge fund "rumor," and related issues was not material in light of the full disclosures in the 2007 Form 10-K, was not relevant to Thornburg Mortgage's financial conditions, and would not have changed the auditors' view on Thornburg Mortgage's OTTI analysis, Goldstone & Simmons MTD at 11; (v) the SEC has not sufficiently alleged facts to support Goldstone and Simmons' liability as "control persons," because the SEC has not adequately alleged a primary securities violation and has not sufficiently alleged that Goldstone and Simmons had "actual knowledge that they substantially assisted Thornburg in its alleged commission of the securities fraud, books and records violations, and internal control violations at issue," Goldstone & Simmons MTD at 11-12.  Goldstone and Simmons also join in Starrett's arguments set forth in the Starrett MTD, and incorporate by reference all of Starrett's arguments into the Goldstone & Simmons MTD.  See Goldstone & Simmons MTD at 12 n.1.

First, Goldstone and Simmons assert that the SEC has failed to state a claim in connection with representations and omissions in Thornburg Mortgage's 2007 Form 10-K. Goldstone and Simmons contend that Thornburg Mortgage's disclosures therein were accurate and not misleading, and further contend that the SEC has not plausibly alleged that Goldstone and Simmons made misrepresentations and omissions with fraudulent intent.  Goldstone and Simmons assert that, under federal securities laws, "a statement or omission is material only if

there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available' to the public."   Goldstone & Simmons MTD at 37 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)(secondary quotations omitted)(citing Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988)).  Goldstone and Simmons assert that the 2007 Form 10-K contained "extensive disclosures concerning the facts that mattered to investors," specifically: (i) the receipt of more than $300 million in margin calls following a sharp downturn in the MBS market on February 14, 2008"; and (ii) "Thornburg's diminished liquidity, and the risks that the MBS market could decline further and subject Thornburg to additional margin calls that it might be unable to meet."  Goldstone & Simmons MTD at 37.  Goldstone and Simmons also note that they disclosed "$427.8 million in unrealized losses on Purchase ARM Assets, [and] diminished liquidity."  Goldstone & Simmons MTD at 40.  Goldstone and Simmons contend that these disclosures render any allegedly omitted information "immaterial as a matter of law."  Goldstone & Simmons MTD at 40.

Goldstone and Simmons note that Thornburg Mortgage reported in the 2007 Form 10-K that, beginning on February 14, 2008, "there was a 'sudden adverse change in mortgage market conditions' that 'resulted in a decline in [the] estimate fair value' of Thornburg's 'mortgage securities backed by Alt-A mortgage loan collateral.'"  Goldstone & Simmons MTD at 17 (quoting 2007 Form 10-K at 37, 114).  Goldstone and Simmons assert that the market's "immediate, negative reaction" to the 2007 Form 10-K, as seen through analysts' reports and Thornburg's subsequent "unprecedented" amount of margin calls, demonstrates the "robustness of these disclosures."  Goldstone & Simmons MTD at 27-30, 32-33, 37 (citing Yalman Onaran, Thornburg Mortgage May Have to Sell Assets to Meet Margin Calls, Bloomberg, Feb. 28, 2008,

filed May 21, 2012 (Doc. 37-36)("Feb. 28 Bloomberg"); Feb. 28 Dow Jones Newswire;

Thornburg Mortgage, Inc., 10-K Provides Update on Still Challenging Financial Conditions,

Bear Stearns, Feb. 29, 2008, filed May 21, 2012 (Doc. 37-19)("Feb. 29 Bear Stearns");

Thornburg Mortg., Volatility Prompts Additional Margin Calls, Jefferies & Company, Inc., Feb.

28, 2008, filed May 21, 2012 (Doc. 37-18)("Feb. 28 Jefferies")).

  Goldstone and Simmons assert, thus, that "additional details regarding the precise manner

in which margin calls were met and the receipt of a boilerplate reservation of rights letters from

Citi" were immaterial.  Goldstone & Simmons MTD at 38.  Goldstone and Simmons assert that,

in Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp., 675 F.3d 1047 (7th Cir. 2012)(Easterbook,

J.), the United States Court of Appeals for the Seventh Circuit "rejected a nearly identical

attempt to impose unnecessary disclosure requirements on a public company."  Goldstone &

Simmons MTD at 38.  Goldstone and Simmons assert that, in Payne v. DeLuca, 433 F. Supp. 2d

547, 594 (W. D. Pa. 2006), a United States District Judge for the Western District of

Pennsylvania rejected the plaintiffs' argument that the defendants should have disclosed "the

difficulty it had meeting" loan covenants, because no specific GAAP provision required a

company to disclose the difficulty it experiences in meeting financial obligations, and the

defendants had made other robust disclosures.  Goldstone & Simmons MTD at 39.  Goldstone

and Simmons also assert that the Court reached a similar conclusion in In re Thornburg Mortg.,

Inc. Sec. Litig., 824 F. Supp. 2d 1214 (D.N.M. 2011)(Browning, J.), where the Court found that

the defendants' failure to disclose the extent of its Alt-A MBS holdings used as collateral for

repo loans was not a material omission, because the defendants disclosed its "'actual, realized

liquidity issues and that it might not be able to recover from them in the future.'"  Goldstone &

Simmons MTD at 39 (quoting In re Thornburg Mortg., Inc. Sec. Litig., 824 F. Supp. 2d at 1266).

Goldstone and Simmons assert that, in light of these three decisions, "where the gravamen of a company's bad news is disclosed, the disclosure of additional, incidental details is unnecessary." Goldstone & Simmons MTD at 39-40.

Goldstone and Simmons also assert that they did not have a duty to disclose the information allegedly omitted from the 2007 Form 10-K. Goldstone and Simmons assert that a duty to disclose arises only when: (i) "it is necessary to correct a previous statement that is false or later turns out to be false," Goldstone & Simmons MTD at 40 (citing Connett v. Justus Enters. of Kansas, Inc., 68 F. 3d 382, 385 (10th Cir. 1995); (ii) "it is mandated by statute or relationship," Goldstone & Simmons MTD at 40 (citing In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d at 1209); or (iii) "it is required by virtue of a fiduciary-type relationship (other than the 'general fiduciary relationship that a corporation and its directors owe shareholders)," Goldstone & Simmons MTD at 40 (quoting New Jersey Div. of Inv. v. Sprint Corp., 314 F. Supp. 2d 1119, 1128, 1138 (D. Kan. 2004)). Goldstone and Simmons assert that a statement is not misleading merely because it omits facts, unless those omissions make the statement "less true." Goldstone & Simmons MTD at 40-41 (citing McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 998-99 (10th Cir. 2002)). Goldstone and Simmons thus assert that they did not have a duty to disclose the details regarding how Thornburg Mortgage was addressing the challenges facing it in the 2007 Form 10-K. See Goldstone & Simmons MTD at 41.

Goldstone and Simmons contend that they did not have a duty to disclose the I/O Strip Transactions in the 2007 Form 10-K, because those transactions were not sales, but rather were "the issuance of secured debt." Goldstone & Simmons MTD at 41 (quoting Complaint ¶¶ 37, 65, 69). Goldstone and Simmons assert that under GAAP, "the creation and transfer of an interest-only strip is indisputably a secured borrowing, not a sale of assets." Goldstone & Simmons

MTD at 41 (Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140")); Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166").  Goldstone and Simmons contend that the SEC's allegations are conclusory regarding the I/O Strip Transactions having depleted Thornburg Mortgage's liquidity to meet margin calls and ability to hold its ARM Securities to maturity.  Goldstone and Simmons also assert that the SEC has provided "no basis to conclude the disclosure of the I/O Strip Transactions was necessary to make the 10-K not misleading." Goldstone & Simmons MTD at 42.

Goldstone and Simmons contend that the assessment whether to recognize $427.8 million in impaired assets as a loss is an "inherently subjective judgment about management's intent and ability."[18]  Goldstone & Simmons MTD at 25-26.  Goldstone and Simmons assert that, if a decline, or an "impairment," "is deemed temporary -- that is, securities are expected to recover their value --" then the impairment is not charged to income and the temporary decline is recorded as an "unrealized loss."  Goldstone & Simmons MTD at 25-26, 25 n. 22 (citing SFAS 115 ¶ 16, at 4); 2007 Form 10-K at 90).  Goldstone and Simmons state that, if an impairment's decline in value is determined to be OTTI "then the amount of the decline is taken as a charge against income in that period."  Goldstone & Simmons MTD at 26, 26 n.25 (citing SEC Staff Accounting Bulletin No. 59, Accounting for Noncurrent Marketable Equity Securities, codified as SAB Topic 5.M, Other Than Temporary Impairment of Certain Investments in Debt and Equity Securities, (March 9, 2011), http://www.sec.gov/interps/account/sabcodet5.htm#5m).

---

[18] Goldstone and Simmons refer to a "$427 million decline in value of" Thornburg's ARM Securities, Goldstone & Simmons MTD at 25, but the SEC, and the 2007 Form 10-K, state that the contest amount of decline in Thornburg's ARM Securities as "427.8 million," Complaint ¶ 46, at 13-14; 2007 Form 10-K at 41.  The Court will use the amount in the 2007 Form 10-K for purposes of this motion.

Goldstone and Simmons assert, thus, that the judgment whether an impairment is temporary "turns on whether the company has the 'intent and ability' to hold the security until maturity or until its value recovers," and thus "requires an assessment of uncertain future events and market conditions."  Goldstone & Simmons MTD at 26.

Goldstone and Simmons assert that they determined that the $427.8 million decline in value of Thornburg Mortgage's ARM securities was temporary, and therefore, did not charge it against income but instead disclosed that Thornburg Mortgage was accounting for the decline as "'gross unrealized loss.'"  Goldstone & Simmons MTD at 26 (quoting 2007 Form 10-K at 100). Goldstone and Simmons assert that the 2007 Form 10-K "clearly set forth how and why TMA made that determination, explaining that the OTTI assessment 'requires management judgment,'" including judgments based upon various market factors which are known to fluctuate.  Goldstone & Simmons MTD at 26 (quoting 2007 Form 10-K at 98-103).  Goldstone and Simmons point out that KPMG did not disagree the OTTI analysis in the 2007 Form 10-K. See Goldstone & Simmons MTD at 27 (citing 2007 Form 10-K at 81-82).

Goldstone and Simmons also assert that they had not duty to disclose the payment plans for Thornburg Mortgage's margin calls.  Goldstone and Simmons first assert that the 2007 Form 10-K does not "contain a statement that Thornburg 'complied with its lending agreements,'" as the SEC contends it does.  Goldstone & Simmons MTD at 42 (quoting Complaint ¶ 60, at 17-18).  Goldstone and Simmons also assert that Thornburg Mortgage was not in breach of its reverse repurchase agreement with Citigroup Global, because the Citigroup Global Repo Agreement "required margin calls to be met on the same business day 'unless otherwise agreed between the Parties,'" and Citigroup Global and Thornburg Mortgage had agreed to another

deadline.  Goldstone & Simmons MTD at 43 (quoting Citigroup Global Repo Agreement § 5.8, at 11).

Goldstone and Simmons assert, thus, that Citigroup Global was incorrect to characterize Thornburg Mortgage as being in breach in a boilerplate statement in the Citigroup Global Letter. Goldstone & Simmons MTD at 19.  Goldstone and Simmons also assert that the SEC has not alleged facts which demonstrate that they received the Citigroup Global Letter, as the electronic mail transmission containing the Citigroup Global Letter was not sent to Goldstone or Simmons. See Goldstone & Simmons MTD at 19 (citing Electronic Mail Transmission from Arlene Hamilton to nfellers&thornburgmortgage.com (February 22, 2008, 9:38 a.m.), filed May 21, 2012 (Doc., 37-7)("Feb. 22 Hamilton/Fellers Email"); Complaint ¶ 34, at 10-11).  Contrary to the SEC's contention that Goldstone and Simmons received the Citigroup Global Letter, Goldstone and Simmons contend that the electronic mail transmissions referenced in the Complaint demonstrate that Goldstone was "traveling by plane, when the letter was sent, and out of town the rest of the week."  Goldstone & Simmons MTD at 19 (citing Complaint ¶ 60, at 17-18; Feb. 21 BOD Email at 2; Feb. 22 BOD Email; Feb. 25 BOD Email).

Moreover, Goldstone and Simmons assert that the SEC has not identified any legal requirement "to disclose precisely how margin call obligations are met."  Goldstone & Simmons MTD at 43.  Goldstone and Simmons contend that there is not "any sound reason why disclosures of such day-to-day difficulties should be required."  Goldstone & Simmons MTD at 43 (citing Mo. Portland Cement Co. v. Cargill, Inc., 498 F.2d 851, 873 (2d Cir. 1974); In re Goodyear Tire & Rubber Co. Sec. Litig., No. CIV A. 88-8633, 1993 WL 130381, at * 8 (E.D. Pa. Apr. 22, 1993), aff'd 16 F.3d 403 (3d Cir. 1993)).  Goldstone and Simmons assert that "'the existence of an event of default permitting a creditor to accelerate the obligation and demand its

payment is not equivalent to an actual current default,'" because an event of default does not alter a company's financial obligations.  Goldstone & Simmons MTD at 43 (quoting <u>Baron v. Smith</u>, 285 F. Supp. 2d 96, 104 (D. Mass. 2003), <u>aff'd</u>, 380 F.3d 49 (1st Cir. 2004)).  Goldstone and Simmons thus assert that they had no duty to disclose the event of default or reservation of rights letter from Citigroup Global, because "no default was declared, all margin calls were satisfied, and Thornburg's financial obligations remained the same."  Goldstone & Simmons MTD at 44.

Goldstone and Simmons also contend that the SEC is seeking to make them liable for failing to predict the future, through the SEC's allegation that the 2007 Form 10-K's statement that "'Thornburg had the intent and ability to hold its ARM Securities until their value recovered in the market'" was "knowingly and recklessly false."  Goldstone & Simmons MTD at 44 (quoting Complaint ¶ 8, at 3-4)(citing Complaint ¶¶ 41-48, 51, at 12-15).  Goldstone and Simmons assert that they could not have predicted that creditors would issue additional margin calls which could not be met without selling assets.  <u>See</u> Goldstone & Simmons MTD at 44.  Goldstone and Simmons also assert that "the federal securities laws do not provide a cause of action for failing to foresee future events."  Goldstone & Simmons MTD at 45 (citing <u>Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.</u>, 675 F.3d at 1050; <u>In re Radian Sec. Litig.</u>, 612 F. Supp. 2d 594, 619 (E.D. Pa. 2009); <u>City of Phila. v. Fleming Cos., Inc.</u>, 264 F.3d 1245, 1260 (10th Cir. 2001)).  Goldstone and Simmons assert that courts addressing claims in the context of the recent financial crisis have "rejected the proposition that corporate officers should have anticipated and disclosed what the crisis would ultimately do to their companies."  Goldstone & Simmons MTD at 45 (citing <u>Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.</u>, 675 F.3d at 1050).  Goldstone and Simmons contend that the SEC has not alleged any facts from which one

"could plausibly conclude that it was obvious before the filing of the 10-K that Thornburg would soon be overwhelmed by margin calls."   Goldstone & Simmons MTD at 46.   Goldstone and Simmons assert that the internal documents to which the SEC cites in the Complaint indicate that "February 2008 was a highly unpredictable time for Thornburg."   Goldstone & Simmons MTD at 46.   Goldstone and Simmons contend that prices in the MBS market declined suddenly, and note that many lenders left the mortgage financing business altogether, while others increased margin requirements.   See Goldstone & Simmons MTD at 15 (citing Thornburg Mortgage, Inc. 3rd Quarter 2007 Form 10-Q at 5, filed May 21, 2012 (Doc. 37-14)("2007 Form 10-Q")). Goldstone and Simmons assert that the SEC is attempting to make them liable for securities fraud "on the mere occurrence of a major adverse event soon after a public statement," a basis for liability which courts have rejected.   Goldstone & Simmons MTD at 46 (citing Fox v. Equimark Corp., 782 F. Supp. 195, 300 (W.D. Pa., 1991)).

Second, Goldstone and Simmons assert that the SEC's scienter allegations are inherently implausible.   See Goldstone & Simmons MTD at 56.   Goldstone and Simmons contend that the SEC has not alleged facts which support a plausible conclusion that they "disregarded risks of misleading investors that were 'so obvious that [they] must have been aware of it.'"   Goldstone & Simmons MTD at 47 (quoting City of Phila. v. Fleming Cos., Inc., 264 F.3d at 1258). Goldstone and Simmons first assert that the disclosure in the 2007 Form 10-K are "fulsome" and "definitively undercut Plaintiff's assertion that Defendants intended to conceal Thornburg's 'margin call crisis' and misrepresent its 'financial condition.'"   Goldstone & Simmons  MTD at 48 (quoting Complaint ¶ 6, at 3; id. ¶ 13, at 5).   Goldstone and Simmons contend that the electronic mail transmissions referenced in the Complaint demonstrate that they "planned to make complete and accurate disclosures in Thornburg's 10-K and to its auditors."   Goldstone &

Simmons MTD at 23 (citing Feb. 21 BOD Email, Feb. 22 BOD Email, Electronic Mail Transmission from Larry Goldstone to Jane Starrett (February 25, 2008, 10:09 a.m.), filed May 21, 2012 (Doc. 37-22)("Feb. 25 Starrett/Goldstone Email"); Complaint ¶¶ 53-55, at 16).

Goldstone and Simmons also assert that the SEC has failed to allege any facts which demonstrate the they "believed the statements in the 10-K were false or misleading at the time they were made." Goldstone & Simmons MTD at 48 (citing Grossman v. Novell, Inc., 120 F.3d 1112, 1124 (10th Cir. 1997)). Goldstone and Simmons note that, before filing the 2007 Form 10-K, Thornburg Mortgage successfully raised cash in the third quarter of 2007, notwithstanding general MBS market turmoil. See Goldstone & Simmons MTD at 16 (citing 2007 Form 10-Q at 9-10). Goldstone and Simmons contend that the Feb. 22 BOD Email demonstrates that Goldstone was concerned about the unpredictability in the mortgage markets, but also that he had a plan to raise cash which he believed would provide Thornburg Mortgage a "'cushion'" of close to $300 million before Thornburg Mortgage filed the 2007 Form 10-K. Goldstone & Simmons MTD at 20 (quoting Feb. 22 BOD Email)(citing Feb. 21 BOD Email; Complaint ¶ 29, at 9). Goldstone and Simmons also assert that Goldstone expressed confidence that Thornburg Mortgage's lenders would agree to payment plans in the weeks preceding the filing of the 2007 Form 10-K. See Goldstone & Simmons MTD at 21 (citing Feb. 22 BOD Email). Goldstone and Simmons contend that the Feb. 25 BOD Email further demonstrates Goldstone's confidence that Thornburg Mortgage would raise the funds it needed to meet its ongoing margin calls. See Goldstone & Simmons MTD at 21 (citing Feb. 25 BOD Email). Goldstone and Simmons further assert that the facts in the Complaint show that: (i) "Thornburg had successfully met all margin calls by the time of the 10-K filing"; (ii) "had not violated its lending agreements"; (iii) "did not sell assets to satisfy its margin calls"; and (iv) "that Defendants believed all of that to be so."

Goldstone & Simmons MTD at 59 (emphasis in original)(citing Feb. 21 BOD Email; Feb. 22 BOD Email; Feb. 25 BOD Email).

Goldstone and Simmons also assert that, because the SEC has not shown that the allegedly omitted facts were material, the SEC has failed to plausibly allege that they acted with scienter.  See Goldstone & Simmons MTD at 50 (citing City of Dearborn Heights v. Waters Corp., 632 F.3d 751, 757-58 (1st Cir. 2011); Rosenberg v. Gould, 554 F.3d 962, 966 (11th Cir. 2009); In re Parmalat Sec. Litig., 684 F. Supp. 2d 453, 475 (S.D.N.Y. 2010)).  Goldstone and Simmons assert that the electronic mail transmissions to which the SEC cites indicate that they did not believe the allegedly omitted information was significant, especially in light of the gravity which Goldstone and Simmons attached to the other events disclosed in the 2007 Form 10-K.  See Goldstone & Simmons MTD at 50.

Regarding the SEC's allegations that the Defendants "'should have' reached a different conclusion in their OTTI analysis based on the facts available to them," Goldstone and Simmons contend that this standard is insufficient to state a claim for negligence, and even more insufficient to state a claim for fraud.  Goldstone & Simmons MTD at 48-49 (quoting Complaint ¶ 51, at 15; id. ¶ 71, at 21; id. ¶ 82, at 24)(citing City of Omaha v. CBS Corp., 679 F.3d 64 (2d Cir. 2012).  Goldstone and Simmons additionally contend that the complexity of the OTTI analysis undercuts the SEC's allegations of scienter.  See Goldstone & Simmons MTD at 50.  Goldstone and Simmons assert, further, that the SEC's allegations that the OTTI guidance at the time was "'clear' defies reality."  Goldstone & Simmons MTD at 51.  Goldstone and Simmons point out that, at the time, the SEC had recommended that the current OTTI guidance be modified or eliminated in favor of a "more uniform system of impairment testing standards for financial instruments."  Goldstone & Simmons MTD at 51 (citing SEC Market-to-Market

Study).  Goldstone and Simmons also assert that the SEC has "grossly mischaracterize[d]" Starrett's February 25 electronic mail transmission, in which she stated that "'some assets' would 'call into question' Thornburg's 'intent and ability' to hold 'all assets' until maturity." Goldstone & Simmons MTD at 51 (internal alterations omitted)(quoting Feb. 25 Goldstone/Starrett Email).  Goldstone and Simmons assert that the SEC's falsely characterizes of this electronic mail transmission as "clear guidance" that the value of all of Thornburg Mortgage's ARM Securities was impaired, as the electronic mail transmission indicates only that Thornburg Mortgage may not be able to hold assets until maturity if some assets were sold, and did not indicate that Thornburg Mortgage's impairment would be OTTI if Thornburg Mortgage decided to sell a portion of its assets instead.  Goldstone & Simmons MTD at 51 (quoting Complaint ¶ 12, at 4; id. ¶¶ 54-56, at 15; id. ¶ 70, at 20-21; id. ¶ 85, at 25).  Goldstone and Simmons also assert that the GAAP does not support the SEC's allegations in the Complaint, because SFAS 115 does not state that a company's sale of some securities calls into question the company's intent and ability to hold all of its securities for purposes of an OTTI analysis.  See Goldstone & Simmons MTD AT 51-52 (citing Complaint ¶ 12, at 4; id. ¶¶ 54-56, at 15; id. ¶ 70, at 20-21; id. ¶ 85, at 25).  Goldstone and Simmons also assert that SFAS 115 indicates only that an OTTI should be recognized when a company intends to sell a specifically identified security before its value has recovered and that the OTTI analysis only extends to that individual security. See Goldstone & Simmons MTD at 52 (citing FASB Staff Position FAS 115-1 and FAS 124-1, filed May 21, 2012 (Doc. 37-35)("FAS 115-1 & 124-1"); Thornburg Mortgage, Inc. 2007 Form 10-K/A, filed May 21, 2012 (Doc. 37-13)("2007 Form 10-K/A").  Goldstone and Simmons argue, therefore, that GAAP does not support the SEC's contention that Thornburg Mortgage

should have taken an impairment, because it might need to sell some portion of its portfolio. Goldstone & Simmons MTD at 52 (citing Complaint ¶ 70, at 20-21; id. ¶ 85, at 25).

Goldstone and Simmons also argue that, even if their judgment was wrong, "'allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claims.'"  Goldstone & Simmons MTD at 52 (quoting City of Phila. v. Fleming Cos., Inc., 264 F. 3d at 1261)(citing In re Int'l Rectifier Corp. Sec. Litig., No. CV07-02544-JFWVBKX, 2008 WL 4555794, at *13 (C.D. Cal., May 23, 2008); Funke v. Life Fin. Corp., 237 F. Supp. 2d 458, 469 (S.D.N.Y. 2002)).  Goldstone and Simmons assert that, absent "facts suggesting that Defendants disbelieved their own OTTI judgment -- which the Complaint does not allege -- the Court has no plausible basis to infer that Defendants made that judgment in bad faith."  Goldstone & Simmons MTD at 53.

Rather than sufficiently alleging a fraudulent scienter, Goldstone and Simmons assert that the Complaint and documents upon which it relies "show that Thornburg was succeeding in cash and capital-raising efforts that would help it avoid selling ARM securities," and that the allegation that the Defendants intended to deceive investors in the OTTI analysis is "flatly implausible."  Goldstone & Simmons MTD at 53-54 (citing Feb. 22 BOD Email; Feb. 25 BOD Email; Feb. 27 Goldstone/Simmons Email).

Goldstone and Simmons also assert that the SEC has read too much into the electronic mail transmissions which they exchanged when the SEC "speculates that Mr. Simmons implicitly acknowledged misleading the investing public."  Goldstone & Simmons MTD at 55 (quoting Complaint ¶ 10, at 4).  Goldstone and Simmons assert that Simmons' statements in an electronic mail transmission to Goldstone on February 28, 2008, regarding the market's reaction to the 2007 Form 10-K, are "inscrutabl[e]," noting that Simmons did not complete his second

sentence.  Goldstone & Simmons MTD at 28, 55 (citing Feb. 28 Simmons/Goldstone Email at 2).  Goldstone and Simmons assert that the SEC's "nefarious interpretation of Mr. Simmons' statement is far less plausible than alternative, innocent explanations."  Goldstone & Simmons MTD at 55.  Goldstone and Simmons contend that Simmons was referring to Thornburg Mortgage's "still-undisclosed plans to raise cash and capital rather than to a fraudulent scheme mentioned nowhere else in the documents," when Simmons mentioned that "if they only knew." Goldstone & Simmons MTD at 55-56.  Goldstone and Simmons assert that this "obvious alternative explanation" renders the SEC's allegations implausible.  Goldstone & Simmons MTD at 56 (citing Ashcroft v. Iqbal, 556 U.S. 662, 682 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)).

Goldstone and Simmons assert that various electronic mail transmissions cited in the Complaint reveal that the market's negative reaction to the 2007 Form 10-K was a surprise to them.  See Goldstone & Simmons MTD at 55.  Goldstone points out that he took efforts to "try to 'calm the panic'" after Thornburg Mortgage's stock price fell eighteen-percent on February 28, 2009.  Goldstone & Simmons MTD at 28 (quoting Feb. 28 IR Email at 2)(citing Complaint ¶ 94, at 27).

Goldstone and Simmons also assert that trying to save Thornburg Mortgage does not demonstrate fraudulent scienter.  Goldstone and Simmons assert that the "desire to save one's company is a standard motive possessed by all corporate executives," and that a desire to save Thornburg Mortgage could only be evidence of fraudulent scienter if the SEC had also alleged that Goldstone and Simmons would personally benefit from Thornburg Mortgage's salvation. Goldstone & Simmons MTD at 56 (citing Brecher v. Citigroup., Inc., 797 F. Supp. 2d 354, 370 (S.D.N.Y. 2011)).  Goldstone and Simmons assert that the SEC has, rather, alleged "only the

type of generic desire that could be attributed to any responsible corporate executive --
'alleviat[ing] [Thornburg's] liquidity crisis.'"   Goldstone & Simmons MTD at 56 (quoting
Complaint ¶ 4, at 2).  Goldstone and Simmons point out that the SEC has not alleged that they
would have benefited through stock sales or "other forms of personal enrichment that courts have
found to be indicative of scienter."   Goldstone & Simmons MTD at 56-57 (citing In re Bear
Stearns, Co., Inc. Sec., Deriv., and ERISA Litig., 763 F. Supp. 2d 423, 499 (S.D.N.Y. 2011)).

       Third, Goldstone and Simmons also assert that the SEC has not sufficiently alleged that
Goldstone made misstatements knowingly or recklessly to Street Signs after the 2007 Form 10-K
was filed.  See Goldstone & Simmons MTD at 57.  Goldstone and Simmons assert that the SEC
is wrong to characterize Goldstone's comments as misstatements, because Goldstone, in addition
to recognizing that Thornburg Mortgage had only forty million dollars available in cash on
February 28, 2008, also expressed in an electronic mail transmission to the Board of Directors
that Thornburg Mortgage "expected to generate $25 million from stock sales within two days,
another $60 million from a securitization by March 3rd, and $25-$50 million from a preferred
stock sale by" the following Monday, which totals "'$150 to $175 million of liquidity while
[Thornburg] work[ed] on a capital raise' (of between $300 to $500 million)."   Goldstone &
Simmons MTD at 57-58 (quoting Feb. 28 BOD Email).  Goldstone and Simmons assert that the
SEC left out Goldstone's plans for raising cash when it alleged that Goldstone's statements on
Street Signs were false, because Thornburg Mortgage had only forty million dollars in cash at the
time.  Goldstone & Simmons MTD at 58.  Goldstone and Simmons assert that the "additional
sources of liquidity provide precisely the type of 'obvious alternative explanation,' consistent
with a non-culpable state of mind, that establishes this claim's insufficiency under the basic

plausibility standards of <u>Twombly</u>, . . . and <u>Iqbal</u>."  Goldstone & Simmons MTD at 58 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 567; <u>Ashcroft v. Iqbal</u>, 556 U.S. at 682).

Goldstone and Simmons also assert that Goldstone's statements should be "evaluated in light of the qualifying statements he made in the CNBC interview," under the "'bespeaks caution' doctrine" -- the rule that, the more a speaker qualifies a statement, the less people will be misled if the statement turns out to be false.  Goldstone & Simmons MTD at 58 (quoting <u>Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust, 2006-3</u>, 825 F. Supp. 2d 1082, 1127 (D.N.M. 2011)(Browning, J.)).  Goldstone and Simmons point out that Goldstone warned on <u>Street Signs</u> that "'this mortgage market continues to be a slippery slope,'" and "'we're just not seeing the bottom of the environment . . . the market continues to trend lower,'" which Goldstone and Simmons assert any reasonable investor would understand as a qualification on Goldstone's statements regarding Thornburg Mortgage's liquidity.  Goldstone & Simmons MTD at 28, 58 (quoting <u>Street Signs</u> at 00:40-52).

Regarding the SEC's allegation that Goldstone's direction to Thornburg Mortgage's investor relations department was a knowing or reckless misstatement, Goldstone and Simmons assert that the SEC has failed to allege that Thornburg Mortgage had received, or Goldstone was informed of, "any additional margin calls before he sent his 'calm the panic' email instructions to the investor relations department," and the SEC's allegation is therefore baseless.  Goldstone & Simmons MTD at 59 (quoting Complaint ¶¶ 94-97, at 27-28).  Goldstone and Simmons contend that the SEC's allegation is an improper attempt to demonstrate "fraud by hindsight."  Goldstone & Simmons MTD at 59.  Goldstone and Simmons further assert that Thornburg Mortgage's history with its lenders gave Goldstone no reason to believe that Thornburg Mortgage's current liquidity and expected incoming cash would be insufficient to satisfy Thornburg Mortgage's

margin call obligations.  See Goldstone & Simmons MTD at 59.  Goldstone and Simmons argue, therefore, that, even if Goldstone was aware of additional margin calls early in the day on February 28, 2008, "he had no reason to conclude that Thornburg could not weather the storm by negotiating payment plans with its lenders -- as it had successfully done before."  Goldstone & Simmons MTD at 59-60.

Turning to the SEC's allegations based upon misrepresentations and omission to KPMG, Goldstone and Simmons similarly assert that the SEC has failed to state a plausible claim for relief under rule 13b2-2.  Goldstone and Simmons contend that the SEC has engaged in "impermissible 'shotgun pleading' that incorporates 'all or nearly all antecedent allegation[s] by reference [to] each subsequent claim for relief or affirmative defenses.'"  Goldstone & Simmons MTD at 60 (alterations in original)(quoting SEC v. Fraser, No. CV-09-00443-PHX-GMS, 2010 WL 5776401, at *9 (D. Ariz., Jan. 28, 2010)(internal quotations omitted)).  Goldstone and Simmons assert that the SEC's reliance on shotgun pleading is, without more, a "sufficient basis to dismiss this claim under Rule 9(b)."  Goldstone & Simmons MTD at 60 (citing SEC v. Fraser, 2010 WL 5776401, at *9); SEC v. Patel, No. 07-cv-39-SM, 2009 WL 2015794, at **1-2 (D.N.H. July 7, 2009)).  Goldstone and Simmons assert that the SEC's scattered allegations of their misrepresentations and omissions to KPMG "do not come close to meeting the minimum pleading requirements of Rule 8 and Rule 9(b)."  Goldstone & Simmons MTD at 60.

Goldstone and Simmons first point out that the SEC brings many of the same allegations against them for deceiving KPMG as it did for securities fraud: (i) "fraudulent omissions concerning Thornburg's purported violation of lending agreements"; (ii) "the Citi reservation of rights letter"; (iii) "the I/O Strip Transactions"; (iv) "not selling assets to meet margin calls"; and (v) "Thornburg's alleged precarious financial condition." Goldstone & Simmons MTD at 60-61.

Goldstone and Simmons assert that these allegations suffer from the same pleading deficiencies as the SEC's securities fraud claims, and the Court should dismiss the claims on that basis.  See Goldstone & Simmons MTD at 61.

Goldstone and Simmons also assert that the SEC has not alleged that KPMG was unaware of Thornburg Mortgage's financial difficulties which Goldstone and Simmons alleged omitted in their communications with KPMG.  Goldstone and Simmons assert that the 2007 Form 10-K "disclosed  Thornburg's difficulties in obtaining financing, the fact that Thornburg had received $300 million in margin calls since February 14th, the $427.8 million in gross unrealized losses that Thornburg considered temporary, and the declining prices in the MBS market that could lead to more margin calls."  Goldstone & Simmons MTD at 23-25, 61. Goldstone and Simmons assert that the SEC cannot allege that KPMG was unaware of these facts, and Goldstone and Simmons point out that the SEC acknowledges that "an unnamed partner at the audit firm discussed the I/O Strip Transactions with Mr. Simmons."  Goldstone & Simmons MTD  at 61 (citing Complaint ¶ 65, at 19).

Goldstone and Simmons also assert that Court should dismiss the SEC's claims under rule 13b2-2, because the SEC has not established that the information withheld from KPMG was material.  See Goldstone & Simmons MTD at 61-62 (citing SEC v. Kovzan, 804 F. Supp. 2d 1024, 1043-44 (D. Kan. 2011); SEC v. Coffman, No. 06-CV-00088 REBBNB, 2007 WL 2412808, at **13-14 (D. Colo. Aug. 21, 2007)).  Goldstone and Simmons assert that the SEC's allegation that KPMG would have reached a different conclusion if it had more details about Thornburg Mortgage's margin call situation before the 2007 Form 10-K is conclusory and unsupported, and, thus, "not entitled to Rule 12(b)(6)'s assumption of truth."  Goldstone & Simmons MTD at 62 (citing Complaint ¶ 83).  Goldstone and Simmons also assert that, because

the SEC contends that the withheld information only would have caused KPMGs to "question," and not disagree with, Thornburg Mortgage's OTTI conclusion, the SEC has not sufficiently alleged that any information omitted was material.  Goldstone & Simmons MTD at 62 (quoting Complaint ¶ 4, at 2)(citing Complaint ¶ 83, at 24).

Regarding Goldstone and Simmons' failure to include the rumored upcoming collapse of a large European hedge fund, Goldstone and Simmons assert that they had no duty to disclose this "rumor," and that Simmons had no obligation to update his opinion of the MBS in light of the rumor.  Goldstone & Simmons MTD at 62 (citing Complaint ¶ 38. at 12; id. ¶¶ 77-78, at 22-23).  Goldstone and Simmons point out that the electronic mail transmission which they received on February 27, 2008 indicated that a Thornburg Mortgage employee, Patrick Feldman, had spoken with a contact who indicated that a large European repo client would collapse, but the contact would not give details beyond stating that the client owned "'billions that presumably would have to get sold.'"  Goldstone & Simmons MTD at 22 (quoting Feb. 27 Simmons/Feldman Email at 2)(citing Complaint ¶¶ 38-40, at 12).  Goldstone and Simmons assert that the federal securities laws impose no "duty to disclose rumors."  See Goldstone & Simmons MTD at 63 (citing In re Synchronoss Sec. Litig., 705 F. Supp. 2d 367, 421 (D.N.J. 2010)).  Goldstone and Simmons assert that, to the contrary, had they disclosed the alleged rumor "'before completing the steps necessary to determine just what had happened,' they 'might more plausibly have been accused of deceiving' the auditor."  Goldstone & Simmons MTD at 53 (quoting Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 760-61 (7th Cir. 2007)).

Goldstone and Simmons also assert that the SEC has not alleged that, because Simmons' opinion regarding the state of the MBS market and MBS price deterioration changed because of the European hedge fund rumor, and, therefore, the SEC has not established that Simmons had a

duty to update his opinion on the MBS market.  See Goldstone & Simmons MTD at 63.

Goldstone and Simmons contend that the SEC has not alleged "facts demonstrating that the

European hedge fund rumor was trustworthy, much less material," and therefore their failure to

disclose the rumor did not render their previous statements false.  Goldstone & Simmons MTD at

63-64 (citing SEC v. Todd, No. 03CV2230 BEN (WMc), 2007 WL 1574756, at *15 (S.D. Cal.

May 30, 2007); SEC Autocorp Equities, Int'l, Inc., No. 2:98-CV-00562 PGC, 2004 WL

1771608, at *6 (D. Utah Aug. 4, 2004)).  Goldstone and Simmons point out that, later on

February 27, 2008, Goldstone sent Simmons an electronic mail transmission regarding final

changes to the 2007 10-K, and stated that UBS AG had mentioned that a "'large Alt-A hedge

fund in Europe' was 'blowing up,'" but Goldstone also expressed his belief that Thornburg

Mortgage would feel the repercussions of the hedge fund's collapse "'more gradually.'"

Goldstone & Simmons MTD at 22 (quoting Feb. 27 Goldstone/Simmons Email at 2)(citing

Complaint ¶ 38, at 12).

Goldstone and Simmons also assert that the SEC mischaracterizes the record in its

allegation that auditors "specifically request[ed] . . . all correspondence between Thornburg and

its lenders during the two week period" before the 2007 Form 10-K was filed.  Goldstone &

Simmons MTD at 64 (quoting Complaint ¶ 99, at 29).  Goldstone and Simmons contend that the

March 3 electronic mail transmission to which the SEC refers makes no such request, but rather

asked Thornburg Mortgage for a position paper which presented evidence that "'events

subsequent to the filing were unforeseeable catastrophic events.'"  Goldstone & Simmons MTD

at 64 (quoting Request for Correspondence at 2-3).  Goldstone and Simmons assert that KPMG

mentioned correspondence as an example of evidence that Thornburg Mortgage could include in

a position paper, but did not specifically request Thornburg Mortgage to produce all

correspondence and letters.   See Goldstone & Simmons MTD at 64 (citing Request for Correspondence at 3).   Goldstone and Simmons assert that the Citigroup Global Letter "was immaterial because it had no impact on Thornburg's financial statements," and is thus insufficient to support a claim under rule 13b2-2.   Goldstone & Simmons MTD at 65.

Last, regarding the SEC's claims under rule 13b2-2, Goldstone and Simmons argue the SEC has not alleged that Simmons' "attribution of the February 28th margin calls to 'unforeseeable' circumstances" was misleading or false.   Goldstone & Simmons MTD at 65 (quoting Complaint  ¶¶ 102-105, at 29-30).   Goldstone and Simmons note that Goldstone stated that Thornburg Mortgage would experience similar problems as those plaguing the European hedge fund, but "'a little more gradually,'" and that Thornburg Mortgage "'should be ready for it.'"   Goldstone & Simmons MTD at 65 (quoting Feb. 27 Goldstone/Simmons Email). Goldstone and Simmons, thus, assert that they did not believe that the European hedge fund collapse "would have immediate, serious consequences for Thornburg," and that their correspondence evidences that Thornburg Mortgage's February 28th margin calls were unforeseeable to Goldstone and Simmons.   Goldstone & Simmons MTD at 65.   Goldstone and Simmons also note that the Position Paper contained evidence which demonstrated that mortgage markets experienced "sudden, stastically unlikely and steep" declines on February 27, 2008. Goldstone & Simmons MTD at 31 (citing Position Paper).

Goldstone and Simmons contend that, because the SEC has failed to sufficiently allege that a primary violation of securities laws, the SEC's claims for aiding and abetting and control-person liability must fail.   See Goldstone & Simmons MTD at 65-66 (citing SEC v. Lucent Techs., Inc., 363 F. Supp. 2d 708, 718 (D.N.J. 2005)(Walls, S.J.); In re Thornburg Mortg. Sec. Litig., 695 F. Supp. 2d at 1189).   Goldstone and Simmons also assert that the SEC has failed to

plausibly allege that they "knowingly provided substantial assistance" to the commission of any primary violation.  Goldstone & Simmons MTD at 66 (quoting 15 U.S.C. § 78t(e)).  Goldstone and Simmons argue that they must have had actual knowledge for the SEC to succeed on their claim for aiding and abetting, and argue that the SEC has failed to allege that they had actual knowledge of any primary violation.  See Goldstone & Simmons MTD at 66-67 (citing 15 U.S.C. § 78u-4(f)(10)(A); SEC v. Lucent Techs. Inc., 610 F. Supp. 2d 342, 369 (D.N.J. 2009)).

### 4.  Starrett's Motion to Dismiss.

Starrett asserts that the SEC's claims that she "made false statements in TMI's 2007 Form 10-K . . . and deceived TMI's outside auditor KPMG LLP . . . are absolutely false."  Starrett MTD at 10.  Starrett contends that the SEC has failed to show that she made "any false statement, either in the 10-K or to KPMG."  Starrett MTD at 11 (emphasis in original).  Starrett also asserts that the SEC has failed to allege facts which support her having the requisite scienter.  See Starrett MTD at 13.  Starrett argues that, because the SEC's allegations of reporting violations, record-keeping violations, and deceit of auditors are derivative of its fraud-based claims, these claims fail to sufficiently allege that Starrett committed fraud.  See Starrett MTD at 13.  Starrett asserts that the SEC's allegations for internal controls violations are insufficiently pled, because the SEC did not "specify which internal controls Ms. Starrett allegedly circumvented, how she supposedly did so, or how better controls would have prevented the alleged problems with TMI's financial reporting."  Starrett MTD at 14.

Starrett asserts that the SEC has failed to meet the heightened pleading standard of rule 9(b) of the Federal Rules of Civil Procedure which applies to its claims under § 17(a) of the Securities Act, and § 10(b) of the Exchange Act.  See Starrett MTD at 14.  Starrett also asserts that, because the SEC "does not differentiate its factual allegations among different claims, but

instead alleges a single, unified course of conduct that it 'incorporate[s] by reference' into each of its eleven claims for relief," the SEC's claims which are not alleging fraud -- § 13 and rules 13b2-1 and 13b2-2 of the Exchange Act -- are subject to the rule 9(b)'s heightened pleading standard.  Starrett MTD at 15 (quoting Complaint ¶¶ 120, 126, 129, 136)(citing In re Daou Sys., Inc., 411 F.3d 1006, 1027 (9th Cir. 2005)).

Starrett first asserts that the SEC has failed to allege particular facts which show that the statements she made in the 2007 Form 10-K were false when made.  See Starrett MTD at 16. Starrett contends that, contrary to the SEC's allegation, the statement that Thornburg Mortgage "'successfully continued[d] to meet margin calls'" was true when made.  Starrett MTD at 16 (quoting Complaint ¶ 5, at 3).  Starrett points out that the SEC concedes that Thornburg Mortgage had "'execute[ed] [sic] its plan to pay all outstanding margin calls before filing its Form 10-K,'" including the Citi margin call, and thus Thornburg Mortgage's statement that it had successfully met all margin calls was true at the time.  Starrett MTD at 16-17 (quoting Complaint ¶ 6, at 3; id. ¶¶ 35, 38 at 11-12).

Starrett also asserts that Thornburg Mortgage's statement that it "'did not sell any assets to meet margin calls'" was true when made, even without the additional disclosure that I/O Strip Transactions were taken to meet those margin calls.  Starrett MTD at 17 (quoting Complaint ¶ 65, at 19).  Starrett points out that the SEC acknowledges that the 2007 Form 10-K accounted for the I/O Strip Transactions as issuances of secured debt.  Starrett also points out that the SEC has not alleged that KPMG was unaware of the I/O Strip Transactions, or that KPMG disagreed with Thornburg Mortgage's accounting for them.  See Starrett MTD at 17 (citing Complaint ¶ 37, at 11; In re Bausch & Lomb, Inc., Sec. Litig., 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008)).  Starrett also asserts that the I/O Strip Transactions were a "gain to TMI," and thus irrelevant when

classifying Thornburg Mortgage's unrealized losses.  Starrett MTD at 17 (emphasis in original).

Starrett thus asserts that the 2007 Form 10-K's statement that "'no [asset] sales had been

required'" meant that Thornburg Mortgage "did not need to sell its impaired ARM Securities at a

loss to meet margin calls."  Starrett MTD at 17 (quoting 2007 Form 10-K at 34-35).  Starrett also

contends that the SEC's assertion that the I/O Strips were components of Thornburg Mortgage's

"'Securitized ARM Loans,'" contradicts the SEC's allegation that the I/O Strips were an

investment subject to evaluation for OTTI under GAAP, or classification under SFAS 115.

Starrett MTD at 17 (quoting Complaint ¶ 36, at 11; id. ¶ 71, at 21)(citing Complaint ¶ 3, at 2; id.

¶ 21, at 7).  Starrett asserts that Securitized ARM Loans are not evaluated for impairment, and

thus Thornburg Mortgage's statement that it was not required to sell any assets to meet margin

calls was true when made.  See Starrett MTD at 18.

Starrett also asserts that Thornburg Mortgage's statement that it had the intent and ability

to hold its ARM Securities until recovery was true when made.   Starrett contends that the SEC is

seeking to hold her liable for a misrepresentation based upon the "unprecedented deluge of

margin calls immediately after the 10-K filing," which is "quintessential fraud-by-hindsight."

Starrett MTD at 19 (emphasis in original)(internal quotations omitted).  Starrett asserts that there

are no bright lines for assessing whether a company has both the intent and ability to hold

impaired assets until recovery, but rather that companies are required to use discretion in judging

market conditions when determining whether they have the intent and ability to hold impaired

assets.   Starrett contends that Thornburg Mortgage was making discretionary judgments

regarding its impairments at a time of "extraordinary global market turmoil and uncertainty,"

which "cuts against the conclusion" that Thornburg Mortgage's statements regarding the future

of its impairments was false when made.  Starrett MTD at 19 (citing Fait v. Regions Fin. Corp., 712 F. Supp. 2d 117, 123 (S.D.N.Y. 2010), aff'd 655 F.3d 105 (2d Cir. 2011)).

Starrett also asserts that the SEC's contention that Thornburg Mortgage's statement of its ability to hold its assets was false overlooks the fact that Thornburg Mortgage "satisfied all outstanding margin calls prior to filing its 10-K."  Starrett MTD at 20 (citing Complaint ¶ 6, at 3).  Starrett points out that Thornburg Mortgage was not notified in advance of filing the 2007 Form 10-K that its lenders would issue a wave of margin calls, a "disaster scenario," which cannot be anticipated.  Starrett MTD at 20 (citing SFAS 115 ¶ 16, at 4).  Starrett also points out that the SEC alleges that Thornburg Mortgage expected a "significant infusion of cash within days of the 10-K filing," and thus Thornburg Mortgage's judgment that it had the ability to hold its impaired assets was reasonable.  Starrett MTD at 21 (citing Complaint ¶ 32, at 10).  Starrett also notes that KPMG agreed with Thornburg Mortgage's assessment of its intent and ability to hold its assets.  See Starrett MTD at 21 (citing 2007 Form 10-K at 81).

Starrett asserts that Thornburg Mortgage's statements could not have been materially false in light of the other disclosures in the 2007 Form 10-K under the "'bespeaks caution doctrine.'"  Starrett MTD at 21-22 (quoting Grossman v. Novell, Inc., 120 F.3d at 1120-2)(citing 2007 Form 10-K at 25, 39, 53).  Starrett asserts that, because Thornburg Mortgage disclosed its "reduced liquidity, the risk of additional margin calls if prices of mortgage-backed securities declined further, and the risk that it might not be able to satisfy additional margin calls without having to sell assets," Thornburg Mortgage disclosed any potentially misleading effect of its statements in the 2007 Form 10-K through these "candid disclosures."  Starrett MTD at 21-22.  Starrett also argues that Thornburg Mortgage's disclosure of its unrealized losses associated with its ARM Securities allowed investors to "assess independently the full impact of a potential

writedown on the Company's income statement," making Thornburg Mortgage's statements regarding its intent and ability to pay not materially misleading.  Starrett MTD at 22 (citing Kuriakose v. Fed. Home Loan Mortg. Corp., No. CIV 08-7281 (JFK), 2011 WL 1158028, at **12-13 (S.D.N.Y. Mar. 30, 2011)(Keenan, J.); In re MRU Holdings Sec. Litig., 769 F. Supp. 2d 500, 509 (S.D.N.Y. 2011)).

Starrett also asserts that the SEC fails to allege particular facts which support its assertion that Starrett made false statements to, or hid information from, KPMG.  See Starrett MTD at 23.  Starrett first contends that the SEC concedes that she was unaware of the Citigroup Global Letter, which Starrett asserts was "only a formality and, as such, is neither material nor subject to a duty of disclosure."  Starrett MTD at 23-24 (citing Complaint ¶ 34, at 10-11; id. ¶ 101, at 29).  Starrett also asserts that the SEC concedes that she was unaware of the European hedge fund rumor, and she contends that there is no obligation to disclose mere rumors about possible market events.  See Starrett MTD at 24 (citing Complaint ¶ 6, at 3; id. ¶¶ 38, 39, at 12; id. ¶¶ 76, 78, 80, at 22-23; id. ¶ 104, at 30).

Starrett also contends that the SEC fails to allege that she had the familiarity with the reverse repurchase agreements, or expertise, such that she would question whether Thornburg Mortgage's payment plan with Citigroup Global violated its reverse repurchase agreement.  Starrett also points out that the Court has rejected the argument that, "because a particular 'default provision in the RPAs was eventually triggered, the provision was material and thus should have been disclosed,'" and that the Court has concluded that the "'failure to disclose a contract provision, without alleging that the provision is unique, cannot constitute a material omission.'"  Starrett MTD at 25 (quoting In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d at 1222-23).  Starrett contends that the SEC alleges only that she was generally aware of the

reverse repurchase agreements and that she was informed that the lenders had agreed to the plans, but not that any information would have put her on notice of Thornburg Mortgage's potential violation of a reverse repurchase agreement.  See Starrett MTD at 25.

Starrett also asserts that the SEC fails to show that she withheld material information from KPMG regarding Thornburg Mortgage's "'margin call situation.'"  Starrett MTD at 26 (quoting Complaint ¶ 32, at 10; id. ¶ 57, at 16-17).  Starrett asserts that the 10-K disclosures which KPMG reviewed in connection with the audit disclosed the "amount of margin calls during the last two weeks of February 2008," and the SEC has not alleged that Thornburg Mortgage's disclosures were inaccurate or misleading.  Starrett MTD at 26 (emphasis in original).  Starrett contends that Thornburg Mortgage had no duty to disclose that it satisfied some of its margin calls pursuant to negotiated payment plans.  See Starrett MTD at 27.

Starrett also asserts that the SEC "cherry-picked an incomplete set of emails allegedly evidencing a scheme to withhold information from KPMG."  Starrett MTD at 26.   Regarding Starrett's statement that Thornburg Mortgage had "'purposely not told [KPMG] about the margin calls so that we don't escalate an issue which we believe will be put to rest by the time they have to issue their opinion,'" Starrett's concern regarding the timing of Thornburg Mortgage's disclosure to KPMG and, the electronic mail transmission as a whole, shows that Starrett intended to disclose the margin calls if Thornburg Mortgage was not able to meet all of its margin calls.  Starrett MTD at 27-28 (alterations added in original)(quoting Complaint ¶ 53, at 16; Feb. 25 Starrett/Goldstone Email).[19]  Starrett asserts that this electronic mail transmission is "consistent with the practical understanding that when a company receives new information, it is

---

[19] The Feb. 25 Goldstone/Starrett Email that Starrett filed with her motion to dismiss is identical, save for an added emphasis, to the Feb. 25 Goldstone Starrett Email that Goldstone and Simmons filed with their motion to dismiss.  Compare Doc. 37-22 with Doc. 38-5.

often prudent to process that information internally and decide upon an appropriate course of action before transmitting it to others."  Starrett MTD at 28 (citing Higginbotham v. Baxter Int'l, Inc., 495 F.3d at 760-61; In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d at 1207, 1212).

Starrett also asserts that she did not make any of the alleged misstatements or omission in the 2007 Form 10-K.  Starrett asserts that "only the 'person or entity with ultimate authority over the [false] statement, including its content and whether and how to communicate it' can be held liable for misstatements under Rule 10b-5 and Section 10(b)."  Starrett MTD at 29 (quoting Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2302 (2011)).  Starrett contends that she cannot be liable for any misstatements or omission in the 2007 Form 10-K, because she only prepared the statement on behalf of Thornburg Mortgage, and did not have the ultimate authority over the contents of the 2007 Form 10-K, or "whether and how to communicate that content."  Starrett MTD at 29.  Starrett contends that, because the SEC excluded her from its control-person claims, the SEC has admitted that Starrett "'did not exercise control over . . . the specific activities upon which Thornburg's violations are based.'"  Starrett MTD at 29 (citing Complaint ¶ 134, at 37; id. ¶ 142, at 39; SEC v. Kelly, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011)(McMahon, J.); Haw. Ironworkers Annuity Trust Fund v. Cole, No. 3:10CV371, 2011 U.S. Dist. LEXIS 98760, at **15-16 (W.D. Ohio, Sep. 1, 2011)).  Starrett asserts that the failure to allege that she had ultimate authority over the contents of the 2007 From 10-K warrants the Court's dismissal of the SEC's claims against her regarding the 2007 Form 10-K.  See Starrett MTD at 29.

Starrett additionally contends that the SEC's failure to allege that she filed or signed, or that her name appears anywhere on, the 2007 Form 10-K also warrants dismissal of the SEC's

allegations arising from the 2007 Form 10-K against her.  Starrett asserts that the SEC has not alleged that Starrett filed or signed, or that her name appears on, the 2007 From 10-K, and the SEC has not alleged that Starrett was a key person "whose services were instrumental" to Thornburg Mortgage's operations.  Starrett MTD at 30 (citing Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. at 2302; Kerr v. Exobox Techs. Corp., No. H-10-4221, 2012 U.S. Dist. LEXIS 7523, at **30-33 (S.D. Tex. Jan. 23, 2012); City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011); 2007 Form 10-K at 1, 24, 74). Starrett also asserts that the SEC has inconsistently pled that she was both a primary violator, and aided and abetted securities violations, an improper tactic which does not follow the Supreme Court of the United States' direction to "'draw a clean line' between primary violators who have ultimate authority over a statement, and aiders and abettors who are subject only to secondary liability."  Starrett MTD at 31 (quoting Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. at 2302 n.6).

Starrett contends that the SEC has failed to allege particularized facts which would support an inference that she acted with fraudulent scienter in preparing the 2007 Form 10-K. Starrett asserts that the SEC must plausibly allege that Starrett had a mental state "'embracing intent to deceive, manipulate, or defraud'" including "'knowing or intentional misconduct' and recklessness," to be liable under § 10(b).  Starrett MTD at 31 (quoting City of Phila. v. Fleming Cos., Inc., 264 F. 3d 1245, 1258 (10th Cir. 2001)).  Starrett asserts that the United States Court of Appeals for the Tenth Circuit is "'cautious about imposing liability for securities fraud based on reckless conduct,'" which is conduct that is "'an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  Starrett MTD at 31

(quoting City of Phila. v. Fleming Cos., Inc., 24 F.3d at 1260).  Starrett contends that she may have fraudulent scienter based upon a non-disclosure only if she had "'knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors.'"  Starrett MTD at 32 (quoting City of Phila. v. Fleming Cos., Inc., 24 F.3d at 1261).

Starrett contends that the SEC has not established that she had the requisite scienter through its allegations that "Starrett either knew (or was reckless in not predicting) the unprecedented margin call crisis that unfolded after the 10-K filing."  Starrett MTD at 32 (emphasis in original)(citing Complaint ¶¶ 9, 12, 14, at 4-5).  Starrett asserts that the Tenth Circuit has rejected this basis of liability, finding that "'there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation.'"  Starrett MTD at 32 (quoting City of Phila. v. Fleming Cos., Inc., 264 F.3d at 1260).  Starrett asserts that, when the 2007 Form 10-K was filed, she knew that: (i) "all outstanding margin calls had been met in full," Starrett MTD at 33 (citing Complaint ¶ 6, at 3; id. ¶ 35, at 11); (ii) Thornburg Mortgage "had a 'cushion' of available cash to meet additional margin calls in the short term," Starrett MTD at 33 (quoting Electronic Mail Transmission from Clay Simmons to Nyira Gitana, re: FW:TMA update (February 21, 2008, 9:30 a.m.), filed May 21, 2012 (Doc. 38-3)("Feb. 21 BOD Email")[20](citing Complaint ¶¶ 61, 66, at 18, 19); and (iii) Thornburg Mortgage had "plans both to soon raise $300 to $500 million or more in new capital through a public offering and to complete a $1 billion securitization," Starrett MTD at 33 (citing

---

[20] The Feb. 21 BOD Email that Starrett filed with her motion to dismiss is identical, save for added emphasis, to the Feb. 21 BOD Email that Goldstone and Simmons submitted with their motion to dismiss.  Compare Doc. 37-10 with Doc. 38-3.

Complaint ¶ 32, at 10; Electronic Mail Transmission from Larry Goldstone to Garrett Thornburg, et al. (February 22, 2008, 8:42 a.m.), filed May 21, 2012 (Doc. 38-4)("Feb. 22 BOD Email")[21]). Starrett contends that she had no way of knowing that a wave of margin calls would follow the filing of the 2007 Form 10-K, or that Thornburg Mortgage would be unable to satisfy those margin calls, as, she asserts, the margin calls was "an event unlike anything TMI had previously experienced."  Starrett MTD at 33 (citing Complaint ¶ 32, at 10; id. ¶ 42, at 13; id. ¶ 102, at 29). Starrett contends that she cannot be held liable for her failure to predict the future or market forces beyond her control.  See Starrett MTD at 33 (citing City of Omaha v. CBS Corp.; In re Radian Sec. Litig., 612 F. Supp. 2d at 619 n.25; Meyer v. St. Joe Co., No. 5:11-cv-27/RS-EMT, 2011 U.S. Dist. LEXIS 94576, at ** 26-27 (N.D. Fla. Aug. 24, 2011)).

Starrett also contends that the negative disclosures in the 2007 Form 10-K negate any plausible inference of scienter.  Starrett asserts that Thornburg Mortgage's negative disclosures in the 2007 Form 10-K undermine any inference that the Defendants "intentionally or recklessly misled the investing public or KPMG."  Starrett MTD at 34 (citing Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund. v. Conseco, Inc., No. 09 Civ. 6966 (JGFK), 2011 WL 1198712, at **6-8 (S.D.N.Y. Mar. 30, 2011); In re Homebanc Corp. Sec. Litig., 706 F. Supp. 2d 1336, 1357-58 (N.D. Ga. 2010)).  Starrett points out that the market's negative response to the 2007 Form 10-K demonstrates that it understood the impact of Thornburg Mortgage's negative disclosures: (i) Thornburg Mortgage's "precarious financial condition"; (ii) the "margin call activity"; (iii) Thornburg Mortgage's "dwindling liquidity"; and (iv) the "significant risks TMI

---

[21]  The Feb. 22 BOD Email that Starrett filed with her motion to dismiss is identical, save for added emphasis, to the Feb. 22 BOD Email that Goldstone and Simmons filed with their motion to dismiss.  Compare Doc. 37-8 with Doc. 38-4.

faced due to turmoil in the market for mortgage-based securities."  Starrett MTD at 33 (citing 2007 Form 10-K at 34-35, 48-49; Complaint ¶¶ 9, 32, at 4, 10).

Starrett points out that the 2007 Form 10-K discloses that Thornburg Mortgage had received margin calls "in excess of $300 million" and had met those calls at the time the 2007 Form 10-K was filed.  Starrett MTD at 34 (quoting 2007 Form 10-K at 38-39).  Starrett asserts that, because of the negative nature of this disclosure, the omission of any disclosures related to the terms of Thornburg Mortgage's reverse repurchase agreement or the use of proceeds from I/O Strip Transactions to meet margin calls was immaterial.  See Starrett MTD at 34-35 (citing Complaint ¶ 31, at 10; id. ¶¶ 65, 66, at 19).  Starrett also contends that the 2007 Form 10-K fully disclosed Thornburg Mortgage's liquidity constraints when it stated that "'our liquidity position was severely impacted by the mortgage market events during the third quarter and fourth quarter of 2007,'" and that the "'sudden decline in the valuation of [Thornburg's Alt-A mortgage securities] has left us with reduced readily available liquidity to meet future margin calls.'" Starrett MTD at 35 (quoting 2007 Form 10-K at 39, 52-53).  Starrett asserts that Thornburg Mortgage fully disclosed the risk of a default on its reverse repurchase agreements and foreclosure through the statement: "If we do not have sufficient unpledged assets or liquidity to meet these [Repo loan] requirements, we may need to sell assets under adverse market conditions or at losses . . . . Alternatively, the lender may terminate the lending agreement and sell the assets without our knowledge . . . ."  Starrett MTD at 36 (quoting 2007 Form 10-K at 25).  Starrett contends that the SEC's allegation that "'more could have been disclosed'" is an attempt to show "'fraud by hindsight,' consistently rejected by the federal courts."  Starrett MTD at 36 (quoting In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d 382, 402 (S.D.N.Y. 2010)).

Starrett asserts that the analysis whether Thornburg Mortgage had the "intent and ability to hold its ARM Securities until maturity or until their value recovered," requires a complex accounting judgment, undermining the SEC's allegations of fraudulent scienter.  Starrett MTD at 37 (quoting Complaint ¶ 12, at 4-5).  Starrett contends that the "OTTI analysis is far from straightforward."  Starrett MTD at 38 (citing Meyer v. St. Joe Co., 2011 U.S. Dist. LEXIS 94576, at *37).  Starrett contends that the OTTI analysis "requires the holder of impaired securities to make subjective, complex judgment and to predict a future value of the impaired assets," which is far from the SEC's description of the OTTI analysis as "'clear accounting guidance.'"  Starrett MTD at 38 (quoting Complaint ¶ 12, at 5).  Starrett points out that the SEC is aware that OTTI guidance was complex and dependent upon factors that "'vary from case to case.'"  Starrett MTD at 38-39 (quoting SEC Staff Accounting Bulletin No. 59, filed May 21, 2012 (Doc. 38-6)("SAB 59")[22]).  Starrett also points out that the OTTI accounting model in effect in 2008 has been proven unworkable and the FASB has since modified it.  See Starrett MTD at 41-42 (citing Report and Recommendations Pursuant to section 133 of the Emergency Economic Stabilization Act of 2008: Study on Mark-to-Market Accounting at 30, 205, filed May 21, 2012 (Doc. 38-10)("Mark-to-Market Study"); FASB Staff Position No. FAS 115-2 and FAS 124-2, ¶¶ 2, 4, 7, at 2, 3, 4, filed May 21, 2012 (Doc. 38-11)("FAS 115-2 & 124-2"); Minutes from FASB March 16, 2009 Board Meeting ¶ 9, at 4, filed May 21, 2012 (Doc. 38-12)("March 16 FASB Minutes"); Minutes from FASB April 2, 2009 Board Meeting ¶ 12, at 6-7 filed May 21, 2012 (Doc. 38-13)("April 2 FASB Minutes").  Starrett asserts that the FASB's recognition

---

[22] SAB 59 is identical to the SEC Staff Accounting Bulletin No. 59, Accounting for Noncurrent Marketable Equity Securities, codified as SAB Topic 5.M, Other Than Temporary Impairment of Certain Investments in Debt and Equity Securities, (March 9, 2011), http://www.sec.gov/interps/account/sabcodet5.htm#5m, which Goldstone and Simmons cite on page 26 of the Goldstone & Simmons MTD.

that the pre-2009 OTTI guidance was "'flawed and confusing' . . . . weighs heavily against the notion that Ms. Starrett acted" with fraudulent scienter.  Starrett MTD at 42 (quoting Apr. 2 FASB Minutes ¶ 12, at 4).

Starrett asserts that, because this statement was based upon her "reasonable belief in the accuracy of the information at her disposal . . . and the undisputed complexity of OTTI accounting judgments, she did not have the requisite mental state to support securities fraud liability."  Starrett MTD at 37 (citing City of Omaha v. CBS Corp., 679 F.3d at 68-69; In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 567-68 (S.D.N.Y. 2004); 2007 Form 10-K at 41).  Starrett asserts that numerous federal courts have "refused to attribute scienter in cases involving difficult accounting judgments that later turn out to have been erroneous, and have dismissed securities fraud cases as a result."  Starrett MTD at 39 (citing In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d at 408-09; City of Omaha v. CBS Corp.; In re BellSouth Sec. Litig., 355 F. Supp. 2d 1350, 1375 (N.D. Ga. 2005); SEC v. Price Waterhouse, 797 F. Supp. 1217, 1241 (S.D.N.Y. 1992)).  Starrett asserts that, in In re Radian Sec. Litig., the United States District Court for the Eastern District of Pennsylvania was presented with similar facts as those in the Complaint, and found that, because the "impairment analysis involved a 'range of reasonable business treatments permitted under GAAP,' . . . even if an impairment occurred earlier than [the defendant] had stated," the plaintiff did not allege facts which demonstrated that the defendant's "'failure to report an impairment . . . was an egregious departure from the range of reasonable business decisions, even in light of the deteriorating subprime market.'"  Starrett MTD at 40 (quoting 612 F. Supp. 2d at 615, 618).  Starrett contends that, in In re Fannie Mae 2008 Sec. Litig., the United States District Court for the Southern District of New York found that the "'accounting rules governing the relevant practices [including OTTI analysis] are sufficiently

flexible so as to encompass Fannie's interpretation" whether its impairment was OTTI or an unrealized loss.  Starrett MTD at 40 (quoting 742 F. Supp. 2d at 408, 411).  Starrett asserts that the SEC's allegations that she should have concluded that Thornburg Mortgage's losses were other-than-temporary is, at most, an allegation that she did not comply with GAAP, and not an allegation of the commission of securities fraud.  Starrett MTD at 37-38 (citing Complaint ¶ 51, at 15).

Starrett also asserts that Thornburg Mortgage's restatement on March 11, 2008 undermines an inference of fraudulent scienter.  Starrett argues that the restatement "'standing alone, does not support an inference of scienter.'"  Starrett MTD at 42 (quoting In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d at 1202-03).  Starrett contends that punishing Thornburg Mortgage "'when subsequent events disclose errors'" in its original 2007 Form 10-K would defeat "'the core purpose of the securities laws.'"  Starrett MTD at 42 (quoting In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 170 (D. Mass. 2000)).  Starrett contends that the Court has acknowledged the "unpredictable volatility of the market during 2007 and 2008," and credited Thornburg Mortgage for disclosing "'material facts quickly, after reasonable investigation.'"  Starrett MTD at 43 (quoting In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d at 1212).

Starrett also argues that the SEC has not adequately alleged that she possessed a motive to mislead investors.  Starrett asserts that the SEC's allegations that the Defendants were "motivated by 'imminent plans to raise additional cash and thereby alleviate [Thornburg's] liquidity crisis'" does not adequately plead the concrete and particular facts necessary to show a motive to mislead.  Starrett MTD at 43 (alteration in original)(quoting Complaint ¶ 4, at 2)(citing City of Phila. v. Fleming Cos., Inc., 264 F.3d at 1261-62, 1269).  Starrett contends that the SEC

has not alleged that she personally benefitted from the alleged misconduct, either through having sold stock or because her compensation was contingent on Thornburg Mortgage's performance reported in the 2007 Form 10-K.  See Starrett MTD at 43 (citing In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000)).

Starrett asserts that the SEC has failed to allege facts showing that she had actual knowledge of Thornburg Mortgage's alleged violation of §§ 10(b) and 13(a), and rules 13a-1 and 12b-2 of the Exchange Act, and, thus, the SEC has not sufficiently pled a claim for aiding and abetting against Starrett.  See Starrett MTD at 44 (citing SEC v. Lucent Techs. Inc., 610 F. Supp. 2d at 362).  Starrett asserts that, given the complexity of the OTTI accounting rules and their subsequent revision, "there is no plausible basis for the SEC's contention that Ms. Starrett knew that TMI incorrectly applied those rules."  Starrett MTD at 44 (emphasis in original).  Starrett asserts that she had no reason to doubt the validity of Thornburg Mortgage's OTTI analysis and did not know before the 2007 Form 10-K was filed that it allegedly misstated Thornburg Mortgage's unrealized losses as temporary.  See Starrett MTD at 43-44 (citing SEC v. Espuelas, 579 F. Supp. 2d 461, 485 (S.D.N.Y. 2008)(Holwell, J.)).

Starrett further contends that the SEC has not alleged sufficient facts to show that she knowingly violated, or aided and abetted, Thornburg Mortgage's alleged violation of the internal control provisions, in §§ 13(b)(5) and 13(b)(2) of the Exchange Act.  Starrett first asserts that the SEC "relies on impermissible puzzle pleading" by incorporating by reference the Factual Background into its claims for relief, "paraphrasing the relevant securities law provisions, and then stating that Defendants violated these provision."  Starrett MTD at 45 (citing Complaint ¶¶ 120-122, at 34; id. ¶¶ 136-39, at 37-38).  Starrett asserts that this pleading tactic is improper because it leaves the Court and the Defendants to decipher which facts apply to which stated

violation and claim for relief.  See Starrett MTD at 45-46 (citing SEC v. Fraser, No. CV-09-00443-PHX-GMS, 2009 U.S. Dist. LEXIS 70198, at 45-46 (D. Ariz. Aug. 11, 2009)).  Starrett further contends that "internal controls" within the meaning of the Exchange Act refers to policies and procedures, and the SEC has not "identified any policies or procedures, let alone alleged that relevant controls were flawed or circumvented," or that superior controls could have been implemented.  Starrett MTD at 46 (citing 17 C.F.R. § 240.13a-15(f)).  Starrett thus contends that the SEC has made only "[u]nsupported, conclusory assertions" which "satisfy neither the plausibility nor the particularity pleading standards of the Federal Rules."  Starrett MTD at 46 (citing SEC v. Fraser, 2009 U.S. Dist. LEXIS 70198, at **47-48).

Starrett also asserts that internal controls need not be perfect to satisfy § 13(b)(2)'s requirements.  Starrett points out that KPMG concluded that Thornburg Mortgage's internal controls were adequate.  She also contends that the evaluation of the sufficiency of internal controls "'is inevitably a highly subjective process in which knowledgeable [sic] individuals can arrive at totally different conclusions.'"  Starrett MTD at 48 (quoting SEC v. World-Wide Coin Inv., Ltd., 567 F. Supp. 724, 751 (N.D. Ga. 1983)).  Starrett asserts that KPMG's and Thornburg Mortgage's evaluation of the internal controls as effective "refutes the notion that deficient internal controls had caused the error in the 10-K."  Starrett MTD at 47 (citing In re Bausch & Lomb, Inc. Sec. Litig., 592 F. Supp. 2d at 341).

Starrett also contends that the SEC did not plausibly allege that she knowingly violated, or aided and abetted, Thornburg Mortgage's alleged violation of the record keeping provisions in §§ 13(b)(5), 13(b)(2)(A), and rule 13b2-1 of the Exchange Act.  Starrett asserts that the Complaint does not clearly set forth which of the Defendants' conduct forms the basis of the SEC's claims under §§ 13(b)(5), 13(b)(2)(A), and rule 13b2-1 of the Exchange Act, and thus the

Complaint does not meet rule 9(b)'s pleading requirements.  See Starrett MTD at 47-48.  Starrett also contends that the SEC has not shown that the Defendants "knew that TMI's OTTI accounting was incorrect, or acted unreasonably or recklessly with respect to the impairment analysis."  Starrett MTD at 48.  Starrett asserts that the "'clarity of authoritative accounting guidance with respect to the misstatement' is one of the factors to be considered" in deciding whether a registrant violated the duty to keep books and records in accurate, reasonable detail, and asserts that the SEC has since found that the OTTI guidance in effect at the time the 2007 Form 10-K was filed was flawed, confusing, and challenging to apply.  Starrett MTD at 48 (quoting SEC Staff Accounting Bulletin No. 99 - Materiality, at 3-4, filed May 21, 2012 (Doc. 38-15)("SAB 99").  Starrett asserts that the complexities and difficulties of applying the OTTI guidance when the 2007 Form 10-K was filed makes the SEC's allegations that the "Defendants acted knowingly or recklessly in applying the OTTI model" implausible.  Starrett MTD at 48.

Last, Starrett contends that the SEC has not alleged sufficient facts to allow a plausible inference that she concealed material information, or otherwise misled KPMG, in violation of Exchange Act rule 13b2-2.  Starrett contends that the information allegedly withheld from KPMG was "either: (i) not in Starrett's possession," such as the Citigroup Global Letter; (ii) "disclosed to KPMG," such as Thornburg Mortgage's margin call situation; and/or (iii) "not material," such as the I/O Strip Transactions.  Starrett MTD at 49.  Starrett thus asserts that the SEC has not alleged sufficient facts to make its claim against her under Exchange Act rule 13b2-2 plausible.  See Starrett MTD at 49 (citing SEC v. Espuelas, 579 F. Supp. 2d at 487).

### 5.    The Defendants' Request for Judicial Notice.

The Defendants request that the Court take judicial notice of the documents they attached to their motions to dismiss.  See Request for Judicial Notice in Support of Defendants' Motions

to Dismiss Complaint, at 1-2, filed May 21, 2012 (Doc. 39)("Request for Judicial Notice").  The

documents fall into the following categories:

1.      Reports filed with the [SEC] by Thornburg Mortgage, Inc. and
        other relevant public companies;

2.      Reports by securities analysts and news reports concerning
        Thornburg during the relevant time period;

3.      Correspondence, legal agreements, memoranda and other
        documents cited by Plaintiff in the Complaint;

4.      SEC and FASB publications regarding applicable accounting
        standards;

5.      Widely reported facts relating to the financial crisis of 2007-08;

6.      Publicly available historical stock price and stock index
        information; and

7.      Public testimony, reports and statements by government
        regulators.

Request for Judicial Notice at 1-2.  The Defendants assert that the Court should "consider the full

text of Defendant's email communications and Thornburg's SEC filings, which are partially

quoted in, and are integral to the theories of, the SEC Complaint."  Request for Judicial Notice at

2-3 (citing In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d at 1188; City of Phila. v.

Fleming Cos., Inc., 264 F. 3d at 1251 n.4; GFF Corp. v. Assoc.'d Wholesale Grocers, 130 F.3d

1381, 1384 (10th Cir. 1997)).  The Defendants also assert that the Court "'may take judicial

notice of . . . documents that are required by law to be filed with the SEC,' such as Forms 10-K

and Forms 10-K/A."  Request for Judicial Notice at 3 (quoting In re Bausch & Lomb, Inc., Sec.

Litig., 592 F. Supp. 2d at 338).  The Defendants assert that the same principle applies to: (i)

records and reports of administrative bodies; (ii) testimony before legislative bodies; (iii) and

public agency filings.  Request for Judicial Notice at 3 (internal quotations omitted)(citing In re

- 71 -

Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 274 (D.N.J. 2007); E&J Gallo Winery v. EnCana Energy Servs., Inc., No. CV F 03-5412 AWI LJO, 2008 WL 4224492, at *6 (E.D. Cal. Sept. 12, 2008); Kavowras v. New York Times Co., 328 F.3d 50, 57 (2d Cir. 2003); Wible v. Aetna Life Ins. Co., 375 F. Supp. 2d 856, 965 (C.D. Cal. 2005)).   The Defendants assert that within the Tenth Circuit it is proper to take judicial notice of "an official government publication."   Request for Judicial Notice at 3 (citing Clappier v. Flynn, 605 F.2d 519, 535 (10th Cir. 1979)).

The Defendants thus assert that, because the accounting standards "'are not subject to reasonable dispute," and are "'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," the Court may properly take judicial notice of those documents.   Request for Judicial Notice at 3 (quoting Fed. R. Evid. 201(b)(2)).   The Defendants also assert that the Court may take "judicial notice of news reports demonstrating the market's awareness of certain facts and of events widely reported during the financial crisis."   Request for Judicial Notice at 4 (citing Lane v. Page, 649 F. Supp. 2d 1256, 1301 (D.N.M. 2009)(Browning, J.).   The Defendants assert that "a court may take judicial notice of historical stock price information and movement in stock price indexes."   Request for Judicial Notice at 4 (citing Katyle v. Penn Nat. Gaming, Inc., 637 F.3d 462, 466 (4th Cir. 2011); La Grasta v. First Union Sec., Inc., 358 F.3d 840, 842 (11th Cir. 2004); In re Acterna Corp. Sec. Litig., 378 F. Supp. 2d 562, 572 (D. Md. 2005)).

## 6.   The SEC's Response to the Goldstone & Simmons MTD.

The SEC asserts that the Defendants are attempting to "prematurely get to the merits of this case" by arguing that their version of the facts, as supported by documents "not alleged at all" in the Complaint and "interpreted the way they argue they should be, show that they did not make any misstatements or intend to deceive."   Plaintiff's Response to the Motion to Dismiss on

behalf of Defendants Larry Goldstone and Clarence G. Simmons at 11-12, filed June 20, 2012 (Doc. 50)("Response to Goldstone & Simmons MTD").  The SEC asserts that the Complaint does not allege fraud-by-hindsight, but rather sets forth that Goldstone and Simmons knew, or recklessly disregarded, material information "when they filed Thornburg's Form 10-K, a filing timed to fall within the narrow window after which Thornburg had managed to meet its outstanding margin calls -- . . . through their lenders' forbearance."  Response to Goldstone & Simmons MTD at 12.  The SEC asserts that its allegations against Goldstone also demonstrate his knowledge after the 2007 Form 10-K was filed, before he spoke on Street Signs.  The SEC argues that the Complaint sets forth the Defendants' "intent to mislead in several ways, perhaps most strikingly in their email acknowledge[ing] that they were 'purposely' not telling KPMG about the lending agreement breaches."  Response to Goldstone & Simmons MTD at 12.  In its Response to Goldstone & Simmons MTD, the SEC addresses issues in the Goldstone & Simmons MTD which overlap with those raised in the Starrett MTD.  See Response to Goldstone & Simmons MTD at 10.

The SEC asserts that Goldstone and Simmons improperly reference documents outside of the Complaint in the Goldstone & Simmons MTD.  The SEC also maintains that Goldstone and Simmons have "misconstrued" or "cited for a completely different proposition" the documents which are referenced in the Complaint.  Response to Goldstone & Simmons MTD at 12.  The SEC asserts that judicially noticed documents "should not be considered for the truth of any statements therein."  Response to Goldstone & Simmons MTD at 13-14 (citing In re Thornburg Mortg. Inc., Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at *2 (D.N.M. Dec. 21, 2009)(Browning, J.)(secondary citation omitted).   The SEC notes that the Court may consider "documents to which the complaint refers, if the documents are central to the plaintiff's claims

and the parties do not dispute their authenticity."  Response to Goldstone & Simmons MTD at 14

(citing In re Thornburg Mortg. Inc., Sec. Litig., 2009 WL 5851089, at *2)(secondary citation

omitted).  The SEC states that the documents which Goldstone and Simmons attached that are

also cited in the Complaint may be considered to show their contents, and that "accounting

standards and public testimony, reports, and statements by government regulators . . . may be

cited, . . . for the fact that they were published and say what they say, but no more."  Response to

Goldstone & Simmons MTD at 14.  The SEC contends that the Court should not consider any

other documents in ruling on the Defendants' motions to dismiss, including: (i) reports by

securities analysts, newspaper reporters, and bloggers; and (ii) "compilations prepared by

Defendants' counsel (Exs. 3-5, 18, 19, 29-31, 36)."  Response to Goldstone & Simmons MTD at

14.  The SEC asserts that the Court should disregard the 2008 Form 8-K, filed May 21, 2012

(Doc. 37-37)("Apr. 1 8-K"), because it states that "'Thornburg successfully raised $1.35 billion

in new capital,'" which the SEC contends is only relevant if true.  Response to Goldstone &

Simmons MTD at 15 (quoting 2008 Form 8-K at 3).

        The SEC contends that the Defendants make numerous references to the attached

documents "for the truth of statements made therein."  Response to Goldstone & Simmons MTD

at 15 (citing Decl. of Stephen McKenna in Opposition to Defendants' Motion to Dismiss, filed

June 20, 2012 (Doc. 51)("McKenna Decl.")).  The SEC asserts that the Defendants' reference to

the attached documents is an attempt to generate an evidentiary record, which the SEC contends

is inappropriate for the Court to consider on a motion to dismiss.  See Response to Goldstone &

Simmons MTD at 16 (citing Sutton v. Utah State Sch. for the Deaf & Blind, 173 F. 3d 1226,

1236 (10th Cir. 1999); In re Network Equip. Techs., Inc., Litig., 762 F. Supp. 1359, 1363 (N.D.

Cal. 1991)).  The SEC also contends that Goldstone & Simmons have attempted to demonstrate a

disputed issue of fact, which the SEC asserts is an inappropriate inquiry for the Court when ruling on a motion to dismiss.  See Response to Goldstone & Simmons MTD at 15 (citing Goldstone & Simmons MTD at 11).

The SEC contends that it may plead scienter generally.  See Response to Goldstone & Simmons MTD at 13 (citing Fed. R. Civ. P. 9(b); SEC v. Gordon, No. 09-CV-0061, 2009 WL 1652464, at *3 (N.D. Okla. June 11, 2009); SEC v. Arnold, No. 03-CV-0328-REB-OES, 2007 WL 2786428, at *3 (D. Colo. Sept. 24, 2007)).  The SEC contends that the Complaint has put the Defendants on adequate notice of the claims against them, and thus has satisfied rule 9(b)'s pleading standard.  See Response to Goldstone & Simmons MTD at 18 (citing Odom v. Microsoft Corp., 486 F.3d 541, 553 (9th Cir. 2007); Schwartz v. Celestial Seasonings, Inc., 125 F.3d 1246, 1252 (10th Cir. 1997); Unified Container, LLC v. Mazuma Capital Corp., No. 2:10CV723DAK, 2012 WL 92898, at *7 (D. Utah, Mar. 16, 2012)).

The SEC asserts that it has specifically identified the allegations against each Defendant, and, thus, the Court should not dismiss the Complaint on grounds that the SEC inappropriately engaged in "'puzzle pleading'" or "'shotgun pleading.'"  Response to Goldstone & Simmons MTD at 19 (quoting Starrett MTD at 36-37; Goldstone & Simmons MTD at 53).  The SEC contends that it has put the Defendants on notice of its allegations that the 2007 Form 10-K contained misstatements, and that the Defendants made materially misleading statements to Thornburg Mortgage's investors and to KPMG, making the SEC's allegations in the Complaint sufficient under rules 8(a)(2) and 9(b).  See Response to Goldstone & Simmons MTD at 19-20 (citing SEC v. Das, No. 8:10CV102, 2010 WL 4615336, at *6 (D. Neb. Nov. 4, 2010); In re Williams Sec. Litig., 339 F. Supp. 2d 1242, 1261 (N.D. Okla. 2003)).  The SEC asserts that the Tenth Circuit has specifically approved of "incorporating paragraphs of a complaint" into claims

against defendants.  Response to Goldstone & Simmons MTD at 20 (citing <u>Schwartz v. Celestial Seasonings, Inc.</u>, 124 F.3d at 1253).

The SEC also disputes the Defendants' assertion that rule 9(b) applies to the SEC's claims under § 13 because they "purportedly 'sound in fraud.'"  Response to Goldstone & Simmons MTD at 20 (quoting Goldstone & Simmons MTD at 29; Starrett MTD at 6).  The SEC asserts that case law has not clearly established such a rule.  <u>See</u> Response to Goldstone & Simmons MTD at 20 (citing <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1105 (9th Cir. 2003); <u>Schwartz v. Celestial Seasonings, Inc.</u>, 124 F.3d at 1251-52; <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 695 F. Supp. 2d at 1190; <u>SEC v. Sys. Software Assocs., Inc.</u>, 145 F. Supp. 2d 954, 958 (N.D. Ill. 2001)).

The SEC contends that it has alleged facts that, if proven true, would support its claims of fraud against the Defendants and entitle the SEC to relief.  <u>See</u> Response to Goldstone & Simmons MTD at 21-24.  The SEC contends that the ninety-percent drop in Thornburg Mortgage's stock price on March 11, 2012, when it admitted that it "violated lending agreements and restated its materially misleading financial statements by . . . recognizing the massive losses associated with its ARM Securities," is evidence that the 2007 Form 10-K did not tell "the whole story" when compared with the eighteen-percent drop in Thornburg Mortgage's stock prices on the day the 2007 Form 10-K was filed.  Response to Goldstone & Simmons MTD at 24 (citing Complaint ¶ 47, at 14; Goldstone & Simmons MTD at 21).

The SEC asserts that it sufficiently alleged material misstatements and omissions in connection with the 2007 Form 10-K.  The SEC asserts that the Defendants' argument that the 2007 Form 10-K was "'accurate and not misleading,'" is "belied by the restatement, which by definition corrects prior inaccurate statements."  Response to Goldstone & Simmons MTD at 24

- 76 -

(quoting Goldstone & Simmons MTD at 30)(citing <u>SEC v. Kelly</u>, 663 F. Supp. 2d at 285).  The SEC asserts that the Defendants' "'extensive disclosure about the bottom-line bad news for Thornburg'" does not make the 2007 Form 10-K accurate and not misleading.  Response to Goldstone & Simmons MTD at 26 (quoting Complaint ¶ 24, at 8).  The SEC contends that the Defendants' failure to disclose that it had not met margin calls from three lenders in accordance with the terms of their reverse repurchase agreements, and that its underlying assets collateralizing those agreements could have been seized, was a material omission.  <u>See</u> Response to Goldstone & Simmons MTD at 25-26 (citing <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 164 (2d Cir. 2000); <u>Grossman v. Novell, Inc.</u>, 120 F.3d at 1119-20; <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 695 F. Supp. 2d at 1214-15).  The SEC asserts that the Defendants' citation to <u>Fulton Cnty. Emp. Ret. Sys. v. MGIC Inv. Corp.</u> is inapposite, because the plaintiffs in that case did not allege "that the company falsely stated it had successfully met margin calls when it fact it had been in breach of its lending agreements and thus subject to default and seizure of its assets," as the SEC alleges in the Complaint.  Response to Goldstone & Simmons MTD at 26 (citing 675 F.3d at 1049; Goldstone & Simmons MTD at 31).  The SEC also asserts that <u>Payne v. DeLuca</u> is distinguishable from the facts in the Complaint, because in that case, the plaintiffs failed to point to any procedure which required disclosure of the company's difficulty in meeting financial obligations, whereas the SEC asserts that the Defendants "violated accounting standards by improperly failing to recognize an other than temporary impairment on its ARM Securities."  Response to Goldstone & Simmons MTD at 27 (citing <u>Payne v. DeLuca</u>, 433 F. Supp. 2d at 594; Complaint ¶¶ 50, 54, 46, at 15-16).  The SEC also asserts that its alleged omissions are distinguishable from those which the Court found to be immaterial in <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, because the SEC has alleged that Thornburg Mortgage "made affirmative

misrepresentations concerning its intent and ability to hold assets, margin call activity, and its income, as well as various omissions," whereas in In re Thornburg Mortg., Inc. Sec. Litig., the alleged omissions were not subject to restatement and did not include affirmative misrepresentations.  Response to Goldstone & Simmons MTD at 27 (citing 695 F. Supp. 2d at 1208).

The SEC contends that the Defendants had a duty to disclose the omitted information. The SEC first asserts that it has alleged not only a duty to disclose, but also that the Defendants "materially misstated Thornburg's income by over $400 million and reported a profit instead of a loss," an allegation which the SEC contends that the Defendants "conveniently overlook . . . in arguing no duty to disclose."  Response to Goldstone & Simmons MTD at 28.  The SEC also asserts that the Defendants have misstated the Tenth Circuit's holding in Connett v. Justus Enters. of Kan., Inc., because the Tenth Circuit imposes liability for a failure to disclose when "'the duty to disclose exists and the withheld information is material,'" Connett, 68 F.3d at 385, and not only when a "'previous statement is false or later turns out to be false.' [(Goldstone & Simmons MTD at 33)]."  Response to Goldstone & Simmons MTD at 28.  The SEC contends that an omission "may be actionable even if the statement that requires disclosure of the omission is true."  Response to Goldstone & Simmons MTD at 28-29 (citing Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC 595 F.3d 86, 92 (2d Cir. 2010); SEC v. Gabelli, 653 F.3d 49, 57 (2d Cir. 2011); SEC v. First Am. Bank & Trust Co., 481 F.2d 673, 678 (8th Cir. 1973)).  The SEC asserts that the proper standard to apply is: "'[W]hen defendants voluntarily disclose information, they have a duty to disclose additional material facts only to the extent that the volunteered disclosure was misleading as to a material fact.'"  Response to

Goldstone & Simmons MTD at 29 (emphasis added)(quoting <u>In re Thornburg Mortg., Inc. Sec.</u>
<u>Litig.</u>, 695 F. Supp. 2d at 1209)(secondary quotation omitted)).

      The SEC contends that the Defendants' statement that Thornburg Mortgage had not sold
any assets to meet its margin calls created a duty to disclose the I/O Strip Transactions.  <u>See</u>
Response to Goldstone & Simmons MTD at 29 (citing Complaint ¶ 65, at 19).  The SEC
contends that, because Thornburg Mortgage stated it did not need to sell assets to meet its margin
calls, Thornburg Mortgage implied that it had sufficient cash and liquidity to meet its margin
calls, which makes the I/O Strip Transactions material information relevant whether Thornburg
Mortgage's cash and liquidity were sufficient to meet its margin calls.  The SEC argues that
Simmons misrepresented to KPMG that the I/O Strip Transactions were "done to take advantage
of opportune pricing, not to meet margin calls," which further demonstrates that the I/O Strip
Transactions were not "'so obviously unimportant to a reasonable investor that reasonable minds
could not differ on the question of their importance.'"  Response to Goldstone & Simmons MTD
at 30 (quoting <u>SEC v. Gabelli</u>, 653 F.3d at 57-58).  The SEC contends that <u>McDonald v. Kinder-</u>
<u>Morgan, Inc.</u> is inapposite, because the Defendants undertook the I/O Strip Transactions which
"it had already been forced to undertake to meet margin calls," whereas the defendants in
<u>McDonald v. Kinder-Morgan, Inc.</u> failed to disclose "contingencies that might alter the
company's future revenue pricing."  Response to Goldstone & Simmons MTD at 30 (citing 287
F.3d at 998).  The SEC contends that the Defendants' actions are more like those in <u>SEC v.</u>
<u>Gabelli</u>, in which the defendants "failed to disclose something it had done that was inconsistent
with the inference to be drawn from its representation to investors."  Response to Goldstone &
Simmons MTD at 30 (citing 653 F.3d at 57).

The SEC also contends that Thornburg Mortgage's statement that it had met all margin calls created a duty to disclose that it had not met the margin calls within the terms of its reverse repurchase agreements, and was not in default only through lender forbearance.  The SEC asserts that Thornburg Mortgage should have stated only that it successfully met margin calls if it had complied with the terms of its reverse repurchase agreements.   The SEC argues that the Defendants do not escape liability for this omission simply because the 2007 Form 10-K did not state that Thornburg Mortgage had complied with its reverse repurchase agreements.   See Response to Goldstone & Simmons MTD at 31 (citing Goldstone & Simmons MTD at 35).

The SEC also contends that the existence of the Citigroup Global Letter evidences that Thornburg Mortgage was in breach of its reverse repurchase agreement with Citigroup Global, and that the Defendants have improperly asked the Court to interpret the language of the Citigroup Global Letter in a light favorable to the Defendants.  See Response to Goldstone & Simmons MTD at 31-32 (citing Goldstone & Simmons MTD at 36; Citigroup Global Repo Agreement).  The SEC asserts that Thornburg Mortgage's breach of the Citigroup Global Repo Agreement and its reverse repurchase agreements with two other lenders was material information, because it "'would inform investors that, at any moment, Thornburg Mortgage, Inc., could be broke which would tend to influence how one might invest money.'"  Response to Goldstone & Simmons MTD at 32 (quoting In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d at 1214-15).  The SEC argues that the Defendants' assertion they were not in breach of the reverse repurchase agreements is a factual question appropriate for a jury to decide, and is not an assertion that the Court should consider on a motion to dismiss.  The SEC asserts that Defendants have mischaracterized the SEC's allegations by contending that they did not need "'to disclose precisely how margin call obligations are met,'" because the Defendants'

misrepresentations were based upon their failure to disclose that Thornburg Mortgage had breached three reverse repurchase agreements, not the failure to disclose the details of Thornburg Mortgage's margin call payments.  Response to Goldstone & Simmons MTD at 32 (quoting Goldstone & Simmons MTD at 36).  The SEC asserts Baron v. Smith is distinguishable because, in Baron v. Smith the information which the Defendants allegedly withheld was not information "'of which the market is already aware,'" such as the effect which a company's bankruptcy filing had on a loan guarantee in Baron v. Smith.  Response to Goldstone & Simmons MTD at 33 (quoting 380 F.3d at 57).

The SEC contends that it has not alleged fraud-by-hindsight, because the Defendants' misrepresentations and omissions were concerning past margin calls and income.  The SEC asserts that its allegations of the Defendants' fraud in filing the 2007 Form 10-K arise out of the Defendants' knowledge of past events, including Thornburg Mortgage's liquidity crisis, its exposure to default and cross-default notices, its receipt of the Citigroup Global Letter, and that the Defendants had conducted I/O Strip Transactions to meet margin calls.  The SEC first contends that the Defendants have provided citations to cases which analyze scienter under "the heightened standard of the [Private Securities Litigation Reform Act of 1996, Pub. L. No. 104-67, 109 Stat. 737 (1995)(codified as amended in scattered sections of 15 U.S.C.)("PSLRA")], which is inapplicable here as the SEC need only plead scienter generally."   Response to Goldstone & Simmons MTD at 34 (citing SEC v. Kovzan, 807 F. Supp. 2d at 1039 n.6).  The SEC also asserts that the Defendants' reliance on City of Phila. v. Fleming Cos., Inc., is inappropriate, because, in that case, the plaintiffs "failed to plead any particular facts by which the court could plausibly infer that two defendants even knew about the litigation," whereas the SEC has pled that the Defendants "knew or were reckless in not knowing that the statements in

Thornburg's Form 10-K regarding liquidity, margin calls, and income were false at the time they were made."   Response to Goldstone & Simmons MTD at 35-36 (citing 264 F.3d at 1263; Complaint ¶ 38, at 12; id. ¶ 40, at 12; id. ¶ 30, at 9-10).   The SEC further argues that the margin calls Thornburg Mortgage received on February 28, 2008, were not "'unprecedented.'" Response to Goldstone & Simmons MTD at 36 (quoting Goldstone & Simmons MTD at 1, 22; Starrett MTD at 1, 10, 23).   The SEC contends that the approximately $200 million in margin calls which Thornburg Mortgage received on February 28, 2008, cannot be unprecedented, given that Citigroup Global issued a margin call of $196 million only two weeks prior, and six months earlier Thornburg Mortgage received two billion dollars in margin calls.   See Response to Goldstone & Simmons MTD at 36 (citing Complaint ¶¶ 26, 29, 33, at 8-10).

The SEC also contends that it has sufficiently alleged that the Defendants acted with fraudulent scienter: "an intent to deceive, manipulate, or defraud -- in other words, acted with a mental state known as scienter."   Response to Goldstone & Simmons MTD at 37 (quoting In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d at 1187).   The SEC asserts that it is not bound by the "'strong inference' of scienter" standard which rules fraud cases under the PSLRA. Response to Goldstone & Simmons MTD at 38 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007))(citing SEC v. Mannion, 789 F. Supp. 2d 1321, 1334 (N.D. Ga. 2011)).   The SEC contends that the Defendants have not cited to a single case in which scienter was alleged under the standard applicable in this case, but rather that the Defendants have cited only to cases decided under the PSLRA's higher requirement.   See Response to Goldstone & Simmons MTD at 43-44.   The SEC argues that the "Complaint leaves no doubt that Defendants were aware that the Form 10-K contained material misstatements at the time it was filed."

Response to Goldstone & Simmons MTD at 38-39 (citing Complaint ¶¶ 60-64, at 17-19; id. ¶¶ 66-71, at 19-21; id. ¶ 79, at 23; id. ¶ 11, at 4; id. ¶¶ 46-47, at 14; Complaint ¶¶ 72-74, at 21-22).

The SEC contends that the Defendants' "negative disclosures" do not "'negate any inference of scienter.'"  Response to Goldstone & Simmons MTD at 39 (quoting Goldstone & Simmons MTD at 40).  The SEC asserts that the Defendants' disclosure of Thornburg Mortgage's future risk of default does not negate the falsity of its statement that it had "'successfully' met the margin calls" and that it had the "intent and ability to hold the ARM Securities until recovery," and the Defendants' failure to "recognize an income statement loss of approximately $428 million for Thornburg's ARM Securities."  Response to Goldstone & Simmons MTD at 40 (citing Complaint ¶¶ 5, 7, at 3; id. ¶ 11, at 4; id. ¶ 32, at 10; id. ¶ 38, at 12; id. ¶¶ 53-54, at 16; id. ¶¶ 68-71, at 20-21; id. ¶¶ 79-80, at 23; id. ¶ 83, at 24).  The SEC asserts that the Defendants' negative disclosures do not negate the existence of their motive to make false statements: "to keep the margin call situation quiet and then quickly raise additional cash."  Response to Goldstone & Simmons MTD at 41 (citing Complaint ¶ 32, at 10).  Finally, the SEC asserts that the Defendants' negative disclosures do not remedy the falsity of other statements they made, specifically the SEC's allegations that the Defendants "failed to disclose . . . specific material facts currently in" Thornburg Mortgage's possession.  Response to Goldstone & Simmons MTD at 41-42 (citing In re Neopharm, Ind. Sec. Litig., No. 02 C 2976, 2008 WL 262369, at *13 (N.D. Ill. Feb. 7, 2003)).  The SEC contends that, in SEC v. BankAtlantic Bancorp, Inc., No. 12-60082-Civ., 2012 WL 1936112 (S.D. Fla. May 29, 2012), the United States District Court for the Southern District of Florida rejected a defendant's argument that its negative disclosures, which the SEC asserts were more fulsome than those which the Defendants

made here, could not undermine an inference of fraudulent scienter.  See Response to Goldstone & Simmons MTD at 42-43 (citing 2012 WL 1936112, at ** 11, 17).

The SEC asserts that, by alleging that the Defendants knew that Thornburg Mortgage had not successfully met its margin calls, that Thornburg Mortgage had entered into the I/O Strip Transactions to meet its margin calls, and that Thornburg Mortgage did not have the intent and ability to hold certain assets until recovery or maturity, the SEC has adequately alleged that the Defendants "believed the statements in the Form 10-K were false or misleading."  Response to Goldstone & Simmons MTD at 45 (citing Goldstone & Simmons MTD at 41; Complaint ¶ 11, at 4; id. ¶ 53, at 16).   The SEC contends that City of Omaha v. CBS Corp. is readily distinguishable, because there the complaint contained only conclusory allegations, whereas the SEC has provided "specific detail" and the Complaint "references to specific correspondence and statements of the Defendants evidencing their knowledge."  Response to Goldstone & Simmons MTD at 45 (citing 679 F.3d, at 67-68).  The SEC contends that the Complaint sets forth that the Defendants were aware that Thornburg Mortgage violated its reverse repurchase agreements, precluding an inference that the Defendants "believed that Thornburg had successfully met all margin calls by the time of the filing" of the 2007 Form 10-K, as the Defendants argue. Response to Goldstone & Simmons MTD at 46 (citing Goldstone & Simmons MTD at 42; Complaint ¶¶ 34-35, 37, at 10-11).

The SEC contends that the nature of the OTTI analysis does not undercut the Defendants' scienter.  The SEC first contends that the Defendants rely on "extrinsic documents for the truth of the statements therein -- that OTTI analysis can be complex and GAAP does not provide bright line rules" -- to assert that they lacked fraudulent intent in their OTTI analysis.  Response to Goldstone & Simmons MTD at 46-47.  The SEC contends that, regardless of the objective

- 84 -

complexity of the OTTI analysis, the Complaint sets forth that Starrett and Goldstone understood the OTTI analysis and its application to their impairments.   See Response to Goldstone & Simmons MTD at 47-48 (citing Complaint ¶¶ 54-55, at 16).   The SEC asserts that the Defendants would have the Court "parse the meaning" of an electronic mail transmission Starrett sent to Goldstone regarding the OTTI analysis, an inappropriate exercise at this stage, to find that the Defendants did not have an intent to withhold information from KPMG.   Response to Goldstone & Simmons MTD at 48 (citing Goldstone & Simmons MTD at 44; Complaint ¶ 53, at 16; Wood v. Wood, No. 3:10-0122, 2010 WL 2813760, at *3 (S.D.W. Va., 2010); Am. Plastic Equip. Inc., v. Toytrackerz, LLC, No. 07-2253-DJW, 2008 WL 917635, at *1 (D. Kan. 2008)). The SEC contends that "it is beyond dispute that Thornburg restated its financials on March 11, 2008" to take a $427,800,000.000 impairment on its ARM Securities portfolio, thus evidencing that Thornburg Mortgage should have accounted for its unrealized losses as OTTI impairments in the 2007 Form 10-K.   Response to Goldstone & Simmons MTD at 49 (citing Complaint ¶ 11, at 4).

The SEC asserts that, while the Defendants are correct that GAAP violations do not alone state a securities fraud claim, "'allegations of GAAP violations are . . . extremely probative of scienter.'"   Response to Goldstone & Simmons MTD at 49 (quoting Carpenters Health & Welfare Fund. v. Coca-Cola Co., 1:00-CV-2838, 2002 U.S. Dist. LEXIS 28072, at *48 (N.D. Ga. Aug. 20, 2002)(secondary quotation omitted)).   The SEC asserts that the United States Court of Appeals for the Eighth Circuit has rejected the argument that accounting analyses are too complex for a defendant to have the requisite scienter for a securities fraud claim and held that the complexity of the relevant accounting analyses was a factual question that the Court should not decide on a motion to dismiss.   See Response to Goldstone & Simmons MTD at 50 (citing

Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 649, 662, 666-67 (8th Cir. 2001)).  The SEC contends that neither the holding in Funke v. Life Fin. Corp., nor SEC v. Espuelas are applicable, because in neither of those cases did the plaintiffs allege that the "defendants withheld and misrepresented information to company auditors and the investing public in order to avoid having to take an impairment on assets that would have turned a reported . . . profit to a loss," as the SEC has alleged here.  Response to Goldstone & Simmons MTD at 51 (citing Funke v. Life Fin. Corp., 237 F. Supp. 2d at 485; SEC v. Espuelas, 579 F. Supp. 2d at 480-81).  The SEC also contends that Starrett is incorrect to rely upon In re Fannie Mae 2008 Sec. Litig., because in that case, there was no "allegation that management knew they had lost the ability to hold assets because their lenders could declare default and seize them, or that they deceived their auditors," as the SEC has alleged here.  Response to Goldstone & Simmons MTD at 51-52 (citing 742 F. Supp. 2d at 410).  The SEC contends that In re Radian Sec. Litig. is also inapposite, because in that matter, the plaintiffs asserted only that the defendants had deceptively stated their company was "'expected'" to return to profitability, whereas the SEC has alleged that the Defendants "falsely represented not an expectation, but a return to profitability that did not exist."  Response to Goldstone & Simmons MTD at 52 (quoting Starrett MTD at 40).

The SEC contends that, because the Complaint "quotes a document where Defendants acknowledge 'purposely' not telling their auditors about margin calls," the Complaint does not support Goldstone and Simmons' arguments that they "hoped to raise additional capital and to meet their expected additional margin calls."  Response to Goldstone & Simmons MTD at 52 (citing Goldstone & Simmons MTD at 47; Complaint ¶ 53, at 16).  The SEC argues that, even though the Defendants disclosed a large unrealized loss, disclosing an unrealized loss while also stating that Thornburg has the intent and ability to hold

those assets until recovery "is not the same as disclosing a realized loss."  Response to Goldstone & Simmons MTD at 53 (citing Goldstone & Simmons MTD at 47).

The SEC argues that Simmons' statement, "[i]f they only knew," is strong evidence of fraudulent scienter.  Response to Goldstone & Simmons MTD at 53.  The SEC contends that the Court should not, at this stage, attempt to divine meaning from the electronic mail transmission containing this statement, beyond the meaning the SEC attaches to the statement in the Complaint.  The SEC also asserts that it has set forth evidence of a fraudulent scheme in other portions of the Complaint, noting that it has alleged that Starrett confirmed to Goldstone and Simmons that the Defendants would purposely not relate certain information to KPMG.  See Response to Goldstone & Simmons MTD at 54 (citing Complaint ¶ 5, at 3; id. 30, at 10; id. ¶ 53, 57-58 at 16-17; id. ¶ 64, at 18-19).

The SEC asserts that its allegation that the Defendants were motivated to commit securities fraud by a desire to save Thornburg Mortgage is sufficient to raise an inference of fraudulent scienter.  See Response to Goldstone & Simmons MTD at 55 (citing Complaint ¶ 4, at 2; In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d at 1202).  The SEC asserts that it is reasonable to infer that the Defendants had a motive to mislead, because they were "inextricably financially intertwined with the continued viability of the company."  Response to Goldstone & Simmons MTD at 55-56 (citing In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d at 1195).

The SEC contends that it has sufficiently alleged that Goldstone made material misstatements on Street Signs on February 28, 2008.  The SEC contends that Goldstone's statements on Street Signs were misrepresentations, because Goldstone did not state that he "expected or hoped to have liquidity and cash available to continue to support the portfolio, he

said 'we have the liquidity and cash available to continue to support the portfolio.'"  Response to Goldstone & Simmons MTD at 57 (quoting Complaint ¶ 98, at 28).  The SEC asserts that this statement was knowingly misleading, because Goldstone knew that Thornburg Mortgage was receiving additional margin calls, that it did not have sufficient cash to meet them, and that Thornburg Mortgage's cash and liquidity had not been sufficient in the weeks before the 2007 Form 10-K was filed to meet its margin call obligations.  See Response to Goldstone & Simmons MTD at 57.  The SEC contends that Goldstone is wrong to argue that the "'bespeaks causation'" doctrine protects him from liability, because that doctrine covers only forward-looking statements, whereas the SEC has alleged that Goldstone's statements on Street Signs and to Thornburg Mortgage's investor relations department were misleading when made because of Thornburg Mortgage's current financial situation.  Response to Goldstone & Simmons MTD at 58 (quoting Goldstone & Simmons MTD at 51)(citing Complaint ¶ 96, at 28).

    The SEC argues that the Complaint sufficiently alleges that the Defendants deceived KPMG.  The SEC asserts that Goldstone and Simmons' arguments regarding the SEC's "'shotgun pleading'" are without merit, because Goldstone and Simmons clearly define the SEC's allegations regarding their deceit of KPMG in the Goldstone & Simmons MTD.  Response to Goldstone & Simmons MTD at 59 (quoting Goldstone & Simmons MTD at 53)(citing Goldstone & Simmons MTD at 53-54).  The SEC contends that it has alleged several facts of which the Defendants were aware, but KPMG was not.  The SEC points out that it alleges that KPMG was not aware of Thornburg Mortgage's breach of three reverse repurchase agreements, the $427.8 million in unrealized losses that should have been realized, and of the purpose of the I/O Strip Transactions.  See Response to Goldstone & Simmons MTD at 60

(citing Complaint ¶ 29, at 9; id. ¶¶ 38-39, at 12; id. ¶¶ 65-69, at 19-20; id. ¶¶ 72-73, at 21; id. ¶¶ 76-77, at 22; Complaint ¶ 83, at 24).

Regarding the SEC's allegation that KPMG would have reached a different conclusion had it been aware of the allegedly withheld information, the SEC contends it is logical to allege, as the SEC has, that KPMG would have questioned Thornburg Mortgage's OTTI conclusion and disagreed with it.  See Response to Goldstone & Simmons MTD at 61 (citing Goldstone & Simmons MTD at 55).  The SEC asserts that the authorities upon which the Defendants rely in arguing that the Complaint is internally inconsistent -- by alleging that KPMG would have first questioned and then disagreed -- are inapposite, either factually or legally.  See Response to Goldstone & Simmons MTD at 61.

In response to the Defendants' assertion that the SEC has not shown that the information withheld from KPMG was material, the SEC asserts that it "has alleged multiple facts that establish the materiality of Defendants' misstatements and omissions to auditors."  Response to Goldstone & Simmons MTD at 62.  The SEC points out that it has alleged that the failure to recognize $427.8 million in losses resulted in a restatement, which is only necessary for material misstatements.  See Response to Goldstone & Simmons MTD at 62.  The SEC further argues that Goldstone & Simmons had a duty to disclose the rumored imminent collapse of a large European hedge fund, because, the SEC asserts, it alleges that the Defendants knew that the collapse of the European hedge fund "would further depress the prices of Thornburg's ARM Securities and trigger additional margin calls."  Response to Goldstone & Simmons MTD at 62-64 (citing Goldstone & Simmons MTD at 55-56; Complaint ¶¶ 38-39, at 12; id. ¶¶ 76-77, at 22-23).  The SEC thus argues that it is not seeking to hold the Defendants liable for the failure to disclose a rumor, but for the failure to disclose information which the Defendants knew was

material to KPMG's analysis.  The SEC thus asserts that the cases upon which the Defendants have relied are distinguishable from the SEC's allegations in the Complaint.  See Response to Goldstone & Simmons MTD at 64 (citing In re Synchronoss Sec. Litig., Higginbotham v. Baxter Int'l Inc., 495 F.3d at 760-61; In re Northern Telecom Ltd. Sec. Litig., 116 F. Supp. 2d at 464).

The SEC further asserts that Simmons had a duty to correct his previous statements to KPMG -- that "he believed the MBS market had reached its low point and further deterioration in prices was unlikely" -- because rule 13b2-2 "'imposes a duty on corporate officers to clarify previous statements that are misleading in the absence of some material fact,'" and because Simmons became aware that the value of Thornburg Mortgage's ARM Securities would decrease more after his initial statement to KPMG as a result of "margin calls and haircuts."  Response to Goldstone & Simmons MTD at 64-65 (quoting SEC v. Autocorp. Equities, Int'l, Inc., 2004 WL 1771608, at *6)(citing Complaint ¶ 39, at 12).

The SEC argues that Goldstone and Simmons' contention regarding whether KPMG requested the Defendants to disclose all correspondence is an argument regarding the facts of this case, and thus not an appropriate issue to be raised on a motion to dismiss.  The SEC contends that the Court must take as true that KPMG requested all of Thornburg Mortgage's correspondence with its lenders in the weeks before the 2007 Form 10-K was filed and should not delve into an evidentiary query of the documents which the Defendants have filed with the Court.  See Response to Goldstone & Simmons MTD at 65 (citing Goldstone & Simmons MTD at 57-58).  Moreover, the SEC argues that, were the Court to conduct a factual inquiry regarding the validity of the SEC's allegation, the Court would find that the record supports the SEC's claim.  See Response to Goldstone & Simmons MTD at 66 (citing Request for Correspondence).

The SEC contends that the Defendants' assertion that the Citigroup Global Letter was immaterial is without merit, because arguing "that the breach was immaterial because it 'would [not] have a material effect on [Thornburg's] financial statements' is circular."  Response to Goldstone & Simmons MTD at 66)(alterations in original)(quoting Goldstone & Simmons MTD at 58).  The SEC contends that it is "inconceivable" that KPMG would not want to see the Citigroup Global Letter.  Response to Goldstone & Simmons MTD at 66.  The SEC contends that it need not establish whether Simmons' characterization of the February 28, 2008, margin calls as unforeseeable was "'false or misleading,'" as the Defendants argue it must, because the Court need only inquire whether this allegation, if true, supports a claim for fraud.  Response to Goldstone & Simmons MTD at 66-67 (quoting Goldstone & Simmons MTD at 58).  The SEC further contends that it has established that Simmons' statement was false, because it has set forth in the Complaint an electronic mail transmission exchange between Goldstone and Simmons on February 27, 2008, in which they discuss how Thornburg Mortgage is likely to receive additional margin calls.  See Response to Goldstone & Simmons MTD at 67.

Lastly, the SEC contends that it has adequately alleged control-person liability, and that Goldstone and Simmons aided and abetted Thornburg Mortgage's violations of the securities laws.  The SEC asserts that dismissing the control-person claim is inappropriate, because the SEC has adequately alleged a primary securities law violation, and Goldstone and Simmons do not refute their status as control persons under § 20(a) of the Exchange Act.  See Response to Goldstone & Simmons MTD at 67.  The SEC contends that the Defendants may be liable for aiding and abetting, because, in the Tenth Circuit, recklessness satisfies the scienter requirement for aiding and abetting the violation of a securities law, and because the SEC has adequately alleged that Goldstone and Simmons "knowingly (and recklessly) provided substantial assistance

to Thornburg's violations of the securities laws."  Response to Goldstone & Simmons MTD at 67-68 (citing <u>Geman v. SEC</u>, 334 F.3d 1183, 1196 (10th Cir. 2003); <u>SEC v. Nacchio</u>, 614 F. Supp. 2d 1164, 1172 (D. Colo. 2006); <u>SEC v. Autocorp Equities, Inc.</u>, 292 F. Supp. 2d 1310, 1331-32 (D. Utah 2003)).

       7.      <u>**The SEC's Response to the Starrett MTD.**</u>

The SEC contends that the Complaint adequately alleges that the Defendants, including Starrett, "embarked on a scheme to mislead their auditors and the public to raise cash to address the Company's liquidity crisis."  Plaintiff's Response to Defendant Jane Starrett's Motion to Dismiss at 8, filed June 20, 2012 (Doc. 49)("Response to Starrett MTD").  The SEC asserts that Starrett reviewed and approved materially false and/or misleading statements published in the 2007 Form 10-K, specifically, that Thornburg Mortgage: (i) had "successfully continued to meet margin calls"; (ii) "did not sell any assets to meet its margin calls"; (iii) "had the intent and ability to hold certain securities until their value recovered in the market"; and (iv) "had returned to profitability in the fourth quarter to the tune of $65 million in net income."  Response to Starrett MTD at 8.  The SEC notes that it addressed the arguments the Defendants all raised in its Response to Goldstone & Simmons MTD, and incorporates those arguments into its Response to Starrett MTD.  <u>See</u> Response to Starrett MTD at 12-13 n.3.

The SEC first argues that the Complaint contains particularized facts which demonstrate that the Thornburg Mortgage 2007 Form 10-K contained materially false and misleading statements, that Starrett made false statements to, and concealed information from, KPMG, and that Starrett participated in a "scheme" which violated rule 10b-5 of the Exchange Act. Response to Starrett MTD at 13, 32.  The SEC contends that Starrett overlooked the Complaint's allegation that she engaged in "an accounting fraud resulting in the overstatement of net income

by \$422 million in the fourth quarter."  Response to Starrett MTD at 13 (citing Complaint ¶¶ 86-87, at 25-26).  The SEC contends that, because the Court is ruling on a motion to dismiss, Thornburg Mortgage's restatement on March 11, 2008, alone defeats any assertion that the net income reported in the 2007 Form 10-K was not false, because a "'complaint pleads facts or misleading statements with sufficient particularity if it alleges that there was a restatement correcting earlier corporate filings and identifies the restated financials.'"  Response to Starrett MTD at 14 (quoting <u>SEC v. Espuelas</u>, 579 F. Supp. 2d at 472 (citing In re FirstEnergy Corp. Sec. Litig., 316 F. Supp. 2d 581, 594, 595 (N.D. Ohio 2004)).

The SEC further contends that it alleged particularized facts which demonstrate that Thornburg Mortgage's statement that it had successfully met all margin calls was false when made.  The SEC points out that it alleges that: (i) Thornburg Mortgage was late in meeting margin calls under the terms of its reverse repurchase agreements with at least three lenders; (ii) Thornburg Mortgage violated its lending agreements with the lenders for whom Thornburg Mortgage was late in meeting its margin calls; (iii) Thornburg Mortgage received a letter from Citigroup Global which stated that Thornburg Mortgage was in breach of its reverse repurchase agreement and reserved the right to declare Thornburg Mortgage in default; (iv) a default for Thornburg Mortgage would trigger cross-defaults with Thornburg Mortgage's other lenders; (v) a default for Thornburg Mortgage could result in its lenders seizing its ARM securities; and (vi) Thornburg Mortgage was required to sell portions of its Securitized ARM Loans to meet its margin calls.  <u>See</u> Response to Starrett MTD at 14-15 (citing Complaint ¶ 3, at 2; <u>id.</u> ¶ 24, at 8; <u>id.</u> ¶ 29, at 9; <u>id.</u> ¶ 34, at 10-11; <u>id.</u> ¶ 36, at 11).  The SEC contends that the 2007 Form 10-K was materially misleading, as a result of Thornburg Mortgage not meeting its margin calls "in the normal course of business and consistent with the terms of the lending agreements," but, rather,

meeting its margin calls late, which violated its reverse repurchase agreements and subjected Thornburg Mortgage to default, cross-default, and the seizure of its assets.  Response to Starrett MTD at 15.  The SEC contends that, even if Thornburg Mortgage's statement that it had successfully met its margin calls was "literally true," the statement created "'a materially misleading impression,'" and is thus sufficient to support the SEC's allegations of securities fraud.  Response to Starrett MTD at 15-16 (quoting SEC v. Gabelli, 653 F. 3d at 57)(citing Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC, 595 F.3d at 92; SEC v. First Am. Bank & Trust Co., 481 F.2d 673, 678 (8th Cir. 1973)).  The SEC contends that, contrary to Starrett's allegations, it has alleged that Citigroup Global was "dissatisfied" with Thornburg Mortgage, as the Complaint sets forth that the Citigroup Global Letter showed Thornburg Mortgage was in breach of its reverse repurchase agreement, and thus, the Court may reasonably infer that Citigroup Global was dissatisfied with Thornburg Mortgage.  Response to Starrett MTD at 16 (citing Complaint ¶ 34, at 10-11).

The SEC contends that the Complaint sets forth sufficient, particularized facts to demonstrate that Thornburg Mortgage's statement -- that it did not sell assets to meet its margin calls -- was misleading.  The SEC points out that it alleges that: (i) Thornburg Mortgage was required to sell I/O Strips, portions of its Securitized ARM Loans, to meet its margin calls; (ii) each Defendant characterized the I/O Strip Transactions as sales, yet the transactions were accounted for as the issuance of secured debt; (iii) Starrett acknowledged that Thornburg Mortgage sold I/O Strips to meet its margin calls; (iv) Goldstone advised Simmons and Starrett that Thornburg Mortgage planned to meet the Citigroup Global margin call by having Citigroup Global sell a $110 million I/O securities; and (v) Starrett informed Goldstone and Simmons that selling some assets calls into question Thornburg Mortgage's intent and ability to hold its assets

to maturity.  Response to Starrett MTD at 17 (citing Complaint ¶¶ 36-37, at 11; id. ¶ 54, at 15; id. ¶¶ 66-68, at 19-20).  The SEC asserts that Thornburg Mortgage's statement that it did not sell any assets to meet its margin calls was misleading, even if the I/O Strip Transactions were not sales, because Thornburg Mortgage's statement led investors to believe that Thornburg Mortgage was not required to dispose of any assets.  See Response to Starrett MTD at 18 (citing SEC v. Gabelli, 653 F.3d at 57); Complaint ¶ 65, at 19).

The SEC contends that the Court has no basis to adopt Starrett's interpretation that the statement that Thornburg Mortgage did not sell assets to meet margin calls meant that Thornburg Mortgage did not sell assets at a loss.  See Response to Starrett MTD at 18 (citing Starrett MTD at 8-9; Complaint ¶ 36, at 11; id. ¶ 54, at 16; id. ¶ 65, at 19; ¶ 71, at 21).  The SEC asserts that whether KPMG was aware of the I/O Strip Transactions is not relevant to whether the 2007 Form 10-K was misleading, contrary to Starrett's assertion that the Complaint does not allege that KPMG was unaware of the I/O Strip Transactions.  See Response to Starrett MTD at 17 n.5. The SEC contends that the authority on which Starrett relies for that assertion -- In re Bausch & Lomb, Inc. Sec. Litig., 592 F. Supp. 2d at 341 -- is inapposite, because the plaintiffs did not allege any facts which allowed an inference that a company kept information from its auditors, unlike the SEC's allegations in the Complaint.  See Response to Starrett MTD at 18 n.5.  The SEC contends that, contrary to Starrett's assertion, whether the I/O Strips were similar to Thornburg Mortgage's ARM securities or components of Thornburg Mortgage's Securitized ARM loans is not relevant, because "'selling some assets is substantially the same as selling all assets,'" and because the I/O Strip Transactions affected Thornburg Mortgage's OTTI analysis, and were material to Thornburg Mortgage's liquidity situation.  Response to Starrett MTD at 18 (quoting Complaint ¶ 54, at 16)(citing Starrett MTD at 9; Complaint ¶ 36, at 11; id. ¶ 65, at 19)

The SEC argues that the Complaint sets forth particularized facts which demonstrate that Thornburg Mortgage's statement that it had the intent and ability to hold its ARM securities until recovery was false and misleading.  The SEC asserts that Thornburg Mortgage's March 11, 2008, restatement defeats Starrett's assertion regarding the veracity of Thornburg Mortgage's intent and ability to hold its ARM Securities, because the restatement "reflects that Thornburg had determined that its previous statement that it had the intent and ability to hold these assets to maturity was false."  Response to Starrett MTD at 19 (citing Complaint ¶ 11, at 14; <u>SEC v. Espuelas</u>, 579 F. Supp. 2d at 472).

The SEC contends that it has not alleged "'fraud by hindsight,'" but has rather alleged that Starrett, Goldstone, and Simmons "had specific information prior to filing the Form 10K that rendered their statement" regarding Thornburg Mortgage's intent and ability to hold its ARM securities fraudulent.  Response to Starrett MTD at 19 (quoting Starrett MTD at 10).  The SEC points out that it has alleged that: (i) Thornburg Mortgage received two billion dollars in margin calls in August, 2007, which resulted in Thornburg Mortgage's default on certain reverse repurchase agreement, and required Thornburg Mortgage to sell twenty-two million dollars of its MBS; (ii) Thornburg Mortgage paid approximately $360 million in margin calls during November, 2007, and $650 million in margin calls in January and February, 2008; (iii) immediately before Thornburg Mortgage filed its 2007 Form 10-K, in the second half of February Thornburg Mortgage received more than $300 million in margin calls; (iv) Thornburg Mortgage could not timely meet its latest margin calls and thus violated its reverse repurchase agreements with at least three lenders; (v) Thornburg Mortgage's late payments could have triggered defaults and cross-default notices from Thornburg Mortgage's lenders, which could have allowed those lenders to seize and sell the ARM Securities that Thornburg Mortgage used

as collateral for its loans; (vi) Citigroup Global sent Thornburg Mortgage a letter informing Thornburg Mortgage that it was in violation of its reverse repurchase agreement with Citigroup Global, and that Citigroup Global reserved the right to declare Thornburg Mortgage in default; (vii) Thornburg Mortgage sold I/O Strips to meet the margin calls it received during the last week of February, 2008; (viii) Starrett informed Goldstone and Simmons that selling some assets would call into question Thornburg Mortgage's intent and ability to hold its assets to maturity; (ix) Goldstone and Simons learned of the European hedge fund collapse the day before the 2007 Form 10-K was filed, and Goldstone acknowledged that the fund's collapse would result in additional margin calls for Thornburg Mortgage; (x) Thornburg Mortgage paid its final outstanding margin call the day before the 2007 Form 10-K was filed, February 27, 2008; (xi) Thornburg Mortgage asserted in its 2007 Form 10-K that its impairments were not OTTI, because it had the intent and ability to hold its ARM securities until recovery; (xii) as of February 28, 2008, Thornburg Mortgage had approximately forty million dollars in available cash; and (xiii) Thornburg Mortgage restated its financial statements on March 11, 2008, which reflected a $427.8 million loss because Thornburg Mortgage did not have the intent and ability to hold its ARM Securities until maturity or recovery.  See Response to Starrett MTD at 19-21 (citing Complaint ¶ 11, at 4; ¶¶ 24, 26-29, at 8-9; id. ¶¶ 34, 36, at 10-11; id. ¶¶ 38-39, at 12; id. ¶ 41, at 12-13; id. ¶ 54, at 16; Complaint ¶ 75, at 22; id. ¶ 95, at 27-28).  The SEC argues that, because Thornburg Mortgage did not satisfy all of its margin calls until February 27, 2008, Thornburg Mortgage's lenders could have seized its assets up to the day before the 2007 Form 10-K was filed, making Thornburg Mortgage's statement that it had the intent and ability to hold its securities until maturity untrue, as Thornburg Mortgage's intent and ability to hold its assets was based upon only its lender's forbearance.  See Response to Starrett MTD at 21-22.

The SEC contends that Starrett's assertion -- that the "'highly judgmental and predictive nature of the intent and ability to hold inquiry cuts against'" finding her statements were false -- is "without support and defies common sense."  Response to Starrett MTD at 22 (quoting Starrett MTD at 10).  The SEC contends that such a position would make "any claim based upon a GAAP provision involving judgment . . . immune from suit" and is "not the law."  Response to Starrett MTD at 22 (citing In re RAIT Fin. Trust Sec. Litig., No. 2:07-cv-03148, 2008 WL 5378164, at *7 (E.D. Pa. Dec. 22, 2008)).  The SEC contends that this argument raises a factual question, which is not appropriate for the Court to address when ruling on a motion to dismiss.  See Response to Starrett MTD at 22 (citing In re Burlington Coat Factory, 114 F.3d 1410, 1421 (3d Cir. 1997); In re Ambac Fin. Group., Inc. Sec. Litig., 693 F. Supp. 2d 241, 273 (S.D.N.Y. 2010)).  The SEC further argues that Starrett cannot "purport to have exercised good faith in making a difficult and subjective judgment when, in fact, she concealed and misrepresented the most critical information relating to that judgment from KPMG."  Response to Starrett MTD at 23.

The SEC similarly asserts that Starrett's argument that the "'issuance of several hundred million dollars in margin calls by multiple lenders . . . is akin to an unexpected 'run on a bank'" and thus could not have been factored into Thornburg Mortgage's OTTI analysis raises a factual question that the Court should resolve at trial, and not on a motion to dismiss.  Response to Starrett MTD at 23 (quoting Starrett MTD at 12).  The SEC further contends that the post-2007 Form 10-K margin calls were not an "anomaly," pointing out that Thornburg Mortgage had received $1.1 billion in margin calls in August, 2007, $360 million in November and December, 2007, $650 million in January and the first half of February, 2008, and $300 million in the last two weeks of February, 2008.  Response to Starrett MTD at 23.  The SEC also points out that the

Defendants were aware of the possibility of more margin calls after the 2007 Form 10-K was filed, as evidenced by Simmons' statement to Starrett that the 2007 Form 10-K should be filed before business opened on February 28, 2008 so as to avoid "'any issues based on Thursday activity.'"  Response to Starrett MTD at 23 (quoting Complaint ¶ 40, at 12).

The SEC contends that Starrett's assertion that Thornburg Mortgage had the intent and ability to hold its ARM Securities until maturity, based upon its expected "'significant infusion of cash within days of the 10-K filing,'" is a circular argument, because such an influx of cash would be based upon the fraudulent statements in the 2007 Form 10-K.  Response to Starrett MTD at 24 (quoting Starrett MTD at 12)(citing Complaint ¶ 32, at 10).  The SEC contends that Starrett's assertion that Thornburg Mortgage's intent and ability to pay was "'thoroughly examined and agreed to by KPMG'" is "wholly misleading," because essential information was withheld from KPMG, and, further, the restatement demonstrates that the OTTI analysis in the 2007 Form 10-K was false.  Response to Starrett MTD at 24 (quoting Starrett MTD at 12)(citing Complaint ¶¶ 53, 57-58, at 16-17; id. ¶¶ 72-74, 76-80, at 21-24).

The SEC contends that Starrett's assertion -- that the statements in the 2007 Form 10-K are not misleading because of other statements -- "fails for a variety of reasons."  Response to Starrett MTD at 25 (citing Starrett MTD at 12-13).  The SEC contends that the "bespeaks caution doctrine," upon which Starrett relies, "has been specifically rejected in connection with a statement related to FAS 115 and an 'other than temporary' impairment analysis."  Response to Starrett MTD at 25 (quoting In re RAIT Fin. Trust Sec. Litig., 2008 WL 5378164, at **7-8). The SEC contends that "'inclusion of general cautionary language regarding a prediction [does] not excuse [an] alleged failure to reveal known material adverse facts.'"  Response to Starrett MTD at 25 (alterations in original)(quoting In re Sprint Corp. Sec. Litig., 232 F. Supp. 2d 1193,

1222 (D. Kan. 2002)).  The SEC contends that the bespeaks caution doctrine applies only to forward-looking statements, but that it has alleged that the statements in the 2007 Form 10-K and the OTTI analysis were false when made.  See Response to Starrett MTD at 25-26 (citing Complaint ¶ 12, at 4-5; Grossman v. Novell, Inc., 120 F.3d at 1123).  The SEC contends that Thornburg Mortgage's OTTI analysis was "one of the most critical statements in the Form 10-K," because it allowed Thornburg Mortgage to report what should have been a $357 million loss as a sixty-five million dollar gain.  Response to Starrett MTD at 26 (citing Ganino v. Citizens Utils. Co., 228 F.3d at 164).

The SEC further contends that it has adequately alleged particular facts which show that Starrett made false statements to, and omitted material information from, KPMG.  The SEC points out that it has alleged that: (i) Starrett misrepresented and/or failed to disclose to KPMG Thornburg Mortgage's precarious financial condition, its violations of its reverse repurchase agreements, its reliance on its lenders' forbearance, and the use of I/O Strip Transactions to satisfy margin call payments late; (ii) Starrett stated in an electronic mail transmission that withholding this information was purposeful; (iii) Starrett, in signing the management representation letter to KPMG, falsely stated that Thornburg Mortgage had complied with all its contractual agreements, had the intent and ability to hold its impaired securities until recovery, was not required to adjust its financial statements or disclose events after December 31, 2007, and that Thornburg Mortgage disclosed all maters relevant to Thornburg Mortgage's ability to continue as a going concern; (iv) Starrett did not disclose to KPMG that Thornburg Mortgage was in violation of certain reverse repurchase agreements, despite KPMG's request for that specific information; (v) Starrett and Simmons provided a materially false Going Concern Analysis to KPMG, which falsely stated that Thornburg Mortgage had successfully met all

margin calls, returned to profitability in the fourth quarter of 2007, and had the intent and ability to hold its ARM securities until recovery.  See Response to Starrett MTD at 27-28 (citing Complaint ¶ 51, at 15; id. ¶¶ 53, 57, at 16-17; id. ¶ 58, at 17; ¶¶ 72-74, at 21-22; id. ¶ 79, at 23). The SEC contends that Starrett's allegation that it engaged in "puzzle pleading is without merit," because the Complaint "'provides notice to [Ms. Starrett] regarding the statements and omissions that'" are allegedly misleading, as Starrett stated that the SEC does not allege she was aware of the Citigroup Global Letter or collapse of the European hedge fund.  Response to Starrett MTD at 28 n.14 (alteration in original)(quoting In re Williams Sec. Litig., 339 F. Supp. at 261).

The SEC asserts that Starrett "appears to argue that . . . she is blameless because she did not understand the [reverse repurchase] agreements."  Response to Starrett MTD at 28.  The SEC asserts that there "is no legal basis for this argument" and, additionally, that it need "only allege that Ms. Starrett made false statements to [Thornburg Mortgage's] auditors"  to plead a violation of rule 13b2-2, and not that Starrett was familiar with the specificity of the reverse repurchase agreements, margin call negotiations, or that she had particular expertise.  Response to Starrett MTD at 28-29 (citing Starrett MTD at 15-16).  The SEC contends that it has alleged that Starrett was aware that Thornburg Mortgage was in violation of its reverse repurchase agreements, specifically through alleging that Starrett was aware that Thornburg Mortgage's lenders were concerned about its delay in meeting margin calls and were requiring that the delay be disclosed, and through alleging that Starrett signed a letter to KPMG stating that Thornburg Mortgage had complied with all contractual agreements.  See Response to Starrett MTD at 29 (citing Complaint ¶ 64, at 18-19; id. ¶ 19, at 7; id. ¶¶ 53, 57, at 16-17).  The SEC contends that Starrett's assertion that the violations were unimportant, and that not all contractual details need to be disclosed, is misplaced, as the SEC asserts it is arguing that Thornburg Mortgage's violations of

its reverse repurchase agreements were material violations, which needed to be disclosed, and is not arguing that every detail of Thornburg Mortgage's reverse repurchase agreements and margin call negotiations should have been disclosed.  See Response to Starrett MTD at 29-30 (citing Starrett MTD at 15-16; Complaint ¶26, at 8; id. ¶ 41, at 12-13).

The SEC contends that it has alleged particularized facts which demonstrate that Starrett made false representations to KPMG regarding Thornburg Mortgage's margin call situation. The SEC asserts that it has alleged, contrary to Starrett's assertion, that she withheld Thornburg Mortgage's violation of its reverse repurchase agreements, the true nature of its financial condition, that Thornburg Mortgage sold asserts to meet margin calls, that Thornburg Mortgage had complied with all of its margin call agreements, and that Thornburg Mortgage need not disclose recent events to KPMG.  See Response to Starrett MTD at 30 (citing Complaint ¶ 51, at 15; id. ¶ 79, at 23; id. ¶ 57, at 16-17)).  The SEC points out that KPMG specifically requested Thornburg Mortgage to disclose any violations of its reverse repurchase agreements, yet Starrett did not.  See Response to Starrett MTD at 30 (citing Complaint ¶ 58, at 17).   The SEC contends that any disclosures Thornburg Mortgage made in the 2007 Form 10-K do not negate that Starrett withheld material information from KPMG, because the 2007 Form 10-K did not disclose "the fact that Thornburg failed to timely satisfy . . . margin calls, that Thornburg had to sell assets to satisfy the margin calls at all, and Thornburg's precarious financial condition." Response to Starrett MTD at 31.  The SEC contends that the Court should disregard Starrett's assertions supported by documents which the Complaint does not reference, as Starrett is attempting to "improperly argue the facts."  Response to Starrett MTD at 31 (citing Starrett MTD at 17-18; Smith v. United States, 562 F.3d 1090, 1098 (10th Cir. 2009)).

The SEC asserts that Starrett's argument regarding the electronic mail transmission in which she acknowledges purposefully withholding from KPMG "merely raises a timing point . . . . [and] is simply false."  Response to Starrett MTD at 32 (citing Starrett MTD at 18).  The SEC asserts that the mail evidences that the Defendants "had no intention of ever telling the auditors about Thornburg's failure to timely satisfy the margin calls, that Thornburg sold assets . . . to meet margin calls, or the true nature of Thornburg's financial condition if the margin calls were paid."  Response to Starrett MTD at 32.   The SEC contends that Starrett's statement in the electronic mail transmission that Thornburg Mortgage would have to inform KPMG of the margin call situation if Thornburg Mortgage was unable to meet its margin calls does not negate that she withheld material information from KPMG.   The SEC argues that, if Thornburg Mortgage did not satisfy its margin calls, "there would be no way to hide" Thornburg Mortgage's default and the seizures of its assets by its lenders from KPGM, making disclosure to KPMG useless at that point.  Response to Starrett MTD at 33.

The SEC contends that it has alleged particularized facts which demonstrate that Starrett engaged in a scheme to violate Exchange Act rule 10b-5.  The SEC asserts that its allegations against Starrett are not based upon her being the "'maker'" of the misrepresentation in the 2007 Form 10-K, but is rather premised on her "scheme liability."  Response to Starrett MTD at 33-34 (quoting Starrett MTD at 20)(citing SEC v. United States Envtl., Inc., 155 F.3d 107, 110-12 (2d Cir. 1998); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1471-72 (2d Cir. 1996); SEC v. St. Anselm Exploration Co., No. 11-cv-00668, 2012 WL 1045707, at *6 (D. Colo. Mar. 28, 2012); SEC v. Lee, 720 F. Supp. 2d 305, 333-34 (S.D.N.Y. 2010); Briton v. Parker, No. 06-cv-01797, 2007 WL 2871003, at *4 (D. Colo. Sept. 26, 2007); Shriners Hospitals for Children v. Qwest Commc'ns Int'l, Inc., No. 04-CV-0781, 2005 WL 2350569, at *6 (D. Colo. Sept. 23, 2005); In re

AOL Time Warner, Inc. Sec. & ERISA Litig., 381 F. Supp. 2d 192, 217, 229 (S.D.N.Y. 2004);

In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 335-37 (S.D.N.Y. 2004)).

      The SEC asserts that the scheme in which Starrett participated was to deceive KPMG and the "'investing public to believe that Thornburg had successfully met all margin calls and that the company was not required to sell any assets to meet its margin calls.'"  Response to Starrett MTD at 34 (quoting Complaint ¶ 5, at 3).  The SEC points out that it has alleged that: (i) Starrett made misrepresentations to KPMG, and purposely did not tell them about Thornburg Mortgage's margin calls; (ii) Starrett scrambled to satisfy margin calls before filing the 2007 Form 10-K, and did not disclose those margin calls to KPMG; (iii) Starrett planned to raise cash quickly after the 2007 Form 10-K was filed to meet future margin calls; and (iv) Starrett improperly performed the OTTI analysis to overstate Thornburg Mortgage's income, she sold the I/O Strips to pay Thornburg Mortgage's margin calls, and she was aware that the I/O Strip Transactions allowed the Defendants to keep Thornburg Mortgage's financial situation quiet while they dealt with it. See Response to Starrett MTD at 34-35 (citing Complaint ¶¶ 5-6, 12, at 3-5; id. ¶ 51, at 15; id. ¶¶ 57-59, at 16-17; id. ¶¶ 66-67, at 19-20; id. ¶ 72, at 16; id. ¶¶ 31-32, at 10).  The SEC asserts that Starrett has waived her objections to the SEC's allegation that she participated in a scheme to violate rule 10b-5 of the Exchange Act, because she did not raise any objections thereto in the Starrett MTD.  See Response to Starrett MTD at 35 (citing United States v. Harrell, 642 F. 3d 907, 918 (10th Cir. 2011)).

      The SEC contends that it has adequately alleged particular facts which demonstrate that Starrett acted with scienter.  The SEC asserts that Starrett's scienter is demonstrated by her statement: "We have purposely not told [the auditors] about the margin calls."  Response to Starrett MTD at 36 (quoting Complaint ¶ 53, at 16).  The SEC asserts that there is "no doubt that

Ms. Starrett was aware that the Form 10-K contained misstatements at the time it was made," given the SEC's allegations that: (i) Goldstone informed Starrett on February 21, 2007 that Thornburg Mortgage could not timely meet its Citigroup Global Repo Agreement, yet the 2007 Form 10-K stated that Thornburg Mortgage had successfully met all margin calls; (ii) Goldstone informed Starrett that Thornburg Mortgage had used I/O Strip Transactions to meet its margin calls, yet the 2007 Form 10-K stated that Thornburg did not sell any assets to meet margin calls; (iii) Starrett knew that Thornburg Mortgage did not have the intent and ability to hold its ARM securities until recovery, because Thornburg Mortgage was in violation of its reverse repurchase agreements and had used I/O Strip Transactions to meet margin calls, yet the 2007 Form 10-K stated that Thornburg Mortgage had the intent and ability to hold its ARM securities until recovery. See Response to Starrett MTD at 36-37 (citing Complaint ¶ 53, at 16; id. ¶¶ 60-64, at 17-19; id. ¶¶ 66-71, at 19-20; id. ¶ 79, at 23).

The SEC contends that any "negative disclosures" in the 2007 Form 10-K do not negate Starrett's scienter. Response to Starrett MTD at 38 (citing Starrett MTD at 25). The SEC asserts that the statements to which Starrett points "contain conditional language regarding what may occur under certain circumstances" and thus "do not refute the false statements alleged in the Complaint." Response to Starrett MTD at 39 (citing Starrett MTD at 26). The SEC contends that the cases to which Starrett cites, in support of her assertion that Thornburg Mortgage's negative disclosures "'undermine any inference that Defendants intentionally or recklessly misled the investing public or KPMG,'" are inapposite, because both cases applied the PSLRA's heightened pleading standard, which the SEC asserts is inapplicable to this case. Response to Starrett MTD at 39 (quoting Starrett MTD at 25)(citing Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco, Inc.; In re Homebanc Corp. Sec. Litig.). The SEC further

contends that the cases are factually distinguishable in that they do not address the allegations in the Complaint.  See Response to Starrett MTD at 40 (citing Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco, Inc., 2011 WL 1198712, at *20; In re Homebanc Corp. Sec. Litig., 706 F. Supp. 2d at 1357).

The SEC contends that Starrett's argument that the complexity of the OTTI analysis precludes finding that she had scienter is irrelevant, because the SEC alleges that Starrett did not properly consider the information at her disposal, and withheld information from KPMG. Response to Starrett MTD at 40 (citing Starrett MTD at 28).  The SEC contends that, because it is not alleging that Thornburg Mortgage "mistakenly applied the relevant accounting knowledge," whether "the accounting rules being violated were simple or complex has no effect on whether these allegations adequately allege scienter."  Response to Starrett MTD at 41.

The SEC argues that Thornburg Mortgage's quick restatement does not "'undermine[] an inference of scienter,'" because KPMG forced the restatement.  Response to Starrett MTD at 41 (quoting Starrett MTD at 33)(citing Complaint ¶ 99, at 29).  The SEC contends that Thornburg Mortgage's rapid financial unraveling reveals "just how precarious Thornburg's financial situation was," and that "'acknowledging one's wrongdoing does not excuse it.'"  Response to Starrett MTD at 41 (alterations omitted)(quoting In re Sonus Networks, Inc. Sec. Litig., No. Civ.A.04-10294, 2006 WL 1308165, at *17 (D. Mass. May 10, 2006)).

The SEC contends that its allegation that the Defendants' motivation was a desire for Thornburg Mortgage to survive the mortgage crisis evidences their scienter, and that the Court "'should not ignore such motives when considering the totality of factual circumstances that might potentially give rise to a strong inference of scienter.'"  Response to Starrett MTD at 42 (quoting In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. at 1202)(citing Complaint ¶ 4, at

2; Starrett MTD at 32).  The SEC contends that Starrett's lack of alleged "'pecuniary gain,'"

Starrett MTD at 34-35, does not negate her scienter, as a "'lack of insider trading does not

always negate or weaken inference of scienter,'" <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 695 F.

Supp. at 1194.  <u>See</u> Response to Starrett MTD at 42.  The SEC contends that the financial crisis

affecting the United States of America in February, 2008, provided another motive for the

Defendants, filling the "'gap left by a lack of suspicious insider-trading activity: survival.'"

Response to Starrett MTD at 42 (quoting <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 695 F. Supp.

at 1194).  The SEC contends that the Defendants' scienter may be inferred, because they were

"inextricably financially intertwined with the continued viability" of Thornburg Mortgage.

Response to Starrett MTD at 42 (<u>citing In re Thornburg Mortg., Inc. Sec. Litig.</u>, 695 F. Supp. 2d

at 1195).

        The SEC contends that it has alleged particularized facts which demonstrate the Starrett

acted with knowledge, or reckless disregard of, the fact that she was aiding or abetting

Thornburg Mortgage's primary violation of the securities laws.  <u>See</u> Response to Starrett MTD at

43 (citing Starrett MTD at 35).  The SEC also contends that it need not allege that Starrett had

actual knowledge of Thornburg Mortgage's violations of §§ 10(b) and 13(a), and rules 12b-20

and 13a-1 of the Exchange Act; the SEC asserts that alleging Starrett's recklessness is sufficient.

<u>See</u> Response to Starrett MTD at 43 (citing 15 U.S.C. § 78t; Dodd-Frank Act, Pub. L. No. 111-

203, § 929O, 124 Stat. 1376, 1862 (2010); <u>Geman v. SEC</u>, 334 F.3d at 1196; <u>SEC v. Nacchio</u>,

614 F. Supp. 2d at 1172; <u>SEC v. Intelliquis Int'l., Inc.</u>, No. 2:02-CV-674, 2003 WL 23356426, at

**13-14 (D. Utah, Dec. 11, 2003); <u>SEC v. Autocorp Equities, Int'l, Inc.</u>, 292 F. Supp. 2d at

1331-32).  The SEC contends that the Dodd-Frank Act's addition of the term "recklessly" for the

scienter necessary for aiding and abetting reflects the scienter requirement "even prior to the

passage of Dodd-Frank."  Response to Starrett MTD at 44 n.25 (citing <u>United States v. Sepulveda</u>, 115 F.3d 882, 885 n.5 (11th Cir. 1997); <u>United States v. Montgomery Cnty.</u>, 761 F.2d 998, 1003 (4th Cir. 1985)).  The SEC further contends that it has adequately alleged the requisite scienter, regardless of whether the standard is knowledge or recklessness, pointing out that Starrett does not contend she was unaware of false statements in the 2007 Form 10-K, even though Starrett maintains that she was unaware that the OTTI was incorrect.  <u>See</u> Response to Starrett MTD at 43 (citing Starrett MTD at 35).

The SEC asserts that it has alleged sufficient facts to demonstrate that Starrett falsified books, records, and accounts in violation of certain internal control provisions, and aided and abetted Thornburg Mortgage's violation of those control provisions.  <u>See</u> Response to Starrett MTD at 43.  The SEC contends, contrary to Starrett's assertion, that it need not "suggest improved controls or explain the effect of improved controls," and that allegations of Starrett's intentional misrepresentations to and concealment of information from KPMG are sufficient to show her violation of internal controls.  Response to Starrett MTD at 45 (citing Starrett MTD at 37; Complaint ¶ 57, at 16-17).  The SEC contends that making false statements to KPMG is a violation of Thornburg Mortgage's internal controls that many courts have recognized.  <u>See</u> Response to Starrett MTD at 45 (citing <u>SEC v. Retail Pro, Inc.</u>, 673 F. Supp. 2d 1108, 1142 (S.D. Cal. 2009); <u>SEC v. Shapiro</u>, No. 4:05cv364, 2008 WL 819945, at *6 (E.D. Tex., Mar. 25, 2008)).  The SEC also asserts that Starrett's improper performance of the OTTI analysis violated Thornburg Mortgage's internal controls.  <u>See</u> Response to Starrett MTD at 45 (citing Complaint ¶ 51, at 15).  The SEC contends that, contrary to Starrett's assertion, whether KPMG determined Thornburg Mortgage's internal controls were relevant is not relevant to the SEC's allegations, because KPMG came to its conclusion on the basis of the Defendants' misrepresentations and

omissions, thereby undermining any statement by KPMG regarding the adequacy of Thornburg

Mortgage's internal controls.  See Response to Starrett MTD at 46 (citing Starrett MTD at 37-38;

Complaint ¶¶ 51, 53, 57, 59, at 15-17; id. ¶¶ 99-103, at 29-30).  The SEC further contends that

the Complaint does not support Starrett's assertion that the "'Defendants knew that Thornburg's

OTTI accounting was incorrect, or acted unreasonably or recklessly with respect to the

impairment analysis.'"  Response to Starrett MTD at 46 (emphasis in original)(quoting Starrett

MTD at 39).  The SEC points out that it alleges that Starrett "knowingly falsified Thornburg's

records and the management letter provided to KPMG, and that she participated in

misrepresenting Thornburg [Mortgage]'s income."  Response to Starrett MTD at 47-48 (citing

SEC v. Delphi Corp., No. 06-14891, 2008 WL 4539519, at *20 (E.D. Mich. Oct. 8, 2008);

Complaint ¶ 57, at 16-17).

### 8. **Goldstone and Simmons' Reply in Support of Their Motion to Dismiss**.

Goldstone and Simmons contend that the SEC's strategy is "to mischaracterize and quote

documents out of context, then demand that the Court ignore these distortions because it would

supposedly be 'premature' to 'weigh the evidence' at the motion to dismiss stage."  Reply Brief

in Support of Motion to Dismiss on Behalf of Defendants Larry Goldstone and Clarence G.

Simmons at 8, filed July 20, 2010 (Doc. 59)("Goldstone & Simmons Reply")(quoting Response

to Goldstone & Simmons MTD at 4-7).  Goldstone and Simmons contend that the SEC's

pleading tactic is an "implicit acknowledgement that the documents on which the Complaint is

based defeat Plaintiff's claims," and is "entirely at odds with firmly established case law."

Goldstone & Simmons Reply at 8 (citing Ashcroft v. Iqbal, 556 U.S. at 679).

Goldstone and Simmons contend that the federal securities laws "do not require

companies to make absolute statements about risks that have not yet materialized, so long as the

possibility of those risks materializing is disclosed."  Goldstone & Simmons Reply at 9 (citing Grossman v. Novell, Inc., 909 F. Supp. 845, 850 (D. Utah, 1995), aff'd, 120 F.3d 1112 (10th Cir. 1997)).   Goldstone and Simmons further contend that the SEC's reliance on "the word 'successfully' . . . demonstrates sheer desperation, as this word is often found to be nothing more than "inactionable puffery."  Goldstone & Simmons Reply at 9, 17 (citing Grossman v. Novell, Inc., 120 F.3d at 1121-22).   Goldstone and Simmons contend that the "biggest defect" in the Complaint is that the 2007 Form 10-K disclosed "the bottom line bad news for Thornburg in every material respect."  Goldstone & Simmons Reply at 11.   Goldstone & Simmons contend that the SEC's assertion that the Court should not consider the market's negative reaction to the 2007 Form 10-K as evidence that it disclosed Thornburg Mortgage's dire financial situation is "contrary to a host of decisions in which courts have taken judicial notice" of analysts' reports and financial publications "at the Rule 12(b)(6) stage to determine what the market knew and whether it was misled."  Goldstone & Simmons Reply at 12 (citing Response to Goldstone & Simmons MTD at 5, 20-23).   Goldstone and Simmons argue that where "publicly available analyst and news reports demonstrate that the defendant's statement were not misleading, courts do not hesitate to grant motions to dismiss."  Goldstone & Simmons Reply at 12 (citing Herring v. Teradync, Inc., 242 F. App'x 469, 471 (9th Cir. 2007)).   Goldstone and Simmons argue that both Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp. and Payne v. DeLuca "could hardly be more on point," because in both cases the courts dismissed a plaintiff's claims that a defendant's failure to disclose its margin calls and difficulty in meeting financial obligations was fraud, and, therefore, the Court should dismiss the SEC's allegations of fraud based upon the same actions. Goldstone & Simmons Reply at 12-13 (citing Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp., 675 F. 3d at 1048-49; Payne v. DeLuca, 433 F. Supp. 2d at 594).

Goldstone and Simmons also contend that the SEC's allegation that Thornburg Mortgage did not successfully fulfill its reverse repurchase agreements is problematic, because Thornburg Mortgage's reverse repurchase agreements "uniformly permitted Thornburg to work out payment plans with its lenders."  Goldstone & Simmons Reply at 15, 15 n.8 (citing Citigroup Global Repo Agreement § 5.8, at 9; Greenwich Repo Agreement § 4(c) at 5, § 11(a), at 7-8; Credit Suisse Repo Agreement §§ 4(c), at 4, § 11(a), at 6.

Goldstone and Simmons assert that, notwithstanding the Citigroup Global Letter, because Thornburg Mortgage arranged a payment plan for all of its margin calls, "there was no material non-compliance with the Repo Agreements to disclose."  Goldstone & Simmons Reply at 15. Goldstone and Simmons further argue that the Court need not accept the SEC's interpretation of the Citigroup Global Repo Agreement indicating that Thornburg Mortgage was in breach and assert that, because Citigroup Global accepted Thornburg Mortgage's payment plan, pursuant to § 5.8, at 11 of the Citigroup Global Repo Agreement, the SEC's allegation that Thornburg Mortgage was in breach is "fatally undermine[d]."  Goldstone & Simmons Reply at 16. Goldstone and Simmons further assert that Thornburg Mortgage's statement that it "successfully" met margin calls, when taken in the context of other negative disclosures in the 2007 Form 10-K, demonstrates that Thornburg Mortgage's statements regarding its financial condition in the 2007 Form 10-K were not materially misleading.  Goldstone & Simmons Reply at 16-17 (citing 2007 Form 10-K at 36).

Goldstone and Simmons also argue that they cannot be liable for their statements regarding Thornburg Mortgage's intent and ability to holds its ARM securities, because the statement that Thornburg Mortgage had the "'intent and ability to hold its ARM securities until their value recovered' . . . is plainly forward-looking."  Goldstone & Simmons Reply at 17-18

(internal alterations omitted)(quoting Response to Goldstone & Simmons MTD at 24-25).

Goldstone and Simmons assert that the SEC has only alleged that they expected to possibly

receive additional margin calls after the 2007 Form 10-K was filed, not that they actually knew

that "Thornburg would be hit with enormous new margin calls shortly after filings its 10-K and

be declared in default by repo lenders who had previously agreed to payment plans"; thus, the

SEC has not alleged any basis upon which the Court could find that Goldstone and Simmons did

not believe their OTTI analysis was accurate.   Goldstone & Simmons Reply at 18 (citing

Response to Goldstone & Simmons MTD at 12-15; Fait v. Regions Fin. Corp., 655 F.3d 105,

112 (2d Cir. 2011)).   Goldstone and Simmons also assert that the SEC has conceded that

Thornburg Mortgage's I/O Strip Transactions were properly characterized as debt transactions,

that the SEC has not alleged any reason why those transactions would cast doubt on Thornburg

Mortgage's OTTI analysis, and, thus, that the SEC has not alleged a reason why the sales should

have been disclosed other than they were in the 2007 Form 10-K, as a form of debt financing.

See Goldstone & Simmons Reply at 18-19 (citing Response to Goldstone & Simmons MTD at

20; Complaint ¶ 37, at 11; Goldstone & Simmons MTD at 34, 35, 37).

        Goldstone and Simmons contend that its March 11, 2008, restatement does not render the

2007 Form 10-K materially misleading, because Thornburg Mortgage "merely recognized losses

on Thornburg's Purchased ARM assets that had already been fully disclosed and explained in

detail in the 10-K."   Goldstone & Simmons Reply at 19-20 (citing Response to Goldstone &

Simmons MTD at 16-17; 2007 Form 10-K at 38. 97-102).   Goldstone and Simmons assert that,

because the SEC stated that "'Thornburg's restatement . . . was forced by Thornburg's auditors,"

the restatement cannot be construed as an admission by Goldstone and Simmons that the 2007

Form 10-K was materially misleading.  Goldstone & Simmons Reply at 20-21 (citing Response to Goldstone & Simmons MTD at 34).

Goldstone and Simmons contend that the SEC's scienter theory "is predicated on negligence and is therefore facially insufficient to support a fraud claim."   Goldstone & Simmons Reply at 10, 21.  Goldstone and Simmons assert that the SEC has alleged nothing more than that they failed to act with reasonable care in their OTTI analysis, and that, to be culpable for securities fraud, the SEC would have had to allege their recklessness -- "'an extreme departure from the standards of ordinary care,'" -- and that Thornburg Mortgage's OTTI analysis presented "'a danger of misleading buyers or sellers'" of which they either knew, or which should have been obvious to Goldstone and Simmons.   Goldstone & Simmons Reply at 21 (quoting City of Phila. v. Fleming Cos., Inc., 264 F.3d at 1258).   Goldstone and Simmons contend that, because the Complaint sets forth that Thornburg Mortgage had successfully met its margin calls by the time the 2007 Form 10-K was filed and planned to raise more capital within a few days, the plausibility that they recklessly disregarded known risks is low.  See Goldstone & Simmons Reply at 22 (citing Goldstone & Simmons MTD at 10-15, 50-51).   Goldstone and Simmons contend that Simmons' Feb. 21 Email to BOD evidences his belief that Thornburg Mortgage had successfully met, and would continue to successfully meet, its margin calls.  See Goldstone & Simmons Reply at 22-23 (citing Feb. 21 BOD Email at 2).

Goldstone and Simmons assert that the SEC dwells too much on the word "sold" in internal electronic mail transmission regarding the I/O Strip Transactions, and contends that the SEC has not alleged that any Defendant believed the Transactions were the sale of assets. Goldstone & Simmons Reply at 23 (citing Feb. 22 BOD Email at 2)

Goldstone and Simmons contend that the SEC has not shown that they believed their OTTI analysis was incorrect, and assert that, in City of Omaha v. CBS Corp., the United States Court of Appeals for the Second Circuit found that the absence of allegations establishing that the defendants did not believe their financial statements were true when made precluded the defendants from liability under the securities laws.  See Goldstone & Simmons Reply at 23-24 (citing 679 F.3d at 68).   Goldstone and Simmons argue that the SEC's only allegations supporting Goldstone's and Simmons' scienter are based upon their "'failure to properly consider'" certain facts, which Goldstone and Simmons assert is insufficient to establish scienter when the OTTI analysis is based upon "management's opinion about future events and no facts are alleged showing that management disbelieved that opinion."  Goldstone & Simmons Reply at 24-25 (quoting Response to Goldstone & Simmons MTD at 37-38)(citing Fait v. Regions Fin. Corp., 655 F.3d at 112).   Goldstone and Simmons also argue that the SEC has "mischaracterize[d] Defendants' point about the complexity of the OTTI judgment" by asserting that complexity is not a defense to scienter.  Goldstone & Simmons Reply at 25 (citing Response to Goldstone & Simmons MTD at 25).  Goldstone and Simmons assert that, when an accounting judgment is complex and one on which reasonable minds may disagree, plaintiffs must allege more than disagreement with the judgment by hindsight.  See Goldstone & Simmons Reply at 25 (citing City of Omaha v. CBS Corp., 679 F. 3d at 68; SEC v. Price Waterhouse, 797 F. Supp. at 1241).  Goldstone and Simmons contend that the complexity of the OTTI analysis does not require the Court to engage in a "'battle of the experts,'" as the SEC asserts it does, but rather requires the SEC to factually allege that the "Defendants understood their OTTI conclusion to be inconsistent with GAAP," or "that Defendants made that judgment in anything other than good faith."  Goldstone & Simmons Reply at 26 (quoting Response to Goldstone & Simmons MTD at

41)(citing <u>Florida State Bd. of Admin. v. Green Tree Fin. Corp.</u>; Goldstone & Simmons MTD at

18-19).   Goldstone and Simmons contend that the SEC has mischaracterized the Feb. 25

Goldstone/Starrett Email as evidence of an intent to falsely categorize Thornburg Mortgage's

impairments as unrealized losses instead of OTTI.   <u>See</u> Goldstone & Simmons Reply at 26

(citing Response to Goldstone & Simmons MTD at 39; Feb. 25 Starrett/Goldstone Email).

Goldstone and Simmons argue that, because the 2007 Form 10-K disclosed the possibility that

Thornburg Mortgage may need to sell assets in the future if it could not reach future margin

calls, the plausibility of the SEC's allegation that the Defendants fraudulently withheld

information from investors and KPMG is low.   <u>See</u> Goldstone & Simmons Reply at 27 (citing

<u>Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.</u>, No. 08-C-797, 2010 WL 1287058,

at *21 (E.D. Wisc. Mar. 30, 2010)).

Goldstone and Simmons contend that the SEC has not shown that they had a motive to

keep the margin call situation "'quiet,'" because Thornburg Mortgage's "'extensive disclosure of

'bad news' about its financial condition and prospects . . . undercuts the Complaint's scienter

theory."   Goldstone & Simmons Reply at 28 (quoting Goldstone & Simmons MTD at 20-21).

Goldstone and Simmons argue that the SEC bases its scienter allegations in part on Simmons'

"inscrutable, incomplete email" on February 28, 2008, in which he states: "If they only knew."

Goldstone & Simmons Reply at 29 (citing Response to Goldstone & Simmons MTD at 44-45).

Goldstone and Simmons contend that the Court should not refrain from determining the meaning

of Simmons' electronic mail transmission, as they assert the SEC would have the Court do, and

should either accept Goldstone and Simmons' interpretation of the statement as expressing

frustration about the market's reaction to the 2007 Form 10-K, or not allow the SEC to base

allegations on the statement at all.   <u>See</u> Goldstone & Simmons Reply at 29.   Goldstone and

Simmons similarly contend that the other electronic mail transmissions on which the SEC relies for its scienter allegations, do not support a finding of scienter, when read "in context and in their entirety."  Goldstone & Simmons Reply at 30 (citing Response to Goldstone & Simmons MTD at 45; Feb. 21 Burns/Goldstone Email; Feb. 22 BOD Email;  Feb. 25 Goldstone/Starrett Email).  Goldstone and Simmons argue that the electronic mail transmissions on which the SEC relies evidence an "intent to ensure appropriate disclosure," which is "flatly inconsistent with an intent to defraud."  Goldstone & Simmons Reply at 30.

Goldstone and Simmons contend that the SEC has not alleged any facts which demonstrate that Goldstone was aware that Thornburg had received margin calls it would not be able to satisfy on February 28, 2008, when Goldstone spoke to Thornburg Mortgage's investor relations department and on Street Signs.  See Goldstone & Simmons Reply at 10.  Goldstone and Simmons assert that J.P. Morgan did not inform Thornburg Mortgage that it would not agree to a payment plan for its margin call, as other lenders had done, until the evening of February 28th.  See Goldstone & Simmons Reply at 31 (citing Goldstone & Simmons MTD at 50-53).  Goldstone and Simmons contend that Goldstone's statements on Street Signs were "off the cuff," and not representations for which courts hold defendants liable for securities fraud.  Goldstone & Simmons Reply at 31 (citing Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc., 679 F. 3d 952, 956 (7th Cir. 2012)).  Goldstone and Simmons contend that Thornburg Mortgage's forty million dollars immediately available in cash on February 28, 2008, as well as its plans to raise $450-675 million within the following week, demonstrate that Goldstone believed that Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio'" when he made that statement.  Goldstone & Simmons Reply at 32 (quoting Complaint ¶ 98, at 28).

Goldstone and Simmons contend that the SEC's allegations that they deceived KPMG are conclusory, or based on immaterial issues.  See Goldstone & Simmons Reply at 32.  Goldstone and Simmons assert that the SEC has implicitly conceded that it has no basis for its allegation that KPMG "would have reached a different OTTI conclusion had it received the information Defendants allegedly failed to disclose."  Goldstone & Simmons Reply at 10.  Goldstone and Simmons argue that the SEC's allegations under rule 13b2-2 are based on speculation, and are insufficient to support the SEC's claims.  See Goldstone & Simmons Reply at 32 (citing 17 C.F.R. § 240.13b2-2; Complaint ¶ 83, at 24; Response to Goldstone & Simmons MTD at 52-53). Goldstone and Simmons contend that the SEC does not dispute, and "therefore concedes," that KPMG was aware of many negative facts regarding Thornburg Mortgage's financial situation, including its $300 million in margin calls, its use of payment plans to satisfy those margin calls, the I/O Strip Transaction, the $427.8 million in unrealized losses, Thornburg Mortgage's difficulties in obtaining financing, and the possibility of more margin calls.  Goldstone & Simmons Reply at 32-33 (citing Goldstone & Simmons MTD at 50-51, 54).  Goldstone and Simmons argue that any information withheld from KPMG cannot have been material in light of its knowledge of Thornburg Mortgage's financial situation.

Goldstone and Simmons contend that Thornburg Mortgage's alleged breaches of the reverse repurchase agreements was immaterial, because the reverse repurchase agreements gave its "lenders discretion to agree to payment plans rather than declare a default."  Goldstone & Simmons Reply at 33 (citing Response to Goldstone & Simmons MTD at 51; Goldstone & Simmons MTD at 37).  Goldstone and Simmons also argue that Thornburg Mortgage's alleged failure to recognize unrealized losses on ARM securities is based on the SEC's conclusory allegation that the Defendants reached the wrong OTTI conclusion, "coupled with unfounded

speculation about what KPMG would have done," and is similarly insufficient to state a claim. Goldstone & Simmons Reply at 33 (citing <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678; Response to Goldstone & Simmons MTD at 51).  Goldstone and Simmons contend that KPMG knew of the I/O Strip Transactions, and that Thornburg Mortgage was in the process of paying off $300 million in margin calls.  Further, given the context of "an historic financial crisis," Goldstone and Simmons assert that "it is patently incredible for Plaintiff to assert that KPMG was somehow deceived as to the use of proceeds from those transactions."  Goldstone & Simmons Reply at 33-34 (citing Complaint ¶ 65, at 19; 2007 Form 10-K at 37-38, 86; Response to Goldstone & Simmons MTD at 51).  Goldstone and Simmons contend that the SEC has cited to no authority which requires them to disclose "unconfirmed rumors to auditors," which they assert is precisely the information that Goldstone and Simmons received regarding the European hedge fund's collapse.  Goldstone & Simmons Reply at 35.  Goldstone and Simmons argue that the SEC relies too much on their use of the word "successfully" in Thornburg Mortgage's Going Concern Analysis which states that "'Thornburg successfully continued to meet all margin calls and returned to profitability in the fourth quarter,'" and moreover that the SEC's allegation regarding this statement amounts to nothing more than disagreement by hindsight, and thus the Going Concern Analysis is not an actionable fraudulent statement.  Goldstone & Simmons Reply at 35 (quoting Complaint ¶ 72, at 21).

Goldstone and Simmons assert that Thornburg Mortgage's issuing of a restatement defeats the SEC's auditor deception claim.  Goldstone and Simmons contend that the SEC has not shown that Goldstone actually received the Citigroup Global Letter, and argue it was unclear whether KPMG had requested "all correspondence with repo lenders."  Goldstone & Simmons Reply at 35-36 (citing Response to Goldstone & Simmons MTD at 56-57 n.16; Deposition of

Larry A. Goldstone, taken Mar. 16, 2010, at 12:17-19, 13:6-9, filed June 20, 2012 (Doc. 51-2)("Goldstone Depo."); Goldstone & Simmons MTD at 37, 57).  Goldstone and Simmons further contend that the Citigroup Global Letter was immaterial, and thus need not be disclosed to KPMG, because it "had no impact whatsoever on Thornburg's financial statements."  Goldstone & Simmons Reply at 36 (citing Goldstone & Simmons MTD at 37).  Goldstone and Simmons argue that the SEC has mischaracterized the facts upon which it relies to contend that Simmons' statements that "unforeseeable circumstances" caused the February 28, 2008 margin calls was fraudulent.  Goldstone & Simmons Reply at 36 (citing Response to Goldstone & Simmons MTD at 57-58).  Goldstone and Simmons contend that the "European hedge fund rumor," and Goldstone's electronic mail transmission on February 27, 2008, in which he relates that the rumor is "a warning that Thornburg would be subject to increases in haircuts," do not support a reasonable inference that Simmons expected increased margin calls after the 2007 Form 10-K was filed.  Goldstone & Simmons Reply at 36 (citing Response to Goldstone & Simmons MTD at 27-28).

Goldstone and Simmons contend that the SEC's allegations of aiding-and-abetting, and of control-person liability, must fail "as a matter of law," because the SEC has not sufficiently pled a primary securities law violation.  Goldstone & Simmons Reply at 11.  Goldstone and Simmons further contend that the pleading standard the SEC sets forth for its aiding-and-abetting allegations is based upon cases which pre-date the Dodd-Frank Act, and thus the SEC is incorrect in arguing that it need only plead that the Defendants were reckless as to the commission of a primary securities law violation.  Goldstone and Simmons contend that, under the current Exchange Act, the SEC must plead that they "knowingly" provided substantial

assistance to another who violated securities laws to survive a motion to dismiss.  Goldstone &

Simmons Reply at 37 (citing 15 U.S.C. § 78u-4(f)(10)(A)).

> **9.      Starrett's Reply to the SEC's Response to the Starrett MTD.**

Starrett joins in the arguments set forth in the Goldstone & Simmons Reply, and makes

her own, against the SEC's Response to Starrett MTD.  See Defendant Jane Starrett's Reply in

Support of Motion to Dismiss, at 7, filed July 20, 2012 (Doc. 57)("Starrett Reply").  Starrett first

contends that the SEC is now attempting to improperly recast its primary liability theory as a

scheme liability claim, which Starrett asserts is not set forth in the Complaint.  Starrett asserts

that the Complaint is based exclusively upon alleged misrepresentations and omission, which

Starrett asserts she did not make.  See Starrett Reply at 8 (citing Complaint ¶ 1, at 1; id. ¶ 13, at

5).  Starrett further asserts that, under Janus Capital Grp., Inc. v. First Derivative Traders, she

cannot be liable for having made statements in the 2007 Form 10-K unless she had "ultimately

authority over those statements," which she did not, and she did not sign the 2007 Form 10-K

and the 2007 Form 10-K did not mention her.  Starrett Reply at 8 (citing 131 S. Ct. at 2296).

Starrett asserts that the SEC has conceded that she cannot be liable for as a primary violator

under rule 10b-5, and, Starrett contends that the same rationale precludes her liability under §

17(a)(2) of the Securities Act.   See Starrett Reply at 8-9 (citing Joint Status Report and

Provisional Discovery Plan at 26, 28, filed June 1, 2012 (Doc. 43)("JSR")).

Starrett asserts that the SEC has disingenuously re-cast its allegations against her as

premised on scheme liability.  Starrett points out that the word "scheme" is only used one time in

the first 105 paragraphs of the Complaint, and when mentioned, is "articulated . . . in the

alternative, and . . . co-extensively with the misrepresentations," which Starrett contends is a

cryptic allegation of scheme liability.  Starrett Reply at 9 (citing Complaint ¶ 5, at 3).  Starrett

further asserts that this allegation of scheme liability supports the Defendants' assertion that the Court should dismiss the Complaint because the SEC used improper puzzle pleading. See Starrett Reply at 9-10 (citing Starrett MTD at 14 n.4, 36).

Starrett contends that, even if the Complaint alleges scheme liability, it has failed to state a valid claim. Starrett asserts that, to allege that she engaged in a scheme which violated rule 10b-5(a) or (c), the SEC must allege that her conduct was "both (i) inherently deceptive, and (ii) distinct from any alleged misrepresentations or omissions." Starrett Reply at 10 (citing SEC v. Kelly, 817 F. Supp. 2d at 359-61; SEC v. Lucent Techs., Inc., 610 F. Supp. 2d 342, 359-61 (D.N.J. 2009)). Starrett asserts that the facts which the SEC alleges in support of her scheme liability fail to state a claim under established case law. See Starrett Reply at 11 (citing JSR at 27-28). Starrett contends that the SEC relies upon the same facts to allege that she engaged in a scheme as the SEC relies upon to assert that the Defendants made fraudulent misrepresentations and omissions, and thus, these allegations fail to satisfy the second requirement of properly pleading scheme liability. See Starrett Reply at 11-12 (citing Complaint ¶¶ 5, 8 at 3-4; id. ¶ 75, at 22; id. ¶¶ 86-87, at 25-26; Joint Status Report at 27-28). Starrett contends that in SEC v. Kelly, the Honorable Colleen McMahon, United States District Judge for the Southern District of New York found that Janus Capital Grp., Inc. v. First Derivative Traders precluded finding a defendant primarily liable under rule 10b-5(b), because the SEC's allegations of scheme liability were improperly based upon the same facts that the SEC alleged demonstrated a primary violation. See Starrett Reply at 12 (citing SEC v. Kelly, 817 F. Supp. 2d at 342-43). Starrett asserts that the same rationale applies here, as she contends that Janus Capital Grp., Inc. v. First Derivative Traders precludes her from being primarily liable under rule 10b-5, and because the SEC has alleged the same facts for her primary liability and scheme liability. See Starrett Reply

at 12, 12 n.6 (citing <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 177 (2d Cir. 2005); <u>In re Royal Dutch/Shell Transp. Sec. Litig.</u>, 2006 WL 2355402, at *10 (D.N.J. Aug. 14, 2005); <u>In re Alstom SA Sec. Litig.</u>, 406 F. Supp. 2d 433, 475-76 (S.D.N.Y. 2005)).

Starrett also contends that many of the facts upon which the SEC relies are not inherently deceptive, and, thus, do not support its allegation of scheme liability.  Starrett argues that the I/O Strip Transactions "were completely legitimate and the SEC does not contend otherwise."  Starrett Reply at 13 (citing <u>SEC v. Lucent Techs., Inc.</u>, 610 F. Supp. 2d at 360-61).  Starrett asserts that "any company faced with $300 million in margin calls in the midst of a market-wide credit crisis would have to . . . 'scramble' to satisfy those obligations," and, thus, Thornburg Mortgage's alleged scrambling was not inherently deceptive.  Starrett Reply at 13 (citing 2007 Form 10-K at 38-39).  Starrett also contends that the alleged "'misrepresentations to auditors'" do not support the SEC's allegation of scheme liability, because "any such misrepresentation" was not directed at the investing public.  Starrett Reply at 13 (citing <u>SEC v. Lucent Techs., Inc.</u>, 610 F. Supp. 2d at 360).

Starrett contends that the SEC can allege only scheme liability against her, yet has failed to properly allege scheme liability, because the SEC has not alleged that Thornburg Mortgage committed a primary securities violation.  <u>See</u> Starrett Reply at 14 (citing <u>SEC v. Lucent Techs., Inc.</u>, 610 F. Supp. 2d at 361; <u>Anixter v. Home-Stake Prod. Co.</u>, 77 F.3d 1215, 1225 (10th Cir. 1996)).  Starrett asserts that the use of the term "successfully" in the 2007 Form 10-K was not false or misleading, because the 2007 Form 10-K as a whole sets forth that Thornburg Mortgage had been subject to margin calls while the market experienced extraordinary disruption, and thus a reasonable investor could not have concluded that Thornburg Mortgage met its margin calls "'in the normal course of business, . . . consistent with the terms of the lending agreements.'"

Starrett Reply at 15 (quoting JSR at 8).  Starrett further argues that the SEC has stretched the meaning of "successfully . . . into a specific assertion of technical legal compliance [which] has no basis in law, fact, or in common usage, and should be rejected."  Starrett Reply at 15.  Starrett further argues that, contrary to the SEC's contention, Thornburg Mortgage's failure to disclose the I/O Strip Transactions as asset sales was not materially misleading.  Starrett contends that the 2007 Form 10-K did not state that Thornburg Mortgage had not sold any assets to meet its margin calls, but rather, the language of the 2007 Form 10-K clearly sets forth that Thornburg Mortgage did not have to sell any ARM securities at a loss to meet margin calls.  See Starrett Reply at 15 (citing 2007 Form 10-K at 39, 53).  Starrett contends that, unlike selling impaired assets, the I/O Strip Transactions resulted in a net gain to Thornburg Mortgage.  See Starrett Reply at 15 (citing Starrett MTD at 9; Complaint ¶¶ 36-37, at 11; id. ¶ 67, at 19-20).  Starrett similarly contends that the Feb. 25 Goldstone/Starrett Email, when read in context, demonstrates that Starrett was referring only to the sale of impaired ARM securities, and not the I/O Strip Transactions.  See Starrett Reply at 16 (citing Complaint ¶ 36, at 11; Starrett MTD at 9).  Starrett contends that the SEC has improperly relied upon the Defendants' colloquial reference to the I/O Strip Transactions as "sales" to assert that the Transactions were asset sales, which ignores "relevant accounting guidance" that specifies transactions should be reported "'in accordance with their substance.'"  Starrett Reply at 16 (citing Joint Status Report at 2, 10; Public Company Accounting Oversight Board, AU § 411.06, filed July 20, 2012 (Doc. 58-1)("AU 411.06"); Speech by SEC Commissioner: Improving Corporate Disclosure - Improving Shareholder Value by Commissioner Cynthia A. Glassman, filed July 20, 2012 (Doc. 58-2)("Glassman Speech")).  Starrett contends that it "is undisputed that the I/O Strip Transactions were in substance 'the

- 123 -

issuance of secured debt'" and that, thus, Thornburg Mortgage did not falsely report that it had not sold any assets to meet margin calls.  Starrett Reply at 17 (quoting Joint Status Report at 10).

Starrett contends that the bespeaks caution doctrine renders Thornburg Mortgage's statement regarding its intent and ability to hold its impaired ARM securities until recovery immaterial.  Starrett asserts that In re RAIT Fin. Trust Sec. Litig. is inapposite.  Starrett contends that, in In re RAIT Fin. Trust. Sec. Litig., the defendant's cautionary language did not concern its present-day financial reporting practices and conformity with GAAP, unlike Thornburg Mortgage's cautionary language, which "directly related to its 'intent and ability to hold' prediction.'"  Starrett Reply at 17 (citing 2008 WL 5378164, at **6-8).  Starrett contends that the time at which Thornburg Mortgage's intent and ability prediction was made, December 31, 2007, does not negate that it was a forward-looking statement rather than, as the SEC contends, a statement of what the Defendants currently believed.  Starrett asserts that in In re Sprint Corp. Sec. Litig., the United States District Court for the District of Kansas rejected the same argument when made by the SEC, finding that to hold a defendant liable for such statements would render all predictions outside the scope of the bespeaks causation doctrine, and the defendant's statements were "'clearly predictive in nature.'"  Starrett Reply at 18 (quoting 232 F. Supp. 2d at 1221).  Starrett contends that Thornburg Mortgage's statement regarding its intent and ability to hold its impaired Purchased ARM Securities to maturity is equally "speculative and contingent upon future events."  Starrett Reply at 18.  Starrett further contends that Thornburg Mortgage's negative disclosures were "specific, precisely tailored to its 'intent and ability to hold' prediction, and warned investors of the . . . risks of default and forced asset sales that subsequently materialized," and thus not of a general cautionary nature which would be insufficient to correct a misleading statement.  Starrett Reply at 18-19 (citing In re Sprint Corp.

Sec. Litig., 232 F. Supp. 2d at 1222; 2007 Form 10-K at 24, 38).  Starrett further contends that, because Thornburg Mortgage's negative disclosures were made at the same time as the 2007 Form 10-K, the negative disclosures are all the more likely to have clarified any misleading elements of the 2007 Form 10-K.  See Starrett MTD at 19 (citing In re Sprint Corp. Sec. Litig., 232 F. Supp. 2d at 1222).  Starrett asserts that the SEC has ignored SEC v. Perry, No. CV-11-1309 R, 2012 WL 1959566 (C.D. Cal. May 31, 2012), in which similar statements regarding a company's OTTI analysis were found to be "'optimistic prediction[s] . . . necessarily contingent on future events and accompanied by meaningful, tailored cautionary language,'" and, thus, under the bespeaks caution doctrine, "'immaterial as a matter of law.'"  Starrett Reply at 19 (quoting 2012 WL 1959566, at *7).  Starrett asserts that the Court should also find that the bespeaks caution doctrine precludes Thornburg Mortgage's intent and ability analysis from being materially misleading.  See Starrett Reply at 19.

Starrett asserts that under § 20(e) of the Exchange Act, applicable at the time of Thornburg Mortgage's alleged violations, the SEC must plead actual knowledge, and not just recklessness, for Starrett to be liable for aiding and abetting.  Starrett argues that "recklessly" was not added into the Exchange Acts sections on aiding-and-abetting liability until 2010, after the events set forth in the Complaint.  Starrett Reply at 20 (citing Dodd-Frank Act, § 929O (2010); 15 U.S.C. § 78t(e) (2010)).  Starrett contends that the SEC has not alleged that Starrett had actual knowledge that Thornburg Mortgage committed a primary violation of the securities laws.  See Starrett Reply at 20.

Starrett argues that the SEC's assertion that the complexity of the OTTI analysis is not relevant in establishing her scienter is contrary to well-established case law.  See Starrett Reply at 20 (citing JSR at 34).  Starrett contends that the complexity of the OTTI analysis, which

requires "the exercise of nuanced judgment," demonstrates that Thornburg Mortgage's OTTI analysis was not "'an egregious departure from the range of reasonable business decisions,'" and thus defeats the SEC's allegations regarding Starrett's scienter.  Starrett Reply at 21 (quoting In re Radian Sec. Litig., 612 F. Supp. 2d at 606, 615, 618)(citing In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d at 408-09).

Starrett contends that the facts in the Complaint do not support the SEC's allegation that she failed to properly consider the information before her.  Starrett asserts that the SEC has not alleged that she knew, or had reason to know, of the Citigroup Global Letter, and she contends, rather, that the SEC has admitted she was unaware of the Letter.  See Starrett Reply at 21-22 (citing Joint Status Report at 7, 9, 13, 21 n.14; Response to Goldstone & Simmons MTD at 37-38, 38 n.12).  Starrett similarly contends that the SEC has not alleged that she was aware of the European hedge fund rumor, and, thus, that she could not have considered this rumor in her analysis.  See Starrett Reply at 22 (citing Joint Status Report at 13-14, 21, 21 n.14; Response to Goldstone & Simmons MTD at 38, 38 n.12).  Starrett further argues that the I/O Strip Transactions were irrelevant to the OTTI analysis, because the analysis only "concerned Purchased ARM Assets," not the Transactions, and thus the Transactions could not have "called into question [Thornburg's] stated intent and ability to hold Purchased ARM Assets until their value recovered or maturity."  Starrett Reply at 22 (citing Feb. 25 Goldstone/Starrett Email).  Starrett further argues that the SEC is incorrect in asserting that she did not consider Thornburg Mortgage's precarious financial condition, because the OTTI analysis required Starrett to "consider not only [Thornburg's] existing liquidity, but also its expected cash inflows from its planned capital raise and other liquidity-boosting endeavors."  Starrett Reply at 22-23 (citing Joint Status Report at 14; Response to Goldstone & Simmons MTD at 37; Starrett MTD at 24).

Starrett contends that the negative disclosures in the 2007 Form 10-K turn the SEC's allegations of scienter into an argument that Thornburg Mortgage could have disclosed more, which, she asserts, is "impermissible 'fraud by hindsight.'"  Starrett Reply at 23 (citing In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d at 402; Joint Status Report at 17, 31; Response to Goldstone & Simmons MTD at 22).  Starrett asserts that the SEC has not alleged that she had a motive to commit fraud, because the SEC has not shown that she was one of Thornburg Mortgage's "'key personnel,'" that she was "'inextricably financially intertwined with the continued viability of the company,'" and, thus, a desire to save Thornburg Mortgage would motivate her.  Starrett Reply at 23-24 (citing 2007 Form 10-K at 28; Joint Status Report at 35).  Starrett asserts that the SEC is distorting the Feb. 25 Goldstone/Starrett Email, because, in the context of the entire electronic mail transmission, Starrett related that Thornburg Mortgage would have to disclose the margin calls if it was unable to meet them.  Starrett contends that this electronic mail transmission cannot support an allegation of securities fraud, because it related to communications with KPMG, not to Thornburg Mortgage's investors.  See Starrett Reply at 24 (citing SEC v. Wolfson, 539 F.3d 1249, 1262-63 (10th Cir. 2008); Jabend, Inc. v. Four-Phase Sys. Inc., 631 F. Supp. 1339, 1344 (W.D. Wash. 1986); Joint Status Report at 29).  Starrett further assets that the SEC has conceded that the 2007 Form 10-K disclosed the margin calls, also negating any allegation of her scienter.  See Starrett Reply at 24.

Starrett contends that the SEC has not adequately alleged that she misled KPMG in violation of rule 13b-2, because the SEC has not alleged that she "plausibly . . . acted unreasonably in making a false statement or omission."  Starrett Reply at 24-25 (citing Joint Status Report at 20, 22).  Starrett contends that the SEC is incorrect in arguing that it need only allege that she made false statements to KPMG regardless of the reasonableness of her

statements.  See Starrett Reply at 25 (<u>SEC v. Espuelas</u>, 579 F. Supp. 2d at 486; <u>SEC v. Leslie</u>, No. C 07-3444, 2010 U.S. Dist. LEXIS 76826, at *83 (N.D. Cal, July 29, 2010)).  Starrett contends that she did not fail to disclose information to KPMG, because Thornburg Mortgage had satisfied its outstanding margin calls when the 2007 Form 10-K was filed.  She also contends that the SEC has not alleged that she acted unreasonably because: (i) the SEC does not allege that she was familiar with Thornburg Mortgage's reverse repurchase agreements or margin call negotiations, or could assess whether reverse repurchase agreements were violated; (ii) the SEC concedes she was unaware of the Citigroup Global Letter; (iii) the SEC's allegations regarding the I/O Strip Transactions are meritless; and (iv) the 2007 Form 10-K contained extensive negative disclosures about Thornburg Mortgage's margin calls, liquidity constraints, and default risks.  See Starrett Reply at 25.

Starrett further argues that the SEC has not adequately alleged that she violated any particular internal controls at Thornburg Mortgage, or that she knowingly falsified Thornburg Mortgage's records, or that she participated in misrepresenting Thornburg Mortgage's income. Starrett asserts that the SEC has not pointed to any case law which would make her culpable for violating internal controls because of intentional misrepresentation and omissions to KPMG. <u>See</u> Starrett Reply at 26 (citing Joint Status Report at 38; Starrett MTD at 37).  Starrett further argues that the SEC has not shown that she knowingly participated in books and records violations, because the OTTI accounting guidance was "'flawed and confusion,'" which Starrett contends the SEC's policies dictate should weigh against finding a books-and-records violation. Starrett Reply at 26 (quoting FASB Apr. 21, 2009 minutes)(citing SAB 99, at 7-8).

10.     <u>The Court's Hearing on July 31, 2012</u>.

The Court held a hearing on July 31, 2012.  <u>See</u> Transcript of Hearing, taken July 31, 2012 ("Tr.").  The Defendants suggested that the parties proceed through what the Defendants identify as two alleged material misrepresentations and three alleged material omissions in the 2007 Form 10-K.  <u>See</u> Tr. at 5:14-23 (Lee).  The Defendants would then address Goldstone's alleged misstatements made after the 2007 Form 10-K was filed, the alleged false statements to KPMG, and any other of the SEC's claims not stated under rule 10b-5.  <u>See</u> Tr. at 6:1-6 (Lee). Starrett informed the Court that she would address arguments specific to her as they arise, and would argue the scheme liability, bespeaks caution doctrine, and aiding-and-abetting issues on behalf of the Defendants.  <u>See</u> Tr. at 6:7-15 (Lee).  The Defendants expressed that the events of the Complaint fall against a backdrop of extraordinary financial turmoil.  <u>See</u> Tr. at 7:13-12:25 (Lee).  The Defendants expressed that the SEC is attempting to "use hindsight judgment to hold the defendants liable for what is essentially having failed to predict the future."   Tr. at 11:1-4 (Lee).

The Defendants stated that the Complaint sets forth two alleged material misstatements in the 2007 Form 10-K: (i) the statement that "'[w]e have successfully continued' or 'we successfully continue to meet all margin calls'"; and (ii) "the specific income statement effect of the $428 million of gross unrealized loss." Tr. at 11:8-16 (Lee).

The Defendants asserted that the SEC has conceded that Thornburg Mortgage met all its margin calls when the 2007 Form 10-K was filed, and, thus, its allegation of a material misstatement is based upon the use of the word "successfully" alone.  Tr. at 12:14-22 (Lee).  The Defendants asserted that the term "successfully" was not misleading in light of the "other disclosures elsewhere in the 10-K [which] clearly and starkly" illustrated Thornburg Mortgage's

true and perilous financial situation.  Tr. at 12:23-14:10 (Lee).  The Court inquired why the word

"successful" was included in the 2007 Form 10-K at all, and the Defendants asserted that

Thornburg Mortgage intended to relay that it "represented a real challenge to have received the

market calls," but that Thornburg Mortgage had met its margin calls and was "highly optimistic

about its prospects."  Tr. at 14:23-15:13 (Court, Lee).  The Court inquired why the 2007 Form

10-K did not state that Thornburg Mortgage would be unable to satisfy future margin calls, and

the Defendants pointed out that, at the time, Thornburg Mortgage had satisfied all of its margin

calls.  See Tr. at 16:18-23 (Court, Lee).  The Defendants expressed that the term "successfully"

is intended to relate management's "sense of accomplishment of having actually met the margin

calls" and was also "a classic example of the kind of puffery that is . . . not the basis of a

securities fraud case."  Tr. at 17:1-7 (Lee).  The Defendants asserted that, at four different places

in the 2007 Form 10-K, there were "abundant stark[,] really extraordinarily negative disclosures

about the distress the company was in . . . [which] was not lost on the market."  Tr. at 13:8-14:10

(Lee)(citing 2007 Form 10-K at 27).  See Tr. at 15:14-16:17 (Lee)(citing 2007 Form 10-K at 38-

39); Tr. at 17:17-18:9 (Lee)(citing 2007 Form 10-K at 48-49); Tr. at 18:10-21 (Lee)(citing 2007

Form 10-K at 114).  The Defendants pointed to a financial report which related that Thornburg

Mortgage's "'share tumbled more than 15% Thursday after the company said renewed difficulty

with mortgage pricing have spurred $300 million of margin calls recently and that it may have to

sell assets at distressed prices to meet more calls.'"  Tr. at 19: 2-6 (Lee)(quoting Feb. 28

MarketWatch).  The Defendants noted that Bloomberg detailed Thornburg Mortgage's financial

difficulties on February 28, 2008:

> Thornburg Mortgage said it may have to sells assets to meet lenders' demands for
> increased collateral.  The Company has already met $300 million of margin calls

> which has depleted its available cash and reduced its ability to meet future demands for more collateral, Thornburg said in a filing with the SEC today.

Tr. at 20:11-16 (Lee)(quoting Feb. 28 Bloomberg).

The SEC responded that the 2007 Form 10-K did not contain "all the negative disclosures that it needed to, to not be materially misleading." Tr. at 21:18-20 (McKenna). The SEC contended that, because the 2007 Form 10-K misstated Thornburg Mortgage's income at $427.8 million, the negative disclosures do not render the misrepresentations immaterial. See Tr. at 22:18-23:1 (McKenna). The SEC asserted that it does not agree with the Defendants' characterization of the 2007 Form 10-K as "extraordinarily negative." Tr. at 23:3-12 (Court, McKenna). The SEC further asserted that it is not alleging fraud by hindsight, but has rather based its allegations on the information which the Defendants had when the 2007 Form 10-K was filed. See Tr. at 23:19-24:8 (McKenna). The SEC conceded that Thornburg Mortgage had met all of its margin calls at the time the 2007 Form 10-K was filed, but asserted that the Defendants "knew that they failed to meet mar[gin] calls in accordance with the agreement . . . [a]nd . . . were subject to having their assets seized by Citi." Tr. at 24:19-25 (McKenna). The SEC asserted that the Defendants cannot truthfully have stated that they had the intent and ability to hold their assets to maturity when they knew that Citigroup Global could seize their assets at any time. See Tr. at 25:1-4 (McKenna).

The Court inquired whether the seizure of a company's assets is a normal risk whenever a margin call was issued, and the SEC contended that it is not. See Tr. at 25:5-17 (Court, McKenna). The Court inquired whether the SEC's allegations were based upon the Defendants' statements being misleading, or that they failed to add that they were in breach of their reverse repurchase agreements, and the SEC responded that the Defendants cannot truthfully "proclaim

to investors, [w]e successfully met our margin calls[,] . . . when you know in the back of your mind," that Thornburg Mortgage could have been declared in default were it not for the lenders' forbearance.   Tr. at 26:9-16 (McKenna).   The Court stated that it does not believe the Defendants' use of the word "successfully" conveyed much information to investors and inquired what the SEC believes that word means.  Tr. at 26:17-25 (Court).  The SEC contended that Thornburg Mortgage met Citigroup Global's margin call "[p]ursuant to Citi's forbearance." Tr. at 30:4-5 (McKenna).   The SEC explained that, in the Feb. 21 BOD email, Goldstone differentiates between the margin calls Thornburg Mortgage had met -- describing them as "successful" -- and Citigroup Global's margin call, which Goldstone does not describe as a "successful" satisfaction.  Tr. at 29:4-10, 17-25, 30:11-16 (McKenna).  The SEC contended that MarketWatch and Bloomberg did not "disclose what we're saying should have been disclosed, which is that Thornburg was in breach of its lending agreements when it worked to meet the $300 million in margin calls."  Tr. at 31:1-9 (McKenna).  The SEC asserted that the analysts' reports in MarketWatch and Bloomberg merely mirrored Thornburg Mortgage's statement in the 2007 Form 10-K and thus do not address the SEC's allegation that the material disclosures were omitted therefrom.  See Tr. at 31:10-15 (McKenna).  The SEC stated that removing the term "successfully" from the 2007 Form 10-K would not have rendered it accurate, but rather, Thornburg Mortgage would still need to disclose that it met its margin calls while in violation of its reverse repurchase agreements and with its assets subject to seizure.  Tr. at 31:22-32:9 (Court, McKenna).  The SEC stated that, had the 2007 Form 10-K stated that Thornburg Mortgage met three of its margin calls within the terms of its reverse repurchase agreements, the 2007 Form 10-K would not have been materially misleading.  See Tr. at 33:9-15 (McKenna).

The SEC contended that the market's reactions, as seen through the analysts' reports, does not evidence that Thornburg Mortgage made all necessary disclosures, because, after Thornburg Mortgage announced that it had experienced a fourth quarter loss rather than a profit and that its impairments were OTTI, Thornburg Mortgage's stock fell much more than it did after the 2007 Form 10-K was filed.  See Tr. at 33:23-34:12 (McKenna).  The Court re-directed the SEC to Thornburg Mortgage's statement regarding having met its margin calls and inquired whether the SEC believes the market would have reacted differently had it known that Thornburg Mortgage was in breach of three of its reverse repurchase agreements.  See Tr. at 34:16-35:2 (Court).  The SEC answered that the market would have reacted more negatively than it did had Thornburg Mortgage disclosed that it was in breach of its reverse repurchase agreements, that it had to scramble to negotiate payment plans, and that its lenders allowed it to keep its assets by forbearance only.  See Tr. at 35:3-8 (McKenna).  The SEC further asserted that, at the motion to dismiss stage, the Court should not be parsing out the facts underlying the allegations set forth in the Complaint.  See Tr. at 35:9-20 (McKenna).

The Defendants responded that the SEC is conflating misstatements and omissions.  See Tr. at 36:2-8 (Lee).  The Court stated that is was uncertain how a margin call of the magnitude of Citigroup Global's -- $200 million -- could not have put the Defendants on notice that Thornburg Mortgage's assets were at risk.  See Tr. at 36:19-23 (Court).  The Defendants responded that they disclosed the risks Thornburg Mortgage was facing, including the possibility of more margin calls.  See Tr. at 37:4-13 (Lee).  The Defendants also stated that, in Grossman v. Novell, Inc., the Tenth Circuit found that a defendant's statement that it had "substantial success relating to the merger integration" was inactionable corporate optimism and puffery, and could not serve as a basis for a securities fraud charge.  Tr. at 37:20-38:2 (Lee).

- 133 -

The Court inquired how the Defendants would respond to the allegation that failing to disclose Thornburg Mortgage's breaches was a material omission rather than to the allegation that Thornburg Mortgage stating it had successfully met its margin calls was a material misrepresentation.  See Tr. at 38:3-6 (Court).  The Defendants stated that they had no duty to disclose the breaches, because the statement that Thornburg Mortgage had met its margin calls successfully was not materially misleading, and, therefore, that the Defendants did not need to make a further disclosure to avoid a misleading representation.  See Tr. at 38:7-17 (Lee).  The Defendants stated that, without the term "successfully" imparting the particular meaning which the SEC attaches to it, the 2007 Form 10-K is not materially misleading.  Tr. at 38:18-39:3 (Court, Lee).  The Defendants noted that a margin call alone does not mean that Thornburg Mortgage is in breach of its reverse repurchase agreements and pointed out that the Citigroup Global Repo Agreement allows the parties to reach a different agreement to satisfy margin calls; therefore, Thornburg Mortgage was not in breach of the Citigroup Global Repo Agreement.  See Tr. at 39:14 - 40:13 (Court, Lee)(citing Citigroup Global Repo Agreement at 11).

The Court inquired what evidence the SEC was using to support its allegation that Thornburg Mortgage was in breach.  See Tr. at 40:14-21 (Court).  The SEC asserted that, by the terms of the Citigroup Global Repo Agreement, if a margin call is not met within twenty-four hours, Thornburg Mortgage is in breach.  See Tr. at 40:22-41:3 (McKenna).  The SEC contended that any modification to the Citigroup Global Repo Agreement must be in writing, the Defendants have not put forward evidence that their payment plan was in writing with Citigroup Global, and, thus, a different agreement does not preclude a finding that Thornburg Mortgage was in breach.  See Tr. at 41:7-11 (McKenna).  The Court noted that the Defendants appear to be arguing that the contract was not modified and that Thornburg Mortgage's deadline for satisfying

margin calls extended beyond the terms of the Citigroup Global Repo Agreement.  See Tr. at 41:12-16 (Court).  The SEC responded that the Citigroup Global Letter states: "We hold you in breach."  Tr. at 41:17-023 (McKenna)(quoting Citigroup Global Letter at 3).  The SEC contended that, even if Thornburg Mortgage reached a different agreement with Citigroup Global, the Defendants should have understood that the Citigroup Global Repo Agreement was breached and remedied when the 2007 Form 10-K was filed, and not that Thornburg Mortgage was never in breach.  See Tr. at 42:17-43:16 (Court, McKenna).

The Defendants asserted that the SEC's guidance in Form 8-K "specifically" provides that "the mere possibility that a lender could declare an event of default does not trigger a disclosure under the SEC's own disclosure rules."  Tr. at 43:24-44:5 (Lee).  The Defendants argued that the Citigroup Global Letter was not a declaration of default, which they would have been required to disclose, but, rather, a "reservation of rights letter, which said we could at some point in the future declare you in default, but we are not declaring you in default."  Tr. at 45:13-16 (Lee).  The SEC disagreed and asserted that the Citigroup Global Letter was a declaration of default, because Citigroup Global could immediately declare default after Thornburg Mortgage breached the Citigroup Global Repo Agreement, and, because Thornburg Mortgage did not have a "cure period."  Tr. at 45:19-46:2 (McKenna).  The Defendants responded that they had reached an agreement for a payment plan with Citigroup Global, and, thus, they did not need to respond to the Citigroup Global Letter and state that they did not believe Thornburg Mortgage was in breach.  See Tr. at 46:17-21 (Lee).

The Defendants asserted that, in the Feb. 21 BOD Email, Goldstone states that Thornburg Mortgage had "'successfully negotiated a resolution and payment plan with Citigroup Global in order to satisfy the call by the end of next week.'"  Tr. at 27:18-21 (Lee)(quoting Feb. 21 BOD

Email at 2).  The Defendants asserted that this statement undermined any notion that Thornburg Mortgage was in breach as of February 21, 2008.  See Tr. at 47:22-48:1 (Lee).  The Defendants noted that, in Goldstone's Feb. 22 BOD Email, he similarly relates that Thornburg Mortgage was reaching agreements with all of its lenders for payment plans, which the Defendants asserted demonstrates that Thornburg Mortgage was neither modifying nor in breach of its reverse repurchase agreements.  See Tr. at 48:7-49:3 (Lee)(citing Feb. 22 BOD Email at 2).

The Court stated that it believes the word "successfully" does not carry any additional meaning and is likely puffery, and, thus, does not convert Thornburg Mortgage's statement regarding having met its margin call situations into a misleading statement.  Tr. at 49:8-14 (Court).  The Court further stated that, because that statement was not misleading, Thornburg Mortgage did not have a duty to disclose whether it was in breach of any reverse repurchase agreements in the six or seven days before the 2007 Form 10-K was filed.  See Tr. at 49:16-18 (Court).  The Court noted it was not clear that Thornburg Mortgage was in breach of the Citigroup Global Repo Agreement.  See Tr. at 49:19-23 (Court).  The Court stated that it is inclined to find that the first misrepresentation or omission is inactionable and did not create a duty for Thornburg Mortgage to disclose more.  See Tr. at 49:24-50:2 (Court).

The SEC noted that the cases on which the Defendants rely to assert that the term "success" is immaterial are merger cases, and the statement of having success with a merger is different from the Defendant's statements regarding successfully meeting margin calls.  Tr. at 72:2-15 (McKenna).  The SEC pointed out two cases the Court should consider regarding the materiality of that statement: In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367 (S.D.N.Y. 2012), and Billhofer v. Flamel, 663 F. Supp. 2d 288 (S.D.N.Y. 2009)(Haight, J.).  See Tr. at 72:16-22 (McKenna).

The Defendants turned to the SEC's second alleged misrepresentation in the 2007 Form 10-K: that "Thornburg's income statement should have recognized approximately $428 million in losses from impairments to its ARM securities."  Tr. at 50:5-8 (Lee).  The Court inquired whether GAAP would allow a company to report a comprehensive income or loss, or unrealized loss, in one period, and then report the same transactions as OTTI in a subsequent period, and the Defendants stated that would be an appropriate accounting practice.  See Tr. at 51:2-17 (Court, Lee).  The Defendants explained that determining how to account for losses is a period specific determination.  See Tr. at 51:21-24 (Lee).  The Defendants asserted that how an impairment is reflected is an "inherently a subjective judgment" and asserted that, in the 2007 Form 10-K, Thornburg Mortgage's impairments for the period were disclosed as gross unrealized losses of $427.8 million on ARM securities.  Tr. at 52:4-54:1 (Lee)(citing 2007 Form 10-K at 40-41, 90).

The Court inquired whether Thornburg Mortgage "just got this one wrong . . . or estimated wrong on this," because its analysis of its impairments was based upon its belief that it could hold those assets until they recovered.  Tr. at 54:2-4 (Court).  The Defendants stated that that they had "estimated wrong," but that their analysis was not wrong at the time the 2007 Form 10-K was filed.  Tr. at 54:5-13 (Lee).  The Court questioned how it could consider that evidence at this point, "given that it turned out to be wrong[.]"  Tr. at 54:15-17 (Court).  The Defendants stated that its analysis was not materially misleading in light of Thornburg's disclosure that its Purchased ARM Securities suffered a $427.8 million in "gross unrealized losses."  Tr. at 54:18-55:1 (Lee).  The Defendants argued that the investing public understood that the analysis "was a judgment-based decision hinging on management's intent and ability," and thus "not materially misleading."  Tr. at 55:1-8 (Lee).  Regarding the SEC's allegations of scienter, the Defendants contended that "there is no possible inference of scienter where the company, at the directional

- 137 -

leadership" of the Defendants, plainly disclosed its "accounting judgments, its accounting systems, its accounting methodology."  Tr. at 55:9- 56:3 (Lee)(citing 2007 Form 10-K at 100-01).

The Court questioned whether the 2007 Form 10-K provided a reader with any further information to assess Thornburg Mortgage's OTTI analysis was correct.  See Tr. at 56:4-9 (Court).  The Defendants asserted that a reader would know that the accounting standard is based upon management's intent and ability, and, thus, a reader would know to take Thornburg Mortgage's OTTI analysis with "a grain of salt," because the analysis is inherently subjective. Tr .at 56:15-24 (Lee).

The Defendants reiterated that KPMG "signed off on this particular accounting treatment" as of the date the 2007 Form 10-K was filed.  Tr. at 57:1-5, 57:8-15 (Lee, Court).  The Defendants further asserted that the SEC has not made any allegations which demonstrate that they "disbelieved their accounting judgments."  Tr. at 57:4-7 (Lee).

The Defendants then addressed the bespeaks caution doctrine, stating that that doctrine applies to whether Thornburg Mortgage's OTTI analysis in the 2007 Form 10-K was materially misleading.  See Tr. at 57:18-21 (Marks).  The Court inquired whether other cases had applied the bespeaks caution doctrine to a company's OTTI accounting analysis, and the Defendants stated that cases had analyzed "similar" statements.  Tr. at 58:13-19 (Court, Marks).  The Defendants stated that, under Grossman v. Novell, Inc., a "forward-looking statement" is not actionable for securities fraud if accompanied with "highly specific . . . very factual" statements which "directly address the predictive statement."  Tr. at 58:20-59:2 (Marks).  The Defendants stated that, in SEC v. Perry, The Honorable Judge Rael, United States District Judge for the Central District of California, found that a defendant's statements that its liquidity was sufficient

to satisfy its operating requirements, "and meet our obligations and commitments in a timely and cost-effective manner," were not actionable for securities fraud under the bespeaks caution doctrine.  Tr. at 59:3-18 (Marks, Court).  The Defendants contended that the OTTI analysis is a similar forward-looking statement, and that, given the entirety of what was disclosed -- including risks facing the mortgage-backed securities market, interest rate changes, real estate value drops, and other economic fluctuations -- it was "an immaterial statement with respect to the bespeaks-caution doctrine."  Tr. at 60:10-61:1 (Marks).  The Defendants asserted that, in the 2007 Form 10-K, Thornburg Mortgage's disclosures of its "the then-existing liquidity, the description of the amount of margin calls that the company has incurred up to that point," would allow a reasonable investor to weigh whether Thornburg Mortgage's OTTI analysis was correct.  Tr. at 61:4-12 (Marks).  For purposes of the bespeaks caution doctrine, the Defendants argued that Thornburg Mortgage's disclosure of its impairments as unrealized losses, set against the backdrop of Thornburg Mortgage's financial situation, was cautionary language that directly addressed its OTTI analysis.  See Tr. at 61:18-62:4 (Marks).  The Defendants pointed out that the 2007 Form 10-K specifically informs investors "that Thornburg may need to sell assets at a loss to satisfy lenders," and detailed on its balance sheet the exact amount that may need to be sold.  Tr. at 61:5-12 (Marks).  The Defendants asserted that these statement were specific and of a cautionary nature sufficient to satisfy the bespeaks caution doctrine, making Thornburg Mortgage's OTTI analysis immaterial.  See Tr. at 62:13-18 (Marks).

The Defendants contended that the cases to which the SEC has cited for the proposition that the bespeaks caution doctrine does not apply are inapposite.  See Tr. at 62:19-23 (Marks).  The Defendants asserted the cases to which the SEC cited involve "historical financial data, a historical fact, not a predictive statement."  Tr. at 62:22-25 (Marks).  The Defendants asserted

that, in <u>In re Sprint Corp. Sec. Litig.</u>, the cautionary statements were made in a separate document, disclosed seven weeks before the allegedly misleading statement.  <u>See</u> Tr. at 63:1-5 (Marks).   The Defendants stated that, in <u>In re RAIT Fin. Trust Sec. Litig.</u>, the allegedly misleading statement was an OTTI analysis, but the cautionary language in <u>In re RAIT Fin. Trust Sec. Litig.</u> was "nowhere near as specific as what we disclosed here."  Tr. at 63:6-15 (Marks). The Defendants asserted, that in <u>In re RAIT Fin. Trust Sec. Litig.</u>, the cautionary language stated only that a company's "investment inevitably carry risk, that they have inherent risk in them." Tr. at 63:17-20 (Marks).  The Defendants asserted that their disclosures regarding "the reduced liquidity of the company at that point in time . . . the outflow, additional margin calls, and we may have to sell assets to satisfy those" were far more specific and rendered Thornburg Mortgage's OTTI analysis immaterial.  Tr. at 64:2-10 (Marks).

The Court stated that it is troubled by the Feb. 25 Goldstone/Starrett Email, in which Starrett states that "'some assets would call into question Thornburg's intent and ability to hold all assets until maturity.'"  Tr. at 64:11-14 (Court)(quoting Feb. 25 Goldstone/Starrett Email at 2).   The Defendants asserted that, in the context of the entire electronic mail transmission, Starrett was referring to "all assets with negative marks," meaning Thornburg Mortgage's impaired ARM securities.   Tr. at 64:11-65:21 (Court, Marks).   The Court inquired whether Starrett's statement in the Feb. 25 Goldstone/Starrett Email indicated that the Defendants should have considered it more likely that Thornburg Mortgage would have to sell its impaired ARM securities, given that Thornburg Mortgage sold those after the 2007 Form 10-K was filed.  <u>See</u> Tr. at 66:1-18 (Court, Marks).  The Defendants conceded that their position would be more tenuous if Thornburg Mortgage had sold its ARM securities on February 29, 2008, or March 1, 2008, but argued that the 2007 Form 10-K states that Thornburg Mortgage was experiencing

"reduced liquidity and . . . may receive additional margin calls that we can't meet" and in such a situation "may need to sell assets at a loss." Tr. at 67:3-13 (Court, Marks). The Defendants asserted that, in the Feb. 25 Goldstone/Starrett Email, Starrett was referring to the situation disclosed in the 2007 Form 10-K: If Thornburg Mortgage received more margin calls which it could not meet, it may need to sell "negative-mark assets," including the ARM securities, at a loss, and would then need to re-assess Thornburg Mortgage's OTTI analysis. Tr. at 67:22-68:1 (Marks).

The SEC responded that within days of the 2007 Form 10-K being filed, KPMG determined that Thornburg Mortgage should have recognized a $427.8 million loss on its income statement in the fourth quarter of 2007. See Tr. at 73:1-7 (McKenna). The SEC asserted that it has set forth in the Complaint that the Defendants did not believe Thornburg Mortgage could hold its impaired assets until maturity or recovery. See Tr. at 73: 8-15 (McKenna). The SEC noted that it alleges that, before the 2007 Form 10-K was filed, Thornburg Mortgage's assets were subject to seizure, and, therefore, it is not reasonable for the Defendants to assert that they believed they could hold those assets until maturity. See Tr. at 73:14-18 (McKenna). The SEC stated that it alleges that the Defendants were conspiring to withhold information from KPMG, and to manipulate the timing of filing the 2007 Form 10-K so that it could be filed in the narrow window when Thornburg Mortgage had no outstanding margin calls. See Tr. at 73:19-14 (McKenna)(citing Complaint ¶ 53, at 16; id. ¶ 67, at 19-20).

Regarding the Defendant's assertion that disclosing a $427.8 million impairment as an unrecognized loss was immaterial, the SEC asserted that the $427.8 million was one-third of Thornburg Mortgage's total losses for 2007, and, therefore, not recognizing such a loss "is a material misstatement." Tr. at 74:15-75:17 (McKenna). The SEC asserted that KPMG's

agreement with Thornburg Mortgage's OTTI analysis is irrelevant, because KPMG was not informed of many things, and noted that KPMG, subsequent to the events after the 2007 Form 10-K was filed, changed its opinion of Thornburg Mortgage's ability to continue as a going concern.  See Tr. at 75:18-76:3 (McKenna).

Regarding the bespeaks caution doctrine, the SEC contended that the Defendants have cited no cases which support their conclusion that "a $400 million swing in net income is immaterial as a matter of law."  Tr. at 76:9-15 (Kasper).  The SEC argued that the Defendants' OTTI analysis is not a forward-looking statement, because it "wasn't . . . saying . . . this is what's going to happen in the future.  It was saying as of 12/31/07 here's how much net income we had, and that statement was false."  Tr. at 77:1-5 (Kasper).  The SEC contended that the Defendants' cautionary language was not "exceedingly specific," because the 2007 Form 10-K contains material omissions.  Tr. at 77:6-12 (Kasper).  The SEC asserted that the Defendants' distinction between In re RAIT Fin. Trust Sec. Litig. and SEC v. Perry is incorrect, because the "true distinction between those cases is the nature of the statements that were involved."  Tr. at 77:13-21 (Kasper).  The SEC contended that, in In re RAIT Fin. Trust Sec. Litig., a misstated accounting made under FAS 115, just as the SEC alleges the Defendants committed, and was specifically found to satisfy the pleading requirements fraud.  See Tr. at 77:22-78:5 (Kasper).  The SEC contended that in In re RAIT Fin. Trust Sec. Litig., the extent of the defendant's disclosures did not render the misstated accounting immaterial, because the misstatement alone was fraudulent.  See Tr. at 78:6-13 (Kasper).  The SEC asserted that, in In re RAIT Fin. Trust Sec. Litig., the alleged misstatement was that the "company's financial statements complied with GAAP," which the SEC contended is akin to its allegations regarding the correctness of Thornburg Mortgage's OTTI analysis.  Tr. at 78:18-22 (Kasper).  The SEC contended that SEC

v. Perry is distinguishable from the facts set forth in the Complaint, because in that case, the defendant's statement was a true, forward-looking statement, not a representation regarding the company's current financial status, such as the OTTI analysis is.   See Tr. at 78:23-79:10 (Kasper).

Regarding the Feb. 25 Goldstone/Starrett Email, the SEC asserted that there is no "consistent way" to read the email which supports the Defendants' contention that Starrett was referring only to the sale of impaired assets.   Tr. at 79:11-25 (Kasper).   The SEC argued that Starrett was "plainly" saying that selling some assets, not just those with "negative marks," was "substantially the same as selling all assets."   Tr. at 79:25-80:3 (Kasper).

The Defendants agreed that the key cases regarding the bespeaks caution doctrine and Thornburg Mortgage's OTTI analysis are In re RAIT Fin. Trust Sec. Litig. and SEC v. Perry. See Tr. at 80:10-13 (Marks).   The Defendants contended that the OTTI analysis is a forward-looking statement, but the Court noted that OTTI analysis in the 2007 Form 10-K did not include any specific information that would allow a reader to reach a different conclusion than Thornburg Mortgage did.   See Tr. at 80:14-81:4 (Marks, Court).   The Court stated that the 2007 Form 10-K "doesn't seem to have the . . . exquisite detail you . . . see with the . . . classical bespeaks-caution type of statement."   Tr. at 81:4-7 (Court).   The Court stated that the OTTI analysis is not clearly a forward-looking statement, because Thornburg Mortgage states a present intent to not sell assets while predicting its ability to hold the assets into the future.   See Tr. at 81:8-13 (Court).   The Court inquired how, even if the Defendants show that the OTTI analysis is a forward-looking statement, the 2007 Form 10-K has the detail necessary to qualify under the bespeaks caution doctrine.   See Tr. at 81:14-17 (Court).   The Defendants responded that the question is whether the Court "believes that the disclosure of what the company's then dwindled

liquidity position was at the time of the K, the disclosure of the amount of unrealized losses . . . [and] the disclosure of the possibility of additional margin calls," is enough for the $427.8 million in unrecognized losses to be immaterial.  Tr. at 81:18-82:5 (Marks).  The Defendants asserted that, because the 2007 Form 10-K discloses that Thornburg Mortgage may have to sell assets at a loss, a reader would infer that, when Thornburg Mortgage expressed it may have to sell assets to meet margin calls, it was referring to the sale of its impaired assets.  See Tr. at 82:12-22 (Court, Marks).  The Defendants contended that the SEC's argument regarding the size of Thornburg Mortgage's unrecognized losses is a "red herring" when analyzing whether Thornburg Mortgage made sufficient cautionary statements to render its OTTI analysis immaterial.  Tr. at 82:23-83:3 (Marks).

The Court inquired how, in light of the February 28, 2008 electronic mail transmissions exchanged between the Defendants, the market's reaction to the 2007 Form 10-K and Thornburg Mortgage's need to sell assets was a surprise to the Defendants.  See Tr. at 83:11-20 (Court).  The Defendants responded that Thornburg Mortgage's disclosures in the 2007 Form 10-K, which specifically outlined that Thornburg Mortgage's margin calls could exceed its liquidity and that it would have to sell assets at a loss, render Thornburg Mortgage's OTTI analysis immaterial under the bespeaks caution doctrine.  See Tr. at 83:21-84:10 (Marks).  The Defendants also asserted that their surprise to the margin calls is evidenced by the lack of any allegation in the Complaint which shows that Thornburg Mortgage had an outstanding margin call, or knew a lender intended to make a margin call, when the 2007 Form 10-K was filed.  See Tr. at 85:18-25 (Marks).

The Court inquired how the OTTI analysis could be a forward-looking statement, because it represented that Thornburg Mortgage's analysis was consistent with GAAP at the

time, and the Defendants responded that it is a forward-looking statement, because the OTTI analysis is based upon the Defendants' predictions of future inflows, outflows, margin calls, and the market.  See Tr. at 84:20-85:13 (Court, Marks).  The Court inquired if the bespeaks caution doctrine had been applied to GAAP principles, and the Defendants stated that it had been, in In re RAIT Fin. Trust Sec. Litig.  See Tr. at 86:8-19 (Court, Marks).  The Defendants asserted, thus, that there is not "any dispute that the bespeaks-caution doctrine can apply to a forward-looking statement; that is, a GAAP statement."  Tr. at 86:21-23 (Marks).

The Court stated that it is inclined to find that the statements in the 2007 Form 10-K do not satisfy the bespeaks caution doctrine.  See Tr. at 88:25-89:2 (Court).  The Court stated that it is not certain whether the OTTI analysis is forward-looking, but regardless, it does not believe that the negative disclosures are highly specific, or directly address the OTTI analysis, rendering the OTTI analysis immaterial.  See Tr. at 89:3-5 (Court).  The Court noted that the cautionary statements are not in the same portion of the 2007 Form 10-K as the OTTI analysis, because a reader would have to examine the financial tables to understand Thornburg Mortgage's negative disclosures, and the Court expressed that cautionary language needs to be more similar to a narrative form under the bespeaks caution doctrine.  See Tr. at 89:6-10 (Court).  The Court stated that it is "not seeing enough cautionary language in here to make it fit in that doctrine."  Tr. at 89:10-13 (Court).

The Defendants responded that the SEC has improperly based its allegation of a rule 10b-5 violation on the theory that Thornburg Mortgage "should" have recognized its unrecognized gross losses in the fourth quarter of 2007, which the Defendants contended is a standard for negligence, but not fraud.  Tr. at 89:17-90 (Lee).  The Defendants asserted that there is no allegation in the Complaint which asserts that they were reckless in the OTTI analysis.  See Tr.

at 90:1-3 (Lee).   The Defendants further argued that the SEC has not sufficiently alleged scienter, because the Complaint alleges only that the Defendants withheld information from KPMG as evidence that the Defendants intended to deceive KPMG.   See Tr. at 90:11-15 (Lee). The Defendants asserted that, in City of Omaha v. CBS, the Second Circuit found that allegations that defendants should have begun interim impairment testing earlier was insufficient to plausibly establish an inference that the defendants did not believe "their statements [] regarding CBS' good will at the time they made them."   Tr. at 90:18-91:11 (Lee).

The Court stated that it is nonetheless inclined to allow the SEC's claims that the OTTI analysis was materially misleading to go forward.   See Tr. at 91:17-19 (Court).   The Court expressed that whether the Defendants had the requisite scienter may depend on how the Feb. 25 Goldstone/Starrett Email is interpreted, but noted that the Court's role is not to adopt a specific interpretation at this point.   See Tr. at 91:19-24 (Court).

The Defendants then turned to the issue of scienter, specifically as seen in a number of electronic mail transmissions that they exchanged in the weeks up to and immediately after the 2007 Form 10-K was filed.   See Tr. at 92:7-12 (Lee).   The Court stated that it does not understand how the margin calls after the 2007 Form 10-K was filed caught the Defendants by surprise, noting specifically that the Defendants' electronic mail transmissions were exchanged on February 28, 2008 and after the 2007 Form 10-K was filed.   See Tr. at 68:11-16 (Court).   The Defendants asserted that, based upon the electronic mail transmissions collectively, the Defendants' conversations before the margin calls "clearly demonstrates the defendants' lack of scienter and . . . also addresses the issue of whether there is any scienter to support the accounting for gross unrealized losses."   Tr. at 92:13-20 (Lee).   The Defendants stated that, in the Feb. 21 BOD email, Goldstone expressed an intent to be completely transparent with the

market regarding Thornburg Mortgage's financial situation and plans for the coming weeks.  See Tr. at 93:6-95:9 (Lee, Court).  The Court agreed that the Feb. 21 BOD Email provides evidence that Goldstone did not intend to deceive investors, but the Court questioned whether it could decide, based on the Feb. 21 BOD Email, that Goldstone did not have the requisite scienter as a matter of law.  See Tr. at 95:10-13 (Court).  The Defendants contended that the Feb. 21 BOD Email establishes, as a matter of law, that Goldstone lacked the requisite scienter, because the SEC's interpretation of the Feb. 21 BOD Email is not "more likely than an equally innocent explanation."  Tr. at 95:14-18 (Lee).  The Defendants asserted that the SEC's interpretation of the Defendants' electronic mail transmissions are implausible, and includes conclusory allegations that Ashcroft v. Iqbal and Bell Atl. Corp. v. Twombly reject.  See Tr. at 95:19-25 (Lee).

Turning to the Feb. 22 BOD Email, the Defendants contended that the SEC has taken out of context Goldstone's statement when he says that "'[w]e don't want to disclose our current circumstance.'"  Tr. at 96:5-15 (Lee)(quoting Feb. 22 BOD email at 1).  The Court inquired to what Goldstone was referring when he mentions "prosup disclosure issues" in the Feb. 22 BOD Email, and the Defendants stated that a "prosup" is short-hand for a "prospectus supplement," a public disclosure that is required when a company does a securitization.  Tr. at 96:21-97:3 (Court, Lee).  The Defendants conceded that, if Thornburg Mortgage had filed a prospectus supplement at the time of the Feb. 22 BOD Email, Thornburg Mortgage would have had to disclose the margin calls.  See Tr. at 97:4-9 (Lee).  The Defendants contended, nonetheless, that Goldstone's electronic mail transmission, as a whole, is "consistent with . . . transparent disclosure," because Goldstone admits that Thornburg Mortgage will disclose the margin calls, but that the manner in which the margin calls will be disclosed will depend on how the coming

weeks develop.  Tr. at 97:8-16 (Lee).  The Defendants contended that the Feb. 22 BOD Email illustrates that they "understood what their disclosure obligations were, and they intended to meet their disclosure obligations."  Tr. at 97:17-23 (Lee).  The Defendants explained that, in the remainder of the Feb. 22 BOD Email, Goldstone expresses optimism with Thornburg Mortgage's plans for meeting its margin calls, and expressed that he does not believe Thornburg Mortgage will need to sell assets, and, therefore, demonstrates how the margin calls caught the Defendants by surprise.  See Tr. at 97:24-98:24 (Lee).

The Defendants then turned to the Feb. 25 BOD Email and noted that Goldstone again informed the Board of Directors that he expected Thornburg Mortgage to raise sufficient funds to satisfy all outstanding margin calls by the end of the following week.  See Tr. at 99:3-19 (Lee). The Defendants noted that Goldstone expresses that his meeting with the underwriters went very well, and that Thornburg Mortgage was doing very well, despite the difficult market at the time, but that Thornburg Mortgage must continue to raise money.  See Tr. at 99:20-100:8 (Lee).  The Defendants contended that this electronic mail transmission demonstrates a "complete absence of scienter, a belief in the company's future intent and ability and a belief that their [] plans to move past this immediate issue . . . and to continue to emerge from that with a strengthened liquidity position."  Tr. at 100:9-24 (Lee).  The Defendants contended that the "snippets" in the Defendants' electronic mail transmissions on which the SEC has focused "bear no resemblance whatsoever to the overall intent and content of the e-mails."  Tr. at 100:19-24 (Lee).

The Defendants also asserted that the SEC has taken Starrett's statement in the Feb. 25 Goldstone/Starrett Email out of context when the SEC asserts that the Defendants purposely did not tell KPMG about Thornburg's margin calls.  See Tr. at 101:3-11 (Lee).  The Defendants contended that the electronic mail transmission chain evidences that the Defendants' discussion

began with an unrelated inquiry from Goldstone whether it is "usual or within the realm of expectation that an audit firm not be able to provide accounting clarity to an audit committee for management six days before filing an annual financial statement." Tr. at 101:12-24 (Lee). The Court inquired how Goldstone could be surprised by KPMG's inability to provide accounting clarity at that point, given that Thornburg Mortgage's financial situation was so fluid and Thornburg Mortgage had cancelled a securitization the preceding week. See Tr. at 101:25-102:24 (Court, Lee)(citing Feb. 22 BOD Email). The Court expressed that it did not know how to interpret the Feb. 25 Goldstone/Starrett Email, given Goldstone's reference to the "KPMG situation," which is not explained in the electronic mail transmission chain. Tr. at 104:19-24 (Court). The Defendants noted that the reference to KPMG is not related to the SEC's allegations of scienter. See Tr. at 104:25-105:10 (Lee, Court). The Defendants asserted that, on the whole, the Feb. 25 Goldstone/Starrett Email is "inconsistent with the notion of scienter." Tr. at 105:11-16 (Lee). The Court inquired to what Starrett is referring when she states that "'[w]e have purposefully not told them about the margin calls.'" Tr. at 106:21-23 (Court)(quoting Feb. 25 Goldstone/Starrett Email at 2). The Defendants contended that the SEC has not alleged that KPMG knew nothing about the margin calls as of the date of the Feb. 25 Goldstone/Starrett Email, and that KPMG must have known of the margin calls, as the SEC "has KPMG's workpapers which shows that they did know about the margin calls." Tr. at 106:24-107:4 (Lee). The Defendants contended, however, that the most important aspect of the Feb. 25 Goldstone/Starrett Email is Starrett's statement: "'Obviously, if we are not able to resolve the situation satisfactorily we will need to inform them before we file.'" Tr. at 107:5-9 (Lee)(citing Feb. 25 Goldstone/Starrett Email at 2). The Defendants asserted, therefore, that their intention was "quite clear" to not conceal relevant information from KPMG. Tr. at 107:10-13 (Lee).

The Court inquired whether the Defendants were putting KPMG in a difficult situation to audit Thornburg Mortgage's finances by not telling KPMG about the Citigroup Global margin call three days before the 2007 Form 10-K was filed.  See Tr. at 107:16-108:17 (Court, Lee). The Defendants admitted that their actions put KPMG "in a time crunch," but maintained that the time crunch was not an attempt to preclude KPMG from accurately auditing Thornburg Mortgage.  Tr. at 108:18-109:1 (Lee).  Court inquired why the Defendants did not inform KPMG of the Citigroup Global margin call with a qualification that they believed the margin call would be resolved before the 10-K is issued, and the Defendants confirmed that they could have disclosed the Citigroup Global margin call with that information.  See Tr. at 109:2-8 (Court, Lee).  The Court stated that the question is not whether the Defendants "could have" informed KPMG, but, rather, is why they chose to not inform KPMG.  Tr. at 109:9-11 (Court).  The Defendants countered that they were planning on Thornburg Mortgage raising sufficient funds to satisfy the Citigroup Global margin call, and, for that reason, they did not disclose the Citigroup Global margin call to KPMG.  See Tr. at 109:12-15 (Lee).  The Defendants asserted that they did not "prematurely ring the alarm bell on . . . their failure to satisfy a margin call" because they were planning to "satisfy the margin call."  Tr. at 109:19-22 (Lee).  The Defendants asserted, therefore, that the relevant question is whether they were required to inform KPMG of the Citigroup Global margin call when they were unsure whether Thornburg Mortgage would meet the Citigroup Global margin call.  See Tr. at 109:22-25 (Lee).  The Defendants contended that a common business decision is "how much information do you need to share with your auditors at any point in time[.]"  Tr. at 110:3-8 (Lee).  The Defendants maintained that they did not have any obligation to tell KPMG about the Citigroup Global margin call, as Thornburg Mortgage's management "clearly does not have a duty to tell auditors . . . every sort of business event that

happens if it turns out that that business event or circumstance is not going to be material or, in fact, is not . . . going to transpire." Tr. at 110:11-18 (Lee). The Court stated that the Citigroup Global margin call was evidently "hugely material," as it was the first piece of news which MarketWatch reported. Tr. at 110:19-21 (Court). The Court expressed that it was "having trouble" with finding that the Defendants had a "legitimate business reason" to not disclose the most important piece of information to their auditors three days before filing the 10-K. Tr. at 110:24-111:5 (Court). The Defendants countered that the legitimate business reason for not disclosing the Citigroup Global margin call is to avoid ringing "the unnecessary alarm bell . . . the failure to meet the margin call." Tr. at 111:6-9 (Lee). The Defendants asserted that they planned to tell KPMG if Thornburg Mortgage did not meet the Citigroup Global margin call, as Starrett states in the Feb. 25 Goldstone/Starrett Email. See Tr. at 111:10-18 (Lee). The Defendants stated that they were "optimistic in their plans to raise liquidity to meet the margin calls, and, indeed, to have a reserve of cash," and, therefore, Starrett states that, in her opinion, they do not need to disclose the Citigroup Global margin call to KPMG as long as they remain confident they will be able to satisfy the margin call before filing the 10-K. Tr. at 111:24-112:9 (Lee). The Defendants asserted that the Court cannot reasonably infer from Goldstone's response in the Feb. 25 Goldstone/Starrett Email -- "'Got it. Understand it. Thanks.'" -- that Goldstone acted with scienter in withholding the Citigroup Global margin call from KPMG. Tr. at 112:13-20 (quoting Feb. 25 Goldstone/Starrett Email at 2).

The Defendants then turned to the Feb. 27 Simmons/Feldman Email, which the SEC alleges evidences that the Defendants made a material omission by not disclosing the "rumor of a European hedge fund blowing up." Tr. at 112:21-113:12 (Lee). The Defendants contended that they had no duty to disclose the rumor. See Tr. at 113:12-14 (Lee). The Defendants contended

that the Feb. 27 Simmons/Feldman Email evidences that the rumor was "solely a rumor" at the time and that the Defendants did not have any details, and, indeed, were "'not even really supposed to know about this situation.'"   Tr. at 113:15-114:4 (Lee)(quoting Feb. 27 Simmons/ Feldman Email at 2).   The Defendants stated that Simmons' statement in the Feb. 27 Simmons/Feldman Email -- "'[t]his makes it even more critical to be done with Citi today so we can get the K filed'" -- is not evidence of fraudulent intent, as the email does not explain what "this" is, and Thornburg Mortgage had to file the 2007 Form 10-K by February 28, 2008, regardless of any situation in Europe.   Tr. at 114:5-20 (Lee, Court)(quoting Feb. 27 Simmons/Feldman Email at 2).

The SEC responded, and stated that its theory "is that Thornburg was deceiving their auditors, was trying to get the K filed in the narrow window in which they were able to meet their margin call so they could report that."  Tr. at 115:18-21 (McKenna).  The SEC asserted that the electronic mail transmissions "clearly show," Tr. at 115:21-22 (McKenna), the Defendants' intent to deceive KPMG and file the 2007 Form 10-K without making disclosing "any outstanding margin calls," Tr. at 116:1-3 (McKenna).   The SEC contended that the Feb. 27 Goldstone/Simmons Email demonstrates that Goldstone was aware of the collapse of a European hedge fund, and that the Feb. 27 Simmons/Feldman Email demonstrates Simmons' intent to file the 2007 Form 10-K in a narrow window when Thornburg Mortgage would not have to disclose any outstanding margin calls.  See Tr. at 116:3-24 (McKenna, Court, Lee).  The SEC asserted that a reasonable inference based on the Feb. 27 Simmons/Feldman Email, is that Simmons expected Thornburg Mortgage to receive more margin calls the following day, and, therefore, Simmons ordered that Thornburg Mortgage file the 2007 Form 10-K immediately, so that Thornburg Mortgage could report only what the Defendants wanted.  See Tr. at 116:23-117:2

(McKenna).   The SEC stated that Thornburg Mortgage filed the 2007 Form 10-K two hours before receiving additional margin calls on February 28, 2008.   See Tr. at 117:3-10 (Court, McKenna).   The SEC clarified that it is not contending that the Defendants made a material omission by failing to disclose the rumored collapse of a European hedge fund.   See Tr. at 117:18-22 (Court, Lee, McKenna).   The Court noted that the relevance of the discussion of a European hedge fund collapsing is to demonstrate the Defendants' scienter for filing the 2007 Form 10-K when they did, without disclosing Thornburg Mortgage's margin calls.   See Tr. at 117:23-25 (Court).   The SEC further clarified that the Complaint alleges that the Defendants should have disclosed the collapse of a European hedge fund to KPMG, but not in the 2007 Form 10-K.   See Tr. at 118:2-8 (Lee, McKenna, Court).

The Defendants countered that the SEC's attempt to make an issue out of when the 2007 Form 10-K was filed is surprising, because the 2007 Form 10-K had to be filed before February 29th, 2008, and, therefore, filing a day early does not evidence scienter.   See Tr. at 118:12-18 (Lee).   The Defendants asserted that a number of other companies filed form 10-Ks around the same time as when Thornburg Mortgage filed the 2007 Form 10-K, and, therefore, the timing of Thornburg Mortgage's filing is not "highly unusual," as the SEC contends.   Tr. at 119:1-6 (Lee). See Tr. at 120:18-21 (Lee)(citing Compilation of 10-K filings made before market opened/after market closed on February 27-28, 2008, filed May 21, 2012 (Doc. 37-31)("10-K Compilation"). The Court stated that a reasonable inference appears to be that Thornburg Mortgage filed the 2007 Form 10-K to avoid having to disclose more margin calls.   See Tr. at 119:8-13 (Court). The Defendants countered that the documents upon which the SEC relies in making that allegation do not support the allegation of fraud.   See Tr. at 119:14-15 (Lee).   The Defendants asserted that the electronic mail transmissions reveal that they believed they would meet all

Thornburg Mortgage's margin calls successfully.  <u>See</u> Tr. at 119:15-25 (Lee).  The Defendants contended that they had no way of knowing Thornburg Mortgage would receive as many margin calls as it did following the filing of the 2007 Form 10-K.  <u>See</u> Tr. at 120:1-5 (Lee).  The Defendants noted that "the chairman of the SEC said investment banks' capital cushions are sound five days before Bear Stearns collapsed.  This was an extraordinary time."  Tr. at 120:6-12 (Lee).

The Defendants then turned to the Feb. 28 BOD Email.  <u>See</u> Tr. at 121:3-6 (Lee).  The Defendants contended that the Feb. 28 BOD Email demonstrates that Goldstone was honest with the Board of Directors regarding Thornburg Mortgage's financial condition, and also demonstrates his optimism that Thornburg Mortgage will raise liquidity in the coming weeks. <u>See</u> Tr. at 121:3-20 (Lee).

The Defendants then turned to the Electronic Mail Transmission from Owen Lopez to Thornburg Board of Directors (February 29, 2008, 9:24 a.m.), filed May 21, 2012 (Doc. 37-26)("Feb. 29 Lopez BOD Email").  <u>See</u> Tr. at 122:1-2 (Lee).  The Defendants contended that the electronic mail transmission chain in the Feb. 29 Lopez BOD Email demonstrates that the "wave of margin calls the company received after the K was totally unexpected."  Tr. at 122:3-8 (Lee). The Defendants contended that the "only reasonable reading of this e-mail" is that Goldstone did not expect the margin calls that Thornburg Mortgage received.  Tr. at 122:24-123:1 (Lee).  The Court stated that, although the electronic mail transmission chain evidences a disappointment with the market's outcome, the chain does not demonstrate surprise.  <u>See</u> Tr. at 123:8-12 (Lee). The Defendants asserted that surprise and disappointment are not distinguishable, and that the Feb. 29 Lopez BOD Email indicates that Goldstone felt as though "all these efforts we had to not only meet the margin calls but to position ourselves for the future . . . are not . . . now or may not

now be sufficient." Tr. at 123:21-25 (Lee).  The Defendants asserted that the electronic mail transmissions do not support a reasonable inference of fraudulent intent necessary to support an action under rule 10(b), as Goldstone initiated the disclosure of the negative developments with Thornburg Mortgage.  See Tr. at 124:1-8 (Lee).

The Defendants then turned to Feb. 28 Simmons/Goldstone Email.  The Defendants contended that Goldstone expressed optimistically that Thornburg Mortgage would be able to hold its assets to maturity.  See Tr. at 124:21-125:7 (Lee).  The Defendants also contended that Simmons' statement -- "'[i]f only they knew'" -- is a fragment which the SEC has construed to indicate a fraudulent intent.  Tr. at 125:8-13 (Lee)(quoting Feb. 28 Simmons/Goldstone Email at 2).  The Defendants asserted that the "most plausible reading" of Simmons' statement is that he was referring to the Defendants' "efforts to build a cash cushion to raise liquidity to ensure the company was well poised for the future." Tr. at 125:14-19 (Lee).  The Defendants asserted that the electronic mail transmissions evidence that they had a good faith belief in their intent and ability to hold their assets to maturity, and that they did not have fraudulent scienter as the SEC alleges in other aspects of the Complaint.  See Tr. at 126:5-16 (Lee).  The Defendants asserted that, even if the Court determines that they made a material omission, the evidence demonstrates that the Defendants acted without scienter.  See Tr. at 126:23-127:11 (Court, Lee).

The Defendants then addressed the SEC's allegations of scienter regarding the Defendants' OTTI analysis.  See Tr. at 128:11-17 (Marks).  The Defendants stated that, in two previous instances, federal courts have granted motions to dismiss similar allegations of fraudulent OTTI analyses.  See Tr. at 128:18-25 (Marks).  The Defendants contended that, in In re Fannie Mae 2008 Sec. Litig., the plaintiffs made the same allegation as the SEC has: that Fannie Mae's OTTI statement was fraudulently false and a violation of rule 10b-5, because "the

defendants had information that should have told them to take that impairment charge earlier."
Tr. at 129:9-14 (Marks).  The Defendants noted that the court in In re Fannie Mae 2008 Sec.
Litig. determined that, even though Fannie Mae's OTTI statement was false when made, it was
not fraudulent.  See Tr. at 129:15-130:3 (Marks).  The Defendants also stated that in Kuriakose
v. Fed. Home Loan Mortg. Corp., the Honorable John Fontaine Keenan, Senior United States
District Judge for the Southern District of New York, determined that similar allegations of fraud
based upon GAAP violations failed to state a claim for relief, even though the defendants'
statements were false, because the court determined that the defendants lacked the requisite
scienter.  See Tr. at 130:18-131:2 (Marks).  The Defendants contended that in Kuriakose v. Fed.
Home Loan Mortg. Corp., Judge Keenan determined that the defendants' "subjective
determination about future events," although wrong, was not evidence of a fraudulent intent.  Tr.
at 131:3-8 (Marks).  The Defendants conceded, however, that whether statements regarding an
OTTI analysis are fraudulent depends on the particular facts of a case.  See Tr. at 131:21-25
(Court, Marks).   The Defendants contended, nonetheless, that the two cases they cite
demonstrate that an OTTI analysis is a "judgment call" and predictive in nature, and, given the
"extraordinary circumstances" surrounding their statements, their OTTI analysis was somewhat
uncertain.  Tr. at 132:3-15 (Marks).

    The Defendants also noted that, regarding the SEC's allegations that they should have
had knowledge of negative market reactions because of the rumor that a European hedge fund
would be collapsing, Starrett had no knowledge of that rumor.  See Tr. at 133:1-10 (Marks).

    The Court inquired whether the Defendants understand that the SEC must comply with
rule 9(b) when alleging fraud, and the Defendants stated that they believe rule 9(b) applies to the
SEC's Complaint.  See Tr. at 133:12-22 (Court, Marks).  The Court inquired what the difference

is between a complaint subject to rule 9(b) and a complaint that the PSLRA governs.  See Tr. at 133:19-22 (Court, Marks).  The Defendants initially stated that they believe the standard under rule 9(b) is higher than that which the PSLRA imposes.  See Tr. at 134:2-4 (Court, Marks).  The Defendants stated that, in the Tenth Circuit, the SEC must allege particular facts to demonstrate scienter.  See Tr. at 134:5-13 (Marks).  The Court stated that rule 9(b) allows plaintiffs to plead scienter generally, which appears to be a different standard than the PSLRA imposes.  See Tr. at 134:14-21 (Court).  The Defendants asserted that, as the SEC alleges, the SEC must plead that the "[D]efendants acted with an intent to deceive and manipulated a fraud; in other words, acted with a mental state known as scienter."  Tr. at 135:2-7 (Marks).  The Defendants conceded that the PSLRA requires more than rule 9(b) in the Tenth Circuit, but nonetheless contended that the SEC must plead facts showing scienter.  See Tr. at 135:17-20 (Marks); id. at 136:10-20 (Marks).

The Defendants then contended that they were not "squeezing" KPMG.  Tr. at 136:24-137:4 (Marks, Court).  The Defendants asserted that KPMG hold the power to sign off on their audit or delay, and Thornburg Mortgage has "no way to force the auditors," and that attempting to force KPMG into a decision would be ineffective.  Tr. at 137:4-11 (Marks).  The Court asked: "[W]hat is the business reason for not telling your auditors about something that's going to appear in the narrative section of the 10-K three days later?"  Tr. at 137:12-14 (Court).  The Defendants asserted that "there's a tremendous amount of confusion about what's being communicated in e-mail."  Tr. at 137:17-18 (Marks).  The Defendants asserted that KPMG was not unaware that "during the January 2008 period that the company received almost a half-billion in margin calls."  Tr. at 137:21-25 (Marks).

Regarding the Feb. 25 Goldstone/Starrett Email, the Court asked counsel for Starrett, Jerry Marks, whether he knows to what Goldstone was referring when he mentioned the "KPMG

situation."  Tr. at 138:15-25 (Marks, Court)(citing Feb. 25 Goldstone/Starrett Email at 3).  Mr.

Marks stated that he understands that Goldstone was experiencing "communication issues

between the audit partner and Thornburg over the course of the audit nature, including various

issues being blown out of proportion or delayed in getting a response."  Tr. at 139:1-6 (Marks).

Regarding Starrett's statement "'[w]e have purposely not told them about the margin

calls so that we don't escalate an issue which we believe will be put to rest by the time they have

to issue their opinion,'" the Defendants contended that the SEC cannot allege that KPMG

"somehow had no idea that Thornburg was receiving hundreds and hundreds of millions of

dollars in margin calls during January and February, 2008," and, therefore, the Feb. 25

Goldstone/Starrett Email does not evidence that the Defendants were attempting to hide margin

calls from KPMG.  Tr. at 139:23-140:9 (Marks).  The Defendants noted that KPMG was aware

that Thornburg Mortgage received $300 million in margin calls between February 14th, 2008,

and when the 2007 Form 10-K was filed, but the Defendants conceded that KPMG might not

have been aware of those margin calls until after the Feb. 25 Goldstone/Starrett Email was sent.

See Tr. at 140:10-141:3 (Marks, Court).  The Defendants contended that the Complaint does not

allege that the Defendants told KPMG nothing about the margin calls.  See Tr. at 141:8-11

(Marks).  The Defendants stated that the SEC's allegation is that they did not tell KPMG about

the Citigroup Global Letter, that Thornburg Mortgage was paying its margin calls over time, or

the European hedge fund collapsing.  See Tr. at 141:12-18 (Marks).

The Court inquired whether the Defendants are suggesting that KPMG knew about the

margin calls, but did not know the details of the margin calls.  See Tr. at 142:10-16 (Court).  The

Defendants stated that the SEC is alleging that they purposefully did not tell KPMG about that

Thornburg Mortgage arranged to pay the Citigroup Global margin call over time.  See Tr. at

143:1-4 (Marks).  The Defendants asserted that the SEC is alleging that they had a duty to tell KPMG about the payment plan for the Citigroup Global margin call.  See Tr. at 143:5-11 (Marks).  The Defendants contended that they ultimately disclosed Thornburg Mortgage's $300 million in margin calls to KPMG and that information about the margin calls was included in the 2007 Form 10-K.  See Tr. at 143:12-16 (Marks).  The Defendants contended, therefore, that the SEC inaccurately includes the Feb. 25 Goldstone/Starrett Email as evidence that the Defendants were "keeping KPMG in the dark about the margin calls entirely."  Tr. at 143:17-21 (Marks). The Defendants asserted that the Feb. 25 Goldstone/Starrett Email refers to an issue of timing and that inferring that KPMG was completely unaware of Thornburg Mortgage's margin calls is unreasonable.  See Tr. at 144:9-16 (Marks).

The Defendants then addressed their position regarding the requisite state of mind the SEC must allege Starrett possessed.  See Tr. at 144:17-20 (Marks).  The Defendants noted that the SEC concedes it is not bringing a cause of action under rule 10b-5(b) against Starrett, which the Defendants stated is the principle method of asserting securities liability.  See Tr. at 144:21-23 (Marks).  The Defendants contended that the SEC has not pleaded scheme liability against Starrett, and, therefore, they must allege that she aided and abetted Goldstone and Simmons' wrongdoing.  See Tr. at 145:4-8 (Marks).  The Defendants asserted that the SEC must demonstrate that Starrett had "actual knowledge" to implicate her on an aiding-and-abetting claim.  Tr. at 145:9-11 (Marks).

The Court inquired what the Defendants' opinion is of the SEC's argument that the Court should dismiss very few cases for failing to allege scienter at the motion to dismiss stage.  See Tr. at 145;19-23 (Court).  The Defendants conceded that it is difficult to dismiss a complaint for the lack scienter allegations, unless the Court agrees with the Defendants that the OTTI analysis

is a speculative determination.  See Tr. at 145:24-146:4 (Marks).  The Defendants noted that the

OTTI analysis is done "in the context of literature that then, subsequent, because it was

questioned and confusing, was redone."  Tr. at 146:4-11 (Marks).  The Defendants asserted that

their OTTI analysis could be a mistake, or negligence, or "even gross negligence," but the

analysis was not fraud.  Tr. at 146:12-18 (Marks).

      The Court stated that it does not understand the importance of the Defendants' position

that they were surprised by the market's reaction to the 2007 Form 10-K.  See Tr. at 146:21-24

(Court).  Mr. Marks noted that counsel for Goldstone and Simmons, Randall Lee, emphasized

that the Defendants were surprised by the market's reaction, but that he does not believe their

surprise is "important or critical or relevant" to their defense.  Tr. at 146:25-147:7 (Marks,

Court).  Mr. Marks stated that nobody could predict how the market would react in 2008.  See

Tr. at 147:8-12 (Marks).  Mr. Marks contended that the Defendants' core argument is that, even

if their OTTI analysis was false, it either was covered by the bespeaks caution doctrine or was

not fraudulent.  See Tr. at 148:13-20 (Marks).

      The Defendants then addressed the SEC's allegations arising from Goldstone's

statements to Street Signs and Thornburg Mortgage's investor relations department, on February

28, 2008, after Thornburg Mortgage filed the 2007 Form 10-K.  See Tr. at 149:1-10 (Valentine).

The Defendants asserted that the SEC has failed to allege that Goldstone knew, before making

those statements, that Thornburg Mortgage had received margin calls it would be unable to meet

without selling assets at a loss.  See Tr. at 149:11-16 (Valentine).  The Defendants contended

that the SEC has not alleged that, when Goldstone told the investor relations department on

February 28, 2008, at 5:29 a.m., that all of Thornburg Mortgage's margin calls were met, that

Thornburg Mortgage had sufficient operating cash, and that Thornburg Mortgage has not sold

assets to meet margin calls, those statements were at that time untrue.  See Tr. at 150:4-16 (Valentine)(citing Feb. 28 IR Email).  The Defendants contended that the SEC has alleged that Thornburg Mortgage had forty million dollars in cash on the morning of February 28, 2008, and noted that the SEC has not alleged that, as of the time of the Feb. 28 IR Email, Thornburg Mortgage had received "even one margin call that would call into question Thornburg Mortgage's ability to meet margin calls in the future."  Tr. at 150:17-21 (Valentine).  The Defendants asserted that, at the time the Feb. 28 IR Email was sent, Thornburg Mortgage had successfully worked out payment plans with its lenders and had not been declared in default.  See Tr. at 151:2-6 (Valentine).  The Defendants noted that the SEC concedes that Thornburg Mortgage did not receive a default notice from J.P. Morgan until the evening of February 28, 2008, and that the J.P. Morgan default notice "was the game-changer, but it didn't happen until after this email was sent."  Tr. at 151:7-14 (citing Complaint ¶ 41, at 12-13).  The Defendants asserted, therefore, that there is no basis to infer that Goldstone "had instructed the investor relations department to make misleading statements, much less that he did so with any sort of intent to defraud."  Tr. at 151:15-18 (Valentine).

The Defendants turned to Goldstone's allegedly false statements on Street Signs: "'We don't think we have to sell more, no.  We have liquidity and cash available to continue to support the portfolio.'"  Tr. at 152:14-17 (Valentine)(quoting Street Signs at 3:54-4:09).  The Defendants confirmed that Thornburg Mortgage had not received the J.P. Morgan margin call when Goldstone spoke on Street Signs.  See Tr. at 152:20-25 (Valentine, Court).  The Court inquired at what time on February 28, 2008, Thornburg Mortgage received the first margin call, but the Defendants stated that the SEC has not alleged in the Complaint the exact time at which Thornburg Mortgage began receiving margin calls on that day.  See Tr. at 152:8-14 (Valentine).

- 161 -

The Defendants contended that the SEC has not alleged that, even if Thornburg Mortgage had received margin calls before Goldstone spoke on MarketWatch, Goldstone believed his statements were untrue at the time.  See Tr. at 152:15-19 (Valentine).  The Defendants asserted that the SEC has not alleged that they "lacked confidence in the company's ability to actually execute" the transactions which the Defendants believed would raise between $450 million and $675 million by the end of the week.  Tr. at 153:20-154:7 (Valentine).

The Defendants asserted that the Feb. 29 Lopez/BOD Email is the only document that the SEC cites in the Complaint which reflects Goldstone's realization that Thornburg Mortgage will not be able to meet its margin calls with payment plans and was sent after the J.P. Morgan margin call.  See Tr. at 154:8-155:13 (Valentine).  The Defendants contended that the SEC has not alleged in the Complaint that Goldstone realized Thornburg Mortgage would not be able to meet its margin calls before the morning of February 29, 2008.  See Tr. at 155:14-18 (Valentine).  The Defendants also asserted that, even though Goldstone knew Thornburg Mortgage had only forty million dollars in cash on February 28, 2008, the SEC has not alleged that Goldstone was aware of the full extent of Thornburg Mortgage's margin calls on that date.  See Tr. at 155:19-156:3 (Valentine).

 The Defendants also noted that Goldstone's statements on Street Signs were made during an "unscripted interview," which should not be held to as high of a standard as Form 10-Ks, which lawyers and auditors vet.  Tr. at 156:4-8 (Valentine)(citing Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund. v. Conseco, Inc., 679 F.3d 952).

The Defendants also asserted that the bespeaks caution doctrine should apply to Goldstone's statements on Street Signs.  See Tr. at 156:16-20 (Valentine).  The Defendants

contended that Goldstone's statements were forward-looking, and that he took "pains to make it clear what the risks were, [and] how bad the market was."  Tr. at 156:21-157:7 (Valentine).

The SEC responded that the Complaint refutes the Defendants' position that Goldstone was unaware of Thornburg Mortgage's margin calls when he spoke on Street Signs and to the investor relations department.   See Tr. at 158:8-15 (McKenna).   The SEC pointed to its allegation in paragraph 9 of the Complaint, at page 4 in which it alleges that Thornburg Mortgage received additional margin calls within two hours of filings the 2007 Form 10-K, margin calls which Thornburg Mortgage could not meet.  See Tr. at 158:16-22 (McKenna).  The SEC conceded that it is not necessarily true that, if Thornburg Mortgage had margin calls which exceeded its liquidity, Thornburg Mortgage would have to sell impaired assets, but the SEC contended that, given Thornburg Mortgage's financial situation at the time, it is reasonable to infer that Thornburg Mortgage's only remaining option was to sell impaired assets.  See Tr. at 159:3-11 (McKenna).  The SEC contended that the electronic mail transmissions before the Court create a reasonable inference that Thornburg Mortgage's only remaining option was to sell impaired assets after filing the 2007 Form 10-K.  See Tr. at 159:15-21 (McKenna).  The SEC conceded that Thornburg Mortgage had plans to raise more capital, but argued that it was, nonetheless, "extremely reckless, if not knowingly fraudulent, for Mr. Goldstone to submit that" Thornburg Mortgage would have liquidity and cash to continue to supports its portfolio, as he states on Street Signs.  Tr. at 160:1-13 (Court, McKenna).  The SEC asserted that Goldstone could not have reasonably relied upon a belief that Thornburg Mortgage's lenders would agree to payment plans, as the Complaint alleges that, in August, 2007, Thornburg Mortgage received default notices and lenders seized Thornburg Mortgage's assets.  See Tr. at 160:14-22 (McKenna).  The SEC asserted, therefore, that by the time Goldstone stated on Street Signs that

- 163 -

Thornburg Mortgage had liquidity and cash available to support its portfolio, that statement was not correct.  See Tr. at 160:23-161:5 (Court, McKenna).

The SEC also stated that Goldstone gave instructions to Thornburg Mortgage's investor relations department "an hour or so before he became aware of the additional margin calls" that exceeded Thornburg Mortgage's cash on hand.  Tr. at 161:9-23 (McKenna, Court).  The SEC contended, however, that they have alleged that, by the end of February 28, 2008, the investor relations department reported to Goldstone that they informed the investors that Thornburg Mortgage had met all of its margin calls, did not expect to sell assets to meet margin calls, and had returned to profitability.  See Tr. at 161:24-162:5 (McKenna)(citing Complaint ¶ 96, at 28).  The Court inquired why the SEC interpreted Goldstone's third message point to the investor relations department -- "'No assets sales to meet margin calls'" -- as a forward looking statement, given that, at the time, the message point could be interpreted as accurately stating only that Thornburg Mortgage had not yet sold assets to meet its margin calls.  Tr. at 162:9-15 Court)(quoting Feb. 29 IR Email at 2).  The SEC conceded that it is "not sure," and that Goldstone's message point could have been a statement in hindsight or forward-looking.  Tr. at 162:16-19 (McKenna).  The SEC asserted that, at the motion to dismiss stage, neither it nor the Defendants can definitively know what Goldstone meant with his message points to the investor relations department.  See Tr. at 162:22-163:7 (McKenna).

Regarding Goldstone's statements on Street Signs, the SEC pointed out that, during the interview, placards beneath Goldstone report that Thornburg Mortgage posted a sixty-five million dollar profit and that the disclosure that Thornburg Mortgage might have to sell assets is a "standard disclosure[]."  Tr. at 163:9-164:5 (McKenna).  The SEC admitted that it is not sure whether Goldstone created the placard.  See Tr. at 164:6-9 (Court, McKenna).   The SEC

asserted, however, that the placard undermines the Defendants' assertion that they adequately warned the market, because the placards characterize the possibility of selling assets as a "standard disclosure." Tr. at 164:15-20 (McKenna). The SEC also asserted that the placard, by its placement, appears to be attributing the statement to Goldstone. See Tr. at 164:25-165:4 (Court, McKenna).

The SEC then turned to the Feb. 21 BOD Email, and the SEC contended that it does not understand how the Defendants can allege, based on this electronic mail transmission in which Goldstone states that Thornburg Mortgage will be issuing further disclosures, that it is "implausible to say that he had an intent to deceive anybody or . . . was . . . showing reckless disregard." Tr. at 165:23-166:7 (McKenna). The SEC also contended that the Defendants have misstated the standard for a motion to dismiss by alleging that the SEC must demonstrate it is more probable than not that Goldstone had fraudulent intent. See Tr. at 166:8-13 (McKenna).

Turning to the Feb. 22 BOD Email, the SEC asserted that it does not agree that KPMG was aware of Thornburg Mortgage's margin calls at the time of the electronic mail transmission. See Tr. at 166:14-25 (McKenna, Court). The SEC asserted that it believes KPMG was unaware of the Citigroup Global Letter and that Thornburg Mortgage had made late payments at the time of the Feb. 25 Goldstone/Starrett Email. See Tr. at 167:3-10 (McKenna). The SEC conceded that it does not know whether KPMG was aware of Thornburg Mortgage's margin calls at the time of the Feb. 25 Goldstone/Starrett Email. See Tr. at 167:11-13 (Court, McKenna). The Court stated that KPMG must have known of Thornburg Mortgage's margin calls by the time the 2007 Form 10-K was filed, because of KPMG's assistance with certain sections of it, and the SEC conceded that KPMG must have known of some margin calls, because margin calls are part of Thornburg Mortgage's daily operations. See Tr. at 167:14-25 (Court, McKenna). The SEC

contended, however, that it is unclear whether KPMG was aware of the Citigroup Global margin call.  See Tr. at 167:25-168:1 (McKenna).  The SEC conceded that KPMG knew Thornburg Mortgage had received $300 million in margin calls by the time the 2007 Form 10-K was filed, but asserted that its "allegation is [KPMG] had not been informed that Thornburg had not been able to meet those on a timely basis and had to rely on the lenders."  Tr. at 168:1-7 (McKenna).

The Court stated that the "guts" of the SEC's case appears to be that KPMG knew Thornburg Mortgage had received $300 million in margin calls, but the Defendants concealed from KPMG Thornburg Mortgage's plan to meet the margin calls with payment plans, which the SEC stated is an accurate characterization.  Tr. at 168:8-16 (Court, McKenna).  The Court inquired why the details of Thornburg Mortgage's payment plans were material disclosures, if KPMG did not inquire of Thornburg Mortgage how it planned to meet the $300 million in margin calls.  See Tr. at 168:17-20 (Court).  The SEC contended that KPMG was interested in the details of Thornburg Mortgage's margin calls, and that Thornburg Mortgage issued a restated 10-K demonstrates that the details were material and of interest to KPMG.  See Tr. at 168:21-169:6 (McKenna).  The SEC contended that the Defendants were attempting to keep KPMG "in the dark" and to not disclose the details of Thornburg Mortgage's payment plans if the Defendants could avoid disclosing them.  Tr. at 169:8-20 (McKenna).  The Court inquired how the Defendants' desire to avoid disclosing negative information demonstrates fraudulent intent and how it is not KPMG's responsibility to inquire of Thornburg Mortgage how it planned to meet its margin calls.  See Tr. at 170:1-5 (Court); id. At 170:21-24 (Court).  The SEC contended that Thornburg Mortgage has the obligation of assessing whether it will be able to meet its margin calls, and KPMG's obligation is to "give an opinion on whether they think that conclusion's reasonable or not."  Tr. at 170:25-171:3 (McKenna).  The SEC contended that

KPMG believed it would be a "close call" whether Thornburg Mortgage could meet its margin calls and that, had the Defendants given more fulsome disclosures, KPMG would have come to a different conclusion.  Tr. at 171:6-15 (McKenna).

The SEC also contended that Goldstone's statement that Thornburg Mortgage should have "'sufficient cash to allow us to avoid selling any assets at a loss which should allow us to avoid any issues with KPMG'" demonstrates his intent to mislead KPMG.  Tr. at 171:17-22 (quoting Feb. 22 BOD Email at 3).  The SEC noted that Goldstone goes on to say: "'By the way, the KPMG comment about 'going concern' issues that was dismissed as a formality at the last Audit Committee meeting is apparently  bigger issue than I had been led to believe.'"  Tr. at 171:23-172:1 (McKenna)(quoting Feb. 22 BOD Email at 3).   The SEC contended that this statement, in conjunction with Goldstone's other statements, demonstrates an intent to deceive KPMG.  See Tr. at 172:2-4 (McKenna).

The Court inquired how the SEC responds to the Defendants' contention that the Feb. 22 BOD Email demonstrates that they believed Thornburg Mortgage would raise sufficient cash to meet its margin calls without selling any assets at the time of the Feb. 22 BOD Email.  See Tr. at 172:5-11 (Court); id. at 172:15-19 (Court)("[I]t says 'That should be sufficient cash to allow us to avoid selling assets at a loss.'  That's about as firm a statement as you're going to get." (quoting Feb. 22 BOD Email at 3)).  The SEC responded that the Defendants' knowledge of the lenders' forbearance, KPMG's unawareness of Thornburg Mortgage's reliance on lender forbearance, the Defendants' statements to investors, and the timing of when the 2007 Form 10-K was filed raise a plausible inference that the Defendants were aware that Thornburg Mortgage's financial situation was much worse than they represented.  See Tr. at 172:20-173:4 (McKenna).  The SEC asserted that the Defendants have inconsistently alleged that they believed

Thornburg Mortgage would be able to meet its margin calls and that they gave adequate cautionary language to represent Thornburg Mortgage's precarious position in the 2007 Form 10-K.  See Tr. at 173:6-16 (McKenna).

The SEC then turned to the Feb. 25 Goldstone/Starrett Email and posited that, when Goldstone states that he has been "stewing all weekend" about the KPMG situation, Goldstone meant that he has been wondering all weekend whether the Defendants would "be able to pull this off."  Tr. at 173:24-174:4 (McKenna).  Regarding the Defendants' contention that, when Goldstone references to the KPMG situation, he is referring to his unhappiness with KPMG's work, the SEC asserted that such an inference is not reasonable based on the allegations in the Complaint.  See Tr. at 174:5-13 (Court, McKenna).  The SEC asserted that the Complaint alleges a "scheme to mislead KPMG and keep them in the dark so that they can issue a . . . relatively clean 10-K and raise more money to keep things going" with a clean audit opinion.  Tr. at 174:17-175:2 (McKenna).

The SEC then turned to the Defendants' assertion that they intended to be transparent, based upon Starrett's statement: "Obviously, if we are not able to resolve the situation satisfactorily, we will need to inform them [KPMG] before we file."  Tr. at 174:8-13 (McKenna)(citing Feb. 25 Goldstone/Starrett Email at 2).  The SEC asserted that this statement does not demonstrate an intention to be transparent, but, rather, demonstrates that the Defendants wanted "to be opaque if they can get away with it."  Tr. at 175:13-18 (McKenna).

The SEC contended that the Feb. 27 Simmons/Feldman Email further demonstrates that the Defendants were doing all they could to file the 2007 Form 10-K within a particular window in which Thornburg Mortgage would appear solvent.  See Tr. at 175:21-176:4 (McKenna).  The SEC asserted that, in the Feb. 27 Simmons/Starrett Email, in which Simmons states that "'I do

not want there to be any issues based on Thursday activity'" and also mandates a deadline of

6:00 a.m., February 28, 2008, for filing the 2007 Form 10-K, Simmons demonstrates a desire to

file the 2007 Form 10-K in a specific window that will allow Thornburg Mortgage to avoid

reporting the margin calls he expects to receive.  Tr. at 176:5-16 (McKenna)(quoting Feb. 27

Simmons/Starrett Email at 2).  The Court asked whether the Feb. 27 Simmons/Starrett Email

demonstrates scienter, given that "any prudent person about to file at 10-K [would] probably

instruct their staff the same way," so that the information in the 10-K would be accurate,

notwithstanding any market fluctuations after the 10-K is filed.  Tr. at 176:17-22 (Court); id. at

176:24-177:2 (Court).  The SEC conceded that the Court's analysis is accurate, but contended

that, in the context of its allegations in the Complaint, the timing of Thornburg Mortgage's filing

the 2007 Form 10-K demonstrates their efforts to "fit the filing into this narrow window," which

the Defendants would not have done had Thornburg Mortgage not been experiencing financial

difficulty.  Tr. at 177:3-12 (McKenna).

The SEC contended that the Feb. 27 Goldstone/Simmons Email, in which Goldstone

discusses an "Alt-A hedge fund in Europe . . . blowing up this afternoon," demonstrates that

Goldstone and Simmons knew that Thornburg Mortgage would soon experience more margin

calls.  Tr. at 177:14-179:7 (McKenna, Court).  The SEC contended that the Feb. 27 BOD Email,

in which Goldstone states that Thornburg Mortgage was "'able to meet all of those recent margin

calls yesterday and we were able to get a clean audit opinion to go with it,'" demonstrates that

Goldstone had a scheme to not tell KPMG about Thornburg Mortgage's margin calls so as to

manipulate its audit opinion.  Tr. at 179:8-22 (McKenna)(quoting Feb. 27 BOD Email at 2).

Regarding the Feb. 29 Lopez/BOD Email, which the Defendants assert is the first

electronic mail transmission that demonstrates Goldstone knew Thornburg Mortgage would not

be able to meet its margin calls, the SEC asserted that it has shown that, because of the amount of cash Thornburg Mortgage had on hand, Goldstone should have known Thornburg Mortgage would not be able to meet its margin calls earlier.  See Tr. at 179:24-180:7 (McKenna).  The SEC also contended that the Feb. 29 Lopez/BOD Email demonstrates that the Defendants made the wrong OTTI analysis.  See Tr. at 180:5-14 (McKenna).  The Court inquired whether margin calls could ever surprise the Defendants, given that Thornburg Mortgage experienced margin calls frequently.  See Tr. at 180:15-22 (Court).  The SEC agreed, and noted that the Goldstone and Simmons' electronic mail transmissions regarding a European hedge fund demonstrate that they expected additional margin calls in the near future.  See Tr. at 180:23-25 (McKenna).

The SEC had two responses to the Defendants' contention that Thornburg Mortgage could have met the Citigroup Global and UBS AG margin calls, but that the J.P. Morgan default notice was its doom.  See Tr. at 181:1-7 (Court, McKenna).  The SEC asserted that the Defendants should have known that Thornburg Mortgage could not meet its margin calls when UBS AG issued a margin call of sixty million dollars, because Thornburg Mortgage had only forty million dollars on hand to meet the margin call.  See Tr. at 181:7-12 (McKenna).  The SEC also asserted that the Defendants cannot honestly allege that the J.P. Morgan default notice was a "game-changer and/or unprecedented," because Thornburg Mortgage received two billion dollars in margin calls in August, 2007, for which it had to sell assets to meet.  Tr. at 181:13-23 (McKenna).  The SEC asserted that the J.P. Morgan default notice "may have been a game-changer in the last two weeks, but it wasn't a game-changer in the last six months."  Tr. at 181:21-23 (McKenna).

The SEC then turned to the Feb. 28 Simmons/Goldstone Email, in which Simmons states: "'I guess the recent developments section did not go over well.  If only they knew[.]'"  Tr. at

182:3-7 (McKenna).  The SEC asserted that the electronic mail transmission is not "cryptic," but, rather, Simmons is telling Goldstone: "Imagine what they would have done had they known that we purposefully withheld them from our auditor; imagine what they would have done if they'd known that . . . we entered into I/O strip transactions that we didn't have to technically call assets sales in order to meet these margin calls?"  Tr. at 182:9-17 (McKenna).  The SEC asserted that its proposed inference -- that the Feb. 28 Simmons/Goldstone Email demonstrates Goldstone's and Simmons' plan to hide information from the market and KPMG -- is the most reasonable inference to be drawn from that electronic mail transmission.  See Tr. at 182:18-22 (McKenna).

The SEC also noted that it has alleged that KPMG asked the Defendants whether Thornburg Mortgage was in breach of any contracts or had noncompliance issues with its lender agreements, which, the SEC asserted, should have prompted the Defendants to disclose Thornburg Mortgage's inability to timely meet its margin calls.  See Tr. at 183:6-14 (Kasper)(citing Complaint ¶ 58, at 17).  The SEC pointed out that it has alleged that the Defendants "each misrepresented and/or failed to disclose that violation."  Tr. at 183:17-21 (Kasper).

The SEC also asserted that it has adequately alleged in the Complaint that Starrett had scienter.  See Tr. at 184:3-10 (Kasper).  The SEC contended that the complexity of Thornburg Mortgage's accounting decisions does not establish that Starrett lacked fraudulent intent as a matter of law under § 10(b) of the Exchange Act.  See Tr. at 184:11-16 (Kasper).

Regarding the relevant pleading standard the SEC must meet when alleging fraudulent intent, the SEC contended that, unlike private litigants under the PSLRA, it "need not show a strong inference of scienter, and, in fact, cases have been distinguished on that specific point." Tr. at 184:17-185:10 (Kasper)(citing SEC v. Mozillo, No. CV09-3994HFWNABX, 2009 WL

3807124 (C.D. Cal. Nov. 3, 2009); SEC v. Arnold).  The SEC asserted that under rule 9(b), the SEC can allege scienter generally.  See Tr. at 185:11-13 (Kasper)(citing SEC v. Arnold).  The SEC contended that its case is far different from that in Kuriakose v. Fed. Home Loan Mortg. Corp., because it has adequately alleged scienter, specifically with the Feb. 25 Starrett/Goldstone Email, which the SEC asserted demonstrates the Defendants' intent to hide information from KPMG.  See Tr. at 185:14-186:9 (Kasper).  The SEC contended that the Feb. 25 Starrett/Goldstone Email demonstrates that the Defendants intended to "never tell KPMG about the fact that [they] were unable to timely meet our margin calls and, as a consequence . . . rely upon the lenders' forbearance to prevent our assets from being sold."  Tr. at 186:10-16 (Kasper).

The SEC asserted that it has always alleged that the Defendants were engaging in a scheme to commit fraud, and that the Complaint "makes it perfectly clear that it was a scheme and that the defendants were aware that it's a scheme."  Tr. at 186:17-25 (Kasper).  The SEC conceded that it has not, and cannot, in light of Janus Capital Grp., Inc. v. First Derivative Traders, "make such [] an argument . . . that Ms. Starrett was a maker" of a fraudulent statement, but asserted that it has always alleged that Starrett participated in a scheme to defraud.  Tr. at 178:12-20 (Kasper).  The SEC contended that it has not alleged scheme liability as a "backdoor change of course," but, rather it has always alleged that the Defendants, including Starrett, engaged in a fraudulent scheme.  Tr. at 187:1-10 (Kasper).

Turning to the Request for Judicial Notice, the SEC informed the Court that it objects to the Defendants' request.  See Tr. at 188:7-8 (McKenna).  The SEC contended that thirty of the statements of which the Defendants have requested the Court take judicial notice contain hearsay or are not statements subject to judicial notice.  See Tr. at 188:7-12 (McKenna).  The SEC also

noted that the Defendants' did not style the Request for Judicial Notice as a motion.  See Tr. at 188:13-17 (McKenna).

The Defendants requested permission to file a surreply addressing scheme liability, and aiding-and-abetting allegations.  See Tr. at 189:11-190:5 (Marks).  The SEC stated that it does not object to the Defendants submitting a surreply, as long as it is allowed an opportunity to argue against the Defendants' surreply.  See Tr. at 190:8-19 (Kasper).  The Court granted the Plaintiff's Motion for Permission to File Surreply or, in the Alternative, for the Court to disregard New Arguments Raised in Defendant Jane Starrett's Reply in Support of Motion to Dismiss, filed July 28, 2012 (Doc. 61), and gave the Defendants permission to file a surreply as well.  See Tr. at 190:20-24 (Court).

The Defendants asserted that there is "nothing wrong" with "a company trying to do everything that they can legally within their power to satisfy all their margin calls under these trying times before they get their K in."  Tr. at 191:5-17 (Marks).  The Defendants also asserted that the decision to not tell KPMG about the Citigroup Global margin call was a judgment call and, therefore, could demonstrate that the Defendants had poor judgment, but does not demonstrate fraud.  See Tr. at 191:18-192:10 (Marks).  The Defendants contended that companies make decisions about what to tell their auditors all the time and that the nature of working with auditors involves similar judgment-based decisions.  See Tr. at 192:11-16 (Marks). The Defendants noted that the SEC has conceded that KPMG knew of Thornburg Mortgage's $300 million in margin calls by the time it filed the 2007 Form 10-K, and, therefore, if KPMG was concerned with Thornburg Mortgage's margin calls, KPMG could have raised that issue with the Defendants.  See Tr. at 192:17-23 (Marks).  The Defendants contended that there is "no question" that KPMG knew about Thornburg Mortgage's $300 million in margin calls, that

- 173 -

Thornburg Mortgage had arranged to meet those margin calls over time, and the amount of money Thornburg Mortgage was paying on a daily basis to meet its margin calls.  Tr. at 193:8-15 (Marks).  The Defendants also noted that, in the Complaint, the SEC does not allege that KPMG was completely unaware, but, rather, the SEC's allegations are based upon the Defendants' alleged failure to tell KPMG certain things, such as about the Citigroup Global Letter.  See Tr. at 193:21-194:9 (Marks).  The Defendants contended that the SEC can only speculate that KPMG would have assessed Thornburg Mortgage differently had it known of the Citigroup Global Letter.  See Tr. at 194:10-15 (Marks).  The Defendants noted that Thornburg Mortgage eventually came forward with information about its margin calls, which the Defendants asserted is inconsistent with the SEC's allegation that they were attempting to hide information.  See Tr. at 194:16-195:13 (Marks).

The Defendants also contended that the SEC has taken a "few liberties" while describing the facts alleged in the Complaint.  Tr. at 195:19-196:1 (Valentine).  The Defendants asserted that paragraphs 96 and 97 of the Complaint do not allege, as the SEC has asserted, that Goldstone was "fully aware of everything that was happening with the margin calls."  Tr. at 196:1-9 (Valentine).  The Defendants asserted that inferring from the Complaint that Goldstone was aware of Thornburg Mortgage's margin calls as they were received is different from asserting in the Complaint that Goldstone knew of the margin calls.  See Tr. at 196:10-16 (Valentine).

Regarding the SEC's allegation of auditor deception, the Defendants also asserted that the Complaint does not specifically allege that KPMG was unaware of certain information.  See Tr. at 196:17-24 (Valentine).  The Defendants contended that there is "no reason to believe that" the SEC will acquire more information as the case progresses, because the SEC has already been

investigating Thornburg Mortgage for four years.  Tr. at 197:2-11 (Valentine).  The Defendants asserted, therefore, that the reason the SEC has not alleged specific facts in the Complaint is because the SEC does not have more specific information.  See Tr. at 197:12-18 (Valentine).  The Defendants also asserted that the SEC's allegation that KPMG "would have disagreed with the company's OTTI conclusion if KPMG had received all of the supposedly omitted information," falls short of stating a claim under rule 13b2-2, because that rule requires materiality, and the SEC has not alleged that KPMG would have altered its OTTI conclusion if the Defendants informed KPMG of Thornburg Mortgage's I/O Strip Transactions and payment plans.  Tr. at 197:19-198:11 (Valentine).  The Defendants contended that, if the SEC cannot make that allegation after investigating Thornburg Mortgage for four years, there is "no reason that the plaintiff should be given the benefit of the doubt in this case that KPMG would have reached a different conclusion."  Tr. at 198:12-20 (Valentine).  The Defendants asserted that the Court should take a very skeptical view of the aspects of the Complaint which they have alleged lack sufficient facts.  See Tr. at 198:21-199:2 (Valentine).

The Court stated that it believes the pleading standard under rule 9(b) could be substantially different from that required in the PSLRA.  See Tr. at 199:7-23 (Court).  The Court also stated it believes some of the Defendants' electronic mail transmission are evidence of benign business-related conduct, but also noted that, taken together, the electronic mail transmissions likely contain sufficient statements to state a plausible case for fraud under rule 9(b).  See Tr. at 199:24-200:7 (Court).

Regarding the SEC's allegations against Starrett, the Defendants noted that the SEC has conceded that it is not alleging that Starrett made a false statement under rule 10b-5, but, rather, the SEC is alleging scheme liability against Starrett.  See Tr. at 201:10-20 (Marks).  The

Defendants contended that the SEC has not pleaded sufficient facts to allege scheme liability against Starrett.  See Tr. at 202:1-3 (Marks).  The Defendants noted that the SEC's theories of liability against Starrett are interrelated, because, if the SEC has not sufficiently pleaded scheme liability, then it must allege that Starrett had actual knowledge of the fraud to implicate her for aiding and abetting.  See Tr. at 202:1-9 (Marks).  The Defendants contended that, under Janus Capital Grp., Inc. v. First Derivative Traders, Starrett cannot be primarily liable under rule 10b-5(b) unless she made a false statement.  See Tr. at 203:2-6 (Marks).  The Defendants contended that, because the SEC has conceded that Starrett is not primarily liable for making a statement, the SEC cannot attempt to make her primarily liable through scheme liability, because that would undermine Janus Capital Grp., Inc. v. First Derivative Traders' holding.  See Tr. at 203:7-204:6 (Marks)(citing SEC v. Kelly).  The Defendants also contended that, under SEC v. Kelly, a necessary element of scheme liability is that a defendant committed an inherently deceptive act. See Tr. at 204:7-12 (Marks).   The Defendants contended that their statements regarding successfully meeting margin calls, the OTTI analysis, Thornburg Mortgage's I/O Strip Transactions, and omissions to KPMG are not inherently deceptive acts.  See Tr. at 204:13-19 (Marks).  The Defendants also asserted that, to allege scheme liability, the SEC must allege that the Defendants committed acts separate from and in addition to the primary deception.  See Tr. at 205:6-17 (Marks)(citing WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039 (9th Cir. 2011), cert. denied 132 S. Ct. 2713 (2012)).  The Defendants asserted that SEC v. Lucent Techs., Inc. also holds that the SEC cannot allege scheme liability on false statements or omissions without also alleging that the Defendants committed inherently deceptive acts.  See Tr. at 205:18-22 (Marks).  The Defendants contended that the SEC has not alleged that they committed deceptive acts separate from the false statements, and, therefore, the SEC has failed to

sufficiently allege scheme liability.  See Tr. at 205:23-206:4 (Marks). The Defendants contended

that the cases on which the SEC has relied do not address the interrelationship of scheme liability

and inherently deceptive acts.  See Tr. at 206:5-18 (Marks).

The Defendants asserted, therefore, that the SEC must allege aiding-and-abetting liability

against Starrett, because the SEC has failed to adequately allege scheme liability.  See Tr. at

206:19-207:2 (Marks).  The Defendants asserted that, in the Tenth Circuit, to state a claim for

aiding and abetting, the SEC must allege a primary violation of the securities laws by another,

that Starrett had knowledge of the violation, and that Starrett substantially assisted another to

violate securities laws.  See Tr. at 207:3-11 (Marks)(citing Anixter v. Home-Stake Prod. Co.).

The Defendants contended that the SEC's reliance on Geman v. SEC for the proposition that it

need only allege recklessness or willful disregard to state a claim for aiding and abetting is

misplaced, because that case does not discuss Anixter v. Home-Stake Prod. Co.  See Tr. at

208:11-20 (Marks).

The SEC asserted that, to state a claim for scheme liability, it must allege "something

other than a misrepresentation."  Tr. at 209:8-15 (Kasper).  The SEC contended that it has stated

a claim of scheme liability against Starrett, pointing to its allegations that Starrett made

misrepresentations to KPMG.  See Tr. at 209:16-210:1 (Kasper)(citing SEC v. Kearns, 691 F.

Supp. 2d 601, 618 (D.N.J. 2010)).  The SEC contended that it has alleged that the Defendants

engaged in deceptive conduct before filing the 2007 Form 10-K through entering into the I/O

Strip Transactions and misrepresenting to KPMG that they entered into I/O Strip Transactions to

take advantage of favorable pricing.  See Tr. at 210:12-211:3 (Kasper).

The SEC also asserted that, under Geman v. SEC, the standard for aiding and abetting in

the Tenth Circuit is knowledge or recklessness.  See Tr. at 211:7-12 (Kasper).  The SEC noted

that Geman v. SEC is more recent than Anixter v. Home-Stake Prod. Co.  See Tr. at 211:133-15
(Kasper).  The SEC asserted that numerous cases support Geman v. SEC's standard for aiding
and abetting in the Tenth Circuit.  See Tr. at 211:16-24 (Kasper)(citing SEC v. Nacchio; SEC v.
Intelliquis Int'l, Inc.; SEC v. Autocorp Equities, Int'l, Inc., 292 F. Supp. 2d 1310).

**11.**      **The Plaintiff's Surreply to Defendant Jane Starrett's Reply in Support of Motion to Dismiss.**

The SEC contends that it has always, and successfully, alleged scheme liability against
Starrett.  See Plaintiff's Surreply to Defendant Jane Starrett's Reply in Support of Motion to
Dismiss, filed August 2, 2012 (Doc. 63)("SEC Surreply").  The SEC contends that it explicitly
alleges Starrett's liability under § 17(a) of the Securities Act and rule 10b-5(a), and (c) of the
Exchange Act, the provisions which encompass scheme liability.  See SEC Surreply at 6, 6 n.2.
The SEC asserts that it need not use the word "scheme" throughout the Complaint to allege
scheme liability against Starrett.  See SEC Surreply at 6-7 n.3 (citing In re Salomon Analyst
AT&T Litig., 350 F. Supp. 2d 455, 464 (S.D.N.Y. 2004)).  The SEC contends that the Complaint
specifically alleges that Starrett, with Goldstone and Simmons, "scheme[d] to raise additional
liquidity to satisfy" margin calls "in order to preserve their lucrative positions at Thornburg."
SEC Surreply at 7.  The SEC asserts that the following allegations in the Complaint set forth the
Defendants' scheme: (i) Starrett's electronic mail transmission stating that the Defendants were
purposefully withholding information from the auditor, in paragraph 53, at page 16; (ii)
Goldstone's electronic mail transmission endorsing a plan that allowed Thornburg Mortgage to
keep its situation quiet, in paragraph 31, at page 10; (iii) Thornburg Mortgage's haste to satisfy
margin calls before filing the 2007 Form 10-K, in the hopes of avoiding full disclosures, in
paragraph 30, at pages 9-10; (iv) Thornburg Mortgage's use of the I/O Strip Transactions to

misleadingly state that it did not sell assets to meet margin calls, in paragraphs 65-66, at page 19; (v) the timing the 2007 Form 10-K's filing, in a window in which it had satisfied all of its margin calls, in paragraph 41, at pages 12-13; and (vi) Thornburg Mortgage's plan to quickly raise cash after filing the 2007 Form 10-K to meet upcoming margin calls, in paragraph 32, at page 10.  See SEC Surreply at 7-8.

The SEC asserts that it has alleged both scheme liability, and aiding and abetting, against the Defendants, as the SEC has argued that the Defendants made material misstatements and omissions in addition to engaging in a scheme to defraud.  See SEC Surreply at 8-9.  The SEC contends that it has clearly alleged that Goldstone and Simmons, but not Starrett, made material misstatements.  See SEC Surreply at 9 (citing Complaint ¶¶ 7, 17-18, 59, 65, 86, 124, at 3, 6, 17, 19, 25, 35).  The SEC also contends that the Joint Status Report demonstrates that the SEC has always alleged scheme liability against the Defendants.  See SEC Surreply at 9-10 (citing Joint Status Report at 2).

The SEC additionally notes that it references in the Complaint § 17(a) of the Securities Act and rule 10b-5(a) and (c) of the Exchange Act, which create liability for scheming to defraud.  See SEC Surreply at 10 (citing Complaint ¶¶ 107, 118, at 31, 33-34).  The SEC cites to SEC v. Lucent Techs. Inc., 610 F. Supp. 2d 342, SEC v. Simpson Capital Mgmt., 586 F. Supp. 2d 196 (S.D.N.Y. 2008), In re Royal Dutch/Shell Transp. Sec. Litig., and In re Global Crossing, Ltd. Sec. Litig., as holding that it must allege that Starrett "committed a deceptive act or manipulative act . . . in furtherance of the alleged scheme to defraud . . . with scienter."  SEC Surreply at 11 (internal quotations omitted).  The SEC also contends that courts have found that allegations similar to those in the Complaint sufficiently state a cause of action for scheme liability.  See SEC Surreply at 11 (citing SEC v. Kearns, 691 F. Supp. 2d at 618).  The SEC

asserts that Starrett may be liable for the fraudulent statements which Goldstone and Simmons made.  See SEC Surreply at 12 (citing SEC v. Lucent Techs., Inc. 610 F. Supp. 2d at 350; In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d at 335).  The SEC contends that rule 10b-4(a) and (c) sets broad parameters for scheme liability, and, therefore, the SEC need not allege that Starrett engaged in egregious conduct.  See SEC Surreply at 12 (citing In re Parmalat Sec. Litig., 376 F. Supp. 2d 472 (S.D.N.Y. 2005)).

The SEC also asserts that it need not allege that Starrett committed a deceptive act completely separate from Goldstone and Simmons' fraudulent statements to be liable for participation in a fraudulent scheme.  See SEC Surreply at 13.  The SEC asserts that, "at most, the cases require that in order to allege scheme liability a plaintiff must prove some conduct beyond the misrepresentation to investors."  SEC Surreply at 13 (citing Lopes v. Viera, No. 1:06-CV-01243, 2012 WL 691665, at *6 (E.D. Cal. Mar. 2, 2012); SEC v. Stoker, No. 11 CIV 7388, 2012 WL 2017736, at *10 (S.D.N.Y. June 6, 2012); In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005)).  The SEC additionally asserts that Starrett's conduct was deceptive independent of the 2007 Form 10-K.  See SEC Surreply at 13-14.  The SEC contends that deceptive conduct that constitutes a fraudulent scheme can include "the misstatement or omission alleged to violate Rule 10b-5 itself" without violating the holding of Janus Capital Grp., Inc. v. First Derivative Traders.  SEC Surreply at 14, 15 n.12 (citing Lopes v. Viera, 2012 WL 691665, at *6; SEC v. Stoker, 2012 WL 2017736, at *10; In re Royal Dutch/Shell Transp. Sec. Litig., 2006 WL 2355402, at *8; In re Alstom SA Sec. Litig., 406 F. Supp. 2d at 475).  The SEC asserts that, by alleging that Starrett misrepresented Thornburg Mortgage's financial position to its auditors, the SEC has alleged that Starrett engaged in a distinct act sufficient to support scheme liability.  See SEC Surreply at 15.

The SEC contends that Starrett's argument that the Defendants' scheme was not inherently deceptive fails.  See SEC Surreply at 15 (citing Starrett Reply at 7).  The SEC asserts that Starrett has not challenged the allegedly deceptive nature of the Defendants' scheme: that the Defendants made misrepresentations to KPMG, improperly conducted the OTTI analysis, planned to raise cash based upon a fraudulent 2007 Form 10-K, and misrepresented Thornburg Mortgage's purpose for entering into the I/O Strip Transactions.  See SEC Surreply at 15 (citing Complaint ¶¶ 37, 65-66, at 11, 19).  The SEC concedes that satisfying margin call obligations is not inherently deceptive, but the SEC contends that "doing so in order to immediately file a fraudulent Form 10-K . . . is a deceptive act."  SEC Surreply at 16 (citing Complaint ¶ 30, at 9-10).

The SEC also contends that Starrett's misrepresentations to the auditors support a claim of scheme liability, even though the statements were not made directly to the investing public, because Starrett's misrepresentations "were part and parcel of the scheme to raise additional cash and were necessary for the fraudulent Form 10-K."  SEC Surreply 16 (citing SEC v. Kearns, 691 F. Supp. 2d at 618; SEC v. Lee, 720 F. Supp. 2d at 334).

Starrett contends that the SEC is attempting to shift its position and recast its Complaint as setting forth an allegation of scheme liability against her.  See Defendant Jane Starrett's Response to the SEC's Surreply on the Issue of Alleged Scheme Liability at 5, filed August 13, 2012 (Doc. 66)("Starrett Surreply").  Starrett also contends that the SEC Surreply demonstrates that it cannot state a claim for scheme liability against her.  See Starrett Surreply at 5-6.

First, Starrett asserts that the Supreme Court has drawn bright lines between primary and secondary liability, and "maker" and "scheme" liability.  Starrett Surreply at 6 (citing Janus Capital Grp., Inc. v. First Derivative Traders; Stoneridge Inv. Partners, LLC v. Scientific-

Atlanta, Inc., 552 U.S. 148 (2008); Cent. Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994)).  Starrett asserts that primary liability requires the SEC to plead either that she made a false statement, under rule 10b-5(b), or she was part of a fraudulent scheme to defraud, under rule 10b-5(a) and (c).  See Starrett Surreply at 6.  Starrett asserts that, under Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., rule 10b-5's private right of action does not encompass suits against aiders and abettors who substantially assist in making a fraudulent statement, but do not make the statement.  See Starrett Surreply at 6 (citing 511 U.S. at 180).  Starrett contends that, under Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., scheme liability does not implicate those who scheme to create a false statement of material fact.  See Starrett Surreply at 6 (citing 552 U.S. at 160-63).  Starrett contends that, under Janus Capital Grp., Inc. v. First Derivative Traders, one who does not make a false statement cannot be held primarily liable for that statement under rule 10b-5(b).  See Starrett Surreply at 7 (citing 131 S. Ct. at 2301, 2302, 2302 n.6).

Starrett also contends that scheme liability requires the SEC to allege that she engaged in inherently deceptive conduct which is distinct from fraudulent misrepresentations, as opposed to conduct which is fraudulent only because of subsequent misrepresentations about the conduct.  See Starrett Surreply at 7-10 (citing SEC v. Kelly, 817 F. Supp. 2d at 342-44; SEC v. Lucent Techs., 610 F. Supp. 2d at 345-61).  Starrett contends that the SEC's allegations against her are "'nothing more than a reiteration of the misrepresentations and omissions' that underlie the SEC's failed Rule 10b-5(b) claim," and, therefore, the Court should dismiss the allegations. Starrett Surreply at 10 (quoting SEC v. Lucent Techs., 610 F. Supp. 2d at 361).

Starrett contends that there is nothing inherently deceptive about sending internal company electronic mail transmissions and asserts that, if internal company electronic mail

transmissions could support a claim of scheme liability, the scope of scheme liability would be boundless.  See Starrett Surreply at 10.  Starrett similarly contends that scrambling to raise cash and receiving margin calls after filing a Form 10-K are not inherently deceptive acts.  See Starrett Surreply at 10-11.

Starrett also contends that the conduct which the SEC alleges demonstrates a fraudulent scheme is not distinct from the Defendants' alleged misrepresentations.  Starrett notes that the SEC has alleged that the Defendants entered into I/O Strip Transactions, scrambled to meet margin calls, and withheld information from KPMG so that they could make a misleading statement in the 2007 Form 10-K.  See Starrett Surreply at 11 (citing SEC Surreply at 3-4, 9; Complaint ¶¶ 4, 5, 7, 65, at 2, 3, 19).

Starrett asserts that the cases upon which the SEC relies are distinguishable, because in those cases, the plaintiffs alleged scheme liability was based upon acts that were both inherently deceptive and distinct from misrepresentations.  See Starrett Surreply at 12-14.  Starrett notes that SEC v. Kearns was decided before Janus Capital Grp., Inc. v. First Derivative Traders, and asserts, therefore, that SEC v. Kearns is not on point with the most recent Supreme Court law. See Starrett Surreply at 12.

## 12.   The Parties' Supplemental Briefs.

On August 31, 2012, the SEC filed its Plaintiff's Supplemental Brief in Opposition to Defendants' Motions to Dismiss (Doc. 68)("SEC Supp.").  The SEC first alleges that the Defendants' arguments go beyond the allegations in the Complaint and improperly contest the merits of the SEC's allegations.  See SEC Supp. at 5.  The SEC notes that the Defendants, combined, attach fifty-five exhibits to their motions to dismiss, and the SEC asserts that the Defendants are requesting the Court to "tread well beyond the confines of a Rule 12(b) analysis

and invade the province of the fact finder."   SEC Supp. at 6.   The SEC contends that the Defendants' counsel proffered their own interpretations of many documents at the hearing.   The SEC contends that factual arguments are wholly inappropriate at this stage.   See SEC Supp. at 6. The SEC notes that the Defendants rely upon documents not referenced in the Complaint for their theory that KPMG was aware of all of Thornburg Mortgage's margin calls.   See SEC Supp. at 6-7 (citing Starrett MTD at 17-18).   The SEC contends that, at this stage, its allegation that the Defendants purposefully did not tell KPMG about Thornburg Mortgage's margin calls and its default notices is uncontroverted.   See SEC Supp. at 7 (citing Complaint ¶¶ 5, 55, at 3, 16).

The SEC also contends that the Defendants made contradictory assertions at the hearing. For example, the SEC contends that the Defendants asserted that the Feb. 28 Simmons/Goldstone Email is cryptic, because Simmons' statement does not have a period at its end, but the Defendants also argued that the market's negative reaction to the 2007 Form 10-K surprised Simmons.   See SEC Supp. at 7 (citing Goldstone & Simmons MTD at 48).   The SEC also contends that the meaning of Goldstone's reference to the KPMG situation, Mr. Marks' discussion of his experience with other audit firms, the playing of the Street Signs, and Goldstone's counsel's statement that he did not know about a sixty million dollar UBS AG margin call on the morning of February 28, 2008, are all inappropriate comments at the motion to dismiss stage.   See SEC Supp. at 7.   The SEC contends that, relying upon the allegations in the Complaint, it has sufficiently alleged that the Defendants committed fraud in connection with the 2007 Form 10-K filing.   See SEC Supp. at 8.

The SEC also asserts that the Court should not subject the Complaint to a higher scrutiny because the SEC has been investigating Thornburg Mortgage over the past four years.   The SEC notes that an SEC investigation is "not akin to nor a substitute for litigation discovery."   SEC

Supp. at 8 (citing <u>SEC v. Monterosso</u>, 746 F. Supp. 2d 1253, 1262 (S.D. Fla. 2010)).  The SEC contends that whether it has been investigating Thornburg Mortgage before filing this lawsuit is irrelevant to whether the Court should dismiss the Complaint.  The SEC further contends that, because it is not subject to the PSLRA, it need only allege scienter generally.  <u>See</u> SEC Supp. at 8-9 (citing SEC Response to Goldstone & Simmons MTD at 28-29).

The SEC also asserts that it has alleged that the Defendants breached the Citi Agreement. The SEC contends that, even if the Citigroup Global Agreement allows the parties to work out a payment plan, the SEC has not alleged in the Complaint that Thornburg Mortgage and Citigroup Global agreed to a payment plan, and, therefore, the SEC's allegation that Thornburg Mortgage was in breach of its reverse repurchase agreements is uncontroverted.  <u>See</u> SEC Supp. at 9 (citing Complaint ¶¶ 4, 29, 34, 58, 72, at 2, 9, 10-11, 17, 21; Goldstone & Simmons MTD at 35-36). The SEC contends that its allegation that Thornburg Mortgage was in breach of the Citigroup Global Agreement is plausible, because the Citigroup Global Agreement requires Thornburg Mortgage to pay margin calls on the day it receives them, which Thornburg Mortgage did not. The SEC also notes that Thornburg Mortgage received the Citigroup Global Letter before filing the 2007 Form 10-K.  <u>See</u> SEC Supp. at 9.  The SEC asserts that, notwithstanding any payment plan, the Citigroup Global Letter demonstrates that Citigroup Global could have declared Thornburg Mortgage in default at any time.  <u>See</u> SEC Supp. at 10.  The SEC contends that, if the Defendants "knew or reasonably should have known that Thornburg's ARM Securities were subject to seizure and sale by its lenders, it was an extreme departure from the standard of ordinary care" to represent that Thornburg Mortgage had the intent and ability to hold its assets until they recovered their value.  SEC Supp. at 10-11.

The SEC asserts that it has sufficiently alleged that Thornburg Mortgage's statement that it had "successfully" continued to meet all margin calls was materially misleading, and the SEC notes that the Defendants could not explain the term "successfully" at the hearing.  SEC Supp. at 11.   The SEC contends that Thornburg Mortgage describing itself as successfully meeting margin calls was not "vague puffery," as the Defendants assert, as it is possible to objectively measure whether Thornburg Mortgage met its margin calls within the terms of its reverse repurchase agreements.  SEC Supp. at 11.  The SEC asserts that other courts have found similar statements actionable for fraud, where the purpose of such disclosures was "'to assure investors that there were no serious difficulties in [a defendant's] access to short-term financing,'" which allegedly was not accurate.  SEC Supp. at 12 (quoting In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d at 402).  The SEC contends that it has similarly alleged that the Defendants represented that Thornburg Mortgage successfully met its margin calls, while knowing that Thornburg Mortgage was relying on lender forbearance and payment plans.  See SEC Supp. at 12.

The SEC also asserts that it has stated a claim under rule 10b-5(a) or (c) for scheme liability.  The SEC asserts that it has alleged that the Defendants' scheme involved lying to auditors, entering into transactions so as to mislead investors, and timing the filing of the 2007 Form 10-K so as to raise money on a fraudulent Form 10-K.  See SEC Supp. at 13.  The SEC contends that SEC v. Kelly stands for the limited proposition that a plaintiff who has failed to sufficiently plead liability based upon misrepresentations cannot salvage its case by attempting to plead scheme liability instead.  See SEC Supp. at 13.  The SEC contends, on the other hand, that it has always alleged that Starrett engaged in a scheme to defraud.  See SEC Supp. at 13.  The SEC further contends that it has set forth that Starrett committed inherently deceptive acts through withholding information from KPMG and timing the filing of the 2007 Form 10-K to be

after Thornburg Mortgage satisfied its last margin call.  <u>See</u> SEC Supp. at 14.  The SEC contends

that Starrett is attempting to set a standard that scheme liability must be premised on acts

completely separate from alleged misrepresentations, and the SEC asserts that "there is no

support for the position that that additional action be wholly unrelated to any alleged

misrepresentation."  SEC Supp. at 14.  The SEC argues that <u>SEC v. Lucent Techs., Inc.</u> "makes

clear that a Defendant can be held liable for a scheme whose purpose was to make a

misstatement."  SEC Supp. at 15 (citing 610 F. Supp. 2d at 359).  The SEC also contends that

<u>SEC v. Kearns</u> is directly on point, noting that the fact it was decided before <u>Janus Capital Grp.,</u>

<u>Inc. v. First Derivative Traders</u> is irrelevant, because <u>SEC v. Kearns</u> discusses the scope of

scheme liability, which the Supreme Court did not discuss in <u>Janus Capital Grp., Inc. v. First</u>

<u>Derivative Traders</u>.  <u>See</u> SEC Supp. at 15.  The SEC contends that <u>SEC v. Kearns</u> "clearly stands

for the proposition that allegations of misleading auditors in connection with fraudulent public

statements -- alleged here -- state a claim under subsections (a) and (c) of Rule 10b-5."  SEC

Supp. at 15.

The SEC also asserts that, if the Court dismisses its allegation of primary liability against

Starrett, the SEC need not demonstrate that Starrett had actual knowledge to succeed on an

allegation of aiding and abetting.  The SEC asserts that, in the Tenth Circuit, recklessness is

sufficient for an aiding-and-abetting violation.  <u>See</u> SEC Supp. at 16 (citing <u>Geman v. SEC</u>, 334

F.3d at 1196; <u>SEC v. Intelliquis Int'l, Inc.</u>, 2003 WL 23356426, at **13-14).  The SEC contends

that, even in <u>Anixter v. Home-Stake Prod. Co.</u>, a case upon which Starrett relies, the Tenth

Circuit held that recklessness satisfies the knowledge requirement of an aiding-and-abetting

claim.  <u>See</u> SEC Supp. at 16.  The SEC contends that <u>SEC v. Rivelli</u>, No. 05-cv-1039, 2010 WL

2775623, at *4 (D. Colo., July 14, 2010), ignores the Tenth Circuit's holding in Geman v. SEC regarding aiding-and-abetting liability.  See SEC Supp. at 16.

On August 31, 2012, Goldstone and Simmons filed their Supplemental Brief in Support of Motion to Dismiss on Behalf of Defendants Larry Goldstone and Clarence G. Simmons (Doc. 69)("Goldstone & Simmons Supp.").  Goldstone and Simmons assert that the SEC has not met its burden in alleging that they committed fraud through Thornburg Mortgage's OTTI analysis, in which the Defendants stated that Thornburg Mortgage would not need to sell MBS assets at a loss to meet potential future margin calls.  Goldstone and Simmons assert that the SEC must assert that they did not believe their OTTI analysis to allege that they had fraudulent intent.  See Goldstone & Simmons Supp. at 6 (citing Lane v. Page, 581 F. Supp. 2d 1094, 1127 (D.N.M. 2008)(Browning, J.)).  Goldstone and Simmons assert, therefore, that the SEC's allegation that they were reckless in their OTTI analysis is insufficient to state a claim.  Goldstone and Simmons also assert that the SEC's complex claims "require more supporting detail than simple claims," even though the SEC is not subject to the PSLRA.  Goldstone & Simmons Supp. at 6 (citing Robbins v. Okla. ex rel. Dep't of Human Servs., 519 F.3d 1242, 1248 (10th Cir. 2008)). Goldstone and Simmons assert that the SEC has failed to allege that they were reckless with their OTTI analysis, as the Defendants believed that Thornburg Mortgage would "ride out the margin call storm without selling assets."  Goldstone & Simmons Supp. at 7.

Goldstone and Simmons assert that the SEC has not "even attempted to plead the second prong" of the scienter requirement for "statements of opinion or belief," which requires alleging that the Defendants' OTTI analysis was subjectively false at the time it was made.  Goldstone & Simmons Supp. at 8 (citing Lane v. Page, 581 F. Supp. 2d at 1126; Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust, 2006-3, 825 F. Supp. 2d at 1178).  Goldstone and Simmons

assert that, in <u>Fait v. Regions Fin. Corp.</u>, the Second Circuit determined that similar allegations, based upon the defendants' knowledge of adverse market conditions, failed to sufficiently allege that the defendants did not believe statements regarding company good will at the time they were made.  <u>See</u> Goldstone & Simmons Supp. at 8-9 (citing 655 F.3d at 111-113).  Goldstone and Simmons assert that the Second Circuit, and other district courts, have reached the same conclusion in the context of securities claims.  <u>See</u> Goldstone & Simmons Supp. at 9-10 (citing <u>City of Omaha v. CBS Corp.</u>, 679 F.3d 64, 68 (2d Cir. 2012); <u>Phelps v. Stomber</u>, No. Civ. A. 11-1142-ABJ, 2012 WL 3276969 (D.D.C. Aug. 13, 2012); <u>In re Deutsche Bank AG Sec. Litig.</u>, No. 09-Civ-1714 (DAB), 2012 WL 3297730, at *2 (S.D.N.Y. Aug. 10, 2012)).  Goldstone and Simmons assert that the SEC's allegations regarding the Defendants' OTTI analysis fail for the same reason: the SEC's alleges that the Defendants should have known that their OTTI analysis was wrong.  <u>See</u> Goldstone & Simmons Supp. at 10 (citing Response to Goldstone & Simmons MTD at 38).  Goldstone and Simmons also contend that their disclosures in the 2007 Form 10-K regarding Thornburg Mortgage's OTTI analysis undercut the SEC's allegations, because the Defendants explained that the OTTI analysis is based on accounting policy, and they included charts "quantifying and itemizing the unrealized losses for investors to examine themselves." Goldstone & Simmons Supp. at 10-11 (citing 2007 Form 10-K at 40-41, 89, 99, 100, 110).

Goldstone and Simmons also assert that the SEC has not distinguished its allegations of fraud from innocent conduct.  Goldstone and Simmons contend that the SEC has alleged no facts which demonstrate that the Defendants were reckless with their OTTI analysis.  <u>See</u> Goldstone & Simmons Supp. at 11-12.  Goldstone and Simmons contend that the SEC's allegations that the Defendants should have known facts, and that they failed to properly consider information before them, are allegations of negligence, but not recklessness.  <u>See</u> Goldstone & Simmons Supp. at

12-13 (citing City of Phila. v. Fleming Cos., Inc., 264 F.3d 1245, 1260 (10th Cir. 2001); Complaint ¶¶ 51-52, 71, at 15-16, 21).  Goldstone and Simmons note that the SEC has not alleged that the Defendants' OTTI analysis "deviated substantially from the standard approach taken by public company accountants in applying the rule."  Goldstone & Simmons Supp. at 13. Goldstone and Simmons assert that the Feb. 25 Goldstone/Starrett Email does not demonstrate that the Defendants were reckless with their OTTI analysis, because Starrett does not describe the GAAP standard in the electronic mail transmission, and, therefore, the SEC has not established that the Defendants recklessly failed to follow a baseline standard of care.  See Goldstone & Simmons Supp. at 13-14 (citing Complaint ¶ 54, at 16).  Goldstone and Simmons assert that, in Dronsejko v. Thornton, 632 F.3d 658 (10th Cir. 2011), a PSLRA case, the Tenth Circuit rejected an allegation of fraud in an accounting decision which was, similarly, based upon ambiguous and general GAAP standards and had some support in the literature of the field. See Goldstone & Simmons Supp. at 14 (citing 632. F.3d at 667-68).   Goldstone and Simmons contend that the only GAAP rule which the SEC has alleged was violated is SFAS 115, which is "highly ambiguous and general, reflecting the inherently judgment-based nature of the OTTI analysis and expressly declining to provide guidance as to how specific OTTI assessments should be conducted."  Goldstone & Simmons Supp. at 14.  Goldstone and Simmons also assert that the Defendants' OTTI analysis had some support, as evidenced by Thornburg Mortgage's lenders' cooperation, Thornburg Mortgage's forty million dollars in cash reserve as of February 28, 2008, and the Defendants' plan to raise an additional $450-$675 million in the week following the filing of the 2007 Form 10-K.  See Goldstone & Simmons Supp. at 14 (citing Feb. 22 BOD Email; Feb. 28 BOD Email; Feb. 21 BOD Email; Complaint ¶ 95, at 27).  Goldstone

and Simmons assert, therefore, that the Defendants' OTTI analysis was not an extreme departure from the standards of ordinary care.  See Goldstone & Simmons Supp. at 15.

Goldstone and Simmons assert that the SEC raised for the first time at the hearing its theory that Starrett schemed to withhold information about Thornburg Mortgage's margin calls from KPMG until shortly before filing the 2007 Form 10-K.  Goldstone and Simmons assert that this theory does not address whether the 2007 Form 10-K was misleading.  Goldstone and Simmons assert, rather, that the Feb. 25 Goldstone/Starrett Email, upon which the SEC relies for this theory, demonstrates that the Defendants believed their OTTI analysis was correct.  See Goldstone & Simmons Supp. at 15.  Goldstone and Simmons also assert that the Feb. 25 Goldstone/Starrett Email fails to support the SEC's allegation of scienter, because the SEC conceded at the hearing that the Defendants disclosed the information in the Feb. 25 Goldstone/Starrett Email to KPMG before Thornburg Mortgage filed the 2007 Form 10-K.  See Goldstone & Simmons Supp. at 15-16.  Goldstone and Simmons similarly assert that the Feb. 22 BOD Email does not support the SEC's allegations of scienter, because Goldstone stated in the electronic mail transmission that whether the Defendants would disclose Thornburg Mortgage's margin calls to KPMG would "'depend on where we are next week,'" indicating that Goldstone planned to make "all necessary disclosures at the appropriate time."  Goldstone & Simmons Supp. at 15 n.9 (quoting Feb. 22 BOD Email at 2).  Goldstone and Simmons also assert that the SEC has not alleged how the Defendants' delayed disclosure to KPMG constituted a scheme to defraud.  See Goldstone & Simmons Supp. at 15-16.

Goldstone and Simmons assert, therefore, that the Complaint is "'merely consistent . . . with liability,'" but that the SEC's theory of liability is too general and encompasses both fraudulent and innocent conduct.  Goldstone & Simmons Supp. at 16 (quoting Ashcroft v. Iqbal,

556 U.S. at 678).   Goldstone and Simmons assert that dismissing the SEC's allegations based upon the Defendants' OTTI analysis would be consistent with numerous courts that have rejected allegations of fraud based upon the defendants' alleged awareness of facts "that arguably, though far from conclusively, called their statements into question."   Goldstone & Simmons Supp. at 17 (citing In re Level 3 Commc'ns, Inc., Sec. Litig., 667 F. 3d 1331, 1343-45 (10th Cir. 2012)).

Starrett filed her Defendant Jane Starrett's Supplemental Brief in Support of Motion to Dismiss on August 31, 2012.  See Doc. 70 ("Starrett Supp.").  Starrett asserts that the SEC must allege that she had actual knowledge of a primary securities violation to survive a motion to dismiss the SEC's aiding-and-abetting allegations, and her OTTI analysis is not actionable for fraud unless she subjectively disbelieved it, which, she contends, the SEC has not alleged.  See Starrett Supp. at 5.

Starrett contends that the SEC must plead that she had actual knowledge of Goldstone's or Simmons' security violations to allege that she aided and abetted those violations.  See Starrett Supp. at 6 (citing 15 U.S.C. § 78t(e); Anixter v. Home-Stake Prod. Co., 77 F.3d at 1225; SEC v. Rivelli).  Starrett contends that, because the PSLRA requires private litigants to allege that the defendants had actual knowledge to state a claim for aiding-and-abetting liability, the SEC, similarly, must allege that Starrett had actual knowledge to hold her liable for aiding and abetting the violations of another.  See Starrett Supp. at 6-7 (citing Pub. L. 104-67 § 104, 109 Stat. 737; Cent. Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A., 511 U.S. at 191; SEC v. Rivelli, 2010 WL 2775623, at *4; SEC v. Lucent Techs. Inc., 610 F. Supp. 2d at 362).  Starrett asserts that the SEC has not alleged that she had actual knowledge of an alleged primary security

violation, and, therefore, contends that the SEC has failed to state a claim for aiding-and-abetting liability against Starrett.  See Starrett Supp. at 8.

Starrett asserts that Geman v. SEC, upon which the SEC relies, does not address Anixter v. Home-Stake Prod. Co., and does not establish that allegations of recklessness are sufficient to state a claim for aiding and abetting liability.  See Starrett Supp. at 8.  Starrett also asserts that the district court cases upon which the SEC relies -- SEC v. Nacchio and SEC v. Autocorp Equities, Inc. -- pre-date SEC v. Rivelli and SEC v. Lucent Techs. Inc., 610 F. Supp. 2d 342, and, therefore, do not address "the effect of Section 20(e)[ of the Exchange Act]'s 'knowingly' requirement."  Starrett Supp. at 9.  Starrett also notes that, in SEC v. Nacchio and SEC v. Autocorp Equities, Int'l, Inc., the plaintiffs alleged that the defendants had actual knowledge of the securities violations, and, therefore, the courts did not need to address whether allegations of recklessness alone were sufficient.  See Starrett Supp. at 9 (citing SEC v. Nacchio, 614 F. Supp. 2d at 1172; SEC v. Autocorp Equities, Int'l, Inc., 292 F. Supp. 2d at 1332).  Starrett also asserts that the district court in SEC v. Intelliquis Int'l, Inc. did not address Anixter v. Home-Stake Prod. Co., did not address the interrelationship of a recklessness standard for aiding-and-abetting liability and Section 20(e) of the Exchange Act, and "appeared to find that the defendant in fact had actual knowledge."  Starrett Supp. at 9.

Starrett also contends that the 2010 amendment to § 20(e) of the Exchange Act, which adds the words "or recklessly" to the statute's knowledge requirement, does not indicate that recklessness satisfied § 20(e)'s knowledge requirement before the amendment.  Starrett Supp. at 9 (citing SEC v. Apuzzo, 689 F. 3d 204, 211 n.6 (2d Cir. 2012)).  Starrett contends that the cases which have discussed the 2010 amendment to the Exchange Act have found that the addition of "or recklessly" constitute a fundamental change in § 20(e)'s meaning, and, therefore, before the

amendment, "knowledge alone . . . was the standard." Starrett Supp. at 10 (citing SEC v. Lucent Techs., Inc., 610 F. Supp. 2d 342).

Starrett also asserts that the SEC must allege that she actually disbelieved her OTTI analysis, as the OTTI analysis is a statement of opinion or belief, and not a factual statement. See Starrett Supp. at 10 (citing Va. Bankshares, Inc. v. Sandberg, 501 U.S. at 1091, 1095). Starrett asserts that the subjective disbelief in a statement of opinion or belief regarding an accounting judgment is necessary to establish that the judgment was "'untrue' within the meaning of the Securities Act and the Exchange Act." Starrett Supp. at 11 (citing City of Omaha v. CBS Corp., 679 F.3d at 67-69; Fait v. Regions Fin. Corp., 655 F.3d at 112 n.5). Starrett asserts that the necessity of pleading that she subjectively disbelieved the OTTI analysis establishes a heightened pleading standard for a misrepresentation or opinion claim under § 10(b) of the Exchange Act. See Starrett Supp. at 11-12 (citing Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 158 (S.D.N.Y. 2004)).

Starrett contends that the SEC has not pled that she disbelieved that Thornburg Mortgage's impaired ARM securities were other than temporarily impaired when Thornburg Mortgage issued its OTTI analysis. See Starrett Supp. at 12. Starrett contends that the OTTI analysis was not an "objectively determinable fact, but rather a statement of opinion." Starrett Supp. at 13. Starrett notes that, in the 2007 Form 10-K, the Defendants describe the OTTI analysis as an "'accounting estimate' that 'require[d] complex management judgment," and, thereby, "heightened its subjective nature." Starrett Supp. at 13 (quoting 2007 Form 10-K at 39, 41). Starrett asserts that the SEC's allegation that the Defendants "could have or should have reached a different opinion or that the opinion reached by them was unreasonable does not satisfy the 'subjective falsity' prong of the applicable pleading standard." Starrett Supp. at 14.

Starrett also asserts that the SEC cannot rely on Thornburg Mortgage's restatement to state a claim of fraud against the Defendants, because, "[a]t most, a restatement of financial results can support a claim that previously issued financials contained objectively false or inaccurate statements." Starrett Supp. at 15 (emphasis in original)(citing In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d at 408; SEC v. Espuelas, 579 F. Supp. 2d at 472). Starrett contends that the restatement of an opinion does not lead to a plausible inference that the Defendants subjectively disbelieved their OTTI analysis. Last, Starrett asserts that the OTTI analysis was a cautionary statement and, therefore, not actionable unless the Defendants were guaranteeing the OTTI analysis. See Starrett Supp. at 16 (citing In re MRU Holdings Sec. Litig., 769 F. Supp. 2d at 510-11).

### 13.    The Parties' Supplemental Authorities.

On September 10, 2012, the SEC provided notice to the Court of SEC v. Sells, No. C 11-4941 CW, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012). See Notice of Supplemental Authority, filed September 10, 2012 (Doc. 71)("SEC 1st S.A."). The SEC asserts that the case supports its allegations of scheme liability against the Defendants, because the United States District Court for the Northern District of California found that allegations of a scheme need not be separate from any alleged misstatement. See SEC 1st S.A. at 1. The SEC notes that the Honorable Claudia Wilken, United States District Judge for the Northern District of Colorado, also rejected an argument, based upon SEC v. Kelly, that imposing scheme liability for an allegedly false statement would contradict the Supreme Court's holding in Janus Capital Grp., Inc. v. First Derivative Traders. Judge Wilken explained that holding the defendants liable for a scheme which included making false statements did not controvert Janus Capital Grp., Inc. v. First Derivative Traders because the plaintiffs sought to hold the defendants liable under rule 10b-5(a)

and (c), and not rule 10b-5(b), which was the section that Janus Capital Grp., Inc. v. First Derivative Traders addressed.  See SEC 1st S.A. at 2 (citing SEC v. Sells, 2012 WL 3242551, at **6-7).

On September 11, 2012, the SEC withdrew its reliance on In re Gen. Elec. Co. Sec. Litig., which it cited on page 8 of the SEC Supp.  See Plaintiff's Withdrawal of Reliance on Cited Authority, filed September 11, 2012 (Doc. 72)("SEC W/D").  The SEC explains that the court recently reconsidered its previous opinion in In re Gen. Elec. Co. Sec. Litig., and determined that General Electric's chief executive officer was not liable for his statement that General Electric had successfully met its commercial paper needs, because that statement was one of opinion, "and not actionable because the statement was true and plaintiff had not alleged that [the chief executive officer] believed otherwise."  SEC W/D at 1.  The SEC also notes that the court determined that, because the plaintiffs explicitly disclaimed that the chief executive officer acted knowingly, the court could not find that the chief executive officer subjectively did not believe his statement.  The SEC contends, nonetheless, that its case is not hampered by the court's reconsideration, because it alleges that the Defendants knew that Thornburg Mortgage had not "successfully" met its margin calls when the Defendants stated otherwise in the 2007 Form 10-K.  SEC W/D at 2.

On September 11, 2012, Starrett responded to the SEC 1st Supp. Auth.  See Defendant Jane Starrett's Response to Notice of Supplemental Authority, filed September 11, 2012 (Doc. 73)("Starrett Resp.-1st S.A.").  Starrett contends that SEC v. Sells "underscores that the Complaint fails to state a claim for scheme liability against Ms. Starrett."  Starrett Resp.-1st S.A. at 1 (emphasis in original).  Starrett notes that the conduct in SEC v. Sells was both inherently deceptive and distinct from any alleged misrepresentation or omission, as the defendants

orchestrated fictitious product sales, created false documentation of those sales, and forged signatures from customers and sales representatives.  Starrett contends that Judge Wilken relied upon the defendants' deceptive conduct beyond misrepresentations in finding them liable for a scheme to defraud.  See Starrett Resp.-1st S.A. at 1.  Starrett also asserts that SEC v. Sells is distinguishable, because, unlike the SEC, the plaintiff in SEC v. Sells relied exclusively on scheme liability under 10b-5(a) and (c), and did not allege that the defendants also were primarily liable for misrepresentations.  See Starrett Resp. - 1st S.A. at 2.

On September 21, 2012, Goldstone and Simmons responded to the SEC W/D.  See Defendants Larry Goldstone and Clarence G. Simmons's Response to Plaintiff's Withdrawal of Reliance on Cited Authority, filed September 21, 2012 (Doc. 74)("G/S Resp.-W/D").  Goldstone and Simmons assert that In re Gen Elec. Co. Sec. Litig. demonstrates that the SEC cannot plead "subjective falsity merely by alleging facts that 'undermine' an opinion's reasonableness."  G/S Resp.-W/D at 2 (quoting In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d at 401-02).  Goldstone and Simmons also assert that the case emphasizes the "importance of evaluating opinion statements 'in context,'" as the chief executive officer's statements were those of opinions, and in the context of other general warnings, were not misleading.  G/S Resp.-W/D at 2 (quoting In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d at 379-80).

On January 8, 2013, the SEC notified the Court of SEC v. Familant, Civil Action No. 12-119 (JEB), 2012 WL 6600339 (D.D.C. Dec. 19, 2012)(Boasberg, J.).  See Notice of Supplemental Authority, filed January 8, 2013 (Doc. 116)("SEC 2nd S.A.").  The SEC asserts that this case "directly challenges the holding in SEC v. Kelly," upon which Starrett relies.  SEC 2nd S.A. at 1.  The SEC notes that in SEC v. Familant, the Honorable James E. Boasberg, United States District Judge for the District of Columbia, determined that SEC v. Kelly interprets

scheme liability too narrowly and was incorrectly decided.  The SEC contends that it has "alleged actions in furtherance of the scheme that are independent of any misstatement" and that SEC v. Familant demonstrates that Starrett's reliance on SEC v. Kelly is misplaced.  SEC 2nd S.A. at 2.

On January 10, 2013, Starrett responded to the SEC 2nd S.A., asserting that SEC v. Familant is inapposite.  See Defendant Jane Starrett's Response to Notice of Supplemental Authority at 1, filed January 10, 2013 (Doc. 119)("Starrett Resp.-2nd S.A.").  Starrett notes that the defendants in SEC v. Familant engaged in inherently deceptive conduct, which "'no innocent business dealings could explain,'" and, therefore, is distinguishable from the SEC's allegations against Starrett, because the SEC "has not alleged any such inherently deceptive conduct by Ms. Starrett."  Starrett Resp.-2nd S.A. at 1-2 (quoting 2012 WL 6600339, at *7).  Starrett contends that the SEC has not alleged any deceptive acts beyond alleged misrepresentations and omissions, and, thus, the SEC has not plausibly alleged that Starrett engaged in a scheme to defraud investors.  See Starrett Resp.- 2nd S.A. at 2.

On January 11, 2013, the Defendants notified the Court of MHC Mut. Conversion Fund, L.P. v. United W. Bancorp, Inc., No. 11-cv-00624, 2012 WL 6645097 (D. Colo. Dec. 19, 2012). See Notice of Supplemental Authority, filed January 11, 2013 (Doc. 12)("Defendants 1st S.A."). The Defendants explain that the United States District Court for the District of Colorado determined that the defendants' OTTI judgment was a statement of "an opinion, not a matter of objective fact, because the 'determination of OTTI reflects the entity's judgment regarding multiple factors."  Defendants 1st S.A. at 1-2 (quoting MHC Mut. Conversion Fund, L.P. v. United W. Bancorp., Inc., 2012 WL 6645097, at *9).  The Defendants further explain that the court held that the plaintiffs asserting violations of securities laws based on opinions must allege

- 198 -

that the opinions are both objectively and subjectively false.  See Defendants 1st S.A. at 2 (citing MHC Mut. Conversion Fund, L.P. v. United W. Bancorp, Inc., 2012 WL 6645097, at *11; Wolfe v. Aspenbio Pharma., Inc., Civil No. 11-cv-00165-REB-KMT, 2012 WL 4040344, at *8 (D. Colo. Sept. 13, 2012)).

The SEC responded to the Defendants' 1st S.A. on January 17, 2013.  See Plaintiff's Response to Defendants' Notice of Supplemental Authority, filed January 17, 2013 (Doc. 123)("SEC Resp.-Defendants 1st S.A.").  The SEC asserts that MHC Mut. Conversion Fund, L.P. v. United W. Bancorp, Inc. is inapposite, because it was decided under the PSLRA's heightened pleading standards, and because the court's assessment the defendants' OTTI analysis was unique to the facts of the case.  See SEC Resp.-Defendants 1st S.A. at 1.  The SEC notes that the court determined that the plaintiffs in MHC Mut. Conversion Fund, L.P. v. United W. Bancorp, Inc. had failed to allege any facts indicating that the defendants' OTTI analysis was subjectively false, which the SEC asserts distinguishes the case from its allegations, because it alleges that the Defendants "did not believe they had the ability to hold assets to recovery and thus did not believe those assets were only temporarily impaired."  SEC Resp.-Defendants 1st S.A. at 2 (citing Complaint ¶ 12, at 4-5).

On March 25, 2013, the Defendants notified the Court of SEC v. Benger, No. 09 C 676, 2013 WL 1150587 (N.D. Ill. Mar. 21, 2013).  See Defendants' Notice of Supplemental Authority, filed March 25, 2013 (Doc. 155)("Defendants 2nd S.A.").  The Defendants assert that the Honorable Jeffrey Neal Cole, United States Magistrate Judge held, in SEC v. Benger, that a "scheme claim must encompass inherently deceptive conduct beyond misrepresentations and not merely 'activities' in furtherance thereof."  Defendants 2nd S.A. at 1 (emphasis added in original)(quoting 2013 WL 1150587, at *7).  The Defendants explain that Judge Cole found that

the SEC's allegations of inherently deceptive conduct encompassed only allegations of concealment, and held that, if concealment could support a claim under rule 10b-5(a) and (c), "'every 10b-5(b) violation could be charged as a 10b-5(a) and (c) violation as well.'" Defendants 2nd S.A. at 2 (quoting 2013 WL 1150587, at *7).

On April 1, 2013, the SEC responded to the Defendants 2nd S.A.  See Plaintiff's Response to Defendants' Notice of Supplemental Authority, filed April 1, 2013 (Doc. 158)("SEC Resp.-Defendants 2nd S.A.").   The SEC contends that the Defendants have mischaracterized SEC v. Benger's holding, as the SEC contends that the court "merely recites that 'other Circuits have determined that a defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions.'"  SEC Resp.-Defendants 2nd S.A. at 1 (quoting SEC v. Benger, 2013 WL 1150587, at *5).  The SEC contends that the Complaint is distinguishable from the facts in SEC v. Benger, because the SEC alleges "significant [] conduct in furtherance of the scheme, including withholding information from Thornburg's auditors."  SEC Resp.-Defendants 2nd S.A. at 1-2 (citing SEC Surreply a 7-8).  The SEC also asserts that the scheme the Defendants allegedly engaged in is distinguishable from that in SEC v. Benger, as the SEC contends the Defendants engaged in a complicated scheme, and not a simple scheme based on a single misrepresentation.  See SEC Resp.-Defendants 2nd S.A.at 2 (citing SEC v. Benger, 2013 WL 1150587, at *6).

On April 1, 2013, the Defendants notified the Court of SEC v. St. Anselm Exploration Co., 11-cv-00668, 2013 WL 1313765 (D. Colo. Mar. 29, 2013)(Blackburn, J.).  See Defendants' Notice of Supplemental Authority, filed April 1, 2013 (Doc. 159)("Defendants 3rd S.A.").  The Defendants assert that SEC v. St. Anselm Exploration Co., 2013 WL 1313765, "adds to an

emerging consensus among the circuits (including the Tenth) that scheme liability 'exists only where there is deceptive conduct going beyond misrepresentations.'"  Defendants 3rd S.A. at 1 (quoting <u>SEC v. St. Anselm Exploration Co.</u>, 2013 WL 1313765, at *15).  The Defendants explain that the Honorable Robert E. Blackburn, United States District Judge for the District of Colorado determined that selling high interest promissory notes to raise funds was not inherently deceptive conduct sufficient to demonstrate a fraudulent scheme.  <u>See</u> Defendants 3rd S.A. at 1. The Defendants assert that the SEC's allegations of scheme liability are based upon conduct which was not "deceptive independent of alleged misrepresentations."  Defendants 3rd S.A. at 2.

On April 8, 2013, the SEC responded to the Defendants 3rd S.A.  <u>See</u> Plaintiff's Response to Defendants' Notice of Supplemental Authority, filed April 8, 2013 (Doc. 160)("SEC Resp.-Defendants 3rd S.A.").  The SEC contends that <u>SEC v. St. Anselm Exploration Co.</u>, 2013 WL 1313765, does nothing more than cite the correct standard for alleging scheme liability and determine that it was not satisfied, based upon facts which are distinguishable from those set forth in the Complaint.  <u>See</u> SEC Resp.-Defendants 3rd S.A. at 1.  The SEC distinguishes the Complaint by noting that it has alleged that Starrett made misrepresentations to KPMG and that the Defendants engaged in multiple forms of deceptive conduct independent of the misrepresentations in the 2007 Form 10-K.  <u>See</u> SEC Resp. - Defendants 3rd S.A. at 2.

On April 22, 2013, the SEC notified the Court of <u>SEC v. Syron</u>, No. 11 Civ. 9201 (RJS), 2013 WL 1285572 (S.D.N.Y. Mar. 28, 2013)(Sullivan, J.).  <u>See</u> Notice of Supplemental Authority, filed April 22, 2013 (Doc. 165)("SEC 3rd S.A.").  The SEC asserts that <u>SEC v. Syron</u> establishes that a public filing can be the source of a misrepresentation if an investor could plausibly be misled by the filing, even if the filing could just as plausibly be read to not mislead investors.  The SEC also asserts that <u>SEC v. Syron</u> "reiterates the 'well settled' law 'that so

called half truths -- literally true statements that create a materially misleading impression -- will support claims for securities fraud."   SEC 3rd S.A. at 1-2 (quoting <u>SEC v. Syron</u>, 2013 WL 1285572, at *17)(citing <u>SEC v. Syron</u>, 2013 WL 1285572, at **15-16).   The SEC contends, therefore, that it has stated a plausible claim for securities fraud, because investors could have been misled by the Defendants' OTTI analysis in the 2007 Form 10-K, which, although possibly accurate, "does not excuse" Thornburg Mortgage's reliance on lender forbearance.   SEC 3rd S.A. at 1-2.

On April 29, 2013, the Defendants responded to the SEC's 3rd S.A.   <u>See</u> Defendants' Response to Plaintiff's Notice of Supplemental Authority, filed April 29, 2013 (Doc. 166)("Defendants Resp.-SEC 3rd S.A.").   The Defendants assert that <u>SEC v. Syron</u> is readily distinguishable, because the court determined that the defendants' disclosures were ambiguous and obscured billions of dollars in subprime MBS exposure.   <u>See</u> Defendants' Resp.-SEC 3rd S.A. at 1 (citing 2013 WL 1285572, at **4, 17).   The Defendants contend that the SEC has alleged that the OTTI analysis -- which the Defendants' assert is a statement of opinion -- was misleading, but not ambiguous.   The Defendants also assert that the 2007 Form 10-K "made crystal clear not only the company's unrealized losses . . . but also the associated risks, disclosing" many aspects of Thornburg Mortgage's precarious financial position.   Defendants Resp.-SEC 3rd S.A. at 1-2.   The Defendants assert, therefore, that their disclosures were fulsome and distinguishable from those in <u>SEC v. Syron</u>.   <u>See</u> Defendants Resp.-SEC 3rd S.A. at 2.

On June 11, 2013, the SEC notified the Court of <u>IBEW Local 90Pension Fund v. Deutsche Bank AG</u>, No. 11 Civ. 4209 (KBF), 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013)(Forrest, J.).   <u>See</u> Notice of Supplemental Authority, filed June 11, 2013 (Doc. 180)("SEC 4th S.A.").   The SEC asserts that this case "runs contrary" to Starrett's contention that an

allegation of scheme liability "cannot coexist with allegations of material misstatements and omissions."  SEC 4th S.A. at 1 (citing 2013 WL 1223844, at *8).  The SEC notes that the scheme alleged in IBEW Local 90Pension Fund v. Deutsche Bank AG consisted of defendants increasing short term profits through acquiring poor quality mortgages, and pooling the mortgages into other securities without disclosing the mortgages and the securities' poor quality.  See SEC 4th S.A. at 1-2 (citing 2013 WL 1223844, at *13).   The SEC also contends that IBEW Local 90Pension Fund v. Deutsche Bank AG distinguishes City of Omaha v. CBS Corp. and Fait v. Regions Fin. Corp., because, unlike the plaintiffs in those cases, the plaintiffs in IBEW Local 90Pension Fund v. Deutsche Bank AG made specific allegations that the defendants had "non-public information that contradicted their public statements and knew that the assets at issue were 'far riskier than an investor might reasonably suppose.'"  SEC 4th S.A. at 2 (quoting 2013 WL 1223844, at *15).   The SEC contends that its allegations in the Complaint are similarly specific and sufficient to state a claim for fraud against the Defendants.  See SEC 4th S.A. at 2.

On June 18, 2013, the Defendants responded to the SEC 4th S.A.   See Defendants' Response to Notice of Supplemental Authority, filed June 18, 2013 (Doc. 183)("Defendants Resp.-4th S.A.").   The Defendants assert that IBEW Local 90Pension Fund v. Deutsche Bank AG does not controvert Starrett's position that "scheme liability requires allegations of inherently deceptive conduct beyond misrepresentations or omissions."  Defendants' Resp.-4th S.A. at 1.  The Defendants contend that the SEC has improperly reiterated its misrepresentation and omission allegations as allegations of scheme liability.   The Defendants contend that, although the court in IBEW Local 90Pension Fund v. Deutsche Bank AG held that misrepresentations and omissions may "'be part of . . . the fraudulent scheme,'" the court did not hold that misrepresentations and omissions alone would suffice to state a claim for scheme

liability.  Defendants' Resp.-4th S.A. at 1-2 (quoting 2013 WL 1223844, at *8).  The Defendants

also assert that IBEW Local 90Pension Fund v. Deutsche Bank AG supports their position that

the SEC must demonstrate a disparity between internal non-public communications and the

validity of the Defendants' public statements to succeed on a misrepresentation and omission

claim.  See Defendants' Resp. - 4th S.A. at 2 (citing 2013 WL 1223844, at **13-14).

## LAW REGARDING RULE(12)(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon

which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion

tests the sufficiency of the allegations within the four corners of the complaint after taking those

allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency

of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must

accept as true all well-pleaded factual allegations in the complaint, view those allegations in the

light most favorable to the non-moving party, and draw all reasonable inferences in the

plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 ("[O]nly if a

reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would

the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d at 1090 ("[F]or

purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual

allegations in a complaint and view these allegations in the light most favorable to the

plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers

labels and conclusions or a formulaic recitation of the elements of a cause of action" is

insufficient.  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at

555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Okla. ex rel. Dep't of Human Servs., 519 F.3d at 1247 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).

## LAW REGARDING MOTIONS TO DISMISS AND REFERENCES TO DOCUMENTS OUTSIDE THE COMPLAINT

Generally, the sufficiency of a complaint must rest on its contents alone. See Casanova v. Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010); Gossett v. Barnhart, 139 F. App'x 24, 24 (10th

Cir. 2005)(unpublished)("In ruling on a motion to dismiss, the district court is limited to the facts pled in the complaint.").[23]   Emphasizing this point, the Tenth Circuit, in <u>Carter v. Daniels</u>, 91 F. App'x 83 (10th Cir. 2004)(unpublished), stated: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint.   The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."   91 F. App'x at 85.   There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, <u>see</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. at 322.   In <u>Gee v. Pacheco</u>, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]."   627 F.3d at 1186.   The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."   <u>Gee v. Pacheco</u>, 627 F.3d at

---

[23]   <u>Gossett v. Barnhart</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   <u>See</u> 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .   However, if an unpublished opinion . . .  has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."   <u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).   The Court finds that <u>Gossett v. Barnhart</u> has persuasive value with respect to a material issue, and will assist the Court in its disposition of this memorandum opinion and order.

1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."  Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).  In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission, and the Tenth Circuit analogized the deadline to a statute of limitations.  The Tenth Circuit found that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment."  167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes statements from defendants in a complaint for the purpose of refuting the statements in the complaint, the Court cannot rely on documents the defendants attach to a motion to dismiss which contain their un-redacted statements.  See Mocek v. City of Albuquerque, No. Civ. 11-1009, 2013 WL 312881, at **50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff only cited the statements to attack their reliability and truthfulness.  See 2013 WL 312881, at **50-51.  Additionally, the Court has ruled that, when determining whether a statute of limitations has run in an action alleging fraud and seeking subrogation from a defendant, it may not use interviews and letters attached to a motion to dismiss which evidence that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, **22-23 (D.N.M. Aug. 23, 2012)(Browning, J.).  The Court determined that the

- 207 -

documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at **22-23.  On the other hand, in a securities class-action, the Court has found that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, and the Court may consider the certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cnty Emps.' Retirement Sys. v. Thornburg Mortg. Sec. Trust 2006-3, 825 F. Supp. 2d at 1150-51.

## RELEVANT LAW REGARDING TAKING JUDICIAL NOTICE OF DOCUMENTS WHEN RULING ON A MOTION TO DISMISS

Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court"; or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b), (f).  "Adjudicative facts are simply the facts of the particular case."   United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule 201).  A court has discretion to take judicial notice of such facts, regardless of whether requested.  See Fed. R. Evid. 201(c).  On the other hand, if a party requests that the court take judicial notice of certain facts and supplies the necessary information to the court, judicial notice is mandatory.  See Fed. R. Evid. 201(d).  Also, if the parties timely request an opportunity to be heard, the Court must grant such an opportunity "as to the propriety of taking judicial notice and the tenor of the matter noticed."  Fed. R. Evid. 201(e).

Judicial notice may be taken during any stage of the judicial proceeding, including on a motion to dismiss.  See 21B Charles Alan Wright & Kenneth W. Graham, Fed. Practice & Procedure § 5110, at 294 & n.17 (2d ed. 2005).  While ordinarily, a motion to dismiss must be converted to a motion for summary judgment when the court considers matters outside the complaint, see Fed. R. Civ. P. 12(d), matters that are judicially noticeable do not have that effect, see Duprey v. Twelfth Judicial Dist. Court, No. 08-0756, 2009 WL 2482171, at *7 (D.N.M. July 27, 2009)(Browning, J.)(citing Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)).  Also, when considering a motion to dismiss, "[t]he court may take judicial notice of its own files and records, matters of public record, as well as the passage of time." Logan v. United States, 272 F. Supp. 2d 1182, 1184 n.1 (10th Cir. 2003).  The documents judicially noticed, however, should not be considered for the truth of the matters asserted therein:

> Exhibits attached to a complaint are properly treated as part of the pleadings for purposes of ruling on a motion to dismiss.  Ordinarily, consideration of material attached to a defendant's answer or motion to dismiss requires the court to convert the motion into one for summary judgment and afford the parties notice and an opportunity to present relevant evidence.  However, facts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment.  This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record.  However, the documents may only be considered to show their contents, not to prove the truth of matters asserted therein.

Tal v. Hogan, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006)(alterations omitted)(citations omitted)(internal quotation marks omitted).

Applying these principles, in Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust, in the context of a securities class action, the Court took judicial notice of news publications regarding the MBS crisis against which the plaintiffs' allegations were set.  See 825 F. Supp. 2d at 1166.  Additionally, In re Thornburg Mortg., Inc. Sec. Litig., another securities

class action, the Court took judicial notice of documents which disclosed the securities held by a person in a particular entity, and/or any changes in those holdings.  See 2009 WL 5851089, at **3-4.  The Court took notice of the existence of the documents and the statements contained therein, but not the truth of the documents' contents.  The Court found that rule 201(d) compelled it to take judicial notice of the documents, because the documents, which were on file with the SEC, were "'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,'" and the defendants intended to use the documents to prove that they did not engage in insider trading, contrary to the plaintiffs' allegations.  2009 WL 5851089, at *3 (quoting Fed. R. Evid. 201(b)).

## RELEVANT LAW REGARDING PLEADING ALLEGATIONS OF FRAUD

A plaintiff must plead "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Fraud claims, however, must meet more stringent standards.  See Fed. R. Civ. P. 9(b).  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  "The requirements of Rule 9(b) must be read in conjunction with the principles of Rule 8, which calls for pleadings to be 'simple, concise, and direct, . . . and to be construed as to do substantial justice.'"  Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1252 (10th Cir. 1997).

"With respect to rule 9(b)'s scope, a court should require parties to plead a cause of action with particularity when that cause of action contains allegations grounded in fraud."  Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d 1200, 1207 (D.N.M. 2011)(Browning, J.)(citing 2 James William Moore, Jeffrey A. Parness & Jerry E. Smith, Moore's Fed. Practice § 9.03(1)(d), at 9-20 (3d ed. 2008)).  On the other hand, a plaintiff may plead claims based on

- 210 -

negligent or innocent misrepresentations, to the extent those claims do not require proof of fraud, in accordance with the more relaxed standards of rule 8(a).  See Tricontinental Indus., Ltd. v. Pricewaterhouse Coopers, LLP, 475 F.3d 824, 833 (7th Cir. 2007)(recognizing that rule 9(b)'s heightened pleading standard does not apply to negligent misrepresentation claims); Gen. Elec. Capital Corp. v. Posey, 415 F.3d 391, 395-96 (5th Cir. 2005)(concluding that negligent misrepresentation claim needs only to satisfy rule 8(a)'s notice pleading standard); Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1104-05 (9th Cir. 2003)("Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)."); Carl Kelley Const. LLC v. Danco Techs, 656 F. Supp. 2d 1323, 1346 (D.N.M. 2009)(Browning, J.) ("[U]nlike with fraudulent misrepresentation, rule 8's notice pleading standard governs [negligent misrepresentations]." (citing City of Raton v. Ark. River Power Auth., 600 F. Supp. 2d 1130, 1142-44, 1153 (D.N.M. 2008)(Browning, J.))

   "The primary motives that animate rule 9(b) help illuminate the reason for limiting the rule's reach to claims grounded in fraud."  S2 Automation LLC v.  Micron Tech., No. 11-0884, 2012 WL 843706, at *6 (D.N.M. Mar. 5, 2012)(Browning, J.).  First, the requirement of pleading with particularity protects the defendants' reputations from the harm attendant to accusations of fraud or dishonest conduct.  See United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 921 (4th Cir. 2003)("Rule 9(b) protects defendants from harm to their goodwill and reputation." (internal quotation marks omitted)); Guidry v. Banks of LaPlace, 954 F.2d 278, 288 (5th Cir. 1992)("[The particularity requirement] stems from the obvious concerns that general, unsubstantiated charges of fraud can do damage to a defendant's reputation.").  Second, the requirement to plead with particularity puts defendants on notice of the allegedly fraudulent conduct so that they can formulate a defense.  See United States ex rel. Harrison v.

Westinghouse Savannah River Co., 353 F.3d at 921.  A related goal of rule 9(b) is to prevent the plaintiffs from tagging on specious fraud claims to their pleadings in an attempt "to induce advantageous settlements or for other ulterior purposes."  Banker's Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992).

The Tenth Circuit has fleshed out the components necessary for a successful rule 9(b) pleading.  In Sheldon v. Vermonty, 246 F.3d 682, 2000 WL 1774038 (10th Cir. 2000)(unpublished table decision), the Tenth Circuit held that the plaintiff had alleged with sufficient particularity a violation of the Securities Exchange Act of 1934.  See 2000 WL 1774038, at *4.  The Tenth Circuit concluded that the complaint

> adequately met Rule 9(b) requirements.  First, as the district court acknowledged, the Complaint alleged misrepresentations with background information as to date, speaker, and the medium of communication. . . . Second, certain of the alleged misrepresentations involved profitable expectations arising from an unowned and inoperable meat-packing plant, a nonexistent lumber company, and fabricated contracts.  Accepting Sheldon's allegations as true, these are patently false statements of present fact.  The district court erred in determining they were mere conclusory allegations of falsity and in characterizing them as fraud by hindsight. . . . Third, the allegations of scienter were sufficient.  In securities fraud cases, although speculation and conclusory allegations will not suffice, great specificity is not required if the plaintiff alleges enough facts to support a strong inference of fraudulent intent.

2000 WL 1774038, at *5 (citations omitted)(internal quotation marks omitted).  "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud."  United States ex rel. Schwartz v. Coastal Healthcare Grp., Inc., 232 F.3d 902, 2000 WL 1595976, at * 3 (10th Cir. 2000)(unpublished table decision).  "To survive a motion to dismiss, an allegation of fraud must 'set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'"  Midgley v. Rayrock Mines, Inc., 374 F. Supp. 2d 1039, 1047 (D.N.M. 2005)(Browning, J.)(quoting

Schwartz v. Celestial Seasonings, Inc., 124 F.3d at 1252).  "On the other hand, rule 9(b) does not

require specific knowledge regarding the defendant's state of mind."  Midgley v. Rayrock Mines,

Inc., 374 F. Supp. 2d at 1047.

## RELEVANT FEDERAL SECURITIES LAW

> During the early days of the New Deal, Congress enacted two landmark
> statutes regulating securities.  The [Securities] Act was described as an Act "to
> provide full and fair disclosure of the character of securities sold in interstate and
> foreign commerce and through the mails, and to prevent frauds in the sale thereof,
> and for other purposes." The Securities Exchange Act . . . was described as an Act
> "to provide for the regulation of securities exchanges and of over-the-counter
> markets operating in interstate and foreign commerce and through the mails, to
> prevent inequitable and unfair practices on such exchanges and markets, and for
> other purposes."

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 727-28 (1975).  The Securities Act deals

with the initial issuance of securities, and with the required contents of registration statements

and prospectuses.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. at 728.  The Exchange

Act, on the other hand, is primarily known for prohibiting fraud in connection with the purchase

or sale of securities.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. at 728-29.

### 1.        Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act.

Section 17(a) of the Securities Act requires substantially the same elements of proof as

Section 10(b) of the Exchange Act.  See SEC v. Wolfson, 539 F.3d at 1256.  Under §17(a) of the

Securities Act, it is

> unlawful for any person in the offer or sale of any securities (including security-
> based swaps) or any security-based swap agreement (as defined in section
> 78c(a)(78) of this title)  by the use of any means or instruments of transportation
> or communication in interstate commerce or by use of the mails, directly or
> indirectly
>
> **(1)** to employ any device, scheme, or artifice to defraud, or

(**2**) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(**3**) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

Under § 10(b) of the Exchange Act, it is unlawful for

any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange --

. . .

(**b**) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Pursuant to the authority Congress granted the SEC under § 10(b) of the

Exchange Act, the SEC promulgated rule 10b-5, which makes it

unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

> In an SEC enforcement action . . . , based on alleged misstatements or omissions contained in public filings, a defendant is liable under § 10(b) if the Commission establishes that he (1) made a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, and (5) by virtue of the requisite jurisdictional means.

SEC v. Wolfson, 539 F.3d at 1256 (citing Geman v. SEC, 334 F.3d at 1192).   Unlike private litigants bringing a cause of action under the PSLRA, the SEC need not prove "reliance or injury in enforcement actions."  Geman v. SEC, 334 F.3d at 1191.

"The principal difference between § 17(a) and § 10(b) lies in the element of scienter, which the SEC must establish under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3). . . .   By contrast, § 10(b) always requires a showing of scienter."  SEC v. Wolfson, 539 F.3d at 1256-57 (citing Aaron v. SEC, 446 U.S. 680, 697 (1980)).   Additionally, under § 17(a) of the Securities Act, the SEC must prove that the fraud occurred "'in the offer or sale of any securities,'" rather than "'in connection with the purchase or sale of any security.'"  SEC v. Wolfson, 539 F.3d at 1256 n.12 (quoting 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b)).

"The purpose of both [§ 10(b) and § 17(a)] is protection of investors from fraudulent practices."  SEC v. Int'l Chem. Dev. Corp., 469 F.2d 20, 26 (10th Cir. 1972).   "In cases of alleged misstatements in public filings submitted to the Commission, the scope of the two sections is essentially coextensive because the fraudulent conduct touches upon both purchases and sales of publicly-traded securities."  SEC v. Wolfson, 539 F.3d at 1257 (citing SEC v. Power, 525 F. Supp. 2d 415, 419-20 (S.D.N.Y.2007)).

a.              **Material Statements or Omissions**.

"To satisfy the first element of a 10b-5 claim, a plaintiff must allege facts showing the defendant made an untrue statement of material fact, or failed to state a material fact necessary for make the statements that were made not misleading." Grossman v. Novell, Inc., 120 F.3d at 1119 (citing 17 C.F.R. § 140.10b-5). The statement or omission must not merely be false now; rather, it must have been false at the time that the document containing it was created. See Grossman v. Novell, Inc., 120 F.3d at 1124 ("What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation . . . .").

A statement of fact is material if "'a reasonable person would consider it important in determining whether to buy or sell'" securities. Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d at 1126 (quoting Schaffer v. Evolving Sys., Inc., 29 F. Supp. 1213, 1220-21 (D. Colo. 1998)(citing Grossman v. Novell, Inc., 120 F.3d at 1119). In a similar context -- a claim under § 14 of the Exchange Act -- the Supreme Court has said that a statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the public. TSC Indus., Inc. v. Northway, Inc., 426 U.S. at 449. Courts in the Tenth Circuit should "not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial." McDonald v. Kinder-Morgan, Inc., 287 F.3d at 997 (quoting Grossman v. Novell, Inc., 120 F.3d at 1118). The Tenth Circuit, in the context of securities fraud claims under § 10b-5 and rule 10b-5 of the Exchange Act, has identified two categories of statements that are, as a matter of law, not materially misleading: vague statements of corporate optimism and "statements considered

immaterial because other documents available to the investing public 'bespoke caution' about the subject matter of the alleged misstatement at issue." Grossman v. Novell, 120 F.3d at 1120.  The Supreme Court, however, has recently emphasized that "[a]ny approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive."  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1318 (2011)(quoting Basic, Inc. v. Levinson, 485 U.S. at 236). Likewise, the Supreme Court reiterated that it was "careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information."  See Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. at 1318 (internal quotation marks omitted)(quoting Basic, Inc. v. Levinson, 485 U.S. at 231).  In analyzing materiality in the context of a 12(b)(6) motion to dismiss, a court should consider whether the "allegations suffice to 'raise a reasonable expectation that discovery will reveal evidence' satisfying the materiality requirement, and to 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. at 1323 (citations omitted)(quoting Ashcroft v. Iqbal, 129 S. Ct. at 1949; Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

 "Alleged omissions create another hurdle for the plaintiff.  Unlike statements, omissions are actionable only if the plaintiff can establish that the defendant had a duty to disclose the omitted information."  Genesee Cnty. Emps' Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d at 1127 (citing McDonald v. Kinder-Morgan, Inc., 287 F.3d at 998 (stating that, in the context of the Exchange Act, "a duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement.")).  See also Basic v. Levinson, 485 U.S. at 239 n.17 ("To be actionable, of course, a

statement must also be misleading.  Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); United States v. Nacchio, 519 F.3d 1140, 1161-62 (10th Cir. 2008)("Information is material if it adds materially to the mix of information already available to investors." (citing TSC Indus. v. Northway, 426 U.S. at 449); Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996)(stating that, in the context of §§ 11 and 12(a)(2) of the Securities Act, "[t]he proposition that silence, absent a duty to disclose, cannot be actionably misleading, is a fixture in federal securities law.")).  That principle is also found in the language of the sections of the Exchange Act and Securities Act at issue here.  Section 10(b) of the Exchange Act makes unlawful "any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," 15 U.S.C. § 78j(b), and § 17(a) of the Securities Act makes it unlawful "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," 15 U.S.C. § 77q(a).  A defendant can therefore be liable under these sections only if he or she omitted material information or made incomplete disclosures that would leave the reader with a false impression that is material.  See Genesee Cnty. Emps' Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d at 1127.

"The 'bespeaks caution' rule is an application of the common-sense principle that the more a speaker qualifies a statement, the less people will be misled if the statement turns out to be false."  United States v. Nacchio, 519 F.3d at 1161-62, vacated in part, United States v. Nacchio, 555 F.3d 1234 (10th Cir. 2009)(en banc).  "At bottom, the 'bespeaks caution' doctrine stands for the 'unremarkable proposition that statements must be analyzed in context' when determining whether or not they are materially misleading." Grossman v. Novell, Inc., 120 F.3d at 1120 (quoting Rubinstein v. Collins, 20 F.3d 160, 167 (5th Cir. 1994)).  See Halperin v.

eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002)(holding that, under the bespeaks caution doctrine, "certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."). Plaintiffs can overcome cautionary language if the "language did not expressly warn or did not directly relate to the risk that brought about plaintiffs' loss." Halperin v. eBanker USA.com, Inc., 295 F.3d at 359. See Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008)(Crotty, J.)("[G]eneral risk disclosures in the face of specific known risks which border on certainties do not bespeak caution."). Furthermore, the bespeaks caution doctrine normally applies only to forward-looking statements such as projections or forecasts, and not to representations of present fact. See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 773 (1st Cir. 2011); Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd., 620 F.3d 137, 142 (2d Cir. 2010). Similarly, the bespeaks caution doctrine does not apply to statements which "may be construed as indicating the speakers' beliefs concerning then-present factual conditions." Grossman v. Novell, Inc., 120 F.3d at 1123. A court may properly apply the bespeaks caution doctrine when considering a motion to dismiss. See Grossman v. Novell, Inc., 120 F.3d at 1120 n.7.

      **b.**    **Scienter.**

Scienter "refers to the mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976). When asserting a claim under § 17(a)(1) of the Securities Act or § 10(b) of the Exchange Act, the SEC must establish at least recklessness, but the SEC must establish only negligence for a claim under §§ 17(a)(2) or 17(a)(3) of the Securities Act. See SEC v. Smart, 678 F.3d 850, 857 (10th Cir. 2012)( "Section

10(b) and § 17(a)(1) require the SEC to establish at least recklessness, whereas negligence is sufficient for § 17(a)(2) and § 17(a)(3).”); SEC v. Wolfson, 539 F.3d at 1256; C.E. Carlson, Inc. v. SEC, 859 F.2d 1429, 1435 (10th Cir. 1988)).

The Tenth Circuit has defined recklessness sufficient to state a claim under § 10(b) of the Exchange Act as “‘conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendants or is so obvious that the actor must have been aware of it.’” Dronsejko v. Thornton, 632 F.3d at 665 (quoting City of Phila. v. Fleming Cos., Inc., 264 F.3d at 1457-58). The Tenth Circuit has emphasized that it “‘is the danger of misleading buyers that must be actually known or so obvious that any reasonable man would be legally bound as knowing.’” City of Phila. v. Fleming Cos., 264 F.3d at 1260 (emphasis in original)(quoting Schlifke v. Seafirst Corp., 866 F.2d 935, 946 (7th Cir. 1989). In other words, when asserting a defendant’s liability for an omission,

> to establish scienter . . . the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors. The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant’s knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors.

City of Phila. v. Fleming Cos., 264 F.3d at 1261. The Tenth Circuit has held that “‘divergence between internal reports and external statements on the same subject’ and ‘disregard of the most current factual information before making statements’ can be factors supporting scienter.” In re Level 3 Commc’ns, Inc. Sec. Litig., 667 F.3d at 345 (quoting Frank v. Dana Corp., 646 F.3d 954, 959 n.2 (6th Cir. 2011)(holding that inconsistencies between internal reports and defendants’ public statements did not evidence scienter, because “some of the critical terms at issue” in the

reports were "open to multiple interpretations," and, therefore, the "strongest inference" the Tenth Circuit could "draw is that defendants were negligent in failing to put together the pieces" (citing Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc., 537 F.3d 527, 540 (5th Cir. 2008)).  See Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc., 537 F.3d at 540 (holding that corporate officers' receipt of internal reports did not demonstrate scienter because the reports did not necessarily include information inconsistent or at odds with the corporation's public statements).

### c.    **Primary Liability.**

Primary liability under § 10(b) of the Exchange Act is "limited in its reach to 'only the making of a material misstatement (or omission) or the commission of a manipulative act.'" SEC v. Wolfson, 539 F.3d at 1257 (quoting Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. at 177-178).   "There is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach."  Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226 (citing SEC v. Holschuh, 694 F.2d 130, 142 (7th Cir. 1982).  Secondary actors, however, such as "accountants, lawyers, or bankers" may be liable for a primary violation of § 10(b) of the Exchange Act in "certain cases."  SEC v. Wolfson, 539 F.3d at 1257.

> Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met.

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. at 191 (emphasis in original).  Secondary actors, therefore, may be liable under § 10(b) of the Exchange Act "so long as they themselves made a material misstatement or omission (or committed some other

fraudulent act), and each of the remaining elements of liability under § 10(b) are satisfied." <u>SEC v. Wolfson</u>, 539 F.3d at 1257-58 (citing <u>Cent. Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. at 191; <u>Anixter v. Home-Stake Prod. Co.</u>, 77 F.3d at 1226).  <u>See Anixter v. Home-Stake Prod. Co.</u>, 77 F.3d at 1226-27 ("[I]n order for accountants to [be primarily liable under § 10(b)], they must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors.").

### i.      Liability for Makers of Misstatements or Omissions.

"[T]he maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it."  <u>Janus Capital Grp., Inc. v. First Derivative Traders</u>, 131 S. Ct. at 2303.  In <u>Janus Capital Grp., Inc. v. First Derivative</u>, the Supreme Court discussed the scope of liability under rule 10b-5 for those who, "'directly or indirectly, . . . make any untrue statement of a material fact' in connection with the purchase or sale of securities."  131 S. Ct. at 2301 (quoting 17 C.F.R. § 240.10b-5(b)).  Looking to the usage and definition of the verb "make," the Supreme Court determined that, in rule 10b-5(b), "'[t]o make any . . . statement' is thus the approximate equivalent of 'to state.'"  131 S. Ct. at 2302.  The Supreme Court reasoned that a person or entity's control over the statement proscribes liability, because, without control over the statement, "a person or entity can merely suggest what to say, not 'make' a statement in its own right."  131 S. Ct. at 2302.  The Supreme Court stated that this interpretation is "supported by our recent decision in <u>Stoneridge</u>," in which the Supreme Court found that entities that agreed to arrangements which allowed another company to mislead its auditor and investors could not be liable for the false statements, because "'nothing [the defendants] did made it necessary or inevitable for [the company] to record the transactions as it did.'"  <u>Janus Capital Grp., Inc. v. First Derivative Traders</u>, 131 S. Ct. at 2303 (emphasis added in original)(quoting

- 222 -

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc. 552 U.S. at 152-53)(citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc. 552 U.S. at 166-67).   In Janus Capital Grp., Inc. v. First Derivative Traders, the Supreme Court ruled that an investment adviser and administrator that was "significantly involved in preparing" a prospectus which contained fraudulent statements and omissions could not be liable for those misstatements and omissions under § 10(b) and rule 10b-5)(b) of the Exchange Act.   131 S. Ct. at 2299, 2305.   The Supreme Court held that only the company which issued the prospectus could be liable for misstatements and omissions, because any assistance the investment advisor provided was subject to the company's ultimate control.   See 131 S. Ct. at 2304-05.   The Supreme Court noted that the company was legally independent from the investment advisor and administrator, and had its own board of trustees.[24]   See 131 S. Ct. at 1204-05.   Similarly, in a case which predates Janus Capital Grp., Inc. v. First Derivative Traders, the Tenth Circuit held that an accountant could be primarily liable under § 10(b) of the Exchange Act for issuing opinions and certifying financial statements which contained false and misleading statements that were ultimately incorporated into a company's prospectus.   See Anixter v. Home-Stake Prod., Co., 77 F.3d at 1227.   The Supreme

---

[24]   The Supreme Court also discussed in Janus Capital Grp., Inc. v. First Derivative Traders the relevance of to whom a statement is attributed when determining who its "maker" is. 131 S. Ct. at 2302.   "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by - - and only by - - the party to whom it is attributed." 131 S. Ct. at 2302. Janus Capital Grp., Inc. v. First Derivative Traders was a case in which a private plaintiff asserted a right under rule 10b-5(b), a cause of action which requires a private plaintiff to demonstrate reliance upon a fraudulent misstatement or omission.   See 131 S. Ct. at 2301, 2301, n.3.   Neither reliance, nor attribution, are necessary elements in an SEC enforcement action.   See SEC v. Wolfson, 539 F.3d at 1259-60.   The Tenth Circuit does not require the SEC to plead and prove reliance in an action under § 10(b) of the Exchange Act.   See Geman v. SEC, 334 F.3d at 1191.   The Tenth Circuit has reasoned that the attribution is related to a private plaintiff's need to prove reliance on an allegedly fraudulent statement, and therefore, "given the unambiguous connection between reliance and attribution, and the fact that the SEC need not prove reliance, we decline to impose an attribution element in an SEC enforcement action." SEC v. Wolfson, 539 F.3d at 1260, 1260 n.17.

Court cited Anixter v. Home-Stake Prod., Co. with approval in Janus Capital Grp., Inc. v. First Derivative Traders, emphasizing that the accountant's signature on an "Auditor's Report" supported the Tenth Circuit's conclusion that the accountant committed a primary securities law violation.  Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. at 2305 n.11 (internal quotations omitted)(citing Anixter v. Home-Stake Prod. Co., 77 F.3d at 1220, 1220 n.4).

Before Janus Capital Grp., Inc. v. First Derivative Traders, the Tenth Circuit stated that a person may be primarily liable for an alleged misstatement or omission if the person was "so involved in creating or communicating the offending misstatement (or omission) that he can fairly be said to have caused it to be made," and he "knew or should have known that the statements would reach investors."  SEC v. Wolfson, 539 F.3d at 1261, 1261 n.18 (citing Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226 n.10).  It is unclear whether this standard still applies after Janus Capital Grp., Inc. v. First Derivative Traders.  In Janus Capital Grp., Inc. v. First Derivative Traders, the Supreme Court rejected an interpretation of rule 10b-5(b) that would impose liability for misstatements and omissions on those who "create" the statements.  131 S. Ct. at 2303.  The Supreme Court determined that this interpretation would conflict with its previous decisions by allowing "private plaintiffs to sue a person who provides the false or misleading information that another person then puts into the statements."  131 S. Ct. at 2303. In SEC v. Wolfson, the Tenth Circuit held that a non-employee consultant could be primarily liable under § 17(a) of the Securities Act and § 10(b) of the Exchange Act, because the consultant "played an integral role in preparing those filings that contained the misstatements and omissions at issue," through drafting the filings which contained the misstatements and omissions that a company filed without modifications, and because the consultant knew from his previous experience that the filings "were calculated to reach investors."  539 F.3d at 1261.  The

Tenth Circuit reasoned that the consultant "caused [the company] to make the relevant statements," even though the filings were issued in the name of the company. 539 F.3d at 1261. This holding is similar to the theory of liability that the Supreme Court rejected in Janus Capital Grp., Inc. v. First Derivative Traders -- an interpretation of rule 10b-5(b) which would allow a plaintiff to sue those who provide misleading information that another entity incorporates into a statement. See Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. at 2303. On the other hand, the facts before the Tenth Circuit in SEC v. Wolfson may have been sufficient to satisfy Janus Capital Grp., Inc. v. First Derivative Traders' standard of "control" over the statement. In a footnote, the Tenth Circuit noted that it did not rely on the defendant's title as a "consultant" in its decision. SEC v. Wolfson, 539 F.3d at 1261 n.19. The Tenth Circuit explained that the defendant was "[f]ar from being a typical outsider to the company," but, rather, "played a central role in the management of [the company] akin to that of a core member of management." 539 F.3d at 1261 n.19. The Tenth Circuit noted that the defendant negotiated with note holders, analyzed potential business opportunities in the industry, and "regularly interfaced with [the company's] independent auditors as a representative of the company." 539 F.3d at 1261 n.19. These facts may have demonstrated that, in addition to contributing to the creation of misstatements and omissions, the defendant controlled their communication. Were SEC v. Wolfson before the Tenth Circuit today, the Tenth Circuit, therefore, may very well reach the same conclusion as it has in the past, although with a different rationale.

### ii.    Liability for Manipulative and Deceptive Conduct.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device." 15 U.S.C. § 78(j)(b). "[C]onduct itself can be deceptive," and there is no requirement that "there must be a

specific oral or written statement before there could be liability under § 10b or Rule 10b-5."

Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 128 S. Ct. at 769.   "Fraud by conduct is a

violation of Rule 10b-5(a) and (c)."   O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 898 (10th

Cir. 1992).   Although the Supreme Court has rejected a private cause of action for aiding and

abetting securities violations, the Supreme Court has expressly reserved a cause of action for

secondary actors based upon deceptive and manipulative conduct.

> The absence of § 10(b) aiding and abetting liability does not mean that secondary
> actors in the securities markets are always free from liability under the securities
> Acts.   Any person or entity, including a lawyer, accountant, or bank, who employs
> a manipulative device or makes a material misstatement (or omission) on which a
> purchaser or seller of securities relies may be liable as a primary violator under
> 10b-5.

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. at 191 (emphasis

added).   See Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 128 S. Ct. at 772-73 (discussing

the scope of the implied private right of action under § 10(b) of the Exchange Act, and stating

that it "continues to cover secondary actors who commit primary violations" (citing Cent. Bank

of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. at 191)).   Manipulation in this

context is "virtually a term of art," and "refers generally to practices, such as wash sales,

matched orders, or rigged prices, that are intended to mislead investors by artificially affecting

market activity."   Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476 (1977).

Although the Tenth Circuit has not used the term "scheme liability," "the two circuit

courts that traditionally see the most securities cases[,] the Second and Ninth Circuits," along

with a majority of the other circuits, have adopted the term to describe the liability rule 10b-5(a)

and (c) creates.   Nicholas Fortune Schanbaum, Scheme Liability: Rule 10b-5(a) and Secondary

Actor Liability after Central Bank, 26 Rev. Litig., 183, 197 (Winter 2007).   See Pub. Pension

Fund Grp. v. KV Pharm. Co., 679 F.3d 972, 987 (8th Cir. 2012)("Claims brought under Rules 10b-5(a) and (c) are generally referred to as 'scheme liability' claims."); In re DVI, Inc. Sec. Litig., 639 F.3d 623, 643 n.29 (3d Cir. 2011)("We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements."); Pac. Inv. Mgmt. Co. v. Mayer Brown, LLP, 603 F.3d 144, 151 (2d Cir. 2010)(addressing whether a plaintiff's "allegations in the complaint are sufficient to state a claim for 'scheme liability' under Rule 10b-5(a) and (c)"); Desai v. Deutsche Bank Sec. Ltd., 573 F.3d 931, 938 (9th Cir. 2009)("Misrepresentations and most omissions fall under the prohibition of Rule 10b-5(b), whereas manipulative conduct typically constitutes 'a scheme . . . to defraud' in violation of Rule 10b-5(a) or a 'course of business which operates . . . as a fraud or deceit upon any person' in violation of Rule 10b-5(c)."); In re Mut. Funds Inv. Litig., 566 F.3d 111, 129 (4th Cir. 2009)(identifying a claim alleging that defendants "carried out a plan, scheme and course of conduct which was intended to and, . . . did . . . deceive the investing public" as a claim of "scheme liability"); Pugh v. Tribune Co., 521 F.3d 686, 696 (7th Cir. 2008)(finding that a private plaintiff may not assert a claim of "scheme liability" under § 10(b) of the Exchange Act against a defendant who "participated in a fraudulent scheme but had no role in preparing or disseminating Tribune's financial statements or press releases"); Regents of Univ. of Ca. v. Credit Suisse First Boston (USA), Inc., 582 F.3d 372, 378-79 (5th Cir. 2007)(recognizing a claim of scheme liability under rule 10b-5(a) for a defendant's allegedly deceptive conduct, but finding that the plaintiffs failed to demonstrate reliance).

The Second, Eighth, and Ninth Circuits have held that scheme liability encompasses only actions which include deceptive conduct beyond assistance with a material misstatement or omission.   See Pub. Pension Fund Grp. v. KV Pharma. Co., 679 F.3d 972, 987 (8th Cir.

2012)("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)."); WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d at 1057 ("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."); Lentell v. Merill Lynch & Co., 396 F.3d 161, 177 (2d Cir.)("[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c)."), cert. denied, 546 U.S. 935 (2005).  This formulation is consistent with the Supreme Court's sharp division between those who may be liable as primary violators of the securities laws, and those who may be liable for only aiding and abetting the violation of another.  In Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., the Supreme Court highlighted the distinction between primary violators and "those who do not engage in the manipulative or deceptive practice."  511 U.S. at 167.  The Supreme Court explained that, unlike primary liability under § 10(b) of the Exchange Act, "aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do."  511 U.S. at 176.  The Supreme Court held in Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A. that §10(b) of the Exchange Act did not include a cause of action for aiding and abetting.  See 511 U.S. at 176.  In response to this holding, Congress created a cause of action for aiding and abetting through the PSLRA exclusively for the SEC's enforcement.  See 15 U.S.C. § 78t(e).  Subsequently, in Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., the Supreme Court rejected a theory of scheme liability which would allow private plaintiffs to hold secondary actors liable absent any evidence that the private plaintiffs relied upon the secondary actors'

deceptive or manipulative conduct, a required pleading element for private plaintiffs.   The plaintiffs asserted that the secondary actors were liable for engaging "in conduct with the purpose and effect of creating a false appearance of material fact to further a scheme to misrepresent Charter's revenue."  128 S. Ct. at 770.  Although the Supreme Court's decision was dispositive on the plaintiffs' inability to prove reliance, the Supreme Court reasoned that, to hold the secondary actors liable for another's misrepresentations would run afoul of Congress' "specific response to Central Bank in § 105 of the PSLRA" which authorizes the SEC, but not private plaintiffs, to bring claims of aiding and abetting a securities violation.  552 U.S. at 162-63.  In Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., without evidence of reliance upon the secondary actors' deceptive conduct, the only primary securities violation the plaintiffs could allege was that a company made material misstatements and omissions in its financial statements and to its auditors.  Although the secondary actors' agreements with the company facilitated the company's misstatements and omissions, the Supreme Court determined that assisting the company's violation of § 10(b) of the Exchange Act alone was insufficient to demonstrate that the plaintiffs' relied on the secondary actors' conduct.   To hold otherwise would allow the plaintiffs to bring a claim for aiding and abetting, contrary to Congress' specific statutory intent with the PSLRA.  See 128 S. Ct. at 770-72.  Similarly, the Second, Eighth, and Ninth Circuits' formulation of scheme liability differentiates between those who engage in manipulative or deceptive conduct, and those who merely help others to manipulate or deceive.  Just as the Supreme Court would not allow the plaintiffs to hold secondary actors liable for another's misstatements and omissions, absent evidence that the secondary actors engaged in deceptive conduct upon which the plaintiffs relied, the Second, Eight, and Ninth Circuits require the plaintiffs to demonstrate that a scheme to defraud included manipulative or deceptive conduct

beyond a misrepresentation or omission.  Liability under § 10(b) of the Exchange Act, therefore, does not attach to secondary actors by "repackaging a fraudulent misrepresentation a 'scheme to defraud.'"  SEC v. St. Anselm Exploration Co., 2013 WL 1313765, at *15 (citing Pub. Pension Fund. Grp. v. KV Pharma Co., 679 F.3d at 987).

Consistent with the Supreme Court's description of manipulative conduct in the context of § 10(b) of the Exchange Act as a "term of art," Santa Fe. Indus., Inc. v. Green, 430 U.S. 476, "scheme liability requires proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance."  SEC v. St. Anselm Exploration Co., 2013 WL 1313765, at *15 (citing SEC v. Daifotis, No. C 11-00137 WHA, 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011)).  See Pub. Pension Fund Grp. v. KV Pharma. Co., 679 F.3d at 987 (finding that the plaintiffs' allegations that corporate officers were aware of misrepresentations and omissions that a company made is insufficient to state a claim for scheme liability).  This restriction on scheme liability recognizes "the importance of maintaining a distinction among the various Rule 10b-5 claims from one another, [and] that the lines dividing the different claims are [] 'carefully maintained' and are 'well-established.'"  WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d at 1057 (quoting Desai v. Deutsche Bank Sec. Ltd., 573 F.3d 931, 941 (9th Cir. 2009)).

For example, in SEC v. Kelly, Judge McMahon determined that a claim of scheme liability failed because, apart from the defendant's public representations about its advertising transactions, the transactions were not inherently deceptive.  See 817 F. Supp. 2d at 344. Similarly, in SEC v. Lucent Techs., Inc., the Honorable William H. Walls, Senior United States District Judge for the District of New Jersey, held that, because the sales at issue "were legitimate business transactions and the customers purchased the product from [defendants] with

every intention of using it or selling it to end customers," the SEC's allegation that the defendants schemed to defraud by not disclosing certain details of the transactions was an improper attempt to re-cast a rule 10b-5(b) claim as one for scheme liability.  610 F. Supp. 2d at 360-61.  Additionally, as long as inherently deceptive conduct is present, a claim for scheme liability does not fail, because the alleged scheme was in furtherance of a misrepresentation or omission.  In SEC v. Familant, Judge Boasberg held that allegations that the defendants had used false transactions to overstate a company's performance sufficiently pleaded scheme liability, notwithstanding that the goal of the scheme was a misrepresentation in accounting statements. Judge Boasberg expressly rejected a reading of scheme liability which would preclude allegations of a scheme to make a misrepresentation or omission.  See 2012 WL 6600339, at *9. Judge Boasberg based this conclusion on his finding that the neither § 10(b) nor rule 10b-5 of the Exchange Act's language precluded liability for a scheme to defraud through public misrepresentations, the Supreme Court has interpreted the nearly-identical language of § 17(a) of the Securities Act as creating multiple forms of liability which are not limited by one another, and that the SEC wrote rule 10b-5 specifically and unambiguously to create liability for schemes, as well as for misstatements and omission.  2012 WL 6600339, at **9-11 (citing United States v. Naftalin, 441, U.S. 768, 773 (1979)).  See United States v. Naftalin, 441 U.S. at 773 (discussing Securities Act Section 17(a), and stating that "[e]ach succeeding prohibition is meant to cover additional kinds of illegalities -- not to narrow the reach of the prior sections.  There is, therefore, no warrant for narrowing alternative provisions which the legislature has adopted with the purpose of affording added safeguards."); SEC v. Lucent Techs., Inc., 610 F. Supp. 2d at 359 (rejecting an argument that "a defendant cannot be liable if his course of conduct was merely participation in a scheme whose purpose was to make a misstatement.  There is no support for

such a reading and such a rule would be nonsensical."). Accordingly, scheme liability does not preclude, outright, claims based upon a scheme to misrepresent or omit material facts. See IBEW Local 90Pension Fund v. Deutsche Bank AG, 2013 WL 1223844, at *8 (finding that a plaintiff may allege "a fraudulent scheme without being tethered to whether specific statements were themselves material misstatements or omissions; such statements may simply be part of the fabric of the fraudulent scheme alleged").

### 2.  Aiding and Abetting Securities Violations.

With the passage of the PSLRA in 1995, the SEC, but not private plaintiffs, may bring a cause of action for aiding and abetting a securities violation.

> For purposes of any action brought by the Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

15 U.S.C. § 78t(e). The Tenth Circuit has not explicitly discussed the meaning of "substantial assistance," but has indicated that an actor who plays a "significant" or "central" role in a primary violation, or is "intricately involved" in a primary violation, without sufficient involvement to be primarily liable, may be liable for aiding and abetting a securities violation. Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226 n.10 (internal quotations omitted)(discussing the distinction between primary liability and aiding-and-abetting liability post Cent. Bank of Denver v. First Interstate Bank of Denver, N.A.).

The phrase "or recklessly" was added to § 20(e) of the Exchange with the Dodd-Frank Act in 2010, and the Dodd-Frank Act does not  indicate that Congress intended for this amendment to apply retroactively. See Black v. M & W Gear Co., 269 F.3d 1220, 1228 n.3

(10th Cir. 2001)("The presumption against retroactive application of a statute applies 'absent clear congressional intent favoring' retroactive application of the new statute . . . [a]nd it applies to amended statutes as well as new statutes."); Lytes v. DC Water & Sewer Auth., 572 F.3d 936, 939-40 (D.C. Cir. 2009)(explaining that a court should not apply a statute to conduct occurring before its enactment if to do so would "affect [] substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment.")(quoting Landgraf v. USI Film Prods., 511 U.S. 244, 278 (1994)).

On the other hand, the Tenth Circuit's decisions on aiding-and-abetting liability after the passage of § 20(e) of the Exchange Act indicate that the Tenth Circuit allowed allegations of recklessness to satisfy its state-of-mind requirement.  In Anixter v. Home-Stake Prod. Co., after the Supreme Court removed a private cause of action for aiding and abetting securities violations, the Tenth Circuit reversed a jury award in favor of a plaintiff because of a general verdict form, which did not specify whether it found the defendant primarily liable, or liable for aiding and abetting.  See 77 F.3d at 1227-30.  Although the Tenth Circuit expressly stated that "aider and abettor liability . . . required the plaintiff to prove . . . knowledge of the primary violation by alleged aider and abettor," the Tenth Circuit emphasized that the "critical element separating primary from aiding and abetting violations is the existence of a representation," and not a higher degree of scienter.  77 F.3d at 1225.  Additionally, the Tenth Circuit did not state that the jury instructions were false or inaccurate, which instructed the jury to find the defendant guilty for aiding and abetting with a state of mind of "knowingly or recklessly."  77 F.3d at 1227 n.13.  Rather, the Tenth Circuit noted that a distinct possibility was that the jury found the defendant primarily liable, because the instructions discussed a "reckless state of mind."  77 F.3d at 1230.  Moreover, to the extent that the Tenth Circuit discussed knowledge as the requisite state

of mind for an aiding-and-abetting violation, <u>Anixter v. Home Stake Prod. Co.</u> is not on all fours, because the Tenth Circuit's ruling was dispositive on the extinction of a private right of action for aiding and abetting.

<u>Geman v. SEC</u> is more instructive regarding the requisite state of mind for an aiding-and-abetting claim in the Tenth Circuit before the Dodd-Frank Act.  In <u>Geman v. SEC</u>, the Tenth Circuit was presented with the question whether the evidence before the SEC was sufficient to find that a defendant was "responsible for aiding and abetting the record keeping failures of" a firm.  334 F.3d at 1195.  The Tenth Circuit reviewed the evidence, and determined that it established a "sufficient factual basis for the conclusion that Geman aided and abetted the violations with a state of mind of recklessness, if not willful disregard."  334 F.3d at 1196.  The Tenth Circuit, therefore, affirmed the SEC's finding that Geman was liable for aiding and abetting.  Although the Tenth Circuit did not set forth the elements of an aiding-and-abetting claim, as it did in <u>Anixter v. Home Stake Prod. Co.</u>, the issue of aiding-and-abetting liability was squarely before the Tenth Circuit, and, accordingly, the Tenth Circuit's pronouncement that recklessness was sufficient demonstrates that, even before the Dodd-Frank Act, the state of mind of recklessness was sufficient for the SEC to allege a claim for aiding and abetting in the Tenth Circuit.

### 3.    <u>Control-Person Liability Under § 20(a) of the Exchange Act</u>.

Section 20(a) of the Exchange Act provides for control-person liability:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To establish a defendant's liability as a controlling person, a plaintiff must prove two things: (i) a primary violation of the securities laws, and (ii) that the defendant had "control" over the primary violator.  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1107.  "The second element of the prima facie case [under § 20(a)] requires that the plaintiffs plead facts from which it can be reasonably be inferred that the individual defendants were control persons."  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Maher v. Durango Metals, Inc., 144 F.3d 1302, 1306 (10th Cir. 1998)).

"The Tenth Circuit observed that § 20(a) 'has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable.'"  Lane v. Page, 649 F. Supp. 2d at 1306 (D.N.M. 2009)(quoting Richardson v. MacArthur, 451 F.2d 35, 41 (10th Cir. 1971)).  This showing requires the plaintiff to specify facts which "indicate that the defendants had 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1306).  See 17 C.F.R. § 230.405 ("The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.").

In Adams v. Kinder-Morgan, Inc., the Tenth Circuit addressed whether certain individuals involved in Kinder-Morgan, Inc. qualified as control persons for the purposes of Section 20(a) liability.  First, the Tenth Circuit held that the directors were not, ipso facto, control persons.

> We . . . conclude that the plaintiffs have failed to allege sufficient facts to support the conclusion that Kinder was a control person. During the period in question, he was not an executive of the company, but simply a member of the board of directors. The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act. Accordingly, the district court was correct to dismiss the claim of control person liability against Kinder.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Dennis v. Gen. Imaging, Inc., 918 F.2d

496, 509-10 (5th Cir. 1990); Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir. 1984);

Cameron v. Outdoor Resorts of Am., Inc., 608 F.2d 187, 195 (5th Cir. 1979)). On the other

hand, the Tenth Circuit held that being a significant executive within the corporation, with

ultimate management authority over a primary violator, is a control person:

> [W]e conclude that the plaintiffs have pled facts supporting the allegation that [Defendant] Hall was a control person. He was the Chairman, President, and CEO of Kinder-Morgan during the relevant period. As President and CEO, Hall would have possessed the ultimate management authority of the corporation on a daily basis. There were no managers higher than Hall. He thus clearly possessed "the power to direct or cause the direction of the management and policies of [Kinder-Morgan]." Hall also had direct control over McKenzie, his chief financial officer and an alleged primary violator of Rule 10b-5.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144

F.3d 1305; citing In re Ribozyme Pharms., Inc. Sec. Litig., 119 F. Supp. 2d 1156, 1167 (D.

Colo. 2000)). A high-ranking position within the corporation, however, standing alone, is

unlikely to satisfy the "control" element of a control-person claim, unless the circumstance of the

defendant's position and the nature of the underlying violation would lead to an inference that

the person had control. See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 (holding that the

CFO of Kinder-Morgan, purely based on his position as CFO, was a control person where the

securities-fraud violations related specifically to official reports on the company's financial

performance).  Importantly, it is not necessary that the control person actively participate in the alleged fraudulent activity.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108.[25]

In Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust, the Court determined that plaintiffs had stated a claim for control-person liability against RBS Securities for the actions of its affiliate in acquiring, owning, and transferring mortgage assets and selling interests in those assets or bonds secured by those assets.  See 825 F. Supp. 2d at 1099, 1021-22.  The court noted that the plaintiffs had alleged that RBS Securities had the "practical ability to direct the actions" of its affiliate, and the RBS Securities' executives significantly overlapped with those of its affiliate, sufficient to demonstrate control over the affiliate.  825 F. Supp. 2d at 1222. Also, in In re Thornburg Mortg., Inc. Sec. Litig., the Court found that plaintiffs sufficiently alleged that Thornburg Mortgage's CEO and COO, its CFO, and its Chief Lending Officer, could be liable as control persons for alleged misstatements in Thornburg Mortgage's reporting of its financial performance.  See 695 F. Supp. 2d at 1217-18.  Similarly, in Lane v. Page, the Court found that plaintiffs sufficiently alleged that a real estate company was liable as a control person over a development company, because the plaintiffs alleged that the real estate company possessed a 92.5% ownership stake in the company, and, pursuant to a joint venture agreement, the real estate company possessed power to approve major decisions involving a proposed merger.  See 649 F. Supp. 2d at 1309-10.

---

[25] If a control person acted in good faith and did not induce the acts on which the liability of the controlled person is founded, the control person is not liable, but good faith is an affirmative defense, thus inappropriate for the Court to consider on a motion to dismiss.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 n.5.

4.      <u>**Liability for False SEC Filings and False Books and Records**</u>.

Section 13(a) of the Exchange Act requires "[e]very issuer of a security registered pursuant to section 78 of this title" to file with the SEC

> **(1)** such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 78l of this title, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.

> **(2)** such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.

15 U.S.C. § 78m(a).  In accordance with the authority Congress granted the SEC to issue "rules and regulations . . . as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security," 15 U.S.C 78m(a), the SEC implemented rules 12b-20 and 13a-1 to enforce § 13(a).  Exchange Act rule 13a-1 requires an issuer of securities to

> file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement.  Annual reports shall be filed within the period specified in the appropriate form.

17 C.F.R. § 240.13a-1.  Rule 12b-20 requires the issuer of a security to include in the annual report "such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading."  17 C.F.R. § 240.12b-20.   Additionally, § 13(b)(2) of the Exchange Act requires the issuer of securities to

> **(A)** make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

> **(B)** devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that--

>    **(i)** transactions are executed in accordance with management's general or specific authorization;
>
>    **(ii)** transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
>
>    **(iii)** access to assets is permitted only in accordance with management's general or specific authorization; and
>
>    **(iv)** the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences; and
>
> **(C)** notwithstanding any other provision of law, pay the allocable share of such issuer of a reasonable annual accounting support fee or fees, determined in accordance with section 7219 of this title.

15 U.S.C. § 78m(b)(2). The SEC interprets § 13(b)(2) of the Exchange Act as not including an element of scienter. See Promotion of the Reliability of Financial Information and Prevention of the Concealment of Questionable or Illegal Corporate Payments and Practices, Exchange Act Release No. 34-15570, 16 S.E.C. Docket 1143, 1979 WL 173674, at *10 (February 15, 1979)("SEC Release No. 34-15570"). Additionally, the statute does not require perfection, and the legislative history "reflects that 'standards of reasonableness' are to be used in applying this provision." SEC Release No. 34-15570, 1979 WL 173674, at *10 (quoting Foreign Corrupt Practices Act of 1977, Pub. L. 95-213, S. Rep. 95-114, 1997 U.S.C.C.A.N. 4098, 4105 (1977)). Courts interpreting these provisions have determined that they create aiding-and-abetting and control-person liability, but not primary liability against individual persons. See SEC v. Quinlan, 373 F. App'x 581, 585 (6th Cir. 2010)(holding that a district court properly found a defendant liable for aiding and abetting a company's violation of § 13(b)(2) and rule 12b-20 of the Exchange Act); SEC v. Black, 2008 WL 4394891, at *2, *14 (N.D. Ill. Sept. 24, 2008)(finding

- 239 -

that the SEC is entitled to summary judgment on its allegations of control-person liability against a defendant for violations of § 13(a) of the Exchange Act.

On the other hand, § 13(b)(5) and rules 13b2-1 and 13a-14 of the Exchange Act create liability for individual persons.  Section 13(b)(5) of the Exchange Act makes it unlawful for a person to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)."  15 U.S.C. § 78m(b)(5).   Similarly, rule 13b2-1 proscribes that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(a)."  17 C.F.R. § 240.13b2-1.  Rule 13a-14 requires "[e]ach principal executive and principal financial officer of the issuer, or persons performing similar functions," to "sign a certification" at the time an issuer of securities files a report which the SEC requires to be filed. 17 C.F.R. § 240.13a-14.  The Ninth Circuit has equated an officer's signature on a certification with making false statements contained therein and found liability for signing the certificate.  See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 (9th Cir. 2000)("[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the documents are true."  (citing In re JWP, Inc., Sec. Litig., 928 F. Supp. 1239 (S.D.N.Y. 1996)).

### 5.   **Deceit of Auditors.**

Exchange Act rule 13b2-2 "provides that directors or officers shall not make or cause to be made a materially misleading statement or omission to an accountant in connection with SEC filings, among other things."  SEC v. Espuelas, 698 F. Supp. 2d at 436.  Specifically, the rule states:

(a) No director or officer of an issuer shall, directly or indirectly:

(1) Make or cause to be made a materially false or misleading statement to    an accountant in connection with; or

(2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant  in connection with:

> (i) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or

> (ii) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

(b)(1) No officer or director of an issuer, or any other person acting under the direction thereof, shall directly or indirectly take any action to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of that issuer that are required to be filed with the Commission pursuant to this subpart or otherwise if that person knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading.

> (2) For purposes of paragraphs (b)(1) and (c)(2) of this section, actions that, "if successful, could result in rendering the issuer's financial statements materially misleading" include, but are not limited to, actions taken at any time with respect to the professional engagement period to coerce, manipulate, mislead, or fraudulently influence an auditor:

> > (i) To issue or reissue a report on an issuer's financial statements that is not warranted in the circumstances (due to material violations of generally accepted accounting principles, generally accepted auditing standards, or other professional or regulatory standards);

> > (ii) Not to perform audit, review or other procedures required by generally accepted auditing standards or other professional standards;

> > (iii) Not to withdraw an issued report; or

- 241 -

(iv) Not to communicate matters to an issuer's audit committee.

(c) In addition, in the case of an investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8), or a business development company as defined in section 2(a)(48) of the Investment Company Act of 1940 (15 U.S.C. 80a-2(a)(48)), no officer or director of the company's investment adviser, sponsor, depositor, trustee, or administrator (or, in the case of paragraph (c)(2) of this section, any other person acting under the direction thereof) shall, directly or indirectly:

(1)(i) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

(ii) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with:

(A) Any audit, review, or examination of the financial statements of the investment company required to be made pursuant to this subpart; or

(B) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise; or

(2) Take any action to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of that investment company that are required to be filed with the Commission pursuant to this subpart or otherwise if that person knew or should have known that such action, if successful, could result in rendering the investment company's financial statements materially misleading.

17 C.F.R. § 240.13b2-2.  Notably, rules 13b2-2(a) and (c)(1) do not proscribe a scienter requirement.  The Ninth Circuit and Second Circuit have split on whether the SEC must plead

and establish a defendant's scienter to succeed on a claim for materially false statements or omissions made to an auditor, and the Tenth Circuit has not reached the issue.  The Ninth Circuit holds that, "[t]o be liable, one must 'knowingly' make false statements."  SEC v. Todd, 642 F.3d 1207, 1219 (9th Cir. 2011)(quoting United States v. Goyal, 629 F.3d 912, 916 n.6 (9th Cir. 2010).  See United States v. Goyal, 629 F.3d at 916 n.6 ("[L]iability under Rule 13b2–2 . . . requires that a false statement to an auditor be made knowingly.").  Notably, the Ninth Circuit's precedent requiring a scienter element in rule 13b2-2(a) and (c)(1) originates from its decision in United States v. Goyal, a criminal matter.  In United States v. Goyal, the Ninth Circuit reasoned that the United States must establish that a defendant knowingly deceived auditors to be criminally liable under the rule, because 15 U.S.C. § 78m(b)(4) and (5), under which the SEC promulgated rule 13b2-2, imposes criminal liability for only those who "'knowingly'" violate § 13(b)(2)'s provisions.   United States v. Goyal, 629 F.3d at 916 n.6 (quoting 15 U.S.C. § 78m(b)(5)).   The Ninth Circuit held that the SEC could not promulgate a rule which encompassed criminal liability beyond the scope of § 13(b)(2)'s allowance, and, therefore, the United States must establish a knowing scienter when alleging a criminal violation of rule 13b2-2.  See United States v. Goyal, 629 F.3d at 916, 916 n.6.

The Second Circuit, on the other hand, has read the SEC's interpretive guidance on rule 13b2-2(a) and (c)(1) and its statutory history to not require the SEC to plead scienter in a civil enforcement action.  See SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998)("[T]he court's ruling that lack of scienter would not be a defense to the claims under § 13 and the regulations thereunder was consistent with precedent in this Circuit and with the Commission's interpretive regulations indicating that scienter is not an element of civil claims under those provisions."); SEC v. Espuelas, 698 F. Supp. 2d at 436 ("Like rule 13b2-1, 13b2-2 does not require the SEC to

plead scienter.").  The Second Circuit has noted that, before the Foreign Corrupt Practices Act,

Pub. L. No. 100-418, § 5002, 102 Stat. 1415, 1415 (1988) amendments to § 13 of the Exchange

Act, § 13 contained no scienter elements.  Scienter was added to § 13 in connection with the

imposition of criminal liability for the "deliberate falsification of books and records and other

conduct calculated to evade the internal accounting controls requirement."  H.R. Rep. 100-576,

at 916-17 (1988) (Conf. Rep.), reprinted in 1998 U.S.C.C.A.N. 1547, 1949-50.  The Second

Circuit has determined that, because Congress specifically added a scienter requirement to §

13(b) in connection with criminal liability, congressional intent "plainly impl[ies] that

falsification of the information to be filed in accordance with § 13(b) need not be knowing in

order to lead to civil liability."  SEC v. McNulty, 137 F.3d at 741.

Indeed, when promulgating rule 13b2-2, the SEC rejected a request to include a scienter

requirement for those who make material misstatements or omissions to auditors:

> The Commission received comments from approximately 80 persons . . . most of
> which questioned certain aspects of the proposal.  The majority of these
> comments expressed concern that the proposed rule would: (a) require no
> showing of scienter in order to establish a violation based upon the making of
> false, misleading or incomplete statements to an accountant in the course of an
> examination or audit; (b) impose liability for oral, as well as written, statements
> made to an accountant; . . . .  [M]any of the comments asserted that imposition of
> liability for misstatements or omissions, in the absence of a scienter requirement,
> would be counter-productive and impede communications between auditors and
> those from whom they seek information in the course of an audit.  In fact, a
> number of comments suggested that some persons would refuse to communicate
> with an auditor rather than expose themselves to potential liability.
>
>  . . .
>
> [T]he Commission believes its experience concerning questionable and illegal
> payments is more persuasive as to the need for such a rule than the opinions
> expressed by some commentators to the effect that the rule will impede
> communications between auditors and those from whom they seek information.
> Under these circumstances, the Commission has decided that the advantages of

the new Rule outweigh the potential disadvantages suggested by certain commentators.

SEC Release No. 34-15570, 1979 WL 173674, at *12.  See SEC Release No. 34-15570, 1979 WL 173674, at *10 (noting that the congressional history of Exchange Act Section 13 does not indicate the necessity of pleading violator's scienter).  Further, when rules 13b2-2(b) and (c) were added to in 2003, as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745 (2002), and the SEC, again, explicitly stated that the amendment does not alter rule 13b2-2(a)'s imposition of civil liability without a showing of scienter.  The SEC explained that, although rules 13b2-2(b) and (c)(2) prohibit a director or officer from misleading an auditor, the amendment "does not alter" rule 13b2-2(a)'s prohibition against "directly or indirectly causing to be made materially misleading statements to auditors," without "imposing what would amount to a new scienter requirement on the pre-exiting provision prohibiting officers and directors from causing misleading statements or omissions to be made to auditors."  68 F.R. 31820-01, 31823, 2003 WL 21218518.

The Court finds the Second Circuit's interpretation of rule 13b2-2(a) and (c) persuasive and consistent with the Supreme Court's guidance regarding administrative interpretations.  In Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945), the Supreme Court held that an administrative agency's interpretation of its rules "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  325 U.S. at 413, 414.  More recently, in Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837 (1984), the Supreme Court stated that, if "Congress has not directly addressed the precise question at issue . . . . [and] the statute is silent or ambiguous with respect to the specific issue, the question for the court is

whether the agency's answer is based on a permissible construction of the statute."  467 U.S. at 843.

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985)(citing American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982)).  The first step in construing a statute requires the court to "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997).  The inquiry stops there "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'"  Robinson v. Shell Oil Co., 519 U.S. at 340 (citing United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 240 (1989)). Whether the statutory language is plain on its face or ambiguous "is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  Robinson v. Shell Oil Co., 519 U.S. at 341 (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477 (1992)).

Congress has not specifically addressed the state of mind necessary for personal civil liability under § 13(b)(2).  Scienter, however, was not added to § 13(b)(2) until the Foreign Corrupt Practices Act in 1988, and was added in accordance with congressional intent to hold only those who knowingly violate the section criminally liable.  The congressional intent in adding an element of scienter to § 13(b) evidences that Congress intended to heighten the requirements for holding directors and officers criminally liable under the section, but the congressional history bears no indication that Congress intended to change any elements of § 13(b) beyond those necessary for criminal liability.  See H.R. Rep. 10-576, at 916, (1988)(Conf.

Rep.), reprinted in 1988 U.S.C.C.A.N. 1547, 1949 ("The Conferees intend to codify current [SEC] enforcement policy that penalties not be imposed for insignificant or technical infractions or inadvertent conduct.  The amendment . . . accomplishes this by providing that criminal penalties shall not be imposed for failing to comply with the . . . books and records or accounting control provisions.").  The SEC has consistently interpreted § 13(b)(2) as not requiring it to allege that a defendant acted knowingly to be civilly liable for deceiving auditors, and this interpretation is consistent with the plain language of the statute, which did not include an element of scienter when rule 13b2-2 was promulgated.  The Court determines that the SEC's interpretation that § 13(b)(2) does not impose an element of scienter for civil enforcement actions is consistent with congressional history and intent, and, therefore, based on a "permissible construction of the statute." Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. at 843.   Accordingly, the Court adopts the SEC's, and the Second Circuit's interpretation of rule 13b2-2(a) and (c)(1), which does not require the SEC to allege that defendants knowingly misled auditors to state a claim for civil liability under those provisions.

## ANALYSIS

The Court grants in part, and denies in part, the Defendants' motions.  The Court will take judicial notice of the documents which the SEC references in the Complaint, and which are central to its allegations.  The Court will also take judicial notice of the documents which contain information that may be verified by resort to sources that accuracy of which is not reasonably in dispute.

The Court will dismiss the SEC's allegation of securities law violations in part.  The Court has determined that the statement in the 2007 Form 10-K that Thornburg Mortgage had successfully met margin calls was not misleading, and, accordingly, the omission of any

discussion of the payment plans and Thornburg Mortgage allegedly being in violation of its reverse repurchase agreements was not material.  The Court has also determined that Thornburg Mortgage did not sell assets to meet margin calls, and that statement, therefore, was not materially misleading in the 2007 Form 10-K.  The Court will dismiss the SEC's allegations that the Defendants deceived the investing public and KPMG through those statements and omissions.  The Court concludes that the SEC has failed to state a claim of scheme liability against Starrett, and the Court will, accordingly, dismiss the SEC's allegations of a primary securities violation based upon an alleged scheme to defraud against Starrett.  The Court also determines that the SEC has failed to sufficiently allege that the Defendants engaged in manipulative or coercive conduct to deceive KPMG.

The Court will not, however, dismiss most of the SEC's allegations regarding the OTTI analysis in the 2007 Form 10-K.  The Court will not dismiss the SEC's allegations that Goldstone and Simmons are primarily liable and liable as control persons for, and that the Defendants aided and abetted, a false OTTI analysis in the 2007 Form 10-K and to KPMG.  The Court determines that the Defendants were aware of objective financial factors which undermined the veracity of the statement in the 2007 Form 10-K, the Going Concern Analysis, and the management representation letter that Thornburg Mortgage had the intent and ability to hold its impaired ARM securities until maturity, or until their value recovered in the market.  The SEC has alleged that the Defendants knew that Thornburg Mortgage had experienced difficulty in timely meeting margin calls in February, 2008, that Thornburg Mortgage had diminished cash and liquidity at the time -- given that it used the I/O Strip Transactions to meet margin calls -- and that Goldstone and Simmons expected the European hedge fund's collapse to cause Thornburg Mortgage to experience increased margin calls.  The SEC has sufficiently alleged that

the Defendants acted with scienter, as they had knowledge of these factors which undermine Thornburg Mortgage's OTTI analysis.  The SEC has, also, sufficiently alleged that Simmons' misrepresentation of the I/O Strip Transactions' purpose materially misled KPMG regarding the OTTI analysis and Thornburg Mortgage's ability to continue as a going concern.

The SEC has sufficiently alleged that Goldstone and Simmons misrepresented Thornburg Mortgage's financial condition after the 2007 Form 10-K was filed.  The SEC has sufficiently alleged that Goldstone's statements through the investor relations department and on Street Signs perpetuated a false representation of Thornburg Mortgage's OTTI analysis.  Additionally, in so far as Goldstone's statements represent that Thornburg Mortgage had met its margin calls and its lenders were fine after the 2007 Form 10-K was filed, Goldstone's statements were false by the afternoon of February 28, 2008, and Goldstone had a duty to correct the truth of his statement as the day progressed.  Further, the SEC has sufficiently alleged that Goldstone and Simmons' failure to respond to the Request for Correspondence with the Citigroup Global Letter materially misled KPMG regarding Thornburg Mortgage's communications with its lenders and its ability to timely meet margin calls before the 2007 Form 10-K was filed.  Last, the SEC has sufficiently alleged that Simmons misrepresented that the negative financial events Thornburg Mortgage experienced after the 2007 Form 10-K was filed were unexpected, and caused by unforeseen factors, given that Goldstone and Simmons were aware that the European hedge fund was collapsing and that it would trigger additional margin calls for Thornburg Mortgage.

## I.     THE COURT WILL GRANT THE REQUEST FOR JUDICIAL NOTICE IN PART.

The Defendants request the Court to take judicial notice of documents in the following categories:

1.      Reports filed with the [SEC] by Thornburg Mortgage, Inc. and other relevant public companies;

2.      Reports by securities analysts and news reports concerning Thornburg during the relevant time period;

3.      Correspondence, legal agreements, memoranda and other documents cited by Plaintiff in the Complaint;

4.      SEC and FASB publications regarding applicable accounting standards;

5.      Widely reported facts relating to the financial crisis of 2007-08;

6.      Publicly available historical stock price and stock index information; and

7.      Public testimony, reports and statements by government regulators.

Request for Judicial Notice at 1-2.  The Defendants assert that the Court may properly consider the full text of their electronic mail transmissions and Thornburg Mortgage's SEC filings, which are referenced and quoted in the Complaint.  See Request for Judicial Notice at 2-3.  The Defendants assert that the Court may take judicial notice of the documents which federal law requires Thornburg Mortgage to file with the SEC, including the 2007 Form 10-K, 2007 Form 10-K/A, records and reports of administrative bodies, testimony before legislative bodies, and public agency filings.  See Request for Judicial Notice at 3.  The Defendants similarly contend that the Court may take judicial notice of the accounting standards, news reports regarding the financial crisis, and historical stock price information attached to the motions to dismiss, which the Defendants assert are "not subject to reasonable dispute," and are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Request for Judicial Notice at 3-4 (internal quotations omitted).  The SEC concedes that the Court may consider documents referenced in the Complaint, if the documents are central to its

claims and of unquestionable authenticity.  See Response to Goldstone & Simmons MTD at 14.

The SEC objects to the Court's consideration of other documents and asserts that the Defendants

improperly played the Street Signs at the hearing.  See Response to Goldstone & Simmons MTD

at 14; SEC Supp. at 7.   The SEC additionally asserts that the Defendants are improperly

attempting to argue the merits of this case by attaching numerous documents to their motions to

dismiss.  See Response to Goldstone & Simmons MTD at 11-12.  The SEC objects to the Court

considering any documents attached to the motions to dismiss for the truth of the matters

asserted therein.  See Response to Goldstone & Simmons MTD at 14-15.

There are three limited exceptions to the rule that the sufficiency of a complaint must rest

on its contents alone: (i) documents that the complaint incorporates by reference, see Tellabs,

Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint

if the documents are central to the plaintiff's claim and the parties do not dispute the documents'

authenticity," Jacobsen v. Deseret Book Co., 287 F.3d at 941; and (iii) "matters of which a court

may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  The

SEC does not incorporate any documents by reference into the Complaint, although it does

reference a number of correspondences between the Defendants, statements which Goldstone

made publicly, Thornburg Mortgage's reverse repurchase agreements, Thornburg Mortgage's

public filings around the time of the events set forth in the Complaint, and a publicly-available

accounting principle.   The Court will consider documents that fall into these categories when

ruling on the Defendants' motions to dismiss.  Additionally, the Defendants have requested the

Court to take judicial notice of a number of documents, which, the Court concludes, are "capable

of accurate and ready determination by resort to sources whose accuracy cannot reasonably be

questioned." Fed. R. Evid. 201(b).  The Court will take judicial notice of those documents, but will not consider those documents for the truth of the matters asserted therein.

The Court will consider the electronic mail transmissions, referenced in the Complaint, which the Defendants have provided to the Court.  The SEC references these electronic mail transmissions as evidence of the Defendants' knowledge and scienter regarding the allegedly false statements and omissions in the 2007 Form 10-K, to the investing public, and to KPMG. Accordingly, the Court determines that these electronic mail transmissions fall into the category of "documents referred to in the complaint" which are "central to the plaintiff's claim," and, the SEC does not "dispute the documents' authenticity."  Jacobsen v. Desert Book Co., 287 F.3d at 941.  See Response to Goldstone & Simmons MTD at 13-14 (conceding that the Court may consider "documents to which the complaint refers, if the documents are central to the plaintiff's claims and the parties do not dispute their authenticity").  Specifically, the Court will consider the following electronic mail transmissions: (i) the Feb. 21 BOD Email, which the SEC quotes on page 19, in paragraph 65 of the Complaint; (ii) the Feb. 21 Burns/Goldstone Email, which the SEC quotes on pages 18-19, in paragraph 64; (iii) the Feb. 22 BOD Email, which the SEC quotes and references on pages 10 and 18-19, in paragraphs 30, 31, 62, and 67; (iv) the Feb. 25 BOD Email, which the SEC quotes on page 20, in paragraph 68; (v) the Feb. 25 Goldstone/Starrett Email, which the SEC quotes on page 16, in paragraphs 53-55; (vi) the Feb. 27 Goldstone/Simmons Email, which the SEC quotes on page 12, paragraph 38; (vii) the Feb. 27 Simmons/Feldman Email, which the SEC quotes on page 12, in paragraph 39; (viii) the Feb. 27 Simmons/Starrett Email, which the SEC quotes on page 12, in paragraph 40; (ix) the Feb. 28 Simmons/Goldstone Email, which the SEC quotes on page 4, in paragraph 10; (x) the Feb. 28 BOD Email, which the SEC quotes on page 28, in paragraph 95; (xi) the Feb. 29 IR Email,

which the SEC quotes on page 27, in paragraph 94; and (xii) the Mar. 3 Hall Email, which the SEC references on page 29, in paragraph 100 of the Complaint. The Court will not consider the following electronic mail transmissions: (i) the Feb. 22 Hamilton/Fellers Email; and (ii) the Feb. 29 Lopez/BOD Email. The SEC has not discussed the Feb. 22 Hamilton/Fellers Email, to which the Citigroup Global Letter is attached. Although Goldstone and Simmons cite to this electronic mail transmission as evidence that the SEC has not alleged that they received the Citigroup Global Letter, see Goldstone & Simmons MTD at 19, the Feb. 22 Hamilton/Fellers Email is not conclusive on this point. In the electronic mail transmission, Arlene Hamilton, whom Goldstone and Simmons assert is a Citigroup Global representative, states: "Please find attached a copy of the default notice that was sent to your attention previously." Feb. 22 Hamilton/Fellers Email at 2. Notably, Hamilton admits that her attached copy of the Citigroup Global Letter is a follow-up to an earlier conveyance of the letter to somebody at Thornburg Mortgage, and, therefore, the Court cannot conclude that the Feb. 22 Hamilton/Fellers Email conclusively establishes that the Defendants never received or were aware of the Citigroup Global Letter. Rather, this electronic mail transmission makes all the more plausible the SEC's allegation that Goldstone and Simmons were aware of the Citigroup Global Letter before issuing the 2007 Form 10-K and reporting to KPMG, as Hamilton indicates the Citigroup Global Letter was sent twice to Thornburg Mortgage. Additionally, the SEC does not reference this electronic mail transmission in the Complaint, and, therefore, the Court cannot properly consider the Feb. 22 Hamilton/Fellers Email when deciding the Defendants' motions to dismiss. Neither does the SEC reference the Feb. 21 Starrett/Coltharp Email, to which the Going Concern Analysis is attached. Last, the SEC does not reference Goldstone's correspondence with Thornburg Mortgage's Board of Directors on February 29, 2008 in the Complaint. Accordingly, the Court will not consider the Feb. 29

Lopez/BOD Email, the Feb. 22 Starrett/Coltharp Email, the Feb. 22 Hamilton/Fellers Email, or the Mar. 3 Hall Email when ruling on the Defendants' motions to dismiss.

The Court will consider certain documents which the SEC references in the Complaint regarding Thornburg Mortgage's obligations in its reverse repurchase agreements.  The SEC references these documents to support its allegation that Thornburg Mortgage was in breach of its reverse repurchase agreements, which, the SEC asserts, should have been disclosed in the 2007 Form 10-K and to KPMG, and which should have factored into the Defendants' OTTI analysis.  Additionally, the SEC has not disputed the authenticity of these documents.  The Court will consider the following documents:   (i) the Citigroup Global Repo Agreement, the Greenwich Repo Agreement, and the Credit Suisse Repo Agreement, which the SEC references on page 8, in paragraph 24 of the Complaint; (ii) SFAS 115, which the SEC references on page 15, in paragraph 50 of the Complaint; and (iv) the Citigroup Global Letter, which the SEC discusses on pages 2, and 10-11, in paragraphs 3 and 34 of the Complaint.

The Court will also consider certain documents which contain the Defendants' allegedly false or misleading statements and omissions, forming the basis of the SEC's allegations.  Although the SEC contends that the Defendants should not have played the Street Signs at the hearing, the Court notes that the SEC quotes from the interview in the Complaint as part of its allegation that Goldstone made false and misleading statements after the 2007 Form 10-K was filed.  See Complaint ¶ 93, at 28; SEC Supp. at 7.  The Street Signs, therefore, contains an interview which is central to the SEC's allegations, and the SEC has not challenged the authenticity of the recording.  The Court will, accordingly, consider the following materials in ruling on the Defendants' motions to dismiss: (i) the Going Concern Analysis, which the SEC references on pages 21-22, in paragraphs 72 and 74 of the Complaint; (ii) the 2007 Form 10-K,

which the SEC discusses throughout the Complaint; (iii) the Street Signs, which the SEC quotes on page 28, in paragraph 98 of the Complaint; (iv) the Position Paper, which the SEC references and quotes on pages 29-30, in paragraphs 102-13 of the Complaint; and (v) the Request for Correspondence, to which the SEC contends the Defendants responded with false and misleading information and omissions, on page 29, in paragraph 100 of the Complaint.

The Court will take judicial notice of the news publications which the Defendants have provided to the Court. The Court has previously determined that it may take judicial notice of facts regarding the financial markets in the context of a federal securities lawsuit. See Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d at 1166-67. Accordingly, the Court will take judicial notice of the following documents, which the Court has determined contain facts which are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b): (i) Dow Jones Averages February 1, 2008 - May 1, 2008, Yahoo! Finance (May 11, 2012), filed May 21, 2012 (Doc. 37-12)("Dow Jones Averages"); (ii) Feb. 28 Dow Jones Newswire; (iii) Feb. 28 MarketWatch; and (iv) Feb. 28 Bloomberg. Additionally, although the Defendants' attorneys prepared the 10-K Compilation, the Court determines that the accuracy of its contents may be readily determined by sources whose accuracy is not reasonably questioned, as the Defendants have provided the Court with links to world wide web sites that verify the date and time at which the various companies filed their 2007 Form 10-Ks. See 10-K Compilation at 2-7. Accordingly, the Court will take judicial notice of the 10-K Compilation.

On the other hand, the Court will not take judicial notice of the various analysts' reports attached to the Motions to Dismiss. Although these reports contain some information the accuracy of which may not reasonably be questioned, such as the price of Thornburg Mortgage

stock, the reports also forecast Thornburg Mortgage's future financial changes, give recommendations whether to buy or sell Thornburg Mortgage stock, and rank Thornburg Mortgage amongst its competitors.  This information, which varies amongst the reports, is not "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Accordingly, the Court will not take judicial notice of: (i) Thornburg Mortgage Incorporated, TheStreet.Com Ratings (January 18, 2008), filed May 21, 2012 (Doc. 37-3); (ii) Thornburg Mortgage INC (TMA): Good Q4'07 Results - Coming Back from the Brink, Citi (February 6, 2008), filed May 21, 2012 (Doc. 37-4); (iii) Thornburg Mortgage Inc. (NYSE: TMA), RBC Capital Markets (February 8, 2008), filed May 21, 2012 (Doc. 37-5); (iv) Feb. 28 Jeffries; and (v) Feb. 29 Bear Stearns.

The Court will take judicial notice of Thornburg Mortgage's public filings which the Defendants have attached to their motions to dismiss.  The Court determines that, because law requires Thornburg Mortgage to file these publicly available documents, and they contain representations from Thornburg Mortgage, the public filings themselves and the existence of the statements therein are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Accordingly, the Court will take judicial notice of: (i) the 2007 Form 10-K/A; (ii) the 2007 Form 10-Q; (iii) Excerpts of the Thornburg Mortgage, Inc., 2007 Form 8-K (March 3, 2008), filed May 21, 2012 (Doc. 37-15)("Mar. 3 8-K"); (iv) Exhibits to the Mar. 3 8-K, filed May 21, 2012 (Doc. 37-17)("Mar. 3 8-K Exs."); (v) Thornburg Mortgage, Inc. 2007 Form 8-K (Feb. 28, 2008), filed May 21, 2012 (Doc. 37-16)("Feb. 28 8-K")[26]; (vi) the Apr. 1 8-K; and (vii) the Thornburg Mortgage, Inc., Mar. 31

_____

[26] The Complaint cites Thornburg's Form 8-Ks, the 2007 Form 10-K/A, and the 2007 Form 10-Q.  See Complaint ¶¶ 9, 11, 26, 42, 44, 46, at 4, 8, 13, 14.  Although the Court

Form 10-Q, filed May 23, 2012 (Doc. 40)("June 18 10-Q").  The Court will not consider these documents for the truth of the matters they assert.

The SEC and Goldstone and Simmons have provided to the Court the Deposition of Larry A. Goldstone (taken March 16, 2010).  See Doc. 51-2, filed June 20, 2012; Doc. 60-4, filed July 20, 2012.  The SEC attached portions of the Goldstone Depo. to its Declaration of Stephen McKenna in Opposition to Defendants' Motion to Dismiss, and Goldstone & Simmons provided the Court the unredacted Goldstone Depo. as an exhibit to the Goldstone & Simmons Reply.  The Defendants have not requested the Court to take judicial notice of the Goldstone Depo.  See Request for Judicial Notice at 1-2.  Although the SEC makes references to Goldstone's knowledge and scienter throughout the Complaint, which the Goldstone Depo. may support, the SEC does not reference the Goldstone Depo. in the Complaint.  The Court, therefore, cannot properly consider the Goldstone Depo. as a document central to the SEC's allegations the accuracy of which the parties do not dispute.  The Court is reluctant to take judicial notice of the Goldstone Depo., because it does not contain or address facts which the Court can verify by reference to sources whose accuracy is not in dispute.  The Goldstone Depo. raises issues of fact regarding Goldstone's knowledge which are material to the SEC's allegations, but to consider the Goldstone Depo. for the truth of the matters it discusses about Goldstone's knowledge of events set forth in the Complaint would require the Court to go beyond the bound of permissible judicial notice.  See, e.g., Goldstone Depo. at 2:13-4:8 (Doc. 51-2).  The parties have not requested or otherwise indicated that they desire to convert the motions to dismiss into motions

---

concludes that it may take judicial notice of these documents, the Court does not believe that these documents are central to the SEC's allegations.  Rather, the SEC appears to be referencing these documents to provide background information to its allegations of fraud in the Complaint.

for summary judgment.  Accordingly, the Court will not consider the Goldstone Depo. in its ruling on the motions to dismiss.

Last, the Defendants have requested the Court to take judicial notice of certain SEC publications, Financial Accounting Standards, and government reports.  These documents are publicly available, the Court determines these documents' discussion of GAAP may be "accurately and readily determined from sources whose accuracy cannot be reasonably questioned."  Fed. R. Evid. 201(b).  Indeed, the Financial Accounting Standards Board is responsible for issuing the standards which create GAAP.  See Generally Accepted Accounting Principles, Black's Law Dictionary 753 (9th ed. 2009).  Accordingly, the Court will take judicial notice of: (i) SFAS 140; (ii) SFAS 166; (iii) FAS 115-1 & 124-1; (iv) FAS 115-2 & 124-2; (v) the March 16 FASB Minutes; (vi) the April 2 FASB Minutes; (vii) the Glassman Speech; (viii) AU 411.06; (ix) Public Company Accounting Oversight Board, AU § 332, filed May 21, 2012 (Doc. 38-7)("AU 332"); (x) Securities and Exchange Commission, Current Accounting and Disclosure Issues in the Division of Corporation Finance, November 30, 2006, filed May 21, 2012 (Doc. 38-8)("SEC Nov. 2006 Paper"); (xi) Securities and Exchange Commission, SEC Office of the Chief Accountant and FASB Staff Clarifications on Fair Value Accounting, Sept. 30, 2008, filed May 21, 2012 (Doc. 38-9)("Sept. 08 SEC Clarifications"); (xii) SAB 59; and (xiii) the Market-to-Market Study.

## II. THE COURT WILL GRANT IN PART AND DENY IN PART THE DEFENDANTS' MOTION TO DISMISS THE SEC'S ALLEGATIONS BASED ON THE 2007 FORM 10-K.

The SEC alleges that the following items in, or related to, the 2007 Form 10-K were materially misleading: (i) the statement that "Thornburg had successfully met all of its margin calls without selling any assets"; Complaint ¶ 7, at 3; 2007 Form 10-K at 35; (ii) the statement

that Thornburg Mortgage had not sold assets to meet margin calls, <u>see</u> Complaint ¶ 37, at 11; <u>id.</u> ¶ 66, at 19; 2007 Form 10-K at 39; (iii) the OTTI analysis, which represented that Thornburg Mortgage had the intent and ability to hold its impaired ARM securities until maturity or their value recovered in the market, <u>see</u> Complaint ¶ 8, at 3-4; <u>id.</u> ¶¶ 51-52, at 15; <u>id.</u> ¶ 70, at 20-21; <u>id.</u> ¶ 85, at 25; 2007 Form 10-K at 38, 100; (iv) Goldstone's communication to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., that Thornburg Mortgage had met its margin calls, its "lenders are fine," and Thornburg Mortgage had "sufficient operating cash," Feb. 28 IR Email at 2; Complaint ¶¶ 94-95, 97, at 27-28; and (v) Goldstone's statements on <u>Street Signs</u> that he did not believe Thornburg Mortgage would have to sell assets, that Thornburg Mortgage had "met all of [its] lending requirements" and had "liquidity and cash available to continue to support the portfolio," Complaint ¶ 98, at 28; <u>Street Signs</u> at 3:54-4:09.   The SEC contends that the Defendants' electronic mail transmissions exchanged around the time that Thornburg Mortgage filed the 2007 Form 10-K demonstrate their knowledge of the falsity of these statements and omissions.   <u>See, e.g.</u>, Complaint ¶ 61, at 18. The Defendants generally attack the SEC's Complaint as improper puzzle pleading, <u>see</u> Starrett MTD at 45, and also contend that their fulsome disclosures negate any falsity in the statements and omissions which the SEC cites, <u>see</u> Goldstone MTD at 37-40; Starrett MTD at 21-22, that they had no duty to disclose the omitted information, <u>see</u> Goldstone MTD at 40-46, and that the SEC has failed to plausibly allege that the Defendants acted with scienter, <u>see</u> Goldstone & Simmons MTD at 47-57; Starrett MTD at 31-44.   The Defendants contend that the SEC has not stated a claim for control-person violations, because the SEC has not alleged that Thornburg Mortgage plausibly committed a primarily violation.   <u>See</u> Goldstone & Simmons MTD at 67-67. They also assert that the SEC has not alleged that they plausibly acted with knowledge, and,

therefore, the SEC's allegations of aiding and abetting fail.  See Goldstone & Simmons MTD at 66-67; Starrett MTD at 44-47.  The Defendants also assert that the SEC has failed to state a plausible claim under the securities provisions governing books and records.  See Starrett MTD at 37, 45, 46.  The Court will address each of the alleged misstatements and omissions in turn.

The Court notes, initially, that the SEC has not engaged in improper puzzle pleading in the Complaint.  The Tenth Circuit has specifically approved of "incorporating paragraphs of a complaint" into securities allegations against defendants.  Schwartz v. Celestial Seasonings, Inc., 124 F.3d at 1253.  The Court will not dismiss the Complaint on the basis of the SEC's pleading each count through incorporation of the preceding paragraphs.  If the plaintiff had to repeat every paragraph in every count, a lengthy complaint already would become unreasonably too long, elevating form over substance.

### A.     THE STATEMENT IN THE 2007 FORM 10-K THAT THORNBURG HAD "SUCCESSFULLY" MET ITS MARGIN CALLS WAS NOT MATERIALLY MISLEADING.

The SEC asserts that the Defendants made a fraudulent statement in the 2007 Form 10-K when they "falsely represented that Thornburg 'successfully continue[d] to meet all margin calls.'"  Complaint ¶ 59, at 17 (quoting 2007 Form 10-K at 35).  The SEC contends that Goldstone "knew, or was reckless in not knowing," that this statement was false, because Thornburg Mortgage had been in violation of its Citigroup Global Repo Agreement in February.  The Defendants' most compelling argument against the SEC's allegations of fraud based upon these statements is that they were true when made.  The Defendants point out that the SEC has not alleged that "even a single margin call was outstanding at the time of filing, or that any lender was dissatisfied with TMI's payment of any margin call."  Starrett MTD at 16-17.  Indeed, the SEC pleads in the Complaint, and conceded at the hearing, that, at the time that

Thornburg Mortgage filed the 2007 Form 10-K, Thornburg Mortgage had met all of its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12; Tr. at 24:9-13 (Court, McKenna)(Court: "So you don't agree . . . that it's undisputed that Thornburg had met all margin calls by the time they filed the 10-K?" McKenna: "No, we would agree with that statement."). The Court concludes that the statement that Thornburg Mortgage had successfully met its margin calls in the 2007 Form 10-K was not materially misleading and, therefore, the Defendants had no duty to disclose further information regarding how Thornburg Mortgage met its margin calls in February, 2008.

"To satisfy the first element of a 10b-5 claim, a plaintiff must allege facts showing the defendant made an untrue statement of material fact, or failed to state a material fact necessary for make the statements that were made not misleading."  Grossman v. Novell, Inc., 120 F.3d at 1119 (citing 17 C.F.R. § 140.10b-5).  The statement that Thornburg Mortgage had successfully met its margin calls as of February 28, 2008, at the time it filed the 2007 Form 10-K was true. Although the SEC does not dispute the veracity of the statement, it contends that the Defendants had a duty to disclose that Thornburg Mortgage was in breach of its reverse repurchase agreements, because it could not meet its margin calls on or after the day they were issued.  See Complaint ¶ 60, at 17; Response to Goldstone & Simmons MTD at 33; Response to Starrett MTD at 14-15.  The SEC cites to Thornburg Mortgage's reverse repurchase agreements, which allow lenders to declare a default and seize Thornburg Mortgage's ARM Securities.  See Complaint ¶ 24, at 8 ("Thornburg's lenders under the repo agreements had the right to seize and sell the ARM Securities as collateral for their loans.").  As the Defendants point out, however, the Citigroup Global Repo Agreement expressly allowed Thornburg Mortgage to negotiate payment plans for margin calls, allowing Thornburg Mortgage to meet margin calls over a period

of time.  See Goldstone & Simmons MTD at 43; Citigroup Global Repo Agreement § 5.8, at 11 ("Where any equivalent Collateral falls to be repaid or redelivered . . . unless otherwise agreed between the parties, it shall be delivered on the same Business Day.").   Similarly, while the Greenwich Repo Agreement and Credit Suisse Repo Agreement allow the lenders to declare an event of default and seize Thornburg Mortgage's assets if Thornburg Mortgage does not satisfy margin calls within one business day, the right to declare a default is an option, and is not a mandatory occurrence, if Thornburg Mortgage fails to pay margin calls on the same business day or the day after they are issued.   See Greenwich Repo Agreement § 11(a), at 8 ("The nondefaulting party may, at its option . . . declare an Event of Default to have occurred."); Credit Suisse Repo Agreement § 11(a), at 7 (same).   Additionally, although Thornburg Mortgage's failure to timely pay the Citigroup Global margin call triggered Citigroup Global's right to declare Thornburg Mortgage in default, the SEC has expressly alleged that the Citigroup Global Letter was not evidence that Thornburg Mortgage was in default.   See Complaint ¶ 34, at 11 ("Citigroup reserved the right to declare Thornburg in default . . . . [and] also made clear that Citigroup, by not immediately exercising its rights under its repo agreement with Thornburg, was not waiving its right to declare Thornburg in default or amending the underlying [] agreement."); Citigroup Global Letter at 3 ("CITI hereby expressly reserves its rights to declare an Event of Default . . . .  CITI's failure or delay . . . shall in no way constitute or be construed to constitute a waiver, amendment, acceptance or modification of any of our rights under any provision of the Agreement.").   That Thornburg Mortgage had difficulty in meeting margin calls as they became due, therefore, does not render misleading the statement that Thornburg Mortgage had met its margin calls without a declaration of default at the time the 2007 Form 10-K was filed.

Moreover, the Court does not believe that the word "successfully" conveys a meaning in the 2007 Form 10-K which renders misleading the statement that Thornburg Mortgage had met its outstanding margin calls.  Initially, the word, as an adverb describing Thornburg Mortgage's recent ability to meet margin calls is more akin to vague statement of corporate optimism than a material misrepresentation.  See Grossman v. Novell, 120 F.3d at 1120.  Although the SEC contends that the statement is not mere puffery, as whether Thornburg Mortgage had met its margin calls may be objectively measured, the objective answer is that Thornburg Mortgage had met its margin calls without a declaration of default.  See SEC Supp. at 11.  Similarly, in In re Gen. Elec. Co. Sec. Litig., the Honorable Denise Cote, United States District Judge for the Southern District of New York, found that the statement that "we continue to successfully meet our commercial paper needs," was a statement of subjective opinion, and not objective fact.  856 F. Supp. 2d at 656.  Judge Cote held that, absent facts which demonstrated that the statement was subjectively false, the statement was inactionable.  Similarly the SEC has not alleged that the Defendants would have subjectively believed that, rather than successfully meeting margin calls when the 2007 Form 10-K was filed, Thornburg Mortgage had failed to meet margin calls.  The SEC cites to Billhofer v. Flamel in support of its theory that the term "successfully" was materially misleading, but that case is readily distinguishable.  In Billhofer v. Flamel, the Honorable Charles Sherman Haight, Jr., Senior United States District Judge for the Southern District of New York, held that a defendant's description of a drug's "success," materially misrepresented the defendant's financial prospects associated with the drug, given that the primary selling point for the drug had failed and its marketability was in dispute.  663 F. Supp. 2d at 297.  Judge Haight determined that the word "success" in combination with the statements that "interest in" the defendant's "technologies has never been higher," were materially

misleading because the defendant knew that the drug had failed a clinical trial when it made those statements.  663 F. Supp. 2d at 298.  Here, on the other hand, the Defendants knew that Thornburg Mortgage had met its margin calls in accordance with its reverse repurchase agreements; therefore, rather than contradicting the statement that Thornburg Mortgage successfully met margin calls, the Defendant's knowledge confirmed that statement in the 2007 Form 10-K.  The Court concludes, therefore, that the use of the term "successfully" to describe Thornburg Mortgage's ability to meet margin calls in the 2007 Form 10-K was not materially misleading, and the Defendants did not have a duty to disclose the difficulty Thornburg Mortgage had in meeting margin calls in the 2007 Form 10-K.

The Court concludes, therefore, that the statement that Thornburg Mortgage had met its margin calls as of the time it filed the 2007 Form 10-K was true when made and not materially misleading on its own.  Further, because Thornburg Mortgage's reverse repurchase agreements allowed Thornburg Mortgage to negotiate payment plans for margin calls, the statement that Thornburg Mortgage had met its margin calls "successfully" was not rendered misleading by the Defendants' omissions of Thornburg Mortgage's payment plans and that an event of default had occurred.  "[A] duty to disclose arises only where both the statement is material, and the omitted fact is material to the statement in that it alters the meaning of the statement."  McDonald v. Kinder-Morgan, Inc., 287 F.3d at 998.  Because the omitted information regarding Thornburg Mortgage's payment plans does not alter the statement that Thornburg Mortgage met its margin calls without a declaration of default before it filed the 2007 Form 10-K, the Defendants had no duty to disclose the details of Thornburg Mortgage's payment plans.  Most Wall Street lending agreement between big banks and big borrowers -- and even single mortgage debts between small banks and homeowners -- contain a number of condition that allow the bank to declare a

default.  Many never materialize.  It does not seem sound to require a reporting company to specify ever debt to see if there was a technical default; reporting would become onerous.  It seems to be more appropriate to focus on whether the lender has declared a default.  Here, there was no declaration of default, but only events of default.  Thornburg Mortgage need not disclose the latter.  The Court must be "careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information."  See Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. at 1318.

The Court, therefore, will dismiss the SEC's allegations in Counts 1, 3, 4, and 8, against the Defendants for their, and Thornburg Mortgage's, alleged violations of § 17(a) of the Securities Act, § 10(b), rule 10b-5 of the Exchange Act, § 13(a) and rules 12b-20, and 13a-1 of the Exchange Act, and Counts 2, 6, and 9 against Goldstone and Simmons, under § 20(a) and rule 13a-14 of the Exchange Act, to the extent those allegations are based upon the statement in the 2007 Form 10-K that Thornburg Mortgage had met its margin calls at that time.

### B.   THE SEC HAS NOT ALLEGED SUFFICIENT FACTS TO DEMONSTRATE THAT THE STATEMENET THAT THORNBURG MORTGAGE DID NOT SELL ASSETS TO MEET MARGIN CALLS WAS PART OF A SCHEME TO DEFRAUD, OR THAT THORNBURG MORTGAGE'S ACCOUNTING OF THE I/O STRIP TRANSACTIONS AS SECURED DEBT WAS MISLEADING.

The SEC contends that the statement in the 2007 Form 10-K that Thornburg Mortgage had not been required to sell assets to meet margin calls was misleading in light of Thornburg Mortgage's issuance of the I/O Strip Transactions.  See Complaint ¶ 37, at 11; id. ¶¶ 65-66, at 19; 2007 Form 10-K at 39. In support of this allegation, the SEC cites to the Defendants' reference of the I/O Strip Transactions as sales.  See Complaint ¶ 37, at 11 ("[T]he transactions were in form the sale of I/O strips and have been characterized as 'sales' by each of the

Defendants."); id. ¶ 66, at 19 (referencing Goldstone's statement in the Feb. 21 BOD Email that Thornburg Mortgage planned to meet the Citigroup Global margin call by "'having Citi sell a $110 million Interest Only security that may generate $20 to 25 million'" and that Thornburg Mortgage "'may undertake additional asset sales depending on how market conditions evolve over the next few weeks'" (quoting Feb. 21 BOD Email at 2)).  The Defendants contend that the I/O Strip transactions are "indisputably" the issuance of secured debt and not asset sales. Goldstone & Simmons MTD at 41 (citing SFAS 140 ¶ 9, at 3).  See SFAS 166 ¶ 26C(b), at 5); Starrett Reply at 17.  The Defendants contend, therefore, that Thornburg Mortgage's use of I/O Strip Transactions to meet its margin calls does not render the statement that Thornburg Mortgage had not sold assets to meet margin calls materially misleading.  See Goldstone & Simmons MTD at 42; Starrett Reply at 17.

The SEC concedes that the I/O Strip Transactions were accounted for as the issuances of secured debt in the 2007 Form 10-K.  See Complaint ¶ 37, at 11.  Notably, the SEC alleges that the I/O Strip Transactions were "in form the sale of assets similar to Thornburg's ARM Securities to meet margin calls," but it does not allege that the I/O Strip Transactions were sales of assets.  Complaint ¶ 71, at 21.  Related to this allegation is the SEC's assertion that the 2007 Form 10-K should have accounted for the I/O Strip Transactions as sales, rather than the issuance of secured debt.  See Complaint ¶ 37, at 11.  The SEC's allegation, therefore, appears to be that the statement in the 2007 Form 10-K that Thornburg Mortgage has not sold assets to meet margin calls, was misleading, because it omitted discussion of "the I/O Strip Transactions, which were in form sales, were undertaken to meet margin calls," and misrepresented the I/O Strip Transactions as the issuance of secured debt.  Complaint ¶ 37, at 11; id. ¶ 65, at 19.  The SEC's allegations regarding the I/O Strip Transactions is, thus, both that the failure to mention their true

nature was an omission and that classifying them as secured debt was materially misleading. The Court does not find that these allegations state plausible misrepresentations or omissions, or that the Defendants schemed to defraud.

A fact is material if "a reasonable person would consider it important in determining whether to buy or sell" securities. Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mort. Sec. Trust, 825 F. Supp. 2d at 1126 (internal quotations omitted). The Supreme Court has described a material omission as one which creates a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available" to the public. TSC Indus., Inc. v. Northway, Inc., 426 U.S. at 449. The Defendants only had a duty to disclose the I/O Strip Transactions in the 2007 Form 10-K if the omission of the statement would alter the meaning of Thornburg Mortgage's statement that it had not sold assets to meet margin calls. See McDonald v. Kinder-Morgan, Inc., 287 F.3d at 998. The Court cannot reasonably infer that the failure to disclose that Thornburg used I/O Strip Transactions to meet its margin calls would have altered the information in the 2007 Form 10-K, or was necessary, in light of the circumstances, to make the 2007 Form 10-K not misleading. See 15 U.S.C. § 77q(a) (making the omission of any fact "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading"); 15 U.S.C. § 78j(b) (same). SFAS 166 specifically excludes from the definition of assets that are accounted as sales interest-only strips created from loans, such as the I/O Strip Transactions at issue here. See SFAS 166 at 3, 5 ("[A] transferor should account for the transfer as a sale only if it transfers an entire financial asset . . . . [An] interest-only strip [created by a transferor from a loan] does not meet the definition of an entire financial asset."); Complaint ¶ 36, at 11 ("Thornburg was required to sell certain portions of its Securitized ARM Loans, . . .

('I/O Strip Transactions').").   Although SFAS 166 was issued in 2009, after the events set forth

in the Complaint, the Financial Accounting Standards Board's issued SFAS 166 as an

amendment to SFAS 140 for the purpose of "clarify[y ]the objective" of SFAS 140.   SFAS 166

at 3.   SFAS 140 was in place in September, 2000, and discusses when transfers should be

accounted as sales.   SFAS 166.   See SFAS 140 at 2.   The Defendants' classification of the I/O

Strip Transactions, therefore, as secured debt, and not asset sales, was not misleading, as the

objective of the accounting guidance in place at the time was that the transfer of interest-only

strips did not constitute a sale.   Conversely, had the Defendants classified the I/O Strip

Transactions as sales, the 2007 Form 10-K may have been materially misleading, as such an

accounting would been contrary to GAAP's proscribed treatment of the transactions.

Just as the Court cannot conclude that classifying the I/O Strip Transactions as secured

debt was materially misleading, the Court cannot infer that omitting any discussion of the I/O

Strip Transactions from the statement that Thornburg Mortgage had not sold assets to meet

margin calls was a material omission.   The SEC contends that, even if the I/O Strip Transactions

were not asset sales, "Thornburg was obliged to disclose these transactions (however

characterized) and that they were undertaken to meet margin calls."   Response to Starrett MTD

at 18.   The SEC asserts that failing to disclose the I/O Strip Transactions "implied to investors

that [Thornburg's] cash and liquidity was sufficient to meet margin calls without dissipating

assets."   Response to Goldstone & Simmons MTD at 30.   This proposed inference, however, is

true: Thornburg Mortgage met its margin calls without dissipating assets.   The Court concludes,

therefore, that the failure to reference the I/O Strip Transactions in relation the statement that

Thornburg Mortgage did not sell assets to meet margin calls was not a material omission, and,

further, the classification of the I/O Strip Transactions as secured debt was not materially false or

misleading.  Similarly, as the Court concludes that the Defendants accurately reported the I/O Strip Transactions as secured debt in the 2007 Form 10-K, the omitting discussion of the transactions in connection with Thornburg Mortgage's ability to meet margin calls without selling assets is not "inherently deceptive" conduct that would support a claim for scheme liability.  SEC v. St. Anselm Exploration Co., 2013 WL 1313765, at *15

The Court, therefore, will dismiss the SEC's allegations in Counts 1, 3, 4, and 8, against the Defendants for their, and Thornburg Mortgage's, alleged violations of § 17(a) of the Securities Act, § 10(b), rule 10b-5 of the Exchange Act,  § 13(b)(5) and rule 13b2-1 of the Exchange Act, § 13(a) and rules 12b-20, 13a-2, and 13a-4 of the Exchange Act, § 13(b)(2) of the Exchange Act, and Counts 2, 6, 9, and 11 against Goldstone and Simmons, under § 20(a) and rule 13a-14 of the Exchange Act, to the extent those allegations are based upon the statement in the 2007 Form 10-K that Thornburg Mortgage did not sell assets to meet margin calls and Thornburg Mortgage's accounting of the I/O Strip Transactions as the issuance of secured debt rather than sales.

### C.   THE SEC HAS ALLEGED SUFFICIENT FACTS TO STATE A CLAIM THAT THE OTTI ANALYSIS WAS FALSE OR FRAUDULENTLY MISLEADING.

The SEC asserts that the Defendants misrepresented in the 2007 Form 10-K that Thornburg Mortgage had the intent and ability to hold its ARM securities until maturity, or until their value recovered in the market.  See Complaint ¶ 3, at 3-4; id. ¶¶ 51-52, at 15.  The SEC asserts that the Defendants should have factored the significance of Thornburg Mortgage using the I/O Strip Transactions to meet margin calls into the OTTI analysis.  See Complaint ¶ 71, at 21.  Similarly, the SEC contends that, because Thornburg Mortgage's ARM securities were other-than-temporarily impaired, Thornburg Mortgage should have recognized a loss of

approximately $400 million in the value of those securities, and should not have reported a net profit in the 2007 Form 10-K, or a fourth quarter profit.  See Complaint ¶¶ 8, 11, 12 at 4-5, id. ¶ 70, at 20-21; id. ¶ 85, at 25; id. ¶ 86-88, at 25-26.  The SEC contends that, because this accounting in the 2007 Form 10-K was false and was incorporated into Thornburg Mortgage's Form S-3 ASR registration that Goldstone and Simmons signed, Thornburg Mortgage's Form S-3 ASR registration was, similarly, materially false.  See Complaint ¶ 89, at 26.  The SEC contends that Starrett is liable for the false Form S-3 ASR registration, because, as Thornburg Mortgage's CAO, she participated in materially misrepresenting Thornburg Mortgage's financial condition, and she knew or should have known that the accounting in the 2007 Form 10-K would be incorporated into the Form S-3 ASR.  See Complaint ¶ 90, at 26.

The Defendants contend that they cannot be liable for fraud based upon a false OTTI analysis, because the OTTI analysis is "inherently subjective."  Goldstone & Simmons MTD at 26.  See Starrett MTD at 39-41.  The Defendants also note that the Financial Accounting Standards Board has since determined that the OTTI guidance in place in February, 2008 was unsatisfactory and difficult to apply, and the Defendants assert that the SEC's allegations fail to demonstrate that the Defendants disclosed a false OTTI analysis with scienter.  See Starrett MTD at 41-42.  The Defendants also assert that the bespeaks caution doctrine protects their OTTI analysis of the ARM securities in the 2007 Form 10-K, because the 2007 Form 10-K discloses that the ARM securities were impaired and that Thornburg Mortgage had not yet recognized their loss in value.  See Starrett MTD at 22.  Starrett also alleges that the SEC has not pleaded sufficient facts to demonstrate that she had knowledge of the false OTTI analysis in the 2007 Form 10-K.  See Starrett MTD at 44. In the end, taking all reasonable inferences in the SEC's favor, the Court concludes that the facts in the Complaint allege that the OTTI analysis in the

2007 Form 10-K could have been materially misleading and that the Defendants are liable for this allegedly fraudulent misstatement.

> ### 1.   The SEC has Sufficiently Alleged That the OTTI Analysis was Materially False.

Although GAAP are "far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions," the principles which govern how a company conducts an OTTI analysis are instructive in the Court's rejection of the Defendants' argument that the OTTI analysis is subjective judgment which cannot form the basis of a fraudulent misrepresentation. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 544 (1979).  SFAS 115, which the SEC cites in the Complaint, see Complaint ¶¶ 49-50, at 14-15, explains that, "if it is probable that the investor will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition, an other-than-temporary impairment shall be considered to have occurred."   SFAS 115 at 4.  SAB 59 provides guidance regarding the meaning of "other than temporary" and explains that the term is not a synonym for "permanent," but, rather, the Financial Accounting Standards Board "consciously chose the phrase 'other than temporary' because it did not intend that the test be 'permanent impairment' as has been used elsewhere in accounting practice."  SAB 59 at 3.  SAB 59, which the SEC staff members issued as an interpretation of accounting rules and legal matters, explains that "[t]here are numerous factors to be considered in [an OTTI] evaluation and their relative significance will vary from case to case."  SAB 59 at 3.  The SEC lists the following factors as relevant to an OTTI analysis:

> a.   The length of the time and the extent to which the market value has been less than cost;
>
> b.   The financial condition and near-term prospects of the issuer, including any specific events which may influence the operations on the issuer such as changes in technology that may impair the earnings potential of the investment or

the discontinuance of a segment of the business that may affect the future earnings potential; or

c.      The intent and ability of the holder to retain its investment in the issuer for a period of time sufficient to allow for any anticipated recovery in market value.

SAB 59 at 3.  Similarly, the American Institute of Certified Public Accountants ("AICPA") notes

that an OTTI analysis

often involve[s] estimating the outcome of future events.  Accordingly judgment is required in determining whether factors exist that indicate that an impairment loss has been incurred at the end of the reporting period.  These judgments are based on subjective as well as objective factors, including knowledge and experience about past and current events and assumptions about future events.

AU 332 ¶ .47, at 3.  The AICPA lists the following as examples of factors that may weigh on an

OTTI analysis:

- Fair value is significantly below cost and --

    o   The decline is attributable to adverse conditions specifically related to the security or to specific conditions in an industry or in a geographic area.

    o   The decline has existed for an extended period of time.

    o   Management does not possess both the intent and the ability to hold the security for a period of time sufficient to allow for any anticipated recovery in fair value.

- The security has been downgraded by rating agency.

- The financial condition of the issuer has deteriorated.

- Dividends have been reduced or eliminated, or scheduled interest payments have not been made.

- The entity recorded losses from the security subsequent to the end of the reporting period.

AU 332 ¶ .47, at 3.

The foregoing descriptions of factors that may be relevant to an OTTI analysis demonstrate that, although the OTTI analysis involves subjective judgment, it must be based upon objective factors known to those persons assessing the nature of an impairment.  The SEC and the AICPA list objective factors that are determinative whether an impairment is temporary, including the length of time that an asset has been impaired, the financial condition of the issuer, the presence of adverse conditions specific to the asset's market, whether dividends have been reduced or eliminated and interest payments made, and whether the company recorded losses from the security in the period subsequent to the reporting period.

Although the Defendants make much of the subjective judgment that they must use in an OTTI analysis, that the analysis involves judgment does not preclude it from being materially misleading as a matter of law.  As the Tenth Circuit has explained, even though the OTTI analysis in the 2007 Form 10-K could be a interpreted as a statement of opinion or belief, "such statements of opinion or belief must rest on 'a factual basis that justifies them as accurate, the absence of which renders them misleading.'"  Grossman v. Novell, Inc., 120 F.3d at 1123 (quoting Va. Bankshares, Inc. v. Sandberg, 501 U.S. at 1093).  It is that factual basis, or, rather, the lack thereof, underlying the OTTI analysis in the 2007 Form 10-K which the SEC alleges renders it fraudulent.

As the Tenth Circuit has held, the SEC must "set forth what is false or misleading about a statement, and why it is false.  In other words, the [SEC] must set forth an explanation as to why the statement or omission complained of was false or misleading."  Grossman v. Novell, Inc., 120 F.3d at 1124 (internal quotations omissions).  The SEC's allegations sufficiently set forth why the OTTI analysis in the 2007 Form 10-K was false or misleading: The SEC contends that the Defendants knew that Thornburg Mortgage did not have the intent and ability to hold its

ARM securities until maturity, or until their value recovered, because of the margin calls

Thornburg Mortgage received from August, 2007, through February 28, 2008, because of

Thornburg Mortgage's inability to immediately meet margin calls as they were due, its use of the

I/O Strip Transactions to satisfy margin calls, and because of Goldstone and Simmons'

awareness that the collapse of a European hedge fund would cause Thornburg Mortgage to

receive additional margin calls.[27]  See Complaint ¶¶ 77, 81-86, at 22-25.  The OTTI analysis is

based on the Defendants' subjective judgment with respect to objective factors, and the SEC's

allegations set forth that the objective factors of which the Defendants were aware undercut the

facts on which the Defendants' OTTI analysis was based.  Although the Defendants contend that

they expected Thornburg Mortgage to raise more cash, as it did in February, 2008, to meet

margin calls, see Starrett MTD at 21, this expectation of future earnings does not alone defeat the

Defendants' knowledge that Thornburg Mortgage had, as the SEC alleges, experienced extreme

difficulty in meeting margin calls in the previous seven months, was required to sell assets to

meet margin calls in August, 2007, and that Goldstone and Simmons expected the margin calls

---

[27] The Court's assessment whether Thornburg's inability to timely meet margin calls was material is different regarding the misrepresentation that Thornburg had "successfully" met margin calls, and the misrepresentation of its OTTI analysis.   The tension between the Court's treatment of this information is in accordance with the different factors that are relevant to the representations.   The Court has concluded that the SEC fails to allege that the statement that Thornburg successfully met margin calls was a material misrepresentation, because Thornburg's reverse repurchase agreements provide for it to arrange payment plans to meet margin calls over time.   The statement that Thornburg had successfully met its margin calls, therefore, was accurate, notwithstanding the payment plans, and the payment plans, accordingly, were not materially omitted from the 2007 Form 10-K.   The OTTI analysis, on the other hand, is dependent upon a variety of financial factors, including the financial condition of the issuer and its experience with past events.  See AU 332 ¶ .47, at 3.  Thornburg's inability to timely meet margin calls is relevant to its financial condition and the Defendants' experience with recent events.   Thornburg's payment plans and inability to timely meet margin calls, therefore, informs the material falsity of the OTTI analysis in a different manner than it informs whether Thornburg successfully met margin calls.

to continue.  These allegations "'identify in the complaint with specificity some reason why the discrepancy between [Thornburg Mortgage's] optimistic projections and its subsequently disappointing results is attributable to fraud.'"  Grossman v. Novell, Inc., 120 F.3d at 1124 (quoting Hillson Partners, Ltd. v. Adage, Inc., 42 F.3d 204, 209 (4th Cir. 1994)).

The Defendants also assert that an allegation of fraud based upon the OTTI analysis is an attempt to allege impermissible "fraud by hindsight," Starrett MTD at 19, because of their inability to "predict the future," Goldstone & Simmons MTD at 44.  Indeed, the Tenth Circuit recognizes that a statement's falsity cannot be established by events occurring after the statement was made:

> What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false.  Securities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price).  Such events might include, for example, a general decline in the stock market, a decline in other markets affecting the company's product, a shift in consumer demand, the appearance of a new competitor, or a major lawsuit.  When such an event has occurred, it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood. In the face of such intervening events, a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made.*

Grossman v. Novell, Inc., 120 F.3d at 1124 (emphasis in original)(internal quotations omitted).  The SEC's allegations, however, are not based upon the occurrence of a "catastrophic event" after the filing of the 2007 Form 10-K.  The SEC is careful to point out that, "[g]iven the financial decline of Thornburg beginning in August 2007," and its "severe liquidity crisis and exposure to additional margin calls," the statement that Thornburg Mortgage had the intent and

ability to hold its ARM securities until maturity was false when made.  Complaint ¶¶ 81, 84, 86, at 24-25.  These allegations are based upon past events, of which the Defendants were aware before they "drafted, reviewed, and approved" the 2007 Form 10-K.  Complaint ¶ 86, at 25. Accordingly, the basis for the SEC's allegation that that OTTI analysis was fraudulent is not an attempt to hold the Defendants liable by hindsight or for their lack of prescience.

The Defendants cite to Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp. and In re Radian Sec. Litig. to contend that the SEC is attempting to hold them liable for forces beyond their control.  See Goldstone & Simmons MTD at 45-46; Starrett MTD at 33.  These cases are readily distinguishable.  The facts of which the SEC has alleged the Defendants were aware, and Thornburg Mortgage's financial condition at the time the 2007 Form 10-K was filed, are far more severe than those set forth in Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.  The United States Court of Appeals for the Seventh Circuit determined that the defendants' statement that a company had "substantial liquidity" was true, because the company had $150 million in reserves, it had met $435 million in margin calls, and, because of the overall turmoil in subprime securities markets at the time, the defendants had no reason to foresee future margin calls.  675 F.3d at 1049.  Here, on the other hand, the SEC has alleged that Thornburg Mortgage had only forty million dollars available in cash at the time the 2007 Form 10-K was filed, that it had experienced margin calls in excess of a billion dollars in the last seven months, that it had to sell assets at a loss to meet margin calls, that Goldstone and Simmons knew more margin calls were coming, and that Thornburg Mortgage could not pay its margin calls on the day they became due, and, therefore, was dependent on lenders not exercising their right to declare a default to meet incoming margin calls.  See Complaint ¶¶ 29, at 9; id. ¶ 35, at 11; id. ¶ 38, at 12; id. ¶ 81, at 24; id. ¶ 95, at 27-28.  These facts make the plausibility of the SEC's contention that Thornburg

Mortgage did not have the intent and ability to hold its ARM securities far more tenable than those set forth in <u>Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.</u>  Additionally, in <u>In re Radian Sec. Litig.</u>, the plaintiffs' allegations were based upon the general decline in the subprime industry.  <u>See</u> 612 F. Supp. 2d at 619.  Here, on the other hand, the SEC has alleged facts specific to Thornburg Mortgage and its financial condition which undermine the OTTI analysis.  <u>See Fulton Cnty. Emp. Ret. Sys. v. MGIC Inv. Corp.</u>, 675 F.3d at 1049 ("Securities law requires issuers to disclose firm-specific information, not news that concerns the industry or economy as a whole.").  The Court determines, therefore, that the SEC has alleged sufficient facts to demonstrate that the OTTI analysis in the 2007 Form 10-K was could have false.

Additionally, a false OTTI analysis would be material.  The Court cannot see how the incorrect OTTI analysis -- which allowed Thornburg Mortgage to inaccurately report a net profit of approximately sixty-five million dollars in the fourth quarter of 2007, instead of a net annual loss of approximately $1.3 billion -- would be of no interest to a reasonable person determining whether to buy or sell Thornburg Mortgage securities.  <u>See Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust</u>, 825 F. Supp. 2d at 1126; Complaint ¶¶ 8, 12, at 4-5; <u>id.</u> ¶¶ 86-88, at 25-26.  The Defendants assert the bespeaks caution doctrine protects the OTTI analysis, given the "candid" disclosures in the 2007 Form 10-K.  Starrett MTD at 22.  The Defendants point to the following disclosures in the 2007 Form 10-K:

> If we did not have sufficient unpledged assets or liquidity to meet these requirements, we may need to sell assets under adverse market conditions or at losses to satisfy our lenders.
>
> . . . .
>
> [I]n the short term, the sudden decline in the valuation of these securities has left us with reduced readily available liquidity to meet future margin calls . . . .  In the

event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.

. . . .

[T]here is no assurance that the value of our mortgage portfolio and derivatives portfolio will not decline further, that we will not experience a further decline in our book value, that lenders will not make additional margin calls, or that we will be able to satisfy additional margin calls.

Starrett MTD at 21 (quoting 2007 Form 10-K at 25, 35).  See Goldstone & Simmons MTD at 24-25.  The bespeaks caution doctrine protects defendants from allegations of fraud based upon statements which, when analyzed in context, are not materially misleading, because of adequate cautionary language accompanying the statements.  See Grossman v. Novell, Inc., 120 F.3d at 1120; Halperin v. eBanker USA.com, Inc., 295 F.3d at 357.  The language from the 2007 Form 10-K contains cautionary warnings.  The SEC can overcome this cautionary language, however, if the language "did not expressly warn or did not directly relate to the risk that brought about plaintiffs' loss."  Halperin v. eBanker USA.com, Inc., 295 F.3d at 359.  Initially, the bespeaks caution doctrine does not apply to statements "indicating the speakers' beliefs concerning then-present factual conditions."  Grossman v. Novell, Inc., 120 F.3d at 1123.  The OTTI analysis expresses, in part, the Defendants' stated beliefs regarding objective factors that weigh on whether Thornburg Mortgage will be able to hold its impaired ARM securities until maturity.  To the extent the OTTI analysis is based upon then-existing factual conditions, the bespeaks caution is of no use to the Defendants.

Another initial obstacle to the bespeaks caution doctrine protecting the OTTI analysis is the number of statements in the 2007 Form 10-K which bolster the OTTI analysis.  For example, regarding the OTTI analysis specifically, the 2007 Form 10-K states: "All of these market value losses are unrealized and there has been no deterioration in the actual credit performance of our

assets." 2007 Form 10-K at 35. The 2007 Form 10-K continues: "[W]e began to see financing conditions improve and, despite the challenging market for financing, we continue to maintain existing short-term financing facilities . . . . [T]he credit quality of our originated and acquired loan portfolios continues to perform extremely well and their performance is consistent with our historical expectations[.]" 2007 Form 10-K at 35. The 2007 Form 10-K also states that the likelihood of the impaired ARM securities declining further in value is low: "Our current credit assessment of these mortgage securities in our portfolio suggests a low possibility of future downgrades and even less risk of actual losses." 2007 Form 10-K at 38. Weighing the negative disclosures in the 2007 Form 10-K in the context of the statements expressing confidence in Thornburg Mortgage's ability to perform and to maintain the value of its assets, the Court does not believe that the context protects the OTTI analysis from being materially misleading. See Grossman v. Novell, Inc., 120 F.3d at 1120 ("[S]tatements must be analyzed in context when determining whether or not they are materially misleading." (internal quotations omitted)).

Additionally, the negative disclosures and cautionary language in the 2007 Form 10-K do not expressly warn against the events which rendered the OTTI analysis allegedly false. Although the 2007 Form 10-K states that Thornburg Mortgage may experience future margin calls, which it may not be able to meet, and which may require it to sell assets at a loss, and that Thornburg Mortgage was operating with "reduced readily available liquidity to meet future margin calls," the 2007 Form 10-K does not disclose many of the facts which made its OTTI analysis allegedly false. 2007 Form 10-K at 39. To the extent the OTTI analysis is a forward-looking statement expressing a projection that Thornburg Mortgage will be able to meet its future margin calls, the statements in the 2007 Form 10-K do not warn of the imminent possibility that, if Thornburg Mortgage receives more than forty million dollars in margin calls

in the near future, it will depend on lenders agreeing to payment plans to avoid losing portions of its ARM securities.   The statement that Thornburg Mortgage's liquidity was "reduced," therefore, was conservative if not an understatement.  2007 Form 10-K at 39.  In the context of other statements which express confidence in Thornburg Mortgage's ability to maintain a profitable portfolio, the cautionary language in the 2007 Form 10-K does not render the OTTI analysis immaterial as a matter of law.  The Court does not see in the 2007 Form 10-K the robust cautionary language that would have made the reader assess the OTTI analysis with a grain of salt.  The Court concludes, therefore, that the allegations in the Complaint suffice "to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement."  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. at 1232 (internal quotations omitted).

> **2.      The SEC has Sufficiently Alleged That Goldstone and Simmons, but not Starrett, are Primarily Liable for the Allegedly     False     OTTI Analysis in the 2007 Form 10-K.**

Primary liability under § 17(a) of the Securities Act and § 10(b) of the Exchange Act attaches to two categories of actors: those who are makers of fraudulent statements or omissions, and those who scheme to defraud.  In this matter, the SEC has alleged that Goldstone and Simmons are liable for making the allegedly false OTTI analysis in the 2007 Form 10-K, and that Starrett is liable for scheming to defraud through her participation in the OTTI analysis.  See Tr. at 178:12-20 (Kasper).  The Court concludes that, under Janus Capital Grp., Inc. v. First Derivative Traders, the SEC has alleged sufficient facts to hold Goldstone and Simmons liable for the allegedly false OTTI analysis in the 2007 Form 10-K.  On the other hand, the Court does not find that the SEC has alleged sufficient facts to hold Starrett liable for scheming to defraud investors through her participation in the OTTI analysis included in the 2007 Form 10-K.

"[T]he maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it." Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. at 2303. In Janus Capital Grp., Inc. v. First Derivative, the Supreme Court discussed the scope of liability under rule 10b-5 as encompassing those who "'directly or indirectly, . . . make any untrue statement of a material fact' in connection with the purchase or sale of securities." 131 S. Ct. at 2301 (quoting 17 C.F.R. § 240.10b-5(b)). Goldstone and Simmons signed the 2007 Form 10-K, see 2007 Form 10-K at 78, and the SEC has alleged that Goldstone and Simmons, but not Starrett, "signed and certified" the 2007 Form 10-I, Complaint ¶ 7, at 3. The Supreme Court has emphasized that signing and certifying a publicly filed report indicates that a person had "authority over the content of the statement and whether and how to communicate it." Janus Capital Grp., Inc. v. First derivative Traders, 131 S. Ct. at 2303. Similarly, the Supreme Court has cited with approval the Tenth Circuit's decision in Anixter v. Home-Stake Prod., Co., in which the Tenth Circuit determined that an accountant could be held primarily liable for making a false statement included in the accountant's "Auditor's Report," which the accountant signed. Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. at 2305 n.11 (citing Anixter v. Home-Stake Prod. Col., 77 F.3d at 1220, 1220 n.4). The SEC has conceded that Starrett cannot be liable as the maker of an allegedly false OTTI analysis, and the Court agrees with that concession. Cf. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. at 152-53 (rejecting a theory of primary liability for false and misleading statements which would hold an entity liable that contributed to, but did not control, whether and how false statements were made). The Court concludes that the SEC's allegations that Goldstone and Simmons signed and certified the 2007 Form 10-K are sufficient to hold them primarily liable for the allegedly false OTTI analysis contained therein.

On the other hand, the Court does not agree with the SEC that it has alleged a scheme to defraud within the meaning of § 17(a) of the Securities Act or § 10(b) of the Exchange Act. Within the context of § 10(b) of the Exchange Act, manipulative conduct is "virtually a term of art," and encompasses deception that is "intended to mislead investors by artificially affecting market activity."   Santa Fe. Indus., Inc. v. Green, 430 U.S. at 476.   As the Defendants have pointed out, the Courts of Appeals which have entertained the highest number of securities-fraud cases, the Second and Ninth Circuit, have held that "scheme liability must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)."   Pub. Pension Fund Grp. v. KV Pharma, Co., 679 F.3d at 987.   See Starrett Reply at 10 ("To maintain a "scheme" claim . . . the SEC must allege that Ms. Starrett engaged in conduct that was both (i) inherently deceptive, and (ii) distinct from any alleged misrepresentations or omissions.")(emphasis in original).   The SEC contends that a claim for scheme liability need not be completely separate from the allegedly fraudulent statements.   District courts around the country, and within the Tenth Circuit, have required a plaintiff alleging a claim for scheme liability to allege facts which demonstrate an "illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance."   SEC v. St. Anselm Exploration Co., 2013 WL 1313765, at *15 (citing SEC v. Daifotis, 2011 WL 2183314, at *9). To hold otherwise would allow plaintiffs, such as the SEC, to overcome the Supreme Court's sharp distinction between those who are primarily liable for engaging in deceptive conduct, and those who only aid and abet the primary violation of another.   See Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 128 S. Ct. at 770.

The SEC agrees with the Defendants that a claim for scheme liability requires "allegations that defendant's actions were deceptive independent of any fraudulent statement

made to the investing public."   SEC Surreply at 14.   The SEC defines the scheme as one "to deceive . . . the investing public to believe, that Thornburg had successfully met all margin calls and that the company was not required to sell any assets to meet its margin calls."   Complaint ¶ 5, at 3.   The SEC also characterizes the scheme was including a plan to "quickly raise substantial cash in the days following the Form 10-K filing so as to have sufficient liquidity to meet future margin calls."   Complaint ¶ 32, at 10.   The SEC alleges the following acts in furtherance of this scheme: (i) Starrett "drafted an email stating that they were 'purposely' withholding information from the auditors"; (ii) Starrett's receipt of an electronic mail transmission from Goldstone which endorses a "plan which would allow Thornburg 'to keep [its] current situation quiet while we deal with it"; (iii) Thornburg Mortgage having "'scrambled' to satisfy margin calls before filing the Form 10-K to avoid having to make 'full disclosures with respect to these margin calls'"; (iv) Thornburg Mortgage using the I/O Strip Transactions "to allow it to misleadingly claim that it had not sold assets"; (v) Thornburg Mortgage filing the 2007 Form 10-K "twelve hours after satisfying the last margin calls, at 4 a.m. in New Mexico, and began receiving additional margin calls two hours later"; and (v) Thornburg Mortgage having "planned to quickly raise cash after the Form 10-K was filed to meet future margin calls."   SEC Surreply at 3-4 (citing Complaint ¶¶ 30-32, at 9-10; id. ¶ 41, at 12-13; id. ¶ 53, at 16; id. ¶¶ 65, 66 at 19). The Court will analyze separately whether the Defendants' dealings with KPMG constituted a scheme to deceive, as the Defendants' representations to auditors are not relayed to the investing public.   See SEC v. Lucent Techs., Inc., 610 F. Supp. 2d at 360 ("If the investing public has no knowledge that an issuer committed an act because the entity has not conveyed any information about that act (nor withheld pertinent information that would make a public statement about that act misleading), there has been no deception because no false impression was created.").

The fatal problem with the SEC's allegations of scheme liability is that, apart from the alleged misrepresentations and omissions to auditors, none of the conduct the SEC references in furtherance of the scheme is inherently deceptive.  The Defendants' scrambling to meet margin calls before filing the Form 10-K evidences nothing more than that they wanted Thornburg Mortgage's margin calls satisfied before filing the Form 10-K, which, in a time of economic downturn in Thornburg Mortgage's MBS market, is not an easy task.  The allegation that the Defendants filed the Form 10-K so as to avoid disclosing the details of its margin calls asserts a primary violation, for which the Court cannot hold Starrett liable, as Starrett was not the maker of any statement or omission regarding Thornburg Mortgage's margin calls.  Additionally, the Court has determined that the disclosure of the I/O Strip Transactions as the issuance of secured debt rather than the sale of assets was not materially misleading.  Last, Starrett's participation in a plan to quickly raise cash after filing the 2007 Form 10-K is not deceptive conduct; indeed, it appears as though the Defendants had successfully raised cash and met margin calls under increased liquidity constraints in the past.  That the plan encompassed using a fraudulent 2007 Form 10-K as a basis for raising cash indicates only that Starrett's conduct was not deceptive apart from an allegedly fraudulent statement.  The Court must recognize the important distinction between conduct that is actionable under rule 10b-5(a) and (c) -- for scheming to defraud, and that which is actionable under rule 10b-5(b) -- for makers of false statements and omissions.  See WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d at 1057.  The Court cannot soundly conclude that the conduct in which the SEC asserts Starrett engaged to further a fraudulent scheme was "illegitimate, [a] shame, or inherently deceptive," as none of the actions the SEC alleges are deceptive, apart from the allegedly false OTTI analysis in the 2007 Form 10-K.  SEC v. St. Anselm Exploration Co., 2013 WL 1313765, at *15.  Accordingly, the Court

dismisses the SEC's allegations in Count 1, 3, 4, 5, 8, and 10 against Starrett for the alleged violations of § 17(a) of the Securities Act, and §§ 10(b), 13(a), 13(b)(2), 13(b)(5), rules 10b-5, 12b-20, 13b2-1 of the Exchange Act, to the extent the allegations are based upon primary liability for participating in a fraudulent scheme to misrepresent Thornburg Mortgage's OTTI analysis in the 2007 Form 10-K.

> **3.      The SEC has Sufficiently Alleged That Goldstone and Simmons Misrepresented the OTTI Analysis in the 2007 Form 10-K With Knowledge or Recklessness as to its Falsity, and That the Defendants Aided and Abetted the Misrepresentation of the     OTTI Analysis.**

Goldstone and Simmons contend that the SEC has failed to allege that, even if the OTTI analysis was false or misleading, they acted with scienter in its representation.  The Defendants make a number of arguments, asserting that the SEC must allege that they subjectively disbelieved the OTTI analysis, see Goldstone & Simmons MTD at 53; Starrett MTD at 48, that the negative disclosures in the 2007 Form 10-K defeat any inference of scienter, see Goldstone & Simmons Reply at 28; Starrett MTD at 34, that the complexity of the OTTI analysis defeats any inference of scienter, see Goldstone & Simmons MTD at 50-51, that the SEC has taken certain electronic mail transmissions out of context in alleging that they demonstrate a fraudulent intent, see Goldstone & Simmons MTD at 55-56, and that attempting to save Thornburg Mortgage is not a motive consistent with fraudulent intent, see Goldstone & Simmons MTD at 56-57.  The parties also dispute the requisite mental state necessary for allegations of aiding and abetting. The Defendants assert that, at the time of the events set forth in the Complaint, before the Dodd-Frank Act amendments to the Exchange Act in 2010, the culpable state of mind requirement for a claim of aiding and abetting an Exchange Act violation was knowledge, and not recklessness. See Goldstone & Simmons MTD at 66.  The SEC contends that it need only plead scienter

generally with respect to primary violations, that the 2010 amendment to Exchange Act Section 20(e) applies retroactively, and that, regardless, the state of mind requirement for aiding-and-abetting claims in the Tenth Circuit in February, 2008, was recklessness.  See Response to Goldstone & Simmons MTD at 67-68; Response to Starrett MTD at 43-44.

The SEC asserts that the fraudulent OTTI analysis in the 2007 Form 10-K was a violation of § 17(a) of the Securities Act and § 10(b) of the Exchange Act.  "Section 10(b) and § 17(a)(1) require the SEC to establish at least recklessness, whereas negligence is sufficient for § 17(a)(2) and § 17(a)(3)."  SEC v. Smart, 678 F.3d at 857.  "In alleging fraud or mistake . . . .  [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  "In securities fraud cases, although speculation and conclusory allegations will not suffice, great specificity is not required if the plaintiff alleges enough facts to support a strong inference of fraudulent intent."  Sheldon v. Vermonty, 2000 WL 1774038, at *5.  Additionally, the Court has determined that recklessness satisfies the state of mind requirement for aiding-and-abetting liability in the Tenth Circuit at the time of the events alleged in the Complaint.  See SEC v. Geman, 334 F.3d at 1196.  In the context of the § 10(b) of the Exchange Act, recklessness is an "extreme departure from the standards of ordinary care, [] which presents a danger of misleading buyers or sellers that is either known to the defendants or is so obvious that the actor must have been aware of it."  Dronsejko v. Thornton, 632 F.3d at 665.

A claim for aiding and abetting under § 10(b) of the Exchange Act, as the SEC has alleged here, requires the SEC to prove: (i) the existence of a primary violation of the securities laws by another; (ii) knowledge or recklessness of the primary violation by the alleged aider and abettor; and (iii) substantial assistance by the alleged aider and abettor in achieving the primary violation.  See Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226; SEC v. Geman, 334 F.3d at

1196.  The Defendants have alleged that the SEC cannot properly allege primary and aiding-and-abetting liability against them.  <u>See</u> Starrett MTD at 31.  The Defendants base this allegation on the Supreme Court's announcement of a "clean line" in <u>Janus Capital Grp., Inv. v. First Derivative Traders</u>, 131 S. Ct. at 2302 n.6, between those primarily liable and those who aid and abet securities law violations.  The Supreme Court's concern with creating a clean line, however, was expressed in the context of limiting primary liability to those who make statements, as opposed to those who aid and abet the statements another made; the Supreme Court was concerned with the scope of primary liability, not the scope of pleading allegations.  Nothing about this distinction precludes the SEC's claims for both aiding and abetting, and for primary liability, to proceed against Goldstone and Simmons at the motion to dismiss stage.  <u>See</u> <u>SEC v. Brown</u>, 878 F. Supp. 2d 109, 119 (D.D.C. 2012)("[T]he statutes do not preclude the SEC from claiming that Brown both 'made' that false statement in violation of rule 10b-5(b) and aided and abetted . . . the 'issuer' of the security, with 'filing' that false statement in violation of Section 13(a), Rule 12b-20 and Rule 13a-1.").  Indeed, the Federal Rules of Civil Procedure allow for pleading in the alternative, Tenth Circuit has entertained cases which allege both primary and aiding-and-abetting liability in the past.  <u>See</u> Fed. R. Civ. P. 8(d)(2)("If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); <u>Edward J. Mawod & Co. v. SEC</u>, 591 F.2d 588, 595 (10th Cir. 1979)(reviewing whether defendants had the requisite mental state to aid and abet, and commit primary violations of, the Exchange Act).  Whether the Goldstone and Simmons are liable for aiding and abetting, or for their primary violations, will be revealed as discovery progresses, and it is true that Goldstone and Simmons cannot be liable for both.  <u>See</u> <u>Janus Capital Grp., Inv. v. First Derivative Traders</u>, 131 S. Ct. at 2302.

The SEC's allegations of the Defendants' role in preparing the OTTI analysis are sufficient to allege that they provided substantial assistance to its false representation.  For example, the SEC contends that the Defendants did not factor the I/O Strip Transactions into the OTTI analysis, see Complaint ¶ 69, at 20, that Goldstone and Simmons did not consider the collapse of a European hedge fund into the OTTI analysis, see Complaint ¶ 76, at 22, and that the Defendants ultimately reviewed and approved the 2007 Form 10-K's allegedly false OTTI analysis, see Complaint ¶ 86, at 25.  The SEC has, therefore, alleged that Starrett, through her contribution to Thornburg Mortgage's accounting underlying the OTTI analysis, and Goldstone and Simmons, who reviewed and approved the OTTI analysis, played significant roles and were intricately involved in crafting its misrepresentation.  See Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226 n.10.  Accordingly, even if the facts reveal that the Goldstone and Simmons are not primarily liable as the makers of the OTTI analysis, these allegations sufficiently allege that the Defendants substantially contributed to Thornburg Mortgage's false statement.

The Defendants' attacks on the SEC's allegations of scienter similarly fail.  The Court is not persuaded by the Defendants' arguments that the SEC has failed to allege that they subjectively disbelieved the OTTI analysis and that the complexity of the OTTI analysis undercuts allegations of scienter.  As the Supreme Court noted in Va. Bankshares, Inc. v. Sandbert, liability for a defendants' false statements of opinion or belief is premised upon finding that the statements "were made with knowledge that [the defendants] did not hold the beliefs or opinions expressed."  501 U.S. at 1090.  Although the complexity of the OTTI analysis may prove fatal to the SEC's allegations at the summary judgment stage, at the motion to dismiss stage, the SEC has alleged sufficient facts to sufficiently demonstrate that the Defendants did not believe, or were reckless in believing, that the impairment on Thornburg Mortgage's ARM

securities was not other than temporary.  Although the OTTI analysis involves judgment, the Defendants' use of judgment is based upon objective factors.  The SEC has alleged that, in light of the margin calls which Thornburg Mortgage received beginning in August, 2007, Thornburg Mortgage's need to sell assets at a loss to meet margin calls, Thornburg Mortgage's current inability to immediately meet margin calls, Thornburg Mortgage's reduced liquidity because of the I/O Strip Transactions, and Goldstone and Simmons' knowledge of a collapsing European hedge fund, the Defendants "knew, or were reckless in not knowing, that Thornburg did not have the intent or ability to hold its ARM Securities until maturity or until their value recovered in the market."  Complaint ¶ 84, at 25.  Moreover, "rule 9(b) does not require specific knowledge regarding the defendant's state of mind."  Midgley v. Rayrock Mines, Inc., 274 F. Supp. 2d at 1047.  The SEC's factual allegations, at the motion to dismiss stage, plausibly allege that the Defendants did not believe the OTTI analysis which they either made or which they substantially assisted in making.

The Defendants also contend that the negative disclosures in the 2007 Form 10-K undercut any allegations of scienter and that the SEC has taken their electronic mail transmissions out of context in alleging fraudulent intent.  See Goldstone & Simmons MTD at 55-56; Starrett MTD at 34, Goldstone & Simmons Reply at 28.  Neither argument is persuasive at this stage.  Taken in context, the 2007 Form 10-K contains negative disclosures, but, as the Court has discussed, those disclosures do not expressly warn of the risks which rendered the OTTI analysis allegedly false.  The Defendants cite to Kuriakose v. Fed. Home Loan Mortg. Corp. to assert that the SEC has failed to allege they acted with fraudulent intent because of the subjective nature of the OTTI analysis, and because the disclosures in the 2007 Form 10-K undercut an allegation of scienter.  Judge Keenan's finding that the plaintiffs had failed to state a

claim of fraud based upon the OTTI analysis at issue in <u>Kuriakose v. Fed. Home Loan Mortg.</u> <u>Corp.</u>, however, is readily distinguishable.  First, the plaintiffs were subject to the heightened pleading standards of the PSLRA, which required the plaintiffs to meet a heightened pleading standard.  Second, in <u>Kuriakose v. Fed. Home Loan Mortg. Corp.</u>, Judge Keenan determined that the defendant's disclosure of the "allegedly fraudulent accounting decisions not to take impairments on certain RMBS . . . gave the public sufficient information to question Freddie Mac's accounting decisions."  2011 WL 1158028, at *12.  Here, on the other hand, the SEC has alleged that, even though the impaired ARM securities were disclosed in the 2007 Form 10-K, the 2007 Form 10-K did not disclose the financial factors which objectively undermined the statement that Thornburg Mortgage would be able to hold its impaired assets until maturity.  The SEC's allegations in this matter, therefore, are more fulsome and distinguishable from those in <u>Kuriakose v. Fed. Home Loan Mortg. Corp.</u>

Moreover, the electronic mail transmissions, even when read in their entirety, do not defeat the SEC's allegations of scienter.  For example, the SEC points to the Feb. 22 BOD Email, which Simmons and Starrett received, in which Goldstone expresses a desire to avoid disclosing Thornburg Mortgage's margin calls until they are satisfied.  <u>See</u> Feb. 22 BOD Email at 2.  This electronic mail transmission sets forth that Goldstone planned to time the filing of the 2007 Form 10-K so that Thornburg Mortgage could state "we had margin calls and all have been met."  Feb. 22 BOD Email at 2.  Although this plan is not inherently deceptive, it evidences a desire control Thornburg Mortgage's disclosures, notwithstanding the measures the Defendants used to avoid negative disclosures.  "[D]efendants cannot ignore obvious warning signs, the investigation of which would reveal the accounting problems."  <u>SEC v. Espuelas</u>, 579 F.2d at 475.  Regarding the Feb. 25 Goldstone/Starrett Email, which Starrett asserts does not relate to

allegations of fraud in the 2007 Form 10-K, because it discusses disclosures with KPMG, see Starrett Reply at 24, the Court concludes that this electronic mail transmission indicates that Goldstone and Starrett at least knew that Thornburg Mortgage's margin call situation in February, 2008, was related to its OTTI analysis.  For example, Starrett expresses that whether Thornburg Mortgage has satisfactory met its margin calls without selling assets implicates whether Thornburg Mortgage will be able to "hold the assets to maturity."   Feb. 25 Goldstone/Starrett Email at 2.   The Court can reasonably infer that this electronic mail transmission evidences that Goldstone and Starrett knew that Thornburg Mortgage's margin calls in February, 2008, and its difficulty in meeting those margin calls, factored into the OTTI analysis.  Additionally, Starrett's statement that they have "purposefully not told them about the margin calls," which they know are factor into an OTTI analysis, allows the Court to reasonably infer that Goldstone and Starrett were manipulating the timing of that discussion for the particular purpose of making a favorable OTTI analysis.  Feb. 25 Goldstone/Starrett Email at 2. Further, Goldstone and Simmons' discussion of the collapsing European hedge fund, and Simmons' statement that he wanted the 2007 Form 10-K filed before the market's activity on February 28, 2008 could impact their disclosures, leads to a reasonable inference that the Defendants expected events after the 2007 Form 10-K was filed to effect the OTTI analysis.  See Complaint ¶¶ 38-40, at 12 (citing Feb. 27 Goldstone/Simmons Email; Feb. 27 Simmons/Feldman Email; Feb. 27 Simmons/Starrett Email); Tr. at 116:23-117:2 (McKenna)("[W]e say a reasonable inference to draw from that is, we're going to get hit with more margin calls tomorrow and we're not going to be able to report like we want to, that we've successfully met them all."). "'[D]ivergence between internal reports and external statements on the same subject' and 'disregard of the most current factual information before making statements' can be factors

supporting scienter." In re Level 3 Commc'ns, Inc. Sec. Litig., 667 F.3d at 345.  This desire to get ahead of upcoming negative market reactions contradicts the Defendants' position that their disclosures of Thornburg Mortgage's precarious position indicate a desire to be forthcoming rather than manipulative.  Last, Simmons' statement on February 28, 2008, in response to Thornburg Mortgage's falling stock prices, "[i]f they only knew," evidences a belief that, whatever reaction the market had to the 2007 Form 10-K, it would have been different if they had known the negative information which Simmons and Goldstone knew at the time, and which was not disclosed to the public.  Feb. 28 Simmons/Goldstone Email at 2.  See Tr. at 182:9-17 (McKenna)("Mr. Simmons is telling Mr. Goldstone, . . . . [i]magine what they would have done had they known that we purposefully withheld [margin call information] from our auditor; . . . we entered into I/O strip transactions that we didn't have to technically call assets sales in order to meet these margin calls?").  Although the Defendants contend that this statement is a reference to the market's unawareness of their plans to raise money, taking all reasonable inferences in the SEC's favor, the Court must infer that this statement was related to the allegedly false OTTI analysis and how it inflated Thornburg Mortgage's financial performance in the 2007 Form 10-K.  See United States v. Nacchio, 519 F.3d at 1166 ("If the defendant was simply too bullish . . . this does not make him guilty . . . ; however, if he knew that he was more optimistic than the market, and that the market would devalue [the company's] stock if it knew what he knew, he is not exonerated by his bullishness.").  While the Defendants contend that the market's reaction to the 2007 Form 10-K surprised them, that surprise is equally attributable to their surprise that an allegedly false OTTI analysis did not have a more positive impact -- a surprise that their misrepresentation failed to persuade the market that Thornburg Mortgage was doing well.  Accordingly, these arguments do not undercut the SEC's allegations, and the reasonable

inferences the Court draws in the SEC's favor, indicating that the Defendants were knowledgeable or reckless as to the falsity of the OTTI analysis in the 2007 Form 10-K.

The Defendants assert that the decisions in City of Omaha v. CBS Corp. and Fait v. Regions Fin. Corp. counsel that the Court should dismiss the Complaint. City of Omaha v. CBS Corp. is a PSLRA case, and, therefore, the plaintiffs' allegations in that matter are distinguishable because the plaintiffs were held to a higher pleading standard. See, e.g., In re Parmalat Sec. Litig., 414 F. Supp. 2d at 432 ("[T]he heightened pleading requirements of the PSLRA do not apply to claims under Rule 10b-5[]."). Additionally, the plaintiffs' allegations are substantively distinguishable from the SEC's. The plaintiffs in City of Omaha v. CBS Corp. alleged only that, at some undetermined earlier date, the defendants "had knowledge of events or circumstances which would have required them to reach the conclusion" that they should have performed an impairment analysis earlier. 679 F. 3d at 68. The complaint was "devoid even of conclusory allegations that defendants did not believe in their statements of opinion regarding CBS's goodwill at the time they made them." 679 F.3d at 68. Here, on the other hand, the SEC has alleged that the Defendants were aware of particular adverse facts, including the difficulty with which Thornburg Mortgage met its margin calls and its heavily reduced liquidity, and the SEC has alleged that the Defendants knew these specific facts negatively impacted the OTTI analysis. These allegations, in a rule 9(b) case, which "does not require specific knowledge regarding the defendant's state of mind," Midgley v. Rayrock Mines, Inc., 374 F. Supp. 2d at 1047, evidence an intent to control the manner in which negative disclosures are made and create a "strong inference," Sheldon v. Vermonty, 2000 WL 1774038, at *5, that the Defendants disbelieved the OTTI analysis in the 2007 Form 10-K. Similarly, Fait v. Regions Fin. Corp. is distinguishable, as the goodwill analysis which the plaintiffs alleged contained fraudulent

misstatements and omissions "reflected judgments as to values that were not objectively determinable."  655 F.3d at 109.  Here, the OTTI analysis, while it incorporates subjective judgments, is also based upon objective facts.  See SAB 59 (explaining that, when conducting an OTTI analysis, the "financial condition and near-term prospects of the issuer, including any specific events which may influence the operations of the issuers," and the "length of time and the extent to which the market value has been less than cost," should be weighed); AU 332 (stating that whether an "entity recorded losses from the security subsequent to the end of the reporting period" should be considered in an OTTI analysis).  Goodwill, on the other hand, is "an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized."  Fait v. Regions Fin. Corp., 655 F.3d at 110.  Additionally, the plaintiffs in Fait v. Regions Fin. Corp. "relie[d] mainly on allegations about adverse market conditions to support the contention that defendants should have reached different conclusions about the amount of and the need to test for goodwill."  655 F.3d at 112.  The SEC, however, has alleged specific facts which the Defendants knew and the public did not, which the SEC contends undercuts Thornburg Mortgage's stated intent and ability to hold ARM securities until maturity.  See IBEW Local 90 Pension Fund v. Deutsche Bank AG, 2013 WL 113844, at *14 ("Plaintiffs allege that at the time of these statements, the same individuals who made the statements had been provided information indicating the opposite.  These allegations present different facts from those in City of Omaha or Fait -- and present facts supportive of both objective and subjective falsity.").  These cases, therefore, do not change the Court's analysis that the SEC has sufficiently alleged that the Defendants plausibly did not believe the OTTI analysis in the 2007 Form 10-K.

Last, the Defendants contend that trying to save Thornburg Mortgage is not a fraudulent motive.  See Goldstone & Simmons MTD at 56; Starrett MTD at 43.  Motive is a factor which the Court may consider in assessing allegations of scienter, but motive and opportunity alone are not dispositive on the issue.  "[C]ourts must look to the totality of the pleadings to determine whether the plaintiffs' allegations permit a strong inference of fraudulent intent.  Allegations of motive and opportunity may be important to that totality, but are typically not sufficient . . . ." City of Phila. v. Fleming Cos., 264 F.3d at 1261-62.  Whether the Defendants would personally benefit from saving Thornburg Mortgage may, at a summary judgment stage, help to defeat allegations of scienter, but the Tenth Circuit has not adopted a standard as a matter of law which requires that scienter be divorced from any altruistic effect that a fraudulent statement may have. "[T]o establish scienter," the SEC must demonstrate that the defendants "knew of the potentially material fact, and [] knew that the failure to reveal the potentially material fact would likely mislead investors."  City of Phila. v. Fleming Cos., 264 F.3d at 1261.  The federal securities laws do not shield parties simply because a fraudulent statement did not pad their personal pocketbook: The federal securities laws protect "investors from fraudulent practices."  SEC v. Int'l Chem. Dev. Corp., 469 F.2d at 26.  Accordingly, the Court will not dismiss Counts 1, 3, 4, 8, and 10 alleging that Goldstone and Simmons committed primary violations, and that the Defendants aided and abetting Thornburg Mortgage's violations of § 17(a) of the Securities Act, §§ 10(b), 13(a), 13(b)(2), and rules 10b-5, 12b-20, 13a-1, and 13b2-1 of the Exchange Act, rule 13b2-1, to the extent the allegations are based upon the OTTI analysis in the 2007 Form 10-K. Similarly, the Court will not dismiss Counts 5 and 6, alleging that the Defendants falsified books, records, and accounts, in violation of § 13(b)(5) and rule 13b2-1 of the Exchange Act, and that Goldstone and Simmons signed false certifications, in violation of rule 13a-14 promulgated

under the Exchange Act, to the extent those allegations are based upon the OTTI analysis in the 2007 Form 10-K.

### 4.    The SEC has Stated a Plausible Claim of Control-Person Liability Against Goldstone and Simmons.

The SEC alleges that Goldstone and Simmons are liable, as control persons, for Thornburg Mortgage's fraud in violation of § 10(b) and rule 10b-5 of the Exchange Act, Thornburg Mortgage's false SEC filings in violation of § 13(a), rules 12b-20 and 13a-1 of the Exchange Act, and Thornburg Mortgage's failure to keep accurate books and records in violation of § 13(b)(2) of the Exchange Act.  See Complaint at 31-32, 37-39.  Goldstone and Simmons assert that the SEC has failed to allege a plausible primary violation, and, therefore, that the SEC cannot allege that they are liable as control persons.  See Goldstone & Simmons Reply at 37. The Court has concluded, however, that the SEC has stated a plausible claim that Thornburg Mortgage materially misrepresented the OTTI analysis in the 2007 Form 10-K.  The Court also concludes that the SEC has alleged sufficient facts to demonstrate "some indirect means of discipline or influence short of actual direction to hold" Goldstone and Simmons liable for Thornburg Mortgage's alleged violation.  Lane v. Page, 649 F. Supp. 2d at 1306.

To establish a defendant's liability as a control person, a plaintiff must prove two things: (i) a primary violation of the securities laws, and (ii) that the defendant had "control" over the primary violator.  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1107.  The SEC has satisfied the first prong.  Regarding the second prong, the SEC has alleged that Goldstone and Simmons, in their respective positions as Thornburg Mortgage's CEO and CFO, controlled Thornburg Mortgage's management, general operations, and policies, and the electronic mail transmissions referenced in the Complaint indicate Goldstone and Simmons' authority at Thornburg Mortgage

support the SEC's allegations.  See Complaint ¶ 17, at 6.  The SEC has alleged that Goldstone's position as CEO allowed him to negotiate with Thornburg Mortgage's lenders, see Complaint ¶ 61, at 18, and empowered him to orchestrate payment plans, see id. ¶ 68, at 20.  Similarly, the SEC has alleged that Simmons, as CFO, ordered the filing of the 2007 Form 10-K before a certain time, indicating that he controlled high-level Thornburg Mortgage management and operations.  See Complaint ¶ 40, at 12.  These facts sufficiently allege that Goldstone and Simmons possessed the "power to direct or cause the direction of management and policies," and, accordingly, may be liable as control persons for Thornburg Mortgage's alleged violations of federal securities laws.  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (internal quotations omitted).  The Court will not, therefore, dismiss the SEC's allegations against Goldstone and Simmons for control-person liability in counts 2, 9, and 11, to the extent those allegations are based upon Thornburg Mortgage's alleged misrepresentation of the OTTI analysis in the 2007 Form 10-K.

### D.   THE SEC HAS SUFFICIENTLY ALLEGED THAT GOLDSTONE'S STATEMENTS AFTER THE 2007 FORM 10-K WAS FILED WERE FALSE OR   MISLEADING, AND MADE WITH SCIENTER.

The SEC alleges that Goldstone perpetuated a misrepresentation of Thornburg Mortgage's financial condition after the 2007 Form 10-K was filed through Thornburg Mortgage's investor relations department and on CNBC's Street Signs.  Specifically, the SEC alleges that the following statements, which Goldstone directed Thornburg Mortgage's investor relations department to decimate in connection with the 2007 Form 10-K, were materially misleading:  (i) "'[a]ll margin calls met'"; (ii) "'[l]enders are fine'"; and (iii) "'[w]e still have sufficient operating cash[.]'"  Complaint ¶¶ 94-95, at 27 (alterations in original)(quoting Feb. 28

IR Email at 2).[28]  Similarly, the SEC alleges that Goldstone materially misled investors through his statements on Street Signs that: (i) "he did not believe Thornburg would have to sell assets"; (ii) "Thornburg had 'met all of [its] lending requirements'"; and (iii) "'we have liquidity and cash available to continue to support the portfolio.'"   Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09).  Goldstone asserts that Thornburg Mortgage had sufficient liquidity at the time he made these statements, that the bespeaks caution shields these statements from material falsity, that he did not know that Thornburg Mortgage had received additional margin calls when he made these statements, and that his statements on Street Signs were "off the cuff" and not sufficient to support allegations that he violated federal securities laws.   Goldstone & Simmons Reply at 10, 32-31.   See Goldstone & Simmons MTD at 57-60.  The Court disagrees with Goldstone and concludes that most of Goldstone's statements after the 2007 Form 10-K were materially misleading.

---

[28] The Feb. 28 IR Email contains the following statement from Goldstone to Thornburg's investor relations department: "No asset sales to meet margin calls."  Feb. 28 IR Email at 2.  The SEC did not base any allegations upon this statement in the Complaint.  See Complaint ¶¶ 94-95, at 27-28 (asserting that the statements in the Feb. 28 IR Email that Thornburg had met its margin calls, "[l]enders are fine," and that Thornburg "still ha[s] sufficient operating cash in the Feb. 28 IR Email were materially misleading).  The Defendants discussed this portion of the Feb. 28 IR Email at the hearing.  See Tr. at 150:4-16 (Valentine)(citing Feb. 28 IR Email).  The rule which allows the Court to consider documents outside of the pleadings allows a Court to consider documents "referenced to in and central to the complaint, when no party disputes its authenticity."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  The Court has already determined that it may consider the Feb. 28 IR Email in its ruling, as the SEC quotes from, and bases allegations on, the statements in that electronic mail transmission.  Accordingly, the Court has considered the statement regarding Thornburg not selling assets to meet margin calls in its analysis of similar statements in the 2007 Form 10-K, and this statement does not change the Court's analysis.

1.        **The SEC has Sufficiently Alleged That Goldstone's Statements Were Materially Misleading.**

Goldstone correctly points out that, at the time he conveyed key message points to the investor relations department, those statements were true.  Thornburg Mortgage had met its outstanding margin calls without selling assets and in compliance with its reverse repurchase agreements at the time the 2007 Form 10-K was filed.  The SEC's alleges, however, that Goldstone's statements through the investor relations department continued throughout the day on February 28, 2008.  See Complaint ¶¶ 96-97, at 28 (alleging that the investor relations department reported to Goldstone at the end of the day on February 28, 2008, that it had reinforced his messages regarding Thornburg Mortgage's financial condition in the market).  Accordingly, although the statement that Thornburg Mortgage had met its margin calls and that lenders were "fine" was true at 5:29 a.m. on February 28, 2008, the SEC is not alleging impermissible fraud by hindsight with its contention that Goldstone's statements "became false within one hour."  Complaint ¶¶ 94-95, at 27.  See Goldstone & Simmons MTD at 52 (arguing that the SEC is alleging impermissible fraud by hindsight).  Rather, Goldstone's electronic mail transmissions indicate that he intended for the investor relations department to communicate messages throughout the day regarding Thornburg Mortgage's financial condition, specifically to counteract the market's negative reaction to the 2007 Form 10-K.  See Feb. 28 IR Email at 2 ("I suspect it will be a busy day on the phones.  Key message points are as follows . . . .").  Although the Court concludes that the statement in the 2007 Form 10-K that Thornburg Mortgage had successfully met its margin calls was not materially misleading as a statement of historical fact, the statements decimated through the investor relations department are distinguishable, because the SEC alleges that Goldstone intended to perpetuate a description of Thornburg Mortgage's

compliance with its reverse repurchase agreements which changed over the course of the day. Goldstone's statements regarding Thornburg Mortgage meeting its margin calls and satisfying its lenders must be read in conjunction with the other statement the SEC alleges was materially misleading: that Thornburg Mortgage had "sufficient operating cash."  Complaint ¶ 94, at 27.  In combination, these statements could have led a reasonable investor to believe that, notwithstanding the margin calls Thornburg Mortgage received after the 2007 Form 10-K was filed, Thornburg Mortgage's financial condition was strong enough to meet its ongoing margin calls with cash on hand and without selling assets.  The SEC alleges that this representation was misleading, given that Goldstone knew Thornburg Mortgage had only forty million dollars in cash on hand when the 2007 Form 10-K was filed.  See Complaint ¶ 95, at 27-28.  A "reasonable person would consider it important" whether Thornburg Mortgage's operating cash was sufficient to meet continued margin calls after the 2007 Form 10-K was filed when considering whether to buy or sell Thornburg Mortgage securities.  Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d at 1126.  Although Goldstone's statements through the investor relations department were likely true in the early morning hours of February 28, 2008, "if a defendant makes a statement on a particular issue, and that statement is false or later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement."  Grossman v. Novell, Inc., 120 F.3d at 1125.  The Court concludes that the SEC's allegations are sufficient to "raise a reasonable expectation that discovery will reveal evidence" that the statements through Thornburg Mortgage's investor relations department were material in the context of the total information available to investors at the time.  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. at 1323 (internal quotations omitted).

Further, although the Court may consider the negative disclosures in the 2007 Form 10-K to assess whether the bespeaks caution doctrine shields these disclosures from material falsity, the disclosure in the 2007 Form 10-K are not sufficiently specific and cautionary to warn investors of Thornburg Mortgage's severe lack of liquidity and cash in the face of expected increased margin calls.  Cf. Grossman v. Novell, Inc., 120 F.3d at 1121 ("[T]he statements complained of are all contained in press releases or interview statements, and were made in conjunction with a registration statement that contained many explicitly risk factors and warnings which Grossman has not challenged as inadequate.").  The negative disclosures in the 2007 Form 10-K did not "expressly warn or . . . directly relate to the risk" that Thornburg Mortgage would receive margin calls in excess of its cash on hand, and be dependent on lender forbearance to meet margin calls after the 2007 Form 10-K to avoid selling assets.  Halperin v. eBanker USA.com, Inc., 295 F.3d at 359.  Accordingly, the SEC has sufficiently alleged that Goldstone's statements to investors through the day on February 28, 2008 became false as the day progressed, and Goldstone, therefore, incurred a duty to at least stop the statements, and, if realized after the fact, correct the first statement.

Similarly, Goldstone's statements on Street Signs on the afternoon of February 28, 2008, are, in part, misleading.  Just as the OTTI analysis could have misled investors that Thornburg Mortgage had the intent and ability to hold its ARM securities until maturity, notwithstanding Thornburg Mortgage's limited cash on hand and strained liquidity, the statements on Street Signs reinforced a materially false representation of Thornburg Mortgage's ability to continue to meet margin calls without selling assets.  See Street Signs at 3:49-56 (Goldstone responding to the question whether Thornburg Mortgage will need to sell more assets to meet margin calls, as it did in August, 2007: "We don't think we'll have to sell more, no.").  Goldstone contends that

this statement is his "off the cuff" opinion, and, therefore, cannot sustain a claim for a securities

violation.  Goldstone & Simmons Reply at 31.  The context of the interview, however, is not an

informal conversation regarding Goldstone's subjective beliefs alone.  Rather, the interview is in

specific discussion of Thornburg Mortgage's 2007 Form 10-K, in which Thornburg Mortgage

represents that it has the intent and ability to hold its ARM securities to maturity or until their

value recovers in the market.  Goldstone's statements, in reference to the 2007 Form 10-K, that

Thornburg Mortgage would not need to sell assets to meet margin calls, because it had sufficient

liquidity and cash to support the portfolio, could have led investors to believe that Thornburg

Mortgage had more cash on hand and I/O Strips to use to meet future margin calls, and that

Goldstone had no reason to expect margin calls in excess of those Thornburg Mortgage met in

February, 2008.  The Court cannot soundly conclude, at the motion to dismiss stage, that a

reasonable investor would have considered Goldstone's representation of Thornburg Mortgage's

financial position unimportant when determining whether to buy or sell Thornburg Mortgage

securities.  See Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d

at 1126.  Accordingly, in so far as Goldstone's statement that Thornburg Mortgage would not

need to sell assets reinforced the OTTI analysis in the 2007 Form 10-K, the statement could have

been materially misleading.  On the other hand, interpreting Goldstone's statement that

Thornburg Mortgage had "met all of [its] lending requirements" as a reference to the 2007 Form

10-K, that statement was accurate in the context of the margin calls discussed in the 2007 Form

10-K, and, therefore, would not have materially misled investors regarding Thornburg

Mortgage's financial position as represented in the 2007 Form 10-K.  Street Signs at 3:54-4:09.

Additionally, the Court concludes that Goldstone's statements on Street Signs could have

been materially misleading, separate from any discussion of the 2007 Form 10-K.  Specifically,

the SEC has alleged that, by the time Goldstone spoke on Street Signs, Thornburg Mortgage had received margin calls in excess of its cash on hand.  See Complaint ¶ 98, at 28.  Therefore, although it may have been true when the 2007 Form 10-K was filed that Thornburg Mortgage had met its margin calls, by the afternoon of February 28, 2008, Thornburg Mortgage had no longer "met all of [its] lending requirements," it did not have sufficient cash to meet incoming margin calls, and its liquidity was increasingly strained.  Street Signs at 3:54-4:09.  The falsity of these statements at the time undercuts Goldstone's expression that he did not believe Thornburg Mortgage will need to sell assets to meet margin calls.  Additionally, although Goldstone makes negative disclosures on Street Signs, he specifically replies to the question that the "bottom line" for Thornburg Mortgage is that it does not have to sell assets, and, further, is in a "much stronger financial position from a balance sheet perspective" than it had been in August, 2007.  Street Signs at 3:50-4:39.  Goldstone's positive representation of Thornburg Mortgage's financial condition counteracts any cautionary effect his negative disclosures may have had to warn investors of Thornburg Mortgage's financial risks -- for example, that the mortgage market is a "slippery slope."  Street Signs at 0:40-45.  The bespeaks caution doctrine, therefore, does not render Goldstone's statements on Street Signs immaterial.  Accordingly, whether Goldstone's statements on Street Signs are made in the context of the 2007 Form 10-K, or as stand-alone statements of Thornburg Mortgage's financial condition on February 28, 2008, the statements could have materially misled investors to believe Thornburg Mortgage's financial condition was stronger than it actually was.

2.         **The SEC has Sufficiently Alleged That Goldstone**      **Misrepresented**
           **Thornburg Mortgage's Financial Condition After the**   **2007 Form 10-K was**
           **Filed With Scienter.**

Goldstone points out, correctly, that the SEC has not alleged that he was specifically

aware of the margin calls Thornburg Mortgage received throughout the day on February 28,

2008.  See Goldstone & Simmons MTD at 59.  Goldstone contends, therefore, that even if the

statements through the investor relations department were false or he incurred a duty to disclose

further, he lacked the requisite scienter to be liable for securities fraud.  Discovery may indeed

reveal that Goldstone was unaware of the margin calls which Thornburg Mortgage received

throughout the day on February 28, 2008.  The SEC's allegations, however, do not require

Goldstone's knowledge; the SEC's allegations may survive with a showing of recklessness.  See

SEC v. Smart, 678 F.3d at 857 ("Section 10(b) and § 17(a)(1) require the SEC to establish at

least recklessness.").   "'[D]ivergence between internal reports and external statements on the

same subject' and 'disregard of the most current factual information before making statements'

can be factors supporting scienter."   In re Level 3 Commc'ns, Inc. Sec. Litig., 667 F.3d at 345

(quoting Frank v. Dana Corp., 646 F.3d at 959 n.2.  The SEC has alleged that Goldstone knew,

or was reckless in not knowing, that Thornburg Mortgage had received margin calls in excess of

its cash on hand by the afternoon of February 28, 2008.  See Complaint ¶ 98, at 28.  The SEC has

further alleged that at the time Goldstone appeared on Street Signs, he knew that Thornburg

Mortgage forty million dollars in available cash was insufficient to meet margin calls on the

level of those it received in February, 2008, that Thornburg Mortgage had decreased liquidity

because it had already used I/O Strip Transactions to meet margin calls, and that Goldstone and

Simmons expected Thornburg Mortgage to continue to receive increased margin calls because of

the European hedge fund's collapse.  These facts present a "divergence between internal reports

and external statements on the same subject," and indicate that Goldstone was plausibly "disregard[ing  ]the most current factual information before making statements" regarding Thornburg Mortgage's financial condition on February 28, 2008.  In re Level 3 Commc'ns, Inc. Sec. Litig., 667 F.3d at 345 (internal quotation omitted).  This divergence and disregard indicate that Goldstone intended to paint a portrait of Thornburg Mortgage for the investing public which overstated its actual financial standing.   Additionally, the Feb. 28 IR Email evidences Goldstone's intention to counteract the market's negative reaction to the 2007 Form 10-K, notwithstanding Thornburg Mortgage's objectively strained liquidity and lessened cash on hand. See Ernst & Ernst v. Hochfelder, 425 U.S. at 194 n.12 (defining scienter as a mental state "embracing intent to deceive, manipulate, or defraud"); Complaint ¶¶ 94-95, at 27.  Goldstone desired that the investor relations department "calm the panic" surrounding the 2007 Form 10-K, but panic may have been needed.  Feb. 28 IR Email at 2.  Further, on Street Signs, Goldstone's "bottom line" regarding Thornburg Mortgage's financial condition was that Thornburg Mortgage was in a "much stronger position from a balance sheet perspective," Street Signs at 3:50-4:39, but the SEC has alleged that Goldstone knew that Thornburg Mortgage had met its margin calls only with lender forbearance and that increased margin calls, in volume and number, were coming, see Complaint ¶ 38, at 12 (asserting that Goldstone was aware of the European hedge fund's collapse and expected increased margin calls in the coming days, as of February 27, 2008).  These facts sufficiently allege that Goldstone knew, or was reckless in not knowing, that his representations of Thornburg Mortgage's cash, liquidity, and ability to meet margin calls without selling assets would mislead buyers regarding Thornburg Mortgage's financial condition, and that he intended to overstate Thornburg Mortgage's solvency.  City of Phila. v. Fleming Cos., 264 F.3d at 1260 ("[It] is the danger of misleading buyers that must be actually

known or so obvious that any reasonable man would be legally bound as knowing."  (emphasis in original)(internal quotation omitted)).

Goldstone points out that he expected Thornburg Mortgage to be able to negotiate payment plans to meet its ongoing margin calls.  See Goldstone & Simmons MTD at 59-60. Although this confidence may be real, Goldstone continued to represent that Thornburg Mortgage had met its margin calls and had sufficient cash, even after Thornburg Mortgage received margin calls in excess of its cash on hand.  Regardless of whether he knew of Thornburg Mortgage's margin calls, the SEC has alleged that he expected more margin calls, and that it was at least reckless for Goldstone to not check if Thornburg Mortgage could still meet its margin calls before he stated, and allowed the investor relations department to state, that Thornburg Mortgage would be able to meet those margin calls with its cash and liquidity and without selling assets.  See Complaint ¶ 98, at 28.  These allegations are sufficient to state a reckless disregard of objective facts which rendered Goldstone's statements false.  Dronsejko v. Thornton, 632 F.3d at 665 (defining recklessness in the context of Exchange Act Section 10(b) as "conduct that . . . presents a danger of misleading buyers or sellers that is either known to the defendants or is so obvious that the actor must have been aware of it").

The Court concludes, therefore, that the SEC has sufficiently alleged that Goldstone misrepresented Thornburg Mortgage's financial condition through the investor relations department and on Street Signs, after the 2007 Form 10-K was filed, and that he did so with scienter.  The Court will not dismiss the SEC's allegations in Counts 1 and 4, for the violation of § 17(a) of the Securities Act and § 10(b) and rule 10b-5 of the Exchange Act, to the extent those allegations are based on Goldstone's statements through the investor relations department and on Street Signs on February 28, 2008.

### III.   THE SEC HAS STATED A PLAUSIBLE CLAIM THAT THE DEFENDANTS DECEIVED KPMG.

The SEC alleges that the Defendants deceived KPMG, in violation of rule 13b2-2 promulgated under the Exchange Act.  Specifically, the SEC alleges that the following actions deceived KPMG regarding the company's financial condition in February, 2008: (i) the February 20, 2008 Going Concern Analysis, which informed KPMG that Thornburg Mortgage had successfully met its margin calls, returned to profitability in the fourth quarter, and had the intent and ability to hold its ARM securities until their value recovered in the market or maturity, see Complaint ¶ 52, at 15-16; id. ¶¶ 72-73, at 21-22; (ii) the February 27, 2008, management representation letter, which did not inform KPMG that Thornburg Mortgage was in violation of its reverse repurchase agreements, and falsely stated that Thornburg Mortgage had not experienced subsequent events which impact its financial statements, and that the financial statements disclosed all matters related to Thornburg Mortgage as a going concern, see Complaint ¶¶ 57-58, at 17; (iii) Simmons' representation to KPMG that Thornburg Mortgage entered into the I/O Strip Transactions to take advantage of opportune pricing, rather than to meet margin calls, see Complaint ¶ 71, at 21; (iv) Goldstone and Simmons' failure to inform KPMG of the Citigroup Global Letter in response to the Request for Correspondence,  see Complaint ¶¶ 100-101, at 29; and (v) the Position Paper, which stated that the collapse of a European hedge fund and the margin calls Thornburg Mortgage received after the 2007 Form 10-K was filed were unexpected, see Complaint  ¶¶ 38-40, at 12; id. ¶¶ 99, 104-05, at 29-30.  The Defendants assert that these alleged misstatements and omissions are immaterial, and that the SEC has failed to allege that the Defendants acted with scienter.  To the extent that the misrepresentations and omissions to KPMG are identical to the misrepresentations and omissions

that the SEC alleges the 2007 Form 10-K contained, the Court's analysis of their materiality is very similar.  Accordingly, the Court concludes that the Defendants had no duty to disclose that Thornburg Mortgage violated its reverse repurchase agreements, because it had not violated its reverse repurchase agreements in February, 2008, and the Court will dismiss the SEC's allegations in Count 7 to the extent they are based upon that misrepresentation or omission.  The Court also concludes that, as Thornburg Mortgage was not in breach of its reverse repurchase agreements on February 20, 2008, the Defendants did not misrepresent that Thornburg Mortgage successfully continued to meet margin calls at that time in the Going Concern Analysis.  The Court also concludes that the SEC has not adequately alleged that the Defendants took action to "coerce, manipulate, mislead, or fraudulent influence" KPMG in connection with its audit, and the Court will therefore dismiss the SEC's allegations in Count 7 under rules13b2-2(b) and (c)(2) promulgated under the Exchange Act.  On the other hand, the SEC has stated a plausible claim that the Defendants deceived KPMG before and after the 2007 Form 10-K was filed through material misstatements and omissions, in violation of rules 13b2-2(a) and (c)(1) promulgated under the Exchange Act.

### A.   THE SEC HAS SUFFICIENTLY ALLEGED THAT THE DEFENDANTS MISLED KPMG BEFORE THE 2007 FORM 10-K WAS FILED.

Exchange Act rule 13b2-2 makes it unlawful for any director or officer to

> directly or indirectly . . . [m]ake or cause to be made a materially false or misleading statement . . . or . . . [o]mit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with . . . [a]ny audit, review or examination of the financial statements of the issuer . . . .   [and] take any action to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of that issuer that are required to be filed with the Commission . . . . if that person knew or should have known that such action, if

successful, could result in rendering the issuer's financial statements materially misleading.

17 C.F.R. § 240.13b2-2(a), (b).  The SEC alleges that the Defendants' Going Concern Analysis, dated February 20, 2008, falsely stated that Thornburg Mortgage recognized a fourth-quarter profit in 2007, and had the intent and ability to hold its ARM securities to maturity and omitted material discussion of Thornburg Mortgage's difficulty meeting margin calls.  See Complaint ¶ 74, at 22.  The SEC also alleges that the Defendants' management representation letter, dated February 27, 2008, falsely stated that Thornburg Mortgage was in compliance with its reverse repurchase agreement, that it had the intent and ability to hold its impaired securities until their value recovered, Thornburg Mortgage had not experienced recent events which required it to adjust its financial statements, and that the financial statements disclosed all matters relevant to Thornburg Mortgage's ability to continue as a going concern.  See Complaint ¶ 57, at 17. Goldstone and Simmons did not inform KPMG of the impending collapse of a European hedge fund.  See Complaint ¶¶ 76-77, at 22-23.  The SEC also alleges that Simmons misrepresented the true purpose of the I/O Strip Transactions to KPMG.   The materiality of the alleged misrepresentations and omissions overlap: the SEC alleges that, had KPMG known the true reason for the I/O Strip Transactions, of Thornburg Mortgage's difficulty meeting margin calls, and of the collapse of a European hedge fund, KPMG would have disagreed with Thornburg Mortgage's OTTI analysis and its profitability in the fourth quarter of 2007.

Just as the Court concludes that the OTTI analysis in the 2007 Form 10-K was material, the Court concludes that the Defendants' misrepresentations and omissions to the auditors which furthered a false OTTI analysis and represented that Thornburg Mortgage had disclosed all material financial events were materially misleading.  The OTTI analysis allowed Thornburg

Mortgage to report a net profit of approximately sixty-five million dollars in the fourth quarter of 2007, instead of a net annual loss of approximately $1.3 billion, a difference which the Court believes a reasonable investor would find important.  See Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d at 1126; Complaint ¶¶ 8, 12, at 4-5; id. ¶¶ 86-88, at 25-26.  The Defendants contend that their OTTI analysis was not materially misleading, because KPMG was aware of Thornburg Mortgage's margin calls before the 2007 Form 10-K was filed.  Although the SEC has conceded that KPMG knew Thornburg Mortgage experienced margin calls in February, 2008 -- to the extent it was disclosed in the 2007 Form 10-K -- the SEC contends, nonetheless, that the Defendants omitted information regarding the payment plans, the purpose of the I/O Strip Transactions, and the collapse of a European hedge fund.  See Response to Goldstone & Simmons MTD at 60; Tr. at 167:20-168:7 (McKenna).  The Defendants contend, in response, that the SEC has not demonstrated that these omissions were material, because the SEC has not alleged that KPMG would have reached a different opinion.  See Tr. at 197:19-198:11 (Valentine).

The Defendants are attempting to minimize the importance they themselves attached to the omitted information.  For example, in the Feb. 25 Goldstone/Starrett Email, Starrett confirms with Goldstone that they have "purposely not told [the auditors] about the margin calls so that we don't escalate an issue which we believe will be put to rest by the time they have to issue their opinion."  Feb. 25 Goldstone/Starrett Email at 2.  Starrett's statement demonstrates that the information they withheld from KPMG -- Thornburg Mortgage's payment plans, for example -- would impact KPMG's opinion.  Were the payment plans truly immaterial the Defendants would have no reason to hide their existence.  The Feb. 22 BOD Email similarly demonstrates the importance of Thornburg Mortgage's payment plans in relation to its financial statements:

Goldstone states that they "don't want to disclose our current circumstances until it is resolved." Feb. 22 BOD Email at 2.  Additionally, Thornburg Mortgage's lenders found its delay in meeting margin calls significant to their ongoing financial relationship: "[Credit Suisse] is willing to withdraw from the underwriting group since they realize their attorneys will probably not agree to anything short of disclosing the delay in meeting their margin call earlier this week."  Feb. 21 Burns/Goldstone Email at 2.  It is likely that discovery will confirm that Thornburg Mortgage's difficulty in meeting margin calls was material to the OTTI analysis, and, therefore, the omission of that discussion was material, in both the Going Concern Analysis and in the management representation letter.  See Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. at 1323.

Goldstone and Simmons contend that the collapsing European hedge fund was only an "unconfirmed rumor," which they had no duty to disclose to KPMG, but their own electronic mail discussion of the "rumor" demonstrates its importance.  Goldstone & Simmons Reply at 34. For example, Simmons' response to the news of the hedge fund's collapse is his directive for Thornburg Mortgage to file the 2007 Form 10-K as soon as possible, indicating that he knows the collapse will impact Thornburg Mortgage's financial statements.  See Feb. 27 Simmons/Feldman Email at 2 ("This makes it even more critical to be done with Citigroup Global today so we can get the K filed.").  Goldstone also indicated that he expected the hedge fund's collapse to negatively impact Thornburg Mortgage: "They got hit with 20 point haircuts on Alt-A AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it."  Feb. 27 Goldstone/Simmons Email at 2.  Just as Goldstone and Simmons considered the collapse of the hedge fund and the increased margin calls which would accompany it relevant to the 2007 Form 10-K, the Court concludes that KPMG would have found the hedge fund's collapse relevant and material in assessing Thornburg Mortgage's ability

to meet margin calls without selling assets going forward.  See Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d at 1126.   The Court notes that the SEC's allegations establish that only Goldstone and Simmons were aware of the collapsing European hedge fund, and that they became aware of the collapse on February 27, 2008.  See Complaint ¶¶ 76, 78, at 22-23.  Accordingly, Starrett cannot be liable for the alleged material omission of the collapsing European hedge fund to KPMG.  Additionally, it appears as though Goldstone and Simmons learned of the collapsing European hedge fund after issuing the Going Concern Analysis to KPMG on February 20, 2008.  See Complaint ¶ 72, at 21.  Goldstone and Simmons cannot be liable, therefore, for failing to disclose the collapse in the Going Concern Analysis, but, to the extent that the hedge fund's collapse rendered their OTTI analysis false, Goldstone and Simmons had a duty to disclose the information.  "[I]f a defendant makes a statement on a particular issue, and that statement is false or later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement."  Grossman v. Novell, Inc., 120 F.3d at 1125.

The SEC's last allegation of a misrepresentation or omission to KPMG before the 2007 Form 10-K was filed relates to Simmons' statement that Thornburg Mortgage entered into the I/O Strip Transactions to take advantage of favorable pricing, but not to meet margin calls.  See Complaint ¶ 65, at 19.  The SEC contends that, had KPMG known of the true purpose of the I/O Strip Transactions, it would have disagreed with Thornburg Mortgage's OTTI analysis, but the materiality of that omission may be weaker than the others.  Regardless of whether Simmons informed KPMG that the I/O Strip Transactions were used to meet margin calls, KPMG could infer, as the SEC asserts the Court should infer, that the I/O Strip Transactions decreased Thornburg Mortgage's liquidity and, accordingly, diminished its ability to continue to meet

margin calls without selling assets.   On the other hand, in the context of the total mix of information available to KPMG, it may not have been apparent that the I/O Strip Transactions were significant in relation to Thornburg Mortgage's ability to meet margin calls, because Simmons' statement hid the purpose of the Transactions and, therefore, minimized Thornburg Mortgage's strained liquidity.   See TSC Indus., Inc. v. Northway, Inc., 426 U.S. at 449 (defining an omission as material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available").   Discovery may indeed reveal that, in the context of all information available to KPMG, Simmons' misrepresentation of the purpose for the I/O Strip Transactions was immaterial, because KPMG could accurately assess Thornburg Mortgage's liquidity knowing that they occurred, regardless of their stated purpose.   On the other hand, Simmons' statement could have caused KPMG to believe that Thornburg Mortgage had no need to sell I/O Strips to meet its margin calls and would have, therefore, overstated Thornburg Mortgage's financial condition.   In so far as Simmons' misrepresentation of the reason for the I/O Strip Transactions "alters the meaning" of the OTTI analysis in the Going Concern Analysis and management representation letter, the Court concludes that the misrepresentation was material.   McDonald v. Kinder-Morgan, Inc., 287 F.3d at 998.   The Court will not, therefore, accept the Defendants' argument that the information allegedly omitted from the Going Concern Analysis and management representation letter regarding Thornburg Mortgage's intent and ability to hold its ARM securities to maturity was immaterial.   The Court has determined that rules 13b2-2(a) and (c)(1) do not require the SEC to allege that the Defendants acted with scienter, and, therefore, the SEC's allegations which establish that the Defendants materially misled KPMG suffice to state a claim under those rules.   The Court will not dismiss the SEC's

allegations in Count 7 to the extent they are based upon the OTTI analysis in the Going Concern Analysis and the management representation letter, the omission of discussion of Thornburg Mortgage's difficulty meeting margin calls, the omission of the discussion of the collapsing European hedge fund in the management representation letter, and Simmons' misrepresentation that Thornburg Mortgage had entered into the I/O Strip Transactions to take advantage of favorable pricing rather than to meet margin calls.

**B.      THE SEC HAS SUFFICIENTLY ALLEGED THAT GOLDSTONE AND SIMMONS MISLED KPMG AFTER THE 2007 FORM 10-K WAS FILED.**

The SEC alleges that, after the 2007 Form 10-K was filed, Goldstone and Simmons failed to provide the "critical" Citigroup Global Letter in response to the Request for Correspondence, Complaint ¶¶ 100-101, at 29, and Simmons misrepresented to KPMG that the margin calls Thornburg Mortgage received were "unforeseeable" and attributable to an "unexpected collapse" of the European hedge fund, Complaint ¶¶ 103-105, at 30, and, in so doing, deceived KPMG in violation of rule 13b2-2.  Goldstone and Simmons contend that the Citigroup Global Letter was immaterial, because KPMG did not request all correspondence, but, rather, indicated that correspondence such as the Citigroup Global Letter may be relevant in its determination whether to restate its opinion, and the Citigroup Global Letter did not impact Thornburg Mortgage's financial statements.  See Goldstone and Simmons Reply at 35-36.  The SEC concedes that Starrett was not aware of the Citigroup Global Letter and, accordingly, cannot be liable for failing to disclose it to KPMG.  See Complaint ¶ 101, at 29.  Simmons also contends that he accurately reported that the margin calls after the 2007 Form 10-K was filed were unforeseeable, as he and Goldstone expected Thornburg Mortgage would receive more gradually the margin calls which the European hedge fund's collapse precipitated.  See Goldstone & Simmons MTD

at 65.  The SEC has not alleged that Goldstone or Starrett made a misrepresentation to KPMG in the Position Paper.  Although the SEC alleges that Goldstone, Simmons, and Starrett received the Request for Correspondence, the SEC specifically alleges that only Simmons reviewed and approved the Position Paper, and Simmons alone misrepresented his awareness of the European hedge fund's collapse.  See Complaint ¶¶ 102-105, at 30 ("Simmons continued to deceive the company's auditor during its restatement work by attributing Thornburg Mortgage's February 28th margin calls to 'unforeseeable' circumstances . . . .").  Accordingly, the Court will analyze whether Goldstone and Simmons' failure to provide the Citigroup Global Letter materially misled KPMG, and whether Simons materially misrepresented that Thornburg Mortgage's margin calls after the 2007 Form 10-K was filed were unforeseeable.  The Court determines that the SEC has sufficiently alleged that the omission and misrepresentation materially misled KPMG in violation of rules 13b2-2(a) and (c)(1) promulgated under the Exchange Act.

The Court does not agree that the Citigroup Global Letter was immaterial to KPMG in response to the Request for Correspondence.  Although Goldstone and Simmons contend that the Request for Correspondence did not require them to produce the Citigroup Global Letter, see Goldstone & Simmons MTD at 64, the Request for Correspondence specifically requested a position paper discussing the management's "assessment of the ability to hold securities for the foreseeable future . . . including but not limited to . . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence," Request for Correspondence at 4.  Goldstone and Simmons received the Citigroup Global Letter by at least February 21, 2008, see Complaint ¶ 60, at 17, and, therefore, the Citigroup Global Letter was "[c]orrespondence with counter parties for the two weeks prior to filing," Request for Correspondence at 4.  Not providing the Citigroup Global Letter in response to the specific request for correspondence with

lenders in the two weeks before the 2007 Form 10-K was filed, therefore, at least could have caused KPMG to believe that Thornburg Mortgage had not experienced an event of default with any of its lenders.  Additionally, the Citigroup Global Letter indicates that Thornburg Mortgage was not able to meet margin calls as it received them before the 2007 Form 10-K was filed, which directly relates to the KPMG's inquiry in the Request for Correspondence: The Request for Correspondence required Thornburg Mortgage to provide evidence that it did not expect to receive additional margin calls after the 2007 Form 10-K was filed and that the management did not expect to be unable to meet those margin calls.  See Request for Correspondence at 3 ("[T]he evidence needs to support that the events subsequent to filings were a sudden and catastrophic event that the Company could not have reasonably foreseen.").  On the other hand, the Court notes that the Request for Correspondence requested evidence which supported the OTTI analysis in the 2007 Form 10-K.  In that regard, the Citigroup Global Letter may not have been within the gamut of information KPMG expected to receive from Thornburg Mortgage, as the Citigroup Global Letter contradicts, rather than supports, the OTTI analysis.  The Court concludes, nonetheless, that its omission could have misled KPMG.  The Court has concluded that the OTTI analysis in the 2007 Form 10-K was materially misleading, as it represented that Thornburg Mortgage had the intent and ability to hold its ARM securities until maturity, notwithstanding Thornburg Mortgage's limited cash on hand, its difficulty meeting margin calls, and Goldstone and Simmons' expectation that Thornburg Mortgage would receive additional margin calls with the collapse of the European hedge fund.  The Request for Correspondence requests that the Defendants verify that the OTTI analysis was correct, given that "there is a presumption that the Company should have been aware or at least should have considered the potential that there was a reasonable chance that the Company could have faced margin calls in

excess of its ability to meet such calls." Request for Correspondence  at 3.  The Citigroup Global

Letter evidences that Thornburg Mortgage could meet margin calls in February, 2008, only

through lender forbearance and negotiating payment plans.  Not disclosing the Citigroup Global

Letter could have led KPMG to believe that Thornburg Mortgage had met its margin calls

without lender forbearance -- a fact which, had it been true, would have supported the OTTI

analysis in the 2007 Form 10-K.  Because the Request for Correspondence focused on the OTTI

analysis, omitting the Citigroup Global Letter could have created a materially false impression of

Thornburg Mortgage's financial position, and of the management's belief in its intent and ability

to hold the ARM securities to maturity, in the context all "information available to" KPMG.

United States v. Nacchio, 519 F.3d at 1161-62.

The Position Paper, also, demonstrates that omitting the Citigroup Global Letter could

have materially misled KPMG.  The Position Paper states: "At the end of the day on February 27

Thornburg Mortgage had sufficient liquidity to meet all of its margin calls and management was

comfortable that there would be sufficient liquidity to meet future margin calls generated from

normal market moves."  Position Paper at 2.  Apart from a discussion of the Citigroup Global

Letter, however, this statement could indicate to KPMG that Thornburg Mortgage's continued

ability to meet margin calls would not be dependent on lender forbearance.  Indeed, the forty

million dollars that Thornburg Mortgage had on hand when it filed the 2007 Form 10-K would

be insufficient to meet margin calls on par with those it received in February, 2008.  The

Citigroup Global Letter, as correspondence with lenders in the relevant time frame, indicates that

the management's expectation of Thornburg Mortgage ability to meet margin calls was based

upon their experience that Thornburg Mortgage could avoid a declaration of default through

negotiating payment plans.  To the extent the Position Paper indicates that the management had

no reason to believe Thornburg Mortgage would be unable to meet margin calls as they became due, without relying on lender forbearance, omitting the Citigroup Global Letter could have misled KPMG as to Goldstone and Simmons' knowledge of Thornburg Mortgage's financial strength.  Further, whether the management expected Thornburg Mortgage to be able to meet margin calls was central to KPMG's investigation whether it should restate its audit opinion.  See SEC v. Espuelas, 698 F. Supp. 2d at 436 (stating the rule 13b2-2 promulgated under the Exchange Act "provides that directors or officers shall not make or cause to made a materially misleading . . . omission to an accountant in connection with SEC filings . . . .").  Omitting the Citigroup Global Letter "alters the meaning of the statement," McDonald v. Kinder-Morgan, Inc., 287 F.3d at 998, that the management was "comfortable that there would be sufficient liquidity to meet future calls," Position Paper at 2, as the management could expect to rely on lender forbearance to meet margin calls on the scale of those Thornburg Mortgage received in February, 2008, rather than meeting margin calls with cash and liquidity on hand.  The Court concludes, therefore, that not disclosing the Citigroup Global Letter in response to the Request for Correspondence could have been a material omission, and the Court will not dismiss the SEC's allegations in Count 7 to the extent they are based on that omission.

The Court also concludes that Simmons' characterization of the European hedge fund's collapse as "unexpected" and of the margin calls after the 2007 Form 10-K was filed as "unforeseeable" could have materially misled KPMG.  Position Paper at 2.  KPMG informed the Defendants that the "Question at hand," on March 3, 2008, was "[w]hat did management know before, during, and after the filing, and what should management have known," given that KPMG's discussion with management before the 2007 Form 10-K was filed indicated that the events on "August 28th through March 3rd were not and could not have been reasonably

anticipated."  Request for Correspondence at 3.  Simmons' response to the question related that "management ha[d] reason to believe that the liquidity situation would improve over the following weeks" after February 27th, 2008, but that "a number of factors including the unexpected collapse of a major hedge fund in Europe" caused the mortgage market to collapse significantly further.  Position Paper at 2.  The SEC alleges that this statement was plainly untrue, as Goldstone and Simmons knew that the hedge fund was collapsing before the 2007 Form 10-K was filed, and they expected Thornburg Mortgage to receive increased margin calls because of its collapse.  See Complaint ¶¶ 38-40, at 12; id. ¶ 105, at 30.  Although Goldstone related to Simmons that he expected Thornburg Mortgage to experience the negative repercussions more gradually, see Feb. 27 Goldstone/Simmons Email at 2, Simmons responded that the news of its collapse made it "critical" that Thornburg Mortgage satisfy the Citigroup Global margin call so that the 2007 Form 10-K could be filed immediately, Feb. 27 Simmons/Feldman Email at 2.  Simmons' response indicates that at least he expected the collapse to have an imminent negative impact on Thornburg Mortgage's margin call situation, contrary to the statement in the Position Paper that the hedge fund's collapse and subsequent downturn in mortgage markets was "unexpected."  Position Paper at 3.  The Court concludes that Simmons' representation to KPMG that the European hedge fund's collapse was "unexpected," and that the subsequent downturn in the mortgage markets was "unforeseeable" could have misled KPMG to believe that Simmons did not believe Thornburg Mortgage would receive additional margin calls soon after the hedge fund's collapse.  Position Paper at 3.  KPMG specifically requested evidence, in connection with its determination whether to restate its audit opinion, that the management did not expect Thornburg Mortgage to receive margin calls it could not meet after the 2007 Form 10-K was filed and Simmons' representation that he did not

expect the European hedge fund's collapse or its negative impact on Thornburg Mortgage's financial statements is belied by his response to the news on February 27, 2008.  The Court concludes, therefore, that Simmons' representation that the European hedge fund's collapse and its negative impact on Thornburg Mortgage's securities was unexpected could have materially misled KPMG regarding Simmons' knowledge before the 2007 Form 10-K was filed.  The Court, therefore, will not dismiss the SEC's allegations in Count 7 to the extent they are based on that alleged misrepresentation.

**C.    THE SEC HAS NOT STATED A PLAUSIBLE CLAIM THAT THE DEFENDANTS VIOLATED RULES 13B2-2(b) AND (c)(2) PROMULGATED UNDER THE EXCHANGE ACT.**

It is not clear to the Court that the SEC is attempting to hold the Defendants liable under rules 13b2-2(b) and (c)(2) of the Exchange Act for taking "any action to coerce, manipulate, mislead, or fraudulent influence any independent public or certified public accountant" in connection with Thornburg Mortgage's audit.  17 C.F.R. § 240.13b2-2(b), (c)(2).  The conduct that the SEC alleges violates rule 13b2-2 relates to misrepresentations and omissions; the SEC alleges that the Defendants misrepresented Thornburg Mortgage's financial condition and the OTTI analysis in the Going Concern Analysis and the management representation letter, that Goldstone and Simmons concealed the Citigroup Global Letter and the European hedge fund's collapse from KPMG, and that Simmons misrepresented the purpose of the I/O Strip Transactions and whether the margin calls were expected in the Position Paper.  The SEC has stated rules 13b2-2(b) and (c)(2) are violated through conduct such as:

   • Offering or paying bribes or other financial incentives, including offering future employment or contracts for non-audit services,

   • Providing an auditor with an inaccurate or misleading legal analysis,

• Threatening to cancel or canceling existing non-audit or audit engagements if the auditor objects to the issuer's accounting,

• Seeking to have a partner removed from the audit engagement because the partner objects to the issuer's accounting,

• Blackmailing, and

• Making physical threats.

68 F.R. 31820-01, 31823, 2003 WL 21218518.  The SEC has noted that the facts of a particular case will determine whether a defendant's conduct is coercion, manipulation, or fraudulent influence that the rule is intended to encompass, see 68 F.R. 31820-01, 31823, 2003 WL 21218518, but the Court sees no indication that the Defendant's alleged misrepresentations and omissions rise to the level of the rules' prohibited conduct.  Although the OTTI analysis is somewhat similar to providing "an inaccurate or misleading legal analysis," 68 F.R. 31820-01, 31823, 2003 WL 21218518, had the SEC intended for rules 13b2-2(b) and (c)(2) to encompass providing a false accounting opinion, the SEC would have no reason to refer to false legal analyses instead.  The Court concludes, therefore, that the SEC's allegations that the Defendants made material misrepresentations and omissions to KPMG in connection with KPMG's audit fail to state a claim for relief under rules 13b2-2(b) and (c)(2) promulgated under the Exchange Act.

In sum, the Court dismisses the SEC's allegations in Count 7 in part.  The Court will dismiss any allegations based upon violations of rules 13b2-2(b) and (c)(2) promulgated under the Exchange Act.  The Court will also dismiss the allegations that the Defendants deceived KPMG through misrepresenting that Thornburg Mortgage successfully continued to meet its margin calls and not disclosing that Thornburg Mortgage was in violation of its reverse repurchase agreements deceived KPMG.   The Court will not dismiss the SEC's allegation that

Defendants deceived KPMG in the Going Concern Analysis through misrepresenting the OTTI analysis and that Thornburg Mortgage returned to profitability in the fourth quarter 2007. The Court will also not dismiss the SEC's allegations that the management representation letter misrepresented the OTTI analysis, and that Thornburg Mortgage had not experienced events between February 20, 2008 and February 27, 2008, which caused it to adjust its financial statements or impacted its ability to continue as a going concern. The Court will not dismiss the SEC's allegations that Simmons' misrepresented the purpose of the I/O Strip Transactions and that he had no reason to expect increased margin calls after the 2007 Form 10-K was filed. The Court will also not dismiss the SEC's allegations that Goldstone and Simmons deceived KPMG through not providing the Citigroup Global Letter in response to the Request for Correspondence.

The Court, therefore, grants the motions to dismiss in part and denies them in part. The Court will dismiss the SEC's allegations in Counts 1, 2, 3, 4, 6, 8, and 9 to the extent they are based on the statement in the 2007 Form 10-K that Thornburg Mortgage had successfully met its margin calls at the time the 2007 Form 10-K was filed. The Court will also dismiss the SEC's allegations in Counts 1, 2, 3, 4, 6, 8, 9, and 11 to the extent they are based upon the statement in the 2007 Form 10-K that Thornburg Mortgage did not sell assets to meet margin calls. The Court will also dismiss the allegations in Counts 1, 3, 4, 5, 8, and 10 to the extent they are based upon Starrett's primary liability for participating in a fraudulent scheme to misrepresent the OTTI analysis in the 2007 Form 10-K. The Court will also dismiss the SEC's allegations in Count 7 to the extent they are based upon the Defendants' statement to KPMG that Thornburg Mortgage had not violated its reverse repurchase agreements and continued to meet its margin calls. The Court will dismiss the SEC's allegations in Count 7 under Exchange Act rule 13b2-

2(b) and (c)(2), because the SEC has not alleged that the Defendants used manipulation or coercion to influence KPMG's audit.

The Court, therefore, grants the motions to dismiss in part and denies them in part. The Court will dismiss the SEC's allegations in Counts 1, 2, 3, 4, 6, 8, and 9 to the extent they are based on the statement in the 2007 Form 10-K that Thornburg Mortgage had successfully met its margin calls at the time the 2007 Form 10-K was filed. The Court will also dismiss the SEC's allegations in Counts 1, 2, 3, 4, 6, 8, 9, and 11 to the extent they are based upon the statement in the 2007 Form 10-K that Thornburg Mortgage did not sell assets to meet margin calls. The Court will also dismiss the allegations in Counts 1, 3, 4, 5, 8, and 10 to the extent they are based upon Starrett's primary liability for participating in a fraudulent scheme to misrepresent the OTTI analysis in the 2007 Form 10-K. The Court will also dismiss the SEC's allegations in Count 7 to the extent they are based upon the Defendants' statement to KPMG that Thornburg Mortgage had not violated its reverse repurchase agreements and continued to meet its margin calls. The Court will dismiss the SEC's allegations in Count 7 under Exchange Act rule 13b2-2(b) and (c)(2) because the SEC has not alleged that the Defendants used manipulation or coercion to influence KPMG's audit.

The Court will not dismiss the allegations in Counts 1, 2, 3, 4, 5, 6, 8, 9, 10, and 11 against Goldstone and Simmons for the misrepresented OTTI analysis in the 2007 Form 10-K, and against the Defendants for aiding and abetting the representation of a false OTTI analysis. The Court will not dismiss the SEC's allegations in Counts 1 and 4 to the extent they are based on Goldstone's misrepresentation of Thornburg Mortgage's financial condition through the investor relations department and on Street Signs after the 2007 Form 10-K was filed.

The Court will also not dismiss the SEC's allegations in Count 7 against the Defendants to the extent they are based upon the OTTI analysis in the Going Concern Analysis and the management representation letter.  The Court will not dismiss the SEC's allegation in Count 7 to the extent it is based upon Goldstone and Simmons' failure to factor the European hedge fund's collapse into the management representation letter's OTTI analysis or disclose that information to KPMG.  The Court will also not dismiss the SEC's allegation that Simmons' misrepresented to KPMG that Thornburg Mortgage entered into the I/O Strip Transactions to take advantage of favorable pricing.  The Court will also not dismiss the allegations in Count 7 that Goldstone and Simmons' failure to disclose the Citigroup Global Letter in response to the Request for Correspondence was a material omission.  The Court will not dismiss the allegations in Count 7 that Simmons' misrepresented in the Position Paper that the European hedge fund and Thornburg Mortgage's increased margin calls were unexpected and unforeseeable events.

**IT IS ORDERED** that (i) the Motion to Dismiss on Behalf of Defendants Larry Goldstone and Clarence G. Simmons and Memorandum of Law in Support, filed May 21, 2012 (Doc. 35), is granted in part and denied in part; (ii) the Defendant Jane Starrett's Motion to Dismiss and Memorandum of Points and Authorities in Support, filed May 21, 2012 (Doc. 36), is granted in part and denied in part; and (iii) the Request for Judicial Notice in Support of Defendants' Motions to Dismiss Complaint, filed May 21, 2012 (Doc. 39)("Request for Judicial Notice"), is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

- 324 -

*Counsel:*

Kenneth J. Gonzalez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

-- and --

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

     *Attorneys for Plaintiff Securities and Exchange Commission*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

-- and --

Chris Johnstone
Alanna G. Buchanan
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

-- and --

John Valentine
Lauren R. Yates
Michael A. Lamson
April N. Williams
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

-- and --

Randall Lee
Jessica Kurzban
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

    *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Andrew G. Schultz
Bruce D. Hall
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

-- and --

Jerry L. Marks
Paul M. Torres
Robert J. Liubicic
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

-- and --

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

    *Attorneys for Defendant Jane E. Starrett*