IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

vs.                                          No. CIV 12-0257 JB/LFG

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

        Defendants.

### MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on KPMG LLP's Motion to Intervene, filed January 18, 2013 (Doc. 125)("Motion to Intervene").  The Court held a hearing on February 11, 2013.  The primary issue is whether the Court should permit Klynveld, Peat, Marwick, Goerdeler LLP ("KPMG") to intervene in this suit under rule 24 of the Federal Rules of Civil Procedure.  The Court will grant the Motion to Intervene, because KPMG has satisfied the elements set forth in rule 24(a)(2) for intervention as a matter of right and the requirements set forth in rule 24(b)(1) for permissive intervention.  The Court concludes that KPMG may intervene for the limited purpose of objecting to Defendants' Motion to Compel Production of PCAOB Deposition Transcripts and Plaintiff's Notes and Memoranda of Interviews with Non-Party Witnesses, filed November 28, 2012 (Doc. 90)("Motion to Compel"), to the extent the Motion to Compel seeks documents or information protected under section 105(b)(5)(A) of the Sarbanes-

---

[1] The Court entered an Order, filed September 24, 2013 (Doc. 216), granting KPMG LLP's Motion to Intervene, filed January 18, 2013 (Doc. 125), and stating: "The Court may . . . issue a memorandum opinion more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

Oxley Act, 15 U.S.C. Section 7215(b)(5) ("PCAOB Privilege")[2], and ensuring KPMG's right to appeal any Court order granting that motion.

## FACTUAL BACKGROUND

Defendants are former officers of Thornburg Mortgage Inc.: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  Complaint ¶ 1, at 1, filed March 13, 2012 ("Doc 1")("Complaint").  The Plaintiff Securities and Exchange Commission ("SEC") alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the Thornburg Mortgage 2007 Form 10-K Annual Report, filed May 21, 2012 (Doc. 37-2)("2007 Form 10-K").  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[3]  Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico and once was the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the allegations in the Complaint, Thornburg Mortgage's shares were traded on the

---

[2] The Defendants refer to the privilege that 15 U.S.C. Section 7215(b)(5)(A) provides as the "PCAOB privilege," whereas KPMG uses the term "Section 105 Privilege."  The Court takes these two terms to refer to the same privilege that the statute provides, and uses "PCAOB Privilege" for the purposes of clarity and continuity.

[3] An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index."  Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo" ARM securities; Thornburg Mortgage also purchased ARM securities that third parties originated.[4]  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and investment business through reverse repurchase agreements backed by ARM securities.[5]  See Complaint ¶ 3, at 2.  Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg

---

[4] "Super-jumbo" and "jumbo," in reference to ARM securities, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that Fannie Mae and Freddie Mac set.  Super jumbo mortgage, Wikipedia.  These limits vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "Super-jumbo" is not expressly defined or regulated, but mortgage companies instead use it to internally and independently set loan parameters.  The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  Super jumbo mortgage, Wikipedia.

[5] A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to repo."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.[6]  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties otherwise agreed.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, § 11(a), at 7-8, filed July 20, 2012 (Doc. 60-2); Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, § 11(a), at 7, filed July 20, 2012 (Doc. 60-3); Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at

---

[6] A "margin call" is a "securities broker's demand that a customer put up money or stock as collateral when the broker finances a purchase of securities.  A margin call usu[ally] occurs when the market prices of the securities are falling."  Margin Call, Black's Law Dictionary 232 (9th ed. 2009).

10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, on February 21, 2008, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  Complaint ¶ 3, at 2; id. ¶ 34, at 10-11.  See Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 between Citigroup Global Markets, Inc. as intermediating agent for Citigroup Global Markets Limited and together with Citigroup Global Markets, Inc. and Thornburg Mortgage, sent February 21, 2008, filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter").  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an electronic mail transmission from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Electronic Mail Transmission from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2 (February 21, 2008, 9:30 a.m.), filed May 21, 2012 (Doc. 37-10).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the

margin calls it received in the second half of the month.[7]  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an electronic mail transmission from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Electronic Mail Transmission from Larry Goldstone to Garret Thornburg et al., Subject: TMA Update - Friday Morning, February 22 at 2 (February 22, 2008 at 8:42 a.m.), filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22 Email")).  In an electronic mail transmission sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "moving towards resolving [its] margin issues" through, among other strategies, having "sold some additional IO securities[.]"  Electronic Mail Transmission from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25 Email")).  See Complaint ¶ 68, at 20 (quoting Feb. 25 Email).

   The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an electronic mail transmission from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its]

---

[7] An "interest-only strip" is a "security based solely on the interest payments from a pool of mortgages, Treasury bonds, or other bonds.  Once the principal on the mortgages or bonds has been repaid, interest payments stop, and the value of the [interest-only strip] falls to zero."  Interest-Only Strip, The Free Dictionary, http://financial-dictionary.thefreedictionary.com/Interest-only-strip (last visited June 5, 2013).

TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"   Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.   Complaint ¶ 30, at 9-10.   In an electronic mail transmission from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> "We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met."

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22 Email at 2).   Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same electronic mail transmission.   Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22 Email at 2).   Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"   Complaint ¶ 31, at 10 (quoting Feb. 22 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing. See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an electronic mail transmission to Simmons on February 27, 2008, in which he said:

> "Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got his with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it."[8]

---

[8] An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia

Complaint ¶ 38, at 12 (quoting Electronic Mail Transmission from Larry Goldstone to Clay Simmons at 2 (February 27, 2008, 3:48 p.m.), filed May 21, 2012 (Doc. 37-21)("Feb. 27 Goldstone/Simmons Email")).  Simmons sent an electronic mail transmission to Goldstone and others regarding the potential collapse of a European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Electronic Mail Transmission from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, (February 27, 2008, 8:08 a.m.), filed May 21, 2012 (Doc. 37-20)("Feb. 27 Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an electronic mail transmission to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40, at 12 (alteration in original)(quoting Electronic Mail Transmission from Clay Simmons to Jane Starrett at 2 (February 27, 2008, 10:35 a.m.), filed May 21, 2012 (Doc. 37-38)("Feb. 27 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone

---

(February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia.  "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5th, 2013).

and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[9]  See Complaint ¶ 37, at 11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that serve as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  Thornburg Mortgage's

---

[9] According to the Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset."  The Financial Accounting Standards Board ("FASB") explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

financial statements in the 2007 Form 10-K were incorporated into its Form S-3 ASR registration statement, which relates to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which Goldstone and Simmons signed and was filed with the SEC on December 10, 2007.[10]  See Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008. See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning electronic mail transmission regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Electronic Mail Transmission from Clay Simmons to Larry Goldstone at 2 (February 28, 2008, 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28 Simmons/Goldstone Email")).  In an electronic mail transmission from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'"  Complaint ¶ 94, at 27 (alterations in original).  See Electronic Mail Transmission from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2 (February 28, 2008, 5:29

---

[10]  "ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

a.m.), filed May 21, 2012 (Doc. 37-27).   At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an electronic mail transmission that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.   See Complaint ¶ 95, at 28; Electronic Mail Transmission from Larry Goldstone to Thornburg Mortgage Board of Directors at 2 (February 28, 2008, 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28 Email"). As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.   See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").   Complaint ¶ 98, at 28.   On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"   Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09 (CNBC television broadcast February 28, 2008), filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.   Complaint ¶ 41, at 13.   At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via electronic mail transmission, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.   We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.   We returned to profitability during the fourth quarter despite a tough market.'"   Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[11]   Complaint ¶¶ 49-50, at 50-51.   As part of Thornburg's 2007 audit, KPMG assessed whether Thornburg's OTTI analysis was accurate.   See Complaint ¶ 49, at 14-15.[12]   The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008; (iv) that Thornburg Mortgage had received the Citi Letter; and (v) that the European hedge fund was on the verge of collapsing.   Complaint ¶ 51, at 15; id. ¶ 76, at 22; id. ¶ 99, at 29.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they stated that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no

---

[11] An "impairment" is a "reduction in a company's stated capital."   Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[12] The Complaint does not identify Thornburg Mortgage's auditor as KPMG.   The Court, however, has determined that it may take judicial notice of documents referenced in the Complaint and central to the SEC's allegations, and the Court has taken judicial notice of an Electronic Mail Transmission from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3 Hall Email"), which indicates that Thornburg's auditor was KPMG, see March 3 Hall Email at 2 (representing that the electronic mail transmission was sent from an employee of KPMG).

subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going concern.  See Complaint ¶ 57, at 17.  Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's.  See Complaint ¶ 76, at 22.  "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."  Electronic Mail Transmission from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel (March 3, 2008 11:44 p.m.) at 2, filed May 21, 2013 (Doc. 37-28)("March 3 Hall Email").  The requested evidence included "correspondence with lenders/attorneys/shareholders, emails."  Request for Correspondence, attached to March 3 Hall Email, at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").  See Complaint ¶ 100, at 29.  KPMG also requested a "position paper" which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . correspondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  At the time, KPMG as auditor was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.  KPMG did not become

aware of the Citi Letter while preparing its restatement.  See Complaint ¶ 101, at 29.  Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"  Complaint ¶ 102, at 29 (quoting citing ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).  The analysis stated: "Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]  No one in the market could have foreseen the sudden decline in mortgage valuations."  Complaint ¶ 103, at 30 (quoting Position Paper at 2)(emphasis added in Complaint).

The SEC subsequently began an investigation.  See Defendants' Motion to Compel Production of PCAOB Deposition Transcripts and Plaintiff's Notes and Memoranda of Interviews with Non-Party Witnesses at 9, filed November 28, 2012 (Doc. 90)("Motion to Compel").  As part of its investigation of Thornburg Mortgage, the SEC served on KPMG a Subpoena for the Production of Documents relating to its audit of Thornburg Mortgage for the 2007 fiscal year, Thornburg Mortgage's quarterly reviews during that time, and any relevant restatements.  See Letter from George Salter, attorney for KPMG, to Jessica Kurzban, attorney for Goldstone and Simmons, sent October 23, 2012, filed December 4, 2012 (Doc. 92-3)("Salter to Kurzban Letter")(quoting the SEC's Subpoena).  "Less than a year later," the Public Company Accounting Oversight Board ("PCAOB"), "a non-governmental entity created by the Sarbanes-Oxley Act of 2002 to oversee the auditors of public companies, began investigating KPMG in connection with its 2007 year-end audit of Thornburg."  Motion to Compel at 9.  As part of its

investigation, the PCAOB took the testimony and sworn statements of eleven KPMG employees.
See Motion to Compel at 9.

## PROCEDURAL BACKGROUND

The SEC brought this case as part of an enforcement action against the Defendants.  See
Complaint at 1.  During discovery, Goldstone and Simmons served on KPMG their Subpoena to
Produce Documents that directs KPMG to produce documents, electronically stored information,
and communications concerning services that KPMG provided in 2007-2008 to Thornburg
Mortgage.  See Subpoena to Produce Documents, Information, or Objects or to Permit Inspection
of Premises in a Civil Action, served September 18, 2012, filed December 4, 2012 (Doc. 92-
1)("Subpoena").  The Subpoena requires KPMG to produce:

Request No. 1

> All DOCMENTS or COMMUNICATIONS CONCERNING the 2007-
> 2008 SERVICES INCLUDING all draft and final workpapers (in hard copy and
> electronic form), reports, correspondence (internal and external), consultations
> with YOUR National Office, notes, memoranda, desk files, and working files.
> For the elimination of doubt, this Request INCLUDES (1) DOCUMENTS or
> COMMUNICATIONS CONCERNING any possible accounting errors,
> irregularities, internal control weaknesses or deficiencies in the books and records
> at THORNBURG, YOUR internal reviews, evaluations or assessments of the
> 2007-2008 SERVICES, YOUR decision to withdraw YOUR audit opinion with
> respect to THORNBURG'S 2007 financial statements, and/or any DOCUMENTS
> or information that THORNBURG did not provide YOU in connection with the
> 2007-2008 SERVICES, and (2) all COMMUNICATIONS with THIRD PARTY
> LENDERS, the PCAOB, or any GOVERNMENT ENTITY.[13]

Request No. 2

> All DOCUMENTS or COMMUNICATIONS CONCERNING any
> INVESTIGATION of KPMG in connection with the 2007-2008 SERVICES,
> INCLUDING an INVESTIGATION by the SEC, the PCAOB, or any other
> GOVERNMENT ENTITY.  For the elimination of doubt, this Request
> INCLUDES production letters, other correspondence CONCERNING
> productions, correspondence CONCERNING interview or meeting with any

---

[13] Terms in capital letters are defined and capitalized in the Subpoena.

current or former KPMG employees, transcripts, notes, memoranda or recordings CONCERNING interviews or meetings (whether on-the-record or off-the-record), and documents read or shown to interviewees during such interviews or meetings. This Request also INCLUDES DOCUMENTS that refer or relate to the PCAOB's findings made after its INVESTIGATION.

Request No. 3

All DOCUMENTS or COMMUNICATIONS CONCERNING any possible deficiencies in the quality control systems at KPMG or any violation by KPMG of securities laws, PCAOB rules, or professional accounting and auditing practices or standards in connection with the 2007-2008 SERVICES.

. . . .

Request No. 7

DOCUMENTS sufficient to identify: (a) all current or former KPMG employees or associated persons interviewed, whether on-the-record or off-the-record, in connection with the SEC's INVESTIGATION of THORNBURG; (b) all current and former KPMG employees or associated persons from whom KPMG collected and produced DOCUMENTS to the SEC in connection with the SEC's INVESTIGATION of THORNBURG; (c) all current or former KPMG employees or associated persons interviewed, whether on-the-record or off-the-record, in connections with any INVESTIGATION of KPMG in connections with the 2007-2008 SERVICES; and (d) all KPMG employees who worked on the 2007-2008 SERVICES. With respect to (a) and (c), such DOCUMENTS shall INCLUDE, for each interview, the date of the interview, the names of the persons who were present during the interview, the locations of the interview, and the duration of the interview.

Subpoena at 8-9, 10, 11-12 (emphasis in original). KPMG objected and responded to the Subpoena on October 2, 2012. See Non-Party KPMG LLC's Objections and Responses to Defendants Larry Goldstone and Clarence Simmons's Subpoena to Produce Documents, filed December 4, 2012 (Doc. 92-2)("KPMG Objections and Responses").

1.  **KPMG's General Objections.**

KPMG objects generally to the Subpoena as "overbroad, unduly burdensome, and oppressive." KPMG Responses and Objections ¶ 2, at 2-3. KPMG states:

> In connection with the [SEC's] investigation of Thornburg Mortgage, Inc., KPMG, after a reasonable and diligent search, produced over 1.5 million pages of documents and electronically stored information in response to an SEC subpoena. The KPMG production to the SEC included all non-privileged and relevant documents in KPMG's custody and control related to the issues in the above-captioned action. Our understanding is that the entire KPMG production has been turned over by the SEC to Defendants. Accordingly, KPMG does not intend to conduct another search for additional documents related to the issues in the above-captioned action. To the extent other documents may exist that are potentially responsive to the Subpoena, the undue burden, expense, and effort of searching for and producing such documents far outweigh whatever minimal probative value, if any, they may have in this case.

KPMG Responses and Objections at 2-3. KPMG further objects to the Subpoena to the extent that any of the documents that Goldstone and Simmons requested "are protected by the attorney-client privilege, the work-product doctrine, and/or certain other privileges, doctrines or immunities, including the accountant-client privilege, the self-evaluation privilege, and the peer review privilege." KPMG Objections and Responses ¶ 4, at 3. KPMG also generally objects to the Subpoena "to the extent that the documents called for are confidential, privileged, and/or exempted from disclosure under [the PCAOB Privilege] or any other related order, statute, rule, regulation, or law." KPMG Objections and Responses ¶ 6, at 4.

2.   **KPMG Specific Responses.**

In response to Request No. 1, KPMG states:

> In addition to its General Objections, KPMG specifically objects to Request No. 1 on the grounds that it is overbroad, unduly burdensome, oppressive, and seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. KPMG further objects to this Request on the ground that it seeks documents protected by the attorney-client privilege, the work-product doctrine, and/or other applicable domestic or foreign privileges, protections, laws, immunities, or rules. In addition, KPMG objects to this Request to the extent that the documents called for are confidential, privileged, and/or exempted from disclosure under [the PCAOB Privilege] or any other applicable statute or regulation. Additionally, KPMG, which is not a party to this action, specifically objects to this Request to the extent it seeks documents created by or in the possession, custody, or control of other entities.

Subject to and without waiving the General Objections and specific objections, KPMG responds that it has already produced to the SEC relevant documents related to the issues in the above-captioned action, including but not limited to documents responsive to this Request.

KPMG Objections and Responses at 10-11.  In response to Request No. 2, KPMG objects using much of the same language as the response to Request No. 1, including an objection "to this Request to the extent that the documents called for are confidential, privileged, and/or exempted from disclosure under [the PCAOB Privilege] or any other applicable statute or regulation."

KPMG Objections and Responses at 12.  KPMG also states:

Subject to and without waiving the General Objections and specific objections, KPMG responds that to the extent this Request calls for documents concerning the SEC investigation of Thornburg, such documents can be obtained from the Plaintiff, a source that is more convenient, less burdensome, and less expensive; any production from KPMG would be needlessly and unreasonably cumulative or duplicative.  To the extent this Request calls for documents concerning a PCAOB investigation, KPMG will not produce responsive documents, if any exist, for the reasons set forth in the General Objections and specific objections, including, but not limited to, General Objections Nos. 4 and 6.

KPMG Objections and Responses at 12.  KPMG responds to Request No. 3 using nearly identical language to the previous responses, including an objection that this Request seeks documents protected by the PCAOB Privilege.  See KPMG Objections and Responses at 13. KPMG adds to its response to Request No. 3: "KPMG further objects to this Request on the grounds that it seeks documents and/or information that contain commercial and/or financial confidential and proprietary information."  KPMG Objections and Responses at 13.  In response to Request No. 7, KPMG responds using identical language to Response to Request No. 3.  See KPMG Objections and Responses at 17.

3.      **November 9, 2012 Hearing.**

On Friday, November 9, 2012, the Court held an emergency telephonic hearing at the Defendants' request.  See Electronic Mail Transmission from Jessica Kurzban to Stephen

McKenna and Gregory Kasper, sent November 8, 2012, filed December 4, 2012 (Doc. 92-6)("Kurzban to McKenna/Kasper Email").  KPMG participated in the hearing.  <u>See</u> Transcript of Hearing at 4:14-22 (Salter)(taken November 9, 2012), filed December 11, 2012 (Doc. 97)("Nov. 9 Tr.")("I was notified just about, well, 15 minutes before the call was going to occur that this call was going to take place.  And it actually concerns transcripts of testimony that was given by KPMG personnel.  So Mr. McKenna at the SEC thought I ought to be informed and because it relates to KPMG issues, I thought I would make myself available on the phone.").  The Court acknowledged Salter, counsel for KPMG, without objection by either party.  <u>See</u> Nov. 9 Tr. at 5:1-2 (Court).

The Defendants began by stating that the Defendants requested the hearing, because they scheduled a deposition for Tuesday, November 13, 2012, and the Court would be closed on Monday, November 12, 2012, in observance of Veterans Day on Sunday, November 11, 2012. <u>See</u> Nov. 9 Tr. at 5:17-21 (Shultz).  The Defendants stated that, during the SEC's pretrial investigation of Thornburg Mortgage, it interviewed two KPMG employees, namely Cynthia Reinhart and Jennifer Hall.  <u>See</u> Nov. 9 Tr. at 6:2-6 (Schultz)(identifying Reinhart as a former KPMG engagement partner and Hall as the lead KPMG senior manager).  The Defendants informed the Court that the Defendants sent written discovery requests about thirty days before and received the responses on November 7, 2012.  <u>See</u> Nov. 9 Tr. at 6:15-27 (Schultz).  As part of those responses, the Defendants received "a privileged log that the SEC submitted, they identified 11 separate witnesses that they have PCAOB . . . transcripts of."  Nov. 9 Tr. at 6:17-20 (Schultz).  The Defendants explained that national counsel has asked the SEC to produce the PCAOB transcripts, "but they will not produce" them.  Nov. 9 Tr. at 7:1-3 (Schultz).  The Defendants maintained that the transcripts should be produced under the Sarbanes-Oxley Act,

specifically 15 USC § 7215 (b)(5)(a).  <u>See</u> Nov. 9 Tr. at 7:3-5 (Schultz).  The Defendants stated

that the section "provides a general rule of confidentiality, your Honor, except there is a broad

exception at the end of that section that says that the confidentiality that's provided does not

apply . . . 'unless and until presented in connection with a public proceeding.'"  Nov. 9 Tr. at

7:11-16 (Schultz).  The Defendants continued:

> Your Honor, it's the Defendant's contention that these matters -- the SEC's
> already relied on this testimony in connection with the present enforcement action
> which is a public proceeding.  They have these documents, your Honor, we know
> that they've relied on them in drafting their complaint.  We need a copy of these
> so that we can take these depositions.

Nov. 9 Tr. at 7:17-21 (Schultz).  The Court then asked whether the people being deposed on

Tuesday, November 13, 2012, were the subject of the interviews.  <u>See</u> Nov. 9 Tr. at 8:1-3

(Court).  The Defendants clarified that they were only deposing one person on that date, Tara

Baucom, who was one of the witnesses the SEC interviewed pretrial.  <u>See</u> Nov. 9 Tr. at 8:4-8

(Schultz).  The Court asked whether just Baucom's testimony would be needed before the

upcoming deposition deadline and the Defendants responded: "For Tuesday, yes, sir.  That's

what we're up against, but whatever ruling the Court gives we think will have an effect for the

other KPMG employees who will be deposed."  Nov. 9 Tr. at 9:1-7 (Court, Schultz).

   The SEC began its response by stating that it did not rely on the PCAOB transcripts when

drafting the complaint, nor does the SEC intend to use the transcripts in the litigation.  <u>See</u>

Nov. 9 Tr. at 9:13-16 (McKenna).  The SEC stated that it "is divided in part into investigative

staff and then trial attorneys and the investigative staff did receive these from the PCAOB," and

that the trial attorneys "haven't read them and don't plan on using them."  Nov. 9 Tr. at 9:19-23

(McKenna).  The SEC then asserted that "reliance" on those transcripts is not the standard for an

exception to the confidentiality provided by statute.  Nov. 9 Tr. at 9:24-10:1 (McKenna).  The

SEC said that "[t]he statute said that they are protected unless and until they are presented in connection with a public proceeding.  And they certainly have not been presented in this litigation nor do we intend to present them in this litigation."  Nov. 9 Tr. at 10:2-5 (McKenna).  According to the SEC, "[t]he exception does not [apply] and the documents are . . . privileged and specifically exempt from disclosure."  Nov. 9 Tr. at 10:6-8 (McKenna).  The Court then asked whether the litigation side of the SEC has seen the transcripts, to which the SEC replied: "I have not.  I mean, I have seen a PDF image, but I've never opened it, never looked at the transcripts nor has anybody on the trial team."  Nov. 9 Tr. at 10:10-15 (Court, McKenna).  The SEC subsequently asserted that the SEC had conducted its own interviews, which it had provided to the Defendants, but that the PCAOB had given the SEC "copies of some -- I'm not even sure it's all -- of the transcripts that the PCAOB took."  Nov. 9 Tr. at 10:18-23 (McKenna).  The Court then allowed KPMG's counsel to speak to help explain the function of the PCAOB:

> [The] Public Company Accounting Oversight Board, the PCAOB, is the primary regulator for the accounting firms that are doing audits of public companies.  And it was an entity that was created out of Sarbanes-Oxley, the legislation.  And there's a provision which has been the topic of this discussion which provides for the confidentiality of the information that is created either by or for the PCAOB in connection with its investigations.  And so our people at KPMG who have provided any responses or answers to inquiries maintain that that privilege is something that needs to be preserved.  The statute expressly provides for it.

Nov. 9 Tr. at 11:15-25 (Salter).  KPMG also noted that the statute allows the PCAOB to share information with SEC and several other agencies without losing the privilege.  See Nov. 9 Tr. at 12:6-9 (Salter).  The Court, the SEC, and KPMG then discussed case law on the matter.  See Nov. 9 Tr. at 12:12-13:23 (Court, Salter, McKenna).  The Court indicated that "if the SEC folks have not read these or looked at these transcripts then they couldn't have relied upon them for bringing their case," Nov. 9 Tr. at 14:20-23 (Court); the Defendants argued that, although the SEC attempted to distinguish between the investigation team and litigation team, the SEC "must

have relied" on the PCAOB information in drafting the Complaint, Nov. 9 Tr. at 15:1-9 (Schultz). The Defendants explained that the Complaint lists part of the investigative team as counsel, and further, the SEC relied on the PCAOB materials in investigating the case, because the transcripts that the SEC provided to the Defendants reveal that, while speaking with Hall and Reinhart, Julian Robinson, a SEC staff attorney and investigator, stated that he would "skip certain questioning that has been conducted by the PCAOB." Nov. 9 Tr. at 15:5-23 (Schultz). The Defendants also stated that they were aware of one other ongoing case where the SEC produced PCAOB transcripts. See Nov. 9 Tr. at 16:16-18 (Schultz). The Court asked the SEC whether, because the investigative team was listed on the Complaint, the Court would need to assume that the investigative team relied on the PCAOB transcripts in drafting the Complaint. See Nov. 9 Tr. at 17:14-18:7 (Court). The SEC argued that, even if the investigative team reviewed the transcripts, that does not mean the transcripts were "presented in connection with a public proceeding. And if it did, it would completely eviscerate the provision . . . availab[le] to government agencies which specifically said that without losing its status as being privileged and confidential, it can be shared with the Commission." Nov. 9 Tr. at 18:8-15 (McKenna). The Court said that it did not think such a rule would eviscerate the statute's protection, because, for example, private plaintiffs against Thornburg Mortgage would not be able to obtain the materials. See Nov. 9 Tr. at 18:16-22 (Court). The SEC said even that protection would not be present under the Defendants' theory, because, as the SEC understood the Defendants' position, it waived the privilege by bringing the Complaint. See Nov. 9 Tr. at 18:23-25 (McKenna).

The Court asked whether the parties would prefer it to make a decision at the hearing, or submit cases to the Court for the Court to consider, and rule by the following Monday, see Nov. 9 Tr. at 19:1-7 (Court); the SEC said it preferred a decision at the hearing, see Nov. 9 Tr. at 19:8-

11 (McKenna).  After continued discussion about the Complaint and whether the SEC relied on the PCAOB transcripts in drafting the Complaint, the Court determined that it was permissible for the SEC to send an electronic mail transmission to its investigators and ask whether they used the transcripts in drafting the Complaint.  See Nov. 9 Tr. at 22:1-4 (Court).  The Court stated: "If the answer is no, . . . I've got to accept counsel's word all the time in these things.  But if they say 'yes . . . we're quoting right out of the PCAOB,' then you need to produce the transcript." Nov. 9 Tr. at 22:4-8 (Court).  The Court continued: "I think that I'll limit it to information.  That if the information is in the Complaint, then it has to be produced.  So that means that [if] certain portions have to be redacted because they weren't presented, then that's in accordance with the Court's order."  Nov. 9 Tr. at 24:23-25:2 (Court).

### 4. Defendants' Motion to Compel and KPMG's Motion to Quash.

The Defendants subsequently filed a motion to compel the SEC to produce two KPMG employees' testimony transcripts before the PCAOB on November 28, 2012.  See Defendants' Motion to Compel.  The Defendants assert that the contention that KPMG would have disagreed with Thornburg Mortgage's determination that its "[p]urchased ARM Assets were not other-than-temporarily impaired" finds no support in any testimony or other material which the SEC produced during discovery.  See Motion to Compel at 1.  The Defendants maintain that "[t]he SEC has refused to produce transcripts and sworn statements of the eleven KPMG witnesses taken by PCAOB in 2009 on which the SEC has implicitly and expressly relied in shaping its investigation and preparing its Complaint."  See Motion to Compel at 1.

KPMG filed a motion to quash the Subpoena served by the Defendants and for a protective order "precluding any discovery in this action of documents and information protected by the Section 105 Privilege."  Non-Party KPMG LLP's Motion to Quash, in Part, or Modify

Subpoena to Produce Documents, and for Protective Order, filed December 4, 2012 (Doc. 91)("Motion to Quash") at 1.  KPMG asserts that it is entitled to assert the PCAOB Privilege to prevent the PCAOB materials from being made public.  See Motion to Quash at 12-16.  KPMG further asserts that "the Section 105 Privilege applies broadly to all documents created in response to the PCAOB's investigation."  Motion to Quash at 17.  KPMG also maintains that it has not waived the PCAOB Privilege and that the SEC "has no power to waive the Section 105 Privilege."  Motion to Quash at 21.

KPMG opposed the Motion to Compel, arguing that the SEC does not have the power to waive the PCAOB Privilege.  See Non-Party KPMG's LLP's Opposition to Defendant's Motion to Compel, filed December 17, 2012 (Doc. 99)("KPMG Opposition") at 4.  KPMG asserts that the fact the SEC may have used the PCAOB materials to prepare its Complaint does not constitute a presentation to the public that would undermine the PCAOB Privilege.  KPMG Opposition at 9.  KPMG also maintains that the SEC's "unauthorized" and "inadvertent" publication of some of the PCAOB questionnaires[14] does not constitute a waiver of the PCAOB Privilege.  See KPMG Opposition at 9.

    **5.**    **KPMG Motion to Intervene.**

On January 18, 2013, KPMG filed its Motion to Intervene.  KPMG identifies two motions that involve KPMG's assertion that materials relating to the PCAOB's investigation of

---

[14] See PCAOB Witness Background Questionnaire for KPMG Employee Tara Baucam, dated April 17, 2009, filed November 28, 2012 (Doc. 90-2)("Questionnaire").  This form asks for background information from PCAOB witnesses such as former addresses, aliases, and publications.  See Questionnaire at 1.  The form states at the top that it is "Privileged and Confidential Pursuant to Section 1005(b)(5)(A) of the Sarbanes-Oxley Act of 2002." Questionnaire at 1.

KPMG are privileged under the PCAOB Privilege: (i) KPMG's Motion to Quash and (ii) the Defendants' Motion to Compel.  See Motion to Intervene at 1.  KPMG states: "[T]he information Defendants are seeking is confidential, privileged, and exempt from discovery under Section 105."  See Motion to Intervene at 2.  KPMG states that it filed the Motion to Intervene after the Defendants asserted that the KPMG Opposition was procedurally improper without formal intervention.  See Motion to Intervene at 2 (referring to Defendants' Reply to Response to Motion to Compel, at 2-3, filed January 3, 2013 (Doc. 110)("Def's Motion to Compel Reply")).

> Because Defendants' motion to compel directly implicates KPMG's Section 105 Privilege and because the SEC and KPMG, as the Defendants concede, have different views on the scope and application of the privilege, KPMG seeks leave from the Court to intervene for the purposes of protecting its privilege, objecting to Defendants' motion to compel, and preserving its right to appeal any order directing the SEC to produce material protected by KPMG's privilege.

Motion to Intervene at 2-3.  KPMG notes that their counsel "conferred in good faith with counsel for Defendants and the SEC on January 18, 2013, and determined that the SEC does not oppose this motion but that Defendants do oppose the motion."  Motion to Intervene at 3 n.2 (citing D.N.M.LR-Civ. 7.1(a)).

In support of its Motion to Intervene, KPMG asserts that it is entitled to intervene as a matter of right under rule 24(a)(2) and argues that intervention should be granted, because: (i) KPMG has an interest in the subject of the action; (ii) the Court's resolution of Defendants' Motion to Compel "may impair or impede[] KPMG's ability to preserve the confidentiality of PCAOB investigation material"; (iii) the SEC does not adequately represent KPMG's interest; and (iv) the Motion to Intervene is timely.

First, KPMG asserts that it has an interest in the subject of the action.  See Motion to Intervene at 4.  "Defendants' motion to compel specifically seeks the production of PCAOB transcripts of the testimony of KPMG witnesses, as to which KPMG has asserted a Section 105

Privilege.  Accordingly, KPMG plainly has a sufficient 'interest relating' to the 'subject of the action' to justify intervention."   Motion to Intervene at 5 (citing Fed. R. Civ. P. 24(a)(2)).  KPMG also states: "There can be no question that KPMG will be substantially affected in a practical sense by an order compelling the SEC to produce the PCAOB's transcripts of the testimony of KPMG witnesses, because information that Congress made confidential to protect an auditor's reputation will be made public."  Motion to Intervene at 5 n.4.

Second, KPMG asserts that a denial of its Motion to Intervene will impair KPMG's ability to protect information that the PCAOB Privilege protects from public disclosure, as an order granting the Defendants' Motion to Compel the SEC to produce the PCAOB transcripts would destroy the privilege and confidentiality which Section 105 guarantees as to those documents.  See Motion to Intervene at 6.

Third, KPMG asserts that the SEC does not adequately represent KPMG's interest.  See Motion to Intervene at 6-9.

> Here, there is no question that the SEC and KPMG have different interests at stake and take different positions.  While both the SEC and KPMG have asserted the Section 105 Privilege, they have taken different positions on its scope and meaning . . . .  For example, KPMG and the SEC have taken different positions on the meaning of "public proceeding" in Section 105 (b)(5)(A): KPMG contends that 'public proceeding' refers to PCAOB proceedings that have been made public and does not include an enforcement action brought by the SEC, while the SEC does not dispute that this case could be a 'public proceeding' within the meaning of the statute.

Motion to Intervene at 7 (internal citation omitted).  "Similarly, KPMG argues that the SEC has no power to waive the Section 105 Privilege, whereas the SEC merely argues that it did not waive the privilege here."  Motion to Intervene at 7 (internal citation omitted).  KPMG asserts that the "obvious" divergence in positions is itself enough to justify intervention, but adds that there "is a serious divergence in interest between the SEC and KPMG."  Motion to Intervene

at 8.  KPMG contends that its sole concern is the preservation of the PCAOB Privilege, while the SEC, aside from having asserted the PCAOB Privilege, also has to take into account its own interest in prosecuting this case and the SEC's view of the broader public interest.  See Motion to Intervene at 8.  KPMG contends that these diverging interests may render the SEC "prepared to compromise the privilege in ways that KPMG believes are not appropriate and are inconsistent with its interests.  Motion to Intervene at 8.  Thus, the SEC may not adequately represent KPMG's interests in this case."  Motion to Intervene at 8.  KPMG also asserts that KPMG and the SEC would likely take different positions regarding the need for appellate review if the Court grants the Motion to Compel and orders production of the PCAOB transcripts.  See Motion to Intervene at 9.  "KPMG will almost certainly seek to appeal the Court's order in order to preserve the Section 105 Privilege, but the SEC might well view its responsibility to attempt to protect the privilege discharged and be more interested in moving forward with prosecution of its case in this Court."  Motion to Intervene at 9.

Fourth, KPMG asserts that its Motion to Intervene is timely.  See Motion to Intervene at 9-10.

> While not formally moving to intervene until after Defendants' motion to compel has been fully briefed, that is because KPMG has already been participating in the discovery dispute concerning the applicability of the Section 105 Privilege, beginning with the November 9, 2012 hearing when Defendants first raised the issue, even without making a formal intervention motion.

Motion to Intervene ¶ 1, at 10.  KPMG contends that it brings its Motion to Intervene at this juncture because Defendants raised the issue of timing in their reply brief in response to KPMG's brief opposing the Motion to Compel and, "because KPMG wants to take all appropriate precautions to ensure that its interests are protected and its status in this case is clear for purposes of any appeal that may be necessary."  Motion to Intervene at 10.  KPMG also

asserts that the Defendants will suffer no prejudice if the Court allows KPMG to intervene, because the Defendants have already submitted a reply brief in response to KPMG's opposition brief, giving Defendants a full opportunity to respond to KPMG's position on the merits of the privilege issues.  See Motion to Intervene at 10.  KPMG also maintains that allowing KPMG to intervene will have little effect on the case as a whole given that KPMG is only seeking limited intervention.  See Motion to Intervene at 10.

"In addition, even if the Court is not satisfied that KPMG is entitled to intervention of right, KPMG respectfully submits that it should be granted permissive intervention pursuant to Federal Rule of Civil Procedure 24(b)(1)(B)."  Motion to Intervene at 11.  KPMG contends that its assertion of privilege and confidentiality rights establish a common question of law or fact sufficient to support permissive intervention.  See Motion to Intervene at 11.  KPMG concludes that the cases cited, "in addition to the arguments set forth above with respect to KPMG's motion for intervention of right, provide a sound basis for the Court to permit KPMG to intervene pursuant to Rule 24(b)(1)(B)."  Motion to Intervene at 11.

The Defendants argue that, although KPMG says it seeks intervention for a limited purpose, "[t]he parties' and this Court's experience with KPMG to date . . . suggests that KPMG intends to take a far broader role going forward with respect to all matters touching upon the PCAOB's investigation of KPMG's audit of Thornburg Mortgage Inc."  Defendants' Response in Opposition to KPMG LLP's Motion to Intervene at 1, filed January 25, 2013 (Doc. 134)("Response").  The Defendants assert that KPMG's limited interest in asserting the PCAOB Privilege does not justify allowing KPMG to intervene.  Further, the Defendants assert that the SEC already adequately represents KPMG's interests by asserting the PCAOB Privilege with respect to PCAOB materials.  See Response at 1.  The Defendants contend that KPMG's counsel

has also represented all current and former KPMG employees in depositions thus far, and may continue to assert the PCAOB Privilege in any future depositions.  See Response at 1. Additionally, the Defendants assert that "[a]ny concerns KPMG or the SEC have about the possible dissemination of PCAOB-related information going forward will be adequately addressed by the stipulated protective order being negotiated by the parties."  Response at 1.

The Defendants argue that KPMG is not entitled to intervention as a matter of right.  See Response at 5.  The Defendants contend that, because the SEC has consistently asserted the PCAOB Privilege regarding PCAOB materials, the SEC already adequately represents KPMG's interests.  See Response at 5.  "The SEC has consistently asserted the PCAOB [P]rivilege to deny Defendants access to PCAOB transcripts and other materials that Defendants believe are critical to their defense -- just as KPMG has sought to do."  Response at 5.  The Defendants assert that KPMG has failed to meet its burden of demonstrating that it and the SEC have divergent interests.  See Response at 6.  The Defendants contend that the differing positions the SEC and KPMG have taken about the PCAOB Privilege's meaning and scope are insufficient to constitute inadequate representation, because the differences are in legal arguments and not differences in objective.  See Response at 6.

> Moreover, insofar as KPMG and the SEC differ as to whether an SEC enforcement action is a "public proceeding" within the meaning of the statute, that difference cannot justify intervention because the Court has already ruled that the PCAOB [P]rivilege does not apply to PCAOB materials the SEC used or relied upon in crafting the Complaint.  The Court should not allow KPMG to intervene for the purpose of relitigating an issue that has already been decided.

Response at 6-7.  The Defendants assert that case law which KPMG cites "suggesting that a showing of inadequate representation is made when the party upon which the intervenor must rely is the government" is not on point.  See Response at 7 (citing Utah Ass'n of Cntys. v. Clinton, 255 F. 3d 1246 (10th Cir. 2001)).

> The court's decision in that case was swayed in part by a concern that the government might change position at a later stage in the litigation -- even though the government had so far been representing the interests of the intervenors in defending the action . . . .  No such concerns about the SEC changing position exist here.

Response at 7.  The Defendants assert that KPMG has no reason to doubt that the SEC will continue to assert the PCAOB Privilege and represent KPMG's interest regarding the materials which the Defendants seek.  See Response at 7.  "Indeed, the SEC has asserted that position in two separate filings with the Court to date."  Response at 7.

The Defendants assert: "Finally, KPMG contends that a possible divergence of interest exists because KPMG and the SEC would likely take different positions on the need for an interlocutory appeal if the Court sides with Defendants and compels production of the PCAOB transcripts.  This concern is purely speculative."  Response at 8.  The Defendants argue that it is "well established that a potential difference in opinion on whether to take an appeal is ordinarily not the type of divergent interest that will justify intervention as of right."  Response at 8.

The Defendants contend that the Court should exercise its discretion to deny KPMG permissive intervention.  See Response at 8.  The Defendants assert that the SEC and KPMG have the same objective in seeking to prevent the Defendants from gaining access to the PCAOB materials.  See Response at 8.  The Defendants also assert that allowing KPMG to intervene will prejudice the Defendants "by needlessly prolonging a case that already has caused enormous damage to Defendants' reputations."  Response at 8.  The Defendants maintain that "KPMG seeks to relitigate issues that have already been decided and has even admitted that it will likely attempt to drag out the proceedings by pursuing an interlocutory appeal if it disagrees with the Court's ruling."  Response at 8-9.  The Defendants assert that KPMG has already prejudiced

them by filing its response to the Defendants' Motion to Compel without first moving to intervene:

> Defendants were forced to prepare a separate reply brief addressing KPMG's arguments because the SEC would not consent to Defendants addressing both the SEC's and KPMG's arguments in a single brief. This was unnecessary. KPMG would not have been entitled to intervene at that time even if it had filed a timely motion to do so.

Response at 9. The Defendants assert that KPMG would likely not suffer any prejudice if the Court denies the Motion to Intervene. See Response at 9. The Defendants argue: "As a practical matter, KPMG has been and will continue to represent its interest in asserting the PCAOB privilege through its counsel's representation of KPMG witnesses in depositions." Response at 9. The Defendants maintain: "Once the Court has provided guidance on the proper scope of the PCAOB privilege by ruling on the pending discovery motions, there is no reason KPMG's counsel will not be able to assert the privilege appropriately going forward." Response at 9.

The Defendants also assert that a confidentiality stipulation and protective order being negotiated between Defendants and the SEC "will allow for both parties, as well as non-parties like KPMG" to prevent public dissemination of information outside the context of the trial by designating information as confidential. Response at 10. The Defendants contend: "Although such information would not necessarily be subject to the PCAOB privilege KPMG would nonetheless be able to effectuate the purpose of the privilege by preventing disclosure of PCAOB-related information to non-participants in this litigation." Response at 10.

KPMG replied to the Defendants' response to the Motion to Intervene on January 28, 2013. See KPMG LLP's Reply Brief in Support of Its Motion to Intervene, filed January 28, 2013 (Doc. 137)("Reply"). KPMG contends that the Defendants' position that the SEC adequately represents KPMG's interest in asserting the PCAOB Privilege is unsupported by the

facts of the case and "has been consistently rejected by the case law."  Reply at 2.  KPMG

further argues:

> But Defendants concede that KPMG has taken different positions from the SEC
> on several issues regarding application of the privilege and interpretation of the
> statute.  These differences in position are the direct result of the fact that the
> interests of KPMG and the SEC in invoking the Section 105 Privilege are very
> different.

Response at 2.  KPMG maintains that KPMG and its personnel hold the PCAOB Privilege, as it

is their privacy and professional reputations at stake, and "it is they who will suffer the

consequences if, contrary to the intent of Congress, protected information is disclosed."  Reply at

2.  KPMG contends that the SEC has broader and less compelling interests than KPMG's

specific interest in maintaining the PCAOB Privilege.  See Reply at 2.  "While the SEC has a

statutory obligation to protect the privilege, the SEC also has much broader public interests that

it must take into account, both in in the handling of this case and in pursuing the public interest

generally."  Reply at 3.

KPMG asserts that the ability to participate in depositions does not provide KPMG the

opportunity to object to the PCAOB materials' disclosure, "and KPMG's right to participate in

the court proceedings on Defendants' Motion to Compel the SEC is precisely the reason for this

Motion to Intervene."  Reply at 3.  KPMG maintains that a protective order would be insufficient

to prevent release of the PCAOB materials to the Defendants and that the PCAOB Privilege

precludes disclosure of protected information to anyone, including to the Defendants.  See Reply

at 3.

KPMG contends that the Defendants' argument that the SEC and KPMG share identical

interests, because they both assert the PCAOB Privilege is "baseless."  See Reply at 2-3.  KPMG

maintains that this argument

ignores the fact that it is KPMG and its personnel, not the SEC, who hold the Section 105 Privilege, and that the privilege is intended to protect information concerning KPMG and its professionals, not the SEC.  It is thus KPMG, not the SEC, who will be most affected by the Court's ruling, and this alone provides sufficient basis for permitting intervention.

Reply at 3.  KPMG asserts that it is "unreasonable" to expect the SEC to protect the PCAOB Privilege to the same extent as KPMG given that the SEC only has a statutory obligation to protect the privilege and will not be personally affected by an order directing the SEC to release the PCAOB materials.  <u>See</u> Reply at 3.  "And the SEC has broader public interests at stake, including its desire to pursue this enforcement action, which could affect the zealousness with which it is prepared to protect the privilege and its willingness to appeal any adverse ruling." Reply at 3.  KPMG asserts that allowing it to participate, without objection, in the November 9, 2012, telephone conference was an implicit acknowledgement by both the Court and the parties that KPMG has a legitimate interest in participating in the PCAOB Privilege aspects of the case "and the fact that the SEC could not adequately represent its interests."  Reply at 4.

Moreover, KPMG has not simply advanced different legal arguments than the SEC, KPMG has taken substantively different legal positions from the SEC on the scope of the Section 105 Privilege and whether it can be waived by the SEC, and these differences in legal positions are the result of the divergent interests that KPMG and the SEC have.

Reply at 5.  KPMG asserts that, in these circumstances, "there is no question that intervention is appropriate."  <u>See</u> Reply at 5.  Further, KPMG contends that a divergence of interests is common when the would-be intervenor is forced to rely on the government to advance its interests.  <u>See</u> Reply at 5.   KPMG contends that the Tenth Circuit has regularly rejected arguments that representation is adequate when the government and would-be intervenor assert similar interests. <u>See</u> Reply at 6.   KPMG argues: "Defendants claim that this well-established line of cases stretching across circuits is inapplicable because thus far the SEC has asserted the Section 105

Privilege.  But the cases on which Defendants rely expressly rejected that very argument, and concluded that intervention was appropriate because the government's position <u>could</u> change." Reply at 6 (emphasis in original).

KPMG asserts that it is not seeking to relitigate issues that have already been decided, as Defendants contend.  <u>See</u> Reply at 7.  KPMG maintains that "As the transcript to the November 9, 2012, hearing makes clear, the Court did not rule on the meaning of 'public proceeding' in Section 105, or many of the other arguments raised by KPMG in its briefing."  Reply at 8-9. KPMG contends that the Court indicated an initial inclination to order the PCAOB transcripts disclosed if the SEC had relied on them, and was doing so at the Defendants' insistence, "on a purported 'emergency' basis, without notice to KPMG or the benefit of briefing.  In these circumstances, even if the Court made an initial ruling during the telephone conference, the Court would be free to revisit the issue under Rule 54(b)."  Reply at 8.  KPMG asserts that it is entitled to address additional issues that the Defendants raised in the Motion to Compel which were not raised at the November 9, 2012, hearing and is also entitled to protect its interest in this litigation.  <u>See</u> Reply at 9.

KPMG contends that a confidentiality order would not allow it to effectuate the purpose of the PCAOB Privilege by preventing dissemination of the PCAOB materials beyond participants in the litigation.  <u>See</u> Reply at 9.  KPMG contends:

> The purpose of the Section 105 Privilege is to make investigation-related information privileged and confidential and to protect it from disclosure to litigants "in any proceeding in any Federal or State Court," including SEC civil lawsuits against management of former audit clients.  15 U.S.C. § 7215. Disclosure -- including disclosure to Defendants -- is thus the very harm that the statute is intended to protect against.

Reply at 9-10 (citation in original).  KPMG concludes that a confidentiality order that permits disclosure to the Defendants is inadequate to preserve the PCAOB Privilege.  <u>See</u> Reply at 10.

Regarding permissive intervention, KPMG asserts that the same reasons supporting its rationale that it is entitled to intervention as a matter of right support a finding that permissive intervention is appropriate.  See Reply at 9.  KPMG asserts that the Defendants' contention  that KPMG's intervention will prejudice the Defendants is "insubstantial."   Reply at 9.   KPMG argues: "Indeed, the only concrete example of 'prejudice' they identify is being 'forced to prepare a separate reply brief addressing KPMG's arguments.'  Because that brief is complete and filed, the prejudice is unrelated to KPMG's pending Motion to Intervene and, in any event, would not be basis [sic] for denying intervention."  Reply at 10.  KPMG contends that the only potential issue which could arise causing delay "would come from the likelihood the KPMG would seek to appeal an adverse ruling in a situation where the SEC would not seek to appeal -- but this possibility is precisely why the interests of KPMG and the SEC diverge and why intervention is appropriate here."  Reply at 10.

KPMG concludes by asserting it will suffer prejudice if the Court denies intervenor status even though KPMG counsel will still represent KPMG witnesses at depositions.  See Reply at 10.  KPMG maintains: "But if Defendants are able to obtain KPMG's privileged information from the SEC, KPMG will be highly prejudiced because the information it seeks to protect will have been disclosed."  Reply at 11.  KPMG asserts that it is for that reason that the Court should allow KPMG to intervene.  See Reply at 10.

The Court held a hearing on January 30, 2013.  See Transcript of Hearing (taken January 30, 2013), filed February 11, 2013 (Doc. 144)("Jan. 30 Tr.").  KPMG asserted that the Motion to Intervene "is directed to the protecting of KPMG's right under Section 105 of the Sarbanes-Oxley Act as it relates to the defendants' Motion to Compel the SEC to produce the PCAOB transcripts."  Jan. 30 Tr. at 13:9-12 (Salter).  KPMG contended that the issue, as presented by the

Defendants' opposition, "[i]s really whether or not the SEC's participation in the motion is going to protect KPMG's interest . . . .  We do not believe that the SEC's participation will sufficiently represent KPMG's interest."  Jan. 30 Tr. at 13:21-14:2 (Salter).  KPMG asserted that its interest in protecting the PCAOB Privilege is to protect the oversight process as well as the reputation of the individual auditors involved in the Thornburg Mortgage audit.  KPMG contended that such an interest goes beyond the SEC's focus in this case.  See Jan. 30 Tr. at 14:3-8 (Salter).  KPMG argued that it takes a different view "as to the scope and breadth of the privilege and its application in this case" than the SEC, and that KPMG has "made different arguments in support of our different legal positions."  Jan. 30 Tr. at 14:11-14 (Salter).

KPMG explained that it became important to make the Motion to Intervene despite having already participated in the November 9, 2012, hearing and having filed a motion to quash to ensure that KPMG could participate fully in the Court's consideration of the motion to compel that the Defendants filed.  See Jan. 30 Tr. at 14:15-22 (Salter).  KPMG argued:

> But also, I think it's important that it's clear that we can participate in any potential appeal on this matter and that's why we decided it was necessary to move to intervene . . . to ensure that there's no problem in standing, going forward, and also to ensure that we could protect to the fullest extent possible that privilege.

Tr. at 14:23-15:3 (Salter).  The Court then asked the SEC if it opposes the Motion to Intervene, to which the SEC responded that the SEC has no opposition.  See Jan. 30 Tr. at 15:12-15 (Court, McKenna).

The Defendants began by recognizing the Court's discretion to deny or grant the motion to intervene.  See Jan. 30 Tr. at 15:22-25 (Marks).  The Court sought clarification regarding the Defendants' position on the timing of the Motion to Intervene and the Motion to Quash:

> Court: Now the point I was going to make is somewhere in here in these early two motions I thought that the defendants were critical of KPMG for not filing a

> motion to intervene . . . .   And is that what this is, an attempt to address that
> argument?
>
> <u>Marks</u>: In some ways, your Honor, it really is and that's what I was getting to:
> that what we really care about is the way this played out . . . but what KPMG did
> is file an opposition to our Motion to Compel without notice to us, without notice
> to the Court, without leave of the Court, and without meeting and conferring on it.

Jan. 30 Tr. at 16:16-17:6 (Court, Marks).  The Defendants then conceded that KPMG needed to

be heard at the current hearing, particularly on KPMG's Motion to Quash, but noted that "[w]e

can't have active litigation against the SEC as plaintiff and have the SEC bring KPMG in and

submit a brief without notice or leave of the Court."  Jan. 30 Tr. at 17:7-11 (Marks).  The Court

then inquired: "Is there something afoot of the SEC going to add KPMG as a plaintiff in this

case?"  Jan. 30 Tr. at 17:12-13 (Court).  The Defendants explained that they are not "privy to the

SEC's thought process."  Jan. 30 Tr. at 17:14-15 (Marks).  The Defendants stated: "I will tell you

that I have seen recently [that] the SEC produced to us what are called 'no action letters' that

they sent to at least the engagement partner and the senior manager on the engagement."  Jan. 30

Tr. at 17:17-20 (Marks).  Defendants identified the two individuals receiving those letters as Hall

and Reinhart.  <u>See</u> Tr. at 17:21-18:1 (Court, Marks).

  The Court then inquired: "What is your fear, then?  What is it about the motion to

intervene that I could do to allay any concerns you have about KPMG's participation in these

motions?"  Jan. 30 Tr. at 18:2-5 (Court).  The Defendants responded: "If in the future the SEC

would like KPMG to participate in an issue or KPMG would like to inject itself in that issue, we

need notice, the Court needs notice, and the Court needs to determine that as a non-party KPMG

could insert itself into the battle."  Jan. 30 Tr. at 18:6-10 (Marks).  The Court asked if that meant

that Defendants were asking that KPMG abide by the rules of meeting and conferring before

filing anything.  <u>See</u> Jan. 30 Tr. at 18:11-13.  The Defendants responded that they would

additionally expect KPMG to give notice in order to avoid a situation where the Defendants get multiple briefs that they have to reply to separately.  See Jan. 30 Tr. at 18:14-17.

KPMG explained that, regarding notice, KPMG was not aware of the November 9th hearing until fifteen minutes before the conference started.  See Jan. 30 Tr. at 19:6-11.  KPMG added that the Defendants knew, because of communications between the parties and the objections KPMG lodged regarding the Subpoena, that KPMG was taking the position that the PCAOB Privilege prevented disclosure of the materials in KPMG's and the SEC's possession.  See Jan. 30 Tr. at 19:6-15 (Salter).  "So I fully appreciate that we are required to give notice and to meet and confer and to try to avoid imposing on this Court if we can avoid it."  Jan. 30 Tr. at 19:16-18 (Salter).  The Court inquired why, then, KPMG filed a response to the Motion to Compel without first filing a Motion to Intervene.  See Jan. 30 Tr. at 19:22-23 (Court).  KPMG explained that they thought it was not necessary to do so, having participated in the November 9 hearing without objection and because the PCAOB transcript issue directly related to an interest that KPMG had already sought to protect in its previous Motion to Quash.  See Jan. 30 Tr. at 19:24-20:4 (Salter).  "Only when we saw the opposition or the -- I guess the reply papers from Defendants when they raised the objection that we thought we should be better safe than sorry and filed the motion."  Jan. 30 Tr. at 20:4-7 (Salter).

The Court stated that it would grant the motion to intervene.  See T Feb. 9 r. at 20:12-13 (Court).  The Court noted that it would later determine whether to grant the motion as a right or permissively, but that for the limited purpose of arguing on the PCAOB materials, the Court viewed KPMG as having an interest.  See Jan. 30 Tr. at 20:13-16 (Court).  The Court also noted that it was clear that the SEC and KPMG do not share the same construction of the PCAOB

Privilege and that the PCAOB Privilege appears to be of major importance to KPMG.  See Jan. 30 Tr. at 20:16-18 (Court).

### LAW REGARDING INTERVENTION AS OF RIGHT

Rule 24(a) provides for intervention of right:

  (a)   **Intervention of Right.**  On timely motion, the court must permit anyone to intervene who:

    (1)   is given an unconditional right to intervene by a federal statute; or

    (2)   claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).  The movant bears the burden of establishing its right to intervene.  See United States v. Tex. E. Transmission Corp., 923 F.2d 410, 414 (5th Cir. 1991).  A court generally may not consider concerns of judicial economy and efficiency when ruling on a request to intervene as of right.  See United States v. Union Elec. Co., 64 F.3d 1152, 1158 & n.1 (8th Cir. 1995)("We find that supplanting the standards applicable to intervention as of right under Rule 24(a) with policy considerations led to the erroneous denial of intervention in this case."); In re Sierra Club, 945 F.2d 776, 779 (4th Cir. 1991)("The district court, however, incorrectly bolstered its denial of intervention of right by referring to concerns of judicial economy and need for guidance.  Although those issues have a place in motions for permissive intervention, Rule 24(a) affords them no weight.").

To intervene as a matter of right under rule 24(a)(2), the movant must show that: (i) the motion is timely; (ii) the movant claims an interest relating to the property or transaction which is the subject of the action; (iii) the movant's interest relating to the property may be impaired or

impeded; and (iv) the movant's interest is not adequately represented by existing parties.  See Elliot Indus. Ltd P'ship v. Am. Prod. Co., 407 F.3d 1091, 1103 (10th Cir. 2005).

"The timeliness of a motion to intervene is assessed in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances." Am. Assoc. of People with Disabilities v. Herrera, 257 F.R.D. 236, 245 (D.N.M. 2008)(Browning, J.)(quoting Utah Ass'n of Cntys. v. Clinton, 255 F.3d 1246, 1250 (10th Cir. 2001)).  "Unusual circumstances" refers to those circumstances that would excuse the untimely filing of a motion to intervene.  In re SEC, 296 F. App'x 637, 640 (10th Cir. 2008)(unpublished).

"Under rule 24(a)(2), the applicants must claim . . . an interest relating to the property or transaction which is the subject of the action." Utah Assoc. of Cntys. v. Clinton, 255 F.3d at 1250 (internal quotation marks omitted).  "The Tenth Circuit requires that the interest be 'direct, substantial, and legally protectable.'" Forest Guardians v. U.S. Dep't of Interior, No. CIV-02-1003, 2004 WL 3426413, at *5 (D.N.M. Jan. 12, 2004)(Browning, J.)(quoting Utah Assoc. of Cntys. v. Clinton, 255 F. 3d at 1250).  The United States Court of Appeals for the Tenth Circuit has also noted that the inquiry is "highly fact-specific," and that "the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." Utah Assoc. of Cntys. v. Clinton, 255 F.3d at 1251-52. "The threshold for finding the requisite legal protectable interest is not high." Forest Guardians v. U.S. Dep't of Interior, 2004 WL 3426413, at *5 (citing Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d 1111, 1115 (10th Cir. 2002))("Furthermore, the Tenth Circuit has deemed the mere threat of economic injury to be sufficient for granting intervention.").

"To satisfy [the impairment] element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied. This burden is minimal." WildEarth Guardians v. U.S. Forest Serv., 573, F.3d 992, 995 (10th Cir. 2009)("If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene."). "Although the intervenor cannot rely on an interest that is wholly remote and speculative, the intervention may be based on an interest that is contingent upon the outcome of the litigation." San Juan Cnty., Utah v. United States, 503 F.3d 1163, 1203 (10th Cir. 2007)(en banc).  A third-party's interest may be impaired "when the resolution of the legal questions in the case effectively foreclose [sic] the rights of the intervenor in later proceedings, whether through res judicata, collateral estoppel, or stare decisis." Ute Distrib. Corp. v. Norton, 43 F. App'x 272, 279 (10th Cir. 2002)(unpublished opinion).

"Although an applicant for intervention as of right bears the burden of showing inadequate representation, that burden is the 'minimal' one of showing that representation 'may' be inadequate." Forest Guardians v. U.S. Dep't of Interior, 2004 WL 3426413 at *6.  "The most common situation in which courts find representation adequate arise when the objective of the [movant] is identical to that of one of the parties." Bottoms v. Dresser Indus., Inc., 797 F.2d 869, 872-73 (10th Cir. 1986)(emphasis added).  The Tenth Circuit, however, has found that the "possibility of divergence of interest need not be great in order to satisfy the burden of the applicants." Coal. of Arizona/New Mexico Cntys. for Stable Econ. Growth v. Dep't of Interior, 100 F.3d 837, 845 (10th Cir. 1996).  This minimal burden is further reduced when it is the government that is supposed to adequately represent the potential intervenor's interest. See Utah Assoc. of Cntys. v. Clinton, 255 F.3d at 1254-1255.  "[A] presumption of adequate

representation arises when an applicant for intervention and an existing party have the same ultimate objective in the litigation," but the Tenth Circuit has "held this presumption rebutted by the fact that the public interest the government is obligated to represent may differ from the would-be-intervenor's particular interest." <u>Utah Assoc. of Cntys. v. Clinton</u>, 255 F.3d at 1255. The Tenth Circuit stated:

> [T]he government's representation of the public interest generally cannot be assumed to be identical to the individual parochial interest of a particular member of the public merely because both entities occupy the same posture in the litigation. In litigating on behalf of the general public, the government is obligated to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor.

<u>Utah Assoc. of Cntys. v. Clinton</u>, 255 F.3d at 1255-56. Thus, when a prospective intervenor shows that the "public interest the government is obligated to represent may differ from the would-be intervenor's particular interest," the burden of demonstrating inadequate representation is met. <u>Id</u>. at 1255.

### <u>LAW REGARDING PERMISSIVE INTERVENTION</u>

Rule 24(b) provides for permissive intervention:

(1)   **In General.**  On timely motion, the court may permit anyone to intervene who:

    (A)   is given a conditional right to intervene by a federal statute; or

    (B)   has a claim or defense that shares with the main action a common question of law or fact.

(2)   **By a Government Officer or Agency.**  On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:

    (A)   a statute or executive order administered by the officer or agency; or

> (B)     any regulation, order, requirement, or agreement issued or
> made under the statute or executive order.
>
> (3)     **Delay or Prejudice.**  In exercising its discretion, the court must consider
> whether the intervention will unduly delay or prejudice the adjudication of
> the original parties' rights.

Fed. R. Civ. P. 24(b).  The movant bears the burden of establishing its right to intervene.  See

United States v. Tex. E. Transmission Corp., 923 F.2d at 414.  "Unlike Rule 24(a), which

governs mandatory intervention, Rule 24(b) specifically vests discretion in district courts to

consider whether intervention will unduly delay or prejudice the adjudication of the rights of the

original parties."   6 J. Moore, Moore's Federal Practice § 24.10[1], at 24-63 (3d ed.

2012)(citation omitted).  Accord In re Sierra Club, 945 F.2d at 779 ("The district court, however,

incorrectly bolstered its denial of intervention of right by referring to concerns of judicial

economy and need for guidance.  Although those issues have a place in motions for permissive

intervention, Rule 24(a) affords them no weight.").   "The district court possesses broad

discretion in determining whether to grant permissive intervention and will rarely be reversed on

appeal."   6 J. Moore, supra, § 24.10[1], at 24-63.   "[C]onsiderations of trial convenience

dominate the question of whether to allow permissive intervention."   6 J. Moore, supra,

§ 24.10[1], at 24-63.  Accord Garza v. Cnty of L.A., 918 F.2d 763, 777 (9th Cir. 1990)("The

decision to grant or deny [permissive] intervention is discretionary, subject to considerations of

equity and judicial economy.").

   "To permissively intervene, a party need not have a direct personal or pecuniary interest

in the subject of the litigation."   San Juan Cnty., Utah v. United States, 503 F.3d at 1207.

Permissive intervention lies in the court's sound discretion, and the appellate court will not

disturb the district court's exercise of that discretion absent clear abuse.  See United Nuclear

Corp. v. Cranford Ins. Co., 905 F. 2d 1424, 1427 (10th Cir. 1990).  As the Court has previously stated:

> Rule 24(b) allows permissive intervention under the following conditions: (i) the application to intervene is timely; (ii) the applicant's claim or defense and the main action have a question of law or fact in common; and (iii) intervention will not unduly delay or prejudice the adjudication of the original parties' rights.

Forest Guardians v.  U.S. Dep't of Interior, 2004 WL 3426413, at *10-11.  The court is required to consider whether intervention will cause undue delay or prejudice when considering whether to grant permissive intervention.  See Fed. R. Civ. P. 24(b)(3); DeJulius v. New Eng. Health Care Emps. Pension Fund, 429 F.3d 935, 943 (10th Cir. 2005)(noting that district courts are required to consider undue prejudice or delay in deciding whether to grant permissive intervention); Am. Ass'n of People with Disabilities v. Herrera, 257 F.R.D. at 259.  While not a required part of the test for permissive intervention, a court's finding that existing parties adequately protect prospective intervenors' interests will support a denial of permissive intervention.  See City of Stilwell, Okla. v. Ozarks Rural Elec. Coop. Corp., 79 F.3d 1038, 1043 (10th Cir. 1996).

## LAW REGARDING LIMITED INTERVENTION FOR DISCOVERY

"Once a district court concludes that a party has a right to intervene, the inquiry is not necessarily at an end.  Even where intervention is a matter of right, district courts may impose appropriate conditions or restrictions upon the intervenor's participation in the action." Wildearth Guardians, Defenders of Wildlife v. Salazar, 272 F.R.D. 4 (D.D.C. 2010).  "The court may limit the scope of intervention, granting intervention only for the limited purpose of protecting the movant's interest that might be injured by the litigation."  In re Urethane Antitrust Litig., 04-MD-1616-JWL, 2010 WL 4226214 (D. Kan. Oct. 21, 2010).  Courts have permitted

non-parties to intervene as of right for limited purposes, such as protecting the right to appeal an adverse district court decision regarding privileged discovery materials.  See, e.g, United States v. Am. Tel. & Tel. Co., 642 F.2d 1285, 1292 (D.C. Cir. 1980).  If a non-party has not been subpoenaed, it must file a motion to intervene before moving for a protective order under rule 26(c) of the Federal Rules of Civil Procedure.  See SEC v. Dowdell, 144 F. App'x 716, 722-23 (10th Cir. 2005)(noting that a non-party may not move for a rule 26(c) protective order if it is not a party to the underlying action, has not intervened, and has not been served a subpoena seeking discovery).

In Western Resources, Inc. v. Union Pacific Railroad Co., No. 00-2043-CM, 2001 WL 1718370 (D. Kan. Sept. 12, 2001)(Waxse, J.), the United States District Court for the District of Kansas noted that, of the Tenth Circuit and District of Kansas cases discussing rule 24 intervention it reviewed, "none appear to have precedential value on the narrow issue of limited intervention in a particular lawsuit with respect only to a collateral discovery issue," 2001 WL 1718370, at *2, but that a few of the cases "touched on the issue":

> See, e.g., In re Grand Jury Subpoenas, 144 F.3d 653, 657 (10th Cir. 1998)(although proceedings criminal and not governed by Fed. R. Civ. P. 24, court affirmed trial court's decision to grant Intervenor's motion to intervene for limited purpose of filing motion to quash subpoena and affirmed trial court's decision to go on to deny motion to quash based on finding that crime-fraud exception to attorney-client privilege applied); Cunningham v. Rolfe, 131 F.R.D. 587, 590 (D. Kan.1990) (holding plaintiffs in product liability case were not entitled to intervene in earlier suit brought by different plaintiffs against same automobile manufacturer -- only interest asserted by applicants was their interest in discovering documents produced in the earlier suit to use in prosecuting their own action and court held such interest to be insufficient pursuant to Fed. R. Civ. P. 24).

2001 WL 1718370, at *2 n.1.  Relying on cases from other jurisdictions, the District of Kansas allowed the non-parties to intervene for the limited purpose of filing a motion for a protective order to protect "their respective proprietary and confidentiality interests in certain contracts

sought by Plaintiff through the discovery process."   2001 WL 1718370, at *4 (citing United States v. Am. Tel. & Tel. Co., 642 F.2d at 1295; In re Sealed Case, 237 F.3d 657, 670 (D.C. Cir. 2001)(finding that the subject of FEC investigation met requirements to intervene as of right in FEC's subpoena enforcement action against third-party witness where subject had legally cognizable interest in maintaining confidentiality of documents that FEC sought to disclose in public record)).

"Intervention can support a nonparty appeal not only when intervention is sought to participate in the trial but also when intervention is sought for the sole purpose of appeal."  15A C. Wright & A. Miller, Federal Practice and Procedure § 3902.1 at 114 (2d ed. 1992).  In United States v. American Telephone and Telegraph Company, the United States Court of Appeals for the District of Columbia Circuit permitted the plaintiff in a private antitrust action to intervene for the purpose of appealing the district court's order to produce work product materials that the plaintiff had released to the government for prosecution purposes in a parallel civil antitrust case. See 642 F.2d at 1295.  The district court ordered the United States of America to produce the materials, and the United States chose not to appeal in order to effectuate a speedy trial.  See 642 F.2d at 1293.  The D.C. Circuit concluded that the divergence of interests between the plaintiff wanting to protect its work product and the government wanting to avoid a lengthy appeal process "is evidence of inadequate representation."  642 F.2d at 1294 (citing Smuck v. Hobson, 408 F.2d 175 (D.C. Cir. 1969), and finding "the divergence of interests for purposes of appeal even more clear in the present case").

> Privileges such as the work product privilege satisfy this definition of legal interest and can be directly lost through the operation of a discovery order. Without the right to intervene in discovery proceedings, a third party with a claim of privilege in otherwise discoverable materials could suffer the obvious injustice of having his claim erased or impaired by the court's adjudication without ever being heard.

United States v. Am. Tel. & Tel. Co., 642 F.2d at 1292 (internal citation omitted).  "This inadequacy of representation exists, however, only with regard to the decision not to appeal; therefore MCI can qualify for intervention of right only for the limited purpose of taking an appeal."  United States v. Am. Tel. & Tel. Co., 642 F.2d at 1294.

In United States v. British American Tobacco Australia Services, Ltd., 437 F.3d. 1235 (D.C. Cir. 2006), the district court had permitted the non-party to intervene in a limited manner to protect its attorney-client and work-product privileges, see 437 F.3d at 1237, but denied the non-party's motion "for expanded intervention as 'clearly untimely,'" 437 F.3d at 1238.  The D.C. Circuit noted that the non-party "requested intervention only as to its possible privilege," and that the district court "granted only a limited intervention."  437 F.3d at 1240.

"An intervenor, whether by right or by permission, normally has the right to appeal an adverse final judgment by a trial court."  Stringfellow v. Concerned Neighbors in Action, 480 U.S. 370, 375 (1987).  See 15A Wright & Miller, supra, § 3902.1 at 109.  See United States v. Alcan Aluminum, Inc., 25 F.3d 1174, 1186 n.17 (3d Cir. 1994)("The right to intervene gives the intervenor the right to appeal an adverse final judgment.").

Formal intervention may not be necessary to appeal an adverse judgment, but doing so is considered a "better practice" in order to gain standing to appeal.  See 15A Wright & Miller, supra, § 3902.1 at 122 (citations omitted).

> Although it would have been better to file a formal motion to intervene, appeal could be taken in a case in which the appellant had participated fully in the proceedings of the district court. . . .  Because the effect of the order would have been to destroy the value of his interest, and he was not adequately represented, he could have intervened as of right. . . .  Those who participate fully can appeal if, as here, the equities weigh in favor of hearing the appeal.

15A Wright & Miller, supra, § 3902.1 at 106 n.8 (citing SEC v. Wencke, 783 F.2d 829, 834-835 (9th Cir. 1986).  See 15A Wright & Miller, supra, § 3902.1 at 107 (citing SEC v. Lincoln Thrift Assn., 577 F.2d 600, 602-603 (9th Cir. 1978); In re Sealed Case, 381 F.3d 1205, 1211 n.4 (D.C. Cir. 2004)("Moreover, courts of appeals have construed a district court's decision to permit a non-party to participate in a discovery dispute as the equivalent of authorizing intervention."). "When intervention was not sought below, however, intervention on appeal will be permitted only in an exceptional case for imperative reasons."  See Elliot Indus. Ltd P'ship v. Am. Prod. Co., 407 F.3d at 1104.

## ANALYSIS

The Court will grant the Motion to Intervene.  KPMG has satisfied the elements that rule 24(a)(2) sets forth for intervention as a matter of right and the requirements that rule 24(b)(1) sets forth for permissive intervention.  The Court concludes, with regard to the Motion to Compel and potential appeals on that Motion, that KPMG may intervene.

## I.   THE COURT WILL PERMIT KPMG TO INTERVENE AS A MATTER OF RIGHT UNDER RULE 24(a)(2).

KPMG requests leave to intervene as a matter of right under rule 24(a)(2) for the limited purpose of objecting to the Defendants' Motion to Compel to the extent it seeks documents or information that the PCAOB Privilege protects and assuring KPMG's right to appeal any court order granting that motion.  To intervene as a matter of right under rule 24(a)(2), the movant must show that: (i) the motion is timely; (ii) the movant asserts an interest relating to the property or transaction which is the subject of the action; (iii) the movant's interest relating to the property may be impaired or impeded; and (iv) existing parties do not adequately represent the movant's interest.  See Elliot Indus. Ltd P'ship v. Am. Prod. Co., 407 F.3d at 1103.  The Court

will grant KPMG leave to intervene as a matter of right under rule 24(a)(2), because KPMG satisfies each of the test's prongs.

First, the Motion to Intervene is timely given the limited nature of the intervention that KPMG requests.   "The timeliness of a motion to intervene is assessed in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances." Am. Assoc. of People with Disabilities v. Herrera, 257 F.R.D. at 245 (internal citation omitted).   "The requirement of timeliness is not a tool of retribution to punish the tardy would-be intervenor, but rather a guard against prejudicing the original parties by the failure to apply sooner.   Federal courts should allow intervention 'where no one would be hurt and greater justice could be attained.'" Utah Ass'n of Cntys. v. Clinton 255 F.3d at 1251 (quoting Sierra Club v. Espy, 18 F.3d 1202, 1205 (5th Cir. 2001)).   The Defendants seeking the PCAOB materials served KPMG with the subpoena on September 18, 2012.  See Subpoena at 1.  KPMG subsequently participated in the November 9, 2012 hearing without objection by the Defendants. While the timing comes after the issue was first presented to the Court, KPMG's Motion to Intervene does not appear to have been made as part of a strategy to intervene late in the case or an attempt to disrupt the lawsuit's progression.   Rather, KPMG began participating in the discovery dispute regarding PCAOB materials on November 9, 2012 with limited notice about the hearing.  Given the timing of the Subpoena and KPMG's participation in the November 9, 2012 hearing, the Court concludes that KPMG has satisfied the first element for intervention as a matter of right under rule 24(a)(2).

Second, KPMG has asserts an interest in the subject of the action.  See Motion to Intervene at 4-5.  "Under rule 24(a)(2), the applicants must claim . . . an interest relating to the

property or transaction which is the subject of the action." Utah Assoc. of Cntys, v. Clinton, 255 F.3d at 1250 (internal quotation marks omitted). "The Tenth Circuit requires that the interest be 'direct, substantial, and legally protectable.'" Forest Guardians v. U.S. Dep't of Interior, 2004 WL 3426413, at *5. "Although the intervenor cannot rely on an interest that is wholly remote and speculative, the intervention may be based on an interest that is contingent upon the outcome of the litigation." San Juan Cnty., Utah v. United States, 503 F.3d at 1203. The Defendants seek PCAOB materials containing testimony by KPMG witnesses, to which KPMG asserts the PCAOB Privilege, a privilege Congress created. The Defendants filed a Motion to Compel in an effort to obtain the PCAOB materials, and a decision by the Court to that end will directly affect KPMG by potentially making the PCAOB materials public. "To bar intervention for collateral discovery issues merely because they do not concern the subject matter of the overall action would in many cases defeat the general purpose of intervention." United States v. Am. Tel. & Tel. Co., 642 F.2d at 1292. Thus, KPMG has satisfied the second element for intervention as a matter of right.

Third, the Court concludes that the litigation may impair KPMG's interests in preserving the PCAOB material's confidentiality. "The 'impair or impede' requirement mandates a showing that the interest holder be injured in a practical sense." 6 J. Moore, supra, § 24.03[3][a], at 24-41. Once again, "[a]lthough the intervenor cannot rely on an interest that is wholly remote and speculative, the intervention may be based on an interest that is contingent upon the outcome of the litigation." San Juan Cnty., Utah v. United States, 503 F.3d at 1203. Foreclosing the possibility that KPMG could argue against Defendants' Motion to Compel would impair KPMG's interest in protecting the PCAOB materials and, in the event the Court ultimately grants the Motion to Compel, denying intervention could foreclose the possibility of appealing such a

ruling.  Formal intervention may not be a necessity to appeal an adverse judgment, but doing so is considered a "better practice" in order to gain standing to appeal.  See 15A Wright & Miller, supra, § 3902.1 at 122 (citations omitted).  Thus, KPMG has demonstrated that the litigation may impair its interest in protecting the PCAOB materials, and has thus satisfied the third element for intervention as a matter of right.

Finally, the SEC may not adequately represent KPMG's interest.  "Although an applicant for intervention as of right bears the burden of showing inadequate representation, that burden is the 'minimal' one of showing that representation 'may' be inadequate."  Forest Guardians v. U.S. Dep't of Interior, 2004 WL 3426413, at *6.  "The possibility that the interest of the applicant and the parties may diverge 'need not be great' in order to satisfy this minimal burden."  Utah Assoc. of Cntys, v. Clinton, 255 F.3d at 1254 (internal citation omitted).  "The most common situation in which courts find representation adequate arises when the objective of the [movant] is identical to that of one of the parties."  Bottoms v.  Dresser Indus., Inc., 797 F.2d at 872-73 (emphasis added).  When a prospective intervenor shows that the "public interest the government is obligated to represent may differ from the would-be intervenor's particular interest," the burden of demonstrating inadequate representation is met.  Utah Assoc. of Cntys, v. Clinton, 255 F.3d at 1255.

KPMG has carried its minimal burden to show that representation may be inadequate, and demonstrating that KPMG and the SEC may not have identical objectives.  While both the SEC and KPMG have asserted the PCAOB Privilege regarding the PCAOB materials, the parties differ in their interpretation of its scope and meaning.  KPMG and the SEC assert different meanings for a "public proceeding" in 15 U.S.C. § 7215(b)(5)(A).  See Motion to Intervene at 7 ("KPMG contends that 'public proceeding' refers to PCAOB proceedings that have been made

public and does not include an enforcement action brought by the SEC, while the SEC does not

dispute that this case could be a 'public proceeding' within the meaning of the statute.")(internal

citation omitted).   "KPMG argues that the SEC has no power to waive the Section 105 Privilege,

whereas the SEC merely argues that it did not waive the privilege here."  Motion to Intervene at

7.  Finally, it is possible that, if the Court were to grant the Motion to Compel, the SEC may

choose not to appeal the ruling.  Denying KPMG's Motion to Intervene might foreclose or make

more difficult KPMG's ability to appeal an adverse decision.  Thus, KPMG has demonstrated

that the SEC may not adequately represent KPMG's interests and has therefore satisfied the

fourth element for intervention as a matter of right under rule 24(a)(2).  Because KPMG has

satisfied all of the elements for intervention as a matter of right, the Court will grant the Motion

to Intervene for the limited purpose of objecting to Defendants' Motion to Compel the

production of PCAOB materials and preserving KPMG's right to appeal an adverse ruling.

## II.    THE COURT WILL PERMIT KPMG TO PERMISSIVELY INTERVENE UNDER RULE 24(b)(1).

In the alternative, KPMG seeks to permissively intervene under rule 24(b)(1).  Even if the

Court were to deny KPMG intervention as of right under rule 24(a)(2), the Court would

conclude that permissive intervention is appropriate under rule 24(b)(1).   As the Court has

previously stated:

> Rule 24(b) allows permissive intervention under the following conditions: (i) the
> application to intervene is timely; (ii) the applicant's claim or defense and the
> main action have a question of law or fact in common; and (iii) intervention will
> not unduly delay or prejudice the adjudication of the original parties' rights.

Forest Guardians v.  U.S. Dep't of Interior, 2004 WL 3426413, at *10-11.  The court is required

to consider whether intervention will cause undue delay or prejudice when considering whether

to grant permissive intervention.  See Fed. R. Civ. P. 24(b)(3); DeJulius v. New Eng. Health

<u>Care Emps. Pension Fund</u>, 429 F.3d at 943 (noting that district courts are required to consider undue prejudice or delay in deciding whether to grant permissive intervention). "[C]onsiderations of trial convenience dominate the question of whether to allow permissive intervention."  6 J. Moore, <u>supra</u>, § 24.10[1], at 24-63.  <u>Accord</u> <u>Garza v. Cnty of L.A.</u>, 918 F.2d at 777 ("The decision to grant or deny [permissive] intervention is discretionary, subject to considerations of equity and judicial economy.").

First, as discussed above, the Motion to Intervene is timely.  The Court could still decide substantive issues related to the PCAOB transcripts and KPMG seeks limited intervention that will not alter the course of proceedings.

Second, KPMG's assertion of the PCAOB Privilege implicates a common question of law or fact that the Motion to Compel raises.  KPMG asserts that the PCAOB Privilege protects the PCAOB materials, preventing the disclosure of the materials that the Defendants seek.  The Defendants seek disclosure of the PCAOB materials by the SEC in its Motion to Compel, because the SEC used the PCAOB testimony in investigating Thornburg Mortgage and bringing the Complaint against the Defendants.  Consequently, the assertion of the PCAOB Privilege by KPMG satisfies the second requirement for permissive intervention.

Third, intervention will not cause undue delay or prejudice to the Defendants.  KPMG has not sought to disrupt the proceedings by unduly delaying the filing of its Motion to Intervene.  Arguments regarding the Motion to Compel can go forward as scheduled; the Defendants have fully briefed the Motion to Compel, and granting permissive intervention will not delay a hearing on the matter.  The Court acknowledges that a potential interlocutory appeal by KPMG -- in the event that the Court grants the Defendants' Motion to Compel -- could delay proceedings, but that risk is present regardless, given that the SEC could raise such an appeal.

That the SEC may choose, for its own reasons, not to pursue an appeal that KPMG would seek warrants permissive intervention.  Thus, KPMG has satisfied the third requirement for permissive intervention and accordingly has satisfied all of the requirements under rule 24(b)(1).

The Court finds that KPMG has satisfied the requirements for intervention as of right and permissive intervention; thus, the Court will grant KPMG intervention for the limited purpose it seeks.

**IT IS ORDERED** that KPMG, LLP's Motion to Intervene, filed January 18, 2013 (Doc. 125), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzalez
   United States Attorney
Michael H. Hoses
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

   *Attorneys for Plaintiff Securities and Exchange Commission*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Chris Johnstone
Alanna G. Buchanan
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

John Valentine
Lauren R. Yates
Michael A. Lamson
April N. Williams
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Randall Lee
Jessica Kurzban
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

*Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Paul M. Torres
Robert J. Liubicic
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

*Attorneys for Defendant Jane E. Starrett*