IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

vs.                                      No. CIV 12-0257 JB/LFG

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Plaintiff's Motion to Determine the

Sufficiency of Defendants' Responses to Requests for Admission Nos. 19 and 24, filed April 15,

2013 (Doc. 162)("RFA Motion").  The Court held a hearing on July 9, 2013.  The primary issues

are: (i) whether the Court should order the Defendants to supplement, modify, or amend their

responses to Requests for Admission ("RFA") No. 19, which asks the Defendants to "[a]dmit

that Thornburg [Mortgage Inc.] had information related to Margin Calls[1] that was not provided

to KPMG [its auditors] prior to the filing of the [Thornburg Mortgage 2007 Form 10-K Annual

Report, filed May 21, 2012 (Doc. 37-2)("2007 Form 10-K")]," Plaintiff's Third Set of Requests

for Admission to All Defendants at 2, dated January 30, 2013, filed April 15, 2013 (Doc. 162-

2)("SEC Third RFA"); and (ii) whether the Court should order the Defendants to supplement,

modify, or amend their responses to RFA No. 24, which states: "Admit that the [interest-only

---

[1] A "margin call" is a "securities broker's demand that a customer put up money or stock
as collateral when the broker finances a purchase of securities.  A margin call usu[ally] occurs
when the market prices of the securities are falling."  Margin Call, <u>Black's Law Dictionary</u> 232
(9th ed. 2009).

("I/O")] Strip[2] Transactions constitute legal sales." SEC Third RFA at 3.  The Defendants objected to both RFAs, saying that they were unable to admit or deny.  See Objections and Responses to Plaintiff's Third Set of Requests for Admission to All Defendants, dated March 8, 2013, filed April 15, 2013 (Doc. 162-3)("Defs' Response").

The Court will grant the RFA Motion in part and deny it in part, and will overrule the Defendants' objections to the SEC's RFAs.  The Court will limit RFA No. 19 to information held by the Defendants from January 1, 2007, until the filing of the Thornburg Mortgage 2007 Form 10-K Annual Report, filed May 21, 2012 (Doc. 37-2).  The Court will incorporate into RFA No. 24 the term "legal sales" that the SEC provided in the Letter Sent Via Electronic Mail from Gregory Kasper to Randall Lee, Jessica Kurzban, John Valentine, Michael Lamson, April Williams, Chris Johnstone, Alanna Buchanan, Jerry Marks, Robert Liubicic, Alisa Schlesinger, and Elena Kilberg, dated March 26, 2013, filed April 15, 2013 (Doc. 162-4)("March 26, 2013 Ltr.")("'Legal Sale' means a legally enforceable transaction transferring title and ownership of a security or securities to a third party.")  After narrowing the scope of RFA No. 19 and clarifying RFA No. 24, the Court will order the Defendants to admit, deny, or state in detail why they cannot admit or deny RFA No. 19 and RFA No. 24.  The Court will allow the Defendants ten days to supplement their answers to the RFAs.

## FACTUAL BACKGROUND

Defendants are former officers of Thornburg Mortgage: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett

---

[2] An "interest-only strip" is a "security based solely on the interest payments from a pool of mortgages, Treasury bonds, or other bonds.  Once the principal on the mortgages or bonds has been repaid, interest payments stop, and the value of the [interest-only strip] falls to zero."  Interest-Only Strip, The Free Dictionary, http://financial-dictionary.thefreedictionary.com/Interest-only-strip (last visited June 5, 2013).

was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1)("Complaint").  Plaintiff Securities and Exchange Commission ("SEC") alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[3]  Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and once was the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the allegations in the Complaint, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo" ARM securities; Thornburg Mortgage also purchased ARM securities that third parties originated.[4]  Complaint ¶ 21, at 7.  Thornburg

---

[3] An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index."  Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

[4] "Super-jumbo" and "jumbo," in reference to ARM securities, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that Fannie Mae and Freddie Mac set.  Super jumbo mortgage, Wikipedia.  Fannie Mae, formally the Federal National Mortgage Association, purchases and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia (March 26, 2014), http://www.investopedia.com/terms/f/fanniemae.asp.  Fannie Mae's "little brother" is Freddie Mac, formally the Federal Home Loan Mortgage Corporation.  Freddie Mac, Investopedia (March 26, 2014), http://www.investopedia.com/terms/f/freddiemac.asp.  Both are government-

Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and investment business through reverse repurchase agreements backed by ARM securities.[5]  See Complaint ¶ 3, at 2.  Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender,

---

sponsored enterprises. "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends.  Fannie Mae, Investopedia.  The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "Super-jumbo" is not expressly defined or regulated, but mortgage companies use it to internally and independently set loan parameters. The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  Super jumbo mortgage, Wikipedia.

[5] A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to *repo*."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties otherwise agreed.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter (Citigroup Letter) to Goldstone and Simmons, on February 21, 2008, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default. See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11.  See also Letter from Stephen G.

Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 between Citigroup Global Markets, Inc. as intermediating agent for Citigroup Global Markets Limited and together with Citigroup Global Markets, Inc. and Thornburg Mortgage, sent February 21, 2008, filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter").  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an electronic mail transmission from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Electronic Mail Transmission from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an electronic mail transmission from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"

Complaint ¶ 67, at 19-20 (alteration in original)(quoting Electronic Mail Transmission from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an electronic mail transmission sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "moving towards resolving [its] margin issues" through, among other strategies, having "sold some additional IO securities[.]"  Electronic Mail Transmission from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).  See Complaint ¶ 68, at 20 (quoting Feb. 25, 2008 Email).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an electronic mail transmission, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an electronic mail transmission from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Feb. 22, 2008 Email at 2.  See Complaint ¶ 30, at 10 (quoting Feb. 22, 2008 Email at 2).

Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current

situation quiet while we deal with it'" in the same electronic mail transmission.  Complaint ¶ 31,

at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also stated:

"'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"

Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

     Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge

fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.

See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would

negatively affect Thornburg Mortgage's ARM securities and sent an electronic mail transmission

to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this
> afternoon.  UBS credit just mentioned it to me.  They got his with 20 point
> haircuts on Alt-A and AAA's overnight.  I think we will get this a little more
> gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Electronic Mail Transmission from Larry Goldstone to Clay

Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27,

2008 Goldstone/Simmons Email")).  Simmons sent an electronic mail transmission to Goldstone

---

[6] An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia.  "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5th, 2013).

and others regarding the potential collapse of a European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Electronic Mail Transmission from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an electronic mail transmission to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40, at 12 (alteration in original)(quoting Electronic Mail Transmission from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K

accounted for the I/O Strip Transactions as the issuance of secured debt.[7]  See Complaint ¶ 37, at

11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to

hold its ARM Securities until their value recovered in the market,'" notwithstanding that the

lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could

have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3

(quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had

the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage

did not recognize $427.8 million in losses associated with its ARM securities that serve as

collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage

also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  Thornburg Mortgage's

Form S-3 ASR[8] registration statement, which relates to Thornburg Mortgage's dividend

reinvestment and stock purchase plan, which Goldstone and Simmons signed, and that was filed

---

[7] According to the Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset."  The Financial Accounting Standards Board ("FASB") explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

[8] "ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

with the SEC on December 10, 2007, incorporates Thornburg Mortgage's financial statements in the 2007 Form 10-K.  See Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008. See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning electronic mail transmission regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Electronic Mail Transmission from Clay Simmons to Larry Goldstone at 2, sent February 28, 2008, at 6:33 a.m., filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).  In an electronic mail transmission from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'"  Complaint ¶ 94, at 27 (alterations in original).  See Electronic Mail Transmission from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, sent February 28, 2008, at 5:29 a.m., filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an electronic mail transmission that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.   See Complaint ¶ 95, at 28; Electronic Mail Transmission from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, sent February 28, 2008, at 6:56 a.m., filed May 21,

2012 (Doc. 37-11)("Feb. 28, 2008 Email").   As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  <u>See</u> Complaint ¶ 9, at 4; <u>id.</u> ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on <u>Street Signs</u> on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On <u>Street Signs</u>, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint ¶ 98, at 28 (alterations in original)(quoting <u>Street Signs: Interview with Larry Goldstone</u> at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  <u>See</u> Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via electronic mail transmission, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'"  Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . .

analysis" ("OTTI analysis").[9]   Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See Complaint ¶ 49, at 14-15.[10]   The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; and (v) that the European hedge fund was on the verge of collapsing, see Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that

---

[9] An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10] The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents referenced in the Complaint and central to the SEC's allegations, and the Court has taken judicial notice of an Electronic Mail Transmission from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg's auditor was KPMG. See March 3, 2008 Hall Email at 2 (representing that the electronic mail transmission was sent from a KPMG employee).

were relevant regarding Thornburg Mortgage's ability to continue as a going concern.  See Complaint ¶ 57, at 17.  Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's.  See Complaint ¶ 76, at 22.  "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."  Electronic Mail Transmission from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, sent March 3, 2008 11:44 p.m, filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email").  The requested evidence included "correspondence with lenders/attorneys/shareholders, emails."  Request for Correspondence, attached to March 3, 2008 Hall Email, at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").  See Complaint ¶ 100, at 29.  KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  At the time, KPMG as auditor was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.  KPMG did not become aware of the Citi Letter while preparing its restatement. See Complaint ¶ 101, at 29.  Simmons reviewed and approved an analysis for the auditor which

explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"  Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).  The analysis stated: "Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]  No one in the market could have foreseen the sudden decline in mortgage valuations."  Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

The SEC subsequently began an investigation.  See Defendants' Motion to Compel Production of PCAOB Deposition Transcripts and Plaintiff's Notes and Memoranda of Interviews with Non-Party Witnesses at 9, filed November 28, 2012 (Doc. 90)("Motion to Compel").  As part of its investigation of Thornburg Mortgage, the SEC served on KPMG a Subpoena for the Production of Documents relating to its audit of Thornburg Mortgage for the 2007 fiscal year, Thornburg Mortgage's quarterly reviews during that time, and any relevant restatements.  See Letter from George Salter, attorney for KPMG, to Jessica Kurzban, attorney for Goldstone and Simmons, sent October 23, 2012, filed December 4, 2012 (Doc. 92-3)("Salter to Kurzban Letter")(quoting the SEC's Subpoena).  "Less than a year later," the Public Company Accounting Oversight Board ("PCAOB"), "a non-governmental entity created by the Sarbanes-Oxley Act of 2002 to oversee the auditors of public companies, began investigating KPMG in connection with its 2007 year-end audit of Thornburg."  Motion to Compel at 9.

## PROCEDURAL BACKGROUND

The SEC brought this case as part of an enforcement action against the Defendants. Complaint at 1.  During discovery, the SEC served upon Defendants the SEC Third RFA on

January 30, 2013.  Among other requests, the SEC included RFA No. 19, which states: "Admit that Thornburg had information related to Margin Calls that was not provided to KPMG prior to the filing of the 2007 Form 10-K."  SEC Third RFA at 2.  Also included is Request for Admission No. 24, which states: "Admit that the I/O Strip Transactions constitute legal sales."  SEC Third RFA at 3.

1.     **The Defendants' Objections and Responses.**

The Defendants subsequently served their Objections and Responses to Plaintiff's Third Set of Requests for Admission to All Defendants, dated March 8, 2013, filed April 15, 2013 (Doc. 162-3)("Defs' Response").  Regarding RFA No. 19, the Defendants object to the RFA as "vague, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence."  Defs' Response at 6.

The Defendants further object that the term "'information related to Margin Calls' is a vague, ambiguous, and overbroad term that could be read to encompass every document that makes any reference or otherwise relates to the term 'margin call' regardless of its materiality to the audit or relevance to this case."  Defs' Response at 6.  The Defendants also object to the extent that the RFA "presumes knowledge by Defendants of all the 'information related to Margin Calls' in the possession of all the individuals, entities, and affiliates that are listed in Plaintiff's definition of 'Thornburg.'"  Defs' Response at 6.  The Defendants also object to the RFA in that it seeks information about what information or documents KPMG possessed before filing the 2007 Form 10-K.  See Defs' Response at 6.  The Defendants maintain they were not aware of all the information or documents that KPMG may have been provided or possessed at that time. See Defs' Response at 6.  "Because multiple terms used in the Request are vague,

ambiguous, and overbroad, Defendants are unable either to admit or deny the Request."  Defs'
Response at 6.

Regarding RFA No. 24, the Defendants object to the term "legal sales" as "vague,
ambiguous, and not defined in Plaintiff's Requests for Admission."  Defs' Response at 9.
"Defendants further object to the definition of 'I/O Strip Transactions' as vague and ambiguous
to the extent the SEC defines the transactions as 'sale or financing transactions' and because this
definition is inconsistent with the definition used by Plaintiff in its Third Set of Interrogatories."
Defs' Response at 9.  The Defendants assert that they are unable to admit or deny Request No.
24 because the term "legal sales" is vague and ambiguous.  Defs' Response at 9.

On March 26, 2013, the SEC's counsel sent an electronic mail transmission to the
Defendants to summarize a telephone call between the parties on March 25, 2013, and to provide
responses and revisions regarding the Defendants' objections to, among others, RFA Nos. 19 and
24.  See March 26, 2013 Ltr.  The SEC revised RFA No. 19 to state: "Admit that the Defendants
had information, of any variety whatsoever, related to Margin Calls that was not provided to
KPMG prior to the filing of the 2007 Form 10-K."  March 26, 2013 Ltr. at 2.  Regarding RFA
No. 24, the SEC added to the drafted form the statement that "'Legal Sale' means a legally
enforceable transaction transferring title and ownership of a security or securities to a third
party."  March 26, 2013 Ltr. at 3.

**2.      The SEC's RFA Motion.**

Subsequent to another telephone call between the parties on April 3, 2012, the SEC filed
the Plaintiff's Motion to Determine the Sufficiency of Defendants' Responses to Requests for
Admission Nos. 19 and 24, filed April 15, 2013(Doc. 162)("RFA Motion").  The SEC argues
that the responses to these RFAs are inconsistent with rule 36(a) of the Federal Rules of Civil

Procedure. See RFA Motion at 2. The SEC moves the Court to determine the sufficiency of the responses pursuant to rule 36(a)(6) and D.N.M.LR-Civ. 7.  Quoting a letter from the Defendants to the SEC, the SEC summarizes the applicable law regarding a party's obligation to respond to RFAs:

> Parties responding to requests for admission are required to respond to the "essential truth contained within the request."  See, e.g., Havenfield v. H&R Block, 67 F.R.D. 93, 97 (W.D. Mo. 1973).  "If the responding party finds the wording of a request for admission imprecise, he should set forth a qualified answer that fairly meets the substance of the request."  House v. Giant of Md., LLC, 232 F.R.D. 257, 262 (E.D. Va. 2005).  "Requests for admission are not games of "Battleship" in which the propounding party must guess the precise language coordinates that the responding party deems answerable.  Id.

RFA Motion at 2 (quoting Letter from Jessica Kurzban to Stephen McKenna, Gregory Kasper, and Dugan Bliss, dated March 30, 2012, filed April 15, 2013 (Doc. 162-5)).  The SEC argues that the Defendants' response to RFA No. 19 is "improper."  RFA Motion at 3.  The SEC maintains that the Defendants "plainly intend" to assert that KPMG possessed all the relevant information related to the accounting determinations reached in the 2007 Form 10-K, "including those affected by Thornburg's receipt of margin calls."  RFA Motion at 3.  The SEC asserts: "By this request for admission, Plaintiff is seeking to establish the doubtlessly true fact that the Defendants . . . had greater information than their auditors related to Thornburg's margin calls."  RFA Motion at 3.  The SEC asserts that, given that the Defendants have deposed twelve current and former KPMG employees, "the Defendants, at this point, have no excuse for not knowing what KPMG knows -- indeed, those depositions have revealed that significant information related to margin calls was not provided to KPMG."  RFA Motion at 3.  The SEC contends that the Defendants do not need to know "everything" that KPMG knows, but that the "Defendants only need to know whether they possess information related to margin calls that was not

provided to KPMG," such as a conversation with a counter party or an internal communication regarding margin calls. RFA Motion at 3-4.

The SEC contends that the Defendants' objection to the term "information related to margin calls" as vague, ambiguous, and overbroad is "gamesmanship." RFA Motion at 4. "[T]he Defendants are hiding behind feigned ambiguity to avoid making a simple admission. . . . [C]ountless hours have been spent discussing margin calls at Thornburg[;] the suggestion [that the term] is unclear is absurd." RFA Motion at 4. The SEC points out that the Defendants have used the term "information related to margin calls" in their own Requests for Admission. RFA Motion at 4 (citing Defendants Second Set of Requests for Admission to Plaintiff Securities and Exchange Commission, Request for Admission No. 29, filed April 15, 2013 (Doc. 162-6)("Admit that YOU have no evidence that DEFENDANTS instructed any employee in the Capital Markets group at Thornburg to withhold information about MARGIN CALLS from KPMG.")(capitalization in original)). For these reasons, the SEC requests that the Court order the Defendants to respond to RFA No. 19 and states that it will accept a response to either formulation of the RFA. See RFA Motion at 4.

The SEC asserts that the Defendants' response to RFA No. 24 is also improper. The 2007 Form 10-K states: "In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash. To date, no such sales have been required to meet margin calls." RFA Motion at 4 (quoting 2007 Form 10-K at 35). The SEC asserts that this statement that Thornburg Mortgage had not been required to sell assets to meet margin calls is false. RFA Motion at 4. "Whether this statement is true turns in signification part upon whether certain transactions -- 'the I/O Strip Transactions' -- were 'sales.'" RFA Motion at 4. The SEC asserts that it is not attempting to assert that these

transactions were sales of purchased ARM assets for accounting purposes, but rather "seeking to establish that, while not sales for accounting purposes, these transactions were legal sales." RFA Motion at 5.

The SEC asserts that, by contending that "legal sales" is a vague and ambiguous term, the Defendants are trying to "hide behind words with plain meanings" in order to avoid responding. RFA Motion at 5. The SEC contends that, even after offering a definition for the term in its March 26, 2013 Ltr. to Defendants, the Defendants have continued to refuse to respond. See RFA Motion at 5. Regarding the Defendants' objection that RFA No. 24 calls for a legal conclusion, the SEC states that rule 36(a)(1)(A) "specifically contemplates that requests for admission may address 'the application of facts to law.' That is precisely what is being asked here." RFA Motion at 5. As with RFA No. 19, the SEC requests that the Court find the Defendants' objections unjustified, and order them to respond to the RFA with or without the clarifying language. See RFA at 5.

### 3. The Defendants' Opposition to the SEC's RFA Motion.

The Defendants subsequently filed their opposition to the SEC's RFA Motion. See Defendants' Opposition to Plaintiff's Motion to Determine the Sufficiency of Defendants' Responses to Requests for Admission Nos. 19 and 24, filed May 2, 2013 (Doc. 167)("RFA Opposition"). The Defendants assert that they have made "reasonable efforts" to respond to all of the SEC's RFAs. RFA Opposition at 2. The Defendants contend: "With respect to RFA Nos. 19 and 24, Defendants specified in detail why they could neither affirm nor deny the requests." RFA Opposition at 2 (citing Defs' Response and Letter from Chris Johnstone to Gregory Kasper, Stephen McKenna, and Dugan Bliss, dated April 4, 2013, filed May 2, 2013 (Doc. 167-2)("April 4, 2013 Ltr.")(stating that the amended RFA No. 19 remains unanswerable and "is even more

overbroad than before," and that the clarification to RFA No. 24 does not cure the problem that it still calls for a legal conclusion, and "continues to be vague, ambiguous, and irrelevant as applied to the type of complex transactions at issue").  The Defendants state:

> From Thornburg's perspective, the I/O Strip Transactions were accurately characterized as secured financings, because Thornburg continued to maintain a more-than-trivial benefit in the pool of loans underlying the securities and because the transfers of I/O Strips were made subject to certain restrictions.  In light of those facts, Generally Accepted Accounting Principles (GAAP) required Thornburg to record the I/O Strip Transactions as secured financings, not as sales of assets.

April 4, 2013 Ltr. at 3. The Defendants maintain: "Notwithstanding all evidence to the contrary, RFA No. 19 is deliberately worded to imply that Defendants or others at Thornburg withheld information about margin calls from KPMG." Defs' Response at 7.  The Defendants also assert that their response to RFA No. 24 is appropriate under rule 36.  See RFA Opposition at 8.  The Defendants contend that RFA No. 24 continues to call for a legal conclusion that the Defendants are unable to provide.  The Defendants assert that the SEC's proposed revision of the RFA to define "legal sale" as a "legally enforceable transaction transferring title and ownership of a security or securities to a third party," "further illustrates why Defendants are unable to admit or deny this RFA."  RFA Opposition at 8.

### 4.      July 9, 2013, Hearing.

The Court held a hearing on July 9, 2013.  See Transcript of Hearing, taken July 9, 2013, filed July 16, 2014 (Doc. 194)("Tr.").  The Court began by expressing surprise that the Defendants object to providing an answer to the RFAs, and would prefer to reach a point where the Defendants could comfortably admit or deny RFA Nos. 19 and 29.  See Tr. 6:12-7:8 (Court).  Regarding RFA No. 19, the Court asked the SEC if it could identify information that it has discovered which the SEC knows the Defendants did not provide to KPMG and that falls within

the scope of RFA No. 19.  See Tr. at 8:2-6 (Court).  The SEC responded that the best example is "a bottomless supply of internal to Thornburg e-mails, charts, evidences of meetings, conference calls, all relating to both the repo agreements and to the margin calls received by Thornburg from the various counterparties."  Tr. at 8:9-13 (Kasper).  The Court inquired whether an admission to RFA No. 19 is particularly useful for the SEC at trial.  See Tr. at 8:17-21 (Court).  The SEC responded that, while it is not the most important piece of information, it is a starting point in making the argument that KPMG did not have all the information it needed.  See Tr. at 8:22-25 (Kasper).  The SEC then addressed the Defendants' assertion that RFA No. 19 is overly broad, stating that the SEC is seeking only an admission or denial, and is not asking the Defendants to "identify each and every thing that every single person at Thornburg and KPMG knew."  Tr. at 10:14-19 (Kasper).

        The Court then turned to the Defendants to seek clarification why the Defendants are opposing admitting or denying RFA No. 19.  See Tr. at 11:11-15 (Court).  The Defendants asserted that RFA No. 19 requests information entirely outside the Defendants' knowledge.  See Tr. at 11:16-19 (Johnstone).  The Defendants argued that RFA No. 19 requires the Defendants to speculate as to all the information held by Thornburg Mortgage, its affiliates, its agents, and KPMG, and "to vouch for whether or not Thornburg had any information, regardless of the relevance or materiality of the information, that was not provided to KPMG."  Tr. at 11:17-25 (Johnstone).  The Court replied that the Defendants will have to take a position on that issue at trial and that, based on the Complaint's allegations, the Defendants would not be able to argue that nothing was withheld from KPMG.  See Tr. at 12:4-17 (Court).  "You're going to have to take a position of saying some of this stuff is not material, it's not relevant."  Tr. at 12:16-17 (Court).  The Defendants replied that, while the SEC is entitled to introduce evidence that

Thornburg Mortgage possessed -- including non-material or irrelevant information -- the Defendants cannot "vouch or speculate about the information that Thornburg had regarding margin calls that may or may not have been given to KPMG."  Tr. at 12:18-13:5 (Johnstone). "There were forty KPMG employees on the audit team.  There were hundreds of Thornburg employees.  Our clients, three individuals, cannot speculate on all of the information." Tr. at 13:5-8 (Johnstone).

The Defendants asserted that there has been significant discovery on this issue.  See Tr. at 13:11-12 (Johnstone).  "In fact, the Defendants have provided substantive responses regarding both the information requested by KPMG and the information Thornburg provided to KPMG." Tr. at 13:12-14 (Johnstone).  The Defendants argued that in light of the substantive interrogatory responses on this matter, and the broad language used in the RFA, the value of RFA No. 19 is minimal.  See Tr. at 13:14-18 (Johnstone).  The Defendants argued: "'Information related to margin calls' could be anything.  As I indicated earlier, it could include irrelevant information.  It could include immaterial information.  We don't really see the use of this."  Tr. at 13:18-21 (Johnstone). The Court responded that the SEC would likely use the Defendants' response to RFA No. 19 as a baseline point at trial.  See Tr. at 13:22-24 (Court)("They're going to take your answer and say, you know, that there's no dispute in this case, that Thornburg had information about these margin calls that it did not provide to KPMG.").  The Defendants asserted that they would prefer more specificity.  See Tr. at 14:6.

The Court asked the Defendants to defend their objections that RFA No. 19 is vague, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence.  See Tr. at 14:12-23 (Court). The Court asked how RFA No. 19 is vague and what the Defendants would want the SEC to do differently.  See Tr. at 15:3-4 (Court).  The Defendants replied:

> Information relating to margin calls' with no date range is vague.  It would be preferable to describe the specific information.  And even better, it would be preferable if they indicated in their RFA that they were seeking information relevant to the allegations in the complaint or relevant to the determinations that KPMG needed to make in the context of the audit of the 2007 Form 10-K.

Tr. at 15:5-12 (Johnstone).  The Defendants also stated: "If the SEC is willing to narrow the RFA to seek relevant or material information to the Form 10-K, that would be a preferable situation for Defendants."  Tr. at 15:15-18 (Johnstone).  The Court asked whether the Defendants' preference for the scope of the RFA is "a good argument" for altering the RFA, given that the SEC is entitled to be the "master of their discovery."  See Tr. at 15:19-20 (Court)("Well, but is that really a good argument, preferable? I mean, they get to be master of their discovery.")  The Defendants asserted that "preferable" may not have been the proper word choice, but that narrowing the RFA makes RFA No. 19 answerable. See Tr. at 15:21-2; 15:24 (Johnstone).  "As I said earlier, as currently written the vague language makes it unanswerable because the Defendants really cannot vouch for all of the information possessed by the entire company of Thornburg relating to an expansive subject as margin calls and whether or not that information was provided to KPMG. . . ."  Tr. at 15:24-16:4 (Johnstone).  The Defendants asserted that, if the Court were to rule in favor of the SEC on the RFA as written, it would prejudice the Defendants by requiring them to speculate about information not within their possession, which could have the tendency to mislead the jury at trial.  See Tr. at 16:5-12 (Johnstone).  The Defendants further asserted that, by contrast, a ruling in the Defendants' favor would not harm the SEC.  See Tr. at 16:13-17 (Johnstone)("If the SEC intends to prove that there was any conceivable information regarding margin calls that was not provided to KPMG, they can make that point at trial with evidence.").

- 24 -

The Court asked if the Defendants had additional comments regarding RFA No. 19 and the Defendants stated that they were troubled by the Plaintiff's statement on page three of their brief that there was "'significant information related to margin calls was not provided to KPMG.'"  Tr. at 16:18-23 (Court, Johnstone).  The Court asked what the Defendants thought of the SEC's identification of information earlier in the hearing.  See Tr. at 17:2-5 (Court)("Well, what do you think about Mr. Kasper's -- obviously that was my first question to him, or one of the earlier questions.  He's listed them out today.  What do you think of that?").  The Defendants responded: "I think getting a toehold that there was some conceivable information is not what they wrote in their brief."  Tr. at 17:6-8 (Johnstone).  The Court responded that the SEC thinks the information is significant and that the SEC's word choice falls within allowable rhetoric.  See 17:9-12 (Court).  The Court noted that the significance of the information is not a secret issue, and asked: "[I]sn't that what this trial's going to be about, whether there is significant information or whether it was not material?"  Tr. at 17:16-18 (Court).  The Defendants responded that the Court was correct, but the Defendants wanted to flag the issue that the brief states that significant information was not provided to KPMG, but that such information was not described or attached as an exhibit.  See Tr. at 17:19-24 (Johnstone).  The Court inquired whether the Defendants were prepared to say that Thornburg Mortgage had no information related to margin calls which was not provided to KPMG before the filing of the 2007 Form 10-K.  See Tr. at 18:1-4.  The Defendants responded that they were prepared to say that KPMG received all information related to margin calls, including a full margin call schedule, prior to the filing of the 2007 Form 10-K.  See Tr. at 18:5-8 (Johnstone).  "And that's the significant information.  That's what I'm concerned about with the rhetoric in the brief, is that it gives the

impression that there is significant information when there was not.  And what there are seeking out of this RFA is insignificant information."  Tr. at 18:10-14 (Johnstone).

The Court asked the SEC if it would be possible to narrow the timeframe for margin calls.  See Tr. at 19:1-8 (Court).  The SEC responded that the timeframe would be from January 1, 2007 through the time of the filing of the 2007 Form 10-K.  See Tr. at 18:14-16 (Kasper).  The SEC noted that, as part of the meet-and-confer process, the SEC revised the RFA to apply to the Defendants rather than Thornburg Mortgage and asserted that the SEC would be willing to accept an answer to either version of the RFA.  See Tr. at 20:1-14 (Kasper). The Court then allowed the SEC to respond to the Defendants' arguments regarding RFA No. 19.

The SEC argued that the RFA does not require speculation, but rather investigation.  See Tr. at 21:1-3 (Kasper).  The SEC asserted that rule 36 imposes a burden on the responding party to make a reasonable inquiry and not to rely solely on a client's personal knowledge.  See Tr. at 21:4-7 (Kasper).  The SEC asserted that the Defendants likely have personal knowledge of information not provided to KPMG, stating: "Mr. Simmons testified to having . . . direct conversations with Citi-Bank regarding margin calls.  Unless he reported . . . the substance of those conversations to KPMG, I don't see how he can do anything other than admit this RFA, because KPMG plainly was not on those phone calls."  Tr. at 21:8-17 (Kasper).  The SEC further asserted that the Defendants' response to interrogatories does not relieve the Defendants of the obligation to respond to RFA No. 19.  See Tr. at 21:18-25 (Kasper).  The SEC argued that the responses to the interrogatories identified by the Defendants were limited to the recollection of the Defendants and "those responses were far from forthcoming."  Tr. at 22:1-5 (Kasper).

The Court stated that it would overrule the objections to RFA No. 19 with the exception of the objection to the RFA's breadth.  See Tr. 22:9-10 (Court).  The Court stated the RFA will

be limited to the beginning of January 1, 2007 regarding the margin calls and will also be limited to the Defendants rather than all of Thornburg Mortgage.  <u>See</u> Tr. at 22:11-16 (Court).  The Court further stated that the Defendants will be required to provide an answer to the reformulated RFA, but could include a qualifying statement that the Defendants are not conceding that any relevant information was withheld.  Tr. at 22:20-25 (Court)("So while I'm not telling you how to write it as far as if you want to put in something that you're not conceding that any relevant information was withheld or something like that, I think that's fine, but I am looking for an answer here.").

The SEC stated that, in RFA No. 24, the Defendants are asked to admit that the I/O Strip Transactions constituted "legal sales."  Tr. at 23:9-11 (Kasper).  The SEC asserted that the Defendants have taken the position that the I/O Strip Transactions were accounted as financings. <u>See</u> Tr. at 23:11-14.  The Court noted that the SEC had conceded in a briefing and at a hearing on a motion to dismiss that, for accounting purposes, the transactions were not sales.  <u>See</u> Tr. at 23:18-21 (Court). The SEC acknowledged that concession and asserted: "[I]t's possible for a transaction to be both accounted for as a financing but as a legal matter to constitute a sale." Tr. at 24:1-5 (Court, Kasper).  The Court inquired what the SEC meant by "legal matter."  <u>See</u> Tr. at 24:6-9 (Court)("Well, what do you mean by 'legal matter?' . . . [I]f the accounting is right, then I guess it's hard for me to see then what the legal matter of it being a sale is.").  The SEC responded that it is a similar concept to a sale and leaseback where there is a sale but the money received is accounted for as rent.  <u>See</u> Tr. at 24:10-14 (Kasper).  The SEC asserted that, while the I/O Strips that underlie the transactions had passed to a buyer in exchange for money, Thornburg Mortgage retained "some sort of a sufficient residual interest that it was allowed to be accounted for as a financing."  Tr. at 24:14-23 (Kasper).  The SEC argued that a KPMG work paper

explicitly discussed that, while there was a legal sale, the transaction should be accounted for as

a financing.  See Tr. at 24:24-25:2 (Kasper).  The SEC read from a KPMG work paper stating:

> Although there was a legal sale of the IO security to a third party, the company
> still maintains more than a trivial benefit in the pool of loans such that the
> company has not relinquished control over the loans and the cash flows derived
> from those loans and should continue to account for the transfer as a secured
> borrowing.

Tr. at 25:11-17 (Kasper).  The SEC asserted that, in the 2007 Form 10-K, the Defendants stated

that they did not have to sell assets to meet margin calls.  See Tr. at 25:18-23 (Kasper).  The SEC

argued: "And to the extent that we can prove that as a legal matter that they did in fact sell assets,

that the I/O Strip Transactions were entered into to raise money to pay margin calls, that

statement becomes false, or at least becomes evidence of falsity."  Tr. at 25:23-26:2 (Kasper).

The SEC argued that, while the Defendants object to RFA No. 24 as calling for a legal

conclusion, rule 36 specifically permits RFAs that involve the application of law to fact.  See Tr.

at 26:9-13 (Kasper).  The SEC asserted that only abstract questions of law are prohibited.  See

Tr. at 26:13-15 (Kasper)(citing Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 275

F.R.D. 551 (D.N.M. 2011).  The SEC argued that RFA No. 24 relates to the facts of the case and

is not abstract.  See Tr. at 26:16-17 (Kasper).  The SEC asserted that the cases which the

Defendants cite for the proposition that an RFA cannot seek a legal conclusion are inapplicable

to RFA No. 24, as the RFAs in those cases sought abstract legal conclusions.  See Tr. at 26:20-24

(Kasper).  The SEC acknowledged that there is a legal component to RFA No. 24, but that it asks

the responding party to apply the law to the facts of this case.  The SEC asserted that the

application of law to facts is "plainly contemplated" by rule 36.  See Tr. at 27:8-11.  The SEC

further argued that the Defendants are obligated under rule 36 to perform a reasonable inquiry to

seek the information required to admit or deny an RFA.  See Tr. at 27:12-19 (Kasper).  The SEC

stated: "And in the [Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK)] case, [the Court] explained that a reasonable inquiry means that a party has to ask their counsel, and if the counsel knows the answer, they need to use that information to admit or deny."  Tr. at 27:19-22 (Kasper). The SEC asserted that the Defendants cannot avoid answering an RFA that applies law to facts merely because the Defendants are not lawyers.  See Tr. at 27:24-28:2 (Kasper)("Obviously, most parties to lawsuits are not lawyers. . . . [I]t would be unfair and clearly not the intent of the rule to exempt non-lawyers from having to respond to RFAs that applied law to facts").

The Court asked the Defendants why they oppose admitting or denying RFA No. 24.  See Tr. at 28:4-6 (Court).  The Defendants responded that "legal sales" is a term of art which the SEC invented and that the term lacks objective meaning.  See Tr. at 28:11-14 (Johnstone).  The Court noted a KPMG working paper used the term.  See Tr. at 28:15-16 (Court).  The Defendants responded that the term appeared in only one work paper out of hundreds of thousands as an offhand remark and that the Defendants never saw that work paper.  See Tr. at 28:17-21 (Johnstone).  The Defendants stated that the Defendants never used the term "legal sales" and that the term is not a term that can be found in a law book.  See Tr. at 28:21-22 (Johnstone).  The Defendants argued that it is improper to ask the Defendants to ascribe a legal conclusion to a complex financial transaction.  See Tr. at 28:22-24 (Johnstone).  The Defendants asserted that the SEC has admitted that the transactions constitute financings, but are attempting to identify the transactions using a legal term that the Defendants cannot understand.  See Tr. at 28:24-29:2 (Johnstone).

The Court stated that it appeared the risk of prejudice to the Defendants if the Court requires them to answer RFA No. 24 is small and asked what the Defendants saw as a potential harm in answering the RFA.  See Tr. at 29:3-30:12 (Court, Johnstone).  The Defendants

responded: "[T]he prejudice that we see with this is that we don't want to buy into the label 'legal sales.'  We think it's confusing to the jury, it's likely to prejudice our clients in doing so, and it's an inappropriate and invented term."  Tr. at 30:13-17 (Johnstone).  The Court turned to the Defendants' specific objections and asked why the Defendants object to the definition of I/O Strip Transactions.  See Tr. at 30:18-20.  The Defendants asserted that I/O Strip Transactions are complex transactions, debt financings, and the Defendants object to the SEC's attempt to assign a legal status to that transaction.  See Tr. at 30:21-24 (Johnstone).  The Defendants asserted that the SEC was unable to provide a clear definition of the term "legal sale."  Tr. at 31:8-11 (Johnstone).  The Defendants argued that the difficulty in defining the term demonstrates the likelihood that its usage in RFA No. 24 could confuse the jury.  See Tr. at 31:11-13 (Johnstone).  The Court quoted a definition that the SEC provided in its March 26, 2013 Ltr. to the Defendants: "'Legal sale' means a legally enforceable transaction transferring title and ownership of a security or securities to a third-party.'"  Tr. at 31:14-18 (Court).  The Defendants stated: "[W]e're beginning this RFA with an invented term of art by the SEC, and then we are using an invented definition found nowhere in the literature and asking the defendants to respond to an RFA with multiple levels of invented language, and that is an improper thing to do."  Tr. at 32:1-6 (Johnstone).  The Defendants argued that case law supports a conclusion that RFA No. 24 requests a legal conclusion, stating:

> Mr. Kasper identified a series of cases, the Disability Rights [Council v. Wash. Metro. Area, 234 F.R.D 1 (D.D.C. 2006)] case, the Reichenbach [v. City of Columbus, No. 2:03-CV-1132, 2006 WL 143552 (S.D. Ohio Jan. 19, 2006)] case, the Lakehead [Pipe Line Co. v. Am. Home Assurance Co.], 177 F.R.D. 454 (D. Minn. 1997)] case and the Stark[-Romero v. Nat'l R.R. Passenger Co. (AMTRAK)] case . . .  I would encourage the Court to look at the RFAs in those cases, and I think the Court will come to the inevitable conclusion that this RFA requests a legal conclusion.

Tr. at 32:7-15 (Johnstone).   The Defendants argued that RFA No. 24 requests no factual information.   See Tr. at 32:16-19 (Johnstone).   The Defendants argued that the appropriate question when evaluating an RFA is whether it asks for factual information, and not whether it relates to factual information. See 32:19-23 (Johnstone).

The Defendants asserted that RFA No. 24 is not analogous to the RFA at issue in Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK).   See Tr. at 322:4-26 (Johnstone).   The Defendants maintained that the RFA that the Court allowed in that case asked a factual question, and not a legal question.   See Tr. at 33:1-6 (Johnstone). The Defendants noted the Court's statement in Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK): "Requests for admissions are rarely useful in twenty-first century complex commercial litigation, and are mostly helpful to authenticating documents or getting the most basic factual stipulations.  Requests for admissions are useful when there is an admission but not very useful when there is not a clear admission." Tr. at 33:10-15 (Johnstone)(quoting Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 275 F.R.D. at 557).   The Defendants stated: "[T]his is precisely the type of [twenty-first] century complex securities litigation where an RFA with an invented term of art is inappropriate."  Tr. at 33:16-18 (Johnstone).

The Court turned to Jerry Marks, Starrett's counsel, for additional comments.  See Tr. at 33:23-24 (Court).  He identified two issues with responding to RFA No. 24.  See Tr. at 34:1-2 (Marks).  The Defendants asserted that there is nothing in the record that indicates that the Defendants or Thornburg Mortgage attempted to determine if the I/O Strip Transactions constitute legal sales.  See Tr. at 34:2-5 (Marks).  The Defendants argued that, if the Court requires them to admit or deny RFA. No 24, they would essentially be stating that they analyzed whether the transactions constitute legal sales and made a subsequent conclusion.  See Tr. at

34:6-15 (Marks).  The Defendants stated: "That's inappropriate to ask of defendants to make that legal conclusion when there's no evidence that was ever made."  Tr. at 34:9-11 (Marks).

Regarding prejudice, the Defendants maintained that there is only one reference to the term "legal sales" in thousands of work papers, and that there is no evidence the Defendants saw that phrase, and that nothing indicates why KPMG used that term on that occasion.  See Tr. at 34:16-23 (Marks).  The Defendants asserted that the SEC may use a denial of RFA No. 24 to create a false conflict between the Defendants and KPMG's analysis.  See Tr. at 34:23-35:3 (Marks)("I certainly could see Mr. Kasper and Mr. McKenna taking an unequivocal 'no' . . . and saying, 'Look, defendants say no, their auditors said yes', and setting up a conflict that's an artificial conflict that we wouldn't want in the record.")

The Defendants asserted that a middle ground between an admission and denial existed in the form of a denial on the basis that the Defendants lack sufficient information to admit or deny the RFA.  See Tr. at 35:4-10 (Marks).  The Defendants requested that the Court either deny the SEC's request for a response to RFA No. 24 or allow the Defendants to consider giving a response that could include a denial based on the fact that nothing in the record indicates that anyone, including the Defendants, conducted an analysis to conclude whether the I/O Strip Transactions constituted legal sales.  See Tr. at 35:11-17 (Marks).

The Court asked whether any of the internal communications from Thornburg Mortgage referred to the transaction as a sale.  See Tr. at 35:18-20 (Marks).  The Defendants responded: "I believe there's e-mails where, colloquially, it was referred to as a sale."  Tr. at 35:21-22 (Marks). The Court expressed that it seems problematic for the Defendants that there are internal references to the transactions as sales but for accounting purposes they are referred to as something other than sales.  See Tr. at 35:23-36:6 (Court).  The Defendants asserted that these

- 32 -

internal references are a problem that the Defendants can address at trial, because both the SEC and KPMG admit that, for accounting purposes, the transactions constitute financings. See Tr. at 36:7-11 (Marks). The Defendants concluded by asserting that the SEC could call an expert witness to state that the transactions constituted legal sales, but that the Defendants are not in a position to make that conclusion. See Tr. at 38:5-12 (Marks).

The SEC responded by asserting that the Defendants had propounded numerous RFAs and interrogatories asking the SEC to make determinations they had never made in the past. See Tr. at 39:4-8 (Marks). The SEC stated:

> For example, the admission that keeps being mentioned, that we've admitted that these transactions constituted a financing for accounting purposes. No one at the Commission had ever done that in 2007 and 2008. It's only as part of this litigation, and it is only as a response to the defendants' RFA that we undertook to make that inquiry and to provide a response, as is our obligation under the federal rules.

Tr. at 39:10-17 (Marks). The SEC asserted that the Defendants should be obliged to undertake a similar inquiry. See Tr. at 39:17-19 (Marks). The Court stated that it would overrule the objections to RFA No. 24 as well as to RFA No. 19. See Tr. at 39:24-25 (Marks). The Court stated that the definition of "legal sales" provided in the SEC's March 26, 2013 Ltr. is included within RFA No. 24. See Tr. at 39:25-40:2 (Court). The Court stated that, with the incorporated definition, the RFA is not vague or ambiguous. See Tr. at 40:2-6 (Court). The Court stated that the Defendants are required to answer RFA No. 24. See Tr. at 40:8-9 (Court).

The Court concluded that RFA No. 24 does not exceed the limits of rule 36 by asking for a purely legal conclusion. See Tr. at 41:1-12 (Court). The Court noted that its decision in Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK) indicates that it is impermissible to ask a purely legal question in an RFA. See Tr. at 41:6-8 (Court). The Court stated, however, that if an RFA involves an application of law to facts, it is generally permissible. See Tr. at 41:9-12

(Court).   The Court determined that RFA No. 24 involves an application of law to facts and therefore falls within a RFA's permissible use.   See Tr. at 41:11-12.

## **LAW REGARDING RFAs**

Rule 36(a)(1) allows for a party to serve on any other party a request that the party admit "the truth of any matters within the scope of Rule 26(b)(1) relating to . . . facts, the application of law to fact, or opinions about either . . . ."   Fed. R. Civ. P. 36(a)(1)(A).   RFAs "expedite trials by establishing as true certain material facts of a case without the necessity of formal proof at trial."   Keen v. Detroit Diesel Allison, 569 F.2d 547, 554 (10th Cir. 1978)(citation omitted).   The 1970 amendment to rule 36(a) deleted "relevant matters of fact," thus allowing requests applying law to fact.   Fed. R. Civ. P. 36, advisory committee note to the 1970 amendments ("As revised, the subdivision provides that a request may be made to admit any matters within the scope of Rule 26(b) that relate to statements or opinions of fact or of the application of law to fact.   It thereby eliminates the requirement that the matters be 'of fact.'").   However, "[t]he amended provision does not authorize requests for admissions of law unrelated to the facts of the case."   Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 275 F.R.D. at 554 (Browning, J.)(quoting Fed. R. Civ. P. 36, advisory committee note to the 1970 amendments).   The advisory committee note to the 1970 amendments further states:

> An admission of a matter involving the application of law to fact may, in a given case, even more clearly narrow the issues [than an admission on a matter of opinion].   For example, an admission that an employee acted in the scope of his employment may remove a major issue from the trial.   In McSparran v. Hanigan, plaintiff admitted that "the premises on which said accident occurred, were occupied or under the control" of one of the defendants, [225 F. Supp. 628, 636 (E.D. Pa. 1963)].   This admission, involving law as well as fact, removed one of the issues from the lawsuit and thereby reduced the proof required at trial.   The amended provision does not authorize requests for admissions of law unrelated to the facts of the case.

Fed. R. Civ. P. 36, advisory committee note to the 1970 amendments.  In Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), the request asked for an admission that the New Mexico Department of Transportation was responsible for administering the federal grade-crossing improvement program in New Mexico.  See 275 F.R.D. at 557.  The Court held that this requirement sought an application of law to fact, rather than the answer to a pure matter of law; thus, the Court concluded that the plaintiffs were required to admit or to specifically deny the RFA, or to state in detail why they could not truthfully admit or deny it.  See 275 F.R.D. at 558.  The Court reasoned that the request "is closer to a request seeking application of law to the facts of the case.  It is trying to narrow the range of entities that -- factually -- administer a particular program in New Mexico; it does not seek the admission of an abstract question of law."  275 F.R.D. at 558.

"[A] respondent must, if he or she cannot admit or deny, state in detail why not."  Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 275 F.R.D. at 555.  Rule 36(a)(4) provides:

> If a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it.  A denial must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest.  The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny.

Fed. R. Civ. P. 36(a)(4).  There is arguably a tension between the first sentence of rule 36(a)(4) and the third sentence.  The first sentence suggests that the answer must describe in detail what efforts have been made to answer the particular RFA; the third sentence suggests that such detail is not necessary and that the answer need only track the third sentence of 36(a)(4).  There thus may be some conflict between rule 36(a)(4)'s requirement that a responding party "state in detail why the answering party cannot truthfully admit or deny" a RFA, and not requiring a responding

party to detail the "reasonable inquiry" the party made.  The Court has adopted the view that a simple statement that a party has made a reasonable inquiry, and does not have adequate information to admit or to deny a RFA suffices, and a party may rest on that statement.  See Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 275 F.R.D. at 554-55.  See also, Asea, Inc. v. S. Pac. Transp. Co., 669 F.2d 1242, at 1247 (9th Cir. 1981)("[A] response which fails to admit or deny a proper request for admission does not comply with the requirements of Rule 36(a) if the answering party has not, in fact, made 'reasonable inquiry,' or if information 'readily obtainable' is sufficient to enable him to admit or deny the matter."); Adley Express Co. v. Highway Truck Drivers & Helpers, Local No. 107, 349 F. Supp. 436 (E.D. Pa. 1972)("Under the amended Rule 36, it would appear that a mere statement in the answer that the answering party has made reasonable inquiry and that the information solicited was insufficient to enable him to admit or deny the requested matter will suffice.").

In all cases, respondents must either admit or specifically deny a request for admission, or state in detail why they cannot truthfully admit or deny it.  See Fed. R. Civ. P. 36(a)(4); Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 275 F.R.D. at 558.  If respondents are going to say that they cannot answer a request for admission, they have to track rule 36(a)(4)'s requirements.  See Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 275 F.R.D. at 558; Fed. R. Civ. P. 36(a)(4).  This requirement means that, if they are going to respond that they cannot truthfully admit or deny the request for admission, because they do not have sufficient information, they must state, consistent with rule 11, "that [they] ha[ve] made reasonable inquiry and that the information [they] know[] or can readily obtain is insufficient to enable [them] to admit or deny.'  Fed. R. Civ. P. 36(a)(4).  A reasonable inquiry means that a party has to ask its counsel, and if its counsel knows the answer, the party needs to use that information to admit or

deny.  See Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 275 F.R.D. at 558; T. Rowe

Price Small-Cap Fund, Inc. v. Oppenheimer & Co., Inc., 174 F.R.D. 38, 43 (S.D.N.Y.

1997)("Reasonable inquiry includes investigation and inquiry of any of defendant's officers,

administrators, agents, employees, servants, enlisted or other personnel, who conceivably, but in

realistic terms, may have information which may lead to or furnish the necessary and appropriate

response." (citation omitted)).

    In Brown v. Montoya, No. CIV 10-0081 JB/ACT, 2013 WL 1010390 (D.N.M. Mar. 8,

2013)(Browning, J.), the plaintiffs asked the Court to compel the defendants to answer RFAs

identifying the defendants' job duties.  See 2013 WL 1010390 at *7.  One RFA, for example,

asked one of the Defendants to "[a]dmit that in your official capacity as Secretary of the New

Mexico Department of Corrections, your duty or authority includes ensuring that the

Department's policies are in compliance with relevant state and federal laws, including the

Fourteenth Amendment to the United States Constitution."  2013 WL 1010390 at *8.  The

defendants objected to the plaintiff's RFAs, arguing that the RFAs called for a legal conclusion.

See 2013 WL 1010390 at *8.  The plaintiffs asserted that the purpose of the RFAs was not to

seek a legal conclusion, but to establish factually what each individual defendant did in his or her

job.  See 2013 WL 1010390 at *15.  The Court, citing Stark-Romero v. Nat'l R.R. Passenger Co.

(AMTRAK), overruled the defendants' objections, concluding that the RFAs permissibly sought

to apply law to the facts of the case.  The Court stated:

> Whereas the RFA in Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK) was
> trying to determine, factually, whether the Department of Transportation was
> responsible for administering a particular program, the RFAs here are also trying
> to determine, factually, if individual Defendants are individually involved in, or
> responsible for, ensuring their office's compliance with laws and the Constitution.
> These RFAs are not asking whether the Constitution's Fourteenth Amendment
> protects an individual's privacy rights from state infringement.  Nor are they
> asking if the New Mexico Constitution's Due Process Clause protects an

individual's privacy rights to the same extent as the United States Constitution's Due Process Clause. They are not a question taken from the Multistate Bar Examination in true/false form, asking the Defendants to admit the truth of the bar exam question.

2013 WL 1010390 at *24. The Court concluded that, because the issue was whether the defendants' offices violated the plaintiffs' constitutional rights, the RFAs were not unrelated to the case. 2013 WL 1010390 at *24.

## ANALYSIS

The Court will order the Defendants to provide answers to RFA Nos. 19 and 24. The Court will overrule the Defendants' objections that RFA N0. 19 is vague and ambiguous, but sustains the objection that RFA No. 19 as originally drafted is overbroad. To cure the overbreadth, the Court will limit the scope of RFA No. 19 to margin calls after January 1, 2007, as well as limiting it to information that the Defendants, rather than all of Thornburg Mortgage, knew. The Court will overrule the Defendants' objections to RFA No. 24. The Court includes in RFA No. 24 the definition of "legal sales" as "legally enforceable transactions transferring title and ownership of a security or securities to a third party." The Court will allow the Defendants ten days to provide their answers to RFA Nos. 19 and 24.

## I.    THE COURT WILL ORDER THE DEFENDANTS TO ANSWER RFA NO. 19.

The SEC asks the Court to overrule the Defendants' objections and order the Defendants to serve an answer to RFA No. 19. See RFA Motion at 2. RFA No. 19 states: "Admit that Thornburg had information related to Margin Calls that was not provided to KPMG prior to the filing of the 2007 Form 10-K." SEC Third RFA at 2. The SEC has offered to revise RFA No. 19 to state: "Admit that the Defendants had information, of any variety whatsoever, related to Margin Calls that was not provided to KPMG prior to the filing of the 2007 Form 10-K.": March 26, 2013 Ltr. at 2. The SEC asserts that RFA No. 19's purpose is to establish that the

Defendants had more information related to Thornburg Mortgage's margin calls than they provided to their auditors, KPMG. <u>See</u> RFA Motion at 3. The Defendants assert that RFA No. 19 is vague, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence. <u>See</u> Defs' Response at 6. The Defendants argued at the hearing that RFA No. 19 requires the Defendants to speculate as to all the information that Thornburg Mortgage, Thornburg Mortgage's affiliates and agents, and KPMG held and "to vouch for whether or not Thornburg had any information, regardless of the relevance or materiality of the information, that was not provided to KPMG." Tr. at 11:17-25 (Johnstone).

Rule 36(a)(1) permits requests for admission that relate to "facts, the application of law to fact, or opinions about either." Fed. R. Civ. P. 36(a)(1). "The purpose of the rule is to reduce the costs of litigation by eliminating the necessity of proving facts that are not in substantial dispute, to narrow the scope of disputed issues, and to facilitate the presentation of cases to the trier of fact." <u>T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co., Inc.</u>, 174 F.R.D. at 42.

Whether the Defendants had information relating to margin calls that they withheld from KPMG before the filing of the 2007 Form 10-K is a factual issue. Both the SEC and the Defendants have used the term "margin calls" repeatedly throughout the course of this litigation. This term, as used in RFA No. 19, is not vague, ambiguous, or overbroad. RFA No. 19, with the amended language that narrows the scope to information held or known to exist by the Defendants, rather than by Thornburg Mortgage, limits the factual inquiry to the Defendants' personal knowledge. By limiting the RFA to knowledge or information possessed from January 1, 2007, until the filing of the 2007 Form 10-K, RFA No. 19 is now narrow in its breadth, giving the Defendants a specific timeframe to use in responding to the RFA. The Defendants, therefore,

must either admit or specifically deny RFA No. 19, or state in detail why they cannot truthfully admit or deny it. See Fed. R. Civ. P. 36(a)(4).

If the Defendants are going to say that they cannot answer RFA No. 19 because of lack of sufficient information, rule 36(a)(4) requires the Defendants to state that they have undertaken a reasonable inquiry, and that the information they know or could readily obtain is insufficient to enable the Defendants to either admit or deny. See Fed. R. Civ. P. 36(a)(4). A reasonable inquiry means that a party has to ask their counsel, and if their counsel knows the answer, they need to use that information to admit or deny the RFA. See Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 275 F.R.D. at 558; T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co., Inc., 174 F.R.D. at 43. For these reasons, and the reasons stated on the record at the hearing, the Court concludes that the Defendants' responses to RFA No. 19 are not adequate and the Court will overrule the objections to RFA No. 19. The Court will thus find that the Defendants' responses are insufficient and will give the Defendants ten days to supplement their answer to RFA No. 19.

The Court understands why the Defendants do not want to admit or deny this RFA, even when reformulated. If they admit the RFA, the SEC will wave the response in front of the jury at the very beginning, saying that the Defendants concede that they withheld information, and then the battle will be over relevance and materiality. If they deny, they are probably denying something that is indisputable, putting them in a difficult position with the jury as the trial develops or with the Court at the end of the trial when and if the SEC requests different findings or attorneys' fees. But not wanting to admit or deny is not a good and legally adequate response. The Defendants, therefore, must either admit or specifically deny RFA No. 19, or state in detail why they cannot truthfully admit or deny it. See Fed. R. Civ. P. 36(a)(4).

## II.   <u>THE COURT WILL ORDER THE DEFENDANTS TO ANSWER RFA NO. 24</u>.

The SEC asks the Court to overrule the Defendants' objections and order the Defendants to serve an adequate response to RFA No. 24.  <u>See</u> RFA Motion at 2.  RFA No. 24 states: "Admit that the I/O Strip Transactions constitute legal sales."  SEC Third RFA at 3.  The Defendants object to RFA No. 24 on the grounds that "legal sales" is vague and ambiguous terms, and that the RFA impermissibly calls for a legal conclusion.  Defs' Response at 9.  The SEC has defined "legal sale" as a "legally enforceable transaction transferring title and ownership of a security or securities to a third party."  March 26, 2013 Ltr.  The SEC asserts that RFA No. 24 permissibly calls for an application of law to facts, as rule 36(a)(1)(A) specifically contemplates.  <u>See</u> RFA Motion at 5.

Rule 36(a)(1)(A) allows for requests for admission applying "law to fact."  Fed. R. Civ. P. 36(a)(1)(A).  However, "[t]he amended provision does not authorize requests for admissions of law unrelated to the facts of the case."  <u>Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK)</u>, 275 F.R.D. at 554.

Both parties point to the same series of cases in support of their relative positions regarding RFA No. 24: <u>Disability Rights Council v. Wash. Metro. Area</u>, <u>Reichenbach v. City of Columbus</u>, <u>Lakehead Pipe Line Co. v. Am. Home Assurance Co.</u>, and <u>Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK)</u>.  <u>See</u> Tr. at 26:13-24 (Kasper); Tr. at 32:7-15 (Johnstone).  The Defendants assert that the distinctions drawn between permissible and impermissible RFAs in those cases will persuade the Court that RFA No. 24 inappropriately asks for a legal conclusion.  <u>See</u> Tr. at 32:14-15 (Johnstone).  The SEC, however, maintains that the case law supports the argument that RFA No. 24 appropriately calls for the application of law to fact.  The Court has found these cases useful for evaluating whether an RFA is in accord with rule 36(a)(1) before.

See Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 275 F.R.D. at 557; Brown v

Montoya, 2013 WL 1010390, at *23.

In Reichenbach v. City of Columbus, the United States District Court for the Southern

District of Ohio addressed the defendants' objection to the plaintiff's RFAs, asserting that the

requests "only sought a conclusion of law." 2006 WL 143552, at *2. The district court stated:

> Rule 36(a) permits requests for admission that "relate to statements or opinions of fact or the application of law to fact." However, "a request for admission which involves a pure matter of law, that is, requests for admission of law which are related to the facts of the case, are considered inappropriate." [Lakehead Pipe Line Company, Inc. v. American Home Assurance Co., 177 F.R.D. at 458].
>
> The challenged discovery requests ask if defendants are in compliance with 28 C.F.R. 35.15(d). That regulation requires that certain public entities develop a transition plan setting forth the steps necessary to achieve the structural changes, such as curb ramps, as required by the ADA. Each plan must include specific elements and particular groups of individuals must be offered the opportunity to be involved in the development of the transition plan. See id. Plaintiff's requests make no reference to facts nor do they seek factual information. The requests, as formulated, seek only legal conclusions. These requests are therefore properly objectionable, because, once again, they focus exclusively on legal questions and contain no factual components.

2006 WL 143552, at *2. The district court noted, however, that the plaintiff could have

proposed the "following request for admission: Defendants adopted a transition plan within six

months of January 26, 1992, as required by 28 C.F.R. 35.150(d)(1). Admit or Deny."

The Court finds RFA No. 24 is not calling for an admission involving a pure matter of

law without making reference to the facts, as the district court in Reichenbach v. City of

Columbus thought the RFA at issue there did. The Court is not convinced that the disputed RFA

in Reichenbach v. City of Columbus sought a conclusion of law unrelated to the facts, and even

the court in Reichenbach v. City of Columbus seems to agree that the conclusion was related to

the facts; the responding party could answer only by reference to the facts of the case. Thus, the

Court might not be inclined to follow the analysis of Reichenbach v. City of Columbus in a case that presented the same or a similar RFA.  Reichenbach v. City of Columbus is still cutting back the scope of proper RFAs too much.[11]  What is important here, however, is that RFA No. 24 is much more like the RFA that the court in Reichenbach v. City of Columbus would have allowed the plaintiff to ask, rather than the one asking the defendants to admit or deny whether they were in compliance with a statute.  See Reichenbach v. City of Columbus, 2006 WL 143552, at *2.

Moreover, RFA No. 24 is more akin to the RFA in Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), which this Court determined to be a permissible use of an RFA seeking application of law to facts.  See 275 F.R.D. at 551.  In Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), the RFA at issue asked for an admission that the New Mexico Department of Transportation was responsible for administering the federal grade-crossing improvement program in New Mexico.  See 275 F.R.D. at 557.  The Court held that this RFA sought an application of law to fact, rather than an answer to a pure matter of law; thus, the Court concluded that the plaintiffs were required to admit or specifically deny the RFA, or state in detail why they could not truthfully admit or deny it.  See 275 F.R.D. at 558.

---

[11] The Court previously distinguished the RFA in Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), from the one in Reichenbach v. City of Columbus stating: "Unlike the plaintiff's request for admission in Reichenbach v. City of Columbus, which sought an admission involving a pure matter of law and did not make reference to the facts, [the disputed RFA in Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK)] is closer to a request seeking application of law to the facts of the case. . . . it does not seek the admission of an abstract question of law."  Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 275 F.R.D. at 558 (emphasis added).  The Court concludes, here, that characterizing the RFA in Reichenbach v. City of Columbus as seeking an answer to an abstract question of law is not the path the Court wants to take.  Answering the RFA, which asked whether the defendants were in compliance with 28 C.F.R. 35.150(d), would require the defendants to apply the statute to the facts of the case to determine whether they should admit or deny the RFA.  Such an RFA strikes the Court as one that permissibly seeks the application of law to facts, as rule 36(a) allows.

RFA No. 24 does not ask the Defendants to admit or deny whether a hornbook, or statute, or Black's Law Dictionary defines a legal sale as a "legally enforceable transaction transferring title and ownership of a security or securities to a third party." An RFA asking the Defendants to admit or deny a pure matter of law would not be in accord with rule 36(a). RFA No. 24, instead, asks the Defendants to admit or deny whether the I/O Strip Transactions -- not all, but those in this case-- constituted legal sales, using a definition that the SEC provides after the Defendants found RFA No. 24 unanswerable on the grounds that "legal sales" was ambiguous, vague, and overbroad. The SEC is attempting to establish, factually, that while the I/O Strip Transactions were accounted for as financings, they constitute a sale for legal purposes in that they were a transaction that transferred title and ownership of a security or securities to a third party. This RFA is not asking the Defendants to admit or deny a matter of black letter law; it asks the Defendants to apply the facts of the case to the "legal sales" definition provided by the SEC and conclude whether the I/O Strip Transactions constitute legal sales. That an RFA has a legal component does not render the RFA impermissible if it seeks an answer based on the application of the law to the facts. See Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 275 F.R.D. at 558 ("[The RFA] is trying to narrow the range of entities that -- factually -- administer a particular program in New Mexico; it does not seek the admission of an abstract question of law."")

While the Defendants assert that the SEC is using an invented term of art, the Court finds this assertion unpersuasive given the usage of "legal sale" in a KPMG work paper and in Thornburg Mortgage's internal communications. Tr. at 25:9-17 (Kasper); Tr. at 35:18-22 (Court, Marks). For these reasons, and the reasons stated on the record at the hearing, the Court believes the Defendants' responses to RFA No. 24 are not adequate and the Court will overrule the

objections to RFA No. 24. The Court will thus find that the Defendants' responses are insufficient. The Court will allow the Defendants ten days to supplement their answer to RFA No. 24.

The Court understands why the Defendants do not want to admit or deny this RFA. If they admit, the response calls into question the statements within Thornburg Mortgage's financing statements. If they deny, the response puts them in conflict with KPMG. Neither response is beneficial. Again, however, discomfort is not a valid reason to not admit or deny. The Defendants, therefore, must either admit or specifically deny RFA No. 24, or state in detail why they cannot truthfully admit or deny it. See Fed. R. Civ. P. 36(a)(4).

**IT IS ORDERED** that the Plaintiff's Motion to Determine the Sufficiency of Defendants' Responses to Requests for Admission Nos. 19 and 24, filed April 15, 2013 (Doc. 162), is granted in part and denied in part. The Court orders the Defendants to: (i) admit, deny, or state in detail why they cannot admit or deny RFA No. 19; (ii) admit, deny, or state in detail why they cannot admit or deny RFA No. 24. The Court limits Request for Admission No. 19 to information held by the Defendants from January 1, 2007, until the filing of the Thornburg Mortgage 2007 Form 10-K Annual Report, filed May 21, 2012 (Doc. 37-2). The Court incorporates into Request for Admission No. 24 the definition of the term "legal sales" that the Plaintiff Security and Exchange Commission provides in the Letter Sent Via Electronic Mail from Gregory Kasper to Randall Lee, Jessica Kurzban, John Valentine, Michael Lamson, April Williams, Chris Johnstone, Alanna Buchanan, Jerry Marks, Robert Liubicic, Alisa Schlesinger, and Elena Kilberg, dated March 26, 2013, filed April 15, 2013 (Doc. 162-4)("'Legal Sale' means a legally enforceable transaction transferring title and ownership of a security or securities to a

third party.")  The Court will allow the Defendants ten days to supplement their answers to the

requests for admission.

_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Kenneth J. Gonzalez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Ian S. Karpel
United States Securities and Exchange Commission
Denver, Colorado

   *Attorneys for Plaintiff Securities and Exchange Commission*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Chris Johnstone
Alanna G. Buchanan
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

John Valentine
Lauren R. Yates
Michael A. Lamson
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Randall Lee
Peiyin Patty Li
Jessica Kurzban
Daniel R. Crump
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

*Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Paul M. Torres
Robert J. Liubicic
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

*Attorneys for Defendant Jane E. Starrett*

W. Spencer Reid
Keleher & McLeod
Albuquerque, New Mexico

--and--

George A. Salter
Peter J. Dennin
New York, New York

    *Attorneys for Intervenor KPMG*