| | |
|---|---|
| From: | Jane Starrett. |
| To: [ - ] | Shawn Buniel; Clay Simmons. |
| Cc: [ - ] | Michael Coltharp. |
| Bcc: [ - ] | . |
| Subject: | Potential sale of IndyMac bond. |

Sent: 2/21/2008 1:15 PM.

Mike has pulled together a good summary of the facts and the related accounting concerns. Please provide us with any feedback. Thanks.



Simply Exceptional

Jane Starrett

Executive Vice President and Chief Accounting Officer

phone: 505.467.5306

fax: 505.467.5206
email: jstarrett@thornburgmortgage.com

PLEASE NOTE NEW PHONE AND FAX NUMBERS

FOIA Confidential Treatment Requested

TMI-SEC00036963



FOIA Confidential Treatment Requested

TMI-SEC00036964

# Thornburg Mortgage                                    Memorandum

TO:      Clay Simmons, Jane Starrett and File
CC:      Shawn Buniel
FROM:    Michael Coltharp
DATE:    February 21, 2008
RE:      Potential Sale of Asset 2310

### BACKGROUND:

TMA is considering selling its IndyMac AAA-rated, non-supersenior bond which is backed by ALT-A loan collateral (Asset 2310: cusip 45669JAC9). In February 2008, Michael Perry, CEO of IndyMac, indicated that the nonperforming assets of the bank increased eight-fold in 2007 to 4.63%, and expects the nonperforming assets to further increase in 2008 to between 7.5% and 8.0%. TMA has determined that it may be beneficial to sell its non-highly rated IndyMac bond prior to further deterioration. This IndyMac security has ordinary credit enhancement only, which makes it more susceptible to future down-grades. We own other AAA-rated bonds backed by IndyMac Alt-A loan collateral but they are all superseniors and have less exposure to potential credit losses than Asset 2310.

At December 31, 2007, the IndyMac 2007-AR15 Trust had no realized losses, and group 2 nonperforming assets of 1.43% (see attached remittance report), which compares to the total IndyMac nonperforming rate of 4.63% as disclosed in the IndyMac annual shareholder letter (see attached). While TMA had not experienced losses and better than average nonperforming performance on this security, concern exists about potential blanket market down-grades of all securities backed by IndyMac loans.

At December 31, 2007, we had a book value of 99.554, and at December 31, 2007 and January 31, 2008, the fair value of the security, as established from sales of comparable securities, was 97.977 and 100.314, respectively. Our purchase price in July 2007 was 99.496. At February 20, 2008, the value of the security, as estimated by Citi Bank, was 75.333.

### ISSUES:

1) What is the impact of the sale of the IndyMac bond on the fair value of other TMA bonds? Does the sale impact the intent or ability of TMA to hold its securities that have an impairment. Does the sale change the impairments to other than temporary impairments requiring recognition in the December 31, 2007 financial statements?
2) Does the sale of the bond represent a Type I subsequent event that should be recorded in the December 31, 2007 financial statements?

### CONCLUSION:

1) The sale of the IndyMac 2310 bond does not have an impact on TMA's other-than temporary impairment analysis of its securities for the following reasons:

   a. TMA will record its loss on sale in February 2008. The bond had been in a loss position for only 1 month at December 31, 2007 (priced at 97.98), and recovered that loss by January 31, 2008 (priced at 100.32). The recovery of value further supports the classification of the impairment at December 31, 2007 was not other than temporary. The decision to sell the security was made in February 2008. In accordance with FSP 115-1, ¶14, the loss of an impaired available-for-sale security should be recognized in the period in which the decision to sell was made, or in the period in which the loss is deemed other than temporary.
   b. The events causing the significant decline in value and potential loss on sale occurred after December 31, 2007. See conclusion #2 on subsequent event treatment.

2) The decline in February 2008 of the IndyMac bond represents a Type II subsequent event, which consists of factors that developed subsequent to year end and do not require adjustment in the prior year financial statements. The deterioration of value in the Alt-A market began in February 2008. Comparable securities were trading at December 31, 2007 and January 31, 2008 at substantially greater values. The decline in the Alt-A market became pronounced during the 2nd half of February 2008.

With respect to the IndyMac security in particular, on February 12, 2008, IndyMac issued its 2007 shareholder letter that included guidance on expectations for 2008 delinquencies. The market anticipated increased delinquencies for 2007, but had not received any guidance on the expected increase in nonperforming assets in 2008 from the 2007 levels. It's impossible to know when IndyMac recognized that the increased in nonperforming assets would occur and whether it had already occurred at December 31, 2007.

The deterioration in fair values of AAA-rated securities backed by Alt-A collateral did not occur until February 2008 as is evidenced by the marks on this asset for prior periods and the negative 2008 guidance issued in February 2008 are both factors that did not exist at December 31, 2007 and qualify as Type II subsequent events.

**AUTHORITATIVE SUPPORT:**

EITF 99-20 *Recognition of Interest Income and Impairment on Purchased Beneficial Interests and Beneficial Interests That Continue to Be Held by a Transferor in Securitized Financial Assets*

   Applies to beneficial interests that are not beneficial interests in securitized financial assets that (1) are of high credit quality (for example, guaranteed by the U.S. government, its agencies, or other creditworthy guarantors, and loans or securities sufficiently collateralized to ensure that the possibility of credit loss is remote) and (2) cannot contractually be prepaid or otherwise settled in such a way that the holder would not recover substantially all of its recorded investment. Instead, interest income on such beneficial interests should be recognized in accordance with the provisions of Statement 91, and determining whether an other-than-temporary impairment of such beneficial interests exists should be based on SAB 59, SAS 92, and the Statement 115 Special Report.

FSP 115-1 *The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments*

**Step 1: Determine Whether an Investment Is Impaired**
7. Impairment shall be assessed at the individual security level (herein referred to as "an investment"). An investment is impaired if the fair value of the investment is less than its cost. Except as provided in paragraph 10, an investor shall assess whether an investment is impaired in each reporting period. For entities that issue interim financial statements, each interim period is a reporting period.
11. In addition, if an investment was previously tested for impairment under Step 2 and the investor concluded that the investment was not other-than-temporarily impaired, the investor shall continue to evaluate whether the investment is impaired (that is, shall estimate the fair value of the investment) in each subsequent reporting period until either (a) the investment experiences a recovery of fair value up to (or beyond) its cost or (b) the investor recognizes an other-than-temporary impairment loss.
12. If an impairment indicator is present, the investor shall estimate the fair value of the investment. If the fair value of the investment is less than its cost, proceed to Step 2.
**Step 2: Evaluate Whether an Impairment Is Other Than Temporary**
13. When the fair value of an investment is less than its cost at the balance sheet date of the reporting period for which impairment is assessed, the impairment is either temporary or other than temporary.
14. In applying that guidance, questions sometimes arise about whether an investor shall recognize an other-than-temporary impairment only when it intends to sell a specifically identified available-for-sale debt or equity security at a loss shortly after the balance sheet date. When an investor has decided to sell an impaired available-for-sale security and the investor does not expect the fair value of the security to fully recover prior to the expected time of sale, the security shall be deemed other-than-temporarily impaired in the period in which the decision to sell is made. However, an investor shall recognize an impairment loss when the impairment is deemed other than temporary even if a decision to sell has not been made.

**SAS No. 1, 12, 98 – Subsequent Events**
**Type I** subsequent events consist of those events that provide additional evidence with respect to conditions that existed at the date of the balance sheet and affect the estimates inherent in the process of preparing financial statements. All information that becomes available prior to the issuance of the financial statements should be used by management in its evaluation of the conditions on which the estimates were based. The financial statements should be adjusted for any changes in estimates resulting from the use of such evidence.
**Type II** subsequent events consist of those events that provide evidence with respect to conditions that did not exist at the date of the balance sheet being reported on but arose subsequent to that date. These events should not result in adjustment of the financial statements.

FOIA Confidential Treatment Requested

TMI-SEC00036967