Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

---

SECURITIES AND EXCHANGE       )
COMMISSION,                   )
    Plaintiff,              )
  vs.                 ) Case No.
LARRY A. GOLDSTONE,           ) CIV 12-0257 JB/LFG
CLARENCE G. SIMMONS, III,     ) VOLUME I
AND JANE E. STARRETT,         )
    Defendants.             )

---

VIDEOTAPED DEPOSITION OF CHRISTOPHER M. JAMES, Ph.D.
LOS ANGELES, CALIFORNIA
WEDNESDAY, APRIL 2, 2014

Reported by:
RICKI Q. MELTON, CSR No. 9400
Job No. 1840093

PAGES 1 - 252

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

---

SECURITIES AND EXCHANGE       )
COMMISSION,                   )
    Plaintiff,              )
  vs.                 ) Case No.
LARRY A. GOLDSTONE,           ) CIV 12-0257 JB/LFG
CLARENCE G. SIMMONS, III,     ) VOLUME I
AND JANE E. STARRETT,         )
    Defendants.             )

---

    Videotaped Deposition of CHRISTOPHER M. JAMES, Ph.D., taken at 601 South Figueroa Street, 30th Floor, Los Angeles, California, commencing at 9:16 A.M., Wednesday, April 2, 2014, before Ricki Q. Melton, CSR No. 9400, RPR No. 45429.

Page 3

1  APPEARANCES OF COUNSEL:
2
3    FOR THE PLAINTIFF:
4
5      UNITED STATES
6      SECURITIES AND EXCHANGE COMMISSION
7      BY:  DUGAN BLISS, ESQ.
8         STEPHEN C. McKENNA, ESQ.
9      1801 California Street
10     Suite 1500
11     Denver, Colorado 80202
12     (303) 844-1026
13     blissd@sec.gov
14
15   FOR THE DEFENDANTS LARRY A. GOLDSTONE AND
16   CLARENCE G. SIMMONS:
17
18     WILMER CUTLER PICKERING HALE AND DORR
19     BY:  RANDALL LEE, ESQ.
20     350 South Grand Avenue
21     Suite 2100
22     Los Angeles, California 90071
23     (213) 443-5360
24     randall.lee@wilmerhale.com
25

Page 4

1  APPEARANCES OF COUNSEL (Continued):
2
3    FOR THE DEFENDANT JANE E. STARRETT:
4
5      MILBANK, TWEED, HADLEY & McCLOY LLP
6      BY:  ROBERT J. LIUBICIC, ESQ.
7         ALISA SCHLESINGER, ESQ.
8      601 South Figueroa Street
9      30th Floor
10     Los Angeles, California 90017
11     (213) 892-4494
12     rliubicic@milbank.com
13
14   ALSO PRESENT:
15
16     DAVID WEST, Video Operator

Page 5

```
                I N D E X

WEDNESDAY, APRIL 2, 2014

WITNESS:                    EXAMINATION

CHRISTOPHER M. JAMES, Ph.D.

   (By Mr. Bliss)              9
   (P.M. Session)             108
   (By Mr. Liubicic)          249


           UNANSWERED QUESTIONS
                (None)


          INFORMATION REQUESTED
                (None)
```

Page 6

```
         DEPOSITION EXHIBITS
       CHRISTOPHER M. JAMES, Ph.D.
NUMBER        DESCRIPTION        IDENTIFIED

Exhibit 386   The Market Pricing of      97
              Other-Than-Temporary
              Impairments.

Exhibit 387   Rebuttal Report of        110
              Lawrence P. Weiner.

Exhibit 388   TED spread February 2008.  172

Exhibit 389   Mortgage Spreads Log      183
              02/26/2008.
```

Page 7

LOS ANGELES, CALIFORNIA, APRIL 2, 2014
              9:16 A.M.
                -o0o-

VIDEO OPERATOR: Good morning. We are on the record at 9:16 A.M. The date today is April 2nd, 2014.

This is the video recorded deposition of Dr. Christopher M. James.

My name is David West, here with our court reporter Ricki Q. Melton. We're here from Veritext Legal Solutions at the request of counsel for plaintiff.

The deposition is being held at 601 South Figueroa Street, 30th Floor -- actually we're on the 31st Floor, thank you -- Los Angeles, California.

The caption of this case is Securities and Exchange Commission versus Larry A. Goldstone, et al., case No. 12257 (JV LFG.)

Please note that audio and video recording will take place unless all parties agree to go off the record. Microphones are sensitive and may pick up whispers, private conversations, as well as cellular interference.

Page 8

I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome in any way.

If there are any objections to proceeding, please state them at the time of your appearance, starting with the noticing attorney.

MR. BLISS: Dugan Bliss on behalf of plaintiff U.S. Securities and Exchange Commission.

MR. McKENNA: Stephen McKenna on behalf of plaintiff U.S. Securities and Exchange Commission.

MR. LIUBICIC: Robert Liubicic and Alisa Schlesinger from Milbank, Tweed, Hadley & McCloy on behalf of defendant Jane Starrett.

MR. LEE: Randall Lee from Wilmer Cutler Pickering Hale and Dorr on behalf of Mr. Goldstone and Mr. Simmons.

VIDEO OPERATOR: Thank you.

The witness will now be sworn in, and we can proceed.

CHRISTOPHER M. JAMES, Ph.D., the witness, having been first administered an oath in accordance with CCP section 2094, testified as follows:

Page 53

1  conclusion that an OTTI disclosure in Thornburg's
2  Form 10-K on February 28th, 2008, would not have
3  had a material impact on Thornburg's stock price?
4      A   I think that the -- and I think we're
5  going over old territory, and I would refer you
6  back to my prior testimony on these issues.
7      I think my analysis indicates that the
8  dates that -- that Mayer has identified and the
9  methodology that he is using is not a methodology,
10 given the facts and circumstances of this case,
11 that would inform the finder of fact as to the
12 materiality of a hypothetical OTTI and going
13 concern based on information on 2/28 that existed
14 on -- as of the beginning of the day on 2/28/08 and
15 that there is, as I discussed earlier today,
16 evidence that would suggest the lack of materiality
17 based upon the nature of the disclosure, the
18 hypothetical disclosure, and the information that
19 was conveyed to the market on 2/28.
20     Q   Okay.  And I appreciate that, and we have
21 talked a lot again about your criticism of
22 Mr. Mayer, but you just referenced evidence that
23 would suggest lacking materiality.
24     Do you recall that?
25     A   That's right.

Page 54

1      Q   And so what I'm focused on is:
2  Independent of your criticism of Mr. Mayer, does
3  your event study lead you to a conclusion on way or
4  another --
5      A   Uh-huh.
6      Q   -- as to whether an OTTI disclosure in
7  Thornburg's Form 10-K on February 28th, 2008, would
8  have had a material impact on Thornburg's stock
9  price?
10     A   And I'll give you the same answer I have
11 given you before.  It -- I don't think it raises --
12 it certainly -- that event study doesn't provide
13 evidence of materiality.
14     Q   "It" being your event study?
15     A   My event study as well as Mr. Mayer's
16 event study.
17     Q   You say it doesn't provide evidence of
18 materiality.
19     What I'm trying to understand is:  Does
20 that mean that your event study concluded that an
21 OTTI disclosure on February 28th, 2008, would have
22 been immaterial?
23     A   I think that it is demonstrating that the
24 court should not rely on Mr. Mayer's analysis for
25 purposes of establishing materiality.

Page 55

1      Q   I appreciate that.
2      A   Let me finish answering the question before
3  you ask me another one, if you would, please.
4      In addition, I think, when you look at the
5  content and the information -- incremental
6  information that would be disclosed with respect
7  to, for example, an OTTI, there are sound economic
8  reasons to believe it would not be material.
9      Q   I appreciate that there are sound economic
10 reasons that would not be material, but did your
11 event study conclude that, in fact, an OTTI
12 disclosure would not have been material?
13     MR. LIUBICIC:  Objection.  Asked and
14 answered.
15     THE WITNESS:  I don't know how to answer
16 that question any differently than I have today.
17 BY MR. BLISS:
18     Q   Well, one way would be "yes" or "no."
19     A   And I've indicated to you on a number of
20 occasions when you've asked me that question, and I
21 can -- I can go through that answer again with you
22 if you would like.
23     Q   Can you answer the question with a "yes"
24 or "no"?
25     Does your event study lead you to a

Page 56

1  conclusion that an OTTI disclosure in Thornburg's
2  Form 10-K on February 28th, 2008, would have been
3  immaterial?
4      Can you answer that with a "yes" or "no"?
5      A   I don't think it's informative of the
6  question for the reasons I have given you.  Okay.
7      As I understand this process, again, is
8  that your expert has -- is to provide an argument
9  as to why it's material, okay, and he has not done
10 that.  He has provided a flawed argument, okay, and
11 I have explained to you what the nature of those
12 flaws are.
13     Then you are saying, well, so can his
14 analysis demonstrate the lack of materiality?
15 Okay.  And the answer is, well, it can't -- it's
16 flawed in terms of trying to identify materiality.
17 I would agree with him.  That's my point.  Okay.
18     Q   And maybe I have been unclear because I am
19 asking now about your analysis about your event
20 study.
21     I definitely understand that one of the
22 things you are accomplishing with your report is to
23 criticize Mr. Mayer's event study; correct?
24     A   Right.
25     Q   What I'm trying to understand is whether,

Page 57

1  in addition to criticizing his conclusion that OTTI
2  disclosure would have been material, whether you
3  are independently finding with your own event study
4  that an OTTI disclosure would have been immaterial.
5  That's what I'm trying to understand.
6     A   I think --
7     Q   Are you doing that?
8     A   I think -- and, again, my -- as my
9  assignment indicates, I have been asked to rebut the
10 testimony and to analyze the testimony of Mr. Mayer
11 and asked to render an opinion as to whether his
12 methodology provides reliable evidence of
13 materiality, and my conclusion is it does not, and
14 I have also concluded that, based on the facts and
15 circumstances that I have seen in this case, I
16 don't see evidence of materiality.
17        Those are the opinions that I expect to
18 provide at trial.
19    Q   And when you say you don't see evidence of
20 materiality, that is from your own studies, from
21 your own event study, from your own analysis?
22    A   As well as the analysis that Mr. Mayer has
23 conducted.
24    Q   But sitting here today, you cannot testify
25 with certainty that an OTTI disclosure on

Page 58

1  February 28th, 2008, in Thornburg's Form 10-K would
2  have been immaterial; is that right?
3     A   I have seen no evidence that indicates it
4  was material.
5     Q   But can you testify that it was
6  immaterial?
7     A   Let me sort of indicate to you how the
8  scientific method works.  Okay?
9         You test on a hypothesis.  We're testing
10 the hypothesis is it material.  Okay?  We find
11 evidence that is indicating that it was not
12 material, okay, or the test is flawed with respect
13 to a determination of materiality.
14    Q   Uh-huh.
15    A   Okay.  I have seen no evidence that
16 indicates that it was material.  Okay?  And your
17 experts haven't provided any evidence of
18 materiality.
19    Q   Okay.  That is helpful.  Let me ask you a
20 question that may be a better question.
21        Did you test the hypothesis that an OTTI
22 disclosure on February 28th, 2008, in Thornburg's
23 Form 10-K would have been immaterial?
24        MR. LIUBICIC:  Objection.  Lack of
25 foundation.

Page 59

1        THE WITNESS:  I think, as I have indicated
2  to you, the evidence that I have seen doesn't
3  provide evidence of materiality.
4  BY MR. BLISS:
5     Q   I do understand that.  You have said that
6  repeatedly, but when you were just explaining it to
7  me, you said specifically that you tested the
8  hypothesis that an OTTI disclosure would have been
9  material.
10    A   Right.
11    Q   What I'm asking you is:  Did you test the
12 hypothesis that an OTTI disclosure would have been
13 immaterial?
14    A   I wasn't --
15        MR. LIUBICIC:  Objection.  Lack of
16 foundation.
17        THE WITNESS:  I wasn't asked to do that.
18 BY MR. BLISS:
19    Q   And so you didn't?
20    A   No.  I have been asked to respond to what
21 I understand your expert's task was, to test the
22 hypothesis as to whether a hypothetical OTTI and
23 going concern would have been material, and as I
24 indicate, he hasn't provided evidence in support of
25 that hypothesis.

Page 60

1     Q   And did your event study lead you to a
2  conclusion as to whether a going concern
3  disclosure -- you know what?  Strike that.  Let me
4  ask a better question.
5     A   Okay.
6     Q   Did you test the hypothesis that a going
7  concern disclosure in Thornburg's Form 10-K on
8  February 28th, 2008, would have been material?
9     A   I think I have already answered that
10 question today, and I would refer you back to my
11 prior testimony.
12        I think my resp -- just to summarize what
13 that testimony is, I mean my answer to that
14 question is the same answer I gave with respect to
15 the OTTI.
16    Q   I'm sorry.  I don't understand what you
17 mean.
18    A   We have been talking about -- you asked me
19 this question within the first 40 minutes of the
20 deposition today.
21        We first went down OTTI and going concern,
22 then we went and looked at OTTI separately, and
23 then you said would there be a difference with
24 respect to your opinion regarding going concern,
25 and I have indicated now my opinions regarding

Page 221

1    As we have talked about, as I understand
2 what has been alleged in the complaint in this case
3 is that it is alleged that Thornburg engaged in
4 accounting fraud in terms of its treatment of its
5 OTTI, and the issue, as I understand it in the
6 context of those allegations, is to assess the
7 probability and the likelihood that they would be
8 able to hold the portfolio until maturity and
9 whether their judgments were reasonable in that
10 context, and as I have indicated to you, that's my
11 opinion and belief, and it also -- I think that
12 Mr. Mayer's analysis doesn't address that specific
13 issue.
14 BY MR. BLISS:
15   Q   And I'm not asking from an accounting
16 perspective, and so let me be more clear on the
17 perspective.
18      From the perspective of defendants, of
19 Thornburg's management, people who want Thornburg
20 to be able to continue as a going concern and meet
21 margin calls as they come in, is -- is it reasonable
22 or would it have been reasonable for Thornburg to
23 have sufficient liquidity to meet margin calls that
24 occur with a 25 percent frequency?
25      MR. LIUBICIC:  Objection.  Lack of

Page 222

1 foundation --
2      THE WITNESS:  Again --
3      MR. LIUBICIC:  -- beyond the scope of the
4 opinion.
5      THE WITNESS:  -- reasonable in what
6 context and over what time period?
7      Is -- if you are looking over the time
8 period that Mr. Mayer analyzes, which I believe runs
9 to March 10th, is that -- was the level of liquidity
10 they had reasonable for purposes of rendering an --
11 a judgment that it was probable or likely that they
12 would be able to hold the portfolio at issue to
13 maturity?  The answer is yes.
14      You know, would it -- was the level of
15 liquidity reasonable in the context of some other
16 business decision?  I haven't been asked to address
17 that.
18 BY MR. BLISS:
19   Q   Okay.  So you don't intend to opine upon
20 that at trial?
21   A   Well, only to the extent -- again, I'm a
22 rebuttal expert to Mr. Mayer, and Mr. Mayer -- I'm
23 not sure and he hasn't specified the business
24 context and the horizon over which he is making an
25 assessment of the reasonableness of management's

Page 223

1 decisions.
2      It appears to me, based on his analysis,
3 that he is assessing reasonableness in terms of
4 having an ability to meet, as the quote you gave
5 earlier to his testimony, margin calls over the
6 period of time that he has analyzed that were
7 remote and unlikely, and if that analysis is used
8 to draw inference regarding the reasonableness of
9 the management's decisions with regard to its OTTI
10 analysis, then I would be -- I expect to be
11 informing the court as to how remote those events
12 are and how they appear -- that analysis is not
13 probabilistic in nature, and the purpose of -- for
14 that analysis is -- hasn't been made -- hasn't been
15 articulated clearly by Mr. Mayer.
16   Q   In your discussion of liquidity, you
17 reference the "CTC 'in the box' reports."
18   A   Yes.
19   Q   Do you recall that?
20      And that included 36.5 million in market
21 value agency securities; is that right?
22   A   That's correct.
23   Q   If there were 36.5 million in agency
24 securities, do you know why they weren't used to
25 pay off the Citibank margin calls earlier?

Page 224

1      MR. LIUBICIC:  Objection.  Lack of
2 foundation.
3      THE WITNESS:  What do you mean?
4 BY MR. BLISS:
5   Q   In other words, the margin calls that were
6 paid over time, do you know why --
7   A   Oh.
8   Q   -- that 36.5 million wasn't used to pay
9 those?
10   A   Well, you know, I haven't delved into the
11 details of their liquidity management in the context
12 of their selective payment of some.
13      I would note that their -- their ability
14 to meet margin calls exceeded their available cash,
15 okay, which indicated the use of alternative sources
16 for purposes of meeting margin calls.
17   Q   So you don't know why the 36.5 million in
18 agency securities were not used to pay off the
19 earlier margin calls?
20   A   Without -- no, I don't --
21   Q   Okay.
22   A   -- specifically with respect to the
23 Citibank.
24   Q   I'm going to hand you what has been
25 previously marked as Exhibit 247.

Page 249

1  professor of finance, whether he is qualified or is
2  expert in finance, whether he's qualified to render
3  the opinions that he has done -- he has rendered.
4  Sorry.
5       MR. BLISS:  Let's take a short break.
6       THE WITNESS:  Okay.
7       VIDEO OPERATOR:  Off the record.  6:17.
8       (Off the record.)
9       VIDEO OPERATOR:  We are back on the record
10 at 6:34.
11      MR. BLISS:  Thank you, Dr. James.  I don't
12 have any more questions.
13      THE WITNESS:  Thank you.
14      MR. LIUBICIC:  Okay.  I believe I only
15 have one area to cover.
16
17            EXAMINATION
18
19 BY MR. LIUBICIC:
20   Q   Dr. James, do you remember a little while
21 ago Mr. Bliss asking you if any portion of your
22 testimony as an expert has ever been excluded?
23   A   Yes.
24   Q   Okay.  Is there anything you would like to
25 add to your answer or provide as a clarification to

Page 250

1  your answer --
2    A   Sure.
3    Q   -- to the question?
4    A   In break, we discussed no portion of my
5  testimony, as I understand it, has been excluded.
6       There is an opinion or a ruling from a
7  magistrate in another SEC case, BankAtlantic, in
8  which she indicated my testimony couldn't be used
9  for -- or my opinion could not be used for purposes
10 of addressing issues of scienter.  That wasn't an
11 opinion that I was going to render in the case and
12 was a use of an opinion concerning certain data
13 that I wasn't making but was being used in argument,
14 and that couldn't be used.  So just to make sure
15 that there's no confusion as to that particular
16 ruling.
17      MR. LIUBICIC:  Okay.  I have no further
18 questions.
19      MR. LEE:  Nothing from me.
20      MR. BLISS:  Thank you.
21      MR. McKENNA:  Thank you.
22      THE WITNESS:  Safe travels.
23      VIDEO OPERATOR:  This concludes today's
24 testimony given by Dr. Christopher M. James.
25      The total number of media used was four

Page 251

1  and will be retained by Veritext Legal Solutions.
2       We are off the record at 6:36.
3       (Whereupon, at 6:36 P.M., the
4       deposition of CHRISTOPHER M.
5       JAMES, Ph.D., was adjourned.)

Page 252

1  STATE OF CALIFORNIA   )
2  COUNTY OF LOS ANGELES )
3
4    I, RICKI Q. MELTON, CSR No. 9400, RPR No. 45429,
5  do hereby certify:
6    That the foregoing deposition testimony of
7  CHRISTOPHER M. JAMES, Ph.D., was taken before me at
   the time and place therein set forth, at which time
8  the witness was placed under oath and was sworn by
9  me to tell the truth, the whole truth, and nothing
   but the truth;
10   That the testimony of the witness and all objections
11 made by counsel at the time of the examination were
   recorded stenographically by me and were thereafter
12 transcribed under my direction and supervision, and
13 that the foregoing pages contain a full, true, and
14 accurate record of all proceedings and testimony to
   the best of my skill and ability.
15   I further certify that I am neither counsel for
16 any party to said action nor am I related to any
17 party to said action, nor am I in any way
18 interested in the outcome thereof.
19   IN WITNESS WHEREOF, I have subscribed my name
20 this 14th day of April, 2014.
21
22
23  _____
24
25  RICKI Q. MELTON, CSR No. 9400, RPR No. 45429