IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

vs.                                                                     No. CIV 12-0257 JB/LFG

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

        Defendants.

## MEMORANDUM OPINION AND AMENDED ORDER[1]

    **THIS MATTER** comes before the Court on: (i) the Defendants' Motion to Compel

Production of PCAOB Deposition Transcripts and Plaintiff's Notes and Memoranda of

Interviews with Non-Party Witnesses, filed November 28, 2012 (Doc. 90)("Motion to

---

[1]On September 24, 2013, the Court issued an Order in which it granted in part and denied in part the Defendants' Motion to Compel Production of PCAOB Deposition Transcripts and Plaintiff's Notes and Memoranda of Interviews with Non-Party Witnesses, filed November 28, 2012 (Doc. 90), see Order, filed September 24, 2013 (Doc. 214)("Motion to Compel Order"), and an Order in which it denied the Non-Party KPMG LLP's Motion to Quash, in Part, or Modify Subpoena to Produce Documents, and for Protective Order, filed December 4, 2012 (Doc. 91), see Order, filed September 24, 2013 (Doc. 215)("Motion to Quash Order"). The Court stated that it would "at a later date issue a memorandum opinion more fully detailing its rationale for this decision." Motion to Compel Order at 1 n.1; Motion to Quash Order at 1 n.1. This Memorandum Opinion and Amended Order is the promised opinion. Consistent with the Court's rulings and comments at the hearing on January 30, 2013, the Court is amending its order to deny the Defendants' Motion to Compel Production of PCAOB Deposition Transcripts and Plaintiff's Notes and Memoranda of Interviews with Non-Party Witnesses, filed November 28, 2012 (Doc. 90), grant in part and deny in part the Non-Party KPMG LLP's Motion to Quash, in Part, or Modify Subpoena to Produce Documents, and for Protective Order, filed December 4, 2012 (Doc. 91), and grant the Plaintiff Securities and Exchange Commission's Motion for a Protective Order to Quash Defendants' Notice of 30(b)(6) Deposition and Second and Third Requests for the Production of Documents, filed January 15, 2013 (Doc. 121).

Compel");[2] (ii) Non-Party KPMG LLP's Motion to Quash, in Part, or Modify Subpoena to Produce Documents, and for Protective Order, filed December 4, 2012 (Doc. 91)("KPMG Motion to Quash"); and (iii) the Plaintiff Securities and Exchange Commission's Motion for a Protective Order to Quash Defendants' Notice of 30(b)(6) Deposition and Second and Third Requests for the Production of Documents, filed January 15, 2013 (Doc. 121)("Motion for Protective Order").   The Court held a hearing on January 30, 2013.   The primary issues are: (i) whether Defendants Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett may obtain through discovery the notes and memoranda that Plaintiff Securities and Exchange Commission ("SEC") obtained during unsworn interviews and attorney proffers with non-party KPMG, LLP's employees; (ii) whether the Court should compel the SEC to produce the testimony transcripts and sworn statements of KPMG employees that the Public Company Accounting Oversight Board ("PCAOB") took in 2009; (iii) whether 15 U.S.C. § 7215(b)(5)(A) ("the PCAOB Privilege"),[3] part of the Sarbanes-Oxley Act of 2002, Pub. L. 107-204, 116 Stat. 745 (2002), protects KPMG from disclosing documents and information between KPMG and the PCAOB; (iv) whether the Defendants may depose an SEC representative under rule 30(b)(6) of the Federal Rules of Civil Procedure; and (v) whether the Court should release the SEC from any obligation to respond to the Defendants' Second and Third Requests for the Production of Documents from the SEC.   First, the Court will not permit the Defendants to obtain the SEC's notes and memoranda from interviews and witness proffers with KPMG, because the notes and memoranda are the SEC's work product and the Defendants have not demonstrated substantial

---

[2]The parties' pleadings in this matter often contain multiple sets of page numbers.  Unless otherwise noted, the Court's citations are to the page numbers attached when a document is filed with the Court, located in the upper-right-hand corner of the documents.

[3]KPMG and the SEC refer to the PCAOB Privilege as the "Section 105 Privilege."

need for the notes.  The Court will not compel the SEC to produce the PCAOB transcripts, because the PCAOB Privilege protects documents that the PCAOB prepared, and the SEC has not waived the PCAOB Privilege in this case.  The PCAOB Privilege protects KPMG from having to disclose "documents and information prepared or received by or specifically for the Board," but not KPMG's communications with the SEC regarding the PCAOB investigation or internal KPMG communications regarding the PCAOB investigation.  The Defendants may not depose a rule 30(b)(6) SEC designee regarding the SEC's communications with the PCAOB and with KPMG, because the PCAOB Privilege protects the SEC's communications with the PCAOB and the work-product doctrine protects the SEC's communications with KPMG.  The PCAOB Privilege and work-product doctrine also protect the documents that the Defendants are requesting in the Second and Third Requests for Production.  The Court will (i) deny the Motion to Compel; (ii) grant in part and deny in part the KPMG Motion to Quash; and (iii) grant the Motion for Protective Order.

## FACTUAL BACKGROUND

The Defendants are former officers of Thornburg Mortgage Inc.: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The Plaintiff Securities and Exchange Commission ("SEC") alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[4]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld

---

[4]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their

important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[5] Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and once was the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation. See Complaint ¶ 2, at 1; id. ¶ 20, at 7. During the time relevant to the allegations in the Complaint, Thornburg Mortgage's shares were traded on the New York Stock Exchange. See Complaint ¶ 20, at 7. Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo"[6] ARM securities; Thornburg Mortgage also

_____

operations and financial conditions." Annual Report, Investopedia, http://www.investopedia.com/terms/a/annualreport.asp. It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc." 10-K, Investopedia.

[5]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

[6]"Jumbo" and "sugar-jumbo," in reference to ARM securities, describe the amount of a mortgage. Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage. These mortgages exceed the conforming loan limit that Fannie Mae and Freddie Mac set. Super jumbo mortgage, Wikipedia. Fannie Mae, formally the Federal National Mortgage Association, purchases and guarantees mortgages that meet its funding criteria. Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014). Fannie Mae's "little brother" is Freddie Mac, formally the Federal Home Loan Mortgage Corporation. Freddie Mac, Investopedia, http://www.investopedia.com/terms/f/freddiemac.asp (last visited August 9, 2014). Both are government sponsored enterprises, that is, financial services corporations that the United States Congress created. See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014). "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States

purchased ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg

Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and

investment business through reverse repurchase agreements[7] backed by ARM securities.  See

Complaint ¶ 3, at 2.  Thornburg Mortgage's reverse repurchase agreements "typically consisted

of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg

Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a

higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg

Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin

calls if the value of the ARM securities serving as collateral on the agreements fell below a

specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg

---

annually, depending upon market conditions and consumer trends.  Fannie Mae, Investopedia.
The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming
loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is
$417,000.00.  Higher-value areas, such as the District of Columbia, have conforming loan limits
of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released
November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo"
mortgage loans are loans that exceed the local conforming loan limit and have higher interest
rates because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct.
11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not
expressly defined or regulated, but mortgage companies use it internally and independently to set
loan parameters.  The definition may vary according to a particular lender's criteria and the area
where the mortgage is being sought.  Super jumbo mortgage, Wikipedia.  The United States
government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was
widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac,
Wikipedia.

[7]A "repurchase agreement" is a "short-term loan agreement by which one party sells a
security to another party but promises to buy back the security on a specified date at a specified
price.  Often shortened to repo."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed.
2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the
buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23,
2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security
(and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the
transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase
agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013),
http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter  to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default,  see Complaint ¶ 3, at 2; id.

¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008) filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an electronic mail transmission from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Electronic Mail Transmission from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an electronic mail transmission from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"

Complaint ¶ 67, at 19-20 (alteration in original)(quoting Electronic Mail Transmission from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an electronic mail transmission sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Electronic Mail Transmission from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an electronic mail transmission, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an electronic mail transmission from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> "We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met."

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also

discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet

while we deal with it'" in the same electronic mail transmission.  Complaint ¶ 31, at 10

(alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our

disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10

(quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge

fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.

See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would

negatively affect Thornburg Mortgage's ARM securities and sent an electronic mail transmission

to Simmons on February 27, 2008, in which he said:

> "Also, you should know that a large Alt-A hedge fund in Europe is blowing up
> this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point
> haircuts on Alt-A and AAA's overnight.  I think we will get this a little more
> gradually, but we should be ready for it."[8]

Complaint ¶ 38, at 12 (quoting Electronic Mail Transmission from Larry Goldstone to Clay

Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27,

---

[8]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell
a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of
calculating capital requirement, margin and collateral levels."  Haircut, Investopedia,
http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A
mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier
than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013,
11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit
ratings, which represent the credit worthiness of corporate or government bonds, and "the
likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14
a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the
quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia.
"AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating
agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5,
2013).

2008 Goldstone/Simmons Email")).  Simmons sent an electronic mail transmission to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Electronic Mail Transmission from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an electronic mail transmission to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40, at 12 (alteration in original)(quoting Electronic Mail Transmission from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To

date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K

accounted for the I/O Strip Transactions as the issuance of secured debt.[9]  See Complaint ¶ 37, at

11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to

hold its ARM Securities until their value recovered in the market,'" notwithstanding that the

lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could

have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3

(quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had

the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage

did not recognize $427.8 million in losses associated with its ARM securities that serve as

collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage

also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form

10K and accompanying financial statements were also incorporated into the company's active

Form S-3 ASR[10] registration statement, relating to Thornburg Mortgage's dividend reinvestment

---

[9]According to the Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset."  The Financial Accounting Standards Board ("FASB") explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

[10]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008. See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning electronic mail transmission regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Electronic Mail Transmission from Clay Simmons to Larry Goldstone at 2, sent February 28, 2008, at 6:33 a.m., filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).  In an electronic mail transmission from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'"  Complaint ¶ 94, at 27 (alterations in original).  See Electronic Mail Transmission from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, sent February 28, 2008, at 5:29 a.m., filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an electronic mail transmission that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  See Complaint ¶ 95, at 28; Electronic Mail Transmission from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, sent February 28, 2008, at 6:56 a.m., filed May 21,

2012 (Doc. 37-11)("Feb. 28, 2008 Email").  As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via electronic mail transmission, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'"  Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[11]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's

---

[11]An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See Complaint ¶ 49, at 14-15.[12]   The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapsing, see Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going concern.  See

---

[12]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents referenced in the Complaint and central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an Electronic Mail Transmission from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the electronic mail transmission was sent from a KPMG employee).

Complaint ¶ 57, at 17.   Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's.   See Complaint ¶ 76, at 22.   "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."   Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."   Electronic Mail Transmission from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, sent March 3, 2008 11:44 p.m, filed May 21, 2013 (Doc. 37-28)("March 3, 2008   Hall   Email").   The requested evidence included "correspondence with lenders/attorneys/shareholders, emails."   Request for Correspondence, attached to March 3, 2008 Hall Email, at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."   Request for Correspondence at 4.   At the time, KPMG as auditor was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.   See Complaint ¶ 99, at 29.   Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.   See Complaint ¶ 101, at 29.   KPMG did not become aware of the Citi Letter while preparing its restatement. See Complaint ¶ 101, at 29.   Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding

collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"  Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).  The analysis stated: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]  No one in the market could have foreseen the sudden decline in mortgage valuations.'"  Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

The SEC subsequently began an investigation.  See Motion to Compel at 9.  As part of its investigation of Thornburg Mortgage, the SEC served on KPMG a Subpoena for the Production of Documents relating to its audit of Thornburg Mortgage for the 2007 fiscal year, Thornburg Mortgage's quarterly reviews during that time, and any relevant restatements.  See Letter from George Salter to Jessica Kurzban, sent October 23, 2012, filed December 4, 2012 (Doc. 92-3)("Salter to Kurzban Letter")(quoting the SEC's Subpoena).  "Less than a year later, the Public Company Accounting Oversight Board ("PCAOB") began investigating KPMG in connection with its 2007 year-end audit of Thornburg."  Motion to Compel at 9 (citing Declaration of Andrew G. Shultz in Support of Defendants' Motion to Compel ¶ 3, Ex. A; PCAOB Witness Questionnaire, filed November 28, 2012 (Doc. 90-1)).  As part of its investigation, the PCOAB took the testimony and sworn statements of eleven KPMG employees.  See Motion to Compel at 9.

According to the Defendants, the SEC also took sworn testimony of KPMG senior manager Jennifer Hall on September 1 and 2, 2009, and KPMG lead engagement partner Cynthia Reinhart on September 3, 2009.  See Motion to Compel at 9.  Between December 14, 2009, and February 2, 2011, the SEC took six days of sworn testimony of Goldstone, Simmons, and

Starrett.  See Motion to Compel at 9.  The SEC conducted another interview with Hall on March 3, 2011, and obtained unsworn statements from Reinhart through attorney proffers on May 17 and 19, 2011.  See Motion to Compel at 10.

## PROCEDURAL BACKGROUND

The SEC brought this case as part of an enforcement action against Goldstone, Simmons, and Starrett.  The SEC filed its Complaint on March 13, 2012; in the Defendants' view, the "centerpiece of the SEC's securities fraud case against Defendants is a series of allegations that Defendants misled Thornburg's outside auditor KPMG in connection with the filing of Thornburg's 2007 Form 10-K . . . ."  Motion to Compel at 6.  In the Defendants' understanding of the SEC's Complaint, had the Defendants disclosed to KPMG "certain allegedly critical information about Thornburg's 'margin call situation,' the auditors 'would have' disagreed with the Company's determination that its Purchased ARM Assets were not other-than-temporarily impaired."  Motion to Compel at 6.  The problem, according to the Defendants, is that "support for the SEC's allegation about what KPMG 'would have' done is not found in any testimony or other material the SEC has produced to Defendants in discovery."  Motion to Compel at 6 (emphasis in original).  When the Defendants asked the SEC to indicate what evidence supported its allegations, "the SEC claimed that its 'would have' allegations are, in fact, supported by off-the-record interviews taken from and proffers submitted by key KPMG witnesses in March, April, and May, 2011 -- after these same witnesses gave sworn testimony to the SEC in September 2009."  Motion to Compel at 6 (emphasis in original).  The Motion to Compel centers on evidence that the Defendants say they need to defend the action, including off-the-record interviews and attorney proffers from several KPMG employees.  See Motion to Compel at 6.  Further, the Defendants seek the transcripts and sworn statements that the PCAOB took during

its investigation in 2009.  See Motion to Compel at 6.  Similarly, KPMG's Motion to Quash and the SEC's Motion for Protective Order address the Defendants' discovery requests for information related to the PCAOB and the KPMG witnesses' previous statements.

1.      **November 9, 2012 Telephonic Hearing.**

The Defendants assert that, after the SEC filed its Complaint, the SEC provided Reinhart's and Hall's sworn testimony transcripts, which refer to their testimony before the PCAOB.  See Motion to Compel at 10.  The Defendants learned in November, 2012, that the PCAOB had also taken nine other KPMG employees' testimony.  See Motion to Compel at 10.  The Defendants requested that the SEC produce the additional PCAOB testimony and sworn statements, and when the SEC refused, the parties had a telephonic hearing before the Court on November 9, 2012.  See Motion to Compel at 10-11.  The parties requested the hearing on November 9, 2012, a Friday, because the following Monday was a federal holiday, and they had scheduled a deposition for Tuesday, November 13, 2012.  See Transcript of Hearing at 5:16-21 (Schultz), taken November 9, 2012, filed December 11, 2012 (Doc. 97)("Nov. 9, 2012 Tr.").

The Defendants explained that, during the SEC investigation, the SEC interviewed Reinhart and Hall, see Nov. 9, 2012 Tr. at 6:3-6 (Schultz), but the Defendants learned only after sending written discovery requests that the PCAOB interviewed eleven KPMG witnesses; according to the Defendants, the SEC has testimony transcripts from the PCAOB interviews but refuses to produce them, see Nov. 9, 2012 Tr. at 6:15-7:3 (Schultz).  In the Defendants' view, the SEC should produce the transcripts under 15 U.S.C. § 7215(b)(5)(A), see Nov. 9, 2012 Tr. at 7:4-5 (Schultz), which "provides a general rule of confidentiality . . . except there is a broad exception at the end of that section that says that the confidentiality that's provided does not apply . . . 'unless and until presented in connection with a public proceeding.'"  Nov. 9, 2012 Tr.

at 7:10-16 (Schultz).  The Defendants argued that the SEC relied on the PCAOB transcripts "in drafting its complaint" and thus, the SEC used the transcripts "in connection with the present enforcement action which is a public proceeding."  Nov. 9, 2012 Tr. at 7:17-21 (Schultz).  "All we're asking for your Honor, basically, is a level playing field so that we have the same information that the SEC has had and that the SEC has relied on in drafting its complaint."  Nov. 9, 2012 Tr. at 7:23-25 (Schultz).  The Defendants explained that, within a week from the hearing, they planned to depose Tara Baucom, one of the witnesses that the SEC identified as having a PCAOB investigative transcript, see Nov. 9, 2012 Tr. at 8:5-11 (Schultz); while the upcoming deposition was the most pressing issue, the Defendants said that "whatever ruling the Court gives we think will have an effect for the other KPMG employees who will be deposed," Nov. 9, 2012 Tr. at 9:4-7 (Schultz).

The SEC argued that it did not rely on the PCAOB transcripts in drafting the Complaint and that it does not otherwise plan to use the PCAOB transcripts in the litigation: "We did not cite those transcripts in our 26(a) disclosures as documents that we will use to prove our claims because we do not intend to.  We have no intent of using those transcripts in this litigation."  Nov. 9, 2012 Tr. at 9:16-19 (McKenna).  The SEC said that its investigative staff is separate from its trial attorneys, and that the trial attorneys have not read the transcripts and do not plan to use them.  See Nov. 9, 2012 Tr. at 9:19-23 (McKenna).  The SEC argued that, under 15 U.S.C. § 7215(b)(5)(a), the standard is not "reliance" as the Defendants argued, but that the PCAOB transcripts "are protected unless and until they are presented in connection with a public proceeding.  And they certainly have not been presented in this litigation nor do we intend to present them in this litigation."  Nov. 9, 2012 Tr. at 9:25-10:5 (McKenna).  The SEC's counsel

stated that he has received a PDF[13] image of the transcripts, but that he has "never opened it, never looked at the transcripts nor has anybody on the trial team."  Nov. 9, 2012 Tr. at 10:12-14 (McKenna).

> KPMG explained the origins of the PCAOB and the confidentiality provision:
>
> The Public Company Accounting Oversight Board, the PCAOB, is the primary regulator for the accounting firms that are doing audits of public companies.  And it was an entity that was created out of Sarbanes-Oxley, the legislation.  And there's a provision which has been the topic of this discussion which provides for the confidentiality of the information that is created either by or for the PCAOB in connection with its investigations.

Nov. 9, 2012 Tr. at 11:15-22 (Salter).  In KPMG's view, the statute allows the PCAOB to provide information to the SEC without the information losing its confidential, privileged nature.  See Nov. 9, 2012 Tr. at 12:3-9 (Salter).  KPMG said that, even without producing the privileged transcripts, the Defendants have access to the same information, because "the witnesses are being made available so that the defendants and the SEC can ask whatever questions they want of the witnesses."  Nov. 9, 2012 Tr. at 12:23-25 (Salter).  KPMG said that there is "very little case law on this issue," and that the only case of which it was aware was Bennett v. Sprint Nextel Corporation, No. 11-9014-MC-W-ODS, 2012 WL 4829312 (W.D. Mo. Oct. 10, 2012), in which the Western District of Missouri "upheld the privilege . . . and excused KPMG from producing any documents that were subject to that privilege."  Nov. 9, 2012 Tr. at 13:14-23 (Salter).

---

[13]Portable Document Format is "an open standard for electronic document exchange" that Adobe Systems invented and that the International Organization for Standardization maintains.  About Adobe PDF, http://adobe.com/products/acrobat/adobepdf.html.  PDF files look "just like they would if printed," but "can contain clickable links and buttons, form fields, video, and audio," and are text searchable using optical character recognition technology.  About Adobe PDF, supra.

The Court indicated that "if the SEC folks have not read these or looked at these transcripts then they couldn't have relied upon them for bringing their case," Nov. 9, 2012 Tr. at 14:20-23 (Court); the Defendants argued that, although the SEC attempted to distinguish between the investigation team and litigation team, the SEC "must have relied" on the PCAOB information in drafting the Complaint, Nov. 9, 2012 Tr. at 15:1-9 (Schultz).  The Defendants explained that the Complaint lists part of the investigative team as counsel and, further, that the SEC relied on the PCAOB materials in investigating the case, because the transcripts that the SEC provided to the Defendants reveal that, while speaking with Hall and Reinhart, Julian Robinson, a SEC staff attorney and investigator, stated that he would "skip certain questioning that has been conducted by the PCAOB."  Nov. 9, 2012 Tr. at 15:5-23 (Schultz).  The Defendants also stated that they were aware of one other ongoing case where the SEC produced PCAOB transcripts.  See Nov. 9, 2012 Tr. at 16:16-18 (Schultz).  The Court asked the SEC whether, because the Complaint lists the investigative team, the Court would need to assume that the investigative team relied on the PCAOB transcripts in drafting the Complaint.  See Nov. 9, 2012 Tr. at 17:14-18:7 (Court).  The SEC argued that, even if the investigative team reviewed the transcripts, that does not mean the transcripts were "presented in connection with a public proceeding.  And if it did, it would completely eviscerate the provision . . . availab[le] to government agencies which specifically said that without losing its status as being privileged and confidential, it can be shared with the Commission."  Nov. 9, 2012 Tr. at 18:8-15 (McKenna).  The Court said that it did not think such a rule would eviscerate the statute's protection, because, for example, private plaintiffs against Thornburg Mortgage would not be able to obtain the materials.  See Nov. 9, 2012 Tr. at 18:16-22 (Court).  The SEC said even that protection would not be present under the Defendants' theory, because, as the SEC understood the Defendants'

position, it waived the privilege by bringing the Complaint.  See Nov. 9, 2012 Tr. at 18:23-25 (McKenna).

The Court asked whether the parties preferred that it rule at the telephonic hearing, or whether they preferred to submit briefing and for the Court to rule by the following Monday, see Nov. 9, 2012 Tr. at 19:1-7 (Court); the SEC said it preferred an immediate ruling from the bench at the telephonic hearing, see Nov. 9, 2012 Tr. at 19:8-11 (McKenna).

KPMG contended that the information that the Defendants believe they would learn from the PCAOB transcripts -- what KPMG would have done with "accurate and complete information about Thornburg's margin call situation during the two-week period leading up to the filing of the Form 10K," Nov. 9, 2012 Tr. at 19:23-20:1 (Salter) -- was not the subject of the PCAOB questioning, see Nov. 9, 2012 Tr. at 20:4-10 (Salter).  "[I]f it's a question that's of particular interest to the defendant, then they can ask each one of the KPMG witnesses.  But that's not what the PCAOB was questioning them about."  Nov. 9, 2012 Tr. at 20:10-14 (Salter).  The Defendants argued that, under the general rules of discovery, they are entitled to the transcripts to make that determination, see Nov. 9, 2012 Tr. at 21:1-4 (Schultz), and that "we simply can't respond to a flat assertion that something doesn't exist without the opportunity to test it for ourselves," Nov. 9, 2012 Tr. at 21:22-24 (Schultz).  The Court noted that "we're not dealing with the general rule" and that it seems that, in this case, the PCAOB Privilege protects the material unless it was "part of this complaint."  Nov. 9, 2012 Tr. at 21:5-13 (Court).  The Court suggested that the SEC's counsel should speak with the people who worked on the Complaint to determine if they relied on any PCAOB material: if the answer is yes, then the SEC would have to produce the transcripts that Defendants requested.  See Nov. 9, 2012 Tr. at 22:2-8

(Court).  When the SEC's counsel asked the Court to clarify how an attorney might rely on the

PCAOB material, the Court said:

> I think they're going to have to be real honest about how they drafted maybe certain portions of this and if they had that PCAOB in front of them and were taking either word for word or paraphrasing or whatever out of those PCAOB transcripts, probably if they had them on the table while they were drafting this complaint, they're going to end up having to produce them.

Nov. 9, 2012 Tr. at 22:19-23:14 (McKenna, Court).  KPMG suggested that, if the SEC relied on

any PCAOB material, the Court should limit disclosure to only those specific portions the SEC

used, see Nov. 9, 2012 Tr. at 24:1-8 (Salter); the Court agreed, and said that it would permit the

SEC to redact portions of the PCAOB material if the SEC did not rely on that portion in

litigation, see Nov. 9, 2012 Tr. at 24:23-25:2 (Court).

       **2.**       **The Defendants' Motion to Compel.**

      On November 12, 2012, the SEC's counsel sent an electronic mail transmission to the

Defendants' counsel stating that its staff "did not use or rely" on the PCAOB testimony:

> We have spoken to staff that conducted the investigation and been told that they did not use or rely on Ms. Baucom's or any other KPMG employee's PCAOB testimony in preparing the complaint.  The attorneys primarily responsible for drafting the complaint never even reviewed the transcripts.  Thus, the PCAOB transcripts are protected from disclosure under 15 USC § 7215(b)(5)(A).

Motion to Compel at 11 (quoting Electronic Mail from Stephen McKenna to John Valentine &

Gregory Kasper, sent November 12, 2012, at 11:13 a.m., filed November 28, 2012 (Doc. 90-8

at 3).  The Defendants' counsel replied with follow-up questions to learn:

> (i) the names of the staff who conducted the investigation; (ii) the names of the persons who took part in drafting or reviewing the Complaint; (iii) whether there were any persons involved in either of these tasks with whom counsel had not spoken; (iv) what standard the SEC used to determine reliance on PCAOB testimony; (v) who were the attorneys primarily responsible for drafting the Complaint; (vi) what was the SEC's basis for voluntarily producing PCAOB transcripts in another pending case; and (vi) what distinguished that case from this one.

Motion to Compel at 11 (citing Electronic Mail from John Valentine to Stephen McKenna & Gregory Kasper, sent November 12, 2012, at 3:19 p.m., filed November 28, 2012 (Doc. 90-8 at 2-3)). On November 13, 2012, the SEC served its interrogatory responses, which "disclosed for the first time that the SEC had also conducted the off-the-record interviews of key KPMG employees . . . ." Motion to Compel at 11-12 (citing Plaintiff Securities and Exchange Commission's Objections and Responses to Defendants' First Set of Interrogatories, No. 32 at 9, filed November 29, 2012 (Doc. 90-9)). On November 13, 2012, and November 15, 2012, the Defendants deposed two core members of KPMG Thornburg's engagement team -- manager Tara Baucom and associate Meg Jones -- both of whom answered over 200 questions with "I don't remember" or "I don't recall." Motion to Compel at 12 (citing Deposition of Tara Baucom, taken November 13, 2012, filed November 28, 2012 (Doc. 90-11); Deposition of Meg Jones, taken November 15, 2012, filed November 28, 2012 (Doc. 90-12)). After Baucom's deposition, the SEC's counsel informed the Defendants' counsel that portions of the Complaint "that Defendants had identified as being unsupported by the sworn testimony of KPMG witnesses or any of the documents in SEC's investigative file were supported not by the PCAOB testimony, but rather by the SEC's off-the-record interviews with KPMG employees." Motion to Compel at 12 (citing Electronic Mail Transmission from Jessica Kurzban to Stephen McKenna and Gregory Kasper, sent November 14, 2012 at 12:01 p.m., filed November 28, 2012 (Doc. 90-8)("Nov. 14 Email"); Electronic Mail Transmission from Stephen McKenna to Jessica Kurzban and Gregory Kasper, sent November 15, 2012, at 6:43 a.m., filed November 28, 2012 (Doc. 90-8)("Nov. 15 Email")). The Defendants also learned that "one of the attorneys who reviewed and edited the Complaint -- Mr. Julian Robinson -- did review the PCAOB transcripts." Motion to Compel at 12 (citing Nov. 14 Email; Nov. 15 Email).

On November 28, 2012, the Defendants filed their Motion to Compel, moving the Court to compel the SEC to produce (i) notes and memoranda of non-party witness interviews, and (ii) non-party witness testimony transcripts that the PCAOB took.  See Motion to Compel at 6. The Defendants argue that the SEC should be compelled to produce its notes and memoranda of interviews with KPMG witnesses; although the SEC contends that the interview notes and memoranda are protected from disclosure under the deliberative, law-enforcement, and investigative privileges, as well as the work-product doctrine, the Defendants argue that the SEC has waived those privileges by (i) filing the enforcement action, and (ii) advancing claims in the Complaint and at oral argument based on witness statements documented in those notes. Arguing that Federal Deposit Insurance Corp. v. Wise, 139 F.R.D. 168 (D. Colo. 1991)("FDIC v. Wise"), involved "nearly identical facts," the Defendants urge the Court to apply the same three-prong test as the District of Colorado used:

> (i) "assertion of the privilege is the result of some affirmative act, such as filing suit, by the asserting party;" (ii) "through the affirmative action, the asserting party has placed the protected information at issue by making it relevant to the case;" and (iii) "application of the privilege would deny the opposing party access to information vital to its defense."

Motion to Compel at 15 (citing FDIC v. Wise, 139 F.R.D. at 171).  In that case, the District of Colorado reasoned that, because the FDIC filed the action based partially on the withheld regulatory documents, and had "'injected into this controversy the actions, knowledge, and beliefs of the regulators, forcing these issues to the very forefront of the litigation,'" it would be "'manifestly unfair to defendants'" to withhold the information.  Motion to Compel at 15 (quoting FDIC v. Wise, 139 F.R.D. at 172).  The Defendants argue for the same result in this case, because the SEC filed its Complaint and "affirmatively used unsworn statements of KPMG witnesses both in the Complaint and at oral argument to attempt to show that Defendants misled

KPMG." Motion to Compel at 15. The Defendants argue that they need the withheld interview notes and memoranda to test the SEC's allegations, especially because they say that Hall's and Reinhart's sworn testimony do not support the SEC's contentions. See Motion to Compel at 15-16.

The Defendants assert that the SEC's interview notes and memoranda are not exempt from disclosure under any asserted privilege theory. See Motion to Compel at 17. First, the Defendants argue that the work-product doctrine does not protect the material, because documents that would otherwise be subject to such protection are discoverable "when the party seeking discovery 'has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.'" Motion to Compel at 17 (quoting Fed. R. Civ. P. 26(b)(3)(A)(ii)). The Defendants say they have a substantial need for the SEC interview notes and memoranda, because central allegations in the SEC's Complaint rely on statements from Reinhart and Hall during interviews and proffer sessions conducted in March and May, 2011, yet none of the sworn testimony from Reinhart and Hall supports the SEC's allegations; the Defendants allege that the off-the-record interviews are inconsistent with the sworn testimony, and that they need the interview notes and memoranda for their defense, impeachment, and refreshing the witnesses' recollection. See Motion to Compel at 17. The Defendants argue that they cannot obtain a substantial equivalent of the withheld materials, because the interviews took place in March and May, 2011, and the witnesses' recollections may have faded since the interviews; "Courts have recognized in evaluating privilege claims that 'statements taken at a time more contemporaneous with the events at issue have unique value[.]'" Motion to Compel at 18 (alteration in original)(quoting SEC v. Shanahan, No. 4:07CV270JCH, 2009 WL 1955747, at *3 (E.D. Mo. July 6, 2009)). The Defendants say they

are unable to obtain equivalent information, because, as the depositions with Baucom and Jones demonstrate, the witnesses are often unable to recall events, making them "effectively unavailable."  Motion to Compel at 19 (internal quotation marks omitted).  Next, the Defendants argue that the SEC cannot withhold the information based on the law-enforcement or investigatory privilege, "a qualified privilege which protects from public dissemination the contents of law enforcement investigatory files that would harm an agency's investigative or enforcement efforts," because they contend that the SEC has failed to carry its "threshold burden of formally claiming the law enforcement privilege," and the relevant factors weigh in favor of disclosure: (i) there is no pending criminal investigation or proceeding to conceal from public view; (ii) the notes and memoranda are important to the Defendants' defense, and they cannot obtain an acceptable substitute for the information; (iii) disclosure will not thwart SEC's investigative efforts, because the civil investigation has concluded; and (iv) the notes and memoranda that the Defendants seek are factual, not evaluative.  Motion to Compel at 19-22. Third, the Defendants contend that the SEC cannot withhold the interview notes and memoranda under the deliberative process privilege, a privilege that "protects documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."   Motion to Compel at 23 (internal quotation marks omitted).  The Defendants argue that the notes and memoranda do not fall within this privilege, because the documents contain factual material, not information reflecting the government's deliberative or policy-making processes: "[T]here is nothing 'deliberative' about records of statements by KPMG witnesses, which the SEC has used as the evidentiary support of its fraud allegations against Defendants."  Motion to Compel at 23-24.

The Defendants also move the Court to compel the SEC to produce the KPMG employees' testimony transcripts and sworn statements that the PCAOB took in 2009: although the SEC asserts the PCAOB Privilege regarding this information, the Defendants argue that, because "the SEC has relied on these same transcripts in investigating and preparing its case, and because the SEC has not asserted the privilege in another pending case, there is no basis for applying the privilege here, and it would manifestly unfair to Defendants to do so." Motion to Compel at 24. The Defendants explain that, when Congress created the PCAOB, it enacted a confidentiality provision for "certain documents and information generated in the course of PCAOB investigations, but created an exception for materials presented in connection with a public proceeding . . . ." Motion to Compel at 24. Because no court has specifically construed the scope of the PCAOB Privilege related to enforcement actions or the "presented in connection with a public proceeding" exemption, the Defendants urge the Court to consider the legislative history underlying the PCAOB Privilege:

> This history reveals that the primary purpose of the privilege was to prevent "outsiders" (e.g., private plaintiffs) from using PCAOB materials against registered public accounting firms and/or their audit clients in private securities suits and thus discouraging cooperation by audit firms with PCAOB investigations. Here, plaintiff is the SEC -- a government agency bringing a public enforcement action against KPMG's former clients with the significant benefit of near contemporaneous PCAOB testimony from almost every member of the Thornburg engagement team. Meanwhile, Defendants are asked to make do with whatever these witnesses can still remember three years later, which, as it turns out, is next to nothing. The PCAOB privilege was never intended to be used in such a strategic and unfair manner.

Motion to Compel at 25 (footnote omitted). The Defendants argue that SEC waived the PCAOB Privilege, because the SEC "expressly relied on the PCAOB testimony in its investigation and because the enforcement action is a 'public proceeding.'" Motion to Compel at 26. The Defendants say that, during the previous telephonic conference on this issue, the "Court found

that the PCAOB testimony transcripts are 'presented in connection with a public proceeding' if the SEC used or otherwise relied on information from those transcripts in preparing the Complaint"; because the SEC's "lead investigator reviewed the PCAOB transcripts and reviewed and edited the Complaint before it was filed," the Defendants argue that the SEC has presented the PCAOB testimony transcripts in a public proceeding.  Motion to Compel at 26.  In the Defendants' view, the SEC, in attempting to prevent disclosure of the PCAOB testimony transcripts, is making an artificial distinction between drafting and reviewing a complaint, and that the practical reality is that Robinson, the SEC's lead investigator, cannot separate the information he learned from the PCAOB testimony transcripts from how he prosecutes this case. See Motion to Compel at 27.  The Defendants point to instances during the SEC's investigation when Robinson questioned Reinhart and Hall, but stated that he would skip certain questioning that the PCAOB already completed.  See Motion to Compel at 27.  "The testimony of Ms. Reinhart and Ms. Hall during the SEC investigation highlights the manner in which the SEC investigative staff built their knowledge of the case on information contained in the PCAOB testimony."  Motion to Compel at 27.  The Defendants argue that the SEC also relied on the nine additional KPMG employees' PCAOB interviews, because "it is highly unusual for the SEC to bring an accounting and disclosure case such as this based on the testimony of only two auditors."  Motion to Compel at 28.  Further, the Defendants assert that the SEC included the PCAOB witness questionnaires in its investigative file, effectively conceding that it relied on PCAOB materials in its investigation; the Defendants contend that the SEC waived its privilege related to those written responses, and there is "no principled reason for producing KPMG witnesses' written responses to PCAOB questions while claiming privilege as to their oral testimony."  Motion to Compel at 28-29.

The Defendants further argue that the SEC should not be able to assert the PCAOB Privilege in this case, because the SEC has inconsistently asserted the privilege: the SEC voluntarily produced PCAOB transcripts "under similar circumstances" in SEC v. Jensen, No. 2:11-cv-05316-R-AGR (C.D. Cal., filed June 24, 2011), a case pending in the Central District of California.  Motion to Compel at 29.  The Defendants assert that the SEC, as a federal law enforcement agency, should not take inconsistent positions in enforcement proceedings, yet the SEC has not provided any justification for why it is treating the Defendants in this case differently from SEC v. Jensen.  See Motion to Compel at 29.  Finally, the Defendants contend that, "[a]s a matter of fundamental fairness," the SEC should not be allowed to bring a case against the Defendants without disclosing the testimony it obtained from eleven key witnesses. Motion to Compel at 30.  Looking to standards for "analogous governmental privileges," the Defendants argue that the factors weigh in favor of disclosure: (i) the evidence is "highly relevant and vital" to the Defendants' case, because the SEC has asserted that the Defendants deliberately concealed information from KPMG, and so what KPMG employees said under oath about their "access to information, the thoroughness of their audit, and their interactions with Defendants is highly relevant and potentially vital to Defendants' defense of this case"; and (ii) the evidence is unavailable through other discovery, because the "Defendants have been unable to get substantive testimony from KPMG witnesses due to their complete memory loss."  Motion to Compel at 31-32.  The Defendants argue that the PCAOB transcripts have unique value, based on the setting and the contemporaneous timing, and that there is no acceptable substitute.  See Motion to Compel at 31-32.

3.    **The SEC's Response to the Motion to Compel**.

The SEC responds that the Defendants are improperly moving the Court to compel

production, when the Court previously ruled on the same request during an emergency hearing

on November 9, 2012, and told the parties that the PCAOB transcripts are discoverable if the

SEC used or relied on the transcripts in preparing the Complaint.   See Plaintiff Security and

Exchange Commission's Opposition to Defendants' Motion to Compel Production of PCAOB

Deposition Transcripts and Plaintiff's Notes and Memoranda of Intterviews [sic] with Non-Party

Witnesses at 8, filed December 17, 2012 (Doc. 98)("MTC Response").   The SEC says that, after

the Court instructed it to ask any SEC counsel whether they relied on the PCAOB transcripts in

drafting or reviewing the Complaint, it asked all staff members directly involved in the

investigation, and reported to the Defendants that none of them relied on PCAOB testimony in

preparing the Complaint.   See MTC Response at 8-9.   The SEC contends that the Defendants are

unsatisfied with the result and, by filing the Motion to Compel instead of a motion to reconsider,

are attempting to re-litigate the Court's prior ruling, contrary to the policy behind "law of the

case" doctrine, which is to promote finality and prevent re-litigation of previously decided

issues.   MTC Response at 9-10.

The SEC says that, even if the Court allows this procedural tactic, the result should not

change, because, it contends, it has not presented the PCAOB transcripts in a public proceeding.

See MTC Response at 10.   Under the SEC's reading of the Sarbanes-Oxley Act of 2002, the

PCAOB may share materials with the SEC without forfeiting the PCAOB Privilege; "[t]he

statutory scheme thus requires something more than simply making PCAOB materials available

to the Commission or filing a lawsuit in order for the privilege to be lost."   MTC Response at 11.

The SEC contends that the Court's solution at the November 9, 2012, hearing properly balanced

the parties' interests by "requiring production of materials used or relied upon in drafting the Complaint, but protect[ing] materials not so used," and that SEC staff did not use or rely on PCAOB materials in drafting the Complaint.  MTC Response at 11.  The SEC submits sworn declarations from "the two attorneys primarily responsible for drafting the Complaint," who say that they never reviewed the PCAOB transcripts, and a sworn declaration from staff attorney Robinson, who reviewed the PCAOB transcripts in preparation to take investigative testimony, but says he does not believe he reviewed them again, and that he "did not use or rely on the transcripts in reviewing the Complaint some two and a half years later, in March of 2012, and no transcripts were on his desk at that time."  MTC Response at 12.  See Declaration of Stephen C. McKenna in Opposition of Defendant's Motion to Compel, filed December 17, 2012 (Doc. 98-1); Declaration of Jeffrey S. Lyons in Opposition to Defendants' Motion to Compel, filed December 17, 2012 (Doc. 98-4); Declaration of Julian Robinson in Opposition of Defendants' Motion to Compel, filed December 17, 2012 (Doc. 98-5).  When Robinson later interviewed Hall and Reinhart and skipped questioning that the PCAOB covered, the SEC says that Robinson "was referring to skipping some general background questions," but did not use the PCAOB transcripts as a substitute for the areas of interest in the SEC investigation, "namely the margin calls, going concern and other temporary impairment analysis conducted by Thornburg, and KPMG's audit work and opinions thereon."  MTC Response at 12.  Similarly, the SEC contends that the PCAOB background questionnaires simply provided factual background information for the witnesses and that the SEC did not use that information to draft the Complaint.  See MTC Response at 13.  Although the SEC did not take testimony from any KPMG employees other than Reinhart and Hall, it contends that this limitation is of "little significance" and does not show that it relied on the nine other PCAOB testimony transcripts in drafting the Complaint,

because Reinhart and Hall were primarily responsible for the KPMG 2007 Thornburg Mortgage audit.  See MTC Response a 13.

The SEC argues that the Court should not consider whether the disclosure of PCAOB background questionnaires should waive the PCAOB Privilege, because the Defendants did not raise the issue to the Court at the November 9, 2012, hearing; if the Court considers the argument, however, the SEC contends that the disclosure of the background questionnaires "in the millions of pages produced" to the Defendants "was inadvertent and should not void any privilege."  MTC Response at 14.  The SEC says that, instead of notifying the SEC that it had produced materials marked as privileged, the Defendants introduced one of the documents at Baucom's deposition, and while the SEC "could and should have objected at that time," the SEC says its counsel did not notice the privileged nature of the document until it read the Motion to Compel's reference to the privileged document.  MTC Response at 14.  The SEC asserts that it then "promptly" notified the Defendants "that the disclosure was inadvertent and requested the return of the documents."  MTC Response at 14-15.  It analogized the PCAOB Privilege to rule 502 in the Federal Rules of Evidence, which "provides that inadvertent disclosure of materials protected by the attorney-client privilege or the work product doctrine in a federal proceeding does not act as a waiver" when (i) "the disclosure was inadvertent;" (ii) "the holder of the privilege took reasonable steps to prevent disclosure;" and (iii) "the holder promptly took reasonable steps to rectify the error."  MTC Response at 15.  The SEC contends that, if the Court evaluates the disclosure under rule 502, it has done everything the rule requires, and further, "[t]he confidentiality and privilege protections of 15 U.S.C. § 7215 are statutory and do not contemplate waiver, thus those protections are arguably even stronger than the attorney-client privilege and work product protection."  MTC Response at 15.  Even if the Court determines that

the SEC has waived its PCAOB Privilege for the written background questionnaires it disclosed to the Defendants, the SEC argues that the Court should not "take the further step of holding that the privilege is waived as to all other PCAOB materials, including the PCAOB transcripts." MTC Response at 16.  The SEC contends that it has not used the background questionnaires in the litigation, and so it is "not a situation where the SEC has voluntarily injected the background questionnaires, let alone the PCAOB transcripts, into this litigation.  Thus, there is no basis for a subject matter waiver with regard to the PCOB investigation."  MTC Response at 16-17. Because there are no cases addressing a waiver of the PCAOB Privilege, the SEC directs the Court to consider the PCAOB's conduct, which the SEC argues demonstrates that disclosing limited materials does not result in a subject-matter waiver:

> For example, when the PCAOB publishes a settled disciplinary order it discloses certain aspects of the PCAOB investigation and enforcement action.  See Settled Disciplinary Orders found at http://pcaobus.org/Enforcement/Decisions/Pages/default.aspx.   Likewise, it provides limited disclosure about PCAOB examinations in its Inspection Reports.   See http://pcaobus.org/Inspections/Reports/Pages/default.aspx.   Yet by disclosing limited details of PCAOB investigations and examinations, including the individuals involved and deficiencies charged, it has never been found that other PCAOB materials should lose their confidential and privileged designation.

MTC Response at 17.   Finally, the SEC contends that it is not acting inconsistently by withholding the PCAOB testimony transcripts in this case and releasing them in SEC v. Jensen, because in that case, the SEC presented the PCAOB transcripts in a public proceeding, thus waiving the privilege; the same is not true in this case.  See MTC Response at 17-18.

The SEC contends that the Defendants have made a "tacit admission that a second motion to compel production of the PCAOB transcripts is not proper," because the Defendants "bootstrap it to a motion to compel Plaintiff's Notes and Memoranda of Interviews with Non-Party Witnesses."  MTC Response at 6.  The SEC contends that "[t]hose notes are work product

of the highest form," MTC Response at 6, because they are attorney interview notes "taken in anticipation of and in furtherance of litigation," MTC Response at 18.  Although the Defendants say they seek only factual, and not evaluative, material, the SEC argues that attorney notes and memoranda of witness interviews warrant stricter limits on disclosure, because such documents likely reveal the attorney's mental processes or litigation strategy.  See MTC Response at 19. The SEC says that the two SEC staff members who took the interview notes -- Robinson and Donna Walker, an SEC accountant -- have declared that "the notes are not akin to a transcript of the witnesses' unsolicited factual statements, but rather reflect their mental processes and impressions in investigating Thornburg and preparing for this litigation."  MTC Response at 19. In the SEC's view, the Defendants have not demonstrated a substantial need for the SEC attorneys' notes, because, although the Defendants say they need the notes to show inconsistencies between the Complaint's allegations and Reinhart's and Hall's sworn testimony, the Defendants have not cited any portion of the Complaint that is inconsistent with the sworn testimony; under the authority that the Defendants cited, "a party must present more than speculative or conclusory statements that the reports will contain invaluable impeachment material."  MTC Response at 21 (quoting Duck v. M.L. Warren, 160 F.R.D. 80, 83 (E.D. Va. 1995)).  Contrary to the Defendants' assertions, the SEC contends that Reinhart's and Hall's investigative testimony is consistent with the Complaint's allegations and with the interview notes; the SEC argues that the Defendants have not shown any inconsistency, "let alone one sufficient to invade the strong work product protection that applies to attorney notes of witness interviews."  MTC Response at 22.  The SEC further argues that the Defendants can obtain a substantial equivalent of the SEC notes by conducting its own depositions; although the Defendants said Baucom and Jones could not recall certain events and answered certain

questions with "I don't remember," or "I don't recall," the SEC contends that Baucom and Jones answered numerous substantive questions, and that other KPMG witnesses have "provided fulsome substantive testimony."   MTC Response at 22-23 (citing Deposition of Matthew Plummer, taken November 28, 2012, filed December 17, 2012 (Doc. 98-10); Deposition of Jennifer Hall, taken December 5, 2012, filed December 17, 2012 (Doc. 98-3)).  Finally, the SEC argues that it did not waive its work-product protection by relying on the witness interviews to bring its claims, because, if that were the standard, the work-product doctrine would be of no value: it would protect only the witness interviews that were useless in litigation -- an "absurd result."  MTC Response at 23.  The SEC contends that the cases that the Defendants cite are inapposite; for example, Federal Deposit Insurance Corp. v. Wise involved withheld regulatory documents, not attorney interview notes, and a key difference, according to the SEC, is that the Defendants in this case "have deposed or will depose the witnesses whose testimony they claim is not available to them."  MTC Response at 20.  Instead, the SEC directs the Court to SEC v. Treadway, 229 F.R.D. 454 (S.D.N.Y. 2005), in which the court held that attorney notes of interviews and proffer sessions are work product, and "where 'Defendants are free to question each of the witnesses at their depositions, and at trial, concerning the witnesses' statements to the SEC' there is no waiver."  MTC Response at 21 (quoting SEC v. Treadway, 229 F.R.D. at 456).

### 4.    KPMG's Opposition to the Motion to Compel.

KPMG filed the Non-Party KPMG LLP's Opposition to Defendants' Motion to Compel, filed December 17, 2012 (Doc. 99)("KPMG Opposition"), arguing that the PCAOB materials are privileged, but not taking a position on the SEC interview notes and memoranda.  See KPMG Opposition at 1.  KPMG asserts that "the PCAOB investigation of KPMG and its professionals is expressly protected under the Sarbanes-Oxley Act as 'confidential and privileged' and exempt

from 'civil discovery or other legal process.'"   KPMG Opposition at 2 (quoting 15 U.S.C. § 7215(b)(5)(A)).   KPMG argues that the Sarbanes-Oxley Act of 2002 authorizes the PCAOB to share information gathered during investigations with the SEC without waiving any privileges: "Section 105(b)(5)(A) thus creates a broad privilege for PCAOB investigation-related materials, and guarantees that the privilege will be maintained in the hands of the SEC."   KPMG Opposition at 2.  Although the Defendants argue that the SEC has waived the PCAOB Privilege, KPMG contends that "the SEC has no power to waive the privilege -- the statutory command to maintain the privilege is absolute, and there is no provision in the statute authorizing the SEC to waive it."   KPMG Opposition at 2-3 (emphasis in original).   KPMG asserts that the statute's reference to "public proceeding" is tied to the PCAOB disciplinary proceedings, and, as such, the SEC did not present any PCAOB information in a public proceeding, even if it relied on PCAOB transcripts in drafting the Complaint.  See KPMG Opposition at 6.

KPMG contends that the Defendants' argument -- that the Defendants are "audit clients" and thus, not the "'outsiders' that Congress was concerned about" -- is a "frivolous" argument, because the Act and legislative history contradict this argument.   KPMG Opposition at 7.  KPMG asserts that the Act draws a distinction "between auditors and the regulatory authority, on the one hand, and 'outsiders,' i.e., everyone else, on the other."   KPMG Opposition at 8.  Even if the PCAOB Privilege contained an exception for audit clients, KPMG contends that the Defendants would not benefit from that exception, because KPMG's client was Thornburg Mortgage, not the three officers who are now the Defendants.  See KPMG Opposition at 9.

In KPMG's view, the SEC did not present PCAOB materials in a public proceeding "by allegedly relying on the transcripts of PCAOB testimony in drafting the complaint in this action," because the SEC confirmed that it did not use or rely on that testimony in preparing the

Complaint; even if the SEC relied on the PCAOB material in drafting the Complaint, KPMG argues that drafting is not sufficient to "present" the PCAOB material in a public proceeding, because such a contention would distort the term's ordinary meaning.  KPMG Opposition at 11. "The Oxford English Dictionary defines 'presented' as '[t]o bring or lay before a court, magistrate, or person in authority, for consideration or trial; to make presentment of,' or '[t]o make a formal statement of; to submit (a fact, request, complaint, etc.).'  Oxford English Dictionary (3d ed. 2007) . . . ."  KPMG Opposition at 11 (alterations in original).  Further, such a broad interpretation would, in KPMG's view, conflict with the PCAOB Privilege's purpose: "If 'presented' is interpreted so broadly as to include mere reliance on PCAOB information as background, then PCAOB investigation files would become public and subject to discovery every time the PCAOB shared confidential and privileged information with the SEC under Section 105(b)(5)(B) and the SEC brought an enforcement action."  KPMG Opposition at 11-12 (emphasis in original).

Although the SEC produced KPMG witness questionnaires, KPMG argues that such a disclosure should not waive the privilege: the witness questionnaires contain background information about the witnesses, and not substantive information, and the disclosure was inadvertent.  See KPMG Opposition at 13.  In KPMG's view, the Court should not treat this limited disclosure as a subject-matter waiver, requiring disclosure of all PCAOB material.  See KPMG Opposition at 14.  Further, although the SEC produced PCAOB transcripts in an unrelated case, KPMG argues that the SEC's inappropriate action in a different case does not support disclosure in this case, when KPMG has not waived its privilege.  See KPMG Opposition at 15.  Moreover, KPMG contends that the SEC has asserted the PCAOB Privilege in at least one other case. See KPMG Opposition at 16 (citing SEC v. Aragon Capital Mgmt., LLC,

No. 07-cv-009019 (S.D.N.Y. filed Feb. 8, 2008)).  Finally, KPMG asserts that there "is simply no basis for grafting a judicially-created 'fairness' exception onto the express prohibition of disclosure in Section 105."   KPMG Opposition at 17.   KPMG argues that, although the Defendants rely on the law-enforcement investigatory privilege in fashioning their fairness exception, the law-enforcement investigatory privilege is a creature of common law, is limited and qualified, and can be overridden by other considerations, whereas the PCAOB Privilege is statutory and absolute.  See KPMG Opposition at 18.

5.     **The Defendants' Reply to the MTC Response**.

Replying to the SEC's MTC Response, the Defendants contend that the SEC and KPMG "are together trying mightily to leave Defendants in the dark regarding the overwhelming majority of what is a vast pre-Complaint investigative record."  Defendants' Reply to Plaintiff Securities and Exchange Commission's Opposition to Defendants' Motion to Compel Production of PCAOB Deposition Transcripts and Plaintiff's Notes and Memoranda of Interviews with Non-Party Witnesses at 2, filed January 3, 2013 (Doc. 109)("MTC Reply")(emphasis in original). The Defendants argue that the SEC's "key allegations . . . are based on unsworn interviews with Ms. Hall and Ms. Reinhart," and that, to defend the case properly, to test the SEC's allegations, and to test KPMG witnesses' credibility, they need the SEC's notes of the unsworn testimony and the PCAOB testimony.  MTC Reply at 2-3.

The Defendants argue that the SEC interview notes and memorandum are not "highly protected" work product, because the notes and memorandum contain "factual answers," and even if the notes and memorandum reflect attorney mental impressions, the SEC should redact those impressions and produce the remaining portions of the notes and memorandum; to the extent necessary to resolve the issue, the Defendants request in camera review of the documents.

MTC Reply at 3-4.  Further, the Defendants assert that the SEC has waived any work-product protection by relying on the notes and memoranda and reaffirming its reliance during Hall's deposition.  See MTC Reply at 4.  In the Defendants' view, the SEC concedes that it relied on the unsworn testimony to support key allegations in the Complaint, and that the SEC "voluntarily re-injected its notes into this litigation shortly after this motion was filed," when the SEC's counsel "had Hall testify about her unsworn interviews in an attempt to bolster the credibility of the often evasive and patently incredible testimony she gave during the deposition."  MTC Reply at 5 (emphasis in original).

> Q. Ms. Hall, I just want to ask you, you were asked yesterday about your [off-the-record] meetings with the SEC after your investigative testimony and prior to today.  Do you recall that?
>
> A. Yes.
>
> * * * *
>
> Q. *During any of that [unsworn] testimony, to the best of your recollection, did you tell [the SEC] anything inconsistent with what you told [Defendants' counsel] and myself today?*
>
> A. No.

MTC Reply at 4 (alteration and emphasis in original)(quoting Deposition of Jennifer L. Hall, at 380:10-381:4 (McKenna, Hall), taken December 6, 2012, filed January 3, 2013 (Doc. 109-5)). The Defendants argue that the SEC "cannot have it both ways," relying on the KPMG witnesses' prior unsworn testimony while also invoking work-product protection regarding the notes and memoranda reflecting that testimony.  MTC Reply at 5.  Although the Defendants admit that they have deposed KPMG witnesses, including Hall and Reinhart, they contend that "no one has testified in support of SEC's key 'would have' allegations."  MTC Reply at 6 (emphasis in original).  The Defendants argue that the KPMG witnesses' testimony has been "evasive and

obstructive," and that the "Defendants' ability to depose Hall and Reinhart, therefore, is no substitute for the SEC's contemporaneous notes of answers those witnesses gave both closer in time to the events at issue and under circumstances in which the witnesses had incentives to cooperate."  MTC Reply at 6.  In the Defendants' view, they have demonstrated a substantial need for the SEC's notes and memoranda -- to test the credibility of the KPMG witnesses and the veracity of the SEC's allegations.  See MTC Reply at 7.  To the extent that the unsworn testimony supports the SEC's "would have" allegations, the Defendants contend that the notes and memoranda must be inconsistent with Hall and Reinhart's recent deposition testimony, because their testimony is "peppered with similar non-committal statements about the significance of the allegedly withheld information."  MTC Reply at 8.  On the other hand, "[i]f the unsworn testimony is not consistent with the 'would have' allegations, then the SEC's critical allegations have no evidentiary support."  MTC Reply at 8.  Although the SEC asserts that the Defendants can depose the KPMG witnesses and get the substantial equivalent of the SEC's notes and memoranda, the Defendants argue that Hall and Reinhart's conduct has "effectively denied Defendants the ability to pursue critical lines of questioning . . . ."  MTC Reply at 9.

The Defendants also argue that the SEC should disclose the PCAOB transcripts, because, although the SEC contends that it did not "use or rely" on the PCAOB transcripts in preparing the Complaint, the record reveals that Robinson and Walker reviewed the PCAOB transcripts, "reviewed the Complaint before it was filed," did not "claim[] in their declaration to have somehow compartmentalized what they learned from reviewing the PCAOB testimony from what they learned from other sources prior to reviewing the draft Complaint," and that the SEC has not addressed "whether Robinson and Walker provided comments or edits to the draft Complaint, which presumably was the purpose of their review."  MTC Reply at 10-11.  The

Defendants focus on Robinson's involvement in the investigation and on that he reviewed PCAOB testimony before taking Hall's 2009 sworn testimony: "The SEC's metaphysical suggestion that Robinson somehow segregated the PCAOB testimony in his own mind cannot be the basis for the SEC to refuse to disclose that testimony."  MTC Reply at 11.  The Defendants further assert that the SEC's decision to take testimony from only Hall and Reinhart to pursue "a complex enforcement action suggests that it relied heavily" on the PCAOB transcripts, especially when "at least four other KPMG witnesses performed the bulk of the audit work."  MTC Reply at 11.

The Defendants again point to the eight PCAOB questionnaires and, although the SEC asserts that it inadvertently disclosed those questionnaires, the Defendants argue that the SEC should not "be allowed to cherry pick some documents it wishes to disclose while keeping others under wraps."  MTC Reply at 12.  The Defendants contend that, when the SEC produced "certain key PCAOB materials, the SEC waived the PCAOB Privilege as to the related testimony of these witnesses."  MTC Reply at 12.  Finally, the Defendants argue that the SEC should not take contradictory positions on voluntarily disclosing PCAOB materials: "Because the SEC voluntarily produced PCAOB transcripts in another pending case [SEC v. Jensen], which, like here, involves transactions audited by an accounting firm subject to an ongoing PCAOB investigation, its obligation to undertake consistent and predictable enforcement practices dictates that it do the same here."  MTC Reply at 13.

6.     __The Defendants' Reply to KPMG's Opposition to the Motion to Compel__.

The Defendants contend that KPMG improperly filed the KPMG Opposition, because it filed before seeking to intervene,[14] and that KPMG's arguments reiterate the SEC's arguments except for "a debate over the meaning of certain legislative history concerning the PCAOB privilege," which the Defendants argue is a "rather secondary issue."  Defendants' Reply to Non-Party KPMG LLP's Opposition to Defendants' Motion to Compel at 2, filed January 3, 2013 (Doc. 110)("MTC Reply to KPMG").  In the Defendants' view, KPMG takes "untenable" and "extreme positions" on the PCAOB Privilege, from which "the SEC correctly distances itself," such as that the SEC does not have the authority to waive the PCAOB Privilege, that this litigation is "not a 'public proceeding' within the meaning of Section 105," or that the PCAOB Privilege is absolute.  MTC Reply to KPMG at 4-5.  The Defendants argue: "In sum, KPMG has simply reargued these and other unpersuasive points covered in its pending Motion to Quash. Indeed, even according to the SEC, some or all of these points are not even in dispute between the real parties to this litigation."  MTC Reply to KPMG at 5.

The Defendants contend that KPMG's remaining arguments are "needlessly duplicative" of the SEC's arguments, such as that "the SEC purportedly did not use or rely on the PCAOB transcripts in preparing its Complaint," that the SEC's production of PCAOB questionnaires was "inadvertent," or that SEC v. Jensen is "irrelevant."  MTC Reply at 5-6.  The Defendants contend that the only argument that does not duplicate the SEC's arguments or KPMG's arguments in its Motion to Intervene regards the legislative history of the Sarbanes-Oxley Act of 2002, and that the

---

[14]On December 4, 2012, KPMG filed the KPMG Motion to Quash.  On December 17, 2012, it filed the KPMG Opposition, and almost a month later, it filed the KPMG LLP's Motion to Intervene, filed January 18, 2013 (Doc. 125)("Motion to Intervene").  The Court granted the Motion to Intervene in a separate Memorandum Opinion.  See Memorandum Opinion, filed December 13, 2013 (Doc. 246).

"Defendants are the type of 'outsiders' that the legislative history of 15 U.S.C. § 7215(b)" shows should not get the material.  MTC Reply to KPMG at 7.  Contrary to KPMG's argument, the Defendants contend that, "at the time of the Thornburg restatement, KPMG hardly considered Defendants to be 'outsiders.'   To the contrary, the record shows that KPMG personnel communicated freely about the PCAOB investigation with numerous Thornburg employees, including all of the Defendants."  MTC Reply to KPMG at 8.  The Defendants further argue that the commentary to PCAOB's proposed rule 5108 indicates that "an auditing firm may freely share PCAOB material with its audit client without interfering with the privilege."  MTC Reply to KPMG at 8 (citing Letter from PricewaterhouseCoopers LLP to the PCAOB Re: PCAOB Rulemaking Docket Matter No. 005, Proposed Rules Relating to Investigations and Adjudications, dated August 18, 2003, filed November 28, 2012 (Doc. 90-14)).

   7.    **KPMG's Motion to Quash.**

   KPMG moves the Court for an order quashing, in part, or modifying the Subpoena to Produce Documents that Goldstone and Simmons served on KPMG related to the PCAOB investigation: KPMG argues the PCAOB Privilege prevents disclosure of the documents that Goldstone and Simmons seek.  See KPMG Motion to Quash at 1.  KPMG explains the history of the Sarbanes-Oxley Act of 2002, which "established the PCAOB to oversee the performance of accounting firms and ensure the quality of their audits of public companies," but "a critical part of the regulatory scheme established by Congress, expressly set out in Section 105(b)(5)(A) of the Act, guarantees the confidentiality of PCAOB inspections and investigations."   KPMG Motion to Quash at 2-3.

        This statutory scheme reflects a deliberate policy choice by Congress to foster a
        cooperative relationship between the PCAOB and the accounting firms by
        guaranteeing that PCAOB inspections and investigations would remain
        confidential -- and would not become fodder for discovery in private litigation --

unless and until a final determination by the Board, upheld after review by the
SEC, that there had been a violation of law or auditing standards.

KPMG Motion to Quash at 3.  KPMG argues that the SEC does not have authority to disregard
the PCAOB Privilege, because, in KPMG's view, it is the auditor who holds the privilege and
must consent to share the materials with anyone other than the SEC.  See KPMG Motion to
Quash at 4.  As KPMG explains, the PCAOB may conduct investigations and require testimony
from people associated with registered public accounting firms, and the PCAOB may then share
that information with the SEC and other law enforcement authorities, but "[t]he Act does not
provide any exception to the requirement in [15 U.S.C. § 7215(b)(5)(B)] that the recipient
agency keep the privileged material confidential and privileged."  KPMG Motion to Quash at 6.
In KPMG's view, if "a PCAOB investigation ends without charges being brought," all the
investigation materials "remain confidential, privileged, and exempt from discovery"; if the
PCAOB decides to institute a disciplinary proceeding, the hearing is not public "unless 'ordered
by the Board for good cause shown' and 'with the consent of the parties to such a hearing.'"
KPMG Motion to Quash at 7 (emphasis in original)(quoting 15 U.S.C. § 7215(c)(2); PCAOB
Rule 5203 -- Public and Private Hearings, available at http://pcaobus.org/Rules/PCAOBRules/
Pages/Section_5.aspx#rule5203).    KPMG argues that the "non-public nature of PCAOB
investigations and disciplinary proceedings is a central feature of the enforcement regime created
by the Act," and that "'the PCAOB is virtually unique among similar regulators in that [its]
disciplinary proceedings are required by law to be kept confidential through charging, hearings,
initial decision, and even appeal.'"  KPMG Motion to Quash at 8 (quoting Claudius B. Modesti,
PCAOB Enforcement Actions Update (Dec. 8, 2010), available at http://pcaobus.org/News/
Speech/Pages/12082010_ModestiSpeech.aspx).

KPMG explains that, when the SEC investigated Thornburg Mortgage, KPMG produced over 1.5 million pages of documents, which the SEC produced to the Defendants in this litigation.   See KPMG Motion to Quash at 8-9.   KPMG notes that the PCAOB began investigating KPMG's work for Thornburg Mortgage, and that, ordinarily, the existence of a PCAOB investigation is confidential and privileged, but argues that, by listing certain documents as privileged on the SEC privilege log, the SEC revealed the existence of the PCAOB's investigation of KPMG.  See Motion to Quash at 9 n.8.

On September 18, 2012, the Defendants served on KPMG what KPMG describes as "an exceedingly broad Subpoena," which requests in part documents and information regarding PCAOB's investigation of KPMG.  KPMG Motion to Quash at 9.  For example:

> Request No. 1 not only asks generally for documents concerning KPMG's services for Thornburg in 2007 and 2008 but also asks expressly for "all communications with . . . the PCAOB."  Salter Declaration, Exhibit 1 at 8-9.
>
> Request No. 2 asks for "[a]ll documents or communications concerning any investigation of KPMG in connection with the 2007-2008 services, including an investigation by . . . the PCAOB," specifically including any correspondence with the PCAOB, any documents relating to interviews or testimony of current or former KPMG employees, transcripts, notes or memoranda of such interviews or testimony, and the documents shown to those witnesses during such interviews or testimony.  Id. at 9.  This Request also makes clear that it "includes documents that refer or relate to the PCAOB's findings made after its investigation."  Id.
>
> Request No. 3 asks for documents or communications concerning "any violation by KPMG of . . . PCAOB rules, or professional accounting and auditing practices or standards" in connection with its work for Thornburg.  Id. at 10.
>
> Request No. 7 asks for the identification of all KPMG witnesses interviewed in connection with any investigation of KPMG relating to its work for Thornburg, including the PCAOB investigation.  Id. at 11-12.

KPMG Motion to Quash at 9 (citing Declaration of George A. Salter, executed November 30, 2012, filed December 4, 2012 (Doc. 92)).   KPMG contends that it timely objected to the Defendants' subpoena, asserting the PCAOB Privilege, but that the Defendants argue that the

PCAOB Privilege does not apply to PCAOB investigation-related information in KPMG's possession: in KPMG's view, the Defendants' position is that "documents relating to the PCAOB's investigation and findings are not protected unless they were prepared 'specifically for the Board,' which term they construe in an impermissibly narrow way."  KPMG Motion to Quash at 10.  KPMG says that the Defendants' position "on the scope and operation of the Section 105 Privilege is inconsistent with the privilege created by Congress, are not supported by the statutory language, and would completely eviscerate the confidentiality protections that Congress created for PCAOB investigations and disciplinary proceedings."  KPMG Motion to Quash at 10.

KPMG acknowledges that the PCAOB Privilege is "relatively new," and so there is "little case law to date addressing the scope and application of the privilege."  KPMG Motion to Quash at 12.  The two cases it identifies -- Bennett v. Sprint Nextel Corp. and Silverman v. Motorola, Inc., No. 07 C 4507, 2010 WL 4659535 (N.D. Ill. June 29, 2010) -- involve the privilege arising in PCAOB inspections under Section 104 rather than PCAOB investigations under Section 105, "but the Section 105 Privilege, by its terms, applies equally to both inspections and investigations."  KPMG Motion to Quash at 12 (citing 15 U.S.C. § 7215(b)(5)(A)).

First, KPMG argues that it is entitled to assert the PCAOB Privilege: although the Defendants contend that the PCAOB Privilege "only protects documents in the hands of the PCAOB," both Bennett v. Sprint Nextel Corp. and Silverman v. Motorola, Inc. reject that argument, because it would render the language "prepared . . . for the Board" in Section 105 "superfluous."  KPMG Motion to Quash at 12-13.  KPMG contends that the language in the PCAOB Privilege is "very broad" and does not support a reading that limits the protection to only those documents "in the hands of" the Board.  KPMG Motion to Quash at 13.  Because the

statute refers to "civil discovery," KPMG argues that "Congress intended that the privilege could be asserted by the subjects of PCAOB investigations, and not merely by the PCAOB itself." KPMG Motion to Quash at 14.  KPMG asserts that the legislative history reveals that accounting firms can use the PCAOB Privilege: "Congress was also advised that the effectiveness of prior enforcement efforts was greatly limited because 'firms will not disclose documents or other information that is likely to wind up in the hands of litigants in legal proceedings.'"  KPMG Motion to Quash at 14-15 (quoting Accounting Reform and Investor Protection: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs, 107th Cong., S. Hrg. No. 107-948, at 987 (2002)("The Road to Reform: A White Paper from the Public Oversight Board on Legislation to Create a New Private Sector Regulatory Structure for the Accounting Profession")).  KPMG argues that the authority the Defendants cite does not support the Defendants' narrow reading of the privilege: 15 U.S.C. § 7215(b)(5)(B), for example, "authorizes the PCAOB to share information with other government regulators, but expressly requires them to preserve the confidentiality of the documents and information," and PCAOB Rule 5108 "provides that investigation files 'shall be confidential in the hands of the Board,' but nothing in the Rule supports Defendants' claim that this indicates that documents in the hands of KPMG are not also covered by the privilege."  KPMG Motion to Quash at 15-16.  Neither source, in KPMG's view, supports a reading that allows the agency to waive the privilege. KPMG Motion to Quash at 16.

Second, KPMG argues that the PCAOB Privilege applies broadly to all documents created in response to the PCAOB's investigation and that the Defendants read too narrowly that the privilege applies to those documents that were created "specifically for the Board."  KPMG Motion to Compel at 17.  KPMG asserts that the privilege protects not only that information that

an accounting firm shares with the PCAOB, but also the documents and information that the firm prepares in response to the PCAOB's investigation but does not share with the Board, within the statutory language "prepared . . . in connection with" and "specifically for" the investigation. KPMG Motion to Quash at 17-18.  KPMG contends that Bennett v. Sprint Nextel Corp. supports this position, as does Congress' intent in enacting the PCAOB Privilege -- assuring "the confidentiality of the very existence of PCAOB investigations unless and until either the Board finds a violation and that finding is upheld on appeal to the SEC or the subject of the investigation consents to make it public."  KPMG Motion to Quash at 19.  In KPMG's view, the proper construction of the privilege protects

> internal KPMG documents that, if disclosed, would reveal (1) the inquiries that the PCAOB made; (2) the responses that KPMG prepared and submitted; and (3) the internal communications which reveal the existence of the investigation, any PCAOB investigative inquiries or any information assembled, and responses made by KPMG to those inquiries (including those not otherwise protected from disclosure by the attorney-client privilege or the attorney work product doctrine).

KPMG Motion to Quash at 19.  KPMG argues that Silverman v. Motorola, Inc. does not undermine KPMG's position, because it did not define where the "line should be drawn" between the information and documents that were prepared for the Board, and those that were not.  KPMG Motion to Quash at 20.  KPMG argues that Bennett v. Sprint Nextel Corp. builds on Silverman v. Motorola, Inc., and clarifies that the PCAOB Privilege protects "documents that 'would not exist' but for the inspection or investigation."  KPMG Motion to Quash at 20.

Third, KPMG argues that it has not waived the PCAOB Privilege.  It argues that the statute provides only one way to waive the privilege in a pending PCAOB investigation or proceeding -- if the parties to the PCAOB disciplinary hearing consent to making it public -- and KPMG has not consented to making any documents or information public in this case.  See KPMG Motion to Quash at 21.

Fourth, KPMG contends that the SEC does not have the power to waive the PCAOB Privilege: 15 U.S.C. § 7215(b)(5)(B) permits the PCAOB to share protected information with the SEC without waiving the information's confidential and privileged nature, but (B) "expressly requires that the SEC 'shall maintain such information as confidential and privileged' -- thus the SEC is statutorily barred from disclosing PCAOB investigation material."   KPMG Motion to Quash at 21-22.  "It is only <u>after</u> the PCAOB has sustained charges against the respondent firm or professional and the resulting sanctions are subject to appeal before the SEC that the SEC has the power to make a determination that its proceedings should be public."   KPMG Motion to Quash at 22 (emphasis in original).   KPMG contends that the Defendants' proposed interpretation, under which the SEC can waive the privilege by presenting information or documents "in connection with a public proceeding" under 15 U.S.C. § 7215(b)(5)(A), would render Congress' command that the information be kept confidential in 15 U.S.C. § 7215(b)(5)(B) a nullity.  KPMG Motion to Quash at 23-24.  Instead, KPMG maintains that 15 U.S.C. § 7215(b)(5)(A)'s reference to a "'public proceeding' refers to -- and <u>only</u> to -- a proceeding by the PCAOB under 'subsection (c) of this section,'" which refers to PCAOB disciplinary proceedings.  KPMG Motion to Quash at 24-25 (emphasis in original).

> Thus, the proper construction of the language on which Defendants rely is one under which the Section 105 Privileged materials are no longer confidential and privileged after they have been "presented" in connection with a PCAOB disciplinary hearing which has been made public following a determination by the Board, "for good cause shown," that the hearing should be public, and after the Board has obtained "the consent of the parties to such hearing."

KPMG Motion to Quash at 25.  Finally, KPMG argues that, if the SEC inadvertently or intentionally produced documents containing KPMG's privileged information, the Court should not "embrace a statutory violation as effecting a waiver" of the privilege, but should "enforce KPMG's right to confidentiality by ordering the return of any improperly produced material, and

directing that any such information may not be utilized in the conduct of discovery or trial in this action."  KPMG Motion to Quash at 25.

8.      **The Defendants' Motion to Quash Response.**

In response to the KPMG Motion to Quash, the Defendants argue that, although the PCAOB's investigation is still open, the Court should not view the PCAOB Privilege as an absolute privilege that bars all discovery relating to that investigation or the credibility of the KPMG employee witnesses.  See Defendants' Response in Opposition to Non-Party KPMG LLP's Motion to Quash, in Part, or Modify Subpoena to Produce Documents, and For Protective Order at 2, filed December 21, 2012 (Doc. 105)("MTQ Response").  The Defendants contend that standard privilege waiver principles should apply to the PCAOB Privilege, and that the PCAOB materials lost their privileged status when the SEC reviewed and relied on them in bringing this lawsuit.  See MTQ Response at 2.  As the Defendants view the Complaint, the "lynchpin" is that the "Defendants misled KPMG in connection with 'other-than-temporary impairment' ('OTTI') accounting for Thornburg's 2007 financial statements," yet the Defendants say that discovery has revealed that "KPMG had all the information it needed to make a fully informed OTTI judgment," and that depositions have revealed that KPMG auditors "were so derelict that they failed to consider that information or were so ignorant about basic aspects of Thornburg's business (e.g., not knowing what a 'margin call' was) that they could not understand the information Thornburg provided."  MTQ Response at 2.  "Evidence pertaining to KPMG's lack of professional competence -- the principal subject of the PCAOB's investigation -- is thus highly probative of the SEC's auditor deception theory."  MTQ Response at 2.

The Defendants argue that, although KPMG's counsel indicated at the November 9, 2012, hearing that the witnesses would be made available for the Defendants to depose,

"[c]ounsel for KPMG gave no hint that he would assert the PCAOB Privilege during those depositions to such an extent that Defendants would be prevented from learning anything whatsoever about the PCAOB investigation."  MTQ Response at 4.  The Defendants explain that, during their depositions of KPMG Senior Manager Tara Baucom, KPMG Senior Manager Matthew Plummer, and Hall, KPMG's counsel instructed the witnesses to not answer any questions regarding any aspect of the PCAOB's investigation, "even where the question does not seek 'documents and information prepared or received by or specifically for' the PCAOB." MTQ Response at 5-7.  Further, the Defendants contend that the SEC continues to assert that they did not use or rely on the PCAOB transcripts, even after admitting that two of its staff members reviewed the PCAOB transcripts before helping to prepare the Complaint, and that Robinson, an attorney in the SEC Enforcement Division, "reviewed the PCAOB transcripts, led the SEC's investigative testimony of KPMG witnesses, and reviewed and/or edited the Complaint."  MTQ Response at 4-5.

The Defendants explain that, "[i]n light of the SEC's reliance on PCAOB materials and its close coordination with KPMG in this litigation," the Defendants served a Second Set of Requests for the Production of Documents on the SEC on December 19, 2012, "seeking all communications between the SEC and the PCAOB related to its investigation into KPMG," and additionally served a rule 30(b)(6) "notice for the deposition of an SEC representative knowledgeable about these SEC-PCAOB communications."  MTQ Response at 7-8.  The Defendants assert that the Court's ruling on the Motion to Compel and KPMG Motion to Quash "will provide valuable guidance to the parties and KPMG with respect to the permissible scope of discovery relating to the PCAOB investigation."  MTQ Response at 9.

The Defendants argue that the SEC made the PCAOB transcripts public in connection with this enforcement proceeding:

> [T]he SEC unquestionably relied on information from the PCAOB investigation. Its lead investigator both reviewed the transcripts of the PCAOB depositions of KPMG employees, decided to omit certain questions of those witnesses because the topics had been covered by the PCAOB, and participated in preparing the SEC's Complaint. This same lead investigator also signed the verification page for the SEC's responses to Defendants' interrogatories. These facts alone should end the inquiry. It would be patently unfair to permit a prosecuting government agency such as the SEC to maintain a trove of secret evidence that it relies upon in formulating charges but then withholds from the charged parties.

MTQ Response at 10 (internal citations omitted). The Defendants contend that KPMG's position is "self-serving" and that "the statute contains no language suggesting that its use of the term 'public proceeding' is restricted to public PCAOB proceedings upheld after a review by the SEC." MTQ Response at 10-11. The Defendants point to the statute's disjunctive language, and argue that "the PCAOB privilege applies 'unless and until' the documents or information at issue are 'presented in connection with a public proceeding or released in accordance with subsection (c) of this section.' Subsection (c), in turn, describes PCAOB disciplinary proceedings." MTQ Response at 11 (citations omitted). The Defendants assert that, "[l]ike any evidentiary privilege, the PCAOB Privilege is not absolute and may be waived," and that the SEC has waived the privilege by placing the PCAOB materials in issue: "Unless that information is made available, Defendants will have no means of determining whether it contains exculpatory evidence that the SEC selectively omitted from the Complaint or facts that the KPMG witnesses could not recall in their depositions in this litigation three years later." MTQ Response at 12-13. The Defendants argue that, according to the "well-established principle," the Court should find a waiver in this case, because "'statutes establishing evidentiary privileges must be construed narrowly because [they] impede the search for the truth.'" MTQ Response at 13 (quoting Pierce Cnty. v. Guillen,

537 U.S. 129, 144-45 (2003)).  Although KPMG argues that the SEC does not have the power to waive the PCAOB Privilege, the Defendants contend that KPMG's position ignores that "[t]he SEC plainly has that power by virtue of its general oversight authority over the PCAOB."  MTQ Response at 14.  In the Defendants' view, the SEC waived any privilege it had over the KPMG witness questionnaires after it produced the questionnaires, because neither the SEC nor KPMG objected when the Defendants used the questionnaires while deposing Baucom and Plummer.  See MTQ Response at 15-16.

The Defendants assert that, if the Court adopts KPMG's "expansive construction" of the PCAOB Privilege -- that the PCAOB Privilege protects even communications acknowledging the investigation's existence -- the Defendants would not be able to obtain "plainly discoverable information," such as KPMG witnesses' understanding of potential PCAOB disciplinary action, which would reveal a "strong incentive to accuse Defendants of deception rather than accept responsibility for their own audit failures"; KPMG's communications with the PCAOB over the course of four years that may reveal witness credibility issues; transcripts of PCAOB testimony of KPMG employees, which "likely contain important evidence concerning the accounting issues at the heart of this case" and could reveal inconsistent testimony; and KPMG's communications with the SEC regarding the PCAOB investigation, which are outside the definition of "'documents and information prepared or received by or specifically for' the PCAOB."  MTQ Response at 16-19.

**9.     KPMG's Motion to Quash Reply.**

In reply, KPMG reiterates its argument that the SEC did not present the PCAOB transcripts in a public proceeding, because "the statutory term 'public proceeding' refers specifically and only to a PCAOB enforcement proceeding that has been made public with the

consent of the parties" under 15 U.S.C. § 7215(c), and "does not refer to any civil litigation, brought by the SEC or any other party."  Non-Party KPMG LLP's Reply Brief in Support of its Motion to Quash, in Part, or Modify Subpoena to Produce Documents, and for a Protective Order at 4, filed January 7, 2013 (Doc. 114)("MTQ Reply").  KPMG asserts that Congress' intent was that all governmental agencies, including the SEC, must "maintain such information as confidential and privileged," and that the agencies cannot breach the privilege "simply by filing a lawsuit once they had received PCAOB information."  MTQ Reply at 5.  KPMG maintains that its interpretation of the PCAOB Privilege is not redundant, because it reads 15 U.S.C. § 7215(b)(5)(A) as stating "two ways that privileged information can become public, each 'in accordance with subsection (c)."  MTQ Reply at 6.

> The phrase "public proceeding . . . in accordance with subsection (c)" in Section 105(b)(5)(A) refers to PCAOB disciplinary proceedings, which -- though usually confidential -- can be made public "for good cause shown, with the consent of the parties."  15 U.S.C. § 7215(c)(2).  On the other hand, the statute's reference to information "released in accordance with subsection (c)" refers to the public release of information about disciplinary sanctions imposed by the PCAOB, which must be made public under the Act once sanctions have been imposed.

MTQ Reply at 5-6.  Thus, KPMG asserts that its reading of the PCAOB Privilege is consistent with the statute's language; even if the Court determines the statute is ambiguous, KPMG argues that its "interpretation of 'public proceeding' is the only one consistent with the statutory purposes."  MTQ Reply at 6.  It contends that, if an SEC civil lawsuit is a "public proceeding," and the SEC can "freely waive the privilege simply by receiving privileged information," then the requirement that "the SEC maintain the confidentiality of PCAOB information . . . is rendered meaningless."  MTQ Reply at 6-7 (emphasis in original).

KPMG argues that the PCAOB Privilege protects accounting firms and that only the auditors subject to PCAOB investigations can waive the privilege.  See MTQ Reply at 7.  KPMG asserts that there are limited ways the PCAOB information can become public:

> [I]n a public PCAOB hearing, which would occur only if the PCAOB found "for good cause" that it should be public and all parties consented, 15 U.S.C. § 7215(c)(2); or following imposition of a sanction by the Board not appealed to the SEC (i.e., not stayed on appeal), 15 U.S.C. § 7215(c), (d)(1)(C); or affirmance of a Board sanction by the Commission, 15 U.S.C. § 7215(c), (d)(1)(C), (e).  Absent any of those situations, Congress intended protected information to remain confidential and exempt from discovery by any litigant or release by any government agency.

MTQ Reply at 8 (emphasis in original).  In KPMG's view, because it has "zealously protected its privilege," there is "no basis for any finding of waiver."  MTQ Reply at 9.  Although the SEC has some oversight responsibilities over the PCAOB, KPMG argues that is not a "basis to ignore Section 105(b)(5)(B)'s explicit command that the SEC 'shall maintain such information as confidential and privileged.'"  MTQ Reply at 9-10 (emphasis in original)(quoting 15 U.S.C. § 7215(b)(5)(B)).  Although the Defendants contend that withholding information from them is unfair, KPMG points out that "[w]ithholding information from a litigant is the natural consequence of the application of any evidentiary privilege."  MTQ Reply at 11.  KPMG asserts that Congress made a policy determination in creating the PCAOB Privilege and that, while the "Defendants may dislike that policy determination," the Court must enforce it.  MTQ Reply at 12.  Finally, KPMG contends that the Defendants have speculated as to what they may find in the PCAOB transcripts, which is insufficient to overcome the privilege, and that the "Defendants have sufficient information to effectively cross-examine KPMG witnesses . . . ."  MTQ Reply at 12-13.

**10.      The SEC's Motion for Protective Order.**

On December 19, 2012, the Defendants served the Notice of Deposition Pursuant to Fed.

R. Civ. P. 26 and Rule 30(b)(6) Directed to Plaintiff Securities and Exchange Commission, filed

January 15, 2013 (Doc. 121-3)("Notice of Deposition"), covering eleven topics:

> 1.      YOUR COMMUNICATIONS with the PCAOB concerning the 2007-2008 SERVICES.

> 2.      YOUR COMMUNICATIONS with the PCAOB concerning the PCAOB INQUIRY.

> 3.      YOUR COMMUNICATIONS with the PCAOB concerning the SEC INQUIRY.

> 4.      YOUR COMMUNICATIONS with the PCAOB concerning the facts alleged in the COMPLAINT.

> 5.      YOUR COMMUNICATIONS with the PCAOB concerning the SEC ENFORCEMENT ACTION.

> 6.      YOUR COMMUNICATIONS with K[PM]G concerning the 2007-2008 SERVICES.

> 7.      YOUR COMMUNICATIONS with K[PM]G concerning the PCAOB INQUIRY.

> 8.      YOUR COMMUNICATIONS with K[PM]G concerning the SEC INQUIRY.

> 9.      YOUR COMMUNICATIONS with K[PM]G concerning the facts alleged in the COMPLAINT.

> 10.      YOUR COMMUNICATIONS with K[PM]G concerning the SEC ENFORCEMENT ACTION.

> 11.      YOUR collection and production of DOCUMENTS in response to Request No. 3 of Defendants' First Set of Requests for the Production of Documents to Plaintiff Securities and Exchange Commission.

Notice of Deposition at 6-7.  The Defendants also served the Defendants' Second Set of

Requests for the Production of Documents to Plaintiff Securities and Exchange Commission,

filed January 15, 2013 (Doc. 121-4)("Second RFP"), requesting "All COMMUNICATIONS between YOU and the PCAOB concerning the 2007-2008 SERVICES, the PCAOB INQUIRY, the SEC INQUIRY, the facts alleged in the COMPLAINT, or the SEC ENFORCEMENT ACTION," Second RFP at 7, and the Defendants' Third Set of Requests for the Production of Documents to Plaintiff Securities and Exchange Commission, filed January 15, 2013 (Doc. 121-5)("Third RFP"), requesting "All COMMUNICATIONS between YOU and KPMG concerning the 2007-2008 SERVICES, the PCAOB INQUIRY, the facts alleged in the COMPLAINT, or the SEC ENFORCEMENT ACTION," Third RFP at 7.

The SEC moves the Court to issue a protective order and quash the Notice of Deposition, Second RFP, and Third RFP, because they are "oppressive and unduly burdensome," "duplicative and cumulative of other discovery already conducted," and "invade[] various privileges and protections."   Motion for Protective Order at 9.   The SEC argues that the requested discovery is irrelevant: the "Defendants' attempts to delve into opposing counsel's communications with the PCAOB and KPMG are not relevant to the claims against them, any defenses to those claims, or, indeed, any factual issue in the case," because the SEC's pre- and post-filing conduct is irrelevant to the current case.   Motion for Protective Order at 9.   The SEC notes that the Defendants have "implied that the SEC is somehow acting improperly in bringing claims against them.   They contend that the SEC is secretly using PCAOB materials against them without disclosing those materials, despite sworn statements of the SEC to the contrary."   Motion for Protective Order at 10.   The SEC asserts that "[t]hese wholly unfounded allegations cannot support the Defendants' requested invasion into the SEC's work product," and that the Defendants' discovery requests are nothing more than a "proposed fishing expedition" that would be "highly unproductive, a waste of time, and significantly prejudicial to the SEC."

Motion for Protective Order at 10.  The SEC argues that the Defendants must carry a heavy burden to justify probing into the SEC's internal processes, which they cannot do, and that allowing the Defendants to depose an SEC attorney on their "unfounded allegations of misconduct" would have a "chilling effect" on the pre-charging conduct between the SEC and parties similarly situated to the Defendants.  Motion for Protective Order at 11.

The SEC argues that, by seeking to depose the SEC about its communications with KPMG and the PCAOB, the "Defendants are effectively seeking to depose opposing counsel," because the SEC lawyers were the people who communicated with KPMG and the PCAOB. Motion for Protective Order at 11.  The SEC does not assert that its communications with KPMG are privileged, but that deposing an SEC attorney would violate the work-product doctrine, because it would involve the attorney's mental impressions; instead, the SEC argues that the Defendants should explore the KPMG and SEC communications by deposing KPMG witnesses. See Motion for Protective Order at 12.  "What an attorney chooses to ask a witness, what his memory recalls as important, or what she chooses to record in her notes, necessarily reflect the attorney's mental impressions, conclusions, and opinions.  Attorney recollections of witness interviews, like notes or memoranda, are subject to heightened protection."  Motion for Protective Order at 13.

The SEC contends that the Defendants are not entitled to depose the SEC's attorneys, because they cannot meet the three-part test in Shelton v. American Motors Corp, 805 F.2d 1323 (8th Cir. 1986), which specifies that a deposition of opposing counsel is "only appropriate 'where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.'"  Motion for

Protective Order at 14 (quoting <u>Shelton v. Am. Motors Corp.</u>, 805 F.2d at 1327).  On the first

prong -- that "no other means exist to obtain the information" -- the SEC contends that, for every

category of information, the Defendants have alternative sources.  Motion for Protective Order at

14.  To the extent that the Defendants seek discovery regarding the SEC's communications with

KPMG witnesses, the SEC notes the similarity of the request in the Motion to Compel for the

SEC's notes and memoranda from KPMG witness interviews; in the SEC's view, the Defendants

cannot show that they need either form of discovery from the SEC, because the Defendants have

deposed the KPMG witnesses and could obtain the same information from those witnesses.  <u>See</u>

Motion for Protective Order at 14-15.  To the extent that the Defendants seek discovery

regarding the SEC's communications with KPMG's counsel, the SEC explains that, in an

attempt to avoid a discovery dispute, it "produced e-mails sent to or received from KPMG

counsel prior to the filing of this lawsuit," and so the Defendants must now be requesting the

"SEC's correspondence with KPMG's counsel during the litigation, and the SEC's recollections

of all conversations with KPMG counsel"; the SEC questions the relevance of those

communications to the Defendant, but states that such "information could be obtained from

KPMG's counsel as easily as it could be from SEC's counsel."  Motion for Protective Order at

15.  The SEC argues that its production of communications before filing the Complaint does not

create a subject-matter waiver as to all communications with KPMG and that its production

"should not be the basis for the wholesale invasion of Plaintiff's work product."  Motion for

Protective Order at 15 n.4.  The SEC argues that the final category of requested information --

the SEC's counsels' recollections of communications with the PCAOB -- can also be obtained

from PCAOB attorneys rather than SEC counsel.  <u>See</u> Motion for Protective Order at 15.  On the

second prong -- that "the information sought is relevant and nonprivileged" -- the SEC asserts

that the "SEC counsel's communications with KPMG witnesses, KPMG counsel, and PCAOB representatives are not relevant to the SEC's claims that Defendants violated the securities laws or any conceivable defense thereto."  Motion for Protective Order at 16.  The SEC also argues that what the SEC counsel recalls is protected as attorney work product and that communications with the PCAOB are privileged.  See Motion for Protective Order at 16.  Regarding the third prong -- that "the information is crucial to the preparation of the case" -- the SEC contends that, even if the Defendants could show that the information it seeks is relevant, they cannot show that it is crucial.  Motion for Protective Order at 16.  As the SEC understands the Defendants' request, the Defendants seek to show that "KPMG witnesses cooperated with the SEC by providing unsworn interviews and attorney proffers," but the SEC asserts that the Defendants do not need to depose the SEC's counsel to show that, because the SEC has already "identified several KPMG interviews and proffers."  Motion for Protective Order at 16-17.  To the extent the Defendants want the information for impeachment purposes, the SEC asserts that, by deposing the KPMG witnesses, the Defendants already have what they need to impeach the witnesses at trial.  See Motion for Protective Order at 17.  Further, to the extent that the Defendants are trying to prove improper coordination between the SEC, KPMG, and the PCAOB, the SEC states that the Defendants may not pursue a "fishing expedition," and that the "SEC has offered to respond to a discovery request that asks it whether it provided any promise, inducement, or incentive, or agreed to forbear from taking any action, in exchange for KPMG's cooperation or testimony," which "obviates the need to depose SEC's counsel about all  communications with the PCAOB and KPMG to explore Defendants' speculations of improper conduct."  Motion for Protective Order at 17-18.

The SEC emphasizes that the PCAOB Privilege and the Deliberative Process Privilege protect its communications with the PCAOB.  See Motion for Protective Order at 18.  As discussed in its other motions, the SEC reiterates that it has not presented its communications with the PCAOB in a public proceeding, and thus the exception in 15 U.S.C. § 7215(b)(5)(A) does not apply.  See Motion for Protective Order at 19.  The SEC also asserts the deliberative-process privilege, which "protects the government's decision-making process to 'prevent injury to the quality of the agency's decisions.'"  Motion for Protective Order at 19 (quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151 (1975)).  The SEC argues that it meets the privilege's two requirements -- "the material must be pre-decisional and it must be deliberative" -- and the Defendants cannot overcome the privilege, because they cannot show "sufficient need."  Motion for Protective Order at 19 (citation omitted).  "Discussions between the SEC and PCAOB about investigation strategy and charging decisions are paradigmatic of the types of communications that should be immune from civil discovery.  And Defendants can show no need for these communications in defending this action."  Motion for Protective Order at 19.

The SEC argues that, for the same reasons it set forth regarding the Notice of Deposition, the Court should quash the Second RFP and the Third RFP.

**11.     The Defendants' Motion for Protective Order Response.**

The Defendants respond with a timeline that, in their view, demonstrates that Reinhart's and Hall's testimony has shifted through time:

> In 2009, Ms. Reinhart and Ms. Hall testified under oath to the SEC that they did not know whether the information Defendants allegedly failed to disclose to KPMG would have altered their judgment that Thornburg did not need to recognize an "other than temporary impairment" ("OTTI") on its Purchased ARM Assets in fiscal 2007.
>
> Notwithstanding that testimony, the SEC's March 2012 Complaint in this case alleged that "[h]ad the Defendants provided Thornburg's outside auditor with

accurate and complete information . . .   Thornburg's outside auditor would have disagreed with the company's OTTI conclusion . . . ."  [Complaint ¶ 83, at 24].

Shortly after the Complaint was filed, Ms. Reinhart and Ms. Hall received written assurance from the SEC that they would not be prosecuted.  In the course of discovery, the SEC informed Defendants that unsworn interviews with Ms. Reinhart and Ms. Hall formed the basis for paragraph 83 of the Complaint.

Then, in their December 2012 depositions, Ms. Reinhart and Ms. Hall altered their testimony again, claiming -- that it was "likely" or "possible" they would have disagreed with Defendants' OTTI conclusion had the allegedly undisclosed information been known to them.

Defendants' Response in Opposition to Plaintiff Securities and Exchange Commission's Motion for Protective Order to Quash Defendants' Notice of 30(b)(6) Deposition and Second and Third Requests for the Production of Documents at 2, filed January 23, 2013 (Doc. 126)("MPO Response").  The Defendants assert that the testimony changed "after Ms. Reinhart, Ms. Hall and their counsel had multiple unsworn communications with the SEC in 2011 and 2012 -- communications that have been cloaked in secrecy thus far."   MPO Response at 2.   The Defendants urge the Court to deny the Motion for Protective Order, because (i) as the "chief accusers" against the Defendants, Reinhart's and Hall's credibility is a relevant subject for discovery; (ii) the Defendants do not seek to depose opposing counsel, because the SEC is free to designate "any appropriately prepared representative it chooses to testify on its behalf"; (iii) the SEC's communications with KPMG and the PCAOB are not privileged, and the work-product doctrine and deliberative-process privilege do not apply "given that the SEC's influence on the testimony of KPMG witnesses is itself at issue"; and (iv) the SEC waived whatever privilege the PCAOB materials once had by relying on them.  MPO Response at 3-4.  The Defendants argue that the SEC's action against them is "'quasi-criminal' in nature," and that, given the "draconian remedies" the SEC seeks against them -- "permanent injunctions, harsh civil monetary penalties, and permanent bars from ever again serving as public company officers or directions" -- the

Court should "not hamstring Defendants by preventing them from fully exploring the grounds for the KPMG witnesses' change in testimony."  MPO Response at 4.

First, the Defendants assert that the information they seek is relevant, because it addresses the KPMG witnesses' credibility.  See MPO Response at 6.  The Defendants describe the background of the SEC's Complaint; the SEC did not provide factual support in the Complaint for its allegation that, had the Defendants provided KPMG with "'accurate and complete information,'" KPMG "'would have disagreed with the company's OTTI conclusion . . . .'"  MPO Response at 7 (quoting Complaint ¶ 83, at 24).  Although the SEC responded to an interrogatory that testimony from Reinhart and Hall supports the SEC's allegation that KPMG would have disagreed with the OTTI conclusion, the Defendants contend that Reinhart's and Hall's 2009 investigative testimony "was flatly inconsistent with paragraph 83 of the Complaint."  MPO Response at 7.  The SEC later explained that unsworn testimony supports the allegation, but refuses to produce the notes and memoranda from those interviews, which is partially the subject of the Motion to Compel.  See MPO Response at 8.  After the "SEC conducted no less than five unsworn interviews or proffer sessions with Ms. Reinhart, Ms. Hall, or their attorneys in 2011 and 2012," the SEC sent Reinhart and Hall "Investigation Closure Letters," which, in the Defendants' view, assured them that "the staff of the SEC's Enforcement Division would not recommend to the Commission that enforcement action be taken against them."  MPO Response at 9.[15]  The Defendants contend that, when they deposed Hall and

_____

[15]The SEC contends that the Defendants' assertion that the SEC assured Reinhart and Hall would not be prosecuted is inaccurate.  See MPO Reply at 9 n.3.  It explains that "[c]losure letters are issued in accordance with an Advisory Committee recommendation in the 'usual . . . practice' and 'must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from the staff's investigation of that particular matter.'"  MPO Reply at 9 n.3 (quoting Procedures Relating to the Commencement of Enforcement

Reinhart in December, 2012, the witnesses "for the first time" stated on the record that the Defendants' "alleged omissions likely would have led KPMG to disagree with the company's OTTI conclusion" and that "it was 'possible' KPMG would have reached a different OTTI conclusion." MPO Response at 9-10. Yet, in the Defendants' view, their discovery reveals that "KPMG had all the information it needed to make an informed OTTI judgment" and that any failure to recognize the significance of that information "was due to KPMG's own lack of competence." MPO Response at 10. The Defendants point to problems they faced when they took the KPMG witnesses' depositions, including that Hall gave false testimony regarding whether the SEC made any representations to her that she would not face sanctions, that Hall "claimed to recall almost nothing about her unsworn interviews with the SEC and was instructed not to answer questions about any aspect of the PCAOB investigation," and that Reinhart "unilaterally terminated her deposition before the questioning was complete." MPO Response at 10-11. The Defendants assert that their current discovery requests, which are the focus of the Motion for Protective Order, address "persistent gaps in the SEC's document production." MPO Response at 11. The Defendants argue that they have "ample cause to believe that material evidence supporting their defenses is being withheld from them." MPO Response at 12. In the Defendants' view, Reinhart and Hall have an "obvious incentive" to "'play ball' with the SEC" after receiving the SEC's assurances that it will not recommend any actions against them, and that the "pendency of the PCAOB investigation" has given them "even greater incentive to support the SEC's claims by shifting blame to Defendants in the hope of avoiding PCAOB disciplinary action for their audit failures." MPO Response at 12. The Defendants assert that

---

Proceedings and Termination of Staff Investigations, dated September 27, 1972, filed January 23, 2013 (Doc. 126-1 at 4)).

Reinhart's and Hall's credibility is relevant, and that the Court should permit them to inquire "into the SEC's dealings with the KPMG witnesses and the PCAOB."  MPO Response at 13.

Next, the Defendants assert that rule 30(b)(6) of the Federal Rules of Civil Procedure allows them to depose a governmental agency and that the SEC should not be treated differently from other organizations.  See MPO Response at 14.  The Defendants argue that the SEC's argument that the Defendants are attempting to depose opposing counsel "is a red herring," because the SEC may choose its designee, and that person does not need to be an SEC attorney. MPO Response at 15.  The SEC's reliance on the three-part test for deposing opposing counsel is, according to the Defendants, misplaced.  The Defendants note, however, that, even under that standard, they should be allowed to proceed with discovery, because (i) Hall's and Reinhart's unsuccessful depositions leave the Defendants without any means to obtain the requested information, (ii) the information pertains to Hall's and Reinhart's credibility, which is relevant and non-privileged, and, (iii) the information is crucial, because Hall and Reinhart are the SEC's chief witnesses.  See MPO Response at 15 & n.10.  The Defendants argue that, to preclude the deposition simply because most SEC employees are lawyers would eviscerate rule 30(b)(6) as applied to the SEC and similar governmental agencies staffed similarly to the SEC.  See MPO Response at 16.  The Defendants contend that, "[o]n an issue as important as the SEC's influence on the testimony of key witnesses, that would be patently unfair to Defendants."  MPO Response at 16.

Third, the Defendants argue that the SEC cannot rely on the work-product doctrine and deliberative-process privilege.  See MPO Response at 16.  The Defendants contend that, even if the SEC might rely on its lawyers' memories or notes to prepare a representative to testify, that does not exempt the SEC from the rule 30(b)(6) procedure: "It is well established that facts, even

when committed to memory or documented by a lawyer, are not protected by the work product doctrine." MPO Response at 17. The Defendants contend that "the salient issue" is not mental impressions, but "whether the actions of SEC lawyers had the effect of unduly influencing the testimony of KPMG witnesses." MPO Response at 17. Further, the Defendants assert that the KPMG witnesses' shifting testimony after "extensive unsworn communications with the SEC and being assured by the SEC that they would not be prosecuted has put the activities of SEC lawyers directly at issue." MPO Response at 18. The Defendants argue that the SEC's actions waived any work-product protection it once had, because those actions placed the contents of the communications at issue "by including allegations in its Complaint and advancing arguments before the Court based on those very communications." MPO Response at 18. Moreover, in the Defendants' view, compelling circumstances overcome the work-product doctrine in this case, because the Defendants "cannot obtain sufficient information about the SEC interviews and proffers from the KPMG witnesses, either because of their faulty memories or their refusal to cooperate, or because they occurred through KPMG's counsel." MPO Response at 18. The Defendants contend that deposing an SEC representative is the only way to obtain information about communications between the SEC and the KPMG witnesses' lawyers, and between the SEC and the PCAOB, because the KPMG witnesses may not have knowledge of the conversations, and deposing the KPMG witnesses' attorney or the PCAOB's counsel "would impose the cost and inconvenience of this discovery on third parties rather than on the plaintiff that initiated this action -- an unfair result." MPO Response at 19. In response to the Second RFP and the Third RFP, the Defendants say the SEC has disregarded the requirement to provide a privilege log, instead asserting a blanket work-product protection, which is insufficient to meet its burden to show that the doctrine applies. See MPO Response at 20-21.

The Defendants further assert that the SEC cannot rely on the deliberative-process privilege, because "communications with third parties such as the PCAOB are, by definition, not covered by the deliberative process privilege."  MPO Response at 21 (citing SEC v. Kovzan, No. 11-2017, 2012 WL 4819011, at *6 (D. Kan. Oct. 10, 2012)).  The Defendants contend that the SEC has not met its burden to invoke the privilege:

> To invoke the privilege, "(1) the department head with control over the matter must make a formal claim of privilege, after personal consideration of the matter; (2) the responsible official must demonstrate, typically by affidavit, precise and certain reasons for preserving confidentiality of the documents in question; and (3) the official must specifically identify and describe the documents."  SEC v. Sentinel Mgmt. Grp., Inc., No. 07-c-4684, 2010 WL 4977220, at *5 (N.D. Ill. Dec. 2, 2010).  The SEC has met none of these requirements.

MPO Response at 21-22.  Further, the Defendants say that the SEC has not shown that the protected information is "predecisional" and "deliberative," because the SEC has not provided enough information about the communications, but rather has made a blanket assertion, which the Defendants contend is "insufficient on its face."  MPO Response at 22.  Additionally, "[o]nce an agency makes a final decision about whether to initiate enforcement action, the information that led to the final decision loses its pre-decisional status and is no longer privileged."  MPO Response at 22.  The Defendants contend that the SEC "waived whatever deliberative process privilege may have once applied," because the SEC asserted the privilege as a result of its own affirmative act, i.e., filing this action; the Defendants argue that the SEC made the information relevant by alleging that the Defendants deceived KPMG during the 2007 audit and that applying the privilege would deny the Defendants the ability to impeach KPMG witnesses.  MPO Response at 23.

Finally, the Defendants argue that the PCAOB Privilege does not apply, because the SEC presented the information in connection with a public proceeding by relying on it in drafting the

Complaint and when the SEC voluntarily produced eight PCAOB questionnaires.  See MPO Response at 24-25.

### 12.    The SEC's Motion for Protective Order Reply.

The SEC contends that the Defendants do not offer "any sound basis for their speculations" that the SEC colluded with or threatened KPMG witnesses, and that the Defendants "fabricate a fishing expedition in an attempt to support" their theory.  Plaintiff Securities and Exchange Commission's Reply in Support of its Motion for a Protective Order to Quash Defendants' Notice of 30(b)(6) Deposition and Second and Third Requests for the Production of Documents at 2, filed January 28, 2013 (Doc. 136)("MPO Reply").  The SEC states that the Defendants had an opportunity to ask Reinhart and Hall "why their positions supposedly changed at their depositions," but that the Defendants did not ask that question; instead, the SEC argues, the Defendants "seek to subject opposing counsel to the harassing practice of being deposed -- directly or through surrogates -- by their adversaries."  MPO Reply at 3.  The SEC notes:

> Defendants fail to mention a crucial piece of evidence in this matter -- the Citibank reservation of rights letter that was withheld from KPMG during both the 2007 audit and restatement -- that was not discovered by the SEC or shown to Ms. Reinhart or Ms. Hall until after their 2009 testimony.

MPO Reply at 3.  The SEC contends that this reservation-of-rights letter explains the shift in Hall's and Reinhart's testimony, of which the Defendants complain.  See MPO Reply at 4.  The SEC states: "Far from evidencing threats or collusion, Ms. Reinhart's and Ms. Hall's deposition testimony simply reflects their learning of the additional information that the Defendants had improperly withheld from them."  MPO Reply at 7.  Further, the SEC points to two other KPMG witnesses' testimony, which indicates that the "Citibank letter would have been important to their OTTI analysis and conclusion," and that neither of those witnesses spoke with the SEC

before their depositions; the SEC stresses how difficult it would be for it to have threatened or colluded with these witnesses without communicating with them.  MPO Reply at 7.

Although the Defendants assert that they are not attempting to depose opposing counsel, the SEC argues that the "Defendants' claim that the SEC can designate a non-lawyer to testify is a 'red herring,'" because the SEC trial and investigative counsel would have to educate the designated representative, and it is the "source of the information that matters, not the designee." MPO Reply at 8.  The SEC again emphasizes that the Defendants could have obtained this information from Hall or Reinhart, but that the Defendants failed to ask those witnesses about their communications with the SEC during the depositions.  See MPO Reply at 8-9.

Regarding the Defendants' assertions that the SEC waived the work-product doctrine's protection, the SEC points out, as the Defendants admit, that the SEC is unable to depose the Defendants' counsel; the SEC argues that the Defendants should be held to the same standards as the SEC, and should get the information they seek during witness depositions or trial, and not through deposing opposing counsel.  See MPO Reply at 9-10.  The SEC also notes that, if it waived its work-product protection by including in the Complaint allegations based on its communications with the KPMG witnesses, the work-product doctrine would be meaningless. See MPO Reply at 10.  The SEC contends that the "central issue" in this case is "whether Defendants knowingly or recklessly provided materially misleading information to the investing public," and that the KPMG witnesses "will testify as to what they were and were not told by Defendants in connection with their audit of Thornburg's financial statements"; although the Defendants speculate that the SEC's communications with the KPMG witnesses and the PCAOB will reveal collusion, and provide "fodder to impeach the KPMG witnesses," this possible impeachment would be true in "any case for any witness -- including any witness with whom

Defendants' counsel has spoken."  MPO Reply at 11.  The SEC contends that the Defendants cannot show compelling circumstances to depose opposing counsel.  See MPO Reply at 11-12. Further, the SEC asserts that the Defendants' argument that the SEC failed to update its Withheld Documents List, filed November 28, 2012 (Doc. 90-3), is meritless, because the SEC listed PCAOB communications on that list, and its response to the Third RFP was not yet due.  See MPO Reply at 12.  Regarding the deliberative-process privilege, the SEC argues that the privilege applies to inter-agency communications; it notes that, while the Defendants indicate that the deliberative-process privilege "may not apply to a communication provided to a third party, that issue arises when the third party is not a government agency."  MPO Reply at 12-13. Thus, the SEC asserts that the deliberative-process privilege protects its communications with the PCAOB.  See MPO Reply at 13-14.

Finally, the SEC argues that it has not waived the PCAOB Privilege, because it did not rely on PCAOB materials in the Complaint or otherwise present them in this case, and it has submitted four declarations so stating.  See MPO Reply at 14.

### 13.     January 30, 2013 Hearing.

The Court held a hearing on January 30, 2013.  See Transcript of Hearing, taken January 30, 2013, filed February 11, 2013 (Doc. 144)("Jan. 30, 2013 Tr.").  The Court began with preliminary comments on the motions, and explained that, because the PCAOB Privilege is codified, a court may not be able to "import all the law of attorney/client privilege [or] work product privilege into this statute."  Jan. 30, 2013 Tr. at 9:10-12 (Court).  Regarding the transcripts, the Court noted that there is no dispute that, "at a basic level," the transcripts "are privileged and confidential and can't be used in a case unless they are presented in a proceeding."  Jan. 30, 2013 Tr. at 10:6-11 (Court).  The Court said that such a proceeding could

be any public proceeding and not the particular proceeding tied to section (c), for which KPMG argued.  See Jan. 30, 2013 Tr. at 10:6-17 (Court).  Further, the Court explained that the parties may have "read too much into" what it had said at the November 9, 2012, telephonic hearing, and clarified that the SEC would have presented the PCAOB transcripts if "they had the transcript in front of them and they were just copying what was in the transcript into the complaint," but that, if an attorney simply read the transcripts and then later worked on the Complaint with that information in his or her head, that was not enough to say that the SEC presented the transcript in the Complaint.  Jan. 30, 2013 Tr. at 10:21-11:5 (Court).  The Court indicated its hesitancy to import waivers into the statutory language and said it would likely focus instead on whether the materials were presented in court.  See Jan. 30, 2013 Tr. at 11:12-18 (Court).  The Court said it was inclined not to compel the PCAOB transcripts, and further, that it did not initially think that it would compel the SEC's notes and memoranda of interviews with KPMG witnesses, either.  See Jan. 30, 2013 Tr. at 11:19-25 (Court).

The Court allowed the Defendants to structure the argument at the hearing according to the three categories of discovery that the Defendants seek: (i) "communications between the SEC and KPMG; both KPMG witnesses, such as Ms. Reinhart and Ms. Hall; and KPMG lawyers, primarily Mr. Salter"; (ii) "the SEC's verbatim notes and interview memoranda, if any, of the KPMG witness interviews and proffers"; and (iii) "PCAOB information . . . ."  Jan. 30, 2013 Tr. at 21:6-20 (Marks).

The Defendants noted that the Motion to Compel and the Motion for Protective Order address the first category: communications between the SEC and KPMG.  See Jan. 30, 2013 Tr. at 22:4-7 (Marks).  First, the Defendants explained that they have seen, through privilege log entries and other sources, that "there were ongoing and substantial oral communications between

the SEC and KPMG," both with KPMG's witnesses and between the lawyers; and second, the Defendants explain that the SEC voluntarily produced the written communications between the SEC and KPMG up until May, 2012.  Jan. 30, 2013 Tr. at 22:12-21 (Marks).  The Defendants say that, although the SEC has produced some of its investigation materials, the SEC has not produced "the vast majority," including "critical oral communications between the SEC and KPMG."  Jan. 30, 2013 Tr. at 22:25-23:9 (Marks).  The Defendants contend that they have not received "almost 90 percent of known testimony, interviews and proffers," and that the "analogy to the government in a criminal situation is apt in the sense that they've given us some, but they've foreclosed almost all of it, which we would be able to get in that context."  Jan. 30, 2013 Tr. at 23:18-23 (Marks).  The Court explored the analogy to a criminal case and asked how the Defendants could obtain the information they seek; the Defendants said the 30(b)(6) deposition is their main vehicle for the communications between the SEC and KPMG.  See Jan. 30, 2013 Tr. at 23:24-24:13 (Court, Marks).  The Defendants stated that, contrary to how the SEC has portrayed this request, the Defendants are not seeking to depose the SEC's counsel to explore trial preparation, but that they want to question the SEC's representative about the investigative period leading up to the Complaint and about the "verbatim interviews" with KPMG witnesses.  Jan. 30, 2013 Tr. at 24:24-25:15 (Marks).  The Court asked how the SEC representative would remember the interviews; the Defendants said that the SEC representative would likely have the interview notes and memoranda, which are the subject of the second category of discovery, and that the deposition would additionally aid the Defendants in understanding any handwritten notes.  See Jan. 30, 2013 Tr. at 15:16-26:16 (Court, Marks).  The Court agreed with the Defendants' argument that it should not preclude the 30(b)(6) deposition based on the likelihood that the SEC would name an attorney as the appropriate representative, but asked at what point

the SEC could assert a work-product privilege, considering that a large portion of the SEC's investigations are with an eye toward litigation, see Jan. 30, 2013 Tr. at 26:22-28:4 (Marks, Court); the Defendants argued that the SEC conducts "a number -- and maybe the majority -- of investigations without ever pursuing any action," and that the point at which an investigation is in anticipation of litigation is on a spectrum, Jan. 30, 2013 Tr. at 28:5-16 (Marks).   The Defendants contended that the SEC's communications in this case could not be work product; in their view, although the notes and memoranda could be work product, the portion of the written materials that are "essentially verbatim" or the interviews or proffers are, "at best, fact work product, which Courts have routinely permitted the other side to obtain . . . ." Jan. 30, 2013 Tr. at 29:6-22 (Marks).   The Defendants suggested that the Court could view the notes and memoranda *in camera*, and strike any opinions or mental impressions.  See Jan. 30, 2013 Tr. at 29:23-25 (Marks).  The Defendants said that they would explore during the deposition whether the SEC waived any work product by sharing it with the KPMG witnesses or attorneys; the Court expressed doubt that speaking with third parties would necessarily waive work product, and the Defendants argued that sharing with a third-party who is a consulting expert may not waive the protection, but sharing with a third party witness would.  See Jan. 30, 2013 Tr. at 30:14-32:11 (Court, Marks).  The Court clarified that work product is different than privilege and that it is "skeptical" of subject-matter waivers on work product, especially because work product is not useful unless the attorney is "selectively disclosing it and using it at the appropriate time."  Jan. 30, 2013 Tr. at 32:15-24 (Court).

The Defendants turned to their concern that unsworn testimony supports the assertion in the Complaint regarding what the KPMG auditors "would have" done with different information; the Court questioned whether the SEC was making a legal conclusion rather than relying on a

specific KPMG employee's statements; the Defendants admitted they did not know whether the allegation was a legal conclusion or based on KPMG witnesses' direct statements.  See Jan. 30, 2013 Tr. at 33:23-36:20 (Marks, Court).   The Court noted that, if the SEC "listened to a discussion and then they reached some impression, conclusion, opinion, or legal theories as the attorneys for SEC," that the situation is "classic work product."  Jan. 30, 2013 Tr. at 37:1-6 (Court).   The Defendants responded that, if the SEC attorneys' notes from the interviews are work product, then the SEC waived the "work product privilege as to the facts that were told to them" by putting the allegations in the Complaint; further, the Defendants mentioned that the SEC injected the factual work product into the record during Hall's deposition, when, according to the Defendants, the SEC attempted to "bolster" Hall's credibility by asking: "'Ms. Hall, is there anything that you told us in the interviews and proffers that preceded this deposition that is inconsistent with what you've testified here today during the entire deposition?'"  Jan. 30, 2013 Tr. at 37:11-38:6 (Marks).  The Court noted that, although the Defendants seem to argue that it is unfair not to have the previous notes and memoranda, the question that the SEC asked Hall at the end of her deposition helps the Defendants, because if she says something different at trial, it will be easy for the Defendants to impeach her.   See Jan. 30, 2013 Tr. at 38:7-20 (Court).   The Defendants stated that they did not view the question the same way and that they want the opportunity to explore whether the previous statements are inconsistent with the deposition testimony to attack her credibility.   See Jan. 30, 2013 Tr. at 38:21-40:20 (Court, Marks).   The Defendants argued that the key cases on this issue are SEC v. Kramer, 778 F. Supp. 2d 1320 (M.D. Fla. 2011), and SEC v. Jensen, Case No. CIV 11-05316 (C.D. Cal. Oct. 12, 2012), and that those cases do not require them to seek evidence through the other witnesses, although they have attempted to get that evidence from witnesses without any success, and that the SEC cannot

refuse a 30(b)(6) deposition, even if it might cause them to designate a lawyer.  See Jan. 30, 2013 Tr. at 41:14-42:6 (Marks).  The Court agreed that the issue is not whom the SEC selects as its representative, but rather, whether the Defendants are entitled to the information.  See Jan. 30, 2013 Tr. at 42:7-10 (Court).

The Defendants further addressed the Court's analogy to criminal practice, and said that, if this were a criminal case, an FBI agent rather than an attorney would have interviewed the witnesses, and that the FBI agents would have prepared memoranda that the prosecutor would disclose to the defendants; the SEC, on the other hand, uses primarily attorneys, and sometimes accountants, as its investigators, and that the SEC's investigators can make notes, but do not have to produce those notes to the defendants.  See Jan. 30, 2013 Tr. at 46:8-47:3 (Lee). According to the Defendants, another difference is that, in criminal trials, the prosecutor must disclose impeachment and potentially exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), but there is not an analogous requirement for the SEC, which is why the Defendants argue they "can't just take the SEC's word at it because they don't have an obligation to tell us."  Jan. 30, 2013 Tr. at 47:4-23 (Lee). The Defendants maintain that the analogy to criminal cases is useful to reveal why they should be free to pursue the discovery they have requested.  See Jan. 30, 2013 Tr. at 47:24-48:19 (Court, Lee).  The Court asked how the case compares to a "straight dispute between two corporations," and whether one party's counsel could depose opposing counsel; the Defendants distinguished the questions that the parties could ask, stating that they planned to ask fact questions, such as "What did you say to Mr. Salter," rather than questions to explore the attorney's mental thought processes, such as "[W]hy did you say that to Mr. Salter?".  Jan. 30, 2013 Tr. at 48:20-49:19 (Court, Lee).  The Court questioned whether the Defendants would favor the consequences of

such an approach to discovery; the Defendants said that, in most cases, deposing opposing counsel would not be necessary, but it ran into "a dead end" when Hall could not remember what she told the SEC or what topics they covered.  Jan. 30, 2013 Tr. at 49:20-51:13 (Court, Lee).  The Court noted that the Defendants were not seeking facts so much as inconsistencies, and it doubted whether they could show a compelling need for impeachment material; the Defendants argued that impeachment material is an appropriate subject for discovery.  See Jan. 30, 2013 Tr. at 52:4-53:11 (Court, Lee).

The SEC asserted that it has given the Defendants "everything we're required to give them under the federal rules and then some," and that it produced its communications with KPMG up to the date of the closure letters "in an attempt to avoid this hearing [and] these motions to compel."  Jan. 30, 2013 Tr. at 54:5-12 (McKenna).  The SEC clarified that it has not produced "some attorney interview notes that the investigative attorneys took while investigating this case . . . because we do believe that those were generated in anticipation of litigation."  Jan. 30, 2013 Tr. at 54:17-21 (McKenna).  Its position is that the Defendants may depose the KPMG witnesses to try to determine what questions the SEC asked, but that the Defendants may not depose the SEC attorneys or discover the attorneys' notes; although the Defendants say they cannot get the information they need from Reinhart or Hall, the SEC contends that the Defendants did not ask Hall or Reinhart why their testimony "supposedly changed."  Jan. 30, 2013 Tr. at 54:21-55:23 (Lee).  The SEC admitted that Hall's and Reinhart's testimony changed from 2009, but asserted that the change occurred after the SEC investigators found the Citigroup Global[16] reservation of rights letter and that the Defendants should not be able to invade work

_____

[16]Although the SEC referred to the "Citibank" letter at the hearing, the Court thinks it meant Citigroup Global, based on its Complaint.  See Complaint ¶ 29, at 9 ("Thornburg was late in meeting margin calls under, and thereby violated, its lending agreements with at least three

product based on speculation.  See Jan. 30, 2013 Tr. at 55:25-57:14 (Court, McKenna).  The SEC

agreed with the Court that some of the notes and memoranda likely included opinion work

product and fact work product, but asserted that the attorneys would not have taken verbatim

notes; rather, which facts the attorneys recorded would reflect, to an extent, what the attorney

thought was important.  See Jan. 30, 2013 Tr. at 57:15-59:3 (Court, McKenna).  The Court asked

how to draw a line between fact and opinion work product; the SEC asserted that there is a

sliding scale, and that attorney opinion work product deserves heightened protection, whereas

factual work product may be easier to discover.  See Jan. 30, 2013 Tr. at 59:5-61:6 (Court,

McKenna).  When pressed about how the SEC might use its notes and memoranda that it is

trying to protect from the Defendants' discovery, the SEC said it would likely use the notes to

structure its questioning at trial, but would not use the notes to impeach the witnesses.  See Jan.

30, 2013 Tr. at 61:14-62:20 (Court, McKenna).  The SEC also agreed with the Court's earlier

analysis, and noted that the KPMG witnesses did not state unequivocally that they would have

changed their conclusions in the Thornburg Mortgage audit with different information, but

asserted that the Complaint is based on the SEC counsel's legal conclusions.  See Jan. 30, 2013

Tr. at 62:21-63:14 (Court, McKenna).  The SEC explained that it did not ask Hall the final

question in her deposition to bolster her credibility, but "to undercut this argument that there has

been . . . some different statement that she made to us in private under duress with some threat

that now is being withheld from defendants, because that's just not the case."  Jan. 30, 2013 Tr.

at 64:5-10 (McKenna).  The SEC argued that the Defendants already have evidence that they

could use to impeach Hall and Reinhart, and that they do not need to depose the SEC's counsel

to get that information; further, the SEC said that the Defendants should not be able to depose

---

lenders," including "Citigroup Global Markets Limited."); id. ¶ 34, at 11 (describing the
Citigroup Global reservation of rights letter).

opposing counsel simply because they think they "might come up with something useful to them." Jan. 30, 2013 Tr. at 64:12-65:12 (McKenna).

The Defendants argued that they want to "explore why there were inconsistencies," and that they are not alleging that the SEC has threatened the KPMG witnesses; although the Defendants agreed that there is a difference between fact and opinion work product, they asserted that they are entitled to the fact work product, because they have "substantial need and cannot obtain the substantial equivalent." Jan. 30, 2013 Tr. at 68:15-70:13 (Court, Marks). The Court observed that the SEC's explanation for the change in testimony "seems rather logical . . . for any tension" in Hall's and Reinhart's 2009 testimony, and the recent deposition testimony; the Defendants argued that, despite the SEC's explanation, they need the notes and memoranda even more, because the SEC disclosed that it talked to the witnesses about the Citigroup Global letter, constituting an additional waiver of the contents of those interviews and proffers. See Jan. 30, 2013 Tr. at 71:14-73:3 (Court, Marks). The Defendants also said that the Citigroup Global letter was not a notice of default, as the KPMG witnesses seemed to indicate, but a reservation of rights for "Citigroup to declare a notice of default in the future if Thornburg didn't satisfy the call, which is fundamentally different from what Ms. Reinhart said was that document and why it was important to her." Jan. 30, 2013 Tr. at 73:4-17 (Marks). The Defendants argued that they would want the interview notes and memoranda to impeach the KPMG witnesses; the Court questioned whether the Defendants' plan to impeach the witnesses with the prior unsworn testimony would support the SEC's case, and the Defendants stated that they could not know that their approach would help the SEC without seeing the notes. See Jan. 30, 2013 Tr. at 73:21-77:14 (Court, Marks). The Defendants argued that the notes and memoranda might come in at trial if the SEC tries to refresh the witnesses' recollection, or use the notes as trial preparation,

and that they do not want to have to wait until that time to review the unsworn testimony; in response to the Court's questioning, the SEC told the Court that it would not use the notes and memoranda to refresh a witness' memory at trial and that it would not use the notes during its trial preparation.  See Jan. 30, 2013 Tr. at 78:11- 80:11 (Marks, Court, McKenna).

The SEC argued that the Defendants have not shown that the information they seek is not available by other means, because the Defendants have deposed Hall and Reinhart; further, the Defendants have not shown that they have a substantial need for the material, because "it's not crucial to have some additional cumulative evidence."  Jan. 30, 2013 Tr. at 84:1-23 (McKenna).

The Court said that it did not think the Defendants could show "a substantial need either at the heightened area for opinion testimony or at the lower standard for fact . . . work product," and that it would not compel the production of the SEC's communications with KPMG through the 30(b)(6) deposition or the SEC's notes and memoranda.  Jan. 30, 2013 Tr. at 85:6-20 (Court).

The Defendants and the Court reviewed the Court's initial comments about the PCAOB Privilege, and that the statute provides a waiver of the privilege when the materials are produced in a public proceeding or released in accordance with subsection (c), but that the Court was reluctant to import other waiver principles into the statute.  See Jan. 30, 2013 Tr. at 85:24-86:19 (Marks, Court).  The Defendants noted that, of the two cases that address the PCAOB Privilege, the Bennett v. Sprint Nextel Corp. court applied "common law waiver principles."  Jan. 30, 2013 Tr. at 86:20-87:8 (Marks).  The Court asked how applying waiver principles to the statute could be consistent with Congress' intent, when the statute specifies that the PCAOB materials are to be "confidential and privileged"; the Defendants argued that Courts import waiver principles onto other statutory privileges.  Jan. 30, 2013 Tr. at 87:9-24 (Court, Marks).  The Defendants agreed with the Court that the PCAOB Privilege is unique among privileges, and said that it did

not want to focus too much on whether the Court could import common law waiver principles, see Jan. 30, 2013 Tr. at 88:12-18 (Marks); the Defendants directed the Court to instead focus on what information is privileged in the first place, see Jan. 30, 2013 Tr. at 93:3-6 (Marks).  The Defendants argued that the privilege does not protect: (i) "KPMG witnesses' understanding of potential exposure to the PCAOB disciplinary action," (ii) "KPMG's communications with the SEC regarding the PCAOB investigation," and (iii) "internal communications within KPMG" involving documents not "prepared specifically for the board," yet the Defendants "have been foreclosed from that discovery."   Jan. 30, 2013 Tr. at 93:3-94:4 (Marks).   The Defendants contended that, at the November 9, 2012, telephonic hearing, KPMG's counsel stated that the KPMG witnesses would be available, but that KPMG and the SEC did not allow the Defendants to ask any questions about the PCAOB process.  See Jan. 30, 2013 Tr. at 94:13-95:5 (Marks). Regarding the third category of information, the Defendants asserted that the Silverman v. Motorola, Inc. court held that the PCAOB Privilege does not protect "internal communications that were not prepared or received specifically for the board."   Jan. 30, 2013 Tr. at 96:1-14 (Marks).   The Defendants argued that the SEC waived the PCAOB Privilege by presenting PCAOB materials in a public proceeding: (i) Robinson reviewed the PCAOB transcripts and later reviewed the Complaint; (ii) during the SEC testimony, Robinson "said that he was going to skip lines of questioning during this SEC testimony because those topics already had been covered in the PCAOB testimony," (iii) Robinson introduced the PCAOB questionnaires as exhibits in the SEC testimony; (iv) Robinson "declined to take testimony from any other KPMG witnesses" besides Hall and Reinhart, and (v) the SEC produced the PCAOB questionnaires and did not object when the Defendants used them during the depositions. Jan. 30, 2013 Tr. at 97:8-99:19 (Marks).  The Defendants further asserted that the SEC voluntarily produced PCAOB

transcripts in <u>SEC v. Jensen</u>, but that the SEC has not explained why the SEC is holding inconsistent views on the PCAOB Privilege.  <u>See</u> Jan. 30, 2013 Tr. at 99:20-100:19 (Marks). The Defendants argue that "a federal law enforcement agency like the SEC should not be permitted in contemporaneous actions to take fundamentally inconsistent positions about something so important as disclosing PCAOB transcripts."  Jan. 30, 2013 Tr. at 100:20-24 (Marks).  Anticipating KPMG's and the SEC's arguments, the Defendants argued that the SEC's disclosures were not inadvertent: the Defendants marked the PCAOB questionnaires, and no one objected, and so "it was either a conscious decision" to let the Defendants have the questionnaires, or "it was incredible ineptitude" to not catch that the questionnaires were from the PCAOB, and that, because this case involves "very skilled lawyers," it was not an inadvertent disclosure. Jan. 30, 2013 Tr. at 101:15-102:8 (Marks).  The Defendants said that they agree with the SEC and KPMG that "merely receiving PCAOB information or merely filing a lawsuit is insufficient to present" PCAOB material and waive the PCAOB Privilege, but that the SEC has relied on the PCAOB materials in this case in connection with the Complaint, and then voluntarily disclosed the materials later; according to the Defendants, these actions constitute presenting the PCAOB materials in a public proceeding.  Jan. 30, 2013 Tr. at 102:14-103:2 (Marks).  Although KPMG takes the position that this lawsuit is not a public proceeding, the Defendants noted that the SEC disagrees with that position, and the statute does not support that argument.  <u>See</u> Jan. 30, 2013 Tr. at 103:3-10 (Marks).  Further, although KPMG argues that the SEC does not have power to waive the PCAOB Privilege, the Defendants pointed out that the SEC does not agree with that position, and that both KPMG and the SEC hold the PCAOB Privilege.  <u>See</u> Jan. 30, 2013 Tr. at 104:9-105:1 (Marks).  Regarding <u>SEC v. Jensen</u>, the Defendants argued that the SEC in that case disclosed PCAOB materials for fairness concerns,

but that KPMG and the SEC in this case cannot show why the SEC should not similarly voluntarily disclose the PCAOB materials to the Defendants.  See Jan. 30, 2013 Tr. at 105:2-106:21 (Marks).

The SEC argued that it is "fundamentally unfair" to have already decided the PCAOB Privilege issues at the November 9, 2012, telephonic hearing, and to reargue the "same issue on a Motion to Compel when the Defendants have already been heard."  Jan. 30, 2013 Tr. at 109:17-20 (McKenna).  The SEC said that, after the November 9, 2012, telephonic hearing, it followed the Court's instructions, asked its staff if anyone relied on the PCAOB transcripts, and, when it discovered that no one relied on the transcripts while working on the Complaint, informed the Defendants, "but quite frankly, they didn't believe us."  Jan. 30, 2013 Tr. at 109:24-110:16 (McKenna).  Although Robinson read the PCAOB transcripts and reviewed the Complaint, "he swore that the last time he remembered looking at a transcript was in August of 2009.  That's over two and a half years before he reviewed the Complaint."  Jan. 30, 2013 Tr. at 111:10-14 (McKenna).  The Court asked why the SEC did not want to turn the PCAOB transcripts over to the Defendants, especially in light of the SEC's position in SEC v. Jensen; the SEC stated that it could only respond on behalf of the trial team in SEC v. Goldstone, and that, as that trial team understands the PCAOB Privilege, "we are supposed to protect [PCAOB materials] unless and until presented in the public proceeding," and that, although the trial team could use the materials offensively, they are trying to err on the side of caution by not disclosing the materials.  Jan. 30, 2013 Tr. at 111:21-113:11 (Court, McKenna).  The SEC admitted that there is some tension between its position in this case and the position that a different regional office took in SEC v. Jensen, but contended that SEC v. Jensen should not control the outcome of this case and how the Court interprets the PCAOB Privilege.  See Jan. 30, 2013 Tr. at 115:9-117:14 (McKenna,

Court).  The SEC argued that it did not present the PCAOB materials in this case, although it could have presented the materials by copying them into the Complaint, citing them in the disclosures, or using them at depositions or at trial.  See Jan. 30, 2013 Tr. at 114:2-6 (McKenna). The SEC indicated that keeping the PCAOB materials confidential furthered the accounting firms' cooperation with the PCAOB during investigations; the Court asked whether the firms had much of a choice in cooperating, and the SEC responded that, while firms must cooperate, keeping materials confidential could foster more openness between the accounting firms and the PCAOB.  See Jan. 30, 2013 Tr. at 114:7-115:1 (McKenna, Court).  The SEC responded to the three categories of information that the Defendants argued was not privileged: (i) regarding KPMG witnesses' understandings of PCAOB investigation, the SEC acknowledged that it did not "have a dog in that fight," but argued that asking a witness "what is your understanding of the . . . PCAOB's investigation against you" goes against the purpose of the statute; (ii) regarding KPMG's communications with the SEC, the SEC noted that the content of the communications would not be privileged, but that the Defendants should not be able to depose the SEC's counsel to obtain the information; and (iii) regarding internal KPMG documents about the PCAOB investigation, the SEC argued that Silverman v. Motorola, Inc. was an "unduly narrow description of what it means to be prepared for or by the Board," and that the description in Bennett v. Sprint Nextel Corp. is a "much more reasonable reading" that protects "why communications are taking place."  Jan. 30, 2013 Tr. at 119:14-122:23 (McKenna, Court).  The SEC reiterated its contention that it inadvertently produced eight two-page questionnaires, in the midst of "over 2 million pages of documents," and that such a small production does not waive the PCAOB Privilege.  Jan. 30, 2013 Tr. at 123:4-10 (McKenna).  Further, even if the Court determines that the disclosure was not inadvertent, the questionnaires cover background

information such as the witnesses' names, addresses, and telephone numbers, and so "the inference that we were somehow purposefully injecting this, presenting this in a public proceeding to gain some advantage is -- is preposterous." Jan. 30, 2013 Tr. at 124:9-125:9 (McKenna). Finally, the SEC asserted that, to whatever extent it may have waived the PCAOB Privilege by producing a limited number of PCAOB documents, the "scope should be limited" and should not result in a subject-matter waiver. Jan. 30, 2013 Tr. at 126:4-8 (McKenna).

KPMG began by discussing the history of the Sarbanes-Oxley Act, the creation of the PCAOB, and the background of the PCAOB Privilege. See Jan. 30, 2013 Tr. at 127:3-131:17 (Salter). Turning to how the PCAOB Privilege works, KPMG argued that the SEC cannot waive the PCAOB Privilege, because it, like any other governmental agency, is directed to maintain the information it receives as confidential and privileged. See Jan. 30, 2013 Tr. at 130:21-131:5 (Salter). KPMG explained that Congress intended PCAOB's oversight system to remain confidential and that, if "civil litigants are allowed to breach that confidentiality, . . . it opens the door to a broader breach which will undermine the regulatory system." Jan. 30, 2013 Tr. at 134:10-21 (Salter). KPMG contended that there are two ways to present the PCAOB materials in a public proceeding, which it determined by referencing 15 U.S.C. § 7215(c) and (d): (i) "PCAOB investigative material can be made public during a pending investigation or disciplinary proceeding . . . with the consent of all the parties," or (ii) if there is a finding of sanctions at the end of an investigation, then that finding must be disclosed to the public. Jan. 30, 2013 Tr. at 135:17-137:3 (Salter, Court). KPMG argued that this confidentiality is important to an auditor, because the auditor's reputation is "really one of the primary assets that a professional has"; Congress's statutory scheme protects the auditor's confidentiality "until there's a finding that a sanction is warranted," which encourages cooperation between the auditor

and the PCAOB until that point.  Jan. 30, 2013 Tr. at 138:1-13 (Salter).  KPMG said that it would not make sense for the SEC to be able to waive the privilege when the statute provides that the PCAOB cannot waive the privilege.  See Jan. 30, 2013 Tr. at 138:14-139:3 (Salter).  The Court and KPMG discussed how to read 15 U.S.C. § 7215(b)(5)(B), especially the last phrase in that section -- "each of which shall maintain such information as confidential and privileged" -- and why Congress separated the SEC from other entities, such as the Attorney General, other federal agencies, and various state attorneys general or agencies; the Court questioned whether the phrase requiring the entities to maintain the information as confidential and privileged bound the SEC, or only the other entities listed in the statute.  Jan. 30, 2013 Tr. at 139:7-140:23 (Court, Salter).  KPMG said it did not find legislative history regarding that question, but that it thought the statute treats the SEC differently from the other entities, because the PCAOB would more regularly share with the SEC, and so it would not require the same PCAOB discretion.  See Jan. 30, 2013 Tr. at 140:13-23 (Salter).  The Court then questioned, if KPMG's interpretation regarding the meaning of a "public proceeding" was correct, why Congress used the phrase "public proceeding" in section (b)(5)(A) but used the phrase "public hearing" in section (c): KPMG admitted that it would have been cleaner for Congress to use the same words, but that "the only way to read that statute consistent with the intent that Congress has reflected in putting the effort into describing all of the ways that this cannot be disclosed, is to read that narrowly. And as we've interpreted, it's consistent with that reading."  Jan. 30, 2013 Tr. at 142:1-18 (Court, Salter).  KPMG explained that, in 15 U.S.C. § 7215(b)(5)(A), it views "in accordance with subsection (c)" as relating to both "in connection with a public proceeding" and "released." Jan. 30, 2013 Tr. at 144:3-8 (Salter).  KPMG argued that this case would therefore not be a public proceeding under the statute.  See Jan. 30, 2013 Tr. at 146:1-5 (Court, Salter).  Regarding

the three categories of information that the Defendants asserted were outside the PCAOB Privilege's scope, KPMG explained that: (i) it instructed the KPMG witnesses not to answer any questions regarding potential PCAOB disciplinary action, except they could answer yes or no questions if they remembered the dates of depositions and who was present, see Jan. 30, 2013 Tr. at 152:18-153:8 (Salter, Court); (ii) it was not aware of documents relating to KPMG's communications with the SEC regarding the PCAOB, see Jan. 30, 2013 Tr. at 153:9-19 (Salter, Court); and (iii) that, when it comes to KPMG internal documents, Silverman v. Motorola, Inc. and Bennett v. Sprint Nextel Corp. explain that the PCAOB Privilege protects those documents that "would not exist" but for the PCAOB investigation, Jan. 30, 2013 Tr. at 153:21-155:11 (Marks, Court, Salter).  Focusing on the third category, the Court asked whether it would be reasonable to require KPMG to prepare a privilege log for those materials; the Court noted that it was "inclined to think that the Bennett v. Sprint Nextel Corp. court was too broad in saying that anything that is related to the investigation is going to fall within this language."  Jan. 30, 2013 Tr. at 157:6-158:4 (Court).  KPMG argued that preparing a privilege log could reveal the status of the PCAOB's investigation, in which case preparing the privilege log would itself reveal privileged information.  See Jan. 30, 2013 Tr. at 158:5-17 (Salter).  When the Court asked about two accountants exchanging electronic mail transmissions, stating "[t]his is a crazy investigation" or "[w]e got a real problem here," KPMG said the PCAOB Privilege would protect those communications to the extent they were discussing the substance of the investigation; the Court said that the phrase "all documents and information prepared specifically for the Board" seems to be "much more narrow" than KPMG's interpretation.  Jan. 30, 2013 Tr. at 158:18-159:12 (Court, Salter).  KPMG emphasized that it produced over a million and a half pages to the SEC, which the SEC produced to the Defendants; further, KPMG said it is not

preventing questions about the audit or communications with Thornburg Mortgage. See Jan. 30, 2013 Tr. at 161:22-162:4 (Salter). KPMG agreed with the SEC's position that SEC v. Jensen should not dictate the outcome of this case and with the Court's interpretation of the PCAOB Privilege. See Jan. 30, 2013 Tr. at 162:5-11 (Salter). It argued that, while the Defendants argue withholding information would be unfair, "the nature of a privilege is that some parties have access to documents while others will not," Jan. 30, 2013 Tr. at 163:16-22 (Salter). The Court asked KPMG if it wanted to "make a backup argument" regarding the meaning of "public proceeding" in section (b)(5)(A); KPMG said that it "looked very closely at the statute and at the legislative history, and I don't think you can make a backup argument about what that means that's consistent with the legislative intent" and section (b)(5)(B). Jan. 30, 2013 Tr. at 164:19-165:12 (Court, Salter). The Court suggested that the SEC or the accounting firm could present the PCAOB material in a federal court, and that the reference to subsection (c) would not have to refer to information that is "presented in connection with a public proceeding." Jan. 30, 2013 Tr. at 165:13-166:2 (Court). KPMG argued that the Court's reading "would undercut the language" in section (b)(5)(B), which requires that the agencies hold the information as confidential and privileged. Jan. 30, 2013 Tr. at 166:3-16 (Salter).

When the Court asked the SEC how it would read section (b)(5)(A), the SEC agreed with the Court's interpretation; for section (b)(5)(B), it said that the phrase "each of which shall maintain such information as confidential and privileged" would likely apply to the SEC and to the other entities listed, because section (b)(5)(B) begins with the phrase "[w]ithout the loss of its status as confidential and privileged in the hands of the Board," which "clearly applies to" the SEC and the other entities. Jan. 30, 2013 Tr. at 166:22-167:20 (Court, McKenna). The SEC noted that it is "not completely comfortable" with KPMG's position that the accounting firms

could use the PCAOB materials against the SEC, but the SEC could not use the materials against the accounting firm unless the accounting firm consented.  Jan. 30, 2013 Tr. at 169:6-12 (Court, McKenna).

The Defendants observed that "there has become some significant common ground among the SEC, us, and what I'm sensing is from the Court in the interpretation of this statute" and that the PCAOB Privilege "cannot be interpreted to allow KPMG to use the [PCAOB] transcripts and not the SEC," and further, that a federal court proceeding, such as the present case, can be a public proceeding under section (b)(5)(A).  Jan. 30, 2013 Tr. at 170:20-171:10 (Marks).  Regarding section (b)(5)(B), the Defendants argued that any of the entities would have discretion to disclose PCAOB materials in a public proceeding; the Court asked whether that interpretation would render the phrase "each of which shall maintain such information as confidential and privileged" superfluous, and the Defendants admitted that its reading would reach the same result regardless if that phrase applied to the SEC or just the other listed entities.  Jan. 30, 2013 Tr. at 173:15-175:5 (Court, Marks).  The Defendants argued that, in light of the SEC's actions in <u>SEC v. Jensen</u>, where the SEC "made the decision in that case in the interest of fairness to voluntarily disclose the transcripts," the SEC in this case also "has the discretion" to disclose the PCAOB materials.  Jan. 30, 2013 Tr. at 176:7-20 (Marks).  Further, the Defendants argued that KPMG asserts that "the fact of the [PCAOB] investigation itself is privileged," but that the "SEC provided us a privilege log that identified the fact and identified multiple communications"; KPMG clarified that, because the SEC's privilege log revealed that it was withholding the PCAOB transcripts, "we allowed the witness to answer whether they were deposed and the date," but, on a "clean slate," KPMG believes the fact of the PCAOB investigation is privileged.  Jan. 30, 2013 Tr. at 178:3-23 (Marks, Salter, Court).  The Court

indicated that, despite the Defendants' argument for waiver, it would not "be very sympathetic to an argument" that preparing a privilege log waives the privilege.  Jan. 30, 2013 Tr. at 179:6-14 (Court).  The Defendants clarified that they were not arguing that the privilege log waives the privilege; rather, they brought up the point to recognize that, like SEC v. Jensen, the SEC has discretion to disclose the PCAOB materials in this case.  See Jan. 30, 2013 Tr. at 179:15-24 (Marks).  The SEC noted that a "potential fair reading of this statute" is that the SEC has the discretion to disclose PCAOB materials if it chooses to do so, but that the facts in this case show that it has "not presented anything in a public proceeding."  Jan. 30, 2013 Tr. at 181:7-19 (McKenna).

The Court stated that it would take the issues under advisement, but it would issue rulings to help the parties move forward in discovery: the Court said that "the best interpretation of this is that . . . all documents and information prepared or received by or specifically for the Board is more narrow than anything that relates to the Board or relates to the PCAOB," and so it would likely approach the PCAOB Privilege differently than Bennett v. Sprint Nextel Corporation.  Jan. 30, 2013 Tr. at 190:10-24 (Court).  Regarding the last phrase of section (b)(5)(A) -- "unless and until presented in connection with a public proceeding" -- the Court said it did not think that a "public proceeding" is the same as a "public hearing" in subsection (c), and that "public proceedings" would include "a Federal trial or Federal proceeding," and thus could apply in this case.  Jan. 30, 2013 Tr. at 190:25-191:9 (Court).  In section (b)(5)(B), the Court said that the phrase "without the loss of its status as confidential and privileged in the hands of the Board" refers to the PCAOB and not the other entities listed; the Court said it wanted to further study the phrase "each of which shall maintain such information as confidential and privileged," and that, as the Defendants argued, it "may not may any difference" whether it applies to the SEC,

because section (b)(5)(B) would refer back to the last clause in section (b)(5)(A) -- "unless and until presented in connection with a public proceeding or released in accordance with subsection (c)," § 105(b)(5)(A), but the Court said it thinks the SEC as well as the accounting firm could choose to disclose the PCAOB material.  Jan. 30, 2013 Tr. at 191:10-192:11 (Court). The Court noted "some value" in finding symmetry in the statute, and said that it would be "uncomfortable with the position that KPMG could disclose this information under its consent powers" in (c)(2), but the SEC could not disclose the information over KPMG's objection.  Jan 9 Tr. at 191:25-192:5 (Court).  "It seems to me that while probably these provisions were a lot of give and take back when the act was enacted to protect accountants, I think still the SEC's oversight power is -- was probably the driving force for having this provision in here.  And I'm inclined to think that the SEC in an action such as this one could choose to use material that the Board has provided to it."  Tr. at 192:5-11 (Court).  Using that interpretation, the Court said it would sustain KPMG's objections to the questions regarding the first category of information -- KPMG witnesses' understanding of the PCAOB investigation -- and that KPMG's counsel drew "a fairly clear distinction between the Board and SEC" when deciding which questions to object to, and that he did not object to questions aimed at, for example, Hall's understanding of the SEC investigation, but only her understanding of the PCAOB investigation. Jan. 30, 2013 Tr. at 192:12-193:5 (Court).

The Court said that the parties would need to produce the second category of information -- KPMG's communications with the SEC regarding the PCAOB; while KPMG has represented that no documents fall within this category, the Court noted that KPMG would need to certify that fact and ensure that it is true, but then the Defendants would need to accept that representation.  See Jan. 30, 2013 Tr. at 194:9-18 (Court).  The Court indicated that the PCAOB

transcripts would fall within this category, because the transcripts are now in the SEC's possession; the SEC could "probably waive the privilege" if it decides to use the transcripts in a public proceeding, but the Court said that the SEC does not have to do so.  Jan. 30, 2013 Tr. at 194:18-195:5 (Court).  "If I adopt this sort of viewpoint, it seems to me that [the SEC] can do a selective sort of presentation of material in connection with this Federal lawsuit."  Jan. 30, 2013 Tr. at 195:7-11 (Court).  The Defendants asked if the Court's ruling on the second category of information included oral communications; the Court noted that KPMG represented that there was nothing in writing, but the Defendants could depose KPMG witnesses or counsel to determine the extent of oral communications between KPMG and the SEC regarding the PCAOB, but the Defendants could not depose the SEC's counsel.  See Jan. 30, 2013 Tr. at 195:25-197:6 (Marks, Court).  KPMG asked for further clarification, because it contended that the only KPMG witnesses who spoke to the SEC were Hall and Reinhart, and that they did not communicate with the SEC about the PCAOB; further, Mr. Salter, KPMG's attorney, said he has been careful to limit his communications with the SEC to avoid discussing the PCAOB, and so he is not aware of any oral communications between KPMG and the SEC that would fit the second category of information.  See Jan. 30, 2013 Tr. at 197:17-199:10 (Court, Salter, Marks).  The Defendants noted that, "if it turns out that there are no documents of that sort in communications, and it turns out that there were no oral communications by KPMG through its lawyer or otherwise about the PCAOB, then it may be a null set"; the Court suggested that KPMG's counsel could confirm with the KPMG witnesses that no communications fall within the second category and send a letter to the Defendants' counsel.  See Jan. 30, 2013 Tr. at 199:12-25 (Marks, Court).  KPMG clarified that it has not attempted to prevent any disclosures

regarding its communications with the SEC and that it has tried diligently to protect the PCAOB. See Jan. 30, 2013 Tr. at 200:1-8 (Salter).

Regarding the third category of information -- KPMG's internal documents -- the Court said that there would likely be overlapping privileges between attorney-client, work product, and the PCAOB Privilege, and so KPMG would probably have to prepare a privilege log "before any of it can really make sense." Jan. 30, 2013 Tr. at 193:6-11 (Court). The Court noted that the parties could agree that certain documents would not have to be logged, such as "documents that Hogan sent to KPMG," but that, without an agreement, KPMG would need to include everything on the log. Jan. 30, 2013 Tr. at 193:14-20 (Court). The Court warned, however: "[B]e careful for what you ask for because you may end up having to log some of your documents if you're the requesting party. So you may just want to agree that that type of document's not going to need to be logged." Jan. 30, 2013 Tr. at 193:20-24 (Court). The Court concluded that KPMG's internal communications that "were not specifically prepared for the Board, [and] weren't received from the Board," would be discoverable, unless the attorney-client privilege or work-product doctrine protects them. Jan. 30, 2013 Tr. at 193:24-194:8 (Court).

## RELEVANT LAW REGARDING DISCOVERY

The proper scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Information sought is relevant "if the discovery appears reasonably calculated to lead to discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Federal courts have held that the scope of discovery under rule 26 is broad. See Gomez v. Martin Marrietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve full disclosure of all potentially

relevant information."). The federal discovery rules reflect the courts' and Congress' recognition that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329 U.S. 495, 507 (1947). As a result of this policy, rule 26 "contemplates discovery into any matter that bears on or that reasonably could lead to other matter that could bear on any issue that is or may be raised in a case." Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 649-650 (D.N.M. 2007)(Browning, J.)(internal quotation marks omitted).

A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim." McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002)(unpublished).[17] "'Discovery . . . is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'" Rivera v. DJO, LLC, 2012 WL 3860744, at *8 (quoting Tottenham v. Trans World Gaming Corp., No. 00 Civ. 7697, 2002 WL 1967023, at *2 (S.D.N.Y. 2002)(Knapp, J.)). See Hardrick v. Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C. 1983)(noting that courts do, and should, remain concerned about "fishing expeditions, discovery abuse and

---

[17]McGee v. Hayes is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that McGee v. Hayes, Miller v. Regents of the Univ. of Colo., 188 F.3d 518, 1999 WL 506520 (10th Cir. 1999)(unpublished table decision), and SEC v. Dowdell, 144 F. App'x 716 (10th Cir. 2005)(unpublished) have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion.

inordinate expense involved in overbroad and far-ranging discovery requests")(internal quotation marks omitted).  "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant."  Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted).

Courts have recognized that, while it is true that relevancy in discovery is broader than that required for admissibility at trial, "the object of inquiry must have some evidentiary value before an order to compel disclosure of otherwise inadmissible material will issue."  Zenith Elecs. Corp. v. Exzec, Inc., No. 93 C 5041, 1998 WL 9181, at *2 (N.D. Ill. Jan. 5, 1998).  Courts have also recognized that "[t]he legal tenet that relevancy in the discovery context is broader than in the context of admissibility should not be misapplied so as to allow fishing expeditions in discovery."  Zenith Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (internal quotation marks omitted).

Rule 26, which once stated that a party may obtain discovery on any matter "relevant to the subject matter," was amended in 2000 to state that the material must be "relevant to the claim or defense of any party."  Fed R. Civ. P. 26(b)(1).  Under the 2000 amendment, however, "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."  Fed. R. Civ. P. 26(b)(1).  The Advisory Committee explained that the amendment was "designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery."  Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2000 amendment (stating that the amendment was made with the intent "that the parties and the court focus on the actual claims and defenses involved in the action").  The Advisory Committee further explained:

> Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses, and, if not, whether good cause exists for authorizing it so long as it is relevant to

the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible.

Fed R. Civ. P. 26(b)(1) advisory committee's note to 2000 amendment.

Rule 34 requires a party on whom a request for production is served to "state that inspection and related activities will be permitted as requested or state an objection to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(A). If objection is made to part of an item or category, the part shall be specified and inspection permitted of the remaining parts. See Fed. R. Civ. P. 34(b)(2)(C). Rule 37 provides enforcement mechanisms for rule 34. According to rule 37, if a party does not respond to an interrogatory or to a request for production, the party requesting the discovery may move the Court to compel the opposing party to respond. See Fed. R. Civ. P. 37(a)(2)(B). "[A]n evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(3). Accord Lewis v. Goldberry, No. 11-0283, 2012 WL 681800, at *4 (D.N.M. Feb. 27, 2012)(Browning, J.).

The Federal Rules of Civil Procedure provide redress for a party's abuses of the discovery process, including failures to disclose. "As a general rule, the imposition of sanctions for abuse of discovery under Fed. R. Civ. P. 37 is a matter within the discretion of the trial court." Coletti v. Cudd Pressure Control, 165 F.3d 767, 777 (10th Cir. 1999)(citations omitted)(internal quotation marks omitted). "'Bad faith is not required for a district court to sanction a party for discovery abuses. Sanctions are proper upon a finding of willfulness, bad faith, or fault on the part of the noncomplying litigant.'" Stranger v. Checker Auto Parts, No. CIV 05-0632 JB/WPL, 2006 U.S. Dist. LEXIS 95628, at *8 (D.N.M. June 30, 2006)(Browning, J.)(original alterations omitted)(quoting Melendez v. Illinois Bell Tel. Co., 79 F.3d 661, 671 (7th Cir. 1996)). "A district court abuses its discretion when it renders an arbitrary, capricious,

whimsical, or manifestly unreasonable judgment." <u>Coletti v. Cudd Pressure Control</u>, 165 F.3d at

777 (citations omitted)(internal quotation marks omitted).

## **LAW REGARDING MOTIONS TO COMPEL**

Rule 37(a) of the Federal Rules of Civil Procedure provides:

On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery.  The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person party failing to make disclosure or discovery in an effort to obtain it without court action.

Fed. R. Civ. P. 37(a).  Under rule 37(a)(4), "an evasive or incomplete disclosure, answer, or

response must be treated as a failure to disclose, answer, or respond."  Fed. R. Civ. P. 37(a)(4).

If a party refuses to turn over documents through proper discovery, a defendant should move to

compel production pursuant to rule 37.  <u>See</u> <u>Lane v. Page</u>, 727 F. Supp. 2d 1214, 1236 n.15

(D.N.M. 2010)(Browning, J.).

## **LAW REGARDING PROTECTIVE ORDERS**

"Federal district courts have broad discretion over discovery."  <u>S2 Automation LLC v.

Micron Tech., Inc.</u>, 283 F.R.D. 671, 680 (D.N.M. 2012)(Browning, J.)  "The trial court has

discretion to grant a protective order pursuant to rule 26(c) of the Federal Rules of Civil

Procedure."  <u>Morales v. E.D. Etnyre & Co.</u>, 228 F.R.D. 694, 696 (D.N.M. 2005)(Browning,

J.)(citing <u>Thomas v. Int'l Bus. Machines</u>, 49 F.3d 478, 482 (10th Cir. 1995)).  Rule 26(c)

provides that, upon a showing of good cause, a court may "issue an order to protect a party or

person from annoyance, embarrassment, oppression, or undue burden or expense," which order

may include forbidding disclosure or discovery.  Fed. R. Civ. P. 26(c)(1)(A).  <u>Accord</u> <u>Miller v.

Regents of the Univ. of Colo.</u>, 188 F.3d 518, 1999 WL 506520, at *12 (10th Cir.

1999)(unpublished table decision)(reasoning that "[t]he district court is in the best position to

weigh these variables and determine the appropriate limits because, unlike an appellate court, the district court has the ability to view firsthand the progression of the case, the litigants, and the impact of discovery on parties and nonparties").

"Federal Rule of Civil Procedure 26(c) expressly limits who may move for a protective order to parties or the person from whom discovery is sought."  SEC v. Dowdell, 144 F. App'x 716, 722-23 (10th Cir. 2005)(unpublished)(noting that a third party may not move for a rule 26(c) protective order if it is not a party to the underlying action, has not intervened, or has not been served a subpoena seeking discovery).  "It is the party seeking the protective order who has the burden to show good cause for a protective order."  Velasquez v. Frontier Med. Inc., 229 F.R.D. 197, 200 (D.N.M. 2005)(Browning, J.).  Accord Murphy v. Gorman, 271 F.R.D. 296, 303 (D.N.M. 2010)(Browning, J.).  The party seeking the protective order must submit "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements."  Gulf Oil Co. v. Bernard, 452 U.S. 89, 102 n.16 (1981)(internal quotation marks omitted).

Although rule 26(c) is silent regarding the time within which the movant must file for a protective order, the Tenth Circuit has held that "a motion under [rule] 26(c) for protection . . . is timely filed if made before the date set for production."  In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 669 F.2d 620, 622 n.2 (10th Cir. 1982)(quoting language from In re Halkin, 598 F.2d 176, 193 (D.C. Cir. 1979), overruled on other grounds by Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33 (1984)).  A party must seek a rule 26(c) protective order from the same court that issued the subpoena.  See United States ex. rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 444 F.3d at 468 ("[A]ny disputes that arise over the subpoena of a nonparty are decided by the court that issued the subpoena." (citing Fed. R. Civ. P. 45(c)(2)(B))).

See also Res. Assocs. Grant Writing & Evaluation Servs., LLC, v. Maberry, No. CIV 08-0552 JB/LAM, 2009 WL 1300561, at *14 (D.N.M. Feb. 5, 2009)(Browning, J.)(explaining that disputes arising "over the subpoena of a nonparty are decided by the court that issued the subpoena")(citing United States ex. rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 444 F.3d at 468).

## LAW REGARDING QUASHING SUBPOENAS

A court may quash or modify a subpoena pursuant to rule 45(d).  See Clower v. GEICO Ins., No. CIV 12-0472 JB/WDS, 2013 WL 1897832, at *5 (D.N.M. Apr. 16, 2013)(Browning, J.)(discussing Fed. R. Civ. P. 45(c), which is now Fed. R. Civ. P. 45(d)[18]); Morales v. E.D. Etnyre & Co., 228 F.R.D. 694, 696 (D.N.M. 2005)(Browning, J)(same).  Rule 45(d)(3)(A) states that the Court

> must quash or modify a subpoena that:
>
>     **(i)**    fails to allow a reasonable time to comply;
>
>     **(ii)**    requires a person to comply beyond the geographical limits specified in Rule 45(c);
>
>     **(iii)**    requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
>
>     **(iv)**    subjects a person to undue burden.

Fed. R. Civ. P. 45(d)(A).  Furthermore, rule 45(d)(3)(B) provides:

> To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

---

[18]The Advisory Committee Notes to the 2013 Amendment, effective December 1, 2013, states: "Subdivision (d) contains the provisions formerly in subdivision (c).  It is revised to recognize the court where the action is pending as the issuing court, and to take account of the addition of Rule 45(c) to specify where compliance with a subpoena is required."  Fed. R. Civ. P. 45 advisory committee's note to the 2013 amendment, subdivision (d).

>       **(i)**      disclosing a trade secret or other confidential research, development, or commercial information; or
>
>       **(ii)**      disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

Fed. R. Civ. P. 45(d)(3)(B).  "The party . . . moving to quash a subpoena has the burden to demonstrate good cause and/or privilege to be protected."  Morales v. E.D. Etnyre & Co., 228 F.R.D. at 696.  See Sentry Ins. v. Shivers, 164 F.R.D. 255, 256 (D. Kan. 1996)("[A] party seeking a protective order also has the burden to show good cause for it.").  Generally, "only the party or person to whom the subpoena is directed has standing to move to quash or otherwise object to a subpoena."  Beach v. City of Olathe, Kan., No. 99-2217GTV, 2001 WL 1098032, at *1 (D. Kan. Sept. 17, 2001)(citing Hertenstein v. Kimberly Home Health Care, Inc., 189 F.R.D. 620, 635 (D. Kan. 1999)).  Moreover, "[a]bsent a claim of privilege, a party has no standing to challenge a subpoena to a nonparty."  Trujillo v. Bd. of Educ., No. CIV 03-1185 JB/LFG, 2007 WL 2296916, at *1 (D.N.M. June 26, 2007)(quoting Donahoo v. Ohio Dep't of Youth Servs., 211 F.R.D. 303, 306 (N.D. Ohio 2002)).  "The exception to this rule is that 'a party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests.'"  Trujillo v. Bd. of Educ., 2007 WL 2296916, at *1 (quoting United States v. Raineri, 670 F.2d 702, 712 (7th Cir. 1982)).

Effective December 1, 2013, rule 45 of the Federal Rules of Civil Procedure requires that "[a] subpoena must issue from the court where the action is pending."  Fed. R. Civ. P. 45(a)(2) & advisory committee's notes to the 2013 amendment.  The 2013 Amendment also specifies that, if a "person commanded to produce documents or tangible things or to permit inspection" objects, "the serving party may move the court for the district where compliance is required for an order compelling production or inspection."  Fed. R. Civ. P. 45(d)(B).  Previously, rule 45 required

that different courts must issue subpoenas depending on the requested action, such as attendance

at a hearing or trial, attendance at a deposition, or for production or inspection.  See Fed. R. Civ.

P. 45(a)(2)(A)-(C) (2012).

### LAW REGARDING RULE 30(b)(6)

Rule 30(b)(6) of the Federal Rules of Civil Procedure provides:

> A party may in the party's notice and in a subpoena name as the deponent a public
> or private corporation or a partnership or association or governmental agency and
> describe with reasonable particularity the matters on which examination is
> requested.  In that event, the organization so named shall designate one or more
> officers, directors, or managing agents, or other persons who consent to testify on
> its behalf, and may set forth, for each person designated, the matters on which the
> person will testify.  A subpoena shall advise a non-party organization of its duty
> to make such a designation.  The persons so designated shall testify as to matters
> known or reasonably available to the organization.  This subdivision (b)(6) does
> not preclude taking a deposition by any other procedure authorized in these rules.

Fed. R. Civ. P. 30(b)(6).  "Under Rule 30(b)(6), when a party seeking to depose a corporation

announces the subject matter of the proposed deposition, the corporation must produce someone

familiar with that subject."  Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d 253, 268 (2d Cir. 1999).

"To satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available

'such number of persons as will' be able 'to give complete, knowledgeable and binding answers'

on its behalf."  Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d at 268.  Accord Gulfstream

Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp., No. 06-1165, 2007 WL 5704041, at *5

(D.N.M. Oct. 24, 2007)(Browning, J.)("A corporation must prepare its designated representative

to provide complete, knowledgeable, and binding answers on the corporation's behalf.").  "The

purpose behind designating a witness to represent the corporation is to prevent bandying, which

is the practice of presenting employees for their depositions who disclaim knowledge of the facts

known by other individuals within the organization."  Gulfstream Worldwide Realty, Inc. v.

Phillips Elec. N. Am. Corp., 2007 WL 5704041, at *5 (internal quotation marks omitted).

As the United States District Court for the District of Connecticut has recognized:

> A deponent under Rule 30(b)(6) has an affirmative obligation to educate himself as to the matters regarding the corporation.  This includes all matters that are known or reasonably available to the corporation.  Even if the documents are voluminous and the review of the documents would be burdensome, the deponents are still required to review them in order to prepare themselves to be deposed.

Concerned Citizens v. Belle Haven Club, 223 F.R.D. 39, 43 (D. Conn. 2004)(citations omitted)(internal quotation marks omitted).  The court in Concerned Citizens v. Belle Haven Club went on to hold that this duty to review, and in essence become educated about the information available to the corporation, applies even if the information is voluminous and multiple people must be consulted to collect the information known to the corporation.  See 223 F.R.D. at 43.  The United States District Court for the District of Columbia has stated:

> Although there is not an abundance of case law on the topic of Rule 30(b)(6), and nearly no case law in this circuit, certain principles are consistent in every court opinion to address these issues so far.  First, the deponent has the duty of being knowledgeable on the subject matter identified as the area of inquiry.  Clearly, a deponent that does not know about the subject matter to be inquired about is useless as a deponent at all.  Second, the designating party is under the duty to designate more than one deponent if it would be necessary to do so in order to respond to the relevant areas of inquiry that are specified with reasonable particularity by the plaintiffs.  Third, the designating party has a duty to prepare the witness to testify on matters not only known by the deponent, but those that should be reasonably known by the designating party.  Obviously, the purpose of a Rule 30(b)(6) deposition is to get answers on the subject matter described with reasonable particularity by the noticing party, not to simply get answers limited to what the deponent happens to know.  Fourth, the designating party has a duty to substitute an appropriate deponent when it becomes apparent that the previous deponent is unable to respond to certain relevant areas of inquiry.

Alexander v. FBI, 186 F.R.D. 137, 141 (D.D.C. 1998)(citations omitted).  Accord 7 J. Moore, Moore's Federal Practice § 30.25[3], at 30-66 to 30-66.1 (3d ed. 2012)(stating the factors from

Alexander v. FBI).  The United States District Court for the District of Utah has ruled the same

way, holding that the entity receiving a 30(b)(6) notice has a duty

> to prepare those persons in order that they can answer fully, completely,
> unevasively the questions posed . . . as to the relevant subject matters.  The duty
> to prepare the designee imposed by the rule goes beyond matters personally
> known to the designee or to matters in which that designee was personally
> involved.  Such preparation requires a good faith effort [by] the designate to find
> out the relevant facts -- to collect information, review documents, and interview
> employees with personal knowledge.  The duty of preparation may require the
> interviewing of past employees.

United States v. Magnesium Corp. of Am., No. 2:01-CV-40 DB, 2006 WL 6924985, at *15-16

(D. Utah Nov. 27, 2006)(Nuffer, J.)(footnote omitted)(internal quotation marks omitted).  As a

general matter, a corporation may designate any person as a corporate representative if he or she

can meet the necessary criteria to satisfy rule 30(b)(6).  See Gulfstream Worldwide Realty, Inc.

v. Phillips Elec. N. Am. Corp., 2007 WL 5704041, at *5 (discussing how it may sometimes be

necessary for a corporation to designate former employees as a rule 30(b)(6) deponent);

7 J. Moore, supra § 30.25[3], at 30-69 ("There is no rule that would prevent corporate counsel, or

even a corporation's litigation counsel, from serving as a Rule 30(b)(6) deponent.").

## LAW REGARDING DEPOSITIONS OF COUNSEL

As the Court has previously recognized, "[f]orcing trial counsel to testify as a witness" is

disfavored.  Archuleta v. City of Santa Fe, No. CIV 04-0247 JB/DJS, 2005 WL 2313706 at *5

(D.N.M. August 10, 2005)(Browning, J.)(quoting Shelton v. Am. Motors Corp., 805 F.2d 1323,

1327 (8th Cir. 1986)(citations omitted)).  As the United States Court of Appeals for the Eighth

Circuit has noted:

> Taking the deposition of opposing counsel not only disrupts the adversarial
> system and lowers the standards of the profession, but it also adds to the already
> burdensome time and costs of litigation.  It is not hard to imagine additional
> pretrial delays to resolve work-product and attorney-client objections, as well as

delays to resolve collateral issues raised by the attorney's testimony.  Finally, the practice of deposing opposing counsel detracts from the quality of client representation.  Counsel should be free to devote his or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent.  Moreover, the "chilling effect" that such practice will have on the truthful communications from the client to the attorney is obvious.

Shelton v. Am. Motors Corp., 805 F.2d at 1327.  In Shelton v. American Motors Corp., the plaintiffs sought the depositions of several individuals, including the defendant's in-house counsel.  See 805 F.2d at 1325.  The attorney was "employed by [the defendant] as an attorney in its Litigation Department, and she was assigned specifically to the case at bar as [the defendant's] supervising in-house counsel."  805 F.2d at 1325 (internal quotation marks omitted).  The defendant moved for a protective order and moved to quash the deposition.  See 805 F.2d at 1325.  The magistrate judge partially granted the protective order, but denied the motion to quash.  See 805 F.2d at 1325.  At the deposition, the attorney refused to answer several questions regarding the existence or nonexistence of several documents.  See 805 F.2d at 1325.  The plaintiff moved for sanctions, which the magistrate judge denied, but the magistrate judge ordered the defendant to make the attorney available to give her deposition.  See 805 F.2d at 1325.  The attorney again refused to answer questions.  See 805 F.2d at 1325.  The magistrate judge ordered the attorney to respond, but the defendant's trial counsel instructed her not to answer, and invoked attorney-client privilege and the work-product doctrine.  See 805 F.2d at 1325.  The magistrate judge recommended that the district court order the defendant to show cause why the in-house counsel should not be held in contempt and why default judgment should not be entered against the defendant.  See 805 F.2d at 1326.  The district court held that neither attorney-client privilege nor the work-product doctrine protected the information that the plaintiffs sought from the in-house counsel.  See 805 F.2d at 1326.  The district court also

reasoned that the fact that documents or knowledge came to an attorney while acting for the client is insufficient to invoke attorney-client privilege.  See 805 F.2d at 1326 (quoting Ark. Nat'l Bank v. Cleburne Cnty. Bank, 525 S.W.2d 82, 84-85 (Ark. 1975))("An attorney may be required to produce papers belonging to his client where the knowledge of their existence is accessible to others or to the public, or if . . . the client might  be compelled to produce them."). The district court ordered default judgment on the issue of liability as a sanction.  See Shelton v. Am. Motors Corp., 805 F.2d at 1326.  On appeal, the Eight Circuit reversed, concluding that default judgment was unwarranted, because "where, as here, the deponent is opposing counsel and has engaged in a selective process of compiling documents from among voluminous files in preparation for litigation, the mere acknowledgment of the existence of those documents would reveal counsel's mental impressions, which are protected as work product."  805 F.2d at 1326. The Eighth Circuit stated that it did "not hold that opposing trial counsel is absolutely immune from being deposed."  Shelton v. Am. Motors Corp., 805 F.2d at 1327.  It "recognize[d] that circumstances may arise in which the court should order the taking of opposing counsel's deposition[,] [b]ut those circumstances should be limited  . . ."  805 F.2d at 1327.  The Eighth Circuit then explained that the "circumstances should be limited to where the party seeking to take the deposition has shown that [(i)] no other means exist to obtain the information[; (ii)] the information sought is relevant and nonprivileged; and [(iii)] the information is crucial to the preparation of the case."  805 F.2d at 1327.  Using those factors, the Eighth Circuit held that the information sought could be obtained by means other than deposing in-house counsel for the defendant and the information sought was privileged.  See 805 F.2d at 1328-29.

In Boughton v. Cotter Corp., 65 F.3d 823 (10th Cir. 1995), the United States Court of Appeals for the Tenth Circuit adopted Shelton v. American Motors Corp.'s three-part test to

determine whether a party can depose opposing counsel.  See Boughton v. Cotter Corp., 65 F.3d at 830.   The trial court in Boughton v. Cotter Corp. had entered a protective order prohibiting the plaintiffs from taking the deposition of outside counsel representing the defendant in that case.  See 65 F.3d at 828.  The plaintiffs contended that the outside counsel's deposition should be taken "because of his role as spokesperson for [the defendant] before regulatory agencies and the press and because of his involvement in helping [the defendant] prepare its various license applications and giving business advice to [the defendant] on the location of a new mill on the site of the old one."  65 F.3d at 828.

The Tenth Circuit noted in Boughton v. Cotter Corp. that the trial court treated the outside counsel as an attorney for the defendant subject to the protection of Shelton v. Am. Motor Corp.  See Boughton v. Cotter Corp., 65 F.3d at 829.  The Tenth Circuit noted that the record supported the trial court's treatment of the outside counsel's status, because, according to the defendant's executive vice president and general manager, and its president, the outside counsel operated solely as an attorney, made no operating decisions, worked as an attorney and intermediary, and was not authorized to make commitments on the defendant's behalf without prior approval.  See 65 F.3d at 829.  The Tenth Circuit stated:

> [W]e approve of the criteria set forth in Shelton v. Am. Motors Corp., . . . , but at this time we need only make the more limited holding that ordinarily the trial court at least has the discretion under Rule 26(c) to issue a protective order against the deposition of opposing counsel when any one or more of the three Shelton criteria for depositions  . . . are not met.

65 F.3d at 830 (emphasis in original).  The Tenth Circuit noted that "[t]he only information for which [the outside counsel] was likely to be an exclusive source [was] [his] own reasons for making certain statements as a spokesperson for [the defendant]."  65 F.3d at 831.  The Tenth Circuit also rejected the plaintiffs' contention that deposition of outside counsel was essential to

their fraud claim, because the plaintiffs had failed to "establish as many elements of the alleged wrongs as was possible through alternative sources before seeking the testimony of [the defendant's] counsel."  65 F.3d at 831.  The Tenth Circuit noted that only after the plaintiffs had directed inquiry to the defendant's officers and directors about knowledge or fraudulent intent on their part would the district court be able to fully assess whether the outside counsel's deposition was crucial to the plaintiffs' case.  See 65 F.3d at 831.

The party seeking to depose opposing counsel bears the burden of establishing that each of the three factors are satisfied; failure to carry that burden permits the trial court to issue the requested protective order.  See Boughton v. Cotter Corp., 65 F.3d at 829-31 & n.9.  In other words, the trial court may issue a protective order against the deposition of opposing counsel when any one or more of the three factors are not met.  See Boughton v. Cotter Corp., 65 F.3d at 830.

In re Subpoena Issued to Dennis Friedman, 350 F.3d 65 (2d Cir. 2003), the creditors' committee alleged that a bankrupt corporation's former officers and directors breached their fiduciary duties; the officers and directors asserted an affirmative defense based on their good-faith reliance on advice of counsel.  350 F.3d at 67.  The district court quashed the deposition subpoena of an attorney "who previously served as counsel during merger negotiations to a now-bankrupt corporation of which the non-attorney defendants[] are former directors."  350 F.3d at 66.  The attorney no longer served as a formal advisor to the former directors, but "is a non-litigation partner at the law firm now representing them in the Delaware litigation."  350 F.3d at 66.  The district court relied upon Shelton v. Am. Motors Corp. to rule that the plaintiff must exhaust all practical alternative means of obtaining the information sought from the attorney before it would allow the plaintiff to take the proposed deposition.  See In re Subpoena Issued to

Dennis Friedman, 350 F.3d at 67.  The United States Court of Appeals for the Second Circuit concluded that the Federal Rules of Civil Procedure require a more flexible approach to attorney depositions than the "rigid Shelton rule."  In re Subpoena Issued to Dennis Friedman, 350 F.3d at 67.  The Second Court did not need to rule definitively on the matter, however, because the attorney consented to the deposition and rendered the appeal moot.  See 350 F.3d at 67.  The Second Circuit noted that it had "never adopted the Shelton rule and ha[s] stated specifically that the disfavor with which the practice of seeking discovery from adversary counsel is regarded is not a talisman for the resolution of all controversies of this nature."  In re Subpoena Issued to Dennis Friedman, 350 F.3d at 71.  The Second Circuit characterized Boughton v. Cotter Corp., 65 F.3d at 830-31, as "approving of the three-pronged test set forth in Shelton, but ultimately upholding the district court's application of the rule under Rule 26."  In re Subpoena Issued to Dennis Friedman, 350 F.3d at 71 n.3.  The Second Circuit ultimately disagreed with the Shelton v. Am. Motors Corp. rule and instead directed district courts to use "the flexible approach that we conclude is mandated by the federal rules."  In re Subpoena Issued to Dennis Friedman, 350 F.3d at 72.

## LAW REGARDING THE WORK-PRODUCT DOCTRINE

The work-product doctrine, which the Supreme Court of the United States first recognized in Hickman v. Taylor, 329 U.S. 495 (1947), "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238 (1975).  "In performing his various duties . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Hickman v. Taylor, 329 U.S. at 510.  Unlike the attorney-client privilege, the work-product doctrine is distinguishable from the testimonial privileges.  See

United States v. Ary, 518 F.3d 775, 783 n.4 (10th Cir. 2008); In re Qwest Commc'n Int'l. Inc,
450 F.3d 1179, 1184 n.3 (10th Cir. 2006).  The work-product doctrine is codified in rule 26(b)(3)
of the Federal Rules of Civil Procedure and is therefore excepted from rule 501 of the Federal
Rules of Evidence.  See United States v. Ary, 518 F.3d at 783 n.4.

      1.    **Work-Product Doctrine Generally.**

      Rule 26(b)(3) governs work-product issues.  See Frontier Ref. Inc. v. Gorman-Rupp Co.,
Inc., 136 F.3d 695, 702 n.10 (10th Cir. 1998).  Rule 26(b)(3) states:

> **(A)**   *Documents and Tangible Things*.  Ordinarily, a party may not discover
> documents and tangible things that are prepared in anticipation of litigation or for
> trial by or for another party or its representative (including the other party's
> attorney, consultant, surety, indemnitor, insurer, or agent).  But, subject to Rule
> 26(b)(4), those materials may be discovered if:
>
> > **(i)**     they are otherwise discoverable under Rule 26(b)(1); and
> >
> > **(ii)**    the party shows that it has substantial need for the materials
> > to prepare its case and cannot, without undue hardship, obtain their
> > substantial equivalent by other means.
>
> **(B)**   *Protection Against Disclosure*.  If the court orders discovery of those
> materials, it must protect against disclosure of the mental impressions,
> conclusions, opinions, or legal theories of a party's attorney or other
> representative concerning the litigation.
>
> **(C)**   *Previous Statement*.  Any party or other person may, on request and
> without the required showing, obtain the person's own previous statement about
> the action or its subject matter.  If the request is refused, the person may move for
> a court order, and Rule 37(a)(5) applies to the award of expenses.  A previous
> statement is either:
>
> > **(i)**     a written statement that the person has signed or otherwise
> > adopted or approved; or
> >
> > **(ii)**    a contemporaneous stenographic, mechanical, electrical, or
> > other recording -- or a transcription of it -- that recites substantially
> > verbatim the person's oral statement.

Fed. R. Civ. P. 26(b)(3).

"[T]he work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." Citizens Progressive Alliance v. U.S. Bureau of Indian Affairs, 241 F. Supp. 2d 1342, 1358 (D.N.M. 2002) (Smith, Magistrate J.)(citing United States v. Nobles, 422 U.S. at 238). The attorney work-product doctrine "is intended only to guard against divulging the attorney's strategies and legal impressions." Resolution Trust Corp. v. Dabney, 73 F.3d 262, 266 (10th Cir. 1995). The work-product doctrine does not protect documents or other items that do not reflect the attorney's mental impressions. See United States v. Nobles, 422 U.S. at 238 ("At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."); In re Grand Jury Proceedings, 658 F.2d 782, 784-85 (10th Cir. 1981)("Such mental impressions are a prerequisite to the invocation of the work product doctrine.").

Analysis whether a communication falls within the attorney-client privilege should precede any inquiry into whether the work-product protection applies. See Upjohn Co. v. United States, 449 U.S. 383, 397 (1981). The work-product protection is broader in scope and reach than is the attorney-client privilege, because the privilege extends only to client communications, while the work-product protection encompasses much that has its source outside client communications. See United States v. Nobles, 422 U.S. at 238. Further, rule 26(b)(3) permits disclosure of documents and tangible things constituting attorney work product only upon a showing of substantial need and inability to obtain the substantial equivalent without undue hardship. See Fed. R. Civ. P. 26(b)(3)(B). The focus of the determination whether a document falls within the work-product protection is whether "the motivating purpose" behind its creation

was to aid in litigation or possible future litigation.   In re Universal Serv. Fund Tel. Billing Practices Litig., 232 F.R.D. 669, 676 (D. Kan. 2005).

"Ordinary work product generally refers to materials that are gathered at the request of an attorney in anticipation of litigation.  This type of work product receives less protection than opinion work product.  Opinion work product is, basically, the mental impressions of the attorney." Anaya v. CBS Broad., Inc., 251 F.R.D. at 650 (quoting Sinclair Oil Corp. v. Texaco, Inc., 208 F.R.D. 329, 334 (N.D. Okla. 2002)).  The party asserting the work-product protection has the burden of demonstrating that it applies and that it has not been waived.  See Anaya v. CBS Broad., Inc., 251 F.R.D. at 650 (citing Kovacs v. Hershey Co., No. 04-cv-01881, 2006 U.S. Dist. LEXIS 69342, 2006 WL 2781591, at *10 (D. Colo. Sept. 26, 2006)).

For the work-product doctrine to apply, the asserting party must show that the documents or materials were prepared in anticipation of litigation by or for a party or that party's representative.  See Fed. R. Civ. P. 26(b)(3).  Litigation need not necessarily be imminent as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation.  See Anaya v. CBS Broad., Inc., 251 F.R.D. at 650; Fox v. Cal. Sierra Fin. Servs., 120 F.R.D. 520, 524 (N.D. Cal. 1988)("There is no requirement that the litigation have already commenced in order for the work-product doctrine to be operative, however, there must be more than a remote possibility of litigation.").  If the party asserting the work-product protection establishes entitlement to the protection, rule 26(b)(3) allows production of attorney work-product materials "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."  Fed. R. Civ. P. 26(b)(3).  The Tenth Circuit explained that "[w]ork product can be opinion work product,

which some courts have held to be absolutely privileged, or non-opinion work product, i.e., fact work product, which may be discoverable under appropriate circumstances."   In re Qwest Commuc'ns. Int'l, 450 F.3d at 1186.

        **2.**        **The Fiduciary Exception and the Work-Product Doctrine.**

The work-product doctrine is distinct from the attorney-client privilege and provides, in some ways, broader protection.  See Foster v. Hill (In re Foster), 188 F.3d 1259, 1272 (10th Cir. 1999)("[The plaintiff] also invoked the work-product doctrine, which is broader than and distinct from the attorney-client privilege."  (citing United States v. Nobles, 422 U.S. at 238 n.11)); 6 J. Moore & P. Higginbottom, Moore's Federal Practice § 26.70[1], at 26-435 (3d ed. 2010)("The work product doctrine is not actually a privilege, but rather a qualified immunity from discovery.").  Unlike the attorney-client privilege, both the attorney and the client hold the right to work-product protections, and either may assert it.  See In re Grand Jury Proceedings, 561 F.3d 408, 411 (5th Cir. 2009).  As a result, "a waiver by the client of the work product privilege will not deprive the attorney of his own work product privilege, and vice versa."  In re Grand Jury Proceedings, 43 F.3d 966, 972 (5th Cir. 1994).  The United States Court of Appeals for the Fifth Circuit has stated: "Because the attorney work product doctrine fosters interests different from the attorney-client privilege, it may be successfully invoked against a pension plan beneficiary even though the attorney-client privilege is unavailable."  Wildbur v. ARCO Chem. Co., 974 F.2d 631, 646 (5th Cir. 1992).  See Helt v. Metro. Dist. Comm'n, 113 F.R.D. 7, 12 (D. Conn. 1986)("The plaintiff does not stand in the same position with respect to the attorney, for whom the work-product rule is designed to benefit, as [he does to his] own trustees." (internal quotation marks omitted)).

Because the work-product doctrine is a qualified immunity set forth in the Federal Rules of Civil Procedure, and not a privilege like the attorney-client privilege, the exceptions to the attorney-client privilege that developed in the common law do not necessarily overcome the protections which the work-product doctrine provides.   Rule 26(b)(3) provides a necessity exception to the work-product doctrine, which states that documents "prepared in anticipation of litigation or for trial" may be discovered only upon a showing that "it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain the substantial equivalent by other means."   Fed. R. Civ. P. 26(b)(3)(A)(ii).   Even in such a case, the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B).   Courts have also found a crime-fraud exception to the work-product doctrine, which applies upon a showing that a client consulted with an attorney in furtherance of a crime or fraud.   See   In re Grand Jury Proceedings (Vargas), 723 F.2d 1461, 1467 (10th Cir. 1983)(finding that the crime-fraud exception applies to both the attorney-client privilege and the work-product doctrine); Newman v. Gen. Motors Co., 228 F. App'x 245, 246 (3d Cir. 2007)(affirming the district court's finding that the crime-fraud exception "applied to pierce both the attorney-client privilege and the work product doctrine."); In re Grand Jury Subpoena, 419 F.3d 329, 335 (5th Cir. 2005)("The work product privilege is subject to the same crime-fraud exception.").

The common law recognizes an exception to the attorney-client privilege called the fiduciary exception: "when a trustee obtains legal advice related to the exercise of fiduciary duties . . . , the trustee cannot withhold attorney-client communications from the beneficiary of the trust."   United States v. Jicarilla Apache Nation, 131 S. Ct. 2313, 2318 (2011).   Whether the

fiduciary exception applies to the work-product doctrine is unsettled.  A number of courts have found that a fiduciary exception does not apply to the work-product doctrine.  See In re Teleglobe Commc'ns Corp., 493 F.3d 345, 385 (3d Cir. 2007); Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1423 (11th Cir. 1994); Sandberg v. Virginia Bankshares, 979 F.2d 332, 355 n.22 (4th Cir. 1992)(the fiduciary exception "does not apply to the work product doctrine"), vacated by Nos. 91-1873(L), CA-88-299-A, 91-1874, CA-88-1020-A, 1993 WL 524680 (4th Cir. April 7, 1993); Koenig v. Int'l Sys. & Controls Corp. Sec. Litig. (In re Int'l Sys. & Controls Corp. Sec. Litig.), 693 F.2d 1235, 1239 (5th Cir. 1982); Lugosch v. Congel, 219 F.R.D. 220, 243 (N.D.N.Y. 2003); Strougo v. BEA Assocs., 199 F.R.D. 515, 524 (S.D.N.Y. 2001); Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co., 951 F. Supp. 679, 687 (W.D. Mich. 1996); Helt Metro. Dist. Comm'n, 113 F.R.D. 7, 11-12 (D. Conn. 1986).  The Fifth Circuit described the fiduciary privilege as the parties having a "mutuality of interests" between the fiduciary and the beneficiaries, but found that once there is an anticipation of litigation, the "mutuality is destroyed."  Koenig v. Int'l Sys. & Controls Corp. Sec. Litig. (In re Int'l Sys. & Controls Corp. Sec. Litig.), 693 F.2d at 1239.  See Tatum v. R.J. Reynolds Tobacco Co., 247 F.R.D. 488, 501 (M.D.N.C. 2008).  In Jicarilla Apache Nation v. United States, 88 Fed. Cl. 1 (2009), the United States Court of Federal Claims found that "there is no corollary 'fiduciary exception' to the work product doctrine."  88 Fed. Cl. at 13.  The United States petitioned the United States Court of Appeals for the Federal Circuit for a writ of mandamus to vacate the Court of Federal Claims' orders requiring the United States to produce documents it asserted the attorney-client privilege protected; the Federal Circuit did not address whether the fiduciary exception applies to the work-product doctrine.  In re United States, 590 F.3d 1305, 1313 (Fed. Cir. 2009)("Nor do we address whether the fiduciary exception applies to documents privileged as attorney work

product."), <u>reversed on other grounds by</u> United States v. Jicarilla Apache Nation, 131 S. Ct. 2313 (2011).[19]

In Stoffels v. SBC Communications, 263 F.R.D. 406 (W.D. Tx. 2009), the district court, in reviewing the plaintiffs' motion to compel the defendants to produce records included on its privilege log, stated it should first consider whether the defendants established an entitlement to the attorney-client privilege, and if so, whether the fiduciary exception applied, and then, if the district court determined the attorney-client privilege did not apply or that the fiduciary exception precluded assertion of the attorney-client privilege, the district court should consider the defendants' entitlement to the attorney work-product protection. See 263 F.R.D. at 412. When the district court found the attorney-client privilege did not apply, it found that the documents were prepared in anticipation of litigation and denied the motion to compel as to those documents. See 263 F.R.D. at 417-18. The district court did not treat the fiduciary exception as a way to invade the attorney's work product; it used it only as an exception to the attorney-client privilege. In Parker v. Stone, Civil Action No. 3:07-cv-00271 (VLB), 2009 WL 1097914 (D. Conn. Apr. 21, 2009), the defendant argued that, if documents fall under the fiduciary exception, they are still not subject to disclosure based upon the doctrine of work-product immunity. See 2009 WL 1097914, at *5. The district court did not discuss whether the fiduciary exception applies to the work-product doctrine, but rather discussed the different burden that must be met when the work-product doctrine is invoked, explaining:

> There is a three-prong standard for federal work product immunity. "The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his

---

[19]The Supreme Court also did not address the issue whether there is a fiduciary exception to the work-product doctrine; although the Court of Federal Claims held that there is no such exception to the work-product doctrine, "[t]he Court of Appeals did not address that issue, and it is not before us." United States v. Jicarilla Apache Nation, 131 S. Ct. at 2320 n.1.

representatives."  [Lagace v. New England Central Railroad, No. 3:06CV1317 (RNC), 2007 U.S. Dist. LEXIS 72540, at *4 (D. Conn. Sept. 28, 2007)] quoting Sicurelli v. Jeneric/Pentron Inc., No. 03-CV-4934 (SLT)(KAM), 2006 U.S. Dist. LEXIS 29813, *5 (E.D.N.Y. May 16, 2006).  Furthermore, the "burden of establishing" the elements of work product immunity is on the "party invoking the privilege."  Id.  "The party asserting the privilege must show 'a real, rather than speculative, concern' that counsel's thought processes 'in relation to pending or anticipated litigation' will be exposed through disclosure of the compiled documents.  This burden of objective proof cannot be met through conclusory ex parte affidavits."  In re Grand Jury Subpoenas, 318 F.3d 379 (2d Cir. 2003).  There is no evidence on the record from which the Court can determine when litigation was anticipated, but it seems that litigation was by no means anticipated from the commencement of Bearn's representation of the trust in 1999.  While it does seem likely that litigation was anticipated at some point before the show cause proceeding in probate court in January 2002, that determination is necessarily fact-specific and that information is likely contained in the very documents withheld.  The burden of proof falls on Stone; and therefore, any documents that are not proven subject to work product immunity must be disclosed.

2009 WL 1097914, at *5.

Some cases have applied the fiduciary exception to the work-product doctrine.  In Riggs Nat'l Bank v. Zimmer, 355 A.2d 709 (Del. Ch. 1976), the Delaware Court of Chancery applied the state-law work-product doctrine, which was patterned after the Federal Rules of Civil Procedure, and found that the doctrine did not bar disclosure to the beneficiaries.  See 355 A.2d at 714.  The Delaware Court of Chancery explained that the memorandum which the beneficiaries sought from the trustees' attorneys "was prepared for the benefit of the beneficiaries and the attorneys' actions were in the context that the beneficiaries were the ultimate clients to be served."  355 A.2d at 716.  "To permit the work product privilege to shield the memorandum from the beneficiaries would contravene the policy of full disclosure which is essential in the trustee-beneficiary relationship."  355 A.2d at 716.  The Delaware Court of

Chancery also found that the requirement of "substantial need" for the documents was fulfilled, explaining:

> There is no "substantial need" in the sense that the beneficiaries need to know the legal views expressed in the memorandum.  They do not as they are represented by competent counsel and can get expert advice on the law.  But, the beneficiaries are entitled to know what the trustees did, that is, what legal opinion was sought on their behalf and what was done in light of that opinion on their behalf.  The production of the opinion would fill a needed factual gap not available, at least not with the same degree of accuracy, from any other source.  Thus, even were we to assume, contrary to the judgment expressed above, that the work product privilege is fully operative, the beneficiaries would nevertheless be entitled to inspect the material under the standard set forth in the Rule.

355 A.2d at 716-17.  In Lawrence v. Cohn, No. 90 Civ. 2396, 2002 WL 109530 (S.D.N.Y. Jan. 25, 2002), because the district court found that the attorneys representing the executor of an estate in his fiduciary capacity was "serving *de facto* as counsel for the estate, and necessarily, for its beneficiaries," the court also found that the work-product doctrine did not protect the attorneys' files from production to the beneficiaries, because "[a]n attorney may not withhold work product from his own client."  2002 WL 109530, at *6.

In Murphy v. Gorman, 271 F.R.D. 296 (D.N.M. 2010)(Browning, J.), the Court agreed with "the weight of authority that has found that the fiduciary exception does not apply to the work-product doctrine."  271 F.R.D. at 321.  "[R]egardless of the relationship between the trustee and the beneficiary, upon which the fiduciary exception is built, the attorney's right to his mental impressions, conclusions, opinions, or legal theories is not implicated in the justification that courts have found for a fiduciary exception to attorney-client privilege."  271 F.R.D. at 320-21.

## LAW REGARDING DELIBERATIVE-PROCESS PRIVILEGE

The deliberative process privilege is designed to prevent injury to the quality of agency decisions by insuring that frank discussions within the agency are not inhibited by public

disclosure.  See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150-51 (1975).  The privilege

> "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government."

Casad v. U.S. Dep't of Health & Human Servs., 301 F.3d 1247, 1251 (10th Cir. 2002)(quoting

Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001)).  To fall

within the deliberative-process privilege, information must be pre-decisional in nature and must

form part of the agency's deliberative process.  See NLRB v. Sears, Roebuck & Co., 421 U.S. at

151-52.

Information is pre-decisional if it is prepared "to assist an agency decisionmaker in

arriving at his decision . . . and may include recommendations, draft documents, proposals,

suggestions, and other subjective documents which reflect the personal opinions of the writer

rather than the policy of the agency."  Formaldehyde Inst. v. Dep't of Health & Human Servs.,

889 F.2d 1118, 1122 (D.C. Cir. 1989)(citations omitted)(internal quotation marks omitted),

implied overruling on different grounds recognized by Nat'l Inst. of Military Justice v. Dep't of

Def., No. 06-5242, 2008 WL 1990366 (D.C. Cir. April 30, 2008)(Tatel, J., concurring in denial

of petition for rehearing en banc).  A pre-decisional document is a part of the deliberative

process if it relates to government decision-making and its disclosure to the public "would

expose an agency's decisionmaking process in such a way as to discourage candid discussion

within the agency and thereby undermine the agency's ability to perform its functions."

Formaldehyde Inst. v. Dep't of Health & Human Servs., 889 F.2d at 1122 (internal quotation

marks omitted).

A pre-decisional document may include recommendations, proposals, suggestions, and

other subjective evaluations which reflect the personal opinions of the writer, and which discuss

the wisdom or merits of a particular agency policy or recommend new agency policy.  See

Pueblo of Zuni v. United States, No. 01-1046 WJ/WPL at 13 (D.N.M. Feb. 13, 2006)(slip op.).

The key inquiry of the deliberativeness prong is whether the "disclosure of the requested material

would tend to discourage candid discussion within the agency."  See Petroleum Info. Corp. v.

U.S. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992)(internal quotation marks omitted).

Generally, factual information is not protected from disclosure under the privilege, while

materials that embody deliberative opinions are.  See Petroleum Info. Corp. v. U.S. Dep't of

Interior, 976 F.2d at 1434.  This privilege "does not apply to individual decisions that a

government agency makes, because the privilege primarily protects deliberation about what the

broad policies should be, not individual decisions implementing existing policy."  Bell v. Bd. of

Educ., No. CIV 06-1137 JB/ACT, 2008 WL 4107445, at *3 (D.N.M. April 22,

2008)(Browning, J.).

### LAW REGARDING THE PCAOB PRIVILEGE, 15 U.S.C. § 7215(b)(5)(A)

"Following the Enron and Worldcom accounting scandals that exposed serious

weaknesses in industry self-regulatory reporting requirements for certain publicly held

companies, Congress enacted the Sarbanes-Oxley Act of 2002, 15 U.S.C. §§ 7201 et seq."  Free

Enter. Fund v. Pub. Co. Accounting Oversight Bd., 537 F.3d 667, 669 (D.C. Cir. 2008), rev'd on

other grounds, 130 S. Ct. 3138 (2010).[20]  The Sarbanes-Oxley Act of 2002 established the

---

[20]In Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 130 S. Ct. 3138 (2010), the
Supreme Court held that the dual for-cause limitations on the removal of PCAOB members
contravened the Constitution's separation of powers.  See 130 S. Ct. at 3151.  The statute
provided that the SEC could remove individual PCAOB members only "for good cause shown,"
"in accordance with" certain procedures in 15 U.S.C. § 7211(e)(6).  295 S. Ct. at 3147.  The
parties agreed that the SEC commissioners "cannot themselves be removed by the President
except under the Humphrey's Executor [v. United States, 295 U.S. 602 (1935)] standard of
'inefficiency, neglect of duty, or malfeasance in office,' 295 U.S. at 620."  130 S. Ct. at 3148.
The Supreme Court concluded that "such multilevel protection from removal is contrary to

PCAOB "to oversee the audit of companies that are subject to the securities laws, and related matters, in order to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports."   15 U.S.C. § 7211(a). Although created by statute, the PCAOB is not a governmental agency; rather, the Sarbanes-Oxley Act provides that the PCAOB is a nonprofit corporation.  See 15 U.S.C. § 7211(b).  "The Act empowers the Board, subject to the oversight of the [Securities and Exchange] Commission, to, among other things, register public accounting firms, establish auditing and ethics standards, conduct inspections and investigations of registered firms, impose sanctions, and set its own budget, which is funded by annual fees."  Free Enter. Fund v. Public Co. Accounting Oversight Bd., 537 F.3d at 669 (citing 15 U.S.C. §§ 7211(c), 7219(c), (d)).  The PCAOB conducts "a continuing program of inspections to assess the degree of compliance of each registered public accounting firm and associated persons of that firm . . . in connection with its performance of audits, issuance of audit reports, and related matters involving issuers," 15 U.S.C. § 7215(a)(1), and "may conduct an investigation of any act or practice, or omission to act, by a registered public accounting firm, any associated person of such firm, or both," that may violate the Sarbanes-Oxley Act of 2002, the PCAOB's rules, securities laws related to "the preparation and issuance of audit reports and the obligations and liabilities of accountants," or professional standards, 15 U.S.C. § 7215(b)(1).

Congress enacted a confidentiality provision for certain documents and information generated during PCAOB inspections and investigations:

Except as provided in subparagraphs (B) and (C), all documents and information prepared or received by or specifically for the Board, and deliberations of the

---

Article II's vesting of the executive power in the President."  130 S. Ct. at 3147.  The Supreme Court concluded, however, that the "unconstitutional tenure provisions are severable from the remainder of the statute."  130 S. Ct. at 3161.

Board and its employees and agents, in connection with an inspection under section 7214 of this title or with an investigation under this section, shall be confidential and privileged as an evidentiary matter (and shall not be subject to civil discovery or other legal process) in any proceeding in any Federal or State court or administrative agency, and shall be exempt from disclosure, in the hands of an agency or establishment of the Federal Government, under the Freedom of Information Act (5 U.S.C. 552a), or otherwise, unless and until presented in connection with a public proceeding or released in accordance with subsection (c) of this section.

15 U.S.C. § 7215(b)(5)(A).  Only two cases analyze this confidentiality provision:  Silverman v. Motorola, Inc. and Bennett v. Spring Nextel Corp.

In Silverman v. Motorola, Inc., the Honorable Amy J. St. Eve, United States District Judge for the Northern District of Illinois, addressed the PCAOB Privilege in the context of a class action that the plaintiffs filed against Motorola, Inc. for allegedly making "public misstatements and material omissions regarding Motorola's 3G mobile handset portfolio."  2010 WL 4659535, at *1.  The plaintiffs asserted that Motorola, Inc. attempted to "cover up" failed technology developments associated with the company's delayed launch of the Motorola 3G phone, in party by failing to disclose transactions that would have revealed the technology issues "in blatant violation of [Generally Accepted Accounting Principles ("GAAP")] and SEC rules."  2010 WL 4659535, at *1.  The plaintiffs issued two subpoenas to KPMG, "the registered accounting firm that conducted audits and reviews of Motorola's financial statements," seeking "documents and communications concerning" the PCAOB's review of KPMG's review and audit of Motorola, Inc., and seeking to depose two KPMG employees.  2010 WL 4659535, at *1.  KPMG moved the court "to quash the subpoenas issued to it by Plaintiffs and to preclude Plaintiffs from questioning KPMG, through Mr. Pratt and Mr. Parrott, regarding the PCAOB inspection process."  2010 WL 4659535, at *2.  Although the plaintiffs agreed to exclude from their request the documents that KPMG "created specifically in response to a request from the

PCAOB," KPMG objected to producing documents "concerning the PCAOB inspection process" or documents "created . . . in connection with a PCAOB inspection."  2010 WL 4659535, at *3 (alteration in original).  KPMG argued that permitting the plaintiffs to discover materials related to the PCAOB's "confidential inspection process" would chill the "open and constructive engagement between the PCAOB and accounting firms," frustrating the Congress' "carefully crafted" statutory framework designed to "improve the quality of public company audits."  2010 WL 4659535, at *3.

> "KPMG's position is, and always has been, that documents and information that are created in response to a PCAOB inspection and that relate or reflect the substance of the inspection process -- such as internal KPMG communications that discuss, but are not in themselves, communications with the Board or the inspectors, or that discuss the content of confidential questions, comments, or critiques made by Board inspectors, or that reflect the firm's development of responses to those questions, comments or critiques ultimately to be communicated to the Board's inspection team -- are protected."

2010 WL 4659535, at *3 (quoting KPMG's reply brief).  Although KPMG urged the court to consider the legislative history and purpose behind the PCAOB Privilege, Judge St. Eve said the "language creating the statutory privilege in Section 105(b)(5)(A) is exceedingly clear," and does not require looking past the plain language to the legislative history.

> Inclusion of the phrase "specifically for the Board" makes clear that Section 105(b)(5)(A) is applicable to only a portion of any information or documents that may derive from, refer to, or relate to a PCAOB inspection.  The reading of the statute proffered by KPMG, which includes any documents "related to" or "concerning" the PCAOB inspection process, extends interpretation of the provision beyond its plain language and renders meaningless the phrase "specifically for the Board."

2010 WL 4659535, at *4.  Judge St. Eve explained that, "[i]f Congress intended the privilege to protect all materials related to the inspection, the text of the statute would reflect that intention."  2010 WL 4659535, at *4.  Judge St. Eve concluded that KPMG "must produce all documents regarding the accounting and disclosure of the 3Q06 transactions that were not 'prepared . . .

specifically for the Board' to Plaintiffs."   2010 WL 4659535, at *6.   Judge St. Eve also acknowledged and disregarded the plaintiffs' contention that the PCAOB Privilege "lies in the hands of the PCAOB, not KPMG"; Judge St. Eve concluded that the statute's plain language did not support this position and further refused to consider the argument, because the plaintiffs did not "explain or support" their assertion.  2010 WL 4659535, at *4 n.2.

In Bennett v. Sprint Nextel Corporation, a putative class alleged securities fraud related to Sprint's merger with Nextel, specifically that Sprint falsely reported financial reports by failing to "timely write off its impaired goodwill."  2012 WL 4829312, at *1.  The plaintiffs issued a subpoena to KPMG, which performed accounting work for Sprint.  The court granted the plaintiffs' motion to compel and ordered KPMG "to produce its entire set of work papers reflecting contemporaneous evidence of KPMG's audits and reviews of Sprint's financial statements."  2012 WL 4829312, at *1.  After KPMG withheld 468 documents, asserting the PCAOB Privilege, the plaintiffs filed a second motion to compel.  The Honorable Ortrie D. Smith, Senior United States District Judge for the United States District Court for the Western District of Missouri, noted that 15 U.S.C. § 7215(b)(5)(A) covers two circumstances:

> The first, which is not of issue here, involves discovery requests directed to the Board itself.  The second circumstance involves discovery requests directed to targets of the Board's investigations.  The second aspect of the privilege protects those who are under investigation from being required to divulge their responses to that investigation.   Notably, however, the privilege does not extend to documents from the underlying transaction or work that is the subject of the investigation as such documents are not prepared for the Board.  When those underlying documents are given to the Board, the fact they were delivered is privileged, but the documents themselves are not.

2012 WL 4829312, at *2.  Judge Smith first addressed the plaintiffs' argument that the PCAOB Privilege protects documents "in the hands" of the PCAOB and "does not protect documents in the hands of third parties"; Judge Smith concluded that the plaintiffs' reading would "render[]

superfluous" the phrase "prepared . . . for" in the PCAOB Privilege, which protects "all documents and information prepared or received by or specifically for the Board," and, therefore, concluded that KPMG could also assert the PCAOB Privilege. 2012 WL 4829312, at *3. Judge Smith also concluded that "the 'Board' as mentioned in section 7215(b)(5)(A) includes the PCAOB's inspectors who actually conduct the investigations," rejecting the plaintiffs' contention that the "Board" included only the five appointed governing members of the Board and not including staff. 2012 WL 4829312, at *3.

Judge Smith noted that the PCAOB Privilege covers two categories of information: "(1) all documents and information prepared or received by or specifically for the board; and (2) deliberations of the Board and its employees and agents." 2012 WL 4829312, at *3. Regarding documents "specifically for the board," the plaintiffs argued that, under Silverman v. Motorola, Inc., the PCAOB Privilege "does not apply to all documents and information relating to a PCAOB inspection"; Judge Smith reviewed Silverman v. Motorola, Inc., but "respectfully decline[d]" to follow that interpretation of the PCAOB Privilege: "While this Court follows Silverman's ultimate holding that the statute limits the protection of materials that are 'specifically for' the Board, this Court finds that internal KPMG communications that discuss confidential questions or comments made by the Board or reflect KPMG's development of responses to Board inquiries are also protected." 2012 WL 4829312, at *4. Judge Smith concluded that internal KPMG communications that revealed PCAOB comments, or "the work to develop the responses to the comments," were privileged as "specifically for the Board because absent the inspection, these documents and communications would not exist." 2012 WL 4829312, at *4. Judge Smith stated: "The Court finds, however, that any substantive information, documents, spreadsheets, or forms that were compiled specifically for Sprint, but

nevertheless used to respond to the Board's inquiries, are not privileged."  2012 WL 4829312, at *4.  Regarding the PCAOB's deliberations, the plaintiffs argued that the PCAOB Privilege could not protect KPMG's internal documents: "KPMG's documents cannot reveal the actual deliberations of the PCAOB because KPMG was not present for or a part of those deliberations." 2012 WL 4829312, at *4.  Because the statute does not define "deliberations," Judge Smith looked to Black's Law Dictionary, which defines "deliberations" as "'the act of carefully considering issues and options before making a decision or taking some action; esp., the process by which a jury reaches verdict, as by analyzing, discussing, and weighing the evidence.'"  2012 WL 4829312, at *4 (quoting Black's Law Dictionary at 492 (9th ed. 2009)).  Judge Smith explained that "[t]he deliberations privilege protects the Board's consideration and analysis of the evidence the Board receives, but not necessarily the evidence itself."  2012 WL 4829312, at *4.  After an in camera review of the documents which KPMG withheld, Judge Smith concluded that none of them qualified as "'deliberations' of the Board."  2012 WL 4829312, at *4.  Finally, Judge Smith addressed whether KPMG waived its privilege by "voluntarily sharing some of the information relating to the PCAOB investigation to Sprint employees and/or named Defendants in the Underlying Action," noting that "[t]here is no caselaw addressing waiver" of the PCAOB Privilege.  2012 WL 4829312, at *5.  Judge Smith considered other privileges, including the attorney-client privilege and the work-product doctrine, and concluded that, although KPMG informed Sprint that the PCAOB inspection took place, and revealed one of the withheld documents to Sprint, such a disclosure was "inadequate to cause a wholesale subject matter waiver."  2012 WL 4829312, at *5.

## ANALYSIS

The Court will deny the Motion to Compel; it will not compel the SEC to produce the notes and memoranda that it took during KPMG witness interviews and proffer sessions, because the notes and memoranda are opinion work product and the Defendants have not demonstrated substantial need for the notes and memoranda -- they may obtain the same information through deposing the KPMG witnesses.  The Court will not compel the SEC to produce the testimony transcripts and sworn statements that the PCAOB took in 2009 and which the PCAOB shared with the SEC, because the testimony transcripts and sworn statements are documents that the PCAOB prepared, and the SEC has not presented them in this proceeding.  Although the SEC inadvertently disclosed some PCAOB background questionnaires during discovery, the inadvertent disclosure does not waive the PCAOB Privilege related to the remaining PCAOB documents and information in its possession.

The Court will grant in part and deny in part the Motion to Quash.  The Court will not permit the Defendants to depose KPMG regarding KPMG's communications with the PCAOB, but it will permit the Defendants to depose KPMG regarding KPMG's communications with the SEC related to the PCAOB investigation.

The Court will grant the Motion for Protective Order and will preclude the Defendants from deposing a SEC 30(b)(6) designee regarding the SEC's communications with the PCAOB and with KPMG, because the PCAOB Privilege protects the SEC's communications with the PCAOB and the work-product doctrine protects the SEC's communications with KPMG. Similarly, the PCAOB Privilege protects the information requested in the Second Request for Production, and the work-product doctrine protects the information sought in the Third Request for Production.

The Court will organize the analysis as the parties argued it at the hearing, addressing first the oral communications between the SEC and KPMG, and then will address the discovery requests that relate to the PCAOB investigation and whether the PCAOB Privilege applies to any of the requested information.   The Court will also discuss the three categories of PCAOB materials that the Defendants seek, including KPMG witnesses' understanding of their exposure to PCAOB disciplinary procedures, KPMG's communications with the SEC regarding the PCAOB, and KPMG's internal communications that were not prepared specifically for the PCAOB.   The Court concludes that the PCAOB Privilege protects the first category of PCAOB materials, because KPMG witnesses' understanding of potential PCAOB disciplinary procedures is information that the witnesses would have received from the PCAOB.   The PCAOB Privilege does not protect KPMG's communications with the SEC or internal communications regarding the PCAOB, because those communications are not "documents and information prepared or received by or specifically for the Board."   15 U.S.C. § 7215(b)(5)(A).

## I.   THE COURT WILL NOT COMPEL THE SEC TO DISCLOSE ITS COMMUNICATIONS WITH KPMG WITNESSES AND KPMG'S ATTORNEY.

The Defendants assert that, although the SEC has produced its written communications with KPMG, see Jan. 30, 2013 Tr. at 22:18-21 (Marks), it has not disclosed "critical oral communications between the SEC and KPMG," including "almost 90 percent of known testimony, interviews and proffers."   Jan. 30, 2013 Tr. at 23:3-19 (Marks).   The three motions highlight a number of discovery tools the Defendants are seeking to use to obtain the content of the oral communications.   In the Motion to Compel, the Defendants seek the SEC's notes and memoranda that the SEC's attorneys took during KPMG witness interviews and attorney proffers.   Although the SEC asserts that the work-product doctrine protects the notes and memoranda, the Defendants contend that they have a substantial need for the notes and

memoranda, and that they cannot obtain a substantial equivalent, because KPMG's key witnesses, Reinhart and Hall, have been, according to the Defendants, less than forthcoming during depositions or cannot remember the requested information.  The Motion for Protective Order highlights another two discovery tools that the Defendants are attempting to employ to obtain the information -- a 30(b)(6) deposition and a request for production of documents.  The SEC asserts that the 30(b)(6) deposition improperly seeks to depose one of its attorneys and invades work product, and that the work-product doctrine protects the materials that the Defendants seek through the request for production.

A.   **THE WORK-PRODUCT DOCTRINE PROTECTS THE SEC'S INTERVIEW NOTES AND MEMORANDA FROM KPMG WITNESSES, AND THE DEFENDANTS HAVE NOT DEMONSTRATED A SUBSTANTIAL NEED FOR THE NOTES AND MEMORANDA.**

For the work-product doctrine to apply, the asserting party must show that the documents or materials were prepared in anticipation of litigation by or for a party, or by or for that party's representative.  See Anaya v. CBS Broad., Inc., 251 F.R.D. at 651 (citing Fed. R. Civ. P. 26(b)(3)).  Although the Defendants argue that the communications between KPMG and the SEC are not work product, see Jan. 30, 2013 Tr. at 29:1-10 (Marks)("[O]n the communications, your Honor, I would say it is not work product in the first instance."), they concede that the notes and memoranda are work product, although they argue that they are fact work product rather than opinion work product, see Jan. 30, 2013 Tr. at 29:11-22 (Marks)("I would submit that the notes of an essentially verbatim interview or proffer by KPMG are, at best, fact work product.").  The Defendants contend that the SEC waived work product by sharing it with KPMG.  See Jan. 30, 2013 Tr. at 30:17-23 (Marks)("First of all, there are at least two ways in which if there's any work product as to that information it has been waived.").  The parties seem to agree that the SEC created the notes and memoranda in anticipation of litigation, and the remaining issues are

whether the notes and memoranda are fact or opinion work product, and whether the Defendants have demonstrated a substantial need for the notes and memoranda.

The SEC asserts that the notes and memoranda are highly protected opinion attorney work product and not simply fact work product.  Although the Defendants contend that the interview notes are essentially verbatim statements, the SEC staff attorney and accountant that took the interview notes have "declared that the notes are not akin to a transcript of the witnesses' unsolicited factual statements, but rather reflect their mental processes and impressions in investigation Thornburg and preparing for this litigation."  Motion to Compel Response at 15.  To support its position that the interview notes and memoranda are not verbatim notes, but rather that they constitute opinion work product, the SEC points to the declaration of the two SEC employees who took notes at the interviews:

> I have reviewed my interview notes and can fairly state that they are not merely unsolicited statements by Hall.  Rather, the responses are reflective of the SEC staff's questioning and views of the case.  Moreover, the notes were not intended to be a transcription of everything that was said during the interview.  Rather, my notes reflect the SEC staff's opinions as to the relevance and significance of the responses to the SEC staff's questions.  Therefore, the Hall interview notes reflect my mental processes and impressions.

Declaration of Julian Robinson in Opposition of Defendants' Motion to Compel ¶ 11, at 3, dated December 14, 2012, filed December 17, 2012 (Doc. 98-5)("Robinson Declaration").

> I took notes regarding the interview of Jennifer L. Hall on March 4, 2011, which I attended.  During that interview, the SEC staff chose to follow-up with Hall on a limited number of questions.  I have reviewed my interview notes and can fairly state that they are not merely unsolicited statements by Hall.  Rather, the responses are reflective of the SEC staff's questions and views of the case.  Moreover, the notes were not intended to be a transcription of everything that was said during the interview.  Rather, my notes reflect the SEC staff's opinions as to the relevance and significance of the responses to the SEC staff's questions.  Therefore, the Hall interview notes reflect my mental processes and impressions.

Declaration of Donna B. Walker in Oppos[i]tion of Defendants' Motion to Compel ¶ 7, at 2, dated December 14, 2012, filed December 17, 2012 (Doc. 98-6)("Walker Declaration").   Mr. McKenna further described that the notes and memoranda would not constitute verbatim transcripts, but rather, impressions from the interview:

> I write down what I think is important, what needs to be followed up, opinion type information.   And despite what they said about these transcripts being verbatim, . . . if you look at the declarations that were signed by the investigative attorneys in this, particularly Mr. Robinson, he signed a declaration saying, you know: My notes are not a verbatim transcript of what's said.

Jan. 30, 2013 Tr. at 58:13-22 (McKenna).   Based on the SEC employees' declarations and the SEC's representations at the hearing that it does not have verbatim notes and memoranda from the interviews, the Court concludes that the interview notes and memoranda reflect, at least to some extent, opinion work product as well as fact work product, because they record the witnesses' statements as filtered through an SEC employee.   "Ordinary work product generally refers to materials that are gathered at the request of an attorney in anticipation of litigation.   This type of work product receives less protection than opinion work product.   Opinion work product is, basically, the mental impressions of the attorney."   Anaya v. CBS Broad., Inc., 251 F.R.D. at 650 (quoting Sinclair Oil Corp. v. Texaco, Inc., 208 F.R.D. 329, 334 (N.D. Okla. 2002)).

If the party asserting work-product protection establishes entitlement to the protection, rule 26(b)(3) allows production of attorney work-product materials "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."   Fed. R. Civ. P. 26(b)(3).   The SEC contends that the Defendants have not demonstrated a substantial need for the notes and that they can obtain a substantial equivalent through deposing Reinhart and Hall.   The Defendants argue that they have

demonstrated substantial need for the materials, because, although they were able to depose Reinhart and Hall, these two key KPMG witnesses could not remember much of the information that the Defendants requested.  See Jan. 30, 2013 Tr. at 41:18-21 (Marks)("Ms. Hall didn't recall much of anything about her interviews and proffers; didn't even recall whether she was asked and discussed the margin call schedule, which is the center of this case."); Jan. 30, 2013 Tr. at 51:6-8 (Lee)("We asked her, 'What did you tell the SEC?  What topics did you cover?'  She barely remembered anything.  So, it wasn't particularly useful.").  The Defendants also contend that they need the notes and memoranda for impeachment material, because, in their view, a "critical assertion" in the case is that, "had KPMG auditors been aware of certain information[,] they would have disagreed with the OTTI conclusion," Jan. 30, 2013 Tr. at 33:23-34:2 (Marks), yet the Defendants say that this assertion is not in any sworn testimony and that the SEC has told them that the assertion came "from one or more of the interviews and proffers of the KPMG witnesses," Jan. 30, 2013 Tr. at 34:3-12 (Marks).  In the SEC's view, the Defendants' attempt to show their substantial need for the notes based on perceived inconsistencies in Reinhart's and Hall's testimony, but the SEC argues that the need for inconsistent statements is not substantial need.  Further, the SEC points out that the Defendants never asked the KPMG witnesses why the witnesses' testimony supposedly changed.  See Jan. 30, 2013 Tr. at 55:18-21 (McKenna).

> The prior statement, the investigative testimony taken in 2009, the witnesses said it would have been important to know about the failure to meet margin calls in a timely basis because it could have had an impact on other-than temporary impairment analysis.  At the deposition they testified that it likely would have changed their opinion.  Ms. Hall testified that it's inconsistent to be unable to meet your margin calls and state you have the intent and ability to hold your assets.
>
> Now, there is a big difference between these two testimonies, your Honor, which neither one of the counsel for defendants mentioned.  In the middle, after the investigative testimony in 2009 and before the deposition testimony, the SEC investigators found the Citibank reservation of rights letter, which you may recall

from the motion to dismiss is a critical piece of evidence in this case.  It's Citibank which issued $196.5 million margin call sending a letter to Mr. Goldstone and Mr. Simmons saying: You're in breach and we are reserving our right to declare you in default, which under the lending agreement gave them the right to sell the assets they held as collateral.

So, with that information, when they gave their recent deposition testimony, they said it likely would have changed their opinion.  It's inconsistent. Neither one of them mentioned that, but that's -- that's the explanation.

Jan. 30, 2013 Tr. at 56:4-57:3 (McKenna).

In SEC v. Treadway, the Defendants moved to compel the SEC to produce "proffer session notes" that the SEC had withheld from discovery.  229 F.R.D. at 455.  The Southern District of New York determined that the proffer session notes represented attorney work product that, "at least in part, 'reflect[s] the thought processes of counsel.'"  229 F.R.D. at 455 (quoting the Magistrate Judge's order denying the defendants' motion to compel).  Further, the Southern District of New York concluded that the Defendants could not demonstrate substantial need for the notes:

Defendants are free to question each of the witnesses at their depositions, and at trial, concerning the witnesses' statements to the SEC at various proffer sessions. No case cited by Defendants concludes that parties cannot, by deposing witnesses, obtain "the substantial equivalent" of earlier attorney interview notes of the same witnesses without "undue hardship."

229 F.R.D. at 456 (quoting SEC v. Thrasher, No, 92 Civ. 6987, 1995 WL 46681 (S.D.N.Y. Feb. 7, 1995)).

The Court concludes that the Defendants have not demonstrated substantial need to obtain the SEC's notes and memoranda from KPMG interviews and proffers.  Although the Defendants speculate that the notes and memoranda reflect KPMG witness testimony regarding the SEC's "critical assertion" that KPMG employees likely would have disagreed with the OTTI conclusion in the 10-K if they had known about Thornburg Mortgage's margin call situation, the

SEC explained at the hearing that this "critical assertion" is not something that the KPMG

witnesses directly stated, but, rather, is a conclusion that the SEC attorneys have drawn based on

the information they received in the case.

> Court:      Are you saying that the witnesses have in these interviews told you
> that they would have -- if they would have had this information they would not
> have issued the audit report that they did?  Have they said that, or is that a
> conclusion that you have reached on the sum total of the interviews and put in the
> complaint?  Which is it?
>
> Mr. McKenna:      Well, if you'll say I haven't waived my work product by
> answering that question -- your Honor is right. . . .  I can't imagine you ever
> getting an auditor to say something unequivocally; it's next to impossible to do.
> It's a conclusion that we drew from their testimony after having seen the Citibank
> reservation of rights letter in connection with all the other information that we
> were able to put in front of them that was withheld from them by defendants.  We
> were able to in good faith make the allegation that we will be able to show a jury
> that ultimately KPMG would have concluded differently.

Jan. 30, 2013 Tr. at 62:23-63:14 (Court, McKenna).  Further, the Defendants have deposed

Reinhart and Hall and will be able to question them further at trial; if these or other KPMG

witnesses testify at trial differently from their deposition testimony, the Defendants have the

ability to impeach them using the deposition testimony, and do not need the SEC's notes and

memoranda to do so.  The SEC has also represented that it will not use the notes and memoranda

at trial, either to impeach or to refresh the witnesses' memory, and argued that, "[t]o the extent

they've lost their memory, it's not available to either one of us."  Jan. 30, 2013 Tr. at 61:9-11

(McKenna).  See Jan. 30, 2013 Tr. at 62:4-8 (Court, McKenna)(stating that the SEC will not use

the notes and memoranda to impeach any witness at trial); id. at 79:14-19 (Court,

McKenna)(representing that the SEC will not use the notes and memoranda to refresh the

memory of any witness at trial); Jan. 30, 2013 Tr. at 81:18-20 (McKenna)(stating that the SEC

would not show the notes to the witnesses during trial preparation).  Although the SEC asked

Hall at the end of her testimony whether any of her testimony was inconsistent with the previous

interviews and proffers to the SEC, the SEC explained that it was not trying to point out an inconsistency or bolster her credibility, but was "trying to undercut this argument that . . . there's some different statement that she made to us in private under duress with some threat that now is being withheld from defendants, because that's just not the case."  Jan. 30, 2013 Tr. at 64:5-10 (McKenna).   Because the Defendants are able to depose the KPMG witnesses and obtain substantially the same information that the SEC has, they have not demonstrated a substantial need for the SEC's notes and memoranda generated from the SEC's interviews or proffers with the witnesses, and thus, the work-product doctrine protects the notes and memoranda from disclosure.   The Court will deny the Motion to Compel regarding the witness notes and memoranda.

**B.**      **THE COURT WILL NOT REQUIRE THE SEC TO PRODUCE DOCUMENTS REGARDING THE SEC'S COMMUNICATIONS WITH KPMG.**

In the Motion for Protective Order, the SEC requests that the Court protect it from the following request for production: "All COMMUNICATIONS between YOU and KPMG concerning the 2007-2008 SERVICES, the PCAOB INQUIRY, the facts alleged in the COMPLAINT, or the SEC ENFORCEMENT ACTION."  Third RFP at 7.  The SEC contends that this request is improper, because its communications with "KPMG reflect the SEC's attorney opinion work product."  Motion for Protective Order at 20.  To the extent that the Defendants' request for production is requesting the same materials as the Motion to Compel, that is, the SEC's notes and memoranda generated from KPMG witness interviews and proffers, the Court will grant the Motion for Protective Order, because the work-product doctrine protects those documents, as previously discussed.   The SEC asserts that it has produced communications, including electronic mail transmissions, between it and KPMG from before it

filed the Complaint.  See Motion for Protective Order at 19 (stating that the SEC "produced e-mails sent to or received from KPMG counsel prior to the filing of this lawsuit" and arguing that the Defendants must now be requesting the "SEC's correspondence with KPMG's counsel during the litigation").  The Defendants did not elaborate on what additional communications between the SEC and KPMG would be appropriate for discovery, and the Court concludes that the Defendants have not demonstrated a substantial need for the communications between the SEC and KPMG after the SEC filed the Complaint.  The Court will grant the Motion for Protective Order regarding the Defendants' request for production of documents for communications between the SEC and KPMG concerning the 2007-08 services, the PCAOB inquiry, the facts alleged in the Complaint, and the SEC enforcement action.  The Court will further address the request for communications regarding the PCAOB inquiry later in the analysis.

### C.    THE COURT WILL NOT PERMIT THE DEFENDANTS TO DEPOSE A SEC 30(B)(6) DESIGNEE REGARDING THE SEC'S COMMUNICATIONS WITH KPMG.

The Defendants seek to depose a 30(b)(6) SEC representative on a number of topics related to the SEC's and KPMG's communications, including:

6.    YOUR COMMUNICATIONS with K[PM]G concerning the 2007-2008 SERVICES.

7.    YOUR COMMUNICATIONS with K[PM]G concerning the PCAOB INQUIRY.

8.    YOUR COMMUNICATIONS with K[PM]G concerning the SEC INQUIRY.

9.    YOUR COMMUNICATIONS with K[PM]G concerning the facts alleged in the COMPLAINT.

10.    YOUR COMMUNICATIONS with K[PM]G concerning the SEC ENFORCEMENT ACTION.

Notice of Deposition at 6-7.  The SEC contends that the Defendants' deposition topics constitute an attempt to depose the SEC's attorneys and invade work product, while the Defendants contend that the SEC does not have to designate one of its trial counsel as the 30(b)(6) representative.  The Court will grant the Motion for Protective Order, because the Defendants' deposition topics would invade the SEC attorneys' work product, and the Defendants have not demonstrated substantial need for the information or that they cannot obtain substantially the same information without undue hardship.  See In re Grand Jury Proceedings, 43 F.3d 966, 970 (5th Cir. 1994)("[S]tricter limits on disclosure of work product which results from oral communications with third parties is also necessary due to the likelihood that such [recollections] will reveal the attorney's mental processes or litigation strategy." (citing Upjohn Co. v. United States, 449 U.S. 383, 400 (1981)).  To be clear, the Court is not precluding the Defendants from taking 30(b)(6) depositions of the SEC, even though it may be true that the 30(b)(6) representative in many cases will be an attorney.  The problem is that the noticed topics would repeatedly invade the SEC's work product, while the Defendants have other avenues available to obtain substantially similar information, including deposing KPMG witnesses.

Several of the deposition topics clearly invade work product.  For example, asking an SEC designee what communications the SEC had with KPMG regarding the SEC enforcement action against Thornburg Mortgage indicates that the communications took place when the SEC had either already filed the Complaint or was contemplating doing so.  The question seeks communications that the SEC's trial counsel or one of its representatives had with KPMG in anticipation of litigation, and, as the SEC correctly notes, the Defendants are free to depose KPMG witnesses to obtain substantially similar information.  Although the SEC could designate an employee who is not trial counsel in this case as the 30(b)(6) designee, the SEC's trial counsel

would have to prepare the designee based on their work product in anticipation of litigation.  The effect of a 30(b)(6) deposition regarding the SEC's communications with KPMG regarding the SEC enforcement action amounts to deposing opposing counsel, see SEC v. Rosenfeld, No. 97 CIV. 1467 (RPP), 1997 WL 5760231 at *2 (S.D.N.Y. Sept. 16, 1997)("[A] Rule 30(b)(6) deposition of an SEC official with knowledge of the extent of [an] investigative effort, amounts to the equivalent of an attempt to depose the attorney for the other side."); SEC v. SBM Inv. Certificates, Inc., Civil Action No. DKC 2006-0866, 2007 WL 609888, at *23-24 (D. Md. Feb. 23, 2007)(finding 30(b)(6) notice designating "all communications" with various third-parties "clearly calls for the revealing of information gathered by the SEC attorneys in anticipation of bringing the instant enforcement proceedings" and thereby invaded attorney work product); SEC v. Jasper, No. C 07-06122 JW (HRL), 2009 WL 1457755 (N.D. Cal. May 26, 2009)(finding 30(b)(6) notice to the Commission as to communications with non-parties to be an attempt to depose the Commission's lawyers).  The Defendants cannot satisfy the test that the Tenth Circuit articulated in Boughton v. Cotter Corp. to depose opposing counsel, because the Defendants may obtain the information by deposing KPMG witnesses rather than the SEC's trial counsel, the information sought would be privileged through the work-product doctrine, and the Court is not convinced that the information is crucial for the Defendants' preparation of the case.  See 65 F.3d at 829.

Other deposition topics do not as clearly implicate the work-product doctrine, because it is at least possible for the communications to have taken place before the SEC anticipated litigation.  For example, the SEC may have communicated with KPMG concerning KPMG's 2007-08 work for Thornburg Mortgage before it anticipated filing the Complaint.  This deposition topic raises the question whether the SEC's investigative staff could also claim the

work-product doctrine, that is, whether the SEC conducted the investigation "in anticipation" of litigation.  "The work product doctrine does not apply automatically to any and all investigations undertaken by government agencies," SEC v. Nacchio, No. CIV.A. 05-CV-00480MS, 2007 WL 219966, at *6 (D. Colo. Jan. 25, 2007)(citing, e.g., Reich v. Great Lakes Collection Bureau, Inc., 172 F.R.D. 58, 61 (W.D.N.Y. 1997)(noting that investigations of employee complaints are undertaken in the ordinary course of the Department of Labor's activities, are not conducted by attorneys, and do not automatically lead to litigation)).   Many times, however, "[i]nvestigation by a federal agency presents more than a remote prospect of future litigation, and provides reasonable grounds for anticipating litigation sufficient to trigger application of the work product doctrine." Martin v. Monfort, Inc., 150 F.R.D. 172, 173 (D. Colo. 1993).  See In re Grand Jury Subpoena, 220 F.R.D. 130, 147 (D. Mass. 2004)(agreeing that "once a governmental investigation has begun, litigation is sufficiently likely to satisfy the 'anticipation' requirement"); Abdallah v. The Coca-Cola Co., 2000 WL 33249254, *5 (N.D. Ga. 2000)(noting that "[l]itigation may generally be expected from agency investigations"); Fine v. U.S. Dep't of Energy, 823 F. Supp. 888, 903 (D.N.M. 1993)(Burciaga, C.J.)("The existence of an active investigation is strong circumstantial evidence that an agency lawyer prepared the document with future litigation in mind"); SEC v. Cavanagh, No. 98 Civ. 1818(DLC), 1998 WL 132842, *2 (S.D.N.Y. 1998)(holding that the SEC had sustained its burden of persuasion under Rule 26(b)(3) where the documents at issue were prepared by SEC attorneys as part of an investigation undertaken "to provide the Commission with information so that it could make the determination whether to proceed with litigation in this matter"); SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1203 (D.C. Cir. 1991)(holding that where an attorney prepares a document in the course of an active investigation focusing on specific events and a specific possible violation by

a specific party, he or she has litigation sufficiently "in mind" for that document to qualify as attorney work product); <u>Feshbach v. SEC</u>, 5 F. Supp. 2d 774, 783 (N.D. Cal. 1997)(applying the work-product doctrine to internal SEC documents after finding that the agency's examination "was based on a suspicion of specific wrongdoing and represented an effort to obtain evidence and to build a case against the suspected wrongdoer"); <u>In re LTV Sec. Litig.</u>, 89 F.R.D. 595, 612 (N.D. Tex. 1981)("From the moment the SEC investigation commenced with the issuance of subpoenas . . . , LTV was virtually assured of a civil suit.").  <u>Compare</u> <u>United States v. Ernstoff</u>, 183 F.R.D. 148, 156-57 (D.N.J. 1998)(declining to find that Department of Justice documents were prepared in anticipation of litigation, where the materials in question were prepared under a system of random testing rather than in response to a specific complaint).  The Court concludes that, whether the deposition questions would require the SEC's trial counsel or the SEC's investigative staff to prepare the designee, both would invade the SEC's work product, because the SEC's investigative staff conducted the investigation of Thornburg Mortgage in anticipation of litigation and not as part of routine procedure or random testing.

Further, the SEC produced at least its written communications with KPMG that occurred before it filed the Complaint:

> In an effort to avoid this issue (and hopefully persuade the Defendants that no witness has been improperly induced to offer testimony), the Plaintiff produced communications with KPMG prior to the filing of the lawsuit. The production of those communications should not be the basis for the wholesale invasion of Plaintiff's work product.

Motion for Protective Order at 15 n.4.  Thus, many, if not most or all, of the communications about which the Defendants would learn through the 30(b)(6) deposition would have taken place after the SEC not only anticipated litigation, but was in the midst of litigation.  By producing its communications with KPMG that occurred before the SEC filed the Complaint, the SEC has

waived its work-product protection regarding those communications, but it has not waived its work-product protection for all of its communications with KPMG.   See EEOC v. Roswell Radio, Inc., No. CIV-06-0253 JB/LAM, 2007 WL 2305521, at *5 (D.N.M. June 12, 2007)(Browning, J.)("The Court believes that extending a broad subject-matter waiver applicable to the attorney-client privilege to the work-product protection would not properly reflect the purpose of the work-product protection.").   The Court will grant the Motion for Protective Order and will not permit the Defendants to conduct a 30(b)(6) deposition of the SEC regarding the SEC's communications with KPMG.

## II.     THE PCAOB PRIVILEGE COVERS SOME, BUT NOT ALL, OF THE INFORMATION THAT THE DEFENDANTS SEEK TO DISCOVER THROUGH THE THREE MOTIONS.

At the center of the three motions -- the Motion to Compel, KPMG Motion to Quash, and Motion for Protective Order -- the Defendants seek discovery related to documents and information that potentially implicates the PCAOB Privilege.   In the Motion to Compel, the Defendants seek testimony transcripts and sworn statements that the PCAOB took from KPMG employees in 2009, which the PCAOB shared with the SEC.   As explained in the KPMG Motion to Quash, the Defendants seek, though the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, filed December 4, 2012 (Doc. 92-1)("KPMG Subpoena"), KPMG's (i) communications with the PCAOB, (ii) documents and communications concerning the PCAOB's investigation of KPMG for its 2007-2008 services to Thornburg Mortgage, including "documents that refer or relate to the PCAOB's findings" from its investigation; (iii) documents and communications related to any KPMG violations of PCAOB rules, or professional accounting and auditing practices or standards in connection with its work for Thornburg Mortgage; and (iv) the identification of KPMG witnesses that the

PCAOB interviewed during its investigation of KPMG.  KPMG Motion to Quash at 9; KPMG

Subpoena at 8-13.  The Motion for Protective Order describes the Notice of Deposition and the

Second RFP, in which the Defendants seek discovery on the SEC's communications with the

PCAOB concerning (i) the 2007-2008 services; (ii) the PCAOB inquiry; (iii) the SEC inquiry;

(iv) the facts in the Complaint; and (v) the SEC enforcement action.  See Notice of Deposition at

6-7.  Also in the Notice of Deposition and the Third RFP, the Defendants seek discovery on the

SEC's communications with KPMG regarding the SEC's communications with KPMG

regarding the PCAOB inquiry.   At the hearing, the Defendants discussed these discovery

requests in three categories: (i) KPMG witnesses' understanding of potential exposure to

PCAOB disciplinary action; (ii) KPMG communications with the SEC regarding the PCAOB

investigation; and (iii) KPMG's internal communications regarding documents not prepared

specifically for the PCAOB.

> **A.    THE    PCAOB    PRIVILEGE    PROTECTS    "DOCUMENTS    AND INFORMATION PREPARED OR RECEIVED BY OR SPECIFICALLY FOR THE BOARD," WHICH IS NARROWER THAN ALL DOCUMENTS AND INFORMATION RELATING TO OR CONCERNING THE PCAOB INVESTIGATION OR INSPECTION.**

The Court must first determine what materials the PCAOB Privilege protects.  The statute

provides that "all documents and information prepared or received by or specifically for the

Board, and deliberations of the Board and its employees and agents, in connection with an

inspection under section 104 or with an investigation under this section, shall be confidential and

privileged as an evidentiary matter."  15 U.S.C. § 7215(b)(5)(A).

Two district courts have addressed what materials the PCAOB Privilege covers, and have

taken slightly different approaches.  Judge St. Eve, in Silverman v. Motorola, Inc., rejected the

KPMG's argument that the PCAOB Privilege protects "documents 'concerning the PCAOB

inspection process' or any documents 'created . . . in connection with a PCAOB inspection.'" 2010 WL 4659535, at *3 (alteration in original).  The plaintiff in that case clarified in its briefing that it was not seeking (i) "communications between the PCAOB and KPMG in connection with the 2007 inspection"; (ii) "documents KPMG prepared and sent to the PCAOB in response to the PCAOB's inquiries in connection with the 2007 inspection"; (iii) "drafts of documents encompassed within the first and second categories"; (iv) "documents evidencing KPMG's cooperation with the PCAOB during the 2007 inspection"; (v) "PCAOB quality control criticism materials"; (vi) documents memorializing 'on-side dialogue' between KPMG and the PCAOB"; or (vii) "the PCAOB's investigative files."  Plaintiffs' Opposition to Non-Parties KPMG, LLP, David Pratt and Dennis Parrott's Motion to Quash or Modify Subpoena and for Protective Order Redacted at 4 & n.4, filed in Silverman v. Motorola, Inc. May 17, 2010 (Doc. 261)("Silverman v. Motorola, Inc. Plaintiffs' Opposition").  KPMG maintained that the PCAOB Privilege protected documents "'concerning the PCAOB inspection process' or any documents 'created . . . in connection with a PCAOB inspection.'"  Silverman v. Motorola, 2010 WL 4659535, at *3 (citations to the record omitted)(alteration in original).

> KPMG attempts to narrow its privilege claim in its reply brief by asserting that, "KPMG's position is, and always has been, that documents and information that are created in response to a PCAOB inspection and that relate or reflect the substance of the inspection process -- such as internal KPMG communications that discuss, but are not in themselves, communications with the Board or the inspectors, or that discuss the content of confidential questions, comments, or critiques made by Board inspectors, or that reflect the firm's development of responses to those questions, comments or critiques ultimately to be communicated to the Board's inspection team -- are protected.

2010 WL 4659535, at *3.  Judge St. Eve rejected KPMG's broad reading of the PCAOB Privilege, explaining that, in her view, the statutory language is clear:

> Here, Section 105(b)(5)(A) protects from disclosure only materials that an accounting firm "prepared . . . specifically for the Board."  There is no ambiguity

in this statutory provision and the Court need not look any further than the text of the statue in order to resolve the pending motion. Inclusion of the phrase "specifically for the Board" makes clear that Section 105(b)(5)(A) is applicable to only a portion of any information or documents that may derive from, refer to, or relate to a PCAOB inspection.  The reading of the statute proffered by KPMG, which includes any documents "related to" or "concerning" the PCAOB inspection process, extends interpretation of the provision beyond its plain language and renders meaningless the phrase "specifically for the Board."

2010 WL 4659535, at *4.   Judge St. Eve also rejected the argument that "internal KPMG documents relating to the inspection process are 'prepared . . . specifically for the Board' because, absent the inspection, they would never have been created in the first place," because, she explained, "[i]f Congress intended the privilege to protect all materials related to the inspection, the text of the statute would reflect that intention.  Instead, the statute limits the protection to materials prepared 'specifically for' the Board."   2010 WL 4659535, at *4 (last alteration added)(some internal quotation marks omitted).

Judge Smith in <u>Bennett v. Spring Nextel Corp.</u> rejected Judge St. Eve's narrow reading of the PCAOB Privilege:

This Court respectfully declines to follow the <u>Silverman v. Motorola</u> court's interpretation of 15 U.S.C. § 7215(b)(5)(A).   While this Court follows <u>Silverman</u>'s ultimate holding that the statute limits the protection of materials that are "specifically for" the Board, this Court finds that internal KPMG communications that discuss confidential questions or comments made by the Board or reflect KPMG's development of responses to Board inquiries are also protected.  Because the final version of PCAOB comments and KPMG responses to those comments are all privileged, then it also holds that any internal KPMG communications that reveal those comments, or the work to develop the responses to the comments, are also privileged.   All of these communications are specifically for the Board because absent the inspection, these documents and communications would not exist.

2012 WL 4829312, at *4.  After an *in camera* review, Judge Smith listed a number of documents from KPMG's privilege log that were privileged, "because they were prepared by the Board, received by the Board, or specifically for the Board," but noted that "any substantive

information, documents, spreadsheets, or forms that were compiled specifically for Sprint, but nevertheless used to respond to the Board's inquiries, are not privileged."  2012 WL 4829312, at *4.

The Court concludes that Judge St. Eve's narrow reading of the PCAOB Privilege is more faithful to the statutory text than Judge Smith's broader reading, because the statute discusses documents and information "specifically for the Board," which is narrower than any documents or information "relating to" or "concerning" the PCAOB's inspection or investigation, or even just "for the Board."  Judge Smith comes close to a "but for" standard, which would probably be proper if the statute said only "for the Board," but seems too broad given that Congress said "specifically"; Judge Smith's interpretation does not give any independent content for the word "specifically."   Judge Smith considers documents and communications to be "specifically for the Board" when, "absent the inspection, these documents and communications would not exist," but the phrase "specifically for" cuts against Judge Smith's conclusion.  For something to be "specifically for" the Board, it is "explicitly, particularly, or definitely" for the Board.  See Straton v. Hodgkins, 155 S.E. 902, 702 (W. Va. 1930)(defining "specifically" as "in a specific manner, explicitly, particularly, definitely" (citing Funk & Wagnall's Dictionary; Century Dictionary and Cyclopedia, no editions or pages cited)); Specifically, Webster's Third New International Dictionary Unabridged, 2187 (1993)(defining "specifically" as "1. In regard to the matter in question; with reference to a quality or condition that is specified or inherent" and "2. With exactness and precision"); Specifically, Oxford English Dictionary, Volume XVI at 158 (defining "specifically" as "1. In respect of specific or inherent qualities: a. Of likeness or difference," and "2. In a specific or definite form or manner").

Although Judge St. Eve did not comment about how the plaintiffs defined their request for documents from KPMG, the Court concludes that the documents that the plaintiffs excluded from their request delineate a proper balance between protected and unprotected information and documents while being faithful to the statutory language.   The plaintiffs did not seek KPMG's communications with the PCAOB, documents prepared and sent to the PCAOB in response to the PCAOB's inquiries, or drafts of those documents.   See Silverman v. Motorola, Inc. Plaintiffs' Opposition at 4.   Items in the first two categories -- communications with the PCAOB or documents sent to the PCAOB -- could be considered documents and information "received by" the PCAOB, meaning that the PCAOB Privilege must do more than sending materials to the PCAOB to give effect to the words "prepared . . . specifically for the Board."   15 U.S.C. § 7215(b)(5)(A).   By including the drafts of KPMG's communications with the PCAOB and documents it submitted to the PCAOB, the phrase "prepared . . . specifically for the Board" does some work, by protecting documents that are not protected through the phrase "prepared or received by . . . the Board," 15 U.S.C. § 7215(b)(5)(A), but to go far beyond protecting drafts starts to render "specifically" meaningless.   If the PCAOB Privilege protects all documents and communications that would not exist but for the PCAOB inspection, KPMG could refuse to disclose a wide variety of documents that it never had any intention of sharing with the PCAOB and that are in no sense "specifically for the Board."   Internal communications regarding the PCAOB investigation, such as communications informing KPMG employees that the PCAOB has initiated an investigation or commentary about the investigation, would not be "specifically for the Board."   At the same time, certain portions of those communications may be privileged, such as the questions that the PCAOB asked during the investigation or inspection, because that information is "prepared . . . by . . . the Board."   15 U.S.C. § 7215(b)(5)(A).   The Court

concludes that the PCAOB Privilege protects KPMG's communications with the PCAOB regarding the investigation, documents submitted to the PCAOB regarding the investigation or in response to the PCAOB's inquiries, and drafts of those two categories, but the PCAOB Privilege does not protect every document concerning or relating to the PCAOB investigation, nor does it protect every document and communication that would not exist but for the investigation.  The Court concludes that this interpretation gives meaning to the statute's words by protecting the documents that are "prepared or received by or specifically for the Board," and is consistent with the requirement that "any privilege limiting discovery is narrowly and strictly construed." Trujillo v. Bd. of Educ., No. Civ. 02-1146 JB/LFG, Civ. 03-1185 JB/LFG, 2007 WL 1306593, at *4 (D.N.M. Mar. 12, 2007)(Browning, J.).

Other privileges may protect some of KPMG's internal communications, especially if KPMG's counsel works with KPMG in responding to the PCAOB's inspection or investigation inquiries.  For example, when the PCAOB begins to investigate a public accounting firm, the firm may anticipate litigation and request its counsel to help prepare responses in the hopes of avoiding litigation or a disciplinary action.  Although an accounting firm may not anticipate litigation when the PCAOB conducts inspections every one to three years, see 15 U.S.C. § 7214(b) (explaining that the PCAOB shall conduct inspections "annually with respect to each registered public accounting firm that regularly provides audit reports for more than 100 issuers," and "not less than once every 3 years with respect to each registered public accounting firm that regularly provides audit reports for 100 or fewer issuers"), the PCAOB Privilege may not cover the documents generated in inspections in the first place, such as "selected audit and review engagements of the firm," 15 U.S.C. § 7214(d)(1); such documents, even under Judge Smith's understanding, would not be "specifically for" the Board, because the documents were prepared

for the public company but used to respond to the PCAOB's inquiries.  Bennett v. Sprint Nextel Corp., 2012 WL 4829312, at *4 (stating that "any substantive information, documents, spreadsheets, or forms that were compiled specifically for Sprint, but nevertheless used to respond to the Board's inquiries, are not privileged").  The work-product doctrine and attorney-client privilege may protect the internal documents and communications even after shared with the PCAOB; although the voluntary disclosure of work product or attorney-client information to a governmental agency who is investigating the entity may result in a waiver of the materials, "[m]ost cases apply a different rule where the investigating agency coerces the production of the documents or subpoenas or otherwise obtains them through compulsory legal process." McCoo v. Denny's, Inc., CIV. A. 98-2458-RDR, 2000 WL 307315, at *2 & n.2 (D. Kan. Mar. 21, 2000)(comparing In re Steinhardt Partners, L.P., 9 F.3d 230, 235-36 (2d Cir. 1993)(trader's submission of legal memorandum to the SEC waived work product immunity); Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1428-30 (3d Cir. 1991)(disclosures to the SEC and Department of Justice during investigations waived protections of both attorney-client privilege and attorney work-product doctrine); Cooper Hosp./Univ. Med. Ctr. v. Sullivan, 183 F.R.D. 119, 128-29 (D.N.J. 1998)(hospital's disclosure of audit report to state attorney general and United States Attorney during investigation of Medicaid fraud and violations of federal securities laws waived work product protection); Schultz v. Talley, 152 F.R.D. 181, 185 (W.D. Mo. 1993)(disclosure to state attorney general investigating college waived work product immunity), with In re Subpoenas Duces Tecum, 738 F.2d 1367, 1373 (D.C. Cir. 1984)("The distinction between voluntary disclosure and disclosure by subpoena is that the latter, being involuntary, lacks the self-interest which motivates the former.  As such, there may be less reason to find waiver in circumstances of involuntary disclosure.")).  The Court notes that other

doctrines, such as the work-product doctrine or the attorney-client privilege, may protect materials that the PCAOB Privilege does not.

Of the information and documents that the Defendants are seeking, the PCAOB Privilege covers the following: (i) at issue in the Motion to Compel, the testimony transcripts and sworn statements that the PCAOB took from KPMG employees in 2009, because the transcripts are documents prepared by the Board; (ii) at issue in the Motion to Quash and in the KPMG Subpoena, KPMG's communications with the PCAOB, because those communications constitute information received by the Board; (iii) at issue in the Motion to Quash and in the KPMG Subpoena, the documents that "refer or relate to the PCAOB's findings" from the investigation to the extent that the documents or information was prepared by or specifically for the Board, but not internal communications that were not specifically prepared by or for the Board; (iv) at issue in the Motion to Quash and in the KPMG Subpoena, the documents and communications related to KPMG violations of PCAOB rules, of professional accounting and auditing practices or of standards in connection with its work for Thornburg Mortgage to the extent that those documents and communications were prepared specifically for the Board; (v) the identification of KPMG witnesses that the PCAOB interviewed during its investigation of KPMG, because that information would be information prepared by the Board; (vi) at issue in the Motion for Protective Order and in the Notice of Deposition and Second RFP, the SEC's communications with the PCAOB concerning the 2007-08 services, the PCAOB inquiry, the SEC inquiry, the facts in the Complaint, and the SEC enforcement action, because that information would be information received by the Board and prepared specifically for the Board. The PCAOB Privilege would not protect the following documents and information: (i) at issue in the Motion to Quash and in the KPMG Subpoena, the documents and communications

concerning the PCAOB's investigation of KPMG for its 2007-08 services to Thornburg Mortgage to the extent those documents and communications were not prepared specifically for the Board; (ii) at issue in the Motion to Quash and in the KPMG Subpoena, the documents and communications related to KPMG violations of professional accounting and auditing practices or standards in connection with its work for Thornburg Mortgage to the extent that the information was not prepared specifically for the Board; and (iii) at issue in the Motion for Protective Order, in the Notice of Deposition, and in the Third RFP, the SEC's communications with KPMG regarding the PCAOB inquiry, because to the extent that information was discussed between KPMG and the SEC rather than with the PCAOB, it is not information "prepared or received by or specifically for the Board." 15 U.S.C. § 7215(b)(5)(A). As the Defendants organized the topics at the hearing, the PCAOB Privilege would protect KPMG witnesses' understanding of their exposure to PCAOB disciplinary procedures, because the witnesses' understanding would have come from communications with the PCAOB. The privilege would not protect KPMG's communications with the SEC regarding the PCAOB, nor would it cover KPMG's internal communications that were not specifically prepared for the Board or received from the Board. Other protections, such as the work-product doctrine or attorney-client privilege, may shelter the documents that the PCAOB Privilege does not cover, but, as the Court mentioned at the hearing, the SEC will need to create a privilege log and assert specific privileges before the Court will rule that the work-product doctrine or attorney-client privilege does or does not apply to those documents or information.

**B.    ALTHOUGH KPMG IS ONE PARTY THAT HOLDS AND MAY WAIVE THE PCAOB PRIVILEGE, THE PCAOB AND THE SEC ALSO HOLD THE PRIVILEGE, AND MAY PRESENT THE PROTECTED DOCUMENTS OR INFORMATION IN A PUBLIC PROCEEDING.**

The Court has concluded that the PCAOB Privilege encompasses at least some of the information and documents that the Defendants seek, but the Court must next determine whether any of the materials have been "presented in connection with a public proceeding or released in accordance with subsection (c)," which requires the Court to determine both who holds the PCAOB Privilege and how it is waived.

KPMG argues that it is the auditor who holds the privilege, and must give consent before the information and documents may be shared with anyone other than the SEC, unless the PCAOB initiates a disciplinary procedure under 15 U.S.C. § 7215(c).  As KPMG sees it, the PCAOB may share information from inspections and investigations with the SEC, and with other law enforcement authorities, but there is no exception to the requirement in subsection (b)(5)(B) that those authorities "shall maintain such information as confidential and privileged."  KPMG contends that the inspection and investigation information and documents are privileged until the PCAOB decides to institute a disciplinary proceeding, and that the "public proceeding" in subsection (b)(5)(A) refers to a public hearing as part of subsection (c)(2) related to disciplinary procedures.  Neither the SEC nor the Defendants hold a similar view of the PCAOB Privilege; the parties seem to agree that the SEC may, in some situations, disclose the PCAOB materials when it presents them in a public proceeding, but they disagree as to whether the SEC has done so here.  The Defendants contend that the SEC has presented the PCAOB information and documents when two of the SEC's staff members reviewed the PCAOB transcripts to help prepare or edit the Complaint, while the SEC maintains that its employees did not rely on the PCAOB transcripts when preparing or editing the Complaint.

KPMG is correct, to an extent: it, and other audit companies that the PCAOB inspects or investigates, may rely on the PCAOB Privilege and refuse to reveal documents and information that it prepared specifically for the PCAOB.  In <u>Bennett v. Sprint Nextel Corp.</u>, Judge Smith explained that the PCAOB Privilege protects documents "in the hands" of the PCAOB as well as in the hands of third parties, including the organization that the PCAOB investigates or inspects. 2012 WL 4829312, at *3.

> KPMG points out that the statute extends to both materials "prepared . . . for" and "received by" the Board.  KPMG argues that if only materials in the possession of the Board (i.e. "received by") were protected, then the phrase "prepared . . . for" would be rendered superfluous.  Further, as discussed previously, the privilege not only protects the Board, but also those who are under investigation from being required to reveal their responses to the Board's inquiries.  The Court agrees and finds the privilege outlined in 15 U.S.C. § 7215(b)(5)(A) may be asserted by KPMG.

2012 WL 4829312, at *3.  The Court agrees with Judge Smith's conclusion that both the PCAOB, and the targets of PCAOB inspections and investigations, may assert the PCAOB Privilege, because the information that the PCAOB Privilege protects documents and information "prepared . . . specifically for the Board," and not just information "received by . . . the Board."  15 U.S.C. § 7215(b)(5)(A).

Further, KPMG is correct to note that the SEC and other government agencies that receive information and documents from the PCAOB are to "maintain such information as confidential and privileged."  15 U.S.C. § 7215(b)(5)(B).  The statute permits the PCAOB to make the information available to certain government agencies, "each of which shall maintain such information as confidential and privileged," including the SEC, and, in the PCAOB's discretion as "necessary to accomplish the purposes of this Act or to protect investors," to the Attorney General of the United States, the appropriate federal functional regulator, state attorneys general, and appropriate state regulatory authorities.  15 U.S.C. § 7215(b)(5)(B).

These additional agencies may also assert the PCAOB Privilege, meaning that PCAOB documents and information that the agencies hold are "confidential and privileged as an evidentiary matter" and "exempt from disclosure."  15 U.S.C. § 7215(b)(5)(A).

The Court disagrees, however, with KPMG's understanding of the last clause in subsection (b)(5)(A), which states "unless and until presented in connection with a public proceeding or released in accordance with subsection (c)."  KPMG interprets "public proceeding" as meaning a "public hearing" in subsection (c)(2), which states, in relation to disciplinary procedures, that "[h]earings under this section shall not be public, unless otherwise ordered by the Board for good cause shown, with the consent of the parties to such hearing." The problem with KPMG's interpretation is that the statute does not refer to "public hearings" in subsection (b)(5)(A), but "public proceeding[s]."  As the Defendants emphasize, the disjunctive "or" demonstrates that public proceedings are different from the disciplinary procedures in subsection (c).  Earlier in subsection (b)(5)(A), the statute refers to "any proceeding in any Federal or State court or administrative agency," and it is at these proceedings where the PCAOB documents and information may be "presented in connection with a public proceeding."  15 U.S.C. § 7215(b)(5)(A).

Part of the question, then, is who may present the PCAOB materials in a public proceeding.  The statute would be clearer had Congress written it in active voice, rather than in passive voice; instead of stating who may present the documents and information in a public proceeding, the statute states "unless and until presented in connection with a public proceeding."  15 U.S.C. § 7215(b)(5)(A).  The Court concludes that the PCAOB is not the only entity that may present the documents and information in a public proceeding, namely because the proceedings seem to refer to proceedings other than the disciplinary procedures outlined in

subsection (c).  Instead, it seems that the listed government agencies, or the accounting firm that

the PCAOB inspects or investigates, may present the materials in federal or state court cases or

administrative hearings.  Although subsection (b)(5)(B) states that the agencies "shall maintain

such information as confidential and privileged," the Court does not think it is inconsistent to say

that the agencies must maintain the materials' confidentiality until the agency presents the

information in a public proceeding by, for example, relying on the information to bring an

enforcement action.  If the Attorney General or the SEC could never bring an action and present

the information, there would be no useful reason to share the information, and the "until

presented" language would not mean anything.  The Court is not sure what benefit it would be

for the PCAOB to share documents and information from its investigations or inspections if the

SEC or other government agencies may not then use the information.

### C.   THE SEC HAS NOT WAIVED THE PCAOB PRIVILEGE IN THIS CASE, WITH THE EXCEPTION OF THE PCAOB BACKGROUND QUESTIONNAIRES THAT IT INADVERTENTLY PRODUCED.

The next issue is whether the SEC has waived the PCAOB Privilege, or has presented the

PCAOB information and documents in connection with a public proceeding.  The Defendants

assert that it is inappropriate for the SEC to disclose PCAOB materials in SEC v. Jensen, but not

disclose them here.  The document that the Defendants cite from SEC v. Jensen is the Objections

of Plaintiff Securities and Exchange Commission to Special Master Order Granting Defendant

Tekulve's Motion to Compel Responses to Second Set of Interrogatories, filed in Case No. CV

11-05316 R (AGRx) October 9, 2012 (Doc. 93)("SEC v. Jensen Objections").  The SEC in that

document asserted that the special master incorrectly found that the SEC did not timely assert the

PCAOB Privilege, and the SEC explains that,

> [w]hen it raised SOX § 105(b)(5) on October 14, 2011, the commission produced
> transcripts, exhibits and correspondence (transmittal letters and emails to schedule

meetings) to the Defendants; nothing else from the PCAOB investigation was produced.  The Commission made this production to avoid any fairness concerns.  When Tekulve sought additional documents pursuant to his rule 34 document request, the Commission objected, stating that to produce any additional documents was unnecessary in light of the parties' agreement that its October 14, 2011 production was all that was required.

SEC v. Jensen Objections at 4 (internal citations omitted).  In the Special Master Order Granting Defendant Tekulve's Motion to Compel Responses to Second Set of Interrogatories, filed in Case No. CV 11-05316R (AGRx) October 12, 2012 (Doc. 94)("SEC v. Jensen Special Master Order"), the Special Master explained the defendant's request for PCAOB information and the SEC's objection:

> The Complaint alleges, inter alia, that Defendants Thomas Tekulve and Peter Jensen violated federal security laws by recognizing revenue on six Basin Water, Inc. transactions that were restated in 2009.

> The Public Company Accounting Oversight Board ("PCAOB"), the regulatory body that oversees, investigates, and disciplines independent accounting firms and independent auditors, (See 15 U.S.C. §7211 *et seq*) initiated an investigation of Singer Lewak's audits of Basin Water, Inc. transactions which ultimately became the basis the within Complaint. The PCAOB commenced discovery on Singer Lewak and auditors in 2008 and purportedly for over the past two years the discovery has been in abeyance.

> . . . .

> In May 2012, Defendant Tekulve learned that the PCAOB's investigation remained open and unresolved.  Seeking an explanation for this unexplained two-year gap in the PCAOB investigation, Defendant Tekulve propounded interrogatories to determine whether or not the SEC and PCAOB acted in concert in order to influence the testimony of Singer Lewak employees by having the threat of PCAOB discipline hanging over them.

> Not satisfied with Plaintiff's responses, on May 22, 2012 Defendant Tekulve served Second Set Of Interrogatories:

> Interrogatory No. 1: DESCRIBE all communications, including any verbal communications, that YOU have had with the Public Company Accounting Oversight Board that refer or relate to Singer Lewak in the context of its work for Basin Water.

On June 25, 2012, Plaintiff filed its objection to Interrogatory No. 1 on various grounds, including: a) The information sought is not reasonably calculated to lead to the discovery of admissible evidence. (Fed. R. Civ. P. 26(b)(1); b) Information not previously produced is prohibited from disclosure pursuant to Section 105(b)(5) of the Sarbanes-Oxley Act of 2002, 15 U.S.C. §7215(b)(5): c) all such information is protected by the law enforcement privilege and work product.

Interrogatory No. 2: DESCRIBE any agreement between YOU and any PERSON, including Singer Lewak, to toll any claims that refer or relate to Basin Water. Plaintiff's response: There are no such agreements.

On July 27, 2012, Defendant Tekulve filed the Motion to Compel Responses to Interrogatory No. 1 alleging that none of the privileges claimed by Plaintiff bar discovery of the SEC'S communications with the PCAOB and, even if these privileges might otherwise have applied, the SEC conclusively waived them not only through its previous production of PCAOB materials but, also, the SEC agreed to produce the documents rather than assert joint law privileges.

CONCLUSION

Mere suspicion that information sought might be relevant is insufficient to meet the requirements of Fed. R. Civ. P. 26(b)(1). However Plaintiff's selective production of documents, failure to raise the privilege issues at the Early Meeting of Counsel or in the Joint Report, failure to assert any privilege on the withheld documents until Defendant sought the specific information described in Interrogatory Number 2, coupled with the unexplained over two year hiatus in the PCAOB investigation, witnesses who are subject to discipline by the PCAOB and whose testimony might be affected thereby taken together is more than mere suspicion and is sufficient to meet the requirements of Fed. R. Civ. P. 26(b)(1).

SEC v. Jensen Special Master Order. The Central District of California overruled the SEC's objections and affirmed "the Special Master's Order in its entirety." Minute Order (In Chambers), filed in Case No. CV-11-5316-R October 30, 2012 (Doc. 102).

Although the Defendants point to the SEC's conduct in SEC v. Jensen to assert that the SEC should produce similar documents in this case, the SEC's conduct in a different case in a different part of the country are not necessarily inconsistent with the SEC's conduct in this case. The SEC in SEC v. Jensen may have more directly relied on the PCAOB documents and information, thus justifying more disclosure. Regardless the reason why the SEC disclosed the

materials in <u>SEC v. Jensen</u>, the Court is not compelled to require the SEC to make similar disclosures in this case.   The statute requires that the SEC maintain the information as confidential and privileged, unless and until presented in connection with a public proceeding. The Court will not conclude that the SEC somehow waived the PCAOB Privilege in this case based on the fact that the SEC may have disclosed PCAOB information and documents in another case.   The SEC in this case is appropriately cautious in heeding the statute's mandate that it "maintain such information as confidential and privileged," 15 U.S.C. § 7215(b)(5)(B), at least unless it presents the documents or information "in connection with a public proceeding. 15 U.S.C. § 7215(b)(5)(A).

The Court concludes that the SEC has not presented the PCAOB documents and information in connection with this public proceeding; the SEC has declared that it did not use or rely on any PCAOB transcripts in preparing or editing the Complaint.   <u>See</u> Declaration of Stephen C. McKenna in Opposition of Defendant's Motion to Compel ¶ 6, at 2, filed December 17, 2012 (Doc. 98-1)("I did not use or rely on any PCAOB transcripts in my preparation of the Complaint"); Declaration of Jeffery S. Lyons in Opposition to Defendants' Motion to Compel ¶ 5, at 2, filed December 17, 2012 (Doc. 98-4)("In preparing the SEC's Complaint against Defendants, I did not use or rely on any testimony provided to the PCAOB.   No PCAOB transcripts were on my desk at the time I drafted the Complaint."); Declaration of Julian Robinson in Opposition of Defendants' Motion to Compel, filed December 17, 2012 (Doc. 98-5)(stating that, although he "reviewed transcripts of six KPMG employees during late August 2009," before he took investigative testimony from KPMG employees in August and September, 2009, "I do not believe that I reviewed any PCAOB transcripts after that time"); <u>id</u>. ¶¶ 7-8, at 2 (stating that he "reviewed the SEC's Complaint against Defendants around March of 2012," but

that he "did not revisit any of the PCAOB transcripts I read in August 2009 in reviewing the Complaint," did not have "any of the PCAOB transcripts on my desk or even in my office at the time I reviewed the Complaint," and, "[t]hus, I did not use or rely on any PCAOB transcripts in my review of the Complaint").  While the SEC could "present" the PCAOB documents or information by incorporating it into a pleading or using the material to write a pleading, those situations, which risk presenting the protected information, did not occur here.

### D.   TO THE EXTENT THAT THE SEC WAIVED THE PCAOB PRIVILEGE BY DISCLOSING EIGHT PCAOB BACKGROUND QUESTIONNAIRES, ANY WAIVER OF THE PCAOB PRIVILEGE IS SELECTIVE AND DOES NOT RESULT IN A SUBJECT-MATTER WAIVER.

The Defendants contend that the SEC, by producing eight PCAOB background questionnaires, has waived the PCAOB Privilege as to other PCAOB-related documents, because, in their view, "[t]here is no principled reason for producing KPMG witnesses' written responses to PCAOB questions while claiming privilege as to their oral testimony."  Motion to Compel at 29.  The SEC asserts that its production was inadvertent and that the production of eight documents does not constitute a subject-matter waiver of the PCAOB Privilege.

The statute does not describe whether there is a subject-matter waiver or a selective waiver of materials.  Although the parties discuss attorney-client privilege and the work-product doctrine in determining whether a similar waiver should apply to the PCAOB Privilege, the Court notes that it must be faithful to Congress' intent in creating the PCAOB Privilege, and it is hesitant to import broad waiver principles into the statute.  In a different context, the Court's previous analysis whether disclosing work product results in a subject-matter waiver or a selective waiver of only those materials disclosed may be helpful here:

> While the Court has previously acknowledged that courts are divided on whether subject-matter waiver applies to work-product protection, see Anaya v. CBS Broadcasting, No. CIV-06-476 JB/KBM (D.N.M. 2007), Memorandum Opinion

and Order at 12-13, filed April 30, 2007 (Doc. 107)(collecting cases), courts that have applied subject-matter waiver to the attorney work-product doctrine have often been careful to confine their application to non-opinion work product, see In re Echostar Commc'ns Corp., 448 F.3d 1294, 1302 (Fed. Cir. 2006)("[W]ork product waiver only extends to factual or non-opinion work product concerning the same subject matter as the disclosed work product."); United States v. Mass. Inst. of Tech., 129 F.3d 681, 688 (1st Cir. 1997)(explaining that rule 26(b)(3) may protect opinion work product from discovery, "even if protection of ordinary work product materials were deemed waived because of selective disclosure"); Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1422 (11th Cir. 1994)("[T]he subject-matter waiver doctrine does not extend to materials protected by the opinion work product privilege."); United States v. Pollard (In re Martin Marietta Corp.), 856 F.2d 619, 626 (4th Cir. 1988)(holding subject matter waiver does not extend to opinion work product).

The Court believes that extending a broad subject-matter waiver applicable to the attorney-client privilege to the work-product protection would not properly reflect the purpose of the work-product protection. See Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M.2004)(Browning, J.)("The attorney work-product protection is based on the recognition that it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel."). The Court also believes that strategically disclosing attorney work-product is fundamental to the litigation process, and that the rule some courts have embraced applying subject-matter waiver to non-opinion work product may stifle advocacy by requiring lawyers to disclose materials that contain both opinion and non-opinion work product. While the Court could protect only opinion work product and find a subject-matter waiver for non-opinion work product, it seems that lawyers should be in control of their work product, and be allowed to strategically decide when to disclose, if ever, their work product. Accordingly, the Court concludes this approach is the most faithful to the policies underlying the attorney work-product doctrine; "[u]nlike the attorney-client privilege, which is designed to protect the client's confidences, the work product doctrine is designed to protect the adversary process." J. Moore, Moore's Federal Practice § 26.70(6)(a) (3d. ed. 2006).

E.E.O.C. v. Roswell Radio, Inc., CIV 06-0253 JB/LAM, 2007 WL 2305521, at *5 (D.N.M. June

12, 2007)(Browning, J.).

There is some support in the legislative history that the purpose of the PCAOB Privilege

is similar to the attorney-client privilege:

Committee witnesses also emphasized that information gathered by Board investigators should be "privileged from outsiders" during the investigative process. Under the bill, any information gathered in the course of an investigation

is to be confidential and privileged for all purposes (including civil discovery), unless and until particular information is presented in connection with a public proceeding.

S. Rep. No. 107-205, at 10 (2002).  As KPMG explained, "[t]his history reveals that the primary purpose of the privilege was to prevent 'outsiders' (e.g., private plaintiffs) from using PCAOB materials against registered public accounting firms and/or their audit clients in private securities suits and thus discouraging cooperation by audit firms with PCAOB investigations."  Motion to Compel at 25.  Like the attorney-client privilege, however, once the information has been shared with an "outsider," the confidence is lost.  In this way, the PCAOB Privilege may be like the attorney-client privilege, which results in subject-matter waivers after disclosure.

On the other hand, the statute states that the material is confidential and privileged "unless and until presented in connection with a public proceeding," 15 U.S.C. § 7215(b)(5)(A), and, as the Court has determined, the public proceeding is not necessarily against the accounting firm that the PCAOB inspected or investigated.  The SEC may present some of the information it receives from the PCAOB in a public proceeding against, for example, the public company that the accounting firm audited, but not present other information that it received from the PCAOB that may deal more directly with the accounting firm.  The statute does not discuss any broader waiver than those that are presented in the public proceeding.  Further, as the SEC pointed out, "PCAOB conduct supports the position that a limited disclosure of materials relating to a PCAOB investigation does not result in subject matter waiver."  Motion to Compel Response at 17.  For example, the PCAOB publishes Firm Inspection Reports by disclosing only certain parts of the PCAOB inspection while stating that "portions of the complete report are omitted from this document in order to comply with sections 104(g)(2) and 105(b)(5)(A) of the Sarbanes-Oxley Act of 2002."  Inspection of Aaron Stein at 1, PCAOB Release No. 104-2008-126A (July

31, 2008), <u>available at</u> http://pcaobus.org/Inspections/Reports/Pages/default.aspx (capitalization altered for readability).  That the PCAOB releases portions of its inspections, yet withholds other information regarding the same inspection, indicates that the PCAOB treats any waiver of the PCAOB Privilege as a selective waiver, rather than a subject-matter waiver.  The Court concludes that the PCAOB privilege is more like the work-product protection than the attorney-client privilege, and that any disclosure of documents or information that the PCAOB Privilege protects results in a limited waiver of the privilege rather than a subject-matter waiver.  Thus, the SEC has waived the PCAOB Privilege as to the eight PCAOB background questionnaires, but not as to those witnesses' transcripts or testimony or any other documents or information it received from the PCAOB.

**IT IS ORDERED** that (i) the Defendants' Motion to Compel Production of PCAOB Deposition Transcripts and Plaintiff's Notes and Memoranda of Interviews with Non-Party Witnesses, filed November 28, 2012 (Doc. 90), is denied; (ii) Non-Party KPMG LLP's Motion to Quash, in Part, or Modify Subpoena to Produce Documents, and for Protective Order, filed December 4, 2012 (Doc. 91), is granted in part and denied in part; and (iii) Plaintiff Securities and Exchange Commission's Motion for a Protective Order to Quash Defendants' Notice of 30(b)(6) Deposition and Second and Third Requests for the Production of Documents, filed January 15, 2013 (Doc. 121), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzalez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Ian S. Karpel
United States Securities and Exchange Commission
Denver, Colorado

  *Attorneys for Plaintiff Securities and Exchange Commission*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Chris Johnstone
Alanna G. Buchanan
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

John Valentine
Lauren R. Yates
Michael A. Lamson
April N. Williams
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Randall Lee
Jessica Kurzban
Peiyin Patty Li
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

 *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Robert J. Liubicic
Paul M. Torres
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

 *Attorneys for Defendant Jane E. Starrett*

W. Spencer Reid
Keleher & McLeod
Albuquerque, New Mexico

--and--

George A. Salter
Peter J. Dennin
New York, New York

 *Attorneys for Intervenor KPMG*