## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

vs.                                                                           No. CIV 12-0257 JB/LFG

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRET,

       Defendants.

## <u>MEMORANDUM OPINION[1]</u>

**THIS MATTER** comes before the Court on Plaintiff Securities and Exchange Commission's Motion for a Protective Order to Quash Defendants' Notice of 30(b)(6) Deposition, filed April 15, 2013 (Doc. 163)("Motion").  The Court held a hearing on July 9, 2013.  The primary issue is whether the Court should grant the protective order to bar any inquiries from the Defendants regarding topics 1-19, 21, and 23 in the Amended Notice of Deposition Pursuant to Fed R. Civ. P. 26 and Rule 30(b)(6) Directed to Plaintiff Securities and Exchange Commission, filed April 15, 2013 (Doc. 163-2)("Amended Notice").  Motion at 2. Because the Court finds that the appropriate remedy is to narrowly tailor the topics, the Court will grant the Motion in part and deny it in part.

---

[1]The Court issued an Order, filed March 31, 2014 (Doc. 39), granting in part and denying in part the Plaintiff Securities and Exchange Commission's Motion for a Protective Order to Quash Defendants' Notice of 30(b)(6) Deposition, filed April 15, 2013 (Doc. 163), stating that the Court "may . . . at a later date issue a memorandum opinion more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

## FACTUAL BACKGROUND

The Defendants are former officers of Thornburg Mortgage Inc.: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The Plaintiff Securities and Exchange Commission ("SEC") alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[2]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[3] Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and once was the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the allegations in the Complaint, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending

---

[2]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions."  Annual Report, Investopedia, http://www.investopedia.com/terms/a/annualreport.asp.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia.
[3]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

operations focused on "jumbo" and "super-jumbo"[4] ARM securities; Thornburg Mortgage also

purchased ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg

Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and

investment business through reverse repurchase agreements[5] backed by ARM securities.  See

---

[4]"Jumbo" and "sugar-jumbo," in reference to ARM securities, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that Fannie Mae and Freddie Mac set.  Super jumbo mortgage, Wikipedia.  Fannie Mae, formally the Federal National Mortgage Association, purchases and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Fannie Mae's "little brother" is Freddie Mac, formally the Federal Home Loan Mortgage Corporation.  Freddie Mac, Investopedia, http://www.investopedia.com/terms/f/freddiemac.asp (last visited August 9, 2014).  Both are government sponsored enterprises, that is, financial services corporations that the United States Congress created.  See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends.  Fannie Mae, Investopedia.  The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined or regulated, but mortgage companies use it internally and independently to set loan parameters.  The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  Super jumbo mortgage, Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

[5]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to *repo*."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security

Complaint ¶ 3, at 2.  Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing

---

(and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default, see Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008) filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an electronic mail transmission from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Electronic Mail Transmission from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid

the Citigroup Global margin call over seven days and made the final payment of seventy-five

million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only

portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the

margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip

Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See

Complaint ¶ 36, at 11.  In an electronic mail transmission from Goldstone to Simmons and

Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans

to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities as

well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"

Complaint ¶ 67, at 19-20 (alteration in original)(quoting Electronic Mail Transmission from

Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin

III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update -

Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012

(Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an electronic mail transmission sent February 25,

2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving

towards resolving [its] margin issues'" through, among other strategies, having "'sold some

additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Electronic Mail Transmission from

Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03

p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future

margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did

not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint

¶ 32, at 10.  In an electronic mail transmission, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an electronic mail transmission from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> "We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met."

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same electronic mail transmission.  Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.  See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an electronic mail transmission to Simmons on February 27, 2008, in which he said:

> "Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point

haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it."[6]

Complaint ¶ 38, at 12 (quoting Electronic Mail Transmission from Larry Goldstone to Clay Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")).  Simmons sent an electronic mail transmission to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Electronic Mail Transmission from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an electronic mail transmission to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40, at 12 (alteration in original)(quoting Electronic Mail Transmission from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."  Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia.  "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[7]  See Complaint ¶ 37, at 11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could

---

[7]According to the Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset."  The Financial Accounting Standards Board ("FASB") explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that serve as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008.  See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning electronic mail transmission regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Electronic Mail Transmission from Clay Simmons to Larry Goldstone at 2, sent February 28, 2008, at 6:33 a.m., filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008

---

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

Simmons/Goldstone Email")).  In an electronic mail transmission from Goldstone to Thornburg

Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone

instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls

met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'"  Complaint ¶ 94, at 27

(alterations in original).  See Electronic Mail Transmission from Larry Goldstone to Thornburg

Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2,

sent February 28, 2008, at 5:29 a.m., filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone

informed Thornburg Mortgage's Board of Directors in an electronic mail transmission that he

estimated Thornburg Mortgage had approximately forty million dollars available in cash at that

time.  See Complaint ¶ 95, at 28; Electronic Mail Transmission from Larry Goldstone to

Thornburg Mortgage Board of Directors at 2, sent February 28, 2008, at 6:56 a.m., filed May 21,

2012 (Doc. 37-11)("Feb. 28, 2008 Email").  As of 7:30 a.m. on February 28, 2008, Thornburg

Mortgage had received over $100 million in margin calls.  Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the

Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On Street Signs,

Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets;

(ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg

Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint

¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-

4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from

J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to

Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February

28, 2008, Goldstone, Simmons, and Starrett confirmed, via electronic mail transmission, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'"  Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[9]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See Complaint ¶ 49, at 14-15.[10]  The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at

---

[9]An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents referenced in the Complaint and central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an Electronic Mail Transmission from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the electronic mail transmission was sent from a KPMG employee).

29; (iv) that Thornburg Mortgage had received the Citigroup Letter, <u>see</u> Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapsing, <u>see</u> Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going concern.  <u>See</u> Complaint ¶ 57, at 17.  Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's.  <u>See</u> Complaint ¶ 76, at 22.  "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."  Electronic Mail Transmission from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, sent March 3, 2008 11:44 p.m, filed May 21, 2013 (Doc. 37-28)("March 3, 2008  Hall  Email").   The  requested  evidence  included  "correspondence  with lenders/attorneys/shareholders, emails."  Request for Correspondence, attached to March 3, 2008

Hall Email, at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."   Request for Correspondence at 4.   At the time, KPMG as auditor was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.   See Complaint ¶ 99, at 29.   Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.   See Complaint ¶ 101, at 29.   KPMG did not become aware of the Citi Letter while preparing its restatement. See Complaint ¶ 101, at 29.   Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"   Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).   The analysis stated: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in mortgage valuations.'"   Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## PROCEDURAL BACKGROUND

The SEC brought this enforcement action against the Defendants.   See Complaint at 1. During discovery, the Defendants served the Amended Notice, which includes twenty-three topics.   See Amended Notice at 8-12.   The Defendants request the SEC to designate a 30(b)(6) representative to discuss the twenty-three topics at the deposition.

1.   **The SEC and the Defendants' Position on the Motion for a Protective Order.**

In its Motion, the SEC objects to twenty-one of the twenty-three topics from the Amended Notice.[11]   Motion at 4 n.4; Defendants' Opposition to Plaintiff's Motion for a Protective Order to Quash Defendants' Notice of Rule 30(b)(6) Deposition at 3 n.1, filed May 2, 2013 (Doc. 168)("Opposition").  The twenty-one topics to which the SEC objects include:

1.   The factual bases for each full or partial denial by YOU in YOUR responses to Defendants' First Set of Requests for Admission to Plaintiff Securities and Exchange Commission, dated October 10, 2012.

2.   Identification of all REPO AGREEMENTS that YOU contend THORNBURG violated between February 14, 2008 and February 28, 2008, and the factual bases for your contention that those REPO AGREEMENTS were violated.

3.   Public statements YOU have expressed since 2007 concerning the clarity or lack of clarity in Generally Accepted Accounting Principles ("GAAP") with respect to accounting for other than temporary impairments ("OTTI"), and the factual bases for those views.

4.   The identification and contents of communications between YOU and third parties since 2007 concerning the meaning and application of the OTTI rules under GAAP.

5.   The factual bases and final policy rationales for YOUR statements in the SEC's Report and Recommendation Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008: Study on Mark-To-Market Accounting at pages 25, 30-31 and 204-05 regarding OTTI analysis under GAAP, including, but not limited to:

    a.   "Impairment accounting can be complex, as there are different definitions of impairment and different impairment tests for different types of financial assets."

    b.   "Judgment is required in assessing whether an OTTI exists."

    c.   In evaluating whether an OTTI exists, companies consider, "the intent and ability of the holder to retain its investment in the issues

---

[11]The SEC and the Defendants resolved their disputes for topics 20 and 22.  See Motion at 4 n.4; Opposition at 3 n.1.

for a period of time sufficient to allow for any anticipated recovery in fair value."

    d.    "The current global economic crisis has highlighted difficulties in performing OTTI evaluations."

    e.    "The current market environment has posed several challenges for preparers as it relates to the calculation of the fair value of certain financial instruments."

    f.    The "FASB should evaluate the need for modifications (or the elimination of current OTTI guidance to provide for a more uniform system of impairment testing standards for financial instruments."

6.    The identification and meaning of the "accounting guidance" set forth in Jane Starrett's electronic mail transmission on February 25, 2008 to Larry Goldstone and Clay Simmons, and the factual bases for YOUR contention that the "accounting guidance" was "clear."

7.    The factual bases for YOUR contention that the I/O Strip Transactions "depleted Thornburg's liquidity."

8.    YOUR understanding of the meaning of the disclosure concerning issuance of "Collateralized Mortgage Debt" on page 35 of the 2007 FORM 10-K, as of March 13, 2012.

9.    YOUR knowledge of Peloton's financial condition and any efforts by government agencies or private parties to assist or purchase the assets of Peloton between February 14 and 29, 2008.

10.    YOUR forecasts and/or predictions in February and March 2008 concerning the credit markets or the repo markets.

11.    The bases and rationale for former SEC Chairman Christopher Cox's statement on March 11, 2008 that "[w]e have a good deal of comfort about the capital cushions at these firms at the moment" in the reference to investment banks.

12.    The bases and rationale for statements by former SEC Chairman Christopher Cox that the failure of Bear Stearns was attributable to a "crisis of confidence."

13.    Public statements YOU have expressed since 2007 concerning the relationship between the repo markets and the financial crisis, and the factual bases for those views.

14.     Expressions of surprise at, or acknowledgement of, a failure to predict or foresee the downturn in or volatility of the credit markets or repo markets in February and March 2008. This topic applies only to the following people as of February and March 2008: Erik R. Sirri, Robert LD Colby, Catherine McGuire, Andrew J. Donohue, Douglas J. Scheidt, Christopher Cox, Kathleen L. Casey, Annette L. Nazareth, Paul S. Atkins, John W. White, Brian V. Breheny, Thomas J. Kim, and Wayne E. Carnall.

15.     YOUR understanding of whether the following practices comply with Generally Accepted Auditing Standards ("GAAS["]], and the bases in GAAS for YOUR understandings.

    a.     Not documenting in audit workpapers representations from audit client management on which an auditor purports to rely to support an audit conclusion.

    b.     Considering information provided by an audit client exclusively for the purpose of tying out a number in a footnote, and not for any other audit-related purpose for which the information would be relevant.

    c.     Assigning the test work for an audit client's payment of margin calls to an auditor who does not know what a margin call is.

16.     The factual bases for YOUR contention that Defendants "failed to implement a system of internal accounting controls to assure that Thornburg's financial statements were prepared in conformity with GAAP."

17.     The identification and meaning of any public guidance or interpretations concerning YOUR position that officers of public companies have a duty under Rule 13b2-2 to update statements or opinions conveyed to auditors.

18.     The identification and meaning of any public guidance issued by YOU or any public accounting authority that addresses:

    a.     How rumors of potential adverse events should be evaluated in connection with accounting and disclosure decisions; and

    b.     How reservation of rights letters should be evaluated in connection with accounting and disclosure decisions.

19.     The factual bases for YOUR contention that Larry Goldstone knew at the time of his CNBC interview on February 28, 2008 that "Thornburg had received margin calls that exceeded its available liquidity."

. . . .

21.     The factual bases for each full or partial denial by YOU in YOUR
        responses to Defendants' Second Set of Requests for Admission to
        Plaintiff Securities and Exchange Commission, dated January 27, 2013.

. . . .

23.     The steps YOU have taken to prepare to answer questions on the
        foregoing topics.

Amended Notice at 8-12. The Amended Notice defines "YOU" and "YOUR," as "the Securities

and Exchange Commission and its staff in each of its Divisions and Offices, including but not

limited to the Division of Enforcement, the Division of Corporate Finance, the Office of the

Chief Accountant, Office of the General Counsel, and Offices of each Commissioner."

Amended Notice ¶ 2, at 4.

        The SEC moves the Court for a protective order pursuant to rule 26(c) regarding the

twenty-one topics. The SEC divides the topics into two categories. See Motion at 2. The first

category incorporates topics 1, 2, 6, 7, 16 and 19-23, and the second category encompasses

topics 3-6, 8-15, and 18. See Motion at 2; id. at 4. The SEC objects to the first category of

topics, which it views as questioning "the SEC about its attorneys' contentions and evidence in

the litigation," for two reasons: (i) the Defendants have exceeded their interrogatory limit, and, in

the SEC's view, the Defendants are asking "what are in fact numerous, additional, contention

interrogatories"; and (ii) the "Defendants have had ample discovery in this matter and cannot

show an overriding need to engage in the harassing practice of deposing opposing counsel."

Motion at 1. The SEC objects to the second category of topics, which it views as seeking

"testimony from the SEC as a whole," because, in its view, the "topics are overbroad, unduly

burdensome, and harassing." Motion at 1.

- 18 -

First, the SEC argues that the first category is a deliberate attempt to evade the interrogatory limitations.  <u>See</u> Motion at 8.  In the Joint Status Report and Provisional Discovery Plan, filed June 1, 2012 (Doc. 43)("Discovery Plan"), the parties agreed to a "[m]aximum of 25 interrogatories by each party to any other party."  Discovery Plan at 10.  <u>See</u> Order Adopting Joint Status Report and Provisional Discovery Plan, filed July 11, 2012 (Doc. 55). The parties did not propose any limitation on contention interrogatories or mention them, and the Court did not limit or mention contention interrogatories.  The SEC explains that the Court approved Discovery Plan, which allows the Defendants seventy-five interrogatories, twenty-five for each Defendant.  Motion at 7.  The SEC asserts that the Defendants propounded one-hundred-fifteen interrogatories.  <u>See</u> Motion at 7.  In its view, the Defendants' 30(b)(6) deposition is an attempt to evade the interrogatory limitations.  <u>See</u> Motion at 8.

Second, the SEC contends that the first category is an attempt to depose opposing counsel.  <u>See</u> Motion at 8.  In its view, the Defendants will invade its attorney-work product, because "the SEC has *no* independent knowledge of *any* facts at issue, and Defendants have been provided with all the evidence the SEC collected during its investigation," and, "[t]hus, an exploration of the SEC's contentions and the factual basis it intends to use to support them, through rule 30(b)(6) testimony, would be an invasion of the SEC's work-product, justifying a protective order."  Motion at 9 (emphasis in original).  The SEC contends that it gave the facts from its investigation to the Defendants and possesses no independent knowledge, alleging that the Defendants will invade its attorney-work product.  <u>See</u> Motion at 9.

The SEC notes that the Court has previously allowed "a plaintiff to depose a defendant about the factual basis of its affirmative defenses."  Motion at 10 (citing <u>Radian Asset Assurance, Inc. v. College of the Christian Bros.</u>, 273 F.R.D. 689, 690 (D.N.M.

2011)(Browning, J)("Radian Asset").  It presents four reasons why the Court should distinguish Radian Asset: (i) the defendant in that case did not make a clear objection based on the work-product doctrine; (ii) the defendant had independent knowledge of the facts for its affirmative defenses; (iii) the plaintiff was not seeking the 30(b)(6) testimony to contravene the court's interrogatory limit; and (iv) the defendant had not previously rejected the plaintiff's attempt to depose opposing counsel.  See Motion at 10.

The SEC further asserts that the second category is blatantly overbroad and significantly burdensome based on the "You" definition in the Amended Notice.  Motion at 12.  According to the SEC, it has five divisions and twenty-three offices, including 3,500 staff in Washington and eleven regional offices over the country.  See Motion at 12.  The SEC asserts that it cannot, for example, satisfy the burden under rule 30(b)(6) for topic 3, which states: "Public statements YOU have expressed since 2007 concerning the clarity or lack of clarity in GAAP with respect to accounting for OTTI . . . ."  Amended Notice at 8.  See Motion at 12.  It asserts that any member of its staff could have made a public statement on these matters over the past six years.  See Motion at 12.  According to the SEC, it is impossible to prepare its designee to testify on "'information known or reasonably available to the organization'" regarding this topic.  Motion at 12.  Moreover, the SEC contends that topic 4 -- "[t]he identification and contents of communications between YOU and third parties since 2007 concerning the meaning and application of the OTTI rules under GAAP," Amended Notice at 8 -- and other similar topics also require the SEC to interview every current and former staff member.  See Motion at 12.  In their view, these topics are overly burdensome and harassing.  See Motion at 12.

Second, the SEC argues that the topics in the second category have marginal to no relevance in this litigation.  See Motion at 13; Reply at 1.  In its view, the lack of relevance for

the topics against the excessive burden tips the balance in favor for the Motion.  See Motion at 13.  According to the SEC, it must prove that "the Defendants committed fraud by disclosing that they had the intent and ability to hold their Purchased ARM securities when, among other things, the fact that those securities have been subject to sale by Thornburg's lenders negated any such intent and ability."  Motion at 13.  Based on these allegations, the SEC contends that public statements from an ordinary employee and his or her remarks to third parties "on the topic[s] of GAAP, OTTI, and the credit and repo markets [have] little to no bearing on this litigation."  Motion at 13.  It argues that "internal SEC communications or policy rationales behind speeches or reports also have little relevance."  Motion at 13.

The SEC further argues that "there is no evidence that any SEC statements or deliberations" about the Defendants' misrepresentation of Thornburg Mortgage's intent and ability to hold its purchased ARM securities "were ever communicated to Thornburg, let alone the Defendants."  Motion at 13.  Thus, in the SEC's view, the SEC's statements and deliberations "have no bearing on Defendants' scienter o[n] whether Thornburg properly performed its OTTI analysis."  Motion at 13.  According to the SEC, the Defendants' conduct should be viewed through security laws and GAAP, and not through public statements and deliberations from SEC employees.  See Motion at 13.  Moreover, the SEC argues that it should not be required to search for information on these topics when it does not dispute the facts concerning these issues.  See Motion at 13-14.  In its view, its search for current and former staff employee statements is not necessary, because the Defendants examined GAAP, OTTI, and credit market issues in depth during twelve depositions of KPMG staff members; the Defendants will study these issues expansively again in expert reports and testimony.  See Motion at 14.  Last, the SEC contends

that individual staff members cannot express views, internally or externally, on the SEC's behalf, and, thus, these employee comments are irrelevant to the SEC's claim.  See Motion at 14.

Third, the SEC asserts that the second category appears to invade the deliberative-process privilege.[12]  See Motion at 15.  The SEC acknowledges that it is uncertain whether the Defendants want to investigate the internal deliberations between the SEC staff members, or between other governmental agencies and the SEC staff members, but it contends that either pursuit invades the deliberative-process privilege.  See Motion at 15.  The SEC provide topic 5 -- "'[t]he  factual bases and final policy rationales for [the SEC's] statements in the SEC's Report and Recommendation Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008: Study on Market-To-Market Accounting at pages 25, 30-31 and 204-05 . . .'" [13] -- as an example of the Defendants' possible attempt to invade the deliberative-process privilege.  See Motion at 15.  The SEC uses the Defendants' rejection of its offer to provide testimony about the content on these designated pages to demonstrate that the Defendants want the factual basis and final policy rationale beyond the current statements in the Section 133 Report; they want its deliberative process.  See Motion at 15.

According to the SEC, the designee must formally assert the privilege when the Defendants ask a question that invades the deliberative process.  See Motion at 16 n.6.  For this reason, the SEC notes that its declaration of the privilege is premature, but it reserves the right to

---

[12]The deliberative-process privilege protects "'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001)(quoting Nat'l Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975)).

[13]SEC, Report and Recommendation Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008: Study on Market-To-Market Accounting, available at http://www.sec.gov/news/studies/2008/marktomarket123008.pdf ("Section 133 Report").

object to a question based on this privilege.  See Motion at 16 n.6.  The SEC further asserts that this privilege protects the deliberative process as well as deliberative material.  See Motion at 16. It, therefore, alleges that this privilege protects the discussions that reflect the SEC's staff and attorneys' notions, opinions, and recommendations regarding their advancement or interpretation of accounting guidance or their examination of the financial crisis.  See Motion at 16-17.  It contends that the Defendants need to demonstrate a sufficient need to overcome the deliberative-process privilege.  See Motion at 17.  In its view, the Defendants cannot demonstrate a need to outweigh the deliberative-process privilege, because they have ample evidence to demonstrate that the financial crisis was substantial and that OTTI analysis can be difficult; further, the Defendants will retain expert witnesses to testify on these issues. See Motion at 17.

The SEC explains why certain topics in category two are unduly burdensome: in regards to topics 3, 13, and 18 -- public statements from the SEC employees since 2007 and SEC's public guidance on certain matters -- it contends that the SEC has 875 public speeches and statements on its website, and has to search through these speeches through author and title.  See Motion at 18; id. at 25.  For topics 11 and 12 -- the bases and rationale for Chairman Christopher Cox's statements in 2008 -- the SEC contends that it spoke with the former Chief of Staff for former Chairman Cox regarding his statements.  See Motion at 24.  According to the SEC, the former Chief of Staff does not know the specific rationale for these statements, but he asserts that Chairman Cox's statement -- "we have a good deal of comfort about the capital cushions at these firms at the moment" -- on topic 11 arose out of a conversation between Chairman Cox and SEC's Deputy Director of Market Regulation.  See Motion at 23; id. at 24.  The SEC alleges that the Deputy Director has left the SEC.  See Motion at 23.  Last, topic 14 -- "[e]xpressions of surprise at, or acknowledgement of, a failure to predict or foresee the downturn in or volatility of

the credit markets or repo markets in February and March 2008" -- requests thirteen individuals for this matter, but the SEC contends that only three individuals are still SEC staff members.  <u>See</u> Motion at 25.  It argues that the Court should not require the SEC to search and communicate with the former employees concerning these issues.  <u>See</u> Motion at 25.

In response, the Defendants organize the topics into three categories: factual contentions, public statements, and accounting interpretations.  <u>See</u> Opposition at 3.   The Defendants contend that the first category, encompassing topics 1-2, 6-10, 16, 19, and 21, requests the SEC's evidentiary bases for its primary factual contentions.  <u>See</u> Opposition at 3.  They further assert that the second category, including topics 3 and 11-14, calls for testimony concerning SEC officials' public statements on the ambiguity in OTTI accounting principles, and on the predictability and causes for the decline in the financial and repurchase agreement markets during the financial crisis.  <u>See</u> Opposition at 3.  Last, the Defendants state that the third category, including topics 4-6, 15, and 17-18, asks for testimony on "the interpretation of accounting and auditing principles and standards" in dispute in this case.  Opposition at 3.

The Defendants explain that they do not seek to designate opposing counsel as the 30(b)(6) representative.  <u>See</u> Opposition at 5.  They assert that the SEC cannot legitimately argue that this option is the only one available.  <u>See</u> Opposition at 5.  The Defendants emphasize that the SEC is a federal agency with 3,500 staff members, including accountants, economists, support staff, and attorneys, and that only a small number of the employees are opposing counsel.  <u>See</u> Opposition at 5.  In their view, depositions will be eliminated if courts preclude 30(b)(6) depositions grounded on the reason that counsel will be involved in the preparation process.  <u>See</u> Opposition at 6.

According to the Defendants, the SEC does not dispute the relevant testimony required for topics 1-2, 6-10, 16, 19, and 21, which involve key facts central to their defense.  See Opposition at 6-9.  In their view, topics 2, 6, 7, 16, and 19 examine the factual basis for the SEC's allegations in its Complaint that

> Thornburg supposedly "violated" its lending agreements with three lenders (Topic 2); that the accounting guidance relating to OTTI was "clear" (Topic 6); that I/O Strip Transactions "depleted Thornburg's liquidity" (Topic 7); that Defendants failed to implement an adequate system of internal controls (Topic 16); or that Mr. Goldstone knew at the time of his CBS interview that "Thornburg had received margin calls that exceeded its available liquidity" (Topic 19).

Opposition at 7.  The Defendants assert that topics 1 and 21 -- seeking the factual basis for the SEC's denial or partial denial to the Defendants' first and second set of requests for admission -- delve into SEC's discovery responses and that they are entitled to comprehend the reasoning for SEC's contentions.  Opposition at 7.  In regards to topics 8-10, dealing with SEC's interpretation, knowledge, and forecasts on certain topics, such as "the disclosure concerning issuance of 'Collateralized Mortgage Debt,'" "Peloton's financial condition," and "predictions . . . concerning the credit markets or repo markets," the Defendants contend that these topics directly examine the issues implicated by the SEC's Complaint.[14]  Amended Notice at 9.  See Opposition at 8-9.

---

[14]Peloton Partners LLP was "a London-based hedge fund firm."  Peloton Hedge Fund to Liquidate $2 Billion ABS fund, Reuters, Feb. 28, 2008, http://www.reuters.com/article/ 2008/02/28/peloton-liquidation-idUSN2859650120080228.  The New York Times reported in 2008 that "Peloton, based in London, joins Thornburg Mortgage and Sailfish Capital Partners on the growing list of funds and companies that have had to sell securities or shut down after banks restricted how much they could borrow, or demanded more collateral as the value of securities backed by mortgages slumped."  Peloton Lays Blame on Wall Street Lending Crackdown for Hedge Fund Liquidation, N.Y. Times, Feb. 29, 2008, http://www.nytimes.com/ 2008/02/29/business/worldbusiness/29iht-hedge.4.10583544.html.

From the Defendants' perspective, the SEC has failed to show that their topics do not possess any relevance to this litigation or the preparation of its designee would be unduly burdensome.  See Opposition at 10. The Defendants, therefore, argue that the SEC cannot establish good cause under rule 26(c) for the protective order.  See Opposition at 10.

In response to the SEC's reliance on Radian Asset, the Defendants contend that the movant in that case made a clear work-product objection, because the Court explicitly mentioned that the defendant grounded its motion for a protective order on the assertion of the work-product doctrine.  See Opposition at 11.  The Defendants further argue that other courts recognize independent knowledge of the facts as an unpersuasive argument for a protective order.  See Opposition at 12 n.6.  According to the Defendants, the Court in Radian Asset explained that "inquiring into the factual basis for a party's claims in a rule 30(b)(6) deposition is not only a permissible practice, but an advisable one."  Opposition at 11.  The Defendants note that it would be illogical to protect factual information from oral deposition with the attorney-work product doctrine, but allow opposing counsel to discover the same information from a written interrogatory.  See Opposition at 12.

They allege that the SEC's assertion of the work-product doctrine is a "blanket invocation."  Opposition at 13.  According to the Defendants, "[u]nless the topic on its face requests attorney work product, such work product assertions are overbroad."  Opposition at 13.  The Defendants have not taken a deposition and therefore assert that the SEC's declaration of the work-product doctrine is premature.  See Opposition at 14.

In response to the SEC's argument that the Defendants' topics evade the Court's interrogatory limit, the Defendants assert that the Discovery Plan does not exclude depositions.  See Opposition ¶ 2, at 14.  They provide the fact that the Defendants have been deposed as

evidence for this contention.  See Opposition at 14.  The Defendants further allege that interrogatories and depositions are essentially different discovery tools.  See Opposition at 14.  In their view, depositions, unlike written interrogatories, permit a party to assess a witness's allegations from live testimony, provide the opportunity to secure comments on ambiguities in responses and related documents, and allow a defendant to examine the facts on which a plaintiff relies for its claim.  See Opposition at 14.

From the Defendants' perspective, the SEC's argument that certain topics are overbroad and burdensome goes against rule 30(b)(6)'s plain language, which encompasses "'a government agency.'"  Opposition at 15.  They state that large entities regularly select designees to testify on their behalf even though the institutes employ a considerable number of people, conduct worldwide operations, and possess complex organizational structures.  See Opposition at 15.  The Defendants assert that the SEC's structure and staff members are not unique, and that the SEC does not offer valid reasons for a blanket protective order.  Opposition at 15.  The Defendants further contend that the SEC needs only to interview and gather documents from "relevant staff members."  Opposition at 16.  They characterize the SEC's argument that it needs to interview former and present staff members as "hyperbolic."  Opposition at 16.  The Defendants use the SEC's conversation with Chairman Cox's former Chief of Staff as an example that the SEC has the capability to take the necessary steps to prepare their representative's testimony.  See Opposition at 16.  As any other federal agency or corporation, the Defendants assert, the SEC can search for notes, electronic mail transmission, and other relevant material to prepare its designee when the employee is no longer available or refuses to cooperate. See Opposition at 16.

The Defendants argue that the Court should reject the SEC's argument that topics concerning the SEC's public statements are irrelevant to this case.  See Opposition at 17.  They allege that the "gravamen of the Complaint" is that the Defendants committed fraud through their OTTI judgments and acted recklessly in regards to their failure to identify to KPMG more than $400 million in losses.  Opposition at 17.  Based on the Complaint, the Defendants contend that the SEC's statements are relevant to the question whether the Defendants acted with scienter, including "the complexity and lack of clarity of the OTTI analysis, the impact of the financial crisis on that analysis, and the foreseeability of the downturn of the credit markets and repo markets in February and March 2008."  Opposition at 17.  According to the Defendants, the SEC's argument that its statements were not communicated to the Defendants misunderstands the primary reason for their pursuit.  See Opposition at 17.  They assert that the SEC's statements

> may directly undermine Plaintiff's theories that the relevant accounting principles were "clear," that Defendants misrepresented Thornburg's likely exposure to future margin calls, and that Defendants knew or were reckless in not knowing that the company did not have the intent or ability to hold its ARM securities to maturity or recovery.

Opposition at 17.  Last, the Defendants argue that they have a right to information on relevant facts, regardless whether these facts -- the difficulty of OTTI accounting guidance, and the severe volatility of the credit and repo lending markets -- are disputed or undisputed.  See Opposition at 17; id. at 18.

The Defendants assert that the SEC cannot support their request for a protective order with "a blanket assertion of the deliberative-process privilege."  Opposition at 18.  They assert that the SEC needs to first produce a designee, then assert appropriate objections, and offer instructions for certain questions to correctly invoke the deliberative-process privilege.  See Opposition at 19.  They further argue that the SEC failed to implement the proper procedures to

raise the privilege.  See Opposition at 19.  The Defendants further respond that topic 5 would not invade the deliberative-process privilege, because they seek only the final policy rationales for SEC's conclusion in its Section 133 Report.  See Opposition at 20.  They allege that the topic does not seek the SEC's internal deliberations before it issued the Section 133 Report.  See Opposition at 20.  They further assert that the SEC's offer to testify about the content on pages 25, 30-31 and 204-05 is insufficient, because the SEC's offer would exclude any questions about the factual basis and policy rationale for SEC's statements regarding the clarity of the OTTI principles.  See Opposition at 20.

Last, the Defendants argue that topics 3-6, 11-15, and 17-18 regarding the SEC's and former Chairman Cox's public statements, and the SEC's interpretation of accounting principles, are relevant to the SEC's allegations against the Defendants.  See Opposition at 21-23.  In their view, the SEC has not demonstrated a specific basis for the lack of relevance or the undue burden on its witness.  See Opposition at 22.  According to the Defendants, the SEC believes "the OTTI principles were 'clear,'" and thus the Court should allow the Defendants to ask questions on topic 3 regarding the SEC's public statements on the clarity or lack of clarity with OTTI principles.  Opposition at 21 (quoting Complaint ¶ 12, at 5).  In their view, the SEC alleges that the "Defendants falsely represented that Thornburg 'had the intent and ability to hold its ARM Securities until their value recovered in the market.'"  Opposition at 21.  Based on this allegation, the Defendants assert that the Court should permit the examination of the SEC's statements on topics 11-14, because "even the SEC failed to anticipate the collapse of the credit markets and repo markets that in turn affected the price of Thornburg's holdings."  Opposition at 22.

From the Defendants' perspective, the SEC further alleges that the Defendants failed to inform the auditors about "the impending collapse of the large European hedge fund" or to disclose the Citigroup Letter. Opposition at 22. The Defendants contend that they are entitled to inquire about topic 18, whether the SEC gave guidance or interpretation on how potential adverse events or reservation-of-rights letters should be "evaluated in connection with accounting and disclosure decisions," Amended Notice at 11, because the SEC expects the Defendants to disclose information on potential adverse events or reservation-of-rights letters, see Opposition at 22.

According to the Defendants, KPMG's audit was deficient, and the SEC's position depends on KPMG's creditability. See Opposition at 23. The Defendants, therefore, argue that topic 15, the SEC's assessment of KPMG and its belief that KPMG audit's complied with GAAS, is relevant. See Opposition at 23. The Defendants assert that topic 17 -- the SEC's public guidance or interpretation supporting its position that SEC Rule 13b2-2, 17 C.F.R. § 240.13b2-2, requires public companies to update auditors -- is relevant. See Opposition at 23; Amended Notice at 23. According to the Defendants, the SEC provides rule 13b2-2 as their basis to illustrate that Simmons "'improperly failed to update what had become a misleading statement to Thornburg's outside auditor.'" Opposition at 23.

The SEC replies that the Defendants did not adequately respond to its argument concerning the Court's interrogatory limit and therefore conceded the argument to the SEC. See Plaintiff Securities and Exchange Commission's Reply in Support of Its Motion for a Protective Order to Quash Defendants' Notice of 30(b)(6) Deposition at 2, filed May 20, 2013 (Doc. 175)("Reply"). The SEC further alleges that the Defendants' depositions are not equivalent to the taking of its deposition. It asserts that the Defendants were percipient witnesses

when the SEC deposed the Defendants, because the "Defendants' testimony was limited to the events that transpired at Thornburg Mortgage"    Reply at 3.   The SEC contends that no SEC employee is a percipient witness for any events at issue in this case.   See Reply at 4.   According to the SEC, it has a heavier burden for its deposition than the Defendants, because the SEC will need to spend many hours in preparation to educate its designee while the Defendants allegedly asserted that they could restrict discovery responses to their personal knowledge.   See Reply at 3; id. at 4.

The SEC agrees that it is not exempt from 30(b)(6) depositions and that counsel's preparation of the designee would not constitute attorney-work product.   See Reply at 4.   It reiterates, however, that the pursuit of its contentions of law and fact, and its evidence, will intrude on its work-product, and is the equivalent of opposing counsel's deposition.   See Reply at 4; id. at 5, id. at 6.   The SEC further contends that the facts used to support a party's claim are attorney-work product, and thus the Defendants must show a sufficient need to outweigh this protection.   See Reply at 5; id. at 6.   In its view, the Defendants do not satisfy this burden, because they received all of the SEC's evidence and have had ample discovery.   See Reply at 6.

The SEC further argues that the Defendants' alleged inconsistency -- "that it is inconsistent to allow contention interrogatories and also claim that a 30(b)(6) deposition on similar topics invades work product" -- is inaccurate.   See Reply at 6.   According to the SEC, rule 33 permits parties to inquire about contentions through interrogatories; rule (30)(b)(6) does not possess the same or a similar provision.   See Reply at 6.   It states that contention interrogatories, rather than depositions, are a better discovery tool to search for a party's theories. See Reply at 6.

The SEC asserts that the Defendants' definition of "YOU" and their request for public statements contradicts their assertion that the SEC only has to pursue relevant employees.  See Reply at 7.  It further contends that "relevant staff members" is ambiguous.  Reply at 8.  In its view, the Defendants will not be content with reasonable efforts regarding its response.  See Reply at 8.  The SEC uses its discussion with the former Chief of Staff to former Chairman Cox as an example for this assertion.  See Reply at 8. The SEC asserts that it communicated with the Defendants, and told them that the former Chief of Staff is unaware of the "specific basis or rationale" for Chairman Cox's statements in 2008.  Reply at 8.  According to the SEC, the Defendants believe that the conversation between the SEC and the former Chief of Staff is not enough to address this issue, that the SEC must speak with present and former employees regarding these statements, and that the SEC should collect relevant materials to prepare for the deposition if the employees are unavailable or uncooperative.  See Reply at 8. The SEC further contends that the Defendants' argument -- that the SEC must retrieve electronic mail transmission and other relevant material when the staff member is unavailable or uncooperative -- does not clearly demonstrate the way in which this material will enable its designee to testify on this issue.  See Reply at 8.  It asserts that the Defendants should ask former Chairman Cox to explain his rationale or basis for the statements.  See Reply at 8.  The SEC argues that its staff members and the majority of the Commissioners' statements are not attributable to the SEC.  See Reply at 9.

Moreover, the SEC asserts that it never alleged that the "the relevant accounting principles were 'clear.'"  Reply at 9 (quoting Opposition at 17).  From its perspective, the SEC alleges that Starrett gave "'clear accounting guidance'" to Goldstone and Simmons.  Reply at 9 (quoting Complaint ¶ 12, at 5).  The SEC contends that its employees' opinions and statements

are not relevant to the Defendants' state of mind when they reported that Thornburg Mortgage had the intent and the ability to hold assets.  See Reply at 9.

The SEC contends that the language of topic 5, the factual bases and final policy rationale for its Section 133 Report, contradicts the Defendants' assertion that the topic seeks only the final policy rationales for the SEC's conclusion in its Section 133 Report.  See Reply at 10.  It asserts that the factual basis for its statements includes the deliberative process that led to its Section 133 Report.  See Reply at 10.  The SEC acknowledges that it has not provided an affidavit that lists its reasons for preserving confidentiality of the documents, because "it is premature to do so," but it reiterates that it raises the privilege concerns to notify the Court that it will use the deliberative-process privilege if a deposition question intrudes in the SEC's privilege.  Reply at 11.

The SEC replies that the Commissioners' and the SEC staff member's comments on the financial crisis or accounting principles is irrelevant to the central claim concerning the Defendants' knowledge and actions.  See Reply at 11.  The SEC asserts that its staff members' interpretations on accounting principles are irrelevant to this matter, which is Starrett's clear accounting guidance to Goldstone and Simmons.  See Reply at 11; id. at 12.

The SEC further asserts that the Defendants' knowledge regarding Thornburg Mortgage's marginal calls, lenders, and liquidity -- not the foreseeability of the financial crisis, or Chairman Cox and the SEC employee's statements -- is essential to its claim.  See Reply at 12. The SEC argues that "what Goldstone and Simmons understood would befall Thornburg" Mortgage in regards to the reported collapse of the European hedge fund and Citigroup Global's reservation-of-rights letter is vital, and not the SEC's guidance on accounting and disclosure decisions. Reply at 12.

According to the SEC, its opinion on whether KPMG conducted a sufficient audit is irrelevant to KPMG's credibility.  <u>See</u> Reply at 12.  The SEC asserts that the jury will decide KMPG's credibility based on its witnesses and not on the SEC staff accountants.  <u>See</u> Reply at 12.  The SEC additionally contends that topic 17, public guidance or interpretations on rule 13b2-2 regarding a duty to update the auditors, is not an issue.  <u>See</u> Reply at 13.  Rather, in the SEC's view, rule 13b2-2's textual content, Simmons' knowledge, and his actions or lack of actions are what matters in this case.  <u>See</u> Reply at 13.

In the Notice of Supplemental Authority, filed July 3, 2013 (Doc. 186)("Notice"), the SEC asserts that the subsequent history for the case on which the Defendants primarily rely -- <u>SEC v. Merkin</u>, 283 F.R.D. 689 (S.D. Fla. 2012) -- demonstrates the danger with allowing a party to ask deposition questions over the non-moving party's objections that the noticed questions seek privileged information.  In <u>SEC v. Merkin</u>, the United States District Court for the Southern District of Florida allowed the defendant to depose the plaintiff under rule 30(b)(6) on seven of fifteen topics.  <u>See</u> Notice at 1.  According to the SEC, the defendant objected to specific questions at the 30(b)(6) deposition, and, in a subsequent opinion, <u>SEC v. Merkin</u>, No. 11-23585-CIV, 2012 WL 5449464 (S.D. Fla. August 13, 2012), the Magistrate Judge found that "'almost all of the disputed questions'" were "'beyond the scope of the deposition (<u>i.e.</u>, not within the seven permissible topics), speculative, problematic because they would require the disclosure of privileged information and/or unduly argumentative.'"  Notice at 2 (quoting <u>SEC v. Merkin</u>, 2012 WL 5449464, at *2).  The SEC argued that another Florida District Court criticized <u>SEC v. Merkin</u>, stating that its "'approach risks the disclosure of privilege information, it would increase the burden on the United States to prepare a witness, and it would increase the burden on this Court which would likely have to make many otherwise unnecessary decisions

about issues of work-product privilege.'"  Notice at 2 (citing <u>United States ex rel. v. Baklid-Kunz</u>

<u>v. Halifax Hosp. Med. Ctr.</u>, No. 6:09-cv-1002-Orl-31TBS, 2012 WL 3537070, at *5 (N.D. Fla.

August 14, 2012)).  The SEC argues that the "Defendants have shown that they too intend to go

beyond 'facts' in order to 'test the assertions of a live witness, follow up on ambiguities in

responses and related documents, and fully explore the facts on which plaintiff's claims rely,'"

and, thus, that the Court should grant the protective order.

    **2.  <u>The July 9, 2013 Hearing</u>.**

    At the hearing on July 9, 2013, the Court began with preliminary remarks on this motion.

<u>See</u> Transcript of Hearing at 41:16-19, taken July 9, 2013, filed July 16, 2013

(Doc. 194)("Tr.")(Court).  The Court stated that rule 30(b)(6) incorporates government entities.

<u>See</u> Tr. at 42:9 (Court).  It stated that the SEC is not immune from rule 30(b)(6), and believes

that the SEC serves 30(b)(6) depositions on corporations that are more expansive than the one it

is resisting.  <u>See</u> Tr. at 42:1-8 (Court).  The Court stated that it potentially would have to

examine each topic, and attempt to narrow the amount of information and the universe of people,

or the target group, that the SEC would have to question to satisfy the SEC's obligations to

prepare a 30(b)(6) designee.  <u>See</u> Tr. at 42:14-16 (Court); <u>id.</u> at 43:3-6 (Court).  It explained that,

although the Defendants seek to embarrass the SEC by discovering, and then introducing at trial,

statements that the SEC has made that are inconsistent, this strategy is permissible.  <u>See</u> Tr. at

42:19-22 (Court).  The Court then permitted the SEC to make opening remarks in support of its

motion for a protective order.  <u>See</u> Tr. at 44:3-4 (Court).

    The SEC stated that it does not take the position that it is exempt from rule 30(b)(6).  <u>See</u>

Tr. at 44:11-13 (McKenna).  The SEC asserted that the Defendants' topics are improper for

several reasons.  <u>See</u> Tr. at 44:19-20 (McKenna).  The SEC reiterated its argument on the

Court's interrogatory limit.  <u>See</u> Tr. at 44:21-24 (McKenna).  The Court responded that it does not require the Defendants to use a particular discovery method over another.  <u>See</u> Tr. at 45:6-8 (Court).  It explained that civil lawyers usually send out request for admissions, interrogatories, and requests for production, and then take depositions, and that, in its view, the Defendants' approach is a typical defense strategy.  <u>See</u> Tr. at 45:9-16 (Court).  The SEC did not disagree with the Court that the Defendants can choose their discovery method, but it again reiterated that the Defendants want to use their depositions as a way to conduct additional contention interrogations.  <u>See</u> Tr. at 46:1-5 (Court).  The Court acknowledged that 30(b)(6) depositions and contention interrogatories have significant similarities.  <u>See</u> Tr. at 46:7-10 (Court).

Further, the SEC argued that the Defendants' topics invade its work-product.  <u>See</u> Tr. at 46:11-15 (McKenna).  The Court replied that the SEC can always object to the questions at deposition based on the work-product doctrine.  <u>See</u> Tr. 46:16-19 (Court).  It stated that the SEC's argument was a blanket assertion where the Defendants would not be allowed to ask any questions on these topics.  <u>See</u> Tr. at 47:17-18 (Court); <u>id.</u> at 47:21-22 (Court).  The SEC affirmed that it wanted the Court to "shut down" the topics alleged to be contention interrogatories.  <u>See</u> Tr. at 47:23-24 (McKenna).  The Court said that it was not inclined to prevent the Defendants from asking about entire topics based on the possible assertion of the work-product doctrine and explained that the parties would need to make certain decisions at the deposition before the Court would determine the issue of work-product: the SEC would need to determine whether to object to the question, and the Defendants would need to decide whether to attempt to overrule the question, or agree that it is work-product and continue.  <u>See</u> Tr. at 48:3-10 (Court).

As to the SEC's argument about the Defendants' pursuit of its contentions and evidence, the Court noted that the SEC is similar to the United States Attorney in a criminal case when only the Assistant United States Attorney knows the facts that support an allegation; the only way the Defendants in this civil case can obtain the necessary information for their defense is to implement a 30(b)(6) deposition, because the Defendants cannot depose anyone else to obtain for this information.  See Tr. at 49:8-10 (McKenna); id. at 50:1-9 (Court).  The SEC replied that its counsel -- Messrs. McKenna and Kasper -- had no independent knowledge about the events at Thornburg in 2007 and 2008.  See Tr. at 50:11-13 (McKenna).  It asserted that the SEC secured its knowledge through documents, depositions, investigations, and discussions with investigators.  See Tr. at 50:13-15 (McKenna).  The SEC stated that it is not like a typical corporation where a party can take a 30(b)(6) deposition to learn about a contract from someone with personal knowledge of the contract, such as from the person who negotiated the contract. See Tr. at 50:15-18 (McKenna).  The Court replied that the SEC's argument is valid, but the SEC has personnel, such as investigators, who, although they do not possess independent factual knowledge, possess important information for the case.  See Tr. at 50:20-21 (Court).

The SEC further presented a hypothetical in which the SEC would serve a 30(b)(6) notice on  the Defendants regarding their attorneys' factual basis to support their defenses.  See Tr. at 51:16-24 (McKenna).  It contends that the Defendants' attorneys would not allow this notice. See Tr. at 51:24-25 (McKenna).  In its view, the SEC is not different from the Defendants in this scenario.  See Tr. at 52:3 (McKenna).  The Court stated that it protects lawyers while every other individual is fair game, demonstrating the distinction between the hypothetical and the dispute here.  See Tr. at 52:7-11 (Court); id. at 52:13-15 (Court).  The SEC continued with the hypothetical. The SEC contended that the Defendants will need to prepare a witness on their

opinions and conclusions about the evidence and contentions.  See Tr. at 52:21-25 (McKenna).
It characterized this scenario as very problematic and asked why the SEC should be treated
differently.  See Tr. at 52:25-53:1-3 (McKenna).  The Court responded that it understood the
SEC's argument, but the Defendants have no other way to retrieve the necessary information for
their defense.  See Tr. at 53:4-17 (Court).  It found that the SEC's main message is that the
Defendants cannot depose it; the SEC merely presents this argument in a different way.  See Tr.
at 53:7-8 (Court).

The SEC again reiterated the problems with SEC v. Merkin, in which the Southern
District of Florida did not uphold the blanket assertions on the topics.  See Tr. at 53:12-15
(McKenna); id. at 54:1-2 (McKenna).  The Court stated that it was planning to rule the same way
as SEC v. Merkin, where the Magistrate Judge allowed the deposition and sustained the SEC's
objections after the 30(b)(6) process.  See Tr. at 54:5-8 (Court); id. at 54:10-15 (Court). The SEC
argued that this approach is inefficient, because the Defendants have shown the intent to move
beyond the facts.  See Tr. at 54:16-24 (McKenna).

As to other general comments, the SEC reaffirmed the Court's idea to limit the target
group at the SEC that it has to canvass.  See Tr. at 55:17-18 (McKenna).  The SEC contended
that one of its main concerns has been the potential target group that the "YOU" definition
encompasses.  See Tr. at 55:17-22 (McKenna).  It provided topic 13 as an example where the
SEC would have to ask former and current employees whether they have made public statements
about repurchase agreement markets or the financial crisis in the past six years.  See Tr. at 56:18-
22 (McKenna).  The Court proposed that the SEC send an electronic mail blast to the individuals
who fit the category, but that the universe would not include the entire SEC.  See Tr. at 56:23-
57:1-16 (Court, McKenna).  The SEC agreed to the Court's proposal and stated that its solution

to send an electronic mail transmission to a smaller subset of people at the SEC is "potentially workable," but it wanted to remind the Court to balance the burden it would endure to seek out the information against what it viewed as minimal relevance for some of the topics.  Tr. at 57:8-9 (McKenna); id. at 57:20-21 (McKenna); id. at 58:4-6 (McKenna).

The Court then asked the Defendants to give their general comments and respond to the proposal to narrow the universe of individuals.  See Tr. at 59:18-22 (Court).  The Defendants agreed that the parties can arrive at a reasonable limitation, but they were concerned that the SEC would considerably limit the universe of individuals.  See Tr. at 60:1-3 (Johnstone).  They concurred with the Court that 30(b)(6) depositions are different discovery tools, and they, therefore, were not attempting to evade the Court's interrogatory limit. See Tr. at 60:17-20 (Johnstone).  They further agreed with the Court that the SEC's work-product argument is "a blanket claim."  Tr. at 61:2-4 (Johnstone).  Last, the Defendants contended that they did not design the topics to embarrass the SEC; they asserted that each topic has relevance to this case. See Tr. at 61:16-20 (Johnstone).

### 3.  <u>Narrowing the Universe, Scope, and Language for the Defendants' Topics</u>.

The Defendants then presented their three categories -- factual contentions, public statements, and accounting interpretations -- as a way for the Court to organize its decision.  See Tr. at 62:9-14 (Johnstone); id. at 63:1-7 (Johnstone).  The Court questioned whether the Defendants believe that the Court can give the same decision for every topic that encompasses each category.  See Tr. at 63:9-13 (Court).  The Defendants asserted that the Court can appropriately decide these topics based on the three categories.  See Tr. at 63:14-15 (Johnstone).

The Court decided to use the three categories and hear the overall objections to the topics within the groupings, but it stated that it will resolve any objections for specific topics in the

categories. See Tr. at 64:17-23 (Court). In the factual contention category, the Court first examined certain topics: 1, 2, 6, 7, 8, 16, 19, and 21. See Tr. at 65:21-23 (Court). The SEC contended that these topics are contention interrogatories that evade the Court's limitation and invade the Plaintiff's work-product. See Tr. at 65:24-25 (McKenna); id. at 66:4-7 (McKenna). The Court overruled these objections and ordered the SEC to provide a witness on these topics. See Tr. at 66:1-10 (Court, McKenna).

Afterward, the SEC gave specific objections to topic 8: "YOUR understanding of the meaning of the disclosure concerning issuance of 'Collateralized Mortgage Debt' on page 35 of the 2007 FORM 10-K, as of March 13, 2012." Amended Notice at 9; see Tr. at 66:21 (McKenna). The SEC contended that their counsel and a possible investigator are the only individuals that understand the disclosure. See Tr. at 66:25-67:1-2 (McKenna). The SEC suggested that, if the Defendants would agree to treat the topic "as a contention interrogatory as well," then it would not have to request information from other SEC employees. Tr. at 67:2-6 (McKenna). The Court proposed to rewrite this topic: "What the SEC's position is going to be at trial as to what the disclosure concerning collateralized mortgage debt on page 35 means." Tr. at 67:8-11 (Court). The SEC and the Defendants agreed to the Court's revision. See Tr. at 67:7-11 (Court).

The Court then shifted to topic 9; the SEC objected that the term "YOUR" is overbroad. Tr. at 67:18 (Court). The Court asked the Defendants which specific SEC Divisions are to be included within this topic. See Tr. at 68:16-18 (Court). The Defendants stated that they want the SEC to interview staff from the Division of Trading and Markets, the Division of Investment Management, the Division of Corporate Finance, and the Commissioners' offices. See Tr. at 68:19-22 (Johnstone). The Court asked which individuals within those Divisions it should

include.  See Tr. at 68:23-25 (Court).  The Defendants replied that Assistant Directors and above would be sufficient, because Assistant Directors are generally authorized to make public statements.  See Tr. at 69:1-3 (Johnstone); id. at 69:19-24 (Lee).

The Court noted the burden for the SEC to search for former employees who had this status and left the SEC after 2007.  See Tr. at 70:20-71:1 (Court).  Because the SEC's knowledge of Peloton in topic 9 was not relevant to its affirmative case, the Court stated that this discovery would benefit only the Defendants.  See Tr. at 71:12-15 (Court).  The Defendants argued that the SEC can find the former employees if it makes a good faith effort, and that a bright line rule that does not require the SEC to search for former employees will eliminate relevant information for this case.  See Tr. at 72:3-15 (Johnstone).  They further contended that the SEC made an allegation that their client had knowledge of Peloton.  See Tr. at 73:14-19 (Johnstone).  The Court stated that it would not eliminate this information, but noted that, at least on topic 9, it would be more appropriate to place the burden on the Defendants rather than on the SEC to locate former SEC employees who had knowledge of Peloton.  See Tr. at 72:16-18 (Court); id. at 73:20-74:4 (Court).

The Court asked the SEC's opinion on the proposed target group for its four Divisions.  See Tr. at 74:22-24 (Court).  The SEC contended that using the Assistant Directors as the baseline is still overbroad.  See Tr. at 75:6-7 (McKenna).[15]  The SEC proposed that the Court change the target group to Associate Director level, because the SEC's counsel believed that the SEC did not allow Assistant Directors to make public statements.  See Tr. at 75:7-12 (McKenna).  Mr. Lee, one of the attorneys for the Defendants, stated that, when he was a Director at the SEC through 2007, Assistant Directors were authorized to give public statements.  See Tr. at 76:9-12

---

[15]The hearing transcript attributes several statements on page 75-79 to Mr. Johnstone, but Mr. McKenna made these statements.

(Lee); id. at 76:21 (Lee). The Court decided to use Assistant Directors as the baseline. See Tr. at 77:9-10 (Court).

The Court ordered on topic 9 that the SEC would need to send an electronic mail blast to Assistant Directors and higher status employees in the four Divisions, but the SEC did not need to search for individuals who had left the SEC. See Tr. at 77:9-21 (Court). The SEC further requested a full calendar year as the timeframe -- January 1, 2007, to January 1, 2008. See Tr. at 102:21-23 (McKenna). The Defendants agreed to this proposal. See Tr. at 103:4 (Johnstone).

Afterward, the Court shifted to topic 10 and asked the Defendants which Divisions should be searched for this topic. See Tr. at 80:8 (Court). The Defendants requested the four Divisions to be searched for topic 10 and also requested to include the Office of the Chief Account. See Tr. at 80:15-18 (Johnstone). The Court asked the Defendants whether the SEC should still use Assistant Directors as the baseline for the target group. See Tr. at 82:13-15 (Court). The Defendants believed that the target group was reasonable. See Tr. at 82:16-17 (Johnstone).

The SEC argued that any individual in the targeted group could have made a personal investment that touches on the credit or repurchase agreements market, which is irrelevant to this litigation. See Tr. at 83:1-3 (McKenna). The Court asked the Defendants whether they would agree to exclude personal investments from this topic, and the Defendants concurred with the SEC. See Tr. at 83:4-5 (Court, Johnstone).[16] The SEC argued that the Court should not allow the Office of the Chief Accountant, the Division of Corporate Finance, and the Division of Investment Management into the targeted group. See Tr. at 84:3-7 (McKenna). It contended that the Office of Chief Accountant handles accounting issues rather than economic predictions,

---

[16]The transcript record states that the Plaintiffs agreed to exclude personal investments, but the Court asked the Defendants if they could agree to that compromise.

the Division of Corporate Finance basically follows the duties of its name, and the Division of Investment Management encompasses a smaller number of individuals who give forecasts and predictions than the Division of Trading and Marketing.  See Tr. at 84:3-10 (McKenna).  The Defendants conceded that the SEC did not need to communicate with the Office of the Chief Accountant on this topic, but they asserted that the Court should include the other four Divisions to receive the necessary information.  See Tr. at 84:15-18 (Johnston).  The SEC agreed to this compromise.  See Tr. at 84:21 (McKenna).  The parties further agreed that the scope should be one calendar year with 2008 as the end date.  See Tr. at 102:21-23 (McKenna); id. at 103:4 (Johnstone).

The Court subsequently moved to the public statement category, which consists of topics 3 and 11-14.  See Tr. at 85:13-14 (Court).  The parties agreed to use the Assistant Directors as the baseline for topics 3 and 13: the SEC's public statements concerning "the clarity or lack of clarity in [GAAP]," "the relationship between the repo markets and the financial crisis," and its factual basis regarding those views.  Amended Notice at 8, 10.  See Tr. at 86:8-16 (Court, Johnstone).  The Defendants, however, asserted that they want to include the Office of the Chief Account with the other four Divisions, because the primary subjects are OTTI, and the relationship between the repo markets and the financial crisis.  See Tr. at 86:21-23 (Johnstone).  They contended that accountants are well informed to make public statements regarding these topics.  See Tr. at 86:24-25 (Johnstone).  The SEC agreed that the Office of the Chief Accountant has involvement with OTTI decisions, but it contended that the Court should remove the Division of Trading and Markets and the Division of Investment Management from the scope.  See Tr. at 87:5-8 (McKenna).  The Defendants agreed to remove the Division of Investment Management, but they refused to eliminate any other Divisions.  See Tr. at 87:13-15 (Johnstone);

id. at 87:17-20 (Johnstone).  They believed that the other Divisions are primarily involved with investment bank issues and OTTI determinations.  See Tr. at 87:17-20 (Johnstone).

The SEC argued that the Court should eliminate the Division of Trading and Markets, because the Office of the Chief Accountant will provide the main information for OTTI.  See Tr. at 88:6-8 (McKenna).  It asserted that the Defendants will receive very little benefit if the Court adds the Division of Trading and Markets to the target group.  See Tr. at 88:8-10 (McKenna).  The Defendants believed that this Division has relevant information, because the Division of Trading and Markets has accountants and economists.  See Tr. at 88:12-14 (Johnstone); id. at 88:22-23 (Johnstone).  The Court ordered that the Office of the Chief Account, the Division of Trading and Markets, the Division of Corporate Finance, and the Commissioners' offices will be the targeted group for topics 3 and 13.  See Tr. at 89:1 (Court); id. at 89:9-12 (McKenna): id. at 89:20-21 (Court).

The SEC asked for clarity on the scope of topics 3 and 13.  See Tr. at 98:14-15 (McKenna); id. at 98:17-18 (McKenna).  The Court asked whether January 1, 2008, can be the start date for topic 3.  See Tr. at 98:24-25 (Court); id. at 99:3 (Court).  The SEC and the Defendants agreed on the start date, but they argued over the end date.  See Tr. at 99:1-2 (McKenna); id. at 99:4-7 (Johnston).  The SEC contended that the end date should be March 15, 2008, because the purpose of topic 3 is to demonstrate that the financial crisis was significant and unpredictable.  See Tr. at 99:12-14 (McKenna); id. Tr. at 99:21-22 (McKenna).  It alleged that this information was well known on March 15, 2008.  See Tr. at 99:14 (McKenna).

The Defendants wanted to extend the end date to March, 2009.  See Tr. at 100:9-10 (Johnstone).  In the Defendants' view, the SEC alleges that the OTTI rules were "cut and dry," Tr. at 99:23-24 (Johnstone), although the SEC said that it never claimed that the rules were that

- 44 -

clear, see Tr. at 100:1 (McKenna).  The Defendants urged the Court to extend the relevant time

to the beginning of 2008 to March 2009, during which the SEC had roundtable discussions,

collaborated with FASB to distribute guidance on OTTI, and revised the OTTI rules.  See Tr. at

100:10-19 (Johnstone).  They argued that the SEC's statements in March 2009 concerning this

matter are relevant to its allegations.  See Tr. at 100:17-19.  The SEC stated that it never made

such an assertion about OTTI and offered to stipulate about the complexity of OTTI rules.  See

Tr. at 100:22-25 (McKenna). According to the SEC, it asserted only that Starrett advised

Goldstone and Simmons whether "contemplating selling assets calls into question their intent to

hold," or whether the sale of assets to satisfy the margin calls raised questions about their ability

to hold.  Tr. at 100:25-101:5 (McKenna).  The SEC contended that the burden is excessive,

especially when the SEC proposes to stipulate to this matter.  See Tr. at 101:5-7 (McKenna).

Because OTTI is the central issue in this case, the Court ordered that the cutoff date should be

March 15, 2009.  See Tr. at 101:8-9 (Court); id. at 101:11-15 (Court).

　　　Further, the SEC contended that topics 3 and 13's target group would not apply to topics

11, 12, and 14.  See Tr. at 89:9-12.  The Court agreed and wanted to first understand the

circumstances involved for topic 11 and 12, which cover the rationale and basis for former

Chairman Cox's statements.  For topic 11, the Defendants stated that former Chairman Cox's

statement was a response to a question from the press, which was made five days before Bear

Stearns' collapse.[17]  See Tr. at 91:14-18 (Johnstone).  In regards to topic 12, the Defendants

asserted that the other statement from former Chairman Cox was a prepared remark for his

congressional testimony after the Bear Stearns' downfall.  See Tr. at 92:7-10 (Court, Johnstone);

---

[17]Bear Stearns was an "investment bank located in New York City that collapsed during
the subprime crisis in 2008."  Bear Stearns, Investopedia, http://www.investopedia.com/terms/b/
bear-stearns.asp

id. at 92:17 (Johnstone); id. at 92:20-21 (Johnstone).   The Court proposed that the SEC send an electronic mail blast to the Chairman's Office, including the Chief of Staff, to provide any basis and rationale for these statements.   See Tr. at 93:1-5 (Court).   The SEC reiterated its conversation with the former Chief of Staff for former Chairman Cox's Chief.   See Tr. at 93:20-21 (McKenna).   In its view, the SEC has pursued the available resources regarding these statements.   See Tr. at 94:2-3 (McKenna).   The Court stated that the SEC will need to communicate with the current Chief of Staff, as well as the former Chief of Staff, to search for any documents related to these topics.  See Tr. at 94:4-5 (Court); id. at 94:11-12 (Court).

Before the Court gave its decision, the Defendants requested that the Court include current counsel for the Chairman's Office.  See Tr. at 97:8-10 (Johnstone).  They believed that the counsel may lead to information concerning the basis for topic 11.  See Tr. at 97:9-13 (Johnstone).   Because the SEC referenced the conversation between Chairman Cox and the Director of Market Regulation, the Defendants asserted that they want to add this Director to the target group for topics 11 and 12.   See Tr. at 96:19-24 (Johnstone).  The SEC, however, stated that this Director is no longer with the SEC.   See Tr. at 97:23-98:1 (McKenna, Court).   The Court decided that the SEC must send an electronic mail blast to the former and the current Chief of Staff, the present counsel for the Chairman's Office, and the current Director of Market Regulations.   See Tr. at 97:1-5 (Court); id. at 97:8-10 (Johnstone); id. at 97:14 (Court); id. at 98:7-8 (Court).  For the same reasons as to topic 9, the Court did not want to place the burden on the SEC to pursue the former Director.  See Tr. at 98:4-6 (Court).

The Court next moved forward to topic 14.  See Tr. at 103:7-8 (Court).  The SEC alleged that only three employees out of the listed thirteen staff members still work at the SEC.  See Tr. at 103:9-12 (McKenna).  The Defendants asserted that the SEC will not be burdened if it makes a

good-faith effort to communicate with the former employees and receive information regarding this topic.  See Tr. at 104:1-3 (Johnstone).  The Court stated that it would not place this burden on the SEC, but it asked the Defendants whether the employees' successors will be useful to them if the Court adds these individuals to the target group.  See Tr. at 104:4-6 (Court).  The Defendants answered in the affirmative.  See Tr. at 104:7 (Johnstone).  The Court ordered that the SEC must send the electronic mail blast to the three current employees and the staff members' successors concerning topic 14.  See Tr. at 104:10-11 (Court).

Finally, the Court shifted to the accounting interpretation category where the Defendants proposed that this category can be divided into three subcategories: (i) interpretation of accounting and auditing principles; (ii) audit principle under GAAS; and (iii) rule 13b2-2.  See Tr. at 104:25 (Court); id. at 105:8-13 (Johnstone).  The Defendants asserted, and the SEC agreed, that the first subcategory encompassed topics 4, 5, and 18.  See Tr. at 105:16-19 (Johnstone, McKenna).  The parties agreed that the Court should decide these topics similarly to topics 3, 9, 10, and 13 in which the chosen target group was Assistant Directors and any occupation with higher status.  See Tr. at 105:19-20 (McKenna).  The parties further agreed that the universe of Divisions should be the same as for topic 3.  See Tr. at 106:16-17 (Johnstone); id. at 106:22:23 (McKenna).

Because topics 4 and 5 relate to the subject matter of OTTI, as with topic 3, the Defendants asserted that the timeframe should be January 1, 2008, to March 15, 2009, for topics 4 and 5.  See Tr. at 107:8-11 (Johnstone).  The Court further advanced the idea that topic 18 would have the calendar year 2008 as its scope.  See Tr. at 107:12-14 (Court).  The parties agreed.  See Tr. at 107:16-21 (Lee, Court, McKenna).

The Court then moved to the second subcategory that covers topic 15.  See Tr. at 108:4-6 (Court).  The Court suggested that it rewrite topic 15 to read: "[W]hat your position will be a[t] trial as to whether certain practices comply with GAAS."  Tr. at 108:4-6 (Court). The SEC and the Defendants concurred with this revision.  See Tr. at 108:12 (Johnstone); id. at 108:16 (McKenna).

The Court went forward with topic 17 and asked whether an alteration similar to that made to topic 15 would be sufficient for the parties.  See Tr. at 108:17-18 (Court).  The Defendants contended that a comparable rewrite would be inadequate, because they do not seek only the SEC's position on its interpretation of rule 13b2-2 at trial.  See Tr. at 108:24-25 (Johnstone); id. at 109:5 (Johnstone).  According to the Defendants, the SEC alleges that, under rule 13b2-2, public companies have a duty to update statements and opinions given to auditors. See Tr. at 108:25-109:1 (Johnstone).  The Defendants asserted that they have been unable to find any case law, public guidance, or statements that support the SEC's allegation.  See Tr. at 110:7-10 (Lee).  Based on this assertion, the Defendants contended that they seek the SEC's public guidance or interpretation, and any statements from the SEC staff about public guidance or interpretations of rule 13b2-2 to use for their potential affirmative defense -- "that there was a lack of fair notice to the Defendants that Rule 13(b)(2)(ii) actually requires officers to update their accountants."  Tr. at 111:13-18 (Lee).  See Tr. at 110:13-16 (Lee); id. at 112:6-8 (Lee).

The SEC agreed to identify its position on rule 13b2-2 and disclose any interpretation that supports its view on rule 13b2-2.  See Tr. at 111:23-112:1 (Court, McKenna).  In regards to possible public statements or other potential interpretations or guidance on rule 13b2-2, the Court limited the target group.  The Court suggested that the SEC communicate with the Office of the Chief Accountant to determine whether its staff has delivered statements, or given public

guidance or interpretation, about rule 13(b)(2).  <u>See</u> Tr. at 17-24 (Court).  The Defendants agreed with this suggestion and proposed that the SEC further communicate with the accountants' offices within the Divisions of Corporate Finance and Enforcement on the same matter.  <u>See</u> Tr. at 112:25-113:1-8 (Lee); <u>id.</u> at 113:13-15 (Lee).  The SEC agreed to this suggestion.  <u>See</u> Tr. at 114:1 (McKenna).  The Defendants further suggested that the target group should be Assistant Directors and any occupation above that status.  <u>See</u> Tr. at 114:2-3 (Lee).  The Court agreed with this proposed target group.  See Tr. at 114:5 (Court).

The SEC advocated that the start date should be in 2005.  <u>See</u> Tr. at 115:5 (McKenna).  According to the Defendants, this topic should have an unlimited scope, even though rule 13b2-2 has been in place for many decades.  <u>See</u> Tr. at 114:9-13 (Lee).  Because the SEC alleged that the Defendants violated rule 13b2-2, the Defendants argued that any public statement, guidance, or interpretation on this rule would be relevant for the case.  <u>See</u> Tr. at 114:14-15 (Lee); <u>id.</u> at 114:20-23 (Lee).  The SEC did not, however, believe that it should be forced to search for statements from 1934 related to this rule.  <u>See</u> Tr. at 115:3-5 (McKenna).  The Defendants assumed that the burden from the scope is the SEC's primary concern, but they argued that the SEC will face the same burden when it asks the target group through electronic mail transmission whether they possess knowledge on any guidance or interpretation of the rule from 1934 or 2005.  <u>See</u> Tr. at 115:8-13 (Lee).

The Court decided that the target group will have to execute "a good faith search of any document" or relevant material from the start date of January 1, 2005, but the SEC must ask the staff whether they have any relevant information about the topic beyond this proposed date.  Tr. at 115:19-21 (Court). <u>See</u> <u>id.</u> at 115:23-24 (Court).  If the staff member has "personal knowledge" on public guidance or interpretations of rule 13b2-2 before the set date, this

employee will need to disclose the information.  Tr. at 115:23-116:1 (Court).  The SEC wanted the Court to clarify its statement "'a good faith search of any document.'"  Tr. at 116:3-7 (McKenna).  The Court explained that if an employee within the target group made a public statement or was aware of a colleague who had made a statement on the requested topic, that employee would need to search the speech pool to confirm whether the speeches relate to the topic.  See Tr. at 117:19-24 (Court).  If the employees are certain that the speech is not applicable to the topic, the employee would not need to search the speech pool.  See Tr. at 119:10-16 (Court).

The Defendants had concerns about the proposed start date, because the rule has had a significant life span.  See Tr. at 121:22-24 (Lee); id. at 122:2-6 (Lee).  The Court stated that the staff members will know any radical changes to the SEC's interpretation or position on auditors after 2005, because the companies have to update the auditors.  See Tr. at 123:17-22 (Court). Because the SEC must ask the employees whether they have any personal knowledge of public guidance or interpretations before the start date, the Court stated that the staff members must disclose the main interpretations for this rule.  See Tr. at 123:23-124:2 (Court).  The Defendants agreed with the Court's logic.  See Tr. at 124:4 (Lee).

The SEC requested an end date for this topic.  See Tr. at 121:14-17.  The Defendants contended that the Complaint's filing date would be the appropriate cut-off date, but the SEC contended that this date does not give the appropriate scope and that the cut off should be the earlier date when the Defendants filed the 10-K form.  See Tr. at 122:10-12 (Lee); id. at 122:14-15 (McKenna).  The Court ordered that the end date will be January 1, 2010.  See Tr. at 123:5-6 (Court).  It required the SEC to ask the target group whether its members have any personal

knowledge about public guidance or interpretations on this rule after the set date.  See Tr. at 123:9-12 (Court).

The Court asked the parties whether they had any more disputes about the accounting interpretation category.  See Tr. at 124:14-15 (Court); id. at 124:17-18 (Court).  The parties agreed that they did not have any more disputes with this category.  See Tr. at 124:16 (McKenna).  The Court then asked if it could provide any guidance for the depositions.  See Tr. at 124:23-125:1 (Court).  The SEC stated that it would provide its contentions and the evidence to support those contentions, but it will not provide any answer to hypothetical questions that the Defendants ask, such as: "What do you think about . . . the fact that [Citigroup Global] didn't declare an event of default when Thornburg was in breach?"  Tr. at 125:2-9 (McKenna).  From the SEC's perspective, a response to these hypothetical questions would qualify as attorney-work product, and its counsel would advise the witness not to respond to this question.  See Tr. at 125:9-11 (McKenna).  The SEC asked for the Court's reaction.  See Tr. at 125:11 (McKenna).

Before the Court would give its response on this scenario, it asked the Defendants whether they would ask follow-up questions and to give the purpose of these questions.  See Tr. at 125:14-17 (Court).  The Defendant asserted that they will ask follow-up questions.  See Tr. at 125:18 (Johnstone).  They contended that the Court should not permit the SEC to write responses for the witnesses to read verbatim and preclude follow-up questions.  See Tr. at 125:18-126:1 (Johnstone).   In their view, this result would be improper, because depositions are live testimonies that attempt to resolve any ambiguities with the designee's answer.  See Tr. at 125:20-126:1 (Johnstone).

The Court replied that the SEC should take whatever action is necessary to prepare its witness.  See Tr. at 126:4-6 (Court).  The Court stated that it will not restrict the Defendants from

asking follow-up questions, but the SEC will have to determine whether it will ask for a recess, and explain to its witness the answer he or she needs to provide for the question.  See Tr. at 126:7-12 (Court).  The Court said that the SEC may not be able to script the entire answer for the Defendants' question.  See Tr. at 126:14-16.  The Court cautioned the Defendants to stay on topic, because 30(b)(6) depositions often lead to questions beyond the scope of the designated topics.  See Tr. at 127:1-5 (Court).

The SEC further reiterated that it may use the deliberative-process privilege on topic 5 regarding the factual basis and final policy rationale for the Section 133 Report.  See Tr. at 129:4-9 (McKenna).  The Court proposed that it will give the SEC one of its memorandum opinions on the deliberative-process privilege as guidance for the deposition.  See Tr. at 129:11-13.  It explained that the Court tends to take a narrow approach to this privilege.  See Tr. at 129:15:-16 (Court).  The Court provided Parker v. United States Dep't of Agric., No. CIV 05-469 JB/RLP, 2006 WL 4109672 (D.N.M. July 30, 2006)(Browning, J.), where the Court upheld the Forest Service's declaration of the deliberative-process privilege.  See Tr. at 135:11-14 (Court); id. at 135:16-20 (Court).

Moreover, the Defendants asked the best way to communicate with the Court to resolve a dispute between the parties at the deposition.  See Tr. at 131:7-10.  The Court responded that the parties can call the Court and it can give a ruling about any dispute.  See Tr. at 131:11-14 (Court); id. at 131:16-19 (Court).  The Court asked if the parties needed additional guidance. See Tr. at 132:11 (Court).  The Defendants inquired whether the deposition will be seven hours. See Tr. at 132:14-17 (Mark).  The Court believed that parties agreed to this timeframe in the Joint Status Report, but the Defendants argued that the time should depend on the number of

witnesses that each witness should receive seven hours.  See Tr. at 133:4-6 (Court); id. at 133:9-14 (Lee).

## LAW REGARDING DISCLOSURE AND DISCOVERY

Rule 26 of the Federal Rules of Civil Procedure provides the basic rules governing disclosure and discovery.  With respect to expert testimony, rule 26(a)(2) requires that a party disclose to other parties the identity of a person who may be used at trial to present evidence in the form of expert testimony, and that a report which the expert prepares and signs accompanies that disclosure.  See Fed. R. Civ. P. 26(a)(2)(A)-(B).  A report shall include

> (i)      a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii)     the facts or data considered by the witness in forming them;
>
> (iii)    any exhibits that will be used to summarize or support them;
>
> (iv)    the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v)     a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi)    a statement of the compensation to be paid for the study and testimony in the case.

Fed R. Civ. P. 26(a)(2)(B).  Pursuant to rule 26(b)(4)(A), a party can depose any person identified as an expert whose opinions may be expressed at trial.  See Fed. R. Civ. P. 26(b)(4)(A).  If an expert report is required under rule 26(a)(2)(B), "the deposition may be conducted only after the report is provided."  See Fed. R. Civ. P. 26(b)(4)(A).

Existing discovery instruments were designed to allow the parties "the fullest possible knowledge of the issues and facts before trial."  Hickman v. Taylor, 329 U.S. 495, 501 (1947)(acknowledging that discovery should serve to narrow and clarify the basic issues between

the parties and to provide a means of ascertaining the facts regarding those issues).  Under rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense -- including the existence, description, nature, custody, condition, and location of any documents, or other tangible things and the identity and location of persons who know of any discoverable matter."  Fed. R. Civ. P. 26(b)(1).  See United States v. Sec. Bank & Trust Co., 661 F.2d 847, 851 (10th Cir. 1981)(stating that discovery should be limited to relevant issues); Cornaglia v. Ricciardi, 63 F.R.D. 416, 419 (E.D. Pa. 1974)("It is beyond question that defendant is entitled to discovery of the facts upon which plaintiff's claim . . .  is founded.").

Rule 26(b)(5)(A) provides:

(A)     *Information Withheld*.  When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:

(i)     expressly make the claim; and

(ii)     describe the nature of the documents, communications, or tangible things not produced or disclosed -- and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

Fed. R. Civ. P. 26(b)(5)(A)(emphasis in original).  See Foster v. Hill, 188 F.3d 1259, 1264 (10th Cir. 1999)(stating that the party asserting the attorney-client privilege must prove its applicability, that the privilege is narrowly construed for purposes of discovery, and that the party bears "the burden as to specific questions or documents, not by making a blanket claim"); Fed. Deposit Ins. Corp. v. United Pac. Ins. Co., 152 F.3d 1266, 1276 n.6 (10th Cir. 1998)(noting that the party invoking "the attorney-client privilege has the burden of establishing its applicability" and that "it is insufficient . . . merely to contend that documents contain privileged information"); United Investors Life Ins. Co. v. Nationwide Life Ins. Co., 233 F.R.D. 483, 488

(N.D. Miss. 2006)("In preparing a privilege log, a party must not invoke several protections or privileges where only one applies. . . .  For instance, when asserting a right to nondisclosure, an attorney should not state 'attorney-client privilege and/or work product.'  Either the attorney-client privilege and the work product doctrine protect the document or not . . . .").

Rule 33 of the Federal Rules of Civil Procedure concerns interrogatories.  Interrogatories may relate to "any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1).  Rule 33(a)(2) states that "[a]n interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact . . . ."  Fed. R. Civ. P. 33(a)(2).  "Requests for opinions or contentions that call for the application of law to fact [-- contention interrogatories --] are proper."  Johnson v. Kraft Foods N. Am., Inc., 236 F.R.D. 535, 544 (D. Kan. 2006).  In Anaya v. CBS Broadcasting, Inc., No. CIV 06-0476 JB/KBM, 2007 WL 2219458 (D.N.M. May 16, 2007)(Browning, J.), the Court held: "Because of the simplicity of notice pleading, [a][p]laintiff should provide as much information as possible regarding his claims without delay . . . ."  Anaya v. CBS Broad, Inc., 2007 WL 2219458, at *6 (quoting Johnson v. Kraft Foods N. Am., Inc., 236 F.R.D. at 544-45)(alterations in original, internal citation and quotation marks omitted).[18]  The Court adheres to

_____

[18]In Anaya v. CBS Broadcasting Inc., the Court stated that "[a] contention interrogatory that seeks, in one paragraph, all of the facts supporting allegations . . . is overly broad and unduly burdensome on its face."  2007 WL 2219458, at *6 (citing Johnson v. Kraft Foods N. Am., Inc., 236 F.R.D. at 544 (Waxse, M.J.); Hiskett v. Wal-Mart Stores, Inc., 180 F.R.D. 403, 404-05 (D. Kan. 1998)(Rushfelt, M.J.)).  The Court made this statement while discussing the Honorable David J. Waxse, United States Magistrate Judge for the District of Kansas.  The Court's statement, without any qualification, suggests that it agrees with the statement.  While the statement is not clear on its fact, the Court thinks it should be qualified in any case.
The Court applied the holding in Johnson v. Kraft Foods N. Am., Inc., that, "because the AMP Defendants are entitled to know the factual basis of Anaya's allegations and should not have to wait until a certain phase of discovery is completed to know this information."  Anaya v. CBS Broad. Inc., 2007 WL 2219458, at *9-10.  The Court continues to agree with that statement. The Court did not, however, adopt or apply the rule from Johnson v. Kraft Foods North America,

this principle under the pleading standard announced in <u>Atlantic v. Twombly</u>, 550 U.S. 544

(2007), and <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009).  <u>See Lane v. Page</u>, CIV 06-1071-JG-ACT,

2011 WL 1004825, at *4 (D.N.M. Feb. 10, 2011)(Browning, J.).

      With respect to the contention that interrogatories are premature, the Federal Rules of

<hr>

<u>Inc.</u>, that "a contention interrogatory which seeks 'all facts' supporting allegations within one
paragraph of a complaint is overly broad and unduly burdensome on its face." <u>Johnson v. Kraft
Foods N. Am., Inc.</u>, 236 F.R.D. at 544.  This latter District of Kansas' rule regarding contention
interrogatories came from a series of cases that the Honorable Gerald L. Rushfelt, United States
Magistrate Judge for the District of Kansas, wrote.  <u>See Lawrence v. First Kansas Bank & Trust
Co.</u>, 169 F.R.D. 657 (D. Kan. 1996)(Rushfelt, M.J.); <u>Hilt v. SFC Inc.</u>, 170 F.R.D. 182 (D. Kan.
1997)(Rushfelt, M.J.); <u>IBP v. Mercantile Bank of Topeka</u>, 179 F.R.D. 316 (D. Kan.
1998)(Rushfelt, M.J.); <u>Hiskett v. Wal-Mart Stores, Inc.</u>, 180 F.R.D. at 405.  Judge Rushfelt
explained his concern with contention interrogatories that request "all" facts:

> The interrogatories in question would require defendant to provide the equivalent
> of a narrative account of its case in defense, addressing each issue and detail
> raised by its denials.  This would include every evidentiary fact, details of
> testimony by supporting witnesses, contents of supporting documents, and even
> argumentative justification for its belief of facts beyond the knowledge of
> defendant.

<u>Lawrence v. First Kan. Bank & Trust Co.</u>, 169 F.R.D. at 662.  Judge Rushfelt went on to limit
some of the interrogatories to "provide the principal or material facts," rather than "all" the facts.
<u>Lawrence v. First Kan. Bank & Trust Co.</u>, 169 F.R.D. at 664.
      The Court does not agree with all of Judge Rushfelt's approach to contention
interrogatories.  The United States Court of Appeals for the Federal Circuit has observed that
contention interrogatories are "'useful in narrowing and sharpening the issues, which is a major
purpose of discovery,'" and they allow parties to "pin down" the other party's "theories of
liability" and  "theories of defense, thus confining discovery and trial preparation to information
that is pertinent to the theories of the case." <u>O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.</u>,
467 F.3d 1355, 1365 (Fed. Cir. 2006)(quoting Fed. R. Civ. P. 33, advisory committee's note to
1980 amendment to subsection (b)).  <u>See Jayne H. Lee, Inc. v. Flagstaff Indus. Corp.</u>, 173 F.R.D.
651, 652 (D. Md. 1997)("Properly drafted, 'contention interrogatories' . . . can help pin down an
opponent's legal theories in a case as well as the primary facts supporting them.").  As the Court
has previously explained regarding contention interrogatory answers, if parties "do not put the
bases for their contentions in their answers, they risk having the Court exclude the bases for their
contentions at trial." <u>Bhandari v. VHA Southwest Community Health Corp.</u>, No. CIV 09-0932
JB/GBW, 2010 WL 4928874, at *3 n.1 (D.N.M. Oct. 18, 2010)(Browning, J.).  The Court thus
does not agree with Judge Rushfelt that a party can only give "principal or material facts"; such
an approach leaves responding to any party's discretion, and could leave a requesting party
without important facts at trial.  A responding party must be forthcoming, even if it means
amending an answer periodically.

Civil Procedure expressly allow the trial court to phase discovery and delay the answers to contention interrogatories: "[T]he court may order that the interrogatory need not be answered until designated discovery is completed or until a pre-trial conference or some other time." Fed. R. Civ. P. 33(a)(2).  On the other hand, courts have held that, "[b]ecause of the simplicity of notice pleading, [a p]laintiff should provide as much information as possible regarding his claims without delay"; "[a p]laintiff is not entitled to withhold discovery information until he has obtained to his own satisfaction all discovery from [the d]efendant[]." Johnson v. Kraft Foods N. Am., Inc., 236 F.R.D. at 544.  Additionally, "[p]arties must provide true, explicit, responsive, complete, and candid answers to interrogatories." Hansel v. Shell Oil Corp., 169 F.R.D. 303, 305 (E.D. Pa. 1996)(internal citation omitted).  "If a party is unable to supply the requested information, the party may not simply refuse to answer, but must state under oath that he is unable to provide the information and set forth the efforts he used to obtain the information." Hansel v. Shell Oil Corp., 169 F.R.D. at 305 (internal quotations omitted).

## LAW REGARDING PROTECTIVE ORDERS

"Federal district courts have broad discretion over discovery." Morales v. E.D. Etnyre & Co., 229 F.R.D. 661, 662 (D.N.M. 2005)(Browning, J.).  The trial court has discretion to grant a protective order pursuant to rule 26(c) of the Federal Rules of Civil Procedure.  See Morales v. E.D. Etnyre & Co., 229 F.R.D. at 663.  Rule 26(c) provides that, upon a showing of good cause, a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," which may include forbidding disclosure or discovery. Fed. R. Civ. P. 26(c)(1)(A).  Accord Miller v. Regents of the Univ. of Colo., 188 F.3d 518, 1999

WL 506520, at *12 (10th Cir. 1999)(unpublished table decision)[19](reasoning that "[t]he district court is in the best position to weigh these variables and determine the appropriate limits because, unlike an appellate court, the district court has the ability to view firsthand the progression of the case, the litigants, and the impact of discovery on parties and nonparties").

"It is the party seeking the protective order who has the burden to show good cause for a protective order." Velasquez v. Frontier Med. Inc., 229 F.R.D. 197, 200 (D.N.M. 2005)(Browning, J.).  The party seeking the protective order must submit "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." Gulf Oil Co. v. Bernard, 452 U.S. 89, 102 n.16 (1981)(internal quotation marks omitted).

"Although rule 26(c) is silent as to the time within which the movant must file for a protective order, the United States Court of Appeals for the Tenth Circuit has held that 'a motion under [rule] 26(c) for protection . . . is timely filed if made before the date set for production.'" Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 2383822, at *5 (D.N.M. June 8, 2012)(Browning, J.)(quoting In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 669 F.2d 620, 622 n.2 (10th Cir. 1982))(alteration in original).

---

[19]Miller v. Regents of the Univ. of Colo. is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Miller v. Regents of the Univ. of Colo. has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

In Velasquez v. Frontier Med. Inc., 229 F.R.D. 197 (D.N.M. 2005)(Browning, J.), the Court denied the defendants' Motion for a protective order.   See 229 F.R.D. at 201.   The defendants objected to two requests for production from the plaintiff and sought a protection order against the two requests.   See 229 F.R.D. at 198-199.   The Court found that the defendants did not show that the requests for production would cause annoyance, embarrassment, oppression or undue burden.   See 229 F.R.D. at 200.   The defendants did not provide any affidavits or documentation to support good cause; the court could not discern any specific harm that the defendants would receive if they would answer the two requests for production.   See 229 F.R.D. at 200.   The defendants asserted only general concerns.   See 299 F.R.D. at 200.

## LAW REGARDING RULE 30(b)(6)

Rule 30(b)(6) of the Federal Rules of Civil Procedure provides:

> A party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination.  The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. A subpoena must advise a nonparty organization of its duty to make this designation.   The persons designated must testify about information known or reasonably available to the organization.   This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

Fed. R. Civ. P. 30(b)(6).   "Under Rule 30(b)(6), when a party seeking to depose a corporation announces the subject matter of the proposed deposition, the corporation must produce someone familiar with that subject."   Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d 253, 268 (2d Cir. 1999).   "To satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available 'such number of persons as will' be able 'to give complete, knowledgeable and binding answers' on its behalf."   Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d at 268.   See Gulfstream Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp., No. 06-1165, 2007 WL 5704041, at *4 (D.N.M. Oct.

24, 2007)(Browning, J.)("'A corporation must prepare its designated representative to provide complete, knowledgeable, and binding answers on the corporation's behalf.'").  "The purpose behind designating a witness to represent the corporation is to prevent bandying, which is the practice of presenting employees for their depositions who disclaim knowledge of the facts known by other individuals within the organization."   Gulfstream Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp., 2007 WL 5704041, at *4 (internal quotation marks omitted).

> A deponent under Rule 30(b)(6) has an affirmative obligation to educate himself as to the matters regarding the corporation.  This includes all matters that are known or reasonably available to the corporation.  Even if the documents are voluminous and the review of the documents would be burdensome, the deponents are still required to review them in order to prepare themselves to be deposed.

Concerned Citizens v. Belle Haven Club, 223 F.R.D. 39, 43 (D. Conn. 2004)(citations omitted)(internal quotation marks omitted).  The court in Concerned Citizens v. Belle Haven Club went on to hold that this duty to review, and in essence become educated about the information available to the corporation, applies even if the information is voluminous and multiple people must be consulted to collect the information known to the corporation.  See 223 F.R.D. at 43.  The United States District Court for the District of Columbia has stated:

> Although there is not an abundance of case law on the topic of Rule 30(b)(6), and nearly no case law in this circuit, certain principles are consistent in every court opinion to address these issues so far.  First, the deponent has the duty of being knowledgeable on the subject matter identified as the area of inquiry.  Clearly, a deponent that does not know about the subject matter to be inquired about is useless as a deponent at all.  Second, the designating party is under the duty to designate more than one deponent if it would be necessary to do so in order to respond to the relevant areas of inquiry that are specified with reasonable particularity by the plaintiffs.  Third, the designating party has a duty to prepare the witness to testify on matters not only known by the deponent, but those that should be reasonably known by the designating party.  Obviously, the purpose of

> a Rule 30(b)(6) deposition is to get answers on the subject matter described with reasonable particularity by the noticing party, not to simply get answers limited to what the deponent happens to know. Fourth, the designating party has a duty to substitute an appropriate deponent when it becomes apparent that the previous deponent is unable to respond to certain relevant areas of inquiry.

Alexander v. FBI, 186 F.R.D. 137, 141 (D.D.C. 1998)(citations omitted). See 7 James Wm. Moore, Moore's Federal Practice § 30.25[3], at 30-67 (3d ed. 2012)(stating the factors from Alexander v. FBI). The United States District Court for the District of Utah has ruled the same way, holding that the entity receiving a 30(b)(6) notice has a duty

> to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed . . . as to the relevant subject matters. The duty to prepare the designee imposed by the rule goes beyond matters personally known to the designee or to matters in which that designee was personally involved. Such preparation requires a good faith effort [by] the designate to find out the relevant facts -- to collect information, review documents, and interview employees with personal knowledge. The duty of preparation may require the interviewing of past employees.

United States v. Magnesium Corp. of Am., No. 2:01-CV-40 DB, 2006 WL 6924985, at *15-16 (D. Utah Nov. 27, 2006)(Nuffer, J.)(alteration in original)(footnote omitted)(internal quotation marks omitted). As a general matter, a corporation may designate any person as a corporate representative if he or she can meet the necessary criteria to satisfy rule 30(b)(6). See Gulfstream Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp., 2007 WL 5704041, at *5 (discussing how it may sometimes be necessary for a corporation to designate former employees as a rule 30(b)(6) deponent); Moore, supra § 30.25[3], at 30-71 ("There is no rule that would prevent corporate counsel, or even a corporation's litigation counsel, from serving as a Rule 30(b)(6) deponent.").

## LAW REGARDING THE WORK-PRODUCT DOCTRINE

The work-product doctrine, which the Supreme Court first recognized in Hickman v. Taylor, 329 U.S. 495 (1947), "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238 (1975). "In performing his various duties . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Hickman v. Taylor, 329 U.S. at 510. "Unlike the attorney-client privilege, the work-product doctrine is distinguishable from the testimonial . . . privileges." United States v. Ary, 518 F.3d 775, 783 n.4 (10th Cir. 2008). See In re Qwest Commc'n Int'l. Inc., 450 F.3d 1179, 1184 n.3 (10th Cir. 2006). "The work-product doctrine is codified in Fed. R. Civ. P. 26(b)(3) and is therefore excepted from Fed. R. Evid. 501" United States v. Ary, 518 F.3d at 783 n.4.

In diversity cases, rule 26(b)(3) of the Federal Rules of Civil Procedure governs work-product issues. See Frontier Ref. Inc. v. Gorman-Rupp Co., Inc., 136 F.3d 695, 702 n.10 (10th Cir. 1998). Rule 26(b)(3)(A)-(B) states:

(A)    *Documents and Tangible Things*.  Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).  But, subject to Rule 26(b)(4), those materials may be discovered if:

(i)      they are otherwise discoverable under Rule 26(b)(1); and

(ii)     the party shows that  it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

(B)    *Protection Against Disclosure*.  If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3)(A)-(B)(emphasis in original).

"[T]he work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." Citizens Progressive Alliance v. U.S. Bureau of Indian Affairs, 241 F. Supp. 2d 1342, 1358 (D.N.M. 2002)(Smith, M.J.)(citing United States v. Nobles, 422 U.S. at 238).   The attorney-work product doctrine "is intended only to guard against divulging the attorney's strategies and legal impressions . . . ." Resolution Trust Corp. v. Dabney, 73 F.3d 262, 266 (10th Cir. 1995). Documents or other items that do not reflect the attorney's mental impressions are not protected by the work product doctrine.  See United States v. Nobles, 422 U.S. at 238 ("At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."); In re Grand Jury Proceedings, 658 F.2d 782, 784-85 (10th Cir. 1981)("Such mental impressions are a prerequisite to the invocation of the work product doctrine.").

Analysis of whether a communication falls within the attorney-client privilege should precede any inquiry into whether the work-product protection applies.  See Upjohn Co. v. United States, 449 U.S. 383, 397 (1981).  The work-product protection is broader in scope and reach than the attorney-client privilege, because the privilege extends only to client communications, while the work-product protection encompasses much that has its source outside client communications.  See United States v. Nobles, 422 U.S. at 238.  Further, Rule 26(b)(3) permits disclosure of documents and tangible things constituting attorney-work product only upon a showing of substantial need and inability to obtain the substantial equivalent without undue hardship.  See Fed. R. Civ. P. 26(b)(3).  The focus of the determination whether a document falls within the work-product protection is whether "the motivating purpose" behind its creation was

to aid in litigation or possible future litigation.  In re Universal Serv. Fund Tel. Billing Practices Litig., 232 F.R.D. 669, 676 (D. Kan. 2005).

"'Ordinary work product generally refers to materials that are gathered at the request of an attorney in anticipation of litigation.  This type of work product receives less protection than opinion work product.  Opinion work product is, basically, the mental impressions of the attorney.'"  Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 651 (D.N.M. 2007)(Browning, J.)(quoting Sinclair Oil Corp. v. Texaco, Inc., 208 F.R.D. 329, 334 (N.D. Okla. 2002)).  "The party asserting the work-product protection has the burden of demonstrating that it applies and that it has not been waived."  Anaya v. CBS Broad., Inc., 251 F.R.D. at 651 (citing Kovacs v. Hershey Co., No. 04-cv-01881, 2006 U.S. Dist. LEXIS 69342, 2006 WL 2781591, at *10 (D. Colo. Sept. 26, 2006)).

For the work-product doctrine to apply, the asserting party must show that the documents or materials were prepared in anticipation of litigation by or for a party or that party's representative.  See Fed. R. Civ. P. 26(b)(3).  "Litigation need not necessarily be imminent as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation."  Anaya v. CBS Broad., Inc., 251 F.R.D. at 651; Fox v. Cal. Sierra Fin. Servs., 120 F.R.D. 520, 524 (N.D. Cal. 1988)("There is no requirement that the litigation have already commenced in order for the work-product doctrine to be operative, however, there must be more than a remote possibility of litigation.").  If the party asserting the work-product protection establishes entitlement to the protection, rule 26(b)(3) allows production of attorney-work product materials only upon a showing that the party seeking discovery has "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A).  "Work product can be

opinion work product, which some courts have held to be absolutely privileged, or non-opinion work product, i.e., fact work product, which may be discoverable under appropriate circumstances." In re Qwest Commc'ns Int'l, 450 F.3d 1179, 1186 (10th Cir. 2006).

## LAW REGARDING RELEVANT EVIDENCE

The threshold issue in determining the admissibility of evidence is relevance.  As a baseline, under the Federal Rules of Evidence, all evidence that is relevant is admissible -- unless another law or rule excludes the evidence -- and any evidence that is not relevant is not admissible.  See Fed. R. Evid. 402.  The standard for relevance is liberal.  See United States v. Leonard, 439 F.3d 648, 651 (10th Cir. 2006)("Rule 401 is a liberal standard.")(citing United States v. McVeigh, 153 F.3d 1166, 1190 (10th Cir. 1998), disapproved on other grounds, and limited by Hooks v. Ward, 184 F.3d 1206 (10th Cir. 1999)).  The evidence need only have "any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining action."  Fed. R. Evid. 401.  See United States v. Leonard, 439 F.3d at 651.  "[A] fact is 'of consequence' when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict," United States v. McVeigh, 153 F.3d at 1190, but it only need to have "any tendency" to do so, United States v. Leonard, 439 F.3d at 651.  Although the threshold burden is low, the rule 401 "does not sanction the carte blanche admission of whatever evidence a defendant would like.  The trial judge is the gatekeeper under the Rules of Evidence."  United States v. Jordan, 485 F.3d 1214, 1218 (10th Cir. 2007).

## LAW REGARDING DELIBERATIVE-PROCESS PRIVILEGE

The deliberative process privilege is designed to prevent injury to the quality of agency decisions by insuring that frank discussions within the agency are not inhibited by public

disclosure.  See Nat'l Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132, 150-51

(1975).  The privilege

> "rests on the obvious realization that officials will not communicate candidly
> among themselves if each remark is a potential item of discovery and front page
> news, and its object is to enhance the quality of agency decisions by protecting
> open and frank discussion among those who make them within the Government."

Casad v. U.S. Dep't of Health & Human Servs., 301 F.3d 1247, 1251 (10th Cir. 2002)(quoting

Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001)).  To fall

within the deliberative-process privilege, information must be pre-decisional in nature and must

form part of the agency's deliberative process.  See Nat'l Labor Relations Bd. v. Sears, Roebuck

& Co., 421 U.S. at 151-52.

Information is pre-decisional if it is prepared "to assist an agency decisionmaker in

arriving at his decision . . . and may include recommendations, draft documents, proposals,

suggestions, and other subjective documents which reflect the personal opinions of the writer

rather than the policy of the agency."  Formaldehyde Inst. v. Dep't of Health & Human Servs.,

889 F.2d 1118, 1122 (D.C. Cir. 1989)(internal quotations and citations omitted), implied

overruling on different grounds recognized by Nat'l Inst. of Military Justice v. Dep't of Def., No.

06-5242, 2008 WL 1990366 (D.C. Cir. April 30, 2008)(Tatel, J., concurring in denial of petition

for rehearing en banc).  A pre-decisional document is a part of the deliberative process if it

relates to government decision-making and its disclosure to the public "would expose an

agency's decisionmaking process in such a way as to discourage candid discussion within the

agency and thereby undermine the agency's ability to perform its functions."  Formaldehyde

Inst. v. Dep't of Health & Human Servs., 889 F.2d  at 1122 (internal quotations omitted).

A pre-decisional document may include recommendations, proposals, suggestions, and

other subjective evaluations which reflect the personal opinions of the writer, and which discuss

the wisdom or merits of a particular agency policy or recommend new agency policy.  See Pueblo of Zuni v. United States, No. 01-1046 WJ/WPL at 13 (D.N.M. Feb. 13, 2006)(slip op.). The key inquiry of the deliberativeness prong is whether the "disclosure of the requested material would tend to discourage candid discussion within the agency."  See Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992)(internal quotation marks omitted). Generally, factual information is not protected from disclosure under the privilege, while materials that embody deliberative opinions are.  See Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d at 1434.  This privilege "does not apply to individual decisions that a government agency makes, because the privilege primarily protects deliberation about what the broad policies should be, not individual decisions implementing existing policy."  Bell v. Bd. of Educ., No. CIV 06-1137 JB/ACT, 2008 WL 4107445, at *3 (D.N.M. April 22, 2008)(Browning, J.).

## ANALYSIS

The SEC presents five arguments to persuade the Court to order a protective order on 21 topics in the Amended Notice: (i) the topics evade the Discovery Plan on contention interrogatories; (ii) the topics seek the equivalent of opposing counsel's deposition, i.e., the Defendants' attorney-work product; (iii) the SEC anticipates that the topics will invade its deliberative-process privilege; (iv) the topics are irrelevant to the primary allegation in this litigation; and (v) the topics are excessively overbroad and unduly burdensome.  The first four arguments fail to persuade the Court, because parties can notice 30(b)(6) deposition inquiries similar to contention interrogatories and choose their method of discovery; declaring the work-product doctrine and the deliberative-process privilege is premature; and the topics are relevant. The Court concludes, however, that the last argument is persuasive, and will, as appropriate,

narrow the target group that the SEC has to contact, the applicable date range, and the scope of the topics.  It, therefore, will grant the Motion in part and deny it in part.

## I.    THE DEFENDANTS MAY SET FORTH RULE 30(b)(6) DEPOSITION TOPICS THAT ARE SIMILAR TO CONTENTION INTERROGATORIES.

The SEC argues that the Defendants attempt to evade the interrogatory limitation in the Discovery Plan through their rule 30(b)(6) deposition, because the Defendant's topics are essentially contention interrogatories.  See Motion at 7-8; Reply at 2.  This argument, however, is inconsistent with the Court's holding in Radian Asset: "[T]he better rule is to allow parties to craft rule 30(b)(6) inquires similar to contention interrogatories."  273 F.R.D. at 691.

In Radian Asset, the defendant filed a protective order on eleven topics in the plaintiff's 30(b)(6) deposition notice.  See 273 F.R.D. at 690.  The defendant argued that the plaintiff was seeking its contentions and legal theories and, therefore the noticed topics were improper for a 30(b)(6) deposition.  See 273 F.R.D. at 691.  The defendant argued that rule 30(b)(6) depositions are designed to uncover facts, and not contentions or legal theories.  See 273 F.R.D. at 691.  The Court discussed whether parties can "explore facts underlying legal claims and theories" under rule 30(b)(6) depositions.  273 F.R.D. at 691.  It determined that

> the better rule is to allow parties to craft rule 30(b)(6) inquires similar to contention interrogatories, because this rule will ultimately lead to fewer disputes about what subject matter is permitted in 30(b)(6) depositions and advances the policy underlying the rules favoring disclosure of information.  If the Court limits rule 30(b)(6) depositions the way that the College suggests, courts would have to referee endless disputes about what is permitted and what is not.  Moreover, rule 30(b)(6)'s plain language does not limit the deposition as the College states.  See Fed. R. Civ. P. 30(b)(6)("The persons designated must testify about information known or reasonably available to the organization.").  Rule 26(b)(1) states that "[u]nless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  Rule 30(b)(6) is not "otherwise limited," but unlimited.

273 F.R.D. at 691-92.  Similarly here, the Court concludes that the better approach is to allow rule 30(b)(6) deposition topics that overlap with the sorts of information obtained through contention interrogatories.  The Court, therefore, denied the protective order.  See 273 F.R.D. at 692.

Because the parties can approach deposition inquiries in this way, the Court will not bar 30(b)(6) deposition topics based on the topics' significant similarities with contention interrogatories.  The parties have a right to choose their discovery method and do not have to follow a particular sequence.  See Tr. at 45:6-8 (Court); Fed. R Civ. P. 26(d)(2)(A) ("Unless, on motion, the court orders otherwise for the parties' and witness' convenience and in the interest of justice: (A) methods of discovery may be used in any sequence . . . .").  Moreover, the discovery devices are different: there is no possibility of follow-up with interrogatories, while depositions allow both sides to get answers.

The SEC argues that, although the Court in Radian Asset "permitted a plaintiff to depose a defendant about the factual basis of its affirmative defenses under rule 30(b)(6)," Motion at 10, the Court should not do so here. It asserts that, unlike this case, (i) the defendant in Radian Asset did not clearly object based on the work-product doctrine; (ii) the defendant had "independent knowledge of the factual basis for its affirmative defense"; (iii) the plaintiff was not using the rule 30(b)(6) deposition as an attempt to evade the Court's interrogatory limit; and (iv) the plaintiff "had not been previously rebuffed in its attempt to depose opposing counsel."  Motion at 10.  The Court finds the SEC's distinctions unpersuasive.  First, the defendant in Radian Asset made a work-product objection.  See 273 F.R.D. at 691 ("CSF contends that the requests . . . designate matters that are inappropriate for rule 30(b)(6) purposes, i.e., attorney-work product, legal opinions and/or conclusion and expert testimony."); 273 F.R.D. at 692 ("The College does

not have to produce information that is protected by the attorney-client privilege or the work-product doctrine, but the other areas appear to be fair game, and to limit the 30(b)(6) deposition as the College suggests would lead to endless disputes and undercut the utility of this important device against corporations.").   Second, a rule 30(b)(6) designee often will not possess independent knowledge to answer all of the deposition topics, but the burden remains on the corporation or counsel to carefully prepare the designee.   An attorney can testify as a rule 30(b)(6) witness, but for a variety of reasons, a corporation and its counsel usually prepare a lay witness to be the 30(b)(6) witness.   Third, the Court notes that the Defendants may choose their discovery method within the Federal Rules of Civil Procedure, and the Amended Notice, seeking a rule 30(b)(6) deposition, is not an attempt to evade the Court's contention interrogatory limit. Last, although the Court has previously granted a protective order preventing the Defendants from deposing the SEC's designee based on concerns that the topics would invade the work-product doctrine as well as the PCAOB Privilege, 15 U.S.C. § 7215(B)(5)(a), the Court does not have the same concern about these deposition topics, and concludes that the better approach would be to let the SEC object to individual questions that may invade the work-product doctrine or attorney-client privilege.

Even assuming that the SEC's alleged distinctions are accurate, the Court declines to create what would be essentially exceptions from the <u>Radian Asset</u> holding.  If the Court starts to implement certain exemptions to the <u>Radian Asset</u> holding, the <u>Radian Asset</u> holding would become meaningless.  The Court would handle a vast number of disputes on the subject matter of rule 30(b)(6) depositions and whether the designated topic is a contention interrogatory, and therefore undermine the policy of voluntary disclosure.  The <u>Radian Asset</u> reasoning remains valid, and the Court does not have any adequate reason to distinguish the holding.

## II.   THE SEC MUST PARTICIPATE IN DEPOSITIONS BEFORE IT CAN ASSERT ATTORNEY-WORK PRODUCT.

The SEC further contends that topics 1, 2, 6, 7, 16, and 19-23 seek to depose opposing counsel, i.e., the pursuit of their attorney-work product.  See Motion at 8.  The Court disagrees. The SEC retains the right to object to any deposition question when it believes that this inquiry intrudes on its attorney-work product.  It has not waived the work-product privilege through disclosure or "offensive use of protected material."  See Anaya v. Broadcasting, Inc., No. CIV 06-476 JB KBM, 2007 WL 2219394, at *6 (D.N.M. April 30, 2007)(Browning, J.).  The Court will not accept blanket assertions of attorney-work product.  See McBride v. Medicalodges, Inc., 250 F.R.D. 581, 587 (D. Kan. 2008)("Courts addressing this issue have generally declined to uphold attorney-client and work-product objections to topics set out in rule 30(b)(6) notices unless the requested topics, on their face, call for testimony invading the attorney-client privilege or attorney-work product doctrine.").  To avoid this finding of a blanket assertion, the SEC must show that the alleged topics, on their face, will intrude on its work-product.  See, e.g., McBride v. Medicalodges, Inc., 250 F.R.D. at 587.

The SEC wants the Court to presume that every question will lead to the counsel's mental thoughts and impressions, but some of the requested information may not deserve protection from this doctrine.  See Tr. at 46:22-24 (Court).  Indeed, after looking at these topics, the Court doubts that most, if any, questions will be getting into information that the work-product doctrine protects.  In any case, for this litigation, the Court needs to examine the inquiries in context and allow the deposition process to unfold before it can resolve any dispute on work-product.  For these reasons, the Court will deny the Motion regarding the work-product doctrine, but will allow the parties to raise the issue again after the deposition has taken place, if needed.

### III.   THE SEC IS ACCURATE THAT A DECLARATION OF THE DELIBERATIVE-PROCESS PRIVILEGE IS PREMATURE.

The SEC argues that the Defendants' topics, especially topic 5, may intrude on its internal deliberations and thus invade the deliberative-process privilege.   Currently, however, any assertion of the deliberative-process privilege is premature.   The deliberative-process privilege protects "'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001)(quoting Nat'l Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975)).   The information "must be pre-decisional in nature and must form part of the agency's deliberative process" to assert the deliberative-process privilege.   See Bell v. Bd. of Educ., 2008 WL 4107445 at *2. This privilege

> rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.

Parker v. United States Dep't of Agric., 2006 WL 4109672, at *4.   Because the SEC does not assert the privilege at this time, however, the Court does not need to delve further into this issue.

### IV.   THE DEFENDANTS' ATTEMPT TO EMBARRASS THE SEC SATISFIES THE RELEVANCE BURDEN.

The SEC asserts that the Defendants' topics regarding the public statements and interpretations from the SEC employees have marginal or no relevance to its allegations that the Defendants misrepresented Thornburg Mortgage's intent and ability to hold purchased ARM securities, and that Starrett provided clear accounting guidance to Simmons and Goldstone.   See Reply at 11-12.   The Court disagrees.   Relevance "is not a high standard because relevance is liberally construed in the context of discovery."   Trujillo v. Bd. of Educ. of the Albuquerque

Pub. Sch., CIV 02-1146 JB/LFG, 2007 WL 1306560 (D.N.M. March 12, 2007).  The Defendants are pursuing these topics to undermine the credibility of the SEC's current assertions.  As an example, the SEC alleges that the Defendants misrepresented Thornburg Mortgage's intent and ability to hold its purchased ARM securities until its value recovered.  See Opposition at 21.  Based on this allegation, the Defendants assert that they are entitled to inquire about the SEC's public statements on the relationship between the repurchase agreement markets and the financial crisis, and about the SEC's expressions of surprise on its failure to foresee the downturn in the credit or repurchase agreement markets, because the SEC failed to predict "the collapse of the credit markets and repurchase agreement markets that in turn affected the prices of Thornburg's holdings."  Opposition at 21-22.  The Defendants, therefore, want to discredit the SEC through its statements to illustrate that the allegation of the Defendants' misrepresentation lacks merit.  This purpose meets the relevance standard, because this strategy is appropriate for trial and is fair game for litigation.  If the SEC could not predict the downturn, the Defendants may argue that the SEC should not criticize the Defendants for not foreseeing certain things.

## V.   NARROWING THE UNIVERSE, SCOPE, AND LANGUAGE WILL RESOLVE THE OVERBROAD TOPICS IN THE AMENDED NOTICE.

The SEC contends that topics 3-6, 8-15, and 18 are unduly overbroad and burdensome.  In its view, the application of the YOU and YOUR definition to the topics would create an excessive burden.  The Court agrees.  These definitions refer to every SEC staff member.  If the Court orders the SEC to address topic 13 as it is written, the SEC will have to interview every employee, former or present, who has made a public statement since 2007 regarding the connection between repurchase agreement markets and the financial crisis.  While the SEC is not exempt from rule 30(b)(6) depositions, the Court fails to see how every public statement from any staff member throughout the SEC on these subject matters is material to this case.  The

Defendants state that the SEC needs only to communicate with "relevant staff members," but this phrase is still ambiguous and imprecise.  Opposition at 16.  The Court acknowledges that the Defendants state in the Opposition and the hearing that they do not want the SEC to communicate with every employee regarding these matters, but the Amended Notice contradicts their statement.  Compare Amended Notice at 4 (requesting public statements in topic 3 and others from "the Securities and Exchange Commission and its staff in each of its Divisions and Offices"), with Opposition at 16 ("In preparing for a Rule 30(b)(6) deposition, counsel is required to interview and collect documents only from *relevant* staff members." (emphasis in original)); Tr. at 60:4-5 (Johnstone)(explaining that the Defendants do not want the SEC to "canvass 3,500 SEC employees").

Although the Court declines to use a protective order to bar questions on any of the Defendants' topics, it agrees with the SEC that the target group as the Amended Notice defines the SEC is too broad.  The Court finds that the appropriate solution to this discovery problem is to narrow the target group of the SEC Divisions and staff members, the scope of the search, and the topics' language.  The following summarizes the Court's decisions regarding the limitations placed on the Defendants' topics:

1.  The SEC will need to provide a designee for topic 1: "The factual bases for each full or partial denial by YOU in YOUR responses to Defendants' First Set of Requests for Admission to Plaintiff Securities and Exchange Commission, dated October 10, 2012." Amended Notice at 8.  See Tr. at 65:21-23 (Court); id. at 66:1-9 (Court, McKenna); id. at 66:12-13 (Court).

2.  The SEC must provide a designee concerning topic 2: "Identification of all REPO AGREEMENTS that YOU contend THORNBERG violated

between February 14, 2008 and February 28, 2008, and the factual bases
for your contention that those REPO AGREEMENTS were violated."
Amended Notice at 8.  See Tr. at 65:21-23 (Court); id. at 66:1-9 (Court,
McKenna); id. at 66:12-13 (Court).

3.       For topic 3 -- "[p]ublic statements YOU have expressed since 2007
concerning the clarity or lack of clarity in [GAAP] with respect to
accounting for [OTTI], and the factual bases for those views," Amended
Notice at 8 -- the Court will narrow the target group persons whom the
SEC's counsel must contact to prepare it designee to people in the Office
of the Chief Accountant, the Division of Trading and Markets, the
Division of Corporate Finance, and the Commissioners' offices, see Tr. at
87:1-2 (Johnstone); id. at 89:1-3 (Court); id. at 89:5-6 (McKenna).
Assistant Directors will be the base for the target group.  See Tr. at 86:10-
17 (Court, Johnstone).  The scope -- when the statements were made --
will be January 1, 2008, through March 15, 2009.  See Tr. at 101:13-15
(Court).

4.       For topic 4 -- "[t]he identification and contents of communications
between YOU and third parties since 2007 concerning the meaning and
application of the OTTI rules under GAAP," Amended Notice at 8 -- the
target group will be the Office of the Chief Accountant, the Division of
Trading and Markets, the Division of Corporate Finance, and the
Commissioners' offices, see Tr. at 105:16-17 (Johnstone); id. at 106:16-17
(Johnstone); id. at 106:24 (Court).  Assistant Directors will be the base for

the target group.  See Tr. at 105:19-22 (McKenna, Court); id. at 106:2 (Johnstone).  The scope will be January 1, 2008, through March 15, 2009.  See Tr. at 107:7-13 (Johnstone, Court).

5.    For topic 5 -- "[t]he factual bases and final policy rationales for YOUR statements in the SEC's [Section 133] Report . . . on pages 25, 30-31, and 204-205 . . . ," Amended Notice at 8 -- the target group will be the Office of the Chief Accountant, the Division of Trading and Markets, the Division of Corporate Finance, and the Commissioners' offices, see Tr. at 105:16-17 (Johnstone); id. at 106:16-17 (Johnstone); id. at 106:24 (Court).  Assistant Directors will be the base for the target group.  See Tr. at 105:19-22 (McKenna, Court); id. at 106:2 (Johnstone).  The scope will be January 1, 2008, through March 15, 2009.  See Tr. at 107:7-13 (Johnstone, Court).

6.    The SEC must provide a designee concerning topic 6: "The identification and meaning of the 'accounting guidance' set forth in Jane Starrett's electronic mail transmission on February 25, 2008 to Larry Goldstone and Clay Simmons, and the factual bases for YOUR contention that the 'accounting guidance' was 'clear.'"  Amended Notice at 9.  See Tr. at 65:21-23 (Court); id. at 66:1-9 (Court, McKenna); id. at 66:12-13 (Court).

7.    The SEC will need to provide a witness concerning topic 7: "The factual bases for YOUR contention that the I/O Strip Transactions 'depleted Thornburg's liquidity."  Amended Notice at 9.  See Tr. at 67:7-11 (Court); id. at 67:16-17 (Court).

8.      The Court will rephrase topic 8.   The Defendants request: "YOUR understanding of the meaning of the disclosure concerning issuance of 'Collateralized Mortgage Debt' on page 35 of the 2007 Form 10-K, as of March 13, 2012," Amended Notice at 9, and the Court will rephrase the topic to: "What the SEC's position is going to be at trial as to what the disclosure concerning collateralized mortgage debt on page 35 means," Tr. at 67:7-11 (Court); id. at 67:16-17 (Court).

9.      For topic 9 -- "YOUR knowledge of Peloton's financial condition and any efforts by government agencies or private parties to assist or purchase the assets of Peloton between February 14 and 29, 2008," Amended Notice at 9 -- the target group will be the Division of Trading and Markets, the Division of Investment Management, the Division of Corporate Finance, and the Commissioners' office, see Tr. at 68:19-23 (Johnstone, Court). Assistant Directors will be the base for the target group.  See Tr. at 77:9-10 (Court).  The scope is the calendar year, January 1, 2007, to January 1, 2008.  See Tr. at 102:21-23 (McKenna); id. at 103:4-5 (Johnstone, Court).

10.     For topic 10 -- "YOUR forecasts and/or predictions in February and March 2008 concerning the credit markets or the repo markets," Amended Notice at 9 -- the target group will be the Division of Trading and Markets, the Division of Investment Management, the Division of Corporate Finance, and  the Commissioners' offices, see Tr. at 84:25-85:1 (Court); id. at 85:3-5 (Court).  Assistant Directors will be the base for the target group.   See Tr. at 82:13-14 (Court); id. at 84:23-25 (McKenna,

Court). To address the SEC's concern that the question would elicit the target group's personal investments in the credit or repurchase agreement markets, the Court will exclude personal investments. See Tr. at 82:25-83:7 (McKenna, Court). The scope is the calendar year, January 1, 2007, to January 1, 2008. See Tr. at 102:21-23 (McKenna); id. at 103:4-5 (Johnstone, Court).

11.    For topic 11 --"[t]he bases and rationale for former Chairman Christopher Cox's statement on March 11, 2008 that 'we have a good deal of comfort about the capital cushions at these firms at the moment' in reference to investment banks" Amended Notice at 10 -- the SEC will have to communicate only with the former and current Chief of Staff, the present counsel for the Chairman's Office, and the current Director of Market Regulations, see Tr. at 97:1-9 (Court, Johnstone); id. at 97:17 (Court); id. at 97:19-21 (Court); id. at 98:6-8 (Court).

12.    For topic 12 -- "[t]he bases and rationale for statements by former SEC Chairman Christopher Cox that the failure of Bear Stearns was attributable to a 'crisis of confidence,'" Amended Notice at 10 -- the SEC will have to communicate only with the former and current Chief of Staff, the present counsel for the Chairman's Office, and the current Director of Market Regulations, see Tr. at 97:1-9 (Court, Johnstone); id. at 97:17 (Court); id. at 97:19-21 (Court); id. at 98:6-8 (Court).

13.    For topic 13 -- "[p]ublic statements YOU have expressed since 2007 concerning the relationship between the repo markets and the financial

crisis, and the factual bases for those views," Amended Notice at 10 -- the Court will narrow the target group to the Office of the Chief Accountant, the Division of Trading and Markets, the Division of Corporate Finance, and the Commissioners' offices, see Tr. at 87:1-2 (Johnstone); id. at 89:1-3 (Court); id. at 89:5-6 (McKenna).   Assistant Directors will be the base for the target group.  See Tr. at 86:10-17 (Court, Johnstone).  The scope will be January 1, 2007, to January 1, 2008.  See Tr. at 102:10-11 (Court).

14.     For topic 14 -- "[e]xpressions of surprise at, or acknowledge of, a failure to predict or foresee the downturn in or volatility of the credit markets or repo markets in February and March 2008," Amended Notice at 10 -- the SEC needs to send an electronic mail blast only to the three staff members who still work at the SEC and to the staff members who succeeded the former employees, see Tr. at 104:10-13 (Court).

15.     The Court will rewrite topic 15 -- "YOUR understanding of whether the following practices comply with [GAAS], and the bases in GAAS for YOUR understandings," Amended Notice at 10 -- to: "[W]hat your position will be a[t] trial as to whether certain practices comply with GAAS."  Tr. at 108:4-7 (Court); id. at 108:17 (Court).

16.     The SEC will need to provide a representative for topic 16: "The factual bases for YOUR contention that Defendants 'failed to implement a system of internal accounting controls to assure that Thornburg's financial statements were prepared in conformity with GAAP."  Amended Notice at

11.  See Tr. at 65:21-23 (Court); id. at 66:1-9 (Court, McKenna); id. at 66:12-13 (Court).

17.     For topic 17 -- "[t]he identification and meaning of any public guidance or interpretations concerning YOUR position that officers of public companies have a duty under rule 13b2-2 to update statements or opinions conveyed to auditors," Amended Notice at 11 -- the SEC must identify its position on rule 13b2-2 and disclose any interpretation that supports its view on rule 13b2-2, see Tr. at 111:23-112:1 (Court, McKenna).  The SEC needs to communicate with the Office of the Chief Accountant, and the accountants' offices within the Division of Corporate Finance and the Division of Enforcement, to determine whether their staff have delivered statements or given public guidance or interpretation, about rule 13(b)(2). See Tr. at 112:17-24 (Court); id. at 113:13-16 (Lee, Court).  The Court orders that the target group should be Assistant Directors and any occupants above.  See Tr. at 114:2-5 (Lee, McKenna, Court).  It further orders that the target group will have to execute "a good faith search of any document" or relevant material from January 1, 2005, to January 1, 2010, but the SEC must ask the staff whether they have any relevant information about the topic before January 1, 2005.  Tr. at 115:19-21 (Court).  See Tr. at 115:23-24 (Court); id. at 123:5-6 (Court).  If the staff member has "personal knowledge" on public guidance or interpretations on this matter before January 1, 2005, this employee will need to disclose the information.  Tr. at 115:23-116:1 (Court).  The target group needs to

search for documents only if they contributed to these materials. <u>See</u> Tr. at 117:19-24 (Court). The target group does not need to search for these documents if they are certain that the information is not applicable to this topic. <u>See</u> Tr. at 119:10-16 (Court). The SEC must ask the target group whether they have any personal knowledge about public guidance or interpretation on this rule after January 1, 2010, but they need not search for documents or do anything further unless they have personal information and memory of guidance or interpretation of rule 13b2-2. <u>See</u> Tr. at 123:9-12 (Court).

18. For topic 18 -- "[t]he identification and meaning of any public guidance issued by YOU or any public accounting authority . . . ," Amended Notice at 11 -- the target group will be the Office of the Chief Accountant, the Division of Trading and Markets, the Division of Corporate Finance, and the Commissioners' offices, <u>see</u> Tr. at 107:7-13 (Johnstone, Court). Assistant Directors will be the base for the target group. <u>See</u> Tr. at 105:19-22 (McKenna, Court); <u>id.</u> at 106:2 (Johnstone). The scope will be the 2008 calendar year. <u>See</u> Tr. at 107:12-14 (Court).

19. The SEC must provide a designee concerning topic 19: "The factual bases for YOUR contention that Larry Goldstone knew at the time of his CNBC interview on February 28, 2008 that 'Thornburg had received margin calls that exceeded its available liquidity.'" Amended Notice at 11. <u>See</u> Tr. at 65:21-23 (Court); <u>id.</u> at 66:1-9 (Court, McKenna); <u>id.</u> at 66:12-13 (Court).

21.     The SEC must provide a designee concerning topic 21: "The factual bases for each full or partial denial by YOU in YOUR responses to Defendants' Second Set of Requests for Admission to Plaintiff Securities and Exchange Commission, dated January 27, 2013."  Amended Notice at 11. See Tr. at 65:21-23 (Court); id. at 66:1-9 (Court, McKenna); id. at 66:12-13 (Court).

23.     The SEC needs to provide a designee concerning topic 23 --"[t]he steps YOU have taken to prepare to answer questions on the foregoing topics" -- because neither the SEC nor the Defendants advocated or argued to narrow the universe, scope, or language.  Amended Notice at 12.

Because the Court decides to narrow the topics' universe, scope, and language rather than bar any inquiries on these matters, the Court will, accordingly, grant in part and deny in part the Motion.

**IT IS ORDERED** that Plaintiff Securities and Exchange Commission's Motion for a Protective Order to Quash Defendants' Notice of 30(b)(6) Deposition, filed April 15, 2013 (Doc. 163), is granted in part and denied in part, in accordance with the Memorandum Opinion.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzalez
   United States Attorney
Michael H. Hoses
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Ian S. Karpel
United States Securities and Exchange Commission
Denver, Colorado

   *Attorneys for Plaintiff Securities and Exchange Commission*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Chris Johnstone
Alanna G. Buchanan
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

John Valentine
Lauren R. Yates
Michael A. Lamson
April N. Williams
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Randall Lee
Jessica Kurzban
Peiyin Patty Li
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

    *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Robert J. Liubicic
Paul M. Torres
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

    *Attorneys for Defendant Jane E. Starrett*

W. Spencer Reid
Keleher & McLeod
Albuquerque, New Mexico

--and--

George A. Salter
Peter J. Dennin
New York, New York

    *Attorneys for Intervenor KPMG*