## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

vs.                                                                                   No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

        Defendants.

## <u>UNSEALED MEMORANDUM OPINION AND ORDER</u>[1]

---

[1]In its Sealed Memorandum Opinion and Order, filed August 13, 2015 (Doc. 364) ("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information in the Sealed MOO before the Court published a public version of the Sealed MOO. Sealed MOO at 1 n.1. The Court gave the parties 7 calendar days to provide notice of any proposed redactions. See Sealed MOO at 1 n.1. The Defendants submitted proposed redactions within 7 days. See Electronic Mail Transmission from Daniel Crump, Wilmer Hale, to K'Aun Wild, Regarding SEC v. Goldstone et al., 12-cv-00257-JB-GBW (dated Aug. 19, 2015), filed August 21, 2015 (Doc. 365). Plaintiff Securities and Exchange Commission ("SEC") does not ask the Court to redact any information and does not oppose the Defendants' proposed redactions. See Electronic Mail Transmission from Stephen C. McKenna to K'Aun Wild, Regarding SEC v. Goldstone et al., 12-cv-00257-JB-GBW (dated Aug. 20, 2015), filed August 21, 2015 (Doc. 367). Intervenor KPMG, LLP agrees with the Defendants' proposed redactions and proposes additional redactions. See Electronic Mail Transmission from George A. Salter to Stephen McKenna, Daniel Crump, and K'Aun Wild, Regarding SEC v. Goldstone et al., 12-cv-00257-JB-GBW (dated Aug. 21, 2015), filed August 21, 2015 (Doc. 369). The Court entered an order on August 21, 2015, asking the SEC and the Defendants to let the Court know, by the end of business on August 21, 2015, whether they object to KPMG's additional proposed redactions. The SEC advised the Court's Courtroom Deputy, by electronic mail transmission, that it did not object to KPMG's requests, and the Defendants' local counsel, by telephone, confirmed that their national counsel was aware of the Court's request. The Court has, thus, not received any objections to the Defendant's or KPMG's proposed redactions. The Court has incorporated the proposed redactions into this Unsealed Memorandum Opinion and Order, and has indicated where it has redacted information by using brackets containing the word "redacted" and a description of the redacted information -- e.g., name redacted, reference to an entity redacted, or reference to an exhibit redacted. The Court has also updated the Table of Contents to reflect changes in page numbering that the redactions caused.

**TABLE OF CONTENTS**

Introduction..................................................................................................................... 1

Factual Background............................................................................................................ 3

Procedural Background................................................................................................... 335

Law Regarding Summary Judgment............................................................................... 502

Relevant Federal Securities Law.................................................................................... 508

Analysis........................................................................................................................... 558

I.   The Court Will Deny the Defendants' Request for Summary Judgment on the
     Objective Falsity Issue............................................................................................ 559

     A.   The Restatement Demonstrates that a Genuine Issue of Material Fact Exists
          For Objective Falsity....................................................................................... 562

     B.   Thornburg Mortgage's Inability to Timely Meet Margin Calls Shows that a
          Genuine Issue of Material Fact Exists for Objective Falsity............................ 566

     C.   Thornburg Mortgage's Depleted Liquidity Shows that a Genuine Issue of
          Material Fact Exists on the Objective Falsity Issue......................................... 568

     D.   The I/O Strip Transactions Demonstrate that a Genuine Issue of Material
          Fact Exists for Objective Falsity...................................................................... 570

     E.   The European Hedge-Fund Rumor Also Shows a Genuine Issue of Material
          Fact on the Objective Falsity Issue.................................................................. 572

II.  The Court Will Deny the SEC's Request for Summary Judgment on the Objective
     Falsity and Materiality Issues.................................................................................. 580

III. There is a Genuine Issue of Material Fact on the Subjective Falsity Issue................ 584

     A.   The February 25, 2008, Email that Starrett Wrote to Goldstone Supports
          Finding that a Genuine Issue of Material Fact Exists Concerning Subjective
          Falsity.............................................................................................................. 590

     B.   Thornburg Mortgage's Decision to Postpone the Securitization Supports
          Finding that there is a Genuine Issue of Material Fact About Subjective
          Falsity.............................................................................................................. 598

C.      The February 28, 2008, Email that Simmons Wrote to Goldstone Supports a Conclusion that a Genuine Issue of Material Fact Exists Whether there is Subjective Falsity.................................................................................. 601

D.      The Hedge-Fund Rumor Shows that there is a Genuine Issue of Material Fact About Subjective Falsity........................................................... 602

IV.   There is a Genuine Issue of Material Fact Concerning Scienter...................... 605

V.    There is a Genuine Issue of Material Fact Whether the Defendants Deceived KPMG.................................................................................................................. 607

A.      Rule 13b2-2 is Violated when a Person Omits a Material Fact that Makes a Statement Misleading........................................................................ 608

B.      KPMG's No-Fraud Conclusion does not Foreclose a Possible Rule 13b2-2 Violation................................................................................................... 612

C.      The SEC has Presented Evidence of Material Misstatements that the Defendants Made to KPMG............................................................... 613

D.      The SEC has Presented Evidence of Omissions that Made Statements Misleading.......................................................................................... 617

## INTRODUCTION

**THIS MATTER** comes before the Court on: (i) the Motion for Summary Judgment on Behalf of Larry Goldstone and Clarence G. Simmons and Memorandum of Law in Support, filed August 9, 2013 (Doc. 201)("Goldstone MSJ"); (ii) the Memorandum of Point and Authorities in Support of Defendant Jane Starrett's Motion for Summary Judgment, filed August 31, 2013 (Doc. 206)("Starrett MSJ")[2]; (iii) the Plaintiff Securities and Exchange Commission's Opposition to Motion for Summary Judgment on Behalf of Larry Goldstone and Clarence G. Simmons and Cross-Motion for Summary Judgment Regarding Objective Falsity and Materiality, filed November 6, 2013 (Doc. 231)("SEC Goldstone Response"); and (iv) the Plaintiff Securities and Exchange Commission's Opposition to Motion for Summary Judgment and Memorandum of Law in Support of Jane Starrett's Motion for Summary Judgment and Cross-Motion for Summary Judgment on the Issues of Objective Falsity and Materiality, filed November 14, 2013 (Doc. 240)("SEC Starrett Response").  The Court held hearings on June 26, 2014, June 27, 2014, August 12, 2014, and August 13, 2014.  The primary issues are (i) whether the Court should use a recklessness or an actual-disbelief standard for determining whether a statement of opinion is subjectively false; (ii) whether the Court should grant summary judgment

---

[2]In the Notice of Errata with Respect to Defendant Jane Starrett's Motion for Summary Judgment and Supplemental Statement of Undisputed Facts in Support Thereof, filed September 10, 2013 (Doc. 211)("Starrett Notice of Errata"), Defendant Jane Starrett states that the Memorandum of Point and Authorities in Support of Defendant Jane Starrett's Motion for Summary Judgment, filed August 31, 2013 (Doc. 206)("Starrett MSJ"), should be retitled as "Defendant Jane Starrett's Motion for Summary Judgment and Memorandum of Law in Support."  Starrett Notice of Errata at 2.

Furthermore, in addition to filing the Goldstone MSJ and the Starrett MSJ, which the Defendants filed under seal, the Defendants filed redacted versions of their motions that are not sealed.  See Motion for Summary Judgment on Behalf of Larry Goldstone and Clarence G. Simmons and Memorandum of Law in Support, filed August 9, 2013 (Doc. 202); Memorandum of Points and Authorities in Support of Defendant Jane Starrett's Motion for Summary Judgment, file August 31, 2013 (Doc. 205).  This Memorandum Opinion and Order disposes of both the sealed and unsealed versions of the motions for summary judgment.

in the Defendants' favor on the issue whether they made an objectively false statement; (iii) whether the Court should grant summary judgment in favor of Plaintiff Securities and Exchange Commission ("SEC") on the issue whether the Defendants made an objectively false statement; (iv) whether the Court should grant the SEC summary judgment on the issue of materiality; (v) whether the Court should grant summary judgment in the Defendants' favor on the issue of subjective falsity; (vi) whether the Court should grant summary judgment on the issue of scienter; and (vii) whether the Court should grant the Defendants summary judgment on the SEC's claim under SEC rule 13b2-2, 17 C.F.R. § 240.13b2-2.

Because of recent opinions from the Supreme Court of the United States of America and from the United States Court of Appeals for the Tenth Circuit, the Court will apply an actual-disbelief standard for determining whether a person subjectively disbelieved the truth of an opinion statement. There are genuine issues of material fact from which a reasonable juror could find that the Defendants made an objectively false statement. The Court will, thus, not grant summary judgment in the Defendants' favor on the objective-falsity issue. Similarly, there is a genuine issue of material fact from which a juror could find that the Defendants' statements were not objectively false; summary judgment is, consequently, also not appropriate for the SEC on the objective-falsity issue. Because the SEC's arguments for materiality are closely tied to its objective-falsity arguments, the same issues of material fact preclude the Court from granting summary judgment in the SEC's favor on the issue of materiality. Even under the stricter actual-disbelief standard, there are genuine issues of material fact whether the Defendants believed that their statements were false when made. These same issues of material fact affect scienter, because the Defendants acted with scienter if they knew that their statements were false when they made them. Accordingly, the Court will not grant the Defendants summary judgment

on the issues of subjective falsity or scienter. Finally, the Defendants made statements that were false or misleading because of omitted information, which show that genuine issues of material fact exist that make summary judgment on the SEC's rule 13b2-2 claim inappropriate. Consequently, the Court will not grant either party summary judgment on any issue.

## FACTUAL BACKGROUND

Thornburg Mortgage, Inc. was a publicly traded, single-family residential mortgage lender that commenced operations in 1993 and was based in Santa Fe, New Mexico. See Statement of Material Facts of Larry Goldstone and Clarence G. Simmons in Support of Their Motion for Summary Judgment ¶ 1, at 4, filed August 9, 2013 (Doc. 203)("Goldstone Facts")(setting forth this fact); Plaintiff Securities and Exchange Commission's Statement of Disputed Material Facts in Opposition to Motion for Summary Judgment on Behalf of Larry Goldstone and Clarence G. Simmons and Cross-Motion for Summary Judgment Regarding Objective Falsity and Materiality at 1-51, filed November 6, 2013 (Doc. 233)("SEC Disputed Facts")(not disputing this fact);[3] Joint Status Report and Provisional Discovery Plan ¶ 3, at 2,

---

[3]The SEC does not state which facts it does not dispute, but, instead, responds only to the facts which it disputes. See SEC Disputed Facts at 1-51. The local rules state:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted. The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b). Because "all material facts . . . will be deemed undisputed unless specifically controverted," D.N.M.LR-Civ. 56.1(b), the Court will deem the facts that the SEC did not address as undisputed.

filed June 1, 2012 (Doc. 43)("Stipulated Facts")(setting forth facts to which the parties

stipulated); Thornburg Mortgage, Inc. 2007 Form 10-K at 16 (filed with Securities and Exchange

Commission on February 28, 2008), filed August 9, 2013 (Doc. 204-244)("2007 Form 10-K").[4]

"Thornburg originated, acquired, and retained investments in adjustable rate mortgage

('ARM')[[5]] assets, particularly High Quality ARM securities, and focused principally on prime

and super-prime borrowers seeking jumbo and super-jumbo ARMs."  Goldstone Facts ¶ 2, at 4.

See SEC Disputed Facts, at 1-51 (not disputing this fact); Memorandum from Shawn Buniel to

Clay Simmons, Jane Starrett, and File, regarding Evaluation of Thornburg Mortgage, Inc., and

Its Ability to Continue Operations (dated August 24, 2007) at 2, filed August 9, 2013

(Doc. 204-12)("Aug. 24, 2007, Memo."); 2007 Form 10-K, at 5-6, 19; Stipulated Facts ¶ 3, at 2.

In the 2007 Form 10-K, Thornburg defined "High Quality" as:

(i) Agency Securities, which are Purchased ARM Assets that are guaranteed by
Ginnie Mae, Fannie Mae or Freddie Mac, (ii) Purchased ARM Assets and

---

[4]The Defendants did not provide the entire 2007 Form 10-K, but only select pages.  See 2007 Form 10-K at 1-48.  In the Goldstone Facts, the Defendants cite the 2007 Form 10-K's original pagination that is listed at the bottom of the pages and not to the pagination that the CM/ECF places at the top of the document.  See Goldstone Facts ¶ 1, at 4.  Many of the exhibits, which the parties provide, and the briefs have pagination that is different than the CM/ECF's pagination -- either because the document has a cover page, an introduction section, or only select pages of the document have been provided.  For clarification and consistency, when citing briefs, exhibits, or other documents filed in the CM/ECF system, the Court will cite the page numbers that the CM/ECF system places on the upper, right-hand corner of the documents, unless the Court specifies otherwise.

[5]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).  "Superjumbo" and "jumbo," in reference to ARMs, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia.org, http://en.wikipedia.org/wiki/Super_ jumbo_mortgage (last visited Aug. 11, 2015). For example, a "super jumbo" mortgage is a "mortgage or other home-equity secured loan in an amount greater than $650,000," although the definition may vary according to a particular lender's criteria.  Super jumbo mortgage, Wikipedia.

> Securitized ARM Loans which are rated within one of the two highest rating
> categories by at least one of the Rating Agencies, (iii) Purchased ARM Assets and
> Securitized ARM Loans that are unrated or whose ratings have not been updated
> but are determined to be of comparable quality (by the rating standards of at least
> one of the Rating Agencies) to a High Quality-rated mortgage security, as
> determined by the Manager and approved by the Board of Directors, or (iv) the
> portion of ARM loans that have been deposited into a trust and have received a
> credit rating of AA or better from at least one Rating Agency.

Goldstone Facts ¶ 3, at 4 (setting forth this fact)(quoting 2007 Form 10-K, at 46).  See SEC

Disputed Facts at 1-51, at 1-51 (not disputing this fact); 2007 Form 10-K, at 46.  "Thornburg's

investment policy required it to invest at least 70% of its total assets in High Quality ARM

Assets and short-term investments."  Goldstone Facts ¶ 3, at 4 (setting forth this fact).  See SEC

Disputed Facts at 1-51, at 1-51 (not disputing this fact); 2007 Form 10-K, at 46.  "On an ongoing

basis, the company's mortgage-backed security ('MBS')[6] investment portfolio generated in

excess of $100 million in principal and interest payments per month.  Thornburg also received

millions of dollars per day from its dividend reinvestment plan and when activated, its

continuous offering program."  Goldstone Facts ¶ 4, at 4 (setting forth this fact).  See SEC

Undisputed Facts at 1-51 (not disputing this fact); Audit Client Restatement -- Engagement

Team Procedures from Cynthia Reinhart, KPMG Engagement Partner, and Jennifer Hall, KPMG

Engagement Senior Manager, to Thornburg Mortgage, Inc. 2007 Restatement Files (dated March

9, 2008, and April 24, 2008) at 15, filed August 9, 2013 (Doc. 204-204)("March 9, 2008,

Restatement Memo."); Declaration of Clarence Simmons ¶¶ 18-19, at 5, filed August 9, 2013

---

[6]A "mortgage-backed security" is a "security (esp[ecially] a pass-through security)
backed by mortgages.  The cash flow from these securities depends on principal and interest
payments from the pool of mortgages."  Mortgage-Backed Security, Black's Law Dictionary
1477 (9th ed. 2009).  A "pass-through" security is a "security that passes through payments from
debtors to investors.  Pass-through securities are usu[ally] assembled and sold in packages to
investors by private lenders who deduct a service fee before passing the principal and interest
payments through to the investors."  Pass-Through Security, Black's Law Dictionary 1477 (9th
ed. 2009).

(Doc. 204-294)("Simmons Decl."); Deposition of Ralph Ahn at 25:3-26:9 (taken January 29, 2013), filed August 9, 2013 (Doc. 204-296)("Ahn Depo."); Ahn Depo. at 145:9-13; Declaration of Patrick Feldman ¶ 21, at 5, filed August 9, 2013 (Doc. 204-292)("Feldman Decl.").

"For tax purposes, Thornburg was organized as a real estate investment trust ('REIT'), which required the company to distribute the majority of its earnings in the form of dividends to shareholders, and which meant that Thornburg was 'dependent on regularly occurring equity capital offerings as a normal course of operations.'"  Goldstone Facts ¶ 5, at 5 (setting forth this fact)(quoting Liquidity Analysis of TMA As of 9/30/2007, prepared by Matt Plummer at 2 (dated March 7, 2008), filed August 9, 2013 (Doc. 204-191)("Sep. 30, 2007, Liquidity Analysis")).  See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 4, 12-14.  "Thornburg used financings to fund its ARM assets, including borrowing money from various financial institutions under reverse repurchase agreements ('repo' agreements)."  Goldstone Facts ¶ 6, at 5 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 9.  "Thornburg's repo agreements involved a simultaneous sale of pledged securities -- the repo collateral -- to the repo lender at an agreed-upon price, with a commitment that Thornburg would repurchase the same securities at a future date at a higher price."  Goldstone Facts ¶ 7, at 5 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 9; Feldman Decl. ¶ 5, at 1.  "Thornburg used MBS securities that it acquired or held for investment purposes as repo collateral.  Those securities principally consisted of: (a) high quality, private-label MBS that were AA- or AAA-rated; and (b) agency securities."  Goldstone Facts ¶ 8, at 5.  See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 5-6; Deposition of Clarence Simmons at 301:25-302:2 (taken Feb. 16, 2010), filed August 9, 2012 (Doc. 204-312)("Simmons

Depo. Vol. II").  If the fair value of Thornburg's repo collateral declined, Thornburg could be subject to margin calls that would require it to either pledge additional collateral or reduce its borrowings, but, if the fair value of Thornburg's repo collateral increased, Thornburg's repo lenders could be subject to margin calls that would require them to send money to Thornburg to align the balances.  See Goldstone Facts ¶ 9, at 5; SEC Disputed Facts at 1-51; 2007 Form 10-K at 10; Reverse Repurchase Debt -- Walkthrough & Process Documentation, Prepared by Daniel Acree at 3 (dated Oct. 2, 2007 & Jan. 15, 2008), filed August 9, 2010 (Doc. 204-31)("Repo. Walkthrough"); Deposition of Clarence Simmons at 84:5-23 (taken Feb. 26, 2013), filed August 9, 2013 (Doc. 204-313)("Simmons Depo. Vol. III").

"Thornburg's Capital Markets group was responsible for managing Thornburg's assets and securities portfolio, which included negotiating, administering and monitoring reverse repurchase agreements and settling margin calls."  Goldstone Facts ¶ 10, at 5 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Declaration of Nathan Fellers ¶ 3, at 2, filed August 9, 2013 (Doc. 204-288)("Fellers Decl."); Feldman Decl. ¶ 3, at 2; Deposition of Jane Starrett at 89:22-90:7, 257:20-258:2 (taken Feb. 19, 2013), filed August 9, 2013 (Doc. 204-316)("Starrett Depo.").  "Repo margin calls were a normal part of Thornburg's business, and discussions between Thornburg and its lenders about the value of repo collateral and margin requirements occurred on a daily basis."  Goldstone Facts ¶ 11, at 6 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Repo. Walkthrough at 3; Deposition of Jennifer Hall at 200:6-20 (taken Dec. 5, 2012), filed August 9, 2013 (Doc. 204-306)("Hall Depo."); Fellers Decl. ¶ 5, at 2; Simmons Decl. ¶ 5, at 2; Feldman Decl. ¶ 7, at 3.  "Thornburg's repo collateral was not traded on public exchanges, and the underlying securities could be priced differently by different lenders."  Goldstone Facts ¶ 12, at 127.  See

SEC Disputed Facts at 1-51 (not disputing this fact); Fellers Decl. ¶ 6, at 2; Feldman Decl. ¶ 7, at 3.  "It was not unusual for Thornburg to dispute repo lenders' valuations of repo collateral (also known as 'marks'), which sometimes led to a recalculation of the amount of margin owed." Goldstone Facts ¶ 13, at 6 (setting forth this fact).   See SEC Disputed Facts at 1-51 (not disputing this fact); Summary of Repo Margin Calls at 3, filed August 9, 2013 (Doc. 204-123); Deposition of Nathan Fellers at 28:14-22 (taken Oct. 14, 2009), filed August 19, 2013 (Doc. 204-302)("Fellers Depo."); Simmons Depo. Vol. II at 28:2-29:13; Deposition of Patrick Feldman at 35:18-36:7 (taken Sept. 23, 2009), filed August 9, 2013 (Doc. 204-301)("Feldman Depo."); Ahn Depo. at 152:11-21; Feldman Decl. ¶¶ 7-8, at 3.  "In her testimony, Jennifer Hall, KPMG's engagement manager on the Thornburg audit for the fiscal year 2007, described a fluid process for settling margin calls whereby lenders would work with Thornburg to reach agreement as to the fair value of the collateral," but the lender had the final say on the collateral's value.  Goldstone Facts ¶ 14, at 6.  See Deposition of Jennifer Hall at 26:15-24 (taken Sept. 1, 2009), filed August 9, 2013 (Doc. 204-305)("Hall SEC Depo.").[7]  "According to Nathan

---

[7]The Defendants' fact states:  "In her testimony, Jennifer Hall, KPMG's engagement manager on the Thornburg audit for the fiscal year 2007, described a fluid process for settling margin calls whereby lenders would work with Thornburg to reach agreement as to the fair value of the collateral."  Goldstone Facts ¶ 14, at 6.  The SEC disputes this fact by stating:  "While lenders would sometimes work with Thornburg in negotiating the fair market value of collateral, the lender was the ultimate arbiter of the fair market value."  SEC Disputed Facts ¶ 14, at 2.  The Defendants respond by arguing that the SEC does not dispute their fact, but, instead, asserts an additional fact.  See Reply in Support of Statement of Material Facts of Larry Goldstone and Clarence G. Simmons In Support of Their Partial Motion For Summary Judgment ¶ 14, at 6, filed January 31, 2014 (Doc. 252)("Goldstone Reply Facts").  The Defendants further argue that the SEC's response supports the fact, because it "admits that lenders would 'work with Thornburg' to determine the fair value of the collateral."  Goldstone Reply Facts ¶ 14, at 6 (quoting SEC Disputed Facts ¶ 14, at 2).  The Court disagrees.  The SEC has disputed the fact, and the Defendants' evidence does not support its proposed fact.  The Defendants' asserted fact suggests that Thornburg Mortgage and its lenders would attempt to reach an agreement to reflect the fair market value of the collateral.  Hall testified, however, that, while Thornburg Mortgage

Fellers, who led the Capital Markets group during the February 2008 time period, Thornburg challenged the pricing of most margin calls received in that period and sometimes discussions to resolve disagreements about marks lasted for several days."  Goldstone Facts ¶ 15, at 6 (internal quotation marks omitted).  See Fellers Decl. ¶ 6, at 2; id. ¶ 14, at 4.[8]  "Repo lender agreements

---

and the lender would compare notes, the lender could adjust its valuation or it could insist on its prior valuation.  See Hall Depo. at 26:15-24.

> Q      Does Thornburg have any right to challenge the value of the collateral that was set by the counterparty pursuant to the repo agreements?

> A      I believe they were given the ability to -- if they received a margin call and they didn't think the value was right, they had the opportunity to go back to the counterparty and say, 'Well, here's what I see in the market' and they would come and compare notes and then the counterparty could adjust if they agreed or they could insist or their value.

Hall Depo. at 26:15-24.  By suggesting that Thornburg Mortgage and its lenders would reach an agreement concerning the collateral's value, the Defendants' asserted fact is not an accurate characterization of the evidence.  Accordingly, the Court has adjusted the fact to more accurately reflect the evidence.

[8]The SEC attempts to dispute this fact, stating: "While negotiating the fair market value of collateral sometimes took more than a day to resolve, lenders had the ability to declare default after the first day when the margin call was unmet."  SEC Disputed Facts ¶ 15, at 2.  The Defendants argue that the SEC did not dispute this fact and that the SEC cannot create a genuine dispute of material fact by submitting additional non-responsive purported facts.  See Goldstone Reply Facts ¶ 15, at 7 (citing Shah v. Consol. Edison Corp. of N.Y., No. CIV 04-2880 JSR, 2005 WL 612713, at *2 (S.D.N.Y. Mar. 15, 2003)(Rakoff, J.)).  The local rules state that "[a]ll material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."  D.N.M.LR-Civ. 56.1(b).  This additional fact does not "specifically controvert[]" the Defendants asserted fact, but instead adds an additional fact to give context to the Defendants' asserted fact.  D.N.M.LR-Civ. 56.1(b).  With an ordinary summary judgment motion, the Court might add additional facts that the non-moving party asserts to dispute the movant's facts to its statement of additional facts, as long as evidence supports the additional facts.  In this case, however, the parties have asserted hundreds of facts and several thousand pages of exhibits.  With this exorbitant amount of briefing, evidence, and facts, the Court does not believe it is necessary for it to parse through the evidence or the parties' responses to extract undisputed facts which the parties do not themselves assert or appear to need to make their cases.  The Court will, thus, not add a more additional fact to the Factual Background section unless the parties themselves assert the fact as an undisputed fact.  Accordingly, the Court finds the Defendants' fact undisputed and will not consider the SEC's additional fact.

varied in their terms but typically required same day or next day payment of margin calls, unless otherwise agreed." Goldstone Facts ¶ 16, at 6 (setting forth this fact). See Global Master Securities Lending Agreement Between CitiGroup Global Markets Inc. and Thornburg Mortgage, Inc. § 5.6 (dated Sept. 20, 2007), filed August 9, 2013 (Doc. 204-17); Hall SEC Depo. at 29:16-22; Deposition of Cynthia Reinhart at 20:14-18 (taken Sept. 3, 2009), filed August 9, 2013 (Doc. 204-310)("Reinhart SEC Depo."); Fellers Depo. At 27:25-28:25.[9]

"It was the custom and practice in the repo lending industry for borrowers to defer margin call payments, without being declared in default, while marks on repo collateral were being negotiated with the lender, which sometimes took several days." Goldstone Facts ¶ 17, at 7 (setting forth this fact). See Feldman Depo. at 49:5-16; Feldman Decl. ¶¶ 8-9, at 3.[10] Occasionally, Thornburg Mortgage received a margin call that it could not satisfy with the cash it had on hand, and its repo lender permitted it to satisfy the call over the course of several days.

---

[9]The SEC attempts to dispute this fact by stating: "Repo lender agreements generally required same-day payment of margin calls (or next-day if issued after a certain time on a given day), and any agreement to the contrary was required to be in writing." SEC Disputed Facts ¶ 16, at 3. The SEC does not dispute the Defendants' fact, but, rather, supports the fact and then adds an additional fact -- that different agreements must be in writing. Because the SEC does not specifically controvert the Defendants' asserted fact, the Court finds it undisputed.

[10]The SEC attempts to dispute this fact by stating:

While negotiating the fair market value of collateral sometimes took more than a day to resolve, lenders had the ability to declare default after the first day when the margin call was unmet. From January 1, 2008 to February 13, 2008 Thornburg received margin calls, each of which was met on the day issued.

SEC Disputed Facts ¶ 17, at 3. The SEC does not specifically dispute the Defendants' asserted fact, but rather confirms the fact's veracity and adds two additional facts: (i) the lenders ability to declare default; and (ii) that Thornburg met its margin calls within one day of receiving them from January 1, 2008, to February 13, 2008. See SEC Disputed Facts ¶ 17, at 3. Because the SEC does not specifically controvert this fact, the Court finds it undisputed.

See Goldstone Facts ¶ 18, at 7 (setting forth this fact); Fellers Decl. ¶ 8, at 3; Feldman Decl. ¶ 10, at 3.[11]   At times, when Thornburg Mortgage failed to immediately meet its margin calls and its repo lenders permitted it to pay the margin calls over time, some repo lenders would send

_____

[11]Goldstone's asserted fact states: "Occasionally, Thornburg received a margin call it could not satisfy with the cash it had on hand and agreed with its repo lender to satisfy the call over the course of several day." Goldstone Facts ¶ 18, at 7.  The SEC disputes this fact by stating:

> The evidence does not establish any agreement to allow Thornburg to satisfy margin calls over time during February 2008.  The Repo Agreements required any such agreement to be in writing, and there was no such writing.  Lender representatives have testified that they are aware of no such agreement existing, and that they could have declared Thornburg in default while margin calls went unmet, but did not do so.  Citi explicitly reserved its right to declare Thornburg in default while its margin calls went unmet.

SEC Disputed Facts ¶ 18, at 3.  The SEC cites two declarations by Thornburg's lenders and an electronic mail transmission to dispute the Defendants' asserted fact.  In the first declaration, Elena Matrullo, a senior credit officer at Citigroup Global Markets Inc., states that she does not remember herself, or anyone else at Citigroup Global, making an agreement with Thornburg Mortgage limiting Citigroup Global's ability to declare Thornburg Mortgage in default.  Declaration on Elena Matrullo ¶ 7, at 2, filed November 6, 2013 (Doc. 231-6).  In the second declaration, Anthony Blasi, a Managing Director at Credit Suisse Securities ("Credit Suisse"), states that he did not know of an agreement between Thornburg Mortgage and Credit Suisse permitting Thornburg Mortgage to pay the margin call over a period of time.  See Declaration of Anthony Blasi ¶ 7, at 2, filed November 6, 2013 (Doc. 231-7)("Blasi Decl.").  Blasi goes on to state that Credit Suisse chose not to declare Thornburg Mortgage in default and permitted Thornburg Mortgage to pay the margin call over a period of time, because it was in Credit Suisse's best interest.  See Blasi Decl. ¶ 7, at 2.

The Defendants respond to the SEC's attempt to dispute the fact by arguing that the SEC's response constitutes "an immaterial semantic argument over the term 'agreed.'"  Goldstone Reply Facts ¶ 18, at 9.  The Court disagrees.  The SEC's evidence shows that Thornburg Mortgage's lenders did not agree to allow Thornburg Mortgage to make payments over time, but, instead, allowed Thornburg to make the payments over time by consciously failing to declare Thornburg in default.  Accordingly, the Court has modified the asserted fact to reflect the evidence.

As for the rest of the SEC's attempt to dispute the Defendants' asserted fact, the SEC merely asserts additional facts -- that an agreement permitting Thornburg to pay a margin call over time must be in writing and that, when Thornburg Mortgage failed to timely meet its margin calls, its lenders reserved their right to declare Thornburg Mortgage in default -- that do not specifically controvert the Defendants' asserted facts.

reservation of rights notices or similar letters to the company.  See Goldstone Facts ¶ 19, at 7 (setting forth this fact); Fellers Decl. ¶ 9, at 3; Feldman Decl. ¶¶ 12-13, at 3; Declaration of Larry Goldstone ¶¶ 7-8, at 1-2, filed August 9, 2013 (Doc. 204-293)("Goldstone Decl.").[12]

> In a typical year, it was not unusual for Thornburg to receive anywhere from 10-20% of the face value of its entire MBS portfolio in margin calls to account for routine "factoring" adjustments that reflected reductions in value (or "factor") associated with principal payments on the mortgages underlying the company's repo collateral.

Goldstone Facts ¶ 20, at 7 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Decl. ¶ 6, at 2-3; Simmons Depo. Vol. III at 84:5-19.  "Given its business model, Thornburg operated at a relatively low level of liquidity."  Supplemental Statement of Undisputed Facts in Support of Defendant Jane Starrett's Motion for Summary Judgment ¶ 51, at 11, filed August 31, 2013 (Doc. 207)("Starrett Facts")(setting forth this fact). See Plaintiff Securities and Exchange Commission's Statement of Disputed Material Facts in Opposition to Defendants Jane Starrett's Motion for Summary Judgment at 1-16, filed November

---

[12]The Defendants' asserted fact states: "At times when Thornburg reached agreement with repo lenders on payment plans to satisfy margin calls that could not be met immediately, some repo lenders would send  reservation of rights notices or similar letters to the  company." Goldstone Facts ¶ 19 at 7.  The SEC disputes this fact by stating:

> The evidence does not establish any agreement to allow Thornburg to satisfy margin calls over time during February 2008.  Citi explicitly reserved its right to declare Thornburg in default while its margin calls went unmet in a reservation of rights letter, which contains no evidence of an agreement on a payment plan.  Other reservation of rights letters from August 2007 similarly reflect no agreement on a payment plan, but rather reflect lenders' reservation of rights to declare Thornburg in default while margin calls went unmet.

SEC Disputed Facts ¶ 19, at 4.  Because the Court has already concluded that it is disputed whether Thornburg Mortgage's lenders agreed to allow Thornburg Mortgage to satisfy its margin calls over time, see supra note 11, the Court has modified the Defendants' asserted fact to more accurately reflect the evidence.

14, 2013 (Doc. 239)("SEC Disputed Starrett Facts")(not disputing this fact); Sep. 30, 2007, Liquidity Analysis at 2.

    1.    **The Defendants.**

"Larry Goldstone helped found Thornburg in 1993.  He was Thornburg's President and director on Thornburg's Board from June 1993 until September 2009.  He was Thornburg's Chief Operating Officer beginning in June 1993 and became Thornburg's CEO in December 2007, a position he held until September 2009."  Goldstone Facts ¶ 21, at 7-8 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Stipulated Facts ¶ 4, at 3; Memorandum from Jennifer Hall, KPMG Engagement Senior Management, to Thornburg Audit Workpapers, ICOFR regarding Other Than Temporary Impairment and Going Concern at 8 (dated March 8, 2008), filed August 9, 2013 (Doc. 204-199)("March 8, 2008, OTTI Memo."). "Goldstone is not and has never been an accountant."  Goldstone Facts ¶ 22, at 8 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Deposition of Larry Goldstone at 13:11-12 (taken Jan. 20, 2010 )(Doc. 204-303)("Goldstone SEC Depo.").

"Clarence . . . Simmons was Thornburg's Chief Financial Officer and Senior Executive Vice President from 2005 until September 2009."  Goldstone Facts ¶ 23, at 8 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo. Vol. II at 14:9-14; Simmons Depo. Vol. II at 14:23-15:2; Simmons Depo. Vol. II at 17:25-18:2; Stipulated Facts ¶ 5, at 3.  "Simmons is not and has never been an accountant."  Goldstone Facts ¶ 24, at 8 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo. Vol. II at 13:14-15.

"Jane Starrett was Thornburg's Chief Accounting Officer from April 2007 until July 2008."  Goldstone Facts ¶ 25, at 5 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not

disputing this fact); Stipulated Facts ¶ 6, at 3; Starrett Depo. at 10:7-10.  "Ms. Starrett is an

accountant whose background involved audit experience at a large auditing firm."  Starrett Facts

¶ 24, at 6 (setting forth this fact).  See SEC Disputed Starrett Facts at 1-16; Declaration of Jane

E. Starrett in Support of Motion for Summary Judgment ¶ 2, at 3, filed August 31, 2013

(Doc. 207-1)("Starrett Decl."); Deposition of Jane Starrett at 214:5-6 (taken Feb. 2, 2011), filed

August 9, 2013 (Doc. 204 315)("Starrett SEC Depo."); Starrett Depo. at 52:2-12.  "As Chief

Accounting Officer ('CAO'), Ms. Jane Starrett reported directly to Clarence Simmons,

Thornburg's Senior Executive Vice President and Chief Financial Officer and indirectly to Larry

Goldstone, Thornburg's President, Director, and Chief Executive Officer."  Starrett Facts ¶ 1,

at 2.  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Starrett Decl. ¶ 4, at 3;

Starrett SEC Depo. at 25:14-16.  "In her role as CAO, Ms. Starrett was responsible for

maintaining the internal accounting and administrative controls necessary to ensure the integrity

of the financial reporting process, and monitoring the daily accounting operations."  Starrett

Facts ¶ 2, at 2 (setting forth this Facts).  See SEC Disputed Starrett Facts at 1-16 (not disputing

this fact); Starrett SEC Depo. at 13:17-14:9; Starrett Decl. ¶ 4, at 3-4.

> Ms. Starrett's responsibilities as CAO did not include the negotiation,
> administration, or any other direct involvement with repo agreements, the
> negotiation or meeting of margin calls, or monitoring of market pricing for
> Thornburg's securities and she was not directly involved in these activities during
> the audit of Thornburg's 2007 year-end financials.

Starrett Facts ¶ 44, at 10 (setting forth this fact).  See Starrett Decl. ¶ 5, at 4.[13]

 "Ms. Starrett relied on members of that Capital Markets and others at Thornburg that

were expert in that area and authorized to negotiate those reverse repurchase . . . agreements for

---

[13]The SEC does not dispute this fact, but states: "Undisputed, but noted that Defendant
Starrett was aware of Thornburg's trading and financing activities.  Specifically during late
February 2008 she received regular updates from Defendant Goldstone."  SEC Disputed Starrett
Facts ¶ 44, at 6.  Because the SEC does not dispute this fact, the Court finds it undisputed.

information about negotiating and administering repo agreements, including the settlement of margin calls, that was relevant to her work as CAO." Starrett Facts ¶ 3, at 2 (setting forth this fact)(alterations omitted)(internal quotation marks omitted). See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Starrett SEC Depo. at 20:17-21:3; Starrett Depo. at 89:22-90:7, 96:7-10; Electronic Mail Transmission from Jane Starrett to Jane Yates at 2-3 (dated Feb. 26, 2008), filed August 31, 2013 (Doc. 207-3). "Ms. Starrett was not intimately familiar with the terms of repo agreements, and did not know what circumstances constituted a breach or an event of default under the agreements." Starrett Facts ¶ 4, at 3 (setting forth this fact). See Defendants' Amended Objections and Responses to Plaintiff's Fourth Set of Interrogatories to All Defendants at 4-5, filed August 31, 2013 (Doc. 207-4); Starrett SEC Depo. at 87:25-88:2; Starrett Depo. at 89:24-90:7, 96:7-10, 104:19-106:9; Starrett Decl. ¶ 5, at 4.[14] "Ms. Starrett

---

[14]The SEC attempts to dispute this fact by stating:

> Defendant Starrett had an understanding that margin calls had to be satisfied per the terms of the agreement. Defendant Starrett was also aware that prior to February 2008, margin calls were met in a day unless either (1) there was a dispute about the value of the underlying security or (2) the margin call was retracted. She was not aware of "payment plans" prior to that time. Defendant Starrett also testified that she understood Repo Agreements to be governed by standardized contracts, and that the process for settling margin calls involved a margin call being made by a lender and then the capital markets department determined whether it was to wire the funds, send a free security, or contest the amount of the margin call. Defendant Starrett was also copied on e-mails from Defendant Goldstone stating to Thornburg's board of directors that Thornburg was out of compliance with its Repo Agreements, and she wrote Thornburg had purposely not told KMPG [sic] about untimely margin call payments, so she knew that Thornburg did not timely meet certain margin calls in February 2008.

SEC Disputed Starrett Facts ¶ 4, at 2. This assertion does not dispute Starrett's asserted fact. The SEC points to the generalized knowledge that Starrett had about the repo agreements. The SEC does not, however, point to information which shows that she had intimate knowledge of the agreements, or that she knew what events would constitute a breach or an event of default. Accordingly, the Court finds Starrett's asserted fact undisputed.

understood that Thornburg's practice was to pay margin calls promptly absent some agreement to the contrary, but she was otherwise not aware of a specific timeframe within which margin calls had to be met." Starrett Facts ¶ 5, at 3 (setting forth this fact). See Starrett Depo. at 95:9-16, 104:19-106:9.[15] "Starrett helped prepare Thornburg's financial statements and public filings such as quarterly and annual SEC reports, including the 2007 Form 10-K." Goldstone Facts ¶ 26, at 8 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Starrett SEC Depo. at 13:12-14:1, 14:19-15:14. "Ms. Starrett had no direct exposure to Thornburg's trading and financing activities." Starrett Facts ¶ 9, at 3 (setting forth this fact). See Starrett Decl. ¶ 5, a 4; Starrett Depo. at 96:8-11.[16] "Ms. Starrett testified that she never had any

---

[15]The SEC attempts to dispute this fact by stating: "Defendant Starrett knew that Thornburg did not timely meet certain margin calls in February 2008." SEC Disputed Starrett Facts ¶ 5, at 2. This assertion does not specifically controvert Starrett's asserted fact. First, Starrett may not have known the timeframe in which Thornburg Mortgage had to pay its margin calls, even if Starrett knew that Thornburg Mortgage did not timely meet certain margin calls in February, 2008. Second, the SEC does not cite any evidence stating that Starrett knew the timeframe in which Thornburg had to meet its margin calls. Rather, in Starrett's deposition testimony, which the SEC cites, Starrett testified that she did not know the contractual time limits within which Thornburg Mortgage had to meet its margin calls. See Starrett SEC Depo. at 101:3-6. The SEC thus fails to present evidence that specifically controverts Starrett's asserted fact, and the Court finds it undisputed.

[16]The SEC attempts to dispute this fact by stating: "Defendant Starrett was aware of Thornburg's trading and financing activities. Specifically during late February 2008 she received regular updates from Defendant Goldstone." SEC Disputed Starrett Facts ¶ 9, at 2. Starrett replies by stating:

> The SEC's response does not raise a genuine dispute as to Starrett Fact 9. The SEC does not contest that Ms. Starrett had no *direct* exposure to Thornburg's trading and financing activities. Rather, the SEC concedes that Ms. Starrett was merely "aware" of such activities and that the information she received in this regard was second-hand through "updates" from Mr. Goldstone, which provides further support for the fact that Ms. Starrett had no *direct* exposure to or involvement in Thornburg's trading and financing activities. The SEC's evidence shows at most that Ms. Starrett, along with Thornburg's Board of Directors, received only general, partial, high-level information about Thornburg's financing activities.

conversation with any reverse repo counterparty during her entire employment with Thornburg Mortgage." Starrett Facts ¶ 45, at 10 (setting forth this fact)(alterations omitted)(internal quotation marks omitted). See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Starrett Depo. at 108:14-16. "In, 2006 Ms. Starrett began to consider a permanent departure from the business world but due to family circumstances could not make this change until 2008." Starrett Facts ¶ 28, at 7 (setting forth this fact). See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Starrett Decl. ¶ 6, at 4. "Ms. Starrett left Thornburg in July, 2008 to pursue volunteer efforts in South America and other interests. She is currently a ski instructor in New Mexico." Starrett Facts ¶ 19, at 5 (setting forth this fact). See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Starrett SEC Depo. at 12:13-14; Starrett Depo. at 5:13-14, 5:20-6:1.

> Mr. Goldstone never sold any of his Thornburg stock holdings and Mr. Simmons' only sale was involuntary -- the result of a margin call in August 2007 -- and made at a substantial loss. As of February 28, 2008, Mr. Goldstone beneficially owned 279,066 shares of Thornburg common stock and Mr. Simmons beneficially owned 1,094 shares. Defendants retained their stock holdings until the company's bankruptcy filing in May 2009, when they lost the entirety of those investments.

Goldstone Facts ¶ 27, at 8 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone SEC Depo. at 17:21-23; Goldstone Decl. ¶ 59, at 11; Simmons Decl. ¶ 69, at 16; Clarence Simmons Form 4, at 3 (dated Aug. 16, 2007), filed August 9, 2013 (Doc. 204-319); Thornburg Mortgage, Inc., Schedule 14A at 3, filed August 9, 2013

---

Defendants Jane Starrett's Corrected Reply in Support of Supplemental Statement of Undisputed Facts ¶ 9, at 9-10, filed February 3, 2014 (Doc. 259)("Starrett Reply Facts")(citation omitted)(emphasis in original).

The Court agrees with Starrett. Starrett asserts that she had not direct exposure to Thornburg's trading and financing activities. Electronic mail updates is indirect exposure, and not direct exposure. The SEC has thus failed to specifically controvert Starrett's asserted fact, and the Court finds it undisputed.

(Doc. 204-251). "Ms. Starrett has never sold any of her Thornburg stock, nor did she receive a bonus or . . . receiv[e] other incentive-based compensation tied to Thornburg's 2007 financial performance." Starrett Facts ¶ 18, at 5 (setting forth this fact). See SEC Disputed Starrett Facts at 1-51 (not disputing this fact); Starrett Depo. at 266:11-16; Starrett Decl. ¶¶ 47-49, at 15-16.

      **2.**    **August, 2007, Margin Calls.**

"During the summer of 2007, mortgage companies such as Countrywide, IndyMac, and American Home Mortgage, which focused on mortgage and home equity lending primarily to subprime and 'Alt-A'[17] customers, began to falter, and some collapsed." Goldstone Facts ¶ 28, at 8 (setting forth this fact)(footnote omitted). See SEC Disputed Facts at 1-51 (not disputing this fact); Deposition of Larry Goldstone at 30:5-31:15 (taken Feb. 28, 2013), filed August 9, 2013 (Doc. 204-304)("Goldstone Depo."); Ben Steverman, Mortgage Crisis Roughs Up IndyMac, Bloomberg Business, (July 18, 2007), http://www.bloomberg.com/bw/stories/2007-07-18/mortgage-crisis-roughs-up-indymacbusinessweek-business-news-stock-market-and-financial-advice; David Mildenberg & Ari Levy, Bank of America to Acquire Countrywide for 37% Less, Bloomberg, (July 1, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=af9EoP0ySH6c. In late July and early August 2007, the confidence of mortgage investors who owned MBS deteriorated as a result of (i) mortgage originators' suggestions that credit problems were beginning to appear in their prime mortgage loan portfolios; (ii) some mortgage lenders filing bankruptcy; (iii) rating agency downgrading a substantial number of MBS; and (iv) several large mortgage originators publicly announcing that they were planning to cease lending in the prime jumbo segment of the mortgage market because of a lack of ability to sell those mortgages

---

[17]An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered more riskier than A-paper, but less risky than subprime mortgages. Alt-A, Wikipedia.org, http://en.wikipedia.org/wiki/Alt-A (last visited Aug. 11 2015).

in the secondary market.  See Goldstone Facts ¶ 29, at 6 (setting forth this fact); SEC Disputed Facts at 1-51 (not disputing this fact); Thornburg Mortgage, Inc. Form 10-Q at 9 (dated Nov. 9, 2007), filed August 9, 2013 (Doc. 204-242)("Nov. 9, 2007, Form 10-Q"); Goldstone Depo. at 30:10-31:21.   "Although the market's deterioration in August 2007 was primarily in the subprime sector and, to a lesser extent, the Alt-A sector, it resulted in a decline in the market prices of all private-label MBS, including those backed by prime mortgage loans, including MBS held in Thornburg's portfolio."  Goldstone Facts ¶ 30, at 9 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo. Vol. II at 43:25-44:5; Nov. 9, 2007, Form 10-Q at 9; Goldstone Depo. at 31:3-32:8.  "As a result of the market's deterioration, in August 2007, Thornburg received over $1 billion in margin calls on its $33.4 billion in collateralized short-term borrowings, including borrowings under repo agreements that took weeks to satisfy."  Goldstone Facts ¶ 31, at 9-10 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Nov. 9, 2007, Form 10-Q at 9; Goldstone Depo. at 33:6-23; Goldstone SEC Depo. at 41:3-9.  "Ms. Starrett received periodic status updates about Thornburg's margin calls from Mr. Goldstone, Mr. Simmons, and members of Thornburg's Capital Markets group, but did not make any decisions with respect to Thornburg's payment of margin calls."  Starrett Facts ¶ 7, at 3 (setting forth this fact).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Starrett Decl. ¶ 5, at 4.

"Thornburg did not have sufficient cash and liquidity on hand to meet all of the August 2007 margin calls in a single day."  Goldstone Facts ¶ 32, at 10 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Nov. 9, 2007, Form 10-Q at 12; Feldman Decl. ¶¶ 12-14, at 3-4; Fellers Decl. ¶¶ 8, 10, & 12, at 3.  "Consistent with its prior dealings with Thornburg, the majority of Thornburg's repo lenders worked cooperatively with the company in

August 2007 to have their margin calls paid over time." Goldstone Facts ¶ 33, at 10 (setting forth this fact). See Electronic Mail Transmission from Debora Gage to Patrick Feldman (dated Feb. 2, 2008), filed August 9, 2013 (Doc. 204-129)("Feb. 2, 2008, Gage Email"); Thornburg Mortgage, Inc. Underwriter Agreement at 7 (dated Aug. 30, 2007), filed August 9, 2013 (Doc. 204-15)("Underwriting Agreement Email"); Fellers Decl. ¶¶ 8-10, at 3; Feldman Decl. ¶¶ 12-13, at 3.[18]

"In mid-August 2007, Thornburg received reservation of rights notices from four repo lenders, including Citigroup, while these repo lenders' margin calls were outstanding." Goldstone Facts ¶ 34, at 10 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Letter From Larry Goldstone Regarding Notice of Failure by Thornburg to Deliver Cash or Additional Securities to Nomura International Securities, Inc., filed August 9. 2013 (Doc. 204-2); Letter from Bear Stearns Bank to Thornburg Mortgage, Inc. (dated Aug. 15, 2007), filed August 9, 2013 (Doc. 204-3); Letter from Goldman, Sachs & Co. to Thornburg Mortgage, Inc. at 2 (dated Aug. 15, 2007), filed August 9, 2013 (Doc. 204-4); Letter from Citigroup Global Markets Inc. to Thornburg Mortgage, Inc. at 3 (dated Aug. 15, 2007), filed

---

[18]The SEC attempts to dispute this fact by stating:

The evidence does not establish any agreement to allow Thornburg to satisfy margin calls over time during August 2007. The Repo Agreements required any such agreement to be in writing, and there was no such writing. The reservation of rights letters from August 2007 reflect no agreement on a payment plan, but rather reflect lenders' reservation of rights to declare Thornburg in default while margin calls went unmet. In fact, certain lenders seized and sold Thornburg's assets.

SEC Disputed Facts ¶ 33, at 4. The SEC does not specifically controvert the Defendants' asserted fact, but, instead, assert additional facts. The Defendants' asserted fact does not state that it had an agreement with its lenders. Rather, the Defendants assert that Thornburg Mortgage's lenders worked with it to allow it to pay its margin calls over time. As such, the Court finds the fact undisputed.

August 9, 2013 (Doc. 204-5).  None of the repo lenders that sent reservation of rights notices in August, 2007, declared Thornburg Mortgage in default based on the delayed payment of margin calls referenced in the notices.  See Goldstone Facts ¶ 35, at 10 (setting forth this fact); Feb. 2, 2008, Gage Email at 2-9; Underwriting Agreement Email at 7; Goldstone Decl. ¶ 10, at 2; Simmons Decl. ¶ 11, at 3-4.[19]  Goldstone and Simmons understood that, because these repo lenders decided to give Thornburg Mortgage additional time to meet margin calls rather than declare an event of default, their reservation-of-rights letters had no financial consequences for Thornburg Mortgage.  See Goldstone Facts ¶ 36, at 10; Simmons Depo. Vol. II at 261:8-22; Goldstone SEC Depo. at 225:15-226:5; Simmons Decl. ¶¶ 8, 11, at 3; Goldstone Decl. ¶ 8, at 2.[20]

---

[19]The Defendants' asserted fact states: "None of the repo lenders that agreed to payment plans and/or sent reservation of rights notices in August 2007 declared Thornburg in default based on the delayed payment of margin calls referenced in the notices."  Goldstone Facts ¶ 35, at 10.  The SEC disputes this fact by stating:

> The evidence does not establish any agreement to allow Thornburg to satisfy margin calls over time during August 2007.  The Repo Agreements required any such agreement to be in writing, and there was no such writing.  The reservation of rights letters from August 2007 reflect no agreement on a payment plan, but rather reflect lenders' reservation of rights to declare Thornburg in default while margin calls went unmet.  In fact, certain lenders seized and sold Thornburg's assets.

SEC Disputed Facts ¶ 35, at 4.  The Court agrees with the SEC.  As the Court has already concluded, while some repo lenders did not exercise their to declare Thornburg Mortgage in default, this decision not to exercise their rights and to permit Thornburg Mortgage to make payments over time does not equate to an agreement to allow Thornburg Mortgage to make payments over time.  See supra note 11.  Accordingly, the Court will modify the Defendants' asserted fact to more accurately reflect the evidence.

[20]The Defendants' asserted fact states: "Mr. Goldstone and Mr. Simmons understood that, because these repo lenders had agreed to give Thornburg additional time to meet margin calls rather than declare an event of default, their reservation of rights letters had no financial consequences for the company."  Goldstone Facts ¶ 36, at 10.  The SEC attempts to dispute this fact by stating:

"Jennifer Hall, KPMG's senior engagement manager on the Thornburg audit, acknowledged that she was not aware of reservation of rights notices having any economic impact." Goldstone Facts ¶ 37, at 7 (asserting this fact). See Hall Depo. at 209:11-14; [*reference to exhibit redacted*].[21] "[T]o an auditor, the issue is not whether a lender declares a default, but rather

_____

> Defendants' claimed understanding is implausible and contradicted by their own admissions. Defendant Goldstone testified that "Citibank could have verbally agreed to a payment plan and they could have woken up the next day and decided that they didn't like what they had agreed to and declared us in default that way. They had every right to do that but they chose not to." Defendant Goldstone also testified that the Citi Letter "is the first reservation of rights letter [I] can ever recall receiving." Defendant Simmons recognized that after issuing its reservation of rights letter (and purportedly agreeing to a payment plan) Citibank "would have the right to declare an event of default."

SEC Disputed Facts ¶ 36, at 4-5. The Defendants reply by arguing that the SEC cannot raise a genuine dispute of material fact through "general and unsupported attacks on the credibility of the Defendants' sworn, uncontroverted testimony about their subjective understandings, views, or beliefs." Goldstone Reply Facts ¶ 36, at 16 (citing SEC v. Antar, 44 F. App'x 548, 554 (3d Cir. 2002)(unpublished)). The Defendants also argue that the evidence which the SEC cites does not cause Simmons' or Goldstone's subjective understandings to be implausible or contradictory. See Goldstone Reply Facts ¶ 36, at 16-17. The Court agrees with the Defendants. The SEC's evidence shows that the lenders had the option to declare Thornburg Mortgage in default. Simmons and Goldstone may have believed that the lenders' ability to declare Thornburg Mortgage in default had no financial consequence on Thornburg Mortgage until the lenders exercised their right and declared default. The Court will modify, however, the Defendants' asserted fact. The Court has already concluded that the lenders' decision to not exercise their right to declare Thornburg in default did not constitute an agreement between Thornburg Mortgage and its lenders. See supra note 11. Accordingly, the Court has modified the Defendants' asserted fact.

[21]The SEC attempts to dispute this fact by arguing that "Hall also testified that a reservation of rights letter was 'significant correspondence' and 'the type of information. . . [that KPMG] would have wanted to know about.'" SEC Disputed Facts ¶ 37, at 5 (alteration in SEC Disputed Facts but not in source)(quoting Hall Depo. at 209:21-25). The SEC does not dispute the Defendants' asserted fact, but instead asserts an additional fact -- that, even if the reservation of rights notices had no economic impact, KPMG would have still wanted to know about them. See SEC Disputed Facts ¶ 37, at 5. Because the SEC does not specifically controvert the Defendants' asserted fact, the Court finds it undisputed.

The Defendants asserted the following fact: "Other KPMG auditors testified that KPMG was interested in learning about events of default, not letters asserting a reservation of rights." Goldstone Facts ¶ 28, at 11. The SEC disputes this fact by stating:

Reinhart testified that a reservation of rights letter "should have been provided to us, and we should have been provided an opportunity to appreciate what the circumstances were and whether or not that had an impact on the financial statements and our opinions and the conclusions related thereto." Hall testified that a reservation of rights letter was "significant correspondence" and "the type of information that KPMG would have wanted to know about." Also, the cited testimony does not support Defendants' claimed fact. Baucom[, a KPMG auditor,] indicated that she was unfamiliar with "reserved rights." McLamb[, KPMG's Business Unit Professional Practice Partner during the 2007 year-end audit,] testified that "If I had known that they were not meeting margin calls on a timely basis and had -- at the time of the filing of the 10-K, and they had already stopped originating loans, so they had already made changes to their core business, I would have certainly asked a lot more questions and would have probably reached a different conclusion [on going concern]." Mr. McLamb also testified that if Thornburg had provided the Citi Reservation of Rights letter to KPMG that it would have raised questions about Thornburg's Form 10-K, Thornburg management's integrity, and why Defendants had not provided the Citi letter to KPMG, as well as further questions. Womack[,KPMG's SEC Reviewing Partner for the Thornburg engagement,] testified that as to reservation of rights letters, in his "position, [he] wasn't looking at the details of this and relying upon the team and what the information they were getting from the client."

SEC Disputed Facts ¶ 38, at 5 (alterations omitted). The Defendants' reply by arguing that

the SEC has not refuted that the cited evidence supports the fact. Ms. Baucom's cited testimony that she was unfamiliar with the term "reserved rights" supports the fact that KPMG was interested in learning about events of default, not letters asserting a reservation of rights. Mr. Womack's cited testimony that he "wasn't looking at the details of this" also supports the fact that KPMG was interested in learning about events of default. Finally, the SEC has not refuted Mr. McLamb's testimony that "I cared whether or not they were in default . . . . I was focused on it, you know, the simple question of were they in default . . ." and the cited testimony does not contradict that KPMG was interested in learning about defaults, not letters asserting a reservation of rights.

Goldstone Reply Facts ¶ 38, at 17-18.

The Court concludes that the evidence does not support the Defendants' asserted fact. The Defendants first cite the Deposition of Tara Baucom (taken Nov. 13, 2012), filed August 9, 2013 (Doc. 204-297)("Baucom Depo."). There, Baucom testified that she was unfamiliar with the term reservation of rights and that she did not know if KPMG would ask Thornburg Mortgage if any lenders sent it reservation-of-rights letters. See Baucom Depo. at 182:7-17. The Defendants argue that the fact that Baucom was unfamiliar with the term reservation of rights shows that KPMG was interested only in events of default and not in letters asserting a reservation of rights. See Goldstone Reply Facts ¶ 38, at 17-18. The Court disagrees with the

- 23 -

whether something has transpired that triggers a default."   Plaintiff Securities and Exchange

Commission's Statement of Undisputed Facts in Opposition to Motion for Summary Judgment

on Behalf of Larry Goldstone and Clarence G. Simmons and Cross-Motion for Summary

Judgment on Objective Falsity and Materiality ¶ Q, at 4, filed November 6, 2013

(Doc. 232)("SEC Facts")(setting forth this fact)(internal quotation marks omitted).   See

Response on Behalf of Larry Goldstone and Clarence Simmons to Plaintiff's Statement of

---

Defendants.   Baucom did not testify that KPMG was not interested in reservation-of-rights
letters, but that she was unfamiliar with them.   Furthermore, Baucom testified that she did not
know whether KPMG would have been interested in the letters.   See Baucom Depo. at 182:13-14
("I'm not familiar with that term you're using, so I don't know if we would or wouldn't have
[asked Thornburg Mortgage about its lenders reserving their rights]").   Baucom's testimony,
thus, stands for the proposition that KPMG might have been interested in the
reservation-of-rights letters.   The Defendants also cite the Deposition of Robert McLamb (taken
Feb. 12, 2013), filed August 9, 2013 (Doc. 204-308)("McLamb Depo.").   Robert McLamb
testified that, on March 18, 2008, he cared whether Thornburg Mortgage was in default and what
events caused the default.   See McLamb Depo. at 26:4-11.   He did not, however, testify that he
was not interested in the reservation-of-rights letters.   Moreover, by March 18, 2008, Thornburg
Mortgage had defaulted on a number of loan agreements and KPMG had already issued the
Form 10-K.   In the Goldstone Facts, however, the position of this fact suggests that, when
KPMG was auditing Thornburg Mortgage before the Form 10-K was issued, KPMG auditors did
not care about the reservation-of-rights letters.   McLamb's testimony refutes this implication.
McLamb later testified that, if he had known that Thornburg Mortgage was not timely meeting
its margin calls, he would have asked Thornburg Mortgage more questions and "would have
probably reached a different conclusion."   McLamb Depo. at 222:9-21.   McLamb's testimony,
thus, contradicts, rather than supports, the Defendants' asserted fact.   Finally, the Defendants cite
the Deposition of Clyde Womack (taken Jan. 22, 2013), filed August 9, 2013
(Doc. 204-318)("Womack Depo.").   Womack testified that, assuming Thornburg Mortgage
disclosed the reservation letters to KPMG and that Thornburg Mortgage paid all of the margin
calls over time, the reservation letters were more of a warning and that the letters, by themselves,
were not something that he would have further thoughts about.   See Womack Depo. at
258:12-260:25.   Womack testified that he did not know whether anyone at KPMG asked
Thornburg Mortgage if it received reservation-of-rights letters.   See Womack Depo. at
284:3-285:11.   Womack also testified that he did not recall asking if Thornburg Mortgage timely
paid the margin calls.   See Womack Depo. at 285:12-20.   This testimony does not support the
Defendants' asserted fact that some KPMG auditors were not interested in the reservation-of-
rights letters.   At most, Womack's testimony shows that, if the letters had been disclosed, the
letters, by themselves, may not have led KPMG to have further thoughts about them.   Womack
did not, however, testify that he was not interested in the letters.   Accordingly, the Court finds
that the evidence does not support the asserted fact, and the Court will not consider it.

Undisputed Facts ¶ Q, at 9, filed January 31, 2014 (Doc. 251)("Defendants Disputed Facts")(not disputing this fact); McLamb Depo. at 224:9-225:4.

"In August 2007, Thornburg sold approximately $22 billion in primarily AA- and AAA-rated ARM MBS to pay off its margin calls.  In association with these asset sales, Thornburg reduced its short term borrowings."  Goldstone Facts ¶ 39, at 11 (setting forth this fact.  See SEC Disputed Facts at 1-51 (not disputing this fact); Nov. 9, 2007, Form 10-Q at 9-14; Goldstone Depo. at 33:2-5.  "Although Thornburg recognized a loss of $1.1 billion on those asset sales in the third quarter of 2007, the company recorded an impairment charge of only $6 million on its Purchased Securitized Loan portfolio based on management's estimate of future losses."  Goldstone Facts ¶ 40, at 11 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Nov. 9, 2007, Form 10-Q at 6.  "Thornburg determined that its Purchased ARM Assets were not other-than-temporarily impaired in the third quarter of 2007 because the company had the intent and ability to hold these assets until recovery and because the third quarter sale 'was made in response to unprecedented turmoil in the credit markets.'"  Goldstone Facts ¶ 41, at 11 (setting forth this fact)(quoting Nov. 9, 2007, Form 10-Q at 7).  See SEC Disputed Facts at 1-51 (not disputing this fact); Nov. 9, 2007, Form 10-Q at 7.

> The number of Thornburg's repo lending relationships was reduced to 13 as of December 31, 2007 compared to 21 at the end of June, and the amount of the company's repo and commercial paper borrowings was reduced from $32.9 billion at June 30, 2007 to approximately $11.9 billion at December 31, 2007.

Goldstone Facts ¶ 42, at 11 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 9, 17, 27, & 42; Thornburg Mortgage, Inc. For 8-K Current Report at 4 (dated Sept. 4, 2007), filed August 9, 2013 (Doc. 204-241); Thornburg Mortgage, Inc. Form 8-K at 6-7 (dated Aug. 20, 2007), filed August 9, 2013 (Doc. 204-240); Memorandum from Shawn Buniel to Larry Goldstone, Clay Simmons, Jane Starrett, and File,

Regarding Evaluation of Thornburg Mortgage, Inc., as a Going Concern at 5 (dated Jan. 29,

2008), filed August 9, 2013 (Doc. 204-62)("Jan. 29, 2008, Buniel Memo."); Simmons Depo.

Vol. II at 67:8-15.  Goldstone, Simmons, "and members of Thornburg's Capital Markets group

believed that Thornburg's group of repo lenders had been pared down to those that understood

Thornburg's business and valued their ongoing relationship with Thornburg.   Additionally,

Thornburg's remaining repo lenders were committed to the mortgage space in general and repo

lending on MBS specifically."  Goldstone Facts ¶ 43, at 11-12 (setting forth this fact).  See SEC

Disputed Facts at 1-51 (not disputing this fact); Simmons Decl. ¶ 12, at 4; Feldman Decl. ¶ 3

at 2; Feldman Decl. ¶ 14, at 4; Fellers Decl. ¶ 12, at 4; Goldstone SEC Depo. at 71:11-17.[22]

---

[22]The Defendants assert the following fact: "After declining precipitously in August
2007, the market conditions for Thornburg's MBS assets rebounded substantially in the ensuing
months."  Goldstone Facts ¶ 44, at 12.  The SEC disputes this fact by arguing:

> The market conditions for Thornburg's MBS assets did not rebound substantially
> in the months following August 2007.   Goldstone himself made a contrary
> statement in his February 28, 2008 CNBC television interview: "Since August it
> has been a series of steps down and February was just another one of those
> environments."   Thornburg's February 20, 2008 going concern memorandum
> stated: "The current value of securities are lower than they were in August . . . ."
> And that "continued market declines in mortgage backed securities pledged
> against [commercial paper] and rev[erse] repo debt that may trigger future margin
> calls."   And in October 2007 Goldstone wrote that Thornburg's spreads "exceed
> those available prior to August 2007."   Additionally, the SEC's expert witnesses
> Weiner and Mayer both opined that market conditions continued to worsen after
> August 2007: "mortgage spreads . . . widened from approximately 200 to nearly
> 800 basis points by the end of 2007, and continued to spike through the beginning
> months of 2008."   (Weiner) "After August 2007, Thornburg and others in the
> industry noted that the market continued down the 'liquidity spiral.'" (Mayer).

SEC Disputed Facts ¶ 44, at 5-6.  The Defendants reply by arguing that the SEC has not
presented competent evidence to support its assertion that market conditions did not rebound
after August, 2007, or competent evidence concerning what market conditions were in that time
frame.  See Goldstone Reply Facts ¶ 44, at 19-20.  The Defendants cite a number of sources,
which it did not cite in the Goldstone Facts, to support its contention that the market had stable
conditions for repo financing after August, 2007.  See Goldstone Reply Facts ¶ 44, at 20.

---

The Court concludes that competent evidence does not support the Defendants' asserted fact.  To begin, the Court will not consider the additional sources which the Defendants cite in the Goldstone Reply Facts.  The local rules state:

> The Memorandum must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists.  The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies.
>
> . . . .
>
> The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection.  Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact.  All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  According to the local rules, the Defendants had to, in the Goldstone Facts, "refer with particularity to those portions of the record upon which" they rely. D.N.M.LR-Civ. 56.1(b).  In most summary judgment motions, the reply brief is used to dispute any additional facts that the non-movant raises in the response.  Here, the SEC has filed a separate brief setting forth additional facts, see SEC Facts, and the Defendants have filed a separate brief disputing those facts, see Defendants Disputed Facts.  Despite this non-traditional briefing, the Court believes that the ordinary summary judgment rules should apply, including that the movant may not raise an additional fact in its reply brief and may not present new evidence in its reply brief.  If the Defendants were permitted to present additional evidence in the reply brief, the SEC would not have a chance to respond to this new evidence.  The Court will thus only consider the evidence that the Defendants present in the Goldstone Facts to support its asserted fact.

The Defendants cite two pieces of evidence to support this fact.  First, the Defendants cite a Thornburg Mortgage press release that contains a quote by Goldstone.  See Electronic Mail Transmission from Clay Simmons to Judy Brennan, Larry Goldstone, Jane Starrett, Sheri Fox, Steve Newton, Suzanne O'Leary Lopez, Garret Thornburg, Allison Yates, and Amy Pell at 2 (dated Oct. 8, 2007), filed August 9, 2013 (Doc. 204-23)("Oct. 8, 2007, Press Release"). Second, the Defendants cite a memorandum from Hall to Thornburg Mortgage.  See Memorandum from Jennifer Hall, Engagement Senior Manager, KPMG, to Thornburg Mortgage, Inc., Audit File at 8 (dated Feb. 20, 2008, Feb. 27, 2008, & March 3, 2008), filed August 9, 2013 (Doc. 204-61)("Feb. 20, 2008, Hall Memo.").  The Court concludes that the statement in the press release is inadmissible hearsay and that the memorandum does not support the asserted fact.  In deciding a motion for summary judgment, the Court "cannot rely on evidence that will not be admissible at trial."  Lopez v. Am. Baler Co., No. CIV 11-0227 JB/GBW, 2014 WL 1285448, at *3 n.16 (D.N.M. Mar. 27, 2014)(Browning, J.)(citing Gross v. Burggraf Const. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)).  Here, Goldstone's statement in the press release is inadmissible hearsay.  It is an out-of-court statement that the Defendants are

- 27 -

"[O]n December 5, 2012 . . . the KPMG audit team didn't have an expectation that there could be a level of margin calls similar to August of 2007."  Starrett Facts ¶ 27, at 7 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Hall Depo. 114:15-17.

### 3.   Thornburg Mortgage's Capital Raising Efforts in Fall of 2007 and Prospects for 2008.

The August, 2007, MBS asset sales provided Thornburg Mortgage with an improved cash and liquidity position, "with reductions in the outstanding bonds position and significant reductions in the leverage multiple of the company's balance sheet."  Goldstone Facts ¶ 45, at 12 (setting forth this fact)(quoting Goldstone SEC Depo. at 43:16-18)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo. Vol. II at 53:25-54:8; Goldstone SEC Depo. at 43:8-21.[23]  "At the end of August 2007, Thornburg

---

offering for the truth of the matter asserted.  See Fed. R. Evid. 801(c).  The statement is thus inadmissible.  See Fed. R. Evid. 802.  Moreover, even if the Court considered the statement, it undermines, rather than supports, the asserted fact.  In the press release, Goldstone is quoted as saying: "[W]e have begun to see modest improvement in financing conditions since August . . . [A]s market conditions and financing terms continue their return to normalcy, we believe that the future profitability of the company will improve."  Oct. 8, 2007, Press Release at 3.  This evidence, at most, shows that there were modest market improvements after August, 2007, but that the market had not yet returned to normalcy.  It does not, however, stand for the assertion that the market conditions "rebounded substantially."  Goldstone Facts ¶ 44, at 12.  As for the memorandum, it states that Thornburg Mortgage experienced a positive cash flow for all but the third quarter of 2007 and that Thornburg Mortgage was projected to experience a positive cash flow through April, 2008.  See Feb. 20, 2008, Hall Memo. at 8.  The memorandum does not, however, say anything concerning the market conditions.  While it may support the assertion that, after August, 2007, Thornburg recognized a profit, it does not support that the market conditions substantially improved.  Accordingly, the Defendants do not present evidence to support their asserted fact, and the Court will not consider it.

[23]Starrett asserts the following fact: "Thornburg replaced repo borrowing with secured permanent financing for its assets."  Starrett Facts ¶ 29, at 7.  The SEC disputes this fact by stating: "Thornburg still maintained $11.5 billion in Repo Agreements as of the quarter ending September 30, 2007."  SEC Disputed Starrett Facts ¶ 29, at 5.  Starrett replies by stating:

completed a $1.4 billion securitization of mortgage loans and securities, the proceeds of which allowed Thornburg to pay off its warehouse lenders and resume funding mortgage loans." Goldstone Facts ¶ 46, at 12 (setting forth this fact).  See SEC Disputed Facts (not disputing this fact); Nov. 9, 2007, Form 10-Q at 12; Goldstone SEC Depo. at 43:18-20; Goldstone SEC Depo. at 64:18-23.  "During the third quarter of 2007, Thornburg raised approximately $50 million through stock sales that were generated primarily from its dividend reinvestment plan." Goldstone Facts ¶ 47, at 12 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not

---

The SEC's response does not raise a genuine dispute as to Starrett Fact 29.

The SEC cannot create a genuine dispute as to Starrett Fact 29 by submitting additional and non-responsive purported facts.  As documented by KPMG, Thornburg substantially reduced its repo debt (and thus exposure to margin calls) from $25 billion in August 2007 to just $11.5 billion at December 31, 2007.

Starrett Reply Facts ¶ 29, at 27-28.
    The evidence to which Starrett cites does not support her asserted fact.  To support her asserted fact, Starrett cites the Sep. 30, 2007, Liquidity Analysis, which states:

To prevent further asset sales or liquidations, de-leverage the Company, and reduce exposure to potential margin calls, management took the following actions;

    a)    suspended the Q3 dividend on the common stock.

    b)    issued a new Preferred Series F stock with net proceeds of $545 million,

    c)    issued additional common stock with net proceeds of $50 million (Exhibit 4).

    d)    completed a collateralized mortgage securitization with $1.3 billion in assets permanently financed (2007-4).

Sep. 30, 2007, Liquidity Analysis at 2.  This evidence does not support Starrett's asserted fact that Thornburg Mortgage replaced repo borrowing with permanent financing for its assets.  It merely shows that Thornburg Mortgage securitized some of its assets with permanent financing, but not necessarily that this permanent financing replaced its repo borrowing.  Accordingly, the Court finds the fact lacks support in the record.

disputing this fact); Nov. 9, 2007, Form 10-Q at 12.  "In September 2007, Thornburg raised approximately $550 million in a public offering of preferred stock."  Goldstone Facts ¶ 48, at 12 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Nov. 9, 2007, Form 10-Q at 12.  "In October 2007, Thornburg completed a securitization of over $830 million."  Goldstone Facts ¶ 49, at 12 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Nov. 9, 2007, Form 10-Q at 12.  "During the fourth quarter of 2007, Thornburg raised $91 million from stock sales in its dividend reinvestment plan and acquired nearly $1 billion worth of new mortgage securities.  The company also recognized a small fourth quarter profit of $65 million."  Goldstone Facts ¶ 509, at 12 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Thornburg Mortgage, Inc. Form 8-K Current Report at 5-6 (dated Feb. 4, 2008), filed August 9, 2013 (Doc. 204-243)("Feb. 4, 2008, Form 8-K"); Memorandum from Jennifer Hall, Engagement Senior Manager, KPMG, to Thornburg Mortgage, Inc. Audit File at 3-8 (dated Feb. 20, 2008, Feb. 27, 2008, & March 3, 2008), filed August 9, 2013 (Doc. 204-61)("Feb. 20, 2008, Hall Memo.").  "In January 2008, Thornburg raised over $230 million through a public offering of preferred and common stock."  Goldstone Facts ¶ 51, at 13 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 4, 2008, Form 8-K at 6.  "Ms. Starrett was aware of Thornburg's plans to raise additional liquidity shortly after the 2007 Form 10-K filing."  Starrett Facts ¶ 52, at 11 (setting forth this fact).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Starrett Decl. ¶ 23, at 9.

> Ms. Starrett knew the Company had specific plans to raise liquidity in the weeks following the Form 10-K filing as outlined in Mr. Goldstone's email updates to the Board on February 21, 22, and 25, including through a securitization and capital raise, and was optimistic that Thornburg would be able to meet future margin calls given the improved liquidity generated through these transactions.

Starrett Facts ¶ 53, at 11-12 (setting forth this fact).  See Starrett Decl. ¶ 23, at 9; id. ¶¶ 36-37, at 12-13.[24]

### 4.   Mid-February, 2008, Margin Calls.

"On or around February 14, 2008, there was a sharp, sudden decline in the market for Alt-A mortgage assets that negatively affected the market valuations of Thornburg's AAA-rated, super senior MBS backed by Alt-A mortgage loans, some of which had been pledged as collateral under Thornburg's reverse repurchase agreements."  Goldstone Facts ¶ 52, at 13 (setting forth this fact).  See 2007 Form 10-K at 20, 43.[25]  "The catalyst of the downturn was

_____

[24]The SEC attempts to dispute this fact by stating:

Defendant Starrett's purported optimism is implausible given Thornburg's extremely limited liquidity on February 28, 2008, the fact that additional capital raising would take time, and the fact that from January 2 through February 27, 2008, Thornburg's average daily margin calls were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, and that as recently as February 21, 2008 Thornburg received $247.4 million in margin calls in a single day.

SEC Disputed Facts ¶ 53, at 8.  The SEC does not explain how Thornburg Mortgage's limited liquidity and large margin calls make it implausible that Thornburg Mortgage could raise liquidity.  In essence, the SEC asserts that, because Thornburg Mortgage had limited liquidity, and because Thornburg Mortgage needed liquidity, Thornburg Mortgage could never, or at least not quickly, raise new capital.  The SEC does not explain why this logic is true.  Accordingly, the SEC fails to dispute this fact, and the Court finds it undisputed.

[25]The SEC attempts to dispute this fact by stating:

While there was a sharp, sudden decline in the market for Alt-A mortgage assets on February 14, 2008, it was a continuation of events that began by at least July or August 2007.  Goldstone stated on February 28, 2008 that "Since August it has been a series of steps down and February was just another one of those environments."

SEC Disputed Facts ¶ 52, at 6.  The SEC does not specifically controvert the Defendants' asserted fact, but, instead, support the fact by stating that there was a sudden decline in the market and then qualify the asserted fact by adding an additional fact -- that the sudden decline

UBS's disclosure of a substantial fourth-quarter loss, its expectation that 2008 would be another difficult year, and its continued exposure to risky U.S. mortgages, including $26.6 billion in Alt-A MBS." Goldstone Facts ¶ 53, at 13 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); UBS Expects 'Another Difficult Year', Dealbook (Feb. 14, 2008, 8:27 a.m.), http://dealbook.nytimes.com/2008/02/14/ubs-to-take-137-billion-write-down/?_r=0; Jody Shenn Alt-A Mortgage Securities Tumble, Signaling Losses (Update2), Bloomberg (Feb. 28, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=ata8HlozaFjQ.[26]

"Following UBS's announcement, Thornburg began to see a significant increase in the frequency and volume of margin calls from repo lenders, disproportionately weighted toward its

---

was part of a continuous decline in the market. See SEC Disputed Facts ¶ 52, at 6. Because the SEC does not specifically controvert the Defendants' asserted fact, the Court finds it undisputed.

[26]The SEC asserts the following fact: "Typical haircuts in February 2008 on Thornburg's Purchased ARM Securities backed by Alt-A mortgage collateral were 10-12%." SEC Facts ¶ V, at 4. The Defendants dispute this fact by stating:

> Disputed. SEC Ex. 42[, Electronic Mail Transmission from Clay Simmons to Kevin M. McCann (dated Feb. 14, 2008), filed November 6, 2013 (Doc. 231-43),] refers vaguely to "market" rates for repo financing as part of a financing proposal to Deutsche Bank; it does not purport to describe typical or actual haircuts on Thornburg's Alt-A repo collateral. In addition, the fact is contradicted by other evidence in the record, including testimony by Mr. Simmons that haircuts in February 2008 on Thornburg's AAA-rated securities backed by Alt-A mortgage collateral were "7 to 15 percent," and probably "closer to the 15 percent." Ex. 340 (Simmons SEC Tr. 422:23-423:17). The KPMG Going Concern Memo states that a "schedule provided by the Company showed that margin requirements for . . . AAA rated securities are 7-15%." Ex. 50 (KPMG Workpaper re Going Concern, at KPMG-THRN-SEC-0001404-05).

Defendants Disputed Facts ¶ V, at 11. To dispute this fact, the Defendants cite Simmons' deposition testimony, where he testified that, in January and February, Thornburg Mortgage received haircuts of 7-15%. See Simmons Depo. Vol. II at 422:23-423:17. The Defendants also cite a memorandum, which states that Thornburg Mortgage received margin requirements of 7-15%. See Feb. 20, 2008, Hall Memo. at 4-5. It is thus disputed whether Thornburg Mortgage received haircuts of 10-12% or of 7-15%. The Court thus finds this fact disputed.

Alt-A MBS collateral.  Between February 14 and February 20, 2008, Thornburg received and satisfied over $130 million in such margin calls."  Goldstone Facts ¶ 54, at 13 (setting forth this fact).  See Restatement of Margin Calls at 6, filed August 9, 2013 (Doc. 204-169)("Restatement Margin Calls"); 2007 Form 10-K at 20-21, 26-27, & 43; Simmons Depo. Vol. II at 188:15-22; Simmons Depo. Vol. II 189:8-13; Reinhart SEC Depo. at 64:20-65:1.[27]  "Thornburg typically did not maintain a cash balance of more than $100 million on any given day."  Goldstone Facts ¶ 55, at 13 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 8, 2008, OTTI Memo. at 3; Simmons Decl. ¶ 23, at 6.  "In addition to cash, Thornburg's liquidity also included unpledged MBS that could be transferred to repo lenders to satisfy margin calls."  Goldstone Facts ¶ 56, at 13-14 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 11; Starrett SEC Depo. at 248:20-24; Feldman Depo. at 94:6-14.  "On February 15, 19 and 20, 2008, Thornburg received repo margin calls from Credit Suisse First Boston ('CSFB') in amounts ranging from $9.5 million to roughly $50 million, at least one of which was delayed."  Goldstone Facts ¶ 57, at 14 (setting forth this fact).  See Electronic Mail Transmission from Eric Smith, Credit Suisse First Boston, to Patrick Feldman, Thornburg Mortgage, Inc. at 2 (dated Feb. 15, 2008), filed August 9, 2013 (Doc. 204-48); Restatement Margin Calls at 4; Electronic Mail Transmission from Eric Smith, Credit Suisse First Boston, to Patrick Feldman, Thornburg Mortgage, Inc. at 2 (dated Feb. 15, 2008), filed August 9, 2013 (Doc. 204-47); Draft of Thornburg Mortgage, Inc. 2007 Form 10-K at 5, filed

---

[27]The SEC attempts to dispute this fact by stating: "Thornburg did not satisfy on time all margin calls received between February 14 and February 20, 2008."  SEC Disputed Facts ¶ 54, at 6.  This statement does not dispute the Defendants' asserted fact.  The Defendants' asserted fact does not state that Thornburg Mortgage timely satisfied all margin calls, but that it satisfied over $130 million in margin calls.  See Goldstone Facts ¶ 54, at 10.  Accordingly, the Court finds the fact undisputed.

August 9, 2013 (Doc. 204-119)("Form 10-K Draft"); Electronic Mail Transmission from Eric

Smith to Xen Stanhope, Patrick Feldman, and Daniel Petrush (dated Feb. 19, 2008), filed August

9, 2013 (Doc. 204-57).[28]   "On February 21, 2008, Thornburg received a margin call from RBS

---

[28]The Defendants' asserted fact states: "On February 15, 19 and 20, 2008, Thornburg received repo margin calls from Credit Suisse First Boston ('CSFB') in amounts ranging from $9.5 million to roughly $50 million, at least one of which was delayed.  Thornburg paid these repo margin calls on the date issued."  Goldstone Facts ¶ 57, at 14.  The SEC disputes this fact by stating:

> Thornburg did not pay the February 15 and 19, 2008 CSFB margin calls on the date issued.  On February 20, 2008 CSFB e-mailed Thornburg stating that the February 15 and 19 margin calls were outstanding for two days and one day, respectively.  On February 19, 2008, Goldstone was asked to be on a call with CSFB to discuss Thornburg's margin deficit.  CSFB's Managing Director testified that Thornburg did not meet certain margin call payments on time during February 2008 and further testified that he was not aware of any agreement to allow Thornburg to meet any margin call over time during February 2008, and that he believes he would have been aware of any such agreement if it had existed.

SEC Disputed Facts ¶ 57, at 6.  The SEC cites two electronic mail transmissions and the Blasi Decl.  In one electronic mail transmission, Tanya Miller, a member of Credit Suisse's Collateral Management team, noted that one margin call had been outstanding for two days and another had been outstanding for one day.  See Electronic Mail Transmission from Eric Smith to Daniel Petrush and Patrick Feldman (dated Feb. 20, 2008), filed November 6, 2013 (Doc. 231-51).  In the other electronic mail transmission, Goldstone stated that Thornburg Mortgage owed Credit Suisse a margin deficit.  See Electronic Mail Transmission from Larry Goldstone to Clay Simmons, Nathan Fellers, and Patrick Feldman (dated Feb. 19, 2008), filed November 6, 2013 (Doc. 231-52).  Finally, in his declaration, Blasi, a Managing Director at Credit Suisse, states that Thornburg Mortgage did not timely meet certain margin calls in February, 2007, and that there was not an agreement between Credit Suisse and Thornburg Mortgage to allow Thornburg Mortgage to pay the margin call over time.  See Blasi Decl. ¶¶ 6-7, at 2.

The Defendants reply by arguing that the SEC's response is immaterial, because Credit Suisse agreed to delay the margin calls, because Credit Suisse accepted full payment for the margin calls on February 20, 2008, because Credit Suisse did not declare Thornburg Mortgage in default, and because Thornburg Mortgage did not breach its repo agreements.  See Goldstone Reply facts ¶ 57, at 23-24.  The Defendants are mistaken.  While it may be immaterial whether Thornburg Mortgage paid the margin calls the date they were issued, the SEC has presented evidence showing that Thornburg Mortgage did not pay the margin calls on the date they were issued.  The SEC has, thus, specifically controverted the Defendants' asserted fact.  Accordingly, the Court has omitted the sentence from the Defendants' asserted fact that states that Thornburg Mortgage paid the margin calls on the date they were issued.

Greenwich ('Greenwich') for approximately $42 million."  Goldstone Facts ¶ 58, at 14 (setting

forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Restatement Margin

Calls at 4; Electronic Mail Transmission from Russell Heald, Greenwich Capital Markets, to Xen

Stanhope,  Thornburg Mortgage, Inc., and Tim Sturdy, Thornburg Mortgage, Inc. at 2 (dated

Feb. 21, 2008), filed August 9, 2013 (Doc. 204-81).[29]  "Greenwich did not declare Thornburg in

default, or even threaten to do so, in connection with Greenwich's February 21, 2008 margin

---

[29]The Defendants assert the fact that: "After Thornburg received the Greenwich margin
call, Thornburg personnel spoke with Greenwich representatives on February 21, 2008,
explained Thornburg's plans to raise capital, and reached [an] agreement with Greenwich on a
plan to satisfy the margin call over the course of several days."  Goldstone Facts ¶ 59, at 14-15.
The SEC disputes this fact by stating:

> The evidence, other than Defendants' self-serving statements, does not show that
> Greenwich agreed to a payment plan to allow Thornburg to satisfy its margin call
> over the course of several days.  The cited "evidence" for this agreement is a
> single e-mail from Goldstone to Simmons and Feldman indicating that Greenwich
> "seem[s] to be pacified for the moment."  Such a statement reflects the opposite
> of an agreement: that Greenwich could change course after another moment.  The
> master repurchase agreement between Thornburg and Greenwich also required
> any such agreement to be in writing, and there was no such writing.

SEC Disputed Facts ¶ 59, at 6-7.  The Defendants reply by arguing that the "SEC's response is
an immaterial semantic argument over the term 'agreed'" and that "[w]hether any agreement to a
payment plan had to be in writing does not refute this fact."  Goldstone Reply Facts ¶ 59,
at 24-25.  The Court agrees with the SEC.  The evidence does not support the Defendants'
asserted fact.  The only evidence which the Defendants cite is an electronic mail transmission
conversation between Goldstone and Fellers.  See Electronic Mail Transmission from Nathan
Fellers to Larry Goldstone at 2 (dated Feb. 21, 2008), filed August 9, 2013
(Doc. 204-83)("Fellers & Goldstone Feb. 21, 2008, Email").  In the electronic mail transmission,
Fellers writes: "We had a $43 million call from Greenwich today and had a conference with Paul
Goudie and others, outlining our plans to raise capital over the coming weeks.  They seem to be
pacified for the moment."  Fellers & Goldstone Feb. 21, 2008, Email at 2.  This electronic mail
transmission does not support the assertion that there was an agreement between Greenwich and
Thornburg Mortgage, but instead shows that, from Fellers' perspective, Greenwich was not
going to immediately exercise its right to declare Thornburg Mortgage in default.  Accordingly,
there is no evidence of an agreement between Greenwich and Thornburg Mortgage to permit
Thornburg Mortgage to pay the margin call over time.  Because the evidence does not support the
asserted fact, the Court will not consider it.

call." Goldstone Facts ¶ 60, at 15 (setting forth this fact).  See Fellers Decl. ¶ 17, at 4; Simmons Decl. ¶ 22, at 6.[30]

"[P]aying [the Greenwich margin call issued to Thornburg Mortgage] over several days . . . [did not] concern[] [Goldstone] given Thornburg's cooperative relationship and ongoing dialogue with Greenwich, which was seeking additional securities underwriting business from Thornburg at the time." Goldstone Facts ¶ 61, at 15 (setting forth this fact).  See Goldstone Decl. ¶¶ 14-15, at 3.[31]  "Mr. Simmons . . . [was] not . . . concerned about [the Greenwich margin call of forty-two million dollars issued to Thornburg Mortgage on February 21, 2008,] at the time given the large volume of business Thornburg did with Greenwich and the cooperative nature of their relationship." Goldstone Facts ¶ 62, at 15 (setting forth this fact).  See Simmons Decl. ¶¶ 21-22 at 5-6; Simmons Depo. Vol. III at 119:3-120:9.[32]  "Thornburg made payments to Greenwich on

---

[30]The SEC attempts to dispute this fact by stating: "Greenwich could have declared Thornburg in default in connection with its failure to satisfy its February 21, 2008 margin call in a timely manner."  SEC Disputed Facts ¶ 60, at 7.  This response does not dispute the Defendants' asserted fact.  Instead, the SEC asserts an additional fact -- that Greenwich could have declared Thornburg Mortgage in default.  See SEC Disputed Facts ¶ 60, at 7.  The Defendants did not, however, assert that Greenwich could not have declared Thornburg Mortgage in default.  Accordingly, the SEC has not specifically controverted the asserted fact, and the Court finds it undisputed.

[31]The SEC attempts to dispute this fact by stating: "Goldstone's claimed belief is implausible given his understanding that Greenwich, as a lender, could have declared Thornburg in default in connection with its failure to satisfy its February 21, 2008 margin call in a timely manner."  SEC Disputed Facts ¶ 61, at 7.  The SEC does not specifically controvert the Defendants' asserted fact.  The Defendants do not assert that Greenwich could not have declared Thornburg Mortgage in default, but asserted that Goldstone was unconcerned, or would have been unconcerned, because of Thornburg Mortgage's relationship with Greenwich.  Accordingly, the Court finds the fact undisputed.

[32]The SEC attempts to dispute this fact by stating: "Simmons's claimed belief is implausible given his understanding that Greenwich, as a lender, could have declared Thornburg in default in connection with its failure to satisfy its February 21, 2008 margin call in a timely manner."  SEC Disputed Facts ¶ 62, at 7.  The Defendants do not assert that Greenwich could not have declared Thornburg Mortgage in default or that Simmons believed that Greenwich could

February 21 and 25 to satisfy the margin call.  By February 25, 2008, Thornburg had satisfied the Greenwich margin call in full."  Goldstone Facts ¶ 63, at 15 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Restatement Margin Calls at 5; Electronic Mail Transmission from Larry Goldstone to Garrett Thornburg, Anne Drue Anderson, David A. Ater, Elliot R. Cutler, Francis I. Mullin, Ike Kalangis, Michael B. Jeffers, Owen Lopez, and Stuart Sherman at 2 (dated Feb. 25, 2008), filed August 9, 2013 (Doc. 204-111)("Feb. 25, 2008, Goldstone Email").  "On February 21, 2008, Thornburg received a margin call from Citigroup for approximately $200 million."  Goldstone Facts ¶ 64, at 15 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from James Kuczmarski to Elena Matrulla (dated Feb. 21, 2008), filed August 9, 2013 (Doc. 204-76); Electronic Mail Transmission from Matther Novotny to Nicholas Kuczkowski (dated Feb. 21, 2008), filed August 9, 2013 (Doc. 204-71)("Feb. 21, 2008, Citi Email").

"In a February 21, 2008 conference call with Citigroup's credit team, Thornburg objected to Citigroup's pricing and 'haircut' changes to Thornburg's collateral, explained its strategies for raising liquidity," and described a plan to meet the margin call over the following week. Goldstone Facts ¶ 65, at 12 (setting forth this fact).  See Goldstone Depo. at 101:14-102:3, 106:4-109:4; Goldstone SEC Depo. at 216:20-218:11; Fellers Decl. ¶¶ 15, 18, at 4; Feldman Decl. ¶¶ 16, 18-19, at 4.[33]  "On February 21, 2008, Mr. Goldstone reported in an email to the

---

not have declared Thornburg Mortgage in default.  The SEC thus does not specifically controvert this fact, and the Court finds it undisputed.

[33]The Defendants' asserted fact states: "In a February 21, 2008 conference call with Citigroup's credit team, Thornburg objected to Citigroup's pricing and 'haircut' changes to Thornburg's collateral, explained its strategies for raising liquidity, and reached agreement with Citigroup on a plan to meet the margin call over the following week."  Goldstone Facts ¶ 65, at 15.  The SEC disputes this fact by stating:

company's Board that Thornburg had successfully negotiated a resolution and payment plan with

Citi in order to satisfy the call by the end of the following week."  Goldstone Facts ¶ 66, at 15-16

(setting forth this fact).  See Electronic Mail Transmission from Clay Simmons to Nyira Gitana

(dated Feb. 21, 2008), filed August 9, 2013 (Doc. 204-78)("Feb. 21, 2008, Simmons Email").[34]

"Citigroup was perfectly willing to give us the time that [Thornburg Mortgage] needed to

execute these transactions to meet the call, . . . Thornburg had an active dialogue with Citigroup

personnel with respect to how Thornburg planned to meet the margin call," and Thornburg

Mortgage successfully met the margin call.  Goldstone Facts ¶ 67 at 16 (setting forth this

---

The evidence does not establish any agreement to allow Thornburg to satisfy the Citi margin call over time during February 2008.  The Repo Agreement required any such agreement to be in writing, and there was no such writing.  Citi's senior credit officer testified that she was not aware of any agreement to allow Thornburg to meet any margin call over time during February 2008, and that she believes she would have been aware of any such agreement if it had existed.  Defendants cite no evidence from Citi of an agreement, but only self-serving claims that there was an agreement, which is contradicted by their own testimony.  Defendant Goldstone testified that "Citibank could have verbally agreed to a payment plan and they could have woken up the next day and decided that they didn't like what they had agreed to and declared us in default that way.  They had every right to do that but they chose not to."  Defendant Goldstone testified that any payment plans reached with Citi were not done "in the context of the agreement."  Defendant Simmons recognized that after issuing its reservation of rights letter (and purportedly agreeing to a payment plan) Citibank "would have the right to declare an event of default."

SEC Disputed Facts ¶ 65, at 7-8.  The Court has already concluded that Thornburg Mortgage did not reach an agreement with its lenders to allow it to pay the margin calls over time.  See supra note 11.  Accordingly, the Court has modified the asserted fact to more accurately reflect the evidence.

[34]The SEC attempts to dispute this fact by stating: "The evidence does not establish any agreement to allow Thornburg to satisfy the Citi margin call over time during February 2008." SEC Disputed Facts ¶ 66, at 8.   While the Court agrees that there was no agreement, the Defendants' asserted fact is that Goldstone reported in an electronic mail transmission that he negotiated a resolution to the margin call.  See Goldstone Facts ¶ 66, at 15-16.  The SEC does not specifically controvert the asserted fact, and the Court finds it undisputed.

fact)(alterations omitted)(internal quotation marks omitted).   See Goldstone SEC Depo. at

220:16-221:1, 225:15-226:5, 249:16-25; Feb. 21, 2008, Simmons Email at 2; Electronic Mail

Transmission from Arlene Hamilton to Marianna Maffucci, Elena T. Matrullo, Shannon J. Hales,

Stephen G. Malekian, Matthew Novotny, and Roy Haynes at 2 (dated Feb. 22, 2008), filed

August 9, 2013 (Doc. 204-98)("Citi Feb. 21, 2008, Reservation Letter").[35]

---

[35]The Defendants' asserted fact states:

> Mr. Goldstone testified that Citigroup was "perfectly willing to give us the time
> that we needed to execute these transactions" to meet the call, that Thornburg had
> an "active dialogue" with Citigroup personnel 'with respect to how Thornburg
> planned to meet [the] margin call,' and that Thornburg "met [its] obligations
> under that agreement."

Goldstone Facts ¶ 67, at 16 (alterations in Goldstone Facts but not in source).  The SEC disputes
this fact by arguing: "The evidence does not establish any agreement to allow Thornburg to
satisfy the Citi margin call over time during February 2008.  Defendants testified that Citi could
have declared default while its margin call went unmet."  SEC Disputed Facts ¶ 67, at 8.  The
Defendants reply by stating:

> The SEC's response does not dispute this fact.

> The SEC's response is an immaterial semantic argument over the term "agreed."

> In addition, the SEC cannot create a genuine dispute as to this fact by submitting
> additional non-responsive purported facts.  Whether Citi could have declared
> Thornburg in default does not refute Mr. Goldstone's testimony that Citi was
> willing to allow Thornburg to satisfy the margin call over time.

Goldstone Reply Facts ¶ 69, at 29 (citations omitted)(internal quotation marks omitted).  While it
is undisputed whether Goldstone testified to what the Defendants assert he did, the fact that the
Defendants appear to want the Court to find undisputed is the underlying fact about which
Goldstone testified.  The SEC's response and the Defendants' reply focus on the fact to which
Goldstone testified and not whether Goldstone testified what the Defendants assert he did.
Moreover, whether a person testified in a deposition is not a fact; the testimony that he or she
gave is.  Accordingly, the Court construes the Defendants' asserted fact to be the fact to which
Goldstone testified and not whether Goldstone said what the Defendants assert he did at his
deposition.  The Defendants use this similar method -- asserting that someone testified to a
certain fact -- throughout the Goldstone Facts.  Unless specified otherwise, the Court will
construe these asserted facts in the same manner -- that the asserted fact is the fact about which
the person testified and not whether the person testified.  As for this asserted fact, the Court

"Mr. Goldstone and Mr. Simmons . . . believed Citigroup would work cooperatively with Thornburg on the February 21, 2008 margin call because of the longstanding relationship between Citigroup and Thornburg, and because Citigroup had not declared Thornburg in default under similar circumstances in August 2007."   Goldstone Facts ¶ 68, at 16 (setting forth this fact).  See Simmons Depo. Vol. II at 139:9-12, 146:4-12, 249:20-250:10, 259:2-10, 264:7-265:9; Goldstone SEC Depo. at 249:20-25; Goldstone Decl. ¶ 16, at 3; Simmons Decl. ¶ 23, at 6.[36]  In an electronic mail transmission to the Board on February 22, 2008, Goldstone wrote that

> all of [Thornburg Mortgage's] repo counterparties [that made margin calls have been] fairly easy to work with.  All have or are cooperating.  No one is panicking.  We have discussed the need to have repo counterparties that understand the business and value our relationship.  The nature of the cooperation we are getting suggests that there is some truth behind that belief.

Goldstone Facts ¶ 69, at 13 (setting forth this fact)(internal quotation marks omitted).  See Electronic Mail Transmission from Larry Goldstone to Garrett Thornburg, Anne Drue Anderson, David A. Ater, Eliot R. Cutler, Francis I. Mullins, III, Ike Kalangis, Michael B. Jeffers, Owen Lopez, and Stuart Sherman at 2 (dated Feb. 22, 2008), filed August 9, 2013 (Doc. 204-96)("Feb. 22, 2008, Goldstone Email").[37]   "[F]rom the time [Goldstone and Simmons] received the

---

agrees that Thornburg did not reach an agreement with Citigroup Global to allow it to make margin call payments over time.  See supra note 11.  The Court has thus modified the Defendants' asserted fact.

[36]The SEC attempts to dispute this fact by stating: "The evidence does not establish any agreement to allow Thornburg to satisfy the Citi margin call over time during February 2008. Defendants testified that Citi could have declared default while its margin call went unmet." SEC Disputed Facts ¶ 68, at 8.  This contention does not specifically dispute the Defendants' asserted fact.  The asserted fact states that Goldstone and Simmons believed that Citigroup Global would work cooperatively with Thornburg Mortgage and not that there was any agreement.  Consequently, the SEC fails to specifically controvert this fact, and the Court finds it undisputed.

[37]The SEC attempts to dispute this fact by stating: "The evidence does not establish any agreement to allow Thornburg to satisfy the Citi margin call over time during February 2008.

Citigroup margin call, they strongly believed that Thornburg would raise sufficient cash and liquidity to meet that call over the ensuing week," and, on "February 22, 2008, Mr. Goldstone's email update to the Board stated: 'Clay thinks we can raise close to $300 million without the securitization proceeds over the next week.'" Goldstone Facts ¶ 70, at 16 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone SEC Depo. at 143:20-144:11; Goldstone Depo. at 106:4-108:8; Simmons Depo. Vol. II at 141:18-142:1; Goldstone Decl. ¶ 17, at 3. "Citigroup did not declare Thornburg in default, or even threaten Thornburg that it would do so, as a result of Thornburg's delayed payment of Citigroup's February 21, 2008 margin call." Goldstone Facts ¶ 71, at 16-17 (setting forth this fact). See Electronic Mail Transmission from Nicholas Kuczkowski to Matthew Gregory, Cecile Morris, Thomas Geisendorfer, Darryl Castro, Emily Chiu, Joanne C. Crisafi, Daniel M. Gumiran, John Kruger, Stephen G. Malekian, Grigorios Markouizos, Lou McCrimlisk, George Meagan, Thomas Mellina, Christopher Quinn, Sanjay V. Reddy, Barrie L. Ringelheim, John W. Straley, Jim Tymeck, John W. Williams, Patricia E. Lenza, Michael P. Hynes, Scott Richter, James Dougherty, Lyndon James, Doreen Della Speranza, Carolyn Sargent, Rachel Symonds, and Edward Gildar at 2 (dated Feb. 21, 2008), filed August 9, 2013 (Doc. 204-85)("Citi repo Exposures Email"); Electronic Mail Transmission from Matthew Novotny to Patrick Feldman, Xen Stanhope, and Nathan Fellers (dated Feb. 22, 2008), filed August 9, 2013 (Doc. 204-95); Electronic Mail Transmission from Patrick Feldman to Matthew Novotny (dated Feb. 26, 2008), filed August 9, 2013 (Doc. 204-115); Simmons Decl. ¶¶ 26-27, at 7.[38] After discussing a

---

Defendants testified that Citi could have declared default while its margin call went unmet." SEC Disputed Facts ¶ 69, at 8. This assertion does not specifically controvert the Defendants' asserted fact. Consequently, the Court deems the fact undisputed.

[38]The SEC attempts to dispute this fact by stating:

payment plan with Citigroup Global "on February 21, 2008, Thornburg provided cash and collateral to Citigroup in several installments, making the final payment on February 27, 2008." Goldstone Facts ¶ 72, at 17 (setting forth this fact).  See Feb. 21, 2008, Simmons Email at 2; Restatement Margin Calls at 2, 7; Form 10-K Draft at 4-6; Citi repo Exposures Email at 2; Electronic Mail Transmission from Nathan Fellers to Elena Matrullo (dated Feb. 22, 2008), filed August 9, 2013 (Doc. 204-100); Fellers Decl. ¶ 15, at 4; Simmons Decl. ¶¶ 26-27, at 7.[39]  "Ms.

---

Citi specifically notified Thornburg that it could declare Thornburg in default in connection with its failure to satisfy its February 2008 margin call in a timely manner.  The reservation of rights letter reflects Citi's reservation of rights to declare Thornburg in default while the margin call went unmet, and Defendants testified that Citi could have declared default while its margin call went unmet.

SEC Disputed Facts ¶ 71, at 8.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants do not assert that Citigroup Global could not have declared Thornburg Mortgage in default, but only that Citigroup Global did not declare Thornburg Mortgage in default and did not threaten to declare Thornburg Mortgage in default.  The Court thus finds this fact undisputed.

[39]The Defendants' original asserted fact states: "After reaching agreement with Citigroup on a payment plan on February 21, 2008, Thornburg provided cash and collateral to Citigroup in several installments, making the final payment on February 27, 2008 as agreed."  Goldstone Facts ¶ 72, at 17.  The SEC argues: "The evidence does not establish any agreement to allow Thornburg to satisfy the Citi margin call over time during February 2008."  SEC Disputed Facts ¶ 72, at 8.  The Court agrees with the SEC.  The undisputed evidence does not show an agreement between Thornburg Mortgage and Citigroup Global.  See supra note 11.  The Court has thus modified the Defendants' asserted fact.

Starrett asserts the following fact: "Prior to the filing of the 2007 Form 10-K, Ms. Starrett understood -- mostly from being copied on Mr. Goldstone's email updates to Thornburg's Board of Directors -- that Thornburg's repo lenders had agreed to negotiated payment plans without declaring default."  Starrett Facts ¶ 46, at 10.  The SEC disputes this fact by stating:

Defendant Goldstone's e-mails do not provide a reasonable basis on which to believe that agreements were reached with repo lenders.  Defendant Starrett "had an understanding that [margin calls] had to be satisfied per the terms of the agreement."  Defendant Starrett was also aware that prior to February 2008, margin calls were met in a day unless either (1) there was a dispute about the value of the underlying security or (2) the margin call was retracted. She was not aware of "payment plans" prior to that time.  Defendant Starrett also testified that

Starrett was not herself involved in negotiating margin call payment plans with Thornburg's repo

lenders in the weeks prior to the filing of the 2007 Form 10-K."  Starrett Facts ¶ 47, at 11 (setting

forth this fact).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Starrett Decl.

¶ 5, at 4; Fellers Depo. at 118:22-119:13.  "By February 27, 2008, Thornburg had met all of its

outstanding margin calls."  Goldstone Facts ¶ 73, at 17 (setting forth this fact).  See Plaintiff

Securities and Exchange Commission's Amended Objections and Response to Defendants' First

Set of Requests For Admission at 6, filed August 9, 2013 (Doc. 204-283)("1st RFAs");

Electronic Mail Transmission from Nathan Fellers to Larry Goldstone and Clay Simmons at 2

(dated Feb. 27, 2008), filed August 9, 2013 (Doc. 204-134).[40]  "Ms. Starrett was aware that in the

---

she understood Repo Agreements to be governed by standardized contracts, and
that the process for settling margin calls involved a margin call being made by a
lender and then the "capital markets department determined whether it was to
wire the funds, send a free security, [or] contest the amount of the margin call."
Defendant Starrett was also copied on emails from Defendant Goldstone stating to
Thornburg's board of directors that Thornburg was out of compliance with its
Repo Agreements, and she wrote Thornburg had purposely not told KMPG [sic]
about untimely margin call payments, so she knew that Thornburg did not timely
meet certain margin calls in February 2008.  Defendant Starrett was not copied on
Starrett Exh. 306, [Electronic Mail Transmission from Elena T. Matrullo to
Patrick Ryan (dated Feb. 20, 2008), filed August 31, 2013 (Doc. 207-12),] and is
not referenced in the cited portions of GSExh. 263, [Fellers Decl.,] so they
provide no support.  Additionally, the evidence does not establish any agreement
to allow Thornburg to satisfy margin calls over time during February 2008.  The
Repo Agreements required any such agreement to be in writing, and there was no
such writing.  Lender representatives have testified that they are aware of no such
agreement existing, and that they could have declared Thornburg in default while
margin calls went unmet, but did not do so.  Citi explicitly reserved its right to
declare Thornburg in default while its margin calls went unmet.

SEC Disputed Starrett Facts ¶ 46, at 6-7.  The Court finds the fact disputed.  It is disputed
whether there was an agreement between Thornburg Mortgage and its repo lenders, and whether
its repo lenders merely chose not to declare default and permitted Thornburg to pay its margin
calls over time.  Consequently, the Court finds the fact disputed.

[40]The SEC attempts to dispute this fact by stating:

week or so prior to filing of the Form 10-K on February 28, 2008, Thornburg received an unusually large volume of margin calls and that some of those calls had to be satisfied over a period of several days."  Starrett Facts ¶ 8, at 3 (setting forth this fact).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Starrett Depo. at 92:19-23, 108:17-109:14; Starrett SEC Depo. at 109:5-8.

### 5.     Citigroup Global's Reservation-of-Rights Letter.

On February 22, 2008, after discussing "a payment plan with Thornburg, Citigroup emailed Nate Fellers of Thornburg a reservation of rights letter."  Goldstone Facts ¶ 74, at 17-18 (setting forth this fact).  See Citi Feb. 21, 2008, Reservation Letter at 2; Fellers Decl. ¶¶ 15-16, at 4.[41]  "Mr. Fellers [did] not . . . forward[] the Citigroup reservation of rights letter to Mr. Goldstone or Mr. Simmons."  Goldstone Facts ¶ 75, at 18 (setting forth this fact).  See

---

As of the time Thornburg filed the 2007 Form 10-K on February 28, 2008, Thornburg had, just hours before the filing, managed to satisfy all outstanding margin calls from repo lenders, but doing so left Thornburg with very limited liquidity and Thornburg had not met all those margin calls in accordance with the Repo Agreements, and thus had been subject to repo lenders declaring Thornburg in default and seizing and selling purchased ARM assets held as collateral on the loans.

SEC Disputed Facts ¶ 73, at 10-11.  The SEC does not specifically dispute this fact, but asserts additional facts.  Consequently, the Court finds the fact undisputed.

[41]The Defendants' original asserted fact states: "On February 22, 2008, after agreeing to a payment plan with Thornburg, Citigroup emailed Nate Fellers of Thornburg a reservation of rights letter."  Goldstone Facts ¶ 74, at 17-18.  The SEC disputes this fact by stating: "The evidence does not establish any agreement to allow Thornburg to satisfy the Citi margin call over time during February 2008."  SEC Disputed Facts ¶ 74, at 9.  The Court agrees.  As the Court has already concluded, see supra note 11, there is no evidence of an agreement between Citigroup Global and Thornburg Mortgage.  The Court has thus modified the Defendants' asserted fact.

Fellers Decl. ¶ 16, at 4.[42]  "Mr. Goldstone and Mr. Simmons . . . learn[ed] about the Citigroup

letter at some point prior to Thornburg's 2007 Form 10-K filing."  Goldstone Facts ¶ 76, at 18

(setting forth this fact).  See Goldstone Decl. ¶ 19, at 4; Simmons Decl. ¶ 25, at 6-7.[43]

"Mr. Goldstone and Mr. Simmons  .  .  .  believed, and had been told by Citigroup, that the

Citigroup letter was a formality."  Goldstone Facts ¶ 77, at 18 (setting forth this fact).  See

---

[42]The SEC attempts to dispute this fact by stating: "Goldstone and Simmons received the Citi Reservation of Rights letter."  SEC Disputed Facts ¶ 75, at 9.  This assertion does not, however, specifically controvert the Defendants' asserted fact.  This fact does not state that Goldstone or Simmons received the letter, but merely that Fellers did not forward the letter to Goldstone or Simmons.  Consequently, the Court finds the fact undisputed.

[43]The Defendants' fact states: "Mr. Goldstone and Mr. Simmons recall learning about the Citigroup letter at some point prior to Thornburg's 2007 Form 10-K filing, but do not recall being given a copy of the letter."  Goldstone Facts ¶ 76, at 18.  The SEC disputes this fact by stating: "Goldstone and Simmons received the Citi Reservation of Rights letter."  SEC Disputed Facts ¶ 76, at 9.  The SEC cites transcripts of depositions where Goldstone testified that he "most likely" received the letter, Goldstone SEC Depo. at 223:13-19, and where Simmons testified that he thought he received the letter on February 21, 2008, or February 22, 2008, see Deposition of Clarence George Simmons, III at 147:8-20 (taken Dec. 14, 2009), filed November 6, 2013 (Doc. 231-31)("Simmons SEC Depo.").  The Defendants reply by arguing:  "The SEC's response is immaterial because it does not claim, and the evidence does not support, that Defendants received the Citi letter before the Form 10-K filing.  Defendants testified that they do not recall seeing the letter in February 2008."  Goldstone Reply Facts ¶ 76, at 33.
    The Court concludes that the SEC has disputed the Defendants' asserted fact.  First, Simmons testified that he thinks he received the letter on February 21, 2008, or February 22, 2008, which was before the Form 10-K was filed.  See Simmons SEC Depo. at 147:8-20.  Second, the Defendants' evidence does not support the assertion that Goldstone does not recall receiving a copy of the letter.  In his declaration, Goldstone states that he could not locate a copy of the letter in his files, but that he recalls learning about and reviewing the letter before the Form 10-K was filed.  See Goldstone Decl. ¶ 19, at 4.  To review the letter before the Form 10-K filing, Goldstone had to have received a copy of it.  The Defendants' evidence undermines their asserted fact.  Moreover, the SEC's evidence contradicts the Defendants' asserted fact, because Goldstone testified that he likely received a copy of the letter.  See Goldstone SEC Depo. at 223:13-19.  Accordingly, the Court finds the Defendants' asserted fact disputed.  The Court has thus modified the asserted fact to more accurately reflect the evidence.

Goldstone SEC Depo. at 224:9-226:5; Simmons Depo. Vol. II at 263:3-16, 267:16-20.[44]  "The February 21, 2008 reservation of rights letter from Citigroup in connection with an approximately $200 million margin call was not addressed to Ms. Starrett and she was not aware of this letter or its contents prior to the filing of the Form 10-K."  Starrett Facts ¶ 6, at 3 (setting forth this fact).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Starrett Decl. ¶ 13, at 6.  "Mr. Simmons understood that Citigroup's reservation of rights letter was intended to memorialize the payment plan that" Thornburg Mortgage proposed.  Goldstone Facts ¶ 78, at 18 (setting forth this fact).  See Simmons Depo. Vol. II at 139:6-12; id. at 145:21-146:12; id. at 249:24-250:10.[45]  An electronic mail transmission exchange between Citigroup Global personnel

---

[44]The SEC attempts to dispute this fact by stating: "The Citi Reservation of Rights letters was not a formality, rather it reflects Citi's reservation of rights to declare Thornburg in default while the margin call went unmet.  Defendants testified that Citi could have declared default while its margin call went unmet."  SEC Disputed Facts ¶ 77, at 9.  The evidence does not, however, support the SEC's assertion.  To dispute the Defendants' asserted fact, the SEC cites the letter and portions of Goldstone's and Simmons' deposition testimony.  The letter does not say that it is more than a formality, but, instead, the first sentence appears to suggest that it was sent as a formality.  The letter begins by stating: "The purpose of this letter is to memorialize the events of today with respect to Paragraphs 5 and 14 of the Agreement."  Citi Feb. 21, 2008, Reservation Letter at 3.  This suggests that the letter was merely to memorialize the events and not to affect the parties' contractual positions or to influence Thornburg Mortgage act.  Similarly, the cited deposition testimony merely shows that, if Citigroup Global wanted, it could have declared Thornburg Mortgage in default.  See Simmons SEC Depo. at 268:11-22; Goldstone SEC Depo at 251:25-252:19.  The SEC has, thus, not presented any evidence disputing the Defendants' asserted fact that the letter was a formality.  The SEC has not specifically controverted the Defendants' asserted fact, and the Court finds it undisputed.

[45]The Defendants' fact states: "Mr. Simmons understood that Citigroup's reservation of rights letter was intended to memorialize the payment plan that Citigroup and Thornburg had agreed upon."  Goldstone Facts ¶ 78, at 18.  The SEC disputes this fact by stating:

> Citi's senior credit officer testified that the reservation of rights letter did not reflect any agreement limiting Citi's ability to declare a default or its ability to otherwise protect itself under the terms of the master repurchase agreement to allow Thornburg to meet any margin call over time during February 2008, but rather stated, consistent with the master repurchase agreement, that Citi had the right to declare Thornburg in default due to its unmet margin call.

on February 20, 2008, stated, among other things: (i) "[w]e are working with them [Thornburg Mortgage] to try to avoid a liquidation, but will reserve our rights"; and (ii) "[g]iven their current liquidity situation we have been working with TMA[, Thornburg Mortgage,] on next steps which include the following: 1) $10MM in cash to be sent on Feb. 21 . . . 6) [o]nce $10MM in cash received, send Reservation of Rights letter to TMA."  Goldstone Facts ¶ 79, at 18 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 21, 2008, Citi Email at 3-4.  "Mr. Goldstone and Mr. Simmons . . . did not believe the receipt of the Citigroup letter was a material event."  Goldstone Facts ¶ 80, at 18 (setting forth this fact).  See Goldstone SEC Depo. at 225:15-226:5, 249:7-15; Simmons Depo. Vol. II at 139:9-21, 142:14-17, 146:4-15, 147:8-14.[46]  No one "at Thornburg who was aware of the Citigroup letter considered it to be a significant event."  Goldstone Facts ¶ 81, at 19 (setting forth this fact).  See Goldstone SEC Depo. at 225:15-226:5, 249:7-15; Simmons Depo. Vol. II at 139:9-21, 142:5-17, 145:21-147:14,

---

SEC Disputed Facts ¶ 78, at 9.  The Court has already concluded that Thornburg Mortgage did not have an agreement between its repo lenders to allow it to make payments over time.  See supra note 11.  Accordingly, this fact is disputed, and the Court will modify it.

[46]The SEC attempts to dispute this fact by stating:

Defendants' claimed belief is implausible and contradicted by their own admissions.  Defendant Goldstone testified that "Citibank could have verbally agreed to a payment plan and they could have woken up the next day and decided that they didn't like what they had agreed to and declared us in default that way.  They had every right to do that but they chose not to."  Defendant Simmons recognized that after issuing its reservation of rights letter (and purportedly agreeing to a payment plan) Citibank "would have the right to declare an event of default.

SEC Disputed Facts ¶ 80, at 9.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants do not assert that Citigroup Global could not have defaulted Thornburg Mortgage, but instead that Goldstone and Simmons did not believe that the reservation-of-rights letter was a significant event.  The Court thus finds the fact undisputed.

264:3-19; Fellers Decl. ¶ 16, at 4.[47]   "The . . . Citigroup letter was not a default notice."
Goldstone Facts ¶ 82, at 19 (setting forth this fact).   See SEC Disputed Facts at 1-51; Plaintiff
Securities and Exchange Commission's Objections and Response to Defendants' Second Set of
Requests for Admission at 9, filed August 9, 2013 (Doc. 204-284)("2d RFAs").

"In the two-week period preceding the 2007 Form 10-K filing on February 28, 2008,
neither Citigroup, nor any other repo lender, declared Thornburg in default under their repo
lending agreements."   Goldstone Facts ¶ 83, at 19 (setting forth this fact).   See SEC Disputed
Facts at 1-51 (not disputing this fact); 1st RFAs at 3-4; 2d RFAs at 9-10.   "Larry Goldstone
testified that it was his understanding in the timeframe leading up to the filing of the Form 10-K
that Citibank had considered Thornburg to have breached its obligations under the global master
securities lending agreement."   SEC Disputed Facts ¶ C, at 1 (setting forth this fact)(internal
quotation marks omitted).   See Goldstone Depo. at 224:10-225:2.[48]   "While Ms. Starrett was

---

[47]The SEC attempts to dispute this fact by stating: "Defendants testified that Citi could
have declared default while its margin call went unmet.  This in turn would have triggered cross-
defaults in other repurchase agreements.  This knowledge contradicts and makes implausible
Defendants' claim that they did not consider the reservation-of-rights letter to be significant."
SEC Disputed Facts ¶ 81, at 10.  This assertion does not specifically contradict the Defendants'
asserted fact.  The Defendants could have believed that the Citigroup Global letter was not
significant, even though Citigroup Global had the right to declare Thornburg Mortgage in
default.  The Court thus finds this fact undisputed.

[48]The Defendants attempt to dispute this fact by stating:

Disputed insofar as the quoted language is in fact part of the SEC's question to
Mr. Goldstone, to which Mr. Goldstone responded, "I guess I could agree with
that, yes.  But they did not declare an event of default."

Moreover, the fact is immaterial because a technical breach of the repo
agreements did not constitute an event of default, and Thornburg's repo lenders,
including Citibank, had the option to and did enter into payment plans rather than
declare Thornburg in default.  Mr. Goldstone reasonably believed Thornburg's
repo lenders would accept payment of margin calls in accordance with those
payment plans, and its repo lenders ultimately did.

generally aware of market volatility and resulting margin calls in the weeks before the filing of

Thornburg's Form 10-K, she had no direct involvement in Thornburg's repo financing

arrangements, including the settlement of margin calls."  Goldstone Fact ¶ 84, at 19 (setting forth

this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Defendants' Amended

Objections and Responses to Plaintiff's Fourth Set of Interrogatories to All Defendants at 16, 21,

26-27, filed August 9, 2013 (Doc. 204-285); Starrett Depo. at 89:18-90:7, 104:19-106:9,

108:14-16.

### 6. The Awareness of Thornburg Mortgage's Board of Margin Calls and Plans to Satisfy Them.

"In email reports from February 15 through February 25, 2008, Mr. Goldstone updated

Thornburg's Board on margin calls that the company had received following the UBS

announcement, the company's strategies to raise additional cash and capital, and its progress in

meeting outstanding margin calls, among other things."  Goldstone Facts ¶ 85, at 19 (setting

forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Declaration of Francis

---

> The fact is also immaterial because by the time KPMG concluded its work on the
> Thornburg restatement, KPMG was aware of all material facts -- including that
> there was a technical breach of the Citigroup repo agreement -- yet concluded that
> it did not have concerns about management's integrity, that there was no material
> weakness in Thornburg's internal controls, and that there had been no fraud by
> Thornburg's management.

Defendants Disputed Facts ¶ C, at 2-3 (citations omitted).  This assertion does not dispute the
SEC's asserted fact.  While the SEC's fact may have included quoted language from a question
that an SEC attorney asked Goldstone, Goldstone agreed with the language in the question.
Additionally, the Defendants' assertion of immateriality does not dispute the SEC's asserted fact.
Materiality is a legal question and not a factual one.  If necessary, the Court will address
materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.
See Walton v. New Mexico State Land Office, No. CIV 13-0343 JB/KBM, 2014 WL 4823841,
at *1 n.2 (D.N.M. Sept. 12, 2014)(Browning, J.)("[O]bjecting to an asserted fact as immaterial in
response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court
finds the fact undisputed.

I. Mullin, III ¶¶ 11-12, at 3, filed August 9, 2013 (Doc. 204-290)("Mullin Decl."); Declaration of

David Ater ¶¶ 5, 9, at 2, filed August 9, 2013 (Doc. 204-289)("Ater Decl.").  "In an email report

to the Board on February 21, 2008, Mr. Goldstone described Thornburg's initial strategy to

satisfy Citigroup's margin call and raise additional cash and capital as follows": (i) "send

Citigroup an immediate payment of $10 million in cash"; (ii) "have Citigroup 'sell a $110

million Interest Only security that may generate $20 to $25 million'"; (iii) "use a portion of the

principal and interest payments due on February 25, 2008 to pay the margin call";

(iv) "potentially complete an $800 million securitization for $50 to $60 million in net proceeds";

(v) "market 'two other Thornburg Mortgage issued securities' for 'more permanent debt

financing,' with potential net proceeds of $75 to $100 million"; (vi) "raise cash through stock

sales in Thornburg's DRP; -- 'Dividend Reinvestment Plan' -- which had 'raised $30 million of

new equity' in 'th[e] past week'"; (vii) "possible 'additional asset sales depending on how

market conditions evolve over the next few weeks, offsetting previously mentioned gains'";

(viii) "an 'equity capital raise with UBS and [Friedman, Billings, Ramsey & Co. ('FBR')] for

$300 to $500 million to settle the 8th of March.'"  Goldstone Facts ¶ 86, at 19-20 (setting forth

this fact)(quoting Feb. 21, 2008, Simmons Email at 2).  See SEC Disputed Facts at 1-51 (not

disputing this fact); Feb. 21, 2008, Simmons Email at 2.

> In a follow up email to the Board on February 22, 2008, Mr. Goldstone reported
> that Thornburg was "not feeling a need to sell assets to shrink our financing book
> at this time.  We have other ideas to raise cash that are better than having to sell."
> His email also stated, among other things:
>
>> "[O]ur total margin requirement over the past 5 business days or so
>> has now reached $350 million or so.  Of that amount, we have
>> already satisfied approximately $100 million with plans to satisfy
>> the rest over the next week."
>
>> "Clay thinks we can raise close to $300 million without the
>> securitization proceeds over the next week.  That would satisfy

everyone by the time we file the K next Thursday.  Then, we can complete the securitization and that will give us some added cushion."

"That should be sufficient cash to allow us to avoid selling any assets at a loss which should allow us to avoid any issues with KPMG."

"We are also providing additional disclosure in the 10-K around this matter so it will be disclosed publicly next week."

"[W]e are successfully executing our plan, we did what we needed to do yesterday and our lenders are helping us and being cooperative.  That is all very positive."

Goldstone Facts ¶ 87, at 20-21 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Feb. 22, 2008, Goldstone Email at 2-3).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 22, 2008, Goldstone Email at 2-3.  "[T]he equity sales were forecasted amounts and . . . with respect to the $60 million securitization referenced in deposition exhibit 239[, Electronic Mail Transmission from Larry Goldstone to Clay Simmons at 2 (dated Feb. 25, 2008), filed August 9, 2013 (Doc. 204-105)("Goldstone Cash Flow Email"),] there [was] always the possibility that somebody [did not] want to buy [Thornburg Mortgage's] bonds."  SEC Facts ¶ T, at 4 (setting forth this fact)(internal quotation marks omitted).  See Goldstone Depo. at 145:8-150:7.[49]  "[A]n equity sale referenced on exhibit 239[, Goldstone Cash

---

[49]The Defendants respond by stating:

Undisputed that Mr. Goldstone testified as quoted, but misleading, because Mr. Goldstone also testified that Thornburg's management "had been led to believe that there was a high degree of interest in these securities, and so the risk that it wouldn't have been completed would be de minimus."

Moreover, the fact is immaterial given the undisputed fact that Thornburg succeeded in raising capital through securitizations, equity sales, and I/O strip transactions consistently between August 2007 and March 2008, including through the planned capital raises referenced in this fact.  With respect to I/O strip

Flow Email,] (a 2/22/08 e-mail from Goldstone to the audit committee outlining prospective capital raising plans) reflected a forecast equity sale subject to execution and settlement." SEC Facts ¶ U, at 4 (setting forth this fact)(internal quotation marks omitted). <u>See</u> Simmons Depo. Vol. III at 161:19-163:18.[50] "On the evening of February 21, 2008, Goldstone sent an email to Simmons, Starrett and others with draft recent developments language stating: 'So far no such [asset] sales have been required, but they are currently being contemplated.'" SEC Facts ¶ OO, at 7 (setting forth this fact)(alterations in SEC Facts but not in source)(quoting Electronic Mail Transmission from Larry Goldstone to Clay Simmons, Jane Starrett, Amy Pell, and Nathan Fellers at 5 (dated Feb. 21, 2008), filed August 9, 2013 (Doc. 204-88)("Feb. 21, 2008, Disclosure Email")). <u>See</u> Feb. 21, 2008, Disclosure Email at 5.[51]

_____

financing transactions, the SEC's fact is also immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶ MM.

Defendants Disputed Facts ¶ T, at 10-11 (citations omitted). Because the Defendants do not dispute this fact, and because asserting that a fact is immaterial does not dispute it, the Court finds the fact undisputed.

[50]The Defendants respond by stating: "Undisputed, but misleading and immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶ T." Defendants Disputed Facts ¶ U, at 11. Because the Defendants do not dispute this fact, and because materiality will be addressed, if necessary, in the Analysis, the Court finds this fact undisputed.

[51]The SEC responds by stating:

Undisputed, but misleading and immaterial because on February 22, 2008, Mr. Goldstone sent an email to the same recipients stating that Thornburg "was not feeling a need to sell assets to shrink our financing book at this time. We have other ideas to raise cash that are better than having to sell."

Further, Mr. Goldstone explained the February 21, 2008 email as follows:

Thornburg was engaged in strategies, in -- formulating strategies to raise liquidity. I believe that there are documents that very clearly lay out what the seven or eight or nine different strategies were that we were primarily focused on, and none of those included the sale

- 52 -

> Thornburg decided not to pursue the sale of assets as a means of increasing liquidity and instead focused on other cash-raising strategies. [T]o raise liquidity, Thornburg had "seven or eight or nine different strategies . . . that we were primarily focused on, and none of those included the sale of assets." [Neither] Mr. Goldstone [n]or any other member of Thornburg's senior management considered selling assets at a loss between February 22, 2008 and the filing of Thornburg's Form 10-K on February 28, 2008.

Goldstone Facts ¶ 88, at 21 (setting forth this fact)(alterations in Goldstone Fact but not in source)(quoting Goldstone Depo. at 135:2-4).   See Goldstone Decl. ¶ 43, at 8-9; Goldstone Depo. at 134:24-135:4; Feb. 22, 2008, Goldstone Email at 2-3; Feb. 25, 2008, Goldstone Email at 2; Goldstone Cash Flow Email at 2; Electronic Mail Transmission from Clay Simmons to Larry Goldstone at 2 (dated Feb. 27, 2008), filed August 9, 2013 (Doc. 204-130).[52]

---

> of assets.   But to suggest that we weren't also thinking about a potential need to sell assets, should the need arise, it would be imprudent for me as a CEO to not think of every possible strategy that might be available under the sun in order to raise liquidity, and selling assets just might be one of those.   It was also not unusual, in terms of crisis, I think I mentioned to you earlier in 1993, 1997, 2007, and now again in 2008, during every one of those crisis periods, when the company needed to think about liquidity issues, it had a process for evaluating its portfolio to look for assets that may be undervalued by repo lenders or overhaircutted by repo lenders as a potential source of liquidity.   Just standard operating procedure in crisis mode.

> Ex. 279 (Goldstone Tr. 134:24-135:19).

Defendants Disputed Facts ¶ OO, at 20-21 (setting forth this fact)(citations omitted).   Because the Defendants do not dispute this fact, and because asserting that a fact is immaterial does not dispute it, the Court finds this fact undisputed.

[52]The SEC attempts to dispute this fact by stating: "Thornburg sold I/O Strip assets to increase liquidity in February 2008.   Defendant Goldstone testified that selling assets at a loss was one of several possible strategies considered as a potential source of liquidity on February 22-24, 2008 and during 'crisis periods.'"   SEC Disputed Facts ¶ 88, at 233.   The SEC cites the expert report of Dale Kitchens and to the 1st RFAs.   In his report, Kitchens opines that the purpose of selling the I/O Strip Transactions was to pay the outstanding margin calls and not to take advantage of favorable prices.   See Report of the Opinions of Dale Kitchens at 64-67 (dated Oct. 7, 2013), filed November 6, 2013 (Doc. 231-2)("Kitchens Report").   In the 1st RFAs, the

SEC admits that the I/O Strip Transactions were not sales of purchase ARM assets, but states that the Defendants referred to the I/O Strip Transactions as sales.  See 1st RFAs at 9-11.

The Defendants reply by arguing that the SEC's response concerning the I/O Strip Transactions is immaterial, because the Court rejected the SEC's argument that the I/O Strip Transactions were assets in ruling on the Motion to Dismiss on Behalf of Defendants Larry Goldstone and Clarence G. Simmons and Memorandum of Law in Support, filed May 21, 2012 (Doc. 35), and Defendant Jane Starrett's Motion to Dismiss and Memorandum of Points and Authorities in Support, filed May 21, 2012 (Doc. 36).  See Goldstone Reply Facts ¶ 88, at 39. They also argue that Goldstone never testified about considering selling assets at a loss.  See Goldstone Reply Facts ¶ 88, at 39.  The Defendants contend that the SEC's own admissions are not competent evidence, because they are hearsay.  See Goldstone Reply Facts ¶ 88, at 39-40 (citing 8B C. Wright &  A. Miller, Federal Practice and Procedure § 2264 (3d 1970); Luster v. Ill. Dep't of Corr., 652 F.3d 726, 731 n.2 (7th Cir. 2011)).  Finally, the Defendants argue that the Court should not rely on Kitchens' report for the reasons set out in the Defendants' Motion to Exclude Evidence and Claims Presented in Plaintiff's Oppositions to Defendants' Motions for Summary Judgment, filed January 31, 2014 (Doc. 254)("MTE").  Goldstone Reply Facts ¶ 88, at 40.

The Court will consider the Kitchens Report, but finds that the SEC has not specifically controverted the Defendants' asserted fact.  At the August 13, 2014, hearing, after the parties finished arguing the Goldstone MSJ, the Starrett MSJ, the SEC Goldstone Response, and the SEC Starrett Response, the Court asked the parties what it wanted to do with the remaining motions, including the MTE, the Defendants' Motion to Exclude the Proffered Expert Testimony of Lawrence Weiner, Dale Kitchens, and Michael Mayer, filed May 9, 2014 (Doc. 292)("Defendants' MTE Experts"), the Plaintiff Securities and Exchange Commission's Motion to Exclude and/or Limit Testimony of Christopher Laursen, Joseph J. Floyd, William W. Holder, Steven M. Hilfer, and Christopher M. James, filed May 9, 2014 (Doc. 291)("SEC MTE Experts"), and the Plaintiff Securities and Exchange Commission's Motion to Strike Errata Changing Testimony of Defendants' Proposed Experts Christopher Laursen and Christopher James, filed June 2, 2014 (Doc. 300)("Motion to Strike").  Transcript of Hearing at 941:3-19 (taken Aug. 13 2014)(Lee, Court), filed August 28, 2014 (Doc. 335)("Tr.").  The Court told the parties that it could: (i) put off ruling on the other motions and let the Court do "with the experts . . . whatever [the Court] decide[s] to do"; (ii) argue the other motions and then rule on the other motions as issues arise in ruling on the summary judgment motions; or (iii) have a hearing on the other motions and formally decide them by writing separate memorandum opinion and orders for each motion before resolving the summary judgment motions.  Tr. at 942:8-943:19.  The Defendants and the SEC agreed that the Court should adopt the first option.  See Tr. at 944:13-25 (Marks, McKenna, Court).  Based on the parties' agreement, the Court will not rule on the MTE, the Defendants' MTE Experts, the SEC MTE Experts, or the Motion to Strike.  The Court will, thus, consider the expert witness reports in ruling on the motions for summary judgment.

Even considering Kitchens' report, the SEC's evidence does not specifically controvert the Defendants' asserted fact.  First, the SEC contends that Goldstone testified that selling assets at a loss was a possible strategy as a source of liquidity.  See SEC Disputed Facts ¶ 88, at 10. The SEC does not, however, cite any of Goldstone's deposition testimony to support this contention.  The local rules state: "Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M.LR-Civ.

On February 22, 2008, Mr. Goldstone and Mr. Simmons participated in an executive session of the Audit Committee. The Audit Committee members present were Francis Mullin (Chairman of the Audit Committee), Anne-Drue Anderson, David Ater and Stuart Sherman. In the executive session, Mr. Simmons mentioned the Citigroup margin call and described [the discussion with Citigroup to pay the margin call over the course of the following week].

Goldstone Facts ¶ 89, at 21 (setting forth this fact). <u>See</u> Thornburg Mortgage, Inc. Minutes of a

Meeting of the Audit Committee at 3 (dated Feb. 22, 2008), filed August 9, 2013

(Doc. 204-93)("Feb. 22, 2008, Audit Committee Minutes"); Mullin Decl. ¶ 15, at 4; Ater Decl.

¶ 10, at 3.[53]  "Goldstone understood that the payment plan that Thornburg reached with Citibank

---

56.1(b). Because the SEC fails to cite the portion of the record on which it relies, the Court should deem the fact undisputed. In any case, the SEC is likely referring to a portion of Goldstone's deposition testimony in which he testified that Thornburg Mortgage "had a process for evaluating its portfolio to look for assets that may be undervalued by repo lenders or overhaircutted by repo lenders as a potential source of liquidity." Goldstone Depo. at 135:11-19. This testimony does not show that Thornburg Mortgage considered selling assets at a loss, but, rather, that Thornburg Mortgage contemplated selling assets to raise liquidity if the sale was a good deal. Second, Kitchens' report does not controvert the Defendants' asserted fact. Kitchens' report stands for the proposition that the I/O Strip Transactions were done to increase liquidity in response to Thornburg Mortgage's margin calls. <u>See</u> Kitchen Report at 64-67. The report does not, however, answer the question whether the I/O Strip Transactions were considered the sale of assets. In its admissions, the SEC "admits that the I/O STRIP TRANSACTIONS were not sales of PURCHASED ARM ASSETS for accounting purposes." 1st RFAs at 9-11. Accordingly, even if the I/O Strip Transactions were conducted to meet Thornburg Mortgage's margin calls, and even if they resulted in a loss, they did not constitute the sale of assets. The SEC thus fails to specifically controvert the Defendants' asserted fact, and the Court finds it undisputed.

[53]The Defendants' fact states:

On February 22, 2008, Mr. Goldstone and Mr. Simmons participated in an executive session of the Audit Committee. The Audit Committee members present were Francis Mullin (Chairman of the Audit Committee), Anne-Drue Anderson, David Ater and Stuart Sherman. In the executive session, Mr. Simmons mentioned the Citigroup margin call and described the agreement with Citigroup to pay the margin call over the course of the following week.

Goldstone Facts ¶ 89, at 21. The SEC disputes this fact by stating: "The evidence does not establish any agreement to allow Thornburg to satisfy the Citi margin call over time during February 2008. KPMG was excluded from this executive session of the Audit Committee."

was outside the terms of the agreement."  SEC Facts ¶ D, at 1-2 (setting forth this fact)(internal

quotation marks omitted).  See Goldstone SEC Depo. at 220:11-19.[54]

> . . . . Citibank could have verbally agreed to a payment plan and then could have
> woken up the next day and decided that they didn't like what they had agreed to
> and declared us in default that way.  They had every right to do that but they
> chose not to.
>
> [I]n the days leading up to Thornburg's filing of its 10-K on February 28, 2008,
> Citibank [and other lenders] had the right to declare Thornburg in default[.]

---

SEC Disputed Facts ¶ 89, at 10.  The Court agrees that there is no evidence of an agreement
between Citigroup Global and Thornburg Mortgage to permit Thornburg Mortgage to pay the
margin call over time.  See supra note 11.  The Court will thus modify the Defendants' asserted
fact.  The Court finds the rest of the fact undisputed.  The SEC's response that KPMG was
excluded from the session does not specifically controvert the asserted fact, because the
Defendants do not assert that KPMG was present.

> [54]The Defendants attempt to dispute this fact by stating:
>
> Disputed.  Mr. Goldstone testified that Thornburg and Citibank reached "verbal
> agreements" that were "memorialized" by the "fact that [Citibank] chose not to
> [issue a default notice and liquidate collateral]."  Mr. Goldstone also testified that
> he "understood the [reservation of rights] letter from [Citibank] to be a formality,
> and an acknowledgment that Citigroup did not intend to declare Thornburg in
> default so long as the Company satisfied the margin call in accordance with our
> agreed upon payment plan."
>
> Moreover, the fact is immaterial for the reasons set forth in Defendants' Response
> to SEC SMF ¶ C.   In addition, the fact is immaterial because the Court ruled that
> "the Citigroup Global Repo Agreement expressly allowed Thornburg Mortgage to
> negotiate payment plans for margin calls, allowing Thornburg Mortgage to meet
> margin calls over a period of time."

Defendants Disputed Facts ¶ D, at 3 (alterations in Defendants Disputed Facts but not in source).
This assertion does not dispute the SEC's asserted fact.  First, it is disputed whether Citigroup
Global and Thornburg Mortgage had an agreement to allow Thornburg Mortgage to pay its
margin call over a period of time.  Second, even if there was an agreement, it would be an
additional agreement that permitted conduct that was outside the original lending agreement.
The Defendants do not assert that paying the margin call over time was within the original
lending agreement.  Additionally, materiality is an issue that will be discussed, if necessary, in
the Analysis.  Asserting that a fact is immaterial does not dispute it.  Consequently, the Court
finds the fact undisputed.

. . .

Again, . . . the . . . nature of the margin and pricing action -- or margin and pricing components of these repo agreements [-- are highly discretionary].   There is nothing contractual in any of these repo agreements that specifies a margin or a price -- nothing.  So any one of these repo dealers can call up any one of their lending counterparties on any given day and they can say, "You know what? Your securities that we valued at par today are worth 20 cents on the dollar and the margin that we assigned at 5 percent yesterday is 100 percent today and we demand the money."  And there is no recourse against those kinds of behaviors -- none.

SEC Facts ¶ E, at 2 (setting forth this fact)(quoting Goldstone SEC Depo. at 252:15-23, 255:1-12).  See Goldstone SEC Depo. at 252:15-23, 255:1-12.[55]  "It was not uncommon for the

---

[55]The Defendants attempt to dispute this fact by stating:

Undisputed that Mr. Goldstone provided the testimony quoted, but misleading, as Mr. Goldstone also testified as follows:

> I do not recall a situation in which a lender agreed to a payment plan and then subsequently declared the Company in default where the Company met its payment obligations under the plan.  As a result, I did not view reservation of rights letters issued by lenders who had agreed to payment plans as having any financial consequences for the Company, nor did I regard them as significant.
> . . . .
>
> I believed Citigroup also understood our business and that we would not have sufficient cash to satisfy such a call in one day, and I fully expected that Citigroup would work with Thornburg on a plan to satisfy the call given Citigroup's longstanding lending relationship with the Company.  Citigroup was a member of the core group of repo lenders that had worked cooperatively with the Company in August 2007.

Ex. 268 (Goldstone Decl. ¶¶ 8, 16).

Moreover, the fact is immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶ C.

Audit Committee to meet in executive session, either with or without management present, or

with or without KPMG present, for purposes of discussing matters that were specifically

pertinent to the Audit Committee."  Goldstone Facts ¶ 90, at 21 (setting forth this fact).  <u>See</u> SEC

Disputed Facts at 1-51 (not disputing this fact); Mullin Decl. ¶ 14, at 4; Ater Decl. ¶ 10, at 3.

> No one on Thornburg's Board -- including the directors on the Audit
> Committee -- raised concerns about Thornburg's accounting for impaired assets,
> its ability to continue as a going concern based on the margin calls received
> between February 14 and February 27, 2008, or its strategies for meeting those
> margin calls and raising additional cash and capital.  Audit Committee members
> have testified that, at the time of the 10-K filing, the Audit Committee's view was
> that Thornburg would be able to continue as a going concern for the foreseeable
> future based on, among other things, the Company's existing plans to raise cash
> and capital in the near term.

Goldstone Facts ¶ 91, at 21-22 (setting forth this fact).  <u>See</u> SEC Disputed Facts at 1-51 (not

disputing this fact); Mullin Decl. ¶¶ 8, 11-12, 15, 20, at 3-5; Ater Decl. ¶¶ 5, 9-10, at 2-3;

Simmons Decl. ¶ 28, at 7; Goldstone Decl. ¶¶ 13, 21-22 at 2-4.

**7.**     **<u>Thornburg Mortgage's Plans to Increase Liquidity Through a Securitization
and Capital Raise.</u>**

On February 15, 2008, Goldstone sent Thornburg Mortgage's Board an electronic mail

transmission stating that "'Nate and Deborah[, Thornburg's Senior Vice President of Structured

Finance,] recently returned from a securitization conference and we [Thornburg Mortgage] were

apparently the only bright spot.  They met with over 40 of our securitization buyers and

prospective investors and got a very good response to our securities.'"  Goldstone also "informed

the Board that Thornburg planned to launch a $600 million securitization during the week of

February 18, 2008, with the potential to increase the size of the transaction to $1 billion

depending on investor interest."  Goldstone Facts ¶ 92, at 22 (setting forth this fact)(quoting

---

Defendants Disputed Facts ¶ E, at 3-4.  Because the Defendants do not dispute this fact, and
because asserting that a fact is immaterial does not dispute it, the Court finds this fact
undisputed.

Electronic Mail Transmission from Larry Goldstone to Garret Thornburg, Anne Drue Anderson, David A. Ater, Eliot R. Cutler, Francis I Mullin III, Ike Kalangis, Michael B. Jeffers, Owen Lopez, and Stuart Sherman at 3 (dated Feb. 15, 2008), filed August 9, 2013 (Doc. 204-49)("Feb. 15, 2008, Goldstone Email").  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 15, 2008, Goldstone Email at 3.  "In the week before the 10-K filing, Thornburg received positive feedback on the prospects of its upcoming capital raise and securitization from the company's investment bankers at UBS and [FBR]."  Goldstone Facts ¶ 93, at 22 (setting forth this fact).  See SEC Disputed Facts (not disputing this fact); Simmons Depo. Vol. II at 363:10-364:4; Goldstone SEC Depo. at 261:20-23; Starrett SEC Depo. at 157:20-25.  "In addition, Mr. Simmons believed that 'there was a lot of fundamental positive evidence.  Interest rates were going lower.  So financing rates would be going lower,' which he believed would benefit MBS values."  Goldstone Facts ¶ 94, at 22 (setting forth this fact)(quoting Simmons Depo. Vol. II at 364:1-3).  See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo. Vol. II at 155L:21-22, 253:25-254:10, 364:1-3; Simmons Decl. ¶ 51, at 11-12.  On February 25, 2008, Goldstone sent Thornburg Mortgage's Board an electronic mail transmission stating,

> "[It] looks like we can complete a $1 billion transaction, up from our expectation of $600 million as our loan collateral continues to be in demand.  We may be the only issuer in this market."  Mr. Goldstone informed the Board that 'it looks like we will be filing our 10-K on Thursday [February 28, 2008] and on Friday we intend to price our February securitization."

Goldstone Facts ¶ 95, at 22 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Feb. 25, 2008, Goldstone Email at 2).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 25, 2008, Goldstone Email at 2.

"Thornburg closed the securitization for approximately $1 billion on March 3, 2008, and used the proceeds to reduce the company's warehouse credit lines by roughly $920 million and

to enhance Thornburg's liquidity position."  Goldstone Facts ¶ 96, at 23 (setting forth this fact).

See SEC Disputed Facts at 1-51 (not disputing this fact); Company Release, Thornburg

Mortgage Finances Nearly $1.0 Billion of Prime Hybrid ARMs in Securitization Transaction at 2

(dated Mar. 3, 2008), filed August 9, 2013 (Doc. 204-254); Electronic Mail Transmission from

Jane Starrett to Jennifer Hall and Cynthia Reinhart at 2 (dated Mar. 3, 2008), filed August 9,

2013 (Doc. 204-164).  "Bear Stearns, CSFB, and Greenwich participated in the securitization by

serving as placement agents for the securities created in this transaction."  Goldstone Disputed

Facts ¶ 97, at 23 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this

fact); Electronic Mail Transmission from David Zawitz at 4 (dated Mar. 3, 2008), filed August 9,

2013 (Doc. 204-167).

> Mr. Goldstone informed the Board in emails on February 15 and 22, 2008 that he
> had discussed "a $300 to $500 million capital raise in early March" with
> investment bankers at UBS and FBR, and that as of February 21, 2008, "they
> were still on board with getting one done' after Thornburg's 2007 Form 10-K had
> been filed and 'absorbed into the market."

Goldstone Facts ¶ 98, at 23 (setting forth this fact)(quoting Feb. 22, 2008, Goldstone Email at 3).

See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 22, 2008, Goldstone Email at 3;

Feb. 15, 2008, Goldstone Email at 2.

On February 25, 2008, Goldstone wrote an electronic mail transmission report to

Thornburg Mortgage's Board stating:

> "We met with underwriters today and we are in position to begin a new capital
> raise next Monday.  We hope to raise $300 to $500 million, or more next week.
> The underwriters will be UBS, FBR, DeutscheBank, and Bear Stearns.
> Co-managers will be JMP Securities, KBW, Piper Jaffray and Jefferies.  It is a
> very strong lineup as we want a very strong capital raise."

Goldstone Facts ¶ 99, at 23 (setting forth this fact)(quoting Feb. 25, 2008, Goldstone Email at 2).

See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 25, 2008, Goldstone Email at 2.

On February 25, 2008, Starrett "circulated a draft of Thornburg's Form 10-K that included draft Recent Developments language to Craig Campbell of FBR, Halle Benett of UBS, and a corporate securities lawyer from Clifford Chance, counsel to the underwriters, all of whom were working on the capital raise."  Starrett's "cover email specifically flagged 'page 32 of the attached draft for disclosure of proposed language for Recent Developments.'"  Goldstone Facts ¶ 100, at 23 (setting forth this fact)(quoting Electronic Mail Transmission from Jane Starrett to Clay Simmons, Larry Goldstone, Craig Campbell, Halle Benett, Jacob Farquharson, and Sheri Fox at 2 (dated Feb. 25, 2008), filed August 9, 2013 (Doc. 204-109)("Feb. 25, 2008, Starrett Email"). See SEC Disputed Facts at 1-51 (not disputing this fact); Feb 25, 2008, Starrett Email at 2; Simmons Decl. ¶ 34, at 8.  The draft disclosure "disclosed, among other things, that Thornburg 'met margin calls in excess of $350 million' since February 14, 2008, the company's 'substantially reduced cash and unpledged securities to meet further margin calls,' and the possibility that Thornburg 'might need to selectively sell assets in order to raise cash.'"  Goldstone Facts ¶ 101, at 23-24 (setting forth this fact)(quoting Feb. 25, 2008, Starrett Email at 9).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 25, 2008, Starrett Email at 2, 9).  "Mr. Goldstone and Mr. Simmons considered these investment bankers to be experienced securities market professionals and valued their opinions."  Goldstone Facts ¶ 102, at 24 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone Decl. ¶ 40, at 8; Simmons Decl. ¶ 35, at 8.  "[O]n February 21, 2008 '[t]here was a concern about making this type of disclosure [the delay in meeting margin calls] at this point in time . . . .'"  SEC Facts ¶ DD, at 5 (setting forth this fact)(alterations in SEC Facts but not in source)(quoting Goldstone Depo. at 115:25-116:1).  See Goldstone Depo. at 115:18-116:1.[56]  "'It

---

[56]The Defendants attempt to dispute this fact by stating:

was also Thornburg's preference to make as few disclosures as possible, given the requirements

to disclose, as it might make.'"   SEC Facts ¶ EE, at 5 (setting forth this fact)(quoting Goldstone

Depo. at 116:10-12).   See Goldstone Depo. at 116:10-12.[57]

---

> Disputed.   The testimony is cited out of context which renders it misleading. Mr. Goldstone testified as quoted "in connection with [the] securitization that Thornburg was undertaking" -- not the Form 10-K filing.   Thornburg had no obligation to move forward with the securitization at any time, and thus had no duty to make a disclosure about margin calls or any other subject at that time. Mr. Goldstone also explained that "[t]his would have constituted, in my view, an incomplete disclosure, if it had been made at that point in time. . . . [W]e believed that . . . we had a plan that would generate sufficient liquidity to successfully meet all of those margin calls.   And so, making a disclosure of this type, sort of in the middle of executing that plan, in my mind, would have been problematic."
>
> Moreover, the fact is immaterial because the Court found in ruling on Defendants' motion to dismiss that there was no duty to disclose Thornburg's so-called difficulty meeting margin calls in the Form 10-K.

Defendants Disputed Facts ¶ DD, at 14 (citations omitted).   This assertion does not dispute the SEC's asserted fact.   The SEC does not assert that Goldstone's concerns involved disclosures surrounding the 2007 Form 10-K filing rather than the securitization.   Moreover, the Court has included this fact in the factual section involving Thornburg Mortgage's securitization and capital raising.   Finally, asserting that a fact is immaterial does not dispute it.   Accordingly, the Court finds the fact undisputed.

> [57]The Defendants attempt to dispute this fact by stating:
>
> Disputed.   The testimony is cited out of context, which renders it misleading. Mr. Goldstone testified that "it was Thornburg's preference to make complete disclosures to investors, not incomplete disclosures.   It was also Thornburg's preference to make as few disclosures as possible, given the requirements to disclose, as it might make," referring to the fact that a disclosure at that point in time would have needed to be corrected within a matter of days, and that Thornburg would prefer to wait for the outcome to be known so that it need not make multiple filings with the SEC.
>
> Moreover, the fact is immaterial because the Court found in ruling on Defendants' motion to dismiss that there was no duty to disclose Thornburg's so-called difficulty meeting margin calls in the Form 10-K.

"At the time of the 10-K filing on February 28, 2008, Mr. Goldstone and Mr. Simmons expected Thornburg to complete the capital raise in the range of $300 to $500 million during the week of March 3, 2008."   Goldstone Facts ¶ 103, at 24 (setting forth this fact).   See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 25, 2008, Goldstone Email at 2; Feb. 21, 2008, Simmons Email at 2; Simmons Decl. ¶ 64, at 15; Goldstone Decl. ¶ 43, at 8-9.

> [No one] either inside or outside of Thornburg -- including KPMG or Thornburg's investment bankers (or their counsel at Clifford Chance) -- expressed concern before the 2007 10-K filing about the Recent Developments' description of the company's liquidity position as "reduced," nor did anyone suggest making additional disclosures about Thornburg's liquidity and volume of margin calls.

Goldstone Facts ¶ 104, at 24 (setting forth this fact).[58]

### 8.   Interest Only Strip Financing Transactions.

"An 'I/O strip' is a[n] AAA-rated tranche of a mortgage securitization that consists of a 'contractual right to receive some or all of the interest due on a bond, mortgage loan, collateralized mortgage obligation, or other interest-bearing financial asset.'   I/O 'stands for interest only.'"   Goldstone Facts ¶ 105, at 24 (setting forth this fact)(quoting FAS 156: Accounting for Servicing of Financial Assets and Amendment of FASB Statement No. 140 at 3,

---

Defendants Disputed Facts ¶ EE, at 14-15 (citations omitted).  This assertion does not dispute the SEC's asserted fact.   Goldstone's testimony referred to disclosures in connection with the securitization efforts, and, because the Court has included the fact in its factual section that concerns securitization, the fact is not out of context.   That Thornburg Mortgage had a preference to make complete disclosures is an additional fact that does not dispute the SEC's asserted fact.  Furthermore, asserting that a fact is immaterial does not dispute it.  Consequently, the Court finds the fact undisputed.

[58]The SEC attempts to dispute this fact by stating: "Defendants did not disclose material information to KPMG about Thornburg's ability to timely meet margin calls and otherwise distressed financial condition, which would have affected KPMG's analysis and Thornburg's disclosures."  SEC Disputed Facts ¶ 104, at 10.  This assertion does not specifically controvert the Defendants' asserted fact.   While KPMG might have had concerns about Thornburg Mortgage's liquidity if Thornburg Mortgage had fully disclosed information concerning its inability to timely meet its margin calls, because Thornburg Mortgage did not disclose such information to KPMG, no one expressed concerns before the 2007 Form 10-K was filed.  The Court thus finds the fact undisputed.

filed August 9, 2013 (Doc. 204-221)("FAS 156")).   See SEC Disputed Facts at 1-51 (not

disputing this fact); FAS 156 at 3; Starrett Depo. at 177:25-178:5.   "Thornburg's I/O strips were

'exclusively' backed by 'first lien prime quality ARM Loans either originated or purchased by

[Thornburg Mortgage] and Hedging Instruments.'"   Goldstone Facts ¶ 106, at 24 (setting forth

this fact)(quoting 2007 Form 10-K at 45).   See SEC Disputed Facts at 1-51 (not disputing this

fact); 2007 Form 10-K at 45.   "In the ordinary course of business, Thornburg sold certain

tranches of its securitizations, including I/O strips, but retained control of the underlying assets."

Goldstone Facts ¶ 107, at 24-25 (setting forth this fact).   See Sec Disputed Facts at 1-51 (not

disputing this fact); Simmons Depo. Vol. II at 292:12-293:10, 295:7-24.   "[U]nder Generally

Accepted Accounting Principles ('GAAP') (and specifically, FAS 140), these bond sales are

accounted for as financings, in the form of the issuance of collateralized borrowings -- not as

sales of assets."   Goldstone Facts ¶ 108, at 25 (setting forth this fact).   See 1st RFAs at 9-11;

2007 Form 10-K at 36; Simmons Depo. Vol. II at 292:20-293:4, 293:16-21; Starrett Depo. at

178:20-179:12, 181:11-21.[59]   Simmons believed that

---

[59]The SEC attempts to dispute this fact by stating:

> The I/O Strip Transactions were referred to as sales by Defendants and others at
> Thornburg, constituted sales, and, regardless, were a relevant factor to be
> considered in a proper [other-than-temporary-impairment ("OTTI")] analysis
> because "selling assets to generate cash with the objective to pay short-term
> commitments is akin to a company selling essential manufacturing equipment to
> generate cash to pay the bills."

SEC Disputed Facts ¶ 108, at 10.   To dispute the Defendants' asserted fact, the SEC cite a
portion of Kitchens' report in which he opines that Thornburg Mortgage's purpose in conducting
the I/O Strip Transactions was to pay the outstanding margin calls and not to take advantage of
favorable pricing.   See Kitchens Report at 64-67.   The Defendants also cite the SEC's
admissions.   The SEC, there, "admits that the I/O STRIP TRANSACTIONS were not sales of
PURCHASED ARM ASSETS for accounting purposes."   1st RFAs at 9-11.   Accordingly, the
SEC's cited evidence either supports the Defendants' asserted fact or does not address it.   The
Court thus finds the fact undisputed.

the I/O strips were appreciating in value in February 2008 due in part to rising interest rates and tightening underwriting guidelines, which were perceived by the market to make refinancing non-agency eligible mortgages more difficult for borrowers and led some in the market to conclude that there would be fewer prepayments of the mortgage loans underlying Thornburg's I/O strips.

Goldstone Facts ¶ 109, at 25 (setting forth this fact).  See Simmons Decl. ¶¶ 42-43, at 9-10;

Simmons Depo. Vol. II at 304:11-19.[60]  Simmons believed that

the loans underlying Thornburg's I/O strips would not have difficulty being refinanced because Thornburg's borrowers were creditworthy.  This led him to conclude the market would overvalue Thornburg's I/O strips, making it "valuable to the company" to move the I/O strips being used as collateral for its repo borrowings from repo financing to permanent financing by issuing them into the market as Collateralized Mortgage Debt.

Goldstone Facts ¶ 110, at 25 (setting forth this fact)(quoting Simmons Depo. Vol. II at 304:20-22).  See Simmons Depo. Vol. II at 304:11-22; Simmons Decl. ¶ 43, at 10.[61]

---

[60]The SEC attempts to dispute this fact by stating:

The I/O Strip Transactions were referred to as sales by Defendants and others at Thornburg, constituted sales, and, regardless, were a relevant factor to be considered in a proper OTTI analysis because "selling assets to generate cash with the objective to pay short-term commitments is akin to a company selling essential manufacturing equipment to generate cash to pay the bills."

SEC Disputed Facts ¶ 109, at 10-11.  This assertion does not address the Defendants' asserted fact, much less dispute it.  Accordingly, the Court finds the fact undisputed.

[61]The SEC attempts to dispute this fact by stating:

The I/O Strip Transactions were referred to as sales by Defendants and others at Thornburg, constituted sales, and, regardless, were a relevant factor to be considered in a proper OTTI analysis because "selling assets to generate cash with the objective to pay short-term commitments is akin to a company selling essential manufacturing equipment to generate cash to pay the bills."

SEC Disputed Facts ¶ 110, at 11.  This assertion does not specifically controvert the Defendants' asserted fact.  The SEC's assertion only tangentially addresses the Defendants' asserted fact with its manufacturing equipment analogy.  Accordingly, the Court finds the fact undisputed.

> Issuing the I/O strips as Collateralized Mortgage Debt enabled Thornburg "to
> make more efficient use of [its] capital because these financings are not subject to
> margin calls and, therefore, the capital requirement to support these financings is
> less than the amount . . . require[d] to support the same amount of financings in
> the Reverse Repurchase Agreement or asset-backed [commercial paper] markets."

Goldstone Facts ¶ 111, at 25 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting 2007 Form 10-K). See 2007 Form 10-K at 10, 21, 27, 29-30.[62] "[T]he I/O strip financing transactions were a contributing factor toward the company's liquidity and that liquidity is one of the principal considerations in the assessment of whether the company could meet margin calls." Starrett Facts ¶ 48, at 11 (setting forth this fact)(internal quotation marks omitted). See Hall Depo. at 428:20-429:19.[63] "Simmons told Reinhart that the I/O Strip Transactions were entered into to take advantage of favorable pricing and KPMG was further

---

[62]The SEC attempts to dispute this fact by stating:

> The I/O Strip Transactions were referred to as sales by Defendants and others at
> Thornburg, constituted sales, and, regardless, were a relevant factor to be
> considered in a proper OTTI analysis because "selling assets to generate cash with
> the objective to pay short-term commitments is akin to a company selling
> essential manufacturing equipment to generate cash to pay the bills."

SEC Disputed Facts ¶ 111, at 11. This assertion does not address, much less specifically controvert, the Defendants' asserted fact. The Court thus finds the fact undisputed.

[63]The SEC attempts to dispute this fact by stating:

> Thornburg sold I/O Strip assets to meet otherwise unmeetable margin calls in
> February 2008, but did not disclose to KPMG that this was the intended purpose.
> Rather, Thornburg claimed the sales were to take advantage of pricing
> opportunities. KPMG specifically asked about the I/O Strip Transactions.
> Ms. Hall testified that the I/O Strip Transactions were asset sales to meet margin
> calls, which should have been disclosed to KPMG so they could consider them.

SEC Disputed Starrett Facts ¶ 48, at 7. The SEC does not dispute that the I/O Strip Transactions contributed to Thornburg Mortgage's liquidity or that liquidity is the principal consideration in assessing whether a company could meet its margin calls. Consequently, the SEC fails to dispute this fact, and the Court finds it undisputed.

told that the sales were for reasons other than immediate liquidity needs." SEC Facts ¶ JJ, at 6 (setting forth this fact)(internal quotation marks omitted). See Reinhart SEC Depo. at 85:10-86:7; Memorandum from Jenifer Hall, KPMG Engagement Senior Manager, to Thornburg Restatement Workpapers at 3 (dated Mar. 9, 2008, Mar. 20, 2008, & Mar. 27, 2008), filed August 9, 2013 (Doc. 204-216)("March 9, 2008, Restatement Workpaper").[64]

---

[64]The Defendants attempt to dispute this fact by stating:

Disputed. The fact is not supported by the evidence cited. Ms. Reinhart testified that she "had conversations with Mr. Simmons about that as well in terms of being opportunistic in the marketplace," not that the sole purpose of the I/O Strip Transactions was to take advantage of favorable pricing. The Market Events Memo states that "management" -- not specifically Mr. Simmons or any of the Defendants -- told KPMG that the "sales were for reasons other than immediate liquidity needs."

The fact is also immaterial because KPMG was aware of Thornburg's liquidity situation, and KPMG identified the I/O strip transactions as a positive factor supporting Thornburg's OTTI conclusion.

The fact is also immaterial because by the time KPMG concluded its work on the Thornburg restatement, KPMG was aware of all material facts -- including that Thornburg had used proceeds from the I/O strips as one source of cash to satisfy margin calls before the 10-K filing -- yet concluded that it did not have concerns about management's integrity, that there was no material weakness in Thornburg's internal controls, and that there had been no fraud by Thornburg's management.

Defendants Disputed Facts ¶ JJ, at 16-17 (citations omitted). This assertion does not dispute the SEC's asserted fact. The Defendants appear to make up their own asserted fact and then dispute that straw-man fact. The SEC asserts that Simmons told Reinhart that the I/O Strip Transactions were effectuated to take advantage of favorable pricing. The Defendants dispute, however, that the sole reason that Thornburg Mortgage entered into the I/O Strip Transactions was to take advantage of favorable pricing. The SEC does not assert that taking advantage of favorable pricing was the sole reason for the transactions, and the Defendants do not assert that Simmons did not tell Reinhart that favorable pricing was the reason for the transactions. Additionally, while the March 9, 2008, Restatement Workpaper does not state that Simmons was the one who passed on this information, Reinhart testified that she received this information through a conversation with Simmons. Finally, asserting that a fact is immaterial does not dispute it. Accordingly, the Court finds the fact undisputed.

Reinhart . . . was not aware that Thornburg's sale of the interest only securities was part of a plan to meet the Citibank margin call, that information would have been important for KPMG to know in the context of analyzing temporary impairment, and the sale of interest only strips to pay off the Citibank margin call would be inconsistent with what she was told by Clay Simmons and Shawn Buniel.

SEC Facts ¶ MM, at 6 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See Reinhart SEC Depo. at 151:3-152:13.[65]

---

[65]The Defendants attempt to dispute this fact by stating:

Disputed.  The evidence lacks foundation insofar as Ms. Reinhart is testifying in response to a question about "a plan" that has not been independently established by the evidence.  The evidence is inadmissible hearsay insofar as Ms. Reinhart is testifying as to the substance of what Shawn Buniel purportedly told her.  Further disputed in that the use of I/O Strips to improve liquidity was not inconsistent with what Ms. Reinhart and KPMG knew before the 2007 Form 10-K filing.

Ms. Reinhart's hindsight testimony that it "would have been important for KPMG to know" the purpose of the I/O strip financing transactions is immaterial because it is not a basis of liability under Rule 13b2-2, and because the undisputed evidence establishes that KPMG was provided information regarding the purpose of the I/O strip financing transactions before the Form 10-K filing. KPMG was aware of Thornburg's liquidity situation, and KPMG identified the I/O strip transactions as a positive factor supporting Thornburg's OTTI conclusion.

The fact is also immaterial because by the time KPMG concluded its work on the Thornburg restatement, KPMG was aware of all material facts -- including that Thornburg had used proceeds from the I/O strips as one source of cash to satisfy margin calls before the 10-K filing -- yet concluded that it did not have concerns about management's integrity, that there was no material weakness in Thornburg's internal controls, and that there had been no fraud by Thornburg's management..

Defendants Disputed Facts ¶ MM, at 19-20 (citations omitted).  This assertion does not dispute the SEC's asserted fact.  First, the SEC does not assert that Thornburg Mortgage had a plan to pay the margin call, but only that Reinhart was unaware of the plan.  The electronic mail transmission, however, supports that Thornburg Mortgage had a plan.  Second, Reinhart's testimony is not hearsay.  She does not testify about Buniel's statements for the truth of those statements, but to say that his statements are inconsistent with other evidence.  Third, asserting that a fact is immaterial does not dispute it.  Consequently, the Court finds the fact undisputed.

> Thornburg's 2006 10-K disclosed the company's plan to continue to "diversify its
> financing sources" by reducing the amount of its repo borrowings and having
> "Collateralized Mortgage Debt and Asset-backed [commercial paper ('CP'] grow
> as a percentage of [its] financing sources."   Thornburg discussed the continuing
> execution of this plan in its 2007 10-K, stating that "as we increase our use of
> Collateralized Mortgage Debt, the risk of margin calls, changes in margin
> requirements and potential refinancing risk is reduced."

Goldstone Facts ¶ 112, at 25-26 (setting forth this fact)(alterations omitted)(quoting Thornburg

Mortgage, Inc. 2006 Form 10-K at 6, filed August 9, 2013 (Doc. 204-237)("2006 Form

10-K"))(quoting 2007 Form 10-K at 29).   See 2006 Form 10-K at 5-6; 2007 Form 10-K

at 29-30.[66]   "On February 21 and 22, 2008, Thornburg entered into I/O strip financing

transactions that generated proceeds of approximately $48.9 million."  Goldstone Facts ¶ 113,

at 26 (setting forth this fact).  See Electronic Mail Transmission from Jane Starrett to Jennifer

Hall and Cynthia Reinhart at 2-5 (dated Mar. 4, 2008), filed August 9, 2013

(Doc. 204-176)("Mar. 4, 2008, Starrett Email"); Electronic Mail Transmission from Ralph Ahn

to Larry Goldstone, Clay Simmons, Nathan Fellers, Xen Stanhope, Patrick Feldman, Jane

Starrett, Shawn Buniel, Tim Sturdy, Dan Petrush, and Kyle Rhoades at 2-4 (dated Feb. 22,

2008), filed August 9, 2013 (Doc. 204-97)("Feb. 22, 2008, Ahn Email").[67]

---

[66]The SEC attempts to dispute this fact by stating:

> The I/O Strip Transactions were referred to as sales by Defendants and others at
> Thornburg, constituted sales, and, regardless, were a relevant factor to be
> considered in a proper OTTI analysis because "selling assets to generate cash with
> the objective to pay short-term commitments is akin to a company selling
> essential manufacturing equipment to generate cash to pay the bills."

SEC Disputed Facts ¶ 112, at 11.  This assertion does not address, much less specifically
controvert, the Defendants' asserted fact.  Consequently, the Court finds the fact undisputed.

[67]The SEC attempts to dispute this fact by stating:

> The I/O Strip Transactions were referred to as sales by Defendants and others at
> Thornburg, constituted sales, and, regardless, were a relevant factor to be

In the 2007 Form 10-K, Thornburg Mortgage disclosed the I/O strip financing transactions and their purpose as follows: "'We improved our liquidity position by issuing Collateralized Mortgage Debt backed by mortgage securities previously pledged under Reverse Repurchase Agreements. Collateralized Mortgage Debt, which replaced Reverse Repurchase Agreement and whole loan financing debt, is non-recourse debt financing not subject to margin calls.'" Goldstone Facts ¶ 114, at 23 (setting forth this fact)(quoting 2007 Form 10-K at 21). See 2007 Form 10-K at 21, 27-28; Electronic Mail Transmission from Jennifer Hall to Jane Starrett at 5 (dated Feb. 27, 2008), filed August 9, 2013 (Doc. 204-125)("Feb. 27, 2008, Hall Email"); Hall Depo. at 217:12-219:8; Simmons Decl. ¶ 47, at 10-11.[68] "KPMG reviewed and approved the accounting for the I/O strip financing transactions as financings in the preparation of Thornburg's 2007 financial statements." Goldstone Facts ¶ 115, at 26 (setting forth this fact). See Hall Depo. at 218:12-219:8; MTM on Securities Testwork Prepared by Matt Plummer, KPMG, for Thornburg Mortgage, Inc. at 7 (dated Jan. 21, 2008), filed August 9, 2013 (Doc. 204-38); Electronic Mail Transmission from Cynthia Reinhart to Michael Smith and

---

considered in a proper OTTI analysis because "selling assets to generate cash with the objective to pay short-term commitments is akin to a company selling essential manufacturing equipment to generate cash to pay the bills."

SEC Disputed Facts ¶ 113, at 12. This assertion does not address, much less specifically controvert, the Defendants' asserted fact. The Court thus finds the fact undisputed.

[68]The SEC attempts to dispute this fact by stating:

The I/O Strip Transactions were referred to as sales by Defendants and others at Thornburg, constituted sales, and, regardless, were a relevant factor to be considered in a proper OTTI analysis because "selling assets to generate cash with the objective to pay short-term commitments is akin to a company selling essential manufacturing equipment to generate cash to pay the bills."

SEC Disputed Facts ¶ 114, at 12. This assertion does not address, much less specifically controvert, the Defendants' asserted fact. Consequently, the Court finds the fact undisputed.

Jennifer Hall at 6 (dated Mar. 15, 2008), filed August 9, 2013 (Doc. 204-212).[69]  "KPMG's own workpapers relied on the sale of IO strips as one of the factors supporting KPMG's determination that management's judgments about the Company's liquidity situation were based on reasonable facts and that the strategies available to the Company to meet its liquidity needs were attainable and reasonable."   Starrett Facts ¶ 49, at 11 (setting forth this fact)(internal quotation marks omitted).   See March 9, 2008, Restatement Memo. at 12; March 9, 2008, Restatement Workpaper at 2-3.[70]  "During the week of February 21, Thornburg had only

---

[69]The SEC attempts to dispute this fact by stating:

The I/O Strip Transactions were referred to as sales by Defendants and others at Thornburg, constituted sales, and, regardless, were a relevant factor to be considered in a proper OTTI analysis because "selling assets to generate cash with the objective to pay short-term commitments is akin to a company selling essential manufacturing equipment to generate cash to pay the bills."

SEC Disputed Facts ¶ 115, at 12.  To dispute this fact, the SEC cites Kitchens' report and the 1st RFAs.  In Kitchens' report, Kitchens opines that the purpose of the I/O Strip Transactions was to pay the margin calls and not to take advantage of favorable pricing.  See Kitchens Report at 64-67.  In its admissions, the SEC "admits that the I/O STRIP TRANSACTIONS were not sales of PURCHASED ARM ASSETS for accounting purposes."  1st RFAs at 9-11.  The SEC, thus, admits that the I/O Strip Transactions were not considered sales for accounting purposes, and Kitchens' report does not address the Defendants' asserted fact.  Consequently, the Court finds the fact undisputed.

[70]The SEC attempts to dispute this fact by stating:

KPMG was deceived: Thornburg sold I/O Strip assets to meet otherwise unmeetable margin calls in February 2008, but did not disclose to KPMG that this was the intended purpose. Rather, Thornburg claimed the sales were to take advantage of pricing opportunities.  Ms. Hall testified that the I/O Strip Transactions were asset sales to meet margin calls, which should have been disclosed to KPMG so they could consider them.

SEC Disputed Starrett Facts ¶ 49, at 7-8.  This assertion does not specifically controvert Starrett's asserted fact.  Starrett does not assert that KPMG was not deceived, and the SEC does not assert that KPMG did not rely on the I/O Strip Transactions as a factor supporting Thornburg's judgments concerning its liquidity.  Accordingly, the SEC fails to dispute this fact, and the Court finds it undisputed.

refinanced $4 billion of its $11.6 billion (notional face value) I/O strip holdings, which meant that as of the time of the 10-K filing, Thornburg had I/O strip holdings with a notional face value of $7.6 billion that could be refinanced to generate additional liquidity if needed." Goldstone Facts ¶ 116, at 27 (setting forth this fact). <u>See</u> Electronic Mail Transmission from Kyle Rhoades to Clay Simmons, Nathan Fellers, and Patrick Feldman at 2-3 (dated Feb. 21, 2008), filed August 9, 2013 (Doc. 204-80); Mar. 4, 2008, Starrett Email at 2-5.[71]

### 9. **Thornburg Mortgage's Cash and Capital Raising From February 14, 2008, to February 28, 2008.**

"In total, from February 14 through February 27, 2008, Thornburg raised in excess of $300 million through stock sales in its Dividend Reinvestment Plan and continuous offering program, principal and interest payments on its MBS investment portfolio, I/O strip financing transactions, and financing previously restricted subordinated bonds." Goldstone Facts ¶ 117, at 27 (setting forth this fact). <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 43; Electronic Mail Transmission from Ralph Ahn to Larry Goldstone, Clay Simmons, Nathan Fellers, Xen Stanhope, Patrick Feldman, Jane Starrett, Shawn Buniel, Tim Sturdy, and Dan Petrush at 2 (dated Feb. 14, 2008), filed August 9, 2013 (Doc. 204-45)("Feb. 14, 2008, Ahn Email"); Electronic Mail Transmission from Ralph Ahn to Larry Goldstone, Clay Simmons, Nathan Fellers, Xen Stanhope, Patrick Feldman, Jane Starrett, Shaw Buniel, Tim

---

[71]The SEC attempts to dispute this fact by stating:

> The I/O Strip Transactions were referred to as sales by Defendants and others at Thornburg, constituted sales, and, regardless, were a relevant factor to be considered in a proper OTTI analysis because "selling assets to generate cash with the objective to pay short-term commitments is akin to a company selling essential manufacturing equipment to generate cash to pay the bills."

SEC Disputed Facts ¶ 116, at 12-13. This assertion does not address, much less specifically controvert, the Defendants' asserted fact. The Court thus finds the fact undisputed.

Sturdy, Dan Petrush, and Kyle Rhoades at 2 (dated Feb. 20, 2008), filed August 9, 2013 (Doc. 204-63); Electronic Mail Transmission from Ralph Ahn to Larry Goldstone, Clay Simmons, Nathan Fellers, Xen Stanhope, Patrick Feldman, Jane Starrett, Shawn Buniel, Tim Sturdy, Dan Petrush, and Kyle Rhoades at 2 (dated Feb. 21, 2008), filed August 9, 2013 (Doc. 204-75); Feb. 22, 2008, Ahn Email at 2; Electronic Mail Transmission from Ralph Ahn to Larry Goldstone, Clay Simmons, Nathan Fellers, Xen Stanhope, Patrick Feldman, Jane Starrett, Shawn Buniel, Tim Sturdy, Dan Petrush, and Kyle Rhoades at 2-4 (dated Feb. 25, 2008), filed August 9, 2013 (Doc. 204-107). "Thornburg did not sell any of its Purchased ARM Assets to meet margin calls in the two weeks before the 2007 Form 10-K filing." Goldstone Facts ¶ 118, at 27 (setting forth this fact). See Feb. 22, 2008, Goldstone Email at 3; Goldstone Depo. at 173:20-24; Simmons Depo. Vol. II at 301:11-25.[72]

"On the morning of February 27, 2008, Thornburg projected that it would have an ending cash balance that day of $94 million." Goldstone Facts ¶ 119, at 27 (setting forth this fact). See

_____

[72]The SEC attempts to dispute this fact by stating:

> While the I/O Strip Transactions were not sales of Purchased ARM Assets for accounting purposes, the I/O Strip Transactions were referred to as sales by Defendants and others at Thornburg, constituted sales, and, regardless, were a relevant factor to be considered in a proper OTTI analysis. Defendants knew, based on e-mails between them, that "selling some assets is substantially the same as selling all assets because the only reason we don't have to recognize the impairments on all assets with negative marks in income now is that we represent we have the intent and ability to hold the assets to maturity. Selling some assets calls into question our intent and having to sell them to meet margin calls or reduce exposure, calls into question our ability to hold them."

SEC Disputed Facts ¶ 118, at 13. This assertion does not dispute the Defendants' asserted fact, but supports it. The SEC admits that "the I/O Strip Transactions were not sales of Purchased ARM assets for accounting purposes." SEC Disputed Facts ¶ 118, at 13. Additionally, whether the I/O Strip Transactions were relevant to the OTTI analysis is an additional fact, as is the Defendants' electronic mail transmission discussing the effect of selling some assets. Consequently, the Court finds the fact undisputed.

- 73 -

SEC Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from Ralph

Ahn to Larry Goldstone, Clay Simmons, Nathan Fellers, Xen Stanhope, Patrick Feldman, Jane

Starrett, Shawn Buniel, Tim Sturdy, Dan Petrush, and Kyle Rhoades at 2-4 (dated Feb. 27,

2008), filed August 9, 2013 (Doc. 204-128).   Hall believed that Thornburg Mortgage "had

between '$100 and $150 million' in total available liquidity as of the close of business on

February 27, 2008."   Goldstone Facts ¶ 120, at 29 (setting forth this fact)(quoting Hall SEC

Depo. at 266:11-13).   See Hall SEC Dep. at 266:11-13.[73]   Of the $100 to $150 million which

Hall believed that Thornburg Mortgage had in available liquidity at the end of the day on

---

[73]The Defendants' fact states: "According to Ms. Hall, the company had between '$100 and $150 million' in total available liquidity as of the close of business on February 27, 2008." Goldstone Facts ¶ 120, at 28 (quoting Hall SEC Depo. at 266:11-23).   The SEC attempts to dispute this fact by stating:

> Ms. Hall testified that she "believed" the amount of Thornburg's available liquidity at the close of business on February 27, 2008 was "between $100- and $150 million."   Hall's testimony at GSExh. 281[, Hall Depo.,] does not support this purportedly "undisputed fact."   The testimony cited to by Defendants does not establish the amount of Thornburg's available liquidity at the close of business on February 27, 2008. Further, the liquidity report for February 28, 2008 shows only that Thornburg had $38.2 million in cash available the morning of February 28, 2008.

SEC Disputed Facts ¶ 120, at 13.   In addition to citing the Hall SEC Depo., the SEC cites an electronic mail transmission from Ralph Ahn.   See Electronic Mail Transmission from Ralph Ahn to Larry Goldstone, Clay Simmons, Nathan Fellers, Xen Stanhope, Patrick Feldman, Jane Starrett, Shawn Buniel, Tim Sturdy, Dan Petrush, and Kyle Rhoades at 2 (dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-154)("Feb. 28, 2008, Ahn Email").   In the electronic mail transmission, Ahn states that Thornburg Mortgage has $38.2 million in cash.   See Feb. 28, 2008, Ahn Email.   This does not, however, specifically controvert the Defendants' asserted fact.   The Defendants' assert that Thornburg had between $100 and $150 million in liquidity on February 27, 2008.   Black's Law Dictionary defines liquidity as "[t]he quality of state of being readily convertible to cash."   Black's Law Dictionary 1015 (9th ed. 2009).   Liquidity, thus, constitutes more than cash; it includes assets or investments that can be quickly converted into cash. Accordingly, the SEC does not specifically dispute this fact.   Hall testified, however, that she believed that Thornburg Mortgage had between $100 and $150 million in liquidity and not that Thornburg Mortgage actually had that amount of liquidity.   The Court will modify the Defendants' asserted fact to accurately reflect the evidence.

February 27, 2008, roughly forty-million dollars was in cash.  See Goldstone Facts ¶ 121, at 28; Electronic Mail Transmission from Ralph Ahn to Larry Goldstone, Clay Simmons, Nathan Fellers, Xen Stanhope, Patrick Feldman, Jane Starrett, Shawn Buniel, Tim Sturdy, Dan Petrush, and Kyle Rhoades at 2-4 (dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-154)("Feb. 28, 2008, Ahn Email"); Electronic Mail Transmission from Larry Goldstone to Garrett Thornburg and Francis Mullin at 2 (dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-145)("Feb. 28, 2008, Goldstone TMA Update").[74]  "Between February 14 and February 28, 2008, Thornburg's average daily opening cash and agency balance was $28.5 million."  Goldstone Facts ¶ 122, at 25 (setting forth this fact).  See SEC Disputed Facts ¶ 122, at 13 (not disputing this fact); Feb. 14, 2008, Ahn Email at 2; Electronic Mail Transmission from Ralph Ahn to Larry Goldstone, Clay Simmons, Nathan Fellers, Xen Stanhope, Patrick Feldman, Jane Starrett, Shawn Buniel, Tim Sturdy, and Dan Petrush (dated Feb. 15, 2008), filed August 9, 2013 (Doc. 204-46); Feb. 28, 2008, Ahn Email at 2.[75]

---

[74]The Defendants' fact states: "Of the $100 to $150 million Thornburg had in available liquidity at the end of the day on February 27, 2008, roughly $40 million was in cash." Goldstone Facts ¶ 121, at 28.  The SEC raises the same objection as it did to the Defendants' fact 120.  See SEC Disputed Facts ¶ 121, at 13 ("Disputed on the same bases as Disputed Fact 120."). For the same reasons, the Court finds the fact undisputed, see supra note 73, but has modified the fact to more accurately reflect the evidence: that Hall believed that Thornburg Mortgage had between $100 and $150 million in liquidity.

[75]The SEC does not dispute this fact, but states: "Undisputed, but noted that Thornburg's average daily margin calls between February 14 and February 27, 2008 were $53.4 million per business day, about $25 million more on a daily basis than Thornburg's average daily opening cash and agency balance."  SEC Disputed Facts ¶ 122, at 13.  Because the SEC does not dispute the Defendants' asserted fact, the Court finds it undisputed.

### 10.   Thornburg Mortgage's Expectations of Margin Calls After the 2007 Form 10-K Filing.

"Before the 10-K filing in 2008, Thornburg's $11.5 billion portfolio of repo collateral, consisting primarily of AAA-rated MBS of 'high credit quality . . . hadn't been downgraded.'" Goldstone Facts ¶ 123, at 28 (setting forth this fact)(alterations in Goldstone Facts but in source)(quoting Simmons Depo. Vol. II at 301:25-302:2, 341:17-18). See Simmons Depo. Vol. II at 301:25-302:2, 241:11-25.[76]  "In the two weeks preceding the 2007 Form 10-K filing, the margin calls that Thornburg received were disproportionately weighted toward its Alt-A MBS assets, which made up approximately 20% of Thornburg's portfolio."  Goldstone Facts ¶ 124, at 28-29 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 20, 2008, Hall Memo. at 7;  Goldstone SEC Depo. at 169:17-170:3, 153:21-154:6, 313:23-314:7.[77]

---

[76]The SEC attempts to dispute this fact by stating: "The characterization of Thornburg's portfolio of repo collateral as 'high quality' is disputed."  SEC Disputed Facts ¶ 123, at 13.  To dispute the fact, the SEC cites the Amended Expert Report of Lawrence P. Weiner, filed November 6, 2013 (Doc. 231-50)("Weiner Report").  In his report, Lawrence Weiner states that the quality of Thornburg Mortgage's bond and collateral fell.  See Weiner at   33-37.  First, Weiner notes that there were a number of issues concerning the securities that should have caused concern.  See Weiner Report at 35.  Second, he notes that, by 2010, the securities began to realize a loss.  See Weiner Report at 36.  Third, he notes that the rating of one of Thornburg Mortgage's bonds dropped on August, 2008, and then again on January, 2009.  See Weiner Report at 36.  Fourth, Weiner includes a graph showing that all of Thornburg Mortgage's bonds began to realize losses in 2010, 2011, and 2012.  See Weiner Report at 37.  This evidence does not specifically dispute the Defendants' asserted fact.  Weiner's report concerns losses and drops in ratings that occurred after the 2007 Form 10-K was released.  The Defendants' asserted fact concerns the collaterals' quality before the 2007 Form 10-K release, while Weiner's report concerns drops in ratings and losses after the Form 10-K filing.  Accordingly, the Court finds the fact undisputed.

[77]The Defendants assert the following fact: "Mr. Goldstone and Mr. Simmons believed that Thornburg was fully margined or close to fully margined on its Alt-A MBS assets and that further mark-downs of those assets were unlikely."  Goldstone Facts ¶ 125, at 29.  The SEC disputes this fact by stating:

KPMG stated, in its workpaper evaluating Thornburg as a going concern, that it was "management's position" that the chances of Thornburg's portfolio declining by more than 2-3% was "remote" and that "Management believes the fair values for [Alt-A] securities are at or approaching bottom, evidenced by recent purchases of similar securities by outside investors at these prices.  The purchases indicate that the market believes prices would not fall further."

---

Defendants' claimed belief is implausible and contradicted by the fact that from January 2 through February 27, 2008, Thornburg's average daily margin calls were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, and that as recently as February 21, 2008 Thornburg received $247.4 million in margin calls in a single day.  Furthermore, Defendant Goldstone previously testified that he believed at that time that Thornburg was "likely to see additional margin calls."  Finally, Defendant Goldstone e-mailed Defendants [sic] Simmons on February 27, 2008 saying that he believed Thornburg would get hit with 20% haircuts.

SEC Disputed Facts ¶ 125, at 13-14.  The SEC cites the Goldstone SEC Depo., where Goldstone testified that he thought that Thornburg was "likely to see additional margin calls."  Goldstone SEC Depo. at 288:1-4.  The SEC also cites an electronic mail transmission from Goldstone to Simmons in which Goldstone states that a European hedge fund "got hit with 20 point haircuts on Alt-A AAA's overnight" and that he thinks that Thornburg Mortgage would "get this a little more gradually," but that Thornburg Mortgage "should be ready for it."  Electronic Mail Transmission from Larry Goldstone to Clay Simmons at 2 (dated Feb. 27, 2008), filed August 9, 2013 (Doc. 204-135)("Feb. 27, 2008, Hedge Fund Email").

The Defendants reply by arguing that the "SEC cannot raise a genuine dispute by general and unsupported attacks on the credibility of Defendants' sworn, uncontroverted testimony about their subjective understandings, views, or beliefs."  Goldstone Reply Facts ¶ 125, at 57.  They also argue that margin calls were a normal part of Thornburg Mortgage's business, and that the prior markdowns and Goldstone's belief of future markdowns do not contradict the "Defendants' belief that further mark-downs on Thornburg's Alt-A MBS in the days before the 10-K filing was unlikely."  Goldstone Reply Facts ¶ 125, at 57-58.  The Defendants contend that markdowns in the past do not mean that future markdowns were likely and that there is no evidence that Goldstone sent an electronic mail transmission to Simmons saying that Thornburg Mortgage would get hit with 20% haircuts.  See Goldstone Reply Facts ¶ 125, at 58.

The Court finds the Defendants' asserted fact disputed.  Goldstone testified that Thornburg Mortgage would likely see future margin calls, and Goldstone stated in an electronic mail transmission to Simmons that Goldstone would likely get hit with haircuts, although more gradually than the European hedge fund.  This evidence controverts the Defendants' asserted fact.  Goldstone and Simmons could not believe that Thornburg Mortgage was fully margined or close to it, or that further markdowns were unlikely, when they believed that they would receive more margin calls and would get hit with haircuts.  More margin calls and haircuts show that either Thornburg Mortgage was not fully margined, that the Alt-A MBS assets were going to be marked down, or both.  Accordingly, the SEC has specifically controverted this fact, and the Court finds it disputed.

Goldstone Facts ¶ 126, at 29 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Feb. 20, 2008, Hall Memo. at 7).  See Feb. 20, 2008, Hall Memo. at 7.[78]  "A decline of 2-3% on Thornburg's $11.5 billion repo portfolio would have represented approximately $230 to $345 million in lost value."  Goldstone Facts ¶ 127, at 29 (setting forth this fact).  See Executive Summary: Activity Related to Liquidity Leading Up to February 27, 2008 at 2-3, filed August 9, 2013 (Doc. 204-201).[79]  Both Fellers and Simmons "ma[de] the statement that the chances of Thornburg's portfolio declining by more than 2-3% was remote . . . .  [A]ny conversation about projected declines in the value of Thornburg's repo collateral would have been memorialized in KPMG's workpapers."  Goldstone Facts ¶ 128, at 29 (setting forth this fact).  See Hall SEC Depo. at 181:9-187:7; Hall Depo. at 89:16-91:9; Reinhart SEC Depo. at 115:1-18.[80]  Fellers agreed with those statements on "management's position" that

---

[78]The SEC attempts to dispute this fact by stating: "But this information, received from Thornburg, was not true.  Moreover, even a much lesser magnitude of margin calls than anticipated would have depleted Thornburg's remaining liquidity on February 28, 2008."  SEC Disputed Facts ¶ 126, at 14.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants' asserted fact does not state that the information that Thornburg provided KPMG was true or that a large margin call would not deplete Thornburg Mortgage's remaining liquidity.  Accordingly, the Court finds the fact undisputed.

[79]The SEC attempts to dispute this fact by stating: "Even a much lesser magnitude of margin calls than anticipated would have depleted Thornburg's remaining liquidity on February 28, 2008."  SEC Disputed Facts ¶ 127, at 14.  This assertion does not address, much less specifically dispute, the Defendants' asserted fact.  Accordingly, the Court finds the fact undisputed.

[80]The SEC attempts to dispute this fact by stating: "Even a much lesser magnitude of margin calls than anticipated would have depleted Thornburg's remaining liquidity on February 28, 2008.  The conversation was memorialized in KPMG's workpapers."  SEC Disputed Facts ¶ 128, at 14.  This assertion does not specifically controvert the Defendants' asserted fact.  First, the Defendants' did not assert that a large margin call would not deplete Thornburg Mortgage's remaining liquidity.  Second, the SEC's assertion that KPMG's workpapers memorialized the conversation supports the Defendants' asserted fact that any such conversation would be memorialized in KPMG's workpapers.  The Court thus finds the fact undisputed.

were referenced in KPMG's workpapers or believed they were reasonable at the time.  Goldstone

Facts ¶ 129, at 29 (setting forth this fact).  See Fellers Depo. at 123:25-127:5.[81]

--------

[81]The Defendants' fact states: "Although neither Mr. Simmons nor Mr. Fellers recalls making the statements of 'management's position' referenced in KPMG's workpapers, they both testified that they agreed with those statements or believed they were reasonable at the time." Goldstone Facts ¶ 129, at 29.  The SEC disputes this fact by stating:

> Defendants' claimed belief is implausible and contradicted by the fact that from January 2 through February 27, 2008, Thornburg's average daily margin calls were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, that as recently as February 21, 2008 Thornburg received $247.4 million in margin calls in a single day, and that on February 26, 2008 Thornburg received $30.5 million in margin calls. Furthermore, Defendant Goldstone previously testified that he believed at that time that Thornburg was "likely to see additional margin calls."   Finally, Defendant Goldstone e-mailed Defendants [sic] Simmons on February 27, 2008 saying that he believed Thornburg would get hit with 20% haircuts.

SEC Disputed Facts ¶ 129, at 14.  The SEC cites a deposition in which Goldstone stated that Thornburg Mortgage would likely receive more margin calls, see Goldstone SEC Depo. at 287:10-288:4, and an electronic mail transmission from February 27, 2008, in which Goldstone told Simmons that he believed that Thornburg Mortgage would get hit with haircuts, but at a more gradual rate than the European hedge fund got hit, see Feb. 27, 2008, Hedge Fund Email at 2.  From this electronic mail transmission, Simmons was aware that Thornburg Mortgage would get hit with more haircuts; thus, Thornburg Mortgage's Alt-A securities were not at or were not approaching the bottom, as the KPMG workpaper stated.  Accordingly, the SEC has disputed this fact as it pertains to Simmons.

The SEC has not, however, presented any evidence showing that Fellers was aware of information that would lead him to believe that Thornburg Mortgage would not receive more margin calls or that Thornburg Mortgage's assets would not further decline in value.  The Court thus finds this portion of the Defendants' asserted fact undisputed and will modify the fact accordingly.

The Defendants assert the following fact: "Mr. Simmons has testified that he was aware that the number and magnitude of margin calls received in the week prior to the Form 10-K filing had abated substantially." Goldstone Facts ¶ 130, at 29.  The SEC disputes this fact by stating:

> From January 2 through February 27, 2008, Thornburg's average daily margin calls were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, hat [sic] as recently as February 21, 2008 Thornburg received $247.4 million in margin calls in a single day, and that on February 26, 2008 Thornburg received $30.5 million in margin calls.

The total repo margin calls Thornburg received between February 22 and 27, 2008 fell below the range it had experienced in January and the first two weeks of February.  Dividing the total amount of margin calls by the number of business days, Thornburg received: roughly $22.9 million in margin calls per business day on average in January 2008; roughly $15.9 million in margin calls per business day on average from February 1 through February 13, 2008; roughly $84.6 million in margin calls per business day on average from February 14 through

----

Furthermore, Defendant Goldstone previously testified that he believed at that time that Thornburg was "likely to see additional margin calls."  Finally, Defendant Goldstone e-mailed Defendants [sic] Simmons on February 27, 2008 saying that he believed Thornburg would get hit with 20% haircuts.

SEC Disputed Facts ¶ 130, at 14-15.  The SEC cites a statement showing Goldstone's daily margin calls in January and February, 2008, a deposition in which Goldstone testified that more margin calls were likely, and an electronic mail transmission from Goldstone to Simmons in which Goldstone stated that Thornburg Mortgage would likely get hit with more haircuts.  See SEC Disputed Facts ¶ 130, at 14-15.

The Defendants reply by arguing:

The SEC's response is immaterial because it does not refute that margin calls in the days before the Form 10-K filing were below the range of margin calls in January and early February and because its "average" of late February margin calls includes the single significant margin calls from Citigroup in the amount of nearly $200 million.

The SEC's submission of additional non-responsive purported facts does not create a dispute of fact with respect to Mr. Simmons' subjective belief.  See Defs.' Reply to SMF ¶ 125.

Moreover, members of Thornburg's Capital Markets Group have testified that the $300 million in margin calls Thornburg received from February 14 through February 27, 2008 (with over $200 million on February 21, 2008 alone) was unusual, and they did not expect Thornburg to continue receiving margin calls anywhere near that magnitude in the future.

Goldstone Reply Facts ¶ 130, at 61-62.

The Court concludes that the SEC has disputed this fact.  The Defendants' concede that the number of margin calls that Thornburg Mortgage received from February 14 through February 27, 208, was unusual.  Moreover, the SEC has shown that Thornburg Mortgage received a high number of margin calls during that same period.  The number of margin calls that Thornburg Mortgage received in the week before filing the Form 10-K had not substantially abated, but was unusually high.  Accordingly, the SEC has disputed the Defendants' asserted fact.

February 21, 2008; and roughly $14.5 million in margin calls per business day on average from February 22 through 27, 2008.

Goldstone Facts ¶ 131, at 30 (setting forth this fact).  See Restatement Margin Calls at 2-7.[82]  No

"'REPO LENDER [gave] notice to THORNBURG [prior to the filing of the 2007 Form 10-K] of

---

[82]The SEC attempts to dispute this fact by stating:

> From January 2 through February 27, 2008, Thornburg's average daily margin calls were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, that as recently as February 21, 2008 Thornburg received $247.4 million in margin calls in a single day, and that on February 26, 2008 Thornburg received $30.5 million in margin calls. Furthermore, Defendant Goldstone previously testified that he believed at that time that Thornburg was "likely to see additional margin calls."

SEC Disputed Facts ¶ 131, at 15.  This assertion does not specifically controvert the Defendants' asserted facts.  Rather, the SEC uses different date ranges to calculate the average margin calls that Thornburg Mortgage received per day.  Additionally, whether Goldstone believed that Thornburg Mortgage would likely receive additional margin calls does not dispute the Defendants' asserted fact.  Consequently, the Court finds the fact undisputed.

The Defendants assert the following fact: "At the time of the 10-K filing, Thornburg's senior management team, which included Mr. Goldstone, Mr. Simmons, Mr. Fellers, and Ms. Starrett, did not anticipate that Thornburg's repo portfolio would be subject to significant additional margin calls in the near term."  Goldstone Facts ¶ 132, at 203.  The SEC disputes this fact by stating:

> Defendants' claimed lack of anticipation of significant additional margin calls is implausible and contradicted by the fact that from January 2 through February 27, 2008, Thornburg's average daily margin calls were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, that as recently as February 21, 2008 Thornburg received $247.4 million in margin calls in a single day, and that on February 26, 2008 Thornburg received $30.5 million in margin calls.  Furthermore, Defendant Goldstone previously testified that he believed at that time that Thornburg was "likely to see additional margin calls."

SEC Disputed Facts ¶ 132, at 15.  The Defendants' reply by stating:

> The SEC's response does not cite evidence that renders "implausible" or "contradicts" Defendants' subjective belief as to the likelihood of significant future margin calls.  See Defs.' Reply to SMF ¶ 125.  Moreover, it is undisputed that KPMG's workpapers documented that "future" margin calls were "difficult, if not impossible, to predict" (Ex. 50 at 7), "large levels of margin calls were not a

---

daily occurrence by repurchase counterparties" and "usually once a margin call is met, it takes time (more than a few days) for a repo counterparty to initiate another margin call" (Ex. 181).  Mr. Goldstone's testimony that Thornburg was "likely to see additional margin calls" does not contradict that Defendants did not anticipate *significant* margin calls in the *near term*.

Moreover, members of Thornburg's Capital Markets Group have testified that the $300 million in margin calls Thornburg received from February 14 through February 27, 2008 (with over $200 million on February 21, 2008 alone) was unusual, and they did not expect Thornburg to continue receiving margin calls anywhere near that magnitude in the future.

Goldstone Reply Facts ¶ 132, at 63 (emphasis in the original).  As the Court has already concluded, it is disputed that (i) Goldstone and Simmons believed that Thornburg Mortgage's assets were fully margined; (ii) its collateral's value would not be reduced, and (iii) Thornburg Mortgage would not receive additional margin calls.  See supra note 77.  If Thornburg Mortgage's assets were not fully margined, its assets were likely to reduce in value, and it would receive additional margin calls, it is likely that Thornburg Mortgage's management expected additional substantial margin calls in the near term.  The Defendants assert that they did not anticipate significant margin calls in the near future.  The Defendants expected additional margin calls and, based on the number of significant margin calls Thornburg Mortgage received in February, thus it is reasonable to infer that, because Thornburg's assets would continue to decrease in value, it would continue to receive significant margin calls.  Accordingly, the Court finds this fact disputed.

The Defendants assert:

Mr. Simmons explained Thornburg's management's market expectations as follows:

I think our expectation at the time was that mortgage backed securities market was not poised to deteriorate further . . . .  [O]ur portfolio was of a significantly higher quality in terms of credit than the securities that were . . . receiving substantial markdowns, i.e., the subprime market . . . our securities were prime, backed by prime collateral and . . . we had experienced no losses, not credit losses on our securities at this point and . . . we looked at the economic environment with interest rates falling, the expectation would be that typically your mortgage backed securities would appreciate in a period of falling interest rates . . . .  [O]ur belief was that . . . our assets had been . . . fully marked to market at that time.

Goldstone Facts ¶ 133, at 30-31 (alterations in Goldstone Facts but not in source)(quoting Simmons Depo. Vol. II at 88:25-89:23).  The SEC disputes this fact for the same reasons that it disputes the Defendants' asserted fact number 132.  See SEC Disputed Facts ¶ 133, at 15 ("Disputed on the same basis as Disputed Fact 132.").  Like the Defendants' asserted fact

its intention or plan to issue additional MARGIN CALLS to THORNBURG after the filing.'"
The "'DEFENDANTS [did not] ha[ve] actual knowledge, prior to the filing of the 2007 FORM
10-K, that any specific REPO LENDER would issue a specific MARGIN CALL on February 28,
2008, or thereafter.'"  Goldstone Facts ¶ 134, at 31 (setting forth this fact)(quoting 1st RFAs
at 5-6)(quoting Plaintiff Securities and Exchange Commission's Amended Objections and
Responses to Defendants' Third and Fourth Sets of Interrogatories at 8, filed August 9, 2013
(Doc. 204-286)("3d RFAs")).  See SEC Disputed Facts at 1-51 (not disputing this fact); 1st
RFAs at 5-6; 3d RFAs at 8.

### 11.    European Hedge Fund Rumor.

On February 27, 2008, Mr. Feldman sent an email to Mr. Goldstone, Mr.
Simmons, and Mr. Fellers entitled "I spoke with Garrett." Mr. Feldman's email
addressed two issues:

> He reported that he had told the company's Chairman, Garrett
> Thornburg, that "we should have Citigroup and all our other
> margin exposures met today"; and

> He reported that he had spoken to a trader at Merrill Lynch named
> "Charles Mac," who "made it sound like a large repo client
> (European, lots of pay option [monthly treasury average ['MTA')])
> was collapsing." The trader "couldn't give me details other than
> they own billions that presumably would have to get sold. . . .  For
> the time being we're not really supposed to know about this
> situation, but news may be coming soon."

In response, Mr. Simmons wrote:

> "This makes it even more critical to be done with Citi today so we
> can get the K filed."

---

number 132, the Court finds this fact disputed.  Goldstone and Simmons believed that Thornburg
Mortgage's securities would receive additional haircuts and margin calls.  See supra note 77.
They could not have, at the same time, believed that its mortgage backed securities would
appreciate in value and that they were fully marked to market value.  Accordingly, the Court
finds the fact disputed.

Goldstone Facts ¶ 135, at 31 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Electronic Mail Transmission from Clay Simmons to Patrick Feldman and Larry Goldstone at 2 (dated Feb. 27, 2008), filed August 9, 2013 (Doc. 204-127)("Feb. 27, 2008, Simmons Email")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 27, 2008, Simmons Email at 2.

> Mr. Simmons stated the following about his response to Mr. Feldman's email . . . : "[W]hat I would have been focused on is what he [Mr. Feldman] said to Garrett" Thornburg.  Mr. Feldman's communication to Mr. Thornburg would have led to "a higher level of urgency [to satisfy the margin calls]. . . if you knew Mr. Thornburg, commitments made to Mr. Thornburg are important ones to keep," which is why Mr. Simmons replied to Mr. Fellers and Mr. Feldman that it was "even more critical" to satisfy the Citigroup margin call in full by the end of the day.

Goldstone Facts ¶ 136, at 31-32 (setting forth this fact)(alterations in Goldstone Facts but not in source)( Simmons Depo. Vol. II at 401:5-404:14).   See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo. Vol. II 401:5-18, 404:13-14.[83]  "Feldman . . . shared the

---

[83]The Defendants assert the following fact:

> Mr. Goldstone and Mr. Feldman did not believe the European hedge fund rumor, even if it were true, would have a significant impact on Thornburg given the different kind of collateral the hedge fund reportedly held.  Mr. Simmons did not recall hearing the rumor on February 27, 2008, but testified that he would not have been concerned because the hedge fund's pay option MTA assets were of an inferior quality to the AAA-rated MBS that made up the bulk of Thornburg's portfolio.

Goldstone Facts ¶ 137, at 32.  The SEC disputes this fact by stating:

> Defendants' claimed beliefs are implausible and contradicted by the facts. Defendant Goldstone emailed Defendant Simmons on February 27, 2008 indicated [sic] that "a large Alt-A hedge fund in Europe is blowing up this afternoon[,]" which Defendants knew by 9:05 a.m.    February 27 per Mr. Feldman's e-mail, and that UBS "got hit with 20 point haircuts on Alt-A AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it."  Thus, Defendants knew on February 27 that a European hedge

> fund was, in fact, blowing up (and that it was impacting other financial institutions) and that it would impact Thornburg. Additionally, Defendants later represented that the hedge fund collapse was one of two major reasons that Thornburg saw substantial margin calls beginning on February 28, 2008, and falsely represented that the collapse was "unexpected," as they knew about it February 27. Mr. Feldman considered the hedge fund news to be "more unhappy news."

SEC Disputed Facts ¶ 137, at 15-16. The SEC cites the Feb. 27, 2008, Simmons Email in which Simmons states, in response to an electronic mail transmission discussing the rumor about the European hedge-fund collapse, that it is "even more critical" that it meet its Citigroup Global margin calls, so that Thornburg Mortgage can file its Form 10-K. Feb. 27, 2008, Simmons Email at 2. The SEC also cites the Feb. 27, 2008, Hedge Fund Email in which Goldstone writes to Simmons:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon. UBS credit just mentioned it to me. They got hit with 20 point haircuts on Alt-A AAA's overnight. I think we will get this a little more gradually, but we should be ready for it. Use of proceeds will be to delever.

Feb. 27, 2008, Hedge Fund Email at 2. The SEC cites Feldman's deposition, in which he testified that the European hedge fund rumor indicated that the market had continued negative pressure on it and that it was "just more unhappy news." Feldman Depo. at 169:20-170:23.

The Defendants reply by arguing:

> The evidence cited by the SEC does not render "implausible" or "contradict" Mr. Goldstone's subjective belief or support that Mr. Goldstone and Mr. Simmons "knew" on February 27 that "a European hedge fund was, in fact, blowing up" and "would [in fact] impact Thornburg." Defendants testified to the contrary, and to the meaning of their emails, and the SEC's unsupported alternate reading of those emails is inadmissible. See Reply Br. at I.B.3. See Defendants' testimony cited in SMF ¶¶ 137-147 . . . .

> The SEC's response misleadingly omits the sentence of Mr. Goldstone's email following his statement that Thornburg "should be ready" for additional haircuts Thornburg will receive "more gradually," given Thornburg's plans to "use []
proceeds. . . to de-lever." See Ex. 278 (Goldstone SEC Tr. 312:22-313:1)("I was indicating that we might see this more gradually, which is why I was indicating that going forward our use of proceeds likely would be to de-lever the balance sheet.").

> The SEC's response also misleadingly equates haircuts with margin calls by suggesting that a European hedge fund's "20 point haircuts" "would impact Thornburg" the very next day. Defs.' Ex. 183 (KPMG Workpaper re Test of Operating Effectiveness of Liquidity Risk Reports, at KPMG-THRN-SEC-

report that a European hedge fund was collapsing with Goldstone and Simmons as [general market news] and that it was bad news."  SEC Facts ¶ X, at 4-5 (setting forth this fact)(internal quotation marks omitted).  See Feldman Depo. at 176:5-178:11.[84]

---

0015920)("haircut increases and decreases . . . are not margin calls")(emphasis added). Haircuts only occur "when the repo agreements mature and rollover into a new agreement." Id. In contrast, margin calls are caused by changes in the fair value of Thornburg's repo collateral, which Thornburg and its lenders evaluated on a daily basis. SMF ¶¶ 9, 11.

Goldstone Reply Facts ¶ 137, at 65-67.
    The Feb. 27, 2008, Hedge Fund Email, by itself, disputes the Defendants' asserted fact. Goldstone sent the electronic mail transmission to Simmons on February 27, 2008; Simmons, thus, knew about the European hedge fund on February 27, 2008. Additionally, the electronic mail transmission shows that Goldstone expected the rumor to affect Thornburg Mortgage. After mentioning the hedge-fund rumor, Goldstone stated that he believed that Thornburg Mortgage would get hit with haircuts more gradually than 20% overnight, but that they should be ready. The Defendants try to tie the additional haircuts to Thornburg's plans to de-lever; however, the electronic mail transmission suggests that the additional haircuts were because of the hedge-fund collapse. The electronic mail transmission, thus, contradicts the Defendants' asserted fact, or, at the very least, creates a material dispute. Additionally, while the Defendants are correct in noting that haircuts do not equal margin calls, their attempt to say that haircuts occur only when a repo agreement matures and rolls over is misplaced and not supported by the evidence. The report that the Defendants cite for this proposition states the information that is in certain reports. See Test of Operating Effectiveness Liquidity Risk Reports at 2 (dated Mar. 9, 2008), filed August 9, 2013 (Doc. 204-206)("Liquidity Risk Reports"). The document states that some of the information contained in the reports is "haircut increases and decreases," and it clarifies that "these are changes in haircuts when the repo agreements mature and rollover into a new agreement under current market terms, these are not margin calls." Liquidity Risk Reports at 2. The document does not say that all haircuts are changes when a repo agreement matures, but that the haircuts listed in those specific reports only include those specific haircuts. A haircut can occur -- i.e., collateral decrease in value -- even before the agreement matures. And, while a haircut does not equate to a margin call, it can lead to a margin call, because the collateral has decreased in value, which increases the margin. Accordingly, the SEC has specifically controverted this fact, and the Court finds it disputed.

[84]The SEC's fact states:  "Feldman testified that he shared the report that a European hedge fund was collapsing with Goldstone and Simmons as market color and that it was bad news."  SEC Facts ¶ X, at 4-5 (internal quotation marks omitted).  The Defendants dispute this fact by stating:

    Disputed insofar as the fact regarding "market color" is not supported by the evidence cited.  Further, the fact is misleading.  Mr. Feldman testified that "there

"Goldstone [did not] do[] anything with the information about a collapsing European

hedge fund."   SEC Facts ¶ Y, at 5 (setting forth this fact).   See Goldstone SEC Depo. at

307:19-308:13.[85]   "Mr. Fellers . . . 'didn't . . . take the time to dissect the rumor' because he

---

is bad news implied in this [rumor], but it doesn't mean the bad news -- we didn't -- it didn't necessarily -- it wasn't certain that that bad news would apply to us.  It was bad market news.   There was bad market news every day, even days we didn't get new margin calls."  SEC Ex. 26 (Feldman SEC Tr. 176:19-23).

Defendants Disputed Facts ¶ X, at 12.   The Court agrees that there is no support that the hedge-fund rumor was reported as market color.  One court has defined the term "market color" as "an occurrence in which market activities of large traders are known in the market and exert large impact on the expectations and subsequent behavior of others."   Hershey v. Pac. Inv. Mgmt. Co., 697 F. Supp. 2d 945, 952 (N.D. Ill. 2010)(Keys, M.J.).   There is nothing in Feldman's deposition testimony to suggest that trading activities of large traders affected the behavior of others.  Instead, he testified that the European hedge-fund collapse was bad news for the market in general and not necessarily for Thornburg Mortgage specifically.   See Feldman Depo. at 176:11-24.   Consequently, the Court has modified the SEC's asserted fact to more accurately reflect the evidence.

[85]The Defendants attempt to dispute this fact by stating:

Disputed.  Mr. Goldstone also testified as follows:

> I don't recall making a whole lot of it [Feldman's email] and in fact, there are some other conversations and there are some other information related to the evolution of this European hedge fund. But you know, there were other large repo clients in other hedge funds and others struggling and having problems in this market. This was just another example of sort of a continuing list of problems that were evident and happening in the market.  I think the fact that they had lots of pay option arms made them somewhat less relevant to us since we really didn't have much of an investment in pay option arms.

Ex. 278 (Goldstone SEC Tr. 303:18-304:2).

Moreover, the fact is immaterial because there was no duty under Rule 13b2-2 to disclose the European hedge fund rumor.  The rumor was a contingent event of negligible anticipated magnitude that did not render Defendants' OTTI judgment false.

tended 'to dismiss most of the rumors that' he heard 'like that.'"  Goldstone Facts ¶ 138, at 32

(setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Fellers Depo. at

145:5-13).  See SEC Disputed Facts at 1-51 (not disputing this fact); Fellers Depo. at 145:5-13.[86]

---

Defendants Disputed Facts ¶ Y, at 12.  This assertion does not dispute the SEC's asserted fact.
Rather than stating what Goldstone did in response to hearing the news about the hedge-fund
collapse, the Defendants provide evidence explaining why Goldstone would not have done
anything with the information about the hedge-fund collapse.  The Defendants thus do not
specifically controvert the SEC's asserted fact, and the Court finds it undisputed.
        The SEC asserts the following fact: "Simmons testifies that he purportedly does not even
recall the e-mails about the collapsing European hedge fund, and by implication therefore did not
notify KPMG."  SEC Facts ¶ Z, at 5.  While the Defendants do not dispute this fact, see
Defendants Disputed Facts ¶ Z, at 12, the SEC does not cite evidence to support this fact.  The
SEC cites the Goldstone MSJ rather than to evidence.  See SEC Facts ¶ Z, at 12.  The local rules
require asserted facts to "refer with particularity to those portions of the record upon which the"
party relies.  D.N.M.LR-Civ. 56.1(b).  A fact asserting that the record contains no evidence of a
certain fact, event, or thing need not cite the record, because the record should not contain
support for that which is not there; however, the SEC's asserted fact is not a no-evidence fact.
Instead, the SEC asserts that Simmons testified to certain information.  Because the SEC does
not cite any evidence to support its asserted fact, the Court finds that lacks support in the record,
and will not consider it.

        [86]The Defendants assert the following fact:

        Mr. Goldstone could not "recall making a whole lot of" Mr. Feldman's email
        (Ex. 114)[, Feb. 27, 2008, Simmons Email,] at the time, because it was just
        another example of others "having problems in this market," and "the fact that
        they had lots of pay option arms made them somewhat less relevant to us since we
        really didn't have much of an investment in pay option arms."

Goldstone Facts ¶ 139, at 32 (quoting Goldstone SEC Depo. at 303:5-304:4).  The SEC disputes
this fact by stating:

        Defendant Goldstone did "make a whole lot' of the hedge fund collapse news, as
        on February 27, 2008 he wrote that 'a large Alt-A hedge fund in Europe is
        blowing up this afternoon[,]" and that UBS "got hit with 20 point haircuts on
        Alt-A AAA's overnight.  I think we will get this a little more gradually, but we
        should be ready for it."

SEC Disputed Facts ¶ 137, at 15-16.  The Defendants reply by stating:  "The SEC's response is
pure argument based on its unsupported and inadmissible speculation regarding the meaning of
Mr. Goldstone's email that is refuted by Mr. Goldstone's sworn testimony."  Goldstone Reply
Facts ¶ 139, at 16.  The Court finds the fact disputed.  As the Court has already concluded,

"[L]iquidation of a hedge fund that would have Alt-A collateral could put downward pressure on

the market in terms of unexpected supply, in the same way that the UBS situation occurred."

SEC Facts ¶ AA, at 5 (setting forth this fact).  See Goldstone Facts 271:9-15.[87]

> In a lunch meeting in New York on February 27, 2008 to discuss UBS's
> participation in the upcoming capital raise, among other things, during which
> Mr. Goldstone discussed the rumor of the European hedge fund collapse with
> UBS representatives, including Larry Cofsky, head of credit at UBS in New York,
> the UBS representatives "made [an overriding] statement about not [having] to

---

Goldstone thought that the European hedge fund's collapse would affect Thornburg Mortgage, or at least there is a material dispute concerning Goldstone's belief.  See supra note 83.

    The Defendants' assert the following fact: "Mr. Simmons does not recall Mr. Feldman's email (Ex. 114)[, Feb. 27, 2008, Simmons Email,] or hearing a rumor about the collapse of a European hedge fund on February 27, 2008."  Goldstone Facts ¶ 140, at 32.  The SEC disputes this fact by stating: "Defendant Simmons received two e-mails describing the hedge fund collapse on February 27, 2008."  SEC Disputed Facts ¶ 140, at 16.  The SEC cites the Feb. 27, 2008, Hedge Fund Email, which Goldstone sent to Simmons on February 27, 2008, discussing the hedge-fund rumor, and the Feb. 27, 2008, Simmons Email, in which Feldman discussed the hedge-fund rumor in an electronic mail transmission to which Simmons replied on February 27, 2008.  The Court thus finds the Defendants' asserted fact disputed, because Simmons received two electronic mail transmissions discussing the hedge-fund collapse, one to which he responded.

    [87]The Defendants attempt to dispute this fact by stating:

> Disputed insofar as the quoted language is in fact part of the SEC's question to
> Mr. Goldstone. SEC Ex. 2 (Goldstone SEC Tr. 179:9-14).  This testimony is also
> cited out of context, which renders it misleading.  Mr. Goldstone testified that
> "the fact that [the hedge fund] had lots of pay option arms made them somewhat
> less relevant to us."   Mr. Goldstone believed that the rumored hedge fund's
> collapse was unlikely at best, and that even if it occurred, it would not have a
> significant impact on Thornburg given the different kind of collateral the hedge
> fund reportedly held.

Defendants Disputed Facts ¶ AA, at 13 (citations omitted).  This assertion does not dispute the SEC's asserted fact.  First, the SEC des not quote, or at least does not indicate that it is quoting, Goldstone's deposition testimony.  Second, Goldstone answered yes to the question whether it was fair to say that the liquidation of a hedge fund which had Alt-A collateral could put downward pressure on the market in the same way as the UBS situation.  Goldstone agreed with the question, and, consequently, his testimony supports the SEC's asserted fact.  Third, whether the hedge-fund rumor was unlikely or whether it was not relevant to Thornburg Mortgage does not dispute, or even address, the SEC's asserted fact.  The Court thus finds the fact undisputed.

> worry about stuff," and Mr. Goldstone came away "with the sense that whatever was going on in Europe had no bearing or relationship on the Thornburg relationship with UBS."

Goldstone Facts ¶ 141, at 32-33 (setting forth this fact)(alteration in Goldstone Facts but not in source)(quoting Goldstone SEC Depo. at 308:8-16).   See Goldstone SEC Depo. at 172:5-19, 307:2-10, 308:5-16, 317:8-18.[88]

> After the UBS meeting, Mr. Goldstone emailed Mr. Simmons about what he had heard from UBS, specifically that "a large Alt-A hedge fund in Europe is blowing up this afternoon . . . .   They got hit with 20 point haircuts on Alt-A AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it."

Goldstone Facts ¶ 142, at 33 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Feb. 27, 2008, Hedge Fund Email at 2).   See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 27, 2008, Hedge Fund Email at 2.

"At the time Mr. Goldstone sent the email (Ex. 121)[, Feb. 27, 2008, Hedge Fund Email,] to Mr. Simmons, Mr. Goldstone did not know the name of the hedge fund or the European country in which it was located."   Goldstone Facts ¶ 143, at 33 (setting forth this fact).   See 2d RFAs at 7-8; Goldstone Decl. ¶ 37, at 7; Electronic Mail Transmission from Patrick Feldman

---

[88]The SEC attempts to dispute this fact by stating:

> Defendant Goldstone came away from the meeting with UBS believing that the hedge fund collapse would impact Thornburg, as on February 27, 2008 he wrote that "a large Alt-A hedge fund in Europe is blowing up this afternoon[,]" and that UBS "got hit with 20 point haircuts on Alt-A AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it."

SEC Disputed Facts ¶ 141, at 16.  While Goldstone may have believed that the hedge-fund collapse would impact Thornburg Mortgage, this belief does not specifically controvert the Defendants' asserted fact that the Goldstone did not believe that the collapse would impact Thornburg's relationship with UBS.  Accordingly, the SEC has not specifically controverted this fact, and the Court finds it undisputed.

to Larry Goldstone, Debora Burns, Clay Simmons, Nathan Fellers, and Jane Starrett at 2 (dated

Feb. 28, 2008), filed August 9, 2013 (Doc. 204-156).[89]

> Mr. Simmons was traveling to Dallas on the afternoon of February 27, 2008 for a
> meeting with the Office of Thrift Supervision ('OTS') the next day.  Upon
> arriving in Dallas, he immediately met with Thornburg's lawyers to prepare for
> the OTS meeting.  Mr. Simmons did not have a functional mobile phone device,
> and he does not recall reading Mr. Goldstone's email (Ex. 121)[, Feb. 27, 2008,
> Hedge Fund Email,] about the rumored hedge fund collapse on February 27.

Goldstone Facts ¶ 144, at 33 (setting forth this fact).  See Simmons Depo. Vol. III at 145:1-18;

Simmons Depo. Vol. II at 106:21-107:6, 419:10-420:8, 432:14-434:12, 434:22-435:2.[90]

---

[89]The Defendants' original asserted fact states: "At the time Mr. Goldstone sent the email
(Ex. 121)[, Feb. 27, 2008, Hedge Fund Email,] to Mr. Simmons, Mr. Goldstone did not know the
name of the hedge fund or the European country in which it was located, and considered the
information to be in the nature of a rumor rather than a confirmed fact."  Goldstone Facts ¶ 143,
at 33.  The SEC disputes this fact by stating: "Defendant Goldstone did not believe the
hedge-fund collapse to be a rumor; he understood it to be a fact.  Defendant Goldstone wrote,
after meeting with UBS on February 27, 2008, that 'a large Alt-A hedge fund in Europe is
blowing up this afternoon.'"  SEC Disputed Facts ¶ 143, at 16 (quoting Feb. 27, 2008, Hedge
Fund Email at 2).  The Defendants reply by arguing: "The SEC cannot raise a genuine dispute as
to Mr. Goldstone's subjective belief by offering inadmissible speculation as to the meaning of
his email.  The SEC's interpretation of the email is refuted by Mr. Goldstone's sworn
testimony."  Goldstone Reply Facts ¶ 143, at 68-69.
     The Court finds that the SEC has specifically controverted the fact.  Goldstone told
Simmons "that a large Alt-A hedge fund in Europe is blowing up" and that Thornburg Mortgage
"will get this a little more gradually, but we should be ready for it."  Feb. 27, 2008, Hedge Fund
Email at 2.  This electronic mail transmission appears to show that Goldstone considered the
hedge-fund rumor to be more than a rumor.  He did not tell Simmons that there was a rumor that
a European hedge fund was exploding, but just stated that a European hedge fund was blowing
up.  The Court finds that there is a dispute of material fact whether Goldstone believed that the
European hedge fund was more than a rumor.  Consequently, the Court finds the Defendants'
asserted fact disputed and will modify it accordingly.

[90]The SEC attempts to dispute this fact by stating: "Defendant Simmons testified that his
'gut reaction would be that [he] would have' checked his e-mail the night of February 27, 2008
when he arrived in Dallas, Texas."  SEC Disputed Facts ¶ 144, at 16 (quoting Simmons Depo.
Vol. II at 434:9-10).  The Defendants reply by stating:

> The SEC's response is misleading. Mr. Simmons testified as follows: 'My gut
> reaction would be that I would have [checked my email the night of February 27,
> 2008], but I don't recall whether I did or didn't.  Again, my -- I mean I had a big

- 91 -

> After the markets had closed on February 27, 2008, Mr. Goldstone had an informal meeting with members of the trading desk at Bear Stearns, including Michael Nierenberg, the head of mortgage trading.  Mr. Goldstone learned that Bear Stearns, on behalf of a group of investors that included PIMCO, had bid on the hedge fund's entire portfolio, and that it was Bear Stearns' view that the European hedge fund should accept that bid.

Goldstone Facts ¶ 145, at 33 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone SEC Depo. at 171:14-172:1, 174:1-12, 308:5-309:14.

> Goldstone's meeting with Bear Stearns where he was purportedly told that Bear Stearns had organized an investor group that had bid . . . [on] a collapsing European hedge fund's portfolio took place at 6:00 or 7:00 p.m. on the evening on February 27.  Goldstone testified that the "offer to buy was not accepted or declined at that point in time.  So as far as I knew, there was an offer to purchase all of the collateral from this European hedge fund by Bear Stearns and PIMCO that evening."

SEC Facts ¶ W, at 4 (setting forth this fact)(quoting Goldstone SEC Depo. 315:1-5).  See Goldstone SEC Depo. at 314:4-315:5.[91]

---

> day the next day and as -- at this point in time, we were not particularly concerned about the environment."

Goldstone Reply facts ¶ 144, at 69 (alterations in Goldstone Reply Facts but not in source)(quoting Simmons Depo. Vol. II at 434:7-12).  The Court agrees with the Defendants. Simmons qualified his gut reaction statement by stating that he does not recall.  The Court thus finds this fact undisputed.

> [91]The SEC's fact states:

> Goldstone's meeting with Bear Stearns where he was purportedly told that Bear Stearns had organized an investor group that had bid $2 billion for a collapsing European hedge fund's portfolio took place at 6:00 or 7:00 p.m. on the evening on February 27.  Goldstone testified that the "offer to buy was not accepted or declined at that point in time.  So as far as I knew, there was an offer to purchase all of the collateral from this European hedge fund by Bear Stearns and PIMCO that evening."

SEC Facts ¶ W, at 4.  The Defendants dispute this fact by stating:  "Disputed insofar as the fact that an investor group had bid $2 billion is not supported by the evidence cited."  Defendants Disputed Facts ¶ W, at 11.  The deposition testimony, which the SEC cites, does not state that the bid for the European hedge fund was $2 billion.  That portion of the SEC's asserted lacks

"After his meeting with Bear Stearns on the evening of February 27, 2008, Mr. Goldstone believed that the rumored hedge fund's collapse and any associated market impact" was not assured to occur.  Goldstone Facts ¶ 146, at 33-34 (setting forth this fact).  See Goldstone SEC Depo. at 171:8-174:12, 309:11-19.[92]  "Bear Stearns, which was one of Thornburg's major repo lenders and closest Wall Street relationships, gave Mr. Goldstone no indication that the hedge fund's difficulties might be a problem for Thornburg."  Goldstone Facts ¶ 147, at 34 (setting

_____

evidentiary support.  The Court has modified the SEC's asserted fact to accurately reflect the record.

[92]The Defendants' asserted fact states: "After his meeting with Bear Stearns on the evening of February 27, 2008, Mr. Goldstone believed that the rumored hedge fund's collapse and any associated market impact were unlikely at best."  Goldstone Facts ¶ 146, at 33-34.  The SEC disputes this fact by stating:

> Defendant Goldstone did not testify that the hedge fund collapse and market impact were "unlikely at best."  Rather, Defendant Goldstone merely testified that as of the evening of February 27, 2008, the "liquidation of that hedge fund was not a foregone conclusion[,]" given Bear Stearns's bid on the hedge fund's portfolio, meaning that liquidation was possible or probable, and further confirming that Defendant Goldstone knew that the impending hedge fund collapse was more than mere rumor.

SEC Disputed Facts ¶ 146, at 16 (quoting Goldstone SEC Depo. at 171:1-18).  The Defendants reply by stating:

> The SEC's response does not dispute, and in fact confirms, that Mr. Goldstone testified that the rumored hedge fund collapse was uncertain to occur.

> The SEC's response that the "liquidation was possible or probable" and that Mr. Goldstone's testimony "confirm[ed] that Mr. Goldstone "knew that the impending hedge fund collapse was more than mere rumor" is inadmissible speculation that is refuted by Mr. Goldstone's sworn testimony which the SEC cites as evidence for its response.

Goldstone Reply Facts ¶ 146, at 70.  In his deposition, Goldstone testified that Bear Stearns made an offer to purchase the European hedge fund's portfolio, which would have prevented the hedge fund from collapsing.  See Goldstone SEC Depo. at 171:8-174:12.  Goldstone did not testify that it was unlikely that the hedge fund would collapse, but instead that it was possible that it would not collapse.  The Court has thus modified the fact to more accurately reflect the evidence.

forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone SEC Depo.

at 173:5-13, 309:7-19, 316:25-318:2; Goldstone Decl. ¶ 37, at 7.  "Mr. Goldstone did not learn

that the hedge fund had rejected the Bear Stearns proposal and that it was liquidating until

February 28, 2008."  Goldstone Facts ¶ 148, at 34 (setting forth this fact).  See SEC Disputed

Facts at 1-51 (not disputing this fact); Goldstone SEC Depo. at 174:7-21.  "Mr. Simmons

returned to Santa Fe from Dallas late in the day on February 28, 2008 and did not learn that the

European hedge fund's assets were being liquidated until after the Form 10-K had been filed."

Goldstone Facts ¶ 149, at 34 (setting forth this fact).  See SEC Disputed Facts at 1-51; Simmons

Depo. Vol. III at 141:8-17; Simmons Depo. Vol. II at 107:1-6, 227:16-25; Simmons Decl.

¶¶ 59-60, at 14.

Starrett, who was serving jury duty on February 27, 2008, had no knowledge about the

rumor and, even if she had,

> [she is] not sure that it would have been relevant to [her].  It sound[ed] like a
> rumor [to her].  [She] would have possibly asked some more questions.  But . . .
> [nothing] in the OTTI guidance . . . said you should consider rumors you've
> heard . . . .  [There was] [n]othing concrete in here for [her] to really act on.

Goldstone Facts ¶ 150, at 34 (setting forth this fact)(quoting Starrett Depo. at 188:24-189:12).

See Starrett Depo. at 147:15-16, 187:18-189:12.[93]  "Thornburg employees frequently heard

rumors in the marketplace about events that did not come to pass."  Goldstone Facts ¶ 151, at 34

(setting forth this fact).  See Feldman Depo. at 184:25-185:4; Fellers Decl. ¶ 19, at 4-5;

Goldstone Decl. ¶ 35, at 7; Simmons Decl. ¶ 58, at 13.[94]  "It was Thornburg's practice to not

---

[93]The SEC attempts to dispute this fact by stating: "The European hedge fund's
impending collapse was not a rumor."  SEC Disputed Facts ¶ 150, at 17.  While Goldstone and
Simmons may have treated the rumor as fact, it was still a rumor as of February 27, 2008.  The
Court thus finds this fact undisputed.

treat rumors as confirmed facts that could be relied upon to make business decisions."  Goldstone

Facts ¶ 52, at 35 (setting forth this fact).  See Fellers Decl. ¶ 19, at 4-5; Feldman Decl. ¶ 23, at 5;

Goldstone Decl. ¶ 36, at 7; Simmons Decl. ¶ 58, at 13.[95]  "Merrill Lynch, UBS, Bear Stearns and

---

[94]The SEC attempts to dispute this fact by stating: "The European hedge fund's impending collapse was not a rumor."  SEC Disputed Facts ¶ 152, at 17.  This assertion does not address, much less specifically controvert, the Defendants' asserted fact.  Consequently, the Court finds the fact undisputed.

[95]The SEC attempts to dispute this fact by stating: "The European hedge fund's impending collapse was not a rumor."  SEC Disputed Facts ¶ 151, at 17.  This assertion does not address, much less specifically controvert, the Defendants' asserted fact.  Consequently, the Court finds the fact undisputed.

The Defendants assert the following fact:  "An internal JP Morgan email, dated Friday, February 29, 2008, noted, '[r]umors of large hedge fund liquidation (turns out to be Peloton) beg[an]' on Wednesday."  Goldstone Facts ¶ 153, at 35 (quoting Electronic Mail Transmission from Megan A. McClellan to Eric C. Norquist at 2 (dated Feb. 29, 2008), filed August 9, 2013 (Doc. 204-158)("Feb. 29, 2008, McClellan Email")(alterations in Goldstone Facts but not in source).  The SEC disputes this fact by stating: "Defendants knew that the European hedge fund's impending collapse was not a rumor; what someone at JP Morgan wrote on February 29, 2008 is inadmissible and irrelevant."  SEC Disputed Facts ¶ 153, at 17.  The SEC does not cite any evidence, but refers the Court to its disputed fact number 137, where it contends that Goldstone and Simmons believed that the European hedge fund rumor was true.  The Defendants reply by arguing:

> The SEC's response does not dispute this fact.
>
> The SEC cannot create a genuine dispute as to this fact by submitting additional non-responsive purported facts.  Defendants' purported subjective understanding regarding a specific hedge fund rumor does not refute the fact.
>
> Moreover, the evidence cited by the SEC does not establish that "Defendants knew that the European hedge fund's impending collapse was not a rumor."
>
> The SEC does not explain the basis for its objection that "what someone at JP Morgan wrote on February 29, 2008 is inadmissible and irrelevant."

Goldstone Reply Facts ¶ 153, at 72.

The SEC's first assertion -- that the Defendants knew that the hedge fund's collapse was not a rumor -- does not address, much less specifically controvert, the Defendants' asserted fact. The SEC's relevance argument similarly does not dispute the fact, because relevance is a legal argument that is best left for the Analysis Section.  The Court, however, agrees with the SEC that the fact lacks support in admissible evidence.  The only evidence that the Defendants cite in

JP Morgan -- lenders that were aware of the European hedge fund rumor on February 27, 2008 --

only issued a combined $2.893 million in margin calls to Thornburg on February 27, 2008."

Goldstone Facts ¶ 154, at 35 (setting forth this fact).  See Feb. 27, 2008, Simmons Email at 2;

Goldstone SEC Depo. at 307:2-10, 308:8-16, 308:20-309:6, 309:11-14; Feb. 29, 2008,

McClellan Email at 2; Restatement Margin Calls at 2-7.[96]  "On February 28 and 29, 2008, those

four repo counterparties issued a combined $146.1 million in margin calls to Thornburg."

Goldstone Facts ¶ 155, at 35 (setting forth this fact).  See Restatement Margin Calls at 2-7.[97]

---

support of their asserted fact is an electronic mail transmission from one JP Morgan employee to another.  See Feb. 29, 2008, McClellan Email at 2.  Moreover, it appears that the Defendants are presenting the electronic mail transmission for the truth of the statements in it -- i.e. it is being presented for the truth of the matter asserted.  The Feb. 29, 2008, McClellan Email is, consequently, an out-of-court statement that is being presented for the truth of the matter asserted, making it inadmissible hearsay.  As the proponents of the evidence, the Defendants have the burden of proving its admissibility.  See U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd., 582 F.3d 1121, 1149 (10th Cir. 2009)("The proponent bears the burden of establishing admissibility.").  Because the Feb. 29, 2008, McClellan Email is hearsay, the Defendants bear the burden of proving that it falls within a hearsay exception.  The Defendants have not argued that any hearsay exception applies and, based on the evidence before the Court, the Court cannot find one.  Accordingly, the Feb. 29, 2008, McClellan Email is inadmissible hearsay that does not fall within any exception.  As such, the Court will not consider it, and the Defendants asserted fact lacks admissible evidence supporting it.  The Court, thus, concludes that the SEC has disputed the fact.

[96]The SEC attempts to dispute this fact by stating:

Margin calls were typically issued based on pricing done at the close of a business day.  Thus, information affecting pricing on February 27, 2008 would -- and here did -- result in margin calls on February 28, 2008.  Defendant Goldstone testified that he believes that the hedge fund collapse may have contributed to the February 28, 2008 margin calls.

SEC Disputed Facts ¶ 154, at 17.  This assertion does not specifically controvert the Defendant's asserted fact.  Instead, the SEC's assertion provides an explanation for the Defendant's fact.  Because the SEC has not specifically controverted the Defendants' asserted fact, the Court finds it undisputed.

[97]The SEC attempts to dispute this fact by stating:

12.    **GAAP Guidance on OTTI Determinations.**

Statement of Financial Accounting Standards No. 115 ("SFAS 115") directed that "[f]or individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary," (or "OTTI").

If the decline is OTTI, then the amount of the decline is recognized as a charge against income in the current period equal to the difference between the investment's cost and fair value.

By contrast, if the unrealized losses were determined to be temporary, an entity could report the unrealized loss as a reduction in equity on its balance sheet.

Goldstone Facts ¶ 156, at 35-36 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Statement of Financial Accounting Standards No. 115: According for Certain Investments in Debt and Equity Securities at 3-4 (May 1993), filed August 9, 2013 (Doc. 204-273)("SFAS 115").  "SFAS 115 provides that 'extremely remote disaster scenarios (such as a run on the bank or an insurance company) would not be anticipated by an enterprise in deciding whether it had the positive intent and ability to hold a debt security to maturity.'" Goldstone Facts ¶ 157, at 36 (quoting SFAS 115 at 5)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); SFAS 115 at 5.  "Appendix A to SFAS 115 stated that 'some have urged the Board to develop guidance that would resolve recent practice problems about the application of other-than-temporary impairment,' but that 'the Board believes

---

Margin calls were typically issued based on pricing done at the close of a business day.  Thus, information affecting pricing on February 27, 2008 would -- and here did -- result in margin calls on February 28, 2008.  Defendant Goldstone testified that he believes that the hedge fund collapse may have contributed to the February 28, 2008 margin calls.

SEC Disputed Facts ¶ 155, at 17.  This assertion does not specifically controvert the Defendants' asserted fact.  Instead, the SEC's assertion provides an explanation for the Defendants' fact. Because the SEC has not specifically controverted the Defendants' asserted fact, the Court finds it undisputed.

that providing comprehensive guidance on other-than-temporary impairment involves issues beyond the scope of this Statement.'"   Goldstone Facts ¶ 158, at 36 (setting forth this fact)(quoting SFAS 115 at  6).  See SEC Disputed Facts at 1-51 (not disputing this fact); SFAS 115 at 6.

> SEC Staff Accounting Bulletin No. 59 ("SAB 59"), which discussed "equity securities," listed as examples three "factors which, individually or in combination, indicate that a decline [in fair value of the individual security] is other than temporary": (1) the length of time and the extent to which the market value has been less than cost; (2) the financial condition and near-term prospects of the issuer; and (3) "[t]he intent and ability of the holder to retain its investment in the issuer for a period of time sufficient to allow for any anticipated recovery in market value."  Aside from the foregoing, SAB 59 did not further explain how to assess "intent and ability."

Goldstone Facts ¶ 159, at 36 (setting forth this fact)(alterations in Goldstone facts but not in source)(quoting Other Than Temporary Impairment of Certain Investments in Equity Securities, U.S. Securities and Exchange Commission at 2-3, filed August 9, 2013 (Doc. 204-279)("SAB 59")).  See SEC Disputed Facts at 1-51 (not disputing this fact); SAB 59 at 2-3.  "FASB Staff Position Nos. FAS 115-1 and FAS 124-1 ('FSP FAS 115-1 and FAS 124-1') provided that '[i]mpairment shall be assessed at the individual security level' but did not explain how to make that assessment."  Goldstone Facts ¶ 160, at 36 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments, FASB Staff Position at 3, filed August 9, 2013 (Doc. 204-272)("FSP FAS 115-1 & FAS 124-1")).  See SEC Disputed Facts at 1-51 (not disputing this fact); FSP FAS 115-1 & FAS 124-1 at 3.

> In Statement on Auditing Standards No. 92 ("SAS 92"), the Auditing Standards Board issued guidance on "[p]rocedures for evaluating management's consideration of the need to recognize impairment losses."  SAS 92 stated that OTTI determinations require the application of "judgments . . . based on subjective as well as objective factors, including knowledge and experience about past and current events and assumptions about future events."

"The auditor should evaluate (a) whether management has considered relevant information in determining whether factors such as those listed in paragraph 47 exist and (b) management's conclusions about the need to recognize an impairment loss.  That evaluation requires the auditor to obtain evidence about such factors that tend to corroborate or conflict with management's conclusions."

Goldstone Facts ¶ 161, at 36-37 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Auditing Derivative Instruments, Hedging Activities, and Investments in Securities, SAS No. 92 at 3-5, filed August 9, 2013 (Doc. 204-276)("SAS 92")).  See SEC Disputed Facts at 1-51 (not disputing this fact); SAS 92 at 3-5; Deposition of Michael Smith at 65:3-17 (taken Mar. 14, 2013), filed August 9, 2013 (Doc. 204-314)("Smith Depo.").

"'[C]onsideration of management's intent and THORNBURG'S ability to hold impaired investment securities until their values recovered generally involved the application of accounting and auditing judgments by THORNBURG'S internal accountants and independent auditor.'" Goldstone Facts ¶ 162, at 37 (setting forth this fact)(quoting 1st RFAs at 11).  See 1st RFAs at 11.[98]

---

[98]The SEC does not dispute this fact, but states:

Undisputed, but noted that both intent and ability are factual conditions.  Either Thornburg management, in fact, intended to hold its impaired Purchased ARM Assets until the values recovered or management did not and either Thornburg had the ability to hold its impaired Purchased ARM Assets until the values recovered or it did not.  Accounting and auditing judgments do not dictate whether management has both the intent and ability to hold impaired securities until the values recover.  To the contrary, these are factual conditions that must be determined by evaluating the facts.  At the time Thornburg filed its 2007 Form 10-K, in light of, among other things, Thornburg's extremely limited liquidity, inability to meet margin calls when due and breach of Repo Agreements subjecting it to having its Purchased ARM Assets sold, and expectation of additional margin calls, Defendants could not justify based on the facts that existed at the time the 2007 Form 10-K was filed that they had both the intent and ability to hold Thornburg's Purchased ARM Assets until losses recovered.

On March 31, 2008, investment banking firm Sandler O'Neil sent a letter to the SEC requesting "emergency interpretive guidance" because "the collision of accounting guidance on fair value and other-than-temporary impairment at a time of extraordinary economic and market dislocations ha[d] created an accounting vortex."  Sandler O'Neil explained that, "[a]s unfortunate as current market dislocations [we]re for the debut of FAS 157's concept of fair value, its imminent head-on collision with other-than-temporary impairment threaten[ed] to transform a severe problem into a disaster."  It stated that this was so, because the fair value of an asset is used to determine if the asset is impaired and, if an impairment is considered other than temporary, "'an impairment loss . . . in earnings equal to the entire difference between the investment's cost and its fair value'" is recognized "and . . . the 'fair value of the investment . . . [which] become[s] the new cost basis of the investment [is] not . . . adjusted for subsequent recoveries in fair value.'"

Goldstone Facts ¶ 163, at 37 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Electronic Mail Transmission from Donald Walker to Stephanie Hunsaker, Amit Pande, Kevin W. Vaughn, John Nolan, Hugh West, and Wayne Carnall at 2-3, 5 (dated Apr. 1, 2008), filed August 9, 2013 (Doc. 204-219)("Sandler O'Neill Letter")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Sandler O'Neill Letter at 2-7.  "On July 9, October 29, and November 21, 2008, the SEC held roundtable discussions among investors, accountants, business leaders, and regulators to discuss 'mark-to-market accounting and the recent period of market turmoil' and 'the benefits and potential challenges associated with existing fair value accounting and auditing standards.'"  Goldstone Facts ¶ 164, at 37-38 (setting forth this fact)(quoting Press Release, Roundtable on Market-to-Market Accounting, Securities and Exchange Commission at 2, filed August 9, 2013 (Doc. 204-261)("Market-to-Market Release"); Press Release, Roundtable on Fair Value Accounting Standards, Securities and Exchange Commission at 2, filed August 9, 2013 (Doc. 204-261)("Fair Value Accounting Release")).  See

---

SEC Disputed Facts ¶ 162, at 17.  Because the SEC does not dispute the Defendants' fact, the Court finds it undisputed.

SEC Disputed Facts at 1-51 (not disputing this fact); Market-to-Market Release at 2; Fair Value

Accounting Release at 2.

> On July 15, 2008, SEC Chairman Christopher Cox testified before the U.S. Senate Committee on Banking, Housing and Urban Affairs about "the difficulty of applying fair value accounting rules to assets for which there is no current market" and recent discussions about how to implement fair value standards under current market conditions.

Goldstone Facts ¶ 165, at 38 (setting forth this fact)(quoting Testimony Concerning Recent

Developments in U.S. Financial Markets and Regulatory Responses, by Chairman Christopher

Cox, U.S. Securities and Exchange Commission, at 3 (July 15, 2008), filed August 9, 2013

(Doc. 204-262)("July 15, 2008, Cox Testimony")).  See SEC Disputed Facts at 1-51 (not

disputing this fact); July 15, 2008, Cox Testimony at 3.

> On September 30, 2008, the SEC Office of the Chief Accountant and the staff of the Financial Accounting Standards Board (FASB) published guidance on "[w]hat factors should be considered in determining whether an investment is other-than-temporarily impaired," which included the following:
>
>> Determining whether impairment is other-than-temporary is a matter that often requires the exercise of reasonable judgment based upon the specific facts and circumstances of each investment. . . .
>>
>> Existing U.S. GAAP does not provide "bright lines" or "safe harbors" in making a judgment about other-temporary impairments.  However, "rules of thumb" that consider the nature of the underlying investment can be useful tools for management and auditors in identifying securities that warrant a higher level of evaluation.

Goldstone Facts ¶ 166, at 38 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(quoting Press Release, SEC Office of the Chief Accountant and FASB Staff

Clarifications on Fair Value Accounting, U.S. Securities and Exchange Commission at 3 (2008),

filed August 9, 2013 (Doc. 204-263)("Clarification Press Release")).  See SEC Disputed Facts

at 1-51 (not disputing this fact); Clarification Press Release at 3.

> In December 2008, the SEC's Office of the Chief Accountant of the Division of Corporation Finance issued a report and recommendations to Congress concerning fair value accounting standards.  The report stated that "[i]mpairment accounting can be complex, as there are different definitions of impairment and different impairment tests for different types of financial assets," that "[j]udgment is required in assessing whether an OTTI exists," and that "[t]he current global economic crisis has highlighted difficulties in performing OTTI evaluations."

Goldstone Facts ¶ 167, at 38-39 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008: Study on Market-to-Market Accounting, Office of the Chief Accountant Division of Corporation Finance at 3-4, filed August 9, 2013 (Doc. 204-280)("R&R to Section 133")).  See SEC Disputed Facts at 1-51 (not disputing this fact); R&R to Section 133 at 3-4.

> The SEC Mark-to-Market Study recommended that "FASB . . . evaluate the need for modifications (or the elimination) of current OTTI guidance to provide for a more uniform system of impairment testing standards for financial instruments." In particular, "FASB should consider whether the 'ability and intent to hold to recovery' test under SFAS No. 115 is sufficiently operational."

Goldstone Facts ¶ 168, at 39 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting R&R to Section 133 at 5).  See SEC Disputed Facts at 1-51 (not disputing this fact); R&R to Section 133 at 5.  "FASB Board members observed during their deliberations in March and April 2009 that 'current market conditions have made the existing impairment model particularly challenging to apply' and that 'the current impairment model is flawed and confusing to many users.'"  Goldstone Facts ¶ 169, at 39 (setting forth this fact)(quoting Minutes of the March 16, 2009, Financial Accounting Standards Board Meeting at 6-7, filed August 9, 2013 (Doc. 204-266)("FASB Mar. 16, 2009, Minutes"); Minutes of the April 2, 2009, Financial Accounting Standards Board Meeting at 7, filed August 9, 2013 (Doc. 204-267)("FASB Apr. 2,

2009, Minutes")).  See SEC Disputed Facts at 1-51 (not disputing this fact); FASB Mar. 16,

2009, Minutes at 6-7; FASB Apr. 2, 2009, Minutes at 7-8.

> In April 2009, FASB amended the OTTI guidance with the express purpose of
> making it more "operational."  The amendments clarified that an OTTI exists only
> if an entity intends to sell the debt security (that is, it has decided to sell the
> security) or if the entity more likely than not will be required to sell the security
> before recovery of its amortized cost basis.

Goldstone Facts ¶ 170, at 39 (setting forth this fact)(alterations omitted)(internal quotation marks

omitted)(quoting Recognition and Presentation of Other-Than-Temporary Impairments, FASB

Staff Position at 4 (Apr. 9, 2009), filed August 9, 2013 (Doc. 204-271)("Apr. 9, 2009, FASB

Staff Position")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Apr. 9, 2009, FASB

Staff Position at 4.

### 13.    Generally Accepted Auditing Standards on Type I/Type II Subsequent Events.

"Generally Accepted Auditing Standards ('GAAS') define subsequent events as 'events

or transactions [that] sometimes occur subsequent to the balance-sheet date, but prior to the

issuance of the financial statements, that have a material effect on the financial statements and

therefore require adjustment or disclosure in the statements.'"  Goldstone Facts ¶ 171, at 40

(setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Subsequent

Events, AU Section 560 at 2, filed August 9, 2013 (Doc. 204-278)("AU § 560")).  See SEC

Disputed Facts at 1-51 (not disputing this fact); AU § 560 at 2.

> Under GAAS, events that occur after the balance sheet date but before the
> issuance of the financial statements "should not result in the adjustment of
> financial statements" (the "subsequent period") unless they are "Type I"
> subsequent events, meaning that they "provide additional evidence with respect to
> conditions that existed at the date of the balance sheet and affect the estimates
> inherent in the process of preparing financial statements."

Goldstone Facts ¶ 172, at 40 (setting forth this fact)(quoting AU § 560 at 2.  See SEC Disputed Facts at 1-51 (not disputing this fact); AU § 560 at 2.  "Events occurring during the subsequent period that are new developments and not a continuation of conditions that existed at the balance sheet date are known as 'Type II events' and do not require adjustments to the financial statements but may simply require disclosure as a 'subsequent event' in the 10-K."  Goldstone Facts ¶ 173, at 40 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); AU § 560 at 2.  "The determination of whether an event is a Type I or Type II subsequent event is a 'highly judgmental area . . . depend[ent] on the facts and circumstances.'"  Goldstone Facts ¶ 174, at 40 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Deposition of Craig Crawford at 178:10-11 (taken Mar. 5, 2013), filed August 9, 2013 (Doc. 204-300)("Crawford Depo.")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Crawford Depo. at 177:23-178:11.  "Accounting for subsequent events is governed by auditing standards that prescribe specific procedures that an auditor must perform 'for the purpose of ascertaining the occurrence of subsequent events that may require adjustment or disclosure' in the financial statements."  Goldstone Facts ¶ 175, at 40 (setting forth this fact)(quoting AU § 560 at 4).  See Sec Disputed Facts at 1-51 (not disputing this fact); AU § 560 at 4.

> KPMG issued a PPL [-- professional practice letter --] in February 2008 expressly advising that the "current illiquid credit market conditions" at the time complicated the determination of whether subsequent events occurring after the balance sheet date but before issuance of the financial statements represented a continuation of conditions existing at the balance sheet date (Type I events) or constituted new developments (Type II events).  The PPL further stated, however, that "changes in estimated fair values of securities during the subsequent period ordinarily would not result in an adjustment of the prior period financial statements.  Those changes typically are the result of market movements occurring after the balance sheet date."

The PPL referenced a similar PPL issued in October 2007, which advised that "valuations of assets . . . should not reflect declines in market prices occurring after the balance sheet date."

Goldstone Facts ¶ 176, at 40-41 (setting forth this fact)(alterations omitted)(quoting Professional Practice Letter from Craig W. Crawford, KPMG Department of Professional Practice at 2 (dated Feb. 4, 2008), filed August 9, 2013 (Doc. 204-42)("Feb. 4, 2008, PPL")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 4, 2008, PPL at 2.

### 14.     Thornburg Mortgage's OTTI Judgment and Going Concern Analysis.

"[T]he OTTI analysis entailed complex subjective and predictive judgments about future events, including potential market developments, the unknown timing and amount of future margin calls, and Thornburg's future ability to obtain financing, raise capital, and generate cash from its operations."  Goldstone Facts ¶ 177, at 41 (setting forth this fact).  See Hall Depo. at 131:4-13, 135:9-140:15, 145:10-15; Womack Depo. at 44:6-49:15, 57:2-13; Deposition of James Browning at 50:6-51:11 (taken Feb. 13, 2013), filed August 9, 2013 (Doc. 204-298)("Browning Depo.").[99]  "[M]arket conditions at the time of the 2007 Form 10-K filing made it particularly difficult for Thornburg to make its OTTI judgment, and . . . the market turmoil made OTTI 'a higher risk [and] more challenging area to conclude on.'"  Goldstone Facts ¶ 178, at 41 (setting forth this fact)(quoting Hall Depo. at 147:6-7).  See SEC Disputed Facts at 1-51 (not disputing

---

[99]The SEC does not dispute this fact, but states:

Undisputed, but noted that the OTTI analysis also entails analysis of objective factors, namely factual conditions, and reasonable expectations regarding future events.  The SEC's accounting expert will further testify that in his experience "objective factors weigh more heavily than subjective factors in the OTTI analysis for obvious reasons (i.e., they are more tangible and more subject to auditable procedures and independent evaluation)."

SEC Disputed Facts ¶ 177, at 17-18.  Because the SEC does not dispute this fact, the Court finds it undisputed.

this fact); Hall Depo. at 145:16-147:7.  "[T]here are 'so many different factors that are involved

in [the] assessment' of a company's ability to hold assets to recovery, some of which require

'predicting future events.' . . .  [P]redicting future events 'is a consideration that would be

contemplated.'"  Goldstone Facts ¶ 179, at 41 (setting forth this fact)(alterations in Goldstone

Facts but not in source)(quoting Smith Depo. at 65:23-66:12).  See SEC Disputed Facts at 1-51

(not disputing this fact); Smith Depo. at 65:8-66:12.

> [R]eaching that [OTTI] conclusion, . . . require[d] a difficult judgment[.]  [I]t's a
> somewhat subjective conclusion.  You're being asked to predict future events
> based on . . . your understanding of the current market and where it might go,
> based on historical conditions, what kind of fluctuations in valuations might have
> been experienced historically for the same types of assets . . . as to ability to hold;
> you're also being asked to sort of predict whether you'll be able to raise capital in
> the future.  Because REITs are required to pay out 95 percent of their earnings in
> dividends each year, . . . REITs are fairly dependent on continuously being in the
> capital market.  So there is a lot of future events involved in that analysis that one
> has to make a subjective decision about whether they are going to occur the way
> you think they will. . . .  Given the difficulty of the judgment and the facts [of
> which Starrett was aware] . . . at the time that the OTTI analysis judgment was
> reached, [it is possible that], reasonable individuals could have differed about the
> appropriate conclusion of the OTTI analysis[.]

Starrett Facts ¶ 22, at 5-6 (setting forth this fact)(alterations in Starrett Facts but not in

source)(quoting Starrett Depo. at 154:22-155:22).   See Starrett Depo. at 154:22-155:22.[100]

"Ms. Starrett did not view payments of margin calls over time as material to Thornburg's OTTI

---

[100]The SEC does not dispute this fact, but states:

> Undisputed, but noted that the OTTI analysis also entails analysis of objective
> factors, namely factual conditions, and reasonable expectations regarding future
> events.  The SEC's accounting expert will further testify that in his experience
> "objective factors weigh more heavily than subjective factors in the OTTI
> analysis for obvious reasons (i.e., they are more tangible and more subject to
> auditable procedures and independent evaluation)."

SEC Disputed Starrett Facts ¶ 22, at 3.  Because the SEC does not dispute this fact, the Court
concludes that it undisputed.

analysis."  Starrett Facts ¶ 33, at 8 (setting forth this fact).  See Starrett Decl. ¶ 18, at 7-8; Starrett

SEC Depo. at 19:21-20:4, 119:3-10, 157:22-25, 180:17-24, 181:1-8, 224:10-21, 225:7-11,

225:5-24, 226:17-22.[101]  "'OTTI can be' a 'difficult judgment to make.' . . . '[M]arket

conditions at the time of the Thornburg's 2007 audit made the OTTI judgment . . . more

difficult.'"  Goldstone Facts ¶ 180, at 41 (setting forth this fact)(alterations omitted)(quoting

Womack Depo. at 45:2-5, 50:2-7).  See SEC Disputed Facts at 1-51 (not disputing this fact);

Womack Depo. at 44:6-45:5, 50:2-7, 60:22-61:4.  "[A]n assessment of a company's ability to

hold 'is an evaluation of the ability to hold in the future.'"  Goldstone Facts ¶ 181, at 41-42

(setting forth this fact)(quoting Hall Depo. at 136:9-10).  See SEC Disputed Facts at 1-51 (not

disputing this fact); Hall Depo. at 136:9-10.  "Thornburg's intent and ability to hold impaired

assets was contingent, in part, on having sufficient liquidity to satisfy future margin calls."

Goldstone Facts ¶ 182, at 42 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not

disputing this fact); Crawford Depo. at 33:22-34:10.  "[T]he volatile, unprecedented market

conditions of the financial crisis made the OTTI rules particularly difficult to apply in 2007 and

2008."  Goldstone Facts ¶ 183, at 42 (setting forth this fact).  See SEC Disputed Facts at 1-51

(not disputing this fact); Hall Depo. 143:2-7, 145:16-147:7; Womack Depo. at 50:2-7,

60:22-61:4; Smith Depo. at 67:8-21.

---

[101]The SEC attempts to dispute this fact by stating: "Defendant Starrett's claimed view is
implausible and inconsistent with the fact that she purposely did not tell KMPG [sic] about
Thornburg's untimely payment of margin calls to avoid escalating the issue."  SEC Disputed
Starrett Facts ¶ 33, at 8.  This assertion does not specifically controvert Starrett's asserted fact.
Purposely withholding from KPMG that Thornburg Mortgage was not timely meeting its margin
calls does not specifically controvert Starrett's asserted fact that she thought the untimely
payment of margin calls was not material to Thornburg Mortgage's OTTI analysis.  In contrast,
purposely not telling KPMG about the untimely margin calls would create the inference that
Starrett did not believe that they were material to Thornburg Mortgage's OTTI analysis.  The
evidence may even lead to the inference that Starrett was attempting to mislead KPMG or was
purposely keeping KPMG in the dark, but it does not specifically controvert Starrett's asserted
fact.  Accordingly, the Court finds the fact undisputed.

KPMG's Professional Practice Letters ("PPLs") -- internal KPMG accounting and auditing guidance documents -- acknowledged that "the unstable credit market conditions and the resulting uncertainties combined in a number of accounting and auditing challenges," particularly "valuation difficulties" and "impairment issues." The PPLs instructed KPMG auditors to "exercise vigilance when assessing the reasonableness of clients' valuation and impairment conclusions."

Goldstone Facts ¶ 184, at 42 (setting forth this fact)(quoting Professional Practice Letter 07-067 from Sam Ranzilla, KPMG Department of Processional Practice, regarding Credit Market Conditions -- Audit Considerations and Policies Regarding Targeted In-Depth Reviews and Involvement of Valuation Specialists at 3 (Dec. 10, 2007), filed August 9, 2013 (Doc. 204-27)("Dec. 10, 2007, PPL"); Professional Practice Letter 07-060 from Sam Ranzilla, KPMG Department of Professional Practice, regarding Accounting and Auditing Considerations Related to Illiquid Credit Market Conditions at 2 (Oc. 5, 2007), filed August 9, 2013 (Doc. 204-19)("Oct. 5, 2007, PPL")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Dec. 10, 2007, PPL at 3; Oct. 5, 2007, PPL at 2; Professional Practice Letter from Mark B. Bielstein, KPMG Department of Professional Practice, regarding Fourth Quarter 2007 Reminders at 2-3 (Jan. 4, 2008), filed August 9, 2013 (Doc. 204-29).

"Mr. Goldstone, Mr. Simmons and Ms. Starrett understood the intent and ability to hold analysis to be a subjective, forward-looking judgment call."  Goldstone Facts ¶ 185, at 42 (setting forth this fact).  See Starrett Depo. at 151:13-152:18, 155:23-156:14; Simmons Depo. Vol. III at 139:3-25; Goldstone Decl. ¶ 42, at 8.[102]  "[R]eaching the OTTI conclusion 'required a

_____

[102]The SEC attempts to dispute this fact by stating:

The OTTI analysis entails analysis of objective factors, namely factual conditions, and reasonable expectations regarding future events.  The SEC's accounting expert will further testify that in his experience "objective factors weigh more heavily than subjective factors in the OTTI analysis for obvious reasons (i.e., they

difficult judgment,' and . . . 'reasonable individuals could have differed about the appropriate conclusion of the OTTI analysis.'"   Goldstone Facts ¶ 186, at 43 (setting forth this fact)(alterations omitted)(quoting Starrett Depo. at 154:22-155:22).   See SEC Disputed Facts at 1-51 (not disputing this fact); Starrett Depo. at 154:22-155:22.   "Mr. Goldstone and Mr. Simmons understood that the OTTI judgment with respect to 'intent and ability to hold' was part of Thornburg's going concern analysis."   Goldstone Facts ¶ 187, at 43 (setting forth this fact).   See SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone SEC Depo. at 68:15-69:23; Simmons Depo. Vol. III at 134:11-135:16.   "KPMG considered 'management's intent and ability to hold . . . [to be] a question of liquidity and that was part and parcel of the going concern analysis.'"   Goldstone Facts ¶ 188, at 43 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Deposition of John Taylor at 43:1-4 (taken Jan. 25, 2013), filed August 9, 2013 (Doc. 204-317)("Taylor Depo.")).   See SEC Disputed Facts at 1-51 (not disputing this fact); Taylor Depo. at 42:21-43:4.   "[There were] only . . . two complex OTTI analyses, one in the third quarter of 2007 and the other in 2008 in connection with the 10-K filing."   Goldstone Facts ¶ 189, at 43 (setting forth this fact).   See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo. Vol. III at 134:11-135:1; Simmons Decl. ¶ 55, at 12.   "Thornburg's [OTTI] judgment was based on input from many individuals in the Company's accounting department and the Capital Markets group, as well as Mr. Goldstone and Mr. Simmons."   Starrett Facts ¶ 10, at 4 (setting forth this fact).   See SEC Disputed Starrett Facts at

---

are more tangible and more subject to auditable procedures and independent evaluation)."

SEC Disputed Facts ¶ 185, at 18.   The Defendants do not assert that the ability to hold analysis is a subjective standard, but only that they understood it to be a subjective one.   They may have believed that the OTTI analysis was based on a subjective standard, even though it should be based on an objective one.   The SEC thus does not specifically controvert the Defendants' asserted fact, and the Court finds it undisputed.

1-16 (not disputing this fact); Starrett Depo. at 151:13-21, 152:20-23, 153:4-23.  "Ms. Starrett

had no trading authority at Thornburg and thus was not in a position to make final decisions with

respect to the company's intent to hold its . . . Purchased ARM assets."  Starrett Facts ¶ 11, at 4

(setting forth this fact)(internal quotation marks omitted).  See Starrett SEC Depo. at 180:17-24,

196:8-9; Starrett Decl. ¶ 5, at 4.[103]

       "Shawn Buniel, a VP Financial Analyst in the Finance Department at Thornburg,

prepared Thornburg's going concern analysis for the fiscal year ending December 31, 2007, and

provided drafts of that analysis to KPMG."  Goldstone Facts ¶ 190, at 43 (setting forth this fact).

See SEC Disputed Facts at 1-51 (not disputing this fact); March 8, 2008, OTTI Memo. at 4-5;

Deposition of Shawn C. Buniel at 134:19-24, 137:5-13 (taken Dec. 10, 2009), filed August 9,

2013 (Doc. 204-299)("Buniel Depo.").  "Given Thornburg's historical profitability, Mr. Buniel

and Thornburg had little experience in preparing a formal going concern analysis."  Goldstone

Facts ¶ 191, at 43 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this

---

[103]The SEC attempts to dispute this fact by stating:

   Regardless of whether Defendant Starrett had trading authority, she was part of
   Thornburg's management, and Thornburg management's intent and ability to hold
   its impaired Purchased ARM Assets until the values recovered are at issue.
   Indeed, Defendant Starrett explained to Defendants Goldstone and Simmons on
   February 25, 2008: "In short, selling some assets is substantially the same as
   selling all assets because the only reason we don't have to recognize the
   impairments on all assets with negative marks in income now is that we represent
   we have the intent and ability to hold the assets to maturity.  Selling some assets
   calls into question our intent and having to sell them to meet margin calls or
   reduce exposure, calls into question our ability to hold them."

SEC Disputed Starrett Facts ¶ 11, at 2.  To dispute this fact, the SEC cites a portion of Kitchens'
report, where he opines that Thornburg Mortgage did not have the ability to hold onto its
purchase ARM assets and an electronic mail transmission in which Starrett states that, if
Thornburg Mortgage sold some of its assets, it would have to recognize that its assets were
impaired.  This evidence does not specifically controvert Starrett's asserted fact.  The SEC does
not assert that Starrett had trading authority or could make a final decision concerning Thornburg
Mortgage's intent to hold its purchase ARM assets.  The Court thus finds the fact undisputed.

fact); Buniel Depo. at 59:11-60:10; Goldstone Decl. ¶ 42, at 8.  "Mr. Buniel and Ms. Starrett

sought guidance from KPMG regarding relevant considerations for Thornburg's going concern

analysis."  Goldstone Facts ¶ 192, at 43 (setting forth this fact).  See SEC Disputed Facts at 1-51

(not disputing this fact); March 8, 2008, OTTI Memo. at 2-9; Buniel Depo. at 60:3-8,

62:25-64:25; Starrett Depo. at 167:19-22; Starrett SEC Depo. at 27:20-24.

> On February 1, 2008, Ms. Hall of KPMG advised Mr. Buniel as to what the
> analysis should include, provided him an example outline of what "discussion
> points" should be included, and gave him written guidance expressly stating that
> the going concern analysis should address the company's and management's
> belief "as of December 31, 2007," and "should exclude the impact of . . .
> financing rounds in January, future rounds, securitizations, auction calls, etc."
> Ms. Hall noted that "KPMG will need to perform additional work on the
> completeness and accuracy of the data included."

Goldstone Facts ¶ 193, at 43-44 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(quoting Electronic Mail Transmission from Jennifer Hall to Shawn Buniel at 3-4 (dated

Feb. 1, 2008), filed August 9, 2013 (Doc. 204-40)("Feb. 1, 2008, Hall Email")).  See SEC

Disputed Facts at 1-51 (not disputing this fact); Feb. 1, 2008, Hall Email at 2-4.  "KPMG's

workpapers state that both 'the CAO [Ms. Starrett] and VPFA [Mr. Buniel] reached out to

KPMG for guidance regarding relevant considerations in the going concern analysis, in light of

the recent market events.'"  Goldstone Facts ¶ 194, at 44 (setting forth this fact)(alterations in

Goldstone Facts but not in original)(quoting March 8, 2008, OTTI Memo. at 4).  See SEC

Disputed Facts at 1-51 (not disputing this fact); March 8, 2008, OTTI Memo. 4.

> The analysis prepared by Mr. Buniel of Thornburg as a going concern through
> January 1, 2009 concluded that "[w]hile [Thornburg's] Purchased ARM Assets
> [we]re designated as available-for-sale, [it did] not expect to sell the Purchased
> ARM Assets held at December 31, 2007 and therefore [did] not expect to realize
> these gross unrealized losses."  The analysis therefore concluded that Thornburg
> had "the ability and intent to hold its Purchased ARM Assets until recovery," and
> its unrealized losses on those securities were not other-than-temporary
> impairments.  This conclusion was based on Thornburg's "on-going
> profitab[i]l[it]y, liquidity position and ability to continue to make margin calls."

> The analysis also noted that "the initial sale of the assets [in the third quarter of 2007] . . . was . . . related to the CP market drying-up without the expansion of the repo market," and that this situation no longer existed.

Goldstone Facts ¶ 195, at 44 (setting forth this fact)(alterations in Goldstone Facts but not in original)(quoting Electronic Mail Transmission from Jane Starrett to Michael Coltharp at 12 (dated Feb. 21, 2008), filed August 9, 2013 (Doc. 204-79)("Draft Going Concern Analysis")). See SEC Disputed Facts at 1-51 (not disputing this fact); Draft Going Concern Analysis at 12. "KPMG received a revised draft of the going concern analysis (dated January 29, 2008) on February 20, 2008." Goldstone Facts ¶ 196, at 44 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from Shawn Buniel to Jennifer Hall at 2-19 (dated Feb. 20, 2008), filed August 9, 2013 (Doc. 204-69)("Jan. 29, 2008, Draft Going Concern Analysis").

"Although Mr. Goldstone's name appears in the 'to' line on the first page of the going concern analysis, he [did] not . . . receiv[e], review[] or contribut[e] to the memo." Goldstone Facts ¶ 197, at 44 (setting forth this fact). See Goldstone Depo. at 226:10-227:2, 231:12-23; Jan. 29, 2008, Draft Going Concern Analysis at 3.[104]   "There is no evidence in the record that Mr. Goldstone participated in preparing Thornburg's going concern memorandum." Goldstone Facts ¶ 198, at 44 (setting forth this fact).[105]   "Thornburg's going concern analysis was used by

---

[104]The SEC attempts to dispute this fact by stating: "Goldstone, as CEO, was responsible for Thornburg's going concern analysis." SEC Disputed Facts ¶ 197, at 18. This assertion does not, however, specifically controvert the Defendants' asserted fact. The Defendants do not assert that Goldstone was not responsible for the going concern analysis, but that Goldstone did not receive, review, or contribute to it. The SEC has not specifically controverted the Defendants' asserted fact, and the Court finds it undisputed.

[105]The SEC attempts to dispute this fact by stating: "Goldstone, as CEO, was responsible for Thornburg's going concern analysis." SEC Disputed Facts ¶ 198, at 18. This assertion does not specifically controvert the Defendants' asserted fact. The Defendants do not assert that

KPMG in preparing its audit opinion on the financial statements contained in the 2007 Form 10-K." Starrett Facts ¶ 13, at 4 (setting forth this fact). See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Thornburg Mortgage, Inc. Audit and Other Concern Items at 3, filed August 9, 2013 (Doc. 204-91)("Thornburg Other Concern Items"). When Thornburg Mortgage issued the going concern memorandum, "KPMG [did not take] issue with any of the conclusions reached or analyses conducted in the going concern memorandum." Goldstone Facts ¶ 199, at 44-45 (setting forth this fact). See Buniel Depo. at 138:13-139:6, 142:25-143:2, 153:24-154:8, 251:11-20; Simmons Depo. Vol. II at 156:7-157:10; Starrett SEC Depo. at 227:11-23.[106]

_____

Goldstone was not responsible for the going concern analysis, but only that he did not participate in preparing it. Accordingly, the Court finds the fact undisputed.

[106]The Defendants' original asserted fact states: "There is no evidence in the record that KPMG took issue with any of the conclusions reached or analyses conducted in the going concern memorandum." Goldstone Facts ¶ 199, at 44-45. The SEC attempts to dispute this fact by stating:

> Defendants did not provide KPMG with information related to Thornburg's inability to pay margin calls on time between February 14-27, 2008, did not advise KPMG that Thornburg had stopped funding loans during this period, did not provide KPMG with a copy of the Citi Reservation of Rights letter, misrepresented the purpose for entering into the I/O Strip Transactions and that the RMBS securities market had bottomed out, and withheld their knowledge that a European hedge fund was collapsing and they expected further margin calls. KPMG representatives testified that they would have wanted this information and it would have impacted KPMG's conclusions as to Thornburg's going concern analysis. Defendant Goldstone wrote at the time, "We don't want to disclose our current circumstance until it is resolved."

SEC Disputed Facts ¶ 199, at 18. This assertion does not specifically controvert the Defendants' asserted fact. The Defendants' asserted fact concerns the time period in which Thornburg issued the going concern analysis. Because the Defendants withheld certain information from KPMG that might have affected KPMG's conclusions regarding Thornburg Mortgage's going concern analysis, however, KPMG did not take issue with the going concern conclusions. Reinhart testified that, if KPMG had been aware that Thornburg Mortgage was not timely meeting its margin calls, KPMG would have required Thornburg Mortgage to amend its going concern analysis. See Reinhart Depo. at 329:4-332:2. KPMG, thus, eventually took issue with Thornburg Mortgage's going concern analysis, but only after it discovered that Thornburg

> On or about February 21, 2008, Michael Coltharp, Thornburg's Controller, provided Mr. Simmons and Ms. Starrett with an impairment analysis that he had prepared that reached the following conclusions with respect to "Asset 2310," an IndyMac bond that had deteriorated and that Thornburg was considering selling:
>
> The analysis concluded that impairment in Asset 2310 did not need to be recognized at December 31, 2007 because "[t]he bond had been in a loss position for only 1 month at December 31, 2007 (priced at 97.98) and recovered that loss by January 31, 2008," and because the decision to sell Asset 2310 was made in February 2008.
>
> The analysis concluded further that because the decline in value was the result of "deterioration . . . in the Alt-A market [that] began in February 2008," the impairment "represent[ed] a Type II subsequent event, which consist[ed] of factors that developed subsequent to year end and do not require adjustment in the prior year financial statements."
>
> The analysis' ultimate conclusion was that the potential sale of Asset 2310 "does not have an impact on TMA's other-than-temporary impairment analysis of its securities."

Goldstone Facts ¶ 200, at 45 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Electronic Mail Transmission from Jane Starrett to Shawn Buniel and Clay Simmons at 4-5 (dated Feb. 21, 2008), filed August 9, 2013 (Doc. 204-82)("2310 Bond Memo.")). See SEC Disputed Facts at 1-51 (not disputing this fact); 2310 Bond Memo. at 3-6.[107]

---

Mortgage had not been timely meeting its margin calls. There is no evidence, however, that, when Thornburg Mortgage issued the going concern analysis, KPMG took issue with its conclusions. While the SEC has not specifically controverted the Defendants' asserted fact, the asserted fact is ambiguous and may be interpreted to mean that KPMG has never taken issue with Thornburg Mortgage's going concern analysis, which is not true. Accordingly, the Court has modified the Defendants' asserted fact to more accurately reflect the evidence.

[107]The Defendants assert the following fact: "At the time of the Form 10-K filing on February 28, 2008, Mr. Goldstone, Mr. Simmons and Ms. Starrett all believed that Thornburg was a going concern and that it had the intent and ability to hold its impaired Purchased ARM Assets until they recovered their value or until maturity." Goldstone Facts ¶ 201, at 45. The SEC Disputes this fact by stating:

> Defendants' claimed belief is implausible and contradicted by the following facts known to them by February 27, 2008, which they did not disclose to KPMG:

1.      Thornburg was unable to timely meet margin calls.

2.      Thornburg had $38.2 million of available cash and limited additional liquidity as of the day the 2007 10-K was filed on February 28, 2008, and it had received $300 million in margin calls between February 14 and February 27 that it struggled to pay and it did not pay timely.

3.      Thornburg had limited control, or recourse, regarding the establishment of collateral values and haircuts that were being imposed by the counterparty lenders, and therefore, the amount of the resulting margin calls.

4.      Thornburg had limited remaining warehouse capacity to continue funding mortgage loans and had substantially reduced mortgage originations.

5.      There were no visible prospects for improvement in the capital markets or values of mortgage investment securities in the foreseeable future, especially given there were no credible signs that mortgage securities values had stabilized or would improve in the foreseeable future.

The Form 10-K was false because Defendants did not disclose -- to investors or KPMG -- the following facts known to them by February 27, 2008:

1.      The complete picture of the total amount of margin calls received by Thornburg Mortgage in the subsequent events period.

2.      The reservation of rights letter to declare default from Citigroup Global and the delayed payments of margin calls to repurchase agreement lenders.

3.      The true purpose of the I/O Strip sales to pay outstanding margin calls and not to take advantage of favorable pricing of the securities.

4.      The reduction or complete cessation to funding new loans in the days prior to the Form 10-K filing.

5.      The news of the collapse of an Alt-A European hedge fund.

- 115 -

_____

       6.     Certain misrepresentations in the going concern analysis memo provided to KPMG.

SEC Disputed Facts ¶ 201, at 18-20.  To dispute the Defendants' asserted fact, the SEC cites Kitchens' and Weiner's reports.  In his report, Kitchens opines that Thornburg Mortgage could not have held its Purchase ARM Assets until they recovered their fair values.  See Kitchens Report at 52-53.  Kitchens reaches this conclusion by noting that Thornburg Mortgage had been unable to meet its margin calls, that Thornburg Mortgage had limited liquidity, that Thornburg Mortgage received $300 million in margin calls between February 14, 2008, and February 27, 2008, that Thornburg Mortgage could not control the turmoil in mortgage markets, that Thornburg Mortgage had limited control concerning the establishment of its collateral's values, and that there was no visible prospects for improvements in the capital markets or values of mortgage investment securities in the foreseeable future.  See Kitchens Report at 51-52.  The SEC also cites a portion of Kitchens' report in which he discusses a number of misleading or false representations that the Defendants made to KPMG or where the Defendants failed to fully disclose certain information to KPMG.  See Kitchens Report at 59-82.  In his report, Weiner discusses that, in a reverse repo agreement, the lender has the power to make margin calls and to value the collateral.  See Weiner Report at 24-26.

The Defendants reply by stating:

The SEC's response does not materially dispute this fact.

The SEC cannot raise a genuine dispute by general and unsupported attacks on the credibility of Defendants' sworn, uncontroverted testimony about their subjective understandings, views, or beliefs.  See Defs.' Reply to SMF ¶ 36.

The evidence cited by the SEC -- which consists of two inadmissible expert reports -- does not render "implausible" or "contradict" Defendants' subjective belief.

First, each Defendant provided sworn testimony attesting to his or her subjective belief in the validity of Thornburg's OTTI and going concern conclusions and explaining why each of them held that belief at the time of the Form 10-K filing.  Whether this belief was also reasonable in some objective sense is irrelevant to SMF ¶ 201.  The SEC cannot substitute its experts' hindsight views regarding the objective reasonableness of Thornburg's OTTI conclusion for Defendants' sworn and uncontroverted testimony as to their subjective and contemporaneous belief.

Second, whether the Defendants disclosed (or were even under a duty to report) certain "facts" to KPMG has no bearing on whether they held the subjective belief that Thornburg was a going concern and had the intent and ability to hold its impaired Purchased ARM Assets until their value recovered.  Moreover, the record shows that KPMG had all the listed "facts" material to its audit and still agreed with Thornburg's OTTI and going concern conclusions.  See Reply Br. At IV.

---

> Third, the SEC's response that the "Form 10-K was false because Defendants did not disclose . . . the following facts . . ." regarding Thornburg's margin call situation is irrelevant to Defendants' subjective belief and directly contradicted by the Court's Motion to Dismiss ruling permitting the SEC's Form 10-K misrepresentation claim to proceed with respect to the disclosure on OTTI, holding that Thornburg "had no duty to disclose further information regarding how Thornburg Mortgage met its margin calls in February, 2008." MTD Op. at *143-48. The SEC cannot revive this claim. MTE, Part III.
>
> Moreover, the SEC's response listing alleged non-disclosed "facts" that rendered the Form 10-K false is an improper eleventh hour attempt to amend its Complaint; the SEC should be precluded from asserting it. Id., Part II.
>
> Defendants object to the SEC's reliance on the unsworn expert reports of Mr. Kitchens and Mr. Weiner because they do not meet the evidentiary requirements of Fed. R. Civ. P. 56(c). First, the reports are inadmissible hearsay. Id., Objection No. 1. Even if not inadmissible hearsay, Mr. Kitchens' report addresses ultimate issues -- the correctness or falsity of Thornburg's OTTI conclusion, whether "KPMG was deceived" -- which are not proper subjects of expert testimony. See id., Objection No. 2. Third, Mr. Kitchens' hindsight opinion that certain "facts" rendered it probable that Thornburg would be required to sell impaired Purchased ARM Assets fails to consider important factors relevant to Thornburg's OTTI analysis, such as Thornburg's near-term plans for raising additional capital. See SMF ¶¶ 204, 207, 209. Fourth, Mr. Kitchen's cited opinions improperly seek to impeach Defendants' credibility, speculate on what Defendants meant by their own emails, and opine on whether or how "KPMG was deceived." MTE, Objection Nos. 3, 4. Finally, the cited pages of the Weiner Report provide a general summary of principles that do not support the SEC's response.

Goldstone Reply Facts ¶ 201, at 90-92. The Court concludes that the SEC has specifically controverted the Defendants' asserted fact. The Defendants knew that Thornburg Mortgage had limited liquidity and that it would not be able to meet the same quantity of margin calls that it received in February, 2007. The Defendants also knew that Thornburg Mortgage was essentially at the mercy of its lenders concerning its collateral's valuation. The lenders could give the collateral a low value and request a margin call, and there is little to nothing Thornburg Mortgage could do, other than pay the margin call. Because the market conditions made it almost certain that Thornburg Mortgage would receive more margin calls, and it would likely not be able to meet those margin calls, it is disputed whether the Defendants could have believed that Thornburg Mortgage would hold its impaired Purchased ARM Assets until they recovered their value or until maturity. The SEC has thus specifically controverted this fact, and the Court finds it disputed.

"[B]efore the 10-K filing, Defendants expressed [no] disbelief or doubt that Thornburg was a going concern."  Goldstone Facts ¶ 202, at 46 (setting forth this fact).[108]  "[B]efore the 10-K filing, Defendants [did not] express[] disbelief or doubt about the OTTI judgment disclosed in Thornburg's 2007 Form 10-K."  Goldstone Facts ¶ 203, at 46 (setting forth this fact).[109]

---

[108]The SEC attempts to dispute this fact by stating: "Defendants could not have believed that there was no doubt as to whether Thornburg could continue as a going concern, given the facts they knew by February 7, 2008."  SEC Disputed Facts ¶ 202, at 20.  While the Court agrees that it is a disputed fact whether the Defendants could have believed that Thornburg would continue as a going concern, the Defendants' asserted fact is that they did not express disbelief or doubt that Thornburg Mortgage was a going concern.  Because the SEC has not disputed the asserted fact, the Court finds it undisputed.

[109]The SEC attempts to dispute this fact by stating: "Defendants could not have believed that there was no doubt as to the OTTI judgment disclosed in Thornburg's 2007 Form 10-K, given the facts they knew by February 27, 2008."  SEC Disputed Facts ¶ 203, at 20.  While the Defendants may not have believed that the OTTI judgment was correct, the Defendants' asserted fact is that they did not express disbelief or doubt.  Because the SEC has not disputed the Defendants' asserted fact, the Court finds it undisputed.
The Defendants assert the following fact:

Mr. Goldstone testified that he believed that Thornburg would be able to hold its Purchased ARM Assets until recovery based on the following:

His perspective "as a businessman" that the company's ability to continue to hold assets was "a function of the company's ability to obtain the various financing capabilities that it needed in order to continue to operate," that he "had no reason to believe that [Thornburg was] going to lose access to [its] reverse repurchase agreement financing," and that Thornburg's "lenders were generally speaking very supportive as a group, with regard to their continued willingness to provide [Thornburg] with the kinds of financing that [it] needed."

Thornburg had already "demonstrated an ability to effectively wind down or reduce [its] access to [its] commercial paper financing, without serious disruption to the company."

Thornburg still "had the ability to securitize loans and issue securities into the marketplace and sell them to investors" and "the market was very discerning and accepting of [Thornburg's] securitized mortgage collateral."

"Mr. Goldstone believed that the I/O strip financing transactions would allow Thornburg to be free from 'a haircut or margin requirement' and 'increase [Thornburg Mortgage's] net proceeds by the amount of that margin requirement,' from which Thornburg 'would benefit greatly.'" Goldstone Facts ¶ 205, at 47 (setting forth this fact)(quoting Goldstone SEC Depo. at 230:6-8; Goldstone Depo. at 148:9-10).  See Goldstone SEC Depo. at 228:18-213:6; Goldstone Depo. at 147:25-148:10.[110]  "Mr. Goldstone understood that the I/O strip financing transactions were a

---

Thornburg   was   scheduled   to   "complete   a   $1   billion [securitization], up from [the company's] expectation of $600 million as [Thornburg's] loan collateral continue[d] to be in demand."

Thornburg was "able to successfully raise equity August 2007.

Thornburg was receiving positive feedback from the underwriters of its upcoming capital raise for $300 to $500 million.

"[E]very aspect of the company's financing mechanisms was functioning, with the exception of [Thornburg's] commercial paper facility, and [Thornburg was] able to find acceptable alternative sources of financing to replace that."

Thornburg "had a very, very slow margin call period during" the last week of February, and so "it appeared that markets were settling down.  It appear[ed] that [Thornburg's] collateral had been appropriately marked to market, and haircuts had been adjusted to reflect [a] market situation."

Thornburg had concrete plans in place to raise up to $500 million more in additional capital in the week after the 10-K filing.

Goldstone Facts ¶ 204, at 46-47 (alterations in Goldstone Facts but not in source).  The SEC disputes this fact by stating: "Defendant Goldstone's claimed belief is implausible and contradicted by the facts known to him by February 27, 2008."  SEC Disputed Facts ¶ 204, at 20. The Court has already concluded that there is a dispute of material fact concerning whether the Defendants could have believed that Thornburg Mortgage would be able to hold its Purchased ARM Assets until recovery.  See supra note 107.  Consequently, this fact is disputed as well.

[110]The SEC attempts to dispute this fact by stating:

source of liquidity for the Company, and this gave him additional comfort that Thornburg would

be able to meet its lending requirements going forward."  Goldstone Facts ¶ 206, at 47 (setting

forth this fact).  See Goldstone Decl. ¶ 43, at 8-9.[111]

_____

> Defendant Goldstone's claimed belief is implausible and contradicted by the fact
> that using assets to generate cash to pay margin calls in the context of a liquidity
> crisis, regardless of the accounting classification, directly calls into question the
> accuracy of the OTTI analysis.  Additionally, I/O Strip sales reduced available
> liquidity by eliminating potential sources of funds to meet margin calls.

SEC Disputed Facts ¶ 205, at 20.  This assertion does not specifically controvert the Defendants'
asserted fact.  The Defendants' fact does not state that Thornburg Mortgage's OTTI analysis was
accurate or that the I/O strip transactions did not reduce available liquidity.  Accordingly,
because the SEC has not specifically controverted this fact, the Court finds it undisputed.

[111]The SEC attempts to dispute this fact by stating:

> Defendant Goldstone's claimed understanding is implausible and contradicted by
> the fact that using assets to generate cash to pay margin calls in the context of a
> liquidity crisis, regardless of the accounting classification, directly calls into
> question the accuracy of the OTTI analysis.  Additionally, I/O Strip sales reduced
> available liquidity by eliminating potential sources of funds to meet margin calls.

SEC Disputed Facts ¶ 206, at 20.  This assertion does not dispute the Defendants' asserted fact.
The Defendants do not assert that the Thornburg Mortgage's OTTI analysis was accurate.
Moreover, while the I/O strip transactions reduced potential long term liquidity, it generated
short term liquidity.  As Kitchens states in a portion of his report which the SEC cites, "using a
cash producing asset, like in the case of the I/O Strip Transaction to generate liquidity for the
short-term commitments such as paying outstanding margin calls, eliminated an ongoing source
of cash for future requirements."  Kitchens Report at 67.  The Defendants do not assert that the
I/O strip transactions created long-term liquidity.  They merely assert that the I/O strip
transactions were a source of liquidity, and the SEC's own expert report supports that
proposition.  The SEC thus has not specifically controverted the Defendants' asserted fact, and
the Court finds it undisputed.

The Defendants assert the following fact:

> Mr. Simmons believed Thornburg had the intent and ability to hold its Purchased
> ARM Assets until their recovery because:

>> Thornburg had met all of its margin calls prior to filing its 2007
>> Form 10-K without needing to sell assets and did not intend to sell
>> any assets at the time.

Mr. Simmons was optimistic about collateral values because Thornburg's repo collateral had already been "beaten down." Thornburg had a cooperative relationship with its repo lenders and was generally able to work out arrangements to meet margin calls over a period of days if it lacked sufficient liquidity to meet the calls immediately.

"The credit quality of [the company's] portfolio was great."

Thornburg's securities "from a fundamental perspective were performing very, very well," with "no downgrades."

Mr. Simmons did not believe the market was likely to take another significant step down because: (a) AAA-rated MBS and agencies were selling off only modestly and in proportion to the gradual rise in U.S. Treasury Bond rates, which made them highly financeable and their pricing relatively consistent with expected relationships; (b) on February 26, 2008, U.S. Treasury Bond rates dropped precipitously, which positively influenced the pricing for agency and most other types of mortgage assets and caused Mr. Simmons to believe that Thornburg would soon be able to issue margin calls to the repo lenders who held that collateral; and (c) margin call activity for Thornburg abated significantly from February 22, 2008 through the Form 10-K filing on February 28, 2008.

The prices of agency MBS were rallying at the time.

Thornburg was successfully executing plans to "raise additional capital" and "continue on as a profitable entity."

Thornburg had a variety of avenues to raise additional cash and capital, such as by financing I/O strips in issuances of Collateralized Mortgage Debt.

Thornburg had a securitization planned and "expected it to be successful."

The value of the impaired securities appeared to have been affected by the economy, in general, and the financial institution industry, in particular, rather than a decline in the expected cash flows from the securities.

Finally, Thornburg had concrete plans in place to raise up to $500 million more in additional capital in the week after the 10-K filing.

> [T]here was [no] "discussion among Thornburg's management about whether the sale of . . . interest-only securities would raise concerns in the minds of Thornburg's auditors about whether they had the ability and intent to hold their assets," . . . because they were "a normal practice," they were "not sales," they merely shifted I/O strips from repo financing to permanent financing in the form of "collateralized mortgage debt," and they were a "good thing" because such financing "is not subject to margin calls."  For the same reasons, Mr. Simmons did not believe that the I/O strip financing transactions negatively influenced the OTTI analysis.

Goldstone Facts ¶ 208, at 49 (setting forth this fact)(quoting Simmons Depo. Vol. II at 295:7-296:23).  See Simmons Depo. Vol. II at 295:7-296:25; Simmons Decl. ¶ 48, at 11.[112]  "Based on

--------

Goldstone Facts ¶ 207, at 47-49.  The SEC disputes this fact by stating: "Defendant Simmons's claimed belief is implausible and contradicted by the facts known to him by February 27, 2008." SEC Disputed Facts ¶ 207, at 20.  The Court has already concluded that there is a disputed fact concerning whether the Defendants could have believed that Thornburg Mortgage could hold its Purchased ARM Asserts until recovery.  See supra note 107.  Consequently, the Court finds this fact disputed.

[112]The SEC attempts to dispute this fact by stating:

> Defendant Simmons's claimed belief is implausible and contradicted by the fact that using assets to generate cash to pay margin calls in the context of a liquidity crisis, regardless of the accounting classification, directly calls into question the accuracy of the OTTI analysis.  Additionally, I/O Strip sales reduced available liquidity by eliminating potential sources of funds to meet margin calls.

SEC Disputed Facts ¶ 208, at 20-21.  This assertion does not dispute the Defendants' asserted fact.  The Defendants assert that there was no discussion concerning OTTI analysis and the sale of the I/O strips and they provide Simmons reasons for why there was no discussion.  The SEC does not address this portion of the Defendants' asserted fact.  Next, the Defendants assert that Simmons did not believe that the I/O strip transactions negatively influenced the OTTI analysis. While the SEC's assertion directly addresses this asserted fact, the evidence which the SEC cites does not support its assertion.  The SEC cites Kitchens' report.  In the portion of Kitchens' report which the SEC cites, Kitchens opines that Thornburg Mortgage's purpose in entering the I/O Strip Transactions was to pay the outstanding margin calls.  See Kitchens Report at 64-67.  That portion of Kitchens' report does not address the accuracy of the OTTI analysis.  See Kitchens Report at 64-67.  The local rules state that a response to a motion for summary judgment must "refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed."  D.N.M.LR-Civ. 56.1(b).  The portion of the record which the SEC cites does not specifically controvert the Defendants' asserted fact.  Moreover, while the Court has concluded that there is a dispute of material fact

concerning whether the Defendants could have believed that Thornburg Mortgage would hold the Purchased ARM Assets until their recovery, the Court has not yet concluded that there is a material fact concerning whether the Defendants could have concluded that the I/O strip transactions did not negatively influence Thornburg Mortgage's OTTI analysis. Accordingly, the Court finds the fact undisputed.

The Defendants assert the following fact:

> With respect to her belief in Thornburg's OTTI judgment, Ms. Starrett testified as follows:
>
>> "[U]nder the accounting literature if you had the intent and the ability to hold those securities you don't need to recognize impairment. And we had the intent and believed we had the ability to hold them."
>>
>> In her mind "the recognition of that impairment would hinge on the intent and ability to hold. Mr. Goldstone . . . had laid out a plan, a specific plan, to raise additional liquidity which gave me assurance that we had the ability to hold them."
>>
>> "[T]here were opportunities to raise additional capital that were being voiced by FBR and UBS as underwriters."
>>
>> Ms. Starrett was confident in Thornburg's OTTI judgment, notwithstanding the margin calls Thornburg had received before the 10-K filing, because Thornburg, in fact, "met those margin calls" and "had a cushion to go forward, and [she] didn't have any reason to believe that [Thornburg] would not be able to continue operations as [it] had in that previous week when [it] had met all [its] obligations."

Goldstone Facts ¶ 209, at 49-50. The SEC disputes this fact by stating: "Defendant Starrett's claimed belief is implausible and contradicted by the facts known to her by February 27, 2008." SEC Disputed Facts ¶ 209, at 21. The Court has already concluded that it is disputed whether the Defendants could have believed that Thornburg Mortgage could hold onto its Purchased ARM Assets. See supra note 107. If Thornburg Mortgage could not have held its Purchased ARM Assets to recovery, then the assets were other-than-temporarily impaired, which would have affected Thornburg Mortgage's OTTI analysis. Accordingly, the Court finds that there is a dispute of material fact concerning whether Starrett could have believed that Thornburg Mortgage's OTTI analysis should have remained unchanged.

Starrett asserts the following fact:

> Ms. Starrett believed that Thornburg had the intent and ability to hold its impaired Purchased ARM Assets until their value recovered in the market and that these assets were properly accounted for as not other-than-temporarily-impaired in

Thornburg's financial statements given, *inter alia*, Thornburg's specific plans to raise liquidity in the weeks following the Form 10-K filing and its cooperative working relationships with repo lenders as to resolving margin call issues.

Starrett Facts ¶ 23, at 6.  The SEC  disputes this fact by stating:

Defendant Starrett's claimed belief is implausible and contradicted by the following facts known to her by February 27, 2008, which she did not disclose to KPMG:

     1.      Thornburg was unable to timely meet margin calls.

     2.      Thornburg had $38.2 million of available cash and limited additional liquidity as of the day the 2007 10-K was filed on February 28, 2008, and it had received $300 million in margin calls between February 14 and February 27 that it struggled to pay and it did not pay timely.

     3.      Thornburg had limited control, or recourse, regarding the establishment of collateral values and haircuts that were being imposed by the counterparty lenders, and therefore, the amount of the resulting margin calls.

     4.      Thornburg had limited remaining warehouse capacity to continue funding mortgage loans and had substantially reduced mortgage originations.

     5.      There were no visible prospects for improvement in the capital markets or values of mortgage investment securities in the foreseeable future, especially given there were no credible signs that mortgage securities values had stabilized or would improve in the foreseeable future.

The Form 10-K was false because Defendant Starrett did not disclose -- to investors or KPMG -- the following facts known to her by February 27, 2008:

     1.      The complete picture of the total amount of margin calls received by Thornburg Mortgage in the subsequent events period.

     2.      The true purpose of the I/O Strip sales to pay outstanding margin calls and not to take advantage of favorable pricing of the securities.

3.      The reduction or complete cessation to funding new loans in the days prior to the Form 10-K filing.

4.      Certain misrepresentations in the going concern analysis memo provided to KPMG.

SEC Disputed Starrett Facts ¶ 23, at 3-4.  Starrett replies by stating:

The SEC's response does not raise a genuine dispute as to Starrett Fact 23.

The SEC cannot raise a genuine dispute by general and unsupported attacks on the credibility of Ms. Starrett's sworn, uncontroverted testimony about her subjective understandings, views, or beliefs.

First, Ms. Starrett submitted a sworn declaration attesting to her subjective belief in the validity of Thornburg's OTTI conclusion and explaining why she held that belief at the time Thornburg reached that conclusion.  The SEC's experts' conclusions reached nearly six years after Thornburg filed its 2007 Form 10-K do not render implausible Ms. Starrett's genuine and contemporaneous belief that Thornburg's assets were not OTTI at December 31, 2007.  In any event, the expert reports (which are inadmissible) do not support the SEC's response to Starrett Fact 23 because neither expert opines that the listed facts contradict Ms. Starrett's *subjective* belief that Thornburg had the intent and ability to hold its impaired securities until their value recovered.

Second, whether Ms. Starrett disclosed (or was even under a duty to report) certain facts to KPMG has no bearing on whether she held the subjective belief that Thornburg had the intent and ability to hold its impaired Purchased ARM Assets until their value recovered.  And in any event, the SEC has never even alleged that KPMG was unaware of e.g., (1) Thornburg's limited available cash and liquidity, (2) receipt of $300 million in margin calls, or (3) its limited control regarding collateral values, the condition of the capital and mortgage markets, etc.  In fact, it is undisputed that KPMG knew all this and still agreed with Thornburg's OTTI judgment.

Third, the SEC's statements about the alleged falsity of the Form 10-K are irrelevant to Ms. Starrett's subjective belief as to the validity of Thornburg's OTTI conclusion.  Moreover, this Court has already ruled that Thornburg had no duty to disclose further information regarding how Thornburg Mortgage met its margin calls in February, 2008 or its I/O strip transactions.

Fourth, the SEC's response that the Form 10-K was false because Defendants did not disclose the following facts regarding Thornburg's margin call situation is irrelevant to Ms. Starrett's subjective belief and directly contradicted by the Court's Motion to Dismiss ruling in which the Court dismissed securities fraud

allegations related to nondisclosure of the listed facts in the Form 10-K and held that Thornburg had no duty to disclose further information regarding how Thornburg Mortgage met its margin calls in February, 2008.

Ms. Starrett objects to the SEC's reliance on the unsworn expert reports of Mr. Kitchens and Mr. Weiner because they do not meet the evidentiary requirements of Federal Rule of Civil Procedure 56(c).  Mr. Kitchens' report also addresses ultimate issues -- the correctness or falsity of Thornburg's OTTI conclusion, whether KPMG was deceived -- which are not proper subjects of expert testimony.   Third, Mr. Kitchens' hindsight opinion that certain facts rendered it probable that Thornburg would be required to sell impaired Purchased ARM Assets fails to consider important factors relevant to Thornburg's OTTI analysis, such as Thornburg's near-term plans for raising additional capital. Fourth, Mr. Kitchens' cited opinions improperly seek to impeach Ms. Starrett's credibility, speculate on what she meant by her own emails, and opine on whether or how KPMG was deceived.  Finally, the cited pages of the Weiner Report provide a general summary of principles that do not support the SEC's response.

SEC Disputed Starrett Facts ¶ 23, at 22-25 (alterations omitted)(citations omitted)(internal quotation marks omitted).

The Court finds this fact disputed.  Starrett knew that Thornburg Mortgage had low liquidity, that Thornburg Mortgage had received substantial margin calls over up until the 2007 Form 10-K filing, that Thornburg Mortgage had trouble paying those margin calls, that Thornburg Mortgage paid those margin calls over a period of time, and that Thornburg Mortgage reduced its ability to raise long-term capital by selling the I/O Strip Transactions.  It is disputed whether Starrett believed that Thornburg Mortgage had an intent and ability to hold its impaired Purchased ARM Assets until they recovered their value.  While Starrett may truly have held such a belief, it should be for a jury to decide at trial and not the Court on summary judgment. Accordingly, the Court finds the fact disputed.

The Defendants also assert the following fact: "Ms. Starrett does not recall having any concern prior to the 10-K filing that the Citigroup and Greenwich margin calls or the I/O strip financing transactions, either individually or collectively, required revisiting the OTTI analysis." Goldstone Facts ¶ 210, at 50.  The SEC disputes this fact by stating:

Defendant Starrett's claimed recollection is implausible and contradicted by the fact that using assets to generate cash to pay margin calls in the context of a liquidity crisis, regardless of the accounting classification, directly calls into question the accuracy of the OTTI analysis.  Additionally, I/O Strip sales reduced available liquidity by eliminating potential sources of funds to meet margin calls.

SEC Disputed Facts ¶ 210, at 21.  The Court has already concluded that the volume of margin calls that Thornburg Mortgage received in February, 2007, decreased its liquidity and its ability to pay future margin calls that it would likely receive.  See supra note 107.  Additionally, by conducting the I/O strip transactions, Thornburg Mortgage decreased its ability to raise future cash, although it raised short-term cash that it used to pay its outstanding margin calls.  The I/O

her discussions with KPMG, Ms. Starrett understood that the I/O strip financing transactions did not negatively influence the OTTI analysis given that they were financings, not sales, and that Thornburg had received 'a positive outcome' and had 'cash generated' through these transactions."   Goldstone Facts ¶ 211 (setting forth this fact)(quoting Starrett SEC Depo. at 121:22-122:2).   See Starrett SEC Depo. at 118:2-119:10, 220:17-222:2.[113]   "KPMG employees acknowledged . . . in workpapers that Thornburg's ability to generate cash through I/O strip financing transactions was a contributing factor toward the company's liquidity that reduced the probability of needing to sell Purchased ARM Assets to meet margin calls."   Goldstone Facts ¶ 212, at 50 (setting forth this fact)(internal quotation marks omitted).   See Hall Depo. at 428:20-429:19; Deposition of Cynthia Reinhart at 107:11-15 (taken Dec. 19, 2012), filed August 9, 2013 (Doc. 204-311)("Reinhart Depo."); March 9, 2008, Restatement Workpaper at 3.[114]

---

strip transactions thus, while by themselves may not have affected Thornburg Mortgage's OTTI analysis, contributed to Thornburg Mortgage not being able to hold its Purchased ARM Assets to recovery.   Accordingly, there is a dispute of material fact whether Starrett could have been unconcerned about Thornburg Mortgage's OTTI analysis after the Citigroup Global and Greenwich margin calls, and the I/O strip transactions.

[113]The SEC attempts to dispute this fact by stating:

Defendant Starrett's claimed understanding is implausible and contradicted by the fact that using assets to generate cash to pay margin calls in the context of a liquidity crisis, regardless of the accounting classification, directly calls into question the accuracy of the OTTI analysis.   Additionally, I/O Strip sales reduced available liquidity by eliminating potential sources of funds to meet margin calls.

SEC Disputed Facts ¶ 211, at 21.   To dispute this fact, the SEC cites a portion of Kitchens' report.   In the portion which the SEC cites, Kitchens opines that Thornburg Mortgage's purpose in entering into the I/O strip transactions was to pay outstanding margin calls.   See Kitchens Report at 64-67.   This evidence does not specifically controvert the Defendants' asserted fact. Accordingly, the Court finds the fact undisputed.

[114]The SEC attempts to dispute this fact by stating: "Using assets to generate cash to pay margin calls in the context of a liquidity crisis, regardless of the accounting classification, directly calls into question the accuracy of the OTTI analysis.   Additionally, I/O Strip sales

- 127 -

> Before the 10-K filing on February 28, 2008, Ms. Hall specifically told Ms.
> Starrett that the issuance of I/O strips would not "taint [Thornburg's] assertion
> that they had the intent to hold their loans."  Ms. Hall also acknowledged that the
> proceeds from I/O strip financing transactions were a "source of cash" for
> Thornburg.

Goldstone Facts ¶ 213 (setting forth this fact)(alterations in Goldstone Facts but not in source)

(quoting Hall Depo. at 150:19-20, 183:2-3).  See Hall Depo. at 150:8-25, 182:18-183:3.[115]

> Thornburg's Board was informed about the repo margin calls Thornburg received
> in the latter half of February 2008, the plan to meet the margin calls, and the
> strategies that the company was implementing to raise additional cash and
> liquidity, and never expressed concern to Mr. Goldstone, Mr. Simmons, or
> Ms. Starrett about Thornburg's intent and ability to retain its Purchased ARM
> Assets or its ability to continue as a going concern.

Goldstone Facts ¶ 215, at 50-51 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not

disputing this fact); Mullin Decl. ¶¶ 10-12, at 3-4; Ater Decl. ¶¶ 5-10, at 2-3.  "Ms. Hall . . . had

no reason to doubt management's intent to hold and its belief that Thornburg would successfully

survive its liquidity challenge."  Goldstone Facts ¶ 215, at 51 (setting forth this fact).  See SEC

Disputed Facts at 1-51 (not disputing this fact); Hall Depo. at 123:5-24, 125:3-7, 134:14-22.

"Ms. Starrett worked directly with Thornburg's outside auditors from KPMG . . . during the

---

reduced available liquidity by eliminating potential sources of funds to meet margin calls."  SEC
Disputed Facts ¶ 212, at 21.  As the Court has already concluded, while the I/O strip transactions
may have reduced Thornburg Mortgage's long-term liquidity and its ability to raise cash, it
created short-term liquidity.  See supra note 111.  Accordingly, the Court finds this fact
undisputed.

[115]The SEC attempts to dispute this fact by stating: "Using assets to generate cash to pay
margin calls in the context of a liquidity crisis, regardless of the accounting classification,
directly calls into question the accuracy of the OTTI analysis.  Additionally, I/O Strip sales
reduced available liquidity by eliminating potential sources of funds to meet margin calls."  SEC
Disputed Facts ¶ 213, at 21.  This assertion does not specifically controvert the Defendants'
asserted fact.  The first part of the asserted fact concerns something Hall told Starrett before
filing the 2007 Form 10-K.  The SEC does not address this portion of the fact.  The second part
of the Defendants' asserted fact is that Hall acknowledged that proceeds from the I/O strip
transactions were a source of cash.  The SEC does not specifically dispute this fact.  While the
I/O strip transactions may have reduced Thornburg Mortgage's long-term liquidity, they
produced cash.  Accordingly, the Court finds this fact undisputed.

audit of the 2007 year-end financial statement."  Starrett Facts ¶ 12, at 4 (setting forth this fact).

See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Starrett SEC Depo. at

14:19-15:14.

### 15.    Filing the 2007 Form 10-K.

"As early as January 2, 2008, in an email copying Tara Baucom, Jennifer Hall and

Cynthia Reinhart, Thornburg provided KPMG a plan to file the 10-K on February 27 -- two days

prior to the SEC's official deadline of February 29.  This target date is reflected in KPMG's

workpapers."  Goldstone Facts ¶ 216, at 51 (setting forth this fact).  See SEC Disputed Facts

at 1-51 (not disputing this fact); Electronic Mail Transmission from Michael Coltharp to Clay

Simmons, Jane Starrett, Amy Pell, Shawn Buniel, Francine Jacquez, and Ben Smiley at 4 (dated

Jan. 2, 2008), filed August 9, 2013 (Doc. 204-28).[116]  "By February 19, 2008, Ms. Hall sent an

---

[116]The SEC asserts the following fact:  "Goldstone testified that the issues Simmons referred to in his instruction to Ms. Jacquez to get the 10-K filed by 6:00 a.m. Thursday morning because he did not want there to be any issues based on Thursday activity was based on a concern about additional margin calls."  SEC Facts ¶ N, at 3.  The Defendants dispute this fact by stating:

> Disputed.  The evidence is speculative and lacks foundation.  Fed. R. Evid. 602.
>
> Further, the evidence cited does not support the fact.  When asked if Mr. Simmons was concerned about "any specific event . . . in giving this directive to have the 'K' filed before 6:00 a.m. on Thursday morning," Mr. Goldstone testified that "[h]e doesn't refer to any and as far as I can tell he says, 'any issues,' meaning any issues."  SEC Ex. 2 (Goldstone SEC Tr. 316:6-10).  When asked if Mr. Simmons expressed to him "any specific event that he was concerned about," Mr. Goldstone testified, "[n]o."  He then added, "I think we were all concerned about the same thing and that is additional margin calls."  Id. (Goldstone SEC Tr. 316:11-14).

Defendants Disputed Facts ¶ N, at 5.  Goldstone testified that Simmons was not referring to any specific event, because any issue could mean any issue.  See Goldstone SEC Depo. at 316:6-10.  Even though additional margin calls may have been an issue about which Simmons was concerned, it is disputed whether it was the issue about which Simmons was concerned.

e-mail to Mr. McLamb advising him that Thornburg expected to file its 10-K on February 28." Goldstone Facts ¶ 217, at 51 (setting forth this fact). See Sec Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from Jennifer Hall to Robert McLamb at 2-18 (dated Feb. 20, 2008), filed August 9, 2013 (Doc. 204-67)("Feb. 20, 2008, Going Concern Email"). "KPMG was under no obligation to issue its audit opinion on February 27 or 28, 2008, and . . . KPMG [did not] need[] additional time to issue its audit opinion." Goldstone Facts ¶ 218, at 50 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); 2d RFAs at 4-5, 10-12. "KPMG employees . . . did not feel pressure to complete their audit early." Goldstone Facts ¶ 219, at 50 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Reinhart SEC Depo. at 57:5-15; Hall SEC Depo. at 92:14-93:13. "[I]f KPMG felt it did not have sufficient information to conclude on the accuracy of the financial statements -- no matter how close to the filing deadline -- KPMG would not have signed off on the audit opinion." Goldstone Facts ¶ 220, at 52 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Hall SEC Depo. at 93:9-10.

"Defendants prepared, and Goldstone and Simmons signed, Thornburg's 2007 Form 10-K, filed on February 28, 2008, which disclosed that Thornburg returned to profitability in the fourth quarter of 2007, [and] had the intent and ability to hold its Purchased ARM Assets to recovery." SEC Facts ¶ A, at 1. See 2007 Form 10 K at 18, 23.[117]

---

Consequently, the Defendants have specifically controverted the SEC's asserted fact, and the Court finds it disputed.

[117]The SEC's original asserted fact states: "Defendants prepared, and Goldstone and Simmons signed, Thornburg's 2007 Form 10-K, filed on February 28, 2008, which disclosed that Thornburg returned to profitability in the fourth quarter of 2007, had the intent and ability to hold its Purchased ARM Assets to recovery, and did not have a going concern issue." SEC Facts ¶ A, at 1. The Defendants dispute this fact by stating:

"KPMG signed off on Thornburg's financial statements to be filed in their 2007 Form 10-K 'at 12:37 AM [MST] on February 28, 2008 (effectively the night of February 27, 2008).'" Goldstone Facts ¶ 221, at 52 (setting forth this fact)(alterations in Goldstone Facts but not in original)(quoting March 9, 2008, Restatement Memo. at 2). See SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo. at 2. "Thornburg often filed financial statements during nonmarket hours." Goldstone Facts ¶ 222, at 52 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo. Vol. II at 101:20-25, 109:21-25; Starrett SEC Depo. at 39:9-22. "Thornburg timely filed its 2007 Form 10-K on February 28, 2008, at 4:29 a.m. MST in conformity with applicable SEC regulations (specifically, 17 C.F.R. § 249.12b-2(2)(i) and 17 C.F.R. § 240.310(b)(1)), which required filing no later than February 29, 2008." Goldstone Facts ¶ 223, at 52 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); 1st RFAs at 16. "Thornburg's 2007 Form 10-K was accepted by the SEC at 6:28 a.m. EST on February 28, 2008." Goldstone Facts ¶ 224, at 52 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo. at 2. "Ms. Starrett did not sign the Form 10-K and is not mentioned

---

Undisputed that Defendants participated in the preparation of the Form 10-K, but disputed insofar as the implication is that Defendants were solely responsible for doing so without substantial input from others at Thornburg and KPMG. Also disputed insofar as Thornburg's Form 10-K did not disclose that Thornburg did not have a going concern issue.

Defendants Disputed Facts ¶ A, at 2.
    The Court concludes that the record does not support the SEC's asserted fact. The SEC does not assert that the Defendants were solely responsible for preparing the 2007 Form 10-K. Thus, the Defendants' contention regarding them being solely responsible does not dispute the SEC's asserted fact. The record does not, however, support last part of the SEC's asserted fact. The 2007 Form 10-K does not state that Thornburg Mortgage did not have a going-concern issue. Because the SEC cites only to the 2007 Form 10-K to support this fact, the Court finds that there is no evidence supporting the last part of the SEC's asserted fact. The Court has thus modified the SEC's asserted fact to more accurately reflect the record.

anywhere in the 10-K."  Goldstone Facts ¶ 225, at 52 (setting forth this fact); 2007 Form 10-K at 31.

"After receiving notice of the 10-K filing, Mr. Simmons emailed Thornburg personnel, as well as Ms. Reinhart and Ms. Hall, to convey his thanks 'for all the effort to get this filed early.'" Goldstone Facts ¶ 226, at 53 (setting forth this fact)(quoting Electronic Mail Transmission from Clay Simmons to Francine Jacquez, Larry Goldstone, Jane Starrett, Deborah Burns, Sheri Fox, Suzanne O'Leary Lopez, Michael Colcharp, and Amy Pell at 2 (dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-138)("Feb. 28, 2008, Simmons Email").  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 28, 2008, Simmons Email at 2.  "Mr. Simmons . . . asked Thornburg's Assistant Controller, Ms. Jacquez, to file early in the morning on February 28, 2008, because he would be in Dallas that day for an Office of Thrift Supervision meeting and he would not have time during the day to devote to the 10-K filing."  Goldstone Facts ¶ 227, at 53 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Decl. ¶ 60, at 14; Simmons Depo. Vol. II at 408:16-409:24.  "Thornburg filed the Form 10-K when it did because that is when KPMG signed off on it. . . .  [I]t was standard practice for Thornburg to file the 10-K immediately after receiving KPMG's sign-off to ensure that the financial statements remained current."  Goldstone Facts ¶ 228, at 53 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Declaration of Francine Jacquez ¶ 12, at 3, filed August 9, 2013 (Doc. 204-291)("Jacquez Decl.").  "[T]he filing of Thornburg's 2007 Form 10-K at 4:29 a.m. MST on February 28, 2008 'was consistent with the schedule [Thornburg] had put forth that [KPMG] agreed to with the company in terms of the timeframe, which was not at all unusual.'"  Goldstone Facts ¶ 229 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Reinhart SEC Depo. at 56:6-8).  See SEC Disputed Facts at 1-51 (not

disputing this fact); Reinhart SEC Depo. at 56:4-11.  "[T]here was [not] 'anything suspicious to [Matthew Plummer, a senior KPMG manager,] about the fact that Thornburg filed its 10-K prior to the opening of the market on February 28.'"  Goldstone Facts ¶ 230, at 53 (setting forth this fact)(quoting Deposition of Matthew Plummer at 209:16-20 (taken Nov. 28, 2012), filed August 9, 2013 (Doc. 204-309)("Plummer Depo.")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Plummer Depo. at 209:16-20.

16.     **The 2007 Form 10-K Disclosures.**

"On February 20, 2008, in response to a question from Thornburg investor relations officer Amy Pell regarding whether Mr. Goldstone and Mr. Simmons were comfortable with the annual report disclosure concerning Thornburg's 2008 outlook, Mr. Goldstone wrote, 'I need to read it again.  We may be a little too optimistic.'"  Goldstone Facts ¶ 231, at 53 (setting forth this fact)(quoting Electronic Mail Transmission from Larry Goldstone to Amy Pell at 2 (dated Feb. 20, 2008), filed August 9, 2013 (Doc. 204-68)("Feb. 20, 2008, Goldstone Email")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 20, 2008, Goldstone Email at 2.

> On the morning of February 21, 2008, Mr. Goldstone circulated draft language to
> Mr. Simmons and Ms. Starrett for an additional Recent Developments disclosure
> about the February 2008 decline in the mortgage market and the margin calls that
> Thornburg had received.  His cover email stated: "I realize that this is not very
> pretty . . .  I think that this information needs to be disclosed."

Goldstone Facts ¶ 232, at 53-54 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Electronic Mail Transmission from Larry Goldstone to Clay Simmons, Jane Starrett, and Amy Pell at 2 (dated Feb. 21, 2008), filed August 9, 2013 (Doc. 204-72)("Feb. 21, 2008, Goldstone Email")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 21, 2008, Goldstone Email at 2; Goldstone Decl. ¶ 28, at 6.

> In an email report to Thornburg's Board on February 21, 2008, Mr. Goldstone
> wrote that management was drafting "some new disclosure to go into our 10-K

> later today because we feel that these events are significant and just materialized last Friday, or maybe Thursday. Either way, the market has moved against us."

Goldstone Facts ¶ 233, at 54 (setting forth this fact)(quoting Feb. 21, 2008, Simmons Email at 2-3). See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 21, 2008, Simmons Email at 2-3. "Ms. Starrett suggested to Mr. Goldstone and Mr. Simmons that Thornburg disclose in its 2007 Form 10-K, inter alia, the uncertainties inherent in the current market." Starrett Facts ¶ 14, at 4 (setting forth this fact). See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Electronic Mail Transmission from Jane Starrett to Larry Goldstone, Clay Simmons, and Deborah Burns at 2 (dated Feb. 20, 2008), filed August 31, 2013 (Doc. 207-7).

> The draft Recent Developments disclosure Mr. Goldstone circulated on February 21, 2008 stated that:

>> Since February 14, 2008 there had been "a sudden and unexpected adverse change" in the MBS market, particularly among those securities backed by Alt-A mortgage collateral, and that Thornburg had "received in excess of $300 million of margin calls, much of it related to the decline in prices of these securities" in the two weeks preceding the 10-K filing.

>> "[T]he sudden decline in these securities prices has left us with substantially reduced cash and unpledged securities to meet further margin calls, should they occur" and if Thornburg could not meet margin calls with available cash, "[the company] might need to selectively sell assets in order to raise cash."

Goldstone Facts ¶ 234, at 54 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Electronic Mail Transmission from Larry Goldstone to Jane Starrett, Clay Simmons, and Amy Pell at 4 (dated Feb. 21, 2008), filed August 9, 2013 (Doc. 204-74)("Recent Development Email")). See SEC Disputed Facts at 1-51 (setting forth this fact); Recent Development Email at 4. "Mr. Goldstone, Mr. Simmons and Ms. Starrett each reviewed and revised the draft Recent Developments disclosure." Goldstone Facts ¶ 235, at 54 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Recent Development Email

at 2-4; Electronic Mail Transmission from Clay Simmons to Sheri Fox, Larry Goldstone, Jane

Starrett, and Deborah Burns at 2-4 (dated Feb. 27, 2008), filed August 9, 2013 (Doc. 204-132).

> On February 21, Thornburg decided to delay its planned securitization
> until after the 10-K filing.  Deborah Burns, Thornburg's Senior Vice President of
> Structured Finance, wrote that Thornburg had been advised that the Form 10-K
> and prospectus supplement disclosures should be consistent and disclosures in the
> "prosupp . . . should be preceded by a corporate disclosure."

Goldstone Facts 236, at 54-55 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(quoting Electronic Mail Transmission from Debora Burns to Patrick Feldman and

Nathan Fellers at 2 (dated Feb. 21, 2008), filed August 9, 2013 (Doc. 204-87)("Feb. 21, 2008,

Burns Email")).  See SEC Disputed Facts at 1-51; Feb. 21, 2008, Burns Email at 2.  "[T]he

securitization was delayed so that something definitive about resolving the margin calls could be

disclosed. . . .  [T]he 10-K would be the lead disclosure document and . . . the prospectus

supplement disclosures would be consistent with it."  Goldstone Facts ¶ 237, at 55 (setting forth

this fact)(internal quotation marks omitted).  See SEC Dispute Facts at 1-51 (not disputing this

fact); Goldstone SEC Depo. at 241:22-242:22; Goldstone Depo. at 116:13-118:1.[118]  "Ms. Burns

---

[118]The Defendants assert the following fact: "Mr. Goldstone testified that the reason the
securitization was delayed was that Thornburg was 'aiming for . . . a complete disclosure' about
the margin calls.  He further testified that Thornburg did not 'want to have multiple documents in
the market with inconsistent disclosure.  We wanted everything to be consistent and complete.'"
Goldstone Facts ¶ 238 (alterations in Goldstone Facts but not in source)(quoting Goldstone SEC
Depo. at 241:19-21).  The SEC disputes this fact by stating:

> Defendant Goldstone wrote on February 22, 2008 that the securitization was
> delayed to avoid disclosing that Thornburg was not timely meeting its margin
> calls: "We postponed our February [2008] securitization transaction because of
> prosup [prospectus supplement] disclosure issues around these margin calls.  We
> don't want to disclose our current circumstance until it is resolved."

SEC Disputed Facts ¶ 238, at 21 (alterations in SEC Disputed Facts but not is source)(quoting
Electronic Mail Transmission from Larry Goldstone to Garrett Thornburg, Anne-Drue Anderson,
David A. Ater, Eliot R. Cutler, Francis I. Mullins, III, Ike Kalangis, Michael B. Jeffers, Owen
Lopez, and Stuart Sherman at 1 (dated Feb. 22, 2008), filed November 6, 2013

explained to an investor that the securitization had been delayed because 'the Company endeavors to make sure all public disclosures are consistent and accurate' and Thornburg was 'unable to coordinate the disclosures for the [securitization] prospectus and the Form 10-K filing in time for the scheduled pricing.'"   Goldstone Facts ¶ 239, at 55 (setting forth this fact)(alterations in Goldstone facts but not in source)(quoting Electronic Mail Transmission from Debora Burns to Jane Starrett, Larry Goldstone, Clay Simmons, Nathan Fellers, and Patrick Feldman at 2 (dated Feb. 22, 2008), filed August 9, 2013 (Doc. 204-99)("Feb. 22, 2008, Burns Email")).   See Feb. 22, 2008, Burns Email at 2.[119]   Goldstone, Simmons, and Starrett were

_____

(Doc. 231-54)("Feb. 22, 2008, Goldstone Update Email")).   In the Feb. 22, 2008, Goldstone Update Email, Goldstone states: "We postponed our February securitization transaction because of prosup disclosure issues around these margin calls.   We don't want to disclose our current circumstance until it is resolved."   Feb. 22, 2008.

The Defendants reply by stating: "The SEC's response improperly seeks to dispute Mr. Goldstone's sworn testimony through its unsupported speculative reading of his email.   See Reply Br. at II.B.   Mr. Goldstone's sworn testimony explains the meaning of his email." Goldstone Reply Facts ¶ 238, at 107.   The Court concludes that the SEC has specifically controverted the Defendants' asserted fact.   The Defendants' assert that the reason Thornburg Mortgage delayed the margin calls was that Goldstone wanted to provide complete disclosure and he did not want to have inconsistent documents in the market.   The SEC cites, however, to an electronic mail transmission in which Goldstone states that the reason Thornburg Mortgage delayed the securitization was because Thornburg Mortgage did not want to disclose that it could not timely meet its margin calls.   This evidence specifically controverts the Defendants' asserted fact.   Thornburg Mortgage could not have been aiming for complete disclosure while at the same time taking steps to not disclose certain information.   Moreover, by not wanting to disclose the margin calls until they were paid, Goldstone is indicating a desire to not alarm anyone to Thornburg Mortgage's liquidity problems or to the fact that Thornburg Mortgage could not timely meet its margin calls.   Accordingly, the Court finds the Defendants' asserted fact disputed.

[119]The SEC attempts to dispute this fact by stating:

Deborah Burns wrote on February 21, 2008 that the securitization was delayed to avoid disclosing that Thornburg was not timely meeting its margin calls: "CSFB is willing to withdraw from the underwriting group since they realize their attorneys will probably not agree to anything short of disclosing the delay in meeting their margin call earlier this week."

willing to make whatever accounting judgments and disclosures concerning Thornburg

Mortgage's inability to pay its margin calls, if the facts called for that action at the time of the

10-K filing.  See Goldstone Facts ¶ 240, at 55 (setting forth this fact); Goldstone Depo. at

278:18-279:2; Simmons Decl. ¶ 56, a 13.[120]

_____

SEC Disputed Facts ¶ 239, at 21-22 (quoting Electronic Mail Transmission from Deborah Burns to Larry Goldstone at 1 (dated Feb. 21, 2008), filed November 6, 2013 (Doc. 231-55)("Feb. 21, 2008, Burns to Goldstone Email")).   This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants assert what Burns told an investor about why the securitization had been delayed and not the actual reason why the securitization had been delayed.  The SEC does not contend that Burns did not tell the investor what the Defendants assert that she did.  Accordingly, the Court finds the fact undisputed.

[120]The Defendants original asserted fact states: "Mr. Goldstone, Mr. Simmons and Ms. Starrett have testified that they were willing to make whatever accounting judgments and disclosures the facts called for at the time of the 10-K filing."  Goldstone Facts ¶ 240, at 55.  The SEC disputes this fact by stating:

> Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- and did not disclose that Thornburg did not control the ability (i.e., have the ability) to hold the impaired available-for-sale debt securities pledged as collateral under the reverse repurchase agreements until market values recovered.  Goldstone also wrote that "[w]e don't want to disclosure our current circumstance until it is resolved.  Our goal for resolution of the filing of the 10-K . . . "our plan is to say that we had margin calls and all have been met."  And that his strategy to sell older TMA securities "that don't require any current disclosure [would allow them to] keep our current situation quiet while we deal with it."

SEC Disputed Facts ¶ 240, at 22 (alterations in SEC Disputed Facts but not in source)(quoting Electronic Mail Transmission from Larry Goldstone to Jane Starrett at 2 (dated Feb. 25, 2008), filed August 9, 2013 (Doc. 204-106)("Feb. 25, 2008, Goldstone KPMG Email")).  While the Defendants' evidence supports the fact that Goldstone was willing to disclose Thornburg's inability to meet its margin calls, if it was still unable to do so when the Form 10-K needed to be filed, the SEC has disputed that Goldstone was willing to disclose Thornburg Mortgage's inability to timely meet its margin calls.  The Defendants purposely did not tell KPMG that Thornburg Mortgage was unable to timely meet its margin calls until it had paid them so that it could merely tell KPMG that it had met all of its margin calls without having to disclose that it took several days to do so.  The Court has thus modified to Defendants' asserted fact to more accurately reflect the evidence.

"Mr. Goldstone, Mr. Simmons and Ms. Starrett genuinely believed that Thornburg's Form 10-K fully and appropriately disclosed Thornburg's satisfaction of margin calls the company had received and the risks facing the company."  Goldstone Facts ¶ 241, at 55 (setting forth this fact).  See Goldstone Decl. ¶ 31, at 6; Simmons Decl. ¶ 41, at 9.[121]

> In an email he sent to Thornburg's Board on the morning of February 22, 2008, Mr. Goldstone stated that while his team's "goal for resolution" of the margin calls was "the filing of [the] 10-K," "[h]ow we disclose this issue and what we say will depend on where we are next week when we need to file."

Goldstone Facts ¶ 242, at 56 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Feb. 22, 2008, Goldstone Email at 2-3).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 22, 2008, Goldstone Email at 2-3.  "'[W]hether margin calls are met or not met *and how they're met* is relevant in the context of proper disclosure, absolutely.'"  SEC Facts ¶ F, at 2 (setting forth this fact)(emphasis in SEC Facts but not in source)(quoting Goldstone Depo. at 286:10-12).  See Goldstone Depo. at 286:4-14.[122]  "Thornburg's 2007 Form

---

[121]The SEC attempts to dispute this fact by stating:

> Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- from KPMG, as demonstrated by Defendant Starrett's February 25, 2008 e-mail to Defendants Goldstone and Simmons: "We have purposely not told them [KPMG auditors] about the margin calls so that we don't escalate an issue which we believe will be put to rest by the time they have to issue an opinion."

SEC Disputed Facts ¶ 241, at 22 (alterations in SEC Disputed Facts but not in source)(quoting Feb. 25, 2008, Goldstone KPMG Email at 2).  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants assert that they believed that they fully disclosed the necessary information while the SEC contends that the Defendants did not disclose Thornburg Mortgage's failure to timely meet its margin calls.  The Defendants do not assert that they disclosed to KPMG Thornburg Mortgage's inability to timely meet its margin calls.  Rather, the Defendants' asserted fact suggests that they do not believe they were required to disclose to KPMG that Thornburg Mortgage was not able to timely meet its margin calls.  Accordingly, the Court finds this fact undisputed.

[122]The Defendants attempt to dispute this fact by stating:

10-K did not disclose that, in the two weeks leading up to the filing of the 2007 Form 10-K, Thornburg had been unable to meet certain margin calls on the day those margin calls were received."  SEC Facts ¶ G, at 2.  See 2007 Form 10-K at 2-48.[123]  "Thornburg's 2007 Form 10-K did not disclose that Thornburg received a $196.5 million margin call from Citigroup on

_____

> Undisputed that Mr. Goldstone provided the testimony quoted, but misleading, as Mr. Goldstone also testified as follows:
>
>> [U]nderstanding the tenor of the relationship and the understanding that there was an agreement amongst the parties and that the parties had good faith conversations -- not even negotiations -- and they were all in agreement -- I think that would be the sort of determining difference in terms of what would be discloseable and what wouldn't be discloseable.
>> . . .
>>
>> [T]he tenor of the relationship could have an implication with regard to how that disclosure or what those disclosure obligations might be.  But ultimately, no, a breach is simply a breach.  There was no default.
>> . . .
>>
>> And so consequently, this [reservation of rights] letter really is not substantive in its -- it doesn't add anything in my mind.  It adds nothing.
>
> Ex. 278 (Goldstone SEC Tr. 247:11-249:12).
>
> Moreover, the fact is immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶ C.

Defendants Disputed Facts ¶ F, at 4-5.  Because the Defendants do not dispute this fact, and because asserting that a fact is immaterial does not dispute it, the Court finds this fact undisputed.

[123]The Defendants respond by saying: "Undisputed but immaterial because the Court found in ruling on Defendants' motion to dismiss that there was no duty to disclose the difficulty meeting margin calls or technical breaches of repo agreements in the Form 10-K.  MTD Op. at *144-45."  Defendants Facts ¶ G, at 5.  Because asserting a fact as immaterial does not dispute it, the Court finds the fact undisputed.

February 21, 2008 that Thornburg had required several days to pay off."  SEC Facts ¶ H, at 2

(setting forth this fact).  See 2007 Form 10-K at 2-48.[124]  "Thornburg's 2007 Form 10-K did not

disclose that Thornburg had sold I/O strips to pay off the Citigroup margin call."  SEC Facts ¶ I,

at 3 (setting forth this fact).  See 2007 Form 10 K at 2-48.[125]

> In an email exchange with Mr. Simmons after the February 22, 2008 Audit
> Committee meeting, which KPMG attended, Mr. Goldstone wrote the following:
>
> > "So as I now understand this, we are a going concern but we may
> > need to mark to market for GAAP.  That means that we would then
> > move to reporting Core Earnings in addition to GAAP earnings.
> > Redwood already does this and Annaly may as well.  It doesn[']t
> > affect taxable income or dividends.  It just makes understanding
> > our earnings a little more complex.  But we could get past it.
> > Maybe we shouldn't care."
>
> Mr. Simmons responded:

---

[124]The Defendants respond by stating: "Undisputed, but immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶ G."  Defendants Disputed Facts ¶ H, at 5.  Because asserting a fact as immaterial does not dispute it, the Court finds the SEC's asserted fact undisputed.

[125]The Defendants attempt to dispute this fact by stating:

Disputed.  While Thornburg's 2007 Form 10-K did not explicitly reference the Citigroup margin call in connection with the I/O strip financing transactions, it disclosed both the receipt of over $300 million in margin calls during the two weeks preceding the Form 10-K filing and the use of I/O strip financing transactions to generate liquidity. SMF ¶¶ 114, 250.

Moreover, the fact is immaterial as the Court found in ruling on Defendants' motion to dismiss that there was no duty to disclose the purpose of the I/O strip transactions in the Form 10-K. MTD Op. at *147.

Defendants Disputed Facts ¶ I, at 5-6.  This assertion does not dispute the SEC's asserted fact. While Thornburg Mortgage mentions the I/O Strip Transactions in one section of the 2007 Form 10-K and then mentions, in another section, that Thornburg Mortgage received over $300 million in margin calls, there is no indication that Thornburg Mortgage entered into the I/O Strip Transactions to pay the margin calls.  Additionally, asserting that a fact is immaterial does not dispute it.  The Court thus finds this fact undisputed.

> "I think this is a good idea particularly in light of the expansion of
> interest margin that will occur this year.  We want analysts and
> investors to focus on core income."

Goldstone Facts ¶ 243, at 56 (setting forth this fact)(alterations in Goldstone Facts but not in
source)(quoting Electronic Mail Transmission from Clay Simmons to Larry Goldstone at 2
(dated Feb. 22, 2008), filed August 9, 2013 (Doc. 204-103)("Feb. 22, 2008, Simmons Going
Concern Email")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 22, 2008,
Simmons Going Concern Email at 2.

> On February 25, 2008, Ms. Starrett wrote to Messrs, Goldstone and Simmons that
> even though she believed the issue would be "put to rest by the time [KPMG has]
> to issue [its] opinion . . . [o]bviously, if we are not able to resolve the [margin
> call] situation satisfactorily, we will need to inform [KPMG] before we file."

Goldstone Facts ¶ 244 (setting forth this fact)(alterations in Goldstone Facts but not in
source)(quoting Feb. 25, 2008, Goldstone KPMG Email at 2).  See Feb. 25, 2008, Goldstone
KPMG Email at 2.[126]  "At the time of Ms. Starrett's email (Ex. 93), . . . '[Thornburg] would
disclose whatever the situation was with respect to margin calls if [it] were not successful.  At

---

[126]The SEC attempts to dispute this fact by stating:

> Defendants purposefully withheld critical information about margin calls -- that
> they were not timely being met -- from KPMG, as demonstrated by Defendant
> Starrett's February 25, 2008 e-mail to Defendants Goldstone and Simmons: "We
> have purposely not told them [KPMG auditors] about the margin calls so that we
> don't escalate an issue which we believe will be put to rest by the time they have
> to issue an opinion."

SEC Disputed Facts ¶ 244, at 22 (alterations in SEC Disputed Facts but not in source)(quoting
Feb. 25, 2008, Goldstone KPMG Email at 2).  This assertion does not specifically dispute the
Defendants' asserted fact.  The Defendants assert that Starrett believed that Thornburg Mortgage
would pay its margin calls before the Form 10-K needed to be filed, but that, if Thornburg
Mortgage did not meet the margin calls, it would inform KPMG.  The SEC's assertion does not
address this asserted fact, because the Defendants do not assert that they disclosed to KPMG
Thornburg Mortgage's inability to timely meet its margin calls.  Accordingly, the Court finds the
fact undisputed.

this time, [Thornburg Mortgage] believed [it was] going to be successful in meeting the margin calls pursuant to the plan which [it] had with the dealers.'" Goldstone Facts ¶ 245, at 56-57 (setting forth this fact)(alterations omitted)(quoting Simmons Depo. Vol. II at 328:11-15). See Simmons Depo. Vol. II at 328:3-18.[127]

"Mr. Simmons asked for Mr. Coltharp's assistance in 'monitoring daily margin call activity . . . to ensure . . . that the 10-K disclosures would be accurate.'" Goldstone Facts ¶ 246, at 57 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Declaration of Michael Coltharp ¶ 11, at 3, filed August 9, 2013 (Doc. 204-287)("Coltharp Decl.")). See SEC Disputed Facts at 1-51 (not disputing this fact); Coltharp Decl. ¶ 11, at 3. "The Form 10-K disclosed that Thornburg had $427,779,000 of unrealized losses on Thornburg's Purchased ARM assets as of December 31, 2007. The unrealized losses were also reported as other comprehensive income (loss) and as a reduction in the shareholders' equity on the company's balance sheet." Goldstone Facts ¶ 247, at 57 (setting forth this fact)(internal quotation marks omitted). See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 37-38, 40.

---

[127]The SEC attempts to dispute this fact by stating:

> Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- from KPMG, as demonstrated by Defendant Starrett's February 25, 2008 e-mail to Defendants Goldstone and Simmons: "We have purposely not told them [KPMG auditors] about the margin calls so that we don't escalate an issue which we believe will be put to rest by the time they have to issue an opinion."

SEC Disputed Facts ¶ 245, at 22 (alterations in SEC Disputed Facts but not in source)(quoting Feb. 25, 2008, Goldstone KPMG Email at 2). This assertion does not specifically controvert the Defendants' asserted fact. The Defendants do not assert that they disclosed Thornburg Mortgage's inability to timely meet its margin calls. Instead, the Defendants' asserted fact suggests that, if Thornburg Mortgage paid its margin calls, it would not disclose the timeliness issue to KPMG. Consequently, the Court finds the fact undisputed.

The financial statements contained within the Form 10-K also provided a breakdown as to how the $427,779,000 was calculated.  In a table entitled, "Unrealized Losses on Purchased ARM Assets as of December 31, 2007" in the financial statement footnotes, Thornburg provided a breakdown of both the unrealized losses and fair value of the Purchased ARM Assets categorized by credit rating and length of time for which the individual securities had had unrealized losses.

Goldstone Facts ¶ 248, at 57 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 40-41.

The determination not to treat the approximately $428 million in losses as OTTI was highlighted in the financial statements footnotes as a "critical accounting policy," which "require[d] complex management judgment."  The 10-K disclosed that:

> "These [OTTI] evaluations require management to make estimates and judgments . . . to determine whether unrealized losses are reflective of credit deterioration and to evaluate management's ability and intent to hold the investment to maturity or recovery. Because the estimate for [OTTI] requires management judgment, we consider this to be a critical accounting estimate."

> "[T]he gross unrealized losses of $427.8 million on Purchased ARM Assets at December 31, 2007 are not reflective of credit deterioration and because we have the ability and intent to hold the Purchased ARM Assets until recovery, the losses are not other-than-temporary impairments."

Goldstone Facts ¶ 249, at 57-58 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting 2007 Form 10-K at 21-23).  See 2007 Form 10-K at 21-23.[128]

In a section of the 10-K entitled "Recent Developments" and in a footnote to the financial statements entitled "Subsequent Events," Thornburg made the following disclosures:

---

[128]The SEC attempts to dispute this fact by stating: "Thornburg's 2007 Form 10-K did not accurately disclose OTTI and going concern issues, and did not highlight its faulty analysis of those issues or its withholding of information from KPMG in the footnotes to its financial statements."  SEC Disputed Facts ¶ 249, at 22.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants do not assert that its OTTI analysis was correct or that Thornburg Mortgage highlighted its faulty analysis or its withholding of information from KPMG.  Accordingly, the Court finds the fact undisputed.

> "Beginning on February 14, 2008," there was "once again a sudden adverse change in mortgage market conditions in general and more specifically in the valuations of mortgage securities backed by Alt-A mortgage loan collateral."
>
> Market valuations for [ARM] securities "have decreased between 10 and 15 percent since January 31, 2008, and as a result, we have been subject to margin calls on this collateral."
>
> Since February 14, 2008, "we have met margin calls in excess of $300 million on our Reverse Repurchase Agreements, the substantial majority of which is related to the decline in valuations placed on these securities."

Goldstone Facts ¶ 250, at 58 (setting forth this fact)(alterations in original)(quoting 2007 Form 10-K at 20-21).  See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 20-21, 26-27, 43.

> The "Recent Developments," "Executive Overview," "Risk Factors," and "Liquidity and Capital Resources" sections of the 10-K, disclosed the following:
>
> > The "sudden decline in the valuation of these securities has left us with reduced readily available liquidity to meet future margin calls, relative to our cash and unpledged securities position of December 31, 2007."
> >
> > "In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required to meet margin calls."
> >
> > "[T]here is no assurance that the value of our mortgage portfolio and derivatives portfolio will not decline further, that we will not experience a further decline in our book value, that lenders will not make additional margin calls or that we will be able to satisfy additional margin calls, if any."

Goldstone Facts ¶ 251, at 58-59 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting 2007 Form 10-K at 21, 27).  See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 14, 18, 20-21, 26-27.

The "Subsequent Events" footnote to the financial statements within the 2007 Form 10-K also disclosed:

> "Despite the lack of historical losses and the currently low credit risk assessment, liquidity for these securities has deteriorated and market valuations of these securities have decreased between 10 and 15 percent since January 31, 2008.  As a result, the Company has been subject to margin calls on this collateral."

> "[T]he Company expects to continue to operate with a historically low level of leverage and to continue to take actions that would support higher levels of liquidity and available cash."

Goldstone Facts ¶ 252, at 59 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting 2007 Form 10-K at 43).  See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 43.

The 10-K disclosed, in the sections on "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," the following:

> "[W]hile we have successfully maintained our financing lines, increasing those lines has become more difficult since February 14, 2008.   Given the current uncertainty regarding these market conditions, we are unable to offer any additional factual information on the situation and how it will impact us other than to disclose what we are currently seeing in the mortgage market."

> "We faced significant challenges during the second half of 2007 . . . and are continuing to face these challenges in 2008.  There is no assurance that these conditions have stabilized or that they will not worsen."

Goldstone Facts ¶ 253, at 59 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting 2007 Form 10-K at 15, 21).  See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 15, 21, 27.  "The 2007 Form 10-K was the first time the Company had

disclosed that it might not be able to meet margin calls going forward."  Goldstone Facts ¶ 254, at 49 (setting forth this fact).  <u>See</u> 2007 Form 10-K at 15, 21, 27; Goldstone Decl. ¶ 28, at 6.[129]

17.      <u>**Market Reaction to the 2007 Form 10-K Filing.**</u>

"Prior to the 10-K filing, Ms. Starrett informed Mr. Simmons and Mr. Goldstone that she had been called to jury duty from February 26 to February 28 and would be out of the office from at least 8:00 a.m. to 6:00 p.m. each day."  Goldstone Facts ¶ 255, at 60 (setting forth this fact).  <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from Jane Starrett to Clay Simmons, Amber Luidke, Natalie Velasco, Shawn Buniel, Michael Coltharp, and Francine Jacquez at 2 (dated Feb. 26, 2008), filed August 9, 2013 (Doc. 204-116). "On February 28, 2008 at 6:29 a.m. [MST], Mr. Goldstone sent an email to members of Thornburg's Investor Relations group, stating that the '10-K filing ha[d] been picked up by the press and the reports [were] not very good.'"  Goldstone Facts ¶ 256, at 60 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Electronic Mail Transmission from Larry Goldstone to Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2 (dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-139)("Feb. 28, 2008, Goldstone Press Email")).  <u>See</u> Notice of Errata with Respect to Statement of Material Facts of Defendants Larry Goldstone and Clarence G. Simmons' in Support of Their Motion for Summary Judgment at 2, filed September

---

[129]The SEC states: "Undisputed, but misleading because Thornburg had previously reported that lenders had seized and sold Purchased ARM Securities held as collateral in August of 2007 and because Goldstone told investors on CNBC on February 28, 2008 that 'REPORTING THAT WE MIGHT HAVE TO SELL ASSETS IS STANDARD DISCLOSURE.'" SEC Disputed Facts ¶ 254, at 22-23.  Because the SEC does not dispute this fact, the Court finds it undisputed.

24, 2013 (Doc. 217)("Goldstone Facts Errata")(amending this fact);[130] SEC Disputed Facts

at 1-51 (not disputing this fact); Feb. 28, 2008, Goldstone Press Email at 2.

> At 6:10 a.m. [MST] on February 28, 2008, Matthew Novotny of Citi sent Mr.
> Feldman of Thornburg a Bloomberg media report titled, "Thornburg Mortgage
> May Have to Sell Assets to Meet Margin Calls," which reported that "[t]he
> company has already met $300 million of margin calls, which has depleted its
> available cash and reduced its ability to meet future demands for more collateral
> . . . ."

Goldstone Facts ¶ 257, at 60 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(quoting Electronic Mail Transmission from Matthew Novotny to Patrick Feldman at 2

(dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-140)("Feb. 28, 2008, Novotny Email")).

See Goldstone Facts Errata at 2 (amending this fact); SEC Disputed Facts at 1-51 (not disputing

this fact); Feb. 28, 2008, Novotny Email at 2.  "Shortly after the market opened on February 28,

2008, Thornburg's stock price declined sharply."  Goldstone Facts ¶ 258, at 60 (setting forth this

fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Alistair Barrr, Thornburg Slumps

After Disclosing Margin Calls MarketWatch (Feb. 28, 2008), http://www.marketwatch.com/

story/thornburg-says-more-than-300-million-in-margin-calls-paid.   "At 6:44 a.m. [MST] on

February 28, 2008, Charles MacIntosh from Merrill Lynch sent Mr. Feldman a Bloomberg

message saying, 'can you fill me in with whats [sic] going on with the reported margin calls

you've received?  Im [sic] getting a lot of heat here today abou[t] this press release.'"  Goldstone

Facts ¶ 259, at 60 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(quoting Electronic Mail Transmission from Charles Macintosh to Patrick Feldman at 2

(dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-144)("Feb. 28, 2008, Macintosh Email")).

---

[130]In the Goldstone Facts Errata, the Defendants amend this fact to state that the correct
time zone is MST and not EST, as the Goldstone Facts state.  See Goldstone Facts Errata at 2.
To acknowledge this amendment, and further amendments that the Defendants make with the
Goldstone Facts Errata, the Court will place the amended portion in brackets within the quoted
fact.

See Goldstone Facts Errata at 2 (amending this fact); SEC Disputed Facts at 1-51; Feb. 28, 2008,

Macintosh Email at 2.

> At 7:30 a.m. [MST] on February 28, 2008, UBS analyst Omotayo
> Okusanya issued an email report placing Thornburg's stock rating and price target
> under review and predicting its "stock should sell-off today."   The report stated
> that:
>
>> "$300M in additional margin calls" were "tied to $2.9B of AAA
>> rated [Residential Mortgage-Backed Security ("RMBS")] backed
>> by 'Alt A mortgages' -- securities that have seen their market value
>> fall 10-15% this month as credit market conditions have worsened
>> materially."
>>
>> Thornburg had "reduced its readily available liquidity to meet
>> current and future margin calls" and "may once again have to
>> selectively sell assets to meet the call requirements."
>>
>> "TMA stock has been up 25% YTD on expectations of an
>> improving outlook given recent Fed cuts, and the increase in loan
>> limits which would make TMA loans eligible for FNM/FRE
>> financing.   However, we believe this recent news will bring
>> liquidity issues back to the fore-front . . . ."

Goldstone Facts ¶ 260, at 60-61 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(quoting Electronic Mail Transmission from Omotayo Okusanya to

Undisclosed-Recipients at 2 (dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-142)("Feb.

28, 2008, Okusanya Email")).   See Goldstone Facts Errata at 2 (amending this fact); SEC

Disputed Facts at 1-51 (not disputing this fact); Feb. 28, 2008, Okusanya Email at 2.  "At 7:43

[MST] on February 28, 2008, Citigroup issued a margin call of $36 million to Thornburg that

was later reduced to $29 million."   Goldstone Facts ¶ 261, at 61 (setting forth this fact).   See

Goldstone Facts Errata at 2 (amending this fact); SEC Disputed Facts at 1-51 (not disputing this

fact); Restatement Margin Calls at 5; Electronic Mail Transmission from Von May to Xen

Stanhope at 2-7 (dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-152).

> At 7:56 a.m. [MST] on February 28, 2008, Mr. Goldstone sent an email to
> Thornburg's Board stating that the company's stock price "opened very weak"
> because of the "disclosure that we made in the 10-K . . . related to the recent spate
> of margin calls that we received and met related to our AAA rated Alt-A backed
> MBS.  Obviously the market didn't like the initial read of that, and the media has
> been reporting the negative side of that."

Goldstone Facts ¶ 262, at 61 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(quoting Feb. 28, 2008, Goldstone TMA Update at 2).  See Goldstone Facts Errata at 2

(amending this fact); SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 28, 2008,

Goldstone TMA Update at 2.

"At 8:23 a.m. [MST] on February 28, 2008, Mr. Fellers emailed Mr. Goldstone and

Mr. Simmons saying, 'I've had calls with Merrill, Bear, and Citi . . . .  The calls are generally

positive, but there is definitely an undertone of fear.  I think the filing has sparked a collateral

grab situation.'"  Goldstone Facts ¶ 263, at 61-62 (setting forth this fact)(alterations in Goldstone

Facts but not in source)(quoting Electronic Mail Transmission from Nathan Fellers to Larry

Goldstone and Clay Simmons at 2 (dated Feb. 28, 2008), filed August 9, 2008

(Doc. 204-148)("Feb. 28, 2008, Fellers Email")).  See Goldstone Facts Errata at 2 (amending this

fact); SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 28, 2008, Fellers Email at 2.  "At

8:56 a.m. EST on February 28, 2008, Elena Matrullo, a Managing Director of Credit Risk at

Citigroup, sent an email about Thornburg to Philip Cartularo, the credit officer at Citigroup

assigned to Thornburg, stating, 'Get the Money,' after receiving the 'news . . . regarding

300 MM in margin calls.'"  Goldstone Facts ¶ 264, at 62 (setting forth this fact)(alterations in

Goldstone  Facts but not in source)(quoting Electronic Mail Transmission from Elena Matrullo

to Philip Cartularo at 2 (dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-155)("Feb. 28,

2008, Matrullo Email")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 28,

2008, Matrullo Email at 2.  "At 2:18 p.m. Standard & Poor's analyst Jason Willey publicly

downgraded Thornburg's stock rating from 'buy' to 'hold,' and reduced his price target on the stock, citing 'market uncertainty' and 'poor demand' for mortgage securities." Goldstone Facts ¶ 265, at 62 (setting forth this fact)(quoting Electronic Mail Transmission from Alison LeMaster to Grant Thornburg *et al* at 11 (dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-157)("Feb. 28, 2008, LeMaster Email")).  See SEC Disputed Facts at 1-51; Feb. 28, 2008, LeMaster Email at 11.

> On February 28, 2008, Mr. Goldstone sent an email to Mr. Simmons stating: "Good thing I didn't go today.  I will be putting out stock price fires all day.  I have had some good calls from investors so I think we will be fine.  Just not as good a stock price.  Good luck today.  Talk to you later."
>
> That same day, Mr. Simmons responded: "I guess the recent developments section did not go over well.  If they only knew [sic]."

Goldstone Facts ¶ 266, at 62 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Electronic Mail Transmission from Clay Simmons to Larry Goldstone at 2 (dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-143)("Feb. 28, 2008, Simmons Stock Price Email")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 28, 2008, Simmons Stock Price Email at 2.[131]

---

[131]The Defendants assert the following fact:

> When asked in testimony what he meant by "if they only knew," Mr. Simmons testified: "I'm talking about how hard we worked and what a tremendous effort the company had made for the shareholders . . . .  [W]e viewed our results and what we had accomplished as positive.  I was surprised by the market reaction given what we had accomplished versus other people in the space."

Goldstone Facts ¶ 267, at 62 (alterations in Goldstone Facts but not in source)(quoting Simmons Depo. Vol. II at 437:16-438:7).  The SEC disputes this fact by stating:

> Defendant Simmons's explanation is implausible.  The more reasonable interpretation of his statement "if they only knew" is that he was referring to the information that Defendants did not disclose in the 2007 Form 10-K, and that if investors knew that information, the market reaction to the 10-K would have been

worse.  This interpretation is supported by the event study performed by SEC expert Michael Mayer wherein he analyzed the drop in Thornburg's share price upon the disclosure of its failure to meet margin calls, inability to hold assets, and questionable going concern status.

SEC Disputed Facts ¶ 267, at 23.  To dispute this fact, the SEC cites its disputed fact number 249, which states: "Thornburg's 2007 Form 10-K did not accurately disclose OTTI and going concern issues, and did not highlight its faulty analysis of those issues or its withholding of information from KPMG in the footnotes to its financial statements."  SEC Disputed Facts ¶ 249, at 22.  The SEC also cites the Expert Report of Michael G. Mayer, filed November 6, 2013 (Doc. 231-26)("Mayer Report").  In his report, Michael Mayer opines that Thornburg's failure to timely pay its margin calls and other factors that should have affected its OTTI analysis and its going concern analysis would have been material to stock holders and, if disclosed in the 2007 Form 10-K, would have influenced Thornburg Mortgage's stock price.  See Mayer Report at 36-49.  The Defendants reply by stating:

> The SEC cannot raise a genuine dispute by general and unsupported attacks on the credibility of Defendants' sworn, uncontroverted testimony about their subjective understandings, views, or beliefs, and by purporting to offer a "more reasonable interpretation of his statement."  See Defs.' Reply to SMF ¶ 36.  The SEC cannot create a dispute as to Mr. Simmons's intended meaning of his email by substituting its own speculative interpretation of his email for his sworn, uncontroverted testimony.

> See Defs.' Reply to SMF ¶¶ 249.

> Defendants object to the SEC's reliance on the unsworn expert report of Mr. Mayer because it does not meet the evidentiary requirements of Fed. R. Civ. P. 56(c).  First, the report is inadmissible hearsay.  MTE, Objection No. 1.  Even if not inadmissible hearsay, the SEC cannot rely upon an expert opinion to dispute the credibility of a fact witness.  Id., Objection No. 3.  Mr. Mayer's "event study" does not refute Mr. Simmons' testimony as to what he subjectively meant when he wrote "if they only knew."

Goldstone Reply Facts ¶ 267, at 120.

The Court finds that this fact is disputed.  In the relevant electronic mail transmission, Goldstone stated: "I will be putting out stocks all day.  I have had some good calls from investors so I think we will be fine.  Just not as good a stock price.  Good luck today"  Feb. 28, 2008, Simmons Stock Price Email at 2.  Simmons responded: "I guess the recent developments section did not go over well.  If they only knew."  Feb. 28, 2008, Simmons Stock Price Email at 2.  On its face, the statement, "[i]f they only knew," appears ominous.  Considered with the preceding sentence -- that "the recent developments section did not go over well" -- the sentence appears to indicate that things would have gone even worse if "they only knew."  Feb. 28, 2008, Simmons Stock Price Email at 2.  Moreover, the Defendants worked hard to pay off Thornburg Mortgage's margin calls before filing the Form 10-K so that they did not have to disclose that either:

Goldstone sent Erin Burnett of CNBC an e-mail on February 28, 2008 in advance of his television appearance on Ms. Burnett's show that stated:

> You can report what I said below in the meantime, with the addition that we always suggest that we might have to sell assets. It doesn't mean we will or would need to sell assets. It is a standard disclosure that lawyers and accountants want us to make. You can report that plus my comments below. . . . There is a lot to say and report beyond what is in our K.

SEC Facts ¶ QQ, at 7 (setting forth this fact)(alterations in SEC Facts but not in source)(quoting

---

(i) Thornburg Mortgage was unable to pay its margin calls, or (ii) Thornburg Mortgage could not timely pay its margin calls. The circumstances surrounding Simmons' statements, thus, support the interpretation that his statement meant that things could have gone much worse if the public knew about Thornburg Mortgage's difficulty with paying margin calls and inability to timely pay them. Furthermore, as Mayer opined, this concealed information would have had a material effect on Thornburg Mortgage's stock prices. The drop in Thornburg Mortgage's stock would have been even greater if the public had only known about the concealed information. The context of the statement, the circumstances surrounding the statement, and Mayer's report contradicts the Defendants' assertion that the statement referred solely to the public knowing about the effort which they gave for the shareholders. While the Defendants put in tremendous effort to meet the margin calls before filing the Form 10-K, the effort to pay the margin calls was to prevent KPMG and the public from discovering Thornburg Mortgage's inability to timely meet margin calls and Thornburg Mortgage's trouble in meeting those margin calls. Accordingly, the Court finds that this fact is disputed.

The Defendants also assert the following fact: "There is no evidence in the record contradicting Mr. Simmons' sworn testimony concerning what he meant in writing 'if they only knew.'" Goldstone Facts ¶ 268, at 62. The SEC disputes this fact by stating:

> Defendant Simmons's explanation is implausible. The more reasonable interpretation of his statement 'if they only knew' is that he was referring to the information that Defendants did not disclose in the 2007 Form 10-K, and that if investors knew that information, the market reaction to the 10-K would have been worse.

SEC Disputed Facts ¶ 268, at 23. Because the Court has concluded that the context of the statement, the circumstances surrounding the statement, and Mayer's report all dispute Simmons' explanation about the statement, the Court finds this fact disputed as well.

Electronic Mail Transmission from Larry Goldstone to Erin Burnett at 1 (dated Feb. 28, 2008), filed November 6, 2013 (Doc. 231-37)("CNBC Email")).  See CNBC Email at 1.[132]  "During his CNBC Interview on the afternoon of February 28, 2008, Goldstone stated: 'We don't think we have to sell more no.  We have dealt with this recent downturn in a part of our portfolio.  We have met all of our lending requirements.  We have liquidity and cash available to continue to support the portfolio.'"  SEC Facts ¶ RR, at 7 (setting forth this fact)(quoting Larry Goldstone CNBC Interview at 3:55-4:08 (taken Feb. 28, 2008), filed May 21, 2012 (Doc. 37-1)("CNBC Interview")).  See CNBC Interview at 3:55-4:08.[133]

---

[132]The Defendants respond by stating: "Undisputed but immaterial for the reasons stated in Defs.' Response to SEC SMF ¶ PP."  Defendants Disputed Facts ¶ QQ, at 251.  Because the Defendants do not dispute this fact, and because asserting that a fact is immaterial does not dispute it, the Court finds the SEC's asserted fact undisputed.

[133]The Defendants respond by stating:

Undisputed.  Mr. Goldstone also stated the following during his February 28, 2008 CNBC interview:

> "[T]his mortgage market continues to be a slippery slope.  You know, we're just not seeing the bottom of the environment and the market just continues to trend lower.
> . . .
>
> We have a supply and demand imbalance . . . you have too many mortgages particularly on the security side of the business and not enough buyers.  So you have prices coming down.
> . . .
>
> What's going on in the marketplace today is you've got a shutdown in the securities business so there's very little liquidity there.
> . . .
>
> When mortgage securities prices go down by this dramatic amount, that's a significant, quote, accounting event and we felt like we had to disclose it."

"Mr. Simmons testified that 'I have no idea what caused the market to move on the 28th the way it did. It surprised us. It shocked us. You know, we were devastated by it.'" Goldstone Facts ¶ 269, at 62 (setting forth this fact)(quoting Simmons Depo. Vol. II at 379:7-10). See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo. Vol. II at 379:7-11. "From February 14 to February 27, 2008, the vast majority of Thornburg's margin calls had been on the company's Alt-A repo collateral." Goldstone Facts ¶ 270, at 62-63 (setting forth this fact)(internal quotation marks omitted). See SEC Disputed Facts at 1-51 (not disputing this fact); 2007 Form 10-K at 20-21. "Following the 10-K filing, Thornburg received large margin calls on derivatives, agencies, and AAA-rated MBS collateral backed by prime mortgages." Goldstone Facts ¶ 271, at 63 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone SEC Depo. at 145:24-146:15, 153:21-154:6. "On February 28, 2008, UBS issued a roughly $60 million margin call on primarily agency and prime MBS collateral." Goldstone Facts ¶ 272, at 63 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone SEC Depo. at 145:24-149:7; Feb. 28, 2008, Fellers Email at 2. "Mr. Goldstone and Mr. Simmons have testified that they were surprised by the UBS margin call given that UBS was one of the underwriters of the company's upcoming equity capital raise and had been provided the 10-K's Recent Developments disclosure in advance of the 10-K filing." Goldstone Facts ¶ 273, at 63 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone SEC Depo. at 146:5-15, 147:14-149:7, 285:13-21; Simmons Depo. Vol. II at 228:6-11. "There is no evidence that CSFB, which was also working with Thornburg on one of its post-filing capital raises, was dissatisfied with the disclosures in the

---

Doc. 37-1, at 0:42-0:54, 1:35-2:31, 3:15-3:22, 4:27-4:37.

Defendants Disputed Facts ¶ RR, at 22-23. Because the Defendants do not dispute this fact, the Court finds it undisputed.

Recent Developments section of Thornburg's Form 10-K."  Goldstone Facts ¶ 274, at 63 (setting

forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact).

> On February 28, 2008, Mr. Goldstone sent an email to Halle Benett at
> UBS, stating that the $60 million margin call from UBS "seems way out of line
> relative to what I heard from Larry [Cofsky] yesterday . . . .  I had a conversation
> with Larry yesterday and he said not to worry about stuff.  Today he hits us with
> $60 million.  What gives?  Your advice please, particularly in the context of UBS
> wanting to expand a relationship with us."

Goldstone Facts ¶ 275, at 63 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(quoting Electronic Mail Transmission from Larry Goldstone to Halle Bennett at 2 (dated

Feb. 28, 2008), filed August 9, 2013 (Doc. 204-150)("Feb. 28, 2008, Goldstone UBS Email")).

See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 28, 2008, Goldstone UBS Email

at 2.

> [Goldstone] meant to convey to Mr. Benett in that email,
>
> > "[His] surprise and [his] disappointment and [his] shock at the
> > events of that morning, or the behavior that morning of UBS,
> > which seemed completely inconsistent with all conversations and
> > communications that had happened the day before '[W]hat gives'
> > implies that it was a behavior that was completely inconsistent
> > with any communication [Goldstone] had had with UBS up to this
> > point in time.  [Goldstone] didn't understand it, and [he] wanted an
> > explanation."

Goldstone Facts ¶ 276, at 63-64 (setting forth this fact)(alterations omitted)(quoting Goldstone

SEC Depo. at 189:18-21, 190:17-21).  See SEC Disputed Facts at 1-51 (not disputing this fact);

Goldstone SEC Depo. at 189:2-21, 191:14-21.[134]  "Ms. Starrett was surprised by the large

---

[134]The Defendants assert the following fact: "Mr. Goldstone and Mr. Simmons had not
expected to receive substantial additional margin calls on Thornburg's Alt-A repo collateral."
Goldstone Facts ¶ 277, at 64.  The SEC disputes this fact by stating:

> Defendant Goldstone and Simmons's claimed lack of anticipation of substantial
> additional margin calls is implausible and contradicted by the fact that from
> January 2 through February 27, 2008, Thornburg's average daily margin calls

volume of margin calls received by Thornburg on February 28, 2008." Goldstone Facts ¶ 278, at 64 (setting forth this fact).  See Starrett Depo. at 219:11-16, 251:12-252:20.[135]  "Ms. Starrett

---

were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, that as recently as February 21, 2008 Thornburg received $247.4 million in margin calls in a single day, and that on February 26, 2008 Thornburg received $30.5 million in margin calls.  Finally, Defendant Goldstone e-mailed Defendants [sic] Simmons on February 27, 2008 saying that he believed Thornburg would get hit with 20% haircuts.

SEC Disputed Facts ¶ 277, at 23.  The Defendants reply by stating:

The SEC cannot raise a genuine dispute by general and unsupported attacks on the credibility of Defendants' sworn, uncontroverted testimony about their subjective understandings, views, or beliefs.  See Defs.' Reply to SMF ¶ 36.

The SEC's hindsight view about what Defendants should have anticipated does not dispute their sworn statements regarding their subjective expectations about Thornburg's receipt of substantial additional margin calls on Thornburg's Alt-A repo collateral.

Moreover, members of Thornburg's Capital Markets Group have testified that the $300 million in margin calls Thornburg received from February 14 through February 27, 2008 (with over $200 million on February 21, 2008 alone) was unusual, and they did not expect Thornburg to continue receiving margin calls anywhere near that magnitude in the future.

Goldstone Reply Facts ¶ 277, at 123.   The Court concludes that the SEC has specifically controverted this fact.  The Court has already concluded that it is disputed whether Simmons and Goldstone could believe that, on February 28, 2008, Thornburg Mortgage was fully margined and future markdowns were unlikely.  See supra note 77.  Goldstone testified that Thornburg Mortgage was "likely to see additional margin calls."  Goldstone SEC Depo. at 288:1-4. Additionally, in an electronic mail transmission from Goldstone to Simmons, Goldstone notes that its assets would get haircuts, but more gradually than the European hedge fund.  See Feb. 27, 2008, Hedge Fund Email at 2.  Simmons and Goldstone, thus, should have expected additional margin calls.  Accordingly, the Court finds this fact disputed.

[135]The SEC attempts to dispute this fact by stating:

Defendant Starrett's claimed lack of anticipation of substantial additional margin calls is implausible and contradicted by the fact that from January 2 through February 27, 2008, Thornburg's average daily margin calls were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, that as recently as February 21, 2008 Thornburg received

. . . believed the 'amount of those margin calls was unforeseeable, unprecedented, and a result of a panic or a run on the bank, a desire by the counterparties to grab as much as they could.'" Goldstone Facts ¶ 279, at 64 (setting forth this fact)(alterations omitted)(quoting Starrett Depo. at 252:16-20).  See Starrett Depo. at 252:9-20.[136]

> "[W]hen [Mr. Feldman of Thornburg's Capital Markets group] walked in on the 28th and saw the messages that were on his Bloomberg system about margin calls he was devastated.  He was genuinely shocked, surprised, devastated." . . .  [T]he "calls were based on outrageously low marks that the Company had never experienced before."

---

> $247.4 million in margin calls in a single day, and that on February 26, 2008 Thornburg received $30.5 million in margin calls.  Finally, Defendant Goldstone e-mailed Defendants [sic] Simmons on February 27, 2008 saying that he believed Thornburg would get hit with 20% haircuts.

SEC Disputed Facts ¶ 278, at 23.  This assertion does not specifically controvert the Defendants' asserted fact.  First, Thornburg Mortgage received more margin calls on February 28, 2008, than its daily average in February.  Second, even if Starrett believed that Thornburg Mortgage would receive additional margin calls, she could still have been surprised by the volume of margin calls Thornburg Mortgage received on February 28, 2008.  Third, Starrett was not included on the electronic mail transmission discussing the European hedge fund.  See Feb. 27, 2008, Hedge Fund Email at 2.  Consequently, the SEC has not specifically controverted this fact, and the Court finds it undisputed.

[136]The SEC attempts to dispute this fact by stating:

> Any Thornburg employee's claimed lack of anticipation of substantial additional margin calls is implausible and contradicted by the fact that from January 2 through February 27, 2008, Thornburg's average daily margin calls were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, that as recently as February 21, 2008 Thornburg received $247.4 million in margin calls in a single day, and that on February 26, 2008 Thornburg received $30.5 million in margin calls.  Finally, Defendant Goldstone e-mailed Defendants [sic] Simmons on February 27, 2008 saying that he believed Thornburg would get hit with 20% haircuts.

SEC Disputed Facts ¶ 279, at 24.  As the Court has already concluded, it is undisputed that the volume of margin calls that Thornburg received on February 28, 2008, surprised Starrett.  See supra note 134.  Accordingly, the Court also finds this fact undisputed.

Goldstone Facts ¶ 280, at 64 (setting forth this fact)(alterations omitted)(quoting Feldman Depo.

at 181:20-25; Feldman Decl. ¶ 30, at 6).   See Feldman Depo. at 181:20-25; Feldman Decl.

¶¶ 29-30, at 6.[137]

> Mr. Fellers of Thornburg's Capital Markets group . . . "was extremely surprised at the magnitude of the margin calls that Thornburg received on February 28, 2008. Based on his discussions with repo lenders that morning, he believed that the disclosures in Thornburg's Form 10-K filing itself were what triggered the bulk of the margin calls that day, as Thornburg's repo lenders rushed to demand cash out of fear that Thornburg might be unable to meet future margin calls."

Goldstone Facts ¶ 281, at 64 (setting forth this fact)(alterations omitted)(quoting Fellers Decl.

¶ 24, at 5).   See Fellers Decl. ¶¶ 23-26, at 5-6.[138]

---

[137]The SEC attempts to dispute this fact by stating:

> Any Thornburg employee's claimed lack of anticipation of substantial additional margin calls is implausible and contradicted by the fact that from January 2 through February 27, 2008, Thornburg's average daily margin calls were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, that as recently as February 21, 2008 Thornburg received $247.4 million in margin calls in a single day, and that on February 26, 2008 Thornburg received $30.5 million in margin calls.   Finally, Defendant Goldstone e-mailed Defendants [sic] Simmons on February 27, 2008 saying that he believed Thornburg would get hit with 20% haircuts.

SEC Disputed Facts ¶ 280, at 24.   This analysis of Feldman is similar to the analysis of Starrett; this assertion does not specifically controvert the Defendants' asserted fact.   First, Thornburg Mortgage received more margin calls on February 28, 2008, than its February daily average. Second, even if Feldman believed that Thornburg Mortgage would receive additional margin calls, the volume of margin calls that Thornburg received on February 28, 2008, could have still surprised him.   Third, the electronic mail transmission discussing the European hedge fund did not include Feldman.   See Feb. 27, 2008, Hedge Fund Email at 2.   The SEC has thus not specifically controverted this fact, and the Court concludes that it is undisputed.

[138]The SEC attempts to dispute this fact by stating:

> Any Thornburg employee's claimed lack of anticipation of substantial additional margin calls is implausible and contradicted by the fact that from January 2 through February 27, 2008, Thornburg's average daily margin calls were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, that as recently as February 21, 2008 Thornburg

"It was not until late in the afternoon or early evening on February 28, 2008 that Mr. Simmons concluded Thornburg would not have sufficient cash and liquidity on hand to meet the margin calls that were made that day." Goldstone Facts ¶ 282, at 64-65 (setting forth this fact). See Simmons Decl. ¶ 65, at 15; Simmons Depo. Vol. II at 230:6-11, 231:25-232:10.[139]

_____

received $247.4 million in margin calls in a single day, and that on February 26, 2008 Thornburg received $30.5 million in margin calls. Finally, Defendant Goldstone e-mailed Defendants [sic] Simmons on February 27, 2008 saying that he believed Thornburg would get hit with 20% haircuts.

SEC Disputed Facts ¶ 281, at 24. The analysis of Fellers is similar to the analysis of Starrett and Feldman; this assertion does not specifically controvert the Defendants' asserted fact. First, Thornburg Mortgage received more margin calls on February 28, 2008, than its February daily average. Second, even if Fellers believed that Thornburg Mortgage would receive additional margin calls, the volume of margin calls Thornburg Mortgage received on February 28, 2008 still could have surprised him. Third, the electronic mail transmission discussing the European hedge fund did not include Fellers. See Feb. 27, 2008, Hedge Fund Email at 2. Consequently, the SEC has not specifically controverted this fact, and the Court concludes that it is undisputed.

[139]The SEC attempts to dispute this fact by stating:

Defendant Simmons's claimed conclusion is implausible and contradicted by the fact that Thornburg had been unable to timely meet its margin calls from February 14-27, 2008 has was [sic] left with less liquidity on February 28, 2008 than the average amount of margin calls for that same time period. Moreover, on the morning of February 28, 2008, Simmons received an e-mail from Nate Fellers reflecting margin calls totaling $158.7 million, which far exceeded Thornburg's available liquidity.

SEC Disputed Facts ¶ 282, at 24-25. The Defendants reply by stating:

The SEC cannot raise a genuine dispute by general and unsupported attacks on the credibility of Defendants' sworn, uncontroverted testimony about their subjective understandings, views, or beliefs. See Defs.' Reply to SMF ¶ 36.

For the reasons set forth in Defs.' Reply to SMF ¶¶ 125 and 131, the evidence cited by the SEC does not "contradict" Mr. Simmons's conclusion. Further, Mr. Fellers' February 28, 2008 email (Ex. 132), reflecting $158.7 million in margin calls based on lenders' marks, does not account for the fact that Thornburg had not yet reviewed or challenged these marks, which might have reduced the total. SMF ¶ 13. Indeed, Mr. Feldman has testified that the February 28, 2008

"Mr. Feldman, who worked with repo lenders on the margin calls received on February 28, 2008, did not realize that Thornburg would be unable to meet its margin calls until late that day, after JP Morgan issued a notice of default."  Goldstone Facts ¶ 283, at 65 (setting forth this fact).  See Feldman Depo. at 128:1-10, 128:25-129:8.[140]

---

margin "calls were based on outrageously low marks that the Company had never experienced before."  Ex. 267 (Feldman Decl. ¶ 30).

Further, the SEC's assertion that the February 28 margin calls "far exceeded" Thornburg's available liquidity is not supported by competent evidence.  The SEC cites no evidence of "Thornburg's available liquidity" at the time Mr. Simmons received Mr. Fellers' February 28 email.  Moreover, the SEC does not dispute the material fact that Thornburg had available sources of liquidity other than cash not reflected on the liquidity reports, such as unpledged securities (Ex. 287 (Simmons SEC Tr. 167:2-19)(testifying that there "were additional securities that were unpledged . . . cash would not be the only liquidity source that we have")) and $7.6 billion of I/O strip financings that could be refinanced (SMF ¶ 116).

Goldstone Reply Facts ¶ 282, at 127-28.

The SEC has not specifically disputed the Defendants' asserted fact.  First, there is no evidence that Simmons received Fellers' electronic mail transmission.  Simmons was in Dallas on February 28, 2008, and he was unable to check electronic mail transmissions, because his mobile telephone was having problems.  See Simmons Depo. Vol. II at 107:1-6; id. at 432:14-434:12.  Second, even if Simmons knew that Thornburg Mortgage received over $160 million in margin calls, Thornburg Mortgage may have had the liquidity to pay those margin calls.  Thornburg Mortgage had between $100 and $150 million in liquidity at the close of business on February 27, 2008.  See Hall SEC Depo. at 266:11-13.  Additionally, Thornburg Mortgage's lenders would, at times, negotiate the price of the margin call.  See Goldstone Facts ¶ 261, at 61 (stating that "Citigroup issued a margin call of $36 million to Thornburg that was later reduced to $29 million").  The $160 million in margin calls could have been reduced slightly below $150 million, which Thornburg Mortgage may have had sufficient liquidity to meet.  Third, while Simmons likely knew that Thornburg Mortgage would not be able to continue to meet its margin calls, based on its liquidity problems and the volume of margin calls it received in February, 2008, he still could have believed, on the morning of February 28, 2008, that Thornburg Mortgage would meet its margin calls.  Accordingly, the Court finds this fact undisputed.

[140]The SEC attempts to dispute this fact by stating: "Mr. Feldman's claimed realization is implausible and contradicted by the fact that Thornburg had been unable to timely meet its margin calls from February 14-27, 2008, and was left with less liquidity on February 28, 2008 than the average amount of margin calls for that same time period."  SEC Disputed Facts ¶ 183, at 25.  The SEC's contention is not that Feldman did not realize that Thornburg could not meet

On February 28, 2008, several other services reported on Thornburg's Form 10-K disclosures. Bloomberg reported that Thornburg Mortgage Inc. said it may have to sell assets to meet lenders' demands for increased collateral as prices of bonds tied to home loans decreased further this month. MarketWatch reported that Thornburg may have to sell assets at distressed prices to meet more margin calls. Dow Jones Newswires reported that margin call payments have cut into the mortgage lender's liquidity and that it could be required to sell assets if margin calls continue.

Goldstone Facts ¶ 284, at 65 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Thornburg Hit With Margin Calls; Shares Slide, Dow Jones Newswires at 2 (Feb. 28, 2008), filed August 9, 2013 (Doc. 204-253); Greg Morcroft, Thornburg, MF Global Send Financial Stocks Lower, MarketWatch at 2 (Feb. 28, 2008), filed August 9, 2013 (Doc. 204-252); Yalman Onara, Thornburg Mortgage May Have to Sell Assets to Meet Margin Calls, Bloomberg at 2 (Feb. 28, 2008), filed August 9, 2013 (Doc. 204-153). "[B]y Friday, February 29, 2008, [Starrett] had become aware that Thornburg had received margin calls it could not meet." Goldstone Facts ¶ 285, at 65 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Starrett SEC Depo. at 254:10-256:25.

"[B]y the evening of February 28, 2008, or the following morning, [Goldstone] was no longer optimistic about the company's liquidity position." Goldman Facts ¶ 286, at 65 (setting forth this fact). See Goldstone Decl. ¶ 55, at 11.[141]

---

its margin calls, but when Feldman reached this realization. While Feldman may have realized that, at some point, Thornburg Mortgage would not be able to keep meeting its margin calls, because of the volume that it had received in February, Feldman could have concluded that Thornburg Mortgage reached this point only after it received JP Morgan's notice of default. Moreover, the Defendants do not assert that Feldman believed that Thornburg could timely meet its margin calls before it received the notice of default, but only that it could meet the margin calls. Feldman may have believed that Thornburg Mortgage could meet its margin calls, albeit not timely, until JP Morgan issued a notice of default, which prevented Thornburg Mortgage from paying its margin calls over time. Accordingly, the Court finds this fact undisputed.

[141]The SEC attempts to dispute this fact by stating:

> On the morning of February 29, 2008, Mr. Goldstone wrote to the Board that, notwithstanding Thornburg's efforts to raise cash and liquidity, he expected another $200 million in margin calls "as all mortgage securities prices continue to fall." Mr. Goldstone stated further, "I am afraid that we are going to need to start selling assets at a loss" because "[m]ortgage markets continue to deteriorate . . . despite our successful efforts to meet $340 million worth of margin calls in the past two weeks."

Goldstone Facts ¶ 287, at 65 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Electronic Mail Transmission from Owen Lopez to Larry Goldstone at 2 (dated Feb. 29, 2008), filed August 9, 2013 (Doc. 204-160)("Feb. 29, 2008, Lopez Email")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 29, 2008, Lopez Email at 2.

> The margin calls received after the 10-K filing were of far greater magnitude than Thornburg had experienced since the start of 2008:
>
>> In the two-week period preceding the Form 10-K filing, the company received in excess of $300 million in margin calls.
>>
>> On February 28, 2008 alone, Thornburg received a total of $157,500,000 in margin calls from seven repo lenders, an increase of almost 400% from the two days before the 10-K filing.

---

> Defendant Goldstone could not have been optimistic about Thornburg's liquidity position on February 27 or 28, 2008 given that Thornburg's average daily margin calls between February 14 and February 27, 2008 were $53.4 million per business day, about $25 million more on a daily basis than Thornburg's average daily opening cash and agency balance.  Moreover, on the morning of February 28, 2008, Simmons received an e-mail from Nate Fellers reflecting margin calls totaling $158.7 million, which far exceeded Thornburg's available liquidity.

SEC Disputed Facts ¶ 286, at 25.  While the Court agrees that a reasonable person in Goldstone's position should not have been optimistic about Thornburg Mortgage's liquidity situation on February 27, 2008, or February 28, 2008, the Court cannot say that Goldstone was not optimistic, and the SEC has not presented any evidence showing that he was not.  Some people are overly optimistic, even during bleak circumstances in which they should not be.  By stating that he was optimistic about Thornburg Mortgage's liquidity situation, Goldstone appears to be such a person.  The Court thus finds the Defendants' asserted fact undisputed, but believes that a reasonable person in Goldstone's position would not have been optimistic about Thornburg Mortgage's liquidity.

By the end of the day on February 29, Thornburg had received another $128,700,000 in margin calls, an increase of 326% over the two days prior to the 10-K filing.

By the end of the day on March 3, 2008, Thornburg had received a total of $456.3 million in margin calls in the three business days following the Form 10-K filing.

Thornburg had received only $481.4 million in the entire month of January and $608.4 million in margin calls in the entire month of February before the 10-K filing.

Goldstone Facts ¶ 288, at 66 (setting forth this fact).  See Restatement Margin Calls at 2-7; March 9, 2008, Restatement Memo. at 2; Thornburg Mortgage Unforeseeable Mortgage Collapse in Late February at 8-9, filed August 9, 2013 (Doc. 204-171)("Unforeseeable Mortgage Collapse Memo.").[142]  "On February 29, 2008, the day after Thornburg filed its Form 10-K, Ms. Starrett wrote that the Recent Developments disclosures 'led to more margin calls!  So much for honesty and transparency.'"  Starrett Facts ¶ 25, at 6-7 (setting forth this fact)(quoting Electronic Mail

---

[142]The SEC attempts to dispute this fact by stating:

The margin calls received by Thornburg after the filing of the 2007 Form 10-K were not of "far greater" magnitude than Thornburg had recently experienced. Thornburg received over $600 million in margin calls from February 1-27, 2008. On February 21 alone, Thornburg received over $247 million in margin calls, more than received on any one day from February 28- March 3, 2008.  And Thornburg had received over $1 billion in margin calls in August 2007. Furthermore, Defendant Goldstone previously testified that he believed at that time that Thornburg was "likely to see additional margin calls."

SEC Disputed Facts ¶ 288, at 25.
    The SEC does not contend that the Defendants' numbers are wrong, but only that the term "far greater" is incorrect.  The Court concludes that the SEC has not disputed the fact. While Thornburg Mortgage received substantial margin calls in January and February, the volume that it received in five days almost exceeded the January total and was well on its way to exceeding the February total by a large degree.  Additionally, the Defendants' asserted fact is that the margin calls were far greater than those that Thornburg Mortgage received in 2008.  The margin calls it received in August, 2007, are thus irrelevant.  Accordingly, because Thornburg Mortgage received a substantial volume of margin calls after filing its 2007 Form 10-K that were disproportionate to the volume of margin calls that it received earlier in 2008, the Court concludes that the SEC has not disputed the fact.

Transmission from Jane Starrett to Bruce Nye at 2 (dated March 29, 2008), filed August 9, 2013

(Doc. 204-159)("March 29, 2008, Starrett Email")).   See SEC Disputed Starrett Facts at 1-16

(not disputing this fact); March 29, 2008, Starrett Email at 2.

   "'[W]hat happened subsequent to the filing of Thornburg's 10-K at the end of February

was that certain events in the market occurred that created a panic in the market and the lenders

of Thornburg all made margin calls.'"  Goldstone Facts ¶ 289, at 66 (alterations omitted)(quoting

Taylor Depo. at 201:8-15).   See SEC Disputed Facts at 1-51 (not disputing this fact); Taylor

Depo. at 201:6-16.

> On March 3, 2008, Thornburg filed a Form 8-K disclosing that it had received
> over $270 million in additional margin calls, a "substantial majority" of which
> had not been met.  The company also disclosed that it had received a notice of
> event of default from one lender and was continuing discussions with that lender,
> which had not yet exercised its right to liquidate pledged collateral, and that other
> lenders could declare an event of default at any time due to cross-default
> provisions in repo agreements.  The Form 8-K warned that "there is no assurance
> that the value of our mortgage portfolio and derivatives portfolio will not decline
> further, that we will not experience a further decline in our book value, that
> lenders will not make additional margin calls, or that we will be able to satisfy
> additional margin calls, if any."

Goldstone Facts ¶ 290, at 66-67 (setting forth this fact)(quoting Thornburg Mortgage, Inc. Form

8-K at 4 (dated March 3, 2008), filed August 9, 2013 (Doc. 204-245)("March 3, 2008, Form

8-K")).   See SEC Disputed Facts at 1-51 (not disputing this fact); March 3, 2008, Form 8-K at 4.

> On March 4, 2008, Mr. Goldstone informed the Board in an email update that "we
> [Thornburg] did receive news this evening that KPMG is going to rescind their
> recently issued audit opinion because the events of the past three days call into
> question our ability to claim that we had the intent and ability to hold our
> mortgage securities to maturity.   Therefore, we are required to restate our
> financial statements for 2007 to reflect the fact that these securities were impaired
> and there [sic] market value loss needs to be reflected in earnings . . . .   We have
> accepted their decision and are moving ahead . . ."

Goldstone Facts ¶ 291, at 67 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(quoting Electronic Mail Transmission from Larry Goldstone to Garrett Thornburg,

Francis I. Mullin, III, Anne-Drue Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Michael B. Jeffers, Owen Lopez, Stuart Sherman at 2 (dated March 4, 2008), filed August 9, 2013 (Doc. 204-182)("March 4, 2008, Thornburg Email")).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 4, 2008, Thornburg Email at 2.

"On March 4, 2008, Federal Reserve Vice Chairman Donald Kohn testified before the U.S. Senate that the U.S. banking system remains in sound overall condition and that the problems in the mortgage and housing markets have been highly unusual but in general these losses should not threaten their viability."   Goldstone Facts ¶ 292, at 67 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Testimony, Vice Chairman Donald L. Kohn: Conditions of the U.S. Banking System, Before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate (Mar. 4, 2008), available at, http://www.federalreserve.gov/newsevents/testimony/kohn20080304a.htm.   "On March 7, 2008, Thornburg issued a press release and Form 8-K disclosing the withdrawal of KPMG's audit opinion and the company's decision to restate."   Goldstone Facts ¶ 293, at 67 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 3, 2008, Form 8-K at 17-20.  "On March 11, 2008, SEC Chairman Christopher Cox told reporters that the SEC was monitoring capital levels at Bear Stearns and other securities firms on a constant basis and had a good deal of comfort about the capital cushions at these firms at the moment.'"  Goldstone Facts ¶ 294, at 67 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); The Financial Crisis Inquiry Report, Financial Crisis Inquiry Commission at 6 (2011), filed August 9, 2014 (Doc. 204-268)("Financial Crisis Inquiry").  "On March 11, 2008, Mr. Goldstone informed Thornburg's Board that it had entered into a standstill agreement on margin calls with its remaining repo lenders, which included Bear

Stearns, Citigroup, Credit Suisse, Greenwich, and UBS, in which these lenders agreed not to issue notices of default to Thornburg."   Goldstone Facts ¶ 295, at 67-68 (setting forth this fact)(internal quotation marks omitted).   See SEC Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from Larry Goldstone to Garrett Thornburg, Francis I. Mullin, III, Anne-Drue Anderson, David A. Ater, Ike Kalangis, Michael B. Jeffers, Owen Lopez, Stuart Sherman, and Eliot R. Cutler at 2 (dated Mar. 11, 2008), filed August 9, 2013 (Doc. 204-211).

"On March 13, 2008, Carlyle Capital -- a hedge fund that held $21.7 billion in exclusively AAA MBS issued by Fannie Mae or Freddie Mac -- collapsed.   The collapse was triggered largely by Carlyle's inability to meet in excess of $400 million in margin calls from its lenders."   Goldstone Facts ¶ 296, at 68 (setting forth this fact).   See SEC Disputed Facts at 1-51 (not disputing this fact); Thomas Heath, Carlyle Fund's Assets Seized, The Washington Post at 2 (Mar. 13, 2008), filed August 9, 2013 (Doc. 204-256).   "On March 16, 2008, the Federal Reserve established the Primary Securities Dealer Credit Facility based on recent, rapidly changing developments and the unusual and exigent circumstances.'"   Goldstone Facts ¶ 297, at 65 (setting forth this fact)(internal quotation marks omitted).   See SEC Disputed Facts at 1-51 (not disputing this fact); Minutes of Board of Governors of the Federal Reserve System at 3, 5 (Mar. 16, 2008), filed August 9, 2013 (Doc. 204-257)("March 16, 2008, Fed Minutes").

> On March 16, 2008, Bear Stearns collapsed.  This collapse was the result of margin calls issued by nervous derivatives counterparties, its inability to continue to borrow in the repo market, and Bear Stearns's liquidity dropping precipitously in a matter of days.  JP Morgan subsequently acquired Bear Stearns's assets for $2 per share.

Goldstone Facts ¶ 298, at 68 (setting forth this fact).   See SEC Disputed Facts at 1-51 (not disputing this fact); March 16, 2008, Fed Minutes at 3-4; Financial Crisis Inquiry at 5-8.

"On March 17, 2008, Mr. Goldstone sent an email to the Board of Directors stating, 'Today's casualty was Bear Stearns.  It was a very shocking and sad ending to a company that we had a great relationship with.'"  Goldstone Facts ¶ 299, at 68 (setting forth this fact)(quoting Electronic Mail Transmission from Larry Goldstone to Garrett Thornburg, Anne-Drue Anderson, David A. Ater, Eliot R. Cutler, Fran Mullin, Ike Kalangis, Michael B. Jeffers, Owen Lopez, and Stuart Sherman at 2 (dated March 17, 2008), filed August 9, 2013 (Doc. 204-213)("March 17, 2008, Goldstone Email")).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 17, 2008, Goldstone Email at 2.

> On March 20, 2008, SEC Chairman Christopher Cox wrote a public letter to the Chairman of the Basel Committee on Banking Supervision, describing Bear Stearns' demise as a crisis in confidence, despite the firm being considered well capitalized during the SEC's daily monitoring in the week before the firm's collapse.  He wrote: "These events illustrate just how critical not just capital, but liquidity is to the viability of financial firms and how the evaporation of market confidence can lead to liquidity being impaired."

Goldstone Facts ¶ 301, at 69 (setting forth this fact)(quoting Letter from Christopher Cox, Securities and Exchange Commission Chairman, to Dr. Nout Wellink, Basel Committee on Banking Supervision Chairman, at 5 (Mar. 20, 2008), filed August 9, 2013 (Doc. 204-258) ("Wellink Letter")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Wellink Letter at 2-5.

> On March 31, 2008, after Thornburg filed several 8-Ks on March 3, 5, and 7, which contained additional negative disclosures, including that the Company could not meet all outstanding margin calls and that it had received a notice of default which in turn triggered cross-defaults, and after Thornburg restated its 2007 financials on March 11, 2008, taking a $427.8 million impairment charge on its Purchased ARM Assets, reporting a fourth-quarter loss, and providing a going concern qualification, Thornburg raised $1.35 billion in a private placement offering conducted by Friedman Billings Ramsey, in which the lead investor was MatlinPatterson, a private equity firm.  The proceeds from the offering were used to satisfy outstanding margin calls from its five remaining repo lenders and to bolster the company's liquidity position.

Goldstone Facts ¶ 301, at 69 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Thornburg Mortgage Filing Search at 2, filed August 9, 2013 (Doc. 204-248)("Restated Form 10-K/A"); Thornburg Mortgage, Inc. Form 8-K at 3 (dated March 27, 2008), filed August 9, 2013 (Doc. 204-220); Thornburg Mortgage, Inc. Form 8-K at 2 (dated March 31, 2008), filed August 9, 2013 (Doc. 204-250); About, MatlinPatterson at 2, filed August 9, 2013 (Doc. 204-269); March 3, 2008, Form 8-K at 4, 6-7; Starrett Depo. at 241:15-17.

"On April 3, 2008, SEC Chairman Christopher Cox testified before the U.S. Senate Committee on Banking, Housing and Urban Affairs about the failure of Bear Stearns, describing the events of the week of March 10th as unprecedented."  Goldstone Facts ¶ 302, at 69 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Testimony Concerning Recent Events in the Credit Markets, by Christopher Cox, U.S. Securities and Exchange Commission Chairman, before the U.S. Senate Committee on Banking, Housing and Urban Affairs at 2 (April 3, 2008), filed August 9, 2013 (Doc. 204-259).  "On May 7, 2008, Erik Sirri, Director of the SEC's Division of Trading and Markets, testified before a U.S. Senate subcommittee that the failure of Bear Stearns resulted from a run on the bank."  Goldstone Facts ¶ 303, at 69 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Testimony Concerning Turmoil in the Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission, by Erik Sirri, U.S. Securities and Exchange Commission, Director, Division of Trading and Markets, before the Subcommittee on Securities, Insurance, and Investment United States Senate at 3 (May 7, 2008), filed August 9, 2013 (Doc. 204-260).  "Thornburg was able to continue as a going concern for a full year after the filing of the Form 10-K on February 28,

2008." Goldstone Facts ¶ 304, at 69 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Starrett Depo. at 235:7-8.

### 18.  <u>Engagement of KPMG and Personnel Assigned to Thornburg Audit</u>.

"KPMG was Thornburg's outside auditor from 2006 through 2008."  Goldstone Facts ¶ 305, at 70 (setting forth this fact).  <u>See</u> 2006 Form 10-K at 7-8; 2007 Form 10-K at 32-33. "Thornburg's retention of KPMG was based, in part, on assurances that KPMG had experience in auditing financial services institutions like Thornburg and had a working familiarly with the types of instruments that Thornburg used to finance its operations."  Goldstone Facts ¶ 306, at 70 (setting forth this fact).  <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone Decl. ¶ 48, at 10; Simmons Decl. ¶ 15, at 4.  "Cynthia Reinhart and Jennifer Hall, both from KPMG's Albuquerque, New Mexico office, served as the lead Engagement Partner and Manager, respectively, on the Thornburg audit for fiscal year 2007."  Goldstone Facts ¶ 307, at 70 (setting forth this fact).  <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); Reinhart SEC Depo. at 55:6-8; Simmons Depo. Vol. II at 75:13-17.

> Clyde Womack was KPMG's SEC Reviewing Partner for the Thornburg engagement.  In that capacity, he performed a concurring review of Thornburg's financial statements for fiscal year 2007, was involved in audit planning, and consulted with the engagement team on key aspects of the audit.  He reviewed audit evidence and conducted the final audit sign-off.  Mr. Womack also performed a concurring review for the restatement of Thornburg's 2007 financial statements.

Goldstone Facts ¶ 308, at 70 (setting forth this fact).  <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); Womack Depo. at 10:24-11:21, 17:2-8, 23:10-22, 24:3-16.

"John Taylor was KPMG's In-Depth Reviewing Partner and conducted an in-depth review for the 2006 and 2007 year-end audits."  Goldstone Facts ¶ 309, at 70 (setting forth this fact).  <u>See</u> Taylor Depo. at 13:13-24, 32:4-11, 50:2-4.

In this role, Mr. Taylor reviewed certain aspects of the audit that Mr. Womack identified as warranting in-depth review, including analysis of Thornburg's ability to continue as a going concern and Thornburg's accounting estimate and judgment as to whether its assets were OTTI. He also served as a technical resource for the engagement team.

Goldstone Facts ¶ 310, at 71 (setting forth this fact). <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); Taylor Depo. at 13:17-20, 15:10-13; Womack Depo. at 24:17-25:18; Browning Depo. at 81:16-18.

Robert McLamb was KPMG's Business Unit Professional Practice Partner during the 2007 year-end audit with whom the engagement team consulted on the going concern analysis in connection with Thornburg's 2007 financial statements. Ms. Reinhart testified that Mr. McLamb was also consulted on OTTI issues. Mr. McLamb also worked on the restatement of Thornburg's 2007 financial statements.

Goldstone Facts ¶ 311, at 71 (setting forth this fact). <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); McLamb Depo. at 9:11-12, 11:8-11; Feb. 20, 2008, Hall Memo. at 9; Electronic Mail Transmission from Jennifer Hall to Clyde Womack at 2-16 (dated Feb. 26, 2008), filed August 9, 2013 (Doc. 204-112)("Feb. 26, 2008, Hall Email"); Reinhart Depo. at 315:15-316:6.

James Browning was the KPMG Area Professional Practice Partner for the Southwest region who prepared KPMG's restatement assessment in connection with the restatement of Thornburg's 2007 financial statements. He also monitored the engagement team's progress during the restatement process and ensured that the team had the right resources in relation to the restatement.

Goldstone Facts ¶ 312, at 71 (setting forth this fact). <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); Browning Depo. at 6:24-7:5, 9:15-24, 17:11-21:12.

The engagement team for the 2007 year-end audit also included:

Tara Baucom, a Manager, who billed 399 hours to the Thornburg engagement;

Matthew Plummer, a Senior Associate, who billed 1286.5 hours to the engagement;

Daniel Acree, an Associate, who billed 1120 hours to the engagement;

David Kowalski, an Associate, who billed 137 hours to the engagement; and,

Meg Jones, an Associate, who billed 327 hours to the engagement.

Goldstone Facts ¶ 313, at 71-72 (setting forth this fact). <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); KPMG Billing Spreadsheet at 2, filed August 9, 2013 (Doc. 204-53)("KPMG Billing Spreadsheet").

In addition to the engagement team, several partners from KPMG's Department of Professional Practice ("DPP") worked on the restatement of Thornburg's 2007 financial statements, including:

Craig Crawford, who, among other things, (a) participated in and was consulted regarding the conclusions that the engagement team reached during the restatement, including KPMG's conclusion that the restatement was not due to fraud and that there was no internal weakness in Thornburg's internal controls, (b) attended Audit Committee meetings during the restatement period, and (c) reviewed a workpaper documenting KPMG's restatement process and conclusions and, in particular, consultation regarding whether a material weakness in internal controls existed;

Mike Foley, who, among other things, (a) participated in and was consulted regarding the decision to require a restatement of Thornburg's 2007 financial statements and the conclusions that the engagement team reached during the restatement (including that there was no weakness in Thornburg's internal controls), and (b) attended Audit Committee meetings during the restatement period;

Sam Ranzilla, who, among other things, was consulted on KPMG's decision to withdraw its audit opinion and require a restatement of Thornburg's financial statements, and on the conclusions reached during the restatement process;

Michael Smith, who, among other things, (a) performed the desk review and coordinated with the engagement team, partners, and senior management during the restatement process to ensure that the process was conducted in accordance with KPMG's policies,

- 171 -

(b) reviewed certain restatement workpapers, and was consulted on conclusions made during the restatement process, including KPMG's conclusion that the restatement was not due to fraud and that there was no internal weakness in Thornburg's internal controls;

Larry Leva, who made the final decision with respect to KPMG's withdrawal of its audit opinion and was consulted on conclusions made during the restatement process, including KPMG's conclusion that the restatement was not due to fraud and that there was no internal weakness in Thornburg's internal controls; and

other DPP partners.

Goldstone Facts ¶ 314, at 72-73 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo. at 6-7; Crawford Depo. at 8:7-25, 12:18-14:6, 36:11-37:16, 39:18-40:11, 84:6-10, 108:4-22, 229:16-20, 235:22-236:20; Smith Depo. at 9:13-12:11; Memorandum from Cynthia Reinhart, KPMG Engagement Partner, and Jennifer Hall, KPMG Engagement Senior Manager, to Thornburg Mortgage, Inc. 2007 Restatement Files at 16 (dated March 9, 2008, & March 28, 2008), filed August 9, 2013 (Doc. 204-218)("Crawford Restatement Draft").   "In addition, two attorneys from KPMG's general counsel's office were consulted during the restatement of Thornburg's 2007 financial statements."   Goldstone Facts ¶ 315, at 73 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo. at 7.

### 19.   KPMG's Involvement in the Third Quarter 10-Q Filing and Knowledge of Events in August, 2007.

"In the course of its work on Thornburg's Form 10-Q for the third quarter of 2007, KPMG learned that Thornburg had received a large volume of margin calls from its repo lenders in August 2007."  Goldstone Facts ¶ 316, at 73 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Hall Depo. at 431:17-433:25.   "Members of the engagement team were also aware of the dislocations in the credit markets in August 2007."  Goldstone Facts

¶ 317, at 73 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact);

Hall Depo. at 431:17-433:25.

> Members of the engagement team were aware that, as disclosed in Thornburg's
> Form 10-Q for the third quarter of 2007, Thornburg and its lenders had sold $21.9
> billion of Thornburg's Purchased ARM Assets, at an aggregate estimated loss of
> $1.1 billion, to meet the August 2007 margin calls and bolster its liquidity
> position.

Goldstone Facts ¶ 318, at 73 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not

disputing this fact); Nov. 9, 2007, Form 10-Q at 10-11.  "At the end of August 2007, Clifford

Chance, counsel for Thornburg's securities offering underwriters, provided KPMG with a

securities underwriting agreement for an equity offering for which KPMG's consent was

required.  The agreement was kept in KPMG's workpapers."  Goldstone Facts ¶ 319, at 74

(setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Underwriting

Agreement Email at 6.

> The underwriting agreement defined "Material Adverse Effect" as follows: "The
> Company . . . is duly qualified to do business and is in good standing as a foreign
> corporation in each jurisdiction [listed in schedule] . . . except where the failure to
> so qualify would not have a material adverse effect on the business, assets,
> properties, prospects, financial condition or results of operation of the Company
> and the Subsidiaries taken as a whole (a 'Material Adverse Effect')."

Goldstone Facts ¶ 320, at 74 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(quoting Underwriting Agreement Email at 5).  See SEC Disputed Facts at 1-51 (setting

forth this fact); Underwriting Agreement Email at 5.

> The disclosure schedule attached to the underwriting agreement identified
> Thornburg's repo lenders, including Citigroup, that had sent reservation of rights
> letters to the company in August 2007 while their margin call remained
> outstanding.  The agreement stated the line items on the attached disclosure
> schedule individually or in the aggregate do not have a Material Adverse Effect
> on the Company.  There is no evidence that KPMG disagreed with this statement.

Goldstone Facts ¶ 321, at 74 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Underwriting Agreement Email at 7; Thornburg Mortgage, Inc. Underwriting Agreement at 5-6 (Aug. 30, 2007), filed August 9, 2013 (Doc. 204-13)("Aug. 30, 2007, Underwriting Agreement").

"KPMG was further informed that in August 2007 certain lenders had declared events of default against Thornburg for non-payment of margin calls and that Thornburg had liquidated a large amount of repo collateral in connection with those defaults."  Goldstone Facts ¶ 322, at 74 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Underwriting Agreement Email at 7; August 30, 2007, Underwriting Agreement at 6; Aug. 24, 2007, Memo. at 2; Hall Depo. 432:7-18.  "In August 2007, KPMG requested documentation from Thornburg concerning the liquidations of Thornburg's collateral by repo lenders that month and was provided documentation by Thornburg employee Ben Smiley that referenced the related notices of default."  Goldstone Facts ¶ 323, at 75 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from Ben Smiley to Matthew D. Plummer at 2 (dated Oct. 2, 2007), filed August 9, 2013 (Doc. 204-18); Electronic Mail Transmission from Ben Smiley to Matthew D. Plummer at 2 (dated Oct. 5, 2007), filed August 9, 2013 (Doc. 204-22).  "KPMG did not require Thornburg to disclose in its third quarter 2007 Form 10-Q the notices of default from repo lenders."  Goldstone Facts ¶ 324, at 75 (setting forth this fact).  See Hall Depo. at 432:19-433:5.[143]

"As part of its review procedures for the third quarter 2007 Form 10-Q, KPMG considered Thornburg's liquidity and whether the company would be able to continue as a going

---

[143]The SEC States: "Undisputed, but misleading because Thornburg was disclosing that Thornburg and its lenders had been forced to sell assets to meet margin calls, making disclosure of notices of default unnecessary."  SEC Disputed Facts ¶ 324, at 25.  Because the SEC does not dispute this fact, the Court concludes that it is undisputed.

concern."  Goldstone Facts ¶ 325, at 75 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Reinhart SEC Depo. at 52:17-24.  "In a handwritten note on a copy of Thornburg's August 2007 going concern analysis contained in KPMG's workpapers, a KPMG auditor noted that the key to Thornburg's going concern is the ability to refinance short term debt as it becomes due."  Goldstone Facts ¶ 326, at 75 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Aug. 24, 2007, Memo. at 2.  "KPMG auditor Tara Baucom, who conducted a debt covenant review as part of KPMG's work on the 2007 Form 10-K, wrote in a workpaper that the August liquidation does not[] put the current repo debt into default as the repo lenders have renewed the debt since August."  Goldstone Facts ¶ 327, at 75-76 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Thornburg Mortgage, Inc. Debt Covenant Review at 3 (Dec. 31, 2007), filed August 9, 2013 (Doc. 204-37)("Dec. 31, 2007, Debt Covenant Review").  "KPMG was provided with Thornburg's third quarter 2007 going concern analysis, which concluded that 'Thornburg Mortgage, Inc. is expected to continue functioning profitability [sic] for the foreseeable future.'  There is no evidence that KPMG disagreed with this conclusion." Goldstone Facts ¶ 328, at 76 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting at Aug. 24, 2007, Memo. at 7).  See SEC Disputed Facts at 1-51 (not disputing this fact); Aug. 24, 2007, Memo. at 7.  "KPMG concluded in its audit workpapers that Thornburg emerged from the August 2007 crisis in a less leveraged, more stable position, with a greater cushion of collateral to protect against future margin calls and with a portfolio of higher quality assets."  Starrett Facts ¶ 30, at 7 (setting forth this fact).  See SEC Disputed Starrett Facts at 1-16 (setting forth this fact); Sep. 30, 2007, Liquidity Analysis at 2.  "KPMG agreed with Thornburg

that there was no OTTI as of September 30, 2007."  Starrett Facts ¶ 31, at 7 (setting forth this

fact).  See Sep. 30, 2007, Liquidity Analysis at 2; Accounting Treatment for Purchased ARM

Assets, prepared by Tara Baucom at 2 (March 7, 2008), filed August 31, 2013

(Doc. 207-11)("March 7, 2008, Purchased ARM Accounting Treatment").[144]

> In a restatement workpaper dated March 7, 2008, titled "Accounting Treatment
> for Purchased ARM Assets," KPMG stated:
>
>> "At 9/30/07, the Company accounted for Purchased ARM Assets
>> of $10.4 billion as available for sale with the gross unrealized
>> losses recorded in OCI.  The other than temporary impairment
>> analysis of gross unrealized loss was reviewed for all Purchased
>> ARM Assets under FAS 115 paragraph 16.  It was determined by
>> the Company and concurred with by KPMG that no other than
>> temporary impairment existed at 9/30/07 as the Company had the
>> intent and ability to hold the securities. . . .  The Company is
>> accurate i[n] considering the securities not other than temporarily
>> impaired or impaired through credit losses at 9/30/07."

Starrett Facts ¶ 32, at 7-8 (setting forth this fact)(alterations in Starrett Facts but not in

source)(quoting March 7, 2008, Purchased ARM Accounting Treatment at 2-3).  See March 7,

2008, Purchased ARM Accounting Treatment at 2-3.[145]

---

[144]The SEC attempts to dispute this fact by stating: "In August 2007, 'the Company was
forced to sell $22 billion in high quality ARM securities.  The sale of such securities resulted in a
loss of approximately $1.099 billion.'  These assets were OTTI and the loss was reflected on
Thornburg's Income Statement."  SEC Disputed Starrett Facts ¶ 31, at 5.  This assertion does not
dispute Starrett's asserted fact.  Starrett asserts that, on September 30, 2007, there were no OTTI,
while the SEC asserts that Thornburg Mortgage was forced to sell ARM securities in August,
2007.  The SEC thus shows that Thornburg Mortgage had OTTI in August, 2007, to argue that it
could not have had no OTTI on September 31, 2007.  The SEC does not, however, provide any
evidence showing that Thornburg Mortgage had OTTI on September 31, 2007.  The Court thus
concludes that the SEC has not disputed the fact.

[145]The SEC attempts to dispute this fact by stating: "The KPMG restatement workpaper
contains a handwritten note next to the quoted language that reads: 'Due to continued margin
calls through February 2008, it was determined @ 12/31/2007 that the Company did not have the
ability to hold the securities.'"  SEC Disputed Starrett Facts ¶ 32, at 5 (quoting March 7, 2008,
Purchased ARM Accounting Treatment at 2).  This assertion does not dispute Starrett's asserted
fact.  The SEC attempts to dispute Starrett's asserted fact that Thornburg Mortgage did not have

20.   **KPMG's and Thornburg's Relationship.**

"When Thornburg was considering whether to hire KPMG to replace its former auditor, PricewaterhouseCoopers, Thornburg expressed reservations about whether KPMG's New Mexico staff had the requisite expertise to handle an audit of Thornburg's magnitude and complexity."   Goldstone Facts ¶ 329, at 76 (setting forth this fact).   See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Decl. ¶ 15, at 4.   "KPMG promised that John Taylor, the lead audit partner on its audit engagement for Countrywide Financial Corporation -- another mortgage origination firm -- would oversee the Albuquerque engagement team and be significantly involved in the Thornburg audit."   Goldstone Facts ¶ 330, at 76 (setting forth this fact).   See Goldstone Depo. at 268:13-269:4; Simmons Depo. Vol. III at 49:10-21, 60:22-24; Womack Depo. at 26:18-23, 27:23-28:13; Simmons Decl. ¶ 15, at 4.[146]   "Mr. Goldstone's and

---

any OTTI assets on September 30, 2007, by stating that Thornburg Mortgage had OTTI assets on December 31, 2007.   That Thornburg Mortgage may have had OTTI assets on December 31, 2007, does not mean that it did not have any OTTI assets on September 30, 2007.   The SEC does not provide any evidence that shows that Thornburg Mortgage had OTTI assets on September 30, 2007.   Consequently, the SEC does not dispute Starrett's asserted fact, and the Court concludes that it is undisputed.

[146]The SEC attempts to dispute this fact by stating:

No KPMG witness indicated that KPMG "promised" that John Taylor would be significantly involved in the Thornburg Year 2007 Audit.   Mr. Taylor indicated that he participated in the proposal process that lead to Thornburg hiring KMPG [sic], and he did not testify to any such promise.   Rather, KPMG's proposal was based on KPMG's experience as a firm and the experience of all the individuals who would be on the Thornburg team.   Additionally, Mr. Taylor performed the same role in the Thornburg Year 2006 Audit as he did in 2007, but Defendants and Thornburg did not remove KPMG as auditor after the 2006 audit, and re-hired KPMG during the 2007 audit.

SEC Disputed Facts ¶ 330, at 25-26.   To dispute this fact, the SEC cites a portion of Taylor's deposition in which he describes the process in which KPMG came to be Thornburg Mortgage's auditor.   See Taylor Depo. at 13:9-14:2; id. at 19:16-24; id. at 50:2-4.   While Taylor does not state that KPMG promised Thornburg Mortgage that he would oversee KPMG's Albuquerque

Mr. Simmons' expectation was that Mr. Taylor would be integrally involved in the audit and that

his broader sophisticated and big company audit experience would substantially support the lead

engagement partner, Ms. Reinhart, who lacked experience in auditing companies of Thornburg's

size and complexity."   Goldstone Facts ¶ 331, at 76 (setting forth this fact).   See Goldstone

Depo. at 267:16-269:25; Simmons Decl. ¶ 15, at 4.[147]

> Mr. Goldstone and Mr. Simmons found that Mr. Taylor was substantially less
> involved in the Thornburg audit than they had originally anticipated, that the lead
> engagement partner, Ms. Reinhart, was left to manage the audit with less
> oversight and support than KPMG had originally proposed, and that the core
> engagement team often had to rely on others at KPMG for consultation.

---

team, Taylor similarly does not say otherwise.   Taylor's testimony neither addresses nor
contradicts the Defendants' asserted fact.   The SEC's evidence thus does not specifically dispute
the Defendants' asserted fact, and the Court concludes that it is undisputed.

[147]The SEC attempts to dispute this fact by stating:

> Defendants' claimed expectation is implausible and contradicted by the fact that
> both John Taylor and Cynthia Reinhart performed the same role in the Thornburg
> Year 2006 and 2007 Audits, but Thornburg did not remove KPMG as auditor
> after the 2006 audit, and re-hired KPMG during the 2007 audit.   There is also no
> support for the claim that Ms. Reinhart "lacked experience in auditing companies
> of Thornburg's size and complexity."

SEC Disputed Facts ¶ 331, at 26.   This assertion does not specifically controvert the Defendants'
asserted fact.   The Defendants' assert that they expected Taylor to have a greater role.   They did
not testify that, if Taylor did not have a larger role than Reinhart, Thornburg Mortgage would
fire KPMG or refuse to hire it.   The SEC is essentially arguing that, if the Defendants truly
believed Taylor would have a greater role than Reinhart, Thornburg Mortgage would have fired
KPMG once they discovered that Taylor and Reinhart had equal roles.   The SEC creates a
straw-man fact, which it then disputes in an attempt to dispute the Defendants' asserted fact.   The
SEC has disputed a non-existent fact, but not the Defendants' asserted fact.   Furthermore, there is
evidence that Reinhart lacked experience to audit a company of Thornburg Mortgage's size.
During his deposition, Goldstone testified that Taylor had "much broader sophisticated and big
company audit experience" and that "Cynthia [Reinhart] basically managed or did audits for
community banks.   Thornton Mortgage was a far cry from a community bank."   Goldstone Depo.
at 269:5-7.   There is evidence to support the fact that Reinhart lacked experience auditing
Thornburg Mortgage-sized companies, and the SEC has not presented any evidence to the
contrary.   Consequently, the Court concludes that the SEC has not disputed this fact.

Goldstone Facts ¶ 332, at 76 (setting forth this fact).  See Goldstone Depo. at 269:8-19; Simmons

Depo. Vol. III at 61:1-62:6; Goldstone Decl. ¶ 49, at 10; Simmons Decl. ¶ 16, at 4-5.[148]

"[A]t the time of Thornburg's 2007 year-end audit in January and February 2008,

[Taylor] spent about 75-80% of his time on the Countrywide audit.   In total, Mr. Taylor

estimated that he spent less than fifty hours on the 2007 Thornburg audit."  Goldstone Facts

¶ 333, at 76-77 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact);

Taylor Depo. at 107:13-108:2.   "Billing reports . . . indicate that by mid-February 2008

Mr. Taylor had only billed 15.5 hours on the Thornburg audit."  Goldstone Facts ¶ 334, at 77

(setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); KPMG Billing

Spreadsheet at 2.  "Mr. Goldstone, Ms. Starrett, and Mr. Simmons found that it became difficult

for Thornburg to obtain timely, definitive answers from KPMG about accounting issues due to

Ms. Reinhart's limited authority and expertise."  Goldstone Facts ¶ 335, at 77 (setting forth this

fact); Simmons Decl. ¶ 16, at 4-5; Goldstone Decl. ¶ 50, at 10; Starrett Depo. at 28:24-29:13.[149]

---

[148]The SEC attempts to dispute this fact by stating: "Defendants' claimed expectation is implausible and contradicted by the fact that both John Taylor and Cynthia Reinhart performed the same role in the Thornburg Year 2006 and 2007 Audits, but Thornburg did not remove KPMG as auditor after the 2006 audit, and re-hired KPMG during the 2007 audit."   SEC Disputed Facts ¶ 332, at 26.  As the Court has already concluded, the SEC builds a straw-man fact that it disputes in an attempt to dispute the Defendants' asserted fact.  See supra note 147. The Defendants do not assert that they would have fired KPMG if Taylor did not have a more involved role, but only that they expected him to have one.   Accordingly, the SEC does not specifically controvert the Defendants' asserted fact, and the Court finds that the SEC has not disputed the fact.

[149]The SEC attempts to dispute this fact by stating:

Defendant Starrett testified that Defendants' concerns about the responsiveness of Cynthia Reinhart caused some agitation, but that no deadlines were missed or public filings delays as a result.  Also, Cynthia Reinhart performed the same role in the Thornburg Year 2006 and 2007 Audits, but Thornburg did not remove KPMG as auditor after the 2006 audit, and re-hired KPMG during the 2007 audit.

Mr. Goldstone [was] frustrate[ed] with Ms. Reinhart . . . :

> "Cynthia had no authority.  She was not like any other audit
> manager or audit partner that [Goldstone] ever had involved.
> Audit partners make decisions.  She had no authority to make a
> decision.  She couldn't say yes or no, because she was too busy
> listening to 15 other people in the national office and in the LA
> office telling her what she was going to be able to do."

Goldstone Facts ¶ 336, at 26 (setting forth this fact)(quoting Goldstone Depo. at 279:13-20).  See

Goldstone Depo. at 278:10-280:1.[150]

_____

SEC Disputed Facts ¶ 335, at 26.  This assertion does not specifically controvert the Defendants'
asserted fact.  The Defendants do not assert that Reinhart caused Thornburg Mortgage to miss a
deadline or delay its public filings.  They assert only that it was difficult to obtain a timely
definitive answer from Reinhart.  Additionally, the fact that Thornburg Mortgage re-hired
KPMG is immaterial to this fact.  Accordingly, the Court concludes that the SEC has not
disputed the fact.

[150]The SEC attempts to dispute this fact by stating:

> Cynthia Reinhart testified that the KPMG audit engagement team was responsible
> to have the audit completed and documented in accordance with generally
> accepted auditing standards and the standards established by the PCAOB, that she
> was responsible for ensuring that all members of the audit engagement team
> complied with that responsibility, and that she had ultimate responsibility for
> determining that the accounting methodology applied by Thornburg's
> management was in conformance with generally accepted accounting principles.

SEC Disputed Facts ¶ 336, at 26.  To dispute the Defendants' asserted fact, the SEC cites a
portion of Reinhart's deposition testimony.  This portion provides:

> Q.      With respect to the 2007 annual audit, who was the member of the
> KPMG engagement team that was ultimately responsible to ensure the audit was
> conducted in accordance with generally accepted auditing standards?
>
> A.      I wouldn't say there was any.  We are all responsible to have the
> audit completed and documented in accordance with generally accepted auditing
> standards and the standards established by the public company accounting
> oversight board. So we all have that responsibility and I as the engagement
> partner are charged with ensuring that all members of the team comply with that
> responsibility.

Thornburg had serious "concerns about the responsiveness of the audit engagement partner" Ms. Reinhart who "didn't have the depth of experience that was needed for a client like Thornburg." . . . . "[O]ften issues brought" to Ms. Reinhart "were not resolved on a timely basis or with the sort of depth of knowledge that we expected to be brought to the table."

Goldstone Facts ¶ 337, at 77 (setting forth this fact)(alterations omitted)(quoting Starrett Depo. at 28:25-29:24).  See Starrett Depo. at 28:24-31:17.[151]

---

Q.      For the 2007 annual audit, who did you perceive as being the member of the KPMG engagement team that was ultimately responsible for determining that the accounting methodology applied by Thornburg's management was in conformance with generally accepted accounting principles?

A.      That was a team decision that was made on the part of myself, Ms. Hall, Mr. Womack, and Mr. Taylor, and Mr. McLamb.

Q.      As engagement partner, did you feel that you had ultimate responsibility for that area?

A.      I do.

Reinhart SEC Depo. at 54:12-55:8.

The Defendants reply by stating: "The fact that KPMG delegated Ms. Reinhart 'ultimate responsibility' for the audit does not contradict Mr. Goldstone's frustrations based on his opinion that Ms. Reinhart lacked authority."  Goldstone Reply Facts ¶ 336, at 147.  The Court agrees with the Defendants.  Reinhart's deposition testimony may support the contention that she was responsible for the audit, but it does not support the assertion that she had authority to make decisions.  The Defendants do not assert that Reinhart was not responsible for the audit, but only that she lacked authority to make decisions.  The SEC's cited testimony concerns only responsibility and not authority.  Moreover, Reinhart's testimony suggests that she did not make independent decisions, by testifying that it "was a team decision" to keep Thornburg Mortgage's management in conformance with GAAP.  Reinhart SEC Depo. at 54:23-55:5.  The SEC has thus not specifically controverted the Defendants' asserted fact, and the Court finds that the SEC has not disputed the fact.

[151]The SEC attempts to dispute this fact by stating:

Defendant Starrett testified that Defendants' concerns about the responsiveness of Cynthia Reinhart caused some agitation, but that no deadlines were missed or public filings delays as a result.  Also, Cynthia Reinhart performed the same role in the Thornburg Year 2006 and 2007 Audits, but Thornburg did not remove KPMG as auditor after the 2006 audit, and re-hired KPMG during the 2007 audit.

"KPMG's 2007 audit work costs significantly exceeded the budget."  Goldstone Facts ¶ 338, at 77 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Thornburg Mortgage, Inc. Minutes of a Meeting of the Audit Committee at 3 (Jan. 22, 2008), filed August 9, 2013 (Doc. 204-36).

> In November 2007, Mr. Simmons wrote Mr. Taylor, copying Ms. Starrett and Mr. Goldstone, to express his concern about a change that Ms. Reinhart had proposed in accounting for derivatives that, in his view, flew in the face of the existing documentation.  Mr. Simmons requested to see the analysis and additional documentation before signing the management representation letter and filing the Form 10-Q.  He also indicated concern that KPMG had not considered the additional complications arising from the proposed change.

Goldstone Facts ¶ 339, at 78 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from Clay Simmons to John Taylor at 2 (dated Nov. 9, 2007), filed August 9, 2013 (Doc. 204-25).

> At one Audit Committee meeting, Mr. Goldstone observed that Ms. Reinhart out of the blue conveyed that KPMG had an audit concern about capitalized mortgages servicing rights in the Thornburg portfolio, about which Ms. Reinhart had never before informed Thornburg.  Mr. Goldstone testified that Thornburg was accustomed to having an open-door relationship with its outside auditors and, thus, was disappointed in KPMG's lack of communication during the year-end audit.

Goldstone Facts ¶ 340, 78 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone Depo. at 276:2-280:12.

> On February 25, 2008, Mr. Goldstone wrote Ms. Starrett, copying Mr. Simmons, to express frustration about KPMG's inability to "provide accounting clarity to an audit committee or management 6 days before filing an annual financial

---

SEC Disputed Facts ¶ 337, at 26-27.  This assertion does not specifically dispute the Defendants' asserted fact.  The Defendants do not assert that Reinhart caused Thornburg Mortgage to miss any deadlines or to delay public filings.  Additionally, the Defendants' decision to re-hire KPMG and not to fire it does not dispute the Defendants' assertion that Reinhart did not timely respond to them and lacked the necessary expertise.  Consequently, the Court finds that the SEC has not disputed the fact.

statement," and whether "a different audit partner [would] behave any differently given our circumstances."  Mr. Goldstone was reacting to KPMG's indecision at the February 22, 2008 Audit Committee meeting ("I have been stewing over our KPMG situation all weekend").  He asked, "Should the three of us be meeting with Cynthia [Reinhart] today to get some clarity on what we should expect? This all seems very strange and random to me.  Am I just overreacting?"

Goldstone Facts ¶ 341, at 78 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Feb. 25, 2008, Goldstone KPMG Email at 3).  See Feb. 25, 2008, Goldstone KPMG Email at 3; Feb. 22, 2008, Audit Committee Minutes at 3.[152]

Ms. Starrett responded:

"[I]t's completely normal for the audit firm to monitor events up to their opinion date and they are required to do so under GAAS.  We have purposely not told [KPMG] about the margin calls so that we don't escalate an issue which we believe will be put to rest by the time they have to issue their opinion."

She then explained:

"[W]e have been wary of selling assets because we feel it is likely this issue will be raised then and it is also likely they will need to involve other experts within the firm, all of which will make reaching a decision a slow process.  So since we believe the situation will be resolved before they have to opine, we have chosen not to put the valuation issue in front of them.  Obviously, if we are not able to resolve the situation satisfactorily, we will need to inform them before we file. . . .  My opinion is that as long as we are still relatively certain that we will be able to say that we have satisfied all margin calls by the time we file, we should not

---

[152]The SEC attempts to dispute this fact by stating:

Defendant Starrett testified that Defendants' concerns about the responsiveness of Cynthia Reinhart caused some agitation, but that no deadlines were missed or public filings delays as a result.  Also, Cynthia Reinhart performed the same role in the Thornburg Year 2006 and 2007 Audits, but Thornburg did not remove KPMG as auditor after the 2006 audit, and re-hired KPMG during the 2007 audit.

SEC Disputed Facts ¶ 341, at 27.  This assertion does not address, much less specifically controvert, the Defendants' asserted fact.  Consequently, the Court concludes that the SEC has not disputed the fact.

> raise that issue in KPMG's minds. All they've said so far is that they need to monitor events through the opinion date. If things change and we don't feel we will be able to make that disclosure, then we should initiate the dialogue."

Goldstone Facts ¶ 342, at 78-79 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Feb. 25, 2008, Goldstone KPMG Email at 2-3). See Feb. 25, 2008, Goldstone KPMG Email at 2-3.[153] "Simmons . . . 'wish[ed] the e-mail hadn't been written' but '[n]o doubt

---

[153]The SEC states:

> Undisputed, but incomplete. The portion of Ms. Starrett's e-mail that Defendants choose to represent with an ellipses reads: "In short, selling some assets is substantially the same as selling all assets because the only reason we don't have to recognize the impairments on all assets with negative marks in income now is that we represent we have the intent and ability to hold the assets to maturity. Selling some assets calls into question our intent and having to sell them to meet margin calls or reduce exposure, calls into question our ability to hold them."

SEC Disputed Facts ¶ 342, at 27. Because the SEC does not dispute this fact, the Court concludes that it is undisputed.

Starrett asserts the following fact: "Ms. Starrett testified that the statements in her February 25, 2008 email to Mr. Goldstone and Mr. Simmons reflected a desire to present KPMG with actual facts about the ultimate resolution of Thornburg's margin calls rather than hypothetical situations." Starrett Facts ¶ 35, at 8 (alterations omitted)(internal quotation marks omitted). The SEC disputes this fact by stating: "Defendant Starrett's explanation is implausible. The more reasonable interpretation of her e-mail is that she purposely withheld information about Thornburg's untimely payment of margin calls because she knew it would have been an issue to KPMG, especially as to OTTI analysis." SEC Disputed Starrett Facts ¶ 34, at 5. Starrett replies by stating:

> The SEC's response does not raise a genuine dispute as to Starrett Fact 34.

> The SEC cannot create a dispute as to Ms. Starrett's intended meaning of her e-mail by (1) general and unsupported attacks on the credibility of Ms. Starrett's sworn, uncontroverted testimony about her subjective understandings, views, or beliefs or (2) characterizing Ms. Starrett's explanation as implausible and substituting its own speculative interpretation of Ms. Starrett's February 25, 208 [sic] e-mail for her sworn, uncontroverted testimony. The SEC cites only to Ms. Starrett's email in its response and has not provided any support, other than its own purportedly more reasonable interpretation, to contest Ms. Starrett's uncontroverted explanation.

- 184 -

Starrett Reply Facts ¶ 34, at 31-32.

The Court concludes that the SEC has disputed this fact.  It is questionable that Starrett could believe that she wanted to present KPMG with actual facts and not hypothetical situations by withholding from KPMG actual facts.  That Thornburg Mortgage could not timely pay its margin calls in February, 2008, was not a hypothetical situation, but was a fact.  The amount of margin calls and Thornburg Mortgage's lack of liquidity to meet them were facts that could have assisted KPMG in its audit.  It is disputed whether Starrett could have believed that withholding from KPMG facts was done for the purpose of presenting KPMG with facts and not hypothetical situations.  Accordingly, the Court concludes that the SEC has disputed Starrett's asserted fact.

Starrett asserts the following fact:  "In her email dated February 25, 2008, Ms. Starrett advised against prematurely discussing with KPMG a hypothetical accounting issue that would arise only if Thornburg was unable to meet its then-pending margin calls."  Starrett Facts ¶ 35, at 8.  The SEC disputes this fact by stating: "Defendant Starrett's explanation is implausible.  The more reasonable interpretation of her e-mail is that she purposely withheld information about Thornburg's untimely payment of margin calls because she knew it would have been an issue to KPMG, especially as to OTTI analysis."  SEC Disputed Starrett Facts ¶ 35, at 5.  Starrett replies by stating:

> The SEC's response does not raise a genuine dispute as to Starrett Fact 35.

> The SEC does not dispute that on February 2, 2011 and February 19, 2013 Ms. Starrett provided the testimony cited in Starrett Fact 35, as confirmed by Exhibits 290 and 291.

> As to the substance of Ms. Starrett's testimony, the SEC cannot raise a genuine dispute by (1) general and unsupported attacks on the credibility of Ms. Starrett's sworn, uncontroverted testimony about her subjective understandings, views, or beliefs or (2) substituting its own speculative interpretation of Ms. Starrett's e-mail for her sworn, uncontroverted testimony as to what she intended to convey and characterizing this sworn testimony as implausible.  The SEC cites only to Ms. Starrett's email in its response and has not provided any support, other than its own claim of implausibility, to contest Ms. Starrett's uncontroverted explanation.

Starrett Reply Facts ¶ 35, at 32-33.

The Court concludes that the SEC has disputed Starrett's asserted fact.  Thornburg Mortgage's failure to timely pay its margin calls was not a hypothetical situation.  Thornburg Mortgage could not meet its margin calls and was having to pay them over time.  Withholding from KPMG this information was not withholding a hypothetical situation, but facts.  Accordingly, the Court concludes that the SEC disputes Starrett's asserted fact.

The SEC asserts the following fact:

> Goldstone testified that he expressed no disagreement with Starrett's statement on February 25, 2008 that they had "purposely not told [KPMG] about the margin calls so that we don't escalate an issue which we believe will be put to rest by the

. . . received [the e-mail], but, . . . [did not] respond[] to it and [he] wish[ed] [he] had reacted. [He] probably wouldn't be here today if that were the case.'" SEC Facts ¶ CC, at 5 (setting forth this fact)(quoting Simmons SEC Depo. at 330:1-2, 333:2-14). See Simmons SEC Depo. at 328:23-330:4, 332:2-333:12.[154]

---

    time they have to issue their opinion . . . we have chosen not to put the valuation
    issue in front of KPMG."

SEC Facts ¶ BB, at 5 (alterations in SEC Facts but not in source). The evidence which the SEC cites does not, however, support this fact. The SEC cites a portion of Goldstone's deposition testimony. The cited portion provides, in full:

> Q      Looking at the response that Ms. Starrett sent to you on Monday, February 25 around 10:00, she writes in the second paragraph, "We have purposely not told them about the margin call so we don't escalate an issue which we believe will be put to rest by the time they have to issue their opinion." Do you have any idea what Ms. Starrett is talking about?
>
> A      Quite frankly, I do not.
>
> Q      Did you have any understanding that Thornburg was purposely not telling Thornburg's auditors about the margin calls?
>
> A      I did not and that would have been inconsistent with our practices at Thornburg Mortgage.
>
> Q      Do you recall responding back to either Ms. Starrett or Mr. Simmons informing them that they needed to bring the auditors up to date with respect to margin calls?
>
> A      I did not, no.

Goldstone SEC Depo. at 271:9-25. This testimony does not support the SEC's asserted fact that Goldstone expressed no disagreement with Starrett's statement. Instead, it shows that Goldstone did not know about what Starrett was talking in the electronic mail transmission and creates the inference that he would have disagreed with it, because it was inconsistent with Thornburg's practices. Because the evidence does not support the SEC's asserted fact, the Court will not consider it.

    [154]The Defendants respond to this fact by stating:

> [T]his e-mail conveyed [Starrett's] understanding at the time that as long
> as Thornburg was able to meet its outstanding margin calls in a timeframe
> acceptable to the lenders, the fact that at that point in time there were margin calls
> that had not yet been paid was not material to the audit.

Goldstone Facts ¶ 343, at 79 (setting forth this fact)(internal quotation marks omitted).  See

Starrett Depo. at 46:2-24, 47:15-18, 50:1-8, 142:13-143:6.[155]  "[T]he issue raised in [Starrett's]

email was the inability to pay margin calls, not the manner in which margin calls were being

met."   Goldstone Facts ¶ 344, at 79 (setting forth this fact).   See Starrett Depo. at

---

> Disputed.  The evidence lacks foundation insofar as Mr. Simmons was asked to
> assume the correctness of the SEC's speculative interpretation of Ms. Starrett's
> email in responding as quoted, which assumptions the SEC fails to include in the
> purported fact.  Mr. Simmons testified that the SEC was "inferring something that
> I'm not prepared to infer," that the SEC's interpretation "does not reflect the
> situation as I understood it at the time," and that "it certainly doesn't reflect my
> recollection of what was going on at the time."
>
> The fact is also misleading and immaterial because the SEC quotes Ms. Starrett's
> email out of context and without providing Ms. Starrett's uncontroverted
> testimony as to the meaning of her own words.
>
> Moreover, the fact is immaterial for the reasons set forth in Defendants' Response
> to SEC SMF ¶ C.

Defendants Disputed Facts ¶ CC, at 13-14 (citations omitted).  This assertion does not dispute
the SEC's asserted fact.  The Defendants do not assert that Simmons did not testify to what the
SEC asserts he did or that Simmons does not believe what he testified he believes.  Accordingly,
the Defendants fail to dispute this fact, and the Court concludes that it is undisputed.

[155]The SEC attempts to dispute this fact by stating: "The most reasonable inference from
Ms. Starrett's email is that Defendants had purposely not told KPMG about Thornburg's failure
to timely meet margin calls, as Defendants knew this would raise issues with KPMG and
Defendants intended to hide this fact from KPMG."  SEC Disputed Facts ¶ 343, at 27.  This
assertion does not specifically controvert the Defendants' asserted fact.  The Defendants may
have purposely not told KPMG about the margin calls to prevent KPMG from raising issues
concerning the margin calls and, at the same time, thought that they were not required to tell
KPMG about the outstanding margin calls, as long as they were paid.  The SEC adds an
additional fact that does not specifically controvert the Defendants' asserted fact.  Accordingly,
the Court concludes that the SEC has not disputed the fact.

171:5-172:19.[156]  "Ms. Starrett understood when she wrote her February 25, 2008 email that

Thornburg's margin call situation would be imminently and favorably resolved."  Starrett Facts

¶ 36, at 8 (setting forth this fact).  See Starrett Depo. at 46:9-24.[157]  "Ms. Starrett's February 25,

_____

[156]The SEC attempts to dispute this fact by stating:

> The most reasonable inference from Ms. Starrett's email is that Defendants had "purposely not told" KPMG about Thornburg's failure to timely meet margin calls, as Defendants knew this would raise issues with KPMG and Defendants intended to hide this fact from KPMG.   Goldstone has testified that "whether margin calls are met or not met and how they're met is relevant in the context of proper disclosure, absolutely."

SEC Disputed Facts ¶ 344, at 27.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants' asserted fact merely concerns to what the word "issue" referred in the electronic mail transmission.  The entire sentence states: "We have purposely not told them about the margin calls so that we don't escalate an issue which we believe will be put to rest by the time they have to issue their opinion."  Feb. 25, 2008, Goldstone KPMG Email at 2.  Because the "issue" would be put to rest by the time KPMG issued its opinion, it appears that the issue refers to Thornburg Mortgage's outstanding margin calls or it inability to pay them, as Starrett asserts.  If the word issue refers to Thornburg Mortgage paying the margin calls over time, it would not be put to rest, because, even after Thornburg Mortgage paid the margin calls, the fact remains that they paid them over time.  The most reasonable inference is that the word issue refers to the outstanding margin calls or Thornburg Mortgage's inability to meet than, and not to Thornburg Mortgage paying the margin calls over time.  Additionally, the Defendants do not assert that the manner in which margin calls are met is not material.   The second part of the SEC's response is thus irrelevant to the Defendants' asserted fact.  Accordingly, the SEC has not specifically controverted this fact, and the Court concludes that the SEC has not disputed it.

[157]The SEC attempts to dispute this fact by stating: "Defendant Starrett's explanation is implausible. Her email shows that she purposely withheld information about Thornburg's untimely payment of margin calls because she knew it would have been an issue to KPMG, especially as to OTTI analysis, regardless of whether the margin calls were ultimately paid." SEC Disputed Starrett Facts ¶ 36, at 5.  This assertion does not specifically controvert Starrett's asserted fact.  The SEC does not assert that Starrett could not have believed that the margin call situation would not be imminently and favorably resolved.  Instead, the SEC contends that Starrett's purpose in withholding the information was related to the untimely margin call payments impacting KPMG's OTTI analysis.   Starrett does not assert that her purpose in withholding from KPMG the information was because of her belief that Thornburg Mortgage's margin call situation would be imminently and favorably resolved.  Rather, she asserts that, at the time, she believed that the margin call situation would be imminently and favorably resolved. The SEC fails to specifically controvert Starrett's asserted fact, and the Court concludes that the SEC has not disputed it.

2008 email conveyed her view that unless and until Thornburg was required to sell assets with negative marks to meet margin calls -- which development could materially impact Thornburg's OTTI accounting -- there was no issue to address with KPMG, and any discussion would revolve around hypothetical problems."  Starrett Facts ¶ 38, at 8 (setting forth this fact)(internal quotation marks omitted).  See Feb. 25, 2008, Goldstone KPMG Email at 2; Starrett Depo. at 47:12-18.[158] "Ms. Starrett explained in her February 25, 2008 email that whether Thornburg had the intent and ability to hold its impaired assets until recovery was contingent, in part, upon having sufficient liquidity to meet outstanding margin calls without selling such assets."  Starrett Facts ¶ 37, at 8 (setting forth this fact).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Feb. 25, 2008, Goldstone KPMG Email at 2-3.

"Ms. Starrett could, in the context of the entire [February 25, 2008] email, have been referring to or alluding to any of eleven different interpretations."  Starrett Facts ¶ 78, at 15 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See Plaintiff Securities and Exchange Commission's Amended Objections and Responses to Defendants' Third and Fourth Sets of Interrogatories at 7-8, filed August 31, 2013 (Doc. 207-25)("SEC's 3d

---

[158]The SEC attempts to dispute this fact by stating:  "Defendant Starrett's explanation is implausible.  The more reasonable interpretation of her e-mail is that she purposely withheld information about Thornburg's untimely payment of margin calls because she knew it would have been an issue to KPMG, especially as to OTTI analysis."  SEC Disputed Starrett Facts ¶ 38, at 6.  This assertion does not specifically controvert Starrett's asserted fact.  The SEC does not present any evidence to dispute Starrett's belief that there was no OTTI issue until Thornburg Mortgage was required to sell its assets with negative marks.  Rather, without more, it merely asserts that Starrett knew that the margin calls would have been an issue that affected KPMG's OTTI analysis.  Because the SEC does not present evidence that specifically controverts Starrett's asserted fact, the Court concludes that the SEC has not disputed it.

& 4th Interrogatories").[159]  "Ms. Starrett's email makes no reference to repo agreements or to liquidations of pledged assets by repo lenders."  Starrett Facts ¶ 79, at 15 (setting forth this fact). See Feb. 25, 2008, Goldstone KPMG Email at 2-3.[160] "'[It is reasonable] that the use of the term obviously in that sentence suggests that Ms. Starrett views it as clear and without question that if the margin call situation could not be satisfactorily resolved, KPMG would need to be informed.'"  Starrett Facts ¶ 80, at 15-16 (setting forth this fact)(quoting Hall Depo. at 438:9-16). See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Hall Depo. at 438:9-16. "Ms. Starrett also noted in her February 25, 2008 email that as far as accountants are concerned, the risk is already disclosed."  Starrett Facts ¶ 81, at 16 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).   See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Feb. 25, 2008, Goldstone KPMG Email at 2.

> [Starrett] had no concern that discussing Thornburg's then-pending margin calls with KPMG on February 25, 2008 would ultimately result in a different, unfavorable OTTI conclusion . . . .  [T]here [was not] any concern on [Starrett's] part that had the disclosure been made at this time, that if KPMG was to bring in its expert, that a different conclusion may have been reached with regards to OTTI[.] . . .  [Her] concern was simply one of time frame[.] . . .  To [Starrett], this was a timing issue, not an issue of a different outcome.

---

[159]The SEC does not dispute this fact, but states: "Undisputed, but noted that each of the interpretations offered by the SEC are related to Starrett's intent to withhold Thornburg's failure to timely meet margin calls from KPMG and are reasonable interpretations of her February 25, 2008 e-mail stating that we have purposely not told them about the margin calls."  SEC Disputed Starrett Facts ¶ 78, at 12.  Because the SEC does not dispute this fact, the Court concludes that it is undisputed.

[160]The SEC attempts to dispute this fact by stating:  "While not explicitly referenced in her e-mail, failure to pay margin calls on time necessarily implicates Repo Agreements, as they define timely payment, and liquidation, as failure to timely pay margin calls gives lenders the right to liquidate assets."  SEC Dispute Starrett Facts ¶ 79, at 12-13.  This assertion does not dispute Starrett's asserted fact.  The SEC does not assert that Starrett referenced repo agreements or liquidation in the electronic mail transmission.  Consequently, the SEC fails to dispute this fact, and the Court concludes that it is undisputed.

Starrett Facts ¶ 39, at 9 (setting forth this fact)(alterations omitted)(quoting Starrett Depo. at

168:17-169:1).  See Starrett Depo. at 168:17-169:1.[161]

    "[D]iscussing with KPMG the hypothetical but remote possibility that Thornburg might

not be able to meet its outstanding margin calls would be unproductive and unnecessarily 'slow

down [the audit] process' at a critical time when 'we're a few days from opinion deadline.'"

Starrett  Facts  ¶  40,  at  9  (setting  forth  this  fact)(alterations  in  Starrett  Facts  but  not  in

---

[161]The SEC attempts to dispute this fact by stating:

> Defendant Starrett's explanation is implausible.  Her email demonstrates that she
> purposely withheld information about Thornburg's untimely payment of margin
> calls because she knew it would have been an issue to KPMG, especially as to
> OTTI analysis.  Starrett's testimony was that she did not want KPMG to get
> "hung up" on the margin calls or the fact that Thornburg could not timely meet
> them.  Her testimony also acknowledged her "concern about the impact that the
> outstanding  margin  calls  might  have  on  the  issue  of  impairment  to
> mortgage-backed securities."  As well as her awareness that if informed about the
> late payments KPMG (and Thornburg) "would spend a lot of time" on the issue.
> This is an admission that, consistent with the testimony of numerous KPMG
> witnesses, KPMG would have considered the payment of margin calls over time
> significant to its OTTI, as well as its going concern, analysis.

SEC Disputed Starrett Facts ¶ 39, at 6.  This assertion does not specifically controvert Starrett's
asserted fact and lacks support in the record.  Specifically, the SEC asserts that Starrett
acknowledged her concern about the impact that the outstanding margin calls would have on
Thornburg Mortgage's OTTI analysis.  If Starrett had given such testimony, Starrett's asserted
fact would be disputed.  The testimony which the SEC cites, however, comes from a question
that the SEC's counsel asked Starrett, and to which Starrett did not affirmatively answer.  The
relevant deposition testimony provides: "Q  There seems to be also some concern about the
impact that the outstanding margin calls might have on the issue of impairment to
mortgage-backed securities; is that not correct? A  Well, that was an issue Larry raised in his
e-mail and that's what I was responding to."  Starrett Depo. at 166:21-167:1.  Starrett did not
testify that she had some concerns about Thornburg Mortgage's OTTI analysis, but that
Goldstone asked about the relationship between the OTTI analysis and untimely margin calls.
Furthermore, that Starrett believed that KPMG would spend a lot of time evaluating Thornburg
Mortgage's failure to meet its margin calls in a timely manner does not specifically dispute
Starrett's asserted fact that she was not concerned that KPMG might have reached a different
conclusion if it knew about the unmet margin calls.  The SEC, accordingly, fails to specifically
controvert Starrett's asserted fact, and the Court finds that the SEC has not disputed it.

source)(quoting Starrett Depo. at 168:11-14).   See Starrett Depo. at 168:6-16.[162]   "[T]he

valuation issue would only arise if Thornburg was unable to pay the outstanding margin calls and

had to sell assets with negative marks, at which point [Thornburg Mortgage] would need to tell

KPMG that."   Starrett Facts ¶ 82, at 16 (setting forth this fact)(alterations omitted)(internal

quotation marks omitted).   See Starrett SEC Depo. at 171:11-13, 172:4-5.[163]   "'It appears from

this statement that Ms. Starrett believes that as long as the margin calls had been settled by the

date of filing, that that wouldn't have any bearing upon the issues that KPMG were looking at

with regards to going concern.'"   Starrett Facts ¶ 41, at 9 (setting forth this fact)(alterations

omitted)(quoting Hall SEC Depo. at 239:2-6).   See SEC Disputed Starrett Facts at 1-16 (not

disputing this fact); Hall SEC Depo. at 239:2-6.   "When Ms. Starrett wrote her February 25,

2008 email, she did not view the fact that Thornburg was paying some of its margin calls over

time pursuant to agreements with its lenders as particularly relevant to the OTTI conclusion as

long as the Company ultimately did pay them."   Starrett Facts ¶ 42, at 9 (setting forth this

---

[162]The SEC attempts to dispute this fact by stating: "Defendant Starrett's explanation is implausible.  Her email demonstrates that she purposely withheld information about Thornburg's untimely payment of margin calls because she knew it would have been an issue to KPMG, especially as to OTTI analysis."  SEC Disputed Starrett Facts ¶ 40, at 6.  This assertion does not specifically controvert Starrett's asserted fact.  The SEC does not contend that discussing the unmet margin calls with KPMG would not have slowed down the audit process.  The Court thus concludes that the SEC has not disputed the fact.

[163]The SEC attempts to dispute this fact by stating: "Defendant Starrett's explanation is implausible.  Her email shows that she purposely withheld information about Thornburg Mortgage's untimely payment of margin calls because she knew it would have been an issue to KPMG, especially as to OTTI analysis, regardless of whether the margin calls were ultimately paid."  SEC Disputed Starrett Facts ¶ 82, at 13.  This assertion does not dispute Starrett's asserted fact.  To dispute this fact, the SEC cites only to the February 25, 2008, electronic mail transmission.  In the electronic mail transmission, Starrett does not state or indicate that Thornburg was withholding information from KPMG because it might have impacted KPMG's OTTI analysis.  The SEC thus fails to present evidence that specifically controverts Starrett's asserted fact, and the Court concludes that the SEC has not disputed it.

fact)(internal quotation marks omitted).  See Starrett Depo. at 171:23-172:7.[164]  "Ms. Starrett['s]

. . . February 25, 2008 email was motivated by a desire to ensure that Thornburg's year-end audit

is not derailed on the eve of the 10-K filing by a remote possibility that Thornburg might be

unable to meet margin calls without selling assets."  Starrett Facts ¶ 43, at 10-11 (setting forth

this fact)(alterations omitted)(internal quotation marks omitted).  See Starrett SEC Depo. at

165:10-22, 171:5-13; Starrett Depo. at 47:12-18.[165]  "Mr. Simmons and Ms. Starrett . . . told

Mr. McLamb -- consistent with Ms. Starrett's e-mail -- that 'they did not think [the timing of

margin call payments] was a material issue as long as they ultimately had met the margin calls

by the time the 10-K was filed.'"  Goldstone Facts ¶ 345, at 79 (setting forth this fact)(alterations

omitted)(quoting  McLamb  Depo.  at  46:5-9).     See  McLamb  Depo.  at  44:13-46:14.[166]

---

[164]The SEC attempts to dispute this fact by stating: "Defendant Starrett's explanation is
implausible.  Her email demonstrates that she purposely withheld information about Thornburg's
untimely payment of margin calls because she knew it would have been an issue to KPMG,
especially as to OTTI analysis."  SEC Disputed Starrett Facts ¶ 42, at 6.  This assertion does not
specifically controvert Starrett's asserted fact.  In the electronic mail transmission, Starrett does
not state that the untimely margin calls would impact KPMG's OTTI analysis.  Rather, it states
that Thornburg Mortgage was purposefully withholding information from KPMG, that
Thornburg Mortgage would need to disclose to KPMG the margin calls if it failed to meet them
before the 2007 Form 10-K filing, and that disclosing the information would slow down the
audit.  Because the SEC fails to dispute this fact, the Court concludes that it is undisputed.

[165]The SEC attempts to dispute this fact by stating: "Defendant Starrett's explanation is
implausible.  The more reasonable interpretation of her e-mail is that she purposely withheld
information about Thornburg's untimely payment of margin calls because she knew it would
have been an issue to KPMG, especially as to OTTI analysis."  SEC Disputed Starrett Facts ¶ 43,
at 6.  This assertion does not dispute Starrett's asserted fact.  The SEC cites only the February
25, 2008, electronic mail transmission, which does not state that Starrett withheld the margin call
information because it could impact Thornburg's OTTI analysis.  The Court thus concludes that
the SEC has not disputed the fact.

[166]The SEC attempts to dispute this fact by stating: "Defendants Simmons and Starrett
told Robert McLamb that they did not make KPMG aware of the fact that Thornburg was not
timely meeting margin calls, which is plainly material."  SEC Disputed Facts ¶ 245, at 27.  This
assertion  does  not  specifically  controvert  the  Defendants'  asserted  fact.    They  assert  that
Simmons and Starrett did not believe that the margin call payments were material -- or rather,

"Mr. Goldstone responded to Ms. Starrett's February 25 email as follows: 'Got it. Understand it. Thanks.'"  Goldstone Facts ¶ 346, at 80 (setting forth this fact)(quoting Feb. 25, 2008, Goldstone KPMG Email at 2).  See SEC Disputed Facts at 1-51 (not disputing this fact)( Feb. 25, 2008, Goldstone KPMG Email at 2).[167]  "Mr. Goldstone departed on February 21, 2008 from Santa Fe to visit colleges on the East Coast with his daughter and stayed in New York until April 2008."  Goldstone Facts ¶ 348, at 203 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone Decl. ¶ 18, at 4.  "Thornburg 'had a plan to get these margin calls paid' -- a plan that 'was working' -- and that 'ultimately [Thornburg Mortgage] believed payment of margin calls would not be an issue.'"  Goldstone Facts ¶ 349, at 80 (setting forth this

---

that they told McLamb that they did not believe that the margin calls were material -- and not that the margin calls were in fact not material.  The SEC's assertion does not dispute the asserted fact, and the Court concludes that the SEC has not disputed it.

[167]The Defendants' asserted fact states:

> In testimony, Mr. Goldstone and Mr. Simmons could not recall the complete email exchange with Ms. Starrett.  They further testified that they could not have understood Ms. Starrett's email to refer to a plan to deceive KPMG, as they understood at the time that KPMG was actively monitoring the company's liquidity and margin calls and obtaining that information directly from Capital Markets personnel.

Goldstone Facts ¶ 347, at 80.  The SEC disputes this fact by stating: "The most reasonable inference from Ms. Starrett's email is that Defendants had 'purposely not told' KPMG about Thornburg's failure to timely meet margin calls, as Defendants knew this would raise issues with KPMG and Defendants intended to hide this fact from KPMG."  Goldstone Facts ¶ 347, at 27.  In the electronic mail transmission, Starrett writes: "We have purposely not told them about the margin calls so that we don't escalate an issue which we believe will be put to rest by the time they have to issue their opinion."  Feb. 25, 2008, Goldstone KPMG Email at 2.  By purposely not telling KPMG about the margin calls until they are resolved, Starrett appears to indicate a plan to keep KPMG in the dark about the outstanding margin calls until Thornburg Mortgage resolves them.  Starrett's wording shows an intent to mislead or deceive KPMG, at least for a period of time.  The electronic mail transmission disputes the Defendants' asserted fact that the electronic mail transmission could not have referred to a plan to deceive KPMG.  Accordingly, the Court finds that the SEC has disputed the Defendants' fact.

fact)(alterations omitted)(quoting Starrett Depo. at 46:12-23).  See Starrett Depo. at 46:12-24; id.

at 47:15-18.[168]

    **21.**    **KPMG's Audit of the December 31, 2007, Financial Statements.**

"In January 2008, KPMG began significant work on its audit of Thornburg's 2007

year-end financial statements in connection with its Form 10-K."  Goldstone Facts ¶ 350, at 80

(setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); KPMG

FSA/IA/SE/VSE Review of Interim Financial Information Checklist at 2-42 (dated Jan. 10,

2008), filed August 9, 2013 (Doc. 204-122).  "During the year-end audit, Thornburg provided

the KPMG engagement team with office space near Thornburg's Capital Markets personnel."

Goldstone Facts ¶ 351, at 80 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not

disputing this fact); Baucom Depo. at 20:16-21:2.  "KPMG personnel had unrestricted access to

Thornburg's offices and personnel during the audit."  Goldstone Facts ¶ 352, at 80 (setting forth

this fact).  See Baucom Depo. at 21:16-18; Deposition of Meg Jones at 41:8-11, 43:6-9 (taken

Nov. 15, 2012), filed August 9, 2013 (Doc. 204-307)("Jones Depo."); Ahn Depo. at 20:6-21:8.[169]

---

[168]The SEC attempts to dispute this fact by stating:  "Defendants plainly recognized that they had 'purposely not told' KPMG about Thornburg's failure to timely meet margin calls, as Defendants knew this would raise issues with KPMG and Defendants intended to hide this fact from KPMG."  SEC Disputed Facts ¶ 349, at 27-28.  This assertion does not address, much less specifically controvert, the Defendants' asserted fact.  Accordingly, the Court concludes that the SEC has not disputed the fact.

[169]The SEC attempts to dispute this fact by stating: "KPMG did not have 'unrestricted access' to Thornburg's offices and personnel.  KPMG's access depended on the availability of Thornburg personnel and the reliability of management's representations."  SEC Disputed Facts ¶ 352, at 28.  This assertion does not dispute the Defendants' asserted fact.  To dispute this fact, the SEC cites Kitchens' report, in which he opines that management should provide reliable representations to auditors and that auditors are reliant on managers' representation.  See Kitchens Report at 26-32.  The Defendants' do not assert that their representations to KPMG were reliable or accurate, but only that KPMG personnel had unrestricted access.  Accordingly, the SEC has not specifically controverted this fact, and the Court concludes that the SEC has not disputed it.

"Thornburg did not place any limitations on the ability of KPMG personnel to request whatever information from Thornburg they wanted.  KPMG often requested information related to its audit objectives from Thornburg personnel and either examined it in person or received it by email." Goldstone Facts ¶ 353, at 80-81 (setting forth this fact).  See Jacquez Decl. ¶¶ 4-10, at 2-10; Plummer Depo. at 26:23-27:8; Jones Depo. at 39:22-41:14; Baucom Depo. at 23:25-25:3; Ahn Depo. at 20:6-22:7; Feldman Decl. ¶ 34, at 7; Goldstone Decl. ¶¶ 45, 47, at 9.[170]   "Every Thornburg employee and Board of Directors member . . . were [sic] free to and did provide any and all information that KPMG requested, and . . . they were never instructed by anyone, including Defendants, to withhold information from KPMG."  Goldstone Facts ¶ 354, at 81 (setting forth this fact).  See Coltharp Decl. ¶¶ 6, 8, at 2; Jacquez Decl. ¶¶ 4-10, at 2-3; Fellers Decl. ¶¶ 27-29, at 6.[171]   "KPMG established the scope of the audit and Thornburg 'provided

---

[170]The SEC attempts to dispute this fact by stating:

> Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- from KPMG.  Defendants also purposefully withheld the Citi letter they received from KPMG, their awareness of the collapsing European hedge fund, and the true reason for entering into the I/O Strip Transactions, i.e. to meet margin calls they otherwise could not meet.

SEC Disputed Facts ¶ 353, at 28.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants do not assert that they did not withhold information, and the SEC does not assert that KPMG requested information that Thornburg Mortgage refused to turn over. The SEC thus has not disputed this fact, and the Court concludes that it is undisputed.

[171]The SEC attempts to dispute this fact by stating:

> Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- from KPMG. Defendants also purposefully withheld the Citi letter from KPMG, their awareness of the collapsing European hedge fund, and the true reason for entering into the I/O Strip Transactions, i.e. to meet margin calls they otherwise could not meet.

everything that they asked for, and never had any complaints that [Thornburg Mortgage was not] forthcoming.'"  Goldstone Facts ¶ 355, at 81 (setting forth this fact)(quoting Starrett Depo. at 107:18-20).  See Starrett Depo. at 107:17-25.[172]  "KPMG had ample access to information about margin calls through sources such as their review of the [commercial trust company] banking activity reports and their interactions with the Capital Markets department which was responsible for settling margin calls with repo lenders."  Starrett Facts ¶ 83, at 16 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See Starrett SEC Depo. at 166:7-17.[173]  "'[P]rior to the opinion date, KPMG did receive the information [regarding] the

---

SEC Disputed Facts ¶ 354, at 28.  The Defendants do not assert that Thornburg Mortgage did not withhold information, but only that it provided all requested information and that Thornburg Mortgage's employees were not instructed to withhold information.  The SEC does not assert that Thornburg Mortgage withheld requested information or that its employees were instructed to withhold information.  Accordingly, the Court finds that the SEC has not disputed the fact.

[172]The SEC attempts to dispute this fact by stating:

Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- from KPMG. Defendants also purposefully withheld the Citi letter from KPMG, their awareness of the collapsing European hedge fund, and the true reason for entering into the I/O Strip Transactions, i.e. to meet margin calls they otherwise could not meet.

SEC Disputed Facts ¶ 355, at 28.  Once again, the Defendants do not assert that they did not withhold information, and the SEC does not assert that Thornburg withheld information that KPMG requested.  Accordingly, the Court concludes that the SEC has not disputed this fact.

[173]The SEC attempts to dispute this fact by stating:

Defendants purposely withheld critical information about margin calls -- that they were not timely being met -- from KPMG, as demonstrated by Defendant Starrett's February 25, 2008 e-mail to Defendants Goldstone and Simmons: "We have purposely not told them [KPMG auditors] about the margin calls so that we don't escalate an issue which we believe will be put to rest by the time they have to issue an opinion."

SEC Disputed Starrett Facts ¶ 83, at 13.  This assertion does not dispute Starrett's asserted fact.  Starrett does not assert that Thornburg Mortgage did not withhold from KPMG any information.

date on which the payments were made to satisfy margin calls' and thus had the 'information as to quote, payment plans, unquote.'"   Starrett Facts ¶ 84, at 16 (setting forth fact)(alterations omitted)(quoting Starrett SEC Depo. at 175:3-8).   See Starrett SEC Depo. at 175:3-8.[174]   "[A]s of approximately February 21 or 22, 2008, [Reinhart] knew that the margin calls Thornburg received were significant and that those margin calls were in the range of $300 million."   Starrett Facts ¶ 85, at 16 (setting forth this fact)(alterations omitted)(internal quotation marks omitted). See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Reinhart SEC Depo. at 87:1-8, 109:17-23.   "KPMG had also been reviewing Thornburg's daily liquidity reports (referred to as 'daily cashflow projections' in the workpapers) and knew that Thornburg's cash balance around February 22, 2008 was relatively tight, at $45.5 million."   Starrett Facts ¶ 86, at 16 (setting forth

---

Additionally, the SEC does not assert that KPMG did not have access to information from the sources which Starrett asserts it had access.   The SEC thus fails to dispute this fact, and the Court concludes that it is undisputed.

[174]The SEC attempts to dispute this fact by stating;

Defendants purposely withheld critical information about margin calls -- that they were not timely being met -- from KPMG, as demonstrated by Defendant Starrett's February 25, 2008 e-mail to Defendants Goldstone and Simmons: "We have purposely not told them [KPMG auditors] about the margin calls so that we don't escalate an issue which we believe will be put to rest by the time they have to issue an opinion."   KPMG personnel have testified, and the SEC's expert has opined, that failure to timely meet margin calls should have been disclosed directly to KPMG by Defendants, and that burying it in a tie-out schedule provided to the lowest-level KPMG team member hours prior to the 10-K filing was insufficient.   When Mr. McLamb interviewed Defendants Simmons and Starrett about their failure to disclose Thornburg's failure to timely meet margin calls, Defendants Simmons and Starrett admitted that they had not done so, and did not assert that the margin call schedule disclosed the information.

SEC Disputed Starrett Facts ¶ 84, at 13.   This assertion does not dispute Starrett's asserted fact. The SEC does not assert that KPMG did not, prior to the 2007 Form 10-K filing, receive any information about the date on which margin calls were paid.   Consequently, the SEC fails to specifically controvert Starrett's asserted fact, and the Court finds it undisputed.

this fact)(alterations omitted)(internal quotation marks omitted).  See Feb. 20, 2008, Hall Memo. at 2, 6, 8.[175]

"With the exception of Ms. Reinhart and Ms. Hall, every member of the KPMG core engagement team . . . was unaware of any inaccurate information provided to, or material information withheld from, KPMG."  Goldstone Facts ¶ 356, at 81 (setting forth this fact).  See Baucom Depo. at 26:15-22, 186:25-187:8; Plummer Depo. at 80:10-81:9, 85:13-87:7; Jones Depo. at 82:9-24, 125:15-21, 186:13-187:6; Deposition of Daniel Acree at 75:15-18, 251:10-12, 262:25-265:15, filed August 9, 2013 (Doc. 204-295)("Acree Depo.").[176]   "[W]henever KPMG

_____

[175]The SEC attempts to dispute this fact by stating:

Defendants did not disclose a liquidity report to KPMG dated February 21, 2008 (factoring in the Citi margin call) that projected negative liquidity through every projected date, to and including April 8, 2008; instead, Defendants removed the Citi margin call from the February 21, 2008 liquidity report and provided KPMG with a liquidity report on February 22, 2008 showing positive projected liquidity, even though the Citi margin call was outstanding.

SEC Disputed Starrett Facts ¶ 86, at 13.  This assertion does not specifically controvert Starrett's asserted fact.  The SEC does not dispute that KPMG reviewed Thornburg Mortgage's daily liquidity reports; rather, it contends that Thornburg Mortgage did not disclose to KPMG one liquidity report.  Starrett does not, however, assert that Thornburg Mortgage disclosed to KPMG every liquidity report.  Consequently, the SEC fails to dispute this fact, and the Court concludes that it is undisputed.

[176]The SEC attempts to dispute this fact by stating:

Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- from KPMG. Defendants also purposefully withheld the Citi letter from KPMG, their awareness of the collapsing European hedge fund, and the true reason for entering into the I/O Strip Transactions, i.e. to meet margin calls they otherwise could not meet.

SEC Disputed Facts ¶ 356, at 29.  The Defendants do not assert that they did not withhold information from KPMG, and the SEC does not assert that anyone in KPMG's engagement team, other than Reinhart and Hall, were aware that Thornburg Mortgage provided inaccurate information or withheld material information.  Consequently, the Court concludes that the SEC has not disputed the fact.

requested information or documents, Thornburg readily complied with such requests." Goldstone Facts ¶ 357, at 81 (setting forth this fact).   See Hall SEC Depo. at 164:6-8, 167:1-169:18; Jones Depo. at 39:22-41:14; Acree Depo. at 211:24-215:4.[177]   "Ms. Hall had unrestricted access to the Capital Markets department and its information about the Company's margin calls and liquidity."  Goldstone Facts ¶ 358, at 81-82 (setting forth this fact).  See Hall SEC Depo. at 33:3-6, 163:17-24, 167:1-169:18; Fellers Depo. at 86:15-17; Ahn Depo. at 111:9-112:4.[178]

---

[177]The SEC attempts to dispute this fact by stating:

> Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- from KPMG. Defendants also purposefully withheld the Citi letter from KPMG, their awareness of the collapsing European hedge fund, and the true reason for entering into the I/O Strip Transactions, i.e. to meet margin calls they otherwise could not meet.  John Taylor testified that: "I would have expected that when this [Citi Reservation of Rights Letter] was received that the audit team would have immediately received a phone call and a copy of it to be aware that it existed and I would think the company would have amended their analysis of their ability to continue as a going concern in order to factor in this information and what needed to be factored in was the fact that they couldn't meet the margin call without a delay and they should have assessed the impact of that on their ability to continue to meet margin calls going forward."

SEC Disputed Facts ¶ 357, at 29 (alterations in SEC Disputed Facts but not in source)(quoting Taylor Depo. at 176:10-20).  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants do not assert that they did not withhold any information from KPMG, and the SEC does not assert that Thornburg Mortgage failed to readily comply with KPMG's information requests.  The Court thus concludes that the SEC has not disputed this fact.

[178]The SEC attempts to dispute this asserted fact by stating:

> Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- from KPMG. Defendants also purposefully withheld the Citi letter from KPMG, their awareness of the collapsing European hedge fund, and the true reason for entering into the I/O Strip Transactions, i.e. to meet margin calls they otherwise could not meet.  Defendants did not disclose a liquidity report to KPMG dated February 21, 2008 (factoring in the Citi margin call) that projected negative liquidity through every projected date, to and

22.     **KPMG's Review of Thornburg Mortgage's OTTI and Going Concern Analysis.**

"During the year-end audit, KPMG identified liquidity and Thornburg's ability to continue as a going concern as areas of current focus and further identified going concern as a high risk area of the audit (i.e., areas that required particular focus)."  Goldstone Facts ¶ 359, at 82 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Thornburg Mortgage 2007 Integrated Audit Dashboard Audit Committee Update -- February 22, 2008, at 2, filed August 9, 2013 (Doc. 204-90); March 9, 2008, Restatement Memo. at 16; Ater Decl. ¶ 8, at 2.  "The going concern judgment was governed by AU § 341, and assessed 'whether there is substantial doubt about [Thornburg's] ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited.'"  Goldstone Facts ¶ 360, at 82 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern at 2, filed August 9, 2013 (Doc. 204-277)("AU § 341").  See SEC Disputed Facts at 1-51 (not disputing this fact); AU § 341 at 2.  "KPMG assessed whether the Company had the intent and ability to hold its mortgage securities through recovery."  Goldstone Facts ¶ 361, at 82 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Thornburg Other Concern Items at 2-3; Hall Depo. at 28:19-29:24, 74:22-75:7.  "On February 18, 2008, Mr. Buniel provided KPMG with a draft of Thornburg's going concern memorandum,

---

including April 8, 2008; instead, Defendants removed the Citi margin call from the February 21, 2008 liquidity report and provided KPMG with a liquidity report the next day showing positive projected liquidity.

SEC Disputed Facts ¶ 358, at 29-30.  This assertion does not specifically dispute the Defendants' asserted fact.  The Defendants' do not assert that they did not withhold any information, and the SEC does not assert that Thornburg Mortgage restricted Hall's access to certain information.  Accordingly, the Court concludes that the SEC has not disputed this fact.

which was dated January 29, 2008.  The draft stated that Thornburg has made all margin calls to date and had recently created a daily Cash Liquidity Report."  Goldstone Facts ¶ 362, at 82 (setting forth this fact)(internal quotation marks omitted).  <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); March 8, 2008, OTTI Memo. at 5; Electronic Mail Transmission from Shawn Buniel to Jennifer L. Hall at 6-7 (dated Feb. 18, 2008), filed August 9, 2013 (Doc. 204-50).  "On February 20, 2008 at 5:08 pm MST, Mr. Buniel sent a revised draft (also dated January 29, 2008) of the going concern memorandum to Ms. Hall."  Goldstone Facts ¶ 363, at 82 (setting forth this fact).  <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); March 8, 2008, OTTI Memo. at 5; Draft Going Concern Analysis at 2.

"At one point 'in the context of reviewing the going concern analysis [and] getting a better understanding of [Thornburg's daily] liquidity reports,' Ms. Hall noted the draft going concern memorandum's reference to '[m]argin calls made or received are being met,' circled the phrase, and wrote 'should we get a list?'"  Goldstone Facts ¶ 364, at 83 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Hall Depo. at 171:14-16; Memorandum from Shawn Buniel to Clay Simmons, Jane Starrett, and File regarding Evaluation of Thornburg Mortgage, Inc., as a Going Concern at 6 (dated Jan. 29, 2008), filed August 9, 2013 (Doc. 204-52)("Jan. 29, 2008, Going Concern Memo.")).  <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); Hall Depo. at 169:4-172:15; Jan. 29, 2008, Going Concern Memo. at 6.

> In an email to Mr. McLamb on February 20, 2008 regarding Thornburg's draft going concern memorandum, Ms. Hall wrote, "The key area we are focusing on is their liquidity risk.  The potential for further declines in their securities pledged against short term debt, which would trigger margin calls, and whether their current liquidity position could meet those margin calls."

Goldstone Facts ¶ 365, at 83 (setting forth this fact)(quoting Feb. 20, 2008, Going Concern Email at 2).  <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 20, 2008, Going

Concern Email at 2.  "Ms. Reinhart reviewed Thornburg's going concern memorandum, noting that 'liquidity stress event is margin call' and that the memorandum needs to reach a conclusion 'about the ability [of Thornburg] to meet margin calls in Jan+Feb (to date) and future expectations.'"  Goldstone Facts ¶ 366, at 83 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Memorandum from Shawn Buniel to Clay Simmons, Jane Starrett, and File regarding Evaluation of Thornburg Mortgage, Inc., as a Going Concern at 2, 5 (dated Jan. 29, 2008)("Reinhart Markup of Jan. 29, 2008, Going Concern Memo.")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Reinhart Markup of Jan. 29, 2008, Going Concern Memo. at 2, 5.

> KPMG concluded during its year-end audit of Thornburg's 2007 financial statements that "the Company had the ability to hold assets until recovery and that substantial doubt as to the Company's ability to continue as a going concern for a reasonable period did not exist as of the date of our auditors' report, February 27, 2008."

Starrett Facts ¶ 50, at 11 (setting forth this fact)(quoting March 9, 2008, Restatement Workpaper at 3).  See March 9, 2008, Restatement Memo. at 4; March 9, 2008, Restatement Workpaper at 2-3.[179]  "KPMG considered Thornburg's near term capital-raising prospects in its OTTI

---

[179]The SEC attempts to dispute this fact by stating:

> KPMG did not reach a going concern conclusion, it opined as to the reasonableness of Thornburg's conclusion based upon the incomplete information Thornburg management had provided.  KPMG's opinion resulted from the fact that Defendants did not provide KPMG with information related to Thornburg's inability to pay margin calls on time between February 14-27, 2008, did not advise KPMG that Thornburg had stopped funding loans during this period, did not provide KPMG with a copy of the Citi Reservation of Rights letter, misrepresented the purpose for entering into the I/O Strip Transactions and that the RMBS securities market had bottomed out, and withheld their knowledge that a European hedge fund was collapsing and they expected further margin calls.  KPMG representatives testified that they would have wanted this information and it would have impacted KPMG's conclusions as to Thornburg's going concern analysis.  Defendant Starrett wrote at the time that Defendants purposely withheld

analysis and reached a conclusion that the Company had the ability to hold its assets until

recovery."  Starrett Facts ¶ 54, at 12 (setting forth this fact)(internal quotation marks omitted).

See March 9, 2008, Restatement Memo. at 12-13.[180]   KPMG initially reached the conclusion that

---

key information about Thornburg's inability to timely pay margin calls from KPMG. Thornburg's 2007 Form 10-K did not accurately disclose OTTI and going concern issues, and did not highlight its faulty analysis of those issues or its withholding of information from KPMG in the footnotes to its financial statements.  After KPMG learned some of this information, Thornburg restated its financials and KPMG came to a different conclusion.

SEC Disputed Starrett Facts ¶ 50, at 8.  This assertion does not specifically controvert Starrett's asserted fact.  The SEC does not cite any evidence supporting its assertion that KPMG merely opined on the reasonableness of Thornburg Mortgage's conclusions and did not reach its own conclusion.  Furthermore, Starrett does not assert that, if KPMG had been fully aware of all the withheld information, it would have reached the same conclusion.  Accordingly, the SEC does not dispute this fact, and the Court concludes that it is undisputed.

[180]The SEC attempts to dispute this fact by stating:

KPMG did not reach a going concern conclusion, it opined as to the reasonableness of Thornburg's conclusion based upon the incomplete information Thornburg management had provided. KPMG's opinion resulted from the fact that Defendants did not provide KPMG with information related to Thornburg's inability to pay margin calls on time between February 14-27, 2008, did not advise KPMG that Thornburg had stopped funding loans during this period, did not provide KPMG with a copy of the Citi Reservation of Rights letter, misrepresented the purpose for entering into the I/O Strip Transactions and that the RMBS securities market had bottomed out, and withheld their knowledge that a European hedge fund was collapsing and they expected further margin calls.  KPMG representatives testified that they would have wanted this information and it would have impacted KPMG's conclusions as to Thornburg's going concern analysis.  Defendant Starrett wrote at the time that Defendants purposely withheld key information about Thornburg's inability to timely pay margin calls from KPMG.  Thornburg's 2007 Form 10-K did not accurately disclose OTTI and going concern issues, and did not highlight its faulty analysis of those issues or its withholding of information from KPMG in the footnotes to its financial statements. After KPMG learned some of this information, Thornburg restated its financials and KPMG came to a different conclusion.

SEC Disputed Starrett Facts ¶ 54, at 8-9.  The SEC does not cite any evidence supporting its assertion that KPMG did not reach a going concern conclusion, and Starrett does not assert that KPMG's conclusion was based on all available information.  The SEC merely asserts a fact that

Thornburg Mortgage had the intent and ability to hold its securities through recovery.  See

Goldstone Facts ¶ 367, at 83 (setting forth this fact); Memorandum from John R. Taylor, KPMG

Reviewing Partner, to Clyde Womack, KPMG SEC Reviewing Partner, at 2 (dated Feb. 27,

2008), filed August 9, 2013 (Doc. 204-121); Womack Depo. at 54:17-25, 63:3-13; Taylor Depo.

at 91:18-23, 156:5-10; Hall Depo. at 28:19-29:24.[181]  "[I]n evaluating OTTI ultimately the

---

is unfavorable to the Defendants without disputing Starrett's asserted fact.  Accordingly, the Court concludes that the SEC has not disputed the fact.

[181]The Defendants' asserted fact states: "KPMG reached the conclusion that that [sic] Company did have the intent and ability to hold its securities through recovery."  Goldstone Facts ¶ 367, at 83.  The SEC attempts to dispute this fact by stating:

> The intent and ability to hold conclusion is reached by Thornburg management and its board of directors, KPMG merely opines on the reasonableness of that conclusion.  Moreover, KPMG's opinion was based on incomplete information about margin calls -- information that Defendants purposely withheld.  After KPMG learned of that information KPMG reversed its opinion on the reasonableness of Thornburg's determination and Thornburg issued its Restatement including the conclusion that Thornburg did not have the intent and ability to hold its securities through recovery.

SEC Disputed Facts ¶ 367, at 83.  The SEC does not, however, cite any evidence stating that Thornburg Mortgage's management makes the ability-to-hold conclusion and that KPMG merely opines whether that conclusion is reasonable.  As for the second part of the SEC's attempted dispute, the Defendants do not assert that, if KPMG knew about the untimely margin calls and reservation-of-rights letter, KPMG would have concluded that Thornburg Mortgage had the intent and ability to hold its securities through recovery.  Accordingly, the SEC's assertion does not dispute the Defendants' asserted fact.  After Thornburg Mortgage filed the 2007 Form 10-K, however, it amended its Form 10-K to state that it did not have the intent and ability to hold its securities through recovery.  See Thornburg Mortgage Inc., Form 10-K/A at 5, filed November 6, 2013 (Doc. 231-63).  At that time, KPMG opined that Thornburg Mortgage did not have the intent and ability to hold its assets through recovery.  The Court has thus modified the Defendants' asserted fact to more accurately reflect the evidence.

The Defendants assert the following fact: "After Ms. Hall received Mr. Buniel's draft going concern memorandum on February 20, 2008, there is no evidence in the record of additional correspondence or other communications between KPMG and Thornburg concerning the memorandum."  Goldstone Facts ¶ 368, at 83.  The SEC disputes this fact by stating:

> There is evidence in the record of additional correspondence or other communications between KPMG and Thornburg concerning the going concern

---

- 205 -

judgment they're [--] the auditors [--] making is management's assertion about their intent and ability to hold securities." SEC Facts ¶ GG, at 5 (setting forth this fact)(alterations omitted)(internal quotation marks omitted). See Defendants Disputed Facts ¶ GG, at 15 (not disputing this fact); Taylor Depo. at 241:8-243:23.

---

  memorandum. For instance, the management representation letter signed by Defendants on February 27, 2008 represented: "The consolidated financial statements disclose all of the matters of which we are aware that are relevant to the entity's ability to continue as a going concern, including significant conditions and events, and our plans."

SEC Disputed Facts ¶ 368, at 30 (setting forth this fact)(quoting Letter from Larry Goldstone to KPMG ¶ 31, at 5 (dated Feb. 27, 2008), filed November 6, 2013 (Doc. 231-62)("Feb. 27, 2008, Thornburg Representation Letter")). To dispute this fact, the SEC cites the Feb. 27, 2008, Thornburg Representation Letter, where Goldstone confirms a number of representations that Thornburg made to KPMG, including "[t]he consolidated financial statements disclos[ing] all of the matters of which [Thornburg is] aware that are relevant to the entity's ability to continue as a going concern, including significant conditions and events, and [its] plans." Feb. 27, 2008, Thornburg Representation Letter ¶ 31, at 5.

  The Defendants reply by stating:

  The SEC does not cite evidence that supports its assertion that "[t]here is evidence in the record of additional correspondence or other communications between KPMG and Thornburg concerning the going concern memorandum." The management representation letter, the only cited evidence for this proposition, does not contain representations concerning the going concern memorandum.

Goldstone Reply Facts ¶ 368, at 164.

  The Feb. 27, 2008, Thornburg Representation Letter is a communication between Thornburg and KPMG. It concerns Thornburg's going concern analysis. The only question is whether the Buniel memorandum is considered to be a consolidated financial statement as the Feb. 27, 2008, Thornburg Representation Letter uses the term. Because the memorandum could be considered a consolidated financial statement, the Court finds that there is a genuine dispute concerning whether, after February 20, 2008, Thornburg and KPMG communicated about the going-concern memorandum. Consequently, the Court concludes that the fact is disputed.

23.    **KPMG's Analysis Whether Thornburg Mortgage Was a Going Concern.**

In February 2008, KPMG performed its own analysis of whether Thornburg could continue as a going concern. In this analysis, KPMG referenced the margin calls that Thornburg received in August 2007 and expressly considered whether Thornburg could survive a situation of high margin calls similar to August 2007. KPMG's memorandum, written by Ms. Hall, also expressly referenced the around $250 million in margin calls that Thornburg had received in February 2008 the week before KPMG's memorandum was drafted and noted that the Company continues to face liquidity challenges.

Goldstone Facts ¶ 369, at 83-84 (setting forth this fact)(internal quotation marks omitted). <u>See</u>

Feb. 20, 2008, Hall Memo. at 2-4, 6; Feb. 26, 2008, Hall Email at 3; McLamb Depo. at

161:18-169:5.[182]   "In a workpaper, entitled 'Completion Document -- Integrated,' the February

margin calls are described as significant."   Goldstone Facts ¶ 370, at 84 (setting forth this

fact)(internal quotation marks omitted).  <u>See</u> SEC Disputed Facts at 1-51 (not disputing this

fact); Thornburg Mortgage, Inc. Completion Document -- Integrated at 5, filed August 9, 2013

(Doc. 204-137)("Completion Doc.").  "The going concern workpaper was initially prepared by

KPMG on February 20, 2008 and updated with the most current information through the audit

opinion date on February 27, 2008."  Starrett Facts ¶ 63, at 13 (setting forth this fact)(internal

quotation marks omitted).  <u>See</u> SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Feb.

20, 2008, Hall Memo. at 2; Thornburg Going Concern from Jennifer Hall, KPMG Engagement

Senior Manager, to Thornburg Mortgage, Inc. Audit File -- Subsequent Changes at 2-9, filed

August 31, 2013 (Doc. 207-19).  "The 'Completion Document' workpaper states that Thornburg

---

[182]The SEC attempts to dispute this fact by stating: "As with intent and ability to hold, Thornburg management and its board of directors are responsible for the going concern conclusion, KPMG merely opines on the reasonableness of that conclusion."  SEC Disputed Facts ¶ 369, at 30.  The SEC does not, however, cite evidence that supports its assertion.  In attempting to dispute this fact, the SEC cites Kitchens' report.  Kitchens opines that a company's management, and not its auditor, is responsible for its financial statements.  <u>See</u> Kitchens Reports at 25-26.  This evidence does not specifically controvert the Defendants' asserted fact that KPMG conducted its own going concern analysis.  Consequently, the Court concludes that the fact is undisputed.

had reduced its exposure to commercial paper 'from $8 billion . . . to $400 million' and reduced '[r]epo debt . . . from $33 billion to . . . $11.5 billion' to reduce the risk of margin calls like those received in August 2007."  Goldstone Facts ¶ 371, at 84 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Completion Doc. at 5).  See SEC Disputed Facts at 1-51 (not disputing this fact); Completion Doc. at 5.  "KPMG incorporated into its 'Completion Document' information from the disclosures about the decline in securities valuation, margin call activity, and liquidity constraints."  Starrett Facts ¶ 15, at 4 (setting forth this fact).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Electronic Mail Transmission from John R. Taylor to Jennifer L. Hall at 2 (dated Feb. 28, 2008), filed August 31, 2013 (Doc. 207-8); Electronic Mail Transmission from Jennifer L. Hall to Cynthia Reinhart at 2 (dated Feb. 28, 2008), filed August 31, 2008 (Doc. 207-9); Completion Document Integrated at 2-3, filed August 31, 2013 (Doc. 207-10).

"In its going concern memorandum, KPMG identified 'liquidity' as '[t]he significant risk for the Company, in relation to going concern.'  Specifically, KPMG noted Thornburg's 'relatively tight' cash balance around February 22, 2008."  Goldstone Facts ¶ 372, at 84 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Feb. 20, 2008, Hall Memo. at 3, 6).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 20, 2008, Hall Memo. at 3, 6.

> Mr. McLamb directed Ms. Hall on February 20, 2008 to ensure that KPMG's going concern analysis detailed the "'stress' testing . . . performed on [management's] projections."  Ms. Hall forwarded Mr. McLamb's response to Ms. Reinhart and two other KPMG partners with an explanation as to how she had addressed his comment: "I added a 'stress test' section . . . to lay out 3 scenarios: probable, worst case, and complete devastation."  This "complete devastation" scenario corresponded to the "severely extreme" scenario in KPMG's analysis.

Goldstone Facts ¶ 373, at 84 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Feb. 20, 2008, Going Concern Email at 2; Electronic Mail Transmission from Jennifer Hall to John R. Taylor, Clyde E. Womack, and Cynthia C. Reinhart at 2 (dated Feb. 22, 2008), filed August 9, 2013 (Doc. 204-94)("Feb. 28, 2008, Hall Email")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 20, 2008, Going Concern Email at 2; Feb. 28, 2008, Hall Email at 2.

> The probable scenario discussed in KPMG's going concern analysis considered a situation where securities values declined, but Thornburg would have more than adequate assets to repay the current level of short term debt.  The memo noted that after a 5-10% decline in security values in January and February 2008 triggered additional margin calls, which Thornburg met primarily by raising capital, Thornburg maintained overcollateralization.

Goldstone Facts ¶ 374, at 84-85 (setting forth this fact)(internal quotation marks omitted).  See SEC Facts at 1-51 (not disputing this fact); Feb. 20, 2008, Hall Memo. at 6-7.  "The worst case scenario assumed that Thornburg would be forced to sell or liquidate assets to satisfy lenders and would have to realize the balance of the unrealized loss on securities of approximately $414 million as of 12/31/07."  Goldstone Facts ¶ 375, at 85 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 20, 2008, Hall Memo. at 7.

> The "severely extreme scenario" assumed that Thornburg "would be forced to sell or liquidate assets to satisfy lenders at zero net cash inflow,' be unable to originate loans, and be required to cut back its 'operating structure . . . to a core group of individuals that could keep track of the flow of funds to keep the Company alive."

Goldstone Facts ¶ 376, at 85 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Feb. 20, 2008, Hall Memo. at 7).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 20, 2008, Hall Memo. at 7-8.

"As part of its going concern analysis, KPMG reviewed the daily cash settlements with

rev repo and CP counterparties noting that Thornburg has met all margin calls required by

lenders subsequent to August 2007."   Goldstone Facts ¶ 377, at 85 (setting forth this

fact)(internal quotation marks omitted).  See Feb. 20, 2008, Hall Memo. at 6.[183]

> In February 2008, KPMG received and reviewed daily cash liquidity reports
> generated by Thornburg that showed the company's cash position at the end of
> each day.  KPMG also reviewed daily cash reports from February 28, 20[0]8
> through February 22, 2008, which showed, among other things:
>
>> management's projected estimated principal and interest payments
>> on assets;
>>
>> repo factor adjustments due (debt repayment);
>>
>> haircut increases and decreases;
>>
>> collateralized mortgage debt, including I/O strips;
>>
>> swap settlements;
>>
>> whole loan fundings; and
>>
>> warehouse line borrowings.
>
> The reports also included expected proceeds from the dividend reinvestment
> program ("equity raises"), whole-loan securitizations, and moving securitized
> ARM loan securities from repo financing to permanent collateralized mortgage
> debt.

Goldstone Facts ¶ 378, at 85-86 (setting forth this fact)(internal quotation marks omitted).  See

Feb. 20, 2008, Hall Memo. at 8; Liquidity Risk Reports at 2-3; Jan. 29, 2008, Draft Going

---

[183]The SEC attempts to dispute this fact by stating: "Thornburg management and its board of directors are responsible for the going concern conclusion, KPMG merely opines on the reasonableness of that conclusion."  SEC Disputed Facts ¶ 377, at 30.  The Defendants have not asserted that they are not responsible for Thornburg's going concern conclusion.  The SEC, accordingly, does not address, much less specifically controvert, the Defendants' asserted fact.  The Court thus concludes that the SEC has not disputed the fact.

Concern Analysis at 19; Ahn Depo. at 111:21-112:4; Hall Depo. at 99:6-100:17; Reinhart Depo. at 96:9-97:3.[184]

"KPMG did not audit the cash liquidity reports provided by Thornburg."  Starrett Facts ¶ 75, at 15 (setting forth this fact).  See Feb. 20, 2008, Hall Memo. at 3, 6.[185]  "KPMG knew that Thornburg's cash balances were fairly low such that there was a need to do a deeper dive into the

---

[184]The SEC attempts to dispute this fact by stating:

Defendants did not disclose a liquidity report to KPMG dated February 21, 2008 (factoring in the Citi margin call) that projected negative liquidity through every projected date, to and including April 8, 2008; instead, Defendants removed the Citi margin call from the February 21, 2008 liquidity report and provided KPMG with a liquidity report on February 22, 2008 showing positive projected liquidity, even though the Citi margin call was outstanding.

SEC Disputed Facts ¶ 378, at 31.  This assertion does not dispute the Defendants' asserted fact. The Defendants do not assert that they disclosed to KPMG the Citi margin call.  Instead of disputing the Defendants' asserted fact, the SEC asserts an additional fact that does not specifically controvert the Defendants' asserted facts.  Accordingly, the Court finds the fact undisputed.

[185]The SEC attempts to dispute this fact by stating:

KPMG reviewed the liquidity reports provided by KPMG.  Further, Defendants did not disclose a liquidity report to KPMG dated February 21, 2008 (factoring in the Citi margin call) that projected negative liquidity through every projected date, to and including April 8, 2008; instead, Defendants removed the Citi margin call from the February 21, 2008 liquidity report and provided KPMG with a liquidity report on February 22, 2008 showing positive projected liquidity, even though the Citi margin call was outstanding.

SEC Disputed Starrett Facts ¶ 75, at 12.  This assertion does not dispute Starrett's asserted fact. First, Starrett does not assert that Thornburg disclosed the February 21, 2008, liquidity report containing the outstanding Citi margin call.  Second, that KPMG reviewed the liquidity reports does not mean it audited them.  The Black's Law Dictionary defines "audit" as a "formal examination of an individual's or organization's accounting records, financial situation, or compliance with some other set of standards."  Black's Law Dictionary 150 (9th ed. 2009).  An audit is more stringent than a mere review.  By reviewing the liquidity reports, KPMG did not necessarily audit them.  Accordingly, the SEC fails to dispute this fact, and the Court concludes that it is undisputed.

45-day cash reports."  Starrett Facts ¶ 76, at 15 (setting forth this fact)(internal quotation marks

omitted).  See Reinhart SEC Depo. at 71:6-18.[186]  "[T]hese daily cash settlements would have

included the dates of margin call payments."  Starrett Facts ¶ 65, at 14 (setting forth this

fact)(internal quotation marks omitted).  See Taylor Depo. at 195:3-196:19.[187]  "In describing

discussions with Thornburg management, KPMG's going concern memorandum only references

Mr. Fellers by name, and does not identify any other members of management."  Goldstone

Facts ¶ 379, at 86 (setting forth this fact)(internal quotation marks omitted).  See Feb. 20, 2008,

Hall Memo. at 7.[188]  "Mr. Fellers . . . believed the opinions of Thornburg management described

in KPMG's going concern memorandum were reasonable based on what was then known."

---

[186]The SEC does not dispute this fact, but states:  "Undisputed, but noted that Ms. Reinhart also testified that 'We looked at the 45-day report that I previously mentioned and considered the timing of activity collections and disbursements there.'"  SEC Disputed Starrett Facts ¶ 76, at 12.  Because the SEC does not dispute this fact, the Court concludes that it is undisputed.

[187]The SEC attempts to dispute this fact by stating: "Mr. Taylor testified that he would think the dates would be included.  He did not know."  SEC Disputed Starrett Facts ¶ 65, at 11.  This assertion is based on mere semantics that do not dispute Starrett's asserted fact.  While Taylor did not testify that he was absolutely certain that the dates would be included in the daily cash settlements, Starrett's asserted fact does not stand for absolute certainty either.  Starrett asserts that the daily cash settlements would have included the dates and not that they did include the dates.  Apparently the SEC would require a deponent to testify in absolute, unequivocal terms, perhaps by making such statements as "I am absolutely certain" or "there is no doubt in mind that."  Because deponents, and people in general, do not talk that way, the SEC's desire will likely never come to fruition, and it will continue to object to any factual assertion based on deposition testimony that is couched in everyday qualifiers, such as "I think," "I believe," "probably," et cetera.  The Court will not, however, require an unequivocal qualifier and will not give weight to an argument based on such semantics.  Accordingly, the Court finds the fact undisputed.

[188]The SEC attempts to dispute this fact by stating: "Defendants were part of Thornburg management and were responsible for the going concern analysis."  SEC Disputed Facts ¶ 379, at 31.  The Defendants do not assert that they were not part of Thornburg's management or that they were not responsible for Thornburg's going concern analysis.  Consequently, the SEC does not dispute the Defendants' asserted fact.

Goldstone Facts ¶ 380, at 86 (setting forth this fact).  See Fellers Depo. at 124:16-18; id. at 126:2-5; id. at 127:3-5.[189]

---

[189]The SEC attempts to dispute this fact by stating:

> The going concern analysis was false due to misrepresentations regarding the availability of short-term financing, the ability of Thornburg to timely meet margin calls, availability of warehouse lines of credit, maintenance of covenant requirements, likelihood of decrease of collateral value, and Thornburg's ability and intent to hold its Purchased ARM Assets until recovery.

SEC Disputed Facts ¶ 380, at 31.  The Defendants do not assert that the going-concern analysis did not have misrepresentations, but only that Fellers believed that Thornburg's management's opinions were reasonable.  The SEC thus does not dispute the Defendants' asserted fact, and the Court concludes that it is undisputed.

The Defendants assert the following fact:

> Mr. Simmons could not recall expressing the opinions ascribed to management in KPMG's going concern memo, but he testified that those opinions were consistent with his views at the time, which were "optimistic."  As he explained:
>
> > "We felt that . . . the market recognized, had fully . . . baked in . . . the irrational pricing in the market and our margin calls.  We paid them and we were done.  And that going forward, . . . the fundamental market forces of lower interest rates, good credit performance, . . . triple-A rated . . . super senior class structure would . . . ultimately provide more profitable results for the company."

Goldstone Facts ¶ 381, at 86 (alterations in Goldstone Facts but not in source)(quoting Simmons Depo. Vol. II at 362:15-22).  The SEC disputes this fact by stating:

> Defendant Simmons's claimed views Thornburg's going concern analysis are implausible because Thornburg's going concern analysis did not account for Thornburg's failure to timely meet margin calls, the resulting ability of counterparties to declare Thornburg in default and liquidate its assets, and Thornburg's insufficient liquidity to meet future margin calls, among other issues.

SEC Disputed Facts ¶ 381, at 31.  To dispute this fact, the SEC cites Kitchens' report, where he opines that Thornburg's going concern analysis contained a number of misrepresentations.  See Kitchens Report at 72-82.  The Defendants reply by stating:

In its going concern memorandum, KPMG concluded that even under KPMG's "severely extreme scenario," the Company was a going concern and "has shown that it can survive a tramatic [sic] event of selling a significant portion of its assets to satisfy its short term lenders . . . ."  KPMG's going concern analysis also noted the Company's ability to refinance its short term reverse repurchase agreements, and the Company's satisfaction of margin calls up through the time of the filing.  The memorandum concluded that "a material uncertainty does not exist related to events or conditions that alone or in aggregate, may cast significant doubt on the Company's ability to continue as a going concern for a reasonable period of time and beyond."

Goldstone Facts ¶ 382, at 86 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(quoting Feb. 20, 2008, Hall Memo. at 4, 7-8).  See Feb. 20, 2008, Hall Memo. at 4, 7-8;

Womack Depo. at 184:11-186:17.[190]

The SEC cannot raise a genuine dispute by general and unsupported attacks on the credibility of Defendants' sworn, uncontroverted testimony about their subjective understandings, views, or beliefs.

Mr. Simmons' subjective belief is not contradicted by the SEC's assertion that the going concern memorandum "did not account" for purported facts. Nor do the purported facts themselves regarding Thornburg's liquidity position and the payment plans Thornburg entered into with its repo counterparties prior to the Form 10-K filing contradict Mr. Simmons' belief that the market was done marking down Thornburg's assets and that the underlying credit performance of the assets would be recognized by the market.

The SEC's response regarding the alleged omissions from Thornburg's going concern analysis should be excluded as a matter of law and is not supported by competent evidence.

Goldstone Reply Facts ¶ 381, at 171 (citations omitted).  The Court concludes that this fact is disputed.  The SEC has introduced evidence showing that Thornburg Mortgage's going-concern analysis contained misrepresentations.  These misrepresentations undermine the Defendants' assertion that Simmons was optimistic at the time.  Accordingly, the SEC has specifically controverted the Defendants' asserted fact, and the Court concludes that it is disputed.

[190]The SEC attempts to dispute this fact by stating: "KPMG did not reach a going concern conclusion, it opined as to the reasonableness of Thornburg's conclusion based upon the incomplete information Thornburg management had provided."  SEC Disputed Facts ¶ 382, at 31.  The SEC's cited evidence does not show that KPMG did not reach a going concern conclusion.  The SEC has thus failed to specifically dispute the Defendants' asserted fact, and the Court concludes that it is undisputed.

Mr. McLamb reviewed the KPMG going concern memorandum before it was finalized.  In his workup, he asked, in connection with the issue of whether Thornburg had sufficient liquidity to survive another wave of margin calls similar to August 2007:

> "where do we answer this question[?]";

> what would happen if Thornburg had "another $250 million in margin calls[?]";

> "how much can [Thornburg's asset values] decline before [Thornburg] runs out of cash[?]"; and,

> what would happen "if [Thornburg] cannot raise more capital?"

Goldstone Facts ¶ 383, at 87 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Feb. 26, 2008, Hall Email at 3, 6, 10, 13).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 26, 2008, Hall Email at 3, 6, 10, 13.  "The engagement team identified margin calls as posing a significant risk for Thornburg."  Starrett Facts ¶ 77, at 15 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Feb. 20, 2008, Hall Memo. at 3; Memorandum from Shawn Buniel to Clay Simmons and Jane Starrett at 2, filed August 9, 2014 (Doc. 204-51).

"Mr. McLamb testified that he raised questions in the draft going concern memorandum in order to understand the risks and the engagement team's process in analyzing whether Thornburg could continue as a going concern.  He ultimately concurred with the memorandum's going concern conclusion under all scenarios described."  Goldstone Facts ¶ 384, at 87 (setting forth this fact).  See McLamb Depo. at 164:21-165:17; id. at 194:5-195:7; id. at 200:18-201:10; id. at 214:9-215:6.[191]  "KPMG concurring review partner Mr. Womack concurred with the

---

[191]The SEC attempts to dispute this fact by stating:

KPMG did not reach a going concern conclusion, it opined as to the reasonableness of Thornburg's conclusion based upon the incomplete information

memorandum's going concern conclusion." Goldstone Facts ¶ 385, at 87 (setting forth this fact). See Womack Depo. at 41:10-25; 171:6-172:24.[192] "KPMG in-depth review partner Mr. Taylor was also consulted on the going concern analysis and was able to provide insights from his work on the Countrywide audit. Mr. Taylor concurred with the conclusion that Thornburg could continue as a going concern." Goldstone Facts ¶ 386, at 87 (setting forth this fact). See Feb. 20, 2008, Hall Memo. at 9-10; Taylor Depo. at 205:25-207:3.[193] "Based on KPMG's own analysis

---

Thornburg management had provided. Further, Mr. McLamb testified that he would have liked to have key information related to the Citi letter Reservation of Rights, Defendants' advance knowledge of the European hedge fund collapse, and Thornburg's inability to meet margin calls, all of which Defendants withheld from KMPG [sic], as the information would have impacted the going concern analysis.

SEC Disputed Facts ¶ 384, at 31-32. The Defendants do not assert that KPMG had all available information. Additionally, the SEC does not present evidence supporting its assertion that KPMG did not reach its own going concern conclusion. Accordingly, the Court concludes that the SEC has not disputed this fact.

[192]The SEC attempts to dispute this fact by stating:

KPMG did not reach a going concern conclusion, it opined as to the reasonableness of Thornburg's conclusion based upon the incomplete information Thornburg management had provided. Further, Mr. Womack testified that key information related to Thornburg's inability to timely meet margin calls, including the Citi Reservation of Rights letter, and the impending collapse of a European hedge fund, all of which Defendants withheld from KMPG [sic] but should have provided, would have been important to know during the audit, as the information would have impacted the going concern analysis.

SEC Disputed Facts ¶ 385, at 32. The Defendants do not assert that the Citi letter, the European hedge-fund collapse, or Thornburg Mortgage's inability to timely meet its margin calls would not have impacted its going concern analysis, but only that Womack concurred with the memorandum's going concern analysis. Additionally, the SEC does not present any evidence to support the assertion that KPMG did not reach a going concern conclusion. Consequently, the SEC has not specifically controverted the Defendants' asserted fact, and the Court concludes that it is undisputed.

[193]The SEC attempts to dispute this fact by stating:

and the draft memorandum provided by Thornburg, KPMG concluded that '[Thornburg's] conclusion that there is not substantial doubt that the entity can continue as a going concern [was] reasonable.'"  Goldstone Facts ¶ 387, at 87 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Completion Doc. at 5).  See Completion Doc. at 5; Feb. 20, 2008, Hall Memo. at 2.[194]

> At the same time that KPMG's going concern memorandum concluded that there was not significant doubt that Thornburg could continue as a going concern for the foreseeable future, it also recognized the risk that "future margin calls" may be "trigger[ed]" in the event of "continued market declines in mortgage backed securities pledged against CP and rev repo debt."  The memorandum noted that this type of "future event is difficult, if not impossible, to predict."

---

KPMG did not reach a going concern conclusion, it opined as to the reasonableness of Thornburg's conclusion based upon the incomplete information Thornburg management had provided.  Further, Mr. Taylor testified that key information related to Thornburg's knowledge of Thornburg's inability to timely meet margin calls and the impending collapse of a European hedge fund, which Defendants withheld from KMPG [sic] but should have provided, possibly would have impacted the going concern analysis.

SEC Disputed Facts ¶ 386, at 32.  The Defendants do not assert that they disclosed to Taylor information about Thornburg Mortgage's ability to timely meet margin calls or about the European hedge-fund collapse, nor do the Defendants assert that this information would not have impacted the going concern analysis.  Additionally, the SEC has not presented evidence supporting the assertion that KPMG did not reach a going concern analysis.  The Court thus concludes that the SEC has not disputed this fact.

[194]The SEC attempts to dispute this fact by stating: "KPMG's going concern opinion was based on incomplete information about margin calls -- information that Defendants purposely withheld.  After KPMG learned of that information, KPMG reversed its opinion on the reasonableness of Thornburg's determination and Thornburg issued its Restatement and included a going concern disclosure."  SEC Disputed Facts ¶ 387, at 32.  The Defendants do not assert that KPMG based its going-concern opinion on complete information, and the Defendants do not assert that KPMG never withdrew its opinion.  The SEC does not dispute the Defendants' asserted fact, but, instead, asserts an additional fact.  Accordingly, the Court concludes that the SEC has not disputed it.

Goldstone Facts ¶ 388, at 88 (setting forth this fact)(alterations in Goldstone Facts but not in original)(quoting Feb. 20, 2008, Hall Memo. at 8).  See Feb. 20, 2008, Hall Memo. at 8.[195] "During the year-end audit, KPMG considered whether Thornburg's purchased ARM Assets were other-than-temporarily impaired at the balance sheet date of December 31, 2007.  As part of this analysis, KPMG reviewed Thornburg's determination that it had the intent and ability to hold impaired assets through recovery and agreed with it."  Goldstone Facts ¶ 389, at 88 (setting forth this fact).  See Hall Depo. at 29:3-30:20.[196]

> After reviewing Thornburg's "subsequent event" footnote disclosures prior to the filing of the Form 10-K, KPMG partner John Taylor wrote in an e-mail to Mr. Womack, Ms. Reinhart, and Ms. Hall that "margin calls and recent liquidity squeeze [were] considered in the going concern analysis," and noted that "disclosure [of February market events] is adequate" and "[t]he drop in value in February [did] not seem to call into question the 12-31-2007 valuation on these assets."

Goldstone Facts ¶ 390, at 88 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Electronic Mail Transmission from John R. Taylor to Clyde E. Womack at 2

---

[195]The SEC attempts to dispute this fact by stating: "KPMG did not reach a going concern conclusion, it opined as to the reasonableness of Thornburg's conclusion based upon the incomplete information Thornburg management had provided."  SEC Dispute Facts ¶ 388, at 33. The SEC's cited evidence does not support the assertion that KPMG did not reach a going-concern conclusion.  The SEC has thus not specifically controverted this fact, and the Court concludes that the SEC has not disputed it.

[196]The SEC attempts to dispute this fact by stating:

KPMG's analysis was based on incomplete information about margin calls -- information that Defendants purposely withheld.  After KPMG learned of that information, KPMG reversed its opinion on the reasonableness of Thornburg's determination and Thornburg issued its Restatement concluding that Thornburg did not have the intent and ability to hold its securities through recovery.

SEC Disputed Facts ¶ 389, at 33.  The Defendants do not assert that KPMG based its analysis on complete information or that KPMG did not reverse its opinion.  Consequently, the SEC does not dispute the Defendants' asserted fact, and the Court concludes that it is undisputed.

(dated Feb. 28, 2008), filed August 9, 2013 (Doc. 204-146)("Feb. 28, 2008, Taylor Email")).[197]

See Feb. 28, 2008, Taylor Email at 2.

> [T]he mid-February 2008 market events were Type II subsequent events, [meaning] that "these events occurred in the last 15 days of February 2008 because of disruption in the Alt-A market and were viewed as a market condition that occurred in February, not something that was indicative of matters that existed at the balance sheet date of December 31, 2007."

Goldstone Facts ¶ 391, at 88 (setting forth this fact)(alterations omitted)(quoting Taylor Depo. at 173:18-174:1). See Taylor Depo. at 173:16-174:1.[198]  "[I]n reviewing Thornburg's and KPMG's going concern memos, 'it was never brought to [McLamb's] attention that the company did not have sufficient assets to meet its margin calls on a timely basis.'"  SEC Disputed Facts ¶ O, at 3 (setting forth this fact)(quoting McLamb Depo. at 135:23-136:2).  See McLamb Depo. at 135:14-136:2.[199]

---

[197]The SEC attempts to dispute this fact by stating: "Mr. Taylor's statements were based on incomplete information about margin calls -- information that Defendants purposely withheld."  SEC Disputed Facts ¶ 390, at 33.  Because the Defendants do not assert that Taylor had complete information about the margin calls, the SEC does not dispute the Defendants' asserted fact.  Consequently, the Court concludes that the fact is undisputed.

[198]The SEC attempts to dispute this fact by stating: "Mr. Taylor's statements were based on incomplete information about margin calls -- information that Defendants purposely withheld."  SEC Disputed Facts ¶ 391, at 33.  The Defendants do not assert that Taylor had complete information.  The SEC has not specifically controverted the Defendants' asserted fact, and the Court concludes that it is undisputed.

[199]The Defendants attempt to dispute this fact by stating:

Disputed.  Mr. McLamb's testimony lacks foundation insofar as there is no evidence that Mr. McLamb's review of Thornburg's and KPMG's going concern memos occurred after the receipt of margin calls that were paid over several days. Fed. R. Evid. 602.

Moreover, the fact is immaterial because the undisputed evidence is that KPMG was provided with information regarding Thornburg's delayed payment of margin calls, and Defendants had no duty under Rule 13b2-2 to bring that information to

"If [McLamb] had known that they were not meeting margin calls on a timely basis and had -- at the time of the filing of the 10-K, and they had already stopped originating loans, so they had already made changes to their core business, [he] would have certainly asked a lot more questions and would have probably reached a different conclusion on going conern [sic]."

SEC Facts ¶ P, at 3-4 (setting forth this fact)(alterations omitted)(quoting McLamb Depo. at 14-21).  See McLamb Depo. at 222:9-21.[200]  "[There is a reasonably good chance that] the Citi call in fact would have changed [Taylor's] conclusion about the reasonableness of the team's

---

Mr. McLamb's attention.  The fact is also immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶ C.

Defendants Disputed Facts ¶ O, at 8-9 (citations omitted).  The SEC does not assert that McLamb's review of the going concern memos occurred after Thornburg Mortgage received margin calls that it could not timely pay.  The Defendants thus fail to dispute the SEC's asserted fact.  Additionally, materiality will be addressed, if necessary, in the Analysis and not in the Factual Background section.  Consequently, the Court concludes that the Defendants have not disputed the fact.

[200]The Defendants attempt to dispute this fact by stating:

Disputed.  The evidence lacks foundation and is speculative as there is no evidence that Thornburg "stopped originating loans" or "had already made changes to their core business."  Fed. R. Evid. 602.

Further, the fact is immaterial because the undisputed evidence is that KPMG was provided information with respect to Thornburg's delayed payment of margin calls, and the undisputed evidence establishes that Thornburg had not "stopped originating loans."  Mr. McLamb's testimony is also immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶¶ C, MM.

Mr. McLamb's hindsight testimony that he "would have certainly asked a lot more questions and would have probably reached a different conclusion" is immaterial because it is not a basis of liability under Rule 13b2-2.

Defendants Disputed Facts ¶ P, at 9 (citations omitted).  This assertion does not dispute the SEC's asserted fact.  The SEC asserts that McLamb would have asked more questions and probably would have reached a different conclusion, if he had known that Thornburg Mortgage was not timely meeting its margin calls and had stopped originating loans.  The SEC does not, however, assert that Thornburg Mortgage stopped originating loans, but only that McLamb would have wanted to know if it did.  Moreover, asserting that a fact is immaterial does not dispute it.  The Court thus concludes that the Defendants have not disputed this fact.

OTTI and going concern judgments."  SEC Facts ¶ FF, at 5 (setting forth this fact)(alterations

omitted)(internal quotation marks omitted).  See Taylor Depo. at 146:13-147:1.[201]

> Taylor had not seen the e-mails between Goldstone and Simmons where they
> discussed the collapsing European hedge fund before his deposition. . . .  [T]his
> was information he would have wanted to know and would have expected
> Thornburg to share with KPMG because it has on impact on what margin calls
> they might get and that question has an impact on the overall conclusion as to
> whether or not there's a material uncertainty of their continuing as a going
> concern.

SEC Facts ¶ HH, at 5-6 (setting forth this fact)(alterations omitted)(internal quotation marks

omitted).  See Taylor Depo. at 241:8-243:23.[202]  "[T]he fact that the president of the company

---

[201]The Defendants attempt to dispute this fact by stating:

> Disputed.   The testimony is cited out of context which renders it misleading.
> Mr. Taylor testified as follows:

>> I think I said there's a reasonably good chance it would have *but
>> we would have to go through that process and analyze the thing
>> and the facts and the company would have to evaluate that data
>> and determine the impact on its evaluation.*

> SEC Ex. 32 (Taylor Tr. 146:21-147:1)(emphasis added).

> The fact is also immaterial (1) for the reasons set forth in Defendants' Response
> to SEC SMF ¶ C, (2) because Mr. Taylor's hindsight testimony as to the
> significance of certain information is not a basis of liability under Rule 13b2-2,
> and (3) because the undisputed evidence establishes that KPMG was in fact
> provided the material information about the Citi call.

Defendants Disputed Facts ¶ FF, at 15 (citation omitted).  This assertion does not dispute the
SEC's asserted fact.  That KPMG and Thornburg Mortgage would have had to analyze the facts
and data does not dispute the SEC's asserted fact that KPMG's OTTI analysis and going-concern
analysis would probably have been different if KPMG knew about the Citigroup Global margin
call.  The Defendants merely assert an additional fact that does not specifically controvert the
SEC's asserted fact.  Additionally, asserting that a fact is immaterial does not dispute it.  The
Court thus concludes that the fact is undisputed.

[202]The Defendants attempt to dispute this fact by stating:

Disputed.  The fact relies on evidence that is speculative and lacks foundation insofar as Mr. Taylor is testifying on the basis of his interpretation of an email he claims to have not seen before his deposition.

The description of Mr. Taylor's testimony is also misleading, because Mr. Taylor merely testified that he would have wanted to know management's assessment of hedge fund rumor.  He did not testify that the rumor itself had independent significance.

Further, the fact is immaterial because there was no duty under Rule 13b2-2 to disclose the European hedge fund rumor, Mr. Taylor's hindsight testimony about what he would have wanted to know does not establish the materiality of information under Rule 13b2-2, and the undisputed evidence establishes the objective immateriality of the rumor'

Defendants Disputed Facts ¶ HH, at 16 (citations omitted).  This assertion does not dispute the SEC's asserted fact.  In asserting that the SEC mischaracterizes Taylor's testimony, the Defendants mischaracterize Taylor's testimony.  First, the SEC does not state what Taylor's interpretation of the electronic mail transmission is.  It merely asserts that Taylor would have wanted to know the information contained in the electronic mail transmission or about the transmission itself.  Second, Taylor testified that he would have expected Thornburg Mortgage's management to share the information about the hedge-fund rumor and not merely management's assessment of the rumor.

The relevant testimony states:

Q      Would you have wanted to know in your work on the OTTI or going concern the fact that Mr. Goldstone and Mr. Simmons were informed by Mr. Feldman that a repo client that owned billions of securities was collapsing?

MR. LIUBICIC: Objection; misstates the E-mail.

THE WITNESS: I would have wanted to know, yes.

. . .

Q      And this, the second paragraph of this E-mail that's from Mr. Goldstone to Mr. Simmons reads, "Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point haircuts on Alt-A AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.  Use of proceeds would be to delever."

Mr. Taylor, if Mr. Goldstone and Mr. Simmons had information that a large Alt-A hedge fund in Europe is blowing up this afternoon on February 27th, and if Mr.

believes they're going to get haircuts and we should be ready for it should be included in the

going concern analysis."  SEC Facts ¶ II, at 6 (setting forth this fact)(internal quotation marks

omitted).  See Taylor Depo. at 251:18-252:4.[203]

---

> Goldstone therefore wrote that he anticipated 20-point haircuts on Alt-A AAA
> securities as a result, is that something you would have wanted to know?
>
> MR. LIUBICIC: Objection; misstates the E-mail, calls for speculation.
>
> THE WITNESS: Yes.
>
>         Q       BY MR. McKENNA: Is that information you would have expected
> Thornburg to share with KPMG as its outside auditor?
>
>         A       I would have expected it to be addressed in their management's
> evaluation of their ability to continue as a going concern, yes.

Taylor Depo. at 242:3-243:17.  Taylor testified that he would have wanted to know about the
electronic mail transmission, and the information that it contained and that he would have
expected Thornburg to address it in its going concern analysis that it shared with KPMG.  The
Defendants are mistaken when they state that Taylor's testimony merely shows that he wanted to
know Thornburg management's assessment of the rumor.  The Defendants thus do not
specifically controvert this fact.  Moreover, asserting that a fact is immaterial does not dispute it.
Consequently, the Court concludes that the Defendant has not disputed the fact.

    [203]The Defendants attempt to dispute this fact by stating:

> Disputed.  The fact relies upon inadmissible evidence that lacks foundation
> insofar as Mr. Taylor is testifying on the basis of his interpretation of an email he
> claims to have not seen before his deposition.  Fed. R. Evid. 602.  The fact also
> lacks foundation because Mr. Taylor's testimony assumes an interpretation of
> Mr. Goldstone's email that is contradicted by Mr. Goldstone's sworn testimony as
> to its meaning.
>
> Further, the fact is immaterial because there was no duty under Rule 13b2-2 to
> disclose the European hedge fund rumor, Mr. Taylor's hindsight testimony as to
> the significance of emails about the hedge fund rumor is not a basis of liability
> under Rule 13b2-2, and the undisputed evidence establishes the objective
> immateriality of the rumor.

Defendants Disputed Facts ¶ II, at 16 (citations omitted).  This assertion does not dispute the
SEC's asserted fact.  It is unclear how Taylor's testimony lacks foundation.  Taylor's
interpretation of the electronic mail transmission, that Thornburg will get hit with haircuts, is the

> [I]n [Reinhart's] down-to-date meeting with Starrett and Simmons she asked questions that should have prompted them to bring the Citigroup reservation of rights letter to her attention, but did not. . . .  [T]he letter was an indication that the company has not satisfied the margin agreement that they have with Citi, and that the counterparty now has the ability to liquidate the collateral and that would have had an impact on KPMG's going concern and OTTI analyses.

SEC Disputed Facts ¶ KK, at 6 (setting forth this fact)(internal quotation marks omitted).  See

Reinhart Depo. at 328:5-332:4.[204]

_____

most reasonable interpretation.   Taylor was shown the electronic mail transmission at his deposition, so his deposition testimony concerning the transmission does not lack support. Moreover, even if Goldstone testified that the electronic mail transmission means something other than what it clearly appears to say, Taylor's testimony, which implies that he interpreted the electronic mail transmission to mean what it says, it not disputed.  The SEC's asserted fact is that the president of a company knowing that the company will get haircuts is something that should be included in a going-concern analysis.  The Defendants do not attempt to dispute this fact, but rather attempt to dispute the implications that this fact may cause -- i.e. that, because Goldstone and Simmons knew that Thornburg Mortgage would receive more haircuts, it should have included the information in Thornburg Mortgage's going concern analysis.  The Defendants do not dispute the SEC's asserted facts, but attempt to dispute their implications.  Finally, asserting that a fact is immaterial does not dispute it.  The Court thus finds the fact undisputed.

[204]The Defendants attempt to dispute this fact by stating:

> Disputed.   The evidence lacks foundation and is speculative insofar as Ms. Reinhart was testifying as to the impact her questions purportedly "should have" had on third parties and as to the meaning of a letter she claims not to have received or read until her deposition.  In addition, Ms. Reinhart was testifying as to the contents of a letter that speaks for itself and is the best evidence of its contents.  Fed. R. Evid. 801.

> The fact is also contradicted by other evidence in the record, including Ms. Hall's admissions that she could not recall KPMG asking anything more than "general questions" of Mr. Simmons and Ms. Starrett in the down-to-date meeting, and that she could not even remember what those questions were.  Ms. Reinhart did not take notes of the meeting on February 27, 2008.  The KPMG workpapers that document the down-to-date discussions with Mr. Goldstone, Mr. Simmons, and Ms. Starrett make no reference to specific questions about the timing of margin call payments, reservation of rights letters, or market rumors.  As to Ms. Starrett, it is undisputed that she was not aware of the Citi letter or the European hedge fund rumor and thus could not have provided this information to KPMG.

KPMG Senior Manager Jennifer Hall testified that she was not shown the Citigroup reservation of rights letter during work on the 2007 Thornburg audit or restatement.  She would have been expected to be shown the letter because it's a significant communication and factor of Thornburg's liquidity.  She would have

---

The fact is also immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶ C, and because the undisputed evidence is that the Citi letter was objectively immaterial because it was duplicative of other information available to KPMG regarding Thornburg's delayed margin call payments.  Moreover, it is undisputed that by the time KPMG concluded its work on the Thornburg restatement, KPMG was aware of all material facts -- including, among others, that there was "technical evidence of default" of repo agreements -- yet concluded that it did not have concerns about management's integrity, that there was no material weakness in Thornburg's internal controls, and that there had been no fraud by Thornburg's management.

Finally, Defendants object to Ms. Reinhart's testimony cited by the SEC insofar as it was elicited by the SEC in response to improper leading questions, lacks foundation in that Ms. Reinhart was speculating about how Thornburg should have responded to questions she allegedly posed, and was non-responsive to the questions asked.

Defendants Disputed Facts ¶ KK, at 17 (citations omitted).  This assertion does not dispute the SEC's asserted fact.  First, the Defendants do not show how Reinhart's testimony is speculative or lacks a foundation.  Reinhart is an accountant at a large accounting firm with experience in large audits.  If anyone could testify to what questions should reveal what information during an audit, it is Reinhart.  Second, it is unclear whether the Defendants are making a hearsay objection or a best evidence objection.  They say that the letter is the best evidence, but then cite rule 801 of the Federal Rules of Evidence.  Either way, the objection fails.  Reinhart testified about the letter's content to show why the letter should have been disclosed and why it would have impacted the OTTI analysis and the going-concern analysis.  Her testimony is not offered for the truth of the content of the letter -- that Thornburg Mortgage failed to timely meet its margin calls and that Citigroup Global could default Thornburg Mortgage if it wanted -- and the SEC is not offering her testimony in lieu of the letter; it is offering her testimony to explain why Thornburg Mortgage should have disclosed the letter.  Third, it is irrelevant that Hall could not remember the general questions asked during the meeting.  The Defendants are arguing that, because Hall cannot remember the questions, Reinhart cannot either.  There is a fallacy in the following statement: "If Hall and Reinhart attended the same meeting, and Hall does not remember the questions from the meeting, Reinhart also must not remember the questions."  Just because Hall does not remember the questions does not mean Reinhart does not remember them.  Fourth, the SEC does not assert that Starrett knew about the Citigroup Global letter, but only that the meeting was with Starrett and Simmons, and that the questions should have prompted Thornburg Mortgage to disclose the Citigroup Global letter.  Fifth, asserting that a fact is immaterial does not dispute it.  Accordingly, the Defendants fail to dispute this fact, and the Court concludes that it is undisputed.

expected to have been shown this letter and asked questions of Goldstone and Simmons that should have prompted them to show her the letter. Hall further testified that it would be inconsistent to say that Thornburg had the intent and ability to hold its purchased ARM assets in late February of 2008, given the breach declared in the Citi reservation of rights letter.

SEC Facts ¶ LL, at 6 (setting forth this fact)(alterations omitted)(internal quotation marks omitted). See Hall Depo. at 309:2-310:5, 311:11-313:21.[205]

Hall . . . was not told in connection with Thornburg's 2007 audit that it had entered into I/O Strip Transactions to meet margin calls (and did not see the email reflecting that fact until giving testimony to the SEC). . . . [S]he should have been told this was the case and it would have impacted her OTTI and going concern analysis because it's a significant factor as to Thornburg's ability to meet its obligations as they come due.

_____

[205]The Defendants attempt to dispute this fact by stating:

Disputed. The evidence lacks foundation and is speculative insofar as Ms. Hall was testifying as to the impact her questions "should have" had on third parties and as to the meaning of a letter she claims not to have received or read until her deposition. The fact also relies upon inadmissible hearsay insofar as Ms. Hall is testifying as to the contents of a letter that speaks for itself and is the best evidence of its contents.

Further, the fact is contradicted by other evidence in the record. As to Ms. Starrett, it is undisputed that she was not aware of the Citi letter and thus could not have provided this information to KPMG.

The fact is also immaterial for the reasons set forth in Defs.' Response to SEC SMF ¶¶ KK

Defendants Disputed Facts ¶ LL, at 18-19. This assertion does not dispute the SEC's asserted fact. First, the Defendants do not explain why Hall's testimony lacks foundation or is speculative. Hall works for a large accounting firm, is an accountant, and has experience auditing companies. Her testimony that she would have expected to be shown the Citigroup Global letter is based on her years of experience. Second, other evidence does not contradict the fact. Even though Hall testified that she does not remember what questions were asked during the meeting, the SEC does not assert that Hall asked questions that should have prompted Thornburg Mortgage to disclose the letter. Instead, the SEC asserts that Hall expects that she would have asked questions which would have prompted Thornburg Mortgage to disclose the letter. Third, the SEC does not assert that Starrett knew about the Citigroup Global letter. Fourth, asserting that a fact is immaterial does not dispute it. Consequently, the Court finds that the Defendants have not disputed the fact.

SEC Facts ¶ NN, at 6-7 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See Hall Depo. at 333:8-337:18.[206]  "Hall and Reinhart did not see Starrett's February 25, 2008 e-mail stating that we have purposely not told KPMG about the margin calls during their audit or restatement work."  SEC Facts ¶ TT, at 8 (setting forth this fact)(internal quotation marks omitted).  See Hall Depo. at 363:4-25; Reinhart SEC Depo. at 145:13-148:13.[207]  "[One]

---

[206]The Defendants attempt to dispute this fact by stating:

Disputed.  Ms. Hall admitted that the Margin Call Schedule, which -- as the SEC itself concedes  -- KPMG received prior to the 2007 Form 10-K filing, showed the I/O strip transactions and the proceeds being used to satisfy margin calls.

Disputed that the use of I/O Strips to improve liquidity was inconsistent with what Ms. Hall had been told by any of the Defendants or what KPMG knew before the 2007 Form 10-K filing.  Ms. Hall clearly acknowledged in testimony and in workpapers that the I/O strip financing transactions "contribut[ed] toward the company's liquidity."  It is undisputed that the liquidity generated from these transactions enabled Thornburg to meet some of its margin calls in February 2008.

Moreover, the fact is immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶¶ MM.

Defendants Disputed Facts ¶ NN, at 20 (citations omitted).  This assertion does not dispute the SEC's asserted fact.  First, even if the Margin Call Schedule shows that Thornburg Mortgage used the I/O Strip Transactions to pay margin calls, that fact does not dispute the SEC's asserted fact that no one told Hall that the transactions were to pay margin calls.  Second, the SEC does not assert that the I/O Strip Transactions did not raise liquidity.  That they raised liquidity does not mean that Thornburg Mortgage entered into them for the purpose of paying margin calls.  Third, asserting a fact as immaterial does not dispute it.  Accordingly, the Court concludes that the Defendants have not disputed the fact.

[207]The Defendants attempt to dispute this fact by stating:

Disputed.  The evidence cited does not support the fact insofar as KPMG was provided unrestricted access to Thornburg's emails during the restatement period, and KPMG performed an extensive review of management's emails.  KPMG had access to all e-mail communications of Thornburg's senior management team "dating back to January 1 to verify the information that [Thornburg] provided them was accurate."  Mr. Simmons testified that Thornburg "provided [KPMG]

---

could not tell margin calls were met over more than one day from the first page of the Tie-Out

Document."  Plaintiff Securities and Exchange Commission's Supplement of Undisputed Facts

in Opposition to Motion for Summary Judgment Memorandum of Law in Support of Defendant

Jane Starrett's Motion for Summary Judgment and Cross Motion for Summary Judgment on the

Issues of Objective Falsity and Materiality ¶ ZZ, at 2, filed November 14, 2013 (Doc. 238)("SEC

Supp. Facts")(setting forth this fact).   See Reinhart Depo. at 23:15-24:6.[208]   "Goldstone's

---

access to e-mails, as they had requested, for a number of individuals.  And -- and we hooked them up with an IT person to get them what they wanted."  Mr. Crawford testified that he was not aware of any limitations placed on KPMG with respect to this email review.

The fact is also misleading in that it quotes Ms. Starrett's email out of context and without her testimony as to its meaning.

Moreover, the fact is immaterial because it is undisputed that KPMG was informed of Thornburg's delayed payment of margin calls before the Form 10-K filing.  The record in this case confirms (and the SEC has admitted) that KPMG indeed received, prior to its opinion date, the information regarding the date on which the payments were made to satisfy margin calls and thus had the information as to payment plans.

Defendants Disputed Facts ¶ TT, at 23-24.  This assertion does not dispute the SEC's asserted fact.  The Defendants do not assert that either Reinhart or Hall saw Starrett's electronic mail transmission.  Rather, the Defendants assert that KPMG had unrestricted access to Thornburg Mortgage's electronic mail transmissions.  The Defendants thus fail to dispute the SEC's asserted fact.  Additionally, stating that a fact is immaterial does not dispute it.  Consequently, the Court concludes that the Defendants have not disputed the fact.

[208]Starrett responds by stating:

Ms. Starrett does not dispute that Ms. Reinhart claimed that she could "not tell" from the "first page" of the Margin Call Schedule that the Greenwich margin call was paid over time, and that it was "unclear" from the "first page" of the Margin Call Schedule whether the Citi margin call was paid over time.  This testimony, however, is immaterial insofar as Ms. Reinhart was only asked about the first of three pages in the Margin Call Schedule.  What is material, and undisputed, is that the entirety of the Margin Call Schedule was provided to KPMG prior to the filing of the Form 10-K, and that pages two and three of the Margin Call Schedule show

personal notebook contains a notation made on March 3 or 4, 2008 in connection with a

---

        that margin calls, including the Citi and Greenwich calls, were met over more
        than one day.

Defendant Jane Starrett's Response to Plaintiff Securities and Exchange Commission's
Supplemental Statement of Undisputed Facts in Opposition to Motion for Summary Judgment
and Cross-Motion for Summary Judgment on the Issues of Objective Falsity and Materiality
¶ ZZ, at 4-5, filed January 31, 2014 (Doc. 256)("Starrett Disputed Facts").  Because Starrett does
not dispute this fact, and because the asserting that a fact is immaterial does not dispute it, the
Court concludes that the fact is undisputed.

      The SEC asserts the following fact: "Reinhart testified that now, knowing about the
information Defendants withheld from KPMG, she has reason to believe that Defendants would
not have provided her information about the magnitude of margin calls Thornburg received in
the subsequent events period if she had asked during the audit."  SEC Supp. Facts ¶ AAA, at 2.
Starrett disputes this fact by stating:

        Ms. Starrett disputes this characterization of Ms. Reinhart's testimony.  When
        posed the question "Do you have some reason to believe, if you just asked, the
        company wouldn't have given [information about the magnitude of margin calls
        in January and February 2008] to you?"  Ms. Reinhart answered "No, I don't have
        any reason to believe [that management would not have provided the info.]"
        While she then attempted to qualify her answer, stating that "[s]itting here today"
        she "might feel differently about that," Ms. Reinhart never stated that this
        purported change in her views was based on learning about "information
        Defendants withheld from KPMG."  Further, immediately following the above
        testimony, Ms. Reinhart admitted that she "can't say that [Thornburg] wouldn't
        have given [information about the magnitude of margin calls in January and
        February 2008] to me" if she had simply asked for it.

        In any event, Ms. Reinhart's testimony is undercut by several members of
        KPMG's engagement team who testified that Thornburg readily complied
        whenever KPMG requested information or documents.

        Ms. Starrett also objects that Ms. Reinhart's claims about whether Thornburg
        would or would not have provided information if asked is speculation
        unsupported by personal knowledge and is therefore inadmissible under Fed. R.
        Evid. 602.

Starrett Disputed Facts ¶ AAA, at 5-6 (citations omitted).  The Court concludes that Starrett has
disputed this fact.  Thornburg Mortgage employees provided KPMG with all information that it
requested and did not have any restrictions on what information they could disclose to KPMG.  It
is thus disputed whether Thornburg Mortgage would have provided Reinhart with information
concerning the magnitude of margin calls that Thornburg Mortgage received if Reinhart
requested the information.

conversation he had with Reinhart that states: Default event → we never mentioned this.' Goldstone claims that he does not know what that notation refers to."  SEC Facts ¶ UU, at 232 (setting forth this fact)(internal quotation marks omitted).  <u>See</u> Goldstone Depo. at 280:15-282:13; Goldstone Notebook Entry at 2, filed November 6, 2013 (Doc. 231-64).[209]

### 24.   <u>KPMG's Knowledge of Thornburg Mortgage's Liquidity Situation, Margin Calls, and Efforts to Meet Margin Calls.</u>

"KPMG workpapers note that because of its business model, Thornburg typically did not keep more than $100 million in cash on hand."  Goldstone Facts ¶ 392, at 88 (setting forth this fact).  <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); March 8, 2008, OTTI Memo. at 3.  "Ms. Hall . . . underst[ood] that Thornburg's cash position in the weeks leading up to the 2007 Form 10-K was lower than in previous time frames."  Goldstone Facts ¶ 393, at 88-89

---

[209]The Defendants respond to this fact by stating:

Undisputed that Mr. Goldstone's notebook contains this notation and that Mr. Goldstone does not know what it refers to, including whether this note reflects Ms. Reinhart's words or his words.  Mr. Goldstone testified that other notes on the same page reflected Ms. Reinhart's words.

Moreover, the fact is immaterial because it is undisputed that after this date, and after Ms. Reinhart indicated in her own notes her awareness of a "technical evidence of default" occurring prior to the original Form 10-K filing, KPMG concluded that it did not have concerns about management's integrity and there was no finding of material weakness in Thornburg's internal controls.  The fact is also immaterial because, to the extent this notation refers to an alleged default event with Citibank, Mr. Goldstone testified that he did not believe the Citibank's reservation of rights letter was a "default event."  As to Ms. Starrett, it is undisputed that she was not aware of the Citi letter and thus could not have mentioned this information to KPMG.

The fact is also immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶ C.

Defendants Disputed Facts ¶ UU, at 24-25 (citations omitted).  Because the Defendants do not dispute this fact, and because asserting that a fact is immaterial does not dispute it, the Court concludes that the fact is undisputed.

(setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC Disputed

Facts at 1-51 (not disputing this fact); Hall Depo. at 82:9-19.

> The daily liquidity reports provided to KPMG showed the following beginning of
> day cash balances for Thornburg in the week preceding the 10-K filing:

> > February 21, 2008: $15.6 million

> > February 22, 2008: $10.5 million

> > February 23-24, 2008: weekend (no projections)

> > February 25, 2008: $16 million

> > February 26, 2008: $61 million

> > February 27, 2008: $27 million

Goldstone Facts ¶ 394, at 89 (setting forth this fact).  See Hall Depo. at 120:4-9, 177:2-15; Feb.

20, 2008, Hall Memo. at 8; Thornburg Mortgage Cash Liquidity Report at 2-3 (dated Feb. 21,

2008), filed August 9, 2013 (Doc. 204-70); Electronic Mail Transmission from Ralph Ahn to

Shawn Buniel at 2-4 (dated Feb. 22, 2008), filed August 9, 2014 (Doc. 204-101); Thornburg

Mortgage Cash Liquidity Report at 2 (dated Feb. 22, 2008), filed August 9, 2013 (Doc. 204-92);

Electronic Mail Transmission from Ralph Ahn to Jennifer Hall at 2-3 (dated Feb. 25, 2008), filed

August 9, 2013 (Doc. 204-108); Electronic Mail Transmission from Ralph Ahn to Jennifer Hall

at 2-3 (dated Feb. 26, 2008), filed August 9, 2013 (Doc. 204-114); Electronic Mail Transmission

from Ralph Ahn to Jennifer Hall at 2-3 (dated Feb. 27, 2008), filed August 9, 2013

(Doc. 204-133).[210]  "KPMG's workpapers show that in the course of KPMG's audit, KPMG

---

[210]The SEC attempts to dispute this fact by stating:

Defendants did not disclose a liquidity report to KPMG dated February 21, 2008
(factoring in the Citi margin call) that projected negative liquidity through every
projected date, to and including April 8, 2008; instead, Defendants removed the

requested and obtained from Thornburg a list of all wire transfers from January 31 through February 21, 2008, which identified, among other things, the dates and amounts of payments made to meet reverse repurchase margin calls." Goldstone Facts ¶ 395, at 89 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); KPMG Workpaper prepared by Davie Kowalski and Meg Jones for Thornburg Mortgage at 2-3 (dated Feb. 1, 2008, Feb. 6, 2008, & Feb. 23, 2008), filed August 9, 2013 (Doc. 204-104); Jacquez Decl. ¶ 8, at 3.

> On February 21, 2008, in response to KPMG senior associate Matthew Plummer's request made on or about that date, Thornburg's Controller, Francine Jacquez, provided Mr. Plummer with general ledger information for the period of February 1, 2008 to February 19, 2008. This general ledger spreadsheet disclosed over $103 million in margin call payments during that nineteen-day period. On February 22, 2008, in response to a follow-up request from Mr. Plummer, Ms. Jacquez sent Mr. Plummer the general ledger information for January 31, 2008.

Goldstone Facts ¶ 396, at 89 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from Francine Jacquez to Matthew D. Plummer at 2-11 (Feb. 21, 2008), filed August 9, 2013 (Doc. 204-89); Electronic Mail Transmission from Francine Jacquez to Matthew D. Plummer at 2 (dated Feb. 22, 2008), filed August 9, 2013 (Doc. 204-102); Jacquez Decl. ¶ 7, at 2-3. "On January 17, 2008 and again on January 31, 2008, in response to Mr. Plummer's request made on or about those dates, Thornburg provided general ledger spreadsheets to KPMG that identified more than $107 million and $76.8 million in margin call payments, respectively." Goldstone Facts ¶ 397, at 90 (setting

---

Citi margin call from the February 21, 2008 liquidity report and provided KPMG with a liquidity report the next day showing positive projected liquidity.

SEC Disputed Facts ¶ 394, at 33-34. The Defendants do not assert that they disclosed the February 21, 2008, liquidity report that projected negative liquidity, and the SEC does not assert that the Thornburg Mortgage's disclosed reports did not contain the figures that the Defendants assert they do. The SEC thus does not dispute the Defendants' asserted fact, and the Court concludes that it is undisputed.

forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from Will D. Fisher to Matthew D. Plummer at 2-28 (dated Jan. 17, 2008), filed August 9, 2013 (Doc. 204-35); Electronic Mail Transmission from Matthew D. Plummer to David J. Kowalski at 2-7 (dated Jan. 31, 2008), filed August 9, 2013 (Doc. 204-39); McLamb Depo. at 141:3-154:2.

"By no later than February 21, 2008, Ms. Hall of KPMG had learned from speaking with Thornburg employees Mr. Buniel and Mr. Fellers that Thornburg had received an increased level of margin calls."  Goldstone Facts ¶ 398, at 90 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Hall SEC Depo. at 110:9-113:5.  "Around February 21, 2008, Ms. Reinhart learned from speaking with Thornburg employees that Thornburg was experiencing larger than normal margin calls."  Goldstone Facts ¶ 399, at 90 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Reinhart SEC Depo. at 65:22-67:4.  "KPMG never asked anyone at Thornburg about the total volume of margin calls received by the Company during the subsequent events period from January 1, 2008 through February 28, 2008."  Starrett Facts ¶ 67, at 14 (setting forth this fact).  See Hall SEC Depo. at 166:19-25.[211]  "[No] []one at KPMG

---

[211]The SEC attempts to dispute this fact by stating:

> Ms. Reinhart testified that she cared what the total magnitude of margin calls that Thornburg received in January and February 2008 was, but knew that the company had rolled its Repo Agreements in January, so that was behind it, and the company identified February 14 through the February 27, 2008 as the relevant significant time period that it believed should be disclosed with respect to margin calls.

SEC Disputed Starrett Facts ¶ 67, at 11.  This assertion does not specifically controvert Starrett's asserted fact.  Starrett does not assert that KPMG did not care about the total magnitude of margin calls, and the SEC does not assert that anyone at KPMG asked about the total volume of margin calls.  Accordingly, the Court finds the fact undisputed.

inquir[ed] of Thornburg's management as to the average level of margin calls received by Thornburg during the 2007 audit or otherwise tried to determine the average." Starrett Facts ¶ 68, at 14 (setting forth this fact). See Hall SEC Depo. at 201:20-22; Reinhart SEC Depo. at 126:5-8, 126:13-15.[212]   "Neither Ms. Hall nor Ms. Reinhart attempted to quantify the total amount of margin calls after year-end 2007 and before the filing of the Form 10-K." Starrett Facts ¶ 69, at 14 (setting forth this fact). See Reinhart Depo. at 132:15-20; Hall SEC Depo. at 181:3-8.[213]   "[T]he KPMG auditors had a general understanding of the decline in the value of Thornburg's pledged securities which would tell [it] the general level of margin calls." Starrett Facts ¶ 70, at 14 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).

---

[212]The SEC attempts to dispute this fact by stating:

> Ms. Reinhart testified that she cared what the total magnitude of margin calls that Thornburg received in January and February 2008 was, but knew that the company had rolled its Repo Agreements in January, so that was behind it, and the company identified February 14 through the February 27, 2008 as the relevant significant time period that it believed should be disclosed with respect to margin calls.

SEC Disputed Starrett Facts ¶ 68, at 11.  Because the SEC does not assert, or cite evidence showing, that someone at KPMG inquired about the average level of margin calls that Thornburg Mortgage received, the SEC does not dispute Starrett's asserted fact.  Consequently, the Court concludes that the fact is undisputed.

[213]The SEC attempts to dispute this fact by stating:

> Ms. Reinhart testified that she cared what the total magnitude of margin calls that Thornburg received in January and February 2008 was, but knew that the company had rolled its Repo Agreements in January, so that was behind it, and the company identified February 14 through the February 27, 2008 as the relevant significant time period that it believed should be disclosed with respect to margin calls.

SEC Disputed Starrett Facts ¶ 69, at 11-12.  This assertion does not dispute Starrett's asserted fact.  The SEC does not assert that Hall or Reinhart attempted to quantify the total amount of margin calls that Thornburg received in 2008 before the 2007 Form 10-K filing.  The Court thus concludes that the SEC has not disputed the fact.

See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Hall SEC Depo. at 166:4-9.

"KPMG's workpaper entitled the 'Completion Document' notes that market valuations of these

Alt-A securities have decreased between 10 and 15 percent since January 31, 2008." Starrett

Facts ¶ 71, at 14 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).

See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Completion Doc. at 9. "During

DPP Review of the audit in connection with the restatement, a DPP Partner reviewing the Going

Concern memo was able to calculate that a 10% decline in value translated into $1.3 billion in

margin calls, signifying that Thornburg was short on collateral." Starrett Facts ¶ 72, at 14

(setting forth this fact)(internal quotation marks omitted). See SEC Disputed Starrett Facts

at 1-16 (not disputing this fact); Thornburg Going Concern Memorandum from Jennifer Hall,

KPMG Engagement Senior Manager, to Thornburg Mortgage, Inc. Audit File, at 2-3 (dated Feb.

20, 2008, Feb. 27, 2008, & Mar. 2, 2008), filed August 31, 2013 (Doc. 207-23). "[No] []one at

KPMG asked anyone at Thornburg whether Thornburg had met within one day the margin calls

it received between February 14, 2008 and February 27, 2008." Starrett Facts ¶ 73, at 14 (setting

forth this fact)(alterations omitted)(internal quotation marks omitted). See 2d RFAs at 13.[214]

---

[214]The SEC attempts to dispute this fact by stating:

The SEC's non-excerpted response to RFA No. 47 is:

> "Denied. The SEC admits that it has no evidence that anyone at
> KPMG asked anyone at THORNBURG the convoluted question of
> "whether THORNBURG had met within one day the MARGIN
> CALLS it received between February 14, 2008 and February 27,
> 2008," but states that various individuals at KPMG, including
> Cynthia Reinhart and Jennifer Hall asked Defendants and others at
> THORNBURG about margin calls and were falsely assured that all
> MARGIN CALLS had been met, which was reasonably interpreted
> as meaning that the MARGIN CALLS had been met in accordance
> with the terms of the REPO AGREEMENTS."

> In the period leading up to the filing of the 2007 Form 10-K, Ms. Hall had "the impression that they [Thornburg] were having to work on [meeting the margin calls."  According to Ms. Hall, "it wasn't as if they [Thornburg] had a large stockpile and . . . as they [the margin calls] would come in and they would pay it, it was more of managing when would come in and watching it very closely to make sure that they did meet those margin calls."

Goldstone Facts ¶ 400 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Hall SEC Depo. at 113:10-17).  See SEC Disputed Facts at 1-51 (not disputing this fact); Hall SEC Depo. at 113:6-17.  "Ms. Reinhart . . . knew prior to the filing of the 2007

---

SEC Disputed Starrett Facts ¶ 73, at 12.  The SEC does not dispute Starrett's asserted fact and misquotes its own admission.  The SEC admitted the requested omission, and never once -- despite its assertion in the SEC Disputed Starrett Facts -- stated that it denied the admission.  The relevant admission provides:

**REQUEST FOR ADMISSION NO. 47:**

> Admit that YOU have no evidence that anyone at KPMG asked anyone at THORNBURG before the filing of the 2007 FORM 10-K whether THORNBURG had met within one day the MARGIN CALLS it received between February 14, 2008 and February 27, 2008.

**Response:**

> The Commission admits that it currently has no evidence that anyone at KPMG asked anyone at THORNBURG the specific, convoluted question of "whether THORNBURG had met within one day the MARGIN CALLS it received between February 14, 2008 and February 27, 2008," but states that various individuals at KPMG, including Cynthia Reinhart and Jennifer Hall asked DEFENDANTS and others at THORNBURG about MARGIN CALLS and were falsely assured that all MARGIN CALLS had been met, which was reasonably interpreted as meaning that the MARGIN CALLS had been met in accordance with the terms of the REPO AGREEMENTS and further states that KPMG sought a representation from THORNBURG in connection with its audit that "the Company has complied with all aspects of contractual agreements that would have a material effect on the consolidated financial statements in the event of noncompliance," DEFENDANTS provided that representation, and that THORNBURG's failure to meet MARGIN CALLS within one day did not comply with applicable REPO AGREEMENTS.

2d RFAs at 13.  The SEC admitted to the requested admission.  Accordingly, the SEC fails to dispute Starrett's asserted fact, and the Court concludes that it is undisputed.

Form 10-K that Thornburg's cash balances were fairly low."  Goldstone Facts ¶ 401, at 90

(setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not

disputing this fact); Reinhart SEC Depo. at 71:6-18.  "In February 2008, KPMG attended [some]

Audit Committee meetings wherein KPMG auditors and members of the Committee asked

Thornburg's management about liquidity and other related topics."  Goldstone Facts ¶ 402, at 90

(setting forth this fact).  See Feb. 22, 2008, Audit Committee Minutes at 2; Ater Decl. ¶¶ 4, 8-9,

at 2; Mullin Decl. ¶¶ 5-8, at 2-3.[215]  "In an Audit Committee meeting on February 22, 2008,

Ms. Reinhart reported that KPMG was monitoring going concern and liquidity issues on a daily

basis and that those issues would remain open until the filing of the 10-K."  Goldstone Facts

¶ 403, at 90 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact);

Feb. 22, 2008, Audit Committee Minutes at 3; Simmons Depo. Vol. II at 157:20-158:9.  "At the

Audit Committee meeting on February 22, 2008, Ms. Reinhart expressly assured the Audit

Committee that KPMG had all the information relating to margin calls and liquidity that it

---

[215]The Defendants' fact states: "In February 2008, KPMG attended Audit Committee
meetings wherein KPMG auditors and members of the Committee asked Thornburg's
management about liquidity and other related topics."  Goldstone Facts ¶ 402, at 90.  The SEC
attempts to dispute this fact by stating:

> KPMG was excluded from a February 22 Audit Committee executive committee
> meeting at which Thornburg's failure to timely meet margin calls was discussed,
> information that Defendants purposely withheld from KPMG.  KPMG was
> provided with final minutes that removed the reference to the discussion about the
> failure to timely meet margin calls during the executive session contained in the
> draft minutes of the meeting.

SEC Disputed Facts ¶ 402, at 34.  The Defendants do not assert that KPMG attended every Audit
Committee meeting in February, 2008, or that Thornburg Mortgage told KPMG that it was not
able to timely meet its margin calls.  The Defendants' asserted fact, however, may be interpreted
to mean that KPMG attended every Audit Committee meeting in February, 2008, and the SEC
has disputed that KPMG attended every meeting.  The Court has thus modified the Defendants'
asserted evidence to more accurately reflect the evidence.

needed for its audit."  Goldstone Facts ¶ 404, at 91 (setting forth this fact).  See Mullin Decl. ¶ 17, at 4; Ater Decl. ¶¶ 11-12, at 3; Goldstone Decl. ¶ 23, at 4-5.[216]

"To better understand the reasons for Thornburg's low liquidity in the days preceding the filing of the 2007 Form 10-K, Ms. Hall requested from Thornburg employees in Capital Markets and Accounting a list of margin calls the company was receiving during that time period." Goldstone Facts ¶ 405, at 91 (Setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Hall SEC Depo. at 167:1-168:18.   On February 27, 2008, Thornburg Mortgage provided KPMG with an up-to-date set of schedules that showed, by counterparty and amount, the margin calls Thornburg Mortgage had received and paid between February 14, 2008, and February 26, 2008 ("Margin Call Schedule").  Goldstone Facts ¶ 406, at 91 (setting forth this fact).  See 1st RFAs at 6-8; Hall Depo. at 35:24-38:16, 49:15-50:21, 55:11-57:7, 73:19-74:3,

_____

[216]The SEC attempts to dispute this fact by stating:

KPMG was excluded from a February 22 Audit Committee executive committee meeting at which Thornburg's failure to timely meet margin calls was discussed, information that Defendants purposely withheld from KPMG.   KPMG was provided with final minutes that removed the reference to the discussion about the failure to timely meet margin calls during the executive session contained in the draft minutes of the meeting.

SEC Disputed Facts ¶ 404, at 34.  This assertion does not dispute the Defendants' asserted fact. The Defendants do not assert that KPMG attended the Audit Committee executive meeting, where the margin calls were discussed, or that Thornburg Mortgage did not remove from the meeting minutes the discussion about the margin calls.  Consequently, the SEC does not dispute the Defendants' asserted fact.   Furthermore, the SEC cites the February 22, 2008, Audit Committee meeting minutes, which state that the committee held an executive session, which KPMG personnel did not attend, but also state that, in the general committee meeting, several KPMG employees, including Hall, attended.   See Thornburg Mortgage, Inc. Minutes of a Meeting of the Audit Committee at 1-2 (dated Feb. 22, 2008), filed November 6, 2013 (Doc. 231-39).   The SEC's evidence thus supports the Defendants' asserted fact that Hall attended an Audit Committee meeting on February 22, 2008.  Accordingly, the Court finds the fact undisputed.

160:11-25, 193:23-194:8; Coltharp Decl. ¶¶ 9, 13, 25, at 2-5; Simmons Decl. ¶ 38, at 9.[217]

"[T]he Tie-Out Document [-- referred to as the Margin Call Schedule in this Memorandum

_____

[217]The Defendants' original fact states: "On February 27, 2008, and in response to Ms. Hall's request, Thornburg provided KPMG with an up to date set of schedules that showed, by counterparty and amount, the margin calls Thornburg had received and paid between February 14, 2008 and February 26, 2008 (hereinafter 'Margin Call Schedule')." Goldstone Facts ¶ 406, at 91. The SEC disputes this fact by stating:

> What Defendants call the Margin Call Schedule and what the SEC calls the Tie-Out document was not provided in response to Ms. Hall's earlier request for a list of margin calls the company had been receiving. The Tie-Out document was provided for the sole purpose of tying out the dollar amount of margin calls disclosed in the Form 10-K. Ms. Hall did not even review the two pages that can be interpreted to indicate payment of margin calls over time.

SEC Disputed Facts ¶ 406, at 34. To dispute this fact, the SEC cites Reinhart's deposition testimony, where she testified that the Margin Call Schedule was requested to provide support for a subsequent events footnote in the 2007 Form 10-K, and was not provided in response to Hall's request for a list of Thornburg's margin calls. See Reinhart Depo. at 234:2-14.

The Defendants reply by stating:

> The SEC cannot create a genuine dispute as to this fact by submitting additional non-responsive purported facts, including facts contradicted by the record. The alleged "purpose" for which the Margin Call Schedule was provided to KPMG and whether Ms. Hall reviewed every page of the document or just some of its pages are irrelevant to this fact. Moreover, this response is immaterial because how an auditor chooses to review the information it is provided is not a basis for Defendants' liability under Rule 13b2-2. See Reply Br. at IV.A.1.

> Defendants object to the evidence cited by the SEC as speculative and lacking foundation insofar as Ms. Hall and Ms. Reinhart purported to testify as to the purpose Thornburg had in providing a document. Fed. R. Evid. 602, 801.

> In any event, the undisputed evidence refutes the SEC's assertion that the document was provided for a "sole purpose." Ms. Reinhart testified that "tying out the dollar amount of margin calls disclosed in the Form 10-K" was not the "sole purpose" of the Margin Call Schedule, and that the document had two parts or "two purposes." One purpose "was a tie-out of the amounts in the financial statements." And [T]he other was to understand the company['s] liquidity position[.]" SMF ¶ 408 (emphasis added). Ms. Hall also testified that she considered the Margin Call Schedule in connection with her analysis of whether Thornburg could continue as a going concern and whether Thornburg needed to

Opinion and Order] . . . was [not] provided to KPMG prior to the filing of the 2007 Form

10-K. . . .   [S]ome document was provided to KPMG reflecting margin calls and . . . it was

provided to support the disclosure that Thornburg had received and  paid over $300 million in

margin calls."  SEC Facts ¶ J, at 3 (setting forth this fact).  See Defendants' Amended Objections

and Responses to Plaintiff's Fourth Set of Interrogatories to All Defendants at 2-4, filed

November 6, 2013 (Doc. 231-42)("Defendants Reponses to 4th Set of Interrogatories").[218]

---

recognize an OTTI on its Purchased ARM Assets.  SMF ¶ 409; see Reply Br. at IV.A.1.

Goldstone Reply Facts ¶ 406, at 183-84.  Reinhart's deposition testimony directly controverts the Defendants' asserted fact.  It is disputed whether the Margin Call Schedule was provided in response to Hall's request for a list of Thornburg Mortgage's margin calls.  The rest of the Defendants' asserted fact, however, remains undisputed.  The Court will thus modify the Defendants' asserted fact to more accurately reflect the evidence.

[218]The Defendants attempt to dispute this fact by stating:

Undisputed that Mr. Goldstone "does not recall specifically being aware of the Margin Call Schedules or whether they were provided to KPMG prior to the filing of the 2007 form 10-K[,] [but] . . . believe[s] that KPMG requested whatever information it deemed necessary to the audit, and believes that Thornburg employees were responsive to all such requests in accordance with the company's normal practice and management's expectations."  SEC Ex. 41 (Response to Interrogatory No. 28, at pp. 28-29).

Disputed that Mr. Simmons and Ms. Starrett do not recall being aware of the Margin Call Schedule or whether it was provided to KPMG prior to the filing of the 2007 Form 10-K.  Mr. Simmons "has a general recollection that [KPMG engagement manager Jennifer Hall] requested a listing of February 2008 margin call activity," and "generally recalls that he asked members of the Finance Group to provide this information to KPMG, and that he understood KPMG received the information."  Id.  Ms. Starrett "recall[s] that [KPMG] w[as] provided with listings of margin calls and how they were settled, and the amount in which they were settled, and the date on which they were settled prior to the filing," and testified that it was possible that she herself had provided the Margin Call Schedule to KPMG prior to the filing of the Form 10-K.  Ex. 291 (Starrett Tr. 62:12-21, 71:13-20).

Moreover, Defendants' recollection of the specific form in which information about margin calls Thornburg had received and met in weeks leading up to the filing of the Form 10-K was provided to KPMG is immaterial given that the record shows this information was, in fact, provided to KPMG prior to the filing. Reply Br. at IV.A; Reply to SMF ¶¶ 406, 411.

Defendants Disputed Facts ¶ J, at 6. This assertion does not dispute the SEC's asserted fact. The evidence that the Defendants cite does not specifically controvert the SEC's asserted fact. The Defendants' response to the SEC's interrogatory states:

**INTERROGATORY NO. 28:**

State whether You were aware that the Tie-Out Schedules were provided to KPMG prior to the filing of the 2007 Form 10-K, and, if so, identify all evidence supporting that You had such knowledge prior to the filing of the 2007 Form 10-K.

**RESPONSE TO INTERROGATORY NO. 28:**

. . . .

Mr. Goldstone further responds that he does not recall specifically being aware of the Margin Call Schedules or whether they were provided to KPMG prior to the filing of the 2007 Form 10-K. He does, however, believe that KPMG requested whatever information it deemed necessary to the audit, and believes that Thornburg employees were responsive to all such requests in accordance with the company's normal practice and management's expectations. Mr. Goldstone also recalls that during the February 22 Audit Committee meeting, the Audit Committee asked Ms. Reinhart whether she had all the information she needed relating to margin calls and liquidity, and she answered that she did.

Mr. Simmons further responds that he does not recall specifically whether the Margin Call Schedules were provided to KPMG prior to the 2007 Form 10-K filing, but has a general recollection that KPMG engagement manager Jennifer Hall requested a listing of February 2008 margin call activity. Although Mr. Simmons does not recall specific communications on that subject, he generally recalls that he asked members of the Finance Group to provide this information to KPMG, and that he understood KPMG received the information. See Simmons Depo Tr. at 72:1-7 (Feb. 26, 2013); see also KPMG-THRN-SEC-0015619. Mr. Simmons believes that KPMG requested from Thornburg whatever information it needed for the audit, and understands that Thornburg employees were responsive to all such requests as was the practice throughout the Company. See Simmons Depo Tr. at 74:25-75:5, 76:13-15, 77:15-22 (Feb. 26, 2013).

"[T]he Tie-Out Document was not a margin call schedule."  SEC Facts ¶ K, at 3 (setting forth

this fact)(internal quotation marks omitted).  See Reinhart Depo. at 37:24-38:15.[219]  "KPMG

included a ticked-and-tied copy of the Margin Call Schedule in its audit workpapers."  Goldstone

---

> Subject to and without waiving the foregoing objections, Ms. Starrett responds
> that prior to the filing of the 2007 Form 10-K she was aware that the Margin Call
> Schedule (KPMGTHRN-SEC-0000052) was prepared as support for the
> disclosure in the 2007 Form 10-K that Thornburg had received and paid over
> $300 million in margin calls in the latter half of February 2008, and that it is
> possible that she provided the document to KPMG.  See Starrett Depo Tr. at
> 60:10-18, 71:13-20 (Feb. 19, 2013).  While Ms. Starrett does not recall at this
> point in time which particular document was provided to KPMG to support the
> disclosure that Thornburg had received and paid over $300 million in margin
> calls, she was aware that Thornburg provided a schedule for every single figure in
> the 10-K filing, including the $300 million figure.  See Starrett Depo Tr. at
> 60:25-61:11, 63:11-17 (Feb. 19, 2013).   Ms. Starrett also recalls that the
> document provided to KPMG included a listing of margin calls, how they were
> settled, the amount in which they were settled, and the date on which they were
> settled prior to the 10-K filing.  See Starrett Depo Tr. at 62:15-21 (Feb. 19, 2013).

Defendants Reponses to 4th Set of Interrogatories at 2-4.  This response shows that Simmons did
not recall whether the Margin Call Schedule was provided to KPMG before the 2007 Form 10-K
filing.  That Simmons asked members of Thornburg's Finance Group to provide information to
KPMG concerning Thornburg Mortgage's margin call activity does not dispute this fact.  It is an
additional fact.  Additionally, the interrogatory states that Starrett does not recall what document
Thornburg Mortgage provided to KPMG, but that some document was provided to KPMG,
showing that Thornburg Mortgage received over $300 million in margin calls.  This evidence
supports the SEC's asserted fact, rather than disputing it.  Furthermore, while Starrett testified
that it is possible that she delivered the Margin Call Schedule to KPMG, she did not testify that
she delivered it.  Finally, the Defendants' assertion that the SEC's asserted fact is immaterial
does not dispute it.  Accordingly, the Court concludes that the Defendants have not disputed this
fact.

> [219]The Defendants respond by stating:
>
> > Undisputed that Ms. Reinhart testified as quoted, but misleading, as Ms. Reinhart
> > also testified that "[t]his was a schedule to disclose what the company thought
> > was significant relative to margin activity in the period prior to filing."  Moreover,
> > KPMG's own workpaper used the term "schedule" to describe the Margin Call
> > Schedule.

Defendants Disputed Facts ¶ K, at 6-7.  Because the Defendants do not dispute this fact, the
Court concludes that it is undisputed.

Facts ¶ 407, at 91 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this

fact); Form 10-K Draft at 4-6; Hall SEC Depo. at 156:1-4, 163:25-164:8.[220]  "KPMG obtained

_____

[220]The SEC asserts the following fact: "The Tie-Out Document was provided to KPMG on the afternoon of February 27 for the sole purpose of allowing KPMG to tie-out the total amount of margin calls KPMG had received in the last two weeks."  SEC Facts ¶ SS, at 7.  The Defendants dispute this fact by stating:

> Disputed.  The evidence is speculative and lacks foundation insofar as Ms. Hall and Ms. Reinhart purported to testify as to the purpose Thornburg had in providing a document.

> Further, Ms. Hall and Ms. Reinhart provided testimony to the contrary.  Ms. Reinhart testified that "tying out the dollar amount of margin calls disclosed in the Form 10-K" was not the "sole purpose" of the Margin Call Schedule.  Rather, she testified that the document had "two purposes."  One purpose "was a tie-out of the amounts in the financial statements.  And, the other was to understand the company's liquidity position[.]"  Ms. Hall testified that she considered the Margin Call Schedule in connection with her analysis of whether Thornburg could continue as a going concern and whether Thornburg needed to recognize an OTTI on its Purchased ARM Assets.

> Moreover, the fact is immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶ C, and because how an auditor chooses to review the information it is provided is not a basis for liability under Rule 13b2-2.

Defendants Disputed Facts ¶ SS, at 23 (citations omitted).  To dispute this fact, the Defendants cite Reinhart's deposition testimony, where she testified that the Margin Call Schedule had two purposes -- to tie-out the amounts in the financial statements and to understand Thornburg Mortgage's liquidity position.  See Reinhart Depo. at 155:15-20.  This testimony specifically controverts the SEC's asserted fact that the Margin Call Schedule had only one purpose.  The Court thus concludes that the Defendants have disputed the fact.

The Defendants assert the following fact: "Ms. Starrett testified that it was possible she herself had provided the Margin Call Schedule to KPMG prior to the filing of the Form 10-K." Starrett Facts ¶ 66, at 14.  The SEC attempts to dispute this fact by stating: "When Mr. McLamb interviewed Defendants Simmons and Starrett about their failure to disclose Thornburg's failure to timely meet margin calls, Defendants Simmons and Starrett admitted that they had not done so, and did not assert that the margin call schedule disclosed the information."  SEC Disputed Facts ¶ 66, at 11.  While the SEC's response does not dispute the Defendants' asserted fact, because the SEC does not contend that Starrett provided the Margin Call Schedule to KPMG, and Starrett does not assert that she or Simmons disclosed to KPMG Thornburg Mortgage's inability to timely meet its margin calls, the Court finds the fact disputed.  At a different deposition, Starrett testified that she did not personally deliver the Margin Call Schedule to

the Margin Call Schedule for 'two purposes.'  One purpose 'was a tie-out of the amounts in the

financial statements.'  And, '[t]he other was to understand the company[']s liquidity position as

of the time period that the company and KPMG were making an assessment of liquidity and

going concern.'"   Goldstone Facts ¶ 408, at 91-92 (setting forth this fact)(alterations in

_____

KPMG.  See Starrett SEC Depo. at 184:20-23.  This evidence specifically controverts the
Defendants' fact, and the Court thus concludes that the SEC has disputed it.

The SEC asserts the following fact:  "Starrett testified during her investigative testimony
on February 2, 2011 that she did not personally recognize any of the pages of the Tie-Out
Document and didn't, and she didn't personally deliver these pages to anyone at KPMG."  SEC
Supp. Facts ¶ WW, at 1 (alterations omitted)(internal quotation marks omitted).  Starrett disputes
this fact by stating:

> Ms. Starrett does not dispute that she provided the testimony contained in this
> fact, but notes that she also testified that while she "[didn't] recall who provided
> [the Margin Call Schedule]" to KPMG, that it was possible that she did so.

> Moreover, whether Ms. Starrett herself provided the Margin Call Schedule to
> KPMG is immaterial given the undisputed fact that it was provided to KPMG
> prior to the filing of the Form 10-K, disclosed "margin calls Thornburg had
> received during [the February 14 through February 26] period," and provided
> information from which it could be "discerned . . . that certain margin calls were
> paid over a period of several days,"

> Ms. Starrett disputes any implication that she had personal responsibility to
> deliver the Margin Call Schedule or related audit evidence to KPMG and that she
> was unaware that this information was provided to KPMG prior to the 10-K
> filing. See JS SUF 62 (Ms. Starrett testifying that KPMG auditors "were provided
> with listings of margin calls and how they were settled, and the amount in which
> they were settled, and the date on which they were settled prior to the filing [of
> the 2007 Form 10-K].").

Starrett Disputed Facts ¶ WW, at 2-3 (citations omitted).  To dispute this fact, Starrett cites
Starrett's deposition testimony, where she testified that it is possible that she was the person who
provided the Margin Call Schedule to KPMG.  See Starrett Depo. at 70:16-71:20.  This
testimony specifically controverts the SEC's asserted fact, and the Court concludes that the
Defendants have disputed this fact.

Goldstone Facts but not in source)(quoting Reinhart Depo. at 155:15-20).  See Reinhart Depo. at

155:15-20.[221]

> Ms. Hall . . . considered the Margin Call Schedule in connection with her analysis
> of whether Thornburg could continue as a going concern and whether Thornburg
> needed to recognize an OTTI on its Purchased ARM Assets. . . .  [T]he schedule
> "didn't seem inconsistent with anything that I had already known or learned about
> or had discussed with management."

Goldstone Facts ¶ 409, at 92 (setting forth this fact)(alterations omitted)(quoting Hall Depo. at

50:4-6).  See Hall Depo. at 49:15-52:10.[222]  "Starrett . . . did not . . . see[] the Tie-Out Document

---

[221]The SEC attempts to dispute this fact by stating: "Ms. Reinhart testified that she does
not know whether she even saw the margin call schedule during the Thornburg audit."  SEC
Disputed Facts ¶ 408, at 34.  This assertion does not dispute the Defendants' asserted fact.  The
Defendants do not assert that Reinhart saw the Margin Call Schedule during the Thornburg
Mortgage audit.  Instead, they assert what the purpose of the Margin Call Schedule is.  The Court
thus concludes that the SEC has not disputed this fact.

[222]The SEC attempts to dispute this fact by stating: "Ms. Hall testified that the margin call
schedule was not provided to disclose how Thornburg was meeting margin calls but merely to
allow KPMG to tie out the recent developments disclosure that Thornburg had met margin calls
in excess of $300 million on its Reverse Repurchase Agreements."  SEC Disputed Facts ¶ 409,
at 34 (alterations omitted)(internal quotation marks omitted).  The SEC's assertion does not
address, much less specifically controvert, the Defendants' asserted fact, and the Court concludes
that the SEC has not disputed the fact.

As shown throughout the Factual Background section of this Memorandum Opinion and
Order, the SEC appears to be using its disputed facts mainly to raise unfavorable facts about the
Defendants, rather than to dispute the Defendants' asserted facts.  In a motion that consists of
over six hundred pages of briefing concerning solely the facts and close to 10,000 pages of
exhibits, such a practice is not helpful to what the Court has to do.  While these motions
constitute complicated issues and concern complex facts, the length of this Memorandum
Opinion and Order could have been shorter, and the parties would have received a ruling earlier,
if they focused on the relevant issues, rather than focusing on semantics or asserting unfavorable
facts under the guise of disputing an asserted fact.  Not only does such a practice misuse time
and resources, it may obscure the pertinent facts that the SEC truly wishes to dispute.  While the
Court has diligently examined every piece of evidence and wrestled with each purportedly
disputed fact, as can be seen by the length of this factual section, the SEC's practice of merely
raising unfavorable evidence while claiming to dispute an asserted fact may cause the Court to
miss or pass over a genuinely disputed fact, because the SEC's practice leads to the expectation
that, when it states that it disputes an asserted fact, it may be asserting unfavorable evidence that
does not dispute the asserted fact.

(Margin Call Schedule) prior to the filing of the 2007 Form 10-K." SEC Supp. Facts ¶ XX, at 1 (setting forth this fact). See Starrett Depo. at 56:16-59:10.[223] "[T]he Tie-Out Document 'was prepared specifically to support the number in the recent developments section, which is a number that we, you know, had to come up with. So we prepared it to determine what that number was.' She did not [have any] level of involvement with the document." SEC Supp. Facts ¶ YY, at 1-2 (setting forth this fact)(quoting Starrett Depo. at 60:2-5). See Starrett Depo. at 59:20-60:9.[224] "Ms. Hall . . . [,] after taking into account the information contained in the

---

[223]Starrett responds to this fact by stating:

Ms. Starrett does not dispute that during her February 19, 2013 deposition she answered "I don't recall" to the SEC's question "Did you see [page bates stamped 52C of the Margin Call Schedule] prior to the filing of the 2007 Form 10-K?" Whether Ms. Starrett personally reviewed the Margin Call Schedule prior to the filing of the Form 10-K is immaterial; the undisputed facts show that Thornburg provided the Margin Call Schedule to KPMG prior to the filing, that the Margin Call Schedule "listed the . . . margin calls Thornburg had received during [the February 14 through February 26] period," and provided information from which it could be discerned . . . that certain margin calls were paid over a period of several days,"

Moreover, Ms. Starrett was aware that KPMG auditors "were provided with listings of margin calls and how they were settled, and the amount in which they were settled, and the date on which they were settled prior to the filing [of the 2007 Form 10-K]." Ms. Starrett disputes any implication that she was not aware that this information was provided to KPMG.

Starrett Disputed Facts ¶ XX, at 3-4 (citations omitted). Because Starrett does not dispute this fact, and because asserting that a fact is immaterial does not dispute it, the Court finds the fact undisputed.

[224]Starrett responds to this fact by stating:

Ms. Starrett does not dispute that she provided this testimony. Ms. Starrett disputes any implication, however, that her testimony regarding not recalling her "level of . . . involvement," with the Margin Call Schedules suggests that she was not aware that they were being prepared.

Margin Call Schedule[,] . . . KPMG concluded Thornburg did not need to recognize impairments on its Purchased ARM Assets." Starrett Facts ¶ 59, at 13 (setting forth this fact).  See Hall Depo. at 49:21-50:21.[225]  "KPMG did not do any testwork on the timing of margin call payments, including the pattern of payments for the $196.5 million Citi margin call, even though this

---

> Ms. Starrett also disputes any implications that KPMG requested the Margin Call Schedule solely for the purpose of tying out the figures in the recent development section, or that KPMG used the Margin Call Schedule solely for this purpose.
>
> Finally, the specific reasoning behind the preparation of the Margin Call Schedule is immaterial; the SEC does not dispute the material facts that Thornburg provided KPMG the Margin Call Schedule prior to the Form 10-K filing, and that the Margin Call Schedule showed "margin calls Thornburg had received during [the February 14 through February 26] period," and provided information from which it could be discerned . . . that certain margin calls were paid over a period of several days,"

Starrett Disputed Facts ¶ YY, at 4 (citations omitted).  This assertion does not dispute the SEC's asserted fact.  Starrett does not dispute the asserted fact, but only the implications that can be drawn from the fact.  Moreover, asserting that a fact is immaterial does not dispute it. Accordingly, the Court finds the fact undisputed.

[225]The SEC attempts to dispute this fact by stating:

> Ms. Hall testified that on February 25 or 26, 2008 Simmons "indicated that they were meeting their margin calls" and "that there weren't issues -- that there were not liquidity issues and that they were meeting their margin calls."  She also testified that she considered the Tie-Out Document "for support of their 10-K disclosures that the amount of margin calls they had been receiving or had received."  What Defendants call the Margin Call Schedule and what the SEC calls the Tie-Out document was not provided in response to Ms. Hall's earlier request for a list of margin calls the company had been receiving.  The Tie-Out document was provided for the sole purpose of tying out the dollar amount of margin calls disclosed in the Form 10-K. Ms. Hall did not even review the two pages that can be interpreted to indicate payment of margin calls over time.

SEC Disputed Starrett Facts ¶ 59, at 9-10.  This assertion does not specifically dispute Starrett's asserted fact.  Even if Hall did not use the Margin Call Schedule to determine whether Thornburg Mortgage met its margin calls over time, the SEC does not assert that it was not used in KPMG's OTTI analysis.  The SEC does not dispute Starrett's asserted fact, and the Court concludes that the fact is undisputed.

information was reflected on the Margin Call Schedule provided to KPMG prior to the filing of

the 2007 Form 10-K." Starrett Facts ¶ 74, at 15 (setting forth this fact). See Acree Depo. at

207:25-208:11; Hall Depo. at 70:10-13, 71:18-72:2.[226] "[L]ooking at that information on the

Margin Call Schedule, it could have raised additional questions and prompted more procedures

that we may have performed." Starrett Facts ¶ 60, at 13 (setting forth this fact)(alterations

omitted)(internal quotation marks omitted). See Hall Depo. at 128:21-24.[227] "Tara Baucom, the

Senior Audit Manager, initialed the Margin Call Schedule." Goldstone Facts ¶ 410, at 92

(setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Baucom Depo.

---

[226]The SEC attempts to dispute this fact by stating:

> What Defendants call the Margin Call Schedule and what the SEC calls the Tie-Out document was not provided in response to Ms. Hall's earlier request for a list of margin calls the company had been receiving. The Tie-Out document was provided for the sole purpose of tying out the dollar amount of margin calls disclosed in the Form 10-K. Ms. Hall did not even review the two pages that can be interpreted to indicate payment of margin calls over time.

SEC Disputed Starrett Facts ¶ 74, at 12. This assertion does not dispute Starrett's asserted fact. The SEC does not assert that KPMG did testwork on the timing of Thornburg Mortgage's margin call payments and does not assert that the Margin Call Schedule did not reflect the timing of the margin call payments. Consequently, the SEC fails to dispute this fact, and the Court concludes that it is undisputed.

[227]The SEC attempts to dispute this fact by stating:

> KPMG personnel have testified, and the SEC's expert has opined, that failure to timely meet margin calls should have been disclosed directly to KPMG by Defendants, and that burying it in a tie-out schedule provided to the lowest-level KPMG team member hours prior to the 10-K filing was insufficient. When Mr. McLamb interviewed Defendants Simmons and Starrett about their failure to disclose Thornburg's failure to timely meet margin calls, Defendants Simmons and Starrett admitted that they had not done so, and did not assert that the margin call schedule disclosed the information.

SEC Disputed Starrett Facts ¶ 60, at 13. This assertion does not address, much less dispute, Starrett's asserted fact. Consequently, the Court concludes that the SEC has not disputed the fact.

at 171:17-172:17.  "[T]he Margin Call Schedule 'listed the . . . MARGIN CALLS Thornburg had received during [the February 14 through February 26] period,' and provided information from which it could be 'discerned . . . that certain MARGIN CALLS were paid over a period of several days. . . . ,' rather than on the same-day or next-day basis."  Goldstone Facts ¶ 411, at 92 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting 1st RFAs at 7-8).  See SEC Disputed Facts at 1-51 (not disputing this fact); 1st RFAs at 6-9.

"[T]he Margin Call Schedule showed that certain margin calls, including the Citigroup call, were paid over several days."  Goldstone Facts ¶ 413, at 92 (setting forth this fact).  See Hall Depo. at 58:5-8, 69:10-70:3, 76:22-77:5, 162:22-163:13, 193:23-194:8; Reinhart Depo. at 225:16-226:12; McLamb Depo. at 96:13-19.[228]  "[T]he Margin Call Schedule was provided to KPMG prior to the filing of Thornburg's 2007 Form 10-K and . . . it could be discerned from that document that certain margin calls had been paid over a period of several days."  Starrett Facts ¶ 61, at 13 (setting forth this fact)(internal quotation marks omitted).  See 1st RFAs at 8.[229]

---

[228]The SEC attempts to dispute this fact by stating:

> What Defendants call the Margin Call Schedule and what the SEC calls the Tie-Out document was not provided in response to Ms. Hall's earlier request for a list of margin calls the company had been receiving, the Tie-Out Document was provided for the sole purpose of tying out the dollar amount of margin calls disclosed in the Form 10-K.  Ms. Hall did not even review the two pages that can be interpreted to indicate payment of margin calls over time.

SEC Disputed Facts ¶ 413, at 34-35.  This assertion does not address, much less specifically controvert, the Defendants' asserted fact.  The Court thus concludes that the SEC has not disputed the fact.

[229]The SEC attempts to dispute this fact by stating:

> KPMG personnel have testified, and the SEC's expert has opined, that failure to timely meet margin calls should have been disclosed directly to KPMG by Defendants, and that burying it in a tie-out schedule provided to the lowest-level KPMG team member hours prior to the 10-K filing was insufficient.  When

"KPMG was provided with listings of margin calls and how they were settled and the amount in which they were settled and the date on which they were settled prior to the filing."   Starrett Facts ¶ 62, at 13 (setting forth this fact)(internal quotation marks omitted).  See Starrett Depo. at 62:12-21.[230]

> For example, with respect to the Citigroup margin call, the Margin Call Schedule reflected, among other things: (a) a $196.5 million margin call from Citigroup on February 21, 2008; (b) on February 21, a notation "pd 10mm;" (c) February 21, 22 and 25, 2008 payments in amounts ranging from $10 million to $40 million; and (d) for February 26, a payment amount of $9.459 million to Citi noted as "pmt for 2/21 call."

---

> Mr. McLamb interviewed Defendants Simmons and Starrett about their failure to disclose Thornburg's failure to timely meet margin calls, Defendants Simmons and Starrett admitted that they had not done so, and did not assert that the margin call schedule disclosed the information.

SEC Disputed Starrett Facts ¶ 61, at 10.  This assertion does not dispute Starrett's asserted fact. The SEC does not contend, in contrast to its prior admission, that it could not be discerned from the Margin Call Schedule that certain margin calls had been paid over the period of several days. The Court thus concludes that the SEC has not disputed the fact.

[230]The SEC attempts to dispute this fact by stating:

> KPMG personnel have testified, and the SEC's expert has opined, that failure to timely meet margin calls should have been disclosed directly to KPMG by Defendants, and that burying it in a tie-out schedule provided to the lowest-level KPMG team member hours prior to the 10-K filing was insufficient.  When Mr. McLamb interviewed Defendants Simmons and Starrett about their failure to disclose Thornburg's failure to timely meet margin calls, Defendants Simmons and Starrett admitted that they had not done so, and did not assert that the margin call schedule disclosed the information.

SEC Disputed Starrett Facts ¶ 62, at 10.  This assertion does not dispute Starrett's asserted fact. The SEC does not assert that the Margin Call Schedule was not provided to KPMG before the 2007 Form 10-K filing, or that the Margin Call Schedule does not contain a list of margin calls and how they were settled.  Accordingly, the SEC fails to specifically controvert this fact, and the Court concludes that it is undisputed.

Goldstone Facts ¶ 414, at 92 (setting forth this fact)(quoting Form 10-K Draft at 5).  See  Form

10-K Draft at 4-6.[231]

> Mr. McLamb, who had never seen the Margin Call Schedule before it was shown
> to him in his deposition in this case, was easily able to identify the Citigroup
> margin call information on the schedule and determine that the Citigroup margin
> call had been paid over several days. . . .   "[T]he schedule certainly shows" the
> "sale of an asset that generated proceeds of approximately 53 million that was
> used to pay the Citi margin call."

Goldstone Facts ¶ 415, at 93 (setting forth this fact)(alterations omitted)(quoting McLamb Depo.

at 121:22-122:3).  See McLamb Depo. at 95:2-96:19, 121:21-122:3.[232]  "[I]t showed a margin

call that was not met in the one-day period."   Goldstone Facts ¶ 416, at 93 (setting forth this

fact)(internal quotation marks omitted).  See Taylor Depo. at 138:21-139:14.[233]

---

[231]The SEC attempts to dispute this fact by stating:

> What Defendants call the Margin Call Schedule and what the SEC calls the Tie-
> Out document was not provided in response to Ms. Hall's earlier request for a list
> of margin calls the company had been receiving, the Tie-Out Document was
> provided for the sole purpose of tying out the dollar amount of margin calls
> disclosed in the Form 10-K.  Ms. Hall did not even review the two pages that can
> be interpreted to indicate payment of margin calls over time.

SEC Disputed Facts ¶ 414, at 35.  This assertion does not address, much less specifically
controvert, the Defendants' asserted fact.  Accordingly, the Court finds that the SEC has not
disputed the fact.

[232]The SEC attempts to dispute this fact by stating:

> What Defendants call the Margin Call Schedule and what the SEC calls the
> Tie-Out document was not provided in response to Ms. Hall's earlier request for a
> list of margin calls the company had been receiving, the Tie-Out Document was
> provided for the sole purpose of tying out the dollar amount of margin calls
> disclosed in the Form 10-K.  Ms. Hall did not even review the two pages that can
> be interpreted to indicate payment of margin calls over time.

SEC Disputed Facts ¶ 415, at 35.  This assertion does not address, much less specifically dispute,
the Defendants' asserted fact.  The SEC has thus not disputed the fact.

[233]The SEC attempts to dispute this fact by stating:

"With respect to the margin call from Greenwich on February 21, 2008, the Margin Call Schedule reflected installment payments over more than one day."  Goldstone Facts ¶ 417, at 93 (setting forth this fact).  See Form 10-K Draft at 5-6; Hall Depo. at 56:22-24; Reinhart Depo. at 226:8-12.[234]  "[B]ased on the Audit Committee's procedures and his specific interactions with

---

> What Defendants call the Margin Call Schedule and what the SEC calls the Tie-Out document was not provided in response to Ms. Hall's earlier request for a list of margin calls the company had been receiving, the Tie-Out Document was provided for the sole purpose of tying out the dollar amount of margin calls disclosed in the Form 10-K.  Ms. Hall did not even review the two pages that can be interpreted to indicate payment of margin calls over time.

SEC Disputed Facts ¶ 416, at 35.  This assertion does not address, much less specifically dispute, the Defendants' asserted fact.  Consequently, the Court concludes the SEC has not disputed the fact.

[234]The SEC attempts to dispute this fact by stating:

> What Defendants call the Margin Call Schedule and what the SEC calls the Tie-Out document was not provided in response to Ms. Hall's earlier request for a list of margin calls the company had been receiving, the Tie-Out Document was provided for the sole purpose of tying out the dollar amount of margin calls disclosed in the Form 10-K.  Ms. Hall did not even review the two pages that can be interpreted to indicate payment of margin calls over time.

SEC Disputed Facts at 1-51.  This assertion does not address, much less specifically dispute, the Defendants' asserted fact.  Accordingly, the Court concludes that the SEC has not disputed the fact.

The Defendants assert the following fact: "KPMG did not identify the payment of margin calls over several days as cause for concern prior to the Form 10-K filing or the restatement."  Goldstone Facts ¶ 418, at 93.  To support this fact, the Defendants cite Hall's deposition testimony.  Hall testified that she did not look at "actual evidence of the pattern of margin calls and payment on those margin calls during . . . the last two weeks of February."  Hall Depo. at 93:2-8.  She also testified that information concerning Thornburg Mortgage paying margin calls over time may have been important.  See Hall Depo. at 93:9-94:15.  Finally, Hall testified that the Margin Call Schedule was disclosed for the purpose of tying out the footnote disclosure in the 2007 Form 10-K and that no one at KPMG said that KPMG should follow up on the information contained in the Margin Call Schedule.  See Hall Depo. at 165:5-166:4.  This evidence does not support the asserted fact that "KPMG did not identify the payment of margin calls over several days as cause for concern prior to the Form 10-K filing or the restatement."  Goldstone Facts ¶ 418, at 93.  If anything, Hall's deposition testimony suggests that KPMG was

KPMG, [Audit Committee member Mullin] had no reason to doubt that KPMG had the information that it needed to properly complete its audit." Goldstone Facts ¶ 419, at 93 (setting forth this fact). See Mullin Decl. ¶ 18, at 4.[235]

> GAAS provides that an auditor's objective is to obtain sufficient competent evidential matter to provide him or her with a reasonable basis for forming an opinion, where the amount and kinds of evidential matter required to support an informed opinion are matters for the auditor to determine in the exercise of his or her professional judgment; that an auditor must perform a thorough search for evidential matter; and that auditors must have an attitude that includes a questioning mind and a critical assessment of audit evidence.

Goldstone Facts ¶ 420, at 93 (setting forth this fact)(alterations omitted)(internal quotation marks omitted). See SEC Disputed Facts at 1-51 (not disputing this fact); AU § 326 Evidential Matter, Public Company Accounting Oversight Board at 3-4, filed August 9, 2013 (Doc. 204-275); AU § 230 Due Professional Care in the Performance of Work at 3, filed August 9, 2013 (Doc. 204-274).

"Ms. Hall did not share the Margin Call Schedule with any of the KPMG audit partners -- Ms. Reinhart, Mr. Womack, Mr. Taylor or Mr. McLamb -- before KPMG signed off on the OTTI and Form 10-K." Goldstone Facts ¶ 421, at 93 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Reinhart Depo. at 4:19-5:24, 17:11-18:1; Womack Depo. at 88:8-90:13; Taylor Depo. at 115:6-13; McLamb Depo. at 267:13-268:11, 275:19-23.

---

unaware that Thornburg Mortgage paid the margin calls over several days. The Defendants' asserted fact, thus, lacks evidentiary support, and the Court will not consider it.

[235]The SEC attempts to dispute this fact by stating: "KPMG was excluded from a February 22, 2008 Audit Committee executive committee meeting at which Thornburg's failure to timely meet margin calls was discussed, information that Defendants purposely withheld from KPMG." SEC Disputed Facts ¶ 419, at 36. The Defendants do not assert that KPMG was included in every Audit Committee executive meeting or that Thornburg Mortgage did not withhold information from KPMG. They assert only that Mullin had no reason to doubt that KPMG had sufficient information to properly complete the audit, which he could have believed despite KPMG being left in the dark about Thornburg Mortgage's failure to timely pay its margin calls.

"Ms. Reinhart expressed no concern about Ms. Hall's decision not to share the Margin Call

Schedule with her before the 10-K filing.  Ms. Reinhart testified . . . reviewed the Margin Call

Schedule for the first time on March 3, 2008, and discussed it with Ms. Hall on March 3 or 4,

2008."  Goldstone Facts ¶ 422, at 94 (setting forth this fact).  See SEC Disputed Facts at 1-51

(not disputing this fact); Reinhart Depo. at 5:4-6:20, 8:12-24, 14:4-16:2, 157:5-158:1.

Ms. Reinhart was not surprised by the total number of margin calls contained in the Margin Call

Schedule.  See Goldstone Facts ¶ 423, at 94 (setting forth this fact); Reinhart Depo. at

6:21-8:11.[236]  "KPMG auditors did not raise any questions or concerns with anyone at Thornburg

---

[236]The Defendants' fact states:  "Ms. Reinhart testified that she was not surprised by anything contained in the Margin Call Schedule."  Goldstone Facts ¶ 423, at 94.  The SEC disputes this fact by stating:  "Ms. Reinhart testified that she was not surprised by the information in the margin call schedule because its purpose was to tie-out the total number of recent margin call activities, not late payments of margin calls, so for its intended purpose, it was not surprising."  SEC Disputed Facts ¶ 423, at 36.  The Defendants reply by stating:  "The SEC's response does not materially dispute this fact.  Instead, the SEC responds with Ms. Reinhart's unsupported speculation about the purpose for which Thornburg provided the Margin Call Schedule to KPMG.  This testimony is inadmissible speculation and hearsay, and is immaterial."  Goldstone Reply Facts ¶ 423, at 190-91 (citation omitted).
     The Defendants and the SEC cite the same portion of Reinhart's deposition testimony either to support the fact or to dispute it.  At her deposition, when asked if she was "surprised that all of that information about margin calls was right there in the 10-K," Reinhart answered that she did not "consider the information that was presented here on these three pages [of the Margin Call Schedule] to be all of the information about margin calls."  Reinhart Depo. at 6:25-7:5.  She was then asked whether she was "surprised at any of the information that was contained on those three pages of the [Margin Call Schedule] that was right there in the 10-K," and Reinhart answered:  "That wasn't the purpose of the schedule.  The purpose was a tie-out for a footnote disclosure in the 10-K."  Reinhart Depo. at 7:3-12.  When asked why she was not surprised about the information in the Margin Call Schedule, Reinhart answered:  "It's because the number was to support a figure in the 10-K.  And it was not a schedule that was purported to reflect margin call activity."  Reinhart Depo. at 7:20-24.  When asked a substantially similar question, Reinhart answered:  "Again, the information as I looked at it was to tie out specifically a number in the 10-K.  Nothing more than that."  Reinhart Depo. at 7:25-8:7.  Reinhart's deposition testimony indicates that the reason that the Margin Call Schedule did not surprise her was because she considered it solely to tie-out a footnote in the 2007 Form 10-K, and not to analyze the manner or timing in which Thornburg Mortgage paid the margin calls.  The Defendants' asserted fact suggests that nothing in the Margin Call Schedule surprised Reinhart.  That assertion, however, mischaracterizes Reinhart's testimony.  Reinhart repeatedly testified

- 254 -

that she examined the Margin Call Schedule solely for the purpose of tying-out the footnote and nothing more.  It is thus only that information that did not surprise her.  Consequently, the Court has modified the Defendants' asserted fact to more accurately reflect the evidence.

The Defendants assert the following fact:

> Ms. Reinhart testified that KPMG had no interest in knowing the total magnitude of the margin calls received and paid by Thornburg in January and February of 2008.   She testified that KPMG was, instead, focused on the value of the collateral as being a better indicator or better driver as to the likelihood of the company experiencing future margin calls.

Goldstone Facts ¶ 424, at 94 (internal citations omitted).  The SEC disputes this fact by stating:

> Ms. Reinhart testified that during the audit she cared what the magnitude of margin calls was that Tho4rnburg [sic] had received in January and February before the K was filed.  She also testified that, to her knowledge, KPMG did not inquire as to what the average level of margin calls were during the 2007 audit but rather discussed the trends during periods of times where there were significant margin calls.  The Form 10-K was false because Defendants did not disclose -- to investors or KPMG -- the complete picture of the total amount of margin calls received by Thornburg Mortgage in the subsequent events period.

SEC Disputed Facts ¶ 424, at 36 (alterations omitted)(internal quotation marks omitted).  At her deposition, Reinhart testified that, during the audit, she cared "what the magnitude of margin calls was that Thornburg had received in January and February before the K was filed."  Reinhart Depo. at 134:11-15.

The Defendants reply by stating:

> The SEC's response does not materially dispute this fact.

> The SEC's quotation of Ms. Reinhart's deposition testimony is misleading because, although Ms. Reinhart testified that she cared "what the magnitude of margin calls was that Thornburg had received in January and February" 2008, she also acknowledged that she had not asked the Company for that information: "I knew that the company had renewed and rolled its reverse repurchase agreements in January, so January was behind it.   And February, we discussed the margin calls that the company had received from . . . February 14 through the end of February. And the company identified that as being the relevant significant time period that it believed should be disclosed in its financial statements." SECExh. 27 (Reinhart Tr. at 134:11-25).

> Moreover, it is undisputed that by the time KPMG concluded its work on the Thornburg restatement, KPMG was aware of all material facts -- including all margin calls Thornburg received during the subsequent events period -- yet concluded that it did not have concerns about management's integrity, that there

with respect to the Margin Call Schedule and how Thornburg was meeting margin calls received

between February 14 and 27, 2008. . . .   KPMG had no specific reason for failing to do so."

Goldstone Facts ¶ 425, at 94 (setting forth this fact).  See Hall Depo. at 79:12-80:13, 165:5-20,

183:16-184:19, 408:19-409:3, 430:16-431:11; Reinhart Depo. at 228:2-18, 238:11-21; Jacquez

Decl. ¶¶ 16-18, at 4; Feldman Decl. ¶ 33, at 7; Simmons Decl. ¶ 38, at 9.[237]  "Mr. McLamb . . .

could not reconcile KPMG's receipt of [daily cash settlement reports reflecting recent margin

---

> was no material weakness in Thornburg's internal controls, and that there had
> been no fraud by Thornburg's management.
>
> The SEC's assertion that the Form 10-K was false because it did not disclose "the
> complete picture of the total amount of margin calls received by Thornburg
> Mortgage in the subsequent events period" is immaterial and irrelevant in light of
> the Court's Motion to Dismiss ruling in which the Court limited the SEC's claim
> relating to the alleged falsity of the Form 10-K claim to the OTTI judgment.
>
> Defendants object to the SEC's reliance on the unsworn expert report of
> Mr. Kitchens for the reasons set forth in Defs.' Reply to SMF ¶ 201.

Goldstone Reply Facts ¶ 424, at 191-92 (citations omitted)(internal quotation marks omitted).
The Court finds that the SEC has not disputed the Defendants' asserted fact.  Reinhart
testified that she cared about the magnitude of margin calls that Thornburg Mortgage received
before the 2007 Form 10-K filing.  That testimony directly controverts the Defendants' asserted
fact.  Accordingly, the Court finds that the SEC has not disputed the fact.

[237]The SEC attempts to dispute this fact by stating:

> Defendants purposefully withheld critical information about margin calls -- that
> they were not timely being met -- from KPMG, as demonstrated by Defendant
> Starrett's February 25, 2008 e-mail to Defendants Goldstone and Simmons: "We
> have purposely not told them [KPMG auditors] about the margin calls so that we
> don't escalate an issue which we believe will be put to rest by the time they have
> to issue an opinion."  Ms. Reinhart and Ms. Hall testified that Defendants should
> have told KPMG about the difficulty meeting margin calls.

SEC Disputed Facts ¶ 425, at 36 (alterations in SEC Disputed Facts but not in source)(quoting
Feb. 25, 2008, Goldstone KPMG Email at 2).  This assertion does not dispute the Defendants'
asserted fact.  The Defendants do not assert that they did not withhold information from KPMG,
but only that KPMG did not raise concerns about the Margin Call Schedule.  Accordingly, the
Court concludes that the SEC has not disputed this fact.

calls] prior to the filing of the 10-K with Ms. Reinhart's later claim to him that the engagement

team was unaware of the magnitude of the margin calls before the filing of the Form 10-K."

Goldstone Facts ¶ 426, at 94 (setting forth this fact)(internal quotation marks omitted).  See

Goldstone Facts Errata at 3 (amending this fact); McLamb Depo. at 197:19-199:9.[238]

> KPMG Business Unit Professional Practice Partner Robert McLamb, who was
> consulted on and approved KPMG's going concern analysis, could not reconcile
> [the statement in the going concern workpaper that the engagement
> team reviewed daily cash settlements with reverse repo counterparties, noting that
> Thornburg has met all margin calls required by lenders subsequent to August
> 2007] with Ms. Reinhart's subsequent assertion to members of the DPP that the
> engagement team was unaware of the magnitude of the margin calls from January
> 1, 2008 up to the point of filing. . . .  [McLamb could not] reconcile the two.

Starrett Facts ¶ 64, at 13 (setting forth this fact)(alterations omitted)(quoting McLamb Depo. at

195:13-19, 199:8-9).  See McLamb Depo. at 195:13-199:9.[239]

---

[238]The SEC attempts to dispute this fact by stating:

> KPMG personnel have testified, and the SEC's expert has opined, that failure to
> timely meet margin calls should have been disclosed directly to KPMG by
> Defendants, and that burying it in a tie-out schedule provided to the lowest-level
> KPMG team member hours prior to the 10-K filing was insufficient.  When
> Mr. McLamb interviewed Defendants Simmons and Starrett about their failure to
> disclose Thornburg's failure to timely meet margin calls, Defendants Simmons
> and Starrett admitted that they had not done so, and did not assert that the margin
> call schedule disclosed the information.

SEC Disputed Facts ¶ 426, at 36-37.  The Defendants do not assert that they should not have
disclosed to KPMG Thornburg's failure to timely meet its margin calls.  The SEC thus fails to
specifically controvert the Defendants' asserted fact, and the Court concludes that the fact is
undisputed.

[239]The SEC attempts to dispute this fact by stating:

> KPMG personnel have testified, and the SEC's expert has opined, that failure to
> timely meet margin calls should have been disclosed directly to KPMG by
> Defendants, and that burying it in a tie-out schedule provided to the lowest-level
> KPMG team member hours prior to the 10-K filing was insufficient.  When Mr.
> McLamb interviewed Defendants Simmons and Starrett about their failure to
> disclose Thornburg's failure to timely meet margin calls, Defendants Simmons

Reinhart . . . told Thornburg's Audit Committee, at the March 18, 2008 Audit
Committee meeting:

> [KPMG] would have liked to have known the amount of margin
> calls that had been received during the subsequent events
> period. . . .   [KPMG] would have liked to have known that the
> company was not meeting its margin calls on a daily basis, in
> accordance with the terms of its repurchase agreements. . . .
> [KPMG] would have liked to have known that it was selling assets
> in order to satisfy margin calls. . . .   [KPMG] would have liked to
> have known that the company had quit funding loans in the week
> or so prior to filing.

SEC Facts ¶ L, at 3 (setting forth this fact)(internal quotation marks omitted)(citing Reinhart

Depo. at 47:15-48:1).  See Reinhart Depo. at 47:10-48:1.[240]

---

and Starrett admitted that they had not done so, and did not assert that the margin
call schedule disclosed the information.  Further, Mr. McLamb testified that he
would have liked to have key information related to the Citi letter Reservation of
Rights, Defendants' advance knowledge of the European hedge fund collapse, and
Thornburg's inability to meet margin calls, all of which Defendants withheld from
KMPG [sic], as the information would have impacted the going concern analysis.

SEC Disputed Starrett Facts ¶ 64, at 10-11.   This assertion does not address, much less
specifically controvert, Starrett's asserted fact.  The Court thus concludes that the SEC has not
disputed this fact.

[240]The Defendants respond to this fact by stating:

Undisputed that Ms. Reinhart testified as quoted, but immaterial because
(1) notwithstanding this testimony, KPMG concluded that Thornburg
management had not acted fraudulently and there was no weakness in
Thornburg's internal controls; (2) the undisputed evidence is that KPMG was
provided information with respect to the amount of margin calls received during
the subsequent event period and Thornburg's delayed payment of margin calls,
and, moreover, Ms. Reinhart testified that KPMG had no interest in knowing the
total magnitude of margin calls received and paid during that period; (3) the
undisputed evidence is that Thornburg was not "selling assets in order to satisfy
margin calls" because I/O strip financing transactions are not asset sales; and
(4) there is no evidence that Thornburg "had quit funding loans," and the
undisputed evidence establishes that it had not.

Ms. Reinhart's testimony is also immaterial for the reasons set forth in
Defendants' Response to SEC SMF ¶¶ C, MM.

25.    **KPMG's Knowledge of the Terms of Thornburg Mortgage's Reverse Purchase Agreements.**

"At the time of the 2007 Thornburg year-end audit, Ms. Hall and Ms. Reinhart had reviewed and were familiar with the terms of Thornburg's reverse repurchase agreements." Goldstone Facts ¶ 427, at 94 (setting this fact). <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); Baucom Depo. at 175:12-17; Reinhart SEC Depo. at 16:19-20:21; Hall SEC Depo. at 22:16-23:7. "Ms. Hall and Ms. Reinhart understood that Thornburg's repo agreements generally required payment of margin calls on the same or next day after the call was received." Goldstone Facts ¶ 428, at 95 (setting forth this fact). <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); Reinhart SEC Depo. at 16:19-20:21; Hall SEC Depo. at 29:12-30:7. "Ms. Hall understood that 'as a practical matter the company was working with its counterparties with respect to margin calls so if they were not meeting the time period set forth in the agreements the parties were . . . working that out.'" Goldstone Facts ¶ 429, at 95 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Hall SEC Depo. at 34:4-7). <u>See</u> Hall SEC Depo. at 34:4-9.[241]   "[P]rior to the filing of the 10-K KPMG [n]ever asked to

---

Ms. Reinhart's hindsight testimony that KPMG "would have liked to have known" certain information is immaterial for the further reason that it is not a basis of liability under Rule 13b2-2, and the undisputed evidence establishes the objective immateriality of the information KPMG allegedly did not know.

Defendants Disputed Fact ¶ L, at 7 (citations omitted).  Because the Defendants do not dispute this fact, and because asserting that a fact is not material does not dispute it, the Court concludes that the fact is undisputed.

[241]The SEC attempts to dispute this fact by stating:

Defendants' citation to Ms. Hall's testimony omits the preceding question and answer where Ms. Hall testified that her understanding during the 2007 audit was that there were no instances where the settlement of margin calls were taking longer than the time period set forth in the agreements.  Ms. Hall also understood

review or requested that Thornburg provide copies of reservation of rights letters from repo

lenders."  Goldstone Facts ¶ 430, at 95 (setting forth this fact).  See Hall Depo. at 211:12-16;

Goldstone Decl. ¶ 32, at 6; Simmons Decl. ¶ 39, at 9.[242]

"[No ]one at KPMG asked anyone at Thornburg whether Thornburg had met within one

day the margin calls received between February 14, 2008 and February 27, 2008.'"  Goldstone

Facts ¶ 431, at 95 (setting forth this fact)(alterations omitted)(quoting 2d RFAs at 13).  See 2d

RFAs at 13.[243]  "[The] reservation of rights letter received from Citigroup . . . 'would not

---

that failing to meet a margin call on time could subject Thornburg to default and
cross default.

SEC Disputed Facts ¶ 429, at 37.  This assertion does not specifically controvert the Defendants'
asserted fact, and the Court finds the fact undisputed.

[242]The SEC attempts to dispute this fact by stating: "KPMG specifically asked for all
correspondence with counterparties by way of a management representation letter, but
Defendants withheld the Citi letter from KPMG."  SEC Disputed Facts ¶ 430, at 37.  The SEC's
cited evidence, however, does not support this assertion.  To dispute the Defendants' asserted
fact, the SEC cites a representation letter that Thornburg Mortgage provided to KPMG.  See Feb.
27, 2008, Thornburg Representation Letter at 1-8.  Nowhere in the letter does Thornburg
Mortgage state that KPMG requested correspondence with counterparties.  Even if the
representation letter stated that Thornburg Mortgage provided KPMG with all correspondences it
had with counterparties, that evidence would support only the fact that Thornburg Mortgage
made a misrepresentation to KPMG and not the fact that KPMG requested the correspondences.
The SEC has thus not presented evidence that specifically controverts the Defendants' asserted
fact, and the Court concludes that the SEC has not disputed this fact.

[243]The SEC attempts to dispute this fact by stating:

The SEC's non-excerpted response to RFA No. 47 is: "Denied.  The SEC admits
that it has no evidence that anyone at KPMG asked anyone at THORNBURG the
convoluted question of 'whether THORNBURG had met within one day the
MARGIN CALLS it received between February 14, 2008 and February 27, 2008,'
but states that various individuals at KPMG, including Cynthia Reinhart and
Jennifer Hall asked Defendants and others at THORNBURG about margin calls
and were falsely assured that all MARGIN CALLS had been met, which was
reasonably interpreted as meaning that the MARGIN CALLS had been met in
accordance with the terms of the REPO AGREEMENTS."

necessarily be something to have further thoughts over' given that Citigroup 'didn't declare a

default' and given that Thornburg paid off the margin calls."   Goldstone Facts ¶ 432, at 95

(setting forth this fact)(quoting Womack Depo. at 260:9-23).   See Womack Depo. at

_____

SEC Disputed Facts ¶ 431, at 37 (quoting 2d RFAs at 13).  The SEC's assertion is contrary to the evidence that it cites, and it misquotes the 2d RFAs.  The SEC never denied the admission.  The SEC's purported quote is wrong and misleading.  The relevant portion of the 2d RFAs states:

> **REQUEST FOR ADMISSION NO. 47:**
>
> Admit that YOU have no evidence that anyone at KPMG asked anyone at THORNBURG before the filing of the 2007 FORM 10-K whether THORNBURG had met within one day the MARGIN CALLS it received between February 14, 2008 and February 27, 2008.
>
> **Response:**
>
> The Commission admits that it currently has no evidence that anyone at KPMG asked anyone at THORNBURG the specific, convoluted question of "whether THORNBURG had met within one day the MARGIN CALLS it received between February 14, 2008 and February 27, 2008," but states that various individuals at KPMG, including Cynthia Reinhart and Jennifer Hall asked DEFENDANTS and others at THORNBURG about MARGIN CALLS and were falsely assured that all MARGIN CALLS had been met, which was reasonably interpreted as meaning that the MARGIN CALLS had been met in accordance with the terms of the REPO AGREEMENTS and further states that KPMG sought a representation from THORNBURG in connection with its audit that "the Company has complied with all aspects of contractual agreements that would have a material effect on the consolidated financial statements in the event of noncompliance,"  DEFENDANTS provided that representation, and that THORNBURG's failure to meet MARGIN CALLS within one day did not comply with applicable REPO AGREEMENTS.

2d RFAs at 13.  Contrary to its statement in the SEC Disputed Facts, the SEC admitted to the Defendants' requested admission that it has no evidence that anyone at KPMG asked anyone at Thornburg Mortgage if Thornburg Mortgage had met, within one day, the margin calls that it received between February 14, 2008, and February 27, 2008.  See 2d RFAs at 13.  The SEC's assertion not only lacks evidence to support it, but it is also contrary its own cited evidence.  The Court thus concludes that the SEC has not disputed the fact.

259:24-260:25.[244]  "A reservation of rights letter is not a notice of default."  Goldstone Facts

¶ 434, at 95 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact);

------

[244]The Defendants' original fact states: "Mr. Womack testified that reservation of rights letter received from Citigroup on February 22, 2008 'would not necessarily be something . . . to have further thoughts over . . . ' given that Citigroup 'didn't declare a default' and given that Thornburg paid off the margin calls."  Goldstone Facts ¶ 432, at 95 (alterations in Goldstone Facts but not in source)(quoting Womack Depo. at 260:9-23).  The SEC attempts to dispute this fact by stating:

> Reservation of rights letter indicates that it was sent by facsimile on February 21, 2008, and thus was received on February 21, 2008, not February 22, 2008. Mr. Womack testified that he did not know what a reservation of rights letter is. Mr. Womack further testified that "if, in fact, the company had been breach of lending agreements leading up to the filing of the K -- 10-K, [that is "absolutely"] something that as an auditor [he] would expect management to tell [him] in a down-to-date meeting."

SEC Disputed Facts ¶ 432, at 95.  First, the Court concludes that the date on which the Defendants received the Citi letter is disputed.  The letter indicates that it was sent on February 21, 2008, yet the Defendants cite an electronic mail transmission containing the letter, which is dated February 22, 2008.  The Court will thus exclude the portion of the Defendants' asserted fact that states the date on which Thornburg received the letter.  Second, the Court finds the rest of the Defendants' asserted fact undisputed.  The Defendants do not assert that Womack fully understood what a reservation-of-rights letter is, and the SEC does not assert that the Thornburg Mortgage was in breach of its lending agreements.  Accordingly, the SEC fails to specifically controvert the rest of the Defendants' asserted fact, and the Court concludes that it is undisputed.

The Defendants assert the following fact: "Ms. Reinhart testified that the Citigroup reservation of rights letter received by Thornburg was a notice of default as opposed to a reservation of rights, and, on that basis, concluded that the Citigroup letter was material."  Goldstone Facts ¶ 433, at 95 (internal quotation marks omitted).  The SEC disputes this fact by stating:

> Ms. Reinhart did not conclude that the Citi letter was material based on it being a notice of default.  While she characterized the letter that way at one point in her testimony, her determination was based on the substance of the Citi letter, not whether it was called a reservation of rights letter or a notice of default.

SEC Disputed Facts ¶ 433, at 37-38.  The SEC cites a portion of Reinhart's deposition where she testified that, regardless whether the letter is characterized as a letter of default or a reservation-of-rights letter, Thornburg Mortgage should have provided KPMG the letter to allow KPMG to have an opportunity to better understand Thornburg Mortgage's circumstances.  See Reinhart Depo. at 381:15-384:12.  The pertinent testimony states:

- 262 -

_____

Q.      Is it your testimony today -- do you stand by your testimony yesterday that you learned the company had received a notice of default from Citibank?

A.      It's my testimony today that that notice, which was called a default notice in the -- in what I saw, constituted an indication from Citibank to the company that they had not paid margin calls in accordance with the agreement. And my view of it was -- is that Citibank now could declare an event of default and sell the collateral.  And so that's what I took away from reading that.

Q.      But, in fact, you now understand there is a difference between a notice of default and a reservation of rights letter; correct?

MR. KASPER: Objection.

A.      Mr. Lee, I don't think for our purposes that would have mattered, because we were interested in understanding whether or not the company had complied with the terms of its agreement and had paid its counterparties in accordance with the representations that they were making to us.

Q.      So is it your testimony that you didn't think it was -- that the distinction between a notice of default and a reservation of rights letter was important?

A.      No, it's my testimony that either one of those, to the extent of the company received that, should have been provided to us, and we should have been provided an opportunity to appreciate what the circumstances were and whether or not that had an impact on the financial statements and our opinions and the conclusions related thereto.

Reinhart Depo. at 383:5-384:12.  The Defendants reply by stating:

The testimony cited by the SEC does not refute that Ms. Reinhart testified that the materiality of the Citi letter was tied to it indicating that the Company had not paid margin calls in accordance with the agreement which understanding is contradicted by the uncontroverted record that the payment plan with Citi was consistent with the terms of the Citi repo agreement; and Citi accepted payments pursuant to payment plans without declaring Thornburg in default.

Goldstone Reply Facts ¶ 433, at 196 (alterations omitted)(citations omitted)(internal quotation marks omitted).  Reinhart's testimony specifically controverts the Defendants' asserted fact. Reinhart testified that the letter showed Thornburg Mortgage's circumstances and that it showed that Thornburg Mortgage was not complying with the agreements' terms.  For those reasons, Reinhart thought Thornburg Mortgage should have provided KPMG with the letter.  The SEC

Hall Depo. at 190:18-191:6. "In depositions, KPMG engagement team members Mr. Plummer, Ms. Baucom, and Ms. Jones could not explain what a reservation of rights letter was, while Mr. Womack had never heard of one." Goldstone Facts ¶ 435, at 95 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Plummer Depo. at 217:12-14; Baucom Depo. at 182:7-17; Jones Depo. at 57:19-21; Womack Depo. at 250:16-18. "In a debt covenant review that KPMG conducted in connection with the 2007 year-end audit, KPMG examined compliance with the financial terms of Thornburg's debt covenants and whether the Company's repo lines were renewed." Goldstone Facts ¶ 436, at 96 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Acree Depo. at 209:15-210:9; Dec. 31, 2007, Debt Covenant Review at 2.

> KPMG's audit [did not] examine[] whether there were deviations from the terms of any repo agreement that did not result in a declaration of an event of default or termination of a repo line. . . . [No one] from KPMG [asked Feldman] about the timing of Thornburg's satisfaction of margin calls, such as whether a margin call was paid over several days rather than on the same day it was received.

Goldstone Facts ¶ 437, at 96 (setting forth this fact). See Feldman Decl. ¶ 33, at 7.[245]

## 26.   **KPMG's Review of Thornburg Mortgage's 2007 Form 10-K Disclosure Language.**

"KPMG reviewed Thornburg's 2007 Form 10-K before it was filed and ultimately issued an unqualified audit opinion for the financial statements in the 10-K." Goldstone Facts ¶ 438,

---

has specifically controverted the Defendants' asserted fact, and the Court concludes that the fact is disputed.

[245]The SEC attempts to dispute this fact by stating: "KPMG's OTTI analysis included examination of whether Thornburg satisfied its margin agreements, as failing to do so would have enabled counterparties to declare default, which in turn would have impacted Thornburg's going concern analysis." SEC Disputed Facts ¶ 437, at 38. The Defendants do not assert that KPMG's analysis did not consider whether Thornburg Mortgage satisfied its margin agreements, but only that its analysis did not consider whether there were deviations that did not result in a default. Accordingly, the SEC fails to specifically controvert this fact, and the Court concludes that it is undisputed.

at 96 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); 2007

Form 10-K at 32-33.

> On February 26, 2008, two days before Thornburg filed its 2007 Form 10-K,
> Ms. Starrett e-mailed Ms. Hall draft language that Thornburg management
> proposed to include in the Recent Developments and Liquidity and Capital
> Resources sections of the 10-K and the Subsequent Events footnote to the
> Company's financial statements.   The draft Recent Developments language
> included reference to approximately $350 million in margin calls.  Ms. Starrett
> also stated that the exact amount of margin calls would be ascertained and
> updated in the final version of the disclosure.

Goldstone Facts ¶ 439, at 96 (setting forth this fact)(internal quotation marks omitted).  See SEC

Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from Jane Starrett

to Jennifer Hall at 2 (dated Feb. 26, 2008), filed August 9, 2013 (Doc. 204-117)("Feb. 26, 2008,

Starrett Email").  "In the e-mail, Ms. Starrett told Ms. Hall that the amount of the margin calls

referenced in the draft disclosures is shaded because Thornburg is still working on documenting

that."  Goldstone Facts ¶ 440, at 96 (setting forth this fact)(alterations omitted)(internal quotation

marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 26, 2008, Starrett

Email at 2.

> The draft language for the Recent Developments, Liquidity and Capital Resources
> sections and the Subsequent Events footnote stated:
>
>> Beginning on February 14, 2008, there was once again a sudden
>> and unexpected adverse change in mortgage market conditions in
>> general and more specifically in the valuations of mortgage
>> securities backed by Alt-A mortgage loan collateral . . . .  [W]e
>> have observed deterioration in the liquidity for these securities and
>> increased difficulty in obtaining market prices.   Accordingly,
>> market valuations of these securities have dropped by between 10
>> and 15 percent in recent days, and as a result, we have been subject
>> to margin calls on this collateral.  Since February 14, 2008, we
>> have met margin calls in excess of approximately 350 million,
>> much of it related to the decline in valuations placed on these
>> securities.  However, in the short term the sudden decline in the
>> valuation of these securities has left us with approximately $150
>> million in readily available liquidity to meet future margin calls, a

> substantially reduced cash and unpledged securities position than
> we were had at December 31, 2007.  As we have stated previously,
> in the event that we cannot meet margin calls from our available
> cash position, we might need to selectively sell assets in order to
> raise cash.  So far no such sales have been required.  Instead, we
> have been able to improve our liquidity position by pledging
> previously    unpledged    mortgage    securities    and    issuing
> Collateralized Mortgage Debt which replaced Reverse Repurchase
> Agreement and whole loan financing debt, and is non recourse
> debt financing and therefore, not subject to margin calls.
> Additionally, we have been able to successfully maintain our
> financing lines, though growing those lines has suddenly become
> more problematic . . . .   However, as discussed above, mortgage
> security market valuations remain volatile, mortgage securities
> trading remains limited and mortgage securities financing markets
> remain challenging as the industry continues to report negative
> news.   As a result, we expect to continue to operate with a
> historically low level of leverage and to continue to take actions
> that would support higher levels of liquidity and available cash.

Goldstone Facts ¶ 441, at 96-97 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(internal quotation marks omitted)(quoting Feb. 26, 2008, Starrett Email at 3).  See SEC

Disputed Facts at 1-51 (not disputing this fact); Feb. 26, 2008, Starrett Email at 2-3.

> [I]n the risk factors section and in the borrowing section, and potentially, as well
> in the liquidity section, [Thornburg Mortgage] made very clear that, if [it]
> borrow[s] money under reverse repurchase agreement transactions, [it is] subject
> to margin calls that [it] may not be able -- that if [it] cannot meet those margin
> calls, [it] may have to sell assets.  Standard disclosure.  And [Goldstone] was . . .
> just reminding investors in this recent developments section of that language that
> appears in all of [Thornburg Mortgage's] filings as standard disclosure.

SEC Facts ¶ PP, at 7 (setting forth this fact)(internal quotation marks omitted)(quoting Goldstone

Depo. at 129:23-130:12).   See  Goldstone Depo. at 129:23-130:12.[246]   "In response to

---

[246]The Defendants respond by stating:

> Undisputed, but immaterial because the 2007 Form 10-K was the first time the
> Company had disclosed that it might not be able to meet margin calls going
> forward.   The Company's disclosures speak for themselves as to what is
> "standard."  Further, Mr. Goldstone testified that some of the language that
> appeared in the Recent Developments section "reminds" readers of other

Ms. Starrett's e-mail, Ms. Hall wrote that the draft disclosure was overkill for purposes of the Subsequent Events footnote and suggested minor changes to condense it." Goldstone Facts ¶ 442, at 98 (setting forth this fact)(alterations omitted)(internal quotation marks omitted). See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 27, 2008, Hall Email at 2.

"[N]o . . . []one from KPMG expressed concern that Thornburg anticipated receiving margin calls up to the time of the Form 10-K filing." Goldstone Facts ¶ 443, at 98 (setting forth this fact).[247] "Ms. Hall also e-mailed Mr. Womack, noting that Thornburg 'should tailer [sic] it [the draft footnote disclosure] down . . . to a few sentences.'" Goldstone Facts ¶ 444, at 98 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Electronic Mail Transmission from Jennifer Hall to Clyde Womack at 2 (dated Feb. 27, 2008), filed August 9, 2013 (Doc. 204-124)("Feb. 27, 2008, Recent Developments Email")). See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 27, 2008, Recent Developments Email at 2. "KPMG associate Ms. Jones ticked and tied Thornburg's Margin Call Schedule to the 10-K Recent Developments and Subsequent Events footnote disclosures, meaning that she was tasked with

---

"standard disclosures" in the Form 10-K, not that all other language in the Recent Developments language was standard.

The fact is also immaterial because Mr. Goldstone described Thornburg's 2007 Form 10-K disclosures as "significant" in correspondence contemporaneous with the filing of the Form 10-K.

Defendants Disputed Facts ¶ PP, at 21-22 (citations omitted). Because the Defendants do not dispute this fact, and because asserting that a fact is immaterial does not dispute it, the Court concludes that the fact is undisputed.

[247]The SEC attempts to dispute this fact by stating: "Margin calls were a focus of KPMG in connection with its going concern and OTTI analysis." SEC Disputed Facts ¶ 443, at 38. This assertion does not dispute the Defendants' asserted fact. The Defendants do not assert that KPMG did not focus on margin calls in connection with its going concern and OTTI analysis, but only that KPMG did not express concern that Thornburg Mortgage anticipated receiving margin calls up until it filed the 2007 Form 10-K. Consequently, the SEC does not specifically controvert the Defendants' asserted fact, and the Court concludes that it is undisputed.

finding evidential support to verify the numbers (including margin call amounts) disclosed." Goldstone Facts ¶ 445, at 98 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Jones Depo. at 78:6-12, 201:21-202:2.  "When Mr. Womack received a copy of the proposed Recent Developments language for the 10-K, he asked whether 'this change[ed] [KPMG's] thinking on the going concern analysis.'  Ms. Hall responded: 'No, we knew about the circumstance during our analysis.  We'll clarify the memo to make that clear.'"  Goldstone Facts ¶ 446, at 98 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Electronic Mail Transmission from Clyde E. Womack to Jennifer L. Hall at 2 (dated Feb. 27, 2008), filed August 9, 2013 (Doc. 204-126)("Feb. 27, 2008, Womack Email")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 27, 2008, Womack Email at 2.

> KPMG's markup of the draft Recent Developments disclosure noted, with respect to the statement "in the event that we cannot meet margin calls from our available cash position, we might need to selectively sell assets in order to raise cash," the following question: "Do you still believe the Company has the intent and ability to hold these mortgage securities backed by Alt-A mortgage loan collateral through recovery?"

Goldstone Facts ¶ 447, at 98 (setting forth this fact)(quoting Electronic Mail Transmission from Clyde E. Womack at Jennifer L. Hall at 5 (dated Feb. 26, 2008), filed August 9, 2013 (Doc. 204-118)("Feb. 26, 2008, FN Disclosure Email")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Form 10-K Draft at 3; Feb. 26, 2008, FN Disclosure Email at 5.  "Ms. Hall . . . was aware of this comment and . . . KPMG determined, based on the information that it gathered in the audit, that Thornburg had the intent and ability to hold its impaired assets through recovery."  Goldstone Facts ¶ 448, at 98 (setting forth this fact).  See Hall Depo. at 29:3-30:20.[248]

---

[248]The SEC attempts to dispute this fact by stating:

> [T]hat the engagement team focused on whether the possibility that the company might have to sell assets to meet margin calls would call into question the Company's intent and ability to hold assets through recovery. [T]hat the engagement team answered that question to its satisfaction, which meant that it concluded that the Company still had the intent and ability.

Goldstone Facts ¶ 449, at 98 (setting forth this fact). See Womack Depo. at 193:2-194:5, 196:19-200:2.[249]

--------

> KPMG's conclusion was based on incomplete information about margin calls. Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- from KPMG. Defendants also purposefully withheld the Citi letter from KPMG, their awareness of the collapsing European hedge fund, and the true reason for entering into the I/O Strip Transactions, i.e. to meet margin calls they otherwise could not meet. Defendants did not disclose a liquidity report to KPMG dated February 21, 2008 (factoring in the Citi margin call) that projected negative liquidity through every projected date, to and including April 8, 2008; instead, Defendants removed the Citi margin call from the February 21, 2008 liquidity report and provided KPMG with a liquidity report the next day showing positive projected liquidity. After KPMG learned of the purposely withheld margin call information, Thornburg issued its Restatement and reached [sic] Thornburg and KPMG reached the conclusion that Thornburg did not have the intent and ability to hold its securities through recovery.

SEC Disputed Facts ¶ 448, at 38. The Defendants do not assert that KPMG's conclusion was based on complete information, but only that it was based on information that KPMG learned during the audit. The SEC thus does not specifically controvert the Defendants' asserted fact, and the Court concludes that it is undisputed.

[249]The SEC attempts to dispute this fact by stating:

> KPMG's conclusion was based on incomplete information about margin calls. Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- from KPMG. Defendants also purposefully withheld the Citi letter from KPMG, their awareness of the collapsing European hedge fund, and the true reason for entering into the I/O Strip Transactions, i.e. to meet margin calls they otherwise could not meet. Defendants did not disclose a liquidity report to KPMG dated February 21, 2008 (factoring in the Citi margin call) that projected negative liquidity through every projected date, to and including April 8, 2008; instead, Defendants removed the Citi margin call from the February 21, 2008 liquidity report and provided KPMG with a liquidity report the next day showing positive projected liquidity. After KPMG learned of the purposely withheld margin call information, KPMG reversed its opinion on the reasonableness of Thornburg's determination and Thornburg issued its

- 269 -

"[T]he Recent Developments disclosure's reference to collateralized mortgage debt described, in part, the I/O strip financing transactions that Thornburg issued in February 2008." Goldstone Facts ¶ 450, at 99 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Hall Depo. at 217:12-219:8, 428:20-429:19. "KPMG was aware of the I/O strip financing transactions that Thornburg issued in February 2008."  Goldstone Facts ¶ 451, at 99 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Hall Depo. at 182:3-5, 329:13-17, 428:20-429:19.  "Mr. Fellers or Mr. Feldman, and not Mr. Simmons or any of the other Defendants, told [Hall] that a purpose of the I/O strip financings was to take advantage of an opportunity in pricing because the company believed that the I/O strips were over-valued in the marketplace."  Goldstone Facts ¶ 452, at 99 (setting forth this fact).  See Hall Depo. at 182:3-17, 272:19-273:24.[250]  "KPMG [did not] raise[]

---

Restatement concluding that Thornburg did not have the intent and ability to hold its securities through recovery.

SEC Disputed Facts ¶ 449, at 38-39.  The SEC's assertion does not address, much less specifically controvert, the Defendants' asserted fact.  Accordingly, the Court concludes that the SEC has not disputed undisputed this fact.

[250]The SEC attempts to dispute this fact by stating:

While Ms. Hall testified she was not told the purpose of the I/O Strip sales by Ms. Simmons, Ms. Reinhart testified that she had a conversation with Simmons wherein he told her the I/O Strips were sold because Thornburg was "being opportunistic in the marketplace."  Thornburg sold I/O Strip assets to increase liquidity in February 2008, but did not disclose to KPMG that this was the intended purpose.  Rather, Thornburg claimed the sales were to take advantage of pricing opportunities.  The I/O Strip Transactions were referred to as sales by Defendants and others at Thornburg, constituted sales, and, regardless, were a relevant factor to be considered in a proper OTTI analysis.

SEC Disputed Facts ¶ 452, at 39.  This assertion does not dispute the Defendants' asserted fact. The Defendants do not assert that they never told Reinhart that the I/O Strip Transactions were conducted to take advantage of favorable prices, but only that they did not tell Hall.  The SEC

any concerns about this disclosure or suggest[] that this language or any other language about the

I/O strip transactions should be changed in any way before the filing of the 10-K."  Goldstone

Facts ¶ 453, at 99 (setting forth this fact).[251]  "While KPMG examined the I/O strip financings

closely, there is no evidence that anyone from KPMG inquired about what the proceeds of the

financings would be used for."  Goldstone Facts ¶ 454, at 99 (setting forth this fact).[252]

_____

has thus not specifically disputed the Defendants' asserted fact, and the Court concludes that it is undisputed.

[251]The SEC attempts to dispute this fact by stating:

> KPMG was deceived: Thornburg sold I/O Strip assets to meet otherwise unmeetable margin calls in February 2008, but did not disclose to KPMG that this was the intended purpose. Rather, Thornburg claimed the sales were to take advantage of pricing opportunities.  Ms. Hall testified that the I/O Strip Transactions were asset sales to meet margin calls, which should have been disclosed to KPMG so they could consider them.

SEC Disputed Facts ¶ 453, at 39.  The SEC fails to point to evidence showing that KPMG raised concerns about the I/O Strip Transaction disclosure; it merely asserts a fact that is unfavorable to the Defendants.  Accordingly, the SEC fails to dispute this fact, and the Court concludes that it is undisputed.

[252]The SEC attempts to dispute this fact by stating:

> Thornburg sold I/O Strip assets to meet otherwise unmeetable margin calls in February 2008, but did not disclose to KPMG that this was the intended purpose. Rather, Thornburg claimed the sales were to take advantage of pricing opportunities.  KPMG specifically asked about the I/O Strip Transactions. Ms. Hall testified that the I/O Strip Transactions were asset sales to meet margin calls, which should have been disclosed to KPMG so they could consider them.

SEC Disputed Facts ¶ 454, at 39.  The SEC does not dispute the Defendants' asserted fact, but instead merely asserts a fact that is not favorable to the Defendants.  Accordingly, the Court concludes that the fact is undisputed.

The Defendants assert the following fact: "KPMG employees have admitted that no one at Thornburg told them that taking advantage of opportune pricing was the sole purpose of the I/O strip transactions."  Goldstone Facts ¶ 455, at 99.  The SEC disputes this fact by stating: "Thornburg told KPMG the I/O Strip sales were to take advantage of pricing opportunities, nothing more."  SEC Disputed Facts ¶ 455, at 39.  To dispute this fact, the SEC cites a portion of Hall's deposition testimony, where she testifies that Thornburg Mortgage employees told her that

"The Margin Call Schedule KPMG received on February 27, 2008 identified the approximately $41.1 million in I/O strip financing transaction proceeds as a source of Cash used to meet margin calls."   Goldstone Facts ¶ 456, at 99-100 (setting forth this fact)(internal quotation marks omitted).   See Form 10-K Draft at 4-6; March 9, 2008, Restatement Memo. at 3.[253]   "[T]he Margin Call Schedule showed I/O strip financing transactions.   She identified four entries relating to Asset sale transactions with CSFB on February 25, 2008 as referring to the IO strip sales."   Goldstone Facts ¶ 457, at 100 (setting forth this fact)(alterations

_____

the I/O Strip Transactions were used to take advantage of favorable prices.   See Hall Depo. at 182:3-183:20.

The Court concludes that the SEC has disputed this fact.   Thornburg Mortgage told KPMG only one purpose for the I/O Strip Transactions.   The Defendants now come back and assert that they never said that the stated purpose was the sole purpose or the only purpose for the transactions.   By not providing KPMG with any additional reasons for the transactions, Thornburg Mortgage implied that the given rationale was the only rationale.   It is unnecessary for Thornburg Mortgage employees to use the magic words "solely" or "only."   The fact that they continuously represented a single purpose to KPMG gives the implication that there was no other purpose for transactions.   The SEC has thus specifically controverted the Defendants' asserted fact, and the Court concludes that it is disputed.

[253]The SEC attempts to dispute this fact by stating: "The Tie-Out Document given to KPMG on the afternoon of February 27, 2008 did not identify anything other than the total amount of margin calls Thornburg had received since February 14, 2008."   SEC Disputed Facts ¶ 456, at 39 (internal quotation marks omitted).   The SEC does not cite evidence for this proposition, but instead cites another disputed fact.   There, the SEC states:

> What Defendants call the Margin Call Schedule and what the SEC calls the Tie-Out document was not provided in response to Ms. Hall's earlier request for a list of margin calls the company had been receiving.   The Tie-Out document was provided for the sole purpose of tying out the dollar amount of margin calls disclosed in the Form 10-K.   Ms. Hall did not even review the two pages that can be interpreted to indicate payment of margin calls over time.

SEC Disputed Facts ¶ 406, at 34. This assertion stands for, at most, that the Margin Call Schedule's purpose was to tie out the dollar amount of the margin calls.   It does not, however, support the assertion that the Margin Call Schedule did not did not identify that the $41.1 million in I/O Strip Transactions were used as sources of cash to meet margin calls.   Moreover, the Margin Call Schedule lists over $40 million dollars from the I/O Strip Transactions that was used to meet the margin calls, which are titled as asset sales.   See Form 10-K Draft at 4.   Accordingly, the SEC fails to dispute this fact, and the Court concludes that it is undisputed.

omitted)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this

fact); Hall Depo. at 40:18-24, 41:18-23, 42:7-12.

> Both Ms. Reinhart and Ms. Hall understood that Thornburg did not segregate its
> cash between funds that would be used to pay margin calls and funds that would
> be used for other purposes. . . .  Defendants [did not] state[] that the proceeds
> from the I/O strip financings would not be used to pay margin calls.

Goldstone Facts ¶ 458, at 100 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not

disputing this fact); Reinhart Depo. at 103:24-105:4; Hall Depo. at 183:4-15.

> [I]n the last week of February 2008, Ms. Starrett specifically asked [Hall] "if the
> sale of the IO strips would taint . . . Thornburg's intention to hold the assets and
> their loan portfolio."  Ms. Hall responded to Ms. Starrett by stating, "I did not
> believe it would taint their assertion for that portfolio."

Goldstone Facts ¶ 459, at 100 (setting forth this fact)(alterations omitted)(quoting Hall Depo. at

150:11-16).  See SEC Disputed Facts at 1-51 (not disputing this fact); Hall Depo. at 150:8-151:5,

274:10-22.  "KPMG considered the I/O strip financing transactions to be a positive factor

supporting Thornburg's OTTI conclusion."  Goldstone Facts ¶ 460, at 100 (setting forth this

fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Hall Depo. at 428:20-429:19;

Reinhart Depo. at 107:11-15.  "KPMG's workpapers identified the the [sic] sale of IO strips as a

fact supporting KPMG's conclusion that management's judgments about the Company's

liquidity situation were based on reasonable facts and that the strategies available to the

Company to meet its liquidity needs were attainable."  Goldstone Facts ¶ 461, at 100 (setting

forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing

this fact); March 9, 2008, Restatement Workpaper at 3.

> **27.**   **Thornburg Mortgage's Management Representation Letter.**

> KPMG asked Mr. Goldstone, Mr. Simmons and Ms. Starrett to sign a
> management representation letter, dated February 27, 2008.  The letter was
> drafted by KPMG and included, among other things, the following
> representations:

there were no "[e]vents that have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment in the consolidated financial statements" (paragraph 4(e));

"[d]eclines in value of debt or equity securities classified as either available-for-sale or held-to maturity are considered to be temporary because we have both the intent and ability to hold these impaired securities for a sufficient period of time" (paragraph 22); and

"[t]he consolidated financial statements disclose all of the matters of which we are aware that are relevant to the entity's ability to continue as a going concern, including significant conditions and events, and our plans."

Goldstone Facts ¶ 462, at 101 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Letter from Larry Goldstone, Clarence Simmons III, and Jane Starrett to Cynthia Reinhart at 3, 7-8 (dated Feb. 27, 2008), filed August 9, 2013 (Doc. 204-120)(" Feb. 27, 2008, Thornburg Representation Letter")).  See SEC Disputed Facts at 1-51 (not disputing this fact); Feb. 27, 2008, Thornburg Representation Letter at 3, 7-8.  "[N]o . . . KPMG employee ever informed anyone at Thornburg that a reservation of rights letter was material for the purpose of the audit."  Goldstone Facts ¶ 463, at 101 (setting forth this fact).  See Reinhart SEC Depo. at 74:1-76:18; Plummer Depo. at 216:11-217:11.[254]  "It was not KPMG's practice to ask its audit

---

[254]The SEC attempts to dispute this fact by stating:

Defendants recognized the materiality of a reservation of rights letter and of Thornburg's failure to timely meet margin calls.  Defendant Goldstone testified that "Citibank could have verbally agreed to a payment plan and they could have woken up the next day and decided that they didn't like what they had agreed to and declared us in default that way.  They had every right to do that but they chose not to."  Defendant Simmons recognized that after issuing its reservation of rights letter (and purportedly agreeing to a payment plan) Citibank "would have the right to declare an event of default."

clients about rumors. . . .   [A] rumor 'by its nature is -- is information that is difficult if not impossible to substantiate' and would have made no difference to KPMG's OTTI or going concern conclusions. . . ."  Goldstone Facts ¶ 464, at 101 (setting forth this fact)(quoting Taylor Depo. at 208:17-19).  See SEC Disputed Facts at 1-51 (not disputing this fact); Taylor Depo. at 207:22-208:19.  KPMG initially agreed with Thornburg's OTTI conclusion.  See Goldstone Facts ¶ 465, at 101 (setting forth fact); In-Depth Memorandum -- Thornburg Mortgage Inc. from John R. Taylor, KPMG Reviewing Partner, to Clyde Womack, SEC Reviewing Partner at 2-3 (dated Feb. 27, 2008), filed August 9, 2013 (Doc. 204-121); Womack Depo. at 54:17-25, 63:3-13.[255]

---

SEC Disputed Facts ¶ 463, at 40-41.  This assertion does not dispute the Defendants' asserted fact.  The SEC does not point to any evidence that KPMG informed any Thornburg Mortgage employee that a reservation letter was material for the purpose of the audit.  Instead, it merely states that the Defendants should have known that the reservation-of-rights letter was material. This assertion is an additional fact that does not specifically controvert the Defendants' asserted fact.  Accordingly, the Court concludes that the SEC has not disputed the fact.

[255]The Defendants' fact states: "KPMG agreed with Thornburg's OTTI conclusion." Goldstone Facts ¶ 465, at 101.  The SEC attempts to dispute this fact by stating:

> KPMG's opinion was based on incomplete information about margin calls. Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- from KPMG. Defendants also purposefully withheld the Citi letter from KPMG, their awareness of the collapsing European hedge fund, and the true reason for entering into the I/O Strip Transactions, i.e. to meet margin calls they otherwise could not meet.  Defendants did not disclose a liquidity report to KPMG dated February 21, 2008 (factoring in the Citi margin call) that projected negative liquidity through every projected date, to and including April 8, 2008; instead, Defendants removed the Citi margin call from the February 21, 2008 liquidity report and provided KPMG with a liquidity report the next day showing positive projected liquidity.  After KPMG learned of the purposely withheld margin call information, KPMG reversed its opinion on the reasonableness of Thornburg's determination and Thornburg issued its Restatement concluding that Thornburg did not have the intent and ability to hold its securities through recovery.

- 275 -

28.     **KPMG's Decision to Withdraw Its Audit Opinions After the 2007 Form 10-K Filing.**

On the morning of Friday, February 29, 2008, Ms. Baucom contacted Ms. Starrett regarding a subsequent events review that KPMG was conducting in connection with Thornburg's upcoming equity offering.  During that conversation and in additional communications on March 2, 2008, Ms. Starrett advised KPMG of Thornburg's receipt of margin calls since the 10-K filing and that Thornburg had $50 million of maturing repo that it could not pay off.

Goldstone Facts ¶ 466, at 101-02.  See Notes From March 2, 2008, Jane Starrett Telephone Call

at 2, filed August 9, 2013 (Doc. 204-162); March 9, 2008, Restatement Memo. at 2-3; Hall SEC

Depo. at 119:14-25, 144:15-21.[256]  "[O]n March 2, 3, and 4 2008, Ms. Starrett updated KPMG

on the margin calls the company had received and informed KPMG that Thornburg could not

---

SEC Disputed Facts ¶ 465, at 40.  This assertion does not dispute the Defendants' asserted fact.  The Defendants do not assert that KPMG would have agreed with its OTTI conclusion if KPMG had complete information about the margin calls.  Moreover, the SEC does not dispute that KPMG agreed with Thornburg Mortgage's OTTI conclusion.  The SEC points out, however, that, after the Form 10-K filing, KPMG reversed its conclusion, even though it originally agreed with it.  The Defendants' disputed fact may be interpreted as asserting that KPMG always agreed with Thornburg Mortgage's OTTI conclusion and did not change its mind.  The Court has, thus, modified the Defendants' asserted fact to more accurately reflect the evidence.

[256]The SEC attempts to dispute this fact by stating: "The evidence (including that cited by Defendants) does not show that Defendant Starrett provided any update to KPMG on Thornburg's margin calls and Thornburg's inability to pay them on February 29, 2008.  The evidence indicates that KPMG was first informed of these facts on March 2, 2008."  SEC Disputed Facts ¶ 466, at 40.  To dispute this fact, the SEC cites a portion of Hall's deposition transcript, where she testified that Starrett first told her about the post-filing margin calls on March 2, 2008.  See Hall SEC Depo. at 144:15-21.  The SEC's assertion and evidence do not specifically controvert the Defendants' asserted fact.  First, the Defendants assert that Starrett told Baucom about the subsequent events on February 29, 2008, and not that she told Hall about the events on that date.  It is thus irrelevant when Starrett first told Hall about the margin calls.  Second, there is evidence to support the Defendants' asserted fact.  In the March 9, 2008, Restatement Memo., Reinhart and Hall write: "At approximately 9 AM on Friday morning, February 29th, Tara Baucom, KPMG manager, made inquiries of Jane Starrett, CAO, for our subsequent event review.  Jane informed Tara that as of that Friday morning, the Company had received margin calls of approximately $110 million but that the Company had met them."  March 9, 2008, Restatement Memo. at 2-3.  Consequently, there is evidence that Starrett contacted Baucom on February 29, 2008, about the margin calls.  The SEC has failed to specifically controvert this fact, and the Court concludes that it is undisputed.

pay off all of the margin calls received since the 10-K filing and had received notices of default from JP Morgan, IXIS, and ING."  Goldstone Facts ¶ 467, at 102 (setting forth this fact).  See March 9, 2008, Restatement Memo. at 2-3; Restatement Margin Calls at 2; Electronic Mail Transmission from Jane Starrett to Jennifer Hall at 2-24 (dated Mar. 4, 2008), filed August 9, 2013 (Doc. 204-177)("March 4, 2008, Midnight Email"); Electronic Mail Transmission from Jane Starrett to Jennifer Hall at 2 (dated Mar. 3, 2008), filed August 9, 2013 (Doc. 204-168).[257]

> Ms. Starrett forwarded KPMG's questions about reverse repurchase agreements to members of Thornburg's Capital Markets group, quickly compiled the requested information received from various sources within Thornburg, including a detailed

---

[257]The Defendants' fact states:

> On February 29, and again on March 2, 3, and 4 2008, Ms. Starrett updated KPMG on the margin calls the company had received and informed KPMG that Thornburg could not pay off all of the margin calls received since the 10-K filing and had received notices of default from JP Morgan, IXIS, and ING.

Goldstone Facts ¶ 467, at 102.  The SEC disputes this fact by stating: "The evidence (including that cited by Defendants) does not show that Defendant Starrett provided any update to KPMG on Thornburg's margin calls and Thornburg's inability to pay them on February 29, 2008.  The evidence indicates that KPMG was first informed of these facts on March 2, 2008." SEC Disputed Facts ¶ 467, at 40.  The Defendants reply by stating: "The SEC does not materially dispute this fact and its response is not supported by the evidence."  Goldstone Reply Facts ¶ 467, at 209.

The Court concludes that the Defendants' asserted fact is disputed.  There is no evidence that Thornburg Mortgage informed KPMG, on February 29, 2008, that it could not pay off the margin calls which it received since the 2007 Form 10-K filing.  While the Defendants have presented evidence showing that, on February 29, 2008, Starrett talked to Baucom about the margin calls, that evidence states that Starrett told Baucom that Thornburg Mortgage had met its margin calls.  See March 9, 2008, Restatement Memo. at 2-3.  In the March 9, 2008, Restatement Memo., Reinhart and Hall wrote: "At approximately 9 AM on Friday morning, February 29th, Tara Baucom, KPMG manager, made inquiries of Jane Starrett, CAO, for our subsequent event review.  Jane informed Tara that as of that Friday morning, the Company had received margin calls of approximately $110 million but that the Company had met them."  March 9, 2008, Restatement Memo. at 2-3.  The Defendants' only piece of evidence concerning a February 29, 2008, communication between Thornburg Mortgage and KPMG disputes the Defendants' asserted fact.  The Court thus concludes that it is disputed that Thornburg Mortgage told KPMG that it could not meet its margin calls on February 29, 2008.  The SEC has not disputed the rest of the Defendants' asserted fact.  Consequently, the Court has modified the Defendants' asserted fact by omitting the disputed portion.

> summary of margin call activity for the period of January 2, 2008 through March 3, 2008, and sent the documents and information to KPMG on March 4, 2008 within hours of receiving KPMG's request.

Starrett Facts ¶ 16, at 4-5 (setting forth this fact).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Electronic Mail Transmission from Jane Starrett to Nathan Fellers, Patrick Feldman, and Xen Stanhope at 2-4 (dated Mar. 4, 2008), filed August 9, 2013 (Doc. 204-173)("March 3d Information Request").

> At 10:44 p.m. MST on March 3, 2008, KPMG sent to Thornburg management a request for information concerning Thornburg's OTTI judgment and whether the events that followed the Form 10-K filing could have been anticipated ("March 3rd Information Request").   The request also sought a position paper from the Company that provides the Company's assessment of the ability to hold securities for the foreseeable future as of February 27, 2008.

Goldstone Facts ¶ 468, at 102 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 3d Information Request 2-4.

> The March 3 Information Request stated:

> > "Considering the proximity of the events to the Form 10- K filing, there is a **presumption** that the Company should have been aware or at least should have considered the potential that there was a reasonable chance that the Company could have faced margin calls in excess of its ability to meet such calls."   To overcome the presumption, KPMG requested "**strong** evidence" that the events after the 10-K filing were "unforeseeable catastrophic events."

Goldstone Facts ¶ 469, at 102 (setting forth this fact)(bold in original)(quoting March 3d Information Request at 3).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 3d Information Request at 3.

> The March 3 Information Request also directed Thornburg to include in its position paper a "[t]imeline of events" that contained information on (a) "[d]ollar amount of [m]argin calls "received" in January and February 2008; (b) "[d]ay-by-day correspondence with counter parties during the week before [the 10-K] filing" and "[c]orrespondence with counter parties for the two weeks prior to filing,

along with supporting evidence"; and (c) "[d]ay-by-day correspondence with counterparties subsequent to filing . . . through March 3, 2008, along with supporting evidence."

Goldstone Facts ¶ 470, at 102-03 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting March 3d Information Request at 4).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 3d Information Request at 4.

"KPMG required Thornburg to provide its response to the March 3 Information Request in advance of the Audit Committee meeting scheduled for approximately sixteen hours later, at 2:00 pm MST on March 4."  Goldstone Facts ¶ 471, at 103 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo. Vol. III at 227:2-17; Thornburg Mortgage, Inc. Minutes of a Meeting of the Audit Committee at 2-3 (March 4, 2008), filed August 9, 2013 (Doc. 204-172)("March 4, 2008, Audit Committee Minutes").  "Mr. Simmons did not see Ms. Hall's late night request until the next morning.  When Mr. Simmons saw it, he emailed Ms. Hall, asking: 'How pretty does this evidence package have to be[?]'  Ms. Hall responded, 'We are not looking for format pretty, we are looking for strength of evidence.'"  Goldstone Facts ¶ 472, at 103 (setting forth this fact)(alterations in Goldstone Facts but not in source).  See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo. Vol. III at 226:13-227:10; Electronic Mail Transmission from Jane Starrett to Jennifer Hall at 2 (dated March 4, 2008), filed August 9, 2013 (Doc. 204-185).

> Mr. Simmons, Ms. Starrett, and Kyle Rhoades, an employee in Thornburg's Finance Department, scrambled to respond to KPMG's request and compile the necessary documentation by the 2 pm MST deadline. . . .  [G]iven the extremely short time frame imposed by KPMG, [Simmons'] focus was on providing evidence and he was not concerned with the prose of the document.

Goldstone Facts ¶ 473, at 103 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo.

Vol. II at 374:23-376:22; Simmons Depo. Vol. III at 231:2-12; Starrett SEC Depo. at 207:6-18.

"In Mr. Simmons' opinion, the deadline imposed by KPMG was unreasonable given the amount

of work required to pull together the necessary documentation."  Goldstone Facts ¶ 474, at 103

(setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons

Depo. Vol. III at 239:3-24.

> During the restatement period, Ms. Starrett reached out to members of the Capital
> Markets group and others within the company to provide detailed responses to
> KPMG's urgent requests for information relating to the restatement, including a
> detailed summary of margin call activity for the period of January 2, 2008 through
> March 6, 2008.

>> KPMG's restatement workpapers acknowledge that on March 4,
>> 2008, Thornburg provided KPMG with a schedule showing $1.2
>> billion in margin calls by counterparty from January 1, 2008
>> through February 27, 2008.

>> The restatement workpapers also acknowledge that Thornburg
>> received another $1.2 billion in margin calls from February 28,
>> 2008 through March 6, 2008.

Goldstone Facts ¶ 475, at 103-04 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not

disputing this fact); Electronic Email Transmission from Larry Goldstone to John Taylor at 2-5

(dated March 4, 2008), filed August 9, 2013 (Doc. 204-184); March 4, 2008, Midnight Email

at 2-31; Restatement Margin Calls at 2-7; Electronic Mail Transmission from Jane Starrett to

Jennifer Hall at 2 (dated March 4, 2008), filed August 9, 2013 (Doc. 204-179); Reinhart SEC

Depo. at 124:2-25.

"Ms. Starrett provided KPMG with a packet of materials in support of Thornburg's view

that the company had sufficient liquidity on February 27th to deal with likely market movements

and that the events of the 28th and 29th represent an unforeseeable catastrophic decline in

mortgage market valuations."  Goldstone Facts  ¶ 476, at 104 (setting forth this fact)(alterations

omitted)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this

fact); Unforeseeable Mortgage Collapse Memo. at 2; Simmons Depo. Vol. II at 231:14-232:10; Electronic Mail Transmission from Jane Starrett to Jennifer Hall at 2 (dated Mar. 4, 2008), filed August 9, 2013 (Doc. 204-178).   "Thornburg continued to provide information to KPMG in response to its Information Request up until the time of the Audit Committee meeting.   At that point, Thornburg had provided KPMG with nearly 80 pages of information and materials responsive to KPMG's request."   Goldstone Facts ¶ 477, at 104 (setting forth this fact).   See Sec Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from Jennifer Hall to Jason Harris at 2 (dated March 8, 2008), filed August 9, 2013 (Doc. 204-202); Electronic Mail Transmission from Jane Starrett to Jennifer Hall at 2-3; Electronic Mail Transmission from Jennifer Hall to Cynthia Reinhart at 2 (dated March 4, 2008), filed August 9, 2013 (Doc. 204-183).

> The March 4, 2008 Audit Committee meeting commenced at 2:00 pm MST. During the meeting, KPMG informed the Audit Committee, Mr. Goldstone, Mr. Simmons and Ms. Starrett that KPMG had decided to withdraw its audit opinion on Thornburg's 2007 financial statements and discussed required steps with respect to the restatement of the financial statements.

Goldstone Facts ¶ 478, at 104 (setting forth this fact)(internal quotation marks omitted).   See SEC Disputed Facts at 1-51 (not disputing this fact); March 4, 2008, Audit Committee Minutes at 2.   "In the meeting, the Audit Committee and Defendants discussed with KPMG whether it would be appropriate not to restate Thornburg's 2007 financial statements and instead reflect any impact on the accounting treatment for Thornburg's mortgage-backed securities in the 2008 financial statements."   Goldstone Facts ¶ 479, at 104 (setting forth this fact).   See SEC Disputed Facts at 1-51 (not disputing this fact); March 4, 2008, Audit Committee Minutes at 2.   "Under AU § 560, catastrophic events are classified as Type II subsequent events, and do not require a restatement."   Goldstone Facts ¶ 480, at 104 (setting forth this fact).   See SEC Disputed Facts

at 1-51 (not disputing this fact); AU § 560 at 2-3; Hall Depo. at 219:9-221:12.  "In the Audit

Committee meeting, Mr. Simmons expressed his belief that the original going concern judgment

was correct and that the events that occurred after the 10-K filing were not foreseeable, making

those events similar to a fire in the factory, a catastrophic situation."  Goldstone Facts ¶ 481,

at 105 (setting forth this fact)(internal quotation marks omitted).  See Simmons Depo. Vol. III at

169:15-171:11.[258]  "Ms. Starrett conveyed her disagreement [about restating the 2007 Form

_____

[258]The SEC attempts to dispute this fact by stating:

> Defendant Simmons could not have believed that there was no doubt as to
> whether Thornburg could continue as a going concern, given the facts he knew by
> February 27, 2008.  Defendant Simmons's claimed lack of anticipation of
> significant additional margin calls is implausible and contradicted by the fact that
> from January 2 through February 27, 2008, Thornburg's average daily margin
> calls were $28.3 million per business day, and were $53.4 million per business
> day from February 14 and February 27, 2008, and that as recently as February 21,
> 2008 Thornburg received $247.4 million in margin calls in a single day.
> Defendant Simmons could not have believed that the European hedge fund
> collapse was unexpected because Defendant Goldstone e-mailed Defendant
> Simmons on February 27, 2008 indicated [sic] that "a large Alt-A hedge fund in
> Europe is blowing up this afternoon," which Defendants knew by 9:05 a.m.
> February 27 per Mr. Feldman's e-mail, and that UBS "got hit with 20 point
> haircuts on Alt-A AAA's overnight. I think we will get this a little more
> gradually, but we should be ready for it."  Thus, Defendants knew on February 27
> that a European hedge fund was, in fact, blowing up (and that it was impacting
> other financial institutions) and that it would impact Thornburg.  Additionally,
> Defendants later represented that the hedge fund collapse was one of two major
> reasons that Thornburg saw substantial margin calls beginning on February 28,
> 2008, and falsely represented that the collapse was "unexpected," as they knew
> about it February 27.

SEC Disputed Facts ¶ 481, at 41 (alterations omitted).  This assertion does not specifically
dispute the Defendants' asserted fact.  The Defendants do not assert that Simmons believed that
Thornburg Mortgage's going concern analysis was correct, but only that he stated at the meeting
that he thought it was correct.  The Court agrees with the SEC that it is disputed whether
Simmons could have believed that Thornburg Mortgage's going-concern analysis was correct,
but taking the Defendants' asserted fact on its face, that disputed fact does not dispute the
Defendants' asserted fact here.  Accordingly, the Court concludes that the fact is undisputed.

The Defendants assert the following fact:

> At the time of the restatement discussions, Mr. Goldstone believed that Thornburg's 10-K filing was accurate as of the time it was filed and believed the events following the 10-K filing were unpredictable.  As Mr. Goldstone testified: "[T]here was a definite difference of opinion" between Thornburg and KPMG "[as] to whether [the] financial statements need[ed] to be restated . . . ." Mr. Goldstone testified that he did not believe that Thornburg's "accounting team, management team, audit committee, board of directors or attorneys believed that the restatement was necessary."

Goldstone Facts ¶ 482, at 105.  The SEC disputes this fact by stating:

> Defendant Goldstone could not have believed that there was no doubt as to whether Thornburg could continue as a going concern, given the facts he knew by February 27, 2008.   Defendant Goldstone's claimed lack of anticipation of significant additional margin calls is implausible and contradicted by the fact that from January 2 through February 27, 2008, Thornburg's average daily margin calls were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, and that as recently as February 21, 2008 Thornburg received $247.4 million in margin calls in a single day. Defendant Goldstone could not have believed that the European hedge fund collapse was unexpected because Defendant Goldstone e-mailed Defendant Simmons on February 27, 2008 indicated [sic] that "a large Alt-A hedge fund in Europe is blowing up this afternoon," which Defendants knew by 9:05 a.m. February 27 per Mr. Feldman's e-mail, and that UBS "got hit with 20 point haircuts on Alt-A AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it."  Thus, Defendants knew on February 27 that a European hedge fund was, in fact, blowing up (and that it was impacting other financial institutions) and that it would impact Thornburg.  Additionally, Defendants later represented that the hedge fund collapse was one of two major reasons that Thornburg saw substantial margin calls beginning on February 28, 2008, and falsely represented that the collapse was "unexpected," as they knew about it February 27.

SEC Disputed Facts ¶ 482, at 41-42 (alterations omitted).  The Defendants reply by stating:

> The SEC's response does not dispute this fact.

> The SEC's unsupported speculation that Mr. Goldstone "could not have believed" as he testified "given the facts he knew by February 27, 2008" is incompetent evidence that is insufficient to create a dispute as to a material fact.

> The evidence cited by the SEC does not "contradict" Mr. Goldstone's belief. Defendants testified to the meaning of their emails and their understanding, and the SEC's speculative and unsupported reading of those emails and unsupported assertion as to Defendants' understanding is inadmissible.

The SEC's response is also misleading as applied to Ms. Starrett in that the SEC refers to "Defendants." But the SEC has never alleged -- and there is no evidence to support -- that Ms. Starrett had any knowledge of the European hedge fund rumor.

Goldstone Reply Facts ¶ 482, at 214.   The Court concludes that the SEC has disputed the Defendants' asserted fact. It is disputed that Goldstone could have believed that the 2007 Form 10-K was accurate when filed in light of his knowledge of the European hedge-fund collapse, his knowledge that Thornburg Mortgage would be hit with haircuts, his knowledge that Thornburg Mortgage had been unable to timely meet its margin calls immediately before the Form 10-K filing, his knowledge of the volume of margin calls that Thornburg received before the Form 10-K filing, and his knowledge of Thornburg Mortgage's low liquidity. While the SEC does not have evidence of Goldstone directly stating that he thought Thornburg Mortgage's OTTI analysis was wrong, the evidence it presented creates a genuine dispute whether Goldstone could have actually believed that Thornburg Mortgage's OTTI analysis was correct, and thus its Form 10-K was correct. Accordingly, the Court concludes that this fact is disputed.

The Defendants assert the following fact:

Ms. Starrett disagreed with KPMG's conclusion that Thornburg needed to restate its 2007 statements to recognize OTTI. Ms. Starrett did not agree that the post filing market events were the type of circumstances that required a restatement. She thought the circumstances constituted a Type II subsequent event and therefore required disclosure but not restatement.

Goldstone Facts ¶ 483, at 105 (internal quotation marks omitted). The SEC disputes this fact by stating:

Defendant Starrett could not have believed that there was no doubt as to whether Thornburg could continue as a going concern, given the facts she knew by February 27, 2008. Defendant Starrett's claimed lack of anticipation of significant additional margin calls is implausible and contradicted by the fact that from January 2 through February 27, 2008, Thornburg's average daily margin calls were $28.3 million per business day, and were $53.4 million per business day from February 14 and February 27, 2008, and that as recently as February 21, 2008 Thornburg received $247.4 million in margin calls in a single day.

SEC Disputed Facts ¶ 483, at 105. The Defendants reply by stating:

The SEC's response does not dispute this fact.

The SEC cannot create a genuine dispute as to this fact by submitting additional non-responsive purported facts. The SEC's addressing [sic] going concern is immaterial to Ms. Starrett's testimony that the post-filing margin calls constituted a Type II subsequent event that required disclosure but not restatement. The

10-K] to KPMG and to others at Thornburg." Starrett Facts ¶ 17, at 5 (setting forth this fact).

See Starrett Depo. at 229:20-231:4.[259]

---

      SEC's recitation of margin call averages in January and February 2008 has no bearing on this fact.

      In any event, this evidence does not support the SEC's response that Ms. Starrett somehow could not have believed that Thornburg's going concern conclusion was accurate given the facts she knew by February 27, 2008, and that her subjective belief was contradicted. The evidence cited by the SEC does not contradict Ms. Starrett's belief, and the SEC's response is nothing more than speculation insufficient to create a dispute as to a material fact in light of the evidentiary record to the contrary.

Goldstone Reply Facts ¶ 483, at 215-16 (citations omitted)(internal quotation marks omitted). The Court concludes that the fact is disputed. Even though there is no evidence that Starrett was aware of the European hedge fund rumor, because she was not included on the electronic mail transmission discussing the rumor, there is a genuine dispute whether Starrett could have believed that Thornburg Mortgage's OTTI conclusion was correct. Starrett was aware of Thornburg Mortgage's low liquidity levels and that Thornburg Mortgage received significant margin calls leading up to the 2007 Form 10-K filing -- levels of which would quickly deplete Thornburg Mortgage's remaining liquidity if they continued, causing Thornburg Mortgage to default on its repo agreements. It is thus disputed whether Starrett could have believed that Thornburg Mortgage had the ability to hold its assets until maturity. While Starrett may have held such a belief, it should be a jury -- and not the Court on summary judgment -- to make that determination.

    [259]The SEC attempts to dispute this fact by stating: "Defendants admitted that Thornburg made the decision to restate the financial statements contained in its 2007 Form 10-K. Defendants also denied that Thornburg's Form 10-K/A filed with the Commission on March 11, 2008 was materially misleading when issued." SEC Disputed Starrett Facts ¶ 17, at 2-3. To dispute this fact, the SEC cites two separate admissions from the Defendants. In the first, the Defendants deny that the 2007 Form 10-K/A was materially misleading. See Defendants' Objections and Responses to Plaintiff's Second Set of Requests for Admission to All Defendants at 2, filed November 6, 2013 (Doc. 231-5). In the second, the Defendants admit that Thornburg Mortgage's Board of Directors decided to restate its financial statements after KPMG withdrew its audit opinion and determined that restatement was necessary. See Defendants' Second Amended Objections and Responses to Plaintiff's Third Set of Requests for Admission to All Defendants at 2, filed November 6, 2013 (Doc. 231-4). The SEC's assertion and cited evidence does not specifically controvert Starrett's asserted fact. Starrett asserts that she conveyed her disagreement with KPMG's decision to restate Thornburg Mortgage's financial statements. The SEC's evidence merely stands for the proposition that Thornburg Mortgage's Board decided to restate its financial statements, but only after KPMG withdrew its audit opinion and decided that a restatement was necessary. Starrett does not assert that Thornburg Mortgage's Board never

- 285 -

"After discussion in the Audit Committee meeting, KPMG informed the Audit Committee and Thornburg management that its decision to withdraw its audit opinion was final." Goldstone Facts ¶ 484, at 105 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 4, 2008, Audit Committee Minutes at 3.  "KPMG also informed the Audit Committee and Defendants that KPMG was considering whether there was a material weakness in the company's internal controls.  Later that day, Ms. Reinhart told Mr. Goldstone that the restatement would include a finding of material weakness by KPMG."  Goldstone Facts ¶ 485, at 105 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 4, 2008, Audit Committee Minutes at 2-3; Electronic Mail Transmission from Jane Starrett to Ben Smiley at 2 (dated March 4, 2008), filed August 9, 2013 (Doc. 204-181).  "There is no evidence in the record that KPMG reviewed the material that Thornburg sent on March 4, 2008 before the Audit Committee meeting, or took it into account in its decision at the Audit Committee meeting to withdraw its audit opinion."  Goldstone Facts ¶ 486, at 105 (setting forth this fact)(citation omitted).  See Electronic Mail Transmission from Jason Harris to Jennifer Hall at 2 (dated Mar. 8, 2008), filed August 9, 2013 (Doc. 204-203)("March 8, 2008, Harris Email"); Simmons Depo. Vol. III at 169:15-170:9.[260]  "In an email dated March 8, 2008, Ms. Hall wrote

---

decided to restate its financial statements or that KPMG did not determine that a restatement was necessary.  The SEC has thus failed to dispute Starrett's asserted fact, and the Court concludes that it is undisputed.

[260]The SEC attempts to dispute this fact by stating:

Ms. Hall's e-mail stated: "[I]t the homework assignment came in about 10 minutes before a big conference call that TMA called because they wanted a conclusion asap but no one on our side had seen it yet because it had just come through. DPP and everyone has seen their main summary about at this point." Simmons' testimony was that he believed KPMG reached its decision to pull its audit opinion "without even having really looked at the homework assignment."

that KPMG received the material 'about 10 minutes before a big conference call' and 'no one on our side had seen it yet . . . because it had just come through.'"  Goldstone Facts ¶ 487, at 106 (setting forth this fact)(alterations in original)(quoting March 8, 2008, Harris Email at 2).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 8, 2008, Harris Email at 2.

"[A]fter KPMG made its decision to withdraw the audit opinion, KPMG would not issue a clean opinion on the original financial statements as filed in the 10-K, and Thornburg had to decide whether to restate or find a new auditor."  Goldstone Facts ¶ 488, at 106 (setting forth this fact).  See SEC Disputed Fact at 1-51 (not disputing this fact); Hall Depo. at 235:8-236:7. "Without audited financial statements, Thornburg would have been unable to raise capital and would have been out of compliance with SEC regulations."  Goldstone Facts ¶ 489, at 106 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Simmons Depo. Vol. III at 173:21-174:18.  "Mr. Goldstone and Mr. Simmons felt that they had no choice but to restate because KPMG's resignation would have left the company without audited financial statements and without audit representation."  Goldstone Facts ¶ 490, at 106 (setting forth this fact).  See March 4, 2008, Thornburg Email at 2-3; Goldstone Depo. at 253:5-255:3; Simmons Depo. Vol. III at 165:7-174:18.[261]  "On March 5, 2008, Thornburg's Board determined

---

SEC Disputed Facts ¶ 486, at 42 (alterations omitted).  It is unclear how this assertion is intended to dispute the Defendants' asserted fact.  The SEC's assertion supports, rather than disputes, the Defendants' asserted fact.  The SEC does not point to any piece of evidence to show that, before the Audit Committee Meeting, KPMG reviewed the material that Thornburg Mortgage sent. Accordingly, the Court concludes that the SEC has not disputed the fact.

[261]The SEC attempts to dispute this fact by stating: "Defendants admitted that Thornburg made the decision to restate the financial statements contained in its 2007 Form 10-K. Defendants also denied that Thornburg's Form 10-K/A filed with the Commission on March 11, 2008 was materially misleading when issued."  SEC Disputed Facts ¶ 490, at 42.  This assertion does not dispute the Defendants' asserted fact.  The Defendants do not assert that Thornburg Mortgage did not decide to restate the financial statements or that Form 10-K/A was materially

that Thornburg would restate its 2007 financial statements."  Goldstone Facts ¶ 491, at 106

(setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Thornburg

Mortgage, Inc. Form 8-K at 7-8 (dated Mar. 3, 2008), filed August 9, 2013 (Doc. 204-247).

"Ms. Starrett responded to the decision to restate, that 'I guess we forgot to polish our crystal

ball.'"  Starrett Facts ¶ 26, at 7 (setting forth this fact)(quoting Electronic Mail Transmission

from Jane Starrett to Amy Pell at 2 (dated March 3, 2008), filed August 9, 2013

(Doc. 204-166)("March 3, 2008, Starrett Email")).  See March 3, 2008, Starrett Email at 2.[262]

> "[T]here were [not] any specific factual events that KPMG discovered [after the
> filing of the 10K that] were known to the company prior to the filing of the Form
> 10K that the company did not properly consider." . . .  [The] "facts that were not
> known is [not] what drove the restatement. . . .  [I]t was the events that occurred
> after the fact that made [KPMG] reconsider what was the condition or the events
> of the company at the time."

Starrett Facts ¶ 21, at 5 (setting forth this fact)(alterations omitted)(emphasis omitted)(quoting

Hall SEC Depo. at 104:3-15).  See Hall SEC Depo. at 104:3-15.[263]

---

misleading.  The SEC has thus failed to specifically controvert the asserted fact, and the Court
concludes that it is undisputed.

[262]The SEC attempts to dispute this fact by stating: "Defendants admitted that Thornburg
made the decision to restate the financial statements contained in its 2007 Form 10-K.
Defendants also denied that Thornburg's Form 10-K/A filed with the Commission on March 11,
2008 was materially misleading when issued."  SEC Disputed Starrett Facts ¶ 26, at 5.  This
assertion does not address, much less specifically controvert, Starrett's asserted fact.
Accordingly, the Court finds that the SEC has not disputed the fact.

[263]The SEC attempts to dispute this fact by stating:

> At the time of Ms. Hall's SEC testimony, she was not aware of the Citi letter,
> Defendants' advance knowledge of the European hedge fund collapse, and
> Defendants' purposeful withholding of Thornburg's inability to meet margin
> calls.  Ms. Hall later testified that if she had known that Defendant Starrett sent an
> e-mail to Defendants Goldstone and Simmons noting that they were purposely not
> telling KPMG about margin calls "it would be difficult for me to expect that we
> would have concluded that we agreed with management's assertion that they had
> the had the intent and ability to hold, or that there wasn't substantial doubt about

29.    **KPMG's Involvement in the Restatement Process.**

"During the restatement process, KPMG conducted interviews and reviewed Thornburg's internal emails and other documentation in an effort to determine whether there was any intentional misrepresentation to or omission of material facts from KPMG during the year-end audit."  Goldstone Facts ¶ 491A, at 106 (setting forth this fact).  See March 9, 2008, Restatement Memo. at 11.[264]  "As a standard part of its restatement process, KPMG performed a thorough investigation to determine if Defendants or anyone else at Thornburg withheld information from or made false representations to KPMG."  Goldstone Facts ¶ 492, at 106 (setting forth this fact).

_____

their going concern."   Ms. Hall also testified that had KPMG known that Thornburg was "not able to meet the margin call in time and were having to negotiate with their lenders is a significant piece of information" that "very well could have" changed KPMG's OTTI analysis, "[e]ven if the margin call were fully satisfied and the lender had agreed to it and had not declared any event of default."

SEC Disputed Starrett Facts ¶ 21, at 3.  This assertion does not specifically controvert Starrett's disputed facts.  Starrett asserts that Hall did not think that there were any facts, which were discovered after the 2007 Form 10-K filing, that Thornburg Mortgage did not properly consider. The SEC, on the other hand, asserts that KPMG could have disagreed with Thornburg Mortgage's OTTI analysis if it knew about the information that Thornburg Mortgage withheld. The SEC does not, however, point to evidence which shows that Thornburg Mortgage did not consider the withheld information, that Thornburg Mortgage should have considered the information, or that, if it had considered the information, Thornburg Mortgage would have reached a different conclusion.  Even considering the withheld information, Thornburg Mortgage could have reached the same OTTI conclusions, and Hall could have disagreed with that conclusion.  The SEC does not specifically controvert Starrett's asserted fact, and the Court concludes that it is undisputed.

[264]The SEC attempts to dispute this fact by stating: "KPMG's review of Thornburg's internal e-mails was limited to the e-mails Thornburg provided and referred to by KPMG as email traffic between the Company's Capital Markets group and repurchase agreement counterparties."  SEC Disputed Facts ¶ 491.5, at 42-43 (internal quotation marks omitted).  This assertion does not specifically dispute the Defendants' asserted fact.  The Defendants do not assert that KPMG reviewed all internal electronic mail transmissions.  The SEC merely asserts an additional fact that does not specifically controvert the Defendants' asserted fact. Accordingly, the Court finds that the SEC has not disputed the fact.

See SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo. at 10-12; Electronic Mail Transmission from Robert P. McLamb to Larry A. Leva at 2 (dated Mar. 5, 2008), filed August 9, 2013 (Doc. 204-189).  "Mr. Browning, in consultation with other members of KPMG's Department of Professional Practice, performed a restatement assessment concerning the Thornburg audit."  Goldstone Facts ¶ 493, at 107 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Browning Depo. at 30:16-32:8, 34:6-35:15. "KPMG interviewed members of Thornburg management (Mr. Simmons and Ms. Starrett), and Mr. Fellers and Mr. Feldman of Thornburg's Capital Markets group, among others, to request additional information, investigate management's knowledge of liquidity monitoring processes, and determine whether the restatement was caused by management's intentional wrongdoing or fraud."  Goldstone Facts ¶ 494, at 107 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo. at 11.  "During the restatement process, KPMG conducted interviews and reviewed Thornburg's internal emails and other documentation in an effort to determine whether there was any intentional misrepresentation to or omission of material facts from KPMG during the year-end audit."  Starrett Facts ¶ 55, at 12 (setting forth this fact).  See March 9, 2008, Restatement Memo. at 1, 11.[265]  "KPMG was

---

[265]The SEC attempts to dispute this fact by stating:

Disputed to the extent Starrett is claiming that KPMG reviewed all Thornburg's internal e-mails in an effort to determine whether there was any intentional misrepresentation.  KPMG witnesses testified they did not see prior to giving testimony to the SEC in this matter, among other things: (1) Starrett's 2/25/2008 email saying that Defendants had purposely not told [KPMG] about the margin calls; (2) the 2/27/2008 email exchange between Goldstone and Simmons discussing the collapsing European hedge fund and its anticipated impact on Thornburg; and (3) the Citigroup reservation of rights letter.

SEC Disputed Starrett Facts ¶ 55, at 9 (internal quotation marks omitted).  This assertion does not dispute Starrett's asserted fact.  Starrett does not assert that KPMG reviewed all of

granted unrestricted access to review Thornburg's emails.  Mr. Crawford . . . was not aware of

any limitations placed on KPMG with respect to this email review."  Goldstone Facts ¶ 495,

at 107 (setting forth this fact).  See Crawford Depo. at 57:18-60:13, 193:5-12, 195:23-196:18;

Simmons Depo. Vol. III at 209:4-10.[266]  "KPMG reviewed the email traffic between the

Company's Capital Markets group and repurchase agreement counterparties for the days leading

up to KPMG's report date."  Goldstone Facts ¶ 496, at 107 (setting forth this fact).  See March 9,

2008, Restatement Memo. at 11.[267]  "After completing the email review, KPMG did not identify

---

Thornburg Mortgage's internal electronic mail transmissions.  Consequently, the Court finds that
the SEC has not disputed this fact.

[266]The SEC attempts to dispute this fact by stating: "KPMG's review of Thornburg's
internal e-mails was limited to the e-mails Thornburg provided and referred to by KPMG as
email traffic between the Company's Capital Markets group and repurchase agreement
counterparties."  SEC Disputed Facts ¶ 495, at 43 (internal quotation marks omitted).  To dispute
this fact, the SEC cites the March 9, 2008, Restatement Memo.  The March 9, 2008, Restatement
Memo. states:

> In addition, the engagement team and BUPPP Bob McLamb interviewed key
> members of Company management, including Capital Markets personnel Nate
> Fellers, Patrick Feldman, CFO Clay Simmons and CAO Jane Starrett, to inquire
> as to management's knowledge of the process used by management to monitor
> liquidity, and request information in the days leading up to our report date.  That
> information included email traffic between the Company's Capital Markets group
> and repurchase agreement counterparties in an effort to conclude on the
> completeness of the information provided to KPMG up to the date of our audit
> report and to assess whether there had been an intentional misrepresentation to or
> omission of material facts from KPMG.

March 9, 2008, Restatement Memo. at 11.  The SEC's cited evidence does not support its
assertion that Thornburg Mortgage limited KPMG to electronic mail transmissions between
Thornburg Mortgage's Capital Markets group and repurchase agreement counterparties.  Instead,
it shows that KPMG requested only those electronic mail transmissions.  The SEC has thus failed
to present evidence that specifically controverts the Defendants' asserted fact, and the Court
concludes that it is undisputed.

[267]The SEC attempts to dispute this fact by stating: "KPMG's review of Thornburg's
internal e-mails was limited to the e-mails Thornburg provided and referred to by KPMG as
email traffic between the Company's Capital Markets group and repurchase agreement

the Citigroup reservation of rights letter that was emailed to Mr. Fellers in its restatement

workpapers as an issue of concern."   Goldstone Facts ¶ 497, at 107-08 (setting forth this fact).

See March 9, 2008, Restatement Memo. at 11-12; Restatement Summary Memo prepared by

Daniel Acree and Brett Thompson at 2-3 (March 8, 2008), filed August 9, 2013 (Doc. 204-195);

March 8, 2008, OTTI Memo. at 2-9.[268]   "Reinhart did not know that Thornburg had received the

_____

counterparties."   SEC Disputed Facts ¶ 496, at 43 (internal quotation marks omitted).   The SEC
essentially repeats the Defendants' asserted fact.   It is unclear how this assertion is intended to
dispute the Defendant's fact.   In any case, the Court finds that the SEC has not disputed the fact.

[268]The SEC attempts to dispute this fact by stating:

> KPMG's review of Thornburg's internal e-mails was limited to the e-mails
> Thornburg provided and referred to by KPMG as email traffic between the
> Company's Capital Markets group and repurchase agreement counterparties.
> Ms. Reinhart, Ms. Hall, and Mr. Taylor each testified that they were not shown
> the Citi Reservation of Rights letter in connection with the audit or the
> restatement. Mr. McLamb, a KPMG auditor involved in conducting the
> restatement assessment, testified that he had not reviewed the Citi letter, and that
> if they had been provided it from Thornburg that it would have raised questions
> about Thornburg's Form 10-K, Thornburg management's integrity, and why
> Defendants had not provided the Citi letter to KPMG, as well as further questions.

SEC Disputed Facts ¶ 497, at 43 (internal quotation marks omitted).   The Defendants reply by
stating:

> The SEC's response does not dispute this fact.
>
> The SEC's response that KPMG's review of Thornburg's internal e-mails was
> "limited" as described is immaterial, not supported by competent evidence, and
> contradicted by other evidence in the record.
>
> The SEC's response is also immaterial because the Citigroup letter was emailed to
> Mr. Fellers and therefore was part of the email traffic between the Company's
> Capital Markets group and repurchase agreement counterparties, which KPMG
> indicated was included in the information it reviewed during the restatement
> period.  The testimony cited by the SEC that certain KPMG employees were not
> shown the Citi Reservation of Rights letter does not contradict the fact that
> KPMG was provided access to those emails or that -- with undisputed knowledge
> of the technical evidence of default -- KPMG did not identify this as an issue of
> concern.

Citigroup Global Letter before the filing of the 2007 10-K/A and she believed the Citigroup

Global Letter was a material fact that should have been brought to her attention."  SEC Facts

¶ M, at 3 (setting forth this fact).  See Reinhart Depo. at 48:17-23.[269]

> McLamb interviewed Clay Simmons and Jane Starrett in connection with Thornburg's restatement and both acknowledged that they had not brought this to Cynthia and Jennifer's attention, the fact that they were not making timely margin calls.

> He also does not believe that the Tie-Out Document was sufficient to advise KPMG that margin calls were not timely met, management should have brought that fact directly to the attention of the lead engagement partner.

---

Goldstone Reply Facts ¶ 487, at 220-21 (citations omitted)(internal quotation marks omitted). The Court agrees with the Defendants.  Fellers' electronic mail transmission was included in the group of electronic mail transmissions that KPMG reviewed.  Additionally, it is immaterial that some KPMG employees would have seen the Citi letter as an issue of concern.  Either the KPMG employee that reviewed Fellers' electronic mail transmission did not think it was an issue of concern, the employee thought it was an issue of concern but failed to bring it to his or her supervisor's attention, or KPMG just missed the Citi letter when reviewing the electronic mail transmissions.  In any event, KPMG did not identify the Citi letter as an issue of concern.  The SEC fails to dispute this fact, and the Court concludes that it is undisputed.

[269]The Defendants respond by stating:

> Undisputed that Ms. Reinhart so testified, but immaterial because KPMG's hindsight testimony as to what information it would have found material is not a basis for liability under Rule 13b2-2, and the undisputed evidence as to KPMG's awareness of Thornburg's margin calls and liquidity establishes the objective immateriality of the Citigroup letter.  Further, the SEC has not refuted the evidence that the Citigroup letter was made available to KPMG for review along with all of senior management's emails back to January 2008.

> The fact is also immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶ C.

Defendants Disputed Facts ¶ M, at 8 (citation omitted).  Because the Defendants do not dispute this fact, and because immateriality does not dispute an asserted fact, the Court concludes that the fact is undisputed.

SEC Facts ¶ R, at 4 (setting forth this fact)(internal quotation marks omitted).  See McLamb

Depo. at 274:8-275:4.[270]  "When asked by McLamb whether they had told KPMG that

Thornburg had been late meeting margin calls leading up to the filing of the Form 10-K, neither

Simmons nor Starrett referenced the Tie-Out Document."  SEC Facts ¶ S, at 4 (setting forth this

fact).  See McLamb Depo. at 313:8-314:10.[271]

---

[270]The Defendants attempt to dispute this fact by stating:

Disputed.  Mr. McLamb's testimony is contradicted by his testimony reflecting that he was able to quickly discern that the schedule "appears to show that, that a Citibank margin call was satisfied in a number of payments over a number of days."

The fact is immaterial because notwithstanding Mr. McLamb's testimony, KPMG still concluded that there had been no fraud or material misstatement on the part of management, undercutting the SEC's claim that Defendants engaged in deceptive conduct with regard to "delayed" payments.  Further, Mr. McLamb's testimony confirms that, regardless of what was communicated during his interviews of Mr. Simmons and Ms. Starrett, "nothing came out of those interviews that caused us to question management's integrity."

The fact is also immaterial for the reasons set forth in Defendants' Response to SEC SMF ¶ C, and because Defendants had no obligation under Rule 13b2-2 to bring specific details of the Margin Call Schedule to the attention of Ms. Reinhart or Ms. Hall.

Defendants Disputed Facts ¶ R, at 9-10 (citations omitted).  This assertion does not dispute the SEC's asserted fact.  Even if the Margin Call Schedule gave the appearance that the Citigroup Global margin call was met over time, it still may have been insufficient to advise KPMG that Thornburg Mortgage was not timely meeting its margin calls.  The Defendants thus fail to specifically dispute the SEC's asserted fact.  Additionally, the Court will address materiality, if necessary, in the Analysis and not in the Factual Background section.  Consequently, the Court finds that the Defendants have not disputed the fact.

[271]The Defendants attempt to dispute this fact by stating:

Disputed.  The evidence supports only that this is Mr. McLamb's testimony, not that his testimony was an accurate description of what occurred.  Ms. Starrett testified that she did not "recall any questions related to margin calls made before the filing date" during the interview with Mr. McLamb, and that Mr. McLamb's

"KPMG also had access to all e-mail communications of Thornburg's senior management team dating back to January 1 to verify the information that Thornburg provided them was accurate."   Goldstone Facts ¶ 498, at 108 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).   See Electronic Mail Transmission from Anne-Drue Anderson to Larry Goldstone, Garret Thornburg, Clay Simmons, and Jane Starrett at 2 (dated Mar. 5, 2008), filed August 9, 2013 (Doc. 204-188); Goldstone Decl. ¶ 57, at 11; Electronic Mail Transmission from Jane Starrett to Bruce Nye at 2 (dated Mar. 7, 2008), filed August 9, 2013 (Doc. 204-193).[272]

---

questions "focused almost entirely on the subsequent [to the 10-K filing] margin calls received."  Ex. 342 (Starrett Tr. 263:8-264:15).

Defendants Disputed Facts ¶ S, at 10 (alterations in Defendants Disputed Facts but not in source).  This assertion does not dispute the SEC's asserted fact.  The Defendants assert that the SEC does not present evidence showing that McLamb's testimony is accurate; however, the Defendants do not provide any evidence showing that it is inaccurate.  The burden is on the Defendants to dispute the SEC's asserted fact once the SEC provides evidence supporting it.  The Defendants have failed to do so.  Starrett's testimony that she does not recall any questions concerning margin calls does not specifically controvert the SEC's asserted fact.  She did not testify that McLamb did not ask questions about margin calls, but only that she does not recall.  The Defendants thus fail to dispute this fact, and the Court concludes that it is undisputed.

[272]The SEC attempts to dispute this fact by stating: "KPMG's review of Thornburg's internal e-mails was limited to the e-mails Thornburg provided and referred to by KPMG as email traffic between the Company's Capital Markets group and repurchase agreement counterparties."  SEC Disputed Facts ¶ 498, at 43 (internal quotation marks omitted).  To dispute this fact, the SEC cites the March 9, 2008, Restatement Memo., which states that KPMG requested electronic mail transmissions from Thornburg Mortgage's Capital Markets group and repurchase agreement counterparties, but does not state that Thornburg Mortgage limited KPMG to those electronic mail transmissions.  See March 9, 2008, Restatement Memo. at 11.  Consequently, the SEC fails to present evidence that specifically controverts the Defendants' asserted fact, and the Court concludes that the fact is undisputed.

The Defendants assert the following fact: "After reviewing the e-mails of Thornburg's senior management team and the Capital Markets group during the restatement process, KPMG raised no questions about the hedge-fund rumor, notwithstanding the clear references to that rumor in those emails and a March 4 memo reference to the hedge fund's collapse as unexpected."  Goldstone Facts ¶ 499, at 108.  The SEC Disputes this fact by stating:

KPMG's review of Thornburg's internal e-mails was limited to the e-mails Thornburg provided and referred to by KPMG as "email traffic between the Company's Capital Markets group and repurchase agreement counterparties." Ms. Reinhart, Ms. Hall, and Mr. Taylor each testified that they were not shown the internal emails referring to the collapsing European hedge fund in connection with the audit or the restatement.  Mr. McLamb, a KPMG auditor involved in conducting the restatement assessment, testified that he had not been made aware of e-mail correspondence regarding the European hedge fund collapse, and that if they had been provided it from Thornburg that it would have raised questions about Thornburg's 10-K, Thornburg management's integrity, and why Defendants had not provided the e-mails to KPMG, as well as further questions. Mr. McLamb simply testified that "we asked the team to ask the company for e-mails around margin calls and the whole liquidity issue in the days leading up to the, leading up to the filing of the original 10-K.  And the company did provide us e-mails in response to -- in response to that question."

SEC Disputed Facts ¶ 499, at 43-44.  The Defendants reply by stating:

The SEC's response does not dispute this fact.

The SEC's assertion with respect to the limited e-mail review is not supported by the evidence cited and is contradicted by the evidence cited by Defendants.

The testimony cited by the SEC that certain KPMG employees were not shown the internal e-mails referring to the collapsing European hedge fund does not contradict the fact that KPMG was provided access to those emails or the fact that it did not raise any questions about the rumor notwithstanding the reference to it in the March 4 memo

Goldstone Reply Facts ¶ 499, at 221.
     While there is no evidence that Thornburg Mortgage limited KPMG's review to certain electronic mail transmissions, KPMG reviewed only electronic mail transmissions between Thornburg Mortgage's Capital Markets group and repurchase agreement counterparties.  See March 9, 2008, Restatement Memo. at 11.  The Defendants do not cite any evidence to support their assertion that KPMG reviewed Thornburg Mortgage's senior management team's electronic mail transmissions.  The electronic mail transmission that referenced the hedge-fund collapse was between Goldstone and Simmons.  See Feb. 27, 2008, Hedge Fund Email at 2.  The electronic mail transmissions that KPMG reviewed, thus, did not include this electronic mail transmission.  There is no evidence to support the Defendants' assertion that KPMG reviewed the hedge fund electronic mail transmission and then did not raise any concerns about it.  Accordingly, the Defendants' asserted fact lacks evidentiary support, and the SEC has specifically controverted it.  The Court thus concludes that the Defendants' asserted fact is disputed.

> On March 9, 2008, Mr. McLamb sent KPMG DPP partner Michael Foley an email that attached a copy of Mr. Goldstone's February 25, 2008 email report to Thornburg's Board of Directors.   In that email, Mr. Goldstone discussed Thornburg's partial payment of margin calls, stating: "[W]e were able to send Citibank $60 million and Greenwich $20 million for a net reduction of $80 million in margin calls. . . .   We believe we owe Citi just under $100 million after today, which is very good."

Goldstone Facts ¶ 500, at 108 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Electronic Mail Transmission from Robert P. McLamb to Michael D. Foley at 3 (dated March 9, 2008), filed August 9, 2013 (Doc. 204-209)("March 9, 2008, McLamb Email")).

See SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, McLamb Email at 2-3.

> When Mr. Simmons and Ms. Starrett were interviewed in connection with the restatement by Robert McLamb, a KPMG professional practice partner, and questioned about this very issue, they told Mr. McLamb -- consistent with Ms. Starrett's e-mail -- that "they did not think the timing of margin call payments was a material issue as long as they ultimately had met the margin calls by the time the 10-K was filed."   After completing his review of Thornburg emails and interviewing management, Mr. McLamb . . . had no reason to doubt the truthfulness of this response and that "there was nothing that came to our attention [--] including the answer quoted above [--] that caused us to be concerned about management's integrity."   In addition, no other KPMG employee informed him that they saw e-mails that would lead them to question management's integrity.

Goldstone Facts ¶ 501, at 108-09 (setting forth this fact)(alterations omitted)(alterations modified for clarity)(quoting McLamb Depo. at 46:6-14, 47:6-9).   See McLamb Depo. at 45:12-47:9, 53:8-19, 55:2-58:23, 279:2-13, 281:10-283:11.[273]

---

[273]The SEC attempts to dispute this fact by stating:

> When Mr. McLamb interviewed Defendants Simmons and Starrett about their failure to disclose Thornburg's failure to timely meet margin calls, Defendants Simmons and Starrett admitted that they had not done so.   Additionally, Defendants' claimed belief is implausible and contradicted by their own admissions.   Defendant Goldstone testified that "Citibank could have verbally agreed to a payment plan and they could have woken up the next day and decided that they didn't like what they had agreed to and declared us in default that way. They had every right to do that but they chose not to."   Defendant Simmons recognized that after issuing its reservation of rights letter (and purportedly

"During the restatement process, KPMG conducted testwork on the reasonableness of a roll-forward of all margin calls that Thornburg received from January 1 through March 7, 2008, and tied out a sample of the margin calls, using emails from counterparties and dealers, wire transfer confirmations, and cash management reports."  Goldstone Facts ¶ 502, at 109 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Reasonableness of Margin Call Rollforward prepared by Heather Carrasco at 2 (Mar. 9, 2008), filed August 9, 2013 (Doc. 204-205).  "KPMG also conducted testwork on the effectiveness of Thornburg's key internal controls related to the cash monitoring process, with a focus on Thornburg's daily liquidity reports, and concluded that this control was operating effectively."  Goldstone Facts ¶ 503, at 109 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Liquidity Risk Reports at 2-3.  "[T]he restatement of financial statements does not, by itself, necessitate that management consider the effect of the restatement on the company's prior conclusion related to the effectiveness of ICFR [--] internal control over financial reporting."  Starrett Facts ¶ 89, at 17 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934; Final Act, 72 Fed. Reg. 35,334 (June 27, 2007), filed August 31, 2013 (Doc. 207-27).  "As part of the restatement process, KPMG performed a comprehensive review of Thornburg's internal controls

---

agreeing to a payment plan) Citibank "would have the right to declare an event of default."

SEC Disputed Facts ¶ 501, at 44.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants assert only that Simmons and Starrett told McLamb that they did not think that the margin calls were material, and that McLamb had no reason to doubt their answers.  The Defendants do not assert that Simmons and Starrett believed that the margin calls were not material, or that they were being honest in their belief.  The SEC has thus failed to dispute the Defendants' asserted fact, and the Court concludes that it is undisputed.

over financial reporting and disclosure for OTTI and ability to continue as a going concern." Starrett Facts ¶ 90, at 17 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); March 9, 2008, Restatement Memo. at 14.  "According to KPMG, the Company had appropriate processes and controls in place over financial reporting and disclosure, but just missed it from the standpoint of their underestimation of the effect that an extremely volatile and illiquid credit market would have on the Company's financial structure."  Starrett Facts ¶ 91, at 17 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See Memorandum from Cynthia Reinhart, KPMG Engagement Partner, and Jennifer Hall, KPMG Engagement Senior Manager, to Thornburg Mortgage, Inc. 2007 Restatement Files, regarding Audit Client Restatement -- Engagement Team Procedures at 3-4 (March 9, 2008), filed August 31, 2013 (Doc. 207-28).[274]  "KPMG's unqualified opinion as to the effectiveness of Thornburg's internal control environment was incorporated into Thornburg's restated Form 10-K/A."  Starrett Facts ¶ 92, at 17-18 (setting forth this fact).  See Restated Form 10-K/A at 2-9.[275]  "In addition, Mr. Womack and KPMG partner David Glass

---

[274]The SEC attempts to dispute this fact by stating:

At the time of its conclusion, KPMG was not aware of the Citi letter, Defendants' advance knowledge of the European hedge fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet margin calls.  These are facts that KPMG would have wanted to know and that would have affected its conclusion.  Mr. McLamb specifically testified that these unknown facts would have raised questions and affected KPMG's analysis.

SEC Disputed Starrett Facts ¶ 91, at 14.  This assertion does not dispute Starrett's asserted fact. The SEC does not assert that KPMG did not reach the conclusion which Starrett asserts it reached, and Starrett does not assert that KPMG was fully aware of all information when it made that conclusion.  The SEC thus fails to specifically controvert Starrett's asserted fact, and the Court concludes that it is undisputed.

[275]The SEC attempts to dispute this fact by stating:

re-performed KPMG's in-depth review, including additional review of procedures and workpapers related to audit objectives associated with significant risks and significant accounting, auditing, and reporting matters to confirm the reasonableness of the judgments made by the engagement team." Goldstone Facts ¶ 504, at 109 (setting forth this fact). <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo. at 17; Memorandum from David Glass, KPMG Reviewing Partner, to Clyde Womack, SEC Reviewing Partner, at 2-3 (dated March 10, 2008).

"Mr. Foley, Mr. Smith, and Mr. Crawford from KPMG's Department of Professional Practice oversaw the restatement process. Mr. Crawford advised the engagement team on the implications of the restatement for KPMG's report on Thornburg's internal controls over financial reporting." Goldstone Facts ¶ 505, at 109 (setting forth this fact). <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo. at 6-7, 17; Smith Depo. at 9:13-11:15; Crawford Depo. at 8:7-13. "In a draft of the workpaper documenting KPMG's engagement team procedures for the restatement, Mr. Smith noted, 'We should discuss what was done in connection with [general counsel] and margin calls prior to release of 10-K, as this was not the first time [KPMG] became aware of margin calls.'" Goldstone Facts ¶ 506, at 109 (setting forth this fact)(quoting Audit Client Restatement -- Engagement Team Procedures

_____

At the time of its conclusion, KPMG was not aware of the Citi letter, Defendants' advance knowledge of the European hedge fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet margin calls. These are facts that KPMG would have wanted to know and that would have affected its conclusion. Mr. McLamb specifically testified that these unknown facts would have raised questions and affected KPMG's analysis.

SEC Disputed Facts ¶ 92, at 14. This assertion does not dispute Starrett's asserted fact. The SEC does not contend that KPMG's opinion was not incorporated in the restated 2007 Form 10-K/A. Consequently, the SEC fails to dispute this fact, and the Court concludes that it is undisputed.

from Cynthia Reinhart, KPMG, Engagement Partner, and Jennifer Hall, KPMG Engagement

Senior Partner, to Thornburg Mortgage, Inc. 2007 Restatement Files at 2 (dated March 9, 2008,

& March 28, 2008), filed August 9, 2013 (Doc. 204-208)("Engagement Team Procedures")).

See SEC Disputed Facts at 1-51 (not disputing this fact); Engagement Team Procedures at 2.

> The final version of the workpaper documenting KPMG's engagement
> team procedures (the "Restatement Memo") referenced the Margin Call Schedule
> three separate times.
>
>> "Management provided a schedule indicating that the Company
>> had received margin calls in excess of $300 million between
>> February 14, 2008 and February 26, 2008, which were met in full
>> as of filing the 10-K on the morning of February 28, 2008."
>>
>> "Before filing the Form 10-K, the Company provided KPMG with
>> a schedule that showed margin calls from February 14th through
>> February 27th of $339 million, excluding factor adjustments
>> (principal pay down of debt due to principal pay down of pledged
>> securities)."
>
> The memo also stated that:
>
>> "On March 4, 2008, the Company provided KPMG with a
>> schedule showing margin calls from January 1st through February
>> 27th (2008) of $1.2 billion, including factor adjustments, which
>> were met."

Goldstone Facts ¶ 507, at 110 (setting forth this fact)(citations omitted)(quoting March 9, 2008,

Restatement Memo. at 2-3, 8).  See SEC Disputed Facts at 1-51 (not disputing this fact); March

9, 2008, Restatement Memo. at 2-3, 8, 10.  "The Restatement Memo stated that on or around

February 14, 2008, the Company began receiving margin calls that they were having difficulty

meeting."  Goldstone Facts ¶ 508, at 110 (setting forth this fact)(alterations omitted)(internal

quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 9,

2008, Restatement Memo. at 13-14.  "The Restatement Memo also explained that Thornburg had

met margin calls in excess of $1 billion in January and February of 2008, and the resulting low

level of the Company's liquidity."  Goldstone Facts ¶ 509, at 110 (setting forth this fact)(internal

quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 9,

2008, Restatement Memo. at 14.  "The Restatement Memo stated that the strategies available to

the Company to meet its liquidity needs were attainable and reasonable."  Goldstone Facts ¶ 510,

at 110 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC

Disputed Facts at 1-41 (not disputing this fact); March 9, 2008, Restatement Memo. at 12.

> The Restatement Memo, in the section entitled, "Primary cause of the error,
> including fraud considerations," stated: "Management's expectations related
> to the performance of the Company's portfolio and liquidity requirements in a
> rapidly changing and illiquid credit market environment were based on certain
> judgments about the likelihood of additional margin calls and the Company's
> ability to meet those margin calls.  These judgments were not consistent with the
> events that occurred on February 28, 2008, and subsequently."

Goldstone Facts ¶ 511, at 110-11 (setting forth this fact)(quoting March 9, 2008, Restatement

Memo. at 10).  See SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008,

Restatement Memo. at 10.

"The Restatement Memo explained that on February 28th, repurchase agreement

counterparties reacted strongly to the news of margin calls and risks disclosed within

Thornburg's Form 10-K, as evidenced in email correspondence on February 28th."  Goldstone

Facts ¶ 512, at 111 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).

See SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo.

at 11.  "The Restatement Memo stated that the magnitude of margin calls that were received on

February 28th and 29th were not in line with management's expectations."  Goldstone Facts

¶ 513, at 111 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See

SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo. at 13.

> The Restatement Memo stated that "[i]t is clear from the events that unfolded
> subsequent to February 27, 2008 that management's expectations and

> assumptions were inconsistent with actual market reactions.  This inconsistency in expected versus actual market reactions fundamentally underlies the cause of the accounting error and subsequent restatement of the Company's 2007 financial statements, resulting in the restatement for the impairment charge."

Goldstone Facts ¶ 514, at 111 (setting forth this fact)(quoting March 9, 2008, Restatement Memo. at 16).   See SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo. at 16.   "The Restatement Memo also stated that Thornburg's 'disclosure provided visibility into the situation that the company was facing as to the increasing margin calls in an increasing [sic] illiquid market for mortgage collateral.'"   Goldstone Facts ¶ 515, at 111 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting March 9, 2008, Restatement Memo. at 16).   See SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo. at 16.

In a draft of the Restatement Memo, Mr. Crawford commented:

> "THE CAUSE OF THE ERROR WAS DUE TO MANAGEMENT NOT SEEING WHAT WAS ABOUT TO HIT THEM . . .  THE ENGAGEMENT TEAM, INCLUDING BOB MCLAMB INDICATED THAT THE COMPANY IS NOT DOING ANYTHING DIFFERENTLY HERE . . . NOR COULD MANAGEMENT HAVE DONE ANYTHING MORE TO ADDRESS THE UNDERLYING CAUSE OF THE MISSTATEMENT."

Goldstone Facts ¶ 516, at 111-12 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting Crawford Restatement Draft at 11).   See SEC Disputed Facts at 1-51 (not disputing this fact); Crawford Restatement Draft at 11; Crawford Depo. at 60:14-65:6.   "KPMG could have identified the errors that led to the restatement during the audit.  In addition, . . . KPMG should have issued a going concern qualification at the time of the audit."   Goldstone Facts ¶ 517, at 112 (setting forth this fact).   See SEC Disputed Facts at 1-51 (not disputing this fact); Browning Depo. at 117:21-118:7; Crawford Depo. at 46:7-13, 47:2-12.

"Mr. Crawford . . . could not recall any member of the engagement team claiming that they were unaware of information related to margin calls prior to the 10-K filing."  Goldstone Facts ¶ 518, at 112 (setting forth this fact).  See Crawford Depo. at 98:10-22.[276]  "During its restatement investigation, KPMG recognized and considered that the payment of certain margin calls in February 2008 over the course of several days had constituted a technical evidence of default under its repo agreements."   Goldstone Facts ¶ 519, at 112 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); KPMG Handwritten note at 3, filed August 9, 2013 (Doc. 204-190); McLamb Depo. at 78:22-80:3, 81:2-22.  "Mr. Crawford . . . [did not] believe the question as to whether the company had satisfied its margin calls, and whether that satisfaction or lack thereof would constitute a technical event of default, is indicative of fraudulent financial reporting."  Goldstone Facts ¶ 520, at 112 (setting forth this fact)(internal quotation marks omitted)(quoting Crawford

---

[276]The SEC attempts to dispute this fact by stating:

Defendants purposefully withheld critical information about margin calls -- that they were not timely being met -- from KPMG, as demonstrated by Defendant Starrett's February 25, 2008 e-mail to Defendants Goldstone and Simmons: "We have purposely not told them [KPMG auditors] about the margin calls so that we don't escalate an issue which we believe will be put to rest by the time they have to issue an opinion."  Several KPMG personnel testified that Defendants withheld information from KPMG related to Thornburg's inability to timely meet margin calls.

SEC Disputed Facts ¶ 518, at 44.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants do not assert that they did not withhold information from KPMG.  Rather, they assert that Crawford did not recall any member of KPMG's engagement team contending that he or she was unaware of information concerning margin calls before the 2007 Form 10-K filing.  The SEC does not dispute this fact, and the Court concludes that it is undisputed.

Depo. at 240:16-21).  See Crawford Depo. at 240:5-21.[277]  "A draft of the Restatement Memo

included the following proposed addition by Cynthia Reinhart: 'In part, the disclosure in the

_____

[277]The Defendants' asserted fact states: "Mr. Crawford, in his capacity as KPMG's Rule 30(b)(6) representative, testified, 'I don't believe the question as to whether the company had satisfied its margin calls, and whether that satisfaction or lack thereof would constitute a technical event of default, is indicative of fraudulent financial reporting.'"  Goldstone Facts ¶ 520, at 112.  The SEC disputes this fact by stating:

> It is not clear that Mr. Crawford was testifying in his capacity as KPMG's 30(b)(6) testimony when giving the testimony Defendants cite.  Mr. Crawford was testifying in both his personal capacity and as a 30(b)(6) witness, and his statement that "I don't believe . . ." appears to be made in his personal capacity.  Mr. McLamb, a KPMG auditor involved in conducting the restatement assessment, testified that he had not been made aware of e-mail correspondence indicating that Defendants "purposely withheld" from KPMG information regarding Thornburg's inability to timely meet margin calls.  Mr. McLamb testified that if he had been provided it from Thornburg that it would have raised questions about Thornburg's Form 10-K, Thornburg management's integrity, Thornburg's ability to continue as a going concern, and why Defendants had not provided the margin call information, as well as further questions.

SEC Disputed Facts ¶ 520, at 44-45 (alterations in Goldstone Facts but not in source).  The Defendants reply by stating:

> The SEC does not dispute the fact that Mr. Crawford testified as quoted.

> The SEC's response that Mr. Crawford's testimony "appears to have been made in his personal capacity" is immaterial and not supported by competent evidence.  Mr. Crawford was responding to a question as to KPMG's audit conclusion in connection with Thornburg's conduct.

> The remainder of the SEC's response is immaterial because Mr. Crawford's testimony is contradicted by undisputed facts, and premised on unsupported speculation: that KPMG had "not been made aware of e-mail correspondence indicating that Defendants 'purposely withheld' from KPMG information regarding Thornburg's inability to timely meet margin calls."

> Mr. McLamb's testimony that his awareness of the e-mail correspondence "would have raised questions" is immaterial because it is not a basis for liability under federal securities laws. It is also immaterial for the reasons set forth in Defs.' Reply to SMF ¶ 345.

10-K filing was a key trigger combined with rapidly deteriorating credit markets that led to the

company's liquidity situation.'"   Goldstone Facts ¶ 521, at 112 (setting forth this fact)(quoting

Audit Client Restatement -- Engagement Team Procedures at 17 (Mar. 9, 2008), filed August 9,

2013 (Doc. 204-207)("Reinhart Restatement Draft")).   See SEC Disputed Facts at 1-51 (not

disputing this fact); Reinhart Restatement Draft at 17; Reinhart Depo. at 178:4-179:12.   "'The

basis for the restatement of the 2007 financial statements was that there were errors in judgment

associated with the likelihood of additional margin calls and the company's ability to meet those

margin calls.'"     Goldstone Facts ¶ 522, at 112 (setting forth this fact)(alterations

omitted)(quoting Crawford Depo. at 33:22-34:3).  See SEC Disputed Facts at 1-51 (not disputing

this fact); Crawford Depo. at 33:33-34:10.  "[T]he basis for KPMG's decision that a restatement

was necessary related to Thornburg's ability to hold assets rather than its intent."   Goldstone

Facts ¶ 523, at 112-13 (setting forth this fact).   See SEC Disputed Facts at 1-51 (not disputing

this fact); Crawford Depo. at 35:17-36:8.

        A draft restatement workpaper concerning the February 28, 2008 market
events prepared by Ms. Hall stated:

        "Most notably in the Company's analysis is their quantitative
        analysis . . . that graphs the daily price change of the AAA
        ABX[278] index. . . .  [A comparison of the drop in ABX index

---

Goldstone Reply Facts ¶ 520, at 228-29 (citations omitted).  The Court agrees with the SEC that
it is disputed whether Crawford was testifying as KPMG's designated representative or in his
personal capacity for the quoted passage.  Crawford began his answer by stating "I don't believe
. . . ."  Crawford Depo at 240:16.  Crawford's answer suggests that he may have been testifying
to his personal belief.  The Court thus finds this portion of the Defendants' asserted fact disputed.
In any case, the Court is not considering whether someone testified to something, but rather
about what the person testified.  Whether a person testified is not a fact, the subject matter of his
or her testimony is. The Court concludes that the remaining portion of the fact is undisputed.
The Defendants do not assert that Crawford was aware that they withheld information from
KPMG.  Consequently, the SEC's response does dispute the Defendants' asserted fact, and the
Court concludes that it is undisputed.

        [278]ABX index is:

> prices on February 27th compared to average daily price changes
> prior to that date showed that] the chance was more remote than a
> natural disaster."
>
> "In the case of [ABX] index 06-1, the chances of the value decline
> on February 27th was more remote than a lightening [sic] strike
> (probability of .00036% per the National Lightening [sic] Safety
> Institute)."

Goldstone Facts ¶ 524, at 113 (setting forth this fact)(alterations in Goldstone Facts but not in

source)(quoting Memorandum from Jennifer Hall, KPMG Engagement Senior Manager, to

Thornburg Restatement Workpapers regarding August 28, 2008 Market Events at 4 (dated

March 20, 2008), filed August 9, 2013 (Doc. 204-217)("March 20, 2008, Hall Memo.")).  See

March 20, 2008, Hall Memo. at 4.[279]  "[A]lthough [Reinhart] suggested in a comment that the

lightning strike analogy be removed from the workpaper, she did not disagree with the

_____

> A financial benchmark that measures the overall value of mortgages made to
> borrowers with subprime or weak credit.  The ABX index uses credit default swap
> contracts to come up with an overall value and is made up of 20 bonds that is
> comprised of groups of subprime mortgages.   Using this index, financial
> institutions are able to determine if the market for these securities are improving
> or worsening.  Also referred to as Asset-Backed Securities Index.

ABX Index, Investopedia.com, http://www.investopedia.com/terms/a/abx-index.asp (last visited
August 11, 2015).

[279]The SEC attempts to dispute this fact by stating:

> The drop of the ABX indices on February 27, 2008 was not a lightning strike or
> natural disaster as to Thornburg or its Form 10-K.  The drop was known prior to
> the filing of Thornburg's Form 10-K, and the volatility of the ABX indices had
> been high for months prior to February 27, 2008.

SEC Disputed Facts ¶ 524, at 45 (internal quotation marks omitted).  This assertion does not
dispute the Defendants' asserted fact.  The SEC does not assert that the draft restatement
workpaper does not state what the Defendants assert it does.  Accordingly, the Court concludes
that the SEC has not disputed the Defendants' fact.

characterization." Goldstone Facts ¶ 525, at 113 (setting forth this fact)(internal quotation marks omitted). See Reinhart Depo. at 111:16-112:12.[280]

> The final version of the KPMG workpaper concerning February 28, 2008 market events concludes[, in a section titled "Company's analysis," that]:
>
>> [Thornburg translated the ABX drop's by stating that] the chance of the magnitude of decline in value of Thornburg's securities on February 28, 2008 was more remote than a natural disaster.
>
>> KPMG also agreed with Thornburg that the market reaction on February 28, 2008 was an almost unprecedented event that would be difficult to predict.

Goldstone Facts ¶ 526, at 113 (setting forth this fact)(alterations omitted)(internal quotation marks omitted)(quoting March 9, 2008, Restatement Workpaper at 4). See March 9, 2008, Restatement Workpaper at 4-5.[281]

---

[280]The SEC attempts to dispute this fact by stating: "The drop of the ABX indices on February 27, 2008 was not a lightning strike or natural disaster as to Thornburg or its Form 10-K. The drop was known prior to the filing of Thornburg's Form 10-K, and the volatility of the ABX indices had been high for months prior to February 27, 2008." SEC Disputed Facts ¶ 525, at 45 (internal quotation marks omitted). This assertion does not dispute the Defendants' asserted fact. The SEC does not dispute that Reinhart suggested that the lightning-strike comment be removed or that Reinhart did not disagree with the analogy. Accordingly, the Court concludes that the SEC has not disputed the fact.

[281]The Defendants' asserted fact states:

> The final version of the KPMG workpaper concerning February 28, 2008 market events concludes:
>
>> "[t]he chance of the magnitude of decline in value of Thornburg's securities on [February] 28, 2008 was more remote than a natural disaster."
>
>> KPMG also agreed with Thornburg that "the market reaction on February 28, 2008 was an almost unprecedented event that would be difficult to predict."

Goldstone Facts ¶ 526, at 113 (alterations in Goldstone Facts but not in source). The SEC attempts to dispute this fact by stating:

_____

The KPMG workpaper reflects what "[t]he Company translated the occurrence" of the ABX drop to be, not KPMG's independent assessment.  The drop of the ABX indices on February 27, 2008 was not a "lightning strike" or natural disaster as to Thornburg or its Form 10-K.  The drop was known prior to the filing of Thornburg's Form 10-K, and the volatility of the ABX indices had been high for months prior to February 27, 2008.  Furthermore, three additional contributing factors to the February 28, 2008 market events were known to Thornburg prior to the filing of its Form 10-K: the ongoing financial crisis, Thornburg's lack of liquidity, and the impending collapse of the European hedge fund.

SEC Disputed Facts ¶ 526, at 45 (alterations in SEC Disputed Facts but not in source).  The Defendants reply by stating:

The SEC's response does not dispute this fact.

The SEC cannot create a genuine dispute as to this fact by submitting additional non-responsive purported facts.  The SEC's own assessment of whether it believes KPMG's analogy was appropriate does not refute the statements in KPMG's workpapers.

For the reasons set forth in Defs.' Reply to SMF ¶ 524, the SEC's response is unsupported by competent evidence and immaterial.

Moreover, the SEC's response that "three additional contributing factors" were "known to Thornburg prior to the filing of its Form 10-K" is immaterial because there is no link between this purported knowledge and the likelihood of the ABX drop on February 27, 2008.  Further, the "ongoing financial crisis" was factored into the ABX index which charted the average daily market price changes before February 27, 2008. Thornburg's lack of liquidity had no bearing on MBS market prices reflected in the ABX index.  And there is no evidence that the "impending collapse of the European hedge fund" was "known" by Defendants prior to the Form 10-K filing, nor did Defendants believe the rumor, even if it was true, would have a significant impact on Thornburg.

The SEC's response is also misleading as applied to Ms. Starrett in that the SEC states that the "impending collapse of the European hedge fund" was "known to Thornburg" prior to the Form 10-K filing. But the SEC has never alleged -- and there is no evidence to support -- that Ms. Starrett had any knowledge of the European hedge fund rumor, . . . .

Defendants object to the SEC's reliance on the unsworn expert report of Mr. Mayer for the reasons set forth in Defs.' Reply to SMF ¶ 524.

Goldstone Reply Facts ¶ 526, at 230-31.  The Court concludes that the SEC does not dispute the Defendants' asserted fact, but that the asserted fact does not accurately reflect the evidence.  In

In KPMG's workpaper on Internal Controls Over Financial Reporting ("ICOFR"), which was drafted during the restatement period to document Thornburg's internal controls over OTTI and going concern determinations, KPMG concluded:

> "[W]hile the conclusion that was reached by management during their financial reporting process was considered, in hindsight, to be incorrect; it appears that the magnitude of the decline in asset values that occurred on February 28th and 29th were [sic] not foreseeable."

Goldstone Facts ¶ 527, at 113-14 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting March 8, 2008, OTTI Memo. at 6).  See March 8, 2008, OTTI Memo. at 6.[282]

---

the final workpaper, the Defendants' quoted language is taken from a section titled "Company's analysis."  March 9, 2008, Restatement Workpaper at 4.  The relevant portion states:

> The Company translated the occurrence to have a likelihood of occurrence, assuming a normal distribution, of zero percent to 9%.  In other words, the chance of the magnitude of decline in value of Thornburg's securities on August 28, 2008 was more remote than a natural disaster.  For example, in the case of index 06-1, the chances of the value decline on February 27th was .00000%.

March 9, 2008, Restatement Workpaper at 4.  The natural-disaster analogy is not KPMG's analogy, but is Thornburg Mortgage's.  The Defendants' asserted fact can be interpreted as KPMG making the analogy.  The Court has thus modified the fact to clarify that the analogy is from a section that Thornburg Mortgage provided.  As for the rest of the asserted fact, the Court concludes that it is undisputed, because the SEC does not dispute that the March 9, 2008, Restatement Workpaper says what the Defendants assert it does.

[282]The SEC attempts to dispute this fact by stating:

Thornburg's asserted analysis of why the market events of February 28 and 29, 2008 were unforeseeable is factually flawed.  The drop of the ABX indices on February 27, 2008 was not a "lightning strike" or natural disaster as to Thornburg or its Form 10-K.  The drop was known prior to the filing of Thornburg's Form 10-K, and the volatility of the ABX indices had been high for months prior to February 27, 2008.  Furthermore, three additional contributing factors to the February 28, 2008 market events were known to Thornburg prior to the filing of its Form 10-K: the ongoing financial crisis, Thornburg's lack of liquidity, and the impending collapse of the European hedge fund.  Additionally, KPMG had not been made aware that Defendants knew in advance about the impending collapse of the European hedge fund.

"[T]he magnitude of the margin calls received by Thornburg in the days after its Form 10-K filing was not foreseeable."  Goldstone Disputed Facts ¶ 528, at 114 (setting forth this fact).  See Hall Depo. at 114:15-17, 229:4-15, 234:3-6;  Reinhart Depo. at 116:7-12, 116:16-117:21; Womack Depo. at 229:5-230:24; Crawford Depo. at 181:4-10.[283]

"Neither KPMG[] . . . nor Mr. Taylor could reconcile the conclusion that the post-10-K margin calls were unforeseeable with the conclusion that Thornburg made an error in judgment regarding the likelihood and magnitude of margin calls that would occur after the 10-K filing." Goldstone Facts ¶ 529, at 114 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Crawford Depo. 142:15-143:22; Taylor Depo. at 216:24-219:22.

KPMG's Restatement Memo provided that Thornburg's OTTI judgment as reported in the 10-K was supported by, among other things:

> The Company's ability to raise equity capital in the past, the near term closing of a $1 billion securitization, its ability to meet margin calls through February 27, 2008, successful permanent financing of assets previously financed with reverse repurchase agreement financing, the sale of IO strips, and demonstrated ability

---

Goldstone Facts ¶ 527, at 45.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants do not dispute that KPMG concluded what the Defendants assert it concluded.  The SEC, instead, asserts an unrelated fact that does not dispute the Defendants' asserted fact.  Accordingly, the Court finds that the SUC has nit disputed the fact.

[283]The SEC attempts to dispute this fact by stating: "Thornburg's asserted analysis of why the market events of February 28 and 29, 2008 were unforeseeable is factually flawed. Additionally, even a much lesser magnitude of margin calls would have depleted Thornburg's remaining liquidity on February 28, 2008."  SEC Disputed Facts ¶ 528, at 46.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants assert that KPMG's auditors testified that the margin calls were unforeseeable, or, in other words, the auditors believed the margin calls were unforeseeable.  Based on the auditor's knowledge, the Court concludes that it is undisputed that they believed that the margin calls were unforeseeable. If the Defendants asserted that Goldstone and Simmons believed that the margin calls were unforeseeable, the Court would conclude that the fact is disputed, because of their knowledge concerning the European hedge-fund collapse.  The SEC's response focuses on the Defendants' knowledge.  The Defendants do not, however, assert that they believed the margin calls were unforeseeable or that they testified that the margin calls were unforeseeable.  Accordingly, the Court concludes that the fact is undisputed.

> to refinance (roll) short term reverse repurchase agreements as they
> came due subsequent to December 31, 2007.

Goldstone Facts ¶ 530, at 114 (setting forth this fact)(alterations omitted)(internal quotation marks omitted)(quoting March 9, 2008, Restatement Memo. at 12). See SEC Disputed Facts at 1-51 (not disputing this fact); March 9, 2008, Restatement Memo. at 12. "A draft of KPMG's Restatement Memo noted the following: 'The engagement team concludes that management had a well-reasoned position, and executed an effective process for, its original accounting for OTTI charges and, accordingly, no deficiency in internal control over financial reporting was identified.'" Goldstone Facts ¶ 531, at 114 (setting forth this fact)(quoting Crawford Restatement Draft at 12). See SEC Disputed Facts at 1-51 (not disputing this fact); Crawford Restatement Draft at 12.

"KPMG . . . concluded that, as of the filing of the 10-K, Thornburg's OTTI conclusion was reasonable and [DPP partner Michael Smith, who was the restatement team leader from KPMG during the restatement process,] agreed with the engagement team's conclusion." Goldstone Facts ¶ 532, at 114-15 (setting forth this fact). See Smith Depo. at 54:5-56:20, 114:13-115:13.[284]

---

[284]The SEC attempts to dispute this fact by stating:

> At the time of its conclusion, KPMG was not aware of the Citi letter, Defendants' advance knowledge of the European hedge fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet margin calls. These are facts that KPMG would have wanted to know and that would have affected its conclusion.

SEC Disputed Facts ¶ 532, at 46. This assertion does not specifically controvert the Defendants' asserted fact. The Defendants do not assert that KPMG knew of their knowledge about the European hedge-fund collapse or that they purposefully withheld information from KPMG. Additionally, the Defendants do not assert that, if KPMG had been fully apprised of the Defendants' knowledge, KPMG would have agreed that Thornburg Mortgage's conclusion. The

> [That the] facts that were not known to KPMG is [not] what drove the
> restatement; rather, it was the events that occurred after the fact that made KPMG
> reconsider what was the condition or the events of the company at the time. . . .
> [T]he level of margin calls that Thornburg received within days of filing their
> 10K was the driving factor which prompted KPMG to withdraw its audit
> opinion. . . .   [A]ll the specific factual events that caused the reconsideration
> occurred postfiling.

Goldstone Facts ¶ 533, at 115 (setting forth this fact)(alterations omitted)(internal quotation

marks omitted).  See Hall SEC Depo. at 98:21-99:1, 104:12-105:19; Crawford Restatement Draft

at 2-16.[285]

_____

SEC's assertion, thus, does not dispute the Defendants' asserted fact.  Accordingly, the Court
concludes that the SEC has not disputed the fact.

    [285]The SEC attempts to dispute this fact by stating: "At the time of Ms. Hall's SEC
testimony, she was not aware of the Citi letter, Defendants' advance knowledge of the European
hedge fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet
margin calls."  SEC Disputed Facts ¶ 533, at 46.  It is unclear how this assertion is intended to
dispute the Defendants' asserted fact.  The SEC's assertion that Hall was unaware of certain
information supports the Defendants' asserted fact that KPMG did not issue the restatement
because of facts of which it did not know.  If Hall and KPMG did not know about the Citigroup
Global letter, Thornburg Mortgage withholding its inability to meet margin calls, and the
Defendants' knowledge of the hedge-fund collapse, then those things could not have been the
reason that KPMG issued the restatement.  The SEC thus fails to dispute the Defendants'
asserted fact, and the Court concludes that it is undisputed.
    The Defendants assert the following fact:

> The SEC has admitted that no witness from KPMG has ever told the SEC that
> KPMG "would have disagreed" with Thornburg's OTTI conclusion and the
> resulting decision not to recognize $428 million in losses associated with its ARM
> Securities "had the Defendants provided [KPMG] with accurate and complete
> information about Thornburg's" satisfaction of margin calls the company had
> received "during the two-week period leading to the filing of Thornburg's 2007
> Form 10-K," as alleged in paragraph 83 of the SEC's Complaint.

> The SEC admitted that the allegation in ¶ 83 of the Complaint as to what KPMG
> would have done was a conclusion reached by counsel for the SEC.

Goldstone Facts ¶ 534, at 115 (alterations in Goldstone Facts but not in original).  The SEC
disputes this fact by stating:

Defendants cite to SEC counsel's statements during a hearing on January 30, 2013. However, after that hearing, KPMG witness Mr. McLamb testified that if he had known about Thornburg's failure to timely meet its margin calls, as well as other information, as to KPMG's going concern conclusion, he "would have probably reached a different conclusion." Ms. Hall testified that if she had known that Starrett sent an e-mail to Goldstone and Simmons noting that they were purposely not telling KPMG about margin calls "it would be difficult for me to expect that we would have concluded that we agreed with management's assertion that they had the had the intent and ability to hold, or that there wasn't substantial doubt about their going concern." Ms. Hall also testified that had KPMG known that Thornburg was "not able to meet the margin call in time and were having to negotiate with their lenders is a significant piece of information" that "very well could have" changed KPMG's OTTI analysis, "[e]ven if the margin call were fully satisfied and the lender had agreed to it and had not declared any event of default."

SEC Disputed Facts ¶ 534, at 46 (alterations in SEC Disputed Facts but not in sources). The Defendants reply by stating:

> The SEC does not dispute that the allegation in ¶ 83 of the Complaint was a conclusion reached by counsel for the SEC. None of the evidence cited by the SEC -- including Mr. McLamb's testimony -- supports that KPMG "would have disagreed" with Thornburg's OTTI conclusion had they been provided the allegedly withheld information, per the allegation in the SEC's Complaint (i.e. the testimony is at most that it "probably" or "could have" impacted their decision). As discussed in Defs.' Reply Br. at IV.B, KPMG's hindsight, and shifting, testimony falls short of establishing materiality.

Goldstone Reply Facts ¶ 534, at 235-36. The Court finds that the SEC has specifically controverted the Defendants' asserted fact.

The relevant portion from the January 30, 2013, hearing states, in full:

> **THE COURT:** Well, talk to me about that, because I asked Mr. Marks a lot of questions about it, exactly what you're saying. Are you saying that the witnesses have in these interviews told you that they would have -- if they would have had this information they would not have issued the audit report that they did? Have they said that, or is that a conclusion that you have reached on the sum total of the interviews and put in the complaint? Which is it?

> **MR. MCKENNA:** Well, if you'll say I haven't waived my work product by answering that question -- your Honor is right. I mean, when you posited, you know: I can't imagine you ever getting an auditor to say something unequivocally; it's next to impossible to do. It's a conclusion that we drew from their testimony after having seen the Citibank reservation of rights letter in connection with all the other information that we were able to put in front of them

that was withheld from them by defendants.  We were able to in good faith make the allegation that we will be able to show a jury that KPMG would have concluded differently.

**THE COURT:** So, you're not sitting here with some statement that they made to you privately that is -- that is different from what they have said either prior to their statements with you to the investigators before you brought the complaint or that they've said in their deposition.

**MR. MCKENNA:** No.  Which is actually why we asked Ms. Hall that question at the end of her testimony, which Mr. Marks pointed out.

Transcript from Hearing at 62:21-63:22 (taken Jan. 30, 2013), filed February 11, 2013 (Doc. 144)("Jan. 30, 2013, Tr.").  The relevant paragraph from the Complaint, filed March 13, 2012 (Doc. 1)("Complaint"), states:

Had the Defendants provided Thornburg's outside auditor with accurate and complete information about Thornburg's margin call situation during the two-week period leading to the filing of Thornburg's 2007 Form 10-K, Thornburg's outside auditor would have disagreed with the company's OTTI conclusion (i.e., that Thornburg had the intent and ability to hold its ARM Securities until recovery), and failure to recognize almost $428 million in losses associated with its ARM Securities on its income statement.

Complaint ¶ 83, at 24.  Thirteen days after the January 30, 2013, hearing, McLamb testified:

If I had known that they were not meeting margin calls on a timely basis and had -- at the time of the filing of the 10-K, and they had already stopped originating loans, so they had already made changes to their core business, I would have certainly asked a lot more questions and would have probably reached a different conclusion.

McLamb Depo. at 222:14-21 (taken Feb. 13, 2008).  Additionally, before the January 30, 2013, hearing, Hall testified that, if she had known that Thornburg Mortgage was not timely meeting its margin calls, "it very well could have" changed the OTTI analysis. Hall Depo. at 441:4-25.
    McLamb's deposition testimony specifically controverts the Defendants' asserted fact. While the SEC may not have had any deposition testimony, as of January 30, 2013, from a KPMG employee saying that the KPMG would have disagreed with Thornburg Mortgage's OTTI analysis if he or she knew that Thornburg Mortgage was not timely meeting its margin calls, McLamb testified to just that on February 13, 2013.  There is testimony that KPMG would have disagreed with Thornburg Mortgage if KPMG knew all available information. Furthermore, while McLamb testified only that he "probably would have reached a different conclusion," McLamb Dep. at 222:20-21, this testimony is sufficient to dispute the Defendants' asserted fact.  The Court will not require McLamb, or other witnesses, to state that they are certain about an asserted fact, especially when the Court is viewing the facts in a light most

The final Restatement Memo documents KPMG's restatement procedures, including the cause(s) of the restatement, and sets forth KPMG's conclusions that:

> "We do not believe Company management was fraudulent in its actions related to the underlying cause of the error in accounting that is the subject of the restatement."

> "Based on [the] interviews [with Thornburg's management], review of emails, and other documentation, the engagement team concludes that the conditions and events underlying the material misstatement of the 2007 financial statements was not due to fraud on the part of management or the Company."

> "The cause of the error relates to an error in judgment on the part of management in concluding that the Company would have sufficient liquidity in a rapidly changing and illiquid credit market."

> "Management had in place a reasonable process of internal controls over financial reporting for reviewing OTTI and going concern disclosures.  There is no deficiency in the related internal control over financial reporting."

Goldstone Facts ¶ 535, at 115-16 (setting forth this fact)(alterations in Goldstone Facts but not in source)(quoting March 9, 2008, Restatement Memo. at 11-12, 14).  See March 9, 2008, Restatement Memo. at 11-12, 14.[286]

---

favorable to the non-moving party.  Accordingly, the SEC specifically controverts the Defendants' asserted fact, and the Court concludes that it is disputed.

[286]The SEC attempts to dispute this fact by stating:

> At the time of its conclusion, KPMG was not aware of the Citi letter, Defendants' advance knowledge of the European hedge fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet margin calls.  These are facts that KPMG would have wanted to know and that would have affected its conclusion.  Mr. McLamb specifically testified that these unknown facts would have raised questions and affected KPMG's analysis of Thornburg management's integrity.

SEC Disputed Facts ¶ 536, at 46-47.  This assertion does not dispute the Defendants' asserted fact.  The Defendants do not assert that KPMG was aware of the Citigroup Global letter, the Defendants' knowledge of the European hedge-fund collapse, or the Defendants' concealing

> During the restatement, KPMG confirmed the reasonableness of Thornburg's OTTI judgment in August 2007, noting that the Company took steps based on the events of August 2007 to increase its liquidity position, stabilize its financing platforms, and create opportunities to raise more equity and secure permanent financing for assets, and was therefore in a position to retain its asset portfolio and meet potential future margin calls.

Goldstone Facts ¶ 536, at 116 (setting forth this fact)(internal quotation marks omitted).  See

SEC Disputed Facts at 1-51 (not disputing this fact); Liquidity Analysis of TMA as of 9/30/2007

prepared by Matt Plummer at 2-3 (March 7, 2008), filed August 9, 2013 (Doc. 204-192).[287]

---

Thornburg Mortgage's inability to timely meet its margin calls.  Additionally, the Defendants do not assert that, if KPMG knew this information, it would have reached the same conclusion. Consequently, the SEC has not specifically controverted the Defendants' asserted fact, and the Court concludes that it is undisputed.

[287]The Defendants assert the following fact: "During the restatement period, KPMG received complete and thorough information on the margin calls and asset sales, and concluded there had been no fraud by management."  Goldstone Facts ¶ 537, at 116.  The SEC disputes this fact by stating:

> At the time of its conclusion, KPMG was not aware of the Citi letter, Defendants' advance knowledge of the European hedge fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet margin calls.  These are facts that KPMG would have wanted to know and that would have affected its conclusion.  Mr. McLamb specifically testified that these unknown facts would have raised questions and affected KPMG's analysis of Thornburg management's integrity.

SEC Disputed Facts ¶ 537, at 47.  The Defendants reply by stating:

> The SEC's response does not dispute this fact.

> The SEC cannot create a genuine dispute as to this fact by submitting additional non-responsive purported facts.  KPMG's purported lack of awareness of the listed facts does not refute KPMG's receipt of complete and thorough margin call information during the restatement period and conclusion there had been no fraud by management.

> Moreover, for the reasons summarized in Defs.' Reply to SMF ¶ 532, the SEC's response is immaterial and not supported by the evidence.

"KPMG recognized that Thornburg's management appeared to make significant effort to ensure the proper accounting treatment."   Starrett Facts ¶ 20, at 5 (setting forth this fact)(internal quotation marks omitted).   See March 8, 2008, OTTI Memo. at 4.[288]   "KPMG also concluded that as of March 8, March 9, and April 24, 2008 Thornburg's internal controls were properly designed and operating effectively."   Goldstone Facts ¶ 538, at 116 (setting forth this fact).   See March 8, 2008, OTTI Memo. at 2-9; March 9, 2008, Restatement Memo. at 14.[289]   "KPMG's

---

Mr. McLamb's hindsight testimony that these purported facts would have raised questions is insufficient to establish materiality or give rise to liability under Rule 13b2-2.

Goldstone Reply Facts ¶ 537, at 238.
     The Court finds that the SEC has specifically controverted the Defendants' asserted fact. KPMG did not receive complete and thorough information about the margin calls when it did not know about the Citigroup Global letter, Goldstone's and Simmons' knowledge of the European hedge fund, and the Defendants' purposefully withholding the fact that Thornburg Mortgage was not timely meeting its margin calls.  The Court thus concludes that this fact is disputed.

     [288]The SEC attempts to dispute this fact by stating:

     At the time KPMG made that statement, it was not aware of the Citi letter, Defendants' advance knowledge of the European hedge fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet margin calls.   These are facts that KPMG would have wanted to know and that could have affected its view of management.

SEC Disputed Starrett Facts ¶ 20, at 3.  This assertion does not specifically controvert Starrett's asserted fact.  Starrett does not state that, when KPMG recognized that Thornburg Mortgage's management appeared to make significant efforts to ensure proper accounting treatment, KPMG knew about the Citigroup Global letter, the Defendants' knowledge of the European hedge-fund collapse, or the Defendants' concealing information concerning Thornburg's inability to meet its margin calls.  Consequently, the SEC fails to dispute this fact, and the Court concludes that it is undisputed.

     [289]The SEC attempts to dispute this fact by stating:

     At the time of its conclusion, KPMG was not aware of the Citi letter, Defendants' advance knowledge of the European hedge fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet margin calls.   These are facts that KPMG would have wanted to know and that would have affected its

ICOFR workpaper concluded that it appears that the Company had controls in place that were operating effectively to address the risk of significant misstatement related to OTTI and going concern."   Goldstone Facts ¶ 539, at 116 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See March 8, 2008, OTTI Memo. at 6.[290]  Smith has not learned any additional facts since KPMG's work on the Thornburg restatement that would call into question KPMG's conclusion that there was no fraud by management or material weakness in

_____

conclusion.  Mr. McLamb specifically testified that these unknown facts would have raised questions and affected KPMG's analysis of Thornburg management's integrity.

SEC Disputed Facts ¶ 538, at 47.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants do not assert that, had KPMG been fully aware of all information, it would have concluded that Thornburg Mortgage's internal controls were properly designed and operating effectively; rather, the Defendants merely assert that KPMG reached such a conclusion.  The SEC thus does not dispute the Defendants' asserted fact, and the Court concludes that it is undisputed.

[290]The SEC attempts to dispute this fact by stating:

At the time of its conclusion, KPMG was not aware of the Citi letter, Defendants' advance knowledge of the European hedge fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet margin calls.  These are facts that KPMG would have wanted to know and that would have affected its conclusion.  Mr. McLamb specifically testified that these unknown facts would have raised questions and affected KPMG's analysis of Thornburg management's integrity.

SEC Disputed Facts ¶ 539, at 47.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants do not assert that, had KPMG had all available information it, it would have concluded that Thornburg Mortgage had controls in place to address the risk of significant misstatements; rather, the Defendants assert that KPMG merely made such a conclusion.  Consequently, the SEC has not disputed this fact, and the Court concludes that it is undisputed.

Thornburg's internal controls.  See Goldstone Facts ¶ 540, at 116 (setting forth this fact); Smith

Depo. at 86:20-87:20.[291]

--------

[291]The Defendants' original asserted fact states: "Mr. McLamb, Mr. Womack and Mr. Smith testified that they have not learned any additional facts since KPMG's work on the Thornburg restatement that would call into question KPMG's conclusion that there was no fraud by management or material weakness in Thornburg's internal controls."  Goldstone Facts ¶ 540, at 117.  The SEC disputes this fact by stating:

> The cited testimony of Mr. McLamb and Mr. Womack's depositions were prior to the time they were shown three pieces of evidence that they had not previously seen: the Citi letter, an e-mail evidencing Defendants' advance knowledge of the European hedge fund collapse, and an e-mail evidencing Defendants' purposeful withholding of Thornburg's inability to meet margin calls.  These are facts that KPMG would have wanted to know and that would have affected its conclusion. Mr. McLamb and Mr. Womack specifically testified that these unknown facts would have raised questions and affected KPMG's analysis of Thornburg management's integrity or fraud.   Mr. Smith was not asked about this new evidence, though it is reasonable to conclude that he would respond in a similar manner to Mr. McLamb and Mr. Womack.

SEC Disputed Facts ¶ 540, at 47-48.  To dispute the Defendants' asserted fact, the SEC cites a portion of McLamb's deposition testimony, where he testified that the Citigroup Global letter would have led to questions about potential fraud by Thornburg Mortgage and about Thornburg Mortgage management's integrity.  See McLamb Depo. at 316:25-317:22.  The SEC also cites a portion of Womack's deposition testimony, where he testified that the Citigroup Global letter may have impacted his opinion whether fraud had taken place and changed his opinion whether there was a material weakness in Thornburg Mortgage's internal controls.  See Womack Depo. at 274:12-275:8.

The Defendants reply by stating:

> The SEC's response does not dispute this fact.

> For the reasons summarized in Defs.' Reply to SMF ¶ 532, the SEC's response with respect to the "three pieces of evidence" that Mr. McLamb and Mr. Womack were purportedly unaware of is immaterial and not supported by the evidence.

> In addition, the cited evidence does not support the fact.  Neither Mr. McLamb nor Mr. Womack testified that "[t]hese are facts that . . . would have affected [KPMG's] conclusion" and "affected KPMG's analysis" or that this information would have changed KPMG's conclusion regarding Thornburg's internal controls over financial reporting and disclosure or its analysis of Thornburg management's integrity or fraud.  Mr. McLamb merely testified that if he had seen the allegedly withheld information, he "would have asked questions about it."   Similarly,

On March 18, 2008, Ms. Reinhart and Mr. McLamb from KPMG attended a meeting of Thornburg's Audit Committee.  During the meeting, Ms. Reinhart reported that KPMG's two primary conclusions from the restatement were that (1) it did not have any concerns about senior management's integrity; and (2) there was no material weakness in Thornburg's internal controls over financial reporting.

Goldstone Facts ¶ 541, at 117 (setting forth this fact).  See Thornburg Mortgage, Inc. Minutes of

a Meeting of the Audit Committee at 2-3 (Mar. 18, 2008), filed August 9, 2013 (Doc. 204-215)

("March 18, 2008, Committee Minutes"); Reinhart Depo. at 44:24-45:12, 68:13-69:4.[292]

---

Mr. Womack testified only that KPMG "would want to know" about the allegedly withheld information so they could "take [it] into account."  KPMG employees' hindsight testimony that these purported facts would have "raised questions" is insufficient to establish materiality or give rise to liability under Rule 13b2-2.

Finally, the SEC's statement that "it is reasonable to conclude that [Mr. Smith] would respond in a similar manner to Mr. McLamb and Mr. Womack" is pure argument based on unsupported and inadmissible speculation. The SEC provides no basis for such a statement.

Goldstone Reply Facts ¶ 540, at 239-40.  The Court concludes that the SEC specifically controverts the Defendants' asserted fact.  The Defendants assert that McLamb, Womack, and Smith have not learned of any information that "would call into question KPMG's" conclusions about fraud and internal controls.  Goldstone Facts ¶ 540, at 116.  Contrary to the Defendants' argument in the Goldstone Reply Facts, the SEC is required only to introduce evidence that McLamb, Womack, or Smith had information that would call into question KPMG's conclusions, rather than unequivocally cause KPMG to reach the opposite conclusion.  The SEC has presented such evidence.  Both McLamb and Womack testified that the Citigroup Global letter would have caused them to question whether KPMG committed fraud.  Accordingly, the SEC has specifically controverted that portion of the Defendants' asserted fact.  The SEC has not disputed, however, the Defendants' asserted fact concerning Smith.  The SEC has not presented any evidence to dispute the Defendants' asserted fact that Smith had no information which would call into question KPMG's conclusions; instead, the SEC asserts that, because McLamb and Womack testified that the Citigroup Global letter would have called KPMG's conclusions into question, Smith would probably had testified to the same, if he saw the letter.  This conclusion is merely an inference without an evidentiary foundation.  The SEC has thus not disputed the Defendants' asserted fact as it pertains to Smith.  The Court has modified the Defendants' asserted fact by excluding the disputed portions.

[292]The SEC attempts to dispute this fact by stating:

In response to an interrogatory asking it to identify specific facts and evidence supporting its claim that Thornburg's internal controls were deficient, the SEC responded that the internal controls failed to ensure that adequate information regarding margin calls and Thornburg's liquidity was evaluated in the financial statement closing process, resulting in Thornburg's failure to realize a loss on its Purchased ARM Securities and requiring a restatement of the 2007 Form 10-K.

Starrett Facts ¶ 87, at 16 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); SEC's 3d & 4th Interrogatories at 10-11.

The SEC Statement on Management's Report on Internal Control Over Financial Reporting states:

Neither Section 404 of the Sarbanes-Oxley Act nor the Commission's implementing rules require that a material weakness in internal control over financial reporting must be found to exist in every case of restatement resulting from an error.

Starrett Facts ¶ 88, at 16-17 (setting forth this fact)(alterations omitted)(quoting Staff Statement on Management's Report on Internal Control Over Financial Reporting, Division of Corporation Finance Office of the Chief Accountant U.S. Securities and Exchange Commission at D (May 16, 2005), http://www.sec.gov/info/accountants/stafficreporting.htm ("Staff Statement on Internal Control")).  See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Staff Statement on Internal Control at D.

---

At the time of its conclusion, KPMG was not aware of the Citi letter, Defendants' advance knowledge of the European hedge fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet margin calls.  These are facts that KPMG would have wanted to know and that would have affected its conclusion.  Mr. McLamb specifically testified that these unknown facts would have raised questions and affected KPMG's analysis of Thornburg management's integrity.

SEC Disputed Facts ¶ 541, at 48.  This assertion does not specifically controvert the Defendants' asserted fact.  The Defendants do not assert that KPMG was fully aware of all information at the March 18, 2008, meeting, but only what KPMG concluded at the meeting.  The SEC does not dispute that Reinhart reported what the Defendants assert she reported at the meeting.  Consequently, the Court finds the fact undisputed.

The minutes of the March 18, 2008 Audit Committee Meeting also reflect that the Audit Committee provided KPMG with a summary of the executive session of the Audit Committee on February 22, 2008, including descriptions of: (1) the large margin call from Citigroup on February 21, 2008; (2) Thornburg's liquidity position; (3) Citigroup's willingness to allow the Company to meet the call over time without default; and (4) the steps Thornburg was taking at the time to meet margin calls before the Form 10-K filing.

Goldstone Facts ¶ 542, at 117 (setting forth this fact)(internal quotation marks omitted).  See

SEC Disputed Facts at 1-51 (not disputing this fact); March 18, 2008, Committee Minutes at 2-3.

[B]y the time of the March 18, 2008 Audit Committee meeting, [Reinhart] was aware of the following information:

the total amount of margin calls that Thornburg had received between January 1, 2008 and February 27, 2008;

that Thornburg had received an approximately $196.5 million margin call from Citigroup on or about February 21, 2008;

that Thornburg had paid the Citigroup margin call over several days;

that Thornburg had been unable to satisfy the margin call from Citigroup on the day it was received or the day after;

that the lending agreements between Thornburg and Citigroup required that Thornburg satisfy a margin call on the day it was received or the following day;

that Citigroup had not declared Thornburg in default with respect to that call;

that before the 10-K filing, Thornburg had been having difficulty meeting margin calls;

that Thornburg received several hundred million in margin calls in the couple of days after the 10-K filing and approximately $1.2 billion in margin calls between February 28, 2008 and March 6, 2008;

that Thornburg received a notice of default on February 29, 2009;

that Thornburg had completed the I/O strips transactions before the 10-K filing, that the I/O proceeds [provided] Thornburg with

liquidity, and that Thornburg had used proceeds from the I/O strips as one source of cash to satisfy margin calls before the 10-K filing; and

that Peloton had announced publicly that it was liquidating its portfolio of mortgage backed securities.

Goldstone Facts ¶ 543, at 117-18 (setting forth this fact).  See Reinhart Depo. at 40:11-41:24, 42:23-44:23.[293]

[B]y the time of the March 18, 2008 Audit Committee meeting, [McLamb] was aware of the following information:

the total amount of margin calls that Thornburg had received between January 1, 2008 and February 27, 2008;

that Thornburg had received a margin call for over $195 million from Citigroup prior to the filing of the 10-K;

that Thornburg had paid the Citigroup call and some other margin calls over several days;

that before the 10-K filing, Thornburg had been having difficulty meeting margin calls;

that Thornburg received several hundred million in margin calls immediately after the 10-K filing and at least hundreds of millions of dollars, if not over a billion dollars, in margin calls between February 28, 2008 and March 6, 2008; and

that before the 10-K filing Thornburg had entered into transactions and that these transactions were one source of capital that Thornburg had used to satisfy margin calls.

_____

[293]The SEC attempts to dispute this fact by stating: "KPMG was not aware of the Citi letter, Defendants' advance knowledge of the European hedge fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet margin calls.  These are facts that KPMG would have wanted to know and that would have affected its conclusion."  SEC Disputed Facts ¶ 543, at 48.  This assertion does not dispute the Defendants' asserted fact.  The Defendants do not assert that Reinhart knew about the Citigroup Global letter, about the Defendants' knowledge of the hedge-fund collapse, or about the Defendants' concealment of certain information.  The Court thus concludes that the SEC has not disputed this fact.

Goldstone Facts ¶ 544, at 118-19 (setting forth this fact).  See McLamb Depo. at 6:8-8:17, 19:7-20:11, 20:23-21:23.[294]  "Even with this knowledge, KPMG concluded that there had been no fraud by anyone in management."  Goldstone Facts ¶ 545, at 119 (setting forth this fact).  See Reinhart Depo. at 45:8-12; Crawford Depo. at 190:14-191:15.[295]  "As a result of the restatement

---

[294]The SEC attempts to dispute this fact by stating: "KPMG was not aware of the Citi letter, Defendants' advance knowledge of the European hedge-fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet margin calls.  These are facts that KPMG would have wanted to know and that would have affected its conclusion."  SEC Disputed Facts ¶ 544, at 48.  This assertion does not dispute the Defendants' asserted fact, because the Defendants have not asserted that KPMG was aware of the Citigroup Global letter, of the Defendants' knowledge of the hedge-fund collapse, or of the Defendants concealing information.  Accordingly, the Court concludes that the SEC has not disputed the fact.

[295]The SEC attempts to dispute this fact by stating:

At the time of its conclusion, KPMG was not aware of the Citi letter, Defendants' advance knowledge of the European hedge fund collapse, and Defendants' purposeful withholding of Thornburg's inability to meet margin calls.  These are facts that KPMG would have wanted to know and that would have affected its conclusion.  Mr. McLamb specifically testified that these unknown facts would have raised questions and affected KPMG's analysis of Thornburg management's integrity.

SEC Disputed Facts ¶ 545, at 48.  This assertion does not dispute the Defendants' asserted fact.  The Defendants assert that, based on the knowledge which KPMG had at the time, it concluded that there was no fraud by anyone in Thornburg Mortgage's management.  The SEC has not specifically controverted this fact, and the Court concludes that it is undisputed.

The Defendants assert the following fact: "There is no evidence that the Margin Call Schedule was ever provided to anyone in DPP during the restatement process."  Goldstone Facts ¶ 546, at 119.  The SEC disputes this fact by stating:

The Tie-Out Document (or Margin Call Schedule as Defendants refer to it) was referred to in KPMG's restatement papers, which were provided to DPP Partners Michael Smith and Craig Crawford.  In the testimony cited by Defendants, Mr. Smith specifically testified that he may have reviewed the Tie-Out Document, but did not recall.

SEC Disputed Facts ¶ 546, at 48.  To dispute this fact, the SEC cites the March 9, 2008, Restatement Memo., which, in referencing the Margin Call Schedule, states: "Management provided a schedule indicating that the Company had received margin calls in excess of $300 million between February 14, 2008 and February 26, 2008, which were met in full as of filing the

of the 2007 Financial Statements of Thornburg Mortgage, Inc., KPMG's Department of Professional Practice deemed it necessary to bring in a Financial Services partner as the second partner on the engagement to support Ms. Reinhart." Goldstone Facts ¶ 547, at 119 (setting forth this fact)(internal quotation marks omitted). See SEC Disputed Facts at 1-51 (not disputing this fact); Memorandum from Bob McLamb to File at 2 (May 7, 2008), filed August 9, 2013 (Doc. 204-222)("May 7, 2008, McLamb Memo."). "DPP deemed it necessary, as a risk management measure following the restatement, to bring in a Financial Services partner as the second partner on the engagement to support Ms. Reinhart." Starrett Facts ¶ 58, at 12-13 (setting forth this fact)(internal quotation marks omitted). See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); May 7, 2008, McLamb Memo. at 2; Electronic Mail Transmission from Larry A. Leva to James H. Browning and Michael D. Foley at 2 (dated May 7, 2008), filed August 31, 2013 (Doc. 207-15). "Defendants prepared, and Goldstone and Simmons signed, Thornburg's 2007 Form 10-K/A, filed March 11, 2008, which disclosed that Thornburg had a

---

10-K on the morning of February 28, 2008." March 9, 2008, Restatement Memo. at 2. The SEC also cites a portion of Smith's deposition testimony where Smith testified that he may have seen the Margin Call Schedule, but he could not "recall specifically." Smith Depo. at 80:8-15.

The Defendants reply by stating:

The SEC's response does not dispute this fact.

The SEC cannot create a genuine dispute as to this fact by submitting additional non-responsive purported facts. The reference to the Margin Call Schedule in workpapers provided to DPP partners and testimony by one such partner that he may have reviewed the document at some point does not refute the lack of evidence that it was provided to anyone in DPP during the restatement process.

Goldstone Reply Facts ¶ 546, at 244 (citation omitted)(internal quotation marks omitted). The Court concludes that the SEC has disputed the Defendants' asserted fact. Smith testified that he may have seen the Margin Call Schedule. Viewing the evidence in a light most favorable to the non-moving party, the SEC, the Court concludes this testimony is sufficient to dispute the Defendants' asserted fact that there is no evidence that any DPP employee saw the Margin Call Schedule during the restatement period. The Court thus concludes that the SEC has disputed the fact.

$605.9 million net loss in the fourth quarter of 2007, may not have the ability to hold its Purchased ARM Assets to recovery, and had substantial doubt as to its ability to continue as a going concern." SEC Facts ¶ B, at 1 (setting forth this fact). <u>See</u> Restated Form 10-K/A at 7-9.[296]   "Thornburg Mortgage management was responsible for the fair and accurate presentation of the financial statements contained in the 2007 10-K and 2007 10-K/A, to be prepared in accordance with GAAP, and for the additional information and disclosures contained in those SEC regulatory submissions." SEC Supp. Facts ¶ VV, at 1, (setting forth this fact). <u>See</u> Kitchens Report at 21.[297]

---

[296]The SEC's fact states: "Defendants prepared, and Goldstone and Simmons signed, Thornburg's 2007 Form 10-K/A, filed March 11, 2008, which disclosed that Thornburg had a $605.9 million net loss in the fourth quarter of 2007, may not have the ability to hold its Purchased ARM Assets to recovery, and had substantial doubt as to its ability to continue as a going concern as of December 31, 2007." SEC Facts ¶ B, at 1. The Defendants dispute this fact by stating:

> Undisputed that Defendants participated in the preparation of the Form 10-K/A, but disputed insofar as the implication is that Defendants were solely responsible for doing so without substantial input from others at Thornburg and KPMG and that the decision to restate was not influenced by, or would have been made in the absence of, KPMG's decision to withdraw its audit opinion. Also disputed insofar as the Form 10-K/A stated that *on March 7, 2008*, the Company reported that it may not have the ability to hold its Purchased ARM Assets to recovery.

Defendants Disputed Facts ¶ B, at 2 (citations omitted)(emphasis in original). The SEC does not assert that the Defendants were solely responsible for the 2007 Form 10-K/A. Consequently, that portion of the Defendants' assertion does not dispute the SEC's asserted fact. While the 2007 Form 10-K/A states that there is substantial doubt about Thornburg Mortgage's ability to continue as a going concern, it does not state that these doubts were present as of December 31, 2007. This portion of the SEC's asserted fact lacks support in the record. Accordingly, the Court has modified the SEC's asserted fact to more accurately reflect the record.

[297]Starrett responds to this fact by stating:

> Ms. Starrett does not dispute that securities law and accounting guidance address management's responsibilities as to the presentation of financial statements in a company's securities filings. The law and guidance, however, speak for

30.    **KPMG Performance Reviews and Compensation Reductions.**

"It is KPMG's practice to assess the performance of KPMG personnel involved in auditing financial statements that are restated.  Consistent with this practice, the Southwest Area Professional Practice partner prepared, and DPP reviewed and approved, an internal quality review of the Thornburg year-end audit, known as a restatement assessment."  Goldstone Facts ¶ 548, at 119 (setting forth this fact).  <u>See</u> SEC Disputed Facts at 1-51 (not disputing this fact); Southwest Area Restatement Assessment Form at 2, filed August 9, 2013 (Doc. 204-225) ("Southwest Assessment Form"); Crawford Depo. at 250:5-22, 252:3-17.   "KPMG's senior professional practice partners identified very significant quality issues with aspects of the audit relating to going concern and OTTI."  Starrett Facts ¶ 56, at 12 (setting forth this fact)(internal quotation marks omitted).  <u>See</u> SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Y2008 Partner Quality Incident Adjustments at 2, filed August 9, 2013 (Doc. 203-1)("Y2008 Quality Incident Adjustments"); Southwest Assessment Form at 2.  "The restatement assessment

themselves and Ms. Starrett disputes what appears to be the SEC's characterization (through its purported expert) of this law and guidance, particularly its vague assertion that management's responsibilities extend to "additional information and disclosures."  Ms. Starrett disputes any implication that accounting determinations reflected in Thornburg's 2007 10-K and 2007 10-K/A, including but not limited to OTTI and going concern determinations, were made without guidance from Thornburg's outside auditors KPMG, or that KPMG had no responsibility for providing competent guidance as to these accounting determinations.

Ms. Starrett also objects to the SEC's reliance on the unsworn expert report of Mr. Kitchens because it does not meet the evidentiary requirements of Federal Rule of Civil Procedure 56(c).  In addition, Mr. Kitchens' generalization about the scope of management's responsibilities -- from which the SEC's fact statement is taken word-for-word -- is unsupported by any citation to law, accounting guidance, fact, or otherwise and as such should be disregarded.

Starrett Disputed Facts ¶ VV, at 1.  Because Starrett does not dispute the SEC's asserted fact -- and only attempts to dispute certain implications that the fact may create -- and because the Court will consider Kitchens' report, the Court concludes that Starrett has not disputed this fact.

form identified quality issues with aspects of the KPMG audit relating to going concern and OTTI."  Goldstone Facts ¶ 549, at 119 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Southwest Assessment Form at 2.

> In these restatement assessments, engagement team members receive a rating on a scale of 0 to 2, where "0" is the best rating that can be received, and "2" is the worst rating with the most negative consequences for the auditor.  The "0" rating signified that the restatement was a result of matters outside the auditors' control such as fraud by management or SEC positions that could not be anticipated.  The "2" rating signified that multiple issues were restated, blocking and tackling type issues, multiple years and that DPP desk top or in-depth review identified additional issues with the quality of the audit.

Goldstone Facts ¶ 550, at 119-20 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Southwest Assessment Form at 2-3; McLamb Depo. at 299:13-19.

> [*sentence redacted*].  Their grading also considered that the issues involved in the restatement were those receiving high focus of attention by the firm and the information that KPMG had at hand and disclosed.

Goldstone Facts ¶ 551, at 120 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Southwest Assessment Form at 2.

"[*name redacted*]'s rating also considered his involvement as a technical industry resource and his involvement with the going concern issue and the industry accounting issues which would include the available for sale securities."  Goldstone Facts ¶ 552, at 120 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Southwest Assessment Form at 2.  "[*name redacted*] received a slightly higher rating of '1' due to the fact that he was consulted on the going concern issue but not the accounting issue and that all facts may not have been provided to him."  Goldstone Facts ¶ 553, at 120 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts

at 1-51 (not disputing this fact); Southwest Assessment Form at 2. "[*name redacted*] . . . did not believe that any KPMG engagement team member who worked on the Thornburg audit deserved a grade of '0,' which is the highest possible rating." Goldstone Facts ¶ 554, at 120 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); McLamb Depo. at 299:8-12. [*sentence redacted*] Goldstone Facts ¶ 555, at 120 (setting forth this fact)(internal quotation marks omitted). See SEC Disputed Facts at 1-51 (not disputing this fact); Taylor Depo. at 222:6-20; 228:25-229:3; McLamb Depo. at 299:20-300:14; Hall Depo. at 255:5-10, 255:20-23; Quality Incident Adjustment: Suggested Course of Action at 2, filed August 9, 2013 (Doc. 204-227)("Quality Incident Adjustment"); FY08 Performance Review Process for [*name redacted*] at 15, August 9, 2013 (Doc. 203-5 & 203-6)("[*name redacted*] FY08 Performance Review").[298]

"KPMG's guidelines provide that severe incidents comprise significant restatements where the engagement partner is accountable and which, in the view of the group, should have been identified during the audit." Goldstone Facts ¶ 556, at 121 (setting forth this fact)(internal quotation marks omitted). See SEC Disputed Facts at 1-51 (not disputing this fact); Quality Incident Adjustment at 2.

> [*name redacted*]'s 2008 performance review noted in connection with the restatement that the quality incident is considered severe and should have been identified during the audit, and that [*portion of sentence redacted*]. [*name redacted*]'s reviewer stated that it is important he make quality improvement a key focus for the upcoming year.

---

[298]Because the [*name redacted*] FY08 Performance Review exhibit is spread over two documents in the CM/ECF system, the Court's citations to the [*name redacted*] FY08 Performance Review will refer to the document's internal pagination and not the pagination that the CM/ECF system places on the top-hand corner of the document.

Goldstone Facts ¶ 557, at 121 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); FY08 Performance Review Process for [*name redacted*] at 12, filed August 9, 2013 (Doc. 203-3).  [*sentence redacted*].  Goldstone Facts ¶ 558, at 121 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); McLamb Depo. at 299:20-300:14.  [*sentence redacted*].  Goldstone Facts ¶ 559, at 121 (setting forth this fact).  See SEC Disputed Facts at 1-51 (not disputing this fact); Hall Depo. at 254:23-255:23.  "As a result of the quality incident adjustment related to the Thornburg restatement, [*portion of sentence redacted*]."  Goldstone Facts ¶ 560, at 121 (setting forth this fact)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); Y2008 Quality Incident Adjustments at 2; [*reference to exhibit redacted*].

> [*name redacted*]'s 2008 performance review noted [*name redacted*]'s past restatements on [*reference to entities redacted*] and tax comments during the FY 2007 QP process, and the 2007 restatement of Thornburg's financials.  The review stated further that [*name redacted*] must learn from these past slips and ensure that similar results do not occur in future audits.  The review further stated that Thornburg is a negative and should be learned from to avoid a repeat.  The review encouraged [*name redacted*] to learn from the issues surrounding quality and overcome those issues in FY 09.

Goldstone Facts ¶ 561, at 121 (setting forth this fact)(alterations omitted)(internal quotation marks omitted).  See SEC Disputed Facts at 1-51 (not disputing this fact); [*name redacted*] FY08 Performance Review at 12-14.

> [*name redacted*] responded as follows to comments in her performance evaluation: "While the events leading to the Thornburg restatement are still under review, I believe the financial disaster in the marketplace that has occurred during 2008 has demonstrated that financial stability can erode overnight and cause extremely negative consequences to companies once perceived as extraordinarily strong [*reference to entities redacted*]."

Goldstone Facts ¶ 562, at 121-22 (quoting [*name redacted*] FY08 Performance Review at 14).

See SEC Disputed Facts at 1-51 (not disputing this fact); [*name redacted*] FY08 Performance Review at 14.

"KPMG did not make Thornburg aware of [*name redacted*]'s prior restatements or other performance issues noted in her 2008 performance review at any point before or during the Thornburg engagement."   Goldstone Facts ¶ 563, at 122 (setting forth this fact).   See SEC Disputed Facts at 1-51 (not disputing this fact); Goldstone Decl. ¶ 51, at 10; Simmons Decl. ¶ 16, at 4.   "Members of KPMG's Thornburg engagement team have been under investigation by the [Public Company Accounting Oversight Board ('PCAOB')] since March 2008 for their work on, among other things, the Thornburg audit."   Goldstone Facts ¶ 564, at 122 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Electronic Mail Transmission from Marla J. Pinkston to Alanna Buchanan, *et al* at 2-3 (dated Nov. 7, 2012), filed August 9, 2013 (Doc. 204-281)("SEC Privilege Log"); [*reference to exhibits redacted*].   "The following current and former KPMG employees have provided sworn testimony to the PCAOB regarding the Thornburg 2007 year-end audit: Tara Baucom, James Browning, David Butler, Max Carrier, Michael Foley, Jennifer Hall, Robert McLamb, Cynthia Reinhart, John Taylor, Clyde Womack, and Mathew Plummer."   Goldstone Facts ¶ 565, at 122 (setting forth this fact).   See SEC Disputed Facts at 1-51 (not disputing this fact); Baucom Depo. at 4:8-17, 7:20-9:2; Browning Depo. at 110:2-11; Hall SEC Depo. at 12:2-14:1, 19:6-21; McLamb Depo. at 311:10-22; Reinhart SEC Depo. at 9:20-11:12; Plummer Depo. at 4:8-16, 5:17-7:1; Taylor Depo. at 8:1-20; Womack Depo. at 206:14-208:3.   "The SEC and KPMG have refused to produce transcripts of the testimony from the PCAOB's investigation of KPMG.   The SEC has refused to produce

notes or memoranda of off-the-record interviews that it conducted of current and former KPMG employees." Goldstone Facts ¶ 566, at 122. See SEC Privilege Log at 3-4.[299]

> Ms. Hall and Ms. Reinhart did not express concerns about the adequacy of the information they received during the Thornburg audit or about Thornburg's management's integrity until they were questioned by the SEC, which was after commencement of the PCAOB and SEC investigations concerning the restatement of Thornburg's 2007 financial statements.

Goldstone Facts ¶ 567, at 123 (setting forth this fact). See Hall Depo. at 362:20-363:25; Reinhart Depo. at 334:22-335:7.[300] "In May 2012, Ms. Reinhart and Ms. Hall received letters from the SEC stating that the SEC's investigation into their conduct was complete and the SEC Staff did not intend to recommend an enforcement action against them." Goldstone Facts ¶ 568, at 123 (setting forth this fact). See SEC Disputed Facts at 1-51 (not disputing this fact); Letter from Ian S. Karpel, SEC Assistant Regional Director, to George A. Salter, Hogan Lovells, at 2-5 (dated May 15, 2012), filed August 9, 2013 (Doc. 204-233); Letter from Ian S. Karpel, SEC Assistant Regional Director, to Gary Bendinger, Sidley Austin LLP, at 2-5 (dated May 15,

---

[299]The SEC attempts to dispute this fact by stating: "The SEC has not produced these documents consistent with the Court's direction at the January 30, 2013 hearing." SEC Disputed Facts ¶ 566, at 48. To dispute this fact, the SEC cites a portion of the January 30, 2014, hearing transcript where the Court said that the SEC was not required to disclose the PCAOB testimony transcripts or its notes. See Jan. 30, 2013, Tr. at 194:18-195:11. At the hearing, the Court said that the SEC did not have an obligation to disclose the PCAOB transcripts or notes, the Court did not say that the SEC is prohibited from disclosing the information. It was the SEC's choice whether to disclose the information. It appears, according to the Defendants' asserted fact, which the SEC does not dispute, that the SEC chose not to disclose the information. Consequently, the Court concludes that the fact is undisputed.

[300]The SEC attempts to dispute this fact by stating: "Ms. Hall and Ms. Reinhart's concerns are based on information withheld from Thornburg, of which they were made aware by SEC personnel during the SEC's investigation." SEC Disputed Facts ¶ 567, at 48-49. This assertion does not dispute the Defendants' asserted fact, but supports it. The SEC agrees that Hall and Reinhart did not express concerns about the adequacy of their information until the SEC investigation, because they learned new information during the SEC investigation. The SEC, consequently, does not dispute the Defendants' asserted fact, but provides the reasoning behind the Defendants' asserted fact. The Court thus concludes that the SEC has not disputed the fact.

2012), filed August 9, 2013 (Doc. 204-234).[301]   [*two substantive sentences and two citation sentences redacted*].   "James Browning, KPMG Area Professional Practice Partner for the Southwest area, . . . was unaware of situations other than the audit of Thornburg's 2007 financials, in which KPMG's . . . [*portion of sentence redacted*]."   Starrett Facts ¶ 57, at 12 (setting forth this fact)(internal quotation marks omitted).   See SEC Disputed Starrett Facts at 1-16 (not disputing this fact); Electronic Mail Transmission from James H. Browning to Glen L. Davidson and Michael C. Plansky at 2 (dated June 9, 2008), filed August 31, 2013 (Doc. 207-13); Electronic Mail Transmission from Larry A. Leva to James H. Browning and Kristeena Paik at 3 (dated June 29, 2008), filed August 31, 2008 (Doc. 207-14).

---

[301]The Defendants assert the following fact: "The PCAOB's investigation of members of the Thornburg engagement team remains open."  Goldstone Facts ¶ 569, at 123.  The Defendants do not cite any evidence to support this fact.  The SEC disputes this fact by stating: "The evidence does not show that any PCAOB investigation remains open."  SEC Disputed Facts ¶ 569, at 49.  Like the Defendants, the SEC does not cite any evidence to dispute the Defendants' asserted fact.  The Defendants reply by stating:

> The SEC has not presented any evidence that the PCAOB's investigation of members of the Thornburg engagement team is closed.

> In fact, there is evidence that the PCAOB investigation remains open. Counsel for KPMG represented to the Court that "if we update the [PCAOB privilege] log," new information would include "communications between counsel and the PCAOB," which would reveal "the contours of the investigation" and "its status." Defs.' Ex. 329 (Hrg. Tr. at 143:3-25, 144:21-25 (Dec. 13, 2013)).

Goldstone Reply Facts ¶ 569, at 250.
     The Court concludes that the record does not support the Defendants' asserted fact.  The local rules state that asserted "facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies."  D.N.M.LR-Civ. 56.1(b).  The burden is on the Defendants to cite a portion of the record to support their fact and not on the SEC to do so to dispute the fact.  The Defendants does not cite any evidence in asserting their fact.  Their only cite to any portion of the record is in their reply, and, even then, it is not evidence, but a statement by the SEC at a hearing before the Court.  Accordingly, the Court concludes that the record does not support the Defendants' asserted fact.

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.  See Complaint, filed March 13, 2012 (Doc. 1)("Complaint").  The SEC alleges eleven claims for relief: (i) fraud in violation of Section 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of Section 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of Section 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of Section 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under Section 20(a) of the Exchange

Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of Section 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under Section 20(a) of the Exchange Act. See Complaint ¶¶ 106-43, at 31-39.

On May 21, 2012, the Defendants moved to dismiss the Complaint.  See Motion to Dismiss on Behalf of Defendants Larry Goldstone and Clarence G. Simmons and Memorandum of Law in Support, filed May 21, 2012 (Doc. 35); Defendant Jane Starrett's Motion to Dismiss and Memorandum of Points and Authorities in Support, filed May 21, 2012 (Doc. 36).  The Court granted the motions to dismiss in part and denied them in part.  See SEC v. Goldstone, 952

F. Supp. 2d 1060, 1257-58 (D.N.M. 2013)(Browning, J.)("MOO").   Specifically, the Court

dismissed: (i) the SEC's allegations in Counts 1, 2, 3, 4, 6, 8, and 9 to the extent that they were

based on statements in the 2007 Form 10-K that Thornburg Mortgage successfully met its

margin calls at the time it filed the 2007 Form 10-K; (ii) the SEC's allegations in Counts 1, 2, 3,

4, 6, 8, 9, and 11 to the extent that they were based on the statement in the 2007 Form 10-K that

Thornburg Mortgage did not sell assets to meet margin calls; (iii) the SEC's allegations in Count

1, 3, 4, 5, 8, and 10 to the extent that they were based on Starrett's primary liability for

participating in a fraudulent scheme to misrepresent the OTTI analysis in the 2007 Form 10-K;

(iv) the SEC's allegations in Count 7 to the extent they were based on the Defendants' statements

to KPMG that Thornburg Mortgage had not violated its reverse purchase agreements and

continued to meet its margin calls; and (v) the SEC's allegations in Count 7 under rule 13b2-2(b)

and (c)(2).  MOO at 322-24.

Of relevance to this Memorandum Opinion and Order, the Court rejected the Defendants'

characterization of the SEC's claims as fraud by hindsight and held that the SEC has sufficiently

alleged that the Defendants made a materially false statement in their OTTI conclusion in the

2007 Form 10-K, and that the Defendants materially misled KPMG before and after the 2007

Form 10-K filing.   See MOO at 248-249.   The Court held that the appropriate scienter

requirement for a § 10(b) claim for a false OTTI judgment is recklessness and not actual

disbelief.  See MOO at 288-94.  Goldstone and Simmons filed the Goldstone MSJ on August 9,

2013, and Starrett filed the Starrett MSG on August 31, 2013.[302]

---

[302]The parties have expended a significant amount of pages and ink in briefing these motions.  Not including notices of errata, the initial summary judgment briefs, responses, and replies total over three hundred and fifty pages.  The briefing on the facts alone surpasses five hundred pages, and there are several thousand pages of exhibits.  The parties have continuously filed supplemental briefs and notices that further expand the considerable amount of trees that

1.      **The Goldstone MSJ.**

The Defendants ask the Court to grant them summary judgment on: (i) the SEC's allegation that they made a false statement in the 2007 Form 10-K concerning OTTI; and (ii) the SEC's allegation that the Defendants deceived KPMG during the audit of Thornburg Mortgage's 2007 financial statements and the subsequent restatement.  See Goldstone MSJ at 9.  Concerning the OTTI analysis, the Defendants assert that the SEC must show that their OTTI judgment was both objectively and subjectively false.  See Goldstone MSJ at 9.  They contend that their OTTI judgment was more than reasonable, which is shown by, among other things:

> the understanding by both Thornburg and KPMG personnel that the mid-February 2008 decline in the Alt-A MBS market and resulting margin calls were a "Type II" subsequent event that, by definition, did not require adjustment to the OTTI determination for the 2007 financial statements;
>
> Thornburg's total liquidity of $100-$150 million as of the 10-K filing (far more than the $40 million in cash alleged in the Complaint);
>
> the willingness of Thornburg's reverse repurchase ("repo") lenders to work cooperatively with Thornburg on the payment of large margin calls;
>
> Thornburg's historic ability to generate substantial liquidity quickly through capital raises, securitizations, interest-only strip financing transactions, the Company's dividend reinvestment program, and principal and interest payments from Thornburg's $11.5 billion mortgage-backed securities ("MBS") investment portfolio;

---

have already given their lives for these motions.  The Court often gives parties leeway in deciding whether to grant page extensions and whether to permit supplemental briefing, because, before the Court has thoroughly considered a motion, the parties often know the issues better than the Court and know whether the Court needs to be informed about additional information. If parties decide to engage in such briefing, however, they will not receive as quick of a decision as they would otherwise receive when the Court has less information to digest and consider.  The amount of time it took the Court to rule on the motions for summary judgment in this case was, in large part, the result of the amount of briefing and evidence that the parties filed in this case. They would have received a decision sooner if they were more conservative and intentional with the amount of briefs and exhibits that they filed with the Court.

the return of margin call activity to pre-February 14, 2008 levels in the days
before the 10-K filing, which reasonably indicated that the Alt-A MBS market
had stabilized;

the capital raise and securitization scheduled to take place shortly after the Form
10-K filing, which together were projected to raise up to $560 million; and

the optimism Thornburg's outside investment bankers expressed about
Thornburg's capital-raising prospects, even after reviewing draft 10-K language
that disclosed in excess of $350 million in margin calls and warned -- for the first
time in Thornburg's history -- that it might receive additional margin calls it could
not satisfy.

Goldstone MSJ at 10.   The Defendants also contend that their OTTI judgment was not

subjectively false and that the SEC offers only speculation to show subjective falsity.   See

Goldstone MSJ at 11.  The Defendants maintain that the SEC cannot prove scienter, because of,

among other things the exceptional complexity of the OTTI judgment in light of
the market turmoil at the time, the reasonable grounds for believing Thornburg
would retain its Purchased ARM Assets, KPMG's concurrence in that judgment
with full knowledge of Thornburg's margin calls, and Defendants' transparency
with the Company's Audit Committee and Board of Directors.

Goldstone MSJ at 11.  The Defendants argue that there is no evidence that they manipulated

Thornburg Mortgage's public disclosures or that they deceived KPMG to obtain a favorable

OTTI conclusion.  See Goldstone MSJ at 11.

Concerning the SEC's allegation that the Defendants deceived KPMG by concealing

Thornburg Mortgage's difficulty in paying its margin calls, the Defendants maintain that they

provided KPMG with the Margin Call Schedule before the 2007 Form 10-K filing.   See

Goldstone MSJ at 12.  They also contend that the manner in which they disclosed to KPMG

information concerning the I/O Strip Transactions, the European hedge fund rumor, and the

Citigroup reservation-of-rights letter was not deceptive or misleading.   See Goldstone MSJ

at 12-13.  The Defendants further argue that the lack of deception is highlighted by the fact that,

during the restatement, KPMG concluded that: (i) Thornburg Mortgage's management did not

act fraudulently; (ii) there were no material weaknesses in Thornburg Mortgage's internal controls; and (iii) unforeseeable events that occurred after Thornburg Mortgage filed the 2007 Form 10-K was filed caused the restatement. See Goldstone MSJ at 13. Instead, the Defendants contend, Reinhart, Hall, and other senior KPMG auditors were responsible for the inadequacies in Thornburg Mortgage's audit. See Goldstone MSJ at 13-14.[303]

The Defendants maintain that, for Counts 1, 2, 3, 4, 5, 6, 8, and 11 of the Complaint, the SEC's only remaining claim is that Thornburg Mortgage's 2007 Form 10-K contained a material false statement concerning Thornburg Mortgage's intent and ability to hold its Purchased ARM Assets until their value recovered in the market. See Goldstone MSJ at 24. They contend that the SEC cannot identify evidence that creates a genuine dispute of material fact concerning whether the statements were false. See Goldstone MSJ at 24. The Defendants assert that "an OTTI analysis requires a Company to exercise its judgment to assess whether, as of a particular date, an unrealized loss on a security is other than temporary and, if it is, to recognize an impairment charge in earnings equal to the difference between the investment's cost and fair value." Goldstone MSJ at 25. The Defendants contend that one of the key factors to an OTTI analysis is a company's intent and ability to hold its investment until its market value recovers in the future, which involves a subjective, forward-looking judgment. See Goldstone MSJ at 26. They maintain that, as of December 31, 2007, Thornburg Mortgage's Purchased ARM Assets were not OTTI, because they had the intent and ability to hold the assets until they recovered their value. See Goldstone MSJ at 26.

---

[303]In the Goldstone MSJ, the Defendants summarize their asserted undisputed facts. See Goldstone MSJ at 14-24. Because the Court has already thoroughly analyzed and considered the Defendants' asserted facts, the Court will not reproduce their summary here.

The Defendants argue that the SEC's case suffers from a fatal defect -- that statements of opinion or belief are actionable under federal securities laws only when a plaintiff can prove that they were both objectively false, and that the defendant did not believe the statement at the time the defendant made them.  See Goldstone MSJ at 27 (citing Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d Cir. 2011); City of Omaha Neb. Civilian Emps. Ret. Sys. v. CBS Corp., 679 F.3d 64, 67-68 (2d Cir. 2012); Lane v. Page, 581 F. Supp. 2d 1094, 1127 (D.N.M. 2008) (Browning, J.)).  They maintain that an OTTI analysis must be both objectively and subjectively false to be actionable.  See Goldstone MSJ at 27 (citing MHC Mut. Conversion Fund, L.P. v. United W. Bancorp, Inc., 913 F. Supp. 2d 1026, 1035 (D. Colo. 2012)(Daniel, C.J.)).

The Defendants assert that the SEC's position concerning Thornburg Mortgage's OTTI analysis ignores the uncertainty that Thornburg Mortgage faced when performing the analysis "in the midst of a financial crisis of historic magnitude."  Goldstone MSJ at 27-28.  They contend that the GAAP principles upon which the SEC grounds its OTTI claim do not set forth a bright-line test.  See Goldstone Facts at 28 (citing SAB 59; SFAS 115; FSP FAS 115-1 & FAS 124-1).  The Defendants maintain that, without a bright-line test, the OTTI analysis requires a subjective judgment that includes "a predictive opinion about the outcome of future events, including future market conditions and the Company's ability to raise new capital."  Goldstone MSJ at 28.  They argue that a statement concerning OTTI is an opinion and not a matter of objective fact.  See Goldstone MSJ at 28 (citing  MHC Mut. Conversion Fund, L.P. v. United W. Bancorp, Inc., 913 F. Supp. 2d at 1035).  They assert that, because OTTI judgment is a matter of opinion, reasonable people can differ whether assets are OTTI.  See Goldstone MSJ at 29.  The Defendants argue that no percipient witness who was involved in Thornburg's OTTI assessment "supports the SEC's contention that it was a simple, black-and-white factual determination," and

that the Defendants have uniformly testified that it was a "highly subjective, forward-looking judgment call," which they made in good faith.  Goldstone MSJ at 29 (internal quotation marks omitted).  The Defendants assert that KPMG's auditors have acknowledged that the OTTI analysis required making an accounting estimate about future events.  See Goldstone MSJ at 29.

The Defendants argue that "[t]he volatile, unpredictable market conditions of the financial crisis in 2007 and 2008" made it difficult to apply an OTTI analysis and triggered extensive discussions within the SEC about whether additional guidance was necessary. Goldstone MSJ at 29-30.  They assert that, on September 30, 2008, the SEC's Office of the Chief Accountant and the FASB staff published guidance on what factors should be considered in an OTTI analysis, and that they concluded that the analysis requires a reasonable judgment based on the facts and circumstances of each investment, and that the existing GAAP did not provide any bright-line rules.  See Goldstone MSJ at 30.  The Defendants state that, in December, 2008, the SEC's Office of the Chief Accountant of the Division of Corporation Finance published a report for Congress in which the SEC noted that the economic crisis highlighted the difficulties of performing OTTI evaluations, and recommended evaluating whether FASB's guidance on OTTI needed to be modified or eliminated.  See Goldstone MSJ at 30.  The Defendants assert that, in April, 2009, FASB amended the OTTI guidance to make it more operational by clarifying that OTTI exists only if an entity intends to sell the security or if it is more likely than not that it will be required to sell the security before it recovered its amortized cost basis.  See Goldstone MSJ at 31.  The Defendants maintain that the OTTI analysis is more complicated than the SEC states it is, and that it is undisputed that Thornburg Mortgage made its OTTI assessment in good faith and against a backdrop of an unpredictable, volatile period that lacked bright-line rules.  See Goldstone MSJ at 31.

The Defendants argue that the undisputed evidence shows that they had objectively reasonable grounds for their OTTI judgment.  See Goldstone MSJ at 31.  They assert that objective falsity requires facts to suggest that an opinion was not plausibly premised on, or was inconsistent with, available information at the time it was made, see Goldstone MSJ at 31 (citing In re Credit Suisse Boston Corp., 431 F.3d 36, 52 (1st Cir. 2005), overruled on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)), and that, if reasonable minds can disagree, the opinion is not objectively false, see Goldstone MSJ at 31-32 (citing In re Sanofi-Aventis Sec. Litig., 774 F. Supp. 2d 549, 568 n.22 (S.D.N.Y. 2011)(Daniels, J.)).  The Defendants assert that, because Thornburg Mortgage and KPMG took the February, 2008, margin calls into consideration in deciding that the financial statements did not need to be adjusted, their OTTI judgment was objectively reasonable.  See Goldstone MSJ at 32.  The Defendants contend that the 2007 Form 10-K makes clear that the OTTI analysis was based on December 31, 2007, yet the SEC relies on events that occurred in February, 2008.  See Goldstone MSJ at 32-33.

The Defendants contend that only Type I subsequent events require adjusting a financial statement, while Type II subsequent events do not.  See Goldstone MSJ at 33.  They argue that, contrary to the SEC's allegations, the disruption in the Alt-A market and the February, 2008, margin calls were Type II subsequent events that required disclosure but not adjustment of the OTTI conclusion.  See Goldstone MSJ at 33-34.  They maintain that, because the market turned south in February, 2008, Thornburg Mortgage employees and KPMG personnel both agreed that the margin calls and market conditions were Type II events.  See Goldstone MSJ at 34-35.  The Defendants further assert that KPMG noted that the illiquid credit market conditions in February, 2008, complicated the Type I/Type II determination and that changes in the estimated values in

securities during a subsequent period would not ordinarily require an adjustment of a prior period's financial statement.  See Goldstone MSJ at 35.  The Defendants argue that the entire premise of the SEC's OTTI claim is wrong and that, because the February, 2008, margin calls did not impact OTTI as of December 31, 2007, the Court should dismiss the SEC's OTTI claims. See Goldstone MSJ at 35 (citing SEC v. Perry, No. CIV 11-1309 R, 2012 WL 1959566, at *7 (C.D. Cal. May 31, 2012)(Real, J.)).

The Defendants contend that a company's ability to raise capital and obtain financing are factors that affect the OTTI judgment and that, since its founding in 1993, Thornburg Mortgage had been successful in raising capital.  See Goldstone MSJ at 36.  They note that, between August, 2007, and February 28, 2008, Thornburg Mortgage successfully raised over $3.5 billion in cash capital:

> At the end of August, Thornburg completed a $1.4 billion securitization of mortgage loans, the proceeds of which allowed the Company to pay off its warehouse lenders and resume funding mortgage loans.
>
> In September 2007, the Company raised approximately $550 million by selling preferred stock in a public offering.
>
> In October 2007, the Company completed a Collateralized Mortgage Debt securitization of more than $830 million.
>
> During the fourth quarter of 2007, Thornburg raised $91 million from stock sales in its dividend reinvestment plan.
>
> In January 2008, Thornburg raised over $230 million in a public offering of common and preferred stock.
>
> Between February 14 and 27, 2008, Thornburg raised in excess of $300 million through stock sales in its dividend reinvestment plan, regular principal and interest payments on its MBS investment portfolio, I/O strip financings, and financing previously restricted (i.e., unfinanced) subordinated bonds.

Goldstone MSJ at 36 (citations omitted).  The Defendants contend that they had a number of near-term capital prospects, including: (i) Thornburg Mortgage's upcoming equity securities

offering that was expected to raise $300-500 million; (ii) Thornburg Mortgage's upcoming securitization that was projected to generate approximately sixty-million dollars; (iii) declining interest rates that made MBS more attractive to investors and that led to higher MBS prices; and (iv) Thornburg Mortgage's investment portfolio that generated over $100 million in principal and interest payments each month.  See Goldstone MSJ at 38.

The Defendants assert that KPMG knew that Thornburg Mortgage was having difficulty meeting margin calls in the two weeks preceding the 2007 Form 10-K filing, that Thornburg Mortgage paid the Citigroup Global margin call over time, that Thornburg Mortgage was in technical default of its repo agreements, that Thornburg Mortgage had low liquidity levels and used the I/O Strip Transactions to meet margin calls, and that Thornburg Mortgage met margin calls in excess of one-billion dollars in January and February, 2008.  See Goldstone MSJ at 38. The Defendants contend that, in spite of all this information, KPMG still concluded that Thornburg's original OTTI conclusion was reasonable.   See Goldstone MSJ at 38-39.   The Defendants maintain that unforeseeable events that occurred after the 2007 Form 10-K filing, and not a slow decline that began in August, 2007, caused the restatement.  See Goldstone MSJ at 39-40.   They argue that the restatement was not the result of Thornburg Mortgage's management failing to consider or disclose to KPMG objective financial factors about which they knew before the 2007 Form 10-K filing.  See Goldstone MSJ at 40.  The Defendants analogize this case to the "fraud by hindsight" theory that the Court rejected in ruling on the motions to dismiss.  Goldstone MSJ at 40.

The Defendants assert that, to prove objective falsity, the SEC must show that there was an inconsistency between their conclusion that Thornburg Mortgage had the intent and ability to hold its assets until recovery, and the information that they knew at the time.  See Goldstone

MSJ at 40-41 (citing In re Credit Suisse Boston Corp., 431 F.3d at 53; In re Sanofi-Aventis Sec.

Litig., 774 F. Supp. 2d at 567-68).  They maintain that there is no concrete evidence from which

a jury could conclude that Thornburg Mortgage's OTTI judgment was objectively false.  See

Goldstone MSJ at 41 (citing Anderson v. Liberty Lobby, 477 U.S. 242, 256 (1986)).

The Defendants contend that Thornburg Mortgage's arrangements between it and its repo

lenders support its OTTI determination.  See Goldstone MSJ at 41-42.  They assert that

Thornburg Mortgage had a cooperative relationship with its repo lenders, who negotiated with

Thornburg Mortgage on margin call disagreements and who had, in the past, permitted

Thornburg Mortgage to meet margin calls over a period of time.  See Goldstone MSJ at 42.  The

Defendants argue that the SEC's claim is based on the premise that Thornburg Mortgage should

have concluded that it did not have the ability to hold its assets because its repo lenders agreed to

payment plans that permitted it to keep its assets.  See Goldstone MSJ at 42-43.  They assert that

this assumption "defies logic."  Goldstone MSJ at 43.  The Defendants argue that the I/O Strip

Transactions also support Thornburg Mortgage's OTTI judgment, because they were a positive

source of liquidity, and because Hall told Starrett that the I/O Strip Transactions would not affect

the OTTI conclusion.  See Goldstone MSJ at 43-44.  The Defendants assert that, at the time of

the 2007 Form 10-K filing, Thornburg Mortgage had $7.6 billion in I/O strip holdings which

could be refinanced to generate additional liquidity.  See Goldstone MSJ at 44.

The Defendants maintain that Goldstone's and Simmons' expectation of future margin

calls does not suggest that they anticipated an enormous, immediate wave of margin calls.  See

Goldstone MSJ at 44.  They assert that, in a typical year, Thornburg Mortgage received margin

calls that equaled twenty percent of their entire MBS portfolio's value.  See Goldstone MSJ

at 44-45.  They maintain that there is no evidence showing that they expected Thornburg

Mortgage to receive the magnitude of margin calls within such a short period of time that it did. See Goldstone MSJ at 45.  The Defendants state that KPMG acknowledged that the magnitude of margin calls that Thornburg Mortgage received on February 28, 2008, and February 29, 2008, was unforeseeable, and that the decline in the subprime MBS market that preceded the margin calls was less likely to occur than a natural disaster or lightning strike.  See Goldstone MSJ at 45. They argue that the margin calls were similar to a run on the bank that a panic in the market triggered.  See Goldstone MSJ at 45-46.  The Defendants contend that GAAP standards exclude anticipating market panic from OTTI determinations.  See Goldstone MSJ at 46.  The Defendants assert that a large part of the post-2007 Form 10-K filing margin calls were on AAA-rated MBS that the margin calls in early February did not significantly affect.  See Goldstone MSJ at 46.  The Defendants argue that the SEC is incorrect in asserting that there is no evidence that Alt-A collateral values ceased declining, because, while there was a substantial uptick in margin calls between February 14 and 21, Alt-A margin calls abated and the margin calls that Thornburg Mortgage received between February 22, 2008, and February 27, 2008, fell within the range that Thornburg Mortgage experienced in January, 2008, and in the first two weeks of February, 2008.  See Goldstone MSJ at 46-47.  The Defendants contend that they believed that the market had bottomed out at that time and that they did not expect more significant decreases in their collateral's value.  See Goldstone MSJ at 47.

The Defendants contend that, against the background of all of these facts from February, 2008, Goldstone's and Simmons' knowledge of the hedge-fund collapse is not evidence that their OTTI judgment was objectively unreasonable.  See Goldstone MSJ at 47.  They maintain that, when an event is contingent or speculative in nature -- like the hedge-fund rumor -- its materiality depends on balancing the probability that the event will occur and the anticipated

magnitude of the event in light of the totality of a company's activities.  See Goldstone MSJ

at 47 (citing Basis v. Levinson, 485 U.S. 224, 238 (1988)).  They also contend that there are a

number of facts that render the hedge-fund rumor immaterial, including:

> The information was vague and far from definitive -- no one knew the identity of
> the hedge fund, the "European" country in which the fund was located, whether
> the "collapse" would in fact occur, and what, if any, impact that would have on
> the market.
>
> According to emails from the time period and the testimony of Thornburg Capital
> Markets employees, rumors were rampant in the marketplace and many turned out
> to be untrue.
>
> Thornburg's consistent practice was to base its business decisions on facts, not
> rumors or "market color."
>
> The collateral the hedge fund was said to hold was "pay option MTA," which was
> substantially inferior to the super-senior, AAA-rated Alt-A MBS that made up the
> bulk of Thornburg's Alt-A MBS portfolio and only 20% of Thornburg's total
> MBS portfolio, and would not be expected to affect the market for Thornburg's
> high quality Alt-A assets significantly, let alone the bulk of its portfolio, which
> was not Alt-A.
>
> Larry Cofsky, the head of credit at UBS, was fully aware of the European hedge
> fund rumor, yet he and his UBS colleagues assured Mr. Goldstone on February 27
> that Thornburg should not be concerned.
>
> Bear Stearns, another of Thornburg's repo lenders and one of its closest Wall
> Street relationships, gave Mr. Goldstone no indication that the hedge fund's
> difficulties might be a problem for Thornburg.  On the contrary, on the evening of
> February 27, Mr. Goldstone was told by Michael Nierenberg, the head of
> mortgage trading at Bear Stearns, that a Bear Stearns-led investor group was
> bidding to buy out the hedge fund's collateral, and that in his view the hedge fund
> should accept the group's bid -- an event that would have prevented a liquidation
> of the hedge fund's assets and eliminated any market impact whatsoever.

Goldstone MSJ at 47-48 (citations omitted).  The Defendants maintain that the hedge-fund rumor

cannot be material, because the vagueness of the information and market rumors' general

unreliability rendered the rumor too inchoate to be material.  See Goldstone MSJ at 48 (citing

Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 989 (S.D.N.Y.

1989)(Sweet, J.)).   They assert that, after Goldstone learned that Bear Stearns was going to acquire the hedge fund's assets, the probability of the hedge fund's liquidation was close to zero. See Goldstone MSJ at 48.   The Defendants contend that the anticipated magnitude of the hedge-fund collapse was negligible, because its repo lenders were aware of the rumor, yet only issued three-million dollars in margin calls that day.   See Goldstone MSJ at 48-49.   Finally, the Defendants argue that Goldstone and Simmons did not have any information that would have allowed them to estimate what impact the hedge-fund collapse would have on Thornburg's repo portfolio.   See Goldstone MSJ at 49.

The Defendants assert that the August, 2007, liquidity events support Thornburg Mortgage's OTTI judgment.   See Goldstone MSJ at 49.   They assert that, after August, 2007, the market's conditions and Thornburg Mortgage's MBS assets rebounded substantially.   See Goldstone MSJ at 49-50.   They contend that Thornburg Mortgage's ability to move forward with a reduced reliance on repo borrowing, with ongoing relationships with a group of cooperative repo lenders, and with continued interest from investors, led Thornburg Mortgage and KPMG to conclude that Thornburg Mortgage could continue to meet its margin calls without having to sell assets.   See Goldstone MSJ at 49-50.   The Defendants maintain that KPMG knew about the August, 2007, margin calls and the subsequent margin calls, and that it still confirmed the reasonableness of Thornburg Mortgage's OTTI analysis.   See Goldstone MSJ at 50.

The Defendants argue that there is no evidence showing that they did not sincerely believe that Thornburg Mortgage's OTTI judgment was correct when it was made.   See Goldstone MSJ at 50.   They contend that, unlike scienter, the SEC cannot prove mere recklessness to establish subjective falsity, but it must show that the Defendants did not believe

that the statements were true.  See Goldstone MSJ at 51 (citing In re Bank of Am. Corp. Sec.,
Deriv., & ERISA Litig., 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010)(Castel, J.)).

The Defendants argue that the evidence shows that they made the OTTI judgments in
good faith.  See Goldstone MSJ at 51.  First, they contend that they were willing to disclose
Thornburg Mortgage's financial situation to KPMG at the time of the 2007 Form 10-K filing.
See Goldstone MSJ at 51.  Second, they assert that they were not concerned whether they had to
recognize an impairment on Thornburg Mortgage's Purchased ARM Assets.  See Goldstone MSJ
at 51-52.  Third, the Defendants argue that Simmons' statement in the February 28, 2008,
electronic mail transmission of "[i]f they only knew" showed Simmons' frustration at the
market's focus on the negative aspects of Thornburg Mortgage's recent developments
disclosures, and not, as the SEC speculates, that the market would have reacted more severely if
it knew that Thornburg Mortgage withheld certain information.   Goldstone MSJ at 52-54.
Fourth, the Defendants contend that the hedge-fund rumor did not alter Goldstone's and
Simmons' subjective belief that Thornburg Mortgage had the intent and ability to hold its assets,
because the hedge fund held pay-option MTA, which is different than the Alt-A collateral that
Thornburg Mortgage held.  See Goldstone MSJ at 54.  They contend that the SEC does not have
any concrete evidence to refute Goldstone's and Simmons' explanations about the electronic
mail transmission in which Simmons stated that the Citigroup Global margin call needed to be
satisfied so that Thornburg Mortgage could file the 2007 Form 10-K, and in which Simmons
stated that he did not want issues related to events that occurred on February 28, 2008, to cause
issues with the 2007 Form 10-K filing.  See Goldstone MSJ at 55-56.  The Defendants contend
that this case is similar to SEC v. Espuelas, 905 F. Supp. 2d 507 (S.D.N.Y. 2012)
(Engelmayer, J.), where, they contend, the court granted the defendants summary judgment,

because the SEC had not presented any evidence creating a genuine issue of material fact that the

defendants knew about roundtrip[304] transactions, because the SEC merely offered spreadsheets

that did not indicate that the transactions were roundtrip transactions, and because the SEC did

not offer any witnesses who could explain the spreadsheets.  See Goldstone MSJ at 56-57.  The

Defendants argue that the SEC has presented no evidence, other than their speculative

interpretation of vague statements in electronic mail transmissions, to create a genuine issue of

material fact concerning Goldstone's and Simmons' belief that Thornburg Mortgage could hold

onto its assets.  See Goldstone MSJ at 57.

The Defendants contend that subjective falsity is not established simply because events

do not occur in the manner in which a person believed they would and that it is irrelevant that

Thornburg Mortgage ultimately had to sell its assets at a loss to meet margin calls.  See

---

[304]Roundtripping is a way in which companies buy and sell assets in a manner that distorts the market.

> **Round-tripping**, also known as round-trip transactions or "Lazy Susans," is defined by The Wall Street Journal, as a form of barter that involves a company selling "an unused asset to another company, while at the same time agreeing to buy back the same or similar assets at about the same price."  Round trips are characteristic of the New Economy companies.  They played a crucial part in temporarily inflating the market capitalization of energy traders such as Enron, CMS Energy, Reliant Energy, and Dynegy.

> In international scenarios, round tripping is used for tax evasion and money laundering as well.

> . . .

> Many such companies have used round-tripping to distort the market by establishing false revenue benchmarks, aiming to meet or beat the numbers put out by Wall Street stock analysts.  As a result of abusive round trips, barter between publicly held companies has become discredited among professional investors.

Round-tripping (finance), Wikipedia.org, http://en.wikipedia.org/wiki/Round-tripping_%28 finance%29 (last visited Aug. 11, 2015).

Goldstone MSJ at 57-58 (citing Lane v. Page, 649 F. Supp. 2d 1256, 1291 (D.N.M. 2009)(Browning, J); In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004)(Lynch, J.); Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004)(Lynch, J.)).  They maintain that, while Thornburg Mortgage's OTTI assessment was complex, it had support in the information which was available to the Defendants at the time, and that the SEC bases its allegations on facts which, with hindsight, the SEC believes should have led the Defendants to reach a different conclusion.  See Goldstone MSJ at 58.

The Defendants assert that the SEC has not presented any evidence showing that Goldstone or Simmons acted with scienter in connection with the OTTI judgment.  See Goldstone MSJ at 58.  They maintain that scienter requires either knowing deception or reckless disregard for the truth, and that the SEC's scienter allegation is without merit.  See Goldstone MSJ at 59.  They contend that Goldstone and Simmons believed that their OTTI judgments were correct and that, "[w]here the correctness of an accounting approach is at issue, courts have granted summary judgment for lack of scienter on that basis alone."  Goldstone MSJ at 59.  They assert that the SEC's scienter theory conflates recklessness with negligence, and that recklessness requires evidence that is akin to a conscious disregard, and not just evidence of negligence or gross negligence.  See Goldstone MSJ at 59 (citing Dronsejko v. Grant Thornton, 632 F.3d 658, 668 (10th Cir. 2011)).  The Defendants argue that Goldstone and Simmons are not accounting experts, that GAAP and GAAS guidance on OTTI at the time was ambiguous and unhelpful, and that Thornburg Mortgage and KPMG personnel believed that the decline in the Alt-A market in February, 2008, was a Type II subsequent event.  See Goldstone MSJ at 60.  They contend that KPMG partners have concluded that there was nothing that Thornburg Mortgage's management could have done to address the misstatement in the OTTI judgment,

and that there is no possibility that Goldstone and Simmons were aware of a danger of misleading investors.   See Goldstone MSJ at 60 (citing City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1260 (10th Cir. 2001)).   The Defendants assert that the SEC's only evidence of scienter is a laundry list of things that it contends Goldstone and Simmons should have known at the time, which is insufficient to show that they should have known that a material statement or omission was false or misleading.   See Goldstone MSJ at 60 (citing SEC v. Shanahan, 646 F.3d 536, 544-45 (8th Cir. 2011)).

The Defendants contend that the documents and the electronic mail transmissions which the SEC use to show scienter do not establish scienter, but rather, some of the documents show that Goldstone and Simmons acted in good faith.   See Goldstone MSJ at 61-62.   The Defendants maintain that they made sincere efforts to make full disclosures of all known information in the 2007 Form 10-K, including Thornburg Mortgage's margin call situation, its diminished liquidity, and the ongoing turbulence in the credit markets.   See Goldstone MSJ at 62.   They contend that every Thornburg Mortgage employee to testify has stated that the Defendants did not place any restrictions on the information that they were permitted to share with KPMG.   See Goldstone MSJ at 64.   The Defendants assert that Goldstone was open and candid with Thornburg Mortgage's Board, and that Goldstone's candor with the Audit Committee and the Board evidences his good faith, and negates any allegation that he intended to commit fraud.   See Goldstone MSJ at 64 (citing In re N. Telecom Sec. Litig., 116 F. Supp. 2d 446, 464 (S.D.N.Y. 2000)(Cedarbaum, J.)).

The Defendants argue that the market's negative reaction to Thornburg Mortgage's Recent Development disclosures shows that Goldstone and Simmons succeeded in being honest and clear in describing Thornburg Mortgage's financial difficulties.   See Goldstone MSJ

at 64-65.   The Defendants assert that the market's reaction illustrates the thoroughness of Thornburg Mortgage's disclosures, and that the detailed risk disclosure negates any scienter inference.   See Goldstone MSJ at 65-66 (citing In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1425 (9th Cir. 1994); In re UBS AG Sec. Litig., No. CIV 07-11225 RJS, 2012 WL 4471265, at *19 (S.D.N.Y. Sept. 28, 2013)(Sullivan, J.); In re Merrill Lynch Auction Rate Sec. Litig., 851 F. Supp. 2d 512, 530 (S.D.N.Y. 2012)(Preska, C.J.)).   The Defendants argue that Goldstone and Simmons had no motive to commit fraud, and that the lack of a personal benefit negates scienter.   See Goldstone MSJ at 66.   They argue that the SEC's theories on motive -- that Goldstone and Simmons wished to retain their employment, to increase their compensation, to preserve the value of Thornburg Mortgage's stock, and to remain in their superiors' good graces -- are completely speculative and that all corporate executives share the SEC's generalized, speculative motives.   See Goldstone MSJ at 66.   The Defendants maintain that the SEC has not presented any evidence showing motive and that they cannot be liable for acting in a manner that is consistent with that of an innocent, responsible corporate officer.   See Goldstone MSJ at 66 (citing United State v. Goyal, 629 F.3d 912, 919 (9th Cir. 2010); In re Acceptance Ins. Cos., Inc., Sec. Litig., 352 F. Supp. 2d 940, 961 (D. Neb. 2004)(Smith Camp, J.)).   They assert that Goldstone and Simmons did not sell any of their Thornburg Mortgage stock during the relevant period, which strongly undercuts the SEC's scienter allegation.   See Goldstone MSJ at 67 (citing Shuster v. Symmetricom, Inc., 35 F. App'x 705, 707 (9th Cir. 2002)(unpublished)).   The Defendants argue that, even in cases involving motive or intent, summary judgment may be appropriate if the nonmoving party relies on mere conclusory allegations, improbable inferences, or unsupported speculation.   See Goldstone MSJ at 67 (citing SEC v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008)).

The Defendants argue that the Court should also grant summary judgment in their favor on the SEC's rule 13b2-2 claim.  See Goldstone MSJ at 68.  They maintain that the record demonstrates that KPMG was fully informed about all material facts before the 2007 Form 10-K filing and that there is no evidence showing that Thornburg Mortgage manipulated the timing of discussions with KPMP to obtain a favorable OTTI conclusion.  See Goldstone at 68.  The Defendants contend that rule 13b2-2(a) does not require directors and officers to make perfect disclosures to a company's auditors, but only that the disclosures and statements are reasonable. See Goldstone MSJ at 68 (citing SEC v. Espuelas, 579 F. Supp. 2d 461, 487 (S.D.N.Y. 2008)(Holwell, J.)).  The Defendants argue that rule 13b2-2 does not impose a duty to report information to accountants, but only that directors or officers not make false statements and not omit information from statements to accountants, if such an omission would render the statement misleading.  See Goldstone MSJ at 69 (citing SEC v. Patel, No. CIV 07-0039 SM, 2008 WL 781914 (D.N.H. Mar. 24, 2008)(McAuliffe, J.)).  The Defendants assert that auditors are responsible for gathering and assessing the information that they deem necessary to audit a company's financial statements.  See Goldstone MSJ at 69.

The Defendants argue that, before the 2007 Form 10-K filing, Thornburg Mortgage provided KPMG with the Margin Call Schedule which shows the margin calls that Thornburg Mortgage received from February 14, 2008, to February 27, 2008.  See Goldstone MSJ at 70. They contend that KPMG considered the Margin Call Schedule to be important and relevant to Thornburg Mortgage's OTTI and going-concern determinations.  See Goldstone MSJ at 70.  The Defendants assert that the Margin Call Schedule clearly shows: (i) a $196.5 million margin call from Citigroup Global on February 21, 2008; (ii) a payment of ten-million dollars to Citigroup Global on February 21, 2008; (iii) separate payments to Citigroup Global on February 21, 22,

and 25, 2008, in various amounts ranging from ten-to-forty-million dollars; (iv) a $9.459 million payment to Citigroup Global on February 26, 2008; and (v) a forty-two-million dollar margin call from Greenwich on February 21, 2008, but only a five-million dollar payment made that day.  See Goldstone MSJ at 71.  The Defendants contend that the Margin Call Schedule shows that the Citigroup Global and the Greenwich margin calls were paid over several days, and that Thornburg Mortgage received approximately $540 million in margin calls from February 1, 2008, through February 26, 2008.  See Goldstone MSJ at 72.  The Defendants argue that the Margin Call Schedule refutes the SEC's contention that they withheld information from KPMG that Thornburg Mortgage paid some margin calls over several days and the full extent of margin calls that Thornburg Mortgage received.  See Goldstone MSJ at 72.  The Defendants also contend that the Margin Call Schedule shows that the I/O Strip Transactions generated approximately $41.1 million in cash that was used to meet margin calls.  See Goldstone MSJ at 72-73.

The Defendants contend that the SEC's allegation that they concealed from KPMG the extent of margin calls that Thornburg Mortgage received in January, 2008, and the first half of February, 2008, is incorrect, because KPMG workpapers show that KPMG reviewed: (i) the daily cash settlements between Thornburg Mortgage and its repo counterparties, which confirms that Thornburg Mortgage met all of its margin calls after August, 2007; (ii) a list of wire transfers from January 31, 2008, through February 21, 2008, which identifies that the wire transfers were made to meet margin calls; and (iii) a general ledger which shows that Thornburg Mortgage paid $183 million in margin calls from January 1, 2008, through January 31, 2008, and that Thornburg Mortgage paid $127 million in margin calls from February 1, 2008, through February 19, 2008.  See Goldstone MSJ at 74.  The Defendants also contend that KPMG

workpapers show that Thornburg Mortgage did not typically keep more than $100 million in cash and liquidity on hand, and that there was a "non-remote risk that Thornburg's $11.5 billion repo portfolio could still decline another $345 million." Goldstone MSJ at 74. The Defendants assert that the information that KPMG had in its possession "plainly demonstrated the magnitude of margin calls received by Thornburg, the low level of liquidity that Thornburg was experiencing, and that the Company was taking more than a day to meet at least some margin calls as a result." Goldstone MSJ at 75. They argue that, on February 26, 2008, Starrett disclosed to KPMG that Thornburg Mortgage received $350 million in margin calls, and that Hall was not surprised by the amount of margin calls. See Goldstone MSJ at 75. Finally, the Defendants assert that KPMG concluded that Thornburg Mortgage would remain a going concern, even if it faced a margin call situation which was similar to August, 2008, and even if Thornburg Mortgage was forced to sell its assets to meet those margin calls. See Goldstone MSJ at 76.

The Defendants maintain that they did not conceal Thornburg Mortgage's difficulty in meeting margin calls from KPMG. See Goldstone MSJ at 77. They contend that KPMG had the Margin Call Schedule in its possession, that Hall knew about the increase in margin calls, that Hall had the impression that Thornburg Mortgage had to work on meeting its margin calls, and that Hall understood that Thornburg Mortgage was working with its counterparties to meet its margin calls. See Goldstone MSJ at 77. The Defendants assert that Reinhart saw the Margin Call Schedule on March 3, 2008, and that she discussed it with Hall that day or the next. See Goldstone MSJ at 77.

The Defendants argue that Thornburg Mortgage's difficulty in meeting its margin calls was immaterial to the OTTI analysis. See Goldstone MSJ at 78. They argue that KPMG was

fully informed about Thornburg Mortgage's difficulty in meeting its margin calls, that Thornburg Mortgage provided KPMG with the Margin Call Schedule on February 27, 2008, and that KPMG had sufficient time to complete its audit before filing the 2007 Form 10-K. See Goldstone MSJ at 78. The Defendants also assert that, by the time KPMG issued the restatement, it was aware that Thornburg Mortgage deviated from its repo agreements, yet KPMG still concluded that Thornburg Mortgage's internal controls were effective and that there was no fraud by Thornburg Mortgage's management. See Goldstone MSJ at 78-79. The Defendants argue that the electronic mail transmissions concerning the margin calls did not concern withholding information from KPMG to create a false OTTI conclusion, but instead concerned finalizing Thornburg Mortgage's 2007 Form 10-K disclosures and consulting with KPMG about the accounting implications of selling assets to meet margin calls. See Goldstone MSJ at 79. The Defendants contend that the SEC is speculating about the meaning of Starrett's electronic mail transmission in which she states that Thornburg Mortgage was purposely withholding information from KPMG and that mere speculation is insufficient to thwart summary judgment. See Goldstone MSJ at 80-81 (citing Nielander v. Bd. of Cnty. Commrs., 582 F.3d 1155, 1171 (10th Cir. 2009)). They maintain that Starrett explained that, as long as Thornburg Mortgage paid its margin calls without selling its assets, there was no OTTI issue. See Goldstone MSJ at 81. They also contend that Goldstone and Simmons did not view Starrett's electronic mail transmission as a plan to deceive KPMG, because they believed that KPMG was monitoring Thornburg Mortgage's liquidity and margin calls. See Goldstone MSJ at 81.

The Defendants argue that Goldstone's board updates show only that he was waiting to see the outcome of Thornburg Mortgage's margin call payment strategy before finalizing the

2007 Form 10-K's language.  See Goldstone MSJ at 82.  Concerning the February 21, 2008, electronic mail transmission, the Defendants argue that Thornburg Mortgage delayed its securitization so that the prospectus supplement would be consistent with the 2007 Form 10-K recent development disclosures.  See Goldstone MSJ at 82.  They also contend that Thornburg Mortgage's delay in meeting the margin calls did not affect its relationship with Credit Suisse.  See Goldstone MSJ at 82-83.  The Defendants argue that KPMG was informed that the proceeds from the I/O Strip Transactions were used to satisfy margin calls.  See Goldstone MSJ at 83.  They contend that the Margin Call Schedule shows that the I/O Strip Transactions were used to pay margin calls and that the 2007 Form 10-K states that Thornburg Mortgage improved its liquidity through collateralized mortgage debt, which included the I/O Strip Transactions.  See Goldstone MSJ at 83-84.

The Defendants contend that there is no evidence that Simmons made a misrepresentation about the purpose of the I/O Strip Transactions.  See Goldstone MSJ at 84.  They also contend that any statement that a Thornburg Mortgage employee may have made about the opportune pricing of the I/O Strip Transactions was not false or misleading.  See Goldstone MSJ at 84-85.  The Defendants argue that it is undisputed that Thornburg Mortgage received favorable pricing from the I/O Strip Transactions and that they increased Thornburg Mortgage's available cash.  See Goldstone MSJ at 85.  The Defendants assert that Reinhart and Hall were aware that the proceeds from the I/O Strip Transactions comprised part of Thornburg Mortgage's available liquidity that it used to meet margin calls.  See Goldstone MSJ at 85.  Finally, they contend that the transactions permitted Thornburg Mortgage to avoid the prospect of future margin calls and freed up liquidity that would otherwise have been tied to significant haircuts.  See Goldstone MSJ at 85.  The Defendants maintain that, even if they made misleading statements about the I/O

Strip Transactions' purpose, those statements were immaterial, because KPMG could accurately assess Thornburg Mortgage's liquidity regardless of the transactions' purpose. See Goldstone MSJ at 85-86.

The Defendants contend that Goldstone and Simmons did not mislead KPMG in connection with the European hedge-fund rumor. See Goldstone MSJ at 87. The Defendants assert that materiality should be determined by whether a reasonable auditor would view the information as altering the total mix of available information. See Goldstone MSJ at 87 (citing SEC v. Phan, 500 F.3d 895, 908 (9th Cir. 2007); SEC v. Straub, No. CIV 11-9645 RJS, 2013 WL 466600, at *1 (S.D.N.Y. Feb. 8, 2013)(Sullivan, J.); SEC v. Patel, No. CIV 07-0039 SM, 2009 WL 3151143, at *30 (D.N.H. Sept. 30, 2009)(McAuliffe, C.J.)). They argue that courts look to rule 10b-5 precedent to evaluate materiality under rule 13b2-2. See Goldstone MSJ at 87 (citing SEC v. Shapiro, No. CIV 05-0364, 2007 WL 788335, at *6 (E.D. Tex. Mar. 14, 2007)(Bush, M.J.)). The Defendants maintain that Goldstone and Simmons had reasonable grounds to believe that the hedge-fund rumor was immaterial to Thornburg Mortgage. See Goldstone MSJ at 88. They contend that KPMG auditors were not concerned with market rumors, and that the hedge-fund rumor would not have changed KPMG's OTTI or going concern conclusions. See Goldstone MSJ at 88. The Defendants argue that KPMG auditors' statements that they would have wanted to know about the hedge-fund rumor does not make it material, because materiality is based on an objective standard, and not on a subjective one. See Goldstone MSJ at 89 (citing TSC Indus. v. Northway, 426 U.S. 438, 445 (1976); SEC v. Hoover, 903 F. Supp. 1135, 1140 (S.D. Tex. 1995)(Rosenthal, J.)). The Defendants assert that Goldstone, Simmons, Fellers, Feldman, and Starrett did not consider the hedge-fund rumor to pose a significant risk to Thornburg Mortgage, and that there is no evidence that they foresaw the

volume of margin calls which Thornburg Mortgage would receive immediately following the 2007 Form 10-K filing.  See Goldstone MSJ at 89-90.  The Defendants further assert that, on February 27, 2008, Goldstone believed that the rumored hedge-fund collapse would be completely averted.  See Goldstone MSJ at 90.

The Defendants contend that the March 4, 2008, memorandum from Thornburg Mortgage to KPMG, which stated that the hedge-fund collapse was unexpected, was not misleading.  See Goldstone MSJ at 90.  They assert that the memorandum was a response to KPMG's request to provide evidence for why KPMG should not restate the 2007 Form 10-K and that KPMG decided to restate the 2007 Form 10-K in spite of the memorandum.  See Goldstone MSJ at 90-91.  The Defendants maintain that, during the restatement process, KPMG did not raise questions about the hedge-fund rumor.  See Goldstone MSJ at 91-92.

The Defendants argue that, during the restatement period, Goldstone and Simmons did not mislead KPMG about the Citigroup Global reservation-of-rights letter.  See Goldstone MSJ at 92.  They contend that KPMG was fully informed about the circumstances surrounding the reservation-of-rights letter -- including the payment of margin calls over time and that Thornburg Mortgage was working with its lenders to meet its margin calls -- and that the Citigroup Global letter would not have conveyed any new information to KPMG.  See Goldstone MSJ at 93 (citing Kepler v. Chater, 68 F.3d 387, 391-92 (10th Cir. 1995); Drexel Burnham Lambert Inc. v. Chi. Title & Trust Co., No. CIV 87-6197, 1990 WL 7166, at *11 (N.D. Ill. Jan 18, 1990)(Nordberg , J.); In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003)(Ross, J.)).  The Defendants assert that KPMG recognized that the payment of certain margin calls over time in February, 2008, constituted a technical default, but that KPMG still concluded that there was no fraud by Thornburg Mortgage's management and that Thornburg

Mortgage had reasonable internal controls in place.  See Goldstone MSJ at 93.  The Defendants maintain that KPMG's restatement conclusions cannot be reconciled with the SEC's contention that Thornburg Mortgage's failure to disclose the reservation-of-rights letter was materially misleading.  See Goldstone MSJ at 93-94.  They contend that KPMG was interested in events of default and not in reservation-of-rights letters, and that KPMG did not agree with Thornburg Mortgage's conclusion that the August, 2007, reservation-of-rights letter did not have a materially adverse effect on Thornburg Mortgage.  See Goldstone MSJ at 94.  The Defendants maintain that KPMG signed off on the 2007 third-quarter Form 10-Q, which did not report any OTTI, despite KPMG's awareness of lender forbearance.  See Goldstone MSJ at 94.  They argue that the reservation-of-rights letter was a mere formality and that, even though the letter was within the scope of KPMG's review of Thornburg Mortgage's internal electronic mail transmissions, KPMG did not identify the letter as a concern.  See Goldstone MSJ at 94-95.  Finally, the Defendants argue that, even if KPMG never received the reservation-of-rights letter during the restatement period, KPMG still changed its OTTI analysis and decided to issue a restatement, based on information that it already had, which shows that the letter's alleged omission was not material.  See Goldstone MSJ at 95.

The Defendants contend that KPMG's restatement findings preclude any finding of auditor deception.  See MSJ at 95.  The Defendants argue that, in the face of a PCAOB and SEC investigation, [*names redacted*] asserted that they did not have sufficient information to make appropriate audit judgments, but the record shows that KPMG had ample information to make informed judgments before the 2007 Form 10-K filing.  See Goldstone MSJ at 95.  The Defendants maintain that KPMG did an extensive investigation during the restatement period to determine if Thornburg Mortgage provided complete and accurate information, and KPMG

concluded that there was no fraud by Thornburg Mortgage's management and that there was no material weakness in Thornburg Mortgage's internal controls.  See Goldstone MSJ at 96.  The Defendants assert that KPMG recognized that its engagement team failed to properly take into account information that Thornburg Mortgage provided to them.  See Goldstone MSJ at 97.

> **2.**      **The SEC's Response and Cross-Motion for Summary Judgment to the Goldstone MSJ.**

The SEC responded to the Goldstone MSJ on November 6, 2013.  See SEC Goldstone Response at 1.  The SEC begins by arguing that the local rules require a short, concise statement of why a movant is entitled to summary judgment and a concise statement of material facts.  See SEC Goldstone Response at 8.  It contends that, based solely on the length of the Goldstone MSJ and the Goldstone Facts, the Court should deny summary judgment.  See SEC Goldstone Response at 8.  The SEC asserts that the record shows that the 2007 Form 10-K was objectively false.   See SEC Goldstone Response at 9.  It argues that, because the 2007 Form 10-K was amended, either the original is false or the amended one is false.  See SEC Goldstone Response at 9.  The SEC states that, even if KPMG had full knowledge of Thornburg Mortgage's situation -- which the SEC contends it did not -- Thornburg Mortgage's OTTI and going concern determinations could still be objectively false, because Thornburg Mortgage, and not KPMG, was responsible for making those determinations.  See SEC Goldstone Response at 9-10.  The SEC contends that Goldstone and Simmons purposely withheld critical information from KPMG during the audit.  See Goldstone Response at 10-11.  The SEC addresses the Defendants' criticism of KPMG by stating that the Defendants blame KPMG for conducting a bad audit, but then rely on KPMG's determination that there was no fraud to argue that they should be exonerated.  See SEC Goldstone Response at 11-12.  The SEC further argues that, during the restatement process, KPMG did not see all of the incriminating electronic mail transmissions and

the Citigroup Global reservation-of-rights letter.  See SEC Goldstone Response at 12-13.    The

SEC also notes that Goldstone and Simmons are moving for summary judgment only on the

SEC's OTTI and KPMG deception claims, and that the Defendants have not moved for summary

judgment on the SEC's claims that Thornburg Mortgage falsely reported a fourth quarter profit,

that Thornburg Mortgage falsely reported on its ability to continue as a going concern, and that

Goldstone misled investors on February 28, 2008.  See SEC Goldstone Response at 14.

The SEC argues that the summary judgment standard is hard to meet in securities fraud

cases, because those cases are so fact specific.  See SEC Goldstone Response at 15-16 (citing

Malone v. Microdyne Corp., 26 F.3d 471, 476 (4th Cir. 1994)).  It maintains that there is an

abundance of evidence establishing that Thornburg Mortgage's OTTI determination was

objectively false.  See SEC Goldstone Response at 16.  The SEC asserts that Thornburg

Mortgage's issuance of a restatement, which materially altered its disclosures concerning its

intent and ability to hold its Purchased ARM Assets, its going-concern determination, and its

profitability, is sufficient to establish a genuine issue whether Thornburg Mortgage made a

material misstatement.  See SEC Goldstone Response at 16 (citing SEC v. Espuelas, 908 F.

Supp. 2d 402, 410 (S.D.N.Y. 2012)(Engelmayer, J.)).  The SEC contends that Thornburg

Mortgage made the decision to restate the 2007 Form 10-K and that the amended Form 10-K

directly contradicts statements in the original.  See SEC Goldstone Response at 16-17.

The SEC asserts that there is abundant evidence showing that Thornburg Mortgage did

not have the intent and ability to hold its Purchased ARM Assets.  See SEC Goldstone Response

at 17.  It contends that Thornburg Mortgage's repo lenders have maintained that they did not

enter into agreements with Thornburg Mortgage to allow it to pay its margin calls over time, but

instead have maintained that, after sending reservation-of-rights letters, they had the ability to

declare Thornburg Mortgage in default at any time.  See SEC Goldstone Response at 17-18.  The SEC asserts that the lending agreements' language prohibited oral modifications or waivers of the lenders' rights.  See SEC Goldstone Response at 19-21.   It contends that there is a disputed material fact whether Thornburg Mortgage's reliance on its lenders' forbearance to prevent the seizure and sale of assets was reasonable.  See SEC Goldstone Response at 21.

The SEC contends that Thornburg Mortgage's liquidity was extraordinarily low in February, 2008, which resulted in Thornburg Mortgage being unable to timely meet three separate margin calls in the two weeks leading up to the 2007 Form 10-K filing.  See SEC Goldstone Response at 21.  The SEC asserts that Thornburg Mortgage's liquidity reports in February, 2008, reflect a negative cash balance -- including one that shows a negative cash balance of $233 million -- but that Thornburg Mortgage shared liquidity reports with KPMG which did not reflect the margin calls and thus showed positive cash balances.  See SEC Goldstone Response at 22-23.  The SEC maintains that Thornburg Mortgage's liquidity situation was at odds with the disclosures that Thornburg Mortgage made to KPMG during the restatement period, which stated that Thornburg Mortgage had sufficient liquidity to meet all margin calls and that Thornburg Mortgage's management was comfortable that there was sufficient liquidity to meet future margin calls.  See SEC Goldstone Response at 23.  The SEC contends that Thornburg Mortgage's prospects for improving its liquidity were mere prospects that were not guaranteed to materialize and which were dependent on third parties.  See SEC Goldstone Response at 24.  The SEC maintains that the Defendants' optimism about future cash raising efforts cannot insulate them from a rule 10b-5 claim when unflattering facts within the Defendants' possession contradicted their optimism.  See SEC Goldstone Response at 24 (citing Warshaw v. XOMA Corp., 74 F.3d 955, 959-60 (9th Cir. 1996)).

The SEC asserts that Goldstone and Simmons acknowledged that they expected more margin calls and that large margin calls were not unusual for Thornburg Mortgage.  See SEC Goldstone Response at 25.  The SEC contends that, in light of the Defendants' knowledge of Thornburg Mortgage's inability to timely meet its margin calls, the I/O Strip Transactions, and the Defendants' withholding of information from KPMG, it does not need to show that the Defendants expected the post-filing margin calls.  See SEC Goldstone Response at 25.  The SEC contends, however, that there is evidence showing that Goldstone and Simmons expected substantial margin calls, including the enormity of the margin calls that Thornburg Mortgage received in the week before the 2007 Form 10-K filing.  See SEC Goldstone Response at 26. The SEC further contends that Goldstone admitted that he expected Thornburg Mortgage to receive additional margin calls and that Goldstone wrote in an electronic mail transmission concerning the European hedge fund that he expected Thornburg Mortgage to be hit by haircuts that would trigger margin calls.  See SEC Goldstone Response at 26-27.

The SEC addresses the Defendants' assertion that Goldstone believed that Bear Stearns would buy the collapsing hedge fund by arguing that Goldstone sent the electronic mail transmission before he learned of Bear Stearns' offer, and that Goldstone knew only that Bear Stearns offered to purchase the hedge fund and not that the hedge fund accepted the offer.  See SEC Goldstone Response at 27-28.  The SEC contends that Simmons responded to the hedge-fund electronic mail transmission by stating that it was essential for Thornburg Mortgage to finish paying the Citigroup Global margin call so that it could file the 2007 Form 10-K, which shows that Simmons expected the hedge-fund collapse to put downward pressure on residential MBS prices, triggering additional margin calls.  See SEC Goldstone Response at 28.  The SEC contends that Simmons further evidenced his concern about future margin calls when he set a

6:00 a.m. deadline to file the 2007 Form 10-K.  See SEC Goldstone Response at 28-29.  The SEC addresses the Defendants' argument that Thornburg Mortgage's lenders were aware of the hedge-fund collapse by arguing that lenders issue margin calls based on the pricing at the close of business the prior day and that, because news of hedge-fund collapse came out on February 27, 2008, the news' impact was reflected by margin calls on February 28, 2008.  See SEC Goldstone Response at 29.

The SEC asserts that Thornburg Mortgage's liquidity crisis in August, 2007, supports its contention that Thornburg Mortgage lacked an intent and ability to hold its Purchased ARM Assets.  See SEC Goldstone Response at 29.  The SEC contends that the Defendants' evidence does not support their contention that the market rebounded substantially, but shows that the market continued to decline and that Thornburg Mortgage continued to suffer losses.  See SEC Goldstone Response at 30-31.  The SEC argues that Thornburg Mortgage's reason for the I/O Strip Transactions should have affected its OTTI judgment.  See SEC Goldstone Response at 31.  It maintains that, while the sale of assets or financing raises cash, if it is done in desperation to raise cash to pay lenders, the transaction decreases liquidity, because the asset is no longer available.  See SEC Goldstone Response at 31-32.  The SEC asserts that the Defendants cannot rely on KPMG's determination that there was no fraud, because Thornburg Mortgage withheld information from KPMG.  See SEC Goldstone Response at 32 (citing Provenz v. Miller, 102 F.3d 1478, 1491 (9th Cir. 1996); C.E. Carlson, Inc. v. SEC, 859 F.2d 1429, 1436 (10th Cir. 1988)).  The SEC asserts that SEC v. Huff, 758 F. Supp. 2d 1288 (S.D. Fla. 2010) (Rosenbaum, M.J.), is instructive; where, according to the SEC, the defendant argued that he relied on his accountant's advice regarding the veracity of letters of credit, but the Honorable Robin S. Rosenbaum, United States Magistrate Judge for the Southern District of Florida,

concluded that, because the defendant did not inform his accountant that the letterhead of one of

the letters fell off, which would have indicated that the letters were false, the defendant could not

rely on the accountant's advice.  See SEC Goldstone Response at 32-33.  The SEC contends that

the Defendants withheld the following information from KPMG which affected KPMG's

opinions concerning Thornburg Mortgage's OTTI and going concern analyses:

> The totality of margin calls received in the subsequent events period;
>
> The fact that Thornburg had been in breach of three of its reverse repurchase agreements for failure to timely meet margin calls;
>
> The fact that Defendants had purposely not told KPMG about the margin calls;
>
> The fact that Thornburg had received a reservation of rights letter from Citigroup Global after failing to timely meet a $196.5 million margin call on February 21, 2008;
>
> The fact that Thornburg's inability to timely meet margin calls forced it to enter into the I/O Strip Transactions;
>
> The fact that Thornburg had reduced or ceased its funding of new loans in the days prior to the filing as a result of its liquidity crisis; and
>
> The fact that Goldstone and Simmons were aware of a hedge fund collapsing on February 27, 2008, Goldstone anticipated 20% haircuts as a result, and thus it was unlikely the market for RMBS had bottomed out.

SEC Goldstone Response at 33 (alterations omitted)(internal quotation marks omitted).

The SEC argues that Thornburg Mortgage did not adequately disclose its margin call

situation to KMG in connection with the 2007 audit.  See SEC Goldstone Response at 33.  The

SEC asserts that, in addition to the electronic mail transmission in which Starrett wrote that

Thornburg Mortgage was purposely withholding information from KPMG, the schedule that

Thornburg Mortgage disclosed to KPMG during the restatement period shows approximately

one-billion dollars in margin calls from January 1, 2008, to February 27, 2008, while the Margin

Call Schedule, which Thornburg Mortgage gave to KPMG before filing the 2007 Form 10-K,

shows only $300 million in margin calls that Thornburg Mortgage received from February 14, 2008. See SEC Goldstone Response at 34. The SEC argues that Thornburg Mortgage provided the Margin Call Schedule to KPMG to tie out a subsequent events footnote showing that Thornburg Mortgage received $300 million in margin calls and not to evaluate Thornburg Mortgage's liquidity. See SEC Goldstone Response at 34-35. It contends that Thornburg Mortgage did not tell KPMG that it was having difficulty meeting margin calls and that it was paying its margin calls over several days. See SEC Goldstone Response at 35. The SEC argues that Hall did not even review the last two pages of the Margin Call Schedule, which indicate that Thornburg Mortgage paid some margin calls over time. See SEC Goldstone Response at 35-36. The SEC contends that, if KPMG knew about Thornburg Mortgage's margin call difficulties, it would have asked more questions and its OTTI analysis may have been different. See SEC Goldstone Response at 37.

The SEC argues that neither Goldstone nor Simmons disclosed the Citigroup Global reservation-of-rights letter to KPMG during the audit or the restatement, and that Hall and Reinhart asked Goldstone and Simmons questions that should have prompted them to disclose the letter. See SEC Goldstone Response at 37. The SEC further argues that the reservation-of-rights letter was material, because it would have affected KPMG's OTTI and going-concern analyses and KPMG's conclusions during the restatement about Thornburg Mortgage management's integrity. See SEC Goldstone Response at 38-39. The SEC contends that KPMG auditors' testimony and their expert witness report are sufficient to establish the letter's materiality. See SEC Goldstone Response at 39 (citing Malone v. Microdyne Corp., 26 F.3d at 478). The SEC addresses the Defendants' argument that the reservation-of-rights letter was immaterial because KPMG did not require Thornburg Mortgage to disclose the reservation-of-

rights letters it received in August, 2007, by noting that this argument contradicts Goldstone's testimony that the Citigroup Global letter was the first reservation-of-rights letter that he recalls receiving.  See SEC Goldstone Response at 39 n.15.  The SEC further argues that, in August, 2007, the reservation-of-rights letters were accompanied by defaults and liquidation of assets, and that the third quarter Form 10-Q disclosed the defaults and sale of assets.  See SEC Goldstone Response at 39-40.  The SEC analogizes the reservation-of-rights letters: "An unattended campfire in a tinderbox forest is material, but it need not be disclosed in the context of disclosures stating that the forest has already burnt to the ground."  SEC Goldstone Response at 40.

The SEC contends that Simmons misled KPMG about the purpose of the I/O Strip Transactions.  See SEC Goldstone Response at 40.  It argues that KPMG's workpapers state that Thornburg Mortgage conducted the I/O Strip Transactions for a purpose other than meeting immediate liquidity needs and that Simmons told Reinhart that the purpose of the transactions was for Thornburg Mortgage to be opportunistic in the marketplace while the transactions were, in reality, a desperate attempt to meet crushing margin calls.  See SEC Goldstone Response at 40-41.  The SEC argues that Thornburg Mortgage did not tell KPMG about its reduction or cessation of funding new loans in the days before the 2007 Form 10-K filing.  See SEC Goldstone Response at 41.  The SEC contends that, leading up to the 2007 Form 10-K filing, Thornburg Mortgage lacked proper liquidity and warehouse credit line capacity, such that it was unable to fund loans on a normal basis, yet KPMG indicated that it was unaware of Thornburg Mortgage's situation.  See Goldstone Response at 41-43.

The SEC contends that Goldstone and Simmons failed to disclose to KPMG that they expected Thornburg to receive 20% haircuts after the European hedge-fund collapse even though

several KPMG auditors testified that the information was significant and might have impacted their OTTI analysis.  See SEC Goldstone Response at 43-44.  The SEC further contends that Simmons did not tell KPMG that his statement about the MBS market having bottomed out was no longer valid in lights of the anticipated haircuts.  See SEC Goldstone Response at 44-45.

The SEC maintains that the Defendants' OTTI determination was not overly complex. See SEC Goldstone Response at 45.  It contends that the Defendants knew or were reckless in not knowing that, if Thornburg Mortgage had to sell some of its assets, Thornburg Mortgage would have to state that its assets were OTTI.  See SEC Goldstone Response at 45-46.  The SEC asserts that there were a number of objective factors upon which the Defendants' OTTI judgment was made, including: (i) Thornburg Mortgage's impaired Purchased ARM Assets were subject to seizure and sale by its lenders; (ii) Thornburg Mortgage entered into the I/O Strip Transactions to meet margin calls; (iii) the I/O Strip Transactions reduced Thornburg Mortgage's liquidity; (iv) on February 21, 2008, Goldstone sent Simmons an electronic mail transmission stating that Thornburg Mortgage was contemplating selling its assets; (v) Goldstone and Simmons communicated about the European hedge-fund collapse; and (vi) six months before the 2007 Form 10-K filing, Thornburg Mortgage sold $22 billion in assets at a loss to meet margin calls. See SEC Goldstone Response at 47.  The SEC states that it is not arguing that GAAP sets a bright-line test for OTTI, but that SAB 59 provides three factors to consider, including: (i) "the length of time and the extent to which the market value has been less than cost"; (ii) "the financial condition and near-term prospects of the issuer"; and (iii) "the intent and ability of the holder to retain its investment in the issuer for a period of time sufficient to allow for any anticipated recovery in the market value."   SEC Goldstone Response at 47 (alterations

omitted)(internal quotation marks omitted).  The SEC asserts that additional factors may affect

an OTTI analysis:

> Fair value is significantly below cost and-
>
> The decline is attributable to adverse conditions specifically related to the security
> or to specific conditions in an industry or in a geographic area.
>
> The decline has existed for an extended period of time.
>
> Management does not possess both the intent and the ability to hold the security
> for a period of time sufficient to allow for any anticipated recovery in fair value.
>
> The security has been downgraded by rating agency.
>
> The financial condition of the issuer has deteriorated.
>
> Dividends have been reduced or eliminated, or scheduled interest payments have
> not been made.
>
> The entity recorded losses from the security subsequent to the end of the reporting
> period.

SEC Goldstone Response at 48 (citations omitted).  The SEC maintains that an OTTI judgment

involves objective and subjective factors, and that the objective ones carry more weight.  See

SEC Goldstone Response at 48-49.

The SEC asserts that there are a number of objective facts that the Defendants knew

about before the 2007 Form 10-K filing, including: (i) Thornburg Mortgage's Purchased ARM

Assets had been significantly impaired since August, 2007; (ii) the decline in its assets was

attributable to conditions affecting MBS; (iii) Thornburg Mortgage's liquidity situation was dire;

(iv) Thornburg Mortgage's lenders had the ability to sell its collateral in the two weeks leading

up to the 2007 Form 10-K filing; (v) credit agencies downgraded Alt-A mortgage loans in the

third quarter of 2007; (vi) Thornburg Mortgage eliminated dividends in 2007; and

(vii) Thornburg Mortgage's securities were further marked down after the end of the reporting

period.  See SEC Goldstone Response at 49.  The SEC argues that an OTTI judgment does not require a person to predict future events.  See SEC Goldstone Response at 49-50.  The SEC addresses the Defendants' assertion that FASB amended the OTTI guidance to make it more operational and to clarify the existing OTTI analysis by arguing that the amendments did not clarify the existing guidance, but amended it, and that the Defendants were still subject to the guidance that was applicable in February, 2008.  See SEC Goldstone Response at 50-51.

The SEC argues that there is abundant evidence showing that the Defendants did not believe or were reckless in believing that the impairment on Thornburg Mortgage's assets was temporary.  See SEC Goldstone Response at 51.  The SEC contends that a recklessly held belief is actionable.  See SEC Goldstone Response at 51.  It argues that the Court already concluded in ruling on the motion to dismiss that recklessness is sufficient to satisfy the subjective falsity requirement.  See SEC Goldstone Response at 51-52.  The SEC contends that the case which the Defendants cite -- In re Bank of America Corp. Securities, Derivative, and ERISA Litigation -- is not binding on the Court and that, even there, the district court recognized that there is disagreement among district courts within the United Stated States Court of Appeals for the Second Circuit whether recklessness can satisfy subjective falsity.  See SEC Goldstone Response at 52.  The SEC maintains that the United States Court of Appeals for the Tenth Circuit has not addressed the issue.  See SEC Goldstone Response at 52.  It contends that the United States Courts of Appeals for the First and Ninth Circuits require an allegation that the defendant did not sincerely believe the stated opinion, which means that the opinion must have some factual basis.  See SEC Goldstone Response at 52.  The SEC argues that this standard is in line with the Supreme Court of the United States of America's guidance that circumstantial evidence can be used to attack statements concerning belief if the circumstantial evidence bears on facts that

would reasonably underlie the reasons asserted and the honesty of the statement.  See SEC Goldstone Response at 52-53 (citing Va. Bankshares Inc. v. Sandberg, 501 U.S. 1083, 1092-93 (1991)).  It contends that, if this were not the case, "any claim of subjective disbelief lacking a contrary statement by the defendant would be easily defeated by defendant's claim that he believed what he said."  SEC Goldstone Response at 53.  The SEC maintains that, even if actual knowledge were the correct standard, it has presented ample circumstantial evidence that reasonably undermines the honesty of the Defendants' OTTI determination.  See SEC Goldstone Response at 53.

The SEC argues that the Defendants' electronic mail transmissions and explanations for why they believed that there was no OTTI are in dispute.  See SEC Goldstone Response at 53 (citing DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 113 (2d Cir. 2010); SEC v. Stoker, 873 F. Supp. 2d 605, 612 (S.D.N.Y. 2012)(Rakoff, J.)).  It contends that Goldstone's February 22, 2008, electronic mail transmission shows that the Defendants were "desperate to avoid disclosing that Thornburg had been unable to meet margin calls leading up to the filing of the 2007 Form 10-K, or that they had any unmet calls at the time the 10-K was filed."  SEC Goldstone Response at 53.  The SEC contends that the electronic mail transmission shows that Goldstone was "willing to postpone a desperately needed securitization transaction -- that would raise capital to meet margin calls -- to avoid" disclosing Thornburg Mortgage's margin call situation.  SEC Goldstone Response at 54.  The SEC argues that the Feb. 21, 2008, Burns Email shows that Thornburg Mortgage's lenders knew that its delay in meeting margin calls was significant and that Goldstone was concerned about disclosing Thornburg Mortgage's inability to meet its margin calls.  See SEC Goldstone Response at 54-55.

The SEC maintains that "there is strong evidence that" the Defendants did not want to disclose Thornburg Mortgage's margin call situation to KPMG, so that Thornburg Mortgage could obtain "a clean audit opinion necessary for their planned securitization and equity capital raise." SEC Goldstone Response at 55. The SEC asserts that Goldstone's statement in the Feb. 22, 2008, Simmons Going Concern Email that maybe he should not care about recognizing an impairment on Thornburg Mortgage's Purchased ARM leaves open the "alternative that *maybe they should*." SEC Goldstone Response at 55 (emphasis in original). The SEC states that, if Thornburg Mortgage recognized an impairment on its assets, it would not have been able to state in the 2007 Form 10-K that it returned a profitable fourth quarter in 2007, because that statement depended on its assets not being OTTI. See SEC Goldstone Response at 55-56. The SEC contends that all of its evidence creates, at a minimum, a factual question. See SEC Goldstone Response at 56.

The SEC responds to the Defendants' argument that Simmons' explanation to his statement "[i]f they only knew" in the Feb. 28, 2008, Simmons Stock Price Email is the only acceptable explanation, by arguing that the statement shows that the Defendants withheld information from the markets and that the markets would have reacted even worse if it had known about the information. SEC Goldstone Response at 56. The SEC states that the Defendants' assertion that Simmons does not know what he meant when he wrote "if they only knew" "is silly," because, while it cannot "go into Simmons' head and extract his memory . . . it can draw reasonable conclusions from what he wrote and the surrounding circumstances." SEC Goldstone Response at 56 n.23. The SEC states that, while a jury may believe Simmons' explanation, the SEC should be allowed to present the electronic mail transmission to a jury to make its own conclusion. See SEC Goldstone Response at 56.

The SEC addresses the Defendants' argument that they did not give any credit to the hedge-fund rumor by arguing that, in the Feb. 27, 2008, Hedge Fund Email, Goldstone wrote that the hedge fund was blowing up and that Thornburg Mortgage will get twenty point haircuts on Alt-A AAA securities.  See SEC Goldstone Response at 57.  The SEC asserts that, in February, 2008, Thornburg Mortgage had ten-to twelve-point haircuts, supporting Goldstone's prediction in the Feb. 27, 2008, Hedge Fund Email.  See SEC Goldstone Response at 57.  The SEC also asserts that the electronic mail transmission shows that Goldstone thought that Thornburg Mortgage might experience future haircuts and that he later testified that he had some concern about the hedge-fund collapse, making the Defendants' assertion that Goldstone was not concerned about the rumored collapse disputed.  See SEC Goldstone Response at 57.  The SEC argues that, in response to an electronic mail transmission from Feldman that discussed the hedge-fund collapse, Simmons stated that it was essential for Thornburg Mortgage to be done with Citigroup Global and to file the 2007 Form 10-K.  See SEC Goldstone Response at 57-58.

The SEC distinguishes SEC v. Espuelas, by arguing that, in that case, the SEC's principal witness and its expert did not conclude that the transactions were "round-trip," while, here, the Defendants acknowledge in the restatement that their initial OTTI analysis was faulty and the SEC's expert concurs that the Defendants' initial OTTI analysis was faulty.  See SEC Goldstone Response at 58 (citing SEC v. Espuelas, 905 F. Supp. at 523).  The SEC maintains that there are genuine factual issues whether the Defendants expected the hedge fund's collapse to affect Thornburg Mortgage's intent and ability to hold its Alt-A Purchased ARM Assets.  See SEC Goldstone Response at 58.  The SEC contends that, contrary to the Defendants' assertion that the Alt-A market appeared to stabilize by February 27, 2008, Thornburg Mortgage received margin

calls on each of the three days leading up to the 2007 Form 10-K filing.  See SEC Goldstone Response at 58.

The SEC contends that its case is not based on fraud by hindsight -- i.e., that the Defendants failed to foresee the margin calls that Thornburg Mortgage would receive after filing its 2007 Form 10-K.  See SEC Goldstone Response at 58.  The SEC argues that the Court has already distinguished this case from Fulton County Employees Retirement Systems v. MGIC Investment Corp., No. CIV 08-0458, 2010 WL 601364 (E.D. Wis. Feb. 18, 2010)(Adelman, J.), in the MOO.  SEC Goldstone Response at 58-59.

The SEC says that it has ample evidence that Goldstone and Simmons acted with scienter.  See SEC Goldstone Response at 60.  The SEC asserts that it does not need to show that the Defendants knew "'the precise accounting treatment that would have been applied'" to show scienter, but only that the Defendants "'knew of facts that contradicted the substance of the reported accounting.'"  SEC Goldstone Response at 60 (quoting SEC v. Espuelas, 908 F. Supp. 2d at 410).  It contends that the Defendants' scienter argument is largely based on their contention that they did not disbelieve their OTTI judgment.  See SEC Goldstone Response at 60.  The SEC argues that there is "a plethora of facts and evidence to the contrary."  SEC Goldstone Response at 60.  It maintains that "'[s]cienter is inherently a fact-intensive inquiry, and courts are normally cautious about granting summary judgment for the defense.'"  SEC Goldstone Response at 60 (quoting In re Smith & Wesson Holding Corp., 669 F.3d 68, 77 (1st Cir. 2012))(citing In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d 1165, 1187-88 (D.N.M. 2010)(Browning, J.)).

The SEC argues that the FASB amendments changed the pre-existing standards and that "[t]he fact that an accounting standard was changed does not establish that it was never

fraudulently applied previously." SEC Goldstone Response at 60. The SEC maintains that there is sufficient evidence showing that, under the applicable accounting standards in February, 2008, the Defendants knew or were reckless in concluding that Thornburg Mortgage did not have the intent and ability to hold its assets. See SEC Goldstone Response at 60-61. The SEC states that Kitchens is prepared to testify that the Defendants knew or were reckless in not concluding that they had OTTI. See SEC Goldstone Response at 61. The SEC addresses the Defendants' argument that KPMG's restatement memoranda removes all doubt that they made their OTTI judgments in good faith, by stating that KPMG's conclusion rested "on the faulty premise that KPMG had all the facts when it conducted its restatement analysis," and that several KPMG witnesses testified that the Defendants misled KPMG during the audit and restatement. See SEC Response at 61. The SEC asserts that Kitchens opines that the Defendants misled KPMG. See SEC Response at 61-62.

The SEC maintains that the Defendants made only half disclosures in the 2007 Form 10-K, because they did not disclose how Thornburg Mortgage met its pre-filing margin calls, and they did not mention that Thornburg Mortgage's lenders decided to not declare it in default and permitted Thornburg Mortgage to make payments over time. See SEC Goldstone Response at 62. The SEC attempts to undercut the Defendants' contention that, in the 2007 Form 10-K, they disclosed that Thornburg Mortgage might not be able to meet its future margin calls, by arguing that this disclosure needs to be measured against the fact that, in August, 2007, Thornburg Mortgage failed to meet its margin calls, which shows that a statement about a mere possibility "does not remove all doubt as to their sincerity." SEC Goldstone Response at 62. The SEC also asserts that Goldstone's statement in the CNBC Email that the disclosure was a standard disclosure that lawyers and accountants wanted them to make, and Goldstone's

appearance on CNBC while a banner underneath him read "Goldstone: Reporting that We Might Have to Sell Assets is Standard Disclosure," undermines the 2007 Form 10-K's statement.  SEC Goldstone Response at 63.  The SEC contends that Goldstone also told investors that he did not think that Thornburg Mortgage would have to sell more assets, which further undermines the statement in the 2007 Form 10-K that Thornburg Mortgage might need to sell assets.  See SEC Goldstone Response at 63-64.

The SEC distinguishes In re Northern Telecom Ltd. Securities Litigation, which the Defendants cite, by arguing that Goldstone's reports to Thornburg Mortgage's Board of Directors were not consistent with Thornburg Mortgage's public statements.  See SEC Goldstone Response at 64.  The SEC asserts that KPMG was excluded from the Audit Committee meeting in which it discussed the Citigroup Global margin call and the need to make payments over time.  See SEC Goldstone Response at 64.  The SEC contends that the Audit Committee's minutes state that it held an executive session, but do not state what the substance of that meeting was, and that the final version of the minutes -- which shows that Simmons advised the Committee that Thornburg Mortgage received a large margin call from Citigroup Global and that Thornburg Mortgage had worked out a schedule to pay the margin call -- was not in KPMG's workpapers.  See SEC Goldstone Response at 64.

The SEC argues that, because the market's negative reaction to the 2007 Form 10-K surprised Goldstone and Simmons, the market's reactions do not negate their scienter.  See SEC Goldstone Response at 64.  The SEC contends that the drop in Thornburg Mortgage's stock after the 2007 Form 10-K filing does not support the Defendants' argument that they made full disclosures, because the Defendants testified that the reaction disappointed and surprised them.  See SEC Goldstone Response at 64-65.  The SEC states that, because the Defendants thought

that the market would receive their disclosures well, they cannot rely on the market's opposite reaction to now argue that they fully disclosed Thornburg Mortgage's troubles.   See SEC Goldstone Response at 65.   The SEC asserts that Mayer's report, which states that Thornburg Mortgage's disclosures were not fulsome, further undercuts the Defendants' argument.   See SEC Goldstone Response at 65.   It maintains that a false OTTI analysis is material.   See SEC Goldstone Response at 65 (citing MOO at 152; SEC v. Espuelas, 908 F. Supp. 2d at 410).   The SEC asserts that its evidence on materiality is so strong that the Court should grant summary judgment on that issue.   See SEC Goldstone Response at 66.

The SEC contends that the Defendants could have intended to deceive or could have been reckless in disclosing Thornburg Mortgage's intent and ability to hold its Purchased ARM Assets in the 2007 Form 10-K, even though they did not sell their Thornburg Mortgage stock in February, 2008.   See SEC Goldstone Response at 66.   The SEC argues that the Defendants' motivation was to save Thornburg Mortgage by not fully disclosing to KPMG and to the public the truth about its liquidity crisis and its exposure to default, which would have undermined its imminent plans to raise additional cash.   See SEC Goldstone Response at 66.   The SEC contends that the Defendants ignore the Court's previous opinion in In re Thornburg Mortgage, Inc., Securities Litigation, where the Court held that: (i) it should consider the totality of the factual circumstances which might give rise to a strong inference of scienter; (ii) self-preservation can be a plausible motive; and (iii) a lack of insider trading does not always negate or weaken a scienter inference.   See SEC Goldstone Response at 66-67.   The SEC argues that the compensation that Goldstone and Simmons received from Thornburg Mortgage -- around seven to eight million dollars each year in 2006 and in 2007 for Goldstone, and around $1.3 million for Simmons each year in 2006 and in 2007 -- was a strong incentive to keep Thornburg Mortgage

afloat.  <u>See</u> SEC Goldstone Response at 67.  The SEC contends that a jury should decide whether the Defendants had the necessary intent and motive.  <u>See</u> SEC Goldstone Response at 68.

The SEC maintains that there is ample evidence showing that the Defendants misled KPMG in violation of rule 13b2-b.  <u>See</u> SEC Goldstone Response at 68.  The SEC contends that it has evidence that the Defendants purposely did not tell KPMG about margin calls, that Simmons told KPMG that the market had bottomed out and failed to correct his statement after he learned that Thornburg Mortgage could expect twenty percent haircuts, that Simmons falsely represented to KMPG that the post-filing margin calls were the result of an unexpected collapse of a major hedge fund in Europe, and that management representation letters which the Defendants signed contained numerous misrepresentations.  <u>See</u> SEC Goldstone Response at 68. The SEC maintains that the Defendants failed to fully inform and misled KPMG, so that they would not have to disclose Thornburg Mortgage's inability to timely meet margin calls, which allowed them to report a fourth quarter profit, rather than the serious losses that Thornburg Mortgage actually suffered.  <u>See</u> SEC Goldstone Response at 68.  The SEC states that KPMG's conclusion in the restatement that the error was in judgment is not determinative, because the Defendants did not disclose to KPMG all of the facts, and because KPMG witnesses have testified that the Defendants misled them.  <u>See</u> SEC Goldstone Response at 68-69.

The SEC says that rule 13b2-2 does not impose a duty on directors to report information to an auditor, but that, when a director provides information, it must be truthful and not omit information that would create a misleading statement.  <u>See</u> SEC Goldstone Response at 69 (citing <u>SEC v. Patel</u>, 2008 WL 781914, at *15).  The SEC contends that it is not required to plead scienter in a civil enforcement case, but, instead, the Court should apply a reasonableness standard.  <u>See</u> SEC Goldstone Response at 70 (citing <u>SEC v. Das</u>, 723 F.3d 943, 954 (8th

Cir. 2013)).  The SEC asserts that is must show "that the defendant knew, or should have known, that he made a material misstatement to an auditor or an omission necessary to make a statement made not misleading."  SEC Goldstone Response at 70 (citing SEC v. Espuelas, 908 F. Supp. 2d at 415, 436).

The SEC argues that there is substantial evidence that the Defendants misled KPMG. See SEC Goldstone Response at 70.  The SEC also argues that Thornburg Mortgage provided KPMG with the Margin Call Schedule to tie-out the excess of $300 million in margin calls, and not to disclose the amount of margin calls that Thornburg Mortgage received or to disclose how it paid them.  See SEC Goldstone Response at 70.  The SEC contends that its experts and KPMG's auditors have stated that the Margin Call Schedule was not an adequate disclosure, and that, even though a thorough examination may have disclosed that Thornburg Mortgage paid margin calls over time, the Defendants cannot testify that they were aware that the Margin Call Schedule was provided to KPMG in connection with its audit.  See SEC Goldstone Response at 70.  The SEC states that Reinhart and Hall testified that Thornburg Mortgage directed their focus to margin calls received after February 14, 2008, but that they were unaware of the total amount of margin calls that Thornburg Mortgage received during the subsequent events period. See SEC Goldstone Response at 71.  The SEC also stated that Reinhart and Hall testified that Thornburg Mortgage should have explicitly told them the total amount of margin calls that it received.  See SEC Goldstone Response at 71.  The SEC contends that Thornburg Mortgage's engagement letter with KPMG required Thornburg Mortgage to fully disclose all of the margin calls that it received during the subsequent events period.  See SEC Goldstone Response at 71.

The SEC contends that the Defendants cannot rely on KPMG's review of liquidity reports to assert full disclosure, because the original February 21, 2008, liquidity report reflects

the margin calls and a negative liquidity, but the report that Thornburg Mortgage gave to KPMG showed a positive liquidity and did not contain the margin calls.  See SEC Goldstone Response at 71.  The SEC maintains that the Defendants did not disclose to KPMG its failure to timely meet margin calls, the OTTI of its Purchased ARM Assets, or the uncertainty of its going-concern analysis.  See SEC Goldstone Response at 71.  The SEC argues that Hall's use of the word "overkill" in the Feb. 27, 2008, Hall Email was to the inclusion of the full recent developments language in a footnote to the financial statements and not the disclosure itself.  See SEC Goldstone Response at 72.  The SEC states that KPMG's going-concern analysis does not show that KPMG was not misled, because the stress tests that it applied to Thornburg Mortgage were scenarios that it considered remote and, thus, did not reflect that KPMG was fully informed about the challenges which Thornburg Mortgage was facing in February, 2008.  See SEC Goldstone Response at 72.

The SEC contends that Thornburg Mortgage withheld material information from KPMG during the audit and the restatement.  See SEC Goldstone Response at 72.  The SEC argues that KPMG's conclusion during the restatement that Thornburg Mortgage had effective internal controls and that Thornburg Mortgage's management did not commit fraud is not determinative, because, even during the restatement, the Defendants withheld from KPMG the Citigroup Global reservation-of-rights letter and did not tell KPMG that they purposely withheld information from KPMG during the initial audit.  See SEC Goldstone Response at 72-73.  The SEC asserts that Starrett's statement in the Feb. 25, 2008, Goldstone KPMG Email that the Defendants had purposely not told KPMG about the margin calls means what it says, which is contrary to the Defendants' interpretation.  See SEC Goldstone Response at 73.

The SEC argues that KPMG's workpapers show that Simmons misled KPMG by telling it that the I/O Strip Transactions were done to take advantage of opportune pricing and not for immediate liquidity needs. See SEC Goldstone Response at 73-74. The SEC says that Reinhart testified that Simmons and Buniel told her that the only purpose for the I/O Strip Transactions was to be opportunistic in the marketplace. See SEC Goldstone Response at 74. The SEC contends that these false statements are material, because Reinhart and Hall testified that, if they knew that Thornburg Mortgage "entered into the I/O Strip Transactions in a desperate effort to meet unmet margin calls," their OTTI and going-concern decisions would be impacted. SEC Goldstone Response at 74. The SEC contends that, while the transactions generated cash if assets are sold to meet existing liquidity needs, future liquidity is worsened, because the asset is no longer available to sell. See SEC Goldstone Response at 74.

The SEC contends that the hedge-fund collapse is important, because the Defendants anticipated that Thornburg Mortgage would be hit with additional haircuts. See SEC Goldstone Response at 75. It asserts that four KPMG witnesses testified that information relating to the hedge fund was material, and that Taylor testified that information indicating that Thornburg Mortgage was going to be hit with additional haircuts should have been included in the OTTI and going-concern analyses. See SEC Goldstone Response at 75. The SEC contends that Goldstone's and Simmons' statements that they found the hedge-fund collapse immaterial are contrary to their statements in the Hedge Fund Email. See SEC Goldstone Response at 75.

The SEC argues that the Unforeseeable Mortgage Collapse Memo is misleading, because on February 27, 2008, Simmons and Goldstone knew about the hedge-fund collapse. See SEC Goldstone Response at 76. The SEC asserts that Simmons' contention that the hedge-fund collapse and haircuts were unexpected is materially misleading. See SEC Goldstone Response

at 76.  The SEC states that KPMG requested that, in connection with the restatement, Thornburg

Mortgage provide it with correspondences that Thornburg Mortgage had with counter parties for

the two weeks before the filing, which should have included the Citigroup Global letter, but that

Thornburg Mortgage did not provide KPMG with the letter.  See SEC Goldstone Response at 77.

The SEC contends that, even though KPMG learned about Thornburg Mortgage's payment of

margin calls over time during the restatement period, the Citigroup Global letter was still

significant and would have impacted KPMG's OTTI analysis.  See SEC Goldstone Response

at 77.  The SEC also contends that the letter would have impacted KPMG witnesses' conclusion

that Thornburg Mortgage's management did not mislead them.  See SEC Goldstone Facts at 77.

The SEC contends that the Feb. 27, 2008, Thornburg Representation Letter contains a

number of misrepresentations including the Defendants' statements that:

1.  The consolidated financial statements referred to above are fairly
presented in conformity with U.S. generally accepted accounting
principles

4.  There are no . . . [e]vents that have occurred subsequent to the balance
sheet date and through the date of this letter that would require adjustment
to or disclosure in the consolidated financial statements."

13.  The company has complied with all aspects of contractual agreements that
would have a material effect on the consolidated financial statements in
the event of noncompliance.  Debt securities that have been classified
as held-to-maturity have been so classified due to our intent and ability to
hold such securities to maturity.  All other debt securities have been
classified as available-for-sale or trading.  Declines in value of debt or
equity securities classified as either available-for-sale or held-to-maturity
are considered to be temporary because we have both the intent and ability
to hold these impaired securities for a sufficient period of time, until
maturity if necessary, to allow for their recovery in market value.

23.  Except as recorded or disclosed in the consolidated financial statements,
there are no declines in values of certain investments that are considered to
be other than temporary in accordance with FSP FAS 115-1 and FAS
124-1, *The Meaning of Other-Than-Temporary Impairment and Its
Application to Certain Investments.*

> 31.    The consolidated financial statements disclose all of the matters of which
> we are aware that are relevant to the entity's ability to continue as a going
> concern, including significant conditions and events, and our plans.

SEC Goldstone Response at 78-79 (quoting Feb. 27, 2008, Thornburg Representation Letter).

The SEC states that, because KPMG's findings were made without material facts, they cannot preclude the Court from concluding that the Defendants deceived KPMG.  See SEC Goldstone Response at 79.  The SEC asserts that Thornburg Mortgage's late margin call payments and its need to complete I/O Strip Transactions to meet margin calls were sufficient for KPMG to pull its audit opinion, but not sufficient for it to conclude that the Defendants misled it. See SEC Goldstone Response at 79.  The SEC maintains that the Defendants withheld additional information during the audit and the restatement, which included the Citigroup Global letter, that Goldstone and Simmons were aware of the hedge-fund collapse, that the Defendants purposely withheld information from KPMG, and that Thornburg Mortgage was in a frail liquidity position before filing the 2007 Form 10-K.  See SEC Goldstone Response at 79. The SEC argues that Hall testified that she was concerned that the Defendants were purposely withholding information from KPMG and that she would have wanted to know that information during the restatement.  See SEC Goldstone Response at 80.  The SEC asserts that, after learning about the Citigroup Global letter, the Defendants' knowledge of the hedge-fund collapse, and the purposeful withholding of information, Hall does not believe that the Defendants were forthcoming to her about Thornburg Mortgage's position in 2008.  See SEC Goldstone Response at 80.

The SEC asserts that Reinhart thought the Defendants should have shown her the Citigroup Global letter and that, if she had been shown the letter, her OTTI analysis may have been different.  See SEC Goldstone Response at 80.  The SEC states that Thornburg Mortgage's

management's failure to show Reinhart the letter raises doubts about their ethics and integrity in how they dealt with KPMG. See SEC Goldstone Response at 80-81. It contends that Taylor testified that he would have expected Thornburg Mortgage to disclose the letter to KPMG, and that the letter may have impacted KPMG's OTTI and going-concern analyses. See SEC Goldstone Response at 81. The SEC also contends that McLamb expected Thornburg Mortgage to bring the Citigroup Global letter to KPMG's attention and that the letter would have been relevant to KPMG's conclusion during the restatement. See SEC Goldstone Response at 81. The SEC maintains that McLamb wanted to see the Feb. 25, 2008, Goldstone KPMG Email during the restatement, because it also impacted KPMG's analysis of Thornburg Mortgage's management's integrity. See SEC Goldstone Response at 81-82. The SEC contends that McLamb would also have liked to see the February 21, 2008, liquidity report that projected a negative cash balance, because it was inconsistent with Thornburg Mortgage's going-concern analysis. See SEC Goldstone Response at 82.

3.    **The Defendants' Reply to the SEC's Response to the Goldstone MSJ.**

The Defendants replied to the SEC Goldstone Response on January 31, 2014. See Reply on Behalf of Larry Goldstone and Clarence Simmons in Support of Motion for Partial Summary Judgment and Opposition to Cross-Motion for Partial Summary Judgment on the Issues of Objective Falsity and Materiality, filed January 31, 2014 (Doc. 253)("Goldstone MSJ Reply"). The Defendants address the SEC's contention that the Court should deny the Goldstone MSJ on the basis of its length by arguing that the SEC expressly agreed to -- and the Court approved -- the page limits. See Goldstone MSJ Reply at 5 n.1. The Defendants argue that the SEC talks past, rather than directly disputing, the Defendants' evidence that they acted in good faith in preparing the Form 10-K and in dealing with KPMG. See Goldstone MSJ Reply at 5. The

Defendants assert that the SEC responds to sworn statements from percipient witnesses and contemporaneous documents

> with unfounded and unsworn hearsay statements from experts with no personal knowledge, new theories that appear nowhere in the Complaint, legally untenable claims the Court has already dismissed, rank speculation about the meaning of emails, and proposed inferences the Court may have been willing to credit under the plaintiff-friendly Rule 12(b)(6) standard but which discovery has since refuted.

Goldstone MSJ Reply at 5.  The Defendants contend that, to survive summary judgment, the SEC must produce concrete evidence, and "not hearsay, innuendo, and speculation."  Goldstone MSJ Reply at 5.

The Defendants maintain that the SEC fails to respond to undisputed evidence that Thornburg Mortgage and KPMG reasonably viewed the disruption in the Alt-A market and the mid-February, 2008, margin calls "as a *new* development and *not* a continuation of conditions that existed as of December 31, 2007 (i.e., a Type II subsequent event)."  Goldstone MSJ Reply at 5 (emphasis in original).  The Defendants argue that, this fact alone, forecloses summary judgment on the SEC's OTTI-based claims.  See Goldstone MSJ Reply at 5.  They state that many of the SEC's arguments are "based on a demonstrably false premise" -- that the Defendants had to be absolutely certain that Thornburg Mortgage would be able to retain its Purchased ARM Assets until recovery.  Goldstone MSJ Reply at 6.  The Defendants contend that Thornburg Mortgage's track record in raising liquidity and the marketplace's uncertainties do not establish the necessary inconsistency between the Defendants' OTTI judgment and the facts that they knew.  See Goldstone MSJ Reply at 6.

For subjective falsity and scienter, the Defendants contend that the SEC does not offer any evidence to rebut the contemporaneous documentary and testimonial evidence that the Defendants were not concerned with recognizing OTTI.  See Goldstone MSJ Reply at 6.  The

Defendants argue that the SEC lacks actual proof of subjective falsity, but instead, rely on "its own speculative interpretations of vaguely-worded emails that are refuted by sworn percipient witness testimony."  Goldstone MSJ Reply at 6.  The Defendants maintain that the SEC does not offer concrete evidence to: (i) support its theory that the Defendants' motive to commit fraud was to save the company and to reap generous earnings; (ii) rebut the Defendants' evidence that they were fully transparent with Thornburg Mortgage's Audit Committee and Board; and (iii) contradict internal correspondence showing that the Defendants intended for the 2007 Form 10-K to disclose whatever was required when it was filed.  See Goldstone MSJ Reply at 6.  The Defendants argue that the SEC's asserted factors, which it contends, in hindsight, should have led the Defendants to reach a different OTTI judgment, are insufficient to support even a negligence claim, much less fraudulent intent.  See Goldstone MSJ Reply at 6.

The Defendants contend that the SEC's auditor-deception claim boils down to the Defendants not providing sufficient information about Thornburg Mortgage's margin call situation to Reinhart and Hall in the form that they preferred.  See Goldstone MSJ Reply at 7. The Defendants assert that the SEC's materiality claim rests only on what Reinhart and Hall, with hindsight, would have liked to know during the audit.  See Goldstone MSJ Reply at 7.  The Defendants argue that these two theories cannot sustain a cause of action under rule 13b2-2(a), because the wealth of undisputed evidence shows that Thornburg Mortgage provided KPMG with all of the information that it needed to make an informed OTTI judgment before the 2007 Form 10-K was filed.  See Goldstone MSJ Reply at 7.

The Defendants assert that the SEC's resort to innuendo, inadmissible evidence, and speculation reveals how hollow its claims are, and that the "SEC achieved a public relations victory simply by filing this lawsuit, and will suffer no ill consequences even though the charges

have proven baseless." Goldstone MSJ Reply at 7. The Defendants contend that, because the case has irreparably damaged their careers and reputation, "they have already lost," and that, if the Court does not "bring this unwarranted prosecution to an end by granting their motion for partial summary judgment in its entirety," they will "face years more of stigma, uncertainty, and substantial litigation costs before they can be vindicated by a jury." Goldstone MSJ Reply at 7-8. The Defendants state that they join and incorporate the arguments that Starrett makes in the Reply in Support of Defendant Jane Starrett's Motion for Summary Judgment and Opposition to Plaintiff Securities and Exchange Commission's Cross-Motion for Summary Judgment on the Issues of Objective Falsity and Materiality, filed January 31, 2014 (Doc. 255) ("Starrett MSJ Reply").

The Defendants maintain that the SEC does not identify any admissible evidence that the "Defendants' OTTI judgment was 'not plausibly premised on, or was inconsistent with' the information known to them before the 10-K filing.'" Goldstone MSJ Reply at 8 (quoting In re Credit Suisse First Boston Corp., 431 F.3d at 52). They contend that the SEC's case is nothing more than a fraud-by-hindsight theory. See Goldstone MSJ Reply at 8. The Defendants state that the SEC does not address or dispute that the Defendants and KPMG reasonably determined that the mid-February, 2008, downturn in the Alt-A MBS market was a Type II subsequent event that did not require adjusting Thornburg Mortgage's 2007 year-end financial statements. See Goldstone MSJ Reply at 8. The Defendants contend that, because the events were Type II events, they did not require the Defendants to adjust their OTTI analysis. See Goldstone MSJ Reply at 8.

The Defendants contend that Taylor advised the engagement team and maintained during his deposition that the February, 2008, events were Type II subsequent events. See Goldstone

MSJ Reply at 8-9.  The Defendants address the SEC's argument that the Defendants purposely withheld information from Taylor by arguing that KPMG was aware that the $300 million in margin calls which Thornburg Mortgage received after February 14, 2008, resulted from a sudden, adverse change in the Alt-A markets and that, because Taylor audited a number of other clients with Alt-A MBS holdings, he was aware of the change.  See Goldstone MSJ Reply at 9. The Defendants maintain that there is no evidence in the record that, if Taylor believed the information that the Defendants withheld, he would have altered his Type II classification.  See Goldstone MSJ Reply at 9.  The Defendants argue that almost all of the SEC's evidence that attack the objective reasonableness of Thornburg Mortgage's OTTI judgment is irrelevant, because it relates to a market disruption that Thornburg Mortgage and KPMG reasonably determined to be a Type II event.  See Goldstone MSJ Reply at 9.

The Defendants contend that the SEC's objective falsity arguments are based on a misconception of the applicable GAAP standards.  See Goldstone MSJ Reply at 9-10.  They argue that the SEC's argument presumes that, to recognize that the assets were not OTTI, the Defendants had to be absolutely certain that Thornburg Mortgage would be able to retain its Purchased ARM Assets until maturity.  See Goldstone MSJ Reply at 10.  The Defendants state that this position lacks support in the OTTI accounting guidance.  See Goldstone MSJ Reply at 10.  They assert that the OTTI guidance recognizes that management must make assumptions about future events and that management does not have to foreclose completely the possibility that losses on impaired assets might one day be realized to determine that they are not OTTI. See Goldstone Reply at 10.  The Defendants argue that, in 2009, the FASB expressly confirmed that "OTTI should be recognized only where there is an intent to sell an asset or that it is more likely than not that the asset will be sold before its value recovers."  Goldstone Reply at 10

(internal quotation marks omitted).  The Defendants address the SEC's argument that the 2009 FASB clarification was a rule change by arguing that the guidance which was in effect in February, 2008, required recognition of an impairment only if it was probable that the investor would be unable to collect all amounts due.  See Goldstone MSJ Reply at 10-11.  The Defendants argue that, because the SEC does not cite any authority supporting its contention that the "Defendants needed ironclad certainty to support their OTTI judgment," its argument fails. Goldstone MSJ Reply at 11.

The Defendants state that they have not argued that Thornburg Mortgage entered into formal agreements with its lenders for the lenders to not declare default, but that Thornburg Mortgage had a cooperative relationship with its lenders.  See Goldstone MSJ Reply at 11.  The Defendants contend that this cooperative relationship gave them ample reason to believe that Thornburg Mortgage's lenders would continue to work cooperatively in the future.  See Goldstone MSJ Reply at 11.  The Defendants address the SEC's argument that Thornburg Mortgage had low levels of liquidity by arguing that situation does not explain how Thornburg Mortgage's liquidity position made their OTTI judgment objectively false.  See Goldstone MSJ Reply at 11-12.  They contend that, in the two weeks before the Form 10-K filing, Thornburg Mortgage paid over $300 million in margin calls, and had between $100 and $150 million in excess liquidity when the Form 10-K was filed.  See Goldstone MSJ Reply at 12.  The Defendants maintain that Thornburg Mortgage's ability to pay such an unusually large volume of margin calls in a two-week period is strong evidence that it had the resources to retain its Purchased ARM Assets going forward.  See Goldstone MSJ Reply at 12.

The Defendants argue that the SEC does not dispute any of the facts that created the reasonable basis for believing that Thornburg Mortgage's liquidity would soon be replenished, including:

> (1) Thornburg's history of successfully raising cash and capital, including literally billions of dollars between August 2007 and February 28, 2008; (2) the $560 million securitization and capital raise scheduled to take place the week after the 10-K filing; (3) the optimism of Thornburg's investment bankers that the capital-raising plans would be successful; and (4) KPMG's agreement that the capital-raising plans supported Thornburg's OTTI judgment.

Goldstone MSJ Reply at 12.   The Defendants state that the SEC's only challenge to these uncontroverted facts is that Thornburg Mortgage's capital-raising prospects were not guaranteed. See Goldstone MSJ Reply at 12.   The Defendants maintain that GAAP and GAAS do not support the SEC's assertion that future expectation is insufficient for an OTTI judgment unless it is guaranteed, because OTTI is an estimate.   See Goldstone MSJ Reply at 12.

The Defendants address the SEC's argument that, because Thornburg Mortgage received a large volume of margin calls in August, 2007, and in mid-February, 2008, they should have assumed that Thornburg Mortgage would receive a similarly large volume of margin calls immediately after the 2007 Form 10-K filing by arguing that the SEC's "argument is flatly at odds with the evidence."  Goldstone MSJ Reply at 12-13.  The Defendants assert that the SEC's argument ignores evidence that Thornburg Mortgage had no reason to expect its lenders to go from extending margin call due dates to requiring immediate payment.   See Goldstone MSJ Reply at 13.  They contend that the SEC's argument assumes that they should have anticipated that Thornburg Mortgage's repo lenders would issue a new round of margin calls on its entire MBS portfolio, and not on its Alt-A MBS, even though there was no recent significant market declines in Thornburg Mortgage's non-Alt-A holdings.   See Goldstone MSJ Reply at 13.   The Defendants argue that the SEC bases its theory on the rumor of an unidentified European

hedge-fund collapse while assuming that the Defendants knew that Thornburg Mortgage's repo lenders would imminently mark down its Alt-A repo collateral despite having marked them down the prior week.  See Goldstone MSJ Reply at 13.

The Defendants contend that the materiality of a contingent or speculative event requires balancing the probability that the event will occur and the event's anticipated magnitude.  See Goldstone MSJ Reply at 13-14 (citing Basic Inc. v. Levinson, 485 U.S. at 238).  They state that the SEC has not seriously contested the Defendants' argument that the vagueness of the hedge-fund rumor and the unreliability of market rumors rendered the hedge-fund rumor too inchoate to be material.  See Goldstone MSJ Reply at 14.  The Defendants contend that the vague electronic mail transmissions which the SEC cites do not refute the sworn testimony of Thornburg Mortgage employees that they viewed the hedge-fund rumor as an unreliable rumor, making summary judgment on the SEC's rumor-based claim appropriate.  See Goldstone MSJ Reply at 14.

The Defendants maintain that the SEC's argument that Simmons and Goldstone believed that Thornburg Mortgage would be hit with twenty-point haircuts, like the European hedge fund was, is speculative, and that the Complaint did not plead this fact.  See Goldstone MSJ Reply at 14.  The Defendants assert that the undisputed evidence shows:

> The European hedge fund's Alt-A collateral was pay option MTA -- a type of MBS that was substantially inferior to Thornburg's super-senior, AAA-rated Alt-A MBS.  The SEC's allegation that the hedge fund held MBS like or similar to Thornburg's ARM Securities is thus indisputably false.
>
> There is no evidence that Mr. Goldstone or Mr. Simmons had reason to believe the haircuts on such low quality pay option MTA would be imposed on Thornburg's far superior Alt-A collateral.
>
> Mr. Goldstone testified -- and his February 27 email expressly states -- that he thought Thornburg would see increased haircuts only more gradually -- not, as the SEC speculates, in the days following the 10-K filing.

- 393 -

In general, haircuts could only be increased as a repo transaction matured.  The typical maturity period for Thornburg's repo agreements was one month to six months.  Thus, increased haircuts were not something that would generate a margin call across an entire portfolio on a day.

Mr. Simmons estimated that the impact of 20% haircuts on Thornburg's Alt-A portfolio would have been $100 million spread out over a three-month period, not a lot of money in the context of the capital raise.

Defendants believed they had a capital raising plan in place sufficient to meet their future obligations.

Goldstone MSJ Reply at 14-15 (alterations omitted)(citations omitted)(internal quotation marks omitted)(footnote omitted).  The Defendants state that the SEC has not offered any objective evidence that Thornburg Mortgage should have expected its lenders to impose the same haircuts on its high quality Alt-A assets as they did on poorer quality pay option MTA.  See Goldstone MSJ Reply at 15.

In addressing the Feb. 27, 2008, Simmons Email, the Defendants argue that it does not mention additional margin calls, that Simmons could not recall the electronic mail transmission, and that Simmons wanted to be done with the Citigroup Global margin call and file the 2007 Form 10-K that day to satisfy the timetable that he set for Thornburg Mortgage's Chairman.  See Goldstone MSJ Reply at 15-16.  The Defendants maintain that the hedge fund's collapse did not concern Simmons, because there is little correlation between pay option MTA and Alt-A holdings.  See Goldstone MSJ Reply at 16.  The Defendants contend that Simmons set a 6:00 a.m. deadline for filing the 2007 Form 10-K, because he was meeting with OTS in Dallas the next day and would be unavailable to address any issues that might arise if the Form 10-K was later filed.  See Goldstone MSJ Reply at 16.  The Defendants argue that a party opposing summary judgment must provide admissible evidence of material fact and not just subjective interpretations of the evidence, which is all that the SEC has provided.  See Goldstone MSJ

Reply at 16 (citing <u>Tran v. Sonic Indus. Servs., Inc.</u>, 490 F. App'x 115 (10th Cir. 2012)(unpublished)).  They contend that the SEC cannot create a factual issue by asserting that a jury might disbelieve Simmons' testimony.  <u>See</u> Goldstone MSJ Reply at 16-17 (citing <u>SEC v. Small Bus. Capital Corp.</u>, No. CIV 12-3237 EJD, 2013 WL 4455850, at *14 (N.D. Cal. Aug. 16, 2013)(Davila, J.)).

The Defendants argue that Goldstone's testimony about Bear Stearns' buyout effort is not a new argument, because he first discussed it in 2010.  <u>See</u> Goldstone MSJ Reply at 17.  The Defendants assert that, "[i]f the SEC believed that testimony could be refuted, it should have obtained percipient witness testimony to the contrary."  Goldstone MSJ Reply at 17.  They address the SEC's argument that Goldstone learned about the buyout efforts after he received the electronic mail transmission concerning the hedge-fund collapse by arguing that, earlier in the afternoon, UBS assured Goldstone that he should not be concerned about the hedge-fund collapse's impact on Thornburg Mortgage's portfolio.  <u>See</u> Goldstone MSJ Reply at 17.  The Defendants argue that, even though Goldstone did not learn about the final outcome of Bear Stearns' buyout effort, he reasonably believed that the collapse would not affect Thornburg Mortgage, which is evidenced by UBS' assurance and by Bear Stearns' statements that the hedge fund should accept the offer.  <u>See</u> Goldstone MSJ Reply at 18.

The Defendants argue that, after August, 2007, Thornburg Mortgage took affirmative steps to make future liquidations less likely, which included significantly reducing Thornburg Mortgage's reliance on repo financing, continuing relationships with lenders that did not default Thornburg Mortgage in August, 2007, and raising additional capital.  <u>See</u> Goldstone MSJ Reply at 18.  The Defendants maintain that the SEC does not offer any competent evidence to dispute their assertion that the market conditions for Thornburg Mortgage's MBS assets rebounded after

August, 2007.  See Goldstone MSJ Reply at 18.  The Defendants assert that the statement in KPMG workpapers that there was a continued decline in the MBS market is "off point," because it was made in a discussion involving a hypothetical future scenario of restricted cash flow, and because it did not mention market conditions in the fourth quarter of 2007.  See Goldstone MSJ Reply at 18 n.11.  The Defendants argue that Goldstone's statement about a series of steps down since August, 2007, was a "general statement that did not purport to describe Thornburg's experience in the fourth quarter of 2007."  Goldstone MSJ Reply at 18-19 n.11.  The Defendants contend that witness testimony, internal Thornburg Mortgage correspondence, and KPMG workpapers show that the market conditions and Thornburg Mortgage's profitability improved after August, 2007.  See Goldstone MSJ Reply at 18-19.

The Defendants argue that the SEC's theories about the I/O Strip Transactions are based on the inadmissible, unfounded opinions of experts and are contrary to the evidence.  See Goldstone MSJ Reply at 19.  The Defendants maintain that the I/O Strip Transactions were a positive factor, because their proceeds were greater than what Thornburg Mortgage "received from repo financing of the same assets (due to elimination of the repo haircuts)," and because the market prices for the I/O Strip Transactions were favorable.  Goldstone MSJ Reply at 19.  The Defendants also argue that the transactions were permanent and eliminated the risk of margin calls.  See Goldstone MSJ Reply at 19-20.  They contend that Hall's statement that she did not know that the I/O Strip Transactions were used to meet margin calls is contrary to the disclosure in the 2007 Form 10-K, which stated that they were enacted to improve liquidity, and to the Margin Call Schedule, which identified the transactions as a source of funds to meet margin calls.  See Goldstone MSJ Reply at 20 n.12.

The Defendants contend that the SEC did not meet and confer with them about its cross motion for summary judgment and that the Court should deny its request for that reason.  See Goldstone MSJ Reply at 20 n.16.  They contend that the SEC's argument that the restatement is conclusive evidence of objective falsity misconstrues the falsity requirement, which asks whether there were objective facts at the time of the opinion to support the opinion.  See Goldstone MSJ Reply at 20 (citing Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d Cir. 2011); In re Credit Suisse, 431 F.3d at 52; C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG, No. CIV 12-4924 KBF, 2013 WL 6576031, at *4 (S.D.N.Y. Dec. 13, 2013)).  The Defendants argue that the restatement has no bearing on whether information was available before the 2007 Form 10-K filing to support their OTTI conclusion.  See Goldstone MSJ Reply at 20-21.  They assert that SEC v. Espuelas is inapposite, because the restatement in that case was based on transactions that already occurred, while the restatement in this case was based on events that occurred after the 2007 Form 10-K was filed.  See Goldstone MSJ Reply at 21 n.14.  The Defendants argue that Thornburg Mortgage did not acknowledge that its OTTI analysis in the 2007 Form 10-K was false, but that, once KPMG withdrew its original audit opinion, Thornburg Mortgage had no choice but to agree to the restatement.  See Goldstone MSJ Reply at 21.  They assert that a restatement should not be treated as an admission that the prior financial statement was false or misleading.  See Goldstone MSJ Reply at 21 n.15 (citing In re Atlas Mining Co. Sec. Litig., 670 F. Supp. 2d 1128, 1133-34 (D. Idaho 2009)(Lodge, J.); In re Metawave Commc'ns Corp. Sec. Litig., 298 F. Supp. 2d 1056, 1079 (W.D. Wash. 2003)(Zilly, J.)).

The Defendants once again argue that, during its initial audit, KPMG was fully aware of Thornburg Mortgage's financial circumstances before the 2007 Form 10-K filing and that, before completing the restatement, KPMG was provided all of the information that the SEC alleges was

omitted.  See Goldstone MSJ Reply at 22.  They contend that KPMG witnesses' hindsight assertions that they wanted information to be presented in a different fashion do not alter the reasonableness of the Defendants' original OTTI judgment.  See Goldstone MSJ Reply at 22. The Defendants assert that no KPMG witness testified that the allegedly excluded information would have changed KPMG's OTTI analysis, which shows that there was no inconsistency between the information that was known to the Defendants and their OTTI conclusion.  See Goldstone MSJ Reply at 22.

The Defendants maintain that recklessness is an inappropriate standard for subjective falsity, because subjective falsity requires actual disbelief of an expressed opinion.  See Goldstone MSJ Reply at 22.  The Defendants contend that the SEC either concedes or does not dispute that the OTTI assessment was complex, because of the lack of a bright-line rule, because it required estimating the outcome of future events, because the financial crisis posed great challenges to regulators and market participants, and because KPMG recognized these challenges amidst unprecedented market conditions.  See Goldstone MSJ Reply at 23.  The Defendants assert that the 2009 FASB amendment shows that the previous OTTI guidance was flawed and confusing, and that market conditions during the financial crisis made it difficult to apply the guidance.  See Goldstone MSJ Reply at 23.  The Defendants address the SEC's argument that the Feb. 25, 2008, Goldstone KPMG Email shows that there was clear guidance on OTTI analyses by arguing that the electronic mail transmission addressed only OTTI rules on the sale of impaired assets, which is a less complex scenario than that which Thornburg Mortgage faced.  See Goldstone MSJ Reply at 23.

The Defendants state that the SEC offers no substantive rebuttal of their evidence that they acted in good faith in reaching their OTTI conclusion, especially the Feb. 22, 2008,

Simmons Going Concern Email that shows that the Defendants were unconcerned about the OTTI issue.  See Goldstone MSJ Reply at 23-24.  They contend that there is no evidence that fourth quarter profits drove their accounting judgments.  See Goldstone MSJ Reply at 24.  The Defendants address the SEC's argument that Thornburg Mortgage waited to disclose the margin call situation until it was resolved as evidence of bad faith by stating that the SEC ignores the undisputed fact that Thornburg Mortgage had already planned to file the 2007 Form 10-K on or about February 28, 2008, and that Goldstone informed the Board that how Thornburg Mortgage disclosed its margin call issue depended on where it was when it needed to file the 2007 Form 10-K.  See Goldstone MSJ Reply at 25.  The Defendants address the SEC's argument concerning the Feb. 21, 2008, Burns to Goldstone Email by arguing that the SEC does not produce testimony from Burns or from Credit Suisse about Credit Suisse's decision to withdraw from the securitization.  See Goldstone MSJ Reply at 25.  The Defendants contend that the electronic mail transmission is hearsay and that Burns' description of what Credit Suisse told her is double hearsay.  See Goldstone MSJ Reply at 25.  They further argue that the SEC cannot speculate what a witness believed if it does not seek discovery from them.  See Goldstone MSJ Reply at 25 n.18.  The Defendants maintain that the securitization was postponed to ensure that the disclosure in the securitization's prospectus supplement was consistent with the 2007 Form 10-K, which would reflect the outcome of Thornburg Mortgage's margin call situation.  See Goldstone MSJ Reply at 25-26.  The Defendants assert that Credit Suisse participated as an underwriter in a securitization the next week and that there is no evidence that Credit Suisse believed that the margin call disclosures were inadequate.  See Goldstone MSJ Reply at 26.

The Defendants contend that no percipient witness supports the SEC's interpretation of electronic mail transmissions that the Defendants did not want to disclose Thornburg Mortgage's

margin call situation to KPMG to obtain a clean audit.  See Goldstone MSJ Reply at 26.  They maintain that the SEC presents no evidence to support their interpretation of the Feb. 28, 2008, Simmons Stock Price Email, which contradicts Simmons' testimony.  See Goldstone MSJ Reply at 26-27.  The Defendants state that, while the SEC's theory about the hedge-fund rumor was sufficient to satisfy the rule 12(b)(6) standard, the undisputed evidence shows that the Defendants were not concerned about the rumor.  See Goldstone MSJ Reply at 27.

The Defendants assert that the SEC has not presented any evidence of scienter.  See Goldstone MSJ Reply at 28.  The Defendants address the SEC's save-the-company scienter theory by arguing that the SEC does not present any evidence showing that the Defendants were concerned that a company with thirty-six-billion dollars in assets would not survive a reported $428 million in unrealized losses.  See Goldstone MSJ Reply at 28.  The Defendants contend that the cases which the SEC cites support its scienter theory involve motions to dismiss, and not motions for summary judgment.  See Goldstone MSJ Reply at 28 n.21.

The Defendants argue that the SEC does not dispute that the 2007 Form 10-K contained negative information and that internal correspondence shows the Defendants' intention to make clear disclosures.  See Goldstone MSJ Reply at 29.  They state that the Court has already ruled that they had no duty to disclose the Citigroup Global letter or the alleged violations of the repo agreements in the 2007 Form 10-K, and that the letter and the alleged violations do not detract from their good faith.  See Goldstone MSJ Reply at 29.  The Defendants contend that the two investor declarations that the SEC filed do not establish materiality, because an investor desiring to know information is not enough to make it material.  See Goldstone MSJ Reply at 29 n.23 (citing Milton v. Van Dorn Co., 961 F.2d 965, 969 (1st Cir. 1992)).  The Defendants state that their surprise to the market's negative reaction does not undercut their intention to make a full

disclosure.  See Goldstone MSJ Reply at 29-30.  They assert that analysts and the media seized on their disclosure that Thornburg Mortgage may not be able to meet margin calls going forward, which shows that they fully disclosed the possibility that they would have to sell assets to meet margin calls.  See Goldstone MSJ Reply at 30.  The Defendants address the SEC's argument that Goldstone stated that this disclosure was standard by arguing that the SEC does not explain why that characterization detracts from the disclosure's significance.  See Goldstone MSJ Reply at 30 n. 25.

The Defendants argue that the SEC does not present evidence of auditor deception.  See Goldstone MSJ Reply at 30-31.  They contend that the SEC does not dispute that

> KPMG reviewed the Margin Call Schedule -- a detailed roadmap of margin calls Thornburg had received and paid, which showed that certain payments (including toward the Citigroup margin call of $196.5 million) had been made over several days, with proceeds of I/O strip financings being used to pay margin calls.
>
> KPMG received numerous records reflecting Thornburg's liquidity and margin calls from January 1 through February 27, 2008, such as wire transfer records, general ledger files, and daily cash settlements and liquidity reports.
>
> KPMG audit partners testified to being aware of Thornburg's margin call and liquidity situation before the 10-K filing.  KPMG reviewed a draft of the Recent Developments disclosure, which described the margin calls, Thornburg's reduced liquidity, and the risks and challenges posed by volatile market conditions.
>
> KPMG concluded in its going concern analysis that Thornburg could continue as a going concern even under the "complete devastation" scenario of forced asset sales with no net proceeds and total inability to obtain repo and warehouse financing.

Goldstone MSJ Reply at 31 (citations omitted)(footnote omitted).  The Defendants argue that KMPG's stress test shows that it thought that Thornburg Mortgage would be a going concern, even under severe circumstances, which demonstrates that any allegedly withheld information about Thornburg Mortgage's less dire margin call situation was not material.  See Goldstone MSJ Reply at 31 n.26.

The Defendants address the SEC's argument that the Margin Call Schedule was provided to KPMG solely to tie out the margin call amount by arguing that Hall testified that she considered it in her going concern and OTTI assessments, and that Reinhart testified that the Margin Call Schedule was obtained to understand Thornburg Mortgage's liquidity position.  See Goldstone MSJ Reply at 32.  The Defendants argue that, while Reinhart testified that someone at Thornburg Mortgage told her that Thornburg Mortgage timely met its margin calls, she did not say who told her this information.  See Goldstone MSJ Reply at 32-33 n.28.  The Defendants contend that it is irrelevant that KPMG auditors did not pick up on the information in the Margin Call Schedule or that KPMG gave the schedule to a junior auditor, because two KPMG auditors reviewed the schedule before the 2007 Form 10-K was filed, and because Thornburg Mortgage did not have a duty to determine how KPMG utilized the information.  See Goldstone MSJ Reply at 32-33.

The Defendants address the SEC's assertion that the Defendants directed KPMG's focus to the mid-February margin calls by arguing that the SEC's theory lacks evidentiary support and that the SEC does not state how its focus theory constitutes a rule 13b2-2 violation.  See Goldstone MSJ Reply at 33-34.  Concerning the SEC's argument that the Defendants omitted certain information from the February 21, 2008, liquidity report, the Defendants contend that this argument is based on pure speculation; that the Capital Markets group -- and not the Defendants -- would occasionally remove information about margin calls from liquidity reports to use in negotiations with repo lenders; and that KPMG would, at times, examine documents in person without taking copies for its workpapers.  See Goldstone MSJ Reply at 34 n.31.  The Defendants argue that, contrary to the SEC's interpretation of the Feb. 25, 2008, Goldstone KPMG Email, KPMG fully disclosed Thornburg Mortgage's margin call situation through conversations Hall

had with members of the Capital Markets group, the Margin Call Schedule, and other sources. See Goldstone MSJ Reply at 34-35.

The Defendants assert that the SEC's rule 13b2-2's claim is based on information that KPMG auditors would have liked to know, but that this standard is insufficient to make the information material. See Goldstone MSJ Reply at 35. The Defendants maintain that the materiality standard is an objective one and that it is based on what a reasonable auditor would have considered significant at the time it was omitted. See Goldstone MSJ Reply at 35-36 (citing TSC Indus. v. Northway, 426 U.S. 438, 445 (1976)). They contend that KPMG auditors did not testify, as the SEC contends, that the additional information would have resulted in a different OTTI conclusion, but only that they would have liked to know the information. See Goldstone MSJ Reply at 36-37. The Defendants acknowledge that, since this case was filed, Hall and Reinhart have testified that their OTTI judgment would have possibly or would have likely been different, but the Defendants maintain that Hall and Reinhart have not testified that their conclusions would have been different. See Goldstone MSJ Reply at 37.

The Defendants argue that any claim based on their failure to provide KPMG with the Citigroup Global letter is precluded, because the Court dismissed that claim in the MOO. See Goldstone MSJ Reply at 37-38. The Defendants contend that, during the restatement period, Thornburg Mortgage did not restrict KPMG's access to any information that may have made them aware of the Citigroup Global letter. See Goldstone MSJ Reply at 38. The Defendants assert that the SEC has not shown any statement that they made that was rendered materially misleading by not disclosing the Citigroup Global letter, and that, because KPMG concluded, without the letter, that a restatement was necessary, the information in the letter would not have altered KPMG's decision, making the letter immaterial. See Goldstone MSJ Reply at 38-39.

The Defendants maintain that, during the restatement period, KPMG knew about Thornburg Mortgage's difficulty in meeting margin calls and its payment of margin calls over time.  See Goldstone MSJ Reply at 39.   The Defendants state that KPMG was not interested in reservation-of-rights letters for its year-end audit, because it knew that some repo lenders issued such letters in August, 2007, without issuing notices of default.  See Goldstone MSJ Reply at 39 & n.34.

For the hedge-fund rumor, the Defendants argue that the SEC's speculation about some electronic mail transmissions' meaning is not competent evidence that can controvert the testimony of the transmissions' authors and that the SEC fails to present any evidence that the rumor rendered their OTTI judgment false.  See Goldstone MSJ Reply at 40.  The Defendants maintain that the rumor was an objectively immaterial contingent event, that the KPMG witnesses testified that they were focused on Thornburg Mortgage management's belief that the rumor would have on Thornburg Mortgage, and that no witness has testified that it was important to know that Goldstone heard a rumor that he did not believe would materialize.  See Goldstone MSJ Reply at 41.

The Defendants argue that the SEC's cessation-of-loan-funding theory is precluded, as a matter of law, because it did not allege it in the Complaint.  See Goldstone MSJ Reply at 41. They also argue that the SEC has not identified statements that the omission of information about loan funding rendered false.  See Goldstone MSJ Reply at 41.  They contend that Thornburg Mortgage's funding of loans continued and that KPMG knew that its volume of certain operations had changed.  See Goldstone MSJ Reply at 41-42.

The Defendants maintain that the SEC has not presented any evidence of misleading statements that they made to KPMG.  See Goldstone MSJ Reply at 42.  They contend that the

Feb. 27, 2008, Hedge Fund Email does not contradict the statements that the market had bottomed out, because the SEC presents only its speculative interpretation of the electronic mail transmission as evidence; that they never told KPMG that opportune pricing was the only purpose for the I/O Strip Transactions; and that Thornburg Mortgage's management representation letter is not false, because the SEC has presented evidence showing that the OTTI conclusion was wrong.   The Defendants maintain that KPMG's conclusions during the restatement -- that there was no auditor deception -- precludes a finding of auditor deception, because they provided KMPG with all of the information that the SEC contends they withheld or because that information is immaterial.  See Goldstone MSJ Reply at 44.

### 4.    The Starrett MSJ.

Starrett filed the Starrett MSJ on August 31, 2013.  See Starrett MSJ at 1.[305]  Starrett states that she joins the arguments that Goldstone and Simmons make in the Goldstone MSJ and

---

[305]The local rules state that the text of briefs must be double spaced.  See D.N.M.LR-Civ. 7.5; id. 10.1 ("Except for footnotes and quotations, the text of all documents must be double spaced.").  Despite the Court permitting numerous page extensions and supplemental briefing, Starrett decided that the hundreds of pages of briefing on the motions for summary judgment were still insufficient.  In her briefs, Starrett -- or more accurately, her counsel, Milbank, Tweed, Hadley & McCloy LLP -- did not comply with the local rules and applies a spacing convention that, at first glance, may appear to be double spaced, but when compared to the SEC's, Goldstone's, and Simmons' briefing, is less-than double spaced.  See, e.g., Starrett MSJ; Reply in Support of Defendant Jane Starrett's Motion for Summary Judgment an Opposition to Plaintiff Securities and Exchange Commission's Cross-Motion for Summary Judgment on the Issues of Objective Falsity and Materiality, filed January 31, 2014 (Doc. 255); Defendants' Supplemental Brief Regarding Experts in Further Support of Defendants' Motions for Summary Judgment, filed May 9, 2014 (Doc. 293); Defendants' Response to Plaintiff Securities and Exchange Commission's Supplemental Brief Opposing Defendants' Motions for Partial Summary Judgment and Supporting its Cross-Motion for Summary Judgment, filed June 6, 2014 (Doc. 304); Defendants' Supplemental Brief Regarding the OTTI Falsity Standard, filed July 29, 2014 (Doc. 326); Defendants' Notice of Supplemental Authority, filed August 5, 2014 (Doc. 327); Defendants' Supplemental Brief Regarding the Requirements of SEC Rule 13b2-2(a) in Support of Motions for Summary Judgment, filed September 22, 2014 (Doc. 343). Starrett's failure to follow the local rules in an effort to gain a slight leg up on the other side runs

the facts that they set forth in the Goldstone Facts.  See Starrett MSJ at 7 n.1.  Starrett asserts

that, after the Court issued the MOO, the SEC's sole securities claim against her is a rule 10b-5

claim for aiding and abetting Simmons and Goldstone in making a false statement concerning

OTTI in the 2007 Form 10-K.  See Starrett MSJ at 7-8.  She also asserts that the SEC's auditor-

deception claim has been limited to whether she failed to disclose to KMPG that Thornburg

Mortgage was having difficulty meeting margin calls.  See Starrett MSJ at 8.  Starrett maintains

that she did not aid or abet Simmons and Goldstone in making a false OTTI statement, because

Simmons and Goldstone did not commit a primary violation.  See Starrett MSJ at 8-9.  She also

contends that she was not reckless to and did not know the falsity of Thornburg Mortgage's

OTTI analysis, which the fact that Reinhart and Hall agreed with her OTTI assessment at the

time highlights.  See Starrett MSJ at 9.  Starrett states that there is no evidence that she received

the Citigroup Global reservation-of-rights letter or that she knew about the hedge-fund rumor.

See Starrett MSJ at 9.

Starrett maintains that she did not mislead KPMG, because KPMG knew all material

information before the Form 10-K filing, and because KPMG did not identify, during the

restatement, any misrepresentation or omission that Thornburg Mortgage's management made.

See Starrett MSJ at 10.  Starrett asserts that there is no evidence that she aided and abetted

Thornburg Mortgage's violation of § 13(b)(2)(b)'s or § 13(b)(5)'s internal control requirements.

See Starrett MSJ at 11.  She, thus, asks the Court to grant the Starrett MSJ and to dismiss the

SEC's remaining claims against her.  See Starrett MSJ at 12.[306]

---

a risk that a court will disregard briefs that do not conform with the local rules' spacing
conventions.
   [306]In the Starrett MSJ, Starrett summarizes the facts, which the Court has already
considered at length.  See Starrett MSJ at 12-19.  Because the Court has already spent a

Starrett argues that, to prove aiding and abetting, the SEC must establish: (i) a primary violation of the securities laws by another; (ii) the aider and abettor's knowledge or recklessness of the primary violation; and (iii) the aider and abettor substantially assisted another in achieving the primary violation.  See Starrett MSJ at 20 (citing Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1225 (10th Cir. 1996)).  Starrett contends that the second and third prongs are inversely related, such that weak evidence of one requires strong evidence of the other or vice versus.  See Starrett MSJ at 20 (citing SEC v. Woodruff, 778 F. Supp. 2d 1073, 1090 (D. Colo. 2011)).  She maintains that the SEC cannot prove any of the elements.  See Starrett MSJ at 20.

Starrett largely repeats the arguments that Goldstone and Simmons set forth in the Goldstone MSJ in arguing that there was no primary securities law violation.  See Starrett MSJ at 21-23.  She contends that the undisputed evidence shows that she did not act recklessly in connection with a primary securities violation and that recklessness is a high standard that is akin to conscious disregard.  See Starrett MSJ at 23-24 (citing Dronsejko v. Grant Thornton, 632 F.3d at 665; Hoffman v. Comshare, Inc. (In re Comshare Inc. Sec. Litig.), 183 F.3d 542, 550 (6th Cir. 1999)).  Starrett maintains that she acted with the prudence of a reasonable person in making a complex and subjective judgment, and that the SEC has not presented any evidence that her conduct constituted an extreme departure from a reasonable person's prudence.  See Starrett MSJ at 24 (citing City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1260 (10th Cir. 2001)).  She states that, because reasonable people could disagree about the OTTI analysis, she was not reckless in her determination.  See Starrett MSJ at 25-26.

Starrett contends that her OTTI judgment was reasonable, considering, among other things, Thornburg Mortgage's capital raising prospects and its cooperative working relationship

---

significant effort considering the facts, including Starrett's, the Court will not reproduce Starrett's summary here.

with its repo lenders.   See Starrett MSJ at 26.   She maintains that she was committed to disclosing full and truthful information, and that she did not consciously disregard any red flags. See Starrett MSJ at 26-27.   Starrett argues that the amount of margin calls that Thornburg Mortgage received on February 28, 2008, genuinely surprised her, that the margin calls were unforeseeable, and that KPMG witnesses confirm that the amount of margin calls was unforeseeable.   See Starrett MSJ at 27-28.   Starrett states that she did not receive any pecuniary gain from Thornburg Mortgage's OTTI judgment, which negates any scienter finding.   See Starrett MSJ at 28 (citing SEC v. Steadman, 967 F.2d 636, 642 (D.C. Cir. 1992); Fecht v. N. Telecom Ltd., 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000)(Cedarbaum, J.)).   Starrett asserts that there is no evidence that a desire to preserve her position at Thornburg Mortgage motivated her, because, at the time of the relevant events, she was already planning on leaving Thornburg Mortgage.   See Starrett MSJ at 28.

Starrett contends that she did not ignore obvious warning signs that her OTTI judgment was incorrect.   See Starrett MSJ at 28-29.   She argues that the August, 2007, margin calls did not create an obvious warning sign, because, after August, Thornburg Mortgage strengthened its financial footing, because Thornburg Mortgage was able to raise a large amount of capital, and because KPMG concluded that Thornburg Mortgage did not have any OTTI on September 30, 2007.   See Starrett MSJ at 29-31.   Starrett asserts: (i) that she did not believe that Thornburg Mortgage's failure to timely meet margin calls was relevant to its OTTI analysis, because, until Thornburg Mortgage was required to sell its assets, there was no issue to address with KPMG and the timeliness involved a hypothetical problem; and (ii) that there is no evidence to support the inference that the Court made in the MOO that she manipulated the timing of disclosing the payment of margin calls over time to influence the OTTI judgment.   See Starrett MSJ at 31-35.

Starrett argues that the SEC's argument starts with the premise that the OTTI judgment was false and, therefore, assumes that Starrett assisted in the falsity by concealing information, while the record shows that Starrett merely wanted to avoid derailing the audit on the eve of filing by bringing up the remote possibility that Thornburg Mortgage might not be able to meet margin calls without selling assets.  <u>See</u> Starrett MSJ at 35.  She argues that the SEC has not presented any percipient witnesses to contradict her interpretation of the Feb. 25, 2008, Goldstone KPMG Email and that the SEC cannot square its interpretation of the electronic mail transmission with the fact that Thornburg Mortgage provided KPMG with the margin call information before the 2007 Form 10-K filing.  <u>See</u> Starrett MSJ at 35.

Starrett states that she considered the I/O Strip Transactions in making her OTTI conclusions and that KPMG believed that the I/O Strip Transactions supported Thornburg Mortgage's OTTI analysis.  <u>See</u> Starrett MSJ at 36-37.  Starrett asserts that this case is similar to <u>SEC v. Coffman</u>, No. CIV 06-0088 REB/BNB, 2007 WL 2412808 (D. Colo. Aug. 21, 2007)(Blackburn, J.), where, she contends, the Honorable Robert E. Blackburn, United States District Judge for the District of Colorado, found no aiding and abetting liability when the defendants performed an analysis of impaired assets and consulted with their outside auditors in doing so.  <u>See</u> Starrett MSJ at 37.

In addressing the SEC's reduced liquidity argument, Starrett argues that Thornburg Mortgage had between $100 and $150 million in liquidity at the time, and that Thornburg Mortgage normally maintained less than $100 million in liquidity on hand, which KPMG knew, and which it documented in its workpapers.  <u>See</u> Starrett MSJ at 37-38.  Starrett maintains that Thornburg Mortgage's forty-million dollars in cash at the time was not concerning, because, between February 14, 2008, and February 28, 2008, Thornburg Mortgage avoided selling assets

despite maintaining an average daily cash balance of $28.5 million.  See Starrett MSJ at 38.  She also maintains that Thornburg Mortgage had concrete plans to raise a substantial amount of capital.  See Starrett MSJ at 38.  Starrett argues that she was unaware of the European hedge-fund rumor.  See Starrett MSJ at 38-39.

Starrett contends that the SEC cannot show that her contribution to the OTTI analysis was substantial assistance.  See Starrett MSJ at 39 (citing SEC v. Espuelas, 698 F. Supp. 2d 415, 433 (S.D.N.Y. 2010)(Holwell, J.)).  She asserts that the allegations that the Court noted in the MOO to show substantial assistance were that: (i) Goldstone and Simmons reviewed and approved the OTTI analysis; (ii) Goldstone and Simmons did not consider the hedge-fund collapse in their OTTI analysis; and (iii) the Defendants did not consider the I/O Strip Transactions in their OTTI analysis.  See Starrett MSJ at 39.  Starrett argues that the first two allegations are not directed against her and that KPMG viewed the I/O Strip Transactions as a positive factor.  See Starrett MSJ at 39-40.

Starrett maintains that she did not mislead KPMG, in violation of rule 13b2-2, and that, because the SEC's misrepresentation and omission claims are interrelated, if the SEC cannot show that she withheld information from KPMG, the SEC's misrepresentation claims must fail as well.  See Starrett MSJ at 40 & n.13.  Starrett contends that, as shown in the Goldstone MSJ, KPMG was fully aware of the amount of margin calls that Thornburg Mortgage received in the weeks leading up to the 2007 Form 10-K filing, of Thornburg Mortgage's limited liquidity, of Thornburg Mortgage's difficulty in satisfying the large volume of margin calls, and of the fact that Thornburg Mortgage paid margin calls over the course of several days.  See Starrett MSJ at 41.  She states that, to prevail on its rule 13b2-2 claim, the SEC must show that she withheld material information or made a material false or misleading statement, and that, for materiality,

the SEC must show that there is a substantial likelihood that, when viewed by a reasonable auditor, the information would have significantly altered the total mix of available information. See Starrett MSJ at 41 (citing SEC v. Retail Pro, Inc., No. CIV 08-1620 WQH/RBB, 2010 WL 1444993 (S.D. Cal. Apr. 9, 2010)(Hayes, J.); SEC v. Autocorp Equities, Inc., 292 F. Supp. 2d 1310, 1332 (D. Utah 2003)(Cassell, J.)).  Starrett contends that, while the Court held that rule 13b2-2 does not have a scienter requirement, the SEC must still show that she acted unreasonably.  See Starrett MSJ at 42 & n.14 (citing SEC v. Leslie, No. CIV 07-3444, 2010 WL 2991038 (N.D. Cal. July 29, 2010)).

Starrett argues that, as part of the restatement, KPMG concluded that unpredictable market conditions, and not fraud or omissions on the part of Thornburg Mortgage's management, caused the restatement.  See Starrett MSJ at 42-43.  Starrett asserts that KPMG made this determination while fully aware that Thornburg Mortgage had difficulty in meeting margin calls, that Thornburg Mortgage paid margin calls over time, and that the I/O Strip Transactions' proceeds were used to meet margin calls.  See Starrett MSJ at 43.  Starrett contends that, while KPMG concluded that there was no fraud on Thornburg Mortgage management's part, KPMG's auditors were reprimanded for the way they handled the audit.  See Starrett MSJ at 44.

Starrett maintains that KPMG had comprehensive evidence about Thornburg Mortgage's difficulty meeting margin calls, specifically through the Margin Call Schedule and through review of daily cash settlements with repo lenders.  See Starrett MSJ at 45-47.  She contends that Thornburg Mortgage continued to fully disclose information and to promptly provide requested information during the restatement period.  See Starrett MSJ at 47 n.21.  Starrett argues that KPMG's conduct corroborates her assertion that it received all of the information it needed to

make an OTTI conclusion.  See Starrett MSJ at 47.  She said that the following facts show that

KPMG was comfortable with the amount of information that it had received:

> KPMG never asked anyone at Thornburg about the total volume of margin calls received by the Company during the "subsequent events" period from January 1, 2008 through February 28, 2008 and had "no specific reason" for failing to do so.
>
> No one from KPMG inquired as to the average level of margin calls received by Thornburg during the 2007 audit or otherwise tried to determine the average.
>
> KPMG did not attempt to quantify the total amount of margin calls after year-end 2007 and before the filing of the Form 10-K even though the auditors "had a general understanding of the decline in the value of Thornburg's pledged securities which would tell us the general level of margin calls."
>
> The SEC has admitted that it "has no evidence that anyone at KPMG asked anyone at Thornburg whether Thornburg had met within one day the margin calls received between February 14, 2008 and February 27, 2008," even though KPMG had reviewed and was undisputedly aware of the relevant provisions of the repo agreements generally requiring payment within one day.
>
> KPMG did not do any testwork on the timing of margin call payments, including the pattern of payments for the $196.5 million Citi margin call, even though this information was clearly reflected in the Margin Call Schedule provided to KPMG prior to the filing of the Form 10-K.
>
> KPMG did not audit the cash liquidity reports provided by Thornburg, even though the auditors knew that Thornburg's "cash balances were fairly low" such that "there was a need to do a deeper dive into the 45-day cash reports."

Starrett MSJ at 47-48 (alterations omitted)(citations omitted)(footnote omitted).   Starrett

maintains that KPMG's failure to request additional information regarding Thornburg

Mortgage's margin call activity shows that it was comfortable making an OTTI decision with the

information that it had.  See Starrett MSJ at 48-49.

Starrett argues that the Feb. 25, 2008, Goldstone KPMG Email does not support the

SEC's contention that she concealed any information from KPMG.  See Starrett MSJ at 49.  She

contends that the SEC has given eleven different interpretations of the electronic mail

transmission, despite Starrett twice testifying about its meaning.  See Starrett MSJ at 49 n.23.

Starrett states that the SEC's assertion that the electronic mail transmission referred to Thornburg Mortgage's assets being subject to liquidation by repo lenders lacks support in the record, because the transmission does not refer to repo agreements, and because Starrett is not well-versed in the repo agreements' terms.  See Starrett MSJ at 49 n.23.  Starrett maintains that, in light of the amount of information concerning margin calls that Thornburg Mortgage provided KPMG, the full text of the electronic mail transmission, and Starrett's explanation of the transmission, there is no basis for finding that she made a material omission in violation of rule 13b2-2.  See Starrett MSJ at 50-51.  She contends that, in the Feb. 25, 2008, Goldstone KPMG Email, she stated that, if Thornburg Mortgage was unable to resolve the margin call situation, it would have informed KPMG before filing the 2007 Form 10-K.  See Starrett MSJ at 51-53.  Starrett argues that other courts have rejected similar attempts by the SEC to cherry-pick language from an electronic mail transmission in a misleading and inappropriate manner.  See Starrett MSJ at 52 (citing SEC v. True N. Fin. Corp., 909 F. Supp. 2d 1073, 1110 (D. Minn. 2012)(Frank, J.)).

Starrett argues that the undisputed evidence shows that she, Simmons, and Goldstone did not fail to implement effective internal controls or circumvent existing internal controls in violation of § 13(b)(5).  See Starrett MSJ at 53.  She contends that the SEC has not provided any information or evidence showing how information concerning Thornburg Mortgage's margin calls and liquidity was not evaluated.  See Starrett MSJ at 53.  Starrett asserts that courts recognize that determining the sufficiency of internal controls is a subjective process in which individuals can arrive at different conclusions.  See Starrett MSJ at 53-54 (citing SEC v. World-Wide Coin Inv., Ltd., 567 F. Supp. 724, 751 (N.D. Ga. 1983)(Vining, J.)).  She argues that the SEC's guidance states that there is no presumption of internal control deficiency based

solely on a restatement.  See Starrett MSJ at 54.  Starrett maintains that KPMG's conclusion during the restatement that Thornburg Mortgage's internal controls were properly designed and operating effectively completely refutes the SEC's internal-control claim.  See Starrett MSJ at 54-55.

### 5.    The SEC Starrett Response.

The SEC responded to the Starrett MSJ on November 14, 2013.  See Plaintiff Securities and Exchange Commission's Opposition to Motion for Summary Judgment and Memorandum of Law in Support of Jane Starrett's Motion for Summary Judgment and Cross-Motion for Summary Judgment on the Issues of Objective Falsity and Materiality at 1, filed November 14, 2013 (Doc. 240)("SEC Starrett Response").  The SEC states that it incorporates, by reference, the arguments that it makes in the SEC Goldstone Response.  See SEC Starrett Response at 1 n.1.  The SEC argues that Starrett attempts to blame KPMG for Thornburg Mortgage's OTTI analysis, while the Defendants, including Starrett, were responsible for the analysis.  See SEC Starrett Response at 4.  The SEC contends that it is immaterial whether KPMG was correct or indifferent to Thornburg Mortgage's financial papers, because what matters is what Thornburg Mortgage disclosed, and because the restatement shows that the original disclosures were misleading.  See SEC Starrett Response at 4-5.  The SEC maintains that KPMG was not fully aware of Thornburg Mortgage's margin call situation and liquidity crisis, and that Starrett's statement in the Feb. 25, 2008, Goldstone KPMG Email contradicts her contentions that KPMG was fully aware of the magnitude of margin calls and that she never withheld any information from KPMG.  See SEC Starrett Response at 5-6.  The SEC asserts that Reinhart, Hall, and McLamb did not see the entire Margin Call Schedule, and that Starrett did not know that the

document was provided to KPMG the day it issued its audit opinion.  See SEC Starrett Response at 6.

The SEC states that its remaining allegations against Starrett are that: (i) she aided and abetted Goldstone and Simmons in committing securities fraud; (ii) she falsified Thornburg Mortgage's books, records, or accounts in violation of § 13(b)(5) and rule 13b2-1; (iii) she deceived Thornburg Mortgage's auditors in violation of rule 13b2-2(a); and (iv) she aided and abetted Thornburg Mortgage in violating § 13(a) and rules 12b-20 and 13a-1.  See SEC Starrett Response at 6.  The SEC also states that its remaining fraud allegations include that the 2007 Form 10-K was materially misleading in disclosing: (i) that Thornburg Mortgage's Purchased ARM assets were not OTTI; (ii) that Thornburg Mortgage had the intent and ability to hold its assets until they recovered their value; (iii) that Thornburg Mortgage returned to profitability in the fourth quarter of 2007; and (iv) that there was no reasonable doubt about Thornburg Mortgage's ability to continue as a going concern.  See SEC Starrett Response at 6.[307]

The SEC argues that there is substantial evidence showing that Starrett aided and abetted Goldstone and Simmons in violating § 10(b).  See SEC Starrett Response at 10.  It agrees with Starrett that, for its aiding and abetting claim, it must prove: (i) a primary violation; (ii) that Starrett knew of or was reckless to the primary violation; and (iii) that Starrett provided substantial assistance in achieving the primary violation.  See SEC Starrett Response at 10-11. The SEC contends that it has provided evidence that creates a triable issue on each element.  See SEC Starrett Response at 11.  The SEC argues that the SEC Goldstone Response illustrates that Goldstone and Simmons committed a primary securities violation.  See SEC Starrett Response

---

[307]The SEC summarizes its asserted facts and Starrett's asserted facts that it contends are disputed.  See SEC Starrett Response at 7-10.  Because the Court has already discussed and considered the facts at length, it will not repeat them here.

at 12.   The SEC argues that Starrett's assertion that KPMG workpapers recognized that the post-filing margin calls were not foreseeable and were difficult to predict is misleading, because those statements in the workpapers are from Thornburg Mortgage's management and not from KPMG's independent conclusion.   See SEC Starrett Response at 12 n.4.   The SEC states that KPMG prepared the workpaper without knowledge of the Citigroup Global letter, or knowledge that Goldstone and Simmons expected twenty point haircuts.   See SEC Starrett Response at 12 n.4.

The SEC maintains that Starrett knew of or was reckless to Goldstone's and Simmons' fraud.   See SEC Starrett Response at 12.   It asserts that the Feb. 25, 2008, Goldstone KPMG Email shows that Starrett was aware of the correct OTTI standard, which could lead a jury to find that she knew or was reckless in not knowing that Thornburg Mortgage's OTTI analysis was wrong.   See SEC Starrett Response at 12-13.   In addressing Starrett's contention that market turmoil further complicated a difficult analysis, the SEC argues that market turmoil made it more unreasonable for Starrett to conclude that Thornburg Mortgage would be able to hold its Purchased ARM assets until recovery.   See SEC Starrett Response at 13.   The SEC contends that the market had been volatile since August, 2007.   See SEC Starrett Response at 13 n.5.   It asserts that Starrett gave sworn testimony that a reasonable person could have come to a different OTTI conclusion than she did.   See SEC Starrett Response at 13-14.

The SEC states that Dronsejko v. Grant Thornton makes clear that a reckless accounting judgment may exist when there is an egregious refusal to see the obvious or to investigate the doubtful.   See SEC Starrett Response at 14 (citing Dronsejko v. Grant Thornton, 632 F.3d at 665).   The SEC also distinguishes Dronsejko v. Grant Thornton's auditor-specific reckless standard, from the Tenth Circuit's standard for when there is a fiduciary relationship between the

defrauded party and the alleged aider and abettor, by arguing that recklessness requires an extreme departure from the ordinary standard of care such that it presents a danger of misleading buyers or sellers that are known to the defendant or to whom the defendant must have been aware.  See SEC Starrett Response at 14 (citing City of Philadelphia v. Fleming Cos., 264 F.3d at 1258; SEC v. Lybrand, 200 F. Supp. 2d 384, 400 (S.D.N.Y. 2002); SEC v. Treadway, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006); SEC v. KPMG LLP, 412 F. Supp. 2d 349, 383-84 (S.D.N.Y. 2006); SEC v. Aronson, No. CIV 11-7033 JSR, 2013 WL 4082900 (S.D.N.Y. Aug. 6, 2013)).  The SEC states that, when there is no fiduciary duty, the reckless standard is higher, and that, as Thornburg Mortgage's CAO, Starrett owed a fiduciary duty to Thornburg Mortgage's investors.  See SEC Starrett Response at 15.  It maintains that, even if the higher standard applied, Starrett's conduct would meet the standard.  See SEC Starrett Response at 15.

The SEC argues that Starrett's capital-raising-prospects argument does not immunize her conduct, because the capital raises were not assured, and because future prospects did not change the fact that Thornburg Mortgage's assets were subject to seizure and sale.  See SEC Starrett Response at 15.  It contends that Starrett's knowledge of Thornburg Mortgage's liquidity situation -- exhibited her statements in the Feb. 25, 2008, Goldstone KPMG Email -- undermines her assertion that there is no evidence showing that she acted in a manner that is akin to conscious disregard.  See SEC Starrett Response at 15 (citing SEC v. Stanard, No. 06-7736 GEL, 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009)).  The SEC maintains that Starrett's surprise to the market's reaction to the 2007 Form 10-K shows that she did not believe that Thornburg Mortgage's disclosures were sufficiently negative to justify such a reaction.  See SEC Starrett Response at 16.  It asserts that, while Starrett did not sell stock in the days leading up to the 2007 Form 10-K filing, it is disputed that, because she was handsomely compensated for her work as

the CAO, she received a personal financial benefit from Thornburg Mortgage's disclosure of a return to profitability, a favorable OTTI conclusion, and an ability to continue as a going concern.  See SEC Starrett Response at 16.

The SEC argues that there is ample evidence of Starrett's knowledge or recklessness. See SEC Starrett Response at 16.  It maintains that, even though Starrett goes to great lengths to explain away her statements in the Feb. 25, 2008, Goldstone KPMG Email, it is undisputed that the electronic mail transmission means what it says -- that Starrett purposely did not tell KPMG about the margin calls.  See SEC Starrett Response at 16.  The SEC states that the Feb. 25, 2008, Goldstone KPMG Email is inconsistent with Starrett's assertion that Thornburg Mortgage told KPMG everything.  See SEC Starrett Response at 16-17 (citing SEC v. Johnson, 530 F. Supp. 2d 296, 303 (D.D.C. 2008)).  The SEC distinguishes SEC v. Espuelas by arguing that, there, the court found that there was no paradigm for proper accounting of the barter transactions, while here, Starrett set forth the proper accounting guidance and recognized that margin calls were related to the OTTI analysis in the Feb. 25, 2008, Goldstone KPMG Email.  See SEC Starrett Response at 17.  The SEC asserts that Starrett testified that she was concerned about the impact that outstanding margin calls might have on the impairment issues of its assets and that she was aware that, if she informed KPMG about the late margin call payments, KPMG and Thornburg Mortgage would spend a lot of time on that issue.  See SEC Starrett Response at 18.  The SEC contends that this admission is consistent with KPMG witnesses' testimony that the untimely margin call payments were material to the OTTI and going-concern analyses.  See SEC Starrett Response at 18.

The SEC maintains that the Electronic Mail Transmission from Jane Starrett to Sheri Fox (dated Feb. 26, 2008), filed November 14, 2013 (Doc. 240-3)("Feb. 26, 2008, Updated 10-K

Draft Email"), shows a lack of transparency with KPMG.  See SEC Starrett Response at 18.  It contends that the electronic mail transmission shows that the Defendants were not ready to share information with KPMG even as late as the morning before the filing date.  See SEC Starrett Response at 18-19.  The SEC argues that the August, 2007, liquidity event shows that the market was extremely volatile, that the market had been volatile for six months, and that Thornburg Mortgage's repo lenders could seize and sell its assets when it failed to meet margin calls.  See SEC Starrett Response at 19.  The SEC maintains that there is evidence that Thornburg Mortgage misled KPMG about the I/O Strip Transactions' purpose, which impacted the OTTI and going-concern conclusions.  See SEC Starrett Response at 20.  The SEC states that Starrett's assertion that Thornburg Mortgage had between $100 and $150 million in liquidity comes from Hall's statement that she believed that it had that much liquidity, even though Thornburg Mortgage only had forty-million dollars in cash at that time.  See SEC Starrett Response at 20.

The SEC contends that there is evidence showing that Starrett provided Goldstone and Simmons substantial assistance in committing securities fraud.  See SEC Starrett Response at 20. It asserts that Starrett was Thornburg Mortgage's CAO, that she was responsible for maintaining internal accounting controls that were necessary to ensure the integrity of the financial reporting process and for monitoring daily accounting operations, and that she reached OTTI and going-concern decisions.  See SEC Starrett Response at 20.  The SEC argues that the OTTI and going-concern judgments in the 2007 Form 10-K were a direct or reasonably foreseeable result of her actions.  See SEC Starrett Response at 20-21.  The SEC states that Starrett affirmatively assisted in the fraud and that the electronic mail transmissions show that she helped conceal the fraud.  See SEC Starrett Response at 21 (citing SEC v. Espuelas, 698 F. Supp. 2d at 433).  The SEC maintains that Starrett's role in preparing the OTTI analysis and her failure to factor into the

analysis the I/O Strip Transactions are sufficient to show substantial assistance.  See SEC Starrett Response at 21.

The SEC contends that Starrett signed a materially misleading management representation letter for KPMG in violation of rule 13b2-2.  See SEC Starrett Response at 21.  It states that the management representation letter, which each Defendant signed, contained a number of false statements and omissions.  See SEC Starrett Response at 22.  The SEC contends that it is disputed whether Starrett provided KPMG with the Margin Call Schedule, because she testified earlier that she did not recognize the document and that she did not personally deliver it to anyone at KPMG.  See SEC Starrett Response at 22.  The SEC argues that the Margin Call Schedule was not provided to disclose to KPMG how Thornburg Mortgage was meeting its margin calls.  See SEC Starrett Response at 22-23.  The SEC asserts that Starrett cannot rely on Thornburg Mortgage's liquidity reports to show KPMG's knowledge of the margin calls, because there is evidence that Thornburg Mortgage doctored the reports to remove the margin calls and to change liquidity from negative to positive.  See SEC Starrett Response at 23.

The SEC argues that there is evidence that the Defendants failed to implement effective internal controls.  See SEC Starrett Response at 23.  It contends that submitting a false or misleading management representation letter to an outside auditor is a § 13(b)(5) violation.  See SEC Starrett Response at 23.  The SEC maintains that there is evidence showing that Thornburg Mortgage did not inform KPMG about the fact that Thornburg Mortgage was unable to timely meet margin calls.  See SEC Starrett Response at 24.  The SEC contends that KPMG's finding that there was no material weakness in Thornburg Mortgage's internal controls was made without knowledge of several important pieces of information.  See SEC Starrett Response at 24.

6.     **The Starrett MSJ Reply**.

Starrett replied to the SEC Starrett Response on January 31, 2014.  See Reply in Support of Defendant Jane Starrett's Motion for Summary Judgment and Opposition to Plaintiff Securities and Exchange Commission's Cross-Motion for Summary Judgment on the Issues of Objective Falsity and Materiality, filed January 31, 2014 (Doc. 255)("Starrett MSJ Reply").  She argues that the SEC fails to demonstrate a genuine dispute of material fact whether she aided and abetted Thornburg Mortgage's false statement concerning its OTTI analysis.  See Starrett MSJ Reply at 6.  Starrett contends that the SEC's claim hinges on its own speculative interpretation of the Feb. 25, 2008, Goldstone KPMG Email, which lacks support in the percipient witness testimony.  See Starrett MSJ Reply at 6-7 (citing Watt v. Brink's, Inc., No. 96-55734, 114 F.3d 1197 (9th Cir. May 23, 1997)(unpublished)(table opinion)).  Starrett asserts that the SEC's rule 13b2-2 auditor-deception theory, which is based on Starrett's alleged failure to disclose to KPMG information concerning Thornburg Mortgage's difficulty in meeting margin calls, must fail, because Thornburg Mortgage did not have a duty to report the information to KPMG, and because Thornburg Mortgage provided the information to KPMG before the 2007 Form 10-K filing.  See Starrett MSJ Reply at 7.  Starrett states that, because the SEC's auditor-deception claim subsumes its internal-controls claim, its internal-controls claim also fails for the same reason that its auditor-deception claims fails.  See Starrett MSJ Reply at 7.

The SEC argues that the SEC's claim that the 2007 Form 10-K was materially misleading in disclosing that there was no reasonable doubt about Thornburg Mortgage's ability to continue as a going concern fails for four reasons:  (i) the claim is precluded because it was not alleged in the Complaint; (ii) the 2007 Form 10-K did not contain any going-concern disclosures or mention going concern; (iii) Thornburg Mortgage's management did not have a duty under

GAAP to directly report to the public its status as a going concern; and (iv) because the SEC is relying exclusively on its OTTI claims to show that Thornburg Mortgage did not have the ability to continue as a going concern, its going-concern claim does not provide an independent basis for securities fraud liability.  See Starrett MSJ Reply at 8 n.4.

Starrett argues that the SEC minimizes the stringency of the recklessness standard.  See Starrett MSJ Reply at 8.  She addresses the SEC's contention that she conceded that recklessness is sufficient to support the SEC's claims by arguing that she has not so conceded, but that she simply noted the Court's holding in the MOO.  See Starrett MSJ Reply at 8 n.4.  Starrett asserts that the reckless standard in Dronsejko v. Grant Thornton of conscious disregard is not auditor specific, and that it applies to any aiding and abetting claim.  See Starrett MSJ Reply at 9.  She states that the Tenth Circuit has applied the conscious-disregard standard to non-accountant officers and directors, and that the SEC's standard of extreme departure from ordinary care is not materially different from the conscious disregard standard.  See Starrett MSJ Reply at 9 (citing In re Level 3 Commc'ns Sec. Litig., 667 F.3d 1331, 1343 (10th Cir. 2012)).  She contends that, in Dronsejko v. Grant Thornton, the Tenth Circuit articulated an accountant-specific standard and that, because Starrett was Thornburg Mortgage's CAO, and because a complex accounting judgment is the subject of the SEC's aiding and abetting claim, the Court can use that standard to inform its analysis of the SEC's recklessness allegations.  See Starrett MSJ Reply at 9 n.5.

Starrett contends that, while SEC v. Lybrand holds that the scienter requirement scales upward for non-fiduciaries, it does not hold or state that the recklessness standard is higher for non-fiduciaries.  See Starrett MSJ Reply at 9.  She argues that courts have sometimes required a higher scienter standard for aiding and abetting claims against non-fiduciaries, in contrast to the recklessness standard that is applied to fiduciary defendants.  See Starrett MSJ Reply at 9.

Starrett asserts that, regardless of which articulation the Court uses, the reckless standard sets an exceedingly high bar and that the Court must view her actions from the perspective of a reasonable person making the OTTI judgment in real time under difficult circumstances.  See Starrett MSJ Reply at 10.

Starrett maintains that there is no evidence that she acted recklessly in connection with Thornburg Mortgage's OTTI judgment.  See Starrett MSJ Reply at 10.  She asserts that the SEC cannot point to any obvious red flags that she disregarded in connection with the OTTI conclusion.  See Starrett MSJ Reply at 10.  Starrett states that the SEC concedes that there was nothing obvious about assessing OTTI under normal circumstances, much less at a time when the financial markets were severely dislocated.  See Starrett MSJ Reply at 10.  Starrett contends that the SEC cannot dispute her un-rebutted testimony that, given the difficulty of the OTTI judgment, reasonable individuals could have differed about the appropriate conclusion, which undermines any alleged recklessness.  See Starrett MSJ Reply at 10-11 n.8 (citing SEC v. Price Waterhouse, 797 F. Supp. 1217, 1241 (S.D.N.Y. 1992)).

Starrett argues that the SEC asserts allegations from the Complaint as evidence of recklessness, but that allegations do not constitute evidence at the summary judgment stage.  See Starrett MSJ Reply at 11 (citing Borchardt Rifle Corp. v. Cook, 727 F. Supp. 2d 1146, 1157 (D.N.M. 2010)(Browning, J.)).  She contends that the OTTI analysis' complexity is fatal to the SEC's recklessness allegation.  See Starrett MSJ Reply at 11.  Starrett maintains that, when Thornburg Mortgage made its OTTI judgment, there was no clear OTTI guidance available.  See Starrett MSJ Reply at 12.   She asserts that the SEC confuses knowledge of an accounting rule with the ability to apply that rule to specific facts and that, while she recited the existing OTTI guidance in the Feb. 25, 2008, Goldstone KPMG Email, there was no simple paradigm for

performing the OTTI analysis.  See Starrett MSJ Reply at 12.  Starrett maintains that one of the reasons that the FASB decided to amend the OTTI rules in 2009 was that the existing impairment model was particularly challenging to apply.  See Starrett MSJ Reply at 12.  She contends that the SEC's reliance on SEC v. Stanard is misplaced, because, there, the court found that the defendant initiated a sham reinsurance deal to circumvent accounting rules, while here, there is no evidence that Thornburg Mortgage's difficulty in meeting margin calls in 2008 contradicted its OTTI judgment as of 2007 year-end or that Starrett knew that the facts did not square with the OTTI rule.  See Starrett MSJ Reply at 13 n.10.

Starrett asserts that the analysis of Type I and Type II subsequent events added further complexity to the OTTI judgment, because the OTTI conclusion related to OTTI as of December 31, 2007, and only Type I subsequent events would affect that analysis.  See Starrett MSJ Reply at 14.  She contends that the SEC's sole support for its conclusion that the February, 2008, margin calls were Type I events is its allegations in the Complaint and Kitchen's report.  See Starrett MSJ Reply at 14 & n.11.  Starrett maintains that KPMG initially classified the margin calls as a Type II event and that she has consistently disagreed with the KPMG's later conclusion that the margin calls were a Type I event.  See Starrett MSJ Reply at 15.  In addressing the SEC's contention that the margin calls were a Type I event, Starrett asserts that the relevant question is whether Thornburg Mortgage had an objectively reasonable basis for concluding that they were a Type II event.  See Starrett MSJ Reply at 15.

Starrett argues that there is no evidence that she ignored any obvious warning signs.  See Starrett MSJ Reply at 15.  Concerning market volatility, Starrett asserts that FASB and KPMG recognized that market volatility made the OTTI analysis more challenging.  See Starrett MSJ Reply at 15.  She contends that no OTTI accounting literature required Thornburg Mortgage to

conclude that its lenders would never seize and sell collateral, or that it controlled the ability to hold its impaired assets.  See Starrett MSJ Reply at 16.  Starrett argues that, before the SEC Starrett Response, the SEC had not alleged that she made any misstatement or was involved in making a misstatement concerning the I/O Strip Transactions.  See Starrett MSJ Reply at 16. She contends that the SEC does not have any evidence that she was involved in a misstatement concerning I/O Strip Transactions or in doctoring liquidity reports.  See Starrett MSJ Reply at 16 & n.12.  Starrett maintains that the SEC presents no evidence that she did not factor the I/O Strip Transactions into her OTTI analysis and ignores evidence showing that she considered the transactions and that she talked to Hall about them.  See Starrett MSJ Reply at 16-17 (citing Phillips v. Calhoun, 956 F.2d 949, 951 (10th Cir. 1992)).

Starrett contends that, after the August, 2007, liquidity event, Thornburg Mortgage was able to recover and respond by significantly reducing its exposure to margin calls and market volatility, regaining its financial footing, and returning to profitability.  See Starrett MSJ Reply at 17.  She asserts that the SEC misstates the OTTI relevancy from the August, 2007, event, and that, because Thornburg Mortgage sold twenty-two billion dollars in assets, there was no OTTI on those assets, because Thornburg Mortgage no longer held them.  See Starrett MSJ Reply at 17-18.

Starrett states that Thornburg Mortgage's reduced liquidity and its prospects for raising capital did not conflict with its OTTI judgment.  See Starrett MSJ Reply at 18.  She argues that, contrary to the SEC's assertion, Thornburg Mortgage had $150 million in liquidity, KPMG's workpapers shows.  See Starrett MSJ Reply at 18-19.  Starrett argues that, at the time of the 2007 Form 10-K filing, Thornburg Mortgage had strong capital raising prospects and that OTTI guidance states that near-term prospects are relevant to an OTTI judgment.  See Starrett MSJ

Reply at 19.  Starrett maintains that the SEC has not presented any evidence showing that she was aware that, if margin calls were not paid within a day, Thornburg Mortgage's repo lenders could seize and sell its assets.  See Starrett MSJ Reply at 19-20 n.14.

Starrett contends that the SEC's unsupported interpretations of several electronic mail transmissions are not evidence of recklessness.  See Starrett MSJ Reply at 20.  She states that the Feb. 25, 2008, Goldstone KPMG Email does not show that she disbelieved Thornburg Mortgage's OTTI conclusion or that she withheld information from KPMG to make a false statement, but that she believed that Thornburg Mortgage could demonstrate its intent and ability to hold its assets as long as it did not sell them.  See Starrett MSJ Reply at 20.  Starrett asserts that her "purposely not told" statement was made in addressing Goldstone's question whether it was normal for auditors to take so long to provide accounting clarity, and that the statements were not made in connection with Thornburg Mortgage's OTTI conclusion.  Starrett MSJ Reply at 20.  She argues that her statement was not in relation to getting a clean audit from KPMG, but in relation to getting a timely audit opinion.  See Starrett MSJ Reply at 20-21.  Starrett contends that, from her experiences working with Reinhart, she knew that raising the issue of possibly selling impaired assets to meet outstanding margin calls with KPMG would make reaching a decision a slow process.   See Starrett MSJ Reply at 21.   Starrett states that SEC v. Johnson is inapposite, because, in that case, there was conflicting testimonial evidence, while here, her testimony is un-rebutted.  See Starrett MSJ Reply at 21 n.16.

Starrett argues that, while the Court should resolve all conflicting inferences of circumstantial evidence in favor of the non-moving party, it should not ignore or distort the plain meaning of words or read them out of context.  See Starrett MSJ Reply at 21 (citing Mason v. Mercy Hosps. of Kan., Inc., No. CIV 94-4076 SAC, 1997 WL 109975 (D. Kan. Feb. 13, 1997);

Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 822 (4th Cir. 1995)).  Starrett contends that the SEC attempts to create a triable issue of fact by proffering its own speculative interpretation of the electronic mail transmission while ignoring Starrett's sworn testimony.  See Starrett MSJ Reply at 22.  She asserts that what ultimately matters is not her words in an electronic mail transmission, but the information that KPMG had in its possession, and that, before the 2007 Form 10-K filing, KPMG had information concerning the timing of margin call payments.  See Starrett MSJ Reply at 22.  Starrett argues that there is no evidence to support the SEC's interpretation of the Feb. 26, 2008, Updated 10-K Draft Email.  See Starrett MSJ Reply at 23.  She states that the SEC has not presented any evidence to dispute her explanation that Thornburg Mortgage wanted to provide KPMG with a complete, finalized recent developments draft, rather than providing KPMG with an unfinished draft.  See Starrett MSJ Reply at 23.

Starrett maintains that the volume of margin calls that Thornburg Mortgage received on February 28, 2008, was significant and outside the norm.  See Starrett MSJ Reply at 24.  She contends that Thornburg Mortgage's Capital Markets group and KPMG attributed the post-filing margin calls to the market reacting to the news of margin calls and to the risks disclosed in the 2007 Form 10-K.  See Starrett MSJ Reply at 25.  Starrett argues that the SEC's contention that lenders made margin calls in the morning based on pricing done at the close of the prior business day lacks support in the evidence other than the SEC's speculation.  See Starrett MSJ Reply at 25 n.19.  She states that the volume of margin calls on February 28, 2008, also surprised KPMG.  See Starrett MSJ Reply at 25.  Starrett contends that her salary was not a motive to act recklessly, because she would have earned her salary regardless what Thornburg Mortgage disclosed in the 2007 Form 10-K, and that sufficient motive allegations require concrete benefits that she can obtain as a result of fraud.  See Starrett MSJ Reply at 25.

Starrett maintains that the SEC has not demonstrated a triable issue for its rule 13b2-2 claim.  See Starrett MSJ Reply at 26.  She asserts that she was not required to tell KPMG every detail about Thornburg Mortgage's difficulty in timely meeting its margin calls or to keep KPMG updated about every post-filing development.  See Starrett MSJ Reply at 26 & n.20.  She maintains that Thornburg Mortgage provided KPMG with all requested information.  See Starrett MSJ Reply at 26.

Starrett argues that KPMG's conclusion that the restatement was not due to fraud is dispositive.  See Starrett MSJ Reply at 27.  She addresses the SEC's argument that Thornburg Mortgage's conclusion created the restatement workpapers' characterization of the margin call events as a market panic by stating that the workpapers show that KPMG concluded that the events were unprecedented and were the result of a market panic.  See Starrett MSJ Reply at 27 n.21.  Starrett asserts that, during the restatement, KPMG was aware of Thornburg Mortgage's difficulty in timely meeting margin calls.  See Starrett MSJ Reply at 27-28.  She contends that the remaining information that she allegedly withheld from KPMG is immaterial, and that the Court has already held in the MOO that she cannot be liable for withholding the Citigroup Global letter or information about the European hedge-fund collapse, because she was not aware of them.  See Starrett MSJ Reply at 28.  Starrett argues that, because KPMG was aware of Thornburg Mortgage's difficulty to timely meet margin calls, her use of the word "purposefully" in an electronic mail transmission is not material withheld information.  Starrett MSJ Reply at 28.  She contends that, during an interview, she and Simmons told McLamb that they had not informed KPMG about Thornburg Mortgage's timeliness issue, yet McLamb still found that Thornburg Mortgage had not intentionally withheld information from KPMG.  See Starrett MSJ Reply at 28 n.23.  She further contends that, after being informed of the timeliness issue, KPMG

still concluded that the original OTTI conclusion was well reasoned and that, only with hindsight, concluded that it was incorrect.  See Starrett MSJ Reply at 28.

Starrett maintains that the Margin Call Schedule disclosed Thornburg Mortgage's difficulty in meeting margin calls.  See Starrett MSJ Reply at 29.  She contends that it is irrelevant whether she or someone else provided the Margin Call Schedule to KPMG, because she believed that some document containing margin call activity was provided to KPMG.  See Starrett MSJ Reply at 29-30.  Starrett asserts that the restatement memorandum, which Reinhart and Hall authored, references the Margin Call Schedule three separate times and that it notes that Thornburg Mortgage provided KPMG with the Margin Call Schedule before the 2007 Form 10-K filing.  See Starrett MSJ Reply at 30.  Starrett argues that, once Thornburg Mortgage provided KPMG with the Margin Call Schedule, it was up to KPMG's auditors to actually review it.  See Starrett MSJ Reply at 30.  In addressing the SEC's argument that, during the restatement period, Thornburg Mortgage provided KPMG with a different schedule, Starrett argues that KPMG requested information concerning all margin call activity from January 1, 2008, through March 3, 2008, so the Margin Call Schedule needed to be updated.  See Starrett MSJ Reply at 30-31.

Starrett states that the electronic mail transmissions are not evidence of a rule 13b2-2 violation.  See Starrett MSJ Reply at 31.  She contends that, because Thornburg Mortgage provided KPMG with the Margin Call Schedule, because KPMG reviewed daily cash settlements with reverse repo counterparties, and because KPMG reviewed Thornburg Mortgage's daily bank statements, KPMG was aware of the timing and magnitude of the margin call payments.  See Starrett MSJ Reply at 31.  Starrett argues that the SEC has not presented any evidence rebutting her testimony concerning the electronic mail transmission's meaning and that the SEC

cannot avoid summary judgment by challenging her credibility.  See Starrett MSJ Reply at 32 (citing SEC v. Antar, 44 F. App'x 548, 554 (3d Cir. 2002); SEC v. Small Bus. Capital Corp., 2013 WL 4455850, at *14; Porter v. Reynolds Leasing, Inc., No. CIV 92-5095 SS, 1994 WL 24769 (S.D.N.Y. Jan. 20, 1994)).

Starrett contends that her statement in the Feb. 25, 2008, Goldstone KPMG Email about not putting the valuation issue before KPMG shows that she did not want to raise a hypothetical situation which might not occur.  See Starrett MSJ Reply at 32-33.  She states that the information Thornburg Mortgage provided to KPMG refutes the SEC's concealment allegations and that it is illogical to suggest that Thornburg Mortgage could secretly meet over $300 million in margin calls in less than two weeks.  See Starrett MSJ Reply at 33 n.24.  Starrett maintains that the hypothetical situation of Thornburg Mortgage not meeting its margin calls was not material and that she did not provide it to KPMG, because KPMG tended to get hung up on hypothetical situations.  See Starrett MSJ Reply at 33.  Starrett contends that, for the reasons set forth in the Goldstone MSJ Reply, the management representation letter cannot, by itself, sustain the SEC's rule 13b2-2 claim.  See Starrett MSJ Reply at 35.  She maintains that the SEC's auditor-deception claim subsumes its internal-controls claim, and that, because there was no auditor deception, the internal control claim must fail.  See Starrett MSJ Reply at 35.

### 7.    The SEC's Supplemental Briefing on Experts.

On April 17, 2014, the parties requested that the Court permit them to file supplemental briefing on expert witnesses, see Joint Motion to File Supplemental Briefs and Responses in Support of their Summary Judgment Motions, to Modify the Page Limits of those Briefs, and to Schedule a Hearing on the Parties' Motions for Summary Judgment, filed April 17, 2014 (Doc. 285), and the Court granted their request, see Order, filed April 25, 2014 (Doc. 287).

Pursuant to the Court's order, the SEC filed the Plaintiff Securities and Exchange Commission's Supplemental Brief Opposing Defendants' Motions for Partial Summary Judgment and Supporting its Cross Motion for Summary Judgment on the Issues of Objective Falsity and Materiality, filed May 9, 2014 (Doc. 290)("SEC Expert Supp.").

The SEC argues that, while it relied on its experts -- Kitchens, Weiner, and Mayer -- in opposing the Starrett MSJ and the Goldstone MSJ, and in supporting the SEC Starrett Response and the SEC Goldstone Response, the Defendants did not rely on their experts' reports to support their motions for summary judgment.  See SEC Expert Supp. at 3.  The SEC asserts that the Defendants' experts -- William Holder, Christopher Laursen, and Joseph Floyd -- dispute or critique its experts' opinions and critique KPMG's audit.  See SEC Expert Supp. at 3.  The SEC states that the disclosures and depositions of the Defendants' experts show that: (i) the Defendants' OTTI determination was objectively false and had a material effect on the 2007 Form 10-K; (ii) Thornburg Mortgage's lenders had the ability to seize its assets in the weeks leading up to the 2007 Form 10-K filing; (iii) no expert is willing to testify that Thornburg Mortgage's OTTI determination was correct; (iv) the documents that Thornburg Mortgage withheld from KPMG were important; (v) any KPMG error does not affect whether Thornburg Mortgage's financial statements contained errors or whether Thornburg Mortgage's management committed fraud; and (vi) even if the hedge-fund rumor was a rumor, it had an impact on share prices and investment decisions.  See SEC Expert Supp. at 4-5.

The SEC contends that, because Thornburg Mortgage refused to recognize $427.8 million in OTTI, Thornburg Mortgage falsely reported a sixty-five million dollar profit in the fourth quarter of 2007 rather than its actual $357 million loss.  See SEC Expert Supp. at 5.  The SEC maintains that the 2007 Form 10-K/A states that, as of December 31, 2007, there was

substantial doubt about Thornburg Mortgage's ability to continue as a going concern, it may not have had the ability to hold its Purchased ARM assets to recovery, and GAAP required it to realize the impairment on its assets.  See SEC Expert Supp. at 5.  The SEC asserts that the Defendants' experts conceded that a restatement, by definition, means that there was a material accounting error.  See SEC Expert Supp. at 6-7.  The SEC argues that its expert, Mayer, opined that Thornburg Mortgage's OTTI and going-concern conclusions had a material impact on its stock prices, and that the Defendants' rebuttal expert witness, Christopher M. James, Ph.D., admitted to key facts that support the SEC's cross motion for summary judgment, including that a going-concern analysis has an impact on stock prices, OTTI analyses inform investors, and Thornburg Mortgage's March, 2008, disclosures were associated with statistically significant stock price movement.  See SEC Expert Supp. at 7-8.

The SEC contends that the Defendants' experts recognize that, if a company gives up control over the sale of its assets, it may not be able to say that it has the ability to hold its assets, and that, by breaching its repo agreements, such that its lenders could declare default and take possession of its assets, Thornburg Mortgage's lenders had control over the sale of its assets. See SEC Expert Supp. at 9-11.  The SEC maintains that, despite retaining five experts, the Defendants do not present an expert who is willing to opine that Thornburg Mortgage's initial OTTI assessment was correct.  See SEC Expert Supp. at 11.  The SEC asserts that the Defendants' accounting expert, Holder, opined only that Thornburg Mortgage's OTTI analysis was reasonable, and that he did not consider any of the February, 2008, events in making this determination, because his opinion is based on the assumption that the February, 2008, events were Type II subsequent events, even though he concluded only that it was reasonable for the Defendants to believe that the events were Type II and not that they were Type II.  See SEC

Expert Supp. at 11-13 & n.3.  The SEC contends that the Defendants' two other accounting experts, Laursen and Floyd, concluded either that the OTTI conclusion was reasonable, without addressing whether the opposite conclusion was reasonable, or do not address the reasonableness of the conclusion at all.  See SEC Expert Supp. at 13-14.

The SEC maintains that the testimony of the Defendants' experts supports its assertion that the materials, which the Defendants withheld from KPMG, were important.  See SEC Expert Supp. at 14-15.  The SEC asserts that the Defendants' experts also acknowledge that, if KPMG was at fault in making financial misstatements and in the restatement, the Defendants may still have committed fraud.  See SEC Expert Supp. at 15-16.  Finally, the SEC argues that the Defendants' experts acknowledge that rumors -- regardless whether they are correct -- can impact the securities' prices and investors' decisions.  See SEC Expert Supp. at 16-17.

### 8.      The Defendants' Response to SEC Expert Supp.

On June 6, 2014, the Defendants filed the Defendants' Response to Plaintiff Securities and Exchange Commission's Supplemental Brief Opposing Defendants' Motions for Partial Summary Judgment and Supporting its Cross-Motion for Summary Judgment, filed June 6, 2014 (Doc. 304)("Defendants Expert Response").  The Defendants argue that the SEC Expert Supp. shows that the SEC's strategy in avoiding summary judgment is to ignore relevant, undisputed facts and to focus on irrelevant generalizations, such as a battle of experts, the purpose of the restatement, and the importance of market rumors.  See Defendants Expert Response at 4.  The Defendants assert that there is no rule precluding summary judgment when a Court is presented with conflicting expert opinions and that a restatement does not establish that the original financial statement was false when issued.  See Defendants Expert Response at 4.

The Defendants state that they did not rely on expert reports when they initially moved for summary judgment, because the factual record, by itself, supports the motions.   See Defendants Expert Response at 4.  They contend that the SEC cannot avoid summary judgment by producing paid experts who support its position and that conflicting expert conclusions are not a barrier to summary judgment when they do not raise a genuine dispute.  See Defendants Expert Response at 4-5 (citing Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008); Matthiesen v. Banc One Mortg. Corp., 173 F.3d 1242, 1247 (10th Cir. 1999); Nat'l Westminster Bank, PLC v. United States, 69 Fed. Cl. 128, 146 (Fed. Cl. 2005)).   The Defendants argue that expert disagreement about OTTI and subsequent analyses support their motions for summary judgment by showing that the issues are complex and that professional accountants can reach different, but equally reasonable conclusions.   See Defendants Expert Response at 5 (citing SEC v. Price Waterhouse, 797 F. Supp. 1217, 1242 (S.D.N.Y. 1992); Danis v. USN Commc'ns, Inc., 121 F. Supp. 2d 1183, 1195 (N.D. Ill. 2000)).

The Defendants maintain that their experts do not support the SEC's cross motions for summary judgment.  See Defendants Expert Response at 6.  They address the SEC's argument that Holder opines only that Thornburg Mortgage's OTTI was reasonable and not that it was correct, by arguing that the OITTI analysis is an imprecise, subjective, and forward-looking estimate, and that Holder testified that, because the OTTI judgment was reasonable, it was correct.  See Defendants Expert Response at 6 (citing Thor Power Tool Co. v. C.I.R., 439 U.S. 522, 544 (1979)).  The Defendants contend that the SEC's insistence that Holder articulate his opinions on complex accounting issues in terms of correctness shows that the SEC misunderstands the underlying OTTI principles.  See Defendants Expert Response at 7.  They state that, by requiring Holder to opine that the February, 2008, margin calls were Type II

subsequent events, the SEC also misunderstands the Type I/Type II distinction, and that Holder testified that he was unaware of facts that would support a Type I finding and that the Type II judgment was an appropriate, reasonable, and correct one.  See Defendants Expert Response at 7 n.2.

The Defendants assert that, because only Type I subsequent events affect an OTTI conclusion, and because the margin calls were Type II subsequent events, Holder was not required to consider the margin calls in opining that Thornburg Mortgage's OTTI conclusion was reasonable.  See Defendants Expert Response at 7-8.  In addressing Holder's refusal to opine whether Thornburg Mortgage's OTTI determination that the February, 2008, margin calls were Type II events, the Defendants argue that this determination would have required Holder to consider a hypothetical situation that is based on either (i) Thornburg Mortgage concluding that the margin calls were Type I events; or (ii) Thornburg Mortgage's Type II conclusion being unreasonable.  See Defendants Expert Response at 8-9.

The Defendants argue that the SEC relies on Kitchen's conclusory opinion that the February, 2008, margin calls were Type I events.  See Defendants Expert Response at 9.  They assert that Thornburg Mortgage's management carefully analyzed the February, 2008, margin calls in determining that they were Type I events, and that Starrett reviewed and approved a memorandum outlying management's analysis.  See Defendants Expert Response at 9 n.3.  The Defendants contend that Kitchens testified that it was not unreasonable or improper for KPMG to assess the margin calls as Type II events.  See Defendants Expert Response at 9.  The Defendants address the SEC's contention that, while Thornburg Mortgage considered the margin calls to be Type II events, it still considered them in the 2007 Form 10-K by arguing that

Thornburg Mortgage was required to consider all subsequent events regardless whether they were Type I or II.  See Defendants Expert Response at 9-10.

The Defendants maintain that Thornburg Mortgage did not give up control of its assets and that its lenders did not have the right to sell its assets before the 2007 Form 10-K filing.  See Defendants Expert Response at 10-11.   The Defendants assert that, because Thornburg Mortgage's repo lenders worked with Thornburg Mortgage and did not declare it in default, its lenders did not have control of its assets or have the right to sell them.  See Defendants Expert Response at 11.  The Defendants argue that the SEC manufactures its own OTTI standard that, because Thornburg Mortgage lacked the ability to control whether its lenders declared default, it also lacked the ability to hold its assets.  See Defendants Expert Response at 11.  They state that the theoretical possibility that Thornburg Mortgage's lenders might declare default and liquidate its assets does not make such an outcome probable.  See Defendants Expert Response at 11-12.

The Defendants argue that the restatement does not establish that Thornburg Mortgage's original OTTI judgment was objectively false.  See Defendants Expert Response at 12.  They contend that, while their experts stated that restatements are normally conducted because of an error or misstatement, the restatement here was unwarranted.  See Defendants Expert Response at 12.  Specifically, the Defendants note that KPMG concluded that the restatement was done because of a difference in judgment and not because of a misstatement.  See Defendants Expert Response at 13.  The Defendants maintain that no expert has opined whether a hypothetical OTTI disclosure would have had a material effect on Thornburg Mortgage's stock price.  See Defendants Expert Response at 13-14.  They assert that the SEC's reliance on Mayer's event study is misplaced, because Mayer's study combined together the impact of OTTI and going concern, without isolating the relative effect of disclosing an OTTI conclusion separate from a

going-concern conclusion.  See Defendants Expert Response at 14 n.6.  The Defendants contend that, while James did not opine that the going-concern and OTTI disclosures would have been immaterial, he testified that Mayer's analysis does not provide reliable evidence that an OTTI disclosure would have a material impact on Thornburg Mortgage's stock.  See Defendants Expert Response at 14.

The Defendants maintain that their experts undermine, rather than support, the SEC's auditor deception claim.  See Defendants Expert Response at 14.  They state that Thornburg Mortgage provided KPMG with all material information, and that there was nothing wrong or fraudulent in Thornburg Mortgage's financial statements.  See Defendants Expert Response at 14-15.  The Defendants contend that the SEC's separation of its § 10(b) OTTI-fraud claim from its rule 13b2-2 auditor-deception claim "is itself a significant concession," because the SEC concedes that KPMG is responsible for any error in the audit, and because it shows that the SEC has improperly conflated its investor and auditor fraud allegations.  Defendants Expert Response at 15-16.  The Defendants maintain that their experts did not testify that the specific information, which the SEC alleges they withheld from KPMG, was important.  See Defendants Expert Response at 16-17.  The Defendants repeat their arguments that the hedge-fund rumor was too vague; that, on February 28, 2008, the hedge fund's collapse was not a foregone conclusion; and that, while market participants may make investment decisions based on rumors, auditors must support their conclusions with reliable evidence.  See Defendants Expert Response at 17-18.

### 9.    The Defendants' Supplemental Briefing on Experts.

On May 9, 2014, the Defendants filed the Defendants' Supplemental Brief Regarding Experts in Further Support of Defendants' Motions for Summary Judgment, filed May 9, 2014 (Doc. 293)("Defendants Expert Supp.").  The Defendants maintain that their OTTI judgment was

objectively reasonable.  See Defendants Expert Supp. at 8.  They state that Holder opined that Thornburg Mortgage management's judgment that the decline in Thornburg Mortgage's Purchased ARM assets was not OTTI was reasonable.  See Defendants Expert Supp. at 8.  The Defendants contend that Laursen opined that their OTTI judgment was consistent with the OTTI guidance that the Federal Reserve provided to auditing firms at that time.  See Defendants Expert Supp. at 9.  They assert that Laursen based his opinion on the following considerations: (i) the price declines in Thornburg Mortgage's assets did not appear to be credit-based; (ii) asset volatility and the market's liquidity had a potentially positive outlook; and (iii) Thornburg Mortgage had demonstrated its ability to hold its assets by reducing leverage, raising capital, and meeting liquidity needs.  See Defendants Expert Supp. at 9.

The Defendants argue that the SEC's accounting expert misapplies GAAP by using information about events that occurred after the relevant OTTI reporting date.  See Defendants Expert Supp. at 9.  They contend that the relevant OTTI date was December 31, 2007, yet Kitchens' OTTI analysis looks at what accounting should have been done on February 28, 2008.  See Defendants Expert Supp. at 10.  They assert that Kitchens testified that, as of February 28, 2008, Thornburg Mortgage did not have the ability to hold its assets until the values recovered.  See Defendants Expert Supp. at 10.  The Defendants argue that, because Kitchens focused on the wrong date to make his OTTI opinion, his opinion cannot be used to create a disputed issue of material fact.  See Defendants Expert Supp. at 10-11.

The Defendants maintain that events which occurred after the balance sheet date can be considered in an OTTI analysis, but only if they are indicative of a condition that existed at the balance sheet date -- i.e., Type I subsequent events.  See Defendants Expert Supp. at 11.  They contend that Thornburg Mortgage, KPMG, and Holder all concluded that the February, 2008,

margin calls were Type II events, which did not affect the December 31, 2007, OTTI conclusion. See Defendants Expert Supp. at 12. They note that Holder opines that changes in quoted market prices are typically reflective of new marketplace conditions, making them Type II events. See Defendants Expert Supp. at 12. The Defendants argue that James opined that the February 14, 2008, losses were separate from the August, 2007, margin calls, because the February, 2008, losses were centered on declines in Alt-A securities' prices while subprime issues caused the August, 2007, event. See Defendants Expert Supp. at 13. They assert that James opined that the February, 2008, market disruption was one of several unanticipated, separate shocks to the market that comprised the financial crisis. See Defendants Expert Supp. at 13.

The Defendants argue that the SEC's reliance on Mayer's and Weiner's opinions that the mid-February margin calls were part of an on-going financial crisis which began in 2007 is based only on hindsight that does not dispute Thornburg Mortgage's conclusion that it made, without hindsight, in February, 2008. See Defendants Expert Supp. at 13 n.4. The Defendants contend that Kitchens' conclusory opinion that the February, 2008, margin calls were Type I events is irrelevant, for two reasons: (i) the Type I/Type II analysis requires a judgment call and, outside AU § 560, there is no GAAP that gives guidance on making the analysis; and (ii) Kitchens testified that he did not think that KPMG's Type II conclusion was unreasonable. See Defendants Expert Supp. at 14.

The Defendants maintain that the SEC's experts apply incorrect standards in evaluating Thornburg Mortgage's OTTI judgment and liquidity positions. See Defendants Expert Supp. at 14. They argue that Thornburg Mortgage needed to recognize OTTI only if it was probable that future events would arise that would impair the assets and that the term "probable" is an accounting term of art that means the upper-end range of likelihood. Defendants Expert Supp.

at 15.  The Defendants maintain that probable is a fairly high standard and that, in a recent case involving the accounting treatment of uncertain future losses, the court granted a motion to reconsider and dismissed the plaintiff's complaint, because the plaintiff failed to satisfy the probable standard.  See Defendants Expert Supp. at 15-16 (citing In re SAIC, Inc. Sec. Litig., No. CIV 12-1353 DAB, 2014 WL 407050 (S.D.N.Y. Jan 30, 2014)).

The Defendants contend that the SEC's expert's OTTI opinions are irrelevant, because they are based on the likelihood of loss, which is less than the applicable probable standard.  See Defendants Expert Supp. at 16.  They assert that Kitchens bases his OTTI conclusion on Thornburg Mortgage's inability to control whether it had the ability to hold its assets and on the reasonable chance that it could have faced additional margin calls.  See Defendants Expert Supp. at 17.  The Defendants state that these two factors have no basis in GAAP and are less than the requisite probable standard.  See Defendants Expert Supp. at 17-18.  They assert that the Court should dismiss Weiner's conclusion that there was a strong possibility that Thornburg Mortgage would receive additional margin calls, because he is not an accounting expert.  See Defendants Expert Supp. at 18 n.8.  The Defendants address Mayer's opinion that Thornburg Mortgage should have anticipated a possibility that it would receive margin calls which it could not meet by arguing that Mayer does not have an OTTI opinion, but only an opinion on good business practices.  See Defendants Expert Supp. at 18-19.  The Defendants maintain that their subjective beliefs in the validity of Thornburg Mortgage's OTTI judgment are undisputed.  See Defendants Expert Supp. at 19-20.  They contend that the OTTI and ability-to-hold analyses were complex and difficult to make.  See Defendants Expert Supp. at 20.  The Defendants argue that Kitchens admitted that there were some positive factors supporting their OTTI judgment that he did not

consider in his report.  See Defendants Expert Supp. at 21 (citing In re Williams Sec. Litig., 496 F. Supp. 2d 1195, 1248 (N.D. Okla. 2007)).

The Defendants argue that the relative significance of objective OTTI factors can vary depending on the facts and circumstances.  See Defendants Expert Supp. at 21.  They contend that the fact that their experts and the SEC used the same factors to reach opposite conclusions concerning the reasonableness of Thornburg Mortgage's OTTI conclusion shows that reasonable minds, looking at the same information, can disagree about the appropriateness of the OTTI judgment.  See Defendants Expert Supp. at 22.  The Defendants address the SEC's argument that the I/O Strip Transactions worsened Thornburg Mortgage's liquidity by arguing that KPMG, Holder, and Weiner all view the transactions as a positive for the company.  See Defendants Expert Supp. at 22.  The Defendants assert that, while all three of the SEC's experts opined that Thornburg Mortgage's failure to timely meet margin calls was material or significant, all three experts conceded that it was not uncommon for repo lenders to work with borrowers and that is often in the lenders' best interest to not default borrowers.  See Defendants Expert Supp. at 23. The Defendants maintain that divergent views on OTTI were common during the financial crisis' turmoil and uncertainty.  See Defendants Expert Supp. at 23-24.  They contend that disagreement among professional accountants does not create a genuine dispute, but instead undermines the SEC's recklessness theory.  See Defendants Expert Supp. at 24 (citing In re IKON Office Solutions, Inc., 277 F.3d 658, 677 (3d Cir. 2002); Danis v. USN Commc'ns, Inc., 121 F. Supp. 2d 1183, 1195 (N.D. Ill. 2000)).  The Defendants assert that the SEC's experts cannot opine on their states of mind regarding Thornburg Mortgage's OTTI judgment.  See Defendants Expert Supp. at 24-25.

The Defendants maintain that the restatement does not establish that Thornburg Mortgage's OTTI judgment was unreasonable or fraudulent.  See Defendants Expert Supp. at 25. They state that the factual record and KPMG's workpapers show that the restatement had nothing to do with any allegedly withheld information.  See Defendants Expert Supp. at 25-26. The Defendants contend that Floyd concluded that KPMG's bases for withdrawing its audit opinion were flawed, because KPMG concluded that the post-filing margin calls were unforeseeable, because KPMG's consideration of events that occurred after the issuance of the 2007 Form 10-K was not a valid basis for restating the financial statements, and because accounting estimates based on new information should be recognized in the financial statements for the current period.  See Defendants Expert Supp. at 26.  The Defendants assert that a change in an accounting estimate based on new information is not an accounting error which requires a restatement.  See Defendants Expert Supp. at 26-27.  They state that, because a decision to issue a restatement is a judgment call, and because KPMG made the decision, and not the Defendants, the issuance of the restatement is not an admission by the Defendants that Thornburg Mortgage's OTTI decision was faulty.  See Defendants Expert Supp. at 27.

The Defendants argue that the restatement was based on post-filing events, and not on the misuse or concealment of pre-filing facts.  See Defendants Expert Supp. at 27.  They maintain that KPMG issued the restatement because of unforeseeable post-filing margin calls, because of a failure to accurately predict the magnitude and likelihood of the post-filing margin calls, and because -- with hindsight -- the OTTI conclusion was considered to be incorrect.  See Defendants Expert Supp. at 28.  The Defendants argue that the SEC and its experts are biased by hindsight, which market professionals did not have at the time.  See Defendants Expert Supp. at 28-31. They assert that James' opinions are based on a contemporaneous forecast and that he opines that

any conclusion that the post-filing margin calls were imminent is based on hindsight.   See Defendants Expert Supp. at 31.

The Defendants maintain that the SEC experts' opinions that KPMG was misled are at odds with the record and the applicable accounting standards.   See Defendants Expert Supp. at 31.   They assert that Floyd noted that the bulk of the allegedly withheld information was in KPMG's own workpapers and that the information in KPMG's possession was sufficient to make an informed OTTI judgment.   See Defendants Expert Supp. at 31-32.   The Defendants contend that Kitchens cannot opine about KPMG's awareness of relevant information, because Kitchens conceded that a lot of the allegedly withheld information was in KPMG's workpapers, that he could not say whether KPMG saw the information that had been made available to it, and that he had no basis to testify about KPMG's awareness of certain information.   See Defendants Expert Supp. at 32-33.   They state that Kitchens conceded that, before the 2007 Form 10-K filing, KPMG possessed information concerning: (i) the magnitude of the January and February, 2008, margin calls; (ii) Thornburg Mortgage's failure to timely meet margin calls; (iii) Thornburg Mortgage's liquidity position; and (iv) Thornburg Mortgage's use of I/O Strip Transaction proceeds to meet margin calls.   See Defendants Expert Supp. at 33.   The Defendants argue that Kitchens ignores relevant information that is in KPMG's workpapers, and, instead, focuses on Reinhart's and Hall's self-serving testimony.   See Defendants Expert Supp. at 34.

The Defendants state that Kitchens mischaracterizes the auditor's and management's roles during the audit process.   See Defendants Expert Supp. at 34.   They contend that Kitchens' belief that they should have ensured that Reinhart and Hall were personally aware of the allegedly withheld information ignores the applicable accounting and legal standards.   See Defendants Expert Supp. at 34-35.   The Defendants assert that Kitchens conceded that he could

not point to any standard which requires the Defendants to proactively and timely inform KPMG of information in which it may have been interested, and that he did not know what rule 13b2-2 says.  See Defendants Expert Supp. at 35.  Instead, the Defendants maintain that GAAS requires auditors to obtain and evaluate audit evidence.  See Defendants Expert Supp. at 35-36.

The Defendants maintain that they cannot be liable for omitting information that was available to KPMG.  See Defendants Expert Supp. at 36.  They argue that there is no accounting rule that would hold management accountable when an auditor fails to pick up specific information that is provided to it and contained in its own workpapers.  See Defendants Expert Supp. at 37.  The Defendants contend that auditors have a duty to exercise professional skepticism and to critically evaluate audit evidence, but that Kitchens testified that he did not see any evidence that KPMG critically evaluated the Margin Call Schedule.  See Defendants Expert Supp. at 37-38.  They argue that Kitchens' testimony that the purpose of the Margin Call Schedule is irrelevant to whether it was an adequate disclosure and Reinhart's testimony that the seniority of the audit team member to whom the schedule was provided is irrelevant contradicts Kitchens' testimony about the insufficiency of the schedule.  See Defendants Expert Supp. at 38.

The Defendants maintain that Kitchens' opinions about KPMG's no-fraud conclusion are not based on what KPMG knew at the time.  See Defendants Expert Supp. at 38.  They argue that Kitchens admitted that he did not analyze what KPMG knew at the time it made its opinion.  See Defendants Expert Supp. at 38.  They assert that Kitchens is unable to point to any evidence in his report of which KPMG was unaware during the restatement process when it made its no-fraud conclusion.  See Defendants Expert Supp. at 39.

10.     **The SEC's Expert Response.**

The SEC responded to the Defendants Expert Supp. on June 6, 2014.  See Plaintiff

Securities and Exchange Commission's Response to Defendants' Supplemental Brief Regarding

Experts in Further Support of Defendants' Motion for Summary Judgment, filed June 6, 2014

(Doc. 302)("SEC Expert Response").  The SEC contends that the Defendants Expert Supp. is an

ill-fated attempt to pass off responsibility for Thornburg Mortgage misstating its financial

statements by $427.8 million.  SEC Expert Response at 6.  The SEC states that the Defendants'

experts are offered solely to rebut its experts and that their critiques do not establish the absence

of disputed issues.  See SEC Expert Response at 6.  The SEC asserts that the Defendants Expert

Supp. ignores the general rule that summary judgment is inappropriate when expert testimony

supports the nonmoving party's case.  See SEC Expert Response at 6 (citing In re Scientific

Atlanta, Inc. Sec. Litig., 754 F. Supp. 2d 1339, 1363-64 (N.D. Ga. 2010)).

The SEC maintains that the Defendants' experts cannot save Thornburg Mortgage's

faulty OTTI determination.  See SEC Expert Response at 6.  According to the SEC, (i) Holder

opines only that the Defendants' judgment regarding OTTI was reasonable and not that

Thornburg Mortgage's OTTI determination was reasonable; (ii) Holder's opinion turns on the

OTTI rules' complexity, and on an opinion that the Defendants' OTTI determination was

objectively reasonable; and (iii) Holder reached his OTTI opinion only after excluding the

February, 2008, events.  See SEC Expert Response at 7.  The SEC also maintains that Laursen is

not a CPA and, therefore, is not qualified to testify to the reasonableness of the Defendants'

OTTI judgment.  See SEC Expert Response at 7.

The SEC contends that Kitchens correctly applied GAAP.  See SEC Expert Response

at 7.  In addressing the Defendants' assertion that the balance sheet date was December 31, 2007,

the SEC states that Type I subsequent events provide additional evidence of conditions that existed at the balance sheet date and that, when Thornburg Mortgage filed the 2007 Form 10-K, Thornburg Mortgage knew additional things about whether it had the ability to hold its impaired assets on December 31, 2007.  See SEC Expert Response at 8-9.  The SEC asserts that Kitchens' testimony is sufficient to raise a disputed issue of material fact and that Laursen agreed with Kitchens' understanding of how subsequent events affect OTTI determinations.  See SEC Expert Response at 9.  It maintains that the relevant accounting literature requires post-balance sheet events to be considered when making an OTTI analysis.  See SEC Expert Response at 9 10.  The SEC argues that the Defendants did not conclude that the February, 2008, margin calls were Type II events, because Goldstone did not know the difference between Type I and Type II events, because they considered the February, 2008, events in making the OTTI analysis, and because Starrett stated that they were purposely not telling KPMG about the margin calls.  See SEC Expert Response at 10-11.  The SEC states that the February, 2008, events were Type I events, as shown by Weiner's opinions, Laursen's testimony that the financial crisis started in 2007, and Goldstone's statements that, since August, 2007, there had been a series of steps down that included the February, 2008, events.  See SEC Expert Response at 11.  Concerning the Defendants' argument that summary judgment is proper because reasonable minds can differ about their OTTI judgment, the SEC argues that conflicting expert reports are a basis for denying summary judgment, and not for granting it.  See SEC Expert Response at 12 n.5.  It asserts that the Defendants mischaracterize Kitchens' testimony that KPMG's Type II conclusion may have been proper, because Kitchens qualified that testimony by stating that it was based on the information which KPMG knew at the time, which did not include information that the Defendants withheld.  See SEC Expert Response at 12 n.5.

The SEC maintains that Kitchens correctly applied the OTTI standards.  See SEC Expert Response at 12.  It contends that there are two ways to conclude that there is OTTI: (i) there is a credit impairment; or (ii) the borrower will not be able to hold the impaired asset until recovery.  See SEC Expert Response at 12-13.  The SEC asserts that the probable standard applies only to a credit-impairment OTTI determination.  See SEC Expert Response at 13.  It distinguishes In re SAIC, Inc. Securities Litigation by arguing that, there, the court concluded that granting the motion to reconsider was appropriate, because the defendant made a showing of exceptional circumstances that factual matters were misconstrued which related to whether the plaintiff had sufficiently pled its § 10(b) claim.  See SEC Expert Response at 13 n.7.  The SEC argues that SAB 59, which concerns the intent and ability to hold analysis, and which Holder recognized is authoritative guidance, does not once set forth a probable standard or another standard of likelihood.  See SEC Expert Response at 13-14.  The SEC states that Kitchens' testimony is based on years of experience and familiarity with the OTTI rules.  See SEC Expert Response at 14.  It contends that, even if a probable standard is a correct one, Kitchens' and Mayer's opinions are still relevant to whether it was probable that Thornburg Mortgage would sell its impaired assets, because there is no requirement that an expert parrot back a particular standard to be relevant.  See SEC Expert Response at 14.  The SEC asserts that it is irrelevant whether Thornburg Mortgage had complete control over its impaired assets, because, in February, 2008, Thornburg Mortgage had no control over its assets and was completely at its lenders' mercy.  See SEC Expert Response at 14.

According to the SEC, substantial evidence disputes the Defendants' alleged subjective belief in the validity of Thornburg Mortgage's OTTI conclusion.  See SEC Expert Response at 15.  The SEC maintains that the OTTI judgment was not overly complex and that any

complexity does not entitle the Defendants to summary judgment. See SEC Expert Response at 15. It contends that Kitchens, Laursen, and Holder all opine that OTTI determinations either have bright-line rules or set ranges of acceptable limits. See SEC Expert Response at 15-16. The SEC states that the Defendants mischaracterize Kitchens' testimony, because he testified that, while the I/O Strip Transactions raised short-term cash, they eliminated an ongoing cash source for future requirements, and because Kitchens testified that Thornburg Mortgage's repo lenders' ability to default it caused it to not have the ability to hold its assets. See SEC Expert Response at 16 n.10. The SEC asserts that violations of GAAP standards can provide evidence of scienter, especially when combined with evidence of the Defendants' knowledge or improper actions. See SEC Expert Response at 16-17 (citing In re Dauo Syst., Inc., 411 F.3d 1006, 1016 (9th Cir. 2005); SEC v. Lucent Tech., Inc., 610 F. Supp. 2d 342, 362-63 (D.N.J. 2009); In re IMAX Sec. Litig., 587 F. Supp. 2d 471, 482-83 (S.D.N.Y. 2008)). The SEC argues that the Defendants committed accounting violations and made improper disclosures, and that there is evidence that the Defendants knew about their violations. See SEC Expert Response at 17-18.

The SEC maintains that the experts' battle shows that there are disputed factual issues that remain for a jury to decide. See SEC Expert Response at 18. It contends that the Defendants ignore the general rule that summary judgment is inappropriate where expert testimony supports the non-moving party's case and that, in the securities fraud context, federal courts have rejected the Defendants' argument that, when there are competing experts, the SEC cannot show scienter. See SEC Expert Response at 18-19 (citing United States v. Kayne, 90 F.3d 7, 12 (1st Cir. 1996)).

The SEC argues that a jury should decide the issues surrounding the Defendants' subjective belief and scienter. See SEC Expert Response at 19. It states that scienter is often an

issue for the jury to decide and that its experts' opinions provide probative evidence that the Defendants' asserted subjective beliefs are implausible.  See SEC Expert Response at 19-20. The SEC asserts that subjective falsity can be proven by showing knowledge of facts that are contrary to the stated opinion.  See SEC Expert Response at 20 n.12 (citing IBEW Local 90 Pension Fund v. Deutsche Bank AG, No. CIV 11-4209 KBF, 2013 WL 1223844, at *14 (S.D.N.Y. Mar. 27, 2013); Abu Dhabi Commercial Bank v. Morgan Stanley & Co., 651 F. Supp. 2d 155, 178-79 (S.D.N.Y. 2009); Abu Dhabi Commercial Bank v. Morgan Stanley & Co., 888 F. Supp. 2d 431, 456-57 (S.D.N.Y. 2012)).  According to the SEC, parties routinely rely upon expert testimony to determine scienter, and an expert may draw conclusions about a person's intent, so long as he or she does not profess to know the defendants' intent.  See SEC Expert Response at 20-21 (citing CILP Assocs., L.P. v. Pricewaterhouse Cooper LLP, 735 F.3d 114, 127 (2d Cir. 2013); United States v. Schneider, 704 F.3d 1287, 1294 (10th Cir. 2013)).

The SEC asserts that, in the Defendants Expert Supp., the Defendants acknowledge that the restatement reflects the correction of an error.  See SEC Expert Response at 21.  It states that, at this point in the case, it does not need to establish that Thornburg Mortgage's OTTI judgment was unreasonable or fraudulent, but only needs to create a material issue of fact, of which the restatement is probative.  See SEC Expert Response at 21.  The SEC contends that Floyd and Kitchens agree that a restatement is the process of revising a previously issued financial statement to correct an error and that the error in this case is that the 2007 Form 10-K stated that $427.8 million in Purchased ARM Assets were not OTTI.  See SEC Expert Response at 21-22. The SEC argues that the restatement corrected an error even if the decision to restate required the exercise of judgment.  See SEC Expert Response at 21-22.  It maintains that, because the restatement showed that the 2007 Form 10-K was wrong, and because the Defendants

acknowledged this error by signing off on the restatement, the restatement precludes awarding the Defendants summary judgment.  See SEC Expert Response at 22.  The SEC argues that the restatement was not done as a result of post-filing events, because, by filing the restatement, the Defendants acknowledged that the 2007 Form 10-K was incorrect, and because the post-filing events merely alerted KPMG to look back at what Thornburg Mortgage knew about liquidity and margin calls on the morning of February 28, 2008.  See SEC Expert Response at 22-24.

The SEC maintains that the Defendants' assertions that the SEC's experts suffer from hindsight bias are irrelevant.  See SEC Expert Response at 24.  It contends that it does not have the burden to prove anything to avoid summary judgment and that its experts tend to show that the Defendants were reckless, because Thornburg Mortgage's repo agreements gave its lenders the right to sell its assets, and because the increased margin calls decreased its liquidity and its ability to pay future margin calls.  See SEC Expert Response at 24-25.

The SEC argues that the Defendants mischaracterize and misstate Kitchens' testimony. See SEC Expert Response at 25.  It asserts that Kitchens did not disregard KPMG's workpapers. See SEC Expert Response at 26.  The SEC contends that the audit engagement letter creates an affirmative obligation that required the Defendants to provide KPMG with material disclosures. See SEC Expert Response at 26-27.  According to the SEC, that KPMG could have divined some information from the Margin Call Schedule does not make Kitchens' opinions irrelevant.  See SEC Expert Response at 27.  The SEC maintains that Kitchens testified that there is still a significant amount of information that could not be divined from the workpapers.  See SEC Expert Response at 27.  It contends that the Defendants mischaracterize Kitchens' testimony about KPMG's access to information by trying to say that KPMG was aware of information that had not been provided to it or that had been withheld from it.  See SEC Expert Response at 28.

The SEC states that Kitchens' experience as an auditor and KPMG's engagement letter support his opinions that the Defendants should have been more forthcoming with information about margin calls and liquidity.  See SEC Expert Response at 28.  The SEC analogizes the Defendants' argument that KPMG should have seen through their deception and discovered uncovered the information to "a cheating husband arguing that the affair is his wife's fault because she could have noticed the lipstick stains on his collar and the Tiffany & Co. charges on his Mastercard."  SEC Expert Response at 28.  The SEC asserts that, during an audit, the client may have a duty to proactively communicate information, even if rule 13b2-2 does not require it. See SEC Expert Response at 29.  The SEC contends that Kitchens is the only expert with a lot of audit experience, that an auditor expects significant information to be brought to its attention, and that Floyd agrees that management has a duty to be honest and forthright with auditors.  See SEC Expert Response at 29.

The SEC maintains that Kitchens' opinion that he might not have determined that Thornburg Mortgage did not commit fraud is reliable and appropriate.  See SEC Expert Response at 29.  It argues that Kitchens identified various pieces of information which the Defendants withheld from KPMG, which supports the SEC's contention that KPMG lacked important pieces of evidence when it made its no-fraud finding.  See SEC Expert Response at 29-30.  The SEC contends that KPMG concluded only that the material misstatements in the 2007 Form 10-K was not a product of fraud and not that there was no evidence of fraud.  See SEC Expert Response at 30 n.19.

**11.    The Hearings.**

The Court held hearings on June 26, 2014; June 27, 2014; August 12, 2014; and August 13, 2014.  See Transcript of Hearing (taken June 26, 2014), filed July 23, 2014 (Doc. 321);

Transcript of Hearing (taken June 27, 2014), filed July 23, 2014 (Doc. 322); Transcript of Hearing (taken Aug. 12, 2014), filed August 28, 2014 (Doc. 334); Transcript of Hearing (taken Aug. 13, 2014), filed August 28, 2014 (Doc. 335)(collectively "Tr.").[308]  The parties agreed to start the hearing by discussing the Goldstone MSJ, but the Defendants wanted to first discuss the SEC's auditor deception claim before addressing the OTTI claim, while the SEC wished to conduct the hearing in the reverse order.  See Tr. at 5:1-7:18 (McKenna, Lee, Marks, Court). The Court decided that it made more sense to address the OTTI claims first and the auditor-deception claims second, which was the order in which the parties briefed the issues. See Tr. at 7:19-8:20 (Lee, Court).

The Court told the parties that the motions for summary judgment read like motions to reconsider the MOO, so it wanted the parties to tell it why it got the MOO wrong and what new information they uncovered through discovery that was different than the Complaint's allegations.  See Tr. at 10:11-11:8 (Court).  The Defendants asserted that discovery uncovered a lot of evidence showing that KPMG was fully informed of all relevant information and that Thornburg Mortgage's OTTI judgment was reasonable and that the facts fully supported its decision.  See Tr. at 11:13-14:8 (Lee).  They argued that the SEC fails to present any concrete evidence to dispute their motions for summary judgment, other than the SEC's own speculation about the meaning of certain electronic mail transmissions and experts who merely parrot the SEC's positions.  See Tr. at 14:15-17:1 (Lee).

---

[308]When citing to the Tr., the Court will use the black page numbers that the Court Reporter places on the upper right-hand corner of each page and not the blue page numbers that the CM/ECF system places at the top of each page.  Additionally, even though the Tr. is spread over four volumes -- a separate volume for each day of the hearing -- the page numbering of each volume is a continuation of the page numbering from the previous document.

a.       **Objective Falsity.**

The Defendants repeated its facts from the briefs -- that the market experienced a substantial disruption in August, 2007; that Thornburg Mortgage recovered and came out in a stronger financial position; that KPMG did not require Thornburg Mortgage to recognize OTTI in that quarter of 2007; that the market took a sudden downturn in February, 2008; that Thornburg Mortgage paid margin calls over several days; and that KPMG was fully aware of Thornburg Mortgage's liquidity challenges.  See Tr. at 17:21-18:19 (Lee).  The Defendants asserted that Thornburg Mortgage and KPMG did not believe that the margin calls affected the financial filings, and that Thornburg Mortgage's management believed that, by February 27, 2008, when Thornburg Mortgage had paid off its margin calls, the market distress had concluded.  See Tr. at 18:20-19:24 (Lee).  They said that the 2007 Form 10-K filing triggered massive margin calls which, over three days, exceeded Thornburg Mortgage's total margin calls from January and February, 2008, which it could not pay, and which were unprecedented and unforeseeable.  See Tr. at 20:2-17 (Lee).  The Defendants maintained that KPMG went into crisis mode, withdrew its audit opinion, conducted an exhaustive investigation -- during with it had unrestricted access to Thornburg Mortgage's electronic mail transmission -- but concluded that there was not fraud, that events which occurred after the 2007 Form 10-K filing triggered the restatement, and that Thornburg Mortgage and KPMG made a good faith and difficult OTTI determination in the first instance.  See Tr. at 20:18-21:21 (Lee).  The Defendants argued that the SEC began an investigation and coerced KPMG's auditors into cooperating with it to avoid prosecution.  See Tr. at 21:22-25:2 (Lee).

The Defendants clarified that they did not intend the motions for summary judgment to be motions for reconsideration, but instead discovery revealed a fuller record which the Court

did not have at the motion-to-dismiss stage.  See Tr. at 40:9-42:6 (Lee, Court).  The Defendants

explained that the 2007 Form 10-K's balance sheet date is December 31, 2007, and explained the

difference between Type I and Type II subsequent events.  See Tr. at 42:12-48:4 (Lee, Court).

They stated that Thornburg Mortgage and KPMG reasonably determined that the February,

2008, events were Type II events, and that the SEC has not presented any evidence showing that

their determination was unreasonable.  See Tr. at 48:18-49:14 (Lee).

In response to the Court's questioning whether the original OTTI was correct or whether

the restatement was correct, the Defendants stated that, while they believe that the restatement

was unnecessary, because OTTI is based on a judgment that has an opinion basis, the original

OTTI determination and the restatement were both reasonable.  See Tr. at 49:15-52:20 (Lee,

Court).  The Defendants refused to characterize an OTTI judgment as accurate or correct,

because it requires a judgment decision, but they maintained that an OTTI determination may be

actionable if there is both objective and subjective falsity.  See Tr. at 52:21-56:7 (Lee, Court).

The Defendants explained KPMG's hierarchical structure for the Thornburg Mortgage audit,

including the location of its auditors.  See Tr. at 57:2-64:3 (McKenna, Lee, Marks, Court).  Of

importance, the Defendants asserted that Baucom, whom the SEC contends Thornburg Mortgage

gave the Margin Call Schedule, was a manager and not a junior auditor.  See Tr. at 57:22-58:2

(Lee).  The Defendants argued that there was not a single person at Thornburg Mortgage who

was providing information to KPMG, that there was not a single person at KPMG who was

receiving information, and that there was a free flow of information between Thornburg

Mortgage and KPMG throughout the audit process.  See Tr. at 64:14-66:18 (Lee).

The Defendants asserted that the Feb. 28, 2008, Taylor Email and Taylor's deposition

make clear that Taylor concluded that the February, 2008, events were Type II events.  See Tr. at

66:19-68:20 (Lee, Court).   They argued that no KPMG witness testified that the allegedly withheld information would have made a difference and that, if KPMG knew all available information, it would not have changed its conclusions.   See Tr. at 68:22-71:10 (Lee, Court). The Defendants maintained that, if the Court found that Thornburg Mortgage's Type II determination was reasonable, it should grant them summary judgment on the OTTI issue, because the February, 2008, events did not affect the OTTI conclusion for December 31, 2007, but that, even if the Court determines that the events were Type I, their OTTI conclusion was still reasonable.   See Tr. at 71:11-76:5 (Lee, McKenna, Court).

According to the Defendants, for OTTI, GAAP provides for a range of reasonable alternatives and does not require a financial statement to be reported with mathematical precision.   See Tr. at 76:9-19 (Lee); id. at 77:22-78:10 (Lee).   The Defendants stated that GAAP provides little guidance on OTTI, but that KPMG's witnesses testified to the analysis' complexity and subjectivity.   See Tr. at 78:11-80:10 (Lee, Court).   The Court asked the Defendants why the February, 2008, events' riskiness and unpredictability did not make them Type I events, and the Defendants responded by arguing that, in 2008, they did not know that the crisis would hit like it did; that the August, 2007, events were based on sub-prime issues, while the February, 2008, events affected the Alt-A market; the concern about the market's condition does not automatically make an event Type I; and that they and KPMG had a reasonable, good-faith basis for concluding that the events were Type II.   See Tr. at 80:24-83:7 (Lee, Court).   The Defendants argued that summary judgment is appropriate on their Type II determination, because they have presented evidence that their Type II determination was reasonable -- including KPMG witness testimony and documents showing the difficulty of predicting the

market conditions and future -- while the SEC has not presented any evidence to the contrary, at least not in the form of percipient witness testimony.  See Tr. at 83:12-93:17.

The Defendants contended that, during the relevant time period, the SEC's and FASB's guidance was complicated and difficult to apply, and that, during that time, a lot of people were seeking guidance on how to apply OTTI.  See Tr. 93:18-103:14 (Lee, McKenna, Court).  The Court asked the Defendants how many of the documents they submit to show the difficulties of applying an OTTI analysis are admissible, and the Defendants argued that the documents are either business records, or are submitted to show the state of the market and not the truth of the matters asserted.  See Tr. at 103:15-105:21 (Lee, Court).  The Defendants contended that the correct standard for an OTTI determination is whether it is probable that Thornburg Mortgage would not be able to hold its assets, and they maintained that the post-filing margin calls were not probable.  See Tr. at 106:16-109:4 (Lee, Court).  They asserted that changes in the estimated fair values of credit markets normally do not require adjustment of the prior period's financial statements.  See Tr. at 109:29-110:32 (Lee).

The Defendants repeated several arguments from the briefing: that Thornburg Mortgage's Purchased ARM assets had not been downgraded; that Thornburg Mortgage recovered from the August, 2007, events; that Thornburg Mortgage fully disclosed its impairments and reasoning for its impairments in the 2007 Form 10-K; and that the SEC cannot show that Thornburg Mortgage's OTTI opinion was inconsistent with known facts.  See Tr. at 112:19-117:7 (Lee, Court).  According to the Defendants, Thornburg Mortgage worked informally with its lenders to satisfy margin calls and that, as long as Thornburg Mortgage was willing to work with them, the lenders would not default it.  See Tr. at 117:8-125:10 (Lee).  The Defendants asserted that, when Thornburg Mortgage filed the 2007 Form 10-K, it had $150 million in liquidity.  See Tr. at

125:17-128:25 (Lee, Court).   The Defendants argued that the I/O Strip Transactions created liquidity, that they were a positive factor, and that Thornburg Mortgage had the ability to quickly raise capital.   See Tr. at 129:1-136:12 (Lee).   The Defendants maintained that the post-filing margin calls were unforeseeable.   See Tr. at 136:13-145:16 (Lee, Court).

Concerning the hedge-fund rumor, the Defendants argued that rumor was not material, because it was vague and it did not contain information about the anticipated impact that it might have on Thornburg Mortgage.   See Tr. at 145:17-146:20 (Lee).   The Defendants contended that, while haircuts affect Thornburg Mortgage's liquidity, they affect liquidity over time, rather than immediately, and they require Thornburg Mortgage only to pledge more collateral rather than paying additional margin calls.   See Tr. at 148:1-154:8 (Lee, Court); id. at 155:19-159:21 (Lee, Court).   The Defendants argued that the SEC never alleged its haircut theory in the Complaint, and the Court said that their argument is like "slicing [the baloney] a little thin," because the Complaint should allege claims and not individualized theories to support the claims.   Tr. at 162:8-25 (Lee, Court).

The Defendants agreed with the Court that the case's principal issue is whether Thornburg Mortgage could meet its future margin calls, but they maintained that there are not factors which are inconsistent with their determination, which would indicate that their decision was wrong.   See Tr. at 163:22-165:16 (Lee, Court).   The Defendants said:

> The issue here is -- I mean, no question, the principal issue in this case is the SEC's allegation that, essentially, they did not have a reasonable basis for the determination they would be able to pay margin calls in the future.   And the undisputed evidence shows that they had -- that there is no necessary inconsistency.   Look, maybe they messed up.   Okay, they may have made the wrong judgment.   They ended up getting hit with a huge volume of margin calls. That is -- it's clear.

> The legal standard, though, is the SEC has to show that the factors were necessarily inconsistent with their opinion that they could hold those assets into the future.

Tr. at 165:3-16 (Lee).  The Defendants refused to concede that the margin calls immediately after the 2007 Form 10-K filing is evidence that, or relevant to whether, the OTTI determination was incorrect, because the 2007 Form 10-K filing triggered the margin calls, because the margin calls were essentially a panic in the market, because markets behave unpredictably all the time, and because the 2007 Form 10-K did not include Thornburg Mortgage's securitization plans, which would have better informed repo lenders of Thornburg Mortgage's financial position.  See Tr. at 165:17-177:9 (Lee, Court).  The Defendants asserted that other market participants referred to the hedge-fund rumor as a rumor.  See Tr. 177:11-181:11 (Kasper, McKenna, Lee, Court).

The Defendants explained the restatement process, how it came to be, and that more senior KPMG employees conducted the restatement.  See Tr. at 184:13-186:14 (Lee, Court). The Court asked the Defendants why the KPMG auditors' poor reviews are not evidence that the OTTI conclusion was wrong, and the Defendants argued that, during the restatement, KPMG had the benefit of hindsight and that the restatement was based on events that occurred after the 2007 Form-10K filing.  See Tr. at 187:3-196:16 (Lee, Court).

The SEC asserted that the Defendants failed to point out anything which the Court got wrong in the MOO.  See Tr. at 25:22-26:1 (McKenna).  Concerning the Margin Call Schedule, the SEC argued that Thornburg Mortgage -- likely through Coltharp -- gave Baucom -- a low-level KPMG employee -- the Margin Call Schedule on the afternoon of February 27, 2008.  See Tr. at 26:5-10 (McKenna).  The SEC maintained that Goldstone and Simmons never saw the document, that Starrett may have seen it, that Reinhart saw it, but only the first page, which does

not state why Thornburg Mortgage paid the margin calls over time.  See Tr. at 26:11-18 (McKenna).

The SEC argued that the Defendants bear the burden at the summary-judgment stage, and it is a high burden when scienter issues are involved and when experts support the nonmovant's claims.  See Tr. at 26:25-27:10 (McKenna).  The SEC said that, after discovery, the evidence bore out similarly to what the Complaint alleged.  See Tr. at 27:11-29:5 (McKenna).  Concerning the Defendants' argument that the SEC coerced the KPMG auditors, the SEC stated that the Defendants have not presented any evidence of coercion.  See Tr. at 29:6-13 (McKenna).  The SEC maintained that there are hundreds or thousands of disputed facts in the case, including whether a reservation-of-rights letter has a financial consequence, whether Thornburg Mortgage should have disclosed the reservation-of-rights letter to KPMG, whether Thornburg Mortgage timely paid the Credit Suisse margin calls from February, 2008, whether Thornburg Mortgage reached agreements with its lenders to pay the margin calls over time, whether Goldstone and Simmons received the Citigroup Global reservation-of-rights letter, whether Thornburg Mortgage considered selling assets to meet margin calls, and whether the Defendants were willing to disclose Thornburg Mortgage's inability to meet margin calls.  See Tr. at 30:19-36:21 (Bliss).  According to the SEC, even though Womack initially testified that he did not learn any facts that made him question KPMG's no-fraud conclusion, after being shown certain electronic mail transmissions, he testified that the new evidence called into question his original conclusions.  See Tr. at 36:22-38:16 (Bliss).

The SEC asserted that, including the Court in its prior MOO, four courts have addressed OTTI and that, in MHC Mutual Conversion Fund, L.P. v. United W. Bancorp, Inc., the Honorable Wiley T. Daniel, Chief United States District Judge for the District of Colorado, held

that OTTI is a subjective judgment.  See Tr. at 201:24-202:15 (McKenna, Court)(citing MHC Mut. Conversion Fund, L.P. v. United W. Bancorp, Inc., 913 F. Supp. 2d 1026); id. at 203:9-205:3 (McKenna, Court); id. at 257:9-260:3 (citing N. Port Firefighters' Pension -- Local Option Plain v. Temple-Inland, Inc., 936 F. Supp. 2d 722 (N.D. Tex. 2013); In re Moneygram Int'l, Inc. Sec. Litig., 626 F. Supp. 947 (D. Minn. 2009)).  Concerning the Type II determination, the SEC argued that, if the Defendants concluded that the February, 2008, events were Type II subsequent events, they would not have worried about the events in making their OTTI determination, which is not what they did.  See Tr. at 205:22-206:8 (McKenna); id. at 208:13-210:2 (McKenna, Court).  The SEC agreed with the Court that, as of February 15, 2008, the OTTI conclusion was probably correct, so the SEC must show that, from February 15, 2008, to February 28, 2008, something happened that made the conclusion unreasonable.  See Tr. at 210:3-212:8 (McKenna, Court).

The SEC maintained that, while KPMG considered the Type I/Type II issue, the 2310 Bond Memo. is the only Type I/Type II analysis that Thornburg Mortgage did.  See Tr. at 213:18-217:19 (McKenna, Court).  According to the SEC, there is a lot of evidence indicating that the February, 2008, events were Type I events, including expert testimony and Goldstone's testimony that they were a continuation of the August, 2007, market disruptions.  See Tr. at 217:20-219:11 (McKenna); id. at 221:18-222:13 (McKenna, Court).  Addressing the Defendants' argument that the August, 2007, events concerned subprime issues, while February, 2008, concerned Alt-A assets, the SEC argued that Alt-A MBS were downgraded in 2007.  See Tr. at 219:12-221:8 (McKenna, Court).  According to the SEC, Thornburg Mortgage's position took a turn for the worse on February 21, 2008, when it was unable to timely pay its margin calls.  See Tr. at 224:21-226:22 (McKenna, Court).  The SEC asserted that the post-filing margin calls were

not unprecedented, because Thornburg Mortgage received similar-sized margin calls in August, 2007.  See Tr. at 226:23-228:4 (McKenna, Court).  The SEC argued that the evidence supports the Complaint's allegations that the Court considered in the MOO, and it repeated its arguments on objective falsity from the briefing concerning Thornburg Mortgage's inability to timely meet margin calls, the I/O Strip Transactions, Thornburg Mortgage's difficulty in meeting margin calls, and the hedge-fund rumor.  See Tr. at 230:16-237:1 (McKenna, Court); id. at 239:9-252:7 (McKenna, Court); id. at 260:13-264:9 (McKenna, Court).  The SEC asserted that the Defendants' own expert testified that a restatement is evidence of an error.  See Tr. at 264:10-265:24 (McKenna); id. at 266:20-267:17 (McKenna, Court)

The SEC addressed the Defendants' arguments about haircuts by stating that haircuts could trigger immediate margin calls.  See Tr. at 237:2-239:7 (McKenna, Court).  For its rule 10(b) claim, the SEC asserted that the Court should apply a preponderance-of-the-evidence standard, rather than a clear-and-convincing evidence standard.  See Tr. at 255:16-256:13 (Bliss, Court)(citing SEC v. St. Anselm Exploration Co., 936 F. Supp. 2d 1281 (D. Colo. 2013)).  The SEC said that, if the correct standard of proof at trial is clear-and-convincing evidence, it should also apply at the summary-judgment stage.  See Tr. at 256:14-257:7 (Bliss, Court).  The SEC argued that Thornburg Mortgage's OTTI determination was material, because it would have been important information that its investors would have wanted to know.  See Tr. at 269:15-272:14 (McKenna, Court).

Addressing the Defendants' argument that KPMG concluded that the post-filing margin calls were unforeseeable, the SEC argued that KPMG did not see the Feb. 27, 2008, Hedge Fund Email.  See Tr. at 272:21-273:12 (McKenna).  Concerning the probability standard, the SEC asserted that SFAS 115 shows that the probability standard applies to credit-impairment OTTI,

while SAB 59, which discusses the intent-and-ability-to-hold analysis, does not provide a probability standard.  See Tr. at 273:13-275:18 (McKenna).  The SEC stated that the Defendants conflate the credit-impairment and intent-and-ability-to-hold OTTI analyses.   See Tr. at 276:11-278:12 (McKenna).   It maintained that Thornburg Mortgage had around forty-million dollars in cash on February 27, 2008.  See Tr. at 278:13-280:5 (McKenna).  Concerning the I/O Strip Transactions, the SEC argued that KPMG considered them to be a positive factor, because Thornburg Mortgage represented that they were being conducted for reasons other than immediate liquidity needs.  See Tr. at 280:6-281:14 (McKenna).

The SEC contended that Thornburg Mortgage's planned securitization would have raised only sixty million dollars, which is a fraction of the over one-billion dollars in margin calls that Thornburg Mortgage received after the 2007 Form 10-K filing, and that the securitization was completed in a manner that substantially diluted Thornburg Mortgage's existing shareholders. See Tr. at 281:15-283:11 (McKenna, Lee).  The SEC addressed the Defendants' argument that the market reaction to the 2007 Form 10-K filing is not evidence of objective falsity, because the market was unaware of Thornburg Mortgage's equity raising and securitization plans, by arguing that the market reaction was lenders issuing margin calls and one of Thornburg Mortgage's lenders, UBS, knew either about Thornburg Mortgage's equity raise or about its securitization plans.  See Tr. at 283:12-284:16 (McKenna, Court).  The SEC maintained that the Court should grant it summary judgment on the objective falsity issue, because of the margin calls that Thornburg Mortgage received, and because it lacked the liquidity to meet them.  See Tr. at 285:5-286:15 (McKenna, Court).

On objective falsity, the Defendants maintained that the SEC relies on attorney argument about the interpretation of certain documents without presenting the testimony of any percipient

witnesses, which the Defendants assert the SEC has in almost every similar case; they conceded, however, that the Court may still look at the electronic mail transmissions and documents to discern their meaning.  See Tr. at 288:1-293:1 (McKenna, Lee, Court).  The Defendants asserted that the objective falsity standard requires the SEC to show that the facts are necessarily inconsistent with Thornburg Mortgage's OTTI determination, which the Defendants say it cannot be because its argument is merely that the Defendants did not give certain factors sufficient weight.  See Tr. at 293:4-301:18 (Lee, Court); id. at 303:13-304:8 (Lee); id. at 328:16-330:13 (Lee, Court).  The Defendants stated that, even if the Court does not adopt the necessarily inconsistent standard, case law stills requires a dramatic disparity between the facts that management knows and the opinions that management expresses.  See Tr. at 326:2-8 (Lee). The Court asked the Defendants why they are not relying on their experts for their summary judgment motions, and they said that they do not believe that experts are necessary for the Court to rule in their favor.  See Tr. at 301:22-303:12 (Lee, Court).  They maintained that the SEC's concession -- that, if the 2007 Form 10-K had been filed on February 15, 2008, there would not have been OTTI -- shows that the events were Type II events and that the SEC has not demonstrated that Thornburg Mortgage's Type II conclusion was unreasonable.  See Tr. at 304:9-311:24 (Lee, Court).  Because of the OTTI determination's opinion nature, the Defendants stated that the SEC cannot show that their determination was objectively false.  See Tr. at 310:25-313:11 (Lee, Court).

According to the Defendants, in August, 2007, Thornburg Mortgage did not recognize OTTI, because it sold its assets, which meant it recognized a loss.  See Tr. at 313:22-314:17 (Lee).  They said that the restatement is not evidence of objective falsity, because it was based on unforeseeable events that occurred after the 2007 Form 10-K filing.  See Tr. at 314:18-324:25

(Lee, Court).  The Defendants asserted that, in In re Fannie Mae 2008 Securities Litigation, 742 F. Supp. 2d 382 (S.D.N.Y. 2010), the Honorable Paul A. Crotty, United States District Judge for the Southern District of New York, dismissed the plaintiffs' OTTI claims, because they relied on hindsight.  See Tr. at 325:1-326:1 (Lee, Court).  The Defendants stated that they have not found any cases within the Tenth Circuit requiring a burden of proof that is higher than preponderance of the evidence.  See Tr. at 326:19-327:1 (Lee, Court).

For its cross-motion on objective unreasonableness, the SEC asserted that it is not comfortable with the Court using a necessarily inconsistent standard from In re Credit Suisse Boston Corp., because that case concerns mergers and because OTTI is not an opinion; according to the SEC, OTTI is a judgment, which GAAP treats differently than it does opinions.  See Tr. at 330:22-333:23 (McKenna, Court).  The SEC stated that the Court should use the standard whether the OTTI conclusion was objectively false, which it said is whether the Defendants' conduct was an extreme departure from the standard of ordinary care.  See Tr. at 333:24-336:12 (McKenna, Court).  The Court asked the SEC to put forth its best evidence for why the Court should not present the objective falsity issue to the jury, and the SEC said that the restatement correcting the OTTI conclusion is its best evidence.  See Tr. at 338:7-22 (McKenna, Court).  The SEC asserted that the only way that the Court could be required to present the objective falsity issue to the jury would be if the Court believed that the restatement was based on post-filing events, which the SEC maintains did not happen.  See Tr. at 332:23-349:20 (McKenna, Court).

The SEC said that it disagrees with the Defendants' classification of the hedge-fund rumor as a Type II event.  See Tr. at 349:23-350:7 (McKenna).  It contended that the restatement does not focus on the Type I/Type II distinction, because it would be disingenuous to say that

- 464 -

Thornburg Mortgage had the ability to hold its assets after it lost them.  See Tr. at 350:8-351:21 (McKenna, Court).  The SEC addressed the Defendants' argument that the restatement was an exception to how restatements are normally conducted by stating that the restatement was not an exception and that it was based on information that was known pre-filing.  See Tr. at 353:5-354:24 (McKenna, Court).

The Court informed the parties that, on the objective falsity issue, it was inclined to deny the Defendants' summary judgment motions and the SEC's cross-motion, and to permit the issue to go to the jury.  See Tr. at 355:5-357:18 (Court).  The Court also told the parties that it was inclined to grant summary judgment in favor of the SEC on the issue of whether the OTTI determination was material.  See Tr. at 948:9-12 (Court).

### b.      Subjective Falsity.

For subjective falsity, the Defendants argued that the SEC must show actual disbelief and not just recklessness.   See Tr. at 358:22-359:7 (Lee).   They maintained that an OTTI determination is the expression of an opinion, which is similar to valuing assets, because it concerns the assets' future value.  See Tr. at 359:8-363:5 (Lee, Court).  The Defendants asserted that subjective falsity in opinion cases is a higher standard than scienter, because it requires actual disbelief.  See Tr. at 363:7-367:8 (citing In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig., 757 F. Supp. 2d at 260).  The Defendants repeated its arguments that the SEC's claims are based on speculation and lack corroborating evidence, while the Defendants have presented concrete evidence and testimony to support their position, specifically, evidence showing that the Defendants acted in good faith and attempted to provide full disclosures.   See Tr. at 367:22-377:4 (Lee, Court); id. at 387:9-390:5 (Lee); id. at 390:21-396:24 (Lee).  They argued that Thornburg Mortgage delayed the securitization, so that it would not have conflicting public

filings and not so that it could conceal its margin-call issues. See Tr. at 377:5-378:7 (Lee, Court); id. at 382:20-383:19 (Lee). The Defendants repeated their arguments that Thornburg Mortgage's future capital-raising prospects support their subjective beliefs. See Tr. at 382:20-385:25 (Lee, Court); id. at 390:6-392:20 (Lee).

The Defendants addressed the SEC's argument that the planned securitization would result in only sixty-million dollars and that it was essentially a fire sale by arguing that the SEC was talking about something different, because, after the market reacted to the 2007 Form 10-K, the capital transactions were different and the terms of the securitization deal became different, which does not bear on the reasonableness of the pre-filing securitization plan. See Tr. at 378:8-379:23 (Court, Lee). The Defendants agreed with the Court that an important factor in delaying the securitization was so that Thornburg Mortgage could truthfully represent that it had paid all of its margin calls. See Tr. at 386:1-20 (Lee, Court).

The Defendants addressed the February 25, 2008, Goldstone KPMG Email by arguing that it shows that the Defendants were willing to issue whatever OTTI judgment KPMG thought appropriate, which shows good faith. See Tr. at 398:13-408:2 (Lee, Court). Concerning Starrett's purposely-not-told statement, the Defendants stated that KPMG was aware of the magnitude of margin calls that Thornburg Mortgage received and that Thornburg Mortgage was paying them over several days, and that Starrett's statement concerned the hypothetical situation in which Thornburg Mortgage was unable to carry out its plan to meet the margin calls and what the valuations would be if Thornburg Mortgage were forced to sell its assets. See Tr. at 408:3-415:1 (Marks, Court); id. at 417:22-420:2 (Marks, Court).

According to the Defendants, Hall noticed that Thornburg Mortgage's liquidity had decreased, and, when she asked Thornburg Mortgage about the decrease, she was told that

Thornburg Mortgage had to pay a large number of substantial margin calls in a short period of time.  <u>See</u> Tr. at 415:2-13 (Marks).  The Defendants asserted that Hall requested a schedule listing all of the margin calls, and, on February 27, 2008, someone at Thornburg Mortgage provided her with the Margin Call Schedule, which showed that Thornburg Mortgage paid the margin calls over time.  <u>See</u> Tr. at 415:14-416:5 (Marks); <u>id.</u> at 427:25-428:13 (Marks, Court).  They maintained that KPMG was not concerned about the untimely paid margin calls, because Thornburg Mortgage was able to satisfy all of them before the 2007 Form 10-K was filed.  <u>See</u> Tr. at 416:10-417:2 (Marks); <u>id.</u> at 420:14-422:24 (Marks, Court).  The Defendants contended that, because Goldstone is not an accountant, it was normal for him to seek accounting advice; that there is no evidence that Simmons read the February 25, 2008, Goldstone KPMG Email; and that they did not think the electronic mail transmission affected OTTI.  <u>See</u> Tr. at 423:8-424:19 (Lee, Court).  The Defendants argued that there is no evidence of a motive.  <u>See</u> Tr. at 424:20-425:22 (Lee).  They also argued that, during the restatement, KPMG concluded that there were no management integrity or fraud issues.  <u>See</u> Tr. at 426:4-427:427:23 (Lee).

The SEC asserted that, at the summary-judgment stage, it does not need to affirmatively prove its case and that scienter is an issue for the jury to decide.  <u>See</u> Tr. at 428:24-429:21 (McKenna)(citing <u>SEC v. Lucent Tech., Inc.</u>, 610 F. Supp. 2d at 362).  The SEC maintained that, for subjective falsity, the Court should use a reckless standard.  <u>See</u> Tr. at 430:1-434:4 (McKenna, Court)(citing <u>In re CIT Group, Inc. Sec. Litig.</u>, 349 F. Supp. 2d 685 (S.D.N.Y. 2012)).  According to the SEC, the evidence supports the factors on which the Court relied in the MOO to find a valid subjective falsity claim.  <u>See</u> Tr. at 434:23-439:3 (McKenna).  The SEC said that there is no evidence that Thornburg Mortgage gave KPMG the Citigroup Global reservation-of-rights letter.  <u>See</u> Tr. at 436:6-22 (McKenna, Court).  It maintained that the

Defendants' refusal to disclose Thornburg Mortgage's margin-call situation is evidence of subjective falsity and scienter.  See Tr. at 439:4-446:12 (McKenna, Court).  According to the SEC, the Defendants withheld from KPMG information showing that Thornburg Mortgage had to pay its margin calls over time, which was a big deal, because its lenders could declare default.  See Tr. at 446:13-450:7 (McKenna, Lee, Court).

The Court told the SEC that the standard of proof is important, because it is easier to find recklessness than actual disbelief, and the SEC responded by arguing that circumstantial evidence can undermine the Defendants' asserted actual belief.  See Tr. at 450:8-451:11 (McKenna, Court).  The SEC asserted that it was so important for Thornburg Mortgage to not recognize any OTTI, because, under its warehouse lending agreements, if Thornburg Mortgage was not profitable, it was in breach of those agreements.  See Tr. at 451:18-454:20 (McKenna, Court).  The SEC stated that, despite the Defendants' contentions that they wanted to fully disclose, they took measures to not disclose that they had trouble paying margin calls and that they had to pay margin calls over time, which is evidence of subjective falsity.  See Tr. at 454:21-462:19 (McKenna, Court); id. at 463:18-464:22 (McKenna, Court).  According to the SEC, the Feb. 26, 2008, Updated 10-K Draft Email shows that the Defendants did not want to tell KPMG about Thornburg Mortgage's margin-call situation until it had paid all of its outstanding margin calls.  See Tr. at 465:8-467:17 (McKenna, Court).

The SEC argued that, if management is keeping things from their auditors, it is more likely that there is bad intent.  See Tr. at 471:11-14 (McKenna).  It asserted that, before February 26, 2008, KPMG was unaware of the volume of margin calls that Thornburg Mortgage received on February 21, 2008, and that the Margin Call Schedule does not state why Thornburg Mortgage paid the margin calls over time.  See Tr. at 471:15-473:2 (McKenna, Court).

- 468 -

According to the SEC, on February 21, 2008, Thornburg Mortgage generated two liquidity reports -- one that listed all of the margin calls, stated a negative cash balance, and was never given to KPMG, and another that did not list all of the margin calls, stated a positive cash balance, and was provided to KPMG -- to keep KPMG in the dark about the volume of margin calls that Thornburg Mortgage received.   See Tr. at 467:18-478:6 (McKenna, Court)(citing Electronic Mail Transmission from Ralph Ahn to Larry Goldstone, Clay Simmons, Nathan Fellers, Xen Stanhope, Patrick Feldman, Jane Starrett, Shawn Buniel, Tim Sturdy, Dan Petrush, and Kyle Rhoades (dated Feb. 21, 2008), filed November 6, 2013 (Doc. 231-16)("Feb. 21, 2008, Negative Liquidity Report"); Electronic Mail Transmission from Ralph Ahn to Nathan Fellers (dated Feb. 21, 2008), filed November 6, 2013 (Doc. 231-17)("Feb. 21, 2008, Positive Liquidity Report")).   Concerning the Feb. 25, 2008, Goldstone KPMG Email, the SEC maintained that it should be able to present to the jury its theory of the electronic mail transmission's meaning and that it is disputed whether Simmons read the electronic mail transmission, because, as the CFO of a major company, he had a practice of reading electronic mail transmissions.   See Tr. at 478:16-479:4 (McKenna, Court).   For motive, the SEC asserted that it does not need to present evidence showing motive, but that the Defendants' desire to keep Thornburg Mortgage in business and to continue receiving compensation are sufficient motive.   See Tr. at 479:5-480:10 (McKenna).

The Court asked the Defendants to address the disparity between the Feb. 21, 2008, Positive Liquidity Report and the Feb. 21, 2008, Negative Liquidity Report, and they argued that there is no evidence of a scheme to defraud KPMG in which they were involved, and no evidence that they directed Ahn or Fellers to omit the margin calls from the liquidity report.   See Tr. at 482:1-484:14 (Lee, Court); id. at 486:3-487:17 (Lee, Court).   The Defendants contended

that the second Feb. 21, 2008, Positive Liquidity Report was created to be given to Citigroup Global, which already knew about its own margin call.  See Tr. at 484:16-485:21 (Lee, Court). They stated that the SEC's statement at the hearing, which is not competent evidence, is only evidence that KPMG was given the Feb. 21, 2008, Positive Liquidity Report, but not the Feb. 21, 2008, Negative Liquidity Report.  See Tr. at 485:22-486:2 (Lee).  According to the Defendants, there is no evidence of subjective falsity, because they fully disclosed to KPMG that they paid all of their margin calls and that they paid them over time.  See Tr. at 488:16-490:24 (Lee, Court).

For the standard which the Court should use, the Defendants argued that the OTTI subjective falsity standard is similar to the loan-loss-reserve and goodwill standards, which both involve subjective and objective factors.  See Tr. at 492:6-494:13 (Lee).  They asserted that the United States Courts of Appeals for the First, Second, Fourth, and Ninth Circuits require actual disbelief to show subjective falsity.  See Tr. at 501:6-17 (Lee); id. at 508:25-509:13 (Lee)(citing Kaess v. Deutsche Bank AG, 572 F. App'x 58 (2d Cir. 2014)(unpublished), vacated sub nom Belmont Holdings Corp. v. Deutsche Bank AG, 135 S. Ct. 2805 (2015)).  The Defendants argued that, in MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., 761 F.3d 1109 (10th Cir. 2014), the Tenth Circuit indicated, but did not decide, that, for opinion statements to be actionable, the plaintiffs need to show actual disbelief and that an OTTI statement is an opinion statement.  See Tr. at 501:23-509:24 (Lee, Court).  The Defendants contended that this case's OTTI judgment concerns an opinion just like the OTTI judgment in MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.  See Tr. at 927:5-14 (Lee). According to the Defendants, the SEC has not presented evidence of actual disbelief.  See Tr. at 509:21-511:25 (Lee); id. at 927:15-929:16 (Lee).  They agreed with the Court that circumstantial

evidence could show disbelief, but that there is not enough evidence here to show actual disbelief.  See Tr. at 935:19-940:3 (Lee, Court)

The SEC addressed the Tenth Circuit's opinion in MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P. by arguing that the Tenth Circuit did not rule on what standard applies, that the Tenth Circuit did not say that actual disbelief was appropriate, and that the Tenth Circuit conflated the subjective falsity inquiry and the possible standards that govern it.  See Tr. at 908:14-913:16 (McKenna, Court).  It asserted, however, that it was comfortable using an actual disbelief standard, because it can still use circumstantial evidence to attack the Defendants' beliefs.  See Tr. at 914:1-924:6 (McKenna, Court).  The Court told the parties that it is uncomfortable using the reckless standard and that it is leaning toward requiring the SEC to show actual disbelief.  See Tr. at 913:17-914:1 (Court).

## c. **Auditor Deception.**

The Defendants repeated its version of the facts that, during the 2008 financial crisis, Thornburg Mortgage and KPMG tried to make reasonable OTTI and going-concern conclusions; that Thornburg Mortgage provided KPMG with access to information; that, after the 2007 Form 10-K filing, Thornburg Mortgage's lenders reacted negatively by issuing margin calls; that, after seeing the volume of margin calls and default notices, KPMG withdrew its audit; that, during the restatement, KPMG concluded that Thornburg Mortgage did not withhold, omit, or misrepresent any information; that KPMG's auditors were reprimanded for their work on the audit; and that KPMG's auditors now contend that information was withheld or misrepresented to them.  See Tr. at 513:17-517:22 (Marks, Court).  The Court asked the Defendants how it could grant them summary judgment when KPMG's auditors have testified under oath that they withheld information, and the Defendants argued that the Court does not need to make a credibility

determination and that the Court can grant summary judgment on whether KPMG had certain information if documents show that it had the information, notwithstanding testimony to the contrary.  See Tr. at 517:23-522:8 (Marks, Court).

According to the Defendants, there are four main allegations remaining in the SEC's auditor deception claim: (i) that Thornburg Mortgage concealed from KPMG that it was having trouble meeting margin calls; (ii) that Simmons misrepresented to KPMG the purpose of the I/O Strip Transactions; (iii) that Goldstone and Simmons did not tell KPMG about their knowledge of the hedge-fund collapse; and (iv) that Goldstone and Simmons did not disclose to KPMG the Citigroup Global reservation-of-rights letter.  See Tr. at 522:12-523:18 (Marks).  The Defendants explained the elements that the SEC must show for its auditor-deception claim.  See Tr. at 525:11-527:12 (Marks).  They explained the size of the Thornburg Mortgage year-end audit and the structure of KPMG's audit team.  See Tr. at 527:19-535:25 (Marks, Court).  The Defendants asserted that KPMG had unrestricted access to Thornburg Mortgage's offices, personnel, and accounting records, and that, during the restatement, KPMG reviewed Thornburg Mortgage's electronic mail transmissions, which undermines the SEC's theory that they withheld any information from KPMG.  See Tr. at 535:25-540:18 (Marks, Court).

The Defendants asserted that the difficulty in meeting margin calls and the Citigroup Global margin call are the crux of the SEC's case and that the evidence shows that KPMG was not in the dark on these issues.  See Tr. at 542:3-544:9 (Marks).  They maintained that KPMG was fully aware of the margin calls' magnitude that Thornburg Mortgage received, that the margin calls depleted Thornburg Mortgage's liquidity, that Thornburg Mortgage paid the margin calls over several days, and that the I/O Strip Transaction proceeds were used to satisfy margin calls.  See Tr. at 544:10-545:14 (Marks).  The Defendants argued that, before the 2007 Form

10-K filing, when KPMG made its decision to sign off on the financial statements, KPMG had all of the information that the SEC alleges they withheld.  <u>See</u> Tr. at 545:15-23 (Marks).  For the margin calls' total volume, the Defendants said that KPMG knew that Thornburg Mortgage's securities declined in value between five to ten percent, which triggered additional margin calls, but that KPMG was not interested in the margin calls' total volume.  Tr. at 546:5-558:20 (Marks, Court).  The Defendants asserted that KPMG changing a portion of a restatement memorandum from stating that the pre-filing margin calls surprised KPMG to stating that the margin calls were larger than what Thornburg Mortgage expected shows that the volume of margin calls did not surprise KPMG. <u>See</u> Tr. at 558:20-569:25 (Marks, Court).  According to the Defendants, KPMG reviewed Thornburg Mortgage's daily cash settlements with its repo counterparties and Thornburg Mortgage's accounting records, which show the total volume of margin calls that Thornburg Mortgage received.  <u>See</u> Tr. at 569:16-570:17 (Marks).  The Defendants argued that the margin calls' total volume was immaterial, because KPMG was not interested in the total volume as long as Thornburg Mortgage met them.  <u>See</u> Tr. at 570:18-578:14 (Marks, Court).

The Defendants asserted that KPMG was aware of Thornburg Mortgage's low liquidity and low cash stockpile leading up the 2007 Form 10-K filing.  <u>See</u> Tr. at 585:17-595:16 (Marks, Court); <u>id.</u> at 601:4-605:3 (Marks, Court).   According to the Defendants, KPMG knew that Thornburg Mortgage received large margin calls and had limited available liquidity to pay them. <u>See</u> Tr. at 605:4-606:11 (Marks).  They argued that KPMG was aware of the Citigroup Global margin call and that Thornburg Mortgage paid some margin calls over several days, specifically, as stated in the Margin Call Schedule that Thornburg Mortgage provided to Hall on February 27, 2008, which KPMG considered during the audit.  <u>See</u> Tr. at 610:18-629:8 (Marks, Court); <u>id.</u> at 633:22-645:5 (Marks, Court).  The Defendants stated that, during the restatement, Reinhart and

Hall discussed the Margin Call Schedule, but never provided it to KPMG's senior members.  See Tr. at 629:9-633:21 (Marks, Court).  The Defendants maintained that KPMG was focused on whether Thornburg Mortgage met its margin calls, and not on when or how it met them.  See Tr. at 645:6-648:19 (Marks, Court).  They asserted that, during the restatement, KPMG was fully aware that Thornburg Mortgage paid margin calls over time, yet still concluded that there was no fraud by Thornburg Mortgage's management.  See Tr. at 648:20-649:15 (Marks).

Concerning the disparity between the Feb. 21, 2008, Positive Liquidity Report and the Feb. 21, 2008, Negative Liquidity Report, the Defendants said that, unlike the SEC's original assertion, the Feb. 21, 2008, Positive Liquidity Report was not given to KPMG and that the Feb. 21, 2008, Positive Liquidity Report was created for Thornburg Mortgage's lenders to see the amount of cash that Thornburg Mortgage had.  See Tr. at 651:3-659:13 (Marks, Court).  The Defendants maintained that the liquidity reports were prepared for Thornburg Mortgage's repo lenders and not for KPMG, that there is no evidence that the liquidity reports were intended to deceive KPMG, that KPMG was aware of Thornburg Mortgage's margin calls, and that KPMG was aware of Thornburg Mortgage's liquidity balance.  See Tr. at 680:8-682:2 (Marks, Court).  The Defendants agreed with the Court that, for a few days between February 21, 2008, and February 27, 2008, Thornburg Mortgage did not want to disclose to KPMG that it was paying margin calls over several days, because it would only be an issue if Thornburg Mortgage was unable to satisfy the margin calls without selling its assets, which was a hypothetical situation that might not come to fruition.  See Tr. at 682:3-687:14 (Marks, Court).

For the I/O Strip Transactions, the Defendants argued that this contention is the SEC's only true misrepresentation claim, specifically, that Simmons represented to KPMG that the I/O Strip Transactions were undertaken for reasons other than immediate liquidity needs.  See Tr. at

Tr. at 694:23-696:1 (Marks, Court).  Relying on Reinhart's and Hall's deposition testimony, the Defendants asserted that Simmons never made any representation to KPMG concerning the I/O Strip Transactions' purpose or any representation that the I/O Strip Transactions were not enacted to satisfy margin calls.  See Tr. at 696:2-15 (Marks); id. at 697:10-699:1 (Marks, Court).  Furthermore, according to the Defendants, KPMG was fully aware of the I/O Strip Transactions' purpose; specifically, the Defendants said that the Margin Call Schedule shows that the I/O Strip Transaction proceeds were used to pay margin calls.  See Tr. at 697:1-9 (Marks); id. at 699:2-703:11 (Marks, Court).  The Defendants maintained that KPMG viewed the I/O Strip Transactions as positive factors.  See Tr. at 703:12-704:21 (Marks, Court).

The Defendants attacked the SEC's rule 13b2-2 claim that is based on the hedge-fund rumor by arguing that the hedge-fund rumor was immaterial to Thornburg Mortgage's OTTI conclusion, because KPMG cannot rely on rumors to make audit conclusions and that rule 13b2-2 omission claims are actionable only if the omission is material.  See Tr. at 706:17-713:3 (Marks, Court).  The Court asked the Defendants whether a haircut could result in immediate margin calls, as Goldstone's testimony implies, and they did not directly respond, but stated that Thornburg Mortgage reduced the number of its lenders and that Goldstone's testimony was focused on the August, 2007, margin calls.  See Tr. at 713:6-715:12 (Marks, Court).  The Defendants stated that the Feb. 27, 2008, Hedge Fund Email shows that the Defendants expected the haircuts to hit gradually and were planning to prepare for the haircuts.  See Tr. at 715:23-719:3 (Marks, Court).  According to the Defendants, a haircut percentage could change only when a repo agreement matures and rolls over every few months, which meant that any expected haircuts would not occur immediately.  See Tr. at 719:4-730:3 (Marks, Court).  They argued that the hedge-fund collapse was a Type II subsequent event, because it did not exist at

the balance sheet date, making it immaterial, and they argued that there is no evidence that the collapse triggered any haircut increases at the end of February, 2008.  See Tr. at 730:4-732:20 (Marks, Court); id. at 753:8-758:19 (Marks, Court).

The Defendants argued that KPMG's conclusion during the restatement, when KPMG had unrestricted access to Thornburg Mortgage's electronic mail transmissions, confirms that there were no material omissions or misstatements.  See Tr. at 733:4-737:3 (Marks, Court); id. at 737:14-743:19 (Marks, Court).  Of relevance, the Defendants stated that, presumably, KPMG would have seen the Feb. 27, 2008, Hedge Fund Email, but they cannot know for certain.  See Tr. at 737:8-13 (Marks).  The Court asked the Defendants what it would tell the jury about KPMG, and they said that KPMG and Thornburg Mortgage made a tough judgment, which turned out to be wrong; KPMG reacted suddenly to the large margin calls; KPMG ultimately concluded that Thornburg Mortgage did not make any misstatements or omissions; and, after Reinhart and Hall became the focus of the SEC's investigation, as a self-preservation tactic, they pointed to the Defendants in an attempt to throw them under the bus.  See Tr. at 748:21-753:7 (Marks, Court).  Concerning whether KPMG considered the European hedge-fund rumor during the restatement, the Defendants said that KPMG making its decision without considering the hedge fund shows that it was not material and that there is no evidence that the hedge-fund collapse caused the post-filing margin calls.  See Tr. at 758:25-774:15 (Marks, Court).

Concerning the materiality of the total amount of margin calls that Thornburg Mortgage received in February, 2008, the SEC argued that, even if KPMG could have discerned the margin call volume from the decrease in asset value, not telling KPMG the total amount of margin calls is inconsistent with the Defendants' obligations under rule 13b2-2, because rule 13b2-2 does not ask what KPMG could have discovered.  See 578:22-584:23 (Kasper, Court).  The SEC asserted

that, as to liquidity, KPMG was not aware that Thornburg Mortgage had negative liquidity the week before the 2007 Form 10-K filing that outstanding margin calls caused, and which Thornburg Mortgage could not pay.  See Tr. at 595:17-601:2 (Kasper, Marks, Court); id. at 606:19-610:03 (Kasper, Court).

The SEC clarified that it previously misspoke when it said that the Feb. 21, 2008, Positive Liquidity Report was found in KPMG's workpapers, because neither liquidity report was in KPMG's workpapers.  See Tr. at 660:13-20 (McKenna); id. at 669:15-670:6 (McKenna, Court).  The SEC asserted, however, that the next day's liquidity report, which Ahn directed Buniel to send to KPMG, omits the February 21, 2008, margin calls and shows a positive cash balance, despite the Feb. 21, 2008, Negative Liquidity Report showing a negative cash balance well into April, 2008.  See Tr. at 661:13-665:2 (McKenna, Court)(citing Electronic Mail Transmission from Ralph Ahn to Shawn Buniel (dated Feb. 22, 2008), filed November 6, 2011 (Doc. 231-20)("Feb. 22, 2008, Liquidity Report")).  According to the SEC, while KPMG had the Margin Call Schedule in its physical possession before the 2007 Form 10-K filing, Thornburg Mortgage did not provide full disclosure, because the Margin Call Schedule was not provided for the purpose of disclosing the timing in which Thornburg Mortgage paid margin calls.  See Tr. 665:3-669:15 (McKenna, Court); id. at 672:3-675:6 (McKenna, Court).  The SEC argued that Thornburg Mortgage kept secret information about the margin calls and about its negative liquidity so that it could represent to KPMG that it had a positive liquidity balance.  See Tr. at 677:15-680:4 (McKenna, Court).  The SEC argued that someone at Thornburg Mortgage giving someone at KPMG the Margin Call Schedule was not enough, because Thornburg Mortgage should have called KPMG to explain its margin call situation, and because rule 13b2-2 does not turn on whether the auditor could have put together all of the pieces from the provided

information to figure out what was going on in the company.  See Tr. at 687:15-695:18 (Kasper, Court).

The SEC argued that the Defendants try to avoid rule 13b2-2 liability by casting blame on KPMG and by asserting that, the day before the 2007 Form 10-K filing, someone else disclosed information to KPMG that "cleaned up their misstatements," which are both irrelevant, because rule 13b2-2 focuses on the Defendants' statements and conduct.  Tr. at 775:3-776:3 (Kasper).  See id. at 777:1-778:16 (Kasper, Court); id. at 780:18-25 (Kasper).  The Court asked the SEC why the Margin Call Schedule does not preclude its rule 13b2-2 claim, and it responded by arguing that KPMG never learned about the hedge-fund collapse or about the Citigroup Global letter until after the restatement.  See Tr. at 776:5-25 (Kasper, Court).  The SEC rehashed the elements for a rule 13b2-2 claim and the policy behind the rule.  See Tr. at 781:1-783:14 (Kasper).  The SEC addressed the Defendants' assertion that KPMG's auditors have tried to throw them under the bus by arguing that KPMG's auditors first said that Thornburg Mortgage did not disclose information when they learned about the information during the SEC's investigation and by arguing that, for the Court to buy into the Defendants' argument, it would have to make a lot of credibility determinations.  See Tr. at 784:2-785:16 (Kasper).

According to the SEC, the Defendants made a false statement to Hall when they failed to disclose or mention the Citigroup Letter when she asked whether there was any information about which she should know about and they responded that there was not any such information.  See Tr. at 785:17-790:6 (Kasper, Court).  The SEC asserted that the Defendants' statements that Thornburg Mortgage returned to profitability in the fourth quarter of 2007, and that it had the ability and intent to hold its Purchased ARM assets until recovery, are both false statements that they made to KPMG.  See Tr. at 790:7-793:22 (Kasper, Hess)(citing Draft Going Concern

Analysis at 3, 9; Feb. 27, 2008, Thornburg Representation Letter at 4, 8).  According to the SEC, the Defendants made a number of false statements to KPMG in the Feb. 27, 2008, Thornburg Representation Letter, including that Thornburg Mortgage has complied with all aspects of its contractual agreements and that the financial statements disclose all matters that are relevant to Thornburg Mortgage's ability to continue as a going concern.  See Tr. at 793:23-795:3 (Kasper). The SEC maintained that the Defendants represented to Reinhart and Hall that Thornburg Mortgage was not having trouble, and that there was no information about which KPMG needed to know.  See Tr. at 795:4-798:12 (Kasper).  The SEC argued that, at a February 27, 2008, meeting, Thornburg Mortgage told Reinhart that it had timely met its margin calls and told Hall that it had met all margin calls, when the Citigroup Global margin call may not have been fully satisfied at the time of the meeting.  See Tr. at 798:3-804:6 (Kasper, McKenna, Court).  The SEC asserted that, during the restatement, McLamb told KPMG that Thornburg Mortgage had not told KPMG about the untimely payment of margin calls.  See Tr. at 804:14-807:3 (Kasper, Court).

Concerning whether the Margin Call Schedule cured any falsity in the Defendants' statements, the SEC contended that one person, unbeknownst to the Defendants, providing Reinhart with a document for a reason other than disclosing the untimely payment of margin calls, cannot relieve the Defendants of their obligations to be truthful.  See Tr. at 807:4-809:14 (Kasper, Court); id. at 829:19-830:3 (Kasper); id. at 833:11-836:13 (Kasper).  The SEC argued that, for such important information, Thornburg Mortgage should have done more than give KPMG the Margin Call Schedule the afternoon before the 2007 Form 10-K filing.  See Tr. at 831:5-833:10 (Kasper, Court); id. at 836:14-838:9 (Kasper, Court).  According to the SEC, by relying on the Margin Call Schedule, the Defendants suggest that, before February 27, 2008, KPMG did not know what was occurring in regards to Thornburg Mortgage's margin call

payments.   See Tr. at 830:4-23 (Kasper).   For materiality, the SEC asserted that KPMG's auditors said that the information was important to them and that the Defendants would not conceal information if it were not important.   See Tr. at 809:15-829:18 (Kasper, Court); id. at 874:10-875:14 (Kasper).

The Court asked the SEC about KPMG's no-fraud conclusion, and it responded by arguing that, during the restatement, when KPMG made its no-fraud conclusion, KPMG was unaware of specific facts, including the hedge-fund collapse, the Citigroup Global reservation-of-rights letter, and the electronic mail transmissions showing that the Defendants were keeping information from KPMG.   See Tr. at 839:7-843:25 (Kasper, McKenna, Court).   The SEC also argued that a no-fraud finding is made under a higher standard than a rule 13b2-2 violation, because rule 13b2-2 does not have a scienter requirement.   See Tr. at 844:1-9 (Kasper).   The SEC asserted that, for the European hedge fund, the Defendants do not contend that they made fulsome disclosures, but only that the rumor was not material.   See Tr. at 844:10-22 (Kasper).   It contended that the hedge-fund rumor made false the Defendants' representation that there were not subsequent events that required disclosure and the Defendants' statements that Thornburg Mortgage assets' value had hit bottom.   See Tr. at 844:23-846:15 (Kasper, Court).   The SEC said that the Thornburg Mortgage Unforeseeable Mortgage Collapse in Late February, filed November 6, 2013 (Doc. 231-53)("Simmons Sudden Decline Paper"), shows that the Defendants thought the hedge fund-collapse was material and evidences another false statement, because Simmons states that the collapse was unexpected.   Tr. at 846:16-848:11 (Kasper, Court).

According to the SEC, Goldstone's and Feldman's testimony shows that they believed that the hedge-fund collapse was material, and, because the hedge fund dumped a large amount of MBS into the market, it drove the prices down, which would trigger additional margin calls.

See Tr. at 484:12-851:13 (Kasper, Court).   The Court asked the SEC why the hedge-fund collapse was not a Type II event, and it responded by contending that its expert will testify that it was a Type I event and by asserting that the Alt-A market had difficulties since 2007.   See Tr. at 856:7-857:25 (Kasper, Court).   The SEC argued that the Defendants' knowledge of the collapse is inconsistent with statements that they made to KPMG.   See Tr. at 858:1-861:18 (Kasper, Court).

For the Citigroup Global reservation-of-rights letter, the SEC asserted that, during the restatement, KPMG requested all correspondence that Thornburg Mortgage had with its lenders, yet it never provided KPMG with the letter and that KPMG asked Thornburg Mortgage questions that should have prompted Thornburg Mortgage to disclose the letter.   See Tr. at 862:1-867:16 (Kasper, Court).   The SEC said that KPMG would have wanted to know about the Citigroup Global letter and that the withholding of the letter calls into question KPMG's no-fraud conclusion.   See Tr. at 876:20-878:1 (Kasper).   The SEC contended that Thornburg Mortgage represented to KPMG that the I/O Strip Transactions were conducted to take advantage of favorable prices, while they were in fact conducted to pay margin calls, and that KPMG would have wanted to know the I/O Strip Transactions' true purpose.   See Tr. at 868:6-874:7 (Kasper, Court).   According to the SEC, Thornburg Mortgage, and not KPMG, made the decision to restate the 2007 Form 10-K.   See Tr. at 875:15-876:6 (Kasper).   The SEC asserted that the Defendants' knowledge of the hedge-fund rumor and their withholding of certain information undermines KPMG's no-fraud conclusion.   See Tr. at 878:3-880:25 (Kasper).

The Defendants argued that, by February 28, 2008, KPMG had all relevant information and that February 28, 2008 -- the date KPMG issued its opinion -- is the relevant date for determining whether there was a rule 13b2-2 violation.   See Tr. at 881:5-884:5 (Marks, Court).

They stated that, for affirmative misstatement cases, the violation occurs when the representation is made, but that, here, any omissions were not material as of the date of filing and that an omission is not actionable if the auditor received the information.   See Tr. at 884:6-888:2 (Marks, Court); id. at 898:12-901:1 (Marks, Court).   The Defendants addressed Reinhart's testimony that someone told her the margin calls were timely made by arguing that there is no evidence that they were the ones who made that statement and there is no evidence as to the statement's timing.   See Tr. at 888:2-891:13 (Kasper, Marks, Court).   Concerning the timing of the payment of the Citigroup Global margin call, the Defendants asserted that the final payment was made before the representation letter was signed and before the down-to-date meeting, where Simmons and Starrett told Reinhart and Hall that Thornburg Mortgage had met all of its margin calls.   See Tr. at 891:14-895:16 (Marks, Court).

The Defendants maintained that the SEC cannot show that KPMG did not have information about the later margin call payments when the 2007 Form 10-K was filed.   See Tr. at 895:17-897:21 (Marks, Court).   For the Citigroup Global letter, the Defendants said that, by the time of the restatement, when KPMG made its no-fraud conclusion, KPMG was aware of the untimely margin calls payments, making actual possession of the letter unnecessary.   See Tr. at 901:25-904:23 (Marks, Court).   According to the Defendants, KPMG had access to Thornburg Mortgage's records from which it could have discerned all of the information that the SEC alleges they withheld.   See Tr. at 904:25-906:7 (Marks).   The Defendants addressed the SEC's arguments on the I/O Strip Transactions by stating that no one told KPMG that the transactions' sole purpose was favorable prices.   See Tr. a 906:25-907:22 (Marks, Court).   They argued that an omission is actionable only if it is tethered to an affirmative statement that the omission made

misleading, and that there is no evidence of statements becoming untrue or misleading because of omitted information.  See Tr. at 929:24-935:18 (Lee, Court); id. at 940:5-22 (Lee).

The Court said that it needed to study the law more before ruling on the Defendants' motions for summary judgment on the rule 13b2-2 issue, but that it was inclined to think that the law supports the SEC's position.  See Tr. at 948:13-950:1 (Court).

### 12.    The SEC's Notice of Clarification.

On August 7, 2014, the SEC filed Plaintiff Securities and Exchange Commission's Notice of Clarification, filed August 7, 2014 (Doc. 329)("SEC Clarification"), to clarify that, at the hearings, the SEC erroneously stated that Fellers was equivocal in responding to the SEC's questions about the February 21, 2008, liquidity reports, when the SEC intended to state that Ahn was equivocal.  SEC Clarification at 1.  The SEC then goes on to address three misstatements that it contends that the Defendants made: (i) the Defendants' statements that haircuts would not result in immediate margin calls; (ii) their representations that there had been no stress or deterioration in the Alt-A markets before February, 2008; and (iii) their statements that Hall testified that she received the Margin Call Schedule the morning of February 27, 2008.  See SEC Clarification at 1-2.  The SEC contends that: (i) Goldstone testified that haircuts often result in immediate margin calls; (ii) the Nov. 9, 2007, Form 10-Q states that Alt-A mortgage loans were downgraded in August, 2007; and (iii) Hall testified only that Thornburg Mortgage gave her the Margin Call Schedule close to the 2007 Form 10-K filing, but she could not remember the time of day.  See SEC Clarification at 2-6.  The SEC also asserts that it misspoke when it said that Ahn, and not Fellers, was equivocal when asked why two liquidity reports were prepared on February 21, 2008, and when it stated that the Feb. 21, 2008, Positive Liquidity Report was found in KPMG's workpapers.  See SEC Clarification at 6-10.

13.     **The SEC's Rule 13b2-2 Brief.**

On September 22, 2014, the SEC filed Plaintiff Securities and Exchange Commission's Brief Regarding Rule 13b2-2 in Further Opposition to Defendants' Motions for Partial Summary Judgment, filed September 22, 2014 (Doc. 342)("SEC Rule 13b2-2 Supp.").   The SEC argues that it has shown that the Defendants attempted to keep information regarding Thornburg Mortgage's difficulty in meeting margin calls from KPMG.  See SEC Rule 13b2-2 Supp. at 7. The SEC contends that rule 13b2-2 does not provide a window during which omissions are permitted and that someone else at Thornburg Mortgage, without the Defendants' knowledge, providing KPMG with the Margin Call Schedule cannot erase the Defendants' rule 13b2-2 violation.  See SEC Rule 13b2-2 Supp. at 7.  The SEC maintains that it has identified a number of false statements that the Defendants made, each of which constitutes a separate rule 13b2-2 violation.  See SEC Rule 13b2-2 Supp. at 7.

The SEC asserts that the Defendants' argument that there is no rule 13b2-2 violation based upon omissions until the time in which the auditor makes its decision lacks support in rule 13b2-2's language, in the law, and elsewhere.  See SEC Rule 13b2-2 Supp. at 8.  According to the SEC, rule 13b2-2's language shows that it is violated when a misstatement or omission is made during an audit, which means it can be violated before the auditor makes its decision.  See SEC Rule 13b2-2 Supp. at 8-9.  The SEC states that, if the Defendants' interpretation were correct, officers and directors of public companies would have no obligation to correct their misstatements, except for the few times a year during which an auditor makes a decision -- such as with Form 10-K filings and quarterly filings.  See SEC Rule 13b2-2 Supp. at 9.  It maintains that rule 13b2-2's language shows that it treats misstatements and omissions in the same fashion. See SEC Rule 13b2-2 Supp. at 9-10.  The SEC argues that the lengths to which the Defendants

went to conceal information from KPMG shows that the information was material.  See SEC Rule 13b2-2 Supp. at 10.

The SEC contends that the Defendants' interpretation of rule 13b2-2 is contrary to the rule's purpose.  See SEC Rule 13b2-2 Supp. at 10.  It states that rule 13b2-2 requires officers and directors of public companies to be candid, open, and fulsome with their auditors.  See SEC Rule 13b2-2 Supp. at 10-11.  The SEC argues that its releases on rule 13b2-2 show that the Defendants' interpretation is inconsistent with the rule's purpose.  See SEC Rule 13b2-2 Supp. at 11 (citing Improper Influence on Conduct of Audits, Exchange Act Release No. 26050, 80 S.E.C. Docket 770, 2003 WL 21148349 (May 20, 2003)("SEC Release No. 26050"); Promotion of the Reliability of Financial Information and Prevention of the Concealment of Questionable or Illegal Corporate Payments and Practices, Exchange Act Release No. 34-15570, 16 S.E.C. Docket 1143, 1979 WL 173674 (February 15, 1979)("SEC Release No. 34-15570")).  It maintains that case law shows that rule 13b2-2 was intended to protect the integrity of audits.  See SEC Rule 13b2-2 Supp. at 11-12 (citing SEC v. World-Wide Coin Inv., Ltd., 567 F. Supp. 724, 747 (N.D. Ga. 1983)).  The SEC contends that the Margin Call Schedule is not a substitute for the Defendants contacting KPMG and telling it directly about the unmet margin calls, about Thornburg Mortgage's inability to meet them, and that certain statements that they made were not reliable.  See SEC Rule 13b2-2 Supp. at 12.

The SEC argues that it does not need to show that KPMG relied on the Defendants' misstatements to show a rule 13b2-2 violation.  See SEC Rule 13b2-2 Supp. at 13.  The SEC contends that the Defendants do not cite any law to support their argument that rule 13b2-2 has a reliance element, and the SEC contends that case law shows that there is not a reliance requirement.  See SEC Rule 13b2-2 Supp. at 13.  It maintains that rule 13b2-2 is violated when

the misstatement is made or the uncorrected omission becomes misleading.   See SEC Rule 13b2-2 Supp. at 13.   The SEC asserts that, for misstatements, courts assume that the violation occurs then the statement is made.   See SEC Rule 13b2-2 Supp. at 14 (citing SEC v. Quinlan, No. CIV 02-60082, 2008 WL 4852904, at *4 (E.D. Mich. Nov. 7, 2008); SEC v. Autocorp Equities, Inc., No. CIV 98-0562 PGC, 2004 WL 1771608 (D. Utah Aug. 4, 2004); SEC v. Kelly, 663 F. Supp. 2d 276, 284 (S.D.N.Y. 2009)).   According to the SEC, there is no reason that rule 13b2-2 omission cases should be treated any differently.   See SEC Rule 13b2-2 Supp. at 14-15. The SEC states that, for rule 13b2-2 criminal violations, courts hold that the crime occurs where the omission was made, which suggests that the rule is also violated when the omission is made. See SEC Rule 13b2-2 Supp. at 15 (citing United States v. Crop Growers Corp., 954 F. Supp. 335, 352-53 (D.D.C. 1997)).

The SEC contends that it has shown genuine issues of fact concerning misstatements that Thornburg Mortgage made to KPMG.   See SEC Rule 13b2-2 Supp. at 15.   It maintains that its claims are not limited to omissions; thus, even if the Court adopts the Defendants' interpretation of rule 13b2-2, the Court should deny their motions for summary judgment.   See SEC Rule 13b2-2 Supp. at 15.   The SEC states that the Feb. 27, 2008, Thornburg Representation Letter, which the Defendants signed, contains a number of misstatements and that rule 13b2-2 violations are regularly based on nothing more than management representation letters that indicate that a false filing was correct.   See SEC Rule 13b2-2 Supp. at 15-17 & n.4 (citing SEC v. Todd, 642 F.3d 1207, 1219-20 (9th Cir. 2011); McConville v. SEC, 465 F.3d 780, 789 (7th Cir. 2007); SEC v. Quinlan, 2008 WL 4852904, at *8).   The SEC argues that, while the statements are false regardless of when the Feb. 27, 2008, Thornburg Representation Letter was signed, there is evidence that the Defendants signed it before Thornburg Mortgage satisfied its outstanding

margin calls -- specifically, the letter contains a note that KPMG received it on February 26, 2008, and Starrett conceded that she signed it on February 26, 2008.  <u>See</u> SEC Rule 13b2-2 Supp. at 17.

The SEC asserts that, at a February 27, 2008, meeting, Simmons and Starrett told Reinhart and Hall that Thornburg Mortgage had satisfied all of its margin calls, even though it had not yet satisfied the Citigroup Global margin call.  <u>See</u> SEC Rule 13b2-2 Supp. at 18.  The SEC states that, while there is not direct proof of this meeting's timing, it had to have occurred before Thornburg Mortgage paid the Citigroup Global margin call, because Fellers notified Goldstone and Simmons at 2:28 p.m. that the Citigroup Global margin call was satisfied, because Simmons left for Dallas around noon, and because Simmons was at the meeting before he left for Dallas.  <u>See</u> SEC Rule 13b2-2 Supp. at 18-19.  The SEC argues that, at the February 27, 2008, meeting, the Defendants gave no indication of trouble or of any concerns.  <u>See</u> SEC Rule 13b2-2 Supp. at 19.  The SEC states that Thornburg Mortgage told Reinhart that it had met all of its margin calls on a timely basis.  <u>See</u> SEC Rule 13b2-2 Supp. at 19-20.

**14.    <u>The Defendants' Supplemental Briefing on Rule 13b2-2.</u>**

On September 22, 2014, the Defendants filed the Defendants' Supplemental Brief Regarding the Requirement of SEC Rule 13b2-2(a) in Support of Motions for Summary Judgment, filed September 22, 2014 (Doc. 343)("Defendants Rule 13b2-2 Supp.").  The Defendants argue that the SEC is proposing a "dramatically new rule of law under the guise of an interpretation of rule 13b2-2(a)."  Defendants Rule 13b2-2 Supp. at 9 (capitalization altered for readability).  The Defendants assert, first, that no court has held that omission liability can result when the omission is cured before the audit opinion is issued.  <u>See</u> Defendants Rule 13b2-2 Supp. at 9.  Second, the Defendants state that the SEC has introduced its novel

interpretation of rule 13b2-2(a) because several elements of its Complaint have proven untrue, mainly: (i) that KPMG did not have current information about Thornburg Mortgage's margin calls and liquidity on February 28, 2008; (ii) that KPMG was thus unable to consider that information in issuing its audit opinion; and (iii) that Thornburg Mortgage's omissions misled KPMG before it issued its audit opinion.  See Defendants Rule 13b2-2 Supp. at 9.

The Defendants argue that the existing rule 13b2-2(a) cases fall into two categories.  See Defendants Rule 13b2-2 Supp. at 9.  The first category involves cases in which the pertinent information was never provided to the auditor.  See Defendants Rule 13b2-2 Supp. at 9-10 (citing SEC v. Kelly, 765 F. Supp. 2d 301, 324 (S.D.N.Y. 2011); United States v. Goyal, No. CR 04-00201 MJJ, 2008 WL 755010, at *6-8 (N.D. Cal. Mar. 21, 2008), rev'd 629 F.3d 912 (9th Cir. 2010); SEC v. Goldsworthy, No. CIV 06-10012 JGD, 2007 WL 4730345, at *17-18 (D. Mass. Dec. 4, 2007)).  The second category involves cases in which the omission of information caused the auditor to reach the wrong conclusion.  See Defendants Rule 13b2-2 Supp. at 9-10 (citing SEC v. Nacchio, 438 F. Supp. 2d 1266, 1283-85 (D. Colo. 2006); SEC v. Patel, No. CIV 07-0039 SM, 2008 WL 781914, at *2 (D.N.H. Mar. 24, 2008)).  The Defendants argue that these two lines of cases are inapposite to this case, because both involve auditor deception -- a circumstance that the Defendants insist was not present here.  See Defendants Rule 13b2-2 Supp. at 10.  The Defendants also assert that the SEC's post hoc interpretation of rule 13b2-2(a) is not entitled to judicial deference, because the SEC inappropriately construes the statutory language in the agency's favor.  See Defendants Rule 13b2-2 Supp. at 10-11 (citing Aspenwood Inv. Co. v. Martinez, 355 F.3d 1256, 1261 (10th Cir. 2004); Milner v. Dep't of Navy, 562 U.S. 562, 571-574 (2011); E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 731 F.3d 1106, 1137, 1139 (10th Cir. 2013), rev'd 135 S. Ct. 2028 (2015); Christopher v. SmithKline

Beecham Corp., 132 S. Ct. 2156, 2166, 2168 (2012); Via Christi Reg'l Med. Ctr., Inc. v. Leavitt, 509 F.3d 1259, 1272-74 (10th Cir. 2007)).

The Defendants assert that rule 13b2-2(a) requires the SEC to demonstrate three elements: (i) an omission, (ii) of a material fact, and (iii) a statement that is misleading as a result of the omitted, material fact.   See Defendants Rule 13b2-2 Supp. at 11 (citing 17 C.F.R. § 240.13b2-2(a)(2)).   The Defendants argue that the SEC cannot prove any one of these three elements, because the evidence shows that KPMG had all of the information it needed before the 2007 Form 10-K filing deadline, considered the information in connection with the OTTI analysis, and did not question or disagree with Thornburg Mortgage's OTTI analysis.   See Defendants Rule 13b2-2 Supp. at 12.

The Defendants assert that a non-disclosure is not actionable at the instant the information is omitted; instead, a non-disclosure is actionable only if the excluded information makes a previous, affirmative statement misleading.   See Defendants Rule 13b2-2 Supp. at 13. Accordingly, the Defendants argue that their "delayed disclosure" of their inability to meet the Citigroup Global margin call on February 21, 2008, does not qualify as an omission for two reasons:   (i) Thornburg Mortgage's February 20, 2008, going-concern memorandum, in which Thornburg indicated it had the intent and ability to hold its Purchased ARM assets to recovery, was true and reasonable at the time it was made; and (ii) all information concerning the delayed Citigroup Global margin call payments was fully disclosed to KPMG by February 27, 2008, within the time period permitted by rule 13b2-2(a) to determine whether Thornburg Mortgage would be able to meet the margin call and how the margin call would impact the company's finances.   See Defendants Rule 13b2-2 Supp. at 13-14.   The Defendants also argue that the SEC

has already conceded that Thornburg Mortgage's going-concern memorandum was true and reasonable.  See Defendants Rule 13b2-2 Supp. at 13.

The Defendants argue that the SEC's "novel theory" creating "an open-ended obligation of instantaneous and continuous disclosure" is inconsistent with the "'business judgment' rule that allows management to take time for prudent consideration before making disclosures." Defendants Rule 13b2-2 Supp. at 14 (citing Fin. Indus. Fund v. McDonnell Douglas Corp., 474 F.2d 514, 518-519 (10th Cir. 1973); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1433 (3d Cir. 1997); Gallagher v. Abbott Labs., 269 F.3d 806, 810 (7th Cir. 2001); Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp., No. CIV 08-C-0458, 2012 WL 4739797, at *3 n.1 (E.D. Wis. Oct. 3, 2012)).  The Defendants assert that the Tenth Circuit has recognized that the timing of disclosures falls squarely within the business-judgment rule's scope.  See Defendants Rule 13b2-2 Supp. at 15 (citing Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 760-61 (7th Cir. 2007); Fin. Indus. Fund v. McDonnell Douglas Corp., 474 F.2d at 518; Berger v. Belectic, 248 F. Supp. 2d 597, 604-605 (N.D. Tex. 2003)).  The Defendants argue that the business-judgment rule exists so that corrections to previous disclosures are accurate.  See Defendants Rule 13b2-2 Supp. at 15 (citing Grossman v Novell, Inc., 120 F. 3d 1112, 1125 (10th Cir. 1997); Gallagher v. Abbott Labs, 269 F.3d at 810; Dalberth v. Xerox, 766 F.3d 172, 167-87 (2d Cir. 2014)).  The Defendants assert that delayed disclosures do not give rise to liability even if disclosures "took longer than a plaintiff would have liked."  Defendants Rule 13b2-2 Supp. at 15 (quoting Berger v. Beletic, 248 F. Supp. 2d at 604-05)(alterations omitted)(internal quotation marks omitted).  The Defendants argue that the Court has already determined that a three-day disclosure delay may be a prudent exercise of caution, and point out that other courts have allowed disclosure delays of up to two months without imposing liability for omissions.

See Defendants Rule 13b2-2 Supp. at 15-16 (citing In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d 1165, 1207 (D.N.M. 2010)(Browning, J.); Fin. Indus. Fund v. McDonnell Douglas Corp., 474 F.2d at 518-19; Berger v. Beletic, 248 F. Supp. 2d at 606; In re Yahoo! Inc. Sec. Litig., No. CIV 11-02732 CRB, 2012 WL 3282819, at *23 (N.D. Cal. Aug. 10, 2012); Higginbotham v. Baxter Int'l, Inc., 495 F.3d at 760; Slayton v. Am. Express Co., 604 F.3d 758, 763-64, 774, 777 (2d. Cir. 2010)).

The Defendants argue that the evidence in this case establishes that Thornburg Mortgage's management used the five-day period between February 22, 2008, and February 26, 2008, to exercise the "business judgment that courts have declined to second-guess." Defendants Rule 13b2-2 Supp. at 16. Specifically, the Defendants contend that they declined to immediately disclose their plan to meet margin calls over time to KPMG, because they were not yet sure whether Thornburg Mortgage would have to sell impaired assets at a loss to meet its outstanding margin calls. See Defendants Rule 13b2-2 Supp. at 16. The Defendants assert that adopting the SEC's interpretation of rule 13b2-2(a) would require companies to bury auditors in trivial information, which would inflict unreasonable costs on the business community. See Defendants Rule 13b2-2 Supp. at 17 (citing TSC Industries v. Northway Inc., 426 U.S. 438, 448 (1976)). The Defendants also argue that the SEC's interpretation would "interfere with corporate decision-making and impede management's ability to respond flexibly" to new business developments. Defendants Rule 13b2-2 Supp. at 16-17.

The Defendants assert that an omission is material if "it would significantly alter the total mix of information available to [the reader]." Defendants Rule 13b2-2 Supp. at 17-18 (quoting SEC v. Patel, No. CIV 07-0039 SM, 2009 WL 3151143, at *30 (D.N.H. Sept. 30, 2009)). For example, the Defendants point out that the "total mix" materiality standard applied in TSC

Industries v. Northway Inc. and in United States v. Goyal.  Defendants Rule 13b2-2 Supp. at 18.

The Defendants contend that the materiality inquiry examines the exact moment that a decision

is made.  See Defendants Rule 13b2-2 Supp. at 18 (citing ECA and Local 134 IBEW Joint

Pension Trust of Chi. v. JP Morgan Chase, 553 F.3d 187, 197 (2d Cir. 2009); Basic Inc. v.

Levinson, 485 U.S. 224, 231-32 (1988); TSC Indus. v. Northway Inc., 426 U.S. at 449; Matrixx

Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1318-19 (2011); SEC v. Battenberg, No. CIV

06-14891, 2011 WL 3472619, at *8 (E.D. Mich. Aug. 9, 2011)).  The Defendants argue that the

SEC's interpretation of rule 13b2-2(a) is flawed, because it would automatically impose liability

the instant an omission is made -- regardless whether the omission affected the total mix of

information available at the time of the auditing decision.  See Defendants Rule 13b2-2 Supp.

at 18 (citing In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 400 (S.D.N.Y. 2012)).  The

Defendants argue that, because they eventually revealed the extended Margin Call Schedule to

KPMG, the initial omission could not have "alter[ed] the total mix" of information that KPMG

had.  Defendants Rule 13b2-2 Supp. at 19.  The Defendants agree that the SEC does not have to

prove that KPMG relied upon the omitted information, but argue that the SEC still has to prove

that the omitted information was material.  See Defendants Rule 13b2-2 Supp. at 19 (citing MHC

Mutual Conversion Fund, L.P. v. Sandler O'Neill Partners, L.P., 761 F.3d at 1113).

The Defendants assert that KPMG considered the allegedly omitted information about the

Citigroup Global margin call before issuing its audit opinion.  See Defendants Rule 13b2-2 Supp.

at 20.  The Defendants contend that KPMG knew, as of February 21, 2008: (i) that Thornburg

Mortgage was receiving "larger than normal margin calls," including one "margin call in a large

amount"; (ii) that Thornburg Mortgage's available liquidity to meet the margin calls was "very

low"; and (iii) that "Thornburg had to work on meeting these margin calls by making the

- 492 -

necessary arrangements with its repo lenders."  Defendants Rule 13b2-2 Supp. at 20 (internal

quotation marks omitted).  The Defendants assert that KPMG issued its audit opinion on

Thornburg Mortgage's financial statements at 12:37 a.m. on February 28, 2008, and argue that,

according to KPMG's audit manual, KPMG was required to consider all information it had up

until that exact moment.  See Defendants Rule 13b2-2 Supp. at 21.  The Defendants argue that

KPMG's internal electronic mail transmissions on the night of February 27, 2008, and morning

of February 28, 2008, reveal that the audit firm contemplated Thornburg Mortgage's "significant

margin calls during February," just hours before signing off on Thornburg Mortgage's 2007

financial statements.  Defendants Rule 13b2-2 Supp. at 22-23.  The Defendants assert, finally,

that KPMG considered the information reflected in the Margin Call Schedule, and concluded that

this information "didn't seem inconsistent with," and therefore did not alter, KPMG's OTTI and

going concern conclusions.  Defendants Rule 13b2-2 Supp. at 24.

### 15.    The SEC's Subjective Falsity Supplemental Brief.

The SEC filed Plaintiff Securities and Exchange Commission's Supplemental Brief

Relating to the Applicable Subjective Falsity Standard (Doc. 324)("SEC Subjective Falsity

Supp."), on July 29, 2014.  The SEC maintains that, for subjective falsity, the Court correctly

ruled in the MOO that a reckless standard governs, but, even if an actual disbelief standard

governs, it has produced sufficient evidence to survive summary judgment.  See SEC Subjective

Falsity Supp. at 5-7.  According to the SEC, case law supports the application of a reckless

standard.  See SEC Subjective Falsity Supp., at 7-9 (citing Freedman v. Value Health, Inc., 958

F. Supp. 745, 753 (D. Conn. 1997); DeSalle v. A.G. Edwards & Sons, Inc., 804 F. Supp. 436,

438 (D. Conn. 1992); In re PHLCORP, No. CIV 88-0306 PNL, 1992 WL 85013, at * 5

(S.D.N.Y. Apr. 10, 1992); In re Hunter Env. Servs., Inc. Sec. Litig., 921 F. Supp. 914, 924-25

(D. Conn. 1996); <u>In re Reliance Sec. Litig.</u>, 135 F. Supp. 2d 480, 515 (D. Del. 2001)).  The SEC asserts that a reckless standard is consistent with the general rule that, when it is the plaintiff, it must prove recklessness to prevail on § 17(a)(1) and § 10(b) claims.  <u>See</u> SEC Subjective Falsity Supp. at 9 (citing <u>SEC v. Smart</u>, 678 F.3d 850, 856-57 (10th Cir. 2012)).

The SEC argues that courts which have applied an actual-disbelief standard permit circumstantial evidence to contradict the belief, and, for the motion-to-dismiss phase, require the plaintiff to plead provable facts that reasonably suggest that the speaker did not believe the particular opinion when given or that suggest the speaker could not have reasonably held the particular opinion.  <u>See</u> SEC Subjective Falsity Supp. at 10-13 (citing <u>In re Bank of Am. Corp.</u> 757 F. Supp. 2d at 310-11; <u>In re Credit Suisse 1st Boston Corp.</u>, 431 F.3d at 47; <u>In re Longtop Fin. Tech. Ltd. Sec. Litig.</u>, 910 F. Supp. 2d 561, 579-80 (S.D.N.Y. 2012); <u>In re CIT Grp., Inc. Sec. Litig.</u>, 349 F. Supp. 2d at 689).  The SEC maintains that it has presented sufficient evidence to undermine the Defendants' asserted subjective belief of Thornburg Mortgage's OTTI analysis.  <u>See</u> SEC Subjective Falsity Supp. at 13-19.

### 16.    <u>The Defendants' Subjective Falsity Supplemental Brief.</u>

On July 29, 2014, the Defendants filed the Defendants' Supplemental Brief Regarding the OTTI Falsity Standard, filed July 29, 2014 (Doc. 326)("Defendants Subjective Falsity Supp.").  The Defendants assert that, because the OTTI statement is an opinion, and not a matter of objective fact, the SEC must show that it was both objectively and subjectively false when made.  <u>See</u> Defendants Subjective Falsity Supp. at 6-7 (citing <u>MHC Mut. Conversion Fund, L.P. v. United W. Bancorp, Inc.</u>, 913 F. Supp. 2d 1026, 1035 (D. Colo. 2012); <u>Fait v. Regions Fin. Corp.</u>, 655 F.3d at 110; <u>City of Omaha, Neb. Civilian Emps. Ret. Sys. v. CBS Corp.</u>, 679 F.3d at 67-68; <u>Lane v. Page</u>, 581 F. Supp. 2d at 1127); <u>Va. Bankshares v. Sandberg</u>, 501 U.S.

at 1095). They argue that, because OTTI requires a judgment call concerning uncertain events, their OTTI judgment is false only if they did not hold the beliefs of their asserted opinions when they made them. See Defendants Subjective Falsity Supp. at 7. According to the Defendants, OTTI is an accounting estimate that is similar to valuation, goodwill, and loan-loss reserves. See Defendants Subjective Falsity Supp. at 8-12.

The Defendants assert that the subjective falsity inquiry requires a false-statement element that is separate from the scienter element. See Defendants Subjective Falsity Supp. at 12 (citing In re Puda Coal Sec. Inc. Litig., 30 F. Supp. 3d 230 (S.D.N.Y. 2014); Buttonwood Tree Value Partners, LP v. Sweeney, 910 F. Supp. 2d 1199, 1203, 1204-08 (C.D. Cal. 2012)); id. at 14-15. They content that, in the § 10(b) context, for opinion statements, the SEC must show actual disbelief. See Defendants Subjective Falsity Supp. at 12 (citing City of Omaha, Neb. Civilian Emps. Ret. Sys. v. CBS Corp., 679 F.3d at 68-69; Rubke v. Capital Bancorp Ltd., 551 F.3d 1156, 1162 (9th Cir. 2009); In re Credit Suisse 1st Boston Corp., 431 F.3d at 49; Nolte v. Capital One Fin. Corp., 390 F.3d 311, 315 (4th Cir. 2004)); Defendants Subjective Falsity Supp. at 16-18. The Defendants maintain that the SEC has not presented any evidence showing that they did not subjectively believe in Thornburg Mortgage's OTTI decision. See Defendants Subjective Falsity Supp. at 18-19.

17.   **Supplemental Authority.**

On August 5, 2014, the Defendants filed the Defendants' Notice of Supplemental Authority, filed August 5, 2014 (Doc. 327)("Defendants Supp. Auth. 1"). The Defendants assert that, on August 1, 2014, the Tenth Circuit, in following the Supreme Court's guidance in Virginia Bankshares v. Sandberg, 501 U.S. 1083 (1991), joined a number of other Courts of Appeals by taking a narrow view of liability for opinion statements in securities filings.

Defendants Supp. Auth. 1 at 1.   The Defendants refer the Court to <u>MHC Mutual Conversion Fund, L.P. v. United Western Bancorp, Inc.</u>, 761 F.3d 1109 (10th Cir. 2014)(Gorsuch, J., joined by Baldock and Bacharach, JJ.), where they contend that the Tenth Circuit affirmed the district court's dismissal of the plaintiffs' claims that the defendants violated section 11 of the Securities Act by not recognizing OTTI on its MBS portfolio.  <u>See</u> Defendants Supp. Auth. 1 at 1.   The Defendants assert that, in <u>MHC Mutual Conversion Fund, L.P. v. United Western Bancorp, Inc.</u>, the Tenth Circuit held that there was no principal basis for distinguishing OTTI from judgments about loan loss reserve or goodwill and that OTTI statements qualify as opinions, because they require the speaker to exercise judgment about matters on which reasonable minds could differ. <u>See</u> Defendants Supp. Auth. 1 at 1.

According to the Defendants, in <u>MHC Mutual Conversion Fund, L.P. v. United Western Bancorp, Inc.</u>, the Tenth Circuit held that opinion liability requires more than evidence of objective falsity to transform the defendant's OTTI opinion into an actionable untrue statement of material fact.  <u>See</u> Defendants Supp. Auth. 1 at 1.  The Defendants state that the Tenth Circuit cited with approval cases applying the subjective disbelief standard and noted that "'the Supreme Court seems to have adopted just this understanding.'"  Defendants Supp. Auth. 1 at 1 (quoting <u>MHC Mut. Conversion Fund, L.P. v. United W. Bancorp, Inc.</u>, 761 F.3d at 1113).   The Defendants contend that the Tenth Circuit did not resolve the issue of what standard is appropriate for opinion liability; they  assert, however, that it expressed skepticism about the objectively reasonable test on which the SEC relies for four reasons: (i) the apparent inconsistency with Supreme Court's teachings; (ii) the potential inconsistency with statutory text and history; (iii) "the SEC itself . . . seemed to conceive of issuers as more like sellers of goods whose crystals balls are thought no better than anyone else's"; and (iv) the possibility that

"expanding opinion liability" would "invite information overload" rather than protect investors. Defendants Supp. Auth. 1 at 1-2 (quoting MHC Mutual Conversion Fund, L.P. v. United Western Bancorp, Inc., 761 F.3d at 1117)(internal quotation marks omitted)(omission in Defendants Supp. Auth. 1 but not in case). The Defendants contend that, there, the Tenth Circuit failed to see how a reasonable investor could have been misled, given the defendants' "disclosure that it could incur OTTI charges if the housing market didn't improve soon." Defendants Supp. Auth. 1 at 2 (internal quotation marks omitted)(citation omitted). The Defendants assert that the statements in MHC Mutual Conversion Fund, L.P. v. United Western Bancorp, Inc. are analogous to Thornburg Mortgage's disclosure of market volatility and risk of inability to meet future margin calls without selling assets. See Defendants Supp. Auth. 1 at 2.

On August 6, 2014, the SEC filed the Plaintiff Securities and Exchange Commission's Response to Defendants' Notice of Supplemental Authority [Docket 327], filed August 6, 2014 (Doc. 328)("SEC Supp. Auth. Response"). The SEC asserts that, in MHC Mutual Conversion Fund, L.P. v. United Western Bancorp, Inc., the Tenth Circuit analyzed objective and subjective falsity in a manner that supports its case. See SEC Supp. Auth. Response 1 at 1. The SEC states that the Tenth Circuit affirmed the district court's dismissal of the plaintiffs' OTTI fraud claim, because the complaint did not include any allegations of subjective disbelief. See SEC Supp. Auth. Response 1 at 1. The SEC asserts that MHC Mutual Conversion Fund, L.P. v. United Western Bancorp, Inc. is different from this case, because here the Court ruled that it sufficiently alleged subjective disbelief. See SEC Supp. Auth. Response 1 at 1.

The SEC maintains that, in MHC Mutual Conversion Fund, L.P. v. United Western Bancorp, Inc., the Tenth Circuit held that, to state a claim for a false opinion, "a plaintiff must show both that the defendant expressed an opinion that wasn't his real opinion (sometimes called

subjective disbelief) and that the opinion didn't prove out in the end (sometimes called objective falsity)."  SEC Supp. Auth. Response 1 at 1 (quoting MHC Mutual Conversion Fund, L.P. v. United Western Bancorp, Inc., 761 F.3d at 1113).  The SEC contends that this description of objective falsity applies here, because the Defendants' OTTI judgment did not prove correct in the end.  See SEC Supp. Auth. Response 1 at 1.

As to subjective falsity, the SEC states that, in MHC Mutual Conversion Fund, L.P. v. United Western Bancorp, Inc., the plaintiffs did not allege that the defendants' opinion was not their true opinion.  See SEC Supp. Auth. Response 1 at 2.  The SEC argues that, here, a jury could reasonably conclude that the Defendants did not believe Thornburg Mortgage's OTTI disclosure.  See SEC Supp. Auth. Response 1 at 2.  The SEC asserts that, in MHC Mutual Conversion Fund, L.P. v. United Western Bancorp, Inc., the Tenth Circuit held that the plaintiffs had not alleged that the defendants had an objectively reasonable basis for their stated opinions. See SEC Supp. Auth. Response 1 at 2.  The SEC argues that, here, the evidence shows that the Defendants did not believe, and could not have reasonably believed, Thornburg Mortgage's OTTI disclosure.  See SEC Supp. Auth. Response 1 at 2.  The SEC maintains that, while the Tenth Circuit did not address whether a recklessness standard applies to subjective disbelief, it has put forward sufficient evidence to survive summary judgment.  See SEC Supp. Auth. Response 1 at 2.

On October 21, 2014, the Defendants filed the Defendants' Notice of Supplemental Authority, filed October 21, 2014 (Doc. 344)("Defendants Supp. Auth. 2"), to give the Court notice of the decision of Honorable Terrence W. Boyle, United States District Judge for the Eastern District of North Carolina, in FDIC v. Willetts, 48 F. Supp. 3d 844 (E.D.N.C. 2014). See Defendants Supp. Auth. 2 at 1.  The Defendants contend that, in FDIC v. Willetts, Judge

Boyle granted the defendant's motion for summary judgment, dismissing the plaintiff's claims that the recession was, not only foreseeable, but that the defendants had foreseen it.   See Defendants Supp. Auth. 2 at 1.   The Defendants argue that the plaintiff's claims in FDIC v. Willetts are analogues to the SEC's theory.   See Defendants Supp. Auth. 2 at 1.   The Defendants assert that, in FDIC v. Willetts, while the plaintiff relied on several pieces of evidence to support its claim that the defendants foresaw the economic downtown as early as October, 2006, the plaintiff ignored numerous economists' and economic forecasters' prognosis of a strong future economy.   See Defendants Supp. Auth. 2 at 1.

The Defendants note that, in FDIC v. Willetts, the plaintiff's claim that the defendants "'were not only more prescient than the nation's most trusted bank regulators and economists, but that they disregarded their own foresight of the coming crisis' was found to be wholly implausible."   Defendants Supp. Auth. 2 at 2 (quoting FDIC v. Willetts, 48 F. Supp. 3d at 853). The Defendants argue that the SEC's theory that they knew that Thornburg Mortgage would be forced to sell its impaired securities, because the February, 2008, events were the product of forces already in motion as early as 2006, is similar to the rejected, implausible arguments in FDIC v. Willetts.   Defendants Supp. Auth. 2 at 2.

On October 23, 2014, the SEC filed the Plaintiff Securities and Exchange Commission's Response to Defendants' Notice of Supplemental Authority, filed October 23, 2014 (Doc. 345) ("SEC Supp. Auth. Response").   The SEC asserts that, in the Defendants Supp. Auth. 2, the Defendants attempt to mischaracterize its claims as claims based on hindsight.   See SEC Supp. Auth. Response 2 at 1.   The SEC argues that "the Defendants are not alleged to have lacked prescience, but rather to have committed fraud by concealing known information from their auditors and investors and saying they had the intent and ability to hold impaired assets when

they knew of multiple factors, unknown to others, indicating that they did not."   SEC Supp.

Auth. Response 2 at 1.   The SEC argues that, in distinguishing Fulton County Employees'

Retirement System v. MGIC Investment Corp., No. CIV 08-0458, 2010 WL 601354 (E.D. Wis.

Feb. 18, 2010), the Court rejected the Defendants' claims that the SEC is attempting to hold

them liable for forces beyond their control.   See SEC Supp. Auth. Response 2 at 1.   The SEC

argues that the Court previously stated that

> the SEC has alleged that Thornburg Mortgage had only forty million dollars available in cash at the time the 2007 Form 10-K was filed, that it had experienced margin calls in excess of a billion dollars in the last seven months, that it had to sell assets at a loss to meet margin calls, that Goldstone and Simmons knew more margin calls were coming, and that Thornburg Mortgage could not pay its margin calls on the day they became due, and, therefore, was dependent on lenders not exercising their right to declare a default to meet incoming margin calls.

SEC Supp. Auth. Response 2 at 1-2 (quoting MOO at 276).   The SEC, thus, maintains that the

conclusion in FDIC v. Willetts concerning allegations that the defendants could and did foresee

the recession has no bearing on this case.   See SEC Supp. Auth. Response 2 at 1

On March 27, 2015, the Defendants filed the Defendants' Notice of Supplemental

Authority, filed March 27, 2015 (Doc. 353)("Defendants Supp. Auth. 3").   The Defendants refer

the Court to Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,

135 S. Ct. 1318 (2015)("Omnicare").   Defendants Supp. Auth. 3 at 1.   The Defendants contend

that, there, the Supreme Court confirmed that actual disbelief is required to establish

misrepresentation liability for opinions.   See Defendants Supp. Auth. 3 at 1.   They assert that the

Supreme Court held that "a sincere statement of pure opinion is not 'an untrue statement of

material fact' regardless whether an investor can ultimately prove the belief wrong," and that the

prohibition on untrue statements of fact "does not allow investors to second-guess inherently

subjective and uncertain assessments."   Defendants Supp. Auth. 3 at 1 (quoting Omnicare, 135

S. Ct. at 1327).  The Defendants assert that the Supreme Court held that liability exists only for the omission of material facts that cannot be squared with a fair reading of the opinion.  See Defendants Supp. Auth. 3 at 1.

The Defendants state that: (i) this inquiry always depends on context, such as hedges, disclaimers, or qualification, which can clarify the tentativeness of the issuer's belief; (ii) opinions sometimes require weighing competing facts and do not become misleading whenever an issuer knows, but fails to disclosure, some facts cutting the other way; (iii) a statement of opinion is not misleading merely because external facts show the opinion to be incorrect; and (iv) reasonable investors do not expect that every fact known to an issuer supports its opinion.  See Defendants Supp. Auth. 3 at 1-2.  The Defendants argue that, here, the SEC lacks evidence to challenge the sincerity of their opinion.  See Defendants Supp. Auth. 3 at 2. The Defendants assert that the SEC also lacks evidence demonstrating that reasonable investors would consider their opinion misleading.  See Defendants' Supp. Auth. 3 at 2.  The Defendants maintain that they were not required to disclose the alleged competing facts that cut against their opinion, and that the 2007 Form 10-K cautioned that Thornburg Mortgage might need to selectively sell its assets and that it could not ensure that it would be able to satisfy additional margin calls.  See Defendants Supp. Auth. 3 at 2.

On March 31, 2015 the SEC filed the Plaintiff Securities and Exchange Commission's Response to Defendants' Notice of Supplemental Authority, filed March 31, 2015 (Doc. 354) ("SEC Supp. Auth. Response 3").  The SEC argues that, in Omnicare, the Supreme Court interpreted § 11 liability for misstatements and omissions.  SEC Supp. Auth. Response 3 at 1. The SEC states that the Supreme Court held that, for misstatements, liability follows "not only if the speaker did not hold the belief she professed but also if the supporting facts she supplied

were untrue."  SEC Supp. Auth. Response 3 at 1 (quoting Omnicare, 135 S. Ct. at 1327)(internal quotation marks omitted).  The SEC argues that, here, the Court has already found evidence of actual disbelief.  See SEC Supp. Auth. Response 3 at 1.  According to the SEC, because there is evidence of actual disbelief, Omnicare supports its misstatement claim.  See SEC Supp. Auth. Response 3 at 1.

The SEC notes that, for omissions, the Supreme Court rejected the argument that a sincerely held statement of opinion can never mislead.  See SEC Supp. Auth. Response 3 at 1.  Instead, the SEC asserts that the Supreme Court focused on a reasonable investor's perspective.  See SEC Supp. Auth. Response 3 at 1.  The SEC contends that numerous facts that the Defendants withheld contradict their statement that Thornburg Mortgage had the intent and ability to hold impaired assets until recovery.  See SEC Supp. Auth. Response 3 at 2.  The SEC asserts that the Court has already found that Goldstone and Simmons knew more margin calls were forthcoming, and that Thornburg Mortgage could not pay its margin calls on the day they became due, making it dependent on lenders not exercising their right to declare a default.  See SEC Supp. Auth. Response 3 at 2.  The SEC argues that these facts show that the Defendants lacked a basis for making their OTTI statements.  See SEC Supp. Auth. Response 3 at 2.

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th

Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will

bear the burden of persuasion at trial, that party must support its motion with credible evidence --

using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if

not controverted at trial."  Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)

(emphasis in original).[309]  Once the movant meets this burden, rule 56 requires the nonmoving

party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp.

v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d

1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)

("However, the nonmoving party may not rest on its pleadings but must set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party

asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It

is not enough for the party opposing a properly supported motion for summary judgment to "rest

---

[309]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme
Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely
understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R.
Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued
a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment
burden of proof operates; they disagreed as to how the standard was applied to the facts of the
case.").

on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If

the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may

be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a

rational trier of fact, considering the record as a whole, could not find for the nonmoving party,

there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of

ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court

must "bear in mind the actual quantum and quality of proof necessary to support liability."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable

inferences and doubts in favor of the nonmoving party, and construe all evidence in the light

most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999);

Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot

decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's

version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In

Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was

appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.

550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most
> favorable to the nonmoving party only if there is a "genuine" dispute as to those

facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[310]] explained that

---

[310]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

the blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"   Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)

(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).   See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

---

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, Wolfe v. Aspenbio Pharm., Inc., 587 F. App'x 493 (10th Cir. 2014)(unpublished), Cook v. Baca, 512 F. App'x 810 (10th Cir. 2013)(unpublished); SEC v. Curshen, 372 F. App'x 872 (10th Cir. 2010)(unpublished), and Cardon v. TestOut! Corp., 244 F. App'x 908 (10th Cir. 2007)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Amended Order.

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court," before

inquiring into whether there are genuine issues of material fact for resolution by the jury.

584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th

Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes

are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the

plaintiffs' facts").

## RELEVANT FEDERAL SECURITIES LAW

"In the aftermath of Black Tuesday, the infamous Wall Street crash of 1929, Congress

enacted the Securities Act of 1933 and the Securities Exchange Act of 1934.  These two Acts

sought to ensure legitimacy in the securities market by, among other things, regulating and

preventing deceptive conduct in securities transactions."  Nathan Lee, The Extraterritorial Reach

of United States Securities Actions After Morrison v. National Australian Bank, 13 Rich. J.

Global L. & Bus. 623, 623 (2015).

> The [Securities] Act was described as an Act "to provide full and fair disclosure
> of the character of securities sold in interstate and foreign commerce and through
> the mails, and to prevent frauds in the sale thereof, and for other purposes."  The
> Securities Exchange Act . . . was described as an Act "to provide for the
> regulation of securities exchanges and of over-the-counter markets operating in
> interstate and foreign commerce and through the mails, to prevent inequitable and
> unfair practices on such exchanges and markets, and for other purposes."

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 727-28 (1975).  The Securities Act deals

with the initial issuance of securities, and with the required contents of registration statements

and prospectuses.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. at 728.  The Exchange

Act, on the other hand, is primarily known for prohibiting fraud in connection with the purchase

or sale of securities.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. at 728-29.

1.    **Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act.**

Section 17(a) of the Securities Act requires substantially the same elements of proof as

Section 10(b) of the Exchange Act.  See SEC v. Wolfson, 539 F.3d 1249, 1256 (10th Cir. 2008).

Under §17(a) of the Securities Act, it is

> unlawful for any person in the offer or sale of any securities (including security-swap swaps) or any security-based swap agreement (as defined in section 78c(a)(78) of this title)  by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> > **(1)**    to employ any device, scheme, or artifice to defraud, or
> >
> > **(2)**    to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> >
> > **(3)**    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

> Under § 10(b) of the Exchange Act, it is unlawful for
>
> any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange --
>
> . . .
>
> > **(b)**    To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Pursuant to the authority Congress granted the SEC under § 10(b) of the Exchange Act, the SEC promulgated rule 10b-5, which makes it

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a)   To employ any device, scheme, or artifice to defraud,
> >
> > (b)   To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (c)   To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

> In an SEC enforcement action . . . , based on alleged misstatements or omissions contained in public filings, a defendant is liable under § 10(b) if the Commission establishes that he (1) made a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, and (5) by virtue of the requisite jurisdictional means.

SEC v. Wolfson, 539 F.3d at 1256 (citing Geman v. SEC, 334 F.3d 1183, 1192 (10th Cir. 2003)).

Unlike private litigants bringing a cause of action under the Private Securities Litigation Reform Act of 1996, Pub. L. No. 104-67, 109 Stat. 737 (1995)("PSLRA"), the SEC need not prove "reliance or injury in enforcement actions."  Geman v. SEC, 334 F.3d at 1191.

"The principal difference between § 17(a) and § 10(b) lies in the element of scienter, which the SEC must establish under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3).  By contrast, § 10(b) always requires a showing of scienter."  SEC v. Wolfson, 539 F.3d at 1256-57 (citing Aaron v. SEC, 446 U.S. 680, 697 (1980))(citation omitted)(footnote omitted).

Additionally, under § 17(a) of the Securities Act, the SEC must prove that the fraud occurred

"'in the offer or sale of any securities,'" rather than "'in connection with the purchase or sale of any security.'"  SEC v. Wolfson, 539 F.3d at 1256 n.12 (quoting 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b)).

"The purpose of both [§ 10(b) and § 17(a)] is protection of investors from fraudulent practices."  SEC v. Int'l Chem. Dev. Corp., 469 F.2d 20, 26 (10th Cir. 1972).  "In cases of alleged misstatements in public filings submitted to the Commission, the scope of the two sections is essentially coextensive because the fraudulent conduct touches upon both purchases and sales of publicly-traded securities."  SEC v. Wolfson, 539 F.3d at 1257 (citing SEC v. Power, 525 F. Supp. 2d 415, 419-20 (S.D.N.Y.2007)).

### a.   **Material Statements or Omissions.**

"To satisfy the first element of a 10b-5 claim, a plaintiff must allege facts showing the defendant made an untrue statement of material fact, or failed to state a material fact necessary for make the statements that were made not misleading."  Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997)(citing 17 C.F.R. § 240.10b-5).  The statement or omission must not merely be false now; rather, it must have been false at the time that the document containing it was created.  See Grossman v. Novell, Inc., 120 F.3d at 1124 ("What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation . . . ." (quoting In re GlenFed, Inc. Sec. Litig., 42 F.3d 1548-49 (9th Cir. 1994)(en banc), superseded by statute as recognized in SEC v. Todd, 642 F.3d 1207, 1216 (9th Cir. 2011)).

A statement of fact is material if "'a reasonable person would consider it important in determining whether to buy or sell'" securities.  Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d 1082, 1126 (D.N.M. 2011)(Browning, J.)(quoting Schaffer v.

Evolving Sys., Inc., 29 F. Supp. 2d 1213, 1220-21 (D. Colo. 1998)(citing Grossman v. Novell, Inc., 120 F.3d at 1119).  In a similar context -- a claim under § 14 of the Exchange Act -- the Supreme Court has said that a statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the public.  TSC Indus., Inc. v. Northway, Inc., 426 U.S. at 449.  Courts in the Tenth Circuit should "not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial."  McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 997 (10th Cir. 2002)(quoting Grossman v. Novell, Inc., 120 F.3d at 1118).  The Tenth Circuit, in the context of securities fraud claims under § 10b-5 and rule 10b-5 of the Exchange Act, has identified two categories of statements that are, as a matter of law, not materially misleading: vague statements of corporate optimism and "statements considered immaterial because other documents available to the investing public 'bespoke caution' about the subject matter of the alleged misstatement at issue."  Grossman v. Novell, 120 F.3d at 1120.   The Supreme Court, however, has recently emphasized that "[a]ny approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive."  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1318 (2011)(quoting Basic, Inc. v. Levinson, 485 U.S. at 236).  Likewise, the Supreme Court reiterated that it was "careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information."  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. at 1318 (internal quotation marks omitted)(quoting Basic, Inc. v. Levinson, 485 U.S. at 231).  In analyzing materiality in the context of a 12(b)(6) motion to dismiss, a court should consider whether the "allegations suffice

to 'raise a reasonable expectation that discovery will reveal evidence' satisfying the materiality requirement, and to 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. at 1323 (citations omitted)(quoting Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)).

"Alleged omissions create another hurdle for the plaintiff.  Unlike statements, omissions are actionable only if the plaintiff can establish that the defendant had a duty to disclose the omitted information."  Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d at 1127 (citing McDonald v. Kinder-Morgan, Inc., 287 F.3d at 998 (stating that, in the context of the Exchange Act, "a duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement.")).  See Basic v. Levinson, 485 U.S. at 239 n.17 ("To be actionable, of course, a statement must also be misleading.  Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); United States v. Nacchio, 519 F.3d 1140, 1161-62 (10th Cir. 2008)("Information is material if it adds materially to the mix of information already available to investors."  (citing TSC Indus. v. Northway, 426 U.S. at 449), vacated in part 555 F.3d 1234 (10th Cir. 2009); Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996)(stating that, in the context of §§ 11 and 12(a)(2) of the Securities Act, "[t]he proposition that silence, absent a duty to disclose, cannot be actionably misleading, is a fixture in federal securities law"), abrogated on other grounds by 15 U.S.C. § 78u-4(B)(2)).  That principle is also found in the language of the sections of the Exchange Act and Securities Act at issue here.  Section 10(b) of the Exchange Act makes unlawful "any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," 15 U.S.C. § 78j(b),

and § 17(a) of the Securities Act makes it unlawful "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," 15 U.S.C. § 77q(a).  A defendant can therefore be liable under these sections only if he or she omitted material information or made incomplete disclosures that would leave the reader with a false impression that is material.  See Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d at 1127.

"The 'bespeaks caution' rule is an application of the common-sense principle that the more a speaker qualifies a statement, the less people will be misled if the statement turns out to be false."  United States v. Nacchio, 519 F.3d at 1161-62.  "At bottom, the 'bespeaks caution' doctrine stands for the 'unremarkable proposition that statements must be analyzed in context' when determining whether or not they are materially misleading."  Grossman v. Novell, Inc., 120 F.3d at 1120 (quoting Rubinstein v. Collins, 20 F.3d 160, 167 (5th Cir. 1994)).  See Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002)(holding that, under the bespeaks caution doctrine, "[c]ertain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering").  Plaintiffs can overcome cautionary language if the "language did not expressly warn or did not directly relate to the risk that brought about plaintiffs' loss."  Halperin v. eBanker USA.com, Inc., 295 F.3d at 359.  See Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008)(Crotty, J.)("[G]eneral risk disclosures in the face of specific known risks which border on certainties do not bespeak caution.").  Furthermore, the bespeaks caution doctrine normally applies only to forward-looking statements such as projections or forecasts, and not to representations of present fact.  See Plumbers' Union Local No. 12 Pension Fund v. Nomura

Asset Acceptance Corp., 632 F.3d 762, 773 (1st Cir. 2011); Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd., 620 F.3d 137, 142 (2d Cir. 2010).  Similarly, the bespeaks caution doctrine does not apply to statements which "may be construed as indicating the speakers' beliefs concerning then-present factual conditions."  Grossman v. Novell, Inc., 120 F.3d at 1123.  A court may properly apply the bespeaks caution doctrine when considering a motion to dismiss.  See Grossman v. Novell, Inc., 120 F.3d at 1120 n.7.

> **b.   Scienter.**

Scienter "refers to the mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976).  When asserting a claim under § 17(a)(1) of the Securities Act or § 10(b) of the Exchange Act, the SEC must establish at least recklessness, but the SEC must establish only negligence for a claim under §§ 17(a)(2) or 17(a)(3) of the Securities Act.  See SEC v. Smart, 678 F.3d 850, 857 (10th Cir. 2012)("Section 10(b) and § 17(a)(1) require the SEC to establish at least recklessness, whereas negligence is sufficient for § 17(a)(2) and § 17(a)(3).");  SEC v. Wolfson, 539 F.3d at 1256; C.E. Carlson, Inc. v. SEC, 859 F.2d 1429, 1435 (10th Cir. 1988)).

The Tenth Circuit has defined recklessness sufficient to state a claim under § 10(b) of the Exchange Act as "'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendants or is so obvious that the actor must have been aware of it.'"  Dronsejko v. Grant Thornton, 632 F.3d at 665 (quoting City of Phila. v. Fleming Cos., Inc., 264 F.3d at 1457-58).  The Tenth Circuit has emphasized that it "'is the danger of misleading buyers that must be actually known or so obvious that any reasonable man would be legally bound as knowing.'"  City of Phila. v. Fleming Cos., 264 F.3d at 1260 (emphasis in original)(quoting Schlifke v. Seafirst Corp., 866

F.2d 935, 946 (7th Cir. 1989).  In other words, when asserting a defendant's liability for an omission,

> to establish scienter . . . the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors.  The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors.

City of Phila. v. Fleming Cos., 264 F.3d at 1261.  The Tenth Circuit has held that "'divergence between internal reports and external statements on the same subject' and 'disregard of the most current factual information before making statements' can be factors supporting scienter."  In re Level 3 Commc'ns, Inc. Sec. Litig., 667 F.3d at 1345 (quoting Frank v. Dana Corp., 646 F.3d 954, 959 n.2 (6th Cir. 2011)(holding that inconsistencies between internal reports and defendants' public statements did not evidence scienter, because "some of the critical terms at issue" in the reports were "open to multiple interpretations," and, therefore, the "strongest inference" the Tenth Circuit could "draw is that defendants were negligent in failing to put together the pieces")).  See Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc., 537 F.3d 527, 540 (5th Cir. 2008)(holding that corporate officers' receipt of internal reports did not demonstrate scienter because the reports did not necessarily include information inconsistent or at odds with the corporation's public statements).

### c.    Primary Liability.

Primary liability under § 10(b) of the Exchange Act is "limited in its reach to 'only the making of a material misstatement (or omission) or the commission of a manipulative act.'"  SEC v. Wolfson, 539 F.3d at 1257 (quoting Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177-178 (1994)).  "There is no requirement that the alleged

violator directly communicate misrepresentations to plaintiffs for primary liability to attach."

Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226 (citing SEC v. Holschuh, 694 F.2d 130, 142

(7th Cir. 1982)).  Secondary actors, however, such as "accountants, lawyers, or bankers" may be

liable for a primary violation of § 10(b) of the Exchange Act in "certain cases."   SEC v.

Wolfson, 539 F.3d at 1257.

> Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met.

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. at 191 (emphasis

in original).  Secondary actors, therefore, may be liable under § 10(b) of the Exchange Act "so

long as they themselves made a material misstatement or omission (or committed some other

fraudulent act), and each of the remaining elements of liability under § 10(b) are satisfied."  SEC

v. Wolfson, 539 F.3d at 1257-58 (citing Cent. Bank of Denver, N.A., v. First Interstate Bank of

Denver, N.A., 511 U.S. at 191; Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226).  See Anixter

v. Home-Stake Prod. Co., 77 F.3d at 1226-27 ("[I]n order for accountants to [be primarily liable

under § 10(b)], they must themselves make a false or misleading statement (or omission) that

they know or should know will reach potential investors.").

### i.      Liability for Makers of Misstatements or Omissions.

"[T]he maker of a statement is the entity with authority over the content of the statement

and whether and how to communicate it."   Janus Capital Grp., Inc. v. First Derivative Traders,

131 S. Ct. 2296, 2303 (2011).  In Janus Capital Group, Inc. v. First Derivative, the Supreme

Court discussed the scope of liability under rule 10b-5 for those who, "'directly or indirectly, . . .

make any untrue statement of a material fact' in connection with the purchase or sale of

securities." 131 S. Ct. at 2301 (quoting 17 C.F.R. § 240.10b-5(b)). Looking to the usage and definition of the verb "make," the Supreme Court determined that, in rule 10b-5(b), "'[t]o make any . . . statement' is thus the approximate equivalent of 'to state.'" 131 S. Ct. at 2302. The Supreme Court reasoned that a person or entity's control over the statement proscribes liability, because, without control over the statement, "a person or entity can merely suggest what to say, not 'make' a statement in its own right." 131 S. Ct. at 2302. The Supreme Court stated that this interpretation is "supported by our recent decision in Stoneridge[ Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148 (2008)]," in which the Supreme Court found that entities that agreed to arrangements which allowed another company to mislead its auditor and investors could not be liable for the false statements, because "'nothing [the defendants] did made it necessary or inevitable for [the company] to record the transactions as it did.'" Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. at 2303 (emphasis added in original)(quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. at 152-53). In Janus Capital Group, Inc. v. First Derivative Traders, the Supreme Court ruled that an investment adviser and administrator that was "significantly involved in preparing" a prospectus which contained fraudulent statements and omissions could not be liable for those misstatements and omissions under § 10(b) and rule 10b-5(b) of the Exchange Act. 131 S. Ct. at 2299, 2305. The Supreme Court held that only the company which issued the prospectus could be liable for misstatements and omissions, because any assistance the investment advisor provided was subject to the company's ultimate control. See 131 S. Ct. at 2304-05. The Supreme Court noted that the company was legally independent from the investment advisor and administrator, and had its own board of trustees.[311] See 131 S. Ct. at 1204-05. In contrast, in a case which predates Janus

---

[311]The Supreme Court also discussed in Janus Capital Group, Inc. v. First Derivative

Capital Group, Inc. v. First Derivative Traders, the Tenth Circuit held that an accountant could be primarily liable under § 10(b) of the Exchange Act for issuing opinions and certifying financial statements which contained false and misleading statements that were ultimately incorporated into a company's prospectus.  See Anixter v. Home-Stake Prod., Co., 77 F.3d at 1227.  The Supreme Court cited Anixter v. Home-Stake Prod., Co. with approval in Janus Capital Group, Inc. v. First Derivative Traders, emphasizing that the accountant's signature on an "Auditor's Report" supported the Tenth Circuit's conclusion that the accountant committed a primary securities law violation.  Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. at 2305 n.11 (internal quotation marks omitted)(citing Anixter v. Home-Stake Prod. Co., 77 F.3d at 1220 & n.4).

Before Janus Capital Group, Inc. v. First Derivative Traders, the Tenth Circuit stated that a person may be primarily liable for an alleged misstatement or omission if the person was "so involved in creating or communicating the offending misstatement (or omission) that he can fairly be said to have caused it to be made," and he "knew or should have known that the statements would reach investors."  SEC v. Wolfson, 539 F.3d at 1261, 1261 n.18 (citing Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226 n.10).  It is unclear whether this standard still applies

_____

Traders the relevance of to whom a statement is attributed when determining who its "maker" is. 131 S. Ct. at 2302.  "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by -- and only by -- the party to whom it is attributed." 131 S. Ct. at 2302.  Janus Capital Group, Inc. v. First Derivative Traders was a case in which a private plaintiff asserted a right under rule 10b-5(b), a cause of action which requires a private plaintiff to demonstrate reliance upon a fraudulent misstatement or omission.  See 131 S. Ct. at 2301, 2301, n.3.  Neither reliance, nor attribution, are necessary elements in an SEC enforcement action.  See SEC v. Wolfson, 539 F.3d at 1259-60.  The Tenth Circuit does not require the SEC to plead and prove reliance in an action under § 10(b) of the Exchange Act.  See Geman v. SEC, 334 F.3d at 1191.  The Tenth Circuit has reasoned that the attribution is related to a private plaintiff's need to prove reliance on an allegedly fraudulent statement, and, therefore, "given the unambiguous connection between reliance and attribution, and the fact that the SEC need not prove reliance, we decline to impose an attribution element in an SEC enforcement action."  SEC v. Wolfson, 539 F.3d at 1260, 1260 n.17.

after Janus Capital Group, Inc. v. First Derivative Traders.  In Janus Capital Group, Inc. v. First Derivative Traders, the Supreme Court rejected an interpretation of rule 10b-5(b) that would impose liability for misstatements and omissions on those who "create" the statements.  131 S. Ct. at 2303.  The Supreme Court determined that this interpretation would conflict with its previous decisions by allowing "private plaintiffs to sue a person who provides the false or misleading information that another person then puts into the statements."  131 S. Ct. at 2303. In SEC v. Wolfson, the Tenth Circuit held that a non-employee consultant could be primarily liable under § 17(a) of the Securities Act and § 10(b) of the Exchange Act, because the consultant "played an integral role in preparing those filings that contained the misstatements and omissions at issue," through drafting the filings which contained the misstatements and omissions that a company filed without modifications, and because the consultant knew from his previous experience that the filings "were calculated to reach investors."  539 F.3d at 1261.  The Tenth Circuit reasoned that the consultant "caused [the company] to make the relevant statements," even though the filings were issued in the name of the company.  539 F.3d at 1261. This holding is similar to the theory of liability that the Supreme Court rejected in Janus Capital Group, Inc. v. First Derivative Traders -- an interpretation of rule 10b-5(b) which would allow a plaintiff to sue those who provide misleading information that another entity incorporates into a statement.  See Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. at 2303.  On the other hand, the facts before the Tenth Circuit in SEC v. Wolfson may have been sufficient to satisfy Janus Capital Group, Inc. v. First Derivative Traders' standard of "control" over the statement.  In a footnote, the Tenth Circuit noted that it did not rely on the defendant's title as a "consultant" in its decision.  SEC v. Wolfson, 539 F.3d at 1261 n.19.  The Tenth Circuit explained that the defendant was "[f]ar from being a typical outsider to the company," but,

rather, "played a central role in the management of [the company] akin to that of a core member of management." 539 F.3d at 1261 n.19. The Tenth Circuit noted that the defendant negotiated with note holders, analyzed potential business opportunities in the industry, and "regularly interfaced with [the company's] independent auditors as a representative of the company." 539 F.3d at 1261 n.19. These facts may have demonstrated that, in addition to contributing to the creation of misstatements and omissions, the defendant controlled their communication. Were SEC v. Wolfson before the Tenth Circuit today, the Tenth Circuit, therefore, may very well reach the same conclusion as it has in the past, although with a different rationale.

### ii.    Liability for Manipulative and Deceptive Conduct.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device." 15 U.S.C. § 78(j)(b). "[C]onduct itself can be deceptive," and there is no requirement that "there must be a specific oral or written statement before there could be liability under § 10b or Rule 10b-5." Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 128 S. Ct. at 769. "Fraud by conduct is a violation of Rule 10b-5(a) and (c)." O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 898 (10th Cir. 1992). Although the Supreme Court has rejected a private cause of action for aiding and abetting securities violations, the Supreme Court has expressly reserved a cause of action for secondary actors based upon deceptive and manipulative conduct.

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5.

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. at 191 (emphasis added). See Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 128 S. Ct. at 772-73 (discussing

the scope of the implied private right of action under § 10(b) of the Exchange Act, and stating that it "continues to cover secondary actors who commit primary violations" (citing Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. at 191)).  Manipulation in this context is "virtually a term of art," and "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476 (1977).

Although the Tenth Circuit has not used the term "scheme liability," "the two circuit courts that traditionally see the most securities cases[,] the Second and Ninth Circuits," along with a majority of the other circuits, have adopted the term to describe the liability rule 10b-5(a) and (c) creates.  Nicholas Fortune Schanbaum, Scheme Liability: Rule 10b-5(a) and Secondary Actor Liability after Central Bank, 26 Rev. Litig., 183, 197 (Winter 2007).  See Pub. Pension Fund Grp. v. KV Pharm. Co., 679 F.3d 972, 987 (8th Cir. 2012)("Claims brought under Rules 10b-5(a) and (c) are generally referred to as 'scheme liability' claims."); In re DVI, Inc. Sec. Litig., 639 F.3d 623, 643 n.29 (3d Cir. 2011)("We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements."), abrogated on other grounds by Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184 (2013); Pac. Inv. Mgmt. Co. v. Mayer Brown, LLP, 603 F.3d 144, 151 (2d Cir. 2010)(addressing whether a plaintiff's "allegations in the complaint are sufficient to state a claim for 'scheme liability' under Rule 10b-5(a) and (c)"); Desai v. Deutsche Bank Sec. Ltd., 573 F.3d 931, 938 (9th Cir. 2009)("Misrepresentations and most omissions fall under the prohibition of Rule 10b-5(b), whereas manipulative conduct typically constitutes 'a scheme . . . to defraud' in violation of Rule 10b-5(a) or a 'course of business which operates . . . as a fraud or deceit upon any person' in violation of Rule 10b-

5(c).”); Pugh v. Tribune Co., 521 F.3d 686, 696 (7th Cir. 2008)(finding that a private plaintiff may not assert a claim of "scheme liability" under § 10(b) of the Exchange Act against a defendant who "participated in a fraudulent scheme but had no role in preparing or disseminating Tribune's financial statements or press releases"); Regents of Univ. of Ca. v. Credit Suisse First Boston (USA), Inc., 482 F.3d 372, 378-79 (5th Cir. 2007)(recognizing a claim of scheme liability under rule 10b-5(a) for a defendant's allegedly deceptive conduct, but finding that the plaintiffs failed to demonstrate reliance).

The Second, Eighth, and Ninth Circuits have held that scheme liability encompasses only actions which include deceptive conduct beyond assistance with a material misstatement or omission.  See Pub. Pension Fund Grp. v. KV Pharm. Co., 679 F.3d at 987 ("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)."); WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011)("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."); Lentell v. Merill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005)("[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c).").  This formulation is consistent with the Supreme Court's sharp division between those who may be liable as primary violators of the securities laws, and those who may be liable for only aiding and abetting the violation of another.

In Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., the Supreme Court highlighted the distinction between primary violators, and "those who do not engage in the manipulative or deceptive practice."  511 U.S. at 167.  The Supreme Court explained that, unlike

primary liability under § 10(b) of the Exchange Act, "aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do."  511 U.S. at 176.  The Supreme Court held in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A. that §10(b) of the Exchange Act did not include a cause of action for aiding and abetting.  See 511 U.S. at 176.  In response to this holding, Congress created a cause of action for aiding and abetting through the PSLRA exclusively for the SEC's enforcement.  See 15 U.S.C. § 78t(e).  Subsequently, in Stoneridge Investment Partners v. Scientific-Atlanta, Inc., the Supreme Court rejected a theory of scheme liability which would allow private plaintiffs to hold secondary actors liable absent any evidence that the private plaintiffs relied upon the secondary actors' deceptive or manipulative conduct, a required pleading element for private plaintiffs.  See 552 U.S. at 159.  Although the Supreme Court's decision was dispositive on the plaintiffs' inability to prove reliance, the Supreme Court reasoned that, to hold the secondary actors liable for another's misrepresentations would run afoul of Congress' "specific response to Central Bank in § 105 of the PSLRA," which authorizes the SEC, but not private plaintiffs, to bring claims of aiding and abetting a securities violation. 552 U.S. at 162-63.  In Stoneridge Investment Partners v. Scientific-Atlanta, Inc., without evidence of reliance upon the secondary actors' deceptive conduct, the only primary securities violation which the plaintiffs could allege was that a company made material misstatements and omissions in its financial statements and to its auditors.  Although the secondary actors' agreements with the company facilitated the company's misstatements and omissions, the Supreme Court determined that assisting the company's violation of § 10(b) of the Exchange Act alone was insufficient to demonstrate that the plaintiffs relied on the secondary actors' conduct. To hold otherwise would allow the plaintiffs to bring a claim for aiding and abetting, contrary to

Congress' specific statutory intent in the PSLRA.  See 128 S. Ct. at 770-72.  Similarly, the Second, Eighth, and Ninth Circuits' formulation of scheme liability differentiates between those who engage in manipulative or deceptive conduct, and those who merely help others to manipulate or deceive.  Just as the Supreme Court would not allow the plaintiffs to hold secondary actors liable for another's misstatements and omissions, absent evidence that the secondary actors engaged in deceptive conduct upon which the plaintiffs relied, the Second, Eight, and Ninth Circuits require the plaintiffs to demonstrate that a scheme to defraud included manipulative or deceptive conduct beyond a primary actor's misrepresentation or omission.  Liability under § 10(b) of the Exchange Act, therefore, does not attach to secondary actors by "repackaging a fraudulent misrepresentation [as] a 'scheme to defraud.'"  SEC v. St. Anselm Exploration Co., 936 F. Supp. 2d at 1298 (citing Pub. Pension Fund. Grp. v. KV Pharm. Co., 679 F.3d at 987).

Consistent with the Supreme Court's description of manipulative conduct in the context of § 10(b) of the Exchange Act as a "term of art," Santa Fe Indus., Inc. v. Green, 430 U.S. 476, "scheme liability requires proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance," SEC v. St. Anselm Exploration Co., 936 F. Supp. 2d at 1299 (citing SEC v. Daifotis, No. C 11-00137 WHA, 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011)).  See Pub. Pension Fund Grp. v. KV Pharm. Co., 679 F.3d at 987 (finding that the plaintiffs' allegations that corporate officers were aware of misrepresentations and omissions that a company made is insufficient to state a claim for scheme liability).  This restriction on scheme liability recognizes "the importance of maintaining a distinction among the various Rule 10b-5 claims from one another, [and] that the lines dividing the different claims are . . . 'carefully maintained' and are

'well-established.'"   WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d

at 1057 (quoting Desai v. Deutsche Bank Sec. Ltd., 573 F.3d 931, 941 (9th Cir. 2009)).

      For example, in SEC v. Kelly, the Honorable Colleen McMahon, United States District

Judge for the Southern District of New York, determined that a claim of scheme liability failed

because, apart from the defendant's public representations about its advertising transactions, the

transactions were not inherently deceptive.  See 817 F. Supp. 2d at 344.  Similarly, in SEC v.

Lucent Techs., Inc., the Honorable William H. Walls, Senior United States District Judge for the

District of New Jersey, held that, because the sales at issue "were legitimate business

transactions and the customers purchased the product from [defendants] with every intention of

using it or selling it to end customers," the SEC's allegation that the defendants schemed to

defraud by not disclosing certain details of the transactions was an improper attempt to re-cast a

rule 10b-5(b) claim as one for scheme liability.  610 F. Supp. 2d at 360-61.  Additionally, as long

as inherently deceptive conduct is present, a claim for scheme liability does not fail, because the

alleged scheme was in furtherance of a misrepresentation or omission.  In SEC v. Familant, 910

F. Supp. 2d 83 (D.D.C. 2012), the Honorable James E. Boasberg, United States District Judge

for the District of the District of Columbia, held that allegations that the defendants had used

false transactions to overstate a company's performance sufficiently pleaded scheme liability,

notwithstanding that the goal of the scheme was a misrepresentation in accounting statements.

See 910 F. Supp. 2d at 100.  Judge Boasberg expressly rejected a reading of scheme liability

which would preclude allegations of a scheme to make a misrepresentation or omission.  See 910

F. Supp. 2d at 94.  Judge Boasberg based this conclusion on his finding that: (i) neither § 10(b)

nor rule 10b-5 of the Exchange Act's language precluded liability for a scheme to defraud

through public misrepresentations: (ii) the Supreme Court has interpreted the nearly-identical

language of § 17(a) of the Securities Act as creating multiple forms of liability which are not limited by one another: and (iii) the SEC wrote rule 10b-5 specifically and unambiguously to create liability for schemes, as well as for misstatements and omissions.  See 910 F. Supp. 2d at 94-95 (citing United States v. Naftalin, 441, U.S. 768, 773 (1979)); United States v. Naftalin, 441 U.S. at 773 (discussing Securities Act Section 17(a) and stating that "[e]ach succeeding prohibition is meant to cover additional kinds of illegalities -- not to narrow the reach of the prior sections.   There is, therefore, no warrant for narrowing alternative provisions which the legislature has adopted with the purpose of affording added safeguards."); SEC v. Lucent Techs., Inc., 610 F. Supp. 2d at 359 (rejecting an argument that "a defendant cannot be liable if his course of conduct was merely participation in a scheme whose purpose was to make a misstatement. There is no support for such a reading and such a rule would be nonsensical."). Accordingly, scheme liability does not preclude, outright, claims based upon a scheme to misrepresent or omit material facts.  See IBEW Local 90Pension Fund v. Deutsche Bank AG, 2013 WL 1223844, at *8 (finding that a plaintiff may allege "a fraudulent scheme without being tethered to whether specific statements were themselves material misstatements or omissions; such statements may simply be part of the fabric of the fraudulent scheme alleged").

### 2.      Aiding and Abetting Securities Violations.

With the passage of the PSLRA in 1995, the SEC, but not private plaintiffs, may bring a cause of action for aiding and abetting a securities violation.

> For purposes of any action brought by the Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

15 U.S.C. § 78t(e).  The Tenth Circuit has not explicitly discussed the meaning of "substantial assistance," but has indicated that an actor who plays a "significant" or "central" role in a primary violation, or is "intricately involved" in a primary violation, without sufficient involvement to be primarily liable, may be liable for aiding and abetting a securities violation. Anixter v. Home-Stake Prod. Co., 77 F.3d at 1226 n.10 (internal quotations omitted)(discussing the distinction between primary liability and aiding-and-abetting liability post Central Bank of Denver v. First Interstate Bank of Denver, N.A.).

The phrase "or recklessly" was added to § 20(e) of the Exchange with the Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376, in 2010, and the Dodd-Frank Act does not indicate that Congress intended for this amendment to apply retroactively.  See Black v. M & W Gear Co., 269 F.3d 1220, 1228 n.3 (10th Cir. 2001)("The presumption against retroactive application of a statute applies 'absent clear congressional intent favoring' retroactive application of the new statute . . . [a]nd it applies to amended statutes as well as new statutes."); Lytes v. DC Water & Sewer Auth., 572 F.3d 936, 939-40 (D.C. Cir. 2009)(explaining that a court should not apply a statute to conduct occurring before its enactment if to do so would "affect . . . substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment")(quoting Landgraf v. USI Film Prods., 511 U.S. 244, 278 (1994)).

On the other hand, the Tenth Circuit's decisions on aiding-and-abetting liability after the passage of § 20(e) of the Exchange Act indicate that the Tenth Circuit allowed allegations of recklessness to satisfy its state-of-mind requirement.  In Anixter v. Home-Stake Production Co., after the Supreme Court removed a private cause of action for aiding and abetting securities violations, the Tenth Circuit reversed a jury award in favor of a plaintiff because of a general verdict form, which did not specify whether it found the defendant primarily liable, or liable for

aiding and abetting.  See 77 F.3d at 1227-30.  Although the Tenth Circuit expressly stated that "aider and abettor liability . . . required the plaintiff to prove . . . knowledge of the primary violation by alleged aider and abettor," the Tenth Circuit emphasized that the "critical element separating primary from aiding and abetting violations is the existence of a representation," and not a higher degree of scienter.  77 F.3d at 1225.  Additionally, the Tenth Circuit did not state that the jury instructions, which instructed the jury to find the defendant guilty for aiding and abetting with a state of mind of "knowingly or recklessly," which were false or inaccurate.  77 F.3d at 1227 n.13.  Rather, the Tenth Circuit noted that a distinct possibility was that the jury found the defendant primarily liable, because the instructions discussed a "reckless state of mind."  77 F.3d at 1230.  Moreover, to the extent that the Tenth Circuit discussed knowledge as the requisite state of mind for an aiding-and-abetting violation, Anixter v. Home Stake Production Co. is not on all fours, because the Tenth Circuit's ruling was dispositive on the extinction of a private right of action for aiding and abetting.

Geman v. SEC is more instructive regarding the requisite state of mind for an aiding-and-abetting claim in the Tenth Circuit before the Dodd-Frank Act.  In Geman v. SEC, the Tenth Circuit was presented with the question whether the evidence before the SEC was sufficient to find that a defendant was "responsible for aiding and abetting the record keeping failures of" a firm.  334 F.3d at 1195.  The Tenth Circuit reviewed the evidence, and determined that it established a "sufficient factual basis for the conclusion that Geman aided and abetted the violations with a state of mind of recklessness, if not willful disregard."  334 F.3d at 1196.  The Tenth Circuit, therefore, affirmed the SEC's finding that Geman was liable for aiding and abetting.  Although the Tenth Circuit did not set forth the elements of an aiding-and-abetting claim, as it did in Anixter v. Home Stake Production Co., the issue of aiding-and-abetting

liability was squarely before the Tenth Circuit, and, accordingly, the Tenth Circuit's pronouncement that recklessness was sufficient demonstrates that, even before the Dodd-Frank Act, the state of mind of recklessness was sufficient for the SEC to allege a claim for aiding and abetting in the Tenth Circuit.

3.      **Control-Person Liability Under § 20(a) of the Exchange Act.**

Section 20(a) of the Exchange Act provides for control-person liability:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To establish a defendant's liability as a controlling person, a plaintiff must prove two things: (i) a primary violation of the securities laws, and (ii) that the defendant had "control" over the primary violator.  Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1107 (10th Cir. 2003).  "The second element of the prima facie case [under § 20(a)] requires that the plaintiffs plead facts from which it can be reasonably be [sic] inferred that the individual defendants were control persons."  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Maher v. Durango Metals, Inc., 144 F.3d 1302, 1306 (10th Cir. 1998)).

"The Tenth Circuit observed that § 20(a) 'has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable.'"  Lane v. Page, 649 F. Supp. 2d at 1306 (quoting Richardson v. MacArthur, 451 F.2d 35, 41 (10th Cir. 1971)).  This showing requires the plaintiff to specify facts which "indicate that the defendants had 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v.

- 530 -

Durango Metals, Inc., 144 F.3d at 1306).  See 17 C.F.R. § 230.405 ("The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.").

In Adams v. Kinder-Morgan, Inc., the Tenth Circuit addressed whether certain individuals involved in Kinder-Morgan, Inc. qualified as control persons for the purposes of § 20(a) liability.  First, the Tenth Circuit held that the directors were not, ipso facto, control persons.

> We . . . conclude that the plaintiffs have failed to allege sufficient facts to support the conclusion that Kinder was a control person.  During the period in question, he was not an executive of the company, but simply a member of the board of directors.  The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act.  Accordingly, the district court was correct to dismiss the claim of control person liability against Kinder.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Dennis v. Gen. Imaging, Inc., 918 F.2d 496, 509-10 (5th Cir. 1990); Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir. 1984); Cameron v. Outdoor Resorts of Am., Inc., 608 F.2d 187, 195 (5th Cir. 1979)).  On the other hand, the Tenth Circuit held that an executive who had ultimate management authority over a primary violator was a control person:

> [W]e conclude that the plaintiffs have pled facts supporting the allegation that [Defendant] Hall was a control person.  He was the Chairman, President, and CEO of Kinder-Morgan during the relevant period.  As President and CEO, Hall would have possessed the ultimate management authority of the corporation on a daily basis.  There were no managers higher than Hall.  He thus clearly possessed "the power to direct or cause the direction of the management and policies of [Kinder-Morgan]."  Hall also had direct control over McKenzie, his chief financial officer and an alleged primary violator of Rule 10b-5.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1305)(citing In re Ribozyme Pharms., Inc. Sec. Litig., 119 F. Supp. 2d 1156, 1167 (D. Colo. 2000)).   A high-ranking position within the corporation, however, standing alone, is unlikely to satisfy the "control" element of a control-person claim, unless the circumstances of the defendant's position and the nature of the underlying violation would lead to an inference that the person had control.   See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 (holding that the CFO of Kinder-Morgan, purely based on his position as CFO, was a control person where the securities-fraud violations related specifically to official reports on the company's financial performance).   Importantly, it is not necessary that the control person actively participate in the alleged fraudulent activity.   See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108.[312]

     In Genesee County Employees Retirement System v. Thornburg Mortgage Securities Trust, the Court determined that the plaintiffs had stated a claim for control-person liability against RBS Securities for the actions of its affiliate in acquiring, owning, and transferring mortgage assets and selling interests in those assets or bonds which those assets secured.   See 825 F. Supp. 2d at 1099, 1021-22.   The Court noted that the plaintiffs had alleged that RBS Securities had the "practical ability to direct the actions" of its affiliate, and that the RBS Securities' executives significantly overlapped with those of its affiliate, sufficient to demonstrate control over the affiliate.   825 F. Supp. 2d at 1222.   Also, in In re Thornburg Mortgage, Inc. Securities Litigation, the Court found that plaintiffs sufficiently alleged that Thornburg Mortgage's CEO and COO, its CFO, and its Chief Lending Officer, could be liable as control persons for alleged misstatements in Thornburg Mortgage's reporting of its financial

---

[312]If a control person acted in good faith and did not induce the acts on which the liability of the controlled person is founded, the control person is not liable, but good faith is an affirmative defense, thus inappropriate for the Court to consider on a motion to dismiss.   See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 n.5.

performance.  See 695 F. Supp. 2d at 1217-18.  Similarly, in Lane v. Page, the Court found that plaintiffs sufficiently alleged that a real estate company was liable as a control person over a development company, because the plaintiffs alleged that the real estate company possessed a 92.5% ownership stake in the company, and, pursuant to a joint venture agreement, possessed power to approve major decisions involving a proposed merger.  See 649 F. Supp. 2d at 1309-10.

### 4.    Liability for False SEC Filings and False Books and Records.

Section 13(a) of the Exchange Act requires "[e]very issuer of a security registered pursuant to section 78 of this title" to file with the SEC:

> **(1)**    such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 78l of this title, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.

> **(2)**    such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.

15 U.S.C. § 78m(a).  In accordance with the authority Congress granted the SEC to issue "rules and regulations . . . as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security," 15 U.S.C 78m(a), the SEC implemented rules 12b-20 and 13a-1 to enforce § 13(a).  Exchange Act rule 13a-1 requires an issuer of securities to "file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement. Annual reports shall be filed within the period specified in the appropriate form."  17 C.F.R. § 240.13a-1.

Rule 12b-20 requires the issuer of a security to include in the annual report "such further material information, if any, as may be necessary to make the required statements, in the light of

the circumstances under which they are made not misleading."   17 C.F.R.   §   240.12b-20.

Additionally, § 13(b)(2) of the Exchange Act requires the issuer of securities to

    **(A)**    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

    **(B)**    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that--

        **(i)**    transactions are executed in accordance with management's general or specific authorization;

        **(ii)**    transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

        **(iii)**    access to assets is permitted only in accordance with management's general or specific authorization; and

        **(iv)**    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences; and

    **(C)**    notwithstanding any other provision of law, pay the allocable share of such issuer of a reasonable annual accounting support fee or fees, determined in accordance with section 7219 of this title.

15 U.S.C. § 78m(b)(2).  The SEC interprets § 13(b)(2) of the Exchange Act as not including an

element of scienter.  See Promotion of the Reliability of Financial Information and Prevention of

the Concealment of Questionable or Illegal Corporate Payments and Practices, Exchange Act

Release No. 34-15570, 16 S.E.C. Docket 1143, 1979 WL 173674, at *10 (February 15, 1979)

("SEC Release No. 34-15570").   Additionally, the statute does not require perfection, and the

legislative history "reflects that 'standards of reasonableness' are to be used in applying this

provision."   SEC Release No. 34-15570, 1979 WL 173674, at *10 (quoting Foreign Corrupt

Practices Act of 1977, Pub. L. 95-213, S. Rep. 95-114, 1997 U.S.C.C.A.N. 4098, 4105 (1977)).

Courts interpreting these provisions have determined that they create aiding-and-abetting and control-person liability, but not primary liability against individual persons.  See SEC v. Quinlan, 373 F. App'x 581, 585 (6th Cir. 2010)(holding that a district court properly found a defendant liable for aiding and abetting a company's violation of § 13(b)(2) and rule 12b-20 of the Exchange Act); SEC v. Black, No. CIV 04-7377, 2008 WL 4394891, at *2, *14 (N.D. Ill. Sept. 24, 2008)(finding that the SEC is entitled to summary judgment on its allegations of control-person liability against a defendant for violations of § 13(a) of the Exchange Act).

On the other hand, § 13(b)(5) and rules 13b2-1 and 13a-14 of the Exchange Act create liability for individual persons.  Section 13(b)(5) of the Exchange Act makes it unlawful for a person to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)."  15 U.S.C. § 78m(b)(5).  Similarly, rule 13b2-1 proscribes that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(a)."  17 C.F.R. § 240.13b2-1.  Rule 13a-14 requires "[e]ach principal executive and principal financial officer of the issuer, or persons performing similar functions," to "sign a certification" at the time an issuer of securities files a report which the SEC requires to be filed. 17 C.F.R. § 240.13a-14.  The Ninth Circuit has equated an officer's signature on a certification with making false statements contained therein and found liability for signing the certificate.  See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 (9th Cir. 2000)("[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the documents are true."  (citing In re JWP, Inc., Sec. Litig., 928 F. Supp. 1239 (S.D.N.Y. 1996))).

5. __Deceit-of-Auditors Claims__.

Exchange Act rule 13b2-2 "provides that directors or officers shall not make or cause to be made a materially misleading statement or omission to an accountant in connection with SEC filings, among other things."  SEC v. Espuelas, 698 F. Supp. 2d at 436.  Specifically, the rule states:

(a)     No director or officer of an issuer shall, directly or indirectly:

   (1)     Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

   (2)     Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:

      (i)     Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or

      (ii)    The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

(b)

   (1)     No officer or director of an issuer, or any other person acting under the direction thereof, shall directly or indirectly take any action to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of that issuer that are required to be filed with the Commission pursuant to this subpart or otherwise if that person knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading.

   (2)     For purposes of paragraphs (b)(1) and (c)(2) of this section, actions that, "if successful, could result in rendering the

issuer's financial statements materially misleading" include, but are not limited to, actions taken at any time with respect to the professional engagement period to coerce, manipulate, mislead, or fraudulently influence an auditor:

(i)     To issue or reissue a report on an issuer's financial statements that is not warranted in the circumstances (due to material violations of generally accepted accounting principles, generally accepted auditing standards, or other professional or regulatory standards);

(ii)    Not to perform audit, review or other procedures required by generally accepted auditing standards or other professional standards;

(iii)   Not to withdraw an issued report; or

(iv)    Not to communicate matters to an issuer's audit committee.

(c)     In addition, in the case of an investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8), or a business development company as defined in section 2(a)(48) of the Investment Company Act of 1940 (15 U.S.C. 80a-2(a)(48)), no officer or director of the company's investment adviser, sponsor, depositor, trustee, or administrator (or, in the case of paragraph (c)(2) of this section, any other person acting under the direction thereof) shall, directly or indirectly:

(1)

(i)     Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

(ii)    Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with:

(A)    Any audit, review, or examination of the financial

> > statements of the investment company required to be made pursuant to this subpart; or
>
> > (B) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise; or
>
> > (2) Take any action to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of that investment company that are required to be filed with the Commission pursuant to this subpart or otherwise if that person knew or should have known that such action, if successful, could result in rendering the investment company's financial statements materially misleading.

17 C.F.R. § 240.13b2-2. Notably, rules 13b2-2(a) and (c)(1) do not prescribe a scienter requirement. The Ninth Circuit, and the Eighth and Second Circuits, have split whether the SEC must plead and establish a defendant's scienter to succeed on a claim for materially false statements or omissions made to an auditor, and the Tenth Circuit has not reached the issue. The Ninth Circuit holds that, "[t]o be liable, one must 'knowingly' make false statements." SEC v. Todd, 642 F.3d 1207, 1219 (9th Cir. 2011)(quoting United States v. Goyal, 629 F.3d 912, 916 n.6 (9th Cir. 2010)). See United States v. Goyal, 629 F.3d at 916 n.6 ("[L]iability under Rule 13b2–2 . . . requires that a false statement to an auditor be made knowingly."). Notably, the Ninth Circuit's precedent requiring a scienter element in rule 13b2-2(a) and (c)(1) originates from its decision in United States v. Goyal, a criminal matter. In United States v. Goyal, the Ninth Circuit reasoned that the United States must establish that a defendant knowingly deceived auditors to be criminally liable under the rule, because 15 U.S.C. § 78m(b)(4) and (5), under which the SEC promulgated rule 13b2-2, imposes criminal liability for only those who

"'knowingly'" violate § 13(b)(2)'s provisions.   United States v. Goyal, 629 F.3d at 916 n.6 (quoting 15 U.S.C. § 78m(b)(5)).   The Ninth Circuit held that the SEC could not promulgate a rule which encompassed criminal liability beyond the scope of § 13(b)(2)'s allowance, and, therefore, the United States must establish a knowing scienter when alleging a criminal violation of rule 13b2-2.   See United States v. Goyal, 629 F.3d at 916, 916 n.6.

The Second and Eighth Circuits, on the other hand, have read the SEC's interpretive guidance on rule 13b2-2(a) and (c)(1), and its statutory history, to not require the SEC to plead scienter in a civil enforcement action.   See SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998) ("[T]he court's ruling that lack of scienter would not be a defense to the claims under § 13 and the regulations thereunder was consistent with precedent in this Circuit and with the Commission's interpretive regulations indicating that scienter is not an element of civil claims under those provisions."); SEC v. Das, 723 F.3d 943, 955 (8th Cir. 2013)("Based on the foregoing, we conclude that Rule 13b2-2 does not require that the SEC prove [the defendant] acted knowingly."); SEC v. Espuelas, 698 F. Supp. 2d at 436 ("Like rule 13b2-1, 13b2-2 does not require the SEC to plead scienter.").   The Second Circuit has noted that, before the Foreign Corrupt Practices Act, Pub. L. No. 100-418, § 5002, 102 Stat. 1415, 1415 (1988) amendments to § 13 of the Exchange Act, § 13 contained no scienter elements.   Scienter was added to § 13 in connection with the imposition of criminal liability for the "deliberate falsification of books and records and other conduct calculated to evade the internal accounting controls requirement." H.R. Rep. 100-576, at 916-17 (1988)(Conf. Rep.), reprinted in 1998 U.S.C.C.A.N. 1547, 1949-50.   The Second Circuit has determined that, because Congress specifically added a scienter requirement to § 13(b) in connection with criminal liability, congressional intent

"plainly impl[ies] that falsification of the information to be filed in accordance with § 13(b) need not be knowing in order to lead to civil liability."  SEC v. McNulty, 137 F.3d at 741.

Indeed, when promulgating rule 13b2-2, the SEC rejected a request to include a scienter requirement for those who make material misstatements or omissions to auditors:

> The Commission received comments from approximately 80 persons . . . most of which questioned certain aspects of the proposal.  The majority of these comments expressed concern that the proposed rule would: (a) require no showing of scienter in order to establish a violation based upon the making of false, misleading or incomplete statements to an accountant in the course of an examination or audit; (b) impose liability for oral, as well as written, statements made to an accountant; . . . .  [M]any of the comments asserted that imposition of liability for misstatements or omissions, in the absence of a scienter requirement, would be counter-productive and impede communications between auditors and those from whom they seek information in the course of an audit.  In fact, a number of comments suggested that some persons would refuse to communicate with an auditor rather than expose themselves to potential liability.
>
> . . .
>
> [T]he Commission believes its experience concerning questionable and illegal payments is more persuasive as to the need for such a rule than the opinions expressed by some commentators to the effect that the rule will impede communications between auditors and those from whom they seek information.  Under these circumstances, the Commission has decided that the advantages of the new Rule outweigh the potential disadvantages suggested by certain commentators.

SEC Release No. 34-15570, 1979 WL 173674, at *12.  See SEC Release No. 34-15570, 1979 WL 173674, at *10 (noting that the congressional history of Exchange Act Section 13 does not indicate the necessity of pleading violator's scienter).  Further, when rules 13b2-2(b) and (c) were added in 2003, as part of the implementation of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745 (2002), the SEC, again, explicitly stated that the amendment does not alter rule 13b2-2(a)'s imposition of civil liability without a showing of scienter.  The SEC explained that, although rules 13b2-2(b) and (c)(2) prohibit a director or officer from misleading an auditor, the amendment "does not alter" rule 13b2-2(a)'s prohibition against "directly or

indirectly causing to be made materially misleading statements to auditors," without "imposing what would amount to a new scienter requirement on the pre-exiting provision prohibiting officers and directors from causing misleading statements or omissions to be made to auditors." 68 F.R. 31820-01, 31823, 2003 WL 21218518.

The Court finds the Second and Eight Circuits' interpretation of rule 13b2-2(a) and (c) persuasive, and consistent with the Supreme Court's guidance regarding administrative interpretations.  In Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945), the Supreme Court held that an administrative agency's interpretation of its rules "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  325 U.S. at 413-14. "When agencies interpret their own regulations -- to, for example, adjudicate whether a regulated party was in compliance with them -- courts accord agencies what is known as Auer or Seminole Rock deference."  Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 305 F.R.D. 256, 286 (D.N.M. 2015)(Browning, J.)(citing Auer v. Robbins, 519 U.S. 452 (1997); Bowles v. Seminole Rock & Sand Co., 325 U.S. at 410).

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985)(citing Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982)).  The first step in construing a statute requires the court to "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997).  The inquiry stops there "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'"  Robinson v. Shell Oil Co., 519 U.S. at 340 (citing United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240 (1989)).  Whether the statutory language is

plain on its face or ambiguous "is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. at 341 (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477 (1992)).

Congress has not specifically addressed the state of mind necessary for personal civil liability under § 13(b)(2). Congress did not add scienter, however, to § 13(b)(2) until the Foreign Corrupt Practices Act in 1988, and it added scienter with the intent to hold criminally liable only those who knowingly violate the section. The congressional intent in adding an element of scienter to § 13(b) evidences that Congress intended to heighten the requirements for holding directors and officers criminally liable under the section, but the congressional history bears no indication that Congress intended to change any elements of § 13(b) beyond those necessary for criminal liability. See H.R. Rep. 10-576, at 916, (1988)(Conf. Rep.), reprinted in 1988 U.S.C.C.A.N. 1547, 1949 ("The Conferees intend to codify current [SEC] enforcement policy that penalties not be imposed for insignificant or technical infractions or inadvertent conduct. The amendment . . . accomplishes this by providing that criminal penalties shall not be imposed for failing to comply with the . . . books and records or accounting control provisions."). The SEC has consistently interpreted § 13(b)(2) as not requiring it to allege that a defendant acted knowingly to be civilly liable for deceiving auditors, and this interpretation is consistent with the statute's plain language, which did not include an element of scienter when the SEC promulgated rule 13b2-2. The Court determines that the SEC's interpretation that § 13(b)(2) does not impose an element of scienter for civil enforcement actions is consistent with § 13(b)(2)'s plain language, and with congressional history and intent, and is therefore based on a "permissible construction of the statute." Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council,

Inc., 467 U.S. at 843.   Accordingly, the Court adopts the SEC's, and the Second and Eight

Circuits' interpretation of rule 13b2-2(a) and (c)(1), which does not require the SEC to allege

that defendants knowingly misled auditors to state a claim for civil liability under those

provisions.

### 6.   Falsity of Opinion Statements.

In Virginia Bankshares, Inc. v. Sandberg, the Supreme Court held that statements of

reasons, opinion, or belief can be actionable under § 14 of the Exchange Act, 15 U.S.C. § 78n(a),

which prohibits the solicitation of proxies though materially false or misleading statements, if the

statement is both objectively and subjectively false.   See 501 U.S. at 1091-96.   See also MHC

Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., 761 F.3d at 1113 (noting that,

in Virginia Bankshares, Inc. v. Sandberg, the Supreme Court seems to have adopted the view

that "a plaintiff must show *both* that the defendant expressed an opinion that wasn't his real

opinion (sometimes called 'subjective disbelief') *and* that the opinion didn't prove out in the end

(sometimes called 'objective falsity')").   Concurring in Virginia Bankshares, Inc. v. Sandberg,

the Honorable Antonin G. Scalia, Associate Justice to the Supreme Court, described the

majority's holding as follows:

> As I understand the Court's opinion, the statement "In the opinion of the
> Directors, this is a high value for the shares" would produce liability if in fact it
> was not a high value and the directors knew that.  It would not produce liability if
> in fact it was not a high value but the directors honestly believed otherwise.

501 U.S. at 1108-09 (Scalia, J., concurring).   While Virginia Bankshares, Inc. v. Sandberg

involved § 14 of the Exchange Act, courts have applied the subjective/objective falsity test to

opinion statements that are challenged under other securities provisions, including §§ 11 and

12(2) of the Securities Act and §§ 10(b) and 20 of the Exchange Act.   See, e.g., Omnicare, 135

S. Ct. at 1326 n.2 (applying test to § 11); Fait v. Regions Fin. Corp., 655 F.3d at 111 n.4

("Although Virginia Bankshares involved claims under section 14(a), the Court addressed whether statements of opinions or beliefs could be considered factual statements under the securities laws, and we have applied the Court's approach in Virginia Bankshares to claims under the 1933 Act."); In re Donald J. Trump Casino Sec. Litig. Taj Mahal Litig., 7 F.3d 357, 372 n.14 (3d Cir. 1993)("Although the Court in Virginia Bankshares addressed § 14(a) of the 1934 Act . . . it is instructive here in addressing the plaintiffs' claims brought under §§ 11 and 12(2) of the 1933 Act, §§ 10 and 20 of the 1934 Act and Rule 10b-5 promulgated thereunder . . . ."); City of Omaha, Neb. Civilian Emps. Ret. Sys. v. CBS Corp., 679 F.3d at 67-68 (holding that "the same reasoning [for applying Virginia Bankshares v. Sandberg to §§ 11 and 12 of the Securities Act] applies under Sections 10(b) and 20(a) of the 1934 Act, as these claims all share a material misstatement or omission element").

It is unclear whether the subjective falsity requirement concerns the falsity of the statement or the scienter requirement -- as will be explained, subjective falsity concerns both -- and  the Courts of Appeals are split over what standard governs subjective falsity.  Most Courts of Appeals require a plaintiff to show that the speaker did not actually believe the opinion statement when it was made.  See Credit Suisse First Boston Corp., In re, 431 F.3d at 47 (1st Cir.)("A plaintiff can challenge a statement of opinion by pleading facts sufficient to indicate that the speaker did not actually hold the opinion expressed (throughout this opinion, we refer to such allegations as claims of 'subjective falsity')."); Fait v. Regions Fin. Corp., 655 F.3d at 111-12 (2d Cir.)("Requiring plaintiffs to allege a speaker's disbelief in, and the falsity of, the opinions or beliefs expressed ensures that their allegations concern the factual components of those statements."); Nolte v. Capital One Fin. Corp., 390 F.3d at 315 (4th Cir.)("In order to plead that an opinion is a false factual statement under Virginia Bankshares, the complaint must allege

that the opinion expressed was different from the opinion actually held by the speaker."); Rubke v. Capitol Bancorp Ltd, 551 F.3d at 1162 (9th Cir.)(stating that a plaintiff must allege that the defendants believed that their opinion was wrong).  The United States Court of Appeals for the Fifth Circuit, on the other hand, rejects the actual-disbelief standard and requires plaintiffs to show that the defendants made the opinion statement with severe recklessness.  See Owens v. Jastrow, 789 F.3d 529, 543 n.14 (5th Cir. 2015)(rejecting the Second and Ninth Circuits' actual-disbelief test, and holding that a plaintiff can show scienter "by knowledge a defendant is publishing materially false information or by severe recklessness in publishing such information").

In Grossman v. Novell, Inc., the Tenth Circuit seemed to indicate that it required an opinion statement to rest on a factual basis to not be false or misleading.  120 F.3d at 1123 ("As the Supreme Court noted in Virginia Bankshares, such statements of opinion or belief must rest on 'a factual basis that justifies them as accurate, the absence of which renders them misleading.'"  (quoting Virginia Bankshares, Inc. v. Sandberg, 501 U.S. at 1092)).  As a district court within the Tenth Circuit, in SEC v. Goldstone, 952 F. Supp. 2d 1060 (D.N.M. 2013)(Browning, J.), the Court was bound to follow the Tenth Circuit's clear statement that an opinion statement is actionable if it lacks a factual basis that renders it accurate.  See Bath v. Bushkin, Gaims, Gaines & Jonas, 913 F.2d 817, 819 (10th Cir. 1990)("The district court is bound to follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits."), abrogated on other grounds by Rotella v. Wood, 528 U.S. 549 (2000).  In deciding when an opinion statement was false, the Court held:

> As the Tenth Circuit has explained . . . , "such statements of opinion or belief must rest on a factual basis that justifies them as accurate, the absence of which renders them misleading."  It is that factual basis, or, rather, the lack thereof, underlying the [opinion statement] which the SEC alleges renders it fraudulent.

S.E.C. v. Goldstone, 952 F. Supp. 2d at 1229-30.  Since the Court issued its decision, however, the Tenth Circuit has retreated from its previous statements and the Supreme Court has issued an opinion that undermines the Tenth Circuit's previous standard for subjective falsity.

In MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., the Tenth Circuit, in an opinion that the Honorable Neil M. Gorsuch, United States Circuit Judge for the Tenth Circuit, authored and Judges Bacharach and Baldock joined, considered the applicable standard for determining a defendant's liability under § 11 for making an opinion statement.  See 761 F.3d at 1109.  Judge Gorsuch listed three standards with which courts can address statements of opinion: (i) statements of opinions cannot be considered statements of fact, and, thus, cannot lead to any liability, see id. at 1112-13 ("To the extent the plaintiffs complain about the defendants' opinion about future events, there could be no liability."); (ii) an opinion statement asserts a factual statement that the speaker believes something, and it can be actionable if the plaintiff can show both that the defendant did not actually hold the opinion and that the opinion was wrong, see id. at 761 F.3d at 1113-15 ("To warrant liability on this view, then, a plaintiff must show *both* that the defendant expressed an opinion that wasn't his real opinion (sometimes called 'subjective disbelief') *and* that the opinion didn't prove out in the end (sometimes called 'objective falsity')." (emphases in original)); and (iii) an opinion statement is actionable if the opinion's offerer lacked an objectively reasonable basis for making the opinion, see id. at 1115-17 ("On this view, at least some subset of opinions about future events contain within them an implicit factual warranty that they rest on an objectively reasonable basis -- and providing an opinion without an objectively reasonable foundation . . . can give rise to a claim.").  After laying out the three potential standards, the Tenth Circuit refrained from holding which

standard is correct, but, instead, assumed the third standard applied to show that the plaintiffs

could not even satisfy the most plaintiff-friendly standard.  See 761 F.3d at 1117

> For our present purposes, however, we don't have to resolve any of these questions.  We can assume with the plaintiffs that the objectively reasonable basis test is at least an available (if not exclusive) one . . . because even under the terms of this test the outcome in our case does not change. The plaintiffs' complaint still fails . . . .

761 F.3d at 1117.[313]  Even though the Tenth Circuit did not affirmatively decide which standard

applies to opinion statements, and even though, in the end, it applied the objectively

---

[313]The Court is concerned with the Tenth Circuit's reluctance to take a firm stance and to clarify a complex issue on which there is not clear case law within the Tenth Circuit.  For a district court, the greatest benefit that a higher court can provide -- other than ensuring that the district court's own decisions are correct -- is clarity in the law on which the district court can confidently rely in the future.  In MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., from Judge Gorsuch's in-depth and thorough analysis of the three potential standards, it appears that that the issue of what standard to apply to opinion statements was properly teed up and sufficiently briefed.  Moreover, as the Court will discuss, the Tenth Circuit tipped its hand by giving support for one theory while criticizing the other two.  The Tenth Circuit, thus, sufficiently analyzed the issue and decided which theory is best, but refused to officially state that decision, leaving the issue unresolved, and leaving a lack of clarity for lower courts.

　　To further obfuscate the issue, the theory which Judge Gorsuch hinted is correct in MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P. -- actual disbelief -- is contrary to statements that the Tenth Circuit made in a prior opinion.  In Grossman v. Novell, Inc., the Tenth Circuit stated, in an opinion that the Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, authored, and Judges Kelly and Briscoe joined, that Virginia Bankshares v. Sandberg, made "clear that a statement as to beliefs or opinions . . . may be actionable if the opinion is known by the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact," 120 F.3d at 1120 n.6, and that "such statements of opinion or belief must rest on 'a factual basis that justifies them as accurate, the absence of which renders them misleading,'" 120 F.3d at 1123 (quoting Virginia Bankshares v. Sandberg, 501 U.S. at 1093).  In criticizing this reasonable-basis-in-fact standard, Judge Gorsuch addressed the first statement in Grossman v. Novell, Inc., by stating that it "appear[s] in a footnote of clearly demarcated dicta" and that it is still not as plaintiff-friendly of a standard for which the plaintiffs in MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., were advocating. 761 F.3d at 1117 n.6.  While Judge Gorsuch did not address every statement from Grossman v. Novell, Inc. that concerns a factual basis for opinions, he clearly held that they are non-binding dicta.  That the relevant statements in Grossman v. Novell, Inc. are dicta does not help the Court much or clarify the issue, because, by not deciding the issue, Judge Gorsuch's entire discussion of the three standards is also non-binding dicta.  The Tenth Circuit's avoidance strategy leaves

reasonable-basis test, the Court believes that the Tenth Circuit sufficiently tipped its hand to indicate that, if it had to decide the issue, it would require plaintiffs to show that the opinion statement's maker did not truly hold the expressed opinion.

Of the three standards espoused in <u>MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.</u>, the first -- no liability for opinion statements about future events -- is the easiest to dismiss. Judge Gorsuch cites no cases adopting such a standard and, to show support for the standard, cites only to contemporaneous scholars from when the Securities Act was enacted, to common-law rules concerning misrepresentations, and to early SEC prohibition on issuing conjectures and speculations. <u>See</u> 761 F.3d at 1112-13. Furthermore, the Supreme Court has recognized the validity of security fraud actions based on opinion statements. <u>See</u> <u>Omnicare</u>, 135 S. Ct. at 1326-27; <u>Virginia Bankshares, Inc. v. Sandberg</u>, 501 U.S. at 1090-91.

---

the Court to choose between two, seemingly contradictory Tenth Circuit opinions, both of which address the relevant issue only in dicta.

The Court believes that the actual disbelief standard is correct; however, in making this determination, the Court is left without the assurance and confidence that comes from an on-point Tenth Circuit opinion. If the Tenth Circuit clearly decides an issue, the Court may confidently rely on the Tenth Circuit's resolution, knowing that the decision will be upheld, absent the Tenth Circuit sitting en banc or the Supreme Court granting certiorari. Here, by not deciding an issue that was properly teed up before it, the Tenth Circuit has left the Court, and every district court within the Tenth Circuit that faces the issue, without any such assurance, and with the risk that, if the Court relies on the wrong dicta, the Tenth Circuit may reverse its decision in a case that has been litigated for several years, and on which the Court and the parties have spent a substantial amount of time. This avoidance strategy seems particularly risky and costly to the parties here, when the case may eventually go to trial with one standard of another; if the Court gets it wrong, all that work will have to be redone, without much reason other than a slavish adherence to an avoidance doctrine that does not even indicate a constitutional question, but merely a statutory question that keeps coming up. This avoidance seems particularly odd here, given that the Tenth Circuit goes out of its way to decide all sorts of issues in other contexts. <u>See</u> <u>United States v. Medina-Copete</u>, 757 F.3d 1092 (10th Cir. 2014)(reversing and remanding case to district court, but then continuing to decide additional issues that were no longer necessary to resolving the appeal). This area seems to be, as with an increasing number of areas, one in which the Tenth Circuit's decision depends upon before which panel the case goes.

The third standard -- lack of an objectively reasonable basis -- which the Court adopted in SEC v. Goldstone, seems to find support in Tenth Circuit case law.  In Grossman v. Novell, Inc., the Tenth Circuit stated that "statements of opinion or belief must rest on 'a factual basis that justifies them as accurate, the absence of which renders them misleading,'" 120 F.3d at 1123 (quoting Virginia Bankshares, Inc. v. Sandberg, 501 U.S. at 1093), and that Virginia Bankshares, Inc. v. Sandberg "made it quite clear that a statement as to beliefs or opinions . . . may be actionable if the opinion is known by the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact,"  120 F.3d at 1120 n.6.  Judge Gorsuch addressed the latter statement, but not the former, by holding that it is dicta and that it seems to set forth a reckless standard, which is stricter than the standard for which the plaintiffs were advocating the Tenth Circuit to apply.  See MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., 761 F.3d at 1117 n.6.

> There we did address Virginia Bankshares but stated that "[t]he Supreme Court in Virginia Bankshares v. Sandberg made it quite clear that a statement as to beliefs or opinions . . . may be actionable if the opinion is known by the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact." (citation omitted).  Not only does this passage appear in a footnote of clearly demarcated dicta, it seems to suggest a speaker must be reckless in his expression of opinion (*know* that his statement lacks any reasonable basis in fact), an interpretation of section 11 the plaintiffs (again) do not wish us to endorse.

761 F.3d at 1117 n.6 (quoting Grossman v. Novell, Inc., 120 F.3d at 1120 n.6 (alterations in MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., but not in quoted source)(emphasis in original).  Judge Gorsuch stated that some courts have appeared to adopt the approach, and before providing a string cite of cases that use such a standard, he questions whether the standard's origin can be gleaned from the securities statutes.  See 761 F.3d at 1116 n.5 ("[T]he statutory provenance for such a standard is less than entirely clear.").  Additionally,

Judge Gorsuch spends more space criticizing the standard than he does stating support for it.  See

761 F.3d at 1116 ("[T]he approach has been questioned by others on various grounds.").

> In the first place, some wonder whether this approach is consistent with the Supreme Court's teachings.  As the defendants note, Virginia Bankshares seemed to endorse the subjective disbelief/objective falsity test and made no mention of an alternative path to liability for opinions.  Of course, by endorsing one test the Court may not have meant to exclude other possibilities.  But the omission at least raises questions about the Supreme Court's intended direction, perhaps especially when many circuit courts have understood Virginia Bankshares as endorsing only the subjective disbelief/objective falsity test.

> Second, one may wonder about the consistency of this test with the statutory text and history.  The text permits liability for false statements of fact or otherwise misleading statements.  A speaker may make one statement of fact when he ventures an opinion -- he may be stating the fact of his belief.  But when a speaker offers an opinion does he also necessarily imply that he possesses an objectively reasonable basis for his opinion?  Don't people often hold and express opinions based on reasons they find sufficient, even though they lack objective proof sufficient to satisfy others?  How is an opinion false or misleading so long as it's earnestly held, even if supported by evidence sufficient to persuade only the speaker?  Contemporary tort law may sometimes choose to treat fiduciaries and experts as supplying a *legally implied* warranty that their opinions are based on objectively reasonable grounds.  But the statute before us doesn't speak of implications imposed by law.  It requires a false or misleading statement to trigger liability.  And a good deal of common law at the time of section 11's enactment suggested that a true and non-misleading opinion is one "founded upon what *appears to the defendant* to be reasonable and certain grounds."  Krause v. Cook, 144 Mich. 365, 108 N.W. 81, 83 (1906)(emphasis added).  The presence of an objectively reasonable basis could be used to show the sincerity of the defendant's belief.  See, e.g., Cranfill v. Hayden, 22 Tex. Civ. App. 656, 55 S.W. 805, 811 (1900)("What better way is there to establish good faith and honest belief than to show a reasonable basis upon which they were founded?").  But the absence of an objectively reasonable basis wasn't necessarily enough to establish liability for misrepresentation so long as a sincere belief existed.  See Restatement (First) of Torts § 552 first caveat (highlighting that the First Restatement "express[ed] no opinion" on whether liability should attach to someone who fails to exercise reasonable care and competence in forming an opinion but honestly believes it to be true).

> Third, the plaintiffs' position depends on a view of securities issuers as analogous to fiduciaries.  Many common law authorities today are willing to imply a warranty of objective reasonableness when a fiduciary offers a professional opinion.  And many may view securities issuers as standing in a similar relationship to investors.  But not everyone has always conceived of

securities issuers as learned fiduciary agents whose opinions reasonable investors do or should accept uncritically.  As we've seen, some early commentators and the SEC itself for some time at least seemed to conceive of issuers as more like sellers of goods whose crystal balls are thought no better than anyone else's.  See Shulman, supra, at 236; Heller, supra, at 307; cf. In re Franchard Corp., 42 S.E.C. 163, 178 (1964)("To generally require information in Securities Act prospectuses as to whether directors have performed their duties in accordance with the standards of responsibility required of them under State law would stretch disclosure beyond the limitations contemplated by the statutory scheme and . . . either result in self-serving generalities of little value to investors or grave uncertainties both on the part of those who must enforce and those who must comply with that Act.").

Finally, some question whether the goal of investor protection would, on a net basis, be enhanced by expanding opinion liability in this way.  Requiring more extensive disclosure of evidence tending to undermine a sincerely held opinion may, in the view of some, do more to invite information overload than materially benefit the consumer.  See Frank H. Easterbrook & Daniel R. Fischel, Mandatory Disclosure and the Protection of Investors, 70 Va. L. Rev. 669, 709 (1984); see also TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 448-49 . . . (1976)("[M]anagement's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information -- a result that is hardly conducive to informed decisionmaking.").

MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., 761 F.3d at 1116-17

(citation omitted).

For the second standard -- actual disbelief -- Judge Gorsuch offers no criticism, but

instead he endorses it.  He states that an opinion makes at least one factual statement: that the

maker of the opinion actually believes it is true.  See 761 F.3d at 1113 ("In offering an opinion,

after all and again, a speaker is making the factual statement that *he believes* something.").

Judge Gorsuch stated this standard as requiring a plaintiff to show "*both* that the defendant

expressed an opinion that wasn't his real opinion (sometimes called 'subjective disbelief') *and*

that the opinion didn't prove out in the end (sometimes called 'objective falsity')."  761 F.3d

at 1113 (emphases in original).  According to Judge Gorsuch, Virginia Bankshares, Inc. v.

Sandberg seems to support this standard, and most Courts of Appeals have adopted it.

> Addressing an analogous provision -- section 14 of the Securities Exchange Act -- the Supreme Court seems to have adopted just this understanding.  In <u>Virginia Bankshares v. Sandberg</u>, the Court held that to establish liability a plaintiff must prove that a challenged opinion turned out to be objectively false in the world -- and, in doing so, the Court also expressly took as given that the plaintiff must show the opinion wasn't subjectively believed at the time offered.  501 U.S. 1083, 1097 . . . (1991); <u>see also id.</u> at 1108-09 . . . (Scalia, J., concurring).  Following this lead, most of the courts of appeals addressing opinion liability in the section 11 context after <u>Virginia Bankshares</u> have held proof on both these scores essential to recovery, just as the district court did in our case.  At least some securities scholars, too, have endorsed these developments.  <u>See</u>, <u>e.g.</u>, 4 Thomas Lee Hazen, <u>The Law of Securities Regulation</u> § 12.9[4] (6th ed.2009)("Reading the relevant securities cases yields the following general rule: while a good faith opinion (or even 'puffing') is not material, a statement of opinion made with no belief in its truth is actionable.").

<u>MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.</u>, 761 F.3d at 1113-14 (footnote omitted).  Moreover, unlike the third standard, in listing cases that have applied the actual-disbelief standard, Judge Gorsuch did not criticize the standard, but instead criticized a recent opinion from the United States Court of Appeals for the Sixth Circuit, which the Supreme Court has since reversed, <u>see</u> <u>Omnicare</u>, 135 S. Ct. at 1318, and which held that objective falsity, by itself, is sufficient, <u>see</u> <u>MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.</u>, 761 F.3d at 1114 n.2.  Finally, unlike the other two standards, Judge Gorsuch defended the standard by addressing and refuting the plaintiffs' argument that actual disbelief could not apply, because it would render § 11's due-diligence defense as surplusage.  <u>See</u> 761 F.3d at 1114-15.

In light of the Tenth Circuit's support for the actual-disbelief standard and criticism of the objectively reasonable-basis standard, the Court concludes that the Tenth Circuit's statements from <u>Grossman v. Novell</u> no longer bind the Court.  Judge Gorsuch declared that <u>Grossman v. Novell</u>'s statements concerning the objectively reasonable-basis standard were mere dicta.  <u>See</u>

MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., 761 F.3d at 1117 n.6.[314]

The Court continues to believe that its decision in SEC v. Goldstone was correct when issued, because, in Grossman v. Novell, Inc., the Tenth Circuit stated that opinion statements are

---

[314]In declaring Grossman v. Novell, Inc.'s statements mere dicta, Judge Gorsuch states that this statement "appear[s] in a footnote of clearly demarcated dicta." MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., 761 F.3d at 1117 n.6. In making this statement, Judge Gorsuch addresses only one of the two statements from Grossman v. Novell, Inc. The Tenth Circuit, in the footnote to which Judge Gorsuch refers, stated:

> The Supreme Court in Virginia Bankshares v. Sandberg, 501 U.S. 1083, 1093-94 . . . (1991), made it quite clear that a statement as to beliefs or opinions (there an opinion as to the fair current value of a tender price) may be actionable if the opinion is known by the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact.

Grossman v. Novell, Inc., 120 F.3d at 1120 n.6. The Tenth Circuit, however, also stated in the text of the opinion: "As the Supreme Court noted in Virginia Bankshares, such statements of opinion or belief must rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." Grossman v. Novell, Inc., 120 F.3d at 1123 (internal quotation marks omitted). Judge Gorsuch did not deal with this second statement, on which the Court relied in SEC v. Goldstone.

While the Tenth Circuit's holding in Grossman v. Novell, Inc. did not turn on whether an opinion statement had a factual basis, the Tenth Circuit twice said that this was the correct standard, showing that its statements were not merely off-hand comments. Moreover, as a district court, the Court takes seriously anything the Tenth Circuit says, regardless whether dicta. See United States v. Loera, 59 F. Supp. 3d 1089, 1162 (D.N.M. 2014)(Browning, J.)("While the Court may not be bound by Tenth Circuit dicta, the Court takes seriously anything that the Tenth Circuit says." (quoting United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1124 (D.N.M. 2012)(Browning, J.)(internal quotation marks omitted))). As a Tenth Circuit judge, Judge Gorsuch may be free to disregard statements by a prior Tenth Circuit panel as mere dicta, knowing that only by an en banc court or by the Supreme Court can his decision be reversed. The Court does not have such luxury. Dicta in a Tenth Circuit's opinion illuminate what the Tenth Circuit, or at least three judges on the Tenth Circuit, thinks of an issue. This observation is especially true when all three judges from that panel are still on the court. Three judges who are still on the Tenth Circuit, one of which is the current chief judge -- Chief Judge Briscoe, and Judges Ebel and Kelly -- decided the opinion in Grossman v. Novell, Inc. Moreover, even Tenth Circuit judges cannot always agree when statements from prior opinions are mere dicta or binding statements of law. Compare Planned Parenthood of Kan. & Mid-Missouri v. Moser, 747 F.3d 814, 833-35 (10th Cir. 2014)(Hartz, J., joined by Obrien, J.)(holding that statements from two prior Tenth Circuit opinions were not binding), with id. at 843 (Lucero, J., dissenting)(arguing that those same statements from prior Tenth Circuit opinions were binding holdings that could be overturned only through an en banc panel).

actionable if the maker lacked an objectively reasonable basis for the opinion; however, MHC

Mutual Conversion Fund, L.P. v. Sandler O'Neil & Partners, L.P. states that the portion from

Grossman v. Novell, Inc. concerning the objectively-reasonable-basis standard is mere dicta.

After MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., the Court can no

longer say that Grossman v. Novell, Inc.'s statements concerning an objectively reasonable basis

is good law.  For opinion statements, thus, the Court will apply the actual-disbelief standard.

Furthermore, after the Tenth Circuit decided MHC Mutual Conversion Fund, L.P. v.

Sandler O'Neill & Partners, L.P., the Supreme Court decided Omnicare, which gives further

support for the actual-disbelief standard.  In Omnicare, the Supreme Court, in an opinion that the

Honorable Elena Kagan, Associate Justice for the United States Supreme Court, wrote, and Chief

Justice Roberts, and Justices Kennedy, Ginsburg, Breyer, Alito, and Sotomayor joined, reversed

the Sixth Circuit's holding that, if a statement of opinion is ultimately found to be incorrect, it

constitutes an untrue statement of material fact under § 11, even if the maker believed it to be

true when made.  See 135 S. Ct. at 1318.  The Supreme Court distinguished between statements

of fact and opinion, and noted that § 11 liability is limited to statements of fact:

> A fact is "a thing done or existing" or "[a]n actual happening."  Webster's New
> International Dictionary 782 (1927).  An opinion is "a belief[,] a view," or a
> "sentiment which the mind forms of persons or things."  Id., at 1509.  Most
> important, a statement of fact ("the coffee is hot") expresses certainty about a
> thing, whereas a statement of opinion ("I think the coffee is hot") does not.  See
> ibid. ("An opinion, in ordinary usage . . . does not imply . . . definiteness . . . or
> certainty"); 7 Oxford English Dictionary 151 (1933)(an opinion "rests[s] on
> grounds insufficient for complete demonstration").  Indeed, that difference
> between the two is so ingrained in our everyday ways of speaking and thinking as
> to make resort to old dictionaries seem a mite silly.  And Congress effectively
> incorporated just that distinction in § 11's first part by exposing issuers to liability
> not for "untrue statement[s]" full stop (which would have included ones of
> opinion), but only for "untrue statement[s] of . . . *fact*."  § 77k(a) (emphasis
> added).

Consider that statutory phrase's application to two hypothetical statements, couched in ways the Funds claim are equivalent. A company's CEO states: "The TVs we manufacture have the highest resolution available on the market." Or, alternatively, the CEO transforms that factual statement into one of opinion: "I *believe* " (or "I think") "the TVs we manufacture have the highest resolution available on the market." The first version would be an untrue statement of fact if a competitor had introduced a higher resolution TV a month before -- even assuming the CEO had not yet learned of the new product. The CEO's assertion, after all, is not mere puffery, but a determinate, verifiable statement about her company's TVs; and the CEO, however innocently, got the facts wrong. But in the same set of circumstances, the second version would remain true. Just as she said, the CEO really did believe, when she made the statement, that her company's TVs had the sharpest picture around. And although a plaintiff could later prove that opinion erroneous, the words "I believe" themselves admitted that possibility, thus precluding liability for an untrue statement of fact. That remains the case if the CEO's opinion, as here, concerned legal compliance. If, for example, she said, "I believe our marketing practices are lawful," and actually did think that, she could not be liable for a false statement of fact -- even if she afterward discovered a longtime violation of law. Once again, the statement would have been true, because all she expressed was a view, not a certainty, about legal compliance.

Omnicare, 135 S. Ct. at 1325-26.[315]

The Supreme Court also recognized that all opinions affirm one fact: "that the speaker actually holds the stated belief." 135 S. Ct. at 1326. Accordingly, if a person expresses an opinion that he or she did not believe to be true, he or she can be subject to § 11 liability. See 135 S. Ct. at 1326. If a person expresses an opinion that is embedded with statements of fact, however -- such as "I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access" -- the statement's maker may

---

[315]This holding is consistent with Justice Scalia's characterization of Virginia Bankshares, Inc. v. Sandberg:

> As I understand the Court's opinion, the statement "In the opinion of the Directors, this is a high value for the shares" would produce liability if in fact it was not a high value and the directors knew that. It would not produce liability if in fact it was not a high value but the directors honestly believed otherwise.

Virginia Bankshares, Inc. v. Sandberg, 501 U.S. at 1108-09 (Scalia, J., concurring).

be liable if he or she did not believe the statement or if the embedded fact is false.  Omnicare, 135 S. Ct. at 1327 ("Accordingly, liability under § 11's false-statement provision would follow (once again, assuming materiality) not only if the speaker did not hold the belief she professed but also if the supporting fact she supplied were untrue.").  The Supreme Court went onto hold that an opinion may be actionable if a reasonable investor would understand the opinion to conveys facts about how the speaker formed the opinion -- i.e. the statement "[w]e believe our conduct is lawful" would be understood to convey the fact that the speaker consulted a lawyer -- but the speaker failed to disclose the absence of these assumed facts.  135 S. Ct. at 1328. Consequently the Supreme Court articulated a plaintiffs' burden when relying on omissions as follows:

> To be specific: The investor must identify particular (and material) facts going to the basis for the issuer's opinion -- facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have -- whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

135 S. Ct. at 1332.

While the Supreme Court's discussion of omissions gives some support to the objectively reasonable-basis standard, at least as far as the speaker knew of information which the investor did not, and which the investor would assume to be true, its falsity discussion supports the actual-disbelief standard.  The Supreme Court affirmed that an opinion asserts one fact -- that the maker believes the opinion.  Accordingly, an opinion is not false unless the maker did not actually believe it to be true.  Omnicare, thus, supports the actual-disbelief standard.

Finally, it is not entirely clear whether the subjective falsity prong falls within the falsity element or within the scienter element -- for the securities provisions that require scienter.  The Court concludes that it falls under both.  An opinion statement is not false unless the speaker

disbelieved it.   Thus, to satisfy the falsity or untrue prong, the plaintiff must show that the

speaker disbelieved the asserted opinion.   Once the plaintiff shows actual disbelief, however, he

or she likely will have satisfied the scienter prong.   The First Circuit, in an opinion that the

Honorable Bruce M. Selya, United States Circuit Judge for the Sixth Circuit, authored, and Judge

Lynch, and the Honorable William E. Smith, United States District Judge for the District of

Rhode Island, sitting by designation, joined, stated:

> In the typical section 10(b) case, the falsity and scienter elements do not overlap and, thus, necessitate separate inquiries.   In those cases, the falsity element addresses objective truth, whereas the scienter element focuses on the speaker's subjective intent.   In cases premised on misstatements of opinion, however, the falsity element, at a minimum, entails an inquiry into whether the statement was subjectively false (whether it also entails an inquiry into objective falsity is a matter on which we take no view).   Accordingly, the subjective aspect of the falsity requirement and the scienter requirement essentially merge; the scienter analysis is subsumed by the analysis of subjective falsity.   We think it follows that if a plaintiff adequately pleads that a statement of opinion was subjectively false when made, the complaint will, ex proprio vigure, satisfy the pleading requirements of the PSLRA relative to scienter.

Credit Suisse First Boston Corp., In re, 431 F.3d at 48.   Accordingly, actual disbelief is necessary

to show a false statement, and, once shown, the plaintiff will likely have satisfied the scienter

requirement as well.[316]

---

[316]In SEC v. Goldstone, the Court applied a reckless standard for scienter, even though the case involved a statement of opinion, see 952 F. Supp. at 1237, because the Tenth Circuit had consistently used a reckless scienter standard, see In re Gold Res. Corp. Sec. Litig., 776 F.3d 1103, 1108 (10th Cir. 2015); Weinstien v. McClendon, 757 F.3d 1110, 1113 (10th Cir. 2014); SEC v. Smart, 678 F.3d at 856-57; In re Level 3 Commc'ns, Inc. Sec. Litig, 667 F.3d at 1333; Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1095 (10th Cir. 2003); City of Phila. v. Fleming Co., 264 F.3d at 1261; Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1232 (10th Cir. 1996); SEC v. Pros Int'l., Inc., 994 F.2d 767, 772 (10th Cir. 1993); Bd. of Cnty. Comm'rs v. Liberty Grp., 965 F.2d 879, 883 (10th Cir. 1992); Dronsejko v. Thornton, 632 F.3d at 665; O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 898-99 (10th Cir. 1992); Anixter v. Home-Stake Prod. Co., 977 F.2d 1549, 1552 (10th Cir. 1992); C.E. Carlson, Inc. v. SEC, 859 F.2d 1429, 1435-36 (10th Cir. 1988); Wolfe v. Aspenbio Pharm., Inc., 587 F. App'x 493, 497 (10th Cir. 2014) (unpublished); Cook v. Baca, 512 F. App'x 810, 822 (10th Cir. 2013)(unpublished); SEC v. Curshen, 372 F. App'x 872, 881 (10th Cir. 2010)(unpublished); Cardon v. TestOut! Corp., 244

- 557 -

## ANALYSIS

The Court will deny the requests in the Goldstone MSJ, the Starrett MSJ, the SEC Goldstone Response, and the SEC Starrett Response.  There are issues of material fact on the issue of objective falsity that preclude the Court from granting either the Defendants or the SEC summary judgment on that issue.  The SEC's arguments for materiality are closely tied to its arguments for objective falsity, also making summary judgment inappropriate on the materiality issue.  Even though the actual-disbelief standard is stricter than a reckless standard, the SEC has presented sufficient evidence to show that a genuine issue of material fact exists whether the Defendants believed that their OTTI conclusion was false when made.  This same evidence precludes summary judgment on the scienter issue, because the Defendants acted with scienter if they believed that their OTTI determination was false when they made it.  Finally, the Defendants made statements that were false or made misleading because of omitted information,

---

F. App'x 908, 915 (10th Cir. 2007)(unpublished), and because the Tenth Circuit had not yet decided MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., and the Supreme Court had not yet decided Omnicare, both of which changed the standard that is used to determine whether an opinion statement is false.  In MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., the Tenth Circuit retreated from its previous statements in Grossman v. Novell, Inc., and, in Omnicare, the Supreme Court made clear that a plaintiff must show that the maker of an opinion statement disbelieved the statement.  Because the Tenth Circuit's standard from Grossman v. Novell, Inc. for determining whether opinion statements are false is no longer good law, neither is the Tenth Circuit's normal scienter standard in the opinion-statement context.

In any case, in deciding pre-trial dispositive motions -- such as motions to dismiss, judgment on the pleadings, and summary judgment -- whether the Court uses a reckless or an actual-disbelief standard may not make a difference.  The reason is simple: the same evidence that may satisfy the reckless standard but not the actual disbelief standard is razor thin.  Both will likely require circumstantial evidence.  Where the difference between the two standards will make the biggest difference is at trial.  If a defendant testifies that he or she believed that his or her opinion was true, a jury can find that the defendant was reckless in holding that belief without having to find that the defendant is lying.  On the other hand, for actual disbelief, once a defendant testifies that he or she believed the given opinion, a jury must find that the defendant is lying before it can hold the defendant liable for making a false statement.

which show that genuine issues of material fact exist that make summary judgment on the SEC's rule 13b2-2 claim inappropriate.

## I.   THE COURT WILL DENY THE DEFENDANTS' REQUEST FOR SUMMARY JUDGMENT ON THE OBJECTIVE FALSITY ISSUE.

The SEC alleges that the Defendants' OTTI determination in the 2007 Form 10-K was false.  In MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., the Tenth Circuit held that an OTTI judgment is an opinion statement similar to statements concerning concentrations of risk, loan loss reserves, goodwill, and investment ratings.  See 761 F.3d at 1120  (citing  Slater  v.  A.G.  Edwards  &  Sons,  Inc., 719  F.3d  1190,  1203  (10th Cir. 2013)(holding that "whether a particular asset constitutes a significant concentration of risk is a matter of judgment"); Fait v. Regions Fin. Corp., 655 F.3d at 111 (holding that "statements regarding goodwill . . . are subjective ones rather than objective factual matters," and that "the adequacy of loan loss reserves . . . reflect management's opinion or judgment" (internal quotation  marks  omitted)); Plumbers'  Union  Local  No.  2  Pension  Fund  v.  Nomura  Asset Acceptance Corp., 632 F.3d at 775 ("The ratings are *opinions* purportedly expressing the agencies' professional judgment about the value and prospects of the certificates."  (emphasis in original)).[317]   Statements of opinion need to be both objectively and subjectively false to be

---

[317]In the MOO, which the Court issued before the Tenth Circuit decided MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., the Court held that an OTTI analysis was not a purely subjective judgment like goodwill.  See MOO at 294 ("Here, the OTTI analysis, while it incorporates subjective judgments, is also based upon objective facts.  Goodwill, on the other hand, is 'an asset representing the future economic benefits arising from other assets acquired  in  a  business  combination  that  are  not  individually  identified  and  separately recognized.'"  (citations omitted)(quoting Fait v. Regions Fin. Corp., 655 F.3d at 110)).  At least one other court similarly held that OTTI is not purely subjective, because it involves the consideration of both subjective and objective factors.  See In re Omnicom Grp., Inc. Sec. Litig., No  CIV  02-4483  WHP/MHD,  2007  WL  2376170,  at  *12  n.15  (S.D.N.Y.  Aug.  10, 2007)(Dolinger, M.J.)("Determining  whether  a  decline  is  'other  than  temporary'  involves considering a variety of subjective and objective factors . . . .").  The Tenth Circuit's opinion in

- 559 -

actionable.  See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. at 1091-96.  Thus, even if the

Defendants subjectively believed that Thornburg Mortgage's OTTI judgment was wrong, but it

turned out to be correct, they cannot be liable.  The Supreme Court has explained:

> [I]n Virginia Bankshares, Inc. v. Sandberg, . . . the Court considered when
> corporate directors' statements of opinion in a proxy solicitation give rise to
> liability under § 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a), which
> bars conduct similar to that described in § 11.  In discussing that issue, the Court
> raised the hypothetical possibility that a director could think he was lying while
> actually (i.e., accidentally) telling the truth about the matter addressed in his
> opinion.  See Virginia Bankshares, 501 U.S., at 1095-1096 . . . .  That rare set of
> facts, the Court decided, would not lead to liability under § 14(a).  See ibid.  The
> Court reasoned that such an inadvertently correct assessment is unlikely to cause
> anyone harm and that imposing liability merely for the "impurities" of a director's
> "unclean heart" might provoke vexatious litigation.  Id., at 1096 . . . (quoting
> Stedman v. Storer, 308 F. Supp. 881, 887 (S.D.N.Y. 1969)).  We think the same is
> true (to the extent this scenario ever occurs in real life) under § 11.  So if our
> CEO[, who said that she believed her company's TVs had the highest resolution
> on the market,] did not believe that her company's TVs had the highest resolution
> on the market, but (surprise!) they really did, § 11 would not impose liability for
> her statement.

Omnicare, 135 S. Ct. at 1326 n.2.  Accordingly, regardless of the Defendants' subjective beliefs,

if the OTTI judgment was correct, the SEC's claim fails.

   Judge Gorsuch succinctly described the objective falsity prong by stating that "the

opinion didn't prove out in the end."  MHC Mut. Conversion Fund, L.P. v. Sandler O'Neil &

Partners, L.P., 761 F.3d at 1113.  The First Circuit has given a fuller explanation: "To ground an

inference of objective falsity, the facts must suggest that a particular [opinion] was not plausibly

premised on, or was inconsistent with, the information available to the [defendant] at that time."

In re Credit Suisse First Boston Corp., 431 F.3d at 52.  There is evidence that creates genuine

issues of material fact concerning the OTTI judgment's objective falsity.  Accordingly, granting

---

MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., overrules this
conclusion from the MOO, and the Court must faithfully follow the Tenth Circuit's language, but
the Court continues to believe it and Magistrate Dolinger's characterization of OTTI as a more
objective-based analysis is more precise than the Tenth Circuit's broad generalization.

summary judgment in the defendants' favor is inappropriate.  The main piece of evidence that undercuts' the Defendants' motions is that, after Thornburg Mortgage filed the 2007 Form 10-K, KPMG withdrew its audit opinion and issued a restatement, to which Thornburg Mortgage agreed, and which stated that Thornburg Mortgage's OTTI determination in the 2007 Form 10-K was incorrect.

SAB 59 provides some guidance for making an OTTI Judgment:

There are numerous factors to be considered in such an evaluation and their relative significance will vary from case to case. . . .  [T]he following are only a few examples of the factors which, individually or in combination, indicate that a decline in value of an equity security classified as available-for-sale is other than temporary and that a write-down of the carrying value is required:

> a. The length of the time and the extent to which the market value has been less than cost;

> b. The financial condition and near-term prospects of the issuer, including any specific events which may influence the operations of the issuer such as changes in technology that may impair the earnings potential of the investment or the discontinuance of a segment of the business that may affect the future earnings potential; or

> c. The intent and ability of the holder to retain its investment in the issuer for a period of time sufficient to allow for any anticipated recovery in market value.

SAB 59 at 3.  SAS 92 provides additional guidance.

Determinations of whether losses are other than temporary often involve estimating the outcome of future events.  Accordingly, judgment is required in determining whether factors exist that indicate that an impairment loss has been incurred at the end of the reporting period.  These judgments are based on subjective as well as objective factors, including knowledge and experience about past and current events and assumptions about future events.  The following are examples of such factors.

> • Fair value is significantly below cost and--

-- The decline is attributable to adverse conditions specifically related to the security or to specific conditions in an industry or in a geographic area.

-- The decline has existed for an extended period of time.

-- Management does not possess both the intent and the ability to hold the security for a period of time sufficient to allow for any anticipated recovery in fair value.

• The security has been downgraded by a rating agency.

• The financial condition of the issuer has deteriorated.

• Dividends have been reduced or eliminated, or scheduled interest payments have not been made.

• The entity recorded losses from the security subsequent to the end of the reporting period.

SAS 92 at 4.

While SAB 59 and SAS 92 list a number of factors to consider in making OTTI determinations, the only factor that is at issue in this case is Thornburg Mortgage's intent and ability to hold its Purchased ARM assets until recovery.  There is evidence from which a jury could find that Thornburg Mortgage's OTTI judgment was objectively false: (i) the restatement said that the original OTTI determination was wrong; (ii) Thornburg Mortgage was unable to meet its margin calls before the 2007 Form 10-K filing; (iii) Thornburg Mortgage's depleted liquidity; (iv) Thornburg Mortgage had to conduct the I/O Strip Transactions to meet margin calls; and (v) Goldstone and Simmons knew that the European hedge fund was collapsing.

**A.   THE RESTATEMENT DEMONSTRATES THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS FOR OBJECTIVE FALSITY.**

The central piece of evidence precluding summary judgment is the restatement.  The Restated Form 10-K/A recognizes that that Thornburg Mortgage "determined that [it] may not

have the ability to hold our Securitized ARM Loans to maturity and, accordingly, [it] ha[s] recognized an aggregate impairment charge totaling $676.6 million in gross unrealized losses on [its] Purchased ARM Assets and Securitized ARM Loans as of December 31, 2007."  Restated Form 10K/A at 9.   Similarly, a memorandum from Reinhart and Hall that concerned the restatement stated:

> In view of the events that occurred from mid to late February 2008, and that continued through March 5, 2008, the Company was no longer able to demonstrate that it had sufficient liquidity to enable it to hold securities through recovery.   The decline in fair value, in light of these circumstances, was considered to be an other-than-temporary impairment as of December 31, 2007.

March 9, 2008, Restatement Memo. at 14.   Moreover, Goldstone and Simmons signed the Restated Form 10K/A, which recognized that Thornburg Mortgage's Purchased ARM assets were OTTI.  See Restated Form 10K/A at 7-9.  Consequently, there is a restatement, which two defendants and KPMG signed, that says the Defendants' original OTTI conclusion was wrong.

Several Courts have held that a restatement, by itself, is sufficient to preclude summary judgment on a claim that the original financial filing was correct.  See SEC v. Espuelas, 908 F. Supp. 2d at 409-10 ("[T]he SEC need only establish at this stage a genuine issue of material fact as to whether StarMedia's filings materially misstated the quality or quantity of revenue. For that limited purpose, the fact of the restatement is sufficient."  (citation omitted)); SEC v. Kelly, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009)(McMahon, J.)("Thus, the fact that AOL restated its revenues to correct for the improper recognition of certain advertising revenues in connection with the transactions detailed in the complaint belies any suggestion that any misstatement or omission was not material.").  See also In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005)(Kaplan, J.)("As another court in this district has explained, '[a]lthough a restatement is not an admission of wrongdoing, the mere fact that financial results were

restated is sufficient basis for pleading that those statements were false and misleading.'" (quoting In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004))(alterations in In re BISYS Securities Litigation but not in source)).[318]   That Thornburg Mortgage restated its 2007 Form 10-K and stated in the Restated Form 10-K/A that the original OTTI determination was wrong is sufficient evidence for the SEC to survive summary judgment on the objective falsity issue.

The Defendants argue that the restatement should not preclude summary judgment on the objective falsity issue, because the restatement was conducted for inappropriate reasons, and because the February, 2008, margin calls were Type II subsequent events that should not have affected OTTI as of December 31, 2007.  Both of these arguments are unpersuasive.

First, the Defendants argue that KPMG withdrew its audit opinion and issued the restatement because of post-filing events, which is not an appropriate reason for restating financial filings.  While the March 9, 2008, Restatement Memo. states that the error in the 2007 Form 10-K was identified through post-filing events, see March 9, 2008, Restatement Memo.

---

[318]While courts regularly hold that the existence of a restatement is sufficient to show that the defendants made a materially false statement, a restatement, by itself, is not sufficient to show scienter, because the original false statement may have been made through mere negligence, absence any wrongdoing.  See In re Fed. Nat. Mortgage Ass'n Sec., Derivative & ERISA Litig., 905 F. Supp. 2d 63, 79-80 (D.D.C. 2012)(Leon, J.)("Without any actual evidence supporting a conclusion of Spencer's scienter, the magnitude of Fannie Mae's earnings restatement alone is insufficient to preclude summary judgment."); In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 662, 680 (E.D. Mich. 1999)("As a general rule, GAAP violations or accounting errors, standing alone, do not give rise to scienter.").

> [T]he fact that a restatement of financials occurred is not sufficient to raise a strong inference of scienter, for it is settled that scienter requires more than a misapplication of accounting principles, and mere allegations that statements made in one report should have been made in earlier reports do not make out a claim of securities fraud.

In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 634-35 (E.D. Va. 2000)(Ellis, J.) (alterations omitted)(internal quotation marks omitted)(footnotes omitted)).

at 10 ("[T]he error was identified when the Company was unable to meet margin call demands from its repo counter parties on February 28 and 29, which were significantly higher than the Company anticipated."), it makes clear that the restatement was based on information that the Thornburg Mortgage knew or should have known on the filing date -- February 27, 2008, see March 9, 2008, Restatement Memo. at 4 ("On March 4th, the engagement team . . . considered conditions and events that were known or should have been known to the Company as of the date of our auditors' report (February 27, 2008) and concluded that the aforementioned financial statements contain material misstatements . . . ."). There is, thus, evidence showing that the restatement was based on information that was known to the Defendants before Thornburg Mortgage filed the 2007 Form 10-K, which creates a genuine dispute of material fact whether restatement was properly based on pre-filing information.

Second, the Defendants argue that the February, 2008, events were Type II subsequent events, such that they should not have affected the OTTI analysis in the 2007 Form 10-K. Again, there is evidence creating a genuine dispute on this issue. AU § 560 provides that Type I subsequent events provide evidence of conditions that existed at the balance sheet date, and which require the financial statements to be adjusted, while Type II subsequent events are based on conditions that did not exist at the date of the balance sheet, and which do not require an adjustment of the financial statements. See AU § 560 at 2.

> The first type consists of those events that provide additional evidence with respect to conditions that existed at the date of the balance sheet and affect the estimates inherent in the process of preparing financial statements. . . . The financial statements should be adjusted for any changes in estimates resulting from the use of such evidence.
>
> . . . .
>
> The second type consists of those events that provide evidence with respect to conditions that did not exist at the date of the balance sheet being

reported on but arose subsequent to that date.  These events should not result in adjustment of the financial statements.

AU § 560 at 2 (footnote omitted).  There is evidence in the record that the February, 2008, margin calls evidenced conditions that existed as of December 31, 2007.  The March 9, 2008, Restatement Memo. states that "the markets ha[d] been dislocated since August 2007"; that "the [February, 2008,] losses were a result of a market condition that existed as of year end that continued to deteriorate"; and that "[t]he decline in fair value . . . was considered to be an other-than-temporary impairment as of December 31, 2007."  March 9, 2008, Restatement Memo. at 13-14.  Consequently, there is evidence that the February, 2008, events were Type I events, which disputes the Defendants' assertion that the events were Type II events that should not have affected the 2007 Form 10-K's OTTI disclosures.

### B.   THORNBURG MORTGAGE'S INABILITY TO TIMELY MEET MARGIN CALLS SHOWS THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS FOR OBJECTIVE FALSITY.

Thornburg Mortgage's inability to timely meet margin calls in February, 2008, also undercuts the Defendants' summary judgment motions on the issue of objective falsity. Thornburg Mortgage's repo agreements required it to meet margin calls on the day that they were issued or the next day.  Failure to meet a margin call within this time period gave the repo lender the ability to declare default and to take possession of the underlying collateral.  If a repo lender declared default, Thornburg Mortgage would lose its assets -- i.e., it no longer had the ability to hold its assets.  Consequently, Thornburg Mortgage's failure to timely meet margin calls could lead to an inability to hold its assets.

The inability to timely meet margin calls does not, automatically, lead to Thornburg Mortgage losing its assets.  As the Defendants point out, Thornburg Mortgage was able to retain its assets up until February 27, 2008, despite being unable to timely meet three margin calls the

prior week.  Through February 27, 2008, Thornburg Mortgage, thus, was able to retain its assets despite being subject to default.  Its inability to timely meet its margin calls at the end of February, 2008, however, indicates that there is a genuine issue of material fact whether Thornburg Mortgage had the ability to retain its assets after that date.

Once Thornburg Mortgage failed to timely meet a margin call, it was at its lenders' mercy whether it would retain its assets.  While some of Thornburg Mortgage's lenders were willing to work with Thornburg Mortgage to allow it to meet margin calls over time, they only did so because it was in their best interest and not necessarily because it was best for Thornburg Mortgage.  As Anthony Blasi, Credit Suisse's Managing Director, stated, Credit Suisse did not default Thornburg Mortgage in February, 2008, only because "declaring Thornburg in default was believed to not have been in the best interest of Credit Suisse at that time."  Blasi Decl. ¶ 7, at 2.  Moreover, even though some repo lenders permitted Thornburg Mortgage to meet margin calls over several days, they retained the ability to declare default.  See Matrullo Decl. ¶¶ 6-7, at 2 (stating that Citigroup Global did not agree to not default Thornburg Mortgage, but retained the ability to declare default); Citi Feb. 21, 2008, Reservation Letter at 3 ("CITI hereby expressly reserves its rights to declare an Event of Default under the Agreement by reason of the Breach."); Blasi Decl. ¶ 6, at 2 ("Based on my experience with margin calls, it is my understanding that Credit Suisse could have declared Thornburg in default at any point after Thornburg failed to meet a margin call on time, until such time as the margin call was fully met.").  Thornburg Mortgage's repo lenders' decision not to declare default was not done out of benevolence for Thornburg Mortgage, but out of self-interest.  If the repo lenders never intended to default in the event of non-payment, they would not have included default provisions in their agreements.

Furthermore, the timing and reason for the untimely payments undercut the reasonableness of Thornburg Mortgage's OTTI determination. Thornburg Mortgage was unable to timely meet margin calls in the week before the 2007 Form 10-K filing. It made the last payment the day before it filed the 2007 Form 10-K. Additionally, the reason that Thornburg Mortgage did not timely meet the margin calls was because it lacked sufficient liquidity. If Thornburg Mortgage failed to timely meet margin calls the beginning of January, 2008, or if it decided to not timely meet margin calls for a reason other than lack of liquidity -- such as to challenge the margin call amount -- the untimeliness may not significantly affect the OTTI analysis. Risk of not being able to hold assets in January following a month and a half of stability would make it more likely that Thornburg Mortgage could continue to hold its assets after February 28, 2008. As is the case here, however, Thornburg Mortgage faced the risk of failing to make its margin calls up until the day before the filing. There was no assurance that the market would stabilize after the 2007 Form 10-K filing. Instead, its depleted liquidity increased the risk that it would be unable to meet future margin calls, which would again place it at risk of losing its assets. Thornburg Mortgage's failure to timely meet its margin calls the week before it filed the 2007 Form 10-K, thus, provides evidence from which a reasonable jury could conclude that the 2007 Form 10-K's OTTI determination was objectively false.

### C. THORNBURG MORTGAGE'S DEPLETED LIQUIDITY SHOWS THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS ON THE OBJECTIVE FALSITY ISSUE.

Thornburg Mortgage's depleted liquidity shows that there is a genuine issue of material fact whether Thornburg Mortgage's OTTI determination was objectively false. Because of its business model, Thornburg Mortgage operated with low liquidity levels. See Sep. 30, 2007, Liquidity Analysis at 2 ("[T]he Company operates at a relatively low level of liquidity and

equity . . . .").   Consequently, low liquidity, by itself, would not necessarily undermine Thornburg Mortgage's OTTI determination.   When combined with the margin calls that it received the week before the 2007 Form 10-K filing, with the I/O Strip Transactions, and with the hedge-fund rumor, however, Thornburg Mortgage's liquidity levels provide additional evidence from which a reasonable jury could find that its OTTI determination was objectively false.

At the close of business, on February 27, 2008, Thornburg Mortgage had between $100 and $150 million in available liquidity, forty-million dollars of which was cash.   See Hall SEC Depo. at 266:11-13 (stating that Hall believed that Thornburg Mortgage had between $100 and $150 million in available liquidity at the close of business on February 27, 2008); Feb. 28, 2008, Goldstone TMA Update at 2 (stating that Thornburg Mortgage closed February 27, 2008, with forty-million dollars in cash).   From February 14, 2008, to February 27, 2008, Thornburg Mortgage received an average of $53.4 million in margin calls each day.   See Restatement Margin Calls at 2-7 (setting forth daily margin calls).   Before the 2007 Form 10-K filing, Thornburg Mortgage did not have adequate liquidity to timely meet its margin calls.   Fellers testified that, to meet margin calls, Thornburg Mortgage was "squeezing everywhere [it] could squeeze . . . to meet the need for the cash -- [the] liquidity shortage [it] w[as] dealing with." Deposition of Nathan J. Fellers at 82:21-83:5 (taken Oct. 14, 2009), filed November 6, 2013 (Doc. 231-25).   Thornburg Mortgage had to take drastic steps to meet the pre-filing margin calls, including conducting the I/O Strip Transactions.   The pre-filing margin calls left Thornburg Mortgage with even less available liquidity to meet future margin calls.   Low liquidity may not have been a significant issue if Thornburg Mortgage did not receive, or expect to receive, additional margin calls.   As Goldstone's and Simmons' knowledge of the hedge-fund rumor

shows, however, they were expecting additional margin calls to hit Thornburg Mortgage.  The combination of low liquidity, the expected margin calls, and the volume of margin calls which Thornburg Mortgage had already received, thus, undermines the reasonableness of the Defendants' OTTI judgment.

The Defendants assert that Thornburg Mortgage expected to raise a substantial amount of capital in the weeks after the 2007 Form 10-K filing through a three-to-five-hundred-million dollar capital raise and a sixty million dollar securitization.  See Goldstone MSJ Reply at 12. The capital raise was set to settle on March 8, 2008, however, and the securitization would raise only sixty-million dollars in net proceeds.  See Feb. 21, 2008, Simmons Email at 2.  The capital raise would not help Thornburg Mortgage with any margin calls it received the first week of March, 2008, and, based on Thornburg Mortgage's average daily margin calls, the securitization would have raised just enough liquidity to meet a day's worth of margin calls.  Thornburg Mortgage received an average of $53.4 million in margin calls each day between February 14, 2008, and February 27, 2008.  See Restatement Margin Calls at 2-7 (setting forth daily margin calls).  The sixty-million-dollar securitization would cover merely a single day's worth of margin calls.  Furthermore, while the capital raise and securitization were planned, neither was guaranteed to take place.  A reasonable jury could find that it was unreasonable for the Defendants to conclude that Thornburg Mortgage could raise sufficient capital to meet future margin calls before Thornburg Mortgage failed to meet a margin call and its lenders defaulted it.

**D.    THE I/O STRIP TRANSACTIONS DEMONSTRATE THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS FOR OBJECTIVE FALSITY.**

The I/O Strip Transactions are further evidence that Thornburg Mortgage's OTTI conclusion was objectively false.  Like Thornburg Mortgage's low liquidity, the I/O Strip Transactions, by themselves, may not show a genuine issue of material fact, but, taken in

context, they undermine the Defendants' summary judgment motions.   Thornburg Mortgage entered into the I/O Strip Transactions on February 21 and 22, 2008.  See Mar. 4, 2008, Starrett Email at 2-5; Feb. 22, 2008, Ahn Email at 2-4.  On February 21, 2008, Thornburg Mortgage received substantial margin calls from Greenwich, Credit Suisse, and Citigroup Global, which it could not meet.  The Margin Call Schedule shows that $41.1 million in proceeds from the I/O Strip Transactions were used to meet margin calls.  See Form 10-K Draft at 4-6.

While there is evidence that the I/O Strip Transactions were enacted to take advantage of favorable prices, see Reinhart SEC Depo. at 85:10-86:7 (stating that Simmons and Buniel told Reinhart that the I/O Strip Transactions were conducted to take advantage of favorable prices), the timing of the transactions in relation to the February 21, 2008, margin calls and the Margin Call Schedule stating that they were used to pay margin calls also create the inference that they were made because Thornburg Mortgage could not meet its margin calls.  The transactions deprived Thornburg Mortgage of the interest it would receive from some of its loans, meaning that Thornburg Mortgage would receive back only the principal of the loans and not the interest as well, depriving its assets of their long-term cash-generating ability.  To borrow the SEC expert's analogy, Thornburg Mortgage sold "essential manufacturing equipment to generate cash to pay the bills."  Kitchens Report at 67.  A factory selling its manufacturing equipment may not be a sign of a financial crisis, but the sale is evidence of financial troubles if the factory sells its equipment when it faces substantial bills, which it cannot meet, and it uses the proceeds to meet those bills.  In the same way, the I/O Strip Transactions would not, under normal circumstances, have an impact on Thornburg Mortgage's OTTI analysis, but when they are enacted at a time in which Thornburg Mortgage is strapped for cash, facing substantial margin calls, unable to meet those margin calls, and facing potential defaults from its lenders, the transactions allow for the

reasonable inference that they were made because Thornburg Mortgage desperately needed cash. Because the Court is to draw all inferences in the non-moving party's favor,[319] the I/O Strip Transactions undermine the Defendants' requested summary judgment on the objective falsity prong.

### E.   THE EUROPEAN HEDGE-FUND RUMOR ALSO SHOWS A GENUINE ISSUE OF MATERIAL FACT ON THE OBJECTIVE FALSITY ISSUE.

The European hedge-fund collapse also supports the conclusion that there is another genuine issue of material fact that precludes summary judgment in the Defendants' favor on the objective falsity issue.  There is no evidence that Starrett knew about the European hedge fund before the 2007 Form 10-K filing.  The restatement, untimely payment of margin calls, low liquidity levels, and I/O Strip Transactions, however, are sufficient to deny her motion for summary judgment on the objective falsity issue.  The European hedge fund is more evidence that there is a genuine issue of material fact counseling that the Court deny Goldstone's and Simmons' motion for summary judgment.

In an electronic mail transmission that Feldman sent to Goldstone and Simmons on the morning of February 27, 2008, Feldman stated:

> I gave [Garrett Thornburg] an update that we should have Citigroup and all our other margin exposures met today even if we are unable to sell more TMST bonds.  We are moving the restricted subs from CS to Merrill and that should free about 50-60mm.  He told me that Treasury believes they have done all they can and there won't be any further changes from them.  He was about to meet with a Congressional group and plant the seed that they should open the discount window to non-banks to provide stability to the financing market.

---

[319]The Defendants have moved for summary judgment, and the SEC has also moved for summary judgment.  Because the Court is to draw all reasonable inferences in the non-moving party's favor, when considering whether to grant the Defendants summary judgment, it will draw all reasonable inferences in the SEC's favor, but when considering whether to grant the SEC summary judgment, it will draw all reasonable inferences in the Defendants' favor.

>      Further, I spoke with Charles Mac and he made it sound like a large repo
> client (European, lots of pay option MTA) was collapsing.  He couldn't give me
> details other than they own billions that presumably would have to get sold.  He
> may be able to give more details later today.  He sounded very concerned about it.
> For the time being, we're not really supposed to know about this situation, but
> news may be coming soon.

Feb. 27, 2008, Simmons Email at 2.  Simmons responded to the electronic mail transmission by

writing: "This makes it even more critical to be done with Citi today so we can get the K filed."

Feb. 27, 2008, Simmons Email at 2.  Later that same day, Goldstone wrote an electronic mail

transmission to Simmons, stating:

>      Also, you should know that a large Alt-A hedge fund in Europe is blowing up this
> afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point
> haircuts on Alt-A AAA's overnight.  I think we will get this a little more
> gradually, but we should be ready for it.  Use of proceeds will be to delever.

Feb. 27, 2008, Hedge Fund Email at 2.  The Feb. 27, 2008, Hedge Fund Email thus shows that

Goldstone and Simmons expected its assets to be hit with haircuts, although more gradually than

the hedge fund's assets were hit.

      The Defendants dispute that haircuts would lead to additional margin calls, because

haircuts would not be recognized immediately, but over time when the agreements rolled over.[320]

See Tr. at 148:1-154:8 (Lee, Court); id. at 155:19-159:21 (Lee, Court).  There appears to be two

different definitions of the term haircut.  One concerns a discount that repo lenders take on

collateral at the front end of a repo agreement to account for risk and to act as interest, i.e., they

value the collateral less than some value such as fair market value.  The second concerns the

difference between the loan amount and the fair market value of the collateral.  The Defendants

argue that, in the Feb. 27, 2008, Hedge Fund Email, Goldstone's use of the term haircuts referred

---

[320]"A rollover is when you do the following: . . . Reinvest funds from a mature security into a new issue of the same or a similar security."  Rollover, Investopedia.com, http://www.investopedia.com/terms/r/rollover.asp (last visited Aug. 11, 2015).

to the first definition, which would not result in margin calls, while the SEC argues that it referred to the second definition, which may result in margin calls.

A description of a repo agreement illustrates how the haircuts are applied under the first definition.

> A repo agreement is accomplished when party A sells a security to party B with the agreement that party A will buy the security back at a future date.  What this amounts to is a loan collateralized by the security.  Repo agreements usually last short periods of time, sometimes as short as overnight.  Assets commonly used in repo transactions include Treasury Securities, private mortgage-backed securities, agency securities, and corporate securities.  Lenders charge interest as compensation for the risk posed by the transaction and the opportunity cost of not being able to use the lent cash elsewhere.  Repo lenders charge interest by purchasing the security at a discount, or "haircut."  When the repo transaction is complete, the borrower buys the security back at full price.

Frederick Hearn, How New Swap Regulations Mandated by the Dodd-Frank Act Could Help Stabilize the Repo Market, 19 PIABA B.J. 317, 322-23 (2012)(footnotes omitted).  See In re Residential Res. Mortgage Investments Corp., 98 B.R. 2, 8 (Bankr. D. Ariz. 1989)("The initial sale's price or the principal amount of the Repurchase Agreement transaction is actually a discounted value from the market value. This discount from market value is known as a 'haircut.'  The haircut is usually expressed as a percentage of the current market value.").

The Defendants put forth evidence in which the term haircut is used in this context. Feldman testified that, when entering into a repo agreement, the repo provider would take "a haircut, which is a reduction or a -- it is a margin of safety for the lending party . . . in case the lending can't be paid back."  Feldman Depo. at 30:4-7.  For this definition of haircut, Feldman testified that the haircuts could not be reset during the term of the agreement, but they could be reset or changed when a new agreement began.  See Feldman Depo. at 30:22-6.  Similarly, Simmons testified that haircuts can be increased "at the maturity of the repo transaction." Simmons Depo. Vol. II at 421:22-25.  In their depositions, Feldman and Simmons are both using

the term haircut to refer to the discount that a repo lender takes off the collateral at the beginning of the repo agreement. These haircuts can be initiated only at the transaction's beginning; thus, they will not lead to margin calls, because they do not refer to a change in the collateral's value throughout the repo agreement term.

The second definition of the term haircut is "[t]he difference between the amount of a loan and the market value of the collateral securing the loan." Black's Law Dictionary 781 (9th ed. 2009). See Wu v. Stomber, 883 F. Supp. 2d 233, 246 n.7 (D.D.C. 2012)(defining "haircut" in the MBS context to mean "the 'difference between the amount of a loan and the market value of the collateral securing the loan'" (quoting Black's Law Dictionary 781 (9th ed. 2009))), aff'd, 750 F.3d 944 (D.C. Cir. 2014). Under this definition, haircut changes can lead to margin calls if the underlying collateral's value drops below the agreed margin.

> Many repo lenders will impose margin requirements on borrowers to ensure that the haircut remains constant. The lender can impose a margin call if the price of the collateral security drops enough to reduce the spread below the minimum margin requirement. For example, say party A enters a repo with party B by selling a $100 bond to B for $99 with an agreement to buy it back in a week. If the price of the bond falls to $99 during the week, B may require A to post $1 in cash to ensure that B's $1 spread is protected. If A does not have the $1, it must sell something to get the cash. If the price of the bond later returns to $100, B will return the cash to A. If A cannot satisfy the margin call, then B will usually recognize this as a default and sell the bond to cover the loss.

Frederick Hearn, supra at 323. The Honorable Robert W. Sweet, United States District Judge for the Southern District of New York, has explained the relationship between haircuts and margin calls:

> The repo buyer (the broker) always paid (loaned) an amount less than the actual value of the security sold (transferred as security for the loan) by the repo seller (the Fund) as protection against default on the obligation to repurchase the security (pay back the loan). The difference between the amount loaned and the security's value is the "haircut." Thus, if a broker took a 20 percent haircut on a security valued at $100,000, then the repo amount (the amount loaned) to the Fund was $80,000 for that $100,000 security.

If the value of the securities in a repo account fell below an amount agreed upon by the parties, the "margin amount," then there was a "margin deficit" and the broker had the right to make a "margin call," i.e., to demand money or additional securities as collateral for the loan.  If a proper margin call was not met, the broker had the right to liquidate the securities in the repo account.

Primavera Familienstifung v. Askin, 130 F. Supp. 2d 450, 461-62 (S.D.N.Y.), abrogated on other

grounds by Casey v. Merck & Co., 653 F.3d 95 (2d Cir. 2011).

The Defendants have acknowledged that a decline in the value of their repo collateral can

lead to margin calls.  See Goldstone Facts ¶ 9, at 5 ("If the fair value of Thornburg's repo

collateral declined, Thornburg could be subject to margin calls that would require the company

either to pledge additional collateral or reduce its borrowings.").  Goldstone has also testified that

haircuts can lead to immediate margin calls.  At the January 20, 2010, deposition, Goldstone

testified as follows:

> Q    And were the margin calls that were triggered during this mid-August 2007 time frame the result of declining values of the collateral of repo line?
>
> A    In part, yes.  But I think they were also driven by changes in the haircut policies as well.
>
> Q    Now the change in the hair cut, how does that trigger a margin call, or is that something that takes place when the repo line is maturing and you're replacing that collateral with that particular reverse repo counterparty?
>
> A    Again, the industry practice was pretty diverse.  In certain instances or for certain types of transactions, hair cuts could be adjusted at the whim of the dealer.  At any instance in time, it could trigger an immediate margin call.
>
> In other instances, dealers would not adjust margins until the repo transaction matured, in which case they would make an adjustment to all the terms of the subsequent transaction with a rollover transaction, meaning price would be adjusted and potentially hair cut as well.

Goldstone SEC Depo. at 41:4-22.   The Defendants address this testimony by arguing that Goldstone went on to testify that, despite some repo agreements from August, 2007, prohibiting the lender from changing the haircut mid-term, the lenders ignored the agreements and changed the haircut anyways.

> Q     And during the mid-August 2007 time frame, you mentioned that there were adjustments and margin calls triggered by changes in hair cut. So was Thornburg subjected to one of these situations where it had counterparties that would immediately adjust the hair cut?
>
> A     We did, and in fact in certain instances, Thornburg stated that it had a documented transaction with certain reverse repurchase agreement counterparties, where the hair cut was to be fixed for the term of the financing, and yet the dealers elected to void or ignore that contractual agreement, and they changed the margin call anyway, and then declared Thornburg to be in default when we didn't meet those margin, that margin call.
>
> MR. SHAPIRO:  So they changed the hair cut?
>
> THE WITNESS:  Changed the hair cut, right.  Yes, in the middle of a period when the contractual requirement was that the hair cut was not to be changed.

Goldstone SEC Depo. at 42:1-17.  This testimony, however, does not support the Defendants' interpretation of the word "haircut."   It shows that Goldstone likely misunderstood the repo lenders' use of the term haircut.  He thought that the haircut could be taken only at the beginning of the contract term -- i.e., using the term to mean the discount that is taken at the beginning of the agreements' term -- while the repo lenders likely used the term to mean the difference between the collateral's value and the loan, which can fluctuate during the contract term, and which can trigger margin calls if it drops below a certain point.   If anything, Goldstone's testimony is evidence that, despite contractual language stating that haircuts can only be taken at

the beginning of the contract term,[321] Thornburg Mortgage's repo lenders may take haircuts at any time, which could trigger margin calls.

In the Feb. 27, 2008, Hedge Fund Email, Goldstone appears to use the term haircut to refer to a reduction in the hedge fund's collateral, resulting in a larger difference between its collateral and its loans.  He writes: "They [the hedge fund] got hit with 20 point haircuts on Alt-A AAA's overnight."  Feb. 27, 2008, Hedge Fund Email at 2.  It would be odd if the hedge fund entered into new repo agreements that discounted twenty point haircuts "overnight."  Goldstone's use of the word "haircut" overnight may have referred to the overnight in Santa Fe which would have been day time in Europe, or he may have been referring to overnight in Europe.[322]  Because all inferences are to be made in the nonmoving party's favor, and because the manner in which Goldstone uses the term haircut is unclear, a jury could reasonably conclude that, in the Feb. 27, 2008, Hedge Fund Email, Goldstone was recognizing that the European hedge fund's collateral was devalued, increasing the difference between its collateral and its loans, and was recognizing that Thornburg Mortgage's collateral would also be devalued, which could result in margin calls.  There is, thus, a reasonable inference that the electronic mail transmission evidences Goldstone's and Simmons' belief that Thornburg Mortgage would be subject to additional margin calls after February 27, 2008.

That Goldstone and Simmons expected additional margin calls undermines their motion for summary judgment on the objective falsity issue.  In the week before the 2007 Form 10-K filing, Thornburg Mortgage had difficulty meeting its margin calls, and, because it could not

---

[321]The Court does not have copies of the contracts from August, 2007, to review their exact language; it is merely relying on Goldstone's characterization of the contracts' language.

[322]The parties have not provided the Court with any evidence of the when or how the European hedge fund received haircuts.  Moreover, the parties did not argue that the term "overnight" means anything but overnight in Europe.

timely meet some margin calls, it opened itself up to being defaulted. The expectation of additional margin calls coupled with diminished liquidity indicates that Thornburg Mortgage would not be able to meet its future margin calls, which could result in defaults and in it not being able to hold its Purchased ARM assets. Accordingly, the hedge-fund rumor provides an additional fact that supports the conclusion that there is a genuine issue of material fact which counsels that the Court should deny the Defendants' request for summary judgment on the objective falsity issue.

Overall, each of these factors, by themselves, demonstrates genuine issues of material fact; when viewed together, the issues become clearer. In the week before the 2007 Form 10-K filing, Thornburg Mortgage had low liquidity troubles and was unable to timely meet its margin calls, exposing itself to being defaulted. These two factors create genuine issues of material fact whether Thornburg Mortgage would have the ability to hold its assets in the future. The desperate measures to which Thornburg Mortgage went to meet its margin calls -- i.e., conducting the I/O Strip Transactions -- further undermines Thornburg Mortgage's ability to hold its assets, because it had to sell long-term cash-generating assets to meet its immediate cash needs, reducing its ability to pay future margin calls. The final nail to the coffin, which demonstrates a genuine issue of material fact, is the hedge-fund rumor, which shows that Goldstone and Simmons expected Thornburg Mortgage to receive more margin calls in the future. Thornburg Mortgage had low liquidity levels, it could barely meet is earlier margin calls and had to undergo extreme measures to pay them, and it was expecting more margin calls. Finally, KPMG restated 2007 Form 10-K to change the OTTI conclusion, which shows that the original conclusion was incorrect. Each of these factors individually precludes summary judgment on objective falsity; together, they do so with more force. There is a genuine issue of

material fact for objective falsity; the Court will, accordingly, deny the Defendants' requested summary judgment on that issue.

## II.     THE COURT WILL DENY THE SEC'S REQUEST FOR SUMMARY JUDGMENT ON THE OBJECTIVE FALSITY AND MATERIALITY ISSUES.

In addition to denying the Defendants' motions for summary judgment on the objective falsity issue, the Court will deny the SEC's motions on the objective falsity and materiality issues.   The SEC's argument on materiality appears to be that, if the OTTI judgment was objectively false, it was also a materially false statement.   Most of the SEC's briefing concerning materiality is intertwined with the objective falsity prong -- i.e. arguing that the Defendants made a materially false statement.   The one portion of the SEC's briefs that discusses materiality separate from the falsity element comes from a section concerning scienter.   See SEC Goldstone Response at 64-66.   The SEC argues that Mayer's opines that Thornburg Mortgage's disclosures in the 2007 Form 10-K were not fulsome and that the omissions were material.   See SEC Goldstone Response at 65.   The SEC also states that the "Court has already found that 'a false OTTI analysis would be material.'"   SEC Goldstone Response at 65 (quoting MOO at 152)). The SEC then asserts that "the evidence of materiality is sufficiently strong that the SEC respectfully asks the Court to grant its [sic] summary judgment on this issue as well."   SEC Goldstone Response at 66.   It thus appears that the SEC's materiality argument is that, if the OTTI judgment was wrong, it was also material.

The Court will deny the SEC's requests for summary judgment on both issues for the same reason: there is a genuine issue of material fact whether the February, 2008, events were Type I or Type II subsequent events.   At the hearing, the SEC conceded that, if Thornburg Mortgage filed the 2007 Form 10-K on February 14, 2008, its OTTI conclusion would have probably been correct, which means that the events that occurred between February 15, 2008,

and February 27, 2008, had to have made that conclusion unreasonable.  See Tr. at 210:3-25
(McKenna, Court); Tr. at 223:9-224:11 (McKenna, Court).  Because Type II subsequent events
do not affect the financial statements, if all events after February 15, 2008, were Type II events,
they would not have affected the Defendants' OTTI judgment, and the Defendants' judgment
would be correct.  It is only if the events from February 15, 2008, to February 27, 2008, were
Type I events could they affect the 2007 Form 10-K's OTTI disclosures and render them false.
The SEC must accordingly show that the February, 2008, events were Type I subsequent events
to prevail on the objective falsity and materiality prongs.

       While the SEC has evidence supporting its objective falsity argument -- the restatement,
the untimely payment of margin calls, Thornburg Mortgage's low liquidity levels, the I/O Strip
Transactions, and the hedge-fund rumor -- this evidence is all based on events that occurred after
December 31, 2007.  These events can affect the OTTI analysis only if they were Type I events.
AU § 560 describes Type I subsequent events as "those events that provide additional evidence
with respect to conditions that existed at the date of the balance sheet and affect the estimates
inherent in the process of preparing financial statements.  AU § 560 at 2.  There is evidence
supporting the SEC's contention that the February, 2008, events were Type I events, but there is
also evidence supporting the Defendants' contention that the events were Type II events.  There
is, thus, a genuine issue a material fact whether the February, 2008, events were Type I events,
making summary judgment inappropriate.

       The March 9, 2008, Restatement Memo. states that "the markets ha[d] been dislocated
since August 2007"; that "the losses were a result of a market condition that existed as of year
end that continued to deteriorate"; and that "[t]he decline in fair value . . . was considered to be
an other-than-temporary impairment as of December 31, 2007."  March 9, 2008, Restatement

Memo. at 13-14.  Goldstone stated in a CNBC interview that the February, 2008, events were just another step down in a serious of steps down in the market.  Laursen, the Defendants' expert, testified that the financial crisis began in "the summer of 2007" and that it "continued to sort of stair-step down" until the end of 2008.  Deposition of Christopher Laursen at 76:6-66:3 (taken March 11, 2014), filed June 6, 2014 (Doc. 302-4).  The Nov. 9, 2007, Form 10-Q states that credit agencies downgraded Alt-A mortgage-loan-backed securities, although the agencies did not downgrade the subprime-mortgage-backed securities to the same extent, resulting in a decline in the securities' prices.  See Nov. 9, 2007, Form 10-Q at 9 ("During 2007, lower credit quality loans and securities backed by subprime mortgage loans and, to a lesser extent, Alt-A mortgage loans were downgraded by rating agencies . . . and, as a result, the prices of securities backed by those loans declined.").  Weiner, the SEC's expert, opines that "the events that occurred in February 2008 surrounding the release of the Thornburg 2007 Form 10-K . . . were not isolated or unforeseeable events, but rather were the product of forces already in evidence as early as the second half of 2006."  Weiner Report at 38.  Kitchens, another SEC expert, opines that "the full magnitude of the approximate $1billion [sic] of margin calls received by Thornburg Mortgage between December 31, 2007 and February 27, 2008, . . . were material Type I subsequent events."  Kitchens Report at 55.

While the SEC's evidence is significant, the Defendants have also presented evidence supporting their Type II position.  Starrett testified that, during the restatement and presently, she believes that, based on the auditing literature, the February events were Type II subsequent events.  See Starrett Depo. at 242:12-21.[323]  In an electronic mail transmission from Taylor to

---

[323]While Starrett's testimony is self-serving, that a deposition testimony is self-serving does not disqualify it from creating a factual issue precluding summary judgment.  The Seventh Circuit has noted:

Womack, Taylor said that, after reviewing the 2007 Form 10-K's subsequent events footnote, which included the February, 2008, margin calls, the liquidity squeeze, and the assets' drop in value, he did not believe that the events called into question the assets' December 31, 2007, valuation -- i.e., they were not Type I events.  See Feb. 28, 2008, Taylor Email at 2.  Taylor also testified that he understood, based on discussions with other KPMG clients, that the events that "occurred in the last 15 days" of February, 2008, were "viewed as a market condition that occurred in February, not something that [was] indicative of matters that existed at the balance sheet."  Taylor Depo. at 173:16-174:1.  Furthermore, in the 2007 Form 10-K, KPMG approved a footnote, rather than an adjustment to the financial statements, discussing the February events, and the 2007 Form 10-K states that the changes in the market conditions began on February 14, 2008.  See 2007 Form 10-K at 26.  In a memorandum from Coltharp, Thornburg's Controller, to Simmons and Starrett concerning the sale of a bond, in analyzing whether the sale was a Type I or II event, Coltharp concluded that "[t]he deterioration of value in the Alt-A market began in

---

> Deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving.  As we have repeatedly emphasized over the past decade, the term "selfserving" must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.

Hill v. Tangherlini, 724 F.3d 965, 967 (7th Cir. 2013).  This observation is not to say that "'generalized conclusionary, unsubstantiated, non-personal affidavits" or deposition testimony are sufficient to oppose summary judgment.  Pona v. Colo. Judicial Dep.t, No. CIV 11-02715 CMA/MJC, 2012 WL 6059370, at *1 (D. Colo. Dec. 6, 2012)("Notably, 'generalized, conclusionary, unsubstantiated, non-personal affidavits are insufficiently to successfully oppose a motion for summary judgment.'"  (quoting Stevens v. Barnard, 512 F.2d 876, 879 (10th Cir. 1975))(citing Garret v. Hewlett-Packard Co., 305 F.3d 1210, 1213 (10th Cir. 2002))).  Starrett's testimony, however, is not generalized, conclusory, unsubstantiated, or non-personal.  Starrett is an accountant, and she made her conclusion based on relevant auditing literature.  Starrett Depo. at 242:12-21 ("So I believed then, and still believe now, that's a Type 2 subsequent event under the auditing literature . . . .").  She was intimately familiar with the audit and the subsequent events.  Moreover, there is other evidence supporting the Defendants' assertion that the February, 2008, events were Type II subsequent events.

February 2008," and that the deterioration "did not exist at December 31, 2007," making it a Type II subsequent event.  2310 Bond Memo. at 5.  Moreover, while the Nov. 9, 2007, Form 10-Q stated that, in early August, 2007, rating agencies downgraded Alt-A loans, the agencies downgraded the Alt-A loans "to a lesser extent" than securities that subprime mortgage loans backed.  Nov. 9, 2007, Form 10-Q at 9.

Both sides have presented competent evidence supporting their positions that the February, 2008, events were, or were not, Type I subsequent events.  There is, accordingly, a genuine issue of material fact whether the February, 2008, events were Type I or Type II events.  Because the February events would not affect Thornburg Mortgage's OTTI conclusion, unless they were Type I subsequent events, summary judgment in the SEC's favor on the objective falsity and materiality issues is inappropriate.  The Court will, thus, deny the SEC's request for summary judgment.

## III.   THERE IS A GENUINE ISSUE OF MATERIAL FACT ON THE SUBJECTIVE FALSITY ISSUE.

The SEC must show that the Defendants did not subjectively believe that Thornburg Mortgage's OTTI determination was correct.  While this standard is more stringent than a lack-of-factual-basis or reckless standard, it is not insurmountable.  The Defendants, over-and-over again, focus on the lack of percipient witnesses disputing their OTTI analysis and their alleged subjective beliefs.  See Goldstone MSJ at 11 ("With respect to subjective falsity, contemporaneous documents and the testimony of percipient witnesses indisputably establish that Defendants sincerely believed that Thornburg's Purchased ARM Assets were not OTTI."); Goldstone MSJ at 29 ("Not a single percipient witness involved in Thornburg's OTTI assessment, including the KPMG auditors, supports the SEC's contention that [the OTTI judgment] was a simple, black-and-white factual determination."   (internal quotation marks

omitted)); Starrett MSJ at 35 ("And, critically, the SEC has no percipient witness testimony from *anyone* supporting their speculative interpretation of [the Feb. 25, 2008, Goldstone KPMG Email] or contradicting Ms. Starrett's reasonable explanation of what she meant when she wrote it." (emphasis in original)); Goldstone MSJ Reply at 6 ("In lieu of actual proof, the SEC relies on a hodge-podge of what it claims is 'circumstantial' evidence -- primarily its own speculative interpretations of vaguely-worded emails that are refuted by sworn percipient witness testimony -- none of which demonstrates that Defendants disbelieved their OTTI judgment."); Goldstone MSJ Reply at 16 ("But not a single email or percipient fact witness bear out the SEC's speculative theory that Mr. Simmons believed on February 27 that large margin calls were imminent."); Goldstone MSJ Reply at 17 ("If the SEC believed that [Goldstone's] testimony [about the Feb. 27, 2008, Hedge Fund Email] could be refuted, it should have obtained percipient witness testimony to the contrary."); Goldstone MSJ Reply at 26 ("Not a single percipient witness supports this speculative interpretation of Defendants' emails."); Starrett MSJ Reply at 6 ("Indeed, the SEC's aiding and abetting claim now hinges almost entirely on its own speculative interpretations -- supported by no percipient witness -- of Ms. Starrett's February 25, 2008 e-mail, a document it references at least thirteen times in its twenty-two-page brief."). The Defendants' focus on percipient witness testimony, and on direct evidence, however, does not account for the well-established rule that circumstantial evidence is sufficient to survive summary judgment. See, e.g., Regan-Touhy v. Walgreen Co., 526 F.3d 641, 651 (10th Cir. 2008)("As a general principle, we agree that circumstantial evidence can suffice to defeat summary judgment in appropriate circumstances; of course a plaintiff is not required to prove his or her case by direct proof alone." (citing U.S. Postal Serv. Bd. of Governors v. Aiken, 460 U.S.

711, 714 n.3 (1983)("As in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence."))).

At the hearings, the Defendants agreed that the SEC could show subjective falsity solely through circumstantial evidence.   See Tr. at 937:14-18 (Lee, Court).   When asked what circumstantial evidence would be sufficient to show subjective falsity, the Defendants, not surprisingly, listed three pieces of evidence, that the SEC does not have: (i) electronic mail transmissions from within Thornburg Mortgage stating that the Defendants could not have believed the OTTI judgment; (ii) a Thornburg Mortgage employee willing to testify that the Defendants acted in bad faith; and (iii) some financial motivation, such as the Defendants selling their stocks before or after the 2007 Form 10-K filing.   See Tr. at 937:19-939:22 (Lee, Court).   In other words, the Defendants argue that the SEC needs stronger circumstantial evidence to overcome the summary judgment motions.   The Supreme Court has held, however, that, at the summary-judgment stage, the Court's task is not to weigh the evidence, but to view the evidence in a light most favorable to the nonmoving party.

> [A] "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."   In making that determination, a court must view the evidence "in the light most favorable to the opposing party."

Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014).

While there may be the rare case in which a speaker confesses that his or her opinion was false when given, most plaintiffs will be left to rely on circumstantial evidence to prove subjective falsity.   The First Circuit has noted:

> Although a speaker's confession that his or her opinion was false when made would suffice, on its own, to show subjective falsity, that species of frank

admission is unlikely to materialize.  In the usual case, therefore, plaintiffs will
need to rely on a more indirect form of evidence to meet their pleading burden.

Credit Suisse First Boston Corp., In re, 431 F.3d at 48 (citing Virginia Bankshares, 501 U.S.

at 1096).  Courts regularly find that circumstantial evidence is sufficient to show a person's

subjective beliefs or to demonstrate a genuine issue of a material fact.  See Burrell v. Hampshire

Cnty., No. CIV 99-30269 MAP, 2002 WL 596210, at *4 (D. Mass. Apr. 10, 2002)(Ponsor, J.)

("A prison official's subjective belief about [the] risk [of serious harm] may be proved by

circumstantial evidence."  (internal quotation marks omitted)); Blasi v. Attorney Gen. of Com. of

Penn., 120 F. Supp. 2d 451, 470 (M.D. Pa. 2000)(McClure, J.)("The element of subjective belief

is especially difficult to prove, requiring circumstantial evidence to establish."); In re Jamesway

Corp., 235 B.R. 329, 346 (Bankr. S.D.N.Y. 1999)(Garrity, B.J.)(stating that, "[m]oreover, the

circumstantial evidence supports the conclusion that [the defendant] did not have a subjective

belief that it was in compliance with the" Worker Adjustment and Retraining Notification Act,

29 U.S.C. § 2101); Taylor v. Com., 534 S.E.2d 373, 376-77 (Va. Ct. App. 2000)(stating that,

"Hill [v. Commonwealth, 43 Va. 594 (1845),] allows circumstantial evidence to prove the [dying

declaration hearsay exceptions'] requirement" that the victim subjectively believed that death is

imminent); State v. Fraser, 608 N.W.2d 244, 246 (N.D. 2000)("'Proof of what a particular

person in fact subjectively believes will of necessity always be by circumstantial evidence.  It is

impossible for the factfinder to step into the shoes of the defendant to see what was actually in

his mind at the time the wrongful conduct was engaged in.'"  (quoting State v. Kaufman, 310

N.W.2d 709, 714 (N.D. 1981), abrogated on other grounds by State v. Cummings, 386 N.W.2d

468 (N.D. 1986))(alterations omitted)(emphasis in State v. Fraser but not in quoted source).  Cf.

Wang v. Bear Stearns Companies LLC, 14 F. Supp. 3d 537, 546 (S.D.N.Y. 2014)(granting

motion to dismiss, because, among other things, "there is no circumstantial evidence from which

to infer that [the defendant] did not subjectively believe that March 11, 2008 was in fact a good

time to invest in Bear Stearns").   In addressing subjective falsity in the § 10(b) context, the

Honorable P. Kevin Castel, United States District Court for the Southern District of New York,

stated that circumstantial evidence can be used to attack the defendant's asserted belief:

> The First and Ninth Circuits have also held that a plaintiff must allege that the
> defendant did not sincerely believe the stated opinion.  See Rubke v. Capitol
> Bancorp Ltd., 551 F.3d 1156, 1162 (9th Cir. 2009); In re Credit Suisse First
> Boston Corp., 431 F.3d 36, 47 (1st Cir. 2005), overruled on other grounds by
> Tellabs, 551 U.S. 308 . . . .   This comports with the Supreme Court's view in
> Virginia Bankshares that statements of belief are statements of fact in the sense
> that they convey that the speaker "do[es] act for the reasons given or hold the
> belief stated," and that such statements may be attacked by "circumstantial
> evidence bearing on the facts that would reasonably underlie the reasons claimed
> and the honesty of any statement" regarding those reasons.  501 U.S.
> at 1092-93 . . . .

In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.,

757 F. Supp. 2d at 310-11.  Circumstantial evidence, accordingly, is sufficient to undermine the

Defendants' asserted subjective belief that Thornburg Mortgage's OTTI determination was

correct.

The Defendants have put forth direct evidence that they actually believed that Thornburg

Mortgage's OTTI judgment was correct.  Specifically, each Defendant has stated or testified that

he or she believed that the OTTI conclusion was correct.  See Goldstone Decl. ¶ 44, at 9 ("I

genuinely believed at the time that Thornburg had the intent and ability to hold its assets for the

foreseeable future."); Goldstone SEC Depo. at 64:3-65:5; Simmons Decl. ¶ 55, at 12-13 ("I

believed that Thornburg would have the intent and ability to hold its impaired assets until their

value recovered."); Simmons Depo. Vol. II at 185:7-11; Starrett Decl. ¶ 22, at 8-9 ("[A]t the time

of the filing itself, I believed that Thornburg had the intent and ability to hold its impaired

Purchased ARM Assets until their value recovered in the market and that these assets were

properly accounted for as not other-than-temporarily-impaired in Thornburg's financial statements.").  The Defendants have, thus, presented direct evidence that they believed that the OTTI judgment was correct from the only people who could have known their subjective beliefs -- themselves.  See State v. Kaufman, 310 N.W.2d at 714 ("It is impossible for the factfinder to step into the shoes of the defendant to see what was actually in his mind at the time the wrongful conduct was engaged in.").

Despite the Defendants' direct evidence, the SEC has presented sufficient circumstantial evidence to create a genuine issue of material fact.  Specifically, the amount of evidence showing objective falsity combined with electronic mail transmissions that the Defendants sent and received in around the audit timeframe creates sufficient evidence from which a reasonable juror could conclude that the Defendants did not subjectively believe that Thornburg Mortgage's OTTI conclusion was correct.

Subjective and objective falsity are two different elements; however, they are related, such that the stronger the evidence showing objective falsity the less likely the speaker held the espoused opinion.  The Court has previously noted:

> It remains important to distinguish between the [objective and subjective falsity], but the Court agrees with [the plaintiffs] that, when it comes to the underlying facts that will support a conclusion that a statement is objectively or subjectively false, there may be significant overlap.  Facts that would make something objectively false can, depending on the circumstances, support an inference that someone espousing an objectively false statement also subjectively believes that his or her statement is false.  Context is important.  The link is not an automatic one.  Circumstantial facts are necessary, however, because it will be a rare case where there is direct evidence that corporate officers did not believe in the truth of their statements.

Lane v. Page, 649 F. Supp. 2d at 1291.  As the Court has already noted, there is evidence showing that Thornburg Mortgage's OTTI conclusion was objectively false.  See supra Analysis, Section I.  Specifically, Thornburg Mortgage's inability to timely meet margin calls, its low

liquidity levels, the use of the I/O Strip Transactions to meet margin calls, and, for Goldstone and Simmons, the hedge-fund rumor all show that the OTTI judgment was false.   While evidence of objective falsity, by itself, is insufficient to show subjective falsity, it at least creates the inference that the Defendants either knew or should have known that the OTTI determination was false.   Here, the SEC is not left solely with evidence of objective falsity; it has also produced circumstantial evidence from which a jury can conclude that the Defendants did not believe that the OTTI judgment was correct.   There are a number of electronic mail transmissions near the time of the 2007 Form 10-K filing which indicate that the Defendants were purposely trying to conceal information from KPMG and from the public; that, if the information had been disclosed, the public would have reacted differently; and that would have rendered Thornburg Mortgage's OTTI judgment false.

### A.  THE FEB. 25, 2008, GOLDSTONE KPMG EMAIL SUPPORTS FINDING THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS CONCERNING SUBJECTIVE FALSITY.

First, there is the Feb. 25, 2008, Goldstone KPMG Email.  Goldstone wrote Simmons and Starrett an electronic mail transmission asking a number of questions about KPMG and the audit process.

> Good morning.  I have been stewing over our KPMG situation all weekend.  I have several questions for the two of you before I do something reactionary.  For example, is it usual or within the realm of expectation that an audit firm not be able to provide accounting clarity to an audit committee or management 6 days before filing an annual financial statement?  Should we or should the audit committee insist on better clarity?  Is this issue really going to be decided within the next 6 days, or do they already know the answer?  Would a different audit partner behave any differently given our circumstances?  Why is selling some assets the same as selling all assets?

Feb. 25, 2008, Goldstone KPMG Email at 3.  Starrett responded by writing:

> First, it's completely normal for the audit firm to monitor events up to their opinion date and they are required to do so under GMS.  <u>We have purposely not</u>

told them about the margin calls so that we don't escalate an issue which we
believe will be put to rest by the time they have to issue their opinion.  They have
not raised the issue of selling assets or marking down any assets.  Rather, we have
been wary of selling assets because we feel it is likely this issue will be raised
then and it is also likely they will need to involve other experts within the firm, all
of which will make reaching a decision a slow process.  So since we believe the
situation will be resolved before they have to opine, we have chosen not to put the
valuation issue in front of them.  Obviously, if we are not able to resolve the
situation satisfactorily, we will need to inform them before we file.

In short, selling some assets is substantially the same as selling all assets because
the only reason we don't have to recognize the impairments on all assets with
negative marks in income now is that we represent we have the intent and ability
to hold the assets to maturity.  Selling some assets calls into question our intent
and having to sell them to meet margin calls or reduce exposure, calls into
question our ability to hold them.

. . .

My opinion is that as long as we are still relatively certain that we will be able to
say that we have satisfied all margin calls by the time we file, we should not raise
that issue in KPMG's minds.  All they've said so far is that they need to monitor
events through the opinion date.  If things change and we don't feel we will be
able to make that disclosure, then we should initiate the dialogue.

Feb. 25, 2008, Goldstone KPMG Email at 2-3 (emphasis added).

The Defendants spend a great deal of ink and paper trying to explain away the meaning

of this electronic mail transmission to make it say something other than that the Defendants were

purposely concealing information from KPMG the week before the 2007 Form 10-K filing.  See

Goldstone MSJ at 79-83; Starrett MSJ at 31-36; Starrett MSJ at 49-53; Goldstone MSJ Reply

at 26; Starrett MSJ Reply at 20-22.  That the Defendants have spent the amount of briefing trying

to make the electronic mail transmission say something other than what it says indicates to the

Court that the electronic mail transmission likely means what it says -- that the Defendants were

intentionally concealing information from KPMG.

Starrett writes that they "have purposely not told [KPMG] about the margin calls."  Feb.

25, 2008, Goldstone KPMG Email at 2.  Starrett further says that they have purposely not told

- 591 -

KPMG about the margin calls "so that we don't escalate an issue which we believe will be put to rest by the time [KPMG] [has] to issue [its] opinion" and that, "since we believe the situation will be resolved before they have to opine, we have chosen not to put the valuation issue in front of them."  Feb. 25, 2008, Goldstone KPMG Email at 2.  She states: "My opinion is that as long as we are still relatively certain that we will be able to say that we have satisfied all margin calls by the time we file, we should not raise that issue in KPMG's minds."  Feb. 25, 2008, Goldstone KPMG Email at 2.  Starrett wrote this electronic mail transmission during a time in which Thornburg Mortgage had several outstanding margin calls, which it could not pay, was in violation of its repo agreements, was at risk of losing its assets, and was at its repo lenders' mercy for whether they chose to default it.  Because Starrett believed the issue with the margin calls would "be put to rest by the time," and would "be resolved before," KPMG issued its audit opinion, Feb. 25, 2008, Goldstone KPMG Email at 2, the issue which the Defendants were purposely not telling KPMG was likely that Thornburg Mortgage had outstanding margin calls, which it could not meet, and that Thornburg Mortgage was in violation of its repo agreements and subject to default.

The Defendants argue that the Feb. 25, 2008 KPMG Email shows the Defendants' willingness to disclose information to KPMG, because Starrett wrote that, if "we are not able to resolve the situation satisfactorily, we will need to inform [KPMG] before we file," and that, "[i]f things change and we don't feel we will be able to make that disclosure[ -- that Thornburg Mortgage satisfied all margin calls --], then we should initiate the dialogue" with KPMG.  Feb. 25, 2008 KPMG Email at 2-3.  The electronic mail transmission only shows, however, that, if Thornburg Mortgage is unable to pay its outstanding margin calls before the 2007 Form 10-K filing, it would disclose that fact to KPMG or at least would "initiate the dialogue" with KPMG.

Feb. 25, 2008 KPMG Email at 2-3.  It does not show that Starrett or the Defendants intended to ever disclose to KPMG that Thornburg Mortgage was unable to timely meet margin calls, received a reservation-of-rights letter from Citigroup Global, was subject to default, or had trouble meeting margin calls, even in an untimely manner.   Indeed, the electronic mail transmission shows the opposite.  Starrett wrote: "My opinion is that as long as we are still relatively certain that we will be able to say that we have satisfied all margin calls by the time we file, we should not raise that issue in KPMG's minds."  Feb. 25, 2008 KPMG Email at 2.  Unless Thornburg Mortgage was unable to satisfy outstanding margin calls by the time it filed the 2007 Form 10-K, Starrett had no intention of disclosing to KPMG the trouble that Thornburg Mortgage had in meeting the margin calls.

The Court has already concluded that Thornburg Mortgage's inability to timely meet margin calls the week before the 2007 Form 10-K filing shows a genuine issue of material fact exists whether Thornburg Mortgage's OTTI judgment was objectively false.  See supra Analysis Section I.B.  The Feb. 25, 2008 KPMG Email shows that, as long as Thornburg Mortgage paid the margin calls before the 2007 Form 10-K filing, the Defendants never intended to disclose to KPMG or to the public the untimely paid margin calls.  Starrett's statements that, if they could not resolve the issue, they would disclose the issue to KPMG shows only that Starrett was not willing to say in the 2007 Form 10-K that Thornburg Mortgage had successfully met its margin calls, when in fact it had not.  In other words, Starrett was willing to conceal information from KPMG, but was not willing to make a blatant false statement in the 2007 Form 10-K that a simple telephone call to Thornburg Mortgage's repo lenders could easily disprove.

The Feb. 25, 2008, Goldstone KPMG Email also shows that Starrett believed that the withheld information was relevant to OTTI.  Goldstone's questions, to which Starrett is

responding, concern the timing and clarity of KPMG's opinion, and "[w]hy . . . selling some assets [is] the same as selling all assets."  Feb. 25, 2008, Goldstone KPMG Email at 3.[324]  After stating that they were purposely not telling KPMG about the margin call situation, Starrett said: "

> [KPMG] ha[s] not raised the issue of selling assets or marking down any assets. Rather, we have been wary of selling assets because we feel it is likely this issue will be raised then and it is also likely they will need to involve other experts within the firm, all of which will make reaching a decision a slow process.

Feb. 25, 2008, Goldstone KPMG Email at 2.  Starrett further answers Goldstone's question why selling some assets is the same as selling all assets by stating:

> In short, selling some assets is substantially the same as selling all assets because the only reason we don't have to recognize the impairments on all assets with negative marks in income now is that we represent we have the intent and ability to hold the assets to maturity.  Selling some assets calls into question our intent and having to sell them to meet margin calls or reduce exposure, calls into question our ability to hold them.

Feb. 25, 2008, Goldstone KPMG Email at 2.

Starrett, consequently, states that: (i) Thornburg Mortgage "ha[d] purposely not told [KPMG] about the margin calls," because she did not want to "escalate an issue which [she] believe[d] w[ould] be put to rest"; (ii) KPMG "ha[d] not raised the issue of selling assets or

---

[324]Goldstone also asked additional questions concerning Thornburg Mortgage's accounting methodology.  He stated:

> I am contemplating sending another email update to the board later today.  It seems that one of our new and big risks is a complete change of accounting methodology retroactive to 12/31/07.  Why have they never asked us to disclose this in the past?  It seems to me that this was always a risk given the nature of our funding structure.  Should the three of us be meeting with Cynthia today to get some clarity on what we should expect?

Feb. 25, 2008 KPMG Goldstone Email at 3.   Starrett responded by stating: "As far as accountants are concerned, this risk is already disclosed.  That's the purpose of the table that shows the total of all assets with negative marks as well as the total of all those that have been negative for more than 12 months in Note 2."  Feb. 25, 2008 KPMG Goldstone Email at 2.

marking down assets"; and (iii) Thornburg Mortgage "ha[d] been wary of selling assets because [Thornburg Mortgage] fe[lt] it is likely this issue w[ould] be raised then."  Feb. 25, 2008, Goldstone KPMG Email at 2.  It is unclear what "issue" Starrett was afraid would be raised if Thornburg Mortgage sold assets.  Starrett mentioned two issues in the two preceding sentences: (i) Thornburg Mortgage's inability to timely meet margin calls; and (ii) selling assets.  In the next sentence, Starrett stated that she "believe[s] the situation will be resolved before [KPMG] ha[s] to opine."  Feb. 25, 2008, Goldstone KPMG Email at 2.  It would be odd if the "issue" which Starrett was concerned would be raised was selling assets, because, if Thornburg Mortgage sold its assets, KPMG would already know about the issue of selling assets. Moreover, after saying that selling assets would likely raise the "issue" before KPMG, Starrett stated that she believed that the situation would be resolved before KPMG had to offer an audit opinion.  If Thornburg Mortgage sold assets, the assets would already be sold; it could not then resolve the asset-selling situation before filing the 2007 Form 10-K.  Instead, the "issue" which Starrett was wary about raising, and which Thornburg Mortgage was working to resolve before the 2007 Form 10-K filing, was that Thornburg Mortgage had outstanding, overdue margin calls. The Feb. 25, 2008, Goldstone KPMG Email, accordingly, shows that Starrett was willing to go to such extreme measures to conceal the margin call issue from KPMG that she was concerned about selling assets, because it might tip off KPMG that Thornburg Mortgage could not timely pay its margin calls and was subject to default.

It is unclear why Starrett was so concerned with KPMG finding out about the unmet margin calls.  One potential explanation is that Starrett believed that the outstanding margin calls would affect KPMG's conclusions concerning Thornburg Mortgage's OTTI determination.  In the first paragraph, Starrett stated that Thornburg Mortgage was "wary of selling assets," and, in

the next paragraph, she explains how selling some assets would call into question Thornburg

Mortgage's ability to hold its assets until maturity.  Feb. 25, 2008, Goldstone KPMG Email at 2.

A second possible explanation is that Thornburg Mortgage believed that this additional

information would slow down the audit process and may prevent KPMG from issuing an opinion

on time.  Starrett wrote that, if Thornburg Mortgage disclosed the margin-call situation to

KPMG, KPMG would "need to involve other experts within the firm, all of which w[ould] make

reaching a decision a slow process."  Feb. 25, 2008, Goldstone KPMG Email at 2.  In that case,

Thornburg Mortgage was not withholding information because it may have affected the OTTI

conclusion; Thornburg Mortgage was withholding the information because it wanted to file the

2007 Form 10-K on time.

　　　　There are two problems with the second explanation.  First, on summary judgment, the

Court is to draw all reasonable inferences in favor of the nonmoving party -- the SEC.  See, e.g.,

Sports Unlimited, Inc. v. Lankford Enters., Inc., 275 F.3d 996, 999 (10th Cir. 2002)("Both the

district court and the court of appeals will draw all reasonable inferences in favor of the

nonmoving party.").  Based on Starrett's discussion of OTTI in the Feb. 25, 2008, Goldstone

KPMG Email, it is reasonable to infer that Starrett was withholding the information because she

believed that it would affect Thornburg Mortgage's OTTI determination.  Second, even if

Thornburg Mortgage withheld the information to receive a timelier audit, the withholding shows

that Starrett believed that, at least KPMG, would have thought the unmet margin calls affected

its OTTI judgment.  The reason the information would slow down KPMG's decision making

process was that KPMG would "need to involve other experts within the firm" to assess the

information.  Feb. 25, 2008, Goldstone KPMG Email at 2.  In other words, Starrett believed that

KPMG would find the information important to the audit process, but she purposely withheld it

from them to speed up KPMG's decision.  The Feb. 25, 2008, Goldstone KPMG Email thus shows that Starrett believed that the withheld information would have resulted in a different OTTI conclusion, or that KPMG would have -- at a minimum -- thoroughly analyzed the information because it would have thought that the information was material to OTTI. Accordingly, the Feb. 25, 2008, Goldstone KPMG Email demonstrates a genuine issue of material fact whether the Defendants believed that their OTTI determination was correct.

The Defendants argue that the SEC can only speculate about the electronic mail transmission's meaning and that speculation is insufficient to thwart summary judgment.  See Goldstone MSJ at 80-81; Starrett MSJ at 49.  The Court disagrees with the Defendants' contention; the Feb. 25, 2008, Goldstone KPMG Email's text demonstrates its meaning, even if it may be subject to more than one reasonable interpretation.  The electronic mail transmission shows that the Defendants were withholding information from KPMG and that they were thinking about OTTI at that time.  While Starrett did not state the exact reason that the Defendants were concealing information, it is reasonable to infer that it was because the Defendants believed that information about unmet margin calls would have affected KPMG's OTTI judgment.  All the SEC needs at this stage of the case is a reasonable inference that shows a genuine issue of material fact, for which the Feb. 25, 2008, Goldstone KPMG Email provides a reasonable basis.

The Defendants also argue that Starrett was writing about not telling KPMG about the hypothetical situation in which Thornburg Mortgage was not able to meet its margin calls before the 2007 Form 10-K filing.  See Goldstone MSJ at 83; Starrett MSJ at 32-33.  The Feb. 25, 2008, Goldstone KPMG Email, however, shows that the Defendants were concerned with a real situation as opposed to a hypothetical one.  Starrett wrote that they had "purposely not told

[KPMG] about the margin calls so that [they] don't escalate an issue which [they] believe will be put to rest by the time [KPMG] ha[s] to issue [its] opinion."  Feb. 25, 2008, Goldstone KPMG Email at 2.     Starrett wrote more than once that she believed that the issue would be resolved before Thornburg Mortgage filed the 2007 Form 10-K.  See Feb. 25, 2008, Goldstone KPMG Email at 2-3.  The situation is not a hypothetical one -- i.e., a theoretical or speculative situation -- but was instead a situation which Thornburg Mortgage was facing.  Accordingly, the Feb. 25, 2008, Goldstone KPMG Email shows that the Defendants were purposely concealing information from KPMG, and it raises the reasonable inference that the Defendants believed that the information was material to Thornburg Mortgage's OTTI determination.  The electronic mail transmission, thus, demonstrates a genuine issue of material fact exists whether the Defendants believed that the OTTI judgment was correct.

### B.   THORNBURG MORTGAGE'S DECISION TO POSTPONE THE SECURITIZATION SUPPORTS FINDING THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT ABOUT SUBJECTIVE FALSITY.

Thornburg Mortgage postponing the securitization further evidences subjective falsity. In the Feb. 21, 2008, Burns Email, Burns writes to Simmons and Starrett, stating that Thornburg Mortgage decided to postpone a planned securitization, because the securitization would require Thornburg Mortgage to issue a prospectus before the 2007 Form 10-K filing.  See Feb. 21, 2008, Burns Email at 2.  Goldstone further elaborated on Thornburg Mortgage's decision to postpone the securitization in the Feb. 22, 2008, Goldstone Update Email, which he wrote to Simmons and Starrett.  He writes:

> We postponed our February securitization transaction because of prosup disclosure issues around these margin calls.  We don't want to disclose our current circumstances until it is resolved.  Our goal for resolution in the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.  However, in the context of the current securitization

which does require a prospectus, we cannot make that statement presently.
Further, some of the lawyers wanted us to do that.  So, we put the transaction on
hold and will resurrect the deal next week at some point.

Feb. 22, 2008, Goldstone Update Email at 1.

Like the Feb. 25, 2008, Goldstone KPMG Email, Thornburg Mortgage made the decision

to delay the securitization when it faced outstanding margin calls that it could not meet and its

repo lenders could have defaulted it.  Consequently, the "current circumstances" which

Goldstone did not want to disclose was that Thornburg Mortgage could not timely pay its margin

calls and was subject to default.  Feb. 22, 2008, Goldstone Update Email at 1.  Similar to his

statements in the Feb. 25, 2008, Goldstone KPMG Email, Goldstone stated that, depending on

where Thornburg Mortgage was immediately before the 2007 Form 10-K filing, Thornburg

Mortgage would decide how to "disclose this issue" and what to say about it.  Feb. 22, 2008,

Goldstone Update Email at 1.  This statement does not, however, show a willingness to fully

disclose Thornburg Mortgage's inability to timely meet margin calls, because, in the next,

sentence Goldstone stated that Thornburg Mortgage's plan was to say that it had margin calls,

which it met.  See Feb. 22, 2008, Goldstone Update Email at 1.  He does not say that Thornburg

Mortgage ever intended to disclose the difficulty that Thornburg Mortgage had in meeting its

margin calls or Thornburg Mortgage's inability to timely meet its margin calls.  Rather, by

postponing the securitization because it could not presently state that it had met all margin calls,

Goldstone is indicating that, if Thornburg Mortgage met all of its margin calls, he never intended

to disclose that Thornburg Mortgage could not timely meet its margin calls.

While this electronic mail transmission does not directly mention OTTI, it shows that the

Defendants intended to conceal certain information from the public.  When viewed in context

with the Feb. 25, 2008, Goldstone KPMG Email and the Feb. 28, 2008, Simmons Stock Price

Email, which the Court will discuss in the next subsection, it creates the inference that the Defendants wanted to prevent the public from discovering Thornburg Mortgage's unmet margin calls because the margin calls could materially affected Thornburg Mortgage's 2007 Form 10-K, specifically its OTTI conclusion.

The Defendants argue that they delayed the securitization because they did not want to issue conflicting financial statements -- i.e., one stating that Thornburg Mortgage had not met all margin calls and another stating that it had met all margin calls.  See Goldstone MSJ at 82-83; Goldstone MSJ Reply at 25-26; Tr. at 377:5-378:7 (Lee, Court); id. at 382:20-383:19 (Lee).  The Feb. 22, 2008, Goldstone Update Email suggests, however, that the Defendants' reasons for delaying the securitization were to not have to disclose that Thornburg Mortgage was unable to timely meet its margin calls.  Goldstone wrote that they wanted to say that Thornburg Mortgage met all of its margin calls, which they could not say on February 21, 2008.  The securitization would have required Thornburg Mortgage to disclose that it could not timely meet its margin calls and that it was subject to default.  While the Defendants may have been concerned with having inconsistent disclosures, a reasonable reading of the Feb. 22, 2008, Goldstone Update Email suggests that they never intended to disclose that Thornburg Mortgage could not timely meet its margin calls.  Indeed, after postponing the securitization, Thornburg Mortgage did not disclose in the 2007 Form 10-K that it was not able to timely meet its margin calls or that its repo lenders could have defaulted it in the week before the 2007 Form 10-K filing.   Accordingly, the Feb. 22, 2008, Goldstone Update Email and the postponed securitization create the reasonable inference that the Defendants wanted to conceal the fact that Thornburg Mortgage could not timely meet its margin calls.

### C.   THE FEB. 28, 2008, SIMMONS STOCK PRICE EMAIL SUPPORTS A CONCLUSION THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS WHETHER THERE IS SUBJECTIVE FALSITY.

The Feb. 28, 2008, Simmons Stock Price Email provides additional evidence of subjective falsity.  After the 2007 Form 10-K filing, and after the market reacted negatively to the filing, Goldstone emailed Simmons: "Good thing I didn't go today.  I will be putting out stock price fires all day.  I have had some good calls from investors so I think we will be fine.  Just not as good a stock price.  Good luck today.  Talk to you later."  Feb. 28, 2008, Simmons Stock Price Email at 2.  Simons replied, stating: "I guess the recent developments section did not go over well.  If they only knew."  Feb. 28, 2008, Simmons Stock Price Email at 2.

The statement "[i]f they only knew" sounds menacing.  Feb. 28, 2008, Simmons Stock Price Email at 2.  By discussing the markets' negative reactions, then stating if they only knew, Simmons seems to be suggesting that the market would have reacted even more negatively if it had known about something that it did not know.  Because the Defendants were actively concealing Thornburg Mortgage's inability to timely meet margin calls from both KPMG and from the public, Simmons' statement in the Feb. 28, 2008, Simmons Stock Price Email appears to refer to that concealed information.  Simmons, thus, appears to be saying that, if the market knew that Thornburg Mortgage was unable to timely meet margin calls and was subject to default, it would have reacted in an even more negative manner.  While the electronic mail transmission does not reference OTTI, as the Court has already concluded, Thornburg Mortgage's inability to timely meet margin calls was a factor that materially affected its OTTI determination.  See supra Analysis Section I.B.  It is reasonable to infer that the market would have reacted more negatively to the 2007 Form 10-K if it knew about the untimely margin calls, because the margin calls would have affected Thornburg Mortgage's OTTI determination.  More

directly, Simmons believed the market would have reacted more negatively if it knew about the untimely margin calls, because he knew that the untimely margin calls made Thornburg Mortgage's OTTI judgment false.

The Defendants argue that Simmons' statement shows his surprise and frustration with the market's reaction, and that he was referring to the effort that Thornburg Mortgage made for its shareholders.  See Goldstone MSJ at 53-54.  According to the Defendants, Simmons' meant "[i]if they only knew" about the Defendants' efforts the week before filing the 2007 Form 10-K. Feb. 28, 2008, Simmons Stock Price Email at 2.  The Defendants' concealment of information before the 2007 Form 10-K filing undercuts this explanation.  Additionally, because the SEC is the nonmoving party, the Court is to draw all reasonable inferences in its favor, and, in light of the Feb. 25, 2008, Goldstone KPMG Email and the Feb. 22, 2008, Goldstone Update Email, it is reasonable to infer that Simmons was referring to Thornburg Mortgage's inability to timely meet margin calls.  Consequently, the Feb. 28, 2008, Simmons Stock Price Email shows a genuine issue of material fact, from which a reasonable juror could conclude that the Defendants did not believe that Thornburg Mortgage's OTTI judgment was correct.

### D.    THE HEDGE-FUND RUMOR SHOWS THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT ABOUT SUBJECTIVE FALSITY.

Simmons' reaction to hearing about the hedge-fund rumor is more evidence from which a reasonable juror could conclude that the Defendants did not subjectively believe that Thornburg Mortgage's OTTI judgment was correct.  On February 27, 2008, Feldman wrote Simmons and Goldstone:

> I gave [Garrett Thornburg] an update that we should have Citigroup and all our other margin exposures met today even if we are unable to sell more TMST bonds.  We are moving the restricted subs from CS to Merrill and that should free about 50-60mm.  He told me that Treasury believes they have done all they can and there won't be any further changes from them.  He was about to meet with a

Congressional group and plant the seed that they should open the discount window to non-banks to provide stability to the financing market.

Further, I spoke with Charles Mac and he made it sound like a large repo client (European, lots of pay option MTA) was collapsing.  He couldn't give me details other than they own billions that presumably would have to get sold.  He may be able to give more details later today.  He sounded very concerned about it.  For the time being, we're not really supposed to know about this situation, but news may be coming soon.

Feb. 27, 2008, Simmons Email at 2.  Simmons responded by stating: "This makes it even more critical to be done with Citi today so we can get the K filed."  Feb. 27, 2008, Simmons Email at 2.

The Defendants argue that Simmons' statement about being done with Citigroup Global and filing the 2007 Form 10-K refers to Feldman's first paragraph, in which Feldman wrote that he told Garrett Thornburg that Thornburg Mortgage should meet all of its margin calls that day.  See Goldstone MSJ at 55-56.  They argue that, because Garrett Thornburg had been informed that all margin calls would be satisfied that day, there was a higher level of urgency to meet the margin calls that day.  See Goldstone MSJ at 55-56.  Another explanation, however, is that Simmons believed that the hedge-fund rumor would result in more margin calls, which Thornburg Mortgage would not be able to meet immediately.  If Thornburg Mortgage had outstanding margin calls at the 2007 Form 10-K filing, it would need to disclose that fact.  Once again, the unmet margin calls would call into question Thornburg Mortgage's ability to hold its assets.  If Simmons' response referred to the second paragraph of Feldman's electronic mail transmission, it shows that Simmons knew that unmet margin calls affected Thornburg Mortgage's OTTI judgment, that he believed the hedge-fund rumor would trigger more margin calls, and that he was taking steps to conceal unmet margin calls from the public by filing the 2007 Form 10-K before Thornburg Mortgage received additional margin calls.

- 603 -

Simmons' statement undermines the Defendants' interpretation.  Simmons wrote: "This makes it even more critical to be done with Citi today so we can get the K filed."  Feb. 27, 2008, Simmons Email at 2 (emphasis added).   Contrary to the Defendants' interpretation, Simmons stated that Thornburg Mortgage needed to be done with Citigroup Global so that it could file the 2007 Form 10-K and not so that it could meet Garrett Thornburg's expectations.   That the purpose for completing the Citigroup Global margin call was to file the 2007 Form 10-K supports the second interpretation -- that Simmons wanted to satisfy the outstanding margin calls so that Thornburg Mortgage could file the 2007 Form 10-K before it was hit with additional margin calls.   Moreover, because the SEC is the nonmoving party, the Court is to draw all reasonable inferences in its favor.   The Defendants took affirmative steps to conceal that Thornburg Mortgage was unable to timely meet margin calls.   Moreover, Goldstone recognized that the European-hedge-fund rumor would trigger additional margin calls.   See supra Analysis Section I.E.   Consequently, it is reasonable to infer that Simmons wanted Thornburg Mortgage to finish paying the Citigroup Global margin call and to file the 2007 Form 10-K that day, because he knew that Thornburg Mortgage would be hit with additional margin calls, which it would be unable to meet, evidencing Thornburg Mortgage's inability to hold its assets.   Accordingly, the Feb. 27, 2008, Simmons Email is further evidence from which a reasonable juror could conclude that the Defendants did not subjectively believe that the OTTI conclusion was correct.

In summary, the Feb. 22, 2008, Goldstone Update Email shows the lengths to which the Defendants were willing to go to conceal the unmet margin calls from KPMG.   Feb. 22, 2008, Goldstone Update Email at 2 ("We postponed our February securitization transaction because of prosup disclosure issues around these margin calls.   We don't want to disclose our current circumstance until it is resolved.").   The Feb. 25, 2008, Goldstone KPMG Email also shows that

the Defendants had "purposely not told" KPMG about Thornburg Mortgage's outstanding margin calls and that they believed the unmet margin calls would affect Thornburg Mortgage's OTTI conclusion.  Feb. 25, 2008, Goldstone KPMG Email at 2 ("We have purposely not told [KPMG] about the margin calls.").  As the Feb. 27, 2008, Simmons Email shows, Simmons believed that Thornburg Mortgage would receive additional margin calls which would impact Thornburg Mortgage's OTTI conclusion.  See Feb. 27, 2008, Simmons Email at 2 ("This makes it even more critical to be done with Citi today so we can get the K filed.").  Finally, after concealing information from KPMG, and the public at large, in the week before the 2007 Form 10-K filing, Simmons commented on the market's reaction to the 2007 Form 10-K by saying "[i]f they only knew," showing that he believed that the concealed information would have resulted in an even greater market reaction.  Feb. 28, 2008, Simmons Stock Price Email at 2 ("I guess the recent developments section did not go over well.  If they only knew.").  Each of these facts, individually, are sufficient to show that genuine issues of material fact exist for subjective falsity; combined, the issues of material fact are more obvious.

## IV.   THERE IS A GENUINE ISSUE OF MATERIAL FACT CONCERNING SCIENTER.

There is a genuine issue of material fact concerning scienter.  Scienter "refers to the mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. at 194 n.12.  For a § 10(b) claim, scienter is normally a separate element than the false-statement element. See, e.g., SEC v. Wolfson, 539 F.3d at 1256 (listing scienter and the making of a misrepresentation as separate elements).  For statement of opinion, however, the two elements merge.  The Supreme Court clarified that statements of opinion are false only if the speaker did not hold the stated opinion.  See Omnicare, 135 S. Ct. at 1325-26.  To establish that a statement was false, a plaintiff must show that the speaker did not actually believe the espoused

opinion -- i.e. a plaintiff must show subjective falsity.  Once a plaintiff shows that the speaker

believed the stated opinion to be false, the plaintiff will have also satisfied the scienter

requirement; a speaker who knowingly made a false statement did so with scienter.

> As the First Circuit has held:

> In cases premised on misstatements of opinion . . . , the falsity element, at a
> minimum, entails an inquiry into whether the statement was subjectively
> false . . . .   Accordingly, the subjective aspect of the falsity requirement and the
> scienter requirement essentially merge; the scienter analysis is subsumed by the
> analysis of subjective falsity.  We think it follows that if a plaintiff adequately
> pleads that a statement of opinion was subjectively false when made, the
> complaint will, ex proprio vigure, satisfy the pleading requirements . . . [for]
> scienter.

Credit Suisse First Boston Corp., In re, 431 F.3d at 48 (citation omitted)(footnote omitted).  In

two separate opinions, the Honorable Gerard E. Lynch, then-United States District Judge for the

Southern District of New York, now-United States Circuit Judge for the Second Circuit, has

explained how, once a plaintiff establishes a misrepresentation for an opinion statement, he or

she has also established scienter, even if the same would not be true for factual statements.

> While in a misstatement of fact case the falsity and scienter requirements present
> separate inquiries, in false statement of opinion cases such as these, the falsity and
> scienter requirements are essentially identical.   That is because a material
> misstatement of *fact* is alleged by pointing to the true fact about the world that
> contradicts the misstatement.  But even if the statement of fact ("the company
> made x million dollars in profit last year") turns out to be objectively false, it
> could have been made in good faith; subjective intent to commit fraud is a wholly
> separate inquiry from whether the statement is objectively true.   However, a
> material misstatement of *opinion* is by its nature a false statement, not about the
> objective world, but about the defendant's own belief.   Essentially, proving the
> falsity of the statement "I believe this investment is sound" is the same as proving
> scienter, since the statement (unlike a statement of fact) cannot be false at all
> unless the speaker is knowingly misstating his truly held opinion.

Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d at 154 (emphases in original).

> Although in the typical case falsity and scienter are different elements, in a false
> statement of opinion case the two requirements are essentially identical.   For
> example, in a case where a material misstatement of fact is alleged, the statement

> may be both objectively false *and* believed in good faith by the speaker to be true. However, in contrast, a material misstatement of opinion is by its nature a false statement, not about the objective world, but about the defendant's own belief. Adequately alleging the falsity of a statement like "I believe AWE will grow" is the same as adequately alleging scienter on the part of the speaker, since the statement (unlike a statement of fact) cannot be false at all unless the speaker is knowingly misstating his truly held opinion.

In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d at 466 (emphasis in original).

The Court agrees with the First Circuit and with Judge Lynch that, once a plaintiff establishes subjective falsity, he or she also establishes scienter. A speaker could not have acted in good faith if he or she believed that the statement was false. Here, the Court has concluded that the SEC presented sufficient evidence to show that a genuine issue of material fact exists on the subjective falsity issue. See supra Analysis III. Consequently, the SEC has also presented sufficient evidence to demonstrate the existence of a genuine issue of material fact whether the Defendants acted with scienter. The Court, accordingly, will not grant the Defendants summary judgment on the scienter element.

## V. THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER THE DEFENDANTS DECEIVED KPMG.

There is a genuine issue of material fact whether the Defendants deceived KPMG in violation of rule 13b2-2. As an initial matter, the Court must determine at what point a person violates rule 13b2-2. Rule 13b2-2 prohibits false misstatements and omissions which make a statement misleading. See 17 C.F.R. § 240.13b2-2(a). Both parties agree that a misstatement violates rule 13b2-2 when the speaker makes the misstatement. They disagree, however, at what point in time a person violates rule 13b2-2 for making an omission.

### A.   RULE 13b2-2 IS VIOLATED WHEN A PERSON OMITS A MATERIAL FACT THAT MAKES A STATEMENT MISLEADING.

The Defendants argue that rule 13b2-2 is violated through omissions when the auditor must rely on the statement from which information was omitted, which, in this case, was when KPMG issued its audit opinion for the 2007 Form 10-K.  According to the Defendants, if they provided KPMG with the omitted information before the 2007 Form 10-K filing, there cannot be a rule 13b2-2 violation.  The SEC, on the other hand, argues that rule 13b2-2 is violated at the point that a statement becomes misleading because of omitted information.  Thus, according to the SEC, the Defendants could violate rule 13b2-2 by making a statement that was misleading, because of omitted information, even if the Defendants provided KPMG with the information before the 2007 Form 10-K filing.  The Court concludes that the SEC's interpretation is correct and is more in line with the rule's plain language and policy.

Rule 13b2-2(a) states:

(a)   No director or officer of an issuer shall, directly or indirectly:

> (1)   Make or cause to be made a materially false or misleading statement to an accountant in connection with; or
>
> (2)   Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:
>
> > (i)   Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or
> >
> > (ii)   The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

17 C.F.R. § 240.13b2-2(a).   Both parties argue that the rule's plain language supports their interpretation.   See SEC Rule 13b2-2 Supp. at 8-10; Defendants Rule 13b2-2 Supp. at 8.   The rule's plain language supports the SEC's interpretation.   Rule 13b2-2 makes it a violation for a director or officer to "[o]mit to state . . . any material fact necessary in order to make statements made . . . not misleading . . . in connection with . . . [a]ny audit . . . or . . . [t]he preparation or filing of any document or report to be filed with the Commission . . . ."   17 C.F.R. § 240.13b2-2(a).   Rule 13b2-2 does not state that an omission requires an auditor to rely on the statement before the rule is violated.   Instead, the rule states that it is a violation to "[o]mit to state . . . any material fact necessary in order to make statements . . . not misleading . . . ."   17 C.F.R. § 240.13b2-2(a).   Once a material fact is omitted from a statement, which the omission made misleading, rule 13b2-2 is violated.

The subsections of § 240.13b2-2(a)(2) further confirm this interpretation.   The material fact must be omitted "in connection with . . . [a]ny audit, review or examination of the financial statements . . . or . . . [t]he preparation or filing of any document or report required to be filed with the Commission . . . ."   17 C.F.R. § 240.13b2-2(a).   Rule 13b2-2 can be violated during an "audit, review or examination of financial statements," or during the "preparation" of documents that are to be filed with the SEC, meaning that it is violated before the auditor must rely on the statement.   17 C.F.R. § 240.13b2-2(a).   Moreover, rule 13b2-2 does not distinguish between omissions and misstatements.   It is a violation to make "a materially false statement to an accountant" or to "[o]mit to state . . . any material fact necessary in order to make statements made . . . not misleading, to an accountant."   17 C.F.R. § 240.13b2-2(a).   The text shows that a rule 13b2-2 is violated when a misstatement is made or material fact is omitted that was necessary to make a statement not misleading.   There is no textual support for the Defendants'

proposed interpretation that a violation occurs when a misstatement is made, but for omissions, there is no violation until the auditor must rely on the statement.

The Defendants state: "The plain language of Rule 13b2-2(a) prohibits auditor *deception*. Without deception, there can be no liability."  Defendants Rule 13b2-2 Supp. at 8 (emphasis in original).  It is unclear to what rule 13b2-2(a) the Defendants are referring; they cannot be referring to SEC rule 13b2-2 that is found in 17 C.F.R. § 240.13b2-2.  Rule 13b2-2(a) does not use the word "auditor" or "deception."  Indeed, the word "deception" is not used in rule 13b2-2.  Rather, it appears that the Defendants have paraphrased rule 13b2-2 and then argue that their paraphrased rule's plain language supports their interpretation.  Because the Court will apply the rule 13b2-2 that the SEC promulgated, and not the Defendants' paraphrased rule, the Court concludes that rule 13b2-2 is violated when an officer or director makes a statement that is misleading because he or she omitted to state a material fact; the violation occurs at the point at which the statement becomes misleading.

The Defendants argue that the business judgment rule gives officers and directors reasonable discretion to control the timing of disclosures.  See Defendants Rule 13b2-2 Supp. at 7-8; id. at 14-17.  They also argue that SEC policy statements show that Congress intended § 13(b) of the Exchange Act to protect management's discretion and flexibility in making decisions.  See Defendants Rule 13b2-2 Supp. at 16-17 (citing Foreign Corrupt Practices Act of 1977, Exchange Act Release No. 17500, 1981 WL 36385 (Jan. 29, 1981)).  The Defendants are mistaken.

The cases which the Defendants cite stand only for the proposition that the business judgment rule gives management discretion for the timing of making disclosures, unless the SEC's rules require otherwise.  The Second Circuit has stated that "the timing of disclosure is a

matter for the business judgment of the corporate officers entrusted with the management of the corporation within the affirmative disclosure requirements promulgated by the exchanges and by the SEC."  SEC v. Tex. Gulf Sulphur Co., 401 F.2d 833, 851 n.12 (2d Cir. 1968)(quoted in Fin. Indus. Fund, Inc. v. McDonnell Douglas Corp., 474 F.2d 514, 518 (10th Cir. 1973)).  The First Circuit has recognized that the SEC's rules constrain the management's business judgment concerning the timing of disclosures: "While the timing of material disclosures may normally be governed by the business judgment of a corporation, this business judgment must operate within the constraints of the Securities and Exchange Commission's affirmative disclosure requirements."  Backman v. Polaroid Corp., 893 F.2d 1405, 1419 (1st Cir. 1990).  Rule 13b2-2 prohibits officers and directors from omitting information that would make statements misleading.  It, thus, places an affirmative obligation on officers and managers to disclose material facts that are necessary to prevent statements from being misleading.  Management does not have discretion whether or when to make such disclosures; rule 13b2-2 prescribes exactly when the disclosure must be made.

The Defendants also cite an SEC policy release that they contend supports their assertion that rule 13b2-2 recognizes the necessity to provide management with flexibility and to protect management's reasonable judgment.  See Defendants Rule 13b2-2 Supp. at 16-17 (citing Foreign Corrupt Practices Act of 1977, Exchange Act Release No. 17500, 1981 WL 36385 (Jan. 29, 1981)).  This release, however, concerns § 13(b) of the Exchange Act's internal control requirements, and not the SEC's auditor deception rules.  See Foreign Corrupt Practices Act of 1977, Exchange Act Release No. 17500, 1981 WL 36385 (Jan. 29, 1981).  Instead, the SEC points to an SEC release that concerns rule 13b2-2's auditor deception provisions -- specifically rules 13b2-2(b) and (c).  There, the SEC states:

The rules, in combination with the existing rules under Regulation 13B-2[, which includes rule 13b2-2(a)], are designed to ensure that management makes open and full disclosures to, and has honest discussions with, the auditor of the issuer's financial statements.  These rules prohibit officers or directors of an issuer, or persons acting under their direction, from subverting the auditor's responsibilities to investors to conduct a diligent audit of the financial statements and to provide a true report of the auditor's findings.

Improper Influence on Conduct of Audits, Exchange Act Release No. 26050, 2003 WL 21148349, at *1 (May 20, 2003).   Consequently, rule 13b2-2's purpose is to encourage management to fully and openly disclose information to auditors, rather than to allow management to have discretion when to disclose material information.

### B.    KPMG'S NO-FRAUD CONCLUSION DOES NOT FORECLOSE A POSSIBLE RULE 13b2-2 VIOLATION.

KPMG's no-fraud conclusion during the restatement does not foreclose a possible rule 13b2-2 violation.   The Defendants argue that, even after KPMG determined that Thornburg Mortgage deviated from its repo agreements' terms by paying margin calls over time, KPMG concluded that the restatement was not conducted because of fraud.   See Goldstone MSJ at 78-79, 93-94, & 96; Starrett MSJ at 42-43.   This argument places the Defendants in a precarious place.   They argue that the restatement is insufficient to grant the SEC summary judgment on objective falsity, because the restatement was wrongly conducted; at the same time, they argue that KPMG's no-fraud conclusion is sufficient for the Court to grant them summary judgment on the auditor deception issue.  The Defendants are asking the Court to ignore one part of the restatement while accepting another part as true.  The Court will not engage in such one-sided slicing of the restatement.

Just as the restatement presents evidence of objective falsity -- precluding summary judgment in the Defendants' favor -- the no-fraud conclusion presents evidence that there was no auditor deception.  If the SEC moved for summary judgment on its rule 13b2-2 claim, which it

has not, KPMG's no-fraud determination may be sufficient to preclude summary judgment. KPMG's conclusion in the restatement that the original OTTI conclusion was incorrect is not determinative of the objective falsity issue. There is still an issue whether the Defendants' OTTI conclusion was objectively false. Similarly, KPMG's no-fraud conclusion is not determinative to the SEC's rule 13b2-2 claim. As the Court explains in the next two subsections, there is a genuine issue of material fact whether the Defendants made material misstatements or omissions.

### C.   THE SEC HAS PRESENTED EVIDENCE OF MATERIAL MISSTATEMENTS THAT THE DEFENDANTS MADE TO KPMG.

The SEC has presented evidence of material misstatements that the Defendants made to KPMG. First, there is the Feb. 27, 2008, Thornburg Representation Letter. In the letter, which the Defendants signed, they made the following statements to KPMG:

> The consolidated financial statements referred to above [-- specifically the 2007 form 10-K --] are fairly presented in conformity with U.S. generally accepted accounting principles.
>
> There are no . . . [e]vents that have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to or disclosure in the consolidated financial statements.
>
> The Company has complied with all aspects of contractual agreements that would have a material effect on the consolidated financial statements in the event of noncompliance.
>
> Debt securities that have been classified as held-to-maturity have been so classified due to our intent and ability to hold such securities to maturity. . . . Declines in value of debt or equity securities classified as either available-for-sale or held-to-maturity are considered to be temporary because we have both the intent and ability to hold these impaired securities for a sufficient period of time, until maturity if necessary, to allow for their recovery in market value.
>
> Except as recorded or disclosed in the consolidated financial statements, there are no declines in values of certain investments that are considered to be other-than-temporary in accordance with FSP FAS 115-1 and F AS 124-1, *The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments.*

Feb. 27, 2008, Thornburg Representation Letter at 2-5

The Court has already concluded that there is a genuine issue of material fact whether Thornburg Mortgage's OTTI determination was objectively false and whether the Defendants believed that the OTTI judgment was correct.  See supra Analysis Sections I & III.  If the OTTI determination was objectively false, and the Defendants believed that it was false, then their statements to KPMG that no subsequent events required adjustment to the financial disclosures and that all assets that are OTTI have been classified as such are also materially false.  Other courts have found that management's statements in a representation letter are sufficient to create a rule 13b2-2 violation.   See, e.g., SEC v. Todd, 642 F.3d at 1219-20 (concluding that defendants' signing of a "management representation letter . . . which falsely stated that the financial statements were prepared in accordance with GAAP" was sufficient to lead to a rule 13b2-2 violation); McConville v. SEC, 465 F.3d at 789 (concluding that there was sufficient evidence to support a rule 13b2-2 claim when the defendants signed a management representation letter which stated "that the financial statements were accurate"); SEC v. Retail Pro, Inc., 673 F. Supp. 2d 1108, 1142-43 (S.D. Cal. 2009)(granting summary judgment in the SEC's favor on a rule 13b2-2 claim when the defendant signed a management representation letter which stated that he had "no knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, or former employees" (alterations omitted)).   Consequently, there is a genuine issue of material fact whether the Defendants' statements in the Feb. 27, 2008, Thornburg Representation Letter violated rule 13b2-2.

There is also evidence that Simmons and Starrett told Reinhart and Hall in a meeting on February 27, 2008, that Thornburg Mortgage had met all of its margin calls, when it had not yet completely paid the Citigroup Global margin call.  Hall testified that, at a meeting on February

27, 2008, Simmons and Starrett told Reinhart and Hall that Thornburg Mortgage had met its margin calls.  See Hall Depo. at 101:5-103:24.  While Thornburg Mortgage finished paying the Citigroup Global margin call on February 27, 2008, it is unclear what time of day Thornburg Mortgage made the last payment.  In an electronic mail transmission from Fellers to Goldstone and Simmons, titled "Quick update," Fellers stated: "Citi is in receipt of their wire for $75 million, and EVERY margin call has been satisfied as of the time of this email."  Electronic Mail Transmission from Nathan Fellers to Larry Goldstone and Clay Simmons at 1 (dated Feb. 27, 2008), filed September 22, 2014 (Doc. 342-4)("Fellers Citigroup Global Email").  The electronic mail transmission states that it was sent on February 27, 2008, at 2:28 p.m.[325]  See Fellers Citigroup Global Email at 1.  Simmons left Santa Fe for Dallas that same day around noon.  See Simmons Depo. Vol. III at 140:24-141:10.  Simmons was, consequently, not in Santa Fe when he received the Fellers Citigroup Global Email, meaning that the meeting with Reinhart and Hall occurred before he received the electronic mail transmission.

While it is unclear at what time Thornburg Mortgage finished paying the Citigroup Global margin call, the Fellers Citigroup Global Email creates the reasonable inference that it was paid a little before 2:28 p.m.  Fellers titled the electronic mail transmission "Quick update."  Fellers Citigroup Global Email at 1.  The only sentence in the electronic mail transmission concerns the Citigroup Global margin call.  Moreover, this electronic mail transmission was sent a few hours before Thornburg Mortgage filed the 2007 Form 10-K.  See March 9, 2008, Restatement Memo. at 2 (stating that the 2007 Form 10-K was filed "at 12:37 AM on February

---

[325]It is unclear to what time zone the 2:28 p.m. refers.  At the hearing, the Defendants stated that the time stamps on electronic mail transmissions are not always reliable, because it is unclear at times to what time zone the stamp refers.  See Tr. at 67:5-14 (Lee).  Because Goldstone, Simmons, and Fellers all reside in New Mexico, the 2:28 p.m. time stamp likely refers to Mountain Standard Time.

28, 2008 (effectively the night of February 27, 2008)").  With the 2007 Form 10-K just hours away, and with the Defendants wanting to settle the margin calls before filing, it is likely that Fellers updated Goldstone and Simmons immediately after the last dollar was wired to Citigroup Global.  There is, thus, a reasonable inference that the Citigroup Global margin call was not satisfied until just before 2:28 p.m.

Fellers sent the Fellers Citigroup Global Email after Simmons left Santa Fe; he, therefore, sent the electronic mail transmission after the February 27, 2008, meeting between Simmons, Starrett, Reinhart, and Hall.  Accordingly, when Simmons and Starrett told Reinhart and Hall that Thornburg Mortgage had met all of its margin calls, it had not yet met the Citigroup Global margin call.  Simmons and Starrett, thus, may have made a material false statement to Reinhart and Hall in violation of rule 13b2-2.  While it is possible that Thornburg Mortgage satisfied the Citigroup Margin call several hours before Fellers sent the electronic mail transmission -- thus making his statement true -- there is no evidence to that effect, and the Fellers Citigroup Global Email indicates that Fellers sent it immediately after wiring the money to Citigroup Global.  As the nonmoving party, the Court is to grant all reasonable inferences in the SEC's favor.  It is reasonable to infer that Fellers sent the electronic mail transmission immediately after Thornburg Mortgage paid its last margin call.  There is, consequently, a genuine issue of material fact whether Simmons and Starrett made a material false statement to Reinhart and Hall.

Finally, in response to questions about the Margin Call Schedule, Reinhart testified that, before giving KPMG the Margin Call Schedule, Thornburg Mortgage represented to KPMG that it had satisfied its margin calls and that the margin calls were met on a timely basis.  See Reinhart Depo. at 236:10-18 ("The company told us and represented to us before giving us this schedule that they had fully satisfied all their margin calls, and they were met on a timely

basis.").  The Defendants addressed Reinhart's testimony by saying that it is unclear who made those statements and at what point in time they were made.  See Tr. at 890:17-22 (Marks).  The timeliness argument does not carry much weight.  Reinhart testified that the statement was made before Thornburg Mortgage provided KPMG with the Margin Call Schedule, see Reinhart Depo. at 236:15-18, and, because the SEC is the nonmoving party, the Court is to draw all reasonable inferences in its favor.  The question of who made the statement is more problematic.  Reinhart merely says "[t]he company told us."  Reinhart Depo. at 236:15.  She does not, however, say who within the company told them.  Rule 13b2-2 prohibits an offer from "[m]aking or caus[ing] to be made a materially false or misleading statement."  17 C.F.R. § 240.13b2-2(a)(1).  If there were evidence that one of the Defendants made the statement or caused someone else at Thornburg Mortgage to make it, the statement would show that a genuine issue of material fact exists which would, by itself, preclude summary judgment.  There is not, however, such evidence.  All the Court knows is that someone at Thornburg Mortgage told Reinhart that Thornburg Mortgage had satisfied all of its margin calls in a timely manner.  Because the Court concludes that there are other misstatements and omissions precluding summary judgment on the SEC's rule 13b2-2 claim, the Court will not grant the Defendants summary judgment, but, if the SEC wishes to prevail on its claim with this statement, it will need to introduce at trial evidence that the Defendants made the statement or caused someone else to make it.  Evidence that some unknown person at Thornburg Mortgage told Reinhart that Thornburg Mortgage had timely met its margin calls is not enough to prevail.

### D.   THE SEC HAS PRESENTED EVIDENCE OF OMISSIONS THAT MADE STATEMENTS MISLEADING.

The SEC has presented evidence of omissions that made statements materially misleading.  These omissions concern Thornburg Mortgage's ability to meet margin calls, the

hedge-fund rumor, and the I/O Strip Transactions.  At the February 27, 2008, meeting between Simmons, Starrett, Reinhart, and Hall, Simmons and Starrett told Reinhart and Hall that Thornburg Mortgage had met its margin calls and they did not indicate that there was any "troubles of concerns."   Hall Depo. at 103:16-24.   The Court has already concluded that Simmons' and Starrett's statements show that a genuine issue of material fact exists whether they made an affirmatively false statement to Reinhart and Hall, because Thornburg Mortgage may not have satisfied its margin calls by that time.  See supra Analysis Section V.C.  Regardless whether Thornburg Mortgage paid its margin calls before the meeting, the statement is misleading, because Simmons and Starrett omitted to tell Reinhart and Hall about the trouble Thornburg Mortgage had in meeting its margin calls.   By telling Reinhart and Hall that Thornburg Mortgage met its margin calls without indicating any trouble, Simmons and Starrett gave the impression that Thornburg Mortgage did not have trouble meeting its margin calls, which was not accurate.   Thornburg Mortgage violated multiple repo agreements, because it could not timely meet its margin calls, which exposed it to default.   Additionally, Thornburg Mortgage was able to meet its margin calls only by conducting the I/O Strip Transactions, which deprived it of long-term income generating assets.  Failure to disclose these facts to Reinhart and Hall caused Simmons' and Starrett's statement to be misleading.

The Defendants rely on the Margin Call Schedule to argue that they told KPMG about the untimely margin calls and told KPMG that the I/O Strip Transactions were used to pay margin calls.   While the Margin Call Schedule may not have been sufficient to fully disclose Thornburg Mortgage's troubles to KPMG -- it was provided hours before the 2007 Form 10-K filing, it does not highlight the untimely margin calls or the I/O Strip Transactions, and it was provided to Reinhart in response to a request for information that merely stated the number of

margin calls that Thornburg Mortgage received -- even assuming it was sufficient, summary judgment is inappropriate.  Thornburg Mortgage provided KPMG with the Margin Call Schedule on February 27, 2008.  See Hall Depo. at 36:13-21.  There is not, however, any evidence of what time it was provided to KPMG.  At the hearing, the SEC represented that it was provided to Reinhart in the afternoon.  See Tr. at 26:5-10 (McKenna).  The Court has not been able to find any evidence supporting the assertion that the Thornburg Mortgage provided KPMG with the schedule in the afternoon.  Because the Court must draw all reasonable inferences in the SEC's favor, and because the meeting took place in the morning, it is reasonable to infer that Reinhart was not provided with the schedule until after the meeting.  Accordingly, the Defendants omitted to state material facts that were necessary to prevent their statement about meeting margin calls from becoming misleading in violation of rule 13b2-2(a).[326]

There is also evidence that Simmons omitted material information concerning the hedge-fund rumor.  Hall and Reinhart both testified that Simmons told them that the likelihood

---

[326]The Margin Call Schedule also did not cure the omission.  The Defendants assert that rule 13b2-2 is not violated until the auditor must rely on the information.  Thus, according to the Defendants, if an officer or director provides an auditor with the omitted information before the auditor must rely on the prior statement, there is no rule 13b2-2 violation.  In other words, because rule 13b2-2 is not violated until the auditor must rely on the statement, an officer or director has an opportunity to cure an omission after it is made.  The Court has already concluded that this interpretation is contrary to rule 13b2-2's plain language and the policy that the rule seeks to advance.  See supra Analysis Section V.A.  Rule 13b2-2 is violated the moment a prior statement is made misleading because an officer or director omitted to state a material fact.  See supra Analysis Section V.A.  See also 17 C.F.R. § 240.13b2-2.  There is no indication in rule 13b2-2's language or history that, once an officer or director violates rule 13b2-2, he or she may later cure the violation.  Moreover, the Defendants concede that, for affirmative misstatements, once rule 13b2-2 is violated, an officer or director cannot later cure the misstatement.  See Tr. at 940:12-16 (Lee)("[A]s I think we've conceded, if one made an affirmative misstatement to an auditor on a particular date, what happened after that would not necessarily cure that affirmative statement.").  Rule 13b2-2 does not distinguish between affirmative misstatements and omissions.  Once rule 13b2-2 is violated -- i.e., an officer makes a material misstatement or omits to state a material fact that makes a prior statement misleading -- disclosing the omitted facts or correcting the misstatement cannot later cure that violation.

of Thornburg Mortgage's collateral decreasing even two-to-three percent was remote.  See Reinhart Depo. at 296:14-23; Hall Depo. at 339:16-340:20.  It is unclear when Simmons made this statement to Reinhart, but Hall testified that it was in a meeting on February 25 or 26, 2008. See Hall Depo. at 240:10-20.  Simmons did not learn about the hedge-fund rumor until February 27, 2008, see Feb. 27, 2008, Simmons Email at 2, and Goldstone did not send him the electronic mail transmission that discussed the twenty point haircuts until the afternoon of February 27, 2008, see Feb. 27, 2008, Hedge Fund Email at 2.  At the hearing, the SEC conceded that Simmons made the statement about the remote possibility of a two-to-three percent decrease before Simmons learned about the hedge-fund rumor.  See Tr. at 846:1-4 (Kasper)("I don't have [the time in which Simmons made the statement] in the front of my mind, Your Honor.  But I guess my point would be is that it either was -- it certainly precedes Mr. Simmons learning about the Peloton information.").  Simmons' statements to Reinhart and Hall were, consequently, not misleading when made, because Simmons did not know of any information which he omitted to tell them.  That the statements were not misleading when made is not, however, the end of the inquiry.

If an officer or director makes a statement, which is not misleading when made, but which becomes misleading because of information that is later discovered, rule 13b2-2 places an affirmative obligation on the officer or director to disclose the later-discovered information. Rule 13b2-2 makes it unlawful to "make . . . a materially false or misleading statement" or to "omit to state . . . any material fact necessary in order to make statements made . . . not misleading . . . ."  17 C.F.R. § 240.13b2-2(a).  The word "make" in subsection 1 and the phrase "omit to state" in subsection 2 are in the present tense.  17 C.F.R. § 240.13b2-2(a) (capitalization omitted for readability).  This language indicates that the rule is violated when the materially

false or misleading statements are made, or when the person omits to state the material fact.  The statements in subsection 2, which are made misleading by omitting to state a material fact, however, is in the past tense.  See 17 C.F.R. § 240.13b2-2(a) (using the phrase "statements made").  The statements must, thus, be made before the officer or director can omit to state material facts.  In clearer English, once an officer or director makes a statement, he or she cannot later omit to state a material fact that is necessary to prevent the previously made statement from becoming misleading.

SEC v. Autocorp Equities, Inc., No. CIV 9800562 PGC, 2004 WL 1771608 (D. Utah Aug. 4, 2004), illustrates this concept.  There, the president of a company helped the company secure certificates of deposit ("CDs") from a Russian bank, which the company listed as assets to secure loans.  2004 WL 1771608, at *1.  The company issued public filings that listed the CDs as assets, and the president used the CDs to obtain loans for the company.  See 2004 WL 1771608, at *1.  Unbeknownst to the president, the CDs were fake, which he later learned.  See 2004 WL 1771608, at *1.  The SEC initiated an enforcement action against the president and others, alleging, among other things, a rule 13b2-2 violation.  See 2004 WL 1771608, at *2.  The Honorable Paul G. Cassell, United States District Judge for the District of Utah, granted the SEC summary judgment on its rule 13b2-2 claim.  See 2004 WL 1771608, at *6.  He reasoned that, even though the president did not know that the CDs were fake when he worked with accountants in issuing the public filings, once the president discovered their falsity, rule 13b2-2 imposed on him an obligation to inform the accountants of the falsity.  See 2004 WL 1771608, at *6. Judge Cassell explained:

> [T]he SEC renews its argument that Beatty is personally liable for violating Rule 13b2-2, which imposes a duty on corporate officers to clarify previous statements that are misleading in the absence of some material fact.  It is undisputed that Beatty worked with accountants to get the CDs and to issue the various SEC

> filings.  If those conversations were the only evidence in support of this claim, summary judgment would not be proper.  However, once Beatty learned the truth of the CDs, Rule 13b2-2 imposed a duty on him to inform the accountants, which he did not do.  Accordingly, summary judgment is proper on this claim as well.

2004 WL 1771608, at *6.  Accordingly, if an officer or director learns about new information that makes a previous statement misleading, rule 13b2-2 places an affirmative obligation on the officer or director to disclose the newly discovered information.

Here, Simmons told Reinhart and Hall that he thought it was a remote possibility that the value of Thornburg Mortgage's collateral would decrease by even two-to-three percent.  Within a day or two, Simmons learned that a hedge fund in Europe was collapsing, which would affect the value of Thornburg Mortgage's assets.  This new information, thus, made the previous statements, at best, misleading or, at worst, false.  By omitting to tell Reinhart and Hall about the hedge-fund collapse, Simmons omitted to state a material fact that was necessary to make a prior statement not misleading.  There is, thus, a genuine issue of material fact whether Simmons violated rule 13b2-2 by not disclosing to KPMG his knowledge of the hedge-fund rumor.

The SEC argues that KPMG asked Thornburg Mortgage a number of questions and requested documents that should have led to the disclosure of the Citigroup Global reservation-of-rights letter.  See Tr. at 862:1-864:3 (Kasper).  Rule 13b2-2 does not, however, prohibit inadequate responses to a requested production.  It prohibits officers and directors only from omitting to state information that makes a previous statement misleading.  Consequently, Reinhart's and Hall's testimony that the Defendants did not disclose the reservation-of-rights letter in response to questions, which they expected would have revealed such information, see Reinhart Depo. at 328:5-25 (stating that she asked a number of questions which she would have expected lead to the disclosure of the reservation-of-rights letter); Hall Depo. at 313:13-21 (stating that she asked Simmons questions which should have prompted him to disclose the

reservation-of-rights letter), does not lead to a rule 13b2-2 violation.   Additionally, that

Thornburg Mortgage did not disclose the letter in response to the KPMG's request for all

correspondence with counter repo parties in the two weeks before the 2007 Form 10-K filing, see

March 3d Information Request at 4, does not violate rule 13b2-2, because the SEC has not

identified any statement that was made misleading by the letter's nondisclosure.

While questions that should have led to the reservation-of-rights letter's disclosure are

insufficient to violate rule 13b2-2, Goldstone made the affirmative representation to Hall at a

meeting on February 27, 2008, that there was not anything they had not discussed that they

should discuss before filing the 2007 Form 10-K.   See Hall Depo. at 312:23-313:12.

> Q.     And do you have a catchall question that you ask at the end of your down
>         to date inquiries . . . [t]hat you asked of Mr. Goldstone?
>
> A.     Yes.
>
> Q.     What is that?
>
> A.     I asked if there is anything I should ask that I hadn't or anything that we
>        should discuss that we haven't.
>
> Q.     And what did Mr. Goldstone say in response to that question?
>
> A.     He said no.

Hall Depo. at 312:23-313:12.   The Court has already concluded that there is a genuine issue of

material fact whether Thornburg Mortgage's OTTI judgment was objectively false and whether

the Defendants subjectively believed that it was false.   See supra Analysis Sections I & III.   By

telling Hall that there was not any more information that they needed to discuss in connection

with the audit, while at the same time believing that the OTTI analysis was wrong, Goldstone's

answer to Hall was, at best, misleading.   There is, consequently, a genuine issue of material fact

whether Goldstone violated rule 13b2-2 by making this statement without telling Hall about the untimely margin calls and the reservation-of-rights letter.

Finally, there is a genuine issue of material fact whether the Defendants violated rule 13b2-2 by representing to KPMG that the I/O Strip Transactions' purpose was to take advantage of favorable prices.  The March 9, 2008, Restatement Workpaper states that Thornburg Mortgage's management told KPMG that Thornburg Mortgage sold the I/O Strip Transactions because they "believed the IO strips could sell at a premium in the market."  March 9, 2008, Restatement Workpaper at 3.  Reinhart also testified that Simmons told her that Thornburg Mortgage sold the I/O Strip Transactions to take advantage of opportunistic prices, but that he did not give any other reason for the transactions.  See Reinhart Depo. at 85:10-86:7.  It is unclear whether Thornburg Mortgage received favorable prices for the transactions.  There is no evidence to that effect other than the Defendants' representations to KPMG that the reason for the transactions was to take advantage of favorable prices.  One thing that is clear, however, is that Thornburg Mortgage entered into the transactions to meet margin calls, and it did not tell KPMG that the I/O Strip Transactions were made for that purpose.

In an electronic mail transmission that Goldstone wrote, and on which Simmons and Starrett were included, Goldstone said that, as part of a plan to meet the Citigroup Global margin call, Thornburg Mortgage would sell I/O Interest Transactions to generate twenty- to twenty-five million dollars in cash.  See Feb. 21, 2008, Simmons Email at 2.  Moreover, the Margin Call Schedule shows that the proceeds from the I/O Strip Transactions were used to meet margin calls.  Thus, the Defendants told KGPM that the I/O Strip Transactions were conducted solely to take advantage of favorable prices when they were conducted to meet margin calls.  Even if the I/O Strip Transactions were sold at favorable prices, it was misleading for the Defendants to not

tell KPMG that they conducted the transactions to also meet margin calls, because that statement implies it was the only reason.  The Court has already concluded that the I/O Strip Transactions create a genuine issue of material fact concerning objective falsity.  See supra Analysis Section I.D.  That Thornburg Mortgage had to sell long-term cash-generating assets to meet immediate liquidity issues calls into question Thornburg Mortgage's financial stability and its ability to hold its assets.  Telling KPMG that the transactions were made to take advantage of favorable prices gives the impression that Thornburg Mortgage did not have a liquidity crisis, but instead had flexibility to sell long-term assets if the price was right.  The Defendants' statements about the I/O Strip Transactions were, accordingly, misleading, because, by omitting information about meeting margin calls with the proceeds, the Defendants created the impression that Thornburg Mortgage was financially stable, and had a fair amount of flexibility to use and to sell its assets, while the opposite was true.  Consequently, the I/O Strip Transactions show another genuine issue of material fact that precludes summary judgment on the SEC's rule 13b2-2 claim.[327]

**IT IS ORDERED** that: (i) Defendants Larry A. Goldstone's and Clarence G. Simmons' requests in the Motion for Summary Judgment on Behalf of Larry Goldstone and Clarence G. Simmons and Memorandum of Law in Support, filed August 9, 2013 (Doc. 201), are denied; (ii) Defendant Jane E. Starrett's requests in the Memorandum of Point and Authorities in Support

---

[327]In ruling on the summary judgment motions, the Court did not rule on the MTE, the Defendants' MTE, the SEC MTE Experts, or the Motion to Strike.  As the Court previously noted, at the hearing, the parties said that they wanted the Court to rule on the motions for summary judgment and that the Court could decide what it wanted to do with the various experts' opinions.  See supra note 52; Tr. at 944:13-25 (Marks, McKenna, Court).  While the Court considered the expert reports in deciding the motions for summary judgment, they did not influence the Court's decision on any of the issues.  Based on the non-expert evidence before the Court, the Court would have come out the same way on every issue, even if it excluded all of the expert reports.  While the parties are free to ask the Court to reconsider its rulings on the motions for summary judgment, after ruling on the motions to exclude, the Court does not believe that such a motion would be very productive, because the Court would likely come out the same way, regardless whether it considers the expert reports.

of Defendant Jane Starrett's Motion for Summary Judgment, filed August 31, 2013 (Doc. 206), are denied; and (iii) the Plaintiff Securities and Exchange Commission's requests in the Plaintiff Securities and Exchange Commission's Opposition to Motion for Summary Judgment on Behalf of Larry Goldstone and Clarence G. Simmons and Cross-Motion for Summary Judgment Regarding Objective Falsity and Materiality, filed November 6, 2013 (Doc. 231), and the Plaintiff Securities and Exchange Commission's Opposition to Motion for Summary Judgment and Memorandum of Law in Support of Jane Starrett's Motion for Summary Judgment and Cross-Motion for Summary Judgment on the Issues of Objective Falsity and Materiality, filed November 14, 2013 (Doc. 240), are denied.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Damon Martinez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

        *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Robert G. Badal
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

       *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Paul M. Torres
Robert J. Liubicic
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

*Attorneys for Defendant Jane E. Starrett*