# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.                                      No. CIV 12-0257 JB/LFG

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Plaintiff Securities and Exchange Commission's Motion to Exclude and/or Limit Testimony of Christopher Laursen, Joseph J. Floyd, William W. Holder, Steven M. Hilfer, and Christopher M. James, filed May 9, 2014 (Doc. 291)("SEC Motion"); (ii) the Defendants' Motion to Exclude the Proffered Expert Testimony of Lawrence Weiner, Dale Kitchens, and Michael Mayer, filed May 9, 2014 (Doc. 292)("Defs. Motion"); and (iii) Plaintiff Securities and Exchange Commission's Motion to Strike Errata Changing Testimony of Defendants' Proposed Experts Christopher Laursen and Christopher James, filed June 2, 2014 (Doc. 300)("MTS"). The Court held a hearing on January 14, 2016. The primary issues are: (i) whether the Court should allow the parties' expert witnesses to testify that the Defendants' judgments were reasonable or material; (ii) whether the Court should admit the parties' event studies into evidence; and (iii) whether the Court should strike the Defendants' errata, because they change the substance of their expert witnesses' testimony. The Court will exclude portions of the expert witnesses' testimony, because they state legal conclusions drawn by applying the law to the facts. The Court will admit the event

studies into evidence as evidence of materiality and, if necessary, damages.  The Court will strike most of the Defendants' errata because they change the substance of their experts' testimony. The Court will thus grant the SEC Motion, the Defs. Motion, and the MTS in part and deny them in part.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1).  The Court presents the facts solely to provide context for the Motion.  It continues to adhere to the decisions on the facts it reached in its Unsealed Memorandum Opinion and Order, filed August 22, 2015 (Doc. 371)("Summary Judgment MOO").

The Defendants are former officers of Thornburg Mortgage, Inc.: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The Securities and Exchange Commission ("SEC") alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[1]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities

---

[1]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[2] Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation. See Complaint ¶ 2, at 1; id. ¶ 20, at 7. During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange. See Complaint ¶ 20, at 7. Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo"[3] ARM securities; Thornburg Mortgage also purchased

---

[2]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

[3]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage. Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/ wiki/Super_jumbo_mortgage. These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set. Super jumbo mortgage, Wikipedia. Fannie Mae purchases and guarantees mortgages that meet its funding criteria. Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014). Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created. See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014). "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends." Fannie Mae, Investopedia. The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00. Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00. See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf. "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates because of the increased risk of issuing a larger loan. Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage. The term "super-jumbo" is not expressly defined

ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out

most of its earnings in dividends, and obtained financing for its mortgage and investment

business through reverse repurchase agreements[4] backed by ARM securities.  See Complaint ¶ 3,

at 2.  Thornburg Mortgage's reverse repurchase agreements "typically consisted of a

simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg

Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a

higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg

Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin

calls if the value of the ARM securities serving as collateral on the agreements fell below a

specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg

Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender,

either on the same day that Thornburg Mortgage received the margin call or on the following

day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating

Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc.,

---

or regulated, but mortgage companies use it internally and independently to set loan parameters.
See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular
lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage,
Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie
Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie
Mae, Wikipedia; Freddie Mac, Wikipedia.

[4]A "repurchase agreement" is a "short-term loan agreement by which one party sells a
security to another party but promises to buy back the security on a specified date at a specified
price.  Often shortened to repo."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed.
2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the
buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23,
2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security
(and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the
transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase
agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013),
http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage

(dated Feb. 21, 2008) filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")). Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement. See Complaint ¶ 34, at 11. In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]" Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10)). Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008. See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month. Complaint ¶ 36, at 11. The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls. See Complaint ¶ 36, at 11. In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[5] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'" Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen

---

[5]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments." Interest Only (IO) Strips, Investopedia (Apr. 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Email from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting

Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing. See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")).  Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Email from

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."  Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia. "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")). Later on February 27, 2008, Simmons sent an email to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K. I do not want there to be any issues based on Thursday activity.'" Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls. See Complaint ¶ 3, at 6; id. ¶ 41, at 12. Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K. See Complaint ¶ 7, at 3. In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets. See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash. To date, no such sales have been required . . . ."). Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[7] See Complaint ¶ 37, at

---

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP.

11.   The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that serve as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

---

About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/.  According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset." The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008. See Complaint ¶ 41, at 12-13. Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K. See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30). Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well. If they only knew." Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2, sent February 28, 2008, at 6:33 a.m., filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")). In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original). See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, sent February 28, 2008, at 5:29 a.m., filed May 21, 2012 (Doc. 37-27). At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time. See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, sent February 28, 2008, at 6:56 a.m., filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email"). As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls. See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'"  Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[9]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See

---

[9]An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

- 12 -

Complaint ¶ 49, at 14-15.[10]   The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, see Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going concern.   See Complaint ¶ 57, at 17.   Goldstone and Simmons did not inform the auditor of the possible

---

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's.  See Complaint ¶ 76, at 22.  "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."   Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, sent March 3, 2008 11:44 p.m, filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"). The requested evidence included "correspondence with lenders/attorneys/shareholders, emails." Request for Correspondence, attached to March 3, 2008 Hall Email, at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  At the time, KPMG as auditor was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.  KPMG did not become aware of the Citi Letter while preparing its restatement.  See Complaint ¶ 101, at 29.  Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"  Complaint ¶

102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).   The analysis stated: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in mortgage valuations.'"   Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.  See Complaint, filed March 13, 2012 (Doc. 1)("Complaint").  The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

1.      **The Proposed Experts.**

The parties have proposed eight expert witnesses to testify at trial.  Each expert witness

aims to

a.      **The Defendants' Proposed Experts.**

The Defendants intend to call five expert witnesses:

- Professor [William W.] Holder is the Dean of the Leventhal School of Accounting at the University of Southern California.  He provides a detailed explanation of the Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Auditing Standards ("GAAS") applicable to Thornburg's determination that unrealized losses on its Purchased ARM Assets were not other-than-temporary-impairments ("OTTI") and evaluates whether Defendants' OTTI judgment was reasonable in light of those standards and the information available at the time.

- Mr. [Christopher] Laursen was a senior official at the Federal Reserve ("the Fed") who consulted with financial institutions about the proper application of OTTI accounting standards during the financial crisis.  He explains that the interpretation of OTTI accounting standards by the Fed -- another branch of the federal government -- was directly contrary to the SEC's position on those standards in this litigation, and that Defendants' OTTI judgment was consistent with the OTTI guidance provided by the Fed in February 2008.

- Mr. [Joseph J.] Floyd is a forensic accountant who has decades of experience with the audit process, restatements of financial statements, and fraud investigations by auditors and audit committees.  He explains the GAAS standards applicable to KPMG's audit of Thornburg's financial statements, analyzes the information in KPMG's workpapers regarding Thornburg's margin calls and liquidity, and concludes that KPMG had sufficient information to reach informed conclusions on OTTI and going concern *before* the filing of Thornburg's Form 10-K.  Applying controlling GAAP and GAAS standards, Mr. Floyd also debunks KPMG's asserted bases for Thornburg's restatement, and explains the significance of KPMG's post-restatement conclusion that the restatement was not due to fraud and that Thornburg had no material weakness in internal controls.

- Mr. [Steven M.] Hilfer worked on Wall Street during the financial crisis, managing, valuing, and structuring MBS, often acting as a repurchase agreement ("repo") lender.  He explains mortgage market and repo industry customs and practices, and examines the events at issue in light of those customs and practices, so that the trier of fact can make an informed determination as to the significance of Thornburg's cooperative relationships

with its repo lenders and the reasonableness of Defendants' resulting expectations.

- Dr. [Christopher M.] James is the William H. Dial/SunBank Eminent Scholar in Finance and Economics and Professor of Finance at the University of Florida.   He uses objective market data to refute the SEC's theory (as articulated by its experts) that the financial crisis was a single, homogeneous event -- a key issue in the OTTI accounting analysis -- and that the post-10-K margin calls were somehow foreseeable.  He also explains fatal defects in the event study prepared by the SEC's expert Michael Mayer.

Defendants' Opposition to Plaintiff Securities and Exchange Commission's Motion to

Exclude Evidence and/or Limit Testimony of Christopher Laursen, Joseph J. Floyd,

William W. Holder, Steven M. Hilfer, and Christopher M. James at 1-2, filed June 6,

2014 (Doc. 303)("SEC Response").

### b.      The SEC's Proposed Experts.

The SEC intends to call three expert witnesses:

- Dale Kitchens is a certified public accountant who retired from Ernst and Young as a Senior Assurance Services Partner after a 31-year career in public accounting. Ex. 1, Expert Report of Dale Kitchens ("Kitchens' Rep.") at 4. He has led or participated in hundreds of audits of financial statements. *Id.* at 6.  He has also served as a testifying expert in numerous accounting related matters. *Id.* at 7-8.  Mr. Kitchens has offered various accounting-related opinions on Defendants' OTTI, analysis, the restatement, and an auditor's expectations of how and what information management provides during an audit.

- Lawrence Weiner is a 28-year veteran of the fixed income securities markets and spent years working at two of the largest banks on Wall Street -- Morgan Stanley and Lehman Brothers -- where he assisted clients with both mortgage-backed securities and reverse repurchase financing.  Ex. 2, Amended Expert Report of Lawrence P Weiner ("Weiner Rep.") at 2; Ex. 3, C.V. of Lawrence P. Weiner at 1-2.  He has previously testified in three cases dealing with related issues involving the recent financial crisis.  *Id.* at 3.  Mr. Weiner has offered expert opinions explaining the highly complex securities Thornburg traded, explaining Thornburg's business model and its implications for Defendants' deficient OTTI analysis, analyzing the relevant market events and developments at Thornburg, and rebutting certain contentions made by Defendants' experts.

- Michael Mayer has worked in the financial field for 29 years, since obtaining his MBA from the Kellogg School of Management. Mr. Mayer is also a Chartered Financial Analyst (CFA). *See* Ex. 4, Expert Report of Michael G. Mayer ("Mayer Rep.") § 1.1. He has worked on cases involving the mortgage markets and financing, liquidity, event studies, and analysis of what investors find important for years. Mr. Mayer has offered opinions evaluating Defendants' liquidity analysis and the materiality of Thornburg's OTTI and going concern disclosures.

Plaintiff Securities and Exchange Commission's Opposition to Defendants' Motion to Exclude Proffered Expert Testimony of Lawrence Weiner, Dale Kitchens, and Michael Mayer at 1, filed June 6, 2014 (Doc. 301)("Defs. Response").

2.      **The SEC Motion.**

The SEC filed its Motion on May 9, 2014. See SEC Motion at 1. The SEC asks the Court "to exclude and/or limit the testimony of Christopher Laursen, Joseph J. Floyd, William W. Holder, Steven M. Hilfer, and Christopher M. James" pursuant to "Federal Rules of Evidence 403 and 702, *Daubert v. Merrill Dow Pharmaceuticals,* 509 U.S. 579 (1993) and *Kuhmo Tire Company, LTD, v. Carmichael,* 526 U.S. 137 (1999)." SEC Motion at 1. It then makes five primary arguments in favor of exclusion.

First, the SEC contends that the Court should exclude Christopher Laursen's opinions in their entirety, because Laursen: (i) has very "extremely limited" experience with the OTTI issues relevant to this matter, and that experience is with federal agencies that had no regulatory authority over real estate investment trusts ("REITs") like Thornburg Mortgage; (ii) does not have an accounting degree; and (iii) will present an opinion that is cumulative of accountant Holder's opinion. SEC Motion at 1. It focuses on a single statement from Laursen's expert report:

Based on my OCC and Fed experience, including my experience supervising large financial institutions, Thornburg's determination not to classify its impaired securities as OTTI was consistent with guidance that the Fed was providing to

financial institutions at the time on how to apply OTTI, particularly in the midst
of the market volatility of 2007-2008.

Expert Report of Christopher Laursen ¶ 31, at 5, filed May 9, 2014 (Doc. 291-1)("Laursen

Report").   The SEC notes that Laursen's experience with OTTI involved assessing credit

impairments, rather than the "intent and ability to hold" at issue here.  SEC Motion at 7.  It cites

other cases excluding expert witnesses in financial cases.  See SEC Motion at 8 (citing Musket

Corp. v. Star Fuel of Oklahoma, LLC, No. CIV-11-444-M, 2012 WL 4758082, at *2 (W.D.

Okla. Oct. 5, 2012)(Miles-Lagrange, J.), and SEC v. Tourre, 950 F. Supp. 2d 666, 678 (S.D.N.Y.

2013)(Forrest, J.)).  It adds that Holder, another defense witness with expertise in the relevant

accounting principles, will make Laursen's testimony needlessly cumulative.  See SEC Motion at

9 (citing F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1258 (2d Cir. 1987)).

Second, the SEC argues that Holder and Hilfer's opinions on the reasonableness of the

Defendants' OTTI judgment "should be excluded because they improperly usurp the jury's role

by applying the law to the facts and opine on Defendants' state of mind."  SEC Motion at 2.  The

SEC focuses on a series of similar statements that Thornburg Mortgage's management's

judgment was reasonable.  See SEC Motion at 2 (citing Expert Report of William W. Holder ¶¶

20-21, 129 at 6-7, 42 (dated November 18, 2013), filed May 9, 2014 (Doc. 291-3)("Holder

Report").  It explains that "[t]hese opinions tell the jury -- without any further analysis or

inference required by the jury -- that the Defendants did not possess the requisite scienter, a legal

conclusion."  SEC Motion at 11.  Citing the Court's opinion in Vondrak v. City of Las Cruces,

No. CIV 05-0172 JB/LAM, 2009 WL 3241555 (D.N.M. Aug. 25, 2009)(Browning, J.), the SEC

contends that testimony that the Defendants' conduct was "reasonable" is a "legal conclusion[]

drawn by applying the law to the facts."  SEC Motion at 12 (citing 2009 WL 3241555, at *12).

Moreover, it argues that Holder and Hilfer's opinions inappropriately describe the Defendants'

states of mind.  See SEC Motion at 13.  On this point, it cites a case from the Northern District of

Illinois:

> [A]ll of Mr. Perks' years of training and experience as an accountant (or, for that
> matter, his training as an attorney) do not specially equip him to divine what
> Defendant truly believed about the reliability of the reports. Any opinions Mr.
> Perks might offer in that regard are not based on the methodology and principles
> of accountancy. Those opinions are, at worst, rank speculation; at best, they are
> credibility choices that are within the province of the jury, not Mr. Perks, to make.

SEC Motion at 14 (quoting S.E.C. v. Lipson, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998)(Schenkier,

M.J.)).

Third, the SEC contends that the Court should exclude Floyd's opinion that KPMG "had

sufficient information to make fully informed OTTI and going concern judgments."   SEC

Motion at 2.  It notes that "the adequacy of KPMG's audit and the conclusions it reached are not

at issue, and even if they were Mr. Floyd offers no opinion on them."  SEC Motion at 2.  It also

points to Floyd's "limited experience with OTTI determinations."  SEC Motion at 2.  It explains

that "[t]he SEC alleges that Thornburg and the Defendants -- not KPMG -- committed

accounting fraud."  SEC Motion at 16.   The Defendants' attacks on KPMG, it argues, are

irrelevant to whether the Defendants engaged in inappropriate financial reporting.  See SEC

Motion at 17 (citing United States v. Sparks, 8 F. App'x 906, 911 (10th Cir.

2001)(unpublished)[11]; United States Sec. & Exch. Comm'n v. St. Anselm Expl. Co., No. 11-CV-

---

[11]United States v. Sparks is an unpublished opinion, but the Court can rely on an
unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See
10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their
persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

00668-REB-MJW, 2012 WL 9189057, at *6 (D. Colo. July 19, 2012)(Blackburn, J.)).  It further asserts that Floyd is unqualified to testify that KPMG "had enough information to make fully informed OTTI and going concern judgments," because he: (i) has never been a signing audit partner; (ii) was last involved in an audit nearly 20 years ago; and (iii) has never done work with an REIT related to an audit or OTTI determination.  SEC Motion at 20.

The SEC adds that the Court should exclude Floyd's opinions about its claim that Thornburg Mortgage failed to implement or circumvented internal controls over financial reporting.  See SEC Motion at 2, 15.  It explains that: (i) Floyd has no expertise in "what the SEC's internal controls claim 'appears to be based on'"; (ii) a jury can assess the bases for its claims; and (iii) Floyd relies on faulty facts and data.  SEC Motion at 12-22.  It seeks to prevent Floyd from "characterizing the drop in Thornburg's stock price immediately following the filing of its Form 10-K as 'dramatic' because he acknowledged at his deposition that he has no expertise in this area."  SEC Motion at 2.  It also asks the Court to prohibit Floyd from testifying that KPMG's determinations are inconsistent with the SEC's internal controls claim.  See SEC Motion at 22-23.  It attacks Floyd's argument that KPMG reviewed the emails and other documents which it quotes in its Complaint.  See SEC Motion at 25 ("[T]here is uncontroverted KPMG testimony that they did not see these materials.").

Fourth, the SEC asserts that the Court should exclude Steven Hilfer's "opinion that the February 27, 2008 e-mail exchange involving Goldstone and Simmons was a 'rumor,'" because Hilfer "has no expertise in rumors and his opinion is merely the interpretation of two e-mails that the jury is capable of interpreting itself."  SEC Motion at 2-3, 29-30 (citing Armeanu v.

_____

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that United States v. Sparks has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

Bridgestone/Firestone N. Am. Tire, LLC, No. CIV 05-619 JB/DJS, 2006 WL 4060665, at *14-16 (D.N.M. Sept. 26, 2006)(Browning, J.)).  The SEC explains that "[t]here is nothing complicated or technical about the emails or testimony."  SEC Motion at 31.  It adds that even when courts have allowed expert testimony on rumors generally, they have excluded testimony that constitutes "discussion and arguments regarding [the defendant's] version of the facts of this case rather than an application of a methodology."  SEC Motion at 32 (citing Procter & Gamble Co. v. Haugen, No. 1:95-CV-94 TS, 2007 WL 750435, at *2 (D. Utah Mar. 7, 2007)(Stewart, J.)).

Fifth, the SEC argues that Holder, Laursen, and Hilfer do not base their opinions on sufficient facts or data.  See SEC Motion at 3.  It complains that they rely "almost exclusively on materials provided by counsel for Defendants that present the issues involved in this matter in a decidedly one-sided fashion."  SEC Motion at 3.  See Leon v. Kelly, No. CIV.07-0467 JB/WDS, 2009 WL 1300936, at *15 (D.N.M. Jan. 12, 2009)(Browning, J.)(unpublished).

Sixth, the SEC contends that Christopher James' opinions attacking Michael Mayer's proposed testimony "are no more than attacks on straw men that Dr. James created" and are irrelevant to this matter.  SEC Motion at 3.  It argues that James' opinions are so nonresponsive that the Court should exclude them under rule 403 of the Federal Rules of Evidence.  See SEC Motion at 39-41.

### 3.    The SEC Response.

The Defendants responded on June 6, 2014.  See SEC Response at 1.  The Response begins with a broad attack on the Motion: "The SEC's objections to Defendants' experts' opinions are unsupported, confusing and, in several instances, facially untenable, without ever genuinely challenging the experts' qualifications, the reliability of their methodologies, or the

relevance of their opinions to the issues in this litigation."  SEC Response at 1.  It proceeds to defend each expert's testimony in turn.  See SEC Response at 1-44.

First, the Defendants attempt to bolster Holder's expert testimony.  See SEC Response at 3-12.  They explain that he "evaluates Defendants' OTTI judgment in light of (a) inherent subjectivity in the applicable standards and the lack of adequate guidance and clarity for applying those standards under the stressful market conditions and (b) objective evidence reflecting the state of the markets and Thornburg's financial condition at the time."  SEC Response at 3 (quotation omitted).  They note that his testimony will help the jury to examine the "Subsequent Events" required to evaluate their OTTI judgments.  See SEC Response at 4.  They point to the evidence supporting Holder's opinions, including "over two dozen speeches, news releases, and other public statements that shed light on market conditions or the proper application of OTTI and Subsequent Events principles, and multiple studies and journal articles related to the financial crisis and its accounting implications."  SEC Response at 5.  They emphasize that Holder can properly testify that their OTTI judgments were "reasonable":

> Under GAAP, "reasonableness" is the standard used to assess judgment-based accounting determinations.  The accounting literature, the parties' experts, and the SEC's own accountants all agree that OTTI and Subsequent Events are matters of *judgment*, which, by definition, are not amenable to "right" or "wrong" determinations.  Thus, "accounting estimates" such as OTTI must be evaluated for reasonableness[.]

SEC Response at 8-9 (citations omitted).  The Defendants argue that testimony that their judgments were "reasonable" meant only that they were "'appropriate,' had a factual basis, and, as articulated in GAAP, fell within the 'range of acceptable limits.'"  SEC Response at 10-11.  They note that "[a]t most, this is a case where there is necessary overlap between an expert's opinion and an aspect of an ultimate issue due to the accounting standards and the Tenth Circuit's definition of recklessness both incorporating the concept of 'reasonableness.'"  SEC

Response at 10 (citing <u>Specht v. Jensen</u>, 853 F.2d 805, 809-10 (10th Cir. 1988)).   The Defendants conclude their discussion of Holder's testimony by denying that he will discuss their mental states and pointing to evidence allowing him to reach objective conclusions.   <u>See</u> SEC Response at 11-12.

Second, the Defendants argue that Laursen's primary opinion -- that their OTTI determination was consistent with Federal Reserve Guidance -- is relevant to establish the applicable standard of care:

> Whether the standard used by Thornburg to reach its OTTI judgment was consistent with the standard used by regulators of financial institutions and other market participants at the time is directly relevant to whether Defendants' conduct deviated from the applicable standard of care, which the SEC must prove to establish the elements of recklessness.

SEC Response at 12-13.   They recite Laursen's extensive experience with financial regulations with the Federal Reserve and private entities.   <u>See</u> SEC Response at 13-16.   That the Federal Reserve lacked regulatory authority over Thornburg Mortgage, they say, "is a distinction with no meaningful difference," because the Federal Reserve applied the same OTTI accounting guidance.   SEC Response at 17.   They conclude that Laursen "is the only expert witness in this case who has personal experience advising managers of financial institutions on how to make OTTI determinations."   SEC Response at 18.   They respond to the SEC's arguments on Laursen's sources by noting that he reviewed the SEC's summary judgment documents and that his reliance on limited materials "go[es] to the weight of Mr. Laursen's opinion and [is] not grounds for exclusion."   SEC Response at 19.

Third, the Defendants oppose the SEC's attempt to exclude Floyd's testimony that: (i) KPMG had sufficient information to make a fully informed judgment; and (ii) a restatement does not imply a weakness in internal controls, and KPMG's restatement's findings indicate that

Thornburg Mortgage's internal control system did not cause any alleged errors in its financial statements.  See SEC Response at 20.  They explain that the Court should allow Floyd to testify regarding the information that Thornburg Mortgage provided to KPMG to rebut the SEC's arguments that they concealed key information from KPMG as it prepared its opinion.  See SEC Response at 22-23.  They emphasize that they offer Floyd's testimony to undermine the SEC's "auditor deception" claim, rather than its claim that they engaged in fraudulent accounting practices.  SEC Response at 26.  They also fault the SEC for declining to identify a specific defect in Thornburg Mortgage's internal controls.  See SEC Response at 29-30.  They explain that Floyd will provide helpful testimony on "KPMG's restatement investigation process, the GAAS standards applicable to that process (including those set forth in KPMG's own internal guidance), and the significance of KPMG's conclusion in light of those GAAS standards."  SEC Response at 30.

Fourth, the Defendants seek to admit Hilfer's opinions on MBS and repossession industry customs and practices.  See SEC Response at 31.  They reinforce his credentials by listing his experience with Credit Suisse before and during the financial crisis.  See SEC Response at 31-32.  They explain that he will support their defense by showing how their judgment that Thornburg Mortgage could satisfy margin calls was reasonable, based on "Thornburg's cooperative relationships with its repo lenders, its liquidity position, the high quality of its collateral, and various positive developments in the marketplace."   SEC Response at 32-33.  They also assert that Hilfer will attack the SEC's argument on the European hedge fund's collapse:

> Based on his "years of experience of being in the business, sitting on a trading
> floor interacting with clients and colleagues and needing to have market
> information in order to make decisions for my business," Mr. Hilfer explains that
> market rumors were often "unsubstantiated" and "unreliable," and that such

> information "lack[ed] the specific details and corroboration needed for a market
> participant to typically rely upon" them.   In his assessment, the information
> conveyed to Mr. Goldstone and Mr. Simmons about the European hedge fund fit
> that description.

SEC Response at 34 (quoting Video Deposition of Steven Hilfer at 10:6-12 (Hilfer) (taken

March 7, 2014), filed June 6, 2014 (Doc. 303-7)("Hilfer Deposition")).   The Defendants also

object to the SEC's argument that Hilfer will testify regarding their states of mind.   See SEC

Response at 34-35.   They contend that he will instead address "whether the conclusion that

Thornburg would have the continued ability to meet margin calls after the 10-K filing

(irrespective of whether this was Defendants' actual conclusion) was objectively reasonable

based on the applicable standard of care in their industry."   SEC Response at 35.   The

Defendants then deny that Hilfer must be an expert on rumors to address the European hedge

fund's collapse, noting that his opinion "focuses on how participants in the MBS markets

evaluated vague or non-specific market information during the financial crisis."   SEC Response

at 36.

Fifth, the Defendants contend that the Court should admit James' opinions.   See SEC

Response at 40.   They first address the SEC's procedural argument that James cannot address

subjects outside the scope of its own expert's report, because James' report is a "rebuttal report."

SEC Response at 41.   The Defendants respond that James' report falls within the second round

of orders set out in the Court's Scheduling Order -- "expert reports in support of issues where the

party propounding *does not bear the burden of proof* ('Rebuttal Expert Reports')."   SEC Motion

at 41 (citing Scheduling Order, filed July 11, 2012 (Doc. 54)("Scheduling Order")(emphasis in

Motion).   The Scheduling Order, they state, limited the opinions' scope only in a separate third

category of reports.   See SEC Motion at 41-42.

The Defendants then explain the relevance of James' substantive testimony.  See SEC Response at 42-45.  His testimony that the financial crisis was not a single, ongoing event, they explain, will "help the trier of fact understand how participants in the mortgage market viewed shifts in the market and the impact of those shifts on the foreseeability (or unforeseeability) of the margin calls Thornburg received."  SEC Response at 42.  They add that James' opinion on the ABX indices[12] will show that "there is no evidence that prior volatility in the subprime ABX indices or the sharp drop in the ABX indices on February 27, 2008, in particular, could have been used to forecast the margin calls Thornburg received after its Form 10-K filing."  SEC Response at 44.  Finally, the Defendants contend that James should be allowed to testify about sources of market decline unrelated to the European hedge fund rumor.  See SEC Response at 45.

### 4.    The SEC Reply.

The SEC replied to the Defendants on June 20, 2014.  See Plaintiff Securities and Exchange Commission's Reply in Support of its Motion to Exclude and/or Limit Testimony of Christopher Laursen, Joseph J. Floyd, William W. Holder, Steven M. Hilfer, and Christopher M. James, filed June 20, 2014 (Doc. 310)("SEC Reply").  The SEC begins with a summary of its arguments:

- Mr. Laursen is still a non-accountant offering an opinion on a narrow accounting  determination with which he has extremely limited experience;

- Defendants acknowledge that Mr. Laursen's sole opinion is duplicative of one of  Mr. Holders' opinions, i.e. both "Professor Holder's and Mr. Laursen's opinions  will address the reasonableness of Thornburg's OTTI judgment"

---

[12]An ABX index is "[a] financial benchmark that measures the overall value of mortgages made to borrowers with subprime or weak credit. . . .  Using this index, financial institutions are able to determine if the market for these securities [is] improving or worsening."  ABX Index, Investopedia (Apr. 22, 2016), http://www.investopedia.com/terms/a/abx-index.asp.

(Opp. at 21);

- Defendants cannot avoid that Mr. Holder's and Mr. Hilfer's Reports both state that they intend to opine, not on any objective judgment that might have been reached by a reasonable person, but rather on the judgments reached by these three Defendants, invading not only the jury's province of determining ultimate issues, but also the Defendants' subjective states of mind;

- Defendants cannot refute that Mr. Floyd has *never* before addressed many of the critical accounting issues at issue and his opinion about what KPMG might have determined had it studied materials that were *available to* it – despite KPMG's testimony that they did not actually review the materials at issue – is nothing more than a confusing digression into an issue of marginal relevance;

- Defendants can offer no basis of expertise for Mr. Floyd's "expert" opinions about the bases for the SEC's claims, the asserted "inconsistency" of certain factual matters, the cause of the drop in Thornburg's stock price on February 28, 2008, or the "dramatic" nature of that drop, or show that those opinions will assist the jury;

- Defendants can offer no basis of expertise for Mr. Hilfer's "expert" opinion on market "rumors" or show that the opinion will assist the jury;

- The reports and testimony of Messrs. Holder, Hilfer, and Laursen make clear that their opinions we reached after a limited review of biased materials; and

- Defendants cannot refute that Dr. James himself acknowledges that his opinions are a rebuttal of Mr. Mayer's opinions, and to a lesser extent other SEC experts, and that those opinions tilt at straw-men as opposed to actual opinions offered by Mr. Mayer.

SEC Reply at 1-2 (emphasis in original).

First, the SEC reinforces its arguments that the Court should exclude Laursen's testimony. See SEC Reply at 3-5. It contends that Laursen's "nine-month bank examiner training program" is no a substitute for an accounting degree and that his "audit-like work" at a "non-bank subsidiary" is no substitute for experience as an auditor. SEC Reply at 3. It notes that Laursen's experience with OTTI assessments did not involve any concerns about "ability or intent to hold." SEC Reply at 3. It repeats that Laursen's opinion is cumulative of Holder's opinion.

See SEC Reply at 4-5.

Second, the SEC reinforces its arguments that Holder and Hilfer will state "legal conclusions drawn by applying the law to the facts" and discuss the Defendants' states of mind. SEC Reply at 5. It explains that: (i) the United States Court of Appeals for the Tenth Circuit's definition of recklessness incorporates the concept of reasonableness; (ii) "reasonableness under GAAP and GAAS will be *the central issue*" in this case; and (iii) Holder and Hilfer will directly state that the Defendants' judgments on these issues were "reasonable." SEC Reply at 5-6 (quoting SEC Response at 11)(emphasis in Reply). It points to Holder's opinion that the "*Defendants'* judgment that Thornburg's purchased ARM Assets were not OTTI *was reasonable*," and Hilfer's opinion that the Defendants' "*judgment* that the Company would be able to continue satisfying margin calls after its 2007 Form 10-K filing *was reasonable*." SEC Reply at 5 (quoting SEC Response at 3-4, 33-34)(emphasis in Reply). It thus concludes that Holder and Hilfer "are telling the jury how to decide the case." SEC Reply at 6. The SEC also argues that Holder and Hilfer opine on the Defendants' states of mind by testifying that the Defendants' judgment was reasonable, rather than merely stating that a "reasonable person could have reasonably reached" the same conclusion. SEC Reply at 9 (quotation omitted). The SEC points to several questions on this point:

- What information was available to each of the three Defendants? A judgment could be reasonable if made by a knowledgeable person and wholly unreasonable if made by someone with less information. The reasonableness of a judgment could turn upon whether the Defendants possessed a certain, specific piece of information.

- Did the person understand the issue? In finding that Mr. Goldstone had made a reasonable judgment "that the February 2008 Market Events were Type II Subsequent Events", Prof. Holder presumably rejected Mr. Goldstone's testimony that he did not know the difference "between a Type 1 event and Type 2 event with respect to other than temporary impairment analysis." Obviously, Mr. Goldstone's judgment could not be reasonable if he did not

know the difference between the two types of subsequent events; it would  be
no more than a guess.

- Under what circumstances was the judgment made?  Was there time for
  reflection?   To gather additional information?   To confer with more
  knowledgeable colleagues?   All of these things could easily turn a
  reasonable judgment into an unreasonable  one.

- Was the judgment approached in good faith? Were their motivations to lie? Is
  there evidence -- as here -- that the Defendants were attempting to keep
  evidence  from their advisors, as opposed to soliciting their input?  Any of
  these things could  quickly render an initially reasonable-seeming judgment
  suspect.

- Finally, was the judgment even made?  Prof. Holder and Mr. Hilfer each
  presume  that the judgments they deem "reasonable" in fact occurred.   This is
  particularly   problematic  for  Prof.  Holder's  opinion  that  "Defendants'
  judgment that the  February 2008 Market Events were Type II Subsequent
  Events was reasonable."   The record reflects that no such judgment was ever
  made.

SEC Reply at 10-11 (citations omitted).  It concludes that there is a significant difference

between testifying that a reasonable person could have reached a judgment and opining that the

Defendants, on this occasion, reached a reasonable opinion.  See SEC Reply at 12.

Third, the SEC again attacks Floyd's opinions on accounting and KPMG.  See SEC Reply

at 12-13.  It contends that Floyd's testimony is really an attack on KPMG, which "is not on trial."

SEC Reply at 14.  It adds that he has insufficient expertise to testify that Thornburg Mortgage's

stock price drop was "dramatic."  SEC Reply at 16.

Fourth, the SEC argues that Hilfer should not be able to testify that signs of the European

hedge fund's collapse were mere market rumors.  See SEC Reply at 16-18.  It objects to

Mr. Hilfer, who has no knowledge greater than the average juror about the spread
of  rumors -- who has admitted that "market rumor[s]" is not a "particular area of
expertise" of his  -- making up a definition of "market rumor," applying it to the
facts of this case, and declaring, as an expert, that the information related to the
Peloton hedge  fund collapse was not significant.

SEC Reply at 17 (quoting Hilfer Deposition at 16:14-18 (Hilfer)).  It repeats that, regardless of

Hilfer's experience on Wall Street, rumors and the interpretation of emails are "well within the jury's understanding."  SEC Reply at 18.

Fifth, the SEC questions the objectivity of Holder's, Laursen's, and Hilfer's sources.  See SEC Reply at 19-20.  Holder, it notes, neglects to even consider the testimony of KPMG's audit team and relies exclusively on the Defendants' expert witnesses.  See SEC Reply at 19.  It states that Laursen and Hilfer similarly rely only on the Defendants' briefing.  See SEC Reply at 20.

Sixth, the SEC argues that the Court should exclude James' opinions altogether.  See SEC Reply at 20-23.  It rejects the Defendants' scheduling order argument, noting that "[r]egardless of what the scheduling order states, Dr. James's opinions are, in fact, rebuttal opinions, as stated in his report and in his testimony."  SEC Reply at 21.  Because these rebuttal opinions do not actually respond to the SEC's experts, it says, the Court should exclude them.  See SEC Reply at 21.  It notes that James' statement  that the financial crisis was not a single ongoing event does not contradict its experts' opinions.  See SEC Reply at 22.  It adds that James' opinions on the European hedge fund's collapse and the ABX indices drop are similarly nonresponsive, and thus irrelevant.  See SEC Reply at 22.

## 5.     **The Defs. Motion.**

On May 9, 2014, the Defendants moved to exclude the SEC's experts' testimony.  See Defs. Motion at 1.  The Defendants open with a general attack on the SEC's expert witnesses: "The obvious thrust of these witnesses' testimony is to aggregate facts in a biased narrative that serves as a preview of the SEC's closing arguments -- a purpose that is plainly improper.  For this reason, each experts' narrative and conclusory opinions should be excluded."  Defs. Motion at 1.  They then list their objections to each expert's testimony in more detail.  See Defs. Motion at 1-45.

First, the Defendants contend that Weiner: (i) is unqualified to provide expert testimony; (ii) launches an irrelevant attack on Thornburg Mortgage's business model; and (iii) makes irrelevant criticisms of the Defendants' judgments that are not based on a standard of care in the mortgage REIT industry.  See Defs. Motion at 1.  They explain that, for Weiner's testimony to be relevant to their alleged negligence or recklessness, he must "shed light on whether Defendants' actions departed from the applicable standard of care for mortgage REIT executives like Defendants in making the OTTI judgment and disclosure decisions at issue."  Defs. Motion at 6.  Weiner's testimony does not make this showing, they state, because the most he can say "about his repo experience is that at times he became aware that his firms' customers received margin calls."  Defs. Motion at 7.  They also complain that Weiner focuses his testimony on the "general risk of Thornburg's use of long-term assets and short-term financing," a business model common in the field, rather than on the Defendants' evaluation of the risks of future margin calls in their OTTI judgment.  Defs. Motion at 9.  Weiner's emphasis on Thornburg Mortgage's business model, they state, provides merely a "pejorative spin" intended to "enflame the passions of the jury."  Defs. Motion at 10.

The Defendants next concentrate on Weiner's testimony on the credit quality of Thornburg Mortgage's MBS portfolio.  See Defs. Motion at 11.  They explain that his opinions on this point are irrelevant, because the SEC has not accused the Defendants of misrepresenting the credit quality of Thornburg Mortgage's portfolio.  See Defs. Motion at 11.  They further note that Weiner's "only direct evidence of the portfolio's supposed lack of quality is that certain of Thornburg's MBS suffered downgrades and principal losses months and years *after* the Form 10-K filing."  Defs. Motion at 11 (emphasis in original).  Subsequent losses, they assert, have no relevance to whether they were aware of the risks before they filed the Form 10-K.  See Defs.

Motion at 11-12.  They complain that Weiner's attack on one of their memoranda is similarly irrelevant, as there is no evidence that they ever saw or relied on the memorandum.  See Defs. Motion at 12.

The Defendants also attempt to undermine Weiner's opinions that they concealed information from KPMG.  See Defs. Motion at 13.  They explain that "Mr. Weiner is no more qualified than a layperson to opine on KPMG and its audit," because "Mr. Weiner: (a) is not an accounting expert; (b) lacks expertise in how auditors interact with senior executives at public companies; and (c) has no expertise concerning public company disclosure practices to auditors." Defs. Motion at 13 (internal citations omitted).  They attack Weiner's testimony that they foresaw further declines in the MBS markets:

> In sum, it is both irrelevant and absurd to suggest, as Mr. Weiner does, that Defendants should have anticipated the margin calls Thornburg received after the 10-K filing based on the 2011 FCIC[13] Report, two analyst reports that Defendants likely did not review in February 2008 and that did not predict an imminent decline in the MBS markets, and the predictions of three investors who took what is widely acknowledged as a contrarian position.

Defs. Motion at 17.  They emphasize that market conditions were very different in February 2008 than in March 2008.  See Defs. Motion at 17-18.

Second, the Defendants argue that Kitchens has no expertise in the MBS markets and that his opinions: (i) consist of conclusory assertions ungrounded in reliable methodology; and (ii) conflict with GAAP and GAAS.  See Defs. Motion at 2.  They assert that Kitchens reaches his conclusions "only by creating his own auditing and accounting standards that appear nowhere in GAAS and GAAP, and by making credibility judgments about Defendants and KPMG

---

[13]The Financial Crisis Inquiry Commission ("FCIC") is a ten-person Committee that Congress created to "examine the causes, domestic and global, of the current financial and economic crisis in the United States."  About the FCIC at Stanford Law School, Financial Crisis Inquiry Commission & Rock Center for Corporate Governance, Stanford University, http://fcic.law.stanford.edu/about (last visited April 30, 2016).

personnel[.]" Defs. Motion at 18. Kitchens' "subsequent events" accounting opinion, they add, is "based entirely on his own uniformed view of the MBS markets." Defs. Motion at 18. They accuse Kitchens of inventing his own OTTI accounting standards, including a requirement that the Defendants "disclose all information that KPMG, in hindsight, would have wanted to know about." Defs. Motion at 21-22. They explain that Kitchens provides "improper conclusory opinions on ultimate legal issues" by opining that "the Defendants deceived KPMG by withholding material information." Defs. Motion at 20 (quotations omitted). The Defendants also contend that Kitchens' testimony that they deceived KPMG requires him to make inadmissible credibility determinations. See Defs. Motion at 23-24.

Third, the Defendants assert that Mayer's opinions "are not based upon a relevant standard of care or sound methodology," and that his event study[14] is unreliable, "because he failed to disentangle the effects of confounding information on Thornburg's stock price on the dates when allegedly material information about the Company's OTTI and going concern determinations was released." Defs. Motion at 2. The Defendants argue that Mayer's testimony consists of a series of credibility determinations that "usurp the trial judge's function of instructing the jury on the law and tell the jury what result to reach on the facts." Defs. Motion at 31-32. These determinations include:

> Thornburg supposedly held the view that "the financial crisis was ongoing"; (2) the drop in the ABX indices was supposedly "known" before the 10-K filing and the indices had been volatile for many months; (3) the European hedge fund's collapse was likewise supposedly "known"; and (4) Thornburg had insufficient

---

[14]"An event study is an established method of determining the impact of the disclosure of new, company-specific information on a stock price (an 'event') using statistical analysis." Defs. Motion at 39. See Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2415 (2014)(defining "event studies" as "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events").

liquidity before the 10-K filing to meet margin calls.

Defs. Motion at 31-32.

The Defendants conclude by attacking Mayer's event study. <u>See</u> Defs. Motion at 38-45. They explain that "[h]is results are tainted by confounding factors that he does not rule out as causes of movements in Thornburg's stock price on the relevant dates," and that "his event study fails to segregate the impact, if any, of the OTTI disclosure from the going concern qualification -- two entirely distinct concepts." Defs. Motion at 38.

They explain that an event study involves four primary steps:

*First*, the researcher identifies the event or events to be studied, which here are the dates the new information was provided to the market (the "event dates"). *Second*, the researcher determines the period over which the subject company's stock price movement is to be analyzed (the "event window"). *Third*, the researcher calculates what the "expected return" of the stock would have been during the event window, absent the event. The expected return is a study control that allows one to predict how the stock should move on a given day. A regression analysis estimates the historical relationship between a stock's actual return and the movement of an index, over a period of time (the "estimation window"). The index chosen often represents an average of the stock prices for multiple companies in the subject company's segment of the market. *Fourth*, the researcher estimates the effect of the event by (a) calculating the difference between the stock's actual return and the expected return during the event window (the "abnormal return"), (b) measuring the statistical significance of the difference, and (c) controlling for confounding factors.

Defs. Motion at 39-40. The Defendants first note that Mayer fails to analyze the OTTI disclosure and the going concern disclosure separately, despite his lack of accounting expertise. <u>See</u> Defs. Motion at 40-41. They explain that management made the OTTI accounting judgment, while KPMG had the "responsibility to determine whether a going concern qualification should be included in its audit opinion for the 10-K." Defs. Motion at 41.

The Defendants add that Mayer's event study is unusable, because Mayer fails to control for confounding factors, such as: (i) Thornburg Mortgage's disclosure that it could not meet an

additional $270 million in margin calls and JP Morgan's notice of default; (ii) Standard & Poor's decision to cut Thornburg Mortgage's counterparty rating[15] to "selective default"[16]; (iii) analyst commentary that Thornburg Mortgage was at risk of bankruptcy if it could not sell assets or raise equity; (iv) JP Morgan's notice that it would liquidate collateral of $320 million and that the notice of default would trigger cross-defaults; (v) FitchRatings' decision to downgrade Thornburg Mortgage; (vi) Thornburg Mortgage's circulation of lists of more than four billion dollars in non-agency assets that it wanted to liquidate; (vii) sharp declines in the prices of agency MBS[17]; (viii) additional analyst commentary titled "Game-Over at Thornburg?" and "bankruptcy is likely outcome"; (ix) press reports of increasing market panic; (x) information that Thornburg Mortgage had outstanding margin calls of $610 million, which exceeded its available liquidity; and (xi) the disclosure of notices of default from Thornburg Mortgage's significant creditors.  Defs. Motion at 42-43.  The Defendants acknowledge that Mayer identifies some of this information, but argue that he dismisses it on unjustified grounds.  See Defs. Motion at 43-44.  They note that Mayer "simply asserts" that a "reasonable investor would place relatively more importance on information that a company was taking a large loss into income as

---

[15]Counterparty risk "is the risk to each party of a contract that the counterparty will not live up to its contractual obligations."  Counterparty Risk, Investopedia (April 30, 2016), http://www.investopedia.com/terms/c/counterpartyrisk.asp.           Ratings       agencies       assign counterparty risk ratings to indicate the rated party's likelihood of defaulting on its obligations.  See Moody's Proposed Counterparty Risk Rating: Frequently Asked Questions at 1, Moody's Investors Service (Jan. 20, 2015).

[16]A selective default occurs when a borrower fails to pay one or more of its obligations, but continues to make good on its other debt obligations.  See Standard & Poor's Ratings Definitions,          S&P          Global          Ratings          (Feb.       1,       2016), https://www.standardandpoors.com/en_US/web/guest/article/-/view/sourceId/504352.

[17]Agency mortgage-backed securities ("Agency MBS") are "mortgage-backed securities issued by government-sponsored enterprises such as Ginnie Mae, Fannie Mae or Freddie Mac."  Agency       MBS       Purchase,       Investopedia       (April       30,       2016), http://www.investopedia.com/terms/c/counterpartyrisk.asp.

a result of its OTTI analysis, and that there were doubts about its ability to continue as a going concern," and dismisses the other possible confounding factors as "information that is generally derivative of those major disclosures." Defs. Motion at 44. They also contend that Mayer selected an arbitrary "percentage of price change" threshold, and failed to perform any analysis to determine whether the OTTI and going concern disclosures met that threshold. Defs. Motion at 44. They conclude that Mayer "opines that the OTTI and going concern disclosures were material simply by assuming their materiality." Defs. Motion at 44.

  **6.**  **The Defs. Response.**

  The SEC Responded on June 6, 2014. See Plaintiff Securities and Exchange Commission's Opposition to Defendants' Motion to Exclude Proffered Expert Testimony of Lawrence Weiner, Dale Kitchens, and Michael Mayer, filed June 6, 2014 (Doc. 301)("Defs. Response"). The SEC condemns the "Defendants' overbroad, hyperbolic, throw-it-all-against-the-wall-and-see-what-sticks briefing." Defs. Response at 2. It notes that the Defendants' "principal complaint" -- that its experts' opinions conflict with their experts' opinions -- is not a basis to exclude any testimony. Defs. Response at 2 (citing United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1235 (D.N.M. 2011)(Browning, J.)).

  The SEC defends Weiner's proposed testimony as relevant, reliable, within the scope of his expertise, and "necessary to prevent the Defendants from disguising their fraud with its complexity." Defs. Response at 2-3. It attempts to bolster Weiner's credentials as an expert in fixed-income securities. See Defs. Response at 3-4, 6-8. It then explains that Weiner's description of Thornburg Mortgage's business model as "highly vulnerable to a downturn in the market for the securities it purchased" is necessary to help the jury determine whether the Defendants exercised reasonable care. Defs. Response at 9. It adds that the Defendants'

criticism of Weiner's testimony -- focused on his alleged failure to examine whether they considered the risk of a market downturn -- is inappropriate, as he is "not an expert in the Defendants' behavior." Defs. Response at 10. It dismisses the Defendants' rule 403 concerns: "It is hard to conceive how Mr. Weiner explaining the intricacies of [various securities], or the agreements governing Thornburg's repo lending arrangements will lead to the abuses Rule 403 is designed to combat." Defs. Response at 10.

The SEC continues that Weiner's opinion that Thornburg Mortgage's assets were not "uniformly high" in quality is relevant, because it rebuts the Defendants' assertions that "the bulk of Thornburg Mortgage's portfolio consisted of AAA-rated, prime MBS of high credit quality" and that there were few signs that the market for these securities was deteriorating. Defs. Response at 11. It explains that Weiner's testimony is based on data from January, 2008, thus invalidating the Defendants' argument that his opinions are "based entirely on hindsight." Defs. Response at 14. It contends that Weiner may testify that there was a "strong possibility" of more margin calls rather than that the calls were "probable." Defs. Response at 14 (citing 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 401.06 (2d. ed. 2013)("It is no objection to admissibility that 'X does not prove Y, your honor.' X is admissible if X *tends* to prove Y.")(emphasis in original)). It rejects the Defendants' arguments that Weiner's testimony will prejudice them, noting that his references to "draconian demands" and a "fire sale of the company at the expense of existing shareholders" rebut the Defendants' statements that Thornburg Mortgage had the ability to raise capital and hold its impaired assets. Defs. Response at 15-16.

Second, the SEC defends Kitchens' opinions on accounting issues. See Defs. Response at 16-17. It explains that Kitchens is not offering an "auditor deception opinion," and that his

opinions whether Thornburg Mortgage complied with its obligation to provide KPMG with all relevant information are relevant and helpful to the jury.  Defs. Response at 17.  It contends that Kitchens can testify that "any reasonable auditor would have wanted to know" about certain documents based on his experience as an audit partner.  Defs. Response at 20.  It adds that, in any case, the Defendants exchanged emails showing that they knew that KPMG would consider their margin calls important.  See Defs. Response at 20.  It contends that Kitchens does not make credibility determinations, as his opinions on the indicia of fraud are based on "his experience as an auditor and his many instances of interactions with clients with regard to OTTI, going concern, and other audit issues."  Defs. Response at 22.  That Kitchens' opinions conflict with Defendants' statements, it notes, does not make them credibility determinations.  See Defs. Response at 23.

The SEC also defends Kitchens' ability to provide an opinion on the Defendants' "subsequent events" analysis.  Defs. Response at 23-24.  It notes that both sides have produced an accountant to testify on this issue and that the Defendants have not explained why only their expert is qualified to offer his opinion.  Defs. Response at 24-25 ("That two experts disagree is not a basis for exclusion.").  It makes similar arguments with respect to Kitchens' OTTI opinions, which it describes as "based upon Mr. Kitchens' extensive accounting experience and his interpretation and application of applicable accounting principles."  Defs. Response at 27.  It notes that Kitchens is providing expert testimony rather than conducting an audit, and that his opinions are consistent with GAAP and GAAS.  See Defs. Response at 27-30.

Third, the SEC argues that the Court should admit Mayer's opinions and event study. See Defs. Response at 33-34.  It begins by arguing that Mayer's attacks on Thornburg

Mortgage's March 4, 2008 memorandum to KPMG[18] are admissible. See Defs. Response at 34-35. It contends that Mayer points out problems with Thornburg Mortgage's explanation, but does not opine that anyone at Thornburg Mortgage was lying. See Defs. Response at 34-35. It explains that Mayer's testimony that the financial crisis was "ongoing" will help the jury to judge the Defendants' OTTI judgment's reasonableness. See Defs. Response at 36. It asserts that his testimony on the ABX indices is relevant, because: (i) information on a drop in the ABX indices was available to Thornburg Mortgage; (ii) ABX indices could be used to predict pricing for Thornburg Mortgage's portfolio; and (iii) the testimony does not offer any opinion regarding OTTI. See Defs. Response at 38-40. It states that Mayer can testify regarding the European hedge fund's collapse, because it was more than a rumor, and both Goldstone's emails and a Bloomberg news report mentioned it. See Defs. Response at 40. In any case, it notes, even a rumor of this magnitude should have been considered in Thornburg Mortgage's decision-making process. See Defs. Response at 40-41.

The SEC also defends Mayer's event study. See Defs. Response at 43-45. It explains that "Mayer assumed that the OTTI and going concern disclosures should be analyzed together because they did, as a factual matter, occur together in this case." Defs. Response at 43. It adds that Mayer performed a comprehensive review of potential confounding information. See Defs. Response at 43. Finally, it emphasizes that investors consider OTTI and going concern disclosures important, and that the disclosures "would have had a material impact on Thornburg's stock price" even if they accounted for only thirty-five percent of Thornburg

---

[18]The March 4, 2008 Memorandum "purport[edly]" set out "the Company's rationale for not recognizing an OTTI and including a going concern qualification in its 2007 financial statements." Defendants' Motion at 30. See Thornburg Mortgage, Memorandum: Unforeseeable Mortgage Market Collapse in Late February (dated March 4, 2008), filed August 9, 2013 (Doc. 204-152).

Mortgage's stock price movement.  Defs. Response at 45.

### 7.     The Defs. Reply.

The Defendants replied on June 20, 2014.  <u>See</u> Defendants' Reply in Support of Motion

to Exclude the Proffered Expert Testimony of Lawrence Weiner, Dale Kitchens, and Michael

Mayer, filed June 20, 2014 (Doc. 311)("Defs. Reply").  The Defendants state:

> When not simply aggregating facts in a biased, hindsight narrative that serves as a preview of the SEC's closing arguments, the SEC's experts offer irrelevant criticisms of Thornburg's business model, express purely personal disagreements with Defendants' judgments, employ result-driven, 'homemade' methodologies that no one in the mortgage REIT industry used in February 2008, invent OTTI accounting standards out of whole cloth, or engage in speculation that is flatly at odds with the evidence.

Defs. Reply at 1.

The Defendants first attack Weiner's qualifications, complaining that his "only repo

industry experience is both stale and secondhand."  Defs. Reply at 2.  They state that Weiner's

testimony on Thornburg Mortgage's business model is irrelevant, because he does not address

whether they "satisfied the standard of care applicable to managers of mortgage REITs like

Thornburg."  Defs. Reply at 5.  They repeat that the testimony will be prejudicial, because it will

"enflame passions in the courtroom by portraying Thornburg as an unreasonably risky

investment."  Defs. Reply at 6.  They add that Weiner's testimony on the quality of Thornburg

Mortgage's MBS portfolio is irrelevant, because he addresses only "*Alt-A* MBS -- a completely

different set of securities than Thornburg's *prime* MBS."  Defs. Reply at 6 (emphasis in

original).  They state that Weiner also excluded the majority of Thornburg Mortgage's portfolio

and excluded contemporaneous data supporting its ability to pay.  <u>See</u> Defs. Reply at 7.  They

conclude that Weiner "could not identify a single MBS investor who used his methodology or

any innovative literature endorsing it."  Defs. Reply at 7.  The Defendants contend that the SEC

errs in applying rule 401 rather than rule 702 to Weiner's "strong possibility" opinion.  Defs. Reply at 8-9.  They add that a "strong possibility" -- which they define to include a chance of "10%, 20%, or perhaps even 49%" -- is insufficient to make an event "probable" under the applicable GAAP.  Defs. Reply at 9.

The Defendants also argue that Weiner's opinion that repo lenders made extraordinary and draconian demands on Thornburg Mortgage in mid-March of 2008 is not an accurate reflection of how they might have responded in February, 2008, given the unprecedented market decline.  See Defs. Reply at 10.  They thus state that this opinion "is plainly intended to blur the distinctions between market conditions in February and March 2008 in order to confuse the trier of fact into believing that the far harsher market conditions of March existed at the time of the 10-K filing in February."  Defs. Reply at 10-11.

Second, the Defendants repeat their contention that Kitchens does not accept that "probable" is the level of certainty required for OTTI assessments.  Defs. Reply at 11.  They add that his requirement that Thornburg Mortgage "control the ability" to sell an asset to hold an asset

> would require any and all impaired securities used as repo collateral to be deemed OTTI because, according to Mr. Kitchens, a repo borrower like Thornburg Mortgage had limited control, or recourse, regarding the establishment of collateral values and haircuts that were being imposed by the counterparty lenders, and therefore, the amount of the resulting margin calls.

Defs. Reply at 12 (quotation omitted).  They note that "[t]here is no evidence that any U.S. company or accounting firm has ever applied such a recklessly indiscriminate OTTI standard," pointing to the Financial Accounting Standards Board's guidelines as the only viable alternative. Defs. Reply at 12.  In short, they explain, Kitchens fails to assess the Defendants' OTTI judgment by the applicable GAAP standards.  See Defs. Reply at 14.

The Defendants also focus on Kitchens' opinions that they deceived KPMG.  See Defs. Reply at 15.  They note that his expert report includes statements that the Defendants "ma[d]e . . . a materially false or misleading statement" to KPMG and "withheld material and important information from KPMG that misled KPMG[.]"  Defs. Reply at 15 (citing Report of the Opinions of Dale Kitchens at 9-10 (dated October 7, 2013), filed May 9, 2014 (Doc. 292-1)("Kitchens Report")).  They add that "[i]t is unclear why Mr. Kitchens's experience as an auditor qualifies him to quote, paraphrase, and characterize documents and testimony as if he was delivering the SEC's closing arguments at trial."  Defs. Reply at 16.  They attack the SEC's argument that Kitchens' standards are based on his experience as an auditor, noting that "he provides no concrete examples from past audit engagements that support his conclusions or demonstrate that his positions are held by anyone other than him."  Defs. Reply at 16 (citing Fed. R. Evid. 702, Notes to 2000 Amends.).  They also point to the lack of overlap between Kitchens' and KPMG's stated reasons for a restatement.  See Defs. Reply at 17.

Third, the Defendants repeat many of their arguments against Mayer's opinions.  See Defs. Reply at 18-25.  They state that his use of the term "financial crisis" is inappropriate in context, because "the financial crisis was still in its infancy in February 2008" and his opinion implies that the "Defendants foresaw the financial cataclysm that was to come."  Defs. Reply at 19.  They appear to argue that Mayer's opinion on the ABX indices is irrelevant, because there is no evidence that ABX indices could be used to predict the prices of Thornburg Mortgage's portfolio.  See Defs. Reply at 21.  They also note that the European hedge fund rumor was only a rumor, and even the SEC's cited Bloomberg article described "speculation a hedge fund is being liquidated."  Defs. Reply at 22.  They also question Mayer's technique in estimating Thornburg Mortgage's liquidity, stating that: (i) mortgage REITs do not predict margin calls using the

highest single-day totals of margin calls or an average of daily margin calls; (ii) his analysis used only "possible margin calls scenarios" rather than "probable" scenarios, the threshold required under GAAP; and (iii) his analysis failed to account for other sources of liquidity.  Defs. Reply at 23.  The Defendants contend that Mayer failed to conduct any formal econometric analysis to weed out confounding factors' impact on Thornburg Mortgage's stock price.  See Defs. Reply at 24-25.

### 8.   **The MTS.**

On June 2, 2014, the SEC moved to strike the Defendants' "substantive changes" to Laursen' and James' sworn deposition testimony.  MTS at 1.  The SEC explains that it is targeting six changes to Laursen's testimony and two changes to James' testimony.  See MTS at 1.  It notes that the Defendants "refused to withdraw these improper substantive changes to their experts' sworn testimony, despite conceding that the changes were not what the witnesses said at their depositions."  MTS at 1.  It first points to the Defendants' most "egregious" modification, which seeks to change Laursen's testimony "that he recalled Thornburg having half a million dollars in unencumbered assets when it filed its Form 10-K to say that in fact he recalled it having $150,000,000; 300 times that amount."  MTS at 2-3.  It notes that: (i) Laursen was asked for his recollection, which cannot be plainly erroneous; (ii) Laursen did not later refresh his recollection during his testimony and change his answer; and (iii) there is no evidence that the question confused Laursen.  See MTS at 3.  The SEC sums up the Defendants' proposed changes to Laursen's testimony:

> In particular, Defendants want to:
>
> - change Mr. Laursen's testimony that he recalled Thornburg having "4 or 500,000" dollars of unencumbered assets at the time it filed its Form 10-K on February 28, 2008, to say that Thornburg had some 300 times that amount, or

"$150,000,000." [Laursen Report ¶ 30, at 5]; Videotaped Deposition of Christopher Laursen at 157:15-161:12 (taken March 11, 2014), filed June 19, 2014 (Doc. 309-1)("Laursen Tr.").[19]

- change his testimony that he "didn't view *looking at* [the possibility of markets getting significantly worse or better] as appropriate," to instead claim that he viewed looking at the possibility as appropriate, but not applying that possibility. [Laursen Report ¶ 30, at 5], Laursen Tr. at 160:5-161:15.

- insert the word "blindly" into Mr. Laursen's testimony about extrapolating a market trend. [Laursen Report ¶ 30, at 5]; Laursen Tr. at 161:16-163:4.

- change Mr. Laursen's reference to "really bad things or really good things happening," to instead refer to a state of events where really bad things or really good things *may happen*. [Laursen Report ¶ 30, at 5]; Laursen Tr. at 166:17-167:20.

- change his testimony that he does not know whether restated financial statements are ultimately stated correctly to instead say he does not know if he agrees with that statement. [Laursen Report ¶ 30, at 5]; Laursen Tr. at 262:4-10.

MTS at 4 (emphasis in original). The SEC also attacks the Defendants' proposed changes to James' testimony:

They have changed Mr. James' testimony about a book on financial econometrics dealing with event studies in a "litigation context," to now say it deals with them in a "non-litigation" context. Ex. G, Errata Sheet to the Deposition Transcript of Christopher James; Ex. F, James Tr. at 38:10-39:11. They have also changed his testimony that the yield curve was "shifting up," to instead say it was "shifting down." [Errata Sheet for the Transcript of Christopher James, filed June 2, 2014 (Doc. 300-7)]; Videotaped Deposition of Christopher M. James, Ph.D. at 183:15-184:2 (taken April 2, 2014), filed June 19, 2014 (Doc. 309-2)("James Tr.").

MTS at 5.

---

[19]The SEC has not moved to strike all of the Defendants' proposed modifications. See MTS at 1-2; MTS Response at 5. The Court will thus present the transcript as the SEC modifies it, with all changes marked, and will mark the changes in dispute in bold.

9.      **The MTS Response.**

The Defendants responded to the MTS on June 19, 2014.  See Defendants' Opposition to Plaintiff's Motion to Strike Certain Corrections to the Transcripts of Christopher Laursen's and Christopher James' Depositions, filed June 19, 2014 (Doc. 309)("MTS Response").   The Defendants first describe the applicable law, explaining that "Courts in the Tenth Circuit have interpreted Rule 30(e) to allow any non-material corrections to deposition testimony."   MTS Response at 2.  They argue that the Court should allow corrections if they: (i) are non-material, which they define as "supported by and consistent with the other language" or "technical"; (ii) reflect a deponent's confusion.  MTS Response at 3.  They contend that "[e]ach of the errata Defendants' experts submitted falls into one of the permitted categories."  MTS Response at 3.

a.      **Correction 1: Laursen Tr. at 161:13.**

The Defendants propose the following change:

Q:      In paragraph 23, you write that you understood it would be inappropriate to rely on predictions of significantly better or worse conditions than those known at the time.  And this is with respect to OTTI analysis; is that correct?

. . . .

A:      Well, when you're looking ahead into sort of forward-looking markets or situations in the accounting context, I believe you need to basically consider what's known at the time, objective, definitive types of factors that you can then weigh in a reasonable way to basically inform any of those types of management judgments or forward-looking judgments that have to be made under the accounting standards.

And so, in my view, they're sort of a base case, here's where we are today, here's things that we can reasonably expect, here's things we're not sure about.  All those things are considered to get to some sort of base case that has maybe some variance around it, but I feel it would be -- it's inappropriate for accounting to assume something is going to get significantly worse or significantly better, because then all those estimates by different firms are going to become less and less comparable.

> So the way the Fed undertook analysis of OTTI in those forward-looking cases was to consider what's known at the time, sort of on a base case going forward, and not sort of interject, well, you know, maybe the Fed comes in and drops rates another 200 basis points tomorrow and everybody is happy, or maybe, you know, something really bad happens, like a run, and things get really bad.
>
> So I didn't view ~~looking at~~ **applying** those sort of tails[20] [as appropriate for OTTI analysis]~~,~~ that [rather] you needed to have a well-defined base case.

Laursen Tr. at 157:15-161:12, <u>as modified by</u> MTS Response at 4-5 (bold and strikethrough added).  The Defendants argue that their changes are "non-material and together simply clarify the record by making explicit what is obviously implicit in the testimony -- namely, that Mr. Laursen did not view applying predictions of significantly better or worse conditions as appropriate for purposes of the OTTI analysis."  MTS Response at 4.  They explain that, if Laursen did not view "looking at those sort of tails as appropriate," then he necessarily did not view "applying" them as appropriate.  MTS Response at 4-5.

### b.    Correction 2: Laursen Tr. at 162:14.

The Defendants propose the following change:

Q:    So just so I understand, and let me try to paraphrase this -- and please correct me if I'm wrong -- but it's not that you just freeze things at the time you're making the accounting analysis, but rather you look back at objective factors in the past and, for instance, if things are trending up at a certain amount, you can reasonably consider them to continue to trend up for the foreseeable future; is that right?

. . .

A:    I don't think so. I think -- you consider what's happened prior, but I don't know that you can just say, if there's an up trend you consider it continuing to go up, or even that the probability is greater that it's going to continue to go up.  Similarly, if there's a down trend, you don't just

---

[20]Tails are "significant deviations from market means and/or medians."    Plaintiff Securities and Exchange Commission's Reply in Support of its Motion to Strike Errata Changing Testimony of Defendants' Proposed Experts Christopher Laursen and Christopher James at 4, filed July 2, 2014 (Doc. 316)("MTS Reply").

assume that it's going to continue to go down.   So you can **blindly** extrapolate a trend on one thing and say, it's going to go up in a straight line.   You can say, it's going to continue to go down.   You can say, it's going to flatline.   There's no necessarily -- no necessary reason why you would just expect the trend to continue in any given direction.

Laursen Tr. at 161:16-162:20 (bold added).   The Defendants describe this change as "an immaterial clarification that is consistent with the surrounding testimony about how these trends should be weighed."   MTS Response at 5.   The revision, they argue, will make it clear that "extrapolation of market trends should not be 'blind,' rather than that there should be no extrapolation at all."   MTS Response at 5.

### c.      Correction 3: Laursen Tr. at 167:12.

The Defendants propose the following change:

Q:      And in your experience, did the Fed ever advise financial firms to include -- to conclude that impairments were OTT (sic) because of increased market volatility and uncertainties in economic conditions going forward?

. . .

A:      So I would say those are features or considerations, but what I mean by that statement is if you get to a certain time period where you're making an assessment and you've got one time period where you think the extreme is, you know, a certain amount looking forward, and -- the extreme up and downs are a certain amount, and then because there's volatility, increased volatility markets, those extremes get more extreme, there's still a base case within both of those market scenarios.

Just because there's a wider swath of really bad things or really good things ~~happening~~ **that may happen**, that doesn't necessarily mean that you should be -- assume that those things are going to happen.

Laursen Tr. at 161:16-162:20 (bold and strikethrough added).   The Defendants contend that the correction is "an immaterial change intended to make the first part of Mr. Laursen's sentence consistent with the second part, in light of the forward-looking nature of the question and his answer."   MTS Response at 7.   They add: "The only logical meaning of Mr. Laursen's testimony

is that because really bad things or good things '*may*' happen in the future, it does not necessarily follow 'that those things *are going* to happen.'"  MTS Response at 7 (emphasis in original).

### d.      Correction 4: Laursen Tr. at 262:10.

The Defendants propose the following change: "Q: Would   you   agree   that   financial statements that are restated are, quote, ultimately presented correctly? . . . . A:      Again, I think it's -- not necessarily. I don't know **that I agree**."  Laursen Tr. at 262:4-10 (bold added).   The Defendants contend that the question was "an extraordinarily incomplete hypothetical" that confused Laursen, and that the change simply clarifies it.  MTS Response at 6-7.  They cite Porter v. W. Side Rest., LLC, No. 13-1112-JAR-KGG, 2014 WL 1642152 (D. Kan. Apr. 24, 2014)(Robinson, J.), as an example of a deponent's acceptable attempt to clarify an answer.  See MTS Response at 6-7 (citing 2014 WL 1642152, at *4).

### e.      Correction 5: Laursen Tr. at 289:4-5.

The Defendants propose the following change:

> Q:     Do you know whether, in fact, there were other unencumbered assets that could be sources of liquidity on February 21st, 2008?
>
> A:     I understand there were other assets. I don't recall the specifics of -- the details of what exactly they were or exactly how much, but I understood there were others that just -- not every single asset was encumbered in the organization.
>
> Q.     Do you recall generally how much they were in terms of unencumbered assets?
>
> A.     I can't recall for the specific date.
>
> Q:     Do you have any recollection whether at or around this date of February 21st, 2008, Thornburg had over or under $100 million in unencumbered assets?
>
> A:     Yeah, on this specific date, I can't recall.

> Q:     And again, I'm not asking this on this specific date, but during this general time period, on or about February 21st, do you have any recollection of approximately how much in unencumbered assets Thornburg had?
>
> A:     Well, my recollection is sort of the week later they might have had something like ~~4 or 500,000~~ **$150 million**, but I can't recall the exact number.
>
> Q:     And do you see how it projects an ending cash balance for that day of $233 million?
>
> A:     I see the cash balance line.
>
> Q:     And do you see how it's projecting negative 233.573 . . . .

Laursen Tr. at 288:12-289:5 (bold and strikethrough added). The Defendants state that this change "is intended to correct his response based on the clear confusion generated by the questions posed during the examination and a refreshed recollection after his deposition." MTS Response at 7. They argue that the questioner asked Laursen the same question four times, and Laursen responded that he did not recall to the first three questions. See MTS Response at 7. They explain: "Given that the record reflects that Thornburg had roughly $150 *million* in unencumbered assets, Mr. Laursen's answer under repeated pressure reflects nothing more than confusion and was erroneous." MTS Response at 7 (emphasis in original). They also argue that the district court in Boyd v. Home Depot, Inc., No. 11-CV-03129-WYD-KLM, 2013 WL 394187 (D. Colo. Jan. 31, 2013)(Mix, M.J.), allowed even more substantive corrections. See MTS Response at 8. These corrections included changing a witness' responses from "stating that she did not remember certain things to later stating that she did recall them and, in a couple of instances, providing additional details." MTS Response at 8 (citing Boyd v. Home Depot, Inc., 2013 WL 394187, at *2). The Defendants thus conclude that, now that "Mr. Laursen has now had the opportunity to refresh his recollection," the Court should allow the change. MTS Response at 9.

### f.      **Correction 6: James Tr. at 38:25.**

The Defendants propose the following change:

> Q:      Are there authoritative sources -- textbooks, treatises, academic literature -
> - that   you consider to be reliable in determining how to deal with
> confounding information related to and going concern disclosures?
>
> . . . .
>
> A:      I mean it -- just to step back a moment, it's a common theme in event
> studies to -- based on, you know, the event studies that I have conducted
> as part of my published work, to try to ensure you are isolating the impact
> -- valuation impact of a particular piece of information as opposed to
> drawing inference from a price impact associated with a number of new --
> pieces of new information that are coming to the market.  I meant that's a
> standard issue that arises in conducting event studies.  I mean, I think, you
> know, M[a]cKinl[a]y's econometrics text[21] sort of deals with that issue
> in, I guess, a ~~litigation~~ **nonlitigation** context.

James Tr. at 38:1-25 (bold and strikethrough added).   The Defendants contend that James'

statement is a non-material technical error that they may correct.  See MTS Response at 9.

### g.      **Correction 7: James Tr. at 183:24.**

The Defendants propose the following change:

> Q:      If you will take a look at Exhibit 389, are you aware of the mortgage
> spread increases in February 2008 that this document demonstrates?
>
> A:      Yes, I was. During this period of time, short-term interest rates were
> declining, and so when you look at spreads for hybrids which are 3/1, 5/1,
> 7/1, 10/1, the spread on their rates relative to short-term swaps should
> increase as the yield curve is shifting ~~up~~ **down**, but this isn't really
> informative of the prices of the securities because it's really looking at
> spreads of -- on short-term relative to long-term instruments.

James Tr. at 183:15-184:2 (bold and strikethrough added).  The Defendants again argue that "Dr.

James simply corrects an error that he made from misspeaking during his deposition."  MTS

---

[21]See John Y. Campbell, Andrew W. Lo, & Craig MacKinlay, The Econometrics of
Financial Markets (1997).

Response at 10.  They add that the SEC has not provided any valid arguments to prevent the change.  See MTS Response at 10.

### 10.   The MTS Reply.

The SEC replied on July 2, 2014.  See MTS Reply at 1.  The SEC first notes that the Defendants do not dispute that the transcripts accurately reflect the witnesses' testimony, and that their errata "change the witnesses' testimony."  MTS Reply at 1.  It explains that the Tenth Circuit prohibits these types of corrections.  See MTS at 1-2.  It contends that: (i) Laursen and James were subject to cross-examination, because the Defendants' counsel defended their depositions; (ii) none of the Defendants' changes are based on newly discovered evidence; and (iii) Laursen and James were not confused during their testimony.  See MTS Reply at 2-3.

The SEC rejects the Defendants' arguments in favor of the first correction.  See MTS Reply at 3.  It argues that "[t]here is a meaningful difference" between "looking at" and "applying" in context:

> Mr. Laursen testified that he didn't even deign to look at the impact of really bad things happening, a situation applicable to Thornburg Mortgage.  Now he wants to change his testimony to make his opinion look more circumspect and state that he looks at negative events, but does not necessarily apply their impact to his OTTI analysis.

MTS Reply at 3.  The SEC states that Laursen's original testimony will allow it to criticize Laursen to failing to examine "significant deviations from market means and/or medians."  MTS Reply at 3-4.

Second, the SEC contends that the Defendants' second change -- from "can extrapolate" to "can blindly extrapolate" -- will create a "markedly different opinion."  MTS Reply at 4.  They seem to state that an expert could easily rule out "blindly" extrapolating, but not extrapolating in general.  MTS Reply at 4.

Third, the SEC questions the Defendants' proposed change from "good things happening" to "good things that may happen." MTS Reply at 4. It asserts that the proposed alteration "changes Mr. Laursen's testimony that really bad things were in fact happening when Thornburg made its OTTI determination to a statement that bad things might happen, and this is impermissible." MTS Reply at 4.

Fourth, the SEC rejects the proposed alteration, which will convert "I don't know" into "I don't know that I agree." MTS Reply at 4. They argue that the question was unambiguous, and that Laursen's testimony gives no indication of confusion. See MTS Reply at 4-5. They explain that the difference is material, in part, because the original statement conflicts with "the opinion of another of Defendants' proffered OTTI experts." MTS Reply at 5.

Fifth, the SEC repeats its objections to the difference between "4 or 500,000," and "$150 million." MTS Reply at 5. It notes that the questions Laursen answered were different, and that, had they been identical, "Defendants' counsel would have undoubtedly interposed an 'asked and answered' objection, an objection that is notably absent from the record." MTS Reply at 5. It distinguishes the Defendants' cited cases on the grounds that: (i) they involve actual confusion; (ii) one involves internally inconsistent responses; (iii) one involves an immaterial statement; and (iv) another involves subsequent testimony, within the same deposition and after reviewing relevant photographs, which correct the original statement. See MTS Reply at 6-7.

Sixth, the SEC rejects the Defendants' attempt to change James' testimony from "litigation context" to "non-litigation context." MTS Reply at 8. It notes that "this is not the type of technical error by a Court reporter contemplated by the Federal Rules of Civil Procedure." MTS Reply at 8. It adds that, in BancFirst ex rel. Estate of M.J.H. v. Ford Motor Co., 422 F. App'x 663 (10th Cir. 2011), the Tenth Circuit referred to a transcription mistake as a

"substantive error" and to the incorrect spelling of a name as a "formal error."  MTS Reply at 8

(quoting <u>BancFirst ex rel. Estate of M.J.H. v. Ford Motor Co.</u>, 422 F. App'x at 665-66).  It states

that it "may want to use Dr. James['] mistake to impeach the thoroughness of his work or his

attention to detail."  MTS Reply at 8.

Finally, the SEC asserts that the Defendants' proposed change -- from "shifting up" to

"shifting down" -- is material.  MTS Reply at 8.  It contends that James was not confused and

that it "should be allowed to make any use of this error as it sees fit under the Federal Rules of

Civil Procedure and Federal Rules of Evidence."  MTS Reply at 8.

   **11.**   **The Hearing.**

The Court held a hearing on January 14, 2016.  <u>See</u> Transcript of Hearing at 1 (taken

January 14, 2016), filed January 26, 2016 (Doc. 291)("Tr.").  The Court opened the hearing by

noting that the parties "can do a lot of things to educate the jury without necessarily using

experts," and that the experts should not "tell the jury the ultimate conclusions" or summarize

their cases. Tr. at 9:4-11 (Court).  The Court then began to provide initial inclinations regarding

specific portions of each expert's testimony.  <u>See</u> Tr. at 7:10-14:3 (Court).

The Court first described Laursen's potential testimony: "I think he's qualified to testify

about OTTI.  I'm not inclined to let him opine about the defendants' OTTI accounting judgment,

that it was reasonable under GAAP.  I'm not inclined to allow him to opine whether the

defendants complied with accounting principles.  I'm not inclined to exclude Laursen as

cumulative." Tr. at 7:11-17 (Court).  The Court then moved on to Holder's opinions.  <u>See</u> 7:18-

8:18 (Court).   It explained that: "I'm not inclined to allow him to opine regarding the

reasonableness of the defendants' judgments. . . .  Holder can say the defendants' accounting

methods were reasonable. He can opine whether an accounting judgment is reasonable, made by

a reasonable person.  But not opine that the defendants -- at a particular time [were] reasonable."  Tr. at 7:18-8:7 (Court).   The Court thus adopted the SEC's proposed distinction between testimony about a reasonable person's actions and testimony that the Defendants actions were reasonable.  See SEC Reply at 9; Tr. at 8:17-18 (Court)("I drew it at the line that the SEC requested.").

The Court applied the same principle to Hilfer's testimony.   See Tr. at 8:19-21 (Court)("With Hilfer, the Court is not inclined to allow Hilfer to opine about the reasonableness of the defendants' judgments.").   It was inclined to bar Hilfer from characterizing the February 27, 2008 email exchange about the European hedge fund as a rumor.   See Tr. at 11:16-18 (Court).   It similarly left the question whether Thornburg Mortgage had the ability to satisfy margin calls to the jury.  See Tr. at 11:22-12:2 (Court).

The Court stated its inclination that "Floyd has enough experience about OTTI to testify about OTTI."  Tr. at 8:22-23 (Court).  It added, however, that it would not allow Floyd to testify that KPMG had sufficient evidence to make an informed OTTI judgment, directly criticize KPMG, or opine that his analysis exposes fundamental problems with Reinhart's and Hall's testimony.   See Tr. at 8:24-9:4 (Court).  It similarly indicated that it would not allow Floyd to testify that KPMG had "a wealth of information available to it that it might have used to ascertain the truth, so it cannot have been misled."  Tr. at 9:8-11 (Court).  Although Floyd could testify on what GAAS require, the Court added, he could not testify that GAAS required KPMG to uncover the truth.   See Tr. at 9:12-13 (Court).  The Court continued that it would not allow Floyd to opine: (i) "that the SEC's internal claims . . . appear to be based on an erroneous presumption"; or (ii) regarding the cause behind Thornburg Mortgage's stock price drop, such as

Thornburg Mortgage's filing of Form 10-K; but added that it would allow him to characterize the stock price drop as "dramatic."  Tr. at 9:22-10:3 (Court).

The Court carefully circumscribed Floyd's testimony regarding KPMG's restatement. See Tr. at 10:8-11:15 (Court).  It allowed Floyd to state that a restatement does not necessarily or always imply weakness in a company's controls, but not that "a material weakness existed here because there was a restatement."  Tr. at 10:8-15, 7-9 (Court).  It added that he would instead allow the fact witnesses to explain what a restatement is and state that it "suggests a material weakness."  Tr. at 11:9-11 (Court).  It would also allow him to state that "a restatement investigation and finding of no material weakness internal controls indicates that the alleged financial statement error was outside of the design or operational effectiveness of the company's internal control system."  Tr. at 10:23-11:3 (Court).

The Court gave similar indications of its likely rulings with respect to James.  See Tr. at 12:3-14:1 (Court).  It explained that it would allow James to testify that "the financial crisis was not a single ongoing homogeneous end that gave borrowers the ability to predict, and just put repo margin calls ex ante."  Tr. at 12:9-12 (Court).  It would not allow the same statement if it focused specifically on the Defendants' ability to predict Thornburg Mortgage's margin calls. See Tr. at 12:3-13 (Court).  It applied the same principle to James' testimony on the sub-prime ABX indices.  See Tr. at 12:14-19 (Court)("Anything else he wants to say specifically about Thornburg on that issue, I would take out.").  It added that James' opinion that the "collateral value of the rumored collapse of an unidentified hedge fund is unscientific and unreliable" was more argumentative than helpful.  Tr. at 12:20-13:2 (Court).  It continued that James would be allowed to testify that there were possible reasons -- but not that "there was a likely explanation"

-- aside from the European hedge fund rumor, for the market decline on February 27, 2008.  Tr.

at 13:3-7 (Court).   The Court continued:

> He cannot testify about the objective reasonableness of the defendants' testimony
> that they expected the impact of the hedge fund's collapse to be minimal.  But he
> can opine why the hedge fund's collapse may have been minimal.  James may not
> opine on the SEC's legal theories.  James cannot say that the financial crisis was
> not a single ongoing homogeneous event that gave defendants the ability to
> predict post-filing events ex ante.  And again, if he wants to substitute "anyone"
> for "defendants," I think I would allow him to testify on that.
>
> Dr. James cannot opine that the collapse was not, quote, "unexpected to
> Goldstone and Simmons, given the emails."  I don't think he's the one that should
> be interpreting that. I think it's for the jury.

Tr. at 13:8-23 (Court).  Finally, the Court noted that it would likely prevent James from "opining

about causation" -- that the European hedge fund's collapse led to a drop in Thornburg

Mortgage's stock prices or collateral value.  Tr. at 13:23-14:1 (Court).

The Defendants responded that they were "willing to accept the way the Court has

proposed to rule on all the motions, and the way the Court proposes to limit all of the experts."

Tr. at 47:5-9 (Lee).  The SEC objected, for the record, to the Court's proposal to prohibit its

witnesses from testifying "on Thornburg-specific things, such as OTTI and Type I, Type II in the

restatement."  Tr. at 48:3-6 (McKenna).  It waived argument, however, on this point.  See Tr. at

48:6-9 (McKenna).  The Defendants accepted the SEC's request that the Court similarly restrict

their witnesses from making specific conclusions about Thornburg Mortgage.  See Tr. at 48:10-

49:5 (Court, Marks, McKenna).

The Court planned to exclude the event studies, but offered the parties a choice.  See Tr.

at 55:20-56:18 (Court).  It recognized that event studies are generally admissible in federal court.

See Tr. at 55:15-16 (Court).  It added, however:

> The problem is that if we're going to have an agreement that the defendants are
> [not] going to have their expert sit there and talk about reasonableness, consistent

> with GAAP, and make their own materiality, that this is material, then I'm
> reluctant, whether it's in the form of an event study, or any other way, to have the
> SEC's experts do it.  So I think I've got to be consistent.

Tr. at 55:55:20-56:2 (Court).

The Court then asked the parties how it should structure its opinion.  See Tr. at 57:10-22 (Court).  To preserve its objections for appeal, the SEC declined to characterize the Court's rulings as parts of an agreement between the parties.  See Tr. at 57:24-58:3 (McKenna).  It stated that it had two primary objections to the Court's proposed decisions.  See Tr. at 58:9-11 (McKenna).  First, it argued that the experts, particularly the accounting experts, "should be able to look at Thornburg-specific issues, at least to a point, not to ultimately tell the jury what to conclude, but to provide their expert guidance as far as these specific facts and circumstances." Tr. at 58:11-18 (McKenna).  Second, it contended that the Court should admit its event studies. See Tr. at 58:19-22 (McKenna).  On the first point, the SEC noted that it "wouldn't ask the Court to necessarily address each of the experts' times when they applied facts to the law or facts to the standard."  Tr. at 59: 3-6 (McKenna).

The Defendants stated that the hearing's results were "a combination of both" an agreement and the Court's rulings.  Tr. at 59:12-13 (Marks).  They noted that, "[a]s to the opinions of Professor Holder and Laursen that the judgments were reasonable on OTTI and Type II, our view is that those were appropriate opinions," but that they would accept the Court's ruling if it applied equally to the SEC's experts.  Tr. at 59:13-24 (Marks).  They requested that the Court issue an order including

> just what Your Honor said each expert could and could not testify to, just
> verbatim from the notes you were reading from . . . as modified after the break in
> a couple of instances.  We don't need reasoning, analysis, discussion of anything.
> We just want to know sooner, rather than later, what they can and can't testify, so
> we can be preparing for trial.

Tr. at 60:20-24 (Marks).

The Court concluded the hearing with its plans:

> What I may do is sit down and try to reduce what I told you today to an order, and then maybe come back with an opinion on some of these three issues; two the SEC has identified, and one that Mr. Marks has identified, work through those a little bit, and give you something so that you preserve your positions for appeal.

Tr. at 61:9-15 (Court).

The Court then began discussion of the parties' errata arguments.  See Tr. at 62:15-22 (Court).  The Court explained its perspective on the law in this area.  See Tr. at 62:23-66:18 (Court).  It noted that the Tenth Circuit has adopted a strict approach to the correction of errata, and quoted two of its opinions preventing witnesses from supplementing or repairing their deposition testimony after the fact.  See Tr. at 64:7-66:12 (Court).

The SEC argued that its objections to the Defendants' proposed changes concern changes that "are clearly not typographical errors."  Tr. at 66:24-25 (McKenna).  It added that the Defendants "certainly can explain themselves on the stand, but we think they should be bound by the testimony they gave under oath at their depositions."  Tr. at 67:6-9 (McKenna).

The Defendants first addressed James' errata, arguing that they are neither "a supplement to his testimony [n]or a repair to his testimony."  Tr. at 68:1-3 (Liubicic).  They contended that their first proposed change, from "litigation context" to "nonlitigation context," corrected a technical and inadvertent error.  Tr. at 68:12-18 (Liubicic).  They add that their second proposed change, from "down" to "up," is another technical repair.  Tr. at 68:19-25 (Liubicic).

The Defendants then argued that their corrections to Laursen's testimony were not attempts to "game the system."  Tr. at 69:3-8 (Johnstone).  They stated that the corrections affected "nonmaterial errata that is reinforced by other testimony."  Tr. at 69:14-18 (Johnstone).  They note that the significant change in the amount of money that Laursen mentions "is based on

- 59 -

clear confusion on the part of the witness," given that it "was so far off" the correct figure.  Tr. at 70:2-9 (Johnstone).

The SEC rejected all of the Defendants' proposed changes.  See Tr. at 70:16-71:5 (McKenna).  It questioned James' proposed correction: "I don't see how you can say changing shifting up to shifting down is not a repair.  That's if it was a red light, it's a green light."  Tr. at 70:16-19 (McKenna).  It added Laursen's proposed change -- from "4 to 500,000" to "150 million" -- is not the result of confusion.  Tr. at 70:21-71:2 (McKenna).

The Court noted that it would "probably" grant the SEC's motion "in large part."  Tr. at 71:6-7 (Court).  It explained:

> I'll go through and use my standard at each one.  But some of these changes certainly struck me as ones that I probably couldn't allow under the Tenth Circuit. So I'll try to go through and do them one by one.  I didn't get that done in advance today.  But I'll try to do that for you.

Tr. at 71:7-13 (Court).

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and

unrealistic.'"   United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012) (Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).   Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403.   Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989)(Baldock, J.).   "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."   United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(Tacha, J.)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)).   The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."   United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(Baldock, J.).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999)(Kelly, J.), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.).   As the Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . .  This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(Thomas, J.)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional response or would otherwise tend to adversely affect the jury's attitude toward a particular matter.  See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999)(Sanborn, J.). Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)(Ebel, J.); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991)(Holloway, J.).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(Hartz, J.)(quoting Fed. R. Evid. 403 advisory committee notes).

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert v. Merrell Dow Pharmaceuticals, Inc.[, 509 U.S. 579 (1993)], trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in

determining the factual issues it must decide." United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert v. Merrell Dow Pharmaceuticals, Inc., whether the opinion testimony is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224. "Daubert v. Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

1.    **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> **(a)**    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)**     the testimony is based on sufficient facts or data;
>
> **(c)**    the testimony is the product of reliable principles and methods; and
>
> **(d)**    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to

land values.").    An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004).  The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.  See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005) (Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).  Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted).  Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

### 2.	The Standard in Daubert v. Merrell Dow Pharmaceuticals, Inc.

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. CIV 03-1160 BB/LAM, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).  The Supreme Court articulated a non-exclusive list of factors that weigh

into a district court's first-step reliability determination, including: (i) whether the method has

been tested; (ii) whether the method has been published and subject to peer review; (iii) the error

rate; (iv) the existence of standards and whether the witness applied them in the present case; and

(v) whether the witness' method is generally accepted as reliable in the relevant medical and

scientific community.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.  The court is

also to consider whether the witness' conclusion represents an "unfounded extrapolation" from

the data; whether the witness has adequately accounted for alternative explanations for the effect

at issue; whether the opinion was reached for the purposes of litigation or as the result of

independent studies; or whether it unduly relies on anecdotal evidence.  Witherspoon v. Navajo

Ref. Co., LP, 2005 WL 5988649 at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146

(1997)).  The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp.:

> Rule 702 requires the district court to "ensure that any and all scientific testimony
> or evidence is not only relevant, but reliable."  [Bitler v. A.O. Smith Corp., 391
> F.3d 1114, 1120 (10th Cir. 2004)](quoting Daubert, 509 U.S. at 589 . . .).  This
> obligation involves a two-part inquiry.  Id.  "[A] district court must [first]
> determine if the expert's proffered testimony . . . has 'a reliable basis in the
> knowledge and experience of his [or her] discipline.'"  Id. (quoting Daubert, 509
> U.S. at 592 . . . .).  In making this determination, the district court must decide
> "whether the reasoning or methodology underlying the testimony is scientifically
> valid. . . ."  Id.  (quoting Daubert, 509 U.S. at 592-93 . . .).  Second, the district
> court must further inquire into whether proposed testimony is sufficiently
> "relevant to the task at hand."  Daubert, 509 U.S. at 597 . . . .

397 F.3d 878, 883-84 (10th Cir. 2005)(footnote omitted).  "The second inquiry is related to the

first.  Under the relevance prong of the Daubert analysis, the court must ensure that the proposed

expert testimony logically advances a material aspect of the case . . . .  The evidence must have a

valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp.,

397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th

Cir. 1995)(on remand from the Supreme Court); Daubert v. Merrell Dow Pharm., Inc., 509 U.S.

at 591).  If the expert's proffered testimony fails on the first prong, the court does not reach the

second prong.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.  In Kumho Tire Co. v.

Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert v.

Merrell Dow Pharmaceuticals, Inc., to non-scientific expert testimony.  See 526 U.S. at 141

("We conclude that Daubert's general holding -- setting forth the trial judge's general

'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but

also to testimony based on 'technical' and 'other specialized' knowledge.").  The Supreme Court

recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow

Pharmaceuticals, Inc. will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule
> 702 inquiry as a flexible one.  Daubert makes clear that the factors it mentions do
> not constitute a definitive checklist or test.   And Daubert adds that the
> gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., the Court

must focus generally on "principles and methodologies, and not on the conclusions generated."

Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619 JB/DJS, 2006 WL

4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert v. Merrell Dow Pharm.,

Inc., 509 U.S. at 595).  "Despite this focus on methodology, an expert's conclusions are not

immune from scrutiny and the court may conclude that there is simply too great an analytical gap

between the data and the opinion proffered."  Armeanu v. Bridgestone/Firestone N. Am., Tire,

LLC, 2006 WL 4060665, at *11 (alterations omitted)(internal quotation marks omitted).  The

proponent of the expert's opinion testimony bears the burden of establishing that the expert is

qualified, that the methodology he or she uses to support his or her opinions is reliable, and that

his or her opinion fits the facts of the case and thus will be helpful to the jury.  See Norris v.

Baxter Healthcare Corp., 397 F.3d at 881.  The Tenth Circuit noted in Hollander v. Sandoz

Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in
> assessing reliability under Daubert, and because, in light of that discretion, there
> is not an extensive body of appellate case law defining the criteria for assessing
> scientific reliability, we are limited to determining whether the district court's
> application of the Daubert manifests a clear error of judgment or exceeds the
> bounds of permissible choice in the circumstances.  Thus, when coupled with this
> deferential standard of review, Daubert's effort to safeguard the reliability of
> science in the courtroom may produce a counter-intuitive effect: different courts
> relying on the essentially the same science may reach different results.

289 F.3d at 1206 (citation omitted).  The United States Court of Appeals for the Ninth Circuit

noted in Claar v. Burlington Northern Railroad Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the
> antithesis of this method.   Certainly, scientists may form initial tentative
> hypotheses.  However, scientists whose conviction about the ultimate conclusion
> of their research is so firm that they are willing to aver under oath that it is correct
> prior to performing the necessary validating tests could properly be viewed by the
> district court as lacking the objectivity that is the hallmark of the scientific
> method.

29 F.3d at 502-503 (citation omitted).

> Once reliability is established, however, it is still within the district court's
> discretion to determine whether expert testimony will be helpful to the trier of
> fact.   In making that determination, the court should consider, among other
> factors, the testimony's relevance, the jurors' common knowledge and experience,
> and whether the expert's testimony may usurp the jury's primary role as the
> evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *10 (Dec. 15,

2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th

Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.

See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated

connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found

- 67 -

to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).   See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)("Test results on animals are not necessarily reliable evidence of the same reaction in humans.").  Courts have excluded experts' opinions when the experts depart from their own established standards.  See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N. R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

   3.   **Necessity of Evaluating an Issue Under Daubert v. Merrell Dow Pharmaceuticals, Inc.**

   The restrictions in Daubert v. Merrell Dow Pharmaceuticals, Inc. apply to both "novel" expert testimony and "well-established propositions."   509 U.S. at 593 n.11 ("Although the Frye[22] decision itself focused exclusively on 'novel' scientific techniques, we do not read the

_____

   [22]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule Fed. R. Evid. 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is

requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . ." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the [polymerase chain reaction] methodology, and in fact some courts have indicated their acceptance of it.").

### 4.   **Expert Testimony on Ultimate Issues.**

Rule 704 of the Federal Rules of Evidence states:

(a)   **In General -- Not Automatically Objectionable.**   An opinion is not objectionable just because it embraces an ultimate issue.

(b)   **Exception.**   In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

---

made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. at 1014.

Fed. R. Evid. 704.  "Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact." Vondrak v. City of Las Cruces, No. 05-0172, 2009 WL 3241555, at *10 (D.N.M. Aug. 25, 2009)(Browning, J.).  "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury." Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10 (quoting 1 K. Broun, McCormick on Evidence § 12 (6th ed. 2006 update)).  The Federal Rules of Evidence reflect that the ultimate-issue rule no longer applies.  See United States v. Smith, 156 F.3d 1046, 1054 (10th Cir. 1998).  Although rule 704(a) permits an expert to testify about areas that embrace an ultimate issue, there are some other limitations, aside from those that rule 704(b) expresses, regarding testimony on ultimate issues.

Expert witnesses are permitted to testify regarding a broad scope of matters.  First, experts may testify regarding ultimate questions of fact.  See Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue."); United States v. Richter, 796 F.3d 1173, 1195 (10th Cir. 2015)("Federal Rule of Evidence 704 allows an expert witness to testify about an ultimate question of fact.").  Second, experts may refer to the law in expressing their opinions.  See United States v. Bedford, 536 F.3d 1148, 1158 (10th Cir. 2008); Specht v. Jensen, 853 F.2d 805, 809 (10th Cir. 1988)("We recognize that a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible.").  Third, experts may testify "to facts or opinions from which the jury could conclude or infer that the defendant had the requisite mental state." United States v. Ganadonegro, No. 09-0312, 2012 WL 592170, at *5 (D.N.M. Feb. 17, 2012)(Browning, J.)(citing United States v. Torres, 53 F.3d 1129, 1141-42 (10th Cir. 1995)).  In short, "[p]ermissible testimony provides the jury with the tools to evaluate an expert's ultimate conclusion and focuses on questions of fact that are

amenable to the scientific, technical, or other specialized knowledge within the expert's field."
United States v. Richter, 796 F.3d at 1195.

The Tenth Circuit has also barred numerous forms of expert testimony.  "Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state[.]"  United States v. Ganadonegro, 2012 WL 592170, at *5.  "[Rules 701, 702, and 403] afford ample assurances against the admission of opinions [under rule 704] which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day."  United States v. Barile, 286 F.3d 749, 759-60 (4th Cir. 2002).  Expert testimony is similarly inadmissible when a jury can evaluate the matter itself.  In U.S. Rodella, No. CR 14-2783 JB, 2014 WL 6634154, (D.N.M. Nov. 18, 2014)(Browning, J.), the United States alleged that the defendant used unreasonable force during an unlawful arrest.  See 2014 WL 6634154, at *1.  The defendant attempted to introduce expert testimony that the arrestee's booking photograph did not show evidence of bruising.  See 2014 WL 6634154, at *18.  The Court rejected this evidence, explaining:

> While Dr. Sanders' methodology is detailed, his methodology boils down to looking at the photograph and deciding whether Tafoya's face appears to be bruised. Whether a person's face appears to be bruised or swollen falls within a juror's common knowledge and experience, and permitting expert testimony on the issue would usurp the jury's primary role as the evaluator of evidence.

2014 WL 6634154, at *18 (quotations omitted).  Expert testimony is likely inadmissible when the expert's testimony tracks the language of the legal principle or statute at issue or when terms employed have a specialized legal meaning.  See United States v. Perkins, 470 F.3d at 158.  In Vondrak v. City of Las Cruces, for example, the defendant sought to introduce testimony from an experienced police officer to show that a police officer reasonably handcuffed the plaintiff during an arrest for driving under the influence.  See 2009 WL 3241555, at *1.  The police officer stated in his report that the defendant acted reasonably and that the amount of time the

plaintiff spent in handcuffs was reasonable.  See 2009 WL 3241555, at *18.  The Court rejected

this evidence, explaining that it impermissibly applied the law to the facts:

> Tipton may not say that McCants acted reasonably, because such testimony involves the application of a legal standard to the facts. . . . [W]hile the ultimate evidence rule has been abolished outside of the context of rule 704(b), experts still are not allowed to express opinions involving the application of legal standards to facts.  Okland Oil Co. v. Conoco Inc., 144 F.3d 1308, 1328 (10th Cir. 1998)("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts.").  Tipton therefore may not express an opinion that the length of time that Vondrak spent in handcuffs was reasonable.

2009 WL 3241555, at *18.

The distinction between permissible and impermissible expert testimony is not always

obvious.  See United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006)("The line between a

permissible opinion on an ultimate issue and an impermissible legal conclusion is not always

easy to discern."); United States v. Simpson, 7 F.3d 186, 189 (10th Cir. 1993)("In this case,

defense counsel sought to admit testimony by the expert as to whether the transactions in

question constituted misapplication or concealment. Whether or not this proffered testimony

amounts to a legal conclusion, devoid of helpfulness to the trier of fact, is a close question."); 3-

704 Federal Rules of Evidence Manual § 704.02 (2015)("Despite the Scop Court's effort to

distinguish ultimate factual conclusions from ultimate legal conclusions, the distinction can be

blurry.").  In 1991, for example, the Tenth Circuit stated that "an expert may not state legal

conclusions drawn by applying the law to the facts."  A.E. By & Through Evans v. Indep. Sch.

Dist. No. 25, of Adair Cty., Okl., 936 F.2d 472, 476 (10th Cir. 1991).  More recently, however, it

has explained that witnesses "are permitted to testify about how the law applies to a certain set of

facts, so long as they provide adequate explanations for their conclusions."  United States v.

Richter, 796 F.3d at 1196.  It is unclear how an expert witness could describe "how the law

applies to a certain set of facts" without reaching a "legal conclusion."  Cases discussing these

issues are not always clear.  In United States v. Buchanan, 787 F.2d 477 (10th Cir. 1986), an

officer with the Bureau of Alcohol, Tobacco and Firearms testified that a firebomb would "have

to be registered" with his agency.  787 F.2d at 483.  The defendant objected on the grounds that

the testimony "constituted an improper legal conclusion."  787 F.2d at 484.  The Tenth Circuit

noted that "[t]he question before the jury involved the consideration of a particular homemade

device against an array of statutory definitions," but nonetheless affirmed the district court's

decision to admit the testimony.  787 F.2d at 483.  It explained:

> While unadorned legal conclusions are impermissible, *see Frase v. Henry,* 444
> F.2d 1228, 1231 (10th Cir. 1971), courts have allowed the expression of expert
> opinions on ultimate issues of fact.  *See, e.g., United States v. Logan,* 641 F.2d
> 860, 863 (10th Cir. 1981).  Experts are allowed to testify that certain drugs come
> within a particular statutory classification, *see United States v. Carroll,* 518 F.2d
> 187, 188 (6th Cir. 1975), and that certain expenses are deductible under the
> federal tax laws, *see United States v. Fogg,* 652 F.2d 551, 556–57 (5th Cir. 1981),
> *cert. denied,* 456 U.S. 905, 102 S.Ct. 1751, 72 L.Ed.2d 162 (1982).

787 F.2d at 484.  The Tenth Circuit placed the officer's testimony into the "ultimate issues of

fact" category.  787 F.2d at 484.  See United States v. Bedford, 536 F.3d 1148, 1158 (10th Cir.

2008)("[W]e agree that a properly qualified IRS agent may analyze a transaction and give expert

testimony about its tax consequences.")(quotation omitted).

## LAW REGARDING ERRATA CORRECTIONS

Rule 30(e) of the Federal Rules of Civil Procedure allows the deponent, within 30 days

after notification that the transcript is available, to: "(**A**) to review the transcript or recording; and

(**B**) if there are changes in form or substance, to sign a statement listing the changes and the

reasons for making them."  Fed. R. Civ. P. 30(e)(1)(emphasis added).  Some courts have

interpreted "substance" in a very restrictive manner, allowing changes only to ensure that the

transcript accurately reflects what the deponent said.  In Greenway v. International Paper Co.,

144 F.R.D. 322 (W.D. La. 1992)(Little, J.), the Honorable F.A. Little, United States District

Judge for the Western District of Louisiana, rejected a plaintiff's attempt to make extensive changes to a deposition transcript that effectively changed the deponent's answers.  See 144 F.R.D. at 325.  For example, the plaintiff sought the following change:

As stated in the deposition:

No, sir.

Correction desired:

Yes, sir.  For example, after I filed the quick-hour grievance in June of 1990, Jimmy retaliated against me by forbidding me from using the telephone while at work, taking any jobs without his permission and talking to any management personnel without first talking to him.  Additionally, there was a fourth step grievance meeting scheduled for 8:00 o'clock a.m., in connection with my quick-hour grievance.  However, Jimmie failed to inform me about this this (sic) meeting; and, in particular, failed to inform me of the date and time set for said meeting.  Mike Hamil had to call Jimmie around 8:15 o'clock a.m., and Jimmie had to come get me off my job.  Jimmie then drove me to Mike Hamil's office, and he made it clear at that time that he was not at all happy with me.  I believe that Jimmie deliberately did not tell me about this meeting.

Greenway v. Int'l Paper Co., 144 F.R.D. at 323.   Judge Little explained that rule 30(e)'s "obvious" purpose is to allow a deponent to correct a reporter's substantive error.  144 F.R.D. at 325.  He explained:

The Rule cannot be interpreted to allow one to alter what was said under oath.  If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses.  Depositions differ from interrogatories in that regard.  A deposition is not a take home examination.

144 F.R.D. at 325.  See Boomsma v. Star Transport, Inc., 202 F. Supp. 2d 869, 876-77 (E.D.Wis. 2002)(striking subsequently given affidavits when "[i]t is obvious that the plaintiffs are attempting to 'repair' their experts' deposition testimony by coming forward with affidavits more in line with their . . . arguments").

The majority of courts have adopted a more liberal approach based on the rule's plain language.  See Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000).  These

courts have held that rule 30(e)'s plan language "authorizes changes in form *or substance*." Thorn v. Sundstrand Aerospace Corp., 207 F.3d at 389 (emphasis in original).  See Pepsi-Cola Bottling Co. of Pittsburgh v. Pepsico, Inc., No. CIV.A.01-2009-KHV, 2002 WL 511506, at *2 (D. Kan. Apr. 3, 2002)(Waxse, M.J.)("Under this approach, the courts apply a broad reading to Rule 30(e)'s language[.]").  To minimize the danger that deponents will make extensive changes to their testimony -- to reflect what they wish they had said, rather than their actual statements -- these courts require that the original transcript be retained "so that the trier of fact can evaluate the honesty of the evaluation."  Thorn v. Sundstrand Aerospace Corp., 207 F.3d at 389.  See Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997)("[W]hen a party amends his testimony under Rule 30(e), the original answer to the deposition questions will remain part of the record and can be read at the trial.")(quotation omitted).

The Tenth Circuit follows the more restrictive approach, prohibiting deponents from supplementing their deposition testimony under rule 30(e).  See Havens v. Johnson, 783 F.3d 776, 780 n.3 (10th Cir. 2015); BancFirst ex rel. Estate of M.J.H. v. Ford Motor Co., 422 F. App'x at 666 ("We have adopted a restrictive view of the changes that can be made pursuant to Rule 30(e), and take a dim view of substantive alteration of deposition testimony."); Boyd v. Home Depot, Inc., 2013 WL 394187, at *2 ("The Tenth Circuit interprets Rule 30(e) narrowly, thus limiting permissible changes to deposition testimony.").  In Garcia v. Pueblo Country Club, 299 F.3d 1233 (10th Cir. 2002), the defendant relied on "errata from deposition testimony where that errata strayed substantively from the original testimony."  299 F.3d at 1242 n.5.  The Tenth Circuit, citing Greenway v. International Paper Co., condemned this attempt:

> We do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony.  *See, e.g., Coleman v. Southern Pac. Transp. Co.,* 997 F. Supp. 1197, 1205 (D. Ariz. 1998)(discrediting deposition

> testimony directly contradicted by errata sheet); *S.E.C. v. Parkersburg Wireless, L.L.C.,* 156 F.R.D. 529, 535 (D.D.C. 1994)(noting modern trend in which courts do not allow a party "to make any substantive change she so desires" in deposition testimony); *Rios v. Bigler,* 847 F. Supp. 1538, 1546–47 (D. Kan. 1994)(stating that the court will consider only those changes which clarify the deposition, and not those which materially alter it); *Greenway v. International Paper Co.,* 144 F.R.D. 322, 325 (W.D. La. 1992)(suppressing deponent's attempt to rewrite material answers given in deposition); *Barlow v. Esselte Pendaflex Corp.,* 111 F.R.D. 404, 406 (M.D.N.C. 1986)(refusing to consider changes to deposition that were made in bad faith).

299 F.3d at 1242 n.5.

The Tenth Circuit has also analogized corrections under rule 30(e) to the submission of "sham affidavits." Burns v. Bd. of Cty. Comm'rs of Jackson Cty., 330 F.3d 1275, 1278 (10th Cir. 2003)("This civil rights appeal raises the following notable issue: whether deposition corrections are subject to a 'sham affidavit' analysis. We answer this question in the affirmative."). Parties seeking to avoid summary judgment based on unfavorable deposition testimony use sham affidavits to "correct" that testimony by creating a false issue of material fact. See Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007)("A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment."); Kurpiel v. Calumet River Fleeting, 691 F. Supp. 2d 827, 832 (N.D. Ill. 2010)(Dow, J.); C. Wright & A. Miller, Federal Practice & Procedure § 2738, n.12 (3d ed. 1998).

The Tenth Circuit set out its test for sham affidavits in Franks v. Nimmo, 796 F.2d 1230 (10th Cir. 1986):

> Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

796 F.2d at 1237.  See Rios v. Bigler, 67 F.3d 1543, 1551 (10th Cir. 1995)(applying this test to

alleged sham affidavits); Martinez v. Barnhart, 177 F. App'x 796, 800 (10th Cir. 2006)(same).

The Tenth Circuit applied this test to a plaintiff's rule 30(e) corrections in Burns v. Board of

County Commissioners of Jackson County, concluding that the corrections did not satisfy any of

the three factors from Franks v. Nimmo.[23]  See Burns v. Bd. of Cty. Comm'rs of Jackson Cty.,

330 F.3d at 1282.  First, it noted that the deponent was cross-examined at his deposition.  See

330 F.3d at 1282.  Second, it explained that the corrections were not based on any newly

discovered evidence.  See 330 F.3d at 1282.  Third, the Tenth Circuit noted that, "although Burns

asserts that he was confused at his deposition, his answers to the direct questions posed by

counsel do not reflect any obvious confusion -- as opposed to indecisiveness or inconsistency --

that the corrections would need to clarify."  330 F.3d at 1282.  Cf. Bouvier v. Northrup

Grumman Ship Sys., Inc., 350 F. App'x 917, at *2 (5th Cir. 2009)(unpublished)("Affidavits

---

[23]The Court notes that the law on this point is somewhat confused.  The earlier cases on point appeared to allow corrections only for transcription errors:

> The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath.

Greenway v. Int'l Paper Co., 144 F.R.D. at 325.  The Tenth Circuit's decision to apply the sham affidavit rule to rule 30(e) corrections appears to allow for additional changes, provided that the changes satisfy the Franks v. Nimmo factors.  See Burns v. Bd. of Cty. Comm'rs of Jackson Cty., 330 F.3d at 1282.  For example, a court reporter could accurately transcribe a deponent's statements.  The deponent could have been cross-examined at his deposition, and then could have discovered new evidence changing his answers or simply noted that he was confused at the deposition.  A strict application of Greenway v. International Paper Co. would not allow for any changes, while the Franks v. Nimmo factors would authorize changes.  At least one of the Tenth Circuit's recent cases on point does not cite Burns v. Board of County Commissioners of Jackson County, but the Court will apply the three-factor test where necessary to ensure that its decision is consistent with existing precedent.  See BancFirst ex rel. Estate of M.J.H. v. Ford Motor Co., 422 F. App'x at 666.

submitted in opposition to a motion for summary judgment may supplement deposition testimony, but cannot contradict prior testimony without explanation.")(citing S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 496 (5th Cir. 1996)); E.E.O.C. v. Yellow Freight Sys., Inc., 253 F.3d 943, 952 (7th Cir. 2001)("As a general rule, the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony.")(internal quotation omitted).

Finally, at least two district courts have allowed changes as a matter of course if they are not material. See Boyd v. Home Depot, Inc., 2013 WL 394187, at *4 ("Because the Court finds that under these circumstances Gillis's Rule 30(e) modifications are not material, the Court need not address the three Burns factors."); Myers v. Dolgencorp, Inc., No. 04-4137-JAR, 2006 WL 408242, at *1 (D. Kan. Feb. 15, 2006)(Robinson, J.)("Fed. R. Civ. P. 30(e) permits non-material changes to deposition testimony, as well as those material changes that satisfy the test adopted by the Tenth Circuit in Burns v. Board of County Commissioners of Jackson County, Kansas."). These courts relied on the Tenth Circuit's footnote in Garcia v. Pueblo Country Club, which stated: "We do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony." 299 F.3d at 1242 n.5 (emphasis added).[24]

---

[24]The Court questions whether it makes sense to require district courts to determine whether specific proposed changes to a deposition transcript are "material" after the summary judgment stage. The definition of "material" in Boyd v. Home Depot, Inc. and Myers v. Dolgencorp, Inc. comes from a Tenth Circuit summary judgment standard. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). It holds that "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d at 670. See Myers v. Dolgencorp, Inc., 2006 WL 408242, at *1 ("A change is material if it bears on an essential element of a claim or defense."). The Court notes that it is difficult, if not impossible to determine whether the addition of a single word in a line of a deposition transcript, which may be hundreds of pages long, "is essential to the proper disposition of the claim," when it is dealing with an errata motion. Adler v. Wal-Mart

- 78 -

The Court has applied these principles in two prior cases. In Armeanu v. Bridgestone/Firestone North American Tire, LLC, No. CIV 05-619 JB/DJS, 2006 WL 4060665 (D.N.M. Sept. 26, 2006)(Browning, J.), the Court noted that a "significant portion" of an expert's affidavit "contradicts or is in tension with his deposition testimony." 2006 WL 4060665, at *14. The Court concluded that, "[b]ecause Johnson was cross-examined at his deposition, because he had access to pertinent evidence at the time of his deposition, and because his deposition testimony does not reflect any confusion, the Court has the authority to disregard those portions of his affidavit that contradict his testimony." 2006 WL 4060665, at *14. The Court nonetheless tried to "harmonize the two sets of testimony to avoid the exclusion of relevant evidence." 2006 WL 4060665, at *14. In Radian Asset Assurance, Inc. v. College of Christian Brothers of New Mexico, No. CIV 09-0885 JB/DJS, 2010 WL 5173316 (D.N.M. Nov. 15, 2010)(Browning, J.), the plaintiff corporation stated that its rule 30(b)(6) representative "may need to supplement its Rule 30(b)(6) testimony" after his deposition. Radian Asset Assur., Inc. v. Coll. of Christian Bros. of New Mexico, 2010 WL 5173316, at *3. The Court commented that "[d]eponents do not have the right to 'supplement' their deposition testimony under the Federal Rules of Civil Procedure[.]" 2010 WL 5173316, at *4. It added that, "like any other witness that gives testimony, Radian Asset may be impeached before the factfinder. A party can impeach its own witness, see Fed. R. Evid. 607, so Radian Asset can elicit testimony from another witness to impeach itself." 2010 WL 5173316, at *4.

---

Stores, Inc., 144 F.3d at 670. For example, a change that tends to reinforce an expert witness' credibility or attention to detail may be important, but may be only tangentially relevant to any element of a claim or defense.

<u>ANALYSIS</u>

The Court will grant the Motion in part and deny it in part.  First, the Court will not exclude any expert witnesses' testimony in its entirety, but it will prevent them from applying the law to the facts to reach impermissible legal conclusions.  Second, the Court will admit the parties' event studies as evidence of materiality and, if necessary, damages.  Third, the Court will strike all but one of the Defendants' proposed changes to their expert witnesses' deposition transcripts.

## I.   THE ACCOUNTING EXPERTS MAY NOT TESTIFY AS TO THORNBURG MORTGAGE-SPECIFIC ISSUES.

The parties contend that the Court should allow their experts to opine about the Defendants' actions with greater specificity.  <u>See</u> Tr. at 58:11-17 (McKenna)("I think, in general, the experts should be able to . . . look at Thornburg-specific issues, at least to a point, not to ultimately tell the jury what to conclude, but to provide their expert guidance as far as these specific facts and circumstances."); <u>id.</u> at 59:13-16 (Marks)("As to the opinions of Professor Holder and Laursen that the judgments were reasonable on OTTI and Type II, our view is that those were appropriate opinions[.]").  The Court will prohibit the parties' witnesses from making such specific statements, because: (i) the statements impermissibly draw legal conclusions by applying the law to the facts; (ii) the statements will not be helpful to the jury, which must make its own determinations; and (iii) the Court will apply its ruling uniformly to both the SEC and the Defendants.

### A.   THE EXPERT WITNESSES' PROPOSED TESTIMONY DRAWS IMPERMISSIBLE LEGAL CONCLUSIONS.

The parties have submitted extensive proposed expert testimony reaching legal conclusions about the Defendants' actions.

The SEC has submitted similar expert testimony, including but not limited to:

Kitchens     "The financial statements included in the 2007 10-K, as originally filed by Thornburg Mortgage on February 28, 2008, contained material misstatements (i.e., material errors) that required restatement in order for those statements to comply with GAAP and SEC rules and regulations[.]" Kitchens Report at 10.

Mayer     "In my opinion, if such disclosures had been included in the 10-K filing, the impact on Thornburg's stock price on February 28, 2008 would have been material." Expert Report of Michael G. Mayer at 22 (dated October 7, 2013), filed June 6, 2014 (Doc. 301-4)("Mayer Report").

The Defendants have proposed expert testimony, including but not limited to:

Laursen     "Thornburg's determination not to classify its impaired securities as OTTI was consistent with guidance that the Fed was providing to financial institutions at the time on how to apply OTTI, particularly in the midst of the market volatility of 2007-2008." Laursen Report ¶ 31, at 5.

Holder     "[M]anagement's judgment that the decline in value of Thornburg's Purchased ARM Assets as of December 31, 2007 was not other-than-temporary was reasonable." Holder Report ¶ 20, at 6. "[M]anagement's judgment that the February 21. 2008 Market Events were not indicative of a condition that existed at December 31, 2007, but rather were evidence of a condition that arose after that date (that is, were "Type II" subsequent events) was reasonable." Holder Report ¶ 21, at 7.

Hilfer     "The judgment of Thornburg's management that the Company would be able to continue satisfying margin calls after the filing of its 2007 Form 10-K was reasonable." Expert Report of Steven M. Hilfer ¶ 25, at 8-9 (dated November 18, 2013), filed May 9, 2014 (Doc. 291-4)("Hilfer Report").

Floyd     "The SEC's claim that Thornburg violated federal securities laws by failing to implement or circumventing internal controls over financial reporting (1) appears to be based on an erroneous presumption that a material weakness existed because there was a restatement . . . ." Amended Expert Report of Joseph J. Floyd at 6 (dated November 26, 2013), filed May 9, 2014 (Doc. 291-6)("Floyd Report").

These statements, as well as similar statements throughout the experts' proposed testimony, "state legal conclusions drawn by applying the law to the facts." A.E. By & Through Evans v. Indep. Sch. Dist. No. 25, of Adair Cty., Okl., 936 F.2d at 476. They use terms with "a separate, distinct and specialized meaning in the law different from that present in the

vernacular." United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006). The terms have "considerable legal baggage." United States v. Perkins, 470 F.3d 150, 158 (4th Cir. 2006).

The legal standards in this case require the SEC to prove that the Defendants made material misrepresentations. See Defs. Response at 1; 17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2; S.E.C. v. Goldstone, No. CIV. 12-0257 JB/GBW, 2015 WL 5138242, at *1 (D.N.M. Aug. 22, 2015)(Browning, J.). Testimony that Thornburg Mortgage's disclosures "contained material misstatements" inappropriately states a legal conclusion drawn by applying the law to the facts. Kitchens Report at 10. In Feinberg v. Katz, No. 01 CIV. 2739(CSH), 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007)(Haight, J.), an expert attempted to testify that specific "omissions from the financial statements are material and it is my opinion that had this information been available, many if not all of the creditors using these financial statements would not have issued credit to the Company." 2007 WL 4562930, at *9. The district court rejected this attempt, explaining that the proposed opinion "manages in a single sentence to both usurp the trial judge's function of instructing the jury on the law and tell the jury what result to reach on the facts: a breathtaking *tour de force* of inadmissibility." 2007 WL 4562930, at *9. The parties' experts may not simply declare certain representations material.

The SEC argues that the Defendants' experts "impermissibly state a legal conclusion applying the law to the facts" when they testify that the Defendants' judgment was "reasonable." SEC Motion at 10. The SEC cites the Court's 2013 Memorandum Opinion and Order, which dealt with the parties' motions to dismiss. See SEC Motion at 11 (citing S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1199 (D.N.M. 2013)(Browning, J.)(the "MTD MOO")). The MTD MOO stated:

> The Tenth Circuit has defined recklessness sufficient to state a claim under §
> 10(b) of the Exchange Act as "'conduct that is an extreme departure from the

> standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendants or is so obvious that the actor must have been aware of it.'" <u>Dronsejko v. Thornton</u>, 632 F.3d at 665 (quoting <u>City of Phila. v. Fleming Cos., Inc.</u>, 264 F.3d at 1257-58).   The Tenth Circuit has emphasized that it "'<u>is the danger of misleading buyers</u> that must be actually known or so obvious that any reasonable man would be legally bound as knowing.'"   <u>City of Phila. v. Fleming Cos.</u>, 264 F.3d at 1260 (emphasis in original)(quoting <u>Schlifke v. Seafirst Corp.</u>, 866 F.2d 935, 946 (7th Cir. 1989)).

952 F. Supp. 2d at 1199.   The SEC concludes that "[a] conclusion that the Defendants' judgment was 'reasonable' would preclude a finding of scienter."   SEC Motion at 11 (citing <u>In re Flag Telecom Holdings, Ltd. Sec. Litig.</u>, No. 02-CV-3400 CM PED, 2010 WL 4537550, at *17 (S.D.N.Y. Nov. 8, 2010)(McMahon, J.)).

The Defendants respond that the Court should permit Holder to testify that the Defendants' accounting decisions were reasonable, because the word is a term of art under GAAP.   <u>See</u> SEC Response at 8.   They explain that "OTTI and Subsequent Events are matters of *judgment*, which, by definition, are not amenable to 'right' or 'wrong' determinations."   SEC Response at 8 (emphasis in original).   They add that auditors thus "exercise professional judgment in *evaluating the reasonableness of accounting estimates* based on information that could reasonably be expected to be available prior to the completion of field work."   SEC Response at 8 (emphasis in original).[25]   The Defendants conclude that, "[a]t most, this is a case where there is necessary overlap between an expert's opinion and an aspect of an ultimate issue due to the accounting standards and the Tenth Circuit's definition of recklessness both incorporating the concept of 'reasonableness.'"   SEC Response at 10.   In any case, the

---

[25]The Defendants cite <u>Thor Power Tool Co. v. C. I. R.</u>, 439 U.S. 522 (1979), in which the Supreme Court noted: "Accountants long have recognized that 'generally accepted accounting principles' are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions.   'Generally accepted accounting principles,' rather, tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management."   SEC Response at 9 (citing 439 U.S. at 544).

Defendants note, "courts have allowed experts to testify to the 'reasonableness' of a party's accounting judgment." SEC Response at 10 (citing In re REMEC Inc. Sec. Litig., 702 F. Supp. 2d 1202, 1228 (S.D. Cal. 2010)(Anello, J.)).

The Court concludes that the experts should not be able to testify that the Defendants' accounting judgment was or was not reasonable. As an initial matter, the Court acknowledges that "reasonableness" is not part of the text of the relevant legal standards. The Court adheres to its earlier decision that the Tenth Circuit's standard for the falsity of opinion statements is the "actual-disbelief" standard, rather than the "objectively reasonable basis" standard. S.E.C. v. Goldstone, No. CIV. 12-0257 JB/GBW, 2015 WL 5138242, at *225 (D.N.M. Aug. 22, 2015)(Browning, J.). By introducing testimony that their accounting judgment was reasonable, however, the Defendants instruct the jury to conclude that they believed that their statements were true when they made them. See SEC Motion at 11 ("A conclusion that the Defendants' judgment was 'reasonable' would preclude a finding of scienter."). A juror confronted with conclusory testimony that the Defendants' judgments were reasonable would have a difficult time concluding that they were incorrect, or that the Defendants had subjective knowledge that their guidance was incorrect. Moreover, the Defendants have not cited any cases allowing experts to directly opine on defendants' accounting judgment. Their closest case, In re REMEC Inc. Securities Litigation, stated in passing only that the court allowed an expert to testify that "the methodology employed by [the defendant] in its related impairment analyses appears reasonable." 702 F. Supp. 2d at 1228.

The Advisory Committee notes to rule 704 explain:

These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did

> T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

Fed. R. Evid. 704, advisory committee notes on 1972 proposed rules.  In In re Longtop Financial Technologies Ltd. Securities Litigation, 32 F. Supp. 3d 453 (S.D.N.Y. 2014)(Scheindlin, J.),  a defendant's expert witness made several statements that the defendant's behavior was "reasonable" and not "reckless."   32 F. Supp. 3d at 463.   The district court excluded this testimony:

> Bell may not state whether Palaschuk's behavior was "reasonable" or "reckless," as that is the ultimate legal conclusion for the jury. Nor may he opine that it was reasonable for Palaschuk to "rely" on the DTT audits.  Instead, he may explain what procedures a CFO is generally expected to undertake, in accordance with industry standards, to corroborate the accuracy of a company's financial statements and to prevent fraud.  He may also explain, in his experience, what steps a CFO would *not* normally undertake in the face of a clean audit report.  The jury will ultimately decide whether Palaschuk's behavior constituted an "extreme departure from the standards of ordinary care" under the circumstances.

32 F. Supp. 3d at 463 (emphasis in original).  Like the expert in that case, the experts here may provide testimony on how corporate officers would normally respond to certain events, but may not conclude for the jury that the Defendants' specific responses were reasonable.

The Court recognizes that there is some tension between its ruling and the Tenth Circuit's statement that witnesses "are permitted to testify about how the law applies to a certain set of facts, so long as they provide adequate explanations for their conclusions."  United States v. Richter, 796 F.3d at 1196.  The Court concludes, however, that this situation is distinguishable from cases applying this principle.  In United States v. Buchanan, for example, the expert addressed only whether a homemade firebomb would be subject to federal registration requirements.  See 787 F.2d at 483.  The Tenth Circuit explained that "[t]he question before the jury involved the consideration of a particular homemade device against an array of statutory

definitions."  787 F.2d at 483.  Similar cases applying the law to a certain set of facts involved similar applications of statutory definitions.  See United States v. Logan, 641 F.2d 860, 863 (10th Cir. 1981)(allowing expert to testify that certain funds were "improperly taken," describing the question as an "issue of fact"); United States v. Carroll, 518 F.2d 187, 188 (6th Cir. 1975)(admitting expert testimony "that Seconal is a barbituric acid which is controlled under Schedule III").  The issues in these cases were far simpler and subject to easy determination by a single expert than the issues here -- such as whether the Defendants' actions were "reasonable" or whether certain information was "material."  Holder Report ¶ 21, at 7; Mayer Report at 22.

### B. THE EXPERTS' PROPOSED STATEMENTS WILL NOT BE HELPFUL TO THE JURY, WHICH MUST REACH ITS OWN CONCLUSIONS.

Expert testimony is not a substitute for the jury's judgment.  Even after reliability is established, the Court must determine whether expert testimony will assist the trier of fact.  "In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence."  Ram v. N.M. Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *10 (Dec. 15, 2006)(Browning, J.).  The expert testimony proposed here is unhelpful to the jury's factual determinations, and "interferes with the function of the judge in instructing the jury on the law."  United States v. Dazey, 403 F.3d 1147, 1171 (10th Cir. 2005)(quoting United States v. Simpson, 7 F.3d 186, 188 (10th Cir. 1993)).  It concludes for the jury that the Defendants' actions were or were not reasonable, while simultaneously determining that specific information was or was not material.

> When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.  When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination.

United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994)(emphasis in original).

### C.   THE COURT WILL APPLY THIS PRINCIPLE IN A UNIFORM MANNER.

The Court's conclusion will not result in unfair prejudice to any party, because it will affect all parties to the dispute in similar ways.   The Defendants stated at the hearing that "we are willing to accept the way the Court has proposed to rule on all the motions, and the way the Court proposes to limit all of the experts."  Tr. at 47:5-9 (Marks).  Although the SEC lodged an objection with respect to Kitchens "[j]ust for the record," it waived argument on the issue.  Tr. at 48:3-9 (McKenna).  Both sides acknowledged that it would be unfair to apply the Court's ruling to only one side.  See Tr. at 48:10-15 (McKenna); Tr. at 59:17-24 (Marks).  The Court's decision will exclude testimony from both sides' witnesses and will not favor one side at the expense of another.

The Court's ruling, which the Court faithfully bases on the law as it understands it, is also consistent with the Court's view, as a trial court, of the role of experts at trial.  After interviewing over one hundred jurors after trial, the Court is struck by how unimpressed and uninfluenced juries are by experts.  Jurors tend to make up their own minds about the facts and, if they rely on experts at all, use them to confirm their own conclusions.  Even the most credentialed experts do not awe jurors.  Jurors do not like to be told what to do or how to rule.  Experts can, however, serve a useful rule by educating the jury about difficult topics and giving it the tools that it needs to do its job.  The Court's rulings keep the experts from sitting on the stand and telling the jury the right conclusions, but allow the experts to say a lot -- educating the jury about a lot of subjects about which a lay person may not be familiar.

## II.   THE COURT WILL ADMIT THE PARTIES' EVENT STUDIES.

The Court will not, however, exclude the parties' event studies.  An event study is a regression analysis that attempts to show how the market price of a company's stock responds to pertinent publicly reported events.  See Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. at 2415.

> Since the Supreme Court's *Daubert* ruling, there has been an increased scrutiny of expert testimony in the courtroom.  This has given rise to the need for analyses that, to the extent possible, are testable, supported by published literature, have a known or potential rate of error, and follow procedures that derive from objective standards rather than from an expert's own potentially subjective opinions or beliefs.
>
> An event study of a security's price, typically the measurement of a stock price's movement in response to a specific event or announcement, is an empirical technique that can be screened for admissibility with a straightforward application of the Daubert factors.

David Tabak and Frederick Dunbar, Materiality and Magnitude: Event Studies in the Courtroom at 1-2, National Economic Research Associates (April 1999), http://www.nera.com/publications/archive/1999/materiality-and-magnitude-event-studies-in-the-courtroom.html.

Event studies can be used in securities cases for two primary purposes.  See In re Vivendi Universal, S.A. Sec. Litig., 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009)(Holwell, J.)("While the plaintiffs at all times bear the burden on loss causation, it is important not to confuse causation with damages when comparing competing causes for a stock decline.").  First, they can support expert testimony on materiality.  In a securities fraud case like this one, event studies can help the trier of fact to determine what a reasonable investor would consider material.  "By examining whether the stock price change is different from random movements that occur on days when there is no news, we can determine whether investors felt that the event under consideration was

material."  David Tabak and Frederick Dunbar, <u>Materiality and Magnitude: Event Studies in the</u> <u>Courtroom</u> at 6 n.9, National Economic Research Associates (April 1999), http://www.nera.com/publications/archive/1999/materiality-and-magnitude-event-studies-in-the-courtroom.html.  Second, event studies can be used to measure the size of a stock's price movement as the basis for a damages calculation.

### A.    THE COURT WILL ADMIT THE PARTIES' EVENT STUDIES AS EVIDENCE OF MATERIALITY.

"In order to prove securities fraud under federal law, one must show that the defendant either misrepresented a material fact or omitted to state a material fact when under a duty to speak."  Richard A. Booth, <u>The Two Faces of Materiality</u>, 38 J. Corp. L. 517, 518 (2014).  <u>See</u> Daniel C. Lengevoort, § 1:2: <u>Securities Fraud and Enforcement</u>, 2015 Securities Law Review.  A statement of fact is material if "'a reasonable person would consider it important in determining whether to buy or sell'" securities.  <u>Genesee Cty. Emps. Ret. Sys. v. Thornburg Mortg. Sec.</u> <u>Trust</u>, 825 F. Supp. 2d 1082, 1126 (D.N.M. 2011)(Browning, J.)(quoting <u>Schaffer v. Evolving</u> <u>Sys., Inc.</u>, 29 F. Supp. 2d 1213, 1220-21 (D. Colo. 1998)(citing <u>Grossman v. Novell, Inc.</u>, 120 F.3d at 1119)).

The Courts of Appeals disagree on precisely how important event studies are to proving materiality.  The United States Court of Appeals for the Third Circuit has essentially made event studies mandatory.  Then-Circuit Judge Samuel Alito linked materiality to stock prices in <u>In re</u> <u>Burlington Coat Factory Securities Litigation</u>, 114 F.3d 1410 (3d Cir. 1997): "[E]fficient markets are those in which information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices. . . .  Therefore, to the extent that information is not important to reasonable investors, it follows that its release will have a negligible effect on the stock price."  114 F.3d at 1425 (quotations and citations omitted).  <u>See</u> <u>S.E.C. v. Berlacher</u>, No.

CIV.A.07-3800, 2010 WL 3566790, at *7 (E.D. Pa. Sept. 13, 2010)(Goldberg, J.)("As opposed to guessing what a reasonable investor would find important or what could alter the total mix of information in the market, the United States Court of Appeals for the Third Circuit has adopted a concrete method of measuring the materiality of information.").  In the Third Circuit, therefore, "[i]f there is no movement in the stock price, then the disclosed information is immaterial as a matter of law."  S.E.C. v. Berlacher, 2010 WL 3566790, at *7.  To show movement in stock prices, district courts in the Third Circuit require event studies.  In S.E.C. v. Berlacher, for example, the plaintiff's expert "did not conduct an event study and relied heavily upon his general familiarity with how securities markets operate" despite his "more than 28 years of impressive experience working for the SEC."  2010 WL 3566790, at *8.  The district court concluded that the SEC's insider trading claim failed for lack of materiality, explaining that the SEC did not provide any "concrete comparison of typical Radyne stock price movement in the market over any defined period of time."  2010 WL 3566790, at *8.

Courts within the Second Circuit have adopted a different position.  Although they recognize that event studies are important -- even "almost obligatory" -- they are not an absolute requirement.  In re Vivendi Universal, S.A. Sec. Litig., 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009)(McMahon, J.).  See United States v. Ferguson, 676 F.3d 260, 275 (2d Cir. 2011)(noting "substantial" alternative evidence of materiality, including testimony from two stock analysts and the defendant's investor-relations manager).  In Veleron Holding, B.V. v. Stanley, 117 F. Supp. 3d 404 (S.D.N.Y. 2015)(McMahon, J.), for example, a shareholder alleged that Morgan Stanley engaged in market manipulation and insider trading by short-selling a corporation's stock while in possession of information that the corporation would likely fail to meet a margin call.  See 117 F. Supp. 3d at 404-23.  Morgan Stanley argued that the shareholder could not

establish materiality, because its experts failed to present an event study.  See 117 F. Supp. 3d at

432.  The district court rejected this argument, noting:

> Morgan Stanley is correct that event studies have become "almost obligatory"
> evidence in securities practice.  In re Vivendi Universal, S.A. Sec. Litig., 634 F.
> Supp. 2d 352, 364 (S.D.N.Y. 2009).  However, they are not actually obligatory.
> And while they may be dispositive in the Third Circuit, they are simply part of the
> evidentiary mix in the Second.

117 F. Supp. 3d at 433 (emphasis in original).  The district court noted that there was "plenty of

evidence -- most of it out of the mouths of Morgan Stanley's own personnel -- from which a jury

could conclude that the non-public information in this case was material as a matter of fact."  117

F. Supp. 3d at 431.[26]

The Court concludes that the Tenth Circuit would likely adopt the Second Circuit's

approach.  The Supreme Court has held that no single fact or occurrence will always determine

materiality:

> Any approach that designates a single fact or occurrence as always determinative
> of an inherently fact-specific finding such as materiality, must necessarily be
> overinclusive or underinclusive.  In TSC Industries this Court explained: "The
> determination [of materiality] requires delicate assessments of the inferences a
> 'reasonable shareholder' would draw from a given set of facts and the
> significance of those inferences to him . . . ."  426 U.S., at 450, 96 S.Ct., at 2133.
> After much study, the Advisory Committee on Corporate Disclosure cautioned
> the SEC against administratively confining materiality to a rigid formula.  Courts
> also would do well to heed this advice.

Basic Inc. v. Levinson, 485 U.S. 224, 236 (1988)(footnote omitted).  Courts must instead

consider the "total mix" of information available.  Basic Inc. v. Levinson, 485 U.S. at 232.

That the Tenth Circuit does not require event studies to show materiality, however, does

not mean that the parties have no right to present them.  In United States v. Martoma, 993 F.

---

[26]The United States Court of Appeals for the Ninth Circuit has also adopted the Second
Circuit's approach.  See  No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.
W. Holding Corp., 320 F.3d 920, 934 (9th Cir. 2003).

Supp. 2d 452 (S.D.N.Y. 2014)(Gardephe, J.), the United States moved to exclude portions of a defense witness' testimony in an insider trading case.  See 993 F. Supp. 2d at 454.  The defendant argued that the witness' testimony was relevant to materiality.  See 993 F. Supp. 2d at 457.  The Court excluded the expert's testimony that certain sock was "overheated," but noted that it would have admitted an event study:

> Here, the materiality issue turns on whether the information Martoma allegedly received from Dr. Gilman and Dr. Ross in July 2008 would have been important to a reasonable investor.  To show that it would have been, the Government is entitled to offer evidence of the significant decline in the price of Elan and Wyeth stock when the information allegedly provided by Dr. Gilman and Dr. Ross to Martoma was publicly disclosed at the ICAD conference.  Defendant, in turn, is entitled to attempt to refute that argument by demonstrating that there is no correlation between the decline in share price and the public disclosure at the ICAD conference.

993 F. Supp. 2d at 458.  The Court has been unable to find any other reported cases discussing whether defendants are entitled to introduce event studies into evidence.

The parties seek to admit their event studies to show that the restated OTTI disclosure would or would not have had a material impact on Thornburg Mortgage's stock price on February 28, 2008.  See Expert Report of Christopher M. James, Ph.D. at 59 (dated November 18, 2013), filed May 9, 2014 (Doc. 291-15)("James Report"); Mayer Report at 37; Defs. Response at 49 ("Mr. Mayer conducted an event study, based on his expertise, and concluded that OTTI and going concern disclosures would have had a material impact on Thornburg's stock price on February 28, 2008, if they had been included in Thornburg's Form 10-K.").  They could dispute materiality through other means.  See Veleron Holding, B.V. v. Stanley, 117 F. Supp. 3d at 433.  "[A] major factor in determining whether information was material is the importance attached to it by those who knew about it."  S.E.C. v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997).  The SEC could present internal emails from Thornburg Mortgage showing that the Defendants knew the relevant information would have a material impact on shareholders.  The Defendants

could present internal documents indicating that they did not view the information in a similar light.  There is no legal authority, however, requiring them to rely on alternative sources of proof.  Given the absence of controlling authority, the Court will allow the parties to present the event studies to the jury.

### B.    THE COURT WILL ADMIT EVENT STUDIES AS EVIDENCE OF DAMAGES.

The Court will admit the event studies at any possible damages calculation stage.  The SEC requests that the Court "[o]rder that each of the Defendants disgorge any and all ill-gotten gains."  Complaint ¶ IV, at 40.  If the jury concludes that the Defendants are liable, the Court will be required to calculate the amount to be disgorged.  See U.S. S.E.C. v. Maxxon, Inc., 465 F.3d 1174, 1179 (10th Cir. 2006).[27]  The Court concludes that event studies, or similarly concrete and quantitative measures, will be helpful in calculating the proper amount of disgorgement.

Courts have considered event studies particularly useful in calculating damages.  See Gordon Partners v. Blumenthal, No. 02 CIV 7377 LAK AJP, 2007 WL 431864, at *13 (S.D.N.Y.

--------

[27]The Tenth Circuit has not yet clarified the measure of disgorgement in civil SEC enforcement actions.  United States v. Nacchio, 573 F.3d 1080 (10th Cir. 2009), involved a criminal conviction for insider trading.  See 573 F.3d at 1064.  In that case, the Tenth Circuit examined whether the defendant would have to disgorge the net profit or gross proceeds of his insider trading offenses.  See 573 F.3d at 1088.  The defendant submitted an event study to show that only $1,832,561.00 of his total sales proceeds of $52,007,549.00 could be attributed to inside information.  See 573 F.3d at 1068.  The Tenth Circuit accepted this rationale, drawing a parallel to disgorgement in SEC enforcement cases.  See 573 F.3d at 1078 (citing S.E.C. v. MacDonald, 699 F.2d 47, 55 (1st Cir. 1983)).  Noting that the insider trading guideline commentary rejected victim loss as the proper measure of culpability, the Tenth Circuit adopted disgorgement as an "appropriate, close-fitting civil analogue."  United States v. Nacchio, 573 F.3d at 1079.  In a subsequent case, however, the United States District Court for the Northern District of Oklahoma questioned whether United States v. Nacchio is conclusive.  See S.E.C. v. Gordon, 822 F. Supp. 2d 1144, 1158 (N.D. Okla. 2011)(Eagan, J.)("Although the Tenth Circuit referenced civil disgorgement penalties when considering how to measure a defendant's 'gain,' the Tenth Circuit did not hold that net profits is the proper means to determine the amount of disgorgement in a civil case.").  The Tenth Circuit affirmed this opinion on other grounds.  See S.E.C. v. Gordon, 522 F. App'x 448, 451 (10th Cir. 2013).  In any case, an event study could be helpful in calculating damages under any theory of disgorgement.

Feb. 9, 2007)(Peck, M.J.), report and recommendation adopted, No. 02 CIV 7377 LAK, 2007

WL 1438753 (S.D.N.Y. May 16, 2007)(Kaplan, J.).  As one law review article explained:

> Over time, the majority of courts have recognized the utility of the event study methodology in the securities context and begun to require experts to include an event study with their damage report because of the need to distinguish between the fraud-related and non-fraud related influences on the stock's price behavior. Indeed, a number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar.

Jay W. Eisenhofer, Geoffrey C. Jarvis, James R. Banko, Securities Fraud, Stock Price Valuation,

and Loss Causation: Toward A Corporate Finance-Based Theory of Loss Causation, 59 Bus.

Law. 1419, 1426 (2004)(quotations and footnotes omitted).  Some courts have even required

event studies to admit expert testimony on damages.  See In re Imperial Credit Indus., Inc. Sec.

Litig., 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003)(Wilson, J.)("[A] number of courts have

rejected or refused to admit into evidence damages reports or testimony by damages experts in

securities cases which fail to include event studies or something similar."); In re Executive

Telecard, Ltd. Sec. Litig., 979 F. Supp. 1021, 1025 (S.D.N.Y. 1997)(Brieant, J.); In re N.

Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000)(Cedarbaum,

J.)("Torkelsen's testimony is fatally deficient in that he did not perform an event study or similar

analysis to remove the effects on stock price of market and industry information and he did not

challenge the event study performed by defendants' expert.").

     The only case to address this issue within the Tenth Circuit reaches similar conclusions,

although it allows for other, similar evidence.  In In re Williams Securities Litigation, 496 F.

Supp. 2d 1195 (N.D. Okla. 2007)(Friot, J.), the plaintiffs' expert witness attempted to testify

regarding damages without conducting an event study or any other study accounting for factors

other than fraud that could have affected the securities' pricing.  See 496 F. Supp. 2d at 1274.

The Honorable Stephen Friot, United States District Judge for the Western District of Oklahoma, explained the empirical base necessary to introduce expert testimony on damages:

> What is required is an event study "or something similar." [In re Imperial Credit Indus., Inc. Sec. Litig.], 252 F. Supp. 2d at 1015. This court assays, within the confines of *Daubert* and Rule 702, the methodology the expert chose to use, *Bitler* [v. A.O. Smith Corp.], 400 F.3d at 1233; it need not select the appropriate methodology. "Thus, Judge Peck did not say that summary judgment was appropriate because plaintiffs had not submitted an event study. He said that it was appropriate because plaintiffs had submitted *no evidence* on the issue of loss causation." *Gordon Partners* [v. Blumenthal], 2007 WL 1438753 at *2 (emphasis in original).

In re Williams Sec. Litig., 496 F. Supp. 2d at 1274-75. Because the parties' event studies are potentially relevant evidence of the appropriate amount of disgorgement, the Court will admit them.

## III.   THE COURT WILL ADHERE TO ITS INCLINATIONS AT THE HEARING REGARDING THE DEFENDANTS' EXPERT WITNESSES.

The Court adopts and formalizes the inclinations that it stated at the hearing. See Tr. at 7:10-14:1 (Court). It will limit Laursen, Floyd, Holder, Hilfer, and James' testimony to ensure that it is relevant, not unfairly prejudicial, and helpful to the jury. The Court restates its conclusions here to ensure clarity and to provide guidance to the parties at trial.

### A.   THE COURT WILL LIMIT SOME OF LAURSEN'S TESTIMONY.

The Court will not exclude Laursen's testimony as cumulative. See Tr. at 7:16-17 (Court). Laursen may testify regarding OTTI in general. See Tr. at 7:11-12 (Court). He may not testify that the Defendants' OTTI judgment was reasonable under GAAP or that the Defendants complied with accounting principles. See Tr. at 7:12-16 (Court).

**B.     THE COURT WILL LIMIT SOME OF HOLDER'S TESTIMONY.**

Holder may not testify that the Defendants' judgments, including their OTTI and going concern judgments, were reasonable.  See Tr. at 7:18-20 (Court).[28]  He cannot, in short, opine that the Defendants acted reasonably at any particular time.  See Tr. at 8:6-7 (Court).

**C.     THE COURT WILL LIMIT SOME OF HILFER'S TESTIMONY.**

Hilfer may not testify regarding the Defendants' judgments' reasonableness.  See Tr. at 8:19-21 (Court).  Nor may he characterize the February 27, 2008, email exchange as a rumor, because the jury does not require expert assistance on this point.  See Tr. at 11:16-21 (Court).  He may not approve the Defendants' judgment that Thornburg Mortgage had the ability to satisfy its margin calls.  See Tr. at 11:22-12:2 (Court).

**D.     THE COURT WILL LIMIT SOME OF FLOYD'S TESTIMONY.**

Floyd has sufficient experience with OTTI to serve as an expert witness.  See Tr. at 8:22-23 (Court).  He may testify that he understands what the SEC's claims are based on, but not that they are erroneous.  See Tr. at 11:4-6 (Court).  He may not state "that the SEC's claims are inconsistent with KPMG's contemporaneous determinations."  Tr. at 11:12-14 (Court).

The Court will not allow Floyd to directly criticize KPMG.  See Tr. at 9:1-2 (Court).  Floyd may not testify that KPMG had ample evidence to make informed OTTI or going concern

---

[28]The Court initially planned to allow Holder to give a broader range of opinions:

> He can say that a reasonable person could have concluded that the decline in the value of Thornburg's ARM assets, as of December 31, 2007, was not other than temporary.  He can say the defendants complied with applicable accounting standards.  Holder can say the defendants' accounting methods were reasonable.  He can opine whether an accounting judgment is reasonable, made by a reasonable person.

Tr. at 7:23-8:6 (Court).  It subsequently revised its decision, however, to ensure that its limitations applied consistently to both parties.  See Tr. at 36:10-19 (Court).

judgments, <u>see</u> Tr. at 8:24-9:1 (Court), or that it had so much information available that it could not have been misled, <u>see</u> Tr. at 9:8-11 (Court).  He may not testify that his analysis "exposes fundamental problems with the work of Reinhart and Hall."  Tr. at 9:2-4 (Court).

Floyd may attempt to dispute Kitchens' testimony, but only the issues about which the Court allows Kitchens to testify.  <u>See</u> Tr. at 9:5-6 (Court).  Floyd cannot testify that GAAS required KPMG to take any particular action, but may explain what GAAS require in general. <u>See</u> Tr. at 9:11-13 (Court).  The Court will also prevent Floyd from attacking the SEC's initial claims as erroneous or "based on an erroneous presumption."  Tr. at 9:19-21 (Court).

He may not testify on the cause of Thornburg Mortgage's stock price drop, including any speculation on the importance of Thornburg Mortgage's Form 10-K.  <u>See</u> Tr. at 9:22-25 (Court). He may testify that the stock price drop was "dramatic."  Tr. at 10:2-3 (Court).

The Court will carefully circumscribe Floyd's testimony on KPMG's restatement.  Floyd may testify that a restatement "does not always or necessarily imply weakness in controls," but must include the qualifiers "always" and "necessarily."  Tr. at 10:8-15 (Court).  He may state that "<u>a</u> restatement investigation and finding of no material weaknesses in internal controls indicates that the alleged financial statement error was outside of the design or operational effectiveness of <u>the company's</u> internal control systems."  Tr. at 10:23-11:3 (Court)(emphasis added).  He may not personalize this statement, however, by stating that <u>KPMG's</u> investigation shows that any alleged error was outside of the design or operational effectiveness of <u>Thornburg Mortgage's</u> internal control systems.  <u>See</u> Tr. at 10:15-22 (Court).  Floyd may state that a restatement suggests a material weakness, but cannot state that KPMG's restatement means that a material weakness existed here.  <u>See</u> Tr. at 11:7-11 (Court).

### E.      THE COURT WILL LIMIT SOME OF JAMES' TESTIMONY.

The Court will place similar limitations on James' ability to testify regarding Thornburg Mortgage or KPMG in particular.  James may not testify that "the financial crisis was not a single ongoing homogeneous event that gave <u>defendants</u> the ability to predict Thornburg's post-filing repo margin calls, ex ante."  Tr. at 12:3-7 (Court).  He may testify, however, that "the financial crisis was not a single, ongoing, and homogenous event that gave <u>borrowers</u> the ability to predict repo margin calls ex ante."  Tr. at 12:4-7 (Court)(emphasis added).

James may testify that "there is no reliable evidence that sub-prime ABX indices had predictive power with respect to repo margin calls," but may not apply this statement to Thornburg Mortgage in particular.  Tr. at 12:14-19 (Court).  He may discuss Thornburg Mortgage's median margin calls over various periods.  <u>See</u> Tr. at 54:1-10 (Bliss, Court).

James may not testify that there was an alternative likely explanation for the market decline on February 27, 2008, other than the hedge fund rumor.  <u>See</u> Tr. at 13:3-5 (Court).  He can state, however, that there may have been other reasons for the decline.  <u>See</u> Tr. at 13:5-7 (Court).  He can explain why the European hedge fund's collapse may have had a minimal impact on the market, but cannot testify that the Defendants' testimony that they expected the impact of the hedge fund's collapse to be minimal is or was objectively reasonable.  <u>See</u> Tr. at 13:8-12 (Court).

James may not testify that the "collateral value of the rumored collapse of an unidentified hedge fund is unscientific and unreliable," because this statement is argumentative and unhelpful to the jury.  Tr. at 12:23-25 (Court).  He may not opine on the SEC's legal theories.  <u>See</u> Tr. at 13:12-13 (Court).  He cannot opine that the collapse was not "unexpected to Goldstone and Simmons, given the emails."  Tr. at 13:19-21 (Court).

## IV.    THE COURT WILL ADHERE TO ITS INCLINATIONS AT THE HEARING REGARDING THE SEC'S EXPERT WITNESSES.

The Court adopts and formalizes the inclinations that it stated at the hearing.  See Tr. at 14:4-45:4 (Court).  It will limit Weiner's, Kitchens', and Mayer's testimony to ensure that it is relevant, not unfairly prejudicial, and helpful to the jury.  The Court restates its conclusions here to ensure its precision and provide guidance to the parties at trial.

### A.    THE COURT WILL LIMIT SOME OF WEINER'S TESTIMONY.

Weiner may testify about the credit quality of Thornburg Mortgage's MBS portfolio.  See Tr. at 23:8-10 (Court).  He may not give opinions about Thornburg Mortgage's business model or strategy.  See Tr. at 23:5-7 (Court).  Nor may he testify about Thornburg Mortgage's alleged efforts to conceal information from KPMG.  See Tr. at 23:11-12 (Court); id. at 31:24-25 (Court). He cannot testify regarding the risks associated with Thornburg Mortgage's business strategy, or state that the strategy "threatened its survivability, and contributed significantly to its demise because repo affords lenders nearly absolute power to demand capital from Thornburg."  Tr. at 23:13-19 (Court).  Weiner may, however, discuss REITs and repo agreements in general, and may state that lenders do have absolute power over such entities.  See Tr. at 23:19-24:8 (Court). He may also question the credit quality of Thornburg Mortgage's MBS portfolio.  See Tr. at 24:9-16 (Court).

Weiner may not testify that "Thornburg intentionally withheld information about margin calls and market events from KPMG."  Tr. at 24:17-19 (Court).  Similarly, he may not testify that the Defendants should have been aware of "a strong possibility of margin calls like those Thornburg received after the 10-K filing."  Tr. at 24:22-25 (Court).  Nor may he state that Thornburg Mortgage was "still in trouble" around that time frame.  Tr. at 25:1-3 (Court).  He

may not testify that the Defendants' actions departed from the standards applicable to REIT executives in making OTTI judgments and decisions.  See Tr. at 25:8-14 (Court).

Weiner may testify about repo lender practices during the financial crisis and "the dangers inherent in using repo financing."  Tr. at 25:16-21 (Court).  He can testify regarding how MBS repo borrowers typically evaluated the risk of future margin calls.  See Tr. at 25:18-19 (Court).  He cannot, however, discuss the "significance of Thornburg not meeting repo calls fully and in a timely manner."  Tr. at 25:22-25 (Court).  He may make the same statement generally, discussing the missed margin calls' significance to "a borrower."  Tr. at 26:6-10 (Court).  He may testify generally about the foreseeability of repo margin calls for any borrower, but cannot make any reference to the foreseeability of Thornburg Mortgage's repo calls.  See Tr. at 26:6-10 (Court).  He may testify generally, but not specifically, about the disproportionate and near absolute power that repo lenders wield over borrowers.  See Tr. at 26:11-15.  He may describe repo lending as a "potentially unstable funding source" and describe the "dangers of using leverage," but cannot state that either method "contributed significantly" to Thornburg Mortgage's demise.  Tr. at 26:16-27:3 (Court).

Weiner may testify that, "in distressed markets," repo borrowers "cede control" over the fate of the relevant repo collateral.  Tr. at 27:5-11 (Court).  He cannot, however, simply criticize Thornburg Mortgage's business model.  See Tr. at 27:4-5 (Court).  Weiner may testify that "[t]he general negativity and increased focus on potential problems in the non-subprime portions of the non-Agency mortgage market would ultimately affect security valuations and the terms under which repo lender would be willing to finance Alt-A mortgage securities," provided that he does not reference Thornburg Mortgage specifically.  Weiner Report at 49.  See Tr. at 27:12-22

(Court).  He may not opine that Thornburg Mortgage subjected investors to "unreasonable risk." Tr. at 27:23-24 (Court).

Weiner may testify that the REITs were highly vulnerable to a downturn, but may not testify that Thornburg Mortgage was vulnerable.  See Tr. at 28:2-4 (Court).  He may also state that "experienced and sophisticated market participants would have had knowledge of [prior fund failures], and, consequently, of the dangers inherent in the use of short-term reverse repo agreements."  Weiner Report at 27.  See Tr. at 28:16-19 (Court).

Weiner may discuss the collapse of three hedge funds over a thirteen-year period leading up to the financial crisis.  See Tr. at 28:20-21 (Court).  He must admit that the funds are disparate and distinguishable on direct examination.  See Tr. at 28: 22-25 (Court).  This qualification on his testimony on direct must include a statement that the other funds were more leveraged than Thornburg Mortgage and "did not have the same high quality MBS as repo collateral."  Tr. at 29:2-4 (Court).  Weiner may not opine that the Defendants should have recognized the danger that Thornburg Mortgage would suffer the same fate as the hedge funds.  See Tr. at 29:6-10 (Court).

Weiner must carefully word his testimony on delinquencies.  He may testify that the January and February 2008, data, which were available at the time of the 10-K filing, showed that the collateral was not uniformly exceptional in quality.  See Tr. at 30:10-12 (Court).  He may not state, however, that the delinquencies showed that "the quality of Thornburg's 'Purchased ARM Assets,' financed by reverse repurchase agreements, was not nearly as uniformly 'exceptional' as the Company repeatedly asserted."  Weiner Report at 29.  See Tr. at 30:13-19 (Court)("So he can talk about the collateral, but he doesn't need to get into criticizing statements

by Thornburg's people.").  Weiner must admit on direct "that delinquency trends cannot be used to predict either actual losses or trends in MBS prices."  Tr. at 30:20-22 (Court).

Weiner may not testify that "certain of Thornburg's MBS suffered downgrades and principal losses months and years after the Form 10-K filing."  Tr. at 30:24-25 (Court).  Weiner may question Patrick Feldman's[29] 2008 analysis, "if there is evidence that the defendants saw it."  Tr. at 31:2-3 (Court).  If such evidence exists, Weiner can attack "Feldman's conclusions that the Alt A bond analyzed would not sustain a principal loss" on the ground that he "should have used more regular functions about future delinquencies."  Tr. at 31:5-9 (Court).  He may also state "what assumptions Feldman should have used, and whether using more negative assumptions would have made a difference."  Tr. at 31:5-12 (Court).  If he did not perform that analysis, the Court will exclude the testimony.  See Tr. at 31:12-13 (Court).  Weiner may testify that Feldman's analysis of the pool shows that the "fundamentals indicated cause for concern."  Tr. at 31:14-16 (Court).

Weiner may not testify regarding the "I/O Strip Transactions: Representations to KPMG."  Weiner Report at 49-50.[30]  He may discuss the European hedge fund's collapse, but cannot comment on related emails.  See Tr. at 32:7-10 (Court).  As a general matter, he may not characterize any of Thornburg Mortgage's omissions to KPMG -- including the alleged "lack of

---

[29]Patrick Feldman, a Senior Vice President and Senior Portfolio Manager for Thornburg, corresponded with the Defendants in this matter.  See Email from Clay Simmons to Patrick Feldman and Larry Goldstone (dated February 27, 2008), filed May 21, 2012 (Doc. 37-20).

[30]The Court allowed the SEC the opportunity to object to this ruling at the hearing.  See Tr. at 32:1-6 ("I don't understand what is meant by the complete nature of I/O strip financing transactions.  So since I don't quite understand it, I'm inclined to exclude it.  But perhaps that's an area that you can come back on.").  The SEC did not address the topic in the rest of the hearing.  Moreover, the Court believes that the jury would have difficulty understanding Weiner's opinion on this particular point, as the Court has struggled to understand his opinion.

disclosure to KPMG," "margin call problems," "the complete nature of the I/O strip sales," and the rumored collapse of the European hedge fund.  Tr. at 32:11-19 (Court).

Weiner may not testify about the foreseeability of any margin calls.  See Tr. at 32:20-21 (Court).  He must not testify that the margin calls which prompted Thornburg Mortgage's restatement "were not isolated or unforeseeable events," but were instead "the product of forces already in evidence as early as the second half of 2006."  Tr. at 33:1-3 (Court).  Nor may he testify that the Defendants should have recognized "a strong possibility" that the "Alt A market would decline further, and that Thornburg would be subject to additional margin calls after February 8, 2008."  Tr. at 33:4-9 (Court).

As to the European hedge fund, Weiner may testify regarding the risks caused by the rumored hedge fund collapse in general.  See Tr. at 33:12-14 (Court).  He may not testify that the risk associated with the collapse of the European hedge fund could "possibly trigger more margin calls as to Thornburg."  Tr. at 33:14-17 (Court).

Weiner may not testify "that the eventual decline of the MBS markets [was] foreseeable." Tr. at 34:3-4 (Court).  He can testify regarding the size of the markets, but cannot testify that it was reckless or negligent for Thornburg Mortgage, or other MBS investors, to have made the same predictions that others made.  See Tr. at 34:5-11 (Court).  Weiner may note that two Wall Street investment banks predicted further deterioration in certain areas of the MBS markets.  See Tr. at 34:12-14 (Court).  He can also point to contrarian investments by Goldman Sachs and two hedge funds based on predictions that the mortgage markets would decline.  See Tr. at 34:15-18 (Court).  Weiner may not testify that the Defendants "should have anticipated the margin calls that Thornburg received after the 10-K filing based either on the 2011 FCIC reports, the two analyst reports, or the predictions of three investors who took contrarian positions."  Tr. at 34:19-

24 (Court).  Nor may he testify about the 2011 FCIC report.  See Tr. at 34:25-25:1.  Weiner may

discuss the two analysts' reports and the three contrarian investors' positions in general.  See Tr.

at 35:2-7 (Court).

Weiner may speak generally about the dire market conditions in March 2008.  See Tr. at

35:13-14 (Court).  He may discuss worldwide and national events that occurred during March.

See Tr. at 35:18-20 (Court).  He may not discuss either conditions or events as they relate to

Thornburg Mortgage.  See Tr. at 35:8-14 (Court).   He may not opine about the "override

agreement" or the capital raise in late March, 2008.  Tr. at 35:10-12 (Court).  He also cannot

testify "that repo lenders' behavior in March 2008 resembled their behavior in February 2008."

Tr. at 35:15-17 (Court).  Weiner may not specifically discuss the agreements that Thornburg

Mortgage reached in March, 2008.  See Tr. at 50:15-51:25 (Court, Kasper).[31]

## B.    THE COURT WILL LIMIT SOME OF KITCHENS' TESTIMONY.

Kitchens can explain the concept of a Type I margin call to the jury, but cannot opine that

the Defendants deceived KPMG or that the margin calls that Thornburg Mortgage received in

January and February were Type I.  See Tr. at 36:1-6 (Court).  He cannot opine that the

Defendants' and KPMG's OTTI judgments were incorrect or unreasonable, or that KPMG

determined that the Defendants' OTTI judgment was incorrect.  See Tr. at 36:7-10 (Court).  He

may not state that the Form 10-K contained material misrepresentations and that the restatement

was correct.  See Tr. at 36:16-19 (Court).

"The Court will exclude Kitchens' opinions about auditor deception that are specific to

Thornburg."  Tr. at 36:20-22 (Court).  Kitchens may, however discuss auditor deception

generally.  See Tr. at 36:22-23 (Court).  Although Kitchens may discuss national or worldwide

_____

[31]The Court concludes that expert testimony on this point is unnecessary.  The SEC may
inquire into these agreements' terms on cross-examination.

events, he cannot discuss events particular to Thornburg Mortgage.  <u>See</u> Tr. at 36:23-37:1 (Court).  Similarly, he may discuss "OTTI generally, but not Thornburg's OTTI."  Tr. at 37:2-3 (Court).  He may discuss restatements in general, but not the restatement in this particular case. <u>See</u> Tr. at 37:4-6 (Court).  He can discuss the concept of a reasonable auditor in light of GAAP, but cannot testify regarding the Defendants' adherence to GAAP or Thornburg Mortgage's OTTI judgment.  <u>See</u> Tr. at 37:7-10 (Court).

Kitchens may not testify that the Form 10-K "contained material misstatements" and that the decision to issue a restatement "was correct."  Tr. at 37:19-21 (Court).  Kitchens may not discuss "auditor deception in this case."  Tr. at 37:22-24 (Court).  He may not testify that the Defendants "deceived KPMG" by "withholding material information."  Tr. at 38:15-18 (Court). Nor may he examine documents, quote from them, and conclude that they are "indicia of fraud." Tr. at 38:1-2 (Court).

Kitchens may not discuss Thornburg Mortgage's "severe liquidity crisis."  Tr. at 38:3-4 (Court).  For example, he cannot note that, on February 26, 2008, Thornburg Mortgage had forty million dollars of cash on hand.  <u>See</u> Tr. at 38:4-6 (Court).  He cannot quote Thornburg Mortgage's Form 10-K.  <u>See</u> Tr. at 38:8 (Court).  He cannot opine that evidence of "dire consequences to come existed on February 27-28, 2008."  Tr. at 38:9-11 (Court).  Nor can he testify that the margin calls after Thornburg Mortgage's 10-K filings were "somehow foreseeable."  Tr. at 38:12-14 (Court).  He may not testify that the Defendants misled KPMG about material issues.  <u>See</u> Tr. at 38:19-21.

Kitchens cannot testify that "the margin call schedules were insufficient to disclose Thornburg's delayed payments of margin calls."  Tr. at 39:2-5 (Court).  Although he can discuss audits in general, he cannot decide for the jury that KPMG was misled here.  <u>See</u> Tr. at 39:9-12

(Court).   Kitchens may not opine that the Defendants' failure to provide KPMG with the Citigroup Global research, including the "reservation of rights letter" and the "complete information regarding margin calls," was materially deceptive, because "any reasonable auditor would have wanted to know about them."  Tr. at 39:17-23 (Court).  Nor may he testify that the Defendants were required to provide KPMG with all of the information about which it would have wanted to know.  See Tr. at 40:1-2 (Court).  Specifically, he cannot testify that the Defendants "were obliged to disclose to KPMG the rumor about the European hedge fund's impending collapse."  Tr. at 40:4-6 (Court).  He may testify, however, about what an auditor would want to know in general.  See Tr. at 39:23-24 (Court).

Kitchens cannot characterize the reports of the European hedge fund collapse as "more than a rumor."  Tr. at 40:7-8 (Court).  Although he can discuss the markets' knowledge of the collapse, he cannot examine the emails and determine whether KPMG or Thornburg Mortgage considered it to be more than a rumor.  See Tr. at 40:9-13 (Court).  Accordingly, he cannot opine that Simmons found the European hedge fund news in an email to be "sufficiently important and specific enough" to cause him to "anticipate a protracted regular impact."  Tr. at 41:3-7 (Court).

Kitchens also cannot "testify that the Citigroup letter conveyed no information to KPMG that KPMG did not already know when it concluded Thornburg had not committed fraud."  Tr. at 40:15-18 (Court).   He cannot provide any auditor deception opinions or make credibility determinations.  See Tr. at 40:19-25 (Court).

The Court will exclude "most, if not all, of Kitchens' subsequent events opinions that related specifically to Thornburg."  Tr. at 41:12-14 (Court).  Kitchens may explain the definition of a Type I event, but cannot argue that the margin calls that Thornburg Mortgage received in January and February of 2009 were Type I events.  See Tr. at 41:12-20 (Court).  Kitchens may

not testify that "the margin calls in the subsequent events period were evidence of conditions that existed on December 31, 2007; i.e., were part of a continuous pattern that spanned the balance sheet date, as opposed to the result of a new market condition that arose after the balance sheet date." Tr. at 42:21-43:2 (Court). Although Kitchens may "opine on the state of MLS markets at the time," he may not "testify whether the severe dislocation in the Alt A market began on February 14, 2008. He can just go through the events and talk about them." Tr. at 42:3-7 (Court). Kitchens cannot testify that Thornburg Mortgage's "ability to hold" assessment was as of the date of the Form 10-K filing -- February 28, 2008 -- rather than the balance sheet date -- December 31, 2007. Tr. at 42:8-12 (Court). Similarly, he may not testify that the full magnitude of the 1.1 billion-dollar margin calls that Thornburg Mortgage received between December 31, 2007 and February 27, 2008 were material Type I subsequent events. See Tr. at 42:13-18 (Court). The Court will exclude his testimony regarding subsequent events unless he can address "generally national and world conditions." Tr. at 42:19-21 (Court). Kitchens may testify regarding OTTI generally, but cannot provide OTTI opinions that are particular to Thornburg Mortgage. See Tr. at 42:22-24 (Court).

Kitchens may explain that he did not mean to draw any distinction between "expected" and "probable" under GAAP. Tr. at 43:2-3 (Court). He may also explain that he would use the term "likely" in the same context as "probable." Tr. at 43:4-6 (Court). He may opine about the movements and predictability of the Alt A market. See Tr. at 43:7-8 (Court). He may not testify, however, that Thornburg Mortgage should have recognized an OTTI, because it did not "control the ability," or "have the positive intent and ability to hold assets to recognition." Tr. at 43:9-13 (Court).

Kitchens may testify that "objective factors weigh more heavily than subjective factors in the OTTI analysis, for obvious reasons; i.e., they are more tangible and more subject to auditable procedures and independent evaluations."  Tr. at 43:15-19 (Court).  He may not testify that, given the "proximity of post-filing events to the Form 10-K filing," there was a "presumption" that "management should have been aware of, or at least should have considered the potential that there was a reasonable chance" that Thornburg Mortgage could have "faced margin calls in excess of its ability to meet them."  Tr. at 43:20-44:4 (Court).

Kitchens may not testify that the Defendants violated their duties by failing to "thoroughly analyze or quantify the chances of losses after hearing a rumor about the potential collapse of the European hedge fund."  Tr. at 44:5-9 (Court).  The Court will exclude his OTTI and restatement opinions as the Court understands them.  See Tr. at 44:10-15 (Court).  He may testify, however, that KPMG "properly applied AU 561[32] in disclosing that a restatement was necessary."  Tr. at 44:16-18 (Court).  Kitchens may also discuss AU 561 and quote it to the jury. See Tr. at 44:19-20.  He may not opine that "KPMG made the right decision after learning that, following the Form 10-K filing, Thornburg had received $150 million of margin calls, but $50 million of repo agreements that it could not pay off" and had received "a notice of default from JP Morgan Chase."  Tr. at 44:20-25 (Court).  Kitchens cannot, however, testify that KPMG's restatement decision "was proper."  Tr. at 45:3-4 (Court).

---

[32]AU 561 is an auditing standard promulgated by the Public Company Accounting Oversight Board covering situations in which an "auditor who, subsequent of the report of upon audited financial statements, becomes aware that facts may have existed at that date which might have affected the report had he or she been aware of such facts."  AU § 561, Subsequent Discovery of Facts Existing at the Date of the Auditor's Report, Public Company Accounting Oversight Board (2004).

C.       THE COURT WILL LIMIT SOME OF MAYER'S TESTIMONY.

The Court will not exclude Mayer's opinions in their entirety.  See Tr. at 14:8-9 (Court).

Mayer may testify that the financial crisis was ongoing as of February 27-28, 2008.  See Tr. at

14:9-11 (Court).   He cannot state that Thornburg Mortgage knew that the financial crisis was

ongoing.   See Tr. at 18:22-24 (Court).   Mayer cannot testify that the collapse was "not

unexpected."  Tr. at 15:7-8 (Court).  He may state that "the ABX indices drop . . . was known

before the filing of Thornburg's Form 10-K," but not that the drop "was known to Thornburg."

Tr. at 14:11-17 (Court).   Similarly, he may state that the European hedge fund's collapse was

known, but cannot state that it was known to Thornburg Mortgage.  See Tr. at 15:12-14 (Court).

He may testify on these facts in general, but cannot cite them as problems with Thornburg

Mortgage's March 4, 2008 memorandum.  See Tr. at 19:8-11 (Court).  He may not state that

Thornburg Mortgage's margin calls were foreseeable.  See Tr. at 15:15-16 (Court).  He may not

testify that the Defendants "should have expected the worst following the filing of the 10-K."

Tr. at 15:17-19.  In general, he cannot opine that the Defendants were aware of certain events.

See Tr. at 14:17-20 (Court).  He may opine that "the ABX volatility was not new."  Tr. at 14:20-

21 (Court).  He may present the chart on page 28 of his Report, which lists the total number of

margin calls by month.  See Tr. at 53:10-17 (Bliss, Court)("Let Mayer do that.  And just leave it

at that without comment.").

Mayer may not opine about problems with: (i) "Thornburg's explanation for why it was

unnecessary to include OTTI and going concern qualifications in the 2007 Form 10-K"; or (ii)

Thornburg Mortgage's March 4, 2008, memorandum to KPMG.  Tr. at 14:22-15:2 (Court).  "He

cannot criticize the reason stated by Thornburg in the memo; that it was given to KPMG hours

before the restatement for not recognizing an OTTI, and including a going concern qualification

in its 2007 financial statement." Tr. at 15:2-6 (Court).  Nor may he cite Thornburg Mortgage and the Defendants' admissions.  See Tr. at 15:20-21 (Court).

Mayer may not "opine on Thornburg's reliance on anything" or "point to the emails."  Tr. at 15:23-24 (Court).  "He cannot attack Thornburg's reasons for not recognizing an OTTI and including a going concern."  Tr. at 15:25-16:2 (Court).  Mayer may not comment on "Thornburg's relationship with its repo lenders" or "the risk associated with Thornburg's business model."  Tr. at 16:5-8 (Court).  He cannot state that Thornburg Mortgage should have better managed its liquidity "as a matter of good business practice."  Tr. at 21:13-15 (Court).  He may comment, however, about the credit quality of Thornburg Mortgage's portfolio to rebut the Defendants' planned testimony.  See Tr. at 16:9-16 (Court).  He may testify as to Thornburg Mortgage's average margin calls for different periods.  See Tr. at 53:18-54:6 (Bliss, Court).  He may also describe the REIT business model in general, including its operations and risks.  See Tr. at 20:22-25 (Court).

Mayer may not discuss the Defendants' "supposed deception of KPMG, the foreseeability of margin calls Thornburg received after the filing of its Form 10-K," or "that the ongoing nature of the financial crisis would have led defendants to expect the worst would follow after the filing of Form 10-K."  Tr. at 16:17-23 (Court).  Mayer may not criticize "certain statements in the memorandum that the company prepared on March 4 . . . setting forth the company's rationale for not recognizing an OTTI, and including a going concern qualification in its 2007 financial statements."  Tr. at 17:4-9 (Court).  For example, he may not state that Thornburg Mortgage "misused facts or misapplied GAAP."  Tr. at 17:9-10 (Court).

The Court will not allow Mayer to testify, in a conclusory manner, that "the combined OTTI and going concern disclosures would have materially affected Thornburg's stock prices if

they had been included in the 2007 Form 10-K."  Tr. at 17:11-14 (Court).  Mayer may state that

the drop in the ABX indices was known, but he may not link that drop to Thornburg Mortgage's

situation before the Form 10-K filing.  See Tr. at 18:8-10 (Court).  Similarly, he cannot state that

"Thornburg had insufficient liquidity before the 10-K filing to meet margin calls."  Tr. at 18:14-

16 (Court).  He certainly cannot testify that the Defendants believed that Thornburg Mortgage

had insufficient liquidity and that they would receive additional margin calls after the 10-K

filing.  See Tr. at 20:17-20 (Court).

Mayer cannot testify that Thornburg Mortgage personnel knew about the decline in the

ABX indices before the 10-K filing.  See Tr. at 19:12-14 (Court).  He may state that the ABX

indices "could be used to predict pricing for a portfolio" without mentioning Thornburg

Mortgage specifically.  Tr. at 19:15-18 (Court).  He may not state that "the possibility of a large

price change was well supported by prior events."  Mayer Report at 30.

Mayer may not "offer his own calculations whether Thornburg had adequate liquidity as

of February 28, 2008."  Tr. at 21:18-20 (Court).  He may not, for example, compare a version of

Thornburg Mortgage's liquidity report, which was circulated on February 28, 2008, to the largest

single day sum of margin calls that Thornburg Mortgage received in January or February 2008.

See Tr. at 21:21-25 (Court).  He cannot use that comparison to state that, "if Thornburg had

received the margin calls the day of the March 4 report in amounts equal to the largest margin

calls during January and February 2008, that . . . 'Thornburg would have run out of liquidity that

day.'"  Tr. at 22:1-5 (Court).  Similarly, he cannot compare Thornburg Mortgage's liquidity

report to the "average of daily margin calls for February 1 and February 27, 2008," to conclude

that Thornburg Mortgage did not have enough liquidity to last much more than a week.  Tr. at

22:8-12 (Court).

**V.      THE COURT WILL GRANT THE SEC'S MOTION TO STRIKE ERRATA THAT MODIFY THE DEFENDANTS' EXPERT WITNESSES' TESTIMONY.**

The Defendants do not dispute that they are not correcting transcription errors.  See MTS Response at 1-10.  None of the Defendants' proposed changes would be permissible under the strictest line of cases.  See Greenway v. Int'l Paper Co., 144 F.R.D. at 325 ("Should the reporter make a substantive error, i.e., he reported 'yes' but I said 'no,' or a formal error, i.e., he reported the name to be 'Lawrence Smith' but the proper name is 'Laurence Smith,' then corrections by the deponent would be in order.")(emphasis added).   The application of the three Franks v. Nimmo factors, however, may lead to a different outcome.  The first two factors are identical across all of the proposed changes.  The SEC agrees -- and the Defendants do not dispute -- that Laursen and James, like the deponents in Burns v. Board of County Commissioners of Jackson County, were subject to cross-examination.   See MTS Reply at 2-3; Response at 1-10 (not disputing this fact); Burns v. Bd. of Cty. Comm'rs of Jackson Cty., 330 F.3d at 1282 ("First, Burns was cross-examined at his deposition.").   The Defendants have not presented, or even mentioned, any new evidence.  See Response at 1-10; Burns v. Bd. of Cty. Comm'rs of Jackson Cty., 330 F.3d at 1282 ("Second, Burns's corrections were not based on any newly discovered evidence.").   The remaining question, which must be answered on a case-by-case basis, is whether the testimony reflects "obvious confusion -- as opposed to indecisiveness or inconsistency -- that the corrections would . . . clarify."   Burns v. Bd. of Cty. Comm'rs of Jackson Cty., 330 F.3d at 1282.

**A.      THE COURT WILL NOT ALLOW CORRECTION 1: LAURSEN TR. AT 161:13.**

The Court will grant the MTS as to the Defendants' first proposed correction, which attempts to change Laursen's testimony that he "didn't view looking at those sort of tails" as

appropriate into a statement that Laursen "didn't view applying those sort of tails" as appropriate.  Laursen Tr. at 157:15-161:12.  The original version indicates that Laursen did not even consider examining certain tails, while the revised version indicates that he did not consider applying them, but may have examined them.  This change is material, because whether Laursen examined these tails is relevant to the strength of his testimony and the SEC's overall OTTI case.  Unlike the change in Larson v. Chase Manhattan Mortgage Corp., which added a "legal interpretation" to a factual statement, this change substantially alters the testimony's meaning.  2006 WL 2375611, at *2.  If the Defendants believe that the SEC is unfairly interpreting Laursen's statement, they may use the surrounding deposition transcript to contextualize it at trial.

**B.      THE COURT WILL ALLOW CORRECTION 2: LAURSEN TR. AT 162:14.**

The Court will deny the MTS as to the Defendants' second proposed alteration, which attempts to change Laursen's statement that "you can extrapolate a trend on one thing" to "you can blindly extrapolate a trend on one thing."  Laursen Tr. at 161:16-162:20.  The context surrounding the passage makes it clear that Laursen is rejecting the premise that, "if things are trending up at a certain amount, you can reasonably consider them to continue to trend up for the foreseeable future."  Laursen Tr. at 161:21-162:2.  The same paragraph within Laursen's testimony ends with the statement that there is "no necessary reason why you would just expect the trend to continue in any given direction."  Laursen Tr. at 162:18-20.  The Court does not fully understand why the Defendants seek to make this change -- it seems unnecessary based on the surrounding statements.  If anything, "the new statements . . . create rather than reduce confusion."  Larson v. Chase Manhattan Mortgage Corp., 2006 WL 2375611, at *3.  Nonetheless, the Court concludes that this statement is not a "material" change that the Tenth

Circuit prohibits and concludes that it does not "substantially qualify" Laursen's other statements.  BancFirst ex rel. Estate of M.J.H. v. Ford Motor Co., 422 F. App'x at 666.

### C.    THE COURT WILL NOT ALLOW CORRECTION 3: LAURSEN TR. AT 167:12.

The Court will grant the MTS as to the Defendants' third proposed correction, which seeks to change Laursen's statement "really bad things or really good things happening" to "really bad things or really good things that may happen."  Laursen Tr. at 167:11-20.  The word "happening" describes an ongoing condition, while the phrase "that may happen" indicates a possibility that events may occur in the future.  Given that Laursen is analyzing the Defendants' accounting judgments, this substantive change to his testimony is material.  Despite the Defendants' contention, see MTS Response at 7, the sentence is logical without the correction. The Defendants may not "return home and plan artful responses" to questions, nor may they "alter what was said under oath."  Garcia v. Pueblo Country Club, 299 F.3d at 1242 n.5.

### D.    THE COURT WILL NOT ALLOW CORRECTION 4: LAURSEN TR. AT 262:10.

The Court will grant the MTS as to the Defendants' fourth proposed revision, which transforms "I don't know" into "I don't know that I agree."  Laursen Tr. at 262:4-10.  A statement that a deponent lacks knowledge is fundamentally different from a statement that he does not agree with the questioner's point.  The SEC's question, which asked whether financial statements that are restated are ultimately presented correctly, is not "an extraordinarily incomplete hypothetical."  MTS Response at 6-7.  Whether Laursen could answer this question bears on the weight to be given to his testimony and his assessment of the Defendants' decisions. The Defendants' citation to Porter v. W. Side Rest., LLC is not on point, because that case allowed a clarification in response to "a compound question" when the deponent's answer

"reflect[ed] confusion" on precisely which question he was answering.  2014 WL 1642152, at *4.  That case also noted that the revised response contained content "consistent with" the deponent's other testimony, which described a specific factual issue rather than an opinion.  2014 WL 1642152, at *4.

### E.   THE COURT WILL NOT ALLOW CORRECTION 5: LAURSEN TR. AT 289:4-5.

The Court will grant the MTS as to the Defendants' fifth proposed correction, which changes Laursen's estimate of Thornburg Mortgage's unencumbered assets from "4 or 500,000" to "$150 million."  Laursen Tr. at 289:3-5.  Given that the amount of Thornburg Mortgage's unencumbered assets on or about February 21, 2008, is important to a variety of issues in this case, this change is material.  The dramatic difference between the two figures shows that this revision is precisely the sort of substantive change that the Tenth Circuit prohibits.  The questioner does not ask Laursen the same question three times -- the transcript shows that each preceding question had distinct content and could have been answered in a different way.  See Laursen Tr. at 288:2-19.  Laursen did not directly answer the last question, so the questioner rephrased it to make it clearer.  See Laursen Tr. at 288:20-289:2.  There is no evidence that the question's content confused Laursen.  Laursen is not like the deponent in Grimes v. Fox & Hound Restaurant Group, who could not determine whether his question concerned "the timing of the decision to terminate Plaintiff" or the "timing of the actual termination."  984 F. Supp. 2d at 1137.  The Defendants have not set out an alternate question that Laursen could have been answering.  Boyd v. Home Depot, Inc. does not help the Defendants here, as the deponent in that case made her changes during a single deposition and after reviewing photographs that "refreshed" her recollection.  2013 WL 394187, at *3.  The district court there specifically noted

that her deposition was "more than two years" after she took the photographs.  2013 WL 394187, at *3.  Laursen does not have a similar excuse for his supposed error.

### F.   THE COURT WILL NOT ALLOW CORRECTION 6: JAMES TR. AT 38:25.

The Court will grant the MTS as to the Defendants' sixth proposed revision, which changes James' statement that M[a]Kinl[a]y's econometrics text deals with confounding information related to going-concern disclosures in a "litigation context" to a statement that the text dealt with the issue in a "nonlitigation context."  James Tr. at 34:23-25.  This change is material, as it affects James' credibility and his familiarity with work in the field that may contradict his own conclusions.   The Defendants do not argue that James was confused or that the question suggested a different answer.  See MTS Response at 10.  The change thus fails to satisfy the final requirement that Burns v. Board of County Commissioners of Jackson County set out.   Moreover, the Defendants' characterization of James' testimony as a "non-material technical error" could potentially convert every incorrect statement in a deposition transcript into an error, as the Court would have no way to distinguish between an error and an incorrect response.  MTS Response at 9.  "A deposition is not a take home examination," and a party may not take a transcript home to double-check its expert witnesses' references to the literature.  Greenway v. Int'l Paper Co., 144 F.R.D. at 325.

### G.   CORRECTION 7: JAMES TR. AT 183:24.

The Court will grant the MTS as to the Defendants' seventh proposed modification, which results in testimony that the yield curve is shifting "down" instead of "up."  James Tr. at 183:19-24.  The Defendants do not explain that this error was immaterial, see MTS Response at 10, and the Court concludes that it alters the substance of James' testimony on a key point.  The Defendants acknowledge that this was not a transcription or spelling error, instead arguing that

James merely misspoke.  See MTR Response at 10.  There is no indication that James was confused at the time.  See James Tr. at 183:19-24.  As with the Defendants' other modification to James' testimony, this change fails the test that Burns v. Board of County Commissioners of Jackson County establishes.

Although the Court's rulings may seem strict to the Defendants, it is merely applying the Tenth Circuit law as it understands it.  Moreover, the Defendants have other ways to make the same arguments on all of their proposed changes.  They may clarify their deponents' testimony and correct any errors by either calling the deponents as witnesses and having them explain the errors or pointing to surrounding parts of the transcript to provide additional context.  See Radian Asset Assur., Inc. v. Coll. of Christian Bros. of New Mexico, 2010 WL 5173316, at *4.

**IT IS ORDERED** that: (i) Plaintiff Securities and Exchange Commission's Motion to Exclude and/or Limit Testimony of Christopher Laursen, Joseph J. Floyd, William W. Holder, Steven M. Hilfer, and Christopher M. James, filed May 9, 2014 (Doc. 291); (ii) the Defendants' Motion to Exclude the Proffered Expert Testimony of Lawrence Weiner, Dale Kitchens, and Michael Mayer, filed May 9, 2014 (Doc. 292); and (iii) Plaintiff Securities and Exchange Commission's Motion to Strike Errata Changing Testimony of Defendants' Proposed Experts Christopher Laursen and Christopher James, filed June 2, 2014 (Doc. 300), are granted in part and denied in part, as the Court has specified in the body of this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
   United States Attorney
Michael H. Hoses
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

         *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Robert G. Badal
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

    *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Paul M. Torres
Robert J. Liubicic
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

    *Attorneys for Defendant Jane E. Starrett*