# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.                                                               No. CIV 12-0257 JB/LFG

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff Securities and Exchange Commission's Motion in Limine Regarding KPMG, filed March 17, 2016 (Doc. 390)("Motion"). The Court held a hearing on May 11, 2016. The primary issues are whether the Court should allow the Defendants[1] to argue and introduce evidence that KPMG, the Defendants' former outside auditor: (i) had ample evidence to make informed OTTI[2] and going-concern judgments; (ii) performed a sub-standard audit, when a normal audit could have discovered and possibly prevented the Defendants' alleged fraud; (iii) was subject to Plaintiff Securities and Exchange

---

[1]Defendant Jane Starrett reached a settlement with Plaintiff Securities and Exchange Commission after the hearing on the Motion. See Transcript of Hearing at 3:10-12 (Marks)(taken May 20, 2016). The Court's references to the "Defendants" refer to all three Defendants solely for the purpose of this Memorandum Opinion and Order. The Court's citations to all transcripts refer to the court reporter's original, unedited versions; any final versions may contain slightly different page and/or line numbers.

[2]An "impairment" is a "reduction in a company's stated capital." Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013). An other-than-temporary-impairment ("OTTI") is an accounting designation that indicates that an entity does not expect to recover the asset's full value. See Other than temporary impairment (OTTI), NASDAQ: Financial Glossary (last visited May 30, 2016).

Commission ("SEC") and Public Company Accounting Oversight Board ("PCAOB") investigations; or (iv) concluded, in its Restatement, that Thornburg Mortgage, Inc.'s management did not commit fraud and that its internal controls over financial reporting had no material weakness.  The Court concludes that the SEC's proposed limits on the Defendants' testimony would de-contextualize KPMG's actions and that the jury must determine their significance.  The Defendants cannot make arguments inconsistent with the Court's legal rulings, but the Court will not preclude the Defendants from introducing evidence that may show both that KPMG had all it needed or was incompetent, because the same evidence may show that the Defendants neither defrauded or intended to defraud KPMG.  The risk of excluding relevant evidence is too great for the Court to pick and choose what might fit into a prohibited category and what might be in an allowed category.  The Court will, however, allow the SEC to introduce evidence on its Enforcement Cooperation Program if the Defendants open the door by implying or suggesting that KPMG has reached a secret cooperation agreement with the SEC, or reached some form of agreement with the SEC.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1).  The Court presents the facts solely to provide context for the Motion.  It continues to adhere to the decisions on the facts it reached in its Unsealed Memorandum Opinion and Order, filed August 22, 2015 (Doc. 371)("Summary Judgment MOO").

The Defendants are former officers of Thornburg Mortgage: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1).

The SEC alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[3]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[4]  Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo"[5] ARM securities; Thornburg Mortgage also purchased

---

[3]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[4]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index."  Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

[5]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/

ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out

most of its earnings in dividends, and obtained financing for its mortgage and investment

business through reverse repurchase agreements[6] backed by ARM securities.  See Complaint ¶ 3,

---

wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that the
Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage
Corporation ("Freddie Mac") set.  Super jumbo mortgage, Wikipedia.  Fannie Mae purchases
and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia,
http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Both Fannie
Mae and Freddie Mac are government-sponsored enterprises, that is, financial services
corporations that the United States Congress created.  See Fannie Mae, Wikipedia,
http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia,
http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored
Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last
updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee
between 40 to 60% of all mortgages originated in the United States annually, depending upon
market conditions and consumer trends."  Fannie Mae, Investopedia.  The conforming limits that
Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and
2014 for most of the United States (including all of New Mexico) is $417,000.00.  See FHA
Announces Conforming Loan Limits for 2014, released November 26, 2013,
http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  Higher-value areas, such as the
District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces
Conforming Loan Limits for 2014, released November 26, 2013,
http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are
loans that exceed the local conforming loan limit and have higher interest rates, because of the
increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013),
http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined
or regulated, but mortgage companies use it internally and independently to set loan parameters.
See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular
lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage,
Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie
Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie
Mae, Wikipedia; Freddie Mac, Wikipedia.

[6]A "repurchase agreement" is a "short-term loan agreement by which one party sells a
security to another party but promises to buy back the security on a specified date at a specified
price.  Often shortened to repo."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed.
2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the
buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23,

at 2.   Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare

---

2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of

[the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[7] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies,

---

[7]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."  Interest Only (IO) Strips, Investopedia (Apr. 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

having "'sold some additional IO securities[.]'"   Complaint ¶ 68, at 20 (quoting Email from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"   Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple

one, meaning all margin calls have been met.'"   Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing. See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.[8]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")).   Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be

---

[8]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."   Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).   An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.   Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.   Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."   Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.   The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.   See Bond credit rating, Wikipedia. "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."   AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Email from

Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2,

sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008

Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an email to Starrett, in

which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline

to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40,

at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent

February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008

Simmons/Starrett Email")).

        Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately

twelve hours after sending its last payment to Citigroup Global and meeting its outstanding

margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted

and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and

Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone

and Simmons represented that Thornburg Mortgage had successfully met its margin calls without

selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges,

we successfully continue to meet all margin calls, we maintain existing short-term financing

facilities with our existing finance counterparties and we have successfully added new financing

capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from

our available cash position, we might need to selectively sell assets in order to raise cash.  To

date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K

accounted for the I/O Strip Transactions as the issuance of secured debt.[9]  See Complaint ¶ 37, at

11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to

hold its ARM Securities until their value recovered in the market,'" notwithstanding that the

lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could

have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3

(quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had

the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage

did not recognize $427.8 million in losses associated with its ARM securities that served as

collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage

also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form

10K and accompanying financial statements were also incorporated into the company's active

---

[9]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP.  About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/.  According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset."  The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

Form S-3 ASR[10] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007." Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008. See Complaint ¶ 41, at 12-13. Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K. See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30). Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well. If they only knew." Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2, (sent February 28, 2008, at 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")). In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original). See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2,

---

[10]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements. Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp. "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates." Accounting Series Release, Investopedia.

(sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27).   At 6:56 a.m.,

Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated

Thornburg Mortgage had approximately forty million dollars available in cash at that time.   See

Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at

2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008

Email").   As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100

million in margin calls.   See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the

Consumer News and Business Channel ("CNBC").   Complaint ¶ 98, at 28.   On Street Signs,

Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets;

(ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg

Mortgage had "'liquidity and cash available to continue to support the portfolio.'"   Complaint

¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-

4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from

J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to

Thornburg Mortgage earlier that day.   See Complaint ¶ 41, at 13.   At the end of day on February

28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they]

reinforced in the market'" were: "'We have met all margin calls to date, and we expect to

continue to do so.   We have sufficient operating cash, and we don't expect to sell assets to meet

margin calls.   We returned to profitability during the fourth quarter despite a tough market.'"

Complaint ¶ 96, at 28 (alterations in original).

- 13 -

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity, or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[11]   Complaint ¶¶ 49-50, at 50-51.   As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.   See Complaint ¶ 49, at 14-15.[12]   The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, see Complaint ¶ 76, at 22.

---

[11]An "impairment" is a "reduction in a company's stated capital."   Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[12]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.   The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern.  See Complaint ¶ 57, at 17.  Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's.  See Complaint ¶ 76, at 22.  "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."   Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email").  The requested evidence included "correspondence with lenders/attorneys/shareholders, emails."  Request for Correspondence, attached to March 3, 2008 Hall Email at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also

requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  At the time, KPMG as auditor was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.  KPMG did not become aware of the Citi Letter while preparing its Restatement.  See Complaint ¶ 101, at 29.  Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"  Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).  The analysis stated: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]  No one in the market could have foreseen the sudden decline in mortgage valuations.'"  Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## **PROCEDURAL BACKGROUND**

The SEC filed this enforcement action on March 13, 2012.  See Complaint, filed March 13, 2012 (Doc. 1)("Complaint").  The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15

U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act. See Complaint ¶¶ 106-43, at 31-39.

### 1. The Motion.

The SEC moved to exclude evidence and arguments related to KPMG on March 17, 2016. See Motion at 1. The SEC argues that the Court should exclude these arguments and evidence under rules 401 and 403 of the Federal Rules of Evidence, because they "would improperly shift the jury's attention from Defendants' conduct and instead focus it on irrelevant or at best marginally relevant aspects of KPMG's audit procedures." Motion at 4. The SEC makes three primary arguments: (i) that the comprehensive nature of KPMG's audit is irrelevant to whether the Defendants made material omissions or misstatements to KPMG; (ii) that attacks on KPMG's audit are irrelevant to whether or not Thornburg Mortgage's OTTI determination was correct, and faults in the audit's quality do not excuse any misstatements; and (iii) that

KPMG's conclusions regarding the Defendants' fraud and internal controls usurp the jury's role as the ultimate decision maker.  See Motion at 2.

First, the SEC objects to the Defendants' proposed defense that, "given all the information that KPMG had available to it, KPMG should have reached a proper OTTI and going concern opinion."   Motion at 4.   It explains that SEC rule 13b2-2 "addresses management's obligation to be forthcoming with auditors, not the scope of the auditors' work or the competency of the auditors."   Motion at 4.   It adds that "[t]he scope of KPMG's audit procedures does not make it any more or less probable that KPMG was misled by the Defendants."  Motion at 5.  The SEC expects the Defendants to "put KPMG on trial in their defense," based in part on the Defendants' focus on KPMG during discovery.  Motion at 5.  This potential focus on KPMG, it notes, creates a "danger that the jury will be confused or misled into believing that KPMG's failure to recognize that Thornburg Mortgage's severe liquidity crisis made its impairments other than temporary ('OTTI') should absolve Defendants of their knowing failure to do the same."  Motion at 5.

The SEC focuses on KPMG documents showing the scope of the firm's audit, including audit workbooks, an 873-page audit manual, billing sheets, and other materials.  See Motion at 6-8.  It states that the documents may show that KPMG "did a lot of work," but that they are irrelevant to whether the Defendants misled KPMG.   Motion at 8.   It also notes that the documents are not necessary to show that the Defendants shared specific materials with KPMG. See Motion at 8.  It cites the Court's ruling that Floyd may not testify that KPMG "had 'a wealth of information available to it that it might have used to ascertain the truth, so it cannot have been misled.'"   Motion at 9 (citing Memorandum Opinion and Order, filed May 10, 2016 (Doc.

447)("<u>Daubert</u> MOO")).  It concludes that, "[j]ust as Floyd should not be allowed to testify as to the 'wealth of information' available to KPMG, Defendants should be precluded from introducing irrelevant or marginally relevant workpapers, indices, bills, and other documents cited above to show the same thing."  Motion at 9.

The SEC argues that the Court should exclude certain KPMG Professional Practice Letters ("PPLs"),[13] because they do not focus on whether Thornburg Mortgage had the intent and ability to hold its Purchased ARM securities, and will simply support Thornburg Mortgage's anticipated "OTTI accounting is complex" argument.  Motion at 9.  They fear that "the jury, which will already be asked to deal with unfamiliar accounting issues, will be confused into believing that the complexity that can be involved in determining a securities fair value in an illiquid market somehow makes the 'intent and ability to hold' determination similarly complex."  Motion at 10.  They cite PPLs that they assert discuss OTTI, but are wholly irrelevant to the jury's task in this case.  <u>See</u> Motion at 10-11.

Second, the SEC urges the Court to exclude the Defendants' criticisms of KPMG.  <u>See</u> Motion at 12.  It explains that it is "no defense to a claim of misleading auditors to argue that had the auditors only been more competent they would not have been misled."  Motion at 12.  It cites the Defendants' exhibit list, deposition transcripts, and other materials that it describes as irrelevant.  <u>See</u> Motion at 13-14.  It concludes that these documents "do not have a tendency to make any fact of consequence to a deceit of auditors claim more or less probable."  Motion at 14 (citing Fed. R. Evid. 401).

---

[13]PPLs are internal KPMG accounting and auditing guidance documents.  <u>See</u> Summary Judgment MOO at 104.

Third, the SEC contends that the Court should exclude all evidence of the PCAOB's investigation into KPMG, its own investigation into KPMG, and its letters stating that it concluded its investigation. See Motion at 14-15. The SEC predicts that the Defendants will use this evidence to show: (i) "that KPMG witnesses should not be believed because they have an incentive to lie -- namely to avoid being sued by either the SEC or the PCAOB"; and (ii) "that Ms. Reinhart and Ms. Hall received some sort of *quid pro quo* from the SEC whereby in exchange for falsely heaping blame on Defendants they avoided prosecution by the SEC." Motion at 15. The SEC argues that allowing the Defendants to target KPMG "will mislead and/or substantially confuse the jury into evaluating KPMG in lieu of, or even in addition to, the conduct of Defendants." Motion at 16.

Fourth, the SEC asserts that evidence and arguments on KPMG's Restatement conclusions -- that the Defendants did not commit fraud and that there was no material weakness in Thornburg Mortgage's internal controls -- will improperly usurp the jury's role. See Motion at 16. It quotes the Defendants' Motion for Summary Judgment, which includes a heading arguing that "KPMG's Own Restatement Findings Preclude Any Finding of Auditor Deception." Motion at 16 (quoting Motion for Summary Judgment on Behalf of Larry Goldstone and Clarence G. Simmons and Memorandum of Law in Support at ii, filed August 9, 2013 (Doc. 201)). It then argues that any prior determination of a jury question's prejudicial effect will substantially outweigh its probative value. See Motion at 17. It explains that courts determining whether to admit Equal Employment Opportunity Commission ("EEOC") findings into evidence examine whether: (i) the findings contain legal conclusions in addition to factual content; and (ii) substantial evidence was presented to the jury on the matters summarized in the EEOC Report.

See Motion at 17-18.  It notes that KPMG's conclusions that "we do not believe Company management was fraudulent in its actions related to this issue" and that "[t]here is no material weakness in the Company's internal control over financial reporting" are both conclusions for the jury.  Motion at 18.  It adds that "[a] jury presented with evidence of KPMG's conclusions on the very issues they are being asked to determine is likely to place undue weight on KPMG's conclusions and/or be confused as to how KPMG's conclusions should impact their own."  Motion at 18.  The SEC also argues that KPMG made its Restatement conclusions "in the heat of battle" without access to "critical information" that could have altered its opinion.  Motion at 18-19.  Although it concedes that the "no-fraud conclusion presents evidence that there was no auditor deception," it argues that KPMG's conclusion "is not determinative to the SEC's rule 13b2-2 claim."  Motion at 19 (quoting Summary Judgment MOO at 613).  It concludes that the Defendants could present the underlying information to the jury for its independent evaluation.  See Motion at 19-20.

### 2.    **The Response**.

The Defendants responded to the Motion on April 14, 2016.  See Memorandum in Opposition to Plaintiff's Motion *In Limine* Regarding KPMG, filed April 14, 2016 (Doc. 425)("Response").  The Defendants contend that "the SEC itself has made KPMG's audit work and the credibility of KPMG witnesses the centerpiece of its case."  Response at 1.  They note that the SEC's main theory is that the Defendants misled KPMG about Thornburg Mortgage's liquidity and margin call payments.  See Response at 1.  Moreover, they state that the SEC relied on KPMG employees' testimony that they "would have liked to have known" the allegedly

withheld information in opposing their motion for summary judgment.  Response at 1.  The

SEC's auditor deception claim, they assert,

> necessarily raises three critical issues: (1) the process by which KPMG reached its
> supposedly erroneous audit conclusions; (2) the nature and extent of the
> information relevant to OTTI and going concern that was available to KPMG
> during the audit and the review and the importance placed (if any) by KPMG on
> that information; and (3) KPMG witnesses' credibility and motivations in
> cooperating with the SEC to accuse Defendants of misconduct *notwithstanding*
> KPMG's own contemporaneous "no fraud" conclusion and given the undisputed
> fact that these same witnesses were (or still are) subject to investigations by
> outside regulators.

Response at 5 (emphasis in original).  The Defendants state that they may argue that "they made

no misstatements or omissions," and that "the information allegedly withheld was immaterial,"

and that the SEC's Motion would exclude documents relevant to these arguments.  Response at 2

(quoting Motion at 4).

The Defendants contend that "[t]he Court need look no further than Rule 13b2-2 itself to

deny the SEC's motion" for three reasons.  Response at 2.  First, they state that Rule 13b2-2 makes

omissions actionable only if they render "statements made, *in light of the circumstances* under which

such statements were made, not *misleading*."  Response at 3 (quoting Rule 13b2-2)(emphases in

Response).  The Defendants contend that the "*audit itself*, including the audit procedures carried out

and audit evidence reviewed by the auditors, constitutes the 'circumstances under which such

statements [were] made.'"  Response at 9 (emphasis and alteration in Response).  The Defendants

argue that "[t]he evidence of KPMG's audit scope and procedures that the SEC seeks to exclude

relates directly to the 'circumstances' in which the alleged omissions were made, and whether any

statements made were in fact 'misleading.'"  Response at 3.

- 22 -

Second, the Defendants argue that their proposed evidence is relevant to materiality.  See Response at 3.  Materiality, they explain, depends on whether any omissions "significantly alter the total mix of information available to the auditor."  Response at 3 (quoting S.E.C. v. Patel, No. CIV. 07-CV-39-SM, 2009 WL 3151143, at *30 (D.N.H. Sept. 30, 2009)(McAuliffe, J.).   The Defendants argue that the Motion would prevent them from describing the total mix of information available to KPMG, including documents on Thornburg Mortgage's liquidity and margin call payments.  See Response at 3.  In short, they state that the jury cannot determine whether the alleged omissions significantly altered the total mix of information at KPMG's disposal using only a small sample of that total mix.  See Response at 3, 8.

Third, the Defendants contend that they "must be able to explore the motivations and impeach the credibility of the SEC's star KPMG witnesses by questioning them about facts and circumstances that might cause them to give biased testimony."  Response at 3.  They note that the SEC's declination letters[14] and KPMG's internal assessments of its auditors' performance could help to explain why KPMG's auditors "reversed their 'no fraud' conclusion and decided to accuse Defendants of wrongdoing."   Response at 4.  The documents, they explain, may also "illustrate whether the allegedly withheld information actually mattered to the auditors at the time of the audit."  Response at 8.  They argue that the declination letters are admissible "under Fed. R. Evid. 408(b) as evidence of (i) the relationship between the SEC and Ms. Reinhart and Ms. Hall, and (2) the tendency of Ms. Reinhart and Ms. Hall to offer biased testimony in the SEC's favor."   Response at 21 (citing Brocklesby v. United States, 767 F.2d 1288, 1292 (9th Cir. 1985)).  They also suggest that

---

[14]The declination letters informed two KPMG auditors and witnesses, Cynthia Reinhart and Jennifer Hall, that the SEC closed its investigation into their conduct.  See Response at 7.

KPMG's internal assessments could be useful to "establish that KPMG witnesses are personally motivated to blame the Defendants to protect their own professional reputations."  Response at 19.

The Defendants also contend that they should be allowed to present the targeted evidence to defend against any novel theories of liability that the SEC raises at trial.  See Response at 9. These theories, according to the Defendants, include allegations that the Defendants doctored liability reports, altered audit committee meeting minutes, and failed to disclose the total amount of margin calls that Thornburg Mortgage received.  See Response at 9-10.

The Defendants attempt to rebut the SEC's arguments on specific documents.  See Response at 12-14.  They point to emails between KPMG auditors predicting that Thornburg Mortgage would remain a going-concern even in a "complete devastation" scenario.  Response at 12.  Other documents, they explain, bolster their argument that their OTTI and going-concern judgments were reasonable.  See Response at 13.  They contend that the PPLs are relevant, because they "bear[] on whether the declines in the value of Thornburg's assets in February 2008 were caused by 'new conditions,' and, as such, represented Type II subsequent events."  Response at 14.  They add that the PPLs are relevant even if their advice is inconsistent with the SEC's position on Type I events.  See Response at 14.

The Defendants deny that admitting these materials will confuse or mislead the jury.  See Response at 4.  They assert that the evidence is "critical to this determination" and that the SEC can raise specific "waste of time" objections during the trial.  Response at 11.  They argue that the jury should be able to weigh KPMG's no-fraud conclusion, along with the other relevant evidence, to determine whether the Defendants violated Rule 13b2-2.  See Response at 15.  According to the Defendants, that KPMG, the supposedly deceived auditor, determined that the Defendants did not

commit fraud is obviously probative in an auditor deception case.  See Response at 16.  The

Defendants distinguish Tanberg v. Sholtis, 401 F.3d at 1163, on the ground that the United States

Court of Appeals for the Tenth Circuit's "rationale . . . was that violating the procedures did not

make the ultimate issue -- whether the arrest violated the Fourth Amendment to the Constitution of

the United States of America -- 'more or less likely' and was therefore 'irrelevant.'"  Response at 15

n.12 (quoting Tanberg v. Sholtis, 401 F.3d at 1163).  They distinguish the SEC's other cited cases on

the grounds that they involved "ultimate issues by neutral administrative bodies, as distinct from the

conclusions of a party or a percipient witness at issue here."  Response at 16.

> ### 3.    The Reply.

The SEC replied on May 3, 2016.   See Plaintiff U.S. Securities and Exchange

Commission's Reply in Support of Motion *In Limine* Regarding KPMG, filed May 3, 2016 (Doc.

430("Reply").  The SEC explains that its Motion "seeks to preclude . . . Defendants turning the

trial into an assessment of the competency of KPMG's audit instead of an inquiry into

Defendants' conduct."  Reply at 1.  The SEC makes six primary arguments in the Reply.  See

Reply at ii.  First, it again contends that the Court should preclude the Defendants from

presenting evidence that KPMG had sufficient information to reach proper OTTI and going-

concern conclusions.  See Reply at ii.  It points to documents that do not provide context with

regard to the OTTI conclusions, including KPMG's budgets and invoices.  See Reply at 3.  It

notes that KPMG witnesses will testify that the Defendants did not inform them of unmet margin

calls and that the Defendants' evidence of KPMG's extensive audit work is only a red herring for

the jury.  See Reply at 3-4.  It denies that its theories have shifted and that it has not identified

any specific misleading statements.  See Reply at 4.  It objects to the Defendants' proposal that

the parties await specific objections at trial on the grounds that it "ignores the purpose of motions *in limine* . . . to manage the course of trials."  Reply at 4-5 (quotation omitted).

Second, the SEC urges the Court to exclude specific documents.  See Reply at 5.  It notes that many of the documents that the Defendants seek to introduce "reference the undisputed fact -- that is easily established through other evidence -- that KPMG evaluated OTTI in its audit and originally signed off on management's determination that Thornburg's Purchased ARM Assets were not OTTI."  Reply at 5.  It adds, however, that the document's weight "goes to the extensive scope of KPMG's audit."  Reply at 5.  It repeats that evidence on valuation, including the PPLs, is irrelevant and is merely meant to confuse the jury.  See Reply at 5-6.  It concludes that "[c]ourts are reluctant to admit evidence that appears at first to be plausible, persuasive, conclusive, or significant if detailed rebuttal evidence or complicated judicial instructions would be required to demonstrate that the evidence actually has little probative value."  Reply at 6 (citing 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, §403.05[3][b] (Mark S. Brodin, ed., Matthew Bender 2d ed. 2015)).

Third, the SEC moves to bolster its argument that KPMG's initial Restatement conclusions are inadmissible.  See Reply at 7.  It contends that KPMG's conclusions are untrustworthy because: (i) "the finding by the independent body was made in a relatively short period of time"; and (ii) KPMG made its conclusions "while Defendants hid key evidence." Reply at 8.  It rejects the Defendants' argument that KMPG's conclusions are distinct from an administrative law judge's ("ALJ") conclusions, noting that "KPMG was independent, so their complaint must be that they were not adjudicative -- but neither were the Standard Operating Procedures or opinions of the police officer's superiors in *Tanberg v. Sholtis*, or the internal

investigation in *Lewis v. City of Chicago*, [563 F. Supp. 2d 905 (N.D. Ill. 2008)(Castillo, J.)]." Reply at 8.  It contends that KPMG's conclusions are irrelevant for impeachment, because they are not contemporaneous and because KPMG has altered its original conclusions.  See Reply at 8.

Fourth, the SEC again argues that KPMG's internal assessments of its audit team are completely irrelevant.  See Reply at 8-9.  It adds that, even if the assessments tend to show that KPMG had sufficient information to reach informed audit conclusions, their potential for confusion and prejudice substantially outweighs their probative value.  See Reply at 9.  The SEC also disagrees on the assessments' significance, noting that the assessments "do not assign blame for the restatement on the auditors nor do they absolve management of any responsibility." Reply at 9.  The SEC denies that the assessments provide effective impeachment evidence, given that: (i) the assessment documents "were created well over seven years ago"; (ii) one auditor had no knowledge that the assessment existed; and (iii) one auditor has retired and the other one has been promoted.  Reply at 9.

Fifth, the SEC argues against the admission of any past investigations or declination letters.  See Reply at 10 ("Defendants do not cite to a shred of evidence that supports their scurrilous allegation that KPMG is committing perjury and the SEC is not only suborning it, but extorting it.").  It remarks that the KPMG witnesses' testimony was consistent before and after they received the declination letters.  See Reply at 10.

Finally, the SEC repeats its concern that "[a] jury presented with evidence of KPMG's conclusions on the very issues they are being asked to determine is likely to place undue weight on KPMG's conclusions and/or be confused as to how KPMG's conclusions should impact their

own."  Reply at 18.  It again notes that KPMG lacked important information when reaching its

conclusions.  See Reply at 19.  Although it acknowledges that the Court has held that KPMG's

"no-fraud conclusion presents evidence that there was no auditor deception," it points out that

the Court also held that "KPMG's no-fraud conclusion is not determinative to the SEC's rule

13b2-2 claim."  Reply at 19 (quoting Summary Judgment MOO at 613-14).

### 4. The Hearing.

The Court held a hearing on May 11, 2016.  See Transcript of Hearing at 1 (taken May

11, 2016), filed May 20, 2016 (Doc. 466)("Tr.").  The Court opened the hearing by stating that it

was inclined to deny the Motion "across the board."  Tr. at 17:20-23 (Court).  It explained that it

was unwilling to try to "slice KPMG" by cabining the Defendants' arguments to specific topics.

Tr. at 18:5-7 (Court).   It noted, however, that KPMG's Restatement conclusions were

problematic:

> Anytime I have an entity outside of these walls giving a conclusion, and then
> telling it to the jury, I always pause on that.  For example, if it's another court,
> another agency, or something like that, that always gives me concern. And if that
> was all that KPMG -- if that was all that this document did, I would probably
> exclude at least that portion.
>
> . . . .
>
> But the problem I have is that I cannot figure out why KPMG did the restatement.
> That seems to be still a mystery to me.  And I think, if I try to -- I think I'd have to
> make a determination as to why KPMG did it, and then say, [e]xclude that
> portion.  So in my view, KPMG's conclusion just doesn't make sense.  And so I
> think KPMG is going to have to explain that statement.

Tr. at 18:19-19:11 (Court).  The Court also cautioned the parties regarding its limited view of

rebuttal evidence.  See Tr. at 19:21-20:6 (Court).  It explained:

- 28 -

> If you're telling me now you may need to bring it up in rebuttal, it's probably not rebuttal. . . .  So if you know it's something you want to get before the jury, and you know that it's going to come up in the defendant's case, be very careful about saying, I'll just bring it up in rebuttal.  You may need to bring it up now, and bring it up in your case-in-chief.

Tr. at 19:21-20:6 (Court).

The SEC acknowledged the Court's proposed ruling, but attempted to make an exception for three "critical" documents.  Tr. at 20:12-21 (McKenna)(citing Defendants' Exhibits 95, 318, and 320).  It noted that these documents reflect the "uncontroversial" point that, if securities are impaired as of a particular date, accounting principles do not take subsequent losses into account.  Tr. at 21:9-15 (McKenna).   It explained that the Defendants might use these documents, however, to argue "that nothing that happens in the subsequent event periods that has any impact on valuation can possibly be a Type II subsequent event."  Tr. at 21:1-5 (McKenna).  In short, the SEC feared that the Defendants would use the valuation point to also argue that subsequent losses could not trigger an inability to hold assets or an OTTI.  See Tr. at 22:6-16 (McKenna).

The SEC also made "a pitch" for the Court to exclude documents that critique KPMG's audit performance.  Tr. at 23:3-8 (McKenna).  It argued that "it really doesn't matter whether KPMG did a good or a bad audit," because "the bottom line is, we're evaluating defendant[s'] conduct here."  Tr. at 23:10-13 (McKenna).  The Court suggested that, in a typical fraud case, a prosecutor might try a case in different ways, depending on whether the deceived party was intelligent or unintelligent.  See Tr. at 23:18-24:5 (Court).  The SEC rejected the suggestion, stating that "it doesn't matter whether they are brilliant or mentally impaired.  If you're lying to them, you're lying to your auditors.  Whether they should believe you or not, seems to me to be beside the question."  Tr. at 24:8-12 (McKenna).  The Court replied that, while the SEC was

- 29 -

ultimately correct, it would nonetheless "take more deception to deceive people who are competent than . . . people who are incompetent."  Tr. at 24:13-17 (Court).

The SEC also addressed the Court's limits on rebuttal.  See Tr. at 24:19-25 (Court).  It explained that it would seek to use a witness to rebut any suggestion that "we had some secret side deal with KPMG[.]"  Tr. at 24:21-22 (McKenna).  The Court suggested that it would allow the SEC to add witnesses on its Enforcement Cooperation Program if the Defendants accused either KPMG witness of cooperating in exchange for more lenient treatment.  See Tr. at 25:1-9 (Court, McKenna).

The Defendants then attempted to undermine the SEC's argument "that deceit of auditors is deceit of auditors, regardless of the competence of the audit team."  Tr. at 26:1-3 (Lee).  They stated that a 13b2-2 claim also requires proof of materiality, evidence of the surrounding circumstances, and unreasonableness.  See Tr. at 26:3-11 (Lee).  For example, they noted, a document stating that KPMG's team had the information they needed "goes to reasonableness, [] goes to materiality, and [] certainly goes to the overall circumstances under which the alleged statement or omission was made."  Tr. at 26:11-18 (Lee).  The Defendants contended that the SEC was "slicing" the three valuation documents "a little too finely."  Tr. at 26:21 (Lee).  They explained that valuation is "one part of an overall assessment of Type I versus Type II," and that valuation is not somehow separate from the other parts of a Type I analysis.  Tr. at 26:23-27:2 (Lee).  The Defendants also backed the Court's inclination to deny the Motion as to KPMG's conclusions: "[A] key issue here will be how did KPMG come to the determination that it was going to require a restatement?  Was it events before or after the filing of the 10-K that required that restatement?"  Tr. at 27:13-17 (Lee).  They argued that the jury will have to attempt to

reconcile the SEC's claims with KPMG's conclusions that there were no concerns about management integrity or material weaknesses.  See Tr. at 27:17-21 (Lee).

The Defendants then addressed the SEC's attempts to exclude KPMG's original conclusions.  See Tr. at 27:22-25 (Lee).  They noted that the SEC's cases "involve a truly outside adjudicative body, such as the EEOC."  Tr. at 28:1-2 (Lee).  The SEC's attempts to show that KPMG relied on incomplete information, they stated, "certainly shouldn't lead to the preclusion of that evidence."  Tr. at 28:7-12 (Lee).  The Defendants also assured the Court that they would not "try to turn the case into a referendum on KPMG."  Tr. at 28:24-29:1 (Lee).  They emphasized that performance-related documents are relevant to materiality and the circumstances surrounding their statements.  See Tr. at 31:14-20 (Lee).

The Court then stated that "I just don't think I should go in and slice it that thin."  Tr. at 33:9-10 (Court).  It repeated that, even if KPMG had sufficient evidence before the filing to reach a conclusion on OTTI, it would not allow the Defendants to avoid the SEC's claims.  See Tr. at 33:22-25 (Court).  It noted, however, that the Defendants could use their disclosures as evidence that they did not attempt to deceive KPMG.  See Tr. at 34:3-5 (Court).  It concluded that "the same evidence" would "support both arguments, one of which is permissible, and one is not permissible."  Tr. at 34:6-9 (Court).  It then repeated its inclination to deny the Motion.  See Tr. at 34:12 (Court).

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant

- 31 -

evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")). "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'" United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012) (Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note). Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible. See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989)(Baldock, J.). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(Tacha, J.)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)). The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule

- 32 -

403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(Baldock, J.).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999)(Kelly, J.), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.).  As the Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . .  This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(Thomas, J.)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional response or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999)(Sanborn, J.).  Evidence is not unfairly prejudicial merely because it damages a party's case. See United States

v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)(Ebel, J.); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991)(Holloway, J.). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(Hartz, J.)(quoting Fed. R. Evid. 403 advisory committee notes).

## LAW REGARDING DECEIT OF AUDITORS CLAIMS

Exchange Act rule 13b2-2 "provides that directors or officers shall not make or cause to be made a materially misleading statement or omission to an accountant in connection with SEC filings, among other things." S.E.C. v. Espuelas, 698 F. Supp. 2d 415, 436 (S.D.N.Y. 2010)(Holwell, J.). Specifically, the rule states:

(a)     No director or officer of an issuer shall, directly or indirectly:

(1)     Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

(2)     Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:

(i)     Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or

(ii)     The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

(b)

- 34 -

(1)     No officer or director of an issuer, or any other person acting under the direction thereof, shall directly or indirectly take any action to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of that issuer that are required to be filed with the Commission pursuant to this subpart or otherwise if that person knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading.

(2)     For purposes of paragraphs (b)(1) and (c)(2) of this section, actions that, "if successful, could result in rendering the issuer's financial statements materially misleading" include, but are not limited to, actions taken at any time with respect to the professional engagement period to coerce, manipulate, mislead, or fraudulently influence an auditor:

    (i)     To issue or reissue a report on an issuer's financial statements that is not warranted in the circumstances (due to material violations of generally accepted accounting principles, generally accepted auditing standards, or other professional or regulatory standards);

    (ii)    Not to perform audit, review or other procedures required by generally accepted auditing standards or other professional standards;

    (iii)   Not to withdraw an issued report; or

    (iv)    Not to communicate matters to an issuer's audit committee.

(c)     In addition, in the case of an investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8), or a business development  company as defined in section 2(a)(48) of the Investment Company Act of 1940 (15 U.S.C. 80a-2(a)(48)), no officer or director of the company's investment adviser, sponsor, depositor, trustee, or

administrator (or, in the case of paragraph (c)(2) of this section, any other person acting under the direction thereof) shall, directly or indirectly:

(1)

    (i)    Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

    (ii)    Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with:

        (A)    Any audit, review, or examination of the financial statements of the investment company required to be made pursuant to this subpart; or

        (B)    The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise; or

(2)    Take any action to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of that investment company that are required to be filed with the Commission pursuant to this subpart or otherwise if that person knew or should have known that such action, if successful, could result in rendering the investment company's financial statements materially misleading.

17 C.F.R. § 240.13b2-2.   Notably, rules 13b2-2(a) and (c)(1) do not prescribe a scienter requirement.  The United States Courts of Appeals for the Ninth and Second Circuits have split whether the SEC must plead and establish a defendant's scienter to succeed on a claim for

- 36 -

materially false statements or omissions made to an auditor, and the Tenth Circuit has not reached the issue.  The Ninth Circuit holds that, "[t]o be liable, one must 'knowingly' make false statements."  SEC v. Todd, 642 F.3d 1207, 1219 (9th Cir. 2011)(quoting United States v. Goyal, 629 F.3d 912, 916 n.6 (9th Cir. 2010)).  See United States v. Goyal, 629 F.3d at 916 n.6 ("[L]iability under Rule 13b2–2 . . . requires that a false statement to an auditor be made knowingly.").  Notably, the Ninth Circuit's precedent requiring a scienter element in rule 13b2-2(a) and (c)(1) originates from its decision in United States v. Goyal, a criminal matter.   In United States v. Goyal, the Ninth Circuit reasoned that the United States must establish that a defendant knowingly deceived auditors to be criminally liable under the rule, because 15 U.S.C. § 78m(b)(4) and (5), under which the SEC promulgated rule 13b2-2, imposes criminal liability for only those who "'knowingly'" violate § 13(b)(2)'s provisions.  United States v. Goyal, 629 F.3d at 916 n.6 (quoting 15 U.S.C. § 78m(b)(5)).  The Ninth Circuit held that the SEC could not promulgate a rule which encompassed criminal liability beyond the scope of § 13(b)(2)'s allowance, and, therefore, the United States must establish a knowing scienter when alleging a criminal violation of rule 13b2-2.  See United States v. Goyal, 629 F.3d at 916, 916 n.6.

The Second and Eighth Circuits, on the other hand, have read the SEC's interpretive guidance on rule 13b2-2(a) and (c)(1), and its statutory history, to not require the SEC to plead scienter in a civil enforcement action.  See SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998) ("[T]he court's ruling that lack of scienter would not be a defense to the claims under § 13 and the regulations thereunder was consistent with precedent in this Circuit and with the Commission's interpretive regulations indicating that scienter is not an element of civil claims under those provisions.");  SEC v. Das, 723 F.3d 943, 955 (8th Cir. 2013)("Based on the

foregoing, we conclude that Rule 13b2-2 does not require that the SEC prove [the defendant] acted knowingly."); SEC v. Espuelas, 698 F. Supp. 2d at 436 ("Like rule 13b2-1, 13b2-2 does not require the SEC to plead scienter.").  The Second Circuit has noted that, before the Foreign Corrupt Practices Act, Pub. L. No. 100-418, § 5002, 102 Stat. 1415, 1415 (1988) amendments to § 13 of the Exchange Act, § 13 contained no scienter elements.  See S.E.C. v. McNulty, 137 F.3d at 741.  Scienter was added to § 13 in connection with the imposition of criminal liability for the "deliberate falsification of books and records and other conduct calculated to evade the internal accounting controls requirement."  H.R. Rep. 100-576, at 916-17 (1988)(Conf. Rep.), reprinted in 1998 U.S.C.C.A.N. 1547, 1949-50.  The Second Circuit has determined that, because Congress specifically added a scienter requirement to § 13(b) in connection with criminal liability, congressional intent "plainly impl[ies] that falsification of the information to be filed in accordance with § 13(b) need not be knowing in order to lead to civil liability."  SEC v. McNulty, 137 F.3d at 741.

Indeed, when promulgating rule 13b2-2, the SEC rejected a request to include a scienter requirement for those who make material misstatements or omissions to auditors:

> The Commission received comments from approximately 80 persons . . . most of which questioned certain aspects of the proposal.  The majority of these comments expressed concern that the proposed rule would: (a) require no showing of scienter in order to establish a violation based upon the making of false, misleading or incomplete statements to an accountant in the course of an examination or audit; (b) impose liability for oral, as well as written, statements made to an accountant; . . . .  [M]any of the comments asserted that imposition of liability for misstatements or omissions, in the absence of a scienter requirement, would be counter-productive and impede communications between auditors and those from whom they seek information in the course of an audit.  In fact, a number of comments suggested that some persons would refuse to communicate with an auditor rather than expose themselves to potential liability.

- 38 -

. . . .

> [T]he Commission believes its experience concerning questionable and illegal payments is more persuasive as to the need for such a rule than the opinions expressed by some commentators to the effect that the rule will impede communications between auditors and those from whom they seek information. Under these circumstances, the Commission has decided that the advantages of the new Rule outweigh the potential disadvantages suggested by certain commentators.

SEC Release No. 34-15570, 1979 WL 173674, at *12.  See SEC Release No. 34-15570, 1979 WL 173674, at *10 (noting that the congressional history of Exchange Act Section 13 does not indicate the necessity of pleading violator's scienter).  Further, when rules 13b2-2(b) and (c) were added in 2003, as part of the implementation of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745 (2002), the SEC, again, explicitly stated that the amendment does not alter rule 13b2-2(a)'s imposition of civil liability without a showing of scienter.  The SEC explained that, although rules 13b2-2(b) and (c)(2) prohibit a director or officer from misleading an auditor, the amendment "does not alter" rule 13b2-2(a)'s prohibition against "directly or indirectly causing to be made materially misleading statements to auditors," without "imposing what would amount to a new scienter requirement on the pre-exiting provision prohibiting officers and directors from causing misleading statements or omissions to be made to auditors."  68 F.R. 31820-01, 31823, 2003 WL 21218518.

The Court concludes that the Second and Eight Circuits' interpretation of rule 13b2-2(a) and (c) is persuasive, and consistent with the Supreme Court's guidance regarding administrative interpretations.  In Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945), the Supreme Court held that an administrative agency's interpretation of its rules "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  325 U.S. at 413-14.

"When agencies interpret their own regulations -- to, for example, adjudicate whether a regulated party was in compliance with them -- courts accord agencies what is known as Auer or Seminole Rock deference."  Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 305 F.R.D. 256, 286 (D.N.M. 2015)(Browning, J.)(citing Auer v. Robbins, 519 U.S. 452 (1997); Bowles v. Seminole Rock & Sand Co., 325 U.S. at 410).

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985)(citing Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982)).  The first step in construing a statute requires the court to "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997).  The inquiry stops there "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'"  Robinson v. Shell Oil Co., 519 U.S. at 340 (citing United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240 (1989)).  Whether the statutory language is plain on its face or ambiguous "is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  Robinson v. Shell Oil Co., 519 U.S. at 341 (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477 (1992)).[15]

---

[15]When agencies interpret their own regulations -- to adjudicate whether a regulated party was in compliance with them -- courts accord agencies what is known as Auer or Seminole Rock deference.  See Auer v. Robbins, 519 U.S. 452 (1997); Bowles v. Seminole Rock & Sand Co..  This deference is applied in the same manner as Chevron deference and is substantively identical.  Justice Scalia, after years of applying the doctrine followed by years of gradually

Congress has not specifically addressed the state of mind necessary for personal civil liability under § 13(b)(2).  Congress did not add scienter, however, to § 13(b)(2) until the Foreign Corrupt Practices Act in 1988, and it added scienter with the intent to hold criminally liable only those who knowingly violate the section.  The congressional intent in adding an element of scienter to § 13(b) evidences that Congress intended to heighten the requirements for holding directors and officers criminally liable under the section, but the congressional history bears no indication that Congress intended to change any elements of § 13(b) beyond those necessary for criminal liability.  See H.R. Rep. 10-576, at 916, (1988)(Conf. Rep.), reprinted in 1988 U.S.C.C.A.N. 1547, 1949 ("The Conferees intend to codify current [SEC] enforcement policy that penalties not be imposed for insignificant or technical infractions or inadvertent conduct.  The amendment . . . accomplishes this by providing that criminal penalties shall not be imposed for failing to comply with the . . . books and records or accounting control provisions."). The SEC has consistently interpreted § 13(b)(2) as not requiring it to allege that a defendant acted knowingly to be civilly liable for deceiving auditors, and this interpretation is consistent with the statute's plain language, which did not include an element of scienter when the SEC promulgated rule 13b2-2.  The Court determines that the SEC's interpretation that § 13(b)(2) does not impose an element of scienter for civil enforcement actions is consistent with

---

beginning to question its soundness, finally denounced Auer deference in his recent dissent in Decker v. Northwest Environmental Defense Center, 133 S. Ct. 1326 (2013)(finding no persuasive justification for Auer deference).  Two other Justices, the Honorable John G. Roberts and Samuel A. Alito, Joined in a concurring opinion stating that "[i]t may be appropriate to reconsider [Auer deference] in an appropriate case.  But this is not that case."  133 S. Ct. at 1338 (Roberts, C.J., concurring).  Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land and the Court must apply it.

§ 13(b)(2)'s plain language, and with congressional history and intent, and is therefore based on a "permissible construction of the statute."  Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. at 843.  Accordingly, the Court adopts the SEC's, and the Second and Eighth Circuits' interpretation of rule 13b2-2(a) and (c)(1), which does not require the SEC to allege that defendants knowingly misled auditors to state a claim for civil liability under those provisions.

## ANALYSIS

The Court will deny the Motion in part and grant the Motion in part.  The Court will not exclude any challenged evidence pretrial, but it will curtail what the Defendants can argue using that evidence.  All of the evidence is admissible for permissible purposes, but the Defendants could also make some arguments from the evidence that would not be permissible.  The Court will not allow certain arguments even though the evidence would support them.  First, the Court will allow the Defendants to introduce evidence on the scope of information available to KPMG during its audit as evidence that the Defendants did not attempt to deceive KPMG, but not as evidence that KPMG's audit cured any deception by the Defendants.  Second, the Court will permit the Defendants to criticize KPMG's audit, because criticism is relevant to KPMG's witnesses' credibility.  Third, the Court will allow the Defendants to introduce evidence of the two investigations and KPMG's declination letters for the same reason.  Finally, the Court will allow the Defendants to admit KPMG's Restatement conclusions that Thornburg Mortgage's management did not commit fraud and that its internal controls over financial reporting had no material weakness.  The Defendants may not argue that: (i) even if they made a misrepresentation or omission to KPMG earlier, they later provided sufficient information to

- 42 -

KPMG, such as the tie-out schedule, so that KPMG had enough evidence to make an informed

OTTI and going-concern judgments, and could not have been deceived; (ii) KPMG's failure to

recognize that Thornburg Mortgage's liquidity crisis made its impairments OTTI absolves the

Defendants of their failure to classify certain assets as OTTI; (iii) the Defendants should not be

liable because KPMG performed an inadequate audit; or (iv) KPMG's Restatement conclusions

bind the jury or preclude the SEC's claims.

I.    **THE DEFENDANTS MAY INTRODUCE EVIDENCE AND MAKE SOME
      ARGUMENTS REGARDING THE INFORMATION AVAILABLE TO KPMG.**

The Court will allow the Defendants to present evidence on the audit's scope, but will not

allow them to argue that, even if they made misstatements or omissions, they later provided

KPMG with enough evidence to make informed OTTI and going-concern judgments.  The Court

ruled in its Summary Judgment MOO that "Rule 13b2-2 is violated the moment a prior statement

is made misleading because an officer or director omitted to state a material fact."  Summary

Judgment MOO at 619 n.326.   Officers and directors cannot cure an omission through

subsequent disclosures.  See Summary Judgment MOO, at 619 n.326.  Moreover, rule 13b2-2

does not require that the misleading statement or omission actually deceive the recipient:

> The Defendants state: "The plain language of Rule 13b2-2(a) prohibits auditor
> deception.  Without deception, there can be no liability."  Defendants Rule 13b2-2
> Supp. at 8 (emphasis in original).  It is unclear to what rule 13b2-2(a) the
> Defendants are referring; they cannot be referring to SEC rule 13b2-2 that is
> found in 17 C.F.R. § 240.13b2-2.  Rule 13b2-2(a) does not use the word "auditor"
> or "deception."  Indeed, the word "deception" is not used in rule 13b2-2.  Rather,
> it appears that the Defendants have paraphrased rule 13b2-2 and then argue that
> their paraphrased rule's plain language supports their interpretation.  Because the
> Court will apply the rule 13b2-2 that the SEC promulgated, and not the
> Defendants' paraphrased rule, the Court concludes that rule 13b2-2 is violated
> when an officer or director makes a statement that is misleading because he or she

omitted to state a material fact; the violation occurs at the point at which the statement becomes misleading.

Summary Judgment MOO at 613-14. The SEC correctly notes that the scope of KPMG's audit and the documents available to it cannot foreclose the SEC's claims that the Defendants omitted to state material facts which made their prior statements misleading. See Motion at 3, 12. Even assuming that KPMG's audit covered Thornburg Mortgage's operations in detail and the Defendants provided KPMG with a mountain of information, the jury would nonetheless have to determine whether the Defendants omitted to state a material fact "necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading." 17 C.F.R. § 240.13b2-2.

Although the audit's scope is not dispositive of the SEC's rule 13b2–2 claim, it is nonetheless relevant evidence. That the Defendants provided KPMG with extensive evidence tends to make it less probable that the Defendants deliberately made misleading omissions. See Fed. R. Evid. 401. The additional information also tends to strengthen the Defendants' argument that KPMG's earlier no-fraud conclusion was correct. The Court makes no comment on the strength of either of these arguments -- the Defendants may have wanted to bury KPMG in documentation to hide the absence of more important documents. The SEC's attacks on this evidence go to its weight, rather than its admissibility. See Motion at 6-9. The jury, not the Court, must evaluate this evidence's importance in relation to the SEC's claims and the other evidence in the case.

The danger of jury confusion does not substantially outweigh this evidence's probative value. See Fed. R. Evid. 403; United States v. Smalls, 605 F.3d at 787 ("Exclusion under rule

403 is an 'extraordinary remedy and should be used sparingly.'").  The Court recognizes that admitting a large number of documents could confuse the jury.  It believes, however, that any attempt to slice up the audit and other evidence surrounding KPMG would ultimately prove even more confusing.  For example, refusing to allow the jury to learn how many employees were involved in the audit, see Motion at 2, or what sort of subjects it covered, see id. at 8, will only increase jurors' focus and curiosity.  The Court does not fully understand how either party will handle KPMG at trial, and it is unwilling to limit their arguments regarding KPMG absent a concrete and more substantial reason to do so.  The Defendants must take care, however, to avoid putting KPMG on trial.  See Tr. at 28:14-20 (Court).  KPMG is a big part of the story, but in the end, whether the Defendants violated 17 C.F.R. § 240.13b2-2 does not hinge on whether KPMG had lots of data or whether KPMG was incompetent, but on the Defendants' statements to KPMG.

## II.   THE DEFENDANTS MAY INTRODUCE KPMG'S ASSESSMENTS OF ITS AUDITORS.

The Court will also allow the Defendants to admit KPMG's internal assessments of its auditors, as general evidence that KPMG considered the Defendants not to be responsible for its Restatement[16] and as impeachment evidence.  The SEC correctly notes that "[i]t is no defense to a claim of misleading auditors to argue that had the auditors only been more competent they would not have been misled."  Motion at 12.  This fact does not mean, however, that KPMG's evaluations of the auditors' performance are irrelevant.  First, the evaluations echo the

---

[16]As discussed in greater detail below, the Court will admit evidence of KPMG's Restatement.  The Court discusses the Restatement here because the grounds for its admissibility are intertwined with the reasons that other categories of evidence are admissible.

- 45 -

Restatement's conclusion that the Defendants did not conceal any material weakness.   See

Response at 19.   That KPMG blamed its own auditors, even in part, for problems with

Thornburg Mortgage's financial statements tends to support the Defendants' position.[17]   See

Response at 20.   The SEC may argue that KPMG made its assessments without "critical

evidence showing Defendants' deception," but the Court will leave this decision to the jury.

Reply at 9.

Second, the Defendants may use the internal assessments to cross-examine the KPMG

witnesses.   Cross-examination serves as "the principal means by which the believability of a

witness and the truth of his testimony are tested."   Davis v. Alaska, 415 U.S. 308, 316 (1974).

As the Supreme Court stated in Davis v. Alaska: "Subject always to the broad discretion of a trial

judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only

permitted to delve into the witness' story to test the witness' perceptions and memory, but the

cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness."   415 U.S.

at 316.   "[C]ross-examination pertinent to the credibility of a witness and for the development of

facts that may tend to show bias or prejudice should be given the largest possible scope."   Abeyta

v. United States, 368 F.2d 544, 545 (10th Cir. 1996)(internal quotation marks omitted).

KPMG's internal assessments allocated responsibility for the Restatement between

KPMG's auditors and Thornburg Mortgage.   See Response at 19.   KPMG concluded that the

auditors were at least somewhat responsible, and reduced their compensation accordingly.   See

---

[17]That the assessments concern members of the audit team rather than KPMG's management is irrelevant, as any attribution of responsibility to KPMG tends to reduce the possibility that the Defendants' deception led to the Restatement.   See Reply at 9.

Response at 19.  The jury is entitled to know that they may have an incentive to downplay their knowledge at the time that the Restatement occurred.  The SEC points out that the assessments date back over seven years, that one auditor was never aware that her assessment existed, that one auditor is retired, and that another auditor has been promoted.  See Reply at 9.  These are topics rich for examination and/or cross-examination, but the Court will not preclude the evidence entirely.  Someone is going to have to explain what KPMG did and why it did it.  All of the KPMG witnesses will be aware of the assessments at trial.  Even absent financial incentives, moreover, the KPMG witnesses' concern for their reputation may still cause them to shift responsibility to the Defendants.

The dangers of unfair prejudice, jury confusion, and wasting time do not substantially outweigh the internal assessments' probative value.  The SEC contends that "an inquiry into the competency of KPMG's audit is a waste of time and is very likely to confuse or mislead the jury into thinking that if KPMG performed a poor audit Defendants should not be found to have deceived them, or perhaps not even be found to have committed fraud."  Motion at 14.  The KPMG witnesses' competency, however, is relevant to their credibility.  If they were really bad auditors, the Defendants can argue that they gave KPMG all of the information necessary for an audit, but that it still reached the wrong conclusions.  In other words, KPMG was not defrauded, but they were incompetent.  While such a strategy -- dumping on KPMG -- has risks, KPMG could begin stating that it was competent, but deceived -- the Court cannot foreclose the Defendants from attempting it.  In the end, however, the Defendants cannot argue that KPMG's incompetence released them from their duty to be truthful.

Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d at 1067.  Moreover, the Court will give jury instructions upon request to prevent the jury from relying wholly on KPMG's assessments.[18]  As the Court noted during the hearing, "each side has some barnacles on their case, and they're just going to have to deal with it."  Tr. at 107:11-13 (Court).  KPMG's statements in the Restatement -- which the SEC does not like -- are some of the problems with its case that it will have to handle at trial.

## III.   THE DEFENDANTS MAY DISCUSS THE INVESTIGATIONS INTO KPMG AND THE DECLINATION LETTERS.

The Court will admit evidence of the SEC and PCAOB investigations into KPMG, as well as the SEC's declination letters to two KPMG auditors, because they are relevant for impeachment purposes.  The Defendants describe the KPMG witnesses as "the SEC's cooperating witnesses," and anticipate that they will provide unfavorable testimony at trial.  Response at 24.  The SEC responds that there is no "shred of evidence" to support these allegations.  Motion at 15.

The Court does not have enough of a record to decide the issue, so the jury will have to determine their accuracy.  The existence of investigations into KPMG and the declination letters are both relevant to the KPMG witnesses' credibility.  This evidence suggests that the KPMG witnesses may be providing testimony favorable to the SEC's version of the facts to protect themselves from liability.  See Response at 2.  It could also indicate that the KPMG witnesses have reached an express agreement with the SEC.  See Response at 20.  That the Defendants

---

[18]The SEC will have to draft any instructions that it would like the Court to give.

may not have extensive evidence of such an agreement is not decisive -- the party attempting to question a witness' credibility need not prove that a cooperation agreement exists, and the SEC will have the opportunity to explain any issues on re-direct examination. The Defendants need only have a good-faith basis for their belief to ask the question. See Trujillo v. Bd. of Educ. of the Albuquerque Pub. Sch., No. CIV 02-1146JB/ACT, 2007 WL 2296974, at *6 (D.N.M. June 24, 2007)(Browning, J.); Chavez v. Franco, No. CIV 13-0338 JB/SCY, 2014 WL 6065616, at *17 (D.N.M. Sept. 30, 2014)(Browning, J.). The SEC may make its arguments that neither investigation is related to the KPMG witnesses' testimony directly to the jury.[19] See Reply at 10 n.2.

_____

[19]The SEC advises the Court that it may call a witness to rebut the Defendants' suggestion that it "had some secret side deal with KPMG[.]" Tr. at 24:21-22 (McKenna). Its Reply mentions three possible categories of rebuttal testimony: (i) "witnesses from the SEC to explain the SEC's cooperating witness program and attest that no KPMG employees involved in this matter applied for or were accepted into that program"; (ii) "character witnesses on behalf of any KPMG employee subjected to such aspersions"; and (iii) testimony from the SEC's investigation of KPMG "as a prior consistent statement under Federal Rule of Evidence 801(d)(1)(B)." Reply at 11 n.3.

The Court cautions the SEC regarding its limited approach to rebuttal:

If you're telling me now you may need to bring it up in rebuttal, it's probably not rebuttal. . . . So if you know it's something you want to get before the jury, and you know that it's going to come up in the defendant's case, be very careful about saying, I'll just bring it up in rebuttal. You may need to bring it up now, and bring it up in your case-in-chief.

Tr. at 19:21-20:6 (Court). As the Court indicated at the hearing, it will permit the SEC to present testimony regarding its Enforcement Cooperation Program in its case in chief. See Tr. at 25:1-7 (Court).

If the Defendants open the door by questioning the KPMG witnesses' veracity, the SEC may introduce testimony supporting their veracity.

Rule 408 does not bar the declination letters' admission.  Although rule 408 can bar evidence of settlement with non-parties like KPMG, see Portugues-Santana v. Rekomdiv Int'l, 657 F.3d 56, 63 (1st Cir. 2011), the Defendants do not seek to introduce the declination letters "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction," Fed. R. Evid. 408(a).  They instead seek to "prov[e] a witness's bias or prejudice," which is a permissible purpose.  Fed. R. Evid. 408(b).  See Brocklesby v. United States, 767 F.2d 1288, 1292-94 (9th Cir. 1985)(admitting a defendant's indemnity agreement with a third party to show: (i) that the defendant and a government defendant were not adverse; and (ii) to attack the defense witnesses' credibility); S.E.C. v. Retail

---

A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

Fed. R. Evid. 608(a).

The SEC may not, however, introduce their SEC investigation testimony as prior consistent statements.  The SEC notes that the KPMG witnesses' testimony "has been consistent throughout their 2009 investigative testimony (which predated the declination letters) and their December 2012 deposition testimony in this litigation (which postdated the letters)."  Reply at 10.  That the testimony predated the letters, however, is immaterial.  The Supreme Court has imposed a "premotive" requirement on prior consistent statements, explaining that a "prior consistent statement has no relevancy to refute the charge unless the consistent statement was made before the source of the bias, interest, influence or incapacity originated."  Tome v. United States, 513 U.S. 150, 156 (1995)(quoting E. Cleary, McCormick on Evidence § 49, at 105 (2d ed. 1972)).  The source of possible bias here is the possibility of lenient treatment by the SEC, which would have become apparent during possible negotiations between the KPMG witnesses and the SEC.  The declination letters, in this hypothetical, would have only confirmed an understanding between the SEC and the KPMG witnesses.  The Defendants may admit prior consistent testimony that the KPMG witnesses provided before any incentive to provide favorable testimony existed, such as before the KPMG witnesses were aware of the investigation.

- 50 -

Pro, Inc., No. 08CV1620-WQH-RBB, 2011 WL 589828, at *6 (S.D. Cal. Feb. 10, 2011)(Hayes, J.)(noting that the parties could introduce evidence of consent decrees to rebut specific witnesses' testimony); Young v. U.S. Postal Serv., No. 86 CIV. 9492 (RLC), 1988 WL 126906, at *2 (S.D.N.Y. Nov. 23, 1988)(Carter, J.).

Moreover, the danger of misleading the jury, confusing the issues, or wasting time does not substantially outweigh this evidence's probative value.  See Fed. R. Evid. 403; Motion at 16 (raising these three specific objections).  The SEC again argues that introducing this evidence "will mislead and/or substantially confuse the jury into evaluating KPMG in lieu of, or even in addition to, the conduct of Defendants."  Motion at 16.  The Court cannot remove KPMG's conduct from the case.  Given that KPMG witnesses will testify at trial, the jury will have to evaluate their credibility in addition to the Defendants' conduct.

## IV.   THE DEFENDANTS MAY INTRODUCE KPMG'S RESTATEMENT FINDINGS INTO EVIDENCE.

KPMG's Restatement conclusions are admissible, because the jury, rather than the Court, must determine their significance at trial.  The SEC urges the Court to exclude this evidence, because: (i) it is irrelevant; (ii) it will usurp the jury's role as the trier of fact; (iii) KPMG's findings contain legal conclusions; and (iv) the Defendants were still concealing documents from KPMG when it made its conclusions.  See Motion at 16-18; Reply at 18-19.  The Defendants respond that the SEC's cited cases are distinguishable, as they involve neutral administrative bodies and, at least in some cases, do not actually address the issue.  See Response at 15-16.

The Court declines to adopt the SEC's arguments for five primary reasons.  First, although the Restatement is not dispositive of the SEC's rule 13b2-2 claim, it is nonetheless

relevant evidence.[20]   See Summary Judgment MOO, at *258 ("Just as the restatement presents evidence of objective falsity -- precluding summary judgment in the Defendants' favor -- the no-fraud conclusion presents evidence that there was no auditor deception.").

The Restatement is a two-edged sword.  It is good for the SEC in that it goes a long way to establish actual falsity.  On the other hand, it suggests that the problem is not Thornburg Mortgage's honesty or internal controls.  Part of the problem is that the Court cannot figure out why KPMG did the Restatement.  On the one hand, KPMG says that Thornburg Mortgage committed no fraud and that its internal controls were adequate.  It also signed off on Thornburg Mortgage's financial statements for December 31, 2007, which suggests that nothing in the last two weeks of February, 2008 should have change the December 31, 2007 statements.  It also did not criticize its own employees in the Restatement.  Yet it did a Restatement.  The Court cannot figure out why.  The jury will have the same question.  If the Court excludes the portions of the Restatement that the SEC wants excluded -- its exoneration of Thornburg Mortgage's employees and management -- it makes it possible for KPMG to say anything it wants about the Defendants, consistent with its internal assessments.  That would be prejudicial to the Defendants, and would likely leave a wrong impression with the jury.  Mr. Goldstone and Mr. Simmons need this

---

[20]The Court usually does not like to have another court, agency, or person say what it thinks about an issue in the case; the Court wants the jury in the case to decide the issues, without being unduly influenced by what others think.  See Leon v. FedEx Ground Package Sys., Inc., No. CIV 13-1005 JB/SCY, 2016 WL 814836, at *12 (D.N.M. Feb. 21, 2016)(Browning, J.)("The federal jury should make that decision uninfluenced by the decision of a state, non-lawyer judge who did not have the robust record and arguments that the federal jury will see here.").  The Court is concerned about the Restatement playing that role here.  Nonetheless, the Court cannot think of a way to tell the story without the Restatement being a key part of it.  And if it starts redacting portions, it is putting its thumb on the scale, which it wants to avoid.

portion of the Restatement to keep KPMG honest and to test its credibility.   Redacting the Restatement the way that the SEC requests would require the Court to put its hand on the scales in the SEC's favor.

Second, the SEC's cited cases largely reflect judges' concern that juries will adopt an administrative agency's earlier conclusions instead of reviewing the evidence before them, or become confused by additional illusory issues.   See Ram v. New Mexico Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079622, at *3 (D.N.M. Dec. 11, 2006)(Browning, J.).   In Rambus, Inc. v. Infineon Techs. AG, 222 F.R.D. 101 (E.D. Va. 2004)(Payne, J.), for example, a Federal Trade Commission ALJ concluded, in a separate enforcement proceeding, that the defendant did not engage in unlawful anticompetitive conduct.   See 222 F.R.D. at 104.   The private plaintiff moved to exclude the ALJ's decision, arguing that the defendant would make it a "central focus of its trial presentation."  222 F.R.D. at 104.   The Honorable Robert Payne, United States District Judge for the Eastern District of Virginia, excluded the ALJ's decision, based in part on rule 403.   See 222 F.R.D. at 109.   Judge Payne explained: "In this case, even though the Initial Report is relevant to several issues in this litigation, it must be excluded under Rule 403 because its probative value is substantially outweighed by the danger of unfair prejudice and its tendency to mislead the jury, confuse the issues, and waste time."  222 F.R.D. at 110.   He noted that the jury would give the ALJ's findings undue weight, that its presence would mislead the jury by introducing new issues, and that it would be impossible to use excerpts to introduce only the relevant facts.   See 222 F.R.D. at 110-11.   Other courts have expressed similar concerns.   See Lewis v. City of Chicago, 563 F. Supp. 2d at 920 ("This [EEOC finding] created an undue risk of confusion in that the jury might simply adopt the result of the internal investigation rather than

- 53 -

come to its own conclusion after hearing all the evidence."). Similarly, in Coleman v. Home Depot, Inc., 306 F.3d 1333 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit held that EEOC findings are not "*per se* admissible as more probative than prejudicial," and that district courts have discretion to admit them on a case-by-case basis. 306 F.3d at 1344-45. The Third Circuit approved the district court's decision to exclude the findings, explaining: "Here that proof value could be said to be low, given the fact that it would have been introduced to the jury after all the evidence had been offered (which evidence was at odds with the EEOC report), and was more conclusory than factual in nature." 306 F.3d at 1345.

The SEC's strongest case is Tanberg v. Sholtis, 401 F.3d 1151 (10th Cir. 2005). In that case, the plaintiff in a § 1983 action attempted to introduce the Albuquerque Police Department's Standard Operating Procedures ("SOPs") into evidence. 401 F.3d at 1161. The Tenth Circuit affirmed the district court's decision to exclude the SOPs as irrelevant to the constitutional standard and potentially confusing. See 401 F.3d at 1164. The Tenth Circuit focused in particular on the plaintiff's attempt to introduce not only the SOPs themselves, but also "evidence demonstrating that the APD found that Officer Sholtis violated the SOPs and attempted to discipline him for it." 401 F.3d at 1164. The Tenth Circuit noted:

> Explaining the import of these convoluted proceedings to the jury would have been a confusing, and ultimately needless, task. The Albuquerque Chief of Police followed the recommendation of an internal affairs investigator to discipline Officer Sholtis both for making an impermissible off-duty arrest and for use of excessive force. An ad hoc committee subsequently reversed this decision. Additional testimony would have been necessary to help the jury understand the significance of these determinations and the procedures used to arrive at these contradictory results. This additional testimony explaining the procedures used at each step in the APD's investigation and decision-making would have led the jury ever further from the questions they were required to answer, and embroiled them in the dispute over whether Officer Sholtis's actions did or did not violate the

SOPs.  At the end of this time-consuming detour through a tangential and tendentious issue, the jury would have arrived at the conclusion that the APD itself seems to have been unable to resolve satisfactorily the question whether Plaintiffs' arrest violated the APD SOPs.  The rules of evidence and our prior law caution against detours as extended and fruitless as this one would almost certainly have been.

Tanberg v. Sholtis, 401 F.3d at 1164-65.  It added:

The similarity of the SOP addressing excessive force to the objective standard employed by state and federal law would render jury confusion even more likely, tempting the jury to conclude that if experienced police officers interpreted Officer Sholtis's actions as a violation of SOPs employing the same standards as the law, then Officer Sholtis must also have violated legal requirements.

401 F.3d at 1165.

As in Tanberg v. Sholtis, KPMG's conclusions -- that "we do not believe Company management was fraudulent in its actions related to this issue" and that "[t]here is no material weakness in the Company's internal control over financial reporting" -- are similar to the legal standards that the jury must apply.  Motion at 18.  Explaining the details of KPMG's audit, like explaining the details of a police department's internal investigation, could raise irrelevant issues and confuse the jury.  See Tanberg v. Sholtis, 401 F.3d at 1164-65.[21]

---

[21]The Defendants attempt to distinguish Tanberg v. Sholtis on the grounds that its "rationale was that violating the procedures did not make the ultimate issue -- whether the arrest violated the Fourth Amendment -- 'more or less likely' and was therefore 'irrelevant.'" Response at 15 n.12.  Although the Tenth Circuit excluded the evidence as to the federal claims as irrelevant under rule 401, it also analyzed whether the evidence was admissible on the state claims under rule 403.  See Tanberg v. Sholtis, 401 F.3d at 1164.  Its analysis is thus relevant to the Court's task here.

As a more general matter, Tanberg v. Sholtis dealt with a very specific issue: what force violates the Fourth Amendment.  The Tenth Circuit did not want to use SOPs -- which may provide more or less protection to the public than the Fourth Amendment -- to define the Fourth Amendment.  The Tenth Circuit excluded the SOPs, even though it allows such evidence -- government statements, statutes, industry standards -- in a host of other fields.  Negligence per

The Court concludes, however, that the SEC's cited cases are distinguishable on other grounds. All of them involved independent review or administrative bodies -- wholly disconnected from the litigation -- reaching findings of fact and law. See Rambus, Inc. v. Infineon Techs. AG, 222 F.R.D. at 104 (excluding an ALJ's conclusions); Lewis v. City of Chicago, 563 F. Supp. 2d at 920 (excluding the EEOC's conclusions); Coleman v. Home Depot, Inc., 306 F.3d at 1344-45 (discussing EEOC determinations); Price v. Fed. Exp. Corp., 283 F.3d at 725 (affirming district court's decision not to consider EEOC conclusions); Tanberg v. Sholtis, 401 F.3d at 1164 (excluding evidence of internal, but independent, police investigation results). Here, on the other hand, KPMG was intimately involved in the events leading to the current enforcement action. The jury may be inclined to defer to KPMG because of the "top-tier" firm's experience on accounting issues. Reply at 7. The Court concludes that this danger is not great, however, because its rulings on other parts of the Motion may undermine the weight of KPMG's findings. A juror presented with evidence questioning KPMG's audit judgments and hearing testimony by KPMG's witnesses is in a different position from a juror reading an ALJ's decision.[22]

---

se, for example, often involves statutes and administrative rules. See Leon v. FedEx Ground Package Sys., Inc., No. CIV 13-1005 JB/SCY, 2016 WL 814836, at *2 (D.N.M. Feb. 21, 2016)(Browning, J.). Tanberg v. Sholtis, in the Court's opinion, was a drastic remedy for a problem that jurors deal with all the time and shows a distrust for jurors in Fourth Amendment excessive force cases.

[22]The Court's decision to exclude various administrative conclusions in Ram v. New Mexico Department of Environment does not alter its conclusions here. See 2006 WL 4079622, at *3. In that case, the Court excluded a series of Department of Justice ("DOJ") and EEOC "letters, determinations, and decisions" because they did "not satisfy the criteria for

Third, other courts have admitted ALJ decisions as probative evidence.  In <u>Zeus Enterprises, Inc. v. Alphin Aircraft, Inc.</u>, 190 F.3d 238 (4th Cir. 1999), an airplane owner sued a restoration firm for failing to restore an aircraft "to a fully airworthy condition."  190 F.3d at 240.  The district court allowed the plaintiff to introduce a National Transportation Safety Board ("NTSB") ALJ's decision that the plane was not airworthy.  <u>See</u> 190 F.3d at 240.  The United States Court of Appeals for the Fourth Circuit affirmed.  <u>See</u> 190 F.3d at 240.  It explained: "The probative value of the ALJ's decision is real and beyond dispute.  His findings were based on an analysis of twelve days of evidence on whether the plane was airworthy, the issue central to the breach of contract claim in this case."  190 F.3d at 243.  It added that the evidence did not unduly influence the jury, because: (i) the defendant "introduced evidence to contradict the ALJ's findings, directed the jury to this evidence in closing, and argued forcefully to the jury that the

---

trustworthiness" under the exceptions to the rule against hearsay contained in rule 803.  2006 WL 4079622, at *3.  The Court explained:

> They are not the product of hearings or of formal procedures aimed at developing a factual record and giving the parties the opportunity to respond to argument and to cross-examine witnesses.  Rather, "the matter and things contained therein express merely the opinion of one whose official office and duty does not rise to the dignity of an adjudicator of causes and effects."  <u>Franklin v. Skelly Oil Co.</u>, 141 F.2d at 572 (excluding a report documenting a fire inspector's opinion regarding the cause of a fire because the report consisted only of the inspector's opinion and were not the product of an adjudicatory proceeding).

2006 WL 4079622, at *3.  The Court dealt with a hearsay exception in <u>Ram v. New Mexico Department of Environment</u>, not a pure rule 403 determination.  <u>See</u> 2006 WL 4079622, at *3.  Its analysis was focused on the administrative conclusions' validity, rather than their potential for usurping the jury's role.  <u>Ram v. New Mexico Department of Environment</u> is also distinguishable on the same grounds as the SEC's cited cases -- it involved an independent administrative body separate from the litigation.

ALJ's decision should be given 'little weight'"; and (ii) "the district court instructed the jury that the ALJ's decision 'is not conclusive on the issue you have before you.'" 190 F.3d at 243.[23] See Smith v. Universal Servs., Inc., 454 F.2d 154, 157 (5th Cir. 1972)(concluding that the district court's decision to exclude an EEOC report was "wasteful and unnecessary"); Dresser v. Ohio Hempery, Inc., No. CIV.A. 98-2425, 1999 WL 1063067, at *2 (E.D. La. Nov. 22, 1999)(Vance, J.)("While the ALJ does have the word 'judge' in his title, this, alone, is not sufficient to find undue prejudice.").

Fourth, any potential limits on KPMG's available information go to its conclusions' weight rather than their admissibility. The SEC notes that courts are more likely to exclude third parties' conclusions when they rely on limited evidence or provide limited evidence to the jury. In Price v. Fed. Exp. Corp., 283 F.3d 715 (5th Cir. 2002), for example, a plaintiff appealed a district court's grant of summary judgment on the grounds that it failed to consider an EEOC "determination letter" -- a shorter form of a standard report. 283 F.3d at 725. The United States Court of Appeals for the Fifth Circuit rejected the plaintiff's argument, noting that the EEOC

---

[23]The Court recognizes that Rambus, Inc. v. Infineon Technologies distinguished Zeus Enterprises, Inc. v. Alphin Aircraft, Inc. before excluding the FTC ALJ's decision. See Rambus, Inc. v. Infineon Techs. AG, 222 F.R.D. at 110. Judge Payne noted that the party opposing the decision's admission lacked access to both the complete text of the ALJ's report and the underlying evidence, asserting that "[u]nder those circumstances, it is unrealistic to expect that Infineon could show a jury how the ALJ's report was in error." 222 F.R.D. at 110. Given the extensive discovery in this matter, the SEC does not suffer from a similar lack of access to evidence. It has all of the tools it needs to attack KPMG's conclusions. Other cases distinguishing Zeus Enterprises, Inc. v. Alphin Aircraft, Inc. have cited similar considerations. See Coryn Grp. II, LLC v. O.C. Seacrets, Inc., No. CIV. WDQ-08-2764, 2011 WL 3240456, at *5 (D. Md. July 27, 2011)(Quarles, J.)("Further, the probative value of the report admitted in Zeus was greater than the TTAB's decision. The TTAB did not consider the issues this jury will decide; its probative value is not 'real and beyond dispute,' and, as explained in the March 10, 2011 Memorandum Opinion, there is a great potential for confusing or misleading the jury.").

"never conducted interviews with anyone other than Price, or compiled an investigative report." 283 F.3d at 725. Because the agency relied on incomplete information, in short, the Fifth Circuit refused to force the district court to admit its conclusions. The SEC contends that KPMG, like the EEOC in Price v. Federal Express Corp., relied on limited evidence in reaching its conclusions. See Reply at 8. The SEC will, however, be able to make the same arguments that it makes to the Court -- regarding various emails and the Citigroup reservation of rights letter -- to the jury at trial. See Reply at 8.

Fifth, KPMG's prior conclusions have far more probative value than the sorts of reports excluded in the SEC's cited cases. In Wade v. Washington Metropolitan Area Transit Authority, No. CIV. 01-0334(TFH), 2006 WL 890679 (D.D.C. Apr. 5, 2006)(Hogan, J.), the court excluded EEOC decisions, explaining: "Here, the danger of unfair prejudice outweighs the decisions' probative value because the factual findings in the decisions are overshadowed by the legal conclusions drawn, and because the facts in the report add little to the evidence that will otherwise be presented to the jury at trial." 2006 WL 890679, at *4 (emphasis added). KPMG's conclusions are more significant in this case. The SEC alleges that the Defendants deceived KPMG, in violation of rule 13b2-2. See Complaint ¶¶ 126-128, at 35-36. KPMG's conclusion that "we do not believe Company management was fraudulent in its actions related to this issue," Motion at 18, has a strong "tendency to make a fact more or less probable than it would be without the evidence," Fed. R. Evid. 401. Indeed, the Court has already held that "the no-fraud conclusion presents evidence that there was no auditor deception." Summary Judgment MOO at 613. KPMG's conclusions will not only add to the evidence presented to the jury at trial -- they

are an important tool to allow the jury to understand the full context surrounding the event in dispute.

**IT IS ORDERED** that: Plaintiff Securities and Exchange Commission's Motion in Limine Regarding KPMG, filed March 17, 2016 (Doc. 390), is denied in part and granted in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

> *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

- 60 -

Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Robert G. Badal
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

*Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Paul M. Torres
Robert J. Liubicic
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

*Attorneys for Defendant Jane E. Starrett*