# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

vs.                                                                    No. CIV 12-0257 JB/LFG

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendants' Motion *In Limine* No. 11 to Preclude Evidence or Argument Relating to Claims Brought Against Defendants Larry Goldstone and Clarence Simmons in any Other Litigation, filed March 17, 2016 (Doc. 402)("Motion"). The primary issue is whether the Court should allow Plaintiff Securities and Exchange Commission ("SEC") to offer evidence or arguments relating to claims brought against Defendants Larry Goldstone and Clarence Simmons in other litigation. The Court will preclude the SEC from offering any evidence or argument relating to claims brought against Goldstone and Simmons in other litigation unless the Defendants open the door, in which case the Court will reexamine the issue. The Court will thus grant the Motion.

## <u>FACTUAL BACKGROUND</u>

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1). The Court presents the facts solely to provide context for the Motion. It continues to adhere to the decisions on the facts it reached in its Unsealed Memorandum Opinion and Order, filed August 22, 2015 (Doc. 371)("Summary Judgment MOO").

The Defendants are former officers of Thornburg Mortgage: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The SEC alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[1]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[2]  Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations

---

[1]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[2]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

focused on "jumbo" and "super-jumbo"[3] ARM securities; Thornburg Mortgage also purchased

ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out

most of its earnings in dividends, and obtained financing for its mortgage and investment

business through reverse repurchase agreements[4] backed by ARM securities.  See Complaint ¶ 3,

_____

[3]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set.  Super jumbo mortgage, Wikipedia.  Fannie Mae purchases and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created.  See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends."  Fannie Mae, Investopedia.  The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates, because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined or regulated, but mortgage companies use it internally and independently to set loan parameters.  See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage, Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

[4]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to *repo*."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the

at 2.   Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's

---

buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."   Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m.,

filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[5] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Email from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

---

[5]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."  Interest Only (IO) Strips, Investopedia (Apr. 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  <u>See</u> Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  <u>See</u> Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K. How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.  <u>See</u> Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would

negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")).  Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an email to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."  Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia.  "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls. See Complaint ¶ 3, at 6; id. ¶ 41, at 12. Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K. See Complaint ¶ 7, at 3. In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets. See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash. To date, no such sales have been required . . . ."). Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[7] See Complaint ¶ 37, at

---

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP. About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/. According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset." The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale. SFAS 166 at 3. The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective. SFAS 166 at 3. Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be

11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that served as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008.  See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch,

---

accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2, (sent February 28, 2008, at 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).  In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original).  See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, (sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email").  As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint

- 11 -

¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-
4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from
J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to
Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February
28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they]
reinforced in the market'" were: "'We have met all margin calls to date, and we expect to
continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet
margin calls.  We returned to profitability during the fourth quarter despite a tough market.'"
Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to
assess whether it had the intent and ability to hold its ARM securities until maturity, or when
they recovered their value on the market -- referred to as an "other-than-temporary
impairment . . . analysis" ("OTTI analysis").[9]   Complaint ¶¶ 49-50, at 50-51.   As part of
Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI
analysis was accurate.  See Complaint ¶ 49, at 14-15.[10]  The Defendants did not disclose to

---

[9]An "impairment" is a "reduction in a company's stated capital."   Impairment,
Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court
has determined, however, that it may take judicial notice of documents that the Complaint
references and that are central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec.
Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning,
J.)("In addition to those documents that are judicially noticeable, a court may consider
documents to which the complaint refers, if the documents are central to the plaintiff's claim and
the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email
from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and
Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013

KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, <u>see</u> Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, <u>see</u> Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, <u>see</u> Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, <u>see</u> Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern.   <u>See</u> Complaint ¶ 57, at 17.   Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's.   <u>See</u> Complaint ¶ 76, at 22.   "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside

---

(Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, <u>see</u> March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."   Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"). The requested evidence included "correspondence with lenders/attorneys/shareholders, emails." Request for Correspondence, attached to March 3, 2008 Hall Email at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").  See Complaint ¶ 100, at 29.  KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  At the time, KPMG as auditor was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.  KPMG did not become aware of the Citi Letter while preparing its Restatement.  See Complaint ¶ 101, at 29.  Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"  Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).  The analysis stated: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped

significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in mortgage valuations.'"   Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.  See Complaint, filed March 13, 2012 (Doc. 1)("Complaint").  The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act, and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

1. **The Motion.**

In their Motion, the Defendants ask the Court to "preclud[e] the SEC from offering any evidence or argument relating to claims brought against Defendants Larry Goldstone and

Clarence Simmons in any other litigation, including the securities class action and a suit brought by the Thornburg bankruptcy trustee." Motion at 1 (referring to In re Thornburg Mortgage, Inc. Securities Litigation, 912 F. Supp. 2d 1178 (D.N.M. 2012)(Browning, J.)(securities class action settlement) and Sher v. SAF Financial, Inc., No. CIV.A. RDB 10-1895, 2011 WL 4835700 (D. Md. Oct. 11, 2011)(Bennett, J.)(bankruptcy trustee suit)). The Defendants argue that evidence from other litigation is irrelevant and thus inadmissible, and cite to rules 401, 402, 404(b), and 403 of the Federal Rules of Evidence, as well as Abu Dhabi Commercial Bank v. Morgan Stanley & Co., No. 08-Civ.-7508 (SAS), 2013 WL 1155420 (S.D.N.Y. March 20, 2013)(Scheindlin, J.), and Estate of Tobin ex rel. Tobin v. SmithKline Beecham Pharmaceuticals, No. 00-CV-0025, 2001 WL 36102165 (D. Wyo. May 18, 2001)(Beaman, M.J.). See Motion at 2-3.

First, the Defendants contend that any evidence or argument relating to other litigation is irrelevant to the factual issues that the jury will decide: (i) whether the Defendants' OTTI conclusion in Thornburg's 2007 Form 10-K was objectively and subjectively truthful; and (ii) whether Defendants made a material misrepresentation or omission to KPMG with that filing. See Motion at 2. They note that the issues raised in other litigation, including a securities class action and a suit that Thornburg Mortgage's bankruptcy trustee brought, are irrelevant to these factual issues. See Motion at 2 (referring to In re Thornburg Mortgage, Inc. Securities Litigation, 912 F. Supp. 2d 1178 (D.N.M. 2012) and Sher v. SAF Financial, Inc., No. CIV.A. RDB 10-1895, 2011 WL 4835700, (D. Md. Oct. 11, 2011)). Further, they contend that the other litigation did not result in judicial determinations of fact. See Motion at 2. Accordingly, the Defendants argue that the Court should exclude any evidence from other litigation under rules 401 and 402. See Motion at 2.

Second, the Defendants contend that any evidence relating to other litigation would only insinuate that they were "accused of and possibly involved in other wrongdoing." Motion at 3. They explain that the evidence is thus prohibited propensity evidence under rule 404(b). See Motion at 3.

Third, the Defendants argue that, even if the evidence relating to other litigation is relevant, the evidence is still inadmissible, because it would have an unfair prejudicial effect, violating rule 403. See Motion at 3.

Finally, the Defendants point to two cases from other United States District Courts to support their contention that evidence from other litigation against the Defendants would be prejudicial and irrelevant: Abu Dhabi Commercial Bank v. Morgan Stanley & Co., No. 08-Civ.-7508 (SAS), 2013 WL 1155420 (S.D.N.Y. March 20, 2013) and Estate of Tobin ex rel. Tobin v. SmithKline Beecham Pharmaceuticals, No. 00-CV-0025, 2001 WL 36102165 (D. Wyo. May 18, 2001). See Motion at 3. The defendants in Abu Dhabi Commercial Bank v. Morgan Stanley & Co. sought to exclude evidence of a government report and underlying testimony, which explored the causes of the financial crisis, for being irrelevant and more prejudicial than probative. See 2013 WL 1155420, at *7. The court held that the testimony of parties in the case discussing relevant issues and memorialized in the reports may be admissible, but references to other lawsuits, "including their factual allegations and evidence," are inadmissible. 2013 WL 1155420, at *7. Further, the court in Estate of Tobin ex rel. Tobin v. SmithKline Beecham Pharmaceuticals ruled that evidence of other litigation involving a pharmaceutical at issue in the case was irrelevant and inadmissible. See 2001 WL 36102165, at *1.

2.     **The Response**.

The SEC responded to the Motion on April 14, 2016.  <u>See</u> Plaintiff U.S. Securities and Exchange Commission's Opposition to Defendants' Motion *in Limine* No. 11 to Bar Plaintiff from Presenting Evidence or Argument Relating to Claims Brought Against Defendants Larry Goldstone and Clarence Simmons in any Other Litigation, filed April 14, 2016 (Doc. 416)("Response").  The SEC begins by stating that it does not "intend to rely on any evidence related to those separate actions to prove any element of its case."  Response at 1.  It then notes that it may have to use evidence of other litigation to impeach the Defendants' trial testimony.  <u>See</u> Response at 1.  The SEC requests that the Court defers ruling on the issue until it arises at trial.  <u>See</u> Response at 1.

3.     **The Reply**.

The Defendants replied on May 3, 2016.  <u>See</u> Reply Memorandum in Support of Defendants' Motion *in Limine* No. 11 to Preclude Evidence or Argument Relating to Claims Brought Against Defendants Larry Goldstone and Clarence Simmons in any Other Litigation, filed May 3, 2016 (Doc. 442)("Reply").  The Defendants first dismiss the Response for giving "the Court no reason why it should not grant Defendants' Motion," and for not disputing that the evidence relating to other litigation "is entirely irrelevant and would be unfairly prejudicial."  Reply at 1.  The Defendants contend that the SEC's argument that it "'cannot foreclose' the theoretical possibility of wanting to use this prejudicial evidence at some point in the trial" is not a basis to deny the Motion.  Reply at 1 (quoting Response at 1).  They add that the SEC does not put forth any scenario that may occur at trial where evidence of other litigation could be used as impeachment evidence.  <u>See</u> Reply at 2.  Finally, the Defendants argue that the Court should not defer ruling on the Motion until trial, because the SEC "(i) has not articulated the relevance of such evidence

and admits it has no bearing on the 'element[s] of its case,' (ii) does not dispute that such evidence is unfairly prejudicial, and (iii) cannot articulate any actual scenario where such evidence would come into play for impeachment purposes."  Reply at 2 (quoting Motion at 1).

### 4.      **The Hearing**.

The Court held a hearing on May 11, 2016.  See Transcript of Hearing at 1 (taken May 11, 2016), filed January 26, 2016 (Doc. 291)("Tr.").  The Court opened the hearing on the Defendants' Motion that it was inclined to grant it.  See Tr. at 147:3-8 (Court).  The Court cautioned the Defendants, however, "to be careful to not open the door," because if their testimony is inconsistent with their testimony in other litigation, the SEC will be permitted to "do what they have to do to impeach it and make the record straight."  Tr. at 147:8-19 (Court).

The Defendants responded that the Court is "exactly right" in granting the Motion and only revisiting the issue "should the door somehow be opened."  Tr. at 148:3-6 (Johnstone).  The SEC agreed with the Court's ruling.  See Tr. at 148:23-24 (Bliss).  Also, the Court granted the Motion with the caveat that, "[i]f anybody needs to talk about other claims being brought against Goldstone and Simmons, approach the bench, and we'll talk about it up here and figure out what to do about it."  Tr. at 149:1-5 (Court).

### LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

evidence." United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")). "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'" United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012) (Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note). Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible. See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989)(Baldock, J.). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(Tacha, J.)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)). The United States Court of Appeals for the Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(Baldock, J.).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999)(Kelly, J.), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.).   The Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . .  This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(Thomas, J.)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).   See United States v. Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional response or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999)(Sanborn, J.). Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)(Ebel, J.); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991)(Holloway, J.). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"   United

States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(Hartz, J.)(quoting Fed. R. Evid. 403

advisory committee notes).

### ANALYSIS

The Court will grant the Motion.  The Court will preclude the SEC from presenting any

evidence relating to claims brought against the Defendants in any other litigation.  If, however,

the Defendants open the door during their testimony, the Court will determine if it should admit

the evidence for impeachment purposes.

I.     **THE EVIDENCE RELATING TO CLAIMS BROUGHT AGAINST THE DEFENDANTS IN OTHER LITIGATION IS IRRELEVANT TO THE ISSUES HERE.**

The Defendants specifically include a shareholder class action and a suit that the

Thornburg Mortgage bankruptcy trustee brought in the "other litigation" that they seek to

exclude.  Motion at 1 (referring to In re Thornburg Mortgage, Inc. Securities Litigation, 912 F.

Supp. 2d 1178 (D.N.M. 2012) and Sher v. SAF Financial, Inc., No. CIV.A. RDB 10-1895, 2011

WL 4835700 (D. Md. Oct. 11, 2011)).  The shareholder class action concerned alleged

misstatements made in Thornburg Mortgage's 2006 and 2007 SEC filings, including the 2007

Form 10-K, but the court dismissed most of the plaintiffs' claims in that case, including the

claims relating to misrepresentations in the 2007 Form 10-K, pursuant to the defendants' rule

12(b)(6) motion.  See Motion at 1 (referring to In re Thornburg Mortgage, Inc. Securities

Litigation, 912 F. Supp. 2d 1178 (D.N.M. 2012) and In re Thornburg Mortgage, Inc. Securities

Litigation, 824 F. Supp. 2d 1214 (D.N.M. 2011)(Browning, J.)(2007 Form 10-K not actionable)).

Further, the bankruptcy trustee suit alleged a breach of fiduciary duties, and the case was settled

with no finding of any liability.  See Motion at 2 (referring to Sher v. SAF Financial, Inc., No.

CIV.A. RDB 10-1895, 2011 WL 4835700, at *1).  Accordingly, these claims have no relevance

- 22 -

to the issues which must be decided here, specifically: (i) whether the Defendants' OTTI conclusion in Thornburg Mortgage's 2007 Form 10-K was objectively and subjectively truthful; and (ii) whether the Defendants made a material misrepresentation or omission to KPMG in connection with that filing.  See Motion at 2.  There is no reason that evidence of these other claims will help make any fact of consequence in determining these issues more or less probable than without the evidence.  See Fed. R. Evid. 401.  Further, the SEC offers only one reason why it would introduce evidence of the other claims -- to impeach the Defendants' trial testimony. See Response at 1.

Because of the nature of the prior litigation, this case is distinguishable from Guidance Endodontics, LLC v. Dentsply International, Inc., 705 F. Supp. 2d 1265 (D.N.M. 2010)(Browning, J.), where the Court admitted evidence of prior litigation involving similar disputes to show defendant's prior conduct.  See 705 F. Supp. 2d at 1271.  This showing of prior conduct could establish the defendant's state of mind and that it willfully violated a statute.  See 705 F. Supp. 2d at 1271.  Here, the SEC offers no reason besides possible impeachment why evidence of prior litigation involving the Defendants should be admissible and states that it does not intend to present such evidence to "prove any element of its case."  Response at 1.  This case is more similar to Predator International, Inc. v. Gamo Outdoor USA, Inc., No. 09-CV-00970-PAB-KMT, 2014 WL 348637 (D. Colo. Jan. 31, 2014)(Brimmer, J.), where the defendant sought to exclude evidence of other litigation brought against it.  See 2014 WL 348637 at *3.  The plaintiff gave no argument why this evidence should be admissible, and the court held the evidence was not relevant.  See 2014 WL 348637 at *3.

## II. THE EVIDENCE RELATING TO CLAIMS BROUGHT AGAINST THE DEFENDANTS IN OTHER LITIGATION MAY BE USED TO IMPEACH THE DEFENDANTS' TRIAL TESTIMONY IF THEY OPEN THE DOOR.

The Federal Rules of Evidence allow the admission of a witness's prior inconsistent statements to impeach that witness.  See Fed. R. Evid. 613(a).  Further, the United States Court of Appeals for the Tenth Circuit has repeatedly held that a witness's prior statements are admissible to impeach or discredit the witness.  See United States v. Carter, 973 F.2d 1509 (10th Cir. 1992)(Brorby, J.); United States v. Neal, 452 F.2d 1085 (10th Cir. 1971)(Pickett, J.).  These statements cannot be used, however, as substantive evidence, and the Court must instruct the jury that these statements can be considered only in evaluating the witness' credibility.  See United States v. Carter, 973 F.2d at 1512.

Evidence of prior lawsuits is generally inadmissible against a defendant, but the Court has held that this evidence is admissible when the defendant testifies as an expert witness.  See Upky v. Lindsey, No. CIV 13-0553 JB/GBW, 2015 WL 3862944, at *20 (D.N.M. June 3, 2015)(Browning, J.).  Also, in United States v. Denetclaw, 96 F.3d 454 (10th Cir. 1996)(Kelly, J.), the Tenth Circuit affirmed the district court's decision to allow the prosecution to introduce tribal court pleas to impeach the defendant's credibility as he testified on his own behalf.  See 96 F.3d at 457.  The district court admitted this evidence, because the right of a defendant to testify on his behalf does not include the right to commit perjury.  See 96 F.3d at 457 (citing Harris v. New York, 401 U.S. 222 (1971)).  The Tenth Circuit also affirmed in United States v. Smith, 776 F.2d 892 (10th Cir. 1985)(Barrett, J.), that there was no reason why defense counsel could not question a witness about inconsistent statements made in a different trial in an attempt to impeach him.  See 776 F.2d at 897.  Further, the Court has previously allowed evidence of a witness's inconsistent past testimony to be introduced for purposes of impeaching that witness.

See United States v. McKenzie, 779 F. Supp. 2d 1257, 1266 (D.N.M. 2011)(Browning, J.), aff'd

532 F. App'x 793 (10th Cir. 2013).   Accordingly, the Court will allow the SEC to present

evidence of claims brought against Defendants Goldstone or Simmons in other litigation in order

to impeach their testimony if they open the door.

**IT IS ORDERED** that: the Defendants' Motion *In Limine* No. 11 to Preclude Evidence

or Argument Relating to Claims Brought Against Defendants Larry Goldstone and Clarence

Simmons in any Other Litigation, filed March 17, 2016 (Doc. 402), is granted without prejudice

to the Plaintiff Securities and Exchange Commission ("SEC") renewing its arguments at trial to

admit evidence of other litigation, if the Defendants open the door in some way.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Ian S. Karpel
Danielle R. Voorhees
Securities and Exchange Commission
Denver, Colorado

    *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Robert G. Badal
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

   *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Paul M. Torres
Robert J. Liubicic
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

*Attorneys for Defendant Jane E. Starrett*