## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.                                                                      No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

      Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett's Motion *In Limine* No. 3 To Bar Evidence And Argument Regarding Defendants Larry A. Goldstone, Clarence G. Simmons, III's Income Or Wealth, filed March 17, 2016 (Doc. 394)("Motion"). The primary issue is whether the Court should allow the SEC to introduce evidence regarding the Defendants' wealth and/or income. The Court will exclude all evidence of wealth, because it is not relevant and it is unfairly prejudicial. The Court will allow some evidence of income, because it is relevant to motive to commit securities fraud and has probative value that outweighs potential unfair prejudice. The Court will thus grant the Motion in part and deny it in part.

### FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1). The Court presents the facts solely to provide context for the Motion. It continues to adhere to the decisions on the facts it reached in its Unsealed Memorandum Opinion and Order, filed August 22, 2015 (Doc. 371)("Summary Judgment MOO").

The Defendants are former officers of Thornburg Mortgage: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The SEC alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[1]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[2]  Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations

---

[1]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[2]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

focused on "jumbo" and "super-jumbo"[3] ARM securities; Thornburg Mortgage also purchased ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and investment business through reverse repurchase agreements[4] backed by ARM securities.  See Complaint ¶ 3,

---

[3]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set.  Super jumbo mortgage, Wikipedia.  Fannie Mae purchases and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created.  See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends."  Fannie Mae, Investopedia.  The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates, because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined or regulated, but mortgage companies use it internally and independently to set loan parameters.  See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage, Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

[4]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to repo."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23,

at 2. Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price." Complaint ¶ 22, at 7-8. The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level. See Complaint ¶ 22, at 8. A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise. See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8. Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had

---

2013), http://en.wikipedia.org/wiki/Repurchase_agreement. "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement." Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  <u>See</u> Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  <u>See</u> Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  <u>See</u> Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  <u>See</u> Complaint ¶ 3, at 2; <u>id.</u> ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  <u>See</u> Complaint ¶ 34, at 11.  In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call

over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[5] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Email from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did

---

[5]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."  Interest Only (IO) Strips, Investopedia (Apr. 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.  See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")).  Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an email to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."  Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia.  "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[7]  See Complaint ¶ 37, at 11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to

---

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP. About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/.  According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset." The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that served as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008.  See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting

---

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

Email from Clay Simmons to Larry Goldstone at 2, (sent February 28, 2008, at 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).   In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original).   See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, (sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27).   At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.   See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email").   As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.   See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").   Complaint ¶ 98, at 28.   On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"   Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to

Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'" Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity, or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[9]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See Complaint ¶ 49, at 14-15.[10]  The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage

---

[9]An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, see Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern. See Complaint ¶ 57, at 17. Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's. See Complaint ¶ 76, at 22. "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further." Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events." Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email").

The requested evidence included "correspondence with lenders/attorneys/shareholders, emails."
Request for Correspondence, attached to March 3, 2008 Hall Email at 3-4, filed May 21, 2012
(Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also
requested a "position paper," which "provides the Company's assessment of the ability to hold
securities for the foreseeable future as of August 27, 2008, including but not limited to . . .
[c]orrespondence with counter parties for the two weeks prior to filing, along with supporting
evidence."  Request for Correspondence at 4.  At the time, KPMG, as auditor, was considering
whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit
opinion's validity.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of the Citi
Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.  KPMG did not become
aware of the Citi Letter while preparing its Restatement.  See Complaint ¶ 101, at 29.  Simmons
reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's
margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were
part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"  Complaint ¶
102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-
25)("Position Paper")).   The analysis states: "'Due to a number of factors including **the
unexpected collapse of a major hedge fund in Europe** the mortgage market gapped
significantly wider. . . [.]  No one in the market could have foreseen the sudden decline in
mortgage valuations.'"  Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper
at 2).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.  See Complaint, filed March
13, 2012 (Doc. 1)("Complaint").  The SEC alleges eleven claims for relief: (i) fraud in violation

of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R.

§ 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15

U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and

rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v)

falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. §

78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange

Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. §

240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange

Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. §

240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act

and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in

violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person

violation for keeping false books and records under § 20(a) of the Exchange Act. See Complaint

¶¶ 106-43, at 31-39.

The Court granted in part and denied in part the SEC's and the Defendants' motions to

dismiss on July 8, 2013. See Memorandum Opinion and Order at 2-3, filed July 8, 2013 (Doc.

190)("Motion to Dismiss MOO"). The Motion to Dismiss MOO dismissed the SEC's

allegations: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's

outside auditor that Thornburg Mortgage successfully met its margin calls without violating its

lending agreements, and did not sell assets to meet margin calls"; and (ii) "that the Defendants

schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-

K." Motion to Dismiss MOO at 2. It declined to dismiss the SEC's claim that "the

representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to

maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was

materially false or misleading."  Motion to Dismiss MOO at 2.  The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are
> primarily liable or liable as control persons for that misrepresentation in the 10-K,
> and the Court will not dismiss the SEC's allegations that the Defendants aided
> and abetted the misrepresentation, as the Court has determined that the SEC
> sufficiently alleged that Goldstone and Simmons made, and the Defendants
> provided substantial assistance to, the misrepresentation with knowledge of
> recklessness to its falsity.  Similarly, the Court will not dismiss the SEC's
> allegations that the Defendants misled Thornburg Mortgage's auditor before the
> 2007 Form 10-K was filed through the statement that Thornburg Mortgage had
> the intent and ability to hold its impaired assets to maturity or their value
> recovered in the market.

Motion to Dismiss MOO at 3.  The Court also allowed certain claims against Goldstone and

Simmons to proceed.  See Motion to Dismiss MOO at 3.  These claims included the SEC's

allegations whether: (i) the Defendants failed to disclose to KPMG before they filed the 2007

Form 10-K that a European hedge fund's collapse would negatively affect Thornburg

Mortgage's financial condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's

financial condition after filing the 2007 Form 10-K; (iii) the Defendants materially misled

KPMG by not providing correspondence showing that Thornburg Mortgage experienced an

event of default in the two weeks before the 2007 Form 10-K filing; and (iv) Simmons

misrepresented that unexpected events had an unexpected financial impact on Thornburg

Mortgage after the 2007 Form 10-K filing.  See Motion to Dismiss MOO at 3.

The Court later denied the Defendants' and the SEC's motions for summary judgment.

See Summary Judgment MOO at 2-3.  It first explained that it would apply an "actual-disbelief"

standard to determine "whether a person subjectively disbelieved the truth of an opinion

statement."  Summary Judgment MOO at 2.  The Court then concluded that genuine issues of

material fact for the jury existed on the SEC's claims that: (i) the Defendants made objectively

false statements; (ii) the statements were material; (iii) the Defendants believed that their statements were false they made them; and (iv) the Defendants made statements that were false or misleading because of omitted information. <u>See</u> Summary Judgment MOO at 2-3. The Court thus declined to grant summary judgment for any party on any issue. <u>See</u> Summary Judgment MOO at 3.

Starrett reached a settlement with the SEC on May 20, 2016. <u>See</u> Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent"). The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include a requirement that Starrett testify for any of the remaining parties. Starrett Consent at 1. Ten claims remain in the case for trial -- all of the original claims, with the exception of the SEC's claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b). <u>See</u> Pretrial Order at 3-4, filed May 11, 2016 (Doc. 448).[11]

### 1.      **The Motion**.

The Defendants filed their Motion on March 17, 2016. <u>See</u> Motion at 1. The Defendants ask the Court "to bar the SEC from offering evidence . . . or making any arguments at trial

_____

[11]The Motion to Dismiss MOO and Summary Judgment MOO did not dismiss the SEC's § 17(a) claim, but it does not appear in the Pretrial Order. The parties have also not submitted any jury instructions on this claim. <u>See</u> Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463). The parties' proposed verdict forms do not include a § 17(a) claim. <u>See</u> Defendant Clay Simmons's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489). The Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim." <u>Wilson v. Muckala</u>, 303 F.3d 1207, 1215 (10th Cir. 2002). The pretrial order that the parties filed in this case, therefore, supersedes all prior pleadings, including the Complaint. <u>See</u> <u>Wilson v. Muckala</u>, 303 F.3d at 1215 (citing C. Wright, A. Miller & M. Kane, <u>6A Fed. Prac. & Proc. Civ.</u> § 1522 (2d ed. 1990)).

regarding the income or wealth of any Defendants." Motion at 2. They then make two arguments in favor of exclusion. See Motion at 3-5.

First, the Defendants contend that evidence regarding their income and wealth is irrelevant, because it does not make any fact of consequence in this case more or less probable. See Motion at 3 (citing Fed. R. Evid. 401). They note that the factual issues for the jury are: "(i) the objective and subjective truthfulness of Defendants' determination regarding other than temporary impairment (OTTI) for purposes of Thornburg Mortgage's 2007 Form 10-K, and (ii) whether Defendants made a material misrepresentation or omission in their dealings with the auditor KPMG in connection with that Form 10-K." Motion at 3. The Defendants contend that "evidence regarding Defendants' income and wealth has nothing to do with these factual issues." Motion at 3.

Second, the Defendants argue that the Court should exclude, pursuant to rule 403 of the Federal Rules of Evidence, information regarding their income and wealth even if the information is relevant, because "the minimal probative value of such evidence would be substantially outweighed by the danger of unfair prejudice that it would pose." Motion at 3. The Defendants contend that "there is no probative value to the amount of Defendants' wealth and certainly not to their tax returns, and the risk of confusion is nearly certain." Motion at 5. They cite to Kinsey v. Cendant Corp., 588 F. Supp. 2d 516 (S.D.N.Y 2008)(Sweet, J.), which rejected a defendant's attempt to introduce a plaintiff's compensation package: "Even assuming that [the plaintiff's] compensation package and negotiations with a [subsequent employer] are of some limited relevance, that relevance is outweighed by the unfair prejudice that would result from its admission." Motion at 4 (quoting Kinsey v. Cendant Corp., 588 F. Supp. 2d at 518). The Defendants also support their argument by citing to a case granting a motion in limine "to

exclude evidence of witness's wealth and lifestyle because it was irrelevant 'and its inclusion would be unfairly prejudicial.'"   Motion at 4 (quoting L-3 Commc'ns Corp. v. OSI Sys., Inc., No. 02 CIV. 9144 (PAC), 2006 WL 988143, at *6 (S.D.N.Y. Apr. 13, 2006)(Crotty, J.)).

The Defendants argue that the Court should exclude five documents on the SEC's exhibit list pertaining to the Defendants' income and wealth in accordance with the Defendants' motion in limine for three reasons: (i) Goldstone's tax returns for 2007, 2008 and 2009; (ii) Starrett's tax returns for the same years; and (iii) a background questionnaire containing financial information that Starrett completed.  See Motion at 4-5.

     **2.**       **The Response.**

The SEC responded on April 14, 2016.  See Plaintiff U.S. Securities and Exchange Commission's Opposition to Defendants' Motion In Limine No. 3 to Bar Evidence and Argument Regarding Defendants' Income or Wealth, filed April 14, 2016 (Doc. 421)("Response").   The SEC seeks to introduce evidence relating to the Defendants' "well-compensated positions" -- namely, how much they earned at Thornburg Mortgage in 2006, 2007 and 2008.  See Response at 1.  The SEC makes two primary arguments in its Response.

First, the SEC argues that the evidence is relevant, because "the Defendants' substantial compensation from Thornburg goes directly to their motive to engage in fraudulent conduct of which the Commission complains."   Response at 2.   The SEC cites to the Court's previous rulings, which state that, "[m]otive is a factor which the Court may consider in assessing allegations of scienter."   Response at 2 (quoting Motion to Dismiss MOO at 295)  The SEC cites to cases in which "other courts have also found that defendants' compensation is relevant to scienter."   Response at 2 (citing SEC v. Delphi Corp., 508 F. App'x. 527, 532 (6th Cir. 2012)(holding that the "self-interested motivation of defendants in the form of saving their

salaries . . . " is "relevant to scienter"); <u>SEC v. McCabe</u>, No. 2:13-cv-161-TS-PMW, 2014 WL 7405518, at *4 (D. Utah Dec. 30, 2014)(Warner, J.)(concluding that tax returns were "relevant to the issue of . . . scienter")).   The SEC also asks the Court to admit this evidence to rebut the Defendants' possible argument that they lacked a motive to engage in fraud.   <u>See</u> Response at 3.

Second, the SEC contends that admitting wealth and income evidence will not result in unfair prejudice.   <u>See</u> Response at 4.   The SEC argues that the "Defendants' compensation is very real evidence of their motive to engage in fraud," and that their compensation thus has significant probative value: "Here, the evidence will be used for its legitimate purpose, as evidence of motive."   Response at 4.   It concludes that such evidence's danger of unfair prejudice does not substantially outweigh its probative value.   <u>See</u> Response at 4.   The SEC cites to <u>United States v. Quattrone</u>, 441 F.3d 153 (2d Cir. 2006), to support its argument that substantial salary "is relevant to motive and is not outweighed by a danger of 'unfair prejudice.'" Response at 4 (citing 441 F.3d at 187).

The SEC further notes that, while the defendants want the Court to exclude their tax returns from the exhibit list, they do not identify specific items from their returns that could lead to a decision on an improper basis.   <u>See</u> Response at 5.   The SEC contends that the Defendants' Motion is too general and that, unlike the situation here, the Defendants' cited cases involve irrelevant evidence.   <u>See</u> Response at 5.

**3.     <u>The Reply</u>.**

The Defendants replied to the SEC's response on May 3, 2016.   <u>See</u> Reply Memorandum In Support of Defendants' Motion <i>In Limine</i> No. 3 To Bar Evidence and Argument Regarding Defendants' Income or Wealth, filed May 03, 2016 (Doc. 435)("Reply").

First, the Defendants contend that the evidence of wealth presented is insufficient to satisfy the scienter element of a Section 10(b) claim.  See Reply at 1.  The Defendants reject the SEC's argument regarding the general relevance of compensation to prove motive: "That the Court decided for purposes of the private shareholder action not to 'ignore' allegations of common motives that '[did] not establish a strong inference of scienter' does not establish the relevance of Defendants' compensation for purposes of the jury trial in this government enforcement action."  Reply at 2 (quoting In re Thornburg Mortg., Inc. Securities Litigation, 695 F. Supp. 2d 1165, 1202 (D.N.M. 2010) (alteration in Reply).  They stress that "the pleading must allege 'a particularized motive for fraud' such as direct 'profit-taking' from the alleged fraud." Reply at 2 (quoting Funke v. Life Fin. Corp., 237 F. Supp. 2d 458, 467 (S.D.N.Y. 2002)(Motley, J.)).  They contend that "the SEC does not argue that the Defendants' compensation represented some sort of 'direct profit-taking' from the allegedly false OTTI judgment."  Reply at 2 (quoting Funke v. Life Fin. Corp., 237 F. Supp. 2d at 467).  Further, the Defendants state that the SEC did not cite case law to support its argument that their compensation is relevant to scienter.  See Reply at 3.  They further argue that the SEC relied on cases which are not analogous to their case, therefore invalidating its arguments on the admission of compensation evidence to prove scienter in an alleged fraud scheme.  See Reply at 4.

Second, the Defendants contend that the SEC advances a general theory of relevance without explaining its specifics.  See Reply at 4.  Because the SEC does not adequately support its argument, the Defendants argue, it does not explain "how or to what extent the amount of each Defendant's compensation makes it more or less likely that he or she subjectively believed in Thornburg's OTTI judgment."  Reply at 4.  This error, they add, makes any link between the

compensation amount and their subjective view of the truthfulness of the OTTI judgment "at best hypothetical and speculative."  Reply at 4-5.

Third, the Defendants argue that their decision not to sell their Thornburg Mortgage stock should not open the door for compensation information to be admitted into evidence.  See Reply at 5.  The Defendants thus argue that the SEC is "unable to make a particularized showing linking Defendants' alleged fraud to 'profit-taking' -- precisely because Defendants did not sell their stock -- evidence of Defendants' wealth is simply not relevant, and evidence that Defendants did not sell their stock does not make it so."  Reply at 5.

Fourth, the Defendants state that evidence of compensation would be unfairly prejudicial. See Reply at 5.  They cite Kinsey v. Cendant Corporation to support their statement that "[c]ourts have excluded evidence of compensation (even when assuming its relevance) based on the potential of such evidence to appeal 'to the fact finder's potential economic sympathies or prejudices.'"  Reply at 6 (citing Kinsey v. Cendant Corp., 588 F. Supp. 2d at 518).  Further, the Defendants argue that the SEC intends to use the compensation evidence, particularly their tax returns, to prejudice the jury.  See Reply at 6.  The Defendants contend that the SEC's failure to allege in its initial Complaint[12] "that Defendants' compensation was evidence of their purported motive to commit fraud or the scienter elements of the Section 10(b) claim" reveals that the SEC itself did not initially regard compensation evidence as relevant.  Reply at 7.

Fifth, the Defendants argue that the SEC concedes in its Complaint that evidence regarding their compensation is not relevant to one of the claims.  See Reply at 7.  The Defendants contend that "the only 'fraudulent conduct' alleged in this case relates to the SEC's claim that Defendants made a false OTTI judgment in Thornburg's 2007 Form 10-K."  Reply at

---

[12]See Securities Exchange Commission's Complaint, filed March 13, 2012 (Doc. 1)("Complaint").

7.  The Defendants note that the "SEC does not argue that evidence of Defendants' compensation is relevant to its auditor deception claim."  Reply at 7.  The Defendants therefore argue that the Court should not admit evidence regarding compensation to support the SEC's other claims.  See Reply at 7.

    **4.**     **The Hearing.**

The Court held a hearing on May 11, 2016.  See Transcript of Hearing (taken May 11, 2016), filed May 20, 2016 (Doc. 466)("Tr.").

The Court initially explained that the SEC needed only salary figures for three years -- 2006, 2007, and 2008.  See Tr. at 83:19-20 (Court).  For that information to be available to the parties, the Court proposed to script out the Defendants' answers as to the salaries they received from Thornburg Mortgage, so that the amounts would be admitted on direct or cross-examination.  See Tr. at 83:19-25 (Court).  The Court proposed: "When the defendants testify -- we script this out, and . . . they need to admit on cross-examination, or if the defendants want to bring it out in their direct examinations if they're not called in the SEC's case-in-chief, they need to admit to those three years what their salary was from Thornburg."  Tr. at 83:21-84:8 (Court).

The Court concluded that the Defendants' salaries would be relevant to their motive.  See Tr. 84:2-3 (Court)("It seems to me that goes to motive.").  The initial proposal by the Court consisted of three questions to each Defendant: what their salaries were in 2006, 2007, and 2008.  See Tr. at 84:9-12 (Court).  Further, the Court initially saw no relevance in evidence of the Defendants' wealth.  See Tr. at 84:14-15 (Court).  Finally, the Court stated that the Defendants' tax returns were not needed, unless the Defendants refused to answer questions regarding their salaries.  See Tr. at 84:24-25 (Court).  The Court's initial proposal was thus to send three questions to the Defendants asking them to answer what their salaries were during three years --

- 23 -

2006, 2007, and 2008.  <u>See</u> Tr. at 84:16-20 (Court).

The Defendants objected to the Court's proposal on two grounds.  <u>See</u> Tr. at 85:7 (Tewksbury). First, the Defendants asserted that the SEC should show a particularized link between the allegation of intent to defraud the market and the alleged profit taking that resulted from the alleged conduct.  <u>See</u> Tr. at 85:9-12 (Tewksbury).  In that respect, the Defendants argued that the only financial information which would be relevant to profit taking would be the bonuses, specifically those earned in 2008.  <u>See</u> Tr. at 85:17-18 (Tewksbury).  The Defendants also asked the Court to admit only the information for 2008.  <u>See</u> Tr. at 85:12-18 (Tewksbury).

The SEC responded to those remarks by mostly agreeing with the Court's proposal.  <u>See</u> Tr. at 86:5-11 (Kasper).  It asked the Court to also allow information regarding significant bonuses and dividends that the Defendants earned between 2006 and 2008: "It's not just salary. They also received significant bonus and dividends.  So I'd rather not just say what their salary, so it would be more than just three questions, but to elucidate their complete compensations for those three years.  But yes, otherwise."  Tr. at 86:6-7 (Kasper).  The SEC's proposed questions would amount to nine per Defendant: one question regarding the salary, one regarding any bonus, and one regarding dividends for each of those three years.  <u>See</u> Tr. at 86:15-17 (Kasper). Further, the SEC noted that the particularized link cited by the Defendants was not required. "This notion of a particularized link is simply not required."  Tr. at 86:24-25 (Kasper).  The SEC argued that the case law upon which the Defendants were relying was distinguishable and that only a relevance standard applies here.  <u>See</u> Tr. at 87:1-6 (Kasper).  The SEC further argued that it needs to show only the relevance of a motive to engage in the alleged conduct in order for the SEC to infer scienter and not a particularized link, unlike what the Defendants argue.  <u>See</u> Tr. at 87:3-14 (Kasper).

- 24 -

In response, the Court asked whether the parties were comfortable with limiting the use of the information regarding the Defendants' salaries only to rebut the motive issue.  <u>See</u> Tr. at 87:22-25 (Court).  The SEC expressed its desire to use the salary information not only for rebuttal purposes, but also to establish the Defendants' motive.  <u>See</u> Tr. at 88:1-3 (Kasper).

The Defendants contested the SEC's request on two grounds.  <u>See</u> Tr. at 88:8-22 (Tewksbury).  First, the Defendants contended that the SEC did not meet its requirement to show how salaries, including bonuses, are relevant to motive.  <u>See</u> Tr. at 88:10-14 (Tewksbury).  Second, the Defendants were concerned at the salary and wealth evidence's potential for unfair prejudice.  <u>See</u> Tr. at 88:16-17 (Tewksbury).  The Defendants thus contended that the SEC had to prove a relationship between bonuses (profit-taking) and false statements to put on such evidence.  <u>See</u> Tr. at 88:19-23 (Tewksbury).  The Defendants reiterated the need to limit the admission of evidence, if any, to 2008.  <u>See</u> Tr. at 89:1-7 (Tewksbury).

After hearing the parties' objections, the Court ruled that some income-related information would be accepted into evidence: "[S]end a letter over to the defendants listing out your nine questions for each one of them, and the answer you expect to get."  Tr. at 89:11-13 (Court).  The Court directed the SEC to send a total of nine questions to each Defendant, asking them to disclose their salaries, bonuses, and dividends for the years of 2006, 2007, and 2008. <u>See</u> Tr. at 89:10-13 (Court).  The Court instructed the SEC to calculate the amounts it expected to receive from the Defendants.  <u>See</u> Tr. at 89:12-13 (Court).  It added that, if the SEC and the Defendants disagreed on the answers, the parties could bring any disagreements to the Court's attention.  The Court and the SEC could examine the Defendants in front of the jury, and the Defendants should be ready to answer those questions on the witness stand.  <u>See</u> Tr. at 90:4-7 (Court).  The Court further indicated that it would exclude all information regarding wealth and

the Defendants' tax returns.  See Tr. at 90:9-18 (Court).  The Court stated that the information should be disclosed for all three years.  "We do need to get into I think a three-year period is sufficient to make a point, that's the immediate point of what they were receiving from Thornburg and make the motive point."  Tr. at 90:19-22 (Court).

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'"  United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012) (Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence." Fed. R. Evid. 403. Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989)(Baldock, J.). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(Tacha, J.)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)). The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(Baldock, J.).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999)(Kelly, J.), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.). The Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(Thomas, J.)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See United States v. Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against

admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional response or would otherwise tend to adversely affect the jury's attitude toward a particular matter.  See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999)(Sanborn, J.). Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d at 1301;  United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)(Ebel, J.);  United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991)(Holloway, J.).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(Hartz, J.)(quoting Fed. R. Evid. 403 advisory committee notes).

## ANALYSIS

The Court will grant the Motion in part and deny it in part.  First, the Court will exclude all information regarding the Defendant's wealth, because evidence of wealth is irrelevant and unfairly prejudicial.  Second, the Court will exclude the Defendants' financial information, except for each Defendant's salary, dividends, and bonuses earned in the years 2007, 2008, and 2009, as evidence of motive.

## I.   THE SEC MAY NOT USE THE DEFENDANTS' WEALTH AS EVIDENCE.

The Court will not admit any evidence regarding the Defendants' wealth.  Courts have long held that a general reference to a party's financial condition is typically not admissible evidence.  Evidence of wealth, "which can be taken as suggesting that the defendant should respond in damages because he is rich," is generally inadmissible in trials not involving punitive

damages.  Reilly v. Natwest Markets Grp. Inc., 181 F.3d 253, 266 (2d Cir. 1999).  Thus, the

default rule is not to admit evidence of wealth, because it is usually irrelevant under rule 401 and

unfairly prejudicial under rule 403.  "[Suggestions] that the defendant should respond in damages

because he is rich and the plaintiff is poor, are grounds for a new trial."  L-3 Commc'ns Corp. v.

OSI Sys., Inc., No. 02CIV.914, 2006 WL 988143, at *6 (S.D.N.Y. Apr. 13, 2006)(Crotty, J.).

See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239 (1940)(Douglas, J.)("[A]ppeals

to class prejudice are highly improper and cannot be condoned and trial courts should ever be

alert to prevent them."); Garcia v. Sam Tanksley Trucking, Inc., 708 F.2d 519, 522 (10th Cir.

1983)(Seymour, J.)("Reference to the wealth or poverty of either party, or reflection on financial

disparity, is clearly improper argument."); Brown v. Coleman Co., No. CIV-06-403, 2007 U.S.

Dist. LEXIS 96221, at *3 (D.N.M. Sept. 17, 2007)(Vazquez, J.)("Generally, any reference to the

wealth or poverty of either party, or reflection on financial disparity, is improper argument.").

Courts have admitted wealth evidence in two circumstances: (i) when a party opens the

door to wealth-related information or the defendants do not object to such information being

presented; and (ii) when the information regarding the Defendants' wealth is necessary to

calculate damages which are punitive in nature:  "To admit financial condition evidence, the

damages to be determined must be punitive in nature."  Whiteley v. OKC Corp., 719 F.2d 1051,

1055 (10th Cir. 1983)(Barrett, J.)(citing Blankenship v. Rowntree, 219 F.2d 597, 598 (10th Cir.

1955)(Bratton, J.)).   None of these circumstances allowing for admission of wealth-related

evidence exist here.

First, courts have admitted wealth evidence when one party has opened the door to such

evidence.

> A party, having himself opened the door to evidence which is inadmissible . . .
> cannot complain that thereafter the court in the exercise of its sound judicial

discretion permitted the opposite party to introduce other testimony bearing upon the field of inquiry, even though under different circumstances the testimony would be subject to valid objection of inadmissibility.

Whiteley v. OKC Corp., 719 F.2d at 1055. In Whiteley v. OKC Corp., an employee of the defendant corporation testified that the corporation was undergoing bankruptcy proceedings. See 719 F.2d at 1055. In an opinion that the Honorable James Barrett, Circuit Judge for the Tenth Circuit Court of Appeals wrote, the Tenth Circuit held that the defense itself opened the door to cross-examination concerning the corporation's financial condition. See 719 F.2d at 1055. Judge Barrett explained that "[t]he introduction of evidence by OKC concerning its current corporate status was clearly trial strategy to show its impecunity, intended to mitigate damages." 719 F.2d at 1055. Judge Barrett thus allowed Whiteley to cross-examine the witness to contradict the evidence of OKC's "'poor boy' status." 719 F.2d at 1055. The Tenth Circuit refused to hold such evidence inadmissible, because the defendant itself raised the issue and did not object to it at trial. See 719 F.2d at 1055.

Similarly, in L-3 Communications Corporation v. OSI Systems., Inc., No. 02CIV.914, 2006 WL 988143 (S.D.N.Y. Apr. 13, 2006)(Crotty, J.), the Honorable Paul Crotty, United States District Judge for the Southern District of New York, granted a defendant's motion in limine to preclude the plaintiff from inquiring about or referring to the wealth and lifestyle of the defendant corporation's Chief Executive Officer and Chairman. See 2006 WL 988143, at *6. Judge Crotty explained that the inclusion of such evidence was "clearly irrelevant . . . and its inclusion would be unfairly prejudicial." 2006 WL 988143, at *6. The court thus granted the defendants' motion in limine "to preclude argument and examination regarding [defense witness] Mr. Chopra's wealth and lifestyle subject to renewal at trial should OSI 'open the door.'" 2006 WL 988143, at *6.

Analogously, in United States v. Ferguson, No. 3:06CR137 (CFD), 2007 WL 4240782 (D. Conn. 2007)(Droney, J.), the Honorable Christopher Droney, United States District Judge for the District of Connecticut, admitted into evidence a deferred compensation plan to prove motive, because American International Group ("AIG")'s performance affected Milton's[13] benefits under the plan.  See 2007 WL 4240782 at *1.  "Evidence that links a defendant's financial compensation to his possible motives for participating in an alleged fraud is relevant to proving the fraud."  2007 WL 4240782, at *1 (D.Conn. Nov. 30, 2007)(Droney, J.)(citing United States v. Quattrone, 441 F.3d at 186).  The compensation plan evidenced the defendant's wealth, and the court found such evidence probative of motive to commit fraud, outweighing its prejudicial effect.  See 2007 WL 4240782, at *1.

The Defendants have not introduced wealth-related information at this stage in the proceedings.  The SEC is the party seeking the inclusion of evidence.  The Defendants have not opened the door to any wealth evidence.

Courts have also allowed wealth-related evidence into evidence when such evidence is necessary to calculate properly punitive damages.  "If punitive damages are an issue, evidence of worth of the defendants may be considered."  Smith v. United States Gypsum Co., 612 P.2d 251, 255 (Okla. 1980).  In Leon v. FedEx Ground Package System, Inc., 313 F.R.D. 615 (D.N.M. 2016)(Browning, J.), the Court explained that "the Tenth Circuit also permits consideration of the defendant's wealth when determining whether the punitive damages awarded comport with the Due Process Clause."  313 F.R.D. at 637.

---

[13]Christian M. Milton was one of several defendants against whom the United States brought charges.  Mr. Milton filed a motion to exclude evidence relating to his compensation package.

In this case, the SEC is seeking the following forms of relief: disgorgement of any and all ill-gotten gains, together with pre-judgment interest in an amount that the Court will determine; civil money penalties in an amount that the Court will determine, plus post-judgment interest; and such other relief as this Court may deem just or appropriate. See Pretrial Order ¶ D, at 3. These damages are not punitive. Even if they were punitive damages, the Court, rather than the jury, will make the determination. In Whiteley v. OKC Corp. and in Smith v. United States Gypsum Co., the jury determined the amount of the damages, although the jury in Smith v. United States Gypsum Co. decided not to award punitive damages. See Whiteley v. OKC Corp., 719 F.2d at 1058; Smith v. United States Gypsum Co., 612 P.2d at 255. In this case, the damages will mostly be equivalent to ill-gotten gains, and the Court will decide the award, making the Defendants' wealth irrelevant to the jury's tasks. See Pretrial Order ¶ D, at 3.

Even if wealth evidence were relevant, the Court would exclude it, because admission would substantially and unfairly prejudice the Defendants. Rule 403 states that the Court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Court must thus apply a balancing test: "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d at 638 (quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)).

In Garcia v. Sam Tanksley Trucking, Inc., a defense witness introduced evidence regarding the defendant corporation's size. See 708 F.2d at 522. Following that disclosure, the Plaintiffs' counsel compared the defendant corporation's size and wealth to the Plaintiffs'

"meager living."      708 F.2d at 522.   In an opinion that the Honorable Stephanie Seymour, Circuit Judge for the Tenth Circuit Court of Appeals wrote, the Tenth Circuit concluded that this argument on financial disparity, which is generally not acceptable, was appropriate under those special circumstances.  See 708 F.2d at 522.  First, because a defense witness opened the door to the defendant's wealth, the jury was aware of that information before the plaintiffs' counsel mentioned it.  See 708 F.2d at 522.  Furthermore, defense counsel "met the issue head-on at the beginning of its own closing argument by telling the jury that the verdict was not to be based on the size of defendant corporation."  708 F.2d at 522.  Finally, the jury was given an instruction that directed it not to take the corporation's size or status into consideration to render its verdict. See 708 F.2d at 522.

None of the circumstances described above, which could counteract potential prejudice, exist here.  The Defendants have not opened the door to their wealth information, the damages are not fully punitive in nature or to be decided by the jury at this stage, and this case has not yet gone to trial.  In Leon v. FedEx Ground Package System, Inc., the Court differentiated punitive damages from civil penalties: "The BMW of North America, Inc. v. Gore guideposts are: (i) the reprehensibility of the defendant's conduct; (ii) "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award;" and (iii) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases."  See 313 F.R.D. at 631 (citing BMW of North America, Inc, v. Gore, 517 U.S. 559, 575).  The Court will therefore exclude the Defendants' wealth from evidence, because admission could allow class prejudice, and because neither the "open door" exception nor the punitive damage exception, apply to this case.

## II.    THE COURT WILL ADMIT SOME OF THE DEFENDANTS' INCOME RELATED EVIDENCE.

The Court will allow limited evidence regarding the Defendants' income to allow the SEC to prove motive and scienter.  The Court will limit such evidence to the Defendants' salaries, dividends, and bonuses for the years of 2006, 2007, and 2008.  Evidence regarding a party's income is generally inadmissible, because it prejudices the jury against the party whose situation is being exposed.  "As a general rule, it is error to admit evidence of a party's financial condition unless necessary to determine the damages sustained."  Whiteley v. OKC Corp., 719 F.2d at 1055 (citing Blankenship v. Rowntree, 219 F.2d at 598).

The Court has already recognized in this matter that "[m]otive is a factor which the Court may consider in assessing allegations of scienter, but motive and opportunity alone are not dispositive on the issue."  Motion to Dismiss MOO at 295.  The Court has also adopted the view from other circuits "that courts must look to the totality of the pleadings to determine whether the Plaintiffs' allegations permit a strong inference of fraudulent intent."  SEC v. Goldstone, 952 F. Supp. 2d at 1242 (citing City of Phila. v. Fleming Cos., 264 F.3d 1245, 1261-62 (10th Cir. 2001)).  Intent is therefore a key element in the SEC's case.  In a similar case also involving the SEC, the United States Court of Appeals for the Sixth Circuit laid out the rule that,

> [i]n the securities fraud context, scienter is a state of mind encompassing intent to deceive, manipulate or defraud.  Scienter may be established by proof of reckless conduct . . . .  A traditional but not exhaustive list of factors relevant to scienter include[s] . . . the self-interested motivation of defendants in the form of saving their salaries or jobs.

SEC v. Delphi Corp., 508 F. App'x. 527, 531 (6th Cir. 2012)(Beckwith, J.).

The Court has also allowed the analysis of motive in showing scienter: "'[T]o establish scienter,' the SEC must demonstrate that the defendants 'knew of the potentially material fact, and [] knew that the failure to reveal the potentially material fact would likely mislead

- 34 -

investors.'" SEC v. Goldstone, 952 F. Supp. 2d at 1242 (citing City of Phila. v. Fleming Cos., 264 F.3d at 1262). The Court has also explained:

> While the Court agrees that "courts distinguish motives common to corporations and executives generally from motives to commit fraud," the Court also realizes that it should not ignore such motives when considering the totality of factual allegations that might potentially give rise to a strong inference of scienter. Thus, the Court will not find that the Plaintiffs' scienter allegations fail merely because they allege common motives.

In re Thornburg Mortg. Sec. Litig., 695 F. Supp. 2d 1165, 1202 (D.N.M. 2010)(Browning, J.)(quoting Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F. Supp. 2d 662, 678)(D. Colo. 2007)(Nottingham, J.)).

In United States v. Quattrone, the United States of America presented evidence of the defendant's salary for two years to prove that his "substantial salary established a motive for him to obstruct the IPO[14] allocation investigations." 441 F.3d at 187. The defendant argued that the Second Circuit should exclude any information regarding his salary, arguing that such information was irrelevant and unduly prejudicial. See 441 F.3d at 187. The Second Circuit agreed with the United States that the salary which the defendant earned during the two years at issue in the case was relevant and that its probative value outweighed its prejudicial effect. See 441 F.3d at 187. Because the evidence regarding the defendant's compensation was to be used only for the limited purpose of proving motive, such evidence was not unfairly prejudicial to the defendant. See 441 F.3d at 187.

Similarly, in United States v. Logan, 250 F.3d 350, 369 (6th Cir. 2001)(Nugent, J.), the Sixth Circuit admitted the defendants' substantial salary as evidence of motive in the mortgage-

---

[14]An Initial Public Offering (IPO) is the first sale of stock by a private company to the public. IPOs are often issued by smaller, younger companies seeking the capital to expand, but can also be done by large, privately owned companies looking to become publicly traded. What is an Initial Public Offering – IPO, Investopedia, www.investopedia.com/terms/i/ipo.asp.

backed securities context.  "[T]he income evidence had a significant probative value because it demonstrated what Appellants stood to lose if they properly reported the actual loan delinquencies.  For this reason, the trial court properly exercised its broad discretion in admitting this evidence."  250 F.3d at 369.

Conversely, in United States v. Ferguson, the United States District Court for the District of Connecticut also ruled that evidence regarding the defendant's salary and bonuses was not admissible, but only because that evidence was irrelevant to the charges brought against him. See 2007 WL 4240782, at *1.  "Milton's salary and bonuses were not affected by AIG's stock price; because of this, they are not probative of any financial incentive Milton may have had to participate in the LPT."  United States v. Ferguson, 2007 WL 4240782, at *1.

In this case, the SEC alleges that the Defendants committed fraud by making various misrepresentations to investors, to the SEC, and to Thornburg Mortgage's auditor.  See Pretrial Order at 3-4.  It is appropriate for the SEC to introduce motive evidence to attempt to prove scienter.  See, e.g., In re Thornburg Mortg. Sec. Litig., 695 F. Supp. 2d at 1202; SEC v. Goldstone, 952 F. Supp. 2d at 1242; City of Phila. v. Fleming Cos., 264 F.3d at 1262.  Mr. Goldstone and Mr. Simmons might have been tempted to fudge the truth in a tough situation in late 2007 and early 2008 to keep their income stream intact.  Some people do not tell the truth and cross the line when times get tough.  The high salaries suggest a motive, in that Mr. Goldstone and Mr. Simmons had skin in the game.  The SEC advanced in its Response that Mr. Goldstone made approximately $7.7 million in 2006, $6.6 million in 2007, and $5.1 million in 2008.  See Response at 1.  It further asserted that Mr. Simmons made $1.3 million in 2006 and 2007 and $450,000 in 2008.  See Response at 1.  The Court thus concludes that motive goes to proof of the Defendants' alleged scienter.

Evidence of motive may be admitted as long as its probative value outweighs its prejudicial effect on the party.  See Fed. R. Evid. 403.  Here, the Defendants' motivation may well have been to keep their position at Thornburg Mortgage to preserve their high salaries, dividends, and bonuses.  See Response at 2.  Following the reasoning and factors that the United States Court of Appeals for the Sixth Circuit established in United States SEC v. Delphi Corp., salaries can be one of the factors relevant to scienter.  See 508 F. App'x. at 531.  Much as in United States v. Quattrone, these Defendants' substantial salaries may have been a motive to misrepresent their company's financial situation.  See 441 F.3d at 187.  The Court therefore concludes that such information is relevant to the alleged charges.  The question before the Court, then, is whether the probative value of such evidence outweighs its potentially prejudicial effect on the Defendants.  Although the Defendants urge the Court in their Reply to consider their motive as a common motive to executives generally, rather than a motive to commit fraud, the Court concludes that, because of this specific context of alleged securities fraud, the SEC should be able to prove motive in order to infer scienter.  Even if, therefore, their salaries were high and "[not] readily replicated in Santa Fe, New Mexico," the probative value of such evidence is so high in potentially proving motive that it should outweigh prejudice.  See Response at 1.

The one case to which the Defendants cite to support the exclusion of income-related evidence does not apply directly to their case.  See Reply at 6.  The Kinsey v. Cendant Corp. court excluded compensation evidence, but the evidence related mostly to wealth -- which the United States District Court for the  District of New Mexico has already excluded -- and the court deemed such compensation information barely relevant and unfairly prejudicial to the question of the plaintiff.  See 588 F. Supp. 2d at 518.  In other words, that case dealt with a

compensation package,[15] not with salaries,[16] dividends,[17] or bonuses,[18] and that information was barely relevant and unfairly prejudicial.  By contrast, in this case, the Defendants' salaries are highly relevant to their potential motive for defrauding the public.

The Defendants' situation in this case is most similar to that of the defendants in United States v. Quattrone and United States v. Logan, because they earned high salaries, dividends on earnings, and bonuses which were directly dependent upon the inflated numbers and financial data that they allegedly misrepresented.  The Court will therefore allow the SEC to include evidence regarding those factors to prove motive and thus scienter.  To limit the prejudicial effect on the Defendants of such disclosure, however, the Court will cabin the evidence.  The Court will exclude the full tax returns of the Defendants for the years of 2007, 2008, and 2009, because such evidence would give the trier of fact irrelevant information on the Defendants' full wealth and financial condition, information that does not go to motive and would be unfairly prejudicial, like the wealth evidence.  The Court will, however, allow limited information regarding the Defendants' salaries, dividends, and bonuses for the years of 2006, 2007, and

---

[15]A compensation package is comprised of a base salary and other benefits, such as stock options.    Compensation    Package,    Collins    Dictionary, http://www.collinsdictionary.com/dictionary/english/compensation-package.  Investopedia offers a detailed explanation of CEO compensation packages: A Guide To CEO Compensation, http://www.investopedia.com/articles/stocks/04/111704.asp.

[16]A salary is a fixed compensation paid regularly for services. Salary, Merriam Dictionary, http://www.merriam-webster.com/dictionary/salary.

[17]A dividend is a distribution of a portion of a company's earnings, decided by the board of directors, to a class of its shareholders.  Dividends can be issued as cash payments, as shares of    stock,    or    other    property.    Dividend,    Investopedia, http://www.investopedia.com/terms/d/dividend.asp.

[18]A bonus is an additional compensation given to an employee above his/her normal wage.  A bonus can be used as a reward for achieving specific goals set by the company, or for dedication    to    the    company.    Bonus,    Investopedia, http://www.investopedia.com/terms/b/bonus.asp#ixzz4BBfATFkm.

2008.  The SEC is to send letters to the Defendants listing the questions for that information, so as to allow that evidence to be revealed on direct or cross-examination.  The Court will exclude all other income-related evidence at this stage.  The SEC may ask Mr. Goldstone and Mr. Simmons the specific dollar amounts of their salaries, the dividends, and the bonuses that they received from Thornburg Mortgage in 2006, in 2007, and in 2008.  If the Defendants call Mr. Goldstone and/or Mr. Simmons to testify first, then the Defendants can ask them those questions. The Court will also allow the SEC to ask for the figures on cross-examination.  The Court will not allow any questions regarding any other aspects of the Defendants' wealth.

**IT IS ORDERED** that: Defendants Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett's Motion In Limine No. 3 To Bar Evidence And Argument Regarding Defendants' Income Or Wealth, filed March 17, 2016 (Doc. 394), is granted in part and denied in part, as the Court has specified in the body of this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Danielle Voorhees
Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Ian S. Karpel

Securities & Exchange Commission
Denver, Colorado

 *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Chris Johnstone
Heather Tewksbury
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Robert G. Badal
Aaron Thompson
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

 *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

- 40 -

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Paul M. Torres
Robert J. Liubicic
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

*Attorneys for Defendant Jane E. Starrett*