# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.                                  No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion in Limine No. 8 to Bar Plaintiff from Presenting Evidence or Argument Relating to Dismissed Claims, filed March 17, 2016 (Doc. 399)("Motion"). The Court held a hearing on May 11, 2016. The Court concludes that the evidence supporting dismissed claims is relevant to remaining claims, and therefore the Court will allow Plaintiff Securities and Exchange Commission to introduce evidence that supports both dismissed claims and remaining claims. The Court will limit, however, that evidence in certain ways. First, the SEC is restricted from arguing or attempting to resurrect the dismissed claims. Second, the Court will not allow the parties to refer to the fact that the Court has dismissed some claims. Finally, the Court will permit the parties to discuss the I/O Strip Transactions[1] and refer to them as a "lost source of liquidity," or using the words in the emails, such as "sales," but the parties are restricted from calling them "assets."

---

[1] Interest only (IO) strips are the interest portion of mortgage, Treasury or bond payments, which is separated and sold individually from the principal portion of those same payments." Interest Only (IO) Strips, Investopedia, http://www.investopedia.com/terms/i/iostrips.asp (last visited June 9, 2016).

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1)("Complaint").  The Court presents the facts solely to provide context for the Motion.  It continues to adhere to the decisions on the undisputed facts it reached in its Unsealed Memorandum Opinion and Order, filed August 22, 2015 (Doc. 371)("Summary Judgment MOO").

The Defendants are former officers of Thornburg Mortgage, Inc.: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1. The Securities and Exchange Commission ("SEC") alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[2]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[3]  Complaint ¶¶ 76-79, at 22.

---

[2]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."    10-K,  Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.    It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."    10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[3]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo"[4] ARM securities; Thornburg Mortgage also purchased

---

[4]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set.  Super jumbo mortgage, Wikipedia.  Fannie Mae purchases and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created.  See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends."  Fannie Mae, Investopedia.  The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined or regulated, but mortgage companies use it internally and independently to set loan parameters.  See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage, Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and investment business through reverse repurchase agreements[5] backed by ARM securities.  See Complaint ¶ 3, at 2.  Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July

---

[5]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to *repo*."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8. Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans. See Complaint ¶ 24, at 8. Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated. See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million. See Complaint ¶ 33, at 10. In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default. See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008) filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")). Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to

amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Email from

Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K. See Complaint ¶ 32, at 10. The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls. See Complaint ¶ 32, at 10. In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'" Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K. Complaint ¶ 30, at 9-10. In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved. Our goal for resolution i[s] the filing of our 10-K. How we disclose this issue and what we say will depend on where we are next week when we need to file. But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2). Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same email. Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2). Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'" Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.

See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would

negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on

February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this
> afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point
> haircuts on Alt-A and AAA's overnight.  I think we will get this a little more
> gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, send

February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008

Goldstone/Simmons Email")).  Simmons sent an email to Goldstone and others regarding the

potential collapse of the European hedge fund, stating: "'This makes it even more critical to be

done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Email from

Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2,

sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008

Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an email to Starrett, in

which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline

to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40,

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."  Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia. "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[7]  See Complaint ¶ 37, at

---

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP. About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/.  According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset." The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166

11. The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that serve as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008. See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones

---

at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

Newswire"); <u>Thornburg, MF Global Send Financial Stocks Lower</u>, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2, sent February 28, 2008, at 6:33 a.m., filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).   In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original).  <u>See</u> Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, sent February 28, 2008, at 5:29 a.m., filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  <u>See</u> Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, sent February 28, 2008, at 6:56 a.m., filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email").  As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  <u>See</u> Complaint ¶ 9, at 4; <u>id.</u> ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on <u>Street Signs</u> on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On <u>Street Signs</u>, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint

- 11 -

¶ 98, at 28 (alterations in original)(quoting <u>Street Signs: Interview with Larry Goldstone</u> at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  <u>See</u> Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'" Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[9]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  <u>See</u> Complaint ¶ 49, at 14-15.[10]   The Defendants did not disclose to KPMG: (i) Thornburg

_____

[9]An "impairment" is a "reduction in a company's stated capital."   <u>Impairment</u>, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, <u>see</u> <u>In re. Thornburg Mortg., Inc. Sec. Litig.</u>, No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013

Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, see Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going concern. See Complaint ¶ 57, at 17. Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's. See Complaint ¶ 76, at 22. "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further." Complaint ¶ 77, at 22-23.

---

(Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."   Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, sent March 3, 2008 11:44 p.m., filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"). The requested evidence included "correspondence with lenders/attorneys/shareholders, emails." Request for Correspondence, attached to March 3, 2008 Hall Email, at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."   Request for Correspondence at 4.   At the time, KPMG as auditor was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.   See Complaint ¶ 99, at 29.   Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.   See Complaint ¶ 101, at 29.   KPMG did not become aware of the Citi Letter while preparing its restatement.   See Complaint ¶ 101, at 29.   Simmons reviewed and approved an analysis for KPMG which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"   Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).   The analysis states: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in

- 14 -

mortgage valuations.'"  Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## **PROCEDURAL BACKGROUND**

The SEC filed this enforcement action on March 13, 2012.  See Complaint at 1.  The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

The Court granted in part and denied in part the SEC's and the Defendants' motions to dismiss on July 8, 2013.  See SEC v. Goldstone, 952 F. Supp. 2d 1060, 1076-77 (D.N.M. 2013)(Browning, J.)).  The Court dismissed the SEC's allegations: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's outside auditor that Thornburg Mortgage successfully met its margin calls without violating its lending agreements, and did not sell assets

to meet margin calls"; and (ii) "that the Defendants schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-K." 952 F. Supp. 2d at 1076. It declined to dismiss the SEC's claim that "the representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was materially false or misleading." 952 F. Supp. 2d at 1076-77. The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are primarily liable or liable as control persons for that misrepresentation in the 10-K, and the Court will not dismiss the SEC's allegations that the Defendants aided and abetted the misrepresentation, as the Court has determined that the SEC sufficiently alleged that Goldstone and Simmons made, and the Defendants provided substantial assistance to, the misrepresentation with knowledge of or recklessness to its falsity. Similarly, the Court will not dismiss the SEC's allegations that the Defendants misled Thornburg Mortgage's auditor before the 2007 Form 10-K was filed through the statement that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market.

952 F. Supp. 2d at 1077. The Court also allowed certain claims against Goldstone and Simmons to proceed. See 952 F. Supp. 2d at 1077. These claims included the SEC's allegations whether: (i) the Defendants failed to disclose to KPMG before they filed the 2007 Form 10-K that a European hedge fund's collapse would negatively affect Thornburg Mortgage's financial condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's financial condition after filing the 2007 Form 10-K; (iii) the Defendants materially misled KPMG by not providing correspondence showing that Thornburg Mortgage experienced an event of default in the two weeks before the 2007 Form 10-K filing; and (iv) Simmons misrepresented that unexpected events had an unexpected financial impact on Thornburg Mortgage after the 2007 Form 10-K filing. See 952 F. Supp. 2d at 1077.

The Court rejected the SEC's argument that the Defendants' omission of the I/O Strip Transactions on the 2007 Form 10-K was misleading. See SEC v. Goldstone, 952 F. Supp. 2d at

1076. The Court explained that it could not "reasonably infer that the failure to disclose that Thornburg used I/O Strip Transactions to meet its margin calls would have altered the information in the 2007 Form 10-K, or was necessary, in light of the circumstances, to make the 2007 Form 10-K not misleading." 952 F. Supp. 2d at 1226. Further, the Court added:

> The Defendants' classification of the I/O Strip Transactions, therefore, as secured debt, and not asset sales, was not misleading, as the objective of the accounting guidance in place at the time was that the transfer of interest-only strips did not constitute a sale. Conversely, had the Defendants classified the I/O Strip Transactions as sales, the 2007 Form 10-K may have been materially misleading, as such an accounting would been contrary to GAAP's proscribed treatment of the transactions.

952 F. Supp. 2d at 1226. The Court also declined to adopt the SEC's argument that the Defendants misled KPMG with respect to the going-concern analysis. See 952 F. Supp. 2d at 1226. The Court concluded that "as Thornburg Mortgage was not in breach of its reverse repurchase agreements on February 20, 2008, the Defendants did not misrepresent that Thornburg Mortgage successfully continued to meet margin calls at that time in the Going Concern Analysis." 952 F. Supp. 2d at 1226.

The Court later denied the Defendants' and the SEC's motions for summary judgment. See Summary Judgment MOO at 2-3. It first explained that it would apply an "actual-disbelief" standard to determine "whether a person subjectively disbelieved the truth of an opinion statement." Summary Judgment MOO at 2. The Court then concluded that genuine issues of material fact for the jury existed on the SEC's claims that: (i) the Defendants made objectively false statements; (ii) the statements were material; (iii) the Defendants believed that their statements were false they made them; and (iv) the Defendants made statements that were false or misleading because of omitted information. See Summary Judgment MOO at 2-3. The Court

thus declined to grant summary judgment for any party on any issue.  See Summary Judgment MOO at 3.

Starrett reached a settlement with the SEC on May 20, 2016.  See Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent"). The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include a requirement that Starrett testify for any of the remaining parties.  Starrett Consent at 1.  Ten claims remain in the case for trial -- all of the original claims, with the exception of the SEC's claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b).  See Pretrial Order at 3-4, filed May 11, 2016 (Doc. 448).[11]

### 1.    The Motion.

The Defendants moved to exclude evidence and arguments related to dismissed claims on March 17, 2016.  See Motion at 1.  The Defendants state that other courts "routinely exclude evidence of dismissed claims (i) not relevant to the remaining claims, and/or (ii) prejudicial to defendants."  Motion at 2.  The Defendants then indicate that dismissed claims "are not of

---

[11]The Court's ruling on the Motions to Dismiss and the Motions for Summary Judgment did not dismiss the SEC's § 17(a) claim, but it does not appear in the Pretrial Order.  The parties have also not submitted any jury instructions on this claim.  See Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463).  The parties' proposed verdict forms do not include a § 17(a) claim.  See Defendant Clay Simmons's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489).  The Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."  Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002).  The pretrial order that the parties filed in this case, therefore, supersedes all prior pleadings, including the Complaint.  See Wilson v. Muckala, 303 F.3d at 1215 (citing C. Wright, A. Miller & M. Kane, 6A Fed. Prac. & Proc. Civ. § 1522 (2d ed. 1990)).

consequence in determining the action and therefore will be excluded."  Motion at 2 (quoting

Gorbea v. Verizon N.Y., Inc., No. 11-cv-3759, 2014 WL 2916964, at *2 (E.D.N.Y. June 25,

2014)(Matsumoto, J.)).  Additionally, the Defendants explain that evidence supporting dismissed

claims might remain relevant, but "its probative value is far outweighed by its prejudicial effect."

Motion at 2 (quoting Fields v. Dep' t of Pub. Safety, No. 11-101-JWD-RLB, 2014 WL 6750663,

at *2 (M.D. La. Nov. 29, 2014)(de Gravelles, J.)).  Finally, the Defendants explain, "a trial court

must be vigilant to exclude evidence that relates to dismissed claims or misconduct of a party

that is irrelevant or that is only marginally relevant to remaining claims, because of the

prejudicial effect of such evidence."  Motion at 2 (quoting Scott v. City of Sioux City, Iowa, 96

F. Supp. 3d 876, 880 (N.D. Iowa 2015)(Bennett, J.)).

   The Defendants argue that the Court should exclude arguments and evidence supporting

dismissed claims to avoid resurrecting these claims which, if raised, would "waste trial time,

mislead and confuse the jury regarding the actual claims to be decided, and prejudice

Defendants, who should not have to re-litigate claims they have already defeated."  Motion at 3.

The Defendants seek to exclude evidence and arguments

> relating to three claims dismissed by the court: (i) that Defendants misrepresented
> in the 2007 Form 10-K that Thornburg had successfully met all margin calls, and
> relatedly, that Defendants had a duty to disclose that Thornburg was in violation
> of its reverse repurchase agreements; (ii) that Thornburg sold assets to meet
> margin calls prior to the filing of the 2007 Form 10-K; and (iii) that Defendants
> misled KPMG through Thornburg's going concern memorandum.

Motion at 4.

   First, the Defendants argue that the Court should bar the SEC from arguing or presenting

evidence that Thornburg Mortgage failed to meet all margin calls or that the Defendants

misrepresented that fact.   See Motion at 5.  The Defendants explain that the Court has already

ruled that Thornburg Mortgage's difficulty in meeting the margin calls "does not render

- 19 -

misleading the statement that Thornburg Mortgage had met its margin calls without a declaration of default at the time the 2007 Form 10-K was filed."  Motion at 4 (quoting SEC v. Goldstone, 952 F. Supp. 2d at 1223).  Further, the Defendants argue that the Court should prohibit the SEC from arguing that the Defendants committed any wrongdoing by omitting discussion of payment plans or alleged violations of reverse repurchase agreements from the Form 10-K.  See Motion at 5.  The Defendants explain that the Court addressed this issue in an earlier opinion, stating that "the omission of any discussion of payment plans and Thornburg Mortgage allegedly being in violation of its reverse repurchase agreements was not material."  Motion at 4 (quoting SEC v. Goldstone, 952 F. Supp. 2d at 1215).  Additionally, the Defendants state that the Court ruled that they had no duty to disclose that Thornburg Mortgage violated the reverse repurchase agreements, because it had not violated them at the time the Defendants filed the 2007 Form 10-K.  See Motion at 4.

Second, the Defendants argue that the Court should exclude evidence and argument regarding the SEC's claim that Thornburg Mortgage sold assets to meet margin calls before filing the 2007 Form 10-K.  See Motion at 5.  The Defendants explain that the Court has concluded that the I/O Strip Transactions were specifically excluded from the definition of assets and that Thornburg Mortgage met margin calls "without dissipating assets."  Motion at 5 (quoting SEC v. Goldstone, 952 F. Supp. 2d at 1227).  Additionally, the Defendants point to the Court's conclusion that Thornburg Mortgage "met its margin calls without dissipating assets" and, therefore, that the Court could not "infer that omitting discussion of the I/O Strip Transactions from the statement that Thornburg Mortgage had not sold assets to meet margin calls was a material omission."  Motion at 5 (quoting SEC v. Goldstone, 952 F. Supp. 2d at 1227).  The Defendants request that the Court prevent the SEC from referring to the I/O Strip

Transactions as "asset sales" or from arguing that Thornburg Mortgage sold assets to meet margin calls.  Motion at 6.  Further, the Defendants contend that the Court should bar the SEC from arguing that the 2007 Form 10-K improperly accounted for the I/O Strip Transactions or that the omission of the I/O Strip Transactions misled investors or KPMG.  See Motion at 6. They point specifically to Thornburg Mortgage's representation that it did not need to sell assets to meet margin calls.  See Motion at 6.

Last, the Defendants argue that the Court should exclude evidence and argument regarding the claim that the Defendants misled KPMG through the company's going-concern analysis.  See Motion at 6.  The Defendants cite to the Court's conclusion that, because Thornburg Mortgage "was not in breach of its reverse repurchase agreements on February 20, 2008, the Defendants did not misrepresent that Thornburg Mortgage successfully continued to meet margin calls at that time in the Going Concern Analysis."  Motion at 6 (quoting SEC v. Goldstone, 952 F. Supp. 2d at 1249).  The Defendants, therefore, assert that the Court should bar the SEC from arguing or presenting evidence that the Defendants misled KPMG on Thornburg Mortgage's going-concern analysis.  See Motion at 6.

        2.    **The Response**.

The Defendants responded to the Motion on April 14, 2016.  See Plaintiff U.S. Securities and Exchange Commission's Opposition to Defendants' Motion In Limine to Bar Plaintiffs from Presenting Evidence or Arguments Relating to Dismissed Claims, filed April 14, 2016 (Doc. 415)("Response").  The SEC argues that the Court should admit the evidence, because it is relevant to the remaining claims.  Response at 1.  The SEC has three arguments in favor of allowing evidence and argument relating to dismissed claims: (i) the Court already ruled that the evidence is admissible; (ii) other courts have ruled that the evidence the Defendants seek the

Court to exclude is admissible; and (iii) the evidence that the Defendants ask the Court to exclude is relevant to the remaining claims and therefore admissible.  See Response at 1.

First, the SEC states it is not trying to resurrect the dismissed claims and argues that the Court has already ruled that the evidence from the dismissed claims is admissible.  See Response at 1.  The SEC argues that the Court should allow the evidence, because the evidence is relevant to its remaining claims. See Response at 1.  It quotes the Court's previous conclusion that "Thornburg's payment plans and inability to timely meet margin calls, therefore, informs the material falsity of the OTTI analysis in a different manner than it informs whether Thornburg successfully met margin calls."  Response at 2 (quoting SEC v. Goldstone, 952 F. Supp. 2d  at 1230 n.27).  According to the SEC, the Court ruled that other evidence from the dismissed claims was important to the OTTI analysis, including Thornburg Mortgage's "inability to immediately meet margin calls as they were due [and] its use of the I/O Strip Transactions to satisfy margin calls."  Response at 1-2 (quoting SEC v. Goldstone, 952 F. Supp. 2d at 1230).  Last, the SEC quotes the hearing transcript from the Defendants' summary judgment motions, which focused on the SEC's use of evidence supporting dismissed claims, in which the Court states the SEC "can still use all that as evidence.  And that's all they're attempting to do here. I didn't exclude any evidence.  I just simply said that that was not actionable."  Response at 3 (quoting Transcript of Hearing at 235:23-236:1 (taken June 27, 2014), filed July 23, 2014 (Doc. 322)(Court)("Tr. SJ")).  For these reasons, the SEC requests that the Court deny the Motion.  See Response at 3.

Second, the SEC argues that other courts admit evidence supporting dismissed claims if the evidence is relevant to the remaining issues.  See Response at 3.  The SEC explains that, while evidence related only to a dismissed claim is irrelevant and can be barred, "this does not

prohibit the introduction of evidence that, while connected to the previously-dismissed claim, is relevant to the remaining issues for trial[.]"  Response at 4-5 (quoting <u>Medecor Pharma LLC v. Fleming Pharma., Inc.</u>, No. 12-291, 2014 WL 3867548, at *1 (M.D. La. Aug. 6, 2014)(Brady, J.)).  The SEC notes that the current Motion's cited authority has the same holding: "[A] trial court must be vigilant to **exclude evidence** that relates to dismissed claims or misconduct of a party **that is irrelevant or that is only marginally relevant to remaining claims**, because of the prejudicial effect of such evidence."  Response at 4 (quoting <u>Scott v. City of Sioux City, Iowa</u>, 96 F. Supp. 3d at 880)(emphasis in Response).

Third, the SEC argues that the evidence is relevant and therefore admissible.  <u>See</u> Response at 4.  The SEC contends that evidence regarding Thornburg Mortgage's failure to successfully and timely meet margin calls is relevant to the Defendants' belief and disclosure of Thornburg Mortgage's OTTI information.  <u>See</u> Response at 4.  Further, the SEC argues that evidence that the I/O Strip Transactions were made to pay margin calls shows that a source of liquidity was removed and affected the Defendants' OTTI judgment.  <u>See</u> Response at 4. Finally, the SEC contends that the misrepresentations in the going-concern memorandum fails to disclose Thornburg Mortgage's standing with margin calls to KPMG, which is relevant to the SEC's deception-of-auditors claim.  <u>See</u> Response at 4.

### 3.   <u>The Reply</u>.

The Defendants replied on May 3, 2016.  <u>See</u> Defendants' Reply Memorandum in Support of Defendants' Motion In Limine to Bar Plaintiff From Presenting Evidence or Argument Relating to Dismissed Claims, filed May 3, 2016 (Doc. 439)("Reply").  The Defendants assert that the SEC does not dispute that the Court should exclude marginally related evidence supporting dismissed claims, "because of the prejudicial effect of such evidence."

Reply at 1 (quoting Scott v. City of Sioux City, Iowa, 96 F. Supp. 3d at 880).  Further, the Defendants contend that the SEC mischaracterizes the scope of the desired exclusion to "make the evidence in question seem more than 'marginally relevant.'"  Reply at 1 (citing 96 F. Supp. 3d at 880).  Finally, the Defendants state that the accurate scope of the proposed evidentiary exclusion has no relevance to the SEC's remaining claims.  See Reply at 1.

First, the Defendants state that they do not want to limit evidence regarding Thornburg Mortgage's ability to meet margin calls on the day they were received.  See Reply at 2.  They explain that they seek to limit only argument and evidence that the Defendants misrepresented that Thornburg Mortgage "successfully met" all margin calls, noting that the Court has ruled that the Defendants' representation was "not misleading."  Reply at 2 (quoting SEC v. Goldstone, 952 F. Supp. 2d at 1215).  The Defendants, therefore, reason that any evidence which supports the assertion that Thornburg Mortgage did not successfully meet margin calls has no relevance to the pending claims.  See Reply at 2.   Additionally, the Defendants argue that the Court should exclude evidence and argument that the Defendants had a duty to disclose alleged lending agreement violations, because the Court's ruling that Thornburg Mortgage "had not violated its reserve repurchase agreements in February, 2008," makes any evidence of alleged violations irrelevant to the SEC's remaining claims.  Reply at 2 (citing SEC v. Goldstone, 952 F. Supp. 2d at 1249).

Second, the Defendants argue that they do not seek to completely exclude evidence of the I/O Strip Transactions, but only to exclude evidence and argument that I/O Strip Transactions were "asset sales," and to prevent the SEC from referring to the transactions as "sales" in arguments and witness questioning.  Reply at 2-3.  The Defendants explain that the Court already

ruled that the I/O Strip Transactions "were not asset sales" and that using these terms could mislead the jury.  Reply at 3.

Third, the Defendants assert that the SEC makes no argument why the Court should exclude the going-concern analysis.  See Reply at 3.  The Defendants further argue that the Court has already ruled that they did not make a misrepresentation, because Thornburg Mortgage "was not in breach of its reverse repurchase agreements" and that the evidence could confuse the jury. Reply at 3 (quoting SEC v. Goldstone, 952 F. Supp. 2d at 1249).

Last, the Defendants contend that the danger of misleading the jury, causing unfair prejudice, and "suggest[ing a] decision on an improper basis" substantially outweighs the arguable probative value of evidence from the dismissed claims.  Reply at 3 (quoting Fed. R. Evid. 403 advisory committee's notes).

## 4.   **The Hearing**.

The Court held a hearing on May 11, 2016.  See Transcript of Hearing at 1 (taken May 11, 2016), filed May 20, 2016 (Doc. 466)("Tr.").  The Court opened the discussion of the motion by stating that it would be "tricky" for the Court to grant it.  Tr. at 120:6-10 (Court).  The Court stated that the SEC cannot argue the dismissed claims, but that evidence in support of dismissed claims can be material and relevant to remaining claims.  See Tr. at 120:10-14 (Court).  After warning the SEC not to argue inconsistently with its rulings, the Court stated that, although claims may not be actionable, evidence may still be admissible.  See Tr. at 120:15-21 (Court). Additionally, the Court stated that the parties should not refer to the fact that the court dismissed certain claims or to try to resurrect dismissed claims.  See Tr. at 120:22-24 (Court).

The Defendants argued that the SEC is trying to resurrect arguments and allegations supporting dismissed claims.  See Tr. at 121:6-9 (Johnstone).  Specifically, the Defendants asked

the Court to "rule that the SEC cannot argue to the jury that Thornburg Mortgage misrepresented to investors and KPMG that it had successfully met margin calls," ensuring that the SEC cannot revive the dismissed allegations.  Tr. at 121:9-15 (Johnstone).  In contrast, the Defendants accepted that the evidence that Thornburg Mortgage misrepresented that it successfully met margin calls could apply to both dismissed and pending claims.  See Tr. at 121:17-22 (Johnstone).  Further, the Defendants wanted to ensure the SEC does not refer to the I/O Strip Transactions as "assets sales."  Tr. at 122:1-6 (Johnstone).  The Defendants reaffirmed that they do not want to exclude entirely evidence of the I/O Strip Transactions.  See Tr. at 122:9-12 (Johnstone).  They limited their objection to arguments that the I/O Strip Transactions are asset sales, that the Defendants did not properly account for these transactions, and that the Defendants made false statements regarding them.  See Tr. at 122:9-18 (Johnstone).

The SEC restated its position that "both this Court and other courts have ruled that evidence that relates to dismissed claims can also relate to existing claims."  Tr. at 122:24-25, 123:1-4 (Bliss).  The SEC then explained that the "missed margin calls" were relevant to the OTTI determination, as the Court has ruled, and that it planned on using that evidence.  Tr. at 123:5-7 (Bliss).  Further, the SEC stated that it planned to use the I/O Strip Transactions, because they depleted Thornburg Mortgage's liquidity and are thus relevant to the OTTI determination.  See Tr. at 123:13-17 (Bliss).  Additionally, the SEC planned to use the term "sales," which is what the Defendants used in emails, because "it would make no sense to ask a witness about a document that refers to the I/O strip sales in front of the jury with that in evidence and not use the word 'sales.'"  Tr. at 123:17-24 (Bliss).  The SEC then acknowledged that it intends to refer to the I/O Strip Transactions as taking "away some form of liquidity" instead of as assets.  Tr. at 124:3-4 (Bliss).

The Defendants stated that referring to the I/O Strip Transactions as taking away a source of liquidity was acceptable and would prevent a misimpression from reaching the jury.  See Tr. at 124:12-16 (Johnstone).  Additionally, the Defendants stated  that "we're headed to the right landing spot" regarding the SEC's position on not resurrecting dismissed allegations.  Tr. at 124:17-21 (Johnstone).

The Court then indicated that it would deny the Motion, but cautioned the SEC not to argue or try to resurrect claims inconsistent with the Court's rulings.  See Tr. at 124:24-125:2 (Court).  Further, the Court determined that the SEC could refer to the I/O Strip Transactions as a "lost source of liquidity" and that it could use the words in the email, but that it must avoid using the word "asset."  Tr. at 125:4-8 (Court).

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is particularly loose under Federal Rule of Evidence 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'"  United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).

Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.   See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Federal Rule of Evidence 403 ("Rule 403") provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403.   Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.   See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989)(Baldock, J.).   "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."   United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(Tacha, J.)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)).   The United States Court of Appeals for the Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(Baldock, J.).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999)(Kelly, J.), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.).   The Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . .  This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(Thomas, J.)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional response or would otherwise tend to adversely affect the jury's attitude toward a particular matter.  See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999)(Sanborn, J.).  Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)(Ebel, J.); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991)(Holloway, J.).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(Hartz, J.)(quoting Fed. R. Evid. 403 advisory committee notes).

## ANALYSIS

The Court will deny the Motion in part and grant it in part.  The Court will allow the SEC to introduce evidence supporting the dismissed claims that is relevant to remaining claims.  The Court will limit, however, argument about that evidence in certain ways.  First, the Court

restricts the SEC from arguing or attempting to resurrect the dismissed claims.  Second, the Court will not allow the parties to refer to the fact that the Court dismissed claims.  Finally, the Court will permit the parties to discuss the I/O Strip Transactions and refer to them as a "lost source of liquidity" or using the words in the emails, such as "sales," but the parties are restricted from calling them "assets."

## I.     THE SEC MAY INTRODUCE EVIDENCE SUPPORTING DISMISSED CLAIMS THAT IS RELEVANT TO REMAINING CLAIMS.

The Court will allow the SEC to present evidence relevant to the remaining claims.  The Court previously concluded that the evidence supporting dismissed claims is relevant to the OTTI analysis.  See SEC v. Goldstone, 952 F. Supp. 2d at 1230.  This analysis addresses "the Defendants' subjective judgment with respect to objective factors of which the Defendants were aware undercut the facts on which the Defendant's OTTI analysis was based."  SEC v. Goldstone, 952 F. Supp. 2d at 1230.  The inability to meet margin calls and the I/O Strip Transactions "inform the material falsity the OTTI analysis in a different manner than it informs whether Thornburg successfully met margin calls."  SEC v. Goldstone, 952 F. Supp. 2d at 1230 n.27.  The Court explained this ruling during the hearing on the Defendant's summary judgment motions, stating that the Court "didn't exclude any evidence" and that the Court dismissing the claims means only that they are "not actionable."  Tr. SJ at 235:23-236:1 (Court).

In a similar vein, the United States District Court for the Southern District of New York concluded that it could not exclude all "evidence supporting" the dismissed claim, because some evidence might be relevant to remaining claims.  See Dollman v. Mast Industries, Inc. No. 08 Civ. 10184 (WHP), 2011 WL 3911035 at *5 (S.D.N.Y. Sept. 6, 2011)(Pauley, J.).  The district court in that case chose to wait until questions were posed at trial before making a ruling.  2011

WL 3911035, at *5.  This ruling indicates the potential relevance that evidence supporting dismissed claims can have on remaining claims.

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence.  See Fed. R. Evid. 401.  Irrelevant evidence, however, is evidence that does not make a fact of consequence more or less probable.  See Fed. R. Evid. 402. Thornburg Mortgage's difficulty in timely meeting margin calls is relevant, because it affects the probability whether the Defendants believed and truthfully disclosed the proper OTTI analysis. Additionally, the I/O Strip Transactions tend to make it more probable that the Defendants used the transactions to meet margin calls, faced difficulty in timely meeting margin calls, and removed a source of liquidity.  Further, the information in the going-concern analysis affects the probability of identifying misrepresentations or omissions to KPMG related to the deception-of-auditors claim.

The probative value of this evidence outweighs the danger of misleading the jury or unfair prejudice.  See Fed. R. Evid. 403; United States v. Smalls, 605 F.3d at 787 ("Exclusion under rule 403 is an 'extraordinary remedy and should be used sparingly.'").  The Court acknowledges the danger of misleading the jury and unfair prejudice regarding irrelevant evidence from dismissed claims.  See Blair v. Willis, 420 F.3d 823, 830 (8th Cir. 2005).  In Blair v. Willis, the United States Court of Appeals for the Eighth Circuit ordered a new trial, because an attorney introduced irrelevant information regarding dismissed claims that had no bearing on the remaining issues.  See 420 F.3d at 830.  The Eighth Circuit concluded that the evidence and argument about the dismissed claims was irrelevant and possibly created prejudice in the jury. See 420 F.3d at 830.

This case, however, is analogous to <u>McGinnis v. American Home Mortgage Servicing,</u> <u>Inc.</u>, No. 5:11–CV–284 (CAR), 2013 WL 3964916 (M.D. Ga. July 31, 2013)(Royal, J.), where the district court concluded that the plaintiff could not argue the dismissed claims or present evidence in support of those claims, but that the plaintiff could use some of the evidence supporting the dismissed claims because the evidence was relevant to a remaining claim.  <u>See</u> 2013 WL 3964916, at *2.  While denying the parties the ability to resurrect the dismissed claims, the district court stated that the evidence "could establish Defendant's awareness of its accounting errors," which was relevant to the remaining wrongful foreclosure claim.  2013 WL 3964916, at *2.  The district court then stated that the "probative value of this evidence substantially outweighs the minimal prejudicial effect."  2013 WL 3964916, at *2.

Similarly, the evidence that the Defendants seek to have the court exclude has little danger of misleading the jury or creating unfair prejudice.  Further, the Court is limiting the argument related to the dismissed claims to avoid any possible prejudice or confusion in the following ways: (i) restricting the SEC from arguing or attempting to resurrect the dismissed claims; (ii) prohibiting the parties from referring to the fact that claims were dismissed; and (iii) permitting the parties to discuss the I/O Strip Transactions and refer to them as a "lost source of liquidity," or, when questioning a witness about emails, using the words in the emails, such as "sales," but restricting the parties from calling them "assets."

## II.     THE SEC IS RESTRICTED FROM ARGUING OR ATTEMPTING TO RESSURECT THE DISMISSED CLAIMS.

While the Court admits evidence from the dismissed claims, the Court bars the SEC from resurrecting or arguing the claims.  The Court dismissed the following three claims: (i) a claim "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's outside auditor that Thornburg Mortgage successfully met its margin calls;" (ii) a claim that "Starrett engaged in

a scheme to defraud the investing public;" and (iii) a claim that "the Defendants schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-K." <u>SEC v. Goldstone</u>, 952 F. Supp. 2d at 1066.

A jury should not hear arguments related to dismissed claims, because they are not "of consequence in determining the action." Fed. R. Evid. 402. Bringing up or arguing these claims is irrelevant to the remaining claims, and the Court will therefore exclude them.

Resurrecting dismissed claims can create prejudice in a jury. <u>See Blair v. Willis</u>, 420 F.3d at 830. Courts often rule that dismissed claims cannot be resurrected or reargued. <u>See McGinnis v. Am. Home Mortg. Servicing, Inc.</u>, 2013 WL 3964916, at *2; <u>Gorbea v. Verizon N.Y., Inc.</u>, 2014 WL 2916964, at *2. Further, arguing dismissed claims can mislead the jury to give them "the impression that something more happened than they were being told." <u>Blair v. Willis</u>, 420 F.3d at 830. Arguing or attempting to resurrect dismissed claims is barred, because of their irrelevant nature, their ability to mislead a jury, and the possibility of creating unfair prejudice.

## III. THE PARTIES MAY NOT TO REFER TO THE FACT THAT CLAIMS WERE DISMISSED.

The Court bars the parties from referring to the fact that the Court dismissed claims. Evidence that charges are dismissed does not prove innocence. <u>See United States v. Marrero-Ortiz</u>, 160 F.3d 768, 775 (1st Cir. 1998)(Selya, J.)(stating that "cases are dismissed for a variety of reasons, many of which are unrelated to culpability"). Further, evidence of dismissal will likely serve to confuse the jury rather than to assist it. <u>See United States v. Marrero-Ortiz</u>, 160 F.3d at 775; Fed. R. Evid. 403.

In <u>L'Etoile v. New England Finish Systems, Inc.</u>, 575 F. Supp. 2d 331, 339 (D.N.H. 2008)(LaPlante, J.), the plaintiff moved to exclude evidence that the plaintiff voluntarily

dismissed claims.  575 F. Supp. 2d at 339.  The defendants in that case wanted to introduce that evidence to attack the plaintiff's credibility.  575 F. Supp. 2d at 339.  The district court concluded that the dismissed claims have little probative value on the plaintiff's credibility, but "carries significant risk of undue delay and waste of time."  575 F. Supp. 2d at 339.  In the current case, the Court bars the introduction of evidence or argument that it dismissed claims in order to avoid confusing the jury or creating undue delay.

## IV.   THE PARTIES MAY INTRODUCE THE I/O STRIP TRANSACTIONS, BUT THEY CANNOT CALL THEM "ASSETS."

The Court will permit the parties to discuss the I/O Strip Transactions and refer to them as a "lost source of liquidity" or, when questioning a witness about emails, to use the words in the emails, such as "sales," but the parties are restricted from calling them "assets."  The Court previously concluded: "SFAS 166 specifically excludes from the definition of assets that are accounted as sales interest-only strips created from loans, such as the I/O Strip Transactions at issue here."  SEC v. Goldstone, 952 F. Supp. 2d at 1226 (citing Statement of Financial Accounting Standards (SFAS) 166 at 3, 5).  If generally accepted accounting principles do not treat them as assets, the parties should not call them assets.  They are really something else, and the parties and the Court should be precise--not sloppy--in a case that is about being accurate.  For this reason, it would be misleading and confusing to the jury for the parties to refer to the I/O Strip Transactions as "assets" or "asset sales."

The I/O Strip Transactions remain relevant, because they tend to make it more probable that the Defendants used the transactions to meet margin calls, faced difficulty in timely meeting margin calls, and removed a source of liquidity.  See Fed. R. Evid. 401.  The Defendants stated that the Court's suggestion that "the I/O Strip Transactions, took away some source of liquidity, would be acceptable to us."  Tr. at 124:12-13 (Johnstone).  Further, the Defendants stated that

this was "the most prudent way to proceed so that we don't give the jury a misimpression about what these financial transactions are."  Tr. at 124:14-16 (Johnstone).  The Court, therefore, will allow the parties to refer to the I/O Strip Transactions as a "lost source of liquidity" and similar terms.

Last, when questioning a witness about emails, the parties may use the terms in the emails that the Defendants and other employees at Thornburg Mortgage use to refer to the I/O Strip Transactions, such as the term "sales."  It would be difficult to "ask a witness about a document that refers to the I/O strip sales in front of the jury with that in evidence and not use the word 'sales.'"  Tr. at 123:17-24 (Bliss).  Since the Defendants used the term "sales" in its correspondence that is now admitted as evidence, the SEC is allowed to use that same terminology to refer to the I/O Strip Transactions when questioning a witness about the email.

## V.   SUMMARY OF LIMITATIONS WITH RESPECT TO EVIDENCE SUPPORTING DISMISSED CLAIMS.

The SEC and the Defendants may use relevant evidence supporting dismissed claims to support remaining claims.  For example, the parties are allowed to question witnesses about the missed margin calls, payment plans, and the relationship between the difficulty in timely meeting margin calls and the OTTI conclusion.

Additionally, the SEC and the Defendants may present evidence and question witnesses about the definition and utility of I/O Strip Transactions.  The witnesses may testify that Thornburg Mortgage used the I/O Strip Transactions to meet margin calls, that the I/O Strip Transactions depleted the liquidity of Thornburg Mortgage, and that the I/O Strip Transactions affected the Defendants' OTTI judgment.  The parties and witnesses may refer to I/O Strip Transactions as a "lost source of liquidity" and similar terms.  Further, the parties may question

witnesses about emails containing I/O Strip Transaction information and refer to the I/O Strip Transactions as "sales" when the emails use that term to describe them.

The SEC and the Defendants may not question witnesses or refer to the fact that the Court dismissed claims.  Also, the parties are not allowed to argue or attempt to resurrect the dismissed claims in any way.  Parties and witnesses may not refer to the I/O Strip Transactions as "asset sales" or as "assets" except as stated above.  Similarly, witnesses may not testify that Thornburg Mortgage sold assets to meet margin calls.  See SEC v. Goldstone, 952 F. Supp. 2d at 1076.  Witnesses may not testify regarding the omission of the I/O Strip Transactions on the 2007 Form 10-K.  Last, parties and witnesses may not testify or suggest that the omission of the I/O Strip Transactions from the 2007 Form 10-K misled KPMG or investors.  See SEC v. Goldstone, 952 F. Supp. 2d at 1226.

**IT IS ORDERED** that: Defendants' Motion in Limine to Bar Plaintiff from Evidence or Argument Relating to Dismissed Claims, filed March 17, 2016 (Doc. 399), is denied in part and granted in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Michael H. Hoses
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Danielle Voorhees
Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

  *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Chris Johnstone
Heather Tewksbury
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Robert G. Badal
Aaron Thompson
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

  *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Paul M. Torres
Robert J. Liubicic
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

      *Attorneys for Defendant Jane E. Starrett*