# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.                                                                              No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants Larry A. Goldstone's and Clarence G. Simmons's Trial Brief on (I) the Admissibility of Evidence Relating to Former Defendant Jane E. Starrett's Settlement with the SEC and (II) the SEC's Ability to Ask Ms. Starrett Leading Questions, filed June 3, 2016 (Doc. 493)("Trial Brief").  The Court held a hearing on June 3, 2016.  The primary issues are: (i) whether the Court should admit evidence that former co-Defendant Jane E. Starrett reached a settlement with the Securities and Exchange Commission ("SEC"); and (ii) whether the Court should allow the SEC to ask Starrett leading questions on direct examination.  First, the Court will allow the SEC to reference the fact that it investigated and sued Starrett based on her role at Thornburg Mortgage during cross-examination, but will exclude all other evidence of the settlement.  Second, the Court will determine whether to allow the SEC to ask Starrett leading questions during the trial.  The Court will thus grant the requests in the Trial Brief in part and deny them in part.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1).  The Court

presents the facts solely to provide context for the Motion.  It continues to adhere to the decisions on the facts it reached in its Unsealed Memorandum Opinion and Order, filed August 22, 2015 (Doc. 371)("Summary Judgment MOO").

The Defendants are former officers of Thornburg Mortgage: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The SEC alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[1]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[2]  Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time

---

[1]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[2]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange. See Complaint ¶ 20, at 7. Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo"[3] ARM securities; Thornburg Mortgage also purchased ARM securities that third parties originated. Complaint ¶ 21, at 7. Thornburg Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and investment

---

[3]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage. Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage. These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set. Super jumbo mortgage, Wikipedia. Fannie Mae purchases and guarantees mortgages that meet its funding criteria. Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014). Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created. See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014). "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends." Fannie Mae, Investopedia. The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00. See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf. Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00. See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf. "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates, because of the increased risk of issuing a larger loan. Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage. The term "super-jumbo" is not expressly defined or regulated, but mortgage companies use it internally and independently to set loan parameters. See Super jumbo mortgage, Wikipedia. The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought. See Super jumbo mortgage, Wikipedia. The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee. See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

business through reverse repurchase agreements[4] backed by ARM securities.  See Complaint ¶ 3, at 2.  Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed

---

[4]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to *repo*."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

- 4 -

July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that

he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[5] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies,

---

[5]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."  Interest Only (IO) Strips, Investopedia (Apr. 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

having "'sold some additional IO securities[.]'"   Complaint ¶ 68, at 20 (quoting Email from

Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03

p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

      The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future

margin calls after filing the 2007 Form 10-K.  <u>See</u> Complaint ¶ 32, at 10.  The Defendants did

not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  <u>See</u> Complaint

¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008,

Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'"

to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet

while we deal with it.'"   Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008

Email at 2).

      The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing

the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22,

2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal
> for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we
> say will depend on where we are next week when we need to file.  But, our plan is
> to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also

discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet

while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting

Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple

one, meaning all margin calls have been met.'"   Complaint ¶ 31, at 10 (quoting Feb. 22, 2008

Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing. See Complaint ¶ 38, at 12. Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon. UBS credit just mentioned it to me. They got hit with 20 point haircuts on Alt-A and AAA's overnight. I think we will get this a little more gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")). Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'" Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")). Later on February 27, 2008, Simmons sent an email to Starrett, in

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels." Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014). An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages. Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A. Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid." Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating. The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB. See Bond credit rating, Wikipedia. "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies." AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K. I do not want there to be any issues based on Thursday activity.'" Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls. See Complaint ¶ 3, at 6; id. ¶ 41, at 12. Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K. See Complaint ¶ 7, at 3. In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets. See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash. To date, no such sales have been required . . . ."). Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[7] See Complaint ¶ 37, at

---

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP. About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/. According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset."

11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that served as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008.  See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007

---

The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2, (sent February 28, 2008, at 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).   In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original).  See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, (sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27).   At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email").  As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

        In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets;

(ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'"  Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity, or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[9]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See Complaint ¶ 49, at 14-15.[10]  The Defendants did not disclose to

---

[9]An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider

KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, <u>see</u> Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, <u>see</u> Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, <u>see</u> Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, <u>see</u> Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern. <u>See</u> Complaint ¶ 57, at 17. Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's. <u>See</u> Complaint ¶ 76, at 22. "[A]t or about the time" that Simmons learned of the

_____

documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, <u>see</u> March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."   Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"). The requested evidence included "correspondence with lenders/attorneys/shareholders, emails." Request for Correspondence, attached to March 3, 2008 Hall Email at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  At the time, KPMG, as auditor, was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.  KPMG did not become aware of the Citi Letter while preparing its Restatement.  See Complaint ¶ 101, at 29.  Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"  Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).   The analysis states: "'Due to a number of factors including **the**

- 14 -

**unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in mortgage valuations.'"   Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.  See Complaint, filed March 13, 2012 (Doc. 1)("Complaint").  The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

The Court granted in part and denied in part the SEC's and the Defendants' motions to dismiss on July 8, 2013.  See Memorandum Opinion and Order at 2-3, filed July 8, 2013 (Doc.

190)("Motion to Dismiss MOO").   The Motion to Dismiss MOO dismissed the SEC's allegations: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's outside auditor that Thornburg Mortgage successfully met its margin calls without violating its lending agreements, and did not sell assets to meet margin calls"; and (ii) "that the Defendants schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-K."   Motion to Dismiss MOO at 2.   It declined to dismiss the SEC's claim that "the representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was materially false or misleading."  Motion to Dismiss MOO at 2.  The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are primarily liable or liable as control persons for that misrepresentation in the 10-K, and the Court will not dismiss the SEC's allegations that the Defendants aided and abetted the misrepresentation, as the Court has determined that the SEC sufficiently alleged that Goldstone and Simmons made, and the Defendants provided substantial assistance to, the misrepresentation with knowledge of or recklessness to its falsity.   Similarly, the Court will not dismiss the SEC's allegations that the Defendants misled Thornburg Mortgage's auditor before the 2007 Form 10-K was filed through the statement that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market.

Motion to Dismiss MOO at 3.  The Court also allowed certain claims against Goldstone and Simmons to proceed.  See Motion to Dismiss MOO at 3.  These claims included the SEC's allegations whether: (i) the Defendants failed to disclose to KPMG before they filed the 2007 Form 10-K that a European hedge fund's collapse would negatively affect Thornburg Mortgage's financial condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's financial condition after filing the 2007 Form 10-K; (iii) the Defendants materially misled KPMG by not providing correspondence showing that Thornburg Mortgage experienced an event of default in the two weeks before the 2007 Form 10-K filing; and (iv) Simmons

misrepresented that unexpected events had an unexpected financial impact on Thornburg Mortgage after the 2007 Form 10-K filing.  See Motion to Dismiss MOO at 3.

The Court later denied the Defendants' and the SEC's motions for summary judgment. See Summary Judgment MOO at 2-3.  It first explained that it would apply an "actual-disbelief" standard to determine "whether a person subjectively disbelieved the truth of an opinion statement."  Summary Judgment MOO at 2.  The Court then concluded that genuine issues of material fact for the jury existed on the SEC's claims that: (i) the Defendants made objectively false statements; (ii) the statements were material; (iii) the Defendants believed that their statements were false they made them; and (iv) the Defendants made statements that were false or misleading because of omitted information.  See Summary Judgment MOO at 2-3.  The Court thus declined to grant summary judgment for any party on any issue.  See Summary Judgment MOO at 3.

Starrett reached a settlement with the SEC on May 20, 2016.  See Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent"). The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include a requirement that Starrett testify for any of the remaining parties.  Starrett Consent at 1.  Ten claims remain in the case for trial -- all of the original claims, with the exception of the SEC's claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b).  See Pretrial Order at 3-4, filed May 11, 2016 (Doc. 448).[11]

---

[11]The Motion to Dismiss MOO and Summary Judgment MOO did not dismiss the SEC's § 17(a) claim, but it does not appear in the Pretrial Order.  The parties have also not submitted any jury instructions on this claim.  See Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463).  The parties' proposed verdict forms do not include a § 17(a) claim.  See Defendant Clay Simmons's First Proposed Special

1.      **The Trial Brief**.

The Defendants filed the Trial Brief on June 3, 2016.  See Trial Brief at 1.   The

Defendants request that the Court

> (i) preclude any reference to or evidence of the fact that the SEC investigated Ms.
> Starrett, charged Ms. Starrett, or sued Ms. Starrett, as well as any reference to or
> evidence of Ms. Starrett's settlement with the SEC or her status as a former
> defendant (collectively, "Settlement Evidence"); and (ii) preclude the SEC from
> asking Ms. Starrett leading questions during direct examination.

Trial Brief at 1.  They make two primary arguments for their first request.  See Trial Brief at 1-2.

First, they contend that rule 408 of the Federal Rules of Evidence bars the Settlement

Evidence's[12] admission.  See Trial Brief at 1-2.  Although they acknowledge that rule 408 allows

---

Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed
Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange
Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489).
The Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in
the pretrial order are waived even if they appeared in the complaint and, conversely, the
inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did
not include that claim."  Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002).  The pretrial
order that the parties filed in this case, therefore, supersedes all prior pleadings, including the
Complaint.  See Wilson v. Muckala, 303 F.3d at 1215 (citing C. Wright, A. Miller & M. Kane,
6A Fed. Prac. & Proc. Civ. § 1522 (2d ed. 1990)).

[12]The Court defines "Settlement Evidence" to include the Order Instituting
Administrative Proceedings Pursuant to Rule 102(e) of the Commission's Rules of Practice,
Making Findings, and Imposing Remedial Sanctions, filed June 3, 2016 (Doc. 495-4)("Starrett
OIP").  The Starrett OIP resolves an earlier SEC administrative investigation into Starrett.  See
Starrett OIP at 2.  Starrett does not admit or deny liability.  See Starrett OIP at 2.  The Court does
not view the Starrett OIP as fundamentally different from the other Settlement Evidence, as it
holds no more probative value than Starrett's settlement in this case.  That the Starrett OIP
qualifies as a "research, report, [or] statement . . . of public offices or agencies, setting forth . . .
factual findings resulting from an investigation made pursuant to authority granted by law"
merely exempts it from the rule against hearsay.  Fed. R. Evid. 803(8)(C).  Rule 803(8) does not
make any investigative findings per se admissible.  Moreover, courts have refused to admit
similar OIP evidence.  See Carpenters Health & Welfare Fund v. Coca-Cola Co., No. 1:00-CV-
2838-WBH, 2008 WL 9358563, at *3 (N.D. Ga. Apr. 23, 2008)(Hunt, J.)("Admitting the SEC
Order . . . would likely have a chilling effect on future attempts by the SEC to settle similar cases
as companies that are the subject of an SEC investigation would necessarily weigh the benefits

certain uses of settlement agreements, including "proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution," Motion at 1-2 (quoting Fed. R. Evid. 408), they contend that the Court has "broad discretion" to admit settlement evidence, Motion at 2 (quoting Leon v. Fedex Ground Package Sys., Inc., No. CIV 13-1005 JB/SCY, 2016 WL 814639, at *14 (D.N.M. Feb. 5, 2016)(Browning, J.)).  They argue that the Court should exercise this discretion in accordance with the "strong public policy favoring settlement."  Trial Brief at 2 (quoting Trout v. Milton S. Hershey Med. Ctr., 572 F. Supp. 2d 591, 599 (M.D. Pa. 2008)(Conner, J.)).  They add that the Settlement Evidence "will serve no purpose beyond improperly implying to the jury that Ms. Starrett has admitted fault on some level, that at a minimum the SEC's claims against the Defendants are legitimate, and that Defendants must somehow be at fault by association."  Trial Brief at 2.  The Defendants cite to the Court's decision to bar admission of a plaintiff's settlement with third-party defendants in Leon v. Fedex Ground Package System, Inc..  They explain that the Court excluded settlement evidence there because it could cause the jury to "unfairly decrease [the defendant's] share of the liability" and to "assume that [the settlement] is an admission of guilt."  Trial Brief at 4 (quoting Leon v. Fedex Ground Package Sys., Inc., 2016 WL 814639, at *14).

Second, the Defendants contend that rules 401 and 403 prohibit the Settlement Evidence's admission, because the danger of unfair prejudice substantially outweighs its minimal

---

of a settlement against the possible damage that the settlement would do to their prospects in pending or future litigation."); id. at *5 ("The findings of fact do not have significant probative value because Defendants were not permitted to challenge those findings by examining the witnesses that the SEC relied on and because Defendants did not have the opportunity to present their own evidence."); In re Blech Sec. Litig., No. 94 CIV. 7696 (RWS), 2003 WL 1610775, at *11 (S.D.N.Y. Mar. 26, 2003)(Sweet, J.).

- 19 -

probative value.  See Trial Brief at 4-6.  It cites to S.E.C. v. Todd, No. 03CV2230BEN(WMC), 2006 WL 5201386 (S.D. Cal. Oct. 17, 2006)(Benitez, J.), in which the Honorable Roger T. Benitez, United States District Judge for the Southern District of California, prohibited the SEC from referencing an employer's settlement during its civil enforcement trial against individual employees.  See 2006 WL 5201386, at *1.  They explain that Judge Benitez reached their desired result on similar facts: "Gateway's settlement with the SEC is irrelevant. The Court also finds that under Fed. R. Evid. 403, any mention of Weitzen's former status as a defendant is likely to lead to prejudice that far outweighs any negligible probative value it has toward showing bias toward the SEC."  2006 WL 5201386, at *1.  They urge the Court to reach a similar result in this case.  See Trial Brief at 4-5.

The Defendants argue that the SEC cannot ask Starrett leading questions, because she is no longer adverse to the SEC and thus not a hostile witness under rule 611(c) of the Federal Rules of Evidence.  See Trial Brief at 5.  They first note that rule 611(c) prohibits a party from asking leading questions during direct examination "unless the witness being examined is hostile, an adverse party, or a witness identified with an adverse party."  Trial Brief at 6.  They explain that the party proposing to ask leading questions has the burden to show that the witness is identified with an adverse party or is hostile.  See Trial Brief at 6 (citing Washington v. Illinois Dep't of Revenue, No. 01-3300, 2006 WL 2873437, at *1 (C.D. Ill. Oct. 5, 2006)(Cudmore, J.)). Now that Starrett has settled with the SEC, the Defendants state, she is no longer adverse to the agency and is not identified with any party.  See Trial Brief at 6.  The Defendants recognize that she was "formerly party to this case and formerly defended herself against the SEC's charges," but argue that these facts do "not warrant a finding that she is hostile absent evidence proffered by the SEC that she has been uncooperative."  Trial Brief at 5 (emphasis in original)(citing

S.E.C. v. World Info. Tech., Inc., 250 F.R.D. 149, 151 (S.D.N.Y. 2008)(Marrero, J.)).   They

assert that Starrett "has consistently shown a willingness to testify cooperatively with the SEC"

and remark that the SEC has not accused her of being uncooperative.   Trial Brief at 6.   Finally,

they warn that leading questions could "potentially distort Ms. Starrett's memory . . . particularly

here where the events in question took place over eight years ago."   Trial Brief at 6.

> **2.**      **The Response.**

The SEC responded to the Trial Brief on June 3, 2016.   See Plaintiff U.S. Securities and

Exchange Commission's Response to Defendants' Trial Brief on (I) the Admissibility of

Evidence Relating to Former Defendant Jane E. Starrett's Settlement with the SEC and (II) the

SEC's Ability to Ask Ms. Starrett Leading Questions, filed June 3, 2016 (Doc.

495)("Response").   The SEC sums up its arguments:

> [A]dmission of evidence regarding Ms. Starrett's former status as a Defendant,
> her settlement with the SEC, and the terms of that settlement are necessary to
> avoid confusion, tell a complete story, and show Ms. Starrett's bias in favor of the
> remaining Defendants.   Finally, her settled administrative proceeding is also
> admissible pursuant to Federal Rule of Evidence 803(8)(C).

Response at 2.

The SEC first argues that the Court should allow it to lead Starrett on direct examination.

See Response at 2.   It quotes a popular treatise: "Rule 611 is designed to enlarge the categories

of witnesses automatically considered to be adverse without any further showing of hostility so

that leading questions may be used during their examination."   Response at 2 (quoting 4-611

Weinstein's Federal Evidence § 611.06 (2015)).   It asserts that a witness is "identified with an

adverse party" if his or her

> relationship to an opposing party is such that the witness' interests vis-a-vis the
> litigation proceedings in which the witness' testimony is offered can reasonably
> be expected, under all the applicable circumstances, to be either identical to those

of the adverse party or, at minimum, both closely aligned with those of the
adverse party and of comparable significance.

Response at 2 (quoting Bixby v. KBR, Inc., No. 3:09-CV-632-PK, 2012 WL 4754942, at *3 (D.

Or. Oct. 4, 2012)(Papak, M.J.)).  The SEC then contends that Starrett has been, and will continue

to be, an adverse party.  See Response at 3.  It notes that she was a co-Defendant, a recent party

to a joint defense agreement, a high-level officer, and the remaining Defendants' personal friend.

See Response at 3-4.  It concludes that "Ms. Starrett is, and has been, closely aligned with Mr.

Goldstone and Mr. Simmons and the SEC should be permitted to ask her leading questions under

Fed. R. Evid. 611(c)."  Response at 4.

        The SEC then explains that the Settlement Evidence is necessary factual background

under rule 401 of the Federal Rules of Evidence.  See Response at 5.  It notes that Starrett is part

of a "three-person conspiracy," that her conduct remains at issue, and that much of the critical

evidence involves her.  Response at 5.  The SEC then argues that the Settlement Evidence is

important to show Starrett's likely bias against it.  See Response at 6.  It notes that rule 408

allows settlement evidence for specific purposes, including "proving a witness's bias or

prejudice."  Response at 6 (quoting Fed. R. Evid. 408).  It points to the Court's decision to admit

the declination letters to the KPMG witnesses as evidence of their potential bias in the SEC's

favor.  See Response at 7 (citing Memorandum Opinion and Order, filed June 3, 2016 (Doc.

494)("KPMG MOO")).  It adds that the Settlement Evidence's potential prejudice can be "easily

remedied by a limiting instruction, which the SEC would not oppose."  Response at 7.  It

questions whether the Defendants' arguments are consistent with their past practice:

        [I]f Ms. Starrett were anticipated to change her testimony and testify unfavorably
        to the Defendants, the SEC anticipates that *Defendants* would be insisting that the
        fact and terms of Ms. Starrett's settlement should be admitted to show that she
        obtained a "good deal" from the SEC in exchange for her testimony, just as they
        have done with respect to KPMG.

Response at 7.   The SEC also attempts to distinguish the Court's opinion in <u>Leon v. Fedex</u> <u>Ground Package System, Inc.</u>, noting that the Court excluded the settlement evidence there to mitigate the risk that the jury would "unfairly decrease [a remaining defendant's] share of the liability," or "speculate as to the settlement's amount and what percentage of fault they should attribute to the absent defendants."   Response at 7-8 (quoting <u>Leon v. Fedex Ground Package</u> <u>Sys., Inc.</u>, 2016 WL 814639, at * 14).   In this case, it adds, "the jury plays no role in determining remedies or apportioning fault."   Response at 8.

The SEC also points to the risks of excluding the evidence under rule 403 of the Federal Rules of Evidence.   <u>See</u> Response at 6.   It states that the evidence "is relevant, probative and not prejudicial and necessary to tell the complete story of this case, as well as to avoid juror confusion."   Response at 5.   It also notes that exclusion would leave inexplicable gaps in its case: "Without evidence of why the other [relevant individuals] were not litigants, the jury would be confused and left to speculate."   Response at 4 (quoting <u>Haynes v. Manning</u>, 717 F. Supp. 730, 733 (D. Kan. 1989)(Saffels, J.)(alteration in Response), <u>reversed in part on other grounds by</u>, 917 F.2d 450 (10th Cir. 1990)).   It expresses concern that the jurors will fault it for engaging in "selective prosecution."   Response at 8.

Finally, the SEC argues in favor of admitting the SEC's Order Instituting Administrative Proceedings Pursuant to Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions, filed June 3, 2016 (Doc. 495-4)("SEC Order").   Response at 8.   It argues that the SEC Order is admissible, because: (i) it "is relevant and probative to explain Ms. Starrett's status in the case and bias"; and (ii) it is a "research, report, [or] statement . . . of public offices or agencies, setting forth . . . factual findings resulting from an investigation made

- 23 -

pursuant to authority granted by law" pursuant to rule 803(8)(C).   Response at 8.   The

Defendants did not file a reply.

### 3.    <u>The Hearing</u>.

The Court held a hearing on June 3, 2016.  <u>See</u> Transcript of Hearing at 1 (taken June 3,

2016)("Tr.").[13]   The Court opened the hearing by stating its inclinations:

> [I]t seems to me Starrett could be a difficult witness for the SEC.  You sued her
> and you got something. . . .  So it seems to me that the settlement isn't particularly
> relevant, and should stay out.  I think my inclination is to think that that's too
> prejudicial to the defendants, because they could conclude that she was brought in
> this case, she got sued in this case, and she settled and therefore the jury might
> begin to rely upon that to conclude that there was wrongdoing.  What I was going
> to suggest, juries don't know everything.  And this would be sort of a two edged
> sword, just simply say that you did sue her.  That can come out, and . . . if you
> feel like she's not a good witness for you, it seems to me that gives you the
> impeachment material to tell the jury why she's acting or answering questions the
> way she is. . . .  They just won't know.  That would be where I'd be inclined to
> draw the line, because it seems to me that if I don't let the SEC impeach, then it's
> taking away some -- a tool to test her credibility.

Tr. at 18:13-19:13 (Court).   The Court added that the parties could "even leave out" that the

settlement occurred in this case.  Tr. at 19:18-20 (Court).  The Defendants responded that the

SEC should not be able to impeach Starrett, because: (i) the SEC will call her to bolster their

case; and (ii) there is no reason to believe that Starrett will not testify truthfully and consistently

with her prior testimony.  <u>See</u> Tr. at 19:21-20:6 (Lee).  They added that the fact of settlement is

irrelevant, and that it would cause them substantial prejudice.  <u>See</u> Tr. at 20:10-15 (Lee).  The

Settlement Evidence, they explained, includes a dismissal of the charges against Starrett,

changing her position with respect to the other parties.  <u>See</u> Tr. at 21:1-9 (Lee).  They also

requested that the Court give an explanatory jury instruction to prevent the jury from considering

---

[13]The Court's citations to the transcript for this hearing refer to the court reporter's
original, unedited version.  Any final version may contain slightly different page and/or line
numbers.

that a party "may have been sued or charged" if the Court admits the Settlement Evidence.  Tr. at 22:2-12 (Lee).   The Court stated its inclination to decline this request, noting that the jury could consider the Settlement Evidence for credibility and bias.  See Tr. at 22:13-23 (Court).

The SEC argued that the Court should admit the Settlement Evidence for the same reasons it admitted the declination letters:

> [A]s your Honor noted [] in the ruling this morning regarding the KPMG witnesses and the evidence that the . . . that the defendants are going to be able to bring in regarding Ms. Reinhart and Ms. Hall, you explained that the existence of the investigation into KPMG by the SEC and the declination letters which is sort of the end of the story with the investigation as to those KPMG witnesses, that both of those were relevant to the KPMG witnesses' credibility and we think that that is even more the case here.

Tr. at 23:6-15 (Voorhees).  The Court distinguished its rulings on the KPMG witnesses from its rulings here:

> I guess I see them as different because the KPMG people I don't know what they say and whose side they're going to be on, so I think I've got to give y'all the ability to test, attack their credibility.  Whereas I'm very concerned, if they learn the settlement here, the prejudice, the defendants are concerned about will occur.  So I guess I'm seeing them a little bit different.

Tr. at 62:3-10 (Court).  The SEC emphasized Goldstone and Simmons' relative importance to the case, and the limited scope of argument on the Settlement Evidence.  See Tr. at 23:15-24:13.  The Defendants responded that Starrett was "no longer a defendant," explaining that "she's a third party witness there are many third party witnesses in the case."  Tr. at 24:16-23 (Lee).

The Court described its ruling's scope:

> I think you get to ask your questions up to the point.  You were investigated, you were interviewed.  We sued you, you get to go there, but then stop with the settlement and no introduction of any document that shows the terms of the settlement.  I think that's where it should be.

Tr. at 25:2-11 (Court).  It also set out specific mechanics for questioning:

> This is one place you can lead.  So when you get to this point I don't want her
> saying anything else . . . so you give her yes no questions, we sued you in this
> case, right.  She'll say yes.  Move on.  Not in this case.  We sued you, right.  And
> she should say yes and that's it.  So we're not even going to get into the fact it
> was this case, another case, something else, okay.

Tr. at 25:25-26:7 (Court).  The Court added that the Defendants could admit the settlement agreement's terms if they disagreed with the Court's ruling, and the SEC indicated that it would not object.  See Tr. at 26:11-18 (Court, Voorhees).

The Court declined to decide whether the SEC could lead Starrett in advance of the trial. See Tr. at 27:9-10 (Court).  It explained that it could not tell whether Starrett would be a hostile witness.  See Tr. at 27:9-13 (Court).  It noted, however, that the SEC could begin to ask leading questions if Starrett is hostile.  See Tr. at 27:9-20 (Court).  The SEC argued in favor of an immediate decision, asserting that, "under rule 611(c), Ms. Starrett is actually in a category [of] witnesses who are presumed to be hostile because she was until very recently an adverse party and she is very much [in sync] with the defendants and has been throughout."  Tr. at 27:23-28:2 (Voorhees).  The Defendants indicated that they accepted the Court's proposed ruling on leading questions.  See Tr. at 28:7-12 (Court, Lee).

The parties concluded the hearing by again clarifying the scope of the Court's decision. See Tr. at 61:24-64:6 (Court, Kasper, Lee).  The Court expressed its concern that jurors would draw an inappropriate conclusion from the settlement -- that "she settled, and so she must [be] guilty and if she's guilty, then so are Mr. Goldstone and Mr. Simmons."  Tr. at 63:4-12 (Court). The Court confirmed that the SEC could lead Starrett through testimony that the SEC sued her, see Tr. at 64:13-18 (Court, McKenna), and confirmed that the SEC could state that she was investigated and sued in connection with her role at Thornburg Mortgage, see Tr. at 63:22-64:5 (Court, McKenna).

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403). "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")). "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'" United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012) (Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note). Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible. See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989)(Baldock, J.). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under

rule 403].” United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(Tacha, J.)(quoting

United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)).  The Tenth Circuit has

reminded district courts that they should be “mindful” that “exclusion of evidence under Rule

403 that is otherwise admissible under the other rules is an extraordinary remedy and should be

used sparingly.”  United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(Baldock, J.).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court’s

discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999)(Kelly, J.), and the

trial court’s discretion to balance possible unfair prejudice against probative value is broad, see

United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v.

Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.).  As the Supreme Court of the United

States has noted:

> In deference to a district court’s familiarity with the details of the case and its
> greater experience in evidentiary matters, courts of appeals afford broad
> discretion to a district court’s evidentiary rulings . . . .  This is particularly true
> with respect to Rule 403 since it requires an “on-the-spot balancing of probative
> value and prejudice, potentially to exclude as unduly prejudicial some evidence
> that already has been found to be factually relevant.”

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(Thomas, J.)(quoting 1

Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed.

1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)(“Assessing the

probative value of [proffered evidence], and weighing any factors counseling against

admissibility is a matter first for the district court’s sound judgment under Rules 401 and 403 . . .

.”).

Evidence may be unfairly prejudicial if it would likely provoke the jury’s emotional

response or would otherwise tend to adversely affect the jury’s attitude toward a particular

matter.  See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999)(Sanborn, J.).

Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)(Ebel, J.); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991)(Holloway, J.).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(Hartz, J.)(quoting Fed. R. Evid. 403 advisory committee notes).

### LAW REGARDING RULE 611(c)

Rule 611(c) of the Federal Rules of Evidence provides: "(c) **Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions: (1) on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Fed. R. Evid. 611(c).  The rule reflects the more general principle that "leading questions are usually permissible on cross-examination and impermissible on direct examination."  Victor J. Gold, 28 Fed. Prac. & Proc. Evid. § 6168 (2d ed.).  This limitation was "designed to guard against the risk of improper suggestion inherent in examining friendly witnesses through the use of leading questions."  Ellis v. City of Chicago, 667 F.2d 606, 612 (7th Cir. 1981).  See 1 McCormick On Evid. § 6 (7th ed.)("One danger of the latter method is that the witness may acquiesce in a false suggestion by the questioner.").  The exception in rule 611(c)(2) recognizes that "the risks of suggestion are reduced where the witness has an interest in promoting a version of the facts contrary to that suggested."  Gold, supra, at § 6168.  See 1 McCormick On Evid. § 6 (7th ed.)("[I]f the witness on direct is legally identified with the opponent, appears hostile to the examiner, or is reluctant or uncooperative, the danger of suggestion disappears.").  The trial court

has "virtually unlimited discretion" in making determinations under rule 611(c).   4-611 Weinstein, supra, at § 611.06.

The definition of a witness "identified with an adverse party" is broader than the old definition of an "adverse party" in the Federal Rules of Civil Procedure:

> Rule 43(b) of the Federal Rules of Civil Procedure has included only "an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party." This limitation virtually to persons whose statements would stand as admissions is believed to be an unduly narrow concept of those who may safely be regarded as hostile without further demonstration. . . . The phrase of the rule, "witness identified with" an adverse party, is designed to enlarge the category of persons thus callable.

Fed. R. Evid. 611, advisory committee notes.   Although the precise meaning of a witness identified with an adverse party is not clearly defined, a few relationships fall within its meaning. These relationships include: (i) employee/employer relationships, see Chonich v. Wayne Cty. Cmty. Coll., 874 F.2d 359, 368 (6th Cir. 1989)(allowing leading questions on direct examinations of community college's former president and personnel director); Haney v. Mizell Mem'l Hosp., 744 F.2d 1467, 1478 (11th Cir. 1984)("Nurse Williamson, an employee of one of the defendants present when the alleged malpractice may have occurred, certainly was identified with a party adverse to [the plaintiff]."); (ii) romantic partners, see United States v. Hicks, 748 F.2d 854, 859 (4th Cir. 1984)("Clearly [the defendant's girlfriend] was a person 'identified with an adverse party' so that interrogation by leading questions was permissible."); and (iii) law enforcement investigators, see United States v. Tsui, 646 F.2d 365, 368 (9th Cir. 1981)(stating that a district court's refusal to permit the defendant to pose leading questions to an IRS investigator was error, albeit harmless error).

Courts must be careful, however, not to expand these pre-existing categories.   See Suarez Matos v. Ashford Presbyterian Cmty. Hosp., Inc., 4 F.3d 47, 50 (1st Cir. 1993)("We find no case

involving the adversary's proposed expert, or suggesting that simply because a party expects favorable testimony from a witness, the opponent is entitled to call him, or her, as hostile."). They may thus wait until trial to determine whether the witness will actually demonstrate hostility.  See Gold, supra, at § 6168 ("[S]ince leading questions can also be justified if the specific witness in question is demonstrably 'hostile,' there is no need to make possibly unwarranted generalizations about the types of witnesses who should be presumed immune to suggestion."); United States v. Brown, 603 F.2d 1022, 1025-26 (1st Cir. 1979)(treating a witness as hostile "after a lengthy direct examination (twenty-five transcript pages) during which all leading questions were excluded").  Courts make determinations outside of existing formal categories based in large part on a witness' demeanor at trial.  See United States v. Cisneros-Gutierrez, 517 F.3d 751, 762 (5th Cir. 2008)(affirming a district court's decision to treat a witness as hostile "given the extent of Edgardo's memory problems, which reasonably appears to have been feigned, and Edgardo's hostility"); United States v. Wiley, 846 F.2d 150, 156 (2d Cir. 1988)(treating witness as hostile where he "was unresponsive and deviated from previous statements").  Even witnesses cooperating with the prosecution pursuant to an immunity agreement may nonetheless be designated hostile witnesses to the United States during their direct examinations.  See United States v. Diaz, 662 F.2d 713, 718 (11th Cir. 1981)("The record clearly reflects, however, that, despite the grant of immunity, Gelebert's hostility was directed to the government, rather than to Diaz.  Previously, Gelebert had testified that he was a very good friend of Diaz and that he had known him for approximately five years[.]").

## ANALYSIS

The Court will grant the Trial Brief's requests in part and deny them in part.  The Court will allow the SEC to state that it investigated and sued Starrett based on her work at Thornburg

Mortgage, but the SEC may not introduce any other Settlement Evidence.  The Court will defer making a final decision on whether the SEC may lead Starrett until it hears her answers at trial, but if she remains aligned with Goldstone and Simmons, the Court will likely permit the SEC to lead her.

I.    **THE SEC MAY MAKE ONLY LIMITED REFERENCES TO THE SETTLEMENT EVIDENCE.**

The SEC may reference its investigation and a lawsuit against Starrett resulting from her role at Thornburg Mortgage during cross-examination, but it may not make any other references to or introduce any other evidence of the settlement.  Rule 408 of the Federal Rules of Evidence bars the admission of settlements "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."  Fed. R. Evid. 408.  Settlement agreements may be admissible "for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."  Fed. R. Evid. 408.

Settlement evidence is not automatically admissible because a party offers it for "another purpose" under rule 408.  Fed. R. Evid. 408 ("The court may admit this evidence for another purpose . . .")(emphasis added); U.S. Aviation Underwriters, Inc. v. Olympia Wings, Inc., 896 F.2d 949, 956 (5th Cir. 1990)("The district court has broad discretion in determining whether to admit evidence of settlement for another purpose and we will not disturb that decision lightly."); Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, Federal Rules of Evidence Manual, Rule 408, at 603-04 (7th Ed. 1998).

The SEC argues that it needs the settlement to "avoid confusion, tell a complete story, and show Ms. Starrett's bias in favor of the remaining Defendants."  Response at 2.  Courts have admitted settlement evidence for these purposes under different circumstances.  In Belton v.

Fibreboard Corp., 724 F.2d 500 (5th Cir. 1984), for example, the United States Court of Appeals for the Fifth Circuit approved a trial court's "admission of the evidence to prevent confusion of the jury." 724 F.2d at 505. See Sterling Sav. Bank v. Citadel Dev. Co., 656 F. Supp. 2d 1248, 1256 (D. Or. 2009)(Haggerty, J.)("Courts have also used their discretion to admit evidence in other situations, such as to prevent confusion for the jury."). Other courts have recognized that settlement evidence may be relevant to bias. See S.E.C. v. Conaway, 698 F. Supp. 2d 771, 867 (E.D. Mich. 2010)(Pepe, M.J.)("In discounting certain of the McDonald testimony, the jury could also consider his potential bias because he had for years been a co-defendant and he settled with the SEC a month before trial because he 'just had enough.'"). The Defendants counter that the Settlement Evidence has "no purpose beyond improperly implying to the jury that Ms. Starrett has admitted fault on some level, that at a minimum the SEC's claims against the Defendants are legitimate, and that Defendants must somehow be at fault by association." Trial Brief at 1.

The Court concludes that the Settlement Evidence's unfair prejudice to the Defendants is greater than the potential danger of jury confusion. See Trout v. Milton S. Hershey Med. Ctr., 572 F. Supp. 2d 591, 596 (M.D. Pa. 2008)(Conner, J.)("Settlement agreements, however, are inadmissible regardless of relevance if offered to establish liability for or the amount of a claim or if introduction thereof would result in undue prejudice to an opposing party."). The Court's decision in Leon v. Fedex Ground Package System, Inc. is similar. In that case, a deceased passenger's widow brought two wrongful death actions: one against FedEx Ground, and another against two other parties. See 2016 WL 814639, at *14. The widow settled with the second group. See 2016 WL 814639, at *13-14. The widow then moved to preclude FedEx Ground from admitting settlement evidence at trial. See 2016 WL 814639, at *1. FedEx Ground

countered that the settlement evidence's absence would confuse the jury.  See 2016 WL 814639, at *14.  The Court excluded the settlement evidence on the grounds that: (i) "[i]nforming jurors that [the other defendants] settled could cause them to unfairly decrease FedEx Ground's share of the liability"; (ii) the jury could "assume that this is an admission of guilt"; and (iii) jury instructions provided an alternative means of mitigating any jury confusion.  2016 WL 814639, at *14.

The SEC contends that Leon v. Fedex Ground Package System, Inc. is distinguishable, because the Court's concern that settlement evidence could cause the jury to "'unfairly decrease [a remaining defendant's] share of the liability'" has no application here, where the jury "plays no role in determining remedies or apportioning fault."   Response at 7-8 (quoting 2016 WL 814639, at *14)(alteration in Response)).   This rationale, however, was only one of the three reasons that the Court excluded the settlement evidence.  See 2016 WL 814639, at *14.  As in Leon v. Fedex Ground Package System, Inc., there is a significant risk that the jury will assume "that this is an admission of guilt."  2016 WL 814639, at *14.  That one co-Defendant in an alleged three person conspiracy settled will suggest to the jury that the remaining Defendants must be liable.  Starrett may have settled with the SEC for a host of other reasons, including the emotional toll of litigation, the cost of trial, and the benefit of certainty.  See Trout v. Milton S. Hershey Med. Ctr., 572 F. Supp. 2d at 597.   In any case, the jury should decide whether Goldstone and/or Simmons violated federal securities laws based on the evidence presented at trial -- not on speculation that Starrett, a close ally of Goldstone and Simmons, is admitting some wrongdoing by settling before trial.

The Court's decision is not inconsistent with its decision to admit the declination letters from the SEC to the KPMG witnesses.  See Response at 7 ("At the Defendants' urging, similar

and less probative evidence has been admitted on the same grounds with respect to the SEC's termination letters to Ms. Reinhart and Ms. Hall.").  The SEC correctly notes that the Court admitted the declination letters so that the Defendants could question the KPMG witnesses' bias, just as the SEC seeks to question Starrett's bias.  See Response at 7 (citing Memorandum Opinion and Order, filed June 3, 2016 (Doc. 494)("KPMG MOO")).  The potential for unfair prejudice, however, is greater in this case.  The declination letters fairly prejudiced the SEC's case by suggesting that the SEC has cleared KPMG, implying that the KPMG witnesses' testimony may not be so probative, because they might have an incentive to testify in the SEC's favor because the SEC did not sue them.  But it will be obvious to the jurors that the SEC does not think that KPMG is the problem; indeed, the SEC is arguing that KPMG was deceived and was in some part the victim.  The SEC does not suffer much prejudice, if at all, from the declination letters.  The Settlement Evidence, on the other hand, unfairly prejudices the Defendants.  Many of Starrett's emails and other communications copy them, and the SEC alleges that all three deceived shareholders and KPMG.  See Trial Brief at 3-5.  A jury confronted with technical and often confusing accounting terminology may be particularly tempted to reason that, because one co-Defendant settled, all three must have committed the alleged wrongs.  The jurors should make their decision based on the evidence they see and hear in the case, and they should not use the Settlement Evidence as a crutch to support their decision.

Because Starrett may be biased against the SEC, because the SEC sued and investigated her, the Court will allow the SEC to ask her whether it has sued her and investigated her based on her conduct while at Thornburg Mortgage.  "[C]ross-examination pertinent to the credibility of a witness and for the development of facts that may tend to show bias or prejudice should be given the largest possible scope."  Abeyta v. United States, 368 F.2d 544, 545 (10th Cir.

1996)(internal quotation marks omitted).  If Starrett turns out to be uncooperative on the stand, the SEC must be allowed to show, at least to some extent, why.  The Court also prefers to allow the jury to have as much understanding of the case as can be reconciled with the need to avoid unfair prejudice.  Drawing the line here will also mitigate the possibility that the jury will question the SEC for engaging in selective prosecution.  See Trial Brief at 8.  Other courts have adopted a similar approach.  In Wallis v. Carco Carriage Corp., 124 F.3d 218 (10th Cir. 1997)(unpublished table decision), the district court "refused to admit any evidence of the settlement agreement," but "permitted [a defendant] to ask the plaintiffs whether they had filed a lawsuit against [the two other defendants]."  124 F.3d 218.  The Tenth Circuit affirmed, concluding that "the district court did not abuse its discretion in permitting [a defendant] to conduct a limited inquiry into the liability of the settling defendants and the plaintiffs' lawsuit against them."  124 F.3d 218.  But see S.E.C. v. Todd, 2006 WL 5201386, at *1 (prohibiting "any mention of [a witness'] former status as a defendant" under rule 403 without further explanation").  The Court concludes that these limited references to the SEC's investigation and suit against Starrett will appropriately balance the SEC's potential need to attack Starrett's bias with the risk of unfair prejudice to the Defendants.

The Defendants may submit a proposed jury instruction prohibiting the jury from drawing any unwarranted inferences from the fact that the SEC investigated and sued Starrett. See Response at 7 ("Defendants will not be prejudiced by the admission of the evidence and the concerns raised by Defendants are easily remedied by a limiting instruction, which the SEC would not oppose.").  Although the Court is unclear exactly what that instruction should say, this method may allow it to prevent jury confusion without introducing an unnecessary risk of prejudice.  In any case, the Defendants may draft a limiting instruction and run it past the SEC.

## II. THE COURT WILL WAIT UNTIL TRIAL TO DETERMINE DEFINITIVELY WHETHER STARRETT QUALIFIES AS A HOSTILE WITNESS OR A WITNESS IDENTIFIED WITH AN ADVERSE PARTY.

The Court will not determine definitively whether the SEC may ask Starrett leading questions until trial, because trial -- probably a few questions into Starrett's direct -- will better enable the Court to determine whether Starrett is hostile or identified with an adverse party under rule 611(c), for three primary reasons.  First, the Court cannot rule out the possibility that Starrett will be uncooperative at trial.   The Defendants contend that, given Starrett's settlement agreement, she "is no longer adverse to the SEC and is not identified with either Defendant." Trial Brief at 5.  The Court does not accept this oversimplified reasoning.  Starrett could be a witness "identified with an adverse party."  Fed. R. Evid. 611(c).  Starrett only recently became a third-party witness instead of a co-defendant.  See Starrett Consent at 1.  She has consistently testified under oath that none of the Defendants made misrepresentations or engaged in other wrongdoing.  See Response at 3.  Her agreement with the SEC neither admits nor denies the allegations in the SEC's Complaint, and she has a continued interest in preserving her reputation for honesty and, after the SEC's three-year bar expires, her professional reputation.  See Starrett Consent at 1-2.  Her relationship with the SEC is such that her interests could "be either identical to those of the adverse party or, at minimum, both closely aligned with those of the adverse party and of comparable significance."  Bixby v. KBR, Inc., 2012 WL 4754942, at *3.  There is little risk that allowing the SEC to lead Starrett would result in inappropriate suggestion, given that she "has an interest in promoting a version of the facts contrary to that suggested."  Gold, supra, at § 6168.  Like the witness in United States v. Diaz, Starrett has reached an arrangement with the government protecting her from further prosecution.  See 662 F.2d at 718.  Similarly, Starrett has a friendly relationship with Goldstone and has entrusted Simmons with her dog for extended

periods of time. See Response at 3-4 (citing Videotaped Deposition of Jane Elise Starrett (taken February 19, 2013), filed June 3, 2016 (Doc. 495-1); Deposition of Clarence George Simmons, III (taken December 14, 2009), filed June 3, 2016 (Doc. 495-2)). Given that the court in United States v. Diaz described leading questions for its witness as "entirely proper," the Court cannot preemptively prohibit them here. 662 F.2d at 718.

Numerous other cases support the Court's determination that Starrett could be considered a witness identified with an adverse party. In Stahl v. Sun Microsystems, Inc., 775 F. Supp. 1397 (D. Colo. 1991)(Finesilver, J.), the plaintiff in an employment dispute called one of the defendant corporation's former employees as a witness and requested leave to use leading questions. See 775 F. Supp. at 1398. The defendant objected on the grounds that the witness was no longer associated with it. See 775 F. Supp. at 1398. The Court allowed the plaintiff to use leading questions, explaining: "Although Ms. Cox is no longer employed by Sun, she is clearly identified with Defendant, both through her previous employment and her ongoing relationship with Mr. Waters, a key witness who attended the trial on behalf of Sun." 775 F. Supp. at 1398.

Moreover, the Defendants' cited cases are not on point. The plaintiff in Washington v. Illinois Department of Revenue failed to meet her burden to show that a defendant's former employee was hostile or identified with an adverse party. See 2006 WL 2873437, at *1. That plaintiff, however, did not present any evidence that the witness would be hostile -- other than the mere fact of his employment with the defendant -- and the court had the benefit of observing the witness' demeanor at trial. See 2006 WL 2873437, at *1. Here, on the other hand, there is evidence available to support the possibility of hostility, and the Court has not yet observed Starrett's approach to the SEC at trial. The Defendants' citation to Ellis v. City of Chicago is

similarly unconvincing.  <u>See</u> Trial Brief at 5.  Their citation, which identifies hostile witnesses as

an adverse party's "officer, director, managing agent," lacks important context.  Trial Brief at 5

(quoting <u>Ellis v. City of Chicago</u>, 667 F.2d at 612).[14]  In that quotation, the United States Court

of Appeals for the Seventh Circuit discussed the law "[b]efore the adoption of Rule 611(c)."  667

F.2d at 612.  <u>Ellis v. City of Chicago</u> does not prohibit courts from expanding rule 611(c)'s scope

beyond these narrow categories -- indeed, it recommends that they do so.  <u>See</u> 667 F.2d at 612-

13.

      Second, the Court should not prohibit or permit leading questions until trial.  Starrett does

not fall into the limited categories of witnesses who may "automatically be treated as hostile."  4-

611 Weinstein, <u>supra</u>, at § 611.06.  Cases allowing a party to lead a witness without an additional

showing at trial appear superficially similar to the situation here.  <u>See</u> <u>Haney v. Mizell Mem'l</u>

<u>Hosp.</u>, 744 F.2d at 1478 (allowing an attorney to lead "an employee of one of the defendants

present when the alleged malpractice may have occurred"); <u>Ellis v. City of Chicago</u>, 667 F.2d at

613 (involving "employees of defendant City of Chicago at all times during the litigation" who

were "each present during portions of the incident which gave rise to this lawsuit" and "worked

closely with" an individual defendant); <u>Jaffe v. Bank of Am., N.A.</u>, 395 F. App'x 583, 588 (11th

Cir. 2010)("Although Ross left Bank of America four years before the trial commenced, he was

a Bank of America employee when the alleged misrepresentations may have occurred, and Bank

of America's counsel represented him personally throughout the litigation."); <u>Stewart v. Hooters</u>

<u>of Am., Inc.</u>, No. 804CV40T17MAP, 2007 WL 3528685, at *7 (M.D. Fla. Nov. 15,

2007)(Kovachevich, J.)(unpublished)("[A]n agent, friend, relative, or an employee certainly

---

[14]The Court notes that the Trial Brief includes a reference to an "employee" in this quotation.  Trial Brief at 5.  The Court cannot locate any reference to an "employee" in <u>Ellis v.</u> <u>City of Chicago</u>.

qualifies as 'identified with the adverse party.'"").    Starrett's situation, however, is distinguishable.  There was enough of a conflict between her and the current Defendants that she had separate counsel even before the settlement.  <u>See</u> Pretrial Order at 1.  She is no longer a party to the Defendants' joint defense agreement.  <u>See</u> Starrett Consent at 1.  She is not the employee of a defendant corporation or government entity with an incentive to support her employer.  <u>See</u> <u>Ellis v. City of Chicago</u>, 667 F.2d at 613; <u>Fehr v. SUS-Q Cyber Charter Sch.</u>, No. 4:13-CV-01871, 2015 WL 6166627, at *3 (M.D. Pa. Oct. 20, 2015)(Brann, J.)("[C]ourts have come to differing conclusions based upon both the former employee's managerial or representative capacity as well as her involvement in the particular transactions or occurrences that gave rise to the litigation.").

Even if Starrett fell into a category allowing the SEC to ask her leading questions without establishing hostility, however, the Court would exercise its discretion not to allow the SEC to do so at such an early stage.  <u>See</u> <u>Jaffe v. Bank of Am., N.A.</u>, 395 F. App'x at 588 ("Thus, Ross was in fact a witness 'identified with' Bank of America, a party adverse to the Jaffes.  Rule 611(c), however, does not give the calling party an absolute right to ask leading questions.")(citations omitted); <u>Scenic Holding, LLC v. New Bd. of Trustees of Tabernacle Missionary Baptist Church, Inc.</u>, 506 F.3d 656, 664 (8th Cir. 2007)("Rule 611(c) is permissive and must be read in context with the trial court's general authority and discretion to control the conduct of the trial.").    Courts generally wait until trial to make this determination, because "[t]he requisite degree of hostility, bias, or reluctance of a witness must usually be demonstrated to the satisfaction of the court."   4-611 Weinstein, <u>supra</u>, at § 611.06.  In <u>S.E.C. v. World Information Technology, Inc.</u>, for example, a witness entered into a partial consent judgment with the SEC that resolved the claims against him, but did not determine the specific amount of

disgorgement, prejudgment interest, and penalties.  See 250 F.R.D. at 151.  The SEC moved to deem the witness hostile and requested the court's permission to use leading questions.  See 250 F.R.D. at 151.  It argued that, although the witness had settled, he was still adverse because the amount of financial penalties was not yet clear, and because he did not admit or deny liability in his consent.  See 250 F.R.D. at 151.  The defendant countered that the witness was not adverse to the SEC, "because he has entered into a settlement agreement and consent injunction, and the SEC could punish Dicapua for testimony adverse to its interests."  250 F.R.D. at 151.  The Honorable Victor Marrero, United States District Judge for the Southern District of New York, concluded that the SEC's motion was "premature," because the SEC had not yet presented any evidence of the witness' lack of cooperation and had "only stated that he is 'free' to deny culpability."  250 F.R.D. at 151.  The Court cannot, at this stage, confidently predict whether Starrett's testimony will be wholly favorable to the Defendants or whether she will be a difficult witness for the SEC.  There may be tension between Starrett and Goldstone and Simmons, that the Defendants have carefully hidden from the Court all these years.  The Court just does not know if there is something that makes her hostile to the remaining Defendants.  Starrett's demeanor and responses at trial will greatly assist the Court in determining whether she is either hostile to the SEC or identified with the Defendants.  While the chances are great that Starrett remains fully aligned with the remaining Defendants, and that leading questions are appropriate, the Court declines to "make possibly unwarranted generalizations about the types of witnesses who should be presumed immune to suggestion."  Gold, supra, at § 6168.

**IT IS ORDERED** that: Defendants Larry A. Goldstone's and Clarence G. Simmons's Trial Brief on (I) the Admissibility of Evidence Relating to Former Defendant Jane E. Starrett's Settlement with the SEC and (II) the SEC's Ability to Ask Ms. Starrett Leading Questions, filed

June 3, 2016 (Doc. 493), is granted in part and denied in part.  Plaintiff Securities and Exchange

Commission may establish, through leading questions, that it investigated and sued Jane E.

Starrett based on her work at Thornburg Mortgage, Inc., but it may not introduce any other

evidence related to Starrett's settlement.  The Court does not rule on whether the SEC may pose

leading questions to Starrett; although it is likely that the SEC will be able to lead, the Court

wants to obtain her temperature after a few questions before deciding whether she is still firmly

aligned with the remaining Defendants.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Danielle Voorhees
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

        *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Heather Tewksbury
Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Aaron Thompson
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

--and--

Robert G. Badal
Los Angeles, California

*Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Robert J. Liubicic
Paul M. Torres
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

*Attorneys for Defendant Jane E. Starrett*