1       IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW MEXICO

3    SECURITIES AND EXCHANGE COMMISSION,

4              Plaintiff,

5    vs.              NO:  12-0257 JB/GBW

6    LARRY A. GOLDSTONE, et al.,

7              Defendants.

8

9              VOLUME 7

10      Transcript of Trial Proceeding before The

11   Honorable James O. Browning, United States District

12   Judge, Albuquerque, Bernalillo County, New Mexico,

13   commencing on June 14, 2016.

14   For the Plaintiff:  Mr. Steve McKenna; Mr. Greg
     Kasper; Ms. Danielle Voorhees; Mr. Dugan Bliss
15

16   For the Defendants:  Mr. Randall Lee; Ms. Heather
     Tewksbury; Mr. Robert Badal; Mr. Andrew Schultz
17

18

19

20

21

22        Jennifer Bean, FAPR, RMR-RDR-CCR 94
               Bean & Associates, Inc.
23        Professional Court Reporting Service
          201 Third Street, Northwest, Suite 1630
24            Albuquerque, New Mexico 87102

25



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1630

1                           I N D E X

2      EXAMINATION OF JENNIFER HALL

3            Continued Cross-Examination by Mr. Lee     1633

4            Redirect Examination by Mr. McKenna        1790

5      EXAMINATION OF CYNTHIA REINHART

6            Direct Examination by Mr. Kasper           1816

7            Cross-Examination by Mr. Lee               1950

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1631

```
 1              THE COURT:  Good morning, everyone.  I
 2   appreciate everybody being here and ready to go.
 3   Ms. Wild is handing each table a set of typed jury
 4   instructions, so what you had yesterday in the p.m.
 5   version is now typed in here.  I haven't had a chance
 6   to look at the SEC's letter that came in yesterday.
 7   I got it this morning.  So I'll take a look at it.
 8   But everything I had written out is typed in.
 9              Ladies and gentlemen, do take a look at
10   that jury.  I'm not going to tell you how to try your
11   case.  They're done.  They're waiting for Mr.
12   Goldstone, Mr. Simmons to testify, and they're done.
13   I know you want a month, and you can have it, but not
14   a single person that I saw yesterday was taking
15   notes.  They've got their arms crossed.  You know, do
16   whatever you want, but keep looking at the jury.
17   That's your audience.
18              Anything we need to discuss before we bring
19   the jury in?  Mr. McKenna?
20              MR. McKENNA:  No, Your Honor.
21              THE COURT:  Mr. Lee?
22              MR. LEE:  No, Your Honor.  I mean, we
23   certainly appreciate the Court's comments.  We are
24   thinking about what to do with our case, and I think,
25   as I indicated last night, I think we're confident
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    about the timetable.

 2            THE COURT:  Well, I'm not telling you how

 3    to try your case, but that's your audience and

 4    they've shut down taking notes, and they're crossing

 5    their arms.  I don't know, just me looking at body

 6    language, they're kind of done.  They're waiting to

 7    hear from your two clients.  That's I think the ball

 8    game for them, and then they'll be ready to decide.

 9    I can look at the list here.  If there is a lot more

10    that you want to do, that's fine.  But it's y'all's

11    case.  I ain't going anywhere.

12            I should have the Starrett opinion out

13    pretty quickly.  I have some changes I'm making to

14    it.  So we should have that to you and give you

15    guidance on the examination of her settlement

16    document.

17            All rise.

18            (The jury entered the courtroom.)

19            THE COURT:  Well, good morning, ladies and

20    gentlemen.  Thank you for being back on time ready to

21    go.  I appreciate all you're doing for us and the way

22    you're going about it.  We appreciate your

23    punctuality and being ready to go every time we ask

24    you to be ready to go.  We appreciate it very much.

25            All right, Ms. Hall, I'll remind you that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   you're still under oath.
 2            Mr. Lee, if you wish to continue your
 3   cross-examination of Ms. Hall, you may do so at this
 4   time.
 5            MR. LEE:  I do.  Thank you, Your Honor.
 6            THE COURT:  Mr. Lee.
 7                      JENNIFER HALL,
 8        after having been previously duly sworn under
 9        oath, was questioned, and continued testifying
10        as follows:
11                 CONTINUED CROSS-EXAMINATION
12   BY MR. LEE:
13        Q.   Good morning, Ms. Hall.
14        A.   Good morning.
15        Q.   When we left off yesterday, we were talking
16   about the size and scope of the actual engagement.
17   Do you recall that?
18        A.   Yes.
19        Q.   And we started to go through members of the
20   engagement team, and then we broke for the evening.
21   Do you recall that?
22        A.   Yes.
23        Q.   So I'd just like to pick up and go through
24   that fairly quickly.  So let's just see if we can
25   identify the principal members of the engagement
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   team.  So it was Ms. Reinhart, Mr. Womack,
 2   Mr. Taylor, and Mr. McLamb were the four partners who
 3   were members of -- core members of the engagement
 4   team; is that right?
 5        A.   They were part of the team; that's correct.
 6        Q.   And then the managers were yourself and Ms.
 7   Baucom?
 8        A.   Yes.
 9        Q.   And then there were a number of folks below
10   the level of manager; is that correct?
11        A.   Yes.
12        Q.   And that included Mr. Plummer?
13        A.   Yes.
14        Q.   Ms. Jones?
15        A.   Yes.
16        Q.   Mr. Acree?
17        A.   Yes.
18        Q.   Mr. Kowalski?
19        A.   I believe so, yes.
20        Q.   Ms. Mondragon?
21        A.   That sounds right.
22        Q.   Any other names I left off at this point?
23        A.   Not that I can think of.
24        Q.   Okay.  And you would agree, would you not,
25   that the total team spent somewhere in the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    neighborhood of 4,500 to 5,000 hours on the

2    engagement up to the time of the issuance of the

3    audit opinion?

4         A.    That sounds right.

5         Q.    And during the audit, the KPMG engagement

6    team had offices at Thornburg; correct?

7         A.    That's correct.

8         Q.    You had your own office space on the second

9    floor of the Thornburg offices?

10        A.    That's correct.

11        Q.    And you had free access to go anywhere

12   within Thornburg's offices; correct?

13        A.    That's correct.

14        Q.    And the office -- your offices were

15   essentially just across the hall from where the

16   Thornburg offices were; right?  Or down the hall?

17        A.    We were where the mortgage department was.

18        Q.    And you had unrestricted access not only to

19   the office, to the Thornburg office themselves --

20   itself, but also to Thornburg employees; correct?

21        A.    That's correct.

22        Q.    In other words, you could go up and talk to

23   and ask questions of any Thornburg employee; right?

24        A.    That's correct.

25        Q.    You didn't have to ask permission of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    anybody or go through any of our clients to ask for
 2    permission to speak to a Thornburg employee, did you?
 3         A.   I did not.
 4         Q.   And you could ask for information directly
 5    from any employee of Thornburg; correct?
 6         A.   That's correct.
 7         Q.   And you did ask for information from many
 8    employees at Thornburg; right?
 9         A.   That's correct.
10         Q.   And the information requests on behalf of
11    KPMG would come not only from you, but any member of
12    the engagement team could ask for information; right?
13         A.   That's correct.
14         Q.   So information from KPMG could go at
15    various levels to various levels at Thornburg; right?
16         A.   That's correct.
17         Q.   There was no central clearinghouse for
18    information requests.
19         A.   No.
20         Q.   Okay.  And you made information requests
21    from time to time?
22         A.   Yes.
23         Q.   And members -- Ms. Baucom did; correct?
24         A.   Yes.
25         Q.   Ms. Reinhart did; correct?
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1        A.   Yes.

 2        Q.   Mr. Plummer did; correct?

 3        A.   Yes.

 4        Q.   And in fact, any member of the team could

 5   and did at various times make information requests of

 6   various people at Thornburg; right?

 7        A.   Correct.

 8        Q.   And no one, to your knowledge, at Thornburg

 9   ever refused a request for information from KPMG, did

10   they?

11        A.   There were times we'd ask for information,

12   and if they didn't have it, they'd say they didn't

13   have it.  But they wouldn't say, "No, I won't give

14   that to you."

15        Q.   And even if a particular piece of

16   information they didn't have it, your request was

17   always addressed somehow; correct?

18        A.   To our satisfaction, yes.

19        Q.   Now, let's just go through some of the

20   people at Thornburg whom you dealt with in addition

21   to Mr. Goldstone and Mr. Simmons and Ms. Starrett.

22   You knew who Michael Coltharp was; correct?

23        A.   Yes.

24        Q.   He was a controller at Thornburg?

25        A.   Yes.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1638

```
 1        Q.   And you dealt with him directly; right?

 2        A.   Yes.

 3        Q.   You made information requests to him?

 4        A.   Yes.

 5        Q.   You knew who Shawn Buniel -- we've already

 6   talked a little about Shawn Buniel; right?

 7        A.   Yes.

 8        Q.   He was in the accounting department?

 9        A.   Right.

10        Q.   And you made requests to him; correct?

11        A.   Correct.

12        Q.   And you dealt with him; correct?

13        A.   Yes.

14        Q.   Do you recall who the head of internal

15   audit was, a gentleman named Ben Smiley?

16        A.   Yes.

17        Q.   And he was Thornburg's own in-house

18   auditor; correct?

19        A.   Yes.

20        Q.   In charge of what's known as their internal

21   audit function, which is different from the external

22   audit function; right?

23        A.   Yes.

24        Q.   So KPMG are the external auditors, but

25   Thornburg also had an internal audit function; right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1639

```
 1        A.   Right.

 2        Q.   And that was Ben Smiley; right?

 3        A.   Right.

 4        Q.   And you dealt with Ben Smiley; correct?

 5        A.   Yes.

 6        Q.   And you requested information from Ben

 7   Smiley?

 8        A.   Yes.

 9        Q.   There was another woman named Francine

10   Jacquez, and she was the assistant controller and

11   financial reporting manager.  Do you recall her?

12        A.   Yes.

13        Q.   And you dealt with her?

14        A.   Yes.

15        Q.   You made requests to her?

16        A.   Yes.

17        Q.   We've talked a little about the capital

18   markets group, and capital markets group was

19   responsible for managing kind of the company's assets

20   and liabilities.  Is that fair to say?

21        A.   Yes.

22        Q.   And one of the responsibilities of the

23   capital markets group was to deal with the company's

24   reverse repurchase lending agreements; is that right?

25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        Q.   And the head of capital markets was an

2   individual named Nate Fellers; correct?

3        A.   That's right.

4        Q.   And you dealt with Mr. Fellers?

5        A.   Yes.

6        Q.   And you requested information directly from

7   Mr. Fellers?

8        A.   Yes.

9        Q.   There was also an individual in capital

10   markets group named Patrick Feldman.  Do you recall

11   him?

12        A.   Yes.

13        Q.   You dealt with him?

14        A.   Yes.

15        Q.   Requested information from him?

16        A.   Yes.

17        Q.   There was another individual in capital

18   markets group named Xen Stanhope.  Do you recall him?

19        A.   Yes.

20        Q.   And you requested information from him?

21        A.   Yes.

22        Q.   And there was another individual in the

23   capital markets group named Ralph Ahn.  Do you recall

24   him?

25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   You dealt with him directly?
 2        A.   Yes.
 3        Q.   And you requested information from him;
 4   correct?
 5        A.   Yes.
 6        Q.   Do you recall an individual named Tim
 7   Sturdy, also in the capital markets group?
 8        A.   Yes, that sounds familiar.  Yes.
 9        Q.   And you recall at least having some
10   dealings with him?
11        A.   Yes.
12        Q.   And of course, you had a relationship with
13   Ms. Starrett; right?
14        A.   Yes.
15        Q.   And you requested information directly from
16   her?
17        A.   Yes.
18        Q.   And you interacted directly with her?
19        A.   Yes.
20        Q.   And you had a relationship with Mr.
21   Goldstone and Mr. Simmons; right?
22        A.   Yes.
23        Q.   And on occasion you requested information
24   directly from them; right?
25        A.   That's correct.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Are there any other Thornburg employees I
 2   haven't touched on whom you recall having dealings
 3   with?
 4        A.   Deborah -- I forget her last name -- that
 5   was structured finance.
 6        Q.   Ms. Burns?  Deborah Burns?
 7        A.   Yes.
 8        Q.   She was head of securitizations?
 9        A.   Yes.
10        Q.   So you had a relationship with her, as
11   well?
12        A.   Yes.
13        Q.   And you requested information from her?
14        A.   Yes.
15        Q.   How about Ms. O'Leary or formerly Ms.
16   O'Leary Lopez?  Do you recall her?
17        A.   Not offhand, no.
18        Q.   Anyone else you recall dealing with?
19        A.   Not that I can think of offhand.
20        Q.   And throughout the audit, then, you had the
21   ability to go up to any one of those individuals and
22   ask for information; correct?
23        A.   That's correct.
24        Q.   And you didn't have to seek the permission
25   of anybody at Thornburg in order to do so; right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   That's correct.

2       Q.   Yesterday you testified about a statement

3   from Mr. Simmons, where you said he told you that it

4   was unlikely that values of the collateral, repo

5   collateral, would decline further and that the market

6   was stabilizing.  Do you recall that?

7       A.   Yes.

8       Q.   Is that another one of those conversations

9   that you don't have notes of?

10      A.   I don't know if I have notes or not.

11      Q.   Do you recall when specifically that

12  conversation was?

13      A.   It was late in February of 2008.

14      Q.   But you don't remember the day?

15      A.   No.

16      Q.   Do you remember where that conversation

17  was?

18      A.   It was in a conference room in the mortgage

19  area.

20      Q.   But you remember that specific statement

21  even though you aren't aware of any notes

22  memorializing that?

23      A.   Yes.  Well, I memorialized it in my memo.

24      Q.   And the memo says it was management's

25  decision, not that it was Mr. Simmons' decision.  Do



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492          BEAN                          FAX (505) 843-9492
                            & ASSOCIATES, Inc.                  1-800-669-9492
                            PROFESSIONAL COURT            e-mail: info@litsupport.com
                            REPORTING SERVICE

1    you recall that?

2        A.   Yes.  I had conversations with Clay and

3    Nate Fellers about that.

4        Q.   And is it your recollection that Mr.

5    Fellers also shared that view?

6        A.   Yes, he talked about the market bottoming

7    out and stabilizing.

8        Q.   And it's not your view today that Mr.

9    Fellers didn't actually believe that, is it?

10       A.   I have no reason to think he did not

11   believe that.

12       Q.   And it's not your view today that Mr.

13   Simmons didn't actually believe that; correct?

14       A.   That's correct.

15       Q.   And you're not opining that anyone

16   predicted the decline in the value of Alt-A

17   securities, are you?

18       A.   Well, given the information in the emails

19   I've seen, it seems like they did expect decline in

20   the Alt-A securities.

21       Q.   Well, the question was:  You don't have any

22   evidence that anyone actually predicted that Alt-A --

23   the Alt-A securities market would decline?

24       A.   I think the email from Larry clearly

25   documents that he expected a decline in Alt-A

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    securities.

2        Q.   Well, that email says it would occur

3    gradually; correct?

4        A.   Yes.

5        Q.   But you're not aware of any evidence that

6    anyone expected it to decline significantly on the

7    28th or the 29th; correct?

8        A.   Not specifically, no.

9        Q.   And you were also, yourself, aware of the

10   distressed market conditions at the time; correct?

11       A.   Yes.

12       Q.   And others at KPMG were monitoring the

13   state of the mortgage markets; correct?

14       A.   Yes.

15       Q.   And you didn't predict that the value of

16   Alt-A securities would decline dramatically on

17   February 28th and 29th, did you?

18       A.   No.

19       Q.   And to your knowledge, no one at KPMG

20   predicted that the value of Alt-A securities would

21   decline dramatically on February 28th and 29th, did

22   they?

23       A.   Nobody on our engagement team.

24       Q.   And during the restatement period, you

25   actually looked specifically at this issue; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   And if we can pull up Exhibit DY.  And this
 3   is a memo from you to the file dated March 20, with
 4   some additional handwritten dates below that.  And
 5   it's entitled "February 28, 2008, market events";
 6   right?
 7        A.   Yes.
 8        Q.   And it says it's to document the client's
 9   analysis regarding the events that unfolded
10   immediately after filing their Form 10-K.  Do you see
11   that?
12        A.   Yes.
13        Q.   And if we can go to page 3 of the document
14   Bates ending 688, to the third full paragraph.  And
15   this -- if I can direct your attention to the third
16   sentence, the third sentence, and continuing through
17   the remainder of the paragraph.  It says, "The
18   company translated the occurrence to have a
19   likelihood of occurrence, assuming a normal
20   distribution, of zero percent to 9 percent.  In other
21   words, the chance of the magnitude of decline in
22   value of Thornburg's securities on August 28, 2008,"
23   and you would agree that's a typo and that should say
24   February 28th?
25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   "The chance of a decline -- of the

2   magnitude of decline in value of Thornburg's

3   securities on February 28, 2008, was more remote than

4   a natural disaster.  For example, in the case of

5   index 06-1, the chances of the value decline on

6   February 27 was essentially zero percent."  Do you

7   see that?

8       A.   Yes.

9       Q.   And KPMG actually did some work to check

10  the accuracy of that projection or prediction view by

11  management; right?

12      A.   No.

13      Q.   Well, let's go down to the next sentence

14  and see if this refreshes your recollection as to

15  what KPMG did?

16      A.   I say we didn't test their analysis, but we

17  did look at other information.

18      Q.   Okay.  So let's read the first sentence.

19  It says, "KPMG obtained analyst reports from Deutsche

20  Bank and Credit Suisse regarding market changes

21  during the same time period."  Do you see that?

22      A.   Yes.

23      Q.   And KPMG, in fact, did that; right?

24      A.   Yes.

25      Q.   And then it goes on to say, "Their reports



SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                    1-800-669-9492
                                                         e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   seem to support the company's analysis."  Do you see
 2   that?
 3        A.   Yes.
 4        Q.   And you believed that at the time; right?
 5        A.   Yes.
 6        Q.   And then it quotes from a publication from
 7   Deutsche Bank which presumably -- I won't get into
 8   the technical details, but presumably supports the
 9   analysis that had been provided by the company;
10   correct?
11        A.   Well, I don't think it's the same analysis
12   that the company had, but it does talk about
13   significant changes in the values on February 27th
14   and 28th -- or 27th, at least.
15        Q.   And you concluded, after reading reports
16   from two of the largest banks in the world, that
17   their reports seemed to support the company's
18   analysis; right?
19        A.   It doesn't have an analysis on the
20   likelihood, but it certainly is consistent with the
21   assertion that market -- the market declined
22   significantly on that date.
23        Q.   And that the chance of that occurring was
24   extremely low; correct?
25        A.   It was at its widest level since the summer
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   of 1986.

 2        Q.   I'd like to talk to you about the liquidity

 3   reports that counsel asked you about yesterday.  You

 4   reviewed a number of liquidity reports during the

 5   restatement period; correct?

 6        A.   Correct.

 7        Q.   If we can go to Exhibit HT.  Exhibit HT is

 8   a memo.  Let's blow up the top.  It's dated March 9,

 9   from the restatement period, and it's entitled "Test

10   of operating effectiveness:  Liquidity risk reports."

11   Do you see that?

12        A.   Yes.

13        Q.   And this memorializes some work you did to

14   review the company's liquidity reports; right?

15        A.   To review controls around -- management's

16   controls around their monitoring the cash process, so

17   their liquidity.

18        Q.   And as part of that, you actually did

19   review a number of liquidity reports; right?

20        A.   That's correct.

21        Q.   And if we can -- under "Sample size

22   selection," if you can highlight that first sentence.

23   It says, "According to the KPMG audit manual, in

24   situations where a manual control is performed on a

25   daily basis, the suggested minimum sample size is 25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1650

1    when the risk of failure is high."  Then it says, "As

2    this process was not implemented until late January

3    2008, the dates sampled are from January 25 through

4    March 7 of 2008."  Do you see that?

5         A.   Yes.

6         Q.   And it says, "KPMG obtained the daily

7    liquidity report from Ralph Ahn, assistant vice

8    president and senior portfolio analyst"; right?

9         A.   Correct.

10        Q.   And so you obtained a number of daily

11   liquidity reports.  In fact, you obtained 25 of these

12   from Mr. Ahn; right?

13        A.   Yes.

14        Q.   And you obtained them from him directly;

15   right?

16        A.   KPMG obtained them.  I didn't personally

17   obtain them.  I'm not sure if that's direct or not.

18        Q.   But a member of the engagement team was

19   able to get those from Ralph Ahn; right?

20        A.   Correct.

21        Q.   They didn't come from Mr. Goldstone; right?

22        A.   I don't know.

23        Q.   They didn't come from Mr. Simmons, right?

24   Well, the memo doesn't say they came from anybody

25   other than Mr. Ahn, correct?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1651

```
 1        A.   That's correct.
 2        Q.   And you know that Mr. Ahn reported to Mr.
 3   Fellers; right?
 4        A.   Correct.
 5        Q.   Right.  So Mr. Ahn didn't even report
 6   directly to Mr. Goldstone or Mr. Simmons; right?
 7        A.   Not directly, but the capital markets group
 8   reported to Clay Simmons.
 9        Q.   Correct.  But KPMG -- my point is:  KPMG
10   was able to get these reports from the individual in
11   charge of actually preparing them; correct?
12        A.   That's correct.
13        Q.   And if we can go to -- take a quick look at
14   page 2, this is a list of the reports you obtained in
15   order to test; correct?
16        A.   That's correct.
17        Q.   And so that lists 25 different reports
18   scanning the period from the beginning of 2008
19   through early March of 2008; right?
20        A.   That's correct.
21        Q.   And the tick marks next to those indicate
22   that each one was reviewed; correct?
23        A.   We obtained them as evidence that the
24   company prepared them or was using them.  I wouldn't
25   say that we went and analyzed each of them.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1652

1    Q.   Then if we can go back to the first page,

2    the very bottom paragraph, it says, "Based on the

3    procedures performed, the control appears to be

4    operating effectively."  And this was your conclusion

5    based on the review of the liquidity reports; right?

6    A.   During the restatement period; that's

7    correct.

8    Q.   And then if we can go to Exhibit BZ.  This

9    is another list of the liquidity reports that members

10   of your team reviewed during the restatement period;

11   correct?

12   A.   That's correct.

13   Q.   And if we can go to the first comment

14   below.  It's a little small, but it says, "Jenni's

15   comments regarding liquidity report."  That's a

16   reference to you; correct?

17   A.   That's correct.

18   Q.   And it says, "I can get 30 of these reports

19   via Ralph's email distribution to management, inquiry

20   and corroborative inquiry test.  I currently have a

21   copy of email distribution for 8/27 and 8/28."  And

22   would you agree those are typos, as well; right?

23   A.   Yes.

24   Q.   So it should be 2/27 and 2/28?

25   A.   That's correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1653

```
 1        Q.   "The only question is how long have they
 2   been doing this report for testing purposes, and do
 3   they retain them to the extent that we can pick a
 4   sample"; correct?
 5        A.   Correct.
 6        Q.   And you satisfied yourself that they did
 7   have them available for testing; right?
 8        A.   That's correct.
 9        Q.   And again, you were able to get these
10   without any problem at all from the company; correct?
11        A.   That's correct.
12        Q.   And these forms -- after getting these
13   reports -- you got these reports during the
14   restatement period; right?
15        A.   That's correct.
16        Q.   And after getting these reports, you
17   concluded, or you and KPMG concluded that there were
18   no issues with management integrity; correct?
19        A.   That's correct.
20        Q.   And you concluded that there were no
21   material weaknesses in the company's internal
22   controls; correct?
23        A.   Correct.
24        Q.   Now, you testified yesterday -- you were
25   asked, did you ever see a liquidity report projecting
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1654

```
 1    any negative liquidity.  Do you recall that question?
 2         A.   Yes.
 3         Q.   And your response was no.
 4         A.   That's correct.
 5         Q.   Do you recall that?  And that's your
 6    testimony today, that you never saw a liquidity
 7    report projecting any negative liquidity?
 8         A.   Yes.
 9         Q.   Let's take a look at Exhibit GA.  Now,
10    Exhibit GA is a liquidity report dated February 14.
11    Do you see that?
12         A.   Yes.
13         Q.   It shows beginning cash balance of $78
14    million.  Do you see that?
15         A.   Yes.
16         Q.   And let's show what the projected ending
17    cash balance is for that day.  It shows negative $2
18    million; correct?
19         A.   Correct.
20         Q.   So that is a daily liquidity report with a
21    negative balance, is it not?
22         A.   It is.
23         Q.   And let's go to the very bottom, to the
24    Bates number on the document.  Do you see what we
25    lawyers call a Bates number?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   That reflects that this document came from
 3   KPMG's own files, didn't it?
 4        A.   Yes.
 5        Q.   So your testimony is, I presume now, that
 6   somebody -- you may not have seen a daily liquidity
 7   report showing a negative balance, but somebody did;
 8   right?
 9        A.   During the restatement period; that's
10   correct.
11        Q.   Well, this doesn't say during the
12   restatement period, does it?
13        A.   I believe it was obtained as part of the
14   restatement.
15        Q.   And what's the basis for that?  There is
16   nothing on this document that shows that, is there?
17        A.   Because I was the one looking at the
18   liquidity reports during the audit, and I never saw
19   one with a negative cash balance.
20        Q.   Well, we're looking at one right here from
21   KPMG's own files that shows a negative liquidity
22   balance.
23        A.   Which would have been obtained during the
24   restatement period.
25        Q.   But you just said you never saw one that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     showed a negative liquidity balance.

2          A.    I personally did not.

3          Q.    Okay.  So I guess you just missed this one.

4          A.    Well, other people were doing the work.

5          Q.    Okay.  Now, when you testified yesterday

6     that you never saw any liquidity report showing a

7     negative liquidity balance, you didn't add the caveat

8     that somebody else on the engagement team might have

9     actually seen one, did you?

10         A.    That's correct.

11         Q.    Didn't you think that was an important

12    piece of information for the jury to know?

13         A.    I wasn't aware of a report that we had with

14    a negative cash balance.

15         Q.    Let's take a look at Exhibit GC just to

16    satisfy ourselves that the one we just looked at

17    isn't a total coincidence.  This is another cash

18    liquidity report.  Do you see that?

19         A.    Yes.

20         Q.    And let's look at the date first.  This is

21    dated February 19, 2008.  Do you see that?

22         A.    Yes.

23         Q.    And the beginning cash balance is $5

24    million; right?

25         A.    Correct.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                          1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    Q.   Let's look at the next four lines, the next

2    four lines down, yes.  This shows a projected

3    negative liquidity of negative $76 million, negative

4    $59 million, negative $57 million, and negative $55

5    million.  Do you see that?

6    A.   Yes.

7    Q.   Let's look and see where this document came

8    from.  This document also came from KPMG's files;

9    correct?

10   A.   Correct.

11   Q.   And so this is another negative liquidity

12   report that apparently members of your team reviewed

13   and didn't tell you about; correct?

14   A.   During the restatement period.

15   Q.   Well, what makes you so sure this was

16   during the restatement period?

17   A.   Because I was the one looking at the daily

18   liquidity reports during the audit period.  I was not

19   given this report.

20   Q.   Is there anything on this report that shows

21   when you were given it and when you reviewed it?

22   A.   I'm going by my memory during the audit.

23   Not by this document, other than understanding what

24   this document shows and knowing that I did not see

25   this report.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And it's your testimony today that eight

2    years later you remember that you didn't review a

3    daily liquidity report dated February 19?  You have

4    that clear memory in your head?

5    A.   It's not the date.  It's the fact that

6    there is a $79 million margin call and a $76 million

7    negative number that I know I did not see.

8    Q.   Well, you're not disputing that these came

9    from KPMG's files; right?

10   A.   Files that included the restatement period.

11   Q.   And you're not disputing that there is

12   nothing accompanying either of these daily liquidity

13   reports that shows when you received them; correct?

14   A.   Correct.

15   Q.   And you testified yesterday -- you didn't

16   qualify your testimony.  You said -- you were asked,

17   did you ever see a liquidity report projecting any

18   negative liquidity.  Did you ever see a liquidity

19   report projecting any negative liquidity, and you

20   answered no.

21   A.   I didn't --

22   Q.   Do you recall that?

23   A.   I recall, and that's true.

24   Q.   You just testified you saw this during the

25   restatement period.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                        1-800-669-9492
                                              e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        A.   I did not say I saw it.

2        Q.   So you -- somebody else on your team saw

3    this.

4        A.   Yes.

5        Q.   And they just didn't tell you about it.

6        A.   Yes.

7        Q.   And when you answered that you never saw a

8    daily liquidity report projecting any negative

9    liquidity, did it occur to you to add the caveat,

10   just as a matter of fairness to my clients, "You know

11   what?  Somebody on my team might have actually seen

12   one, because I didn't personally review all of them"?

13   Wouldn't that have been the more fair thing to say?

14       A.   I wasn't aware that there were reports with

15   negative cash balances that we had.

16       Q.   Now, let's go to Exhibit OD.  Exhibit OD,

17   would you agree with me, is a draft of the Thornburg

18   going concern memo -- of the KPMG going concern memo

19   about Thornburg, that is?

20       A.   That is correct.

21       Q.   And you reviewed this draft; correct?

22       A.   Yes.

23       Q.   And let's go to the Bates ending 705.  And

24   these are a variety of comments that were inserted by

25   various people.  Whoever was commenting on this draft

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    could go into the documents and add comments; right?

 2         A.   That's correct.

 3         Q.   And one of the comments says, "The cash

 4    balance around February 21, 2008, is very tight,

 5    projected to be $476,000."  Do you see that?

 6         A.   Yes.

 7         Q.   And you would agree with me that a lot of

 8    the numbers on the daily liquidity reports -- they're

 9    in thousands, so you add three zeroes; right?

10         A.   Right.

11         Q.   So if it says 5,000, it actually means $5

12    million?

13         A.   Right.

14         Q.   On this document this comment actually

15    means $476,000; right?

16         A.   I believe so, yes.

17         Q.   And so on -- and you see how it's dated

18    February 21, 2008?

19         A.   Yes.

20         Q.   So on February 21, 2008, somebody at KPMG

21    was aware that the cash balance as of that date was

22    projected to be only $476,000; right?

23         A.   Correct.

24         Q.   And now let's go to Exhibit -- let's keep

25    that up and go to Exhibit OO.  So Exhibit OO is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    another draft of the KPMG going concern memo; right?

 2         A.   Correct.

 3         Q.   And if we can go to the page ending --

 4    we've seen this a few times in this trial -- 826, and

 5    that is dated -- that's another comment inserted by

 6    somebody at KPMG; right?

 7         A.   Right.

 8         Q.   Dated February 23, 2008; right?

 9         A.   Correct.

10         Q.   And that reads, "The company has had around

11    $250 million in margin calls in the last week or so,

12    covered by the recent equity offerings"; right?

13         A.   Correct.

14         Q.   And so by then, KPMG knew -- or members

15    of -- either you or members of your engagement team

16    knew that as of just less than two days -- basically

17    a day before the company had projected cash balance

18    of less than half a million dollars, and as of a day

19    later the company -- KPMG is also recognizing that

20    the company has had around $250 million in margin

21    calls; right?

22         A.   Correct.

23         Q.   So you knew by then that if Thornburg

24    received a margin call of any size at all, that it

25    would exceed the amount of cash on hand; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Well, they're on different days, and we're
 2   looking at their inflows and outflows of cash.  So we
 3   looked and saw that they had tight cash; went and
 4   talked to the company who described, you know, that
 5   their pattern of cash does increase and decrease
 6   throughout the month as part of their normal cycle.
 7   So that was part of the understanding.  And then I --
 8   then, yes, we knew that they had received -- that
 9   part of the reason that their cash was so low was
10   that they had received this elevated amount of margin
11   calls.
12        Q.   And now let's take a look at Exhibit AS.
13   Now, Exhibit AS is the final KPMG going concern memo;
14   correct?
15        A.   Correct.
16        Q.   And we've looked at this before and this
17   was from you to the audit file; correct?
18        A.   Yes.
19        Q.   If we can go to the page Bates 1408, and I
20   want to ask you some questions about the degree to
21   which you relied on these cash projections at all.
22   Now, you see about the middle of the page the
23   highlighted language says, "As discussed above, the
24   company projects a positive cash balance through the
25   end of the report, April 10, 2008, of $377 million.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    The report is a management tool to make appropriate

2    decisions on a day-to-day basis."

3            I want to draw your attention to that next

4    sentence.  It says, "It is not relied upon to predict

5    a cash balance with any level of precision beyond a

6    week or so."  Do you see that?

7        A.   Yes.

8        Q.   And that was true at the time you wrote

9    that; correct?

10       A.   Correct.

11       Q.   And then that point was, it wasn't enough

12   to just mention the fact that you don't actually rely

13   on these cash reports once.  You had to repeat it

14   again at the end of that paragraph.  And that is why

15   it says, "Again, these projections were not relied

16   upon as audit evidence, but used for informational

17   purposes only."  Do you see that?

18       A.   Correct.

19       Q.   And that's what you believed back then;

20   correct?

21       A.   I was making the distinction of --

22   sometimes when we use financial projections from

23   management, we'll go and test the assumptions

24   underneath those and we do in-depth testing of them.

25   But in this case we were just considering the reports

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1664

```
 1    and the information we have.  So it's not something
 2    that we would look and go try to test, you know, the
 3    assumptions throughout the whole period.
 4         Q.   And you would agree that "audit evidence"
 5    is actually an auditing term; right?
 6         A.   Yes.
 7         Q.   It's not just a colloquial term.  "Audit
 8    evidence" is a specific term; right?
 9         A.   That's correct.
10         Q.   So you were not considering these liquidity
11    reports as audit evidence.
12         A.   Right.  We were considering the
13    information.
14         Q.   But not as audit evidence.
15         A.   Not in the sense that we were going to do
16    substantive testing on it.
17         Q.   Not as audit evidence.
18         A.   That's correct.
19         Q.   And so again, I assume you're interested in
20    Mr. Goldstone and Mr. Simmons having a fair trial;
21    correct?
22         A.   Correct.
23         Q.   When the SEC asked you a number of
24    questions about the liquidity reports and how they
25    showed all these positive cash balances going ahead
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    in time, you didn't mention that, in fact, you didn't

2    even rely on these cash projections as audit

3    evidence, did you?

4         A.   Well, we certainly considered them as part

5    of our audit.

6         Q.   That wasn't my question, Ms. Hall.  My

7    question is:  You didn't even mention -- when the SEC

8    asked questions about these, you didn't even mention

9    that you don't actually -- you didn't actually

10   consider these as audit evidence, did you?

11        A.   We didn't consider it audit evidence to the

12   extent of projecting out 45 days or beyond.  That was

13   the point here.

14        Q.   And you didn't mention that you don't even

15   rely on these cash balances to have any level of

16   precision at all beyond about a week or so.  You

17   didn't mention that, did you?

18        A.   I didn't mention that, no.

19        Q.   And don't you think it would have been more

20   fair to actually have told the jury that -- given the

21   jury the full picture of what you actually did with

22   these liquidity reports?

23        A.   I'm answering the questions as I'm asked

24   them.

25        Q.   All right.  We can take that down.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1666

```
1              I'd like to turn your attention now to what
2      we've been referring to as the subsequent events
3      disclosure.  Okay?
4          A.   Okay.
5          Q.   And just to sort of lay the groundwork, the
6      concept of subsequent events in this case is the
7      period from January 1 to the filing of the Form 10-K
8      on the morning of February 28; right?
9          A.   Yes.
10         Q.   That is the subsequent events period.
11     That's what the term means in this case; right?
12         A.   That's correct.
13         Q.   In this case, there was a disclosure in the
14     Form 10-K about events that had occurred during the
15     subsequent events period; right?
16         A.   Correct.
17         Q.   And in fact, that disclosure, various forms
18     of that disclosure, occurred in three different
19     places in the Form 10-K.  Do you recall that?
20         A.   Yes.
21         Q.   It occurred in the section called "Recent
22     developments"; right?
23         A.   Right.
24         Q.   There was another disclosure in a section
25     of the Form 10-K called "Liquidity and capital
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    resources."  Do you recall that?

2        A.   Yes.

3        Q.   And there was another disclosure in the

4    footnotes to the financial statements called

5    "Subsequent events"; right?

6        A.   Right.

7        Q.   And they were variations of essentially the

8    same language; right?

9        A.   Yeah, there was more on the recent

10   development in the liquidity section than the

11   footnote, but the margin calls and the decline in

12   fair value securities was disclosed in each of them.

13       Q.   And the portion that occurred in the

14   footnotes through the financial statements, the

15   subsequent events footnote, was actually covered by

16   KPMG's audit opinion; correct?

17       A.   That's correct.

18       Q.   Now, this language originated with a draft

19   prepared by Thornburg; right?

20       A.   That's correct.

21       Q.   Let's take a look at Exhibit CA.  And the

22   bottom email is an email that I believe you testified

23   about yesterday.  And that is Ms. Starrett to you

24   with a copy to Mr. Simmons, Ms. Jacquez, and Mr.

25   Coltharp on February 26 at 7:19 in the evening,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   attaching a draft of the company's proposed language

2   to be included in the Form 10-K about what had

3   happened during the subsequent event period; is that

4   right?

5       A.   That's correct.

6       Q.   Then you turned around and you forwarded

7   that same -- late at night or early in the morning,

8   within approximately seven hours, six hours of having

9   received it, you forwarded it to Mr. Womack; right?

10      A.   I don't know if the date stamps really

11  relate to each other like that.  But I would have

12  forwarded it recently after getting it.

13      Q.   And you would have forwarded it pretty

14  quickly; right?

15      A.   Yeah, I would have.

16      Q.   And it says, "Clyde, the attached is the

17  draft version of the recent developments section.

18  They indicated" -- and the "they" there is somebody

19  at Thornburg; right?  When you wrote "they"?

20      A.   Yes.

21      Q.   "They indicated that they were going to put

22  in the subsequent event footnote, but we think they

23  should tailor it down for the footnote to a few

24  sentences"; right?

25      A.   Correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   And if we look at the language, if we go to

2    the next page, that the company drafted and

3    proposed -- actually, let's blow it up and just show

4    the whole page.  You can see that that is more than a

5    few sentences; right?

6       A.   Correct.

7       Q.   So the company's first draft included

8    substantially more information than you believed was

9    appropriate to include in the footnote; correct?

10      A.   Correct.

11      Q.   And then if we -- let me just highlight

12   just a few of these sentences.  The first sentence

13   says, "Beginning on February 14, 2008, there was once

14   again a sudden and unexpected adverse change in

15   mortgage market conditions in general and more

16   specifically in the valuations of mortgage securities

17   backed by Alt-A mortgage collateral."  Do you see

18   that?

19      A.   Yes.

20      Q.   And then down in the middle of the page it

21   says, "Accordingly, market valuations of these

22   securities have dropped by between 10 and 15 percent

23   in recent days, and as a result, we have been subject

24   to margin calls on this collateral."  And then the

25   next sentence refers to the amount of margin calls,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1670

```
 1   which Ms. Starrett had pointed out was still in draft

 2   form.

 3          And then let's take a look at the very

 4   bottom paragraph.  "However, as discussed above,

 5   mortgage security market valuations remain volatile,

 6   mortgage securities trading remains limited, and

 7   mortgage securities financing markets remain

 8   challenging as the industry continues to report

 9   negative news."

10          So this was all being -- this extremely

11   negative language was being proposed by the company's

12   management to be included in the Form 10-K; is that

13   right?

14       A.   That's correct.

15       Q.   And when you received this, you knew that

16   it was essentially a work in progress, right, the

17   draft?

18       A.   Yes.

19       Q.   And in fact, Ms. Starrett's cover email

20   points out that it's a draft; right?

21       A.   Correct.

22       Q.   And this was to be included in a document

23   that was to be filed not that moment, but in a couple

24   of days hence; right?

25       A.   Right.  The next day.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Q.   And in any event, everyone's goal was that

2 it would be included in a document that would be

3 filed two days from then, by February 29, which was

4 the actual due date; right?

5    A.   I'm sorry, can you repeat the question?

6    Q.   You're aware that the actual filing date,

7 filing deadline for the company Form 10-K, was

8 February 29; right?

9    A.   Correct.

10    Q.   And so this draft was to be included in a

11 document that everyone understood could have been

12 filed as late as February 29 and still have been on

13 time; right?

14    A.   Correct.

15    Q.   And now let's go to Exhibit BT.  And let's

16 start from the bottom.  Let's go to the very bottom.

17 Yeah, perfect.

18         Okay.  So the very bottom email in this

19 chain is an email from Ms. Reinhart to you February

20 26, at 8:05 p.m.  Do you see that?

21    A.   Yes.

22    Q.   And this would appear to be a shortened

23 version of the disclosure that the company had

24 provided to you; right?

25    A.   That's correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1672

1    Q.   And so it appears that Ms. Reinhart had

2  actually tried to condense all of the information

3  that the company provided into a few sentences;

4  right?

5    A.   We drafted language to have a concise

6  disclosure about the decline in values and the margin

7  calls.

8    Q.   And you see how this concise version

9  eliminates a lot of the very negative and cautionary

10 language that management had included; right?

11   A.   Right.  We felt that that was more relevant

12 to be in the MD&A section.

13   Q.   And then let's go up to the next email.

14 Ms. Reinhart forwards it to Mr. Womack with a copy to

15 you and Ms. Baucom.  She says, "A more condensed

16 version for the subsequent events footnote.  Let me

17 know what you think."

18        And Mr. Womack responds, "This seems okay

19 to me."  Right?

20   A.   Correct.

21   Q.   And then if we go to the top, Ms. Reinhart

22 says, "We will send another slightly different

23 version shortly."

24        And you then forward, it looks like, as

25 attachments Word documents with both versions, both

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    the shorter version and the longer version of the

2    disclosure; right?

3         A.   Correct.

4         Q.   And then let's go to the very last page of

5    the document.  And do you see the very first

6    sentence?

7              Highlight the very first sentence.

8              It again has the language about what

9    happened on February 14; right?

10        A.   Correct.

11        Q.   And now, you see there are a bunch of

12   comment bubbles on the right-hand side.  Do you see

13   that?

14        A.   Yes.

15        Q.   And let's go to the very first actual

16   comment, the very first substantive comment.  It says

17   K-1.  Can you blow that up?

18             Now, somebody from KPMG made a comment that

19   said, "Do you still believe the company has the

20   intent and ability to hold these mortgage securities

21   backed by Alt-A mortgage loan collateral through

22   recovery?"  Correct?

23        A.   Correct.

24        Q.   And you don't recall specifically who made

25   that comment; right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Correct.

 2        Q.   But it was either yourself or Ms. Reinhart

 3   or Mr. Womack; correct?

 4        A.   Correct.

 5        Q.   And so this reflects that KPMG was

 6   specifically focused on the potential effect of the

 7   distressed mortgage markets on the company's intent

 8   and ability to hold; correct?

 9        A.   Correct.

10        Q.   And that means that KPMG was specifically

11   focused on the effect of the distressed mortgage

12   markets on the company's OTTI; correct?

13        A.   Correct.

14        Q.   And let's go back to the email chain.  In

15   your internal discussions among your colleagues at

16   KPMG, no one said, "Wait a second, we've never heard

17   about $350 million in margin calls," did they?

18        A.   No.

19        Q.   And no one said, "Wait a second.  We had no

20   idea the mortgage markets were this distressed," did

21   we?

22        A.   No.

23        Q.   And no one said, "Wait a second.  We had no

24   idea that the value of the company's Alt-A collateral

25   had declined that significantly"; correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Correct.

2        Q.    In fact, this was treated by KPMG as

3   something that you at KPMG already knew; correct?

4        A.    Right.   It was consistent with what we

5   understood.

6        Q.    And no one at KPMG said, "Wait a second, we

7   didn't know your liquidity levels were at extremely

8   low levels"; right?

9        A.    That's correct.

10       Q.    And that comment bubble that said, "Do you

11   still believe the company has the intent and ability

12   to hold," you satisfied yourself -- you satisfied

13   yourself that the company did have the intent and

14   ability to hold these mortgage securities; correct?

15       A.    Correct.

16       Q.    You specifically considered the issue in

17   light of the very candid disclosures that the company

18   was providing about the distressed mortgage markets,

19   and you still concluded to your satisfaction that the

20   company had the ability and intent to hold; correct?

21       A.    Correct.

22       Q.    Now, let's go to Exhibit CB.   And let's

23   just start at the very bottom, just quickly.   I think

24   it's -- there is a second page about -- maybe go to

25   the top, that one and the email above.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              So I'm just trying to illustrate here that
 2    this email chain that we're about to look at is a
 3    continuation or a different thread on the same email
 4    chain we looked at in the last exhibit; right?
 5         A.   Correct.
 6         Q.   This is from Ms. Reinhart with the
 7    condensed version of the disclosure, and she sends it
 8    to you, and so on; correct?
 9         A.   Right.
10         Q.   Now let's go up to the bottom two emails on
11    the first page, the bottom two emails.  Okay.  So the
12    bottom email is the one where you forward the
13    attachments with the draft disclosures; right?
14         A.   Correct.
15         Q.   And then above that is a response from
16    Mr. Womack.  Do you see that?
17         A.   Yes.
18         Q.   And he responds later that evening.  He
19    says, "I am okay with this, but does this change our
20    thinking on the going concern analysis?"  Do you see
21    that?
22         A.   Yes.
23         Q.   So he responds just a couple of hours after
24    you sent it to him; right?
25         A.   It looks like that, yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   He didn't say, "Wait a second.  I need more
2    time to review this," did he?
3    A.   No.
4    Q.   He was able to review it and comment on it
5    almost immediately; right?
6    A.   Correct.
7    Q.   So he's asking you a question.  "Does this
8    change our thinking on the going concern analysis?"
9         Now, let's see how you respond.  You
10   respond just about an hour later and you say, "No, we
11   knew about the circumstance during our analysis.
12   We'll clarify the memo to make that clear."  That was
13   your response; right?
14   A.   Yes.
15   Q.   You didn't say, "This information has come
16   as a total surprise to us"; right?
17   A.   No, we knew the market was dislocated.  We
18   knew they were receiving margin calls.  We knew there
19   was a decline in those Alt-A securities.
20   Q.   And you knew their liquidity was extremely
21   low; correct?
22   A.   Correct.
23   Q.   And you didn't say to him, "I can't tell
24   you whether this changes my thinking on the going
25   concern analysis, because I've been waiting for this

SANTA FE OFFICE                                            MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   disclosure, and I just received it, and now I need to

 2   go take into account that information and analyze

 3   it"; right?

 4        A.   Correct.

 5        Q.   You responded within one hour and said,

 6   "No, this doesn't change anything"; right?

 7        A.   Right.

 8        Q.   And then if we can go up to Mr. Womack's

 9   response to you, he then responds early in the

10   morning, so a few hours later.  He says, "Whatever

11   makes the most sense as to disclosure so there is no

12   doubt as to the situation"; right?

13        A.   Correct.

14        Q.   And again, he doesn't ring any alarm bells,

15   either, does he?

16        A.   No.

17        Q.   Now let's go to Exhibit CC.  And this is --

18   that are a lot of threads on this email, but the

19   bottom email is the same email that we saw in which

20   Ms. Starrett forwards to you the first draft of the

21   language; right?

22        A.   Correct.

23        Q.   And then let's go to your response to her,

24   if we can blow up the response.  Now, you respond

25   early the next morning; right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1679

```
 1        A.   Yes.
 2        Q.   So less than 12 hours after you receive the
 3   draft; right?
 4        A.   Correct.
 5        Q.   And by then you've already conferred with
 6   Ms. Reinhart and Mr. Womack; right?
 7        A.   Correct.
 8        Q.   And you've gotten their signoff on it;
 9   right?
10        A.   Yes.
11        Q.   And you respond to Ms. Starrett with a copy
12   to Mr. Simmons, Ms. Jacquez, Mr. Coltharp, and Ms.
13   Reinhart, "Looks good.  We added some minor changes
14   and a couple comments"; right?
15        A.   Yes.
16        Q.   And you said, "You were right.  After
17   reading the wording, it is probably a little overkill
18   for the footnote.  Attached is a suggested condensed
19   version for the footnote disclosure."  Do you see
20   that?
21        A.   Yes.
22        Q.   You didn't express any surprise to
23   Ms. Starrett about the information contained in the
24   draft disclosure, did you?
25        A.   No.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1680

```
 1        Q.   You didn't express concern about the fact
 2   that they hadn't told you that the company had
 3   received $350 million in margin calls in just less
 4   than a two-week time period, did you?
 5        A.   No.
 6        Q.   You didn't express concern about the fact
 7   that the company was telling you how bad the mortgage
 8   markets had gotten, did you?
 9        A.   No, we knew that there was dislocation in
10   the market.
11        Q.   You didn't express concern about the fact
12   that the company included in its disclosure and told
13   you that they might have to selectively sell assets
14   to raise cash, did you?
15        A.   I believe that's when we asked the question
16   about intent and ability.
17        Q.   And you didn't express any concern or
18   surprise to Ms. Starrett about the low levels of
19   liquidity, did you?
20        A.   That's correct.
21        Q.   And yesterday, when you testified that you
22   would have liked more than a couple of days to have
23   reviewed this disclosure, do you recall that?
24        A.   I described that they were providing the
25   disclosure to the attorneys, so I believed that if
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1  they provided it to the attorneys, they could provide

 2  it to us.

 3      Q.   But you also said -- or the SEC got you to

 4  say that, "Yes, I would have liked more than a couple

 5  of days to review this"; right?

 6      A.   In my mind, it's the information about the

 7  margin calls that would have been good to have time

 8  to review.

 9      Q.   Right.  You said more than a couple of days

10  to review; right?

11      A.   Right.

12      Q.   And you made a big point about the fact

13  that this came in just a couple of days before the

14  filing date; right?

15      A.   This came in a few days before.  The detail

16  about the margin calls came right at the end.

17      Q.   But this came in just a couple of days

18  before the filing date, and the SEC tried to get you

19  to make a big deal out of the fact that it came in

20  very late; right?

21      A.   That's what we discussed, yes.

22      Q.   And in fact, you didn't need a couple of

23  days to review this, did you?  You needed less than

24  12 hours to review this and sign off on it; correct?

25      A.   We were able to, yes.

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                     201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                         (505) 843-9494
FAX (505) 843-9492                                FAX (505) 843-9492
                                                      1-800-669-9492
                                            e-mail: info@litsupport.com



PROFESSIONAL COURT
REPORTING SERVICE

1        Q.   And you reviewed it within -- with your

2    colleagues within, we saw, a couple of hours; right?

3        A.   Correct.

4        Q.   And you had no concerns about the

5    disclosure; correct?

6        A.   Right, other than the question about intent

7    and ability.

8        Q.   Right, which you satisfied; correct?

9        A.   Correct.

10        Q.   And again, you said you're interested in a

11    fair trial for my clients.  When you testified that

12    you would have liked more time to review this and

13    made it sound like it was coming in at the very last

14    minute, you didn't think it was a more fair thing to

15    tell the jury that, in fact, you were able to sign

16    off on it in a couple of hours and there was nothing

17    in there that was surprising to you?

18        A.   My concern was about the information

19    provided about the margin calls that was provided at

20    the very end.  I don't understand why they would have

21    waited to provide us a disclosure anyway.

22        Q.   But in the end, it didn't matter, did it?

23    Because you signed off on it in a few hours.

24        A.   We were able to review it, yes.

25        Q.   Now, you were asked a number of questions

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

1683

1    about the company's going concern analysis and KPMG's

2    going concern conclusion; right?

3         A.   Correct.

4         Q.   So I'd like to turn to that topic.  You

5    would agree that the determination of whether an

6    entity is a going concern was, in early 2008, solely

7    the auditor's responsibility; correct?

8         A.   There is other guidance for management for

9    their need to disclose significant risks.  They don't

10   use the term "substantial doubt" about going concern.

11   That's not in the accounting standards.  But in the

12   auditing standards the going concern assessment

13   requirements are for auditors.

14        Q.   Right.  And so let's take a look.  So I

15   think you've already covered the analysis and work

16   that you and your team did to reach a conclusion on

17   going concern; right?

18        A.   Okay.

19        Q.   Just generally, you talked about that

20   yesterday.  Do you recall that?

21        A.   Yes.

22        Q.   Let's take a look at Exhibit BM and let's

23   go to the bottom email.  Now, you testified yesterday

24   that the company prepared a going concern memo which

25   KPMG analyzed and then KPMG wrote up its own memo;

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    right?

 2         A.    That's correct.

 3         Q.    And so this document, this email, dated

 4    February 19 is transmitting to Mr. McLamb and Ms.

 5    Reinhart a draft of the company's going concern memo.

 6    Do you see that?

 7         A.    Yes.

 8         Q.    And let's take a look at the second

 9    sentence of that email, and it says, "It has been

10    reviewed by John Taylor and we are in the process of

11    testing the assumptions and key data within their

12    analysis."  Do you see that?

13         A.    Yes.

14         Q.    And Mr. Taylor was the industry sort of

15    expert on the team; right?

16         A.    He was our technical topic expert.

17         Q.    And that means sort of in plain English

18    that he had particular experience and expertise with

19    companies like Thornburg?

20         A.    With the accounting issues being addressed,

21    yes.

22         Q.    With the accounting issues; correct.  So

23    you were asking Mr. Taylor to review -- or you had

24    asked Mr. Taylor to review the company's analysis, to

25    bring his expertise to it; correct?

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                        1-800-669-9492
                                              e-mail: info@litsupport.com



```
 1        A.    Correct.
 2        Q.    And now let's go up to the next -- well,
 3   okay.  Now, let's go on to Exhibit AM.  We'll come
 4   back to that, to Exhibit BM later.  Now, Exhibit AM,
 5   as we'll see in a second, is a draft, another draft
 6   of Thornburg's going concern memo; correct?
 7        A.    Correct.
 8        Q.    And the reason it was to Jennifer Hall from
 9   Steve Hall is that you were either faxing or emailing
10   yourself handwritten comments on the memo; right?
11        A.    Correct.
12        Q.    So now let's go to the next page.  And you
13   see there are handwritten notes on this page.  Those
14   are your notes; correct?
15        A.    That's correct.
16        Q.    Now, let's turn to page -- and this is, by
17   the way -- the memo is dated January 29.  Do you see
18   that?
19        A.    Yes.
20        Q.    And the fax or the transmittal is not
21   dated, so we don't know exactly what date you were
22   sending it to yourself; right?
23        A.    Correct.
24        Q.    Okay.  Now let's go to the Bates ending 315
25   at the very top, the first full paragraph.  And let's
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1686

```
 1   go to the sentence that is circled.  It says, "Margin
 2   calls made or received are being met and the change
 3   in collateral value is being verified on a normal
 4   daily basis."  Do you see that?
 5       A.   Yes.
 6       Q.   And you circled the part of the sentence
 7   that says, "Margin calls made or received are being
 8   met," and you wrote, "Should we get a list"; right?
 9       A.   Correct.
10       Q.   And that was essentially a note to yourself
11   to actually get a list; right?
12       A.   Right.
13       Q.   And that's what prompted you to get a list
14   of the company's margin call activity; correct?
15       A.   That's why I went and asked Nate Fellers
16   for a list.
17       Q.   And that's the list -- you eventually did
18   get that list; right?
19       A.   Well, my understanding was that there
20   wasn't a list.  We were then in discussions with
21   management about the margin calls, the need to
22   disclose the calls, and requested support for that
23   disclosure.  And so my understanding was the list
24   didn't exist; they were working on it, compiling it.
25   And then ultimately at the end they provided it to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    support the disclosure.
 2         Q.   And more specifically, Mr. Fellers told you
 3    that capital markets didn't keep a list, but they
 4    were able to get one from accounting; correct?
 5         A.   No, I don't think he said that.
 6         Q.   Well, your understanding is, even though he
 7    said capital markets didn't have a list, you did get
 8    one from accounting; correct?
 9         A.   Ultimately, yes.
10         Q.   So Mr. Fellers wasn't refusing your
11    request, was he?
12         A.   No, he indicated they didn't have it.
13         Q.   And then you eventually -- the company
14    provided it to you; correct?
15         A.   At the end, yes.
16         Q.   Okay.  So you had specifically called out
17    the importance of getting that list; right?
18         A.   I had thought about getting that list, yes.
19         Q.   And then if we can go to the last sentence
20    of that paragraph, or the last sentence of the
21    following paragraph, sorry, it says, "The company has
22    made all margin calls to date."  Do you see that?
23         A.   Yes.
24         Q.   Then you circled that.  And you also write
25    "Get a list"; right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1688

```
 1        A.   I believe so, yes.

 2        Q.   And again, you recognize the importance of

 3   understanding the company's margin call activity;

 4   right?

 5        A.   I thought it would be helpful, yes.

 6        Q.   Then if we can go to the Bates ending 320.

 7   Now, do you recognize that table?

 8        A.   Yes.

 9        Q.   That table is the breakdown of the $428

10   million in unrealized losses, or of impairments on

11   the company's securities that are at issue in this

12   case; correct?

13        A.   Correct.

14        Q.   And this table shows that the company has

15   decided to treat them as unrealized losses which

16   would be reported in the company's financial

17   statements on the balance sheet; right?

18        A.   That's correct.

19        Q.   And this footnote is the footnote that

20   eventually does get included in the Form 10-K; right?

21        A.   Correct.

22        Q.   And you're aware that the company had

23   decided to treat these impairments in that manner;

24   right?

25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And you signed off on that; right?

2    A.   Yes.

3    Q.   And then let's go to your handwritten note

4  where it says, "The company has the ability."  You

5  write, "The company has the ability to hold these

6  securities based on the same liquidity and margin

7  call considerations discussed above"; right?

8    A.   Correct.

9    Q.   And so that was something you specifically

10  considered; right?

11    A.   Yes.

12    Q.   And you were suggesting that that

13  disclosure be included; right?

14    A.   Yes.  If that was their assertion, we want

15  them to document it.

16    Q.   Let's go to Exhibit AV and to go to the

17  very top email.  And so this is, again, a

18  transmission to Mr. McLamb of the Thornburg going

19  concern memo; right?

20    A.   Correct.

21    Q.   And you write, "The key area we are

22  focusing on is their liquidity risk.  The potential

23  for further declines in their securities pledged

24  against short-term debt which would trigger margin

25  calls and whether their current liquidity position



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   could meet those margin calls"; right?
2        A.   Correct.
3        Q.   And so again, this reflects that you were
4   specifically focused on the margin calls the company
5   had received and the risk of additional margin calls;
6   right?
7        A.   Correct.
8        Q.   Now let's go to page -- the Bates ending
9   3103; right?  Now, let's blow up that paragraph with
10  the highlighted sentence.
11            Now, counsel for the SEC asked you about
12  that sentence that reads, "Margin calls made or
13  received are being met and the change in collateral
14  value is being verified on a normal daily basis";
15  right?
16       A.   Correct.
17       Q.   And you would agree with me that the
18  sentence could be read in one of two ways; right?  It
19  could be read, "Margin calls made or received are
20  being met, and the change in collateral value is
21  being verified on a normal daily basis."  So in other
22  words, it's only the change in collateral value
23  that's being verified on a normal daily basis.
24  That's one way of reading that sentence; right?
25       A.   Right.  I wouldn't think you'd verify -- I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    mean, I think verifying on a normal daily basis

2    relates to the collateral value.

3        Q.   Right.  But the way that the SEC tried to

4    get you to interpret that was to say, "Margin calls

5    made or received are being met on a normal daily

6    basis"; right?

7        A.   Well, I was looking at margin calls made or

8    received being met.  That implies that they're -- as

9    they receive them, they meet them.

10       Q.   But it doesn't say anything about the

11   timing of their meeting those, does it?

12       A.   No.

13       Q.   So would you agree that that sentence is a

14   little ambiguous as to what it meant?

15       A.   It's always open to interpretation.

16       Q.   And now let's go to the first page of that

17   memo itself.  You've seen that before.  You see that

18   the memo was actually drafted by Shawn Buniel;

19   correct?

20       A.   Correct.

21       Q.   And you never went to Shawn Buniel to ask

22   him exactly what he meant; right?

23       A.   I had conversations about margin calls with

24   him.  We didn't discuss that particular sentence.

25       Q.   And so to this day, you don't know what the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1692

```
 1    author of the memo actually meant when he wrote that

 2    sentence, do you?

 3         A.   I believe he was saying that they're

 4    meeting the margin calls as they receive them.

 5         Q.   But you never actually asked Mr. Buniel

 6    about the ambiguity in that sentence, did you?

 7         A.   No.

 8         Q.   Now let's go to Exhibit AS.  This is the

 9    final KPMG going concern memo; right?

10         A.   Correct.

11         Q.   And we've already looked at this a couple

12    of times.  And there is a lot here, and I'm not going

13    to go through it all because the jury will have this

14    available to them.  But I just want to highlight a

15    few portions of it.

16              So let's go to the paragraph at the bottom

17    of that first page called "Identification of going

18    concern uncertainties."  It says, "In August 2007,

19    worldwide money markets were severely dislocated due

20    to concerns over increasing default rates on subprime

21    mortgage loans and securitizations"; right?

22         A.   Correct.

23         Q.   Then it says, "That concern carried over to

24    generally all mortgage-backed products that were not

25    government-guaranteed"; right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1693

1      A.   Correct.

2      Q.   And so you were aware of the dynamic that

3   had hit Thornburg, that the genesis or the trigger

4   for the concern was only in subprime, but that it was

5   having essentially a ripple effect.  Fair to say?

6      A.   Yes.

7      Q.   And then let's go to the next page, to the

8   carryover, to the last two sentences of the carryover

9   paragraph.  And the last two sentences refer again to

10   the events of August 2007, right, and the fact that

11   the company sold assets?

12      A.   Yes.

13      Q.   And reported a loss; right?

14      A.   Yes.

15      Q.   And again, these were factors that

16   influenced or you took into account in your going

17   concern analysis; right?

18      A.   Correct.

19      Q.   Let's go to page 1405, the top paragraph.

20   It says, "The audit team has confirmed all debt with

21   existing lenders or performed alternative procedures

22   to test the completeness of the debt balances."  Do

23   you see that?

24      A.   Yes.

25      Q.   And so that was something that KPMG

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    specifically did; right?

2        A.    Right, as of December 31.

3        Q.    Well, let's look at the next sentence.  It

4    says, "We obtained a schedule from the lender, CSFB,

5    showing that the company has available committed

6    capacity of $300 million as of February 25, 2008";

7    right?

8        A.    Correct.

9        Q.    So presumably you obtained that after

10   December 31.

11       A.    Yes.

12       Q.    In fact, you obtained that very close to

13   the filing date; right?

14       A.    Correct.

15       Q.    Let's go to the last full paragraph where

16   it says, the last couple of sentences beginning in

17   the middle, "However, Thornburg was able to close a

18   securitization in August of 2007 and October 2007.

19   The company is working on another securitization with

20   an expected closing date of February 28.  This timing

21   of completing one securitization per quarter is

22   consistent with past experience, although current

23   market conditions have made it more difficult

24   essentially."

25       A.    Correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.  So you were aware of the company's

 2   historic pattern over time of being able to complete

 3   securitizations; right?

 4        A.   Yes.

 5        Q.   And you were aware that the company had

 6   been able to complete a securitization even in the

 7   midst of the turmoil of August of 2007; right?

 8        A.   Correct.

 9        Q.   KPMG actually had a specialist who had

10   particular experience with securitizations; right?

11        A.   Yes.

12        Q.   And let's go to the top sentence of the

13   next paragraph -- of the next page.  Actually, let's

14   go to the bottom paragraph, where it says, "KPMG's LA

15   structured finance group."  That refers to a group at

16   KPMG that has particular expertise in

17   securitizations?

18        A.   Correct.

19        Q.   And it says, "The engagement team has

20   inspected email correspondence from the underwriters'

21   counsel and the company's counsel regarding the

22   logistics of the securitization and estimated closing

23   date.  Per discussion with Tim Stoliar" -- he's the

24   specialist I asked you about?

25        A.   She is, yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1696

1       Q.    Tina.   I'm sorry.   "The project is moving

2   along and is expected to close within the next couple

3   of weeks, early March."   Do you see that?

4       A.    Yes.

5       Q.    So you were also aware of that and took

6   that factor into account in reaching your going

7   concern conclusion; correct?

8       A.    Yes.

9       Q.    Then under "Liquidity position" let's go to

10  that next paragraph.   Actually, let's take that first

11  sentence.   It says, "As of December 31, 2007, the

12  company had securities valued at $12.8 million," and

13  you would agree that that should say "billion"?

14      A.    Yes.

15      Q.    "Held as collateral for the $11.9 billion

16  of rev repo and CP debt, which is collateralization

17  of approximately 7 percent"; right?

18      A.    Right.

19      Q.    That means that the company had more

20  collateral than its actual borrowings; right?

21      A.    That's right.

22      Q.    And that meant, if you just do the math

23  there, the company had about $900 million, almost a

24  billion, of excess collateral, correct, on its

25  reverse repurchase and commercial paper borrowings;

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    correct?

2         A.    Correct.

3         Q.    As of December 31, almost a billion dollars

4    of excess collateral; right?

5         A.    Right.

6         Q.    Now let's go to the first sentence of the

7    next paragraph.  It says, "Subsequent to year end,

8    the company raised capital of $282 million in January

9    of 2008 through a common stock offering, a preferred

10   stock offering, and their dividend reinvestment stock

11   purchase plan"; right?

12        A.    Correct.

13        Q.    And the company's ability to continue to

14   raise capital even during this period of time was an

15   additional source of comfort in reaching a going

16   concern conclusion; right?

17        A.    Correct.

18        Q.    Now, let's go to the sentence that says,

19   "Engagement team."  I'm sorry, the third full

20   paragraph.  It says, "The engagement team reviewed

21   the daily cash settlements with rev repo and CP

22   counterparties, noting that Thornburg has met all

23   margin calls required by lenders subsequent to August

24   of 2007."  Do you see that?

25        A.    Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1         Q.   And that is a fairly absolute statement,
2    would you agree?
3         A.   It's an incorrect statement.
4         Q.   And you testified yesterday that you meant
5    to take that sentence out, but you just didn't get
6    around to it?  You forgot?
7         A.   I forgot.  I forgot to.
8         Q.   So you didn't actually do this --
9         A.   I did not.
10        Q.   -- even though it's in the final memo;
11   right?
12        A.   That's correct.
13        Q.   The final memo that you approved and that
14   was initialed by Ms. Reinhart on three different
15   dates; right?
16        A.   That's correct.
17        Q.   It was a memo that the engagement partner
18   herself reviewed, and it included an important
19   sentence about work that supposedly was done to test
20   whether margin calls had been met.  And your
21   testimony today is you didn't actually do it and you
22   just forgot to take it out?
23        A.   That's correct.
24        Q.   Now, when you testified before the SEC
25   during the investigation of this matter in 2009, you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    testified for two full days; right?
2         A.   That sounds right.
3         Q.   And you did not tell the SEC that you
4    didn't actually do that, do those testings, and that
5    you forgot to take that sentence out.  You didn't
6    tell the SEC that, did you?
7         A.   I don't know if it was discussed or not.
8    If we talked about it at all, I would have said that.
9         Q.   But you didn't, did you?
10        A.   I don't know if I did or not.
11        Q.   Well, would it help refresh your memory if
12   I were to show you a transcript of your two days of
13   testimony and you can review it to see if you think
14   you told the SEC about it?
15        A.   No, if you say it's not in there, then I'll
16   take your word for it.
17        Q.   And you also had your deposition taken in
18   this case; right?
19        A.   Correct.
20        Q.   And for two full days you were deposed in
21   this case; right?
22        A.   Correct.
23        Q.   And that was in 2012; right?
24        A.   Correct.
25        Q.   And you still didn't tell anybody, either
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    us or the SEC, that you didn't actually do that

2    procedure and you forgot to take that sentence out;

3    right?

4         A.   It's a deposition, so I'm asked specific

5    questions and I respond to them.  So if I was asked,

6    I would have.  If I was not asked, I wouldn't have.

7         Q.   You were asked questions by the SEC in your

8    deposition; right?

9         A.   Yes.

10         Q.   You didn't think it was important to tell

11   the SEC that, Hey, by the way, this memo, this going

12   concern memo that you intend to use as evidence

13   against Mr. Goldstone and Mr. Simmons might be

14   inaccurate and that a critical sentence in there was

15   in error and you just left it out?  That wasn't

16   important for you to tell the SEC?

17         A.   If they asked me questions about it, I

18   would.

19         Q.   When did you tell the SEC that that

20   sentence was a mistake and you just forgot to take it

21   out?

22         A.   I don't know.

23         Q.   Did you ever tell the SEC that?

24         A.   I believe so, yes.

25         Q.   You have no recollection of when?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    No.
 2        Q.    Well, you recall Mr. McKenna asked you
 3   specifically about that sentence, right, and asked
 4   when you had done that?
 5        A.    Correct.
 6        Q.    Does that refresh your memory that perhaps
 7   you told the SEC just recently that you just forgot
 8   to take out that sentence?
 9        A.    I don't know if it was recently or if it
10   was discussed previously.
11        Q.    But it was not in 2009, a year after the
12   events; and it was not in 2012, four years after the
13   events.  The first time you've ever told us, counsel
14   for Mr. Goldstone and Mr. Simmons, who are attempting
15   to get our clients a fair trial -- the first time you
16   ever told us was eight years after the fact; isn't
17   that right?
18        A.    If it's not in the deposition and
19   testimony, then that may be accurate.
20        Q.    You see there is a sentence there called --
21   or a heading called "Stress testing"?
22        A.    Yes.
23        Q.    I'd like to turn to Exhibit GX.  Okay.  So
24   let's look at the bottom of the bottom email.  The
25   bottom email is from Mr. McLamb to you transmitting
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                 1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

1    the Thornburg going concern memo; right?

2         A.   Correct.

3         Q.   And he says, "Send whatever you can as soon

4    as you can.  I do not mind looking at drafts.  The

5    key is that our documentation must detail the stress

6    testing we performed on their projections"; right?

7         A.   Correct.

8         Q.   "We also need to follow the guidance of PPL

9    08-01"; right?

10        A.   Correct.

11        Q.   So you respond to him, to the above email.

12   You respond to him a couple days later and you say,

13   "Thornburg's revised going concern analysis and our

14   audit memo is attached for your review."  And then

15   you add in the next paragraph, you say, "I added a

16   stress test section in an effort to respond to

17   McLamb's comment below regarding stress testing.

18   Thornburg's situation is not really reliant on

19   projections."  There's that disclaimer about

20   projections again.  "So I attempted to lay out three

21   scenarios:  Probable, worst case, and complete

22   devastation."

23             So you were attempting to test whether

24   Thornburg could continue as a going concern with

25   different variables or under different scenarios:

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   Probable, a probable scenario; a worst-case scenario,

 2   and a complete-devastation scenario; correct?

 3        A.   I think I did a base case, a worst case,

 4   and an even worse case.

 5        Q.   And when you were describing it to three

 6   partners at KPMG, you at least colloquially described

 7   that as probable, worst case, and complete

 8   devastation; right?

 9        A.   Correct.

10             THE COURT:  Mr. Lee, would this be a good

11   point for us to take our morning break?

12             MR. LEE:  Sure, Your Honor.

13             THE COURT:  All right.  Let's be in recess

14   for about 15 minutes.  All rise.

15             (The jury left the courtroom.)

16             THE COURT:  All right.  Anything we need to

17   discuss?  Mr. McKenna?  Mr. Lee?

18             MR. LEE:  No, Your Honor.

19             THE COURT:  All right.  We'll be in recess.

20             (The Court stood in recess.)

21             (The jury entered the courtroom.)

22             THE COURT:  All right, Ms. Hall.  I'll

23   remind you that you're still under oath.

24             Mr. Lee, if you wish to continue your

25   cross-examination of Ms. Hall, you may do so at this
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   time.

 2            MR. LEE:  Thank you, Your Honor.

 3            THE COURT:  Mr. Lee.

 4        Q.   (By Mr. Lee)  Ms. Hall, before we broke, we

 5   were talking about the stress testing that Mr. McLamb

 6   asked you to do.  Do you recall that?

 7        A.   Yes.

 8        Q.   And you reported back to him that you had

 9   done stress testing, and you characterized the

10   scenarios that you ran as probable, worst case, and

11   complete devastation; correct?

12        A.   Correct.

13        Q.   Now, I'd like to turn back to Exhibit AS to

14   see the actual results of your stress testing.  And

15   so what you called probable is the base scenario;

16   correct?

17        A.   Right.  In my final documented memo, I did

18   a base scenario.

19        Q.   And that corresponds with what you were

20   colloquially calling the probable scenario; right?

21        A.   I'm not sure I really thought of this as

22   being probable.

23        Q.   Well, you used the word "probable" in your

24   email to three partners at KPMG, did you not?

25        A.   I did.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Okay.  So whether it's the base scenario or

2    the probable scenario, you considered a variety of

3    variables here in which the end result was, you

4    concluded under all of these facts and circumstances

5    the company could continue as a going concern; right?

6    A.   I'm sorry.  Could you say that again?

7    Q.   Whether you called it the probable scenario

8    or the base scenario, this sets forth the

9    considerations, your assumptions, based on which you

10   concluded that the company could continue as a going

11   concern; right?

12   A.   Correct.

13   Q.   All right.  So now let's go to scenario 1.

14   Scenario 1 is the worst-case scenario; correct?  In

15   other words, it corresponds to what you called the

16   worst-case scenario to three partners at KPMG; right?

17   A.   Right.

18   Q.   And in this, the first sentence says,

19   "Despite management's position that a scenario more

20   severe than the above is remote, we further

21   considered a scenario where reverse repurchase

22   lenders are unwilling or unable to provide financing

23   to the company.  The company would be forced to sell

24   or liquidate assets to satisfy lenders, similar to

25   the situation in August of 2007, and realize the

SANTA FE OFFICE                                      MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                              FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   balance of the unrealized loss on securities of

2   approximately $414 million"; correct?

3       A.   Correct.

4       Q.   And that refers to -- the last phrase,

5   "realize the balance of the unrealized loss"

6   essentially refers to actually taking the OTTI into

7   income; right?

8       A.   Correct.

9       Q.   As a loss.

10      A.   Correct.

11      Q.   And the bottom of that paragraph says, "The

12  net inflow of cash could sustain the operations of

13  the company for multiple years.  Operations would

14  continue to be profitable, excluding the recognition

15  of the unrealized loss on the sale of assets, because

16  the company could continue to earn a margin on its

17  retained interest in the TMV securities, and so on."

18  Do you see that?

19      A.   Correct.

20      Q.   So even under this worst-case scenario, you

21  concluded that the company could continue as a going

22  concern; right?

23      A.   That was my understanding at the time.

24      Q.   Now and if we can go back up to the prior

25  paragraph, the base scenario, the top of the page, do

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    you see, "It is management's position that the

2    likelihood that collateral values decrease by more

3    than another 2 to 3 percent is remote."  Do you see

4    that?

5         A.   Yes.

6         Q.   And the SEC asked you about that sentence

7    and about that representation yesterday; right?

8         A.   Correct.

9         Q.   And they tried to suggest that that was

10   somehow misleading; right?

11        A.    I don't recall the context of the

12   discussion, but I think the point was that I was

13   relying on that assertion.

14        Q.   Right.  But now if we go back down, that's

15   under the base scenario; right?

16        A.   Right.

17        Q.   And if we go to the worst-case scenario,

18   you concluded that even under a worst-case scenario,

19   a scenario more severe than the above, they could

20   still continue as a going concern; correct?

21        A.   Correct.

22        Q.   So that sentence, "It is management's

23   position that the likelihood that collateral value

24   decreased by more than another 2 to 3 percent," you

25   actually were relying on that; right?  Because you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   concluded that even if it was worse than that, the

2   company could still continue as a going concern,

3   didn't you?

4        A.   I was relying on that and considering the

5   likelihood of the changes in the future, certainly

6   relevant to the intent and ability to hold.

7        Q.   But it would have made no difference

8   whatsoever to your going concern conclusion, because

9   even under a worst-case scenario, they still would

10  have continued as a going concern; correct?

11       A.   I think if their view was it could be a

12  much more significant change, we would have looked

13  more into the impact of that.

14       Q.   Well, you did look much more into the

15  impact.  You ran a worst-case scenario, which is a

16  more severe circumstance; right?  So the notion that

17  that one sentence, "It is management's position that

18  the likelihood that collateral values decrease by

19  more than another 2 to 3 percent is remote" -- the

20  notion that, sitting here today, eight years after

21  the fact, that that was somehow important -- that is

22  totally contradicted by your analysis at the time

23  showing that that sentence didn't matter at all.

24       A.   That's not correct.  If management had a

25  different view that there was going to be a

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                          1-800-669-9492
                                               e-mail: info@litsupport.com



1    significant change in the values, we would want them

2    to include that in their assessment and evaluate what

3    that impact would have been on their business and

4    their liquidity.

5         Q.   And you already conceded this morning,

6    though, right at the beginning of the day, you

7    already conceded that you have no evidence that

8    management didn't actually believe that, do you?

9         A.   I believe we believed it at the time it was

10   said.

11        Q.   Okay.  So now let's go to the complete-

12   devastation scenario.  This is scenario 2.  And this

13   corresponds to what you called to three KPMG partners

14   the complete-devastation scenario; correct?

15        A.   Right.

16        Q.   And under this scenario, the company, you

17   write, would be forced to sell securities, no net

18   cash inflow from the sales, repo and warehouse

19   lenders do not waive resulting covenant violations

20   and stop lending.  That was the complete-devastation

21   scenario; right?

22        A.   Correct.

23        Q.   And you write, "Despite the positive

24   outlook in scenario 1, we further stress-tested the

25   circumstance by looking at a severely extreme

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    scenario, scenario 2, in which the company would be

2    forced to sell or liquidate assets to satisfy lenders

3    at zero net cash inflow, and the warehouse line

4    lenders refuse to grant waivers for the resulting net

5    operating loss."

6            It goes on to say, "The company would not

7    be able to originate additional loans, and the

8    operating structure would need immediate cutbacks to

9    a core group of individuals that could keep track of

10   the flow of funds to keep the company alive"; right?

11   That is the complete-devastation scenario you

12   contemplated; correct?

13        A.   Correct.

14        Q.   And even under that scenario, you concluded

15   that the company could continue as a going concern;

16   right?

17        A.   Right.  This scenario did not incorporate

18   that the repo collateral wouldn't be enough to repay

19   the repo, so this assumes a net wash on the

20   repurchase repo, and then the company would survive

21   on its existing operations.  So it doesn't include a

22   situation where the values decrease so much that

23   there wasn't enough cash and liquidity to pay that

24   debt.  Right?  It assumed that the values decreased

25   to a certain point to where, you know, the collateral

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    would be turned over to the counterparty.  It doesn't

2    reflect a shortfall that the counterparty could then

3    come after the company for, basically the recourse on

4    the debt.

5         Q.   And you reference here the fact that the

6    company -- as one of your assumptions, the company

7    would not be able to originate additional loans;

8    right?

9         A.   Correct.

10        Q.   Yesterday, when the SEC asked you some

11   questions, you said, Well, you wished you had known

12   the company had stopped for a period of time

13   originating additional loans; right?

14        A.   Correct.

15        Q.   And even under your complete-devastation

16   scenario, that didn't even matter; right?  You

17   concluded that the company could still continue as a

18   going concern?

19        A.   Under this extremely unlikely scenario.

20        Q.   Right.  So when you tried to suggest

21   yesterday to the jury that that piece of information

22   would have mattered to you, in fact, it wouldn't have

23   mattered.  You're only testifying that way now today,

24   eight years after the fact; right?

25        A.   It's information that we should have been

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    told of in order to include it in our assessment, and

2    for management to include in theirs, as well.

3         Q.   And you did contemplate that outcome;

4    right?  And at the time, eight years ago, before you

5    were sitting here today in court, having been

6    protected from a prosecution by the SEC, eight years

7    ago you concluded it wouldn't have mattered.

8         A.   I wouldn't characterize it as being

9    protected.  And this scenario was an extremely

10   unlikely scenario that we evaluated.

11        Q.   And even under that extremely unlikely

12   scenario, you concluded the company had the ability

13   to continue as a going concern; right?

14        A.   Correct.

15        Q.   You were asked some questions yesterday.

16   We can take that down now.  You were asked some

17   questions yesterday about the sale of a particular

18   type of security, which we won't get into the

19   details, but called an interest-only security; right?

20        A.   Right.

21        Q.   And you know that that -- for purposes of

22   accounting, the -- what you colloquially called a

23   sale is actually a financing; right?  And it was

24   treated as a financing?

25        A.   For accounting, it's accounted for as a




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    secured borrowing.

 2         Q.   Right.  So for accounting, even though it's

 3    generally referred to as a sale of an asset, for

 4    accounting purposes it's actually a financing; right?

 5         A.   That's correct.

 6         Q.   And you testified that management told you

 7    that they believed these interest-only instruments

 8    could be sold at a premium, and that they perceived

 9    an opportunity to sell them for -- you know, at a

10    good price essentially, and that the transactions

11    were for reasons other than immediate liquidity

12    needs; right?

13         A.   Correct.

14         Q.   Do you recall making that statement?

15         A.   Yes.

16         Q.   And you were told that by Mr. Feldman and

17    Mr. Fellers; right?

18         A.   Correct.

19         Q.   You were not told that by Mr. Simmons;

20    right?

21         A.   I don't have a specific recollection of

22    that, no.

23         Q.   And you were not told that by Mr.

24    Goldstone; right?

25         A.   Correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1      Q.   And you were not told that by Ms. Starrett;

 2  right?

 3      A.   Correct.

 4      Q.   It was two other individuals, Mr. Feldman

 5  and Mr. Fellers; right?

 6      A.   Correct.

 7      Q.   And when the SEC tried to lump in everybody

 8  and just said management told you that, you didn't

 9  clarify that that was management, not including my

10  clients in this case, did you?

11      A.   I don't recall the specifics of the

12  question and answering.

13      Q.   But you understand that the term

14  "management" could include any number of people;

15  right?

16      A.   Yes.

17      Q.   And for purposes of this trial, you

18  understand that it's important to distinguish who

19  actually made what statements; right?

20      A.   Yes.

21      Q.   You can't just say management and hope that

22  everybody assumes that it includes my clients, can

23  you?

24      A.   No.

25      Q.   That wouldn't be fair; right?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Correct.
 2        Q.   All right.  And so these statements that
 3   the SEC elicited from you and just attributed to
 4   management were, in fact, not made by my clients;
 5   right?
 6        A.   Not to me, not that I can recall to me.
 7        Q.   Now, let's turn to the list of margin calls
 8   that you requested.  You requested a list of margin
 9   calls after becoming aware that the company was
10   receiving a heightened level of margin calls and had
11   low liquidity; correct?
12        A.   Correct.
13        Q.   And that was in about the third week of
14   February; right?
15        A.   Correct.
16        Q.   And you wanted to better understand the
17   margin call activity; right?
18        A.   Correct.
19        Q.   And Mr. Fellers told you that the capital
20   markets group didn't have the particular list that
21   you were looking for, and so you got it from -- or
22   somebody from KPMG got it from the accounting
23   department; right?
24        A.   So I made the request the third week of
25   February, and there was ongoing discussions with
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    management.  We talked about the decline in the

2    values, the margin calls, and the need to disclose

3    that in the footnotes.  At that point, we requested

4    support for the footnote, and then management

5    provided a list for those margin calls that were in

6    the footnote.

7         Q.   And this is in reference now to -- let's

8    just go to Exhibit DL.  The SEC showed you this.  You

9    recognize this document; right?

10        A.   Yes.

11        Q.   This is what has been referred to as the

12   tie-out version of the Form 10-K?

13        A.   Correct.

14        Q.   And let's go to the page with the Bates

15   number 52C.  And would you agree that this is one of

16   three schedules that was provided by the company to

17   KPMG in response to your request for a list of margin

18   call activity; right?

19        A.   This was one of three schedules that was

20   provided to us in response or request for support for

21   the footnote disclosure.

22        Q.   And you don't know specifically to whom at

23   KPMG it was provided; right?

24        A.   I believe it was to one of our staff.  I

25   don't remember which one.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   When you say staff, that could be anybody;
 2   right?
 3        A.   Seniors or associates.
 4        Q.   But you don't know specifically when it was
 5   provided; right?
 6        A.   It was one of the last things we received
 7   before issuing.
 8        Q.   And you don't know specifically.  Well, let
 9   me -- your recollection is that it was provided to a
10   staff member?
11        A.   I believe it was, yes.
12        Q.   And not you?
13        A.   Correct.
14        Q.   And not Ms. Baucom?
15        A.   Correct.
16        Q.   Not Ms. Reinhart?
17        A.   Correct.
18        Q.   How about Mr. Plummer?
19        A.   It may have been.
20        Q.   But you have some recollection that it was
21   not certain people; correct?
22        A.   I'm sorry?
23        Q.   In other words, you now recall, eight years
24   later, that it was not provided to you; right?
25        A.   It was not provided to me; that's correct.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1718

```
 1        Q.   And you now recall, eight years later, that
 2    it was not provided to Ms. Baucom; right?
 3        A.   I don't believe it was, but I don't know
 4    who it was provided to.
 5        Q.   You don't know, one way or the other?
 6        A.   I don't.
 7        Q.   It could have been provided to Ms. Baucom.
 8        A.   I don't believe it was, but we'd have to
 9    ask Ms. Baucom.
10        Q.   Well, you recall your deposition testimony
11    in this case; correct?
12        A.   Correct.
13             MR. LEE:  I'd like, with the Court's
14    permission, to play the excerpt of Ms. Hall's
15    deposition, page 36, line 22, through page 37, line
16    16.
17             THE COURT:  You may.
18             (Video played.)
19        Q.   (By Mr. Lee)  Ms. Hall, during your
20    deposition, were you asked those questions and did
21    you give those answers?
22        A.   Yes.
23        Q.   Now, in any event, we've established when
24    you testified to Mr. McKenna that it was provided
25    only to a staff member, that wasn't accurate, was it?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**
e-mail: info@litsupport.com

```
 1        A.    I believe it was, but I don't know.

 2        Q.    And you didn't point out, when you were

 3   asked that question, to whom it was provided, you

 4   didn't point out that, A, you're not sure to whom it

 5   was provided; and B, you testified four years ago

 6   that you didn't know, did you?  You didn't point that

 7   out, did you?

 8        A.    I testified that I believe it was, but I

 9   don't know.

10        Q.    Now, in any event, you reviewed at least --

11   let's go back to 52C.  You reviewed that page that's

12   on the screen; right?

13        A.    I saw this schedule.  I didn't review

14   through it in detail.

15        Q.    Okay.  But you saw it; right?

16        A.    Yes.

17        Q.    And it didn't seem inconsistent with

18   anything you had already known; correct?

19        A.    It showed that they had received margin

20   calls in excess of 300, so we considered that as

21   support for the footnote.

22        Q.    My question was:  It didn't seem

23   inconsistent with anything you had already known;

24   correct?

25        A.    Right.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1720

1      Q.   And it didn't seem inconsistent with

2   anything you had already learned about during the

3   audit; correct?

4      A.   I knew that they had received these margin

5   calls.  We had talked about them.  So to that extent,

6   it was not inconsistent.

7      Q.   And it didn't seem inconsistent with

8   anything you had already discussed with management;

9   correct?

10      A.   To the extent I used it, was that it had

11   the roughly $300 million in margin calls which was

12   consistent with what I understood.

13      Q.   And it didn't appear to be inconsistent

14   with anything else that you were aware of; correct?

15      A.   Not that I identified; that's correct.

16      Q.   And no one from KPMG followed up with

17   anyone at Thornburg to ask for an explanation of any

18   of the information on this schedule; correct?

19      A.   Not that I know of.

20      Q.   And in fact, when I say "on this schedule,"

21   if we can just quickly show pages 53 and 54, there

22   were three pages, right, of this what we're calling

23   margin call schedules?

24      A.   Yes.

25      Q.   And no one from KPMG followed up with

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1721

```
 1    anyone at Thornburg to ask for an explanation of any

 2    of the information contained on any of these three

 3    pages; correct?

 4         A.   Not that I know of; that's correct.

 5         Q.   And you personally did not follow up with

 6    anyone at Thornburg to ask for an explanation of any

 7    of the information contained on these schedules;

 8    correct?

 9         A.   Correct.

10         Q.   And you said that you used this for support

11    of the footnote disclosure showing that the company

12    had received and met over $300 million of margin

13    calls in the last two weeks of February; correct?

14         A.   Correct.

15         Q.   But in fact, you also considered the

16    information in this margin call schedule in your OTTI

17    analysis; correct?

18         A.   To the extent of having disclosures about

19    the liquidity risk, that's correct.

20         Q.   And when it was provided to you, no one

21    told you to only look at it for a particular purpose;

22    right?

23         A.   Correct.

24         Q.   And there was nothing stopping you from

25    doing any further testwork on this schedule; correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1        A.   Correct.
 2        Q.   There was nothing stopping you from doing
 3   further follow-up on this schedule; correct?
 4        A.   Correct.
 5        Q.   There is nothing stopping you from asking
 6   more questions about the information on this
 7   schedule; correct?
 8        A.   Correct.
 9        Q.   And you believe that Ms. Reinhart would
10   have taken these schedules into account in her OTTI
11   analysis; correct?
12        A.   It was considered as part of the
13   information for the disclosure of the margin calls,
14   and she would have considered it to that extent, as
15   well.
16        Q.   But my specific question is:  You believe
17   Ms. Reinhart would have taken these margin call
18   schedules into account in her OTTI analysis; correct?
19        A.   To the extent it was supporting a footnote
20   disclosure for the liquidity risk.
21        Q.   Again, that's not my question.  My question
22   is:  You believe Ms. Reinhart would have taken these
23   schedules into account in her OTTI analysis.  I'm not
24   talking about the footnote disclosures.  I'm talking
25   about her OTTI analysis.  You believe Ms. Reinhart
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   would have taken these schedules into account in her
 2   OTTI analysis; correct?
 3           MR. McKENNA:  Objection, asked and
 4   answered, and relevance, Your Honor.
 5           THE COURT:  Overruled.
 6      A.   We received the schedule, and we requested
 7   support for the footnote disclosures, and in response
 8   we were provided this schedule, and we considered it
 9   to the extent that it supported the footnote
10   disclosure.
11           MR. LEE:  Your Honor, with the Court's
12   permission, I'd like to play another portion from Ms.
13   Hall's deposition transcript, page 50, lines 7
14   through 13.
15           THE COURT:  You may.
16           (Video played.)
17      Q.   (By Mr. Lee)  And just to make clear,
18   because you keep trying to refer to the footnote
19   disclosure, you considered the information in this
20   margin call schedule in your OTTI analysis; correct?
21      A.   We considered it, and used it for purposes
22   of supporting the footnote disclosure.
23           MR. LEE:  Your Honor, with the Court's
24   permission, I'd like to play another excerpt from Ms.
25   Hall's deposition, page 49, lines 21 through 24.
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  You may.

 2              (Video played.)

 3        Q.   (By Mr. Lee)  You also considered the

 4   information in this schedule in your going concern

 5   analysis; correct?

 6        A.   Correct.

 7        Q.   And you believe Ms. Reinhart would have

 8   taken that information into account in her going

 9   concern analysis; correct?

10        A.   Correct.

11        Q.   After taking into account the information

12   contained in the schedule, you concluded that the

13   company did not need to take an OTTI; correct?

14        A.   Correct.

15        Q.   And after taking into account the

16   information on this schedule, you concluded that the

17   company was a going concern; correct?

18        A.   Correct.

19        Q.   Let's go back and look at a few of the

20   entries.  I won't belabor this because we've gone

21   through this with the jury before, but I do think

22   it's important to point out.  So this is one of the

23   pages, one of the three pages of the schedule; right?

24        A.   Correct.

25        Q.   And if we can go to the -- there is an
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    entry, about a third of the way down, for Greenwich,

2    $42 million.  Do you see that?

3         A.   Yes.

4         Q.   That shows a margin call from Greenwich on

5    February 21 in the amount of $42 million; correct?

6         A.   Correct.

7         Q.   And if we go down to the line for CSFB for

8    59, that shows the margin call from CSFB on February

9    15 for $50 million; correct?

10        A.   Correct.

11        Q.   And this -- some of the entries below that

12   on February 25, it says, "Asset sale, CSFB, $30

13   million.  Asset sale, CSFB $10 million.  Do you see

14   that?

15        A.   Yes.

16        Q.   Those are in reference to those particular

17   financing transactions, the interest-only

18   transactions we talked about a little bit ago; right?

19        A.   I can't tell you for sure, but that sounds

20   reasonable.

21        Q.   And then below that is a reference to the

22   Citibank call of $196 million on February 21.  Do you

23   see that?

24        A.   Yes.

25        Q.   Then it shows, below that, three payments

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    on that Citi call of $10 million and $40 million and

2    $20 million; correct?

3         A.   Correct.

4         Q.   By the way, when -- just as a matter of

5    timing, when you were asked during the SEC's

6    examination about the timing of the payment of

7    particular margin calls, you included weekends;

8    correct?

9         A.   I wasn't thinking about weekends.

10        Q.   And margin calls are not paid on weekends;

11   right?

12        A.   I wouldn't believe so.

13        Q.   And so you're aware that the period during

14   which the company was paying the Citibank margin call

15   included a weekend.  So February 23 and 24 was a

16   weekend.  Do you recall that?

17        A.   I'll take your word for it.

18        Q.   And the prior week, when you were asked

19   questions about how long it took to pay the CSFB

20   call, in fact, February 16th, 17th and 18th were a

21   weekend, because the 16th and the 17th were Saturday

22   and Sunday, and the 18th was Presidents' Day, so that

23   was a long weekend; correct?

24        A.   I'll take your word for it.

25        Q.   And so when you testified about the length

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



1-800-669-9492
PROFESSIONAL COURT                                  e-mail: info@litsupport.com
REPORTING SERVICE

1    of time it took the company to pay some of these

2    margin calls, it actually was inflated because it

3    didn't take into account the fact that there were

4    intervening weekends and, in one case, a long

5    weekend; right?

6        A.   Can you repeat?  I think the question was:

7    When are they due.  And I was -- that day or the next

8    day.

9        Q.   Okay.  So you would agree with me, though,

10   that if you were attempting to characterize how long

11   it took to pay off a margin call, it would be

12   inaccurate to just lump in the weekends; correct?

13       A.   I see.  I believe so, yes.

14       Q.   And now if we can go to the next page of

15   the schedule.  We've looked at this before, as well.

16   This is -- at the top it says, "Source call log from

17   Tim Sturdy."  Do you see that?

18       A.   Yes.

19       Q.   Call amount, the amount of the call, and

20   how settled, meaning how it was paid or resolved;

21   right?

22       A.   Correct.

23       Q.   And this schedule also -- let's just go

24   down to the Citigroup call, because you testified you

25   weren't aware.  You testified yesterday, in fact,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that you weren't aware of the Citigroup call at all.

2        A.    That's correct.

3        Q.    Even though it's on the schedules that you

4    reviewed for the purposes of your OTTI and going

5    concern analysis; right?

6        A.    I saw the schedule.  I didn't go through it

7    in detail.

8        Q.    And this shows that the company received a

9    margin call from Citi?

10       A.    Sorry, I'll correct.  I saw the first page.

11   I did not go through in detail.

12       Q.    And the first page also showed the

13   Citigroup margin call; right?

14       A.    Yes.

15       Q.    And you went through it in enough detail to

16   conclude on OTTI and going concerns; right?

17       A.    I considered it for purposes of supporting

18   the footnote.  Showing that they had received $300

19   million in margin calls did not seem inconsistent

20   with my understanding.  So to the extent it was, I

21   didn't believe it provided new information.  That was

22   the extent that I considered it.

23       Q.    And for purposes of OTTI and going concern,

24   two of the most critical issues in the audit, you

25   considered that schedule.  The record is what it is,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1729

```
 1    but you previously testified that you considered this
 2    information for your going concern and OTTI analysis,
 3    and you testified to that under oath four years ago;
 4    correct?
 5         A.   I used it for purposes of supporting the
 6    footnote disclosures which are relevant to the OTTI
 7    and going concern analysis.
 8         Q.   And this page shows that the Citibank call
 9    wasn't paid in a single day; correct?
10         A.   Correct.
11         Q.   You can tell from a quick look at this
12    schedule that there were payments over the course of
13    several days; right?
14         A.   I believe so, yes.
15         Q.   And this page and the last page shows the
16    $42 million margin call from Greenwich; right?
17         A.   Correct.
18         Q.   And you can tell from this schedule that
19    the Greenwich call wasn't paid on time; right?
20         A.   Correct.
21         Q.   And when counsel asked you yesterday about
22    whether you were aware of the Greenwich call, I think
23    he asked you a couple of times and you said, "Not
24    specifically."  Do you recall that?
25         A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   Q.   And that was a very careful choice of

2   words, wasn't it?

3   A.   Yeah.  We knew that they were receiving

4   margin calls, but they hadn't identified any specific

5   margin call.

6   Q.   And so with all of this information in

7   hand, when KPMG issued its unqualified audit opinion,

8   KPMG was aware that Thornburg had received

9   approximately $300 million in margin calls during the

10  two weeks leading up to the Form 10-K; correct?

11  A.   Yes.

12  Q.   And with all of this information in front

13  of you, KPMG was aware that the company was not able

14  to pay all of those margin calls within a single day;

15  correct?

16  A.   No, I don't believe we were of that

17  knowledge, no.

18  Q.   Now, you testified multiple times that you

19  used the schedule for purposes of auditing the

20  footnote, subsequent event footnote?

21  A.   For supporting that disclosure, yes.

22  Q.   And for auditing, right, because we

23  established before that the subsequent event footnote

24  is included in your audit opinion; right?

25  A.   That's correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    And that means that that footnote includes
 2   the statement that the company has received and met
 3   approximately $300 million in margin calls; correct?
 4        A.    Correct.
 5        Q.    And that was something you had to audit;
 6   correct?
 7        A.    Correct.
 8        Q.    And these schedules clearly show that the
 9   $300 million in margin calls had not been met at the
10   time of the filing of the Form 10-K, at the time of
11   these schedules; correct?
12        A.    I'm sorry, can you repeat that?
13        Q.    These schedules clearly show -- in other
14   words, you just do the math and look at any one of
15   these schedules, you can tell that as of the time
16   these schedules were prepared, not all of the margin
17   calls had been met in full; correct?
18        A.    Correct.
19        Q.    And in fact, you can tell just by looking
20   at these schedules that the Citigroup margin call
21   hadn't been paid in full at whatever time of day this
22   scheduled had been prepared; correct?
23        A.    Correct.
24        Q.    And so had you been auditing the subsequent
25   events footnote, you would have had to do additional
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1732

```
1   testwork in order to find support for the statement
2   that the company has actually met $300 million in
3   margin calls in the last two weeks; correct?  Because
4   these schedules don't support that.
5        A.   No, we relied on assertions from management
6   for that.
7        Q.   Now, this schedule is not the only thing
8   you did to look at margin call activity; right?
9   There were other audit procedures you followed to
10  keep -- to review the company's records of margin
11  calls paid and received; correct?
12       A.   Not that I could think of.
13       Q.   You reviewed Thornburg's general ledger?
14       A.   We looked at aspects of the general ledger.
15       Q.   And the general ledger is an accounting
16  document that keeps track of all of the company's
17  transactions; right?  All of their financial
18  transactions.
19       A.   Their account balances, and then in the
20  system would be detail.
21       Q.   And so the general ledger would reflect
22  payments on margin calls; correct?
23       A.   The transactions -- they would be entered
24  as transactions in the general ledger for their cash
25  transactions; that's correct.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And you also reviewed wire transfer records

2    from the company; correct?

3    A.   For wires during the fiscal year or for

4    payment subsequently, that's correct.

5    Q.   And you reviewed some wire transfer records

6    during the subsequent events period; correct?

7    A.   Correct.   KPMG would have, not me

8    personally.

9    Q.   Members of the audit team, engagement team,

10   reviewed wire transfer records during the subsequent

11   events period; correct?

12   A.   I believe so.

13   Q.   And you're aware that the payment of margin

14   calls, at least some of them, occur by wire transfer;

15   correct?

16   A.   Correct.

17   Q.   And KPMG also reviewed some email or

18   essentially they're called Bloomberg messages, but

19   they're a form of text message with repo

20   counterparties; correct?

21   A.   I'm not specifically aware of that during

22   the audit period.   It's possible.

23   Q.   And you talked to people in the capital

24   markets department about the company's margin call

25   activity; right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Correct.

 2        Q.    Talked to Nate Fellers?

 3        A.    Correct.

 4        Q.    Talked to Patrick Feldman?

 5        A.    Yes.

 6        Q.    Talked to Xen Stanhope?

 7        A.    Yes.

 8        Q.    They were all independent sources of

 9   information about the company's margin call activity;

10   correct?

11        A.    Correct.

12        Q.    And the company had a bank account

13   called -- which was known by the acronym of the CTC

14   account; right?

15        A.    I believe so, yes.

16        Q.    And that was essentially the company's

17   checking account; right?

18        A.    It was one of their cash accounts.

19        Q.    And you reviewed those records, too; right?

20        A.    Not me personally, but our team would look

21   at some of them.

22        Q.    Okay.  And those records, the CTC reports,

23   would also reflect payments by the company of margin

24   calls; correct?

25        A.    I believe so, yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   I'm going to ask you some questions about
 2   the events after the file of the Form 10-K.  You
 3   testified that shortly after the Form 10-K was filed,
 4   you were notified by Ms. Starrett that the company
 5   had received a large volume of additional margin
 6   calls, and that the company had received a default
 7   notice; correct?
 8        A.   Correct.
 9        Q.   And that was over the weekend following the
10   filing of the form 10-K?
11        A.   Correct.
12        Q.   And you testified that you made a request
13   to the company for information that would support the
14   position that the margin calls the company had
15   received on February 28th and 29th were
16   unforeseeable?
17        A.   Correct.
18        Q.   And you sent that request to the company on
19   March 4; correct?  Or it was actually late at night
20   on March 3.  Do you recall that?
21        A.   That sounds reasonable.
22        Q.   And specifically you sent a request to Mr.
23   Goldstone, Ms. Starrett, Mr. Simmons, and Mr. Buniel
24   at 12:44 in the morning on Tuesday, March 4.
25   Actually, let's take a look at Exhibit DI.  So the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1736

 1    bottom email is from you to the folks I just

 2    mentioned at 12:44 a.m.  It says, "Please give us a

 3    call in the morning.  We will walk you through the

 4    attached."  Do you see that?

 5         A.   Yes.

 6         Q.   And if we can just quickly look at the

 7    attached, these are the series -- we'll come back to

 8    this.  But these are the series of requests that you

 9    wanted the company to address; right?

10         A.   Yes.

11         Q.   Now, if we can go back to the cover email.

12    And early the next morning, a few hours later, at

13    5:22 a.m., Ms. Starrett forwards it on to Mr.

14    Fellers, Mr. Feldman, and Mr. Stanhope and says,

15    "Please read the attached and let me know what you

16    believe we can get as far as their request for

17    documentation."  Right?

18         A.   Yes.

19         Q.   And so she was asking members of the

20    capital markets group to handle that request, at

21    least in the first instance; right?

22         A.   Yes.

23         Q.   And the response that the company provided

24    came in early afternoon the next day; right?

25         A.   That sounds reasonable.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1737

1       Q.   At shortly before 2:00 Mountain Time the

2    company sent you a response; right?

3       A.   That sounds reasonable.

4       Q.   And so less than -- about a half-day, not

5    even a full business day later, the company pulled

6    together a bunch of information in order to provide

7    you an immediate response to the request; correct?

8       A.   Correct.

9       Q.   And at 2:00 that day, there was a meeting

10   of the audit committee; right?

11      A.   Yes.

12      Q.   And if we can go to Exhibit DF.  These are

13   minutes of the audit committee meeting on March 4.

14   Do you see that that starts at 2:00 p.m.?

15      A.   Yes.

16      Q.   And that started just about ten minutes

17   after you received the company's response to the

18   request that you sent at almost 1:00 a.m. for

19   information about what had happened on February 28th

20   and 29th; right?

21      A.   Correct.

22      Q.   And this was a telephonic call of the audit

23   committee; right?  And you can see you were not on --

24   oh, yes, you were on this conference call; right?

25      A.   Yes.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1738

1        Q.   And if we can go down to "KPMG withdrawal

2    of the audit opinion," and in that meeting, KPMG

3    informed the audit committee and management of its

4    decision to withdraw its opinion on the company's

5    financial statements, and that KPMG believed there

6    was doubt as to whether the company could continue as

7    a going concern; right?

8        A.   Correct.

9        Q.   And I think you testified a little about

10   this meeting.  This was a meeting where KPMG

11   essentially presented its view that this was going to

12   happen; right?

13       A.   Correct.

14       Q.   And do you recall the company, management

15   of the company, disagreed with that position?

16       A.   They were not happy with that agreement,

17   yes.

18       Q.   And they tried to persuade you that it was

19   the wrong decision?

20       A.   Yes.

21       Q.   And members of the audit committee

22   disagreed with that decision; right?

23       A.   I don't have a specific recollection of

24   their response.

25       Q.   Members of the audit committee tried to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  persuade you at least that it was the incorrect

2  decision; right?

3       A.   I don't have that specific recollection.

4       Q.   And after that discussion of that audit

5  committee meeting, KPMG did not say, "Well, we'll go

6  back and think about it," did they?

7       A.   No, we were concluded.

8       Q.   Right.  So let's go to the first paragraph

9  of the next page.  It says, "After a lengthy and

10 detailed discussion, KPMG informed the audit

11 committee and management that its decision to

12 withdraw its audit opinion on the 2007 financial

13 statements was final"; right?

14      A.   Yes.

15      Q.   And this was in a meeting that started ten

16 minutes after you had received the packet of

17 information from the company in response to your 1:00

18 a.m. request; correct?

19      A.   I'd have to look at the emails, but if

20 that's -- I mean, it was certainly all happening very

21 close together, and I was receiving information and

22 talking to our partners real-time.

23      Q.   And in fact, you didn't even have time to

24 consider the company's response that was provided you

25 ten minutes before that meeting started; you didn't

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                         1-800-669-9492
                                                              e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

```
 1    even have time to consider that, because KPMG had
 2    already made up its mind; right?
 3        A.   I had looked at the information.  I had my
 4    computer up in Cynthia's office as we were having our
 5    conference calls.  I was looking at the information
 6    real-time as it came through, talking with Cynthia
 7    about it and with our partners on the phone.
 8        Q.   But it couldn't have taken more than -- you
 9    wouldn't have spent more than ten minutes looking at
10    it; right?
11        A.   I looked at what it was.  I don't know how
12    much time I spent on it.  But I even, during the
13    meeting, could have been looking at it.
14        Q.   And you later reported to another partner.
15    Are you familiar with an individual named Jason
16    Harris?
17        A.   Yes.
18        Q.   He's another partner at KPMG?
19        A.   Yes.
20        Q.   And you reported to him that Thornburg
21    pulled all the data together, but it came in about
22    ten minutes before a big conference call; right?
23        A.   I don't have a specific recollection.
24        Q.   Would it refresh your recollection to see a
25    copy of that email?
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2             MR. LEE:  Your Honor, may I approach?
 3             THE COURT:  You may.
 4        Q.   (By Mr. Lee)  I'm handing you what's been
 5   marked as Exhibit PX, an email from you to Mr. Harris
 6   on Saturday, March 8.  If you could just take a look
 7   and read through the email at the top.
 8        A.   Okay.
 9        Q.   Does that refresh your recollection that,
10   in fact, the information that Thornburg put together
11   came in about ten minutes before this conference
12   call?
13        A.   Yes.
14        Q.   And does that reflect your recollection
15   that at the time of the conference call, no one on
16   the KPMG side had seen this information?
17        A.   Correct.  I'd not specifically seen the
18   documents.  I had not seen the documents themselves.
19   I had seen the summary points, and then there was
20   discussion about them.
21        Q.   Now, let's take a look at Exhibit 284.  You
22   were shown this yesterday by the SEC; right?
23        A.   Yes.
24        Q.   And it had the -- it says PBC, prepared by
25   client, and it has the names Kyle Rhoades and Clay
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Simmons; correct?

2        A.   Yes.

3        Q.   Whose handwriting is that?

4        A.   Cynthia Reinhart.

5        Q.   Is that Kyle Rhoades' and Clay Simmons' --

6    that's their handwriting?

7        A.   Yes.

8        Q.   You testified that Mr. Rhoades and Mr.

9    Simmons wrote this document; right?

10       A.   I believe it was provided by them.  I don't

11   know who specifically wrote it.

12       Q.   Right.  You don't actually know who wrote

13   this document, do you?

14       A.   No.

15       Q.   I don't want to characterize your

16   testimony, but if you testified yesterday that it was

17   written by Mr. Rhoades and Mr. Simmons, that was not

18   correct; fair to say?

19       A.   Whether it was written by somebody else or

20   not, it was provided by Clay.

21       Q.   And you don't know -- you don't remember

22   who actually provided this document to you, do you?

23       A.   I'm going by the note that it was provided

24   by Mr. Simmons.

25       Q.   But you have no independent recollection of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1743

```
 1    Mr. Simmons providing it to you, do you?
 2         A.   Not specifically, no.
 3         Q.   So you're just assuming that it was
 4    provided by Mr. Simmons, even though it says, in
 5    somebody else's handwriting, Kyle Rhoades and Clay
 6    Simmons; right?
 7         A.   This was in response to our request that I
 8    know Clay and Jane were leading.
 9         Q.   But if you testified that this was either
10    provided to you by Mr. Simmons or written by Mr.
11    Simmons, that's just an assumption on your part;
12    right?
13         A.   Yes.
14         Q.   And that's an assumption the SEC wanted you
15    to make to support their case; right?
16         A.   We requested it of Jane and Clay, and they
17    provided it.
18         Q.   In fact, this information was not provided
19    by Mr. Simmons, was it?
20         A.   I don't have a specific recollection.
21         Q.   Would it refresh your memory to take a look
22    at the email that was sent to you transmitting this
23    information?
24         A.   Okay.
25              MR. LEE:  May I approach, Your Honor?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1              THE COURT:  You may.
 2        Q.   (By Mr. Lee)  Ms. Reinhart (sic), I've
 3   handed you a document marked as Exhibit PW.  Do you
 4   see that?
 5        A.   Yes.
 6        Q.   If you take a look at the first email, do
 7   you see that?
 8        A.   Yes.
 9        Q.   And do you see -- does that refresh your
10   recollection that this -- well, take a look at the
11   attachments.
12        A.   Okay.
13        Q.   Does that refresh your recollection that
14   this email was provided to you, this information was
15   provided to you, by Ms. Starrett; right?
16        A.   Yes, it was emailed to us by Ms. Starrett,
17   but all of it is capital markets type information
18   that would have come from capital markets, which
19   reports to Clay.
20        Q.   But it was not actually provided to you by
21   Mr. Simmons, was it?
22        A.   Not directly, no.
23        Q.   And in fact, Mr. Simmons is not even copied
24   on this email, is he?
25        A.   No.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1745

```
 1        Q.   And in fact, it was not provided to

 2   Ms. Starrett by Mr. Simmons, was it?

 3        A.   I don't know.

 4        Q.   Well, take a look at the next email.  See

 5   if that refreshes you.

 6        A.   Okay.

 7        Q.   It was not provided to Ms. Starrett by Mr.

 8   Simmons, was it?

 9        A.   No.

10        Q.   It was provided to Ms. Starrett by Mr.

11   Rhoades; right?

12        A.   Right.

13        Q.   And Mr. Simmons isn't copied on that email

14   either, is he?

15        A.   No.

16        Q.   And so insofar as the email traffic shows

17   how this was actually provided to KPMG, it's sheer

18   speculation that it was provided by Mr. Simmons,

19   isn't it?  Because there is nothing in the email

20   traffic showing that it was provided by Mr. Simmons

21   or even that he was copied on it, is there?

22        A.   I know that Jane and Clay were leading the

23   effort to pull this information together.

24        Q.   But the actual provision of this

25   information, Mr. Simmons isn't copied anywhere, is
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   he?

2        A.   No.

3        Q.   Mr. Goldstone isn't copied anywhere, is he?

4        A.   No.

5        Q.   And you would agree that the information

6   that I just handed you in Exhibit PW is the same as

7   the information in Plaintiff's Exhibit 284; right?

8   They're the same packets?

9        A.   I believe so, yes.

10        Q.   And so when the SEC showed you only Exhibit

11   284, and you speculated about this having been

12   prepared and provided by Mr. Rhoades and Mr. Simmons,

13   they didn't show you the underlying email traffic

14   that showed that you that it was only provided by

15   Ms. Starrett; that it was provided to Ms. Starrett by

16   Mr. Rhoades, and that Mr. Simmons isn't even copied.

17   They didn't show you all that, did they?

18        A.   No.

19        Q.   And they didn't show the jury all that, did

20   they?

21        A.   No.

22        Q.   And you just willingly went along with the

23   assumption that Mr. Simmons provided this to you,

24   because that's what you thought the SEC wanted to

25   hear; right?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     A.   No, it's because my understanding is that

2   Clay Simmons was leading this effort to pull this

3   information together, and Kyle Rhoades is the person

4   that would do this type of analysis.

5     Q.   But in terms of your own personal

6   knowledge, you don't know where this information came

7   from specifically, do you?

8     A.   Not specifically.

9     Q.   Let's take a look at Exhibit 285.   Exhibit

10  285 is a copy of the request that was made by KPMG to

11  Thornburg that has somebody's handwritten notes on

12  it; right?

13    A.   Yes.

14    Q.   Do you know whose handwritten notes these

15  are on this document?

16    A.   Those are mine.

17    Q.   And the first sentence -- let's look at the

18  first sentence at the top, or the second paragraph,

19  sorry.  "Considering the proximity of the events to

20  the filing of the Form 10-K, there is a presumption

21  that the company should have been aware or at least

22  should have considered the potential that there was a

23  reasonable chance that the company could have faced

24  margin calls in excess of its ability to meet such

25  calls."  Do you see that?


SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492
                                                       1-800-669-9492
                                              e-mail: info@litsupport.com

```
 1          A.   Yes.
 2          Q.   That's a lot of "should haves"; right?
 3   Should have been aware, or should have considered;
 4   right?
 5          A.   Yes.
 6          Q.   That's a lot of disclaimers there that
 7   there was a reasonable chance that the company could
 8   have faced margin calls; right?
 9          A.   Right.
10          Q.   So you were essentially there
11   second-guessing what the company should have done or
12   could have done; right?
13          A.   Right.
14          Q.   And the reference to "there was a
15   presumption that the company should have done all of
16   that" -- that's not actually a presumption grounded
17   in any accounting principle, is it?  That was just
18   KPMG's presumption?
19          A.   That's correct.
20          Q.   And that was KPMG's presumption because as
21   soon as the company notified KPMG of the events that
22   had happened after the 10-K, KPMG decided that it
23   wanted to withdraw its audit opinion; right?
24          A.   Yes.
25          Q.   Now, let's look at the next page, the
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1749

```
 1   portion that says, "Day-by-day correspondence with
 2   counterparties during the week before filing."
 3   Counsel for the SEC asked you about this, right,
 4   yesterday?
 5        A.   Yes.
 6        Q.   And the specific request:  "Correspondence
 7   with counterparties for the two weeks prior to
 8   filing, along with supporting evidence."  And there
 9   is a note that says, "Not received."  Do you see
10   that?
11        A.   Yes.
12        Q.   And that's your handwriting?
13        A.   Yes.
14        Q.   And then there is another note that says,
15   "Management indicated there was minimal
16   correspondence."  Do you see that?
17        A.   Yes.
18        Q.   And that suggests that you never did
19   receive that minimal correspondence; right?
20        A.   Correct.
21        Q.   You didn't do anything to follow up on
22   that, did you?
23        A.   No.  We felt we had what we needed.
24        Q.   And you never followed up to get the
25   minimal correspondence that there was.  You simply
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   wrote, "Not received."  But you never followed up to
 2   actually get it, did you?
 3        A.   No.
 4        Q.   And you never asked anyone on the
 5   engagement team to follow up, did you?
 6        A.   I don't believe so, no.
 7        Q.   And you never discussed with anyone on the
 8   engagement team the fact that this item hadn't yet
 9   been received; correct?
10        A.   I'm sorry?
11        Q.   You never actually discussed with anyone on
12   the engagement team the fact that you hadn't yet
13   received this correspondence; right?
14        A.   I may have.  I just don't recall.
15        Q.   Yesterday counsel asked you about some
16   emails relating to a rumor of a collapsing unnamed
17   hedge fund in Europe; right?
18        A.   Right.
19        Q.   And rumors are not something that an
20   auditor actually audits; right?
21        A.   Right.
22        Q.   You don't have a procedure for evaluating
23   rumors?
24        A.   We evaluate information.
25        Q.   But something that's unconfirmed, that's a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   rumor, you wouldn't, as a matter of practice,

 2   evaluate; correct?

 3        A.   Well, I would consider information, whether

 4   it was a rumor or not.

 5        Q.   There is no accounting guidance for how to

 6   evaluate rumors, is there?

 7        A.   Specifically, no.

 8        Q.   Now, let's look at the first of the emails

 9   that the SEC showed you.  Let's look at Exhibit 113.

10   Now, the bottom email is the one that the SEC focused

11   on as transmitting this information.  And Mr.

12   Feldman -- if we can blow up the bottom -- it's from

13   Mr. Feldman to Mr. Goldstone, Mr. Simmons, copying

14   Nate Fellers; right?

15        A.   Right.

16        Q.   And he reports, "I spoke with Charles Mac

17   and he made it sound like a large repo client,

18   European, lots of pay option MTA was collapsing.  He

19   couldn't give me details other than they own billions

20   that presumably would have to get sold.  He may not

21   be able to give more -- he may be able to give more

22   details later today.  He sounded very concerned about

23   it.  For the time being, we're not really supposed to

24   know about this situation, but news may be coming

25   soon."

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            Do you see that?
 2       A.   Yes.
 3       Q.   And the reference to the repo client,
 4   European, lots of pay option MTA -- do you know what
 5   pay option MTA is?
 6       A.   I don't recall what the MTA stands for.
 7   But pay option is a type of security where the
 8   underlying loans the borrowers have an option to pay.
 9       Q.   But you don't know what the MTA stands for?
10       A.   Not offhand, no.
11       Q.   So you don't know whether lots of pay
12   option MTA is comparable at all to Thornburg, do you?
13       A.   They do have a small amount of pay option
14   ARM-type assets, but it's not a significant amount.
15       Q.   Okay.  So except for a small amount, this
16   information alone does not suggest any comparability
17   to Thornburg, does it, in terms of the type of
18   securities at issue?
19       A.   It's mortgage-related assets, which are
20   relevant, just like the subprime assets became an
21   issue even for high-quality assets.
22       Q.   But the pay option tells you that it's
23   different from Thornburg; correct?
24       A.   Among the majority of the other assets,
25   yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And this doesn't identify the name of the
 2   repo client; right?
 3        A.   Right.
 4        Q.   It doesn't even identify the country in
 5   Europe where the repo client is located; right?
 6        A.   Right.
 7        Q.   And this was sent by Mr. Feldman; right?
 8        A.   Correct.
 9        Q.   And you've never talked to Mr. Feldman
10   about what he meant when he sent this email, have
11   you?
12        A.   That's correct.
13        Q.   You've never asked him what he thought of
14   that information, have you?
15        A.   That's correct.
16        Q.   And you've never asked Mr. Feldman whether
17   he thought this information would have any relevance
18   to Thornburg, have you?
19        A.   I have not.
20        Q.   And when the SEC showed you this email in
21   the investigation, you didn't say to the SEC, "You
22   know, wait a second, I think we ought to hear from
23   the author of the email, from Mr. Feldman."  You
24   didn't say that to them, did you?
25        A.   Actually, I did.  I said I would be
```



SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    interested in knowing what management's expectations
 2    about this would be.
 3        Q.   And did they tell you what Mr. Feldman said
 4    about this?
 5        A.   No.
 6        Q.   And they didn't tell you because they were
 7    just trying to get you to adopt their theory of the
 8    case; right?
 9            MR. McKENNA:  Objection, argumentative.
10            MR. LEE:  I'll withdraw the question.
11        Q.   (By Mr. Lee)  And you can't tell us today
12    what you would have done, had you seen this
13    information back during the audit, can you?
14        A.   If it was brought up to us, we would have
15    discussed it with management to understand their
16    perspective of what it meant for their portfolio.
17        Q.   You would have discussed it with Mr.
18    Feldman?
19        A.   To Mr. Feldman or Mr. Simmons.
20        Q.   Mr. Feldman would have been an obvious
21    person to have discussed this with; right?
22        A.   Yes.
23        Q.   But when you saw this email, when you found
24    out about it during the SEC's investigation, you
25    didn't ask to go talk to Mr. Feldman, did you?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   No, I wouldn't think that's appropriate for

2  me.

3      Q.   Well, you knew that the SEC was conducting

4  a very serious investigation of the securities laws.

5  Wouldn't you, before expressing an opinion on this,

6  want to have talked to Mr. Feldman?  You would have

7  wanted to talk to him during the audit period.

8  Wouldn't it be even more important to talk to him

9  during an SEC investigation to understand the

10  context?

11      A.   I don't think that's my role.

12      Q.   If you had known this information, that Mr.

13  Feldman had spoken with Charles Mac and heard this

14  rumor about a collapsing European repo client, you

15  can't say whether that would have changed your view

16  on any issue in the audit; correct?

17      A.   I would have needed to discuss it with

18  management to understand the implications before I

19  knew how it would impact the audit.

20      Q.   And now let's go to -- well, by the way, do

21  you know who Charles Mac is?

22      A.   I believe he was -- I don't know offhand.

23  I don't believe he was somebody at Thornburg.

24      Q.   Did the SEC tell you who Charles Mac was?

25      A.   Not that I recall.  I mean, I have a vague

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    memory of understanding that he was somebody that
 2    Patrick Feldman would correspond with regarding, you
 3    know, the portfolio or investments in the market.
 4        Q.   Now, let's go to Exhibit 122.  Now, this is
 5    another email the SEC showed you yesterday.  Do you
 6    recall that?
 7        A.   Yes.
 8        Q.   And there is an email from Mr. Goldstone to
 9    Mr. Simmons, and specifically the SEC focused on the
10    second paragraph, which reads -- blow that up --
11    "Also, you should know that a large Alt-A hedge fund
12    in Europe is blowing up this afternoon.  UBS Credit
13    just mentioned it to me.  They got hit with 20-point
14    haircuts on Alt-A AAAs overnight.  I think we will
15    get this a little more gradually, but we should be
16    ready for it.  Use of proceeds will be to delever."
17            Do you recall they asked you questions
18    about that?
19        A.   Yes.
20        Q.   And you have never spoken to Mr. Goldstone
21    about what he meant when he wrote that; right?
22        A.   That's correct.
23        Q.   And you have never spoken to Mr. Goldstone
24    to understand what he believed about the impact that
25    might have on Thornburg; right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   That's correct.

 2        Q.   And so you can't say whether Mr. Goldstone

 3   believed that this was a situation that would have an

 4   immediate or significant impact on Thornburg at all,

 5   can you?

 6        A.   I think reading it there is an indication

 7   of that.

 8        Q.   But you haven't actually talked -- would

 9   you agree with me that the author of the email would

10   be the person best suited to talk about what he

11   meant?

12        A.   Yes.

13        Q.   You're not better situated than Mr.

14   Goldstone to talk about what the email meant, are

15   you?

16        A.   No.

17        Q.   And when he talks there about haircuts, you

18   understand that haircuts are different from margin

19   calls; right?

20        A.   Yes.

21        Q.   And you understand that haircuts change

22   only when a repo agreement matures and rolls over

23   into a new agreement; right?

24        A.   Correct.

25        Q.   So the fact that somebody got hit with
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1758

```
 1    haircuts doesn't mean that it triggers a margin call
 2    the next day; correct?
 3         A.   Correct.
 4         Q.   And in fact, your own workpapers reflect
 5    your understanding that, quote, haircut increases or
 6    decreases are changes -- that these are changes in
 7    haircuts when repo agreements mature and roll over
 8    into a new agreement under current market terms;
 9    right?  Does that sound familiar to you?
10         A.   Yes.
11         Q.   As something pulled -- a quote pulled
12    directly from a KPMG workpaper; right?
13         A.   Okay.
14         Q.   So any change in haircuts, as a result of
15    this unnamed hedge fund in Europe collapsing, would
16    have occurred, if at all, only when Thornburg's repo
17    agreements matured, whether weeks or months later;
18    correct?
19         A.   The actual haircut would change, but if
20    they know today that they're going to change their
21    haircut by 20 points, it also indicates it's because
22    those assets aren't valued as much, which could
23    affect the value that day and could change the value
24    and trigger margin calls.
25         Q.   And Mr. Goldstone's view, as written in his
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   email, is that we will get this a little more
 2   gradually; right?
 3        A.   Correct.
 4        Q.   And you're not aware of any haircut
 5   increases that actually occurred for Thornburg on
 6   February 28 or 29 as a result of a hedge fund
 7   collapse, are you?
 8        A.   Not specifically, no.
 9        Q.   And Mr. Goldstone also wrote, "We should be
10   ready for it."  And would you agree that that
11   suggests he believed that Thornburg would be able to
12   handle whatever impact might come from this unnamed
13   hedge fund in Europe?
14        A.   It indicates that he believed they should
15   be ready for it.
16        Q.   Right.  And "should be" could mean there,
17   "We will be ready for it"; right?
18        A.   It could.
19        Q.   When the SEC showed you this email, they
20   didn't tell you what Mr. Goldstone's explanation of
21   the email was, did they?
22        A.   No.
23        Q.   And they didn't tell you what information
24   Mr. Goldstone had learned that very same day in New
25   York about the fact that there was a potential buyout
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    of this hedge fund; right?  They didn't tell you

2    that; right?

3         A.   Right.

4         Q.   And they didn't tell you that Mr. Goldstone

5    believed that because of the information he learned

6    while he was in New York, this hedge fund that was

7    supposedly blowing up might actually be acquired;

8    right?

9         A.   Right.

10        Q.   And they didn't tell you that, when they

11   met with you and showed you this email, that what Mr.

12   Goldstone had learned in New York about the fact that

13   this hedge fund might be acquired gave him some

14   comfort that this would not have any immediate impact

15   on Thornburg; correct?

16        A.   That was not discussed; that's correct.

17        Q.   All they did was they showed it to you and

18   said, "Is this information you would have wanted to

19   know"; right?

20        A.   Yes, and it was.

21        Q.   They didn't give you the context?

22        A.   I didn't have the additional information

23   you just discussed.

24        Q.   And you recall that news of a hedge fund in

25   Europe collapsing was first published the following

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    day, on February 28.  Do you recall that?

2        A.   I believe so, yes.

3        Q.   In other words, on the 27th, when this

4    email was sent, this had not been publicly announced

5    or reported; correct?

6        A.   Correct.

7        Q.   And after you saw the news about the hedge

8    fund actually collapsing the next day, on the 28th,

9    you didn't go to Thornburg and ask them if they had

10   known about this, did you?

11       A.   No.

12       Q.   And you didn't do an analysis to see

13   whether that impact -- whether the collapse of the

14   hedge fund that actually occurred on the 28th had had

15   any impact on Thornburg, did you?

16       A.   There was no need.  You know, we were

17   seeing the impact to Thornburg in their circumstances

18   directly.

19       Q.   Well, when you say, "We were seeing the

20   impact," all you saw was the next day Thornburg

21   received additional margin calls; right?

22       A.   Correct.

23       Q.   And KPMG attributed that to the disclosures

24   in the Form 10-K itself; correct?

25       A.   KPMG did not.  That was management's

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492
                                                                 1-800-669-9492
                                                        e-mail: info@litsupport.com



 1   assertion.

 2        Q.   And KPMG also reported that assertion in

 3   its restatement memo; correct?

 4        A.   Correct.

 5        Q.   And KPMG did not check to see whether the

 6   news of the European hedge fund had actually had any

 7   impact on Thornburg; correct?

 8        A.   No.

 9        Q.   As we sit here today, you're not aware that

10   the collapsing European hedge fund actually had any

11   impact on Thornburg or was what triggered the margin

12   calls, are you?

13        A.   I think there was a lot of things happening

14   in the market, and this was one contributing factor

15   to the downturn in the market.

16        Q.   And you didn't -- when the SEC showed you

17   this, did they show you the evidence that banks that

18   issued the margin calls immediately after the filing

19   of the Form 10-K had pointed to the actual 10-K

20   disclosure itself as the triggering cause?  Did they

21   show you that evidence?

22        A.   No.

23        Q.   In other words, they didn't show you the

24   internal emails from the banks themselves showing

25   that what they were reacting to was the disclosures

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    in the Form 10-Ks?

2         A.   No.

3         Q.   10-K, that is.  Now, I think we're done

4    with that.

5              You testified yesterday that the failure to

6    disclose the delayed payment of margin calls would

7    have changed KPMG's OTTI conclusion.  Do you recall

8    that?

9         A.   Yes.

10        Q.   But in fact, during the restatement period,

11   you became aware and you learned of the delayed

12   payment of margin calls; right?

13        A.   Yes.

14        Q.   And in fact, the restatement itself was not

15   based on the delayed payment of margin calls, was it?

16        A.   Well, everything would have been

17   considered, but the driving factor for the

18   restatement was the view that management should have

19   understood or considered it reasonably possible that

20   the events that occurred on the 27th, 28th could have

21   occurred.

22        Q.   28th and 29th, you mean?

23        A.   Yes.

24        Q.   And that's not the delayed payment of

25   margin calls before the 28th; correct?  That was not

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    cited as a reason for the restatement; correct?

2         A.   I mean, everything we're given we consider.

3    So I can't -- it's not one particular thing and not

4    another, but the driving factor was that we

5    considered that the events that took place after

6    filing appeared to be a continuation of a

7    deterioration in their portfolio that should have

8    been considered as possible or reasonably possible.

9         Q.   And let's go to Exhibit HS.   Exhibit HS is

10   the final restatement memo; right?

11        A.   Yes.

12        Q.   And this sets forth procedures KPMG

13   followed and conclusions that KPMG reached as a

14   result of its work on the restatement; correct?

15        A.   Correct.

16        Q.   And let's go to Bates number 627.   And if

17   we can highlight the bullet that says, "Primary cause

18   of the error, including fraud considerations."   This

19   was primary cause of the error in the company's

20   originally filed financial statements; correct?

21        A.   Yes.

22        Q.   And let's look at the first two sentences.

23   It says, "Management's expectations related to the

24   performance of the company's portfolio and liquidity

25   requirements in a rapidly changing and illiquid

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1765

```
 1    credit market environment were based on certain
 2    judgments about the likelihood of additional margin
 3    calls and the company's ability to pay those margin
 4    calls.  Those judgments were not consistent with the
 5    events that occurred on February 28, 2008, and
 6    subsequently."  Correct?
 7         A.   Correct.
 8         Q.   And that means those judgments were not
 9    consistent with what actually happened after the 10-K
10    was filed; right?
11         A.   Right.
12         Q.   And nowhere do you mention the delayed
13    payment of margin calls before the Form 10-K was
14    filed as a cause of the error leading to the
15    restatement, do you?
16         A.   We don't document it here, but it was
17    certainly something that we communicated to the
18    company that was information that we should have been
19    provided that would have affected our analysis.
20         Q.   But it is -- not only do you not document
21    it there; you don't document it anywhere in this
22    17-page memo, do you?
23         A.   I don't believe so, no.
24         Q.   The memo written at the time, back eight
25    years ago in March and April, when the events were
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   fresh in your mind, when the work you did was fresh

2   in your mind, when the analysis and conclusions you

3   reached were fresh in your mind -- there is not one

4   single mention of the fact that knowledge of the

5   delayed payment of margin calls was a triggering

6   factor for the restatement; correct?

7       A.   We weren't as focused on that piece of it.

8   It was more of a focus on what occurred shortly after

9   filing.

10      Q.   And the reason you weren't as focused on

11  that is because you knew about it, and even knowing

12  about it wouldn't have changed the OTTI; right?

13      A.   No, I don't believe that's true.

14      Q.   Because you didn't make any mention of it

15  in the memo as a factor that made any difference at

16  all, did you?

17      A.   That doesn't mean that it wasn't a factor.

18      Q.   But it wasn't an important enough factor

19  back in March and April of 2008 to memorialize in a

20  17-page memo that went into KPMG workpapers, was it?

21      A.   I documented the primary factor.

22      Q.   Right.  And today, you're claiming that the

23  failure to disclose the delayed payment of margin

24  calls would have changed the OTTI.  That's the focus

25  of your testimony today before the SEC, even though

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   eight years ago, at the time, you made no mention of
 2   it whatsoever.  Isn't that right?
 3        A.   In this memo, yes.
 4        Q.   And that's because today you're testifying
 5   on behalf of the SEC, eight years after the fact, and
 6   all of a sudden there is a new theory and that is
 7   that the delayed payment of margin calls would have
 8   changed your OTTI; correct?
 9             MR. McKENNA:  Objection, argumentative,
10   Your Honor.
11             THE COURT:  Well, it's very compound.  Why
12   don't you break it down.
13             MR. LEE:  It was so compound, I'm having
14   trouble remembering it.
15        A.   I can answer the question.  It's not a new
16   theory.  I mean, this is information that -- we went
17   to the audit committee and told them that this is
18   information that was not provided to us that should
19   have been.  And that's because it would have an
20   impact on our analysis and certainly something that
21   should have been considered as part of the analysis.
22        Q.   (By Mr. Lee)  But it was not important
23   enough to put in anywhere in a 17-page-long
24   single-spaced memo that went into your official
25   workpapers on the process and the reasons for the
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1768

```
 1    restatement eight years ago before there was any
 2    threat of an SEC investigation, was it?
 3         A.   In this section of this memo, I was
 4    documenting the primary focus of the reason for the
 5    restatement.
 6         Q.   I'm not now just focused on that section.
 7    You admitted then nowhere -- not just that section
 8    but nowhere in the 17 pages is that factor mentioned;
 9    correct?
10         A.   This is the section that talks about the
11    reason for the restatement.  The other sections of
12    the memo are other topics.
13         Q.   And none of those topics addresses what
14    you're testifying to today or yesterday, that all of
15    a sudden, eight years later, the failure to disclose
16    the delayed payment of margin calls would have
17    changed your OTTI.  It's not mentioned in the memo.
18         A.   It's not all of a sudden.  It's information
19    that we should have been told, and we communicated
20    that to Thornburg at the time.
21         Q.   And even though you're now testifying it
22    would have changed the OTTI, that was never cited as
23    a reason in your workpapers for the restatement;
24    correct?
25         A.   I documented the primary factor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1769

1       Q.   And when Mr. McKenna asked you questions

2  about that, the SEC didn't -- you didn't clarify that

3  it was a minor factor or not the primary factor, and

4  not a factor important enough to put in the

5  restatement memo, did you?

6       A.   I wouldn't consider it a minor factor, but

7  in this memo I was documenting the primary factor.

8  Because I didn't mention the other factors doesn't

9  mean that they're not important.

10      Q.   Just not important enough to put in your

11  restatement memo.

12           Let's turn to Exhibit 268, please.  Exhibit

13  268 is the management representation letter you

14  testified about; correct?

15      A.   Correct.

16      Q.   And let's go to page 2.  And let's go to

17  the very top.  The management representation letter

18  begins, "We confirm, to the best of our knowledge and

19  belief, the following representation made to you

20  during your integrated audit."  Do you see that?

21      A.   Yes.

22      Q.   And so this is the qualifier here that the

23  entire premise for the management representation

24  letter is the signer's knowledge and belief at the

25  time; right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   So let's go to paragraph 4a -- or I'm
 3   sorry, 4e.   Let's include the preface at item number
 4   4.   So counsel for the SEC asked you about several of
 5   the provisions in the management representation
 6   letter.   Do you recall that?
 7        A.   Yes.
 8        Q.   And the first provision he asked you about
 9   is, there are no events that have occurred subsequent
10   to the balance sheet date and through the date of
11   this letter that would require adjustment to or
12   disclosures in the consolidated financial statements.
13   Do you see that?
14        A.   Yes.
15        Q.   And would you agree with me that if a
16   signer of this representation letter actually
17   believed that there had been no events that have
18   occurred subsequent to the balance sheet date and
19   through the date of this letter that would require
20   adjustment or disclosure, that this would not be an
21   inaccurate statement?
22        A.   So you know, assertion is management's
23   view, and their assertion.   So, yes, it's provided
24   based on their knowledge and their belief.
25        Q.   Right.   So if they actually believed this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    was true, that there weren't any events that would

2    require adjustment to or disclosure in the financial

3    statements, then this wouldn't be an inaccurate

4    management representation, would it?

5         A.   If they believed that and it was true, it

6    would be accurate.

7         Q.   Well, no.  It doesn't say if it were true.

8    It just says, "To the best of our knowledge and

9    belief."  So if they actually believed it was true --

10   even if it turned out later, after the fact, with the

11   benefit of hindsight, not to be true, if they

12   believed it at the time, this would not be an untrue

13   representation, would it?

14        A.   I think that's fair.

15        Q.   Now let's go to page 6, paragraph 22 of

16   page 6.  And I want to focus on the last sentence of

17   that paragraph.  I believe that was the sentence that

18   counsel from the SEC had you focus on.  "Declines in

19   value of debt or equity securities classified as

20   either available for sale or held to maturity are

21   considered to be temporary because we have both the

22   intent and ability to hold these impaired securities

23   for a sufficient period of time, until maturity, if

24   necessary, to allow for their recovery in market

25   value."

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                    Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492
                                                                          1-800-669-9492
                                                              e-mail: info@litsupport.com


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1772

```
 1            Would you agree with me that if management

 2    actually believed that was true, if they actually

 3    believed they had the intent and ability to hold,

 4    even if it later turned out, with the benefit of

 5    hindsight, that they didn't have the ability, that

 6    this would not be an untrue statement?

 7         A.   Not if they know they already weren't able

 8    to hold their assets, even at that time.

 9         Q.   But if they believed.  You agree that this

10    statement about intent and ability to hold a

11    sufficient period of time involves a judgment about

12    future events; right?

13         A.   It does, but if an individual already knew

14    there was an event where he did not have the ability

15    to hold, I don't see how you can believe that to be

16    true.

17         Q.   But if you didn't -- because none of us has

18    a crystal ball and so we can't predict the future.

19    So if you didn't know what would happen on February

20    28th and 29th and you believed that on the night of

21    the 27th, when this letter was signed, if you

22    believed you had the ability to hold, then this

23    wouldn't be untrue, would it?

24         A.   Not if you already had to sell assets

25    because you didn't have the ability to hold them.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1773

```
 1        Q.   So you're disputing the notion that
 2   somebody could hold a good-faith belief that turned
 3   out to be wrong later.  Are you disputing that
 4   notion?
 5        A.   No.
 6             THE COURT:  Mr. Lee, would this be a good
 7   time for us to break for lunch?
 8             MR. LEE:  Let me just ask two more
 9   questions on this document, then we'll be done.
10   Thank you, Your Honor.
11        Q.   (By Mr. Lee)  This represents, "Except as
12   recorded or disclosed in the consolidated financial
13   statements, there are no declines in values of
14   certain investments that are considered to be other
15   than temporary in accordance with," and it cites some
16   accounting literature; right?
17        A.   Right.
18        Q.   And this embodies -- the
19   other-than-temporary-impairment notion embodies the
20   ability and intent to hold your securities to some
21   point in the future; right?
22        A.   Correct.
23        Q.   And so again, if management believed that
24   they would have the ability to hold their securities
25   to recovery at some point in the future, even if they
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  turned out to be wrong later, this wouldn't be

2  untrue, would it?

3       A.   Again, I think if management knew they

4  already had to sell assets, such that they already

5  didn't have the ability to hold, I don't see how that

6  belief could be accurate.

7       Q.   Well, at February 27, the company had paid

8  all of its margin calls; correct?

9       A.   For, you know, as of that exact moment.

10      Q.   Right.  All the margin calls had been paid;

11 correct?

12      A.   Correct.

13      Q.   And KPMG was aware of the volume of margin

14 calls the company had received and signed off on the

15 form 10-K; correct?

16      A.   We are aware of the roughly $300 million in

17 margin calls that were disclosed.

18      Q.   Right.  And KPMG also concluded that the

19 events of February 28th and 29th were unforeseeable;

20 correct?

21      A.   No, that's not correct.

22      Q.   And then let's go to paragraph 31.  We'll

23 come back to that after lunch, then, if you're

24 disputing that.

25           Paragraph 31, I believe, is the last

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   paragraph counsel asked you about.  This says, "The
 2   consolidated financial statements disclose all of the
 3   matters of which we are aware that are relevant to
 4   the entity's ability to continue as a going concern,
 5   including significant conditions and events and our
 6   plans."
 7            And again, my question is:  If the signers
 8   of this on the 27th believed in good faith that they
 9   had disclosed all of the matters covered by this
10   paragraph, this wouldn't be untrue, would it?
11        A.   I think that's fair.
12            MR. LEE:  Nothing further on this document,
13   Your Honor.  Thank you.
14            THE COURT:  All right.  Let's break for
15   about an hour.  By about 1:05 let's try to be back.
16   I know it's hard to get in and out in an hour, but
17   let's shoot for that.  Finish your sandwich.  Nobody
18   is going to start without you.
19            All right.  All rise.
20            (The jury left the courtroom.)
21            THE COURT:  All right.  Anything we need to
22   discuss, Mr. Lee?
23            MR. LEE:  No, Your Honor.
24            THE COURT:  See you in about an hour.
25            MR. LEE:  Thank you, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                  (The lunch recess was held.)

 2             THE COURT:  Anything?

 3             MR. McKENNA:  No, Your Honor.

 4             MR. LEE:  No, Your Honor.

 5                  (The jury entered the courtroom.)

 6             THE COURT:  All right.  Everyone be seated.

 7             All right, Ms. Hall, I'll remind you that

 8    you're still under oath.

 9             Mr. Lee, if you wish to continue your

10    cross-examination of Ms. Hall, you may do so at this

11    time.

12             MR. LEE:  Thank you, Your Honor.

13             THE COURT:  Mr. Lee.

14        Q.   (By Mr. Lee)  Good afternoon, Ms. Hall.

15        A.   Good afternoon.

16        Q.   Do you recall before we broke for lunch, I

17    was asking you some questions about the management

18    representation letter; right?

19        A.   Yes.

20        Q.   And I was specifically asking you -- well,

21    I asked you questions about a number of provisions,

22    but one of those provisions or actually two of those

23    provisions I asked you about was about the company's

24    assertion that it had the intent and ability to hold

25    its assets until recovery.  Do you recall that?
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      A.   Yes.

2      Q.   And I asked you if management actually, in

3  good faith, believed that they had the intent and

4  ability to hold, that representation would not be

5  untrue.  Do you recall that?

6      A.   Yes.

7      Q.   And you said, I think about five times,

8  "Well, if management knew that it had already sold

9  assets, it could not make that assertion"; right?

10     A.   Sold assets because they needed to, to meet

11 the margin calls.

12     Q.   Right.  And in fact, the fact of the matter

13 is, management did not sell assets in the period

14 leading to the Form 10-K; correct?

15     A.   I believe they did.

16     Q.   In fact, management did not sell assets at

17 all during the period leading up to the Form 10-K;

18 correct?

19     A.   I believe they sold some of their

20 securities that were in their loan portfolio.

21     Q.   The interest-only strips, are you referring

22 to?

23     A.   Yes.

24     Q.   And you conceded this morning that even

25 though you called the sale of the interest-only

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1778

 1    strips a sale, it's actually a financing; right?

 2        A.   That's correct.

 3        Q.   So it's not actually a sale of assets for

 4    accounting purposes; right?

 5        A.   The I/O strips would be -- the sale of the

 6    I/O strips would be accounted for as a financing.

 7        Q.   Right.  And when you met with the SEC, did

 8    they tell you that the Court in this case actually

 9    found that those transactions were not the sale of

10    assets?

11        A.   No.

12        Q.   So when you sort of refused to answer my

13    question about if management's good-faith belief in

14    their intent and ability would make that a true

15    representation, and you kept referring to if you know

16    you've already sold assets, that observation is

17    actually factually both inaccurate and irrelevant,

18    isn't it?

19             MR. McKENNA:   Objection, Your Honor.

20             THE COURT:   Overruled.

21        A.   No, I believe if you're in a position when

22    you're not able to meet your obligations as they

23    become due, I don't believe you can in turn have the

24    intent and ability to hold your assets.

25        Q.   (By Mr. Lee)  And in fact, the company, for

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    accounting purposes, they did not sell assets;
 2    correct?
 3         A.   For accounting purposes, that's correct.
 4         Q.   And in fact, on February 28, when the Form
 5    10-K was filed, the company had paid all of its
 6    margin calls; correct?
 7         A.   That's correct.
 8         Q.   Now, right before we broke, you said that
 9    KPMG did not conclude that the magnitude of margin
10    calls on the 28th and the 29th were not foreseeable.
11    Is that your testimony?
12         A.   That's correct.
13         Q.   All right.  Well, let's take a look at
14    Exhibit HR.  We looked at this this morning or
15    yesterday.  This is the memo to the workpapers on
16    internal control of a financial report; correct?
17         A.   Yes.
18         Q.   And this is a memo written by you?
19         A.   Yes.
20         Q.   And it's initialed by you?
21         A.   Yes.
22         Q.   And it's also, in the lower right-hand
23    corner, initialed by Ms. Reinhart; correct?
24         A.   That's correct.
25         Q.   And if we could go to page 5 of the lower
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    portion of Bates 890 and the paragraph that says,

2    "Timing."  And let's go to the second sentence.  It

3    reads, "So while the conclusion that was reached by

4    management during their financial reporting process

5    was considered, in hindsight, to be incorrect, it

6    appears that the magnitude of the decline in asset

7    values that occurred on February 28th and 29th were

8    not foreseeable"; correct?

9        A.    That's correct.  I'd say we determined that

10   the magnitude of the decline was not foreseeable.

11       Q.    And it's the decline in asset values that

12   actually triggered margin calls; right?

13       A.    That's correct.

14       Q.    And you believed this was accurate at the

15   time you wrote it; right?

16       A.    Correct.

17       Q.    And that was in March of 2008; right?

18       A.    That's correct.

19       Q.    Before the SEC got involved; right?

20       A.    Correct.

21       Q.    And it's only today that you now are

22   testifying that KPMG, in fact, did not conclude that

23   the magnitude of the margin calls was not

24   foreseeable?

25       A.    We considered that the magnitude of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    decline would not be foreseeable, but we concluded

 2    that the potential for margin calls to be received in

 3    excess of available liquidity -- that potential

 4    likelihood should have been considered as reasonably

 5    possible.

 6         Q.   Reasonably possible.  Should have been

 7    considered as reasonably possible.

 8         A.   Correct.

 9         Q.   Following the restatement, Ms. Hall, KPMG

10    took steps to assess the responsibility for the

11    restatement; is that right?

12         A.   Can you repeat that?

13         Q.   Following the actual restatement, KPMG took

14    steps to assess responsibility, internal

15    responsibility within KPMG, for the restatement;

16    correct?

17         A.   I believe so, yes.

18         Q.   And KPMG assigned a senior auditor for KPMG

19    to actually carry out that assessment; correct?

20         A.   Correct.

21         Q.   And this senior auditor was named James

22    Browning; correct?

23         A.   That seems reasonable.

24              MR. LEE:  Right.  And no relation to the

25    Court, for the record.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And Mr. Browning -- he was a very senior

2  audit partner at KPMG; right?

3    A.   He was a partner in our Houston office that

4  had supervisory responsibility.

5    Q.   Supervisory responsibility over the

6  Albuquerque office?

7    A.   Yes.

8    Q.   And he did not participate in the

9  underlying audit; correct?

10    A.   Correct.

11    Q.   And so he was brought in as a set of

12  outside eyes to try to determine what had happened at

13  KPMG with respect to the restatement; correct?

14    A.   Correct.

15    Q.   And one of the things he looked at was the

16  information that was actually known to the engagement

17  team at the time of the filing of the Form 10-K;

18  correct?

19    A.   Correct.

20    Q.   And following that, KPMG prepared what's

21  called a restatement assessment form.  Do you recall

22  that?

23    A.   I understood that during the investigation

24  period, yes.

25    Q.   And let's look at Exhibit IO.  Let's just

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    blow up the top first.  So this is entitled

 2    "Southwest area restatement assessment form."  Do you

 3    see that?

 4         A.   Yes.

 5         Q.   And it says, "Form to be completed by the

 6    BUPPP."  That's a professional practice partner;

 7    right?

 8         A.   Yes.

 9         Q.   And it relates to Thornburg Mortgage for

10    the -- relating to the 2007 financials which were

11    restated on March 11, 2008; right?

12         A.   Correct.

13         Q.   And it identifies Ms. Reinhart as the

14    engagement partner, and it identifies Mr. Womack as

15    the concurring review partner, and it identifies you

16    as manager; right?

17         A.   Correct.

18         Q.   And it goes down to -- let's go down to the

19    box that says, "Description of restatement issue" and

20    blow that up.  And it basically summarizes what

21    happened.  The company received margin calls which it

22    could not meet within a few days of issuance of audit

23    report.  This called into question whether

24    substantial doubt existed as to going concern at date

25    of report.  Consultation with DPP occurred."  DPP is

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492
                                                                   e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    your national office; correct?
 2         A.    Right.
 3         Q.    Department of Professional Practice?
 4         A.    Yes.
 5         Q.    "And accounting for securities as available
 6    for sale was also questioned.  It was determined that
 7    the accounting for the available-for-sale securities
 8    should be restated and the auditor's report would be
 9    reissued with modification related to going concern."
10    Do you see that?
11         A.    Yes.
12         Q.    And let's go to the second page, the
13    grading considerations.  And so you see there are a
14    possibility of three scores that a member of the
15    engagement team could have received as a result of
16    that assessment; right?
17         A.    Right.
18         Q.    And it ranges from zero to two, and zero is
19    the best score; right?
20         A.    Correct.
21         Q.    And two is the worst score; right?
22         A.    No, it's the opposite.  Let me read it for
23    a second.  You're correct.
24         Q.    So zero is the worst score, and two is the
25    best score; right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   Correct.

2    Q.   And under zero, the grading consideration,

3  if there had been fraud or intentional misstatement,

4  that might yield a score of zero because if there had

5  been fraud or intentional misstatement, members of

6  the engagement team wouldn't be responsible; correct?

7    A.   Correct.

8    Q.   That's the underlying rationale; right?

9  The same with typographical or reclassification only,

10  client decided to restate; even though immaterial,

11  less severe matters, SEC position that could not be

12  anticipated.  Those are all a zero; right?

13    A.   Correct.

14    Q.   And then one, the middle score, says a

15  single issue, highly technical issue, or evolving

16  area, single year involved, DPP desktop review did

17  not identify additional issue.  That's the middle

18  score.

19         And then the worst score is the score of 2,

20  which says, "Multiple issues restated,

21  blocking-and-tackling-type issues, multiple years,

22  DPP desktop or in-depth review identified additional

23  issues."  Do you see that?

24    A.   Yes.

25    Q.   And so that is identifying the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    circumstances that would result in the worst of the

2    three possible scores; correct?

3         A.   Correct.

4         Q.   And let's go to the grading.  And these are

5    the recommended grading for each of the members of

6    the team.  You see Ms. Reinhart received a 2; right?

7         A.   Yes.

8         Q.   And Mr. Womack received a 2, and you

9    received a 2, and Mr. Taylor received a 2, and Mr.

10   McLamb received a 1.  Do you see that?

11        A.   Yes.

12        Q.   And so you received the worst possible

13   score corresponding to the grading considerations

14   above as a result of your work on the 2007 audit;

15   correct?

16        A.   Correct.

17        Q.   And now let's go up to the grading

18   rationale.  It's a narrative.  And that says,

19   "Grading considered that the issues involved were

20   those receiving high focus of attention by the firm."

21   Do you see that?

22        A.   Yes.

23        Q.   And it goes on to state, "Grading as it

24   relates to the engagement partner, manager, and

25   concurring reviewer considers this and the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    information at hand and disclosed"; correct?

2        A.   Correct.

3        Q.   And that tells you that KPMG, Mr. Browning,

4    an independent senior partner with responsibility for

5    the Albuquerque office, concluded in June of 2008

6    that you and Ms. Reinhart and Mr. Womack had all the

7    information you needed at hand and disclosed in order

8    to reach a proper judgment on the company's financial

9    statements; isn't that correct?

10       A.   I wouldn't go that far, no.

11       Q.   And you see this was -- if you go back to

12   the first page -- well, you do see it refers to "the

13   information at hand and disclosed"; right?

14       A.   Right, the information that he was aware

15   of.

16       Q.   And this was -- you see it was approved in

17   June of 2008, and it was submitted to DPP in June of

18   2008; correct?

19       A.   Correct.

20       Q.   Now, yesterday the SEC showed you a dozen

21   or so emails, and asked you if these were emails that

22   you would have wanted to have seen during the audit;

23   correct?

24       A.   Yes.

25       Q.   And they showed you a bunch of emails, a

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                                (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492
                                                            1-800-669-9492
                                                   e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  dozen or so emails, and they asked you, at least in

2  some of them, to speculate about the meeting;

3  correct?

4      A.   They asked me questions about what was

5  written in the emails; correct.

6      Q.   And they asked you what you thought or how

7  you interpreted those emails; right?

8      A.   My thoughts about them, yes.

9      Q.   And they asked you to speculate about

10  emails written by Deborah Burns.  Do you recall that?

11      A.   I don't recall the specific question about

12  it, but I was shown that email and asked a question.

13      Q.   And they asked you to speculate about a

14  memo written by Mr. Buniel; right?

15      A.   They asked me questions about a memo

16  written by Mr. Buniel.

17      Q.   And they asked you questions about emails

18  written by Ms. Starrett and Mr. Simmons and Mr.

19  Goldstone; right?

20      A.   Correct.

21      Q.   And they asked you to speculate about what

22  those emails meant or referred to; right?

23      A.   They asked me questions about my thoughts

24  about the matter that was discussed.

25      Q.   And they didn't show you any of the context

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    surrounding those emails, did they?

 2         A.   Not that I know of.

 3         Q.   And we've now seen, through our examination

 4    this morning and yesterday afternoon, additional

 5    context, additional information that helps shed light

 6    on at least some of those emails, doesn't it?

 7         A.   Yes.

 8         Q.   And you haven't seen the testimony here in

 9    court of some of the witnesses such as Ms. Burns, who

10    explained what she actually meant when she wrote some

11    of the emails the SEC asked you to speculate about.

12         A.   I have not.

13         Q.   To this day, you don't know what she

14    actually meant, do you?

15         A.   That's correct.

16         Q.   When you met with the SEC when you had your

17    private meetings with them -- I think yesterday you

18    had four, at least four private meetings with the

19    SEC; right?

20         A.   Yes.

21         Q.   In those private meetings with the SEC,

22    they didn't give you any additional context.  They

23    simply showed you those emails and said, "Is this

24    something you would have liked to have known"; right?

25         A.   That's correct.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                    1-800-669-9492
                                                          e-mail: info@litsupport.com



PROFESSIONAL COURT
REPORTING SERVICE

1790

```
 1        Q.   And they didn't tell you what some of the
 2   authors of the emails said they meant, the people who
 3   actually wrote the emails -- they didn't tell you
 4   what the authors themselves have said they meant, did
 5   they?
 6        A.   I don't believe so.
 7        Q.   And that's what we've been trying to
 8   establish and that's the reason for my
 9   cross-examination of you today.  Do you understand
10   that?
11        A.   I do.
12             MR. LEE:  I have no further questions, Your
13   Honor.
14             THE COURT:  Thank you, Mr. Lee.
15             Mr. McKenna, do you have redirect of Ms.
16   Hall?
17             MR. McKENNA:  I do, Your Honor.
18             THE COURT:  Mr. McKenna.
19                     REDIRECT EXAMINATION
20   BY MR. MCKENNA:
21        Q.   Good afternoon, Ms. Hall.
22        A.   Good afternoon.
23        Q.   I know you've been up there a while.  I'll
24   try to keep this as brief as I can, but I think there
25   are a few points I need to clarify or correct about
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    some of the questions you were asked.  Okay?

 2        A.   Okay.

 3        Q.   Let's start with when I asked you questions

 4    yesterday.  Did I ever ask you to speculate about

 5    what emails meant?

 6        A.   No.

 7        Q.   And let's just go back to that Exhibit IO,

 8    please.

 9             Will you bring that up, Mr. King?

10             Can you just highlight that submitted

11    approved section, that section of this form?  You see

12    it's in the top third in the form of work?  That last

13    approved line, Mr. Lee said this was all approved.

14    It's blank, isn't it?  Nobody dated that, did they?

15        A.   That's correct.

16        Q.   So do you know if this was finalized as to

17    you?

18        A.   I do not.

19        Q.   Okay.  Can we bring up Exhibit PU, please?

20    Now, this was a document Mr. Lee asked you about

21    yesterday.

22             THE CLERK:  It's not in evidence.

23             THE COURT:  Why don't you pull it off the

24    screen?

25             THE CLERK:  It's not on there.  That's a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   different one.
 2           MR. McKENNA:  This was a new one, so we
 3   don't have this exhibit.
 4           THE COURT:  It has not been admitted so --
 5           MR. McKENNA:  Oh, okay.  I'm sorry, I'm
 6   misreading my notes.  I need Exhibit BY.  My fault.
 7      Q.   (By Mr. McKenna)  This is the document I
 8   meant to refer to.  Do you recognize this document?
 9      A.   Yes.
10      Q.   And who prepared this document?
11      A.   Tara Baucom.
12      Q.   And can we look a little further down,
13   please, Mr. King?
14           When Mr. Lee asked you about this, he
15   pointed to this line under "Management" that said,
16   "Jenni Hall inquired of Jane Starrett, Clay Simmons,
17   and Larry Goldstone on February 27, 2008."  And he
18   said, and I'm quoting here, "You wrote here this
19   sentence."  Did you actually write that sentence?
20      A.   I did not.
21      Q.   Who did?
22      A.   I believe Tara Baucom.
23      Q.   Okay.  And you don't normally write in the
24   third person, do you, about "Jenni Hall inquired"?
25      A.   No.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1      Q.   The context of this was trying to determine

 2  when that down-to-date meeting took place with Mr.

 3  Simmons and Ms. Starrett.  Do you recall that?

 4      A.   Yes.

 5      Q.   And when you had given deposition or

 6  investigative testimony before, had you been made

 7  aware of some of the facts that we talked about

 8  yesterday, such as Mr. Simmons flying off to Dallas

 9  at noon on February 27?

10      A.   Sorry?  When -- what's the time period

11  you're asking about?

12      Q.   I'm asking when you -- let's just say when

13  you gave your deposition, which was December of 2012,

14  were you aware that Mr. Simmons had flown off to

15  Dallas at noon on the 27th?

16      A.   I don't believe I recalled that, no.

17      Q.   You were aware of Ms. Starrett's jury duty,

18  though; is that right?

19      A.   Yes.

20      Q.   Okay.  So when we kind of narrowed it down

21  to thinking that the meeting took place on the

22  evening of February 26, was that based on the new

23  knowledge about Mr. Simmons' travel?

24      A.   Yes.

25      Q.   Okay.  And let me just ask you this.

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                        1-800-669-9492
                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1794

```
 1    Whether or not this meeting took place on the 26th or
 2    the 27th, do you believe you should have been told at
 3    that time about the unmet margin calls that Thornburg
 4    had had leading up to that meeting?
 5        A.   Yes.
 6        Q.   It really doesn't matter whether it's the
 7    26th or the 27th, does it?
 8        A.   No.  Right.  It really should have been
 9    before that.
10        Q.   Yesterday, as well, Mr. Lee said he had
11    some documentation showing that I believe you had
12    spent 524 hours working on the audit prior to the
13    filing, not counting the restatement period.  Do you
14    recall that?
15        A.   Yes.
16        Q.   And then he asked you if you'd been working
17    12-hour days for the next two weeks, and I believe
18    you said no because you had another -- what did you
19    say?
20        A.   I had another engagement that I was working
21    on.
22        Q.   Okay.  But nonetheless, Mr. Lee blew past
23    that, and the next time he referred to it, he said
24    you worked 600 hours on the engagement.  Do you
25    remember that?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.

 2        Q.   And then two sentence later that had jumped

 3   up to 650 hours.  Do you remember that?

 4        A.   Yes.

 5        Q.   So just to be clear, if the jury wants to

 6   know -- if it even matters -- how much time you

 7   actually spent on the audit, should they trust what

 8   Mr. Lee said or should they look to some

 9   contemporaneous KPMG documents?

10        A.   Documentation would be better.

11        Q.   Mr. Lee also talked about the engagement

12   team at KPMG employed for the Thornburg audit.  Do

13   you remember that?

14        A.   Yes.

15        Q.   Specifically he asked about Mr. Taylor,

16   about him being put on the initial team because he

17   had special expertise with mortgage-type companies?

18        A.   Correct.

19        Q.   What was the company that Mr. Taylor's

20   expertise came from?

21        A.   Countrywide.

22        Q.   What happened to Countrywide?

23        A.   They went bankrupt.

24        Q.   Like Thornburg?

25        A.   Yes, or they were acquired; more accurate.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1796

1    Q.   Could we go to Exhibit DY, please?  Do you

2  recall this document, Ms. Hall?

3    A.   Yes.

4    Q.   And what is it?

5    A.   This is a memo in our restatement

6  workpapers.

7    Q.   Okay.  Can we go to page 3 of this

8  document, please?  And this was a document where

9  Mr. Lee was talking about the magnitude or the margin

10  calls on February 28, them being of the likelihood of

11  a natural disaster.  Do you remember that?

12    A.   Yes.

13    Q.   Can we find that language, Mr. King?  I

14  don't know exactly where it is.

15    A.   Last sentence in the first paragraph.

16    Q.   So it was the company's position -- so the

17  company's position -- that the magnitude of the

18  decline on February 28 could not have been seen and

19  the likelihood of the occurrence was akin to a

20  national disaster.  Remember, we looked at that

21  schedule of margin calls and we looked at what had

22  happened on February 28, then we compared it to what

23  happened a week earlier, on February 21?

24    A.   Yes.

25    Q.   Do you recall the difference?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   Yes.   The margin call on the 21st was much

2    higher than the margin calls received on the 28th.

3    Q.   Almost $100 million higher; right?

4    A.   Correct.

5    Q.   So basically what management was telling

6    you was, you know, they had an earthquake on February

7    21, then a week later they had a slightly lesser

8    tsunami?

9    A.   That's one way to look at it.

10   Q.   Did you adopt management's interpretation?

11   A.   No.

12   Q.   Mr. Lee also went through some liquidity

13   reports with you and he pointed out that it appeared

14   that there were a couple days in some of the

15   liquidity reports in KPMG's files that did show

16   slightly negative balances.   Do you recall that?

17   A.   Yes.

18   Q.   And I believe you testified that you hadn't

19   seen those prior to today or yesterday or whenever he

20   showed them to you.

21   A.   That's correct.

22   Q.   And when I was asking you questions about

23   the liquidity report, what period were we focusing

24   on?   Remember, we had the audit period, the

25   restatement period, and the investigation period?

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                    Albuquerque, NM 87102
(505) 989-4949                                                (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes.

 2        Q.    What period were we focusing on?

 3        A.    The audit period.

 4        Q.    And you had not seen those in the audit

 5   period, had you?

 6        A.    That's correct.

 7        Q.    And if you had, do you think you would have

 8   done something about it?

 9        A.    Yes, I would have taken them to management

10   to understand why their cash was negative.

11        Q.    And similarly, if Ms. Reinhart had seen

12   such a report, do you think she would have done

13   something with it?

14        A.    Yes.

15        Q.    The same kind of thing?

16        A.    Yes.

17        Q.    Could we go to Exhibit OO, please?  So this

18   is one of those going concern memos that we looked at

19   several of.  Do you see that?

20        A.    Yes.

21        Q.    It's from you.  If we could go to page 7 of

22   this PDF.  If you could blow up the one towards the

23   bottom there.

24              Mr. Lee also asked you about this, and he

25   referenced the $250 million in margin calls that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  Thornburg had received in the last week or so.  Do

2  you remember that?

3       A.   Yes.

4       Q.   And he contrasted that with a number that

5  was 400-something, that was slightly less than half a

6  million dollars, that the company had in available

7  cash at about the same time.  Do you remember that?

8       A.   Yes.

9       Q.   What this reflects -- doesn't this reflect

10 that the company has had around $250 million in

11 margin calls?  And he didn't talk to you about the

12 clause after the comma, "covered by the recent equity

13 offerings."  So what does that mean to you?

14      A.   That means that they had the significant

15 inflow of cash from the equity offerings which would

16 cover the amount of margin calls that were being

17 discussed.

18      Q.   Would cover or the word used is "covered"

19 in the past tense; correct?

20      A.   Right.

21      Q.   So did you understand this to mean that

22 this $250 million had already been covered with the

23 equity raises that Thornburg had made?

24      A.   Yes.

25      Q.   So this doesn't mean that Thornburg was out

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    of cash and it had more than $200 million in margin
 2    calls more than available cash, does it?
 3         A.   No.
 4         Q.   Let's go to Exhibit AV, please.  All right.
 5    So this is -- we looked at this before, as well.
 6    This is your email to Mr. McLamb where you're
 7    forwarding the Thornburg going concern analysis; is
 8    that right?
 9         A.   That's right.
10         Q.   And I believe we established yesterday that
11    the going concern analysis at least was received.  Do
12    you recall the date?
13         A.   No.
14         Q.   Let's go down a little bit, then.  Right
15    here.  So that's an email on the 19th saying you
16    received their documentation yesterday.  Does that
17    refresh your recollection?
18         A.   Yes, February 18.
19         Q.   Now, if we could go to page 6 of this PDF,
20    and if we could highlight that language we looked at
21    a couple of times about margin calls being met on a
22    normal daily basis.  There you go.
23              Mr. Lee talked to you about this language;
24    do you remember that?
25         A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And he said that margin calls made or

2    received are being met, and then he said comma.  Is

3    there a comma in that sentence after "met"?

4    A.   No.

5    Q.   There is not, is there?

6    A.   No.

7    Q.   So what this says is that they're being met

8    and -- not or -- and the change in collateral value

9    is being verified on a normal daily basis.  What do

10   you take that to mean?

11   A.   I took this sentence to mean that as they

12   are receiving margin calls, they're meeting them in

13   the normal course.

14   Q.   And on a normal daily basis?

15   A.   Yes.

16   Q.   Now, if we can go down a couple more

17   paragraphs on the same page, the very last line here.

18   I didn't notice this, up one more paragraph, the last

19   line in the paragraph above that.  I hadn't noticed

20   this until Mr. Lee pointed it out.  So this was

21   received on February 18.  What does it say there?

22   A.   That the company has made all margin calls

23   to date.

24   Q.   That's not true, is it?

25   A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Because they had that Credit Suisse margin
 2   call on the 13th that wasn't met till the 21st.
 3        A.   That's correct.
 4        Q.   This was sent on the 18th.
 5        A.   That's correct.
 6        Q.   So all margin calls had not been met to
 7   date, had they?
 8        A.   They had not.
 9        Q.   On the final version of this, we had that
10   short paragraph that was a sentence or two where it
11   said you had reviewed the daily cash liquidity
12   reports.  Do you recall that?
13        A.   Yes.
14        Q.   And you testified, in fact, that hadn't
15   happened and you meant to, but had not removed it
16   from the memo; is that right?
17        A.   That's correct.
18        Q.   And Mr. Lee was saying, "Well, nobody told
19   us this.  It's been eight years."  Do you remember
20   all that?
21        A.   Yes.
22        Q.   Do you remember having your deposition
23   taken?
24        A.   Yes.
25        Q.   It was taken on December -- in December of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    2012; is that right?
 2         A.   Yes.
 3         Q.   Do you remember the first day, Mr. Lee
 4    spent almost nine hours asking you questions?
 5         A.   Yes.
 6         Q.   Okay.  And then the next day, I got to ask
 7    you questions for about two and a half hours, then
 8    Mr. Lee got another hour and a half?
 9         A.   That sounds right.
10         Q.   Does that sound right?  Okay.  I did check
11    during the break.  Did Mr. Lee ever once ask you a
12    question about that sentence in the going concern
13    memo during those ten and a half hours of
14    questioning?
15         A.   I don't believe so, no.
16         Q.   And he's talked an awful lot about fairness
17    up here.  Do you think it's fair to him to accuse you
18    of not pointing that out when he questioned you for
19    ten and a half hours and didn't even bother to ask?
20         A.   No.
21         Q.   Now, in that same going concern memo -- and
22    I won't pull it up, because I'm not sure exactly
23    where it is -- but it's also got that statement about
24    a decline in values of more than 2 to 3 percent being
25    remote.  Do you recall that?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   Okay.  And you said that you had no reason
 3   to doubt that Mr. Simmons believed that at the time
 4   he said it.
 5        A.   Correct.
 6        Q.   Okay.  But let me ask you this.  If things
 7   changed after he said it and he had reason to doubt
 8   that they would not decline more than 2 to 3 percent,
 9   should he have come to you or Ms. Reinhart or
10   somebody at KPMG and told you?
11        A.   Yes.
12        Q.   And in fact, we looked at emails, the
13   emails about the collapsing hedge fund.  Do you
14   remember those?
15        A.   Yes.
16        Q.   Before the filing of the 10-K; right?
17        A.   Yes.
18        Q.   Nobody came to you and told you about that,
19   did they?
20        A.   No.
21        Q.   In fact, nobody came to anybody at KPMG and
22   told them about that, did they?
23        A.   No.
24        Q.   Mr. Simmons certainly didn't, did he?
25        A.   He did not.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   You were also questioned about that tie-out

2    document that was Exhibit DL that was found in the

3    tie-out workpapers of KPMG.  Do you remember that?

4    A.   Yes.

5    Q.   And Mr. Lee said several times that you're

6    recalling now, eight years later, that, you know, you

7    looked at that for the purpose of tying out that $300

8    million.  Do you remember that?

9    A.   Yes.

10   Q.   Have you ever testified any differently,

11   either in December of 2012 when you had your

12   deposition taken for a day and a half, almost two

13   days, or prior, when you had your investigative

14   testimony taken by the SEC?  Have you ever testified

15   any differently about that document?

16   A.   No.

17   Q.   And in fact, Mr. Lee played three clips

18   from the video, the December 2012 video.  Do you

19   remember that?

20   A.   Yes.

21   Q.   In any one of those clips did you say

22   anything inconsistent with your testimony either

23   today, yesterday, or at any time previously?

24   A.   No.

25   Q.   And when did you receive that tie-out

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                               (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492
                                                                          1-800-669-9492
                                                              e-mail: info@litsupport.com



1    document?

2         A.   The final form 10, this version of the

3    10-K?

4         Q.   Well, this is the version with the three

5    pages that Mr. Lee talked to you about at some

6    length.   When did you receive those three pages?

7         A.   It was right before filing.

8         Q.   So late in the day on February 27?

9         A.   Correct.

10        Q.   Okay.  So you received those well after the

11   emails that we looked at yesterday, saying things

12   like, "All margin calls have been met, margin calls

13   have been met on a normal daily basis," et cetera?

14        A.   Correct.

15        Q.   You received that after all those emails?

16        A.   Yes.

17        Q.   And are you aware that defendants have

18   testified -- both of them have testified that they've

19   never even seen that tie-out document before?

20        A.   No, I was not aware of that.

21        Q.   Are you aware that neither one of them

22   testified that they told anybody at Thornburg to give

23   that tie-out document to KPMG?

24        A.   No, I wasn't aware of that.

25        Q.   Exhibit 284, please.  So Mr. Lee talked to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1807

```
 1    you at length about this document, as well.  Do you

 2    remember that?

 3         A.   Yes.

 4         Q.   That PBC.  What does that stand for?

 5         A.   Prepared by client.

 6         Q.   Prepared by; is that right?

 7         A.   Yes.

 8         Q.   Not provided by?

 9         A.   That's correct.

10         Q.   Because Mr. Lee did a little switch there;

11    right?  He kept saying it was provided by

12    Mr. Rhoades, and Mr. Simmons isn't on any of these

13    emails.  Do you remember that?

14         A.   Yes.

15         Q.   What that says is who it was prepared by;

16    is that right?

17         A.   That's correct, yes.

18         Q.   And it says it was prepared by Mr. Rhoades

19    and Mr. Simmons?

20         A.   Correct.

21         Q.   And that's consistent with all your

22    testimony about Ms. Starrett and Mr. Simmons taking

23    the lead on this, et cetera?

24         A.   Yes.

25         Q.   You were also asked about you only getting
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  this ten minutes before the audit committee meeting.

2  Do you remember that?

3          A.    Yes.

4          Q.    And you said you were looking at it and you

5  may have been looking at it on your screen during the

6  audit committee meeting; correct?

7          A.    Correct.

8          Q.    Regardless, you've had an opportunity to

9  look at this document in some length at this point;

10  right?

11          A.    Yes.

12          Q.    Having had a full opportunity to look at

13  this as much as you wanted to, does it change any of

14  your conclusions about the company's ability to hold

15  or its going concern analysis?

16          A.    For the restatement period, no.

17          Q.    Now, Mr. Lee also asked you about the

18  collapsing hedge fund emails, and he asked you

19  whether you, in fact, audit rumors.  Do you remember

20  that?

21          A.    Yes.

22          Q.    You said you audit all information.

23          A.    We consider all information.

24          Q.    Consider all information.  Thank you.  Now,

25  in either the email that initially Mr. -- I think it

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   was Fellers that sent to Mr. Goldstone and Mr.
2   Simmons, or Mr. Goldstone's email back to Mr. Simmons
3   talking about expecting the 20 percent haircuts, was
4   the word "rumor" used in either one of those emails;
5   do you recall?
6        A.   I don't believe so.
7        Q.   Right.  It was not.  Let's look at Exhibit
8   45 now.  And blow it up so we can see what this is.
9             So this is an email that Mr. Goldstone
10  sends to his board of directors copying Mr. Simmons
11  and Ms. Starrett on February 15.  And can we go down
12  to the second paragraph?  I'm going to have to find
13  it here.  It starts with, "This morning we received a
14  surprising number of margin calls in the amount of
15  $113 million as mortgage security prices in AAA
16  super-senior segment of the Alt-A collateral MBS
17  market suddenly and significantly fell overnight."
18  Mr. Goldstone writes, "Apparently, this decline in
19  prices was the result of an overnight rumor by UBS
20  that they owned $30 to $40 billion of this type of
21  MBS and that they were going to sell it at fire sale
22  prices.  That rumor was subsequently denied by UBS,
23  but nonetheless, it had a very negative impact on MBS
24  prices."
25             So is this Mr. Goldstone acknowledging that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1810

```
 1    rumors in fact, even if they're denied, can have a
 2    very negative impact on mortgage-backed security
 3    prices?
 4         A.   It appears so, yes.
 5         Q.   Now, in Mr. Goldstone's email about this,
 6    he talked about expecting -- about how the collapsing
 7    hedge fund received 20-point haircuts and how he
 8    expected that, as well, although perhaps more
 9    gradually.  Do you remember that?
10         A.   Yes.
11         Q.   And Mr. Lee said -- and he said this twice,
12    actually -- that haircuts change only when a repo
13    agreement matures.  Do you recall that?
14         A.   Yes.
15         Q.   And he said that they can't trigger margin
16    calls.  Do you remember that?
17         A.   Yes.
18         Q.   Would you be surprised to know that Mr.
19    Goldstone testified under oath in 2010 that, in fact,
20    haircuts can be changed by lenders at their whim?
21         A.   No, I did not know that.
22         Q.   Let me just read you what he did say,
23    actually.
24              MR. LEE:  Your Honor, I would just object,
25    reading his out-of-court statements is hearsay.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Is this the deposition or --

 2              MR. McKENNA:  It's a deposition, Your

 3    Honor.  It's a statement of a party opponent.

 4              THE COURT:  I think it needs to be

 5    presented a different way.  Sustained.

 6              MR. McKENNA:  Very well.

 7         Q.  (By Mr. McKenna)  Ms. Hall, do you also

 8    recall Mr. Lee stating that the collapsing hedge fund

 9    had no impact on Thornburg or the decline in their

10    asset values was based upon their filing as opposed

11    to the collapsing hedge fund?

12         A.  Yes.

13              MR. McKENNA:  May I approach, Your Honor?

14              THE COURT:  You may.

15         Q.  (By Mr. McKenna)  Ms. Hall, do you

16    recognize the document I've just handed you?

17         A.  Yes.

18         Q.  What is it?

19         A.  It's an email from myself to Clyde and

20    Cynthia and John Taylor where I'm forwarding an

21    article.

22         Q.  What do you say in your email?

23         A.  I say, "This is the article that TMA,"

24    which is Thornburg, "said set off the margin calls

25    subsequent to file."
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And what is the article that you're

2  forwarding?

3      A.   It's an article about the Peloton hedge

4  fund that went under or had to liquidate a

5  significant amount of securities.

6      Q.   And is that the hedge fund that was

7  referred to in the February 27 emails between Mr.

8  Goldstone and Mr. Simmons?

9      A.   I believe so, yes.

10      Q.   So in fact, is this -- and the email from

11  Mr. Buniel to yourself copying Ms. Starrett, in fact,

12  are they laying blame to the selloff in

13  Thornburg's -- or the decline in value in Thornburg's

14  assets and the margin calls on that collapsing hedge

15  fund?

16      A.   Yes.

17           MR. LEE:  Objection, misstates the

18  document.

19           THE COURT:  Overruled.

20      A.   Yes.

21      Q.   (By Mr. McKenna)  Mr. Lee also questioned

22  you at length about the fact that the unmet margin

23  calls and the untimely met margin calls leading up to

24  the filing of the 10-K on February 28, the morning of

25  February 28, were not specifically called out in your

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1813

1    memorandum.  Do you remember that?

2        A.   Yes.

3        Q.   Are you aware of the amount of the stock

4    price drop that Thornburg's stock took on March 3,

5    2008, when it was disclosed that they had unmet

6    margin calls?

7        A.   I don't recall the amount.

8        Q.   Would you be surprised to know it was over

9    50 percent?

10       A.   That does sound familiar.

11       Q.   And Mr. Lee showed you a lot of KPMG

12   workpapers.  He read various sections to you.  He

13   noted things like check marks on various documents,

14   et cetera.  Do you recall that?

15       A.   Yes.

16       Q.   Ms. Hall, would it be consistent with

17   defendants committing fraud and with lying to their

18   auditors if, in fact, some of those lies made it into

19   KPMG's workpapers?

20            MR. LEE:  Objection, argumentative, lack of

21   foundation.

22            THE COURT:  Overruled.

23       A.   Can you repeat the question?

24       Q.   (By Mr. McKenna)  My question is:  Would it

25   be consistent with claims that defendants lied, Mr.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1   Goldstone and Mr. Simmons lied to KPMG and that they

 2   committed fraud if some of those lies made their way

 3   into KPMG's workpapers?

 4        A.   Yes.

 5        Q.   It would be consistent?

 6        A.   Yes.

 7        Q.   The ability-to-hold question turns on

 8   whether Thornburg as of December 31 had the ability

 9   to hold its ARM assets until recovery or maturity; is

10   that correct?

11        A.   Correct.

12        Q.   What did the unmet margin calls leading up

13   to the filing of the 10-K tell you about that

14   ability?

15        A.   That they did not have the ability to hold.

16        Q.   Okay.  Same question with respect to the

17   default that they received on February 28.

18        A.   That they did not have the ability to hold.

19        Q.   And going back to that restatement where

20   the evaluation, or whatever it was, that didn't have

21   a date next to approved -- were you promoted after

22   the restatement of Thornburg's financial statements?

23        A.   Yes.

24        Q.   What position were you promoted to?

25        A.   I was promoted first to managing director,

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                       1-800-669-9492
                                              e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1815

```
 1    and then to partner.

 2         Q.   And when did those promotions take place?

 3         A.   Managing director was two years ago and

 4    partner was last year.

 5         Q.   Thank you, Ms. Hall.  Nothing further.

 6              THE COURT:  Thank you, Mr. McKenna.

 7              All right, Ms. Hall.  You may step down.

 8              Is there any reason Ms. Hall cannot be

 9    excuse from the proceedings?

10              MR. McKENNA:  There is not, Your Honor.

11              THE COURT:  Mr. Lee?

12              MR. LEE:  No, Your Honor.

13              THE COURT:  All right.  You're excused from

14    the proceedings.  Thank you for your testimony.

15              All right, Mr. McKenna.  Does the SEC have

16    its next witness or evidence?  Mr. Kasper?

17              MR. KASPER:  We do, Your Honor.  We'd call

18    Cynthia Reinhart.

19                        CYNTHIA REINHART,

20         after having been first duly sworn under oath,

21         was questioned, and testified as follows:

22              THE CLERK:  Please be seated.  State your

23    name for the record, please.

24              THE WITNESS:  Cynthia Reinhart.

25              THE COURT:  Ms. Reinhart, Mr. Kasper.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1816

```
1              MR. KASPER:  Thank you, Your Honor.
2                      DIRECT EXAMINATION
3    BY MR. KASPER:
4         Q.   Ms. Reinhart, can you tell the members of
5    the jury where you live?
6         A.   I live in Albuquerque, New Mexico.
7         Q.   And how long have you lived here?
8         A.   Since 1981.
9         Q.   And where do you work?
10        A.   I'm currently retired.
11        Q.   Congratulations.  And when did you retire?
12        A.   September 30 of 2014.
13        Q.   And prior to that, where did you work?
14        A.   For KPMG.
15        Q.   And how long had you worked at KPMG?
16        A.   Since 1986.
17        Q.   And when you retired, what was your
18   position there?
19        A.   I was the managing partner of the
20   Albuquerque office.
21        Q.   And how long had you had that position?
22        A.   Since about 2001.
23        Q.   And was part of your work there related to
24   the conduct of audits of public companies?
25        A.   Yes, it was.
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                      1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

1    Q.   And do you have a rough number of how many

2  audits you worked on in your career?

3    A.   During the time that I was a partner,

4  probably 10 to 12 a year.  And so that was from about

5  1989 till my retirement in 2014.  1998, excuse me,

6  until my retirement in 2014.  So whatever that math

7  is.

8    Q.   I won't try to do it without a calculator.

9  And are those the number of audits that you worked on

10  where you were the engagement partner, or is that a

11  different number?

12    A.   That's where I was the engagement partner.

13    Q.   During the course of your almost 30 years,

14  I suppose, at KPMG, did you have certain areas you

15  specialized in?

16    A.   Yes, I did.

17    Q.   What were those areas?

18    A.   Financial institutions, governmental

19  entities, health care.  Those were a few of the areas

20  that I specialized.

21    Q.   And by financial institution, that would

22  include entities such as Thornburg?

23    A.   Yes, banks, mortgage banks, savings and

24  loans when they existed.

25    Q.   You mentioned you retired.  What are you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    doing now?

2         A.    I serve on the board of a couple of private

3    companies as an advisory board and as a board member.

4    I'm also still active in community organizations, as

5    well.

6         Q.    Why did you retire when you did in 2014?

7         A.    KPMG has a mandatory retirement age for

8    partners, and when I hit that retirement age, I

9    retired in accordance with that policy.

10        Q.    And did your retirement have anything to do

11   with Thornburg or its 2007 audit?

12        A.    No.

13        Q.    Now, did you ever perform work for

14   Thornburg Mortgage?

15        A.    Yes.

16        Q.    And what work did you work for Thornburg?

17        A.    I was the engagement partner for the 2006

18   and the 2007 audits.

19        Q.    Now Ms. Reinhart, you and I have met

20   before; right?

21        A.    Yes.

22        Q.    And you've met with other lawyers from the

23   SEC?

24        A.    Yes.

25        Q.    And was that on more than one occasion?

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 843-9492                                                          FAX (505) 843-9492
                                                                                  1-800-669-9492
                                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   Yes.
 2        Q.   And when we've had those meetings, did I
 3   show you some documents?
 4        A.   Yes.
 5        Q.   And I asked you some questions about what
 6   you knew relevant to your work at Thornburg?
 7        A.   Yes.
 8        Q.   And why did you agree to meet with me?
 9        A.   Because it was the right thing to do.  You
10   had asked, and I thought it was appropriate for me to
11   meet with the government in connection with its case.
12        Q.   And have you met with Mr. Goldstone's or
13   Mr. Simmons' counsel in advance of trial?
14        A.   No.
15        Q.   Had they asked to meet with you?
16        A.   Yes.
17        Q.   Why didn't you meet with them?
18        A.   Because in the recent past I've found that
19   they were not forthcoming with me on certain
20   information that would have been important to us as
21   their auditors.
22        Q.   Now, Mr. King, if you can put up Exhibit
23   LS, please.
24             Ms. Reinhart, this is a letter from you to
25   George Salter.  Is he your lawyer?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   And in the first sentence there, the letter
 3   from the SEC says, "This investigation has been
 4   completed as to your client, Cynthia Reinhart,
 5   against whom we do not intend to recommend any
 6   enforcement action by the Commission."  Do you see
 7   that?
 8        A.   Yes.
 9        Q.   And what is the date of that letter?
10        A.   May 12 of 2012.
11        Q.   Now, did you testify both during the SEC's
12   investigation into the activities at Thornburg as
13   well as in the litigation in this case?
14        A.   Yes.
15        Q.   Okay.  Now, in the testimony in connection
16   with the investigation, was that before or after May
17   15, 2012?
18        A.   Before, as I recall.
19        Q.   And then what about your deposition?  Was
20   it before or after May 15, 2012, the date of this
21   letter from the SEC?
22        A.   It was afterwards.
23        Q.   And at the time of your investigative
24   testimony, did you have any -- were you aware that
25   roughly three years later you would be receiving this
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   letter from the SEC?

 2        A.   No.

 3        Q.   And how about at your deposition, at the

 4   time of your deposition, did you know that you had

 5   received this letter?

 6        A.   I believe my attorneys told me that they

 7   had been notified.

 8        Q.   And was your testimony, both in your

 9   investigative -- during the investigation which

10   occurred prior to you receiving this letter and the

11   deposition which occurred after it, consistent?

12        A.   Yes.

13        Q.   And at all times have you testified

14   truthfully and to the best of your abilities?

15        A.   Yes.

16        Q.   And you're going to do that today?

17        A.   Yes, I will.

18        Q.   Has this letter had any impact on the

19   testimony you offered either during the investigation

20   or your deposition or in this court?

21        A.   No.

22        Q.   Now, I think you may have mentioned this,

23   but what was KPMG's involvement with Thornburg's 2007

24   financial statements?

25        A.   KPMG was the external auditor for the
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



1-800-669-9492
PROFESSIONAL COURT                                                 e-mail: info@litsupport.com
REPORTING SERVICE

 1    company in connection with the 2007 financial

 2    statements.

 3         Q.   Mr. King, can you bring up Exhibit 429,

 4    please?

 5              Ms. Reinhart, do you recognize what this

 6    document is?

 7         A.   Yes.

 8         Q.   What is it?

 9         A.   It's the engagement letter that was

10    provided to the company on June 14 of 2006.

11         Q.   Okay.  Now, there has been some testimony

12    about this. I just want to draw your attention to one

13    particular provision.  If we can go to page 9,

14    please.  And if you can go to the paragraph -- I'm

15    looking at the third paragraph from the bottom.  And

16    in that paragraph the letter states, "Thornburg

17    Mortgage, Inc., agrees that all records,

18    documentation, and information we request in

19    connection with our integrated audit will be made

20    available to us, that all material information will

21    be disclosed to us, and that we will have the full

22    cooperation of Thornburg Mortgage, Inc.'s personnel."

23    Do you see that?

24         A.   Yes.

25         Q.   And this is part of the agreement between

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Thornburg and KPMG in the conduct of its audit?

2        A.   Yes.

3        Q.   And when you refer there to "all material

4    information will be disclosed to us," what do you

5    understand that to mean?

6        A.   It means that anything that either we

7    request or if it is important to the conduct of our

8    audit, it will be provided, whether in writing or

9    orally.

10       Q.   And do you understand that to be a narrow

11   provision or a broad provision?

12       A.   It's a very broad provision.

13       Q.   And does it provide affirmative obligations

14   on Thornburg to provide information?

15       A.   Yes.

16       Q.   And why is a provision like this included

17   in an engagement letter?

18       A.   To make sure that there is no

19   misunderstanding about the responsibility of

20   management with respect to the financial statements

21   which are the -- which belong to management.  The

22   auditor is to express an opinion on the statements,

23   but the financial statements belong to the company.

24       Q.   Now, I believe you indicated that this

25   letter was from 2006.  Was there not a separate

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   letter for 2007?

2       A.   There was an addendum to the 2006 letter

3   that covered the 2007 audit.

4       Q.   So all of the provisions in this letter,

5   including the one we just looked at, were applicable

6   to the 2007 audit?

7       A.   Yes.

8       Q.   Now, Ms. Reinhart, for the conduct of the

9   2007 audit of Thornburg, can you, to the best that

10  your memory permits, tell us who was on the team that

11  conducted that audit?

12      A.   Yes.  Myself.  I was lead audit engagement

13  partner.  There were two additional managers that

14  worked for me.  One was Ms. Jennifer Hall.  She was a

15  senior manager.  The other was Ms. Tara Baucom.

16  There were two senior associates, Matt Plummer and

17  Daniel Acree.  There was a staff person, Meg Jones,

18  that also worked on the audit.  There may have been

19  some additional staff that were engaged from time to

20  time to carry out procedures.  But that was the core

21  team.

22           And then in addition to that, there were

23  other partners and senior managers that were

24  involved.  There was Clyde Womack, who was referred

25  to as the SEC partner.  There was Bob McLamb, who was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    the business unit professional practice partner.
2    There was John Taylor, who helped with what we called
3    the in-depth review.  There were some specialists,
4    Yuval Ron, that assisted with valuation of the
5    company's securities.
6              There was a woman, Anita Agrawal, who
7    assisted with some of the securitization.  And then
8    there was a team that focused on some of the
9    derivatives transactions.  Enrique Tijerina was one
10   of those individuals.  So there were others outside
11   of the Albuquerque office that participated.
12        Q.   Fair to say it was a large team?
13        A.   It was a large team.
14        Q.   And is that unusual in any way for an audit
15   of this kind?
16        A.   No.
17        Q.   And during the conduct of that audit, did
18   certain team members work substantially out of
19   Thornburg's offices?
20        A.   Yes.
21        Q.   And is that unusual for auditors to
22   actually physically be present on a client's -- in a
23   client's office during the conduct of an audit?
24        A.   No.
25        Q.   We've heard during this trial that the team
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    may have worked as many as 5,000 hours on this audit.
 2    Is that possible?
 3          A.   Yes.
 4          Q.   Is that unusual in any way?
 5          A.   No.
 6          Q.   I don't know if you can see the cart over
 7    here.  Let me get it over here for you.  Can you see
 8    that?
 9          A.   Yes.
10          Q.   Now, the defendants have represented that
11    these represent some of the workpapers from that
12    audit.  You can see it's a full cart of papers.  Does
13    that surprise you in any way to see that many papers
14    that would be workpapers prepared in the conduct of
15    the audit?
16          A.   No.
17          Q.   Would it be normal for there to be
18    workpapers in this amount during the conduct of an
19    audit of a client such as Thornburg?
20          A.   It would be normal.
21          Q.   Now, we're going to talk about OTTI and
22    going concern and some related things.  But can you
23    tell the members of the jury the other types of
24    matters that ended up being investigated during the
25    2007 audit?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.   Yes.   There was a lot of time spent on

2  valuing the company's securities.   The company had in

3  some cases easy-to-price securities, but others were

4  very difficult to price.   So we spent a lot of time

5  working with a specialist on evaluating the company's

6  process for valuing its investment securities.

7           Derivative transactions were also very

8  complex, and so we had specialists that were involved

9  in assisting the team with the understanding of some

10 of the application of the accounting associated with

11 derivatives.

12          The issues that surrounded going concern

13 which I'm sure we'll talk about -- those were also

14 complicated.   And in addition to that, the

15 assessments that we made related to the company's

16 ability to hold their securities under the OTTI

17 standards -- those were also part of what we focused

18 our intention on.

19          Securitizations.   The company had

20 complicated securitization transactions where they

21 securitized loans that they either originated or

22 acquired into investment securities and then sold,

23 and the accounting for that was complex.   So those

24 are some of the ones that come to mind.

25      Q.   Is it fair to say lots of issues?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1828

1       A.   Lots of issues.

2       Q.   And those are all documents in the

3   workpapers.

4       A.   Yes.

5       Q.   Okay.  Ms. Reinhart, generally speaking,

6   can you explain to the jury how auditors go about

7   gathering information to conduct their audits?

8       A.   When we begin the process of starting an

9   audit, we plan that audit, and part of the planning

10   process requires us to make some assessments about

11   risk.  The areas that are most risky are then

12   allocated to more experienced auditors, those that

13   are more senior in having dealt with those matters.

14          We then request information from the

15   company in the form of schedules, and those

16   schedules -- some of them are requested in advance,

17   others are requested while we're in the field, and so

18   all of the work that's performed is then gathered,

19   assembled, and subjected to audit testwork.

20          Some of that might be a confirmation

21   process with a third party.  Others would be

22   associated with agreeing information into the

23   company's accounting records, like invoices from

24   vendors and the like, looking at the details of those

25   records.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            And then the results of that testwork get
 2   then bound into a set of workpapers that you see
 3   here, and that forms the body of evidence that then
 4   our audit opinion is based upon.
 5        Q.   And in the conduct of an audit, do you
 6   evaluate every transaction?
 7        A.   No.
 8        Q.   And do you have to rely on the company to
 9   bring certain information to your attention?
10        A.   Yes.
11        Q.   And are different types of information
12   presented to the auditors in different ways?
13        A.   Yes.
14        Q.   Can you give me some examples of how
15   different types of matters are presented to the
16   auditors?
17        A.   Some of the more routine nature would be
18   again pursuant to requests that we make in the way of
19   schedules.  So those would come to us.  Other
20   information we would receive directly through
21   conversations with the company and senior
22   representatives of the company through conversations,
23   meetings, and the like.
24        Q.   What about if there was a significant
25   adverse development?  How would you expect that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1830

```
 1    information to be communicated to you?
 2         A.   I would expect that the company,
 3    management, would come to us and speak to us directly
 4    about those matters.
 5         Q.   What about between, you know, the company
 6    on the one hand and the auditors on the other?  Who
 7    has more -- who knows more about the company's
 8    business?
 9         A.   The company.
10         Q.   Was that true at Thornburg?
11         A.   Yes.
12         Q.   Let's talk for a moment about management
13    integrity.  Is that a concept you're familiar with?
14         A.   Yes.
15         Q.   Now, does an auditor's view of management
16    integrity impact their work?
17         A.   Yes.
18         Q.   Is it something that is focused on during
19    the course of the audit?
20         A.   Yes.
21         Q.   What, if anything, did KPMG do to satisfy
22    itself that there are not problems with management
23    integrity prior to accepting an audit client?
24         A.    Prior to the acceptance of an audit client,
25    we conduct a public record inquiry, background checks
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  of the senior officials of the company.  We talk to

2  their bankers, we speak with their attorneys, others

3  that are -- that know the company in the business

4  community.  We look at information that's available

5  in the public domain to look at the company's

6  filings, to see what kind of matters that are out

7  there in the open.  And then we also then, during the

8  course of the audit, continually evaluate

9  management's integrity in terms of whether they're

10  being truthful to us.

11      Q.   And why is there this focus on management

12  integrity during your work?

13      A.   Because some of the information that's

14  going to come to us is going to be provided orally by

15  the company, and not just from the accounting

16  records.  And so we have to know that we can believe

17  that information.

18      Q.   Now, turning to Thornburg, were you aware,

19  during 2007 and 2008, if Thornburg used something

20  called repo lending?

21      A.   Yes.

22      Q.   I won't walk through all of that.  The jury

23  has heard plenty about that.  But there were a few

24  things I wanted to raise with you.  Was the repo

25  lending governed by written agreements?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    Yes.
 2          Q.    Mr. King, if you can pull up Exhibit 10,
 3    please.
 4                Do you recognize this document, Ms.
 5    Reinhart?
 6          A.    Yes.
 7          Q.    What do you recognize it to be?
 8          A.    This is the repo agreement with Citigroup
 9    and the company.
10          Q.    And does this document contain the terms of
11    Thornburg's repo lending with Citibank?
12          A.    Yes.
13          Q.    And did you have occasion to review this
14    agreement during your work at Thornburg?
15          A.    Yes.
16          Q.    Mr. King, if you could scroll down from the
17    first page to the last.  I think what you'll see, if
18    you can go straight down to the last page, you'll see
19    that it reflects that it's a 41-page agreement; is
20    that correct?
21          A.    Yes.
22          Q.    And is this document signed by a
23    representative of Citibank?
24          A.    Yes.
25          Q.    And a representative of Thornburg?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   Yes.
 2          Q.   Now, Ms. Reinhart, if there was some sort
 3     of modification to this agreement, is that something
 4     that you would have needed to know about in order to
 5     conduct your audit?
 6          A.   Yes.
 7          Q.   Okay.  For example, if the time to meet
 8     margin calls was changed pursuant to some sort of
 9     agreement between Thornburg and Citi, would you have
10     needed to know that?
11          A.   Yes.
12          Q.   Were you ever advised that there had been
13     such a change to this agreement?
14          A.   No.
15          Q.   Now, did Thornburg have agreements similar
16     to this with other lenders?
17          A.   Yes.
18          Q.   And did you also review those?
19          A.   Yes.
20          Q.   Now, in connection with your audit work, do
21     you also know what a margin call is, as that term is
22     used in connection with repo lending?
23          A.   Yes.
24          Q.   And again, I won't walk you through how
25     that works, because I think everybody understands
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    that.  There were a few things I did want to make

2    sure were clear.  If a margin call was issued to

3    Thornburg, how long would they have to pay?

4         A.   The agreement provided for settlement

5    within the day, a day's time.

6         Q.   And if a lender were to issue a margin call

7    to Thornburg, who has the ultimate power to determine

8    the amount of that margin call?

9         A.   The lender ultimately determines the amount

10   of the margin call.

11        Q.   Under the master repurchase agreements, the

12   documents like Exhibit 10 that we were looking at,

13   what were the consequences to Thornburg if they

14   didn't satisfy their margin calls on time?

15        A.   Then the lender could seize the collateral

16   and either sell it or take it for their own

17   portfolio.

18        Q.   And would the lender have to seek

19   Thornburg's permission to do that?

20        A.   No.

21        Q.   It could just do it?

22        A.   Yes.

23        Q.   And what about -- could they declare an

24   event of default pursuant to their repurchase

25   agreement?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1835

```
 1        A.   Yes.
 2        Q.   And if they did declare an event of
 3   default, what consequence would that have for
 4   Thornburg's other repo agreements?
 5        A.   There were what's referred to as
 6   cross-default provisions in those agreements.  If
 7   they were to default on one, then they would be in
 8   default on others, and other of their lending
 9   arrangements, as well.
10        Q.   So did I understand that right, if they
11   defaulted on one, then their other lenders could also
12   default them?
13        A.   Potentially, yes.
14        Q.   All right.  Ms. Reinhart, I'd like to turn
15   to some of the issues that arose during the 2007
16   audit which I understand took place in early 2008; is
17   that right?
18        A.   The end of the field work took place in
19   2008.  But there were other parts of the audit that
20   occurred during 2007.
21        Q.   Now, did there come a time that you learned
22   that Thornburg received more margin calls than usual
23   in the latter part of February 2008?
24        A.   Yes.
25        Q.   And to the extent you remember, can you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   tell the jury what you recall about that?

2         A.   The company informed us that there were

3   excessive margin calls that they were receiving

4   outside the normal level of margin calls in

5   connection with a segment of its portfolio that is

6   referred to as Alt-A collateral.

7         Q.   And what do you understand that to be?

8         A.   It's collateral that -- it's not prime,

9   it's not subprime.  It's kind of in that intermediate

10  classification of collateral.

11        Q.   And from whom did KPMG learn that fact?

12        A.   We learned it -- Ms. Hall told me about it,

13  that it was in connection with the conversation that

14  we were having with the company in that last time

15  period.  So I believe it came through Shawn Buniel

16  and Mr. Simmons and Ms. Starrett.

17        Q.   And did you learn that in connection

18  with -- was there a process going on, in connection

19  with the audit, of analyzing the company's going

20  concern, whether or not the company was a going

21  concern?

22        A.   Yes.

23        Q.   And there was sort of a memo-writing

24  process going on both at Thornburg and at KPMG about

25  analyzing that question?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1837

```
1        A.    Yes.

2        Q.    And is it in connection with that is when

3   you learned about these margin calls?

4        A.    Yes.

5        Q.    Okay.  So the next thing I'd like to turn

6   to is, moving a little forward in time, let's go to

7   Exhibit 81, please.

8              Ms. Reinhart, there has been some testimony

9   about audit committee meetings thus far.  Did you

10  attend audit committee meetings at Thornburg?

11       A.    Yes.

12       Q.    And looking at this document, do you

13  recognize this to be the minutes of an audit

14  committee meeting from February 2008?

15       A.    Yes.

16       Q.    And if you look there on the first line, it

17  says, "The meeting of the audit committee of

18  Thornburg Mortgage, Inc. was duly convened on Friday,

19  February 22, at 3:00 p.m."; is that correct?

20       A.    Yes.

21       Q.    And if you look down a little further,

22  you'll see that it indicates that you attended by

23  telephone?

24       A.    Yes.

25       Q.    And is that consistent with your
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1838

1 recollection?

2     A.   Yes.

3     Q.   Okay.  And then I'd like to draw your

4 attention, if we go to the second page, the section

5 entitled, "Review and approval of annual report on

6 Form 10-K," please.  Do you see that there?

7     A.   Yes.

8     Q.   And this reads, "Mr. Mullin asked the

9 committee members for comments and questions on the

10 10-K.  Members of the committee suggested some

11 language changes, asked questions, and discussed

12 various disclosure items with management.  At the

13 conclusion of the discussion, Mr. Mullin asked if the

14 disclosure committee had met and asked management if

15 they were prepared to sign the certifications in the

16 10-K, to both of which management replied in the

17 affirmative.  A motion to approve the 10-K and

18 recommend that the audited financial statements be

19 included in the 10-K and filed with the SEC was

20 unanimously carried."

21       Do you see that?

22     A.   Yes, I do.

23     Q.   Do you recall a part of meeting that was

24 consistent with what I just read?

25     A.   Yes.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Can you just describe what happened during

2  that part of the meeting?

3    A.   Well, as the minutes say here, the

4  committee members were asking if there were any other

5  revisions that needed to be made to the audited

6  financial statements, the statements that were about

7  to be released, in order for them to be presented

8  fairly and accurately, and if there were any, those

9  would be incorporated and then be ready to file.  So

10 it's part of their due diligence that they're doing

11 as audit committee members.  It's a requirement that

12 they had to approve the filing before it was actually

13 made with the Securities and Exchange Commission.

14    Q.   And I take it this is something that's

15 required to do as you get ready to file your Form

16 10-K; is that right?

17    A.   Yes.

18    Q.   If the audit committee doesn't approve,

19 you're not -- they won't be issued?

20    A.   That's right.

21    Q.   And during -- at any time during that

22 meeting of which you were aware, was there any

23 discussion of there being a $196 million margin call

24 from Citi?

25    A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        Q.   So you discussed whether or not the 10-K
2   could be filed, but nobody mentioned that there was
3   an outstanding margin call from Citi?
4        A.   That's correct.
5        Q.   We'll come back to that.
6             Mr. King, let's go to Plaintiff's Exhibit
7   106, please.
8             All right.  If you would look at this
9   document, you can see that it's an email from
10  Ms. Starrett to Ms. Hall and you, and Mr. Simmons and
11  others were copied on it.  And the cover email says,
12  "The draft language is attached," and then it goes on
13  at the end of that paragraph, it concludes and says,
14  "The amount of the margin calls is shaded because we
15  are still working on documenting that, and we also
16  will update the number up to the time we file."  Do
17  you see that?
18       A.   Yes.
19       Q.   And if you look, if you go to the second
20  page, you see that this is some language that
21  ultimately becomes the recent developments
22  disclosures in the Form 10-K; is that right?
23       A.   Yes.
24       Q.   Okay.  And as to the language we were
25  looking at on the first page, it's making reference
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1841

 1    to those disclosures on the second page; right?

 2         A.   Yes, it is.

 3         Q.   Okay.  And essentially, it's saying that on

 4    the second page -- let's just go to the second page.

 5    You see it says, "Since February 14, 2008, we have

 6    met margin calls in excess of approximately $350

 7    million"; right?

 8         A.   Right.

 9         Q.   Okay.  And what the language on the first

10    page is saying is that that $350 million number may

11    change.  Is that what you understood?

12         A.   That's what we understood, yes.

13         Q.   Okay.  Now, when you received this email,

14    was it the first time you received a communication

15    from Thornburg with these draft recent development

16    disclosures?

17         A.   Yes.

18         Q.   And this document is dated February 26, at

19    6:19 p.m.  Do you see that?

20         A.   Yes.

21         Q.   And when did you actually end up signing

22    your audit opinion?

23         A.   Shortly after midnight on February 28th.

24         Q.   So late at night the following day was when

25    you signed?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                               1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                       e-mail: info@litsupport.com

```
 1           A.   Yes.
 2           Q.   Okay.  Now, and when you received this
 3      document, did you understand it to be true?
 4           A.   Yes.
 5           Q.   And in doing your audit work, did you rely
 6      on it being true?
 7           A.   Yes.
 8           Q.   And as I noted at the beginning, this
 9      document identifies that it's a draft.  Does the fact
10      that it's a draft in some way allow it to not be
11      true?
12           A.   No.
13           Q.   The language, "Since February 14, 2008, we
14      have met margin calls in excess of approximately $350
15      million."  Do you see that?
16           A.   I did see it.
17           Q.   We'll get that there.
18           A.   It's there.  I can see it now.
19           Q.   Okay.  Here we go.  What did you understand
20      that to mean when you received that at 6:00 on
21      February 26?
22           A.   That the company was working on documenting
23      the actual number.  This was the draft of the
24      language that they intended to provide in the 10-K.
25           Q.   And did you understand that that language
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN &ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    was true, that as of the time that you received that,

2    on February 26, that they had, in fact, met margin

3    calls in excess of 350 -- whatever the number turned

4    out to be, that they had, in fact, met those margin

5    calls?

6         A.   Yes.

7         Q.   And if I later show you documents showing

8    that there were outstanding margin calls at 6:00 on

9    February 26, would that not be true?

10        A.   That would not be true.

11        Q.   Now, Ms. Reinhart, I'd like to turn your

12   attention to what I understand to be one of the

13   accounting issues that was being dealt with at the

14   company that's called going concern.  Is that a

15   concept you're familiar with?

16        A.   Yes.

17        Q.   Can you explain for the jury what it means?

18        A.   Well, the condensed version, that means

19   that a company --

20        Q.   Let's stick with the condensed version.

21        A.   -- wouldn't be able to meet their

22   obligations as they would come due.

23        Q.   And is that an analysis that the company

24   and the auditors undertake?

25        A.   Yes.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492
                                                                              1-800-669-9492
                                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      Q.   And what happens if the determination is

2    that there is some substantial concern about whether

3    or not the company is a going concern?

4      A.   If the auditors are unable to satisfy

5    themselves that the company isn't able to continue as

6    a going concern, then the auditor's report is

7    modified, an explanatory paragraph is inserted into

8    the opinion to let the users know that there is this

9    significant uncertainty.

10      Q.   You said an explanatory paragraph.  And

11    using words we might understand, what would that

12    paragraph say?

13      A.   So there would be an additional word in the

14    auditor's report, additional wording that would say

15    that the financial statements have been prepared on

16    the basis that the company would continue as a going

17    concern, but if it's not, if there is substantial

18    doubt, then adjustments would be required and you may

19    not be able to rely upon the fact that the company

20    wouldn't be able to meet its obligations.  So it

21    would be a red flag to an investor.

22      Q.   Is it fair to say it's a way of telling

23    investors that there is some concern that the company

24    might go out of business?

25      A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.    And is that something that, in amongst the

2    world of public companies and auditors, is a pretty

3    big deal?

4        A.    Yes.

5        Q.    And why is it a big deal?

6        A.    Because if a company has a going concern

7    opinion, then its lenders and investors wouldn't be

8    very interested in continuing financial arrangements

9    with them going forward.

10       Q.    And now, thinking back specifically to

11   Thornburg, what would have been the impact at

12   Thornburg if there was such language put into your

13   opinion?

14       A.    They wouldn't have been able to access the

15   capital markets to raise money in an equity offering

16   with the Securities and Exchange Commission, and

17   their lenders would have been concerned about

18   continuing their borrowing arrangements, as well.

19       Q.    And are both of those things things that

20   you understood that Thornburg pretty much had to have

21   to continue in business?

22       A.    Yes.

23       Q.    Now, as of what date do you make the going

24   concern determination?

25       A.    That determination is made right up to the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   date of the report.

 2        Q.   And so in Thornburg's case, the report is

 3   February 28, whereas the sort of the balance sheet

 4   date was December 31.  So this is a decision made not

 5   at December 31, but on February 28?

 6        A.   February 27 was our report date, and so

 7   that's the date that we made that determination.

 8        Q.   And you consider information right up until

 9   the time that you sign your opinion?

10        A.   Yes.

11        Q.   I want to turn now to the Thornburg going

12   concern memo.

13             MR. KASPER:  Actually, I have a binder of a

14   handful of exhibits that I think I'd like to show the

15   witness.  If it's okay, I'll give those to her.

16             THE COURT:  You may.

17        Q.   (By Mr. Kasper)  I'll still likely put them

18   up on the screen, but these might be useful to you,

19   as well.

20             Now, Mr. King, if we can turn to Exhibit

21   240, please.

22             All right.  You can look on your screen or

23   in your binder, either one.

24        A.   Okay.

25        Q.   And I just want to make sure that you know

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492
                                                         e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1847

```
1    we're not just directing you to the wrong thing or
2    something for some of these documents or some of the
3    larger documents.
4              So this document is addressed to Larry
5    Goldstone, Clay Simmons, Jane Starrett, and the file.
6    Do you see that?
7        A.   Yes.
8        Q.   And it's dated January 29?
9        A.   Yes.
10       Q.   And do you understand that that date is
11   correct as to the final version of this memorandum?
12       A.   No, it was updated subsequent to that date.
13       Q.   And looking there at the first paragraph,
14   what do you understand Thornburg's purpose was in
15   preparing this memo?
16       A.   The purpose of the memo was to support
17   management's assessment of the company's ability to
18   continue as a going concern.
19       Q.   And the last thing is, if you can go down
20   to the bottom right-hand part of the page.  There you
21   go.  This document has what the lawyers call a Bates
22   number there.  It begins KPMG.  What do you
23   understand that to mean?
24       A.   That means it came out of our working
25   papers on that cart.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1848

```
 1        Q.    And the handwriting right above that -- can
 2   you explain what you understand that to mean?
 3        A.    There are my initials and three dates, and
 4   those are the three dates that I reviewed the memo.
 5        Q.    Is that part of the way that you know that
 6   there were multiple drafts of this document?
 7        A.    Yes.
 8        Q.    And were these drafts prepared after the
 9   balance sheet date and going forward up to nearly the
10   time of filing of your audit opinion?
11        A.    Yes.
12        Q.    Now, Ms. Reinhart, are you aware, does this
13   document reach a conclusion about whether or not
14   Thornburg is a going concern as we've been talking
15   about that term?
16        A.    Yes.
17        Q.    And what conclusion does it reach?
18        A.    It reaches a conclusion that the company
19   believes they will be able to continue as a going
20   concern.
21        Q.    And as part of KPMG's audit work, did you
22   rely on that conclusion?
23        A.    Yes.
24        Q.    And the other documents that are contained
25   in this document?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes.

 2        Q.    And knowing what you now, do you believe

 3   that that conclusion is correct?

 4        A.    No.

 5        Q.    We'll come back to that.  249, please.

 6              Now, Ms. Reinhart, in addition to

 7   Thornburg's memo we were just looking at, did KPMG

 8   also prepare a memo addressing these issues?

 9        A.    Yes.

10        Q.    And is that this memo?

11        A.    Yes.

12        Q.    And this one also has multiple dates on it.

13   It's dated February 20, 2008; February 27, 2008; and

14   March 2, 2008.  Do you see that?

15        A.    Yes.

16        Q.    And does that again reflect the multiple

17   drafts?

18        A.    Yes.

19        Q.    And who wrote this document?

20        A.    Jennifer Hall.

21        Q.    And again looking down at the bottom

22   right-hand part of the document, do you see your

23   initials and your handwriting there again?

24        A.    Yes.

25        Q.    And what does that mean?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1850

```
 1        A.   It means that I reviewed it on those three

 2   dates, different drafts.

 3        Q.   Okay.  And then if you -- looking back up

 4   to the first paragraph of the memo, or just if you

 5   recall, what is the purpose of KPMG drafting this

 6   document?

 7        A.   This memo documents our consideration of

 8   the key assumptions that management made in its memo,

 9   and also audit testwork that we performed to validate

10   some of the information that was provided by

11   management in reaching its conclusions.

12        Q.   And can you explain to us the process for

13   how this memo gets prepared?  Who all is involved in

14   the drafting and so on?

15        A.   The memo was initiated by Ms. Hall, and we

16   talked about it in advance of her preparing the memo

17   in terms of the things that we thought that it would

18   include.  She prepared the first draft.  It was then

19   subjected to a series of reviews, myself being one of

20   them, and then several other partners that

21   participated in the review, which included our SEC

22   partner, our in-depth reviewing partner, and our

23   business unit professional practice partner, Mr.

24   McLamb.  And we discussed various elements of the

25   memo and once everyone was satisfied that their
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  questions had been answered, a final draft was then

2  prepared and put in the workpapers, and the memo was

3  essentially finalized then.

4      Q.   So during the drafting, you send around

5  comments to each other about what you think about

6  various parts of the draft?

7      A.   Yes.

8      Q.   And then does the final draft reflect sort

9  of everyone's views?

10     A.   Yes.

11     Q.   And did you approve of the final draft?

12     A.   Yes.

13     Q.   And did you have discussions with anyone at

14  Thornburg, as part of reviewing this memo and

15  preparing -- as part of reviewing the Thornburg memo

16  and preparing the KPMG memo that we've been looking

17  at?

18     A.   Yes.

19     Q.   We'll come back and talk about those.  And

20  what conclusion did KPMG reach in this memo regarding

21  going concern?

22     A.   We reached a conclusion that the company

23  had the ability to continue as a going concern.

24     Q.   And do you now believe that conclusion to

25  be correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1852

```
 1        A.    No.
 2        Q.    We'll come back to that, as well.
 3              All right.  Now I'd like to turn,
 4   Ms. Reinhart, to the other principal accounting
 5   determination we've been discussing, which is the
 6   OTTI determination.  Is that something you know
 7   about?
 8        A.    Yes.
 9        Q.    And how do you know about it?
10        A.    Because it is an accounting standard that
11   is certainly one that's important in the audit of a
12   financial institution that holds investment
13   securities, so it's through my past experience in
14   dealing with the issue.
15        Q.    So it had come up with other clients; is
16   that fair to say?
17        A.    Yes.
18        Q.    And it was also an issue at Thornburg?
19        A.    Yes.
20        Q.    And do you ultimately -- if you determine
21   that certain securities have been impaired at the
22   balance sheet date, in Thornburg's case December 31,
23   is that when you have to conduct an OTTI
24   determination?
25        A.    Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1853

```
 1        Q.   And at what date do you reach that
 2   determination?
 3        A.   As of the date of the auditor's report,
 4   February 27th, 2008.
 5        Q.   And so you consider information all the way
 6   up to the time of filing the Form 10-K?
 7        A.   Yes.
 8        Q.   And at Thornburg, was it determined that
 9   certain assets were impaired?
10        A.   Yes.
11        Q.   And was an OTTI analysis performed by
12   Thornburg?
13        A.   Yes.
14        Q.   And was that in the same document that we
15   were just looking at a few moments ago?
16        A.   Yes.
17        Q.   And do you know, do you recall from that
18   memorandum what the conclusion was about whether or
19   not Thornburg had the intent and ability to hold
20   those impaired assets?
21        A.   The conclusion was that the company had the
22   intent and ability to hold the assets through their
23   recovery.
24        Q.   Mr. King, if you can put up PX 240 and go
25   to page 10, please.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        And if you can look at the very first

2   paragraph on that page.  Now, if you look there at

3   the second sentence, beginning of the second

4   sentence, the memo -- this is Thornburg's memo --

5   says, "As the company has the ability and intent to

6   hold its purchased ARM assets until recovery, losses

7   are not considered to be other than temporary

8   impairments.  The basis for the company's ability to

9   hold these securities is predicated on its ongoing

10  profitability, liquidity position, and ability to

11  continue to make margin calls as discussed above."

12  Do you see that?

13       A.   Yes.

14       Q.   And did you understand this to be

15  Thornburg's basis for concluding that it had the

16  intent and ability to hold its impaired assets?

17       A.   Yes.

18       Q.   And if KPMG was not provided truthful and

19  complete information about Thornburg's ongoing

20  profitability, would that impact KPMG's ability to

21  adequately analyze Thornburg's OTTI conclusion?

22       A.   Yes.

23       Q.   And what if KPMG was not provided complete

24  information about Thornburg's liquidity situation?

25       A.   The same thing.  We wouldn't be able to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    reach a conclusion, as well.

2        Q.   And what if KPMG was not provided complete

3    information about Thornburg's ability to continue to

4    make margin calls?

5        A.   The same answer.  That would be important

6    to the conclusions that we were reaching.

7        Q.   And do you believe that the conclusion

8    that's reflected here on page 10 of the Thornburg

9    going concern memo is correct?

10       A.   No.

11       Q.   We'll come back to that, too.

12            Now, did KPMG also analyze the question of

13   whether or not Thornburg's impaired assets were other

14   than temporarily impaired?

15       A.   Yes.

16       Q.   And does that take place in the Thornburg

17   going concern memo we were looking at?

18       A.   It's documented in both memos.  We look at

19   the company's memo, but then we have our separate

20   independent memo that evaluates our assessment and

21   comes to a conclusion about that.

22       Q.   In doing that analysis, can KPMG rely on

23   Thornburg's conclusion that we just looked at?

24       A.   Yes.

25       Q.   And what did KPMG conclude in its

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492
                                                                       1-800-669-9492
                                                               e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1856

 1    memorandum?

 2         A.   We concluded that the company didn't have

 3    permanent impairment.  So the impairments that they

 4    had on their securities were not considered to be

 5    other than temporarily impaired.

 6         Q.   Okay.  Now, before we move away from OTTI

 7    for a minute, I want to ask you, do you know who

 8    James Kroeker is?

 9         A.   No, I don't recognize that name.

10         Q.   Do you know who Rachel Mincin is?

11         A.   No.

12         Q.   Did anyone at Thornburg ever mention them

13    to you, in your recollection?

14         A.   No.

15         Q.   Did anybody ever tell that you they were

16    relying on what Mr. Kroeker and Ms. Mincin thought

17    about OTTI in reaching their OTTI determinations?

18         A.   No.

19         Q.   We've talked about this a little bit.  I

20    want to make sure I'm clear.  What I want to talk to

21    you about is what information you consider in

22    reaching the going concern and OTTI determinations.

23    I'm sorry, in reaching the OTTI determinations.  So

24    my first question is:  In conducting the OTTI

25    analysis, you considered information after the



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   balance sheet date, which, in Thornburg's case, was

2   December 31?

3        A.   Yes.

4        Q.   So let's take a look at Plaintiff's Exhibit

5   240, which was Thornburg's going concern memo.

6             And Mr. King, if you could put up the

7   bottom half of page 2, please.

8             So this is Thornburg's consideration of

9   its -- of the memorandum in which they made an OTTI

10  determination; correct?

11       A.   Yes.

12       Q.   And can you tell me -- and there is this

13  table.  Do you see the table there, table 1?

14       A.   Yes.

15       Q.   And it's entitled "Detailed historical

16  spread for 2007 and January 2008"?

17       A.   Yes.

18       Q.   And it lists certain spread information,

19  whatever that is, and can you tell me what time

20  periods it considers?

21       A.   It considers all the quarters of 2007 and

22  the first month of January 2008.

23       Q.   So this would be an example of Thornburg

24  explicitly considering information that occurred

25  after the balance sheet date in connection with

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    reaching its OTTI determination?

2        A.    Yes.

3        Q.    And just to look at one other example,

4    let's go to page 4 of 15, please.

5            THE COURT:    Mr. Kasper, when you find a

6    good breaking point --

7            MR. KASPER:    Just one moment and I will.

8            THE COURT:    Certainly.

9        Q.    (By Mr. Kasper)  And looking here, can we

10   blow up the first paragraph of page 4 of 15, please?

11   And if you look there, in the second sentence it

12   says, "For now, CP" -- and that refers to commercial

13   paper; correct?

14       A.    Yes.

15       Q.    "For now, CP is nearly nonexistent in the

16   marketplace for MBS products.  The company does not

17   expect that borrowing from CP facility will be

18   available in the near future, and has not planned on

19   gaining access to that financing for 2008.  As such,

20   of the $400 million in CP financing at year end, $100

21   million matured in January 2008 and was placed on

22   repo, and the remaining $300 million will mature by

23   the end of February 2008."  Do you see that?

24       A.    Yes.

25       Q.    Is that another example of Thornburg



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                   1-800-669-9492
                                                          e-mail: info@litsupport.com

```
 1    explicitly considering the events of January and
 2    February 2008 in connection with reaching its OTTI
 3    determination?
 4         A.   Yes.
 5         Q.   Okay.  Let's take our break.
 6              THE COURT:  All right.  We'll be in recess
 7    for about 15 minutes.
 8              (The jury left the courtroom.)
 9              THE COURT:  All right.  Anything you need
10    to discuss?
11              MR. McKENNA:  No, Your Honor.
12              THE COURT:  Mr. Lee?
13              MR. LEE:  No, Your Honor.
14              THE COURT:  All right.  We'll be in recess
15    for a few minutes.
16              (The Court stood in recess.)
17              (The jury entered the courtroom.)
18              THE COURT:  All right, Ms. Reinhart, I'll
19    remind you that you're still under oath.
20              Mr. Kasper, if you wish to continue your
21    direct examination of Ms. Reinhart, you may do so at
22    this time.
23              MR. KASPER:  Thank you, Your Honor.
24              THE COURT:  Mr. Kasper.
25         Q.   (By Mr. Kasper)  Ms. Reinhart, what does it
```

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                                FAX (505) 843-9492
                                                  1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    mean to tie-out a Form 10-K?

2         A.    It means that the auditors take the Form

3    10-K and agree the amounts to underlying information

4    that's in the workpaper files that you see there.

5         Q.    When you say the amounts, what are you

6    referring to?

7         A.    It might be any numbers that are in there,

8    the balance sheet information, the income statement

9    information, the footnote detail information that's

10   contained in management's discussion and analysis,

11   things of that nature.

12        Q.    Lots of numbers in a 10-K?

13        A.    Lots of numbers in a Form 10-K.

14        Q.    It's a big job?

15        A.    It's a big job.

16        Q.    Let's take a look at Exhibit DL, please.

17              Do you recognize this document, Ms.

18   Reinhart?

19        A.    Yes.

20        Q.    What do you recognize this to be?

21        A.    This is the version of the Form 10-K that

22   was filed with the SEC.  We call it the EDGARized

23   version.

24        Q.    And is this the document from KPMG's

25   workpapers?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1861

```
 1          A.   Yes.

 2          Q.   And Mr. King, if you can highlight the

 3    handwritten note there in the middle of the page.

 4               Do you see that, Ms. Reinhart?

 5          A.   Yes.

 6          Q.   And what does that note tell you about what

 7    this document is?

 8          A.   It says here that -- take a look at another

 9    10-K that's at GB-H-3, so the majority of the tie-out

10    is contained there, and if there is anything that's

11    been added since then, it's contained in this

12    version.

13          Q.   And when is the EDGARized version of the

14    document prepared?

15          A.   It's pulled down from the SEC website after

16    the filing.

17          Q.   It's late in the process?

18          A.   Yes, it's very late in the process.

19          Q.   So by virtue of the fact this is the

20    EDGARized version, I'm just trying to determine if we

21    can conclude when you might have received this.

22          A.   It would have been after the filing, the

23    28th of February 2008, potentially.  We put it in the

24    file, as I recall, on March 3, 2008.

25          Q.   If you'd like to look at your handwritten
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    notes down at the bottom of the page.  And what does

2    that indicate to you?

3         A.   That indicates that we pulled it down on

4    March 3, as you can see the typed date there on the

5    right, and that I signed off on it on March 3 of

6    2008.

7         Q.   Okay.  And so that note revealed that there

8    is some other document that ties out many of the

9    numbers in the 10-K, but there are -- some of the

10   numbers are tied out in this document; is that right?

11        A.   Yes.

12        Q.   All right.  If you can turn to the pages

13   that are Bates-stamped 52, 53 and 54, and this is one

14   that's in your binder and may be helpful to you to

15   look at in your binder.

16        A.   Which tab is this one?

17        Q.   It's DL.  And I want to start off by asking

18   if you could take a look at pages 52, 53, 54 -- the

19   jury has seen these pages many times now -- and just

20   ask you if you know the circumstances under which

21   those documents were provided to KPMG.

22        A.   My understanding is, these were provided to

23   us as a tie-out for the footnote disclosure in the

24   subsequent events.

25        Q.   Is that the $300 million worth of margin

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   call number that we've talked about, or that's been
 2   discussed?
 3        A.   Yes.
 4        Q.   Do you know if these pages were provided
 5   together or they came separately?  Or do you not
 6   know?
 7        A.   I do not know.
 8        Q.   And do you know if you reviewed them prior
 9   to filing the Form 10-K?
10        A.   I don't believe I did.
11        Q.   And is that informed by the note you saw on
12   the front page of the Form 10-K?
13        A.   Yes.
14        Q.   Now, these three pages -- were they
15   provided to KPMG in connection with the going concern
16   analysis we were discussing before the break?
17        A.   No.
18        Q.   And if they were provided in connection
19   with that, would it have been analyzed and
20   memorialized and reflected in those going concern
21   memos?
22        A.   Yes, it would have been included.
23        Q.   And was this document provided to KPMG, to
24   your knowledge, in any way in connection with the
25   OTTI analysis?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1864

```
 1        A.    No.
 2        Q.    For what purpose did KPMG gather these
 3   documents and review them?
 4        A.    They were gathered to support the footnote
 5   disclosure called the subsequent events footnote in
 6   the audited financial statements.
 7        Q.    Do you know if this was one of the last
 8   things that KPMG received prior to signing the audit
 9   opinion?
10        A.    Yes.
11        Q.    Now, if you assume that you can discern
12   from these three documents that Thornburg did not pay
13   its margin calls on a single day, do you believe that
14   this would constitute appropriate communication of
15   that fact?
16        A.    No.
17        Q.    How would you expect that fact to be
18   communicated to yourself and the KPMG audit team?
19        A.    We would expect senior management to come
20   to me or Ms. Hall and talk to us about the
21   circumstances around the margin calls.
22        Q.    Would you expect that it would have been
23   incorporated and analyzed into their going concern
24   memo?
25        A.    Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1865

1     Q.    Would you have expected it would have been

2     given prior to the last day before you signed your

3     audit opinion?

4     A.    Yes.

5     Q.    You can set that one aside.

6           I've been trying to move forward in time

7     from when you learned about these additional margin

8     calls up through the audit committee meeting and the

9     recent developments language and some of the other

10    events we've talked about.  And so now we're getting

11    to the point where I think it's about time that KPMG

12    is going to sign its audit opinion.

13          But before we talk about your audit opinion

14    and your signing on February 27, I want to show you

15    some things to see if you were aware of them at the

16    time that you did sign that audit opinion.  So the

17    first thing I'd like to show you is Plaintiff's

18    Exhibit 81, and you'll recognize that this is the

19    audit committee minutes that we were looking at

20    before.  And we talked about these before, that they

21    indicated that the meeting began at 3:00 p.m.  But

22    the first thing that happened, if we go to the top of

23    the second page, Mr. King, is that there was an

24    executive session.  Do you recall if you were

25    included in that executive session?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        A.    I don't believe I was, no.

2        Q.    And in the middle of that paragraph there,

3    it says, "Mr. Simmons advised the committee that the

4    company had received a large margin call from Citi.

5    He said that the company had worked out a schedule

6    with Citi to meet the requirement and anticipated

7    fully meeting it and any other liquidity requirements

8    by the time the 10-K is filed."  Were you told that

9    during that meeting?

10       A.    No.

11       Q.    Were you told that information prior to the

12   time that you signed your audit opinion?

13       A.    No.

14       Q.    Would that have been important information

15   for you have prior to signing the audit opinion?

16       A.    Yes.

17       Q.    And why would that information have been

18   important to you?

19       A.    Because it was critical information related

20   to the company's liquidity struggles at that

21   particular point in time.

22       Q.    Now, let's take a look at Plaintiff's

23   Exhibit 58, please.  So that related to the Citi

24   margin call.  This document relates to a margin call

25   from Credit Suisse.  If you look at this document,

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                         1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                            e-mail: info@litsupport.com

```
 1    it's dated February 20, and it's from someone
 2    named -- and I'm looking at the second email -- it's
 3    from someone named Tanya Miller, if you can go
 4    through the entire email including the signature
 5    block.  It's from Ms. Tanya Miller to Digna Rivera,
 6    and it says, "Regards Tanya R. Ferrier, Credit
 7    Suisse."  Let me draw your attention to this.  It
 8    says, "Thornburg remains in call for," and there's
 9    three rows of information there.
10            Can you look at that and tell me what you
11    understand that to communicate?
12        A.   It's communicating, the first line, that
13    there is $50 million that's outstanding and hasn't
14    been satisfied for two days.  There is a $9.5 million
15    that's outstanding for one day.  Then there is a
16    $16.7 million call that is a new call, for a total of
17    $76.6 million.
18        Q.   And did you receive this document prior to
19    the time that KPMG signed this audit opinion?
20        A.   No.
21        Q.   And do you believe it would have been
22    important for you to receive this document?
23        A.   Yes.
24        Q.   Were you otherwise provided this
25    information about these outstanding margin calls?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1868

1        A.    No.

2        Q.    All right.  Let's take -- I want to draw

3    your attention now to some additional emails that I'm

4    going to show you that are a series of emails that

5    Mr. Goldstone wrote to the board of directors of

6    Thornburg.  The first one is Plaintiff's Exhibit 45,

7    if we could put that on the screen, Mr. King.

8            And you'll see that this is an email from

9    Larry Goldstone to the board of directors, and copies

10   Mr. Simmons there.  And you see it's sent February

11   15, 2008, at 4:44 p.m.  Do you see that?

12       A.    Yes.

13       Q.    And drawing your attention to the first

14   paragraph, he says -- Mr. Goldstone writes,

15   "Beginning today, we are going to try a new

16   management communication process with the board in

17   order to facilitate better communication of

18   information in a more timely and consistent fashion

19   than may have been true in the past.  Each Friday,

20   Clay, Paul, and I will collaborate on a weekly

21   summation of various subjects, including financing,

22   liquidity, mortgage spreads, origination activity,

23   capital raising, and anything else that we think may

24   be of interest."

25            So my question is:  Did you see this?  Were



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1869

```
1   you provided this document prior to the time that
2   KPMG signed its audit opinion?
3        A.   No.
4        Q.   Were you told that Mr. Goldstone and Mr.
5   Simmons had begun a new process of communicating
6   information about liquidity and financing and
7   origination activity and capital raising to the board
8   of directors?
9        A.   No.
10       Q.   Now I'd like to draw your attention to some
11   of the items in this email.  If we look at the next
12   paragraph from the one I was reading from, the second
13   sentence there says, "Over the past several weeks the
14   mortgage market has once again developed an
15   increasingly negative tone."  Is that information
16   that was communicated to you by Mr. Goldstone?
17       A.   No.
18       Q.   And if you look further down in that
19   paragraph it says, "This morning we received a
20   surprising number of margin calls in the amount of
21   $113 million," and then further down it says,
22   "Fortunately, we were able to meet or negotiate a way
23   to meet all of those margin calls."
24            And then if we look down to the second
25   page, the last paragraph prior to the closing, Mr.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1870

```
 1   Goldstone wrote, "That is it for now.  Markets remain
 2   difficult and we are working diligently to continue
 3   to do what we need to do to get through it."  Do you
 4   see that?
 5        A.    No.  That must be the next --
 6        Q.    The next paragraph?
 7        A.    -- paragraph.  Yes, I see that now.
 8        Q.    And again, was this a document that was
 9   given to you prior to the time that you completed
10   your audit opinion?
11        A.    No.
12        Q.    And do you believe this would have been
13   important information to have?
14        A.    Yes.
15        Q.    And why would this information have been
16   important to you?
17        A.    Well, because, again, it conveys the
18   difficulty that the company was facing at that time
19   in meeting margin calls, and also that they weren't
20   meeting margin calls on a daily basis, which is not
21   consistent with what they were telling us.
22        Q.    And why would it be important if they were
23   not meeting margin calls on a daily basis?
24        A.    Because the terms of the reverse repurchase
25   agreements required that they meet them and it would
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    be contradictive to the OTTI assertion at least that

2    the company was making to us at that time.

3        Q.   Okay.  Mr. King, if we can put up

4    Plaintiff's Exhibit 62.  And that prior document was

5    from February 15, and this next one is from February

6    21.  And again, it's from Mr. Goldstone to members of

7    the board and it copies Mr. Simmons.

8            I won't walk through all of this, but I

9    want to just point to, I guess, right there, the last

10   sentence in the paragraph begins, "We plan to meet

11   this call with the following strategies," and it

12   lists eight different things about how they're going

13   to meet a margin call from Citi.  Is that information

14   that was provided to you during the course of your

15   audit work?

16       A.   No.

17       Q.   Is that information that would have been

18   important for you to see?

19       A.   Yes.

20       Q.   Let's take a look at Plaintiff's Exhibit

21   85.  This is from the next day, February 22.  Mr.

22   Goldstone sends yet another email to his board of

23   directors.  And Mr. Goldstone writes, "Here is a

24   recap of yesterday's events regarding margin calls

25   and our progress in developing and executing plans

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    and strategies to meet them."

2            In the next paragraph he said, "We did

3    receive some additional margin calls yesterday," and

4    then prior to the numbered paragraph, the paragraph

5    that has numbers in it, he says, "The highlights from

6    yesterday are as follows," and he lists a whole

7    variety of things.

8            Was that information that was provided to

9    you prior to the time that you reached your audit

10   conclusion?

11       A.   No.

12       Q.   And would it have been helpful to you to

13   have seen Mr. Goldstone's email to the board

14   describing these activities at that time?

15       A.   Yes.

16       Q.   Would it have been important to you to see

17   this information?

18       A.   Yes.

19       Q.   Let's take a look at Plaintiff's Exhibit

20   95.   This is from February 25, another email from Mr.

21   Goldstone to the board.   And again he's discussing --

22   in the first paragraph he says, "We were able to send

23   Citibank $60 million and Greenwich $20 million for

24   net reduction of $80 million in margin call."

25            Then a couple sentences down he says, "We

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  believe we owe Citi just under $100 million today."

2     And then he goes on to talk about the

3  timing of the filing of the 10-K.  Again, was this

4  information that was provided to you prior to the

5  time that you filed your audit opinion?

6    A.  No.

7    Q.  And would it have been important to you?

8    A.  Yes.

9    Q.  Now, Ms. Reinhart, before going to the next

10  category of documents that I think you haven't seen,

11  Mr. Lee, one of the lawyers for the defendants, asked

12  your partner, Bob McLamb, some questions during his

13  testimony suggesting that Mr. McLamb should have

14  talked to the authors of the documents or read

15  transcripts or something like that before he

16  testified to the jury.  I have a couple of questions

17  about that assertion.  First, do you need any help

18  understanding Mr. Goldstone's words in these emails?

19    A.  No.

20    Q.  And as an auditor with almost 30 years of

21  experience, what do you think is a more reliable

22  source of information?  The words of the documents

23  written in 2008 or what the defendants on trial say

24  they mean?

25    A.  As they were written in 2008.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1874

1     Q.   All right.  Thank you.  Mr. King, let's put

2  up Plaintiff's Exhibit 88, please, and go to the

3  second page of that document.  Now, if you can put up

4  the whole body of the letter, please.

5        This is a February 21 letter from Citi to

6  Thornburg Mortgage.  You can see the attention line

7  is Larry Goldstone and Clay Simmons and Nate Fellers.

8  And it says it's regarding the global master

9  securities lending treatment dated as of September

10  20, 2007.  Do you understand that to be the document

11  that we looked at before the break?

12     A.   Yes.

13     Q.   And in the first paragraph it closes by

14  saying, "As a result of the breach in accordance with

15  paragraph 14.1(ii) of the agreement, Citi now has the

16  right to declare an event of default to have

17  occurred."  Do you see that?

18     A.   Yes.

19     Q.   Can you tell me what you understand that to

20  mean?

21     A.   It means that because the company hasn't

22  met the margin calls in accordance with the terms of

23  the agreement, settling on a daily basis, Citi has

24  the right to accelerate and either seize the

25  securities or sell the securities.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        Q.   And did Citi need to seek Thornburg's

 2   permission to do those things?

 3        A.   No.

 4        Q.   Now, during -- prior to the time that you

 5   signed your audit opinion, were you told that

 6   Thornburg had received this letter?

 7        A.   No.

 8        Q.   Again going back to Mr. Lee's questions to

 9   Mr. McLamb about talking to the authors of the

10   documents before you received them, and so forth, is

11   there anything that Mr. Simmons or Mr. Goldstone

12   could say to you to explain their failure to provide

13   this document prior to the time of your signing the

14   audit opinion?

15        A.   No.

16        Q.   Do you believe this is something that would

17   have been important for you to see?

18        A.   Yes.

19        Q.   How would it have affected your work on the

20   audit?

21        A.   It would have been both important to our

22   conclusions about the company's ability to continue

23   as a going concern, and their ability to hold their

24   securities until recovery under the OTTI analysis.

25        Q.   Did you ever ask for this, for documents of

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                   1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  this type from Thornburg?

2       A.   Yes.

3       Q.   And was it given to you in response to that

4  request?

5       A.   No.

6       Q.   All right.  We'll look at that a little bit

7  later.

8            Let's go to Plaintiff's Exhibit 75, please.

9  Now, if we can go to the second page first, Mr. King.

10 The third page.  Thank you.

11           Ms. Reinhart, do you recognize the form of

12 this document?

13      A.   Yes.

14      Q.   And what do you recognize it to be?

15      A.   This is the company's cash liquidity

16 report, the 45-day liquidity report that they

17 developed in early 2008.

18      Q.   And do you have an understanding of how

19 often these documents were prepared?

20      A.   Yes.

21      Q.   How often were they prepared?

22      A.   My understanding, they were prepared on a

23 daily basis.

24      Q.   So there was a new one for every day?

25      A.   Yes.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492
                                                      e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1877

1    Q.   And this one, if we can look on the

2  right-hand side, if we can see the date one, I

3  believe this one is dated February 21.   The top

4  right-hand side, Mr. King.

5         Do you see that?

6    A.   Yes.

7    Q.   And if we can look at the date on the left

8  and compare that to the cash balance on the right, I

9  want to ask, do you have an understanding of whether

10  or not you saw this particular daily liquidity

11  report?

12    A.   No, I did not see this one.

13    Q.   I mean, they all look roughly the same.

14  How can you be so certain that you didn't see this

15  particular one?

16    A.   Because I would have recalled it, because

17  every day of the period shows a negative cash

18  balance.

19    Q.   And why would that be significant?

20    A.   Because it was inconsistent with the

21  company's assertion that they were going to be able

22  to generate enough liquidity in the foreseeable time

23  period to meet their obligations as they came due,

24  and this shows that they're out of cash.

25    Q.   And Mr. King, if you could show the Bates

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    number on this to remind -- and to see where this

 2    document came from.

 3            Do you understand what that Bates number

 4    refers to?

 5        A.   Yes.

 6        Q.   What does that indicate to you?

 7        A.   That indicates that it came through the SEC

 8    investigation.

 9        Q.   From the files of Thornburg?

10        A.   Yes, from Thornburg to the SEC.

11        Q.   Now if we can go back to that first thing,

12    Mr. King, that would be helpful.  Now, if you can

13    show the whole email, please.

14            Did you see emails in this form that, you

15    know, accompanied the liquidity reports during the

16    audit?

17        A.   I don't recall seeing an email that would

18    accompany the report.

19        Q.   Now, Mr. King, if we can call up Exhibit GE

20    briefly, and again, if we can start at the top

21    right-hand corner, we can see the date of this

22    document.

23            Do you see that this one is also dated

24    February 21?

25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1879

1       Q.   And Mr. King, if you could do the analysis

2    you've done before to compare the right-hand column

3    with the left-hand column, please.

4            Do you see a difference between the

5    document we looked at previously, also dated February

6    21, and this one?

7       A.   Yes.

8       Q.   And what's the difference?

9       A.   This one shows that for each day in the

10   period being forecasted, there is a positive cash

11   balance.

12      Q.   Is it possible that you saw this document?

13      A.   It is possible I saw this one, yes.

14      Q.   Let's take a look at some documents from

15   February 27.  The first one I'd like to show you is

16   Plaintiff's Exhibit 113.  Now, Ms. Reinhart, this is

17   an email from Mr. Simmons to Mr. Feldman and Mr.

18   Goldstone.  I want to focus on the second email from

19   Mr. Feldman to Mr. Goldstone and Mr. Simmons.  And in

20   particular, I want to draw your attention to the

21   second paragraph.  Mr. Feldman writes, "Further, I

22   spoke with Charles Mac and he made it sound like a

23   large repo client, European, lots of pay option MTA,

24   was collapsing.  He couldn't give me details other

25   than they own billions that presumably would have to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1880

```
1    get sold.  He may be able to give more details later
2    today.  He sounded very concerned about it."
3             Were you provided this email during the
4    course of your audit work?
5         A.   No.
6         Q.   Would it have been important for you to
7    have been provided this document?
8         A.   Yes.
9         Q.   Can you tell me why you believe it would
10   have been important to you?
11        A.   This would have been important to
12   understanding the environment which the company
13   faced.  They had indicated to us that the market was
14   stabilizing, and this would indicate that it was not
15   stabilizing.
16        Q.   Now, if we can look at that first email
17   from Mr. Simmons, you see that Mr. Simmons writes,
18   "This makes it even more critical to be done with
19   Citi today so we can get the K filed."  Do you see
20   that?
21        A.   Yes.
22        Q.   Did Mr. Simmons ever communicate to you
23   that he was concerned about market events such that
24   he wanted to get the K filed?
25        A.   No.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And when he says "critical to be done with

2    Citi today," what do you understand that to mean?

3      A.   I can only surmise that it would mean that

4    he has to satisfy all of the remaining balance with

5    Citi that's outstanding, that has been outstanding

6    for a period of days, so that they can make the

7    statement that all margin calls have been met.

8      Q.   And if we look at the top of this document,

9    we can see that it's from 8:08 a.m. on the 27th.

10          Mr. King, let's go to Plaintiff's Exhibit

11   116, please.  And pull that up.

12          I'll tell you this is an email from Mr.

13   Simmons to Ms. Starrett and copying Ms. Jacquez, and

14   it's dated that same day, and the time on that

15   document is 10:35 a.m.  Mr. Simmons writes, "I gave

16   Francine a 6:00 a.m. Thursday morning deadline to

17   file the K.  I do not want there to be any issues

18   based on Thursday activity."

19          Did Mr. Simmons tell you prior to the time

20   that KPMG signed its audit opinion that he wanted to

21   file the K before Thursday activities?

22      A.   No.

23      Q.   Did Mr. Simmons communicate in any way that

24   he had any concerns about what was going to happen in

25   the market on Thursday?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.   No.

2      Q.   And the last document related to this, I

3  want to look at Plaintiff's Exhibit 122.  This is an

4  email from Mr. Goldstone to Mr. Simmons.  And in the

5  second paragraph Mr. Goldstone writes, "Also, you

6  should know that a large Alt-A hedge fund in Europe

7  is blowing up this afternoon.  UBS Credit just

8  mentioned it to me.  They got hit with 20-point

9  haircuts on Alt-A AAAs overnight.  I think we will

10 get this a little more gradually, but we should be

11 ready for it."  Do you see that?

12     A.   Yes.

13     Q.   And what do you understand Mr. Goldstone to

14 be communicating to Mr. Simmons, the chief financial

15 officer?

16     A.   As we came to find out, that this large

17 hedge fund, which was Peloton, was collapsing at that

18 particular point in time, and so he was concerned

19 that the market was, in fact, very unstable, and he's

20 telling Mr. Simmons about that fact.

21     Q.   And so Mr. Goldstone took time out of his

22 day to convey that to Mr. Simmons.  Did he take time

23 out of his day to convey that to you?

24     A.   No.

25     Q.   To anyone else on the KPMG audit team?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    No.

 2        Q.    Would you expect, if he had this

 3   information, that he would have let you know?

 4        A.    Yes.

 5        Q.    And would this have been important

 6   information for you to have in connection with your

 7   audit?

 8        A.    Yes.

 9        Q.    Now let's take a look at Plaintiff's

10   Exhibit 94.  I want to focus on the second email

11   again, Mr. King, the email from Ms. Starrett.

12            This is an email from Ms. Starrett to Mr.

13   Goldstone and Mr. Simmons.  And in the second

14   paragraph she writes, "We have purposely not told

15   them about the margin calls."  And can you tell from

16   the context there who the "them" is?

17        A.    That's KPMG.

18        Q.    "We have purposely not told them about the

19   margin calls, so that we don't escalate an issue

20   which we believe will be put to rest by the time they

21   have to issue their opinion.  They have not raised

22   the issue of selling assets or marking down any

23   assets.  Rather, we have been wary of selling assets

24   because we feel it is likely that the issue will be

25   raised and it is also likely they will need to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  involve other experts within the firm, all of which

2  will make reaching a decision a slow process.  So

3  since we believe the situation will be resolved

4  before they may have to opine, we have chosen not to

5  put the valuation issue in front of them.  Obviously,

6  if we are not able to resolve the situation

7  satisfactorily, we will need to inform them before we

8  file."

9         Were you provided this email prior to the

10 time that you reached your audit opinion?

11      A.   No.

12      Q.   And is it your understanding that it's

13 appropriate for audit clients to purposely not tell

14 their auditors information?

15      A.   It's not appropriate for that to happen.

16      Q.   And why is that not appropriate?

17      A.   Because management is responsible for their

18 financial statements, and they are responsible for

19 informing the auditors of all significant matters

20 that would have an impact on those financial

21 statements.

22      Q.   Is that true even if it's an issue that

23 they don't want to escalate and which they believe

24 will be put to rest by the time they have to issue

25 their opinion?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1      A.   They still have an affirmative

 2   responsibility to communicate with the auditors about

 3   matters of significance.

 4      Q.   Even if it's going to make the process of

 5   reaching a decision a slow process, as Ms. Starrett

 6   writes?

 7      A.   The audit process can sometimes be slow,

 8   but it's supposed to be slow and careful.

 9      Q.   And why is it supposed to be slow and

10   careful?

11      A.   Because you don't want to issue an opinion

12   that's incorrect that investors would rely upon.

13      Q.   All right.  And I just want to ask you to

14   look at one other paragraph, which is the next

15   paragraph, where Ms. Starrett writes, "In short,

16   selling some assets is substantially the same as

17   selling all assets, because the only reason we don't

18   have to recognize the impairments on all assets with

19   negative marks in income now is that we represent we

20   have the intent and ability to hold the assets to

21   maturity.  Selling some assets calls into question

22   our intent and having to sell them to meet margin

23   calls or reduce exposure calls into question our

24   ability to hold them."

25          What do you understand Ms. Starrett to be

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    communicating to Mr. Goldstone and Mr. Simmons?

2        A.    That she is essentially saying here that

3    they've made the assertion to us that they intend to

4    hold those securities that are underwater, and if

5    they were to sell any of those securities, it would

6    trigger questions about their ability and intent to

7    hold them and then cause the negative marks, as she

8    calls it, which is the difference between fair value

9    and carrying amount, to be recorded in the income

10   statement.

11       Q.    Is it fair to say that this is

12   Ms. Starrett's summarization of the applicable OTTI

13   accounting rules?

14       A.    Yes.

15       Q.    And do you believe this to be a correct

16   summary of the applicable accounting rules?

17       A.    Yes, I do.

18       Q.    Mr. King, can we go to Exhibit 69, please?

19             Now, Ms. Reinhart, this is an email from

20   Deborah Burns and its subject line is "TMST 2008-1

21   update."  Do you know what TMST 2008-1 refers to?

22       A.    That's a securitization transaction the

23   company was in the process of putting together in the

24   late February time period.

25       Q.    Were you provided this email in connection

SANTA FE OFFICE                                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                               Albuquerque, NM 87102
(505) 989-4949                                                                                         (505) 843-9494
FAX (505) 843-9492                                                                               FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    with your audit work?

2        A.    No.

3        Q.    Now, Ms. Burns writes, she begins, "We have

4    a shot at upsizing the deal to $1 billion."  Do you

5    see that?

6        A.    Yes.

7        Q.    Then in the next paragraph she says, "So

8    the language in the red needs to satisfy the

9    underwriters today and next week or the trade will be

10   at risk.  The tricky part is the disclosure around

11   margin calls and liquidity."  Do you see that

12   paragraph?

13       A.    Yes.

14       Q.    Now, what do you understand Ms. Burns to be

15   communicating to Mr. Goldstone and Mr. Simmons and

16   Ms. Starrett?

17       A.    So effectively saying here that the draft,

18   which is the red, needs to have all the disclosures

19   in it; otherwise, they won't be able to go forward.

20       Q.    And if you look at the next sentence, it

21   says "CSFB" and this refers to Credit Suisse?

22       A.    Yes.

23       Q.    "CSFB is willing to withdraw from the

24   underwriting group since they realize their attorneys

25   will probably not agree to anything short of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1888

```
 1    disclosing the delay in meeting their margin call

 2    earlier this week."  What do you understand Ms. Burns

 3    to be saying there?

 4         A.    She's effectively saying that CFSB doesn't

 5    want to be involved with it because they know that

 6    they haven't had their margin call satisfied, so they

 7    don't want to go forward with an underwriting that

 8    they're attached to or associated with, knowing that

 9    the disclosures are incomplete.

10         Q.    And is this information that would have

11    been important for you to have during the time that

12    you were performing your audit work?

13         A.    Yes.

14         Q.    And why would this have been important?

15         A.    Because we were not aware that they were

16    delaying the underwriting because they didn't want to

17    disclose the company's inability to meet their margin

18    calls.

19         Q.    Let's take a look at Plaintiff's Exhibit 85

20    which also addresses that issue, and you'll recognize

21    that this is one of the Mr. Goldstone's emails to the

22    board that you previously testified was not provided

23    to you.

24              In the first numbered paragraph, paragraph

25    number 1, Mr. Goldstone advises the board, "We
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1889

```
 1   postponed our February securitization."  And you
 2   understand that to be referring to the TMST 2008-1?
 3       A.   Yes.
 4       Q.   Okay.  "We postponed our February
 5   securitization transaction because of prosup
 6   disclosure issues around these margin calls.  We
 7   don't want to disclose our current circumstance until
 8   it is resolved."
 9           And then later on he says, "Further, some
10   of the lawyers wanted us to do that, so we put the
11   transaction on hold and will resurrect the deal next
12   week at some point."
13           Were you told this information prior to the
14   time that KPMG issued its audit opinion?
15       A.   No.
16       Q.   And based on your familiarity with how the
17   company worked, was it their normal practice to
18   postpone securitizations to avoid making disclosures?
19       A.   That was not a normal practice.
20       Q.   And would it be important for you to have
21   known that they were now doing just that?
22       A.   Yes.
23       Q.   And why would that have been important?
24       A.   Again, because it would put in context the
25   degree of the struggle that the company was having at
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1890

1    that particular point in time when we, as their

2    auditors, were reaching very critical decisions about

3    going concern and OTTI.

4         Q.   Now, the last email -- this is PX 90,

5    Mr. King.

6              And you'll see that this refers to TMST

7    2008-1, and you'll see the first email is from

8    Ms. Burns to Eric Smith and a

9    JamesBuccola@CreditSuisse.com, and the subject line

10   is "Investor explanation for postponement."

11             And Ms. Burns writes, "The company is in

12   the process of finalizing its Form 10-K for fiscal

13   year 2007, which it plans to file late next week.  As

14   is always the case, the company endeavors to make

15   sure all public disclosures are consistent and

16   accurate.  As a result of changing market conditions,

17   we have been working on our disclosure.

18   Unfortunately, we were unable to coordinate the

19   disclosure for the TMST 2008-1 prospectus and the

20   Form 10-K filing in time for the scheduled pricing,

21   and have decided to postpone pricing until we can do

22   so."

23             Is that consistent with what Mr. Goldstone

24   told his board of directors?

25        A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1891

1    Q.   Then lastly I want to draw your attention

2  on this document to the first sentence.  It says, "If

3  KPMG or anyone else asks about the postponement of

4  this deal, you should send them to me.  Here is the

5  language that McKee and I came up with to give to the

6  RMBS investor."  Do you see that?

7    A.   Yes.

8    Q.   And what do you understand Ms. Burns to be

9  communicating there to the structured finance group

10  and Amy Pell and others about what to do if you ask

11  about the postponement of that securitization?

12    A.   She wants to control the flow of that

13  information.

14    Q.   And do you understand that she intends to

15  provide you the investor explanation that's contained

16  in this document and that's inconsistent with what

17  Mr. Goldstone was telling his board of directors?

18    A.   Yes.

19    Q.   And does that give you any concern?

20    A.   Yes.

21    Q.   We talked about management integrity

22  before.  Does that raise a management integrity issue

23  for you?

24    A.   Yes.

25    Q.   Can you explain that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   I would say they're not being forthcoming

2   at all the information that would be necessary for

3   the external auditors to have at a critical time when

4   we're reaching our conclusions about the auditors'

5   reports.

6        Q.   Now I want to talk to you about the company

7   contemplating selling assets.  Let's look at

8   Plaintiff's Exhibit 62 again.  That's another one of

9   Mr. Goldstone's emails to the board.  This is one

10  from February 21.  And you'll see that before getting

11  to the numbered paragraphs, Mr. Goldstone writes, "We

12  plan to meet this call," and he's referring to the

13  Citi margin call.  "We plan to meet this call with

14  the following strategies."  Number 6 says, "We may

15  undertake additional asset sales depending on how

16  market conditions evolve over the next few weeks

17  offsetting previously mentioned gains."

18            Were you told prior to the time that KPMG

19  completed its audit work that Mr. Goldstone was

20  contemplating selling assets?

21       A.   No.

22       Q.   Is that something that would have been

23  important for you to know?

24       A.   Yes.

25       Q.   Why would that have been important for you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   to know?

2       A.   Because again, that wasn't consistent with

3   the company's assertions that they were making to us

4   at the time as to the reason for, for example,

5   selling the I/O strip that they had previously sold

6   to take advantage of market opportunities, and this

7   would be contrary to the OTTI assertion that the

8   company made to us at that time, that they could hold

9   these assets to their maturity until they recovered.

10      Q.   And staying on this same document, if you

11  look up at item -- the second item on this list, Mr.

12  Goldstone writes one of the ways they plan to meet

13  the Citi margin call was "Having Citi sell a $110

14  million interest-only security that may generate $20

15  to $25 million.  That sale may also generate a gain

16  on sale against which we might be able to sell other

17  assets at a loss to net something close to zero."  Do

18  you see that?

19      A.   Yes.

20      Q.   And what do you understand Mr. Goldstone to

21  be saying there?

22      A.   He's talking about a potential sale that

23  they would be making out of their portfolio of an

24  interest-only security, which is a specific type of

25  security, that would potentially generate a gain to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1894

```
 1   help them satisfy the Citi margin call.
 2        Q.   And is that information that was provided
 3   to you prior to the time that you issued your audit
 4   opinion?
 5        A.   No.
 6        Q.   And would it have been important for you
 7   have that information?
 8        A.   Yes.
 9        Q.   Okay.  The last of the category of things I
10   want you to look at, if we can go to Plaintiff's
11   Exhibit 95, and again, this is another one of Mr.
12   Goldstone's emails.  This is one from February 25.
13   And Mr. Goldstone writes his board, including Mr.
14   Simmons, if we go down to, I guess, the third
15   paragraph from the bottom, he says, "Finally, we have
16   been funding loans at a reduced rate over the past
17   few days and are working very hard at trying to add
18   warehouse capacity to enable us to pick up the
19   funding pace.  I met with Credit Suisse today and we
20   are hopeful to open their warehouse line for an
21   additional $50 million tomorrow.  That would help our
22   customers a great deal."
23             What do you understand Mr. Goldstone to be
24   communicating to his board in that paragraph?
25        A.   That the company is not able to fund loans
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    or close loans at the level that they had previously
 2    been accustomed to because they don't have the
 3    capacity through their lending arrangements with
 4    Credit Suisse.
 5         Q.   And is that something that would have been
 6    significant to you while you were doing your audit
 7    work?
 8         A.   Yes.
 9         Q.   And tell me why.
10         A.   Because again, that would speak to the
11    degree of struggle.  If the company is not able to
12    fund loans, that means that they're potentially short
13    of cash, and that whole notion of having sufficient
14    resources to make the assertions in the -- related to
15    going concern and OTTI are dependent upon that.
16         Q.   Well, Mr. Goldstone thought this was
17    sufficiently important to inform his board on
18    February 25.  Did he tell you this fact?
19         A.   No.
20         Q.   And a fact of this significance -- would
21    you have expected him to bring it to you?
22         A.   Yes.
23         Q.   These documents we went through -- had you
24    seen any of these documents at the time you reached
25    your OTTI determination?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   No.

2       Q.   Had you seen any of these documents at the

3   time you reached your conclusion regarding Thornburg

4   being a going concern?

5       A.   No.

6       Q.   Mr. Goldstone never brought any of this to

7   your attention?

8       A.   No.

9       Q.   Mr. Simmons never brought any of this to

10  your attention?

11      A.   No.

12      Q.   If you had all of this information, would

13  you have reached the same conclusion regarding

14  whether or not Thornburg was, in fact, a going

15  concern?

16      A.   We would not have reached the same

17  conclusion.

18      Q.   And if you had had all this information,

19  would you have reached the same conclusion whether or

20  not Thornburg's assets had the ability to hold their

21  impaired assets?

22      A.   We would not have reached that same

23  conclusion.

24      Q.   Mr. King, if you could put up Plaintiff's

25  Exhibit 321, please.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              This document is the Form 10-K that was

 2    ultimately filed.  And if we can turn to pages F3 and

 3    F4.  This is one that's in your binder, if you want

 4    to look there, as well.  This paper is entitled

 5    "Report of independent registered public accounting

 6    firm."  What do you recognize this to be?

 7         A.   This is KPMG's report on the 2007 financial

 8    statements.

 9         Q.   So this is the opinion that I've been

10    asking about previously?

11         A.   Right.  This is the auditor's opinion and

12    report that's issued at the culmination of an audit.

13         Q.   Just to make sure it's clear, let's go

14    through what this says.  This document is addressed

15    to the Thornburg board of directors and shareholders;

16    is that right?

17         A.   Yes.

18         Q.   If we look at the first paragraph there,

19    there is a sentence that says, "Thornburg Mortgage,

20    Inc.'s management is responsible for these

21    consolidated financial statements and financial

22    statement schedule for maintaining effective internal

23    control over financial reporting and for its

24    assessment of the effectiveness of internal control

25    over financial reporting, including in the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    accompanying management annual report on internal

2    control over financial reporting appearing under item

3    9.

4              What is that communicating to Thornburg's

5    investors and shareholders and board members?

6         A.   It communicates that management is the

7    party that's responsible for making sure that the

8    financial statements are accurate and that their

9    internal control structure is operating in order to

10   prevent or detect material instances of fraud, and

11   it's not auditor's responsibility.  Our

12   responsibility is to conduct an audit, which the

13   report will say later on.

14        Q.   If you look at the next sentence, does that

15   sentence describe what your responsibility was?

16        A.   It does.  It says --

17        Q.   Can you explain that, please?

18        A.   Our responsibility is to express an opinion

19   on the financial statements and financial statement

20   schedules and to provide an opinion on the company's

21   internal control over financial reporting based on

22   our audits.  So we do the audit, the company prepares

23   the financial statements, and our opinion wraps onto

24   the financial statements.

25        Q.   Looking at the next-to-the-last paragraph



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   on this page, you say -- you write, "Because of its

 2   inherent limitations, internal control over financial

 3   reporting may not prevent or detect misstatements.

 4   Also, projections of any evaluation of effectiveness

 5   to future periods are subject to the risk controls

 6   may become inadequate because of changes in

 7   conditions or that the degree of compliance with the

 8   policies or procedures may deteriorate."

 9           Then you go on and I understand this next

10   to be your opinion.  "In our opinion, the

11   consolidated financial statements referred to above

12   present fairly in all material respects the financial

13   position of Thornburg Mortgage, Inc. and subsidiaries

14   as of December 31, 2007, and 2006, in the results of

15   their operations and their cash flows for each of the

16   years in the two-year period ended December 31, 2007,

17   in conformity with U.S. generally accepted accounting

18   principles."

19           Having now seen the documents that we've

20   gone through, do you still believe that opinion to be

21   correct?

22       A.   No, I do not.

23       Q.   Now, Ms. Reinhart, was your deposition

24   taken in this matter?

25       A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And was it at the defendants' -- the
 2   defense required that you sit for a deposition?
 3        A.   Yes.
 4        Q.   And if you remember, do you remember
 5   roughly how long they deposed you?
 6        A.   It was about a day-long deposition.
 7        Q.   Did they ask you about your going concern
 8   opinion?
 9        A.   Yes.
10        Q.   Did they ask you about the OTTI
11   determination that you had reached?
12        A.   Yes.
13        Q.   And during that deposition, did counsel for
14   the defendant show you all of these documents that
15   we've just walked through?
16        A.   No, I didn't see those.
17        Q.   Okay.  They didn't try to find out what you
18   thought about these various documents that I've now
19   shown you?
20        A.   No.
21        Q.   Do you think it would have been a more fair
22   examination if they had, in fact, shown you these
23   documents that you didn't see prior to the time that
24   you reached your audit conclusion?
25        A.   It certainly would have been more complete,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    I would say.

 2         Q.   Now, before we get to the actual filing of

 3    the 10-K, there is one additional topic I want to

 4    cover, and that's specific communications, both

 5    written and oral, that you had with the defendants

 6    prior to the Form 10-K being filed.

 7              Mr. King, I'd like to start with

 8    Plaintiff's Exhibit 240.

 9              As you may remember, that's the Thornburg

10    going concern memo; right?

11         A.   Yes.

12         Q.   And if we turn to page 4, please, Mr. King,

13    the third paragraph on that page.  There you go.

14    Thank you.

15              And in this memorandum, Thornburg writes,

16    "Margin calls made or received are being met and the

17    change in collateral value is being verified on a

18    normal daily basis."

19              Can you explain what you understood that to

20    mean about the timeliness of which margin calls were

21    being satisfied?

22         A.   That they're satisfying them on a daily

23    basis in accordance with their agreements with their

24    repurchase agreement counterparties.

25         Q.   Is that what you understood at the time

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                         1-800-669-9492
                                                              e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

 1   that you were doing your audit work?

 2        A.   Yes.

 3        Q.   And did you understand that that

 4   representation was true?

 5        A.   At the time we were doing our audit work,

 6   we certainly thought it was true.

 7        Q.   And did Mr. Goldstone ever tell you it

 8   wasn't true?

 9        A.   No.

10        Q.   Did Mr. Simmons ever tell you it wasn't

11   true?

12        A.   No.

13        Q.   If we can just go back to the very first

14   part of this document again.  This is a document from

15   Mr. Buniel, who I understand was an employee at

16   Thornburg, and it was addressed to Larry Goldstone,

17   Clay Simmons, Jane Starrett, and the file; right?

18        A.   Yes.

19        Q.   Now, in addition to this written

20   communication, did you have any oral communications

21   with anyone at Thornburg during the going concern

22   memo process?

23        A.   Yes.

24        Q.   Now, were you aware at that time that that

25   memo-writing process was going on, that Thornburg had

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



 1    entered into certain transactions involving their I/O

 2    strips?

 3         A.   Yes.

 4         Q.   What, if anything, did Thornburg tell you

 5    about the reason for those sales of I/O strips?

 6         A.   Our understanding and what I was told was

 7    that they sold the I/O strips in order to take

 8    advantage of opportunities in the marketplace; that

 9    the market was willing to pay them more than they

10    thought the security was worth.

11         Q.   Did they say anything about that it was

12    done to satisfy liquidity?

13         A.   No.

14         Q.   Let's take a look at Plaintiff's Exhibit

15    312, please.  This is a document we haven't looked at

16    yet.  It's entitled "February 28, 2008, market

17    events."  It appears to be a KPMG workpaper and its

18    purpose is listed as to document the client's

19    analysis regarding the events that unfolded

20    immediately after filing their Form 10-K.

21              And if you look over on to page 2, the

22    first full paragraph there, I'm going to read you the

23    first and last sentence of that paragraph.  It says,

24    "The audit team was aware that Thornburg was in the

25    process of selling certain assets, and management

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                              1-800-669-9492
                                                         e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1904

```
 1    asserted that these sales were for reasons other than
 2    immediate liquidity needs."  Then it goes on, "Our
 3    understanding was that management believed the I/O
 4    strips could sell at a premium in the market, and
 5    received an opportunity to sell the I/O strips for
 6    more than management believed they were worth."
 7            Is that essentially writing down the oral
 8    representation you just described to me?
 9      A.    Yes.
10      Q.    And that oral representation -- who made
11    that to you?
12      A.    Mr. Simmons did.
13      Q.    And did he make it to you personally?
14      A.    Yes.
15      Q.    Now, you were aware, right, that the upshot
16    of these transactions was going to be that Thornburg
17    would receive money; right?
18      A.    Yes.
19      Q.    And you would understand that they could
20    use that money for any purpose they wanted, including
21    to satisfy margin calls; right?
22      A.    Yes.
23      Q.    So then what difference does it make
24    whether they undertook to sell these assets
25    specifically to satisfy margin calls or because there
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    was a good price in the market?

2        A.   Because it would be important to us to

3    understand, again, the purpose for the sale.  If it

4    was to satisfy margin calls, that would speak to the

5    degree of the struggle that the company was having at

6    that particular point in time, and we would have

7    wanted to know about that.

8        Q.   Now, in light of the documents that we've

9    reviewed, including Mr. Goldstone's emails to the

10   board, do you now believe that Mr. Simmons'

11   communication to you about the purpose for those I/O

12   strip sales was true?

13       A.   No.

14       Q.   Ms. Reinhart, what is a down-to-date

15   meeting?

16       A.   That's a meeting that auditors have with

17   senior members of management at about the date that

18   the opinion is signed.

19       Q.   And what's the purpose of the meeting?

20       A.   It's to provide an opportunity for

21   management to convey to the auditors and for the

22   auditors to ask management whether or not there have

23   been any events of significance that we should become

24   aware of that would have an impact on the financial

25   statements and ultimately the audit report.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1906

```
1        Q.   And for what period of time are you seeking

2    information?  I mean, are you looking back to the

3    time prior to the balance sheet date, December 31, or

4    more recent events?

5        A.   We're typically interested in more recent

6    events, but it includes the entire audit period from

7    the very first date of the company's fiscal year on

8    which the report is based up through the date of our

9    opinion.

10       Q.   Is this something that you do for every

11   audit prior to issuing your opinion?

12       A.   Yes.

13       Q.   And consistent with that practice, did you

14   do one for Thornburg?

15       A.   Yes.

16       Q.   Let's take a look at one of your workpapers

17   that I think addresses this.  Let's go to workpaper

18   document BY, Mr. King.

19            And you can see this document is entitled

20   "Fraud and other specific topic inquiries."  Under

21   the section entitled "Management," it says, "Jenni

22   Hall inquired of Jane Starrett, chief accounting

23   officer, on February 27, 2008, Clay Simmons, chief

24   financial officer, on February 27, 2008, and Larry

25   Goldstone, chief executive officer, on February 27,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1907

1    2008.  We inquired of the following."  And amongst

2    the things it lists was company and its environment,

3    including its internal control; management's

4    assessment of the risk that the financial statements

5    may be materially misstated due to fraud.

6            If we can turn over to page 2, Mr. King,

7    we'll get page 2 and 3 in this part, there is a

8    section in there entitled, "Going concern illegal

9    acts, litigation, claims and assessments, subsequent

10   events, related parties."  It says, "Jenni Hall

11   inquired of Jane Starrett, chief accounting officer,

12   on February 27, 2008; Clay Simmons, chief financial

13   officer, on February 27, 2008; and Larry Goldstone,

14   chief executive officer, on February 27, 2008."

15           And then it says, "We inquired of the

16   following," and it lists a variety of things,

17   including knowledge of events or conditions and

18   related business risks beyond the period of

19   assessment used by management that may cast

20   substantial doubt on the company's ability to

21   continue as a going concern.  And then the last

22   bullet point on page 3 says, "Knowledge of any

23   subsequent events in 2008."

24           Now, what do you understand what I just

25   referred to to be referring to?  Is that the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    down-to-date meeting?

2         A.   Yes.

3         Q.   And your name wasn't listed there, but do

4    you believe you participated in at least some of

5    those down-to-date meetings?

6         A.   Yes.

7         Q.   And do you have any idea why your name

8    wasn't listed there?

9         A.   No.

10        Q.   Now, tell me the meeting -- did you

11   participate in one or more than one?

12        A.   I participated in at least one.

13        Q.   Tell me about that one.  Who attended that

14   meeting?

15        A.   My recollection was that was with Mr.

16   Simmons and Ms. Hall, and I believe Ms. Starrett was

17   there, as well.

18        Q.   The way you said that, do you have less

19   certainty that Mr. Starrett was present?

20        A.   It's been a while, but I think she was, but

21   that's my best recollection.

22        Q.   Now, when do you think that meeting would

23   have occurred?

24        A.   Either late the 26th or the 27th so very

25   close to the opinion date, which was the 27th.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1909

1    Q.   For anything that you learned during that

2    meeting, does it matter whether you learned it on the

3    26th or the 27th?

4    A.   No.

5    Q.   Now, what about -- did you participate in

6    the down-to-date meeting with Mr. Goldstone that's

7    referred to in the exhibit we looked at?

8    A.   I don't believe so.

9    Q.   Let's talk about the meeting that at least

10   involved Mr. Simmons.  Can you just describe for the

11   jury how that meeting was conducted, where it took

12   place, who led the meeting, what sorts of questions

13   were being asked?

14   A.   It was conducted in his office, and so both

15   Jenni and I were seated in front of his desk.  And we

16   had a memory jogger, a checklist that we use to go

17   through various questions to make sure that we've

18   covered all of the bases.  And we went through those

19   questions asking him about any matters that we needed

20   to know about related to the subsequent event period

21   in the financial statements that were going to be

22   filed in the next day or so.

23   Q.   I want to talk to you about some of those,

24   in particular, but before I do, I want to ask you,

25   did Mr. Simmons raise any particular issues during

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   that meeting?

2       A.   He didn't raise any adverse issues at the

3   time that he communicated to us.

4       Q.   Did he tell you anything that suggested to

5   you that there was anything unusual going on at the

6   company?

7       A.   No.

8       Q.   Fair to say that his description was

9   business as usual?

10      A.   Yes.

11      Q.   Is one of the topics that you asked about

12  whether or not the company was in compliance with its

13  contractual terms?

14      A.   The contractual terms of its agreements,

15  yes.

16      Q.   And would those agreements -- would that

17  include the reverse repurchase agreements that we've

18  talked a little bit, you and I, today such as the

19  Citi agreement that we looked at when we began?

20      A.   Yes.

21      Q.   Okay.  And so would this question elicit a

22  response that would include if Thornburg was not

23  timely meeting its margin calls?  Would that be the

24  type of issue you're trying to raise by those

25  questions?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1911

```
 1        A.   Yes.
 2        Q.   And what, if anything, do you recall Mr.
 3   Simmons saying about whether Thornburg was meeting
 4   its margin calls in accordance with the terms of its
 5   contractual obligations?
 6        A.   He didn't indicate that they were not
 7   meeting the terms of those agreements.
 8        Q.   Did you ask any questions that would have
 9   clearly elicited the fact that the margin calls were
10   being paid over a period of days as opposed to the
11   terms of the agreement?
12        A.   I don't specifically recall about asking
13   that point, question, but we did ask about compliance
14   with agreements, which would encompass the reverse
15   repurchase agreements.
16        Q.   And that question about compliance with
17   agreements would have -- should have elicited Mr.
18   Simmons to explain that certain margin calls had been
19   paid in a way different than the contract required?
20        A.   Yes.
21        Q.   And what about, did Mr. Goldstone say
22   anything about the value of Thornburg's collateral,
23   its assets?
24        A.   Yes, he did.
25        Q.   What do you recall Mr. Simmons saying about
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1912

1   that?

2       A.   Mr. Simmons conveyed to us that he thought

3   the value of the company's collateral was --

4   continued to be strong, and that the markets were

5   stabilizing, and that he perceived the likelihood of

6   a decline in values, and he put a range on it of 2 to

7   3 percent that that would be unlikely.  In fact, I

8   think the word he used was "remote."  It would be

9   remote that a further decline would occur.

10      Q.   And Mr. King, if you can call back up

11  Plaintiff's Exhibit 249.

12           And Ms. Reinhart, that's the KPMG going

13  concern memo that we've talked about at length today.

14  And if we could go to page 6, please.  At the top

15  there, it says, "It is management's position that the

16  likelihood that collateral values decrease by more

17  than another 2 to 3 percent is remote.  Per the

18  discussion with Nate Fellers, capital markets, the

19  decline in asset values was concentrated in the Alt-A

20  securities within their portfolio.  Alt-A securities

21  make up about 20 percent of the balance.  Management

22  believes the fair values for these securities are at

23  or approaching bottom, evidenced by recent purchases

24  of similar securities by outside investors at these

25  prices."

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              Is this you reporting what Mr. Simmons told

 2      you and Ms. Hall during the down-to-date meeting?

 3           A.   Yes.

 4           Q.   And after the time of this memorandum or

 5      after the time of the down-to-date meeting, did Mr.

 6      Simmons ever come to you and say that he changed his

 7      mind, that now it looked like maybe the company's

 8      assets might possibility decrease by more than 2 to 3

 9      percent?

10           A.   No.

11           Q.   Now, is part of this down-to-date meeting

12      which you've been testifying to -- was there any sort

13      of like wrap-up questions, something that you asked

14      at the end of the -- at the end of the meeting?

15           A.   There is a question that I asked, and it's:

16      Is there anything else that we should be aware of?

17      The open-ended question that auditors -- that I

18      asked.  And I did not get a response back that would

19      indicate there was anything that we should be

20      concerned about in connection with the audit report

21      that KPMG was about to issue.

22           Q.   Did he tell you that they were late meeting

23      their margin call from Citi?

24           A.   No.

25           Q.   Did they tell you that Citi had issued them
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                               201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    a reservation of rights letter?

2         A.    No.

3         Q.    Did he tell you that they were late meeting

4    a margin call from Credit Suisse?

5         A.    No.

6         Q.    Did he tell you that they were having to

7    slow down their funding of new loans?

8         A.    No.

9         Q.    Did he provide you the numerous emails that

10   Mr. Goldstone wrote to the board providing updates on

11   the true liquidity situation of the company?

12        A.    No.

13        Q.    Did he tell you that they withdrew a

14   securitization to raise money the company needed to

15   avoid providing disclosures about margin calls?

16        A.    No.

17        Q.    Did he tell you that they were

18   contemplating selling assets?

19        A.    No.

20        Q.    Did he tell you about the real purpose for

21   the I/O strip sales?

22        A.    No.

23        Q.    Now, if you can explain to the jury what a

24   management representation letter is.  Is that

25   something you're familiar with?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   Yes.

2       Q.   Can you explain what that is?

3       A.   The management representation letter is a

4   letter that management signs, senior management

5   signs.  In this case, I believe it was signed by Mr.

6   Goldstone, Mr. Simmons, and Ms. Starrett, and they

7   gave it to us, and it's got a date that coincides

8   with the audit report, so February 27th of 2008.  And

9   it reaffirms certain things that you've seen in other

10  exhibits.  It reaffirms that the company takes

11  responsibility for their financial statement.  It

12  reaffirms that the -- all information has been

13  provided to us.  It reaffirms that the financial

14  statements are accurate and free of material

15  misstatement.  And it reaffirms that subsequent

16  events have been provided to us, and that the company

17  is in full compliance with all of its contractual

18  agreements.  And it's a long letter, in this case,

19  and it covers a number of other elements, but that's,

20  in substance, some of the key points.

21      Q.   And when do you require management to

22  provide that?

23      A.   It matches the date of the auditor's

24  report, so February 27, 2008.

25      Q.   And why do you do that?  Why do you require

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    it to be the date of your audit opinion?

 2         A.   So that there can be no misunderstanding

 3    about any gap that might exist there between the

 4    representation letter and auditor's report.  It

 5    matches to the date.

 6         Q.   And I mean, are you seeking information up

 7    to the date of your audit report?

 8         A.   Yes, we are.

 9         Q.   Let's take a look at the one in this case,

10    Plaintiff's Exhibit 268, please.  Do you recognize

11    this to be the management representation letter from

12    Thornburg?

13         A.   Yes.

14         Q.   And as you predicted, it's dated February

15    27, which is the date of your opinion; right?

16         A.   Yes.

17         Q.   And to everyone's relief we won't walk

18    through all the provisions, but there are a few I

19    would like to draw your attention to.

20              If we could look to paragraph 4, please.

21    Mr. King, I'm going to look at 4e, so there you go.

22              4e says, "There are no events that have

23    occurred subsequent to the balance sheet date and

24    through the date of this letter that would require

25    adjustment to or disclosure in the consolidated
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   financial statements."
 2          Can you explain to the jury what you're
 3   asking the company to represent when they sign a
 4   letter that makes that representation?
 5       A.   We're asking them to affirm to us in
 6   writing that there hasn't been anything that has
 7   occurred after December 31, 2007, in this case, up
 8   through February 27, 2008, that need to be disclosed
 9   or recorded in the financial statements.
10       Q.   And would that be -- would this particular
11   representation be consistent with Thornburg having
12   received a reservation of rights letter from Citi?
13       A.   No, it would not.
14       Q.   And as you sit here today, do you believe
15   that this representation is true?
16       A.   No.
17       Q.   Let's take a look at paragraph 13, please.
18   It's two pages forward, I believe.  Paragraph 13,
19   please.  Here, the company represents, "The company
20   has complied with all aspects of contractual
21   agreements that would have a material effect on the
22   consolidated financial statements in the event of
23   noncompliance."
24          Can you explain what you understand that to
25   be that the company is representing to you?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1918

```
 1        A.   They're telling us here that if they've --
 2    that they're in compliance, that they haven't
 3    violated the terms of any of their significant
 4    agreements that would be important to the
 5    consolidated financial statements.
 6        Q.   And would that include their repo
 7    agreements, such as the agreement with Citi that we
 8    looked at earlier?
 9        A.   Yes.
10        Q.   And as you sit here today, do you believe
11    that representation to be true?
12        A.   No, I do not.
13        Q.   Take a look at paragraph 22.  Paragraph 22
14    states, "Debt securities that have been classified as
15    held to maturity have been so classified due to our
16    intent and ability to hold such securities.  All
17    other debt securities have been classified as
18    available for sale or trading.  Declines in value of
19    debt or equity securities classified as available for
20    sale or held to maturity are considered to be
21    temporary because we have both the intent and ability
22    to hold these impaired securities for a sufficient
23    period of time, until maturity, if necessary, to
24    allow for their recovery in market value."
25             Without getting too deep into the weeds
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    about available for sale and so forth, but focusing

 2    on the issues we've been addressing today, what do

 3    you understand this paragraph to be representing?

 4         A.   Management is reasserting that the

 5    classification of their investment securities is

 6    consistent with their intent.  So they intend to hold

 7    them, they don't intend to sell them, and they have

 8    financing in place such that they won't be forced to

 9    sell that if the lender withdrew that financing for

10    some reason.  So the classification is accurate.

11         Q.   So the point is, the impaired assets that

12    we've talked about -- they had the ability to hold

13    those for the necessary period for the OTTI

14    determination.

15         A.   That's what they're telling us here.

16         Q.   And I think before I said these were

17    representations from the company.  These are, in

18    fact, representations from Mr. Goldstone, Mr.

19    Simmons, and Ms. Starrett; right?

20         A.   Yes.

21         Q.   And the last paragraph I want to look at is

22    paragraph 31.  In that paragraph Mr. Goldstone and

23    Mr. Simmons represented that "The consolidated

24    financial statements disclose all of the matters

25    which we are aware that are relevant to the entity's

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    ability to continue as a going concern, including

2    significant conditions and events and our plans."

3            Can you explain what that paragraph is

4    meant to be a representation of?

5        A.   So here, they're again reaffirming that

6    they've provided all of the elements that are

7    necessary for the consideration and the evaluation of

8    the going concern assertion that they made in the

9    memorandums that we looked at earlier, and that there

10   isn't anything that's missing from those.

11       Q.   And knowing what you know now, do you

12   believe that representation to be true?

13       A.   No.

14       Q.   Now, in doing your audit work and reaching

15   your opinion, did you rely upon these

16   representations?

17       A.   Yes.

18       Q.   Did you rely on management being truthful

19   in these management representation letters?

20       A.   Yes.

21       Q.   Now I'd like to draw your attention to

22   Exhibit 176.  And actually, if we could look at the

23   second page on this one.  This is a Thornburg letter

24   from February 29 to KPMG and it's signed by Mr.

25   Simmons and Ms. Starrett.  Looking at this document,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   can you tell what their document is?

 2        A.   Yes.  This is a representation letter that

 3   the company provided to us on the 29th in connection

 4   with a registration that they were going to be doing

 5   shortly after the audits of the financial statements

 6   were filed with the SEC.

 7        Q.   And when you say registration, that has to

 8   do with them raising money; is that right?

 9        A.   Raising money.  It's a capital raise.

10        Q.   And they needed a comfort letter, is that

11   what it's called, from KPMG in order to do that?

12        A.   Right, they needed to effectively have this

13   registration statement out there and available so

14   that they could then issue securities under that

15   registration statement.  So this would provide the

16   vehicle for them to do that legally under the

17   securities laws.

18        Q.   Now, let's take a look at what Mr. Simmons

19   at least represented to you on February 29.  "In

20   connection with the registration statement," I'll

21   skip the number, "to be filed by this company under

22   the Securities Act of 1933, we affirm to the best of

23   our knowledge and belief that during the period from

24   December 31, 2007, to this date, February 29, 2008,

25   and except as set forth in such registration

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   statement and related prospectus, no events have

 2   occurred that would require adjustment to the

 3   consolidated financial statements as of December 31,

 4   2007, or that should be disclosed in order to keep

 5   those statements from being misleading."  Skipping

 6   ahead a little bit, we're not quite to February 28

 7   yet, but the jury has heard evidence about what

 8   happened on that date.  Do you understand that

 9   statement to be true?

10        A.   It's not true.

11        Q.   And why do you believe that not to be true?

12        A.   Because I became aware that on that date

13   they failed to meet a margin call with JPMorgan, and

14   JPMorgan declared them in default.

15        Q.   So having gone through your audit work and

16   your going to the audit committee, and documents you

17   didn't see, and communications you had and the

18   representation letter you received, if we can put

19   Plaintiff's Exhibit 321 back up.  Early in the

20   morning on February 28, did the 10-K get filed?

21        A.   Yes.

22        Q.   That's that document here?

23        A.   Yes.

24        Q.   After that document got filed, were there

25   any significant developments that followed shortly

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    thereafter that you learned of?

2        A.    Yes.

3        Q.    And what were those?

4        A.    That the company received a demand from

5    JPMorgan, as I mentioned, and they were unable to

6    satisfy that demand, and this was in the form of

7    margin calls under JP's repo agreement with the

8    company.

9        Q.    And how did you learn this fact?

10        A.    I got a call from Ms. Hall on Sunday, March

11    2.

12        Q.    Where were you when you received that call?

13        A.    I was in the car with my family coming back

14    from a ski trip.

15        Q.    And so what did you do after Ms. Hall

16    called you?

17        A.    I told her that I would meet her in the

18    office later that evening.

19        Q.    Did you, in fact, do that?

20        A.    Yes.

21        Q.    What happened when you and Ms. Hall got to

22    the office?

23        A.    She related to me what the events were.

24    Then we called our SEC partner, Mr. Clyde Womack, to

25    inform him of the events and discussed it.

SANTA FE OFFICE                                                            MAIN OFFICE
119 East Marcy, Suite 110                                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                                     Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                     FAX (505) 843-9492
                                                                       1-800-669-9492
                                                                   e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Q.   And did you consider this to be a good

2  development?

3    A.   No.

4    Q.   And did you consider it an event that was

5  going to require additional work on KPMG's part?

6    A.   Yes.

7    Q.   So after you spoke with Mr. Womack, did you

8  do anything further on Sunday night?

9    A.   We agreed that we would make plans in the

10  morning to reconvene and talk about it further, and

11  make some calls for our national office, which we

12  referred to as the Department of Professional

13  Practice.

14    Q.   Let's take a look at Plaintiff's Exhibit

15  280, please.  And this is an email from that Monday,

16  March 3, from you to Mr. Taylor.  Subject line:  "Are

17  you available?  I need to speak with you ASAP."  Is

18  this you reaching out to Mr. Taylor to have those

19  conversations?

20    A.   Yes.

21    Q.   So fair to say that you continued to

22  discuss this with folks at KPMG?

23    A.   Yes.

24    Q.   And did you ultimately conclude that you

25  needed to gather additional information?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   Yes.

2       Q.   Let's take a look at Plaintiff's Exhibit

3   201, please.  I'd like to look at the second email.

4   This is an email from Ms. Hall to Mr. Goldstone,

5   Ms. Starrett, Mr. Simmons, and Mr. Buniel and you're

6   copied on it.  Looks like it's late Monday night or

7   early Tuesday morning.  And it says, "Please give us

8   a call in the morning.  We will walk you through the

9   attached."

10          So let's look at the attached, if can you

11  turn the page, please, and blow up the top half of

12  the page, if that's possible.  And this is what Ms.

13  Hall communicated to the folks I listed at Thornburg.

14  It says, "A consent to include our audit opinion in a

15  registration is, in effect, a reissuance of our audit

16  opinion.  Therefore, events that occurred subsequent

17  to our original opinion and the date of our consent

18  must be considered in evaluating the continued

19  validity of our audit opinion."

20          What do you understand that to be

21  communicating?

22      A.   That's effectively saying here that if we

23  are to provide a consent in connection with the

24  company's plans to file a Form S-3 with the

25  Securities and Exchange Commission, that included in

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                            Albuquerque, NM 87102
(505) 989-4949                                                                         (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492
                                                                                    1-800-669-9492
                                                                           e-mail: info@litsupport.com



BEAN &ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    that document is the auditor's report.  And because

2    it's included, it's effectively reissuing the report

3    again.  If there's any events that have occurred, we

4    have to consider those events in order to be able to

5    reissue that report.

6        Q.   Okay.  And then the document goes on.  It

7    says, "Considering the proximity of the events to the

8    filing of the Form 10-K, there is a presumption that

9    the company should have been aware or at least should

10   have considered the potential that there was a

11   reasonable chance that the company could have faced

12   margin calls in excess of its ability to meet such

13   calls."

14          Can you explain what that is communicating?

15       A.   That's effectively recounting the

16   circumstances that had just transpired, and that was

17   that the company, after filing its Form 10-K, wasn't

18   able to meet the margin call demand that was made

19   from JPMorgan that very next day.  So we're

20   effectively saying here that there is some indication

21   that -- an awareness that perhaps should have been

22   present at the time.

23       Q.   And then the next sentence says, "The

24   company's inability to meet margin calls within 48

25   hours of filing the Form 10-K calls into question



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   management's assertion and consequently our audit

2   opinion as of the filing date that the company had

3   the ability to hold the securities for the

4   foreseeable future, and that the available-for-sale

5   securities did have an other-than-temporary

6   impairment to be recognized" -- I'm sorry, "did not

7   have an other-than-temporary impairment to be

8   recognized in earnings as of December 31, 2007."  So

9   what is that saying?

10      A.   That's saying that the company didn't have

11  sufficient liquidity, as demonstrated by its

12  inability to meet the margin call from JPMorgan, so

13  it calls into question the assertion that they made

14  to us that they could hold these securities until

15  they recovered.

16      Q.   And then it says, "The question at hand:

17  What did management know before, during, and after

18  the filing and what should management have known?

19  Per discussions with management, the events on August

20  28 through March 3 were not and could not have been

21  reasonably anticipated."

22           And then it goes on to seek some

23  information; is that correct?

24      A.   Yes, it does.

25      Q.   Okay.  So this is sort of laying out your



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    position and asking them to provide you some

 2    information; is that right?

 3         A.    Yes.

 4         Q.    Now, did you get back written responses

 5    from Thornburg in response to this request?

 6         A.    We did get back written responses for some

 7    of the requests.

 8         Q.    And they knew that this was very

 9    time-sensitive; correct?

10         A.    Yes.

11         Q.    And they got back to you the next day?

12         A.    Yes.

13         Q.    So the first document I'd like to look at

14    is Plaintiff's Exhibit 282, please.  So this is an

15    email from Ms. Starrett to Ms. Hall and to you, and

16    it appears to be answering a series of questions.

17    And I want to draw your attention to the one there,

18    the one that says, "Do they essentially have the

19    unilateral ability to reduce asset values?"

20              And Mr. King, if we could go back to

21    Plaintiff's Exhibit 201 and look at the last page of

22    that document, please, then blow up paragraph 3.  And

23    if you look there, one of the questions that you're

24    asking is:  "Do they essentially have the unilateral

25    ability to reduce asset values?"

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                              1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

1        So Exhibit 282 is Ms. Starrett's answer to

2   that question.  Is that what you understand?

3        A.   Yes.

4        Q.   Okay.  So let's look at what Ms. Starrett

5   wrote.  "No, but in reality, they really have the

6   ultimate say, and under current conditions have

7   generally discounted the company's view when it has

8   challenged the pricing.  So the company is, in

9   effect, solely subject to their pricing.  The company

10  has submitted disputes where it believes its assets

11  were undervalued but, as stated, upon dispute, the

12  counterparty rechecks their margin through their

13  pricing department."

14        So what do you understand Ms. Starrett to

15  be communicating to you there?

16        A.   She's essentially saying there is a bit of

17  back-and-forth between the company and the

18  counterparty, but ultimately, if there is a

19  disagreement, the counterparty, or the lender,

20  rechecks and their pricing department has the

21  ultimate say in the value.

22        Q.   Now, let's take a look at Plaintiff's

23  Exhibit 284, please.  Do you recognize this as being

24  a further response of Thornburg on March 4 in

25  response to the document that we were looking at

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    previously from Ms. Hall late on -- I guess late on

 2    the night of March 3 or early on the morning of March

 3    4?

 4         A.   Yes.

 5         Q.   Okay.  And at the top there, there is some

 6    handwriting that says, "PBC PVC Kyle Rhoades and Clay

 7    Simmons."  Can you tell me what you understand that

 8    to be?

 9         A.   The "PBC" stands for "prepared by client,"

10    and the authors were Kyle Rhoades, who worked at

11    Thornburg, and Clay Simmons.

12         Q.   I just want to draw your attention to one

13    particular thing that's contained in this document.

14    In the second paragraph it says, "Due to a number of

15    factors, including the unexpected collapse of a major

16    hedge fund in Europe, the mortgage market gapped

17    significantly wider."  Do you know what Mr. Rhoades

18    and Mr. Simmons are referring to here when they refer

19    to an unexpected collapse of a major hedge fund?

20         A.   That was the Peloton fund that collapsed.

21         Q.   Having now seen the emails that Mr. Simmons

22    was on and that Mr. Goldstone was on, do you have an

23    understanding of whether this was known to Mr.

24    Simmons prior to the Form 10-K being filed?

25         A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And what's that understanding?
 2        A.   They were aware that Peloton, a European
 3   hedge fund I think was how it was put, was
 4   collapsing.
 5        Q.   Now, Mr. King, would you call up
 6   Plaintiff's Exhibit 285, please?
 7             Ms. Reinhart, I believe this document is
 8   another copy of the document that we were looking at
 9   before the request that you sent over to Thornburg.
10   But this one comes from KPMG's files.  Look down at
11   the Bates number at the bottom.  You'll see that the
12   Bates number reflects it's from your files.  Does
13   this -- judging from the handwriting and the
14   markings, does that seem correct to you?
15        A.   Yes, it does.
16        Q.   Okay.  What I'd like to do is draw your
17   attention to the second page, and you see that there
18   is -- it says, "Outline time line of events," and
19   there is a whole series of things listed there.  What
20   do you understand this to be?
21        A.   This is a request that we were providing to
22   the company to give the KPMG auditors information
23   about the margin call activity in the time periods
24   that are outlined here.
25        Q.   Okay.  I want to draw your attention to the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    one at (B)(i).  It says, "Correspondence with

2    counterparties for the two weeks prior to filing

3    along with supporting evidence."  Do you see that?

4        A.   Yes.

5        Q.   And is that a request for communications

6    that Thornburg was having with its repo lending

7    counterparties?

8        A.   Yes.

9        Q.   And would that request have -- was that

10   request asking for documents such as the Citi

11   reservation of rights letter?

12       A.   Yes.

13       Q.   And in response to this request, did

14   Thornburg, in fact, provide you that Citi reservation

15   of rights letter?

16       A.   No.

17       Q.   From looking at this document, can you

18   determine what Thornburg's response was to this

19   particular request?

20       A.   Yes.

21       Q.   And what was that?

22       A.   That management indicated there was minimal

23   correspondence in that time period.

24       Q.   Okay.  All right, Ms. Reinhart.  Now I'd

25   like to move to a slightly new topic.

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                                       (505) 843-9494
FAX (505) 843-9492                                                          FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1933

```
 1              So after you learned about these margin

 2   calls and after you gathered this information, what

 3   did KPMG decide that it was going to do about its

 4   audit opinion?

 5        A.   We decided that we would withdraw our audit

 6   report.

 7        Q.   When you say "we," who is the "we" in that

 8   sentence?

 9        A.   It's me and the SEC concurring partner,

10   Mr. Womack; Mr. McLamb, who was the business unit

11   professional practice partner.  There were

12   individuals in our Department of Professional

13   Practice in New York, which included Mr. Foley, Mr.

14   Crawford, and I believe Mr. Ranzilla.  And so it was

15   a decision that was reached among partners at the

16   highest level of the firm.

17        Q.   What is Mr. Ranzilla's position?

18        A.   He was in charge of KPMG's Risk Management

19   Department.

20        Q.   Big job.

21        A.   A very big job.

22        Q.   And so it's fair to describe these people

23   as senior folks at KPMG?

24        A.   Yes.

25        Q.   And why were so many senior folks at KPMG
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    involved in making this one decision?
 2         A.   Because we don't take the potential
 3    withdrawal of an audit opinion on a public company
 4    lightly.
 5         Q.   Any idea, between yourself and these five
 6    other folks, how many years of auditing experience
 7    that would represent in 2008?
 8         A.   300.  That's a guess.  A lot.
 9         Q.   So I take it that this is a serious
10    decision.
11         A.   It is.
12         Q.   Involving serious people at the highest
13    levels of your firm?
14         A.   Yes.
15         Q.   And it's not a decision that's made
16    lightly?
17         A.   Not at all.
18         Q.   And are there consequences to KPMG deciding
19    to withdraw its opinion?
20         A.   Yes.
21         Q.   And can you tell the jury what some of
22    those consequences would be?
23         A.   Well, first off, it would certainly draw
24    the attention of the regulators, pretty much right
25    away, that there is an opinion being withdrawn.  And
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    it draws unfavorable attention certainly to me

2    personally as a partner within the firm.

3        Q.   When you say the regulators, you're talking

4    about me, you're talking about the SEC; right?

5        A.   Yes.

6        Q.   So your point is, it makes it more likely

7    that you're going to be investigated by withdrawing

8    your audit opinion than if you don't?

9        A.   Yes.

10       Q.   So you convened all these people with lots

11   of experience, you thought about it, and you

12   ultimately decided to do this thing that apparently

13   is not something that's done lightly or has any

14   particular good benefit to you; is that right?

15       A.   That's right.

16       Q.   Okay.  So why did you decide that this was

17   the thing that you had to do?

18       A.   Well, it was the right thing to do.  We

19   became aware that the financial statements were

20   misleading and that investors were relying upon that

21   report.  It became paramount to getting the report

22   off the street so that further reliance was not made.

23       Q.   Let's take a look at Plaintiff's Exhibit

24   281.  Is this a letter from KPMG to the Thornburg

25   audit committee advising them of this decision that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  you and the other folks had reached about withdrawing

2  the audit opinion?

3       A.   Yes.

4       Q.   And if you look here in the middle

5  paragraph it says, "Under our professional standards,

6  we have considered conditions and events that were

7  known or should have been known to the company as of

8  the date of our auditor's report and have concluded

9  that the aforementioned financial statements contain

10 material misstatements associated with

11 available-for-sale securities and that our auditor's

12 report should have contained an explanatory paragraph

13 indicating that substantial doubt exists relative to

14 the company's ability to continue as a going concern

15 for a reasonable period of time."

16           Can you explain to the jury what those

17 words mean?

18      A.   Those words mean that we believe the

19 financial statements are not accurate with respect to

20 the accounting for those securities that had

21 other-than-temporary impairments and that the

22 company's liquidity assessment related to going

23 concern that wrapped around those securities -- that

24 those conclusions were not accurate any longer.

25      Q.   And the next sentence says, "Accordingly,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1937

```
 1    the company should take appropriate actions to
 2    prevent further reliance on our auditor's report."
 3    What does that mean?
 4         A.    That means that the company needs to advise
 5    the investing public via a filing, a Form 8-K, that
 6    the auditors have withdrawn their report.
 7         Q.    And why are you telling the company that
 8    they need to take those actions?
 9         A.    Because they're responsible for their
10    financial statements and their securities filings.
11    That's not something that the auditors do.
12         Q.    And now is this something that gets
13    communicated?  Who does this get communicated to?
14    Does it get communicated to the audit committee?
15         A.    Yes, it does.
16         Q.    Let's take a look at Exhibit 180, please.
17               THE COURT:  Mr. Kasper, I want to give the
18    jury a little break and particularly Ms. Bean.  Would
19    this be a good time for a break?
20               MR. KASPER:  Yes, Your Honor.
21               THE COURT:  All right.  Let's come back in
22    a few minutes and work till about 5:30.
23         A.    All rise.
24               (The jury left the courtroom.)
25               THE COURT:  Anything we need to discuss?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. KASPER:  No, Your Honor.

 2            MR. McKENNA:  No, Your Honor.

 3            THE COURT:  Mr. Lee?

 4            MR. LEE:  No, Your Honor.

 5            (The Court stood in recess.)

 6            THE COURT:  All right.  Are y'all ready?.

 7            (The jury entered the courtroom.)

 8            THE COURT:  All right.  Everyone be seated.

 9            All right, Ms. Reinhart.  I'll remind that

10    you're still under oath.

11            Mr. Kasper, if you wish to continue your

12    direction of Ms. Reinhart, you may do so at this

13    time.

14            MR. KASPER:  Thank you, Your Honor.

15       Q.   (By Mr. Kasper)  Ms. Reinhart, do you see

16    there on the screen Plaintiff's Exhibit 180, which is

17    the March 4 audit committee minutes?  That's the same

18    date as the letter we were looking at before the

19    break.  Is this when you communicated to the board

20    that you were withdrawing your opinion?

21       A.   Yes.

22       Q.   How did that go?

23       A.   It was tough.  It was a difficult

24    conversation.

25       Q.   What was the company's position?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1939

```
 1        A.    The company -- their position was, they
 2   didn't want to withdraw that report; that they wanted
 3   us to consider whether or not the events that had
 4   occurred would be events that would be recorded in
 5   the first quarter of 2008.
 6        Q.    And what did you ultimately conclude?
 7        A.    That the report needed to be withdrawn.
 8        Q.    And did that decision mean it was likely
 9   that Thornburg would restate its financials?
10        A.    Yes.
11        Q.    And did they ultimately reach that
12   determination?
13        A.    Yes.
14        Q.    So can you explain to the jury, when do you
15   have to restate your financials?
16        A.    When you become aware of a material
17   misstatement, an error in the financial statements,
18   required to go through a consideration as to whether
19   or not they need to be restated.
20        Q.    And if there is such an error, that's when
21   you have to file a restatement?
22        A.    In general, yes.  It depends somewhat on
23   the time period after the discovery of the error.
24   But typically, if you find that the financial
25   statements contain an error, you go through a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  restatement.

2      Q.   Is that something, you know, that's

3  discretionary or are there rules that prescribe it

4  and if the rules say you have to restate, you have to

5  restate?

6      A.   It's a little bit of both, I would say.

7  There is judgment involved in the determination, but

8  once you reach the conclusion that the report would

9  be withdrawn, then you proceed through the

10  restatement.

11     Q.   Now, would there be consequences for

12  Thornburg associated with restating its financial

13  statements?

14     A.   Yes.

15     Q.   It was going to make their business more

16  complicated going forward; correct?

17     A.   Yes.

18     Q.   And it would likely make it more difficult

19  for them to raise money; right?

20     A.   Yes.

21     Q.   But if a restatement is going to make it

22  more difficult for a company to raise money, is that

23  a reason not to restate?

24     A.   No.

25     Q.   And I assume it was going to cause a lot of



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    disruption, and Thornburg's management was going to

2    have to pay a lot of attention to this issue.  And if

3    a restatement is going to cause that sort of

4    disruption and management's resources being diverted,

5    is that a reason not to restate?

6         A.   No.

7         Q.   And does Thornburg's restatement advantage

8    KPMG in some way?

9         A.   No.

10        Q.   Did KPMG withdraw its audit opinion for any

11   reason other than the fact that the auditing

12   standards require it?

13        A.   No.

14        Q.   And do you have a view of the investors'

15   need for that information that KPMG had withdrawn his

16   audit opinion?

17        A.   I do have a view, yes.

18        Q.   What's that view?

19        A.   That the investors needed to know that the

20   financial statements contained a material error in

21   it, and they needed to know that promptly.

22        Q.   And that's what we saw in your letter, that

23   you were advising them that they needed to let

24   investors know that; right?

25        A.   Yes.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And did you ask them to release this fact

2    that you had withdrawn your opinion right away?

3    A.   Yes.

4    Q.   And what did they say?

5    A.   My recollection is they wanted to delay the

6    filing of the 8-K that included our letter and notice

7    a few days.

8    Q.   Let's take a look at Plaintiff's Exhibit

9    328, please.  So this is a document dated March 7.

10   And if we look at item 4.02, which is about the fifth

11   or sixth page in, Mr. King, this says, "On March 4,

12   the company was advised by its independent

13   accountant, KPMG, that no further reliance should be

14   placed on the auditor's report dated February 27,

15   2008."

16         To your knowledge, was this the first time

17   that fact was communicated to the market?

18   A.   Yes, this is the first time.

19   Q.   And this was on March 7?

20   A.   Yes, I believe it was.

21   Q.   And so on March 5th, your audit report had

22   been withdrawn, but Thornburg investors were not

23   aware of that fact?

24   A.   That's right.

25   Q.   And March 6, also the same?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1943

```
 1        A.   That's right.
 2        Q.   So people were out making investment
 3   decisions without knowing that you had withdrawn your
 4   audit opinion?
 5        A.   I would presume so, yes.
 6        Q.   And you had asked the company to disclose
 7   the fact that you'd withdrawn your audit opinion, but
 8   they refused?
 9        A.   Well, I don't know that they refused it,
10   but they wanted to delay it.
11        Q.   They requested to delay it.
12        A.   Yes.
13        Q.   In light of the company's decision to
14   restate, would you have to issue a new audit opinion?
15        A.   Yes.
16        Q.   And before you could do that, did you have
17   to look into why there was a need for a restatement
18   in the first place?
19        A.   Yes.
20        Q.   And was that sort of -- was that question
21   looked into prior to your issuing your audit opinion
22   in connection with the restatement?
23        A.   Yes.
24        Q.   And was that the work that Mr. McLamb was
25   involved in?
```

SANTA FE OFFICE                                             MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                          1-800-669-9492
                                                  e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.   He was involved in a portion of that work,

2  yes.

3      Q.   And he conducted some interviews related to

4  that?

5      A.   Yes.

6      Q.   And do you know, one way or the other,

7  whether or not he asked the Thornburg employees that

8  he did meet with why KPMG was not told that margin

9  calls were not met on a daily basis?

10     A.   I wasn't part of those meetings, so I don't

11  recall.

12     Q.   But is it fair to say that he did do some

13  work in connection with making that determination?

14     A.   Yes.

15     Q.   Okay.  And then after KPMG withdrew its

16  opinion and after the 8-K was belatedly released and

17  after you did this additional work, including the

18  review of the reasons for the restatement, did

19  Thornburg ultimately issue its restatement?

20     A.   Yes.

21     Q.   Can we put up Plaintiff's Exhibit 329?  And

22  this is that document?

23     A.   Yes, it is.

24     Q.   And if we looked in there, we'd find that

25  there is an audit opinion from you in there.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492
                                                              1-800-669-9492
                                                  e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1       A.   Yes.

2       Q.   And unlike the other one, it would have

3  that going concern paragraph that we talked about an

4  hour or so ago?

5       A.   It would.  It does.

6       Q.   And what role, if any, did KPMG have in the

7  restatement?

8       A.   Well, our role is, again, to serve as the

9  independent auditors, and so our role is to once

10 again reach an opinion on the financial statements,

11 perform sufficient testwork to allow us to reach that

12 opinion.

13      Q.   And do you recall when the restatement was

14 filed?

15      A.   I believe it was March 11, if I'm not

16 mistaken, 2008.

17      Q.   So for the type of work you do, is from

18 March 4 to March 11 a long time or a short time to do

19 the work associated with a new 10-K filing?

20      A.   It's a short time.

21      Q.   So was there lots of work being done?

22      A.   Yes, there was.

23      Q.   Were you working weekends?

24      A.   Yes, we were.

25      Q.   Nights?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Nights, yes.
 2        Q.    And during that time, did you have any
 3    encounters, notable encounters, with Mr. Simmons
 4    during that period?
 5        A.    Yes.
 6        Q.    Can you tell me about that?
 7        A.    My recollection, it was on the weekend
 8    leading up to finalizing accounting entries
 9    associated with the impaired securities.  And he was
10    angry that we could not reach what he thought was a
11    quick decision on the accounting entries, and so he
12    came to the second floor and was extremely hostile to
13    me personally as we were trying to wrap things up.
14        Q.    All right.  So the restatement gets filed
15    on March 11.  And then the last thing I want to cover
16    is:  Do you ultimately have a meeting on March 18
17    with the audit committee?
18        A.    Yes.
19        Q.    And if we can pull up Exhibit IB, please,
20    Mr. King.  Thank you.
21              And this is the minutes of that meeting.
22    It's the minutes of a meeting of the audit committee
23    dated March 18, and it indicates that you and Mr.
24    McLamb were present, Mr. McLamb by phone.  Is that
25    consistent with your recollection?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   Yes.

2    Q.   Okay.  And I wanted to talk to you about --

3    did you -- during that meeting, did you tell the

4    audit committee about certain things that had

5    happened and that you learned about during the

6    restatement that you didn't know about during the

7    audit that you feel like you should have known about?

8    A.   Yes, we did.

9    Q.   And what were those things?

10   A.   The things that we told them were that,

11   one, the company had stopped funding loans in that

12   time period.  We were not made aware of that.  Two,

13   that the company was not meeting its margin calls on

14   a daily basis, not satisfying calls that were issued

15   by lenders on a daily basis, not meeting those in

16   accordance with the agreements.  Three, that they had

17   received, from January 1st up through the date of the

18   filing, nearly a billion dollars of margin calls in

19   that time period.

20        And the fourth thing --

21   Q.   Does it relate to I/O strips?

22   A.   Yes, the purpose of the I/O strip sale.

23   Q.   So you communicated that to the board, that

24   those were things not told to you during the audit

25   but you wish they had been?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes, we told the audit committee.
 2        Q.    So let's look at the KPMG overall
 3   conclusion section of the minutes.  And the first
 4   bullet there says that "Cynthia Reinhart stated that
 5   KPMG's two primary conclusions were:  There are no
 6   concerns about senior management's integrity during
 7   this period, February 14 to March 11."
 8             Did you give them that opinion at the
 9   meeting?
10        A.    I did.
11        Q.    And how did you reach that opinion in light
12   of the additional information you learned during the
13   restatement that you had just -- that you also told
14   the audit committee at that meeting?
15        A.    At the time, we didn't think that they
16   weren't being purposely forthcoming, but that they
17   for -- didn't appreciate that we needed that
18   information in order to be able to reach our
19   conclusions.
20        Q.    You thought it was sort of an oversight on
21   their part?
22        A.    Oversight, yes.
23        Q.    Now, at the time that you reached this
24   opinion on March 18 that's memorialized in these
25   audit commitment meetings that there were no concerns
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1949

```
 1    about senior management's integrity, did you know at
 2    that moment that Thornburg had received a reservation
 3    of rights letter from Citi?
 4         A.   No.
 5         Q.   Did you know at that moment that
 6    Thornburg's senior management knew about the
 7    impending collapse of the Peloton hedge fund prior to
 8    filing the Form 10-K?
 9         A.   No.
10         Q.   Did you know that Thornburg had canceled a
11    securitization to avoid making disclosures about its
12    margin call situation?
13         A.   No.
14         Q.   Did you know that Ms. Starrett had
15    indicated in an email to Mr. Goldstone and Mr.
16    Simmons that they had purposely not told KPMG certain
17    things about margin calls?
18         A.   No.
19         Q.   And those are all things we've seen in the
20    documents today.
21         A.   That's correct.
22         Q.   If you had known all that information on
23    March 18, would you have reached the same conclusion?
24         A.   I would not have.
25         Q.   What is your opinion today?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1950

```
 1        A.   My opinion today is that we were --
 2   information was purposely withheld from us as the
 3   external auditors.
 4             MR. KASPER:   That's all the questions I
 5   have, Your Honor.
 6             THE COURT:   Thank you, Mr. Kasper.
 7             Cross-examination, Mr. Lee?
 8             MR. LEE:   Thank you, Your Honor.
 9             THE COURT:   Mr. Lee.
10                  CROSS-EXAMINATION
11   BY MR. LEE:
12        Q.   Good afternoon, Ms. Reinhart.
13        A.   Good afternoon, Mr. Lee.
14        Q.   You testified a number of times this
15   afternoon about your view or your belief that
16   management has an affirmative obligation to bring
17   significant information to the attention of the
18   auditors; right?
19        A.   Yes, I did.
20        Q.   And that testimony was in reference to the
21   management -- the engagement letter that was entered
22   into between Thornburg and KPMG; correct?
23        A.   The engagement letter and also the
24   representation letter that's provided from management
25   to KPMG has those affirmations.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Right.  And you understand that the

2  engagement letter is not at issue in this case.  You

3  understand that Mr. Goldstone and Mr. Simmons are not

4  being charged with breaching the engagement letter;

5  correct?

6    A.   I don't know specifically what the charges

7  are, Mr. Lee.

8    Q.   Oh, you don't even know that the engagement

9  letter is -- violating the engagement letter is not a

10  violation of the federal securities laws?  You're not

11  aware of that?

12    A.   I've not focused on the specific charges.

13  That's all.

14    Q.   And are you aware that there is actually a

15  federal statute that governs the provision of

16  information by management to auditors?  Are you aware

17  of that?

18    A.   Yes.

19    Q.   And can you tell me what statute is?

20    A.   No, I cannot tell you what that statute is.

21    Q.   And you don't have an opinion on that

22  statute; correct?

23    A.   No, I don't.

24    Q.   And you understand that that statute is

25  what my clients are charged with violating in this

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                               1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1   case; correct?

2        A.   If you say so, yes.

3        Q.   And so you have no opinion on whether or

4   not the provision of information or the lack of

5   information alleged by my client is a violation of

6   the statute at issue in this case, do you?

7        A.   No, I don't.

8        Q.   And so all of your testimony about -- your

9   view that management has an affirmative obligation to

10  bring information to your attention, none of that is

11  relevant to the statute, at least insofar as you

12  understand it; correct?

13       A.   Well, I can only relate to you what I

14  understand with respect to auditors and auditees'

15  responsibilities among themselves.

16       Q.   Right.  But you don't have an understanding

17  of the statute that actually sets forth the legal

18  framework for the relationship between auditors and

19  management; correct?

20       A.   No, I do not.

21       Q.   Now, you were asked a number of questions

22  about emails written by other people.  Do you recall

23  that?

24       A.   Yes, I do.

25       Q.   And you were asked by Mr. Kasper to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   speculate about the meaning of various emails written

2   by other people; right?

3        A.   I read those emails, yes.

4        Q.   And he asked you what did you understand

5   them to mean; right?

6        A.   Yes.

7        Q.   And you have not spoken to the authors of

8   those emails; right?

9        A.   I have not.

10       Q.   And Mr. Kasper asked you a question about

11   whether it would be more useful to look at the letter

12   or the text of the email, or whether it would be

13   better, on the other hand, to hear an explanation

14   from two people who are on trial.  Do you recall that

15   question?

16       A.   Yes, I do.

17       Q.   And you testified that you would rather

18   just look at the email; correct?

19       A.   That was my testimony, yes.

20       Q.   And so your testimony is, you actually

21   aren't interested in the explanation of two people

22   who are on trial.  Is that fair to say?

23       A.   No, I wish I had the opportunity to hear

24   from those people at the time.  But I was not

25   afforded that opportunity.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And did you ever request the SEC for that

 2   opportunity when they started showing you emails

 3   during the investigation of this case?  Did you ever

 4   ask them for that opportunity?

 5        A.   No, I did not.

 6        Q.   Did you ever ask your lawyers, your team of

 7   lawyers that has been sitting here in court all day

 8   and throughout this trial -- did you ever ask them

 9   for the opportunity to hear what my clients have to

10   say about the emails that were being shown to you by

11   the SEC?

12        A.   No.

13        Q.   What about emails written by other people?

14   Do you recall Mr. Kasper showed you an email written

15   by Deborah Burns?  Do you recall that?

16        A.   Yes.

17        Q.   And he asked you, what do you understand

18   her to mean in her email; right?

19        A.   Yes.

20        Q.   And your response about what you understand

21   her to mean -- that is total speculation, isn't it?

22        A.   Well, I read the email and put it into the

23   context of what I understand was happening at that

24   time.

25        Q.   But you have no idea what Ms. Burns
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    actually meant, do you?
 2         A.   It would be hard for us to say "No idea."
 3    That would be, I don't think, true.
 4         Q.   Well, you've never spoken to Ms. Burns
 5    about what she meant in those emails; right?
 6         A.   I have not.
 7         Q.   You've never asked for the opportunity to
 8    speak to Ms. Burns about what's in those emails;
 9    right?
10         A.   I did not.
11         Q.   You haven't asked the SEC for that
12    opportunity?
13         A.   No.
14         Q.   And you haven't asked your lawyers for that
15    opportunity?
16         A.   No.
17         Q.   And you haven't gone to Ms. Burns directly
18    to ask for that opportunity, to hear what she had to
19    say; right?
20         A.   I wouldn't think that would be appropriate.
21         Q.   Well, Ms. Burns is not a defendant in this
22    case, is she?
23         A.   No, she's not.
24         Q.   Ms. Burns is a third-party witness, former
25    Thornburg employee, hasn't been employed at Thornburg
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    in eight years.  Why wouldn't it be appropriate for
 2    you to just ask her what she meant?
 3         A.   I wouldn't think it would be appropriate to
 4    discuss the matters of the trial to anybody outside
 5    of my attorneys, and having my best recollection.
 6         Q.   But you felt free to testify about what you
 7    think she meant, even though you had never heard from
 8    her; correct?
 9         A.   I did.
10         Q.   And you know that she testified in this
11    trial; right?
12         A.   I don't know if she did or is going to.  I
13    don't know.
14         Q.   So you haven't read the transcript of
15    her -- I'll represent to you that she testified.  You
16    haven't read the transcript of her testimony, have
17    you?
18         A.   No.
19         Q.   And do you know that Ms. Burns was actually
20    called as a witness by the SEC?
21         A.   I don't know if I'm aware of that.  I don't
22    know.
23         Q.   And you're not actually -- you don't
24    actually mean to be suggesting to the jury that
25    Ms. Burns was somehow engaged in a cover-up along
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    with my clients, are you?

 2         A.   I don't know.  I don't know if she was or

 3    wasn't.

 4         Q.   How about -- let's take a look at Exhibit

 5    69.  You see this was one of the emails that Mr.

 6    Kasper showed you?

 7         A.   Yes.

 8         Q.   And you see at the bottom she references --

 9    the very last sentence says, "I am going to put

10    something together with the help of our McKee

11    counsel."  Do you see that?

12         A.   Yes.

13         Q.   And do you know what the reference to McKee

14    counsel is?

15         A.   That's the company's outside third-party

16    attorneys.

17         Q.   Right.  McKee Nelson is a law firm that

18    represented Thornburg in connection with their

19    securitizations; right?

20         A.   That's correct.

21         Q.   You're not actually suggesting to members

22    of this jury that McKee Nelson, a big, reputable law

23    firm, is also somehow involved in a cover-up with my

24    clients, are you?

25         A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1        Q.   And you never reached out and talked to

 2   anybody at McKee Nelson about the circumstances

 3   surrounding the securitization, have you?

 4        A.   I never saw this email at the time, so I

 5   wouldn't -- I won't be able to answer that question.

 6             THE COURT:  Could we call it a day,

 7   Mr. Lee?

 8             MR. LEE:  Sure.

 9             THE COURT:  All right.  Well, ladies and

10   gentlemen, I appreciate your hard work today.  Let's

11   try to get another full day in tomorrow.  So I'll ask

12   you to be in the jury room about 8:30.  I know I

13   speak for everybody.  We appreciate your hard work

14   today and we appreciate all you've done for us.

15             All right.  We'll be in recess until 8:30

16   tomorrow.  All rise.

17             (The jury left the courtroom.)

18             THE COURT:  All right.  Everyone be seated.

19   Let me give you the totals so we see where we are at

20   the end of the day.  SEC has been on its feet since

21   openings, 18 hours and one minute.  And the

22   defendants have been on their feet since openings, 17

23   hours and 58 minutes.  So it's about as even as you

24   can get.

25             How do you feel, Mr. McKenna, at the end of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   day 7?  Do you feel like we're on track?

2          MR. McKENNA:  I think we've fallen a little

3   behind today, but I think we're still on track to get

4   done.  We're hoping to rest maybe even this week.

5          THE COURT:  All right.  Mr. Lee, what's

6   your assessment?

7          MR. LEE:  We're in agreement, Your Honor.

8          THE COURT:  Okay.  Somewhere today I passed

9   out to you the beginning of the verdict form.  I

10  didn't get any further progress on it.  But we'll

11  show you how -- I'm going to probably finish that

12  form tomorrow.

13          Is there anything we need to discuss before

14  we leave?  Mr. Kasper?

15          MR. KASPER:  I had a couple of evidentiary

16  issues I thought it might be helpful to discuss now.

17          THE COURT:  All right.  Go ahead.

18          MR. KASPER:  One is, during Mr. Lee's

19  examination of Ms. Hall, he asked a whole variety of

20  questions that went strictly to KPMG's internal

21  processes.

22          MR. LEE:  Your Honor, we'd ask -- I'm not

23  sure if it's appropriate for Ms. Reinhart --

24          THE COURT:  All right, Ms. Reinhart.  Why

25  don't you go ahead and step down for the evening, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1960

1    we'll see you again at 8:30 in the morning.

2              THE WITNESS:   Okay.

3              MR. KASPER:   So Your Honor, there was a

4    variety of questions that went to KPMG's internal

5    processes, and we had talked, you know, at one of the

6    pretrial conferences about the limits that were going

7    to be imposed on KPMG, and you know, and Your Honor

8    had said -- I wrote it down from the transcript --

9    the issue is not whether KPMG was competent or not.

10   And Mr. Lee said that he agreed with that, and that's

11   hopefully not what the case is about.

12             But then Your Honor went on to explain,

13   there is going to be the tie-out documents coming in

14   and there's going to be evidence about that.  But

15   it's -- what's allowed is -- it shows that it goes to

16   KPMG and that indicates that we, the defendants,

17   didn't deceive them or they didn't have the intent to

18   deceive.

19             So I understand that there is a lot of

20   stuff that comes in, but lots of the questions went

21   to, you know, once my clients gave you this little

22   piece of information, shouldn't you have followed up

23   and done these 11 other things, or whatever?  I don't

24   see how that possibly goes to any issue that's left

25   in the case.  It just seems like it plainly goes to

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                               1-800-669-9492
                                                        e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   the thing that Mr. Lee said that he wasn't going to

2   do, which is putting KPMG's competency on trial.  So

3   before -- I presume he's going to ask some similar

4   questions of Ms. Reinhart.  I just wanted to raise

5   that to see if there was going to be any limits

6   placed on that at all.

7          THE COURT:  All right.  Mr. Lee?

8          MR. LEE:  Well, Your Honor, I guess it's a

9   little hard to respond in a vacuum.  I'm not sure

10  exactly what Mr. Kasper is referring to. I don't

11  think the thrust of our argument has been -- or the

12  thrust of our questioning has been attacking KPMG's

13  competence at all.  We've taken great pains and it's

14  been laborious, as the Court knows, to go through all

15  the things that KPMG did do.

16         If there were questions about areas that

17  they could have followed up on, I mean, that's a

18  natural part of providing the overall context to the

19  work they did do and didn't do, particularly because

20  the entire thrust of the prosecution here is all the

21  things that KPMG didn't know.

22         THE COURT:  All right.

23         MR. KASPER:  Your Honor, the issue isn't

24  whether or not KPMG could have sussed it out, whether

25  or not they were the world's greatest auditors, they

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                           1-800-669-9492
                                                   e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  could have figured this out.  It goes to whether or

2  not the defendants were being fulsome or not, and I

3  don't see how any of those things go to that issue.

4  And I thought that issue had been addressed and

5  agreed, and all the parties had sort of a boundary in

6  mind about where those limits were.  And anyway, what

7  happened earlier today with Ms. Hall I thought was

8  well on the other side of that line.  So I just --

9  that's what I wanted to raise, because, I mean, I'm

10  happy to wait and make my objection when Mr. Lee goes

11  there and asks those questions, but I thought it

12  might make sense to do it now while we had a moment

13  without the witness or the jury here.

14          THE COURT:  Well, you know, it's been a

15  difficult line to draw.  I mean, I think it's

16  probably just going to have to sort itself out more

17  in closing argument than it really is on an

18  evidentiary scale.

19          Yes, I think there might be a few questions

20  that are more going to the negligence or the

21  competence of KPMG rather than to the fraud, but the

22  problem is, I think the line is so hard to draw, I

23  haven't been willing because I don't think I've been

24  able to confidently draw the line in the past.  It

25  may be one of those things where we have to take it a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    question at a time.  But in the end, I wonder if it's

 2    going to save us any time to try to slice the meat

 3    that thin.

 4              MR. KASPER:  I will at least tomorrow, to

 5    the extent I hear those questions, at least give it

 6    one or two tries and see if I get anywhere.

 7              There was another evidentiary issue I

 8    wanted to raise, which was:  We had talked about

 9    defendants' compensation so I had sort of two

10    questions about that.  One is:  Are we going to be

11    entitled to inquire of Ms. Starrett about what her

12    compensation was during those years, since she's no

13    longer a defendant?  The first question.

14              THE COURT:  I don't think that her -- I

15    mean if you want to impeach her, you know, you can

16    impeach her.  It's impeachment evidence, her bias,

17    goes to her credibility, why she had a motive to do

18    what she did.  I don't think that's changed.  If, in

19    fact, you feel that you need to get into her motive,

20    I think that evidence is still available to you.

21              MR. KASPER:  Thank you.  And then the other

22    issue was, you know, our motion ended up being about

23    defendants' compensation for 2006, 2007, 2008,

24    because, that's what we had written documents about,

25    and those documents ended up on our exhibit list when

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1964

1    the defendants filed their motion.  So my question

2    was what the Court's feelings were on their

3    compensation beyond that time.  We have other

4    evidence, testimonial evidence.  I know Mr.

5    Simmons -- I specifically asked him, and he told me.

6    And that evidence seems plainly relevant to me under

7    the same theory that it was before, they were making

8    these nice salaries before and the significance is

9    not only that they were nice salaries; in fact, I

10   think the real significance is they were salaries

11   that couldn't be recreated somewhere else other than

12   Thornburg.  And so the fact that they were making

13   these high salaries while they worked at Thornburg

14   and made significantly less money in the years since

15   seems relevant to me.

16           So I just wanted to not wander -- and we've

17   exchanged the letters you've instructed us to

18   exchange.  So for those years I have exactly the

19   questions and so forth.  But I didn't know if I would

20   be running afoul of the Court's order if I sought to

21   introduce evidence of Mr. Simmons' compensation, for

22   example, in the years after the documents we had and

23   that we exchanged the letter about.

24           THE COURT:  Any thoughts on that, Mr. Lee?

25           MR. LEE:  Well, yes.  I believe we have

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   already addressed this.  I mean, the motion was

2   argued.  I think any period of time after 2008 is

3   irrelevant.  It's not charged conduct.  The Court

4   heard argument on this issue.  The Court has, you

5   know, very carefully considered how to present that

6   evidence.  We've done that.  We've taken the time to

7   determine and reach agreement with the SEC on an

8   accurate sort of calculation and an accurate

9   presentation for 2006 through 2008.  We had taken the

10  position, as the Court may recall, that even 2006 was

11  irrelevant, but the Court felt like it was

12  appropriate to let in.

13          So I don't think further opening the door,

14  particularly at this late stage, is warranted.

15          THE COURT:  Well, I'm going to leave it

16  there.  I'm not sure how the evidence hurts you.  I

17  mean, in some ways, the fact that they're earning

18  less might draw some sympathy from the jury, the fact

19  that they suffered, just like everybody else,

20  including the shareholders.  But I do think as far as

21  evidence of motive, I guess it proves the fact.  But

22  it doesn't really show more motive.  So I'll leave my

23  ruling where it is.  I think we've carefully crafted

24  the way we're going to get in the evidence of motive.

25  I think the fact that they're not making what they

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    were doesn't really go to motive.  It just shows

2    that, you know, the motive was strong.

3            So I'll just leave the ruling where it was,

4    and that will be the limited evidence that we have of

5    salaries.

6            All right.  See y'all at 8:30 in the

7    morning.

8            MR. SCHULTZ:  Your Honor, one brief thing.

9    I have a hearing in state court in Gallup tomorrow.

10   With the Court's permission, I'd like to be excused

11   tomorrow.

12           THE COURT:  No objection from the SEC?

13           MR. McKENNA:  No.

14           THE COURT:  Have fun in Gallup.  Y'all have

15   a good evening.

16           (Court stood in recess.)

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1967

```
1                    C-E-R-T-I-F-I-C-A-T-E

2

3    UNITED STATES OF AMERICA

4    DISTRICT OF NEW MEXICO

5

6

7         I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

8    Official Court Reporter for the State of New Mexico,

9    do hereby certify that the foregoing pages constitute

10   a true transcript of proceedings had before the said

11   Court, held in the District of New Mexico, in the

12   matter therein stated.

13        In testimony whereof, I have hereunto set my

14   hand on June 14, 2016.

15

16

17

18   _____
                 Jennifer Bean, FAPR, RMR-RDR-CCR
19               Certified Realtime Reporter
                 United States Court Reporter
20               NM CCR #94
                 333 Lomas, Northwest
21               Albuquerque, New Mexico 87102
                 Phone:  (505) 348-2283
22               Fax:    (505) 843-9492

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com