1968

1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW MEXICO

3     SECURITIES AND EXCHANGE COMMISSION,

4                 Plaintiff,

5         vs.           NO:  12-0257 JB/GBW

6     LARRY A. GOLDSTONE, et al.,

7                 Defendants.

8

9                 VOLUME 8

10        Transcript of Trial Proceeding before The

11    Honorable James O. Browning, United States District

12    Judge, Albuquerque, Bernalillo County, New Mexico,

13    commencing on June 15, 2016.

14    For the Plaintiff:  Mr. Steve McKenna; Mr. Greg
      Kasper; Ms. Danielle Voorhees; Mr. Dugan Bliss

15

16    For the Defendants:  Mr. Randall Lee; Ms. Heather
      Tewksbury; Mr. Robert Badal;

17

18

19

20

21

22        Jennifer Bean, FAPR, RMR-RDR-CCR 94
              Bean & Associates, Inc.
23        Professional Court Reporting Service
          201 Third Street, Northwest, Suite 1630
24            Albuquerque, New Mexico 87102

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1969

```
1                    I N D E X
2    EXAMINATION OF CYNTHIA REINHART
3         Continued Cross-Examination by Mr. Lee 1972
4         Redirect Examination by Mr. Kasper     2144
5    EXAMINATION OF RALPH AHN
6         Direct Examination by Mr. Bliss        2173
7         Cross-Examination by Mr. Lee           2216
8         Redirect Examination by Mr. Bliss      2256
9         Recross-Examination by Mr. Lee         2264
10                  EXHIBITS ADMITTED
11   Defendants' Exhibit QE   Admitted           2232
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          THE COURT:  All right.  Is there anything
 2   we need to discuss before we bring the jury in, Mr.
 3   McKenna?
 4          MR. McKENNA:  No, thank you, Your Honor.  I
 5   was just going to mention we're going to file some
 6   more jury instructions this morning.
 7          MS. VOORHEES:  Just edits.
 8          THE COURT:  I got your three yesterday.  I
 9   haven't had a chance to study them yet.  I'll try to
10   take a look at those later this morning.
11          MR. McKENNA:  Thank you.
12          THE COURT:  Mr. Lee?
13          MR. LEE:  No.  We also intend to file some,
14   a few proposed additional jury instructions tonight,
15   and either tonight or tomorrow or shortly, some
16   thoughts on the Court's existing proposals.
17          THE COURT:  Well, I'm still proofing them.
18   My legal assistant did a pretty good job of typing
19   them up, but I'm still proofing them.
20          (The jury entered the courtroom.)
21          THE COURT:  All right.  Everyone be seated.
22          I guess we were just too rough on Ms. Wild;
23   right?  As she's probably told everybody.  I told the
24   lawyers and parties here, she got out of her car
25   yesterday and stepped on her ankle wrong, and she
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    began to come in from that break we had about 4:45

2    yesterday, I noticed that she was limping badly, and

3    I had to drive her to her car yesterday.  It was

4    beginning to swell.  And she stopped at urgent care

5    on the way home.  I guess it was so swollen, it began

6    to swell so much that they can't even tell whether

7    it's fractured or just a bad strain at the present

8    time.

9            I've known Ms. Wild since she was 18 -- or

10   I'll say 13, that would be better -- and she's always

11   moved pretty fast, so we finally figured out a way to

12   slow her down.

13           Well, good morning.  Thank you for being

14   back on time, ready to go.  We really appreciate all

15   you're doing for us, and look forward to a good day's

16   worth of work here.

17           All right, Ms. Reinhart, I'll remind you

18   that you're still under oath.

19           Mr. Lee, if you wish to continue your

20   cross-examination of Ms. Reinhart, you may do so at

21   this time.

22           MR. LEE:  Thank you, Your Honor.

23           THE COURT:  Mr. Lee.

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                      CYNTHIA REINHART,
 2          after having been previously duly sworn under
 3          oath, was questioned, and continued testifying
 4          as follows:
 5                    CONTINUED CROSS-EXAMINATION
 6    BY MR. LEE:
 7          Q.   Good morning, Ms. Reinhart.
 8          A.   Good morning, Mr. Lee.
 9          Q.   So yesterday when we left off, we were
10    talking about how the SEC kept asking you to
11    speculate about the meaning of emails that you were
12    not either sender or recipient on.  Do you remember
13    that?
14          A.   I think I wouldn't call it speculating, but
15    reading the emails, and then interpreting them as I
16    would understand them.
17          Q.   Without the benefit of actually hearing
18    from the authors of the email; right?
19          A.   That's correct.
20          Q.   So interpreting it based on your own
21    perspective without having any idea whatsoever as to
22    what the author actually intended; correct?
23          A.   Based on my experience and just reading the
24    email, I was able to interpret those emails to the
25    best of my ability.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And we were specifically talking about a

2    couple of emails sent by Deborah Burns.  Do you

3    recall that?

4    A.   Yes.

5    Q.   And the SEC had asked you on a couple of

6    occasions, I believe twice, what you thought

7    Ms. Burns meant; right?

8    A.   Yes.

9    Q.   And you responded to those questions

10   without ever having talked to her; right?

11   A.   Yes.

12   Q.   And you responded to the SEC's questions

13   without ever having asked for the opportunity to hear

14   what she had to say; right?

15   A.   Yes.

16   Q.   And you at one point said, when I asked

17   you, "Well, why didn't you just ask to try to talk to

18   her?" you said, well, you thought it would be

19   inappropriate for you to contact her.  Do you recall

20   that?

21   A.   Yes, I do.

22   Q.   But you also could have asked the SEC what

23   she had told them; right?

24   A.   I suppose if I thought about that, yes.

25   Q.   Right.  If you thought about it, you could

SANTA FE OFFICE                                        MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                         1-800-669-9492
                                              e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1974

```
 1    have.  And the SEC had interviewed her, so you could

 2    have asked the SEC -- you could have told the SEC,

 3    when you met with them, you could have said, "You

 4    know, before I go opining on someone else's email,

 5    I'd actually like to hear what that person has to

 6    say."  You could have done that.  Right?

 7         A.   I suppose.  I didn't know if that would be

 8    proper, but if you're suggesting it would be proper,

 9    I suppose I could have.

10         Q.   Well, you didn't even ask the question, did

11    you?

12         A.   No, I did not.

13         Q.   And how many times have you met with the

14    SEC in total, not including your deposition or the

15    testimony they took while the investigation was

16    pending?

17         A.   Three or four times, perhaps.  Three times.

18         Q.   And when was the last time you met with

19    them?

20         A.   Earlier this week.

21         Q.   And how about before that, when did you

22    last meet with them?

23         A.   Several weeks ago.

24         Q.   And how long did each of those meetings

25    last, approximately?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   A couple of hours, perhaps.
 2        Q.   So you had had ample opportunity in the
 3   last few weeks to try to get a better understanding
 4   of what people, the authors of various emails, might
 5   say; right?
 6        A.   Yes.  If I thought it was necessary I would
 7   have asked.  But I didn't.
 8        Q.   And that's because you just wanted to adopt
 9   whatever the SEC was leading you to say; right?
10        A.   No, I thought that I could appreciate what
11   the emails essentially were conveying, again based on
12   my reading of them and my experience with the
13   company.
14        Q.   And Ms. Burns testified at trial recently;
15   right?  You were aware of that?
16        A.   I'm not aware if she had testified or not.
17        Q.   But did you even ask the SEC if she had
18   already testified by the time you took the stand?
19        A.   I did not.
20        Q.   You didn't ask for the opportunity to see
21   what she had testified to about the emails that the
22   SEC was asking you to speculate on?
23        A.   No, I did not.
24             MR. KASPER:  Objection, Your Honor.  Could
25   we approach?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  You may.
 2              (The following proceedings were held at the
 3    bench.)
 4              MR. KASPER:  Both parties have invoked the
 5    rule.  It would have been completely improper if the
 6    witness had sought to review Ms. Burns' testimony.
 7    And Counsel's suggestion that she should have is
 8    completely improper.
 9              THE COURT:  Well, it does seem a little
10    odd.  Are you going to continue this?
11              MR. LEE:  I'm done with that questioning.
12              THE COURT:  Well, let's move on then.
13              MR. LEE:  Okay.
14              (The following proceedings were held in
15    open court.)
16              THE COURT:  All right, Mr. Lee.
17         Q.  (By Mr. Lee)  Now, yesterday we looked at
18    Exhibit 64, which was one of the emails the SEC asked
19    you to comment on.  Let's look at -- take a quick
20    look at that.  Do you recall this one?  That must not
21    be the right one.  The second one I want to look at
22    is Exhibit 90.  Do you recognize this email?
23         A.  Yes, I do.
24         Q.  This was the second of the emails that
25    counsel for the SEC asked you to comment on.  Do you
```

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                     (505) 843-9494
FAX (505) 843-9492                                 FAX (505) 843-9492
                                                   1-800-669-9492
                                                   e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    recall that?

2         A.   I don't remember if it was the second or

3    first, but I did look at it and I did comment on it.

4         Q.   Right.  And they pointed you to the

5    sentence that says, "If KPMG or anyone else asks

6    about the postponement of this deal, you should refer

7    them to me."  Right?  They asked you about that

8    sentence?

9         A.   Yes.

10        Q.   The next sentence, however, reads, "Here is

11   the language that McKee and I came up with to give to

12   the RMBS investor that asked for an explanation in

13   writing."  Do you see that?

14        A.   Yes, I do.

15        Q.   And we established yesterday that you know

16   that McKee is short for McKee Nelson, which was a law

17   firm representing Thornburg in its securitizations;

18   right?

19        A.   Yes.

20        Q.   And you know that McKee is a

21   well-recognized, reputable firm based in New York

22   that specializes in that kind of work; right?

23        A.   If you say so.

24        Q.   Well, you had heard of McKee Nelson, I

25   assume, right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2             MR. KASPER:  Objection, Your Honor.  Could
 3   we approach again?
 4             THE COURT:  You may.
 5             (The following proceedings were held at the
 6   bench.)
 7             THE COURT:  I thought McKee Nelson was out
 8   of Washington.
 9             MR. KASPER:  That wasn't my objection.
10             THE COURT:  I think it is.
11             MR. KASPER:  Your Honor, during the
12   pretrial in this case, we exchanged interrogatories
13   with the defendants.  We specifically asked them if
14   they were going to make a reliance-of-counsel
15   defense, and they specifically told us they were not.
16   And they are going to great lengths in this trial to
17   do exactly what they told us they were not, and they
18   should be obliged to --
19             THE COURT:  I noticed in your jury
20   instructions you submitted a reliance-on-counsel
21   instruction.  So is this unanticipated?
22             MR. KASPER:  I guess that's probably -- to
23   be honest, I haven't been focused on the jury
24   instructions.
25             THE COURT:  I think it was yours.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1979

```
1            MR. McKENNA:  But that was more for the
2     auditors as opposed to counsel, was what that
3     instruction pointed to.
4            THE COURT:  So you're saying the
5     interrogatory says that they were not going to rely
6     upon lawyers?
7            MR. KASPER:  Right.  We specifically asked,
8     "Do you intend to rely on the advice of legal counsel
9     in any manner as a defense to any claim in the
10    complaint?"
11           And they say some objections and they say,
12    "Defendants do not intend to assert advice of counsel
13    as a formal defense to any claim in the complaint."
14           THE COURT:  Does this go to something else?
15           MR. LEE:  It does, Your Honor.  This is not
16    a reliance on counsel.
17           THE COURT:  And you're not intending to
18    raise a reliance-on-counsel defense?
19           MR. LEE:  We are not.  The point is that,
20    you know, she's essentially alleging this big
21    cover-up and the SEC, the necessary implications of
22    all of this -- many of SEC's questions is that there
23    is a cover-up by other people beyond Mr. Goldstone
24    and Mr. Simmons.  I asked this question yesterday.  I
25    was planning to ask it again, essentially, that are
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   you suggesting that McKee Nelson somehow engaged in
 2   improper behavior, as well as --
 3           THE COURT:  The SEC is alleging what --
 4   that there is a cover-up beyond -- I haven't heard
 5   that.
 6           MR. KASPER:  You haven't heard it because
 7   we haven't made it.
 8           THE COURT:  You know, I guess you could ask
 9   the question, but it seems to me it's a phantom
10   issue.
11           MR. LEE:  I think it will become clear as I
12   go through my cross on some other documents, the
13   necessary implications of the SEC's arguments that
14   such and such a piece of information or such-and-such
15   a document --
16           THE COURT:  Seems like you're fighting an
17   issue that's not here.
18           MR. LEE:  Oh, I respectfully disagree.  I
19   think it is.
20           THE COURT:  I've never heard it in the case
21   before that they think there is anything beyond
22   Goldstone and Simmons and Starrett.  So I guess to
23   start dragging in law firms, you're doing it, not
24   them.
25           MR. LEE:  The point, Your Honor, is that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    they have shown her -- and her as well as other

2    witnesses -- a number of documents and asked the

3    question or series of questions about whether this

4    should have been disclosed, whether you would have

5    wanted this to have been disclosed.  And the point is

6    that on many of those documents there are other

7    people -- there are other people either copied on the

8    document or there are other people referenced in the

9    document such as within a particular document.  And

10   the necessary implication is that all of those other

11   people who were also participants in the discussion,

12   the email chain and so on.

13           THE COURT:  I don't see that as being a

14   necessary implication.  I think you're dragging in

15   issues and you're creating phantom issues, and then

16   trying to defend against them.  So I don't see it.

17           MR. KASPER:  Even if we were dragging in

18   somebody else, whether that person is a lawyer or

19   not, or how esteemed a lawyer, or in New York or

20   Washington, D.C., certainly has no place in the case

21   other than to suggest that they were relying upon

22   legal advice and that their conduct was appropriate

23   because the lawyers told them that was appropriate,

24   and that's explicitly what the defendants said they

25   would not do.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1982

1        MR. LEE:  Your Honor, Ms. Burns herself

2   testified that she worked, in the case of this

3   particular email --

4        THE COURT:  I'm not going to preclude the

5   question.  I'm going to take your word that you're

6   not going to rely upon advice of counsel for a

7   defense.  But I think you better be careful.  You've

8   got enough things to defend against.  Dragging in

9   more doesn't seem to be helpful to you.  I mean, I

10  just don't agree with you that it's a necessary

11  implication.  Till this moment, I never thought that

12  the SEC was intending that McKee Nelson or anybody

13  else was part of the wrongdoing here.  So if you want

14  to make them part of it, I guess I can think about

15  the strategic implications of that, but I just don't

16  agree that it's a necessary implication of what the

17  SEC's charges are.

18        MR. LEE:  Well, I guess to put it

19  differently, I mean, it is a sort of a strategic

20  approach by us, but to put it differently, I think it

21  tends to rebut the implication that our clients did

22  anything purposeful or intentional or nefarious, if

23  it is open, and, you know, if the various emails that

24  were supposedly concealed were open and publicized or

25  published to a number of different people.  And that

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                          1-800-669-9492
PROFESSIONAL COURT                        e-mail: info@litsupport.com
REPORTING SERVICE

1983

```
 1    will, I think, become clear in a couple of lines of
 2    cross.
 3              THE COURT:  I think that's the reason I'm
 4    going to allow the question, but I don't agree with
 5    the other argument.
 6              MR. LEE:  Okay.
 7              MR. KASPER:  Thank you, Your Honor.
 8              (The following proceedings were held in
 9    open court.)
10              THE COURT:  Mr. Lee.
11        Q.   (By Mr. Lee)  So Ms. Burns, in reference to
12    the sentence that is highlighted there, "Here is the
13    language that McKee and I came up with," you're not
14    suggesting that McKee somehow itself, that law firm,
15    did anything improper, are you?
16        A.   Ms. Burns?
17        Q.   No, with reference to the language in the
18    email sent by Ms. Burns --
19        A.   Okay.
20        Q.   -- which says, "Here is the language that
21    McKee and I came up with to give to the RMBS
22    investor," you're not suggesting that the law firm
23    McKee did anything improper, are you?
24        A.   No, I'm not.
25        Q.   Now, yesterday Mr. Kasper asked you some
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    questions about the fact that the Citi margin call

2    had been discussed in executive session without KPMG

3    present.  Do you recall that?

4         A.   Yes, I do.

5         Q.   And the implication was that somehow the

6    fact that KPMG hadn't been present in the executive

7    session was suspicious or nefarious, wasn't it?

8         A.   I don't know what the implication -- you

9    know, if that's the implication you want me to

10   believe.  It was just -- in my opinion, it wasn't

11   very informative to us, as the external auditors, to

12   not be present during that conversation.

13        Q.   And you understand that executive sessions

14   in an audit committee meeting -- and that is to say a

15   meeting between just members of the audit committee

16   and members of management without the auditor

17   present -- are common; correct?

18        A.   They're probably less common, I would say.

19   There are times when the auditors aren't present.

20   Typically it might be to discuss the performance of

21   the audit team.  That's a typical way.  But in most

22   cases the auditors are at the -- that's my

23   experience.  I've always been at the audit committee

24   meetings.

25        Q.   And isn't it the case, in the case of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    Thornburg, at nearly every audit committee meeting
 2    there was a portion of the meeting where management
 3    and the auditors -- management and the audit
 4    committee members met without KPMG present?
 5         A.   I don't recall.
 6         Q.   And there were also times at nearly every
 7    audit committee meeting where members of the audit
 8    committee and KPMG met without management present;
 9    correct?
10         A.   There weren't very many of those.  No,
11    there were not.
12         Q.   It didn't happen at most audit committee
13    meetings that management was excused from a portion
14    of the meeting so that KPMG could meet with members
15    of the audit committee?
16         A.   There were a few of those, but not many.
17         Q.   And you understand that that is generally a
18    common practice among audit committees; right?
19         A.   It is.  At least on an annual basis, the
20    auditors will meet separate and apart from management
21    at least on an annual basis to conduct their
22    inquiries to make sure there isn't anything they
23    should be made aware of.
24         Q.   And there weren't any occasions where KPMG
25    requested the opportunity to meet with the audit
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                     FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    committee in executive session without management

 2    present and that request was declined, were there?

 3         A.   Not that I can recall, no.

 4         Q.   So in your experience, anytime KPMG wanted

 5    to meet with members of the audit committee without

 6    management present, it could; correct?

 7         A.   Yes.

 8         Q.   And if we can pull up Exhibit 81, the board

 9    minutes.  So Exhibit 81 is the minutes of the

10    February 22 audit committee meeting; right?

11         A.   Yes.

12         Q.   And let's go down to the second page toward

13    the bottom, the section that says, "Review and

14    approval of annual report on Form 10-K."  And you

15    recall that the SEC counsel asked you a number of

16    questions about this particular paragraph; right?

17         A.   Yes.

18         Q.   And you testified about the discussion that

19    occurred with the audit committee about the filing of

20    the Form 10-K.  Do you recall that?

21         A.   Yes.

22         Q.   And you testified about the fact that the

23    10-K was being finalized, and eventually the audit

24    committee voted to approve the 10-K; right?

25         A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And you were asked, "So you discussed

2    whether or not the 10-K could be filed, but nobody

3    mentioned that there was an outstanding margin call

4    from Citi."  Do you recall that?

5    A.   Yes.

6    Q.   And you responded, "That's correct"; right?

7    A.   Yes.

8    Q.   And you were trying to suggest that somehow

9    the information about the Citi call which had been

10   discussed in executive session had somehow been

11   concealed from KPMG; correct?

12   A.   We were not aware of it, yes.

13   Q.   And you were trying to suggest that that

14   was somehow improper; correct?

15   A.   Yes.  Being not aware of a significant

16   transaction is something that we should be apprised

17   of.

18   Q.   Now, the minutes make clear that by the

19   time this discussion occurred, about the review and

20   approval of the Form 10-K, the board members already

21   knew that the Citi call -- they knew that the Citi

22   call had been received and that it was being paid

23   over time.  Do you recall that?

24   A.   I don't know what the board members knew.

25   I only know what I know.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Okay.  Well, let's try to make that clear,

2    because I think the timing is actually important

3    here.  So let's go back to the first page at the very

4    beginning.  Do you see at the very top, the

5    introductory paragraph says that the meeting began at

6    3:00 Mountain time.  Do you see that?

7    A.   Yes.

8    Q.   And then go back to the next page, and

9    let's go to the executive session portion, and then

10   it describes that the committee met in executive

11   session and it describes the participants and gives a

12   short summary of the discussion, and then it says,

13   "The executive session was adjourned and the regular

14   meeting convened at 4:00"; correct?

15   A.   Yes.

16   Q.   And then the minutes go on to describe what

17   happened in the regular meeting; right?

18   A.   Yes.

19   Q.   And so the executive session occurred from

20   3:00 to 4:00, without KPMG present, and then at 4:00

21   KPMG joined the meeting; correct?

22   A.   Yes.

23   Q.   So let me ask again.  The minutes, if you

24   look at the time of the various portions of the

25   meeting as reflected in the audit committee meeting

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    minutes, makes clear that by the time the discussion

2    of the approval of the Form 10-K occurred, the board

3    members who were present already knew about the Citi

4    call and they already knew that the Citi call was

5    being paid over time.  Would you agree with me?

6         A.   Yes.

7         Q.   Now, let's go down to the list of

8    attendees.  I think you have to blow up the

9    introductory paragraph, as well.  So you know that

10   Fran Mullin was the chairman of the audit committee;

11   right?

12        A.   Yes.

13        Q.   And so Fran Mullin already knew about the

14   Citi call; correct?

15        A.   Prior to the meeting?

16        Q.   No.  By the time KPMG joined the meeting

17   and by the time of the discussion of the Form 10-K,

18   Fran Mullin was aware of the Citi call; correct?

19        A.   It appears so, yes.

20        Q.   And by the time of the discussion of the

21   Form 10-K when KPMG joined the meeting, Anne-Drue

22   Anderson was aware of the Citi call; correct?

23        A.   Yes.

24        Q.   And by the time of the discussion of the

25   Form 10-K when KPMG was present, David Ater knew

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1    about the Citi call; correct?

 2        A.   Yes.

 3        Q.   And by the time of the discussion of the

 4    Form 10-K with KPMG, Stuart Sherman also knew about

 5    the Citi call; correct?

 6        A.   Yes.

 7        Q.   And certain other members of the board of

 8    directors who were not members of the audit committee

 9    but were board members also attended this meeting.

10    Do you see that?

11        A.   Yes.

12        Q.   And so by the time of the discussion of the

13    Form 10-K portion of the audit committee meeting,

14    where KPMG was present, Michael Jeffers, another

15    director, knew about the Citi call; correct?

16        A.   Yes.

17        Q.   And by the time of the meeting discussing

18    the Form 10-K where KPMG was present, Ike Kalangis,

19    another director, knew about the Citi call; correct?

20        A.   Yes.

21        Q.   And by the time of the portion of the

22    meeting in which the Form 10-K was discussed with

23    KPMG, Garrett Thornburg, the chairman of the board,

24    was aware of the Citi call; correct?

25        A.   Yes.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And none of these individuals, none of

2  these board members and audit committee members

3  discussed the Citi call with KPMG in the portion of

4  the meeting that you have suggested was somehow

5  improper, did they?

6    A.   They did not discuss the Citi call with me

7  in the board meeting, no.

8    Q.   And you're not actually meaning to suggest

9  that any of those members of the audit committee and

10 board, Fran Mullin, Anne-Drue Anderson, David Ater,

11 Stuart Sherman, Garrett Thornburg, Michael Jeffers,

12 and Ike Kalangis, all of whom knew about the Citi

13 call and all of whom didn't say anything about the

14 Citi call during the discussion of the Form 10-K --

15 you're not actually suggesting that all of them were

16 somehow involved in a cover-up?

17   A.   I'm not suggesting that, no.

18   Q.   Now, on March 18, you did learn about the

19 fact that the Citi call had been discussed in

20 executive session; correct?

21   A.   Yes.

22   Q.   And if we can go to Exhibit IB, these are

23 minutes of the meeting of the audit committee.  Do

24 you see that?

25   A.   Yes.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   And if we can go to the section entitled
2   "KPMG overall conclusions."  Now, this is the portion
3   of the meeting minutes that we've generally been
4   focused on, but let's go to the next page.  Notice,
5   this is the second page of the audit committee
6   meeting minutes which I don't believe counsel for the
7   SEC showed you when asking you about what happened on
8   February 22.  This says, "The audit committee
9   provided KPMG with a summary of the meeting held with
10   company management on Friday, February 22,
11   immediately prior to the regularly scheduled audit
12   committee meeting.  The meeting with the company
13   focused on the status of a large margin call,
14   especially a large margin call that had been received
15   from CitiCorp tied to its Alt-A collateral which
16   occurred following the further February 14
17   deterioration of that segment of the MBS market, the
18   company's liquidity position, and the willingness of
19   CitiCorp to allow the company to meet the call over
20   time without default, and the steps that were being
21   taken to meet the margin calls before the filing of
22   the Form 10-K."  Do you see that?
23       A.   I do.
24       Q.   And you became aware of that during the
25   March 18 meeting; correct?

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                                       Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                        FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        A.    Yes.

2        Q.    And even after learning that the executive

3  session on February 22 had occurred, that did not

4  change your opinion that there were no concerns about

5  management's integrity, did it?

6        A.    At that time, no.

7        Q.    And when you testified yesterday in

8  response to the SEC's questions leaving the

9  impression that somehow the executive session on

10  February 22 had been improper, you didn't point out

11  to the jury that, in fact, you later learned about it

12  and it still didn't change your conclusion on

13  management's integrity.  You didn't point that out,

14  did you?

15        A.    I wasn't asked about it, so I didn't point

16  it out.

17        Q.    Right.  The SEC didn't try to elicit the

18  full picture from you, did they?

19        A.    I just wasn't asked that question.  I don't

20  know about the full picture.

21        Q.    And when you testified about the February

22  22nd executive session and then the full discussion

23  on February 22 that included KPMG, and somehow

24  suggested that the fact that the Citi call hadn't

25  been discussed in the session with KPMG, you didn't

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    mention the fact that it was six or eight other
 2    members of the board had also participated in the
 3    executive session and had also not said anything
 4    about the Citi call, did you?
 5         A.   No, I did not.
 6         Q.   You tried to leave the impression, or at
 7    least in the questions that were asked of you, you
 8    tried to leave the impression that that was a
 9    decision made by Mr. Goldstone and Mr. Simmons,
10    didn't you?
11         A.   No.  I just simply answered the question
12    that was posed to me about the meeting that I
13    attended, the portion of the meeting that I was
14    present for.
15         Q.   But you could have pointed out that there
16    were six or eight other members of the board of
17    directors who also participated in both the executive
18    session and the portion with KPMG.  You could have
19    pointed that out; right?
20         A.   If I was asked that, I would have answered
21    the question to the best of my ability.
22         Q.   So you didn't -- your response is, you're
23    just answering the questions asked; you don't feel
24    like it's necessary to provide any context?
25         A.   I'd be happy to provide the context.  But
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    I'm trying to just be focused on your questions and
 2    do that to the best of my ability, answer them to the
 3    best of my ability.
 4        Q.   On the SEC's questions, that is.  So it's
 5    the SEC that's not actually asking you to provide
 6    context, isn't it?
 7        A.   Any question that I'm asked, Mr. Lee,
 8    whether it's from you or the SEC, I'll try to be very
 9    responsive to those questions.
10        Q.   Now, you were shown a number of updates by
11    Mr. Goldstone to members of the board.  Do you recall
12    that?
13        A.   A number of updates?
14        Q.   A number of emails that Mr. Goldstone
15    referred to generally in the case as board updates,
16    but a number of emails that Mr. Goldstone sent to
17    members of the board during the latter half of
18    February; right?
19        A.   Yes.
20        Q.   And they were generally updates on various
21    developments and events in the business; right?  Just
22    generally speaking?
23        A.   Yes.
24        Q.   And you were asked if you would have wanted
25    to see those; right?
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   I wanted to see them or be told about the

2  events that were occurring in that time period, yes.

3       Q.   Well, I think you were specifically asked

4  if you would have wanted to see the emails

5  themselves.  Do you recall that?

6       A.   Yes, I do.

7       Q.   Now, it's common for a CEO to communicate

8  with board members by email; right?

9       A.   I would presume so, yes.

10      Q.   And you don't, as a general course, ask to

11  review emails between members of management and the

12  board, do you, as part of your audit procedures?

13      A.   Typically not, no.

14      Q.   And you typically don't ask to be copied

15  every time a member of management sent an email to a

16  member of the board of directors, do you?

17      A.   No, we do not.

18      Q.   And indeed, by doing, at that time, I think

19  you testified an average of 10 to 12 audits a year,

20  it would be virtually impossible for you to review

21  every email sent by a member of management to a

22  member of the board for all the clients that you're

23  auditing; correct?

24      A.   That's correct.

25      Q.   And one of the emails you were shown was a

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                           (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

```
 1   board update dated February 25.  And if we can pull

 2   that up, please, it's Exhibit 95.  And this was one

 3   of the emails that you testified you would have

 4   wanted to know about; correct?

 5        A.   Yes.

 6        Q.   And you said it would have been important

 7   to you to know or to have seen.  Do you recall that?

 8        A.   To either have seen it or been told about

 9   what was happening with respect to the company's

10   liquidity situation at that time.

11        Q.   And during the restatement period, two of

12   your partners did, in fact, see that email, didn't

13   they?

14        A.   I don't know if they did.

15        Q.   Let's pull up Exhibit DX.  Now, Exhibit DX,

16   the cover is an email from Mr. McLamb.  He was the

17   partner on the audit; correct?  One of the partners

18   involved in the audit; right?

19        A.   He was our business unit professional

20   practice partner.

21        Q.   Right.  And he was involved in the audit of

22   Thornburg; correct?

23        A.   He was involved in the going concern

24   analysis and then he was also involved in the

25   restatement activities.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1         Q.    Right.   And this is an email from him to
 2    Michael Foley.   And Michael Foley is one of the
 3    people that you said was in the national office who
 4    got involved when the decision to withdraw the audit
 5    opinion became a topic of discussion; right?
 6         A.    Yes.
 7         Q.    And he became involved in the restatement;
 8    correct?
 9         A.    Yes.
10         Q.    And this is being sent on March 9, 2008;
11    right?
12         A.    Yes.
13         Q.    And that's after KPMG has decided to
14    withdraw the audit opinion; right?
15         A.    Yes.
16         Q.    And after the decision has been made to
17    restate the company's 2007 financial statements;
18    right?
19         A.    That's right.
20         Q.    And if we can go to the next page, there is
21    an attachment.   Blow that up.   Do you see he's
22    attaching a copy of Mr. Goldstone's board update
23    dated Monday, February 25.   And you see it's the
24    exact same board update.   Would you like to compare
25    them side by side?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1999

1        A.   No, I see it is the update that Mr.

2   Goldstone provided to his board.

3        Q.   Right.  And so two of your partners

4   actually saw this email during the restatement

5   period; right?

6        A.   Yes.

7        Q.   And they saw it during -- in the course of

8   the work that members of KPMG were doing in order to

9   assess the circumstances surrounding the restatement

10  and in order to assess whether KPMG should withdraw

11  from its association with Thornburg as a client;

12  correct?

13       A.   Yes.

14       Q.   And one of the things that KPMG did as part

15  of that work that it was doing during the restatement

16  period was to review emails; correct?

17       A.   At least this email, and we also asked for

18  email correspondence between the company and its

19  counterparties associated with the margin call

20  activity in the last two weeks.  So we did look at

21  some other emails, as well.

22       Q.   Right.  And you looked at management

23  emails, right, that this would reflect; correct?

24       A.   That's right.  It would indicate that Mr.

25  McLamb and Mr. Foley looked at this particular email.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2000

```
 1    I don't know if there were others that they looked at
 2    from the company.
 3         Q.   And in fact, KPMG had unlimited access to
 4    management's emails; correct?
 5         A.   I don't know that I would call it unlimited
 6    access.  We didn't do a forensic audit in that time
 7    period.  We asked the company to provide us with
 8    emails, and they gave us certain emails in response
 9    to that request.
10         Q.   And isn't it a fact that KPMG would not
11    have permitted Thornburg to put any limitations on
12    the emails to which KPMG wanted access?  Isn't that
13    true?
14         A.   That's true.
15         Q.   So KPMG could have had unlimited access and
16    did have unlimited access to Thornburg management's
17    emails; correct?
18         A.   Again, that's difficult to say in the
19    context of which we were performing the restatement
20    procedures.  We weren't conducting a forensic audit.
21    That would have taken weeks and weeks and weeks to do
22    an email retrieval activity.
23         Q.   Well, the difference -- the distinction is
24    that whatever it is that KPMG decided to do and
25    whatever emails KPMG decided it wanted to review,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   KPMG had unlimited access to Thornburg management

2   emails during the restatement period; correct?

3       A.   In that period we obtained what we thought

4   was necessary.

5       Q.   And in fact, as this Exhibit DX reflects,

6   however KPMG obtained it, whether KPMG went directly

7   into Thornburg's email system or whether it was

8   provided by members of Thornburg IT department or

9   whether it was provided by somebody else at

10  Thornburg, the February 25 board update was, in fact,

11  provided to and reviewed by KPMG; correct?

12      A.   Yes.

13      Q.   And it was, in fact, discussed, or it would

14  appear it was, in fact, discussed by two partners at

15  KPMG; correct?

16      A.   Yes.

17      Q.   Because the email from Mr. McLamb to Mr.

18  Foley says, "After you have read this, can you call

19  me?"  And that would suggest that he wanted to have a

20  discussion about the contents of that email; correct?

21      A.   I read that to be what he's asking.

22      Q.   And even after reviewing this specific

23  email that you testified would have been important

24  for you see and know about in 2016, back in 2008 Mr.

25  McLamb concluded that management had not engaged in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    fraud; correct?

 2         A.   That's correct.

 3         Q.   And even after seeing this email that today

 4    you say you would have wanted to know about, Mr.

 5    McLamb concluded back in 2008 that there are no

 6    concerns about management's integrity; correct?

 7         A.   That's correct.

 8         Q.   That was back in 2008 before the SEC got

 9    involved; right?

10         A.   That's right.

11         Q.   And before you had an incentive to say what

12    you think the SEC wants you to say; correct?

13         A.   I have no incentive to say anything other

14    than the truth.

15         Q.   So you didn't -- before coming in here

16    today, you didn't know that two of your partners had

17    actually reviewed the very email that you testified

18    yesterday you would have wanted to see?

19         A.   I don't have a recollection, is all I'm

20    saying.

21         Q.   Now, Mr. Kasper showed you -- let's go back

22    to the better copy of the February 25 board update.

23    Mr. Kasper pointed you to a sentence that says,

24    "Finally, we have been funding loans at a reduced

25    rate."  And that is the fourth paragraph of that.
```

SANTA FE OFFICE                                             MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    And the sentence reads, "Finally, we have been

2    funding loans at a reduced rate over the past few

3    days, and are working very hard at trying to add

4    warehouse capacity to enable us to pick up the

5    funding pace.  I met with Credit Suisse today and we

6    are hopeful to open their warehouse line for an

7    additional $50 million tomorrow.  That would help our

8    customers a great deal."  Do you see that?

9        A.   Yes.

10       Q.   And just to provide a little context, the

11   warehouse capacity or warehouse line is a type of

12   borrowing against individual mortgages, essentially;

13   right?

14       A.   Right.  The company funds loans and it uses

15   the warehouse to finance those until they're

16   securitized into one of the company's own structures.

17       Q.   Right, right.  And Mr. Kasper asked you

18   about the sentence and said, "Is this information you

19   would have wanted to know about"; right?

20       A.   Yes, it would be.

21       Q.   And in fact, during this period Thornburg

22   only stopped funding loans for one single day;

23   correct?

24       A.   I don't know the number of days, but the

25   fact that they had stopped funding loans again was an

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    indication of the degree of the struggle that we --

2    would have added to our appreciation of what was

3    happening in that time period.

4         Q.   Would you -- did you know at the time, did

5    you ever know that Thornburg only stopped funding

6    loans for one single day, or you just can't remember?

7         A.   I didn't know at the time that we were

8    completing our audit and finalizing our report that

9    the company had stopped funding loans.  That was

10   something I came to find out after the report had

11   been issued in the restatement period but after -- it

12   was one of the comments and communications that we

13   made to the audit committee that we became aware of.

14        Q.   And you would agree that there is a

15   difference between stopping funding loans for a

16   single day and stopping funding loans for weeks or

17   months; correct?

18        A.   There is a difference.

19        Q.   And we can show you, if you want to see it,

20   or you can accept my representation, but we do have a

21   document, the company's own loan funding report, that

22   shows that the company stopped funding loans during

23   this period of time for only one single day.  Do you

24   accept that?

25        A.   I haven't seen the -- I don't know.  I

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                      FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

2005

1    haven't seen the report, so I'm really not able to

2    accept it or refute it, Mr. Lee.

3         Q.   Well, let me hand you a document and see if

4    that either illuminates things or refreshes your

5    recollection.

6              MR. LEE:  Your Honor, may I approach?

7              THE COURT:  You may.

8         Q.   (By Mr. Lee)  Ms. Reinhart, I've handed you

9    what's been marked for identification as Exhibit QB.

10   Do you see that?

11        A.   Yes.

12        Q.   It's a Thornburg locked/funded trend

13   report.  Do you see that?

14        A.   Yes.

15        Q.   And you recognize the format of this report

16   from your work on the audit?

17        A.   I'd have to say it's been a long time.  I

18   don't recognize this, just straight up.

19        Q.   If you see that on February -- so it's a

20   list of -- without bogging us down in details, it's a

21   list of dates and loan balances, loan funding

22   balances, and you see next to February 18, there is a

23   zero; correct?

24        A.   Under the balance combined funded?  Yes.

25        Q.   Correct.  And every other day that's shown

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2006

1   on this report up to the day of the filing of the

2   Form 10-K shows a positive balance of loan funding.

3   Do you see that?

4        A.   Yes, I do.

5        Q.   And so it's just one single day that shows

6   that no loans were funded during the period February

7   12 to February 28.  Do you see that?

8        A.   Yes.

9        Q.   Now, as a point of comparison, in the third

10  quarter of 2007, Thornburg stopped funding loans for

11  several weeks or even longer.  Do you recall that?

12       A.   Yes, I do.

13       Q.   And you knew that at the time; right?

14       A.   Yes.

15       Q.   And this was disclosed to the public at the

16  time; right?

17       A.   I believe so, yes.

18       Q.   And let's go to Exhibit EE.  Now Exhibit EE

19  is the Form 10-Q for the third quarter, which is the

20  period ending September 30, 2007; correct?

21       A.   Yes.

22       Q.   And we haven't seen a lot of Form 10-Qs in

23  the case so far, but Form 10-Q is the quarterly

24  report that companies file with the SEC; right?

25       A.   That's right.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   It's the quarterly analogue to the Form

2    10-K, which is the annual report; correct?

3      A.   That's right.

4      Q.   And if we can go to page 39.  So in the

5    third quarter Form 10-Q, the company disclosed,

6    "Money originations totaled $1.3 billion for the

7    third quarter and $4.7 billion for the first nine

8    months of 2007, compared to our targets of $2 billion

9    and $5.1 billion respectively.  As a result of

10   liquidity concerns and cessation of our loan fundings

11   for a portion of the third quarter our loan

12   commitment and funding loan volumes were

13   significantly reduced and the fallout-adjusted

14   pipeline of loans declined significantly to $128.5

15   million at September 30, 2007, compared to $831

16   million at June 30, 2007."  Do you see that?

17     A.   Yes.

18     Q.   And it says then -- it goes on to say, "As

19   a result of recent mortgage rate adjustments that we

20   made during October, loan lock activity is beginning

21   to improve."  Do you see that?

22     A.   Yes.

23     Q.   And so in the third quarter there had been

24   a significant decline in loan funding activity by

25   Thornburg; right?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2008

```
 1        A.    That's right.
 2        Q.    And in the third quarter Thornburg stopped
 3   being able to fund loans for several weeks or for
 4   even more than a month; correct?
 5        A.    Yes.
 6        Q.    And KPMG was aware of that; correct?
 7        A.    That's right.  The company told us about
 8   that.
 9        Q.    And that was a significant drop off what
10   the company told you about; correct?
11        A.    Yes.
12        Q.    Much, much longer than a single day;
13   correct?
14        A.    Longer than a single day, yes.
15        Q.    And KPMG actually reviewed this language in
16   the Form 10-Q before it was filed; correct?
17        A.    That's right.  We did review it.
18        Q.    And in connection with this Form 10-Q and
19   the quarterly report on Thornburg's financial
20   statements for the period ended September 30, 2007,
21   the company had impaired assets; correct?
22        A.    Yes.
23        Q.    And the company did not take an OTTI on
24   those impaired assets; correct?
25        A.    Well, a number of impaired assets were
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2009

 1    actually liquidated in connection with the

 2    contraction of the commercial paper market and some

 3    of the repurchase agreement lenders selling some of

 4    the company's collateral in that time period.  So

 5    what they were left with was assets that were being

 6    financed at that point in time that did have

 7    impairments but had a liquidity source associated

 8    with them.

 9         Q.   Right.  So this is critical.  So the

10    company sold a number of assets in August of 2007;

11    right?

12         A.   They either sold them or their

13    counterparties sold them.

14         Q.   And so for the assets that were sold, they

15    experienced actual losses; correct?

16         A.   My recollection is, those losses were about

17    over a billion dollars, yes.

18         Q.   And so those were losses on the sale -- say

19    they had a security that was on their books or that

20    the original cost was $10 and they sold it for $8,

21    they experienced an actual loss of $2; right?

22         A.   That's a correct calculation.

23         Q.   And that's what actually happened.  That's

24    one of the things that happened in the third quarter,

25    is that when the company actually sold certain of its

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2010

 1   assets or when, as you say, certain of its assets

 2   were sold, whether directly or indirectly, when

 3   certain of its impaired assets were sold, the company

 4   experienced and reported an actual loss on those

 5   assets that were sold that had been impaired;

 6   correct?

 7        A.   I would call it they recorded -- they

 8   realized a loss, and that loss was recorded in the

 9   income statement.

10        Q.   Right.  And that's because it was, the

11   assets were actually sold, so there wasn't any

12   question of an OTTI or not.  The assets were actually

13   sold and the loss was incurred by the company;

14   correct?

15        A.   That's right.  Once they lost the ability

16   to hang on to those assets until they were no longer

17   underwater or reached maturity, that loss was

18   realized in their financial statements, yes.

19        Q.   But the company didn't sell all of their

20   assets; correct?

21        A.   That's right.

22        Q.   And the company held on to some assets that

23   were still impaired; correct?

24        A.   Yes.

25        Q.   And those assets that the company held on



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    to that were still impaired, the company did not take

 2    an OTTI; correct?

 3         A.   That's correct.

 4         Q.   And KPMG concurred with that determination;

 5    correct?

 6         A.   We did.

 7         Q.   And so even though in the third quarter the

 8    company had sold assets and realized an actual loss

 9    of $1.1 billion, the company did not need to take an

10    OTTI on the assets that it held on to; correct?

11         A.   That's right.

12         Q.   And even though the company stopped funding

13    loans for weeks or more during the 3rd quarter, the

14    company still did not need to take an OTTI on the

15    assets that it continued to hold, even though they

16    were impaired; correct?

17         A.   That's correct.

18         Q.   And we talked about context, when counsel

19    for the SEC asked you about the February 25 board

20    report that mentions the loan funding, and you

21    testified that it would have been important for you

22    to see that, or know that information, it would have

23    been useful context for the jury to know that the

24    loan funding had ceased during that time period for

25    only one single day when, in the third quarter, the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    company had ceased funding loans for weeks and it

2    still hadn't affected the company's OTTI

3    determination.

4         A.   February 25 board report?

5         Q.   Correct.

6         A.   February 25?  I guess I'm not --

7         Q.   That's the email, if we can just go back

8    to --

9         A.   Oh, the email to the board.  Okay.  Got it.

10        Q.   Yes.  And counsel led you to answer a bunch

11   of questions, including questions about whether you

12   would have wanted to have known that information.  It

13   would have been helpful context for the jury to

14   understand that that involved a cessation of loan

15   funding for only a single day in comparison to which

16   KPMG already knew that the company had stopped

17   funding loans for weeks in August, and it still had

18   not affected the OTTI determination.

19        A.   Well, the distinction here is that in the

20   fall of 2007, in the third and fourth quarter, KPMG

21   is not getting ready to issue an audit report upon

22   which investors will be relying.  So whether it was a

23   day, a week, a month, the degree of the struggle that

24   the board and the company -- the board was aware of

25   and the company was facing was information that we

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                   201 Third NW, Suite 1630
Santa Fe, NM 87501                          Albuquerque, NM 87102
(505) 989-4949                                      (505) 843-9494
FAX (505) 843-9492                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

2013

 1    wanted to know.  And so that's what's important, is

 2    context of informing us about the struggle, the

 3    liquidity struggle and what the company was facing in

 4    that time period.

 5        Q.   And isn't it, in fact, what is -- that you

 6    actually hit on the key difference.  In connection

 7    with the third quarter 10-Q, KPMG did not issue an

 8    opinion; right?

 9        A.   That's right.  Auditors don't issue

10    opinions on quarterly reports.

11        Q.   And that means the auditor didn't have the

12    same level -- KPMG didn't have the same level of

13    liability attached to the third quarter 10-Q;

14    correct?

15        A.   That's right.

16        Q.   By the way, when we were talking about the

17    February 22 board minutes and the fact that the Citi

18    call had been discussed in executive session, you

19    were aware before the filing of the Form 10-K that

20    Thornburg had received a margin call of a large

21    amount; isn't that right?

22        A.   We were aware that the company had received

23    margin calls in the approximate range of $300 million

24    in that last two-week period.

25        Q.   If we can go to Exhibit 106, please.  Now,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Exhibit 106 is another email that counsel for the SEC

2    asked you about.  And this is an email from

3    Ms. Starrett to Ms. Hall, forwarding a draft of the

4    recent developments language; correct?

5        A.   Yes.

6        Q.   And you were not actually copied on this,

7    but it was eventually forwarded to you; correct?

8        A.   That's right.

9        Q.   And you understood that this draft language

10   is language that was to be inserted into the Form

11   10-K; correct?

12       A.   Yes.

13       Q.   And you understood that this draft language

14   was language that was to be inserted into the Form

15   10-K which was to be filed in approximately a day or

16   two or three after this draft was sent to you;

17   correct?

18       A.   Not three days.  The 10-K was filed, I

19   think, at 12:30 a.m. or we signed off on it at 12:30

20   a.m. on February 28th of 2008.  So whatever that --

21   it wouldn't be three days, but a day and a half.

22       Q.   But the Form 10-K was due to be filed by

23   February 29; correct?

24       A.   That's right, because it was a leap year,

25   yes.

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                       FAX (505) 843-9492
                                                                                1-800-669-9492
                                                            e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2015

1       Q.   And so it could have been filed at any

2   point, and really the driving force as to when it

3   could be filed was when KPMG had completed its audit

4   work; correct?

5       A.   That's right.

6       Q.   The 10-K could not be filed before KPMG was

7   done with its work; correct?

8       A.   That's right.

9       Q.   So it could have happened at any point in

10  time up to February 29; correct?

11      A.   That's right.

12      Q.   So you understood, when you got this draft,

13  that it was not for inclusion and dissemination to

14  the public immediately; correct?

15      A.   That's right.  It's an initial draft.

16      Q.   And you knew that the audience for the

17  language was readers of the Form 10-K; correct?

18      A.   Readers, you mean internal readers or --

19      Q.   I'm sorry, that was not a clear question.

20  You understood that this language, the draft language

21  that was being circulated, was to be included in a

22  Form 10-K and so therefore the language itself was

23  intended for those who were going to be reading the

24  Form 10-K?

25      A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2016

1      Q.   It was not meant to be a representation to

2    KPMG; correct?

3      A.   Not intended to be a representation, but

4    it's our expectation that information that's provided

5    to us would be complete and accurate, even if it's in

6    draft form.

7      Q.   But you understand that sometimes when

8    people draft documents, they draft documents with the

9    anticipation and understanding that they will be true

10   when they are finalized; correct?

11     A.   No, I don't expect that I would get

12   anything other than something that's true.  Maybe

13   number changes or grammar changes within the draft

14   document, but I always expect what's provided to me

15   as an auditor to be true.

16     Q.   So you're not familiar with the dynamic or

17   the process in which people circulate drafts of

18   documents well before the draft is intended to be

19   finalized and that, therefore, the draft itself may

20   not actually be accurate?  That doesn't ring a bell

21   to you?

22     A.   The information may contain numbers that

23   are tentative or still a work in process, but I

24   always expect that the information that's provided

25   would be true in its context and faithful as to the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

2017

```
 1    representation of the facts and circumstances.
 2         Q.    That wasn't my question, Ms. Reinhart.  My
 3    question was:  Are you familiar with the drafting
 4    process in which sometimes drafts are circulated that
 5    are not true at the time the draft is circulated, but
 6    are intended to be true when the draft is -- when the
 7    document is final and complete and disseminated to
 8    its audience?
 9         A.    I'm familiar with the drafting process, but
10    it's not been my experience that information is
11    provided to me that's not true at the time of the
12    draft.
13         Q.    So your audit was completed on February 28;
14    correct?
15         A.    It was completed -- the date of our report
16    was February 27th, so it included all activity of the
17    company's activity through the 27th of February and
18    the signoff date was -- or the time stamp,
19    effectively, was about 12:30, midnight, on February
20    28.
21         Q.    Your audit wasn't concluded on February 18,
22    was it?
23         A.    No, it was not.
24              MR. LEE:  Your Honor, may I approach?
25              THE COURT:  You may.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2018

```
 1        Q.   (By Mr. Lee)  Ms. Reinhart, I've handed you
 2   what's been marked for identification as Exhibit QC.
 3   Do you see that?
 4        A.   Yes, I do.
 5        Q.   And QC is an email from Meg Jones to you
 6   with a copy to Ms. Hall.  Do you see that?
 7        A.   Yes.
 8        Q.   And Meg Jones was a member of the
 9   engagement team; correct?
10        A.   Yes.
11        Q.   And the title is "Draft opinion with
12   revisions."  Do you see that?
13        A.   Yes.
14        Q.   And it's dated Monday, February 18.  Do you
15   see that?
16        A.   Yes.
17        Q.   And it says, "Cynthia, here is the draft
18   opinion."  Do you see that?
19        A.   Yes, I do.
20        Q.   And it is a draft of the audit opinion that
21   KPMG was going to issue in approximately nine days;
22   correct?
23        A.   That's right.
24        Q.   And first if you could turn your attention
25   to the first sentence, and just read to the jury that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2019

1   first sentence.

2        A.   Sure.   "We have audited the accompanying

3   and consolidated balance sheets of Thornburg

4   Mortgage, Inc. and subsidiaries (the company), as of

5   December 31, 2007, and 2006, and the related

6   consolidated statements of operations, shareholders

7   equity, and cash flows for each of the years in the

8   two-year period ended December 31, 2007.

9        Q.   And that wasn't actually true on February

10  18, was it?

11       A.   It wasn't actually true?

12       Q.   You hadn't actually completed your audit on

13  February 18?

14       A.   No, we had not concluded our audit, no.

15       Q.   Even though this draft letter says, "We

16  have audited the financial statements"?

17       A.   That's right.

18       Q.   And the last paragraph says, "In our

19  opinion, the consolidated financial statements

20  referred to above fairly present in all material

21  respects the financial position of Thornburg, et

22  cetera, in conformity with accounting principles

23  generally accepted in the United States"; correct?

24       A.   That's right.

25       Q.   And even though the letter says that, you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2020

1   hadn't yet concluded that; correct?

2        A.   We hadn't concluded it, but everything in

3   the report is accurate and the draft is, in fact,

4   substantially unchanged from the final version that

5   was filed with the Securities and Exchange Commission

6   on the 28th of February.

7        Q.   Right.  But on February 18 it was not

8   accurate; correct?

9        A.   No.  Well, we provided a draft so the

10  company had something to provide to the person that

11  was typing the document so they didn't have to do it

12  all at the last moment.

13            THE COURT:  Mr. Lee, which document are you

14  looking at?

15            MR. LEE:  I'm sorry, I handed it to

16  Ms. Wild.

17            THE CLERK:  I apologize.

18            THE COURT:  I'm sorry.

19        Q.   (By Mr. Lee)  Now, if we can pull up

20  Exhibit 62.  Exhibit 62 is another one of Mr.

21  Goldstone's emails to the board and this one is dated

22  February 21.  Do you see that?

23        A.   Yes.

24        Q.   And this is another email to the board or

25  board update, as we've been calling them, that you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

1  testified you would have wanted to know about;

2  correct?

3       A.   Yes.

4       Q.   Or at least you either would have wanted to

5  know about the email itself or about the information

6  in the email; correct?

7       A.   That's right.

8       Q.   And Mr. Kasper pointed you specifically to

9  the language in item number 6.  Do you see that?

10 Item number 6 says, "We may undertake additional

11 asset sales, depending on how market conditions

12 evolve over the next few weeks, offsetting previously

13 mentioned gains."  Do you see that?

14      A.   Yes.

15      Q.   And you suggested that that sentence was

16 inconsistent with the company's assertion of its

17 intent and ability to hold in connection with OTTI;

18 correct?

19      A.   Right, that would be an indication that

20 they intended to dispose of certain assets.

21      Q.   That doesn't indicate an intention to

22 dispose.  It says, "We may undertake."  Do you see

23 that?

24      A.   Yes, it says "We may undertake," but it is

25 an indication that the company is thinking, based

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   upon its liquidity situation, that it may need to

2   undertake those asset sales in order to meet those

3   liquidity needs.  Not for any other purpose that I

4   can see here.

5        Q.   And what you didn't point out when you

6   answered the SEC's questions about this, suggesting

7   that this was somehow concealed from KPMG, you didn't

8   point out that the recent developments section of the

9   Form 10-K includes almost identical language, did

10  you?

11       A.   No, I did not.

12       Q.   And let's go to Exhibit EF.  This is the

13  Form 10-K and let's go to page 35.  Blow that

14  sentence up.  That sentence says, "In the event that

15  we cannot meet future margin calls from our available

16  cash position, we might need to selectively sell

17  assets in order to raise cash."  Do you see that?

18       A.   I do.

19       Q.   And so in the board update on February 21,

20  Mr. Goldstone used the word "may."  Do you see that?

21       A.   Yes.

22       Q.   And in the disclosure which KPMG reviewed

23  before the filing, the company used the term "might."

24  Do you see that?

25       A.   Mr. Lee, can I see the broader context of

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                             Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

2023

```
1    where this is within the 10-K, this disclosure?
2         Q.   Sure.
3         A.   And even back in this -- MD&A item 7
4    executive overview.  Is that where it is?
5         Q.   If you like, if it's easier, I'm happy to
6    hand you a hard copy.
7         A.   That would be helpful, please.
8              MR. LEE:  If I may?
9              THE COURT:  You may.
10        Q.   (By Mr. Lee)  This is the same binder that
11   the SEC gave you, so I don't know what tab it is, but
12   I assume it's the thickest document.
13             MR. KASPER:  That's 321.
14        A.   Okay.
15        Q.   It is actually easier to use a hard copy
16   than look at a long document electronically.  So you
17   see page 35, it's under the section entitled "Recent
18   developments"?
19        A.   I do.
20        Q.   And so in the recent developments section
21   which KPMG reviewed, the company disclosed that it
22   might need to selectively sell assets; correct?
23        A.   That's correct.
24        Q.   And in Mr. Goldstone's email to the board
25   on February 21, that was sort of supposedly
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2024

1    concealed, Mr. Goldstone reported, "We may undertake

2    additional asset sales."  Do you see that?

3         A.   Yes.

4         Q.   So there was nothing hidden about the

5    possibility that the company either may or might

6    undertake asset sales, was there, because it's right

7    there in the Form 10-K.

8         A.   That's right.

9         Q.   If we can go to Exhibit 58, please, Exhibit

10   58 is an email from Eric Smith at Credit Suisse to

11   two Thornburg employees, Patrick Feldman and Daniel

12   Petrush; correct?

13        A.   Yes.

14        Q.   Dated February 20?

15        A.   Yes.

16        Q.   And it's forwarding an email from Tanya

17   Miller at Credit Suisse to Digna Rivera at Credit

18   Suisse copying Eric Smith and George Pawlowski.  Do

19   you see that?

20        A.   Yes.

21        Q.   Other than Patrick Feldman, do you know any

22   of the individuals on this email?

23        A.   No.

24        Q.   And this is another email that the SEC

25   asked you to speculate about and interpret, even



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    though you're not on it and you don't even know the
 2    people on it except for Patrick Feldman, do you?
 3         A.   No, but I can read it and understand it.
 4         Q.   Okay.  Now, the part that you believe you
 5    can read and understand was about outstanding margin
 6    calls; correct?
 7         A.   That's right.
 8         Q.   Do you know whether the margin calls
 9    reported in this email are on Thornburg's reverse
10    repurchase agreements?
11         A.   It looks like it is, because the securities
12    that are listed below the amounts are securities from
13    their portfolio.  There is a Countrywide.  There is a
14    BSARM.  There is an IndyMac.  There is a B of A, a
15    Bear Stearns, and they're identifying the prices in
16    terms of how the price has declined on those specific
17    securities.
18         Q.   And you know there are actually different
19    types of margin calls; correct?
20         A.   Different types of margin call?
21         Q.   There are margin calls on Thornburg's
22    reverse repurchase agreements; right?
23         A.   That's right.
24         Q.   And that's what -- when we have talked
25    generally in this case about margin calls, we've
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    generally been referring to margin calls on reverse
 2    repurchase agreements; correct?
 3         A.    That's right.
 4         Q.    But there are also margin calls on swap
 5    agreements; correct?
 6         A.    That's right.  There are.
 7         Q.    And swap agreements are a whole different
 8    type of instrument that aren't at issue in this case,
 9    at least as you understand it; right?
10         A.    That's correct.  They're derivatives.
11         Q.    And the company can also receive and make
12    margin calls on swap agreements; right?
13         A.    That's right.  The company can receive?
14         Q.    The company can receive margin calls and
15    the company can make margin calls, just as it can
16    with reverse repurchase agreements.
17         A.    Yes.
18         Q.    It can on swap agreements, too?
19         A.    On the value; right.
20         Q.    And those are different from reverse
21    repurchase agreements' margin calls; right?
22         A.    That's right.  They still require a
23    settlement of cash between the company and its lender
24    or counterparty in the case of a swap agreement, the
25    exchange of cash.
```

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                          Albuquerque, NM 87102
(505) 989-4949                                   (505) 843-9494
FAX (505) 843-9492                          FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And of this 76 million that you testified

2   about yesterday, do you know what portion of those

3   are actually swap margin calls and are not reverse

4   repurchase agreement margin calls?

5    A.   I do not.  I do see that they're

6   outstanding for more than the time period that would

7   be provided within the repo agreements, two days, a

8   day, and then new.  So that tells me that there is a

9   delay in settling the actual cash that's required.

10    Q.   Well, let's take a look at Exhibit 59 for a

11   second.  Exhibit 59 is a liquidity report from Ralph

12   Ahn to various people at Thornburg dated February 20.

13   Do you see that?

14    A.   I do.

15    Q.   Let's go to the first asterisked paragraph.

16   It says, "We were able to meet $59 million of the $79

17   million CSFB margin call by matching it with the

18   non-AAA pieces.  $20 million of that margin call is

19   due to swap auction calls which they demanded cash

20   for and we have yet to meet, although we think that

21   will be reduced to $15 million for today."  Do you

22   see that?

23    A.   Yes.

24    Q.   So if we can go back to Exhibit 58, when

25   you look at these two documents side by side, would

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    you agree with me that only approximately $59
 2    million, not $77 million, relate to reverse
 3    repurchase agreements; correct?
 4          A.   That --
 5          Q.   The margin calls on reverse repurchase
 6    agreements?
 7          A.   That looks right, yes.
 8          Q.   And you don't have an understanding of how
 9    many days Thornburg has to pay margin calls on swap
10    agreements, do you?
11          A.   I don't have a recollection.  At the time I
12    may have.
13          Q.   So when counsel for the SEC showed you this
14    document, Exhibit 58, and asked you what it meant,
15    even though you're not on it, you just immediately
16    jumped to the conclusion that all of it was related
17    to reverse repurchase margin calls, didn't you?
18          A.   I concluded from this that there were
19    margin calls that were outstanding for more than a
20    day's period, two days', one day's and a new margin
21    call for $76.6 million.  So my point is that the
22    email, as I read it, was indicative of the struggle
23    that the company faced at that time that we weren't
24    aware of.
25          Q.   But Ms. Reinhart, "outstanding" doesn't
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    mean late, does it?  "Outstanding" simply means
 2    unpaid?
 3         A.   It was the practice of the counterparties
 4    and the repo agreements to require settlement on a
 5    daily basis.
 6         Q.   Under swaps?  You just testified you
 7    weren't familiar with the terms of swaps.
 8         A.   Under the repo agreements.
 9         Q.   Right.  So you didn't point out that only
10    $59 million of this $77 million related to repo
11    agreements for which payment is ordinarily due within
12    one day, did you?
13         A.   Was it $59 million or was it $56.6 million?
14         Q.   Either.  You didn't point out that only
15    two-thirds of this amount related to the margin calls
16    at issue in this case?
17         A.   No, I didn't.
18         Q.   And the reason you didn't was the SEC
19    wasn't interested in asking you about the context for
20    any of these emails, was it?
21         A.   The question that I was asked was whether
22    or not I had seen this email and whether I would have
23    wanted to, I think, know about it at the time that we
24    were rendering our opinion.  And that is information
25    that I've previously testified to that would have
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1    been important to us, as the external auditors, to
2    know before we issued our report.
3        Q.    Would it have been important for you to
4    understand the different types of margin calls and
5    the payment terms thereof?
6        A.    Yes, it would have been important for
7    someone to come and talk to us about the fact that
8    the company was facing this struggle, and help us
9    understand exactly what was happening.   But that
10   wasn't the case.
11       Q.    And in fact, you referred to the struggle.
12   You knew about the struggle; right?   You knew the
13   company had extremely low levels of liquidity in the
14   two weeks leading up to the filing of the Form 10-K,
15   didn't you?
16       A.    We knew about a part of that struggle.   We
17   didn't have an appreciation, no, just now severe or
18   dire the struggle was.
19       Q.    You knew that the company at one point had
20   $476,000 in available cash; correct?
21       A.    I don't have a specific recollection.
22       Q.    And when the SEC asked you about this
23   email, you didn't believe it was important to
24   identify either the context, to identify the fact
25   that this includes different types of margin calls,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to identify the fact that one-third of this total

2    amount of margin calls doesn't have anything to do

3    with this case at all, or to identify the fact that

4    you don't know the terms of payment for swap margin

5    calls, as you sit here today; correct?

6              THE COURT:  Mr. Kasper?

7              MR. KASPER:  Objection, Your Honor.  This

8    is both argumentative and compound.

9              THE COURT:  Well, it is compound, but I'm

10   going to overrule it.  If Ms. Reinhart can answer the

11   question, I'll allow her to answer it.

12             THE WITNESS:  Could you read the question

13   back.

14             THE COURT:  "And when the SEC asked you

15   about this email, you didn't believe it was important

16   to identify either the context, identify the fact

17   that this includes different types of margin calls,

18   identify the fact that one-third of this total amount

19   of margin calls doesn't have anything to do with this

20   case at all, or to identify the fact that you don't

21   know if the terms of the payment for swap margin

22   calls as you sit here today."

23        A.   Thank you.  I believe that when I was shown

24   the email, it was information that was new to me.  I

25   hadn't previously seen it during the course of the

SANTA FE OFFICE                                      MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                      1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1    audit, and I communicated that it was information
 2    that I would have wanted to have known.  I would have
 3    liked to have known all of the things that you
 4    described, Mr. Lee.  But I've really never had the
 5    opportunity to delve into that detail.
 6         Q    (By Mr. Lee) Now let's go to Exhibit 45.
 7    This is another email from Mr. Goldstone to members
 8    of the board that you said you would have liked to
 9    have seen.  This is dated February 15; correct?
10         A    I would have liked to have known about the
11    information being communicated to the board, and if
12    that would be to give me the email, whatever is the
13    most expedient; but to communicate to the external
14    auditor, the audit partner, about this kind of thing.
15         Q    Yesterday you testified -- I don't know
16    which specific emails, but yesterday you were asked
17    whether you would have wanted to see certain emails
18    themselves.  And you said yes.  Do you recall that?
19         A    I do.
20         Q    Now, I'd like to draw your attention to a
21    sentence in the middle of the second paragraph.  This
22    sentence says, "Fortunately, we were able to meet or
23    negotiate a way to meet all of those margin calls
24    today, and are in the process of raising additional
25    cash next week in order to meet expected further
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    margin calls."  Do you see that?
 2         A.   Yes.
 3         Q.   And presumably you don't know what Mr.
 4    Goldstone meant by reference to negotiating a way to
 5    meet certain margin calls, do you?
 6         A.   I do not.
 7         Q.   And you don't know that, in fact, CSFB,
 8    Credit Suisse, had agreed to give Thornburg
 9    additional time to meet a margin call; correct?
10         A.   I was not told that, no.
11              MR. LEE:  Your Honor, may I approach?
12              THE COURT:  You may.
13         Q.   (By Mr. Lee)  Ms. Reinhart I've handed you
14    what's been marked as Exhibit QB, I believe.
15              THE COURT:  You handed me one that says QD.
16         Q.   I apologize.  QD?
17         A.   Yes.
18         Q.   Exhibit QD is the internal -- do you
19    recognize that as an internal message through a form
20    of text messaging known as Bloomberg messaging?
21         A.   I see that it's from Eric at Credit Suisse
22    to Patrick Feldman at Thornburg Mortgage.
23         Q.   And you see it has the email address from
24    EricSmith@Bloomberg.net?
25         A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And you're familiar that traders and those
 2   in the financial markets often communicate via what's
 3   called a Bloomberg messaging system, which is
 4   essentially a form of text messaging?
 5        A.   Yes.
 6        Q.   And it's an email from Eric Smith dated
 7   February 15 to Patrick Feldman, and the subject is:
 8   "I have that index piece that settles today lined up
 9   for repo."  Do you see that?
10        A.   Yes.
11        Q.   And the message says, "Great."  This is
12   from Eric Smith.  "Great.  Buccola agreed to postpone
13   settlement to Tuesday."  Do you see that?
14        A.   I do.
15        Q.   So you weren't aware that, in fact, Credit
16   Suisse had agreed to give Thornburg additional time
17   to pay that margin call.  That was the negotiation
18   referred to by Mr. Goldstone.  You weren't aware of
19   that, were you?
20        A.   No, no one told me that.
21        Q.   And that's the danger of jumping to
22   conclusions from emails without seeing the context,
23   isn't it?
24        A.   That's right.  That's certainly the danger.
25   But if there is a modification to an agreement that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2035

1  is outside of what the auditors have in their

2  possession, management needs to bring that to the

3  attention of the external auditors.

4          MR. LEE:  Your Honor, I'd offer Exhibit QD

5  into evidence.

6          THE COURT:  Any objection?

7          MR. KASPER:  Yes, Your Honor, lack of

8  timeliness.  We didn't have this document previously.

9          THE COURT:  Well, I think you've gotten

10  what you want out of it.  But I'm not going to admit

11  the document because of its late disclosure.

12          MR. LEE:  Well, may I be heard on that,

13  Your Honor?

14          THE COURT:  You may.

15          (The following proceedings were held at the

16  bench.)

17          THE COURT:  This is all that was handed to

18  the Court, so I don't have the document.

19          MR. LEE:  I'm sorry.  We were trying to

20  save paper, Your Honor.  I believe it's two-sided.

21  And the cover page refers to an exhibit from the MSJ.

22  So the SEC has been well aware of this.  We have --

23  we're seeking to introduce it as impeachment for the

24  fact that, you know, there was this -- the

25  implication that there was somehow a breach of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2036

```
 1    agreement where clearly Credit Suisse is agreeing to
 2    allow delayed payment.  And by the way, it didn't
 3    either declare a default or even send a reservation
 4    rights letter.
 5              MR. KASPER:  Your Honor, not only is the
 6    document out of time, it contains hearsay, and this
 7    particular version of it certainly shouldn't be
 8    allowed to go to the jury.  The box on this is not
 9    something done by Mr. Smith or anyone else.  It's
10    something done by defendants' counsel.  So the
11    document has effectively been, you know, altered.
12              MR. LEE:  Fair, I agree with that latter
13    part.
14              THE COURT:  We're not going to bring in
15    additional documents.  I think this testimony could
16    have been anticipated and this rebuttal, as you call
17    it.  I think it's just cross-examination material
18    that could have been anticipated.  So I'm going to
19    keep the document.
20              MR. KASPER:  Thank you, Your Honor.
21              MR. LEE:  Thank you, Your Honor.
22              (The following proceedings were held in
23    open court.)
24              THE COURT:  Mr. Lee, would this be a good
25    time for us to take our break?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2037

```
1              MR. LEE:  Yes, Your Honor.
2              THE COURT:  Do you want to finish something
3    up?
4              MR. LEE:  No, Your Honor.  This is a good
5    time.
6              THE COURT:  We'll be in recess for about 15
7    minutes.  Hold on.  You sit there.
8              Mr. Chavez, why don't you open the door.
9              (The jury left the courtroom.)
10             THE COURT:  Anything we need to discuss?
11             MR. McKENNA:  No, thank you, Your Honor.
12             MR. LEE:  No, Your Honor.
13             THE COURT:  All right.  We'll be in recess
14   for 15 minutes.
15             (The Court stood in recess.)
16             THE COURT:  Is there anything to discuss
17   before the jury comes back in?  Mr. McKenna?
18   Mr. Lee?
19             MR. McKENNA:  No, Your Honor.
20             MR. LEE:  No, Your Honor.
21             (The jury entered the courtroom.)
22             THE COURT:  All right.  Everyone be seated.
23             All right, Ms. Reinhart, I'll remind you
24   that you're still under oath.
25             Mr. Lee, if you wish to continue your
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2038

```
 1    cross-examination of Ms. Reinhart, you may do so at

 2    this time.

 3              MR. LEE:  Thank you, Your Honor.

 4              THE COURT:  Mr. Lee.

 5         Q.   (By Mr. Lee)  Could we please call up

 6    Exhibit 62?  Ms. Reinhart, I have back on the screen

 7    Exhibit 62, which is the board minutes from February

 8    21.  Do you see that?

 9         A.   Board minutes?

10         Q.   I'm sorry.  My mistake.  It's the update

11    from Mr. Goldstone to the board on February 21.

12         A.   Yes.

13         Q.   And we talked -- if we can go down to

14    paragraph 6, we talked before the break about the

15    language about the fact that the company may

16    undertake additional assets sales; right?

17         A.   Yes.

18         Q.   And we compared that to the disclosure in

19    the Form 10-K in the recent developments section

20    where it was disclosed that the company might

21    undertake additional asset sales.  Do you recall

22    that?

23         A.   Yes.

24         Q.   And in fact, the Form 10-K was not the

25    first time you had seen from the company the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    contemplation of possible asset sales; correct?

2        A.   It wasn't the first time I saw that

3    language; that's correct.

4        Q.   And if we can go back to Exhibit 106, this

5    is the draft that Ms. Starrett is forwarding to KPMG

6    on February 26 of recent developments language, and

7    if we can go to the second page.  And if we can go to

8    the sentence that says, "As we have stated

9    previously," about a third of the way down.  So even

10   on February 26, the company was informing you that in

11   the event that it cannot meet margin calls from its

12   available cash, it might need to selectively sell

13   assets to raise cash.  Do you see that?

14       A.   I do see that, yes.

15       Q.   And you would agree that that's essentially

16   the language that ended up in the Form 10-K; correct?

17       A.   I believe so.

18       Q.   And when you saw this, you reviewed this

19   draft; right?

20       A.   Yes, I did.

21       Q.   You never expressed any surprise about the

22   fact that the company might need to sell assets, did

23   you?

24       A.   No, I didn't express any surprise, no.

25       Q.   You never went back to the company to ask

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    questions about that statement that the company might

2    need to sell assets, did you?

3        A.    No.   I did talk to the company.   I talked

4    to specifically Mr. Simmons and Ms. Starrett about

5    their intent and ability to hold their securities in

6    connection with our down-to-date meeting, and they

7    indicated that they had both the intent and

8    ability -- the company had the intent and ability to

9    hold those assets to recovery or maturity.

10       Q.    You never went to anybody at the company

11   and said, "Wait a second.   I didn't know you might

12   need to sell assets."   You didn't have that

13   conversation, did you?

14       A.    I don't have a recollection, no.

15       Q.    You didn't say to any of your colleagues at

16   KPMG, "Wait a second.   This is a huge surprise.   We

17   didn't know that the company might need to sell

18   assets," did you?

19       A.    I didn't put it that way, no.

20       Q.    And you testified in reference to Exhibit

21   62, the email to the board, that had you seen that

22   information you would have wanted to ask additional

23   questions; right?

24       A.    Had I seen all of the information.   It's

25   just not one bit of information, but the full context

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2041

1    of the struggle that was occurring at that particular

2    time is information that I, as the audit partner,

3    would have wanted to know in the time period that the

4    company was facing those circumstances.

5        Q.   And Mr. Kasper, when he asked you about the

6    board email on February 21, he specifically called

7    out that paragraph, didn't he, and he asked you if

8    this was information you would have wanted to know;

9    right?

10       A.   Yes, I believe he did.

11       Q.   And you said you would have wanted to ask

12   more questions and understand the circumstance

13   better; right?

14       A.   Yes.

15       Q.   But even though you were told that exact

16   same thing on February 26, you never went and asked

17   more questions, did you?

18       A.   We had a number of conversations.  But I

19   didn't ask a specific question about this.

20       Q.   And in fact, you just referenced you would

21   have wanted to know about the struggle that the

22   company was facing.  That also is disclosed in this

23   language, isn't it?  This draft language discloses

24   the volatility and difficulty in the mortgage

25   markets, the stress on the company's liquidity, the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2042

1   receipt of margin calls, and the possibility that

2   these conditions could continue into the future;

3   right?

4       A.   That's what that language says, yes.

5       Q.   And you didn't follow up and express any

6   alarm or surprise or ask additional follow-up

7   questions after you got this draft, did you?

8       A.   No, I did.  I asked Mr. Simmons what his

9   view of the collateral was, and that's when he

10  expressed to us that he didn't believe that the

11  likelihood of a further 2 to 3 percent decline was --

12  he thought that that was remote, I think were his

13  words that he put it in.

14      Q.   And that was in the down-to-date meeting?

15      A.   Yes, it was.

16      Q.   And on February 26 after you got this, you

17  didn't write to any of your KPMG colleagues and

18  express alarm or concern about these circumstances,

19  did you?

20      A.   I didn't write to them.  I think we

21  discussed them and they reviewed drafts of the Form

22  10-K.  Mr. Womack reviewed a draft of the Form 10-K

23  language in the recent developments, and Mr. Taylor

24  also reviewed a draft of the language, as well, and

25  Ms. Hall.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2043

1       Q.   And the possibility that the company might
2   need to sell assets remained essentially unchanged in
3   the eventual Form 10-K language; right?
4       A.   That's correct.
5       Q.   And you would agree with me you had as much
6   time as you needed to review this language; right?
7       A.   We did.
8       Q.   You weren't under any time pressure, were
9   you?
10       A.   No.
11       Q.   And in fact, the timing of when KPMG will
12   issue its audit opinion is solely up to KPMG;
13   correct?
14       A.   Well, there are deadlines that are stated
15   by the Securities and Exchange Commission, so the
16   timing is based upon that calendar.  But we take as
17   much time as we need to do our work to be able to
18   render our opinion.
19       Q.   And if you needed more time to ask
20   questions about the possibility that the company
21   might need to sell assets, you could have had that
22   additional time; right?
23       A.   We could have had that additional time,
24   yes.
25       Q.   And in fact, if you thought it was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2044

1    important, you would have insisted on having that

2    additional time; correct?

3        A.   If we had been informed of the degree of

4    the company's liquidity situation, we would have

5    taken more time, yes.

6        Q.   And if you had had additional questions

7    about the statement in this recent developments

8    disclosure about the company's -- about the fact that

9    the company might need to sell assets, you could have

10   taken more time to follow up on that; correct?

11       A.   Yes, if we had questions, yes.

12       Q.   Now, if we can just go back briefly to

13   Exhibit DX.  Now, this is the version of the February

14   25 email update to the board that was reviewed by two

15   KPMG partners; right?

16       A.   Yes.

17       Q.   And if we can go to the actual email again,

18   I just wanted to note one additional portion.  Go to

19   the very last full paragraph, that full paragraph.

20           The last substantive paragraph of Mr.

21   Goldstone's February 25 update says, "It's really

22   tough out there, but we are succeeding under very

23   difficult circumstances.  Friday is quarter end for

24   many Wall Street dealers, and it will not be a good

25   quarter.  Billions will be written off when earnings

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2045

```
 1    are released.  That is why it is imperative that we
 2    raise more money.  Markets are really struggling."
 3    Do you see that?
 4        A.   I do.
 5        Q.   And that's Mr. Goldstone's disclosure of
 6    his view of market conditions to the board on
 7    February 25; right?
 8        A.   That's right.
 9        Q.   And that was reviewed by two KPMG partners
10    during the restatement period; right?
11        A.   During the restatement period, yes.
12        Q.   And even after reviewing this language from
13    Mr. Goldstone, those partners concluded that there
14    were no concerns about management integrity; correct?
15        A.   That's right.
16        Q.   Now, yesterday you testified about the
17    terms of Thornburg's repurchase lending agreement
18    with Citibank; right?
19        A.   Yes.
20        Q.   And I believe you testified that you were
21    familiar with that document?
22        A.   Yes.
23        Q.   And you testified that you had had occasion
24    to review it in the course of your work on the
25    Thornburg engagement?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2046

```
 1        A.    Yes.
 2        Q.    And you testified that Thornburg had
 3   similar agreements with other lenders; correct?
 4        A.    Yes.
 5        Q.    And you testified that you also reviewed
 6   those other agreements; right?
 7        A.    Me or members of my team did, yes.
 8        Q.    And you said that the Citi agreement
 9   required payment of a margin call within one day?
10        A.    Yes.
11        Q.    And that the lender ultimately determined
12   the amount of the margin call; correct?
13        A.    That's my understanding, yes.
14        Q.    You also said that if Thornburg declared --
15   or if the lender, rather, declared an event of
16   default, there were consequences for Thornburg's
17   other repo agreements; correct?
18        A.    That's right.
19        Q.    And you said there were cross-default
20   provisions, which means that a default under the Citi
21   agreement would trigger defaults under other repo
22   lending agreements; correct?
23        A.    Repo lending agreements as well as other
24   lending arrangements that the company had with
25   nonrepo lenders.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2047

1      Q.   And since you reviewed the lending

2   agreement with Citibank, you believed it was

3   important to understand; correct?

4      A.   Yes.

5      Q.   And it was an important document to

6   understand as part of KPMG's going concern analysis;

7   correct?

8      A.   As part of the liquidity analysis and the

9   OTTI analysis, as well as just understanding how the

10  terms of the agreements worked and how they were

11  reported and reflected in the financial statements.

12  A whole number of reasons as to why they were

13  important to read and understand.

14     Q.   And if we can pull up Exhibit 10, please.

15  Exhibit 10 is the agreement, the repo lending

16  agreement with Citigroup that you referred to

17  yesterday; right?

18     A.   Yes.

19     Q.   And so let's take a look.  And it's a legal

20  document, so it will take a little navigating, but

21  let's take a look to see what the terms of that

22  agreement actually provide.  All right?

23          First, let's go to page 9.  Actually, let's

24  go to paragraph 5.4 of the agreement, which is on

25  page 8 of the actual agreement, page 9 of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2048

 1    document.  This section is entitled "Marking to

 2    market of collateral during the currency of a loan on

 3    aggregated basis."  And if we go to the paragraph

 4    marked 3(i).  It says, "If at any time on any

 5    business day the aggregate market value of the posted

 6    collateral in respect of all loans outstanding under

 7    this agreement falls below the aggregate of required

 8    collateral values in respect of all such loans,

 9    borrower shall, on demand, provide such further

10    collateral to lender as will eliminate the

11    deficiency."  Do you see that?

12        A.   Yes.

13        Q.   And would you agree with me that this sets

14    forth the terms governing when the lender can make a

15    margin call; correct?

16        A.   Yes.

17        Q.   And would you agree with me that this sets

18    forth, as the sort of trigger point, if you will, for

19    a margin call the defined term market value of the

20    collateral; right?  It's by reference to market

21    value.  Do you see that?

22        A.   Yes.

23        Q.   And would you agree with me that then the

24    only way Citibank under this agreement can make a

25    margin call is if the posted collateral -- the market

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                              1-800-669-9492
                                                         e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2049

```
 1   value of the posted collateral declines below the

 2   required collateral value?

 3       A.   Yes.

 4       Q.   And so this agreement sets forth a specific

 5   circumstance required in order to trigger a margin

 6   call; correct?

 7       A.   Right.

 8       Q.   Now let go to the definition of "market

 9   value" which is on page 3 carrying over to page 4 of

10   the agreement.  And you see this defines the term

11   "market value" which -- for purposes of whether a

12   margin call can be triggered; right?

13       A.   Yes.

14       Q.   And it essentially says that the market

15   value is pegged to a price equal to a market quote or

16   to some other reputable source, trying to simplify

17   it.  But would you agree that that is essentially

18   what this says?

19       A.   Right.  That's the first step.

20       Q.   For determining market value.  And so it

21   requires reference to either a bid price in (i), or

22   prices or rates bid by a reputable dealer for a

23   relevant instrument, for a comparable instrument;

24   correct?

25       A.   Are you looking at (i) or --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      Q.   Well, both.

2      A.   Both.  Right.  So if you can't get a price,

3  if you can't return a price for that specific

4  security, you take a similar security with similar

5  terms, similar types of products, similar coupon, and

6  you price off that.

7      Q.   Right.  Right.  And you would agree, then,

8  that if the bank has not -- if any bank has not made

9  a margin call in accordance with the terms of this

10  agreement by reference to the defined term market

11  value, it would not be a proper margin call.  Would

12  you agree with that?

13      A.   I don't know.  Is there a third (i),

14  3(iii)?

15      Q.   There is just a further -- sure.  We can

16  try to pull it up.  I don't think it sets forth the

17  definition of market value, but sure, if you want to

18  scroll down to paragraph 3(i)?

19      A.   My recollection of the agreement is that is

20  a provision in there that the counterparty is the

21  ultimate determinant of the value of the collateral

22  if there is a disagreement or a dispute.

23      Q.   But my point is that a counterparty can't

24  just issue a margin call on a whim; correct?

25      A.   On a whim, no.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2051

1          Q.   And would you agree with me that there is

2     an actual legal document, this agreement, that sets

3     forth the terms and conditions under which a

4     counterparty can issue a margin call?

5          A.   Yes.

6          Q.   And would you agree with me that that sets

7     forth particular indexes or data points that the

8     counterparty is required to look to in order to

9     determine whether a margin call is appropriate?

10         A.   I don't have a recollection of that

11    agreement in mind.  If you're referring to a second

12    agreement?

13         Q.   No, I'm sorry, it may be a little

14    confusing.  I'm referring to this agreement.  Would

15    you agree with me that this agreement includes a

16    particular definition of the index or metric that can

17    be used to define market value?

18         A.   I can't recall without looking at the

19    provision that you're thinking of, Mr. Lee.

20         Q.   Well, I'm referring to the fact that one

21    has to either obtain a price from a reputable pricing

22    source, or bids or prices for comparable instruments.

23         A.   Yes.

24         Q.   And if we can turn to page 18 of the

25    agreement under "Events of default," this sets

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2052

```
 1    forth -- this paragraph, section -- sets forth the
 2    various ways in which a party can default under the
 3    agreement; correct?
 4         A.   Yes.
 5         Q.   And by reference to the highlighted
 6    section, "Events of default" under 2(i), either the
 7    lender or the borrower can be declared in default
 8    under this agreement; correct?
 9         A.   That's correct.
10         Q.   So Thornburg could be declared in default
11    for failing to comply with its obligations; correct?
12         A.   Yes.
13         Q.   And the lender can be declared in default
14    for failing to comply with its obligations; correct?
15         A.   Yes.
16         Q.   And paragraph 5, which we looked at before,
17    section 5 includes the provision that a margin call
18    has to be triggered by reference to the term market
19    value.  Do you recall that?
20         A.   Yes, I do.
21         Q.   And so a violation of that term by a lender
22    could result in a default by the lender; right?
23         A.   Yes, either party.
24         Q.   Right.  And if we can go back to the events
25    of default section.  And this section for an event of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2053

```
 1   default also requires a written notice of an event of
 2   default; correct?
 3        A.   Yes.
 4        Q.   And a reservation of rights letter would
 5   not be the same, would not satisfy a written notice
 6   for purposes of this agreement to declare an event of
 7   default; correct?
 8        A.   I don't know without speaking to legal
 9   counsel, but again, I think this is the fact that the
10   company had received a reservation of rights letter
11   under a cover email that said notice of default or
12   something similar was something we wanted to have
13   known at the time.
14        Q.   I understand that there are various things
15   you say you would have wanted to know.  My question
16   is a more straightforward one, which is that a
17   reservation of rights letter is not the same as a
18   written notice of default under the terms of the
19   actual lending agreement, is it?
20        A.   I don't know, sitting here.  I'd have to
21   have taken a look at it and talked to counsel about
22   whether or not it was a legal default or not.
23        Q.   Now, under the agreement, assuming that is
24   a valid margin call, the repayment must be made
25   within the same business day, correct, as a general
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    principle?

2         A.   Yes.   General principle is one day, same

3    day.

4         Q.   Let's look at section 9 of the agreement.

5    I'm sorry, page 9, paragraph 5.8.  This says, "Timing

6    of repayments of excess collateral or deliveries of

7    further collateral."  Would you agree that this

8    governs the timing within which a borrower would have

9    to meet a margin call?

10        A.   Yes.

11        Q.   And you notice how it says, "Where any

12   equivalent collateral fails to be repaid or

13   redelivered, as the case may be, or further

14   collateral is to be provided under paragraph 5 unless

15   agreed between the parties, it shall be delivered on

16   the same business day."  Do you see that?

17        A.   Yes.

18        Q.   So the terms of the agreement itself

19   contemplate that the parties can agree to a different

20   payment provision; correct?

21        A.   Yes.

22        Q.   So this agreement wouldn't have to be

23   modified in order for the parties to agree otherwise

24   as to the payment term; right?  It's set forth right

25   there in section 5.8; correct?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                              1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

2055

```
 1        A.   It would allow the parties to agree
 2   differently than the agreement provides, yes.
 3        Q.   Now, you testified about cross-defaults.
 4   And what I'd like to do, with the Court's permission,
 5   is hand you a hard copy of this exhibit which will be
 6   easier than trying to review the whole thing
 7   electronically.
 8             THE COURT:  You may.
 9        Q.   I'm handing you a hard copy of Exhibit 10.
10   And Ms. Reinhart, I'd like you to take as much time
11   as you need and point out to me where the
12   cross-default provision is contained, the
13   cross-default provision that would trigger defaults
14   in other lending agreements, either repurchase
15   lending agreements or other types of lending
16   agreements with another party.
17        A.   There is a cross-default provision on page
18   38.  Cross-default, cross-collateralization.
19             MR. LEE:  Your Honor, may the record
20   reflect that approximately 11 minutes have elapsed?
21             THE COURT:  The record will so reflect.
22        Q.   (By Mr. Lee)  I'm glad you noticed that,
23   Ms. Reinhart.
24        A.   And there's also -- there's also some
25   provisions on page 18 that would provide that if
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    there was an act of insolvency, which is the

2    presentation of a ^winding-up of business or any

3    analogous proceeding, so in my mind that wouldn't

4    necessarily mean a bankruptcy filing, a petition for

5    bankruptcy, but could be something similar there.  So

6    those were at least -- I mean, it's a long document

7    and I tried to go through it as quickly as I could,

8    but those were at least a couple of things that come

9    out, Mr. Lee.

10            And then there are other agreements that

11   the company has.

12        Q.   All right.  You've answered my question.

13        A.   Okay.  Thank you.

14        Q.   I'm glad you noticed the provision on page

15   38.  I don't know if you read it carefully, though,

16   because in fact, what the provision entitled

17   cross-default, cross-collateralization on page 38

18   refers to is a cross-default only with another

19   lending agreement with Citigroup, doesn't it?  It

20   doesn't apply to any lending agreement with any other

21   financial institution, does it?

22        A.   I don't know without actually studying this

23   in more than 11 minutes, Mr. Lee.

24        Q.   The paragraph at page 38 specifically

25   refers to cross-default with an affiliate, and an

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2057

1    affiliate is defined as Citigroup global markets

2    holding and any entity controlled by it.  So there

3    are no cross-default provisions that would trigger --

4    under which an event of default in this agreement

5    would trigger any default with any other agreement

6    with any other bank.

7        A.   I don't know that for a fact.

8        Q.   Well, would you like additional time to

9    read paragraph 38, or are you willing to accept my

10   representation that paragraph 38 is limited to other

11   agreements with Citigroup or one of its affiliates?

12           MR. KASPER:  Your Honor, I object.  It's

13   calling for the witness to make a legal conclusion

14   about what a contract means.

15           THE COURT:  Well, if she can't take your

16   representation, I think we're going to move on.

17       A.   Mr. Lee, there are other agreements that

18   the company had that were dependent upon its

19   compliance and its solvency in order for them not

20   to --

21       Q    (By Mr. Lee) Ms. Reinhart, you'll have your

22   opportunity to explain.  I asked you a specific

23   question, which is:  Are you willing to accept my

24   representation that the paragraph on page 38 is

25   limited to agreements with other Citigroup entities.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2058

1   So either yes or no.

2        A.   No, I'm not willing to accept your

3   representation, Mr. Lee.

4        Q.   But what your review of this agreement has

5   illustrated is that it would have been beneficial for

6   you to read this agreement in detail before

7   testifying broadly yesterday that there were

8   cross-default provisions under the Citigroup

9   agreement that's Exhibit 10; right?  That would have

10  been better; right?

11       A.   It's been certainly some time since I've

12  looked at these.  But I am aware of cross-default

13  provisions within the company's legal agreements that

14  affect other lending agreements, is how I understood

15  them at the time.

16       Q.   But your testimony yesterday was not about

17  other lending agreements.  Your testimony yesterday

18  was about this particular agreement, Exhibit 10,

19  which you said you were familiar with and which you

20  said had a cross-default provision that would trigger

21  defaults with other lenders.  That was your testimony

22  yesterday.

23       A.   Well, the cross-default provision relates

24  to other agreements being triggered.  So if the

25  company defaults on the Citi agreement, then the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    other agreements that are there, other agreements

2    that the company had with Greenwich for its warehouse

3    line and for other repo agreements and for its other

4    debt agreements, contained provisions that the

5    company had to maintain certain financial ratios and

6    be in compliance with those agreements.  So that's

7    the cross-default provision that I was speaking

8    about.

9         Q.   All right.  Well, you didn't make that

10   clear yesterday.  You just testified that there was a

11   cross-default provision in Exhibit 10 that would

12   trigger defaults under other lending agreements, and

13   that's not there, is it?

14        A.   Without again studying it and -- I can't

15   answer your question there, Mr. Lee.

16        Q.   Now, since we were talking about

17   reservation of rights letters, you testified you

18   would have wanted to know about the reservation of

19   rights letter that Citi sent to the company on or

20   about February 21.  You were aware that Thornburg had

21   received reservation of rights letters in August of

22   2007; correct?

23        A.   No, I'm not.  I was not aware of that fact.

24        MR. LEE:  Your Honor, may I approach?

25        THE COURT:  You may.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2060

```
 1              MR. KASPER:  Can I please get a copy?
 2              MR. LEE:  I'm getting you a copy.
 3      Q.   (By Mr. Lee)  I've handed you what's been
 4   marked as Exhibits PG and PH.  Do you see those in
 5   front of you?
 6      A.   Yes, I do.
 7      Q.   And Exhibit PG is an email from a lawyer at
 8   Clifford Chance to you and others.  Do you see that?
 9      A.   Yes, I do.
10      Q.   And it's transmitting an underwriting
11   agreement.  Do you see that?
12      A.   Yes.
13      Q.   And then if you look at Exhibit PH, that is
14   a copy of the underwriting.  Do you see that?
15      A.   Yes.
16      Q.   And in the lower right-hand corner, that
17   contains your initials; right?
18      A.   It does.
19      Q.   And in the upper right-hand corner, it
20   contains Tara Baucom's initials; correct?
21      A.   Yes.
22      Q.   And you can tell from these documents that
23   they came from KPMG's files; correct?
24      A.   Yes.
25      Q.   And I'd like to turn your attention to just
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2061

1  look at Exhibit PH, which is the one with your

2  initials on it, to schedule 3 L at Bates ending 4129.

3  And that is a schedule of both default notices and

4  reservation of rights notices, correct?

5      A.   Yes.

6      Q.   And that schedule shows that Thornburg

7  received four reservation of rights notices, a

8  reservation notice from Liquid Funding dated August

9  15, a reservation notice from Nomura dated August 14,

10  a reservation notice from NATIXIS dated August 14,

11  and a reservation notice from Citigroup dated August

12  15.  Do you see that?

13      A.   Yes.

14      Q.   And under the notes it indicates -- there's

15  some comment about what happened and next to the

16  Liquid Funding reservation of rights notice it says,

17  "No action," and under the Nomura notice, it says,

18  "No action," and then next to the NATIXIS notice it

19  says, "Voluntarily terminated swaps."  And under the

20  Citigroup it says, "No action."  Do you see that?

21      A.   Yes.

22      Q.   And this agreement was provided to KPMG in

23  connection with its issuance of a comfort letter;

24  correct?

25      A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2062

1       Q.   And if you could turn to page 7 of the

2   agreement which ends at 4096.  Are you there?

3       A.   Yes.

4       Q.   Under section L.  And section L reads,

5   "Except as set forth on schedule L, the line items of

6   which individually or in the aggregate do not have a

7   material adverse effect on the company, any of its

8   subsidiaries, or the manager, neither the company,

9   any of its subsidiaries nor the manager is in breach

10  of or in default of, nor has any event occurred with

11  which notice, lapse of time, or both would result in

12  a breach of or constitute a default of," and then it

13  goes on to list the various types of agreements.  Do

14  you see that?

15      A.   Yes.

16      Q.   And would you agree with me that this

17  schedule that's referred to here is the schedule that

18  contains the listing of four reservation of rights

19  letters the company received in August?

20      A.   Yes.

21      Q.   And would you agree with me that the way to

22  read this is that the company is representing its

23  belief that the items listed on that schedule,

24  including the reservation of rights letters, do not,

25  either individually or together, constitute a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   material adverse effect on the company; correct?

 2        A.   The reservation of rights letters?

 3        Q.   As set forth on the schedule, that's how

 4   this language in paragraph L reads; right?

 5        A.   That's what the company is representing.

 6        Q.   Right.  That each of the reservation of

 7   rights letters, both together and individually, do

 8   not have a material adverse effect on the company;

 9   right?

10        A.   That's what they're saying, yes.

11        Q.   And KPMG received this in or about

12   September of 2007; correct?

13        A.   Yes.

14        Q.   And even though KPMG received this

15   information informing KPMG that the company had

16   received four reservation of rights letters, KPMG did

17   not require the company to disclose those reservation

18   of rights letters in its Form 10-Q, did it?

19        A.   No, but the company basically disclosed the

20   events of significant amounts of liquidations of

21   securities as a result of counterparties either

22   terminating the agreements or the company voluntarily

23   selling.  And so the events that would have

24   surrounded any notice of default or reservation of

25   rights, had they occurred -- that had essentially
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    happened, and that, in fact, was disclosed.  So that

2    was the more, in our mind, significant event that

3    needed to be provided for.

4          Q.    It was the events of default that led to

5    certain liquidations; correct?

6          A.    Events of default or actions on the part of

7    the company to terminate agreements that led to the

8    liquidations of assets.

9          Q.    But the lenders that issued reservation of

10   rights letters did not default the company; correct?

11         A.    From this -- I can't actually tell without

12   going back to the audit work.

13         Q.    Citigroup was one of the lenders.

14   Citigroup did not default the company in August of

15   2007, did it?

16         A.    I don't have a recollection, Mr. Lee.

17         Q.    So your rationale or explanation of why the

18   reservation of rights letters weren't important to

19   you in August isn't actually accurate, because what

20   triggered the liquidations was only the actual

21   defaults, not the lenders that only issued

22   reservation of rights letters; isn't that right?

23         A.    Well, what triggered the company having to

24   sell or the counterparties seizing the collateral was

25   the contraction of the commercial papers market.  So

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1     there was no lending vehicle under commercial paper

2     that was available.  So the company essentially had

3     to scramble for new sources of liquidity to finance

4     its assets, and so that was the event that was

5     significant.  That fact, plus the loss that was taken

6     was, in fact, disclosed.  The reservation of rights

7     and default notices -- that was, in our mind, no

8     longer relevant for the third-quarter disclosure.

9          Q.   And one of the reasons it was no longer

10    relevant was that the reservation of rights letters

11    from those lenders never actually resulted in any

12    default; correct?

13         A.   Right.  Effectively, the refinancing

14    activities and the events that occurred -- it was

15    done by the time the company had to file its Form

16    10-Q.

17         Q.   And KPMG never asked Thornburg for copies

18    of the four reservation of rights letters, even after

19    seeing the existence of those letters on this

20    schedule.  KPMG never went back to Thornburg and

21    asked for copies of those letters, did it?

22         A.   I don't know if anybody did.

23         Q.   And KPMG did not request that the company

24    provide reservation of rights letters in connection

25    with the 2007 audit, even though it knew about the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

2066

1    existence of four reservation of rights letters in

2    August, did it?

3         A.   I don't have a recollection, Mr. Lee.

4         Q.   You testified about a down-to-date meeting

5    that occurred on or about February 27.  Do you recall

6    that?

7         A.   Yes, I do.

8         Q.   And you testified that at that meeting, Mr.

9    Simmons said that the likelihood of collateral values

10   decreasing by more than 2 to 3 percent was remote.

11   Do you recall that?

12        A.   Yes.

13        Q.   And you remember that from the meeting on

14   February 27?

15        A.   Yes, on or about the 27th, yes.

16        Q.   And then let's go to Exhibit 249, please.

17   Exhibit 249 is KPMG's final going concern memo.  Do

18   you see that?

19        A.   Yes.

20        Q.   And you testified that in this going

21   concern memo you were reporting what Mr. Simmons had

22   told you and Ms. Hall during the down-to-date meeting

23   about the likelihood of collateral values declining.

24   Do you recall that line of questions?

25        A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And if we can go to the relevant sentence,

2   it's our Exhibit AS.  And you see at the top it says,

3   "It is management's position that the likelihood that

4   collateral values decrease by more than another 2 to

5   3 percent is remote."  Do you see that?

6      A.   Yes.

7      Q.   And you testified that that was reporting

8   what Mr. Simmons had told you in the down-to-date

9   meeting, which occurred on or about the 27th; is that

10   right?

11      A.   Yes.

12      Q.   Let's take a look at Defendants' Exhibit

13   OO.  Exhibit OO is a draft of the going concern memo.

14   Do you see that?

15      A.   Yes.

16      Q.   And if we can just scroll down to the end

17   of the area where the comments are inserted.  Okay.

18   So you can see that these are a number of comments

19   that have been inserted by members of KPMG.  Do you

20   see that?

21      A.   Yes.

22      Q.   And you can see they're inserted if we --

23   go to the Bates ending 826.  Actually, the whole

24   page.  You can see that the comments are inserted by

25   KPMG on February 22 and 23; right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2068

1        A.   Yes.

2        Q.   And now go to the Bates ending 827 at the

3   bottom.  This is language that was inserted on

4   February 23, 2008.  Do you see that?

5        A.   Yes.

6        Q.   At 9:42 a.m.  Do you see that?

7        A.   Yes.

8        Q.   And that says, "It is management's position

9   that the likelihood that collateral values decrease

10  by more than another 2 to 3 percent is remote."  Do

11  you see that?

12       A.   Yes.

13       Q.   That was inserted into the going concern

14  memo four days before the down-to-date meeting where

15  Mr. Simmons supposedly told you this information;

16  right?

17       A.   It was inserted on that date, but he also

18  told us that same information at the down-to-date

19  meeting.  I remember it specifically.

20       Q.   But you didn't testify yesterday -- you

21  didn't make clear that it had originally come from --

22  are you saying it originally came from another

23  source?

24       A.   I didn't say that.  I just simply said I

25  remembered him saying that at the down-to-date

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   meeting.
 2        Q.   And would you agree that the actual draft
 3   of the going concern memo -- well, back up for a
 4   second.  You testified you remembered him saying
 5   that; right?
 6        A.   Yes.
 7        Q.   On or about February 27?
 8        A.   Yes.
 9        Q.   And you testified that that was what you
10   were reporting in the going concern memo; right?
11        A.   Yes.
12        Q.   But what the draft of the going concern
13   memo actually shows is that that statement was put
14   into the memo four days, four days, before this
15   down-to-date meeting that you've testified about,
16   doesn't it?
17        A.   It does.
18        Q.   And you didn't take any notes at this
19   meeting?
20        A.   I don't recall that I did, no.
21        Q.   And Ms. Hall didn't take any notes during
22   this down-to-date meeting, did she?
23        A.   I don't know.  You'd have to ask her that
24   question.
25        Q.   You've never seen any notes prepared by
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2070

1    either you or Ms. Hall of the down-to-date meeting,

2    have you?

3        A.   I have not, that I remember, no.

4        Q.   So you didn't actually write down any of

5    the statements that were supposedly made during that

6    meeting; correct?

7        A.   I had in front of me the representation

8    letter, I had a checklist in front of me.  And so

9    that served as the way that mentally I documented the

10    questions that were being asked and the responses

11    that I was getting back.  This one sticks out in my

12    mind specifically because of the conversation that we

13    were having about the company's margin calls, its

14    liquidity, its going concern assessment, its OTTI

15    assertions, and this one was important to us to get

16    management's view of its collateral in the

17    marketplace at that particular point in time.

18        Q.   And the checklist that you referred to --

19    that contained or was a guide only to your questions

20    that you were going to ask during the down-to-date

21    meeting; correct?

22        A.   That's right.

23        Q.   So there is absolutely no written record of

24    what actually was said by anybody in the meeting;

25    correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1          A.   This is the written record that reflects --
 2    the final memo reflects what was -- partially what
 3    was said, as well as everything else.  If there was
 4    something that refuted the information that we had
 5    accumulated up to that point, we would have made note
 6    of it.  But at that meeting the company and Mr.
 7    Simmons specifically was asserting to us that all of
 8    the information that we had and that the company
 9    provided to us was accurate for our consideration.
10          Q.   And approximately how long was this
11    meeting?
12          A.   I don't remember.
13          Q.   Do you have a ballpark?
14          A.   No, I don't.
15          Q.   No idea how long this meeting was?
16          A.   I don't.
17          Q.   Five minutes, an hour, two hours?
18          A.   More than five minutes.
19          Q.   And it wasn't important enough to you as to
20    what Mr. Simmons or Ms. Starrett said to actually
21    take notes or to have any written record at the time
22    of what they said, was it?
23          A.   If I thought it was important, I thought
24    what I accumulated in my head and what was
25    communicated and documented in our final memoranda

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    was sufficient.
 2         Q.    Now, after the meeting ended, you didn't go
 3    and write down notes to yourself, either, did you?
 4         A.    No.  We were finalizing all of the
 5    memoranda to the file, and so it wasn't necessary for
 6    us to have a long list of notes that needed to be
 7    accumulated to be recorded later on, because we were
 8    at the end, essentially, of the audit.
 9         Q.    And so eight years later you can't even
10    give me a ballpark estimate of how long this meeting
11    was, but you can remember one specific statement from
12    that meeting.
13         A.    That's right.
14         Q.    Even though the specific statement that you
15    attributed to Mr. Simmons as having been recorded in
16    the going concern memo was actually inserted into the
17    going concern memo four days beforehand.
18         A.    That statement is crystalized in my memory.
19         Q.    Ms. Reinhart, I'd like to ask you a few
20    questions about Mr. Taylor's role in the audit.
21    Mr. Taylor, I believe you testified yesterday, was
22    the so-called in-depth review partner?
23         A.    Yes.
24         Q.    What does that mean?
25         A.    That means that he assists the SEC
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    reviewing partner -- Mr. Womack, in this case -- in

2    reviewing the audit workpapers and discussing with

3    the engagement team those areas that are of a

4    technical nature within his area of expertise, which

5    was mortgage banking.

6         Q.   And so he was part of the team at least in

7    part because he had particular or specialized

8    experience with the accounting issues surrounding

9    mortgage companies?  Is that fair to say?

10        A.   That's fair.

11        Q.   And Mr. Taylor was part of the original

12   proposal to Thornburg when KPMG was essentially

13   pitching for the business; right?

14        A.   Yes.

15        Q.   If we can go to Exhibit AW, please, the

16   second page or the third page.  So this is a draft of

17   the Thornburg going concern memo.  Do you see that?

18        A.   Yes.

19        Q.   Now, if we can go back to the first page.

20   So Mr. Taylor is forwarding to you and Ms. Hall his

21   comments on a draft of the going concern memo;

22   correct?

23        A.   Yes.

24        Q.   And it's on February 20, 2008; right?

25        A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   And he says, "Here are my notes."

2        A.   Yes.

3        Q.   And if we can go to Bates ending 925, you

4   can see just generally that Mr. Taylor is putting in

5   handwritten comments on the memo; right?

6        A.   Yes.

7        Q.   And let's blow up this particular comment

8   that's highlighted where it says, "The company has

9   made all margin calls to date," and he writes, "Any

10  chance they won't?"  And then writes, "Projection or

11  forecast"; right?

12       A.   Yes.

13       Q.   And he was specifically calling out the

14  possibility that Thornburg might not be able to pay

15  its margin calls; right?

16       A.   He's -- that's right.  He is.  He's calling

17  that out, as well as asking if there is -- are they

18  able to project or forecast.

19       Q.   And his comment -- you took his comments to

20  be comments that he wanted you and/or other members

21  of the engagement team to pay attention to.  Fair to

22  say?

23       A.   He wanted to discuss these with him, and

24  so, in fact, we did.

25       Q.   And now let's go to page 930.  The first

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                              FAX (505) 843-9492
                                                        1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

 1    sentence of the first full paragraph reads, "As the

 2    company has the ability and intent to hold its

 3    purchased ARM assets until recovery, losses are not

 4    considered to be other than temporary impairments."

 5    Do you see that?

 6         A.   Yes.

 7         Q.   And that sentence relates to the

 8    intent-and-ability component of OTTI; correct?

 9         A.   Yes.

10         Q.   And so Mr. Taylor was reviewing that

11    portion of the company's analysis; right?

12         A.   Yes.

13         Q.   And he wrote, "What about the $22 billion

14    sold."  Do you see that?

15         A.   Yes.

16         Q.   And you understood that to be a reference

17    to the $22 billion in assets that had been sold in

18    August of 2007; right?

19         A.   Yes.

20         Q.   And you understood Mr. Taylor to be raising

21    a specific question of whether that large an amount

22    of sale of assets in August would call into question

23    the ability and intent to hold in February; correct?

24         A.   Yes.

25         Q.   And so he was aware of and pointing out the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2076

1  experience that the company had gone through in

2  August; correct?

3       A.   Yes.

4       Q.   Including the sale of assets; right?

5       A.   Yes.

6       Q.   And was asking the question, would that --

7  essentially, would that have any impact upon the

8  company's OTTI analysis for purposes of the Form

9  10-K; correct?

10      A.   Yes.

11      Q.   And in fact, the sale of assets, I think

12 we've already talked about, actually triggered what

13 was at least triggered in part by certain defaults;

14 correct?

15      A.   Yes.  The sale of assets was triggered by

16 defaults, as well as the unavailability of commercial

17 paper as a vehicle to finance those assets at that

18 time.

19      Q.   Right.  Right.  And Mr. Taylor presumably

20 knew that in the third quarter, in August of 2007,

21 during the company's third quarter, even though there

22 had been $22 billion in assets sold, the company did

23 not take an OTTI; correct?

24      A.   Well, the company recorded realized losses

25 on those assets that were sold and then they were

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2077

```
 1   able to successfully refinance the remaining assets

 2   under repurchase agreement arrangements that were

 3   determined to be such that they would be able to hold

 4   those assets through recovery or maturity.

 5        Q.   And you consulted with Mr. Taylor on the

 6   company's OTTI decision in February of 2008; correct?

 7        A.   He was one of the several partners that I

 8   consulted with, yes.

 9        Q.   And did you also consult with him on the

10   decision or on the company's position not to take an

11   OTTI in the third quarter of 2007?

12        A.   On the remaining assets that were -- the

13   company continued forward with, we talked about that

14   as being at least a reasonable approach, yes.

15        Q.   Now, we've talked a little about the

16   concept of subsequent events; right?

17        A.   Yes.

18        Q.   Or at least counsel for the SEC asked you

19   some questions about subsequent events; right?

20        A.   Yes.

21        Q.   And just without delving too much into the

22   details, there are essentially -- subsequent events

23   refer to events that occur between the end of the

24   reporting period and the time the company's financial

25   statements are actually filed; correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1         A.    Yes.

 2         Q.    So the subsequent events period in this

 3    case was from January 1, 2008, to February 27, 2008;

 4    right?

 5         A.    Yes.

 6         Q.    And there are essentially two types of

 7    subsequent events, what's known by auditors as Type I

 8    and Type II; right?

 9         A.    Yes.

10         Q.    And Type I describes an event that relates

11    to a condition that was in existence at year end, so

12    in this case a condition that was in existence at

13    December 31, 2007; right?

14         A.    Yes.

15         Q.    And a Type II event relates to an event

16    that is not related to an event, to a condition that

17    was in existence at year end; correct?

18         A.    Yes.

19         Q.    And in this case in the original Form 10-K,

20    Thornburg reported that the events that -- the

21    decline in Alt-A values and the resulting margin

22    calls that resulted in mid-February were Type II

23    events in your original Form 10-K; correct?

24         A.    In the original Form 10-K, yes.

25         Q.    And in the original Form 10-K, KPMG

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    concurred with the determination that those events --

2    that the decline in the value of the Alt-A and the

3    resulting margin calls -- were Type II events;

4    correct?

5         A.   Yes.

6         Q.   And that's why there was a subsequent

7    events disclosure, because they had been treated as

8    Type II events; right?

9         A.   Yes.

10        Q.   Now, I'd like to turn to Exhibit HJ.

11   Exhibit HJ is an email from Mr. Taylor to Mr. Womack,

12   cc'ing you and Ms. Hall; right?

13        A.   Yes.

14        Q.   And it's sent early in the morning right

15   after the 10-K has been filed; right?

16        A.   Yes.

17        Q.   And he writes in the first sentence, "The

18   team sent me the updated completion memo and the

19   changes to the Form 10-K, and I have reviewed them."

20   Do you see that?

21        A.   Yes.

22        Q.   And the completion memo is essentially a

23   memo that KPMG puts in its workpapers to record the

24   fact that it has completed all the various steps and

25   audit procedures that KPMG has conducted before

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                   1-800-669-9492
                                                           e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    issuing its audit opinion; right?

 2          A.   It's a summary of significant audit

 3    procedures and what the results of our testwork are,

 4    as well as a number of other required elements.

 5          Q.   And so you had sent that completion memo to

 6    Mr. Taylor for his review; correct?  Or somebody on

 7    your team had sent it to him for his review; right?

 8          A.   Yes.

 9          Q.   And there -- it sounds like from this email

10    there were changes to the Form 10-K that he had been

11    asked to review, as well; right?

12          A.   Yes.

13          Q.   And even though he's responded after the

14    10-K was actually filed, you would assume that he did

15    his review before the Form 10-K was filed and before

16    the audit opinion was issued?

17          A.   Yes.

18          Q.   So he may have just been a little late in

19    responding to the team; right?

20          A.   Yes.

21          Q.   And then he goes on to say, "I think the

22    disclosure is adequate, and I understand the margin

23    calls and recent liquidity squeeze was considered in

24    the going concern analysis."  Do you see that?

25          A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And then he writes, "The drop in value in

2   February does not seem to call into question the

3   12/31/07 valuation on these assets."  Do you see

4   that?

5    A.   Yes.

6    Q.   And so that tells you, since you were the

7   recipient of this email, that tells you that Mr.

8   Taylor was aware of the margin calls the company had

9   received in February; right?

10    A.   He was aware, as we were, of the margin

11   calls in the two-week period that were disclosed in

12   the subsequent event footnote, the $300 approximate

13   million that was received on the Alt-A collateral.

14    Q.   And he was aware of something that he

15   characterized, anyway, as a, quote, recent liquidity

16   squeeze; correct?

17    A.   Yes.

18    Q.   And he was acknowledging that those facts

19   had actually been considered in KPMG's going concern

20   analysis; right?

21    A.   That's right.

22    Q.   And he concurred in the conclusion of the

23   engagement team that, in fact, Thornburg could

24   continue and would continue as a going concern;

25   right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   He concluded, as we did, that there was not

2    substantial doubt, is how auditors refer to that

3    assertion.

4      Q.   Okay.  And he also -- the last sentence

5    refers to his concurrence in the view that the

6    decline in the value of Alt-A securities in

7    mid-February was a Type II event; correct?

8      A.   He didn't put it in that term, whether it's

9    Type I or Type II, but he clearly didn't think that

10   that would need to be pushed back to the 12/31/07

11   financial statements.

12     Q.   And in fact, if he had concluded that it

13   was a Type I event, it would have had to have been

14   pushed back; right?

15     A.   Well --

16     Q.   Let me rephrase that.  If KPMG had

17   concluded that what Mr. Taylor was writing here, that

18   the decline in value in February was a Type I event,

19   it would have had to have been pushed back to the

20   12/31 reporting; correct?

21     A.   The decline in value, in and of itself,

22   wouldn't require it to be pushed back.  It was all

23   about the company's liquidity associated with those

24   securities.  So if we determined that the company

25   didn't have sufficient liquidity to hold those

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2083

1   securities, then the decline in value would be pushed

2   through the company's income statement at 12/31 of

3   '07.

4       Q.   And what Mr. Taylor is referring to here is

5   specifically the drop in value in February, so that

6   sentence doesn't say "liquidity."  The sentence says

7   "drop in value in February," and you understand him

8   to be referring to the drop in value of the company's

9   Alt-A securities; right?

10      A.   I don't see anything about the Alt-A

11  securities specifically there.

12      Q.   But you recall that it was the Alt-A

13  securities or at least it was concentrated in the

14  Alt-A securities; the decline in mid-February was

15  concentrated in the company's Alt-A securities.  You

16  were aware of that; correct?

17      A.   The margin calls of $300 approximate

18  million were focused, as the company told us, around

19  the Alt-A collateral that they had.

20      Q.   Right.  And so Mr. Taylor is concluding

21  that -- however you want to define the relevant

22  securities, the drop in value, he's referring to

23  securities; right?

24      A.   Yes.

25      Q.   The drop in value -- the effect of what

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     he's concluding is that the drop in value was a Type

2     II event; correct?

3          A.   Yes.

4          Q.   Now, you were asked by the SEC yesterday to

5     speculate about the meaning of a couple of emails

6     relating to a rumored or impending collapse of an

7     unnamed European hedge fund.  Do you recall that?

8          A.   I recall the line of questioning about the

9     European hedge fund, yes.

10         Q.   And specifically you were asked about two

11    emails that you were not on; correct?  You weren't on

12    those emails; right?

13         A.   I don't believe I was copied on those

14    emails, no.

15         Q.   And you testified that that information,

16    the emails themselves, the fact that members of

17    Thornburg management had heard of an impending

18    collapse of an unnamed European hedge fund was

19    information you would have wanted to know?

20         A.   Yes.

21         Q.   And you testified that that would have been

22    important for you to know; correct?

23         A.   Yes.

24         Q.   Are you aware that the SEC itself didn't

25    even hear of this rumor until February 28?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                                  1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                               e-mail: info@litsupport.com

2085

```
 1        A.   I don't know when the SEC heard about it.
 2        Q.   Let's go to Exhibit HB.  Exhibit HB is an
 3   internal email from the SEC.  And you can tell from
 4   the top -- although not all the addressees have the
 5   email address reproduced -- the very top email does
 6   show that they're @SEC.GOV addresses; right?
 7        A.   Yes.
 8        Q.   So let's go to the bottom email, the first
 9   email chronologically.  And you know that among other
10   things, SEC has regulatory authority over
11   accountants; right?
12        A.   Yes.
13        Q.   But you know that the SEC also has
14   regulatory authority over all market participants,
15   such as investment banks; right?
16        A.   Yes.
17        Q.   And you know that the SEC also has
18   authority over our stock exchanges; correct?
19        A.   Yes.
20        Q.   And you know that the SEC has an entire
21   division called the Division of Trading and Markets;
22   correct?
23        A.   I don't know if I have specific
24   recollection of that one.
25        Q.   But you know that in general the SEC is --
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    one of their missions is to regulate our securities

2    markets; correct?

3         A.   Right, regulate and protect investors,

4    right.

5         Q.   And so this first email in the chain is an

6    email from Matthew Eichner at the SEC dated Thursday

7    February 28 at 8:53 a.m.; right?

8         A.   Yes.

9         Q.   So the next day after the emails that the

10   SEC asked you about.  And it reads, "Craig" -- the

11   subject is "Heads up from Craig," and it reads,

12   "Craig left me a message this morning saying that

13   there is a fairly large hedge fund heavy into

14   mortgages that is liquidating.  GS has collateral and

15   thinks they'll be covered, although he caveated that

16   view with a comment that if the word gets out, that

17   could hurt.  He said that he'll give us an update

18   later if there is any news.  He asked us to be

19   circumspect as it's not in the press.  The name

20   sounded like Peloton, although I couldn't hear very

21   well, and I wouldn't want to get that too wrong."  Do

22   you see that?

23        A.   Yes.

24        Q.   And Mr. Eichner is reporting a conversation

25   that he had with an individual named Craig Broderick.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Do you know who Craig Broderick is?

2         A.   No.

3              MR. KASPER:  Objection, Your Honor.  There

4    is no foundation that this witness knows anything

5    about internal SEC emails.

6              THE COURT:  You can ask your question, but

7    you have to be careful that you do lay a foundation

8    for particular questions.

9         Q.   (By Mr. Lee)  Okay.  Do you see that this

10   email appears to reflect that Mr. Eichner at the SEC

11   is learning on February 28 in the morning, 8:53 in

12   the morning, about a fairly large hedge fund that is

13   liquidating where the name sounded like Peloton but

14   he's not sure?

15        A.   Yes, that's what I read.

16        Q.   And he's -- would you agree that he is

17   expressing some caution about knowing for sure what

18   that hedge fund is, because he says in the last

19   sentence, "I wouldn't want to get that too wrong."

20   Do you see that?

21        A.   That's what it says.

22        Q.   And you see that he's reporting a

23   conversation with somebody named Craig, that he'll

24   give us an update later if there is any news, and he

25   asks us to be circumspect, as it's not yet in the

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

2088

 1   press.  Do you see that?

 2        A.   Yes.

 3        Q.   And then if we go to the email above,

 4   Mr. Eichner is forwarding this news to other

 5   colleagues of his at the SEC.  Do you see that?

 6        A.   I think Mr. Eichner is not forwarding it.

 7   He's receiving it, if I'm reading that right.

 8        Q.   You're right.  You're right.  I stand

 9   corrected.  This is a continuation of the chain.

10   Sometimes the way these emails are produced, it's not

11   entirely sequential.

12        A.   Right.

13        Q.   But it's a continuation of the same chain?

14        A.   Yes.

15        Q.   And it's a chain among various folks at the

16   SEC; correct?

17        A.   I would presume so.  I don't know if

18   Mr. Hsu is an SEC person or not.

19        Q.   And this is just a few minutes later, also

20   the same subject, "Heads up from Craig," and Mr. Hsu

21   writes, "Ouch.  Peloton has been on the top ten

22   exposure list for a while.  The theory, if I remember

23   right, was that they were doing a long/short strategy

24   with the long leg at Goldman and the short leg

25   elsewhere.  Goldman was making big margin calls on

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2089

 1    them for several months in a row, and they had always

 2    met them, giving CRMA comfort that they were indeed

 3    making it on the other side.  It looks like that

 4    might have been a false conclusion."  Do you see

 5    that?

 6        A.   Yes.

 7        Q.   And would you understand that Goldman there

 8    refers to Goldman Sachs, the investment bank?

 9        A.   I'm assuming so. I don't know which part of

10    Goldman would be involved in that transaction.

11    They've got lots of entities.

12        Q.   And now let's go to Exhibit HC.  Let's just

13    start at the bottom email.  Do you see the bottom

14    email is the same email we looked at on the prior

15    exhibit; right?

16        A.   Yes.

17        Q.   And the top email from Michael, another

18    email from Michael Hsu to the same folks with the

19    same subject line, so it appears to be a continuation

20    of the same chain; correct?

21        A.   It does.

22        Q.   And in this email, this is a few minutes

23    later, 9:00 a.m. on the 28th.  He writes -- he

24    writes -- there is some technical language about

25    relating to the Peloton fund and the amount of

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                               1-800-669-9492
                                                      e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    collateral, and then he writes, "Not sure how that

2    makes sense.  Something's not right."  Do you see

3    that?

4         A.    Let me read that there.  Yes, I see that.

5         Q.    Fair to say that 24 hours after the first

6    email that the SEC asked you yesterday in which

7    members of Thornburg management learned about the

8    rumored collapse, 24 hours later the SEC itself, the

9    primary regulator of our financial markets, still

10   hadn't figured out what was going on.

11        A.    I don't -- they were -- it appears that

12   they weren't aware until the following morning.

13        Q.    Now let's go to Exhibit HD.  Let start at

14   the bottom email.  Well, actually, let's take a quick

15   look at the top email.  In the top email you can tell

16   there that the Michael Hsu is an SEC employee;

17   correct, HSUM@SEC.GOV?

18        A.    Yes.

19        Q.    Let's go to the bottom e-mail.  You would

20   agree that the bottom email is an internal email

21   among SEC employees, because each of their domain and

22   addresses are contained in the top email; right?

23        A.    Yes.

24        Q.    Let's go to the bottom email.  This is

25   another continuation of the same chain re: "Heads up

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    from Craig," in the morning of February 28th, and

2    Ms. Bettinger writes, "Actually, Jeff mentioned

3    something about a large fund in mortgages having

4    difficulties, as well.  I think LB might be their PB.

5    So far, they are meeting calls.  I would question

6    whether it is Peloton, which is up over 100 percent

7    for the year.

8           So would you agree with me that

9    Ms. Bettinger there is not willing to accept that

10   whatever it is they're hearing about this collapsing

11   hedge fund may not actually be Peloton; right?

12          MR. KASPER:  Objection, Your Honor.  I'm

13   renewing my foundation objection.  She can't possibly

14   know what Ms. Bettinger thought.

15          THE COURT:  Why don't you ask if she knows,

16   first.  Even after reading it, does she know?  If she

17   says no, let's move on.

18       Q.   (By Mr. Lee)  Do you know -- well, let me

19   rephrase my question.  Well, I'll just move on to the

20   top email.  The top email from another internal SEC

21   email, continuation of the same chain, says, "I agree

22   on treading carefully.  Hopefully I caveated my email

23   sufficiently.  I listened to Craig's V mail," voice

24   mail, "several times trying to decipher the name."

25   Do you see that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2092

```
 1         A.   Yes.
 2         Q.   That tells you that the SEC, our primary
 3    financial markets regulator, is trying to be careful
 4    before reacting to the information they heard about a
 5    hedge fund that might or might not be named Peloton;
 6    correct?
 7              MR. KASPER:  Objection again, Your Honor.
 8    He's again asking her about an email that she's never
 9    seen before, about people she's never met.
10              MR. LEE:  Your Honor, that's what the SEC's
11    entire examination was yesterday, asking her about
12    emails that she's not on.
13              THE COURT:  Well, but I think this is
14    qualitatively different.  Ask her first if she can
15    answer the question.
16              MR. LEE:  All right.
17         Q.   (By Mr. Lee)  Can you answer my question?
18         A.   Can you please read the question now?
19              THE COURT:  "That tells you that the SEC,
20    our primary financial markets regulator, is trying to
21    be careful before reacting to the information they
22    heard about a hedge fund that might or might not be
23    named Peloton; correct?"
24         A.   I don't know, Mr. Lee.
25         Q.   (By Mr. Lee)  Let's turn to Exhibit HE.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2093

```
 1    Now, let's start at the -- just to help follow the
 2    chain, start at the bottom of the page.  The bottom
 3    of the page, the "Ouch, Peloton has been on the top
 4    ten exposure list for a while."  We saw that email
 5    already; right?
 6         A.   Yes.
 7         Q.   And then above that Ms. Bettinger responds,
 8    again, part of the same chain, "Also, regardless of
 9    who it is, it appears that word is already out, given
10    Jeff's comments."  Do you see that?
11         A.   Yes.
12         Q.   And then if we go up to the next email from
13    Matthew Eichner to Lori Bettinger, another
14    continuation in the chain, this is about an hour
15    later, right, 9:42 a.m., an hour after the very first
16    email we looked at?
17         A.   No.
18         Q.   55, 50 minutes after the very first email
19    we looked at?
20         A.   You know, one of the things you really
21    can't tell is where these people are, whether they're
22    east coast, west coast.  But I would presume it is an
23    hour later.
24         Q.   Fair enough.  What their time stamps says.
25    They're not reliable in this case?  In any event,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2094

1    Mr. Eichner writes, "If you want to call Craig,

2    please feel free.  You can cite general rumblings,

3    plus his message to me, or we can just wait for the

4    story and name to come out, which will surely happen

5    before long."

6           And then Ms. Bettinger responds, "Maybe

7    I'll give him a call just to make sure.  I can cite

8    his message to you, which cannot be construed as

9    rumor mongering since it is his information in the

10   first place."  Do you see that?

11        A.   Yes.

12        Q.   Would you agree with me that the reasonable

13   interpretation of this email is that the SEC, our

14   nation's primary financial regulator, was exercising

15   caution about the rumor they had heard earlier that

16   morning?

17           THE COURT:  Again, ask her first if she can

18   answer the question, if she has enough knowledge to

19   answer it.

20        A.   I don't know, Mr. Lee.

21        Q.   Yesterday you testified about some other

22   emails that you hadn't been on that you were willing

23   to surmise about the meaning of those emails.  So

24   this is a yes-or-no question.  Are you willing to

25   surmise about the meaning of this email?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   I wouldn't characterize my testimony as

2    surmising.  Those were people that I had -- during

3    the course of an audit that I had worked with, so I

4    also had a foundation to be able to make comments

5    about the meaning of emails that I read.

6         These are people that I do not know and

7    have never worked with before.

8    Q.   All right.  And now let's go to Exhibit HF.

9    Let's start at the bottom.  This is another internal

10   email, this one to many more, and according to the

11   date stamp it's sent later that same day, 12:53 p.m.

12   to a number of other addressees.  And he writes, "Hi.

13   We have heard from two CSEs today."  And are you

14   familiar with the term CSE?  Do you know that it

15   stands for consolidated supervised entity?

16   A.   No.

17   Q.   Do you know that it essentially refers to

18   the five or six investment banks?

19   A.   If it's supervised, it's got be somebody

20   that's subject to FDIC or somebody like that.

21   Q.   "We have heard from two CSEs today that a

22   large hedge fund active in the mortgage space has run

23   into trouble.  The fund has cash positions of about

24   10 billion, with another 5 billion synthetic.  They

25   made lots of money last year shorting mortgages, but

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    then this year positioned long AAAs, figuring those

2    were oversold, and short BBBs, figuring those would

3    be wiped out.  But bad news over the past several

4    days caused AAAs to go down.  As of two days ago, all

5    margin calls were being met.  But a new round went

6    out today which will likely not be met.  The fund is

7    reportedly exploring a sale of assets, a la Sowood's

8    sale to Citadel.  Both CSE firms feel that they have

9    adequate collateral, assuming an orderly liquidation.

10   The name of the fund is Peloton Partners, and it is

11   run by a Goldman alum."  Do you see that?

12        A.   Yes.

13        Q.   And you recall that yesterday I asked you

14   if, before opining on Mr. Goldstone's email to Mr.

15   Simmons about the news he had heard, if you were

16   aware that Mr. Goldstone had heard that the fund was

17   reportedly exploring a sale of its assets.  Do you

18   recall that, I asked you that question?

19        A.   You asked me yesterday that question?

20        Q.   I asked you if you were aware -- if you had

21   been aware before you expressed an opinion on what

22   Mr. Goldstone meant, if you had been aware that that

23   same day he had heard that that fund was exploring a

24   sale of assets.  Do you recall that?

25        A.   I just remember from my testimony yesterday

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that there was an email between Mr. Goldstone and I

2    think Mr. Feldman about the possibility that a hedge

3    fund in Europe was exploding.  That's what I recall.

4    And that the company would receive possibly haircuts

5    further on down the road; they should be ready, as I

6    remember.

7        Q.   Let's go up to the top email.  The top

8    email is another internal SEC email, continuation of

9    the chain.  "Hi.  I just got off the phone with Craig

10   Broderick, who confirmed much of this but had some

11   detail to add."  This is now 1:00 in the afternoon.

12   This is now over 24 hours after the internal emails

13   at Thornburg.  "The problems are with Peloton ABS

14   Master Fund.  There is also a Peloton Multistrategy

15   Fund which is not necessarily in trouble right now,

16   but will face name-related reputational issues in

17   staying viable.  Craig said they had heard rumors for

18   Peloton for some time, but that they kept going back

19   to the fund, talking to the manager, et cetera, and

20   gained comfort."  Do you see that?

21       A.   Yes.

22       Q.   And then let's go down to the last

23   sentence.  The last two sentences say, "To date,

24   Peloton has met its calls at Goldman and currently

25   has $1 billion posted with them.  Craig was very

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   surprised by the speed of this and not entirely

2   pleased with how this played out, as in no one likes

3   surprises."  Do you see that?

4        A.   Yes.

5        Q.   And this reflects to you that whoever is

6   reporting -- does this reflect to you that whoever is

7   reporting this internally at the SEC heard that day

8   that there had been rumors about Peloton, but that

9   Craig, from whatever firm he's at, had gained

10  comfort.  Do you see that?  Would you agree with me

11  that's a reasonable interpretation of this email?

12       A.   That appears to be what it says.

13       Q.   We've just looked at four or five of these

14  internal SEC emails on the 28th, the day after, the

15  day after the emails that the SEC asked you to

16  speculate about.  When the SEC showed you those

17  emails, the emails from Mr. Feldman and Mr.

18  Goldstone, did the SEC tell you that the SEC itself,

19  the primary financial regulator, had not known about

20  Peloton until the following day?

21       A.   I was not aware that Peloton was -- that

22  the SEC was aware of Peloton until the following day.

23       Q.   And when the SEC showed you the email from

24  Mr. Feldman and Mr. Goldstone, did the SEC also tell

25  you that it, members of its staff who monitor and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    regulate our financial markets, had expressed caution

2    about not taking any action in response to what might

3    be a rumor?  Did they tell you that?

4         A.   No, I'm just seeing these emails here for

5    the first time.

6         Q.   And when the SEC showed you and asked you

7    to comment on the email from Mr. Feldman and Mr.

8    Goldstone, did they tell you that members of the SEC

9    staff charged with regulating our financial markets

10   had expressed uncertainty about what to make of the

11   news at all on the following day on February 28?

12        A.   No.

13        Q.   And when the SEC showed you the email from

14   Mr. Feldman and Mr. Goldstone and asked you to

15   comment on what you thought they meant, did they tell

16   you that members of the SEC itself, this very same

17   agency, this agency charged with regulating our

18   financial markets, had said in an email about this

19   very same news the following day we should tread

20   carefully?

21        A.   Well, they asked me what I felt about the

22   Goldstone/Feldman email, was that I felt that

23   information should have been made available to me

24   before we signed our opinion.  I don't have any -- I

25   was not aware of the latter part, the second part of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    your statement to me, in terms of the SEC being

 2    made -- being -- treading carefully.

 3         Q.   Pull up Exhibit 285, please.  Exhibit 285

 4    was the request that members of KPMG provided to

 5    members of Thornburg.  I think it was very late at

 6    night or early in the morning on March 4.  Do you

 7    recall that?

 8         A.   Yes.

 9         Q.   And if we can go to page 2 of this

10    document.  And counsel for the SEC asked you about

11    item 1-B in particular.  Day-by-day correspondence

12    with counterparties during the week before filing.

13    Correspondence with counterparties for the two weeks

14    prior to filing, along with supporting evidence.

15    Where, it says not received and then management

16    indicated, there was minimal correspondence.  Do you

17    recall that?

18         A.   Yes.

19         Q.   You don't know who among management that

20    management refers to, do you?

21         A.   Not specifically, no.

22         Q.   You don't know that that management refers

23    to Mr. Goldstone, Mr. Simmons, Ms. Starrett, Mr.

24    Rhoades, Mr. Fellers, any of the many people who

25    were -- Mr. Feldman, Mr. Fellers; you don't know
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1    specifically who among any of those people the

2    reference to management is, do you?

3         A.   No, I don't.

4              THE COURT:  Mr. Lee, would this be a good

5    time to take our lunch break?

6              MR. LEE:  Yes, Your Honor.

7              THE COURT:  All right.

8              When you're excused for lunch, Mr. Madrid,

9    Ms. Montoya, if you would report to jury services.

10   If you'd visit them sometime during the lunch break,

11   that would be great.  So if you'll do that for me.

12             All right.  All right.  We'll be back about

13   1:05.  About an hour.  Again, finish your meal.

14   We're not going to start without anybody but we'll

15   shoot for about an hour.

16             (The jury left the courtroom.)

17             THE COURT:  All right.  Anything we need to

18   discuss?

19             MR. McKENNA:  No, thank you.

20             THE COURT:  Mr. Lee?

21             MR. LEE:  No.

22             THE COURT:  See you in about an hour.

23             MR. BADAL:  May I be excused this

24   afternoon?  I have some work to do on this case.

25             MR. McKENNA:  No problem.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. BADAL:  Actually, they encouraged me to
 2    leave.
 3              THE COURT:  Well, have fun.  See you in an
 4    hour.
 5              (The lunch recess was held.)
 6              THE COURT:  Anything we need to discuss
 7    before we bring the jury in?  Mr. McKenna?  Mr. Lee?
 8              MR. McKENNA:  No, Your Honor.
 9              MR. LEE:  No, Your Honor.
10              (The jury entered the courtroom.)
11              THE COURT:  All right.  Everyone be seated.
12    I was telling the lawyers and the parties, probably
13    all of us from New Mexico here appreciate that I got
14    a memo here that says, "Good morning.  Everyone needs
15    to be aware that we're seeing bats on the 7th floor
16    balcony area this morning.  We have had a few
17    instances of bats entering the building in the past
18    but they usually stay near the glass dome at the top
19    of the building.  However, we had a group of bats
20    flying into the windows of the CRD's office on the
21    7th floor, and currently there is a bat hanging on
22    the balcony wall on the 7th floor."
23              So when you leave here, you might take a
24    look up this evening.  It might be something you
25    don't see every day.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          All right, Ms. Reinhart.  I'll remind you
 2   you're still under oath.
 3          Mr. Lee, if you wish to continue your
 4   cross-examination, you may do so at this time.
 5          MR. LEE:  Thank you, Your Honor.
 6          THE COURT:  Mr. Lee.
 7   Q.   (By Mr. Lee)  Good afternoon, Ms. Reinhart.
 8   A.   Good afternoon, Mr. Lee.
 9   Q.   I'd like to draw your attention to the
10   meeting of the audit committee on -- it was actually
11   a telephone conference call on March 4, 2008, in
12   which KPMG informed Thornburg and its audit committee
13   that it would be withdrawing its audit opinion.  Do
14   you have that in mind?
15   A.   Yes, I do.
16   Q.   And you testified a little about what
17   transpired at that meeting yesterday.  Do you recall
18   that?
19   A.   Yes, I do.
20   Q.   And you testified generally that management
21   of the company was not happy with that decision;
22   correct?
23   A.   Correct.
24   Q.   And in fact, what management expressed to
25   KPMG on that call was that management believed that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the decision was incorrect as a matter of accounting;

2    right?

3        A.   As a matter of accounting and auditing, I

4    guess, with respect to the conclusions, yes.

5        Q.   And the reason -- the specific reason the

6    company expressed to KPMG for its unhappiness, as you

7    say, was that the company took the position that it

8    didn't make any sense to restate the 2007 financials,

9    because of events that had just occurred; is that

10   correct?

11       A.   That's my understanding, as well.

12       Q.   And in fact, the audit committee also

13   expressed disagreement with the position taken by

14   KPMG; correct?

15       A.   I don't have a strong recollection about

16   the audit committee's objections, Mr. Lee.

17       Q.   Do you recall that Ms. Anne-Drue Anderson

18   expressed disagreement with the necessity of

19   restating the company's 2007 financials?

20       A.   I don't know if there were disagreements,

21   but there were questions, certainly, questions about

22   the rationale and conclusions that were reached, but

23   I'm not sure I could characterize it as a

24   disagreement.

25       Q.   Do you recall that after the March 4

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    meeting, certain members of the audit committee had a
 2    separate telephone call with certain members of KPMG
 3    outside the context of the audit committee meeting to
 4    express their disagreement with the decision?  Do you
 5    recall that happening?
 6         A.   I do not recall.
 7         Q.   And do you recall Mr. Mullin, the chairman
 8    of the audit committee, expressing his disagreement
 9    with the position extremely vociferously, almost
10    pounding his fist on the table?  Do you recall that?
11         A.   I don't remember any fist-pounding, no.
12         Q.   Do you remember that the audit committee
13    itself -- not management but the audit committee
14    itself -- also took the position that it didn't make
15    sense to restate the 2007 financial statements for
16    events that had happened on February 28th and 29th?
17    Do you recall that?
18         A.   There was a lot of discussion about it.  I
19    don't know that there was disagreement.  There was
20    certainly a lot of discussion.
21         Q.   And you testified that the company believed
22    it should be a first-quarter event.  Do you recall
23    that?
24         A.   I do.
25         Q.   And what that specifically meant was that
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the company was taking the position that the events

2    that happened on February 28th and 29th could -- if

3    they affected the company's financial statements, the

4    financial statements that they would affect would be

5    the first-quarter financial statements for the period

6    ending March 31 of 2008.  Do you recall that?

7        A.   Yes.

8        Q.   And do you recall that the company also

9    took the position that because, in their view, it

10   didn't make sense to restate the 2007 financials for

11   events that had occurred on February 28th and 29th,

12   that the proper treatment for those events was not

13   only to use them to adjust the March 31 financials

14   but to disclose them in the form of an 8-K instead of

15   a restatement?  Do you recall that?

16       A.   I do recall the first part.  In other

17   words, recording the events in the March 31 Form

18   10-Q.  But I don't remember the second part,

19   disclosing it in an 8-K.  I don't recall that.

20       Q.   So would you agree with me that what the

21   company essentially wanted to do was treat the events

22   of February 28th and 29th as what we've called Type

23   II events; correct?

24       A.   Yes.

25       Q.   And if a company decides that a particular

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    set of events are Type II events and, therefore,

2    don't need to affect the prior period financials, and

3    if the company decides that those events are

4    material, one way of treating those events is to

5    disclose them in a Form 8-K.  Would you agree with

6    that?

7         A.   Yes.

8         Q.   And so when you testified that the company

9    was unhappy, and the company wanted to treat it as a

10   first-quarter event, really the issue is whether the

11   events of February 28th and 29th should affect the

12   December 31 financials or the March 31 financials; is

13   that correct?

14        A.   Yes.

15        Q.   So no one from the company expressed the

16   view that there should be no disclosure or

17   consideration of the February 28th and 29th events;

18   correct?

19        A.   I don't recall any discussion along that

20   line.

21        Q.   And no one from the audit committee

22   expressed the view that there should be no

23   consideration or disclosure of the February 28th and

24   29th events; correct?

25        A.   I don't recall that, either.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And so I want to ask you if this

2   disagreement was essentially an accounting

3   disagreement and you said, "Well, accounting and

4   auditing."  The reason you modified the response is

5   that Type I and Type II is really more of an auditing

6   issue than an accounting issue.  It's a technical

7   matter.  Is that fair to say?

8      A.   The auditing issue comes into play with

9   respect to the form of the auditor's report.  So the

10  auditor's report is all about the results of

11  auditing.  The accounting is about effectively the

12  treatment of the OTTI.

13     Q.   Okay.  But the determination of Type I and

14  Type II comes from generally accepted auditing

15  standards; right?

16     A.   Yes.

17     Q.   Now if we can turn to Exhibit 176, please.

18  And Exhibit 176 -- go to the second page.  Exhibit

19  176 is a preparation letter that the SEC asked you

20  about yesterday, and this one is dated February 29.

21  Do you see that?

22     A.   Yes.

23     Q.   And do you recall that counsel asked you

24  about the accuracy of this letter?  Correct?

25     A.   Yes.

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                                    Albuquerque, NM 87102
(505) 989-4949                                                                 (505) 843-9494
FAX (505) 843-9492                                                        FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

2109

1    Q.   And counsel noted in his questioning that

2  by February 29, the company had received a default

3  notice from JPMorgan the evening of February 28.  Do

4  you recall that?

5    A.   Yes.

6    Q.   And the SEC, to my recollection, didn't

7  focus on the specific language of the letter.  So

8  let's look at that.  Because obviously, if you're

9  going to accuse somebody of saying something

10  inaccurate in a letter, you should look at the

11  specific language; right?  You would agree with that

12  basic proposition, would you not?

13    A.   I'm just here to read the letter and answer

14  your questions.

15    Q.   So maybe we can blow up the text just a

16  little bit.  So there are essentially two

17  representations, and the first is:  "We affirm to the

18  best of our knowledge and belief that during the

19  period from December 31, 2007, to this date, and

20  except as set forth in the registration statement and

21  related prospectus, no events have occurred that

22  would require adjustment to the consolidated

23  financial statements as of December 31, 2007, or that

24  should be disclosed in order to keep those statements

25  from being misleading."  Do you see that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   Yes.

2    Q.   And then the second phrase is essentially,

3  "We affirm to the best of our knowledge and belief,"

4  et cetera, "that no information has come to our

5  attention about conditions that existed as of

6  December 31, 2007, that would have a material effect

7  on the effectiveness of internal controls over

8  financial reporting as of December 31, 2007";

9  correct?

10   A.   Yes.

11   Q.   And when management signed this letter,

12 management had taken the position that the events of

13 February 28th and 29th were new events that did not

14 require adjustment to the December 31 financials;

15 correct?

16   A.   That was their position.

17   Q.   Right.  And that position, whether or not

18 KPMG eventually agreed or disagreed with it -- that

19 position that had been set out, the company's

20 position on what the proper accounting and auditing

21 was, was consistent with the representations in this

22 letter; correct?

23   A.   It was consistent, but it was incorrect.

24   Q.   And it was incorrect because KPMG decided

25 that the events of February 28th and 29th should

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  be -- should result in adjustment of the December 31

2  financial statements; right?

3       A.   Well, the events that were known as of the

4  date of the report, not the events of the 28th and

5  29, per se.  But the fact that the company was facing

6  a mortgage disruption in the marketplace and the

7  value of the company's portfolio was not as strong as

8  they certainly believed, so that is the known

9  condition that would have driven the adjustment to

10 the December 31, 2007, financial statements.

11      Q.   Okay.  So KPMG reached a different view on

12 the proper accounting treatment than the view that

13 had been advocated by management; correct?

14      A.   Yes.

15      Q.   This letter was not actually provided to

16 KPMG, was it?

17      A.   No, I think it came from the SEC files,

18 perhaps.  I don't know.

19      Q.   Let's take a look at the Bates number on

20 the bottom.  There has been testimony in this case

21 that the TMI Bates number reflects documents produced

22 by Thornburg and that the KPMG Bates number reflects

23 documents produced by KPMG.  Do you accept that?

24      A.   Yes.

25      Q.   And this would suggest that this did not

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    even come from KPMG; correct?
 2         A.   The copy that we see here, perhaps not.
 3         Q.   And counsel for the SEC didn't point that
 4    out when counsel asked you whether this letter was
 5    accurate or not, did he?
 6         A.   No.
 7         Q.   Now, you were asked questions about the
 8    company's filing of a Form 8-K informing investors
 9    that KPMG would be withdrawing its audit opinion.  Do
10    you recall that?
11         A.   Yes.
12         Q.   And just to sort of remind folks of the
13    context, when KPMG informed the company that it was
14    withdrawing its audit opinion and when it became
15    clear that that view was final, KPMG informed the
16    company that it needed to disclose that; correct?
17         A.   Yes.
18         Q.   And the form in which it needed to be
19    disclosed was on a Form 8-K; correct?
20         A.   Yes.
21         Q.   And an 8-K is a form which public companies
22    use to report the occurrence of significant corporate
23    events; correct?
24         A.   Yes.
25         Q.   So an 8-K, just as one example, might be
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    used to report a significant merger or acquisition;
 2    right?
 3         A.   Yes.
 4         Q.   And 8-K, just as another example, might be
 5    used to report a resignation of a member of the board
 6    of directors; correct?
 7         A.   Yes.
 8         Q.   And one of the circumstances required to be
 9    disclosed on a Form 8-K is an auditor's notification
10    that it's withdrawing its audit opinion; correct?
11         A.   Yes.
12         Q.   And on March 4, KPMG informed the company
13    that it was withdrawing its audit opinion; correct?
14         A.   Yes.
15         Q.   And on March 7 the company filed a Form
16    8-K; correct?
17         A.   Yes.
18         Q.   And you characterized that period of three
19    days as a delay.  Do you recall that?
20         A.   Yes.
21         Q.   And counsel for the SEC asked you a number
22    of questions designed to illustrate that it was a
23    delay.  Do you recall those questions?
24         A.   Yes.
25         Q.   And he made a big deal out of it.  He asked
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    you questions if investors were relying on inaccurate

2    information on March 5 and on March 6 and March 7.

3    So he tries to sort of, you know, make a big deal out

4    of the fact that there had been a three-day delay.

5    Do you recall that?

6         A.   Yes, but irrespective of that, our internal

7    discussions within the firm, we thought it was a big

8    deal to delay, to have the withdrawal notice not

9    filed immediately.  Internally, I had a number of

10   conversations with senior partners of the firm as to

11   why there was a delay in getting that 8-K out there.

12        Q.   And Ms. Reinhart, are you aware of the

13   SEC's own rules on the timing of a filing of a Form

14   8-K?

15        A.   Yes, I am.

16        Q.   And so you're aware that companies are

17   required to file a Form 8-K within how many days?

18        A.   It's five.

19        Q.   Or four or five days, depending on the day

20   of the week?

21        A.   Um-hum.

22        Q.   So the company, in filing its Form 8-K on

23   March 7, 2008, was in compliance with the SEC's own

24   rules relating to 8-Ks, was it not?

25        A.   Technically it was.



SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                      1-800-669-9492
PROFESSIONAL COURT                              e-mail: info@litsupport.com
REPORTING SERVICE

1      Q.   Well, not technically.  The company was in

2   compliance with the SEC's own rules when it filed

3   that Form 8-K on March 7, wasn't it?

4      A.   Yes.

5      Q.   And you didn't think that was important to

6   explain, that was important context that the jury

7   should understand when it was characterized as a

8   delay, that actually the SEC's own rules, the rules

9   written and enforced by these folks, allowed

10  companies to take four or five days to announce that

11  information.  Isn't that important context?

12     A.   I was just answering the question

13  truthfully.

14     Q.   And in fact, on March 3, the company filed

15  a Form 8-K reporting its inability to meet margin

16  calls and resulting event of default; correct?

17     A.   Yes.

18     Q.   So even before KPMG announced it was

19  withdrawing its audit opinion, the company filed on

20  its own accord a Form 8-K announcing what had

21  happened on February 28, 29; correct?

22     A.   Yes.

23     Q.   And let's take a look at Exhibit EG,

24  please.  Exhibit EG is a Form 8-K filed by the

25  company on March 3.  Do you see that?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                   1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                                  e-mail: info@litsupport.com

```
 1          A.   Yes.
 2          Q.   And if we can go to the first page of
 3    disclosure, and is there a way we can blow that up a
 4    little more?
 5          A.   On the first page, could you go back to
 6    that, the cover page?
 7          Q.   Sure.
 8          A.   Okay.
 9          Q.   Okay.  The Form 8-K -- this is the form
10    we've been talking about; right -- filed by Thornburg
11    Mortgage on March 3; correct?  If we can blow this
12    language up.  Let's look at what the company actually
13    disclosed on March 3.  Go to the middle of the page
14    where it says, "As of February 27" -- it says, "As of
15    February 27, 2008, we had met all margin calls,
16    including margin calls received between February 14
17    and February 27, 2008, in an amount in excess of $300
18    million on our reverse repurchase agreements, the
19    substantial majority of which were related to the
20    decline in valuations placed on these securities.
21    However, after February 27, 2008, we saw further
22    continued deterioration in prices of mortgage
23    securities, and we have incurred additional margin
24    calls in an amount in excess of $270 million.  As a
25    result of margin calls prior to February 27, we have
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    limited available liquidity to meet these recent

 2    margin calls as well as any future margin calls."

 3             Then let's skip over a sentence.  Well, it

 4    says, "Consequently, to date, we have not met the

 5    substantial majority of the most recent margin

 6    calls."  Then it says, "On Thursday, February 28,

 7    2008, one lender delivered a notice of event of

 8    default under a reverse repurchase agreement after we

 9    failed to satisfy a margin call in the amount of

10    approximately $28 million."  Do you see that?

11        A.   Yes.

12        Q.   And so -- and March 3 was a Monday;

13    correct?

14        A.   Yes.

15        Q.   And so the filing of the Form 10-K was on

16    Thursday morning; correct?

17        A.   Yes.

18        Q.   And Thursday during the day the company

19    received a large volume of margin calls; correct?

20        A.   Yes.

21        Q.   And Thursday night, February 28, the

22    company received an event of default notice from

23    JPMorgan; correct?

24        A.   Correct.

25        Q.   And then there was Friday, the 29th, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    then it was the weekend; right?

2         A.   Correct.

3         Q.   So on March 3, two days later, just two

4    business days later, the company is notifying the

5    market of what had happened.  Isn't that correct?

6         A.   Yes.

7         Q.   Even before KPMG informed the company of

8    the withdrawal of its audit opinion, the company went

9    ahead and informed the market of what had happened;

10   correct?

11        A.   Yes.  But the withdrawal of the audit

12   opinion hadn't yet occurred until the following day,

13   so one came after the other, obviously.

14        Q.   And when counsel was leading you to the

15   characterization that there had been some sort of

16   delay in notifying the market of the withdrawal of

17   the audit opinion by KPMG, didn't you think it was

18   important context for the jury to know that even

19   before that two business days after the events in

20   question, the company had already informed the market

21   of what had happened?  Isn't that part of the overall

22   picture that the jury should know about?

23        A.   The SEC was asking me specifically about

24   the delay in the filing of the 8-K for the auditor's

25   report withdrawal, not about the notice of the 8-K on

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    the margin call.

 2         Q.   But you would agree this is relevant

 3    context, would you not?

 4         A.   This is separate context of an adverse

 5    event that occurred that the company needed to

 6    disclose.

 7         Q.   And that the company disclosed early, even

 8    before the four business days it's allowed to;

 9    correct?

10         A.   I wouldn't call it early or late, but they

11    disclosed it within the time frame that's required by

12    the SEC rules.

13         Q.   And sooner than the time frame required?

14         A.   Sooner than the expiration of that time

15    frame.

16         Q.   All right.  Take that down.  Now, you

17    testified that there were consequences to withdrawing

18    your audit opinion; right?

19         A.   Yes.

20         Q.   You said that it would draw the attention

21    of regulators, specifically the SEC; right?  Or that

22    it might draw the attention of regulators?

23         A.   Yes.

24         Q.   And you said that it draws unfavorable

25    attention to you individually; right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    Yes.
 2          Q.    And you said that there was no real benefit
 3    to withdrawing the audit opinion; correct?
 4          A.    That's correct.
 5          Q.    And that the reason you decided to do it
 6    was because it was, quote, the right thing to do;
 7    right?
 8          A.    Yes.
 9          Q.    And you also said it became paramount to
10    get the report off the street.  Do you recall that?
11          A.    Yes.
12          Q.    In fact, there were consequences to KPMG of
13    not withdrawing the audit opinion, aren't there?
14          A.    Are you talking about in the hypothetical,
15    if we didn't withdraw the audit report?
16          Q.    There are potentially costly consequences
17    to KPMG if it hadn't -- there were potentially costly
18    consequences to KPMG if it hadn't withdrawn the audit
19    opinion, weren't there?
20          A.    There's always consequences when you do the
21    wrong thing.
22          Q.    Well, the day after the 10-K was filed, the
23    stock price of Thornburg Mortgage dropped; correct?
24          A.    I don't recall, but I think that's right.
25          Q.    And you know when the stock price of a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   company drops, one of the frequent results is that
 2   shareholders file lawsuits; correct?
 3        A.   Yes.
 4        Q.   And those lawsuits -- you know that when
 5   shareholders file those lawsuits, they sometimes name
 6   the auditor as a defendant; correct?
 7        A.   Yes.
 8        Q.   And so KPMG wanted to withdraw its opinion
 9   as quickly as possible to minimize its liability from
10   shareholder suits that might ensue from the drop in
11   stock price; isn't that right?
12        A.   No, that's not right.
13        Q.   And so the restatement by KPMG and the
14   decision to withdraw its audit opinion was about KPMG
15   protecting its own liability from possible lawsuits,
16   wasn't it?
17        A.   No, it was not.
18        Q.   And the consequences to you personally had
19   no bearing, one way or the other, on the decision
20   because that decision was made by folks at the very
21   highest levels of KPMG, wasn't it?
22        A.   They participated in the decision.  But I
23   was a part of that decision and I agreed with it.
24        Q.   And those folks who participated in the
25   decision, the folks sitting in New York from the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1    national office who weighed in, we've heard their
 2    names, a number of names of folks who weighed in on
 3    that, they knew almost nothing about what had
 4    actually happened at Thornburg; correct?
 5         A.   No, that's not true.
 6         Q.   They knew -- they didn't know nearly enough
 7    to make an informed judgment as to whether there, in
 8    fact, had been an accounting error; isn't that right?
 9         A.   No, that's not.
10         Q.   And it had nothing to do with the facts
11    because all KPMG wanted to do is minimize its own
12    liability from possible shareholder suits following
13    the drop in stock price; isn't that right?
14         A.   No, that's not right.
15         Q.   And that's why KPMG made this decision two
16    business days after learning of the events, two
17    business days.  That restatement decision wasn't
18    based on any analysis, was it?
19         A.   It was based on an analysis, and it was the
20    right decision.
21         Q.   And one of the folks who was involved was a
22    guy named Sam Ranzilla; right?
23         A.   Yes, Mr. Ranzilla was involved.
24         Q.   And his title at the time was head of risk
25    management; isn't that right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   I may have said that yesterday.  He was

2   actually the head of our Department of Professional

3   Practice and the audit practice, I believe was his

4   title.

5       Q.   And two days wasn't nearly enough for those

6   folks sitting in New York to know nearly enough about

7   the specific facts at Thornburg to make the decision,

8   was it?

9       A.   It was -- there were others that were

10  involved.  Mr. Foley was involved, and Mr. Foley was

11  the head of our banking practice.  And in fact, Mr.

12  Foley and I and Mr. Goldstone had had conversations

13  back in the fall of 2007 when the company went back

14  through its liquidation event, when the markets

15  disrupted with respect to CP.  So Mr. Foley was well

16  aware of what the company was going through.

17          Mr. Womack was involved.  He was our SEC

18  reviewing partner.  And Mr. McLamb was also involved

19  in those conversations, as well, and he was the

20  partner that participated in the analysis we were

21  going through with respect to the company's going

22  concern and the substantial doubt consideration under

23  the auditing standards.

24          So there were members of that group that

25  were quite familiar with what was happening at the

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 843-9492                                                            FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

2124

1    company.

2         Q.   Mr. Foley -- isn't it true that the issue

3    that Mr. Foley discussed with you and Mr. Goldstone

4    in the fall of 2007 had nothing to do with margin

5    calls or reverse repurchase agreements or OTTI?  He

6    was consulted on a totally different issue; isn't

7    that right?

8         A.   No, that's not right.  He was consulted on

9    the issues related to the company's -- the sale of

10   the securities or the -- and the termination of some

11   of the CP borrowings that the company had and how

12   that was being reflected in the Form 10-Q, as well as

13   an offering that the company was doing in that fall

14   time period.

15        Q.   And so you've identified some folks who did

16   have knowledge of Thornburg.  Mr. Ranzilla hadn't

17   been involved in the audit, had he?

18        A.   No, he had not.

19        Q.   Mr. Leva hadn't been involved in the audit,

20   had he?

21        A.   I don't think Mr. Leva was consulted at

22   that time.  I could be mistaken.

23        Q.   Mr. Veihmeyer hadn't been involved in the

24   Thornburg audit, had he?

25        A.   My recollection was that Mr. Veihmeyer was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   not involved at that point, but he was involved a

2   little bit later on when we got into the discussion

3   as to whether or not there was a material weakness in

4   internal control.

5       Q.   And whoever was involved, the folks that

6   you've testified to, you said there were folks in the

7   national office in New York, and they had all of two

8   days to make a decision about whether the accounting

9   treatment was correct.

10      A.   Yes.  They, together with me and Ms. Hall

11  and Mr. Womack and Mr. McLamb and Mr. Taylor, all of

12  us.

13      Q.   And because the restatement wasn't based on

14  any information you now claim you didn't know, there

15  was no need for more than 48 hours of analysis, was

16  there?

17      A.   No, we thought we had enough information to

18  make that call.

19      Q.   The restatement decision was not based on

20  learning of the Citibank margin call; correct?

21      A.   We didn't know that at the time

22  specifically, no.

23      Q.   The restatement was not based, therefore,

24  on the payment of the Citi margin call over the

25  course of several days; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2126

1      A.   No, not at that time, no.

2      Q.   The restatement was not based on your

3   learning that certain I/O strip transactions had

4   yielded proceeds for the payment of margin calls;

5   correct?

6      A.   I don't believe so, no.

7      Q.   The restatement was not based on learning

8   that Mr. Goldstone and others had had a discussion on

9   February 27 about an impending collapse of a European

10  hedge fund; correct?

11     A.   No, we didn't find that out until much

12  later.

13     Q.   And the restatement was not based on the

14  fact that the company had received a reservation of

15  rights letter; correct?

16     A.   Didn't find that out until much later.

17     Q.   And in fact, it was the disclosures in the

18  Form 10-K itself that was a key trigger, combined

19  with rapidly deteriorating credit markets, that had

20  led to the company's liquidity situation.  That was

21  the impetus for the restatement, wasn't it?

22     A.   No, it was not.

23     Q.   If we can pull up Exhibit HU.  Ms.

24  Reinhart, Exhibit HU is a draft of the restatement

25  memo that was looked a lot at in this case.  Do you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    see that?

2         A.   Yes.

3         Q.   And if we can turn to the next page, that's

4    your handwriting on this draft; correct?

5         A.   Yes.

6         Q.   You've marked up this draft with your

7    comments; correct?

8         A.   Yes.

9         Q.   Now, let's go to the page ending 849.  And

10   first let's take a look at the heading of this first

11   section.  See it says "Primary cause of the error,

12   including fraud considerations."  Do you see that?

13        A.   Yes.

14        Q.   Now let's go to the second paragraph and

15   blow that up and the handwritten note.  That note

16   says, in part, "The disclosure in the 10-K filing was

17   a key trigger combined with rapidly deteriorating

18   credit markets that led to the company's liquidity

19   situation."  That's your handwriting; correct?

20        A.   Yes.

21        Q.   And that's what you wrote at the time,

22   eight years ago; correct?

23        A.   That's what I wrote at the time, eight

24   years ago.

25        Q.   Before you had any incentive to testify

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    differently; correct?

2        A.    I have no incentive to testify other than

3    the truth as I recall it.

4        Q.    And it was those disclosures in the Form

5    10-K filing that you're referring to in your

6    handwritten note on the restatement memo that led to

7    the decline in the company's stock price; correct?

8        A.    That's what we thought initially, but as

9    we -- in the next few days, in those days that

10   occurred, we determined that it was really the

11   company's -- they didn't assess the riskiness of the

12   environment in which they faced, and they misjudged

13   the owned value of their collateral and the amount of

14   cash and unpledged securities that they would need to

15   have on hand.  That's what truly led to the triggers

16   for the margin calls.

17       Q.    But in your draft of the restatement memo,

18   what you attributed it to at the time was that at

19   least in part the 10-K filing itself was a, quote,

20   key trigger, correct, at the time?

21       A.    Initially that was our thinking, but I

22   think that thinking changed.

23       Q.    And it was because at that time your view

24   was the 10-K filing was a key trigger which, in turn,

25   triggered a decline in the stock price.  That's why

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    KPMG didn't need to do any further analysis of

 2    whether it was appropriate to withdraw its audit

 3    opinion.

 4         A.   No.

 5         Q.   Because KPMG's sole concern at that point

 6    was pulling its audit opinion in order to minimize

 7    potential civil liability from shareholder suits that

 8    would result from the drop in stock price; correct?

 9         A.   No.

10         Q.   Now, yesterday -- I just want to clarify

11    something.  Mr. Kasper asked you if it would have

12    been more fair if we had shown you in your deposition

13    some of the documents that the SEC showed you

14    yesterday.  Do you recall that?

15         A.   Yes.

16         Q.   And I want to address that with you,

17    because folks might not understand what the context

18    was and why a deposition was occurring in the first

19    place.  All right.  And your deposition was in

20    December of 2012; correct?

21         A.   Yes.

22         Q.   And at that time you weren't on trial;

23    right?

24         A.   No, I think by that time I received the

25    letter from the SEC or my attorneys advised me that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    the letter had come indicating that they were not

2    pursuing any actions against me.

3         Q.   Right.  And so the reason your deposition

4    was taken was because my clients, Mr. Goldstone and

5    Mr. Simmons, had already been sued by the SEC;

6    correct?

7         A.   Yes.

8         Q.   And your deposition was being taken because

9    you had been identified as a witness; correct?

10        A.   Yes.

11        Q.   And not only were you a witness, but as you

12   just testified or just acknowledged, by December of

13   2012 you already knew that the SEC was taking the

14   position that you would not be prosecuted; correct?

15        A.   Yes.

16        Q.   And if we can just show Exhibit LS, please.

17   And this is the letter that you're referring to in

18   which you were informed, directly or indirectly, that

19   you would not face enforcement action by the

20   Commission; correct?

21        A.   Yes.

22        Q.   And so in December of 2012, when your

23   deposition was taken, safe to say you hadn't been

24   accused of any wrongdoing at all; correct?

25        A.   That's correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1          Q.   And you understood that we took that

 2     deposition in order to defend and represent Mr.

 3     Goldstone and Mr. Simmons in this very lawsuit that

 4     we're now on trial for, four years later.  You

 5     understand that; right?

 6          A.   Yes.

 7          Q.   And you understand that there were certain

 8     rules governing the conduct of that deposition;

 9     correct?

10          A.   I'm not an attorney, so I don't know what

11     the rules are related to the conduct of depositions,

12     Mr. Lee.

13          Q.   And in fact, some of the documents that Mr.

14     Kasper asked you about yesterday you had already seen

15     at the time of your deposition, right, because SEC

16     had shown them to you during your investigative

17     testimony in 2009 or '10, whenever that was?

18          A.   Some of them, yes.

19          Q.   And at that point you were still

20     potentially subject to enforcement action during the

21     investigation; right?

22          A.   At that time being what time?

23          Q.   At the time of your investigative

24     testimony; correct?

25          A.   In 2009?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.    Correct.

2       A.    Presumably so, yes.

3       Q.    So by the time December of 2012 rolls

4    around, the only reason you're being deposed is that

5    you're a witness in a case in which we are defending

6    and representing Mr. Goldstone and Mr. Simmons;

7    right?

8       A.    Yes.

9       Q.    And so the deposition wasn't about fairness

10   to you, was it?  The deposition was about fairness

11   and ensuring that Mr. Goldstone and Mr. Simmons were

12   appropriately and fairly and vigorously represented.

13   Wasn't that the purpose of the deposition?

14           MR. KASPER:  Objection, Your Honor.  There

15   is no foundation that the witness knows the purpose

16   of a deposition.

17           THE COURT:  If she knows, she can answer

18   the question.  Overruled.

19      A.    I think my role in providing answers to

20   both your questions and those of the SEC was to

21   provide my best recollection and understanding of the

22   information that was presented to me in answering

23   those questions truthfully and faithfully to the best

24   of my ability.

25      Q.    (By Mr. Lee)  Mr. Kasper asked you, well,

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                              1-800-669-9492
                                                    e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    wouldn't it have been more fair to you if we had

 2    shown you certain documents?  But that's not the

 3    purpose of the deposition.  The purpose of the

 4    deposition -- because then you were not -- you were

 5    not a defendant.  You were just a witness.  The

 6    purpose of the deposition was for us to represent our

 7    clients; correct?

 8         A.   And I think I answered him back that I

 9    couldn't comment as to fairness, but I could comment

10    about completeness, right?  That would be my role in

11    this process.  It's not my position to judge.  That's

12    the jury's position to judge and determine fairness.

13         Q.   And speaking of completeness, I think we've

14    now established and the reason my cross-examination

15    has taken so long is that it's important -- when

16    you're looking at any particular document or trying

17    to figure out what the meaning of any particular

18    document is, it's important to have a complete

19    picture, isn't it?

20         A.   Yes.

21         Q.   Now, on March 18 -- we've talked about that

22    some -- the audit committee of March 18, you and

23    Mr. McLamb reported that you did not have any

24    concerns about management integrity and that your

25    view was that management had not engaged in fraud;
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    correct?

2         A.   That's correct.

3         Q.   As of March 18, and that conclusion was

4    reiterated in a restatement memo the last date of

5    which is April 24, 2008; correct?

6         A.   I don't know the date of that restatement

7    memo, but we did conclude that.

8         Q.   Okay.  And by March 18, by the time you

9    reported that conclusion, you were aware of the total

10   amount of margin calls, approximately $1 billion,

11   that Thornburg had received between January 1, 2008,

12   and February 27, 2008; correct?

13        A.   Yes.

14        Q.   And by March 18, 2008, you were aware that

15   Thornburg had received a margin call from Citibank in

16   the amount of approximately $196 million; correct?

17        A.   Yes.

18        Q.   And by March 18, when you reported your

19   conclusions to the audit committee, you were aware

20   that Thornburg had paid that Citi call over the

21   course of several days; correct?

22        A.   I think Citi and maybe some others, as

23   well, is my recollection.

24        Q.   And you were aware, therefore, that

25   Thornburg by March 18 -- let me rephrase that.  By

SANTA FE OFFICE                                                         MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492

 

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    March 18 you were aware that Thornburg had been

2    unable to pay the Citi call on the day it was

3    received; correct?

4         A.    Yes.

5         Q.    And by March 18, you were aware that

6    because Thornburg had been unable to pay the Citi

7    call within one day, that it was in violation at that

8    time of its repo lending agreement; correct?

9         A.    Yes.

10        Q.    And you were aware by March 18 that because

11   Citibank hadn't been paid in full within one day on

12   its margin call, it could have declared Thornburg in

13   default; correct?

14        A.    Yes.

15        Q.    By March 18, you were aware that Thornburg

16   had used the proceeds from certain interest-only

17   transactions as one source of cash to pay the margin

18   calls; correct?

19        A.    Yes.

20        Q.    And knowing all of that information, you

21   concluded that there were no concerns about

22   management's integrity; correct?

23        A.    That's correct.

24        Q.    And knowing all of that information, you

25   concluded that management had not engaged in fraud;

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                       1-800-669-9492
                              e-mail: info@litsupport.com



```
 1    correct?
 2         A.   At that time, that's correct.
 3         Q.   Now, you testified yesterday that you
 4    retired a couple of years ago?
 5         A.   Yes.
 6         Q.   And you testified that you had reached the
 7    retirement age; correct?
 8         A.   Yes.
 9         Q.   You were, in fact, asked to retire early,
10    were you not?
11         A.   No, I was not.
12         Q.   You were not asked by the firm to retire
13    early?
14         A.   No, I was not.
15         Q.   You were criticized in an assessment that
16    was performed of the circumstances surrounding the
17    restatement; correct?
18         A.   Criticized?  I'm not sure I understand that
19    comment.
20         Q.   You received the lowest possible rating on
21    an assessment that was performed of the circumstances
22    surrounding the restatement; correct?
23         A.   I don't know what the rating was.  I do
24    know that that was -- there was an assessment, but I
25    don't know what the rating scale is or how it's
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   determined or anything else about that, Mr. Lee.

2        Q.   Let's take a look at Defendants' Exhibit

3   IO.  Now, I won't go through this in great detail

4   because the jury has seen this already.  But this is

5   entitled "Southwest area restatement assessment

6   form."  Do you see that?

7        A.   Yes.

8        Q.   And it relates to the Thornburg 2007 audit;

9   correct?

10       A.   Yes.

11       Q.   And it refers to the date the restated

12  financials were issued, March 11, 2008, and it

13  identifies you as engagement partner, and so on.  Do

14  you see that?

15       A.   Yes.

16       Q.   And if we look at the second page, the

17  grading scale goes from zero to 2.  Do you see that?

18       A.   Yes.

19       Q.   And zero is the best score that an auditor

20  can receive; correct?  And two is the worst score?

21       A.   In terms of the grading considerations?

22       Q.   In terms of the scale as it is presented

23  here, you would agree with me that zero is the best

24  and 2 is the worst?

25       A.   As it's presented here at this particular

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                           (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492
                                                         1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                        e-mail: info@litsupport.com

1    point in time, yes.

2         Q.    And then if we can go back to the grade.

3    And are you aware that this assessment was conducted

4    by another independent partner at KPMG named James

5    Browning?

6         A.    I don't have any visibility into the --

7    that Mr. Browning -- I'd not seen this form

8    previously at the time that it was prepared.  So I

9    don't have any insight into who prepares it, how it's

10   prepared, who they consult with, anything like that.

11   It's prepared, the grade for -- the fact that there

12   was a restatement, there was a natural consequence to

13   that, and so -- but in terms of how it's determined,

14   I don't know.

15        Q.    And this form indicates that the BUPPP/APPP

16   recommended grading for you was a 2, so the worst on

17   a scale of zero to 2; correct?

18        A.    Right.  All four of the participants,

19   Mr. Womack, Ms. Hall, Mr. Taylor, and myself.

20        Q.    And Mr. McLamb received a slightly better

21   grade; correct?

22        A.    Yes.

23        Q.    And if you go to the grading rationale, it

24   says, "Grading considered that the issues involved

25   were those receiving high focus of attention by the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   firm.  The grading as it relates to engagement

2   partner, manager, and concurring reviewer considers

3   this and the information at hand and disclosed."  Do

4   you see that?

5       A.   Yes.

6       Q.   And that would suggest that at least one of

7   the considerations was that there was information at

8   hand and disclosed available to you and other

9   members -- well, to you, Ms. Hall, and Mr. Womack;

10  correct?

11      A.   Again, I don't have any visibility into

12  the -- what the -- what that relates to.

13      Q.   And then if you go down, it says, "The

14  rating of McLamb," at the bottom, "considers he was

15  consulted on the going concern issue.  It appears all

16  facts may not have been provided to him, and he was

17  not consulted on the accounting issue."

18          Do you see that?  And would you agree with

19  me that that appears to provide the justification why

20  he only received a 1 when everyone else on the team

21  received a 2?

22      A.   That's what is being written.

23      Q.   And the Thornburg audit also had an impact

24  on your performance review for fiscal year 2008;

25  isn't that correct?

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   It did.
 2        Q.   If we can go to Exhibit LR.  Just blow up
 3   the top.  This is a fiscal year performance review
 4   process for Cynthia Reinhart.  This is a form that
 5   relates to you; correct?
 6        A.   Yes.
 7        Q.   And you have seen this form before; right?
 8        A.   Yes.
 9        Q.   And this form contains comments by those
10   who are reviewing you; correct?
11        A.   Yes.
12        Q.   And it also contains comments that you
13   provide in terms of your own self-assessment;
14   correct?
15        A.   It does.
16        Q.   And if we can go to the page ending 980 and
17   go to the second paragraph that says "Max carrier
18   year end business results comments," do you see that?
19        A.   Yes.
20        Q.   I'm going to skip over a couple of names
21   just so they're not in the record.  But it says, "No
22   one questions Cynthia's drive and commitment to do
23   the right thing in the right way for the firm.
24   However, half restatements on entity Number 1, entity
25   number 2, and tax comments during the fiscal year
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    2007 QP process, the 2007 restatement of Thornburg's

2    financials impacts Cynthia's overall evaluation for

3    fiscal year '08.  Cynthia must learn from these past

4    slips and ensure that similar results do not occur in

5    future audits."  Do you see that?

6        A.   Yes.

7        Q.   And is this indicating that the Thornburg

8    restatement was actually the third restatement that

9    you had gone through?

10       A.   It was the third.  There is obviously

11   rationale behind the other two in terms of the

12   reasons for those.  But since 1998 up through 2007,

13   that would be correct.

14       Q.   And then if we go for the top of the next

15   page, the first line of text, this says, "The

16   Thornburg quality incident has been the only negative

17   this year.  In spite of the restatement, I

18   demonstrated leadership under extremely difficult

19   circumstances."  Is it fair to say that's your

20   writing there?

21       A.   That's my comment, yes.

22       Q.   And then the next sentence down, which is

23   someone else's comment says, "I agree that Thornburg

24   is a negative and should be learned from to avoid a

25   repeat."  That was somebody else's comment; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.   Yes.

2          Q.   And then if we can go to the next page, if

3     we go to the first line entitled "Interim overall

4     performance rating comments," that says, "Very strong

5     year from a business perspective.  Only negative

6     weighing against that is the Thornburg quality

7     incident."  Do you see that?

8          A.   Yes.

9          Q.   And that was written by somebody else;

10    correct?

11         A.   Yes.

12         Q.   Characterizing what had happened at

13    Thornburg as a quality incident; correct?

14         A.   That's correct.

15         Q.   And then let's go to the year-end overall

16    performance rating comments.  And these comments are

17    comments written by you as part of your own either

18    response to or self-assessment on your performance

19    for the year; correct?

20         A.   Yes.

21         Q.   And the first sentence says, "I've done

22    everything the firm has asked of me this past year

23    under very difficult circumstances."  And I'd like

24    you to read for the jury the second sentence there.

25         A.   "While the events leading to the Thornburg

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    restatement are still under review, I believe the

2    financial disaster in the marketplace that has

3    occurred in 2008 has demonstrated that financial

4    stability can erode overnight and cause extremely

5    negative consequences to companies once perceived as

6    extraordinarily strong (AIG, Citi, Wachovia, GE

7    Capital)."

8         Q.   And that's exactly what happened in the

9    case of Thornburg; isn't it?

10        A.   No.

11        Q.   And that's why you wrote that, because you

12   were responding to a specific critique of your

13   performance on Thornburg, isn't it?

14        A.   That's what I wrote at the time, but I

15   subsequently learned that was more information

16   available to management that wasn't provided to us

17   that likely would have allowed us to reach a

18   different conclusion.

19        Q.   And have you changed your view that

20   financial stability can erode overnight?  That has

21   nothing to do with Thornburg, does it?

22        A.   I have not changed my view about that.

23        Q.   Let's look at the final comment.  The

24   reviewer wrote, "I encourage Cynthia to learn from

25   the issues surrounding quality and overcome those

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    issues in fiscal year '09."  Do you see that?

 2         A.   Yes, I do.

 3              MR. LEE:  May I have a minute, Your Honor?

 4              THE COURT:  You may.

 5              MR. LEE:  I don't have any further

 6    questions, Your Honor.

 7              THE COURT:  Thank you, Mr. Lee.

 8              Mr. Kasper, do you have redirect of Ms.

 9    Reinhart?

10              MR. KASPER:  I do, Your Honor.

11              THE COURT:  Mr. Kasper.

12                     REDIRECT EXAMINATION

13    BY MR. KASPER:

14         Q.   Good afternoon.

15         A.   Good afternoon.

16         Q.   Yesterday Mr. Lee asked you some questions

17    about Ms. Burns' testimony?

18         A.   Yes.

19         Q.   And suggesting that you should have

20    reviewed that testimony somehow prior to answering my

21    questions about the emails that I showed you that she

22    wrote.  Do you recall that?

23         A.   Yes, I do.

24         Q.   Have you noticed, as you come into court,

25    that there is a sign as you come into court that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    witnesses are not allowed in the courtroom?

2         A.   Yes.

3         Q.   Do you understand that as a witness in this

4    case, if you had reviewed that testimony, you would

5    have been violating the Court's order?

6         A.   I don't -- my understanding is that you

7    want my best recollection, my own best recollection,

8    not somebody else's recollection.  So Mr. Kasper, I'm

9    not aware of what the Court's rules are.  But that's

10   what seems to me to be the right thing to do.

11        Q.   Let me ask you this.  If you had seen

12   Mrs. Burns' emails during the audit as opposed to

13   during this litigation, is it fair to say that then,

14   under those circumstances, you would have, in fact,

15   had a chance to ask Ms. Burns what she thought about

16   those emails?

17        A.   Yes.

18        Q.   And if you had seen them in that context,

19   would you have asked Ms. Burns?

20        A.   Yes.

21        Q.   Now, Mr. Lee also had some questions for

22   you related to the February 22 board minutes.  Do you

23   recall that?

24        A.   Yes.

25        Q.   And I think he discussed a whole series of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    questions to essentially establish that there was an
 2    executive session where there was a discussion about
 3    the Citi margin call and the plan that they were
 4    coming up to deal with that.  Then it was only later,
 5    after that executive session, was when there was a
 6    discussion about the filing of the Form 10-K.  Do you
 7    recall those questions?
 8         A.   Yes, I do.
 9         Q.   And do you recall that Mr. Lee specifically
10    noted that those audit committee members who are both
11    in the executive session and then were in the regular
12    meeting that you were permitted to attend -- that
13    they didn't mention anything about the Citi margin
14    call, either?
15         A.   They did not.
16         Q.   Let me ask you, do you know -- not having
17    been in the executive session, do you otherwise know
18    whether those audit committee members knew about the
19    reservation of rights letter that Citi had received?
20         A.   I only found that out later on that they
21    were aware of the reservation of rights letter when
22    we attended the March 18 meeting.
23         Q.   Mr. King, if you could please pull up
24    Plaintiff's Exhibit 81, and if we could go to the top
25    of the second page, please.  This is a paragraph
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    we've seen several times now, and it says, "Mr.

2    Simmons advised the committee that the company had

3    received a large margin call from Citi.  He said that

4    the company had worked out a schedule with Citi to

5    meet the requirement and anticipated fully meeting it

6    and any other liquidity requirements by the time the

7    10-K is filed."

8              Do you see any discussion there of the

9    reservations of rights letter?

10        A.   No, I don't.

11        Q.   Let me ask you this.  Do you know if,

12   during that executive session, Mr. Simmons told the

13   members of the audit committee that KPMG had been

14   apprised of the Citi's margin call?  Do you know if

15   he told them that?

16        A.   No, I don't have any recollection of that.

17        Q.   If he had told them that, would that

18   explain why no one on the audit committee mentioned

19   it to you?

20        A.   Perhaps.

21        Q.   Mr. Lee also had some questions now for you

22   related to the board update emails that Mr. Goldstone

23   began sending on February 15 to the board members.

24        A.   Yes.

25        Q.   I guess I want to clarify one thing that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   maybe wasn't clear from my question yesterday.  Were

2   you concerned about the fact that you weren't

3   provided those actual emails, or that the information

4   contained in those emails weren't provided to you

5   prior to the time of your audit?

6        A.   It would be the information that was

7   contained in the emails.  I don't think I have any

8   expectation of the company sharing the emails between

9   Mr. Goldstone and his management team and members of

10  the board, but I do have every expectation of

11  important information.  It's critical to me as the

12  lead audit partner to have that information on a time

13  period that's contemporaneous with the events that

14  are occurring.

15       Q.   And do you have -- being familiar with that

16  process, do you have an expectation where that

17  information would have turned up?  Would it have been

18  in connection with the going concern process?

19       A.   It could have been in connection with the

20  going concern process.  It could have been at any

21  point during the time that the company was

22  experiencing the cash requirements that were causing

23  stress and causing a great amount of difficulty at

24  that particular point in time.  So there were

25  certainly ample points in that final few weeks

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    leading up to the signing of the audit report that I
 2    would have expected to have those kinds of
 3    conversations.
 4         Q.   Now, Mr. Lee showed you one of those
 5    emails.  There were multiple emails; right?
 6         A.   Yes.
 7         Q.   And he showed you one that had found its
 8    way into the KPMG files during the restatement; is
 9    that right?
10         A.   Yes.
11         Q.   Did you have that document or the
12    information that was contained therein at the time of
13    the audit opinion?
14         A.   The initial audit opinion, the original
15    audit, no.
16         Q.   Thank you.  Now, I showed you a variety of
17    other emails from Mr. Goldstone updating his board;
18    right?
19         A.   Yes.
20         Q.   And Mr. Lee didn't show you those; right?
21         A.   No.
22         Q.   And do you know if any of those documents
23    were ever provided to KPMG?
24         A.   No, they were not.
25         Q.   All right.  Do you recall that Mr. Lee had
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      some questions for you related to the loan funding?

2          A.   Yes.

3          Q.   And Mr. Lee made a point that there was

4      only a single day when there was -- when Thornburg

5      didn't fund any loans; is that right?

6          A.   Yes.

7          Q.   Now, did you have an understanding of why

8      it was that Thornburg stopped funding loans?  Or do

9      you now have that understanding?

10         A.   I now have that understanding, but at the

11     time --

12         Q.   What is that understanding?

13         A.   That they didn't have any capacity on their

14     line with Greenwich.  Greenwich was their warehouse

15     provider, and they also had repo agreements with

16     Greenwich.

17         Q.   So is it fair to say they didn't have any

18     money or any ability to borrow money to enter into

19     mortgages?  Is that right?

20         A.   They couldn't close those loans.  They

21     could take applications, they could process them, but

22     they couldn't close the loan.

23         Q.   And is funding loans such as that -- is

24     that a way that Thornburg made money?

25         A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   So if you can fish out in front of you
 2   Exhibit QB, which is one of the documents that
 3   Mr. Lee showed you --
 4        A.   Okay.  I've got it.
 5        Q.   All right.  And just hang on to that.
 6   Before we go to that, I want to take a quick look at
 7   Plaintiff's Exhibit 85, please.  And this is one of
 8   Mr. Goldstone's emails.  And this one is dated
 9   February 22; right?
10        A.   Yes.
11        Q.   And if we can go to the second page,
12   please, the third paragraph from the end, the larger
13   paragraph there.  There you go.  Thank you.  And in
14   this paragraph can you see that Mr. Goldstone is
15   discussing the funding of loans?
16        A.   Yes.
17        Q.   And you can see that he says -- towards the
18   middle of that paragraph, he says, "We are able to
19   continue to fund loans on a limited basis"; right?
20        A.   Yes.
21        Q.   He didn't say that they weren't able to
22   fund any loans, but just they were on a limited
23   basis?
24        A.   That's right.
25        Q.   And then let's look at Plaintiff's Exhibit
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2152

1   95, please.  This is another email from Mr. Goldstone

2   to the board and this one is dated February 25, so

3   three days later.  And if we look again at the third

4   paragraph from the bottom, the one that begins,

5   "Finally."  "Mr. Goldstone advised the board, finally

6   we have been funding loans at a reduced rate over the

7   past few days."  Do you see that?

8        A.   Yes.

9        Q.   Okay.  Now let's take a look back at

10  Exhibit QB that you have in front of you there.  And

11  I understood from Mr. Lee's questioning that the

12  column entitled "Balance" is the column that

13  represents the new loans funded that day.  Did you

14  understand that?

15       A.   That's what he indicated, yes.

16       Q.   And can you see that there are numerous

17  days there where Thornburg funded over $10 million

18  worth of loans, or at least a couple of days there

19  where they funded on or about $10 million worth of

20  loans?

21       A.   Yes.

22       Q.   Okay.  And then there is the day, February

23  18, that Mr. Lee pointed to where they funded zero;

24  correct?

25       A.   Yes.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   All right.  Do you also see that there is

2   another day there, that week, February 22, February

3   21, where they funded $532,000 in loans?  Right?

4      A.   That's correct.

5      Q.   That's probably one home loan; correct?

6      A.   Probably one jumbo.

7      Q.   And then you also see that there is another

8   day that's less than $2 million, and another day

9   that's barely $3 million, and another day that's four

10   and a half million.  Do you see that?

11      A.   Yes.

12      Q.   So is it fair to say that just from this

13   document, from the document that Mr. Lee selected,

14   that you can see there was at least five days where,

15   just as Mr. Goldstone described in his emails, there

16   was reduced funding of loans?

17      A.   Yes.

18      Q.   Okay.  You can set that aside now.

19           Mr. King, if we could please pull up

20   Plaintiff's Exhibit 106, please.  Also, if you could

21   fish out Exhibit QC, I'm going to ask you questions

22   about that document.

23      A.   Okay.

24      Q.   Now, do you recall that Mr. Lee said that

25   the language attached to Plaintiff's Exhibit 106,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com


BEAN &ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    which is the recent developments language we've
 2    discussed at length -- that wouldn't be filed until
 3    KPMG signed off on the audit; right?
 4         A.    That's correct.
 5         Q.    Is it also true that the 10-K could not be
 6    filed, or at least with disclosures that looked
 7    anything like the disclosures on Plaintiff's Exhibit
 8    106, until the Citi margin call was paid?
 9         A.    Repeat that for me.  I'm sorry, I was --
10         Q.    Mr. King, if you can put up the second
11    page, the recent development language there.
12              In addition to -- the idea is that these
13    disclosures were going to find their way into the
14    Form 10-K that would be publicly filed; right?
15         A.    That's right.
16         Q.    And Mr. Lee's point was that you wouldn't
17    be able to file that 10-K until KPMG signed off on
18    the 10-K, until you filed your audit; correct?
19         A.    Right.
20         Q.    And my question was:  It's also the case
21    that that 10-K couldn't be filed with disclosures
22    similar to the ones contained here until after the
23    Citi margin call had been satisfied?
24         A.    That's right.
25         Q.    Because this doesn't say anything that we
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    have outstanding margin calls; right?

 2         A.    That's correct.

 3         Q.    Mr. Lee made a point that you should have

 4    known that this wasn't true on February 26 when you

 5    received it, because you should have known that this

 6    was just saying this is what will be true at the time

 7    of filing; and to do that, he showed you this Exhibit

 8    QC; right?

 9         A.    Yes.

10         Q.    And he showed you that this is a draft of

11    your opinion from February 18 where you say that

12    you'd completed your audit work; right?

13         A.    Yes.

14         Q.    And it's an email from Meg Jones, who is

15    one of the staff lawyers that worked for you?

16         A.    Staff accountants.

17         Q.    Staff accountants.  Sorry.  And it's

18    addressed to you; right?

19         A.    Yes.

20         Q.    Same as the Plaintiff's Exhibit 106 was

21    addressed to Ms. Hall at KPMG?

22         A.    Yes.

23         Q.    Now, at the time that Meg Jones wrote this

24    email to you in which she had a draft that said, "We

25    have audited the company and consolidated balance
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2156

```
 1    sheets," did you know that you had not yet completed
 2    your audit work of Thornburg?
 3         A.   Yes.
 4         Q.   Did Ms. Jones know that you knew that you
 5    hadn't completed your audit work of Thornburg?
 6         A.   Yes.
 7         Q.   By contrast, when Thornburg in Plaintiff's
 8    Exhibit 106 sent you that information, you did not
 9    know that the information contained in there was
10    untrue, did you?
11         A.   We did not know that.
12         Q.   All right.  Can we take a look at
13    Plaintiff's Exhibit 58, please.  And if you can call
14    up the body of -- thank you.
15              Do you recall Mr. Lee had some questions
16    about this one for you, as well?
17         A.   Yes.
18         Q.   Okay.  Now -- and the suggestion from the
19    question was that there was -- that maybe the $76
20    million wasn't all repo loans; is that right?
21         A.   That's right.
22         Q.   So my question is whether it was $59
23    million worth of outstanding margin calls or $76
24    million worth of outstanding margin calls, do you
25    know now that Credit Suisse received margin calls --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    I'm sorry, that Thornburg received from Credit Suisse

2    margin calls that it couldn't pay on time?

3         A.   Yes, I do.

4         Q.   And did you know that at the time, February

5    20, the time of this email?

6         A.   No, I did not.

7         Q.   And that's information that you told us

8    yesterday you would have wanted to know?

9         A.   We would have wanted to know that.

10        Q.   Now, if you could fish out Exhibit QD,

11   please.   This was the Bloomberg message that Mr. Lee

12   had some questions for you about that involved a

13   fellow named Eric Smith who worked at Credit Suisse

14   and another fellow named Patrick Feldman, who we've

15   heard talk about that works at Thornburg.   Do you see

16   that?

17        A.   Yes.

18        Q.   Okay.   Mr. King, if you could put up

19   Defendants' Exhibit OW which has been previously

20   admitted into evidence.   As it comes up, while

21   Mr. King gets the document ready for us, I'll tell

22   you it's a declaration from a man named Anthony Blasi

23   who has testified here in court.   How are we doing?

24   And as you'll see in a moment this declaration

25   indicates that Mr. Blasi is a managing director at

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                             (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Credit Suisse.

2              If you'll go to paragraphs 3 and 4, please.

3              It further indicates during February 2008

4    he was a senior trader on the Credit Suisse's

5    repurchase agreement desk and at that time Thornburg

6    was a longstanding client of the Credit Suisse and as

7    part of his position he was involved with Credit

8    Suisse's repurchase agreement trades with Thornburg.

9    So my first question is:  As between you or

10   Mr. Blasi, who do you think would be in a better

11   position as to interpret Mr. Smith and Mr. Feldman's

12   message exchange?

13        A.   Mr. Blasi.

14        Q.   Let's take a look at paragraph 7, which is

15   on the next page, Mr. King.

16              You'll see there that Mr. Blasi says, "I am

17   unaware of any agreement between Credit Suisse and

18   Thornburg to allow Thornburg to meet any margin calls

19   over time during February 2008.  In my position, I

20   believe that I would have known if there had been

21   such an agreement."  Do you see that?

22        A.   Yes.

23        Q.   And did Mr. Lee tell you that he did not

24   ask Mr. Blasi any questions about Exhibit QD?

25        A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Now, Mr. King, if you could call up
 2   Plaintiff's Exhibit 10, please.
 3             Do you recall that Mr. Lee had some
 4   considerable amount of questions for you about
 5   Plaintiff's Exhibit 10; right?
 6        A.   Yes.  You won't make me read it again, will
 7   you?
 8        Q.   Nor will I make you hunt for anything in
 9   it.  Now, I want to make sure that we're clear about
10   this agreement.  During the term of the agreement,
11   who holds the collateral?
12        A.   It's held in third-party custodian.
13        Q.   Who has control over it?
14        A.   It's for the benefit of the lender in this
15   case, so it would be -- Citigroup would have control
16   over it, because the security has been sold
17   effectively under these agreements.
18        Q.   And having gone through it now with
19   Mr. Lee, do you agree that if Citi takes the position
20   that the market value of that collateral has
21   declined, they would be able to issue a margin call?
22        A.   Yes.
23        Q.   And Mr. King, if we could look at page 4,
24   briefly.  You see there the definition of market
25   value that Mr. Lee was pointing you to?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1        A.   Yes.

2        Q.   And it says, (ii) says, "If unavailable,

3   the market value thereof as derived from the prices

4   or rates bid by reputable dealer for the relevant

5   instrument reasonably chosen in good faith by a

6   lender."

7        A.   Yes.

8        Q.   Who is the lender in that sentence?

9        A.   That's Citi.

10       Q.   Okay.  And if there is a disagreement

11  between what Citi, on the one hand, thinks the market

12  value is worth and what Thornburg, on the other hand,

13  thinks the market value is worth, who wins that

14  disagreement?

15       A.   Citi.

16       Q.   Now, if I can draw your attention to

17  section 5.2, I believe it is, if you could just blow

18  up the first part of that, Mr. King.  Thank you.

19            And you recall that Mr. Lee asked you some

20  questions about this.  In particular, he noted that

21  the agreement provides, unless otherwise agreed

22  between the parties.  Do you see that?

23       A.   Yes.

24       Q.   And do you recall Mr. Lee's questions?

25       A.   Yes.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                  1-800-669-9492
                                                           e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      Q.    And if you could go to section 28.3.  I

2   don't believe Mr. Lee pointed you to this provision.

3   And you see that this is also a provision of that

4   agreement; correct?

5      A.    Yes.

6      Q.    And it provides, "No amendment in respect

7   to this agreement will be effective unless in

8   writing, including a writing evidenced by a facsimile

9   transmission and executed by each of the parties or

10  confirmed by another exchange of telexes or

11  electronic messages on an electronic messaging

12  system."

13         Now, do you have an understanding of how

14  this provision of the contract impacts the part that

15  Mr. Lee was showing you about the agreement between

16  parties?

17     A.    Yes.

18     Q.    And can you explain that?

19     A.    Well, that there needs to be a written

20  documentation of any other agreement that would allow

21  the parties to operate outside the terms of this

22  agreement, both signed by Citi on one part and by the

23  company on the other part.

24     Q.    And during the course of your audit work,

25  were you ever provided such a written document?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No.
 2        Q.   Let me ask you this.  Even if it was
 3   written or not, if there was any sort of modification
 4   to the agreement, is that something that should have
 5   been provided to you during the course of the audit?
 6        A.   Yes.
 7        Q.   Now, he also had some questions for you
 8   about cross-defaults.  Do you recall that?
 9        A.   Yes, I do.
10        Q.   That's where he asked you to hunt for the
11   provision?
12        A.   Yes.
13        Q.   All right.  So if we look on -- and he was
14   talking about -- he asked you to look at provisions
15   within this exhibit, Exhibit 10; right?
16        A.   Yes.
17        Q.   Can you explain generally what a
18   cross-default provision is?
19        A.   A cross-default provision would allow
20   another lender outside of the lender that is involved
21   with the arrangement -- so in this, for example, if
22   Citi and the company have an agreement and the
23   company were to violate that agreement and have a
24   default, then Greenwich, who isn't a part of that
25   agreement, is aware of that default, could cause a
```

SANTA FE OFFICE                                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                          Albuquerque, NM 87102
(505) 989-4949                                                                                       (505) 843-9494
FAX (505) 843-9492                                                                            FAX (505) 843-9492
                                                                                                      1-800-669-9492
                                                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   default in the Greenwich agreement or the Credit
 2   Suisse agreement or any other agreement that would be
 3   out there.
 4       Q.   Is it fair to say that you wouldn't have a
 5   cross-default for a default of your own agreement?
 6       A.   No.
 7       Q.   Okay.  Let's take a look at Plaintiff's
 8   Exhibit 233.  Ms. Reinhart, can you tell me if you
 9   recognize this document?
10       A.   Yes.
11       Q.   Can you tell me what you recognize it to
12   be?
13       A.   This is a workpaper from KPMG's audit files
14   that summarizes key provisions within the company's
15   debt agreements as to debt covenants.
16       Q.   And Mr. King, if you could turn to the
17   handwritten note at the bottom of the second page,
18   please, looking at the starred provision it says,
19   "These agreement (sic) do have a cross-default
20   clause, which is if one defaults, they all default."
21   Can you tell me what you understand that to mean?
22       A.   Can you go up and see where it's
23   asterisked.
24       Q.   Sure.
25       A.   Yes.  So its referring to the reverse
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    repurchase agreements.

2         Q.   Can you see on your screen?

3         A.   Yes, I can.

4         Q.   Can you explain to the jury what it refers

5    to?

6         A.   So there is an asterisk beside the debt

7    instrument called reverse repurchase, and it refers

8    down to the asterisk at the bottom of the page, the

9    handwritten note that says, "These agreements have a

10   cross-default clause which, if one defaults, they all

11   default.  When a default occurs, collateral is

12   liquidated."

13        So what this effectively allows is other

14   lenders to declare an event of default if they become

15   aware of another lender declaring an event of

16   default.  So it's a cross-default.

17        Q.   And the last exhibit I want to show you on

18   this topic is Plaintiff's Exhibit 326.  Do you

19   recognize this document?

20        A.   Yes, this is an 8-K filing.

21        Q.   An 8-K filed by Thornburg?

22        A.   Yes.

23        Q.   All right.  And if we can turn to the third

24   page of the agreement, please, the document, please

25   and if we could highlight the last sentence on the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    page.  That's fine, too.

2         Do you see the last sentence on the page

3    reads, "The company's receipt of the notice of an

4    event of default has triggered cross-defaults under

5    all of the company's other reverse repurchase

6    agreements and its secured loan agreements.  The

7    company's obligations under those agreements are

8    material."  What do you understand that to mean?

9         A.   That's consistent with what I just read out

10   of the KPMG workpapers, and that is that because the

11   company has defaulted on the JPMorgan reverse

12   repurchase agreement, then the other debt agreements

13   that the company has with its repo lenders and its

14   secured lenders could be in default, as well,

15   declared in default, as well.

16        Q.   Now, let me ask you to go, Mr. King, to the

17   last page.

18        If you can tell me if you agree with me

19   that this document was, in fact, signed by Mr.

20   Goldstone?

21        A.   Yes.  Slash S.  That's what slash S slash

22   means.

23        Q.   You also recall that Mr. Lee had some

24   questions for you about the down-to-date meeting?

25        A.   Yes.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE
                                                                   e-mail: info@litsupport.com

1      Q.   And your note-taking practices at

2   down-to-date meetings?

3      A.   Yes.

4      Q.   Is it fair to say that you didn't take any

5   notes during that meeting because Mr. Simmons didn't

6   say anything noteworthy?

7      A.   He didn't say anything that was -- I

8   wouldn't say necessarily noteworthy, but inconsistent

9   with what we had come to learn during the course of

10   the audit.  So there wasn't anything that triggered

11   me to take a note, and we were very close to the end.

12   So it wasn't as if we had days and days of time that

13   needed to elapse before we memorialized the

14   conversation.

15      Q.   Let me ask the question this way.  If

16   Mr. Simmons had told you that the company had

17   received a reservation of rights letter from Citi,

18   would you have taken out your pen and taken some

19   notes then?

20      A.   Yes.

21      Q.   Now, Mr. King, if you could call up Exhibit

22   HJ, please.

23           And this is the communication involving Mr.

24   Taylor, I believe, and that Mr. Lee had some

25   questions for you about?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        A.   Yes.

2        Q.   Okay.  And Mr. Taylor wrote, "I think the

3   disclosure is adequate and I understand the margin

4   calls and recent liquidity squeeze was considered in

5   the going concern analysis."  Is that correct?  Is

6   that what you understood at that time?

7        A.   Yes.

8        Q.   And that's what you told me yesterday that

9   was required under the accounting rules; you consider

10  everything up until the time of the audit opinion in

11  reaching your going concern decision?

12       A.   That's right.

13       Q.   And then he says, "Drop in value in

14  February does not seem to call into question the

15  12/31/2007 valuation on these assets."  To your

16  understanding, was there any issue about the

17  appropriate valuation of the impaired assets?

18       A.   No, no question about the value.

19       Q.   Can you take that one down, Mr. King.

20            Now, I want to go back to the Peloton issue

21  that Mr. Lee asked you some questions about, and I'd

22  like to call up Plaintiff's Exhibit 113, please.  Do

23  you recall this is the email from Mr. Feldman to Mr.

24  Goldstone and Mr. Simmons, and this is where they

25  first make reference to learning about this

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

```
 1    collapsing hedge fund.  Do you recall that?
 2         A.   Yes.
 3         Q.   And do you see that they said they learned
 4    it from Charles Mac.  Do you know who Charles Mac is?
 5         A.   No.
 6         Q.   Do you know where he works?
 7         A.   I have no idea.
 8         Q.   Is it possible that he was somebody that
 9    worked at Merrill Lynch?
10              MR. LEE:  Objection, calls for speculation,
11    same objection as --
12              THE COURT:  Well, it's just a yes/no
13    answer.
14         A.   I don't know.
15         Q.   (By Mr. Kasper)  And let's take a look
16    at -- this was on February 27.  Do you recall that
17    Mr. Goldstone was out of town?
18         A.   Yes, I do.
19         Q.   And do you recall that he was in New York
20    City meeting with bankers?
21         A.   Yes.
22         Q.   Let's take a look at Plaintiff's Exhibit
23    122.  This was the other email that we've asked some
24    questions about related to the Peloton.  And here in
25    this email he says, "Also you should note that a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    large Alt-A hedge fund in Europe is blowing up this

2    afternoon.  UBS Credit just mentioned it to me."

3              Who do you understand UBS Credit to be?

4         A.   One of the companies, counterparties, UBS

5    is a significant bank in New York.

6         Q.   And do you know if Mr. Goldstone had other

7    meetings with other New York banks during that time?

8         A.   I believe so, but I don't know the

9    specifics.

10        Q.   Is it fair to say that these emails reflect

11   Mr. Goldstone and Mr. Simmons gathering information

12   from their Wall Street connections?

13        A.   Yes.

14        Q.   And having been walked through the emails

15   that you've never seen before from the SEC, is it

16   fair to say that on February 27, Mr. Goldstone and

17   Mr. Simmons had better information about the

18   impending collapse of Peloton than the SEC did?

19        A.   Yes.

20        Q.   Mr. Lee also asked some questions about the

21   possibility that there was going to be some sort of

22   bailout of Peloton.  Do you remember that?  Or there

23   was going to be a buyout or some other information

24   that I hadn't presented to you about Peloton?

25        A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1         Q.   And so my question is:  If that's true and

 2    there becomes evidence that there was some other

 3    information, is it your opinion that if Mr. Goldstone

 4    learned this other information, that that means that

 5    he should tell you nothing, or that he should have

 6    told you about everything that he knew about Peloton?

 7         A.   To the extent that it has a significant

 8    impact or he expects it will have an impact on their

 9    book that they're financing, he needs to be telling

10    us right then and there.

11         Q.   And what, in fact, did Mr. Goldstone tell

12    you about Peloton on February 27?

13         A.   Nothing.

14         Q.   Right.  And the last topic I wanted to come

15    to was Mr. Lee asked you some questions about the

16    timing of the filing of the 8-K.  Do you recall that?

17         A.   Which 8-K?

18         Q.   The 8-K disclosing that KPMG had withdrawn

19    its audit opinion.

20         A.   Yes.

21         Q.   And he asked you some questions about

22    whether the SEC rules require that information be

23    disclosed; right?

24         A.   Yes.

25         Q.   Do you know if there is anything in those

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492
                                                              1-800-669-9492
                                                        e-mail: info@litsupport.com


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    roles that would have prevented Thornburg from filing

2    the 8-K on March 4 or March 5 or March 6?

3         A.   No.

4         Q.   So the rules provide an outer limit but

5    don't prevent companies from making more timely

6    disclosures?

7         A.   That's correct.

8         Q.   And in fact, in your experience with public

9    companies, is it your experience that sometimes

10   companies do, in fact, make more -- provide that

11   information prior to the four-or-five-day deadline in

12   the SEC rules?

13        A.   Yes, they do.

14        Q.   And I take it from your testimony

15   previously that it was KPMG's view that this was one

16   of those cases when the better course would have been

17   for Thornburg to make the disclosure as soon as

18   possible as opposed to the last possible time allowed

19   by the rules?

20        A.   That's correct.

21             MR. KASPER:  That's all the questions I

22   have, Your Honor.

23             THE COURT:  Mr. Kasper.

24             All right, Ms. Reinhart.  You may step

25   down.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2172

```
 1              Is there any reason that Ms. Reinhart
 2    cannot be excused from the proceedings?
 3              MR. KASPER:  No, Your Honor.
 4              THE COURT:  Mr. Lee?
 5              MR. LEE:  No, Your Honor.
 6              THE COURT:  All right.  You're excused from
 7    the proceedings.  Thank you for your testimony.
 8              All right.  We're probably close enough to
 9    take our first afternoon break, so why don't we go
10    ahead and do that at this time.  So let's be in
11    recess for about 15 minutes.
12              All rise.
13              (The jury left the courtroom.)
14              THE COURT:  All right.  Anything we need to
15    discuss?
16              MR. McKENNA:  No, Your Honor.
17              THE COURT:  Mr. Lee?
18              MR. LEE:  No, Your Honor.
19              THE COURT:  All right.  We'll be in recess
20    for about 15 minutes.
21              (The Court stood in recess.)
22              THE COURT:  All right.  Anything we need to
23    discuss, Mr. McKenna?  Mr. Lee?
24              MR. LEE:  No, Your Honor.
25              THE COURT:  All rise.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              (The jury entered the courtroom.)
 2              THE COURT:  All right.  Everyone be seated.
 3              All right, does the SEC have its next
 4   witness or evidence?
 5              MR. BLISS:  Yes, Your Honor.  Securities.
 6   and Exchange Commission calls Ralph Ahn.
 7              THE COURT:  Mr. Ahn, if you'll come up and
 8   stand next to the witness box, my right, your left,
 9   my courtroom deputy, Ms. Wild, will swear you in.
10                        RALPH AHN,
11      after having been first duly sworn under oath,
12      was questioned, and testified as follows:
13              THE CLERK:  Please be seated.  State your
14   name for the record, please.
15              THE WITNESS:  My name is Ralph Ahn.
16              THE COURT:  Mr. Ahn, Mr. Bliss.
17              MR. BLISS:  Thank you, Your Honor.
18                        EXAMINATION
19   BY MR. BLISS:
20      Q.  Good afternoon, Mr. Ahn.  Can you tell me
21   where you live?
22      A.  I currently live in Seattle, Washington.
23      Q.  Thank you for traveling here, and thank you
24   for your patience today.  I know it's been a long day
25   waiting to come in.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Thank you.
 2        Q.    What do you do for a living currently?
 3        A.    I am a consultant in what they call asset
 4   liability management.  So it's kind of assessing the
 5   risk of a bank.
 6        Q.    What's the name of the company you work
 7   for.
 8        A.    Azimuth.
 9        Q.    And who works at Azimuth?
10        A.    Currently it's me and Clay.  We are
11   partners.  And underneath we have about five
12   employees.
13        Q.    Clay as in Mr. Simmons?
14        A.    Mr. Simmons, yes.  I should use last names.
15        Q.    What's your business relationship with Mr.
16   Simmons currently?
17        A.    We're partners.
18        Q.    Sorry, I know you're partners.
19        A.    Yes, we're partners.
20        Q.    How long have you worked with Mr. Simmons
21   at Azimuth?
22        A.    I think we're approaching close to two
23   years now.
24        Q.    And have you worked in Seattle the whole
25   time?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   I have not.

 2          Q.   Where did you start?

 3          A.   Started in Albuquerque -- or Santa Fe, New

 4     Mexico.

 5          Q.   And before working at Azimuth with Mr.

 6     Simmons, where did you work?

 7          A.   Aventure.

 8          Q.   And what's Aventure?

 9          A.   That was Larry's company, and so I was

10     partnered -- well, I shouldn't say partner.  I was an

11     employee of that company.

12          Q.   And that's Mr. Goldstone's company?

13          A.   Mr. Goldstone, I'm sorry.

14          Q.   And did Mr. Simmons work for that company

15     in any way?

16          A.   Yes.

17          Q.   And how long did that go back, your work at

18     Aventure?

19          A.   I believe that was about a year to a year

20     and a half.

21          Q.   So about the past three years or so, you've

22     worked at Azimuth and Aventure?

23          A.   Correct.

24          Q.   Prior to that, what did you do?

25          A.   Prior to that I worked at the Federal Home
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Loan Bank of San Francisco doing similar things, just
 2   not as a consulting role.  I was an employee at that
 3   bank.
 4        Q.   What about before that?
 5        A.   Before that was Wells Fargo, which was for
 6   about nine months, doing again similar stuff.
 7        Q.   Also in San Francisco?
 8        A.   Also in San Francisco.
 9        Q.   What about before that?
10        A.   And then before that was my Thornburg
11   experience.
12        Q.   Okay.  And I'm going to ask you some
13   questions about your work at Thornburg momentarily.
14   Now, you've talked about working with Mr. Goldstone
15   and Mr. Simmons after Thornburg.  Are you friends
16   with Mr. Goldstone and Mr. Simmons?
17        A.   Yes, I am.
18        Q.   And did you have your deposition taken in
19   this case?
20        A.   Yes.
21        Q.   And that was in January of 2013?
22        A.   Sounds about right.
23        Q.   And do you remember that I took that
24   deposition?
25        A.   Yes, I do.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And that Mr. Lee then asked you some
 2   questions, as well?
 3        A.   I do.
 4        Q.   And did I meet with you last night for
 5   about ten minutes?
 6        A.   That's correct.
 7        Q.   And did you meet with counsel for
 8   defendants after that?
 9        A.   I did.
10        Q.   How long did you meet with them?
11        A.   About the same amount of time.
12        Q.   Have you met with them before?
13        A.   I have.
14        Q.   How many times?
15        A.   Just once.
16        Q.   And how long was that, and when was that?
17        A.   That one was about two hours, I would say.
18        Q.   And when do you think it was?
19        A.   That was about two weeks ago, three weeks
20   ago.
21        Q.   So how long did you work at Thornburg?
22        A.   How long did I work for Thornburg?  It was
23   about four years.
24        Q.   And what was the time period?
25        A.   2004, right after I left college, and I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   worked there for about another four years, about

2   2008.

3        Q.   And what degree did you get in college?

4        A.   Bachelor of science in finance.

5        Q.   Where did you go to college?

6        A.   University of Pennsylvania, Wharton School.

7        Q.   So what was your job title at Thornburg, or

8   did you have multiple titles?

9        A.   At the end or at the beginning?

10       Q.   Let's focus on the February 2008 time

11  frame.

12       A.   So at that time I believe my title was --

13  so there is two titles, so there was the senior

14  portfolio analyst, and then I was also AVP, or

15  assistant vice president, really.

16       Q.   Who did you report to?

17       A.   At that time it was Kyle Rhoades.

18       Q.   And did Mr. Rhoades report to someone?

19       A.   Yes.

20       Q.   Who was that?

21       A.   That was Nate Fellers.

22       Q.   What about Mr. Fellers?  Who did he report

23  to?

24       A.   Because he was kind of the role, like,

25  treasurer of capital markets, he pretty much reported

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   to Larry and Clay.

 2         Q.   And when you're talking about capital

 3   markets, what is capital markets?

 4         A.   That was the department we were working in,

 5   kind of like the market facing group of the company,

 6   so anything that has to do with facing outward of the

 7   company with markets or -- that's pretty much --

 8   capital markets.

 9         Q.   So what did you do exactly as part of your

10   job in January and February of 2008?

11         A.   Multiple things.  So primarily was kind of

12   what I've done now, consulting, which is asset

13   liability management.  So it's a lot of kind of

14   preparing this one program that's called QRM.  In

15   essence, you just load up the balance sheet and you

16   assess the risk -- the balance sheet.  So that was

17   one part.

18              And the other part was kind of an earnings

19   model, forecasting, so forecasting how well the

20   company was going to look in terms of earnings.

21              And then the third one was during this

22   time, just assisting how I could with kind of the

23   troubles of the time, and so that included liquidity

24   reports.

25         Q.   And we'll talk about the liquidity reports.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492

 

BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

2180

1   What do you mean by the troubles of the time?

2       A.   You know, it's more a general description

3   of kind of how the markets were at that time.  So I

4   don't think it's no surprise to anybody there was

5   quite a bit of distress across the entire financial

6   industry.  So it was a hectic time.

7       Q.   So at some point in January of 2008, did

8   you start creating the liquidity reports?

9       A.   That sounds correct.

10      Q.   Why did you do that?

11      A.   So before that, we had kind of a mini-scare

12  in August, where we kind of -- another smaller

13  financial crisis, you could say, and realization

14  that, kind of, cash was something that we should

15  start looking into and be concerned about.  And so

16  that was decided to kind of have a monitoring report

17  to just kind of see the ins and outs of cash and try

18  to do our best to project it over time.

19      Q.   And when you say it was decided, who was

20  involved in that decision?

21      A.   I don't think there was any one particular

22  person.  I think it was one of those -- it came out

23  of ALCO as a joint effort to say we should start

24  tracking cash.

25      Q.   What's ALCO?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2181

1        A.    Sorry, yes.  ALCO is Asset Liability

2   Committee.  It's kind of a group of all the higher

3   upper management to kind of review all things

4   important to Thornburg.

5        Q.    How would you actually create the liquidity

6   reports?

7        A.    Yeah, so there's a few things that can go

8   into a liquidity report that you can predict with

9   pretty good certainty.  So the one that is really of

10  certainty is like interest payments on the mortgages

11  that we held.  So that's contractually based, and so

12  we can figure out fairly easily.  There's several

13  other things that you can kind of figure out because

14  there's contractual features, and it's just pulling

15  the data and doing the math.  Some other parts, which

16  are a little less uncertain, you have to kind of keep

17  your ears out to kind of what's happening to the

18  marketplace, and pretty much do your best.

19       Q.    From the time you started making those

20  liquidity reports in January 2008, did you do it on a

21  daily basis for all the weekdays?

22       A.    I believe so.  And there were some days

23  that we would have to do it more than once in a day

24  because of some event.  But typically, yes.

25       Q.    Okay.  I'm going to ask you about some of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   the liquidity reports.  We won't look at every single

2   day.

3         A.   Okay.

4         Q.   But let's start with January 25, 2008,

5   which is Exhibit 15.  Do you believe that this was

6   the first liquidity report that you created?

7         A.   Oh, I don't know specifically.

8         Q.   Does it sound about right that in January

9   you started creating these reports?

10        A.   Yes, that sounds about right.

11        Q.   Now, if you look at this dated January 25,

12  you sent the report to Mr. Goldstone, Mr. Simmons,

13  Mr. Fellers, and Mr. Stanhope; is that right?

14        A.   Yes, it appears so.

15        Q.   And so the beginning balance of $225

16  million -- what does that indicate?

17        A.   So that's a portion of the company's

18  liquidity, so there's various ways to define

19  liquidity.  In this case, this captures two parts of

20  that which are really cash, which is the most liquid

21  form, and agencies, which is another very liquid form

22  of asset that you can pretty much readily transfer

23  into cash if you need to do.

24        Q.   And when you look at the report itself, it

25  will say it's a cash liquidity report, which leads me

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to ask, why are agencies included in a cash liquidity

2    report?

3         A.   Yeah.   I think it's more than I just named

4    it poorly.   Cash liquidity would imply just simply

5    cash.   Really, this was a -- like I said, a small

6    subset.   So it really should be cash, most liquid

7    assets liquidity report.   So that would be cash and

8    agencies.

9         Q.   Got it.   So what is an agency and what

10   makes it so liquid?

11        A.   Agency is kind of considered to be like the

12   best quality of type of mortgage out there, and so as

13   a result it's kind of been vetted by how it's been

14   underwritten, so it's considered to be very pristine.

15   And as a result, it's very easy to go throughout and

16   exchange it for cash or trade it for cash, if need

17   be.

18        Q.   Then on the next line it has 125 notables

19   P&I.   What does P&I refer to?

20        A.   P&I is principal and interest.   So for

21   those who have a mortgage, you should be familiar

22   with this.   You make the monthly payment and when you

23   make the monthly payment, there are two portions.

24   There is principal, which pays down the balance; and

25   then there is the interest, being allowed to borrow

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    that.  So P&I is the reflection of that.

 2         Q.   Would that typically come into Thornburg on

 3    the 25th of every month?

 4         A.   Yes.

 5         Q.   Then you have the estimated ending balance

 6    there of $290 million.  What is that referring to?

 7         A.   So this should just be -- if I saw the

 8    other portion, it should be the 225, plus whatever

 9    ins and outs there are that day that causes it to end

10    up in 290.  So it should be an estimated ending

11    balance.

12         Q.   So let's look at the next page of this

13    exhibit and if we could expand the whole -- let's go

14    to the top left, first of all.  There where it says

15    "Thornburg cash liquidity report," do you see that?

16    And again, you said it really refers more to agencies

17    and whatever the most liquid assets were?

18         A.   Yes.

19         Q.   Then if we could expand down, I'd like to

20    look at the bars in bold all the way across the top,

21    if you could, Mr. King.  Yeah, start with those.

22              So you have several here that are listed

23    asset interest received, asset principal received,

24    repo adjustments, CMD/swap, and fundings/warehouse.

25    Are these all factors that affect Thornburg's

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                              1-800-669-9492




```
 1   liquidity?

 2        A.   Yes.

 3        Q.   How so?

 4        A.   Each one of these kind of reflect either a

 5   provision of cash or a requirement of cash.  And so

 6   it should be kind of the ins and outs that we -- for

 7   cash to end up at the 290 balance.

 8        Q.   So it could be either cash going in or cash

 9   going out?

10        A.   Yes.

11        Q.   Then the right-hand column, it says,

12   "Manual."  What does the manual column refer to?

13        A.   As I kind of mentioned, liquidity reports

14   are broken down by two things.  There are some that

15   are contractual and easy to guess.  And some, as I

16   said, you have to listen out to the market to assess.

17   The manual is a reflection of those, and that

18   typically would come from management or kind of what

19   the market is telling us.

20        Q.   And here are the two listed possibilities

21   are equity raise, margin call, and then a third,

22   other?

23        A.   Correct.

24        Q.   And then what is the -- on the far right,

25   the change in cash and the cash balance?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.   So change in cash would be the summation of

2   all those individual parts to the left.  And the cash

3   balance would just be the beginning cash balance plus

4   whatever change in cash there was for that day, which

5   ends up in the cash balance.

6      Q.   If we could scroll down just a little bit

7   or expand that just a little bit so I'm understanding

8   this correctly.  At the very top, you've got a number

9   of $225,000.  Is that the beginning cash that you

10  started the day with?

11     A.   Yes.  I think that's million.  $225

12  million.

13     Q.   Sorry, you're right.  It does refer to

14  million.  $225 million to start the day.  Then the

15  change in cash indicates an additional $659.7 million

16  or so; is that right?

17     A.   Yes.

18     Q.   So you add those up and you get the cash

19  balance projected for the end of the day; is that

20  right?

21     A.   Yes.

22     Q.   Excellent.  Thank you.  I just want to look

23  at some more of these liquidity reports if we could

24  go to Exhibit 19.

25           So at the end of January, on the 31st, a

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1    liquidity report showing beginning cash of $146

 2    million; is that right?

 3         A.   Yes.

 4         Q.   And so that was down from the prior

 5    liquidity report we looked at from a few days prior?

 6         A.   Yes.

 7         Q.   And you have agencies of $45 million?

 8         A.   Yes.

 9         Q.   And then projected ending cash of $172

10    million?

11         A.   Yes.

12         Q.   Then if you look at the two parts of the

13    email, there are some additional folks who were added

14    to the email list:  Mr. Feldman, Ms. Starrett,

15    Mr. Buniel, Mr. Sturdy.  Why did you send this email

16    or start sending the email to more people?

17         A.   So the initial cut, if that really was my

18    first time, was just to make sure that it looked

19    okay.  So it was only sent to those who could really

20    validate and tell me if the format needed to be

21    changed or looked good.  These additional individuals

22    were interested in the information I was

23    disseminating so they would have just been included.

24         Q.   Now, when you say they were interested, how

25    do you know that Mr. Goldstone and Mr. Simmons were

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492
                                                                                   1-800-669-9492
                                                                      e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    interested in this information?

2         A.   Gosh, I hope they were.  They were in

3    charge of the company.  I mean, they asked for it.  I

4    guess that's the best way to say it.

5         Q.   They both asked for it?

6         A.   Yeah.

7         Q.   And again, just quickly, if we go to the

8    second page, the second page in the top right, if we

9    just expand the same kind of section we were looking

10   at before, this, again, shows the detail of how you

11   got to the cash balances referred to on the cover

12   email; is that right?

13        A.   Yes.

14        Q.   If you go to Exhibit 20, which is February

15   1st so we are going to look at two days in a row, but

16   I promise we'll skip ahead.  Let me ask about this

17   one.  Because you've got a line where you have an

18   asterisk next to the "Beginning cash/agency balance"

19   that says, "This is different from the $172 million

20   predicted because there was about $24 million in

21   margin calls by CSFB."  What does that mean?

22        A.   So it appears that from the time I ran it

23   the previous day, a margin call came in of $24

24   million from CSFB.  We met it, and so that reduced

25   our cash balance.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2189

1      Q.   Got it.   In other words, it came in after

2    you sent out the previous day's liquidity report?

3      A.   Right.

4      Q.   Under today's notables it includes $12

5    million in known margin calls.   Do you see that?

6      A.   Yes.

7      Q.   Then a projected ending cash of $155

8    million?

9      A.   Yes.

10     Q.   And if we look at the next page and expand

11   the top right, and further down, so I take it that

12   the $12 million known margin call referred to on the

13   email ends up in the margin call column here.

14     A.   Right.

15     Q.   All right.   Now, if we could move ahead to

16   February 13 of 2008, which is Exhibit 35.   First of

17   all, just a clarification.   I see that the email is

18   dated February 13, although the subject line is

19   February 12.   Was this, in fact, the February 13

20   liquidity report?

21     A.   Yeah, I manually update the subjects and I

22   wasn't as good of an analyst then as I am now, so...

23     Q.   And we start with -- or Thornburg starts

24   with $67 million in cash and $2 million in agencies;

25   is that right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Yes.

2        Q.    And so again, that's lower than we've been

3    talking about in prior periods; correct?

4        A.    Correct.

5        Q.    And we see today's notables include margin

6    calls from Citi in the amount of $19 million and $30

7    million from CSFB; is that right?

8        A.    Correct.

9        Q.    With a projected ending cash of $41.5

10   million.  On this one -- so it looks to me like there

11   are $49 million in margin calls.  Am I reading that

12   correctly?

13       A.    Correct.

14       Q.    And I just wanted to clarify -- well, first

15   of all, let's look at the next line of the future

16   notables, where it says, "Tomorrow we will face about

17   $32 and a half million in combined auction swap/swap

18   margin from CSFB."  How did you know that tomorrow

19   you were going to get a swap margin call?

20       A.    Swap is kind of contractual, so that one is

21   easier to predict.  So that one -- I don't remember

22   the specifics nowadays, but there was a clear-cut

23   formula as to actually derive it, and there was a set

24   day when it should occur.  So that's what that is.

25       Q.    And as far as repo margin calls, the margin

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    calls of $19 million and $30 million above from Citi

 2    and CSFB -- are those repo margin calls?

 3         A.   Correct.

 4         Q.   And explain how you would learn about a

 5    repo margin call.

 6         A.   A dealer would usually just call us up and

 7    tell us, "Hey, your assets aren't worth" -- shall I

 8    explain repos?

 9         Q.   I don't think -- let's not go through repos

10    again.  It's been a little bit of a long trial so

11    far.

12         A.   So the underlying collateral that kind of

13    backs the repo, right, is not valued as much as it

14    once was.  So they would call up and say, "You need

15    to pony up some cash because it's not worth as much

16    as it once was."

17         Q.   So when you're talking about a dealer,

18    you're talking about a Wall Street bank?

19         A.   Yes.

20         Q.   And when you're talking about us, do you

21    mean you would get a call?

22         A.   Primarily Xen Stanhope and Pat Feldman.

23         Q.   So and how would you personally learn about

24    margin calls coming in?

25         A.   Xen Stanhope or Pat Feldman would tell me.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   So whenever I ran these liquidity reports, the first

2   thing I did was pretty much just run over and say,

3   "What happened?"

4        Q.   And so do you mean literally every morning

5   you'd pop your head in one of their offices and say,

6   "Did we get margin calls today?"

7        A.   They didn't have an office.  They were a

8   cube down.  So I would yell at them, yes.

9        Q.   Got it.  And looking at the $49 million in

10  margin calls, I just wanted to clarify on the next

11  page, which is the actual report, if we look at the

12  upper-right corner again for the first few days, the

13  first entry for margin calls is, you know, negative

14  $34.6 million.  So I'm just wondering how you got to

15  that number, if you recall.

16       A.   I don't recall.  I think that 34 -- is that

17  the swap one?  And maybe --

18       Q.   If you look at the cover page, it says,

19  "tomorrow we'll face a $32 and a half million auction

20  swap call."  So I think that's what's in the second

21  line.  I just wasn't sure how you arrived at $34.6

22  million, because the cover email does indicate $49

23  million in margin calls.

24       A.   I'm not sure.  I know that there was one of

25  these reports where I made a mistake and I corrected

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                      e-mail: info@litsupport.com

 1    it following, and I can't remember the exact date.

 2    But I'm wondering if this is that report.

 3         Q.   But in any case, on this date, for

 4    instance, on February 13, 2008, it shows a change in

 5    cash of negative $27 and a half million,

 6    approximately, resulting in a liquidity balance of

 7    about $42 million; is that right?

 8         A.   Right.

 9         Q.   Then if we could look at the next day which

10    is Exhibit 37, February 14.  So you're sending out a

11    corrected report here?

12         A.   Yep.

13         Q.   And this is, like you said, sometimes you'd

14    send out a second report; is that right?

15         A.   Correct.

16         Q.   Okay.  And here you have a beginning cash

17    balance of $76 million; is that right?

18         A.   Yes.

19         Q.   $2 million of agency?

20         A.   Yep.

21         Q.   And then $32 and a half million in margin

22    calls from CSFB and $30 million from Goldman; is that

23    right?

24         A.   Correct.

25         Q.   Then if we look at the next page, the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    report itself, those are reflected in the upper
 2    right-hand corner with the margin call of negative
 3    $62.5 million; is that right?
 4         A.    Yes.
 5         Q.    And so this report, the next day, on
 6    February 14 shows a change in cash of about negative
 7    $80 million, resulting in a projected negative cash
 8    balance of about $2.3 million; is that fair?
 9         A.    Correct.
10         Q.    Now, were you concerned at this point about
11    the negative projected cash balance?
12         A.    Yes.
13         Q.    Why?
14         A.    Because it is negative and it's low.  But
15    you know, there are two things that I would want to
16    point out about this report.  One, if you look at the
17    next day, the cash balance jumps up pretty
18    significantly.  So I believe that is a P&I day, so
19    kind of the sentiment was, if we could just make it
20    past one day, then we should be okay.
21             And the other thing is that this also kind
22    of reports most liquid of the cash and agencies that
23    we have, but we do have other forms of liquidity that
24    aren't being captured here that would -- that could
25    be tapped into to help alleviate this.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1         Q.    And let's go to the February 19 liquidity
 2    report.  So now we're moving ahead in time five days.
 3    Sorry, it's Exhibit 53.  Moving in time five days,
 4    and we show beginning cash balance of $5 million,
 5    zero agency, and $5 million total then of the
 6    combined; is that right?
 7         A.    Yes.
 8         Q.    And with today's notables of a $79 million
 9    margin call from CSFB?
10         A.    Correct.
11         Q.    With projected ending cash of $76 million?
12         A.    Correct.
13         Q.    Then if we go to the next page or the
14    report itself, let's again look at the top right
15    corner like we've been doing.  Can you see that
16    margin call again is represented in that column?
17         A.    Yes.
18         Q.    And so here we have a beginning cash
19    balance in the upper right of about $5 million?
20         A.    Yes.
21         Q.    And then projected negative liquidity going
22    forward for, it looks like, four days?
23         A.    Correct.
24         Q.    Negative $76 million, negative $59 million,
25    negative $57 million, negative $55 million; is that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2196

```
 1    correct?
 2         A.    Right.
 3         Q.    And then the cash and liquidity goes
 4    positive again because February 25 is going to be a
 5    principal and interest day; is that right?
 6         A.    Right.
 7         Q.    Then you said you would learn, was it from
 8    Mr. Stanhope and Mr. Feldman, when margin calls came
 9    in?
10         A.    Yes, correct.
11         Q.    Would they also tell you when margin calls
12    were paid off?
13         A.    Not so much in the known, when that
14    occurred.  Typically it wasn't really until the next
15    morning that I found out.
16         Q.    Did you discuss margin calls with
17    Mr. Goldstone and Mr. Simmons anytime during January
18    and February of 2008?
19         A.    More as a messenger, just passing the
20    message along from Pat and Xen, I did, but I was
21    never really the source.
22         Q.    When you say "being the messenger," can you
23    describe what those interactions with Mr. Goldstone
24    and Mr. Simmons were like?
25         A.    Sure.  They might pop their head in and go,
```

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492
                                                      e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    "Ralph, what happened with margin calls?  I see Xen

2    and Pat are on the phone.  Could you find out?"

3           I would run over when they're off the

4    phone, I'd find out, and send an email or tell them

5    in person.

6           Q.   Back in February 2008 -- I know you said

7    now you're friends with Mr. Goldstone and

8    Mr. Simmons.  Did you consider yourself friends with

9    them back in February of 2008?

10          A.   Yes, not as close as now.  But yes, I saw

11    them more as my bosses.  So you're as much of a

12    friend as you could be with your boss.

13          Q.   It sounds like you talked with them with

14    some regularity.  Is that fair to say?

15          A.   Yes.

16          Q.   Can you characterize how regular they would

17    pop in their head or you'd pop in?

18          A.   Yeah, I would say definitely once a week,

19    and more frequently towards busy times.  So it would

20    be as often as daily.

21          Q.   As often as daily, for instance, during

22    those two weeks in February with low liquidity?

23          A.   Yes.

24          Q.   Is it fair to say that during -- starting,

25    you know, in mid-February up until the time that the

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492
                                                           1-800-669-9492
                                                           e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2198

1    Form 10-K was filed on February 28, that the tone was

2    frantic at Thornburg?

3         A.   Yes.

4         Q.   And is it fair to say that it was crisis

5    mode at Thornburg?

6         A.   Yes.

7         Q.   Why would you say that it was crisis mode

8    at Thornburg?

9         A.   Well, it was crisis mode for everybody in

10   the financial industry.  Things were happening that

11   nobody expected to have happened.  And so when there

12   is a fire right outside your door, you do whatever

13   you can to protect yourself.

14        Q.   And we've seen some negative balances on

15   some of these liquidity reports, and you said you had

16   expressed some concern.  Did you ever have

17   conversations with Mr. Goldstone or Mr. Simmons about

18   those negative balances?

19        A.   Yes, in the sense that I would share the

20   report.  I was a pretty junior analyst so it was kind

21   of produce the report, show it to them, and say, "Not

22   looking good," and then they would react accordingly.

23        Q.   And when you say "react accordingly," what

24   would they say?

25        A.   Well, that's kind of where I would kind of

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                        1-800-669-9492
                                            e-mail: info@litsupport.com


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    not be involved.  So it would primarily be going over

2    to Xen or Pat and seeing what kind of pieces could we

3    do.  Like I mentioned, there are other pieces of

4    liquidity, other than just the two that are mentioned

5    on the email.  So things like I/O pieces, or any

6    other types of subs that we might be able to put up

7    would be discussed.

8         Q.   And when you said you'd go tell Mr.

9    Goldstone and Mr. Simmons, you know, that -- I'm

10   sorry, you said something about, you know, "Not

11   good."  What do you mean by that?  Would you just go

12   in their office and hand them a report, something

13   like that?

14        A.   Yep, as simply as that.  If they were quite

15   busy, because they were on the phones because of it

16   being crisis mode, it's just kind of what you see on

17   the email.

18        Q.   Because they were getting it by e-mail,

19   too?

20        A.   Yes.

21        Q.   And I know you brought up these other forms

22   of liquidity a few times without me asking about

23   them.  Are these the sources of liquidity you talked

24   about with defendants' lawyers during that two-hour

25   meeting?

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                       201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                 FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No.  I mean, we did talk about it, but I
 2   was aware of it beforehand.
 3        Q.   You knew the various sources of liquidity
 4   of the company?
 5        A.   Yeah.  That was part of my job.
 6        Q.   So let's look at Exhibit 75.  So this
 7   email, like all of the others, was from you to Mr.
 8   Goldstone and Mr. Simmons, as well as a variety of
 9   other people; correct?
10        A.   Correct.
11        Q.   And it shows beginning cash of $15.6
12   million; is that right?
13        A.   Yes, correct.
14        Q.   And then if you look under today's notables
15   it has a total of $246 million in margin calls.  $196
16   million from Citigroup, $42 million from Greenwich,
17   and a few million from Goldman and UBS.  Do you see
18   that?
19        A.   Yes.
20        Q.   So you've projected the ending cash at $233
21   million as of February 21; is that right?
22        A.   Correct.
23        Q.   Then if we go to the next page of the
24   report or actually go to the report itself on the
25   third page, if we could expand the entire right side
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   from "manual" on over.

2           And first of all, focusing at the top, do

3   you see that margin call portion that you included on

4   all the reports?  So that's where you showed the 254

5   million in margin calls; correct?

6       A.   Correct.

7       Q.   Then you have the cash balance of negative

8   $233 million for that day, the 21st; correct?

9       A.   Correct.

10      Q.   Then if you scroll down the column for

11  every day going forward through April 9, there is a

12  negative projected balance down to about negative $85

13  million on the last days; is that correct?

14      A.   Right.

15      Q.   Now, I'd like to show you Exhibit 74.  Now,

16  Exhibit 75 was sent at 7:38 in the morning.  Can we

17  quickly just go back to Exhibit 75 so we can see that

18  time stamp.  So Exhibit 75 was sent at 7:38 in the

19  morning; is that right?

20      A.   Correct.

21      Q.   Now, going back to Exhibit 74, this is an

22  email that you're sending to Mr. Fellers alone at

23  9:01 a.m. the same day; right?

24      A.   Correct.

25      Q.   So less than 90 minutes after you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2202

1  circulated the liquidity report showing negative $233

2  million projected liquidity; right?

3       A.   Right.

4       Q.   And here there is nothing more than

5  projected through May 2008 on the cover email;

6  correct?

7       A.   Correct.

8       Q.   Then if we go to the third page of the

9  document, which is the report itself, and again, if

10  we expand, let's expand the upper right.  So 90

11  minutes after you had sent out that first liquidity

12  report on February 21, 2008, this liquidity report

13  does not have any margin calls; correct?  Under the

14  margin call column, it's empty.

15       A.   Correct.

16       Q.   That's why, when you look on the right

17  side, you have a positive cash balance of $20

18  million; is that correct?

19       A.   Right.

20       Q.   So the difference between these two reports

21  is simply that this does not include margin calls.

22       A.   Correct.

23       Q.   And if we scroll all the way down to the

24  bottom of the right hand, we see that the projected

25  liquidity ends up being a positive $375 million; is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that right?

2         A.   Correct.

3         Q.   Now, do you recall that on the prior

4    liquidity report from 90 minutes before, on April 9,

5    it showed a projected liquidity of negative $85

6    million?

7         A.   Yep.

8         Q.   And so here on April 9, if we could stay on

9    Exhibit 74, down on April 9 it shows a positive

10   balance of about $375 million; is that right?

11        A.   Yes.

12        Q.   So what is the difference between $375

13   million and negative $85 million?

14        A.   Pretty much the 450, so about 450 in margin

15   calls.

16        Q.   About $450 million?

17        A.   I believe so.

18        Q.   Okay.  So why did you -- first of all, did

19   you personally change the February 21 liquidity

20   report?

21        A.   I did.

22        Q.   And why did you do that?

23        A.   So as kind of -- you made the similar

24   observation.  The other report did not look good in

25   terms of a negative balance.  Nate Fellers came to me

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    and mentioned that we are working with the repo

2    counterparties so that we can actually negotiate with

3    them, and did not want to reflect the margin calls in

4    that other cash report.  So that's why that second

5    report was only sent to Nate.  And I believe he sent

6    that along to the repo counterparties.

7         Q.   Okay.  And again, who did Mr. Fellers

8    report to at this time?

9         A.   It was Clay Simmons and Larry Goldstone.

10        Q.   And you said that Mr. Fellers -- did Mr.

11   Fellers tell you that he wanted a version to send to

12   repo parties without the margin calls in it?

13        A.   Correct.

14        Q.   And did you have an understanding of why he

15   wouldn't want to reflect those margin calls to the

16   counterparties?  By the way, the counterparties are

17   the Wall Street banks; right?

18        A.   Yes.

19        Q.   Did you have an understanding why he

20   wouldn't want to show those to the Wall Street banks?

21        A.   Yeah.  We didn't want them to see the

22   magnitude of what the calling was of the other banks.

23   So during this time, the repo counterparties

24   themselves are -- they're strapped for cash,

25   themselves.  So you know, if they knew that we had

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    lots of margin calls coming in, they themselves might

2    pick up their own in order to try to get as much of

3    it as they could.

4        Q.   Okay.  Let's look at the next day, February

5    22, which is Exhibit 89.  And so here we look at the

6    February 22, 2008, liquidity report.  And it shows

7    beginning cash balance of $10.5 million; is that

8    right?

9        A.   Correct.

10       Q.   And a projected ending cash balance of $51

11   million; is that right?

12       A.   Correct.

13       Q.   Now, these numbers don't factor into

14   account that over $200 million in margin calls were

15   still outstanding on February 22; correct?

16       A.   Correct.  I should mention, though, that

17   these reports are made to be as accurate as possible

18   during the time of the report.  And so at this time,

19   because Nate was negotiating with the repo

20   counterparties, they did pause on the margin calls,

21   and so until the deal was kind of worked out, and

22   that is what's kind of being reflected here in the

23   report.

24       Q.   Okay.  Then let's go ahead and look at the

25   report itself, on the third page of the document.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    And again, just looking at the upper right-hand
 2    portion of the document.  Okay.  So you see that this
 3    is the February 22 liquidity report.  Now, this was
 4    the one that you circulated internally like you
 5    always did right at this time.
 6         A.   Correct.
 7         Q.   So under margin call, that column that
 8    clearly says margin call is empty; correct?
 9         A.   Correct.
10         Q.   And so then you see the beginning cash
11    balance of $10.5 million, with the projected ending
12    balance of $51 million; is that right?
13         A.   Correct.
14         Q.   Now, if we could keep that up, you've been
15    talking about Mr. Fellers providing liquidity reports
16    to the Wall Street banks, but KPMG also reviewed
17    liquidity reports; correct?
18         A.   Correct.
19         Q.   And did Jenni Hall look at liquidity
20    reports during February 2008?
21         A.   Yeah, she did.
22         Q.   And part of what you ended up doing was
23    emailing liquidity reports to Ms. Hall as part of
24    your job; is that right?
25         A.   Correct.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.    Okay.   So if we could, Mr. King, keep that

2  up and move it off to the side, if that's possible,

3  and I want to look at Exhibit 91.   So if we could

4  expand the top.   So this is the same day, so it's

5  dated February 28 in the afternoon.   Do you see that?

6      A.    Yes.

7      Q.    And do you see that it is the February 22

8  liquidity report?

9      A.    Yes.

10      Q.    And it says, "Can you forward this to Jenni

11  and Cynthia?   I don't know their emails or last

12  names."   Now Jenni and Cynthia.   Does that refer to

13  the KPMG auditors?

14      A.    Correct.

15      Q.    And I take it from your email that this

16  time you didn't know their last name and their

17  emails, so you couldn't send the email to them

18  yourself; correct?

19      A.    Correct.

20      Q.    So would this have been the first time that

21  you sent this liquidity report by email to KPMG?

22      A.    By email, yes.   But I believe that -- yes.

23  I was under the impression that Shawn Buniel was

24  sharing it with them beforehand.   And yes, to answer

25  your question by email, yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2208

1      Q.   And when you said you were under the

2  impression that Shawn Buniel was doing that, you were

3  not doing it?

4      A.   I was not.

5      Q.   Okay.  And did Ms. Hall review the reports

6  before this date that you emailed her?

7      A.   Yes, she did.

8      Q.   In what context?  Would she come to your

9  cubicle and you explain what they were?

10      A.   Yes.

11      Q.   Got it.  So it says, "To Ms. Auditors.  The

12  format has changed a little bit.  I had to separate

13  out the other values and give them descriptions so

14  now days can span over 2 to 3 items but hopefully

15  it's still pretty clear.  Let me know if you have any

16  questions."

17           So let's look at the next page which is the

18  report itself, and again I want to expand the top of

19  the document.  Now, first of all, we have the same

20  beginning cash in both of them, but then the

21  projected cash balance is a little bit lower on the

22  left.  Is that an indication that something changed

23  during the day, you know, before 2:00 in the

24  afternoon?

25      A.   It must have.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                  1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                        e-mail: info@litsupport.com

2209

1      Q.   But then under the manual section, you'll

2   notice how on the right side the internal liquidity

3   report, just like every liquidity report we've seen

4   up until now, says, "Margin call."  Do you see that?

5      A.   Yes.

6      Q.   Now this version that you sent to KPMG

7   doesn't say "Margin call."  It says "Notes."  Did you

8   change the reports from margin call to notes?

9      A.   Yes.

10      Q.   Why?

11      A.   Larry wanted more -- Mr. Goldstone wanted

12   more information in the other, so that 33.9 wanted to

13   be able to break it out and actually understood what

14   the other different pieces came from.  The notes, the

15   left-hand side was kind of superior in format because

16   it would allow me to actually put in margin calls

17   plus the CP or the I/O pieces and be able to actually

18   describe it out in multiple lines rather than just

19   limit it to just one call.

20      Q.   To be clear, Mr. Goldstone told you to

21   remove the margin call entry and replace it with

22   notes?

23      A.   No.  To be clear, he asked me to have more

24   descriptors on the other.  The report was already

25   cramped in space.  It was the only solution I could

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                   1-800-669-9492

PROFESSIONAL COURT                          e-mail: info@litsupport.com
REPORTING SERVICE

 1    think of to break it out.

 2        Q.   And on the 22nd, the day after we saw the

 3    negative $233 million suddenly positive, did Mr.

 4    Goldstone or Mr. Simmons ask you, "Hey, why did we

 5    turn positive?  Where did the negative liquidity go?"

 6        A.   Not directly to me.  They were well aware

 7    of what was happening with Nate Fellers and the repo

 8    counterparties.

 9        Q.   So do you remember understanding Mr.

10    Goldstone and Mr. Simmons were well aware of what was

11    going on with the liquidity reports?

12        A.   Yes.

13        Q.   Now, if we look at Exhibit 99, this is the

14    February 25 email to Ms. Hall attaching a liquidity

15    report.  Now, you don't include, when you send the

16    e-mail to KPMG, the information like today's notables

17    and the sort of thing we've seen on the other emails;

18    right?

19        A.   It appears so, yes.

20        Q.   Why didn't you do that?

21        A.   I don't think any reason.  I think they

22    were just asking for the actual report itself, so I

23    just sent them just the report.

24        Q.   Then we look at the attached liquidity

25    report.  Nothing -- if we look at the upper

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                           (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1     right-hand side, nothing on this liquidity report has

 2     any indication of nearly $100 million of a Citi

 3     margin call still being owed; correct?

 4          A.   Correct.

 5          Q.   Then if we go to Exhibit 110, so this is

 6     the February 26 email with the liquidity report.  And

 7     there you talk about P&I days where some money came

 8     in, et cetera.  Do you see that?

 9          A.   Correct, yes.

10          Q.   But again, not containing today's notables

11     and the other section, like you said before?

12          A.   Correct.

13          Q.   And if we look again at the liquidity

14     report on the next page, again, there is nothing to

15     indicate anywhere, including the upper right, that a

16     large portion of Citi margin call remained unpaid on

17     February 26; correct?

18          A.   Correct.

19          Q.   Then on February 27, Exhibit 124.  So this

20     is the day before the 10-K was filed; correct?  Do

21     you remember?

22          A.   No, I don't.  I'll take your word for it.

23          Q.   So again, forwarding the liquidity report

24     here without comments, and then again, if you look at

25     the liquidity report itself in the upper right

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2212

1    column, is there anything here to indicate that still

2    on February 27, 2008, hours before the 10-K was to be

3    filed, that Thornburg still had not paid $75 million

4    of a Citibank margin call?

5         A.   No.

6         Q.   Let's look at Exhibit 129.  Do you remember

7    whether, after the 10-K was filed, you stopped

8    forwarding liquidity reports to KPMG?

9         A.   I don't recall.

10        Q.   Do you remember that there was a

11   restatement in March of 2008?

12        A.   I do.

13        Q.   Do you remember or were you involved with

14   KPMG getting copies of liquidity reports from

15   February as part of the restatement process?

16        A.   So dates become kind of vague to me during

17   this whole time.  There were Jenni and team would

18   come up and audit the liquidity reports and ask for a

19   particular day's.  If they requested it, I provided

20   that, as necessary.  I don't know if it was before or

21   after the 28th, or not.

22        Q.   But at some point in there, you remember

23   giving KPMG copies of liquidity reports?

24        A.   Yes.

25        Q.   And you would expect that those would show

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    up in KPMG's files?

2        A.   Correct.

3        Q.   Let's look at Exhibit 129, which is the

4    February 28 liquidity report.  So I'll represent to

5    you that the 10-K was filed just a couple of hours

6    before this email.  If you look here it says,

7    "Beginning cash, $38.2 million."  Do you see that?

8        A.   Yes.

9        Q.   "Beginning agency zero."  So the beginning

10   cash/agency is $38.2 million; is that right?

11       A.   Correct.

12       Q.   Now, under today's notables, are there any

13   margin calls listed under today's notables?

14       A.   There is not.

15       Q.   Okay.  And so then there is a projected

16   ending cash of $109 million; is that right?

17       A.   Correct.

18       Q.   Why weren't there any margin calls included

19   in the February 28 liquidity report?

20       A.   I'm not too sure.  I'm assuming that there

21   were no margin calls, but I'm unaware.

22       Q.   Let's check that assumption.  Let's look at

23   Exhibit 142.  So on February 28 at 7:23 a.m., so that

24   was before, about an hour before your liquidity

25   report, Mr. Fellers wrote to Mr. Goldstone and Mr.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492



1-800-669-9492
PROFESSIONAL COURT                                e-mail: info@litsupport.com
REPORTING SERVICE

2214

 1    Simmons with the subject, "Important," in all caps,

 2    "Update."  Do you see that?

 3         A.   Yes.

 4         Q.   Then it says, "I've had calls with Merrill,

 5    Bear, and Citi, and will continue to make the rounds.

 6    The calls are generally positive, but there is

 7    definitely an undertone of fear.  I think the filing

 8    has sparked a collateral grab situation."  Do you see

 9    that?

10         A.   Yes.

11         Q.   Then it says, "Margin calls today.  Morgan

12    Stanley, $4.7 million.  UBS, $61.5 million.  IXIS, $9

13    million.  Greenwich, $18 million.  Citi, $36 million.

14    Goldman, $4.5 million.  JPMorgan, $25 million."  Do

15    you see those?

16         A.   Yes, I do.

17         Q.   I can tell you that I used a calculator

18    last night.  That total is $158.7 million of margin

19    calls received on February 28, 2008.  Does that

20    number look correct to you?

21         A.   Yes, roughly.

22         Q.   So Mr. Fellers didn't tell you about the

23    margin calls received that morning?

24         A.   He did not.

25         Q.   Mr. Stanhope, Mr. Feldman -- they didn't

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2215

1    tell you about the margin calls received that

2    morning?

3         A.   He did not.  But typically to produce these

4    liquidity reports, they take some time to actually

5    update and make -- I mean, the time stamps, even

6    though you state it's an hour before, it takes me

7    about an hour and a half to produce these reports.

8    It may just be a difference in timing.

9         Q.   Do you remember learning about these margin

10   calls at some point?

11        A.   I do.  Afterwards, yes, I don't know if it

12   was exactly on the day of the 28th or the 29th.

13        Q.   Let's keep Exhibit 142 up on one side of

14   the screen, and if we go back to Exhibit 129.  So on

15   the prior liquidity reports we've seen the margin

16   calls simply subtract from the projected ending cash;

17   correct?

18        A.   Correct.

19        Q.   All right.  And so the margin calls

20   received on February 28, 2008, were in the amount of

21   $158.7 million.  If you subtract that from

22   Thornburg's projected ending cash on February 28,

23   what number do you arrive at?

24        A.   You said it was $158.

25        Q.   $158.7.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                     1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1         A.    So it would be a negative $49 million.
 2         Q.    Negative $49 million on February 28, 2008.
 3    And then again, Mr. Goldstone is recipient and Mr.
 4    Simmons is a recipient of both of those emails;
 5    correct?
 6         A.    Correct.
 7               MR. BLISS:  No further questions.
 8               THE COURT:  Thank you, Mr. Bliss.
 9               Do Mr. Goldstone and Mr. Simmons have
10    cross-examination, Mr. Lee?
11               MR. LEE:  Yes, Your Honor, thank you.
12               THE COURT:  Mr. Lee.
13               MR. LEE:  And Your Honor, with the Court's
14    permission, at some point in the examination we'd
15    like Mr. Ahn to draw a diagram on the board there.
16               THE COURT:  That's fine.
17               MR. LEE:  May I move the board now in
18    position?
19               THE COURT:  You may.
20                    CROSS-EXAMINATION
21    BY MR. LEE:
22         Q.    Good afternoon, Mr. Ahn.  Did Mr. Goldstone
23    ever tell you to change the format of the liquidity
24    reports in order to hide margin call information from
25    KPMG?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   He did not.

2        Q.   Did Mr. Simmons ever tell you to change the

3   format of the liquidity reports in order to hide

4   information from KPMG?

5        A.   He did not.

6        Q.   Did anyone at Thornburg tell you to change

7   the format of the liquidity reports in order to hide

8   information from KPMG?

9        A.   No one did.

10       Q.   Do you have any reason to believe that Mr.

11  Fellers wanted you to change the format of the

12  liquidity report in order to hide information from

13  KPMG?

14       A.   No, he did not.

15       Q.   And did Mr. Goldstone ever tell you at any

16  point during your four years at Thornburg to conceal

17  any information from KPMG?

18       A.   No, never.

19       Q.   Did Mr. Simmons ever tell you at any point

20  during your four years at Thornburg to conceal

21  information from KPMG?

22       A.   No, he did not.

23       Q.   And do you have any reason to believe that

24  Mr. Fellers ever intended for you to conceal

25  information from KPMG?

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                               201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

2218

1          A.   He did not, either.

2          Q.   Now that we've established that, I'd like

3    to go back and ask you some background questions.  As

4    Mr. Bliss elicited, we've met before; right?

5          A.   Correct.

6          Q.   And even though the SEC called you as a

7    witness in its case, you're aware that we, on behalf

8    of Mr. Goldstone and Mr. Simmons, also intended to

9    call you as a witness in our case; right?

10         A.   Correct.

11         Q.   And you're aware that we reached an

12   agreement with the SEC so that you can do all of your

13   testimony at once, so that you don't have to come

14   back; right?

15         A.   Yes.  I'm a popular guy.

16         Q.   I'd like to start by talking just a little

17   more about the structure and organization of the

18   capital markets group.  If you could just tell us

19   generally just kind of, you know, what the capital

20   markets group did and the different functions and

21   groups within capital markets.

22         A.   So I would say the head of capital markets

23   was Nate Fellers, whom we've mentioned quite a bit.

24   And it was broken down into three sections,

25   functions.  So there was analytics, kind of what I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    was part of, and a couple others.  Then there was

2    more of the market-facing, which was Pat Feldman and

3    Xen Stanhope and a few others.

4            And then there was those related to loan

5    origination, and I don't think those names came up.

6    I don't think we have to mention them.

7        Q.   Then more specifically, with respect to the

8    analytics group, that was the group that you were in?

9        A.   Yes.

10       Q.   What did the analytics group do?

11       A.   Everything that had to be done.  So if it

12   required advance modeling, then, you know, we

13   performed the numbers and calculated them.  And so it

14   ranged from liquidity reports, earnings models, ALCO

15   reports, which I mentioned earlier, any of those kind

16   of items.

17       Q.   And do you remember the names of the people

18   who worked in the analytics group during, say, late

19   2007 and early 2008?

20       A.   Yeah, so that would be Kyle Rhoades, who as

21   I mentioned was my manager.  There was me.  There was

22   Dwight Burks, Devona Benavidez, and Perry Martin.

23       Q.   And then how about the market-facing group?

24   Can you just describe a little bit more what the

25   market-facing group did?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Yeah, they called up all those repo

2  counterparties or CP counterparties, CP being

3  commercial paper, and kind of getting a gauge of

4  activity, what they were concerned about, margin

5  calls, as mentioned, those kind of things.

6      Q.   And do you recall who worked in the

7  market-facing group at capital markets in the late

8  2007, early 2008 time frame?

9      A.   I do.  So that was Xen Stanhope, Pat

10 Feldman, Deborah Gage.  Yeah, Deborah Gage, and Dan

11 Petrush.

12     Q.   Then finally you mentioned the third group

13 was the loan origination group?

14     A.   Correct.

15     Q.   Generally at a high level, what did they

16 do?

17     A.   They kind of helped with purchasing of

18 mortgages and originating of mortgages.  That's

19 pretty much right.

20     Q.   And do you recall who worked in that group

21 in late 2007, early 2008?

22     A.   Yes, John Dowell and Blake Gordon.  Sorry.

23 I forgot her last name.  She got married so I have a

24 hard time remembering.

25     Q.   And all of these folks reported directly or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    indirectly to Mr. Fellers?

2         A.   Right.

3         Q.   And I take it the capital markets groups

4    offices were located at Thornburg's headquarters?

5         A.   Yes.

6         Q.   In Santa Fe?

7         A.   Yes.

8         Q.   Now, just to focus a bit more on the

9    analytics group and the work that you did, you talked

10   about earnings reports or earnings models?

11        A.   Correct.

12        Q.   Can you describe what the earnings models

13   were and what the purpose was?

14        A.   Yeah.  So it's just an attempt to see how

15   much the company would make over a set time period,

16   usually about three years, based on kind of current

17   market situations and assumptions by management and

18   projecting what the income would look like over that

19   time period.

20        Q.   And how often did you prepare those kind of

21   reports?

22        A.   About monthly.

23        Q.   And how about -- you mentioned the ALCO

24   reports.  What were those?

25        A.   ALCO, again, asset liability committee.  So

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                            e-mail: info@litsupport.com

1    anything that had to do really with risk would be

2    present inside of those reports.

3         Q.   Could you be a little more specific?

4         A.   Yeah.  So the main report that we would

5    generate is one that was called duration report.  And

6    what that pretty much says is how sensitive the

7    entire portfolio would be to a change in interest

8    rates.  And we have other reports like liquidity

9    reports, the interest rate kind of market overview,

10   so how much has the markets actually changed since

11   the last time we met in ALCO, and a whole bunch of

12   kind of reports related to the loan origination, too.

13        Q.   And then you referenced the ALCO meetings,

14   as well; is that right?

15        A.   Yes.

16        Q.   ALCO stands for the asset liability

17   committee; right?

18        A.   Correct.

19        Q.   So you prepared ALCO reports for the ALCO

20   committee?

21        A.   Correct.

22        Q.   Could you describe who was on the ALCO

23   committee and what its purpose and function was?

24        A.   Almost everyone of a high-ranking official

25   would be present.  So Larry Goldstone, Clay Simmons,

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                1-800-669-9492
                                                        e-mail: info@litsupport.com




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   Nate Fellers.  I would be present, and many others.

 2        Q.   And what was the purpose of that committee?

 3        A.   Again, to just review the contents of the

 4   ALCO packet and to go over, really, anything that has

 5   to do with the threats to the company, risks.

 6        Q.   When you say threats or risks to the

 7   company, what do you mean?

 8        A.   Interest rate risks.  Anything that is just

 9   really the hot topic of that particular time.  So it

10   depends.  I mean, it was a very open discussion

11   about, we're about to do a securitization pricing.

12   What do we need to be worried about?  Really, just --

13   it was all over the place.  It was very

14   comprehensive.

15        Q.   And you mentioned the duration reports.

16   Why did you keep track of -- what was the purpose of

17   a duration report?

18        A.   Duration report was to kind of assess our

19   risk to a change in interest rates, so kind of if you

20   hear in the news about the fed chairman, which at

21   that time was Greenspan, and him changing rates, that

22   could have an effect on how the portfolio is valued.

23   So capturing that requires pretty heavy analytics, so

24   it had to be viewed and we would have to hedge our

25   risk, if necessary.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   How often did the ALCO committee meet?

2      A.   Weekly.

3      Q.   You said there were a bunch of kind of top

4   managers, I think is what you said.  Can you recall

5   approximately how many people would typically attend

6   an ALCO meeting?

7      A.   A lot, because ALCO was typically not

8   limited.  It was really anybody who wanted to join

9   could join, and it became the place to be.  So it

10  would get so full that there would be people standing

11  around to just listen in.

12     Q.   So these weren't limited to a small select

13  group of people?

14     A.   It was not.

15     Q.   And you described a little bit with Mr.

16  Bliss the nature or degree of your interactions with

17  Mr. Simmons and Mr. Goldstone.  Could you describe a

18  little more specifically -- let's start with Mr.

19  Simmons.  What would typically be the reasons that

20  you would have interaction with him?

21     A.   So if I was doing any runs on the earnings

22  model, or I just typically had any concerns with any

23  of the reports, I would walk into his office and

24  discuss it.  The most time we would actually

25  communicate with each other is whenever these

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                           (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492
                                                                         1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                        e-mail: info@litsupport.com

1    earnings models were being produced, which were on a

2    monthly basis.

3         Q.   Then the same question as to Mr. Goldstone.

4    Could you describe generally the types or reasons

5    that you would have interactions with him?

6         A.   Yes.  Similar things.  So anything that had

7    to do with ALCO packets, if he wanted to see changes,

8    but again primarily when we would do runs of the

9    earnings model, I would go in there and ask him what

10   he would like to see and change accordingly.

11        Q.   And I think if I'm counting correctly, Mr.

12   Rhoades, Mr. Fellers, Mr. Simmons, and Mr.

13   Goldstone -- there were either three or four levels

14   of managers between you and Mr. Goldstone?

15        A.   Correct.

16        Q.   Is that right?  But you were still able to

17   go and approach and talk to Mr. Goldstone directly.

18        A.   Oh, absolutely.  He was very approachable,

19   always has his door open, and that was never a

20   concern.

21        Q.   And the same with Mr. Simmons.  He was at

22   least three levels -- two or three levels above you.

23   Were you able to approach him directly?

24        A.   Yes, very much so.

25        Q.   And was his accessibility similar to that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    of Mr. Goldstone?

2         A.   Yes, definitely.

3         Q.   And you worked with each of them for

4    approximately four years?

5         A.   Yes.

6         Q.   Could you describe Mr. Simmons' style and

7    approach as a manager, as your manager?

8         A.   Mr. Simmons?

9         Q.   Mr. Simmons.

10        A.   Yeah, so Mr. Simmons is very smart and very

11   intelligent and very experienced.  And so I would say

12   that he's very highly principled in the sense that he

13   wants to get the clear message out of what's right.

14   And when it kind of comes to the entire room saying

15   it should be one way, he's the one guy that would

16   come up and say, "No, this is how it should be," and

17   change it.

18             And for me, that was kind of how I see Mr.

19   Simmons, is the one that he could impressively kind

20   of stand up and say things should kind of change.

21   And that came a lot from his kind of experience, from

22   the background, being working at Thornburg and

23   Countrywide before that.  He was just very, very

24   smart.

25        Q.   And then the same question with respect to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    Mr. Goldstone.  Could you describe generally his
 2    approach as a manager and your experience with him as
 3    your manager?
 4         A.   Yeah.  So Larry is probably more of a --
 5    he's a leader, so he's very charismatic, very
 6    personable.  Everybody is friends, you could say.
 7    And he's very good at kind of unifying the entire
 8    company to kind of follow his vision.  And that's
 9    what he's very good at.
10         Q.   How would you describe the overall kind of
11    corporate culture, if you will, at Thornburg?  Just
12    what was it like as a place to work?
13         A.   It was a fantastic first job.  It was very
14    flat, despite there being two or three levels of
15    management above me.  It was very open.  ALCO was
16    open.  I mean, I learned a lot from Thornburg.  It
17    was a lot of work.  It was tough.  Everyone worked
18    hard, and everyone played hard together, and it was
19    one of the best jobs I've had.
20         Q.   And when you say it was very flat, what do
21    you mean?
22         A.   Flat in the sense that typically when you
23    want to go approach somebody of that level, you would
24    have to go to a manager and get an okay and then go
25    to the next level, and so on and so on.  But
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2228

1    everybody's doors were open, and everything was very

2    exposed, and it was very easy.

3         Q.   Could you describe a little the physical

4    layout?  I'll have you draw it in a second, but if

5    you could just describe the physical layout of the

6    capital markets department.

7         A.   So the third floor was primarily where we

8    all were, and there were pretty much just cubes,

9    cubicles, really, and walls that were really just

10   above your chest that wrapped around the entire

11   group.  The only ones that really had offices were,

12   like, Nate Fellers and Clay Simmons and Larry

13   Goldstone.

14        Q.   And where was capital markets in relation

15   to other departments at the company?

16        A.   Yeah, so there was accounting kind of

17   around the corner.  And then just next to us was the

18   securitization department, and then a lot of kind of

19   further offices along the wall.  And then everything

20   that had do with origination was on the second floor.

21        Q.   So the third floor was capital markets and

22   accounting?

23        A.   Yes, and securitization.

24        Q.   And securitization, okay.  And were the

25   departments physically segregated, or was it

SANTA FE OFFICE                                                                          MAIN OFFICE
119 East Marcy, Suite 110                                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                               Albuquerque, NM 87102
(505) 989-4949                                                                            (505) 843-9494
FAX (505) 843-9492                                                                   FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1    basically sort of continuous?

 2         A.   It was continuous.  The only segregation we

 3    had was that low wall, low cubicle wall.

 4         Q.   And each of the capital markets -- did it

 5    look a little like a trading floor?  Did everyone

 6    have kind of modern terminals?

 7         A.   Yes, correct.

 8         Q.   So could you -- if you were walking on the

 9    floor, could you look over the cubicles and sort of

10    see what was going on?

11         A.   Yes.  Unfortunately, yes.

12         Q.   And just describe a little more if you

13    walked onto the third floor of Thornburg Mortgage in

14    2008, what the sort of scene would have looked like.

15         A.   Yeah, so kind of, like, everyone just

16    sitting around and working on their monitors.  The

17    way it is, is that if you walked on the third floor,

18    you could pretty much just walk by us.  Just to get

19    to accounting, you would have to go around the corner

20    and you would walk by capital markets, and

21    unfortunately, like I said, you could see my screen

22    and everybody else's screens, but that was kind of

23    the layout, yeah.

24         Q.   Now, I think now would be as good a time as

25    any, with the Court's permission, I'd like to ask Mr.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492
                                                                          1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

2230

```
 1    Ahn if he could just do a diagram of the third floor
 2    offices as best he can.
 3            THE COURT:  He may.
 4       A.   I'll do my best.  So this was kind of
 5    accounting department.  This was kind of the hallway.
 6    Right here would be Nate Fellers' office.  Right here
 7    was somebody else's office, and this was Larry's
 8    office.  There may have been another office.  I may
 9    have gotten that wrong, but right here is kind of a
10    stairway, and right here was capital markets.  And
11    capital markets was consisting of really three
12    sections.  And the openings were all here, and all of
13    these were very low bearing walls, and right here was
14    securitization.  And along this wall here would be
15    Clay's office, and a few other offices over here.
16    And so in order to get to accounting, you pretty much
17    had to go like that.
18       Q.   And where was your cubicle?
19       A.   Right here.
20       Q.   Then how about your manager, Mr. Rhoades?
21       A.   Yeah, so just to lay everybody out, Mr.
22    Rhoades would be right here.  The two members that I
23    had mentioned that was kind of more with origination
24    would be right here.  Here was more of other analytic
25    members here, and then right here was kind of the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    market-facing individuals.  So when I said that I
 2    would just pop my head up, I would just -- you
 3    know...
 4         Q.   And then was there an elevator onto the
 5    floor?
 6         A.   There was.  So the elevators are over here.
 7    There were some other cubes over here, but to get to
 8    it, typically IT, to get through it, you have to get
 9    past IT and come all the way out.
10         Q.   Could you just initial that and put today's
11    date on it?
12         A.   What is today?
13         Q.   The 15th.
14         A.   15th.
15         Q.   And the diagram that you've just drawn --
16    that is a fair and accurate representation of the
17    Thornburg third floor as it existed in early 2008?
18         A.   Yes.
19              MR. LEE:  Your Honor, we'd offer that into
20    evidence.
21              THE COURT:  Any objection, Mr. Bliss?
22              MR. BLISS:  No objection at all, Your
23    Honor.
24              THE COURT:  What do we make this?  Do you
25    have a number on it?
```

SANTA FE OFFICE                                         MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1              MR. McKENNA:  Your Honor, we can mark it as
2       Exhibit QE.
3              THE COURT:  Defendants' Exhibit QE will be
4       admitted into evidence.
5              (Defendants' Exhibit QE admitted.)
6              MR. McKENNA:  May I approach?
7              THE COURT:  You may.
8              MR. McKENNA:  Your Honor, before I start a
9       new topic, would now be an appropriate time for a
10      restroom break?
11             THE COURT:  If you'd like.  All right.
12      We'll be in recess for a few minutes.
13             All rise.
14             (The jury left the courtroom.)
15             THE COURT:  All right.  Anything we need to
16      discuss?
17             MR. McKENNA:  No, thank you.
18             MR. LEE:  No, thank you, Your Honor.
19             THE COURT:  We'll be in recess for a few
20      minutes.
21             (The Court stood in recess.)
22             THE COURT:  All right.  Anything we need to
23      discuss before we bring the jury in?
24             MR. McKENNA:  No, thank you.
25             THE COURT:  Mr. Lee?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. LEE:  No, Your Honor.

 2              THE COURT:  All rise.

 3              (The jury entered the courtroom.)

 4              THE COURT:  All right.  Everyone be seated.

 5              All right, Mr. Ahn, I'll remind you that

 6    you're still under oath.

 7              Mr. Lee, if you wish to continue your

 8    cross-examination of Mr. Ahn, you may do so at this

 9    time.

10              MR. LEE:  Thank you, Your Honor.

11              THE COURT:  Mr. Lee.

12         Q.  (By Mr. Lee)  Mr. Ahn, I'd like to now ask

13    you some questions about KPMG.  All right?  While you

14    were working for Thornburg, did you have regular

15    interactions with KPMG auditors?

16         A.  Yes, I did.

17         Q.  Could you describe just generally the

18    nature and extent of your dealings with KPMG?

19         A.  So typically anything I produced, or they

20    need any explanation of analytics, they would just

21    stop by my desk and ask for particular reports or

22    we'll just go through it.  Occasionally they'd send

23    email and I would share whatever information I could.

24         Q.  Were there particular people at KPMG whom

25    you dealt with most frequently?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2234

1      A.   I dealt with a multitude of them, but the
2    one that I remember the most is Jenni Hall.   In fact,
3    the only one I remember is Jenni Hall.
4      Q.   That's the only one you remember
5    specifically by name?
6      A.   Specifically.   There were always a lot of
7    new faces coming through each time.   So it seems like
8    she was the only consistent one I would see.
9      Q.   And you said that members of KPMG would
10   just stop by your cubicle to ask for information;
11   right?
12     A.   Correct.
13     Q.   When you received a request like that, did
14   you have to go and ask permission from anybody at
15   Thornburg in order to respond to the request?
16     A.   No, it was generally just share whatever
17   was available.   It was quite open.
18     Q.   And how did you know that you had that
19   authority to be able to provide information directly
20   to KPMG without going through your manager or asking
21   permission?
22     A.   Typically, I think it was more by example.
23   So Kyle Rhoades was very much that kind of mentality,
24   which was share what we have, and so I followed by
25   example.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Q.    And did you have any general understanding

2    as to the availability of information that was to be

3    provided to KPMG from capital markets?

4          A.    No, I can't think of a time when I was

5    really restricted to share anything.  So it was

6    pretty much just share what I had.

7          Q.    Do you recall ever being asked not to share

8    anything with KPMG?

9          A.    No.

10         Q.    Do you recall ever receiving a request from

11   anybody from KPMG where you were told by somebody at

12   Thornburg not to respond or provide the requested

13   information?

14         A.    No.

15         Q.    And just generally, can you estimate how

16   often you dealt with somebody from KPMG, say, during

17   the audit period of early 2008?

18         A.    So during the January and February time

19   frame?

20         Q.    Yes.

21         A.    So yes, because we were kind of in crisis

22   mode, they would come up quite frequently, pop up

23   quite frequently at my desk, asking for the liquidity

24   report or what's been going on, and I would share

25   what I knew.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Did KPMG have offices at Thornburg?
 2        A.   I don't think so.  I know they were located
 3   somewhere on the second floor, but I don't know if
 4   they were placed in an office or not.
 5        Q.   But they had a work space on the second
 6   floor?
 7        A.   Yes.
 8        Q.   And was the second floor part of the
 9   overall Thornburg space?
10        A.   Yes, correct.
11        Q.   And were there any restrictions on the
12   ability of anyone from KPMG to walk through or around
13   the third floor?
14        A.   Not that I know of, no.
15        Q.   Did you see KPMG auditors walking freely
16   around the third floor during the January and
17   February time frame?
18        A.   Yeah, all the time.  Frequently, yes.
19        Q.   Did you see members of KPMG walking to the
20   accounting department during the January and February
21   time frame?
22        A.   Yes.
23        Q.   And if you could just, with the Court's
24   permission, show on the chart the jury where and how
25   you would see KPMG auditors walk to accounting.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  You may.
 2       A.   So because the elevators are here, they
 3  would all typically come down here and go to
 4  accounting, or go the long way.  Either way, they
 5  passed right by me.
 6       Q.   Okay.  Thank you.  Do you know or did you
 7  ever see Ms. Hall dealing with other members of
 8  capital markets?
 9       A.   Yes, frequently.
10       Q.   Whom did you see her dealing with most
11  often?
12       A.   Almost equal time with everybody.  I mean,
13  she talked to Kyle Rhoades, Xen Stanhope, Pat
14  Feldman, Nate Fellers, almost everyone.
15       Q.   And did you ever see any occasion in which
16  Ms. Hall dealt with somebody else at Thornburg, and
17  somebody else at Thornburg would not respond to a
18  request from Ms. Hall?
19       A.   No.
20       Q.   Do you recall ever seeing an occasion where
21  people at Thornburg were talking, or you and your
22  colleagues at capital markets were talking, and you'd
23  stop talking because KPMG was in the room?
24       A.   Probably because we were talking about
25  inappropriate things, but not related to work, but...
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com




1    Q.   And did you have -- did you ever socialize

2    with people from KPMG?

3    A.   Yeah.  I actually liked Jenni Hall quite a

4    bit.  And there was a time that we actually -- after

5    everything happened, we actually went out for drinks

6    together.

7    Q.   How about Ms. Reinhart?  Did you ever see

8    her on the third floor of Thornburg?

9    A.   No, never.  I actually have no idea what

10   she looks like to this day.

11   Q.   Now, we talked about the liquidity reports,

12   and I think you testified that you provided the

13   liquidity reports to KPMG; correct?

14   A.   Correct, yes.

15   Q.   And you began providing them to KPMG by

16   email at a certain date; right?

17   A.   Correct.

18   Q.   And Mr. Bliss showed that to you?

19   A.   Correct.

20   Q.   Before that date, do you recall providing

21   the liquidity reports to KPMG?

22   A.   I do.

23   Q.   And how do you recall providing those

24   reports to KPMG?

25   A.   More in person, so -- because it was kind

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



1    of crisis time, and they were all over the place,

2    they would stop by my desk pretty often, and I would

3    provide a printed-out report to them and discuss it

4    with them.

5        Q.   And do you recall how often you provided

6    the liquidity reports to KPMG?

7        A.   As frequently as they asked.  So again, I

8    don't know exactly specifics, if it was exactly

9    daily.  But whenever Jenni Hall stopped by, she would

10   say, "Reports?"  And I would provide it.

11       Q.   Were there ever any requests for reports

12   for a particular day that you didn't provide to KPMG?

13       A.   No.

14       Q.   And when you -- I think you testified you

15   first started creating these reports in January, late

16   January or so?

17       A.   Correct.

18       Q.   When you started creating these reports,

19   did you explain them to KPMG?

20       A.   Yes.  So I believe I explained them almost

21   over three times to particular individuals at KPMG,

22   for lack of a better term, their minion, the lackeys

23   would come up and often ask me, and I would have to

24   walk them through it from left to right.  And I did

25   that at least three times.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And so you explained exactly what -- how
 2   they were calculated, or how they were prepared, the
 3   contents, how to read them, and so on?
 4        A.   Yes, correct.
 5        Q.   Did you provide that explanation to Ms.
 6   Hall?
 7        A.   Yes.
 8        Q.   And what do you recall about that?
 9        A.   Like I said, the reason why I liked Jenni
10   was because she was competent.  She could actually
11   follow.  So kind of showing her things were easier,
12   and she got it.  She walked away understanding what
13   the report was.
14        Q.   So at least you had the understanding and
15   impression that Ms. Hall understood the reports?
16        A.   Correct.
17        Q.   And understood how to read them?
18        A.   Correct.
19        Q.   How about other members of KPMG?  Did you
20   have the understanding that they understood how to
21   read the reports?
22        A.   I got a lot of yeses, but you know, it's
23   unclear exactly how much they understood.  They were
24   fairly green, I would say.  Typically kind of felt
25   like straight out of college, so a lot of explanation
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   would be necessary.
 2        Q.   Did Ms. Hall ever say anything or do
 3   anything to indicate that she didn't understand the
 4   reports?
 5        A.   No.
 6        Q.   By the way, just one sort of background
 7   question I forgot to ask.  During January and
 8   February of 2008 was Thornburg experiencing IT,
 9   information technology, issues?
10        A.   Yes, I believe there were some issues kind
11   of with the data.
12        Q.   What do you recall about that?
13        A.   We were kind of going through this
14   transition period where we were taking data tables
15   and trying to make them more universal.  And at the
16   time, it sounded great, but it was very much a pain.
17   It made pulling data a little bit harder.  So I think
18   I mentioned earlier these reports take me a few hours
19   to do them, mainly because the data was not as
20   readily available as it once was.
21        Q.   What did you understand the purpose was of
22   this change in IT?
23        A.   A lot of it was kind of more for the
24   origination programs, which are I don't think
25   anything really related to what we're talking about.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    But the idea was, as we were growing, to try to make

 2    a more -- better universal underlying data table.

 3    And that was the extent of what we were trying to do.

 4         Q.   Now, if we can show you Defendants' Exhibit

 5    HT.  Now, Mr. Ahn, this is a document you are not on,

 6    although you are mentioned by name.  Exhibit HT is a

 7    KPMG workpaper entitled "Test of operating

 8    effectiveness in liquidity risk reports."  Do you see

 9    that?

10         A.   Yeah.  They butchered my name.

11         Q.   They did indeed.  In the sample size

12    selection, it says, "KPMG obtained the daily

13    liquidity report from Rallof Ann."  And if we can go

14    to the second page.  And if we could go to the second

15    page, you see it's a list of reports that were

16    provided to KPMG?

17         A.   Yes.

18         Q.   Do you recall providing those reports to

19    KPMG?

20         A.   I do.

21         Q.   How is it that you recall that?

22         A.   I'm sorry, I couldn't hear that over the

23    cough.  Say again.

24         Q.   I'm sorry.  I asked, do you recall

25    providing those reports?

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                  1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

```
 1        A.    I do.

 2        Q.    To KPMG?

 3        A.    Yes.

 4        Q.    And how is it you recall providing that

 5   collection of reports to KPMG?

 6        A.    I remember that somebody stopped by my desk

 7   and pretty much asked for each one of them, so I

 8   printed each one of them out and provided them.

 9        Q.    Was that the first time that you had

10   provided those reports to KPMG?

11        A.    In a mass fashion like this, might have

12   been.  In fact, if I recall, they had some dates and

13   there were just some dates that were missing.  I just

14   had to fill in the gaps.

15        Q.    Now, Mr. Bliss asked you about the change

16   in the format of the liquidity reports.

17        A.    Yes.

18        Q.    Did you explain to KPMG that you had

19   changed the format of the reports?

20        A.    I did.

21        Q.    Whom did you explain that to?

22        A.    Specifically whom I don't recall.  I

23   definitely did lay it out in the email to Jenni Hall.

24   But in person, I don't recall exactly who.

25        Q.    But you do recall explaining it in person
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2244

```
 1   to somebody at KPMG?

 2        A.   Yes, they would always stop by during that

 3   time and ask questions, and so I would relay that

 4   information.

 5        Q.   And if we can go to Exhibit 99, please.

 6   This is an email from you to Ms. Hall that Mr. Bliss

 7   showed you from February 25 transmitting a liquidity

 8   report; is that right?

 9        A.   Yes.

10        Q.   And you write, "Sorry for the delay.  The

11   power outage broke my computer."  Do you see that?

12        A.   Yes.

13        Q.   Do you recall what you were referring to?

14        A.   Yeah.  As I'm sure the jury knows, Santa Fe

15   gets some epic rainstorms and occasionally knocks out

16   our power, and this was one of those days.

17        Q.   And do you recall Ms. Hall responding to

18   you?

19        A.   I believe she did.  I don't remember

20   exactly what she says.

21        Q.   Would it refresh your recollection to see

22   her response?

23        A.   Yes.

24             MR. LEE:  Your Honor, may I approach?

25             THE COURT:  You may.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   (By Mr. Lee)  Do you have in front of you
 2   an email response from Ms. Hall to you?
 3        A.   I do.
 4        Q.   And does that refresh your recollection as
 5   to what she said?
 6        A.   Yes, it does.
 7        Q.   And how did she respond to your email to
 8   her about the power outrage?
 9        A.   Read it out?
10        Q.   If it refreshes your recollection, yes.
11        A.   Sure.  She says, "No problem.  Thanks for
12   sending.  It must have been the giant cash balance
13   that caused the power outage.  Smiley face."
14        Q.   What was that?
15        A.   Smiley -- emoticon.
16        Q.   And what did you understand her to be
17   meaning when she wrote that email in response to you?
18        A.   That she understood that the cash came in,
19   and that's what could have caused the power outage.
20        Q.   Now I want to show you, if we can pull up,
21   side by side, two of the liquidity reports that Mr.
22   Bliss showed you, Exhibits 74 and 75.  These are both
23   dated February 21, and these are different formats of
24   the same liquidity reports.  Do you recall that?
25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And they had -- one had margin calls and
 2   the other didn't?  Do you recall that?
 3        A.   Yes, correct.
 4        Q.   Now, if we can look at the first page of
 5   each liquidity report and kind of blow up the upper
 6   right-hand corner of each.  Now, Mr. Bliss pointed
 7   out the fact that one of them has a margin call and
 8   the other doesn't.  Do you see that?
 9        A.   Yes.
10        Q.   Take a look at the column that's titled
11   "Equity raise."  Do you see they're different?
12        A.   Yes.
13        Q.   And the one with the margin calls has four
14   entries, and the other one has additional entries.
15   Do you have an understanding as to why you changed
16   that part of the report, as well?
17        A.   I don't recall specifically.  I'm assuming
18   that more information was obtained from -- between
19   the timing of the two reports.
20        Q.   And again, did you make that change in the
21   report with the intent of deceiving anyone?
22        A.   No.
23        Q.   Now, okay, we're done with that.  Now, you
24   testified that Mr. Fellers asked you to change the
25   report in order to be able to provide a version of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2247

1    the new report, the report without the margin calls

2    to the lenders; correct?

3         A.   Correct.

4         Q.   And you testified that your sort of

5    understanding was that he didn't want each lender to

6    know about the total volume of margin calls?

7         A.   Correct.

8         Q.   And did that concern you at all at the

9    time?

10        A.   Yeah.  I mean, the amount of margin calls

11   did concern me, yes.

12        Q.   I meant that the change in format for

13   that --

14        A.   No.  I mean, that makes total sense as to

15   why he was doing that.

16        Q.   And why does it make total sense?

17        A.   The repo counterparties don't talk to each

18   other, right, so the idea is you want each of them to

19   kind of be able to see an unaltered cash flow, to be

20   able to kind of be able to negotiate a deal.  And if

21   you show too much, then it takes away the message.

22        Q.   And if we can pull up Defendants' Exhibit

23   BG, please.  This is an email from Nate Fellers to

24   Elena Matrullo at Citigroup dated February 22

25   entitled -- or subject, 2/22/08 liquidity report Andy

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    writes, Hi, Elena.  The far right column is our

2    projected cash position.  This report does not factor

3    in margin calls."  And the "does not" is in all caps.

4    Do you see that?

5         A.   Yes.

6         Q.   And he goes on to report some additional

7    information about expected calls and incoming cash.

8    Do you see that?

9         A.   Yes.

10        Q.   Is this consistent with your understanding

11   that the reason for the change in the format of the

12   liquidity reports was for the lenders?

13        A.   Yes.

14        Q.   And is this consistent with your

15   understanding that the reason for the change in the

16   liquidity reports had nothing do with hiding

17   information from KPMG?

18        A.   Correct.

19        Q.   Now, Mr. Bliss showed you various liquidity

20   reports from various points in time, and I won't go

21   through them all.  But do you have any reason to

22   believe that any given liquidity report from any

23   given day wasn't provided to KPMG?

24        A.   No.

25        Q.   And do you have any reason to believe that

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                           (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                      1-800-669-9492
                                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    any given liquidity report from any given day wasn't
 2    available to KPMG upon request?
 3         A.   No.
 4         Q.   Oh, and I think, did you have an
 5    understanding as to whether Mr. Goldstone or Mr.
 6    Simmons was aware of the change in the format of the
 7    liquidity report?
 8         A.   Yes.  I think they were aware of the change
 9    in the liquidity report.
10         Q.   Now, Mr. Bliss asked you a little about the
11    margin call activity that occurred in February of
12    2008.  Do you recall that?
13         A.   Yes.
14         Q.   Were you aware of the increased level or
15    heightened level of margin calls in February?
16         A.   So specific days I am not.  I won't
17    remember day by day.  I do recall that there were
18    margin calls in February.
19         Q.   Do you recall that some of those margin
20    calls were not paid in a single day?
21         A.   Yes.
22         Q.   And do you recall any discussion
23    surrounding the those margin calls?
24         A.   Yes.  We were working deals with many of
25    those counterparties.  Like I said, they themselves
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    needed cash, and so rather than completely making

2    them solvent, they wanted to get cash even if it

3    meant over a couple of days rather than immediately,

4    at once.  So they were willing to work with us.

5        Q.   And how did you view the impact of the

6    margin calls that occurred in February on the

7    company's prospects going forward?

8        A.   Well, so almost all of the liquidity

9    reports state that things would get better if we

10   could just ride it out.  And I know that that was a

11   sentiment that was very strong at that time, was if

12   we could just get past this day or get past tomorrow

13   and get to the next P&I, then we should be in good

14   shape.

15       Q.   And did you have that view, as well?

16       A.   Yes.

17       Q.   Was your view on the company's ability to

18   manage the margin calls in February informed at all

19   by the experience of August of 2007?

20       A.   Yes, in the sense that we had a feeling we

21   would get margin calls.  We had no idea the magnitude

22   at which they would have occurred.

23       Q.   And why do you say you had no idea?  And

24   what does that have to do with August of 2007?

25       A.   Yeah, so August 2007 was the first inkling



SANTA FE OFFICE                                            MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                        1-800-669-9492
                                                e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2251

1    that something was going wrong, so we knew something

2    was going to happen.  But I remember that when we

3    first went into that crisis, this feeling that if we

4    could just ride it out, we'd be fine, and the typical

5    kind of crisis or recession only really lasts several

6    months.  And we never thought that there would be a

7    double dip like it did in February, where it was a

8    greater impact.

9         Q.   Do you remember discussion of that in an

10   ALCO meeting or in any ALCO meetings?

11        A.   I do, yes.

12        Q.   What do you recall about those discussions?

13        A.   I recall kind of that similar -- just that

14   sentiment where, you know, Thornburg's business model

15   is based upon having really high-quality assets.  And

16   the idea was that those really high-quality assets

17   would stand its price against the repo

18   counterparties, and pretty much, we could ride

19   through the crisis and be in great shape.  What we

20   didn't account for was the baby-with-the-bath-water

21   kind of effect, where if mortgages get hurt somewhere

22   else, they would hurt us, too.  And that's kind of

23   what happened.  And in hindsight, I think it's just

24   the repo counterparties just needed cash themselves.

25        Q.   And did you yourself hold this view that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2252

1    the quality of Thornburg's portfolio would be strong

2    enough to sustain you through these times?

3        A.   Yes, definitely.  But that's one of the

4    most, I would say, frustrating parts about it.  In

5    theory, if you look at it, it sounded very sound;

6    right?  It sounded like a great idea.  And in

7    practice we got hit for it.  I mean, if you look at

8    our Thornburg mortgages, we had single basis points

9    in losses, which is -- basis points is very, very

10   small.  It's like .01 percent of losses.

11       Q.   Can you explain a little more what you mean

12   by single basis points in losses?

13       A.   Yeah.  So a typical loan, when somebody

14   defaults or can't pay for it, that would attribute to

15   kind of that loss percentage.  And Thornburg

16   mortgages were underwritten so well that the only

17   losses that we incurred were well under like .1

18   percent, .2 percent.  It was very, very low.  And so

19   the idea is, as these crises occur, our defaults

20   occur, our assets should have held its price, but it

21   didn't.

22       Q.   Now, how about the overall economic

23   environment and the interest rate environment?  Did

24   the interest rate environment play into your thinking

25   about the company's ability to withstand the



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2253

```
1    challenges of February?
2         A.   Yeah.  So if I recall, rates were fairly
3    high at that time, and to kind of prevent the crisis
4    from spinning further, rates were dropping, and it
5    was actually very favorable for the Thornburg kind of
6    business model.  So we were again anticipating and
7    hoping to take benefit of that, and it didn't happen.
8         Q.   And when you say "we," did you yourself
9    hold that view?
10        A.   Yeah, yes.
11        Q.   And you yourself viewed that the declining
12   interest rate environment would be another factor
13   that would help the company survive the challenges?
14        A.   Yeah.  Yes.
15        Q.   Now, Mr. Bliss asked you about what
16   happened on the day after the filing of the Form 10-K
17   and the fact that the company received a large volume
18   of additional margin calls.  Do you recall that?
19        A.   Yes.
20        Q.   Do you recall how you felt on the day that
21   the Form 10-K was filed?
22        A.    I do, which was a feeling of relief.  I
23   actually recall Clay coming in and -- Clay Simmons
24   coming into our cubicle, being happy, because he was
25   feeling fulfilled that the 10-K was filed and all
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   margin calls were actually paid off.
 2        Q.   Did you feel the same way?
 3        A.   Absolutely.  Yeah, I had a beer with
 4   dinner.
 5        Q.   Did you expect that the company would
 6   receive additional margin calls following the filing
 7   of the Form 10-K?
 8        A.   I think it's unrealistic to say that we
 9   wouldn't have received any margin calls.  I knew we
10   would receive some.  I did not expect the magnitude
11   that we did receive it.
12        Q.   When you eventually learned of the
13   magnitude, I think you told Mr. Bliss you weren't
14   sure if it was that exact same day or maybe the next
15   day, or shortly thereafter, anyway.  How did you feel
16   when you learned about the magnitude of the margin
17   calls that the company did receive?
18        A.   It was very hard.  It was very hard to hear
19   that, because it was a feeling of we're past it and
20   good times ahead, but that's not what happened.
21        Q.   And the feeling of we were past it -- you
22   shared that feeling, as well?
23        A.   Yes.
24        Q.   During your entire time at Thornburg, did
25   Mr. Goldstone ever ask you to do anything at all that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    you thought was illegal or even unethical?

2         A.   No.

3         Q.   During your entire time at Thornburg, did

4    Mr. Simmons ever ask you to do anything at all that

5    you thought was illegal or unethical?

6         A.   No.

7         Q.   During your entire time at Thornburg, did

8    anyone at Thornburg ever ask you to do anything that

9    you thought was illegal or even unethical?

10        A.   No.

11        Q.   During your entire time at Thornburg, did

12   anyone ever ask you to do anything that you thought

13   was not the right thing to do?

14        A.   No.

15             MR. LEE:  May I have one moment, Your

16   Honor?

17             THE COURT:  You may.

18             MR. LEE:  Thank you, Your Honor.  I don't

19   have any further questions.

20             THE COURT:  Thank you, Mr. Lee.  Thank you,

21   Mr. Ahn.

22             Mr. Bliss, do you have redirect of Mr. Ahn?

23             MR. BLISS:  Yes, thank you, Your Honor.

24             THE COURT:  Mr. Bliss.

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                    REDIRECT EXAMINATION
 2    BY MR. BLISS:
 3         Q.   Hello again, Mr. Ahn.
 4         A.   Hello.
 5         Q.   You were just talking about some various
 6    aspects of your belief in Thornburg as a company, and
 7    I'd like to ask you a few things about February 2008.
 8    Were you aware that Thornburg held in its portfolio
 9    25 percent, that is, of its portfolio was in Alt-A
10    securities in February of 2008?
11         A.   Yes, that sounds familiar.
12         Q.   And did you know that on February 21, Mr.
13    Feldman wrote a memo indicating that, quote, "The
14    margin calls created by this type of pricing," that
15    is occurring on February 21, 2008, "will surely
16    create even more selling, further impairing liquidity
17    in the MBS market"?  Did you know he wrote that memo?
18         A.   I did not.
19         Q.   Did you know that on February 27, 2008, the
20    day before Thornburg's financial statements were
21    filed, Mr. Goldstone wrote to Mr. Simmons that,
22    quote, "You should know that a large Alt-A hedge fund
23    in Europe is blowing up this afternoon.  UBS Credit
24    just mentioned it to me.  They got hit with 20-point
25    haircuts on Alt-A AAAs overnight.  I think we will
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

2257

1    get this a little more gradually, but we should be

2    ready for it."  Did you know that?

3         A.   I did not.

4         Q.   Now, in response to my questioning about

5    why the liquidity report was changed and the margin

6    calls were eliminated so that it went from a negative

7    $233 million to a positive, you said that Mr. Fellers

8    did not want to reflect margin calls to the

9    counterparties.  Do you recall that?

10        A.   Yes.

11        Q.   Let's look at Exhibit BG, which you were

12   just asked about.  And this again was from Mr.

13   Fellers to Ms. Matrullo.  I assume you never saw this

14   at the time?

15        A.   Did not.

16        Q.   And he wrote, "The far right column is our

17   projected cash position.  This report does not," in

18   all caps, "factor in margin calls."

19             So in fact, Mr. Fellers did want to explain

20   to the banks, the Wall Street banks, that the report

21   didn't include margin calls; correct?

22        A.   Yes, correct.

23        Q.   And none of the emails we looked at from

24   you to KPMG attaching the liquidity report uses that

25   language, "This report does not factor in margin

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    calls"; correct?

2        A.   Correct.  But I mean, Jenni Hall was very

3    familiar with it.  I mean, she would know that margin

4    calls -- I mean, she would have to ask and we talked

5    about it frequently.

6        Q.   And speaking of Jenni Hall, I just want to

7    make sure I heard you right.  Did you say that you

8    laid out the changes that you made in the liquidity

9    report in an email to Jenni Hall?

10       A.   I thought I did, yes.

11       Q.   Okay.  Now, you testified that no one --

12   Mr. Goldstone, Mr. Simmons, Mr. Fellers -- ever told

13   you to hide anything from KPMG.  That was your

14   testimony; correct?

15       A.   That's correct.

16       Q.   And you also testified that Mr. Goldstone

17   wanted to change the liquidity report to reflect more

18   information in the other column; is that right?

19       A.   Correct.

20       Q.   And if we go back to that liquidity report,

21   first of all let's look at Exhibit 89, which was the

22   internal liquidity report on February 22, the day

23   after the margin calls were removed, the $250 million

24   in margin calls were removed.  Do you recall this

25   internal liquidity report?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   I do.

2      Q.   And then the report itself, if you turn to

3  that, it says in the upper right-hand corner, "Margin

4  call" with a blank; correct?

5      A.   Yes.

6      Q.   All right.  Then a few hours later you

7  emailed KPMG -- well, actually, in Exhibit 91 you

8  sent an email to Mr. Buniel because at this point you

9  didn't know Jenni's last name on February 22, that

10  afternoon; correct?

11      A.   Correct.

12      Q.   All right.  And so you forward an email

13  with the liquidity report, or you ask for it to be

14  forwarded.  And if we go to the liquidity report

15  itself and look at the upper right-hand column.  So

16  this is the first email where you attach a liquidity

17  report and email it to KPMG; correct?  We already

18  established that.

19      A.   Correct.

20      Q.   And every other liquidity report that we

21  saw prior to this date that was circulated internally

22  included the margin call column; correct?

23      A.   Correct.

24      Q.   And so your testimony, then, must be that

25  it's simply coincidence that the first time KPMG is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2260

1    emailed a liquidity report, it has notes instead of

2    margin calls; correct?

3         A.   Yes.  But when you say "coincidence," it's

4    more than a coincidence.  So before this, because we

5    were getting margin calls and because it was more of

6    a crisis, Jenni Hall was stopping -- was stopping by

7    my desk more so than necessarily waiting for an email

8    response.  I mean, that's how she did things during

9    that time.  So she was at my desk a lot more

10   frequently.

11        And then once we actually started talking

12   to the repo counterparties to slow down on the margin

13   calls, that's when we could have slowed down the

14   reports and she could actually wait for it to come in

15   the email form.

16        Q.   Okay.  Let's talk about that February 21

17   liquidity report again.  And that's Exhibit 75.  With

18   the projected negative $230 million, if we could go

19   to the liquidity report itself report that's

20   attached.  So if we highlight that right column

21   again, so of course, you recognize this as the

22   liquidity report projecting a negative cash balance

23   through April.

24        A.   Yes.

25        Q.   And if we could just expand it down to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   April 9th.

 2           Now, this version of the liquidity report

 3   showing the negative liquidity shows a TMI Bates

 4   stamp.  Do you know what TMI is?

 5       A.   I do.

 6       Q.   I'll represent to you that it represents

 7   Thornburg.

 8       A.   Oh, yeah.

 9       Q.   Thornburg Mortgage.  If we could expand the

10   Bates stamp.  Now, you talked about providing KPMG

11   liquidity reports at some point in a mass fashion?

12       A.   Correct.

13       Q.   And that was in connection with a

14   restatement document that said that was dated March

15   9th, I believe?

16       A.   Okay.

17       Q.   If we could look at Exhibit GE.  Do you see

18   that Exhibit GE has a KPMG stamp on the bottom,

19   meaning it's produced by KPMG?

20       A.   Um-hum.

21       Q.   Do you see that this liquidity report dated

22   February 21, 2008, going all the way to the bottom,

23   neither shows the $250 million in margin calls nor

24   shows any projected negative liquidity for any date

25   going forward?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2262

1      A.   I do see that.  But again, that's because

2  the repo counterparties agreed to pause on the margin

3  calls because clearly the other liquidity report

4  meant we couldn't really go forward.  So when Nate

5  called the repo counterparties and arranged that,

6  that's what's being reflected, and these reports are

7  kind of changed to reflect what's best known at that

8  particular time.  So the 2/21, date at the end of the

9  day, that margin call was being paused, and so was

10 not being reflected in the report.

11     Q.   Now, wait a minute.  You're talking about

12 the repo counterparties holding off on margin calls?

13     A.   Yes, or being negotiated with Nate.  Yeah.

14     Q.   Are you talking about the standstill

15 agreement where they agreed not to go into any more

16 margin calls?

17     A.   It's more that they wanted to actually be

18 receiving the cash over a set period of time.  So as

19 I kind of mentioned before, we don't always pay at

20 that particular day.

21     Q.   Now, you're aware that that agreement with

22 the counterparties didn't occur until March 2008;

23 right?

24          MR. LEE:  Your Honor, misstates the

25 evidence and the testimony.  They're talking about

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                        1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN &
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

2263

```
 1    two different things.
 2            THE COURT:  Well, if you want to clear it
 3    up, I'll give you a chance to recross.  Overruled.
 4        Q.   (By Mr. Bliss)  Okay.  Just to clarify what
 5    we're talking about here, on February 21, 2008, are
 6    you saying that there was a formal agreement with
 7    multiple counterparties to not provide additional
 8    margin calls to Thornburg?
 9        A.   I'm not sure if there was a formal
10    agreement.  I do know that Nate was discussing it
11    with the repo counterparties, such that we couldn't
12    pay those margin calls.  So it was under discussion
13    to actually try to pay it over time.
14        Q.   And that was with multiple counterparties?
15        A.   I believe so.
16        Q.   And was that after a default had occurred?
17        A.   I don't know.
18        Q.   And so if, in fact, that actually occurred
19    in March of 2008, then you're not really sure about
20    the sequence of events, when things happened relative
21    to these liquidity reports in either February or
22    March.  Is that fair to say?
23        A.   That's fair to say.
24        Q.   You can't pinpoint the dates when you, for
25    instance, provided liquidity reports to KPMG, whether
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    it was February or March; right?

 2         A.   Correct.

 3         Q.   You don't have a clear memory of those

 4    occurrences in either February or March 2008?

 5         A.   Correct.

 6         Q.   And the fact of the matter is, though, that

 7    the exhibit that you have in front of you showing the

 8    KPMG Bates stamp with a February 21 liquidity report

 9    does not show any negative cash balance on it

10    whatsoever; correct?

11         A.   Correct.

12              MR. BLISS:   Thank you.   Nothing further,

13    Your Honor.

14              THE COURT:   All right.   Mr. Ahn -- did you

15    want to have --

16              MR. LEE:   Just briefly, Your Honor.

17              THE COURT:   Go ahead, Mr. Lee.

18                    RECROSS-EXAMINATION

19    BY MR. LEE:

20         Q.   Mr. Ahn, I'd like to try to clear up what I

21    think may be a miscommunication.   Was it your

22    understanding that in February of 2008, before the

23    Form 10-K was filed, there were occasions where

24    Thornburg received margin calls that it could not pay

25    in one day?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Correct.

2        Q.    And was it your understanding that for

3    those margin calls that Thornburg could not pay in

4    one day, that Thornburg tried to work out

5    arrangements with the lenders in order to be able to

6    pay those over several days?

7        A.    Correct.

8        Q.    And is it your understanding that that is

9    different from any agreement that was later entered

10   into with a number of repo counterparties, a more

11   formal agreement?

12       A.    Correct.

13       Q.    And so when you were describing the

14   conversations that you understood Mr. Fellers was

15   having with the repo counterparties, what were you

16   referring to?

17       A.    Again, the repo counterparties, they

18   themselves wanted the cash.  So it's actually not in

19   their interest to completely wipe us out.  So a lot

20   of that, what happens during that time is, if we

21   can't all pay it, we reach out and say, "Look, this

22   is the cash projection.  You have to work with us and

23   take that margin call back, and we'll work some deal

24   out where you get it paid over a particular set

25   period of time."

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          So that is my understanding of what's

2    occurred during that time.

3          Q.   Did you have an understanding that Mr.

4    Fellers was having those discussions with at least a

5    couple of repo counterparties in the February time

6    frame?

7          A.   Yes.

8               MR. LEE:  Nothing further, Your Honor.

9               THE COURT:  Thank you, Mr. Lee.

10              Mr. Bliss, do you have any redirect?

11              MR. BLISS:  No, Your Honor.

12              THE COURT:  Mr. Ahn, you may step down.

13              Is there any reason that Mr. Ahn cannot be

14   excused from the proceedings, Mr. Bliss?

15              MR. BLISS:  No, Your Honor.

16              THE COURT:  Mr. Lee, can he be excused?

17              MR. LEE:  Yes, Your Honor.

18              THE COURT:  All right.  You're excused from

19   the proceedings.  Thank you for your testimony.

20              All right.  Well, we're pretty close to the

21   end of the day, so why don't we call it a day and

22   pick up new witnesses or evidence in the morning?

23              Again, thank you for your hard work.  Try

24   to do what you've been doing all along and be in the

25   jury room at 8:30.  We'll try to be ready for you.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

2267

```
 1   We're going to stay a little bit and talk a little

 2   bit this evening.  But my sense is that probably

 3   we're on track, but I'm going to talk to the lawyers

 4   a little bit tonight and make sure of that.

 5            But again, thank you for your hard work,

 6   and I appreciate the way you've been going about your

 7   task.  We'll see you in the jury room at 8:30 in the

 8   morning.  Y'all have a good evening.

 9            All rise.

10            (The jury left the courtroom.)

11            THE COURT:  All right.  Everyone be seated.

12            All right.  As far as the SEC, as far as

13   them being on their feet since openings, it has been

14   on their feet 19 hours and 37 minutes.  And the

15   defendants have been on their feet since openings 22

16   hours and 39 minutes.

17            Mr. McKenna, where do you think we stand

18   this afternoon?  Do you think we're on track?

19            MR. McKENNA:  Yes, we have three witnesses

20   left:  Ms. Starrett and the two defendants.

21            THE COURT:  So you think we're in good

22   shape?

23            MR. McKENNA:  Yes, sir.

24            THE COURT:  How about you, Mr. Lee?

25            MR. LEE:  Yes, Your Honor, I agree.  I did
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    want to let the Court know of one witness-related

2    issue.  We've already told the SEC that, but just so

3    it doesn't come as a surprise to the Court, we do

4    intend to call our clients in our case.  So I

5    understand that the SEC is going to call them in

6    their case.  Our cross-examination will be -- we'll

7    intend to keep within the scope of the direct.  And

8    then we intend to call them in our case.  And we told

9    the SEC that.  But that won't have an effect on

10   timing.  We will be well within our time estimate.

11          THE COURT:  All right.  I've gotten

12   comments back from the SEC and also some jury

13   instructions.  When did y'all say you were going to

14   have yours to me?

15          MR. LEE:  We will have a first set on at

16   least the -- we will have several additional proposed

17   jury instructions to the Court tonight.  Then we will

18   have comments to the Court on the jury instructions

19   relating to the two primary claims, Rule 10b-5 and

20   Rule 13b2-2 tonight, and then the other charges that

21   came in the second wave of instructions we're working

22   through.

23          THE COURT:  Okay.  All right.  Well, I

24   think I may hold up at least generating another draft

25   until I get yours.  If I don't get the other set, I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    may go ahead and generate another draft so you start

 2    seeing what I'm thinking.  But I'll wait to generate

 3    a draft until I get those from the defendants.

 4           Is there anything else we need to discuss

 5    while we're together, Mr. McKenna?

 6           MR. McKENNA:  No, Your Honor.

 7           THE COURT:  Mr. Lee?

 8           MR. LEE:  Just one procedural question and

 9    that is, we intend to make a Rule 50 motion at the

10    close of the evidence.  We think we have a strong

11    basis for a Rule 50 motion on some, if not all, of

12    the claims and we want to find out the Court's

13    preference and approach to how we do that, whether we

14    argue it orally or submit a brief, and so on.

15           THE COURT:  It's up to you.  I'll take

16    whatever you want to do.  If you want to make it

17    orally, that's fine.  If you want to submit

18    something, that's fine.  So I'll leave that to you.

19    However you want to make it.

20           Anything else?

21           MR. LEE:  No, Your Honor.

22           THE COURT:  All right.  Well, y'all have a

23    good evening.  I appreciate your hard work.  See

24    y'all tomorrow at 8:30.

25           (The Court stood in recess.)
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2270

```
1              C-E-R-T-I-F-I-C-A-T-E

2

3    UNITED STATES OF AMERICA

4    DISTRICT OF NEW MEXICO

5

6

7         I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

8    Official Court Reporter for the State of New Mexico,

9    do hereby certify that the foregoing pages constitute

10   a true transcript of proceedings had before the said

11   Court, held in the District of New Mexico, in the

12   matter therein stated.

13        In testimony whereof, I have hereunto set my

14   hand on June 6, 2016.

15

16

17

18   _____
     Jennifer Bean, FAPR, RMR-RDR-CCR
19   Certified Realtime Reporter
     United States Court Reporter
20   NM CCR #94
     333 Lomas, Northwest
21   Albuquerque, New Mexico 87102
     Phone:  (505) 348-2283
22   Fax:    (505) 843-9492

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com