IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

vs.                                                                          No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett's Motion *In Limine* No. 7 to Preclude any Evidence or Argument Relating To Shareholder Losses, filed March 17, 2016 (Doc. 398)("Motion"). The Court held a hearing on May 11, 2016. The primary issue is whether the Court should allow the Plaintiff Securities and Exchange Commission ("SEC") to introduce evidence regarding Thornburg Mortgage shareholders' losses. The Court will allow evidence of shareholder losses, because losses are relevant to prove materiality, and because the potential for unfair prejudice does not substantially outweigh the evidence of losses' probative value. The Court will, however, exclude actual loss amounts, because they are irrelevant and too unfairly prejudicial. The Court will thus grant the Motion in part and deny it part.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1). The Court presents the facts solely to provide context for the Motion. It continues to adhere to the decisions on the facts it reached in its Unsealed Memorandum Opinion and Order, filed August 22, 2015

(Doc. 371)("Summary Judgment MOO").

The Defendants are former officers of Thornburg Mortgage, Inc.: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The SEC alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[1]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[2]  Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations

---

[1]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[2]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

focused on "jumbo" and "super-jumbo"[3] ARM securities; Thornburg Mortgage also purchased ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and investment business through reverse repurchase agreements[4] backed by ARM securities. See Complaint ¶ 3,

_____

[3]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage. Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set.  Super jumbo mortgage, Wikipedia.  Fannie Mae purchases and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created.  See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends."  Fannie Mae, Investopedia.  The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates, because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined or regulated, but mortgage companies use it internally and independently to set loan parameters.  See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage, Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

[4]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to repo."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23,

at 2. Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price." Complaint ¶ 22, at 7-8. The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level. See Complaint ¶ 22, at 8. A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise. See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8. Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had

2013), http://en.wikipedia.org/wiki/Repurchase_agreement. "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement." Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  <u>See</u> Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  <u>See</u> Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  <u>See</u> Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  <u>See</u> Complaint ¶ 3, at 2; <u>id.</u> ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  <u>See</u> Complaint ¶ 34, at 11.  In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call

over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[5] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Email from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did

---

[5]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."  Interest Only (IO) Strips, Investopedia (Apr. 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.  See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")).  Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an email to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."  Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia.  "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[7]  See Complaint ¶ 37, at 11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the

---

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP.  About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/.  According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset."  The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral. Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41). In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that served as collateral on its reverse repurchase agreements. See Complaint ¶ 8, at 4. Thornburg Mortgage also reported a fourth-quarter 2007 profit. See Complaint ¶ 11, at 4. "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007." Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008. See Complaint ¶ 41, at 12-13. Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K. See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30). Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well. If they only knew." Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2, (sent February 28, 2008, at 6:33 a.m.), filed

---

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements. Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp. "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates." Accounting Series Release, Investopedia.

May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).  In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original).  See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, (sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email").  As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February

28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'" Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity, or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[9]   Complaint ¶¶ 49-50, at 50-51.   As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See Complaint ¶ 49, at 14-15.[10]  The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see

---

[9]An "impairment" is a "reduction in a company's stated capital."   Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, <u>see</u> Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, <u>see</u> Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern. <u>See</u> Complaint ¶ 57, at 17. Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's. <u>See</u> Complaint ¶ 76, at 22. "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further." Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events." Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"). The requested evidence included "correspondence with lenders/attorneys/shareholders, emails."

Request for Correspondence, attached to March 3, 2008 Hall Email, at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."   Request for Correspondence at 4.   At the time, KPMG as auditor was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.   See Complaint ¶ 99, at 29.   Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.   See Complaint ¶ 101, at 29.   KPMG did not become aware of the Citi Letter while preparing its Restatement.   See Complaint ¶ 101, at 29.   Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"   Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).   The analysis stated: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in mortgage valuations.'"   Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.   See Complaint, filed March 13, 2012 (Doc. 1)("Complaint").   The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R.

§ 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

The Court granted in part and denied in part the SEC's and the Defendants' motions to dismiss on July 8, 2013. See Memorandum Opinion and Order at 2-3, filed July 8, 2013 (Doc. 190)("Motion to Dismiss MOO"). The Motion to Dismiss MOO dismissed the SEC's allegations: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's outside auditor that Thornburg Mortgage successfully met its margin calls without violating its lending agreements, and did not sell assets to meet margin calls"; and (ii) "that the Defendants schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-K." Motion to Dismiss MOO at 2. It declined to dismiss the SEC's claim that "the representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was materially false or

misleading." Motion to Dismiss MOO at 2. The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are primarily liable or liable as control persons for that misrepresentation in the 10-K, and the Court will not dismiss the SEC's allegations that the Defendants aided and abetted the misrepresentation, as the Court has determined that the SEC sufficiently alleged that Goldstone and Simmons made, and the Defendants provided substantial assistance to, the misrepresentation with knowledge of or recklessness to its falsity. Similarly, the Court will not dismiss the SEC's allegations that the Defendants misled Thornburg Mortgage's auditor before the 2007 Form 10-K was filed through the statement that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market.

Motion to Dismiss MOO at 3. The Court also allowed certain claims against Goldstone and Simmons to proceed. See Motion to Dismiss MOO at 3. These claims include the SEC's allegations whether: (i) the Defendants failed to disclose to KPMG before they filed the 2007 Form 10-K that a European hedge fund's collapse would negatively affect Thornburg Mortgage's financial condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's financial condition after filing the 2007 Form 10-K; (iii) the Defendants materially misled KPMG by not providing correspondence showing that Thornburg Mortgage experienced an event of default in the two weeks before the 2007 Form 10-K filing; and (iv) Simmons misrepresented that unexpected events had an unexpected financial impact on Thornburg Mortgage after the 2007 Form 10-K filing. See Motion to Dismiss MOO at 3.

The Court later denied the SEC's and the Defendants' motions for summary judgment. See Summary Judgment MOO at 2-3. It first explained that it would apply an "actual-disbelief" standard to determine "whether a person subjectively disbelieved the truth of an opinion statement." Summary Judgment MOO at 2. The Court then concluded that genuine issues of material fact for the jury existed on the SEC's claims that: (i) the Defendants made objectively false statements; (ii) the statements were material; (iii) the Defendants believed that their

statements were false they made them; and (iv) the Defendants made statements that were false or misleading because of omitted information. See Summary Judgment MOO at 2-3. The Court thus declined to grant summary judgment for any party on any issue. See Summary Judgment MOO at 3.

Starrett reached a settlement with the SEC on May 20, 2016. See Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent"). The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include a requirement that Starrett testify for any of the remaining parties. See Starrett Consent at 1. Ten claims remain in the case for trial -- all of the original claims, with the exception of the SEC's claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b). See Pretrial Order at 3-4, filed May 11, 2016 (Doc. 448).[11]

---

[11]The Motion to Dismiss MOO and Summary Judgment MOO did not dismiss the SEC's § 17(a) claim, but it does not appear in the Pretrial Order.  The parties have also not submitted any jury instructions on this claim.  See Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463).  The parties' proposed verdict forms do not include a § 17(a) claim.  See Defendant Clay Simmons's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489). The Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."  Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002).  The pretrial order that the parties filed in this case, therefore, supersedes all prior pleadings, including the Complaint.  See Wilson v. Muckala, 303 F.3d at 1215 (citing C. Wright, A. Miller & M. Kane, 6A Fed. Prac. & Proc. Civ. § 1522 (2d ed. 1990)).

1.      **The Motion.**

The Defendants filed their Motion on March 17, 2016.  See Motion at 1.  The Defendants ask the Court "to bar the SEC from presenting evidence and/or argument relating to losses sustained by Thornburg shareholders."  Motion at 2.  The SEC intends to call two former Thornburg Mortgage shareholders who sustained significant losses in their investments.  See Motion at 1.  The Defendants argue that the Court should exclude such evidence, because the evidence is irrelevant to the SEC's claims, and it would be unfairly prejudicial.  See Motion at 1. Further, the Defendants argue that this loss would confuse the jury, because determining the cause of the shareholder losses would "necessitate delving into other macro forces in the stock market that might have caused those losses."  Motion at 2.

First, the Defendants contend that evidence regarding the shareholders' losses is irrelevant to the SEC's claims.  See Motion at 3 (citing Fed. R. Evid. 401).  The Defendants note that the SEC alleges that they committed fraud, and that shareholder losses are not relevant to proving fraud.  See Motion at 3.   The Defendants cite to Geman v. SEC, 334 F.3d 1183 (10th Cir. 2003), to support their argument that evidence of shareholder losses is not relevant and that the Court should thus exclude this evidence, because "[t]he SEC is not required to prove reliance or injury in enforcement actions."  Motion at 3 (quoting 334 F.3d at 1191).  The Defendants further state that "the SEC itself has repeatedly and successfully sought to exclude evidence of just such investor losses on grounds that the evidence is irrelevant in an enforcement action." Motion at 4.  The Defendants cite other cases involving the SEC in which courts excluded evidence of shareholder losses.  See Motion at 4.  They first cite to SEC v. True North Financial Corp., No. 10-cv-3995 (DWF/JJK), 2013 WL 4781037 (D. Minn. July 24, 2013)(Donovan, J.), in which "the SEC opposed defendant's attempt to introduce evidence that shareholder losses

were caused by the financial crisis on grounds that such evidence must be excluded because none

of the SEC's claims related to shareholder losses."  Motion at 4 (quoting 2013 WL 4781037, at

*2).  The Defendants also cite to <u>In re Reserve Fund Securities & Derivative Litig.</u>, No. 09-cv-

04346-PGG, 2012 WL 12354220 (S.D.N.Y. Aug. 10, 2012)(Gardephe, J.), in which the SEC

also moved to exclude evidence of investor losses.  <u>See</u> Motion at 4 (citing <u>In re Reserve Fund</u>

<u>Sec. & Derivative Litig.</u>, 2012 WL 12354220, at *1).  Finally, the Defendants cite to a motion in

limine that the SEC filed in which the SEC stated that it did not need to prove investor harm to

make its case.  <u>See</u> Motion at 4-5 (citing 2012 WL 12354220, at *2).

Second, the Defendants argue that, even if evidence of shareholder losses is relevant, it is

too unfairly prejudicial to the Defendants and too confusing to the jury.  <u>See</u> Motion at 5.  The

Defendants argue that the Court should exclude information regarding Thornburg Mortgage's

shareholder losses pursuant to rule 403 of the Federal Rules of Evidence, because even if the

information is relevant, "the minimal probative value of such evidence would be substantially

outweighed by the danger of unfair prejudice that it would pose."  Motion at 5.  Because such

evidence is not relevant, they argue that it would be used to "manipulat[e] the emotions of the

jury."  Motion at 5.  Further, the Defendants argue that presenting this evidence would be

misleading and confusing, because establishing that the "Defendants somehow caused

shareholder losses, when there is no evidence of such causation . . . would require an exploration

into matters not only irrelevant to this case, but also entirely unsubstantiated."  Motion at 5-6.

The Defendants argue that establishing that causal link is not only irrelevant to the SEC's claims,

but would also require an unnecessary and confusing market analysis.  <u>See</u> Motion at 6.

2.      **The Response**.

The SEC responded on April 14, 2016.  <u>See</u> Plaintiff U.S. Securities and Exchange Commission's Opposition to Defendants' Motion *In Limine* No. 7 to Preclude any Evidence or Argument Relating To Shareholder Losses, filed April 14, 2016 (Doc. 418)("Response").  The SEC relies on two primary arguments in its Response.  <u>See</u> Response at 1.

First, the SEC argues that the evidence is relevant to materiality, an important element of its claims.  <u>See</u> Response at 1.  The SEC advances that "[a] statement or omission is material if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available to the public."  Response at 1-2 (quoting Summary Judgment MOO at 203 (quoting <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976))).  Further, the SEC quotes <u>SEC v. Stanard</u>, No. 06 CIV.7736 (GEL), 2009 WL 196023 (S.D.N.Y. 2009)(Lynch, J.), in which the district court held that "materiality may be established through investor testimony, among other evidence."  Response at 2 (quoting 2009 WL 196023, at *26-27).

The SEC rejects the Defendants' argument that the investor losses are inadmissible because they were not an element of the SEC's initial claims.  <u>See</u> Response at 2.  The SEC rejects that contention, because "whether or not a fact is also an element of a claim does not determine its admissibility."  Response at 2.  The SEC thus argues that the Court should allow it to present evidence of actual investor losses, because "this evidence has a tendency to make materiality more probable than it would be without the evidence under rule 402."  Response at 3.

Second, the SEC contends that the Court should admit evidence of investor losses under rule 403, because the evidence is not unfairly prejudicial, and because its probative value on the element of materiality outweighs its potentially unfair prejudice to the Defendants.  <u>See</u>

Response at 3.   To support this argument, the SEC cites to <u>United States v. Forbes</u>, No. 3:02CR264 (AHN), 2006 WL 2792883 (D. Conn. Sept. 28, 2006)(Nevas), in which "[the] probative value is not substantially outweighed by the minimal danger of unfair prejudice to Forbes in the form of juror anger or class resentment."   Response at 3 (quoting 2006 WL 2792883, at *5).   Further, the SEC argues that "[r]ule 403 does not bar powerful, or even 'prejudicial' evidence.   Instead, the Rule focuses on the 'danger of unfair prejudice,' and gives the court discretion to exclude evidence only if that danger 'substantially outweigh[s]' the evidence's probative value."   Response at 3 (quoting <u>United States v. Pettiford</u>, 517 F.3d 584, 590 (D.C. Cir. 2008)).

Finally, the SEC argues that it would be unfair for the Court not to allow evidence of investor losses, because the Defendants may present evidence that they suffered the loss of their personal investments.   <u>See</u> Response at 4.   The SEC asserts that the Defendants may use that evidence to generate sympathy from the jury and that not "permitting the SEC to explain that Thornburg investors were also harmed" would be unfair.   Response at 4.

### 3.   **The Reply**.

The Defendants replied to the SEC's response on May 3, 2016.   <u>See</u> Reply Memorandum In Support of Defendants' Motion *In Limine* No. 7 To Preclude Any Evidence Or Argument Relating To Shareholder Losses, filed May 03, 2016 (Doc. 443)("Reply").

First, the Defendants reiterate in their Reply that shareholder testimony regarding investor losses is not relevant.   <u>See</u> Reply at 1.   To support this argument, the Defendants first contend that the SEC need not prove investor losses.   <u>See</u> Reply at 1 (citing <u>SEC v. Teo</u>, 746 F.3d 90, 102-03 (3d Cir. 2014)).   Such losses, they state, "have no relevance to the question of whether someone violated the law."   Reply at 1.   The Defendants then cite to cases in which the

SEC argued that the Court should exclude investor testimony.  See Reply at 2.  For example, the

Defendants cite to Securities and Exchange Commission v. True North Financial Corp., No. 10-

3995 (DWF/JJK)(D. Minn., Sept. 6, 2013)(Frank, J.), in which the SEC opposed the defendant's

attempt to introduce evidence that the financial crisis caused shareholder losses, because

"reliance and causation of investor harm are not elements of the SEC's claims."  Motion at 2

(quoting SEC v. True North Financial Corp., 2013 WL 4781037, at *2).  Citing to another

similar case, the Defendants state that the SEC "cannot reconcile its position in these prior cases

with its position in this case."  Reply at 2 (citing In re Reserve Fund Sec. & Derivative Litig.,

2012 WL 12354220).

     The Defendants further argue that the SEC did not explain how its investor losses

evidence is relevant to materiality.  See Reply at 2.  The Defendants advance that the SEC

misreads the definition of materiality.  See Reply at 3.  First, the Defendants set out a definition

stating that "the materiality test requires the court to consider all the information available to the

hypothetical reasonable investor."  Reply at 3 (quoting SEC v. Morgan Keegan, 678 F.3d 1233,

1248 (11th Cir. 2012)).  They argue that the testimony of two arbitrarily selected investors who

lost money on their investments with Thornburg Mortgage is not relevant to materiality.  See

Reply at 3.  The Defendants argue that the SEC's argument that investor loss "'may have

impacted' the particular decisions of [shareholder witnesses]" is not at stake here.  See Reply at 4

(quoting Response at 4).  Rather, the Defendants argue that the issue of materiality "turns on

whether (i) . . . the OTTI judgment . . . and Goldstone's CNBC interview . . . would have

significantly altered the total mix of information made available to a hypothetical reasonable

investor in the marketplace."  Reply at 3.  The Defendants contend, therefore, that the jury

should determine what would be significant to a hypothetical reasonable investor, and not to the

specific investors the SEC plans on calling.  See Reply at 3-4.  The Defendants further argue that, although the two investors declare that it would have been important to them to know that Thornburg Mortgage had been unable to meet margin calls, the Court has held that the "'Defendants had no duty to disclose whether it was in breach of any reverse repurchase agreements in the . . . days before the 2007 Form 10-K was filed.'"  Reply at 4 (quoting Motion to Dismiss MOO at 136).  The Defendants therefore argue that the alleged "omissions in relation to which the SEC argues the shareholders' testimony would provide evidence of materiality are not even part of the SEC's securities fraud claim."  Reply at 4.

The Defendants' second argument is that the shareholder testimony would be unfairly prejudicial, confuse the jury, and needlessly lengthen the trial.  See Reply at 5.  The Defendants advance that the SEC's use of the investor's testimonies would be unmistakably prejudicial, as it would show the jury that investors lost a significant amount of money.  See Reply at 5.  The Defendants thus argue that this evidence is inadmissible under rule 403.  See Reply at 5.  They further contend that this testimony might confuse the jury and that allowing the two investors to testify would unnecessarily lengthen the trial.  See Reply at 6.

Finally, the Defendants assert that their decision not to sell their Thornburg Mortgage stock does not open the door to shareholder testimony.  See Reply at 6.  The Defendants then repeat that the fact that they did not sell their stock is relevant to profit-taking and to their motive, or lack thereof, for committing fraud.  See Reply at 6.  They conclude by reiterating that shareholder losses are not relevant and would unduly generate sympathy from the jury.  See Reply at 7.

4.      __The Hearing__.

The Court held a hearing on May 11, 2016.  See Transcript of Hearing (taken May 11, 2016), filed May 20, 2016 (Doc. 466)("Tr.").  The Court first explained that the SEC must be allowed to prove materiality.  See Tr. at 108:19-22 (Court)(expressing concern about "clipping too much back on materiality.").  The Court stated that it saw shareholder testimony as one way to prove materiality.  See Tr. at 108:23-24 (Court).  The Court indicated its inclination to let the investors testify.  See Tr. at 109:3-4 (Court).  The Court then explained its concerns regarding the substance of the investors' testimony.  See Tr. at 109:5-8 (Court).  The Court wondered whether to let the investors state only their investments or to let them talk about their actual losses.  See Tr. at 109:6-11 (Court).

The Defendants expressed their concern that the shareholders' testimony will be highly prejudicial, because it will allow the SEC to "point the finger at the defendants."  Tr. at 109:18-24 (Johnstone).  The Defendants further stated that, in previous cases, the SEC argued for exclusion of evidence of investor losses, because it would mislead the jury.  See Tr. at 110:1-10 (Johnstone).  Further, the Defendants argued that, if the SEC is allowed to use investor testimony to prove materiality, then the Court should cabin that testimony's content.  See Tr. at 110:22-111:1 (Johnstone).  They stated that the testimony should relate only to "the alleged false statement in this case being material to their decision of whether or not to invest in Thornburg stock."  Tr. at 111:1-5 (Johnstone).  The Defendants further argued that the investors' testimony should be specific and should not discuss matters that the Court has already dismissed.  See Tr. at 111:6-10 (Johnstone).  Specifically, the Defendants objected to any shareholder testimony about all information that was important to them, such as Thornburg Mortgage not being able to meet margin calls in February 2008.  See Tr. at 111:10-22 (Johnstone).  The Defendants then

concluded by stating that the investors' testimony would not provide any information that the SEC's experts could not.  See Tr. at 112:4-10 (Johnstone).

The SEC first argued that its witness investors' testimony is an important element of its case and that the jury should determine materiality based on that testimony.  See Tr. at 112:21-23 (Voorhees).  The testimony would thus help establish relevant information to a reasonable investor, which goes to materiality -- an essential element of the SEC's claim.  See Tr. at 112:20-24 (Voorhees).  The SEC further stated that the testimony would be fairly brief and would not be cumulative.  See Tr. at 113:3-4 (Voorhees).  The SEC also stated that it did not intend to draw a causal link between the fraud claim and the investor losses, and that it did not intend to hold the Defendants responsible for those losses.  See Tr. at 113:7-9 (Voorhees).  The SEC further explained that the testimony would be cabined to important statements in the Form 10-K and the impact that Mr. Goldstone's CNBC interview had on a particular investor.  See Tr. at 113:9-17 (Voorhees).  The SEC referred to cases it cited in its brief, in which investor testimony was admissible.  See Tr. at 113:22-23 (Voorhees).  The SEC concluded its argument by stating that, ultimately, the case is about what the Defendants said in their various public filings and the consequences those had on their investors.  See Tr. at 114:4-13 (Voorhees).

The Court then asked the SEC whether it would limit the testimony to the OTTI issue and maybe to the television interview.  See Tr. at 114:17-20 (Court).  The SEC partially agreed with the Court, but implied that it intended to have its witnesses testify to other points, such as whether Thornburg Mortgage was profitable and whether it was going to remain in business.  See Tr. at 114:22-25 (Voorhees).  The Defendants countered that the Court should limit the testimony to the OTTI judgment and the television interview.  See Tr. at 115:8-15 (Johnstone).

The Court then asked the parties whether they believed that profitability should fall within the scope of the OTTI-related testimony.  See Tr. at 115:16-18 (Court).  The SEC responded that the investors would testify about the "[fact that] the 10-K explained that Thornburg returned to profitability in the fourth quarter of 2007, was impacted by the OTTI . . . and the fact that it was going to remain in business, as well as the statements that Mr. Goldstone specifically said on national television."  Tr. at 116:3-10 (Voorhees).  The Court then noted that those elements seemed "close enough to the things that would impact OTTI to allow the SEC to bring that out from the investors."  Tr. at 116:13-16 (Court).  The Defendants responded that, as long as the investors' statements connect to the OTTI statements, their testimony should be introduced -- provided that they recall seeing the statements at issue and that the statements were material to them.  See Tr. at 116:18-117:7 (Johnstone).

The Court then asked the SEC if its two witnesses would be able to abide by these limits.  See Tr. at 117:8-9 (Court).  The SEC answered that the witnesses had seen the statements as well as the other evidence.  See Tr. at 117:10-17 (Voorhees).  The SEC reassured the Court that both witnesses could testify that they saw the statements and the interview, that they recalled reviewing them, and that the information which they had at the time was important to them.  See Tr. at 117:17-18 (Voorhees).   The Defendants then noted that the SEC does not cite cases in which investor testimony was both challenged and admitted.  See Tr. at 117:20-24 (Johnstone).  Further, the Defendants stated that the cases which the SEC cites do not include motions in limine.  See Tr. at 117:20-118:1 (Johnstone).

The Court decided to let the witnesses testify.  See Tr. at 118:4-5 (Court).  The Court reasoned that their testimony would not be "terribly cumulative."  Tr. 118:5-6 (Court).  It added that the testimony would be relevant to materiality, which is an important element that the SEC

must prove.  See Tr. at 118:9-12 (Court).  The Court also decided, however, not to allow investor testimony relating to losses.  See Tr. at 118:13-14 (Court).  The Court reasoned that investor loss evidence "is just going to generate sympathy and stick in people's mind," thus making it too unfairly prejudicial.  Tr. at 118:14-17 (Court).  The Court specified that the SEC should first lay the foundation of what the witnesses saw and read.  See Tr. at 118:13-16 (Court).  The Court also stated that the SEC should then let the Defendants object if they wish to do so, and have the witnesses testify on their impressions of what they would have done differently had they seen the undisclosed information in the 10-K statements.  See Tr. at 118:24-119:9 (Court).  The SEC asked for clarification whether the investors can explain that they lost money at all and whether they could state a dollar amount.  See Tr. at 119:11-13 (Voorhees).  The Court responded that the investors could disclose their stock purchases and how much they invested.  See Tr. at 119:14-18 (Court).  The Court declined, however, to let the SEC introduce losses or amounts lost.  See Tr. at 119:18-19 (Court).  The Court concluded that the amount of the witnesses' investment is relevant and contributes to proving materiality.  See Tr. at 120:1-3 (Court).

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.")).  "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'"   United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012) (Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403.   Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989)(Baldock, J.).   "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."   United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(Tacha, J.)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)).  The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."   United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(Baldock, J.).

The decision to admit or to exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999)(Kelly, J.), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v.

Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.).   The Supreme Court of the United

States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . .  This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(Thomas, J.)(quoting 1

Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed.

1999)).   See United States v. Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)("Assessing the

probative value of [proffered evidence], and weighing any factors counseling against

admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . .

.").

Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional

response or would otherwise tend to adversely affect the jury's attitude toward a particular

matter.  See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999)(Sanborn, J.).

Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States

v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d 1057, 1067 (10th

Cir. 2003)(Ebel, J.); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991)(Holloway,

J.).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest

decision on an improper basis, commonly, though not necessarily, an emotional one.'"   United

States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(Hartz, J.)(quoting Fed. R. Evid. 403

advisory committee notes).

<u>ANALYSIS</u>

The Court will grant the motion in part and deny it in part.  The Court will admit some evidence of shareholder actions because such evidence goes to prove materiality.  The Court will limit that evidence, however, so that its potential unfair prejudice does not substantially outweigh its probative value.  The Court will admit two specific shareholders' testimony, but it will not allow them to testify to the specific loss amounts.

I.      **THE COURT WILL ADMIT SHAREHOLDER TESTIMONY, BECAUSE IT IS <u>RELEVANT TO PROVE MATERIALITY.</u>**

The Court will admit limited evidence regarding shareholder actions to allow the SEC to prove materiality.  The Court will limit that evidence to two specific shareholders' testimony that they held Thornburg Mortgage shares, and that knowledge of the company's actual financial condition would have been material to their investment decisions.

In the context of a securities fraud claim, "[a] statement is material for purposes of Exchange Act and Securities Act liability if a substantial likelihood exists that a reasonable investor would consider the information important in making an investment decision."  <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988).  Further, the Supreme Court has held: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  <u>TSC Ind., Inc., v. Northway, Inc.</u>, 426 U.S. at 449.  The Supreme Court explained:

> It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.  Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

TSC Ind., Inc., v. Northway, Inc., 426 U.S. at 449.

Investor testimony may be admissible evidence if it is relevant to materiality.   The determination of materiality to a shareholder "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."   TSC Ind., Inc., v. Northway, Inc., 426 U.S. at 450.   For example, the Honorable Alan H. Nevas, United States District Judge for the District of Connecticut, allowed investor testimony in a 2006 case because it was "relevant to the issue of materiality."   United States v. Forbes, 2006 WL 2792883, at *5. In SEC v. Stanard, No. 06 Civ. 7736 (GEL), 2009 WL 196023 (S.D.N.Y. 2009)(Lynch, J.), the Honorable Gerard E. Lynch, United States District Judge for the Southern District of New York, admitted shareholder testimony, because it was material to the SEC's fraud claim.   See 2009 WL 196023, at *23.   For example, "RenRe investor Robert Lloyd, a portfolio manager at a large, growth-oriented mutual fund that purchased more than $20 million of RenRe's shares during the relevant period, testified that the particular quarterly and annual earnings misstatements at issue would have been significant to his investment decisions at the time."   2009 WL 196023, at *23. Lloyd further testified that he had reviewed the Form 10-K and the Form 10-Q, as well as quarterly earnings releases.   See 2009 WL 196023, at *23.   He added that knowledge of the company's actual net income decrease would have significantly impacted his investment decision.   See 2009 WL 196023, at *23.   Judge Lynch admitted the evidence, because it was material to a reasonable investor's decision.   See 2009 WL 196023, at *26.   Similarly, this Court has held that "[a] statement of fact is material if 'a reasonable person would consider it important in determining whether to buy or sell' securities."   Genesee County Emps. Ret. Sys. v. Thornburg Mortg. Sec. Tr., 825 F. Supp. 2d 1082, 1126 (D.N.M. 2011)(Browning, J.)(quoting Schaffer v.

Evolving Systems, Inc., 29 F. Supp. 2d 1213, 1220–21 (D. Colo. 1998)(Brimmer, J.)(citing Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997))).

The Court will admit the shareholders' testimony that knowledge of Thornburg Mortgage's margin calls, and a complete understanding of its financial condition, would have been important to their decision to retain or sell their shares. This testimony is particularly relevant in this case, which involves an allegation that Goldstone made direct misrepresentations to investors during a nationally broadcast television program. As in Securities and Exchange Commission v. Stanard, the shareholders' testimony here, in conjunction with the SEC's event studies and expert testimony, is an important tool to prove materiality. See 2009 WL 196023, at *23.

It is true that the Court could exclude shareholder testimony entirely and force the SEC to prove materiality by the experts' event study or through the KPMG witnesses. But shareholder witnesses can be powerful witnesses, because it is often a sophisticated lay person in a sea of accountants, professionals, experts, Wall Street employees, and competent executives, and their unvarnished testimony often stands out. The Court is reluctant to take that proof away from the SEC. As the Court explained in Leon v. FedEx Ground Package System, Inc., No. CIV. 13-1005 JB/SCY, 2015 WL 10383441 (D.N.M. 2015)(Browning, J.): "the Court cannot ordinarily force the parties to stipulate to facts; parties can, except under very narrow circumstances, turn down the offered stipulation and proceed to prove the facts with the robustness that the party wishes." 2015 WL 10383441, at *12 (citing Old Chief v. United States, 519 U.S. 172, 186-87 (1997)). The SEC should be able to prove materiality with the robustness of whatever evidence is at its disposal.

## II. THE COURT WILL NOT ADMIT EVIDENCE OF SHAREHOLDER LOSSES, BECAUSE ITS UNFAIR PREJUDICE OUTWEIGHS THE PROBATIVE VALUE OF SUCH EVIDENCE.

The Court will not admit evidence of shareholder losses, including the specific loss amounts, because the evidence's potential unfair prejudice outweighs the evidence's probative value. That the investors lost money will be obscure to the jury without the investors mentioning dollars , because the jury will have heard of the bankruptcy from all sources. The jury need not hear about the amount of the investors' losses, because that would merely engender sympathy for that individual investor.

"Rule 403 'does not bar powerful, or even "prejudicial" evidence. Instead, the Rule focuses on the "danger of unfair prejudice," and gives the court discretion to exclude evidence only if that danger "substantially outweigh[s]" the evidence's probative value.'" United States v. Pettiford, 517 F.3d 584, 590 (2008)(quoting United States v. Gartmon, 146 F.3d 1015, 1021 (D.C. Cir. 1998)(quoting Fed. R. Evid. 403)). The Tenth Circuit has long held that "[e]vidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury, or if the evidence otherwise tends to adversely affect the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." United States v. Valencia-Montoya, No. CR-11-2990 JB, 2012 WL 8251407, at *5 (D.N.M. 2012)(Browning, J.)(citing United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999)).

In United States v. Forbes, 2006 WL 2792883, at *5, the district court did not exclude the evidence of shareholder losses and justified its conclusion as follows:

> [T]hat probative value is not substantially outweighed by the minimal danger of unfair prejudice to Forbes in the form of juror anger or class resentment. Moreover, this evidence is relevant to counter Forbes's claim that CUC was a

> good company with excellent cash flow that was never on the verge of bankruptcy
> -- in the government's words, his "no harm no foul" defense.

United States v. Forbes, 2006 WL 2792883, at *5.

In this case, the Defendants did not introduce a "no harm no foul" defense, since Thornburg Mortgage went bankrupt.  Furthermore, here, the two shareholders will testify that, as investors, knowledge of Thornburg Mortgage's actual financial condition would have significantly impacted their investment decisions.  See Tr. at 116:3-10 (Voorhees).  Additional testimony that they had losses or discussions of the specific amounts lost would thus not add significant probative value to the materiality issue.  Pursuant to rule 403 of the Federal Rules of Evidence, evidence may be unfairly prejudicial if it would likely provoke the jury's emotional response or would otherwise tend to adversely affect the jury's attitude.  See United States v. Rodriguez, 192 F.3d at 951 (10th Cir. 1999)(holding that "[e]vidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.").  Emotional testimony from shareholders who lost their retirement savings has a tendency to suggest decision on an improper basis.  For these reasons, the Court will allow two specific shareholders to testify to their shares and their amounts.  The Court will not, however, allow them to testify on their losses, as the evidence's risk of unfair prejudice outweighs its probative value.

**IT IS ORDERED** that: Defendants Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett's Motion *In Limine* No. 7 to Preclude any Evidence or Argument Relating To Shareholder Losses, filed March 17, 2016 (Doc. 398), is granted in part and denied in part.  The Court will admit two specific shareholders' testimony, but it will not allow them to testify to the specific loss amounts.

UNITED STATES DISTRICT JUDGE

Counsel:

Damon Martinez
    United States Attorney
Michael H. Hoses
    Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Danielle Voorhees
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

        *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Robert G. Badal
Los Angeles, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Heather Tewksbury
Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Aaron Thompson
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

*Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Robert J. Liubicic
Paul M. Torres
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

*Attorneys for Defendant Jane E. Starrett*