## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.                                                                    No. CIV 12-0257 JB/LFG

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion in Limine No. 9 to Exclude Irrelevant and Prejudicial Evidence Suggesting Defendants Misled Investors or KPMG with Respect to Matters Other than the OTTI Conclusion in the 2007 Form 10-K, filed March 17, 2016 (Doc. 400)("Motion").  The Court held a hearing on May 11, 2016.  The Court will allow the SEC to introduce both the evidence pertaining to issues other than the OTTI conclusion and the emails related to the securitization filing, because they are relevant and admissible.  The Court will limit, however, the use of the screenshot from Goldstone's website.  The SEC may use the screenshot to question Goldstone about basic information, but the SEC may not ask Goldstone what he has left out of his work history or to use the screenshot to elicit character information.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1).  The Court presents the facts solely to provide context for the Motion.  It continues to adhere to the decisions on the undisputed facts it reached in its Unsealed Memorandum Opinion and Order, filed August

22, 2015 (Doc. 371)("Summary Judgment MOO").

The Defendants are former officers of Thornburg Mortgage, Inc.: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The Securities and Exchange Commission ("SEC") alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[1]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[2] Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New

---

[1]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[2]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo"[3] ARM securities; Thornburg Mortgage also purchased ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and investment business through reverse repurchase agreements[4] backed by ARM securities.  See Complaint ¶ 3,

---

[3]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set.  Super jumbo mortgage, Wikipedia.  Fannie Mae purchases and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created.  See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends."  Fannie Mae, Investopedia.  The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined or regulated, but mortgage companies use it internally and independently to set loan parameters.  See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage, Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

[4]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to repo."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23,

at 2. Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had

---

2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008) filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call

over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[5] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Email from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did

---

[5]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."  Interest Only (IO) Strips, Investopedia (Apr. 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.  See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")).  Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an email to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."   Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).   An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.   Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.   The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia. "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls. See Complaint ¶ 3, at 6; id. ¶ 41, at 12. Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K. See Complaint ¶ 7, at 3. In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets. See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash. To date, no such sales have been required . . . ."). Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[7] See Complaint ¶ 37, at 11. The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to

---

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP. About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/. According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset." The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale. SFAS 166 at 3. The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective. SFAS 166 at 3. Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange." SFAS 140 ¶ 9, at 3.

hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that serve as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008.  See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting

---

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

Email from Clay Simmons to Larry Goldstone at 2, sent February 28, 2008, at 6:33 a.m., filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).  In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original).  See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, sent February 28, 2008, at 5:29 a.m., filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, sent February 28, 2008, at 6:56 a.m., filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email").  As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to

Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'" Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[9]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See Complaint ¶ 49, at 14-15.[10]  The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip

---

[9]An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, see Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going concern.  See Complaint ¶ 57, at 17.  Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's.  See Complaint ¶ 76, at 22.  "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."  Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, sent March 3, 2008 11:44 p.m., filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email").  The requested evidence included "correspondence with lenders/attorneys/shareholders, emails."

Request for Correspondence, attached to March 3, 2008 Hall Email, at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."   Request for Correspondence at 4.   At the time, KPMG as auditor was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.   See Complaint ¶ 99, at 29.   Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.   See Complaint ¶ 101, at 29.   KPMG did not become aware of the Citi Letter while preparing its restatement.   See Complaint ¶ 101, at 29.   Simmons reviewed and approved an analysis for KPMG which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"   Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).   The analysis states: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in mortgage valuations.'"   Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.   See Complaint, filed March 13, 2012 (Doc. 1)("Complaint").   The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R.

§ 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15

U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and

rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v)

falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. §

78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange

Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. §

240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange

Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. §

240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act

and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in

violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person

violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint

¶¶ 106-43, at 31-39.

The Court granted in part and denied in part the SEC's and the Defendants' motions to

dismiss on July 8, 2013.  See Memorandum Opinion and Order at 2-3, filed July 8, 2013 (Doc.

190)("Motion to Dismiss MOO").  The Motion to Dismiss MOO dismissed the SEC's

allegations: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's

outside auditor that Thornburg Mortgage successfully met its margin calls without violating its

lending agreements, and did not sell assets to meet margin calls"; and (ii) "that the Defendants

schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-

K."   Motion to Dismiss MOO at 2.  It declined to dismiss the SEC's claim that "the

representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to

maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was

materially false or misleading."  Motion to Dismiss MOO at 2.  The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are
> primarily liable or liable as control persons for that misrepresentation in the 10-K,
> and the Court will not dismiss the SEC's allegations that the Defendants aided
> and abetted the misrepresentation, as the Court has determined that the SEC
> sufficiently alleged that Goldstone and Simmons made, and the Defendants
> provided substantial assistance to, the misrepresentation with knowledge of or
> recklessness to its falsity.  Similarly, the Court will not dismiss the SEC's
> allegations that the Defendants misled Thornburg Mortgage's auditor before the
> 2007 Form 10-K was filed through the statement that Thornburg Mortgage had
> the intent and ability to hold its impaired assets to maturity or their value
> recovered in the market.

Motion to Dismiss MOO at 3.  The Court also allowed certain claims against Goldstone and

Simmons to proceed.  See Motion to Dismiss MOO at 3.  These claims included the SEC's

allegations whether: (i) the Defendants failed to disclose to KPMG before they filed the 2007

Form 10-K that a European hedge fund's collapse would negatively affect Thornburg

Mortgage's financial condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's

financial condition after filing the 2007 Form 10-K; (iii) the Defendants materially misled

KPMG by not providing correspondence showing that Thornburg Mortgage experienced an

event of default in the two weeks before the 2007 Form 10-K filing; and (iv) Simmons

misrepresented that unexpected events had an unexpected financial impact on Thornburg

Mortgage after the 2007 Form 10-K filing.  See Motion to Dismiss MOO at 3.

The Court later denied the Defendants' and the SEC's motions for summary judgment.

See Summary Judgment MOO at 2-3.  It first explained that it would apply an "actual-disbelief"

standard to determine "whether a person subjectively disbelieved the truth of an opinion

statement."  Summary Judgment MOO at 2.  The Court then concluded that genuine issues of

material fact for the jury existed on the SEC's claims that: (i) the Defendants made objectively

false statements; (ii) the statements were material; (iii) the Defendants believed that their statements were false they made them; and (iv) the Defendants made statements that were false or misleading because of omitted information.  See Summary Judgment MOO at 2-3.  The Court thus declined to grant summary judgment for any party on any issue.  See Summary Judgment MOO at 3.

Starrett reached a settlement with the SEC on May 20, 2016.  See Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent"). The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include a requirement that Starrett testify for any of the remaining parties.  Starrett Consent at 1.  Ten claims remain in the case for trial -- all of the original claims, with the exception of the SEC's claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b).  See Pretrial Order at 3-4, filed May 11, 2016 (Doc. 448).[11]

---

[11]The Motion to Dismiss MOO and Summary Judgment MOO did not dismiss the SEC's § 17(a) claim, but it does not appear in the Pretrial Order.  The parties have also not submitted any jury instructions on this claim.  See Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463).  The parties' proposed verdict forms do not include a § 17(a) claim.  See Defendant Clay Simmons's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489). The Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."  Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002).  The pretrial order that the parties filed in this case, therefore, supersedes all prior pleadings, including the Complaint.  See Wilson v. Muckala, 303 F.3d at 1215 (citing C. Wright, A. Miller & M. Kane, 6A Fed. Prac. & Proc. Civ. § 1522 (2d ed. 1990)).

1.      **The Motion.**

On March 17, 2016, the Defendants moved to bar the SEC from presenting evidence that they misled investors or KPMG on matters other than the OTTI conclusion.  See Motion at 1. The Defendants explain that the jury is asked to decide "two overarching factual questions: (i) whether Defendants' other-than-temporary impairment ('OTTI') conclusion in Thornburg's 2007 Form 10-K was objectively and subjectively truthful, and (ii) whether Defendants made a material misrepresentation or omission to KPMG in connection with that filing."  Motion at 1. Next, the Defendants contend that the SEC's trial exhibit list contains "numerous documents having no bearing" on the issues, and whose "only conceivable purpose" is to mislead or create prejudice in the jury.  Motion at 1.  The Defendants ask the Court to exclude this evidence, because it is irrelevant and "any probative value is substantially outweighed" by the possibility of confusing, misleading, or prejudicing the jury.  Motion at 1 (citing Fed. R. Evid. 402, 403). The Defendants call these arguments "red herrings" and explain that they would waste trial time. Motion at 1.

The Defendants note that courts have broad discretion to exclude relevant evidence if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, . . . or needlessly presenting cumulative evidence."  Motion at 2 (quoting Fed. R. Evid. 403).  The Defendants explain that this broad discretion is grounded in a "district court's familiarity with the details of the case and its greater experience in evidentiary matters."   Motion at 2 (quoting Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)).   The Defendants add that evidence is unfairly prejudicial if it has an "undue tendency to suggest decision on an improper basis," such as an

emotional basis.  Motion at 2 (quoting <u>United States v. Caraway</u>, 534 F.3d 1290, 1301 (10th Cir.

2008)).

The Defendants ask the Court to exclude a series of exhibits that they contend are

irrelevant and highly prejudicial, such as

> evidence and argument suggesting that: (a) Defendants made misrepresentations
> to investors or KPMG other than with respect to the OTTI conclusion in
> Thornburg's 2007 Form 10-K; and (b) Defendants acted inappropriately with
> respect to the timing and content of Thornburg's filings for a securitization that
> occurred on March 4, 2008, after the Form 10-K was filed.

Motion at 2.  First, the Defendants contend that the SEC's exhibit list contains documents that

have no information regarding the Defendant's alleged misrepresentation to KPMG and

investors on the OTTI conclusion in the Form 10-K, which is the only remaining

misrepresentation which the Complaint alleges.  <u>See</u> Motion at 3.  Instead, the Defendants

contend, the SEC and/or the jury can use these documents to suggest other misrepresentations

and to create unfair prejudice.  <u>See</u> Motion at 3.  The Defendants contend that all of the

following exhibits are not relevant to the OTTI conclusion or to the Defendants' communications

with KPMG:

1. <u>SEC Trial Ex. 120</u>: An email from Goldstone giving input on language in the
   annual report.  The Defendants contend that its only purpose is to suggest that the
   Defendants made misrepresentations in the annual report, which the SEC does not
   allege.  <u>See</u> Motion at 3.

2. <u>SEC Trial Exs. 176 and 177</u>: Emails relating to a request that KPMG allow
   Thornburg Mortgage to use its audit opinion for shelf filing[12].  The Defendants
   contend that the emails' only purpose is to suggest other misrepresentations that
   were not alleged.  <u>See</u> Motion at 3.

---

[12]Shelf filings are part of a regulation that a corporation can evoke to comply with the
SEC registration requirements for a new stock offering up to three years before doing the actual
public offering. However, the corporation must still file the required annual and quarterly reports
with the SEC.  It is formally known as SEC Rule 415.  <u>Shelf Registration</u>, Investopedia,
http://www.investopedia.com/terms/s/shelfregistration.asp (last visited June 20, 2016).

- 19 -

3.  <u>SEC Trial Ex. 190</u>: An email that contains Goldstone's comments on a draft of a press release.  The Defendants contend that the only purpose of the email is to suggest that the press release was misleading or that Goldstone tried to make it misleading.  <u>See</u> Motion at 3.

4.  <u>SEC Trial Ex. 193</u>: An email containing Goldstone's comments on a Form 8-K filing and press release draft.  The Defendants contend that the only purpose of the email is to suggest that Goldstone was attempting to make the press release misleading.  <u>See</u> Motion at 4.

5.  <u>SEC Trial Ex. 222</u>: A screenshot from Goldstone's current business website.  The Defendants contend that the screenshot can be used only to "influence the impression the jury forms" of Goldstone.  Motion at 4.

6.  <u>SEC Trial Ex. 307</u>: A "management representation letter to KPMG in connection with the restatement."  The Defendants contend the letter's only purpose is to suggest other misrepresentations not alleged.  <u>See</u> Motion at 4.

7.  <u>SEC Trial Ex. 418</u>: An email with Goldstone's suggestions on responses to reporter's questions.  The Defendants contend the only purpose of the email is to suggest Goldstone proposed misleading responses, which the SEC does not allege.  <u>See</u> Motion at 4.

<u>See</u> Motion at 3-4 (citing Omnibus Declaration of Jerry L. Marks in Support of Defendants' Motions in Limine ¶¶ 38-45, Exs. EE-LL, filed March 17, 2016 (Doc. 404-10-24))("Marks Decl.").  The Defendants argue that these exhibits have "no bearing" on the objective and subjective truthfulness of the OTTI conclusion, and whether the Defendants made a "material misrepresentation or omission to KPMG in connection with" the 2007 Form 10-K.  Motion at 4.  The Defendants ask the Court to exclude these exhibits as "not relevant, prejudicial, confusing, and misleading," because they serve only to show misrepresentations that are not the subject of the case.  Motion at 4-5.  The Defendants also ask the Court to bar the SEC from arguing or using other evidence to imply that the Defendants misled the public or KPMG in any way that is not a remaining claim in this suit.  <u>See</u> Motion at 5.

Second, the Defendants contend that emails related to Thornburg Mortgage's securitization filings are irrelevant, and would be "highly prejudicial, confusing, and

misleading." Motion at 5. The Defendants explain that none of these emails are relevant to the OTTI conclusion in the 2007 Form 10-K and would serve only to suggest that the Defendants were part of a larger effort at Thornburg Mortgage to mislead investors through the securitization transactions. See Motion at 5. The Defendants ask the Court to exclude the following:

1. SEC Trial Ex. 69: An email from Deborah Burns to the Defendants and another employee that references the efforts to "gin up language [for the preliminary prospectus] that moves away from discussion of the status of margin calls." Motion at 5. The Defendants contend that the only purpose of this email is to imply a larger effort to mislead investors, which is not alleged. See Motion at 5.

2. SEC Trial Ex 70: An email from Burns to Simmons and other employees that references the decision to delay securitization until after filing the Form 10-K. See Motion at 5.

3. SEC Trial Ex. 78: An email from Thornburg Mortgage's Sandy Timmons to Simmons and other employees stating that "Credit Suisse has requested more cautionary language to be added [to the preliminary prospectus] regarding our ability to renew warehouse lines[13] and meet margin calls." Motion at 6.

4. SEC Trial Ex. 90: An email from Burns to "several Thornburg recipients, instructing that '[i]f KPMG or anyone else asks about the postponement of this deal, you should refer them to me.'" Motion at 6.

5. SEC Trial Ex. 107: An email from Burns that states a plan to "print the 'red' (i.e., the preliminary prospectus) on Wednesday night, file the Form 10-K before markets open on Thursday, file the 'red' on Thursday, print the 'black' (i.e., the final prospectus) on Friday, and settle on Monday." Motion at 6.

6. SEC Trial Ex. 164: An email from Nathan Fellers that states:

   Underwriters have caught wind or heard rumors that we haven't met all our margin calls and will most likely want to update language in the prospectus. We could try to stick with the language that's in the 10-k, but I feel that we will get

---

[13]Warehouse lending is a line of credit given to a loan originator to pay for a mortgage the borrower used to purchase property. The life of the loan generally extends from its origination to the time it is sold into the secondary market, either directly or through securitization. The payment of warehouse lines of credit is ensured by lenders through charges on each transaction in addition to charges when loan originators post collateral. Warehouse lending, Investopedia, http://www.investopedia.com/terms/w/warehouse_lending.asp (last visited June 20, 2016).

caught stretching the truth and jeopardize our street relationships, or worse. Motion at 6.

7.  <u>SEC Trial Ex. 173</u>: An email from Deborah Burns that states:

We are being asked to make some very negative disclosures. The impact of this disclosure on the company could be very damaging, especially if the investors walk. In short, if we make these disclosures and don't get 2008-1 [the securitization] closed we will have put ourselves in the worst possible position with no good news to show for it.  Motion at 7.

Motion at 5-7 (citing Marks Decl. ¶¶ 46-52, Exs. MM-SS, filed March 17, 2016 (Doc. 404-26-38)).  The Defendants reiterate that Thornburg Mortgage's securitization decisions and filings are not relevant to the issues in the case, because they occurred after Thornburg Mortgage filed the 2007 Form 10-K.  <u>See</u> Motion at 7.

The Defendants argue that the SEC should not be able to use these emails to show that Thornburg Mortgage could not meet margin calls or postponed a securitization transaction to avoid disclosures.  <u>See</u> Motion at 7.  The Defendants contend that this argument is improper for trial, because there is no remaining claim regarding an inability to meet margin calls and the Court already ruled that the Form 10-K was not misleading "on that front."  Motion at 7-8 (citing <u>SEC v. Goldstone</u>, 952 F. Supp. 2d 1060, 1226 (D.N.M. 2013)(Browning, J.)).  Last, the Defendants explain that these emails have no relevance whether the Defendants disbelieved the OTTI conclusion or whether there was a misrepresentation to KPMG regarding the 2007 Form 10-K.  <u>See</u> Motion at 8.  The Defendants ask the Court to bar the SEC from presenting evidence or argument about the delayed securitization.  <u>See</u> Motion at 8.

2.  **The Response**.

The SEC responded to the Motion on April 14, 2016.  <u>See</u> Plaintiff U.S. Securities and Exchange Commission's Opposition to Defendants' Motion *In Limine* to Exclude Irrelevant and Prejudicial Evidence Suggesting Defendants Misled Investors or KPMG with Respect to Matters

Other than the OTTI Conclusion in the 2007 Form 10-K, filed April 14, 2016 (Doc. 420)("Response").  The SEC contends that the various documents suggesting that the Defendants attempted to mislead investors and KPMG are relevant, because they "are probative of either the fact that Defendants issued a false OTTI disclosure or that they deceived KPMG."  Response at 1.  The SEC then argues that the evidence of the postponement of a securitization is relevant to subjective falsity and shows that the Defendants violated securities laws.  See Response at 1.

First, the SEC explains why the evidence that the Defendants want the Court to exclude is relevant to show that the Defendants misled investors and KPMG.  See Response at 2.  The SEC notes that each of the emails in question show the Defendants' intent, preparation, and plan to lie to investors and KPMG through the false Form 10-K.  See Response at 2-4.  Additionally, the SEC states that this evidence is admissible under rule 404(b)(2).  See Response at 2 n.1 (quoting Fed. R. Evid. 404(b)).  In summary, the SEC contends that the exhibits which the Defendants want the Court to exclude are relevant and not prejudicial, because the evidence supports the SEC's case, and it does not suggest a decision "on an improper basis."  Response at 4 (citing United States v. Delgado, No. CR 05-920 JB, 2006 WL 1228774, at *3 (D.N.M. Feb. 10, 2006)(Browning, J.)).

Second, the SEC contends that the evidence regarding the securitization's postponement is relevant and admissible.  See Response at 4.  The SEC explains that the Court has already ruled that "Thornburg Mortgage postponing the securitization further evidences subjective falsity."  Response at 4 (quoting Summary Judgment MOO at 599).  Additionally, the SEC argues that the evidence of the securitization postponement is important and highly relevant, because it suggests that Thornburg Mortgage filed a false Form 10-K showing no OTTI impairment and claim profitability.  See Response at 5.  The SEC explains that the Defendants

postponed the securitization to avoid disclosing unpaid margin calls, stating that, "by postponing the securitization because it could not presently state that it had met all margin calls, Goldstone is indicating that, if Thornburg Mortgage met all of its margin calls, he never intended to disclose that Thornburg Mortgage could not timely meet its margin calls."  Response at 5-6 (quoting Summary Judgment MOO at 600).  The SEC explains that the securitization postponement also evidences the OTTI claim, because it shows that the Defendants were attempting to hide the margin call situation from KPMG and investors.  See Response at 6.  Additionally, the SEC states that many of the emails which the Defendants want the Court to exclude show Thornburg Mortgage's efforts to hide the unmet margin calls from investors and are admissible to show the Defendants' "motive, intent, preparation, and plan to lie to investors via the false Form 10-K." Response at 6 (citing Fed. R. Evid. 404(b)).

The SEC concludes that the Court should deny the Motion.  See Response at 8.  The SEC reasons that the evidence is relevant and crucial to the SEC's case, and that there is no prejudice, because "the evidence provides no improper basis for the jury to make its decision."  Response at 7-8 (citing United States v. Delgado, 2006 WL 1228774, at *3).

3.   **The Reply**.

The Defendants replied on May 3, 2016.  See Defendants' Reply Memorandum in Support of Defendants' Motion In Limine to Exclude Irrelevant and Prejudicial Evidence Suggesting Defendants Misled Investors or KPMG With Respect to Matters Other than the OTTI Conclusion in the 2007 Form 10-K, filed May 3, 2016 (Doc. 440)("Reply").  The Defendants explain that the Motion seeks to exclude two categories of exhibits:

> (i) emails and other documents pertaining to a variety of miscellaneous matters including language for Thornburg's annual report and press releases, communications with KPMG with respect to which the SEC has never alleged any deception, and the website of Mr. Goldstone's current business venture, and

(ii) emails relating to an offering of mortgage-backed securities (the securitization) Thornburg was working toward at the time of the filing of Thornburg's 2007 Form 10-K on February 28, 2008.

Reply at 1. The Defendants assert that neither of these categories of evidence is relevant to the SEC's claims of securities fraud or auditor deception. See Reply at 1. The Defendants contend that it would be unfair for the SEC to use evidence that suggests Defendants did something wrong when the SEC has no claim aligned with those suggestions. See Reply at 2.

The Defendants contend that the SEC plans to use this evidence as propensity evidence, which precludes rule 404(b) of the Federal Rules of Evidence, to show that the Defendants' other acts show a propensity to commit the acts at issue here. See Reply at 2 (citing United States v. Rodella, 101 F. Supp. 3d 1075, 1109 (D.N.M. 2015)(Browning, J.)). The Defendants also contend that other jurisdictions have ruled that previous misrepresentations to a government agency are inadmissible in a securities fraud action relating to an alleged lie to the SEC. See Reply at 2 (quoting United States v. Cushing, No. S3 00 CR. 1098 (WHP), 2002 WL 1339101, at *3 (S.D.N.Y. June 18, 2002)(Pauley, J.)). Additionally, the Defendants explain that evidence that a company executive allegedly lied is irrelevant and inadmissible under rule 404(b) where it is used only to show that the executive "'will lie to any governmental entity.'" Reply at 2 (quoting United States v. Hatfield, 685 F. Supp. 2d 320, 323 (E.D.N.Y. 2010)(Seybert, J.)).

Next, the Defendants address the SEC's contentions that the evidence in question falls within rule 404(b)(2)'s exception, because it shows the Defendants' "'motive, intent, preparation, and plan'" to lie to investors and to KPMG. See Reply at 3 (quoting Response at 2-4, 7). The Defendants explain that, for these exhibits to be admissible under that exception, the SEC must show that "'the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to

commit the bad act.'"   Reply at 3 (quoting <u>United States v. Rodella</u>, 101 F. Supp. 3d at 1110). The Defendants assert that the SEC has not met this requirement and that, therefore, the evidence is inadmissible.  <u>See</u> Reply at 3.

Additionally, the Defendants contend that, even if the evidence has a proper purpose under rule 404, the Court should exclude the evidence under rule 403, because the "probative value is substantially outweighed by the potential for unfair prejudice."  Reply at 3 (citing <u>United States v. Rodella</u>, 101 F. Supp. 3d at 1109-10).   Further, the Defendants contend that the evidence is prejudicial, because it attempts to sway the jury into believing that the Defendants are "wrongdoers in a general sense" and could lead the jurors to find the Defendants guilty based on their emotions.  Reply at 3-4.  The Defendants note that character evidence "'is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.'"   Reply at 4 (quoting <u>United States v. Enjady</u>, 134 F.3d 1427, 1430 (10th Cir. 1998)).

The Defendants contend that the SEC intends to use the exhibits pertaining to miscellaneous matters not involving the OTTI judgment and related communications with KPMG to imply to the jury that the Defendants are guilty of the alleged offenses because of their "efforts to whitewash" other disclosures.  Reply at 4-5.  The Defendants assert that the SEC wants the jury to "infer that the Defendants had a propensity to commit bad acts."  Reply at 5 (citing <u>Rodella</u>, 101 F. Supp. 3d at 1110).  Further, the Defendants argue that the SEC fails to show how any of the evidence shows "intent, preparation, and plan" to lie, and that the Court should excuse the evidence, because any probative value is "outweighed by the potential for prejudice."  Reply at 5-6 (citing <u>Rodella</u>, 101 F. Supp. 3d at 1110).

Last, the Defendants contend that the SEC is attempting to use emails related to Thornburg Mortgage's securitization filings to suggest to the jury that the Defendants "engaged in separate misconduct in order to support a finding of liability."  Reply at 6.  The Defendants assert that the Court has already ruled that the Form 10-K "did not need to disclose more about how the margin calls were met," and, therefore, the SEC's contentions that the postponement of the securitization was to hide the unmet margin calls is irrelevant, prejudicial, and confusing. Reply at 6 (citing SEC v. Goldstone, 952 F. Supp. 2d at 1094).  The Defendants note that they are not attempting to exclude any reference to the securitization's postponement.  See Reply at 6. Instead, the Defendants seek to exclude only a series of emails, which they did not author, relating to the decision to not include certain language about the margin calls in the Form 10-K disclosures and unrelated securitization filings.  See Reply at 7.  The Defendants assert that, because there was "no obligation to include the language" and they did not write any of the emails, these exhibits will mislead and confuse the jury.  Reply at 7.

The Defendants reiterate that the SEC plans to use each of their target exhibits regarding the securitization filings to show that the Defendants "wanted to 'hide the truth about unmet margin calls from investors.'"  Reply at 7-8 (citing Response at 6-7).  The Defendants argue, however, that they had no duty to disclose to the public that Thornburg Mortgage had unmet margin calls, because Thornburg Mortgage had met all of its margin calls when the Form 10-K was filed.  Reply at 8 (citing SEC v. Goldstone, 952 F. Supp. 2d at 1223).  Additionally, the Defendants contend that the Court should bar the evidence because of its ability to mischaracterize the Defendants' conduct, which was legal and not the subject of the current case. See Reply at 8.  The Defendants conclude that using this evidence would focus the jury's attention on "uncharged, unproven claims" and would allow the SEC to prove liability with

propensity evidence.   Reply at 8.   Last, the Defendants state: "There is . . . no question that propensity would be an 'improper basis' for conviction and that evidence of a prior conviction is subject to analysis under Rule 403 for relative probative value and for prejudicial risk of misuse as propensity evidence."   Reply at 8 (quoting Old Chief v. United States, 519 U.S. 172, 182 (1997)).   For these reasons, the Defendants ask the Court to exclude these exhibits related to the securitization's postponement.   See Reply at 9.

### 4.   **The Hearing**.

The Court held a hearing on May 11, 2016.   See Transcript of Hearing at 1 (taken May 11, 2016), filed May 20, 2016 (Doc. 466)("Tr.").   The Court opened the discussion of the Motion by stating that it was "inclined to deny the Motion," because the SEC would need some "leeway" to prove the high standard that subjective falsity requires.   Tr. at 125:15-18 (Court). Additionally, the Court stated that it sees the series of incidents as one event and, therefore, is inclined to overrule the rule 404(b) objection.   See Tr. at 125:21-126:2 (Court).

The Defendants stated that they seek to exclude two categories of documents: a series of emails "relating to issues other than OTTI and the 10-K," and a series of emails about the securitizations that the Defendants did not author.   Tr. at 126:16-21 (Lee).   For the first category, the Defendants acknowledged the high burden of subjective falsity, but argued that the emails they seek to exclude all postdate the OTTI judgment on which the claim rests.   See Tr. at 127:1-9 (Lee).   The Defendants explained that, because the emails postdate the judgment date, they also postdate "any sort of issue of subjective falsity."   Tr. at 127:14-15 (Lee).   For the second category, the Defendants argued that the documents are not relevant to the OTTI judgment, because they relate to other filings instead of the Form 10-K.   See Tr. at 127:16-17 (Lee).

The Court commented that the res gestae is the total cumulative events and that "slicing"

the total time period is not the proper way to analyze the situation.  Tr. at 128:7-11 (Court).  The Court explained that someone can say something "three weeks from today that's terribly relevant and material evidence," and that a statement postdating the filing of the document is not necessarily irrelevant.  Tr. at 128:20-24 (Court).  The Defendants disagreed that the res gestae is the total cumulative events.  See Tr. at 129:1-7 (Lee).  Arguing that the evidence in question postdates the OTTI analysis and is unrelated to that OTTI judgment, the Defendants contend that the evidence is separate, because it does not show a preparation or plan for the charged offense.  See Tr. at 129:1-7 (Lee).  Further, the Defendants explained that the evidence they seek the Court to exclude is propensity evidence, which is improper under rule 404(b).  See Tr. at 129:19-22 (Lee).  Additionally, the Defendants stated that they do not understand how a screenshot from Goldstone's current website is relevant.  See Tr. at 129:24-130:1 (Lee).

The Defendants' arguments were "largely the same" for the securitization evidence, but they noted that they are not trying to exclude the theory that the Defendants postponed the securitization to address the margin calls.  Tr. at 130:7-13 (Lee).  Instead, the Defendants are asking the Court to exclude the arguments that there were other violations related to the securitization or failures to disclose.  See Tr. at 130:16-19 (Lee).  The Defendants contended that these arguments would only prejudice the jury.  See Tr. at 131:6-7 (Lee).  Finally, the Defendants explained that, because they did not author any of the emails, the emails "can't be probative of any other clients' intent, preparation, and plan," and do not fall within a rule 404(b) exception.  Tr. at 131:8-13 (Lee).

The SEC stated that the Court has already ruled in the summary judgment briefing that postponing the securitization is evidence of subjective falsity.  See Tr. at 131:25-132:3 (Bliss).  The SEC contended that both categories of evidence that the Defendants seek to exclude are

connected with Thornburg Mortgage's need to raise money.  See Tr. at 132:3-14 (Bliss).

Further, the SEC explained that the Defendants' attempt to whitewash the truth and keep it from

investors is a "singular act" and a "continuing act of hiding the truth from investors."  Tr. at

132:17-23 (Bliss).  Additionally, the SEC asserted that the emails are relevant to meet the high

burden of subjective falsity.  See Tr. at 133:3-6 (Bliss).  Last, the SEC contended that the emails

show Goldstone's efforts to "whitewash or limit disclosures made to investors," which are

important to scienter.  Tr. at 133:8-11 (Bliss).

The SEC assured the Court that it planned to use the screenshot only to question

Goldstone about the basic facts of his work history.  See Tr. at 133:22-134:2 (Bliss).  The SEC

then argued, however, that it is entitled to question Goldstone over the fact that his website

"characterizes his work at Thornburg, but it does not mention the fact that he led Thornburg into

bankruptcy."  Tr. at 134:16-21 (Bliss).  Next, the SEC explained that the screenshot is relevant to

Goldstone's character.  See Tr. at 135:3-5 (Bliss).  The Court responded: "Isn't that propensity

evidence?"  Tr. at 135:6 (Court).  The SEC responded that it might be and that it needed to

discuss the matter further.  See Tr. at 135:9-11 (Bliss).

The SEC then explained that Exhibit 307 is particularly important, because it is an email

from Goldstone about the restatement representation letter made before the Defendants disclosed

the Citigroup Global reservation of rights letter.  See Tr. at 135:18-136:1 (Bliss).  The SEC

argued that this email shows that the Defendants "were aware of [the] Peloton collapse prior to

the filing of the [Form 10-K], and Ms. Starrett had written that the Defendants were intentionally

not telling KPMG about the late margin call payments."  Tr. at 136:2-6 (Bliss).

In reference to the securitization emails, the SEC explained that at least one of the

Defendants received the emails.  See Tr. at 136:10-13 (Bliss).  Additionally, the SEC contended

- 30 -

that Goldstone wrote to the Thornburg Mortgage Board "that the reason that the securitization was being postponed was to avoid disclosing margin calls," which shows that Goldstone was in control of the securitization's postponement.  Tr. at 136:17-22 (Bliss).

Last, the SEC responded to the Defendants' rule 404(b) concerns by stating that the emails show "intent, preparation, and plan to lie."  Tr. at 137:1-5 (Bliss).  The SEC agreed that the situation is a singular act, but argued that the relevant evidence would be admissible even if considered as separate evidence.  See Tr. at 137:7-12 (Bliss).  Further, the SEC argued that Burns' requirement that KPMG inquiries be directed to her shows a plan to hide the truth from KPMG and the outside world.  See Tr. at 137:10-18 (Bliss).  Additionally, the SEC explained that the emails show that Goldstone was being honest with the Thornburg Mortgage Board about postponed securitization, which is "classic evidence that would go to plan, intent, and preparation."  Tr. at 137:18-24 (Bliss).  Finally, the SEC stated that it does not have a separate claim for the securitization itself, but that its securitization evidence supports its existing claims. See Tr. at 138:2-6 (Bliss).

The Defendants agreed with the Court that the screenshot of Goldstone's website is propensity evidence.  See Tr. at 138:10-12 (Lee).  Further, the Defendants expressed their concern with the SEC's assertions that they are "whitewashing the truth" after the Form 10-K, noting that the SEC has not charged them with "whitewashing the truth."  Tr. at 139:2-6 (Lee).  The Defendants were concerned with the potential prejudice of that claim leading the jury to believe that these events are all interrelated instead of focusing on the specific statements relating to the OTTI judgment.  See Tr. at 139:7-12 (Lee).  In response to the securitization emails, the Defendants contended that the statements made by others do not show any plan, intent, or preparation.  See Tr. at 139:13-17 (Lee).  Last, the Defendants stated their fear that the SEC will

imply to the jury that the securitization's postponement is a separate claim.  See Tr. at 139:24-140:2 (Lee).  In the alternative, the Defendants asked the Court to give a limiting instruction when the emails are introduced.  See Tr. at 140:2-5 (Lee).

The Court stated that it will not preclude the use of "the website or the face page to get basic data and talk to the witness about it."  Tr. at 140:8-10 (Court).  The Court explained that it will not, however, allow the SEC to ask Goldstone what is left out of his work history, because it could lead the jury to believe that he is omitting something.  See Tr. at 140:11-17 (Court)(citing Fed. R. Evid. 404(b)).  Further, the Court stated that it believes the other issues are "so close in time, certainly on the securitization issues, the planning of it, I'm not seeing a basis for excluding the evidence, at least on relevancy grounds."  Tr. at 140:18-22 (Court).  The Court stated that this evidence is so important that excluding it would "unduly harm" the SEC's case.  Tr. at 140:23-141:2 (Court).  To end the discussion of this Motion, the Court stated that it is "inclined to deny it, with the exception of . . . how we're going to deal with the website."  Tr. at 140:3-5 (Court).

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is

particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'"  United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012) (Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989)(Baldock, J.).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."  United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(Tacha, J.)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)).  The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."  United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(Baldock, J.).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999)(Kelly, J.), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v.

Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.).   The Supreme Court of the United

States has noted:

> In deference to a district court's familiarity with the details of the case and its
> greater experience in evidentiary matters, courts of appeals afford broad
> discretion to a district court's evidentiary rulings . . . .   This is particularly true
> with respect to Rule 403 since it requires an "on-the-spot balancing of probative
> value and prejudice, potentially to exclude as unduly prejudicial some evidence
> that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. at 384 (quoting 1 Steven Alan Childress &

Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).   See United States v.

Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)("Assessing the probative value of [proffered

evidence], and weighing any factors counseling against admissibility is a matter first for the

district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional

response or would otherwise tend to adversely affect the jury's attitude toward a particular

matter.   See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999)(Sanborn, J.).

Evidence is not unfairly prejudicial merely because it damages a party's case.   See United States

v. Caraway, 534 F.3d at 1301;   United States v. Curtis, 344 F.3d 1057, 1067 (10th

Cir. 2003)(Ebel, J.);   United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991)(Holloway,

J.).   Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest

decision on an improper basis, commonly, though not necessarily, an emotional one.'"   United

States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(Hartz, J.)(quoting Fed. R. Evid. 403

advisory committee notes).

## LAW REGARDING RES GESTAE

The Tenth Circuit has explained that "[e]vidence of other crimes should not be

suppressed when those facts come in as res gestae -- as part and parcel of the proof of the

offense[] charged in the indictment." United States v. Kimball, 73 F.3d 269, 272 (10th Cir. 1995)(Logan, J.)(alteration in original)(internal quotations and citations omitted). The Tenth Circuit has approved using res gestae evidence "when it provides the context for the crime, is necessary to a full presentation of the case, or is appropriate in order to complete the story of the crime on trial by proving its immediate context or the res gestae." United States v. Kimball, 73 F.3d at 272 (internal quotations and citations omitted). The Sixth Circuit has defined res gestae as "those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense." United States v. Hardy, 228 F.3d 745, 748 (6th Cir. 2000)(Collier, J.)(citations omitted). See United States v. McVeigh, 153 F.3d 1166, 1203 (10th Cir. 1999)(Ebel, J.)(describing res gestae evidence as "inextricably intertwined with proper evidence" (internal quotations omitted)). As the Sixth Circuit in United States v. Hardy explained,

> Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense.

228 F.3d at 748 (citation omitted). In Wilson v. Jara, No. CIV 10-0797, 2011 WL 6739166 (D.N.M. Nov. 1, 2011)(Browning, J.), aff'd on other grounds, Wilson v. Jara, No. 11-2231, 2013 WL 923192 (10th Cir. Mar. 12, 2013)(unpublished),[14] the Court allowed evidence that, in the course of an allegedly unlawful arrest, a plaintiff spat on and touched the defendant police officers. See 2011 WL 6739166, at *1, *8. The Court concluded that the spitting was "res

---

[14] Wilson v. Jara is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Court finds that Wilson v. Jara has persuasive value with respect to a material issue, and will assist the Court in its disposition of this memorandum opinion and order.

gestae of the incident," because it placed the plaintiff's conduct "in context": "If Wilson's touching of a police officer, and other conduct and speech, contributed to [her son's] resisting arrest, her conduct could be viewed as disturbing the peace and disorderly conduct. . . .  Wilson should not be able to suggest that everything was calm and her son did not resist arrest."  2011 WL 6739166, at *8.

In United States v. Ganadonegro, No. CR 09-0312 JB, 2011 WL 3957549 (D.N.M. Aug. 30, 2011)(Browning, J.), the Court allowed evidence that a defendant, accused of causing the death of an infant child, called a family member on three occasions to complaint that he could not get the infant to stop crying, and that the infant was crying when the family member arrived. See 2011 WL 3957549, at *1.  The Court found that the evidence was res gestae and background information useful to "paint the picture that the baby cried a lot," and not that the defendant acted in conformity with his previous conduct.  2011 WL 3957549, at *1, *5 ("the evidence that the United States seeks to introduce is not 404(b) evidence, . . . it is closer to background evidence or res gestae evidence . . . .").  Additionally, in United States v. Zuni, No. CR 05-2369 JB, 2006 WL 4109664 (D.N.M. July 7, 2009)(Browning, J.), the Court admitted evidence that an alleged rape and kidnapping occurred after a defendant had a dispute with a victim regarding their children, and that the dispute escalated into violence and culminated in the charged offenses. 2006 WL 4109664, at *2-3.  The Court determined that this evidence made the charged offenses understandable "by describing the context in which they arose," as these events had a "causal, spatial, and temporal connection with the charged offense."  2006 WL 4109662, at *6.

## LAW REGARDING RULE 404(b)

Under rule 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith.  See Fed. R. Evid. 404(b).  Rule 404(b) provides:

**(b)**     **Crimes, Wrongs, or Other Acts.**

> **(1)**     **Prohibited Uses.**  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> **(2)**     **Permitted Uses; Notice in a Criminal Case.**  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  On request by a defendant in a criminal case, the prosecutor must:
>
> > **(A)**     provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
> >
> > **(B)**     do so before trial -- or during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b).  "In other words, one cannot present evidence the relevance of which is based on the forbidden inference: the person did X in the past, therefore he probably has a propensity for doing X, and therefore he probably did X this time, too."  Wilson v. Jara, No. CIV 10-0797 JB/WPL, 2011 WL 6739166, at *5 (D.N.M. Nov. 1, 2011)(Browning, J.).  "The rule, however, has a number of 'exceptions[15]' -- purposes for which such evidence will be

---

[15]The United States Court of Appeals for the Seventh Circuit stated that describing rule 404(b)(2) as exceptions to 404(b)(1)'s broad rule is a misconception, because subsection (2) permits the evidence to be used for other purposes that are not described in subsection (1).  See United States v. Gomez, 763 F.3d 845, 855 n.3 (7th Cir. 2014)(en banc).

A common misconception about Rule 404(b) is that it establishes a rule of exclusion subject to certain exceptions. That's not quite right. The text of the rule

admissible." <u>Wilson v. Jara</u>, 2011 WL 6739166, at *5.  Those purposes include proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. <u>See</u> Fed. R. Evid. 404(b).  The Supreme Court has enunciated a four-part process to determine whether evidence is admissible under rule 404(b).  <u>See</u> <u>Huddleston v. United States</u>, 485 U.S. 681, 691-92 (1988)(Rehnquist, J.).  The Tenth Circuit has consistently applied that test:

> To determine whether Rule 404(b) evidence was properly admitted we look to [a] four-part test . . . : (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

<u>United States v. Zamora</u>, 222 F.3d 756, 762 (10th Cir. 2000)(Ebel, J.)(citing <u>United States v. Roberts</u>, 185 F.3d 1125 (10th Cir. 1999)(Porfilio, J.)).  <u>See</u> <u>United States v. Higgins</u>, 282 F.3d 1261, 1274 (10th Cir. 2002)(Holloway, J.); <u>United States v. Hardwell</u>, 80 F.3d 1471, 1488 (10th Cir. 1996)(Briscoe, J.)(citing <u>Huddleston v. United States</u>, 485 U.S. at 691-92).

Rule 404(b)'s prohibition finds its source in the common-law protection of the criminal defendant from risking conviction on the basis of evidence of his character.  <u>See</u> <u>United States v.</u>

---

does not say that propensity evidence is inadmissible *except* when it is used to prove motive, opportunity, intent, etc. Rather, it says that propensity evidence—other-act evidence offered to prove a person's character and inviting an inference that he acted in conformity therewith—is *categorically* inadmissible.  Fed. R. Evid. 404(b)(1).  But the rule also acknowledges that there may be "another" use for other-act evidence—*i.e.,* a different, *non-propensity* use. Fed. R. Evid. 404(b)(2).  So it's technically incorrect to characterize the purposes listed in subsection (2) as "exceptions" to the rule of subsection (1). The Rules of Evidence do contain some true exceptions to the rule against propensity evidence, but they're found elsewhere—notably in Rules 412 through 415, which are limited to sexual-assault cases. In contrast, the purposes enumerated in subsection (2) of Rule 404(b) simply identify situations in which the rule of subsection (1) by its terms does not apply.

<u>United States v. Gomez</u>, 763 F.3d at 855 n.3 (emphases in original).

Lucas, 357 F.3d 599, 611 (6th Cir. 2004)(Boggs, J.).  In United States v. Phillips, 599 F.2d 134 (6th Cir. 1979)(Merritt, J.), the United States Court of Appeals for the Sixth Circuit noted, in addressing rule 404(b)'s limitations and requirements, that the rule addresses two main policy concerns: (i) that the jury may convict a "bad man" who deserves to be punished, not because he is guilty of the crime charged, but because of his prior or subsequent misdeeds; and (ii) that the jury will infer that, because the accused committed other crimes, he probably committed the crime charged.  United States v. Phillips, 599 F.2d at 136.  "'[W]hen other-act evidence is admitted for a proper purpose and is relevant, it may be admissible even though it has 'the potential impermissible side effect of allowing the jury to infer criminal propensity.'"  United States v. Moran, 503 F.3d 1135, 1145 (10th Cir. 2007)(Tacha, J.)(quoting United States v. Cherry, 433 F.3d 698, 701 n.3 (10th Cir. 2005)(Tacha, J.)).  See United States v. Romero, No. CR 09-1253 JB, 2011 WL 1103862, at *12 (D.N.M. March 9, 2011)(Browning, J.)("Rule 404(b) evidence almost always has some propensity evidence; that is the reason for limiting instructions.").

When bad-act evidence is both relevant and admissible for a proper purpose, "the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the bad act." United States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999)(McKee, J.)(alterations omitted).  The Tenth Circuit has also stated that district courts must "identify specifically the permissible purpose for which such evidence is offered and the inferences to be drawn therefrom."  United States v. Youts, 229 F.3d 1312, 1317 (10th Cir. 2000)(Seymour, J.)(citing United States v. Kendall, 766 F.2d 1426, 1436 (10th Cir. 1985)(Seymour, J.)).

> The Government must articulate precisely the evidentiary hypothesis by which a
> fact of consequence may be inferred from the evidence of other acts.  In addition,

> the trial court must specifically identify the purpose for which such evidence is offered and a broad statement merely invoking or stating Rule 404(b) will not suffice.

United States v. Romine, 377 F. Supp. 2d 1129, 1132 (D.N.M. 2005)(Browning, J.)(quoting United States v. Kendall, 766 F.2d at 1436). Rules 401 to 403 and the conditional relevancy rules in rule 104(b) govern the applicable burden the proponent must meet to successfully offer evidence under rule 404(b). See Huddleston v. United States, 485 U.S. at 686-91.

The Tenth Circuit has recognized the probative value of uncharged, unrelated acts to show motive, intent, and knowledge, when the uncharged, unrelated acts are similar to the charged crime and sufficiently close in time. See United States v. Olivo, 80 F.3d 1466, 1468-69 (10th Cir. 1996)(Briscoe, J.)(finding the district court did not abuse its discretion when it admitted evidence about an event over one year after a defendant's arrest); United States v. Bonnett, 877 F.2d 1450, 1461 (10th Cir. 1989)(Brorby, J.)(holding that evidence about events over a year after the charged conduct was not "too remote in time and unrelated to the transactions with which he was charged"). The evidence's proponent may show this similarity through "physical similarity of the acts or through the 'defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offenses.'" United States v. Queen, 132 F.3d 991, 996 (4th Cir. 1997)(Niemeyer, J.)(quoting United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978)(en banc)). See United States v. Bonnett, 877 F.2d at 1461 ("The closeness in time and the similarity in conduct [are] matters left to the trial court, and [its] decision will not be reversed absent a showing of abuse of discretion."). The more similar the act or state of mind, the more relevant the evidence becomes. See United States v. Queen, 132 F.3d at 996. Moreover, when establishing probative value, although the uncharged crime must be similar to the charged offense if it is unrelated to the charged offense, it need not

- 40 -

be identical.  See United States v. Gutierrez, 696 F.2d 753, 755 (10th Cir. 1982)(McWilliams, J.).  "A much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind."  United States v. Myers, 550 F.2d 1036, 1045 (5th Cir. 1977)(Clark, J.).

In United States v. Tan, 254 F.3d 1204 (10th Cir. 2001), the Honorable LeRoy C. Hansen, United States District Judge for the District of New Mexico, excluded, in a second-degree murder case, evidence that the defendant had previously been convicted of driving while intoxicated.  See 254 F.3d at 1206-07.  The murder charge rose out of the defendant driving a vehicle while intoxicated and striking a motorcyclist with his vehicle.  See 245 F.3d at 1206.  Judge Hansen concluded that evidence of the other convictions would show only that the defendant had a propensity for drunk driving and would be more prejudicial than probative.  See 254 F.3d at 1207.  The Tenth Circuit reversed.  See 254 F.3d at 1213.  In an opinion that the Honorable Stephen H. Anderson, United States Circuit Judge for the Tenth Circuit, wrote, and Judges Seymour and Kelly joined, the Tenth Circuit held that, because second-degree murder requires proof of malice, the prior convictions were probative of the proper purpose of proving malice or intent, reasoning that a person who is convicted of drunk driving is more aware of the substantial risks and harm that it can cause to others.  See 254 F.3d at 1210-11.

The Court dealt with rule 404(b) in several recent cases.  In United States v. Rodella, No. CR 14-2783 JB, 2014 WL 6911573 (D.N.M. Sept. 21, 2014)(Browning, J.), the United States prosecuted Thomas R. Rodella, the former Sheriff of Rio Arriba County, for unlawfully arresting and injuring a motorist during a traffic stop.  See 2014 WL 6911573, at *4.  The United States

argued that Rodella, wearing civilian clothes, tailgated the motorist for an extended period to provoke a disrespectful act before pulling the motorist over and forcing him to submit to Rodella's authority. See 2014 WL 6911573, at *5. The United States offered evidence of three prior incidents in which Rodella, wearing civilian clothes, drove in a threatening manner, stopped motorists, and forced them to acknowledge his authority. See 2014 WL 6911573, at *2-3. The Court admitted the evidence, because there was a high degree of similarities between the prior incidents and the charged crime, and to help the jury determine whether Rodella's conduct was willful. See 2014 WL 6911573, at *15. The Court also required the United States to make specific statements in its closing argument and offered to provide a limiting instruction to prevent the jury from using the evidence for propensity. See 2014 WL 6911573, at *18. Rodella appealed the Court's ruling to the Tenth Circuit, arguing that the 404(b) evidence required the jury to make inferences based on propensity to find that he acted willfully.[16] See United States v. Rodella, 804 F.3d 1317, 1334 (10th Cir. 2015).

The Tenth Circuit affirmed the Court's decision. See United States v. Rodella, 804 F.3d at 1334. It concluded that the jury did not have to make propensity-based inferences to find that Rodella acted willfully:

[T]he jury was not required to make any such inferences in order to also infer that Rodella purposely had his son drive in a threatening manner in order to provoke

---

[16]The Tenth Circuit treats rule 404(b) evidence with less hostility than the Seventh Circuit, with the Seventh Circuit holding that, if intent is not disputed, then other-act evidence is not admissible to show intent. See United States v. Rodella, 101 F. Supp. 3d 1075, 1117 n.9 (citing United States v. Gomez, 763 F.3d at 858). The Seventh Circuit's treatment of other-act evidence is distinct between general and specific intent crimes. See United States v. Rodella, 101 F. Supp. 3d at 1117 n.9. For general intent crimes, "other-act evidence is not admissible to show intent *unless* the defendant puts intent at issue beyond a general denial of guilt," but the Seventh Circuit rejects a similar rule for specific intent crimes, "because in this class of cases intent is automatically at issue." United States v. Rodella, 101 F. Supp. 3d at 1117 n.9 (quoting United States v. Gomez, 763 F.3d at 858).

Tafoya into a disrespectful act, that Tafoya purposely intended to force Tafoya to submit to his authority and not to enforce any traffic law, and that Rodella knew that his identity as a law enforcement officer was not readily apparent to Tafoya until the very end of the encounter.   These inferences would reasonably have "rest[ed] on a logic of improbability that recognizes that a prior act involving the same knowledge decreases the likelihood that the defendant lacked the requisite knowledge in committing the charged offense."   *Moran,* 503 F.3d at 1145; *see United States v. Queen*, 132 F.3d 991, 996 (4th Cir.1997)(noting that the prior doing of other similar acts is relevant in terms of "reducing the possibility that the act in question was done with innocent intent").

United States v. Rodella, 804 F.3d at 1334.  The Tenth Circuit also concluded that the evidence's

potential prejudice did not substantially outweigh its probative value:

At most, [Rodella] asserts that the government "elicited unnecessary details from the [other-act] witnesses -- including about how they felt when Rodella accosted them." . . . To the extent Rodella is implying that this testimony would have caused the jury to find him guilty on the basis of its emotions or to punish Rodella for his involvement in the other acts, the fact of the matter is that Rodella's conduct towards Tafoya was more severe than his conduct towards the drivers involved in the other three incidents.

United States v. Rodella, 804 F.3d at 1334-35.

Under different facts, the Court reached the opposite conclusion in United States v. Chapman, No. CR 14-1065 JB, 2015 WL 4461243 (D.N.M. July 15, 2015)(Browning, J.).  In that case, the United States sought to introduce evidence that the defendant in a domestic violence prosecution: (i) threatened his wife to the point where she contacted the police in 2013; (ii) removed his wife's battery cables so that her car would not operate; and (iii) removed all vehicle keys from the couple's home so that his wife could not leave.  See 2015 WL 4461243, at *3.  The Court excluded the evidence, explaining that it "is relevant only for propensity purposes" and that the "danger of unfair prejudice substantially outweighs its probative value." 2015 WL 4461243, at *13-14.  First, the Court dismissed the United States' argument that the statements could rebut the defendant's self-defense argument:

> These prior incidents are relevant to showing that L. Chapman's statements that
> D. Chapman was the initial aggressor and that he acted in self-defense are untrue
> only if the jury draws the forbidden inference that, because L. Chapman has been
> angry in the past, he was likely angry this time and, thus, was the initial aggressor
> and did not act in self-defense.

2015 WL 4461243, at *15.  Second, the Court rejected the United States' argument that the

incidents were relevant to show motive on the same grounds.  See 2015 WL 4461243, at *15.  It

noted that "[e]vidence that L. Chapman became angry could only be relevant to showing motive

if the jury inferred that, because L. Chapman has been angry in the past, the reason he assaulted

D. Chapman -- his motive -- was that he was angry."  2015 WL 4461243, at *15.  The Court

stated that the incidents' unfair prejudice substantially outweighed their probative value.  See

2015 WL 4461243, at *15.  Finally, it concluded that the incidents involving the vehicle battery

and keys were not "similar and sufficiently close in time to the charged crime."  2015 WL

4461243, at *16 (citing United States v. Olivo, 80 F.3d 1466, 1469 (10th Cir. 1996)).

The Court granted a motion to introduce evidence under rule 404(b) in United States v.

Ballou, 59 F. Supp. 3d 1038 (D.N.M. 2014)(Browning, J.).  United States v. Ballou involved a

nurse's prosecution for assaulting a patient within a Department of Veterans Affairs hospital.

See 59 F. Supp. 3d at 1043-44.  The United States moved to bar the nurse from introducing

testimony and documentary evidence of hostile encounters between the alleged assault victim

and various hospital employees, including the defendant.  See 59 F. Supp. 3d at 1045-46.  The

Court allowed the testimony -- but not most of the documents -- about the prior altercations

between the victim and hospital employees.  See 59 F. Supp. 3d at 1062.  It explained that, under

the "relaxed 'reverse' rule 404(b)[17] standard" applicable to non-defendants, the nurse could use

---

[17]The reverse 404(b) rule applies to the admissibility of prior acts that the defendants
proffer.  See U.S. v. Ballou, 59 F. Supp. 3d 1038, 1054 (D.N.M. 2014) (Browning, J.).  The
Tenth Circuit notes that rule 404(b)

testimony about prior incidents "to show Ballou's [the nurse's] state of mind -- in particular, his belief regarding the necessity and amount of force he needed to use against Jaquez to defend himself, and the reasonableness of that belief -- as well as to show Jaquez' animus towards the VA Hospital staff, including Ballou specifically."  59 F. Supp. 3d at 1062.  It excluded most of the documents on separate hearsay grounds.  See 59 F. Supp. 3d at 1063.

In Leon v. FedEx Ground Package System, Inc., 313 F.R.D. 615 (D.N.M. 2016) (Browning, J.), the Court concluded that prior-act evidence was admissible in that civil case, because it was not being used for the "conduct-in-conformity inference that rule 404(b) prohibits."  Leon v. FedEx Ground Package Sys., Inc., 313 F.R.D. at 648.  Further, the Court noted that the evidence would have a propensity effect, but that would not make it "inadmissible if it is proffered for other purposes."  313 F.R.D. at 648.

## ANALYSIS

The Court will grant the Motion in part and deny it in part.  The Court will allow the SEC to introduce both sets of evidence in question, including the communications not directly related to the OTTI judgment in the 2007 Form 10-K and emails relating to Thornburg Mortgage's postponement of the securitization filings.  The Court will limit the use of the screenshot from Goldstone's website.   The SEC may use the screenshot to question Goldstone about basic

---

is typically used by prosecutors seeking to rely on a criminal defendant's prior bad act as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in the crime charged. The Rule is not so limited in its application, however, and evidence of a witness' other wrongs, acts, or crimes is admissible "for defensive purposes if it tends, alone, or with other evidence, to negate the defendant's guilt of the crime charged against him."

United States v. Montelongo, 420 F.3d 1169, 1174 (quoting Agushi v. Duerr, 196 F.3d 754, 760 (7th Cir. 1999)).

information, but the SEC may not ask Goldstone what he has left out of his work history or use the screenshot to elicit character information.

## I.   THE SEC MAY INTRODUCE EVIDENCE THAT THE DEFENDANTS MISLED INVESTORS OR KPMG WITH RESPECT TO MATTERS OTHER THAN THE OTTI CONCLUSION IN THE 2007 FORM 10-K.

The Court will allow the SEC to introduce both sets of evidence in question, including the emails and documents that are not directly related to the OTTI judgment in the 2007 Form 10-K and the emails relating to Thornburg Mortgage postponing its securitization, for two reasons.  First, this evidence is so inextricably intertwined with the OTTI conclusion that the res gestae[18] is a single event and forms an integral part of Thornburg Mortgage's response to the difficulty in meeting margin calls and the Restatement.  See United States v. Hardy, 228 F.3d at 748; United States v. Chavis, 429 F.3d 662, 670 (7th Cir. 2005)(noting that inextricably intertwined evidence is properly admitted to give the jury the complete story).  Second, this evidence is not inadmissible under rule 404(b), because it can be used to show the Defendants' motive, intent, preparation, and plan to keep Thornburg Mortgage in business.  See Fed. R. Evid. 404(b).

### A.   THE EVIDENCE THAT THE DEFENDANTS WANT THE COURT TO EXCLUDE IS ADMISSIBLE RES GESTAE EVIDENCE.

The Court concludes that both sets of evidence are admissible as res gestae, because the evidence is intertwined with the remaining claims and describe the context in which they arose. See United States v. Kimball, 73 F.3d at 272 (noting that evidence is admissible to "complete the story . . . by proving its immediate context or the res gestae").  The Defendants urge that the evidence should be excluded under rule 404(b) as propensity evidence, because it has no direct

---

[18]The Court cannot find any civil Court of Appeals decisions applying res gestae by name in this specific context, but the Court believes that the term captures the general sense that there are no separate events here.

relationship to the remaining claims in the case.  See Reply at 2; Tr. at 129:1-8 (Lee); Fed. R. Evid. 404(b).  The Honorable William H. Pauley III, United States District Judge for the Southern District of New York, ruled under rule 404(b) that previous misrepresentations to a government agency are inadmissible in a securities fraud action relating to an alleged lie to the SEC.  See United States v. Cushing, 2002 WL 1339101, at *3.  Judge Pauley's conclusion was based on the fact that the previous lie was completely unrelated to the current claim; it was a lie to a "separate investigatory authority on a different subject at a [different] point in time."  2002 WL 1339101, at *3.  In that same case, however, Judge Pauley states that "evidence may be admitted where it is closely 'intertwined' with the evidence regarding the charged offenses."  2002 WL 1339101, at *1 (citing United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)).

In this case, all of the events are so intertwined that the res gestae of this case is one cumulative event, and there are no separate wrongdoings or acts.  The emails and representation letter were written in the same general time period as the actions that gave rise to the SEC's claims and give relevant background information.  For example, Exhibit 120 shows that counterparties panicked and liquidated a large amount of mortgage securities, which can show the Defendants' perspective prior to filing the Form 10-K and the OTTI judgment.  See Response at 2.  Additionally, the evidence that the Defendants want the Court to exclude is important to paint the picture that Thornburg Mortgage was in a difficult position, and that the Defendants were attempting to guide the company through that situation with as little injury as possible.

### B.   THE EVIDENCE THAT THE DEFENDANTS WANT THE COURT TO EXCLUDE IS ADMISSIBLE UNDER RULE 404(b)(2).

Additionally, both sets of evidence are admissible under rule 404(b)(2) to show the Defendants' intent, preparation, and plan regarding the OTTI judgment.  See Fed. R. Evid. 401. The Defendants contend that the emails postdate the OTTI judgment and, therefore, the emails

are irrelevant because of the fact that they postdate "any sort of issue of subjective falsity."  Tr. at 127:14-15 (Lee).   The emails tend, however, to show the Defendants' motive, intent, preparation, and plan regarding the OTTI judgment.  See Fed. R. Evid.  401, 404(b).  As the Court noted earlier, that a statement postdates the filing of the document will not make it irrelevant -- a person could say something "three weeks from today that's terribly relevant and material evidence."  Tr. at 128:20-24 (Court).

Rule 404(b) states that: "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Rule 404(b)(2).  The SEC must prove subjective falsity, in the Defendants' actions surrounding the OTTI judgment, which includes the Defendants' subjective beliefs, such as their intent, preparation, and plan.  See Summary Judgment MOO at 584.  Circumstantial evidence may be used to show a person's subjective beliefs.  See Blasi v. Attorney Gen. of Com. of Penn., 120 F. Supp. 2d 451, 470 (M.D. Pa. 2000)(McClure, J.)("The element of subjective belief is especially difficult to prove, requiring circumstantial evidence to establish.").

While the evidence that the Defendants ask the Court to exclude is not required for the OTTI conclusion in the Form 10-K, the evidence is useful to give context to Thornburg Mortgage's position and insight into the Defendants' state of mind at the time surrounding the Form 10-K.  The emails that are not directly related to the OTTI judgment and the emails concerning the postponement of the securitization are relevant to show the Defendants' subjective intent with regard to the disclosures in the 2007 Form 10-K.  See United States v. Queen, 132 F.3d at 996 (indicating that similar acts are relevant in terms of "reducing the possibility that the act in question was done with innocent intent").  The Court previously concluded that the securitization's postponement is important evidence on subjective falsity.  See

Summary Judgment MOO at 599.  The SEC must prove the subjective falsity of the Defendants' OTTI determination.  See Summary Judgment MOO at 584; In re Credit Suisse First Boston Corp., 431 F.3d 36, 47 (1st Cir. 2005)("A plaintiff can challenge a statement of opinion by pleading facts sufficient to indicate that the speaker did not actually hold the opinion expressed.").  The United States Court of Appeals for the First Circuit explains subjective falsity in relation to similar claims, stating: "This transplantation makes sense; even though section 10(b), in terms, deals with statements of fact, a statement of opinion may be considered factual in at least two respects: as a statement that the speaker actually holds the opinion expressed and as a statement about the subject matter underlying the opinion."  Credit Suisse First Boston Corp., 431 F.3d at 47 (citing Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1991)).  In other words, subjective falsity requires that the statement be both objectively and subjectively false. See In re Puda Coal Sec. Inc., Litig., 30 F. Supp. 3d 230, 259 (S.D.N.Y. 2014)(Forrest, J.).  See also Fait v. Regions Fin. Corp., 655 F.3d 105, 113 (2d Cir. 2011).

Evidence that is admissible under rule 404(b) must still have a probative value that the potential for unfair prejudice and confusion of the jury does not substantially outweigh.  See United States v. Delgado, 2006 WL 1228774, at *3 (stating that evidence that passes rule 404(b) "must still survive the rule 403 balancing test to be admitted").  The Court concludes that there is significant probative value in allowing the jury to see the full picture of the situation at Thornburg Mortgage and the Defendants' motive, intent, and knowledge surrounding the filing of the Form 10-K.  Additionally, this evidence is not unfairly prejudicial, because background information is unlikely to provoke an emotional response or adversely affect the jury's attitude toward the Defendants.  See United States v. Rodriguez, 192 F.3d at 951.  Further, the Court concludes that this evidence is unlikely to confuse the jury.  While the evidence is not directly

linked to the OTTI conclusion, it will give the jury needed information to try and grasp the difficult concepts involved in OTTI and the Defendants' role in the OTTI conclusion.  For these reasons, the Court concludes that the probative value of the evidence is not substantially outweighed by the potential for unfair prejudice or misleading the jury.

## II.   THE COURT BARS THE SEC FROM QUESTIONING GOLDSTONE OVER WHAT INFORMATION IS NOT INCLUDED ON HIS WEBSITE.

The SEC may use the screenshot to question Goldstone about basic information, but the SEC may not ask Goldstone what specific information he has omitted from his information or work history.  Goldstone's website is available to the public and is useful to give basic facts about him.  Under rule 404(b), however, the Court will prohibit the SEC from asking what information is omitted, because that line of questioning would elicit solely propensity evidence.

The SEC stated that it should be able to describe Goldstone's character by questioning him as to why the website mentions his work at Thornburg Mortgage, but "does not mention the fact that he led Thornburg into bankruptcy."  Tr. at 134:16-135:5 (Bliss).  The Court concludes that the SEC would like to use the screenshot primarily as character evidence to show the jury that Goldstone chose not to include Thornburg Mortgage's collapse on his website.  In other words, the SEC wants the jury to infer that, because he is leaving out material information now, he probably did the same in 2008.  This evidence could create unfair prejudice by leading the jury to believe that: (i) if Goldstone chose to omit this information from his website, he has a propensity for dishonesty; and (ii) that he acted in accordance with that character trait to omit information from the 2007 Form 10-K.  See Fed. R. Evid. 404(b).  Further, the current website is too far removed from the events upon which the claims are based.  Some of it is not being offered for any legitimate 404(b) purpose.  The Court concludes that the evidence has only a propensity -- an illegitimate purpose -- and will not help the jury decide any issue in the case on

a proper basis. See United States v. Chapman, 2015 WL 4461243, at *15 ("Because the evidence is relevant to showing only propensity, the Court will exclude it."). For these reasons, the Court bars the SEC from asking Goldstone what is not on the website, i.e., the bankruptcy.

**IT IS ORDERED** that: Defendants' Motion *In Limine* No. 9 to Exclude Irrelevant and Prejudicial Evidence Suggesting Defendants Misled Investors or KPMG with Respect to Matters Other than the OTTI Conclusion in the 2007 Form 10-K, filed March 17, 2016 (Doc. 400), is denied in part and granted in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Danielle Voorhees
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

   *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Robert G. Badal
Los Angeles, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Heather Tewksbury
Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Aaron Thompson
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

 *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Robert J. Liubicic
Paul M. Torres
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

*Attorneys for Defendant Jane E. Starrett*