## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

vs.                                                                 No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

       Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion for Trial Continuance on Behalf of Defendants Larry A. Goldstone and Clarence G. Simmons, III, filed May 21, 2016 (Doc. 467)("Motion"). The primary issue is whether the Court should allow a trial continuance given that Defendant Jane E. Starrett, with whom Defendants Larry A. Goldstone and Clarence G. Simmons, III have had a joint defense for almost four years and who planned to take on half of all pre-trial and trial work, settled two weeks before trial. The Court concludes that there is not a high risk of prejudice to Goldstone and Simmons if the case is tried in June, 2016 with jury selection beginning June 6, 2016 as planned. The Court concludes that a trial continuance is not proper under the circumstances, because there are still fifteen days to prepare for trial, Goldstone and Simmons have been represented by at least thirteen attorneys from two firms during the heart of this case, and because the Court has a high degree of confidence that Wilmer, Cutler, Pickering, Hale and Dorr LLP and Rodey, Dickason, Sloan, Akin & Robb, PA will provide excellent representation to Goldstone and Simmons, even if they have to prepare for a few more witnesses. Accordingly, the Court will deny the Motion.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1).  The Court presents the facts solely to provide context for the Motion.  It continues to adhere to the decisions on the facts it reached in its Unsealed Memorandum Opinion and Order, filed August 22, 2015 (Doc. 371)("Summary Judgment MOO").

The Defendants are former officers of Thornburg Mortgage: Goldstone was the chief executive officer, Simmons was the chief financial officer, and Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The SEC alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[1]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[2]  Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the

---

[1]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[2]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo"[3] ARM securities; Thornburg Mortgage also purchased ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and investment

---

[3]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set.  Super jumbo mortgage, Wikipedia.  Fannie Mae purchases and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created.  See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends."  Fannie Mae, Investopedia.  The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates, because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined or regulated, but mortgage companies use it internally and independently to set loan parameters.  See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage, Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

business through reverse repurchase agreements[4] backed by ARM securities.  See Complaint ¶ 3, at 2.  Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed

---

[4]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to *repo*."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that

he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[5] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies,

---

[5]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."  Interest Only (IO) Strips, Investopedia (Apr. 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

having "'sold some additional IO securities[.]'"   Complaint ¶ 68, at 20 (quoting Email from

Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03

p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future

margin calls after filing the 2007 Form 10-K.  <u>See</u> Complaint ¶ 32, at 10.  The Defendants did

not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  <u>See</u> Complaint

¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008,

Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'"

to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet

while we deal with it.'"   Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008

Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing

the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22,

2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal
> for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we
> say will depend on where we are next week when we need to file.  But, our plan is
> to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also

discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet

while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting

Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple

one, meaning all margin calls have been met.'"   Complaint ¶ 31, at 10 (quoting Feb. 22, 2008

Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing. See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")).  Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an email to Starrett, in

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."  Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia.  "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K. I do not want there to be any issues based on Thursday activity.'" Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls. See Complaint ¶ 3, at 6; id. ¶ 41, at 12. Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K. See Complaint ¶ 7, at 3. In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets. See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash. To date, no such sales have been required . . . ."). Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[7] See Complaint ¶ 37, at

---

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP. About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/. According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset."

11.   The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that served as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008. See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007

---

The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2, (sent February 28, 2008, at 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).  In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'"  Complaint ¶ 94, at 27 (alterations in original).  See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, (sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email").  As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets;

(ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'" Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity, or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[9]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See Complaint ¶ 49, at 14-15.[10]  The Defendants did not disclose to

---

[9]An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider

KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, <u>see</u> Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, <u>see</u> Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, <u>see</u> Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, <u>see</u> Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern.  <u>See</u> Complaint ¶ 57, at 17.  Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's.  <u>See</u> Complaint ¶ 76, at 22.  "[A]t or about the time" that Simmons learned of the

---

documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, <u>see</u> March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."   Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"). The requested evidence included "correspondence with lenders/attorneys/shareholders, emails." Request for Correspondence, attached to March 3, 2008 Hall Email at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  At the time, KPMG, as auditor, was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.  KPMG did not become aware of the Citi Letter while preparing its Restatement.  See Complaint ¶ 101, at 29.  Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"  Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).   The analysis states: "'Due to a number of factors including **the**

**unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in mortgage valuations.'"   Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.  See Complaint at 1.  The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

The Court granted in part and denied in part the SEC's and the Defendants' motions to dismiss on July 8, 2013.  See Memorandum Opinion and Order at 2-3, filed July 8, 2013 (Doc. 190)("Motion to Dismiss MOO").   The Motion to Dismiss MOO dismissed the SEC's

allegations: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's outside auditor that Thornburg Mortgage successfully met its margin calls without violating its lending agreements, and did not sell assets to meet margin calls"; and (ii) "that the Defendants schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-K."   Motion to Dismiss MOO at 2.   It declined to dismiss the SEC's claim that "the representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was materially false or misleading."   Motion to Dismiss MOO at 2.   The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are primarily liable or liable as control persons for that misrepresentation in the 10-K, and the Court will not dismiss the SEC's allegations that the Defendants aided and abetted the misrepresentation, as the Court has determined that the SEC sufficiently alleged that Goldstone and Simmons made, and the Defendants provided substantial assistance to, the misrepresentation with knowledge of or recklessness to its falsity.   Similarly, the Court will not dismiss the SEC's allegations that the Defendants misled Thornburg Mortgage's auditor before the 2007 Form 10-K was filed through the statement that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market.

Motion to Dismiss MOO at 3.   The Court also allowed certain claims against Goldstone and Simmons to proceed.   See Motion to Dismiss MOO at 3.   These claims included the SEC's allegations whether: (i) the Defendants failed to disclose to KPMG before they filed the 2007 Form 10-K that a European hedge fund's collapse would negatively affect Thornburg Mortgage's financial condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's financial condition after filing the 2007 Form 10-K; (iii) the Defendants materially misled KPMG by not providing correspondence showing that Thornburg Mortgage experienced an event of default in the two weeks before the 2007 Form 10-K filing; and (iv) Simmons

misrepresented that unexpected events had an unexpected financial impact on Thornburg Mortgage after the 2007 Form 10-K filing.  See Motion to Dismiss MOO at 3.

The Court later denied the Defendants' and the SEC's motions for summary judgment. See Summary Judgment MOO at 2-3.  It first explained that it would apply an "actual-disbelief" standard to determine "whether a person subjectively disbelieved the truth of an opinion statement."  Summary Judgment MOO at 2.  The Court then concluded that genuine issues of material fact for the jury existed on the SEC's claims that: (i) the Defendants made objectively false statements; (ii) the statements were material; (iii) the Defendants believed that their statements were false they made them; and (iv) the Defendants made statements that were false or misleading because of omitted information.  See Summary Judgment MOO at 2-3.  The Court thus declined to grant summary judgment for any party on any issue.  See Summary Judgment MOO at 3.

On October 29, 2015, the Court set the jury selection and trial in this matter to begin on June 6, 2016.  See Order Setting Hearing Dates, Pre-Trial Deadlines, and Trial at 2, filed October 29, 2015 (Doc. 380)("Trial Order").  The parties' inordinate requests to be involved in the jury selection forced the Court to spend a considerable amount of time coordinating, planning and preparing to ensure that the requisite number of qualified jurors -- sixty as agreed to by the parties -- appeared for selection on June 6, 2016.

The parties' request for a four-week jury trial created a level of complexity that does not exist in most cases.  Also, the parties' request to seat a twelve-person jury in a civil case is not typical.  The parties' request that the Court allow the use of a Special Juror Questionnaire ("SJQ") added a unique complexity to the jury selection for this trial.  The use of an SJQ requires extensive planning.  Jury Division personnel must gather data and calculations to estimate the

percentages of: questionnaires sent out but returned as undeliverable by mail, questionnaires sent to unqualified individuals, people who failure to respond, and people who failure to appear. Laying the proper groundwork is essential to empaneling a jury on the day of selection.  In a routine jury trial the venire panel has been pre-qualified well in advance of the summons for appearance.

On March 18, 2016, Jury Division personnel sent out 1,100 initial qualifying questionnaires and voir dire questionnaires ("VDQ").  See Transcript of Hearing at 24:18-23 (Court)(taken April 8, 2016), filed April 26, 2016 (Doc. 427)("Tr. April 8"); id. at 32:10-12 (Court).  Of this number, the Jury Division personnel estimated that one-third of the individuals would be disqualified, one-third would not respond at all, and one-third would be the actual individuals that the parties would choose from to seat a jury.  The process was started in March to ensure that a SJQ could be sent to the actual group on April 8, 2016.  See Tr. April 8 at 32:18-21 (Court).  This was necessary in order to allow the prospective jurors to complete the SQJ by April 22, 2016, and return it to the Court so that the VDQs and SJQs could be provided to the parties no later than May 6, 2016.  See Tr. April 8 at 35:15-17 (Court).  Two hundred and thirty three people returned their SJQ to the Court.   See Transcript of Hearing at 207:17-18 (Court)(taken May 11, 2016), filed May 20, 2016 (Doc. 466)("Tr. May 11").

Starrett reached a settlement with the SEC on May 20, 2016, and held a telephonic hearing with the Court on the same day.  See Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent"); Transcript of Hearing at 1

(taken May 20, 2016).[11]   The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include a requirement that Starrett testify for any of the remaining parties.  Starrett Consent at 1.  Ten claims remain in the case for trial -- all of the original claims, with the exception of the SEC's claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b).  See Pretrial Order at 3-4, filed May 11, 2016 (Doc. 448).[12]

    After Starrett's settlement, the parties exercised for-cause and hardship challenges over the two weeks preceding trial, which reduced the pool by ninety and left about 143 prospective jurors.  See Transcript of Hearing at 12:13-18 (Lee)(taken May 23, 2016), filed June 1, 2016 (Doc. 486)("Tr.").  Jury Division personnel performed a random selection to reduce the target number of individuals to appear on June 6, 2016 from 143 to sixty.

    1.    **The Motion.**

---

    [11]The Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version. Any final version may contain slightly different page and/or line numbers.

    [12]The Motion to Dismiss MOO and Summary Judgment MOO did not dismiss the SEC's § 17(a) claim, but it does not appear in the Pretrial Order.  The parties have also not submitted any jury instructions on this claim.  See Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463).  The parties' proposed verdict forms do not include a § 17(a) claim.  See Defendant Clay Simmons's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489). The Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."  Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002).  The pretrial order that the parties filed in this case, therefore, supersedes all prior pleadings, including the Complaint.  See Wilson v. Muckala, 303 F.3d at 1215 (citing C. Wright, A. Miller & M. Kane, 6A Fed. Prac. & Proc. Civ. § 1522 (2d ed. 1990)).

In their Motion, Goldstone and Simmons ask the Court to grant a one-month trial continuance.  See Motion at 3.  Goldstone and Simmons begin with a brief introduction, contending that, for more than four years, Milbank, Tweed, Hadley and McCoy LLP, representing Starrett, and WilmerHale, representing Goldstone and Simmons, had planned a joint defense and divided responsibilities in preparing for trial.  See Motion at 2.  Goldstone and Simmons argue that, when Starrett entered into a settlement with the SEC, it "necessarily and significantly disrupted the trial preparation being conducted on behalf of her co-defendants" by WilmerHale.  Motion at 2.  Further, they argue that the complexity of the securities fraud claims in the case necessitates time to migrate the Milbank Tweed work-product to WilmerHale for their counsel to be fully prepared for trial.  See Motion at 2-3.  Goldstone and Simmons argue the continuance is necessary to prevent "severe prejudice" against them.  Motion at 3.

Goldstone and Simmons then provide a factual background to explain the coordinated efforts between WilmerHale and Milbank Tweed to defend this suit for more than four years since its filing on March 13, 2012.  See Motion at 3.  They explain that, before trial, the two firms coordinated the extensive efforts involved in motion practice and discovery strategy.  See Motion at 3.  They add that, to prepare for trial, the two firms continued to share the preparation involved, including preparing the approximately thirty witnesses.  See Motion at 3.  As such, with Starrett's settlement, WilmerHale must now execute all the work that was once spread evenly between two firms.  See Motion at 4.  Goldstone and Simmons request a brief trial continuance of a month to give WilmerHale time to finish the work needed for trial.  See Motion at 4.  They also note that only twenty-five of 230 potential jurors indicated they are unavailable in July, 2016, whereas fifty-five indicated they would be unavailable during the current trial dates of June 6, 2016 through July 8, 2016.  See Motion at 4.

Goldstone and Simmons rely on the Supreme Court of the United States' decision in Morris v. Slappy, 641 U.S. 1 (1983)(Burger, J.), which stated that trial courts have broad discretion regarding continuances.  See Motion at 4 (citing 641 U.S. at 11).  They point out four factors that district courts in the United States Court of Appeals for the Tenth Circuit consider when evaluating a motion for continuance, which include:

> the diligence of the party requesting the continuance; the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; the need asserted for the continuance and the harm that [the moving party] might suffer as a result of the district court's denial of the continuance.

Motion at 5 (quoting United States v. West, 828 F.2d 1468, 1469 (10th Cir. 1987)(Reinhardt, J. by designation)).  The Tenth Circuit in United States v. West pointed out that none of these factors is determinative and that the weight given to one will vary depending on the extent of the movant's showing on the others.  See 828 F.2d at 1469.

Goldstone and Simmons then point to cases in which other district courts in the Tenth Circuit have granted trial continuances after considering the above four factors.  See Motion at 5. In United States v. Becker, 2010 U.S. Dist. LEXIS 33573 (D. Kan. 2010)(Robinson, J.), the court granted a trial continuance to allow the defendant's counsel extra time to prepare because of his unfamiliarity with the type of case and the vast discovery at issue.  See 2010 U.S. Dist. LEXIS 33573, at *4.  Further, in Boardwalk Apartments, L.C. v. State Auto Property & Casualty Insurance Co., 2014 U.S. Dist. LEXIS 1788 (D. Kan. 2014)(Robinson, J.), the moving party had alerted the court of a schedule conflict before the trial date was set and sought a limited continuance, which the court could accommodate and granted.  See 2014 U.S. Dist. LEXIS 1788, at *3.  Goldstone and Simmons use these cases to show how district courts consider the factors when deciding whether to grant a trial continuance.  See Motion at 5.  Goldstone and Simmons

- 21 -

then argue that they satisfy all four factors, so the Court should grant them a trial continuance, too.  See Motion at 5.

First, Goldstone and Simmons argue that they exercised diligence in requesting the trial continuance.  See Motion at 5.  They assert that, on the day when Starrett entered into a settlement with the SEC, her counsel requested a telephonic hearing with the Court.  See Motion at 5.  Goldstone and Simmons state that they requested a trial continuance during that hearing.  See Motion at 5.  Goldstone and Simmons explain that consolidation of the trial preparation will require additional time and that, without the continuance, Goldstone and Simmons would be "severely prejudiced."  Motion at 5.  Goldstone and Simmons contend that their counsel "could not have acted any more quickly or diligently" in apprising the Court of their situation.  Motion at 5.

Second, Goldstone and Simmons argue that a trial continuance will allow WilmerHale the additional time needed to migrate the trial work from Milbank Tweed and prepare for a one-firm trial defense.  See Motion at 6.  Further, Goldstone and Simmons contend that, had Starrett not settled, they would have been fully prepared for trial.  See Motion at 6.

Third, Goldstone and Simmons argue that the prejudice to them outweighs any potential inconvenience to the SEC, its witnesses, and the Court.  See Motion at 6.  Goldstone and Simmons recognize the potential inconvenience, but believe that they can mitigate it.  See Motion at 6.  They argue that, as trial is not set to begin for another two weeks, there is enough time for the SEC to inform its witnesses that their appearances will be delayed.  See Motion at 6.  Further, they note that two of the KPMG witnesses indicated conflicts in June, 2016, but not in July, 2016, and that one of the KPMG witnesses is gone for almost all of June, 2016.  See Motion at 6.  Accordingly, they contend that a trial date in July, 2016, could alleviate scheduling

conflicts with the trial witnesses.  See Motion at 6.  Goldstone and Simmons argue that the SEC's opposition to this motion "reflects an unbecoming will to win" when it should be interested in achieving justice.  Motion at 6.  Also, they point out that the number of prospective jurors indicating conflicts in July, 2016, on their voir dire questionnaire is fewer than those who indicated conflicts with the June, 2016, trial dates.  See Motion at 7.  Goldstone and Simmons contend that there will not need to be a reissuance of questionnaires and that a jury can be selected from the current 230 prospective jurors.  See Motion at 7.  Finally, Goldstone and Simmons state that they respect the Court's time and schedule, but submit that "the risk of prejudice to them is too great" and hope that the likely shorter trial length from one less Defendant and one less law firm will mitigate the impact on the Court's calendar.  Motion at 7.

Fourth, Goldstone and Simmons contend they risk "suffering irreparable harm if a continuance is not granted."  Motion at 7.  They state that it is not their fault that they are making this Motion, as they would have been adequately prepared to proceed with trial had Starrett's circumstances not changed.  See Motion at 7.  They request additional time to take over the entire trial defense, which was once split between two firms.  See Motion at 7.  Further, they contend the "entire landscape of the defense has shifted," as Starrett, once a co-Defendant, is now solely a prime witness.  Motion at 7.  They also request additional time to prepare for this new landscape and dynamic among the former co-Defendants.  See Motion at 8.

Finally, Goldstone and Simmons assert this action is "quasi-criminal" in nature and thus the harm they will suffer, should the Court deny the Motion, is magnified.  Motion at 8.  They point to SEC v. Merkin, 283 F.R.D. 689, 694 n.4 (S.D. Fla. 2012)(Goodman, J.), which stated that civil enforcement actions seeking severe penalties could be considered "quasi-criminal."  Motion at 8.  The SEC is seeking "permanent injunctions, harsh civil monetary penalties, and

permanent bars against Defendants to keep them from ever again serving as public company officers or directors."   Motion at 8.   Goldstone and Simmons contend that the Court should consider these "very severe" sanctions as another factor.   See Motion at 8.   They argue that the amount of time for which they are asking is small compared to the magnitude of harm they will suffer with an unfavorable jury verdict.   See Motion at 9.   They add that United States v. West stated that the most important factor a court should consider in a motion for trial continuance is the moving party's need and the prejudice that could result from a denial, which they assert weigh in favor of granting their Motion.   See Motion at 9 (citing 828 F.2d at 1471).

   2.   **The Response**.

   The SEC responded to the Motion two days later, on May 23, 2016.   See Plaintiff U.S. Securities and Exchange Commission's Opposition to Defendants' Motion for Trial Continuance, filed May 23, 2016 (Doc. 468)("Response").   The SEC begins by mocking Defendants' argument that they will be prejudiced by having to continue with only the multi-national law firm WilmerHale and a leading New Mexico firm, the Rodey firm, representing them at trial after Starrett's proposed settlement with the SEC.   See Response at 1.   The SEC states that the Court should deny Goldstone and Simmons' request for a trial continuance, pointing to the fact that Goldstone and Simmons' WilmerHale lawyers have represented them for years, have substantial trial experience, and know the case "backwards and forwards."   Response at 1.   The SEC argues the Court should exercise its broad discretion on the matter of continuances and deny Goldstone and Simmons' request.   See Response at 1.   Further, it notes that the Tenth Circuit has stated that a trial judge's decision to deny a trial continuance is only an abuse of discretion where the denial was arbitrary or unreasonable, and materially prejudiced the moving party.   See Response at 2 (citing Phillips v. Ferguson, 182 F.3d 769, 775 (10th Cir.

1999)(Ebel, J.)).   The SEC argues that the determination whether a denial is an abuse of discretion depends on four factors:

> the diligence of the party requesting the continuance, the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance, the inconvenience to the opposing party, its witnesses, . . . and the harm that [the moving party] might suffer as a result of the . . . court's denial of the continuance.

Response at 2 (quoting <u>Case v. Mondragon</u>, 887 F.2d 1388, 1396 (10th Cir. 1989)(Anderson, J.)).

The SEC then argues that the Court's denial of Goldstone and Simmons' requested trial continuance would not be arbitrary or unreasonable.  <u>See</u> Response at 2.  The SEC argues that the mentioned factors do not support Goldstone and Simmons' Motion and that they, importantly, fail to note that a denial of the Motion is an abuse of discretion only if the denial was "arbitrary or unreasonable and materially prejudiced the moving party."   Response at 2 (citing <u>Phillips v. Ferguson</u>, 182 F.3d at 775).   The SEC contends that the Court's denial of the Motion would not be arbitrary or unreasonable, because of the "vast knowledge, experience, and resources available to Defendants through their counsels' law firms, the extended length of this litigation, and this case's ripeness for trial."   Response at 3.

First, the SEC argues that Goldstone and Simmons' diligence in requesting a continuance does not justify a continuance.  <u>See</u> Response at 3.  The SEC posits Goldstone and Simmons' counsel knew the settlement was being finalized by at least May 16, 2016 -- not May 20, 2016 -- and thus could have acted more quickly and diligently.  Response at 3 (citing Motion at 5).  Further, it points out that it ultimately does not matter how quickly Goldstone and Simmons requested a trial continuance, as this factor alone does not justify granting their Motion.  <u>See</u> Response at 3.

Second, the SEC argues that additional time to prepare for trial to migrate Milbank Tweed's work to WilmerHale does not justify a continuance.  <u>See</u> Response at 3.  The SEC points out that WilmerHale represented Goldstone and Simmons before this litigation during the SEC's pre-suit investigation.  <u>See</u> Response at 3-4.  Accordingly, the SEC argues that counsel's "knowledge of the case is therefore thorough and complete."  Response at 4.  It then cites to the WilmerHale website and biographies of its lawyers working on this case to illustrate the vast experience Goldstone and Simmons' counsel have in trial work and securities litigation, and the vast resources available to this multi-national law firm.  <u>See</u> Response at 4-5.  The SEC also points to the website for the New Mexico law firm, the Rodey firm, which is representing Goldstone and Simmons, to illustrate its great experience.  <u>See</u> Response at 5.  Further, the SEC points to the Motion's suggestion that Milbank Tweed's trial preparation will be migrated to WilmerHale as evidence that Goldstone and Simmons will continue to "benefit substantially from Milbank's work."  Response at 5 (quoting Motion at 2).  The SEC uses this information to show that Goldstone, Simmons, and their counsel are "more than well equipped" to adequately defend this case without a continuance.  Response at 5-6.

Third, the SEC argues that the inconvenience a continuance poses to itself, its witnesses, and the Court strongly weighs against granting the continuance.  <u>See</u> Response at 6.  It states that Goldstone and Simmons did not confer with it as to the length of their requested trial continuance and that its attorneys are not available for a trial in July, 2016.  <u>See</u> Response at 6. It explains that this trial has been set for over six months, and its attorneys planned their work and personal schedules around a trial in June, 2016.  <u>See</u> Response at 6 (citing Trial Order). Further, the SEC emphasizes that it arranged for its busy witnesses to be available in June, 2016, and does not know their availability going forward.  <u>See</u> Response at 6.  The SEC states that the

Court's availability must also be considered and that, given the number of schedules involved in this trial, it is thus unreasonable for Goldstone and Simmons to request a one-month continuance. <u>See</u> Response at 6.  Finally, the SEC argues that its opposition to the Motion does not reflect an interest in "'capitalizing on a lucky advantage'" as Goldstone and Simmons contend but, rather, reflects the desire to achieve justice and to try the case in front of the jury after four years of litigation.  Response at 6-7 (quoting Motion at 6).

Fourth, the SEC contends that Goldstone and Simmons did not assert any "irreparable harm" which would justify the grant of a trial continuance.  Response at 7.  The SEC again emphasizes the migration of trial work and that Starrett has always been a prime witness in this case, and thus denies any "'fundamental shift'" resulting from Starrett's settlement with the SEC.  Response at 7 (quoting Motion at 8).  Goldstone and Simmons will also be important witnesses at trial, and the SEC expects that they and Starrett will testify consistently with how they testified previously.  <u>See</u> Response at 7.

Finally, the SEC argues that the potential penalties which Goldstone and Simmons face do not justify a trial continuance.  <u>See</u> Response at 7.  It allows that Goldstone and Simmons face harsh penalties, including a permanent bar against serving as an officer or director of a public company.  <u>See</u> Response at 7.  It adds, however, that as Goldstone and Simmons do not face loss of their freedom, this case is not a criminal or "'quasi-criminal'" case.  Response at 7 (quoting Motion at 8).  The SEC contends that the Court should deny Goldstone and Simmons' motion for a trial continuance, because taking on more work than originally anticipated "simply does not rise to the level of material prejudice that would justify a trial continuance."  Response at 8.

**3.     The Hearing.**

The Court held a hearing on May 23, 2016.  <u>See</u> Tr. at 1.  Goldstone and Simmons

recognized the Court's previous indication to deny the Motion in the May 20, 2016, phone call, but respectfully asked the Court to consider granting at least a two-week trial continuance, for the same reasons set forth in the moving papers, which asked for a continuance of a month.  See Tr. at 3:10-14 (Lee).  They argued that WilmerHale's size was not dispositive, pointing to the SEC's approximately 1,200 lawyers, and stated: "I assume that they don't have lawyers sitting around ready to try a case at the drop of a hat."  Tr. at 3:18-23 (Lee).  Goldstone and Simmons argued that they need additional time to deploy their resources to take over the work Milbank Tweed had previously been handling and to get up to speed on the case.  See Tr. at 3:24-25 (Lee); id. at 4:2-3 (Lee).  Further, Goldstone and Simmons contended that they only learned of Starrett's settlement on Friday morning, May 20, 2016, when she signed the settlement papers, and brought their problem to the Court's attention that same day.  See Tr. at 4:8-19 (Lee).  Goldstone and Simmons explained they were aware that the SEC and Starrett were discussing a settlement about a week beforehand, but that Starrett's counsel repeatedly told them that he "believed the prospects for settlement were extremely low."  Tr. at 6:10-20 (Lee).

Goldstone and Simmons also submitted that they understand it is inconvenient to move the trial date at all and certainly respect the Court's time, but argued that the SEC did not address any of the factors which weigh in favor of granting a continuance.  See Tr. at 5:6-11 (Lee).  These factors, they said, include the large venire, which appears able to allow for a short continuance of two weeks.  See Tr. at 5:11-14 (Lee).  They also noted that some key witnesses might be more available in July, 2016, than in June, 2016.  See Tr. at 5:17-19 (Lee).  Finally, they argued that the elimination of Starrett as a Defendant might make the trial shorter than it otherwise would have been.  See Tr. at 5:20-22 (Lee).  Goldstone and Simmons asserted that the SEC's attorneys' schedules do not warrant denying the Motion.  See Tr. at 5:23-25 (Lee).  They

concluded that the interests of fairness and justice -- in light of the "tremendous amount at stake" -- weigh strongly in favor of granting a continuance and an SEC attorney's unavailability does not overcome these interests.  Tr. at 6:1-7 (Lee).

The Court then asked Goldstone and Simmons' counsel how Starrett's settlement impacts the proceedings.  See Tr. at 7:8-9 (Court).  Specifically, the Court assumed that Starrett will still testify truthfully and stated that it did not have any sense how this settlement would affect the proceedings.  See Tr. at 7:5-9 (Court).  Goldstone and Simmons contended that Starrett's settlement is not a development which necessitates a trial continuance.  See Tr. at 7:14-18 (Lee). They again noted that counsel from WilmerHale and Milbank Tweed split the approximately thirty witnesses, and that Milbank Tweed took the lead on half of them.  See Tr. at 7:19-23 (Lee). They asserted that it would be an "extraordinary undertaking" to meet with Milbank Tweed's fifteen witnesses, prepare their outlines, and fully prepare for the start of trial.  Tr. at 8:1-3 (Lee).  See id. at 7:23-25 (Lee).

The Court then shared its impression that all the paralegals in the courtroom working on the case were WilmerHale's employees.  See Tr. at 8:4-10 (Court).  Goldstone and Simmons corrected the Court, however, and informed it that the plan was for paralegals and the junior lawyers from WilmerHale and Milbank to rotate in and out of court.  See Tr. at 8:13-16 (Lee). Goldstone and Simmons also informed the Court that their plan was to have Randall Lee and Heather Tewksbury handle "the lion's share of the work," tr. at 8:24-25 (Lee), and that Robert Badal would handle "[a] handful of discrete witnesses."  Tr. at 9:2-4 (Lee).

The Court asked how the work would be divided if it should deny the Motion.  See Tr. at 9:8-9 (Court).  Goldstone and Simmons replied that they have been trying to decide on the division, complaining that they have not met with the witnesses on whom Milbank Tweed had

taken the lead and citing the "extraordinary" amount of work left to be done.  Tr. at 9:11-14 (Lee).  They noted that they cannot simply bring on another partner from WilmerHale, because this case is not one a lawyer can adequately understand in a week.  See Tr. at 9:15-19 (Lee).  The Court asked whether the division of the handling of witnesses between the two firms was completely even and what "handling" meant.  Tr. at 10:8-9 (Court).  See id. at 9:25 (Court).  Goldstone and Simmons responded that, to the best of their knowledge, the division of witnesses was completely even.  See Tr. at 10:4-7 (Lee).  Further, they stated that the "handling" of witnesses included preparing for trial by making an examination outline, compiling exhibits, meeting with the witnesses, and trial examination in regards to those witnesses.  Tr. at 10:15-20 ([Lee]).[13]

The Court then pointed out that the questionnaires sent to the jury specifically asked about the dates of June 6, 2016, through July 8, 2016, and that it is "not as sanguine" as Goldstone and Simmons in believing that all the work done in getting a jury would not have to be redone.  Tr. at 11:12-19 (Court).  It explained that, because the SEC's counsel would not be available if the trial is moved two weeks or a month, the trial would have to be pushed even further into the future and all the jury selection work would probably be endangered.  See Tr. at 11:19-24 (Court).  Goldstone and Simmons noted, however, that there were approximately 230 jury questionnaires returned and that there were still approximately 170 jurors after the for-cause or hardship challenges.  See Tr. at 12:13-18 (Lee).  Because of this result, Goldstone and Simmons expressed their optimism that they could still seat a jury of twelve, especially because the Court gave each side only three peremptory challenges.  See Tr. at 12:19-22 (Lee).  The

---

[13]The transcript states that Stephen McKenna, the SEC's counsel, made this statement, but it is clear from the context that Mr. Lee was the speaker.  See Tr. at 10:12-21 (McKenna).

Court asked whether Milbank Tweed is going to restrict in any way their trial materials in the migration to WilmerHale.  See Tr. at 13:1-3 (Court).  Goldstone and Simmons answered that Milbank Tweed will share all the work it has done.  See Tr. at 13:7-13 (Lee, Court).

The SEC then responded that "[i]t's just unrealistic" to move the trial two weeks or a month, because "the Commission is simply not available in July," 2016.  Tr. at 13:20-23 (Bliss).  The SEC explained that its counsel has "very real deadlines," and that they purchased tickets for vacation and scheduled surgery in anticipation of this trial occurring in June, 2016.  Tr. at 13:25 (Bliss); id. at 14:1-7 (Bliss).  Further, the SEC noted the resources available to WilmerHale, including the fact that Mr. Lee has decades of experience and is an expert in the securities field and that Ms. Tewksbury is a "self-described outstanding trial lawyer."  Tr. at 14:14-21 (Bliss).  It concluded that, should the current team decide to add additional attorneys, they have a substantial pool of lawyers with knowledge dating back years throughout the litigation and should thus be prepared to go forward with trial in two weeks.  See Tr. at 15:19-25 (Bliss); id. at 16:1 (Bliss).  As to witnesses, the SEC stated that it asked about their availability only in June, 2016, as that has been the trial schedule for over six months.  See Tr. at 16:5-9 (Bliss).  Further, the SEC noted that it does not have a view what the future availability of the jurors is and strongly suspects all the work done in securing a jury will have to be redone.  See Tr. at 16:23-25 (Bliss); id. at 17:1 (Bliss).  It also noted that WilmerHale will have the benefit of Milbank Tweed's high-quality work product.  See Tr. at 17:6-17 (Bliss).  The SEC stated that it believes all parties have the ability to proceed with trial as scheduled, and that Goldstone and Simmons will not suffer the material prejudice needed to grant a continuance merely because WilmerHale will have to do some additional work.  See Tr. at 17:12-16 (Bliss).  In contrast, the SEC argued that a continuance would prejudice it, because a delay would affect all the other cases on which

its team is working, and impair its ability to achieve justice and protect investors.  <u>See</u> Tr. at 17:18-25 (Bliss).  Finally, the SEC expressed its intent to put forth the same case as before Starrett's settlement and that the trial "will basically proceed as planned."  Tr. at 18:5-21 (Bliss).

Goldstone and Simmons then responded that the SEC's desire to quickly dispense of this case and achieve justice "just rings a little hollow," because it took the SEC four years to investigate this case, and it has been litigated for four years.  Tr. at 19:6-12 (Lee).  They also pointed out that their non-partner attorneys are not expected to try the case and that the other lawyers whom the SEC mentioned have not worked on the case in years.  <u>See</u> Tr. at 19:19-23 (Lee).

The Court then asked Goldstone and Simmons three questions: (i) why there are two law firms for the three Defendants; (ii) whether some Directors and Officers liability insurance policy is funding the case; and (iii) if the same D&O policy is funding the two firms, whether this would prevent the Milbank Tweed lawyers from continuing to work on this case, <u>i.e.</u> entering an appearance for Goldstone and Simmons, and then continuing its work as planned. <u>See</u> Tr. at 20:6-14 (Court).  Goldstone and Simmons answered that they probably should not comment why there are two firms, but affirmed that the same D&O insurance policy is funding the case for all three Defendants.  <u>See</u> Tr. at 20:19-21 (Lee).  They added that the D&O insurance carrier did not want any duplication of effort and so most of the work had been handled separately -- which is why WilmerHale has not "even met with the witnesses whom Milbank was handling."  Tr. 20:23-24 (Lee).  <u>See</u> <u>id.</u> at 21:2-5 (Lee).  The Court then asked if there is something that would prevent Milbank Tweed from entering an appearance on Goldstone and Simmons' behalf, so that Milbank Tweed could keep doing its planned share of the work. <u>See</u> Tr. at 21:22-24 (Court).  Goldstone and Simmons answered that Milbank Tweed probably

would not enter an appearance on behalf Goldstone and Simmons, because Milbank Tweed anticipates continuing to represent Starrett throughout her testimony.  <u>See</u> Tr. at 22:1-7 (Lee). The Court also asked how many of the fifteen witnesses allocated to Milbank Tweed had not been prepped or met with.  <u>See</u> Tr. at 22:8-10 (Court).  Goldstone and Simmons estimated that they would have to prep roughly six witnesses and pointed out they still needed to prepare for their own witnesses.  <u>See</u> Tr. at 22:13-18 (Lee).  They also pointed out they had nothing to do with the settlement and that its timing was unfortunate.  <u>See</u> Tr. at 22:24-25 (Lee); <u>id.</u> at 23:1-4 (Lee).   The Court asserted, however, that settlement is always a possibility and asked hypotheticals regarding what Goldstone and Simmons would have done had Starrett settled the night before trial or the second day of trial.  <u>See</u> Tr. at 23:5-10 (Court); <u>id.</u> at 23:17-18 (Court). Goldstone and Simmons answered that they thought their argument would be stronger if the settlement had occurred even closer to trial and would have given "serious consideration" to asking for a continuance if Starrett had settled during trial.  Tr. at 23:19-21 (Lee).  <u>See id.</u> at 23:13-16 (Lee).

The Court then gave its thoughts as to the viability of a trial continuance.  <u>See</u> Tr. at 24:13-15.  It stated that there does not seem to be any visibility as to when the case could be tried, as a reset would require more than a month-long delay.  <u>See</u> Tr. at 24:14-20 (Court).  The Court recognized the work and difficulty involved in getting ready for a trial, especially one lasting for a month.  <u>See</u> Tr. at 25:4-8 (Court).  The Court also recognized, however, the WilmerHale lawyers' "tremendous reputation" and their "ability to do difficult things."  Tr. at 25:13-16 (Court).  The Court stated that litigators realize the difficulty involved in trial, but suggested that is the reason they do trial work -- because not everyone can do trials.  <u>See</u> Tr. at 26:1-15 (Court).  The Court also noted that this trial will be a "top-quality trial" and the work

will be done "very well."  Tr. at 26:16-18 (Court).  Further, the Court asserted that a continuance would force it to re-do all the juror work, because of the lack of visibility as to when the case will be reset.  See Tr. at 27:6-8 (Court).  The Court then described its own July, 2016 schedule, explaining that it can consider its own calendar as well as the parties' convenience when deciding a motion to continue.  See Tr. at 27:8-12 (Court).  The Court noted that there are only four days in July in which it does not have settings and that it could not preclude the possibility of having some hearings on those days.  See Tr. at 27:12-18 (Court).  The Court also stated that it has to spend time on a multidistrict litigation as well as four related criminal cases with forty-one defendants, twenty-three of whom are death-penalty eligible.  See Tr. at 28:4-9 (Court).  The Court also described its firm setting in July, 2016, for a case older than this one, which the Court does not want to move.  See Tr. at 28:20-25 (Court).  The Court concluded that granting the Motion would be very disruptive.  See Tr. at 29:1-7 (Court).  Finally, the Court stated that Goldstone and Simmons' quality representation means that any prejudice is minimal.  See Tr. at 29:16-19 (Court).  The Court noted that the denial seems like "more of a hardship" because of the strategic decision which the insurance company and lawyers made, which the lawyers are now "being somewhat penalized for."  Tr. at 30:1-7 (Court).  The Court concluded that it would be unfair to shift the prejudice to the SEC by granting the Motion.  See Tr. at 30:18-25 (Court).

## LAW REGARDING GRANTING CONTINUANCES

The Tenth Circuit has articulated four factors for evaluating motions for continuance: (i) "the diligence of the party requesting the continuance"; (ii) "the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance"; (iii) "the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance"; and (iv) "the need asserted for the continuance and the harm that [the

movant] might suffer as a result of the district court's denial of the continuance." United States v. West, 828 F.2d at 1470.   The Tenth Circuit has also said that "[n]o single factor is determinative and the weight given to any one may vary depending on the extent of the [movant's] showing on the others." United States v. West, 828 F.2d at 1470.   "[T]he determination whether the denial of a continuance constitutes an abuse of discretion turns largely upon the circumstances of the individual case." Rogers v. Andrus Transportation Services, 502 F.3d 1147, 1151 (10th Cir. 2007)(Hartz, J.)(citations omitted)(internal quotation marks omitted).

In Chavez v. Board of Education, No. CIV 05-0380 JB/CG, 2008 WL 6044569 (D.N.M. Oct. 20, 2008)(Browning, J.), the Court denied the defendant's motion to vacate and reschedule the trial setting. See 2008 WL 6044569, at *1.   The defendant requested a continuance, because one of its witnesses was unavailable for the trial setting. See 2008 WL 6044569, at *1. Although the defendant asserted it would suffer prejudice without this particular witness's testimony, it never took her deposition. See 2008 WL 6044569, at *3.   The Court did not conclude that her unavailability showed the defendant's lack of diligence, but noted that this factor still weighed against granting a continuance, although not heavily. See 2008 WL 6044569, at *4.   Moreover, the defendant overstated this witness's importance and undervalued the testimonies of other witnesses, so granting the continuance would not have achieved its stated purpose. See 2008 WL 6044569, at *4.   The Court also held that moving the trial date would inconvenience the plaintiffs. See 2008 WL 6044569, at *6.   Finally, the defendant did not show that it would suffer great harm from a denial of the motion. See 2008 WL 6044569, at *7. Accordingly, the Court denied the motion. See 2008 WL 6044569, at *8; Navajo Health Foundation-Sage Memorial Hospital, Inc. v. Burwell, 110 F. Supp. 3d 1140 (D.N.M. 2015)(Browning, J.)(denying a continuance of a hearing because the inconvenience to plaintiff

- 35 -

and marginal harm suffered by a denial outweighed granting the continuance); Anderson Living

Trust v. WPX Energy Production, LLC, No. CIV 12-0040 JB/WPL, 2014 WL 3421039 (D.N.M.

June 20, 2014)(Browning, J.)(denying a continuance of a class certification hearing because the

inconvenience to plaintiff and marginal harm suffered by a denial outweighed granting the

continuance).

### ANALYSIS

The Tenth Circuit has articulated four factors to consider when evaluating a motion for

continuance:

> the diligence of the party requesting the continuance; the likelihood that the
> continuance, if granted, would accomplish the purpose underlying the party's
> expressed need for the continuance; the inconvenience to the opposing party, its
> witnesses, and the court resulting from the continuance; the need asserted for the
> continuance and the harm that [the movants] might suffer as a result of the district
> court's denial of the continuance.

United States v. West, 828 F.2d at 1469.   The Court has broad discretion in matters of

continuances, and may weigh the factors depending on Goldstone and Simmons' showing.

Although Goldstone and Simmons have met some of the factors, the harm to the SEC and the

Court in granting the continuance substantially outweighs any marginal prejudice that Goldstone

and Simmons would face.  The Court will thus deny the Motion.

## I.     GOLDSTONE AND SIMMONS ACTED DILIGENTLY IN REQUESTING A TRIAL CONTINUANCE.

First, the Court concludes that Goldstone and Simmons acted diligently when they filed

their Motion.  See United States v. West, 828 F.2d at 1470.  Goldstone and Simmons assert that

they learned Starrett and the SEC were discussing settlement approximately only a week before

Starrett signed the settlement papers on May 20, 2016.  See Tr. at 6:10-17 (Lee).  Further, they

allege that Starrett's counsel believed the prospects for a settlement agreement were "remote"

even the week before the settlement papers were signed.  Tr. at 6:20-23 (Lee).  Because of these

representations, Goldstone and Simmons assumed that Starrett would be proceeding to trial as a

Defendant and continued to prepare for trial accordingly.  See Tr. at 4:19-21 (Lee).  They were

not aware that Starrett was settling with the SEC until the day she signed the settlement papers

on the morning of Friday, May 20, 2016.  See Tr. at 4:7-10 (Lee).  During a telephonic hearing

with the Court that same day, counsel for Goldstone and Simmons, the remaining Defendants,

requested a continuance of the trial date.  See Motion at 5.  They filed their Motion the following

day -- Saturday, May 21, 2016.  See Motion at 1.  Goldstone and Simmons promptly alerted the

Court of their request for a continuance and thus exercised diligence.  See Navajo Health

Foundation-Sage Memorial Hospital, Inc. v. Burwell, 110 F. Supp. 3d at 1184 ("The Court

cannot fault the Defendants for taking two or three days to determine the best cause of action.

Accordingly, the Defendants acted diligently . . . .").

        This factor weighs in favor of granting the Motion, but not strongly.  The D&O insurance

carrier and the Defendants' counsel made certain financial and strategic decisions about dividing

up work that they should have known could create problems if one of the law firms' clients

settled, either close to trial or during trial.  Given that about 1.8% of civil cases go to trial, the

probability was very likely that Starrett, and all Defendants, would settle.  See Marc Galanter,

The Vanishing Trial: An Examination of Trials and Related Matters in Federal and State Courts,

1:3 J. of Empirical Legal Studies 459 (2004).  Moreover, while the Court concludes that

Goldstone and Simmons have acted diligently, they had at least another week before trial to start

preparing for the possibility that Starrett might settle.  Thus, even if the decision to divide work

up the way the Defendants did makes sense given the possibility of settlement, they had another

week to start adjusting to the increasing possibility of settlement and did not do anything to

adjust.  Here, Goldstone and Simmons may have acted diligently in moving to continue the trial, but may not have been considerate and diligent in preparing for the possibility of settlement.

## II.    GRANTING THE MOTION WOULD ACCOMPLISH THE PURPOSE UNDERLYING GOLDSTONE AND SIMMONS' STATED NEED FOR A CONTINUANCE.

Second, the Court concludes that granting the Motion will achieve the purpose underlying Goldstone and Simmons' expressed need in asking for a continuance.  See United States v. West, 828 F.2d at 1470.  The underlying purpose for Goldstone and Simmons' stated need in asking for a trial continuance is to allow their WilmerHale lawyers additional time to obtain all the work that Starrett's counsel at Milbank Tweed produced.  See Motion at 6. Because the two firms relied on the same D&O policy, they employed a strict separation of work to prevent any duplication of effort.  See Tr. at 20:19-25 (Lee); id. at 21:1-5 (Lee).  Accordingly, the WilmerHale lawyers state that they need time to take over the defense trial work that Milbank Tweed has been handling.  See Tr. at 4:1-3 (Lee).  While Goldstone and Simmons concede that Starrett's settlement does not impact the proceedings, they argue that meeting with the witnesses on whom Milbank Tweed was to have had the lead and preparing outlines for them will require time.  See Tr. at 7:11-25 (Lee).  Granting a trial continuance would provide this time.

This factor does not, however, weigh heavily in Goldstone and Simmons' favor.  See Navajo Health Foundation-Sage Memorial Hospital, Inc. v. Burwell, 110 F. Supp. 3d at 1185 (granting a continuance would achieve the defendants' purpose in asking for it by allowing counsel to argue in person but does not accomplish anything as counsel can make an appearance via videoconferencing technology).  The Defendants will still continue to substantially benefit from Milbank Tweeds' work.  See Tr. at 13:1-8 (Court, Lee).  Further, Goldstone and Simmons'

counsel at WilmerHale have the resources of their multi-national law firm, and are very experienced and knowledgeable in this matter.  See Response at 4-5.  WilmerHale has a tremendous reputation, and its attorneys understand the difficulty of preparing for trial.  See Tr. at 25:2-16 (Court).  Accordingly, it is unlikely that these highly experienced lawyers need -- as opposed to want -- extra time to prepare for trial.  Contra United States v. Becker, 2010 U.S. Dist. LEXIS 33573, at *4 (continuance was granted in part because defense counsel was inexperienced).  Trials are hard, and no one enjoys picking up extra work two weeks before trial. But it happens.  Trial lawyers get used to it.  It is one of the most difficult but exciting things about trial work.  Every day trial lawyers have had to deal with the challenge of getting some new witness to handle a day before trial.  Granting the continuance would thus not serve a useful purpose except to prolong the agony and mess up everyone's summer schedules.  See United States v. West, 828 F.2d at 1470.  WilmerHale will get all of its work done well.

III.   **VACATING THE JUNE 6, 2016 TRIAL AND SETTING A NEW TRIAL WOULD INCONVENIENCE THE SEC AND THE COURT.**

Third, the Court concludes that granting the continuance would inconvenience both the SEC and the Court.  See United States v. West, 828 F.2d at 1470.  Goldstone and Simmons ask for a continuance of one month or, alternatively, of two weeks.  See Tr. at 3:10-14 (Lee).  The trial date, however, has been set for over six months.  See Response at 6.  The SEC's counsel have set their schedules in anticipation of going to trial in June, 2016, and are thus not available in July, 2016.  See Response at 6.  They have scheduled deadlines for other cases around the June, 2016, trial date, and it is unrealistic to move trial a month or two weeks without wrecking everyone's schedules for the rest of the summer or longer.  See Tr. at 13:20-24 (Bliss).  Further, the SEC has arranged for its witnesses to be available for a June, 2016, trial and their availability going forward is unknown.  See Response at 6.  This case has been litigated for four years, and

- 39 -

the SEC is ready to proceed with trial and, it its view, achieve justice.  <u>See</u> Response at 6-7.
Should this case be pushed forward, it will impact all the other cases on which these attorneys
are working.  <u>See</u> Tr. at 21-25 (Bliss).

Moving back the trial would also inconvenience the Court.  Given all the moving parts in
this case -- witnesses and SEC's counsel -- it is unlikely that the trial will slide only a week or
two.  It seems likely that the trial will have to be rescheduled at every one's convenience months
in the future, likely the fall.  All the work done to get a jury will have to be redone.  <u>See</u> Tr. at
27:6-8 (Court).  Further, the Court is booked in July, with only four days in which it does not
have settings.  <u>See</u> Tr. at 27:12-13 (Court).

The Court has been assigned a multidistrict litigation and four criminal cases with forty-
one defendants, twenty-three of whom are death-penalty eligible.  <u>See</u> Tr. at 28:4-12 (Court).
Also, the Court has given a firm setting in July for a case that is older than this one.  <u>See</u> Tr. at
28:20-23 (Court).

Goldstone and Simmons' counsel made a strategic decision to split the defense work
between two firms.  <u>See</u> Motion at 2.  Experienced trial counsel should anticipate that settlement
is always a possibility.  <u>See</u> Tr. at 23:7-8 (Court).  The Defendants' counsel now face a hardship
because of the decision to split up the defense work, and it would be unfair to shift this hardship
to the SEC.  <u>See</u> Tr. at 30:1-7 (Court); <u>id.</u> at 30:18-25 (Court).  This case is ready to go to trial,
and it would inconvenience the SEC and the Court to vacate and set a later trial date, so this
factor weighs heavily against granting the Motion.  <u>See</u> <u>Chavez v. Board of Education of</u>
<u>Tularosa Municipal Public Schools</u>, No. CIV. 05-0380JBCG, 2008 WL 6044569, at *6-7
(D.N.M. Oct. 20, 2008)(Browning, J.)(stating that the plaintiffs have been waiting a long time to
have their day in Court).  The fact that all of the hard work that all parties and the Court have

done to summon and impanel a fair and impartial jury would be wasted and have to be totally
redone weighs heavily against redoing all that work unless it is absolutely necessary to avoid
prejudice to Goldstone and Simmons, which the Court has determined is not that great.

## IV.    GOLDSTONE AND SIMMONS WILL NOT SUFFER GREAT HARM FROM THE COURT'S DENIAL OF THE MOTION FOR A TRIAL CONTINUANCE.

Finally, the Court concludes that Goldstone and Simmons will not suffer material
prejudice if it denies their Motion. See United States v. West, 828 F.2d at 1470. Goldstone and
Simmons' justification for their Motion is the risk of prejudice and potential harm that they will
face if their lawyers do not have enough time to take over all trial responsibilities and prepare for
the defense's shifted landscape. See Motion at 7-8. Goldstone and Simmons concede, however,
that Starrett's settlement does not impact the proceeding. See Tr. at 7:11-18 (Lee). The trial
without her as a Defendant is going to look very similar to a trial would have before the
settlement. The necessity of trial-work migration is more of a hardship on the lawyers rather
than something that will materially prejudice Goldstone and Simmons. See Tr. at 30:1-7 (Court).
Further, knowledgeable counsel at the multi-national law firm WilmerHale represent Goldstone
and Simmons, and there is no reason to think that their counsel will not be able to adequately
prepare in the two weeks before trial. See Response at 3-5. Given that the trial will last a month
and they are Defendants, some work can be slid to later in the month and not done pretrial. This
will make it easier for new seasoned counsel and/or seasoned local counsel to take some
witnesses. Accordingly, Goldstone and Simmons will not face any prejudice resulting from
being represented by inexperienced counsel. Contra United States v. Becker, 2010 U.S. Dist.
LEXIS 33573, at *4 (granting continuance in part because defense counsel was inexperienced).
Their representation will not impact or change the potential harm Goldstone and Simmons may

suffer because of the penalties that the SEC seek which will result from an unfavorable jury verdict.  This factor thus does not weigh in favor of granting the continuance.

In sum, only two factors weigh in favor of granting the continuance, and two factors weigh against.  Each of the factors that weigh in favor of granting the Motion do not weigh strongly in favor of a continuance.  In the end, the development that matters the least for a continuance is the kind that experienced trial counsel always have to anticipate and deal with, and the Court is confident that the WilmerHale and the Rodey law firm lawyers will deal with the challenge more than competently, but superbly, and that Goldstone and Simmons have representation that few in America receive.  The Court does not underestimate the hardship, but the work will have to be done sometime -- either now or later.  Trial work is just hard, and the Court cannot take all of the hardship out of it.  The Court is confident that Goldstone and Simmons' counsel are up to the task.

**IT IS ORDERED** that: the Defendants' Motion for Trial Continuance on Behalf of Defendants Larry Goldstone and Clarence G. Simmons, filed May 21, 2016 (Doc. 467)("Motion"), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

- 42 -

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Danielle Voorhees
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

    *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Robert G. Badal
Los Angeles, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Heather Tewksbury
Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Aaron Thompson
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

    *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Robert J. Liubicic
Paul M. Torres
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

    *Attorneys for Defendant Jane E. Starrett*