# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.                                No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendants Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett's Motion *In Limine* No. 4 to Bar Plaintiff from Arguing that Defendants Removed (or Caused to be Removed) any Information from Draft Audit Committee Meeting Minutes Provided to KPMG, filed March 17, 2016 (Doc. 395)("Motion"). The Court held a hearing on May 11, 2016.  The primary issue is whether the Court should allow Plaintiff Securities and Exchange Commission ("SEC") to argue that the Defendants removed information from draft audit committee meeting minutes that were provided to KPMG, LLP -- Thornburg Mortgage Inc.'s outside auditor.  The Court will allow the SEC to introduce minutes as evidence of its fraud claim, because the committee minutes are relevant to prove materiality, and because the potential for unfair prejudice does not substantially outweigh the minutes' probative value.  The Court will not, however, let the SEC use the word "removed," unless the SEC can offer evidence by trial that the Defendants removed part of the minutes that they forwarded to KPMG.  The Court will thus grant the Motion in part and deny it part.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1)("Complaint"); from the Draft Memo written by Jennifer Hall, Senior Engagement Manager at KPMG, LLP (written on March 8, 2008 and filed on March 17, 2016, as Exhibit J, Doc. 404-19)("KMPG's Draft Memo"); and from the Defendants' Motion in limine No. 4 (the subject of this Memorandum Opinion and Order).  The Court presents the facts solely to provide context for the Motion.  It continues to adhere to the decisions on the facts it reached in its Unsealed Memorandum Opinion and Order, filed August 22, 2015 (Doc. 371)("Summary Judgment MOO").

The Defendants are former officers of Thornburg Mortgage, Inc.: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The SEC alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[1]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg

---

[1]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

Mortgage's adjustable rate mortgage ("ARM") securities.[2]  Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo"[3] ARM securities; Thornburg Mortgage also purchased

---

[2]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

[3]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage. Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set.  Super jumbo mortgage, Wikipedia.  Fannie Mae purchases and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created.  See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends."  Fannie Mae, Investopedia.  The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates, because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined

ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and investment business through reverse repurchase agreements[4] backed by ARM securities.  See Complaint ¶ 3, at 2.  Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc.,

---

or regulated, but mortgage companies use it internally and independently to set loan parameters. See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage, Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

[4]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to repo."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.   Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.   See Complaint ¶ 24, at 8.   Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.   See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.   See Complaint ¶ 33, at 10.   In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.   See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage

(dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup

Global made clear that, although Citigroup Global was not exercising its rights under the reverse

repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to

amend the underlying reverse repurchase agreement.  Complaint ¶ 34, at 11.  In an email from

Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he

had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of

[the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay

Simmons to Nyira Gitana, Subject: FW: TMA Update at 2 (sent February 21, 2008, at 9:30 a.m.),

filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call

over seven days and made the final payment of seventy-five million dollars on February 27,

2008.  See Complaint ¶ 35, at 11.

        In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only

portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the

margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip

Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See

Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22,

2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to

meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[5] as well for a gain

of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20

(alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne

Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen

---

[5]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."  Interest Only (IO) Strips, Investopedia (April 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2 (sent February 22, 2008 at 8:42 a.m.), filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")). In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Email from Larry Goldstone to the Thornburg Mortgage Board of Directors (sent February 25, 2008, at 5:03 p.m.), filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting

Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing. See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2 (sent February 27, 2008, at 3:48 p.m.), filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")).  Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."  Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia.  "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")). Later on February 27, 2008, Simmons sent an email to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2 (sent February 27, 2008, at 10:35 a.m.), filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[7]  See Complaint ¶ 37, at

---

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP. About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/.  According to the FASB's Statement of Financial Accounting

11.   The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that served as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

---

Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset." The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008. See Complaint ¶ 41, at 12-13. Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K. See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30). Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well. If they only knew." Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2 (sent February 28, 2008, at 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")). In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original). See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2 (sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27). At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time. See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email"). As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls. See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'"  Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity, or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[9]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI

---

[9]An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

analysis was accurate.  See Complaint ¶ 49, at 14-15.[10]  The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, see Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern.  See

---

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

Complaint ¶ 57, at 17.   Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's.   See Complaint ¶ 76, at 22.   "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."   Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."   Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"). The requested evidence included "correspondence with lenders/attorneys/shareholders, emails." Request for Correspondence, attached to March 3, 2008 Hall Email, at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."   Request for Correspondence at 4.   At the time, KPMG, as auditor, was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.   See Complaint ¶ 99, at 29.   Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.   See Complaint ¶ 101, at 29.   KPMG did not become aware of the Citi Letter while preparing its Restatement.   See Complaint ¶ 101, at 29.   Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were

part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"   Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).   The analysis stated: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in mortgage valuations.'"   Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

Thornburg Mortgage held an executive session of the audit committee meeting on February 22, 2008, which only Thornburg Mortgage's Board of directors attended.   The company then held an audit committee meeting to which KPMG was invited later on February 22, 2008.   See Motion at 1.   While Thornburg Mortgage's Board of directors discussed the large Citigroup margin call during the executive session, the general session held on that same day did not mention the margin call.   See Motion at 1.   Thornburg Mortgage filed its Form 10-K on February 28, 2008.   KPMG signed off on the audit opinion at 12:38AM on February 28, 2008. "The Company filed the Form 10-K shortly thereafter, and it was accepted by the SEC at 6:28AM on February 28, 2008."   KPMG's Draft Memo at 4.   Thornburg Mortgage did not send KPMG the audit committee minutes until after filing the 10-K, when KPMG requested these minutes.   See Motion at 3 and KPMG's Draft Memo at 4.   Thornburg Mortgage Corporate Compliance Officer Ben Smiley stated in a sworn declaration that Thornburg Mortgage's outside counsel, Steve Newton, prepared the minutes, and that no one instructed him to withhold information from KPMG.   See Motion at 2.   Smiley testified in a sworn declaration that KPMG learned about a large margin call by Citigroup in the March 18, 2008 audit committee minutes. See Motion at 4.

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.  See Complaint at 1.  The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

The Court granted in part and denied in part the Defendants' motions to dismiss on July 8, 2013. See Memorandum Opinion and Order at 2-3, filed July 8, 2013 (Doc. 190)("Motion to Dismiss MOO"). The Motion to Dismiss MOO dismissed the SEC's allegations: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's outside auditor that Thornburg Mortgage successfully met its margin calls without violating its lending agreements, and did not sell assets to meet margin calls"; and (ii) "that the Defendants schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10- K."  Motion to

Dismiss MOO at 2.  It declined to dismiss the SEC's claim that "the representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was materially false or misleading."  Motion to Dismiss MOO at 2.  The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are primarily liable or liable as control persons for that misrepresentation in the 10-K, and the Court will not dismiss the SEC's allegations that the Defendants aided and abetted the misrepresentation, as the Court has determined that the SEC sufficiently alleged that Goldstone and Simmons made, and the Defendants provided substantial assistance to, the misrepresentation with knowledge of or recklessness to its falsity. Similarly, the Court will not dismiss the SEC's allegations that the Defendants misled Thornburg Mortgage's auditor before the 2007 Form 10-K was filed through the statement that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market.

Motion to Dismiss MOO at 3.  The Court also allowed certain claims against Goldstone and Simmons to proceed. See Motion to Dismiss MOO at 3. These claims include the SEC's allegations that: (i) the Defendants failed to disclose to KPMG before they filed the 2007 Form 10-K that a European hedge fund's collapse would negatively affect Thornburg Mortgage's financial condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's financial condition after filing the 2007 Form 10-K; (iii) the Defendants materially misled KPMG by not providing correspondence showing that Thornburg Mortgage experienced an event of default in the two weeks before the 2007 Form 10-K filing; and (iv) Simmons misrepresented that unexpected events had an unexpected financial impact on Thornburg Mortgage after the 2007 Form 10-K filing.  See Motion to Dismiss MOO at 3.

The Court later denied the SEC's and the Defendants' motions for summary judgment. See Summary Judgment MOO at 2-3. It first explained that it would apply an "actual-disbelief" standard to determine "whether a person subjectively disbelieved the truth of an opinion

statement." Summary Judgment MOO at 2. The Court then concluded that genuine issues of material fact for the jury existed on the SEC's claims that: (i) the Defendants made objectively false statements; (ii) the statements were material; (iii) the Defendants believed that their statements were false they made them; and (iv) the Defendants made statements that were false or misleading because of omitted information. See Summary Judgment MOO at 2-3. The Court thus declined to grant summary judgment for any party on any issue. See Summary Judgment MOO at 3.

Starrett reached a settlement with the SEC on May 20, 2016. See Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent"). The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include a requirement that Starrett testify for any of the remaining parties. See Starrett Consent at 1. Ten claims remain in the case for trial -- all of the original claims, with the exception of the SEC's claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b). See Pretrial Order at 3-4, filed May 11, 2016 (Doc. 448).[11]

_____

[11]The Motion to Dismiss MOO and Summary Judgment MOO did not dismiss the SEC's § 17(a) claim, but it does not appear in the Pretrial Order. The parties have also not submitted any jury instructions on this claim. See Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463). The parties' proposed verdict forms do not include a § 17(a) claim. See Defendant Clay Simmons's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489). The Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim." Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002). The pretrial order that the parties filed in this case, therefore, supersedes all prior pleadings, including the Complaint. See Wilson v. Muckala, 303 F.3d at 1215 (citing C. Wright, A. Miller & M. Kane, 6A Fed. Prac. & Proc. Civ. § 1522 (2d ed. 1990)).

1.      **The Motion.**

The Defendants filed their Motion on March 17, 2016.  <u>See</u> Motion at 1.  The Defendants

ask the Court to:

> bar the SEC from arguing at trial that Defendants removed (or caused to be
> removed) any information from Thornburg Audit Committee meeting minutes
> that were provided to KPMG after the 2007 Form 10-K was filed, including but
> not limited to references to discussions held during an executive session of the
> Audit Committee on February 22, 2008.

Motion at 1.  The Defendants make two primary arguments in favor of exclusion.  <u>See</u> Motion at

1-6.  The Defendants first argue that the SEC is "attempt[ing] to spin a new theory about that

Audit committee meeting" by asserting that the Defendants removed the reference to margin

calls from the minutes they provided to KPMG.  Motion at 1-2.  First, the Defendants contend

that the SEC will ask the jury to infer that they intentionally omitted the reference to the margin

calls in the initial minutes they provided to KPMG for the February 22, 2008 audit committee

meeting.  <u>See</u> Motion at 2.  The Defendants dispute the veracity of the SEC's allegation, calling

this argument "wholly baseless."   Motion at 2.   The Defendants contend that Thornburg

Corporate Compliance Officer Ben Smiley stated in a sworn declaration that Thornburg

Mortgage's outside counsel prepared the minutes, that the Defendants were not directly involved

in the preparation of the minutes, and that when the minutes were ready, no one instructed Mr.

Smiley to withhold them from KPMG.  <u>See</u> Motion at 2-3.  The Defendants then offer a timeline

to challenge the SEC's assertion.  <u>See</u> Motion at 3.  The Defendants specify that KPMG did not

request the minutes from the audit committee meeting until after the Form 10-K was filed.  <u>See</u>

Motion at 3.  They add that Smiley forwarded to KPMG a response from Thornburg Mortgage's

outside counsel stating that no more committee minutes would be finalized until the Board would

meet later that month.  <u>See</u> Motion at 3.  The Defendants further advance that, according to

Smiley's testimony, KPMG learned about a large margin call by Citigroup in the March 18, 2008 audit committee minutes.  See Motion at 4.  The Defendants mention that KPMG engagement partner Cynthia Reinhart confirmed Smiley's testimony.  See Motion at 4.  The Defendants point out a few more points from Smiley's testimony, which mentioned that the final minutes "included a more detailed description of what had transpired at the executive session," and that outside counsel prepared these minutes.  Motion at 4.  For these reasons, the Defendants conclude, the SEC's contention that the Defendants removed references to large margin calls from the February 22, 2008 audit committee minutes is speculative and inaccurate.  See Motion at 4.

Second, the Defendants contend that the SEC's speculation that the Defendants removed information from the minutes is irrelevant and highly prejudicial and the Court should thus exclude it.  See Motion at 5.  The Defendants first refer to rules 401, 402 and 403 of the Federal Rules of Evidence to support exclusion.  See Motion at 5.  They also cite Hilderbrand v. Levis Strauss & Co., No. 3:09cv243 DPJ-FKB, 2011 WL 2946717 (S.D. Miss. 2011)(Jordan, J.), to support their assertion that "[s]peculative testimony is not admissible."  Motion at 5 (quoting 2011 WL 2946717, at *5).  The Defendants further cite to Kay v. First Continental Trading, Inc., 1997 U.S. Dist. LEXIS 14809 (N.D. Ill. 1997)(Shadur, J.), stating that "[s]peculative argument by counsel is even more improper, especially when such argument has the potential to mislead a jury and prejudice a party."  Motion at 6 (quoting 1997 U.S. Dist. LEXIS 14809, at *9-11).  The Defendants conclude that for these reasons and pursuant to rule 403, the Court should exclude the SEC's "suggestion that there was a conspiracy or scheme among Thornburg employees to tamper with minutes provided to KPMG," because it is "unsupported speculation that would be irrelevant, improper, and highly prejudicial to Defendants."  Motion at 6.

2.      **The Response**.

The SEC responded on April 14, 2016.  <u>See</u> Plaintiff U.S. Securities and Exchange Commission's Opposition to Defendants' Motion *In Limine* No. 4 to Bar Plaintiff from Arguing that Defendants Removed (or Caused to be Removed) any Information from Draft Audit Committee Meeting Minutes provided to KPMG, filed April 14, 2016 (Doc. 414)("Response"). The SEC argues that the Defendants omitted reference to the margin calls in the meeting minutes.  <u>See</u> Response at 1.

The SEC first contends that it does not plan to ask the jury to infer that the Defendants intentionally omitted the Citigroup margin call references in the minutes.  <u>See</u> Response at 1-2. The SEC states that it plans to present facts to the jury regarding the timeline of the executive and the regular meetings, and that the draft minutes mentioned only that an executive session was held, without disclosing what was discussed.  <u>See</u> Response at 2.  The SEC therefore contends that the Court should allow it to mention the minutes and that omission, as the "minutes go directly to the SEC's deceit of auditors claim and to Defendants' scienter, because they show that the Citi margin call was almost immediately and extensively addressed at the highest levels within Thornburg, while at the same time information about the call was purposely not told to KPMG."  Response at 2.  The SEC contends that the Court should allow it to present this evidence to the jury and allow it to "draw whatever inference it deems appropriate from this evidence."  Response at 2.  The SEC states that it will not, however, advance that the Defendants removed the reference to the margin call from the draft minutes or directed anyone else to do so, "unless such evidence becomes available during the trial."  Response at 2.

### 3.    The Reply.

The Defendants replied to the SEC's response on May 3, 2016.  See Reply Memorandum In Support of Defendants' Motion *In Limine* No. 4 To Bar Plaintiffs from Arguing Defendants Removed (or Caused to be Removed) any Information from Draft Audit Committee Meeting Minutes Provided to KPMG, filed May 03, 2016 (Doc. 436)("Reply").  The Defendants contend that the SEC, in its Response, admits that it does not have evidence that the Defendants removed or caused to be removed information from the minutes.  See Reply at 1.  They argue that the SEC, therefore, does not oppose the Defendants' motion.  See Reply at 1.  They contend that the SEC is inconsistently trying to link the minutes to "an entirely unrelated email" to prove the SEC's claim of deceit of auditors and the Defendants' scienter.  Reply at 1.

The Defendants further argue that the minutes themselves do not support the SEC's contention that information was purposely not told to KPMG, because "the SEC cites no evidence tying Defendants to the preparation of the minutes or the manner in which the minutes were ultimately provided to KPMG."   Reply at 2.   The Defendants contend that the SEC's conspiracy contentions are speculative and prejudicial, and that the Court should therefore not allow the SEC to present them to the jury.  See Reply at 2.

### 4.    The Hearing.

The Court held a hearing on May 11, 2016.  See Transcript of Hearing (taken May 11, 2016), filed May 20, 2016 (Doc. 466)("Tr.").  The Court first explained that the parties seemed to be arguing over the use of the word "removed."  Tr. at 91:2-5 (Court).  The Court stated that it was too early to determine whether the SEC may state that the Defendants removed the reference to the Citigroup margin call from the minutes they gave to KPMG.  See Tr. at 91:6-8 (Court).  The Court explained that, at this stage in the proceedings, because the word "removed" is

conclusory and argumentative and is inappropriate in opening unless there is a good factual basis in the facts and record, the SEC should refrain from using it in its opening statement.  Tr. at 91:8-12 (Court).  The Court advised the SEC that, instead of using the term "removed," it should say only that the information was given to certain people and not to others.  Tr. at 91:12-14 (Court).  The Court explained, however, that, if the SEC could gather evidence that removal occurred, then it would allow the SEC to use the word "removed" in closing.  Tr. at 91:14-16 (Court).  The Court stated that the SEC's ability to use the word removed and what stage will depend on the evidence available at trial.  See Tr. at 91:18-20 (Court).  The Court further explained that the SEC could ask the witnesses whether the information regarding the margin call reference was in the minutes.  See Tr. at 91:20-23 (Court).  Finally, the Court stated that, if the SEC wishes to use the word "removed," then it could -- provided that it sets forth evidence of removal.  See Tr. at 92:6-9 (Court).  The Court then listened to the Defendants' arguments on the motion.  See Tr. at 92:11 (Court).

The Defendants first contended that they did not want the SEC to use the minutes "as the vehicle by which information was kept [from] KPMG," because such use would be "speculative and counter-factual."  Tr. at 92:14-19 (Liubicic).  The Defendants offered the Court a timeline of events, stating that KPMG learned about the content of the February 22, 2008 executive session at the March 18, 2008 audit committee meeting.  See Tr. at 92:20-93:2 (Liubicic).  The Defendants then mentioned that Thornburg Mortgage's outside counsel, Steve Newton (from the Heller Ehrman firm), prepared the minutes.  See Tr. at 93:5-8 (Liubicic).  The Defendants further advanced that there is no evidence that they were involved in preparing the minutes.  See Tr. at 93:8-10 (Liubicic).  The Defendants explained that Newton sent Thornburg Mortgage draft audit minutes on February 26, 2008, and that he explained in a cover email that the minutes for the

February 22, 2008 meeting had not been drafted yet.  See Tr. at 93:11-16 (Liubicic).  The Defendants finally explained that, on April 3, 2008, Thornburg Mortgage asked Newton (its outside counsel) if any more draft or finalized minutes were available, and that he responded that, "given everything going on," it would not prepare any more draft or finalized minutes until later in April, 2008.  Tr. at 93:17-94:1 (Liubicic).  The Defendants concluded that the record shows that, as of April 3, 2008, no minutes for the February 22 meeting minutes even existed.  See Tr. at 94:2-6 (Liubicic).  The Defendants stated that the SEC did not question this timeline, and that it would therefore be improper for the SEC to suggest to the jury that there were minutes in existence regarding the February 22, 2008, minutes and that those were withheld from KPMG.  See Tr. at 94:12-21 (Liubicic).  The Defendants concluded that, given the timeline that the Defendants present, and the lack of evidence linking them to the preparation of the minutes that KPMG received, the SEC's argument would be irrelevant, prejudicial, and confusing to the jury.  See Tr. at 95:2-8 (Liubicic).

The SEC first expressed its agreement to not using the word "removed" in opening arguments.  Tr. at 95:18-20 (McKenna).  The SEC explained that, if it does not have the evidence by the time the trial starts, it will not use that word in closing arguments.  See Tr. at 95:20-21 (McKenna).  The SEC explained, however, that the timeline which the Defendants present is based on declarations from witnesses to whom the Defendants talked, but that the SEC had not yet had a chance to interview these witnesses.  See Tr. at 95:21-25 (McKenna).  The SEC therefore asked the Court to let it explore, depending on how the evidence unfolds at trial, the veracity of the Defendants' account of those events and their timing.  See Tr. at 95:25-96:2 (McKenna).  The SEC then rejected the Defendants' contention that the minutes do not show anything about KPMG being misled.  See Tr. at 96:3-5 (McKenna).  The SEC further contended

that the minutes reflect that an executive session was held without KPMG and that the Citigroup margin call was discussed during that session.  <u>See</u> Tr. at 96:5-8 (McKenna).  The SEC stated that the rest of the minutes do not mention that Citigroup margin call.  <u>See</u> Tr. at 96:3-5 (McKenna).  The SEC advanced that the Defendants admitted that they told KPMG about the Citigroup margin call weeks after filing the Form 10-K and over a week after filing the amended Form 10-K.  <u>See</u> Tr. at 96:10-14 (McKenna).  The SEC therefore concluded that the minutes and argument about them is relevant.  <u>See</u> Tr. at 96:14-15 (McKenna).

The Defendants first responded that the minutes regarding the February 22, 2008, executive session meeting were not created until "sometime after April 3," 2008.  Tr. at 96:25-97:3 (Liubicic).  The Defendants reiterated that "KPMG ha[d] already been told all of that information on March 18," 2008.  Tr. at 97:4-5 (Liubicic).  The Defendants therefore contended that the SEC could not possibly make a relevant and non-prejudicial argument.  <u>See</u> Tr. at 97:5-7 (Liubicic).  The Defendants then repeated that, under the existing record, the SEC cannot argue that the minutes themselves were "a vehicle by which defendants kept information from KPMG."  Tr. at 97:8-22 (Liubicic).

The Court noted that the SEC "has a very high burden" on scienter, and that it had to prove fraud circumstantially using all the evidence at its disposal.  Tr. at 98:2-4 (Court).  The Court then explained that the minutes are "part of the constellation of facts that the SEC has" to prove its case.  Tr. at 98:5-6 (Court).  For that reason, the Court expressed its reluctance to exclude facts at this stage, and its inclination to let the jury hear the explanation in the context of all the other factors.  <u>See</u> Tr. at 98:7-11 (Court).  The Court therefore denied the Defendants' motion, but scripted out the way the SEC should use the word "removed."  Tr. at 98:12-14 (Court).

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'"  United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012) (Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989)(Baldock, J.).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under

rule 403].” United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(Tacha, J.)(quoting

United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)).  The Tenth Circuit has

reminded district courts that they should be “mindful” that “exclusion of evidence under Rule

403 that is otherwise admissible under the other rules is an extraordinary remedy and should be

used sparingly.”  United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(Baldock, J.).

        The decision to admit or to exclude evidence pursuant to rule 403 is within the trial

court’s discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999)(Kelly, J.), and

the trial court’s discretion to balance possible unfair prejudice against probative value is broad,

see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v.

Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.).   The Supreme Court of the United

States has noted:

> In deference to a district court’s familiarity with the details of the case and its
> greater experience in evidentiary matters, courts of appeals afford broad
> discretion to a district court’s evidentiary rulings . . . .  This is particularly true
> with respect to Rule 403 since it requires an “on-the-spot balancing of probative
> value and prejudice, potentially to exclude as unduly prejudicial some evidence
> that already has been found to be factually relevant.”

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(Thomas, J.)(quoting 1

Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed.

1999)).   See United States v. Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)(“Assessing the

probative value of [proffered evidence], and weighing any factors counseling against

admissibility is a matter first for the district court’s sound judgment under Rules 401 and 403 . . .

.”).

        Evidence may be unfairly prejudicial if it would likely provoke the jury’s emotional

response or would otherwise tend to adversely affect the jury’s attitude toward a particular

matter. See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999)(Sanborn, J.).

Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)(Ebel, J.); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991)(Holloway, J.).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(Hartz, J.)(quoting Fed. R. Evid. 403 advisory committee notes).

## ANALYSIS

The Court will grant the motion in part and deny it in part.  The Court held in United States v. Gutierrez-Castro: "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  2011 WL 3503321, at *3.  The meeting minutes are relevant, because they are part of the circumstantial evidence that the SEC may use to prove its fraud claim.

Numerous courts have admitted meeting minutes to show the contents of discussion and intent.  In United States v. Brown, No. CRIM.A. 12-0367, 2014 WL 3797201 (E.D. Pa. 2014)(Surrick, J.), the Honorable Richard Surrick, United States District Judge for the Eastern District of Pennsylvania, admitted draft board meetings into evidence, because the minutes constituted relevant evidence.  See 2014 WL 3797201, at *13.  The district court explained that "[t]he evidence showed that Defendant directed others to draft board meeting minutes evidencing the board's approval of the contracts, when in fact, many board members who were listed on the minutes, testified that they were not at the meeting and never approved of any contracts with AcademicQuest."  2014 WL 3797201, at *13.

In United States v. Flanders, 491 F.3d 1197 (10th Cir. 2007), the United States of America prosecuted the former Chief Executive Officer and major shareholder of a bank for, among other claims, misapplication of bank funds and scheming to defraud the bank.  See  491 F.3d at 1202.  The Tenth Circuit agreed with the district court's decision to allow the United States to introduce board meeting minutes as relevant evidence to prove fraud.  See  491 F.3d at 1214.  The Tenth Circuit further agreed that testimony regarding the minutes was appropriate and proved that the defendant instructed an outside contract typist to delete a reference to a restriction the company's board illegally placed on loan participations in the draft minutes before they were finalized.  See  491 F.3d at 1214.  As in United States v. Flanders, the possibility of deletion in meeting minutes is relevant here, because the SEC may use it to prove fraud.

In United States v. Muños-Franco, 487 F.3d 25 (1st Cir. 2007), the United States Court of Appeals for the First Circuit concluded: "The district court did not abuse its discretion in allowing the use of the minutes to demonstrate that the Board did not receive material information about many of the transactions it considered."  487 F.3d at 39.  Witnesses testified about the minutes, and the court held that the minutes were not hearsay under rule 803(7) of the Federal Rules of Evidence. The court thus held that, when business records are prepared regularly, and the company's board reviews and ratifies the records, the court may allow the minutes into evidence to prove fraud.  See 487 F.3d at 39.

In this case, the Court concludes that, like in United States v. Flanders, the audit committee meeting minutes are relevant to the SEC's claim of fraud.  See 491 F.3d at 1214.  The SEC  alleges that the Defendants withheld information from their auditor, KPMG, and that the Defendants did not provide thorough minutes to KPMG.  See Motion to Dismiss MOO at 3.   At a minimum, they suggest that the Citigroup margin call was discussed in the audit committee,

but not when KPMG was in the room.  The minutes tend to support the SEC's contention that the Defendants deceived KPMG about the payment of the margin calls before filing its Form 10-K. The minutes are relevant, and the risk of unfair prejudice does not substantially outweigh the evidence's probative value.  The Court will, therefore, allow the SEC to prove its claim by introducing the audit committee meeting minutes, as well as testimony regarding these minutes.

The Court will, however, preclude the SEC from telling the jury that the Defendants "removed" the reference to the Citigroup margin call from the minutes they eventually provided to KPMG, unless the SEC gathers enough evidence by the time the trial starts to prove that the Defendants removed that reference.  To use the word "removed" would be argumentative and would lack a good factual basis in the current record.  If the SEC interviews witnesses and finds evidence that the Defendants removed the reference to margin calls, rather than the evidence was just not there, the Court will allow the SEC to prove that the Defendants contributed to the removal of the reference to margin calls in the minutes.  The use of the word "removed" would -- without the support by proper evidence -- be unfairly prejudicial to the Defendants under rule 403.  That risk will disappear, however, if the SEC is able to prove the removal.

**IT IS ORDERED** that: Defendants Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett's Motion *In Limine* No. 4 to Bar Plaintiff from Arguing that Defendants Removed (or Caused to be Removed) any Information from Draft Audit Committee Meeting Minutes Provided to KPMG, filed March 17, 2016 (Doc. 395)("Motion"), is granted in part and denied in part.  The SEC may introduce the February 22, 2008, audit committee meeting minutes and argument relating to these minutes to prove its contention that the Defendants withheld information from KPMG.   The SEC may not, however, tell the jury that the Defendants

"removed" that information from the minutes, unless it has sufficient evidence to prove that they

did.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
   United States Attorney
Michael H. Hoses
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Danielle Voorhees
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

        *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Robert G. Badal
Los Angeles, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Heather Tewksbury
Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Aaron Thompson
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

*Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Robert J. Liubicic
Paul M. Torres
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

*Attorneys for Defendant Jane E. Starrett*