IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.                                No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion *In Limine* No. 10 to Preclude Evidence or Argument Associating Thornburg with Causes of the Financial Crisis, Subprime Lenders and Lending, or Wall Street Investment Banks, filed March 17, 2016 (Doc. 401)("Motion").  The primary issue is whether the Court should allow Plaintiff Securities and Exchange Commission ("SEC") to offer evidence or arguments associating Thornburg Mortgage with the causes of the financial crisis, subprime lenders and lending, or Wall Street investment banks.  The Court will not allow the SEC to argue or introduce evidence that Thornburg Mortgage caused the financial crisis, is a subprime lender, or is a Wall Street investment bank. The Court will thus grant the Motion.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1).  The Court presents the facts solely to provide context for the Motion.  It continues to adhere to the decisions on the facts it reached in its Unsealed Memorandum Opinion and Order, filed August 22, 2015

(Doc. 371)("Summary Judgment MOO").[1]

The Defendants are former officers of Thornburg Mortgage: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The SEC alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[2]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[3]  Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New

_____

[1]SEC v. Goldstone, No. CIV. 12-0257 JB/GBW, 2015 WL 5138242 (D.N.M. August 22, 2015)(Browning, J.).

[2]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[3]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

- 2 -

York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations

focused on "jumbo" and "super-jumbo"[4] ARM securities; Thornburg Mortgage also purchased

ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out

most of its earnings in dividends, and obtained financing for its mortgage and investment

business through reverse repurchase agreements[5] backed by ARM securities.  See Complaint ¶ 3,

---

[4]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a
mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/
wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that the
Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage
Corporation ("Freddie Mac") set.  Super jumbo mortgage, Wikipedia.  Fannie Mae purchases
and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia,
http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Both Fannie
Mae and Freddie Mac are government-sponsored enterprises, that is, financial services
corporations that the United States Congress created.  See Fannie Mae, Wikipedia,
http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia,
http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored
Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last
updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee
between 40 to 60% of all mortgages originated in the United States annually, depending upon
market conditions and consumer trends."  Fannie Mae, Investopedia.  The conforming limits that
Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and
2014 for most of the United States (including all of New Mexico) is $417,000.00.  See FHA
Announces Conforming Loan Limits for 2014, released November 26, 2013,
http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  Higher-value areas, such as the
District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces
Conforming Loan Limits for 2014, released November 26, 2013,
http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are
loans that exceed the local conforming loan limit and have higher interest rates, because of the
increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013),
http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined
or regulated, but mortgage companies use it internally and independently to set loan parameters.
See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular
lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage,
Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie
Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie
Mae, Wikipedia; Freddie Mac, Wikipedia.

[5]A "repurchase agreement" is a "short-term loan agreement by which one party sells a
security to another party but promises to buy back the security on a specified date at a specified
price.  Often shortened to repo."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed.

at 2. Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price." Complaint ¶ 22, at 7-8. The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level. See Complaint ¶ 22, at 8. A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise. See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8. Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's

---

2009)(emphasis in original). A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's. Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement. "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement." Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m.,

filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.   See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[6] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Email from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

---

[6]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."   Interest Only (IO) Strips, Investopedia (Apr. 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.  See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would

negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon. UBS credit just mentioned it to me. They got hit with 20 point haircuts on Alt-A and AAA's overnight. I think we will get this a little more gradually, but we should be ready for it.[7]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")). Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'" Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")). Later on February 27, 2008, Simmons sent an email to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K. I do not want there to be any issues based on Thursday activity.'" Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent

---

[7]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels." Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014). An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages. Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A. Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid." Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating. The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB. See Bond credit rating, Wikipedia. "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies." AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[8]  See Complaint ¶ 37, at

_____

[8]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP. About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/.  According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset." The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be

11.   The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that served as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[9] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008.  See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch,

---

accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

[9]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2, (sent February 28, 2008, at 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).  In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original).  See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, (sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email").  As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint

¶ 98, at 28 (alterations in original)(quoting <u>Street Signs: Interview with Larry Goldstone</u> at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  <u>See</u> Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'"  Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity, or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[10]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  <u>See</u> Complaint ¶ 49, at 14-15.[11]  The Defendants did not disclose to

---

[10]An "impairment" is a "reduction in a company's stated capital."  <u>Impairment</u>, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[11]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, <u>see</u> In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013

KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, see Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern. See Complaint ¶ 57, at 17. Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's. See Complaint ¶ 76, at 22. "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside

---

(Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."   Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"). The requested evidence included "correspondence with lenders/attorneys/shareholders, emails." Request for Correspondence, attached to March 3, 2008 Hall Email at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  At the time, KPMG, as auditor, was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.  KPMG did not become aware of the Citi Letter while preparing its Restatement.  See Complaint ¶ 101, at 29.  Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"   Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).   The analysis states: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped

- 14 -

significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in mortgage valuations.'"   Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.  See Complaint at 1.  The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

The Court granted in part and denied in part the SEC's and the Defendants' motions to dismiss on July 8, 2013.  See Memorandum Opinion and Order at 2-3, filed July 8, 2013 (Doc.

190)("Motion to Dismiss MOO").[12]   The Motion to Dismiss MOO dismissed the SEC's allegations: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's outside auditor that Thornburg Mortgage successfully met its margin calls without violating its lending agreements, and did not sell assets to meet margin calls"; and (ii) "that the Defendants schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-K."   Motion to Dismiss MOO at 2.   It declined to dismiss the SEC's claim that "the representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was materially false or misleading."  Motion to Dismiss MOO at 2.  The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are primarily liable or liable as control persons for that misrepresentation in the 10-K, and the Court will not dismiss the SEC's allegations that the Defendants aided and abetted the misrepresentation, as the Court has determined that the SEC sufficiently alleged that Goldstone and Simmons made, and the Defendants provided substantial assistance to, the misrepresentation with knowledge of or recklessness to its falsity.   Similarly, the Court will not dismiss the SEC's allegations that the Defendants misled Thornburg Mortgage's auditor before the 2007 Form 10-K was filed through the statement that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market.

Motion to Dismiss MOO at 3.  The Court also allowed certain claims against Goldstone and Simmons to proceed.  See Motion to Dismiss MOO at 3.  These claims included the SEC's allegations whether: (i) the Defendants failed to disclose to KPMG before they filed the 2007 Form 10-K that a European hedge fund's collapse would negatively affect Thornburg Mortgage's financial condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's financial condition after filing the 2007 Form 10-K; (iii) the Defendants materially misled KPMG by not providing correspondence showing that Thornburg Mortgage experienced an

---

[12]S.E.C. v. Goldstone, 952 F.Supp.2d 1060 (D.N.M. July 8, 2013)(Browning, J.).

event of default in the two weeks before the 2007 Form 10-K filing; and (iv) Simmons misrepresented that unexpected events had an unexpected financial impact on Thornburg Mortgage after the 2007 Form 10-K filing.  See Motion to Dismiss MOO at 3.

The Court later denied the Defendants' and the SEC's motions for summary judgment. See Summary Judgment MOO at 2-3.  It first explained that it would apply an "actual-disbelief" standard to determine "whether a person subjectively disbelieved the truth of an opinion statement."  Summary Judgment MOO at 2.  The Court then concluded that genuine issues of material fact for the jury existed on the SEC's claims that: (i) the Defendants made objectively false statements; (ii) the statements were material; (iii) the Defendants believed that their statements were false they made them; and (iv) the Defendants made statements that were false or misleading because of omitted information.  See Summary Judgment MOO at 2-3.  The Court thus declined to grant summary judgment for any party on any issue.  See Summary Judgment MOO at 3.

Starrett reached a settlement with the SEC on May 20, 2016.  See Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent"). The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include a requirement that Starrett testify for any of the remaining parties.  Starrett Consent at 1.  Ten claims remain in the case for trial -- all of the original claims, with the exception of the SEC's claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b).  See Pretrial Order at 3-4, filed May 11, 2016 (Doc. 448).[13]

---

[13]The Motion to Dismiss MOO and Summary Judgment MOO did not dismiss the SEC's § 17(a) claim, but it does not appear in the Pretrial Order.  The parties have also not submitted any jury instructions on this claim.  See Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First

1.      **The Motion.**

In their Motion, the Defendants ask the Court to preclude the SEC from arguing or introducing evidence to associate Thornburg Mortgage with causes of the financial crisis by: "(1) falsely equating Thornburg with subprime lenders such as Countrywide Financial ('Countrywide'); (2) falsely equating the Alt-A mortgages in which Thornburg invested with subprime mortgages; or (3) falsely likening Thornburg to Wall Street investment banks." Motion at 1.  They argue that this evidence would be highly prejudicial to them and is irrelevant to any claims.  See Motion at 1.  They point out that the SEC "trumpeted its charges as one of its 'financial crisis-related enforcement actions'" in a press release for this case and assert that the SEC wants to introduce this sort of evidence to "inflame the passions of the jury."  Motion at 1 (quoting SEC Charges Three Mortgage Executives with Fraudulent Accounting Maneuvers in Midst of Financial Crisis, Securities and Exchange Commission (March 13, 2012), https://www.sec.gov/News/PressRelease/Detail/PressRelease/1365171487714).  The Defendants argue that it would be easy for the SEC to introduce evidence which suggests that they should be held responsible for the financial crisis, despite its causes being beyond the case's scope.  See Motion at 2.  They assert this suggestion would be "extraordinarily prejudicial."  Motion at 2.

---

Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463).  The parties' proposed verdict forms do not include a § 17(a) claim.  See Defendant Clay Simmons's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489).  The Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."  Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002).  The pretrial order that the parties filed in this case, therefore, supersedes all prior pleadings, including the Complaint.  See Wilson v. Muckala, 303 F.3d at 1215 (citing C. Wright, A. Miller & M. Kane, 6A Fed. Prac. & Proc. Civ. § 1522 (2d ed. 1990)).

- 18 -

The Defendants point to a number of district court decisions which they attest stand for the idea that discussion of the financial crisis is unfairly prejudicial.  See Motion at 2.  The first case they cite, Island Intellectual Property, LLC v. Deutsche Bank AG, No. 09 CIV. 2675 KBF, 2012 WL 526722 (S.D.N.Y. Feb. 14, 2012)(Forrest, J.), was a patent infringement action in which the district court held that abstract discussion of the financial crisis was irrelevant and that the risk of prejudice outweighed any relevance.  See 2012 WL 526722, at *3.  The Defendants then cite Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc., No. 08 Civ. 7508 (SAS), 2013 WL 1155420 (S.D.N.Y. March 20, 2013)(Scheindlin, J.), where the district court held that evidence of a rating agency's ratings of certain financial products -- products that the defendants could not acquire -- was irrelevant and prejudicial, because it would link the defendants with the financial crisis more generally.  See 2013 WL 1155420, at *3.  The Defendants also cite Aristocrat Leisure Limited v. Deutsche Bank Trust Co. Americas, No. 04 Civ. 10014 (PKL), 2009 WL 3111766 (S.D.N.Y. Sept. 28, 2009)(Leisure, J.), in which the district court precluded the plaintiffs from making inflammatory statements irrelevant to the issues bring tried, such as "tax haven" and statements linking hedge funds to the financial crisis.  2009 WL 3111766, at *7.  Finally, they cite to rule 403's advisory committee notes, which defines "unfair prejudice" as eliciting a decision on an emotional -- or some other improper -- basis.  Motion at 2 (quoting Fed. R. Evid. 403, Notes of Advisory Committee on Proposed Rules).

The Defendants argue that the Court should preclude the SEC from falsely equating Thornburg Mortgage with subprime lenders.  See Motion at 3.  They state that it is undisputed that Thornburg Mortgage was not a subprime lender and that it did not deal in subprime loans. See Motion at 3 (citing Summary Judgment MOO at 4).  They also note that the Court already precluded the SEC's experts from attacking Thornburg Mortgage's business model, noting these

criticisms tend to cause the jury to make a decision on an improper basis. See Motion at 3 (citing Omnibus Declaration of Jerry L. Marks in Support of Defendants' Motions *in Limine* ¶ 15 ("Declaration"), Ex. M (Jan. 14, 2016 Hearing Transcript) filed March 17, 2016 (Doc. 404-25)). They argue that the SEC's exhibit list indicates its intent to make inaccurate and irrelevant comparisons between Thornburg Mortgage and subprime lenders.   See Motion at 4.   The Defendants note that SEC trial exhibit 76 -- an email, dated February 21, 2008, between Thornburg Mortgage employees Xen Stanhope, the portfolio funding manager, and Mark Plasters, the executive vice president national sales manager -- is especially indicative of the SEC's prejudicial intentions because of the attached cartoon "ridiculing the subprime lending process."  Motion at 4 (citing Declaration, Ex. TT Email from Xen Stanhope to fellow employee Mark Plasters, Subject: RE: your gonna love this (sent February 21, 2008 at 6:54 a.m.), filed March 17, 2016 (Doc. 404-40)("Cartoon")).   The Cartoon shows the process of a person receiving a mortgage after he tells the broker, "I don't think I can afford the monthly payments." Cartoon at 6.  It then shows the process the investment banks go through to use these "crappy mortgage loans" as collateral for a new security, then transfer the ownership of the subprime mortgages to a shell company so the investment banks do not have to list them on their balance sheets.  See Cartoon at 10-28.  According to the investment bank, they have "convinced [the people who wrote the accounting rules] that it is vitally important to the health of the U.S. financial system that investors not know about these complex transactions and what is behind them."  Cartoon at 29.  When the investors stop receiving their payments because of the collapse of the subprime mortgages, the Cartoon shows the investment banks being rude and unapologetic to the irate investor when he calls to find out what happened.  See Cartoon at 34-47.   For example, the investment bank explains to the investor, a "Norwegian Village Pension Fund," that

he is not being paid because "the loans were quite a bit crappier than we originally thought . . . [w]e fucked up.  Sorry."  Cartoon at 37-39.

There is no evidence the Defendants received the Cartoon contained in the email and endorsed its message, such as by saying, "Boy, that captured what was going on," or anything similar, or were even aware of the email and the Cartoon.  See Motion at 4.  Accordingly, the Defendants contend that the SEC's sole purpose for introducing the Cartoon is to "mislead the jury into believing that Thornburg's conduct was comparable to that of an investment bank originating and securitizing subprime loans."  Motion at 4.  The Defendants posit that such a comparison is inaccurate and prejudicial, because jurors may identify subprime lenders as a cause of the financial crisis.  See Motion at 4.

Second, the Defendants argue the Court should preclude the SEC from falsely equating Alt-A loans with subprime loans.  See Motion at 5.  They assert that Alt-A and subprime mortgages[14] are "of an entirely different quality," so there is no legitimate basis for such a comparison.  Motion at 5.  They define Alt-A loans as loans given to "individuals who would typically otherwise qualify for a prime mortgage because of a satisfactory credit score, but lack the necessary proof of income or verification of assets."  Motion at 5 (citing In re Thornburg Mortgage Inc. Sec. Litig., 695 F. Supp. 2d 1165, 1176 (D.N.M. 2010)(Browning, J.)).  They state that subprime loans are loans made to an individual who would otherwise be disqualified from receiving a conforming mortgage loan because of his credit score.  See Motion at 5 (quoting In re

---

[14]Subprime mortgages are normally made to borrowers with lower credit ratings who do not qualify for a conventional mortgage because they are viewed as "having a larger-than-average risk of defaulting on the loan."  As a result of carrying more risk, lending institutions tend to charge interest at a rate higher than that of a conventional mortgage.  Subprime Mortgage, Investopedia, (June 28, 2016), http://www.investopedia.com/terms/s/subprime_mortgage.asp.

Thornburg Mortgage Inc. Sec. Litig., 695 F. Supp. 2d at 1176 n.10).  The Defendants assert that Thornburg Mortgage's portfolio of mortgages did not have the same risk profile as a portfolio of subprime mortgages and that there is no reasonable basis to argue otherwise.  See Motion at 5. They note that Alt-A mortgages are generally less risky than subprime mortgages and that, by comparing Thornburg Mortgage to subprime lending, the SEC is "seeking to tarnish Thornburg's business model as unduly risky" and to prejudice the jury against the Defendants.  Motion at 6.

Finally, the Defendants assert that the SEC should be prevented from falsely equating Thornburg Mortgage with Wall Street investment banks.  See Motion at 6.  They state that the Cartoon shows the "supposed indifference of Wall Street investment banks to the pain of the common people to whom [they] sold 'garbage' securities."  Motion at 6.  Accordingly, they assert that any comparison between Thornburg Mortgage and Wall Street investment banks is also highly prejudicial.  See Motion at 6.  They note that the public perceives that Wall Street had a role in causing the financial crisis and that its view towards Wall Street is thus negative. See Motion at 7.

  **2.  The Response.**

The SEC responded to the Motion on April 14, 2016.  See Plaintiff U.S. Securities and Exchange Commission's Opposition to Defendants' Motion In Limine No. 10 to Preclude Evidence or Argument Associating Thornburg with Causes of the Financial Crisis, Subprime Lender and Lending, or Wall Street Investment Banks, filed April 14, 2016 (Doc. 422)("Response").  The SEC begins by denying the Defendants' allegations that it intends to make false comparisons during trial.  See Response at 1.  The SEC states that it has no such intention and, because "the entire motion is based on a plainly false premise," the Court should

deny it.  Response at 1.  The SEC further notes that it is unclear what evidence it would be prohibited from offering should the Court grant the Motion.  See Response at 2.

The SEC argues that it intends to offer only relevant evidence to demonstrate that Thornburg Mortgage's OTTI determination was false.  See Response at 2.  It offers a few examples of the evidence it is planning to offer, including evidence related to: Thornburg Mortgage's business model, the credit quality of Thornburg Mortgage's portfolio, market conditions and the effect of the subprime market on other sectors of the mortgage market, how repo agreements work, and how Thornburg used them.  See Response at 2-3.  The SEC then rebuts the Defendants' cited cases by pointing out that the cases "stand for nothing more than irrelevant evidence should not be admitted."  Response at 3 (citing Island Intellectual Prop., LLC v. Deutsche Bank AG, 2012 WL 526722; Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc., 2013 WL 1155420; and Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, 2009 WL 3111766).  It states that these cases are not applicable here, because it intends to introduce relevant evidence, which the Court should therefore not exclude.  See Response at 4.

The SEC then argues that evidence relating to the subprime market is relevant, and that it has no intention to "defraud the jurors" by comparing Thornburg Mortgage and Alt-A securities to subprime lenders and subprime securities.  Response at 4.  It notes that the Defendants themselves asserted that the Alt-A MBS market and subprime MBS market are more similar than they are different.  See Response at 4.  Both Alt-A and subprime are securities based upon the non-prime mortgages of homes in the United States and are part of the larger MBS market.  See Response at 4.  Accordingly, the SEC argues that Alt-A MBS and subprime MBS are not entirely different -- as the Defendants assert -- and that evidence related to the subprime market is relevant in this case.  See Response at 4.  It argues that evidence of the decline in the subprime

market is relevant, because it shows that the entire market at the time, including Alt-A securities, "was declining and at risk."  Response at 5.  The SEC contends that this evidence is also stated in Thornburg Mortgage's Form 10-Q for the quarter ending September 30, 2007, which Goldstone and Simmons signed.  See Response at 5, 31 (citing Exhibit C (Form 10-Q), filed April 14, 2016 (Doc. 422-3)).  Accordingly, the SEC posits that, while there are distinctions between Alt-A MBS and subprime MBS, the poor economic conditions impacted all sectors.  See Response at 6. It concludes that, despite that Thornburg Mortgage was not a subprime lender, evidence of the subprime market is still relevant to Thornburg Mortgage's OTTI determination, because of subprime lending's far-reaching impact.  See Response at 6.

The Defendants assert that the SEC intends to make false and prejudicial comparisons, but only point to one exhibit that they argue shows this intention -- the Cartoon.  See Response at 6 (citing Motion at 4).  This exhibit is an email sent between two Thornburg employees with a cartoon, which the SEC asserts "demonstrates that there are significant concerns with subprime MBS and that the underlying loans were poor."  Response at 6 (citing Cartoon).  The SEC argues that the Cartoon is important evidence, because it shows that the problems with subprime MBS were well known within Thornburg Mortgage by February, 2008, and the jury should thus consider this knowledge when judging whether Thornburg Mortgage's OTTI was correct.  See Response 7.  It further asserts that the Court should not exclude this evidence, because its probative value is not "substantially outweighed" by the danger of "unfair prejudice."  Response at 7 (quoting Fed. R. Evid. 403).  It notes that the Court has held that "unfair prejudice" means a tendency to produce a decision on an improper basis, such as an emotional one.  Response at 7 (quoting United States v. Delgado, No. CR 05-920 JB, 2006 WL 1228774, at *4 (D.N.M. Feb. 10, 2006)(Browning, J.)(quoting Fed. R. Evid. 403 advisory committee note)).  The SEC asserts

that there is no risk of unfair prejudice to the Defendants from the Cartoon, because it does not suggest Thornburg Mortgage did anything improper or caused the financial crisis, and it is a document the jury will easily understand and that shows the issues of subprime MBS. See Response at 7.

Finally, the SEC rejects the Defendants' contention that it intends to suggest that Thornburg Mortgage was a Wall Street investment bank. See Response at 8. It will, however, address Thornburg Mortgage's business model, the nature of its repo agreements, and its repo lenders -- including Wall Street investment banks -- because this evidence is relevant in showing Thornburg Mortgage's false OTTI determination. See Response at 8. Further, it noted that the Defendants intend to call an expert witness who will testify that repo lenders, including Wall Street investment banks, had a strong incentive to work with Thornburg Mortgage. See Response at 8. The SEC argues that it should also be able to present evidence of Thornburg Mortgage's ties to Wall Street. See Response at 8.

**3.     The Reply.**

The Defendants replied on May 3, 2016. See Reply Memorandum in Support of Defendants' Motion *in Limine* No. 10 to Preclude Evidence or Argument Associating Thornburg with Causes of the Financial Crisis, Subprime Lenders and Lending, or Wall Street Investment Banks, filed May 3, 2016 (Doc. 441)("Reply"). The Defendants begin by noting that the SEC does not dispute that the comparisons they want the Court to preclude would be inaccurate. See Reply at 1. They assert that they do not seek to exclude any of the evidence which the SEC states that it wants to present; it seeks to ban only comparisons that the SEC concede are inaccurate. See Reply at 1.

The Defendants also note that, despite the SEC agreeing that Thornburg Mortgage was not a subprime lender, the SEC still opposes the Cartoon's exclusion.  See Reply at 2.  The Defendants argue that this exhibit is prejudicial and irrelevant, because the Cartoon is highly satirical and vulgar.  See Reply at 2.  They assert that the SEC's arguments on the Cartoon's importance are not credible, especially because the Cartoon is "clearly intended to be a joke, not a factual report on market events."  Reply at 3.  They complain that there is no nexus between the Cartoon and their action, or any explanation how the Cartoon bears on whether the Defendants' OTTI determination was reasonable.  See Reply at 3.  The Defendants argue it would be easy for the jury to form false impressions from viewing the Cartoon.  See Reply at 3.  Accordingly, they assert that the Cartoon has no relevance, and, even if it did, exclusion under Fed. R. Evid. 403 is warranted.  See Reply at 4.  Finally, they posit that the Court needs to set parameters for comparisons before trial and should thus grant the Motion.  See Reply at 4.

### 4.    **The Hearing.**

The Court held a hearing on May 11, 2016.  See Transcript of Hearing at 1 (taken May 11, 2016), filed May 20, 2016 (Doc. 466)("Tr.").  The Court stated that the SEC must be precise with its language, and thus cannot say Thornburg Mortgage is a subprime lender or that it caused the financial crisis.  See Tr. at 141:11-16 (Court).  The Court stated that the SEC could, however, explain what a subprime lender is and what Thornburg Mortgage is.  See Tr. at 141:14-15 (Court).  Further, the Court stated the SEC could talk about Wall Street investment banks, but cannot say Thornburg Mortgage is a Wall Street investment bank -- because it is not.  See Tr. at 141:17-21 (Court).

The Court then asked counsel to remind it what the Cartoon is.  See Tr. at 142:1-3 (Court).  Ms. Tewksbury reminded the Court that Cartoon is the email containing the subprime

primer cartoon.  See Tr. at 142:7 (Tewksbury).  The Court then stated its inclination to keep out

that exhibit.  See Tr. at 142:8-9 (Court).  The Court explained that, because there is not anything

tying this exhibit to the three Defendants and it just seems to be "floating around at Thornburg,"

there is not enough of a connection to get in the exhibit.  Tr. at 142:14-16 (Court).   It further

stated that the SEC has a "natural advantage" in the trial, because people lived through the

financial crisis and may have even seen the movie The Big Short.  Tr. at 142:19-23 (Court).

The Defendants were happy with the Court's inclination.  See 143:8-9 (Tewksbury).  The

SEC asked, however, for its chance to argue for the Cartoon.  See 143:12-13 (Kasper).  The SEC

asserted that it has to show that Thornburg Mortgage violated Section 10(b) for one of its claims,

and that Thornburg Mortgage can obviously only make that showing through its employees and

officers.  See Tr. at 143:23-25 (Kasper).   It argued that the Cartoon shows employees'

knowledge at Thornburg Mortgage of how bad the subprime crisis was.  See Tr. at 144:3-7

(Kasper).

The Court noted that its concern with the Cartoon stemmed from the Court's belief that it

was just something people got off the Internet, and was not a document solely in the hands of

Thornburg Mortgage, so it really shows nothing but a certain kind of sense of humor.  See Tr. at

144:15-19 (Court).  Because of this concern, the Court did not think that the Cartoon showed

much at all.  See Tr. at 144:22 (Court).

The SEC disagreed, however, and argued that the Cartoon showed it was widely

understood within the company that there was a big problem with the subprime market.  See Tr.

at 145:3-6 (Kasper).  Further, it argued that Thornburg Mortgage was thus aware of this problem

when it made its OTTI judgment.  See Tr. at 145:10-13 (Kasper).  The Court ruled, however, that

the SEC will have experts explain these points to the jury and that it would thus exclude the

Cartoon.  <u>See</u> Tr. at 145:18-19 (Court).

## <u>LAW REGARDING THE RELEVANCY OF EVIDENCE</u>

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  <u>Train v. City of Albuquerque</u>, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  <u>United States v. Gutierrez-Castro</u>, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'"  <u>United States v. Ganadonegro</u>, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012) (Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  <u>See</u> Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## <u>LAW REGARDING RULE 403</u>

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  <u>See</u> <u>United States v. Record</u>, 873 F.2d 1363, 1375 (10th Cir. 1989)(Baldock, J.).  "[I]t is only unfair prejudice,

substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(Tacha, J.)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)). The United States Court of Appeals for the Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(Baldock, J.).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999)(Kelly, J.), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.). The Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(Thomas, J.)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See United States v. Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional response or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999)(Sanborn, J.). Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)(Ebel, J.); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991)(Holloway, J.). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(Hartz, J.)(quoting Fed. R. Evid. 403 advisory committee notes).

## ANALYSIS

Trial courts have discretion to decide whether to admit or exclude evidence under rule 403. See United States v. Lugo, 170 F.3d at 1005. The Cartoon pokes fun at the subprime MBS crisis. This exhibit is relevant for showing how bad the market was at the time in question. The Court concludes, however, that the danger of unfair prejudice against the Defendants is high and outweighs any marginal probative value, because there is no evidence the Defendants saw the Cartoon themselves and the SEC has other, stronger evidence to show the market conditions at the time. The Court will thus exclude the Cartoon. The Court will also prohibit the SEC from describing Thornburg Mortgage as a Wall Street investment bank or subprime lender, because such statements would not be true.

I.     **THE SEC MAY NOT INTRODUCE EVIDENCE ASSOCIATING THORNBURG WITH CAUSES OF THE FINANCIAL CRISIS, SUBPRIME LENDERS AND LENDING, OR WALL STREET INVESTMENT BANKS.**

The SEC must be precise with its language at trial, and cannot say that Thornburg Mortgage is something that it is not, i.e. a subprime lender or Wall Street investment bank.  The SEC may, however, explain what these terms are, because they help explain the market conditions at the time in question and how Thornburg Mortgage conducted business.  See Fed. R. Evid. 401.  As stated in the Response, the SEC intends to offer evidence related to Thornburg Mortgage's business model, which requires discussing Wall Street investment banks because Thornburg Mortgage borrowed money from these banks to finance ARM assets.  See Response at 2.  Further, to present evidence to show the credit quality of the Thornburg Mortgage portfolio the SEC will need to explain Alt-A MBS and subprime MBS to highlight the differences and similarities between them, because the collapse of the subprime market had a wide-reaching impact.  See Response at 3.  It would be hard to have this trial and sufficiently educate the jury without allowing either party to describe what these terms are.  Providing evidence that defines these terms will make the existence of a fact of consequence more probable than not, and is thus admissible.  See Fed. R. Evid. 401.  Accordingly, as long as the SEC is careful and precise with its language, it may describe subprime lenders, subprime lending, and Wall Street investment banks.

II.    **THE SEC'S TRIAL EXHIBIT NUMBER 76 IS UNDULY AND UNFAIRLY PREJUDICIAL, AND THE COURT WILL NOT ALLOW ITS ADMISSION.**

The SEC cannot admit the Cartoon, because its unfair prejudice to the Defendants substantially outweighs its marginal probative value.  See Fed. R. Evid. 403.  While the Cartoon is probative of the effect subprime MBS were having on the market at the time, the exhibit does not demonstrate that the Defendants had anything to do with subprime MBS or even that the

Defendants were aware of the Cartoon.  Further, the SEC has experts to explain the subprime MBS' negative effect on the entire market.  See Tr. at 145:18-19 (Court).  The Cartoon is more likely to draw an emotional response from the jury, and it could suggest a decision on this improper emotional basis rather than on the evidence that the SEC presents.  Accordingly, the exhibit is more prejudicial than probative, if it is relevant at all.  See United States v. Delgado, No. CR 05-920 JB, 2006 WL 128774, at *3 (D.N.M. Feb. 10, 2006)(Browning, J.)(analyzing rule 403); Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 800-01 (10th Cir. 1997)(Brorby, J.)(holding trial court did not abuse its discretion in excluding a cartoon from evidence because it was irrelevant and unfairly prejudicial)(abrogated on other grounds).  There is no connection between the Cartoon and the Defendants.  There is no evidence they saw it.  There is no evidence of what they thought of it.  There is no evidence it was created at Thornburg Mortgage.  It is just an internet cartoon, most likely, that someone downloaded and had in his or her files.  If there needs to be evidence of how the country came to get into the financial crisis in 2007-2008, it should come in a more controlled way, where the Court and the parties can in an orderly way review and object, if necessary, to each statement, rather than coming in a satirical and vulgar stick-person cartoon.

        **IT IS ORDERED** that: the Defendants' Motion *In Limine* No. 10 to Preclude Evidence or Argument Associating Thornburg with Causes of the Financial Crisis, Subprime Lenders and Lending, or Wall Street Investment Banks, filed March 17, 2016 (Doc. 401)("Motion"), is granted.  The SEC cannot introduce its trial exhibit number 76, the Cartoon, because of its unduly prejudicial nature, but may explain what subprime lenders and lending are and what Wall Street investment banks are, as long as it is precise with its language, because these terms are relevant to the case.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico
--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Danielle Voorhees
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

    *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Robert G. Badal
Los Angeles, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Heather Tewksbury
Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Aaron Thompson
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

     *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Robert J. Liubicic
Paul M. Torres
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

     *Attorneys for Defendant Jane E. Starrett*

George A. Salter
Peter J. Dennin
Hogan Lovells US, LLP
New York, New York

--and--

William S. Reid
Keleher & McLeod
Albuquerque, New Mexico

*Attorneys for Intervenor KPMG, LLP*