IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.                                No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendants Larry A. Goldstone and Clarence G. Simmons's Motion to Strike Investigative and Deposition Transcripts from SEC's Exhibit List, filed May 26, 2016 (Doc. 474)("Motion"). The Court held a hearing on June 3, 2016. The primary issue is whether the Court should allow Plaintiff Securities and Exchange Commission ("SEC") to introduce unedited investigative and deposition transcripts into evidence. The Court will not allow the SEC to use full transcripts in its exhibit list, because it would place an undue burden on the Defendants to review over 1,400 pages of transcripts to prepare objections on their content. The Court will, however, allow the SEC to designate additional portions of the transcripts to use at trial. The Court will thus grant the Motion in part and deny it in part.

**FACTUAL BACKGROUND**

The Court takes its facts from the United States Securities and Exchange Commission's Complaint, filed March 13, 2012 (Doc. 1)("Complaint"). The Court presents the facts solely to provide context for the Motion. It continues to adhere to the decisions on the facts it reached in

its Unsealed Memorandum Opinion and Order, filed August 22, 2015 (Doc. 371)("Summary Judgment MOO").   See SEC v. Goldstone, No. CIV. 12–0257 JB/GBW, 2015 WL 5138242 (D.N.M.)(Browning, J.).

The original Defendants are former officers of Thornburg Mortgage, Inc.: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1.  Starrett settled before Goldstone and Simmons filed their Motion, so the movants are only Goldstone and Simmons.  The SEC alleges that Goldstone, Simmons and Starrett were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[1]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that Goldstone, Simmons and Starrett misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[2] Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the

---

[1]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."   10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.   It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."   10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[2]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo"[3] ARM securities; Thornburg Mortgage also purchased ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and investment

---

[3]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set.  Super jumbo mortgage, Wikipedia.  Fannie Mae purchases and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created.  See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends."  Fannie Mae, Investopedia.  The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates, because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined or regulated, but mortgage companies use it internally and independently to set loan parameters.  See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage, Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

business through reverse repurchase agreements[4] backed by ARM securities.  See Complaint ¶ 3, at 2.  Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's

---

[4]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to repo."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  Complaint ¶ 34, at 11.  In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of

[the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2 (sent February 21, 2008, at 9:30 a.m.), filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[5] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2 (sent February 22, 2008 at 8:42 a.m.), filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")). In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Email from

---

[5]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."  Interest Only (IO) Strips, Investopedia (April 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

Larry Goldstone to the Thornburg Mortgage Board of Directors (sent February 25, 2008, at 5:03 p.m.), filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

Goldstone, Simmons and Starrett planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10. Goldstone, Simmons and Starrett did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"   Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

Goldstone, Simmons and Starrett "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"   Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.

See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2 (sent February 27, 2008, at 3:48 p.m.), filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")).  Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an email to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40, at 12 (alteration in

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."  Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia. "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

original)(quoting Email from Clay Simmons to Jane Starrett at 2 (sent February 27, 2008, at 10:35 a.m.), filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls. See Complaint ¶ 3, at 6; id. ¶ 41, at 12. Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K. See Complaint ¶ 7, at 3. In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets. See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash. To date, no such sales have been required . . . ."). Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[7] See Complaint ¶ 37, at

_____

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP. About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/. According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset." The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale. SFAS 166 at 3. The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective. SFAS 166 at 3. Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be

11.   The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.   Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).   In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that served as collateral on its reverse repurchase agreements.   See Complaint ¶ 8, at 4.   Thornburg Mortgage also reported a fourth-quarter 2007 profit.   See Complaint ¶ 11, at 4.   "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."   Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008. See Complaint ¶ 41, at 12-13.   Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.   See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).   Simmons commented to Goldstone, in an early-

accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."   SFAS 140 ¶ 9, at 3.

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.   Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.   "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."   Accounting Series Release, Investopedia.

morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2 (sent February 28, 2008, at 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).  In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original).  See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2 (sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email").  As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'" Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity, or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[9]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See Complaint ¶ 49, at 14-15.[10]  Goldstone, Simmons and Starrett did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51,

---

[9]An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, see Complaint ¶ 76, at 22.

Goldstone, Simmons and Starrett each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern. See Complaint ¶ 57, at 17. Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's. See Complaint ¶ 76, at 22. "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further." Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from Goldstone, Simmons and Starrett evidence "that the events subsequent to filing were unforeseeable catastrophic events." Email from

KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email").   The requested evidence included "correspondence with lenders/attorneys/shareholders, emails."  Request for Correspondence, attached to March 3, 2008 Hall Email, at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  At the time, KPMG, as auditor, was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.   See Complaint ¶ 99, at 29. Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.   KPMG did not become aware of the Citi Letter while preparing its Restatement.  See Complaint ¶ 101, at 29.  Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"  Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).  The analysis stated: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]  No one in the market could have foreseen the sudden decline in mortgage valuations.'"  Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.  See Complaint at 1.  The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

The Court granted in part and denied in part Goldstone, Simmons and Starrett's motions to dismiss on July 8, 2013.  See Memorandum Opinion and Order at 2-3, filed July 8, 2013 (SEC v. Goldstone, 952 F. Supp. 2d 1060 (D.N.M. 2013)(Browning, J.)) (Doc. 190)("Motion to Dismiss MOO"). The Motion to Dismiss MOO dismissed the SEC's allegations: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's outside auditor that Thornburg Mortgage successfully met its margin calls without violating its lending agreements, and did not sell assets to meet margin calls"; and (ii) "that the Defendants schemed to defraud

Thornburg Mortgage's outside auditor in connection with the 2007 Form 10- K." SEC v. Goldstone, 952 F. Supp. 2d at 1075. It declined to dismiss the SEC's claim that "the representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was materially false or misleading." SEC v. Goldstone, 952 F. Supp. 2d at 1076. The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are primarily liable or liable as control persons for that misrepresentation in the 10-K, and the Court will not dismiss the SEC's allegations that the Defendants aided and abetted the misrepresentation, as the Court has determined that the SEC sufficiently alleged that Goldstone and Simmons made, and the Defendants provided substantial assistance to, the misrepresentation with knowledge of or recklessness to its falsity. Similarly, the Court will not dismiss the SEC's allegations that the Defendants misled Thornburg Mortgage's auditor before the 2007 Form 10-K was filed through the statement that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market.

SEC v. Goldstone, 952 F. Supp. 2d at 1077. The Court also allowed certain claims against Goldstone, Simmons, and Starrett to proceed. See SEC v. Goldstone, 952 F. Supp. 2d at 1077. These claims include the SEC's allegations that: (i) Goldstone, Simmons, and Starrett failed to disclose to KPMG before they filed the 2007 Form 10-K that a European hedge fund's collapse would negatively affect Thornburg Mortgage's financial condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's financial condition after filing the 2007 Form 10-K; (iii) Goldstone, Simmons, and Starrett materially misled KPMG by not providing correspondence showing that Thornburg Mortgage experienced an event of default in the two weeks before the 2007 Form 10-K filing; and (iv) Simmons misrepresented that unexpected events had an unexpected financial impact on Thornburg Mortgage after the 2007 Form 10-K filing. See SEC v. Goldstone, 952 F. Supp. 2d at 1077.

The Court later denied the SEC's, and the Goldstone, Simmons, and Starrett's motions for summary judgment.  See 2015 WL 5138242, at *1.  It first explained that it would apply an "actual-disbelief" standard to determine "whether a person subjectively disbelieved the truth of an opinion statement."  2015 WL 5138242, at *1.  The Court then concluded that genuine issues of material fact for the jury existed on the SEC's claims that: (i) Goldstone, Simmons, and Starrett made objectively false statements; (ii) the statements were material; (iii) Goldstone, Simmons, and Starrett believed that their statements were false when they made them; and (iv) Goldstone, Simmons, and Starrett made statements that were false or misleading because of omitted information.  See 2015 WL 5138242, at *1.  The Court thus declined to grant summary judgment for any party on any issue.  See 2015 WL 5138242, at *1.

Starrett reached a settlement with the SEC on May 20, 2016.  See Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent"). The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include a requirement that Starrett testify for any of the remaining parties.  See Starrett Consent at 1. Ten claims remain in the case for trial -- all of the original claims, with the exception of the SEC's claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b).  See Pretrial Order at 3-4, filed May 11, 2016 (Doc. 448).[11]

_____

[11]The Motion to Dismiss MOO and Summary Judgment MOO did not dismiss the SEC's § 17(a) claim, but it does not appear in the Pretrial Order. The parties have also not submitted any jury instructions on this claim. See Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463). The parties' proposed verdict forms do not include a § 17(a) claim. See Defendant Clay Simmons's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489). The United States Court of Appeals for the Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the

1.    **The Motion.**

Goldstone and Simmons filed their Motion on May 26, 2016.   See Motion at 1.

Goldstone and Simmons ask the Court to strike the investigative[12] and deposition transcripts

from the SEC's exhibit list.  See Motion at 1.  Goldstone and Simmons first give the Court some

background information to support their motion for exclusion.  See Motion at 2.  They refer to

the October 29, 2015 pre-trial schedule that the Court ordered, which set "a March 15, 2016

deadline for the parties to exchange designations of deposition testimony."  Motion at 2.  The

parties agreed during a meet-and-confer that they had nationwide subpoena power, and that no

witness would therefore be unavailable.  See Motion at 2.  Goldstone and Simmons advance that,

during that meeting, the parties also agreed that "there was no need to exchange deposition

designations."  Motion at 2.  On March 14, 2016, the SEC informed Goldstone and Simmons that

it would nonetheless designate testimony from their investigative and deposition transcript.  See

Motion at 2.   On April 18, 2016, Goldstone and Simmons sent a letter objecting to those

designations.  See Motion at 2.  The Defendants argue that, on May 11, 2016, the Court held a

pre-trial conference, and stated that it would likely overrule any objections to the use of

deposition testimony, and that investigative testimony would be treated as documents reflecting

party admissions, which could be moved into evidence subject to hearsay objections being

overcome.  See Motion at 2 (citing May 11, 2016 Hearing Transcript at 179-180 (Court)("Hrg.

Tr.")).  The Defendants further refer the Court to an Email (from Stephen McKenna, attorney for

complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any
previous pleadings which did not include that claim."  Wilson v. Muckala, 303 F.3d 1207, 1215
(10th Cir. 2002). The pretrial order that the parties filed in this case, therefore, supersedes all
prior pleadings, including the Complaint.  See Wilson v. Muckala, 303 F.3d at 1215 (citing C.
Wright, A. Miller & M. Kane, 6A Fed. Prac. & Proc. Civ. § 1522 (2d ed. 1990)).

[12]The Defendants' investigative transcripts are transcripts of the testimony they gave
during the SEC's investigation.

the SEC, to K'Aun Wild, Judge Browning's courtroom deputy, and to Chris Johnstone, attorney

for Goldstone and Simmons, Wilmer, Cutler, Pickering, Hale & Dorr, LLP, filed May 26, 2016

(Doc. 474-1)("Email 1")), in which the SEC stated: "Because Defendants initially objected to

[its] designation of certain portions of Defendants prior testimony, [the SEC] ha[s] not filed any

designations and do[es] not intend to do so."   Motion at 2 (quoting Email 1 at 2).   Instead,

Goldstone and Simmons explain, the SEC listed the testimony in its entirety on its exhibit list

and will introduce it at trial as it deems appropriate, following the Court's guidance.   See Motion

at 2-3.

Goldstone and Simmons first argue that the Court's statements at the May 11, 2016 pre-

trial conference "do not support the inclusion of the transcripts in their entirety on the SEC's

exhibit list."   Motion at 3.   Goldstone and Simmons contend that the Court said only that "it

would allow statements of Defendants made during the depositions or investigative interviews

into evidence, subject to such evidence overcoming evidentiary objections."   Motion at 3.   The

Defendants therefore advance that the Court did not allow the SEC to introduce these testimonies

in their entirety, "including statements of counsel, statements of Defendants that are irrelevant or

have been precluded by the Court, and testimony covered by a proper evidentiary objection."

Motion at 3.

Goldstone and Simmons further argue that allowing the transcripts in their entirety would

be highly prejudicial.   See Motion at 3.   They cite Byrne v. Telesector Resource Group, Inc., No.

04-CV-076S, 2007 U.S. Dist. LEXIS 77358 (W.D.N.Y. 2007)(Skretny, J.), in which the

defendant filed a motion "to exclude deposition transcripts that the plaintiff had included in their

entirety on her exhibit list."   Motion at 3.   In that case, the Honorable William M. Skretny,

United States District Judge for the Western District of New York, held that the plaintiff should

file an amended pre-trial exhibit list "identifying with specificity the deposition testimony she intends to introduce at trial."   Motion at 4 (quoting 2007 U.S. Dist. LEXIS 77358, at *3). Goldstone and Simmons argue that this case is similar to <u>Byrne v. Telesector Resource Group, Inc.</u>, because the SEC has listed transcripts of the Defendants' testimony that "span a total of seven full days of testimony and include approximately 1,400 pages of testimony, along with statements of counsel and others."   Motion at 4.   Goldstone and Simmons contend that they "should not be expected to comb through this mountain of testimony to identify possible objections, with only days remaining before trial begins."   Motion at 4.   Goldstone and Simmons conclude that the SEC "should be required to identify with specificity the deposition testimony it intends to introduce at trial."   Motion at 4.

Goldstone and Simmons also contend that the transcripts that the SEC has listed on its exhibit list "contain material already excluded by the Court and other material that is plainly inadmissible."   Motion at 5.   Goldstone and Simmons assert that the SEC has not redacted the transcripts included in the exhibit list, and that these include mentions of matters that the Court has excluded in previous motions in limine, or that are not admissible for evidentiary reasons -- "relevance, prejudice, or other grounds."   Motion at 5.   They advance that the Court should strike the transcripts under rule 32 of the Federal Rules of Civil Procedure.   <u>See</u> Motion at 6.   They cite to rule 32(b) of the Federal Rules of Civil Procedure to support their argument that the SEC, by listing the full transcripts on its exhibit list, would allow the jury to review the entire deposition, and thus "the jury would review every inadmissible thing to which Defendants objected during the deposition and could object to at trial."   Motion at 6.   The Defendants also cite rule 32(c) of the Federal Rules of Civil Procedure to argue that the Court should apply procedural safeguards

"to prevent the bias that would arise from unsupervised review of documents testimonial in nature." Motion at 6.

2. **The Response**.

The SEC responded on May 27, 2016. See Plaintiff U.S. Securities and Exchange Commission's Opposition to Defendants' Motion to Strike Investigative and Deposition Transcripts from SEC's Exhibit List, filed May 27, 2016 (Doc. 475)("Response"). The SEC first cite the Court's statement during the hearing it held on May 11, 2016: "I probably will not sustain any objections to use of [Goldstone, Simmons, and Starrett's] depositions. So those you can use." Response at 1 (quoting Hrg. Tr. at 179:12-14)(Court). The SEC further advances that the Court previously stated that it would allow investigative testimony and that the SEC could easily overcome hearsay objections. See Response at 1. The SEC contends that rule 32 of the Federal Rules of Civil Procedure renders "Defendants' deposition testimony . . . admissible for any purpose." Response at 1. The SEC further contends that rule 801(d)(2) of the Federal Rules of Evidence makes Goldstone and Simmons' investigative testimony admissible "as an admission of a party opponent." Response at 1. The SEC thus quotes SEC v. Universal Express, 475 F. Supp. 2d 412 (S.D.N.Y. 2007)(Lynch, J.), in which the Honorable Gerard E. Lynch, United States District Judge, held that the "defendants' investigation testimony clearly would be admissible at trial as party admissions." Reply at 1 (quoting SEC v. Universal Express, 475 F. Supp. 2d at 416 n.1). The SEC reassures the Court that the Defendants' testimony is admissible evidence, and the SEC will use it as such. See Response at 2. It also argues that using Goldstone and Simmons' testimony will be more efficient than "engaging in the laborious process of asking [them] a question, determining its consistency or inconsistency . . . , and then impeaching the witnesses as appropriate." Response at 2. The SEC asserts that it will not "use

the transcripts to circumvent the Court's instructions on examining the witnesses."  Response at 2.  Finally, the SEC mentions that the case which the Defendants cite, <u>Byrne v. Telesector Resource Group, Inc.</u>, dealt with different circumstances from those of this case.  <u>See</u> Response at 2 (citing 2007 U.S. Dist. LEXIS 77358, at \*1).  Here, the parties are not dealing with twenty-five transcripts, like they did in <u>Byrne v. Telesector Resource Group, Inc.</u>, but, rather, with the two remaining Defendants' testimony, "testimony the Court has already determined is not hearsay."  Response at 2.

     **3.**     **<u>The Reply</u>.**

     Goldstone and Simmons replied to the SEC's Response on May 3, 2016.  <u>See</u> Reply Memorandum In Support of Defendants' Motion to Strike Investigative and Deposition Transcripts from SEC's Exhibit List, filed May 28, 2016 (Doc. 476)("Reply").  Goldstone and Simmons contend that the SEC "blatantly mischaracterize[s] Defendants' motion," and does not address "the wholesale admission of investigative testimony and deposition transcripts," which would be highly prejudicial and improper.  Reply at 1.  Goldstone and Simmons' main concern is that they will be prejudiced if the Court allows the SEC to list entire transcripts.  <u>See</u> Reply at 1.  Goldstone and Simmons are thus concerned that they will be "forced to review 1,400 pages of testimony only days before trial in an effort to protect themselves from the prejudice that would result from the SEC's attempt to introduce wholly improper and inadmissible material."  Reply at 1.  Goldstone and Simmons further advance that the SEC does not address that issue and thus "apparently is attempting to create this prejudice for tactical reasons," which is improper.  Reply at 2.  They also reject the SEC's contention that they seek to exclude all prior testimony.  <u>See</u> Reply at 2.  They thus clarify that they ask the Court instead to order the SEC to use the testimony it already designated.  <u>See</u> Reply at 2.

Goldstone and Simmons support their use of <u>Byrne v. Telesector Resource Group, Inc.</u>, explaining that that court struck the transcripts which the plaintiff had listed as exhibits in their entirety, because of the prejudice the defendant would suffer by having to review hundreds or thousands of pages.  <u>See</u> Reply at 2.  Goldstone and Simmons conclude by distinguishing <u>SEC v. Universal Express</u>, from this case.  <u>See</u> Reply at 3 (citing 475 F. Supp. 2d 412).  They contend that the case does not address the pre-trial situation at issue here, and that the SEC's tactics are unfair and improper.  <u>See</u> Reply at 3.

**4.      <u>The Hearing</u>.**

The Court held a hearing on June 3, 2016.  <u>See</u> Transcript of Hearing (taken June 3, 2016)("Tr.").[13]  The Court first shared its initial thoughts on the motion to strike.  <u>See</u> Tr. at 3:23-25 (Court).  The Court expressed its inclination not to allow the SEC to include the entire depositions in its exhibit list.  <u>See</u> Tr. at 3:25-4:1 (Court).  The Court explained that, if the evidence were an affidavit, that affidavit would have to be redacted to remove anything that is objectionable.  <u>See</u> Tr. at 4:2-6 (Court).  The Court then stated that: (i) Goldstone and Simmons' statements should be marked as exhibits; but (ii) should only include the materials that the SEC wants introduced; and (iii) will be subject to Goldstone and Simmons' objections.  <u>See</u> Tr. at 4:9-19 (Court).  The Court clarified the statements that it made during the May 11, 2016 hearing.  <u>See</u> Tr. at 4:19 (Court).  The Court explained that it did not mean to allow "the SEC to introduce the transcripts into evidence without regard to relevance or other evidentiary objections."  Tr. at 4:19-22 (Court).  Rather, the Court meant to "allow the Defendants' investigative and deposition transcripts into evidence as opposing party statements under 801(d)(2) if the SEC could

---

[13]The Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

overcome any additional evidentiary objections." Tr. at 4:22-6:2 (Court). The Court noted that the 1,400 pages of transcripts may contain evidence that is irrelevant or that the Court has already excluded, which would unfairly prejudice the Defendants. See Tr. at 5:2-10 (Court). The Court further stated that admitting the transcripts in their entirety would require Goldstone and Simmons to go through all the documents to raise potential objections, including to documents that the SEC may not intend to use at trial. See Tr. at 5:11-15 (Court). The Court thus held that it would not be fair to require Goldstone and Simmons to review the full transcripts "this close to trial," with little benefit to the SEC. Tr. at 5:15-17 (Court). The Court therefore decided that, because the SEC had already designated specific investigative and deposition testimony pursuant to the Court's pretrial scheduling order, the designations should be limited to those. See Tr. at 5:20-25 (Court). The Court further asserted that the parties could use all undesignated transcripts for impeachment purposes. See Tr. at 5:25-6:3 (Court). Finally, the Court explained that rule 32(a) does not prohibit redacting or designating depositions. See Tr. at 6:8-9 (Court).

The Defendants agreed with the Court, and stated that, during the May 11, 2016 hearing, the Court asked the SEC and Goldstone and Simmons to notify each other of the responses they intended to use. See Tr. at 6:21-24 (Tewksbury). Goldstone and Simmons therefore suggested that, instead of "redacting big chunks of the transcript and marking that and allowing it to go back to the jury," the SEC notify Goldstone and Simmons of which designations it plans to use. See Tr. at 6:24-7:3 (Tewksbury). The SEC agreed to abide by those proposed guidelines. See Tr. at 7:11-12 (McKenna). The SEC asked the Court, however, not to limit it to the previously designated portions of the transcripts, because it picked only "a few select things" during the pretrial phase and did not do a thorough designation. Tr. at 7:18-22 (McKenna). The SEC thus

advanced that it might need forty-eight hours to "designate a little broader."  Tr. at 8:1-7

(McKenna).  Goldstone and Simmons expressed their concern about having to review a high

volume of designations in a short amount of time.  See Tr. at 8:10-13 (Tewksbury).  The SEC

stated that the new designations would likely amount to twenty pages at the most.  See Tr. at

8:18-20 (McKenna).  Goldstone and Simmons agreed to these terms.  See Tr. at 8:23

(Tewksbury).

## LAW REGARDING DEPOSITIONS UNDER RULE 32

Rule 32 of the Federal Rules of Civil Procedure provides, in relevant part:

**(a)  Using Depositions.**
**(1)  In General.**  At a hearing or trial, all or part of a deposition may
be used against a party on these conditions:

> (A)  the party was present or represented at the taking of the
> deposition or had reasonable notice of it;

> (B)  it is used to the extent it would be admissible under the Federal
> Rules of Evidence if the deponent were present and testifying;
> and

> (C)  the use is allowed by Rule 32(a)(2) through (8).

**(2)  Impeachment and Other Uses.**  Any party may use a deposition
to contradict or impeach the testimony given by the deponent as a witness, or for
any other purpose allowed by the Federal Rules of Evidence.

**(3)  Deposition of Party, Agent, or Designee.**  An adverse party may
use for any purpose the deposition of a party or anyone who, when deposed, was
the party's officer, director, managing agent, or designee under Rule 30(b)(6) or
31(a)(4).
. . . ,

**(6)  Using Part of a Deposition.**  If a party offers in evidence only part
of a deposition, an adverse party may require the offeror to introduce other parts
that in fairness should be considered with the part introduced, and any party may
itself introduce any other parts.

      **(b)**    **Objections to Admissibility.**  Subject to Rules 28(b) and 32(d)(3), an objection may be made at a hearing or trial to the admission of any deposition testimony that would be inadmissible if the witness were present and testifying.

Fed. R. Civ. P. 32. In other words, provided that certain prerequisites are met, "[t]estimony obtained from depositions is admissible 'if rules of evidence permit.'"  Reeg v. Shaughnessy, 570 F.2d 309, 317 (10th Cir. 1978).  The Court has broad discretion in determining whether a deposition may be used and abuses its discretion only if its determination results in fundamental unfairness. See Lear v. Equitable Life Assurance Soc'y, 798 F.2d 1128, 1135 (8th Cir. 1986).

      The Federal Rules of Civil Procedure do not use the term "trial deposition."  While practicing lawyers use the term, the Federal Rules do not distinguish between "trial" depositions and deposition for other purposes.  Cf. Battle v. Mem'l Hosp. at Gulfport, 228 F.3d 544, 551 (5th Cir. 2000)(citing Savoie v. Lafourche Boat Rentals, Inc., 627 F.2d 722, 724 (5th Cir. 1980)(holding that nothing prohibits the use of discovery depositions at trial)).  Courts should avoid formally creating a subcategory of depositions that the Federal Rules, which Congress has reviewed and declined to alter, have not created or recognized.  See Wheeler Peak, LLC v. L.C.I.2, No. 07–1117, 2010 WL 520523, at *2–3 (D.N.M. Jan. 26, 2010)(Browning, J.).

## ANALYSIS

      The Court will allow the SEC to add more transcripts to its exhibit list, as long as the SEC designates the relevant portions of these transcripts, if the testimony is consistent with the Court's prior evidentiary rulings.  To allow parties a fair chance to review exhibits before trial, courts require parties to designate portions of the testimony they intend to use as evidence.  For example, United States District Judge Donovan W. Frank has explained: "To the extent that Plaintiff seeks to introduce at trial deposition testimony [from a related case], the motion is granted, provided that Plaintiff properly designates the portions of [the] testimony it intends to

introduce." <u>SEC v. True North Fin. Corp.</u>, CIV No. 10-3995 (DWF/JJK), 2013 WL 4781037, at *3 (D. Minn. 2013)(Frank, J.).  Similarly, in <u>Byrne v. Telesector Resource Group, Inc.</u>, 2007 U.S. Dist. LEXIS 77358, the court required the parties to "identify any deposition testimony that will be offered at trial."  <u>See</u> 2007 U.S. Dist. LEXIS 77358, at *102.

Furthermore, "the admissibility of the testimony designations of both parties [are] still governed by the Federal Rules of Evidence."  <u>Pacific Gas & Elec. Co. v. United States</u>, 92 Fed. Cl. 175, 209 (Fed. Cl. 2010)(Hewitt, C.J.).  Just like any evidence introduced on an exhibit list for trial, designated transcripts should abide by the rules of evidence and the Court's prior evidentiary rulings.  <u>See</u> <u>Pacific Gas & Elec. Co. v. United States</u>, 92 Fed. Cl. at 209.  The Court will, therefore, allow the SEC to add more designated testimony to its exhibit list, as long as the SEC only designates relevant and admissible testimony.

The Court is also concerned about fairness to both parties.  In <u>Securities and Exchange Commission v. True North Financial Corp.</u>, the Honorable Donovan W. Frank ordered the parties to "meet and confer to establish a mutually agreeable schedule for any designations and counter-designations."  <u>SEC v. True North Fin. Corp.</u>, 2013 WL 4781037, at *3.  Similarly, in <u>In Re IBM Peripheral EDP Devices Anti-Trust Litigation</u>, 444 F. Supp. 110 (N.D. Cal. 1978), United States District Judge Samuel Conti ruled that the parties may designate materials for use in the case and set up a "designation-counter-designation procedure."  <u>In Re IBM Peripheral EDP Devices Anti-Trust Litigation</u>, 444 F. Supp. at 111.  The order provided: "The parties shall fix appropriate times and procedures by which any party objecting to the proposed use at trial of Designated or Counter Designated Materials shall file and serve a statement of objection to such designation setting forth each ground therefor."  <u>In Re IBM Peripheral EDP Devices Anti-Trust Litigation</u>, 444 F. Supp. at 111.  Similarly, in this District, courts have been concerned about

fairness to the parties when a party uses deposition testimony as evidence.  For example, in Williams v. Sports N.M., Inc., 2008 WL 7628955 (D.N.M. 2008)(Johnson, J.), the Honorable William P. Johnson considered important that the defendant would be given time to object and counter-designate portions of a deposition testimony that the plaintiff intended to introduce.  See 2008 WL 7628955, at *2.  The District Court thus stated: "admitting [plaintiff's witness]'s designated deposition testimony without allowing Defendant to rebut this testimony would be unfairly prejudicial."  2008 WL 7628955, at *2.  For this reason, the District Court allowed designated portions of the plaintiff's witness's admissible deposition testimony, provided the defendant would have an opportunity to review the designated testimony, so he could object to it and counter-designate portions of the same testimony.  See 2008 WL 7628955, at *2.

In this case, as in Byrne v. Telesector Resource Group, Inc., the Court will limit the content of the transcripts that the SEC may use.  In that case, the plaintiff attempted to introduce transcripts from twenty-five depositions.  See 2007 U.S. Dist. LEXIS 77358, at *1.  Here, the transcripts that the SEC introduced in their entirety amount to 1,400 pages of documents. Furthermore, the SEC added these transcripts to its exhibit list only a few days before the start of trial.  As in Byrne v. Telesector Resource Group, Inc., reference to entire deposition transcripts is not sufficient.  As in Byrne v. Telesector Resource Group, Inc., the SEC's "exhibit list suggest[s] that [it] will use each word of the . . . deposition transcripts listed."  2007 U.S. Dist. LEXIS 77358, at *2.  The Court agrees with the Defendants that this case is similar to Byrne v. Telesector Resource Group, Inc., and thus orders the SEC to designate the portions of the deposition testimony it intends to introduce at trial.  In sum, the SEC may use the depositions of the Defendants -- Goldstone and Simmons -- for any purpose.  In fairness to the Defendants, however, the Court will require the SEC to designate pre-trial any deposition testimony that it

intends to offer for "any purpose."  The Court will allow the Defendants to object to any designations under the Federal Rules of Evidence and under the orders that the Court has entered before trial.  As to the portions of the deposition of the remaining parties -- Goldstone and Simmons -- that the SEC uses purely for impeachment, no designations need be given, because the SEC cannot be fairly expected to predict how Goldstone and Simmons will depart at trial from the deposition testimony.  As to the sworn investigative testimony, the Court will not exclude it entirely.  It seems odd that the Court would allow some emails that Goldstone and Simmons sent in 2008, but exclude sworn testimony they gave to the SEC in 2013, even though that 2013 testimony was not subject to cross-examination.  In that case, as with emails, the SEC must designate pre-trial what investigative statements it intends to introduce against Goldstone and Simmons.  It could not say "all emails"; it must say specifically what portions of the investigative statements it intends to use.  Because the testimony is more like an email than a deposition in the case, the SEC must mark the investigative testimony as an exhibit to be admitted at trial.  These designated portions may be used for any purpose at trial as any admitted exhibit, but before trial, they are subject to the Defendants' objections under the Federal Rules of Evidence and the Federal Rules of Civil Procedure.

**IT IS ORDERED** that: Defendants Larry A. Goldstone and Clarence G. Simmons's Motion to Strike Investigative and Deposition Transcripts from SEC's Exhibit List, filed May 26, 2016 (Doc. 474), is granted in part and denied in part.  The SEC may introduce designated portions of relevant and admissible deposition and investigative testimony that it plans to introduce at trial.  The SEC may not, however, introduce full transcripts to its exhibit list, because it would be unfair for the Defendants to have to read 1,400 pages of transcripts days before trial starts.

UNITED STATES DISTRICT JUDGE

Counsel:

Damon Martinez
   United States Attorney
Michael H. Hoses
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Danielle Voorhees
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

   *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Robert G. Badal
Los Angeles, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Heather Tewksbury
Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Aaron Thompson
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

*Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Robert J. Liubicic
Paul M. Torres
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

*Attorneys for Defendant Jane E. Starrett*

George A. Salter
Peter J. Dennin
Hogan Lovells US, LLP
New York, New York

--and--

William S. Reid
Keleher & McLeod
Albuquerque, New Mexico

*Attorneys for Intervenor KPMG, LLP*