**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

vs.                                                                       No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

       Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Defendants' Motion *In Limine* No. 5 to

Bar Plaintiff from Arguing that Defendants (a) Caused any Thornburg Liquidity Report not to be

Provided to KPMG or (b) Caused any Material to be Removed from any Liquidity Report

Provided to KPMG, filed March 17, 2016 (Doc. 396)("Motion").  The Court held a hearing on

May 11, 2016.  The issues are: (i) whether there is evidence that the Defendants Larry A.

Goldstone, Clarence G. Simmons, III, and Jane E. Starrett withheld any of Thornburg Mortgage,

Inc.'s liquidity reports from KPMG, US LLP; (ii) whether there is evidence that the Defendants

doctored any of the liquidity reports provided to KPMG; and (iii) whether the Defendants would

be irreparably prejudiced should the Court allow the Plaintiff Securities and Exchange

Commission ("SEC") to make such arguments at trial.  The Court will allow the liquidity reports

to be introduced as evidence, because it cannot put its thumb on the scale and remove evidence

that needs to be explained.  It will not permit the SEC, however, to be argumentative or

characterize the liquidity reports in its opening statement.  The Court will thus grant in part and

deny in part the Motion.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1).  The Court presents the facts solely to provide context for the Motion.  It continues to adhere to the decisions on the facts it reached in its Summary Judgment Opinion.  SEC v. Goldstone, No. CIV. 12-0257 JB/GBW, 2015 WL 5138242 (D.N.M. August 22, 2015)(Browning, J.).

The Defendants are former officers of Thornburg Mortgage: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The SEC alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[1]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[2]  Complaint ¶¶ 76-79, at 22.

---

[1]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[2]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation. See Complaint ¶ 2, at 1; id. ¶ 20, at 7. During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange. See Complaint ¶ 20, at 7. Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo"[3] ARM securities; Thornburg Mortgage also purchased

---

[3]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage. Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage. These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set. Super jumbo mortgage, Wikipedia. Fannie Mae purchases and guarantees mortgages that meet its funding criteria. Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014). Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created. See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014). "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends." Fannie Mae, Investopedia. The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00. See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf. Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00. See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf. "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates, because of the increased risk of issuing a larger loan. Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage. The term "super-jumbo" is not expressly defined or regulated, but mortgage companies use it internally and independently to set loan parameters. See Super jumbo mortgage, Wikipedia. The definition may vary according to a particular

- 3 -

ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out most of its earnings in dividends, and obtained financing for its mortgage and investment business through reverse repurchase agreements[4] backed by ARM securities.  See Complaint ¶ 3, at 2.  Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating

---

lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage, Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

[4]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to *repo*."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8. Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans. See Complaint ¶ 24, at 8. Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated. See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million. See Complaint ¶ 33, at 10. In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default. See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20,

2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to

meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[5] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Email from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

    The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

_____

[5]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."  Interest Only (IO) Strips, Investopedia (Apr. 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K. Complaint ¶ 30, at 9-10. In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved. Our goal for resolution i[s] the filing of our 10-K. How we disclose this issue and what we say will depend on where we are next week when we need to file. But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2). Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same email. Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2). Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'" Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing. See Complaint ¶ 38, at 12. Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon. UBS credit just mentioned it to me. They got hit with 20 point haircuts on Alt-A and AAA's overnight. I think we will get this a little more gradually, but we should be ready for it.[6]

_____

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels." Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014). An "Alt-A

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")).   Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"   Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")).   Later on February 27, 2008, Simmons sent an email to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"   Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding

---

mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.   Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.   The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia. "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[7]  See Complaint ¶ 37, at 11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to

---

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP. About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/.  According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset." The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale. SFAS 166 at 3.  The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

- 10 -

hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that served as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008.  See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-

---

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2, (sent February 28, 2008, at 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).  In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'"  Complaint ¶ 94, at 27 (alterations in original).  <u>See</u> Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, (sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  <u>See</u> Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email").  As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  <u>See</u> Complaint ¶ 9, at 4; <u>id.</u> ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on <u>Street Signs</u> on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On <u>Street Signs</u>, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint

¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'" Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity, or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[9]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See Complaint ¶ 49, at 14-15.[10]  The Defendants did not disclose to

---

[9]An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and

KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, see Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern.  See Complaint ¶ 57, at 17.  Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg

---

the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

Mortgage's.  See Complaint ¶ 76, at 22.  "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."  Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email").  The requested evidence included "correspondence with lenders/attorneys/shareholders, emails."  Request for Correspondence, attached to March 3, 2008 Hall Email at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").  See Complaint ¶ 100, at 29.  KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  At the time, KPMG, as auditor, was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.  KPMG did not become aware of the Citi Letter while preparing its Restatement.  See Complaint ¶ 101, at 29.  Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"  Complaint ¶

102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).   The analysis states: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in mortgage valuations.'"   Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.  See Complaint at 1.  The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

The Court granted in part and denied in part the SEC's and the Defendants' motions to dismiss on July 8, 2013.  See Motion to Dismiss Opinion S.E.C. v. Goldstone, 952 F.Supp.2d 1060 (D.N.M. July 8, 2013)(Browning, J.).  The Motion to Dismiss Opinion dismissed the SEC's allegations: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's outside auditor that Thornburg Mortgage successfully met its margin calls without violating its lending agreements, and did not sell assets to meet margin calls"; and (ii) "that the Defendants schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-K."  Motion to Dismiss Opinion S.E.C. v. Goldstone, 952 F.Supp.2d at 1076.  It declined to dismiss the SEC's claim that "the representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was materially false or misleading."  Motion to Dismiss Opinion S.E.C. v. Goldstone, 952 F.Supp.2d at 1076-77.  The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are primarily liable or liable as control persons for that misrepresentation in the 10-K, and the Court will not dismiss the SEC's allegations that the Defendants aided and abetted the misrepresentation, as the Court has determined that the SEC sufficiently alleged that Goldstone and Simmons made, and the Defendants provided substantial assistance to, the misrepresentation with knowledge of or recklessness to its falsity.  Similarly, the Court will not dismiss the SEC's allegations that the Defendants misled Thornburg Mortgage's auditor before the 2007 Form 10-K was filed through the statement that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market.

Motion to Dismiss Opinion S.E.C. v. Goldstone, 952 F.Supp.2d at 1077.  The Court also allowed certain claims against Goldstone and Simmons to proceed.  See Motion to Dismiss Opinion S.E.C. v. Goldstone, 952 F.Supp.2d at 1077.  These claims included the SEC's allegations whether: (i) the Defendants failed to disclose to KPMG before they filed the 2007 Form 10-K

that a European hedge fund's collapse would negatively affect Thornburg Mortgage's financial condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's financial condition after filing the 2007 Form 10-K; (iii) the Defendants materially misled KPMG by not providing correspondence showing that Thornburg Mortgage experienced an event of default in the two weeks before the 2007 Form 10-K filing; and (iv) Simmons misrepresented that unexpected events had an unexpected financial impact on Thornburg Mortgage after the 2007 Form 10-K filing.  See Motion to Dismiss Opinion S.E.C. v. Goldstone, 952 F.Supp.2d at 1077.

The Court later denied the Defendants' and the SEC's motions for summary judgment. See Summary Judgment Opinion SEC v. Goldstone, 2015 WL 5138242, at *1.  It first explained that it would apply an "actual-disbelief" standard to determine "whether a person subjectively disbelieved the truth of an opinion statement."  Summary Judgment Opinion SEC v. Goldstone, 2015 WL 5138242, at *1.  The Court then concluded that genuine issues of material fact for the jury existed on the SEC's claims that: (i) the Defendants made objectively false statements; (ii) the statements were material; (iii) the Defendants believed that their statements were false they made them; and (iv) the Defendants made statements that were false or misleading because of omitted information.  See Summary Judgment Opinion SEC v. Goldstone, 2015 WL 5138242, at *1.  The Court thus declined to grant summary judgment for any party on any issue.  See Summary Judgment Opinion SEC v. Goldstone, 2015 WL 5138242, at *1.

Starrett reached a settlement with the SEC on May 20, 2016.  See Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent"). The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include a requirement that Starrett testify for any of the remaining parties.  Starrett Consent at 1.  Ten

claims remain in the case for trial -- all of the original claims, with the exception of the SEC's

claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b).  See Pretrial

Order at 3-4, filed May 11, 2016 (Doc. 448).[11]

>    **1.    The Motion.**

In their Motion, the Defendants ask the Court to prevent the SEC from arguing that the

Defendants "(a) caused any Thornburg liquidity report not to be provided to KPMG, or (b)

caused any material to be removed from any liquidity report provided to KPMG."  Motion at 1.

The Defendants note that the SEC previously made "speculative and unsupported statements" in

its papers for summary judgment and oral arguments that someone tampered with Thornburg

Mortgage's liquidity reports to prevent KPMG from learning about the February 2008 margin

calls.  Motion at 1.  The Defendants contend there is no evidence to support these statements or

to support the idea that they were involved in any conspiracy.  See Motion at 1.  They argue that

---

[11]The Motion to Dismiss Opinion, see S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, and Summary Judgment Opinion, see SEC v. Goldstone, 2015 WL 5138242, did not dismiss the SEC's § 17(a) claim, but it does not appear in the Pretrial Order (Doc. 448).  The parties have also not submitted any jury instructions on this claim.  See Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463).  The parties' proposed verdict forms do not include a § 17(a) claim.  See Defendant Clay Simmons's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489).  The United States Court of Appeals for the Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."  Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002).  The pretrial order that the parties filed in this case, therefore, supersedes all prior pleadings, including the Complaint.  See Wilson v. Muckala, 303 F.3d at 1215 (citing C. Wright, A. Miller & M. Kane, 6A Fed. Prac. & Proc. Civ. § 1522 (2d ed. 1990)).

the Court allowing the SEC to make these "baseless arguments" before the jury at trial will prejudice them.  Motion at 1.

The Defendants note that there is evidence that Thornburg Mortgage employee Ralph Ahn, Assistant Vice President, Senior Portfolio Analyst, sent two emails on February 21, 2008, which attached two different versions of Thornburg Mortgage's February 21, 2008 liquidity report -- one took account of the margin calls and the other did not.  See Motion at 1 (citing Email from Ralph Ahn to Larry Goldstone, Clay Simmons, Nathan Fellers, Xen Stanhope, Patrick Feldman, Jane Starrett, Tim Sturdy, Dan Peltrush, Kyle Rhoades, Subject: 02/21/08 Liquidity Report at 3 (sent February 21, 2008, at 7:38 a.m.), filed November 6, 2013 (Doc. 231-16)("Report with Margin Calls"); Email from Ralph Ahn to Nathan Fellers, Subject: 02/21/08 Liquidity Cash Flows Report at 3 (sent February 21, 2008, at 9:01 a.m.), filed November 6, 2013 (Doc. 231-17)("Report without Margin Calls")).  The liquidity report including the margin calls was sent to several Thornburg Mortgage employees, including the Defendants, whereas the liquidity report that excluded the margin calls was sent only to Thornburg Mortgage employee Nathan Fellers, Executive Vice President, Treasurer, and Managing Director.  See Motion at 1 (citing Report with Margin Calls and Report without Margin Calls).  The Defendants note that Ahn stated in his deposition that he was asked to prepare the version of the liquidity report without the margin calls to give Fellers "a reference point for discussions with repo counterparties to project future cash flow" and that this request had nothing to do with KPMG. Motion at 2 (citing Omnibus Declaration of Jerry L. Marks in Support of Defendants' Motion *in Limine* ¶ 30, at 3, (executed March 17, 2016), filed March 17, 2016 (Doc. 404)("Declaration"); Deposition of Ralph Ahn at 105:1-4 (taken January 29, 2013), filed March 17, 2016 (Doc. 404-

43)("Ahn Depo."). The Defendants assert that Ahn's unrebutted testimony states that he provided the unedited liquidity reports with the margin calls to KPMG. See Motion at 2 (citing Ahn Depo. at 149:9-15). The Defendants note that the SEC, despite this unrebutted testimony, still speculates that something was happening in Thornburg Mortgage to prevent KPMG from learning about the margin calls. See Motion at 2.

The Defendants assert that the Court should not allow the SEC to speculate during trial that the Defendants prevented any Thornburg Mortgage liquidity report from being provided to KPMG or caused any material to be removed from any liquidity report provided to KPMG, because "[s]peculative testimony is not admissible." Motion at 3 (quoting Hilderbrand v. Levi Strauss & Co., No. 3:09CV243-DPJ-KFB, 2011 WL 2946717, at *2 (S.D. Miss. July 21, 2011)(Jordan, J.)). In Hilderbrand v. Levi Strauss & Co., the district court granted the defendant's motion in limine to exclude speculative testimony, because the federal rules of evidence state that speculative testimony is inadmissible. See 2011 WL 2946717, at *2 (citing Fed. R. Evid. 602). The Defendants argue that speculative argument from counsel is even more improper because the district court in Kay v. First Continental Trading, Inc., No. 95C3089, 1997 WL 614378 (N.D. Ill. Sept. 23, 1997)(Shadur, J.), held that the plaintiff could not introduce evidence of a cross-claim against the defendant to show motive, because any argument the plaintiff could make would be counsel's speculation and would confuse the jury or have the potential for unfair prejudice. See 1997 WL 614378, at *3-4. The Defendants also point to rule 403 of the Federal Rules of Evidence, which allows the Court to exclude evidence if the risk of unfair prejudice or confusing the jury substantially outweighs its probative value. See Motion at 3 (citing Fed. R. Evid. 403).

The Defendants further argue that the SEC is not afraid to make speculative arguments that they conspired to conceal margin calls from KPMG and that Simmons instructed Ahn to remove the margin calls from the liquidity report.  See Motion at 4.  The Defendants assert that there is no evidence supporting the assertion that the Thornburg Mortgage liquidity reports provided to KPMG were doctored to hide the margin calls or that the Defendants had anything to do with this contention.  See Motion at 4.  The Defendants argue that, if the SEC makes these speculative arguments at trial, the SEC will confuse the jury, and the Defendants will suffer "extreme prejudice."  Motion at 4.  Accordingly, the Defendants ask the Court to preclude the SEC from speculating at trial that the Defendants prevented KPMG from receiving any Thornburg Mortgage liquidity report or caused someone to remove any material from any liquidity report provided to KPMG.  See Motion at 4.

> 2.      **The Response.**

The SEC responded to the Motion on April 14, 2016.  See Plaintiff U.S. Securities and Exchange Commission's Opposition to Defendants' Motion *In Limine* No. 5 to Bar Plaintiff from Arguing that Defendants (a) Caused any Thornburg Liquidity Report not to be Provided to KPMG or (b) Caused any Material to be Removed from any Liquidity Report Provided to KPGM, filed April 14, 2016 (Doc. 417)("Response").  The SEC argues that Thornburg Mortgage's provision of the early 2008 liquidity reports to KPMG is "highly relevant to both the SEC's deceit of auditor claim and the Defendants' scienter."  Response at 1.  It asserts that the liquidity reports are important aspects of the case, so the Court should deny the Motion.  See Response at 1.

The SEC notes that it intends to introduce evidence at trial relating to Thornburg Mortgage's liquidity reports.  See Response at 1.  This evidence includes the liquidity report that Ahn sent to the Defendants and other Thornburg Mortgage employees on February 21, 2008 at 7:38 a.m. which shows $254 million in margin calls and a negative projected ending cash balance.  See Response at 1 (citing Report with Margin Calls).  The SEC also intends to show the liquidity reports that Ahn sent to Fellers on February 21, 2008 at 9:01 a.m. and February 22, 2008 at 10:48 a.m., which omitted the margin calls and reported a positive projected ending cash balance.  See Response at 2 (citing Report without Margin Calls; Email from Ralph Ahn to Nathan Fellers, Subject: 02-22-08 Liquidity Report (sent February 22, 2008, at 10:48 a.m.), filed November 6, 2013 (Doc. 231-18)("Feb. 22 Report")).  The SEC also wants to show that Fellers sent Citigroup, Inc. the February 22, 2008 liquidity report that did not include the margin calls, but explained this fact to Citigroup and disclosed the amount of outstanding margin calls, whereas KPMG received the same liquidity report without a similar explanation.  See Response at 2 (citing Email from Ralph Ahn to Shawn Buniel, Subject: 02-22-08 Liquidity Report at 1 (sent February 22, 2008, at 2:42 p.m.), filed November 6, 2013 (Doc. 231-20)).  The SEC argues that, after that time, the liquidity reports given to KPMG excluded the margin calls, and Ahn reported to Fellers, who reported to Goldstone and Simmons.  See Response at 2-3.  The SEC further notes that Ahn did not testify that Fellers asked him to prepare the liquidity report without margin calls, because he inferred this information after seeing the emails at his deposition.  See Response at 3 n. 1 (citing Ahn Depo. at 105:1-9).  It also notes that the request had nothing to do with KPMG, because Ahn did not know how Fellers used the liquidity reports.  See Response at 3 n. 1 (citing Ahn Depo. at 105:15-19).

The SEC argues that this evidence relating to Thornburg Mortgages is "highly probative" of the deceit-of-auditors claim, because, beginning on February 22, 2008, the KPMG auditors were provided with liquidity reports that did not include margin calls.  Response at 3.  It asserts that the evidence is also probative of the Defendants' scienter, because it shows their knowledge of the margin calls and Thornburg Mortgage's "significant liquidity deficiency" in late February, 2008.  Response at 3.  Accordingly, it argues that the Court should deny the Motion to the extent that it seeks to limit the SEC's use of the liquidity reports or testimony regarding the liquidity reports.  See Response at 3.  Finally, the SEC argues that the Motion is premature, because the jury should be free to draw any appropriate inferences it wants from the evidence at trial.  See Response at 3.  The SEC asserts that it is premature to preclude it from arguing "what may well be a reasonable inference," until all of the evidence is presented.  See Response at 3-4.

### 3.   **The Reply**.

The Defendants replied on May 3, 2016.  See Reply Memorandum in Support of Defendants' Motion *In Limine* No. 5 to Bar Plaintiff from Arguing that Defendants (a) Caused any Thornburg Liquidity Report not to be Provided to KPMG or (b) Caused any Material to be Removed from any Liquidity Report Provided to KPMG, filed May 3, 2016 (Doc.437)("Reply").  The Defendants note that the SEC does not deny that it has argued that the Thornburg Mortgage liquidity reports were "doctored" and that it does not even try to defend these prior speculations.  Reply at 1.  They also argue that the SEC did not, and cannot, point to any evidence that would support such speculative arguments.  See Reply at 1.

The Defendants further argue that the liquidity reports do not provide evidence for the argument which the SEC wants to make without the need for "speculative leaps."  Reply 2.  The

Defendants assert that the SEC is speculating that the evidence shows that there was a conspiracy within Thornburg Mortgage to withhold the margin call information from KPMG and that the Defendants orchestrated this conspiracy.  See Reply at 2.  Further, the Defendants argue that none of the facts to which the SEC points as relevant to the auditor deception claim tie the Defendants to any of the purported wrongdoing in connection with the liquidity reports.  See Reply at 2.

The Defendants note that "the SEC must show that a *Defendant* . . . made a materially false statement to KPMG or omitted to state a material fact to make one of his/her statements to KPMG not misleading" to prevail on its auditor deception claim.  Reply at 3 (emphasis in Reply).  The Defendants assert, however, that none of the facts to which the SEC cites in its Response show that the Defendants provided the supposedly false liquidity reports to KPMG. See Reply at 3.  Further, they argue that the evidence shows only that they were among many Thornburg Mortgage employees who received a liquidity report from Ahn on February 21, 2008. See Reply at 3.

### 4.    **The Hearing.**

The Court held a hearing on May 11, 2016.  See Transcript of Hearing at 1 (taken May 11, 2016), filed May 20, 2016 (Doc. 466)("Tr.").  The Court stated its inclination to deny the Motion, because the liquidity reports seemed like something the Defendants would just have to explain and excluding them would be putting a "thumb on the scale."  Tr. at 99:10-14 (Court).

The Defendants described the SEC's position that the Motion is premature as "interesting."  Tr. at 99:25 (Liubicic).  The Defendants stated that they believe the SEC's response concedes that the current evidence does not allow any inference that any of them

caused KPMG to not receive any liquidity report or to receive a liquidity report from which material was removed.  See Tr. at 100:1-7 (Liubicic).  They did not ask the Court to reconsider its ruling but, rather, to give some guidance to what the SEC can argue about this evidence, especially in the opening statement.  See Tr. at 100:15-19 (Liubicic).  The Defendants asked the Court for guidance how this evidence can be characterized in opening statements.  See Tr. at 100:18-19 (Liubicic).  They asserted it would be unduly prejudicial for the SEC to characterize the evidence as "doctored, something being afoot, that defendants were not giving KPMG the full story."  Tr. at 101:25; id. at 102:1-3 (Liubicic).  They also requested that, because the SEC argued only that the Motion was premature, the Court should allow them to renew the Motion at trial.  See Tr. at 102:7-13 (Liubicic).

The SEC argued that the liquidity reports are an important part of the story about information that was not provided to KPMG.  See Tr. at 102:20-22 (Voorhees).  It stated that it believes that more evidence may develop during trial and, depending on how the trial goes, it will make reasonable arguments from that evidence.  See Tr. at 103:3-5 (Voorhees).  The Court then asked what the SEC intended to say regarding the reports in its opening.  See Tr. at 103:20 (Court).  The SEC responded that it does not intend to be "overly argumentative" in its opening and that it will not say the liquidity reports were "doctored."  Tr. at 103:21-23 (Voorhees).  Further, the SEC stated that it intends to explain in its opening that Thornburg Mortgage did not provide certain evidence to KPMG and made untrue statements to KPMG.  See Tr. at 104:4-6 (Voorhees).  The SEC was not sure whether it would mention the specific liquidity reports.  See Tr. at 104:7-8 (Voorhees).  The SEC noted, however, that it would save argument for the closing.  See Tr. at 104:11-12 (Voorhees).

The Defendants asserted, however, that the record does not support the argument that they withheld information from KPMG via the liquidity reports.  <u>See</u> Tr. at 104:19-24 (Liubicic). Accordingly, they argued that the SEC should not be able to suggest that withholding in its opening.  <u>See</u> Tr. at 104:25; <u>id.</u> at 105:1 (Liubicic).  They also argued that, by arguing that the motion is premature, the SEC effectively concedes that there is insufficient evidence to support the SEC's inferences.  <u>See</u> Tr. at 105:6-12 (Liubicic).  The Defendants also reiterated their request that the Court allow them to renew the Motion at trial.  <u>See</u> Tr. at 106:7-9 (Liubicic).

The Court denied the Motion, because the liquidity reports are part of the story and need to be explained.  <u>See</u> Tr. at 106:13-15 (Court).  The Court cautioned the SEC to be careful, however, to ensure that its opening is not argumentative, especially regarding the liquidity reports, and to avoid characterization of them in any way.  <u>See</u> Tr. at 106:18-25; <u>id.</u> at 107:1-3 (Court).

## <u>LAW REGARDING THE RELEVANCY OF EVIDENCE</u>

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  <u>Train v. City of Albuquerque</u>, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  <u>United States v. Gutierrez-Castro</u>, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is

- 27 -

particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'"   United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012) (Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).   Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403.   Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989)(Baldock, J.).   "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."   United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(Tacha, J.)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)).   The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."   United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(Baldock, J.).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999)(Kelly, J.), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v.

- 28 -

Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.).  The Supreme Court of the United

States has noted:

> In deference to a district court's familiarity with the details of the case and its
> greater experience in evidentiary matters, courts of appeals afford broad
> discretion to a district court's evidentiary rulings . . . .  This is particularly true
> with respect to Rule 403 since it requires an "on-the-spot balancing of probative
> value and prejudice, potentially to exclude as unduly prejudicial some evidence
> that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(Thomas, J.)(quoting 1

Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed.

1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)("Assessing the

probative value of [proffered evidence], and weighing any factors counseling against

admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . .

.").

Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional

response or would otherwise tend to adversely affect the jury's attitude toward a particular

matter.  See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999)(Sanborn, J.).

Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States

v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d 1057, 1067 (10th

Cir. 2003)(Ebel, J.); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991)(Holloway,

J.).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest

decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United

States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(Hartz, J.)(quoting Fed. R. Evid. 403

advisory committee notes).

## ANALYSIS

The Court will grant in part and deny in part the Motion. The liquidity reports are an important part of the story and need to be explained. The evidence these reports provide may bear on the two factual issues in this case: (i) whether the Defendants subjectively believed their OTTI determination for Thornburg Mortgage's 2007 Form 10-K; and (ii) whether the Defendants made a material misrepresentation or omission in their dealings with KPMG. The Court should not put its thumb on the scale for the Defendants and exclude this evidence. The Court will not allow the SEC to characterize the liquidity reports in any way during its opening, nor will it permit the SEC to be argumentative, so there is no undue risk of prejudice to the Defendants. In opening, the SEC can simply give what the facts are about what the SEC will show -- who got what emails and reports, and what the emails and reports say.

That there were two versions of the liquidity reports made -- one containing the margin calls and one excluding the margin calls -- is an interesting piece of the story that the jury should know and the Defendants must explain. The liquidity reports may provide evidence that the Defendants deceived KPMG and had the required scienter. See Response at 1. Depending on how the evidence develops during trial, the liquidity reports could be probative evidence on the deceit-of-auditors claim. They show that, beginning on February 22, 2008, the KPMG auditors were provided with the liquidity reports that did not factor in the margin calls. See Response at 3. Further, the liquidity reports could be evidence of the Defendants' knowledge of the margin calls and Thornburg Mortgage's liquidity deficiency, and thus show scienter. See Response at 3. Accordingly, these liquidity reports are highly relevant to this case and need to be explained to the jury for it to understand the full story. See Fed. R. Evid. 401. Further, the liquidity reports

have a high probative value and, without argument or characterization regarding them, this value substantially outweighs any danger of unfair prejudice to the Defendants or of risk of confusing the jury. Accordingly, the Court does not think that excluding the liquidity report evidence under rule 403 is proper. See United States v. Courtney, No. CR 11-2860 JB, 2013 WL 4782148, at *15 (D.N.M. Sept. 3, 2013)(Browning, J).

Finally, the SEC cannot make speculative arguments or characterize the liquidity reports in any way during its opening statement. Argument does not belong in opening statements. See Sec. State Bank v. Baty, 439 F.2d 910, 913 (10th Cir. 1971)(Breitenstein, J.). Further, prejudicial or improper comments do not belong in the opening statement. See Arizona v. Washington, 434 U.S. 497, 498 (1978)(Stevens, J.). Accordingly, the Court will not allow the SEC to present any argument or prejudicial statements, about the liquidity reports and in general, in its opening statement. Specifically, the SEC cannot say that the reports were doctored or that the Defendants intentionally withheld the margin call information from the liquidity reports unless more evidence comes to light before trial. At the present time, the SEC can only describe who got what emails and reports, and what the emails and reports say.

**IT IS ORDERED** that the Defendants' Motion *In Limine* No. 5 to Bar Plaintiff from Arguing that Defendants (a) Caused any Thornburg Liquidity Report not to be Provided to KPMG or (b) Caused any Material to be Removed from any Liquidity Report Provided to KPMG, filed March 17, 2016 (Doc. 396)("Motion"), is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Danielle Voorhees
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

      *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Robert G. Badal
Los Angeles, California

--and--

John Valentine

Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Heather Tewksbury
Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Aaron Thompson
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

*Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

--and--

Jerry L. Marks
Robert J. Liubicic
Paul M. Torres
Alisa Schlesinger
Elena Kilberg

Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

     *Attorneys for Defendant Jane E. Starrett*

Larry J. Montano
Holland & Hart, LLP
Santa Fe, New Mexico

--and--

Samuel J. Rubin
Freshfields Bruckhaus Deringer US LLP
New York, New York

     *Attorneys for Material Witness Elena Matrullo*

George A. Salter
Peter J. Dennin
Hogan Lovells US, LLP
New York, New York

--and--

William S. Reid
Keleher & McLeod
Albuquerque, New Mexico

     *Attorneys for Intervenor KPMG, LLP*