**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.                                 No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE,
CLARENCE G. SIMMONS, III, and
JANE E. STARRETT,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendants' Motion *In Limine* No. 6 to

Exclude Irrelevant and Highly Prejudicial Emails, filed March 17, 2016 (Doc. 397)("Motion").

The Court held a hearing on May 11, 2016.  The primary issue is whether the Court should allow

Plaintiff Securities and Exchange Commission ("SEC") to offer evidence of certain emails which

Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett contend are irrelevant and

prejudicial.  The Court will allow the SEC to introduce the emails, because they are relevant, the

risk of unfair prejudice does not substantially outweigh their probative value, and the Court

cannot get rid of all the bad evidence in the case for either side.  The Court will thus deny the

Motion.

**FACTUAL BACKGROUND**

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1).  The Court

presents the facts solely to provide context for the Motion.  It continues to adhere to the decisions

on the facts it reached in its Summary Judgment Opinion.   See SEC v. Goldstone, No. CIV. 12-

0257 JB/GBW, 2015 WL 5138242 (D.N.M. August 22, 2015)(Browning, J.).

The Defendants are former officers of Thornburg Mortgage: Larry A. Goldstone was the chief executive officer, Clarence G. Simmons, III, was the chief financial officer, and Jane E. Starrett was the chief accounting officer.  See Complaint ¶ 1, at 1, filed March 13, 2012 (Doc. 1). The SEC alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[1]  Complaint ¶¶ 1-3, at 1-2.  The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[2]  Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations

_____

[1]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission.  Typically, the 10-K contains much more detail than the annual report."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).  An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions.  It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc."  10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[2]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

focused on "jumbo" and "super-jumbo"[3] ARM securities; Thornburg Mortgage also purchased

ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage paid out

most of its earnings in dividends, and obtained financing for its mortgage and investment

---

[3]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage. Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set.  Super jumbo mortgage, Wikipedia.  Fannie Mae purchases and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created.  See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends."  Fannie Mae, Investopedia.  The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) is $417,000.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates, because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined or regulated, but mortgage companies use it internally and independently to set loan parameters.  See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage, Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

business through reverse repurchase agreements[4] backed by ARM securities.  See Complaint ¶ 3, at 2.    Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit

_____

[4]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to *repo*."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to

amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an email

from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that

he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of

[the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay

Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m.,

filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call

over seven days and made the final payment of seventy-five million dollars on February 27,

2008.  See Complaint ¶ 35, at 11.

        In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only

portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the

margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip

Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See

Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22,

2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to

meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[5] as well for a gain

of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20

(alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne

Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen

Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent

_____

        [5]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond
payments, which [are] separated and sold individually from the principal portion of those same
payments."        Interest   Only   (IO)   Strips,   Investopedia   (Apr.   22,   2016),
http://www.investopedia.com/terms/i/iostrips.asp.

February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008 Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"   Complaint ¶ 68, at 20 (quoting Email from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008 Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"   Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008 Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet

while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.  See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, send February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."  Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations represent the quality of the bond, such as AAA, AA, A, BBB, and BB.  See Bond credit rating, Wikipedia. "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

Goldstone/Simmons Email")).  Simmons sent an email to Goldstone and others regarding the potential collapse of the European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008 Simmons/Feldman Email")).  Later on February 27, 2008, Simmons sent an email to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"  Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

        Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To

date, no such sales have been required . . . .").   Thornburg Mortgage's 2007 Form 10-K

accounted for the I/O Strip Transactions as the issuance of secured debt.[7]   See Complaint ¶ 37, at

11.   The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to

hold its ARM Securities until their value recovered in the market,'" notwithstanding that the

lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could

have seized Thornburg Mortgage's ARM securities pledged as collateral.   Complaint ¶ 8, at 3

(quoting 2007 Form 10-K at 41).   In accordance with the statement that Thornburg Mortgage had

the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage

did not recognize $427.8 million in losses associated with its ARM securities that served as

collateral on its reverse repurchase agreements.   See Complaint ¶ 8, at 4.   Thornburg Mortgage

also reported a fourth-quarter 2007 profit.   See Complaint ¶ 11, at 4.   "Thornburg's . . . Form

10K and accompanying financial statements were also incorporated into the company's active

_____

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP. About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/.   According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset." The FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale. SFAS 166 at 3.   The FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective. SFAS 166 at 3.   Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange." SFAS 140 ¶ 9, at 3.

Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008. See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2, (sent February 28, 2008, at 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008 Simmons/Goldstone Email")).   In an email from Goldstone to Thornburg Mortgage's investor relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original).  See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2,

---

[8] "ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

(sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email").  As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on Street Signs on the Consumer News and Business Channel ("CNBC").  Complaint ¶ 98, at 28.  On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'"  Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity, or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[9]   Complaint ¶¶ 49-50, at 50-51.   As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.   See Complaint ¶ 49, at 14-15.[10]   The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, see Complaint ¶ 76, at 22.

---

[9]An "impairment" is a "reduction in a company's stated capital."   Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at 2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern.  See Complaint ¶ 57, at 17.  Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's.  See Complaint ¶ 76, at 22.  "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."   Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email").  The requested evidence included "correspondence with lenders/attorneys/shareholders, emails." Request for Correspondence, attached to March 3, 2008 Hall Email at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").  See Complaint ¶ 100, at 29.  KPMG also

requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."   Request for Correspondence at 4.   At the time, KPMG, as auditor, was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.   <u>See</u> Complaint ¶ 99, at 29.   Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.   <u>See</u> Complaint ¶ 101, at 29.   KPMG did not become aware of the Citi Letter while preparing its Restatement.   <u>See</u> Complaint ¶ 101, at 29.   Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"   Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).   The analysis states: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]   No one in the market could have foreseen the sudden decline in mortgage valuations.'"   Complaint ¶ 103, at 30 (emphasis in Complaint)(quoting Position Paper at 2).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.   <u>See</u> Complaint at 1.   The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in

violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the

Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of §

13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in

violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2

of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in

violation of § 13(a) of the Exchange Act, 15 U.S.C. 78m(a), and rules 12b-20, 17 C.F.R. §

240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings

under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in

keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. §

78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of

the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

The Court granted in part and denied in part the SEC's and the Defendants' motions to

dismiss on July 8, 2013.  See Motion to Dismiss Opinion S.E.C. v. Goldstone, 952 F.Supp.2d

1060 (D.N.M. July 8, 2013)(Browning, J.).  The Motion to Dismiss Opinion dismissed the SEC's

allegations: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's

outside auditor that Thornburg Mortgage successfully met its margin calls without violating its

lending agreements, and did not sell assets to meet margin calls"; and (ii) "that the Defendants

schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-

K."  Motion to Dismiss Opinion S.E.C. v. Goldstone, 952 F.Supp.2d at 1076.  It declined to

dismiss the SEC's claim that "the representation that Thornburg Mortgage had the intent and

ability to hold its impaired assets to maturity or their value recovered in the market at the time it

- 16 -

filed the 2007 Form 10-K was materially false or misleading."  Motion to Dismiss Opinion

S.E.C. v. Goldstone, 952 F.Supp.2d at 1076-77.  The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are primarily liable or liable as control persons for that misrepresentation in the 10-K, and the Court will not dismiss the SEC's allegations that the Defendants aided and abetted the misrepresentation, as the Court has determined that the SEC sufficiently alleged that Goldstone and Simmons made, and the Defendants provided substantial assistance to, the misrepresentation with knowledge of or recklessness to its falsity.  Similarly, the Court will not dismiss the SEC's allegations that the Defendants misled Thornburg Mortgage's auditor before the 2007 Form 10-K was filed through the statement that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market.

Motion to Dismiss Opinion S.E.C. v. Goldstone, 952 F.Supp.2d at 1077.  The Court also allowed

certain claims against Goldstone and Simmons to proceed.  See Motion to Dismiss Opinion

S.E.C. v. Goldstone, 952 F.Supp.2d at 1077.  These claims included the SEC's allegations

whether: (i) the Defendants failed to disclose to KPMG before they filed the 2007 Form 10-K

that a European hedge fund's collapse would negatively affect Thornburg Mortgage's financial

condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's financial condition

after filing the 2007 Form 10-K; (iii) the Defendants materially misled KPMG by not providing

correspondence showing that Thornburg Mortgage experienced an event of default in the two

weeks before the 2007 Form 10-K filing; and (iv) Simmons misrepresented that unexpected

events had an unexpected financial impact on Thornburg Mortgage after the 2007 Form 10-K

filing.  See Motion to Dismiss Opinion S.E.C. v. Goldstone, 952 F.Supp.2d at 1077.

The Court later denied the Defendants' and the SEC's motions for summary judgment.

See Summary Judgment Opinion SEC v. Goldstone, 2015 WL 5138242, at *1.  It first explained

that it would apply an "actual-disbelief" standard to determine "whether a person subjectively

- 17 -

disbelieved the truth of an opinion statement."  Summary Judgment Opinion <u>SEC v. Goldstone</u>, 2015 WL 5138242, at *1.  The Court then concluded that genuine issues of material fact for the jury existed on the SEC's claims that: (i) the Defendants made objectively false statements; (ii) the statements were material; (iii) the Defendants believed that their statements were false they made them; and (iv) the Defendants made statements that were false or misleading because of omitted information.  <u>See</u> Summary Judgment Opinion <u>SEC v. Goldstone</u>, 2015 WL 5138242, at *1.  The Court thus declined to grant summary judgment for any party on any issue.  <u>See</u> Summary Judgment Opinion <u>SEC v. Goldstone</u>, 2015 WL 5138242, at *1.

Starrett reached a settlement with the SEC on May 20, 2016.  <u>See</u> Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent").  The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include a requirement that Starrett testify for any of the remaining parties.  Starrett Consent at 1.  Ten claims remain in the case for trial -- all of the original claims, with the exception of the SEC's claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b).  <u>See</u> Pretrial Order at 3-4, filed May 11, 2016 (Doc. 448).[11]

---

[11]The Motion to Dismiss Opinion and Summary Judgment Opinion did not dismiss the SEC's § 17(a) claim, but it does not appear in the Pretrial Order.  The parties have also not submitted any jury instructions on this claim.  <u>See</u> Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463).  The parties' proposed verdict forms do not include a § 17(a) claim.  <u>See</u> Defendant Clay Simmons's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489).  The Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely,

1.      **The Motion.**

In their Motion, the Defendants ask the Court to exclude irrelevant and highly prejudicial emails and, specifically, to strike three of the SEC's trial exhibits.  <u>See</u> Motion at 1.  The first exhibit at issue is SEC Ex. No. 192, an email chain dated March 6, 2008, in which Defendant Jane Starrett wrote to Amy Pell, a Thornburg Mortgage employee, that she was "pissed off." Motion at 1 (quoting Email from Jane Starrett to Amy Pell, Subject: RE: KPMG's 10-K/A review at 2 (sent March 6, 2008, at 2:55 p.m.), filed March 17, 2016 (Doc. 404-45)("10-K/A Email")).  The next exhibit that the Defendants challenge is SEC Ex. No. 194, an email chain, dated March 7, 2008, from Starrett to Bruce Nye, a friend of Starrett's, discussing her frustrations with KPMG.  <u>See</u> Motion at 1 (quoting Email from Jane Starrett to Bruce Nye, Subject: RE: Cashin's Comments: March 7, 2008 at 2 (sent March 7, 2008, at 7:26 p.m.), filed March 17, 206 (Doc. 404-46)("Comments Email")).  The last exhibit the Defendants mention is SEC Ex. No. 195, another email chain from Starrett to Nye in which she further states her frustrations with KPMG.  <u>See</u> Motion at 1 (quoting Email from Jane Starrett to Bruce Nye, Subject: RE: Mountain West Conference Official Athletic Site at 2 (sent March 7, 2008, at 8:06 p.m.), filed March 17, 2016 (Doc. 404-2)("MW Email")).  The Defendants explain that Starrett sent the 10-K/A, Comments, and MW Emails to third parties on March 6 and 7, 2008, to express to her friends her frustrations with the KPMG auditors.  <u>See</u> Motion at 1 (citing K/A Email at 2,

---

the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."  <u>Wilson v. Muckala</u>, 303 F.3d 1207, 1215 (10th Cir. 2002).  The pretrial order that the parties filed in this case, therefore, supersedes all prior pleadings, including the Complaint.  <u>See</u> <u>Wilson v. Muckala</u>, 303 F.3d at 1215 (citing C. Wright, A. Miller & M. Kane, <u>6A Fed. Prac. & Proc. Civ.</u> § 1522 (2d ed. 1990)).

Comments Email at 2, and MW Email at 2).  Accordingly, they argue that these emails have no relevance to the issues in this case and "are clearly intended to embarrass Ms. Starrett," so the Court should preclude the SEC from admitting or referencing those exhibits.  Motion at 1.

The Defendants posit that only relevant evidence -- evidence that has any tendency to make a fact of consequence in determining the action more or less probable than without the evidence -- can be admitted.  See Motion at 2 (citing Fed. R. Evid. 401, 402).  They also note that, if the danger of unfair prejudice outweighs a piece of evidence's probative value, the Court may exclude the evidence from trial.  See Motion at 2 (citing Fed. R. Evid. 403).  They quote United States v. Carroway, 534 F.3d 1290 (10th Cir. 2008)(Hartz, J.), which defines unfair prejudice as evidence that "has an 'undue tendency to suggest decision on an improper basis,'" such as an emotional one.  Motion at 2 (quoting United States v. Carroway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note)).

The Defendants argue that the 10-K/A, Comments, and MW Emails are irrelevant, and that the Court should exclude them because they have no bearing on the case's factual issues, which are: "(i) whether Defendants' determination regarding other than temporary impairment ('OTTI') for purposes of Thornburg Mortgage's 2007 Form 10-K (filed 2/28/08) was objectively and subjectively truthful, and (ii) whether Defendants made a material misrepresentation or omission in their dealings with the auditor KPMG in connection with that Form 10-K."  Motion at 2.  They note that the 10-K/A, Comments, and MW Emails were sent after February 28, 2008, the date of the Form 10-K filing in question, and assert that the emails "contain little more than expressions of natural exasperation and fatigue."  Motion at 2.  They argue that the emails contain no evidence about the OTTI judgment at issue, and provide no evidence that any of the

Defendants or Thornburg Mortgage made the alleged material misrepresentations or omissions to KPMG.  See Motion at 2.

The Defendants conclude that, even if the 10-K/A, Comments, and MW Emails were somehow relevant, they are highly prejudicial, and that the Court should exclude them under rule 403.  See Motion at 3 (citing Fed. R. Evid. 403).  This prejudice is because the emails are "embarrassing" to Starrett and could bias the jury against her.  Motion at 3.  They argue that the SEC wants to introduce the 10-K/A, Comments, and MW Emails only to cause Starrett embarrassment or to bias the jury against her.  See Motion at 3.  They also fear the SEC wants the jury "to reach an unfounded conclusion about Ms. Starrett's communications with KPMG." Motion at 3.  They assert that Starrett was working under extremely stressful conditions and it would be "extremely unfair" to introduce these emails to the jury.  Motion at 3.

  **2.**  **The Response.**

The SEC responded to the Motion on April 14, 2016.  See Plaintiff U.S. Securities and Exchange Commission's Opposition to Defendants' Motion *In Limine* No. 6 to Exclude Irrelevant and Highly Prejudicial Emails, filed April 14, 2016 (Doc. 419)("Response").  It points out that the 10-K/A, Comments, and MW Emails are evidence of Starrett's contempt for KPMG, because she wrote "that she is 'pissed off' at KPMG ([10-K/A Email]), that 'KPMG sucks' ([Comments Email]), and that '[t]hey still suck' ([MW Email])."  Response at 1.  The SEC also argues that the emails are not highly prejudicial, because they will not elicit an emotional or passionate response from the jury.  See Response at 1.  Accordingly, the SEC argues that the Court should not exclude the 10-K/A, Comments, and MW Emails.  See Response at 1.

The SEC argues that the 10-K/A, Comments, and MW Emails support its allegations. See Response at 1.  Further, in light of the Defendants' intended defense -- challenging KPMG's competency and truthfulness -- the SEC asserts that Starrett's assessment of KPMG in these emails is "plainly relevant."  Response at 1.  The SEC additionally argues that, as the Defendants plan to attack KPMG senior manager Jennifer Hall, "it would be unfair to hide from the jury that Ms. Starrett . . . held Ms. Hall in high regard even while expressing her disdain for KPMG generally."  Response at 2 n.1.  For example, Starrett wrote, "[a]ctually the senior manager is very smart and we like her.  So my fantasy is that now that her career at KPMG is over, we can hire her to clean the coffee room for a year while she's becoming 'independent' again and then she can take my job and I can be a ski bunny."   MW Email at 2.  It argues that the 10-K/A, Comments, and MW Emails show Starrett was frustrated with KPMG, because the auditors were a "hurdle to be overcome in issuing the false 2007 Form 10-K."  Response at 2.  Further, the SEC argues that it is easier to lie to someone with whom you are angry and for whom you have contempt than to lie to someone you hold in high regard.  See Response at 2.

Finally, the SEC asserts that there is nothing embarrassing in any of the emails.  See Response at 2.  It argues that there is nothing personal in the 10-K/A, Comments, and MW Emails, and nothing that would "inflame a jury's passion or emotion."  Response at 2.  For these reasons, the SEC argues that it is appropriate for the Court to deny the Motion.  See Response at 2.

### 3.    **The Reply**.

The Defendants replied on May 3, 2016.  See Reply Memorandum in Support of Defendants' Motion *in Limine* No. 6 to Exclude Irrelevant and Highly Prejudicial Emails, filed

May 3, 2016 (Doc. 438)("Reply").  They argue that the SEC's Response further shows the irrelevance of the 10-K/A, Comments, and MW Emails, and that the emails have no bearing on the factual issues in the case.  <u>See</u> Reply at 1.  They also note that there is no way that the SEC can argue that the 10-K/A, Comments, and MW Emails suggest that Starrett hid or intended to hide anything from KPMG.  <u>See</u> Reply at 1.  They make fun of the SEC's use of "pop psychology" to argue that the emails are relevant and assert that this argument only underscores how irrelevant they are.  Reply at 1-2.

The Defendants point to the "loaded language" that the SEC uses in its Response in connection with the 10-K/A, Comments, and MW Emails to argue that the SEC's goal in introducing these emails is to "portray Ms. Starrett as an unlikeable person" and thus "invoke negative emotions among jurors" towards her.  Reply at 2.  Finally, they assert that, because the SEC cannot identify any securities laws that require respect for auditors, the SEC seems to imply that Starrett broke the law simply by expressing her frustrations with KPMG.  <u>See</u> Reply at 2.

### 4.    <u>The Hearing</u>.

The Court held a hearing on May 11, 2016.  <u>See</u> Transcript of Hearing at 1 (taken May 11, 2016), filed May 20, 2016 (Doc. 466)("Tr.").  The Court first stated its initial inclination to deny the Motion, because it "can't sanitize all of the bad facts or evidence out of the case" for any of the parties.  Tr. at 107:7-11 (Court).  It stated that both sides would just have to deal with the "barnacles on their case."  Tr. at 107:11-13 (Court).  The Court stated that Starrett's attitude toward KPMG is revealing and indicates some motive for her to withhold information from the auditors.  <u>See</u> Tr. at 107:14-16 (Court).  The Court did not think the SEC would be able to fully put on its case if it granted the Motion, and took out the 10-K/A, Comments, and MW Emails,

which "give some color" to the relationship between the Defendants and KPMG.  Tr. at 107:22-25 (Court).  The Defendants submitted to the Court's tentative ruling.  See Tr. at 108:3-4 (Whooley).  The SEC made no additional comment.  See Tr. at 108:9 (Kasper).

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401)("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'"  United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012) (Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence." Fed. R. Evid. 403.   Under rule 403, the trial court must weigh the

proffered evidence's probative value against its potential for unfair prejudice. See United States

v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989)(Baldock, J.).   "[I]t is only unfair prejudice,

substantially outweighing probative value, which permits exclusion of relevant matter [under

rule 403]."   United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(Tacha, J.)(quoting

United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(Brorby, J.)).   The United States

Court of Appeals for the Tenth Circuit has reminded district courts that they should be "mindful"

that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is

an extraordinary remedy and should be used sparingly."   United States v. Smalls, 605 F.3d 765,

787 (10th Cir. 2010)(Baldock, J.).

        The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's

discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999)(Kelly, J.), and the

trial court's discretion to balance possible unfair prejudice against probative value is broad, see

United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v.

Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.).   The Supreme Court of the United

States has noted:

        In deference to a district court's familiarity with the details of the case and its
        greater experience in evidentiary matters, courts of appeals afford broad
        discretion to a district court's evidentiary rulings . . . .   This is particularly true
        with respect to Rule 403 since it requires an "on-the-spot balancing of probative
        value and prejudice, potentially to exclude as unduly prejudicial some evidence
        that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(Thomas, J.)(quoting 1

Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed.

1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional response or would otherwise tend to adversely affect the jury's attitude toward a particular matter.  See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999)(Sanborn, J.). Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)(Ebel, J.); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991)(Holloway, J.).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(Hartz, J.)(quoting Fed. R. Evid. 403 advisory committee notes).

## ANALYSIS

The Court will deny the Motion.  The 10-K/A, Comments, and MW Emails, which the Defendants seek to exclude, are relevant to the two overriding factual issues in this case -- (i) whether the Defendants subjectively believed the accuracy of their OTTI determination for Thornburg Mortgage's 2007 Form 10-K, and (ii) whether the Defendants made a material misrepresentation or omission in their dealings with KPMG -- and are not highly prejudicial. The Court cannot exclude all of the damaging evidence in the case.  The emails are relevant, and they do not subject the Defendants to the risk of substantial unfair prejudice.  Accordingly, the

- 26 -

Court will allow the SEC to introduce the 10-K/A, Comments, and MW Emails as evidence.

I.     **THE SEC MAY INTRODUCE THE EMAILS STARRETT SENT, BECAUSE THEY ARE PROBATIVE AND NOT UNFAIRLY PREJUDICIAL.**

The SEC seeks to introduce the 10-K/A, Comments, and MW Emails to show Starrett's frustration with KPMG, and to provide a motive or an intent for lying to KPMG.  See Tr. at 107:14-16 (Court); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 663 F. Supp. 2d 1138, at 1145 (holding that emails introduced to show the defendants' motive or intent are admissible).  Further, because the emails point to motive, their probative value is high and substantially outweighs any prejudicial value or danger they may pose of confusing the jury.  See United States v. Courtney, No. CR 11-2860 JB, 2013 WL 4782148, at *15 (D.N.M. Sept. 3, 2013)(Browning, J.).  The Court accepts the SEC's argument that these emails are relevant.  See Response at 1.  Rule 402 thus allows this evidence to come into evidence and excluding it under rule 403 is an "extraordinary remedy and should be used sparingly."  United States v. Smalls, 605 F.3d at 787.

While the Defendants consider the SEC's arguments to be pop psychology, the Court does not think it is a far-fetched argument to say that, because Starrett had contempt for the KPMG people, she may have found it easier to lie to and deceive them.  People generally have a harder time lying to people they like.[12]  In any case, this is an issue for the jury to decide, not the Court.  It is one of many factors that goes into the crucible of a jury to use in making the difficult

---

[12]Resentment, for example, is usually felt towards criminals and those who make us question our self-worth, and this often leads to hate.  See Joshua Dressler, Hating Criminals: How Can Something That Feels So Good Be Wrong? Forgiveness and Mercy. by Jeffrie G. Murphy and Jean Hampton. New York: Cambridge University Press. 1988. Pp. Xii, 194. $29.95., 88 Mich. L. Rev. 1448 (1990).

determination of credibility and scienter.  Given the high standard that the SEC must satisfy --

subjective finding of recklessness -- Starrett's contempt and belittling of KPGM cannot be said

to be irrelevant, and the Court is reluctant to take away any of the scienter and credibility

evidence without a clear justification.

The Court must balance 10-K/A, Comments, and MW Emails' probative value against

any possible unfair prejudice.  See United States v. Bice-Bey, 701 F.2d at 1089; United States v.

Masters, 622 F.2d at 87-88.  The emails are probative, and while they may not paint Starrett in

the most favorable light, they are not highly prejudicial and are just an example of some bad

evidence that the Court should not strike from the record.  The 10-K/A, Comments, and MW

Emails do not contain any overly coarse language that might be prejudicial.  See In re: E. I. Du

Pont De Nemours and Company Personal Injury Litigation, No. 2:13-CV-170, 2016 WL,

659112, *59-60 (S.D. Ohio Feb. 17, 2016)(Sargus, J.)(requiring the coarse language contained in

emails offered for evidence to be redacted because it was prejudicial).  While some of the

commentary in these emails could possibly lead the jury to think Starrett is cynical, this

commentary is probative as it points to her intent or motive.  See Hart v. RCI Hospitality

Holdings, Inc., 90 F. Supp. 3d 250, 287-88 (S.D.N.Y. 2015)(Engelmeyer, J.)(requiring parts of

emails to be redacted, because it could cause the jury to believe the defendants were cynical and

heartless).  Accordingly, there is no reason to think this evidence will cause the jury to be excited

to irrational behavior and thus prejudice the Defendants so substantially as to unduly outweigh

its important probative value.  See United States v. Masters, 622 F.2d at 87.   Both the SEC and

the Defendants have barnacles on their cases, and they will just have to deal with them.  The

Court should not, under the guise of doing its job under rule 403, try to sanitize all of the bad

evidence for one side or the other.  The Court should not put its thumb on the scale here for the

Defendants, when it is unlikely to be consistent in trying to even it up.

      **IT IS ORDERED** that the Defendants' Motion *In Limine* No. 6 to Exclude Irrelevant

and Highly Prejudicial Emails, filed March 17, 2016 (Doc. 397)("Motion"), is denied.  The SEC

may introduce the 10-K/A, Comments, and MW Emails to the jury.

                                         _____

                                         UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Michael H. Hoses
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Danielle Voorhees
Ian S. Karpel
Securities & Exchange Commission
Denver, Colorado

 *Attorneys for the Plaintiff*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

- 29 -

Robert G. Badal
Los Angeles, California

--and--

John Valentine
Lauren R. Yates
April N. Williams
Skye Lynn Perryman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Washington, D.C.

--and--

Heather Tewksbury
Chris Johnstone
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

--and--

Randall Lee
Jessica Kurzban
Daniel R. Crump
Aaron Thompson
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

   *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons, III*

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Thomas Arena
Milbank, Tweed, Hadley & McCloy, LLP
New York, New York

- 30 -

--and--

Jerry L. Marks
Robert J. Liubicic
Paul M. Torres
Alisa Schlesinger
Elena Kilberg
Milbank, Tweed, Hadley & McCloy, LLP
Los Angeles, California

     *Attorneys for Defendant Jane E. Starrett*

Larry J. Montano
Holland & Hart, LLP
Santa Fe, New Mexico

--and--

Samuel J. Rubin
Freshfields Bruckhaus Deringer US LLP
New York, New York

     *Attorneys for Material Witness Elena Matrullo*

George A. Salter
Peter J. Dennin
Hogan Lovells US, LLP
New York, New York

--and--

William S. Reid
Keleher & McLeod
Albuquerque, New Mexico

     *Attorneys for Intervenor KPMG, LLP*