# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff,

vs.                                                                    No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE; CLARENCE G.
SIMMONS, III and JANE E. STARRETT,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Renewed Motion for Judgment as a Matter of Law, filed July 27, 2016 (Doc. 594)("Renewed Motion for Judgment"). The Court held a hearing on December 1, 2016.  The primary issues are: (i) whether specific factual findings the jury made that Defendant Larry A. Goldstone and Defendant Clarence G. Simmons III did not falsify books or records, and that Thornburg Mortgage did not fail to keep accurate books or records, require dismissal of Plaintiff Securities and Exchange Commission's claim that Goldstone and Simmons made false statements or omissions to Thornburg's accountant, KPMG, LLP; and (ii) whether the SEC presented legally sufficient evidence at trial for a reasonable jury to conclude that Goldstone committed securities fraud on February 28, 2008, either by making statements on the Consumer News and Business Channel ("CNBC") or in an email to Thornburg Mortgage's Investor Relations group.  Because the jury's factual findings do not necessarily imply that Goldstone or Simmons did not make a misleading statement or omission to KPMG, the jury's verdict does not require dismissal of the SEC's rule 13b2-2(a) claim.  Further, when viewed in the light most favorable to the SEC, the SEC presented evidence by which a reasonable jury could find that Goldstone knowingly or recklessly

made a false or misleading statement on February 28, 2008, amounting to securities fraud. Accordingly, the Court grants in part and denies in part the Defendants' Renewed Motion for Judgment. The Court grants the Defendants' Renewed Motion for Judgment regarding Claims 2, 3, and 6. The Court denies the Defendants' Renewed Motion for Judgment regarding Claims 1 and 8.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1). The Court presents the facts solely to provide context for the Renewed Motion for Judgment. It continues to adhere to the decisions on the facts that it reached in SEC v. Goldstone, No. CIV. 12-0257 JB/GBW, 2015 WL 5138242 (D.N.M. August 22, 2015)(Browning, J.)("Summary Judgment Opinion").

The Defendants are former officers of Thornburg Mortgage: Goldstone was the chief executive officer, Simmons was the chief financial officer, and Jane E. Starrett was the chief accounting officer. See Complaint ¶ 1, at 1. The SEC alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[1] Complaint ¶¶ 1-3, at 1-2. The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities

---

[1] A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission. Typically, the 10-K contains much more detail than the annual report." 10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014). An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions. It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc." 10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[2] See Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation. See Complaint ¶ 2, at 1; id. ¶ 20, at 7. During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange. See Complaint ¶ 20, at 7. Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo"[3] ARM securities; Thornburg Mortgage also purchased

---

[2]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

[3]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage. Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage. These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set. Super jumbo mortgage, Wikipedia. Fannie Mae purchases and guarantees mortgages that meet its funding criteria. Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014). Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created. See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014). "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends." Fannie Mae, Investopedia. The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States (including all of New Mexico) was $417,000.00. See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf. Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00. See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf. "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates, because of the

ARM securities that third parties originated.  Complaint ¶ 21, at 7.  Thornburg Mortgage used

most of its earnings to pay dividends, and obtained financing for its mortgage and investment

business through reverse repurchase agreements[4] backed by ARM securities.  See Complaint ¶ 3,

at 2.   Thornburg Mortgage's reverse repurchase agreements "typically consisted of a

simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg

Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a

higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg

Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin

calls if the value of the ARM securities serving as collateral on the agreements fell below a

specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg

Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender,

either on the same day that Thornburg Mortgage received the margin call or on the following

day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating

---

increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013),
http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined
or regulated, but mortgage companies use it internally and independently to set loan parameters.
See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular
lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage,
Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie
Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie
Mae, Wikipedia; Freddie Mac, Wikipedia.

   [4]A "repurchase agreement" is a "short-term loan agreement by which one party sells a
security to another party but promises to buy back the security on a specified date at a specified
price.  Often shortened to repo."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed.
2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the
buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23,
2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security
(and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the
transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase
agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013),
http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); id. at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call would be an event of default and would allow a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted would then be allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  See Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  See Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  See Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  See Complaint ¶ 3, at 2; id. ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global

Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  See Complaint ¶ 34, at 11.  In an email from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2, sent February 21, 2008, at 9:30 a.m., filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  See Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[5] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20

---

[5]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."  Interest Only (IO) Strips, Investopedia (Apr. 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

(alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2, sent February 22, 2008 at 8:42 a.m., filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008, Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"  Complaint ¶ 68, at 20 (quoting Email from Larry Goldstone to the Thornburg Mortgage Board of Directors, sent February 25, 2008, at 5:03 p.m., filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008, Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  See Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008, Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also

discussed strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it'" in the same email.  Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008 Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing. See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point haircuts on Alt-A and AAA's overnight.  I think we will get this a little more gradually, but we should be ready for it.[6]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, sent February 27, 2008, at 3:48 p.m., filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008 Goldstone/Simmons Email")).  Simmons sent an email to Goldstone and others regarding the potential collapse of the

---

[6]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels."  Haircut, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013, 11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit ratings, which represent the credit worthiness of corporate or government bonds, and "the likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14 a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations, such as AAA, AA, A, BBB, and BB, represent the bond's quality.  See Bond credit rating, Wikipedia.  "AAA" refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."  AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

European hedge fund, stating: "'This makes it even more critical to be done with Citi today so we can get the K filed.'"   Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2, sent February 27, 2008, at 8:08 a.m., filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008, Simmons/Feldman Email")).   Later on February 27, 2008, Simmons sent an email to Starrett, in which he stated: "'I gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not want there to be any issues based on Thursday activity.'"   Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2, sent February 27, 2008, at 10:35 a.m., filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008 Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K

accounted for the I/O Strip Transactions as the issuance of secured debt.[7]  See Complaint ¶ 37, at

11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to

hold its ARM Securities until their value recovered in the market,'" notwithstanding that the

lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could

have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3

(quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had

the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage

did not recognize $427.8 million in losses associated with its ARM securities that served as

collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage

also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form

10K and accompanying financial statements were also incorporated into the company's active

Form S-3 ASR[8] registration statement, relating to Thornburg Mortgage's dividend reinvestment

---

[7]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP.  About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/.  According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset." FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

[8]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines

and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008. See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2, (sent February 28, 2008, at 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008, Simmons/Goldstone Email")).  In an email from Goldstone to Thornburg Mortgage's Investor Relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original).  See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, (sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at

_____

and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008 Email"). As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls. See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on CNBC's Street Signs. See Complaint ¶ 98, at 28. On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'" Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008, filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day. See Complaint ¶ 41, at 13. At the end of the day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so. We have sufficient operating cash, and we don't expect to sell assets to meet margin calls. We returned to profitability during the fourth quarter despite a tough market.'" Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity, or when they recovered their value on the market -- referred to as an "other-than-temporary

impairment . . . analysis" ("OTTI analysis").[9]   Complaint ¶¶ 49-50, at 50-51.   As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.   See Complaint ¶ 49, at 14-15.[10]   The Defendants did not disclose to KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, see Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for

---

[9]An "impairment" is a "reduction in a company's stated capital."   Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[10]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.   The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at *2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008 Hall Email at 2 (representing that the email was sent from a KPMG employee).

them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern.  See Complaint ¶ 57, at 17.  Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's.  See Complaint ¶ 76, at 22.  "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further."  Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events subsequent to filing were unforeseeable catastrophic events."   Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008 Hall Email").  The requested evidence included "correspondence with lenders/attorneys/shareholders, emails."  Request for Correspondence, attached to March 3, 2008 Hall Email at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").   See Complaint ¶ 100, at 29.   KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  At the time, KPMG, as auditor, was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of

the Citi Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.  KPMG did not

become aware of the Citi Letter while preparing its Restatement.  See Complaint ¶ 101, at 29.

Simmons reviewed and approved an analysis for the auditor which explained that Thornburg

Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage

market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"

Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012

(Doc. 37-25)("Position Paper")).  The analysis states: "'Due to a number of factors including **the**

**unexpected collapse of a major hedge fund in Europe** the mortgage market gapped

significantly wider. . . [.]  No one in the market could have foreseen the sudden decline in

mortgage valuations.'"   Complaint ¶ 103, at 30 (quoting Position Paper at 2)(emphasis in

Complaint).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.  See Complaint at 1.  The SEC

alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934,

15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for

fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in

violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the

Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of

§ 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification

in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-

2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in

violation of § 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and rules 12b-20, 17 C.F.R.

§ 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings

under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

The Court granted in part and denied in part the SEC's and the Defendants' motions to dismiss on July 8, 2013.   See SEC v. Goldstone, 952 F. Supp. 2d 1060 (D.N.M. 2013)(Browning, J.).  The Motion to Dismiss Opinion dismissed the SEC's claims: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's outside auditor that Thornburg Mortgage successfully met its margin calls without violating its lending agreements, and did not sell assets to meet margin calls"; and (ii) "that the Defendants schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-K."  SEC v. Goldstone, 952 F. Supp. 2d at 1076.   It declined to dismiss the SEC's claim that "the representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was materially false or misleading."  SEC v. Goldstone, 952 F. Supp. 2d at 1076-77.  The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are primarily liable or liable as control persons for that misrepresentation in the 10-K, and the Court will not dismiss the SEC's allegations that the Defendants aided and abetted the misrepresentation, as the Court has determined that the SEC sufficiently alleged that Goldstone and Simmons made, and the Defendants provided substantial assistance to, the misrepresentation with knowledge of or recklessness to its falsity.   Similarly, the Court will not dismiss the SEC's allegations that the Defendants misled Thornburg Mortgage's auditor before the 2007 Form 10-K was filed through the statement that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market.

SEC v. Goldstone, 952 F. Supp. 2d at 1077.  The Court also allowed certain claims against

Goldstone and Simmons to proceed.  See SEC v. Goldstone, 952 F. Supp. 2d at 1077.  These claims include the SEC's allegations that: (i) the Defendants failed to disclose to KPMG before they filed the 2007 Form 10-K that a European hedge fund's collapse would negatively affect Thornburg Mortgage's financial condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's financial condition after filing the 2007 Form 10-K; (iii) the Defendants materially misled KPMG by not providing correspondence showing that Thornburg Mortgage experienced an event of default in the two weeks before the 2007 Form 10-K filing; and (iv) Simmons misrepresented that unexpected events had an unexpected financial impact on Thornburg Mortgage after the 2007 Form 10-K filing.  See SEC v. Goldstone, 952 F. Supp. 2d at 1077.

The Court later denied the Defendants' and the SEC's motions for summary judgment. See SEC v. Goldstone, No. Civ. 12-0257 JB/GBW, 2015 WL 5138242, at *1 (D.N.M. Aug. 22, 2015)(Browning, J.).  The Court first explained that it would apply an "actual-disbelief" standard to determine "whether a person subjectively disbelieved the truth of an opinion statement."  SEC v. Goldstone, 2015 WL 5138242, at *1.  The Court then concluded that genuine issues of material fact for the jury existed on the SEC's claims that: (i) the Defendants made objectively false statements; (ii) the statements were material; (iii) the Defendants believed that their statements were false when they made them; and (iv) the Defendants made statements that were false or misleading because of omitted information.  See SEC v. Goldstone, 2015 WL 5138242, at *1.  The Court thus declined to grant summary judgment for any party on any issue.  See SEC v. Goldstone, 2015 WL 5138242, at *1.

Starrett reached a settlement with the SEC on May 20, 2016.  See Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent"). The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include

a requirement that Starrett testify for any of the remaining parties.  Starrett Consent at 1.

Ten claims were tried to a jury.  These included the claims that the SEC alleged in its Complaint, see Complaint ¶¶ 106-43, at 31-39, excepting the SEC's claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b).  See Pretrial Order at 3-4, filed May 11, 2016 (Doc. 448).[11]  The trial commenced on June 6, 2016.  See Transcript of Trial Proceeding at 1:13 (taken June 6, 2016)(Court)("Trial Tr.").[12]

On June 17, 2016, Goldstone and Simmons moved in open court under rule 50(a) of the Federal Rules of Civil Procedure for judgment as a matter of law and dismissal of the SEC's claims.  See Trial Tr. at 2862:10-12 (Lee).  The Court heard argument on the Defendants' rule 50(a) motion.  See Trial Tr. at 2862-2911.  The Court also invited further argument by the parties on the Defendant's rule 50(a) motion.  See Trial Tr. at 2911:16-24 (Court).  Goldstone and Simmons filed a notice of supporting argument.  See Defendants' Letter Supplementing Rule 50(a) Arguments, filed June 21, 2016 (Doc. 535); Defendants' Letter in Further Support of Rule

---

[11]The Motion to Dismiss Opinion and Summary Judgment Opinion did not dismiss the SEC's § 17(a) claim, but it did not appear in the Pretrial Order.  The parties also did not submit any jury instructions on this claim.  See Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463).  The parties' proposed verdict forms did not include a § 17(a) claim.  See Defendant Clay Simmons' First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489).  The Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."  Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002).  The Pretrial Order that the parties filed in this case, therefore, supersedes all prior pleadings, including the Complaint.  See Wilson v. Muckala, 303 F.3d at 1215 (citing C. Wright, A. Miller & M. Kane, 6A Fed. Prac. & Proc. Civ. § 1522 (2d ed. 1990)).

[12]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

50(a) Motion for a Judgment As a Matter of Law, filed June 21, 2016, (Doc. 546); SEC's Response to Defendants' Supplemental Rule 50(a) Arguments, filed June 21, 2016 (Doc. 548); SEC's Response to Defendants' Supplemental Rule 50(a) Arguments, filed June 22, 2016 (Doc. 551). The Court did not grant the Defendants' rule 50(a) motion and submitted the ten claims to the jury. See The Court's Final Verdict Form at 1-22, filed June 29, 2016 (Doc. 585)("Final Verdict Form").

The jury returned a partial verdict on June 29, 2016. See Trial Tr. at 4470:5-10 (Court, Valdez); Final Verdict Form at 1-22. The jury reached a unanimous verdict in favor of Goldstone and Simmons on five of the ten claims that were tried: (i) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1 ("Claim 4"); (ii) control-person violation for keeping false books and records under § 20(a) of the Exchange Act ("Claim 5"); (iii) false certification in violation of rule 13a-14 of the Exchange Act ("Claim 7"); (iv) control person liability for false SEC filings under §§ 13(a) and 20(a) of the Exchange Act and rules 12b-20 and 13a-1 ("Claim 9"); and (v) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1 ("Claim 10"). See Final Verdict Form at 8-11, 14-15 & 18-21. The jury, however, failed to reach a unanimous verdict on the five remaining claims against Goldstone and Simmons: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5 ("Claim 1"); (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t ("Claim 2"); (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5 ("Claim 3"); (iv) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2)("Claim 6"); and (v) deceit of auditors

in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2 ("Claim 8").   Final

Verdict Form at 1-7, 12-13 & 16-17.

     The jury made specific findings of fact in reaching a verdict in favor of Goldstone and

Simmons on Claim 4, Claim 5, and Claim 7.   See Final Verdict Form at 8-11, 14-15.   In reaching

a verdict on Claim 4, the jury found that the SEC did not prove, by a preponderance of the

evidence, "[t]hat Mr. Goldstone falsified a book, record, or account, which, in reasonable detail,

did not accurately and fairly reflect the transactions and dispositions of the assets of Thornburg,"

Final Verdict Form at 8; "[t]hat Mr. Goldstone directly or indirectly falsified or caused to be

falsified any book, record, or account of a public company," Final Verdict Form at 8; "[t]hat Mr.

Simmons falsified a book, record, or account, which, in reasonable detail, did not accurately and

fairly reflect the transactions and dispositions of the assets of Thornburg," Final Verdict Form at

9; or "[t]hat Mr. Simmons directly or indirectly falsified or caused to be falsified any book,

record, or account of a public company," Final Verdict Form at 9.   In reaching a verdict on

Claim 5, the jury found that the SEC did not prove, by a preponderance of the evidence, that

Thornburg Mortgage either "fail[ed] to make and keep books, records, and accounts, which, in

reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of

Thornburg [Mortgage]," Final Verdict Form at 10-11, or "fail[ed] to devise and maintain a

system of internal accounting controls sufficient to provide reasonable assurance that

transactions were recorded as necessary to permit preparation of financial statements in

conformity with generally accepted accounting principles," Final Verdict Form at 10-11.   With

respect to its verdict on Claim 5, the jury also specifically found that both Goldstone and

Simmons "acted in good faith and did not directly or indirectly induce the act or acts constituting

a violation of Section 13(b)(2)."   Final Verdict Form at 10-11.   Finally, in reaching a verdict on

Claim 7, the jury specifically found that the SEC did not prove, by a preponderance of the evidence, that Goldstone or Simmons filed or caused to be filed a false certification that Thornburg Mortgage's 2007 Form 10-K did not contain any untrue statement or omit a fact necessary to make the statements made, in light of the circumstance under which the statement was made. See Final Verdict Form at 14-15; Court's Final Jury Instructions at 55, filed June 24, 2016 (Doc. 573)("Jury Instructions").   The jury did not make any specific findings of fact in reaching its verdict in favor of Goldstone and Simmons on Claim 9 and Claim 10.   See Final Verdict Form at 19-21.

Further, the jury made specific factual findings on the Final Verdict Form with respect to Claim 6, despite not returning a verdict regarding that claim.   See Final Verdict Form at 12.   The jury unanimously found that Thornburg Mortgage did not violate Section 13(b)(2) of the Exchange Act by "failing to make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Thornburg." Final Verdict Form at 12-13.   The jury also unanimously found that, in providing substantial assistance to Thornburg Mortgage, Simmons did not act knowingly or recklessly.   See Final Verdict Form at 13.   After the jury handed the verdict form to the Court, the Court reviewed the verdict form before reading it; the Court noticed that the jury had been able to agree on some factual questions but not on liability.   The Court summoned the trial lawyers to the bench for a sidebar before reading the verdict form.   The Court asked the parties whether they preferred the Court to read the entire verdict form regarding Claim 6, including the jury's specific factual findings, or to state that the jury had been unable to reach a verdict and declare a mistrial on Claim 6.   See Trial Tr. at 4493:11-15 (Court).   The parties indicated their preference that the Court simply declare a mistrial without reading the entire verdict form as to Claim 6 -- in other

words, to not read the factual findings -- and further represented to the Court that they had reached an agreement that the jury's specific factual findings on a claim would not be binding where the jury had not returned a verdict on that claim.  See Trial Tr. at 4493:16-23 (McKenna, Lee).

The jury also made specific factual findings on the Final Verdict Form with respect to Claim 8, despite not returning a verdict on that claim.  See Final Verdict Form at 16.  After declaring a mistrial on Claim 8, the Court read the jury's answers to two subsidiary questions that the jury had unanimously answered on the verdict form.  See Trial Tr. at 4484:3-18 (Court). Regarding Claim 8, the jury found that Goldstone did not make or cause to be made "a materially false statement to an account."  Final Verdict Form at 16.  The jury also found, however, that Goldstone "omitted to state or caused another person to omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant."  Final Verdict Form at 16.

On June 29, 2016, the Court discharged the jury.  See Trial Tr. at 4496:7-8 (Court).  On July 27, 2016, twenty-eight days after the Court discharged the jury, Goldstone and Simmons timely filed the Renewed Motion for Judgment, seeking judgment on those claims the jury's verdict did not decide.  See Renewed Motion for Judgment.  On August 11, 2016, the Court entered judgment in favor of Goldstone and Simmons against the SEC on Claims 4, 5, 7, 9, and 10.  See Judgment at 1 (dated July 17, 2016), filed August 11, 2016 (Doc. 597).

**1.      The Defendants' Renewed Motion for Judgment as a Matter of Law.**

In their Renewed Motion for Judgment, the Defendants assert two principal arguments that the Court should enter judgment in their favor on the remaining five claims.  See Renewed Motion for Judgment at 1-11.  First, the Defendants argue that the jury's verdict on Claims 4, 5,

7, 9, and 10, together with the specific factual findings which the jury made in reaching its verdict on Claims 4, 5, and 7, requires dismissal of the majority of the SEC's remaining claims under the doctrines of collateral estoppel and law of the case.   See Renewed Motion for Judgment at 1-11.  Specifically, the Defendants argued that the jury's verdict and specific factual findings preclude and require dismissal of Claim 1, but only as it relates to fraud in the Form 10-K, and Claims 2, 3, 6, and 8.  See Renewed Motion for Judgment at 10-11.  Second, in their Renewed Motion for Judgment, the Defendants argue that the Court should enter judgment as a matter of law in their favor, because the SEC failed to introduce legally sufficient evidence at trial to support Claims 1, 2, 3, and 6.  See Renewed Motion for Judgment at 1-2, 11-25.

### 2. The SEC's Notice of Withdrawal.

On September 23, 2016, the SEC noticed a withdrawal of Claims 2, 3, and 6.  See Notice of Withdrawal of Certain Claims at 1, filed September 23, 2016 (Doc. 602)("Notice of Withdrawal").  The SEC also noticed that it would no longer pursue Claim 1 as that claim related to Thornburg Mortgage's 2007 Form 10-K.  See Notice of Withdrawal at 1.  Consequently, the SEC informed the Court that it would seek to prove at retrial only Claim 1, on the theory that Goldstone's statements on February 28, 2008, violated Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 thereunder, and Claim 8, on the theory that Goldstone and Simmons made misrepresentations and omissions to KPMG in violation of rule 13b2-2.   See Notice of Withdrawal at 1.

### 3. Two of the Defendants' Arguments for Judgment as a Matter of Law Remain Ripe for Decision.

The SEC's Notice of Withdrawal rendered moot many of the Defendants' arguments for judgment as a matter of law on Claims 1, 2, 3, and 6.  Two of the Defendants' arguments, however, remain ripe for decision: (i) that the jury's verdict and specific factual findings

preclude and require dismissal of Claim 8; and (ii) that the SEC did not introduce legally sufficient evidence for a reasonable jury to find that Goldstone committed securities fraud by making statements on CNBC the morning of February 28, 2008, or in an email to Thornburg Mortgage's Investor Relations group regarding "[k]ey message points" to convey.  See Renewed Motion for Judgment at 1, 7-11 & 16-20.

Regarding the Defendants' argument that the jury's findings preclude Claim 8, the Defendants assert that the SEC must prove that the Defendants made a material false statement to KPMG, either orally or in writing, or declined to state a material fact to KPMG that was necessary to render other statements made to KPMG not misleading.  See Renewed Motion for Judgment at 7-9, 11.  The Defendants then contend that, by necessary implication, the jury found that the Defendants did not make any such material false statement or omissions.  See Renewed Motion for Judgment at 7-9, 11.  In support of their contention, the Defendants point to the jury's specific factual findings regarding Claims 4 and 5 that the Defendants did not falsify or act unreasonably with any of Thornburg Mortgage's books and records, that the Defendants did not fail to make and keep accurate records, and that the Defendants acted in good faith in keeping Thornburg Mortgage's books and records.  See Renewed Motion for Judgment at 7-9, 11.

With respect to the Defendants' sufficiency-of-the-evidence argument, the Defendants assert that the SEC failed to introduce sufficient evidence to prove that Goldstone's statement on CNBC that "we have met all of our lending requirements" was false.  See Renewed Motion for Judgment at 1, 16-20.  The Defendants contend that the SEC failed to introduce evidence that Thornburg Mortgage was not in compliance with its lending requirements at the time that Goldstone made that statement on February 28, 2008.  See Renewed Motion for Judgment at 16-20.  The Defendants argue that, to satisfy its burden of proof, the SEC had to introduce evidence

showing what Thornburg Mortgage's lending requirements were at the time that Goldstone made statements on CNBC, including evidence of the reverse repurchase agreements governing the seven margin calls made on the morning of February 28, 2008, and that Thornburg Mortgage had not met those requirements at the time that Goldstone spoke.  <u>See</u> Renewed Motion for Judgment at 17.  The Defendants assert that the SEC did not introduce evidence of the terms of the agreements that governed the seven margin calls and, therefore, argue that the SEC presented insufficient evidence of Thornburg Mortgage's lending requirements and whether those requirements were satisfied at the time of Goldstone's CNBC statements.  <u>See</u> Renewed Motion for Judgment at 17-18.

The Defendants also argue that the evidence at trial is legally insufficient to support Goldstone's liability for the alleged statements that Thornburg Mortgage's Investor Relations group made.  <u>See</u> Renewed Motion for Judgment at 20-22.  The Defendants assert that the record does not contain any document or testimony showing specific statements that Investor Relations personnel made to particular investors.  <u>See</u> Renewed Motion for Judgment at 20.  The Defendants contend that Investor Relations made all its statements on the telephone, and those statements were neither recorded nor communicated over email or through other writing.  <u>See</u> Renewed Motion for Judgment at 20.  The Defendants also argue that the SEC failed to introduce any evidence that the statements made by Investor Relations personnel to Thornburg Mortgage's investors were either false or material.  <u>See</u> Renewed Motion for Judgment at 21.

The Defendants further contend that Goldstone was not a "maker" of the Investor Relations statements to Thornburg Mortgage investors and, therefore, that Goldstone cannot be liable for those statements.  <u>See</u> Renewed Motion for Judgment at 21 (citing <u>Janus Capital Grp., Inc. v. First Derivative Traders</u>, 564 U.S. 135, 141 (2011)).  In support of this contention, the

Defendants argue that trial testimony established that Goldstone did not approve the talking points which the Investor Relations group used.  See Renewed Motion for Judgment at 21 (citing Trial Tr. at 1206:18-24 (O'Leary); id. at 1218:21-1219:5 (O'Leary); id. at 1220:9-16 (O'Leary)). The Defendants emphasize that the Investor Relations group used Goldstone's early morning emails as guidance, but ultimately made its own decision about what to communicate to investors.  See Renewed Motion for Judgment at 22.  The Defendants, therefore, conclude that, because the Investor Relations group made its own decisions about what to communicate to Thornburg Mortgage investors, the evidence that the SEC presented at trial regarding Goldstone's early morning email to the group is insufficient to support liability for securities fraud under Claim 1.  See Renewed Motion for Judgment at 22.

### 4. **The SEC's Opposition to the Defendants' Renewed Motion for Judgment as a Matter of Law.**

The SEC opposes the portions of the Defendants' Renewed Motion for Judgment involving the claims that the SEC did not withdraw.  See Plaintiff's SEC's Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law at 1-18, filed October 7, 2016 (Doc. 604)("Opposition").  In its Opposition, the SEC contends that the jury's verdict does not preclude the jury's determination upon retrial whether the Defendants made false or misleading statements or omissions to KPMG.  See Opposition at 8.  The SEC advances several arguments in support of that contention.  See Opposition at 1-18

First, the SEC adverts to the jury's specific factual finding on the Final Verdict Form with respect to Claim 8.  See Opposition at 8.  Although the jury did not return a verdict on Claim 8, the jury answered "yes" to the question whether Goldstone "'omitted to state or caused to state any material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading, to an accountant?'"  Opposition at 8

(quoting Final Verdict Form at 16).  The SEC concedes that the parties agreed that this finding is not binding.  See Opposition at 8; Trial Tr. at 4493:16-23 (McKenna, Lee).  Nevertheless, in its Opposition, the SEC argues that the jury's specific finding "refutes Defendants' claim that the jury reached the opposite conclusion . . . ."  Opposition at 8.

Second, attending closely to the factual findings that the jury made on Claims 4 and 5, and to the jury instructions which the Court made with respect to Claim 8, the SEC argues that the jury's verdict does not necessarily imply that the Defendants did not make false or misleading statements or omissions to KPMG.  See Opposition at 9.  The SEC notes that the Court instructed the jury that, to find that the Defendants violated rule 13b2-2, the jury had to find that the "Defendants 'made or caused to be made a false or *misleading* material statement to an accountant . . . .'"  Opposition at 9 (quoting the Court's Final Jury Instructions (Given), Instruction No. 35, at 46, filed June 24, 2016 (Doc. 574)("Final Jury Instructions (Given)"))(emphasis in original).  The SEC also points to the Court's jury instruction "that Rule 13b2-2 'places an *affirmative obligation* on officers and managers to disclose material facts that are necessary to prevent statements from being misleading.'"  Opposition at 9 (quoting Final Jury Instructions (Given), Instruction No. 34, at 45)(emphasis in original).  Additionally, the SEC adverts to the Court's jury instruction that "'Rule 13b2-2 is violated as soon as an officer makes a material misstatement or omits to state a material fact that makes a prior statement misleading.'"  Opposition at 9 (quoting Final Jury Instructions (Given), Instruction No. 34, at 45).  The SEC accordingly argues that, while the jury found that Thornburg Mortgage's records were not false or falsified, in finding for the Defendants on Claims 4 and 5, the jury did not necessarily reach a conclusion about: (i) whether those records were misleading, which the SEC underscored as an adequate basis for liability under rule 13b2-2, see Opposition at 9;

(ii) "whether the Defendants satisfied their affirmative obligation to disclose information to their auditors," Opposition at 9; or (iii) whether a record that was later corrected so as not to be "falsified" was, nevertheless, originally false, Opposition at 10.  Additionally, the SEC argues that the jury's findings regarding Claims 4 and 5 provide no basis to conclude either that the jury unanimously agreed that there were no false records or that the jury's finding that the Defendants acted in "good faith" necessarily entails a finding that the Defendants did not violate rule 13b2-2. Opposition at 10.  The SEC further emphasizes that Claims 4 and 5 addressed only whether a book, record, or account has been falsified.  See Opposition at 10.  In making factual findings regarding these Claims 4 and 5, according to the SEC, the jury did not necessarily make any finding "about the truth or falsity of oral communications made to KPMG or material withheld from KPMG, both of which support liability under Rule 13b2-2."  Opposition at 11.

Third, the SEC contends that, as a legal matter, collateral estoppel demands an evaluation of the elements of the claims on which a jury reached a verdict, and not on subsidiary factual findings made by a jury established by a verdict form.  See Opposition at 11-14.  The SEC emphasizes that the Court included the jury's specific factual findings in the verdict form "'as an indication for [counsel] and for the Court, and also for the Tenth Circuit as to what the jury thought.'"  Opposition at 11 (alteration in original)(quoting Trial Tr. at 4471:22-25).   The SEC accordingly maintains that the jury's specific findings are not binding and, hence, cannot support the Defendant's collateral estoppel argument.  See Opposition at 11.  Looking exclusively to the jury's verdicts regarding Claims 4 and 5, the SEC argues that those verdicts are not preclusive of the factual issues underlying Claim 8.  See Opposition at 12-13.

The SEC also opposes the Defendants' assertions that the SEC presented inadequate evidence related to Goldstone's February 28, 2008, statements on CNBC and through Thornburg

Mortgage's Investor Relations group.  See Opposition at 1.  The SEC notes that the Court has previously and painstakingly considered sufficiency-of-the-evidence arguments in the Defendants' motion to dismiss, motion for summary judgment, and motion for judgment as a matter of law.  See Opposition at 3.  The SEC argues that the Court should reject the Defendants' sufficiency-of-the-evidence arguments they make in their Renewed Motion for Judgment.  See Opposition at 3.

Responding to the Defendants' argument that the SEC failed to introduce sufficient evidence regarding Thornburg Mortgage's lending requirements at the time of Goldstone's February 28, 2008, CNBC statements, the SEC points to three Thornburg Mortgage's reverse repurchase agreements that the Court admitted at trial.  See Opposition at 4 (citing Citigroup Global Markets, Inc. and Thornburg Mortgage Inc., ISLA Global Master Securities Lending Agreement (dated Aug. 20, 2007)("Trial Ex. 10"); Master Repurchase Agreement between Greenwich Capital Markets, Inc. and Thornburg Mortgage, Inc. (dated Sept. 14, 2007)("Trial Ex. 225"); Master Repurchase Agreement between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation (dated Sept. 20, 1997)("Trial Ex. 226").  The SEC contends that myriad other evidence introduced at trial demonstrates that the applicable reverse repurchase agreements required that the margin calls which Thornburg Mortgage received on the morning of February 28, 2008, were to be paid that day.  See Opposition at 4.  The SEC asserts that this evidence is sufficient to establish Thornburg Mortgage's lending requirements at the time Goldstone made the CNBC statements and further argues that there is no requirement that each trade agreement be introduced into evidence.  See Opposition at 4-5.

The SEC also contests the Defendants' argument that there is no evidence that Thornburg Mortgage had not met its lending requirements when Goldstone spoke on CNBC.  See

Opposition at 5.  According to the SEC, Goldstone conceded at trial that, among the $158.7 million in margin calls which Thornburg Mortgage received on the morning of February 28, 2008, Thornburg Mortgage "didn't have enough cash available to meet" JP Morgan's twenty-five million dollar margin call, and, as a result, JP Morgan declared Thornburg Mortgage in default that afternoon or evening.  Opposition at 5 (quoting Trial Tr. at 2821:1-7 (Goldstone)).  The SEC thereby concludes that Goldstone's statement made on CNBC that all lending requirements were met was false and misleading.  See Opposition at 5-6.

Turning to Goldstone's morning email to the Investor Relations group, the SEC contests the Defendants' contention that the SEC introduced no document or testimony showing what particular statements the Investor Relations group members made to any particular investor.  See Opposition at 6.  The SEC specifically points to Goldstone's trial testimony that the message points he sent to Investor Relations personnel were consistent with the messages that group reinforced in the market.  See Opposition at 6 (citing Trial Tr. at 2828:1-19 (O'Leary)).  The SEC also argues that the statement which Goldstone directed the Investor Relations group to communicate -- namely, "All margin calls were met.  Lenders are fine . . ." -- was false for the same reasons that Goldstone's CNBC statement is false.  See Opposition at 6-7 (quoting Email from Larry Goldstone to Amy Pell, Suzanne O'Leary Lopez, Allison Yates, re: Stock Price (dated Feb. 28, 2008)(Trial Ex. 152)("Feb. 28 Goldstone Email re: Stock Price").  Last, the SEC argues that sufficient evidence was introduced to support a conclusion that Goldstone was the maker of the Investor Relations' statements, pointing to evidence which establishes that Goldstone was Thornburg Mortgage's CEO and that Investor Relations was under his control.  See Opposition at 7 (citing Trial Tr. at 1180:19-25 (O'Leary); id. at 2814:1-6 (Goldstone)).

Finally, the SEC argues that, even if there is insufficient evidence to establish that

Goldstone's statements at issue were false, ample evidence was introduced to establish that those statements were misleading.  See Opposition at 7.  The SEC asserts that Goldstone's statement that Thornburg Mortgage had met all of its lending requirements was misleading "when margin calls had been received, those margin calls were due that day, and there was not enough money to pay them."  Opposition at 7.

5.   **The Defendants' Reply in Support of Its Renewed Motion for Judgment as a Matter of Law.**

The Defendants replied to the SEC's Opposition.  See Defendants' Reply in Support of Its Renewed Motion for Judgment as a Matter of Law, filed October 21, 2016, (Doc. 605)("Reply").   In their Reply, the Defendants assert that any retrial of Claim 8, the auditor deception claim, might result in an inconsistent verdict, because the first jury "already determined that Thornburg did not keep false books and records and that the Form 10-K was not false."   Reply at 1.   Regarding their argument that the Court is collaterally estopped from presiding over a retrial of Claim 8, the Defendants restate that "the question before the Court is whether the auditor deception claim has been resolved by 'necessary implication' of the first jury verdict."   Reply at 1 (quoting Copar Pumice Co. v. Morris, No. CIV 07-0079 JB/ACT, 2009 WL 5201799, at *10 (D.N.M. Oct. 23, 2009)(Browning, J.), aff'd 639 F.3d 1025 (10th Cir. 2011)). The Defendants emphasize that there is no legal requirement for the Court to consider the "seriousness" of claims to determine if a jury's finding regarding one claim is preclusive of retrial on another claim.  Reply at 3.  The Defendants rather stress that factual determinations that are necessarily implied by a jury's verdict preclude relitigation of the same issues of fact. See Reply at 3.  The Defendants also contend that, as a matter of law, the Court may consider jury responses to special interrogatories on the final verdict form when determining collateral estoppel of factual issues on retrial.  See Reply at 3 (internal citations omitted).

- 31 -

The Defendants also disregard the jury's answer "yes" to the special interrogatory on Claim 8 whether Goldstone "'omitted to state or caused to state any material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading, to an accountant?'" Final Verdict Form at 16. See Reply at 5. The Defendants argue that, because the jurors did not return a verdict on Claim 8, this factual finding is not binding. See Reply at 5. The Defendants reassert the argument that they made in their Renewed Motion for Judgment that both the jury's answers to the special interrogatories on Claims 4 and 5, combined with the jury's verdict on those claims, are preclusive of the facts at issue in Claim 8. See Reply at 4, 5-7; Defendants' Summary of Rule 13b2-2 Allegations in the SEC's Closing Arguments and Jury Findings That Dispose of These Allegations at 1-7, filed Oct. 21, 2016 (Doc. 605-1)("Defendants' Reply Ex. A.").

The Defendants also reply to the SEC's opposition to the Defendants' arguments that insufficient evidence was introduced at trial regarding Goldstone's statements to CNBC or his email to Investor Relations to support liability for securities fraud in violation of rule 10b-5. See Reply at 1-2, 8-12. In reply to the SEC's reference to the litigation of similar sufficiency-of-the-evidence issues at previous procedural junctures, the Defendants contend that their Renewed Motion for Judgment is a distinct challenge brought under rule 50 of the Federal Rules of Civil Procedure, and, therefore, its sufficiency challenge must be evaluated by the evidence presented to the jury at trial. See Reply at 2. The Defendants then reassert that the SEC did not introduce sufficient evidence at trial of Thornburg Mortgage's lending requirements on February 28, 2008, for a reasonable jury to find that Goldstone made false or misleading statements at the time he appeared on CNBC. See Reply at 9. The Defendants argue that, because the SEC failed to ask Goldstone at trial to what "lending requirements" he was referring during his CNBC statement,

the SEC's assertion that lending requirements must mean margin calls is speculative and lacks sufficient evidentiary support.  Reply at 9-10.  The Defendants also parse a margin call from a lending requirement, arguing that a lending requirement does equate to a margin call, but rather means that a margin call must be met by a contractual or negotiated deadline. See Reply at 10. With that distinction in hand, the Defendants argue that the SEC did not introduce sufficient evidence to establish that Goldstone made a false or misleading statement at the time he spoke on CNBC.  See Reply at 10.  Separately, the Defendants advert to evidence introduced at trial that lenders could modify margin calls or that "lenders regularly allowed for payments over time" and, therefore, argue that there is not substantial evidence from which a reasonable jury could conclude that Thornburg Mortgage's lending requirements "had or had not been met" on February 28, 2008.  Reply at 10.  The Defendants also point to other general statements about the market that Goldstone made during the CNBC interview and argue that, in the light of those statements, no reasonable jury can conclude that Goldstone's statement that Thornburg Mortgage had met its lending requirements was intentionally misleading.  See Reply at 10-11.

In their Reply, the Defendants also maintain their argument that no reasonable jury can find Goldstone liable for securities fraud based on statements which he made in a February 28, 2008, email to the Thornburg Mortgage Investor Relations group.  See Reply at 11-12.  The Defendants reassert that the SEC did not introduce at trial any evidence of the specific statements that members of the Investor Relations group made to specific investors on February 28, 2008. See Reply at 11.  The Defendants, therefore, contend that the jury was presented with insufficient evidence to determine whether the statements made to investors were false or misleading.  See Reply at 12.

6.     **The Hearing on the Defendants' Renewed Motion for Judgment as a Matter of Law**.

The Court held a hearing on the Defendants' Renewed Motion for Judgment.  See Draft Transcript of Hearing at 3:12-13 (taken December 1, 2016)(Court)("Tr.").[13]  The Court began by expressing skepticism of the Defendants' sufficiency-of-the-evidence arguments and collateral estoppel arguments.  See Tr. at 6:1-9 (Court).

The Defendants began by addressing the collateral estoppel argument.  See Tr. at 6 (Tewksbury).  They proposed a "very broad definition" that books and records referenced in the special interrogatories in Claims 4 and 5, and noted that, at trial, the SEC relied on overlapping evidence to support the SEC's claims -- Claims 4 and 5 -- that the Defendants falsified books and records, and the SEC's claim that the Defendants deceived KPMG -- Claim 8.  Tr. at 6-7 (Tewksbury).  Accordingly, the Defendants suggested that, in light of how the SEC tried its case regarding Claims 4 and 5, the jury's verdict in the Defendants' favor on those claims precludes a retrial of Claim 8.  See Tr. at 7:17-23, 8:8-16 (Tewksbury).  The Court expressed skepticism of the Defendants' reliance on "how the SEC tried the case" for the Defendants' argument that the jury's verdicts preclude a retrial of Claim 8.  Tr. at 8:17-23.  The Defendants, while adverting to Defendants' Reply Ex. A, then rehearsed their view how the jury's factual findings regarding Thornburg Mortgage's books and records preclude retrial of the factual issues involved in the alleged false statements and omissions to KPMG.  See Tr. at 10:3-4 (Tewksbury).  In response to the Court's inquiry about the possible scope of the Defendants' collateral estoppel argument, the Defendants clarified that the argument relates only to Claim 8, auditor deception.  See Tr. at 12:16-18 (Tewksbury).  The Defendants maintained that "any verdict in favor of the auditor

---

[13]  The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

deception claim for the SEC . . . would contravene the jury's prior verdicts . . . except for maybe something that relates to oral statements that are not covered by books and records."  Tr. at 12:6-10 (Tewksbury).

The SEC responded by first reviewing the SEC's view of the outcome of the trial: (i) the jury did not find for the Defendants on the auditor deception claim; (ii) the jury did not make a specific finding that each and every document was correct; and (iii) the jury found that at least Goldstone omitted certain information from the auditors.  See Tr. at 13:12-24 (Kasper).  The SEC summarized its view that collateral estoppel requires "that the issue previously decided is identical with the one presented in the action in question."  See Tr. at 15:5-9, 24:1-10 (Kasper). The SEC then argued that whether Thornburg Mortgage's books and records had "a clean bill of health" is separate from whether the Defendants satisfied their obligations to their auditor, KPMG.  Tr. at 16:10-21.  The SEC also reiterated its view that the jury, given the Court's instructions, did not render a verdict that every Thornburg Mortgage document introduced at trial is free from a misleading material statement or omission.  See Tr. at 21:14-22:2 (Kasper).

The Defendants replied by directing the Court to Jury Instruction No. 30, relating to Claim 4.  See Tr. at 29:14-23 (Tewksbury)(citing Final Jury Instructions (Given) at 37-38).  The Court expressed its view of the instruction.   See Tr. at 30:6-16 (Court)("I think that sentence . . . [is] not . . . undercutting . . . the unanimity of theory.  It's simply saying that [the jury] could have found that Mr. Goldstone falsified one document for purposes of the claim against Mr. Goldstone, and Mr. Simmons falsified another document.").  The Court also noted that the jury instructions might inform the Court as to what the jury necessarily decided.  See Tr. at 30:19-25 (Court)("I'm going to have to go back and look very carefully at what we were telling the jury here, to make a determination as to what they said.  Because we're going to have

to make the determination as to whether it was necessarily decided.").  The Defendants then argued that, in light of the jury instructions relating to Claims 4 and 5, the jury found that none of Thornburg Mortgage's books or records were false or inaccurate, and, therefore, the jury found that the "going concern memo, the management rep letter, the liquidity reports," which were books and records under Claim 4, were neither false nor inaccurate.  Tr. at 31:2-17 (Tewksbury); id. at 36:21-37:25 (Tewksbury).  The Defendants also argued that the jury's answer to a specific interrogatory under Claim 8 that Goldstone omitted or caused another to omit a material fact necessary not to mislead KPMG is not binding, because the jury did not reach a verdict on Claim 8.  See Tr. at 39:12-24 (Tewksbury).  In response to the Court's inquiry concerning the bearing of the Seventh Amendment requirement that a second jury may not reexamine a fact, see Tr. at 40:17-20 (Court), the Defendants argued that the constitutional requirement also supports their motion for dismissal of Claim 8, see Tr. at 40:21-41:6 (Tewksbury).  Finally, prescinding from the jury's answers to the special interrogatories related to those claims, the Defendants argued that the jury's verdicts on Claims 4 and 5 alone preclude a retrial of Claim 8.  See Tr. at 41:22-42:9 (Tewksbury).

The SEC requested leave to comment, which the Court granted.  See Tr. at 42:15-17 (Kasper, Court).  The SEC opposed the Defendants' argument that the Court may consider the jury's answers to special interrogatories in Claims 4 and 5, but not in Claim 8, to determine whether the jury necessarily decided the factual issues in Claim 8.  See Tr. at 42:19-25, 46:2-22 (Kasper).  The Defendants responded that, whereas the jury delivered verdicts on Claims 4 and 5, the jury did not deliver a verdict on Claim 8.  See Tr. at 48:1-49:3 (Tewksbury).

The Defendants then turned to their sufficiency-of-the-evidence challenge to Claim 1. See Tr. at 50:10-12 (Tewksbury).  The SEC and the Defendants presented arguments that they

made in their respective briefing regarding the sufficiency of the evidence that Goldstone committed securities fraud on February 28, 2008, by making statements on CNBC.  See Tr. at 50:10-54:17 (Tewksbury); id. at 54:21-56:7 (Kasper); id. at 56:13-57:6 (Tewksbury).   The Defendants emphasized that the SEC did not introduce "the actual physical evidence to show what the lending requirements were for the jury to make the determination as to whether or not Mr. Goldstone mislead investors" by stating on CNBC that all lending requirements had been met.  Tr. at 57:2-6 (Tewksbury).  The SEC and the Defendants also presented arguments that they made in their respective briefing regarding the sufficiency of the evidence that Goldstone committed securities fraud on February 28, 2008, in his email to Thornburg Mortgage's Investor Relations group.  See Tr. at 57:8-62:3 (Tewksbury); id. at 62:7-63:10 (Kasper); id. at 63:13-64:14 (Tewksbury).

The Court indicated an inclination to deny the Defendants' Renewed Motion for Judgment, see Tr. at 66:7-8 (Court), and an intention to issue its decision before the pretrial conference, see Tr. at 80:13-14 (Court).

## LAW REGARDING JUDGMENT AS A MATTER OF LAW

Rule 50(a) of the Federal Rules of Civil Procedure provides for judgment as a matter of law.  The rule states:

(1) *In General.* If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

**(2)** *Motion.* A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

Fed. R. Civ. P. 50(a).

Judgment as a matter of law is proper where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). This standard for a directed verdict mirrors the standard for summary judgment. See Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986)(concluding "that this [Rule 56] standard mirrors the standard for directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.")(internal citation omitted); Wiles v. Michelin No. America, Inc., 173 F.3d 1297, 1303 (10th Cir. 1999)("We review the district court's ruling on a motion for JMOL under a standard that is essentially identical to the 'genuine issue' requirement in the summary judgment context.")(internal citation omitted). A court may grant judgment as a matter of law, however, even though it has denied summary judgment, because the parties have been able to address all relevant, available evidence. See Lee v. Glassing, 51 F. App'x 31, 32 (2d Cir. 2002).[14]

---

[14]Lee v. Glassing is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that Lee v. Glassing has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

In determining whether to grant judgment as a matter of law, a court may not weigh the evidence or make its own credibility determination, see Shaw v. AAA Eng'g. & Drafting, 213 F.3d 519, 529 (10th Cir. 2000), and must draw all reasonable inferences in favor of the nonmoving party, see Thompson v. State Farm Fire & Cas. Co., 34 F.3d 932, 941 (10th Cir. 1994).  Such a judgment is warranted if the evidence permits only one rational conclusion.  See Crumpacker v. Kan. Dep't of Human Res., 474 F.3d 747, 751 (10th Cir. 2007).  In other words, "'[t]he question is not whether there is literally no evidence supporting the [nonmoving] party . . . but whether there is evidence upon which the jury could properly find [for that party].'" Century 21 Real Estate Corp. v. Merj Int'l Inv. Corp., 315 F.3d 1271, 1278 (10th Cir. 2003)(alterations in original)(quoting Hurd v. Am. Hoist & Derrick Co., 734 F.2d 495, 499 (10th Cir. 1984)).

## LAW REGARDING RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

"Rule 50(b) . . . sets forth the procedural requirements for renewing a sufficiency of the evidence challenge after the jury verdict and entry of judgment."  Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc., 546 U.S. 394, 400 (2006).  The rule states:

> **Renewing the Motion After Trial; Alternative Motion for a New Trial.**  If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.  In ruling on the renewed motion, the court may:
>
> > **(1)** allow judgment on the verdict, if the jury returned a verdict;
> >
> > **(2)** order a new trial; or
> >
> > **(3)** direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).  Much like a rule 50(a) motion, "[a] renewed motion for judgment as a

matter of law under Rule 50(b) . . . must state the grounds on which it was made."  9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2537, at 604-05 (3d ed. 2008).

The standard for ruling on a rule 50(b) motion is similar to that for ruling on a rule 50(a) motion -- whether there is sufficient evidence upon which a reasonable jury could have arrived at the verdict that the jury returned.  See Wagner v. Live Nation Motor Sports, Inc., 586 F.3d 1237, 1244 (10th Cir. 2009)("A party is entitled to JMOL only if the court concludes that 'all of the evidence in the record . . . [reveals] no legally sufficient evidentiary basis for a claim under the controlling law.'")(quoting Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d 1260, 1269 (10th Cir. 2008)).  "In ruling on such a motion, the court should disregard any jury determination for which there is no legally sufficient evidentiary basis enabling a reasonable jury to make it." Fed. R. Civ. P. 50(b) advisory committee's note.  See Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d at 1269 ("A party is entitled to judgment as a matter of law 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.'")(quoting Tyler v. RE/MAX Mountain States, Inc., 232 F.3d 808, 812 (10th Cir. 2000).  The court must, however, draw all reasonable inferences in the non-moving party's favor. See Wagner v. Live Nation Motor Sports, Inc., 586 F.3d at 1244 ("[W]e . . . will reverse the district court's denial of the motion for JMOL 'if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.'")(quoting Hardeman v. City of Albuquerque, 377 F.3d 1106, 1112 (10th Cir. 2004)); Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d at 1269.  It is not the court's province to "weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury."  Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d at 1269.

A prerequisite to a rule 50(b) motion, implicit in its nature as a renewed motion for judgment as a matter of law, is that the moving party have made a rule 50(a) motion for judgment as a matter of law during trial and that the party raise in the rule 50(a) motion all issues it seeks to raise in the subsequent rule 50(b) motion.  See M.D. Mark, Inc. v. Kerr-McGee Corp., 565 F.3d 753, 762 (10th Cir. 2009)("Kerr-McGee did not assert these arguments in its Rule 50(a) motion at the close of Mark's case-in-chief, and is thus precluded from relying on them as a basis for Rule 50(b) relief."); Marshall v. Columbia Lea Reg'l Hosp., 474 F.3d 733, 738 (10th Cir. 2007)(noting that raising a particular defense in a "pre-verdict Rule 50(a) motion . . . is a prerequisite to a post-verdict motion under Rule 50(b)."); United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd., 210 F.3d 1207, 1229 (10th Cir. 2000)("[M]erely moving for directed verdict is not sufficient to preserve any and all issues that could have been, but were not raised in the directed verdict motion."); First Sec. Bank of Beaver v. Taylor, 964 F.2d 1053, 1057 (10th Cir. 1992)("[A] party is precluded from relying upon grounds in a [rule 50(b)] motion for judgment notwithstanding the verdict that were not previously raised in support of the [rule 50(a)] motion for a directed verdict.")(citing Karns v. Emerson Elec. Co., 817 F.2d 1452, 1455 n.2 (10th Cir. 1987)); 9B C. Wright & A. Miller, supra § 2537, at 603-04 ("[T]he district court only can grant the Rule 50(b) motion on the grounds advanced in the preverdict motion, because the former is conceived of as only a renewal of the latter."); 9B C. Wright & A. Miller, supra § 2537, at 603-04 ("[T]he case law makes it quite clear that the movant cannot assert a ground that was not included in the earlier motion.").  The Advisory Committee notes to the 1991 amendment state that "[a] post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."  Fed. R. Civ. P. 50 advisory committee's note (citing Kutner Buick, Inc. v. Am. Motors Corp., 848 F.2d 614 (3d Cir. 1989)).

Furthermore, "Rule 50(b) allows a motion for a new trial under Rule 59 to be joined in the alternative with a renewed motion for judgment as a matter of law; subdivisions (c) and (d) make elaborate provision for when the two motions are made in the alternative."  9B C. Wright & A. Miller, <u>supra</u>, § 2521, at 222.  The rule states: "[T]he movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  Even if no rule 50(a) motion was made and, therefore, the court cannot grant a rule 50(b) motion for judgment as a matter of law, the court is nevertheless permitted to entertain a rule 59 motion for a new trial on the basis that the verdict was based on a quantum of evidence that is insufficient as a matter of law.  <u>See</u> Fed. R. Civ. P. 59.  Professors Charles Wright and Arthur Miller state:

> [I]f the verdict winner's evidence was insufficient as a matter of law but no motion for judgment as a matter of law was made under Rule 50(a), even though the district court cannot grant judgment as a matter of law under Rule 50(b) for the party against whom the verdict is rendered, it can set aside the verdict and order a new trial.

9B C. Wright & A. Miller, <u>supra</u> § 2537, at 604.

## <u>LAW REGARDING RULE 59(a) MOTION FOR A NEW TRIAL</u>

"As a general rule, motions for a new trial should be granted when the trial court is firmly convinced that the jury has reached a plainly erroneous result or the verdict is a miscarriage of justice."  9 <u>Moore's Federal Practice</u> ¶ 50.06[6][a], at 50-37 (3d ed. 2016).  Regarding motions for a new trial, rule 59(a) provides:

**(a) In General.**

**(1) *Grounds for New Trial.*** The court may, on motion, grant a new trial on all or some of the issues -- and to any party -- as follows:

**(A)** after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or

> **(B)** after a nonjury trial, for any reason for which a rehearing has
> heretofore been granted in a suit in equity in federal court.

Fed. R. Civ. P. 59(a)(1).  "A motion for a new trial must be filed no later than 28 days after the entry of judgment."  Fed. R. Civ. P. 59(b).

"The applicable standard applied by the trial court in its exercise of discretion [in granting or denying a rule 59 motion] varies with the grounds for which relief is sought."  12 Moore's Federal Practice ¶ 59.13[1], at 59-39 (3d ed. 2016).  In Montgomery Ward & Co. v. Duncan, 311 U.S. 243 (1940), the Supreme Court of the United States provided a list of grounds for which party may move for a new trial:

> The motion for a new trial may invoke the discretion of the court in so far as it is
> bottomed on the claim that the verdict is against the weight of the evidence, that
> the damages are excessive, or that, for other reasons, the trial was not fair to the
> party moving; and may raise questions of law arising out of alleged substantial
> errors in admission or rejection of evidence or instructions to the jury.

311 U.S. at 251.  See United States v. Hess, 341 F.2d 444, 448 (10th Cir. 1965)("Insufficiency of the evidence is one of the common law grounds for directing a verdict or granting a motion for a new trial . . . .")(citing Montgomery Ward & Co. v. Duncan, 311 U.S.at 251).

"A Rule 59(a) motion for a new trial 'normally involves a review of the facts presented at trial, and thus involves the discretion of the trial court.'"  Elm Ridge Expl. Co., LLC v. Engle, 721 F.3d 1199, 1216 (10th Cir. 2013)(quoting Escue v. OK Coll., 450 F.3d 1146, 1157 (10th Cir. 2006)).  See 9 Moore's Federal Practice ¶ 50.06[6][b], at 50-38 (3d ed. 2016)("Trial courts have broad discretion to grant motions for new trial . . . .").  "In deciding a new trial motion based on insufficiency of the evidence, a district court must analyze whether the verdict 'is clearly, decidedly or overwhelmingly against the weight of the evidence.'"  Elm Ridge Expl. Co., LLC v. Engle, 721 F.3d at 1216 (quoting M.D. Mark, Inc. v. Kerr-McGee Corp., 565 F.3d at 762).  The United States Court of Appeals for the Tenth Circuit has stated that, when reviewing a rule 59

motion, "[t]he court considers the evidence in the light most favorable to the prevailing party."

Snyder v. City of Moab, 354 F.3d 1179, 1188 (10th Cir. 2003)(citing United Int'l Holdings, Inc.,

v. The Wharf (Holdings) Ltd., 210 F.3d 1207, 1227 (10th Cir. 2000)).  See Escue v. OK Coll.,

450 F.3d at 1156.[15]

---

[15] The Court notes that the Tenth Circuit's position regarding the standard for viewing the evidence when determining a rule 59 motion for new trial is in tension with the weight of modern authority.  See Rivera v. Rivera, 262 F. Supp. 2d 1217, 1230 (D. Kan. 2003)(O'Hara, M.J.)(citing Manus v. Am. Airlines, Inc., 314 F.3d 968, 973 (8th Cir. 2003)(concluding that trial court is entitled to interpret the evidence and judge the credibility of witnesses on a motion for a new trial); Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 634-35 (2d Cir. 2002)(concluding that district court is free to weigh the evidence on a motion for new trial and need not view the evidence in the light most favorable to the verdict winner), cert. denied, 536 U.S. 958 (2002); Mentor H/S, Inc. v. Med. Device Alliance, Inc., 244 F.3d 1365, 1374 (Fed. Cir. 2001)(concluding that district court may weigh the evidence and credibility of the witnesses on a motion for a new trial); Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 200 (4th Cir. 2000)(concluding that district court may weigh the evidence and consider the credibility of the witnesses on a motion for a new trial); Clay v. Ford Motor Co., 215 F.3d 663, 672 (6th Cir. 2000)(concluding that district court must compare and weigh evidence on a motion for a new trial); Whitehead v. Food Max of Miss., Inc., 163 F.3d 265, 270 (5th Cir. 1998)(concluding that district court may weigh the evidence in ruling on a motion for a new trial, and it need not view the evidence in the light most favorable to the verdict winner, as is required in passing on motions for judgment as a matter of law); Thomas v. Stalter, 20 F.3d 298, 304 (7th Cir. 1994)(concluding that district court may weigh the evidence and assess the witnesses' credibility in ruling on a motion for a new trial); Landes Constr. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir. 1987)(concluding that trial court may weigh the evidence and assess the credibility of witnesses on a motion for a new trial, and it need not view the evidence in the light most favorable to the prevailing party); Mayo v. Schooner Capital Corp., 825 F.2d 566, 569 (1st Cir. 1987)(concluding that district court may consider witnesses' credibility in ruling on a motion for a new trial)).  Moreover, a leading treatise explains that "a trial judge hearing a motion for a new trial is free to weigh the evidence and need not view it in the light most favorable to the verdict winner."  12 Moore's Federal Practice ¶ 50.06[6][b], at 50-38 (3d ed. 2016).  This rule is in contrast to rule 50, under which "courts may grant judgment as a matter of law only if there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmovant under controlling law and may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence."  12 Moore's Federal Practice ¶ 50.06[6][b], at 50-39 (3d ed. 2016).  Because rule 50 motions are often made in conjunction with rule 59 motions, it is significant to emphasize that the standards that a trial court applies to a renewed motion for judgment as a matter of law under rule 50 and a new trial motion differ.  See 12 Moore's Federal Practice ¶ 59.05[5], at 59-16.1 (3d ed. 2016).

**LAW REGARDING COLLATERAL ESTOPPEL OR ISSUE PRECLUSION**

"The doctrine of issue preclusion [also known as collateral estoppel] prevents a party that has lost the battle over an issue in one lawsuit from relitigating the same issue in another lawsuit." In re Corey, 583 F.3d 1249, 1251 (10th Cir. 2009). "Under federal law, issue preclusion attaches only when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." In re Corey, 583 F.3d at 1251 (quoting Arizona v. California, 530 U.S. 392, 414 (2000)(quoting Restatement (Second) of Judgments § 27, at 250 (1982)))(internal quotations and alterations omitted). See Restatement (Second) of Judgments § 27 ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."). "Issue preclusion not only promotes judicial efficiency and repose but also prevents the embarrassment resulting from inconsistent determinations of the same question." Butler v. Pollard, 800 F.2d 223, 225 (10th Cir. 1986)(citation omitted).

"Collateral estoppel, or issue preclusion, can be used either defensively or offensively." O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1084 (D.N.M. 2012)(Browning, J.). "In both the offensive and defensive use situations, the party against whom estoppel is asserted has litigated and lost in an earlier action." Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 329 (1979). Further, in either the offensive and defensive use situation, the party asserting issue preclusion bears the burden of proof. See Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1093 (10th Cir. 2003)(citing In re King, 103 F.3d 17, 19 (5th Cir. 1997)). The Tenth Circuit has made clear that four elements must be shown:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been fully adjudicated on the merits, (3) the

> party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1093 (quoting United States v. Botefuhr, 309 F.3d 1263, 1282 (10th Cir. 2002))(internal quotation marks omitted).  Regarding the fourth element, the Tenth Circuit has also said that collateral estoppel requires that "the role of the issue in the second action was foreseeable in the first action."  Butler v. Pollard, 800 F.2d at 225 (citation omitted).  "Only where the party invoking the doctrine shows that all the elements are met will collateral estoppel operate as a preclusive defense."  Stan Lee Media, Inc. v. Walt Disney Co., 774 F.3d 1292, 1297-98 (10th Cir. 2014).

"A prior issue has not been finally adjudicated on the merits unless the adjudication was necessary to the judgment."  Edwell v. Chase, No. CIV 05-34 JB/RHS, 2005 WL 3664804, at *4 (D.N.M. Dec. 7, 2005)(Browning, J.).  See Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation, 975 F.2d 683, 687 (10th Cir. 1992); Ins. Co. of N. Am. v. Norton, 716 F.2d 1112, 1115 (7th Cir. 1983)("It is axiomatic that a party will be precluded by collateral estoppel from relying on an argument only where the determination as to the argument relied on was essential to the judgment in a prior action.").  See also generally 18 C. Wright & A. Miller, supra § 4421, at 536-82 (reviewing "necessarily decided" as an element of issue preclusion).

A jury's finding of fact, necessarily made in reaching a general verdict on a claim, may preclude a determination of the same factual issue at a subsequent trial.  See Butler v. Pollard, 800 F.2d at 225 ("We find that issue preclusion is present . . . . By finding for the defendants in the general verdict, the jury, of necessity, concluded . . . that there was no trespass in this case."); Copar Pumice Co. v. Morris, 2009 WL 5201799, at *10 ("The United States Court of Appeals for the Tenth Circuit has applied the doctrine of issue preclusion in holding that a jury's verdict

binds the trial court where the jury determined factual issues that are common to the claims . . . [presented to] the court.")(citing AG Servs. of Am., Inc. v. Nielsen, 231 F.3d 726, 731-32 (10th Cir. 2000)).  See also Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc., 106 F.3d 894, 901 (9th Cir. 1997)("Similar to traditional issue preclusion analysis, the district court in this case merely drew inferences from the verdicts to determine the issues that the presumptively rational jurors must have determined, and then used those implicit findings of fact as the basis for judgment as to certain issues."); Chew v. Gates, 27 F.3d 1432, 1438 (9th Cir. 1994)("Where the prior judgment was based on a general verdict, the inquiry is whether rational jurors must necessarily have determined the issue as to which estoppel is sought.")(citations omitted).

When determining whether a jury's verdict precludes an issue of fact at a subsequent trial, courts are to "examine the possible inferences from the verdict against" the issue of fact for which preclusion is sought.  AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 731-32.  "The true test is whether the jury verdict by necessary implication reflects the resolution of a common factual issue."  AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 732.  "If so, the district court may not ignore that determination . . . ."  AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 732.  See also Copar Pumice Co. v. Morris, 2009 WL 5201799, at *10 ("The Court is bound by both the actual findings of the jury and those that were necessarily implicit in its verdict . . . .").

## LAW REGARDING THE SEVENTH AMENDMENT'S RE-EXAMINATION CLAUSE

The Seventh Amendment to the Constitution of the United States of America governs proceedings in federal court.  The Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than

according to the rules of the common law."  U.S. Const. amend. VII.  The right to a jury trial is deeply ingrained in the American judicial system.  Jury trials are guaranteed by the Seventh Amendment and by rule 38, which provides that "[t]he right of trial by jury as declared by the Seventh Amendment to the Constitution -- or as provided by a federal statute -- is preserved to the parties inviolate."  Fed. R. Civ. P. 38(a).  Under to the Seventh Amendment, however, the right to the jury trial is not immune from the authority of a federal trial court "according to the rules of the common law."  U.S. Const., amend. VII.

"In keeping with the historic understanding, the 're-examination' Clause does not inhibit the authority of trial judges to grant new trials 'for any of the reasons for which new trials have been heretofore been granted in actions at law in the courts of the United States.'"  Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 432-33 (1996)(quoting Fed. R. Civ. P. 59(a)).  As the Supreme Court has recognized, "[t]hat authority is large."  Gasperini v. Ctr. for Humanities, Inc., 518 U.S. at 433 (citing 6A Moore's Federal Practice ¶ 59.05[2], at 59-44 to 59-46 (2d ed. 1996)("The power of the English common law trial courts to grant a new trial for a variety of reasons with a view to the attainment of justice was well established prior to the establishment of our Government."); Aetna Cas. & Sur. Co. v. Yeatts, 122 F.2d 350, 353 (4th Cir. 1941)("The exercise of [the trial court's power to set aside the jury's verdict and grant a new trial] is not in derogation of the right of trial by jury but is one of the historic safeguards of that right.")(alterations in original)).  Without abridging the "re-examination" Clause, a trial court's "discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)."  Gasperini v. Ctr. for Humanities, Inc., 518 U.S. at 433.

Moreover, a trial court may grant entry of judgment under rule 50(b), where appropriate,

without offending the Seventh Amendment's "re-examination" Clause.    Moore's Federal

Practice explains,

> The Rules [50(a) and 50(b)] get around this Seventh Amendment violation by
> structuring the post-verdict motion for judgment as a matter of law as a renewal of
> the Rule 50(a) motion for judgment.  The motion for judgment as a matter of law
> is beyond constitutional challenge (as long as the court properly applies the
> standards) since it has a long history in the common law, and since it does not
> involve 're-examination' of a jury verdict.  Under Rule 50, the court's decision on
> the initial motion is automatically reserved if the motion is not granted before
> submission of the case to the jury; the subsequent motion for judgment as a matter
> of law is thereby transformed into a renewal of the earlier motion, and the court is
> not technically setting aside the jury's verdict but is in essence withdrawing the
> case from the jury's consideration.

8 Moore's Federal Practice ¶ 38.12[2][c][i] at 38-46 (3d ed. 2016)(citing Baltimore & Carolina

Line Inc. v. Redman, 295 U.S. 654, 659-61 (1935)).  Moore's Federal Practice also explains,

> The [Seventh Amendment's] provision prohibiting re-examination does not
> prevent the trial judge from entering a judgment as a matter of law (formerly a
> judgment notwithstanding the verdict or j.n.o.v.), in accordance with Rule 50(b),
> or setting aside the verdict as against the weight of the evidence and granting a
> new trial under Rule 59.

8 Moore's Federal Practice ¶ 38.03[3][b][ii] at 38-25 (3d ed. 2016).

According to the Seventh Amendment, "the rules of the common law" permit a "Court of

the United States" to reexamine a "fact tried by a jury," U.S. Const. amend. VII, and, according

to the Supreme Court in Gasperini v. Center for Humanities, Inc., 319 U.S. 372, and Parklane

Hosiery Co. v. Shore, 439 U.S. 322, the Seventh Amendment's meaning, including its reference

to "the rules of the common law," was not fixed at 1791, U.S. Const. amend. VII.  See Gasperini

v. Ctr. for Humanities, Inc., 518 U.S. at 436 n.20; Galloway v. United States, 319 U.S. 372, 390

(1942).  "[M]any procedural devices developed since 1791 that have diminished the civil jury's

historic domain have been found not to be inconsistent with the Seventh Amendment."  Parklane

Hosiery Co. v. Shore, 439 U.S. 322, 336 (1978)(citing Galloway v. United States, 319 U.S. at

388-93 (holding that directed verdict does not violate the Seventh Amendment); <u>Gasoline Prods.</u> <u>Co. v.  Champlin Ref. Co.</u>, 283 U.S. 494, 497-98 (1930)(holding that retrial limited to question of damages does not violate the Seventh Amendment even though there was no practice at common law for setting aside a verdict in part); <u>Fidelity & Deposit Co. v. United States</u>, 187 U.S. 315, 319-21 (1902)(holding that summary judgment does not violate the Seventh Amendment)).[16]  Additional procedures that the Supreme Court has regarded as compatible with the Seventh Amendment, which were "not in conformity with practice at common law when the Amendment was adopted, include . . . Federal Rule of Civil Procedure 50(b)'s motion for judgment as a matter of law," <u>Gasperini v. Ctr. for Humanities, Inc.</u>, 518 U.S. at 436 n.20 (citations omitted), and the offensive use of the collateral estoppel doctrine, <u>see Parklane Hosiery</u> <u>Co. v. Shore</u>, 439 U.S. at 333-37.  In sum, "a party has a right to a jury trial in an action at law, but not to a jury verdict."   8 <u>Moore's Federal Practice</u> ¶ 38.12[2][c][i] at 38-46 (3d ed. 2016)(citing <u>Newell Cos., Inc. v. Kenney Mfg. Co.</u>, 864 F.2d 757, 763 (Fed. Cir. 1988)).  "The verdict need not be obtained, and may be set aside under common law principles incorporated into the Constitution when there is no fact issue for the jury to decide."  8 <u>Moore's Federal</u> <u>Practice</u> ¶ 38.12[2][c][i] at 38-46 (3d ed. 2016)(citing <u>Newell Cos., Inc. v. Kenney Mfg. Co.</u>, 864 F.2d at 763).

When describing the rationale of the holdings diminishing the role of the civil jury as consistent with the Seventh Amendment, the Supreme Court has said and reiterated:

"The Amendment did not bind the federal courts to the exact procedural incidents or details of jury trial according to the common law in 1791, any more than it tied

---

[16]The Court notes that the Supreme Court has significantly limited the jury's role so that its modern role is not nearly as robust as it was at the time of the Founding.  <u>See generally</u> <u>United States v. Courtney</u>, 960 F. Supp. 2d 1152, 1163-74 (D.N.M. 2013)(Browning, J.)(discussing the history and evolution of the jury's role from the time of the Founding to modern day).

them to the common-law system of pleading or the specific rules of evidence then prevailing.  Nor were 'the rules of common law' then prevalent, including those relating to the procedure by which the judge regulated the jury's role on questions of fact, crystallized in a fixed and immutable system . . . . The more logical conclusion, we think, and the one which both history and the previous decisions here support, is that the Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even then so widely among common-law jurisdictions."

Parklane Hosiery Co. v. Shore, 439 U.S. at 336-37 (quoting Galloway v. United States, 319 U.S.

at 390, 392)(footnote omitted in original).

## LAW REGARDING RULE 10B-5 LIABILITY

### 1.     The Elements of a Rule 10b-5 Claim and Misleading Statements.

During the early days of the New Deal, Congress enacted two landmark statutes regulating securities.  The 1933 Act was described as an Act to provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof, and for other purposes.  The Securities Exchange Act of 1934 was described as an Act to provide for the regulation of securities exchanges and of over-the-counter markets operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges and markets, and for other purposes.

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 727-28 (1975).

The Exchange Act "is primarily known for prohibiting fraud in connection with the

purchase or sale of securities."  In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d 1165,

1186 (D.N.M. 2010)(Browning, J.).  "In § 10(b) [of the Exchange Act], Congress prohibited

manipulative or deceptive acts in connection with the purchase or sale of securities."  Cent. Bank

of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 173 (1994).  "In 1942,

acting under the authority granted to it by § 10(b) of the 1934 [Exchange] Act, the [Securities

and Exchange] Commission promulgated Rule 10b-5."  Blue Chip Stamps v. Manor Drug Stores,

421 U.S. at 729.  Rule 10b-5(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(b).

> To state a claim under Rule 10b-5 for securities fraud . . . a plaintiff's complaint must contain allegations addressing the following five elements: (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1095 (citing Grossman v. Novell, Inc., 120 F.3d 1112, 1118 (10th Cir. 1997)).  Regarding a rule 10b-5 claim's first element -- namely, a false or misleading statement or omission of material fact -- § 10(b) and rule 10b-5 prohibit conduct that "'irreducibly entails some act that gives the victim a false impression.'"  SEC v. Dorozhko, 574 F.3d 42, 50 (2d Cir. 2009)(quoting United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008)).

## 2.    Makers of Misleading Statements at Issue in Rule 10b-5 Claims.

"For the purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 142 (emphasis added).  See id. at 144 (holding "that the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it").  Absent control, a person or entity cannot "'make' a statement in its own right."  Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 142.  "One who prepares or publishes a statement on behalf of another is not its maker."  Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 142.  For a defendant

to be "maker" of a false or misleading statement alleged to establish rule 10b-5 liability, the defendant must "actually exercise[] control over the content" of the statements at issue. Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 427 (7th Cir. 2015)(emphasis in original)(citing Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 144-147). Moreover, "nothing in Janus precludes a single statement from having multiple makers." Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d at 427 (citing In re Pfizer Inc. Sec. Litig., 936 F. Supp. 2d 252, 268-69 (S.D.N.Y. 2013)(Swain, J.); City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012)(Rakoff, J.); City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011)(Koeltl, J.)).

## ANALYSIS

The Court denies the Defendants' Renewed Motion for Judgment.  The jury's verdict does not require dismissal of the SEC's Rule 13b2-2(a) claim -- i.e., Claim 8 -- because the jury's factual findings do not necessarily imply that Goldstone or Simmons did not make misrepresentations or omissions to KPMG.  Further, when viewed in the light most favorable to the SEC, the SEC presented evidence by which a reasonable jury could find that Goldstone knowingly or recklessly made a false statement on February 28, 2008, in violation of Section 10(B) of the Exchange Act and rule 10b-5.

## I.     THE DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE SEC'S RULE 13B2-2(A) CLAIM.

The Defendants argue that the Court should dismiss Claim 8 -- the SEC's rule 13b2-2(a) claim -- as a matter of law, because the jury's verdict collaterally estops that claim, see Renewed Motion for Judgment at 5-11; Reply at 1-8; Defendants' Reply Ex. A. at 1-7, and because the Seventh Amendment requires that it not be resubmitted to a jury, see Tr. at 40:21-41:6

(Tewksbury).  Neither the doctrine of issue preclusion nor the Seventh Amendment counsels that the Court may not submit Claim 8 to a jury on retrial or that, regarding Claim 8, the Defendants are entitled to judgment as a matter of law.

### A.    THE JURY'S VERDICT DOES NOT ISSUE PRECLUDE THE SEC'S RULE 13B2-2(A) CLAIM.

The jury's verdict does not preclude the issues of fact arising from Claim 8 -- the SEC's rule 13b2-2 claim.  For a party to establish issue preclusion, four elements must be shown:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been fully adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1093 (quoting United States v. Botefuhr, 309 F.3d 1263, 1282 (10th Cir. 2002))(internal quotation marks omitted).  A jury's finding of fact, necessarily made in reaching a general verdict on a claim, may preclude a determination of the same factual issue at a subsequent trial, even where the subsequent trial is a part of the same case.  See AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 729-31; Butler v. Pollard, 800 F.2d at 225.  See also Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc., 106 F.3d at 901; Chew v. Gates, 27 F.3d at 1438;  Copar Pumice Co. v. Morris, 2009 WL 5201799, at *10.  To determine whether a jury's verdict precludes an issue of fact at a subsequent trial, courts are to "examine the possible inferences from the verdict against" the issue of fact for which preclusion is sought.  AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 731-32.  "The true test is whether the jury verdict by necessary implication reflects the resolution of a common factual issue."  AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 732.  See Chew v. Gates, 27 F.3d at 1438 ("Where the prior judgment was based on a general verdict, the inquiry is whether rational jurors must necessarily have determined the issue as to which estoppel is sought.")(citations omitted).

To determine whether the jury's verdict necessarily resolved the factual issues arising in Claim 8, the Court "'must consider what findings are explicit or necessarily implied by the verdict, including examining alternative bases by which the jury could have reached its conclusion.'" Bangert Bros. Const. Co. v. Kiewit W. Co., 310 F.3d 1278, 1299 (10th Cir. 2002)(quoting AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 731). The Court need not, however, "'determine the precise basis of the jury verdict.'" Bangert Bros. Const. Co. v. Kiewit W. Co., 310 F.3d at 1299 (quoting AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 731). In this case, the jury reached a unanimous verdict in favor of Goldstone and Simmons on Claims 4, 5, 7, 9, and 10. See Final Verdict Form 8-11, 14-15 & 18-21.

In considering whether the jury's verdict precludes factual issues arising in claims to be resubmitted to a new jury, the Court also considers the jury's responses to interrogatories that the Court posed to it on the verdict form. See Smith v. Dinwiddie, 510 F.3d 1180, 1184-85 (10th Cir. 2007)(considering the jury's answer to four special interrogatories in applying collateral estoppel of a criminal prosecution); Aiello v. City of Wilmington, 470 F. Supp. 414, 423 (D. Del. 1979)("In view of the jury's verdict by special interrogatories on plaintiff's constitutional claims, it is concluded that principles of collateral estoppel foreclose plaintiff . . . on the precise questions that he wishes to resubmit to a new jury . . . ."). The Court also considers its instructions to the jury to determine what facts the jury necessarily found in reaching its verdict for the Defendants. See Weeks v. Angelone, 528 U.S. 225, 234 (2000)("A jury is presumed to follow its instructions."). Next, the Court examines the possible inferences from the jury's verdict and the jury's answers to interrogatories against the factual dispute at issue in the claim that the party seeking issue preclusion wants to preclude. See Bangert Bros. Const. Co. v. Kiewit W. Co., 310 F.3d at 1299 ("'[W]e examine the possible inferences from the verdict

against the findings and conclusions made by the district [court] on the equitable claims.'")(quoting AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 731).

At issue in Claim 8 is whether Goldstone or Simmons violated rule 13b2-2(a) of the Exchange Act.  That rule provides:

(a) No director or officer of an issuer shall, directly or indirectly:

(1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

(2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:

(i)  Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or

(ii)  The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

17 C.F.R. § 240.13b2-2.

Regarding Claim 8, the Court instructed the jury that rule 13b2-2's "purpose is to encourage management to fully and openly disclose information to auditors," and that the rule "places an affirmative obligation on officers and managers to disclose material facts that are necessary to prevent statements from being misleading."  Final Jury Instructions, Instruction No. 34, at 57.  The Court also instructed the jury that, to establish a rule 13b2-2(a) violation, the SEC has to prove that Goldstone or Simmons unreasonably

(i)  made or caused to be made a false or misleading material statement to an accountant; or (ii)  omitted to state, or caused another person to omit to state, any material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading, to an accountant

and that "the false or misleading statement, or omission, was made in connection with any audit, review, or examination of the financial statements of Thornburg Mortgage."   Final Jury

Instructions, Instruction No. 35, at 58.   Accordingly, Claim 8 presents the factual dispute whether Goldstone or Simmons made a materially false or misleading statement or omission to KPMG.

The Defendants are not entitled to judgment as a matter of law on Claim 8, because the jury's verdict on Claims 4, 5, 7, 9 and 10, and the jury's related answers to interrogatories on the verdict form, do not preclude the factual issues arising in Claim 8.   A jury's verdict on a claim does not preclude retrial of a claim on which a jury hung where there is no complete overlap in the required proof to establish each claims and where the plaintiff did not condition recovery on the hung claim on recovery under the claim on which a jury returned a verdict.   See Amarel v. Connell, 102 F.3d 1494, 1521-22 (9th Cir. 1996)(reversing a district court's grant of judgment as a matter of law, because claim on which the jury reached a verdict did not collaterally estop the factual issues presented by a claim on which the jury had hung).   In Amarel v. Connell, the district court granted judgment as a matter of law on the plaintiff's restraint-of-trade claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, on which the jury had hung, because the jury had returned a verdict in favor of the defendants on a monopoly claim under Section 2 of the Sherman Act, 15 U.S.C. § 2.   See 102 F.3d at 1521.   The United States Court of Appeals for the Ninth Circuit reversed the district court's grant of judgment as a matter of law as error, because there was no necessary overlap in the required proof to establish a restraint-of-trade claim, and a monopoly claim and because the plaintiff's theory of the case "does not condition recovery under Section 1 on recovery under Section 2."   Amarel v. Connell, 102 F.3d at 1522.

In this case, the jury hung on Claim 8, despite returning a verdict in the Defendants' favor on Claims 4, 5, 7, 9, and 10.   See Final Verdict Form at 8-11, 14-21.   The jury did not resolve whether Goldstone and Simmons violated rule 13b2-2(a) by making a materially false or

misleading statement or omission to KPMG.  See Final Verdict Form at 16-17.  The jury, therefore, did not perceive that its verdict in the Defendants' favor on Claims 4, 5, 7, 9, and 10 necessarily resolved the factual question whether Goldstone or Simmons made a materially false or misleading statement or omission to KPMG.  The Defendants make light of the jury's rejection that its verdict on Claims 4, 5, 7, 9, and 10 necessarily resolves the factual issue which Claim 8 presents, arguing that "[c]ollateral estoppel would not exist in hung jury cases if it required the jury to decide the claim being challenged -- there would be no hung claim to challenge."  Reply at 5.  In making this argument, however, the Defendants do not direct the Court to a case concluding that a jury's verdict on one or more claims collaterally estopped a second jury from considering a hung claim on which the first jury hung.  In Amarel v. Connell, the Ninth Circuit reached the opposite conclusion, holding that collateral estoppel did not exist with respect to a hung claim, because there was no complete overlap in the required proof to establish the hung claim and the claim on which the jury returned a verdict, and because the plaintiff's theory of the case did not condition recovery on the hung claim on recovery under the claim on which a jury returned a verdict.  See Amarel v. Connell, 102 F.3d at 1522.[17]

In this case, the SEC did not condition its demonstration of the Defendants' liability on Claim 8 on the SEC's proof of liability on Claims 4, 5, 7, 9, and 10.  As the Court explains below, the proof required to establish a violation on Claim 8 does not completely overlap with

---

[17]The Court also notes that the clearest binding precedent in this area of law addresses those instances in which the jury's findings preclude common issues of fact arising in claims that were not presented to the jury, but rather to the court.  See Copar Pumice Co. v. Morris, 2009 WL 5201799, at *10 ("The United States Court of Appeals for the Tenth Circuit has applied the doctrine of issue preclusion in holding that a jury's verdict binds the trial court where the jury determined factual issues that are common to the claims . . . [presented to] the court.")(citing AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 731-32).  See also Butler v. Pollard, 800 F.2d at 225 (concluding that the jury's general verdict that there was no trespass precluded the trial court from considering the same issue when considering whether to grant equitable relief).

what the SEC had to prove to establish liability on Claims 4, 5, 7, 9, and 10.  The jury did not commit a logical error in its understanding of the relationship between its verdict in the Defendants' favor on Claims 4, 5, 7, 9, and 10, and its inability to resolve the factual issues present in Claim 8.  In light of the Court's instructions to the jury, the jury's verdict, the jury's answers to interrogatories, and the proof required to establish the Defendants' liability for Claim 8, the Court concludes that the jury's verdict in favor of the Defendants on Claims 4, 5, 7, 9, and 10 did not, by necessary implication, resolve whether Goldstone or Simmons made a materially false or misleading statement or omission to KPMG.

First, the jury's findings regarding Claims 4 and 5 do not necessarily imply that Goldstone or Simmons did not make a materially false or misleading statement or omission to KPMG.  With respect to Claim 4, the Court instructed the jury that, to establish that Goldstone or Simmons violated rule 13b2-1, the SEC has to prove that Goldstone and/or Simmons "directly or indirectly falsified or caused to be falsified any book, record, or account of a public company," and that Goldstone or Simmons "acted unreasonably."  Final Jury Instructions, Instruction No. 30, at 45.  The Court instructed the jury that the terms "book, record, or account" include "the records used at Thornburg Mortgage to prepare its financial statements as well as the financial statements themselves."  Final Jury Instructions, Instruction No. 30, at 45.  The Court further instructed the jury that, to establish that Goldstone or Simmons directly or indirectly falsified or caused to be falsified any book, record, or account, the SEC has to prove "that a book, record, or account did not, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the company's assets."  Final Jury Instructions, Instruction No. 30, at 45-46.  Regarding Claim 5, the Court instructed the jury that, to establish its claim that Goldstone and/or Simmons are liable for Thornburg Mortgage's violation of section 13(b)(2) of the Exchange Act,

the SEC has to prove that Goldstone and/or Simmons "exercised control, directly or indirectly, over Thornburg Mortgage," and that Thornburg Mortgage failed "to make or keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of Thornburg Mortgage."   Final Jury Instructions, Instruction No. 31, at 48.   The Court further instructed the jury that, if they find that the SEC proves those elements regarding Claim 5, the burden shifts to Goldstone and/or Simmons "to prove by the greater weight of the evidence that [Goldstone and/or Simmons] acted in good faith and did not directly or indirectly induce the act or acts constituting a § 13(b)(2) violation."   Final Jury Instructions, Instruction No. 31, at 48.

Given these instructions, the jury answered interrogatories on the verdict form finding that neither Goldstone nor Simmons "directly or indirectly falsified or caused to be falsified any book, record, or account of a public company," or "falsified a book, record, or account, which, in reasonable detail, did not accurately and fairly reflect the transactions and dispositions of the assets of Thornburg."   Final Verdict Form at 8-9.   Further, the jury answered interrogatories finding that neither Goldstone nor Simmons failed "to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Thornburg."   Final Verdict Form at 10-11.   The jury also answered interrogatories concluding that neither Goldstone nor Simmons failed "to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles."   Final Verdict Form at 10-11.   Although the finding was not essential to its verdict, the jury answered an interrogatory finding that Goldstone and Simmons "acted in good faith and did not directly or indirectly induce the act

or acts constituting a violation of Section 13(b)(2)."  Final Verdict Form at 10-11.

      The jury's findings as revealed by its answers to interrogatories related to Claims 4 and 5 do not necessarily imply that Goldstone or Simmons did not make a false or misleading oral communication to KPMG.  The Court agrees with the SEC's observation that "the jury made no finding whatsoever about the truth or falsity of oral communications made to KMPG . . . ." Opposition at 10-11.  For example, the jury did not reach any conclusions about oral misstatements or omissions.  See Final Verdict Form at 8-11.  At the hearing which the Court held on Defendants' motion, the Defendants even conceded this point.  See Tr. at 12:6-10 (Tewksbury)(stating that "any verdict in favor of the auditor deception claim for the SEC . . . would contravene the jury's prior verdicts . . . except for maybe something that relates to oral statements that are not covered by books and records").  The SEC emphasizes that "the evidence at trial was largely focused on oral statements made to KPMG and what KPMG was not told," Opposition at 11, and the Court notes that the SEC litigated at trial factual issues involved in Claim 8 that pertained to oral statements which the Defendants made to KPMG, see, e.g., Trial Tr. at 4282:16-4283:10 (Kasper)(referring to oral communications from Simmons to KPMG "about the purpose of the I/O strip transactions"); Trial Tr. at 4284:4-12 (Kasper)(referring to oral communications from the Defendants to KPMG whether Thornburg Mortgage "had . . . defaulted on any of its contracts"); Trial Tr. at 4285:2-16 (Kasper)(referring to oral communications from the Defendants in response to KPMG's question whether there was "anything that we should talk about that we haven't already talked about").  Without violating any logical restrictions pertaining to necessary implication, the jury could find that the Defendants did not falsify any books or records, while nevertheless considering, as an independent and open question, whether the Defendants made false or misleading statements or

omissions to KMPG regarding any particular book or record.  Accordingly, the Court concludes that the jury's findings regarding Claims 4 and 5 do not necessarily imply any finding by the jury regarding any such oral statements or omissions.

Nor do the jury's findings appurtenant to Claims 4 and 5 necessarily imply that Goldstone or Simmons did not make a false statement to, or avoided withholding material from, KPMG.  Despite the jury's findings that the Defendants (i) did not falsify a book or record; (ii) did not fail to make a book or record that accurately and fairly reflect the transactions and dispositions of the assets of Thornburg Mortgage; (iii) did not fail to maintain a system of internal accounting controls; and (iv) acted in good faith with respect to Thornburg Mortgage's system of internal accounting controls, a jury may nevertheless find that Goldstone or Simmons made a false or misleading statement or omission to KPMG.  The jury's findings regarding Claims 4 and 5 concern the accuracy in the preparation of Thornburg Mortgage's books and records.  Those findings, however, do not exhaustively and necessarily resolve all factual issues concerning the transmittals of Thornburg Mortgage's books and records from Goldstone and/or Simmons to KPMG, or concerning communications -- particularly oral communications -- from Goldstone and/or Simmons to KMPG in connection with KMPG's examination of Thornburg Mortgage's financial statements.  Although the jury's findings reflect that neither Goldstone nor Simmons either falsified a record or failed to make an accurate record, those facts do not logically foreclose all issues whether Goldstone and/or Simmons made false or misleading statements or omissions to KMPG in connection with KMPG's review of Thornburg Mortgage books and records.  The Court cannot soundly conclude that the jury committed a logical error by not reaching a verdict on Claim 8, even though it reached a verdict regarding Claims 4 and 5 in the Defendants' favor.  Accordingly, the jury's verdicts on Claims 4 and 5 do not collaterally

estop the Court from submitting Claim 8 to retrial before a new jury.

The Court concludes, however, that the jury's verdict collaterally estops the SEC from relitigating certain delimited factual issues at retrial: (i) whether Goldstone and/or Simmons falsified a book or record that did not accurately and fairly reflect the transactions and dispositions of Thornburg Mortgage's assets; and (ii) whether Goldstone and/or Simmons failed to make and keep a book or record that did not accurately and fairly reflect the transactions and dispositions of Thornburg Mortgage's assets.   The Court again notes that it instructed the jury, with respect to Claim 4, that the terms "book, record, or account" includes "the records used at Thornburg Mortgage to prepare its financial statements as well as the financial statements themselves."   Final Jury Instructions, Instruction No. 30, at 45.   With respect to Claim 5, the Court instructed the jury that the terms "book, records, or accounts" means "accounts, correspondence . . . and other documents or transcribed information of any type . . . ."   Final Jury Instructions, Instruction No. 31, at 49.   Given these instructions and the jury's verdict on Claims 4 and 5, see Final Verdict Form at 8-11, the SEC cannot relitigate whether Goldstone and/or Simmons falsified any of Thornburg Mortgage's financial statements or the records used to prepare Thornburg Mortgage's financial statements, or whether those statements or records fairly reflect Thornburg Mortgage's transactions and dispositions of assets.   The jury decided those factual questions, see Final Verdict Form at 8-11, and the SEC cannot argue contrary to those now established facts.[18]

---

[18]The Court notes that, according to Tenth Circuit case law, it is bound "under collateral estoppel or issue preclusion principles" to treat the jury's verdict on Claims 4 and 5 as binding at a subsequent trial.   AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 731.   See Butler v. Pollard, 800 F.2d at 224-25.   Indeed, the Court has followed the Tenth Circuit's reasoning in Copar Pumice Co. v. Morris.

Notwithstanding those limitations, the SEC is not collaterally estopped from litigating whether Goldstone and/or Simmons used a Thornburg Mortgage book or record to make a false or misleading statement or omission to KPMG -- either in conjunction with an oral statement or omission, or by transmitting or failing to transmit a Thornburg Mortgage book or record to KPMG.   As explained above, the jury's verdict did not necessarily resolve those factual

---

The United States Court of Appeals for the Tenth Circuit has applied the doctrine of issue preclusion in holding that a jury's verdict binds the trial court where the jury determined factual issues that are common to the claims that the court [is called to resolve.] . . . [T]he trial judge's findings on equitable claims may not conflict with the jury's determinations.

See Copar Pumice Co. v. Morris, 2009 WL 5201799, at *10 (citing AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 730, 732).   In addition to the doctrine of issue preclusion, the Court notes that, where the jury has rendered a verdict, the Seventh Amendment's "re-examination" Clause entails that those factual findings implicit in the jury's verdict bind a finder of fact at a subsequent trial.   See Bangert Bros. Const. Co. v. Kiewit W. Co., 310 F.3d at 1301 (holding that "the district court's judgment in favor of Meridian on the quantum meruit claim must be set aside under principles of issue preclusion, as well as to preserve Bangert's Seventh Amendment rights").   Accordingly, to preserve the Defendants' Seventh Amendment rights, at retrial, the jury, in reviewing Claims 8, may not reexamine afresh those factual findings that are necessarily implicit in the first jury's verdict in the Defendants' favor.   While the Tenth Circuit has used "collateral estoppel" to talk about the jury's verdict binding the trial judge's determinations in the same case, the Court believes the Seventh Amendment -- not collateral estoppel -- is the doctrine that binds the judge or the second jury in the same action.   It does not make sense -- given the use of "action" in the elements of collateral estoppel -- that collateral estoppel applies in the same case.   For example, a judge could find a fact earlier in the case, but later change his or her mind.   Without a final judgment, the judge's factual finding is interlocutory, and the judge has abundant discretion to change it.   See Fye v. Oklahoma Corp Comm'n, 516 F.3d 1217, 1223 n.2 (10th Cir. 2008)(noting the "district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment")(quoting Wagoner v. Wagoner, 938 F.2d 1120, 1122 n.1 (10th Cir. 1991)).   Where the jury has resolved certain factual issues by rendering a verdict and the Court has entered judgment, however, a re-examination of those same factual issues, either by a judge or a subsequent jury, would violate the Seventh Amendment.

Although the Defendants have a Seventh Amendment right that a subsequent jury not reexamine those factual findings implicit in the first jury's verdict, the Defendants do not have a Seventh Amendment right against a retrial on Claim 8.   The factual findings implicit in the jury's verdict do not necessarily encompass  the factual issue arising in Claim 8 -- namely, whether Goldstone and/or Simmons made a false or misleading statement or omission to KPMG.   See infra at 68-69.

questions.  The Court recognizes that the law of issue preclusion creates what may appear to be needle-threading demands regarding how the SEC may attempt to prove Goldstone and/or Simmons's liability on Claim 8.  Indeed, at the hearing on the Defendant's Renewed Motion for Judgment, the Court expressed its view that a finding that Goldstone and/or Simmons had not falsified any of Thornburg Mortgage's financial statements or the records used to prepare Thornburg Mortgage's financial statements damages the SEC's case with respect to Claim 8.  See Tr. at 19:20-20:21 (Court).  The Court said:

> And if that's true, it may not -- you may be right, it may not wipe out your claim, but doesn't it become a fact in this case that you can't then argue to the jury that there is any false books, records, accounts, documents?  And if that's the case, it seems to me that it may not wipe out your claim, but . . . it just damages it. . . .
>
> But don't I have to tell the SEC that, you, SEC, cannot turn to that jury now and ask them in any way to reconsider the fact that Mr. Goldstone created some document that had misleading or incorrect information in it?  And doesn't -- at some point I tell the jury that Mr. Goldstone did not falsify any book, record, or account, which in reasonable detail did not accurately and fairly reflect" -- I mean, so, you know, there may be some oral statement out there to the accountants, or something, but it just seems to me that it takes away the case that I saw tried.

Tr. at 19:20-20:21 (Court).  The Court again notes that, in its Opposition, the SEC argues that "the evidence at trial was largely focused on oral statements made to KPMG and what KPMG was not told."  Opposition at 11.  At this juncture, the Court expresses no view whether the SEC can prove Goldstone's and/or Simmon's liability given the SEC's inability to argue on retrial that Goldstone and/or Simmons falsified any of Thornburg Mortgage's financial statements or the records used to prepare Thornburg Mortgage's financial statements.

Furthermore, the jury's verdicts in the Defendants' favor on Claim 7, 9, or 10 do not necessarily imply that the Defendants did not make a false or misleading statement or omission to KPMG.  Regarding Claim 7, the Court instructed the jury that, to find that Goldstone and/or

Simmons violated rule 13a-14 of the Exchange Act, the SEC has to prove: (i) Goldstone and/or Simmons

> filed or caused to be filed a certification that Thornburg Mortgage's 2007 Form 10-K (Exhibit 321) did not contain any untrue statement or omit a fact necessary to make the statements made, in light of the circumstances under which the statement was made, not misleading with respect to the period covered by this report;

(ii) that "the certification was false"; (iii) that "the untrue statement or omitted fact was material"; and (iv) that Goldstone or Simmons "knew the certification was false when he/they signed it."  Final Jury Instructions, Instruction No. 33, at 55.  Regarding Claim 9, the Court instructed the jury that, to find that Goldstone and/or Simmons are liable as control persons for Thornburg Mortgage's violation of § 13(a) of the Exchange Act, the SEC has to prove (i) that "Thornburg Mortgage . . . fil[ed] with the SEC a false or misleading annual report on its 2007 Form 10-K that failed to add such further material information, if any, as was necessary to make the statements made, in light of the circumstances under which they were made, not misleading;" and (ii) that Goldstone or Simmons "exercised control, directly or indirectly, over Thornburg Mortgage."  Final Jury Instructions, Instruction No. 37, at 63.  Regarding Claim 10, the Court instructed the jury that, to find that Goldstone and/or Simmons violated § 13(a) of the Exchange Act and rules 12b-20 and 13a-1, the SEC has to prove (i) that Thornburg Mortgage "fil[ed] with the SEC a false or misleading annual report on its 2007 Form 10-K that failed to add such further material information, if any, as was necessary to make the statements made, in light of the circumstances under which they were made, not misleading"; (ii) that Goldstone and/or Simmons provided substantial assistance to Thornburg Mortgage in violation of § 13(a) of the Exchange Act and rules 12b-20 and 13a-1; and (iii) that Goldstone and/or Simmons provided "such assistance to Thornburg Mortgage knowingly or recklessly."  Final Jury Instructions,

Instruction No. 38, at 65.

Given these instructions, the jury returned a verdict in the Defendants' favor on Claims 7, 9, and 10.  See Final Verdict Form at 14-15, 18-21.  In reaching a verdict on Claim 7, the jury also found that the SEC did not prove, by a preponderance of the evidence, that Goldstone or Simmons filed or caused to be filed a false certification that Thornburg Mortgage's 2007 Form 10-K did not contain any untrue statement or omit a fact necessary to make the statements made, in light of the circumstance under which the statement was made.  See Final Verdict Form at 14-15; Jury Instructions, Instruction No. 33, at 55.

In light of the jury instructions, the jury's verdicts on Claims 7, 9, and 10 establish the jury's factual findings about statements that Thornburg Mortgage and the Defendants, through Thornburg Mortgage, made to the SEC; however, those factual findings do not, by necessary implication, resolve all factual issues concerning whether the Defendants made false or misleading statements or omissions to KPMG.  Although the jury found that Goldstone and Simmons did not file or cause to be filed a false or misleading annual report with the SEC, that finding does not necessarily imply that Goldstone and/or Simmons did not make, at any point in time, any false or misleading statement to KPMG in connection with KMPG's examination of Thornburg Mortgage's financial statements.  It was logically open to the jury to conclude that neither Goldstone nor Simmons filed or caused to be filed a false annual report with the SEC but that, at some point before making that filing, Goldstone and/or Simmons made a false or misleading statement or omission to KPMG that related to KPMG's examination of Thornburg Mortgage's financial statements.  The jury, therefore, did not commit a logical error by hanging on Claim 8 even though it had found in the Defendants' favor on Claims 7, 9, and 10.  See Final Verdict Form at 14-15, 18-21.  Accordingly, the jury's verdicts on Claims 7, 9, and 10 do not

collaterally estop the Court from submitting Claim 8 to retrial before a new jury.

The jury's verdict, however, precludes the SEC from relitigating at retrial whether Goldstone and/or Simmons caused Thornburg Mortgage to file with the SEC a false or misleading annual report on its 2007 Form 10-K.  The jury resolved that factual issue.  See Final Verdict Form at 14-15, 18-21.  The SEC cannot argue that the 10-K is false or misleading.  Again, however, the SEC is not precluded from litigating whether Goldstone and/or Simmons made a false statement or omission to KPMG.  The SEC may still argue that the Defendants made false oral statements and omissions to KPMG in connection with KPMG's examination of Thornburg Mortgage's financial statements while the Defendants and KPMG were preparing Thornburg Mortgage's 2007 Form 10-K.  The SEC, therefore, is not precluded from arguing that Goldstone and/or Simmons made a false oral statement or omission to KPMG that concerned Thornburg Mortgage's 2007 Form 10-K or the documents related to its preparation.  The jury's verdict -- although it confines how the SEC may attempt to prove its view of the factual question whether Goldstone and/or Simmons made a false or misleading statement or omission to KMPG, liability Claim 8 -- does not itself logically foreclose that factual question by necessary implication.

## B.   THE DEFENDANTS HAVE NO RIGHT UNDER THE SEVENTH AMENDMENT TO AVOID A RETRIAL ON THE SEC'S RULE 13B2-2(A) CLAIM.

A retrial of Claim 8 does not violate the Defendants' Seventh Amendment right that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."   U.S. Const. amend. VII.  If principles of issue preclusion demand that a claim on which a jury hung must be dismissed as a matter of law, given a necessary implication of factual findings that the jury made, then retrial of that hung claim

would violate a party's Seventh Amendment rights.  See Bangert Bros. Const. Co. v. Kiewit W. Co., 310 F.3d at 1301 (holding that "the district court's judgment in favor of Meridian on the quantum meruit claim must be set aside under principles of issue preclusion, as well as to preserve Bangert's Seventh Amendment rights"); AG Servs. of Am., Inc. v. Nielsen, 231 F.3d at 731-32 (stating that, under the Seventh Amendment, the jury's determination of factual issues common to both legal and equitable claims binds a court presiding over an equitable claim)(citing Skinner v. Total Petroleum, Inc., 859 F.2d 1439, 1442-43 (10th Cir. 1988)).  In this case, however, the jury's verdict in the Defendants' favor on Claims 4, 5, 7, 9, and 10 does not by necessary implication resolve the factual issues that Claim 8 presents.  The jury's verdict does not require that the Court dismiss Claim 8 under principles of issue preclusion, and, therefore, the Defendants are not entitled to judgment as a matter of law on Claim 8.  The law does not prevent the Court from submitting Claim 8 to a jury for retrial.  See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. at 432-33 (concluding that "the 're-examination' Clause does not inhibit the authority of trial judges to grant new trials 'for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States'")(quoting Fed. R. Civ. P. 59(a)).

## II.   THE SEC PRESENTED EVIDENCE BY WHICH A REASONABLE JURY COULD FIND THAT GOLDSTONE KNOWINGLY OR RECKLESSLY MADE A FALSE STATEMENT ON FEBRUARY 28, 2008, IN VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5.

At trial, the Court instructed the jury that, to establish its claim that Goldstone violated section 10(b) of the Exchange Act and rule 10b-5 by making statements on television and to the Investor Relations group, the SEC had to prove that the statements at issue were false and that Goldstone knew, or was reckless in not knowing, that the statements were false, and/or that Goldstone did not believe the statements at the time he expressed them.  See Final Jury

Instructions, Instruction No. 29, at 41.  The Court also instructed the jury that, with respect to this theory of Goldstone's alleged violation of section 10(b) of the Exchange Act and rule 10b-5, "[f]alse or misleading statements may form the basis for liability."  Final Jury Instructions, Instruction No. 29, at 42.  The Defendants assert that the SEC introduced legally insufficient evidence to support liability for securities fraud and renew their motion that the Court dismiss Claim 1 as a matter of law.  See Renewed Motion for Judgment 16-22.

The standard for ruling on a rule 50(b) motion is similar to that for ruling on a rule 50(a) motion -- whether there is sufficient evidence upon which a reasonable jury could have arrived at the verdict that the jury returned.  See Wagner v. Live Nation Motor Sports, Inc., 586 F.3d at 1244 ("A party is entitled to JMOL only if the court concludes that 'all of the evidence in the record . . . [reveals] no legally sufficient evidentiary basis for a claim under the controlling law.'")(quoting Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d at 1269).  This standard for ruling on a motion for judgment as a matter of law also mirrors the standard for summary judgment.  See Anderson v. Liberty Lobby, 477 U.S. at 250 (concluding "that this [Rule 56] standard mirrors the standard for directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict")(internal citation omitted); Wiles v. Michelin No. America, Inc., 173 F.3d at 1303 ("We review the district court's ruling on a motion for JMOL under a standard that is essentially identical to the 'genuine issue' requirement in the summary judgment context.")(internal citation omitted).  "In ruling on such a motion, the court should disregard any jury determination for which there is no legally sufficient evidentiary basis enabling a reasonable jury to make it."  Fed. R. Civ. P. 50(b) advisory committee's note.  See Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d at 1269 ("A party is entitled to judgment as

a matter of law 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.'")(quoting Tyler v. RE/MAX Mountain States, Inc., 232 F.3d at 812).   The court must, however, draw all reasonable inferences in the non-moving party's favor.   See Wagner v. Live Nation Motor Sports, Inc., 586 F.3d at 1244 ("[W]e . . . will reverse the district court's denial of the motion for JMOL 'if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.'")(quoting Hardeman v. City of Albuquerque, 377 F.3d at 1112).   When ruling on a rule 50(b) motion, the Court will not "weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury."   Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d at 1269.

When drawing all reasonable inferences in the SEC's favor as the non-moving party, the Court holds that the SEC presented a legally sufficient evidentiary basis for a reasonable jury to find that that Goldstone knowingly or recklessly made a false statement on February 28, 2008, in violation of section 10(b) of the Exchange Act and rule 10b-5.   The SEC presented a legally sufficient evidentiary basis to support two theories of its rule 10b-5 claim: (i) that Goldstone knowingly or recklessly made a false statement on CNBC on February 28, 2008; and (ii) that Goldstone knowingly or recklessly made a false statement in a February 28, 2008, email to members of the Thornburg Mortgage Investor Relations group.   Accordingly, the Court denies the Defendants' Renewed Motion for Judgments on Claim 1.

**A.   THE SEC PRESENTED LEGALLY SUFFICIENT EVIDENCE TO SUPPORT A REASONABLE JURY'S FINDING THAT GOLDSTONE KNOWINGLY OR RECKLESSLY MADE A FALSE STATEMENT ON CNBC ON FEBRUARY 28, 2008.**

In the afternoon of February 28, 2008, Goldstone appeared on CNBC's Street Signs.   See Larry Goldstone CNBC Interview at 3:55–4:09 (taken Feb. 28, 2008), filed May 21, 2012

(Doc. 37–1)("CNBC Interview"); Trial Tr. at 2819:22-2820:17 (McKenna, Goldstone). On Street Signs, Goldstone stated that: (i) he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "met all of [its] lending requirements"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'" CNBC Interview at 3:55-4:09. See Trial Tr. at 2820:8-15 (McKenna, Goldstone).

The SEC asserts in Claim 1 that Goldstone's February 28, 2008, CNBC statements violated of section 10(b) of the Exchange Act and rule 10b-5(b), see Complaint ¶¶ 106-108 at 31, and Claim 1 was tried and submitted to the jury, see Final Verdict Form at 1. In the Defendants' Renewed Motion for Judgment, the Defendants argue that Claim 1, with respect to Goldstone's CNBC statements, should be "dismissed as a matter of law because the SEC failed to introduce evidence that Thornburg was out of compliance with its lending requirements at the time Mr. Goldstone spoke." Renewed Motion for Judgment at 16.

The SEC, however, presented legally sufficient evidence at trial for a reasonable jury to conclude that Thornburg Mortgage was not in compliance with its lending requirements when Goldstone said on CNBC that Thornburg Mortgage had "met all of [its] lending requirements" and that Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'" CNBC Interview at 3:54-4:09. The jury was presented with evidence that, on the morning of February 28, 2008, Goldstone sent an email to Thornburg Mortgage's board of directors, indicating that Thornburg Mortgage closed with $40 million in cash on the night of February 27, 2008. See Trial Tr. at 2822:24-2823:1 (McKenna, Goldstone). Specifically, the jury heard the following testimony:

> Q. Okay. Let's go to Exhibit 135. This is your February 28 email to your board of directors; is that right?
>
> A. Yes.

- 72 -

Q.  TMA update, Thursday, February 28?

A.  Yes.

Q.  And you see you say there, "Additionally" -- in the second paragraph -- "and more importantly, we were able to meet all of those recent margin calls yesterday and we were able to get a clean audit opinion to go with it."  Is that right?

A.  That's correct.

Q.  And then skipping one sentence you say, "We closed last night with $40 million in cash;" correct?

A.  That's what it says.

Q.  Okay, now, when you gave this to your board of directors, you were trying to be accurate?

A.  Yes.

Q.  And it was your understanding at that time that you had about $40 million in cash?

A.  Yes, this was before I got the email from Nate.

Trial Tr. at 2822:12-2823:9 (McKenna, Goldstone).

The jury was presented with evidence regarding the "the email from Nate [Fellers]" to which Goldstone referred.  Trial Tr. at 2823:8-9 (Goldstone).  The jury heard testimony that Fellers communicated by email that, on the morning of February 28, 2008, Thornburg Mortgage received $158.7 million in margin calls.  See Email from Nathan Fellers to Larry Goldstone, Clay Simmons re: IMPORTANT update (dated February 28, 2008)(Trial Ex. 142)("Feb. 28 Fellers' Email"); Trial Tr. at 2820:21-2821:7 (describing email from Fellers to Goldstone and Simmons sent on the morning of February 28, 2008, disclosing $158.7 million in margin calls)(McKenna, Goldstone).  The jury also heard testimony that the margin calls that Thornburg Mortgage received on February 28, 2008, were due that day.  See Trial Tr. at 2824:3-5 ("Q.

Okay.  The margin calls you received on that Thursday were due that day; right?  A.  They would have been, yes.")(McKenna, Goldstone).  The jury heard testimony that margin calls impacted Thornburg Mortgage's cash position.  See Trial Tr. at 2822:8-11 ("Q.  And margin calls would, in fact, impact Thornburg's cash position; right?  A.  I don't think there is any dispute about that.")(McKenna, Goldstone).

Further, the jury heard testimony that Goldstone represented in the February 28, 2008, email to Thornburg Mortgage's board of directors that Goldstone expected that Thornburg Mortgage would "raise 25 million in stock sales over the next two days."  Trial Tr. at 2823:11-13 (Goldstone).  The jury also heard testimony, referencing that email, (i) that Goldstone expected a "securitization generating possibly 60 million by the following Monday," Trial Tr. at 2823:15-18 (McKenna, Goldstone); (ii) that Goldstone was speaking with "Wellington[19] about another 25 to 50 million again by the Monday of [the following] week," Trial Tr. at 2823:19-22 (McKenna, Goldstone); and (iii) that Goldstone indicated "[t]hat should give us 150 to 175 million while we work on a capital raise," Trial Tr. at 2823:23-2824:2 (McKenna, Goldstone).  The jury also heard testimony indicating that, on Thursday, February 28, 2008, Thornburg Management hoped to raise $150 million to $175 million by the following Monday.  See Trial Tr. at 2823:23-2824:2 (McKenna, Goldstone)("Q. . . . 150 to 175 is what you're hoping to have by the following Monday; is that right?  A.  Sure.").  From the testimony regarding Goldstone's communications to Thornburg Mortgage's board of directors, which was made before Fellers informed Goldstone that Thornburg Mortgage had received $158.7 million in margin calls on the

---

[19]Wellington Management Company is a private, independent investment management company with client assets under management totaling in excess of $998 billion and serves as an investment advisor for over 2,150 institutional clients in over 50 countries.  Wellington Management Company, Wikipedia (Jan. 23, 2017), http://en.wikipedia.org/wiki/Wellington_Management_Company.

morning of February 28, 2008, a reasonable jury might conclude that, at the time Thornburg

Mortgage received $158.7 million in margin calls, Thornburg Mortgage was not in a position on

February 28, 2008, to meet those margin calls.

Moreover, the jury heard testimony that, on February 28, 2008, JPMorgan made a $25

million margin call that Thornburg Mortgage was unable to meet, "because [Thornburg

Mortgage] didn't have enough cash available to meet all the margin calls received on February

28." Trial Tr. at 2829:15-17 (McKenna).   Regarding Thornburg Mortgage's inability to meet

JPMorgan's margin call, the jury heard the following colloquy:

> Q. Now, on February 28, Thornburg received a margin call of approximately $25 million from JPMorgan; correct?
>
> A. Yes, they did.
>
> Q. Okay.  And [Thornburg Mortgage] was unable to meet that margin call; right?
>
> A. Yes.
>
> Q. And that was because you didn't have enough cash available to meet all the margin calls you received on February 28?
>
> A. Yes.
>
> Q. And JPMorgan declared Thornburg in default this afternoon or evening; correct?
>
> A. Yes, they did.

 Trial Tr. at 2829:8-21 (McKenna, Goldstone).

The jury also heard testimony from Mark Cisz, a banker at JPMorgan Chase.  See Trial

Tr. at 543:8-17 (Voorhees, Cisz).  The jury heard Cisz' testimony regarding JPMorgan's practice

of making margin calls and its communications with Thornburg Mortgage:

> Q.    And these communications that you had with Thornburg regarding this change in price -- what are those called?

A.  Those are called margin calls.

Q.   And you said that the margin calls would be made.   It was JPMorgan's practice to make those by when?

A.  So under the agreement that we have, we have to make the margin calls before 10:00 a.m.

Q.  Okay.  And why is that?

A.  Because we need to give the client time to review the call to make sure that they agree with it, and then be able to move the money or move the collateral to us.

Q.  And how long did the client, in this case Thornburg, have to pay the margin call?

A.  Until the end of the day, usually until the Fed closes, which the Fed can vary when they actually close the wire, but by around 6:00 on most days.

Trial Tr. at 553:15-554:8 (Voorhees, Cisz).  The jury heard similar testimony from Lawrence Wiener, whom the SEC retained to provide an expert opinion.  See Trial Tr. at 603:2-5 (Kasper, Wiener).  Wiener testified, regarding margin calls, that, if a margin call "is received by 10:00 a.m. in the morning, it has to be satisfied that day."  Trial Tr. at 623:22-23 (Wiener).

Regarding JPMorgan's February 28, 2008, margin call to Thornburg Mortgage, the jury heard Cisz testify:

So there was a margin call on February 28 of 2008 that was brought to my attention in the afternoon that the client didn't -- we made a margin call to the client at 7:30 in the morning, and they had told their operational people that they didn't have the ability to make that payment.  And then our trader actually had a call with their trader with the same message.  Turned out the trader on our side reached out to tell me that the client was going to have problems making that margin call.

Trial Tr. at 556:18-557:2 (Cisz).  The jury also heard the following testimony about JPMorgan's February 28, 2008, margin call:

Q.  Did Thornburg dispute the pricing on that [February 28, 2008] margin call, that valuation analysis?

- 76 -

A.  Not to my knowledge.

Q.  Did Thornburg pay that margin call by the end of the day?

A.  They did not.

Q.  Was it required to pay by the end of the day?

A.  It was.

Q.  All right.  And it sounds like there was some back-and-forth, then, between the companies.  Can you describe to us what happened first when Thornburg did not make the margin call?

A.  Right.  Well, the margin call would have been made by 6:00, but we actually had a number of steps before 6:00 that day to try to understand what the situation was with Thornburg.

So again, the operations group made the call around 7:30 in the morning. Hugh Rose,[20] our trader, notified me in the afternoon, midafternoon, that the counterparty, Thornburg, said they were having difficulties and they wouldn't be able to make the $24.6 million margin call.  I reached out to the relationship manager on Thornburg, whose name was John Heeger.  John arranged a call with Nate Fellers, who was the treasurer from Thornburg, for myself, John, and Nate to talk about what's going on, because we wanted to make sure that there wasn't miscommunications between the trading desks at Thornburg and the operations group versus the treasurer who essentially moves the money every day.  So we had a call with Nate, and Nate explained, Mr. Fellers explained what the situation was.  He said there had been a number of margin calls made on the company over the last two weeks and that they were not going to be able to make the $24.6 million deficiency whole, and he asked us to waive that requirement until the following week.  We asked why.  He said there was a number of ways in which the company was trying to raise more money, including securitization, that they felt that they would have $30 to $50 million of proceeds come in and that would be enough to make us whole.

We took everything that Mr. Fellers said back.  We went back, I notified my credit chain, my seniors, and we got back in touch with Mr. Fellers to try to arrange another call to get a little bit more clarity.  So we identified it wasn't an operational issue at that point.  We identified it wasn't a pricing discrepancy at that point.  We wanted kind of a bigger picture call, and there was a call later in the day before 6:00 that included the CFO, Mr. Simmons.

---

[20]According to Cisz' trial testimony, Hugh Rose was an employee at JPMorgan authorized to deal with Thornburg Mortgage.  See Trial Tr. at 559:6-7 (Cisz).

Trial Tr. at 558:13-560:15 (Voorhees, Cisz).

The jury also heard Cisz testify that, on that evening call, Thornburg Mortgage representatives informed JPMorgan representatives that Thornburg Mortgage had received $111 million of margin calls or short calls in total, and Thornburg Mortgage representatives asked JPMorgan "not to call them in an event of default but to forebear that until the following week." Trial Tr. at 561:3-5 (Cisz).  Cisz also testified that, on that February 28, 2008, call, JPMorgan was told that Thornburg Mortgage had received $750 million in margin calls over the prior two weeks, which contrasted greatly with an article from Reuters that Cisz and other JPMorgan representatives had seen around 8:30 a.m. on February 28, 2008, indicating that "Thornburg had a number of margin calls over the last two weeks, but it was a much smaller number," around $300 million.  Trial Tr. at 561:12-19 (Cisz).  The jury heard Cisz testify that, in light of the discrepancy, it was important for JPMorgan "to understand from a credit perspective . . . how much additional liquidity might exist for [Thornburg Mortgage] going forward to run their business."  Trial Tr. at 561:20-23 (Cisz).  Cisz testified that JPMorgan was concerned that Thornburg Mortgage could not make the JPMorgan margin call, see Trial Tr. at 561:24-562:6 (Voorhees, Cisz), and that, at 7:30 p.m. on February 28, 2008, JPMorgan sent by fax an event of default notice to Thornburg Mortgage for failure to make the margin call payment, see Trial Tr. at 565:2-5 (Cisz).

To establish liability under rule 10b-5, a plaintiff must demonstrate that the defendant made a false or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1095. Viewing the foregoing evidence in the light most favorable to the SEC, the Court concludes that the jury was presented with sufficient evidence at trial for a reasonable jury to find that

Goldstone's television statements that (i) Thornburg Mortgage had "met all of [its] lending requirements"; and (ii) Thornburg Mortgage had "liquidity and cash available to continue to support the portfolio," were false or misleading and that Goldstone knew them to be false or misleading.  CNBC Interview at 3:54-4:09.  See Trial Tr. at 2820:8-15 (McKenna, Goldstone). In light of the evidence about (i)  Goldstone's morning Feb. 28 email to Thornburg Mortgage's board of directors, detailing the company's position as of Wednesday, February 27, 2008, and Goldstone's plans to raise liquidity before the following Monday, see Trial Tr. at 2822:12-2823:9 (McKenna, Goldstone); (ii)  Feller's email, which Goldstone received on the morning of Thursday, February 28, 2008, communicating that Thornburg Mortgage had received $158.7 million in margin calls, see Feb. 28 Fellers' Email; Trial Tr. at 2820:21-2821:7 (McKenna, Goldstone);  (iii) Goldstone's concession that such margin calls indisputably impacted Thornburg Mortgage's cash position, see Trial Tr. at 2822:8-11 (McKenna, Goldstone); (iv)  testimony regarding Thornburg Mortgage's inability to meet its margin calls, see, e.g., Trial Tr. at 2829:8-21 (McKenna, Goldstone); Trial Tr. at 558:13-560:15 (Voorhees, Cisz); and (v)  testimony regarding JPMorgan's notice of Thornburg Mortgage's default, see Trial Tr. at 565:2-5 (Cisz), a reasonable jury, viewing this evidence in the SEC's favor, could conclude that Goldstone's television statements that Thornburg Mortgage had "met all of [its] lending requirements," and had "liquidity and cash available to continue to support the portfolio" were knowingly false or misleading when made.

The Defendants argue that the SEC did not introduce legally sufficient evidence for a reasonable jury to find that Goldstone's February 28, 2008, statements on CNBC were false at the time Goldstone made those statements.  See Renewed Motion for Judgment at 16-20; Reply at 8-11.  According to the Defendants, the SEC did not present sufficient evidence for a jury to

conclude that Thornburg Mortgage had not met its contractual requirements at the time that Goldstone delivered the remarks at issue on CNBC.  See Reply at 10.  The Defendants say that the SEC did not introduce evidence of the reverse repurchase agreements or the terms of the margin calls setting forth what Thornburg Mortgage's lending requirements were when several lending institutions made margin calls on the morning of February 28, 2008.  See Renewed Motion for Judgment at 17-19; Reply at 9.  The Defendants suggest that, absent the introduction of the specific reverse repurchase agreements governing the margin calls which Thornburg Mortgage received on February 28, 2008, the SEC cannot show what Thornburg Mortgage's lending requirements were and, therefore, a reasonable jury cannot conclude that Thornburg Mortgage had not met those requirements at the time Goldstone made the remarks at issue on CNBC.  See Renewed Motion for Judgment at 17-19; Reply at 9-10.

The jury, however, was presented with substantial evidence -- including Goldstone's testimony -- indicating that the margin calls which Thornburg Mortgage received on the morning of February 28, 2008, were due that day per the agreements governing those margin calls.  See Trial Tr. at 2824:3-5 (McKenna, Goldstone); Trial Tr. at 623:22-23 (Wiener); Trial Tr. at 558:13-560:15 (Voorhees, Cisz).  The jury was afforded the opportunity to review communications about the margin calls that Thornburg Mortgage received on the morning of February 28, 2008.  See Feb. 28 Fellers' Email; Email string involving Larry Goldstone, Nathan Fellers, Clay Simmons, Patrick Feldman re: Projected Liquidity through Monday (dated February 28, 2008)(Trial Ex. 143); Email string between Halle Bennet, Larry Goldstone, re: Credit Person (dated Feb. 28, 2008)(Trial Ex. 147).  See also Trial Tr. at 2820:21-24 (McKenna)(discussing Feb. 28 Fellers' Email).  Consequently, prescinding from the several reverse repurchase agreements' specific terms governing the February 28, 2008, margin calls, the

jury was presented with substantial evidence to reasonably find that Goldstone's television statement that Thornburg Mortgage had the "liquidity and cash available to continue to support the portfolio" was false.  Contrary to the Defendants' assertions, evidence of some of Thornburg Mortgage's specific reverse repurchase agreements at trial.  See Opposition at 4 (citing Citigroup Global Markets, Inc. and Thornburg Mortgage Inc., ISLA Global Master Securities Lending Agreement (dated Sept. 20, 2007)(Trial Ex. 10); Master Repurchase Agreement between Greenwich Capital Markets, Inc. and Thornburg Mortgage, Inc. (dated Sept. 14, 2007)(Trial Ex. 225); Master Repurchase Agreement between Credit Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation (dated Sept. 20, 2007)(Trial Ex. 226)).

A reasonable jury could make findings about Thornburg Mortgage's lending requirements, based on all of the evidence presented to it at trial in a light favoring the SEC, without needing to parse through every reverse repurchase agreement term governing every margin call in the $157 million in margin calls that Thornburg Mortgage received on the morning of February 28, 2008.  A reasonable jury, therefore, could conclude that it was misleading for Goldstone to say that all lending requirements had been met when he knew that Thornburg Mortgage had margin calls that had not been met; that the lender had not finally declared a default may make the clause, "met all of its lending requirements," correct for a nanosecond, but that does not save the statement from being misleading.  E.g., Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 705-07 (7th Cir. 2008)(Posner, J.)(reiterating a prior ruling that several of the defendant's statements were adequately pleaded as materially false, including the defendant's statement that sales were "still going strong," and noting that statement would be misleading if the defendant knew that its sales were about to collapse).

The Defendants argue that, at the time Goldstone spoke on CNBC, it was true that

Thornburg Mortgage had "met all of its lending requirements."   Trial Tr. at 2820:8-15 (McKenna, Goldstone).   The Defendants bifurcate a margin call from a lending requirement, emphasizing that "the initiation of a margin call is not a 'lending requirement'; meeting a margin call by a contractual of negotiated deadline is."   Reply at 10.   "At best," according to the Defendants, "the 'lending requirement' here is the alleged contractual condition that a margin call must be paid by 5 p.m. Eastern, unless otherwise agreed."   Reply at 10.   The Defendants therefore imply that, because Goldstone spoke on CNBC before the 5 p.m. contractual deadline, Goldstone's statement that Thornburg Mortgage had "met all of its lending requirements" was true.   See Reply at 10.   The SEC responds that Goldstone's statement that Thornburg Mortgage had "met all of its lending requirements" was, in fact, a representation that Thornburg Mortgage had "no margin calls outstanding" at the time Goldstone made that remark on television. Opposition at 5-6.   The SEC underscores that, under its interpretation that Goldstone intended to imply that "lending requirements" includes margin calls, Goldstone's statement was clearly and knowingly false or misleading when made.   Opposition at 5-6.

It is within the jury's province to decide questions of fact, including questions concerning what Goldstone meant by his statement on CNBC that Thornburg Mortgage had "met all of its lending requirements" and, hence, whether that statement was true when made.   Viewing all of the evidence presented to the jury in the light most favorable to the SEC, a reasonable jury could conclude that, by referring to Thornburg Mortgage's "lending requirements" on the afternoon of February 28, 2008, Goldstone referred to -- or willingly enabled his audience to form the impression that he referred to -- the margin calls that Thornburg Mortgage received on the morning of February 28, 2008.

The jury was presented with evidence that on the morning of February 28, 2008,

Goldstone was aware that "[s]tock [was] down 25 percent or so in early trading."  Trial Tr. at 2817:18-19 (McKenna).  The jury heard testimony that, to stem or to counteract the losses, Goldstone planned to communicate to the market certain "[k]ey message points," including (i) "all margin calls met.  Lenders are fine"; (ii) "We still have operating cash"; and (iii) "no asset sales to meet margin calls."  Trial Tr. at 2817:16-25 (McKenna, Goldstone); Feb. 28 Goldstone Email re: Stock Price.  Shortly after communicating those "[k]ey message points" to Thornburg Mortgage's Investor Relations group, Goldstone directed members of that group to let him know "if CNBC or Bloomberg want me on later this morning."  Trial Tr. at 2818:3-5 (McKenna).  The jury heard Goldstone testify that "these would be the key positive points related to all of the negative headlines related to [Thornburg Mortgage's 10-K] disclosure."  Trial Tr. at 2818:14-17 (Goldstone).  The jury was presented with evidence that, regarding his central communications to the market via Thornburg Mortgage's Investor Relations group, Goldstone's focus was on margin calls.  See Trial Tr. at 2817:16-25 (McKenna, Goldstone).  A reasonable jury, therefore, could understand Goldstone's CNBC statement about "lending requirements" to mean -- or at the least encompass -- margin calls.  Viewing Goldstone's statement in that light, a reasonable jury could conclude that Goldstone's statement that Thornburg Mortgage had "met all [its] lending requirements" was knowingly false or misleading.

Furthermore, separate from what Goldstone had in mind by "lending requirements" and whether, as a matter of fact, a margin call is a lending requirement, the jury also heard substantial evidence at trial to reasonably find that Goldstone's television statement that Thornburg Mortgage had the "liquidity and cash available to continue to support the portfolio" was also false or misleading when made.  CNBC Interview at 3:54-4:09.  See Trial Tr. at 2820:8-15

(McKenna, Goldstone).   See, e.g., 2822:12-2823:9 (McKenna, Goldstone)(testifying as to Goldstone's morning Feb. 28 email to Thornburg Mortgage's board of directors, detailing the company's position as of Wednesday, February 27, 2008, and Goldstone's plans to raise liquidity before the following Monday); Feb. 28 Fellers' Email; Trial Tr. at 2820:21-2821:7 (McKenna, Goldstone)(testifying as to Feller's email communicating that Thornburg Mortgage had received $158.7 million margin calls); Trial Tr. at 2822:8-11 (McKenna, Goldstone)(testifying that the $158.7 million in margin calls indisputably impacted Thornburg Mortgage's cash position); Trial Tr. at 2829:8-21 (McKenna, Goldstone)(testifying as to Thornburg Mortgage's inability to meet its margin calls); Trial Tr. at 558:13-560:15 (Voorhees, Cisz)(testifying as to Thornburg Mortgage's inability to meet its margin calls).   Accordingly, the SEC presented a legally sufficient evidentiary basis for a reasonable jury to find Goldstone liable on Claim 1, because Goldstone knowingly or recklessly made a false or misleading statement on CNBC on February 28, 2008.

### B.   THE SEC PRESENTED EVIDENCE BY WHICH A REASONABLE JURY COULD FIND THAT GOLDSTONE KNOWINGLY OR RECKLESSLY MADE A FALSE STATEMENT IN THE FEBRUARY 28, 2008, EMAIL TO THORNBURG MORTGAGE'S INVESTOR RELATIONS GROUP.

On the morning of February 28, 2008, Goldstone sent an email to Investor Relations group members.   See Trial Tr. at 2817:11-15 (McKenna, Goldstone); Feb. 28 Goldstone Email re: Stock Price.   The email's subject was "stock price."   Trial Tr. at 2817:11-15 (McKenna, Goldstone); Feb. 28 Goldstone Email re: Stock Price.   The jury heard the following testimony regarding Goldstone's email:

> Q.  And you see you wrote, "Our 10-K has been picked up by the press and the reports are not very good.  Stock is down 25 percent or so in early trading.  I suspect it will be a busy day on the phones.  Key message points are as follows: Number 1, all margin calls met.  Lenders are fine; 2, we still have sufficient operating cash, though less than at December 31; 3, no asset sales to meet margin

calls."

A. Yes, I do.

Q. Did you, in fact, write that?

A. Yes, I did.

Trial Tr. at 2817:16-2818:2 (McKenna, Goldstone); Feb. 28 Goldstone Email re: Stock Price. The Court submitted to the jury the SEC's claim against Goldstone for violations of section 10(b) of the Exchange Act and rule 10b-5(b), predicated on Goldstone's February 28, 2008, email statement of "[k]ey message points" to Thornburg Mortgage's Investor Relations group. Final Jury Verdict at 1; Final Jury Instructions, Instruction No. 29, at 41-43.  After the jury failed to return a verdict on this claim, see Final Jury Verdict at 1, the Defendants renew their motion for judgment as a matter of law, arguing that the Court should dismiss the SEC's rule 10b-5 claim predicated on Goldstone's email to Thornburg Mortgage's Investor Relations group, see Renewed Motion for Judgment at 20-22.

In their Renewed Motion for Judgment, the Defendants assert two primary arguments to support its view that the Court dismiss this claim as a matter of law.  See Renewed Motion for Judgment at 20-22.  First, the Defendants argue that the evidence introduced at trial is legally insufficient to support Goldstone's liability for the alleged statements that Thornburg Mortgage's Investor Relations group made.  See Renewed Motion for Judgment at 20-22.  Second, relying on Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. at 141, the Defendants argue that Goldstone was not a "maker" of the Investor Relations statements to Thornburg Mortgage investors and, therefore, that Goldstone cannot be liable for those statements.  See Renewed Motion for Judgment at 21.  These arguments do not persuade the Court.  The Court concludes that the SEC presented legally sufficient evidence at trial for a reasonable jury to find that

- 85 -

Goldstone was a maker of the statements that the Investor Relations group members conveyed to Thornburg Mortgage investors on February 28, 2008, and that those statements were knowingly or recklessly false, or misleading.

> **1.** **The SEC Presented Legally Sufficient Evidence By Which a Reasonable Jury Could Find that Goldstone Was a Maker of the Statements that Investor Relations Group Members Conveyed to Thornburg Mortgage Investors on February 28, 2008.**

The jury was presented with substantial evidence at trial to conclude that Goldstone made the statements that Thornburg Mortgage Investor Relations group members conveyed to Thornburg Mortgage investors on February 28, 2008 -- namely that "all margin calls met[,]" "[l]enders are fine[,]" and "we still have sufficient operating cash."  Trial Tr. at 2817:16-2818:2 (McKenna, Goldstone).  Rule 10b-5(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(b).  "For the purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 142 (emphasis added).  See also Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 144 (holding "that the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it").  Absent control, a person cannot "'make' a statement in its own right."  Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 142.  "One who prepares or publishes a statement on behalf of another is not its maker."  Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 142.

The Defendants argue that the SEC failed to produce substantial evidence that Thornburg Mortgage's Investor Relations group members conveyed the statements, "all margin calls met[,]" "[l]enders are fine[,]" and "we still have sufficient operating cash" to investors, emphasizing that the Investor Relations group members spoke to Thornburg Mortgage investors over the telephone and their conversations were unrecorded.   Renewed Motion for Judgment at 21-22. This argument is unconvincing.   The jury heard the following testimony regarding an email that O'Leary sent to Goldstone on the afternoon of February 28, 2008, reflecting that the Investor Relations group members conveyed the specific statements that Goldstone had directed group members to convey in his "key message points" directive:

> Q. . . . Mr. Goldstone, do you recognize . . . an email that Ms. O'Leary Lopez sent to you on the afternoon of February 28?
>
> A.  Yes, I do.
>
> Q.  You and others, I should say?
>
> A.  Yes.
>
> Q.  And the subject is investor relations and corporate coms end-of-day recap; is that right?
>
> A.  Yes.
>
> Q.  And she says in the middle there, "All in all" -- or at the bottom of the screen, "We got about 65 phone calls and 20 emails."  Do you see that?
>
> A.  Yes.
>
> Q.  Do you know whether that's heavy or light or average traffic for the investor relations department?
>
> A.  In my view, that's pretty light.
>
> Q.  Okay.  And it says at the bottom of the email, if you could scan down . . . it says, "Top messages reinforced in the market."  Do you see that?
>
> A.  Yes I do.

Q.  And it says, "We have met all margin calls to date"; right?

A.  Yes, it does.

Q.  Then a little further on, the next sentence says, "We have sufficient operating cash."  Is that right?

A.  I'm sorry, yes, it does say that.

Q.  "And we don't' expect to sell assets to meet margin calls."  Is that right?

A.  That's correct.

Q.  And are those consistent with the email you sent in the morning to the investor relations department?

A.  Well, yes.

Q.  We can go back.

A.  That's fine, yes.

Trial Tr. at 2827:9-2828:21 (McKenna, Goldstone).  This testimony is legally sufficient for a reasonable jury to find that Investor Relations group members conveyed the "key message points" which Goldstone directed those Thornburg Mortgage employees to convey to investors on the morning of February 28, 2008.  Trial Tr. at 2817:16-2818:2 (McKenna, Goldstone); Feb. 28 Goldstone Email re: Stock Price.  Given this testimony, pace the Defendants' argument, it was not necessary for the jury to hear testimony specifically recounting the sixty-five telephone conversations to which O'Leary made reference in her February, 28, 2008, afternoon email to Goldstone.  See Trial Tr. at 2827:18-20 (McKenna).

The Defendants also contend that Goldstone did not himself make the February 28, 2008, statements at issue to Thornburg Mortgage investors and, hence, cannot be liable for those statements.  See Renewed Motion for Judgment at 21-22.  The Defendants' emphasize that Goldstone did not expressly approve the talking points that Investor Relations group members

- 88 -

used, arguing that, although the Investor Relations group used Goldstone's early morning emails as guidance, it ultimately made independent decisions what to communicate to investors.  See Renewed Motion for Judgment at 22.  The Defendants conclude that, because the Investor Relations group made its own decisions what to communicate to Thornburg Mortgage investors, a reasonable jury could not conclude, based on the evidence presented, that Goldstone was a maker of the February 28, 2008, statements that the Investor Relations group members conveyed to Thornburg Mortgage investors.  See Renewed Motion for Judgment at 22.

The SEC presented sufficient evidence, however, for a reasonable jury to find that Goldstone was a maker of the statements -- "all margin calls met.  Lenders are fine" and "we still have sufficient operating cash" -- that Thornburg Mortgage Investor Relations group members conveyed to Thornburg Mortgage investors on February 28, 2008.  Trial Tr. at 2817:16-2818:2 (McKenna, Goldstone); Feb. 28 Goldstone Email re: Stock Price.  The SEC introduced sufficient evidence that, for purposes of rule 10b-5(b) liability, Goldstone had "authority over the content of the[se] statement[s] and whether and how to communicate [them]."  Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 144.  Goldstone was Thornburg Mortgage's CEO, and the SEC introduced substantial testimony that Goldstone had authority over the content and communication of statements which Thornburg Mortgage's Investor Relations group issued.  See Trial Tr. at 2814:1-6 (McKenna, Goldstone)(testifying that Goldstone worked with O'Leary in crafting messaging for Thornburg Mortgage investors and outside analysts); id. at 2812:19-2813:25 (McKenna, Goldstone)(testifying that O'Leary sought, and Goldstone provided, guidance and direction regarding Goldstone's "preference for referring to the August assets sales for consistency purposes throughout the annual report").  Moreover, the jury heard the following testimony from O'Leary, a Thornburg Mortgage's Investor Relations group member:

Q.  Did you often run message points by Mr. Goldstone?

A.  Oh, yes.

Q.  Okay.  I guess I should ask, who did you work for at the company?

A.  Larry.

Q.  Mr. Goldstone?

A.  Mr. Goldstone.  Actually, Amy Pell was my direct report.  I reported in to Amy, but she was on maternity leave at that time.

Trial Tr. at 1180:16-25 (McKenna, O'Leary).  Regarding the February 28, 2008, statements, "all margin calls met[,]" "[l]enders are fine[,]" and "we still have sufficient operating cash," the jury heard testimony that Goldstone directed Investor Relations group members to convey these statements and, later that afternoon, O'Leary confirmed with Goldstone that Investor Relations group members conveyed those messages to investors in response to over sixty-five calls and twenty emails that the Investor Relations group received that day.  Trial Tr. at 2827:9-2828:21 (McKenna, Goldstone).  Accordingly, the SEC introduced sufficient testimony for a reasonable jury to find that Goldstone had authority both "over the content" of the February 28, 2008, statements at issue, and "whether and how to communicate" those statements.  Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 144.  Accordingly, a reasonable jury could find that Goldstone was a "maker" of the Investor Relations statements.  Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 144.

Moreover, the Defendants' reliance on Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 144, is misplaced.  In that case, the Supreme Court held that the plaintiff-respondent, First Derivative Traders, failed under rule 12(b)(6) of the Federal Rules of Civil Procedure to state a claim in a private action asserted under rule 10b-5(b), because the defendant-petitioner, Janus Capital Management, LLC ("JCM"), a wholly owned subsidiary of Janus

- 90 -

Capital Group, Inc., did not make statements in the prospectuses that Janus Investment Fund

issued.  See 564 U.S. at 137-138.  The Supreme Court "declined [First Derivative's] invitation to

disregard the corporate form," Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at

145, reasoning that "JCM and Janus Investment Fund remain legally separate entities," 564 U.S.

at 147.  Unlike in Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 144-47, in this

case, the Court does not confront the Defendants' arguments in the motion to dismiss posture,

but rather in the posture of a renewed motion for judgment after a trial during which the jury

heard sufficient evidence that Goldstone had authority over the communications that Thornburg

Mortgage's Investor Relations employees conveyed.  See Trial Tr. at 1180:16-25 (McKenna,

O'Leary); Trial Tr. at 2812:19-2813:25 (McKenna, Goldstone); Trial Tr. at 2814:1-6 (McKenna,

Goldstone); Trial Tr. at 2827:9-2828:21 (McKenna, Goldstone).  Furthermore, the relationship

between JCM and Janus Investment Fund, which are separate corporate entities, see Janus

Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at 147, is dissimilar from the relationship

between Goldstone, as Thornburg Mortgage CEO, and the employees of the Thornburg

Mortgage Investor Relations group.

What is essential under Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. at

144-47, is whether the defendant "actually exercised control over the content" of the statements

at issue.   Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 427 (7th Cir.

2015)(emphasis in original)(citing Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S.

at 144-47).[21]  Moreover, "nothing in Janus precludes a single statement from having multiple

---

[21]See, e.g., In re Lehman Bros. Sec. & ERISA Litig., No. 09-MD-2017-LAK, 2013 WL 5730020, at *2 (S.D.N.Y. Oct. 22, 2013)(Kaplan, J.)(holding that the "defendants are appropriately considered to have been 'makers' of the statements at issue under Janus," because the "defendants undoubtedly had 'ultimate authority' over their content as chief executive officer and chief financial officer of LBHI, respectively, and the filings were explicitly attributed to

makers."  Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d at 427 (citing In re Pfizer Inc.

Sec. Litig., 936 F. Supp. 2d at 268-69; City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin

Corp., 875 F. Supp. 2d at 374; City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc., 814

F. Supp. 2d at 417).   As Judge Rakoff explained, Janus Capital Grp., Inc. v. First Derivative

Traders

>    addressed only whether third parties can be held liable for statements made by
>    their clients.  Its logic rested on the distinction between secondary liability and
>    primary liability and has no bearing on how corporate officers who work together
>    in the same entity can be held jointly responsible on a theory of primary liability.
>    It is not inconsistent with Janus Capital to presume that multiple people in a single
>    corporation have the joint authority to "make" an SEC filing, such that a
>    misstatement has more than one "maker."

City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d at 374

(emphasis in original).  Consequently, the Supreme Court's holding and opinion in Janus Capital

Grp., Inc. v. First Derivative Traders, 564 U.S. at 144, is unavailing for the Defendants.

---

LBHI in the offering memorandum"); SEC v. Levin, No. 12-21917-CIV, 2013 WL 5588224, at
*14 (S.D. Fla. Oct. 10, 2013)(Rosenbaum, J.)(holding that "the allegations state a claim for
primary liability under Section 10(b) and Rule 10b-5 based on Levin's alleged ultimate authority
over the content of the Banyon PowerPoints and BIF offering materials"); SEC v. Daifotis, 874
F. Supp. 2d 870, 881 (N.D.Cal. 2012)(Alsup, J.)(holding that, "in the wake of Janus, an
executive who undisputedly exercised authority over his own non-casual statements with the
intent and reasonable expectation that such statement would be relayed to the investing public,
should be deemed to be the person who 'made' the statements to the investing public"); SEC v.
Mercury Interactive, LLC, No. 5:07-CV-02822-WHA, 2011 WL 5871020, at *2 (N.D. Cal. Nov.
22, 2011)(Fogel, J.)(denying motion to dismiss because the defendant "signed the notices in her
capacity as an officer of the company, and that the company is the sole 'maker' of the proxy
statements").

> 2. **The SEC Presented Legally Sufficient Evidence By Which a Reasonable Jury Could Find that the February 28, 2008, Statements which Goldstone Made, and that Thornburg Mortgage Investor Relations Group Members Conveyed, Were Knowingly or Recklessly False, or Were Misleading.**

The SEC presented legally sufficient evidence at trial for a reasonable jury to conclude that those statements which Goldstone made and which members of Thornburg Mortgage's Investor Relations group conveyed, were knowingly or recklessly false, or misleading. In their Renewed Motion for Judgment, the Defendants assert that the SEC failed to introduce any evidence that the statements which Investor Relations personnel made to Thornburg Mortgage's investors were either false or material. See Renewed Motion for Judgment at 21. The Defendants' assertion is incorrect.

Goldstone's statements made on February 28, 2008, on CNBC are highly similar to the morning statements that Goldstone made to Thornburg Mortgage's Investor Relations group members and directed those employees to convey to Thornburg Mortgage investors. Compare Trial Tr. at 2819:22-2820:17(McKenna, Goldstone)(testifying regarding Goldstone's CNBC statements), with Trial Tr. at 2817:16-2818:2 (McKenna, Goldstone)(testifying regarding Goldstone's statements to Investor Relations personnel). On television, Goldstone stated that Thornburg Mortgage had "met all of [its] lending requirements," and had "liquidity and cash available to continue to support the portfolio." Trial Tr. at 2820:8-15 (McKenna, Goldstone). In his email to Investor Relations group members, Goldstone stated, and directed those employees to convey, that "all margin calls met[,]" "[l]enders are fine[,]" and "we still have sufficient operating cash." Trial Tr. at 2817:16-2818:2 (McKenna, Goldstone). As the Court earlier detailed, the SEC presented substantial evidence by which a reasonable jury could find that Goldstone's CNBC statements were knowingly false or misleading. See, e.g., Trial Tr. at

2822:12-2823:9 (McKenna, Goldstone)(testifying about Goldstone's morning Feb. 28 Email to Thornburg Mortgage's board of directors, detailing the company's position as of Wednesday, February 27, 2008, and Goldstone's plans to raise liquidity before the following Monday); Feb. 28 Feller's Email; Trial Tr. at 2820:21-2821:7 (McKenna, Goldstone)(testifying about Feller's email communicating that Thornburg Mortgage had received $158.7 million margin calls); Trial Tr. at 2822:8-11 (McKenna, Goldstone)(testifying that the $158.7 million in margin calls indisputably impacted Thornburg Mortgage's cash position); Trial Tr. at 2829:8-21 (McKenna, Goldstone)(testifying about Thornburg Mortgage's inability to meet its margin calls); Trial Tr. at 558:13-560:15 (Voorhees, Cisz)(testifying about Thornburg Mortgage's inability to meet its margin calls).   This evidence is also legally sufficient for a reasonable jury to find that the statements which Goldstone made to the Thornburg Mortgage Investor Relations group members, and which those employees conveyed to Thornburg Mortgage investors, were knowingly false or misleading.   The Court therefore denies the Defendants' Renewed Motion for Judgments as a Matter of Law on Claim 1.

**IT IS ORDERED** that the Defendants' Renewed Motion for Judgment as a Matter of Law, filed July 27, 2016 (Doc. 594), is granted in part and denied in part.   The Court grants the Defendants' Renewed Motion for Judgment regarding Claims 2, 3, and 6, reflecting the SEC's notice of withdrawal of those claims.   The Court denies the Defendants' Renewed Motion for Judgment regarding Claims 1 and 8.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Michael H. Hoses
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

-- and --

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Ian S. Karpel
Danielle Voorhees
Securities and Exchange Commission
Denver, Colorado

   *Attorneys for Plaintiff Securities and Exchange Commission*

Robert Badal
Santa Barbara, California

-- and --

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin, & Robb P.A.
Albuquerque, New Mexico

-- and --

Skye Lynn Perryman
Michael A. Lamson
April N. Williams
Wilmer Cutler Pickering Hale & Dorr LLP
Washington, DC

-- and --

Randall R. Lee
Aaron Thompson
Daniel Crump
Wilmer Cutler Pickering Hale & Dorr LLP
Los Angeles, California

-- and --

Heather S. Tewksbury
Christopher W. Johnstone
Wilmer Cutler Pickering Hale & Dorr LLP
Palo Alto, California

-- and --

Elena Kilberg
Robert J. Liubicic
Jerry L. Marks
Alisa Schlesinger
Paul M. Torres
Milbank, Twee, Hadley & McCloy LLP
Los Angeles, CA

*Attorneys for Defendants Larry Goldstone, Clarence G. Simmons, III, and Jane E. Starrett*

Peter J. Dennin
George A. Salter
Hogan Lovells US LLP
New York, NY

-- and --

William Spencer Reid
Keleher & McLeod
Albuquerque, NM

*Attorneys for Intervenor KPMG, LLP*