**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

vs.                                                                  No. CIV 12-0257 JB/GBW

LARRY A. GOLDSTONE; CLARENCE G.
SIMMONS, III and JANE E. STARRETT,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Plaintiff Securities and Exchange Commission's Motion in Limine to Exclude Argument or Evidence that the Defendants did not Violate Rule 13b2-2 as a Result of Providing the "Tie-Out Document" to KPMG, filed March 17, 2016 (Doc. 392)("Motion"). The Court held a hearing on May 11, 2016. The primary issue is whether the Court should allow the Defendants, Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett,[1] to introduce evidence that, on February, 27, 2008, Thornburg Mortgage provided to its auditor, KPMG, LLC, a "Tie-Out Document," which constituted a schedule of margin calls that Thornburg Mortgage received in the two weeks before that date. The Court will allow the Defendants to introduce evidence related to the Tie-Out Document, because such evidence is not irrelevant to whether the Defendants violated rule 13b2-2 and because the danger

---

[1]Starrett reached a settlement with the Securities and Exchange Commission ("SEC") on May 20, 2016. Consent of Defendant Jane E. Starrett at 1 (dated May 20, 2016), filed May 26, 2016 (Doc. 472-1)("Starrett Consent"). The Starrett Consent neither admits nor denies the Complaint's allegations, and does not include a requirement that Starrett testify for any of the remaining parties. Starrett Consent at 1. The term "Defendants," when describing the case's factual and procedural history, includes Starrett until the Starrett Consent's entry.

of unfair prejudice does not substantially outweigh the Tie-Out Document's probative value. Accordingly, the Court denies the Motion.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed March 13, 2012 (Doc. 1). The Court presents the facts solely to provide context for the Motion. It continues to adhere to the decisions on the facts that it reached in SEC v. Goldstone, No. CIV. 12-0257 JB/GBW, 2015 WL 5138242 (D.N.M. August 22, 2015)(Browning, J.)("Summary Judgment Opinion").

The Defendants are Thornburg Mortgage officers: Goldstone was the chief executive officer, Simmons was the chief financial officer, and Starrett was the chief accounting officer. See Complaint ¶ 1, at 1. The SEC alleges that the Defendants were involved in fraudulent misrepresentations and omissions made in connection with the 2007 Form 10-K.[2] See Complaint ¶¶ 1-3, at 1-2. The SEC asserts that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditor, KPMG, LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities ("MBS") similar to the Thornburg Mortgage's adjustable rate mortgage ("ARM") securities.[3] Complaint ¶¶ 76-79, at 22.

Thornburg Mortgage was a publicly traded single-family mortgage lender and real estate

---

[2]A Form 10-K is "[a] comprehensive summary report of a company's performance that must be submitted annually to the Securities and Exchange Commission. Typically, the 10-K contains much more detail than the annual report." 10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014). An annual report is "an annual publication that public corporations must provide to shareholders to describe their operations and financial conditions. It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc." 10-K, Investopedia, http://www.investopedia.com/terms/1/10-k.asp (last visited August 9, 2014).

[3]An "adjustable rate mortgage" is a "mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Adjustable Rate Mortgage, Black's Law Dictionary 1102 (9th ed. 2009).

investment trust, founded in 1993, headquartered in Santa Fe, New Mexico, and was once the second-largest independent mortgage company in the United States of America after Countrywide Financial Corporation.  See Complaint ¶ 2, at 1; id. ¶ 20, at 7.  During the time relevant to the Complaint's allegations, Thornburg Mortgage's shares were traded on the New York Stock Exchange.  See Complaint ¶ 20, at 7.  Thornburg Mortgage's lending operations focused on "jumbo" and "super-jumbo"[4] ARM securities; Thornburg Mortgage also purchased ARM securities that third parties originated.  See Complaint ¶ 21, at 7.  Thornburg Mortgage

_____

[4]"Jumbo" and "super-jumbo," in reference to ARM securities, describe the amount of a mortgage.  Super jumbo mortgage, Wikipedia (Dec. 24, 2012), http://en.wikipedia.org/wiki/Super_jumbo_mortgage.  These mortgages exceed the conforming loan limit that the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") set.  Super jumbo mortgage, Wikipedia.  Fannie Mae purchases and guarantees mortgages that meet its funding criteria.  Fannie Mae, Investopedia, http://www.investopedia.com/terms/f/fanniemae.asp (last visited August 9, 2014).  Both Fannie Mae and Freddie Mac are government-sponsored enterprises, that is, financial services corporations that the United States Congress created.  See Fannie Mae, Wikipedia, http://en.wikipedia.org/wiki/Fannie_Mae (last updated July 26, 2014); Freddie Mac, Wikipedia, http://en.wikipedia.org/wiki/Freddie_Mac (last updated July 18, 2014); Government-Sponsored Enterprise, Wikipedia, http://en.wikipedia.org/wiki/Government-sponsored_enterprise (last updated January 9, 2014).  "Together, Fannie Mae and Freddie Mac purchase or guarantee between 40 to 60% of all mortgages originated in the United States annually, depending upon market conditions and consumer trends."  Fannie Mae, Investopedia.  The conforming limits that Fannie Mae and Freddie Mac set vary by county, but the conforming loan limit for 2013 and 2014 for most of the United States, including all of New Mexico, was $417,000.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  Higher-value areas, such as the District of Columbia, have conforming loan limits of up to $625,500.00.  See FHA Announces Conforming Loan Limits for 2014, released November 26, 2013, http://www.fhfa.gov/webfiles/25847/CLL2014112613Final.pdf.  "Jumbo" mortgage loans are loans that exceed the local conforming loan limit and have higher interest rates, because of the increased risk of issuing a larger loan.  Jumbo Mortgage, Wikipedia (Oct. 11, 2013), http://en.wikipedia.org/wiki/Jumbo_mortgage.  The term "super-jumbo" is not expressly defined or regulated, but mortgage companies use it internally and independently to set loan parameters.  See Super jumbo mortgage, Wikipedia.  The definition may vary according to a particular lender's criteria and the area where the mortgage is being sought.  See Super jumbo mortgage, Wikipedia.  The United States government did not explicitly guarantee Fannie Mae or Freddie Mac's securities, but there was widespread belief of an implied federal guarantee.  See Fannie Mae, Wikipedia; Freddie Mac, Wikipedia.

used most of its earnings to pay dividends, and obtained financing for its mortgage and investment business through reverse repurchase agreements[5] which ARM securities backed.  See Complaint ¶ 3, at 2.  Thornburg Mortgage's reverse repurchase agreements "typically consisted of a simultaneous sale of pledged securities to a lender at an agreed price in return for Thornburg Mortgage's agreement to repurchase the same securities at a future date (the maturity date) at a higher price."  Complaint ¶ 22, at 7-8.  The reverse repurchase agreements required Thornburg Mortgage to maintain a certain degree of liquidity and subjected Thornburg Mortgage to margin calls if the value of the ARM securities serving as collateral on the agreements fell below a specified level.  See Complaint ¶ 22, at 8.  A margin call would generally require Thornburg Mortgage to pay cash to reduce its loan amount or to pledge additional collateral to the lender, either on the same day that Thornburg Mortgage received the margin call or on the following day, unless the parties agreed otherwise.  See Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and [Counterparty] Thornburg Mortgage, Inc., International Securities Lenders Association ISLA Global Master Securities Lending Agreement § 5.8, at 11, filed May 21, 2012 (Doc. 37-6)(brackets in original); Master Repurchase Agreement Between Greenwich Capital Markets, Inc., and Thornburg Mortgage, Inc. § 4(c) at 5, filed July 20, 2012 (Doc. 60-2); id. at § 11(a), at 7-8; Master Repurchase Agreement Between Credit

---

[5]A "repurchase agreement" is a "short-term loan agreement by which one party sells a security to another party but promises to buy back the security on a specified date at a specified price.  Often shortened to *repo*."  Repurchase Agreement, Black's Law Dictionary 1419 (9th ed. 2009)(emphasis in original).  A "reverse repurchase agreement" is the same agreement from the buyer's point of view rather than the seller's.  Repurchase agreement, Wikipedia (Nov. 23, 2013), http://en.wikipedia.org/wiki/Repurchase_agreement.  "For the party selling the security (and agreeing to repurchase it in the future) it is a repo; for the party on the other end of the transaction (buying the security and agreeing to sell in the future) it is a reverse repurchase agreement."  Reverse Repurchase Agreement, Investopedia (Dec. 8, 2013), http://www.investopedia.com/terms/r/reverserepurchaseagreement.asp.

Suisse First Boston Corporation and Thornburg Mortgage Asset Corporation § 4(c), at 4, filed July 20, 2012 (Doc. 60-3); <u>id.</u> at § 11(a), at 7; Complaint ¶ 23, at 8.  Thornburg Mortgage's failure to timely meet a margin call was an event of default and allowed a lender to declare Thornburg Mortgage in default, which would trigger cross-defaults on Thornburg Mortgage's other reverse repurchase agreements, and all lenders with whom Thornburg Mortgage had defaulted were then allowed to seize and to sell the ARM securities collateralizing Thornburg Mortgage's loans.  <u>See</u> Complaint ¶ 24, at 8.  Receiving margin calls was part of Thornburg Mortgage's normal course of business, as the value of its ARM securities often fluctuated.  <u>See</u> Complaint ¶ 25, at 8.

Citigroup Global Markets, Inc.'s margin call on February 21, 2008, was the largest of the three margin calls that Thornburg Mortgage could not immediately meet -- $196 million.  <u>See</u> Complaint ¶ 33, at 10.  In response to Thornburg Mortgage's inability to meet the Citigroup Global margin call on February 21, 2008, Citigroup Global sent a letter to Goldstone and Simmons, stating that Thornburg Mortgage had breached the parties' reverse repurchase agreement and reserving Citigroup Global's right to declare Thornburg Mortgage in default.  <u>See</u> Complaint ¶ 3, at 2; <u>id.</u> ¶ 34, at 10-11 (citing Letter from Stephen G. Malekian to Thornburg Mortgage, Inc., Re: The Global Master Securities Lending Agreement dated as of September 20, 2007 Between Citigroup Global Markets, Inc. as Intermediating Agent for Citigroup Global Markets Limited and Together with Citigroup Global Markets, Inc. and Thornburg Mortgage (dated Feb. 21, 2008), filed May 21, 2012 (Doc. 37-7)("Citigroup Global Letter")).  Citigroup Global made clear that, although Citigroup Global was not exercising its rights under the reverse repurchase agreement, it was not waiving its right to declare Thornburg Mortgage in default or to amend the underlying reverse repurchase agreement.  <u>See</u> Complaint ¶ 34, at 11.  In an email

from Goldstone to Simmons, Starrett, and others, dated February 21, 2008, Goldstone stated that he had negotiated a "payment plan with Citigroup Global in order to satisfy the call by the end of [the following] week[.]"  Complaint ¶ 61, at 18 (alterations in original)(quoting Email from Clay Simmons to Nyira Gitana, Subject: FW: TMA Update at 2 (sent February 21, 2008, at 9:30 a.m.), filed May 21, 2012 (Doc. 37-10)).  Thornburg Mortgage paid the Citigroup Global margin call over seven days and made the final payment of seventy-five million dollars on February 27, 2008.  See Complaint ¶ 35, at 11.

In the last week of February, 2008, Thornburg Mortgage had to sell the interest-only portions of its ARM loans ("I/O Strip Transactions") to generate sufficient cash to meet the margin calls it received in the second half of the month.  Complaint ¶ 36, at 11.  The I/O Strip Transactions further depleted Thornburg Mortgage's liquidity to meet margin calls.  See Complaint ¶ 36, at 11.  In an email from Goldstone to Simmons and Starrett on February 22, 2008, Goldstone informed them of some of Thornburg Mortgage's plans to raise liquidity to meet margin calls: "'Citi sold two of [Thornburg Mortgage's] IO securities[6] as well for a gain of approximately $25 million and net proceeds to Citi of $10 million.'"  Complaint ¶ 67, at 19-20 (alteration in original)(quoting Email from Larry Goldstone to Garret Thornburg, Anne Anderson, David Ater, Eliot Cutler, Francis Mullin III, Ike Kalangis, Michael Jeffers, Owen Lopez, and Stuart Sherman, Subject: TMA Update - Friday Morning, February 22 at 2  (sent February 22, 2008 at 8:42 a.m.), filed May 21, 2012 (Doc. 37-8 at 2)("Feb. 22, 2008, Email")).  In an email sent February 25, 2008, Goldstone informed Simmons and Starrett that Thornburg

---

[6]"Interest only (IO) strips are the interest portion of mortgage, Treasury, or bond payments, which [are] separated and sold individually from the principal portion of those same payments."  Interest Only (IO) Strips, Investopedia (April 22, 2016), http://www.investopedia.com/terms/i/iostrips.asp.

Mortgage was "'moving towards resolving [its] margin issues'" through, among other strategies, having "'sold some additional IO securities[.]'"   Complaint ¶ 68, at 20 (quoting Email from Larry Goldstone to the Thornburg Mortgage Board of Directors (sent February 25, 2008, at 5:03 p.m.), filed May 21, 2012 (Doc. 37-9)("Feb. 25, 2008, Email")).

The Defendants planned to quickly raise cash to satisfy Thornburg Mortgage's future margin calls after filing the 2007 Form 10-K.  Complaint ¶ 32, at 10.  The Defendants did not plan to disclose that Thornburg Mortgage was late in meeting margin calls.  See Complaint ¶ 32, at 10.  In an email, from Goldstone to Simmons and Starrett, on February 22, 2008, Goldstone stated that Thornburg Mortgage was "'planning to sell two of [its] TMA securities'" to meet margin calls and that this sale would "'allow[] us to keep our current situation quiet while we deal with it.'"  Complaint ¶ 67, at 20 (alterations in original)(quoting Feb. 22, 2008, Email at 2).

The Defendants "scrambled" to meet Thornburg Mortgage's margin calls before filing the 2007 Form 10-K.  Complaint ¶ 30, at 9-10.  In an email from Goldstone dated February 22, 2008, which Simmons and Starrett received, Goldstone stated:

> We don't want to disclose our current circumstance until it is resolved.  Our goal for resolution i[s] the filing of our 10-K.  How we disclose this issue and what we say will depend on where we are next week when we need to file.  But, our plan is to say that we had margin calls and all have been met.

Complaint ¶ 30, at 10 (alteration in original)(quoting Feb. 22, 2008, Email at 2).  Goldstone also discussed in the same email strategies that would allow Thornburg Mortgage "'to keep [its] current situation quiet while we deal with it.'"   Complaint ¶ 31, at 10 (alteration in original)(quoting Feb. 22, 2008, Email at 2).  Goldstone also stated: "'Hopefully our disclosure will be a simple one, meaning all margin calls have been met.'"  Complaint ¶ 31, at 10 (quoting Feb. 22, 2008 Email at 3).

Goldstone and Simmons also learned, on February 27, 2008, that a large European hedge

fund with substantial MBS holdings, similar to those Thornburg Mortgage held, was collapsing.

See Complaint ¶ 38, at 12.  Goldstone anticipated that the European hedge fund's collapse would

negatively affect Thornburg Mortgage's ARM securities and sent an email to Simmons on

February 27, 2008, in which he said:

> Also, you should know that a large Alt-A hedge fund in Europe is blowing up this
> afternoon.  UBS credit just mentioned it to me.  They got hit with 20 point
> haircuts on Alt-A and AAA's overnight.  I think we will get this a little more
> gradually, but we should be ready for it.[7]

Complaint ¶ 38, at 12 (quoting Email from Larry Goldstone to Clay Simmons at 2, sent February

27, 2008, at 3:48 p.m.), filed May 21, 2012 (Doc. 37-21)("Feb. 27, 2008, Goldstone/Simmons

Email")).  Simmons sent an email to Goldstone and others regarding the potential collapse of the

European hedge fund, stating: "'This makes it even more critical to be done with Citi today so

we can get the K filed.'"  Complaint ¶ 39, at 12 (quoting Email from Clay Simmons to

Thornburg Mortgage Employee Patrick Feldman and Larry Goldstone at 2 (sent February 27,

2008, at 8:08 a.m.), filed May 21, 2012 (Doc. 37-20)("Feb. 27, 2008, Simmons/Feldman

Email")).  Later on February 27, 2008, Simmons sent an email to Starrett, in which he stated: "'I

gave [Thornburg's SEC Reporting manager] a 6:00 AM Thursday deadline to file the K.  I do not

---

[7]A "haircut" is "[t]he difference between prices at which a market maker can buy and sell
a security," or "[t]he percentage by which an asset's market value is reduced for the purpose of
calculating capital requirement, margin and collateral levels."  Haircut, Investopedia,
http://www.investopedia.com/terms/h/haircut.asp (last visited August 23, 2014).  An "Alt-A
mortgage" is an abbreviation for "Alternative A-paper," which generally is considered riskier
than A-paper, but less risky than subprime mortgages.  Alt-A, Wikipedia (February 16, 2013,
11:03 a.m.), http://en.wikipedia.org/wiki/Alt-A.  Credit rating agencies assign bond credit
ratings, which represent the credit worthiness of corporate or government bonds, and "the
likelihood the debt will be repaid."  Bond credit rating, Wikipedia (December 13, 2013, 9:14
a.m.), http://en.wikipedia.org/wiki/Bond_credit_rating.  The letter designations, such as AAA,
AA, A, BBB, and BB, represent the bond's quality.  See Bond credit rating, Wikipedia.  "AAA"
refers to the "highest possible rating assigned to the bonds of an issuer by credit rating agencies."
AAA, Investopedia, http://www.investopedia.com/terms/a/aaa.asp (last visited July 5, 2013).

want there to be any issues based on Thursday activity.'"  Complaint ¶ 40, at 12 (alteration in original)(quoting Email from Clay Simmons to Jane Starrett at 2 (sent February 27, 2008, at 10:35 a.m.), filed May 21, 2012 (Doc. 37-38)("Feb. 27, 2008, Simmons/Starrett Email")).

Thornburg Mortgage filed its 2007 Form 10-K on February 28, 2008, approximately twelve hours after sending its last payment to Citigroup Global and meeting its outstanding margin calls.  See Complaint ¶ 3, at 6; id. ¶ 41, at 12.  Goldstone, Simmons, and Starrett drafted and reviewed Thornburg Mortgage's 2007 Form 10-K before filing it, and Goldstone and Simmons signed the Form 10-K.  See Complaint ¶ 7, at 3.  In the 2007 Form 10-K, Goldstone and Simmons represented that Thornburg Mortgage had successfully met its margin calls without selling any assets.  See Complaint ¶ 7, at 3; 2007 Form 10-K at 35 ("[D]espite these challenges, we successfully continue to meet all margin calls, we maintain existing short-term financing facilities with our existing finance counterparties and we have successfully added new financing capacity since year end."); id. at 39 ("In the event that we cannot meet future margin calls from our available cash position, we might need to selectively sell assets in order to raise cash.  To date, no such sales have been required . . . .").  Thornburg Mortgage's 2007 Form 10-K accounted for the I/O Strip Transactions as the issuance of secured debt.[8]  See Complaint ¶ 37, at

---

[8]The Financial Accounting Standards Board ("FASB") "is the independent, private-sector, not-for-profit organization . . . that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow" GAAP. About the FASB, Financial Accounting Standards Board (May 2, 2016), http://www.fasb.org/facts/.  According to the FASB's Statement of Financial Accounting Standards No. 166 ¶ 26C(b), at 5, filed May 21, 2012 (Doc. 37-33)("SFAS 166"), "[i]n a transaction in which the transferor creates an interest-only strip from a loan and transfers the interest-only strip, the interest-only strip does not meet the definition of an entire financial asset." FASB explains that, when an interest-only strip does not meet the definition of an "entire financial asset," it should not be counted as a sale.  SFAS 166 at 3.  FASB issued SFAS 166 in June, 2009, as an amendment to the Statement of Financial Accounting Standards No. 140 ¶ 9, at 3, filed May 21, 2012 (Doc. 37-32)("SFAS 140"), to clarify SFAS 140's objective.  SFAS 166 at 3.  Paragraph 9 of SFAS 140 states: "A transfer of financial assets (or all or a portion of a

11.  The 2007 Form 10-K also stated that Thornburg Mortgage had the "'intent and ability to hold its ARM Securities until their value recovered in the market,'" notwithstanding that the lenders which declared Thornburg Mortgage in default of reverse repurchase agreements could have seized Thornburg Mortgage's ARM securities pledged as collateral.  Complaint ¶ 8, at 3 (quoting 2007 Form 10-K at 41).  In accordance with the statement that Thornburg Mortgage had the intent and ability to hold its ARM securities until their value recovered, Thornburg Mortgage did not recognize $427.8 million in losses associated with its ARM securities that served as collateral on its reverse repurchase agreements.  See Complaint ¶ 8, at 4.  Thornburg Mortgage also reported a fourth-quarter 2007 profit.  See Complaint ¶ 11, at 4.  "Thornburg's . . . Form 10K and accompanying financial statements were also incorporated into the company's active Form S-3 ASR[9] registration statement, relating to Thornburg Mortgage's dividend reinvestment and stock purchase plan, which was signed by Goldstone and Simmons and had been filed with the Commission on December 10, 2007."  Complaint ¶ 89, at 26.

Thornburg Mortgage began receiving margin calls at 6:00 a.m. on February 28, 2008.  See Complaint ¶ 41, at 12-13.  Thornburg Mortgage's stock prices fell after it filed the 2007 Form 10-K.  See Complaint ¶ 10, at 4; Thornburg Hit with Margin Calls; Shares Slide, Dow Jones Newswires, Feb. 28, 2008, filed May 21, 2012 (Doc. 37-29)("Feb. 28 Dow Jones Newswire"); Thornburg, MF Global Send Financial Stocks Lower, Dow Jones MarketWatch,

---

financial asset) in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange."  SFAS 140 ¶ 9, at 3.

[9]"ASR" stands for "Accounting Series Release" and refers to the SEC's official accounting rule pronouncements.  Accounting Series Release, Investopedia (December 8, 2013), http://www.investopedia.com/terms/a/accounting-series-releases.asp.  "ASRs provide guidelines and rules on all aspects of corporate accounting, including requirements, auditing policies and disclosure mandates."  Accounting Series Release, Investopedia.

Feb. 28, 2008, filed May 21, 2012 (Doc. 37-30).  Simmons commented to Goldstone, in an early-morning email regarding Thornburg Mortgage's falling stock prices: "I guess the recent development section did not go over well.  If they only knew."  Complaint ¶ 10, at 4 (quoting Email from Clay Simmons to Larry Goldstone at 2 (sent February 28, 2008, at 6:33 a.m.), filed May 21, 2012 (Doc. 37-24)("Feb. 28, 2008, Simmons/Goldstone Email")).  In an email from Goldstone to Thornburg Mortgage's Investor Relations department on February 28, 2008, at 5:29 a.m., Goldstone instructed the group to "'try to calm the panic,'" and to inform investors that "'[a]ll margin calls met,' '[l]enders are fine,' and '[w]e have sufficient operating cash[.]'" Complaint ¶ 94, at 27 (alterations in original).  See Email from Larry Goldstone to Thornburg Mortgage IR Department Employees Amy Pell, Suzanne O'Leary Lopez, and Allison Yates at 2, (sent February 28, 2008, at 5:29 a.m.), filed May 21, 2012 (Doc. 37-27).  At 6:56 a.m., Goldstone informed Thornburg Mortgage's Board of Directors in an email that he estimated Thornburg Mortgage had approximately forty million dollars available in cash at that time.  See Complaint ¶ 95, at 28; Email from Larry Goldstone to Thornburg Mortgage Board of Directors at 2, (sent February 28, 2008, at 6:56 a.m.), filed May 21, 2012 (Doc. 37-11)("Feb. 28, 2008, Email").  As of 7:30 a.m. on February 28, 2008, Thornburg Mortgage had received over $100 million in margin calls.  See Complaint ¶ 9, at 4; id. ¶ 41, at 13.

In the afternoon of February 28, 2008, Goldstone appeared on CNBC's Street Signs.  See Complaint ¶ 98, at 28.  On Street Signs, Goldstone stated that: (i)  he did not believe Thornburg Mortgage would need to sell assets; (ii) Thornburg Mortgage had "'met all of [its] lending requirements'"; and (iii) Thornburg Mortgage had "'liquidity and cash available to continue to support the portfolio.'"  Complaint ¶ 98, at 28 (alterations in original)(quoting Street Signs: Interview with Larry Goldstone at 3:54-4:09, CNBC television broadcast February 28, 2008,

filed May 21, 2012 (Doc. 37-1)).

On the evening of February 28, 2008, Thornburg Mortgage received a default notice from J.P. Morgan Chase Bank, N.A. for an unpaid margin call that J.P. Morgan had issued to Thornburg Mortgage earlier that day.  See Complaint ¶ 41, at 13.  At the end of the day on February 28, 2008, Goldstone, Simmons, and Starrett confirmed, via email, that the "'top messages [they] reinforced in the market'" were: "'We have met all margin calls to date, and we expect to continue to do so.  We have sufficient operating cash, and we don't expect to sell assets to meet margin calls.  We returned to profitability during the fourth quarter despite a tough market.'"  Complaint ¶ 96, at 28 (alterations in original).

As part of Thornburg Mortgage's auditing process in 2007, Thornburg Mortgage had to assess whether it had the intent and ability to hold its ARM securities until maturity, or when they recovered their value on the market -- referred to as an "other-than-temporary impairment . . . analysis" ("OTTI analysis").[10]  Complaint ¶¶ 49-50, at 50-51.  As part of Thornburg Mortgage's 2007 audit, KPMG assessed whether Thornburg Mortgage's OTTI analysis was accurate.  See Complaint ¶ 49, at 14-15.[11]  The Defendants did not disclose to

---

[10]An "impairment" is a "reduction in a company's stated capital."  Impairment, Investopedia, http://www.investopedia.com/terms/i/impairment.asp (last visited June 10, 2013).

[11]The Complaint does not identify Thornburg Mortgage's auditor as KPMG.  The Court has determined, however, that it may take judicial notice of documents that the Complaint references and that are central to the SEC's allegations, see In re. Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at *2 (D.N.M. Dec. 21, 2009)(Browning, J.)("In addition to those documents that are judicially noticeable, a court may consider documents to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity."), and the Court has taken judicial notice of an email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Thornburg Mortgage Employee Shawn Buniel (March 3, 2008, 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008, Hall Email"), which indicates that Thornburg Mortgage's auditor was KPMG, see March 3, 2008, Hall Email at 2 (representing that the email was sent from a KPMG employee).

KPMG: (i) Thornburg Mortgage's "precarious" financial condition, Complaint ¶ 51, at 15; (ii) that Thornburg Mortgage was in violation of its repurchase agreements and relying on lender forbearance to meet its margin calls, see Complaint ¶ 51, at 15; (iii) that Thornburg Mortgage had used I/O Strip Transactions to meet margin calls in the last two weeks of February, 2008, see Complaint ¶ 99, at 29; (iv) that Thornburg Mortgage had received the Citigroup Letter, see Complaint ¶ 99, at 29; or (v) that the European hedge fund was on the verge of collapse, see Complaint ¶ 76, at 22.

The Defendants each signed Thornburg Mortgage's February 27, 2008, management representation letter to KPMG, in which they represented that: (i) Thornburg Mortgage was in compliance with all aspects of its contractual obligations that would have a material effect on its consolidated financial statements in the event of a noncompliance; (ii) Thornburg Mortgage had the intent and ability to hold its impaired securities for a sufficient period of time to allow for them to recover their value in the market; (iii) Thornburg Mortgage had experienced no subsequent events requiring it to adjust or disclose its financial statements; and (iv) Thornburg Mortgage's financial statements disclosed all matters of which the Defendants were aware that were relevant regarding Thornburg Mortgage's ability to continue as a going-concern. See Complaint ¶ 57, at 17. Goldstone and Simmons did not inform the auditor of the possible collapse of a large European hedge fund, which held ARM securities similar to Thornburg Mortgage's. See Complaint ¶ 76, at 22. "[A]t or about the time" that Simmons learned of the possible collapse of the European hedge fund, he had "just advised . . . Thornburg's outside auditor that he believed the MBS market had reached its lowest point and MBS prices were not likely to deteriorate further." Complaint ¶ 77, at 22-23.

On March 3, 2008, KPMG requested from the Defendants evidence "that the events

subsequent to filing were unforeseeable catastrophic events."   Email from KPMG Senior Manager Jennifer Hall to Larry Goldstone, Jane Starrett, Clay Simmons, and Shawn Buniel at 2, (sent March 3, 2008, 11:44 p.m.), filed May 21, 2013 (Doc. 37-28)("March 3, 2008, Hall Email").  The requested evidence included "correspondence with lenders/attorneys/shareholders, emails."  Request for Correspondence, attached to March 3, 2008 Hall Email at 3-4, filed May 21, 2012 (Doc. 37-28)("Request for Correspondence").  See Complaint ¶ 100, at 29.  KPMG also requested a "position paper," which "provides the Company's assessment of the ability to hold securities for the foreseeable future as of August 27, 2008, including but not limited to . . . [c]orrespondence with counter parties for the two weeks prior to filing, along with supporting evidence."  Request for Correspondence at 4.  At the time, KPMG, as auditor, was considering whether to restate Thornburg Mortgage's financial statements and was reevaluating its audit opinion's validity.  See Complaint ¶ 99, at 29.  Goldstone and Simmons were aware of the Citi Letter, but did not provide it to the auditor.  See Complaint ¶ 101, at 29.  KPMG did not become aware of the Citi Letter while preparing its Restatement.  See Complaint ¶ 101, at 29.  Simmons reviewed and approved an analysis for the auditor which explained that Thornburg Mortgage's margin calls on February 28, 2008, and the corresponding collapse in the mortgage market were part of "'an unforeseeable catastrophic decline in mortgage market valuations.'"  Complaint ¶ 102, at 29 (quoting ABX Index Moves Late February at 2-3, filed May 21, 2012 (Doc. 37-25)("Position Paper")).  The analysis states: "'Due to a number of factors including **the unexpected collapse of a major hedge fund in Europe** the mortgage market gapped significantly wider. . . [.]  No one in the market could have foreseen the sudden decline in mortgage valuations.'"   Complaint ¶ 103, at 30 (quoting Position Paper at 2)(emphasis in Complaint).

## PROCEDURAL BACKGROUND

The SEC filed this enforcement action on March 13, 2012.  See Complaint at 1.  The SEC alleges eleven claims for relief: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5; (iv) fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b); (v) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1; (vi) false certification in violation of rule 13a-14 of the Exchange Act; (vii) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; (viii) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1; (ix) control person liability for false SEC filings under § 20(a) of the Exchange Act and rules 12b-20 and 13a-1; (x) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and (xi) control-person violation for keeping false books and records under § 20(a) of the Exchange Act.  See Complaint ¶¶ 106-43, at 31-39.

The Court granted in part and denied in part the SEC's and the Defendants' motions to dismiss on July 8, 2013.   See SEC v. Goldstone, 952 F. Supp. 2d 1060, 1076 (D.N.M. 2013)(Browning, J.).  The Court dismissed the SEC's claims: (i) "based upon the statement in the 2007 Form 10-K and to Thornburg Mortgage's outside auditor that Thornburg Mortgage successfully met its margin calls without violating its lending agreements, and did not sell assets to meet margin calls"; and (ii) "that the Defendants schemed to defraud Thornburg Mortgage's outside auditor in connection with the 2007 Form 10-K."  SEC v. Goldstone, 952 F. Supp. 2d at

1076. The Court declined to dismiss the SEC's claim that "the representation that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market at the time it filed the 2007 Form 10-K was materially false or misleading." SEC v. Goldstone, 952 F. Supp. 2d at 1076-77. The Court continued:

> The Court will not dismiss the SEC's allegation that Goldstone and Simmons are primarily liable or liable as control persons for that misrepresentation in the 10-K, and the Court will not dismiss the SEC's allegations that the Defendants aided and abetted the misrepresentation, as the Court has determined that the SEC sufficiently alleged that Goldstone and Simmons made, and the Defendants provided substantial assistance to, the misrepresentation with knowledge of or recklessness to its falsity. Similarly, the Court will not dismiss the SEC's allegations that the Defendants misled Thornburg Mortgage's auditor before the 2007 Form 10-K was filed through the statement that Thornburg Mortgage had the intent and ability to hold its impaired assets to maturity or their value recovered in the market.

SEC v. Goldstone, 952 F. Supp. 2d at 1077. The Court also allowed certain claims against Goldstone and Simmons to proceed. See 952 F. Supp. 2d at 1077. These claims include the SEC's allegations that: (i) the Defendants failed to disclose to KPMG before they filed the 2007 Form 10-K that a European hedge fund's collapse would negatively affect Thornburg Mortgage's financial condition; (ii) Goldstone materially misrepresented Thornburg Mortgage's financial condition after filing the 2007 Form 10-K; (iii) the Defendants materially misled KPMG by not providing correspondence showing that Thornburg Mortgage experienced an event of default in the two weeks before the 2007 Form 10-K filing; and (iv) Simmons misrepresented that unexpected events had an unexpected financial impact on Thornburg Mortgage after the 2007 Form 10-K filing. See SEC v. Goldstone, 952 F. Supp. 2d at 1077.

The Court later denied the Defendants' and the SEC's motions for summary judgment. See SEC v. Goldstone, No. Civ. 12-0257 JB/GBW, 2015 WL 5138242, at *1 (D.N.M. Aug. 22, 2015)(Doc. 371)(Browning, J.). The Court first explained that it would apply an "actual-

disbelief" standard to determine "whether a person subjectively disbelieved the truth of an opinion statement."  2015 WL 5138242, at *1.  The Court then concluded that genuine issues of material fact for the jury existed on the SEC's claims that: (i) the Defendants made objectively false statements; (ii) the statements were material; (iii) the Defendants believed that their statements were false when they made them; and (iv) the Defendants made statements that were false or misleading because of omitted information.  See 2015 WL 5138242, at *1.  The Court thus declined to grant summary judgment for any party on any issue.  See 2015 WL 5138242, at *1.

Ten claims were tried to a jury.  These included the claims that the SEC alleged in its Complaint, see Complaint ¶¶ 106-43, at 31-39, excepting the SEC's claim for fraud in violation of § 17(a) of the Securities Act, 15 U.S.C. § 78a(b).  See Pretrial Order at 3-4, filed May 11, 2016 (Doc. 448).[12]  The trial commenced on June 6, 2016.  See Transcript of Trial Proceeding at 1:13 (taken June 6, 2016).  The jury returned a partial verdict on June 29, 2016.  See Trial Tr. at 4470:5-10 (Court, Valdez); Final Verdict Form at 1-22.  The jury reached a unanimous verdict in

---

[12]The Motion to Dismiss Opinion and Summary Judgment Opinion did not dismiss the SEC's § 17(a) claim, but it did not appear in the Pretrial Order.  The parties also did not submit any jury instructions on this claim.  See Plaintiff Securities and Exchange Commission's Proposed Jury Instructions and Verdict Form, filed May 19, 2016 (Doc. 459); Defendants' First Proposed Final Jury Instructions, filed May 19, 2016 (Doc. 463).  The parties' proposed verdict forms did not include a § 17(a) claim.  See Defendant Clay Simmons' First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 465); Defendant Larry Goldstone's First Proposed Special Verdict Form, filed May 19, 2016 (Doc. 464); Plaintiff U.S. Securities and Exchange Commission's Trial Brief Regarding Proposed Verdict Forms, filed June 2, 2016 (Doc. 489). The Tenth Circuit has held that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."  Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002).  The Pretrial Order that the parties filed in this case, therefore, supersedes all prior pleadings, including the Complaint.  See Wilson v. Muckala, 303 F.3d at 1215 (citing C. Wright, A. Miller & M. Kane, 6A Fed. Prac. & Proc. Civ. § 1522 (2d ed. 1990)).

Goldstone's and Simmons' favor on five of the ten claims that were tried: (i) falsifying books, records, or accounts in violation of § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and rule 13b2-1 ("Claim 4"); (ii) control-person violation for keeping false books and records under § 20(a) of the Exchange Act ("Claim 5"); (iii) false certification in violation of rule 13a-14 of the Exchange Act ("Claim 7"); (iv) control person liability for false SEC filings under §§ 13(a) and 20(a) of the Exchange Act, and rules 12b-20 and 13a-1 ("Claim 9"); and (v) aiding and abetting in false SEC filings in violation of § 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1 ("Claim 10").   <u>See</u> Final Verdict Form at 8-11, 14-15 & 18-21.   The jury failed to reach, however, a unanimous verdict on the five remaining claims against Goldstone and Simmons: (i) fraud in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78l(b)p and rule 10b-5, 17 C.F.R. § 240.10b-5 ("Claim 1"); (ii) controlling person liability for fraud under § 20(a) of the Exchange Act, 15 U.S.C. § 78t ("Claim 2"); (iii) aiding and abetting in fraud in violation of § 10(b) of the Exchange Act and rule 10(b)-5 ("Claim 3"); (iv) aiding and abetting in keeping false books and records in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2)("Claim 6"); and (v) deceit of auditors in violation of rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2 ("Claim 8").   Final Verdict Form at 1-7, 12-13 & 16-17.   On August 11, 2016, the Court entered judgment in Goldstone's and Simmons's favor of against the SEC on Claims 4, 5, 7, 9, and 10.   <u>See</u> Judgment at 1 (dated July 17, 2016), filed August 11, 2016 (Doc. 597).

     1.    **<u>The SEC's Motion.</u>**

     Before the trial, the SEC filed a motion to exclude argument or evidence that the Defendants did not violate rule 13b2-2 as a result of providing KPMG with the Tie-Out Document.   Motion at 1-2.   In its motion, the SEC recalls two of the Defendants' summary-

judgment arguments: (i) because Thornburg Mortgage provided KPMG with the Tie-Out Document, which showed the margin calls that Thornburg Mortgage received in the two weeks before February 27, 2008, the SEC consequently cannot establish that KPMG was unaware that Thornburg Mortgage had difficulty in meeting its margin calls, see Motion at 1 (citing Motion for Summary Judgment on Behalf of Larry Goldstone and Clarence G. Simmons and Memorandum of Law in Support at 69, filed August 9, 2013 (Doc. 201)); and (ii) because the Defendants supplied KPMG with truthful disclosures before KPMG decided whether Thornburg Mortgage had the ability to hold its impaired securities, the SEC cannot prove that the Defendants violated rule 13b2-2(a), see Motion at 1-2.  Next, the SEC contrasts the Defendants' arguments with the Court's conclusion "that the Tie-Out Document 'did not cure the [Defendants'] omission."  Motion at 2 (quoting Summary Judgment Memorandum Opinion and Order at 620 n. 326, filed August 13, 2015 (Doc. 364)("Summary Judgment Opinion")).  The SEC argues that, in light of the Court's summary judgment ruling, evidence related to the Tie-Out Document is irrelevant to whether the Defendants violated rule 13b2-2 or, if relevant, the danger of unfair prejudice substantially outweighs the Tie-Out Document's probative value and, hence, is inadmissible under Federal Rule of Evidence 403.  See Motion at 2 (citing Fed. R. Evid. 401, 403).

### 2.    The Defendants' Opposition.

The Defendants oppose the Motion.  See Defendants' Memorandum in Opposition to Plaintiff's Motion in Limine to Exclude Argument or Evidence that the Defendants Did Not Violate Rule 13b2-2 as a Result of Providing the "Tie Out Document" to KPMG, filed April 14, 2016 (Doc. 424)("Opposition").   In their Opposition, the Defendants restate the Court's conclusions in denying the Defendants' summary judgment motion.  Opposition at 2-3.  The

Defendants state that the Court "nowhere suggested that the Margin Call Schedule was irrelevant to whether Defendants had committed any violation of Rule 13b2-2." Opposition at 3.[13] The Defendants note the Court's conclusions on summary judgment: (i) "that '[o]nce a material fact is omitted from a statement, which the omission made misleading, rule 13b2-2 is violated,'" Opposition at 2 (quoting Summary Judgment Opinion at 610)(alteration in original); (ii) "that the later receipt of the Margin Call Schedule would not impact whether there was an earlier actionable omission, if in fact there was an earlier omission," Opposition at 2 (citing Summary Judgment Opinion at 620); and (iii)

> that . . . if at some point prior to when the Margin Call Schedule was provided to KPMG, Defendants made a statement to KPMG from which they omitted a material fact, and the omission made that statement misleading, such that a violation of rule 13b2-2 had occurred, then . . . provision of the Margin Call Schedule to KPMG would also not cure that violation of Rule 13b2-2,

Opposition at 2 (alteration and emphases in original)(citing Summary Judgment Opinion at 620 n.326). The Defendants emphasize that the Court's conclusions do not constitute a holding that the Tie-Out Document was irrelevant, stating that the Court's Summary Judgment Opinion concludes "that its ruling does not foreclose Defendants from using the Margin Call Schedule to show that they did not omit any material information in the first place." Opposition at 3.

The Defendants make four arguments to support the Tie-Out Document's relevancy. First, the Defendants argue that the Tie-Out Document is directly relevant to the omission element of the SEC's rule 13b2-2 claim, because if KPMG received the Tie-Out Document before any alleged omission, the SEC cannot establish auditor deception. See Opposition at 3.

---

[13]In their Opposition, the Defendants refer to what the SEC calls the "Tie-Out Document" as the "Margin Call Schedule." Compare Motion at 1, with Opposition at 1. The Court recognizes that these alternative names refer to the same set of documents, transmitted to KPGM on February 27, 2008, which documents margin calls that Thornburg Mortgage had received in the two weeks before that date. See Motion at 1; Opposition at 2.

Second, the Defendants argue that "KPMG's response and reaction . . . to the information contained in the Margin Call Schedule . . . are relevant to how important (or unimportant) such information was to KPMG at the time, both before the original 10-K filing and during the restatement period, when the Margin Call Schedule was again reviewed by KPMG."  Opposition at 4.  Third, the Defendants argue that the Tie-Out Document is relevant to the circumstances of the Defendants' communications with KPMG.  "The 'circumstances' surrounding any purported omission," the Defendants stress, "bear directly on whether any purported omission by Defendants was misleading."  Opposition at 4.  Fourth, the Defendants argue that the Tie-Out Document is relevant to whether they "acted unreasonably in their communications with KPMG about margin call activity."  Opposition at 4-5 (citing SEC v. Leslie, No. C07-3444, 2010 WL 2991038, at *28 n.19 (N.D. Cal. July 29, 2010)(Fogel, J.)(noting that, for purpose of a rule 13b2-2 claim, the "plaintiff must . . . show that the defendant acted unreasonably")).

The Defendants also oppose the SEC's rule 403 challenge, contending that the SEC fails to explain how the Tie-Out Document causes the SEC unfair prejudice.  See Opposition at 5.  According to the Defendants, "the SEC provides no explanation of how it will suffer any prejudice if it not granted relief, and certainly does not carry its burden of showing that such prejudice substantially outweighs the probative value of the evidence."  Opposition at 5.  Consequently, the Defendants urge the Court to deny the Motion.  See Opposition at 5.

### 3.  The SEC's Reply.

The SEC counters the Defendants' Opposition.  See Plaintiff U.S. Securities and Exchange Commission's Reply in Support of its Motion in Limine to Exclude Argument or Evidence that the Defendant did not Violate Rule 13b2-2 as a Result of Providing the "Tie-Out Document" to KPMG at 1-8, filed May 3, 2016 (Doc. 432)("Reply").  The SEC restates its

request that the Court grant the Motion, and exclude any argument or evidence by the Defendants that they did not violate rule 13b2-2 because they provided the Tie-Out Document to KPMG on February 27, 2008.  See Reply at 1, 8.

In its Reply, the SEC maintains its argument that the Tie-Out Document is irrelevant to the rule 13b2-2 claim.  See Reply at 2-6.  While acknowledging that the Defendants provided KPMG with the Tie-Out Document on February 27, 2008, the SEC outlines its theory of Defendants' liability under rule 13b2-2: "There are four categories of statements actionable under Rule 13b2-2: (1) misstatements made before or (2) after the Tie-Out Document was provided to KPMG; and (3) omissions made before or (4) after the Tie-Out Document was provided to KPMG."  Reply at 5.  The SEC argues that, in light of the Court's Summary Judgment Opinion, the Tie-Out Document is "indisputably irrelevant to the first three categories."  Reply at 5.  The SEC notes the Court's ruling that, because rule 13b2-2 places an affirmative obligation on the Defendants not to make a false or misleading statement to KPMG, the rule is violated "[o]nce a material fact is omitted from a statement, which the omission made misleading."  Reply at 2 (quoting Summary Judgment Opinion at 610)(alteration added).  The SEC then argues that the Tie-Out Document cannot be relevant to the Defendants' liability for any omission violating rule 13b2-2, if the Defendants provided the Tie-Out Document to KPMG after the Defendants made an omission to KPMG that violated rule 13b2-2.  See Reply at 3-5.  The SEC restates its concern that the Defendants seek to argue -- contrary to this Court's ruling on summary judgment -- that the Defendants cannot have deceived KPMG, in violation of rule 13b2-2, so long as the Defendants provided KPMG with the Tie-Out Document.  See Reply at 5.

The SEC acknowledges that the Tie-Out Document could be relevant "if the Defendants can show that the Tie-Out Document was provided prior to any charged omission."  Reply at 5.

According to the SEC, "[t]he Tie-Out Document could only possibly be relevant to the Rule 13b2-2 claim if the evidence at trial is that the omission was made <u>after</u> the Tie-Out Document was received by KPMG."  Reply at 5-6 (emphasis in original).  The SEC contends, however, that this condition for the Tie-Out Document's relevancy remains unsatisfied.  <u>See</u> Reply at 6. According to the SEC, "the bulk of Defendants' statements for which the Commission has charged the Defendants under Rule 13b2-2 are affirmative misrepresentations, and, therefore, cannot provide a basis for the Defendants' intended use of the Tie-Out Document."  Reply at 6. Furthermore, the SEC states that "[t]he omissions charged by the Commission [occurred] prior to the Tie-Out document being given to KPMG" and alleges that there is no "evidence that such an omission was made following KPMG's receipt of the Tie-Out Document . . . ."  Reply at 6.  The SEC concludes, therefore, that unless the Defendants can development evidence that the Tie-Out Document was provided before any charged omission, that the Court should proscribe the Defendants from introducing the Tie-Out Document.  <u>See</u> Reply at 6.

The SEC also buttresses its rule 403 argument, contending that the Defendants want to rely on the Tie-Out Document to "suggest to the jury that they did nothing wrong" and to train the jury's attention on something other than the applicable law.  Reply at 7.  The SEC, therefore, argues that the Tie-Out Document is likely to confuse the jury regarding the conditions that establish liability for a rule 13b2-2 violation.  <u>See</u> Reply at 7.  The SEC contends that the danger of misleading or confusing the jury is prejudicial, and, assuming that the Tie-Out Document is relevant, that danger substantially outweighs the Tie-Out Document's relevance.  <u>See</u> Reply at 7.

### 4.    <u>The Hearing</u>.

 The Court held a hearing on the Motion.  <u>See</u> Transcript of Hearing at 51:23-62:2 (taken May 11, 2016)(Doc. 466)(Court)("Tr.").  The Court indicated at the hearing's outset that it was

inclined to deny the Motion.  See Tr. at 52:3 (Court).  The Court explained that the Tie-Out Document is "probably needed to tell the complete story."  Tr. at 52:7 (Court).  The Court made clear that the Defendants "cannot argue that this document cures any sort of deception or fraudulent activity that they engaged in earlier or were in engaging in that day."  Tr. at 52:8-10 (Court).  The Court noted, however, that without the Tie-Out Document, the Defendants would be unable to present their complete story to the jury.  See Tr. at 52:13-15 (Court).  The Court then invited the parties' argument.  See Tr. at 52:20-23 (Court).

The SEC argued that the Defendants' use of the Tie-Out Document amounts to "a strategy to deceive the jury by trying to say that KPMG wasn't deceived, when the issue isn't whether KPMG was deceived."  Tr. at 54:3-5 (Kasper).  The SEC indicated that the issue is, rather, whether "the defendants [were] fulsome and complete in their dealings with their auditors."  Tr. at 54:7-8 (Kasper).   The SEC argued that allowing the Tie-Out Document to be introduced into evidence "is going to have the impact of . . . confusing the jury."  Tr. at 54:19-20 (Kasper).  The SEC argued that, because the Court ruled in its summary judgment opinion that liability does not depend on whether KPMG was deceived, but rather whether the Defendants made a false or misleading statement or omission to KPMG, the Tie-Out Document would allow the Defendants "to effectively argue something that's contrary to the law of this case."  Tr. at 54:21-22 (Kasper).  The SEC also alleged that the Tie-Out Document cannot bear on whether the Defendants' conduct was unreasonable.  See Tr. at 54:25-55:1 (Kasper).  The SEC reiterated its concern that the Defendants would use the Tie-Out Document to argue that it cures their rule 13b2-2 violations.  See Tr. at 55:10-12 (Kasper).

The Defendants responded that the SEC has to establish the elements of a rule 13b2-2 violation and that the Tie-Out Document is relevant to multiple elements.  See Tr. at 56:9-18

(Lee).   The Defendants argued that the Tie-Out Document is relevant, because "it goes to whether there was an admission, it goes to materiality, it goes to the circumstances, [and] it goes to the unreasonableness."   Tr. at 56:12-15 (Lee).   The Defendants also stated that they did not intend to "argue around" the Court's ruling on what constitutes an actionable omission.   Tr. at 56:24-57:5 (Lee).   The Defendants additionally indicated that "the timing of when the alleged omission occurred, vis-à-vis when the margin call schedule was provided, is critical," Tr. at 57:10-12 (Lee), and contended "that the specific timing of when the margin call schedules were provided has not been established," Tr. at 57:19-21 (Lee).

The SEC replied that the Defendants are "really fundamentally just dressing up their same point . . . that KPMG was not deceived."   Tr. at 58:10-12 (Kasper).   The SEC argued that the Tie-Out Document is not relevant to materiality, contending that the Defendants do not offer "any theory of how a document they received on the 27th . . . could possibly address the materiality concern [of statements made in the management representation letter]."   Tr. at 58:15-19 (Kasper).   The SEC also argued that the Defendants failed to establish how the Tie-Out Document makes it more likely that the Defendants' statements or omissions to KPMG were not misleading, see Tr. at 59:11-18 (Kasper), or how the Tie-Out Document makes it more probable that their conduct was reasonable, given that "there is no evidence that the defendants were aware of this document," Tr. at 59:11-18 (Kasper).   The SEC also emphasized that the Defendants' "misstatements can't be fixed regardless of when the tie-out document was received, and some omissions . . . occurred . . . after the tie-out document was received."   Tr. at 60:16-19 (Kasper).   The SEC pointed to the Court's summary judgment ruling, arguing that the ruling, "fairly read, suggests that the timing doesn't matter . . . .   [T]he tie-out document cannot cure the defendants' misstatements or omissions."   Tr. at 61:4-7 (Kasper).

After hearing the parties' arguments, the Court remained inclined to deny the Motion. See Tr. at 62:1-2 (Court). The Court warned that "the defendants are going to have to be careful what they do with this document," Tr. at 61:11-12 (Court), stating that "[t]he defendants will not use it to try to say that this cures the problem, if they had made some blatant or deceptive comments," Tr. at 61:17-19 (Court). The Court noted, however, that it is necessary to introduce the Tie-Out Document into evidence "to tell the complete story." Tr. at 61:21 (Court).

## LAW REGARDING RULE 401 OF THE FEDERAL RULES OF EVIDENCE

 "The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402 & 403). "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." United States v. Gutierrez–Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")). "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'" United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note). Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible. See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403 OF THE FEDERAL RULES OF EVIDENCE

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)). The United States Court of Appeals for the Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983)(Ervin, J.); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980)(Russell, J.). As the Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings. . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(Thomas, J.)(quoting 1 Steven A. Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).

See United States v. Abel, 469 U.S. 45, 54 (1984)(Rehnquist, J.)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional response or would otherwise tend to adversely affect the jury's attitude toward a particular matter.  See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999).  Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d at 1301; United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

## ANALYSIS

The Court will allow the Defendants to introduce evidence related to the "Tie-Out Document," because such evidence is not irrelevant to whether the Defendants violated rule 13b2-2, and the danger of unfair prejudice does not substantially outweigh the Tie-Out Document's probative value.

## I.   THE TIE-OUT DOCUMENT IS RELEVANT EVIDENCE UNDER RULE 401.

The Court concludes that the Tie-Out Document is relevant evidence under rule 401.  See Fed. R. Evid. 401.  First, as the Court suggested at the hearing, the Tie-Out Document enables the jury to hear "the complete story."  Tr. at 61:21 (Court).  In other words, the Tie-Out Document is relevant to the "circumstances" under which, according to the SEC, the Defendants omitted information that was necessary to render other statements that the Defendants had made

to KPMG not misleading.  Rule 13b2-2(a)(2) provides: "No director or officer of an issuer shall, directly or indirectly . . . [o]mit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, <u>in light of the circumstances under which such statements were made</u>, not misleading, to an accountant . . . ."   17 C.F.R.  §  240.13b2-2(a)(2)(emphasis added).  As the Court indicated at the hearing, the Tie-Out Document allows the jury a more complete picture of the circumstances that make it more or less likely that any of the Defendants' omissions of material fact were misleading and, consequently, violated rule 13b2-2.  Because the Tie-Out Document enables the jury a more complete picture of the circumstances under which the Defendants' made statements and omissions to KPMG, the evidence is relevant.  <u>Cf.</u> <u>United States v. Hardy</u>, 228 F.3d 745, 748 (6th Cir. 2000)("Proper background evidence . . . forms an integral part of a witness's testimony, or completes the story of the charged offense."); <u>United States v. Ganadonegro</u>, 2011 WL 3957549, at *1 (D.N.M. 2011)(Browning, J.)(concluding that evidence was properly introduced as res gestae and background information).

Beyond helping to tell the story, the Tie-Out Document is relevant.  The Tie-Out Document is evidence that Thornburg Mortgage knew about the margin calls.  If Thornburg Mortgage told KPMG about the margin calls, then the Tie-Out Document is relevant evidence to that disclosure.  The SEC does not dispute this assertion, but says that the Tie-Out Document does not assist the jury in determining whether the Defendants made any misstatements or omissions to KPMG before providing KPMG the Tie-Out Document.  <u>See</u> Reply at 5.  That statement is true, but the Court is not the one to decide if there were or were not prior misstatements or omissions.

The Court also notes that, if the Defendants omitted any information to KPMG after

- 29 -

Thornburg Mortgage provided KPMG with the Tie-Out Document, then the Tie-Out Document is relevant to whether -- because it makes it less probable that -- the omission is misleading and, hence, violates rule 13b2-2.  See Fed. R. Evid. 401 ("Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").  Consequently, if the Defendants introduce sufficient proof at trial that the Defendants' alleged omissions of material fact occurred after Thornburg Mortgage provided KPMG with the Tie-Out Document, then the Tie-Out Document is relevant to whether those omissions violate rule 13b2-2.  See Fed. R. Evid. 104(b); Huddleston v. United States, 485 U.S. 681, 690-91 (1988)(Rehnquist, C.J.)(noting that "in assessing the sufficiency of the evidence under Rule 104(b), the trial court must consider all evidence presented to the jury").  The Tie-Out Document is also relevant to whether the Defendants deceived KPMG regarding any statements that the Defendants made to KPMG that were concurrent with the Defendant's provision of the Tie-Out Document to KPMG.  And the jury -- not the court -- should decide whether, under the circumstances, Thornburg Mortgage or the Defendants made false or misleading statements or omissions to KPMG.  Thus, because the Tie-Out Document enables the jury to comprehend the circumstances under which the Defendants made statements and omissions to KPMG, the Tie-Out Documents' relevance does not entirely depend on the Defendant's proof that any alleged omission of material fact occurred after Thornburg Mortgage provided KPMG with the Tie-Out Document.  In any case, it is for the jury to decide whether the Defendants made false or misleading statements or omissions to KPMG.

## II.     THE DANGER OF UNFAIR PREJUDICE DOES NOT SUBSTANTIALLY OUTWEIGH THE TIE-OUT DOCUMENT'S PROBATIVE VALUE.

The SEC's rule 403 challenge to the introduction of the Tie-Out Document into evidence

does not persuade the Court, because the danger of unfair prejudice does not substantially outweigh the Tie-Out Document's probative value.  "The danger of 'confusion of the issues' and 'misleading the jury' arises when circumstantial evidence would tend to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue in the current case."  United States v. McVeigh, 153 F.3d 1166, 1191 (10th Cir. 1998)(citing United States v. Guardia, 135 F.3d 1326, 1331-32 (10th Cir. 1998)).  The Court acknowledges the possibility that the Tie-Out Document's introduction into evidence might make it more difficult for the jury to rule in the SEC's favor; however, the Court concludes that the risk of potential jury confusion to be minimal.  The Court has warned that "the defendants are going to have to be careful what they do with this document."  Tr. at 61:11-12 (Court).  At the hearing, the Court made plain that "[t]he defendants will not use it to try to say that this cures the problem, if they had made some blatant or deceptive comments."  Tr. at 61:17-19 (Court).  In addition to this warning to the Defendants, the Court concludes that proper jury instructions can minimize any risk of potential jury confusion as to import of the Tie-Out Document.  See Noland v. City of Albuquerque, 779 F. Supp. 2d 1235, 1241 (D.N.M. 2011)(Browning, J.)(holding that "the Court will not exclude this evidence under rule 403," because "[t]he proper jury instructions will help ensure that this evidence will not mislead or confuse the jury"); Conrad v. Bd. of Johnson Cty., Kansas Comm'rs, No. CIV.A. 00-2277-DJW, 2002 WL 1461975, at *4 (D. Kan. July 2, 2002)(Waxse, M.J.)("Although the Court foresees the possibility of some confusion . . . any risk of confusion may be minimized by proper jury instructions.").  The Court is prepared, if the SEC requests it, to instruct the jury that statements in a Tie-Out Document that the Defendants made before the 10-K was filed do not mean that the Defendants did not make deceptive statements or omissions to KPMG.  Consequently, the danger that the jury will misunderstand the relevance of

the Tie-Document to the rule 13b2-2 claim does not substantially outweigh the Tie-Out Document's probative value. The Court, therefore, will decline to exclude the Tie-Out Document on the basis of the danger of jury confusion and unfair prejudice to the SEC.

**IT IS ORDERED** that the Plaintiff Securities and Exchange Commission's Motion in Limine to Exclude Argument or Evidence that the Defendants did not Violate Rule 13b2-2 as a Result of Providing the "Tie-Out Document" to KPMG, filed March 17, 2016 (Doc. 392), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Michael H. Hoses
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

-- and --

Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
Danielle Voorhees
Ian S. Karpel
Securities and Exchange Commission
Denver, Colorado

   *Attorneys for Plaintiff Securities and Exchange Commission*

Robert Badal
Santa Barbara, California

-- and --

Skye Lynn Perryman
Michael A. Lamson
April N. Williams
Wilmer Cutler Pickering Hale & Dorr LLP
Washington, D.C.

-- and --

Randall R. Lee
Aaron Thompson
Daniel Crump
Wilmer Cutler Pickering Hale & Dorr LLP
Los Angeles, California

-- and --

Heather S. Tewksbury
Christopher W. Johnstone
Wilmer Cutler Pickering Hale & Dorr LLP
Palo Alto, California

-- and --

Jerry L. Marks
Robert J. Liubicic
Elena Kilberg
Alisa Schlesinger
Paul M. Torres
Milbank, Tweed, Hadley & McCloy LLP
Los Angeles, California

-- and --

Bruce D. Hall
Andrew G. Schultz
Melanie B. Stambaugh
Rodey, Dickason, Sloan, Akin, & Robb P.A.
Albuquerque, New Mexico

   *Attorneys for Defendants Larry Goldstone, Clarence G. Simmons, III, and Jane E. Starrett*

Peter J. Dennin
George A. Salter
Hogan Lovells US LLP
New York, New York

-- and --

William Spencer Reid
Keleher & McLeod P.A.
Albuquerque, New Mexico

*Attorneys for Intervenor KPMG, LLP*